**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 1:18-cv-24190**

WILLIAM O. FULLER, and
MARTIN PINILLA, II,

       Plaintiffs,

  v.

JOE CAROLLO,

       Defendant.
_____/

## SECOND AMENDED COMPLAINT

William "Bill" O. Fuller ("Fuller") and Martin Pinilla, II ("Pinilla") (collectively "Plaintiffs") sue Joe Carollo ("Carollo") and allege as follows:

## INTRODUCTION

The First Amendment to the United States Constitution guarantees every citizen the absolute and fundamental rights to freedom of speech, to peaceably assemble, and to petition the Government for redress of grievances. For eighteen months, Miami City Commissioner Joe Carollo has obliterated these fundamental rights by using the power and influence of his government office to engage in a campaign of harassment, retribution and retaliation against Plaintiffs. Carollo's actions, designed to destroy Plaintiffs' businesses and reputations, is pure political ***payback***—targeting Plaintiffs simply because they dared to support Carollo's opponent in a run-off election, and because they filed an Ethics Complaint against Carollo.

Unchecked retaliation and political payback on this scale would lead the United States down the path of Cuba and Venezuela today. Carollo's prolonged and multifaceted retaliation has

been in blatant violation of the City of Miami Charter's prohibition on Commissioners providing direct orders to City employees to wrongfully use City resources for their own political means.  He has wrongfully employed City resources, including the Police, the Fire Department, Code Enforcement, and the Special Event Department, in his attacks against Plaintiffs to (a) shut down the Christmas Party Plaintiffs hold for their own employees, their tenants and their tenant's employees, and their families, including young children each year (a party previously attended by City Commissioners and employees); (b) prevent Plaintiffs' use of the same shipping containers authorized by the City in the Wynwood Yard and the Wharf on the Miami River to house commercial business, thereby nearly destroying a family business operating a wildly popular restaurant in that spot (Sanguich); (c) shut down Plaintiffs' tenant Union Beer by sending multiple police and code enforcement personnel to raid their anniversary party; (d) permanently shut down construction of the kiosk market Plaintiffs had invested in and already obtained City approval for; (e) disrupt and shut down the wildly popular Viernes Culturales, merely because Plaintiff Fuller is the Chairman of the Board of that nonprofit organization; and (f) trespass on Plaintiffs' properties and conduct illegal searches and government surveillances.  Carollo has also made false "anonymous" noise complaints against Plaintiffs' business Ball & Chain; solicited the residents of neighboring buildings to make those same false noise complaints; repeatedly alleged code violations by the company that operates the valet for Ball & Chain; and even defamed and disparaged Plaintiffs on the radio, calling Plaintiff Fuller "*El Padrino*," and falsely stating that Fuller "*operate[s] like a Godfather*" backed by corrupt Venezuelan criminals, thereby destroying Plaintiffs' good name.

Carollo has also managed to amend key provisions of the Miami City Code to target Plaintiffs' businesses in violation of the U.S. Constitution's prohibition on bills of attainder.

Carollo's stated intention is to drive Plaintiffs out of business even if he has to destroy the life savings and work of the businesses who rent from Plaintiffs.

These are not mere allegations.  They are confirmed by Carollo's own aid, City of Miami employees, a Miami-Dade Ethics Commission investigative report, and even by another Commissioner of the City of Miami.  There are also reams of text messages, emails, photographs and even live video showing Carollo in action lurking around Plaintiffs' properties in alleyways and behind trees in the middle of the night on numerous occasions.  In fact, Carollo has himself stated that he is the "new Sheriff in town," and that he "is the law."

Carollo knows that such retaliation for exercising one's right to free speech is not only morally wrong but also illegal as Carollo himself has previously sued the Mayor and City of Doral claiming that they had retaliated against him for exercising his free speech rights.  *See Carollo v. Boria*, 833 F. 3d 1322 (11th Cir. 2016).  Carollo must be must be held accountable for the emotional distress and mental anguish, as well as the millions of dollars in damages he has caused. An award of punitive damages of at least $10 million dollars must also be entered against Carollo to punish and deter such conduct in the future.

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Fuller is a resident of Miami-Dade County, Florida.

2.      Plaintiff Pinilla is a resident of Miami-Dade County, Florida.

3.      Collectively, Plaintiffs own or control real estate investments directly or through various affiliated entities.

4.      Defendant Carollo is a City of Miami Commissioner, two-time former Mayor of Miami, and at all times mentioned herein was a resident of Miami-Dade County, Florida.

5.      This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331.

6.      Venue lies in the Southern District of Florida because the cause of action accrued and the parties are located within this district.

7.      All conditions precedent to the filing of this lawsuit have been performed, satisfied and/or waived.

## ALLEGATIONS

8.      Plaintiffs are local entrepreneurs operating out of the Futurama building in the heart of the Calle Ocho District of Little Havana.

9.      Over the course of the last 15 years, Plaintiffs worked hard to build a diverse real estate investment business from the ground up, one building at a time.

10.      Today, Plaintiffs' businesses provide hundreds of jobs for local residents and produce hundreds of thousands of dollars in tax revenue for the City of Miami, Miami-Dade County and the State of Florida.

11.      Plaintiffs have dedicated their professional careers to revitalizing the neighborhood of Little Havana, where they have helped to generate economic activity and new life into the area while at the same time preserving its historical significance and cultural identity.

12.      In this vein, Fuller and Pinilla are "a galvanizing force behind the area's cultural resurgence."[1]

---

[1] https://www.miaminewtimes.com/arts/viernes-culturales-little-havanas-rebirth-begins-6388896

13.     Renowned Miami historian Dr. Paul George has likewise noted that Fuller and Pinilla "are both very history-minded and are also very civic-minded . . . [They] understand that the neighborhood has a multilayered history."

14.     Plaintiffs consider their work to be that of curators and caretakers of the neighborhood, accordingly, they seek out development partners and tenants "who share a similar vision of preserving and protecting the heritage, the culture, and the history. . ."[2] of Little Havana.

15.     For example, in 2014, Fuller and two of his childhood friends reopened the famous Ball & Chain nightclub.

16.     For decades during the 1930's to 1950's, Ball & Chain was an important music venue, presenting titans of the era such as Billie Holiday and Count Basie.

17.     With the vision of restoring the venue to its past glory days, Fuller and his partners have made Ball & Chain once again a premier entertainment destination for people of all ages, races, and nationalities.

18.     From its opening in 2014 to January 2018, Ball & Chain has served the community and operated without interference from the City, receiving only one noise complaint and zero parking related citations from the City.

19.     Fuller and Pinilla are also currently working on Little Havana's first boutique hotel through a redevelopment and restoration of the historic Tower Hotel.

20.     The Tower Hotel served as a World War II hospital and famously hosted African-American jazz greats during the era of segregation.[3]

---

[2]     https://www.nbcnews.com/news/latino/miami-s-little-havana-working-class-neighborhood-global-tourist-hot-n738236
[3] https://www.miamiherald.com/news/business/article204754109.html#storylink=cpy

21.     Preserving that history, in which the legacies of various cultures converged on Calle Ocho, is central to Plaintiffs' vision for the project.

22.     Through these and many other projects in the area, Plaintiffs have sought to reestablish Little Havana as a healthy, dynamic neighborhood, showcasing new cultural life while celebrating its important place in Miami's history.

23.     Plaintiffs' efforts in the neighborhood have born significant fruit—Little Havana offers visitors many new options of sights to see, places to seek entertainment and a vibrant arts scene to enjoy, much of which retains or reflects the cultural distinction, rich history and atmosphere that make Little Havana special.

24.     Little Havana is now a major Miami destination for tourists and locals alike, sought after as one of the few authentic Cuban legacy neighborhoods left in Miami.

25.     In 2017, the National Trust for Historic Preservation declared Little Havana a national treasure.

26.     Throughout all of this, Plaintiffs have nurtured great relationships with City Commissioners, including Carollo's two predecessors, his brother Frank Carollo and Joe Sanchez, both of whom appointed Fuller and Pinilla to participate in various City boards or trusts, such as the Stars of Calle Ocho and Viernes Culturales.[4]

### THE RACE FOR CITY COMMISSIONER

27.     In the summer of 2017, Carollo, who had previously served as Mayor of Miami, announced his campaign for Commissioner for the City of Miami's for District 3, which includes Little Havana.

---

[4] In addition, Fuller and Pinilla are also active in the Dade Heritage Trust and Live Healthy Little Havana.

28.     At that time, other prominent Miami Mayors expressed concern over Carollo's history of "abusing power, profiting from taxpayers and *using government resources to intimidate his political opponents*."[5]

29.     During the campaign, Fuller met privately with Carollo when Carollo was seeking Fuller's political support.  They discussed ways they could work together to improve Little Havana.

30.     Steve Miro ("Miro"), a top campaign staffer for Carollo, noted that, at that time, Carollo was not "targeting . . . [Fuller], Joe was trying to ally himself with him."[6]

31.     Carollo's main opponents in the election race were Alfie Leon, Tomas Regalado and Zoraida Barreiro.  Plaintiffs made financial contributions to Leon, Regalado and Carollo.

32.     In the general election, held on November 7, 2017, Carollo received 1,818 votes, and Alfonso Leon received 1,221 votes.

33.     On election night, Carollo was seated with Lugo, one of his top campaign advisors.[7]

34.     Because neither candidate received a majority of votes, a run-off election was scheduled for November 21, 2017.

---

5 https://www.miamiherald.com/news/local/community/miami-dade/article179627391.html

6 *See* Ethics Report, attached herein as Exhibit A, p. 25. As noted herein, on or about March 12, 2018, Fuller filed an Ethics Complaint against Carollo with the Miami-Dade Commission on Ethics and Public Trust (the "Ethics Complaint").  Following the conclusion of the Ethics Commission's investigation, the Commission released its Investigative Report (the "Ethics Report") which includes the testimony of over 14 individuals regarding many of the allegations contained herein. Plaintiffs will refer to said testimony throughout this Complaint.

