**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 18-24190-CIV-SMITH**

WILLIAM O. FULLER, and
MARTIN PINILLA, II,

      Plaintiffs,

v.

JOE CAROLLO,

      Defendant.

_____ /

## DEFENDANT, JOE CAROLLO'S NOTICE OF FILING CASELAW IN SUPPORT OF DEFENDANT'S PROPOSED JURY INSTRUCTIONS AND VERDICT FORM

Defendant, Joe Carollo, by and through his counsel, hereby files Caselaw in Support of Defendant's Proposed Jury Instructions and Verdict Form, in response to the Court's Order Requiring Joint Jury Instruction (DE 441):

1. *O'Boyle v. Commerce Grp., Inc.*, 2023 U.S. App. LEXIS 6665, *10, 2023 WL 2579134 (11th Cir. Mar. 21, 2023);
2. Answer and Amended Affirmative Defenses (Doc 60) in *Martin E. O'Boyle, Jonathan O'Boyle and William Ring v. Town of Gulfstream,* Case No. 19-cv-80196-BLOOM/REINHART (S.D. Fla.);
3. *Indigo Room, Inc. v. City of Ft. Myers*, 589 F. App'x 938, 947 (11th Cir. 2014);
4. Answers and Affirmative Defenses (Docs 25 and 27), *The Indigo Room, Inc., Raimond Aulen and Dylan Jones v. City Of Fort Myers, FMPD Chief Douglas Baker, in his individual capacity, FMPD Officer Alain Gagnon, in his individual capacity*, Case No. 2:12-cv-39-UA-SPC (M.D. Fla.);
5. *Clark v. Alabama*, 141 Fed. Appx. 777 (11th Cir. 2005);
6. *Pennington v. City of Huntsville*, 261 F.3d 1262 (11th Cir. 2001);
7. *Stanley v. City of Dalton*, 219 F.3d 1280 (11th Cir. 2000);
8. *Gattis v. Brice*, 136 F.3d 724 (11th Cir. 1998);
9. *Hunt v. Wise*, 2009 U.S. Dist. LEXIS 61586, 2009 WL 2163108 (M.D. Fla. July 17, 2009);
10. Rule 8, Fed. R. Civ. P.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of May, 2023, I electronically filed the foregoing with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Respectfully submitted,
KRINZMAN HUSS LUBETSKY
   FELDMAN & HOTTE
Co-Counsel for Defendant, Joe Carollo
Alfred I. duPont Building
169 E. Flagler Street, Suite 500
Miami, Florida 33131
Telephone: (305) 854-9700
Primary email: map@khllaw.com
Primary email: mschneider@khllaw.com
Secondary: eservicemia@khllaw.com

By: /s/ Mason A. Pertnoy
   Mason A. Pertnoy, Esq.
   Florida Bar No. 18334
and

SHUTTS & BOWEN
Co-Counsel for Defendant, Joe Carollo
200 S. Biscayne Boulevard, Suite 4100
Miami, FL 33131
Telephone: (305) 415-9072
Email: msarnoff@shutts.com

By: /s/ Marc D. Sarnoff
Marc D. Sarnoff, Esq.
Florida Bar No. 607924

and

KUEHNE DAVIS LAW, P.A.
Co-Counsel for Defendant, Joe Carollo

2

100 S.E. 2nd Street, Suite 3105
Miami, FL 33131-2154
Telephone: (305)789-5989
Email: ben.kuehne@kuehnelaw.com;
mdavis@kuehnelaw.com
efiling@kuehnelaw.com

By:  /s/ Benedict P. Kuehne
Benedict P. Kuehne, Esq.
Florida Bar No. 233293

### SERVICE LIST

| | |
|---|---|
| **Jeffrey W. Gutchess, Esq.**<br>**Rossana Arteaga-Gomez, Esq.**<br>**Joshua A. Shore, Esq.**<br>**Amanda Suarez, Esq.**<br>**Courtney Caprio, Esq.**<br>**Joanna Niworowski,  Esq.**<br>AXS Law Group, PLLC<br>2121 N.W. 2nd Avenue, Suite 201<br>Miami, FL 33127<br>Email: jeff@axslawgroup.com;<br>rossana@axslawgroup.com;<br>josh@axslawgroup.com<br>amanda@axslawgroup.com<br>courtney@axslawgroup.com<br>joanna@axslawgroup.com<br>eservice@axslawgroup.com<br>*Counsel for Plaintiffs* | **Robert Zarco, Esq.**<br>**Alejandro Brito, Esq.**<br>Zarco Einhorn Salkowski & Brito, P.A.<br>One South Biscayne Tower<br>2 South Biscayne Boulevard, 34th Floor<br>Miami, FL 33131<br>Email: rzarco@zarcolaw.com; abrito@zarcolaw.com;<br>apiriou@zarcolaw.com<br>*Counsel for Viernes Culturales/Cultural Fridays, Inc.* |

 Neutral

As of: May 24, 2023 8:34 PM Z

## *O'Boyle v. Commerce Grp., Inc.*

United States Court of Appeals for the Eleventh Circuit

March 21, 2023, Filed

No. 22-10865 Non-Argument Calendar

**Reporter**

2023 U.S. App. LEXIS 6665 *; 2023 WL 2579134

MARTIN E. O'BOYLE, JONATHAN O'BOYLE, WILLIAM RING, Plaintiffs-Appellants, versus COMMERCE GROUP, INC., et al., Defendants, TOWN OF GULF STREAM, Defendant-Appellee.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History: [*1]** Appeal from the United States District Court for the Southern District of Florida. D.C. Docket No. 9:19-cv-80196-AMC.

*O'Boyle v. Commerce Grp., Inc., 2023 U.S. App. LEXIS 3085, 2023 WL 1816381 (11th Cir. Fla., Feb. 8, 2023)*

**Disposition:** AFFIRMED.

## Core Terms

probable cause, district court, retaliatory, lawsuits, complaints, public record, retaliation, disorderly conduct, summary judgment, arrest, public records request, protected speech, retaliation claim, counterclaims, charges, resisting arrest, genuine dispute, state attorney, state-court, municipal, trespass

## Case Summary

### Overview

HOLDINGS: [1]-In plaintiffs' suit against the town under *§ 1983* for allegedly retaliating against their First-Amendment-protected activity, the parties' stipulation that there was probable cause to charge plaintiff with trespass and disorderly conduct was fatal to his retaliatory prosecution claim.

### Outcome

Judgment affirmed.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Legal Entitlement

*HN1*[⤓] **Entitlement as Matter of Law, Appropriateness**

The appellate court reviews de novo an order granting summary judgment. Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

Labor & Employment Law > ... > Retaliation > Statutory

2023 U.S. App. LEXIS 6665, *1

Application > Reconstruction Statutes

**HN2**[⬇] **Fundamental Freedoms, Freedom of Speech**

The *First Amendment's free speech clause*, *U.S. Const. amend. I*, protects not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right. A person who suffers retaliation for activity the *First Amendment* protects can seek relief under *42 U.S.C.S. § 1983*. To do so, he must show that (1) his speech was constitutionally protected; (2) he suffered adverse action such that the government actor's allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

Evidence > Burdens of Proof > Allocation

Labor & Employment Law > ... > Retaliation > Elements > Causation

**HN3**[⬇] **Fundamental Freedoms, Freedom of Speech**

To meet the causation element of a *First Amendment* retaliation claim, a plaintiff must establish a causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury. But where the government actor can show it had probable cause to take legal action against the plaintiff's protected activity, a retaliation claim will usually fail as a matter of law. The Eleventh Circuit has recognized only two exceptions to this rule. The first is where the government has selectively punished the plaintiff but not others engaged in similar conduct. The second is in the unique circumstances presented in Lozman.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

Labor & Employment Law > Discrimination > Retaliation

**HN4**[⬇] **Fundamental Freedoms, Freedom of Speech**

Under the Lozman exception, the existence of probable cause does not defeat a *First Amendment* retaliation claim where several conditions are satisfied. A plaintiff must show, for example, that he suffered retaliation as the result of an official municipal policy of intimidation. And he must also show that there was little relation between the protected speech that prompted the retaliatory policy and the actions that triggered an allegedly retaliatory response.

Civil Rights Law > Protection of Rights > Section 1983 Actions

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

**HN5**[⬇] **Protection of Rights, Section 1983 Actions**

There is no question that a state official who directly violates a clearly established *First Amendment* right can be held liable under *section 1983*.

Governments > Local Governments > Claims By & Against

Labor & Employment Law > Discrimination > Retaliation

**HN6**[⬇] **Local Governments, Claims By & Against**

Where there is little relation between the protected expression and the allegedly retaliatory action—and where the other Lozman elements are met—the plaintiff must show only that the official act would not have occurred but-for the protected expression. But, where the official or municipality acts in direct response to protected expression, it can be held liable only if there was no probable cause to believe the expression was illegal.

Torts > Intentional Torts > Malicious Prosecution

**HN7**[⬇] **Intentional Torts, Malicious Prosecution**

False prosecution claims are governed not by Lozman but by Hartman v. Moore.

Criminal Law & Procedure > Commencement of Criminal Proceedings > Grand Juries

Criminal Law & Procedure > Counsel > Prosecutors

*HN8*[↧] **Commencement of Criminal Proceedings, Grand Juries**

Florida's state attorney acts in noncapital investigations as a one-person grand jury.

Legal Ethics > Prosecutorial Conduct

Torts > ... > Malicious Prosecution > Elements > Lack of Probable Cause

*HN9*[↧] **Legal Ethics, Prosecutorial Conduct**

Evidence of a police officer's animus does not necessarily show that the officer induced the action of a prosecutor. Showing the absence of probable cause is thus necessary to bridge the gap between the nonprosecuting government agent's motive and the prosecutor's action.

**Counsel:** For MARTIN E. O'BOYLE, JONATHAN O'BOYLE, WILLIAM RING, Plaintiffs - Appellants: Robert J. Frank, Law Firm of Robert J. Frank & Assoc., PLLC, LEWISBURG, WV; Chad R. Bowman, Matthew S.L. Cate, Charles David Tobin, Ballard Spahr, LLP, WASHINGTON, DC; Leonard Martin Reeder Jr., Atherton Galardi Mullen & Reeder, PLLC, WEST PALM BEACH, FL.

For TOWN OF GULF STREAM, Defendant - Appellee: Hudson Carter Gill, Jeffrey L. Hochman, Johnson Anselmo Murdoch Burke Piper & Hochman, PA, FORT LAUDERDALE, FL.

**Judges:** Before ROSENBAUM, GRANT, and LUCK, Circuit Judges.

# Opinion

Per Curiam:

We deny the appellants' petition for rehearing but withdraw our previous opinion dated Feb. 2, 2023, *O'Boyle v. Com. Grp., No. 22-10865, 2023 U.S. App.*

*LEXIS 3085, 2023 WL 1816381 (11th Cir. Feb. 8, 2023)*, and substitute the following opinion in its place:

* * *

Martin O'Boyle, his son Jonathan O'Boyle, and their lawyer William Ring sued the Town of Gulf Stream for violating the *First Amendment* by allegedly retaliating against their extensive public records litigation. The district court granted summary judgment in Gulf Stream's favor because the town had probable cause to take the allegedly retaliatory conduct. On appeal, Ring and the **[*2]** O'Boyles argue that they did not need to show a lack of probable cause to show retaliation. But, under our precedent, they did. So we affirm.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

This opinion is the third in a saga that chronicles Martin O'Boyle's feud with Gulf Stream and its leadership. *See Town of Gulf Stream v. O'Boyle (O'Boyle I), 654 F. App'x 439 (11th Cir. 2016); DeMartini v. Town of Gulf Stream, 942 F.3d 1277 (11th Cir. 2019)*. Most of the relevant facts are set out at greater length in *O'Boyle I* and *DeMartini*, so we tell here an abbreviated version of the story.

A.

Martin O'Boyle is a Gulf Stream resident who has long disliked town leadership. After the town denied him a building permit, he painted cartoons on his house ridiculing the town's mayor and hung signs criticizing town leadership from a truck that he parked at the town hall. He also began filing public records requests with the town, often in the name of various companies he owned. In January 2014, O'Boyle started the Citizen's Awareness Foundation, Inc., a nonprofit ostensibly dedicated to government transparency, and staffed it with his longtime employees and business associates. The Foundation also lodged public records requests against the town, overwhelming the small handful of municipal staff who had to respond to them. *See DeMartini, 942 F.3d at 1281-82*. Between 2013 and late 2014, **[*3]** O'Boyle and his associates filed nearly 2,000 public records requests—many for vague and hard-to-identify topics like "[a]ll email addresses created or received by the Town of Gulf Stream" or "[A]ll phone numbers in the town's records." *Id. at 1282* (citing *O'Boyle I, 654 F. App'x at 441-42*).

When the town failed to respond timely to a public

records request, Martin O'Boyle or the Foundation would sue the town under Florida's sunshine law. *Id. at 1283*. Jonathan O'Boyle and Ring—both attorneys—represented the entities related to Martin O'Boyle in these lawsuits. *Id.* Usually acting through The O'Boyle Law Firm, Jonathan O'Boyle and Ring would sue or threaten to sue the town, then demand settlements far in excess of costs and fees actually incurred. *Id.*

In April 2014, Gulf Stream's town commission elected a new mayor, Scott Morgan. Frustrated by the lawsuits and records requests that Martin O'Boyle and his team were filing, Mayor Morgan announced in a letter to Gulf Stream residents that the town would be "stepping up its defense" of the litigation and taking a "firm stance . . . to limit the detrimental effects" of the lawsuits on the town's morale and budget. The letter stated that by June 2014, the town had spent more than $160,000 in legal **[*4]** fees—against a legal budget of $15,000 for the whole year—defending the lawsuits and receiving advice on how to combat the O'Boyles' activities.

Gulf Stream and its outside counsel took a three-pronged legal approach to fighting the public records litigation, all starting in early 2015. First, the town filed several counterclaims in one of the state-court public records lawsuits and moved for sanctions against Jonathan O'Boyle and Ring, based partly on their flying banners and signs that the town felt demeaned its outside counsel. Second, Mayor Morgan filed bar complaints against Jonathan O'Boyle and Ring that alleged the two had violated various legal ethics rules. Third, the town sued the O'Boyles, Ring, The O'Boyle Law Firm, and several others in federal district court under the *Racketeer Influenced and Corrupt Organizations Act (RICO)*, *18 U.S.C. §§ 1962(c)*, *1964(c)*.

At a town meeting in September 2015, Mayor Morgan expressed hope that the town's legal strategy was working. He stated that "[t]hings have returned, at least in physical and visual nature, to the way [the] town used to be," because the O'Boyles were no longer flying banners critical of the town. Mayor Morgan said that if the banners started flying again, "that would be deemed abusive and malicious, with **[*5]** legal connotation." He also told the town that the number of public records requests had decreased substantially and that the public records lawsuits were "winnowing down" in response to the motions for sanctions they had filed.

Meanwhile, in the courtroom, the town mostly saw defeat. The Florida Bar declined to discipline Ring or

Jonathan O'Boyle, and the state court declined to sanction them. The state court also dismissed the town's counterclaims. The federal district court dismissed the RICO suit, and we affirmed the dismissal because the town had not alleged facts showing that Martin O'Boyle and his associates had conspired to do anything illegal. *O'Boyle I, 654 F. App'x at 445*.

After the town meeting in September 2015, Gulf Stream Police Sergeant John Passeggiata saw Martin O'Boyle attempting to write on a bulletin board in the lobby of the town hall. Sergeant Passeggiata and his boss, Police Chief Garrett Ward, confronted O'Boyle to get him to stop. O'Boyle and Chief Ward began arguing, and eventually the officers escorted a noncompliant O'Boyle out of the building. While O'Boyle was being driven away by ambulance—he had suffered minor injuries in the scuffle—Chief Ward told Sergeant Passeggiata that he would **[*6]** charge O'Boyle for the incident. The State Attorney filed an information against O'Boyle for trespass, resisting arrest, and disorderly conduct. In August 2021, a state judge dismissed the trespassing and resisting arrest charges, and a jury found O'Boyle not guilty of disorderly conduct.

B.

The O'Boyles and Ring sued Gulf Stream under *section 1983* for allegedly retaliating against their *First Amendment*-protected activity. The complaint identified three forms of alleged retaliation: (1) the town's RICO lawsuit, (2) the bar complaints filed against Ring and Jonathan O'Boyle, and (3) Martin O'Boyle's prosecution. After discovery closed, the parties filed cross-motions for summary judgment. The town argued that it had civil probable cause to file the RICO suit and bar complaints—and that the State Attorney had criminal probable cause to prosecute Martin O'Boyle—so the plaintiffs could not establish a *First Amendment* retaliation claim. The O'Boyles and Ring argued in response that they did not need to show a lack of probable cause because their case paralleled *Lozman v. City of Riviera Beach*, where the Supreme Court allowed a false arrest claim to proceed even though probable cause existed to arrest the plaintiff. *138 S. Ct. 1945, 1955, 201 L. Ed. 2d 342 (2018)*. They also argued **[*7]** that, even if *Lozman* did not apply, there was still a genuine dispute of material fact whether the town had probable cause to take legal action against them.

The district court initially denied summary judgment. It agreed with the town that *Lozman* did not apply, so the O'Boyles and Ring had to show the town lacked

2023 U.S. App. LEXIS 6665, *7

probable cause to take legal action against them. The district court relied heavily on our decision in *DeMartini*. There, we held that Martin O'Boyle's employee Denise DeMartini—not a party here—hadn't provided evidence that would bring her within *Lozman*'s exception to the principle that probable cause defeats a *First Amendment* retaliation claim based on an allegedly retaliatory legal process. *See DeMartini, 942 F.3d at 1306*. Based on *DeMartini*, the district court concluded there was no dispute the town had probable cause to file the RICO lawsuit—and the state-court counterclaims—notwithstanding additional evidence that Ring and the O'Boyles had submitted.

The district court also concluded that the town's bar complaints against Ring and Jonathan O'Boyle were "sufficiently analogous to civil litigation" that, unless *Lozman* applied, the town would prevail if it had probable cause to file them. And the town did have probable cause, the **[*8]** district court explained, to send the initial bar complaints. But there was a genuine dispute about whether the town had probable cause to file additional complaints after receiving notice that the initial complaints had been resolved.

Finally, as to the criminal charges, the district court found no genuine dispute that the state attorney had probable cause to prosecute Martin O'Boyle for trespass. But, the district court concluded, there were genuine disputes as to whether there was probable cause to charge O'Boyle with disorderly conduct and resisting arrest.

After the district court denied summary judgment, the parties filed a joint stipulation that (1) the town hadn't filed additional bar complaints against Ring or Jonathan O'Boyle after receiving notice that the initial complaints had been resolved and (2) there was probable cause to charge Martin O'Boyle with disorderly conduct and resisting arrest. The district court then entered a revised order granting summary judgment for Gulf Stream. Ring and the O'Boyles timely appealed.

### STANDARD OF REVIEW

*HN1*[↑] We review de novo an order granting summary judgment. *Broadcast Music, Inc. v. Evie's Tavern Ellenton, Inc., 772 F.3d 1254, 1257 (11th Cir. 2014)*. "Summary judgment is appropriate when 'there is no genuine dispute as to any material **[*9]** fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting *Fed. R. Civ. P. 56(a)*).

### DISCUSSION

*HN2*[↑] The *First Amendment's free speech clause*, see *U.S. Const. amend. I*, "protects 'not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right.'" *DeMartini, 942 F.3d at 1288* (quoting *Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000)*). A person who suffers retaliation for activity the *First Amendment* protects can seek relief under *42 U.S.C. section 1983*. See *Bennett v. Hendrix, 423 F.3d 1247, 1249-50 (11th Cir. 2005)*. To do so, he must show that "(1) his speech was constitutionally protected; (2) [he] suffered adverse action such that the [government actor's] allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech." *Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008)*.

Here, Gulf Stream concedes that the appellants engaged in constitutionally protected speech when they made public records requests, sued to enforce Florida public records laws, and offered to settle those lawsuits. See *DeMartini, 942 F.3d at 1288*. And the town doesn't dispute that its activities could deter a reasonable person from engaging in protected speech. Cf. *id. at 1298-99* (analyzing *First Amendment* retaliation cases from other circuits that involved allegedly retaliatory lawsuits). The issue we must decide is whether a reasonable factfinder **[*10]** could conclude that Gulf Stream's lawsuit and bar complaints—or O'Boyle's criminal charges—were causally connected to the O'Boyles' and Ring's protected activity. See *Smith, 532 F.3d at 1276*.

*HN3*[↑] To meet the causation element of a *First Amendment* retaliation claim, "a plaintiff must establish a causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury." *Nieves v. Bartlett, 139 S. Ct. 1715, 1722, 204 L. Ed. 2d 1 (2019)* (marks and citation omitted). But where the government actor can show it had probable cause to take legal action against the plaintiff's protected activity, a retaliation claim will usually "fail[] as a matter of law." *Id. at 1728*.

We have recognized only two exceptions to this rule. The first is where the government has selectively punished the plaintiff but not others engaged in similar conduct. *Id. at 1727*. The second is in the "unique" circumstances presented in *Lozman*. See *DeMartini*,

*942 F.3d at 1293*.

**HN4**[⬆]] Under the *Lozman* exception, the existence of probable cause does not defeat a *First Amendment* retaliation claim where several conditions are satisfied. A plaintiff must show, for example, that he suffered retaliation as the result of an "'official municipal policy' of intimidation." *Id.* (quoting *Lozman, 138 S. Ct. at 1954*). And he must also show that there was "little relation between the 'protected speech that **[*11]** prompted the retaliatory policy'" and the actions that triggered an allegedly retaliatory response. *Id. at 1294* (applying *Lozman, 138 S. Ct. at 1954-55*)). In *Lozman*, the plaintiff was arrested for disorderly conduct at a town hall meeting for objecting to the arrest of a former town official, but he alleged that the arrest was actually part of a municipal policy to intimidate him for criticizing the city's eminent domain activities. *138 S. Ct. at 1949-50*. His "prior, protected speech" about eminent domain, *Lozman* explained, bore "little relation to the criminal offense for which the arrest [was] made," so his lawsuit could proceed regardless whether there was probable cause for his disorderly conduct arrest. *Id. at 1954*.

Ring and the O'Boyles argue that we should reject *Lozman*'s "little relation" requirement: they claim this element will insulate government actors from liability whenever they directly target protected speech. But this argument misunderstands how the *Lozman* exception functions. True, direct retaliation against protected speech will always bear more than a "little relation" to the speech itself. **HN5**[⬆]] But there is no question that a state official who directly violates a clearly established *First Amendment* right can be held liable under *section 1983*. *See, e.g., Bennett, 423 F.3d at 1255* (denying **[*12]** qualified immunity for officials who allegedly suppressed protected political expression).

*Lozman* concerned when *probable cause* for an allegedly retaliatory arrest will defeat a *First Amendment* retaliation claim. **HN6**[⬆]] Where there is little relation between the protected expression and the allegedly retaliatory action—and where the other *Lozman* elements are met—the plaintiff must show only that the official act would not have occurred but-for the protected expression. *See DeMartini, 942 F.3d at 1294*. But, where the official or municipality acts in direct response to protected expression, it can be held liable only if there was no probable cause to believe the expression was illegal. *Id.* That is what the Supreme Court held in *Lozman* and what we reaffirmed in *DeMartini*.

On appeal, Ring and the O'Boyles do not dispute the district court's conclusion that the town had probable cause to file its RICO suit and state-court counterclaims, the initial bar complaints, or the trespassing charge against Martin O'Boyle. Ring and the O'Boyles don't argue that they were selectively prosecuted. *Cf. Nieves, 139 S. Ct. at 1727*. And the parties also jointly stipulated before the district court there was probable cause to charge Martin O'Boyle with disorderly conduct and resisting arrest. **[*13]** The sole legal issue on appeal is thus whether the *Lozman* exception applies to the town's alleged retaliatory actions: the RICO lawsuit and state-court counterclaims, the initial bar complaints, and Martin O'Boyle's criminal charges. We address each in turn.

A.

The district court correctly found that Gulf Stream's civil litigation fell outside the *Lozman* exception. The town filed the RICO suit and state-court counterclaims as a direct response to the hundreds of public records requests, and multiple lawsuits, that were draining municipal resources and manpower. *See O'Boyle I, 654 F. App'x at 442*. Even though the litigation was ultimately unsuccessful, the town was attempting to pursue legitimate goals: preventing harassment and minimizing public expenditures on legal fees.

The appellants argue that Mayor Morgan's "firm stance" letter and the speech he gave at the September 2015 town hall show evidence of the town's retaliatory intent. But the letter actually highlights the connection between the town's legal actions, the public records requests, and the public records litigation. Mayor Morgan specifically noted the financial burden of the records requests as a reason for the town to adopt a more aggressive response. **[*14]** The letter thus shows that the town's litigation strategy bore more than "little relation" to the public records requests. *Cf. Lozman, 138 S. Ct. at 1954*.

B.

The district court also correctly concluded that the bar complaints the town filed against Ring and Jonathan O'Boyle were closely related to their public records litigation activity. The bar complaints included as potential ethics violations: (1) Jonathan O'Boyle's appearance in the public records litigation cases without a license from The Florida Bar; (2) The O'Boyle Law Firm's "feeder relationship" with Martin O'Boyle and the businesses he created to carry out his public records litigation; and (3) the firm's "windfall fee scheme" of threatening Gulf Stream with litigation unless it agreed

to settlements in excess of The O'Boyle Law Firm's actual fees and costs. All of these bases for the bar complaints were intimately linked to Ring and the O'Boyles' protected activity—asking for public records and filing lawsuits about the requests.

C.

Martin O'Boyle's criminal charges also fell outside the *Lozman* exception. *HN7*[⬆] As the district court explained, false prosecution claims are governed not by *Lozman* but by *Hartman v. Moore, 547 U.S. 250, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006)*. Because the State Attorney's decision to charge O'Boyle **[\*15]** added a layer of independent judgment between a government official's alleged retaliatory motive and the criminal charges filed, *Hartman* made "showing an absence of probable cause" a necessary "element[] of the tort" of retaliatory prosecution. *Id. at 263*.

On appeal, Martin O'Boyle argues that because the Gulf Stream police chief pressed charges against him, we should apply *Lozman* rather than *Hartman*. But it was the State Attorney who filed the information against Martin O'Boyle to trigger the prosecution, and not anyone who worked for the town. *See Doe v. State, 634 So. 2d 613, 615 (Fla. 1994)* (*HN8*[⬆] "Florida's state attorney acts in noncapital investigations as a one-person grand jury . . . ."). *HN9*[⬆] Even if Chief Ward wanted to retaliate against O'Boyle, "[e]vidence of [a police officer's] animus does not necessarily show that the [officer] induced the action of a prosecutor." *Hartman, 547 U.S. at 263*. Showing the absence of probable cause is thus necessary to "bridge the gap between the nonprosecuting government agent's motive and the prosecutor's action." *Id.* In light of *Hartman*, the parties' stipulation that there was probable cause to charge Martin O'Boyle with trespass and disorderly conduct was fatal to his retaliatory prosecution claim. The district court did not err.

**CONCLUSION**

Because **[\*16]** Ring and the O'Boyles either stipulated, or did not contest on appeal, that probable cause existed for the actions the complaint identified as retaliatory, and because *Lozman* doesn't apply to any of those acts, the district court did not err in granting Gulf Stream's motion for summary judgment.

**AFFIRMED**.

**End of Document**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 19-cv-80196-BLOOM/REINHART

MARTIN E. O'BOYLE, JONATHAN O'BOYLE,
and WILLIAM RING,

              Plaintiffs,

v.

TOWN OF GULF STREAM,

              Defendant.

_____/

## **DEFENDANT, TOWN OF GULF STREAM'S, ANSWER AND AMENDED DEFENSES**

Defendant, TOWN OF GULF STREAM ("Town"), by and through its undersigned attorneys, files its Answer and Amended Defenses to the Second Amended Complaint (DE 33), filed by the Plaintiffs, MARTIN E. O'BOYLE, JONATHAN O'BOYLE, and WILLIAM RING, and states as follows:

### I. ANSWER

1.      As to Paragraph 1, the Town is without sufficient knowledge at this time to admit or deny the allegations asserted therein and therefore denies the same and demands strict proof thereof.

2.      As to Paragraph 2, the Town denies the allegations asserted therein.

3.      As to Paragraph 3, the Town denies the allegations asserted therein.

4.      As to Paragraph 4, the Town denies the allegations asserted therein.

5.      As to Paragraph 5, the Town denies the allegations asserted therein.

6.      As to Paragraph 6, the Town admits that the Court has jurisdiction, but denies all remaining allegations and demands strict proof thereof.

7.      As to Paragraph 7, the Town admits that venue is proper in the Southern District of Florida pursuant to federal law, but denies all remaining allegations and demands strict proof thereof.

1

8. As to Paragraph 8, the Town is without sufficient knowledge at this time to admit or deny the allegations asserted therein and therefore denies the same and demands strict proof thereof.

9. As to Paragraph 9, the Town is without sufficient knowledge at this time to admit or deny the allegations asserted therein and therefore denies the same and demands strict proof thereof.

10. As to Paragraph 10, the Town is without sufficient knowledge at this time to admit or deny the allegations asserted therein and therefore denies the same and demands strict proof thereof.

11. As to Paragraph 11, the Town admits the allegations asserted therein.

12. As to Paragraph 12, the Town denies the allegations asserted therein.

13. As to Paragraph 13, the Town denies the allegations asserted therein.

14. As to Paragraph 14, the Town is without sufficient knowledge at this time to admit or deny the allegations asserted therein and therefore denies the same and demands strict proof thereof.

15. As to Paragraph 15, the Town is without sufficient knowledge at this time to admit or deny the allegations asserted therein and therefore denies the same and demands strict proof thereof.

16. As to Paragraph 16, the Town is without sufficient knowledge at this time to admit or deny the allegations asserted therein and therefore denies the same and demands strict proof thereof.

17. As to Paragraph 17, the Town is without sufficient knowledge at this time to admit or deny the allegations asserted therein and therefore denies the same and demands strict proof thereof.

18. As to Paragraph 18, the Town is without sufficient knowledge at this time to admit or deny the allegations asserted therein and therefore denies the same and demands strict proof thereof.

19. As to Paragraph 19, the Town denies the allegations asserted therein.

20.     As to Paragraph 20, the Town is without sufficient knowledge at this time to admit or deny the allegations asserted therein and therefore denies the same and demands strict proof thereof.

21.     As to Paragraph 21, the Town is without sufficient knowledge at this time to admit or deny the allegations asserted therein and therefore denies the same and demands strict proof thereof.

22.     As to Paragraph 22, the Town denies the allegations asserted therein.

23.     As to Paragraph 23, the Town submits that the pleadings from Martin O'Boyle's 2013 federal lawsuit and the related settlement agreement speak for themselves, denies all remaining allegations, and demands strict proof thereof.

24.     As to Paragraph 24, the Town denies the allegations asserted therein.

25.     As to Paragraph 25, the Town denies the allegations asserted therein.

26.     As to Paragraph 26, the Town is without sufficient knowledge at this time to admit or deny the allegations asserted therein and therefore denies the same and demands strict proof thereof.

27.     As to Paragraph 27, the Town denies the allegations asserted therein.

28.     As to Paragraph 28, the Town denies the allegations asserted therein.

29.     As to Paragraph 29, the Town is without sufficient knowledge at this time to admit or deny the allegations asserted therein and therefore denies the same and demands strict proof thereof.

30.     As to Paragraph 30, the Town denies the allegations asserted therein.

31.     As to Paragraph 31, the Town admits the allegations asserted therein.

32.     As to Paragraph 32, the Town submits that the pleadings and documents from Martin O'Boyle's referenced federal lawsuit speak for themselves, denies all remaining allegations, and demands strict proof thereof.

33.     As to Paragraph 33, the Town denies the allegations asserted therein.

34.     As to Paragraph 34, the Town is without sufficient knowledge at this time to admit or deny the allegations asserted therein and therefore denies the same and demands strict proof thereof.

35. As to Paragraph 35, the Town denies the allegations asserted therein.

36. As to Paragraph 36, the Town is without sufficient knowledge at this time to admit or deny the allegations asserted therein and therefore denies the same and demands strict proof thereof.

37. As to Paragraph 37, the Town denies the allegations asserted therein.

38. As to Paragraph 38, the Town denies the allegations asserted therein.

39. As to Paragraph 39, the Town submits that Mayor Morgan's June 2014 letter speaks for itself, denies all remaining allegations, and demands strict proof thereof.

40. As to Paragraph 40, the Town submits that the pleadings from the referenced lawsuits speak for themselves, denies all remaining allegations, and demands strict proof thereof.

41. As to Paragraph 41, the Town submits that the orders and rulings from the referenced federal proceedings speak for themselves, denies all remaining allegations, and demands strict proof thereof.

42. As to Paragraph 42, the Town submits that the orders and rulings from the referenced lawsuits speak for themselves, denies all remaining allegations, and demands strict proof thereof.

43. As to Paragraph 43, the Town denies the allegations asserted therein.

44. As to Paragraph 44, the Town denies the allegations asserted therein.

45. As to Paragraph 45, the Town denies the allegations asserted therein.

46. As to Paragraph 46, the Town submits that the referenced filings speak for themselves, denies all remaining allegations, and demands strict proof thereof.

47. As to Paragraph 47, the Town submits that the referenced bar complaints speak for themselves, denies all remaining allegations, and demands strict proof thereof.

48. As to Paragraph 48, the Town is without sufficient knowledge at this time to admit or deny the allegations asserted therein and therefore denies the same and demands strict proof thereof.

49. As to Paragraph 49, the Town is without sufficient knowledge at this time to admit or deny the allegations asserted therein and therefore denies the same and demands strict proof thereof.

50. As to Paragraph 50, the Town is without sufficient knowledge at this time to admit or deny the allegations asserted therein and therefore denies the same and demands strict proof thereof.

51. As to Paragraph 51, the Town denies the allegations asserted therein.

52. As to Paragraph 52, the Town is without sufficient knowledge at this time to admit or deny the allegations asserted therein and therefore denies the same and demands strict proof thereof.

53. As to Paragraph 53, the Town denies the allegations asserted therein.

54. As to Paragraph 54, the Town denies the allegations asserted therein.

55. As to Paragraph 55, the Town submits that Mayor Morgan's June 2014 letter speaks for itself, denies all remaining allegations, and demands strict proof thereof.

