**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 18-24190-CIV-SMITH**

WILLIAM O. FULLER, and
MARTIN PINILLA, II,

      Plaintiffs,

v.

JOE CAROLLO,

      Defendant.

_____ /

**DEFENDANT, JOE CAROLLO'S NOTICE OF FILING BENCH MEMO – HEARSAY**
**STATEMENTS**

      Defendant, Joe Carollo, by through his counsel, hereby files the attached Bench Memo submitted to the Court during the trial.

**CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that on this 30th day of May, 2023, I electronically filed the foregoing with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record in this case.

Respectfully submitted,
KRINZMAN HUSS LUBETSKY
   FELDMAN & HOTTE
Co-Counsel for Defendant, Joe Carollo
Alfred I. duPont Building
169 E. Flagler Street, Suite 500
Miami, Florida 33131
Telephone: (305) 854-9700
Primary email:  map@khllaw.com
Primary email:  mschneider@khllaw.com
Secondary:  eservicemia@khllaw.com

By:  /s/ Mason A. Pertnoy
      Mason A. Pertnoy, Esq.
      Florida Bar No. 18334
And

SHUTTS & BOWEN
Co-Counsel for Defendant, Joe Carollo

1

200 S. Biscayne Boulevard, Suite 4100
Miami, FL 33131
Telephone: (305) 415-9072
Email: msarnoff@shutts.com

By: /s/ Marc D. Sarnoff
Marc D. Sarnoff, Esq.
Florida Bar No. 607924

And

KUEHNE DAVIS LAW, P.A.
Co-Counsel for Defendant, Joe Carollo
100 S.E. 2nd Street, Suite 3105
Miami, FL 33131-2154
Telephone: (305)789-5989
Email: ben.kuehne@kuehnelaw.com;
mdavis@kuehnelaw.com
efiling@kuehnelaw.com

By: /s/ Benedict P. Kuehne
Benedict P. Kuehne, Esq.
Florida Bar No. 233293

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case No.: 1:18-cv-24190-SMITH**

WILLIAM O. FULLER, and
MARTIN PINILLA, II,

      Plaintiffs,

  v.

JOE CAROLLO,

      Defendant.

_____/

**TRIAL MEMORANDUM REGARDING HEARSAY
STATEMENTS AND REQUEST FOR CURATIVE INSTRUCTION**

Defendant, Joe Carollo, by and through his undersigned counsel, hereby submits this Trial

Memorandum regarding the various hearsay statements admitted over objection and as grounds

therefore, states as follows:

I.      **Testimony as to what "everybody knows" is inadmissible hearsay and should be
stricken.**

Testimony that a fact in issue is "common knowledge" constitutes inadmissible hearsay.

*Evans v. McClain*, 131 F. 3d 957 (11th Cir. 1997) ("The district court correctly dismissed this

evidence as 'not significantly probative' because it was based on gossip, common knowledge, and

the hearsay statement of an unidentified representative."); *Alexander v. United States*, 2022 U.S.

App. LEXIS 34669 (11th Cir. 2022) (affirming exclusion of "common knowledge" evidence,

stating, "we don't try cases on rumors.").

In fact, the law cited by Plaintiffs' for an unrelated proposition similarly excludes

"common knowledge" evidence. *See Daly v. Far Eastern Shipping Co. PLC*, 238 F. Supp. 2d 1231

(W.D. Wa. 2003) ("Testimony that a fact is common knowledge is hearsay because such testimony summarizes the knowledge of persons other than the declarant."). The Court in *Daly* relied upon opinions of the Ninth and Fifth Circuits in properly excluding "common knowledge" evidence. *See id.* (citing *Miller v. Pezzani*, 35 F.3d 1407, 1420 n.4 (9th Cir. 1994) (superseded by statute on unrelated issues); *Leonard v. Dixie Well Serv. & Supply, Inc.*, 828 F. 2d 291 (5th Cir. 1987)).

Throughout the trial, Plaintiffs, and their witnesses, have repeatedly testified that "everybody knows" Joe Carollo was behind the alleged targeting of Plaintiffs. Some of this testimony was properly excluded, but other times it has been allowed into evidence. *See e.g.*:

> Q. Why was that obvious to you that were adding properties to this list to make it look like Mr. Fuller wasn't being targeted? Why was that obvious?
>
> MR. PERTNOY: Objection. Leading.
>
> THE COURT: Overruled.
>
> THE WITNESS: Because what had been going on was openly known throughout the city, I mean, down in the park people talk about it, the community talks about it, it was in wide open knowledge in Miami that he was being targeted.
>
> MR. PERTNOY: Move to strike, improper hearsay testimony.
>
> THE COURT: Overruled.

Trial Transcript dated April 18, 2023, testimony of Art Acevedo, p. 102-103:22-8.

Accordingly, in order to limit the damage done by the introduction of improper hearsay statements, Defendant respectfully requests the Court to issue a curative instruction to the jury with respect to the inappropriate "common knowledge" evidence.

Respectfully submitted,

KRINZMAN HUSS LUBETSKY
FELDMAN & HOTTE
Co-Counsel for Defendant, Joe Carollo
Alfred I. duPont Building
169 E. Flagler Street, Suite 500

Miami, Florida 33131
Telephone: (305) 854-9700
Primary email: map@khllaw.com
Primary email: mschneider@khllaw.com
Secondary: eservicemia@khllaw.com

By: /s/ Mason A. Pertnoy
       Mason A. Pertnoy, Esq.
       Florida Bar No. 18334

And

SHUTTS & BOWEN
Co-Counsel for Defendant, Joe Carollo
200 S. Biscayne Boulevard, Suite 4100
Miami, FL 33131
Telephone: (305) 415-9072
Email: msarnoff@shutts.com

By: /s/ Marc D. Sarnoff
       Marc D. Sarnoff, Esq.
       Florida Bar No. 607924

And

KUEHNE DAVIS LAW, P.A.
Co-Counsel for Commissioner Joe Carollo
100 S.E. 2nd Street, Suite 3105
Miami, FL 33131-2154
Telephone: (305)789-5989
Email: ben.kuehne@kuehnelaw.com;
mdavis@kuehnelaw.com
efiling@kuehnelaw.com

By: /s/ Benedict P. Kuehne
       Benedict P. Kuehne
       Florida Bar No. 233293

And

COLE, SCOTT & KISSANE
Co-counsel for Commissioner Joe Carollo
9150 S. Dadeland Blvd., Suite 1400
Miami, FL 33156
Email: Amber.Dawson@csklegal.com

3

By: /s/ Amber C. Dawson
    Amber C. Dawson
    Florida Bar No. 1008084

# *Evans v. McClain, Inc.*

United States Court of Appeals for the Eleventh Circuit

December 18, 1997, Decided

No. 96-9004.

**Reporter**

131 F.3d 957 *; 1997 U.S. App. LEXIS 35642 **; 77 Fair Empl. Prac. Cas. (BNA) 965; 134 Lab. Cas. (CCH) P33,629; 72 Empl. Prac. Dec. (CCH) P45,094; 4 Wage & Hour Cas. 2d (BNA) 419; 11 Fla. L. Weekly Fed. C 896

Aric EVANS, Plaintiff-Appellant, v. McCLAIN OF GEORGIA, INC., McClain Industries, Inc., Defendants-Appellees.

**Subsequent History: [**1]** As Amended January 5, 1998.

**Prior History:** Appeal from the United States District Court for the Middle District of Georgia. (No. 5:95-CV-112-1). Hugh Lawson, Judge.

**Disposition:** REVERSED and REMANDED.

## Core Terms

district court, plant, employees, salary, prima facie case, promotion, discriminatory discharge, direct evidence, discriminatory, summary judgment, overtime compensation, non discriminatory reason, black employee, terminated, reasons, fired, grant of summary judgment, discriminatory motive, plant manager, contends, exempt, matter of law, genuine, pretext

## Case Summary

### Procedural Posture

Appellant employee sought review of an order of the United States District Court for the Middle District of Georgia, that granted summary judgment to appellee employer in his race discrimination case brought under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.* and *42 U.S.C.S. § 1981* as well as his claim for overtime compensation under the Fair Labor Standards Act, *29 U.S.C.S. § 201 et seq.*

### Overview

Appellant employee sought review of the grant of summary judgment in favor of appellee employer in his race discrimination case brought under *42 U.S.C.S. § 2000e et seq.* and *42 U.S.C.S. § 1981*. Appellant contended that he had been harassed and given menial job responsibilities, and had ultimately been fired because of his race. Appellant also alleged that he was denied overtime pay under *29 U.S.C.S. § 201 et seq.* The court reversed and held that under the law when appellant established a prima facie case of racial discrimination, a legal presumption of unlawful discrimination arose and the burden shifted to appellee employer to articulate legitimate, nondiscriminatory reasons for the action and that the lower court erred in finding that appellant failed to meet his burden. The court also held that summary judgment was improper because appellant presented sufficient evidence to create a genuine issue of material fact as to the truth or falsity of appellee's legitimate, nondiscriminatory reasons for firing appellant.

### Outcome

The court reversed and remanded and held that appellant employee met his burden of establishing a prima facie case of racial discrimination and further presented sufficient evidence so as to create a genuine issue of material fact as to the truth or falsity of appellee employer's nondiscriminatory reasons for its actions.

**Counsel:** For APPELLANT(S): David J. Worley, JACOBS & SLAWSKY, P.A., Norman J. Slawsky, Atlanta, GA.

For MCCLAIN OF GEORGIA & MCCLAIN INDUSTRIES, APPELLEE: Thomas H. Williams, Esq., JAFFE, RAITT, HEUER & WEISS, Detroit, MI.

For MCCLAIN OF GEORGIA, INC., APPELLEE: W. Warren Plowden, Jr., Esq., JONES, CORK & MILLER, Macon, GA.

**Judges:** Before EDMONDSON and DUBINA, Circuit Judges, and LIMBAUGH, * Senior District Judge.

---

* Honorable Stephen N. Limbaugh, Senior U.S. District Judge for the Eastern District of Missouri, sitting by designation.

131 F.3d 957, *957; 1997 U.S. App. LEXIS 35642, **1

LIMBAUGH, Senior District Judge, concurring.

## Opinion

**[*960]** PER CURIAM

Plaintiff-Appellant Aric Evans ("Appellant") appeals from the district court's grant of summary judgment on his claims of race discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. § 2000e et seq.* and *42 U.S.C. § 1981* (" *§ 1981*") and for overtime compensation under the Fair Labor Standards Act ("FLSA"), *29 U.S.C. § 201 et seq.* For the reasons set **[**2]** forth, we reverse and remand.

*Facts and Procedural Background*

Defendants-Appellees McClain of Georgia, Inc. and McClain Industries, Inc. (collectively "Appellees") own and operate an industrial plant in Macon, Georgia, and fabricate there large steel trash bins and compactors. Prior to his discharge, Appellant had worked at Appellees' Macon plant for approximately eight years.

In July of 1994, the plant manager, Ken Graham, resigned. He was replaced on a temporary basis by the assistant plant manager, Al Buckalew. There appears to be no dispute that Appellant, in assisting Buckalew, was second in command. He contends that he was running the plant.

On October 3, 1994, Kenneth McClain, chairman of the board and president of McClain Industries, Inc., named Ken Cole as the new plant manager. Buckalew remained as an unofficial assistant plant manager and Appellant was, purportedly, next in line.

During this time there was an incident involving one of the leadmen at the plant, Tim Hall. Appellant contends that when Buckalew told Hall that Appellant was next in line to be the plant manager, Hall stormed out of the plant saying that he would not work for a "nigger." McClain, who was **[**3]** upset by the prospect of losing Hall, sent another employee to find him and, upon his return, allegedly promised Hall that he would be trained as the next plant manager at Appellees' Texas plant. After this incident, Appellant claims Hall was placed over him in the plant's managerial hierarchy.

Cole proved to be an incompetent manager and was terminated on November 22, 1994. He was replaced by

Neal Flowers, a manager from one of Appellees' Oklahoma plants. Appellees claim Flowers was brought in to assist in the plant's conversion to a new product line.

Contemporaneous with all of these events was a campaign to organize a union at the plant. Whether or not Appellant was a management level employee, he was perceived by everyone as an integral part of the union's effort. In fact, Appellees' counsel, Thomas H. Williams, met with Appellant and informed him that he was not to engage in any further union activity because he was an assistant plant manager. Appellant denied his management status, noting that he was employed as an hourly wage earner.

Shortly thereafter, Appellant became a salaried employee. Although he admits being charged with supervisory responsibility, he contends that **[**4]** he was still treated as an hourly employee. To support his position, Appellant claims that he was not included in the plant's management meetings, did not make work assignments, and still had to report at 6:00 am with the hourly employees. Appellant maintains that he was only given a salary to remove him from the bargaining unit in an attempt to thwart the union's organization effort.