7 At the time, Lugo was employed by the City of Miami Code Enforcement division and served as Secretary of the American Federation of State County and Municipal Employees ("**AFSCME**"), the City of Miami employees union. Lugo willingly and materially assisted Carollo in his campaign of harassment, political retribution and First Amendment retaliation directed against Plaintiffs. Lugo is also a former employee of the City of Miami Code Enforcement division.

**CAROLLO SHUTS DOWN ALFIE LEON RALLIES ON PLAINTIFFS' PROPERTIES**

35.     Early voting for the run-off election commenced on November 17, 2017.

36.     Two locations were designated to cast early voting ballots for the run-off, one of which was directly across from one of Plaintiffs' properties.

37.     In fact, the property owned by Plaintiffs, less than 75 feet away from the entrance to that early voting center.

38.     On November 18, 2017, a rally in support of electing Carollo's opponent, Alfie Leon, was held on Plaintiffs' property.

39.     The rally on Plaintiffs' lot was clearly visible to all voters casting ballots at that voting location.  Pictures of the rally can be seen below.

 

40.     There was free food, music and signs supporting Leon, which attracted the attention of most passersby, including voters.

41.     Conversely, Carollo did not put on any such comparable event within view of the early voting center.

42.     Rather than compete fairly, Carollo and others acting at his direction[8] worked their contacts at the City and engineered a shut down of the rally by Code Enforcement Officers and the police, who forced all attendees to leave.

43.     Undeterred, Leon supporters gathered for another rally at the same location the next day, Sunday, November 19, 2017, the last day of early voting.

44.     Like the first rally, this one also had music and food and was highly visible to the public, including potential voters.

45.     And like the first, there was no comparable event for Carollo anywhere nearby.

46.     Miro spotted Pinilla at the rallies, passing along the information to Carollo.

47.     The rallies were a threat to Carollo's chance of winning the run-off election and, consequently, Carollo sought to shut down the second rally.

48.     Miro confronted Fuller by phone and demanded that he shut down the rally, implying that Plaintiffs were responsible for the rallies based on having spotted Pinilla there.

49.     Instead of relying on Fuller to comply with Miro's demand, Carollo and Miro exploited any City contact they could to shut the rally down.

50.     Indeed, based on Carollo's efforts, both rallies were shut down by Code Enforcement or other City agents, and the property received a bogus permitting citation.

51.     Miro later confirmed that Carollo camp was responsible for the shutdown of the rallies.  Miro stated that Carollo actually instructed Lugo on site at the Alfie rally, and that Lugo was leveraging her contacts in the City on behalf of Carollo to get the rally shut down.

---

[8] This included Lugo and Miro, who was Carollo's Chief of Staff at the time.

52.     The run-off election was held on November 21, 2017 and Carollo defeated Leon by a mere 352 votes.

53.     If Carollo had not succeeded in shutting down the Leon rallies, he may indeed have lost the run-off election to Leon.

54.     Instead, on December 2, 2017, Carollo was sworn in and pledged his allegiance to the City of Miami and its Charter.

## RELEVANT CITY OF MIAMI CHARTER PROVISIONS

55.     Among other things, the City of Miami Charter governs the powers vested in the various arms of City government including the Mayor, City Manager and the Commissioners.

56.     Section 4(g)(6) gives the Mayor the power to appoint the City Manager and Section 15 of the Charter establishes that the City Manager shall be the head of the administrative branch of the City government.

57.     Section 4(d) of the Charter delineates the division of power between the Mayor, City Manager and Commissioners as follows:

> Except for the purpose of inquiry and as may be necessary as provided in section 14, the mayor, the city commission, any committees and members thereof **shall deal with the administrative service solely through the city manager, and neither the mayor nor the city commission, nor any committees nor members thereof shall give orders to any of the subordinates of the city manager, city attorney, city clerk and independent auditor general, either publicly or privately**.
>
> Any such dictation, prevention, orders or other interference or violation of this section on the part of the mayor or a member of the city commission or committees shall be deemed to be **violation of the Charter, and upon conviction before a court of competent jurisdiction any individual so convicted shall be subject to a fine not exceeding five hundred dollars ($500.00) or imprisonment for a term of not exceeding sixty days or both, and in the discretion of the court shall forfeit his or her office.** Any willful violation of the provisions to this section by the mayor or any city commissioner shall be **grounds for his or her**

**removal from office by an action brought in the Circuit Court by the state attorney of this county**.

58.     The Charter makes clear that neither the Mayor nor any Commissioner can give direct orders to any department that is subordinate to the City Manager.  Instead, they are required to direct all orders to the City Manager who then has the authority to direct the various departments of the City to take action.

## CAROLLO'S RETALIATION AGAINST PLAINTIFFS

59.     Upon taking office, Carollo immediately drew up a list of Plaintiffs' properties and associated businesses in District 3.

60.     Miro stated it explicitly: "**when Carollo took office . . . he went after Mr. Fuller, obviously**.  You know-he does have a spreadsheet…of all the businesses he [Fuller] has in the district."[9]

61.     Likewise, Orlando Diez ("Diez"), who was then the Director of Code Compliance, Construction Manager, Office of Capital Improvements for the City of Miami, testified that Carollo told him: "There's a guy there who owns a lot of businesses, buildings, his name is Bill Fuller."

62.     Diez further testified that Carollo said he had a list of addresses for Fuller's properties that he would give to Diez, from which Diez understood Carollo was asking him to selectively target Fuller's properties.

---

[9] On or about August 3, 2018, Plaintiffs took the voluntary sworn testimony of Miro as part of the ethics investigation (the "Miro Statement").  A copy of the Miro Statement is attached hereto as **Exhibit B**.  Plaintiffs will also refer to the testimony herein.  Exhibit B, p. 7, ll. 5-13. (emphasis added)

63.     Miro testified that Carollo also used the spreadsheet to point out alleged legal violations on Plaintiffs' properties during a walk with the Mayor, the City Manager, the Deputy City Manager and Code Enforcement Director.

64.     As Miro explained: "[w]e walked up and down 8th Street all the way to 6th Avenue [and back]; . . . .  showing the business that have violations and obviously, they were [Fuller's] businesses."[10]  By doing so, Carollo put the City on notice of his intentions to selectively target and harass Plaintiffs as retaliation.

65.     Miro further noted that Carollo was targeting Plaintiffs as political retribution because Fuller went against Carollo in the run-off election by supporting Alfie Leon and allowing Leon to use Plaintiffs' property for the rallies.

66.     Specifically, when asked why Carollo was targeting the Plaintiff, Miro answered: "**obviously, [Fuller] went against him in the commissioners by donations to -- giving him building and what have you.**"[11]   That means that Fuller went against Carollo in the run-off election by supporting his opponent, Alfie Leon, and allowing Leon to use Fuller's property to conduct a rally across from the early voting center.

## CAROLLO ATTACKS PLAINTIFFS' CHRISTMAS PARTY

67.     On December 15, 2017, a few weeks after the run-off election, Plaintiffs held their annual office holiday party at the historic Tower Hotel.

---

[10] *Id*. pp. 7 & 8.
[11] *Id.* at p. 10, ll. 12-25 and p. 11, ll. 1-13. (emphasis added)

68.     The event was hosted by Plaintiffs for the benefit of employees, tenants, and their families, including young children and other guests for five straight years with no issue from the City.  In past years, even City Commissioners attended the Christmas Parties.

69.     Carollo learned of Plaintiffs' Christmas Party, and, after "driving by" to confirm it was taking place, conspired with Lugo to mobilize Code Enforcement officials to disrupt the Christmas Party and shut it down.

70.     Lugo then repeatedly called and texted Diez, the Director of Code Enforcement, insisting that he shut the event down and stating in support that Christmas Party lacked a Special Events Permit.

71.     In response, Diez explained to Lugo that such a permit was required only if more than 100 people were at the party.

72.     Lugo, assured Diez that this was the case (which she knew to be false) and insisted Diez call the police to shut the Christmas Party down.

73.     Diez did not send the police, but he did agree to send a Code Officer, Scarlett Morua ("Morua") to investigate.

74.     Morua arrived at the property soon afterwards, entering the Christmas Party in full uniform and causing guests great unease and concern.

75.     Morua reported to Diez that there were no more than 50 people at the Christmas Party, including children.

76.     Diez told Lugo there were fewer than 100 people and that he would not call the police, to which Lugo responded: "You're wrong . . . You don't know how to read the Code."

77.     Diez then instructed that Morua go back to make sure there were no other guests somewhere in the hotel and she responded back assuring him that was not the case.

78.     Jessica Capo ("Capo"), then Chief of Code Enforcement, and a close friend of Lugo, also contacted Morua and instructed her to go to the Christmas Party.

79.     Morua advised Capo that she already had been to the event, verified that it was an ordinary holiday party and that no violations were evident.  Undeterred, Capo told Morua to return to the hotel and wait outside until the event ended.

80.     Morua returned to the party and spent an extended period of time in plain sight of party guests, intimidating attendees, which included the extended family and young children of Fuller and Pinilla.

81.     Prior to this incident, Morua had never been directed to respond to a party and to stay until the party was concluded.

82.     For the Christmas Party, however, she was told to wait and to call back to advise when the Party was over.  Morua indicated "it was kind of weird."

83.     Diez also received a call regarding the Christmas Party from Assistant City Manager Alberto Parjus ("Parjus"), who directed Diez to go to the event in person because the complaints were "coming from a Commissioner's office" whose people were "driving [him] crazy."  Yet again, through these actions, the City had full notice of Carollo's intent to retaliate and harass Plaintiffs.

84.     Diez then went to the Christmas Party himself with additional code enforcement officers.  By then, there were only 10-15 people left at the party.

85.     At approximately 1:00 AM, Fuller learned that Diez had come to the property looking to speak with him.

86.     Diez told Fuller this was a political target, that there were many people involved in the effort, and that Fuller should meet him in person so that Diez could explain how Carollo and his allies were trying to use Code Enforcement resources for political retribution.