56. As to Paragraph 56, the Town submits that the record from the October 10, 2014, meeting speaks for itself, denies all remaining allegations, and demands strict proof thereof.

57. As to Paragraph 57, the Town is without sufficient knowledge at this time to admit or deny the allegations asserted therein and therefore denies the same and demands strict proof thereof.

58. As to Paragraph 58, the Town denies the allegations asserted therein.

59. As to Paragraph 59, the Town denies the allegations asserted therein.

60. As to Paragraph 60, the Town denies the allegations asserted therein.

61. As to Paragraph 61, the Town denies the allegations asserted therein.

62. As to Paragraph 62, the Town denies the allegations asserted therein.

63. As to Paragraph 63, the Town denies the allegations asserted therein.

**Count I**

64. As to paragraph 64, the Town reincorporates its responses to paragraphs 1 through 63.

65. As to Paragraph 65, the Town is without sufficient knowledge at this time to admit or deny the allegations asserted therein and therefore denies the same and demands strict proof thereof.

66.     As to Paragraph 66, the Town submits it is legal conclusion which will be determined by the Court, therefore denies the same, and demands strict proof thereof.

67.     As to Paragraph 67, the Town denies the allegations asserted therein.

68.     As to Paragraph 68, the Town denies the allegations asserted therein.

69.     As to Paragraph 69, the Town denies the allegations asserted therein.

70.     As to Paragraph 70, the Town denies the allegations asserted therein.

71.     As to Paragraph 71, the Town denies the allegations asserted therein.

## II. AFFIRMATIVE DEFENSES

72.     The Plaintiffs have failed to state a claim upon which relief may be granted. Without limitation, the Town asserts the pleading defects addressed in the Town's Motion to Dismiss (DE 41), maintains that each Plaintiff is required to allege an absence of probable cause in support of each claim for First Amendment retaliation, and maintains that the Second Amended Complaint does not assert the elements of a Lozman-style claim.

73.     Any constitutional deprivation alleged by the Plaintiffs was not caused by any policy adopted by the Town.

74.     Any constitutional deprivation alleged by the Plaintiffs was not caused by any custom which was adopted by, or can be attributed to, the Town.

75.     The Plaintiffs did not engage in activity protected by the First Amendment.

76.     The First Amendment rights at issue do not insulate the Plaintiffs from being the subject of judicial proceedings, claims, or actions, from being the subject of the lawsuit filed by the Town under the Racketeer Influenced Corrupt Organizations Act ("RICO"), from being the subject of bar complaints, or from being arrested and subject to criminal prosecution when such efforts are supported by probable cause and such efforts are not frivolous.

77.     All of the Town's efforts at issue were supported by probable cause. Without limitation, the Town attempted to address conduct the Town believed to be unlawful, to be subject to a proper judicial remedy, or to be in violation of the Florida Rules of Professional Conduct, and the Town's conclusions were objectively reasonable.

78.     None of the Town's efforts at issue were forms of unlawful retaliation where such efforts were supported by probable cause and were not frivolous.

79.     None of the Town's efforts at issue were forms of unlawful retaliation where such efforts were a reasonable response to the Plaintiffs' own litigation or threat of litigation.

80.     The Town was protected by a privilege and constitutional entitlement to engage in legitimate responsive litigation and to secure proper remedies to defend itself against the Plaintiffs' conduct.

81.     There is no causal relationship between any alleged protected activity and the Town's alleged efforts at issue. Specifically, the Town attempted to address conduct which it believed to be unlawful, to be subject to a proper judicial remedy, or be in violation of the Florida Rules of Professional Conduct, and the Town did not seek to prevent the Plaintiff from engaging in protected activity.

82.     In light of the Plaintiffs' conduct, the Town would have engaged in the same efforts at issue even if the Plaintiffs had not engaged in alleged protective activity.

83.     The Town did not take the Plaintiffs' alleged protected activity into account when the Town engaged in the efforts at issue.

84.     The Plaintiffs were in privity with Denise DeMartini and are barred by the doctrines of issue preclusion, judicial estoppel, and res judicata from litigating matters that were determined, expressly or by implication, in <u>DeMartini v. Town of Gulf Stream</u>, 942 F. 3d 1277 (11th Cir. 2019).

85.     The Plaintiffs failed to mitigate their damages as required by law.

86.     Some or all of the Plaintiffs' claims are barred by the applicable statute of limitations.   Claims based on events occurring more than four years before the commencement of this litigation would be time barred.

### III.   DEMAND FOR ATTORNEYS' FEES

87.     The Plaintiffs have sued the Town pursuant to 42 U.S.C. §1983.

88.     The Town has been required to retain the undersigned attorneys to represent it in this matter and to pay a reasonable fee.

89.     The Plaintiffs' claims are frivolous, unreasonable, and without foundation.

90.     Pursuant to 42 U.S.C. §1988, the Town is entitled to recover its reasonable attorneys' fees in this action.

## IV. DEMAND FOR JURY TRIAL

91.     Defendant, TOWN OF GULF STREAM, demands a trial by jury on all issues so triable as a matter of right.

**WHEREFORE**, Defendant, TOWN OF GULF STREAM, hereby demands entry of judgment in its favor, entry of an order allowing it to go hence without day, entry of an award of costs, attorney's fees, and such other and further relief as this Court deems just and proper.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this **9th** day of September 2020, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system. I further certify that I either mailed the foregoing document and the Notice of Electronic Filing by first class mail to any non CM/ECF participants and/or the foregoing document was served via transmission of Notice of Electronic Filing generated by CM/ECF to any and all active CM/ECF participants.

<div style="margin-left:40%">

*/s Hudson C. Gill*
JEFFREY L. HOCHMAN
FLA. BAR NO. 902098
Attorneys for Defendant Town of Gulfstream
JOHNSON, ANSELMO, MURDOCH,
BURKE, PIPER & HOCHMAN, P.A.
2455 E. Sunrise Blvd., Suite 1000
Fort Lauderdale, FL 33304
(954) 463-0100
Fax: 954-463-2444
Hochman@jambg.com
Finley@jambg.com

</div>

## SERVICE LIST

**Attorneys for Plaintiff**
Martin Reeder, Esq.
Atherton Galardi and Mullen & Reeder P.A.
224 Datura Street, Suite 815
West Palm Beach , FL 33401
(561) 293-2530
Fax: (561) 293-2593
martin@athertonlg.com

Charles D. Tobin, Esq.
Ballard Spahr LLP
1909 K Street, NW, 12th Floor
Washington, DC 2006-1157
(202) 661-2218
tobinc@ballardspahr.com

**Attorney for Town of Gulf Stream**
Jeffrey L. Hochman, Esq.
Johnson, Anselmo, Murdoch,
Burke, Piper & Hochman, P.A.
2455 E. Sunrise Blvd., Suite 1000
Fort Lauderdale, FL 33304
(954) 463-0100
Fax: (954) 463-2444
Hochman@jambg.com
Hgill@jambg.com

 Positive
As of: May 24, 2023 7:48 PM Z

# *Indigo Room, Inc. v. City of Fort Myers*

United States Court of Appeals for the Eleventh Circuit

October 16, 2014, Decided

No. 14-11041 Non-Argument Calendar

**Reporter**

589 Fed. Appx. 938 *; 2014 U.S. App. LEXIS 19793 **

THE INDIGO ROOM, INC., RAIMOND AULEN, DYLAN JONES, Plaintiffs-Appellants, versus CITY OF FORT MYERS, DOUGLAS BAKER, FMPD Chief, in his individual capacity, ALAN GAGNON, FMPD Officer, Badge No. 299, in his individual capacity, Defendants-Appellees.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History: [**1]** Appeal from the United States District Court for the Middle District of Florida. D.C. Docket No. 2:12-cv-00039-SPC-CM.

*Indigo Room, Inc. v. City of Fort Myers, 2014 U.S. Dist. LEXIS 10815 (M.D. Fla., Jan. 29, 2014)*

**Disposition:** AFFIRMED.

## Core Terms

inspections, Ordinance, establishments, violations, political activity, email, underage, retaliation, alcohol-serving, searches, district court, twenty-one, police department, summary judgment, visited, Counts, rights, protected speech, ethics, reasonable jury, identification, warrantless, downtown, grant summary judgment, retaliatory conduct, alcoholic beverage, retaliation claim, record evidence, compliance

## Case Summary

### Overview

HOLDINGS: [1]-In a civil rights suit wherein a bar was challenging an ordinance and seeking permanent injunctive relief against a city, the trial court properly granted summary judgment to the city defendants because the record did not support the notion that police officers conducted 100 inspections, or even 88 of them, after receiving information that underage persons were drinking alcohol and using fake identification at the bar; [2]-The court further held that the trial court properly granted summary judgment to the city defendants as to the free speech retaliation claims because the unrefuted record evidence showed that, in 2011, the bar owner was not cited for ordinance violations more than other establishments that apparently did not participate in the same political activities as the owner.

### Outcome

Judgment affirmed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

**HN1[⬇]  Standards of Review, De Novo Review**

An appellate court reviews de novo a district court's grant of summary judgment, applying the same legal standards that governed the district court.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

589 Fed. Appx. 938, *938; 2014 U.S. App. LEXIS 19793, **1

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Legal Entitlement

**HN2[**⬇**]    Entitlement   as   Matter   of   Law, Appropriateness**

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a).* A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

Evidence > Weight & Sufficiency

**HN3[**⬇**]    Evidence, Weight & Sufficiency**

When conflicts arise between the facts evidenced by the parties, the appellate court credits the nonmoving party's version.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

Criminal Law & Procedure > Search & Seizure > Warrantless Searches > Administrative Searches

**HN4[**⬇**]    Search & Seizure, Scope of Protection**

The *Fourth Amendment's, U.S. Const. amend. IV*, prohibition against unreasonable searches applies to administrative inspections of private commercial businesses. Warrantless administrative inspections do not offend the *Fourth Amendment* if they are necessary in order to monitor closely regulated businesses for the purpose of learning whether a particular business is conforming to the statute regulating that business. Liquor establishments, including nightclubs and bars, are closely regulated. Administrative inspections may be unreasonable if they do not have a properly defined scope. The primary purpose of the *Fourth Amendment* in that context is to protect citizens from the unbridled discretion of executive and administrative officers.

Civil Rights Law > ... > Section 1983

Actions > Elements > Causal Relationship

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

Civil Rights Law > ... > Section 1983 Actions > Elements > Protected Rights

**HN5[**⬇**]    Elements, Causal Relationship**

To state a *First Amendment, U.S. Const. amend. I*, retaliation claim under *42 U.S.C.S. § 1983*, a plaintiff must establish the following: (1) his speech or conduct was constitutionally protected; (2) the retaliatory conduct of the defendant adversely affected the protected speech, in that the retaliation would likely deter a person of ordinary firmness from engaging in the protected speech; and (3) there is a causal connection between the retaliatory conduct and the protected speech. The causal-connection inquiry asks whether the defendants were subjectively motivated to retaliate because the plaintiffs engaged in protected speech. Subjective motivation in turn requires that the defendants had actual knowledge of the plaintiffs' protected speech, which can be established by circumstantial evidence. Circumstantial evidence of temporal proximity alone is insufficient when there is unrefuted testimony from the defendant that he knew nothing of the protected conduct.

Civil Rights Law > ... > Section 1983 Actions > Scope > Government Actions

**HN6[**⬇**]    Scope, Government Actions**

A local government is liable under *42 U.S.C.S. § 1983* for its policies and customs that cause constitutional torts.

**Counsel:** For The Indigo Room, Inc., Raimond Aulen, Dylan Jones, Plaintiffs - Appellants: Mara Shlackman, Law Offices of Mara Shlackman, PL, Ft Lauderdale, FL; Jennifer Lucas Keesler, Keesler Law, Cape Coral, FL; Robert William Ross Jr., Robert W. Ross, Jr., Bonita Springs, FL.

For City of Fort Myers, DOUGLAS BAKER, FMPD Chief, in his individual capacity, Defendants - Appellees: David C. Potter, Carl Joseph Coleman, Marilyn W. Miller, Buchanan Ingersoll Rooney Fowler White Boggs, PA, Fort Myers, FL; Grant Williams Alley, City of Fort Myers, Fort Myers, FL.

Civil Rights Law > ... > Section 1983

589 Fed. Appx. 938, *938; 2014 U.S. App. LEXIS 19793, **1

For ALAN GAGNON, FMPD Officer, Badge No. 299, in his individual capacity, Defendant - Appellee: Grant Williams Alley, City of Fort Myers, Fort Myers, FL; Robert Barry Burandt, Burandt Adamski Feichthaler, PL, Cape Coral, FL.

**Judges:** Before TJOFLAT, ROSENBAUM, and ANDERSON, Circuit Judges.

# Opinion

 **[*939]**  PER CURIAM:

Plaintiffs-appellants The Indigo Room, Inc., Raimond Aulen, and Dylan Jones (collectively, "Appellants"), appeal the district court's grant of summary judgment in favor of defendants-appellees the City of Fort Myers ("City"), Fort Myers **[**2]** Police Chief Douglas Baker, and Fort Myers Police Officer Alain Gagnon (collectively, "Appellees"). Appellants sued Appellees under *42 U.S.C. § 1983* for alleged ongoing and threatened violations of their *First*, *Fourth*, and *Fourteenth Amendment* rights, resulting in part from the City's enforcement of an ordinance prohibiting persons under the age of twenty-one from entering certain alcohol-serving establishments. After careful review of the record and consideration of the parties' arguments, we affirm the entry of summary judgment in favor of Appellees.

**I.**

Aulen is the owner of the Indigo Room, a commercial business in downtown Fort **[*940]** Myers, Florida, that serves food and alcoholic beverages. Aulen opened the Indigo Room in 1996 and has been active in local politics since that time. He alleges that in September 2011 he increased his political activity, much of which was critical of the City and the police department, causing the Appellees to retaliate against him.

In 2011, during the alleged violations, Jones was nineteen years old and a member of "Occupy Fort Myers."[1] He asserts that he was cited by police for

violating the underage-persons ordinance in retaliation for attending one of Aulen's political events at the Indigo Room. Before **[**3]** addressing the merits, we first summarize the evidence relevant to Appellants' political activity, Appellees' alleged retaliatory conduct, and Appellees' awareness of Appellants' political activity.

**A. Appellants' Political Activity**

In September 2011, Aulen became actively involved with two groups known as Wake Up Fort Myers ("Wake Up") and Find a Better Way for Lee County ("Find a Better Way"), which supported an anti-discrimination amendment to the City's charter that prohibited, among other things, discrimination against persons based on age once they reach the age of majority. In particular, Aulen took issue with Fort Myers, Fla., Code § 6-83 (the "Ordinance"), which provides, "It shall be unlawful for persons under the age of 21 years to enter or remain in any alcoholic beverage establishment, or to be permitted to do so by owners, managers, employees or independent contractors of alcoholic beverage establishments, **[**4]** except as . . . provided." The City enforced that Ordinance against what it deemed to be alcohol-serving nightclubs, including the Indigo Room, to preclude 18-to-20-year-old people from patronizing them. In support of the amendment initiative, Aulen held voter-registration drives at the Indigo Room from September 2011 until the November 2011 election.

In addition, around this time, Aulen was interviewed on the local television news and was critical of the mayor of Fort Myers. Aulen also sent an email to "concerned citizens," claiming that the police department was ineffective and unresponsive in certain respects. Later, Aulen was the leader of a charter-amendment effort to consolidate the police with the Lee County Sheriff's Office.

Aulen and Jones were both affiliated with Occupy Fort Myers ("Occupy"), and Aulen sometimes partnered with Occupy to host events at the Indigo Room. On November 17, 2011, Aulen held a petition drive to request an ethics investigation into the current mayor. Jones, who was wearing an Occupy t-shirt, and several other Occupy members entered the Indigo Room to sign the petition, signed the petition, and immediately exited. When Jones left the Indigo Room, Gagnon **[**5]** and Officer Najar were outside talking with members of

---

[1] "Occupy Fort Myers" was an unincorporated association of individuals who had gathered in Fort Myers, Florida, to bring visibility to the influence of private money on the nation's political process through symbolic, around-the-clock, peaceful protests referred to as "occupations." *Occupy Fort Myers v.*

*City of Fort Myers, 882 F. Supp. 2d 1320, 1324 (M.D. Fla. 2011)*.

589 Fed. Appx. 938, *940; 2014 U.S. App. LEXIS 19793, **5

Jones's group who had left before Jones. The officers asked the group for identification, stating that individuals coming out of the Indigo Room looked like they were under twenty-one. Jones then admitted that he was under twenty-one and received a citation for violating the Ordinance. The other individuals in Jones's group were over twenty-one and were not cited. Aulen, who also was wearing **[*941]** an Occupy t-shirt and was listed as the alcoholic-beverage-license holder for the property, was cited under the Ordinance as well.

As a result of these political activities, Aulen asserts, the City retaliated against him and his business by disproportionately increasing the number of inspections and citations to which it subjected them. Jones contends that the citation that he received on November 17, 2011, was in retaliation for exercising his *First Amendment* rights.

## B. Appellees' Alleged Retaliatory Conduct

The police department conducts warrantless administrative inspections at alcohol-serving businesses in downtown Fort Myers, such as the Indigo Room, to ensure compliance with alcoholic-beverage laws. These inspections are authorized by statute. *See Fla. Stat. § 562.41*. The **[**6]** police department conducts planned operations, usually initiated by the officer or officers responsible for patrolling the area, as well as unplanned inspections, while on patrol. Baker, as Chief of Police, does not personally select businesses for administrative inspections or determine the frequency of those inspections. He has directed that inspections not be limited to a single geographic area.

Gagnon testified that, as a bike-unit officer in downtown Fort Myers, he is responsible for conducting inspections of alcohol-serving establishments in the area. Generally, he decides which locations will be targeted in a planned operation. There are no guidelines to determine the frequency of administrative inspections, although he often conducts them in response to reports of underage presence at the locations. The inspections generally take less than an hour and are conducted by at least two officers. All alcohol-serving establishments in the downtown area are inspected. According to both Baker and Gagnon, the frequency with which a given establishment is inspected is linked to past violations. If police find violations at a particular place, they are more likely to return to ensure compliance. **[**7]**

According to Aulen, the Indigo Room did not permit

entry to underage persons from 2002, when the Ordinance went into effect, until September 2011. In the fall of 2011, however, Aulen took the position that the Indigo Room qualified for an exemption under the Ordinance as a "*bona fide* restaurant," which would have allowed him to admit persons under twenty-one.[2] Then, Aulen held three "18 and up" events at the Indigo Room in September 2011. After the second of these events, Gagnon brought Aulen copies of the Ordinance, explained that persons under twenty-one could not enter the Indigo Room, and informed Aulen that he would be cited for violating the Ordinance if he again allowed entry to underage persons. Aulen responded that he intended to continue hosting 18-to-20-year-old people at the Indigo Room on Tuesdays. True to his word, on September 27, 2011, Aulen held a third "18 and up" event. Police visited the Indigo Room during the event and issued five citations for Ordinance violations. In an email to his superiors, Gagnon explained that, although twenty to thirty underage people were present at that event, he issued only five citations to Aulen. Gagnon **[*942]** further opined that he was "sure **[**8]** you will hear about this sooner than later knowing Aulen." No additional "18 and up" events were held after the one on September 27. According to Aulen, however, officers showed up every Tuesday in October 2011 to ask patrons for identification.

On January 7, 2012, police officers, including Gagnon, conducted an inspection of the Indigo Room in conjunction with the Florida State Division of Alcoholic Beverages and Tobacco. Officers had received information that underage persons were drinking alcohol and using fake identification at the Indigo Room. Four underage girls were cited. Aulen was not present on this occasion, but was issued four citations on January 12, 2012, for the underage girls' presence in the Indigo Room on January 7.

Aulen testified that he had not seen "a lot of activity from the police or code enforcement **[**9]** prior to my political activity. And then suddenly I was getting visits from them constantly." He also described the police presence as "excessive." According to Aulen, Gagnon sometimes would inspect the Indigo Room multiple times on a

---

[2] A "*bona fide* restaurant" is an establishment "engaged primarily in the service of food and nonalcoholic beverages, where the sale or service of alcoholic beverages is incidental to the sale and service of food and nonalcoholic beverages," and meets certain criteria. Fort Myers, Fla., Code § 6-81. A judge later found that the Indigo Room did not qualify as a *bona fide* restaurant.

single night. Baker testified that departmental policy allows an officer to enter an alcohol-serving establishment more than once in a single night.

According to police department records, officers issued thirty-seven total citations for Ordinance violations in 2011, six of them to Aulen and one to Jones. Five of the citations issued to Aulen were given on September 27, 2011[3], and one was given on November 17, 2011, when Jones received his citation. For comparison, one other establishment received six citations and two others received five citations in 2011. In 2012, officers issued twenty-one total citations for violations of the ordinance. Aulen received six of these citations, four on January 12, 2012, one on April 26, 2012, and one on December 1, 2012. Gagnon confirmed that other establishments have been cited under the Ordinance and stated that one other establishment had more citations than the Indigo Room. Neither Aulen nor the Indigo Room received **[**10]** any citations in 2013.

Appellants contend that the record supports the inference that Gagnon conducted an administrative search or inspection of the Indigo Room 88 times since the fall of 2011. They base their position on the fact that Gagnon testified that he visited the Indigo Room on "official business" about one hundred times since 2008 and that he also testified that he conducted around a dozen inspections of the Indigo Room from 2008 to September 2011. Subtracting the twelve visits from the 100, Appellants assert that Gagnon testified to inspecting the Indigo Room 88 times since September 2011.

The district court found that Appellants mischaracterized Gagnon's testimony, and that, in context, "visits" for official business was a much broader category than "searches or inspections." In this regard, Gagnon prefaced his answer to the question about how many times he was "at the Indigo Room on official business" by stating, **[**11]** "I don't know. It's a lot of times. I mean, sometimes they call us to—to be there for something. . . ." In addition, during the same deposition testimony on which the Appellants relied to argue that Gagnon had conducted 88 inspections of the Indigo Room, Gagnon actually answered the specific question, "[F]rom September 1st, 2011, to the present, how many

**[*943]** times have you conducted a warrantless administrative search or inspection at the Indigo Room, to detect the possible violation of the City's underage persons ordinance?" Gagnon responded, "I would say ten." Thus, the district court determined that, when viewed in context, Gagnon's testimony that he had visited the Indigo Room 100 times included all of the times that he had been at the Indigo Room, including when he had been there at the Indigo Room's request.

## C. Appellees' Awareness of Appellants' Political Activity

Appellants argue that the City was monitoring the political activity at the Indigo Room, that Baker was actively involved in directing police activity toward the Indigo Room, and that Gagnon was motivated by animus toward them. We review the evidence relating to these contentions.

With respect to the City, it appears that some **[**12]** officials within the City forwarded an email Aulen sent entitled, "More downtown Shootings. Another black eye for merchants," which was critical of the police department. It is unclear to whom Aulen sent the email; he asserts that it was sent to "concerned citizens." The forwarded emails contain no negative comments toward Aulen.

The record also contains City Council minutes relating to the anti-discrimination ballot measure and to the charter-amendment measure to merge the police department with the Sheriff's Office. A few of the council members described the anti-discrimination measure as an attempt to change the City Code prohibiting persons under twenty-one from entering alcohol-serving establishments. Finally, in an email dated January 11, 2013, one of the council members responded to an email from a "concerned Businessowner" complaining about Aulen and the Indigo Room. The council member stated that there are "ongoing issues with the Indigo Room" and that the concerns identified in the email would be placed on the next City Council agenda.

Baker and Gagnon both testified that they had no knowledge of Aulen's or Jones's political activity with respect to Wake Up, Find a Better Way, **[**13]** or Occupy Fort Myers, at the time of the supposed retaliatory conduct. According to Baker, the first time he heard about the petition drive was at the deposition, he had no knowledge that Aulen was targeted for his political activity, and he did not know Jones before this case. Communications between Baker and others show

---

[3] It appears that the citations technically were issued on September 28, 2011, likely early in the morning, but arose out of Aulen's third "18 and up" event held on the evening of September 27. The date September 27 will be used for all citations related to this event.

589 Fed. Appx. 938, *943; 2014 U.S. App. LEXIS 19793, **13

that Baker had been informed of the inspections and citations at the Indigo Room and numerous other establishments, and that he had directed officers, through a subordinate, to "[w]rite a citation for EACH underage person[,] [n]ot just a few of them," if they "encounter any more issues with Ray or the other clubs." Baker also received updates on the Occupy movement. One officer visited the Indigo Room's Facebook page, viewed its photo album, and identified underage persons.

Gagnon was listed as one of the recipients of an email on September 25, 2011, that noted that Aulen was involved in the political group Wake Up, which wanted "to allow 18 and up in the clubs," and directed the email recipients to "be careful" enforcing the Ordinance because it would not be surprising if Aulen was cited and then called to talk to the media about it. Gagnon was not asked about this email during **[**14]** his deposition, and the copy contained in the record appears to have been obtained from another listed recipient, so it is unknown whether or when Gagnon received or reviewed the email. In emails sent on September 25 and 26, 2011, however, Gagnon requested information **[*944]** about the Indigo Room's licenses and occupant capacity, in an apparent attempt to investigate Aulen's claim that the Ordinance did not apply to the Indigo Room since he was operating the Indigo Room a *bona fide* restaurant, "even though he's operating as a nightclub."

Aulen videotaped the police inspection conducted on September 27, 2011. Soon after, Aulen posted a video, entitled "Human Rights Violated by Police Raid at Indigo Room Mix Tape Tues 9-27-11," on YouTube. Gagnon emailed his supervisor about the video on October 6, 2011, stating:

> This libelous statement is directed toward me personally and Aulen's associate made sure my name on my shirt was visible as you can see toward the end of the video. There are civil laws prohibiting such defamation. Do you think our city legal department should look into this matter and serve Aulen with a letter or possibly take civil action against Aulen?

Regarding the proposed merger **[**15]** of the police department with the Sheriff's Office, Gagnon testified he first heard about the merger proposal in the summer of 2013. He further stated that he did not know that Aulen was the chairperson of the group supporting the merger. Gagnon admitted that he believed that the merger would negatively affect his job.

## II.

Appellants filed a ten-count civil-rights complaint under *§ 1983*. Counts I-IV were facial challenges to the Ordinance, seeking permanent injunctive relief against the City. The district court denied Appellants' motion for a preliminary injunction with respect to these counts. On appeal, this Court affirmed the denial of injunctive relief, holding that the Ordinance does not infringe on Appellants' *First Amendment* rights and it is not unconstitutionally vague. *Indigo Room, Inc. v. City of Fort Myers, 710 F.3d 1294, 1299-302 (11th Cir. 2013)*. The district court subsequently granted unopposed summary judgment in favor of the City with respect to these counts. That left Counts V-X, which are the subject of this appeal.

Aulen and Jones alleged *First Amendment* retaliation claims against the City (Count V), and against Baker (Count VI) and Gagnon (Count IX) in their individual capacities. Aulen and the Indigo Room alleged violations of the *Fourth Amendment* against Baker (Count VII) and Gagnon (Count X) **[**16]** in their individual capacities. Finally, all plaintiffs alleged *First Amendment* viewpoint discrimination against Gagnon in his individual capacity (Count VIII). Baker and Gagnon raised the defense of qualified immunity.

The district court granted summary judgment in favor of Appellees on the remaining counts, finding no violation of a constitutional right, and, even if a violation occurred, the individual defendants were entitled to qualified immunity. Appellants bring this appeal, challenging the court's resolution of Counts V-X.

## III.

*HN1*[⬆] We review *de novo* a district court's grant of summary judgment, applying the same legal standards that governed the district court. *Bradley v. Franklin Collection Serv., Inc., 739 F.3d 606, 608 (11th Cir. 2014)*. *HN2*[⬆] Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, [*945] 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id. at*

*249-50, 106 S. Ct. 2505* (citations omitted).

In making this determination, we consider the record and draw all reasonable inferences in the light most favorable to **[**17]** Appellants, the non-moving parties. See *Bradley, 739 F.3d at 608*; *Feliciano v. City of Miami Beach, 707 F.3d 1244, 1247 (11th Cir. 2013)*. **HN3**[⬆] "[W]hen conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's version." *Evans v. Stephens, 407 F.3d 1272, 1278 (11th Cir. 2005)* (*en banc*) (emphasis omitted).

**IV**.

We first analyze Appellants' claims against the individual defendants, Baker and Gagnon. We then turn to Appellants' claims against the City.

**A. Claims Against the Individual Defendants**

*1. Unreasonable Warrantless Administrative Inspections*

Aulen and the Indigo Room argue that summary judgment should have been entered in their favor on their *Fourth Amendment* claims that they were subjected to an excessive number of warrantless inspections. Because there was no justification for the increased police activity, Appellants assert, the administrative searches were unreasonable and simply a pretext to harass and intimidate Aulen.

The *Fourth Amendment's* **HN4**[⬆] prohibition against unreasonable searches applies to administrative inspections of private commercial businesses. *Donovan v. Dewey, 452 U.S. 594, 598, 101 S. Ct. 2534, 69 L. Ed. 2d 262 (1981)*. Warrantless administrative inspections "do not offend the *Fourth Amendment* if they are necessary in order to monitor closely regulated businesses for the purpose of learning whether a particular business is conforming to the statute regulating that business." *Bruce v. Beary, 498 F.3d 1232, 1239 (11th Cir. 2007)*. Liquor establishments, including nightclubs **[**18]** and bars like the Indigo Room, are "closely regulated." *Crosby v. Paulk, 187 F.3d 1339, 1346-48 (11th Cir. 1999)*; *see Colonnade Catering Corp. v. United States, 397 U.S. 72, 77, 90 S. Ct. 774, 25 L. Ed. 2d 60 (1970)*.

Administrative inspections may be unreasonable if they do not have a "properly defined scope." *Bruce, 498 F.3d*

*at 1240* (quotation marks omitted). The primary purpose of the *Fourth Amendment* in this context "is to protect citizens from the 'unbridled discretion [of] executive and administrative officers.'" *Id.* (quoting *Marshall v. Barlow's, Inc., 436 U.S. 307, 323, 98 S. Ct. 1816, 56 L. Ed. 2d 305 (1978)*).

Appellants do not argue that Gagnon had no authority to conduct administrative inspections of the Indigo Room to ensure compliance with alcoholic-beverage laws, or that the statute authorizing such searches violates the *Fourth Amendment*. See *Crosby, 187 F.3d at 1346-48* (concluding that a similar Georgia statute satisfied the requirements of the *Fourth Amendment*). Rather, their argument rests on the contention that the number of searches was excessive and, therefore, unreasonable. This contention, in turn, is based on the inference Appellants draw from Gagnon's testimony that Gagnon conducted 88 inspections of the Indigo Room between September 2011 and August 2013.

We conclude that the evidence is insufficient to raise a genuine issue of material fact with respect to the reasonableness of the warrantless inspections under the *Fourth Amendment*. We respectfully **[*946]** reject Appellants' assertion that Gagnon testified that he searched **[**19]** or inspected the Indigo Room 88 times since September 2011. At his deposition, Gagnon testified that he visited the Indigo Room on "official business" about 100 times since 2008, and he specifically stated that he had conducted about ten inspections of the Indigo Room since September 2011. Gagnon did not testify that he conducted 100 inspections from September 2008 through 2013. Nor does Aulen point to any other evidence contradicting Gagnon's statement that he executed about ten inspections of the Indigo Room between September 2011 and 2013, other than Aulen's general description of the increase in police activity as "huge" or "excessive." This vague testimony has little probative value as to the number of inspections actually conducted.

There is similarly no "significantly probative" evidence in the record to support Appellants' contention that the inspections were for a purpose other than learning whether the Indigo Room was conforming to the alcoholic-beverage laws, including the Ordinance. See *Anderson, 477 U.S. at 248, 106 S. Ct. 2505*; *Bruce, 498 F.3d at 1239-40*. The City admitted that the Indigo Room experienced some additional police activity beginning in September 2011, which Appellants argue was because of Aulen's increased political

589 Fed. Appx. 938, *946; 2014 U.S. App. LEXIS 19793, **19

activity. **[**20]**  But Aulen himself concedes that he held three "18 and up" nights at the Indigo Room on Tuesdays in September in violation of the Ordinance. One such event was held after Gagnon specifically told Aulen that the events violated the Ordinance and that if he continued to hold them in the future, he would receive citations for violations. Then Aulen advised Gagnon that he intended to continue to hold such events in the future.

Consistent with the policy of returning to inspect an establishment found in violation to ensure compliance, officers went to the Indigo Room every Tuesday in October to check patrons' identification. Officers also searched the Indigo Room in January 2012 after receiving information that underage persons were drinking alcohol and using fake identification at the Indigo Room, and this search turned up four additional violations of the Ordinance. Thus, despite Appellants' contentions on appeal, the City presented evidence of a pattern of violations with respect to underage persons at the Indigo Room that provided a legitimate basis for the increased police activity.

We do not find Appellants' reliance on *Bruce* persuasive. *Bruce* favorably cited a Fourth Circuit case holding **[**21]**  that it was unreasonable for officers to perform over 100 inspections of a particular bar, when there was no evidence in the record to support the need for such repeated searches. *Bruce, 498 F.3d at 1245* (citing *Turner v. Dammon, 848 F.2d 440, 446 (4th Cir. 1988))*. First, contrary to Appellants' contentions and for the reasons previously discussed, the record in this case, unlike in the Fourth Circuit case, does not support the notion that Gagnon and other Fort Myers Police Department officers conducted 100 inspections, or even 88 of them, between September 2011 and 2013. Second, *Bruce* noted that the record in the Fourth Circuit case contained only the officers' "unsubstantiated statements" in support of the need for the searches. Here, by contrast, the reasonableness of the repeated inspections was objectively supported by record evidence. Third, this Court in *Bruce* addressed a situation where the defendants' inspections exceeded the scope of authority conferred by statute. See *Bruce, 498 F.3d at 1248*. Here, Appellants' challenge is to the frequency of Gagnon's inspections; they do not assert that the inspections exceeded **[*947]** the scope of authority granted by *Fla. Stat. § 562.41*.

For these reasons, we affirm the grant of summary judgment on Counts VII and X.

### 2. *First Amendment* Retaliation Claims

Appellants argue that **[**22]**  a jury could find that Baker and Gagnon used city ordinances to harass and intimidate them in retaliation for their political activity. According to Appellants, both Baker and Gagnon exhibited animus toward Aulen.