On February 22, 1995, the day before the union election, McClain asked for Appellant's keys, told him that he was fired, and even accused Appellant of threatening to shoot someone at the plant. Appellees now contend, however, that Appellant was not actually **[*961]** fired until February 24, 1995, the day after the union election.

Appellees claim that McClain fired Appellant because he had become a disruptive force in the plant and was intentionally creating racial tensions among the lower level employees. They further contend that Appellant was negligent in performing his duties and had threatened certain white employees.

Appellant claims that after the incident with Tim Hall, McClain began to harass him in an attempt to force him to resign. He explains that McClain continually changed his job duties and reduced **[**5]** his responsibilities. He insists that he was denied promotions and ultimately terminated because of his race. He also maintains that he was wrongfully denied overtime compensation in violation of the FLSA.

The district court granted summary judgment against Appellant on both claims. *Evans v. McClain of Georgia, Inc., 934 F. Supp. 1383 (M.D.Ga.1996)*.

131 F.3d 957, *961; 1997 U.S. App. LEXIS 35642, **5

In concluding that Appellant could not establish a *prima facie* case of discriminatory failure to promote, the district court completely discounted the probative value of the incident involving Tim Hall. The court stated:

> Whether or not Tim Hall made the racially offensive statement attributed to him, nothing in the record suggests that Hall received a preferential promotion or that Hall was placed in a position of greater responsibility or prestige than Plaintiff enjoyed. While the record fails to describe the nature of Hall's position or the scope of his authority, it does not suggest that he was in a position above the Plaintiff, but rather shows that Plaintiff and Hall each had responsibility for a separate phase of the plant's operations, and were assistant managers of approximately equal status.

*Evans, 934* **[**6]** *F. Supp. at 1388*.

Although the district court concluded that Appellant could establish a *prima facie* case of discriminatory discharge, it held that he made no showing of pretext to overcome Appellees' legitimate, non-discriminatory reasons for his termination.

Finally, the district court concluded that Appellant was ineligible for overtime compensation under the FLSA because he was working in an executive capacity and was a salaried employee.

Appellant raises four points on appeal: 1) the district court erred in analyzing his discrimination claims under the standard announced in *McDonnell Douglas v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*, because he presented direct evidence of discrimination; 2) the district court erred in concluding that his circumstantial evidence was insufficient as a matter of law on the issues of failure to promote and discriminatory discharge; 3) the district court erred in concluding that no reasonable trier of fact could conclude that he had established failure to promote and discriminatory discharge in light of the subsequent decision of the National Labor Relations Board ("NLRB") in a related case; and 4) the district court **[**7]** erred in concluding that he was exempt from the overtime requirements of the FLSA.

### Standard of Review

This Court reviews *de novo* a district court's grant of summary judgment, applying the same legal standards that bound the district court, and viewing all facts and

any reasonable inferences therefrom in the light most favorable to the non-moving party. *Hale v. Tallapoosa County, 50 F.3d 1579, 1581 (11th Cir.1995)*; *McGuire Oil Co. v. Mapco, Inc., 958 F.2d 1552, 1557 (11th Cir.1992)*. Summary judgment is appropriate only when "there is no genuine issue of material fact and … the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c)*.

### Direct Evidence

"When there is direct evidence that discrimination was a motivating factor in the challenged employment decision, the appropriate analysis is different from that employed in a case where only circumstantial evidence is available." *Trotter v. Board of Trustees of University of Alabama, 91 F.3d 1449, 1453 (11th Cir.1996)*; *Bell v. Birmingham Linen Service, 715 F.2d 1552, 1556* (11th Cir.), *cert. denied, 467 U.S. 1204, 104 S. Ct. 2385,* **[*962]** *81 L. Ed. 2d 344 (1984)*. The basis for the analysis **[**8]** is that once a plaintiff produces direct evidence of a discriminatory motive, "the ultimate issue of discrimination is proved." *Bell, 715 F.2d at 1556*. As such, "the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the [illegitimate criterion] into account." *Price Waterhouse v. Hopkins, 490 U.S. 228, 258, 109 S. Ct. 1775, 1795, 104 L. Ed. 2d 268 (1989)*.

Appellant argues that McClain's statements, conduct, and attitudes are direct evidence of his discriminatory motive. See *EEOC v. Alton Packaging Corp., 901 F.2d 920 (11th Cir.1990)* (general racially discriminatory remarks constitute direct evidence of decisionmakers' failure to promote black employees for discriminatory reasons). At his deposition, McClain testified that Appellant intimidated white employees by his "strut." He further testified that Appellant, "a very large, very strong, very muscular black man," was attempting to intimidate "three smaller or overweight white men."

These statements and others in Appellees' brief, however inappropriate they may be, are not direct evidence of a discriminatory **[**9]** motive with respect to Appellant's claims of failure to promote or discriminatory discharge. See *Burrell v. Board of Trustees of Georgia Military College, 125 F.3d 1390, 1393 (11th Cir.1997)*("Direct evidence is evidence, which if believed, proves [the] existence of fact in issue without inference or presumption.")(internal quotation omitted). At best, these statements merely suggest a

131 F.3d 957, *962; 1997 U.S. App. LEXIS 35642, **9

discriminatory motive which, by definition, makes them circumstantial evidence. [1] *Id. at 1393-94*.

Similarly, the incident involving Tim Hall is not direct evidence of a discriminatory motive with respect to Appellant's claims of failure to promote or discriminatory discharge. As Hall was not a decisionmaker with respect to either of these employment decisions, his discriminatory comment cannot **[**10]** satisfy Appellant's burden in this regard. *See Price Waterhouse, 490 U.S. at 277, 109 S. Ct. at 1804-05* (O'Connor, J., concurring)("Thus, stray remarks in the workplace … cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria. Nor can statements by nondecisionmakers….."); *Trotter, 91 F.3d at 1453-54* (same). Moreover, assuming for the sake of argument that Hall's outburst resulted in his promotion and/or Appellant's demotion, there is no evidence which directly proves that McClain acted with a discriminatory motive. *Price Waterhouse, 490 U.S. at 277, 109 S. Ct. at 1804* (O'Connor, J., concurring)("What is required is … direct evidence that *decisionmakers* placed substantial negative reliance on an illegitimate criterion in reaching their decision.")(emphasis added).

Appellant further argues that he presented undisputed evidence that McClain would talk to white employees but ignore black employees, that he laid off black employees with more experience than comparable white employees, that he promoted white employees with less seniority than comparable black employees and that he would give white employees **[**11]** privileges, such as loans, that were not given to black employees. Additionally, Appellant contends that one of the local temporary agencies indicated that it would not send black applicants to the plant because McClain did not want black employees in office positions.

==The district court correctly dismissed this evidence as "not significantly probative" because it was based on gossip, common knowledge, and the hearsay statement of an unidentified representative. There is no indication that any of this evidence can be reduced to admissible evidence at trial. *See Pritchard v. Southern Co. Services, 92 F.3d 1130, 1135* (11th Cir.)(inadmissible hearsay cannot defeat a motion for summary judgment==

when it is not reducible to admissible form at trial), *amended on reh'g, 102 F.3d 1118 (11th Cir.1996)*.

 **[*963]** Finally, Appellant argues that in the history of Appellees' operations (650 employees in eight plants), there have only been three black supervisory employees. Appellees argue, however, that Appellant has provided no other information (*i.e.*, whether any black employees ever applied for supervisory positions) to make this otherwise anecdotal information significant. *See e.g., Howard [**12] v. BP Oil Co., Inc., 32 F.3d 520, 524 (11th Cir.1994)*(" … for this fact to be relevant, plaintiff would have had to present evidence as to how many blacks applied and were rejected and evidence of the success rate of equally qualified white applicants."). We agree. Statistics without an analytic foundation are "virtually meaningless." *Brown v. American Honda Motor Co., 939 F.2d 946, 952-53* (11th Cir.), *cert. denied, 502 U.S. 1058, 112 S. Ct. 935, 117 L. Ed. 2d 106 (1992)*.

Accordingly, the district court appropriately analyzed Appellant's discrimination claims under the *McDonnell Douglas* standard.

*The McDonnell Douglas Standard*

Under the *McDonnell Douglas* standard, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824; Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253-54* & n. 6, *101 S. Ct. 1089, 1094* & n. 6, *67 L. Ed. 2d 207; Combs v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir.1997), cert. denied, 118 S. Ct. 685, 139 L. Ed. 2d 632 (U.S. 1997)*. If the plaintiff successfully establishes a *prima facie* **[**13]** case, a legal presumption of unlawful discrimination arises and the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824*; *Burdine*, 450 U.S. at 254, 101 S. Ct. at 1094; *Combs, 106 F.3d at 1528*. "To satisfy that burden of production, "the defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.' " *Combs, 106 F.3d at 1528* (quoting *Burdine, 450 U.S. at 254-55*, 101 S.Ct.at 1094).

If the employer meets this burden of production, "the presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply

---

[1] Implicit in this finding is our conclusion that these comments are narrowly tailored to a specific event and, therefore, are distinguishable from the comments made in *Alton Packaging*. *See Burrell, 125 F.3d at 1393, n. 7*.

131 F.3d 957, *963; 1997 U.S. App. LEXIS 35642, **13

drops out of the picture." *St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 2749, 125 L. Ed. 2d 407 (1993); see also Burdine, 450 U.S. at 255* & n. 10, *101 S. Ct. at 1095* & n. 10. Still, the elements of the *prima facie* case remain. *Combs, 106 F.3d at 1528.* Moreover, when accompanied by evidence of pretext [**14] or disbelief of the defendant's proffered explanation, in some instances, they may permit a finding for the plaintiff. *Id. at 1529; see also Hicks, 509 U.S. at 511, 113 S. Ct. at 2749.* The plaintiff employee, however, always retains the ultimate burden of proving that he was the victim of intentional discrimination. *Hicks, 509 U.S. at 508, 113 S. Ct. at 2747-48; Burdine,* 450 U.S. at 253, 101 S. Ct. at 1093-94.

*Discussion*

A. Failure to Promote

A *prima facie* case of discriminatory failure to promote requires the plaintiff to show that he is a member of a protected class; he was qualified for and applied for the promotion; he was rejected; and other equally or less qualified employees who were not members of the protected class were promoted. *Combs, 106 F.3d at 1539 n. 11.*

The district court concluded that Appellant could not establish a *prima facie* case of discriminatory failure to promote because the record did not indicate that he was actually denied a promotion. *Evans, 934 F. Supp. at 1388* ("The record shows that Plaintiff was given a salary and the title of assistant manager or stock manager, and, despite his argument that the promotion [**15] was in name only, the Plaintiff's own deposition states that in the shakeup after the firing of Ken Cole, Plaintiff acquired new managerial responsibilities beyond those of his previous job."). The district court also concluded that nothing in the record suggested that Tim Hall "received a preferential promotion or that [he] was placed in a position of greater responsibility [*964] or prestige than [Appellant] enjoyed." *Id.* Accordingly, the district court granted summary judgment in favor of Appellees.

Our review of the record, however, reveals additional facts concerning the Appellant's lack of promotion. Three of Appellant's nephews, who also worked at the plant, testified that McClain held a meeting with certain employees shortly after the incident involving Hall

occurred. All three testified that McClain announced that he was putting Hall over Appellant. They further testified that McClain proceeded to tell an off-color joke in which he compared certain employees at the plant to various body parts, concluding with Appellant being compared to an anus.

Additionally, Appellant testified that in the months following the incident involving Hall, his job assignments changed almost [**16] weekly. He contends that he was frequently given demeaning and menial tasks. *See e.g., McCabe v. Sharrett, 12 F.3d 1558, 1564 (11th Cir.1994)*(employee who was given fewer responsibilities and was made to perform more menial tasks suffered adverse employment action).

Finally, Appellant maintains that he was only given a salary to remove him from the bargaining unit in an attempt to thwart the union's organization effort. The evidence on this point is at best inconclusive. Certainly the discrepancies between Appellants assignments and those of the other managers, as well as the delayed manner in which he became a salaried employee, could support such a finding.

Accordingly, we conclude that Appellant met his preliminary burden of establishing a *prima facie* case of discriminatory failure to promote. As this was the sole basis for the district court's grant of summary judgment, its decision must be reversed. [2]

_____

[2] Although the district court chose not to address the issue of whether Appellant's Complaint properly asserted a claim of discriminatory failure to promote, we will consider it because it was properly raised by the parties and it involves a pure question of law. *See Narey v. Dean, 32 F.3d 1521, 1526 (11th Cir.1994).*

The Federal Rules of Civil Procedure require only that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief, and a demand for judgment for the relief the pleader seeks." *Fed.R.Civ.P. 8(a).* "A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests." *Sams v. United Food & Comm'l Workers Int'l Union, 866 F.2d 1380, 1384 (11th Cir.1989); see also Dussouy v. Gulf Coast Investment Corp., 660 F.2d 594, 604 (5th Cir.1981)*("The form of the complaint is not significant if it alleges facts upon which relief can be granted, even if it fails to categorize correctly the legal theory giving rise to the claim."). We conclude that Appellant's Complaint satisfies these liberal standards.