87.     When Fuller met Diez in person, Diez confirmed Plaintiffs' suspicion that Carollo was behind the Code Enforcement interference at the party.  Diez also stated that Lugo instructed him not to reveal that Carollo was the source of the complaints.

88.     Diez later explained that, based on his understanding of the City Charter and Administrative Policy Manual, elected officials are not allowed to give direction to staff and can only raise concerns through the City Manager's Office.  He indicated in the case of Carollo, many of the code-related complaints originated from Carollo's office through Lugo and Miro as well as communication through his direct boss, Parjus.[12]

89.     This was echoed by Parjus who he stated "the right way to communicate a complaint is through the Manager, then it is communicated to him and in turn he contacts Code Enforcement regarding the allegation.  The wrong way is a Commissioner calling the Director of Code Enforcement."[13]

90.     Plaintiffs feared that this harassment at their holiday party might indicate Carollo had plans for future harassment against them and their businesses.

## RETALIATION AGAINST BARLINGTON GROUP AND ITS TENANT "SANGUICH DE MIAMI"

91.     Plaintiffs, along with Barlington Group, LLC ("Barlington Group"), a limited liability company of which they are managing members, also supported the development of

---

[12] Exhibit A, p. 29.
[13] *Id*. p. 19.

Sanguich de Miami ("Sanguich") an innovative restaurant aiming to bring a remodeled shipping container, an architectural concept recognized around the world, to create further retail activation on a part of the street that was a non-descript parking lot.

92.     The success of shipping containers for retail activation was not only a worldwide phenomenon, it had also been established in hugely popular sections of Miami, including in the Wynwood Yard and at The Wharf on the Miami River. These were established pursuant to Temporary Use Permits ("TUPs") under the City Code.

93.     Here is a photo of the Sanguich structure on the property owned by Fuller and Pinilla in December of 2017:



94.     Former District 3 Commissioner Frank Carollo (Joe Carollo's brother), was a "huge proponent" of the Sanguich business and its location in the refurbished shipping container.  Frank Carollo even suggested they partner with Plaintiff Fuller.

95.     Many City officials including former Mayor Tomas Regalado and the Chief of Police attended Sanguich's ribbon-cutting ceremony on Oct. 27, 2017.

96.     Sanguich obtained a business license from the City, known as a "BTR" and a state license for preparing and selling food and worked with a City of Miami Assistant Attorney to get temporary zoning approvals from the City.

97.     Sanguich became a huge success, was overwhelmed with customers, received rave reviews, and would often times sell out of its products.

98.     On November 26, 2017, just one week after Carollo discovered Plaintiffs supporting his competitor Leon, and only 5 days after he won the run-off election against Leon, Sanguich was "raided" by 25-30 City enforcement personnel including police, fire, building and Code Enforcement officers.

99.     Just minutes before the raid, Fuller was contacted by City Manager Daniel Alfonso ("Alfonso"), who advised him that Code Enforcement had been summoned to the property.  When Fuller asked if this was retaliation from the incoming commissioner Carollo, the City Manager responded simply by saying "si."  Again, the City had full knowledge of Carollo's campaign to retaliate against Plaintiffs for their support of Mr. Leon.

100.    After the Sanguich owners, Rosa Romero ("Romero") and Daniel Figueredo ("Figueredo"), also contacted Alfonso, he confirmed to them that **the raid was performed at the direction of Carollo** and that Alfonso had no power to stop it.  Alfonso advised them to meet with Carollo to learn the reason for the raid.

101.    Romero and Figueredo met with Carollo on December 6, 2017.  Carollo expressed that he felt the location of their business (on Plaintiffs' property) was problematic and that they relocate to City-owned property.   Specifically, Carollo stated, "I love it [the business]," just

"maybe not where you are, I think there's a little park that's near there and maybe the City can accommodate you."[14]

102.    Solely to ensure that Plaintiffs could not use the same concept approved and succeeding in Wynwood and the Miami River, within two miles of their location, Carollo managed at the Commission Meeting on December 14, 2017 to remove TUP's solely from District 3.[15] Carollo did so without meeting the proper City procedure.  There was no first hearing on the issue, and there was no public notice on the issue.  He circumvented the proper procedure by inserting it into another commissioner's legislation, on its second reading, depriving Plaintiffs of their due process rights and destroying the opportunity they had built, and were building, with other projects in their pipeline.

103.    Thus, the same shipping containers that are authorized and in use in The Wharf on the Miami River and at Wynwood Yard in Wynwood could no longer be used in Little Havana.

104.    Sanguich reopened on January 6, 2018 with a Temporary Events Permit (TEP).[16] That same day, however, City of Miami Code Enforcement showed up and advised them they were

---

[14] Romero and Figueredo were eventually told that they were raided because they lacked a Certificate of Use (CU), but since they were operating a mobile vending unit and not a permanent structure that made no sense.  After discussing this with the Assistant City Attorney, they were advised that they could operate, at least temporarily, with a Temporary Events Permit (TEP), while they sought to gain zoning approvals.  The Assistant City Attorney further informed them that the City's zoning code is vague and that a great deal of subjectivity is involved. They were advised that as a result of this, the District Commissioner, in this case Carollo, would likely have final say as to whether a building met code regulations.

[15] *See* Ordinance 13733 enacted on January 11, 2018.

[16] Figueredo had been informed that because they were a mobile vendor, having installed axels on the container as requested by the City, no Certificate of Occupancy was required.  Indeed, many other businesses in the City such as The Wharf on North River Drive were operating under TEPs that allowed them to operate for up to two years if they are opened on vacant lands.  However, Carollo had made it clear that he did not want TUPs to be utilized in Little Havana and as a result of that, he directed both the Building and Zoning Departments to make an example out of Sanguich because of its location on Plaintiffs'

not allowed to open.  Code Officer Yacmany Salvatierra ("Salvatierra") told them, **"I'm sorry, this came from above, just know people are watching.**"

105.    Sanguich nevertheless opened and, two days later, on January 8th at approximately 11:00 AM, Salvatierra returned with police and stated, "You're not supposed to be open because the TEP had a condition that had not been met," and threatened to arrest them if they did not close the business.  When Figueredo inquired with Building Department Director Jose Camero ("Camero") as to why they were forced to close despite having a BTR and TEP, Camero stated "I got a phone call, but I can't say from who . . .."

106.    In his testimony to the Ethics Commission, Parjus confirmed that the **calls to the Building Department and the City were coming from Carollo personally or from a person acting at Carollo's direction, stating "every time the guy [Figueredo] would open the door to clean up the place or do something we'd get a call . . . 'hey they're open up again,' from the Commissioner's Office or somebody else."**[17]  When receiving these repeated calls from Carollo personally or from a person acting at his direction, the City understood and continued to support Carollo's unconstitutional campaign of harassment against Plaintiffs and their affiliated business continued.

107.    Asked the reason for the harassment, Carollo told Figueredo, **"my problem is not as much with you as it is with your landlord."**

108.    The Sanguich proprietors, Romero and Figueredo are a husband and wife team who had invested their family's entire savings in the concept.  The machinations of Carollo and the City

---

property.
[17] Exhibit A, p. 19. (emphasis added)

drove them to the verge of bankruptcy and Carollo ultimately succeeded in shutting down Sanguich on property owned and rented by Plaintiffs.

109.    Sanguich has since relocated to a nearby typical retail building:



110.    Since relocating off of Plaintiffs' property, Sanguich has ceased receiving any City code violations or any retaliation by Carollo.

111.    Plaintiffs have suffered monetary damages as a result of Carollo forcing Sanguich to relocate off of Plaintiffs' property including the loss of rental income in excess of $12,000 per year.  All claims related to monetary damages have been assigned by the relevant business entity to Plaintiffs in their individual capacities.

112.    Further, with the realization that Carollo was now relentlessly targeting businesses that rented from Plaintiffs, and in the past had been welcomed by city officials with open arms, Plaintiffs began to experience extreme mental anguish and emotional distress, which manifested through sleeping difficulties and other physical ailments.

**RETALIATION AGAINST PLAINTIFFS AND THEIR TENANT UNION BEER**

113.    Fuller and Pinilla are also the landlords and partners of the Union Beer Store, an oasis for beer lovers in Miami's Little Havana neighborhood with 18 taps, pouring the best beers, local and otherwise, including beers on nitro, cask ales from a beer engine and a growler station.

114.    David Rodriguez and Cecilia Rodriguez are also a husband and wife team who have invested their life savings into creating Union Beer, which is located at 1547 SW 8th Street, a building owned by Plaintiffs.  Union Beer has been a tenant of Plaintiffs since February 2017.

115.    On **February 10, 2018,** Union Beer held its one-year anniversary party in the parking lot behind their business.  Carollo suddenly appeared at the property with several police officers with flashing lights and approximately 15-20 Code Enforcement officers.  Carollo confronted the Rodriguezes and told them "You need a temporary events permit . . . but even if you had applied for one, I would have denied it."  The City Commissioner does not approve special events permits.  They are approved by City administration, not by commissioners.  Therefore, his statements were both false and threatening by nature.

116.    Carollo ordered Code Enforcement to shut the party down and posted a Code Enforcement officer at the door of the business for the next two hours.   In doing so, Carollo, supported by the City, coordinated a well-organized attack by an overwhelming number of police, Code Enforcement and other City employees, and Carollo himself attended to videotape the chaos.

117.    Prior to this event, Union Beer had never been cited for any significant code violations nor had any of its operations shut down.

118.    Carollo was heard bragging to patrons of the El Pub bar that he would do everything possible to shut down Union Beer.

119.    Learning that Carollo was continuing to target businesses that partnered with, or rented from Plaintiffs, with the aim of shutting those businesses, further exacerbated Plaintiffs' mental anguish and emotional distress, including sleeping difficulties and other physical ailments.

### CAROLLO'S RETALIATION AGAINST BALL & CHAIN'S VALET OPERATIONS

120.    On **February 18, 2018** at approximately 12:30 A.M., Carollo, Lugo, Miro and Miro's wife entered a parking lot located at 1411 SW 11 St., Miami FL 33135.