*HN5* ⬆] To state a *First Amendment* retaliation claim under *§ 1983*, a plaintiff must establish the following: (1) his speech or conduct was constitutionally protected; (2) the retaliatory conduct of the defendant adversely affected the protected speech, in that the retaliation "would likely deter a person of ordinary firmness" from engaging in the protected speech; and (3) there is a causal connection between the retaliatory conduct and the protected speech. *O'Bryant v. Finch, 637 F.3d 1207, 1212 (11th Cir. 2011)*; *Bennett v. Hendrix, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005)*.

The causal-connection inquiry asks whether the defendants were subjectively motivated to retaliate because the plaintiffs engaged in protected speech. *O'Bryant, 637 F.3d at 1217*. Subjective motivation in turn requires that the defendants had actual knowledge of the plaintiffs' protected speech, which can be established by circumstantial evidence. See *Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 798-800 (11th Cir. 2000)* (for a retaliation claim under the Family and Medical Leave Act, the plaintiff generally must show that the decision maker was aware of the protected conduct at the time of the adverse action). Circumstantial evidence of temporal **[**23]**  proximity alone is insufficient when there is unrefuted testimony from the defendant that he knew nothing of the protected conduct. *Id. at 799-800*.

After a careful examination of the entire record, we conclude that no reasonable jury could find even circumstantial evidence sufficient to return a verdict favorable to Jones and Aulen on their retaliation claims.

With respect to Jones, the alleged retaliation complained of—a single citation for violating an ordinance prohibiting persons under the age of twenty-one from entering certain alcohol-serving establishments—is insufficient under the circumstances to "deter a person of ordinary firmness" from engaging in the protected speech. *O'Bryant, 637 F.3d at 1212*. We previously have held that the Ordinance, on its face, does not infringe upon the Appellants' *First Amendment* rights. *Indigo Room, 710 F.3d at 1300*. Jones remains

free to engage in similar political speech, but he simply cannot do so in establishments that primarily derive their sales from alcoholic beverages consumed on the premises—until he reaches the age of twenty-one. *See id.*

Moreover, the record evidence is insufficient to support an inference that Jones's protected activity—signing the ethics petition and assembling with other members of Occupy Fort Myers—was **[\*\*24]** a motivating factor behind the citation. Jones arrived in Fort Myers only a week before he received the citation, and Baker testified that he had no prior knowledge of Jones, his political activity, or the ethics petition drive at the Indigo Room. Nor does any evidence in the record tend to contradict Baker's assertions in this regard. Therefore, no reasonable jury could conclude that Baker was subjectively motivated to retaliate against Jones because he signed the ethics petition. *See Brungart, 231 F.3d at 799-800.*

 **[\*948]** As for Gagnon, although he did have actual knowledge that Jones was an Occupy member, we disagree that the evidence could support an inference that Jones was targeted for his affiliation with Occupy or the signing of the ethics petition. First, Gagnon testified that he went to the Indigo Room on routine patrol, and Appellees have pointed to no evidence in the record to contradict that. Second, as recounted previously, just a few weeks earlier, Aulen had advised Gagnon that he intended to continue to host events that welcomed 18-to-20-year-old people, in violation of the Ordinance. Third, when Gagnon encountered Jones coming out of the Indigo Room, a place that the Ordinance required him to be at least **[\*\*25]** 21 to have entered, Jones admitted that he was underage. Fourth, the officers' interaction with the members of the group that Jones was with was limited to checking their identification. Fifth, both Jones and the other persons in his group all had left the Indigo Room and all had signed the ethics petition, so, presumably, under Appellants' reasoning, all of them took the same position that was contrary to Gagnon's liking. Yet only Jones, who was the only one under 21 and who, as a result, was in violation of the Ordinance, was cited for violating a law. Quite simply, there is nothing about these facts that suggests that Jones was targeted because of his participation in Occupy or his signing of the ethics petition.

With respect to Aulen's claims against Baker, Appellants have not identified any record evidence showing that Baker was aware of Aulen's political activity and acted in response to it, either by directing subordinates to engage in unlawful actions or by failing to stop them from acting unlawfully. *See Keating v. City of Miami, 598 F.3d 753, 764-65 (11th Cir. 2010)* (for a supervisor to be liable under *§ 1983,* plaintiffs much establish a causal connection between the actions of the supervising official and the alleged constitutional violation). **[\*\*26]** Baker does not personally select establishments for administrative searches. And, although Baker knew of inspections at the Indigo Room and directed officers to issue citations to any underage person found in any alcohol-serving establishment, there is no support for the contention, other than sheer speculation, that Baker knew that the searches were allegedly conducted in retaliation for protected speech. Accordingly, the district court properly granted summary judgment in favor of Baker on Count VI.

Regarding Aulen's claims against Gagnon, it is a closer question whether a reasonable jury could infer from the circumstances, taken as a whole, that Aulen's political activities were a motivating factor in Gagnon's decisions to inspect the Indigo Room and to cite Aulen for violating the Ordinance. The record contains some evidence supporting Aulen's contention that Gagnon was motivated to retaliate against Aulen. Specifically, after Aulen posted to YouTube a video from the September 27, 2011, inspection, claiming that Gagnon violated human rights during the "police raid," Gagnon emailed his supervisor about the possibility of initiating legal action against Aulen. Yet, aside from that **[\*\*27]** email, there is little, if any, evidence of a causal connection between Aulen's political speech and Gagnon's conduct.

Nonetheless, even assuming that a reasonable jury could infer that Gagnon was subjectively motivated to retaliate against Aulen for some of his political speech, the record is clear that Gagnon would have taken the same actions in the absence of Aulen's protected activity. *See O'Bryant, 637 F.3d at 1217; Smith v. Mosley, 532 F.3d 1270, 1278-79 (11th Cir. 2008).* In particular, Gagnon testified that all alcohol-serving establishments in the downtown **[\*949]** area are inspected and that other owners were cited under the Ordinance.

Indeed, Gagnon's reports show that he and other officers regularly conducted compliance reviews of numerous establishments in a single evening. For example, on September 30, 2011, the Gagnon's report shows that the officers contacted ten businesses, none of which were the Indigo Room. Similarly, over a two-day period from January 12 to 13, 2012, the officers

inspected fourteen businesses, including the Indigo Room. On February 25, 2012, the officers visited ten businesses to conduct underage checks, including the Indigo Room. Three days later, on February 28, 2012, the officers "made contact with" fifteen businesses, none of which included **[**28]** the Indigo Room. On March 16, 2012, they "made contact with" fourteen businesses, again, none of which included the Indigo Room. None of this evidence was contradicted by anything else in the record.

Other unrefuted record evidence showed that, in 2011, Aulen was not cited for Ordinance violations more than other establishments that apparently did not participate in the same political activities as Aulen. Furthermore, the particular inspections evidenced in the record—on September 27, 2011, Tuesdays in October 2011, January 7, 2012, April 26, 2012, and December 1, 2012—were linked either to specific unlawful conduct at the Indigo Room or to planned police operations involving multiple alcohol-serving establishments. Consequently, we conclude that Aulen could not prevail before a reasonable factfinder on his claim of *First Amendment* retaliation again Gagnon. We therefore affirm the district court's grant of summary judgment in favor of Gagnon as to Count IX.

*3. Viewpoint Discrimination*

Appellants argue that the district court erred in granting summary judgment on their claim for *First Amendment* viewpoint discrimination because, on November 17, 2011, the police cited only Aulen and Jones, who were both wearing Occupy **[**29]** t-shirts at the time. We disagree. The Ordinance, on its face, does not infringe upon the Appellants' *First Amendment* rights, and there is no record evidence supporting an inference that the Ordinance violated Appellants' rights as applied in these circumstances. *Indigo Room, 710 F.3d at 1300.* Accordingly, the court properly granted summary judgment on Count VIII.

**B. Claims Against the City**

*HN6*[⬆] A local government is liable under *§ 1983* for its policies and customs that cause constitutional torts. *McMillian v. Monroe Cnty., Ala., 520 U.S. 781, 784, 117 S. Ct. 1734, 138 L. Ed. 2d 1 (1997)* (citing *Monell v. Dep't of Social Servs., 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*). Because we have concluded that no constitutional violation occurred in

this case, the City cannot be held liable. To the extent that the claim against the City alleges constitutional harm apart from what has been discussed above, after reviewing the entire record, we find the record evidence insufficient for a reasonable jury to infer that the City had a policy or custom that caused, or was the "moving force" behind, the purported constitutional violations. *See City of Oklahoma v. Tuttle, 471 U.S. 808, 819-24, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985).*

**V.**

In sum, we hold that the district court properly granted summary judgment in favor of Appellees on Counts V-X.[4] Accordingly, **[*950]** we affirm the judgment of the district court.

**AFFIRMED**.

_____

**End of Document**

_____

[4] Because we have concluded that no constitutional right was violated, we do not address the district court's **[**30]** alternative ruling that the individual defendants would have been entitled to qualified immunity even if they had violated Appellants' constitutional rights.

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

THE INDIGO ROOM, INC., RAIMOND AULEN,
and DYLAN JONES,

        Plaintiffs,

vs.                        CASE NO.  2:12-cv-00039-UA-SPC

CITY OF FORT MYERS, FMPD CHIEF
DOUGLAS BAKER, in his individual capacity,
FMPD OFFICER ALAIN GAGNON (Badge No. 299).
in his individual capacity,

        Defendants.

_____/

**FMPD OFFICER ALAIN GAGNON'S ANSWER TO PLAINTIFFS' COMPLAINT
AND AFFIRMATIVE DEFENSES**

    COMES NOW the Defendant, FMPD OFFICER ALAIN GAGNON, by and through his

undersigned counsel and files this his Answer to Plaintiffs' Complaint and state the following:

**JURISDICTION AND VENUE**

1.    Deny, but admit to the Court's jurisdiction over Plaintiffs' claims and statutory

authority.

2.    Admit.

3.    Deny.

**PARTIES**

**Plaintiffs**

4.    Without knowledge, therefore, denied.

5.    Without knowledge, therefore, denied.

6.     Without knowledge, therefore, denied.

**Defendants**

7.     Denied.

8.     Denied.

9.     Denied.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

**Political and Social Awareness Activity of Plaintiff Aulen and the Indigo Room**

10.     Without knowledge, therefore, denied.

11.     Without knowledge, therefore, denied.

12.     Without knowledge, therefore, denied.

**The Constitutionally-Protected Activity of November 17, 2011**

13.     Without knowledge, therefore, denied.

14.     Without knowledge, therefore, denied.

15.     Without knowledge, therefore, denied.

16.     Denied.

17.     Denied.

18.     Denied.

**Harassment and Intimidation of Plaintiffs Aulen and the Indigo Room by City Officials**

19.     Denied.

20.     Denied.

21.     Denied.

22.     Denied.

23.     Denied.

24.     Denied.

25.     Denied.

26.     Denied.

27.     Denied.

28.     Denied.

29.     Denied.

30.     Denied.

## City of Fort Myers Ordinances

### *Provision of the Underage Persons Odinance, Sec. 6-83.*

31.     Without knowledge, therefore, denied.

32.     Without knowledge, therefore, denied.

33.     Without knowledge, therefore, denied.

34.     Without knowledge, therefore, denied.

35.     Without knowledge, therefore, denied.

36.     Without knowledge, therefore, denied.

37.     Without knowledge, therefore, denied.

### *The Definition of Bona Fide Restaurant, Ordinance Sec. 6-81*

38.     Without knowledge, therefore, denied.

### *Definitions*

39.     Without knowledge, therefore, denied.

### *Penalties for Violations*

40.     Without knowledge, therefore, denied.

# CAUSES OF ACTION

41.    Denied.

## COUNT ONE
*Monell* Claim - Official Policy to Suppress Protected Speech and Assembly
(42 U.S.C. § 1983 - Violation of First Amendment - Licensing Scheme Lacking Procedural Safeguards)

Facial Challenge - Fort Myers City Code, Sec. 6-83
ALL PLAINTIFFS Against CITY OF FORT MYERS

42.    Defendant, ALAIN GAGNON realleges Paragraphs 1-41, as if set forth at length herein.

43.    Denied.

44.    Denied.

45.    Denied.

46.    Denied.

47.    Denied.

48.    Denied.

49.    Denied.

## COUNT TWO
*Monell* Claim - Official Policy to Suppress Protected Speech and Assembly
(42 U.S.C. § 1983 - Violation of First Amendment - Overbreadth)
Facial Challenge - Fort Myers City Code, Sec. 6-83
ALL PLAINTIFFS Against CITY OF FORT MYERS

50.    Defendant realleges Paragraphs 1-41, as if set forth at length herein.

51.    Denied.

52.    Denied.

53.    Denied.

54.    Denied.

55.    Denied.

56.    Denied.

## COUNT THREE
***Monell* Claim - Official Policy to Suppress Protected Speech and Assembly**
**(42 U.S.C. § 1983 - Violation of Fourteenth Amendment - Vagueness)**
**Facial Challenge - Fort Myers City Code, Sec. 6-83(a)**
**BY PLAINTIFF JONES Against CITY OF FORT MYERS**

57.    Defendant realleges Paragraphs 1-41, as if set forth at length herein.

58.    Denied.

59.    Denied.

60.    Denied.

61.    Denied.

## COUNT FOUR
***Monell* Claim - Official Policy to Suppress Protected Speech and Assembly**
**(42 U.S.C. § 1983 - Violation of Fourteenth Amendment - Vagueness)**
**Facial Challenge - Fort Myers City Code, Sec. 6-81 and 6-83**
**BY PLAINTIFFS AULEN and THE INDIGO ROOM Against CITY OF FORT MYERS**

62.    Defendant, ALAIN GAGNON realleges Paragraphs 1-41, as if set forth at length

herein.

63.    Denied.

64.    Denied.

65.    Denied.

66.    Denied.

67.    Denied.

## COUNT FIVE
*Monell* Claim - Practice of Suppression of Protected Speech and Assembly
(42 U.S.C. § 1983 - Violation of First Amendment - Retaliation)
BY PLAINTIFFS AULEN and JONES Against CITY OF FORT MYERS

68.     Defendant, ALAIN GAGNON realleges Paragraphs 1-41, as if set forth at length herein.

69.     Denied.

70.     Denied.

71.     Denied.

72.     Denied.

73.     Denied.

## COUNT SIX
Supervisory Liability - Protection of Protected Speech and Assembly
(42 U.S.C. § 1983 - Violation of First Amendment - Retaliation)
BY PLAINTIFFS AULEN and JONES Against DEFENDANT BAKER

74.     Defendant, ALAIN GAGNON realleges Paragraphs 1-41, as if set forth at length herein.

75.     Denied.

76.     Denied.

77.     Denied.

78.     Denied.

79.     Denied.

80.     Denied.

81.     Denied.

82.     Denied.

## COUNT SEVEN
**Supervisory Liability Claim- Illegal Administrative Search**
**(42 U.S.C. § 1983 - Violation of Fourth Amendment - Unlawful Search)**
**BY PLAINTIFFS AULEN and THE INDIGO ROOM Against DEFENDANT BAKER**

83. Defendant, ALAIN GAGNON realleges Paragraphs 1-41, as if set forth at length herein.

84. Denied.

85. Denied.

86. Denied.

87. Denied.

88. Denied.

## COUNT EIGHT
**Individual Liability - Suppression of Protected Speech and Assembly**
**(42 U.S.C. § 1983 - Violation of First Amendment - Viewpoint Discrimination)**
**ALL PLAINTIFFS Against DEFENDANT GAGNON**

89. Defendant, ALAIN GAGNON realleges Paragraphs 1-41, as if set forth at length herein.

90. Denied.

90. Denied.

91. Denied.

92. Denied.

## COUNT NINE
**Individual Liability - Suppression of Protected Speech and Assembly**
**(42 U.S.C. § 1983 - Violation of First Amendment - Retaliation)**
**PLAINTIFFS AULEN and JONES Against DEFENDANT GAGNON**

93. Defendant, ALAIN GAGNON realleges Paragraphs 1-41, as if set forth at length

herein.

94.    Denied.

95.    Denied.

96.    Denied.

## COUNT TEN
### Individual Liability Claim - Illegal Administrative Search
### (42 U.S.C. § 1983 - Violation of Fourth Amendment - Unlawful Search)
### PLAINTIFFS AULEN and THE INDIGO ROOM Against DEFENDANT GAGNON

97.    Defendant, ALAIN GAGNON realleges Paragraphs 1-41, as if set forth at length

herein.

98.    Denied.

99.    Denied.

100.    Denied.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

And as for the First Affirmative Defense, Defendant would state that everything that was

allegedly done by the individual officers was done in their official capacity while on duty,

therefore, they have no individual liability under the facts of this case.

### Second Affirmative Defense

And as for the Second Affirmative Defense, Defendant would state that at all times

relative hereto, he was a Fort Myers Police Officer acting in his official capacity to protect and

serve the public. As such, he is entitled to absolute immunity.

### Third Affirmative Defense

And as for the Third Affirmative Defense, Defendant would affirmatively allege that any recovery for or on behalf of THE INDIGO ROOM, INC., RAIMOND AULEN, and DYLAN JONES should be reduced by the amount of collateral source payments paid or payable for or on behalf of THE INDIGO ROOM, INC., RAIMOND AULEN, and DYLAN JONES.

### Fourth Affirmative Defense.

And as for the Fourth Affirmative Defense, Defendant would affirmatively allege that Plaintiffs are not permitted to recover for the damages alleged in their complaint in that through their actions, they Placed the Defendant in a reasonable apprehension of immediate bodily harm to themselves and to others, thereby invoking a reasonable response of self defense.

### Fifth Affirmative Defense.

As and for the Fifth Affirmative Defense, Defendant would affirmatively allege that the acts and actions as pled in the complaint, if committed, were made in good faith under reasonable belief that such acts and actions were wholly legal and constitutional.

### Sixth Affirmative Defense

As and for the Sixth Affirmative Defense, Defendant would affirmatively allege that his actions as pled in the complaint are presumed to have been actions designated to prevent a public harm.  THE INDIGO ROOM, INC., RAIMOND AULEN, and DYLAN JONES may rebut this presumption only by clear and convincing evidence to the contrary pursuant to Florida Statutes §11.066(2).

### Seventh Affirmative Defense

As and for the Seventh Affirmative Defense, Defendant would affirmatively allege that the Officer GAGNON had probable cause for the arrest, detention, and use of force existed as a

matter of fact.

### Eighth Affirmative Defense

As and for the Eighth Affirmative Defense, Defendant would affirmatively allege that probable cause for the arrest, detention, and use of force existed as a matter of law.

### Ninth Affirmative Defense

As and for the Ninth Affirmative Defense, Defendant affirmatively alleges that his actions were reasonable to effectuate compliance with lawful commands.

### Tenth Affirmative Defense

As and for the Tenth Affirmative Defense, Defendant affirmatively alleges that the THE INDIGO ROOM, INC., RAIMOND AULEN, and DYLAN JONES was engaged in illegal conduct.

### Eleventh Affirmative Defense

As and for the Eleventh Affirmative Defense, Defendant affirmatively alleges the defense of mutual combat.

### Twelfth Affirmative Defense

As and for the Twelfth Affirmative Defense, Defendant affirmatively alleges that this Defendant, at all times material hereto, acted within the course and scope of their employment. All actions taken by them were taken in good faith or in a good faith belief that they was not in any way violating the constitutional rights of THE INDIGO ROOM, INC., RAIMOND AULEN, and DYLAN JONES.

### Thirteenth Affirmative Defense

As and for the Thirteenth Affirmative Defense, Defendant affirmatively alleges that THE INDIGO ROOM, INC., RAIMOND AULEN, and DYLAN JONES have not incurred any

damages.

### Fourteenth Affirmative Defense

As and for the Fourteenth Affirmative Defense, Defendant affirmatively alleges that THE INDIGO ROOM, INC., RAIMOND AULEN, and DYLAN JONES's rights, privileges and immunity secured under the Constitution and the laws of the United States have not been violated. Any harm to THE INDIGO ROOM, INC., RAIMOND AULEN, and DYLAN JONES was a direct and proximate result of their own actions.

### Fifteenth Affirmative Defense

As and for the Fifteenth Affirmative Defense, Defendant affirmatively alleges that in his individual and official capacity, at all times herein mentioned, he was exercising discretion in carrying out his duties as a law enforcement officer and in doing so, he did not violate clearly established law of which a reasonable person would have been aware. Accordingly, he is entitled to the defense of qualified immunity.

### Sixteenth Affirmative Defense

As and for the Sixteenth Affirmative Defense, Defendant affirmatively alleges that the carelessness and negligence of THE INDIGO ROOM, INC., RAIMOND AULEN, and DYLAN JONES was the sole or proximate cause of the happening of the incident, which is the subject matter of this suit, and therefore, THE INDIGO ROOM, INC., RAIMOND AULEN, and DYLAN JONES is estopped from recovery herein. Alternatively, the carelessness or negligence of THE INDIGO ROOM, INC., RAIMOND AULEN, and DYLAN JONES contributed to the cause of the incident so that the negligence of all parties hereto must be compared. By this affirmative defense, Defendant is in no way admitting to negligence on their part.

## Seventeenth Affirmative Defense

As and for the Seventeenth Affirmative Defense, Defendant affirmatively allege that THE

INDIGO ROOM, INC., RAIMOND AULEN, and DYLAN JONES caused or contributed to

cause the alleged incident to such a degree or percentage that any damages assessed against the

Defendant must be reduced to an amount equal to the comparative degree of negligence of THE

INDIGO ROOM, INC., RAIMOND AULEN, and DYLAN JONES.

## Eighteenth Affirmative Defense

As and for the Eighteenth Affirmative Defense, Defendant affirmatively alleges that if

THE INDIGO ROOM, INC., RAIMOND AULEN, and DYLAN JONES suffered any damages

as a result of the matters alleged in the Complaint, it is the result of the negligence of other

persons or parties other than these Defendant, and accordingly, the Defendant, ALAIN

GAGNON, would bear no responsibility therefore; or, alternatively, would only bear a portion of

the responsibility of the damages claimed.

## Nineteenth Affirmative Defense

As and for the Nineteenth Affirmative Defense, Defendant affirmatively alleges that THE

INDIGO ROOM, INC., RAIMOND AULEN, and DYLAN JONES undertook the action

described in the Complaint, which allegedly gave rise to his alleged damages, thereby assuming

the risks involved.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 9th day of March 2012, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: **Jennifer Lucas Keesler, Esq.,** jennifer@keeslerlaw.com; **Mara Shlackman, Esq.,** Mara@shlackmanlaw.com, **Robert W. Ross, Esq.,** rob@rosslawfla.net, **Grant Williams Alley, ;** galley@cityftmyers.com, **David C. Potter, Esq.,** david.potter@fowlerwhite.com, **Marilyn W. Miller, Esq.,** marilyn.miller@fowlerwhite.com.

> Robert B. Burandt, Esq. /s/
> Robert B. Burandt
> Fla. Bar Number 434477
> Attorney for Defendant ALAIN GAGNON
> BURANDT, ADAMSKI & FEICHTHALER, PL
> 1714 Cape Coral Parkway East
> Cape Coral, FL 33904
> Telephone: (239)542-4733
> Fax: (239)542-9203
> E-mail: robert@capecoralattorney.com

 Positive
As of: May 24, 2023 8:00 PM Z

# *Clark v. Alabama*

United States Court of Appeals for the Eleventh Circuit

June 2, 2005, Decided ; June 2, 2005, Filed

No. 04-13809 Non-Argument Calendar

**Reporter**

141 Fed. Appx. 777 *; 2005 U.S. App. LEXIS 10276 **

SUSAN CLARK, Plaintiff-Appellant v. ALABAMA, STATE OF, LEE EAKINS, Defendants-Appellees, JEFFERSON COUNTY HEALTH DEPARTMENT, Defendant

**Notice: [**1]** RULES OF THE ELEVENTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**Prior History:** Appeal from the United States District Court for the Northern District of Alabama. D.C. Docket No. 02-03056-CV-CO-S.

**Disposition:** AFFIRMED.

## Core Terms

retaliation, protected activity, summary judgment, prima facie case, adverse employment action, district court, disciplinary, e-mail, direct evidence, equal-protection, employees, reasons, warning, sexual, qualified immunity, deposition, suspension, supervise, suspend, disciplinary action, retaliation claim, recommendations, pretextual, testifying, causation, proffered, quotation, genuine issue of material fact, summary judgment motion, adverse action

## Case Summary

### Procedural Posture

Plaintiff employee appealed a judgment of the United States District Court for the Northern District of Alabama granting defendants, an employer and a supervisor, summary judgment under *Fed. R. Civ. P. 56* in the employee's action alleging retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII), *42 U.S.C.S. § 2000e-3*, and a violation of her equal protection rights

under *42 U.S.C.S. § 1983.*

### Overview

The employee sued her employer, the state of Alabama, alleging that she was retaliated against for testifying at a trial on behalf of a co-worker and herself as part of a prior Title VII action, and that her supervisor violated her equal protection rights by physically grabbing her and restraining her in retaliation for her complaints of race discrimination, retaliation, and/or her testimony. The district court did not err by granting the employer summary judgment on the employee's retaliation claim because she failed to establish a prima facie case, as there was a six-year gap between her protected activity and the suspension and termination of her employment and she failed to produce sufficient alternative evidence showing that her protected activity and the employment actions were not wholly unrelated. Nor did the district court err by granting the supervisor summary judgment on the employee's equal protection claim because no clearly established right existed under the *equal protection clause* to be free from retaliation.

### Outcome

The judgment granting the employer summary judgment on the employee's retaliation and equal protection claims was affirmed.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Supporting Materials > Discovery Materials

Civil Procedure > ... > Discovery > Methods of Discovery > General Overview

141 Fed. Appx. 777, *777; 2005 U.S. App. LEXIS 10276, **1

Civil Procedure > Judgments > Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

Civil Procedure > Appeals > Standards of Review > De Novo Review

*HN1*[⬇] **Supporting Materials, Discovery Materials**

A court's grant of summary judgment is reviewed de novo, viewing all evidence and all factual inferences therefrom in the light most favorable to the non-moving party. Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Labor & Employment Law > Discrimination > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary

Judgment > Entitlement as Matter of Law > Materiality of Facts

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

Labor & Employment Law > Discrimination > Retaliation > General Overview

Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof

Labor & Employment Law > ... > Retaliation > Statutory Application > General Overview

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

*HN2*[⬇] **Summary Judgment, Opposing Materials**

It is unlawful under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e-3*, for an employer to retaliate against an employee because the employee has opposed any practice made an unlawful employment practice or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing. *42 U.S.C.S. § 2000e-3(a)*. In cases involving circumstantial evidence of retaliation, once a plaintiff employee successfully alleges a prima facie case, the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action. If the defendant offers legitimate reasons, the presumption of retaliation disappears. The plaintiff then must show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct. If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant's articulated reasons is pretextual, the defendant is entitled to summary judgment.

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

Labor & Employment Law > Discrimination > Actionable Discrimination

141 Fed. Appx. 777, *777; 2005 U.S. App. LEXIS 10276, **1

Civil Procedure > ... > Summary
Judgment > Burdens of Proof > General Overview

**HN3[⤓]**   **Summary Judgment, Evidentiary Considerations**

Where the nonmovant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence. The United States Court of Appeals for the Eleventh Circuit, however, has explained in Merritt that direct evidence is evidence, which if believed, proves existence of fact in issue without inference or presumption. Evidence that only suggests discrimination, or that is subject to more than one interpretation, does not constitute direct evidence.

Labor & Employment
Law > Discrimination > Retaliation > General Overview

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

**HN4[⤓]**   **Discrimination, Retaliation**

To successfully assert a claim of retaliation under Title of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e-3*, a plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression.

Labor & Employment
Law > Discrimination > Retaliation > General Overview

**HN5[⤓]**   **Discrimination, Retaliation**

In establishing that a defendant's adverse actions were causally related to her protected activity, a plaintiff only needed to show that the decisionmaker was aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated. Moreover, a plaintiff satisfies this causation element if she provides sufficient evidence of knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse action. However, this "temporal proximity" must be very close. If there is a substantial delay between the protected expression and the adverse action, in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law.

Civil Procedure > ... > Summary
Judgment > Appellate Review > Standards of Review

Civil Procedure > ... > Summary
Judgment > Appellate Review > General Overview

**HN6[⤓]**   **Appellate Review, Standards of Review**

An appellate court may affirm a district court's decision to grant summary judgment on any adequate ground, even if it is other than the one on which the court actually relied.

Labor & Employment
Law > ... > Evidence > Burdens of Proof > Burden Shifting

Labor & Employment
Law > Discrimination > Retaliation > General Overview

**HN7[⤓]**   **Burdens of Proof, Burden Shifting**

Once a plaintiff successfully alleges a prima facie case of retaliation, and once the employer articulates a legitimate, non-discriminatory reason for the challenged employment action, the plaintiff must proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual. In determining whether the plaintiff has met this burden, courts examine whether such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action exist, such that a reasonable factfinder could find all of the reasons unworthy of credence.

Business & Corporate Compliance > ... > Unfair
Labor Practices > Employer
Violations > Interference With Protected Activities

Labor & Employment
Law > Discrimination > Retaliation > General Overview

141 Fed. Appx. 777, *777; 2005 U.S. App. LEXIS 10276, **1

HN8[⬇] **Employer Violations, Interference With Protected Activities**

A plaintiff must establish that the employer was actually aware of the protected expression at the time it took adverse employment action.

Computer & Internet Law > Criminal Offenses > Sex Crimes

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

Labor & Employment Law > Employee Privacy > Invasion of Privacy

HN9[⬇] **Criminal Offenses, Sex Crimes**

A plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, so long as the reason is one that might motivate a reasonable employer. Indeed, federal courts do not sit to second-guess the business judgment of employers.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

HN10[⬇] **Burdens of Proof, Burden Shifting**

Mere conclusory allegations and assertions will not suffice to establish pretext in an employment discrimination action.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

Civil Rights Law > ... > Section 1983 Actions > Scope > Government Actions

HN11[⬇] **Summary Judgment, Burdens of Proof**

A government official who is sued under *42 U.S.C.S. § 1983* may seek summary judgment on the ground that

he is entitled to qualified immunity. Qualified immunity protects government officials performing discretionary functions from liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. The burden rests on the plaintiff to show that qualified immunity is not appropriate.

Business & Corporate Compliance > ... > Protection of Rights > Federally Assisted Programs > Civil Rights Act of 1964

Constitutional Law > Equal Protection > Nature & Scope of Protection

Governments > Legislation > Statutory Remedies & Rights

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Public Employees

Labor & Employment Law > Discrimination > Retaliation > General Overview

HN12[⬇] **Governments, Civil Rights Act of 1964**

The right to be free from retaliation is clearly established as a *First Amendment* right and as a statutory right under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e-3*, but no clearly established right exists under the *equal protection clause* to be free from retaliation.

Business & Corporate Compliance > ... > Unfair Labor Practices > Employer Violations > Interference With Protected Activities

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Public Employees

Labor & Employment Law > Discrimination > Retaliation > General Overview

Constitutional Law > Bill of Rights > Fundamental Freedoms > General Overview

141 Fed. Appx. 777, *777; 2005 U.S. App. LEXIS 10276, **1

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > General Overview

HN13[⬇]  **Employer Violations, Interference With Protected Activities**

To successfully state a retaliation claim under the *First Amendment*, a public employee must show that her employer retaliated against her because of her speech on a matter of public concern. A public employer retaliates when he takes an adverse employment action that is likely to chill the exercise of constitutionally protected speech. To be considered an adverse employment action in a *First Amendment* retaliation case, the challenged act must involve an important condition of employment, which includes such acts as discharges, demotions, refusals to hire or promote, and reprimands.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > Preliminary Considerations > Justiciability > General Overview

Civil Procedure > ... > Justiciability > Mootness > General Overview

Civil Procedure > ... > Injunctions > Grounds for Injunctions > General Overview

HN14[⬇]  **Standards of Review, De Novo Review**

An appellate court reviews the question of mootness de novo. Standing has three constitutional elements. A plaintiff seeking to invoke a federal court's jurisdiction must show: (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Moreover, a plaintiff seeking injunctive or declaratory relief must prove not only an injury, but also a real and immediate threat of future injury in order to satisfy the injury in fact requirement. Thus, a plaintiff seeking prospective relief must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future.

**Counsel:** For Susan Clark, Appellant: Roderick Graham, Esq., BIRMINGHAM, AL.

For State of Alabama, Appellee: Charles Brinsfield Campbell, Margaret L. Fleming, Attorney General's Office, Montgomery, AL.

**Judges:** Before ANDERSON, MARCUS and FAY, Circuit Judges.

# Opinion

[*779]  PER CURIAM:

Susan Clark appeals through counsel the district court's grant of summary judgment in favor of her employer, the State of Alabama ("the state"), in her retaliation claim, filed pursuant to Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e-3*; and in favor of her former supervisor, Lee Eakins ("Eakins"), in her equal-protection claim, filed pursuant to *42 U.S.C. § 1983*. On appeal, Clark argues that the district court erred in concluding that no genuine issue of material fact existed as to these claims. [1] For the reasons set forth more fully below, we affirm the district court's order granting the defendants summary judgment on Clark's Title VII and *§ 1983* retaliation claims.

[**2]  Clark, an employee of the state who serves as a Disease Intervention Specialist ("DIS"), filed a counseled amended complaint against the state and Eakins, alleging, among other claims, that the state retaliated against her, in violation of Title VII, for engaging in the protected activity of testifying at trial on behalf of a co-employee and herself as part of a prior Title VII action ("Clark I"). Clark also contended that, on February 22, 2002, Eakins violated her equal-protection rights, under *§ 1983*, by "physically grabb[ing] and restrain[ing] [her] in retaliation for [her] complaints of

―――――――――――――――――――――

[1] Clark also asserted in her amended complaint a claim based on the state's non-payment of overtime, in violation of the *Fair Labor Standards Act ("FLSA")*; and a state-law claim of assault and battery against Eakins. However, on Clark's motion, the court dismissed her FLSA claim. Moreover, after the court granted summary judgment on Clark's federal claims, it declined to exercise supplemental jurisdiction over Clark's remaining state-law claim. Because Clark has not challenged these decision, we deem them abandoned. *See Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004)*(issues not argued in initial brief are deemed abandoned).

race discrimination, retaliation and/or her testimony in [Clark I]."