[**17]   B. Discriminatory Discharge

A *prima facie* case of discriminatory discharge requires a plaintiff to show that he was a member of a protected class; he was qualified for the job; he was terminated despite his qualifications; and after his termination the position remained open and the employer continued to seek applicants of similar qualifications. *Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1375 (11th Cir.1996)*.

There is no dispute that Appellant established a *prima facie* case of discriminatory discharge. Accordingly, the district court considered Appellees' legitimate, nondiscriminatory reasons. It found several, including that Appellant was fired for "intimidating employees, telling employees they were targeted to be fired, failing to order parts on time, insubordination, and making threats." *Evans, 934 F. Supp. at 1389*. The district court properly determined that Appellees met their burden of production.

The district court then looked to the issue of pretext. It concluded that although there may have been some dispute as to the credibility of Appellees' legitimate, nondiscriminatory reasons, Appellant could not prevail unless the evidence presented also [**18] indicated that intentional race discrimination was the true reason for his discharge. *Evans, 934 F. Supp. at 1389* (citing *Hicks, 509 U.S. at 515, 113 S. Ct. at 2751-52*).

In this respect, the district court was in error. Under the established rule of law in this Circuit, a plaintiff can survive a [*965] motion for summary judgment or for judgment as a matter of law simply by presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, nondiscriminatory reasons. *Combs, 106 F.3d at 1530-32*; *Howard, 32 F.3d at 527-28*; *Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 921 (11th Cir.1993)*.

On our review it appears that Appellant presented sufficient evidence to create a genuine issue of material fact with respect to the truth or falsity of each of Appellees' legitimate, nondiscriminatory reasons. Accepting Appellant's version of the facts as true, we must conclude that he was fired on February 22, 1995. The record indicates that, as of that date, McClain had not yet been informed by anyone that Appellant was attempting to stir up racial tensions at the plant. Nor is there any indication that Appellant [**19] had been negligent or insubordinate in performing his duties. On the contrary, it appears that Appellant was a capable employee who was frequently relied upon to assist in the day to day operations of the plant. Appellees' *ad hoc* explanations and arguments regarding Appellant's actual date of termination are simply insufficient at this stage of the proceedings.

Appellees' assertions concerning Appellant's "veiled threats" are similarly insufficient. Even the district court recognized that these "were subject to question by a trier of fact." *Evans, 934 F. Supp. at 1389*.

Accordingly, the district court's grant of summary judgment on Appellant's claim of discriminatory discharge must be reversed. [3]

*Overtime Compensation*

[**20]   The FLSA exempts from its overtime pay requirements "any employee employed in a bona fide executive, administrative, or professional capacity" who receives payment on a salary basis. *29 U.S.C. § 213(a)(1)(1994)*; see also *Avery v. City of Talladega, 24 F.3d 1337, 1340 (11th Cir.1994)*. Exemptions under the FLSA, however, are to be construed narrowly. *Nicholson v. World Business Network, Inc., 105 F.3d 1361, 1364* (11th Cir.), *cert. denied,* S. Ct. (1997). Indeed, the employer has the burden of showing that it is entitled to the exemption. *Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 594 (11th Cir.1995)*.

The district court concluded that Appellant was exempt from the overtime compensation requirements of the FLSA because he was working in an executive capacity and was paid an annual salary of $ 35,000.00. *Evans, 934 F. Supp. at 1391* (" *29 C.F.R. § 541.1(f)* provides "that an employee who is compensated [on] a salary basis at a rate of not less than $ 250 per week, … and whose primary duty consists of the management of the enterprise in which the employee is employed … and includes the customary and regular discretion of the work of two or more other employees [**21] therein' meets the requirements of *section 213(a)* and is exempt from the overtime pay requirements."). Accordingly, the district court granted summary judgment on Appellant's claim for overtime compensation for the months immediately preceding his discharge.

---

[3] In light of this conclusion, we deem it unnecessary to consider whether, and to what extent, the factual findings and credibility determinations of the NLRB in subsequent and collateral proceeding bind a district court on a motion for reconsideration of its grant of summary judgment.

131 F.3d 957, *965; 1997 U.S. App. LEXIS 35642, **21

Appellant argues that the district court erred in considering him a salaried employee because he was only given a salary in an attempt to "obviate the requirements of the National Labor Relations Act." He further contends that he was not endowed with managerial responsibility because he could not hire, fire, promote, suspend, reward, or even grant time off for other employees.

We do not believe that an employer's subjective motivations are relevant to the inquiry of whether or not an employee was compensated on a salary basis. The regulations speak in purely objective terms. 29 U.S.C. § 213(f)("The term "employee employed in a bona fide executive * * * capacity' in section 13(a)(1) of the act shall mean any employee: … who is compensated for his services on a salary basis ….")(emphasis added). Nevertheless, we conclude that the district court's grant of summary judgment on Appellant's claim for overtime compensation [**22] under the FLSA was erroneous. It is not at all clear from the record whether Appellant actually acted in a bona fide executive, administrative, or professional capacity in the months immediately preceding his discharge.

*Conclusion*

For the reasons stated in this opinion, we reverse the district court's grant of summary judgment on Appellant's claims of race discrimination and for overtime compensation and remand to the district court for further proceedings.

REVERSED and REMANDED.

**Concur by:** LIMBAUGH

## Concur

LIMBAUGH, Senior District Judge, concurring:

I concur with both the analysis and the result in this case under established Eleventh Circuit precedent. As the presiding district judge in the bench trial of the *Hicks* case, however, I feel compelled to write separately, and respectfully, to note my disagreement with the rule of law propounded in *Combs v. Plantation Patterns, 106 F.3d 1519 (11th Cir.1997)*.

In *Hicks* the Supreme Court unequivocally stated, "even though (as we say here) rejection of the defendant's

proffered reasons is enough at law to *sustain* a finding of discrimination, *there must be a finding of discrimination*." *Hicks, 509 U.S. at 511 n.4, [**23] 113 S. Ct. at 2749* (emphasis in original). The Court explicitly recognized that "trial courts or reviewing courts should [not] treat discrimination differently from any other ultimate questions of fact. Nor should they make their inquiry even more difficult by applying legal rules which were devised to govern the basic allocation of burdens and order of presentation of proof in deciding this ultimate question." *Id., at 524, 113 S. Ct. at 2756* (quoting *Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716, 103 S. Ct. 1478, 1482, 75 L. Ed. 2d 403 (1983)*) (internal quotations and citation omitted). Simply put, the *McDonnell Douglas* burden shifting framework "is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination," *Burdine,* 450 U.S. at 255 n. 8, 101 S. Ct. at 1094, not to raise the bar for defendant employers in the traditional application of *Fed.R.Civ.P. 56(c)*. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2510-11, 91 L. Ed. 2d 202 (1986)* (the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor **[**24]** to allow a jury to return a verdict for it); *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986)* (same). In employment discrimination cases, "the ultimate question is discrimination *vel non.*" *Hicks, 509 U.S. at 518, 113 S. Ct. at 2753* (quoting *Aikens, 460 U.S. at 714, 103 S. Ct. at 1481*).

A more than plausible reading of the facts of this case amply demonstrates the problem with the analysis offered in *Combs.* Assume Appellant establishes a *prima facie* case of discriminatory discharge. Assume further that Appellees advance several legitimate, nondiscriminatory reasons for the employer's actions, *i.e.,* Appellant had become a disruptive force in the plant by intentionally creating racial tensions among the lower level employees, negligently performing his duties, and threatening certain white employees. Finally, assume Appellant presents evidence sufficient to create a genuine issue of material fact as to the truth or falsity of Appellees' legitimate, nondiscriminatory reasons. Under the existing rule of law in this Circuit, Appellant can survive a motion for summary judgment or for judgment as a matter of law.

Suppose, **[**25]** however, that there is virtually no evidence indicating that Appellant's discharge was motivated by his race. On the contrary, suppose the evidence overwhelmingly suggests that Appellant was discharged for his participation in a union organization

131 F.3d 957, *966; 1997 U.S. App. LEXIS 35642, **25

effort at the plant. While this motivation is clearly unlawful under the National Labor Relations Act, *see McClain of Georgia, Inc., 322 N.L.R.B. 367 (1996)*, it in no way violates Title VII or § 1981. *See 42 U.S.C. 2000e-2(a); 42 U.S.C. 1981(a); see also Hazen Paper Co. v. Biggins, 507 U.S. 604, 608-14, 113 S. Ct. 1701, 1705-08, 123 L. Ed. 2d 338 (1993)* (employer does not violate the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., by terminating older employees in order to prevent their pension benefits from **[*967]** vesting, even though engaging in such action is unlawful under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.). Absent some evidence indicating that the employer was motivated by a discriminatory animus, "we have no authority to impose liability ... for alleged discriminatory employment practices." *Hicks, 509 U.S. at 514, 113 S. Ct. at 2751.* Accordingly, judgment **[**26]** as a matter of law must be granted in favor of the employer.

For these reasons and for the reasons mentioned therein, I find the analysis offered in *Isenbergh v. Knight-Ridder Newspaper Sales, Inc., 97 F.3d 436, 440-44* (11th Cir.), *cert. denied, __ U.S. __, 117 S. Ct. 2511, 138 L. Ed. 2d 1014 (1997)*, to be a more persuasive and accurate reading of *Hicks. See also Hidalgo v. Overseas Condado Ins. Agencies, Inc., 120 F.3d 328, 335 (1st Cir.1997)* ("In the context of a summary judgment proceeding, *Hicks* requires that once the employer has advanced a legitimate nondiscriminatory basis for its adverse employment decision, the plaintiff, before becoming entitled to bring the case before the trier of fact, must show evidence sufficient for the factfinder reasonably to conclude that the employer's decision to discharge him ... was wrongfully based on [an illegitimate criterion].") (internal quotation omitted); *Fisher v. Vassar College, 114 F.3d 1332, 1340 (2d Cir.1997)* (en banc) ("a prima facie case meeting the minimal standard of *McDonnell Douglas* (even where elements are acknowledged by the defendant), together with a finding of pretext, do not necessarily **[**27]** add up to a sustainable case of discrimination"), *cert. denied, 118 S. Ct. 851, 139 L. Ed. 2d 752 (U.S. 1997); Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 994 (5th Cir.1996)* (en banc) ("The employer, of course, will be entitled to summary judgment if the evidence taken as a whole would not allow a jury to infer that the actual reason for the discharge was discriminatory."); *Ryther v. KARE 11, 108 F.3d 832, 848* (8th Cir.) (Loken, J., in a partial separate concurrence commanding a majority of the Eighth Circuit en banc), *cert denied, __ U.S. __, 117 S. Ct. 2510, 138 L. Ed. 2d 1013 (1997)* ("[a] district court may grant summary judgment or JAML for the employer, even if plaintiff has some evidence of pretext if that evidence, for one reason or another, falls short of proving intentional discrimination.").

---

End of Document

# *Alexander v. United States*

United States Court of Appeals for the Eleventh Circuit

December 15, 2022, Filed

No. 21-13720 Non-Argument Calendar

**Reporter**
2022 U.S. App. LEXIS 34669 *; 2022 WL 17688692

CHARNESHA ALEXANDER, Plaintiff-Appellant, versus UNITED STATES OF AMERICA, PAUL ROLSTON, Defendants-Appellees.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History:** [*1] Appeal from the United States District Court for the Northern District of Florida. D.C. Docket Nos. 4:19-cv-00138-RH-MAF.

**Disposition:** AFFIRMED.

## Core Terms

district court, exam, sexual, sexual abuse, questions, impeach, prison, evidentiary, chaperone, pretrial, complaints, reputation, witnesses, inmates, prior statement, cross-examination, vicarious, assault, tests, clearly erroneous, negligence claim, providers, happened, abused, breast, rumors

## Case Summary

### Overview

HOLDINGS: [1]-Appellant did not show an abuse in the district court's decision under *Fed. R. Evid. 611(a)* in exercising control over the examination of a nursing assistant of the prison because counsel attempted to ask the nurse about the contents of the prior statements on direct examination without first eliciting testimony that was inconsistent with those statements; [2]-The government did not breach a duty to appellant and others by permitting defendant to continue performing well woman exams, so long as a chaperone was present because despite appellant's broad claims of a culture of impunity at the prison, appellant identified no evidence that would have given prison officials reason to credibly suspect defendant of sexual abuse at the time he examined her.

**Outcome**
Judgment affirmed.

**Counsel:** For CHARNESHA ALEXANDER, Plaintiff - Appellant: James Vernon Cook, Law Office of James Cook, TALLAHASSEE, FL; Richard Errol Johnson, Law Office of Richard E. Johnson, TALLAHASSEE, FL.

For UNITED STATES OF AMERICA, Defendant - Appellee: Marie Moyle, U.S. Attorney's Office, TALLAHASSEE, FL; U.S. Attorney Service - Northern District of Florida, U.S. Attorney's Office, PENSACOLA, FL.