121.    The lot is attached to St. Peter & Paul Orthodox Christian Church but at night is leased by S.H. Valet, the valet operator for Ball & Chain.  S.H. Valet had leased and used the Church's lot for parking cars for many years without any complaints from the City.

122.    Lugo and Miro's wife began photographing the parked cars.

123.    Initially when approached by the valet employee, Lugo claimed it was a "private" matter and she had a meeting with the priest (at 12:30 AM).

124.    The valet attendant then noticed another woman taking photos (Miro's wife) and asked what she was doing and asked her to stop taking pictures.

125.    Carollo then lowered his car window, flashed his City of Miami identification telling the valet attendant that he was performing an "official investigation" of the valet operation and lot and that he was doing so in his official capacity as a City of Miami Commissioner.

126.    A few minutes after the discussion, the operator of S.H. Valet, Alain Garcia ("Garcia"), arrived at the lot and confronted Carollo.  Garcia explained that the valet operation at the lot had been approved by the Miami Parking Authority and that S.H. Valet had a valid lease with the Church to utilize the lot at night.

127.   Garcia then once again questioned what Carollo was doing there and in response Carollo told Garcia, "**I am the law**."  Miro corroborated this fact during his testimony to the Ethics Commission.[18]

128.   Carollo further went on to tell Garcia that while he may be a hard worker just doing his job, he was "working for a millionaire" (meaning Fuller) which was not acceptable to the Commissioner.

129.   During his testimony to the Ethics Commission, Carollo denied ever having flashed his badge or telling Garcia that he worked for a millionaire. Yet in an article published in the Miami New Times on September 17, 2018,[19] which included video footage of the incident in question taken by Miro's wife,[20] Carollo can clearly be heard saying in Spanish "pero trabajando con un millionario," which in English means, "but you are working for a millionaire" establishing that he lied to the Ethics Commission.

130.   After Garcia once again asked him to leave the private property, Carollo told Garcia he would receive the official results of his "investigation" in the next few days.  He then exited the lot with his associates.

131.   Learning that Carollo was continuing to make midnight raids on businesses that partnered with, or rented from Plaintiffs, with the aim of shutting those businesses, added to Plaintiffs' mental anguish and emotional distress, including sleeping difficulties and other physical ailments.

---

[18] Exhibit A, p. 26
[19] https://www.miaminewtimes.com/video/video-suggests-commission-joe-carollo-lied-to-ethics-commission-ppu1d8bv
[20] The Ethics Report establishes the fact that Miro's wife was the one filming the incident in question that evening. *See* Exhibit A, p. 6.

### CAROLLO'S RETALIATORY ACTIONS AT THE GAY 8 FESTIVAL

132.    The Gay 8 Festival took place on Calle Ocho on Sunday, **February 18, 2018,** hours after Carollo had raided Fuller and Ball & Chain's valet operation.

133.    Carollo's target at the Gay 8 Festival was Sanguich, which was still at that time a tenant of Plaintiffs, and had obtained permission to operate as a tent vendor during the festival.

134.    Carollo sent Miro to the festival on his behalf to be the onsight administrator of an orchestration of a barrage of attacks by the Fire Department, the Police Department, the Special Events Department and Code Enforcement, and Miro was telling all of the City employees that Carollo was available to talk by phone.

135.    Carollo asked Miro to speak to Carlos Diaz ("Diaz"), a fire inspector for the City of Miami, to inform him that Carollo was concerned about one vendor whom he alleged was selling contaminated food.

136.    When Diaz arrived, Carollo spoke to him on the phone.  According to Diaz, Carollo identified himself as the Commissioner and made false accusations about spoiled food at "Sanguich" stating he had reason to believe the food had been brought in a day or two ago, had been stored in a hot trailer and might be contaminated.  He also stated that the vendor lacked proper licenses.

137.    Diaz informed Carollo that as fire inspectors, they do not inspect food or licenses, but that he would pass along the information.  Carollo told Diaz that the City had "issues" in the past with the vendor in question and that he wanted the inspectors "to follow up" with the vendor.

138.   Diaz went to the site and conducted the inspection of the kitchen area of Sanguich and determined that "everything was brand new" and "everything had been inspected" and there was no spoiled food: "Nothing smelled bad, nothing was rotten."

139.   The inspection was conducted in both the container and the tent.  Upon concluding the inspections, Diaz notified Miro, the police officers, the "Sanguich" owners and the Gay 8 coordinator that they passed the surprise inspection.  Romero and Figueredo were permitted to continue to operate despite suffering significant embarrassment and despite Carollo costing the City hundreds of dollars in blatant misuse of City resources and employees.

140.   In Diaz's 27-year career as a City Fire Inspector "neither he nor any of the inspectors had ever received such a call from a Commissioner."

141.   Miro confirmed Carollo's direct involvement with the targeted attack on Sanguich and further explained that although Carollo was not physically present, Carollo was in constant contact with City Attorney Victoria Mendez and Parjus about the situation.  Through Carollo's constant contact with the City Attorney and Mr. Parjus during this act of retaliation, the City again had further knowledge of Carollo's retaliation against Plaintiffs, and failed to take any steps to deter this repeated unconstitutional activity.

142.   Because Carollo had sent Miro to work at the festival on a Saturday, a normal day off for most City employees, Carollo arranged for the City to compensate Miro for Miro's actions on Carollo's behalf at the Gay 8 Festival in the form of compensated vacation days.

143.   Carollo did not target any other vendor at the Gay 8 Festival.

144.   Learning that Carollo would continue to target businesses that rented from Plaintiffs during community building festivities added to Plaintiffs' mental anguish and emotional distress, including sleeping difficulties and other physical ailments.

## CAROLLO ORDERS CODE ENFORCEMENT TO TARGET OTHER PROPERTIES OF PLAINTIFFS

### a.    The March 3, 2018 Carollo Ride Along

145.    On Saturday, March 3, 2018, Carollo violated the City Charter so egregiously that it was unprecedented.

146.    Carollo called a Code Enforcement supervisor named Michelle Watt and asked her to instruct a Code Enforcement officer to meet him in Little Havana because he had some questions and needed assistance.  Watt instructed Code Enforcement Officer Dennis Uriarte ("Uriarte") to meet Carollo at 1600 SW 8th Street.  Uriarte had been assigned to Coconut Grove, not Little Havana.  Uriarte found the request "very unusual" because Commissioners should "know better" than to call Code Enforcement directly,[21] and he had never before received such a call, saying: "in my 2 ½ years, that was the first time, it's been the only time."[22]

147.    When Uriarte arrived, Carollo said he believed the construction at the property lacked permits.  Uriarte verified online with the City's iBuild website and determined the sight was "legit" and had permits.  Uriarte obtained a copy of the construction site's plans and found they were proceeding legally.

148.    Uriarte thought that would be the extent of his interaction with Carollo, but Carollo then asked if he could ride with him in the City Code Compliance vehicle, in order to point out five additional sites, located elsewhere on SW 8th Street, three of which belonged to Fuller and Pinilla, on which he wanted to search for code violations.

---

[21] Exhibit A, p. 34
[22] *Id*. pp. 34-35.

149.   Uriarte stated "I don't think it is part of our job . . . it never happens . . . this was a very unusual task given to me." He continued by stating, "probably the supervisor didn't even know that he wanted to ride with me." Uriarte added that "I had to say yes" and did not want to get in "trouble for saying no to a Commissioner."[23]

150.   In fact, because Uriarte and his supervisor Sierra were uncomfortable with the request for the ride-along, they called their former supervisor Diez who suggested that they put something in writing documenting the request.[24]

151.   After the ride-along Carollo called Uriarte to follow-up to see if Uriarte had issued citations to the Plaintiffs for the alleged code violations Carollo had claimed existed.   Uriarte directed him to Sierra for any code violations on the properties in question.

152.   Sierra consequently sent James Bernat ("Bernat"), the new Acting Code Enforcement Director, an email on March 8, 2018 explaining that he "received a phone call . . . yesterday in the evening from Commissioner Carollo requesting updates on the complaints he [Carollo] gave inspector Dennis Uriarte last Saturday during their ride along." Sierra also provided updates for each complaint.  A copy of the Sierra March 8 Email is attached hereto as **Exhibit C**.

153.   At the time of the ride-along, Bernat was on his first week at the job as the new Acting Code Enforcement Director.  Bernat stated that the ride-along was done "without his knowledge or authorization,"[25] and that Commissioners should not be going in cars or doing ride-alongs with inspectors, especially without the approval of their supervisor.  Bernat has since directed his officers that they cannot participate in ride-alongs with Commissioners.

---

[23] *Id*.
[24] Exhibit A, p. 31.
[25] *Id*. p 22.

154. On the ride along, three of the five properties Carollo pointed out to Uriarte were owned by Plaintiffs. The fourth was owned by a close friend of Plaintiffs named Marcus Lapuic. When he inquired why he had been targeted, Lapuic learned from a source close to Carollo, that "because you're a friend of Fuller, you're a friend of the enemy, and therefor you're a frenemy" and was on the list of properties to consider targeting.

155. None of this occurred through the proper legal channels of the City Manager as required by the City Charter.

156. Learning that Carollo was now targeting any property associated with Plaintiffs added to Plaintiffs' mental anguish and emotional distress, including sleeping difficulties and other physical ailments.