In a joint status report, the parties agreed on the following facts. In 1994, Clark accepted employment with the state as a DIS with the Dallas County Health Department ("DCHD"). As a condition of her employment, Clark was subject to the state's policies and procedures, which included the state's policy prohibiting sexual harassment in the workplace. [2] In 1996, based on a settlement agreement in Clark [*780] I, Clark was transferred to work at the Jefferson County Health Department ("JCHD"), as a DIS in the Sexually Transmitted [**3] Disease ("STD") Program. Although Clark remained an employee of the state, employees of the JCHD, supervised her work. (Id.). Clark's duties as a DIS included (1) questioning persons who tested positive for STDs on the identities of their sexual and/or needle-sharing partners; (2) locating these partners and attempting to have them tested; (3) completing accurate forms and documents; and (4) maintaining accurate indices of clients, suspects, and partners.

[**4] This report further included that, from 1996 through August 2001, Lee Eakins, another DIS employed by the JCHD, served as Clark's immediate supervisor. From August 2001 until Clark's transfer in 2002 to the Tuscaloosa County Health Department ("TCHD"), Bridget Norman, a federal employee who was on assignment as a Supervisory Public Health Advisor with the JCHD, served as Clark's immediate supervisor. Moreover, from 1996 through 2002, Terrie Outlin, the STD Program Manager for the JCHD, supervised both of Clark's supervisors. In February 2002, Clark filed a charge with the Equal Employment Opportunity Commission ("EEOC"), allegingrthat, since 1996, the state had "harassed, intimidated, and subjected [her] to differing terms and conditions of employment and discipline," in retaliation against her testifying in Clark I.

Citing to these facts and to evidence it gathered during

discovery, the state filed a summary judgment motion and a supporting brief. The state asserted in the argument section of its brief that, in attempting to establish a *prima facie* case of retaliation, Clark only had alleged two acts that arguably could qualify as "adverse employment actions," that is, the [**5] suspension and transfer of her employment. The state also asserted that Clark could not show that her protected activity was causally related to her adverse employment actions because these events were separated by six years. The state similarly argued that no evidence showed that Clark's disciplinary actions were linked to her prior testimony. In addition, the state contended no inference of causation existed because the persons who requested Clark's transfer did not know of her protected activity.

Furthermore, the state argued that, even if the court concluded that Clark had established a *prima facie* case of retaliation, the state had presented legitimate reasons for Clark's suspension and transfer. The state explained that these adverse employment actions were taken because Clark had a history of disciplinary problems. The state also argued that, because the JCHD was not a division of the state, Dr. Donald E. Williamson, M.D., the state's -Health Director, had "little choice" but to honor the JCHD's request that Clark be reassigned to another office. Regardless, the state argued that Clark had produced no evidence showing that Dr. Williamson's decision to suspend and transfer [**6] Clark's employment was linked to Clark's prior protected activity in Clark I. [3]

The state introduced in support of its summary judgment motion Clark's deposition, in which Clark testified that, as the [*781] result of a June 7, 1996, settlement agreement in Clark I, Clark was transferred to work at the JCHD. The state also introduced Eakins's deposition, in which he testified that his only knowledge about Clark I was "what Susan Clark has said," and that Clark told him that she had testified on behalf of some employee. Eakins stated, however, that [**7] he did not know that Clark had been transferred to the JCHD based on a settlement agreement in Clark I.

---

[2] This policy on sexual harassment instructed that:

Every employee has a right to work in an environment free of harassment on the basis of gender. It is and shall continue to be the policy of this Department that its employees and their work environment shall be free from all forms of sexual harassment and intimidation. Verbal and physical conduct of a sexual nature including sexual advances, requests for sexual favors, or other conduct which tends to create an intimidating, hostile, or offensive work environment by any employee, supervisor, or manager is strictly prohibited . . . . "

---

[3] Although the state also argued in the district court that it was not a proper defendant in this action, it has failed to challenge in a cross-appeal the district court's determination to the contrary. Thus, we conclude that this issue is waived. *See Pierre v. Rivkind, 825 F.2d 1501, 1506 n.3 (11th Cir. 1987)*("appellee who has failed to cross-appeal may not attack a decree to enlarge his own rights thereunder or attack the rights of his adversary").

Similarly, Outlin testified during his deposition that, although Clark "made statements . . . during her time with [the JCHD] that she was there by court order," Outlin "was told that [these statements were] not true."

On Clark's disciplinary actions, the state introduced documents showing that, on June 9, 1999, Eakins issued Clark a written warning for insubordination, stating that Clark had attended an organizational meeting with .Girl's Incorporated, after having been instructed not to attend the meeting. On November 15 and 28, 2000, Outlin issued Clark written warnings for being absent without leave ("AWOL"), when Clark attended a meeting of the Governor's Commission on AIDS. In August and September 2001, Norman issued Clark two verbal warnings for (1) being AWOL from her work site, and (2) excessive use of leave. On December 6, 2001, Norman issued Clark a verbal warning for failure to submit cases in a timely manner. On February 1, 2001, Norman issued Clark a memorandum, counseling her on time management and "the number of delinquent paper[s] in [her] pouch." Finally, **[**8]** on February 22, 2002, Norman issued Clark a memorandum, stating that an e-mail Clark had forwarded to four JCHD employees, including Eakins, which depicted a nude man with his penis caught in a glass shower door ("sexual e-mail"), violated state policies, including those on electronic communication, professional conduct, and sexual harassment.

During Clark's deposition, she conceded that she forwarded the sexual e-mail to JCHD employees, and that an intentional forwarding of such an e-mail would violate the state's sexual harassment policy, but she asserted that she sent it by mistake. Clark also stated that, on February 25, 2002, she asked Eakins why he had forwarded the sexual e-mail to Outlin, after which he yelled at her and grabbed her arm. That same day, Clark filed an EEOC complaint and lodged a complaint against Eakins with the Birmingham Police Department, alleging that he grabbed her arm during a conversation about the e-mail.

Additional evidence included a March 15, 2002, memorandum from Norman to Dr. Williamson, which was sent through Outlin and Dr. Michael Fleenor, M.D., the Health Officer for the JCHD, in which Norman requested that the state suspend Clark for five **[**9]** days without pay, based on Clark's sending the sexual e-mail, insubordination, excessive use of leave, and failure to complete work assignments in a timely manner. Dr. Williamson responded by informing Clark that a due process hearing would be conducted on

March 27, 2002, to determine whether she should be suspended. In addition, on March 19, 2002, Dr. Fleenor wrote a letter to Dr. Williamson, outlining Clark's disciplinary problems and expressing his desire that Clark be transferred.

On April 9, 2002, after the state conducted a due process hearing, Dorothy Norwood, the hearing officer, determined that the evidence offered by the JCHD supported its recommendations. Norwood, thus, recommended that Clark be (1) suspended for three days without pay, and (2) reassigned permanently to the TCHD. In making her findings and recommendations, **[*782]** Norwood summarized Clark's disciplinary incidents, along with noting that the JCHD had followed its progressive discipline policy, and that Dr. Fleenor had requested the transfer. Furthermore, on April 11, 2002, after reviewing this report, Dr. Williamson sent Clark a letter, informing her that he had adopted these recommendations.

The state also introduced **[**10]** James Michael O'Cain's deposition, in which he testified that (1) as a federal employee employed by the Federal Centers for Disease Control, he was assigned, from April 1990 until he retired in January 2003, as the state's STD Director; (2) although he did not supervise Clark while she was assigned to the JCHD, he was informed of her disciplinary problems; and (3) he discussed these problems and responded to questions from Outlin on disciplinary procedures. O'Cain, however, clarified that any negative comments he made were not related to Clark's protected activities in Clark I. Dr. Williamson similarly attested to these facts in his affidavit, along with asserting that (1) O'Cain worked with, but did not directly supervise, Clark; and (2) O'Cain was supervised by federal, instead of state employees. [4]

_____

[4] Williamson further attested in his affidavit that (1) his decision to suspend Clark's employment was based on Norwood's recommendation; (2) his decision to transfer Clark temporarily to Tuscaloosa County was based on the request from JCHD that Clark be removed, and on the state's need for an additional DIS in Tuscaloosa; (3) "once [Dr. Fleenor] asked that Ms. Clark be reassigned, [Dr. Williamson] felt it incumbent on [him] to do that"; (4) his decision to permanently reassign Clark was based on Norwood's recommendation; (5) these decisions "had nothing to do with Ms. Clark's involvement in a lawsuit more than five years earlier"; (6) the state Health Department and the county health departments were "separate and distinct entities"; and (7) while Dr. Williamson exercised general supervisory authority over county health officers under state law and could remove a health officer under limited circumstances, he did not believe that Clark's

**[\*\*11]** Eakins also filed a motion for summary judgment, arguing, among other things, that no genuine issue of material fact existed as to the *§ 1983* claim because Clark had failed to show that Eakins was acting under color of state law when he committed the alleged retaliatory act. Eakins also contended that he was entitled to qualified immunity because Clark had failed to show that he violated clearly established law. Eakins explained that, assuming the validity of Clark's . allegation, (1) she failed to show a connection between the act and her prior testimony in Clark I; and (2) this Court had no clearly defined law at the time of the incident stating that the act of grabbing her arm in retaliation for her testimony in a trial six years earlier, without more, violated her constitutional rights. Eakins cited to, among other evidence, his deposition testimony that he (1) did not touch Clark, and (2) was not directed to take personnel action against her.

Clark filed a combined response to the defendants' motions for summary judgment. [5] Clark argued that a genuine issue of material fact existed as to whether she established a causal connection between her protected activity and the adverse **[\*\*12]** employment **[\*783]** actions and, therefore, a *prima facie* case of retaliation because O'Cain testified that (1) he believed and informed other persons that Clark's support of the plaintiff in Clark I was for the purpose of diverting attention away from her own problems, leading him to believe that Clark was a "troublemaker"; (2) after Clark testified in Clark I, O'Cain followed her employment and told her different supervisors that she was a problem employee; (3) despite Clark's repeated complaints of discrimination and retaliation, the state did not investigate them. Clark further contended that she showed that Eakins knew of her protected activity by (1) testifying during her deposition that Eakins took a phone call that was meant for her from the plaintiff in Clark I, after which he asked her about the caller, and (2) attaching affidavits from Anthoneria McElroy and June Wilson, in which they attested that employees of the

JCHD knew about the facts surrounding Clark's transfer to the JCHD. Clark asserted, as well, that she showed a continuing pattern of retaliation throughout her employment and established an inference of retaliation from O'Cain's repeated disparaging comments about **[\*\*13]** her.

In addition, Clark argued that the state's reasons for the adverse employment actions were pretextual because the disciplinary actions on which it relied were unsupported by the record. Clark specifically contended that (1) her attendance at the June 1999 meeting occurred during her lunch break; (2) her disciplinary action in August 2001 for being AWOL occurred despite that she received permission from Norman to return late from lunch; (3) her September 2001 warning about her use of leave resulted from **[\*\*14]** her inability to re-enter the country for a week after the terrorist attack on September 11, 2001; (4) her December 2001 warning for failure to submit cases in a timely manner was contradicted by Outlin's testimony that the JCHD's records showed otherwise; (5) Outlin agreed that Clark's February 2002 memorandum counseling her on time management was not a disciplinary write-up; and (6) her February 2002 warning on the sexual e-mail was unreasonable because she sent the e-mail by mistake, the e-mail was not prohibited by any county or state policies, and employees of the JCHD dealt with similar pictures on a daily basis as part of their job duties.

Last, Clark asserted that she established a *prima facie* case against Eakins because, by asserting that he was entitled to qualified immunity, Eakins essentially conceded that he was "acting under color of law" when he attacked her. Clark also contended that Eakins was not entitled to qualified immunity because "it [was] clearly unlawful for a supervisory employee to physically attack one of his subordinates" and to "create a hostile work environment."

The district court granted the state's motion for summary judgment "in all respects, **[\*\*15]** " and Eakins's motion in part. In examining whether Clark had shown a *prima facie* case of Title VII retaliation against the state, .the court discussed that the parties had not disputed that Clark's participation in Clark I constituted protected activity. The court also found that Clark's disciplinary actions and her ultimate suspension and transfer to another department constituted adverse employment actions. In addition, the court determined that Clark provided sufficient evidence to show that the state was aware of her protected activity.

---

situation would have warranted his exercise of this authority in requiring that Clark stay at JCHD.

[5] Although the state objected to Clark's filing of this brief as untimely, the court implicitly overruled this objection, as demonstrated by its statement in granting the defendants' summary judgment as follows: "the facts set out below are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party."

141 Fed. Appx. 777, *783; 2005 U.S. App. LEXIS 10276, **15

Nevertheless, the court concluded that Clark failed to establish a *prima facie* case because she failed to show a causal connection between her protected activity and the adverse employment actions. In reaching this conclusion, the court found that the substantial time lapse, that is, six years, **[\*784]** between Clark's protected activity in Clark I and the suspension and transfer of her employment "hindered her ability to prove causal connection." The court discussed that, although Clark also identified as retaliatory acts her supervisor's unfounded disciplinary actions against her, she had not established that they either dated back to 1996, or **[\*\*16]** occurred on a continuous basis. The court also determined that (1) Clark had failed to show that all of the disciplinary acts were unwarranted, and (2) her "intervening violations of state policies [had] operate[d] to sever any causal connection." The court concluded, as such, that Clark had failed to establish a *prima facie* case of Title VII retaliation.

On Clark's claims against Eakins, the court determined that summary judgment was warranted as to Clark's *§ 1983* equal-protection claim to the extent she was seeking monetary damages. In doing so, the court explained that, although the right to be free from retaliation was a clearly established *First Amendment* right under Title VII, it was not a clearly established equal-protection right. Moreover, although the court recognized that Clark's failure to show a violation of a clearly established constitutional right did not bar her corollary claim for injunctive relief, the court concluded that this request for relief was moot because Clark was no longer under Eakins's supervision. Finally, the court declined to exercise supplemental jurisdiction over Clark's remaining state-law claim of assault and battery.

**Issue 1:  [\*\*17]**   *Retaliation Claim*

   Clark argues for the first time on appeal that the court erred in granting the state summary judgment on her Title VII retaliation claim because, by introducing O'Cain's testimony that he believed and informed Clark's supervisors that Clark was a "troublemaker," Clark showed direct evidence of retaliation. In the alternative, Clark contends that she set forth a *prima facie* case of retaliation because, despite the six-year gap between her protected activity of testifying in Clark I and the suspension and transfer of her employment, she established a causal connection through (1) evidence showing a pattern of continued retaliation, (2) O'Cain's testimony that he communicated his belief that she was a "troublemaker" to her supervisors, and (3) Clark's testimony that she consistently complained of

retaliation. After discussing the circumstances surrounding her "bogus" disciplinary actions, Clark also argues that the state failed to provide a legitimate reason for suspending and transferring her employment.

*HN1*[↑] A court's grant of summary judgment is reviewed *de novo*, "view[ing] all evidence and all factual inferences therefrom in the light **[\*\*18]** most favorable to the non-moving party." *Miller v. King, 384 F.3d 1248, 1258-59 (11th Cir. 2004)*. "Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment." *Id.* (quotation omitted). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quotation omitted).

*HN2*[↑] It is unlawful under Title VII for an employer to retaliate against an employee "because [the employee] has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter [of Title VII]." *See 42 U.S.C. § 2000e-3(a)*. In cases involving circumstantial evidence of retaliation, once a plaintiff employee successfully alleges a *prima facie* case, "the burden shifts to the defendant **[\*\*19]** to  **[\*785]** rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." *Sullivan v. AMTRAK, 170 F.3d 1056, 1059 (11th Cir. 1999)*(quotation omitted). "If the defendant offers legitimate reasons, the presumption of retaliation disappears." *Id.* "The plaintiff then must show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct." *Id.* "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant's articulated reasons is pretextual, the [defendant] is entitled to summary judgment." *Chapman v. AI Transport, 229 F.3d 1012, 1024-25 (11th Cir. 2000)*(en banc)(discussing pretext in context of age and disability discrimination). [6]

---

[6] The Supreme Court set out this burden-shifting framework in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)*, and *Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55, 67 L. Ed. 2d 207, 101 S. Ct. 1089, 1093 (1981)*.

141 Fed. Appx. 777, *785; 2005 U.S. App. LEXIS 10276, **19

**[**20] a. *Whether Clark offered direct evidence of retaliation***

To the extent Clark is arguing that the court erred in granting summary judgment on her Title VII retaliation claim because she offered direct evidence of retaliation, she arguably waived this argument by failing to raise it in the district court. *See Stavropoulos v. Firestone, 361 F.3d 610, 616 n.6 (11th Cir. 2004)*(declining to consider a legal theory that was not presented to the district court), *petition for cert. filed,* No. 04-1099 (U.S. Feb. 11, 2005). Regardless, this argument is without merit. As Clark contends, *HN3* ] "where the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence." *Merritt v. Dillard Paper Co., 120 F.3d 1181, 1189 (11th Cir. 1997)*. We, however, explained in *Merritt* that direct evidence is "evidence, which if believed, proves existence of fact in issue without inference or presumption. Evidence that only suggests discrimination, or that is subject to more than one interpretation, does not constitute direct evidence." **[**21] *Id; see also Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004)*("only the most blatant remarks . . s. constitute direct evidence").

In the instant case, Clark has cited as direct evidence to O'Cain's testimony that he believed, and informed Clark's supervisors, that Clark was a "troublemaker." However, O'Cain, who was a federal employee assigned to serve at the Director of the state's STD program, did not supervise Clark, and, thus, was not responsible for disciplining her. Moreover, O'Cain testified that, in discussing Clark's performance or behavior with other supervisors, any negative comments he made were not related to her protected activity of testifying in Clark I. Clark, therefore, failed to show that O'Cain's testimony evidence, if believed, "prove[d] [the] existence of [the retaliatory motive] without inference or presumption." *See Merritt, 120 F.3d at 1189*. Thus, the record does not reflect that Clark presented direct evidence in response to the state's summary judgment motion.

**b. *Whether the state's adverse employment actions were causally related to Clark's protected activities, such that she established a* [**22] *prima facie case of Title VII retaliation***

Furthermore, the district court did not err in concluding that Clark failed to establish **[*786]** a *prima facie* case of Title VII retaliation. *HN4* ] To successfully assert such a claim, a plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. *Cooper v. Southern Co., 390 F.3d 695, 740 (11th Cir. 2004)*. As the parties do not contest the court's determination that Clark satisfied the first two elements of this *prima facie* case, the only issue for us to determine is causation.

*HN5* ] In establishing that the state's adverse actions of imposing a three-day suspension and transferring her employment to the TCHD was causally related to her protected activity of testifying in Clark I, Clark only needed to show that "the decision-maker[s] [were] aware of the protected conduct," and "that the protected activity and the adverse action were not wholly unrelated." *See Gupta v. Florida Bd. of Regents, 212 F.3d 571, 590 (11th Cir. 2000)*(quotation omitted). Moreover, "[a] plaintiff **[**23]** satisfies this [causation] element if she provides sufficient evidence of knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse action." *Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004)*(quotation and marks omitted)(reviewing grant of summary judgment in claim filed under the anti-retaliation provision of the *Americans with Disabilities Act*). However, this "temporal proximity" must be "very close." *Id.* "If there is a substantial delay between the protected expression and the adverse action[,] in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Id. at 1220-21* (concluding that three-month period between the protected activity and the adverse employment action, in the absence of other evidence of causation, was insufficient to establishing a *prima facie* case of Title VII retaliation).

Similarly, in *Maniccia v. Brown, 171 F.3d 1364 (11th Cir. 1999)*, we concluded that the district court did not err in determining that the employee failed : to establish this causation element. *Id. at 1370.* **[**24]** In *Maniccia,* the employee was reassigned to a different position 15 months after she filed a sexual harassment grievance against her supervisor, and her employment was terminated 21 months later. *Id. at 1369-70*. We determined that (1) instead of representing a pattern of retaliatory activity, these two employment actions were isolated events that had no temporal relationship to her protected activity; and (2) "the more than 15-month period that elapsed between [her] grievance and the alleged adverse employment actions belie[d] her assertion that the former caused the latter." *Id. at 1370.*

Moreover, we explained that the employee failed to show any other evidence suggesting this causation. *Id.*

Compared with the 3-month delay in *Higdon,* and the 15-month delay in *Maniccia,* the 6-year gap between Clark's protected activity and the suspension and termination of her employment was an even greater "delay." Moreover, in the absence of "a close temporal relationship," Clark failed to produce sufficient alternative evidence showing that her protected activity and the employment actions were "not wholly unrelated." *See Gupta, 212 F.3d at 590.* **[**25]** Although Clark cites to a continued pattern of disciplinary acts against her, a three-year gap existed between Clark's testimony in Clark I and her first written warning in June 1999. Moreover, although O'Cain conceded that he informed Clark's supervisors ft that Clark was a "troublemaker," these discussions were conducted as&part of O'Cain's duties as the state's STD Director and were supported **[787]** by Clark's disciplinary record. Thus, Clark failed to allege successfully a *prima facie* claim of Title VII retaliation. *See Higdon, 393 F.3d at 1220-21*.

### (c)   *Whether Clark established that the state's proffered non-retaliatory reasons for the adverse employment actions were pretextual*

Even if Clark established a *prima facie* case of Title VII retaliation, the district court did not err in granting summary judgment because Clark failed to show that the state's proffered non-discriminatory reasons for taking these actions were not pretextual. *See Admiral Ins. Co. v. Cresent Hills Apartments, 328 F.3d 1310, 1312 (11th Cir. 2003)HN6[↑]* ("we may affirm a district court's decision [to grant summary judgment] on any adequate ground, even **[**26]** if it is other than the one on which the court actually relied"). As discussed above, *HN7*[↑] once a plaintiff successfully alleges a *prima facie* case of retaliation, and once the employer articulates a legitimate, non-discriminatory reason for the challenged employment action, the plaintiff must proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual. *Sullivan, 170 F.3d at 1059*. In determining whether the plaintiff has met this burden, courts examine whether "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [exist, such] that a reasonable factfinder could find [all of the

reasons] unworthy of credence." *Watkins v. Sverdrup Tech., Inc., 153 F.3d 1308, 1314 (11th Cir. 1998)*(internal quotation omitted).

As a preliminary matter, *HN8*[↑] a plaintiff must establish that "the employer was actually aware of the protected expression at the time it took adverse employment action." *Brungart v. BellSouth Telecommunications, Inc., 231 F.3d 791, 799 (11th Cir. 2000)* **[**27]** (reasoning that "a decision-maker cannot have been motivated to retaliate by something unknown to him"). To the extent the state is arguing that the persons who, ultimately, decided to suspend and transfer Clark's employment did not have knowledge of her protected activity, the state arguably waived this issue by failing to cross-appeal the court's determination, at least in the context of determining whether Clark established a *prima facie* case, that sufficient knowledge existed. *See Rivkind, 825 F.2d at 1506 n.3*. Although the record includes Dr. Williamson's attestation that his ultimate decision to suspend and transfer Clark's employment "had nothing to do with Ms. Clark's involvement in a lawsuit more than five years earlier," he did not state that he had no knowledge about Clark I. Moreover, Clark produced evidence showing that Eakins and other JCHD employees knew of the facts surrounding Clark's transfer to the JCHD.

We, however, need not determine whether this issue is waived or whether sufficient knowledge existed because Clark failed to show that the state's reasons for the employment actions were pretextual. Despite Clark's arguments that pretext was shown **[**28]** by the fact that her suspension and transfer were based on unfounded disciplinary acts against her, at least some of the conduct for which Clark was disciplined was forbidden in the state's written policies and procedures. *See Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984)*('Title VII does not take away an employer's right to interpret its rules as its chooses, and to make determinations as it sees fit under those rules"). Indeed, the parties stipulated that Clark was subject to the state's policies, which included a policy **[788]** prohibiting sexual harassment in the workplace. Clark also conceded that she forwarded, albeit mistakenly, the sexual e-mail to JCHD employees.

Clark contested, as well, whether these disciplinary acts were warranted because (1) her use of leave did not violate the JCHD's policies; (2) her use of leave in part was because of her inability to re-enter the country for a week after September 11, 2001; (3) her production records contradicted her warning for failure to submit

records; (4) her February 2002 memorandum on time management was not a "disciplinary write-up"; and (5) the negative effect of her sexual e-mail is **[**29]** belied by the fact that JCHD employees regularly dealt with similar pictures as part of their job duties. However, *HN9*[⬆] "a plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, so long as the reason is one that might motivate a reasonable employer." *See Pennington v. City of Huntsville, 261 F.3d 1262, 1267 (11th Cir. 2001)*(internal quotation and marks omitted). Indeed, "federal courts do not sit to second-guess the business judgment of employers." *See Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997)*.

Although Clark also speculated that she established an inference of retaliation from O'Cain's repeated disparaging remarks about her, she failed to counter assertions by O'Cain or Dr. Williamson that O'Cain did not directly supervise Clark. *HN10*[⬆] "Mere conclusory allegations and assertions will not suffice" to establish pretext. *See Earley v. Champion Intern. Corp., 907 F.2d 1077, 1081 (11th Cir. 1990)*(citation omitted). Moreover, the record shows that the state did not suspend and terminate Clark's employment until after (1) it conducted **[**30]** a due process hearing; and (2) a hearing officer issued a detailed written report, outlining why these recommended employment actions were necessary. (*See* R1-64 at Exhs. 13, 19, 20). Thus, even if the district court erred in concluding that Clark failed to establish a *prima facie* case of retaliation, Clark failed to show that a genuine issue of material fact existed as to pretext. The court, therefore, did not err in granting the state summary judgment on Clark's Title VII retaliation claim.

**Issue 2:** *Section 1983 Equal-Protection Claim*

Clark also argues that the district court erred in granting Eakins summary judgment on her *§ 1983* equal-protection claim. Clark contends that she showed a violation of a clearly established constitutional right through testimony that she was assaulted in retaliation against her testifying in the prior litigation, which was speech protected by the *First Amendment*. Clark also argues that the court erred in determining that her request for injunctive relief was moot because (1) she presented evidence of consistent past discrimination; and (2) because she was seeking reinstatement to her former position and likely would need job **[**31]** recommendations in the future, there was a reasonable probability of further noncompliance with the law.

*HN11*[⬆] "A government official who is sued under *§ 1983* may seek summary judgment on the ground that he is entitled to qualified immunity." *Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004)*. "Qualified immunity protects government officials performing discretionary functions from liability if their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Snider v. Jefferson State Community College, 344 F.3d 1325, 1327 (11th Cir. 2003)*(quoting *Hope v. Pelzer, 536 U.S. 730, 739,* **[*789]** *153 L. Ed. 2d 666, 122 S. Ct. 2508, 2515 (2002))*. "The burden rests on the plaintiff to show that qualified immunity is not appropriate." *Snider, 344 F.3d at 1327*.

We have concluded that, *HN12*[⬆] "the right to be free from retaliation is clearly established as a *first amendment* right and as a *statutory* right under Title VII; but no clearly established right exists under the *equal protection clause* to be free from retaliation." *Ratliff v. DeKalb County, Ga., 62 F.3d 338, 340 (11th Cir. 1995)* **[**32]** (emphasis in original). Because the plaintiff in *Ratliff* only alleged an equal-protection claim of retaliation under *§ 1983*, we reversed the district court's denial of qualified immunity as to that claim. *Id. at 341*. Similarly, because Clark only asserted in her amended complaint an equal-protection claim under *§ 1983*, the district court did not err in concluding that Clark failed to allege a "clearly established statutory or constitutional right" and that qualified immunity was warranted, *see Ratliff, 62 F.3d at 340*. [7]

Moreover, even if Clark had alleged a *First Amendment* claim of retaliation, *HN13*[⬆] to successfully **[**33]** state such a claim, "a public employee must show that her employer retaliated against her because of her speech on a matter of public concern." *Stavropoulos, 361 F.3d at 618*. A public employer retaliates when he takes an adverse employment action that is likely to chill the exercise of constitutionally protected speech. *Id.* To be considered an adverse employment action in a *First Amendment* retaliation case, the challenged act "must involve an important condition of employment," which includes such acts as discharges, demotions, refusals to hire or promote, and reprimands. *Id. at 619*. Because

---

[7] Although Eakins did not appear to argue in the district court the defense of mixed motives, this Court should note that, in both Title VII and *§ 1983* retaliation claims, "an employer can avoid liability if it can prove it would have made the same described employment decision in the absence of the alleged bias." *See Pennington, 261 F.3d 1269*.

141 Fed. Appx. 777, *789; 2005 U.S. App. LEXIS 10276, **33

Clark failed to explain why Eakins's alleged grabbing and restraining her "involved an important condition of employment," she also would not have been able to establish a *First Amendment* claim of retaliation. Thus, this district court also did not err in granting Eakins summary judgment on Clark's *§ 1983* claim.

Finally, to the extent Clark is challenging the court's determination that her request for injunctive relief was moot, **HN14**[↑] we review the question of mootness *de novo, Coral Springs Street Systems, Inc. v. City of Sunrise, 371 F.3d 1320, 1328 (11th Cir. 2004).* **[**34]** "Standing has three constitutional elements. A plaintiff seeking to invoke a federal court's jurisdiction must show: (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, riot conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Koziara v. City of Casselberry, 392 F.3d 1302, 1304 (11th Cir. 2004)*(citation omitted). Moreover, a plaintiff seeking injunctive or declaratory relief must prove not only an injury, but also "a real and immediate threat of future injury in order to satisfy the injury in fact requirement." *Id. at 1305*. Thus, a plaintiff seeking prospective relief "must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." *Id. at 1305-06* (concluding that plaintiff failed to assert, much less show, that a real and immediate threat of future injury).

 **[*790]** As discussed above, Clark is asserting that a "real and immediate threat of future injury" exists because she **[**35]** wishes to be reinstated to her former position and may need future job recommendations. To the extent Clark did not waive these arguments by failing to argue them in the district court, *see Stavropoulos, 361 F.3d at 616 n.6*, she has failed to show how these concerns related to her *§ 1983* equal-protection claim. Furthermore, the parties conceded in their joint status report that, after 2002, Eakins no longer served as Clark's supervisor. Thus, similar to the plaintiff in *Koziara,* Clark failed to show "a sufficient likelihood that she [would] be affected by the allegedly unlawful conduct in the future,"and the court did not err in concluding that Clark's request for injunctive relief was moot. *See Koziara, 392 F.3d at 1305-06*.

Accordingly, we conclude that the district court did not err in granting the defendants summary judgment on Clark's Title VII and *§ 1983* retaliation claims. We,

therefore, affirm.

**AFFIRMED.**

---

**End of Document**

⚠️ Caution
As of: May 24, 2023 8:00 PM Z

## *Pennington v. City of Huntsville*

United States Court of Appeals for the Eleventh Circuit

August 17, 2001, Decided ; August 17, 2001, Filed

No. 00-12757.

**Reporter**

261 F.3d 1262 *; 2001 U.S. App. LEXIS 18565 **; 88 Fair Empl. Prac. Cas. (BNA) 227; 82 Empl. Prac. Dec. (CCH) P40,952; 14 Fla. L. Weekly Fed. C 1137

Michael Joel PENNINGTON, Plaintiff-Appellant, v. CITY OF HUNTSVILLE, Defendant-Appellee.

**Prior History:** **[**1]** Appeal from the United States District Court for the Northern District of Alabama. D. C. Docket No. 98-02026-CV-H-NE. Judge: James H. Hancock.

**Disposition:** AFFIRMED.

## Core Terms

promotion, retaliation, accommodation, evaluations, conditions, religious, mixed-motive, reasons, prima facie case, retaliatory, interviews, causal, adverse employment action, retaliation claim, grievance, district court, indicates, rescinded, cases, grant summary judgment, summary judgment, arguendo, genuine, biased, motive, bias

## Case Summary

### Procedural Posture

Plaintiff employee sued defendant employer under Title VII of the Civil Rights Act of 1964, and *42 U.S.C.S. §§ 1981* and *1983*. The United States District Court for the Northern District of Alabama granted summary judgment for the employer. The employee sought review.

### Overview

The appellate court held that summary judgment was properly granted since the employee had adduced no evidence of race discrimination. As to the first claim of failure to promote, the evidence showed that the employer would have made the same decision regardless of any alleged retaliation. As to the second claim of failure to promote, the employer had articulated legitimate reasons for the employer's conditions on the employee's promotion. Specifically, the employer had stated that the employee's writing lacked detail. As to the performance evaluations, the employer had concerns about the employee's ability to handle community-based religious programming because the employee had been exposed to mostly athletic programming previously, and that the employer wanted to make sure that employee would not experience retaliation from his supervisors. Further, the mere fact that the employee had two years earlier requested and was granted an accommodation for his religious beliefs, was not sufficient to create a genuine issue of fact that there was a causal relationship between the employer's decision regarding the employee's promotion and his previous request for religious accommodation.

### Outcome

The judgment of the district court was affirmed.

## LexisNexis® Headnotes

Labor & Employment Law > ... > Religious Discrimination > Scope & Definitions > General Overview

*HN1*[⬇️] **Religious Discrimination, Scope & Definitions**

A plaintiff cannot make a claim of retaliation based on religion under *42 U.S.C.S. § 1981*.

Civil Procedure > Appeals > Standards of Review > De Novo Review

261 F.3d 1262, *1262; 2001 U.S. App. LEXIS 18565, **1

Civil Procedure > Judgments > Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Appellate Review > General Overview

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

_HN2_[ ] **Standards of Review, De Novo Review**

The court reviews de novo the district court's order granting summary judgment. Summary judgment is appropriate where there is no genuine issue of material fact. _Fed. R. Civ. P. 56(c)_. On a motion for summary judgment, the court reviews the facts and all reasonable inferences in the light most favorable to the non-moving party.

Business & Corporate Compliance > ... > Unfair Labor Practices > Employer Violations > Interference With Protected Activities

Evidence > Burdens of Proof > Ultimate Burden of Persuasion

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

Labor & Employment Law > Discrimination > Retaliation > General Overview

_HN3_[ ] **Employer Violations, Interference With Protected Activities**

To establish a prima facie case of retaliation under Title VII of the Civil Rights Act of 1964, a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events. The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity

and the negative employment action are not completely unrelated. Once a plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action. The ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff.

Labor & Employment Law > Discrimination > Disparate Treatment > General Overview

_HN4_[ ] **Discrimination, Disparate Treatment**

A plaintiff employee may not establish that an employer's proffered reason is pretextual for an adverse employment action merely by questioning the wisdom of the employer's reason as long as the reason is one that might motivate a reasonable employer. Federal courts do not sit to second-guess the business judgment of employers.