For PAUL ROLSTON, Defendant - Appellee: Joel Steven Carter, Miriam Rebekkah Coles, Henry Buchanan Hudson Suber & Carter, TALLAHASSEE, FL.

**Judges:** Before WILSON, ROSENBAUM, and ANDERSON, Circuit Judges.

## Opinion

PER CURIAM:

Charnesha Alexander appeals the judgment in favor of defendants Paul Rolston and the United States after trial on her claim that she was sexually abused by Rolston, a physician assistant at FCI Tallahassee, during a medical examination at the federal prison in September 2016. She sued Rolston individually under *Bivens*[1] for violating her *Eighth Amendment* right to be free from cruel and unusual punishment. And she brought claims against the government under the *Federal Tort Claims Act ("FTCA")* for negligence [*2] and vicarious liability. A jury heard the claim against Rolston and returned a verdict in his favor. The FTCA claims were submitted for

---

[1] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971).*

a bench trial to the district court, which entered judgment for the government. Alexander appeals, challenging the district court's handling of various evidentiary matters at trial and its resolution of the FTCA claims. After careful review, we affirm.

## I.

In March 2019, Alexander filed a *§ 1983* lawsuit alleging that she was sexually abused by Physician Assistant Rolston during a medical examination on September 27, 2016, while she was a federal prisoner at FCI Tallahassee. She asserted that Rolston's sexual abuse amounted to cruel and unusual punishment under the *Eighth Amendment*, and that the government was both negligent for failing to protect Alexander and vicariously liable for Rolston's conduct as his employer.

Alexander's case went to trial in hybrid form. A jury heard her claim against Rolston individually. Her FTCA claims against the government, plus some additional evidence not given to the jury, were submitted to the district court for resolution by bench trial. *See Fed. R. Civ. P. 52.*

## A.

Before diving into the details of the trial, we start with some of the district court's pretrial **[*3]** evidentiary rulings, which are relevant to several issues on appeal but which Alexander does not directly challenge. In June 2021, following pretrial and status conferences in May 2021, the court entered a pretrial order ruling on the parties' motions in limine and other matters.

In relevant part, the district court put limits on the evidence Alexander could present or elicit at trial. The court prohibited Alexander from mentioning to the jury "Rolston's reputation among inmates and comments about [him]," the history of assaults or other misconduct by FCI Tallahassee personnel and any related investigations that did not involve Rolston, and settlements with other alleged victims, among other information.

Nonetheless, the district court allowed evidence of other alleged assaults by Rolston, as well as "the conduct of unnecessary PAP smears by [him]," whether occurring before or after the alleged assault of Ms. Alexander." The latter statement refers to two affidavits prepared in connection with a Bureau of Prisons ("BOP")

investigation into Rolston. In the affidavits, Letitia Davis, a nursing assistant at FCI Tallahassee, asserted that Rolston conducted Pap tests and anal exams when they **[*4]** were not necessary or wanted, and that half of the Pap tests she observed Rolston perform were unnecessary. The court explained that Alexander could use the evidence to impeach Davis's testimony at trial "with a prior inconsistent statement," but not "as affirmative evidence on its own" because it was hearsay.

## B.

At trial, Alexander testified that Rolston sexually abused her during a medical examination in September 2016. Alexander explained that, while she was a prisoner at FCI Tallahassee, she had requested to see a doctor for a vaginal bacterial infection. By the time she was seen, though, she had used a home remedy to fix the problem, and she informed medical staff that the visit was unnecessary when she arrived. Yet Rolston still wanted to do a Pap test and pelvic exam, even after finding out that Alexander had her period and felt uncomfortable.

During the exam, Alexander felt Rolston touch her clitoris twice in circular motions while he inserted his fingers into her vagina. The nursing assistant and chaperone, Davis, was not looking at the time. Alexander began to cry once Rolston finished the exam and left the room. As she was crying, Rolston returned and offered to conduct a breast **[*5]** exam, which she refused. Then, while Alexander was waiting to leave the medical area, a guard saw her crying and advised her to "speak up" for herself and others "[i]f he did something to you," which Alexander understood to refer to "the other women that it had happened to that [she] wasn't aware of."

Five other women testified about similar experiences during medical exams conducted by Rolston at FCI Tallahassee. The court repeatedly made clear to the jury that it could evaluate this testimony for only the purpose of evaluating Rolston's intent when examining Alexander. Several women reported that Rolston touched their clitoris, sometimes with circular motions, during a pelvic exam or Pap test. A few said he squeezed their breasts or pinched their nipples during breast exams in ways that felt inappropriate. Many of these witnesses also testified that they did not report the sexual abuse for fear of retaliation or loss of privileges. Because of complaints by Alexander and others,

Rolston was transferred to a men's facility.

Rolston testified in his defense and called several witnesses, including supervisors and coworkers. After a brief rebuttal witness, the case against Rolston was submitted [*6] to the jury. The jury returned a verdict for Rolston, finding he did not engage in a sexual act or sexual contact during his exam of Alexander.

**C.**

After Alexander rested her case, the government moved for judgment on the two claims against it. The district court noted that it could "find facts" on its own as to those claims, in contrast to the claim against Rolston, which was for the jury. The court heard argument from the parties and then entered judgment for the government.

On the battery claim, the district court found that if Rolston committed the sexual acts alleged, he was not "doing the government's business" or a "slight deviation" from that business, but rather a "profoundly different undertaking than what he was hired to do and could appropriately do." So, in the court's view, the alleged conduct was outside the scope of both his employment and the government's vicarious liability.

On the negligence claim, the district court concluded that there was "no failure to use reasonable care" that harmed Alexander. The court explained there was no evidence that the government was aware Rolston had been accused of sexual misconduct before July 2016, when an inmate named Shendolyn Blevins [*7] complained that Rolston had touched her breasts through her shirt without a chaperone present. The court noted, however, that during the prompt BOP investigation of her complaint, Blevins "said very clearly nothing inappropriate happened during the exam," and that she just wanted a female provider or chaperone. Because Blevins denied improper sexual contact, the court reasoned that the government was not negligent in allowing Rolston to continue to perform "well woman" exams. The court also noted that Alexander was not harmed by the lack of a female chaperone because one was present for her exam with Rolston.

**II.**

We start with the district court's evidentiary rulings, which we review for an abuse of discretion. *Lamonica v. Safe Hurricane Shutters, Inc., 711 F.3d 1299, 1317*

*(11th Cir. 2013)*. The court has broad authority to control the admissibility of evidence and the manner of examining witnesses. *United States v. Pon, 963 F.3d 1207, 1223 (11th Cir. 2020)*; *City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 556 (11th Cir. 1998)*; *see Fed. R. Evid. 611(a)*. The abuse-of-discretion standard allows "a range of choice for the district court," so long as the court does not make a mistake of law or a clear error of judgment. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1103-04 (11th Cir. 2005)*.

Even where a district court abuses its discretion on an evidentiary issue, relief is not warranted unless "substantial rights were affected." *Proctor v. Fluor Enters., Inc., 494 F.3d 1337, 1352 (11th Cir. 2007)*. That standard is met only if "the error probably [*8] had a substantial influence on the jury's verdict." *Id.* (quotation marks omitted).

Alexander contends that the district court abused its discretion in handling five evidentiary issues, which resulted in an unfair trial, but we are not persuaded. We consider each issue in turn.

**A.**

First, the record does not support Alexander's claim that she was "never permitted to explore reasons why a prisoner might be afraid to decline unwanted care."

The trial transcript shows that the district court allowed Alexander to inquire about these matters so long as the testimony was limited to "why the witness did what the witness did" and was not simply a conduit for rumors. For instance, Alexander testified that she did not feel free to decline treatment in prison because "it's what they say" and "[y]ou are up under their rules." Blevins testified that she "didn't question" the medical staff or Rolston "[b]ecause [she] didn't want to go to the SHU," or the Special Housing Unit, and the jury heard why the SHU was less desirable. Another witness, Daphne Rodriguez, testified that she had suffered retaliation after disagreeing with prison medical providers, stating that "[t]hey don't help you at all" and will [*9] ignore your requests for treatment. In addition, multiple witnesses testified about fear of retaliation or loss of privileges for reporting sexual abuse in prison.

Alexander cites two instances where the district court purportedly "shut her counsel down" when inquiring why inmates might be afraid to decline care or report abuse. But in those instances, the court appears to have simply

2022 U.S. App. LEXIS 34669, *9

sustained narrow objections to specific questions, not imposed any broad prohibitions.[2]

In one instance, the district court sustained two objections to questions of Alexander about refusing medical treatment at FCI Tallahassee as leading, and Alexander does not dispute that the questions were leading as phrased. Moreover, the questions lacked foundation because Alexander had not yet testified about her examination with Rolston or whether she felt free to decline Rolston's conduct.

In the other instance, a witness was permitted to describe in general terms the negative consequences she suffered after disagreeing with prison medical providers. But the district court prohibited counsel from inquiring about "specific episodes of that kind of problem." Because that witness's testimony was admitted "only for the [*10] purpose of evaluating Rolston's intent," her specific interactions with prison officials other than Rolston were not relevant to the issues at trial and instead could have confused the issues and wasted time. We cannot say that the district court abused its discretion in excluding this evidence.

**B.**

Nor did the district court abuse its discretion in exercising control over the examination of Davis, a nursing assistant at FCI Tallahassee. As we noted above, Davis prepared affidavits for purposes of a BOP investigation stating her opinions that Rolston conducted Pap tests and anal exams which were not necessary or wanted, and that half of the Pap tests she observed Rolston perform were unnecessary. Alexander called Davis as a witness during her case-in-chief, and her counsel began asking Davis about the prior statements in the affidavits on direct examination without first eliciting testimony about the matters covered in the affidavits.

The district court sustained multiple objections to this line of inquiry, ultimately advising Alexander's counsel, "You may ask her on the stand what her testimony is.

You may not ask her first what her testimony was at some other time." The court then permitted [*11] counsel to ask over objection, "Do you believe that Paul Rolston did Pap smears 50 percent of the time that were unnecessary?" Davis responded indirectly that prisoners were frequently "scheduled for something else but when [Rolston] looked in the computer he would say that they would need a Pap smear" as well. Alexander's counsel did not seek further clarification or elaboration of this response, nor did he attempt to impeach Davis at that time with her prior statements.

Here, Alexander has not shown an abuse of the district court's discretion. In Alexander's view, the court erred in excluding Davis's affidavits as hearsay because they were prior inconsistent statements admissible to impeach her. See *United States v. Khanani, 502 F.3d 1281, 1292 (11th Cir. 2007)* ("[P]rior inconsistent statements of a witness are admissible to impeach that witness."). But as the district court explained, counsel attempted to ask Davis about the content of the prior statements on direct examination without first eliciting testimony that was inconsistent with those statements. The court previously had warned counsel he could not introduce Davis's "out-of-court-statement[s] as affirmative evidence on its own." In our view, the court reasonably required counsel to [*12] first elicit testimony at trial inconsistent with Davis's prior statements before asking her about them. Indeed, a witness cannot be impeached if she has not testified in a way that is inconsistent with the prior statement the questioner seeks to use to impeach her.

Alexander maintains that it was proper to impeach Davis on her response denying that she "ma[d]e any critical comment about the way [Rolston] does Pap smears" and stating that she "just said he did them different from what I saw other providers do them." We disagree. Counsel had not asked Davis any questions about her views on the way Rolston did Pap tests or the necessity of the procedures he conducted. So again, there was no basis to impeach testimony on those points with prior statements. Nor is it apparent that Davis's testimony was inconsistent with the statements in her affidavit, which likewise stated that she had never seen a medical provider perform Pap tests like Rolston.

**C.**

We see no support in the record for Alexander's claim that the district court prevented her from rebutting testimony about training on or implementation of the

---

[2] At some points in the trial transcripts, the basis for or fact of an objection are not apparent. The district court addressed this matter at trial, explaining that "there will be a number of places where I have said 'sustained' without the transcript [saying] that anybody said 'objection'. Because you were standing up, and it seemed clear to me what the objection was, and I said 'sustained.'" We therefore look to the surrounding context to inform our analysis of the court's rulings.

2022 U.S. App. LEXIS 34669, *12

Prison Rape Elimination Act ("PREA"). Again, Alexander mischaracterizes the court's rulings.

During cross-examination of [*13] Rolston, the district court prevented Alexander's counsel from asking about "complaints of sexual violations at FCI by other officials" than Rolston. It then instructed the jury that whether "there had been violations of the Prison Rape Elimination Act by other officials at the institution" had "absolutely nothing to do with this case," which was solely about what "Mr. Rolston might have done." But the court permitted counsel to question Rolston generally about reporting PREA complaints by inmates, and it said counsel could also inquire about the incidents described in witness testimony. The court's actions are consistent with its pretrial evidentiary rulings, which Alexander does not directly challenge on appeal. We see no abuse of the court's discretion.