### b. The March 14, 2018 Park and Walk – Fabricated Noise Complaints

157. Eleven days later, on March 14, 2018, Carollo arranged for a "park and walk" with numerous City employees, including Bernat, a police officer, two Code Enforcement personnel, Sean Moy, President of the AFSCME Union, Lugo, who was also then an Executive Board Member of the AFSCME Union, and Steve Miro.[26]

---

[26] One might ask why the AFSMCE Union officials would be assisting Carollo, how they benefitted, what they owe Carollo, and why all that is relevant to this case. As Commissioner of District 3, Carollo is also the Chairman of the Bayfront Park Management Trust, a prestigious board that is responsible for the oversight of Bayfront Park. In exchange for assisting in his dirty work, Carollo rewarded Lugo, an Executive Board Member of AFSMCE, with an appointment to the Bayfront Park Management Trust Board. Not coincidentally, upon information and belief, Carollo then colluded with Lugo to have her support his initiative to gift $3 million dollars in "surplus" funds from the Bayfront Trust to the City of Miami to help the city "balance the budget" and ensure that its union workers, including those in the AFSMCE, would not suffer a pay cut. Shortly thereafter, Plaintiffs have learned that, upon information and belief, Carollo convinced the City to replace the current Chief of Code Enforcement, with AFSMCE President Sean Moy. Meaning that Carollo will now have a "friend" running Code Enforcement that will owe him a favor for ensuring his union members did not suffer a salary cut. This favor will surely come in the form of a storm of "legitimate" Code Enforcement actions against Plaintiffs.

---

158.   This again was done by Carollo as a City Commissioner with City employees outside the knowledge and purview of the City Manager in direct violation of the City Charter.

159.   Prior to the walk, Carollo and Lugo had visited residents in a building located to the rear of Ball & Chain on 7th Street, close to 15th Avenue.  Carollo and Lugo had visited several times and provided the residents with Carollo's cell phone number, instructing them to call him directly in the event they had complaints of any kind.  Carollo explained to the tenants that he would then call Code Enforcement himself to address any issue (which, of course, would violate the Charter).

160.   Lugo then brought Bernat to meet one of the residents who lived behind Ball & Chain, whom Carollo and Lugo had already prepped.  Not surprisingly, the woman complained of loud music after 9:00 pm at the club.

161.   Bernat further stated that he had received calls directly from Carollo's office about Ball & Chain and other businesses throughout 8th Street.  Bernat indicated that Carollo did make allegations of corrupt dealings between the MPA and Ball & Chain and stated that the valet in front of Ball & Chain was illegal and should not be allowed to operate, but he did not provide any tangible evidence.

162.   Prior to Carollo and his team's visits, there had been very few noise complaints about Ball & Chain but after Carollo's team had reached out to the neighbors, the complaints became an onslaught (orchestrated by Carollo).

163.   To assure that it could defend any false reports of noise violations, Fuller and his partners in Ball & Chain spent significant resources to implement high tech noise cancellation equipment and a master switch to control the volume of the music automatically depending on the time of the night.  This master switch could not be changed by staff.

164.    Learning that Carollo was now galvanizing broad City personnel and resources in his targeting of Plaintiffs added to Plaintiffs' mental anguish and emotional distress, including sleeping difficulties and other physical ailments.

**FULLER'S ETHICS COMPLAINT AGAINST CAROLLO**

165.    On or about March 12, 2018, Fuller c/o The Barlington Group filed the Ethics Complaint against Carollo with the Miami-Dade Commission on Ethics and Public Trust.

166.    After the Ethics Complaint was filed, Carollo attempted to tamper with the witnesses and get them to perjure themselves.

167.    In particular, Carollo asked Miro (now his acting senior advisor) how he planned to respond to questions from investigators.  Miro responded that he would answer all questions truthfully.  Carollo was upset by this response, and instructed Miro to tell the investigators that all actions taken against properties owned by or related to the business interests of Bill Fuller/Barlington Group were the result of "anonymous complaints."[27]   Miro stated that Carollo tried to "coerce me into saying something that is totally not true" and he (Miro) would not put himself in that predicament, to lie about anonymous complaints.  "Joe wanted me to say there were anonymous complaints and there were none. I never received any anonymous complaints," said Miro, noting that in his City position, he would have to be aware of citizens' complaints.[28]

168.    From that point forward, Miro's relationship with Carollo soured, ultimately leading to his termination by Carollo on June 4, 2018.

---

[27] Exhibit A, p. 27.
[28] Exhibit A, p. 27.

169.     After Fuller filed the Ethics Complaint, and for the next five months while the investigation was pending, Carollo temporarily ceased his harassment.  There was a noticeable difference, becoming eerily quiet.  It went from a constant barrage of harassment to nothing.

170.     In fact, even the noise complaints against Ball & Chain ceased.

171.     On or about August 6, 2018, Fuller requested permission to withdraw the Ethics Complaint, and it was withdrawn as of August 13, 2018.

172.     Fuller withdrew the Ethics Complaint because it had been too narrowly drafted.

173.     An abundance of information surfaced that had become the basis of filing the Complaint in this action and possible additional filings, including both ethics and possible criminal complaints.

174.     Carollo interpreted the withdrawal of the Ethics Complaint as a sign of weakness and defeat and as a green light to resume and even ramp up his attacks on the Plaintiffs, which is jokingly now called in City circles as "Round 2."

175.     For example, after the withdrawal of the Ethics Complaint, noise complaints against Ball & Chain resumed, with the first one being filed directly by Carollo himself by text message on September 14, 2018, not by any neighbors of Ball & Chain.  (As explained further below, on October 2, 2018, Carollo was again found walking around the Ball & Chain neighborhood trying to find neighbors willing to complain).

## CAROLLO TARGETS PLAINTIFFS' CALLE OCHO MARKETPLACE

176.     Another target on Carollo's hit list was Plaintiffs' property located at 1380 SW 8th Street, known as Calle Ocho Marketplace.  Calle Ocho Marketplace consists of two (2) contiguous

parcels of land.  The first has an existing Mexican restaurant on it and the second consists of an open-air lot where Plaintiffs intended to put a kiosk marketplace.

177.  To that end, Fuller and Pinilla had invested over $100,000 dollars to retro-fit containers into smaller kiosks to house the marketplace vendors.

178.  On August 20, 2018, a mere seven days after Plaintiffs had withdrawn the Ethics Complaint against Carollo, Plaintiffs received a letter from the City which included notice of a code violation of Section 3.63(g) of Miami 21 at Calle Ocho Marketplace (the "Notice"). Specifically, Section 3.63(g) of Miami 21 relates to "Off-Street Parking Facilities" and states as follows:

> Inoperable vehicles and other inoperable Recreational Watercraft or equipment shall be stored only in storage facilities or other approved places where they are completely concealed from public view.

179.  The Notice contended that the kiosks somehow constituted equipment and the marketplace somehow constituted a parking facility and that Plaintiffs therefore either had to fasten down the kiosks or remove them no later than August 22, 2018.

180.  Given that the kiosks were actual building structures and not equipment, and further given the fact that Plaintiffs had a lawful Farmer's Market TUP and Building Permit to have the kiosks on the property, the Plaintiffs consulted with their attorney Dombrowski who reached out to Assistant City Attorney to resolve the issue.

181.  On August 31, 2018, while the parties were still discussing how to resolve the matter, the City filed an Emergency Motion for Injunctive Relief ("Motion") asking the Court to either force Plaintiffs to remove the kiosks or grant the City the authority to remove ***and destroy*** every kiosk from the property.

182. On September 4, 2018, Plaintiffs received a letter from the City indicating that it was revoking the Farmer's Market TUP on the property.  Because the TUP formed the basis for the building permit that allowed for the kiosks to be on the property, the City also indicated it would revoke the building permit, which it did 7 days later on September 11, 2018.

183. On September 6, 2018, Judge Miguel De La O denied the Motion.

184. That same day, the City dragged Plaintiffs in front of the Code Enforcement Board.

185. Once again, Carollo attended the meeting.  During that meeting the City Attorney Victoria Mendez told the Code Enforcement Board that the Farmer's Market TUP never should have been issued because the lot was less than 5,000 feet.  This was a blatant lie as the plans submitted for the permit clearly indicated that there was over 8,300 square feet for the market.

186. To add fuel to the fire, Carollo delivered a defamatory and false speech, lasting more than 10 minutes, attacking the Plaintiffs.  Carollo argued that while the Plaintiffs had a Farmer's Market permit, he knew they were not going to sell vegetables but rather would hock goods as they would in a fourth or fifth world market.

187. The combination of the City Attorney's lie regarding the square footage of the lot and the false and defamatory statements made by Carollo to the Board, resulted in the Board's decision to give Plaintiffs less than 48 hours to remove the kiosks or else start to incur fines of $250 per day.

188. Believing that they had been significantly wronged and intending to challenge the revocation of their permits, Plaintiffs did not remove the kiosks by the deadline.  Accordingly, the City requested an emergency hearing at the next Code Enforcement Board Meeting on September 12, 2018.

189.   Plaintiffs attended the hearing with their attorney who attempted to explain the errors behind the revocation of the TUP and the false statements made to the Board by Victoria Mendez.  Rather than give the Plaintiffs a chance to argue their case, the Board, who had clearly been prejudiced by the prior statements made by Carollo and Mendez, granted the City permission to enter the property and remove the kiosks.

190.   This whole chain of events added to Plaintiffs' mental anguish and emotional distress, including sleeping difficulties and other physical ailments.

## CAROLLO'S RETALIATION AGAINST THE PLAINTIFFS' USE OF THE 7TH STREET PARKING LOT

191.   On the morning of Saturday, September 15, 2018, at approximately 12:30 am, three City of Miami Code Enforcement Officers and a police officer showed up at Ball & Chain to complain about alleged illegal parking on a lot owned by Plaintiffs that was adjacent to Ball & Chain.  According to Code Enforcement, they were there as a result of an "anonymous" complaint about illegal parking.  The lot, which is zoned commercial and therefore may be used for parking, is utilized by the employees of Ball & Chain to park their cars while they are at work.

192.   Fuller was not there but both the valet manager and general manager dealt with the officers. The Code Enforcement officers issued Plaintiffs a citation for illegal parking and failure to have a Certificate of Use on the lot and then, at the direction of the police officer, forced all of the employees to stop working and immediately move their cars.

193.   The problem with that is Code Enforcement is only empowered to issue citations. Citations can then be contested.  Code Enforcement is not empowered to take affirmative action to remove perceived code violations prior to a hearing.