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

Labor & Employment Law > Discrimination > Disparate Treatment > General Overview

_HN5_[ ] **Discrimination, Title VII Discrimination**

Generally the denial of a promotion is an adverse employment action. The decision to reprimand or transfer an employee, if rescinded before the employee suffers a tangible harm, is not an adverse employment action. But when an employee loses pay or an employment benefit from a delayed promotion, courts have held that the employment action is not adverse only when the action is rescinded and backpay is awarded.

Labor & Employment Law > ... > Disability Discrimination > Evidence > General Overview

Labor & Employment Law > Discrimination > Disparate Treatment > General Overview

261 F.3d 1262, *1262; 2001 U.S. App. LEXIS 18565, **1

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

*HN6*[⬇] **Disability Discrimination, Evidence**

In both Title VII of the Civil Rights Act of 1964 and *42 U.S.C.S. § 1983* lawsuits, the Supreme Court has recognized that an employer can avoid liability if it can prove that it would have made the same disputed employment decision in the absence of the alleged bias. It is clear that this mixed-motive defense remains good law in *§ 1983* cases.

Labor & Employment Law > ... > Age Discrimination > Defenses > General Overview

Labor & Employment Law > Affirmative Action > General Overview

Business & Corporate Compliance > ... > Discrimination > Age Discrimination > Federal & State Interrelationships

Labor & Employment Law > ... > Age Discrimination > Remedies > Compelled Employment

Labor & Employment Law > ... > Disability Discrimination > Evidence > General Overview

Labor & Employment Law > ... > Gender & Sex Discrimination > Defenses > General Overview

Labor & Employment Law > ... > Gender & Sex Discrimination > Evidence > General Overview

Labor & Employment Law > ... > Gender & Sex Discrimination > Remedies > Hiring & Reinstatement

Labor & Employment Law > Discrimination > National Origin Discrimination > General Overview

Labor & Employment Law > Discrimination > National Origin Discrimination > Scope & Definitions

Labor & Employment Law > Discrimination > National Origin Discrimination > Evidence

Labor & Employment Law > ... > Racial Discrimination > Evidence > General Overview

Labor & Employment Law > ... > Racial Discrimination > Evidence > Mixed Motive

Labor & Employment Law > ... > Racial Discrimination > Remedies > General Overview

Labor & Employment Law > ... > Religious Discrimination > Scope & Definitions > General Overview

Labor & Employment Law > ... > Religious Discrimination > Defenses > General Overview

Business & Corporate Compliance > ... > Discrimination > Religious Discrimination > Federal & State Interrelationships

Labor & Employment Law > Discrimination > Religious Discrimination > Remedies

Labor & Employment Law > Discrimination > Retaliation > General Overview

Labor & Employment Law > ... > Retaliation > Statutory Application > Age Discrimination in Employment Act

Labor & Employment Law > ... > Statutory Application > Title VII of the Civil Rights Act of 1964 > General Overview

Labor & Employment Law > ... > Statutory Application > Title VII of the Civil Rights Act of 1964 > Gender & Sex

Labor & Employment Law > ... > Statutory Application > Title VII of the Civil Rights Act of 1964 > Color & Race

Labor & Employment Law > Discrimination > Title VII Discrimination > Amendments

Labor & Employment Law > ... > Title VII Discrimination > Remedies > General Overview

Labor & Employment Law > ... > Title VII Discrimination > Remedies > Affirmative & Equitable Relief

261 F.3d 1262, *1262; 2001 U.S. App. LEXIS 18565, **1

Labor & Employment Law > Wrongful Termination > Remedies > Reinstatement

*HN7*[🔽]  **Age Discrimination, Defenses**

With the Civil Rights Act of 1991 (1991 Act), Congress overruled in part the mixed-motive defense in Title VII of the Civil Rights Act of 1964 (Title VII) cases by reinstating limited damages for discrimination based on race, color, religion, sex and national origin, even though other factors also motivated the practice. 42 U.S.C.S. § 2000-2(m). Although the 1991 Act overruled in part the mixed-motive defense to discrimination suits based on race, color, sex, and national origin, the United States Court of Appeals for the Eleventh Circuit holds that the mixed-motive defense is still available in retaliation cases. The relevant sections of the 1991 Act does not apply to mixed-motive retaliation claims under the Age Discrimination in Employment Act (ADEA). The 1991 Act overruled and limited the mixed-motive defense in discrimination cases based on race, color, religion, sex and national origin, but left the defense intact for retaliation cases. The court typically applies legal standards for Title VII and ADEA cases interchangeably.

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

*HN8*[🔽]  **Discrimination, Title VII Discrimination**

Where a decisionmaker conducts his own evaluation regarding an employee and makes an independent decision, his decision is free of the taint of a biased subordinate employee. When the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and a legally permissible basis, the bias of the subordinate is not relevant.

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

*HN9*[🔽]  **Discrimination, Title VII Discrimination**

A subsequent untainted and independent decision can break the chain of causation of a disputed employment action made by a subordinate and therefore absolve the employer of liability. Causation is not broken, however, when the ultimate decisionmaker never would have made the decision in the absence of the actions of the biased employee, or was influenced by the bias.

**Counsel:** For Michael Joel Pennington, Appellant: Joel S. Isenberg, Samuel Fisher, Gordon, Silberman, Wiggins & Childs, P.C., Birmingham, AL.

For City of Huntsville, Appellee: Michael L. Fees, Fees & Burgess, P.C., Huntsville, AL. Allen L. Anderson, Page Law Firm, FEES & BURGESS, P.C., Huntsville, AL.

**Judges:** Before ANDERSON, Chief Judge, and HULL and COX, Circuit Judges.

**Opinion by:** ANDERSON

# Opinion

 **[*1263]**  ANDERSON, Chief Judge:

Plaintiff Michael Pennington appeals the district court's order granting summary judgment in favor of Defendant City of Huntsville ("City") on his employment discrimination **[*1264]** and retaliation claims. Pennington alleged discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, and *42 U.S.C. §§ 1981* and *1983*. Because we find that the district court properly granted summary judgment, we affirm.

## I. BACKGROUND

As part of a pretrial order, the parties submitted an agreed summary of the facts of the case. Below we set forth a condensed version of the facts relevant to the issues we discuss. Beginning in 1988, Pennington worked as a Recreational Aide for the City at the Scruggs Center. In 1994, he filed a grievance with the City, seeking a religious accommodation. Following the grievance, Pennington was transferred to the Westside Center as a Recreational Aide.

Pennington applied for a promotion **[**2]** to the position of Neighborhood Services Programmer ("Programmer") in March of 1996. The City's personnel department selected five people, including Pennington, for interviews. After the interviews, Joey Flanders was selected for the position. Pennington then filed a grievance with the City, alleging that he was denied the promotion because of retaliation and race discrimination. Mia Puckett, the City's Equal

261 F.3d 1262, *1264; 2001 U.S. App. LEXIS 18565, **2

Employment Officer, determined that Pennington's prior religious accommodation may have been considered in the selection process. The record indicates that Puckett sent a memorandum to Richard Liles, the head of the Department of Parks and Recreation, stating:

> In this selection process, the initial recommendation was biased. The Zone Coordinator Hughes was heavily involved in the religious accommodation of Mr. Pennington. It is my opinion that the Zone Coordinator was unable to separate the emotions and events surrounding the religious accommodation in late 1994/early 1995 and the qualifications of Mr. Pennington for the position.

(Puckett Mem. (Doc. 002179-80).) She concluded that the selection process "resulted in retaliation against Mr. Pennington." ( **[**3]** *Id.*)

Following this finding, the City rescinded Flanders' job offer. Liles conducted new interviews and, according to the record, evaluated the candidates' writing samples. Flanders was again selected as a Programmer for the Scruggs Center. However, this time Pennington was offered the Programmer position at the Calvary Hills Center. In addition, Pennington's offer was subject to conditions that were not imposed on Flanders.

Although not mentioned in the parties' summary of the facts, our review of the record indicates the following facts are undisputed. Pennington's promotion was premised on two conditions: (1) participation in a writing skills program and (2) agreeing to additional evaluations at three months and six months after the promotion. Liles explained that the additional performance evaluations were necessary because Pennington had never worked at the Calvary Hills facility before and he was concerned about Pennington's familiarity with other community activities there. Liles also indicated that he wanted to personally conduct these evaluations himself to make sure that Pennington did not receive any retaliation for **[**4]** his past religious accommodation from his supervisors. The writing skills were necessary because Liles found that Pennington's writing lacked detail.

Pennington claims that he communicated his acceptance to Liles both verbally and in writing, even though it was not required to be in writing. The City asserts that Pennington would one day verbally accept and another day deny acceptance **[*1265]** of the promotion. It is undisputed that Liles then wrote a memo to Pennington, requesting that he respond in writing that

he was accepting the promotion and all its conditions. Pennington responded that he would submit a written acceptance when the City placed its conditions in writing. Liles did not put the conditions in writing, and Pennington never accepted in writing.

Pennington filed this retaliation lawsuit [1] in 1998, claiming that the City retaliated against him for his prior request for religious accommodation. The district court granted the City's motion for summary judgment on the grounds that Pennington had not established a prima facie case of retaliation and that Pennington had not refuted the City's legitimate, non-retaliatory reasons for its decisions. *See Pennington v. City of Huntsville, 93 F. Supp. 2d 1201 (N.D. Ala. 2000)*. **[**5]** Throughout the pendency of this lawsuit, Pennington has remained in his position as a Recreational Aide.

## II. DISCUSSION

**HN2**[⬆️] We review *de novo* the district court's order granting summary judgment. *See Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1313 (11th Cir. 1999)*. Summary judgment is appropriate where there is no genuine issue of material fact. *See* **[**6]** *Fed.R.Civ.P. 56(c)*. On a motion for summary judgment, we review the facts and all reasonable inferences in the light most favorable to the non-moving party. *See Whatley, 189 F.3d at 1313*.

All of Pennington's claims relate to two incidents in 1996: Hughes' initial decision to promote Flanders instead of Pennington to Programmer at the Scruggs Center; and Liles' decision to offer Pennington a conditional promotion at the Calvary Hills Center. [2]

---

[1] Pennington also sued for race discrimination. Pennington adduced no evidence of race discrimination, and we affirm the district court's grant of summary judgment in favor of the City without need for further discussion. Thus, the only claims warranting discussion are claims that the City retaliated against Pennington.

**HN1**[⬆️] A plaintiff cannot make a claim of retaliation based on religion under *§ 1981*. *See Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 613, 107 S. Ct. 2022, 2028, 95 L. Ed. 2d 582 (1987)*. Thus, to the extent that Pennington's complaint can be construed as raising a *§ 1981* retaliation claim, it is without merit.

[2] Pennington also argues that he was discriminated against because the City did not process his promotion. Based on Pennington's admission that he was aware of the conditions on his promotion, we find that the City's refusal to accede to Pennington's unauthorized demand that the City put the conditions in writing is not evidence of discrimination or

261 F.3d 1262, *1265; 2001 U.S. App. LEXIS 18565, **6

Because Pennington's claims under *§ 1983* and Title VII generally have the same elements of proof and use the same analytical framework, we will only explicitly address the Title VII claims unless otherwise noted. *See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998)*; *Richardson v. Leeds Police Dep't, 71 F.3d 801, 805 (11th Cir. 1995)*.

[**7]  Pennington has not challenged the district court's finding that no direct evidence of retaliation exists. Hence, the only dispute on appeal is whether Pennington presented sufficient circumstantial evidence to avoid summary judgment. We address Pennington's claims in reverse chronological order, starting with the conditional promotion decision.

*A. Conditional Promotion*

Pennington argues that the City retaliated against him by placing conditions on his promotion to the Calvary Hills [*1266] position. [3] "*HN3* ↥] To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events." *Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998)* (citing *Meeks v. Computer Associates Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994)*). The causal link element is construed broadly so that " 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" *Olmsted, 141 F.3d at 1460* (quoting *E.E.O.C. v. Reichhold Chem., Inc., 988 F.2d 1564, 1571-72 (11th Cir. 1993)*). [**8]  Once a plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action. *Olmsted, 141 F.3d at 1460*; *Meeks, 15 F.3d at 1021*. The ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff. *Olmsted, 141 F.3d at 1460*.

Although we have considerable doubt about whether

_____

retaliation. Pennington could have accepted the promotion with these conditions at any time. He failed to do so, and thus this claim has no merit.

[3] To the extent that Pennington argues retaliation based on promotion to the Calvary Hills position rather than the Scruggs position, we reject such argument as meritless and warranting no discussion.

Pennington can satisfy the elements of a prima facie case, particularly the adverse employment action prong, [4] we assume *arguendo* that Pennington has established a prima facie case, because we find the City's legitimate reasons for the decision are dispositive. Richard Liles [**9]  decided that two conditions should be attached to Pennington's promotion at Calvary Hills-- participation in a writing program, and agreeing to evaluations after three and six months as a Programmer. As to both of these conditions, Liles proffered legitimate, non-retaliatory reasons. On the first condition, Liles stated that his review of Pennington's writing sample indicated that his writing lacked detail. As to the additional performance evaluations, Liles explained that he had concerns about Pennington's ability to handle community-based programming at Calvary Hills because plaintiff had been exposed to mostly athletic programming previously; and he also explained that he wanted to make sure that Pennington would not experience retaliation from his supervisors.

[**10]  The City having proffered legitimate reasons, Pennington has the burden of establishing that the City's reasons are pretextual. Pennington is not able to do so. Pennington points out that in his interview Liles mentioned the prior interview and the possible bias that was involved, but nothing in the depositions suggests that [*1267] these remarks were evidence of a retaliatory motive toward Pennington. Rather, the record indicates that Liles raised these issues to explain the need for the re-interview.

_____

[4] Indeed, the district court found that Pennington had failed to establish an adverse employment action. *See Pennington, 93 F. Supp. 2d at 1214*. The court noted that the crucial question was whether the conditions imposed amounted to an adverse employment action, and it found that neither of these conditions were objectively adverse. *See id. at 1214-15*.

Additionally, on the causal link prong of the prima facie case, the mere fact that Pennington had two years earlier requested and was granted an accommodation for his religious beliefs, is not sufficient to create a genuine issue of fact that there was a causal relationship between Liles' decision and Pennington's previous request for religious accommodation. In *Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999)*, we noted that gaps of 15 and 21 months between the employee's and employer's respective actions were too great to support a causal nexus. Here, the two year break between Pennington's grievance and Liles' decision probably would prevent a court from finding a causal nexus as well. However, we assume *arguendo* not only the adverse employment prong, but also the causal link prong.

Pennington next argues that the writing program was not necessary because Liles stated that he had passed the writing test and because Liles had no specialized training in the area to enable him to discern which employees needed additional writing training. These objections are insufficient because "*HN4*[↑] a plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason" as long as "the reason is one that might motivate a reasonable employer." *Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997)* ("Federal courts do not sit to second-guess the business judgment of employers."). A reasonable **[**11]** employer might be motivated by a perceived lack of detail in an employee's writing to require that employee to undergo additional training. Significantly, Pennington, when pressed in deposition, could not say that the two conditions were unreasonable.

Pennington also complains that no other employee was subjected to additional evaluations at three and six months. However, these evaluations were justified by Pennington's inexperience with community-based programming. Pennington does not deny his lack of experience; instead, he argues that such conditions would not have been necessary if he was promoted at Scruggs. This is a challenge to the City's business judgment in deciding to promote him at Calvary Hills rather than Scruggs.

For the foregoing reasons, and because Pennington has failed to show any causal connection between Liles' decision and Hughes' prior decision, see *infra* Part II.B., we conclude that Pennington has failed to adduce sufficient evidence to create a genuine issue of fact that Liles' reasons for the conditions imposed were not the real reasons. Therefore, Pennington has not met his burden to show that the City had a retaliatory intent when it promoted him **[**12]** at Calvary Hills, and the district court properly granted summary judgment on this claim.

## B. Initial Promotion Decision

We now turn to the initial decision by Hughes to promote Flanders instead of Pennington. As to this decision, we assume *arguendo* that Pennington has adduced sufficient evidence to establish the elements of a prima facie case. The first element is not in dispute: Pennington filed a grievance seeking a religious accommodation.

With respect to the second element, *HN5*[↑] generally the denial of a promotion is an adverse employment action. *See Walker v. Mortham, 158 F.3d 1177, 1187 (11th Cir. 1998)*. However, the district court found that Pennington suffered no adverse employment action because Hughes' decision was quickly reversed by Liles who offered Pennington the desired promotion. The caselaw in this area indicates that the decision to reprimand or transfer an employee, if rescinded before the employee suffers a tangible harm, is not adverse employment action. *See Breaux v. City of Garland, 205 F.3d 150, 158 (5th Cir. 2000); Dennis v. County of Fairfax, 55 F.3d 151, 156 (4th Cir. 1995); Blalock v. Dale County Bd. of Educ., 84 F. Supp. 2d 1291, 1311 (M.D. Ala. 1999)*. **[**13]** But when an employee loses pay or an employment benefit from a delayed promotion, courts have held that the employment action is not adverse only when the action is rescinded and backpay is awarded. *See Dobbs-Weinstein v. Vanderbilt University, 185 F.3d 542, 544 (6th Cir. 1999); Benningfield v. City of Houston, 157 F.3d 369, 378 (5th Cir. 1998); see* **[*1268]** *also Miller v. Federal Express Corp., 56 F. Supp. 2d 955, 960 (W.D. Tenn. 1999)* (rescinding termination did not render action non-adverse in part because plaintiff lost five days of pay and bonuses). Whether the City has offered Pennington backpay to the date of Hughes' decision to deny his promotion is not clear from the record, and indeed we would not expect such backpay to be awarded until Pennington accepts his new position, which it does not appear that he has done. For the purpose of our analysis here, we will assume *arguendo,* but expressly do not decide, that his initial denial of a promotion was an adverse employment action.

With respect to the causal link element, Pennington has adduced evidence sufficient to create an inference that Hughes' decision not to promote Pennington **[**14]** was influenced in part by Pennington's filing of a religious accommodation grievance. The best evidence was supplied by Mia Puckett's memorandum to Liles and her notes on her meeting with Hughes. Puckett's memorandum to Liles stated that Hughes' promotion decision was probably biased by his being involved in Pennington's religious accommodation. The basis for this opinion is not clear. During a meeting with Hughes, Puckett wrote that Hughes had relied upon "negative info" although the meaning of her notation is ambiguous. (Puckett Notes (Doc. 000782).) At one point she wrote, "Michael's File--Negative info--grievance 2 yrs ago--Tony's notes in Mike's file," and at another point, "Negative--way Mr. Pennington reacted to the transfer from Scruggs based on religious accommodation."

(Puckett Notes (Doc. 000782-83).) In her deposition, Puckett was not able to clarify the meaning of "negative info" in her notes. It is possible that Hughes relied upon a legitimate reason (Pennington's negative reaction to being transferred), or that he relied in part on an illegal consideration (the fact that Pennington filed a religious accommodation grievance). Because the basis for Puckett's opinion **[**15]** that Hughes' decision was biased is not clear from the record, a genuine issue of material fact exists as to whether Pennington can establish the causal link element.

In light of Pennington's satisfaction of the first prong (protected expression) and our assumption without decision of the second prong (adverse employment action), and the genuine issue of fact with respect to the third prong (a causal link), we assume *arguendo* the prima facie case, and we examine the legitimate, non-retaliatory reasons offered by Hughes for his selection of Flanders instead of Hughes. He states that he relied on his limited personal knowledge of the candidates, their responses to interview questions, and contents of their personnel files, including evaluations and attendance records. He also noted that he was particularly impressed with Flanders having received highly favorable evaluations from two supervisors.

In light of Puckett's report, however, we assume *arguendo* that Pennnington has created a genuine issue of fact that Hughes' decision was motivated in part by retaliation. Thus, we turn to the City's mixed-motive defense--i.e., the question of whether the City has established that **[**16]** it would have made the same decision without an illegal motive. We conclude that the record is clear that the City would have made the same decision. *See Harris v. Shelby County Bd. of Educ., 99 F.3d 1078, 1085 (11th Cir. 1996)* (assuming that plaintiff could establish a prima facie case, but finding the evidence overwhelming that defendant would have made the same decision); *Marshall v. City of Cape Coral, 797 F.2d 1555, 1561 (11th Cir. 1986)* (same); *see also Stanley v. City of Dalton, 219 F.3d 1280, 1293-94 (11th Cir. 2000)* (refusing to grant judgment as a matter of law **[*1269]** where issue remained as to whether employer would have made the same decision).

*HN6*[⬆] In both Title VII and *§ 1983* lawsuits, the Supreme Court has recognized that an employer can avoid liability if it can prove that it would have made the same disputed employment decision in the absence of the alleged bias. *See Price Waterhouse v. Hopkins, 490 U.S. 228, 258, 109 S. Ct. 1775, 1795, 104 L. Ed. 2d 268 (1989)* (Title VII); *Mt. Healthy Sch. Dist. Bd. of Educ. v.*

*Doyle, 429 U.S. 274, 287, 97 S. Ct. 568, 576, 50 L. Ed. 2d 471 (1977)* (§ *1983*). **[**17]** It is clear that this mixed-motive defense remains good law in *§ 1983* cases. *See Harris, 99 F.3d at 1085*. But *HN7*[⬆] with the Civil Rights Act of 1991, Congress overruled in part the *Price Waterhouse v. Hopkins* holding regarding the mixed-motive defense in Title VII cases. The Act did so by reinstating limited damages for discrimination based on "race, color, religion, sex and national origin ..., even though other factors also motivated the practice." 42 U.S.C. § 2000-2 (m). Although the 1991 Act overruled in part the mixed-motive defense with respect to discrimination suits based on race, color, sex, and national origin, this circuit and other circuits have held that the mixed-motive defense is still available in retaliation cases. In *Lewis v. YMCA, 208 F.3d 1303, 1305 (11th Cir. 2000)*, we held that the relevant sections of the 1991 Act did not apply to mixed-motive retaliation claims under the Age Discrimination in Employment Act ("ADEA"). We stated that the 1991 Act overruled and limited the mixed-motive defense only in discrimination cases based on race, color, religion, sex and national origin, but left the defense intact **[**18]** for retaliation cases. *Id.* It is true that *Lewis* was a retaliation case in the context of an ADEA claim, whereas the instant case is a retaliation case brought under Title VII. However, the reasoning of *Lewis* applies with equal force in this context. Moreover, we typically apply legal standards developed in Title VII and ADEA cases interchangeably. *See, e.g., Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000)* (en banc) (applying framework established in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*, a Title VII case, to the ADEA). Therefore, we hold that the mixed-motive defense remains good law not only with respect to Pennington's *§ 1983* retaliation claim, but also with respect to his Title VII retaliation claim. On this point, we are in agreement with all other circuits that have considered this issue. *See Matima v. Celli, 228 F.3d 68, 81 (2d Cir. 2000)* (holding that the *Price Waterhouse* analysis applies to retaliation claims under Title VII); *Norbeck v. Basin Elec. Power Coop., 215 F.3d 848, 852 (8th Cir. 2000)* (same); *Kubicko v. Ogden Logistics Servs., 181 F.3d 544, 552 n.7 (4th Cir. 1999)* **[**19]** (same); *McNutt v. Bd. of Trustees, 141 F.3d 706, 709* (same); *Woodson v. Scott Paper Co., 109 F.3d 913, 935 (3d Cir. 1997)* (same); *Tanca v. Nordberg, 98 F.3d 680, 684 (1st Cir. 1996)* (same). Thus, the City may prevail on both the Title VII and *§ 1983* retaliation claims if it proves that it would have made the same decision absent Hughes' alleged bias. We now turn to that inquiry.

Even assuming that Hughes was also influenced in part by retaliatory animus, Liles' actions confirm that the City would have made the same decision regarding the promotion. After Puckett reported that Hughes' decision may have been tainted, Liles rescinded the initial promotion of Flanders, and personally conducted a fresh set of writing tests and interviews of Flanders and Pennington. No one who had participated in the previous, now rescinded, selection of Flanders participated in Liles' decisionmaking. Liles independently reached the decision that Flanders, rather than Pennington, **[*1270]** should be promoted to the Programmer position at the Scruggs Center. Liles' decision to offer Pennington the Programmer position at the Calvary Hills Center is additional evidence that Liles harbored **[**20]** no retaliatory motive toward Pennington.

Upon a thorough review of the record, we find no evidence that suggests that Liles' decision was tainted either by the previous Hughes' decision or by any other retaliatory animus towards Pennington. **_HN8_**[↑] Where a decisionmaker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee. _See Wright v. Southland Corp., 187 F.3d 1287, 1304 n.20 (11th Cir. 1999)_ (finding that biased employee did not manipulate the final decisionmaker); _Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998)_ (finding that decisionmaker's employment decision was not causally related to a subordinate's discriminatory animus); _Willis v. Marion County Auditor's Office, 118 F.3d 542, 547 (7th Cir. 1997)_ ("When the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and a legally permissible basis, the bias of the subordinate is not relevant."). Pennington adduced no evidence that Liles' decision was tainted by Hughes' **[**21]** decision or the retaliatory animus which we assume with respect to Hughes. The record indicates that Liles' decision was completely independent of Hughes' decision, and therefore untainted. Liles' untainted decision indicates that the City would have made the same decision regarding Pennington's promotion in the absence of any retaliatory bias harbored by Hughes. [5] Because

**[*1271]** the City would have made the same decision, it is entitled to summary judgment on the retaliation claims.

**[**22]** The availability of the mixed-motive defense is particularly apt here because the City heeded the advice of its Equal Employment Officer and took corrective

---

under the facts presented the subordinate decisionmakers set in motion events that ultimately led to the adverse employment actions, and therefore it concluded that the employer would not have made the same decision in the absence of the subordinates' illegitimate motivations. _See id._ The Fifth Circuit addressed a similar issue in _Professional Ass'n of Coll. Educators v. El Paso County Cmty. Coll. Dist., 730 F.2d 258, 266 (5th Cir. 1984)_, where it considered a mixed-motive defense based on a college board of trustees' decision to terminate an employee. The board had relied on the recommendation of the college's biased president, and the court refused to grant a judgment as a matter of law because the jury could have concluded that the board never would have considered dismissing the employee if the president had not brought charges in reprisal for protected activity. _See id._

While not mentioning a mixed-motive defense, other courts have explained that _HN9_[↑] a subsequent untainted and independent decision can break the chain of causation of a disputed employment action made by a subordinate and therefore absolve the employer of liability. _See English v. Colorado Dep't of Corr., 248 F.3d 1002, 1011 (10th Cir. 2001); Eiland v. Trinity Hosp., 150 F.3d 747, 752-53 (7th Cir. 1998); Lacks v. Ferguson Reorganized Sch. Dist., 147 F.3d 718, 725 (8th Cir. 1998); Wilson v. Stroh Cos., 952 F.2d 942, 946 (6th Cir. 1992); DeHorney v. Bank of America Nat'l Trust & Savings Ass'n, 879 F.2d 459, 467 (9th Cir. 1989)._ But courts have also noted that causation is not broken when the ultimate decisionmaker never would have made the decision in the absence of the actions of the biased employee, or was influenced by the bias. _See Russell v. McKinney Hosp. Venture, 235 F.3d 219, 228-29 (5th Cir. 2000); Kramer v. Logan County Sch. Dist., 157 F.3d 620, 624-25 (8th Cir. 1998); Shager v. Upjohn Co., 913 F.2d 398, 405 (7th Cir. 1990); Saye v. St. Vrain Valley Sch. Dist., 785 F.2d 862, 867-68 (10th Cir. 1985); Hickman v. Valley Local Sch. Dist. Bd. of Educ., 619 F.2d 606, 610 (6th Cir. 1980)._ We are not faced with a concern here, similar to that in _Gilbrook,_ that Hughes set in motion events that led to Pennington being denied the promotion at the Scruggs Center, because Pennington himself set in motion the events by applying for the promotion. Liles' independent evaluation of the candidates breaks the causal chain of events from Hughes' decision, and it establishes that Flanders would have received that promotion in the absence of any retaliatory bias harbored by Hughes.

---

[5] The Ninth Circuit in _Gilbrook v. City of Westminster, 177 F.3d 839, 854-55 (9th Cir. 1999)_, recognized that an employer may assert a mixed-motive defense when a decisionmaker with legitimate motives makes a redetermination of a challenged adverse employment action. However, that court found that

261 F.3d 1262, *1271; 2001 U.S. App. LEXIS 18565, **22

action. Liles, conducting an independent evaluation of the candidates in the face of discrimination charges, ensured that Pennington's civil rights were protected. Moreover, allowing Liles' actions to support the City's mixed-motive defense effectuates the policy expressly called for by Congress--to encourage alternative dispute resolution of employment discrimination charges. *See* Civil Rights Act of 1991, Pub.L. No. 102-166, § 118, 105 Stat. 1071, 1081 (codified at *42 U.S.C. § 1981*) ("the use of alternative means of dispute resolution … is encouraged"); *see also Dennis, 55 F.3d at 154* ("Encouraging non-judicial resolution of workplace grievances is thus an important part of the statutory scheme that Congress enacted.").

Having concluded that the district court properly granted summary judgment in favor of the City, both with respect to the initial failure to promote Pennington and the subsequent conditional promotion, the judgment of the district court is

AFFIRMED. **[**23]**

---

End of Document

 Caution
As of: May 24, 2023 8:01 PM Z

# *Stanley v. City of Dalton*

United States Court of Appeals for the Eleventh Circuit

July 26, 2000, Decided ; July 26, 2000, Filed

No. 99-10593

**Reporter**

219 F.3d 1280 *; 2000 U.S. App. LEXIS 18053 **; 78 Empl. Prac. Dec. (CCH) P40,190; 13 Fla. L. Weekly Fed. C 893

JERRY M. STANLEY, Plaintiff-Appellee, versus CITY OF DALTON, Georgia, JAMES D. CHADWICK, individually and in his official capacity, Defendants-Appellants.

**Prior History: [**1]** Appeal from the United States District Court for the Northern District of Georgia. D. C. Docket No. 98-00089-4-CV-HLM. Judge: Harold L. Murphy.

**Disposition:** REVERSED AND REMANDED.

## Core Terms

termination, Cooper, qualified immunity, protected speech, clearly established law, deception, motive, police chief, undisputed, police department, summary judgment, district court, theft, polygraph, cases, retaliation, Narcotics, interview, reprimand, promoted, constitutional right, circumstances, misconduct, temper, light most favorable, investigations, violations, profanity, buy, gap

## Case Summary

### Procedural Posture

Defendant appealed from a judgment of the United States District Court for the Northern District of Georgia denying his motion for summary judgment based on qualified immunity related to plaintiff police officer's claim alleging wrongful termination in violation of his *U.S. Const. amend. I* rights under *42 U.S.C.S. § 1983*.

### Overview

Defendant, chief of police, appealed a district court order denying his motion for summary judgment based on qualified immunity related to plaintiff police officer's claim alleging wrongful termination in violation of his

*U.S. Const. amend. I* rights under *42 U.S.C.S. § 1983*. The court of appeals reversed the district court's judgment. The court found that defendant's termination of plaintiff was objectively reasonable. The court reasoned that on the facts the police chief would have fired plaintiff for telling lies, concerning plaintiff's use of profanity and loss of temper, absent the protected speech. The court added that the police chief was entitled to qualified immunity where the record indisputably established that he in fact was motivated, at least in part, by lawful considerations in terminating the plaintiff for his misconduct. Accordingly, the court reversed the denial of the police chief's motion for summary judgment and remanded for entry judgment for the chief on plaintiff's *U.S. Const. amend. I* claims.

### Outcome

Judgment reversed and remanded denying defendant's motion for summary judgment on plaintiff's civil rights claims where the defendant's termination of plaintiff was objectively reasonable and as such he was entitled to qualified immunity because the record indisputably established that he was motivated in part by plaintiff's misconduct.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

**HN1[ ]** **Standards of Review, De Novo Review**

Appellate courts review a district court's denial of qualified immunity de novo.

Civil Rights Law > ... > Immunity From

219 F.3d 1280, *1280; 2000 U.S. App. LEXIS 18053, **1

Liability > Local Officials > Customs & Policies

*HN2*[⬇] **Local Officials, Customs & Policies**

Pursuant to the qualified immunity doctrine, government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

*HN3*[⬇] **Local Officials, Customs & Policies**

For the law to be clearly established, and hence to find liability for civil damages pursuant to the qualified immunity doctrine, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law.

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

*HN4*[⬇] **Local Officials, Customs & Policies**

Under the qualified immunity doctrine, a necessary concomitant to the question of whether a plaintiff has alleged a violation of a clearly established federal right is the determination of whether the plaintiff has asserted a violation of a constitutional right at all.

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

*HN5*[⬇] **Local Officials, Customs & Policies**

In evaluating qualified immunity, courts must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation. If a plaintiff has not sufficiently alleged a violation of any constitutional right, it is axiomatic that the plaintiff likewise has failed to allege the violation of a "clearly established" right.

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

*HN6*[⬇] **Appellate Jurisdiction, Interlocutory Orders**

A public official may file an interlocutory appeal of the denial of qualified immunity where the disputed issue is whether the official's conduct violated clearly established law.

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

*HN7*[⬇] **Local Officials, Customs & Policies**

Where the only issue on appeal is a question of "evidence sufficiency" as to the constitutional right, the denial of qualified immunity is not immediately appealable.

Civil Procedure > Appeals > Appellate Jurisdiction > General Overview

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

*HN8*[⬇] **Appeals, Appellate Jurisdiction**

Qualified immunity analysis has two components: First, what was the official's conduct, based on the pleadings, depositions, and affidavits, when viewed in the light most favorable to the non-moving party? Second, could a reasonable public official have believed that such conduct was lawful based on clearly established law? Further, the resolution of the second issue constitutes a final, collateral order and is immediately appealable. When such a ruling is appealable, the first issue-the factual issue-may be addressed by an appellate court because it is part of the core qualified immunity analysis. If only the first issue is appealed, however, the appellate court has no jurisdiction to hear the case.