**D.**

The district court did not abuse its discretion by admitting reputation testimony supporting Rolston while excluding evidence of his reputation in prison.

As part of his defense, Rolston called several witnesses to offer testimony about his work performance and professionalism based on personal knowledge as his coworkers or supervisors. During cross-examination of one of these witnesses—Harold White, the assistant health service administrator at FCI Tallahas-see—the [*14] district court sustained objections to the question, "Have people come to you and said that he has multiple women complaining about him?," and an attempted follow-up question.

Outside the jury's presence, the district court explained that these questions violated the pretrial order's prohibition on the jury hearing evidence of Rolston's reputation among inmates or comments about him. Alexander's counsel argued that the questions were relevant to the case because "one of the nurses had reported to [White] that there were complaints." The court responded that relevance was not an excuse to violate the pretrial order, and that, if counsel had grounds for believing "this ought to be admitted, the way to deal with it is to raise it with me outside the jury's hearing." It does not appear the issue was raised again.

Alexander contends that Rolston opened the door to inquiry into Rolston's reputation by offering witness testimony about his professionalism and sterling reputation. Her briefing, however, fails to identify an instance where the district court prevented questioning of Rolston's witnesses about the specific allegations by Alexander and the other women who testified at trial. See [*15] _Fed. R. Evid. 405(a)_ ("On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct."). Plus, even assuming the questions by Alexander's counsel were valid impeachment and would justify overriding the pretrial order, there was no abuse of discretion because, as the court directed, the matter should have been raised with the court beforehand.

Alexander's real complaint appears to be the district court's pretrial ruling that she could not offer testimony about prison rumors or Rolston's reputation in prison. In particular, the court barred Alexander from offering evidence that it was "common knowledge among the inmates that Rolston performed unnecessary pelvic exams and took sexual liberties in the course of those exams." In refusing to admit this testimony, the district court explained that "we don't try cases on rumors," and that the rumor evidence was not based on personal knowledge.[3] Alexander offers no rebuttal to the court's explanation and has not shown that the court made a clear error of judgment or a mistake of law by excluding this evidence.

Moreover, even if the district court abused its discretion by improperly limiting [*16] cross-examination of White to show that "White did nothing," Alexander has not shown that this "error probably had a substantial influence on the jury's verdict." _Proctor, 494 F.3d at 1352_. White was a brief witness in the three-day trial and one of several witnesses who testified about working with or supervising Rolston. His testimony was not so significant that it prejudiced Alexander, even assuming the court should have permitted inquiry into White's knowledge of complaints against Rolston. As the district court repeatedly emphasized, the actions of other prison official like White were not relevant to the issue before the jury, which concerned what happened during the exam in September 2016. So evidence that "White did nothing" in response to complaints about Rolston would have properly been excluded as irrelevant and confusing. And we see no indication more broadly that Alexander was prevented from effectively impeaching Rolston's witnesses.

---

[3] Nevertheless, the district court permitted "evidence that anybody that worked for the Bureau of Prisons ever heard the rumor" only for the claims against the government.

**E.**

Finally, Alexander claims that the district court should have excluded, under *Rules 403* and *408, Fed. R. Evid.*, evidence that Alexander filed a claim with the government—a presuit requirement under the FTCA—for $5 million in damages arising from the events involving Rolston. The parties dispute **[*17]** whether the damages request on an FTCA claim form is subject to *Rule 408*, which generally prohibits evidence of compromise offers or negotiations, but we need not resolve that issue. Even assuming *Rule 408* applies, that rule excepts evidence admitted "for another purpose, such as proving a witness's bias or prejudice." *Fed. R. Evid. 408(b)*.

Here, the evidence was offered for impeachment purposes on cross-examination and was arguably relevant to Alexander's valuation of her claim and her biases as a witness. *See United States v. Hall, 653 F.2d 1002, 1008 (5th Cir. Aug. 1981)* ("[A] witness's motivation for testifying, as well as any potential incentives for falsification, are always relevant lines of inquiry.").[4] Alexander has developed no supporting argument for her assertion that the evidence should have been excluded under *Rule 403* as substantially more prejudicial than probative. In any case, we are not persuaded that any error on this point, which was a brief, isolated point on cross-examination, had a prejudicial effect on the trial.

**F.**

More broadly, Alexander maintains that the district court's evidentiary errors resulted in a one-sided presentation of the evidence and denied her a fair trial. But on closer inspection, her bold claims of error, and at times her descriptions of the **[*18]** court's actions more generally, are simply not supported by the record. Rather, the record reflects that the district court made and enforced clear, reasonable guidelines about permissible evidence and questioning, within which Alexander was afforded a full and fair opportunity to present her case. No trial is perfect, and any evidentiary errors in this case, in our view, fall well short of showing an effect on her substantial rights. *See Proctor, 494 F.3d at 1352*; *see also McDonough Power Equip., Inc.*

---

[4] This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)* (en banc).

*v. Greenwood, 464 U.S. 548, 553, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984)* ("This Court has long held that a litigant is entitled to a fair trial but not a perfect one, for there are no perfect trials.") (cleaned up).

For these reasons, we affirm the judgment for Rolston.

**III.**

Next, we consider the FTCA claims, which were resolved by bench trial. "On appeal from a bench trial, the district court's conclusions of law are reviewed de novo, but its findings of fact shall not be set aside unless clearly erroneous." *Compulife Software Inc. v. Newman, 959 F.3d 1288, 1301 (11th Cir. 2020)* (cleaned up). A factual finding is clearly erroneous if, based on the record as a whole, we are confident that the court made a mistake. *Morrissette-Brown v. Mobile Infirmary Med. Ctr., 506 F.3d 1317, 1319 (11th Cir. 2007)*. But if the court's account of the evidence is reasonable, we must affirm. *Id.*

**A.**

Alexander argues that the district court erred in evaluating her FTCA negligence claim **[*19]** by focusing solely on the "74 days" between Blevins's complaint and Alexander's examination. In her view, evidence of a broader "culture of impunity" at FCI Tallahassee with regard to sexual abuse by staff, including lengthy delays in investigating Alexander's and others' allegations of sexual abuse, foreseeably led to the harm she suffered.

The FTCA permits claims against the government for "violations of state law by federal employees." *Shivers v. United States, 1 F.4th 924, 928 (11th Cir. 2021)*. To succeed on a claim of negligence under Florida law, "a plaintiff must establish the four elements of duty, breach, proximate causation, and damages." *Limones v. Sch. Dist. of Lee Cnty., 161 So. 3d 384, 389 (Fla. 2015)*. Whether a duty exists is a legal question, but "the remaining elements of negligence—breach, proximate causation, and damages—are to be resolved by the fact-finder." *Id.*

Alexander's briefing largely sidesteps the reasons for the district court's ruling in favor of the government on her negligence claim. The court found, in relevant part, that there was no evidence of complaints about sexual misconduct by Rolston before July 16, 2016, when an inmate, Blevins, complained that he conducted a breast exam through her shirt without a chaperone present. So,

2022 U.S. App. LEXIS 34669, *19

according to the court, the "whole question" **[\*20]** was whether the government "use[d] reasonable care between that date and September 27th, 2016, when Ms. Alexander had her examination."

On that question, the district court noted that Blevins later "said very clearly nothing inappropriate happened during the exam." As a result, the court reasoned, it was "not negligent for the government to allow Mr. Rolston to continue to conduct well woman" exams. The court further explained that, even if the government had been negligent to allow Rolston to have previously conducted an exam without a same-sex chaperone present, Alexander did not suffer any resulting harm because a chaperone was present for her examination. Accordingly, the court determined that there was "no failure to use reasonable care" that harmed Alexander.

Here, Alexander has not shown that the district court committed a legal error or made clearly erroneous factual findings. We reject the claim that the court improperly "clos[ed] the door on the past conduct of Rolston at FCI Tallahassee." The court explained that Alexander was free to present evidence against the government "that anybody that worked for the Bureau of Prisons ever heard the rumor" that "Rolston is a sexual **[\*21]** abuser" before the assault on Alexander. But as Alexander's counsel admitted in the district court, there was "[n]o evidence of any allegation against Mr. Rolston before the assault on Ms. Alexander," apart from Blevins's complaint. We also see no reason to second-guess the court's ruling that evidence of what prison officials heard or did after Alexander's September 27, 2016, exam was not relevant to what they should have done before that date, which is what the negligence claim was about. Negligence committed after Alexander's injury could not have foreseeably caused that injury.

Despite her broad claims of a "culture of impunity" at the prison, Alexander identifies no evidence that would have given prison officials reason to credibly suspect Rolston of sexual abuse at the time he examined her. She admits it was "not . . . clearly erroneous" for the court to find that Blevins, after making the complaint, "said very clearly nothing inappropriate happened during the exam." Because the sole complainant before Alexander had denied sexual misconduct, the court reasonably concluded that the government did not breach a duty to Alexander and others by permitting Rolston to continue performing **[\*22]** "well woman" exams, so long as a chaperone was present. *See Morrissette-Brown, 506 F.3d at 1319; Limones, 161 So. 3d at 389.*

**B.**

Next, Alexander challenges the district court's conclusion that the government was not vicariously liable under the FTCA because any battery committed by Rolston against Alexander was outside the scope of his employment.

Under the FTCA, the government's vicarious liability is limited to instances where a government employee was "acting within the scope of his or her employment." *28 U.S.C. § 1346(b).* "[W]hether an employee's actions are within the scope of his employment for purposes of the [FTCA] is an issue governed by the law of the state where the incident occurred." *S.J. & W. Ranch, Inc. v. Lehtinen, 913 F.2d 1538, 1542 (11th Cir. 1990), amended, 924 F.2d 1555 (11th Cir. 1991).* Because the incident here occurred in Florida, that state's law governs.

Under Florida law, an employee's conduct is "within the course and scope of employment when it (1) is of the kind the employee is hired to perform, (2) occurs substantially within the time and space limits authorized or required by the work to be performed, and (3) is activated at least in part by a purpose to serve the master." *Goss v. Human Servs. Assocs., Inc.,* 79 So. 3d 127, 132 (Fla. 5th DCA 2012). Applying this three-part test, Florida court have generally held sexual torts "to be outside the scope of an employee's employment and, therefore, insufficient **[\*23]** to impose vicarious liability on the employer." *Id.* (quotation marks omitted); *Nazareth v. Herndon Ambulance Serv., Inc., 467 So. 2d 1076, 1078 (Fla. 5th DCA 2012).*

Alexander maintains that Rolston's alleged conduct of "[r]ubbing the clitoris without a medical purpose" could be described as a "slight deviation" from the government's business, not an abandonment of it, and that Rolston "intersperse[d] actual work in the employer's behalf with actionable sexual conduct." She cites case law indicating that such "dual purpose" conduct by employees may be within the scope of employment.

Yet, importantly, Alexander concedes that it was for the "factfinder" to resolve whether Rolston's conduct was within the scope of his employment. And here, the factfinder was the district court, *see Fed. R. Civ. P. 52,* which found that the alleged sexual battery was *not* motivated by a purpose to serve the government's business, and that it was a "profoundly different

undertaking than what he was hired to do and could appropriately do."

We are not convinced that the district court clearly erred in finding that Rolston's alleged sexual abuse was outside the scope of his employment. *See Morrissette-Brown, 506 F.3d at 1319*. Rather, the record supports the court's findings that the alleged sexual abuse was not the kind of conduct Rolston was hired **[*24]** to perform and was not motivated in any way by a purpose to serve the government. Those findings are also consistent with how Florida law generally treats sexual torts by employees. *See Goss, 79 So. 3d at 132* ("[T]he sexual assault was not within the course and scope of her employment because the act was not in furtherance of her employment."). So even assuming the record supported a contrary finding, the district court's view of the evidence was not clearly erroneous. *See Compulife Software, 959 F.3d at 1301*.

**IV.**

For these reasons, we affirm the judgment for Rolston on Alexander's *Eighth Amendment* claim and for the government on her claims under the FTCA.

**AFFIRMED.**

---

End of Document

⚠ Caution
As of: May 12, 2023 2:40 PM Z

# *Daly v. Far Eastern Shipping Co. PLC*

United States District Court for the Western District of Washington, Seattle Division

January 7, 2003, Decided ; January 7, 2003, Filed, Entered

CASE NO. CO1-0880C

### Reporter

238 F. Supp. 2d 1231 *; 2003 U.S. Dist. LEXIS 914 **; 60 Fed. R. Evid. Serv. (Callaghan) 1436

LCDR JOHN R. DALY, JR. U.S.N., Plaintiff, v. FAR EASTERN SHIPPING COMPANY PLC, FESCO AGENCIES N.A., INC. AND FESCO INTERMODAL, INC., Defendants.