194.     This process took approximately an hour as 25 employees – management, waiters, bartenders, busboys, the disc jockey – all took turns leaving work and moving cars, resulting in a significant disruption of work at Ball & Chain.   The Code Enforcement officers and police remained on the premises essentially intimidating the staff until every car had been moved.

195.     Later that morning, after having learned about the incident, Fuller called a Code Enforcement Officer (the "Officer") to inquire as to why the citations were issued when the parking was legal.

196.     The Officer informed Fuller that he was not aware that Code Enforcement had been sent to Ball & Chain but said he would investigate and get back to Fuller.   Approximately a half hour later, the Officer called Fuller back and said there must have been a mistake because the lot was zoned commercial and could be used for parking and that he would see what he could do about it.

197.     On Monday, September 17, 2018, Fuller made a public records request to try to ascertain the source of the complaint.

198.     On Tuesday, September 18, 2018, just as he was walking into a previously scheduled meeting with the Officer, he received a response to the records request which included a screenshot of a **text message sent by Carollo to the City Manager on September 15, 2018 that said "Mr. manager 1530 sw 7 street still parking illegally and music blaring in violation of city code.**"

199.     Here is a picture of the actual text message:



200.    Neither the Code Enforcement officers nor the police officer mentioned any noise complaints while they were at Ball & Chain and no citation had been issued for excessive noise while they were there.  Fuller, armed with the knowledge that it was Carollo who made the complaint directly, and who was with his attorney Dombrowski at the meeting, again discussed the events of Friday night with the Officer.  The Officer told Fuller "no hard feelings but we received an anonymous complaint."  At that point, Fuller showed the Officer the screenshot of the text message from Carollo and said that there was nothing anonymous about it.  Carollo had

contacted the City directly to send Code Enforcement to cite the bar.  In response, Officer stated, "[h]oly shit!"

201.    The Officer then advised Fuller that Ball & Chain also received a noise citation on Friday night.

202.    When Fuller explained that they had not received any noise violation and that despite being on the property for almost two hours, the Code Enforcement officers never mentioned a noise violation or took any decibel readings, the Officer looked in the computer and confirmed that nothing had been issued.

203.    Approximately an hour after the meeting at 3 pm on Tuesday, September 18th, a violation was posted outside Ball & Chain for excessive noise with a date of September 15, 2018.

204.    In his testimony before the Ethics Commission, Daniel Sierra explained that it was new code enforcement policy that whenever noise complaints were issued, the Code Enforcement officer had to return to the establishment cited every 45 minutes to verify whether they were in violation of the noise ordinance.[29]  Despite this official policy on noise violations, no one said a word to anyone at Ball & Chain on the night of the 15th about a noise violation and no one returned in 45-minute intervals to take decibel readings.  Nonetheless, the notice of the noise violation from that night was posted on the outside of Ball & Chain on September 18th following Fuller's meeting with the Officer, three days after the alleged violation occurred.

205.    This was obviously Carollo manufacturing a false noise violation against Plaintiffs' businesses, and with the City's assistance in pursuing this false and belated noise violation.

---

[29] Exhibit A, p. 34

206.    This false noise complaint is of great significance since, with three such (false) complaints, Carollo may attempt to force Ball & Chain to shut down permanently.

207.    This chain of events, and confirmation of Carollo's continued attacks on Plaintiffs and their associated businesses, with the aim of shutting them down, added to Plaintiffs' mental anguish and emotional distress, including sleeping difficulties and other physical ailments.  It also caused significant monetary damage and all claims for monetary damages that have been suffered by entities associated with Plaintiffs have been assigned to Plaintiffs in their individual capacities.

### CAROLLO IS DISCOVERED LURKING BEHIND BALL & CHAIN NEXT TO THE 7TH STREET PARKING LOT AT 9 PM SEARCHING FOR CODE VIOLATIONS

208.    On October 2, 2018 at 9 pm, one of the Ball & Chain managers was returning to his car in the 7th Street parking lot when he noticed three men standing next to the lot in front of some residences discussing Ball & Chain.

209.    One of the men was Carollo.  The second was Saul Cimbler, a Cuban-American attorney who has been suspended by the Florida Bar and who runs a business assisting people to "legally do business in Cuba."[30]  It is not clear why Carollo had Cimbler with him lurking behind Ball & Chain.

210.    The third was Frank Pichel, a current member of the Code Enforcement Board.  It is highly suspicious why Carollo would be with a Code Enforcement Board Member in the dark in the back of Ball & Chain on a Tuesday night. Moreover, Mr. Pichel's participation again

---

[30] http://loramedia.com/blog/team/saul-cimbler/

signifies the City's knowledge and support for Carollo's unconstitutional retaliation against the Plaintiffs.

211.    After discussing the fact that the residences were over 100 feet away from the music playing at the bar, Carollo went over to the apartments and began knocking on doors to ask the residents about the music, to see if he could find any to file a noise complaint against Ball & Chain.

212.    At that point, the General Manager arrived on scene and began filming Carollo. Realizing that he was on film, Carollo became very defensive, took out his phone and started filming the Ball & Chain employees. Here is a photo from that night.



213.    The General Manager subsequently spoke to the people living in the apartments where Carollo had been knocking on doors.  The neighbors stated that they had no issues with the music coming from Ball & Chain and that most times they did not notice it.  They confirmed that no complaints had been made that night and they did not know why the Commissioner was knocking on their doors at 9 pm on a Tuesday night.

214.     While the video clearly shows Carollo at the location, the third man, Pichel, who sits on the Code Enforcement Board and, if he does not recuse himself, would be ruling on any noise complaints, refused to be on video and hid behind a tree.

215.     Carollo's continued stalking of Plaintiffs, bringing along members of the Code Enforcement Board, added to Plaintiffs' mental anguish and emotional distress, including sleeping difficulties and other physical ailments.

### CAROLLO'S RETALIATION AGAINST VIERNES CULTURALES

216.     Fuller is President of the neighborhood organization Viernes Culturales, a nonprofit organization which coordinates the popular Viernes Culturales/Cultural Fridays art, music and culture festival held on the last Friday of every month on Calle Ocho.   Viernes Culturales is currently in its 18th year.

217.     One of the main areas that the festival utilizes to house its vendors is Domino Plaza. On a typical Friday night, there would be a cultural gathering such as the following:



218.    In August 2018, Carollo ordered that Domino Plaza be shut down and physically barricaded.  No public reason was ever given.

219.    However, when the security guard at Domino Plaza was asked why it was shut down, she said it was at the order of the Commissioner.  Asked how she knew Carollo had closed it, she said he had come to the site on Thursday to make sure it was shut down.

220.    Domino Plaza reopened on August 29, 2018, and on Friday, August 31, 2018, just two hours before Viernes Culturales was set to begin, he ordered it shut again.  The excuse was "pothole repair," but in reality there were only a few tiles that had been removed (probably at the order of Carollo).

221.    Since the Plaza was completed in the mid 2000s, Viernes Culturales has always used the Plaza for the event.  It has never had to relocate for a festival.  Carollo's forced relocation resulted in many people believing that the festival was canceled.

222.    Carollo's closing of Domino Plaza is a direct attempt to target and destroy Viernes Culturales simply because Fuller is the President.

223.    In fact, another City Commissioner has stated explicitly that Carollo is targeting the festival to "fuck with Fuller."

224.    During his sworn statement, Miro explained that Carollo had hired his attorney to form a competing organization to Viernes Culturales that he hoped would replace it.  Miro explained "[s]o he had his attorney, Ben Kuehne open up another corporation of the Que Pasa Little Havana I believe.  You got to check Sunbiz for that, that's what I believe it's called.  To take

-- take over Viernes Culturales."[31]  When Fuller asked Miro why Carollo would want to take over

Viernes Culturales, Miro replied, "Just because it's yours."[32]

## CAROLLO'S RETALIATORY DEFAMATION AGAINST PLAINTIFFS

225.    Carollo has also gone on popular radio shows and defamed Plaintiffs and their

businesses and their tenants.

226.    This defamation is part and parcel of Carollo's retaliation against Plaintiffs and is

aimed specifically to harm their businesses.

227.    On the Raul Martinez show, Carollo, referencing Plaintiffs specifically, said:

> *"There is a large group of people buying property in the historic part of Little
> Havana to de-Cubanize and de-Latinize Little Havana"*.

228.    Carollo further alleged that Plaintiffs were connected to the corrupt socialist

dictatorships in Cuba and Venezuela, claiming that Plaintiffs were:

> "*Being supported by a small group of Venezuelans that have companies in
> Panama or the father of one of them is a Venezuelan ambassador to Cuba.*"

229.    Carollo then alleged that the corrupt Venezuelans were:

> "*leaving El Padrino [referring to Plaintiff Bill Fuller] to operate like a Godfather
> buying places full of code violations, buildings and nothing happens.*"

230.    Carollo then claimed that Plaintiff Fuller:

> "*has purchased all of the major commercial properties of Calle Ocho and he says
> that 'we buy properties from investors funds'*"

231.    Carollo further suggested and implied that Plaintiff Fuller's money for investment

was coming from corrupt Venezuelans:

> *"This guy has been buying properties for 4 years, he had said that he didn't have
> any money and suddenly he has it.  From where is this money coming?"*

---

[31] Exhibit B, p. 18, ll. 13-25 and p. 19, ll. 1-19.
[32] *Id.*

232.     Carollo next falsely claimed that Fuller was sending City inspectors to pressure property owners to sell their property to Fuller:

> *"Then, I hear stories of merchants even 3rd generation merchants that operate here, Cubans, other no Cubans that are Hispanics that have businesses, that 'they' are sending those city inspectors, another way to pressure them to sell their businesses to them, this is ugly."*

233.     During the Radio Actualidad show, Carollo falsely claimed that Plaintiff Fuller (a) "Operates all of his businesses without permission," (b) was "Robbing money from the City of Miami by not paying valet fees," and (c) that "Ball & Chain has caused prostitution on Calle 8."

234.     Each of Carollo's statements listed above was knowingly false, malicious, published widely to the community, and intended to harm Plaintiff Fuller and his businesses.