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Public Employees

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > General Overview

**HN9**[⬇] **Local Officials, Customs & Policies**

A state employer can not retaliate against a state employee for engaging in speech constitutionally protected under *U.S. Const. amend. I*. The law recognizes, however, that the state has an interest as an employer in regulating the speech of its employees and attempts to balance the competing interests of the public employee and the state.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Public Employees

**HN10**[⬇] **Freedom of Speech, Public Employees**

A public employee does not relinquish *U.S. Const. amend. I* rights to comment on matters of public interest by virtue of government employment.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Public Employees

Labor & Employment Law > Wrongful Termination > General Overview

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > General Overview

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

**HN11**[⬇] **Freedom of Speech, Public Employees**

Where a public employee alleges wrongful termination because of the exercise of free speech, the employee must show by a preponderance of the evidence that: (1) the employee's speech is on a matter of public concern; (2) the employee's *first amendment* interest in engaging in the speech outweighs the employer's interest in

prohibiting the speech in order to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a "substantial part" in the employer's decision to demote or discharge the employee. If the employee succeeds in showing the preceding factors, the employer must prove by a preponderance of the evidence that (4) it would have reached the same decision even in the absence of the protected conduct.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Public Employees

Criminal Law & Procedure > ... > Abuse of Public Office > Conflicts of Interest > Elements

**HN12**[⬇] **Freedom of Speech, Public Employees**

To involve a matter of public concern, a government employee's speech must relate to any matter of political, social, or other concern to the community. If the government employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior. Because an employee's speech will rarely be entirely private or entirely public, the "main thrust" of the employee's speech must be determined.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Public Employees

Constitutional Law > Bill of Rights > Fundamental Freedoms > General Overview

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > General Overview

**HN13**[⬇] **Freedom of Speech, Public Employees**

In determining the protection of a public employee's free speech under *U.S. Const. Amend. I*, courts weigh the employee's *first amendment* interests against 'the interest of the state, as an employer, in promoting the

efficiency of the public services it performs through its employees. In striking this balance, courts consider the following factors: (1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time, and place of the speech, and (3) the context within which the speech was made.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Public Employees

*HN14*[🔽] **Freedom of Speech, Public Employees**

Where termination closely follows protected activity, it is usually reasonable to infer that the activity was the cause of the adverse employment decision.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Public Employees

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > General Overview

*HN15*[🔽] **Freedom of Speech, Public Employees**

A municipal defendant is entitled to summary judgment on a *U.S. Const. amend. I* retaliation claim, despite the assumption that the plaintiff could show that his speech was a substantial factor in his failure to be promoted, where the defendant can show that the same decision would be made even absent the protected speech.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Public Employees

*HN16*[🔽] **Freedom of Speech, Public Employees**

Once the plaintiff shows that his constitutionally protected speech was a "substantial" or "motivating factor" in his or adverse treatment by the employer, the employer should be given an opportunity to show by a preponderance of the evidence that it would have reached the same decision as to the plaintiff even in the absence of the protected conduct.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Public Employees

*HN17*[🔽] **Freedom of Speech, Public Employees**

An employer must show by a preponderance of the evidence, that, in light of its knowledge, perceptions, and policies at the time of the termination, it would have terminated the employment regardless of the protected speech.

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Public Employees

*HN18*[🔽] **Local Officials, Customs & Policies**

A police chief can guess wrong about the constitutionality of his conduct in terminating a subordinate officer, provided the mistake is a reasonable one.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Public Employees

*HN19*[🔽] **Freedom of Speech, Public Employees**

The presence of a jury issue about a defendant's improper intent does not necessarily preclude qualified immunity. Where the facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful and unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity.

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Public Employees

219 F.3d 1280, *1280; 2000 U.S. App. LEXIS 18053, **1

Torts > Public Entity Liability > Immunities > Qualified Immunity

**HN20**[🔽] **Local Officials, Customs & Policies**

Qualified immunity is not ruled out wherever discriminatory intent appears in the summary judgment record even if discriminatory intent is an element of the underlying constitutional tort. Indeed, the United States Supreme Court has not instructed courts to drop qualified immunity (with its test of objective reasonableness) from cases in which discriminatory intent is an element of the underlying tort.

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Public Employees

**HN21**[🔽] **Local Officials, Customs & Policies**

A defendant is entitled to qualified immunity under the Foy rationale only where, among other things, the record indisputably establishes that the defendant in fact was motivated, at least in part, by lawful considerations.

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

**HN22**[🔽] **Local Officials, Customs & Policies**

Even if motivated in substantial part by an unlawful motive, a public employer's termination of a public employee may be objectively reasonable for the purposes of qualified immunity.

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Public Employees

**HN23**[🔽] **Local Officials, Customs & Policies**

Because the Pickering test requires a balancing of competing interests on a case-by-case basis, decisions

tilt strongly in favor of immunity by recognizing that only in the rarest of cases will reasonable government officials truly know that the termination or discipline of a public employee violated "clearly established" federal rights.

**Counsel:** For City of Dalton, Chadwick, James D., Appellants: Miller, Terry L., Mitchell & Mitchell, Dalton, GA.

**Judges:** Before EDMONDSON, HULL and WOOD [*], Circuit Judges.

**Opinion by:** HULL

# Opinion

 **[*1282]** HULL, Circuit Judge:

Appellee Jerry M. Stanley, a police officer, brought this *§ 1983* action against Appellant James D. Chadwick, the Chief of Police, alleging wrongful termination in violation of his *first amendment* rights. Chadwick appeals the district court's denial of his motion for summary judgment based on qualified immunity. We reverse.

### I. FACTUAL BACKGROUND

We first review the record evidence in the light most favorable to Stanley. Stanley joined the City of Dalton Police Department in 1977. In 1993, Stanley was a Lieutenant in the Narcotics Unit, and Chadwick was Deputy Chief in charge of the evidence room. Gene Slade was Chief.

### A. GBI Interview

During 1993, the Georgia Bureau of Investigation ("GBI") investigated the suspected theft of money from the evidence room. The GBI interviewed Stanley with Chief Slade, Captain **[**2]** Bagley, and Lieutenant Black present. The record contains no transcript or GBI report regarding exactly what Stanley said to the GBI. In his 1998 deposition, Stanley testified that he gave the GBI his "theory" that he suspected Chadwick of the theft

---

[*] Honorable Harlington Wood, Jr., U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

219 F.3d 1280, *1282; 2000 U.S. App. LEXIS 18053, **2

because Chadwick was one of two people with keys to the evidence room and the theft appeared to be an "inside job":

> All it was was theory [sic], that's what we were talking about discussing suspects and theory. . . . There was only two people that had keys [to the evidence room]. [Chadwick] was one of them and Cooper was the other one, he and Cooper that knew the combination. The evidence from the case itself suggested it was inside, it was people with knowledge of where the monies were kept, how they were kept, what was actually there. So at the time there was a lot of political talk going on that Slade wasn't going to be reappointed, and I dealt with some people in the past in the political end of it who talked about the way the City government would appoint their chiefs and some of the things that were done in the past. So these facts and circumstances led me to that conclusion. And this was only a theory, that was something **[\*\*3]** for them to check.

Stanley knew Chadwick wanted to become Chief and speculated that Chadwick may have staged the theft to damage Chief Slade's credibility. Stanley testified that he informed only those people in the GBI interview.

**[\*1283]** The GBI interviewed Chadwick, who took a polygraph test. Chadwick testified that he learned of Stanley's comments to the GBI. Chadwick confronted Stanley about his comments, told Stanley that he did not appreciate them, and asked him if he had any evidence to support his suspicions. Ultimately, the GBI never identified anyone as responsible for the theft.

### B. Retaliatory Employment Actions

In late 1993, Chadwick became the Acting Chief of Police. Soon after becoming Chief in early 1994, Chadwick announced his intention to transfer Stanley from the Narcotics Unit to the third shift in the Uniform Patrol Division. The previous Chief preferred that persons serve in the Narcotics Unit for no longer than six years, and at the time of his transfer, Stanley had been in the Narcotics Unit for six years. Chadwick asked other officers being transferred about their preferences of duty, but not Stanley.

When notified of the transfer, Stanley told **[\*\*4]** Chadwick that he wished to remain in the Criminal Investigation Division to complete several gambling and narcotics investigations. Chadwick still transferred Stanley, but the transfer did not involve any loss of rank

or decrease in salary. Stanley did lose his $ 600 uniform allowance and the use of a department automobile. According to Stanley, the transfer also prevented him from concluding his ongoing gambling and narcotics investigations and required him to work excessively long hours.

After his transfer, Stanley continued his gambling and narcotics investigations. Because Stanley's work schedule interfered with those investigations, Chadwick told Stanley that he would allow Stanley to "take some time off" if necessary to work on those cases. Despite this allowance, Chadwick frequently asked Stanley's supervisor, Captain Walthour, to check on Stanley and confirm that Stanley was actually at work.

Stanley also contends that he was passed over for promotion at least once after his statements to the GBI. According to Stanley, Chadwick failed to follow department procedure requiring the posting of notices for available positions. Rather than posting the availability of a Captain's **[\*\*5]** position, Chadwick posted an opening for a Lieutenant's position, promoted a Sergeant to that position, and then immediately promoted the Sergeant to the Captain's position.

### C. "Buy Fund" Investigation

In April 1994, Chadwick began an investigation of the "buy fund" in the Narcotics Unit which Stanley supervised prior to his transfer. The fund's accounting records contained inconsistencies, but there was no evidence money was missing. Stanley passed a polygraph test.

After the internal investigation, the City Auditor's audit revealed that department members had not completed the proper paperwork when receiving money from the "buy fund." Chadwick issued a written reprimand to Stanley in August 1994 for violating departmental policy by failing to ensure that the officers under his command properly completed the paperwork to utilize the "buy fund." Stanley maintains that the reprimand was undeserved and asserts that his officers properly completed the paperwork. The reprimand does state that Stanley received "very little guidance as to what was expected from [him]." Chadwick met with Stanley to inform him of the reprimand, and, as Stanley left this meeting, Chadwick asked: **[\*\*6]** "How does it feel to be put under the microscope of suspicion?"

### D. Cooper Incident

In May 1997, Stanley had an altercation with Lieutenant Cooper. Stanley wanted to copy a large stack of papers and asked Lieutenant Cooper to instruct his staff to assist. Cooper refused even though his staff was not busy. Stanley responded by saying "damn it, I'll do it myself." Stanley proceeded to the copy room and began to make copies. Cooper followed Stanley and told Stanley that he would take care of it. Stanley asked Cooper to leave him alone, **[*1284]** but Cooper insisted on helping and pulled the stack of papers away, causing them to fall.

Stanley and Cooper began to argue and Stanley repeatedly asked Cooper to leave the room, but he refused. When Stanley tried to leave the room, Cooper stood in the doorway, blocking the exit. Stanley placed his hands on Cooper to try to move him out of the way, causing him to stumble. As described by Stanley, "I was going to march him through the door but when I went to spin him he jerked out backwards and he nearly fell." Cooper then left the copy room. When Captain Neal asked what was going on, Cooper reported that Stanley had struck him. Stanley began **[**7]** "cussing [Cooper] out" because Cooper had falsely accused him of striking Cooper.

After the altercation, Chadwick placed Stanley on administrative leave pending investigation. Captain Walthour investigated, and his written summary concluded that misconduct had occurred because Stanley used profanity and placed his hands on Cooper. Walthour also found that Cooper shared responsibility for the incident. Walthour concluded that "we can not tolerate this type of interaction between employees. I recommend a ten day suspension without pay and advanced training in interpersonal relations as well as conflict management."

After a pre-disciplinary conference with Stanley, Chadwick issued a written reprimand of Stanley for conduct unbecoming an officer and simple battery, ordered Stanley to serve a six-day suspension, and required Stanley to undergo a "fitness for duty" examination by a psychologist. [1] Chadwick's written reprimand stated that "I will not tolerate in the future your display of temper in this manner in any form. Any further conduct along this line will result in further disciplinary action up to and including termination." No disciplinary action was taken against Cooper.

**[**8] E. Coker Incident and Stanley's Termination**

In November 1997, Stanley discussed a shift change with a subordinate, Sergeant Coker. Coker told Captain Walthour that Stanley lost his temper and used profanity, but Stanley denies this. Walthour relayed Coker's complaint to Chadwick and interviewed both Coker and Stanley. Because they reported differing versions of the incident, Walthour's report concluded that no evidence existed to support misconduct charges against Stanley. Chadwick requested polygraph tests. Coker's results indicated truthfulness, but Stanley's indicated deception, as follows:

> The below-indicated pertinent questions were among those asked during the over-all examination.
> 5. HAVE YOU LIED REGARDING THIS INCIDENT WITH YOUR SERGEANT?
> 7. REGARDING THIS INCIDENT WITH YOUR SERGEANT HAVE YOU LIED ABOUT ANY PART OF IT?
> A total of three polygraph charts were recorded. An assessment of the psychophysiological responses of the examinee to the above questions reflected significant reactions which would [sic] considered to be indicative of deceptive criteria.
>
> It is polygraphist's opinion that physiological responses which are usually indicative **[**9]** of deception was [sic] noted. DECEPTION INDICATED.

Chadwick charged Stanley with "unprofessional conduct in the presence of a subordinate with the use of profanity, failure to control his temper, and providing false statements in an internal investigation." [2] After a pre-disciplinary conference, [3] Chadwick **[*1285]** terminated Stanley based on the Coker and Cooper incidents, the "buy fund" investigation, and Stanley's polygraph results indicating deception. [4]

---

[2] Chadwick recalls charging only one other officer with unprofessional conduct for losing his temper. That incident was between an officer and a public citizen.

[3] Stanley asserts that the examiner testified at this conference that the polygraph results could indicate Stanley's "inability to clearly remember the incident in question." But what the polygraph examiner said was that Stanley had "some doubt about what happened, I think you are not completely sure" and then later in the testimony that deception "was indicated."

[4] Chadwick also points to an incident in 1984 in which Barbara Goforth alleged that Stanley called her a slut, and told her he

---

[1] After the examination, the psychologist concluded that Stanley was psychologically fit to perform his duties.

219 F.3d 1280, *1285; 2000 U.S. App. LEXIS 18053, **9

[**10] Stanley appealed his termination to the City of Dalton Public Safety Commission. After a hearing, that Commission found that "the charges of conduct unbecoming an officer arising out of the November 13, 1997 incident are true and that [Stanley] . . . be herewith discharged from employment with the Dalton Police Department effective December 22, 1997." In April 1998, Stanley filed this § 1983 action for violation of his first amendment rights alleging that Chadwick terminated him for naming Chadwick as a suspect in the 1993 GBI interview. The only issue on appeal is whether the district court erred in denying Chadwick qualified immunity on Stanley's first amendment claim. [5]

## II. QUALIFIED IMMUNITY

HN2[↑] Pursuant to the qualified immunity doctrine, "government officials performing discretionary [**11] functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982). It is undisputed that Chadwick acted within his discretionary authority in terminating Stanley. Thus, we examine whether Stanley demonstrated that Chadwick violated clearly established law. See Gonzalez v. Lee County Hous. Auth., 161 F.3d 1290, 1295 (11th Cir. 1998); Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1281 (11th Cir. 1998).

HN3[↑] For the law to be clearly established, the law "must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law." Lassiter v. Alabama A&M Univ. Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987)). HN4[↑] The Supreme Court has held

that a "necessary [**12] concomitant" to the question of whether a plaintiff has alleged a violation of a clearly established federal right is "the determination of whether the plaintiff has asserted a violation of a constitutional right at all." Siegert v. Gilley, 500 U.S. 226, 232, 114 L. Ed. 2d 277, 111 S. Ct. 1789 (1991); GJR Invs., Inc. v. County of Escambia, 132 F.3d 1359, 1367 (11th Cir. 1998); Cottrell v. Caldwell, 85 F.3d 1480, 1485 (11th Cir. 1996).

HN5[↑] In evaluating qualified immunity, courts "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." Wilson v. Layne, 526 U.S. 603, 609, 119 S. Ct. 1692, 1697, 143 L. Ed. 2d 818 (1999) (quoting Conn v. Gabbert, 526 U.S. 286, 289, 119 S. Ct. 1292, 1295, 143 L. Ed. 2d 399 (1999)). [6] "If a [*1286] plaintiff has not sufficiently alleged a violation of any constitutional right, it is axiomatic that the plaintiff likewise has failed to allege the violation of a 'clearly established' right. [**13] " GJR Invs., Inc., 132 F.3d at 1367. [7]

## III. JURISDICTION

Chadwick challenges the district court's rulings both on the sufficiency of evidence to prove the underlying constitutional violation and on the clearly established law issue. [8] [**15] Stanley challenges our jurisdiction

---

was "going to knock [her] god damned head off." Stanley denies threatening Ms. Goforth, and states that he immediately apologized to her when told that he had hurt her feelings. Stanley avers that the first time he realized that he received a reprimand for that incident was when he received a reprimand for the Cooper incident.

[5] HN1[↑] We review the district court's denial of qualified immunity de novo. Belcher v. City of Foley, 30 F.3d 1390, 1395 (11th Cir. 1994). Stanley brought other claims not relevant to this appeal.

---

[6] See Hartley v. Parnell, 193 F.3d 1263, 1268 (11th Cir. 1999) (recognizing the necessity of this order of proof); McElligott v. Foley, 182 F.3d 1248, 1254 (11th Cir. 1999) (same); Crosby v. Paulk, 187 F.3d 1339, 1345 (11th Cir. 1999) (same).

[7] See also Marshall v. Allen, 984 F.2d 787, 793 (7th Cir. 1993) ("Courts are not required to examine the clearly established law at the time of the offense if the plaintiff's allegations do not assert a violation of constitutional rights." (citing Siegert, 500 U.S. at 232)).

[8] On the "evidence sufficiency" front, Chadwick primarily argues (1) that Stanley presented no evidence that his 1997 termination was based in substantial part on his 1993 statements and (2) that, in any event, Chadwick has shown that he would have terminated Stanley absent the statements. Chadwick also argues that Stanley has not alleged, and his evidence does not show, any protected speech as a matter of law. On the clearly established law front, Chadwick argues that Stanley failed to cite any law with materially similar facts that would have notified Chadwick that his conduct violated clearly established law. Chadwick also challenges the district

over Chadwick's "evidence sufficiency" issues, and thus we discuss it. *HN6*[↑] A public official may file an interlocutory appeal [**14] of the denial of qualified immunity where the disputed issue is whether the official's conduct violated clearly established law. See *Mitchell v. Forsyth, 472 U.S. 511, 527, 86 L. Ed. 2d 411, 105 S. Ct. 2806 (1985)*. In *Johnson v. Jones, 515 U.S. 304, 132 L. Ed. 2d 238, 115 S. Ct. 2151 (1995)*, *HN7*[↑] the Supreme Court held that, where the only issue on appeal is a question of "evidence sufficiency" as to the constitutional right, the denial of qualified immunity is not immediately appealable. *Id. at 313*. [9] This court has explained the proper jurisdictional analysis when, as here, an interlocutory appeal presents both "evidence sufficiency" and clearly established law issues. See *Vista Community Serv. v. Dean, 107 F.3d 840, 843-44 (11th Cir. 1997)*; *McMillian v. Johnson, 88 F.3d 1554, 1562-63 (11th Cir. 1996)*; *Johnson v. Clifton, 74 F.3d 1087, 1091 (11th Cir. 1996)*.

As stated in McMillian, "this circuit has not construed Johnson to bar immediate appellate review of fact-based rulings in all circumstances, and the Supreme Court's subsequent [**16] decision in *Behrens v. Pelletier, 516 U.S. 299, 133 L. Ed. 2d 773, 116 S. Ct. 834 (1996)*, confirms that Johnson did not work such a constriction of interlocutory appellate jurisdiction over orders denying a qualified immunity defense." *McMillian, 88 F.3d at 1563*. We have outlined how to draw the line between cognizable issues on appeal and those over which we lack jurisdiction. See *Johnson v. Clifton, 74*

---

court's failure to apply the appropriate objective legal reasonableness standard in determining whether Chadwick's conduct violated clearly established law.

[9] As we explained in *Johnson v. Clifton, 74 F.3d 1087, 1090-91 (11th Cir. 1996)*, the issue in Johnson v. Jones was:

whether there was any evidence in the record to support the District Court's ruling that a reasonable fact finder could find that the public officials were involved in the plaintiff's beating. The defendants admitted that such a beating was unconstitutional and violated clearly established law; they only argued that the District Court had erred when it found a genuine issue of material fact in regard to their involvement in the unconstitutional conduct. The Supreme Court held that such a ruling by the District Court could not be appealed as a final, collateral order. It seems clear to us that the Supreme Court was not changing the well-established law of qualified immunity in the context of summary judgment, just elaborating on it.

*Id. at 1090-91*.

---

*F.3d at 1091*.

*HN8*[↑]   Qualified immunity analysis has two components: "First, what was the official's conduct, based on the pleadings, depositions, and affidavits, when viewed in the light most favorable to the non-moving party? Second, could a reasonable public official have believed that such conduct [*1287] was lawful based on clearly established law?" Id. Further, "the resolution of the second issue constitutes a final, collateral order . . . [and] is immediately appealable. When such a ruling is appealable, the first issue-the factual issue-may be addressed by an appellate court because it is part of the core qualified immunity analysis. See *Anderson v. Creighton, 483 U.S. 635, 641, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987)*. [**17]  " Id. If only the first issue is appealed, however, the appellate court has no jurisdiction to hear the case. Id.

In McMillian, we emphasized that "an appellate court may address the factual issue of what conduct the defendant engaged in because the issue is a necessary part of the core qualified immunity analysis of whether the defendant's conduct violated clearly established law." *McMillian, 88 F.3d at 1563*. [10] Therefore, "so long as the core qualified immunity issue is raised on appeal, a final, collateral order is being appealed, and the appellate court has jurisdiction to hear the case, including challenges to the district court's determination that genuine issues of fact exist as to what conduct the

---

[10] See *Mencer v. Hammonds, 134 F.3d 1066, 1071 (11th Cir. 1998)* (examining whether the plaintiff proved the requisite subjective intent in a case where subjective intent is an element of the underlying constitutional violation in an interlocutory qualified immunity appeal); *Cottrell v. Caldwell, 85 F.3d 1480, 1491-92 (11th Cir. 1996)* (in an interlocutory appeal of the district court's denial of summary judgment, turning first to plaintiff's evidence of the constitutional violation itself and holding, "plaintiff has failed to show a violation of due process, and it necessarily follows that the defendants are entitled to summary judgment on qualified immunity grounds"); *Adams v. Poag, 61 F.3d 1537 (11th Cir. 1995)* (in another interlocutory appeal of the district court's denial of summary judgment, holding defendants were entitled to summary judgment based on qualified immunity because plaintiffs failed to present evidence of deliberate indifference to support their *eighth amendment* claim); see also *Johnson v. City of Fort Lauderdale, 126 F.3d 1372, 1379 (11th Cir. 1997)*; *Walker v. Schwalbe, 112 F.3d 1127, 1132 (11th Cir. 1997)*; *McMillian v. Johnson, 101 F.3d 1363, 1368 (11th Cir. 1996)* (Propst, J., specially concurring); *Foy v. Holston, 94 F.3d 1528, 1534-36 (11th Cir. 1996)*; *Dolihite v. Maughon, 74 F.3d 1027, 1033 n.3 (11th Cir. 1996)*.

defendant engaged in." Id.

[**18]   Further, when both the "evidence sufficiency" and clearly established issues are raised, we have two options of how to treat the factual issue. First, we may take the facts that the district court assumed when it denied qualified immunity as a given and address only the pure legal issues in the appeal. Or, we may conduct our own analysis of the facts in the light most favorable to the plaintiff. See Johnson v. Clifton, 74 F.3d at 1091. We may choose to conduct our own factual analysis either because the district court did not adequately identify the facts or because "such a determination is part of the core qualified immunity analysis." Id. Also, as stated in Johnson v. Clifton, "even if such a determination were not part of the core qualified immunity analysis, it would be 'inextricably intertwined' with that analysis and within the appellate court's pendent jurisdiction. Swint v. Chambers County Com'n, __ U.S. __, 115 S. Ct. 1203, 1209 (1995). See also Johnson, __ U.S. at __, 115 S. Ct. at 2159." Id. Although we may independently review the record facts, we will not disturb a factual finding by the district court if [**19] there is any record evidence to support that finding. See id. We, like the district court, must consider the record evidence regarding the defendant's conduct in the light most favorable to the plaintiff.

In this appeal, because Chadwick raises both "evidence sufficiency" and clearly established law arguments, we have jurisdiction to review them. Choosing the latter of our two options, we have made an independent review of the facts from the record. [11]

---

[11] Even when both "evidence sufficiency" and clearly established issues are raised, we may, but are not required to, review the "evidence sufficiency" issues. In some cases, we have accepted the district court's facts as supported by the evidence and then exercised our discretion to decline to review the "evidence sufficiency" issues. See Cooper v. Smith, 89 F.3d 761, 764 n.3 (11th Cir. 1996) ("The district court determined that Cooper had adduced sufficient evidence to create a jury question as to whether Cooper's speech in cooperating with the GBI caused Smith to terminate him. To the extent that Smith challenges that determination on appeal, we decline to address Smith's argument, which amounts to an evidentiary sufficiency issue not itself immediately appealable." (emphasis added) (citations omitted)). At first glance, Cooper's footnote may seem inconsistent with other decisions but it is not. An evidentiary sufficiency issue itself is not immediately appealable, but is appealable only if it is a core part of, or is "inextricably intertwined with," the clearly established law issues. Further, when both types of issues are presented, as in Cooper, this court is not required to look at,

[**20]

[*1288] IV. *FIRST AMENDMENT* VIOLATION

We now turn to whether Stanley showed a violation of his constitutional rights at all. HN9[↑] A state employer can not retaliate against a state employee for engaging in speech constitutionally protected under the *First Amendment*. See Rankin v. McPherson, 483 U.S. 378, 383, 97 L. Ed. 2d 315, 107 S. Ct. 2891 (1987); Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir. 1989). [12] The law recognizes, however, that the state has an interest as an employer in regulating the speech of its employees and attempts to balance the competing interests of the public employee and the state. See Rankin, 483 U.S. at 384; Pickering v. Board of Educ., 391 U.S. 563, 568, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1968).

[**21]   To strike this balance, we utilize a four step inquiry in assessing *first amendment* retaliation claims. See Bryson, 888 F.2d at 1565. HN11[↑] Where a public employee alleges wrongful termination because of the exercise of free speech, the employee must show by a preponderance of the evidence that: (1) the employee's speech is on a matter of public concern; (2) the employee's *first amendment* interest in engaging in the speech outweighs the employer's interest in prohibiting the speech in order to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a "substantial part" in the employer's decision to demote or discharge the employee. If the employee succeeds in showing the preceding factors, the employer must prove by a preponderance of the evidence that (4) "it would have reached the same decision . . . even in the absence of the protected conduct." Id. at 1565-66 (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977)).

---

and can decline to review, an evidentiary sufficiency issue because such evidentiary sufficiency issue is not itself appealable. However, in this case we not only have elected the second option of reviewing the record but also have exercised our discretion to address the evidentiary sufficiency issues. See Cottrell, 85 F.3d at 1490; Adams, 61 F.3d at 1542-43.

[12] HN10[↑] A "public employee does not relinquish *First Amendment* rights to comment on matters of public interest by virtue of government employment." Connick v. Myers, 461 U.S. 138, 140, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983).

## A. Public Concern

Stanley's speech is a theory, voiced to the GBI, that Chadwick might have **[**22]** stolen money from the evidence room. This speech relates to a matter of public concern. [13] See *Cooper v. Smith, 89 F.3d 761, 765 [*1289] (11th Cir. 1996)* (concluding that a deputy's cooperation with a GBI investigation into corruption in the Sheriff's Department constituted speech on a matter of public concern and stating that "there can be no doubt that corruption in a police department is an issue of public concern"); *Bryson, 888 F.2d at 1566* (concluding that a police officer's complaint to the city manager that the Chief of Police stole whiskey from the department evidence room was speech on a matter of public concern); see also *Fikes v. City of Daphne, 79 F.3d 1079, 1084 (11th Cir. 1996)* (finding a police officer's complaints to officials, including the Alabama Bureau of Investigation, regarding police misconduct to be a matter of public concern).

**[**23]** Chadwick asserts that Stanley's speech is not protected because it was made in the form of a speculative theory about the missing money rather than a statement of concrete fact. Although the theoretical form of Stanley's statements affects the weight we give this speech in the <u>Pickering</u> balance, it does not defeat

---

[13] **HN12**[⬆] To involve a matter of public concern, a government employee's speech must "relate to any matter of political, social, or other concern to the community." *Connick, 461 U.S. at 146.* If the government employee speaks "not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id. at 147.* Because "an employee's speech will rarely be entirely private or entirely public," the "main thrust" of the employee's speech must be determined. *Morgan v. Ford, 6 F.3d 750, 755 (11th Cir. 1993).* This determination is made by examining "the content, form, and context of a given statement, as revealed by the whole record." *Connick, 461 U.S. at 147-48; Morgan, 6 F.3d at 754.* When there is a personal element to the speech, complaints of wrongdoing within a public agency may not constitute speech on a matter of public concern. See *Maggio v. Sipple, 211 F.3d 1346, 1352 (11th Cir. 2000); Morgan, 6 F.3d at 754.* At this juncture, the record contains no evidence of a personal motivation by Stanley.

the public concern nature of Stanley's speech. [14]

## B. <u>Pickering</u> *Balance*

**[**24]** **HN13**[⬆] We next weigh "the employee's *first amendment* interests against 'the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Bryson, 888 F.2d at 1565* (quoting *Pickering, 391 U.S. at 568*). [15] In striking this balance, we consider these factors: "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time, and place of the speech, and (3) the context within which the speech was made. *Id. at 1567* (punctuation and citations omitted).

**[**25]** We weigh Stanley's interest in voicing to the GBI his theory about Chadwick's stealing money against the admittedly strong interests of Chadwick and the police department in maintaining close working relationships, mutual respect, discipline, and trust in the quasi-military setting of the police department. [16] There is no bright-line standard, and <u>Pickering</u> requires a careful balancing of competing interests on a case-by-case basis.

---

[14] See *Hansen v. Soldenwagner, 19 F.3d 573, 577 (11th Cir. 1994)* (stating that "the manner of a public employee's speech is an important element in the <u>Pickering</u> balance"); *Dartland v. Metropolitan Dade County, 866 F.2d 1321, 1323 n.2* & 1324 (11th Cir. 1989) (assuming that the plaintiff's statements to the press that the County Manager was a "paid lackey" were statements on a matter of public concern and stating that this assumption did not require it to "give the speech the same weight we would give to a simple statement of opinion" in performing the <u>Pickering</u> balance).

[15] Chadwick appears to argue that we should weigh Stanley's interest in making the protected speech against the department's interest in firing Stanley (rather than the department's interest in prohibiting the speech). This argument is without merit as Chadwick confuses this, the second prong, with the third and fourth prongs of <u>Bryson</u>. See *Vista Community Servs. v. Dean, 107 F.3d 840, 845 (11th Cir. 1997)* (rejecting a similar argument).

[16] See *Hansen v. Soldenwagner, 19 F.3d 573, 577 (11th Cir. 1994)* (recognizing that "order and morale are critical to successful police work: a police department is 'a paramilitary organization with a need to secure . . . efficiency among the ranks due to its status as a quasi-military entity different from other public employers.'"(citations omitted)); *Busby v. City of Orlando, 931 F.2d 764, 774 (11th Cir. 1991)* (describing the unique need for maintaining loyalty, discipline, and good working relationships within a police department).

Sometimes, one aspect of the speech in issue can be determinative. Indeed, in weighing these factors, this court has reached divergent outcomes in similar police department cases because of the presence or lack of a particular factor. Compare *Cooper, 89 F.3d at 765*, and *Fikes, 79 F.3d at 1084*, with *Bryson, 888 F.2d at 1567*, and *Hansen, 19 F.3d at 577-78*.

**[\*\*26]   [\*1290]** For example, in Cooper a deputy sheriff's interest in cooperating with a GBI investigation into corruption at the sheriff's office outweighed the sheriff's interest in the efficient operation of the department. However, in Bryson, this Court concluded that the Pickering balance weighed in favor of the defendant police department. Bryson filed a complaint with the city manager that Chief Taylor "had stolen whiskey from the police department evidence room in 1980." *Bryson, 888 F.2d at 1564*. Similar to this case, that complaint was later determined to be unfounded. However, Bryson also made "bitter complaints" to all who would listen in the police department and became increasingly dissatisfied with the Chief's personnel decisions. As a result, Bryson's speech was afforded less weight. *Id. at 1567*; see also *Hansen, 19 F.3d at 577* (finding that the Pickering balance did not inevitably favor the plaintiff officer where he provided deposition testimony in the criminal prosecution of another police officer because his statements were made in a "vulgar, insulting, and defiant" manner). [17]

**[\*\*27]** There is no evidence that Stanley's speech caused disruption in the Dalton Police Department or was stated in an inappropriate manner. However, Stanley's speech admittedly were merely a theory rather than concrete statements of fact about what Stanley had actually seen, heard, or knew about criminal activity in the police department. Chadwick was Deputy Chief, and the only basis for Stanley's theory was, in effect, Chadwick's management role over the evidence room and his possession, in that role, of a key to that room. Making an accusation as serious as theft against a Deputy Chief based on only his role as a manager undoubtedly could be considered disruptive

and potentially undermining to the mutual respect and confidence needed for fellow officers in a police department.

The police department has a strong interest in preventing disruptive speech, such as unfounded accusations against superiors. This is especially true here where Stanley could easily have advised the GBI that **[\*1291]** Chadwick was in charge of the evidence room and had one of the two keys without going further and accusing Chadwick of theft. At a minimum, Stanley has a diminished interest in offering a theft accusation **[\*\*28]** which he, as a trained police officer, described as merely a theory. The fact that the GBI initiated the questioning of Stanley does not mean that everything Stanley said was protected speech. See *Hansen, 19 F.3d at 576* (stating that "the act of providing testimony does not, by itself, absolutely shield the public employee from further scrutiny by his superiors"). If, for example, Stanley intentionally and knowingly falsely accused Chadwick of theft, the Pickering balance readily would favor the government's need for trustworthy police officers. [18]

**[\*\*29]** On the other hand, because the theft looked to Stanley like "it was inside" and Chadwick was in charge of the evidence room, Stanley had some factual basis, albeit slight, for telling the GBI that he suspected Chadwick. Stanley also did not voice his suspicions to any co-workers outside the GBI interview room or the public. [19] In contrast to Hansen, Stanley's statements

---

[17] See also *Busby, 931 F.2d at 774* (finding that the balance would not inevitably weigh in favor of the plaintiff police officer because the defendants merely sought to delay access to a public forum until the police department's internal affairs division could investigate the complaints); *Dartland, 866 F.2d at 1324* (stating that the "rude and insulting" nature of the speech gave the speech a personal rather than public aspect and thereby diminished the interest of the plaintiff in expressing the sentiments).