**Subsequent History:** *Affirmed by Daly v. FESCO Agencies NA Inc., 2004 U.S. App. LEXIS 17934 (9th Cir. Wash., Aug. 23, 2004)*

**Disposition:** [**1] Plaintiff's motion for a new trial denied and plaintiff's motion to file declaration granted.

## Core Terms

laser, experiment, photograph, time limit, pretrial order, parties, new trial, rebuttal, motion for a new trial, declaration, estimates, modified, bridge, flaw, inadmissible, longshoreman, proper rebuttal, intelligence, disclosures, eight-day, irritated, addendum, hearsay, reasons, coming, ship, properly excluded, time of trial, travel plans, case-in-chief

## Case Summary

### Procedural Posture

Plaintiff seaman moved for a new trial after the jury returned a verdict for defendant merchant vessel owner (owner) in the seaman's action seeking damages for an eye injury.

### Overview

The seaman was conducting surveillance of the owner's merchant vessel on behalf of the U.S. Navy when allegedly a laser on the vessel struck and injured the seaman's eye, causing him permanent eye damage. The seaman moved for a new trial after the jury found in the owner's favor. The court held that the seaman was not entitled to a new trial based upon newly obtained evidence, namely a letter from a longshoreman stating that there was a laser on the owner's vessel. Portions of

potential testimony, that the longshoreman told the seaman that there was a laser, that the laser's presence was common knowledge, and that a doctor had found the longshoreman's eyes were irritated, were inadmissible hearsay. The fact that the longshoreman claimed to have seen a light coming from the vessel would not have changed the trial's outcome because it was undisputed at trial that a light was housed on the vessel's bridge. The court's imposition of an eight-day limit on the trial did not necessitate a new trial; the seaman's counsel failed to object during the trial, the time limit was based on the parties' own pretrial estimates, and it was more than enough time to try the simple battery claim.

### Outcome

The seaman's motion for a new trial in his battery action against the owner was denied.

## LexisNexis® Headnotes

Civil Procedure > ... > Relief From Judgments > Grounds for Relief from Final Judgment, Order or Proceeding > Newly Discovered Evidence

### *HN1*[⇩] Grounds for Relief from Final Judgment, Order or Proceeding, Newly Discovered Evidence

Newly discovered evidence warrants a new trial where: (1) the evidence was discovered after the trial; (2) the evidence could not have been discovered earlier through a diligent search; and (3) the newly discovered evidence is of such a magnitude that production of it earlier likely would have changed the outcome of the trial.

238 F. Supp. 2d 1231, *1231; 2003 U.S. Dist. LEXIS 914, **1

Evidence > ... > Hearsay > Rule
Components > Nonverbal Conduct

Evidence > ... > Hearsay > Rule
Components > General Overview

*HN2*[⬇] **Rule Components, Nonverbal Conduct**

Testimony that a fact is common knowledge is hearsay because such testimony summarizes the knowledge of persons other than the declarant. *Fed. R. Evid. 802*.

Civil Procedure > Trials > General Overview

*HN3*[⬇] **Civil Procedure, Trials**

A party must raise its objection to a time limit during the trial. A party that fails to raise the objection waives its ability to do so after the trial.

Civil Procedure > Pretrial
Matters > Conferences > Case Management

Civil Procedure > Trials > General Overview

*HN4*[⬇] **Conferences, Case Management**

The Ninth Circuit specifically has approved of time limits based upon parties' own estimates.

Civil Procedure > Trials > General Overview

Criminal Law &
Procedure > Trials > Witnesses > Presentation

*HN5*[⬇] **Civil Procedure, Trials**

A party objecting to trial time limits must show there was harm incurred as a result of the time limits.

Civil Procedure > Pretrial
Matters > Conferences > General Overview

*HN6*[⬇] **Pretrial Matters, Conferences**

*Fed. R. Civ. P. 16(e)* provides that the pre-trial order shall control the course of the action unless modified by a subsequent order. *Fed. R. Civ. P. 16(e)* further

provides and that the pretrial order should be modified only to prevent manifest injustice. The Ninth Circuit has made clear that a court should not modify a pretrial order simply because the opposing party would suffer no prejudice. In order to effect the "salutary purpose" of *Fed. R. Civ. P. 16(e)*, trial courts may modify the order only upon a showing of "substantial justification."

Evidence > Admissibility > Expert Witnesses

Evidence > Types of
Evidence > Testimony > General Overview

Evidence > ... > Testimony > Expert
Witnesses > General Overview

Evidence > ... > Testimony > Lay
Witnesses > Personal Knowledge

*HN7*[⬇] **Admissibility, Expert Witnesses**

Where the plaintiff does not designate a witness an expert witness, the witness can testify only to facts within his personal knowledge. *Fed. R. Evid. 602*. A witness has personal knowledge of a fact only if the witness had an opportunity to observe, and has actually observed, the fact.

Evidence > Relevance > Preservation of Relevant Evidence > Exclusion & Preservation by Prosecutors

Evidence > ... > Testimony > Examination > General Overview

*HN8*[⬇] **Preservation of Relevant Evidence, Exclusion & Preservation by Prosecutors**

Rebuttal evidence is allowed to permit a litigant to counter new, unforeseen facts brought out in the other side's case. Rebuttal evidence is admissible only where the need for it could not have been foreseen at the time the plaintiff presented its case-in-chief. When a party knows that a contested matter is in the case, yet fails to address it in a timely fashion, he scarcely can be heard to complain that the trial court refused to give him a second nibble at the cherry.

Civil Procedure > Judicial

Case 1:18-cv-24190-RS   Document 463   Entered on FLSD Docket 05/31/2023   Page 25 of 32

Page 3 of 10

238 F. Supp. 2d 1231, *1231; 2003 U.S. Dist. LEXIS 914, **1

Officers > Judges > Discretionary Powers

Evidence > ... > Testimony > Examination > General Overview

#### HN9[⬇] Judges, Discretionary Powers

The Ninth Circuit has not specified a particular rule for determining whether rebuttal evidence is proper but has held instead that this is a determination solely within the sound judicial discretion of the trial judge.

Civil Procedure > Pretrial Matters > Conferences > Pretrial Orders

Civil Procedure > Pretrial Matters > General Overview

Civil Procedure > Pretrial Matters > Conferences > General Overview

#### HN10[⬇] Conferences, Pretrial Orders

Persons not named in the pretrial order may not testify unless the offering party shows a substantial justification for modifying the pretrial order.

Civil Procedure > Discovery & Disclosure > Disclosure > Mandatory Disclosures

Evidence > ... > Testimony > Expert Witnesses > General Overview

Civil Procedure > Discovery & Disclosure > Disclosure > General Overview

#### HN11[⬇] Disclosure, Mandatory Disclosures

*Fed. R. Civ. P. 26(a)(2)* states that rebuttal disclosures may only contain opinions offered "solely to contradict or rebut" other expert testimony.

Civil Procedure > Judgments > Relief From Judgments > Altering & Amending Judgments

Civil Procedure > Judgments > Relief From Judgments > General Overview

Civil Procedure > Judgments > Relief From

Judgments > Motions for New Trials

#### HN12[⬇] Relief From Judgments, Altering & Amending Judgments

*Fed. R. Civ. P. 59(b)* rule requires that a motion for new trial be filed within 10 days of entry of judgment.

**Counsel:** For JOHN R DALY, JR, LCDR, U.S.N., plaintiff: Michael J Hurley, HOWREY SIMON ARNOLD & WHITE, Larry Klayman, Paul J Orfanedes, KLAYMAN & ASSOCIATES, WASHINGTON, DC.

For JOHN R DALY, JR, LCDR, U.S.N., plaintiff: Richard A Bersin, LAW OFFICE OF RICHARD A BERSIN, BELLEVUE, WA.

For FESCO AGENCIES NA INC, FESCO INTERMODAL INC, defendants: Marc E. Warner, LEGROS, BUCHANAN & PAUL, SEATTLE, WA.

**Judges:** JOHN C. COUGHENOUR, CHIEF UNITED STATES DISTRICT JUDGE.

**Opinion by:** JOHN C. COUGHENOUR

## Opinion

[*1233] ORDER

### I. Introduction

This matter is before the Court on plaintiff's motion for a new trial (Dkt. No. 86) and plaintiff's motion to file the declaration of Adam Adirim (Dkt. No. 98). For the reasons described below, the motion for new trial is DENIED. The motion to file Mr. Adirim's declaration is GRANTED.

This action arises out of plaintiff's mission to conduct surveillance of defendants' merchant vessel on behalf of the U.S. Navy in 1997. Plaintiff took several photographs of the ship [**2] from a helicopter as the ship traveled through the Strait of Juan de Fuca. Plaintiff claims that a laser emitted from defendants' ship struck him in the eye while he took the photographs, causing him permanent eye damage. Plaintiff alleges that the ship, the M/ V Kapitan Man, was in fact a Russian spy ship posing as a merchant vessel.

After an eight-day trial, a jury found for the defendants on all counts. Plaintiff now moves for a new trial based

Case 1:18-cv-24190-RS   Document 463   Entered on FLSD Docket 05/31/2023   Page 26 of 32

Page 4 of 10

238 F. Supp. 2d 1231, *1233; 2003 U.S. Dist. LEXIS 914, **2

on newly discovered evidence and several assignments of error.

## II. Analysis

### A. Newly obtained evidence does not necessitate a new trial.

At trial the parties disputed whether there was a laser aboard the Kapitan Man. Shortly after the trial, plaintiff received a letter from a Canadian longshoreman named Adam Adirim. Dkt. No. 86, Ex. 1. Mr. Adirim claimed that he worked on the Kapitan Man when the ship called at Vancouver, British Columbia in 1997. In the letter, Mr. Adirim stated that it was "common knowledge" among longshoremen that the Kapitan Man had a laser on board. Mr. Adirim wrote that a fellow longshoreman told Mr. Adirim that if he saw a light coming from the Kapitan Man's bridge he should avert his eyes. Mr. Adirim **[**3]** states that he did see a light coming from the bridge one evening and looked at the light despite the longshoreman's advice. Mr. Adirim wrote that his doctor subsequently told Mr. Adirim that there was evidence of scorching on his eye.

After speaking with attorneys for both parties, Mr. Adirim sent a second letter to plaintiff's counsel. Dkt. No 99, Ex. 1. In that letter Mr. Adirim stated that he could not help plaintiff because his testimony would be hearsay. Mr. Adirim also stated that "the irritation in my eyes would not be considered a laser upon scrutiny, as no medical record exists other than my doctor telling me that irritation was present." *Id.*

Plaintiff's attorneys then interviewed Mr. Adirim and obtained his sworn declaration. Dkt. No 99, Ex. 3. In the declaration, Mr. Adirim repeats his statement that a longshoreman told him not to look at the Kapitan Man's bridge because a laser housed there would damage his eyes and restates his belief that it was "common knowledge among the longshoreman with whom I worked the Kapitan Man had a laser aboard." *Id.* Mr. Adirim's declaration also recounts that he saw a "beam **[*1234]** of bright white light" coming from the Kapitan Man's **[**4]** bridge. At a routine doctor's appointment after the incident, the declaration states, the doctor told Mr. Adirim that Mr. Adirim's eyes were irritated.

Plaintiff contends that the discovery of Mr. Adirim's testimony warrants a new trial. **HN1**[⬆️] Newly

discovered evidence warrants a new trial where: 1) the evidence was discovered after the trial; 2) the evidence could not have been discovered earlier through a diligent search; and 3) the newly discovered evidence is of such a magnitude that production of it earlier likely would have changed the outcome of the trial. *Defenders of Wildlife v. Bernal, 204 F.3d 920, 929(9th Cir. 2000).*

Mr. Adirim's potential testimony does not necessitate a new trial because most of it is inadmissible and because the portions that are admissible would not have changed the outcome of the trial. Mr. Adirim's declaration makes four points: 1) another longshoreman told him that there was a laser aboard the Kapitan Man; 2) it was "common knowledge" that there was a laser aboard the Kapitan Man; 3) Mr. Adirim saw a light coming from the Kapitan Man's bridge; and 4) shortly thereafter a doctor told Mr. Adirim that his eyes were irritated. Each point **[**5]** of testimony is either inadmissible or insignificant.

The first two points of potential testimony--that a longshoreman told plaintiff about a laser and that the presence of the laser was common knowledge--are hearsay and would be inadmissible at trial. **HN2**[⬆️] Testimony that a fact is common knowledge is hearsay because such testimony summarizes the knowledge of persons other than the declarant. *Fed. R. Evid. 802; Miller v. Pezzani (In re Worlds of Wonder Sec. Litig.), 35 F.3d 1407, 1420 n.4(9th Cir. 1994); Leonard v. Dixie Well Serv. & Supply, Inc., 828 F.2d 291, 295(5th Cir. 1987).*

The third point of potential testimony--that Mr. Adirim saw a light coming from the Kapitan Man's bridge--may be admissible, but the testimony would not have changed the outcome of the case. It was undisputed at trial that a light was housed on the Kapitan Man's bridge; the only dispute was whether the light was a laser or a navigational light. Mr. Adirim does not opine on whether the light he saw was a laser or a navigational light and in any event would be unqualified to offer such an opinion. *Fed. R. Evid. 703(c).* Testimony stating simply that a light was housed in the bridge area would not **[**6]** have affected the outcome of the trial.