235.     Further, Carollo uses his perceived immunity to defamation as a public official to intentionally defame Plaintiffs in order to harm their reputation and cause economic damages.

236.     Carollo's false and defamatory statements have caused Plaintiffs' to suffer mental anguish and emotional distress and have harmed Plaintiffs' reputations.

**CAROLLO'S ATTEMPT TO DESTROY VIERNES CULTURALES AFTER THE FILING OF THE COMPLAINT IN THIS ACTION**

237.     Undeterred by the filing of the Complaint in this action, and a stay entered by this Court based on Carollo's attorney's representations that Carollo was busy with upcoming elections, Carollo and the City's retaliatory action towards Fuller, Pinilla and Viernes Culturales has continued.

238.     During the 18-year history of the Viernes Culturales festival, and right up until October 2018, Viernes Culturales had never applied for or obtained a special events permit in relation to Domino Plaza, where a key part of the festival occurs. And despite its heavy

involvement in the festival, prior to October 2018, the City has never requested or required Viernes Culturales in its 18 years of existence to pull any type of events permit.

239.    The first time Viernes Culturales applied for a special events permit for use of Domino Plaza was for the October 2018 event.  The reason Viernes Culturales did so in that month was because Mr. Fuller learned that Carollo was planning to apply for a permit for himself for that same day, in order to block the Viernes Culturales festival.

240.    Accordingly, Pati Vargas, the Director of Viernes Culturales, applied for and was granted a special events permit for the event on the last Friday of October, 2018.

241.    Ms. Vargas had been asked to secure permits for the remaining fourth Fridays of each month as well.  When she submitted the application for the last Friday of November, however, she was informed by the City that Commissioner Carollo had in fact beaten her to the punch and filed his application for use of the Plaza (the same location) for the fourth Friday of each month (the same time period), for the **next year**.

242.    Specifically, the City stated: "Please be advise [sic] that at this time you [sic] application for Viernes Culturales for Domino Plaza can't be process [sic] since the park has been reserve [sic] for those days."

243.    Plaintiffs obtained a copy of the application Carollo submitted, which he did on November 8, 2018. The application was submitted in Commissioner Carollo's own name, and the City Attorney, despite being fully aware of Carollo's retaliatory conduct, has rebuffed complaints from Viernes Culturales, stating that Commissioners have the right to reserve public spaces whenever they want.

244.    Accordingly, not only did the City condone Carollo's unconstitutional retaliation against Plaintiffs and Viernes Culturales, but assisted Carollo in doing so by, for the first time in

18 years, requiring that Viernes Culturales obtain a permit for Domino Plaza and assisting Carollo in reserving that location/time period that had been consistently used by Viernes Culturales.

245.    Commissioner Carollo has not even tried to pretend that his intention is anything other than destroying Viernes Culturales.  In an interview Carollo gave to the Miami Herald for a story entitled *"Joe Carollo wants to force out Viernes Culturales and host his own monthly festival,"* Carollo claimed that Viernes Culturales' festival has become a "tired, lackluster event" that is little more than a "flea market," and he "thinks he can do better with food, merchants and music," and that this would not be a one time affair but rather, "[w]e're going to do that every month, to bring Little Havana back alive again."[33]

246.    Additionally, after Plaintiffs filed a Motion for Temporary Restraining Order in this lawsuit against Carollo, to restrain Carollo from holding his event on the last Friday of each month, Carollo, through the City, began sending out false advertisements about the event to gain further support.

247.    Specifically, Carollo sent out the following advertisement:



---

[33] https://www.miamiherald.com/news/local/community/miami-dade/little-havana/article221762265.html

248.    The text of the advertisement claims that for Carollo's event there would be "a performance by our very own 'Mr. 305' Pitbull."

249.    When contacted by the Miami Herald, Pitbull flatly denied that he would be performing at Carollo's event.

250.    Upon information and belief, Carollo, with the assistance of the City and its Twitter Feed, knowingly published the above false advertisement as part of Carollo's effort to destroy Viernes Culturales and retaliate against Plaintiffs by attempting to gather public support for the event, despite all of the negative press coverage.

251.    Since the Miami Herald story ran noting that Pitbull would not in fact be appearing, the City removed the false advertisement from its Twitter Feed.

252.    Additionally, while Carollo has told the Miami Herald that Viernes Culturales had become a "glorified flea market," Carollo's staff has nevertheless contacted the very same vendors that put on the Viernes Culturales festival to secure their participation in Carollo's proposed festival.

253.    While Plaintiffs have provided in detail many of the unconstitutional actions of Carollo, the City and Lugo above, there are additional instances of retaliation and harassment that are not specifically alleged herein.

254.    Knowing that Carollo would seek to destroy a non-profit organization, created by the City itself and devoted to improving the community, solely because Plaintiff Fuller had become associated with the organization, has added to Plaintiffs' mental anguish and emotional distress, including sleeping difficulties and other physical ailments.

## VALETINE'S DAY COMMISSION MEETING

255.    On Thursday, February 14, 2019, Carollo raised the issue of "code compliance" with the full City commission.

256.    However, the sole focus of the presentation was Carollo's efforts to go after Plaintiffs' properties in Little Havana.

257.    As the Miami Herald reported, "Carollo raised concerns almost exclusively about Fuller-owned properties Thursday."

258.    Carollo had called upon city officials to speak during what at times seemed like a series of depositions.

259.    He presented false and misleading documents and photographs claiming to  show various code violations on Plaintiffs' properties.

260.    To prepare these false accusations, Carollo had shut down the City's microfiche department for two days so his people could scour the past history of Plaintiffs' properties.

261.    Carollo advocated to have the City shut down a number of Plaintiffs' businesses claiming they had "life safety" issues.

262.    Carollo claimed that the fact that Plaintiffs had not received many more code violations was due to "selective protection" by current and past City officials.

263.    Carollo convinced a number of other Commissioners to pass a resolution calling for a "task force" to investigate code compliance issues.

264.    About a week after the meeting, City Attorney Mendez emailed several top city administrators asking them to conduct new site inspections and to review all city records for multiple properties discussed on Feb. 14, 2019.  Of the eleven (11) 11 properties Mendez listed, seven (7) are owned by Fuller and his affiliates or associated with Fuller-owned businesses.

265.     Miami's Chief of Police sent a letter to the City Manager regarding Carollo and the

City Attorney's unlawful targeting of Plaintiffs:

> the item on the agenda was a discussion item, however, the main focus of the discussion was aimed at one particular business owner in the city. The resolution that the city attorney prepared pertains to 'properties describe[d] at the 2/14/2019 city commission meeting.'  However, the addresses forwarded in her email targets the particular business owner [Plaintiffs] which gives the impression that the city is selectively targeting his business for new investigations.  **The concern is that this request, through the city attorney, may amount to an <u>unsanctioned and unlawful exercise of powers</u> beyond the limits of his [Carollo's] legislative power <u>as a city commissioner to intentionally cause harm to a business owner</u>. As such my departments actions under the resolution may be in violation of the code of ethics ordinance**.

> **Furthermore this is selective enforcement against the business owner's properties using city ordinance.**

266.     Deputy City Manager Joe Napoli also voiced his worries to Gonzalez in response

to Mendez's request: "I am concerned that what the City Attorney is directing our staff to do is

beyond what was directed by the Commission and can be interpreted as targeting businesses," he

emailed his boss.

267.     Zerry Ihekwaba, another assistant city manager, echoed Napoli in another email:

"We ought to be enforcing the Code citywide and not just targets," he wrote.

268.     And Miami's Mayor, Frances Suarez, summed it up best, when he said: "**we as a

government are being used as an instrument for political vengeance**."

<u>**FIRST AMENDMENT RETALIATION, NOT CODE VIOLATIONS**</u>

269.     Evidence that Carollo's targeting of Plaintiffs is based upon political retaliation,

and not concern about code violations, is easily found by looking at Carollo's own long history of

code violations.

270.     A complete microfilm search of Carollo's residence 3230 Morris Lane, a property

that he purchased in January of 2001, revealed the Carollo has engaged in repeated violations of

the same City Code he claims that he is protecting.  Specifically, Carollo, violated City Code in at

least the following ways:

- By erecting an illegal and unsafe entrance arch with a mature bougainvillea growing through it without pulling a permit;

- By constructing an illegal and unsafe rooftop deck, that appears  to be in a state of disrepair or in the process of ongoing construction without ever having pulled a permit;

- By erecting (again with no permit) three illegal and unsafe carport structures that anyone with a minimal understanding of the South Florida Building code knows would never qualify for a building permit due to its inability to hold up during a hurricane; and

- By engaging in the the systematic, cutting and eventual killing of a mature, native, old growth, banyan tree on his property-an act that is specifically prohibited by City Code and punishable by fines in the thousands of dollars.

271.    Plaintiffs held a press conference in front of City Hall to make the City aware of

Carollo's failure to follow the City Code and resulting violations.

272.    In response to this public exposure, the City initially refused to issue citations for

Carollo's code violations.

273.    After additional public pressure, the City did issue citations to Carollo, but the City

never followed through to inspect Carollo's properties for additional code violations that were not

visible from the outside.

274.    Incredibly, despite being found guilty of violating the Code, Carollo continued with

his violations by taking actions to remediate the issues without first pulling permits-additional

illegal behavior.

### Carollo's Efforts To Prevent Plaintiffs From Purchasing Additional Properties

275.     It has recently come to Plaintiff's attention that Carollo, perhaps having been forced to accept that his code violation jig was up, has focused his attentions on a new plan of attack against the Plaintiffs.

276.     Specifically, Plaintiffs have learned that since late 2018, Carollo has engaged in a campaign to direct City officials to utilize City resources and funds.

277.     In an attempt to purchase properties adjacent to Plaintiff's current properties and most of which, Plaintiffs had made prior offers to purchase themselves.the very same properties Plaintiffs had been attempting to purchase.