---

[18] At this juncture, Chadwick has not shown knowledge or reckless falsehood, but we agree that knowingly or recklessly false statements would not be entitled to *first amendment* protection. See *Chappel v. Montgomery County Fire Protection Dist. No. 1, 131 F.3d 564, 576 (6th Cir. 1997)* (stating "although protection may not be available when a public employee knowingly or recklessly makes false statements, it is the defendants' burden to establish that [the plaintiff] knew or was recklessly indifferent to the fact that his speech was false") (citations omitted); see also *Dill v. City of Edmond, Okla., 155 F.3d 1193, 1202 (10th Cir. 1998)* (stating that defendants must show that the plaintiff knew or should have known that the statements were false); *Powell v. Gallentine, 992 F.2d 1088, 1091 (10th Cir. 1993)* (stating that even false statements are protected as long as they were not knowingly or recklessly false).

[19] If Stanley did in fact voice his suspicions to co-workers, such as Walthour, outside of the context of the GBI interview, a different outcome might ensue. Given the summary judgment posture of this case, however, we must assume the accuracy of Stanley's testimony that he did not do so.

were responsive to the GBI's inquiry, and in contrast to Bryson, there is no evidence of disruption of the Dalton police department's operations. We conclude that the Pickering balance tilts in Stanley's favor.

## C. Substantial Factor in Termination

Under Bryson, we next determine whether Chadwick terminated Stanley in 1997 in substantial **[**30]** part because of Stanley's statements to the GBI in 1993. The district court correctly concluded that Stanley's evidence created a jury question regarding whether his protected speech was a substantial factor in Chadwick's employment decision. We have stated that the plaintiff's burden in this regard is not a heavy one. See _Walker v. Schwalbe, 112 F.3d 1127, 1131 (11th Cir. 1997)_; _Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554, 1564 (11th Cir. 1995)_. Further, "it is neither possible nor desirable to fashion a single standard for determining when an employee has met her initial burden of demonstrating that a retaliatory intent was a 'substantial' or 'motivating factor' behind a government employment decision." _Beckwith, 58 F.3d at 1564._ Rather, we examine the record as a whole to ascertain whether Stanley presented sufficient evidence for a reasonable jury to conclude that his protected speech was a "substantial" motivating factor in the decision to terminate him. Id. [20]

_____

[20] In conducting this examination in the past, we considered several factors as relevant. We concluded that "_HN14_ ⬆" where termination closely follows protected activity, it is usually reasonable to infer that the activity was the cause of the adverse employment decision." _Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 745 (11th Cir. 1996)._ We also examined whether any other asserted reasons for the termination were shown to be pretextual. See _Walker, 112 F.3d at 1131_ (noting a question of fact as to whether the policy under which the employee was allegedly fired was in effect at the time of the conduct in question); _Stewart v. Baldwin County Bd. of Educ., 908 F.2d 1499, 1507 (11th Cir. 1990)_ (noting evidence calling the asserted reason for the discharge into question). Further, we examined any comments made, or actions taken, by the employer indicating that the discharge was related to the protected speech. See _Fikes, 79 F.3d at 1084_ (noting the police chief's statement that he wanted the plaintiff out of the department); _Stewart, 908 F.2d at 1507_ (noting comments indicating the speech was a factor in the termination decision); _Morro v. City of Birmingham, 117 F.3d 508, 516 (11th Cir. 1997)_; _Beckwith, 58 F.3d at 1565_; _Schneider v. Indian River Community College Found., Inc., 875 F.2d 1537, 1543 (11th Cir. 1989)_. We also looked to whether the asserted reason for the discharge varied. See

**[**31]** In this case, Stanley is not able to show any inference of causation from temporal proximity. Indeed, there was an almost four year gap between his protected speech and his termination, which arguably defeats causation. Nonetheless, we have stated that "gaps of time, standing alone, do not preclude [a plaintiff] from producing enough evidence for a reasonable jury to conclude that protected speech was a substantial factor in the decision to terminate him." _Beckwith, 58 F.3d at 1567_ (fourteen-month lapse in time); _Schneider v. Indian River Comm. College Found., Inc., 875 F.2d 1537, 1543 n.9 (11th Cir. 1989)_ (ten-month lapse in time). **[*1292]** Although the gaps of time in these cases were significantly shorter than the four year gap here, Stanley is not precluded from producing other evidence to establish causation.

Stanley's evidence shows that Chadwick confronted Stanley about his statements to the GBI and challenged the basis for Stanley's suspicions. When Chadwick became Chief, he transferred Stanley without asking his preference of assignments as he did others. Chadwick also failed to follow departmental policy in advertising an available promotion and **[**32]** promoted another employee even though Stanley was eligible for consideration for the promotion. In 1994, Chadwick ordered an investigation of the "buy fund" and reprimanded Stanley even after he passed a polygraph test. Tellingly, Chadwick also asked Stanley how it felt "to be put under the microscope of suspicion." In 1997, Chadwick reprimanded only Stanley and not Cooper even though the internal investigation faulted both of them. Chadwick then discharged Stanley after the Coker incident. Although a close call, we conclude that Stanley presented sufficient evidence to create a jury question on causation.

## D. "But For" Test

The district court summarily stated that "a finding in Plaintiff's favor on the third part of the Bryson test compels a finding in favor of Plaintiff on the fourth part

_____

_Fikes, 79 F.3d at 1084_ (noting that the initial cause cited for discharge was different than the cause stated at an internal hearing). Finally, we considered circumstantial evidence of causation including such facts as who initiated any internal investigations or termination proceedings, whether there was any evidence of management hostility to the speech in question, or whether the employer had a motive to retaliate. See _Beckwith, 58 F.3d at 1564-65_. There is no one factor that is outcome determinative, but all factors must be taken into account.

as well." This was error because a defendant may still obtain summary judgment on the affirmative defense set out in Bryson's fourth step, even if a plaintiff presents a factual issue on the third prong. Chadwick may still prevail by showing that there is no question of fact as to whether he would have taken the same action in the absence of the speech. See *Harris v. Shelby County Bd. of Educ., 99 F.3d 1078, 1086 (11th Cir. 1996)* [**33] (granting **HN15**[⬆️] summary judgment for the defendant on a *first amendment* retaliation claim, despite the assumption that plaintiff could show that his speech was a substantial factor in his failure to be promoted, because the defendant showed that the same decision would be made even absent the protected speech); *Marshall v. City of Cape Coral, 797 F.2d 1555, 1561 (11th Cir. 1986)* (same). [21] Rather than remanding this issue, we address it in light of our independent review of the record on other issues.

[**34] Bryson's fourth step involves an affirmative defense that is derived directly from the Supreme Court's decision in *Mt. Healthy City Board of Education v. Doyle, 429 U.S. 274, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977)*. Plaintiff Doyle claimed that he had been discharged as a public school teacher for exercising his free-speech rights under the *First Amendment*. Because the Court did not wish to place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing, *id. at 285*, the Court concluded that such an employee ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to

rehire on the basis of that record. *429 U.S. at 286*. **HN16**[⬆️] As a result, the Court in Mt. Healthy held that once the **[*1293]** plaintiff shows that his constitutionally protected speech was a "substantial" or "motivating factor" in his adverse treatment by the employer, the employer should be given an opportunity to show "by a preponderance of the evidence that it would have reached the same decision as to [the [**35] plaintiff] even in the absence of the protected conduct." *429 U.S. at 287*.

To fulfill this burden, a government employer must show that the legitimate reason would have motivated it to make the same employment decision. See *Holley v. Seminole County Sch. Dist., 755 F.2d 1492, 1505 (11th Cir. 1985)* (stating that the issue under Mt. Healthy "is not whether the Board had objective reason not to renew Holley - it apparently did - but, rather, what in fact motivated the Board in light of Holley's political activity."). **HN17**[⬆️] An employer must show "by a preponderance of the evidence, that, in light of [its] knowledge, perceptions, and policies at the time of the termination, [it] would have terminated [the employment] regardless of [the protected] speech." Board of County Comm'rs, Wabaunsee *Cty., Kansas v. Umbehr, 518 U.S. 668, 685, 135 L. Ed. 2d 843, 116 S. Ct. 2342 (1996)*. In cases where we affirmed summary judgment for the employer under this fourth prong, we found no liability despite the employer's partial reliance upon protected speech in taking an adverse employment action. In each case, we focused on the particular evidence in the [**36] summary judgment record. For example, in *Harris v. Shelby County Board of Education, 99 F.3d 1078 (11th Cir. 1996)*, the plaintiff, an assistant high school principal, alleged that he was not selected as principal due to his comments to a newspaper regarding racial and criminal tensions at the school. There was strong evidence that speech was a substantial factor in the decision because the main decisionmaker stated that she was "mad as hell" about the newspaper article, she intended to ask the plaintiff about it, and that the plaintiff was "too controversial" for the position. *Id. at 1081*. We concluded, however, that even if the plaintiff succeeded on Bryson's first three prongs, the defendant presented sufficient evidence that the same decision would have been made absent the protected speech to warrant summary judgment. Specifically, the successful candidate had nine years' experience as a principal, while the plaintiff had none, and was certified for school administration while the plaintiff was not. The successful candidate had been named the Outstanding Secondary School Principal in Alabama and President of the Alabama Association of

---

[21] We recognize that in Beckwith this court stated that "if Appellant produced enough evidence for a reasonable jury to conclude that a retaliatory animus substantially motivated his termination, Appellees could only rebut this showing by convincing the jury, not the court, that a legitimate reason justified the decision. *Beckwith, 58 F.3d at 1564*; see also *Morro v. City of Birmingham, 117 F.3d 508, 516 (11th Cir. 1997)*. However, Beckwith was an appeal from a final judgment on the merits in favor of the defendant and no qualified immunity issues were raised in that case. Beckwith focused on the third prong about whether the plaintiff had shown his protected speech was a substantial factor in the employer's decision to terminate him and did not examine the evidence regarding, or discuss, the fourth prong. In contrast, those cases involving a qualified immunity defense all appear to conduct an inquiry of the fourth prong on the merits prior to reaching the qualified immunity question. See, e.g., *Vista, 107 F.3d at 845-46*; *Walker, 112 F.3d at 1132*. Thus, this is what we do here.

219 F.3d 1280, *1293; 2000 U.S. App. LEXIS 18053, **36

Secondary [**37] School Principals. Also, the plaintiff himself expressed uncertainty as to whether he was ready to assume a high school principalship. _Id. at 1085-86_.

Similarly, in _Marshall v. City of Cape Coral, 797 F.2d 1555 (11th Cir. 1986)_, the plaintiff was Superintendent of the Water Production Division of the Cape Coral Utilities Department and oversaw two water plants where water quality standards were not observed. The plaintiff's supervisor discharged him for insubordination and failing to perform certain duties relating to the violations of water quality standards. The plaintiff alleged that the true reason for his discharge was his memorandum criticizing his supervisor, which he sent to the City Manager directly (instead of through proper channels). This court found that, even assuming the memorandum was protected speech and the insubordination charge was improper, it was not disputed that water quality standards were violated and plaintiff failed to report the violations. The City Manager affirmed the plaintiff's discharge based solely on deficient performance, and felt he had no choice but to fire the plaintiff given the admitted violation of water [**38] standards. As a result, we stated that "we cannot say that summary judgment is never appropriate for these employee speech claims where the defendant so clearly had compelling independent reasons for not continuing employment." _Id. at 1561_ (quoting _Montgomery v. Boshears, 698 F.2d 739, 743 (5th Cir. 1983))_.

This same fact intensive approach has been followed in retaliation cases in the [*1294] employment setting where we affirmed the denial of summary judgment. [22] Thus, in evaluating summary judgment involving Bryson's fourth step, we have engaged in a case-by-case approach based upon the particular facts of each case in order to determine whether the defendant would have fired the plaintiff absent the protected speech.

Chadwick attempts to prevail [**39] by proffering evidence of the polygraph results indicating deception, the Coker and Cooper incidents, and Stanley's history of similar outbursts. Stanley, however, still disputes the Coker incident and parts of the Cooper altercation. There is deception in Stanley's polygraph results. Lies

by a police officer can alone be sufficient to support termination and can carry the day under the fourth prong in certain circumstances. However, here, Stanley's deception concerned whether he used profanity and lost his temper with Coker, rather than any form of criminal activity or sexual harassment of other employees. Thus, while Chadwick has presented sufficient evidence to create a jury issue on the fourth step's affirmative defense, his evidence is not strong enough to warrant judgment as a matter of law. While the deception alone was an adequate lawful basis to terminate Stanley, we cannot say as a matter of law that Chadwick necessarily would have done so absent Stanley's having accused him of theft.

## V. CLEARLY ESTABLISHED LAW

Having created jury issues on the existence of his constitutional claim, Stanley still must demonstrate that a reasonable police chief would know that [**40] terminating a subordinate officer in these factual circumstances violated clearly established law. See _Harlow v. Fitzgerald, 457 U.S. 800, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982)_. We examine the precise conduct by Chadwick and Stanley--such as, the precise information Stanley had before his GBI interview and Chadwick possessed about Stanley's misconduct before terminating him--in order to determine whether a reasonable police chief would have known that terminating Stanley violated clearly established law. [23] The question is not whether a reasonable police chief would know the general principle that it violates the law to terminate a public employee in retaliation for protected speech. Instead, here, as in all qualified immunity cases, the issue is fact specific: in 1997, would a reasonable police chief have known that terminating a subordinate officer in this particular factual context violated clearly established law.

 [**41] This objective formulation shields Chadwick from suit, even though he in fact committed constitutional violations, provided that a police chief reasonably, albeit mistakenly, could have believed that his conduct was lawful. In other words, _HN18_[⬆] a police chief can guess wrong about the constitutionality of his conduct, provided the mistake is a reasonable one. The Supreme Court has stated that "the Harlow [objective reasonableness] standard . . . gives ample

---

[22] See _Holley, 755 F.2d at 1505_; _Clemons v. Dougherty Cty., Ga., 684 F.2d 1365, 1370-71 (11th Cir. 1982)_; _Avery v. Homewood City Bd. of Educ., 674 F.2d 337, 341 (5th Cir. Unit B 1982)_.

[23] See the discussion of this approach in _Dolihite v. Maughon, 74 F.3d 1027, 1034 n.3 (11th Cir. 1996)_.

room for mistaken judgments." *Malley v. Briggs, 475 U.S. 335, 343, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986).* [24] *Harlow* does because "reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow, 457 U.S. at 818.*

 **[\*\*42]** At this stage of our inquiry, Chadwick asserts two different theories of qualified **[\*1295]** immunity. First, Chadwick argues that, because Chadwick was motivated, at least in part, by legitimate considerations, Chadwick - even if he also acted, in part, upon unlawful motives - acted in an objectively reasonable manner. Second, Chadwick argues that, because the <u>Pickering</u> balance in this case was not inevitable, it was not clearly established in this circuit in 1997 that Stanley's speech was entitled to *first amendment* protection. We now address Chadwick's arguments in turn.


**A. Clearly Established Law and Mixed Motives**

Chadwick contends that the record - even when viewed in the light most favorable to Stanley - demonstrates, at worst, a mixed-motives case. Chadwick says that the record indisputably establishes that Chadwick was motivated, at least in part, by lawful considerations. And, Chadwick - citing our decision in *Foy v. Holston, 94 F.3d 1528 (11th Cir. 1996)* - argues that, in the light of these lawful motives, a reasonable police chief in Chadwick's circumstances (having both lawful and unlawful motives) would not have known that terminating Stanley's **[\*\*43]** employment violated clearly established law. Accordingly, Chadwick says that he is entitled to qualified immunity.

**HN19**[⬆] ] In <u>Foy</u>, we noted that the presence of a jury issue about a defendant's improper intent does not necessarily preclude qualified immunity. [25] **[\*\*44]** *Foy,*

---

[24] Our prior decisions discuss in depth the policy reasons why the qualified immunity defense allows for reasonably mistaken beliefs. See, e.g., *Foy v. Holston, 94 F.3d 1528, 1532-34 (11th Cir. 1996)*; *Lassiter v. Alabama A & M Univ. Bd. of Trustees, 28 F.3d 1146, 1149-50 (11th Cir. 1994)* (en banc).

[25] **HN20**[⬆] ] Qualified immunity is not ruled out "wherever discriminatory intent appears in the summary judgment record even if discriminatory intent is an element of the underlying constitutional tort." *Foy, 94 F.3d at 1533.* Indeed, "the Supreme Court has not instructed us to drop qualified

*94 F.3d at 1533.* We explained that "where the facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful <u>and</u> unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity." *Id. at 1535.* The decision in <u>Foy</u> is the law of this circuit and sets out the proper analysis to apply in potential mixed-motive cases. [26] See *Johnson v. City of Fort*

---

immunity (with its test of objective reasonableness) from cases in which discriminatory intent is an element of the underlying tort." *Id. at 1533-34.* "At least when an adequate lawful motive is present, that a discriminatory motive might also exist does not sweep qualified immunity from the field even at the summary judgment stage." *Id. at 1534-35.*

[26] Since we decided <u>Foy</u>, the Supreme Court has decided *Crawford-El v. Britton, 523 U.S. 574, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998)*. The parties disagree about the effect of <u>Crawford-El</u> upon <u>Foy</u> and its progeny. We, therefore, have re-examined <u>Foy</u> in the light of <u>Crawford-El</u>. We conclude that <u>Foy</u> remains the law of this Circuit.

In <u>Crawford-El</u>, the Supreme Court rejected a rule - adopted by the D.C. Circuit - imposing a heightened burden of proof on plaintiffs in unconstitutional-motive cases. See *118 S. Ct. at 1588-90* (discussing rule adopted by lower court). The Court - concluding that a heightened burden of proof is unnecessary to preserve the qualified immunity defense in unconstitutional-motive cases - noted that the settled rules of summary judgment and qualified immunity facilitate the disposition of even unconstitutional-motive cases at the summary judgment stage. *523 U.S. at 593, 118 S. Ct. at 1594.* The Court, however, did not discuss how exactly courts should apply the objective reasonableness test after a plaintiff has created a jury question on improper motive where improper motive is an element of the plaintiff's claim. See *523 U.S. at 602, 118 S. Ct. at 1599* (Rehnquist, C.J., dissenting) (noting that Court did not "discuss this question at all"); <u>see also</u> Eskow and Cole, <u>The Unqualified Paradoxes of Qualified Immunity: Reasonably Mistaken Beliefs, Reasonably Unreasonable Conduct, and the Specter of Subjective Intent That Haunts Objective Legal Reasonableness</u>, *50 Baylor L. Rev. 869, 895 (1998)* ("<u>Crawford- El</u> did not, however, address what the district court should do once the plaintiff submits his or her evidence of intent to the court and a defendant raises a qualified immunity defense."). In this regard, <u>Crawford-El</u> did not separately propose its own analysis for unconstitutional-motive cases, much less reject the kind of analysis we used in <u>Foy</u>. And, because <u>Foy</u> is based on well-settled principles of summary judgment and qualified immunity, we think that the approach taken in <u>Foy</u> is consistent with the Supreme Court's words and holding in <u>Crawford-El</u>. We, therefore, conclude that <u>Foy</u> remains the law of this circuit. See *United States v. Smith, 201 F.3d 1317, 1322 (11th Cir. 2000)* (explaining that this Court is

*Lauderdale, 126 F.3d 1372, 1379 [\*1296] (11th Cir. 1997)* (applying <u>Foy</u> and granting qualified immunity at summary judgment in a *first amendment* retaliation case indicating mixed motives). We, therefore, apply the <u>Foy</u> analysis in this case.

**[\*\*45]** We conclude that Chadwick is due qualified immunity under <u>Foy</u>. *HN21*[⬆] A defendant is entitled to qualified immunity under the <u>Foy</u> rationale only where, among other things, the record indisputably establishes that the defendant in fact was motivated, <u>at least in part</u>, by lawful considerations. See *Foy, 94 F.3d at 1535* (The record makes it clear that Defendants' acts were actually motivated by lawful considerations without which they would not have acted."); *see also Johnson, 126 F.3d at 1379* (noting that <u>Foy</u> "rested primarily on the existence of an indisputable and adequate lawful motive"). In this case - viewing the record in the light most favorable to Stanley, as we must at the summary judgment stage - we can say that the record undisputably establishes (a) that objectively valid reasons did exist for the step Chadwick took, and (b) that Chadwick was motivated, at least in part, by these lawful considerations. Thus, even at the summary judgment stage, we can say that this case is indisputably one of mixed motives. Therefore, <u>Foy</u> commands qualified immunity on mixed-motive grounds in this case. [27]

**[\*\*46]** First, an undisputed and adequate lawful basis existed for Stanley's termination. While Stanley denies certain parts of the Coker and Cooper incidents, Stanley admitted that he used profanity and placed his hands on Cooper and that Walthour's internal investigation faulted him, along with Cooper. Chadwick then wrote Stanley that he would not tolerate further displays of temper and that further conduct along this line could result in discipline, including termination. Subsequently, Coker

complained about Stanley's loss of temper and profanity. While Stanley denied Coker's allegations, the undisputed evidence shows that Stanley's polygraph results indicated deception in his statements during the Coker internal investigation. Thus, an adequate lawful basis existed for the termination of Stanley. [28] *Foy, 94 F.3d at 1535*. Furthermore, Stanley has not shown that it would have been unlawful to terminate him for his conduct with Cooper and deception in the Coker matter absent his speech. No jury could find that it would have been unlawful to terminate Stanley as Chadwick did absent retaliatory motive. See *Foy, 94 F.3d at 1535*.

**[\*\*47]** Secondly, the record also establishes without dispute that Chadwick was motivated, at least in part, by Stanley's deception and incidents with Cooper and Coker. [29] Chadwick consistently--in a meeting **[\*1297]** with Stanley, in a letter to Stanley, in his deposition, and in an affidavit--identified Stanley's deception and the incidents with Cooper and Coker as motives for Chadwick's decision to terminate Stanley. Captain Walthour recommended to Chadwick that Stanley be terminated because of his deception and losing his temper with Cooper and Coker. And, very important, it is undisputed that Stanley's protected speech was in 1993 but that Chadwick did not terminate Stanley until <u>after</u> Stanley's incidents with Coker and Cooper in 1997. While we cannot say on the underlying constitutional claim--at this summary judgment stage--that it is indisputable that Stanley would have reached the same decision totally <u>absent</u> the protected speech, we can

---

bound by earlier panel holding "unless and until that holding is overruled en banc, or by the Supreme Court").

[27] <u>Foy</u>'s approach is particularly appropriate in this *first amendment* case because <u>Foy</u> drew, in part, on the Supreme Court's decision in <u>Mt. Healthy City Board of Education v. Doyle</u>, which is directly applicable to Stanley's constitutional claim. Even if a plaintiff proves a retaliatory motive <u>and</u> causation, a defendant employer can still win under <u>Mt. Healthy</u> (<u>Bryson</u>'s fourth step) if the employer shows that it would have made the same decision absent the protected speech. Even if improper retaliatory motive and causation are proven, a defendant employer still has an affirmative defense to liability under <u>Bryson/Mt. Healthy</u> and an affirmative defense to suit under qualified immunity.

---

[28] In the Dalton City Handbook, both "the willful making of false statements to supervisors, officials, the public, boards, commissions, or agencies" and "engaging in offensive conduct or using offensive language toward the public, supervisory personnel, or fellow employees" are listed as actions subject to discipline up to, and including, dismissal. Further, the Dalton Police Department Rules of Conduct lists both lying in a departmental investigation and profane language as Conduct Unbecoming an Officer for which the maximum penalty is dismissal.

[29] We emphasize that it is not sufficient for Chadwick to establish that there exists a lawful basis for a reasonable police chief to have terminated Stanley. Rather, in order for the <u>Foy</u> analysis to apply, Chadwick himself must have been actually motivated, at least in part, by that lawful basis. See *Johnson, 126 F.3d at 1379* (noting that <u>Foy</u> "rested primarily on the existence of an indisputable and adequate lawful motive on the part of the social service employees"); *Foy, 94 F.3d at 1535* ("the record makes it clear that Defendants' acts were actually motivated by lawful considerations without which they would not have acted.").

say that it is indisputable that, even given that speech, Chadwick would not have terminated Stanley in 1997 absent the 1997 incidents. Although the four year time gap does not preclude Stanley from showing that Chadwick acted in substantial part **[**48]** because of Stanley's protected speech, this time gap and the undisputed fact that Chadwick did not terminate Stanley until after Stanley's deception and after not one, but two, incidents with co-employees show undisputably that Stanley's 1997 conduct and deception prompted, at least in part, Chadwick's actions. It is also undisputed that after the first incident, Chadwick warned Stanley about the consequences of similar conduct in the future, and then terminated him only after the conduct reoccurred. Thus, the summary judgment record undisputably establishes that Chadwick was motivated, at least in part, by Stanley's misconduct and deception in 1997.

**[**49]** As explained above, Chadwick may prevail on the merits of this *first amendment* retaliation claim even if Stanley establishes that Chadwick acted in substantial part in retaliation for Stanley's protected speech. Specifically, Chadwick would prevail if he could show that he would have reached the same decision absent the protected speech. Although Chadwick has not succeeded on this affirmative defense at the summary judgment stage, the presence of the defense nonetheless must be taken into account in our analysis of the clearly established law. The result is that Chadwick is entitled to qualified immunity if, given the presence of an undisputable and lawful motive, a reasonable police chief would not have known that firing Stanley for both his protected speech and this lawful reason violated Stanley's constitutional rights.

Here, Stanley has not demonstrated that a reasonable police chief, faced with the same evidence of Stanley's conduct and acting at least in part with a lawful motive, would have known that terminating Stanley violated clearly established law. Even if a reasonable police chief acted with retaliatory motive, the law in 1997 did not clearly establish that a reasonable **[**50]** police chief--faced with the same undisputed evidence of Stanley's misconduct and undisputably acting at least in part because of Stanley's misconduct--should not have terminated Stanley in the same manner. See *Johnson v. City of Fort Lauderdale, Fla., 126 F.3d 1372, 1379 (11th Cir. 1997)*. Stanley points us to no cases (and we have found none) which have clearly established as a matter of law that a reasonable police chief cannot act lawfully under these circumstances--even when we accept that the circumstances do include a retaliatory

motive on account of Stanley's protected speech. See *Foy, 94 F.3d at 1536*.

*HN22*[↑] Because, given the circumstances and the state of the law, a reasonable police chief could have lawfully terminated Stanley for his misconduct and thus could have considered Chadwick's termination proper, even if motivated in substantial part by an unlawful motive, Chadwick's termination of Stanley was objectively reasonable for the **[*1298]** purposes of qualified immunity. See *Johnson, 126 F.3d at 1379*; *Foy, 94 F.3d at 1536*. Thus, the district court erred in denying Chadwick qualified immunity.

**B.  Clearly  [**51]   Established  Law  and  the Pickering Balance**

We find Chadwick's second argument - that the outcome of the Pickering balance in this case was not inevitable - equally compelling. We conclude that, in 1997, it was not clearly established in this circuit that the Pickering balance would inevitably weigh in Stanley's favor. Given the fact that Stanley's "theory" that Chadwick stole money was based mainly on Chadwick's being the manager over the evidence room and that this theory was never substantiated, we cannot say that the Pickering balance would lead a reasonable police chief to "the inevitable conclusion" that Stanley's speech was protected by the *First Amendment*. See *Dartland v. Metropolitan Dade County, 866 F.2d 1321, 1323 (11th Cir. 1989)* (stating "the employer is entitled to immunity except in the extraordinary case where Pickering balancing would lead to the inevitable conclusion that the [act taken against] the employee was unlawful"); see also *Hansen v. Soldenwagner, 19 F.3d 573, 575-76 (11th Cir. 1994)*; *Sims v. Metropolitan Dade County, 972 F.2d 1230, 1236-37 (11th Cir. 1992)*; *Busby v. City of Orlando, 931 F.2d 764, 773-75 (11th Cir. 1991)*. **[**52]** As we have said before, "*HN23*[↑]] because Pickering requires a balancing of competing interests on a case-by-case basis, our decisions tilt strongly in favor of immunity by recognizing that only in the rarest of cases will reasonable government officials truly know that the termination or discipline of a public employee violated 'clearly established' federal rights." *Hansen, 19 F.3d at 576*; see also *Dartland, 866 F.2d at 1323-24*. Thus, the district court erred in denying Chadwick qualified immunity on this ground as well.

**VI. CONCLUSION**

Under our circuit precedent, we conclude that the district

219 F.3d 1280, *1298; 2000 U.S. App. LEXIS 18053, **52

court erred in denying Chadwick qualified immunity on Stanley's *first amendment* claims. Accordingly, to that extent, we reverse the district court's order, dated April 16, 1999, denying Chadwick's motion for summary judgment and remand this case for the district court to enter judgment for Chadwick on Stanley's *first amendment* claims.

**REVERSED AND REMANDED.**

End of Document



⚠ Caution
As of: May 24, 2023 8:01 PM Z

## *Gattis v. Brice*

United States Court of Appeals for the Eleventh Circuit

March 3, 1998, Decided

No. 95-4117.

**Reporter**

136 F.3d 724 *; 1998 U.S. App. LEXIS 3658 **; 13 I.E.R. Cas. (BNA) 1725; 11 Fla. L. Weekly Fed. C 1129

Gary GATTIS, Plaintiff-Appellant, v. Herman BRICE, individually and in his official capacity as Fire Chief of Palm Beach County Fire Rescue, Palm Beach County, Florida, a local governmental agency, Michael Iacona, individually and in his official capacity as Deputy Chief of Palm Beach County Fire Rescue, Larry Koester, individually and in his official capacity as Deputy Chief of Palm Beach County Fire Rescue, Robert Weisman, in his official capacity as County Administrator for Palm Beach County, Defendants-Appellees.

**Prior History: [**1]** Appeal from the United States District Court for the Southern District of Florida. (No. 91-8739-CIV-JCP), James C. Paine, Judge.

**Disposition:** AFFIRMED.

## Core Terms

demoted, battalion chief, deputy chief, motives, recommendation, retaliatory

## Case Summary

**Procedural Posture**

Plaintiff employee challenged the judgment of the United States District Court for the Southern District of Florida that granted defendant county and fire department administrators summary judgment after the pleadings closed in plaintiff's action filed under *42 U.S.C.S. § 1983*. Plaintiff claimed that he had been demoted within the fire department because he exercised his *U.S. Const. amend. I* right of free speech.

**Overview**

In proceeding under *42 U.S.C.S. § 1983*, plaintiff employee sought injunctive relief to restore him to his former position and money damages against defendant county and fire department administrators. The district court granted defendants' summary judgment motions. On appeal, summary judgment was affirmed. The court found the salient facts to be that defendant administrator anticipated that there would be a county budget finding that the fire department had too many senior officers, and took action to reorganize the department to keep it within budgetary constraints. As a result, the department eliminated eleven positions and personnel holding the eliminated positions, such as plaintiff, were generally demoted to the next tier of management. The court found no evidence in the record that would have permitted a jury to conclude that such actions represented a county policy established in retaliation for plaintiff's exercise of his *U.S. Const. amend. I* right to free speech in his criticism of two of defendant's administrative policy decisions, or that mere acceptance of the list of poorly-rated battalion chiefs, which included plaintiff, was in any way retaliatory.

**Outcome**

The trial court's grant of summary judgment to defendant county and fire department administrators in plaintiff employee's action that claimed violation of his right of free speech was affirmed. The court found that plaintiff had presented nothing that would have convinced a reasonable jury that his speech was a substantial or motivating factor in his demotion. Therefore his claim could not survive summary judgment.

## LexisNexis® Headnotes

Civil Rights Law > ... > Section 1983
Actions > Scope > Government Actions

Governments > Local Governments > Claims By &

136 F.3d 724, *724; 1998 U.S. App. LEXIS 3658, **1

Against

Civil Rights Law > Protection of Rights > Section 1983 Actions > Scope

*HN1*[⬇] **Scope, Government Actions**

A local government can only be held liable under *42 U.S.C.S. § 1983* if a municipal policy or custom exists pursuant to which that government violates a plaintiff's constitutional rights.

Civil Rights Law > ... > Section 1983 Actions > Scope > Government Actions

Governments > Local Governments > Employees & Officials

Civil Rights Law > Protection of Rights > Section 1983 Actions > Scope

*HN2*[⬇] **Scope, Government Actions**

If a county official holds final policymaking authority for the county in the subject area of the alleged violation of *42 U.S.C.S. § 1983*, that official's decisions may constitute county policy.

Civil Rights Law > Protection of Rights > Section 1983 Actions > Scope

*HN3*[⬇] **Protection of Rights, Section 1983 Actions**

To succeed in a *42 U.S.C.S. § 1983* suit based on a claim of retaliation for speech, the plaintiff must show that his speech was a "substantial" or "motivating" factor in the allegedly retaliatory decision. The question of whether the plaintiff has established this element is one for the fact-finder.

Civil Rights Law > ... > Section 1983 Actions > Scope > Government Actions

Civil Rights Law > Protection of Rights > Section 1983 Actions > Scope

*HN4*[⬇] **Scope, Government Actions**

A policymaker's approval of an unconstitutional action can constitute unconstitutional county policy under *42 U.S.C.S. § 1983* only when the policymaker approves a subordinate's decision and the basis for it.

**Counsel:** For APPELLANT(S): Mark Berkowitz, Ft. Lauderdale, Florida. Joseph E. Altschul, ALTSHUL & LANDRY, Weston, FL.

For APPELLEE(S): PETER JOSEPH HURTGEN, Morgan, Lewis & Bockius, P.A., Miami, FL. James G. Brown, RICHESON & BROWN, P.A., Orlando, FL. DENISE JOANNE BLEAU, Palm Beach County Atty. Office, West Palm Beach, FL.

**Judges:** Before TJOFLAT, Circuit Judge, and RONEY and PHILLIPS [*], Senior Circuit Judges.

**Opinion by:** TJOFLAT

# Opinion

[*725]  TJOFLAT, Circuit Judge:

In this case, an employee of the Palm Beach County Fire Department, appellant Gary Gattis, claims that he was demoted within the department because he exercised his *First Amendment* right of free speech. Gattis expressed his views on two issues: one concerned the department's proposed alterations to the county's fire code; the other concerned the department's equipment procurement policies. Gattis has sued the county, the county administrator, and in the order of descending [**2] supervisory authority in the department, Fire Administrator Herman Brice and Deputy Chiefs Michael Iacona and Larry Koester. Proceeding under *42 U.S.C. § 1983 (1994)*, Gattis seeks an injunction restoring him to his former position, [1] and money damages against the county and each individual defendant in the defendant's official capacity. Gattis also seeks damages against Brice, Iacona, and Koester in their individual capacities.