The fourth point of potential testimony--that a doctor found that Mr. Adirim's eyes were irritated--appears to be hearsay. Plaintiff has not submitted a declaration from the doctor. Even setting aside the hearsay problem, the testimony would not be significant enough to change the outcome of the trial. As Mr. Adirim points

Case 1:18-cv-24190-RS   Document 463   Entered on FLSD Docket 05/31/2023   Page 27 of 32

Page 5 of 10

238 F. Supp. 2d 1231, *1234; 2003 U.S. Dist. LEXIS 914, **6

out, the doctor did not conclude that there was laser damage to Mr. Adirim's eyes; simply that Mr. Adirim's eyes were irritated. At trial, plaintiff offered evidence to show that Patrick Barnes, who participated in the same surveillance mission as plaintiff, suffered eye problems consistent with laser damage. This evidence was far stronger than the proposed testimony that Mr. Adirim's eyes were irritated, yet the testimony relating to Barnes was insufficient to persuade the jury that plaintiff's claim was valid. It is therefore extremely unlikely that Mr. Adirim's testimony would have had any effect on the outcome of this trial. The evidence does not merit a new trial.

## B. The imposition of time limits does not necessitate a new trial.

On September 18, 2001, this Court conducted a status conference with counsel for [**7]  [*1235] both parties. Counsel agreed, on the record, that the case would take a total of one week to try. This Court found that duration appropriate and set the matter for trial on October 7, 2002.

At a pre-trial conference one week before trial, counsel requested for the first time that the Court double the time allotted for trial and permit *each party* five days to present its case. The Court denied the request but granted a second request by plaintiff's counsel to allow each party four days, for a total trial time of eight days. Midway through the trial, the Court expanded the trial day by shortening the lunch recess by one half-hour. The Court observed this expanded schedule the last five days of trial, effectively adding a half-day to the trial.

The Court informed counsel of the time remaining at several points in the trial and reminded plaintiff's counsel to reserve time if plaintiff planned to present rebuttal testimony. Despite these warnings, plaintiff's counsel exhausted all of plaintiff's time and then attempted to call an additional rebuttal witness, Senator Robert Smith. The Court excluded Senator Smith's testimony for several reasons, including that plaintiff had exhausted [**8] his allotted time. [1]

Plaintiff did not object to the time limit at any point in the trial. In his motion for new trial, however, plaintiff asserts that this Court erred by imposing an "arbitrary" time limit. Plaintiff's counsel contends that the time limits were

driven by this Court's travel plans, not the characteristics of the litigation. The assertion is baseless and offensive. This Court did in fact have travel plans following the trial, but those plans bore no relationship to the decision to set and enforce a time limit. The trial concluded on a Thursday. This Court did not have to travel until the following Saturday. Moreover, all parties and the Court agreed that the trial could proceed on Columbus Day (Monday of the second week of trial), though this did not become necessary. This Court's rulings that set and enforced the time limits could not have been motivated by the Court's travel plans because even two [**9] additional days of trial would not have conflicted with the plans. The Court notified counsel of the travel plans not because they motivated the time limits but to give counsel fair notice that counsel needed to use all of the time available each day. If counsel had rested early on several afternoons the trial might have been pushed back far enough to create an actual conflict. By seeing that each trial day was filled, this Court ensured that no conflict arose.

Rather than exercising the fortitude to look inward and learn from a case tried less than perfectly, plaintiff's counsel seized on his knowledge of the Court's travel plans to direct the blame for the adverse verdict at this Court. Apparently this reaction is a habitual one for plaintiff's counsel. *MacDraw, Inc. v. CIT Group Equip. Fin., Inc., 138 F.3d 33, 38 (2d Cir. 1998)*(affirming revocation of Mr. Klayman's and Mr. Orfanedes' *pro hac vice* status in the Southern District of New York and finding that Mr. Klayman's accusation of pro-Asian bias on the part of the trial judge had "no factual basis" and that the charges were "discourteous, degrading, and prejudicial to the administration of justice"); *Baldwin Hardware Corp. v. Franksu Entm't Corp., 78 F.3d 550, 555-62(Fed. Cir. 1996)* [**10] (affirming revocation of Mr. Klayman's *pro hac vice* status in the Central District of California for making [*1236] misrepresentations to the Court; in the appellate briefing Mr. Klayman accused the trial judge of being anti-Asian and anti-Semitic). Regrettably, counsel's behavior appears to be part of a larger trend within a segment of the trial bar to engage in ad hominem attacks when dissatisfied with a result at trial.

In any case, this Court's imposition of the eight-day time limit does not necessitate a new trial for several reasons. First, *HN3* a party must raise its objection to a time limit during the trial. A party that fails to raise the objection waives its ability to do so after the trial. *Monotype Corp., PLC v. Int'l Typeface Corp., 43 F.3d 443, 451(9th Cir. 1994)*. Because plaintiff's counsel did

---

[1] The other reasons for excluding this witness's testimony are described at Section D below.

238 F. Supp. 2d 1231, *1236; 2003 U.S. Dist. LEXIS 914, **10

not object to the time limits and in fact suggested the eight-day time limit in the first place, plaintiff will not now be heard to argue that the eight-day time limit was improper.

Second, the eight-day time limit was based on the parties' own pretrial estimates of the time needed for trial. The eight days permitted was itself a substantial increase over the parties' **[**11]** original estimate of five days. In addition, this Court expanded the trial days by one half-hour, adding the equivalent of a half-day of trial time. Thus, the trial time permitted was not only based on, but significantly exceeded, counsel's estimates.

*HN4*[⬆] The Ninth Circuit specifically has approved of time limits based upon parties' own estimates. *Amarel v. Connell, 102 F.3d 1494, 1513(9th Cir. 1996)*. There is good reason to hold parties to the estimates that they make at status conferences. It is essential to the management of a trial court's docket that parties estimate with reasonable accuracy the time they will need for trial. It is for this reason that courts hold status conferences to plan trials months in advance of the trial date. Permitting parties to double their long-standing estimates immediately before trial without showing a substantial justification for doing so would introduce an unacceptable and unnecessary element of chaos into the calender. Because the eight-day limit was proposed by plaintiff's counsel and far exceeded counsel's original estimate, plaintiff's position that the time limits were arbitrary is not well-taken.

Third, eight days was more **[**12]** than enough time to try this case. At bottom, plaintiff asserted a simple battery claim that probably could have been tried in five days as the parties originally estimated. The defendants had no difficulty presenting their case in the allotted time, and there was a substantial amount of repetition in the presentations of both parties. The fact that plaintiff's counsel chose to pursue a theory of the case that relied on far-flung issues of military and foreign policy did not entitle plaintiff to unlimited trial time.

Fourth, plaintiff does not identify any particular harm he suffered as a consequence of the time limits. *HN5*[⬆] A party objecting to trial time limits "must show there was harm incurred as a result" of the time limits. *Monotype, 43 F.3d at 451*. Plaintiff intended to call only one witness after plaintiff's time limit expired. As explained in Section D of this order, the Court excluded that witness for several reasons unrelated to the time limits. Plaintiff also states that he was required to cut short the testimony of

his laser expert, Terrence Kessler, but does not describe the additional testimony that Mr. Kessler would have given in the absence of the time **[**13]** limit. Plaintiff has therefore not made the necessary showing of harm. The time limits were properly enforced and do not necessitate a new trial.

## C. Rear Admiral Cramer's testimony was properly excluded.

In his *Fed. R. Civ. P. 26(a)* disclosure, plaintiff identified Admiral Michael **[*1237]** Cramer to testify about the "facts and circumstances surrounding the surveillance mission." Dkt. No. 94, Ex. 10. On September 27, 2002, the parties submitted a proposed pretrial order. The order made no mention of Admiral Cramer.

On September 30, plaintiff submitted an "errata" to the pretrial order. The errata proposed that Admiral Cramer testify on the subject of "Russian intelligence agencies' use of FESCO-owned merchant vessels for intelligence gathering activities against the United States, Russian monitoring of U.S. nuclear ballistic submarines and U.S. carrier battle groups in the 1990's, [sic] and Soviet/ Russian intelligence agencies' use of lasers as weapons against U.S. intelligence gathering operations in the 1990's [sic]." Plaintiff's Errata to Pretrial Order.

Defendants moved in limine to exclude Admiral Cramer's testimony based on plaintiff's failure to make proper disclosures, **[**14]** and this Court granted the motion. Plaintiff now contends that this Court erred by excluding the testimony.

Admiral Cramer's testimony was properly excluded because he was not identified in the pretrial order and because his proposed testimony was not based on personal knowledge. *HN6*[⬆] *Fed. R. Civ. P. 16(e)* provides that the pre-trial order "shall control the course of the action unless modified by a subsequent order." *Rule 16(e)* further provides and that the pretrial order should be modified "only to prevent manifest injustice." Plaintiff contends that the Court should have modified the pretrial order because to do so would not have prejudiced the defendants. However, the Ninth Circuit has made clear that a court should not modify a pretrial order simply because the opposing party would suffer no prejudice. In order to effect the "salutary purpose" of *Rule 16(e)*, trial courts may modify the order only upon a showing of "substantial justification." *United States v. Lummi Indian Tribe, 841 F.2d 317, 320-21(9th Cir. 1988)*.

238 F. Supp. 2d 1231, *1237; 2003 U.S. Dist. LEXIS 914, **14

Plaintiff's only justification for his failure to include Admiral Cramer in the pretrial order is that plaintiff's senior counsel did not have an opportunity [**15] to review the proposed pretrial order. This did not justify modification of the pretrial order. This Court set the deadline for submission of the pretrial order in September 2001, giving plaintiff over one year of advance notice of the deadline. Plaintiff's senior counsel failed to review the proposed order at his own peril. As the Ninth Circuit noted in the *Lummi Tribe* decision, "any injustice resulting from exclusion" results from the "party's own failure properly to present his case." *841 F.2d at 320*, quoting *Colvin v. United States, 549 F.2d 1338, 1340(9th Cir. 1977)*. Because plaintiff provided no justification for modifying the pretrial order, the original order controlled the trial and required that Admiral Cramer be excluded.

This Court properly excluded Admiral Cramer's testimony for the additional reason that Admiral Cramer had no personal knowledge of the facts about which he proposed to testify. **HN7**[⬆] Because plaintiff did not designate Admiral Cramer an expert witness, Admiral Cramer could testify only to facts within his personal knowledge. *Fed. R. Evid. 602*. A witness has personal knowledge of a fact only if the witness "had an opportunity [**16] to observe, and has actually observed, the fact." *United States v. Owens, 789 F.2d 750, 754(9th Cir. 1986)* rev'd on other grounds, *484 U.S. 554, 98 L. Ed. 2d 951, 108 S. Ct. 838*; see *Fed. R. Evid. 602* advisory committee's notes.

As a very high ranking naval officer, Admiral Cramer obtained his knowledge of Russian intelligence operations from briefings and other second-hand reports, not personal experience. While Admiral Cramer may have been qualified to give [*1238] expert testimony on these subjects, plaintiff failed to make expert disclosures on behalf of Admiral Cramer as required by *Fed. R. Civ. P. 26(a)(2)*. The testimony was properly excluded.

## D. Senator Smith's testimony was properly excluded.

Shortly before the lunch recess on the last day of trial, plaintiff's counsel announced that plaintiff intended to call United States Senator Robert Smith as a rebuttal witness. Plaintiff did not identify Senator Smith in the pretrial order or on any of plaintiff's witness disclosures. Counsel stated that Senator Smith would testify that he believed the Office of Naval Intelligence ("ONI") had

altered a photograph of the Kapitan Man to conceal a [**17] laser and then "stonewalled" when Senator Smith inquired into the alterations at an Armed Services Committee hearing. This Court excluded Senator Smith's testimony because 1) the proposed testimony related to issues that were the subject of plaintiff's case-in-chief and therefore was not proper rebuttal; 2) Senator Smith was not identified in the pretrial order; 3) the testimony would have been more prejudicial and misleading than probative; and 4) plaintiff's time had expired. Each was a proper basis on which to exclude Senator Smith's testimony.