278.     Those properties, which include 711 SW 15th Ave., 1474 SW 7th St., 1510 SW 7th St., and 200-230 SW 12th Ave., because they are adjacent to Plaintiffs' current properties, are all natural extensions of Plaintiffs' properties and businesses.

279.     In fact, at least 2 of the properties targeted were "off market" and were unsolicited offers by the city.

280.     In one case, Plaintiffs offered a seller $1M for his property on 15th Ave, an offer that was already a premium to market valuations, and he scoffed, saying "the city already offered me $1.32M." The city did not end up buying the property because the actual appraisal came back at $850k.

281.     This harms Plaintiffs overall business strategy.  By doing this, Carollo and the City are artificially inflating the market, and boosting the value expectation of these potential sellers and thereby making the properties difficult to acquire.

282.     The mandate by the Carollo and the City is clearly to "buy properties around" Plaintiffs and not to "buy 15th Ave properties" because, if it had been the latter, then the City

would have clearly offered to buy Plaintiffs' properties at the same premium, which it has not done.

## SUMMARY OF DAMAGES

283.    Plaintiffs have suffered through more than a year and a half of emotional distress and mental anguish.

284.    This emotional distress and mental anguish has been growing and compounding with each retaliatory act by Carollo.

285.    Plaintiffs have been unable to sleep at night.  They have spent many nights awake. The little sleep they have gotten has been disturbed.

286.    Plaintiffs became concerned for their safety and the safety of their families.

287.    On more than one occasion Plaintiffs called the police department to report suspicious vehicles parked near their homes or businesses.

288.    Plaintiffs cannot escape the feeling that Carollo and the City are seeking to fabricate evidence, complaints, and violations, all with the sole purpose of shutting their businesses and destroying their lives, all because they supported Carollo's political opponent.

289.    Carollo has unlimited funds and resources to try to destroy the Plaintiffs and their businesses and their families and to shut down their livelihood and their ability to provide for kids

290.    Plaintiffs spent a large part of their lives building a great business with a great portfolio of properties, and developed a stellar reputation in the community.

291.    The injury has not only been mental or emotional.  Plaintiffs' physical appearance and well-being has changed and their physicalhealth has suffered..

292.    In addition, Plaintiffs' ability to conduct their daily business has become significantly more difficult due to Carollo.  Potential business partners are reluctant to do business with Plaintiffs for fear of becoming targets of Carollo.

293.    In fact, one businessman who had committed to a major project with Plaintiffs pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo.  This alone cost Plaintiffs $5 million.

294.    Carollo's attacks on Plaintiffs' Calle Ocho Marketplace have caused Plaintiffs to suffer monetary damages in excess of $1.8 million.

295.    Carollo's various attacks on Plaintiffs' businesses and tenants in the Futurama building have caused Plaintiffs to suffer monetary damages in excess of $600,000.

296.    Carollo's various attack on Taquerias El Mexicano have caused Plaintiffs to suffer monetary damages in excess of $525,000.

297.    Carollo's various attacks on Ball & Chain have caused Plaintiffs to suffer monetary damages in excess of $370,000.

298.    All claims related to monetary damages have been assigned by the relevant business entity to Plaintiffs in their individual capacities.

## COUNT I
## VIOLATION OF THE CONSTITUTIONAL RIGHT TO FREE SPEECH
## AND FREEDOM OF ASSOCIATION
## (First Amendment Retaliation—Against Carollo)

299.    Plaintiffs reallege paragraphs 1 through 298 above as though fully set forth herein.

300.    The First Amendment to the United States Constitution provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the

right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

301.    The First Amendment rights to freedom of speech and association protects not only the affirmative rights to free speech and association but also the right to be free from retaliation perpetrated by the government upon the exercise of that right.

302.    Section 1983 provides a private cause of action with respect to the violation of federal constitutional rights.  The Act provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ***.

42 U.S.C. § 1983 (2012).

303.    The aim of Section 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.

304.    The United States Constitution's First Amendment guarantee to free speech and free association applies to local and state governments through decisions of the United States Supreme Court, as well as through the Fourteenth Amendment.

305.    Plaintiffs exercised their right to free speech and free association by supporting Mr. Leon in the run-off election and hosting a rally for Mr. Leon on Plaintiffs' property.

306.    Carollo discovered the rally for Mr. Leon being held on Plaintiffs' property on November 18 and November 19, 2017, and discovered Plaintiff Pinilla at the rally itself.

307.    Upon winning office, Carollo immediately retaliated against Plaintiffs by instituting a campaign of harassment beginning that very same day.

308.    Carollo's discovery of the Leon rally at Plaintiffs' property on November 18, and Carollo's retaliatory campaign of harassment beginning that same day, and continuing each day thereafter, establishes causation between the exercise of free speech and the retaliation.

309.    In addition, causation is also established by the testimony of Mr. Miro, Carollo's own top advisor.   When asked why Carollo was targeting the Plaintiffs, Miro answered: "**obviously, [Fuller] went against him in the commissioners by donations to -- giving him building and what have you.**"

310.    Causation is also established by the testimony and statements of the many other City employees.

311.    In addition, Carollo's retaliatory actions temporarily ceased upon Plaintiff Fuller's filing of the Ethics Complaint against Carollo in late March 2018. However, within days of Fuller's withdrawal of the Ethics Complaint, Carollo resumed his campaign of harassment, this time in retaliation for both the exercise of their First Amendment rights in supporting of Leon and for the exercise of their First Amendment rights in filing the Ethics Complaint.

312.    Carollo was at all times acting under the color of state law (including when he was criminally violating the City Charter).

313.    Carollo's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity.

314.    As a result of Carollo's retaliation, Plaintiffs are reluctant to participate in the political process by supporting candidates for office.

315.    In addition, as a result of Carollo's retaliation, Plaintiffs have suffered out of pocket losses and other monetary harms associated with disruption to their various businesses in an amount to be proven at trial.

316.    Carollo was not acting within the scope of his discretionary authority as a Miami City Commissioner.  In fact, by directing City employees to target Plaintiffs, Carollo was violating the Miami City Charter.

317.    In addition to the monetary losses, Plaintiffs have suffered impairment to their reputation, personal humiliation, emotional distress and mental anguish and suffering.

318.    Plaintiffs also are entitled to punitive damages to punish Carollo's reprehensible conduct and to deter its future occurrence.  Carollo's conduct was reprehensible in that it was repeatedly violating the Miami City Charter's rules designed to prohibit this type of behavior, designed to preclude commissioners from threatening City employees to get them to carry out the commissioners' personal vendettas.  It was reckless in its disregard for Plaintiffs' free speech rights.  And it was, and is, motivated by an evil intent – to drive Plaintiffs out of business and deprive the residents of Little Havana of all the positives the Plaintiffs have brought to the neighborhood.

319.    Plaintiffs also are entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Awards Act of 1976 (42 U.S.C.A. § 1988[b]).

320.    Finally, Plaintiffs also seek a permanent injunction against further retaliation against them and further violations of the Miami City Charter as (a) there is no adequate remedy at law, (b) Plaintiffs will suffer irreparable injury if the injunction is not granted, (c) the injury to Plaintiffs, including the deprivation of their constitutional rights, outweighs any harm that could be caused to Carollo from having to follow the law, and (d) the injunction would benefit, and not be adverse, to the public interest.

321.    Among other things, Carollo should be permanently enjoined from:

a.  making any requests to, or providing any instructions or suggestions to, any City employees that target Plaintiffs, Plaintiffs' properties, employees, tenants, or any affiliates of Plaintiffs;

b.  directly soliciting any complaints and/or demands regarding Plaintiffs, Plaintiffs' properties, employees, tenants, or any affiliates of Plaintiffs, including but not limited to, directly contacting, or going door-to-door to the surrounding neighbors of Plaintiffs, Plaintiffs' properties, employees, tenants, or any affiliates of Plaintiffs to seek complaints for noise or other violations; and

c.  participating in any decision of the Board of Commissioners in relation to any matters that target the Plaintiffs, Plaintiffs' properties, employees, tenants, or any affiliates of Plaintiffs, including but not limited to noise violations, permits, zoning, or licenses for Plaintiffs, Plaintiffs' properties, employees, tenants, or any affiliates of Plaintiffs.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in the Plaintiffs' favor against Carollo and award damages for business disruption, emotional distress, reputational harm, punitive damages, attorneys' fees, enter a permanent injunction against Carollo enjoining him from further retaliation against Plaintiffs, and grant such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial of all claims so triable.

Respectfully submitted,

**AXS LAW GROUP PLLC**
2121 NW 2nd Avenue
Miami, FL 33127
Tel: (305) 297-1878

By:  ___/s/ Jeffrey W. Gutchess___
**JEFFREY W. GUTCHESS**
Florida Bar No. 702641
Jeff@axslawgroup.com

*Attorney for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that a true and correct copy of the forgoing was served via

CM/ECF on counsel of record in this action on this 28th day of June, 2019:

**Benedict P. Kuehne, Esq.**
Kuehne Davis Law, PA.A.
Miami Tower, Suite 3550
100 SE 2nd Street
Miami, FL 33131-2154
Tel: 305-789-5987
Fax: 305-789-5987
Email: ben.kuehne@kuehnelaw.com
*Counsel for Defendant Carollo*

**Thomas E. Scott, Esq.**
Cole, Scott & Kissane P.A.
Cole, Scott & Kissane Building, Suite 1400
9150 South Dadeland Blvd.
Miami, FL 33156
P: 305-350-5381
F: 305-373-2294
Thomas.scott@csklegal.com
*Counsel for Defendant Carollo*

**Robert Zarco, Esq.**
**Alejandro Brito, Esq.**
Zarco Einhorn Salkowski & Brito, P.A.
One South Biscayne Tower
2 South Biscayne Boulevard, 34th Floor
Miami, FL 33131
rzarco@zarcolaw.com
abrito@zarcolaw.com
apiriou@zarcolaw.com
*Counsel for Viernes Culturales/Cultural Fridays, Inc.*

*/s/ Jeffrey W. Gutchess, Esq.*