After the pleadings closed, the district court granted the defendants summary judgment. Gattis now appeals, presenting one issue: whether Brice demoted Gattis

---

[*] Honorable J. Dickson Phillips, Jr., Senior U.S. Circuit Judge for the Fourth Circuit, sitting by designation.

[1] Gattis' amended complaint seeks an injunction but does not indicate the relief the injunction should provide. We assume that relief is the restoration of Gattis' former position of Battalion Chief.

136 F.3d 724, *725; 1998 U.S. App. LEXIS 3658, **2

pursuant to a county policy, established by Brice in his capacity as fire administrator, which called for Gattis' demotion in retaliation for his engaging in the above speech. [2] We find no evidence in the record that would permit [**3] a jury to conclude that Brice established such a policy for the county and that he demoted Gattis in pursuance thereof. We therefore affirm.

[**4]  I.

The salient facts are these. In 1991, the Palm Beach County Fire Department was [*726] arranged in the following descending hierarchy: Fire Administrator, Division Chiefs, Deputy Chiefs, Battalion Chiefs, District Chiefs, and Captains. Fire Administrator Brice reported to the county administrator, who in turn reported to the board of commissioners for Palm Beach County. In the fall of 1991, Administrator Brice, in anticipation of a report from the Office of Finance, Management, and Budget finding that the fire department had too many senior officers, reorganized the department to keep it within budgetary constraints. As a result of this reorganization, the department eliminated eleven positions: one deputy chief, two division chief, three battalion chief, and five district chief positions. Personnel holding the eliminated positions were

generally demoted to the next tier of management.

To determine which battalion chiefs would be demoted to district chief positions, Chief Brice asked Deputy Chiefs Koester, Iacona, and Sweat [3] to recommend for reassignment three of the battalion chiefs under their supervision. The deputy chiefs developed an objective evaluation form, upon which they [**5] rated each battalion chief numerically in five areas: Leadership, Teamwork, Organizational Skills, Knowledge and Experience, and Accountability. They then forwarded the names of the three lowest-rated battalion chiefs to Administrator Brice, who adopted the deputy chiefs' recommendation and demoted those individuals. Gattis was one of the three lowest-rated battalion chiefs and was thus demoted to a district chief position.

Gattis contends that Brice demoted him because: (1) he opposed the department's policy favoring two fire codes--one for the rural portions of the county, and the other for the more densely populated urban areas--and argued that the county should have only one code; and (2) he opposed the department's equipment procurement policies. We disagree.

II.

HN3[↑] To succeed in a *section 1983* suit based on a claim of retaliation for speech, the plaintiff must show that his speech was a "substantial" or "motivating" factor in the allegedly retaliatory decision. [**6] *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568, 576, 50 L. Ed. 2d 471 (1977)*; *Bryson v. City of Waycross, 888 F.2d 1562, 1565-66 (11th Cir.1989)* (establishing four-part test that requires plaintiff to prove speech in question was a substantial or motivating factor behind plaintiff's injury). The question of whether the plaintiff has established this element is one for the fact-finder. *Id.* To survive summary judgment, Gattis must therefore make a showing sufficient to permit a reasonable jury to find that his protected speech was a substantial or motivating factor behind his demotion. He has not done so.

Gattis claims that the record permits the inference that his speech was a factor in Administrator Brice's decision. [4] We assume for purposes of this appeal that

---

[2] Gattis specifically appeals the district court's ruling that Administrator Brice is not a county "policymaker." *HN1[↑]* A local government can only be held liable under *§ 1983* if a municipal "policy" or "custom" exists pursuant to which that government violated a plaintiff's constitutional rights. *See Monell v. Department of Social Servs. of New York, 436 U.S. 658, 690-94, 98 S. Ct. 2018, 2035-38, 56 L. Ed. 2d 611 (1978)*; *McMillian v. Monroe County, Ala., 520 U.S. 781, _ - _, 117 S. Ct. 1734, 1735-36, 138 L. Ed. 2d 1 (1997)* (applying *Monell* 's principles to a suit against a county). *HN2[↑]* If a county official holds final policymaking authority for the county in the subject area of the alleged constitutional violation, that official's decisions may constitute county policy. *See Pembaur v. City of Cincinnati, 475 U.S. 469, 480-83, 106 S. Ct. 1292, 1299-1300, 89 L. Ed. 2d 452 (1986)* (establishing principle for a municipality); *McMillian v. Johnson, 88 F.3d 1573, 1577 (11th Cir.1996)*, *aff'd sub nom McMillian v. Monroe County, Ala., 520 U.S. 781, 117 S. Ct. 1734, 138 L. Ed. 2d 1 (1997)* (applying *Pembaur* 's principles in a suit against the county); *Mandel v. Doe, 888 F.2d 783, 792-93 (11th Cir.1989)* (stating that liability may attach for decisions of county officials who "possess[] the authority and responsibility for establishing final policy with respect to the issue in question"). We assume that Administrator Brice is a policymaker for Palm Beach County. This assumption, however, does not affect the outcome of the case.

---

[3] Chief Sweat is not a defendant in this suit.

[4] The record contains no direct evidence that Brice demoted Gattis on account of his speech; the question thus becomes whether the record permits the inference that speech played a role in Brice's decision.

136 F.3d 724, *726; 1998 U.S. App. LEXIS 3658, **6

Gattis' speech was entirely protected. Administrator Brice's decision to demote Gattis, however, had nothing to do with that speech. The decision Brice made was to adopt the recommendation of his deputy chiefs. There is nothing in the record to suggest that Brice's mere acceptance of the list of three poorly-rated battalion chiefs was in any way retaliatory. Brice did not **[*7]** generate the list. He did not himself evaluate Gattis and the other two individuals recommended for reassignment. He simply made a decision to rely on the experience and judgment of Chiefs Koester, Iacona, and Sweat as to which three battalion chiefs were doing the worst job in the Fire Department.

Gattis argues that the low marks he received from Chiefs Iacona and Koester were themselves retaliation for his speech. Even though the evaluation forms contain nothing to suggest such retaliation, Gattis claims that the deputy chiefs harbored retaliatory motives that rendered Administrator Brice's adoption of the chiefs' recommendation retaliatory as well. There is very little **[*727]** to support a claim that Chiefs Iacona and Koester acted upon any "hidden" motives when they filled out their evaluation forms. Even if **[**8]** the deputy chiefs did have improper motives, however, those motives do not render Brice's decision an unconstitutional county policy.

*HN4*[↑] ] A policymaker's approval of an unconstitutional action can constitute unconstitutional county policy only when the policymaker "approves a subordinate's decision *and the basis for it.*" *City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S. Ct. 915, 926, 99 L. Ed. 2d 107 (1988)* (emphasis added). Gattis must therefore present evidence that Administrator Brice not only accepted the recommendation of his deputy chiefs, but knew of and ratified the improper motives behind their recommendation. *See Hill v. Clifton, 74 F.3d 1150, 1152 (1996)*. There is nothing in the record that suggests Chief Brice was aware of any such motives on the part of Chiefs Koester and Iacona. As mentioned *supra,* the evaluations themselves contain nothing retaliatory, and there is nothing to suggest that Brice learned of improper motives from other sources. Brice's adoption of the deputy chiefs' recommendation therefore cannot constitute unconstitutional county policy even if the chiefs did act upon retaliatory motives in making their evaluations. [5]

**[**9]** III.

Gattis has presented nothing that would convince a reasonable jury that his speech was a substantial or motivating factor in his demotion. His claim therefore cannot survive summary judgment, and the decision of the district court is AFFIRMED.

---

**End of Document**

---

[5] Gattis argues in the alternative that the county administrator, Robert Weisman, is a policymaker for Palm Beach County, and that Weisman rendered the County liable by ratifying

Brice's decision to demote Gattis. As discussed *supra,* liability cannot attach to the County because of Brice's decision; therefore, any ratification of that decision is harmless.

 Neutral

As of: May 24, 2023 8:20 PM Z

## *Hunt v. Wise*

United States District Court for the Middle District of Florida, Tampa Division

July 17, 2009, Decided; July 17, 2009, Filed

Case No. 8:07-cv-1168-T-30TGW

**Reporter**

2009 U.S. Dist. LEXIS 61586 *; 2009 WL 2163108

DENNIS HUNT, Plaintiff, v. NORMA J. WISE, as Library Director, James J. Lunsford Law Library, in her official capacity and individual capacities, et al., Defendants.

**Prior History:** *Hunt v. Hillsborough County, 2008 U.S. Dist. LEXIS 82387 (M.D. Fla., Sept. 22, 2008)*

## Core Terms

law library, summary judgment motion, patrons, machines, ban, qualified immunity, deposition, copies, custom, trespass, policymaker, disruptive, genuine, summary judgment, photocopying, undisputed, decisions, encounter, barring

**Counsel: [*1]** Dennis Hunt, Plaintiff, Pro se, Sun City Center, FL.

For Norma J. Wise, as Library Director, James J. Lunsford Law Library, in her official and individual capacities, David L. Pilver, as Library Assistane, James J. Lunsford Law Library, in his official and individual capacities, Law Library Board, Defendants: Stephen M. Todd, LEAD ATTORNEY, Hillsborough County Attorney's Office, Tampa, FL.

For Peter J. Grilli, Mediator: Peter John Grilli, LEAD ATTORNEY, Peter J. Grilli, PA, Tampa, FL.

**Judges:** JAMES S. MOODY, JR., UNITED STATES DISTRICT JUDGE.

**Opinion by:** JAMES S. MOODY, JR.

## Opinion

### ORDER

THIS CAUSE comes before the Court upon Defendant David L. Pilver's Motion for Summary Judgment and Memorandum of Law (Dkt. 28), Defendant Norma J. Wise's Motion for Partial Summary Judgment and Memorandum of Law (Dkt. 32), Defendant Law Library Board's Motion for Summary Judgment and Memorandum of Law (Dkt. 40), and Plaintiff Dennis Hunt's Responses to same (Dkts. 57-59). The Court, having reviewed the motions, memorandums of law, responses, and being otherwise advised in the premises, finds that Defendant David L. Pilver's Motion for Summary Judgment (Dkt. 28) should be denied and Defendants Norma J. Wise and Law Library Board's Motions **[*2]** for Summary Judgment (Dkts. 32 and 40) should be granted.

### BACKGROUND

Plaintiff's claims arise from his use of the James J. Lunsford Law Library (the "Law Library"). In 2002 and 2003, Plaintiff used the Law Library on a frequent basis to research case law and court procedures. Plaintiff is not a lawyer, but used the Law Library's many resources to educate himself on the law and court procedures for a civil case that he was involved with and, more generally, for his own personal interest in learning about the law and courtroom procedure.

At some point in 2003, Plaintiff had several encounters with David L. Pilver ("Pilver"), the Senior Library Assistant. The first significant encounter involved Plaintiff's request for CLE materials. Pilver informed Plaintiff that only active members of the Florida Bar who had a Hillsborough County address could check out CLE materials and Plaintiff expressed disapproval of that policy and asked for the Law Library's director's name.

The next significant encounter involved Plaintiff's use of a personal portable copy/fax machine in the Law Library. Pilver observed Plaintiff using the machine and advised Plaintiff that the Law Library had a rule and/or policy **[*3]** that prevented patrons from using personal

2009 U.S. Dist. LEXIS 61586, *3

photocopying machines. Plaintiff stopped using the machine but asked Pilver what rule and/or policy stated that patrons could not use personal copying machines. Pilver could not identify the specific rule and/or policy. Subsequently, on April 30, 2003, Plaintiff sent a written public records request to Norma J. Wise ("Wise"), the Law Library's Director, requesting written verification of the rule and/or policy preventing patrons from using personal copying machines. In response, Wise informed Plaintiff that there was no formal rule barring patrons from bringing personal copying machines to the Law Library, but that the Law Library did not permit such activity because it relied on money received from the copiers to maintain its budget for book costs and operating expenses.

On May 5, 2003, Plaintiff wrote another letter to Wise, questioning the validity of Wise's assertions regarding the Law Library's position on personal photocopying machines and the procedures for collecting and protecting the money in the photocopying machines. At the end of the letter, Plaintiff made a comment about Pilver watching cable television while working at the front **[*4]** desk.

After complaining to Wise about Pilver's conduct, Plaintiff claims Pilver began to single him out and treat him with disdain during his visits to the Law Library. As a result, on May 19, 2003, Plaintiff wrote another letter to Wise, complaining that Pilver was handing heavy books to Plaintiff in a dangerous manner. Specifically, Plaintiff stated that Pilver "stretches one arm out, with the book in one hand, at a level of height of my forehead or above." (Dkt. 30, Exhibit 4 thereto). Plaintiff also complained that Pilver did not like to be disturbed while "watching his television programs." (Id.). In response to Plaintiff's May 19, 2003 letter, Law Library staff were told to stop handing books to patrons and only put the books on the counter top. According to Pilver, around this same time, he started to view Plaintiff's actions as "annoying," and started to wonder if Plaintiff was out to get him. (Pilver's deposition at 90:10-12; 93:21-24).

During this same relevant time, the Law Library Board held a public meeting on whether Law Library patrons were entitled to use personal photocopying machines. At the meeting, an Assistant Hillsborough County Attorney advised the Board that under **[*5]** Florida law, patrons of the Law Library were permitted to bring their own duplicating devices. Subsequently, the Law Library Board permitted Plaintiff and other patrons to use personal photocopying machines.

According to Pilver, a third significant encounter with Plaintiff involved Plaintiff's dissatisfaction with copies Plaintiff had made with the Law Library's copy machine. When Pilver told Plaintiff the amount of money he owed for the number of copies he made, Pilver claims that Plaintiff said that some of the copies were not good, because they were not readable. Pilver then allegedly agreed to reimburse Plaintiff for the unreadable copies and waited for Plaintiff to pay for the difference. According to Pilver, Plaintiff threw the copies across the table at him and said that he did not want any of the copies anymore. Plaintiff then walked out of the library. According to Pilver, he never informed anyone at the Law Library about this incident.

On July 1, 2003, Plaintiff and Pilver had another significant encounter. According to Plaintiff, Pilver failed to provide Law Library patrons with a five minute warning prior to the 8:00 p.m. closing time, as was his custom. When Plaintiff realized **[*6]** the library was about to close, he headed for the door where he was confronted by Pilver. Pilver allegedly blocked Plaintiff's egress and accused him of trespassing. Plaintiff claims Pilver berated him, acted in a very aggressive manner, and then finally moved out of the way and allowed him to leave. Plaintiff then claims he observed Pilver discussing the incident with law enforcement officers. Plaintiff discussed the incident with the officers, and later reported the incident to Wise in another letter dated July 3, 2003.

Pilver's version of the July 1, 2003 incident varies significantly. According to Pilver, when he asked Plaintiff to leave the library, because it was after closing time, Plaintiff "exploded," started yelling and cursing and said something to the effect of "You're messing with the wrong guy." (Pilver's deposition at 104-108). Plaintiff's behavior scared Pilver and Pilver was afraid that Plaintiff might hit him. According to Pilver, after Plaintiff left, he closed the Law Library and walked across the street to the county center and told the county security officers about the incident with Plaintiff. The security officers informed Pilver that if he ever needed them to **[*7]** remove someone from the Law Library that was acting in a threatening manner, he could give them a call and they would take care of the situation. Significantly, Plaintiff and Pilver were the only individuals present in the Law Library during the July 1, 2003 incident.

Pilver then discussed the July 1, 2003 incident with Sandra Kellaher ("Kellaher"), the Law Library Board's Director. Pilver could not discuss the incident with Wise,

because she was out on medical leave. According to Pilver, Kellaher told Pilver that if he ever felt threatened in the future, he should use his common sense and handle the situation as he saw fit to protect himself or the other Law Library patrons.

According to Plaintiff, he visited the Law Library on July 3, 2003 and was not asked to leave. However, on July 5, 2003, Plaintiff arrived at the Law Library around 3:00 p.m. Plaintiff began conducting research at a work station in the Law Library. He then observed a security officer having a conversation with Pilver. Following the conversation, the security officer told Plaintiff that he had to leave. Plaintiff refused to leave and Tampa Police Officer Charles Hatchcox informed Plaintiff that he was trespassing **[\*8]** after warning. When Plaintiff still refused to leave the Law Library, he was arrested.

As a result, Plaintiff filed the instant action. Plaintiff's Verified Amended Complaint alleges four claims under *42 U.S.C. § 1983* as follows: (1) claim against Defendant Law Library Board for its violation of Plaintiff's *First Amendment* right by barring Plaintiff from the Law Library (Count I); (2) claim against Defendant Wise, in her individual capacity, for violating Plaintiff's *First Amendment* right by barring Plaintiff from the Law Library (Count II); claim against Pilver, in his individual capacity, for violating Plaintiff's *First Amendment* right by barring Plaintiff from the Law Library (Count III); and (4) claim against the Law Library Board and Wise, in her official capacity, for violating Plaintiff's *First Amendment* and *Fourteenth Amendment* rights by barring Plaintiff from the Law Library and failing to provide Plaintiff with notice and an opportunity to be heard regarding Plaintiff's ban from the Law Library (Count IV).

## DISCUSSION

### I. Summary Judgment Standard

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, **[\*9]** together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine*

issue of *material* fact." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)* (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. Id. Throughout this analysis, the court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor. *Id. at 255*.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex, 477 U.S. at 324*. **[\*10]** The evidence must be significantly probative to support the claims. *Anderson, 477 U.S. at 248-49 (1986)*.

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co., 906 F.2d 559, 564 (11th Cir. 1990)*. "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung, 695 F.2d 1294, 1296 (11th Cir. 1983)*. A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson, 477 U.S. at 248*; *Hoffman v. Allied Corp., 912 F.2d 1379 (11th Cir. 1990)*. However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989)*.

## II. Legal Analysis

### A. Pilver's Motion for Summary Judgment on Qualified Immunity

Pilver argues in his Motion for Summary Judgment (Dkt. 28), that he is entitled to qualified immunity. Qualified immunity protects government actors performing discretionary functions from being sued in their individual capacities. See *Wilson v. Layne, 526 U.S. 603, 609, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999)*. **[\*11]** The doctrine shields government officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457*

*U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*. The Eleventh Circuit has recognized that "qualified immunity liberates government agents from the need to constantly err on the side of caution by protecting them both from liability 'and the other burdens of litigation, including discovery.'" *Holmes v. Kucynda, 321 F.3d 1069, 1077 (11th Cir. 2003)* (quoting *Lambert v. Fulton County, 253 F.3d 588, 596 (11th Cir. 2001))*. At the same time, qualified immunity does not offer protection "if an official 'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].'" *Harlow, 457 U.S. at 815* (quoting *Wood v. Strickland, 420 U.S. 308, 322, 95 S. Ct. 992, 43 L. Ed. 2d 214 (1975))* (emphasis omitted).

To receive qualified immunity the public official "must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)* (quoting *Courson v. McMillian, 939 F.2d 1479, 1487 (11th Cir. 1991))*. [*12] It is clear from the record that Pilver was acting within his discretionary authority on July 5, 2003. From there, qualified immunity analysis proceeds in two steps. *Chesser v. Sparks, 248 F.3d 1117, 1122 (11th Cir. 2001)*. First, the court must address the "threshold question" of whether the facts as alleged, viewed in the light most favorable to plaintiff, establish a constitutional violation at all. *Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)*. If no constitutional violation is established, then the defendant prevails, and "there is no necessity for further inquiries concerning qualified immunity." *Id.* If, however, under the plaintiff's version of facts it appears a constitutional right has been violated, the court must then determine whether that right was clearly established at the time the events in question occurred. *Id.*

The Law Library Board is permitted to regulate the use of its libraries to prohibit disruptive conduct. As Stated by the Supreme Court:

A State or its instrumentality may, of course, regulate the use of its libraries or other public facilities. But it must do so in a reasonable and nondiscriminatory manner, equally applicable to all and administered with equality [*13] to all. It may not do so as to some and not as to all . . . it may not invoke regulations as to use-whether they are ad hoc or general-as a pretext for pursuing those engaged in lawful, constitutionally protected exercise of their fundamental rights.

*Brown v. State of La., 383 U.S. 131, 143, 86 S. Ct. 719, 15 L. Ed. 2d 637 (1966)*. Plaintiff had a fundamental right to access the Law Library and receive the information provided therein. See *id.*; see also *Martin v. Struthers, 319 U.S. 141, 143, 63 S. Ct. 862, 87 L. Ed. 1313 (1943)* (recognizing the right of freedom of speech and press under the *First Amendment* embraces both the right to distribute literature and the right to receive it); *Bounds v. Smith, 430 U.S. 817, 828, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977)* (holding prison inmates had fundamental constitutional right of access to the courts in the form of adequate law libraries or adequate assistance from persons trained in the law).

In Brinkmeier v. City of Freeport, the court made it clear that banning a person forever from using a library "for a single instance of misconduct no matter how minor" could not be considered reasonable in light of the *First Amendment* or recognized concepts of due process. *No. 93 C 20039, 1993 U.S. Dist. LEXIS 9255, 1993 WL 248201 (N.D. Ill. July 2, 1993)*. In Brinkmeier, the court [*14] relied on the Third Circuit's decision in *Kreimer v. Bureau of Police for the Town of Morristown, 958 F.2d 1242 (3d Cir. 1992)*, to determine that a person has a *First Amendment* right to receive information. Although that right is not without limitation, any restriction on a person's *First Amendment* right to access a library must be reasonable and not an effort to suppress expression merely because a public official opposes the speaker's view. *Brinkmeier, 1993 U.S. Dist. LEXIS 9255, 1993 WL 248201 at *5*; see also *Kreimer, 958 F.2d at 1242* (noting that prohibiting disruptive behavior is perhaps the clearest and most direct way to achieve maximum library use); *Neinast v. Board of Trustees of Columbus Metropolitan Library, 346 F.3d 585 (6th Cir. 2003)* (holding that library's requirement that patrons wear shoes did not violate patron's *First Amendment* right because the requirement was rationally related to legitimate government interests of protecting public health and safety); *Madrid v. Lopez, 21 F. Supp. 2d 1151, 1997 WL 102508, *1 (N.D. Cal. 1997)* ("restrictions on talking and other disruptive behavior in a library are fundamentally reasonable"); *Tronsen v. Toledo-Lucas County Public Library, 2008 U.S. Dist. LEXIS 20359, 2008 WL 2622939 (N.D. Ohio February 26, 2008)* [*15] (holding that plaintiff's suspension for six months from accessing library reasonable when plaintiff disrupted a female library patron's right to quiet enjoyment by handing her an offensive note).

Pilver's Motion for Summary Judgment is premised on Pilver's version of the facts surrounding the July 1, 2003 incident. First, there is no doubt that when Plaintiff was

removed from the Law Library on July 5, 2003 and charged with trespassing, federal law was clear, as set forth herein, that a person has a *First Amendment* right to access and enjoy a library and that any limitation on this access must be reasonable. According to Pilver, the Law Library "can certainly constitutionally remove [Plaintiff] for threatening behavior" and summary judgment is appropriate if Pilver was motivated at least in part by objectively valid reasons. (Dkt. 28).

The Court agrees that Plaintiff's *First Amendment* right to enjoy the Law Library could be curtailed if he acted in a threatening manner. However, there is an issue of material disputed fact as to whether Plaintiff acted in a threatening manner. As explained by the Eleventh Circuit in Bogle v. McClure, "in a case involving mixed motives, the presence of **[*16]** a jury issue about a defendant's improper intent does not necessarily preclude qualified immunity." *332 F.3d 1347, 1355-56 (11th Cir. 2003)*. However, a defendant is entitled to qualified immunity only if the "record *indisputably* establishes that the defendant in fact was motivated, *at least in part*, by lawful considerations." *Bogle, 332 F.3d at 1355* (quoting *Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1296 (11th Cir. 2000))* (emphasis in original).

In this case, the record does not indisputably establish that Pilver was motivated, at least in part, by lawful considerations. According to Plaintiff, he did not act in an aggressive, threatening, or irate manner on July 1, 2003, when Pilver asked him to leave because the Law Library was closing. Plaintiff also contends that Pilver had it out for him and wanted to ban Plaintiff from the Law Library out of retaliation for the complaints Plaintiff had made about Pilver in his letters to Wise. Moreover, it is undisputed that on July 5, 2003, when Pilver reported Plaintiff to security, Plaintiff was researching in the Law Library and not disrupting Pilver or any other patrons. The record is also undisputed that Plaintiff never disrupted any **[*17]** patron of the Law Library and that the Law Library never received any complaints regarding Plaintiff's behavior from any other patron.

Assuming the evidence in a light most favorable to Plaintiff, the nonmovant, as the Court must do at the summary judgment stage, there is a significant material disputed fact that must be left for the jury to decide. Specifically, the jury will have to determine whether, based on the evidence, Pilver was motivated by an objectively valid reason. Because there are disputed facts regarding the July 1, 2003 incident, it is impossible for the Court to determine whether a reasonable library assistant, faced with the same set of facts, would have

acted similarly to Pilver and had Plaintiff removed and banned from the Law Library. It is also impossible to determine whether a reasonable person, in the same position as Pilver, would have known that banning Plaintiff from the Law Library was a violation of clearly established law, because the facts leading up to Plaintiff's removal from the Law Library are entirely in dispute. If a jury believes Plaintiff's allegations that he did not act in a threatening or aggressive manner on July 1, 2003, then a jury could **[*18]** find that Pilver's behavior was clearly and obviously in violation of existing federal law, and that a reasonable library assistant would know that banning a library patron, for no good reason, is a violation of that patron's *First Amendment* right. Accordingly, Pilver's Motion for Summary Judgment must be denied.

**B. Wise's Motion for Summary Judgment**

Wise argues in her Motion for Summary Judgment (Dkt. 32) that she is entitled to judgment as a matter of law because she was on medical leave during the July 1 and July 5 incidents between Plaintiff and Pilver. The record is clear and undisputed that Wise was not involved in the decision regarding how Pilver should deal with Plaintiff after Pilver perceived Plaintiff to be a threat, according to his version of the events that transpired on July 1, 2003. Pilver testified during his deposition that he did not discuss the incident with Wise because she was on leave. Wise also testified during her deposition that she had no role in advising Pilver on how to handle the circumstances with Plaintiff. Clearly, Wise, in her individual capacity, cannot be liable for violating Plaintiff's *First Amendment* right if she was not involved in this decision, **[*19]** directly, or in a supervisory role. Accordingly, Wise's Motion for Summary Judgment must be granted.

**C. Law Library Board's Motion for Summary Judgment**

The Law Library Board argues, in part, in its Motion for Summary Judgment (Dkt. 40) that it is entitled to summary judgment as a matter of law because the Law Library Board did not have a custom, policy, or practice that confers liability under *Section 1983*.

A governmental entity is not liable under *Section 1983*, merely as a matter of *respondeat superior*, for constitutional injuries inflicted by its employees. *Brown v. Neumann, 188 F.3d 1289, 1290 (11th Cir. 1999)*

(citation omitted). A local government is, however, liable under *Section 1983* "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Department of Social Services, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)* (holding that liability of municipalities and other governmental entities under *Section 1983* is limited to instances of official policy or custom). To attribute liability to the Law Library Board, Plaintiff must demonstrate that it had an official policy **[*20]** or custom that was "the moving force of the constitutional violation." *Vineyard v. County of Murray, Ga., 990 F.2d 1207, 1211 (11th Cir. 1993)* (quoting *Polk County v. Dodson, 454 U.S. 312, 326, 102 S. Ct. 445, 70 L. Ed. 2d 509 (1981))*.

The Eleventh Circuit "has interpreted Monell's policy or custom requirement to preclude *Section 1983* municipal liability for a subordinate official's decisions when the final policymaker delegates decision making discretion to the subordinate, but retains the power to review the exercise of that discretion." *Scala v. City of Winter Park, 116 F.3d 1396, 1399 (11th Cir. 1997)*. Thus, "[f]inal policymaking authority over a particular subject area does not vest in an official whose decisions in the area are subject to meaningful administrative review." *Id. at 1401*; see *Manor Healthcare Corp. v. Lomelo, 929 F.2d 633, 638 (11th Cir. 1991)* (holding that mayor was not the final policymaker with respect to zoning decisions where the city charter provided that the city council could override the mayor's veto of zoning ordinances); *Hill v. Clifton, 74 F.3d 1150, 1152 (11th Cir. 1996)* (accepting concession that city police chief was not final policymaker with respect to employment decisions where **[*21]** police chief's decisions could be reversed by the city manager); *Martinez v. City of Opa-Locka, 971 F.2d 708, 713-15 (11th Cir.1992)* (finding final policymaking authority where "the City Manager's decision to hire or fire administrative personnel is completely insulated from review").

In this case, the undisputed facts demonstrate that the Law Library Board did not have an instituted policy, custom, or procedure that led to the alleged violation of Plaintiff's *First* and *Fourteenth Amendment* rights. Moreover, Pilver was never given the authority by the Law Library Board to have Plaintiff removed and/or banned from the Law Library and Pilver did not have final policymaking authority to decide that Plaintiff should be banned from the Law Library. Specifically, Wise testified during her deposition that the Law Library Board has no written or non-written policies concerning

trespass warnings or enforcement of trespass warnings. She specified that "[t]hese are criminal matters and are handled by law enforcement." (See Wise's deposition at 23:18-22). The facts are also undisputed that when Pilver consulted with Kellaher, she told him to use his best judgment, but did not tell him that he could **[*22]** trespass Plaintiff and/or ban him from the library. During Plaintiff's criminal trial before Judge Barber, Kellaher testified that she told Pilver that if he felt he was in physical danger, he should go into a room and call security. Kellaher also stated that Plaintiff should not be kicked out of the Law Library if he came into the Law Library, went to a cubicle, and minded his own business.

Plaintiff argues that although the Law Library Board may not have an official written policy or custom regarding trespass situations, it had an ad hoc policy to permanently ban him from the Law Library. However, the record also rebuts this argument. In fact, at the conclusion of the 2005 criminal trial before Judge Barber, Judge Barber specifically held that he would not order Plaintiff to stay away from the Law Library. [1] Plaintiff testified during his deposition that he never made a request to the Law Library Board to return to the Law Library and has not visited the Law Library since his arrest on July 5, 2003. Clearly, these facts indicate that the Law Library Board did not have an ad hoc policy to have Plaintiff permanently banned from the Law Library. Rather, this issue was decided in the **[*23]** criminal trials, first by Judge Nazaretian, when he ordered Plaintiff to stay away from the Law Library, and then by Judge Barber, when he ordered that Plaintiff did not have to stay away from the Law Library. Plaintiff, for whatever reason, has simply chosen to not return to the Law Library or discuss the matter with the Law Library Board. Accordingly, the Law Library Board's Motion for Summary Judgment must be granted.

## CONCLUSION

For the reasons set forth herein, it is therefore ORDERED AND ADJUDGED that:

   1. Pilver's Motion for Summary Judgment (Dkt. 28) is hereby **DENIED**.

   2. Wise's and the Law Library Board's Motions for

---

[1] At the conclusion of the 2003 criminal trial before Judge Nazaretian, Judge Nazaretian ordered Plaintiff to stay away from the Law Library.

2009 U.S. Dist. LEXIS 61586, *23

Summary Judgment (Dkts. 32 and 40) are hereby
**GRANTED**.

**DONE** and **ORDERED** in Tampa, Florida on July 17,
2009.

/s/ James S. Moody, Jr.

**JAMES S. MOODY, JR**.

**UNITED STATES DISTRICT JUDGE**

---

**End of Document**

## *USCS Fed Rules Civ Proc R 8, Part 1 of 3*

Current through changes received April 20, 2023.

*USCS Federal Rules Annotated  >  Federal Rules of Civil Procedure  >  Title III. Pleadings and Motions*

## Rule 8. General Rules of Pleading

**(a) Claim for Relief.**  A pleading that states a claim for relief must contain:

**(1)** a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

**(2)** a short and plain statement of the claim showing that the pleader is entitled to relief; and

**(3)** a demand for the relief sought, which may include relief in the alternative or different types of relief.

**(b) Defenses; Admissions and Denials.**

**(1)** *In General.* In responding to a pleading, a party must:

**(A)** state in short and plain terms its defenses to each claim asserted against it; and

**(B)** admit or deny the allegations asserted against it by an opposing party.

**(2)** *Denials—Responding to the Substance.* A denial must fairly respond to the substance of the allegation.

**(3)** *General and Specific Denials.* A party that intends in good faith to deny all the allegations of a pleading—including the jurisdictional grounds—may do so by a general denial. A party that does not intend to deny all the allegations must either specifically deny designated allegations or generally deny all except those specifically admitted.

**(4)** *Denying Part of an Allegation.* A party that intends in good faith to deny only part of an allegation must admit the part that is true and deny the rest.

**(5)** *Lacking Knowledge or Information.* A party that lacks knowledge or information sufficient to form a belief about the truth of an allegation must so state, and the statement has the effect of a denial.

**(6)** *Effect of Failing to Deny.* An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied. If a responsive pleading is not required, an allegation is considered denied or avoided.

**(c) Affirmative Defenses.**

**(1)** *In General.* In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including:

• accord and satisfaction;

• arbitration and award;

• assumption of risk;

• contributory negligence;

• duress;

• estoppel;

- failure of consideration;

- fraud;

- illegality;

- injury by fellow servant;

- laches;

- license;

- payment;

- release;

- res judicata;

- statute of frauds;

- statute of limitations; and

- waiver.

**(2)** *Mistaken Designation.* If a party mistakenly designates a defense as a counterclaim, or a counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were correctly designated, and may impose terms for doing so.

**(d) Pleading to Be Concise and Direct; Alternative Statements; Inconsistency.**

**(1)** *In General.* Each allegation must be simple, concise, and direct. No technical form is required.

**(2)** *Alternative Statements of a Claim or Defense.* A party may set out two or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.

**(3)** *Inconsistent Claims or Defenses.* A party may state as many separate claims or defenses as it has, regardless of consistency.

**(e) Construing Pleadings.**  Pleadings must be construed so as to do justice.

## History

As amended Feb. 28, 1966, eff. July 1, 1966; March 2, 1987, eff. Aug. 1, 1987; April 30, 2007, eff. Dec. 1, 2007; April 28, 2010, eff. Dec. 1, 2010.

USCS Federal Rules Annotated
Copyright © 2023 All rights reserved.

**End of Document**