Senator Smith's testimony was not proper rebuttal. **HN8**[⬆] Rebuttal evidence is allowed "to permit a litigant to counter new, unforeseen facts brought out in the other side's case." *Faigin v. Kelly, 184 F.3d 67, 85 (1st Cir. 1999)*; see Charles Alan Wright and Victor James Gold, 28 Federal Practice and Procedure § 6164 (1993) (rebuttal evidence "may not merely support the case-in-chief of the prosecution or plaintiff"). Rebuttal evidence is admissible only where the need for it could not have been foreseen at the time the plaintiff presented its case-in-chief. *Id.* "When a party knows that a contested matter is in the case, [**18] yet fails to address it in a timely fashion, he scarcely can be heard to complain that the trial court refused to give him a second nibble at the cherry." *Id.* [2]

Plaintiff offered Senator Smith's testimony to attack the ONI report's conclusion that plaintiff's photograph did not show a laser coming from the bridge of the Kapitan Man. Both parties knew long before trial that the validity of the ONI report would be one of the most hotly [**19] contested issues in this case. Plaintiff identified at least seven witnesses in the pretrial order to testify that the ONI investigation and its conclusions were flawed. [3] At trial, plaintiff spent a substantial portion of his case-in-chief attacking the ONI investigation, and plaintiff

---

[2] **HN9**[⬆] The Ninth Circuit has not specified a particular rule for determining whether rebuttal evidence is proper but has held instead that this is a determination "solely within the sound judicial discretion of the trial judge." *Rodella v. United States, 286 F.2d 306, 309(9th Cir. 1960)*. The Court finds the majority approach described by the First Circuit in *Faigin* to be well-reasoned and finds unpersuasive the unpublished Sixth Circuit decision cited by plaintiff for the proposition that rebuttal evidence may respond to evidence foreseeable by the plaintiff.

[3] These witnesses are Robert Bennett, Michael Cleary, Raymond Elliott, Nancy Swanson, Russell Kraus, Terrence Kessler, and plaintiff.

238 F. Supp. 2d 1231, *1238; 2003 U.S. Dist. LEXIS 914, **19

himself testified that he believed the ONI had engaged in a cover-up of the alleged laser attack. Senator Smith's testimony that he thought the ONI "stonewalled" would have constituted a similar attack on the investigation and should have been presented along with the other testimony to this effect in plaintiff's case-in-chief. Senator Smith's proposed testimony was not proper rebuttal.

[*1239] Even if Senator Smith's testimony had been proper rebuttal, the Court would not have permitted him to testify because plaintiff did not identify him in the pretrial order. As Section C of this order explains, [**20] HN10[⬆] persons not named in the pretrial order may not testify unless the offering party shows a substantial justification for modifying the pretrial order. *Lummi Indian Tribe, 841 F.2d at 320-21.* And as explained in the preceding paragraph, Senator Smith could have been identified in the pretrial order because any need for his testimony was evident long before the parties submitted the proposed pretrial order. Because plaintiff failed to identify Mr. Smith in the pretrial order and did not show a substantial justification for modifying the order, his testimony was inadmissible.

Senator Smith's testimony was inadmissible for the additional reason that it would have been more prejudicial than probative. Because Senator Smith is not a photography expert, his opinion that plaintiff's photograph had been altered was inadmissible. The only potential admissible testimony related to Senator's Smith's perception that the ONI "stonewalled" when he asked about the photograph. Whether the ONI "stonewalled" in a Senate hearing bears only tangentially on the relevant question whether plaintiff's photograph showed a laser. On the other hand, a U.S. Senator's assertions of wrongdoing by [**21] the Navy could have been highly prejudicial and misleading to the jury. The testimony was inadmissible under *Fed. R. Evid. 403.*

Finally, Senator Smith's testimony was properly disallowed because plaintiff had exhausted his time. If, as plaintiff asserts, Senator Smith's testimony would have been powerful enough to change the minds of the jurors, plaintiff's counsel should have reserved time for the testimony. Because counsel chose not to do so, fair application of the time limits required that the testimony be excluded.

**E. Terrence Kessler's testimony relating to his laser experiment was properly excluded.**

Plaintiff designated Mr. Terrence Kessler to give expert testimony about whether plaintiff's photograph of the Kapitan Man showed a laser or a navigational light. One major subject of Mr. Kessler's expert report was the validity of the Dalgren Report, the Navy's analysis of plaintiff's photograph. The authors of the Dalgren Report photographed lasers and then compared those images to the image in plaintiff's photograph. The authors found that the image on plaintiff's photograph did not resemble the images of the lasers and concluded that plaintiff's photograph did not show [**22] a laser.

Mr. Kessler's expert report analyzed the Dalgren Report in detail and identified what he believed were ten specific flaws in the report's methodology. He concluded that the report was methodologically unsound and that its conclusion--that plaintiff's photograph did not show a laser--was unreliable. Mr. Kessler's report also stated that he was in the process of conducting his own experiment that, like the Dalgren Report, compared plaintiff's photograph with control photographs of images known to be lasers. Mr. Kessler stated in a footnote that he would describe the experiment and its results in a subsequent report.

Defendants responded to Mr. Kessler's report with the report of Dr. Siegman. Like Mr. Kessler, Dr. Siegman reviewed the Dalgren Report, but Dr. Siegman concluded that the report was sound. Dr. Siegman concurred with the Dalgren Report's authors in the conclusion that plaintiff's photograph did not show a laser. Dr. Siegman also addressed Mr. Kessler's discussion of flaws in the Dalgren Report.

[*1240] On the deadline for plaintiff's expert rebuttal report, plaintiff produced an "addendum" to Mr. Kessler's report. Some of the addendum responded directly to statements in [**23] Dr. Siegman's expert report. However, the addendum also reported for the first time the results of an experiment that Mr. Kessler conducted in which he took his own pictures of a laser and compared them to plaintiff's photograph. Some of the lasers that Mr. Kessler photographed were powered at a lower level than the lasers that the ONI photographed in the Dalgren Report. Mr. Kessler found that the lower powered lasers were not visible on photographs. Based on this finding, Mr. Kessler hypothesized that a laser with an energy level high enough to cause eye damage, but lower than the one used in the Dalgren experiment, might not be visible in a photograph. Mr. Kessler concluded that his experiment identified a new flaw in the Dalgren Report: that the lasers used in the Dalgren Report were powered at a

Case 1:18-cv-24190-RS   Document 463   Entered on FLSD Docket 05/31/2023   Page 31 of 32

Page 9 of 10

238 F. Supp. 2d 1231, *1240; 2003 U.S. Dist. LEXIS 914, **23

higher level than necessary and therefore may have exaggerated the visibility of an injurious laser in a photograph.

Defendants moved in limine to exclude or limit Mr. Kessler's testimony. Defendants argued that opinions based on Mr. Kessler's experiment should be excluded because the experiment was not proper rebuttal to Dr. Siegman's report. Defendants also moved to exclude other portions [**24] of Mr. Kessler's testimony for reasons not relevant here. On October 7, this Court granted defendants' motion and forbade plaintiff from offering any of the testimony set out in the addendum to Mr. Kessler's report.

Plaintiff moved for reconsideration of the order in limine. On October 11, this Court issued a written order granting the motion for reconsideration in part and denying it in part. The Court ruled that some of the testimony described in Mr. Kessler's addendum was proper rebuttal and would be admitted. However, this Court maintained its refusal to admit evidence relating to Mr. Kessler's experiment because the new experiment did not address any issue raised by Dr. Siegman's report. Because the experiment simply identified a new flaw in the Dalgren Report it should have been disclosed in Mr. Kessler's first report which was largely devoted to challenging the Dalgren Report. The order also noted that Mr. Kessler began the new experiment *before* Dr. Siegman provided his report to plaintiff, which underscored that the experiment could not have been undertaken to rebut Dr. Siegman's report. The Court concluded that any testimony relating to the experiment was not admissible [**25] under *HN11*[⬆️] *Fed. R. Civ. P. 26(a)(2)*, which states that rebuttal disclosures may only contain opinions offered "solely to contradict or rebut" other expert testimony.

Plaintiff nonetheless argues that it was error to exclude testimony about Mr. Kessler's experiment. Plaintiff does not identify any portion of the Siegman report that the experiment rebuts or contradicts as required by *Rule 26*. Instead, plaintiff contends that any challenge to the Dalgren Report constitutes a challenge to Dr. Siegman's opinion because Dr. Siegman concurred with the Dalgren Report. Plaintiff also denies the Court's finding that Mr. Kessler began his experiment before receiving Dr. Siegman's report.

This Court properly excluded Mr. Kessler's testimony relating to the experiment for the reasons stated in the October 11 order. Plaintiff's contention that any attack on the Dalgren Report is rebuttal is erroneous. In his

rebuttal, Mr. Kessler could properly address Dr. Siegman's opinions about the Dalgren report, but he could not make new challenges to the report that did not relate to Dr. Siegman's opinions. Mr. Kessler's experiment did [*1241] not address any particular opinion in Dr. Siegman's report. Rather, the experiment [**26] was a new means to support Mr. Kessler's original opinion that the Dalgren Report was flawed. This flaw should have been included among the ten flaws that Mr. Kessler identified in his original report.

Plaintiff's contention that Mr. Kessler began work on the experiment after receiving Dr. Siegman's report is not supported by the record and in any event would not change this analysis. Plaintiff's contention runs contrary to plaintiff's previous representation to this Court that Mr. Kessler's addendum "merely provided quantitative results obtained in laser experiments begun prior to the submission of, and referenced in, the original report." Dkt. No. 67 at 2. The contention also conflicts with Mr. Kessler's own deposition testimony which indicates that he began the experiment before receiving Dr. Siegman's report. Dkt. No. 94, Ex. 11. And plaintiff presents no evidence to the contrary beyond the bare assertions in his pleading. All evidence in the record indicates that Mr. Kessler began the experiment before receiving Dr. Siegman's report and could not have performed the experiment "solely to contradict or rebut" Dr. Seigman's testimony as required by *Rule 26*.

Mr. Kessler did not [**27] finish his experiment before the deadline set by *Rule 26* and instead attempted to submit the results under the guise of rebuttal testimony one week before trial. Mr. Kessler's tardy disclosure left defendants one week rather than one month to develop a response to the new experiment. The tactic was highly prejudicial to defendants and could not be allowed.

## F. Plaintiff's remaining contentions do not warrant a new trial.

Plaintiff's contentions regarding the conduct and demeanor of this Court are bizarre and without merit. Plaintiff's claim that a discussion between this Court's staff and an Assistant United States Attorney constituted an improper *ex parte* contact is without merit because the United States was not a party to the case. Moreover, that discussion consisted solely of the AUSA informing the Court that he would be present at the trial. Plaintiff's suggestion that this discussion "poisoned the well" by biasing this Court is baseless.

Equally fantastic is plaintiff's contention that the jury was

238 F. Supp. 2d 1231, *1241; 2003 U.S. Dist. LEXIS 914, **27

influenced by the fact that this Court hosted a delegation of Russian judges as part of a sister court exchange. As plaintiff is well aware, this Court arranged to host [**28] the judges long before this trial was placed on the Court's calender. Plaintiff did not object at trial to the fact that this Court hosted the judges; only to the prospect of the judges' presence in the courtroom. Despite this Court's view that the judges' presence could not possibly prejudice the jury, this Court nonetheless did not permit the Russian judges in the courtroom. Even though it is beyond far-fetched that the knowledge of the judges' visit to Seattle could have influenced the jury, the Court clarifies for the record that the jurors had no knowledge of the visit.

Plaintiff also objects to the fact that this Court told counsel that a dome on the Kapitan Man did not appear to be spy equipment as plaintiff asserted, but was in fact a type of antenna cover widely used on civilian watercraft. The objection is meritless because this discussion took place at a sidebar conference and could not have influenced the jury.

**G. Plaintiff's supplement to his motion for new trial does not justify a new trial.**

On December 12, plaintiff filed a supplement to his motion for new trial. The [*1242] motion sets out a new assignment of error not described in plaintiff's motion for new trial. [**29] At trial, this Court sustained defendants' objection to plaintiff's testimony about the contents of a book entitled *Betrayal: How the Clinton Administration Undermined National Security*. Plaintiff now argues that the testimony would not have been hearsay because it was offered not for its truth but to show the basis of plaintiff's view that the Clinton administration had committed treason and to counter the impression that plaintiff was an extremist.

This claim of error must be rejected for three reasons. First, the pleading is untimely under *Fed. R. Civ. P. 59(b)*. **HN12**[↑] That rule requires that a motion for new trial be filed within ten days of entry of judgment. Because this "supplement" is equivalent to a second motion for new trial, and because plaintiff filed the motion nearly two months after the entry of judgment, the supplement must be stricken as untimely.

The arguments set out in the supplement must be rejected for the additional reason that plaintiff's counsel did not offer this rationale for admitting the testimony at trial. In fact, plaintiff's counsel made no response to

either defendants' objection to the testimony or to this Court's ruling sustaining the objection. Trial [**30] Transcript at 273-4. Finally, the claim must be rejected because plaintiff made no offer of proof as to what plaintiff's testimony would have been had this Court permitted the testimony. *Fed. R. Evid. 103(a)(2)*.

**IV. Conclusion**

Plaintiff's motion for new trial is DENIED.

SO ORDERED this 7th day of January, 2003.

JOHN C. COUGHENOUR

CHIEF UNITED STATES DISTRICT JUDGE

---

End of Document