**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 18-24190-CIV-SMITH**

WILLIAM O. FULLER, and
MARTIN PINILLA, II,

      Plaintiffs,

v.

JOE CAROLLO,

      Defendant.

_____/

### DEFENDANT, JOE CAROLLO'S NOTICE OF FILING BENCH MEMO – DAMAGES

Defendant, Joe Carollo, by through his counsel, hereby files the attached Bench Memo on

Preclusion of Plaintiffs' Evidence and Testimony Related to Economic and Non-Economic

Damages submitted to the Court during the trial.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of May, 2023, I electronically filed the foregoing with

the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day

on all counsel of record.

Respectfully submitted,
KRINZMAN HUSS LUBETSKY
   FELDMAN & HOTTE
Co-Counsel for Defendant, Joe Carollo
Alfred I. duPont Building
169 E. Flagler Street, Suite 500
Miami, Florida 33131
Telephone: (305) 854-9700
Primary email:  map@khllaw.com
Primary email:  mschneider@khllaw.com
Secondary:  eservicemia@khllaw.com

By:  _/s/ Mason A. Pertnoy_
      Mason A. Pertnoy, Esq.
      Florida Bar No. 18334
And

SHUTTS & BOWEN

1

Co-Counsel for Defendant, Joe Carollo
200 S. Biscayne Boulevard, Suite 4100
Miami, FL 33131
Telephone: (305) 415-9072
Email: msarnoff@shutts.com


By: _/s/ Marc D. Sarnoff_____
Marc D. Sarnoff, Esq.
Florida Bar No. 607924

And

KUEHNE DAVIS LAW, P.A.
Co-Counsel for Defendant, Joe Carollo
100 S.E. 2nd Street, Suite 3105
Miami, FL 33131-2154
Telephone: (305)789-5989
Email: ben.kuehne@kuehnelaw.com;
mdavis@kuehnelaw.com
efiling@kuehnelaw.com


By: _/s/ Benedict P. Kuehne_____
Benedict P. Kuehne, Esq.
Florida Bar No. 233293

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case No.: 1:18-cv-24190-SMITH**

WILLIAM O. FULLER, and
MARTIN PINILLA, II,

        Plaintiffs,

  v.

JOE CAROLLO,

        Defendant.

_____/

**TRIAL MEMORANUM ON PRECLUSION OF PLAINTIFFS' EVIDENCE AND
TESTIMONY RELATED TO ECONOMIC AND NON-ECONOMIC DAMAGES**

      Defendant, Joe Carollo, by and through his undersigned counsel, hereby submits this Trial

Memorandum setting forth the various grounds to preclude the Plaintiffs reliance on any

documentation in support of their economic and non-economic damages, in addition to oral

testimony of damages for failure to comply with Federal Rule of Civil Procedure 26(a)(1). As

grounds therefore Defendant, Joe Carollo, states as follows:

**FACTUAL BACKGROUND**

      On December 7, 2020, Plaintiffs served their initial disclosures in accordance with Federal

Rule of Civil Procedure 26. *See* DE 301 at 5. Plaintiffs' initial disclosures included the amount of

damages Plaintiffs sought, which included compensatory damages of at least $8,295,000.00. *Id.*

301 at 1. On October 10, 2022, Plaintiffs served amended initial disclosures, but did not amend

the damages disclosures. *Id.* at 1. Plaintiffs' amended initial disclosures reiterated Plaintiffs'

request for $8,295,00.00 in compensatory damages, which is the same amount of damages indicated in Plaintiffs' initial disclosures and Second Amended Complaint [DE 125].

Defendant filed its Motion to Strike, in Part, Plaintiffs' Second Amended Rule 26 Disclosures, arguing that Plaintiffs sought $8,295,000.00 in compensatory damages on behalf of non-party entities, contrary to the District Court's May 13, 2021 Order on Defendant's Motion to Dismiss  [DE 186 at 9]. Specifically, the District Court's Order held as follows:

> "As the R&R noted, 'the conduct alleged to have impacted nonparty entities are examples of [Defendant's] retaliatory conduct toward Plaintiffs, as he allegedly targeted all businesses that Plaintiffs are associated with.' Consequently, <u>Defendants Motion is granted to the extent Plaintiffs seek to recover monetary damages allegedly suffered by non-parties</u> . . ."

(*Id.* at 8-9)(emphasis added). The Dismissal Order thus held that the damages Plaintiffs seek must only relate to the alleged harm suffered by Plaintiffs.

To date, Plaintiffs have not provided any reliable, non-speculative evidentiary documentation in support of their computation of damages allegedly sustained in their individual capacities, and Plaintiffs continue to improperly allege damages on behalf of non-party corporate entities, which they claim to hold undisclosed interests in[1] (*see e.g.* Second Amended Complaint ¶293-298; *see also* Plaintiffs' Combined Damages Disclosures 1-161 attached hereto as Exhibit "A").

As noted by in the Order of Dismissal,

> Rule 26(a)(1)(A)(iii) states that a party must provide as part of its initial disclosure "a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure,

---

[1] Note: The Court has addressed the issue of damages not only in the instant matter, but in finding that Plaintiffs are not making a claim for damages on behalf of their corporate entities while suing in their individual capacities. Any damages alleged by Plaintiffs' businesses have been pled in related case:

on which each computation is based, including materials bearing on
the nature and extent of injuries suffered." Fed. R. Civ. P.
26(a)(1)(A)(iii). "By its very definition, the disclosure required by
the Rule is one that is capable of computation." *Marine Depot, Int'l,
Inc. v. James River Grp., Inc.*, No. 19-CV-24821, 2020 WL
7864100, at *2 (S.D. Fla. Dec. 30, 2020). "Rule 26(a)'s purposes are
to allow for adequate case preparation and foreclose unfair surprises
. . . The initial disclosure requirement should be applied with
common sense keeping in mind the salutary purposes that the rule is
intended to accomplish." *Sec. & Exch. Comm'n v. Montano*, No.
618CV1606ORL31GJK, 2019 WL 2254946, at *2 (M.D. Fla. Mar.
5, 2019) (citations omitted).

[DE 313 at 4]. In Plaintiff's Second Amended Initial Disclosure, Plaintiffs were required under
Fed. R. Civ. P. 34 to make available for copying and inspection the documents or other evidentiary
material, unless privileged or protected from disclosure, on which each computation of damages
is based, including materials bearing on the nature and extent of injuries suffered. Plaintiffs'
Second Amended Initial Disclosure provided as follows with regard to the computation of their
economic and non-economic damages:

> a. <u>Damages</u>: Plaintiffs have suffered years long emotional distress
> damages from Carollo's targeting and attempts to shut down their
> businesses and ruin their livelihoods and destroy their reputations.
> Plaintiffs will ask the jury to value these emotional distress damages
> in excess of $10 million for each Plaintiff.

> b. Plaintiffs have also suffered reputational damages from Carollo's
> false and defamatory statements attempting to characterize plaintiffs
> as organized crime leaders and associated with Venezuelan
> corruption. These reputational damages were incurred as a result of
> Carollo's action that significantly altered Plaintiff's constitutionally
> recognized legal rights.

> c. Carollo has also caused Plaintiffs to suffer damage to their ability
> to develop business in the Miami-Dade community. In particular,
> Carollo has told individuals looking to do business in Miami that he
> would "support you anyplace but not in Bill Fuller's buildings."
> These and other statements by Carollo, as well as a broad-based
> understanding in the community that Carollo will attempt to shut
> down any business that is associated with Fuller, have caused
> numerous individual [sic] to refuse to conduct business with Fuller
> and Pinilla. These have included the following:

> d. Matt Malone wanted to open a business in one of Plaintiffs'
> properties, paying $200,000 per year in rent for 5 years, then
> $250,000 per year for an additional five years, for a total of $2.5

million, an income stream that could have been sold at a 6% return for $3.3 million.

e. Daniel Figueredo and Rosa Romero wanted to open their Sanguich de Miami in one of Plaintiffs' properties but were informed they would be harassed as long as they rented on any of Plaintiffs' properties. This inability to rent any property to Sanguich cost Plaintiffs $2.8 million in rent over ten years, an income stream that could have been sold at a $4.6 million value.

f. Selina Hospitality was interested in working with Plaintiffs, and would have paid $750,000 per year for 10 years, or $7.5 million in rent, an income stream that could have been sold for $12.5 million at a 6% return.

g. Carollo's interference with the Plaintiffs' ability to develop the Calle Ocho Marketplace cost Plaintiffs 250,000 in rent over ten years, or $2.5 million, an income stream that could have been sold for $2.75 million at a 6% return.

h. Finally, Plaintiffs have had to devote 20% of their time to fighting against Carollo's attempts to shut down their various businesses. The value of 20% of Plaintiffs' time, based upon the income generated over the past five years, is $10 million.

i. Punitive Damages: at least $10 million dollars.

[DE 315-2 at 33-34]. As evident when comparing the documents produced to support Plaintiffs' computation of damages, Plaintiffs' failure to produce any documents whatsoever in support of their Second Amended Disclosures can only be classified as willful disregard for requirements as litigants and/or as proof that no such documents exist. As it relates to the prospective lease agreements provided by Plaintiffs, such documents are merely speculative and/or unsubstantiated other than by oral testimony.

As it relates to non-economic damages, Plaintiffs' Subsection (h) of the Damages Section of their Second Amended Disclosures may be the most absurd of all their damage allegations. Plaintiffs essentially seek reimbursement for time spent litigating a claim they brought against the Commissioner. This allegation is not a compensable damage. *See, e.g., Jimenez v. Deutsche Bank*,

2012 U.S. Dist. LEXIS 201677, *11, fn. 61 (W.D. Tex. Dec. 12, 2012) (citation omitted) ("litigant's loss of time" is not recoverable). Plaintiffs claim to have devoted "20% of their time to fighting against Carollo's attempts, yet Plaintiffs have only provided 16 pages of doctors notes in the midst of trial during the deposition of Ms. Bernheim to support any allegations of pain and suffering.

Despite the clear dictates of Federal Rule of Civil Procedure 26(a)(1)(A)(iii) and the Court's Order Granting Motion to Strike, Plaintiffs' Second Amended Disclosures have failed to provide any substantiated basis for the computation for the monetary amounts claimed. *Marine Depot*, 2020 U.S. Dist. LEXIS 244385 at *8. This Court previously addressed Plaintiffs' deficient damages allegations and the scope of allowable damages in **three prior Court Orders** and required Plaintiffs to re-plead their alleged damages in compliance with Federal Rule of Civil Procedure 26(a)(1)(A)(iii).

**I. Plaintiffs are excluded from offering any documentary evidence and/or testimony in support of their speculative claims for economic damages (lost profits, lost rents, lost business opportunities and future earnings) for failure to provide any non-speculative computation or supporting documentation.**

Federal Rule of Civil Procedure 26(a)(1)(A)(iii) explicitly requires that Plaintiffs provide in their initial disclosures:

> (iii) a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered . . .

In direct violation of Federal Rule of Civil Procedure 26(a)(1)(A)(iii), Plaintiffs have failed to provide a computation of any of the categories of damages claimed and Plaintiffs have failed to provide documents or other evidentiary material on which any such computation is based. *See.*

*gen. Carter v. BPCL Management, LLC*, 2021 WL 7502558, at *2 (S.D. Fla. 2021) ("[P]laintiffs

must provide a computation of each category of damages . . . Plaintiffs must also make available

for copying the documents upon which each computation is based.").

As set forth in the Court's Order Granting Motion to Strike [DE 313 at 4]:

> Rule 26(a)(1)(A)(iii) states that a party must provide as part of its
> initial disclosure "a computation of each category of damages
> claimed by the disclosing party—who must also make available for
> inspection and copying as under Rule 34 the documents or other
> evidentiary material, unless privileged or protected from disclosure,
> on which each computation is based, including materials bearing on
> the nature and extent of injuries suffered." Fed. R. Civ. P.
> 26(a)(1)(A)(iii). "By its very definition, the disclosure required by
> the Rule is one that is capable of computation." *Marine Depot, Int'l,
> Inc. v. James River Grp., Inc*., No. 19-CV-24821, 2020 WL
> 7864100, at *2 (S.D. Fla. Dec. 30, 2020). "Rule 26(a)'s purposes are
> to allow for adequate case preparation and foreclose unfair surprises
> . . . The initial disclosure requirement should be applied with
> common sense keeping in mind the salutary purposes that the rule is
> intended to accomplish." *Sec. & Exch. Comm'n v. Montano*, No.
> 618CV1606ORL31GJK, 2019 WL 2254946, at *2 (M.D. Fla. Mar.
> 5, 2019) (citations omitted).

In the Order Granting in Part and Denying in Part the Commissioner's Motion to Dismiss

(the "Dismissal Order"), the Court **dismissed** Plaintiffs' damages allegations in their Second

Amended Complaint "**to the extent Plaintiffs seek to recover monetary damages allegedly

suffered by non-parties**" [DE 186 at 9]. The Court dismissed from this case alleged damages

suffered by Plaintiffs' corporate entities. *Id.* In doing so, the Court rejected Plaintiffs' purported

assignment of the damages as alleged in the Second Amended Complaint [DE 125 ¶ 298], holding

"Even if the non-parties have assigned their claims to Plaintiffs, there are no claims of First

Amendment retaliation pled as to the non-parties…. Thus, there is no alleged 'claim' for the non-

parties to assign." [DE 186 at 8-9].

The non-economic damages asserted by Plaintiffs, *inter alia*, are improper as evidenced by Plaintiffs' Second Amended Rule 26(a) Initial Disclosures. Such purported computation of $10 million for "the value of 20% of Plaintiffs' time" is speculative, and the failure to present any computation of their damages was neither substantially justified nor harmless[2]. Here, as in *Piers 1 Cruise* Experts, Plaintiffs' claims for losses of future earnings contain speculative unsubstantiated amounts of rents, lost business opportunities and reputational harm resulting in alleged income streams that could have been sold at a 6% rate of return over periods of five to ten years and belong to third-party entities' commercial properties do not substantiate Plaintiffs' claims for any damages sustained in their individual non-corporate capacities. Critically, as to all of the alleged damages, Plaintiffs utterly "fail to provide any substantiated basis for the computation for the monetary amount claimed as damages[3]" [DE 313 at 5] (citing *Marine Depot, Int'l, Inc. v. James River Grp., Inc.*, No. 19-CV-24821, 2020 WL 7864100, at *8 (S.D. Fla. 2020)).

Plaintiffs' gross speculation that 20% of their time over the past five years is somehow worth $10 million with no basis for such figures, no provision of documents to support such allegations; including, but not limited to, tax returns showing income, and no factual detail to support their purported "computation".

---

[2] *See Pier 1 Cruise Experts v. Revelex Corp.*, 929 F.3d 1334, 1342-1343 (11th Cir. 2019) (emphasis added) ("We agree with the district court's determination that Pier 1's lost-profits calculation was too speculative to proceed and that, without it, the evidence regarding lost profits was legally insufficient. The district court correctly concluded that Peres seemed to have "decided to *pick a number out of thin air*" to conclude that Pier 1 could have sold "double[]" the number of cruises that sold through conventional means. … Peres's calculation of Pier 1's increased expenses— 10%—was also impermissibly speculative. … Peres testified that "it was [her] intent to be conservative with respect to the calculations," but her choice to peg the expense increase at 10% also *seems to have come out of "thin air."*).

**II.**   **Plaintiffs are precluded from suggesting any specific damage amount to the jury of their emotional distress damages for failure to provide any computation.**

As it relates to mental anguish, the law is clear that "computation of all damages is necessary, including non-economic damages . . ." *Carter*, 2021 WL 7502558, at *8 (S.D. Fla. 2021). In *Carter*, the Court emphasized that while the computation of intangible damages such as pain and suffering may not be feasible, a plaintiff shall still be precluded from suggesting a specific amount of intangible damages to the jury. *Id.* The Court in *Carter* held that where the Plaintiff had not provided a computation of his damages due to mental anguish, the Plaintiff left the computation of intangible damages to the jury, and consequently, Plaintiff was precluded from suggesting a specific amount. *Id.*

Here, Plaintiffs allege emotional distress damages in excess of $10 million for each Plaintiff and will ask the jury for $10 million each for their emotional distress. [DE 315-2 at 33]. Given that no documentary evidence nor computation of Plaintiffs' speculative $20 million pain and suffering damages have been provided to date, Plaintiffs must be precluded from suggesting any specific damage amount to the jury. *Carter,* 2021 WL 7502558, at *9 (S.D. Fla. 2021) ("to the extent that no computation has been provided, the Court finds that [Plaintiff] has left the computation of intangible damages to the province of the jury, and consequently, [Plaintiff] is precluded from suggesting a specific damage amount to the jury.")

Plaintiffs' cherry-picking selection of $10 million each with no computation or evidence is nothing more than pure speculation, and is therefore wholly improper, and must be excluded as inadmissible testimony. Further, any documentary evidence in support thereof should be stricken as untimely disclosed[4]. *See, e.g.*, *Scotlynn USA Div., Inc. v. Titan Trans Corp.*, 555 F. Supp. 3d

---

[4] In order to substantiate that 20% of Plaintiffs' time over the last five years is worth $10 million, Plaintiffs would need to show tax returns evidencing that their personal income over that time period is $50 million (20% of $50 million = $10 million).

1246, 1271 (M.D. Fla. 2021) (citation omitted) ("damages may not be awarded on the basis of conjecture or speculation … it is also elementary that purely speculative damages cannot be recovered").

For all of the foregoing reasons, Plaintiffs must be precluded from offering any documentary of testimonial evidence as to any specified amount of both economic and non-economic damages each allege to have sustained.

Respectfully submitted,

KRINZMAN HUSS LUBETSKY
FELDMAN & HOTTE
Co-Counsel for Defendant, Joe Carollo
Alfred I. duPont Building
169 E. Flagler Street, Suite 500
Miami, Florida 33131
Telephone: (305) 854-9700
Primary email:  map@khllaw.com
Primary email:  mschneider@khllaw.com
Secondary:  eservicemia@khllaw.com

By:  /s/ Mason A. Pertnoy
        Mason A. Pertnoy, Esq.
        Florida Bar No. 18334

And

SHUTTS & BOWEN
Co-Counsel for Defendant, Joe Carollo
200 S. Biscayne Boulevard, Suite 4100
Miami, FL 33131
Telephone: (305) 415-9072
Email: msarnoff@shutts.com

By:  /s/ Marc D. Sarnoff
        Marc D. Sarnoff, Esq.
        Florida Bar No. 607924

And

KUEHNE DAVIS LAW, P.A.
Co-Counsel for Commissioner Joe Carollo
100 S.E. 2nd Street, Suite 3105
Miami, FL 33131-2154
Telephone: (305)789-5989
Email: ben.kuehne@kuehnelaw.com;
mdavis@kuehnelaw.com
efiling@kuehnelaw.com

By:  /s/ *Benedict P. Kuehne*
        Benedict P. Kuehne
        Florida Bar No. 233293

And

COLE, SCOTT & KISSANE
Co-counsel for Commissioner Joe Carollo
9150 S. Dadeland Blvd., Suite 1400
Miami, FL 33156
Email: Amber.Dawson@csklegal.com

By:  /s/ Amber C. Dawson
        Amber C. Dawson
        Florida Bar No. 1008084

2021 WL 7502558

2021 WL 7502558
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

Paul CARTER, Plaintiff,
v.
BPCL MANAGEMENT, LLC d/b/a Bahamas
Paradise Cruise Line, Cruise Operator Inc.,
d/b/a Bahamas Paradise Cruise Line; and
Paradise Cruise Line Operator Ltd., Inc. d/b/
a Bahamas Paradise Cruise Line, Defendants.

CASE NO. 19-60887-CIV-DIMITROULEAS/SNOW
|
Signed 05/10/2021

**Attorneys and Law Firms**

Paul Carter, Mesquite, TX, Pro Se.

Catherine Ann Mancing, Hall, Lamb, Hall & Leto, P.A.,
Paul T. Bagley, Catherine J. MacIvor, Thomas Dennis Alan
Briggs, Foreman Friedman P.A., Miami, FL, for Defendant
Paradise Cruise Line Operator LTD. Inc. c/o CT Corporation
System 1200 South Pine Island Road Plantation, FL 33324.

ORDER

LURANA S. SNOW, UNITED STATES MAGISTRATE
JUDGE

 **\*1** THIS CAUSE is before the Court on Paradise Cruise
Line Operator Ltd., Inc.'s Motion for Rule 37(c) Sanctions
against Plaintiff for Failure to Amend Discovery Responses
and Rule 26 Disclosures Concerning Plaintiff's Damages
and for Late Disclosed Documents. (ECF No. 188) The
Honorable William P. Dimitrouleas referred all pretrial
discovery motions to United States Magistrate Judge Lurana
S. Snow for appropriate resolution. (ECF No. 78 at 6)

Background

On April 4, 2018, Carter boarded a cruise ship owned by
Paradise. (ECF No. 109 at 4) Carter, who drinks a specific
brand of water due to kidney issues, sought to bring bottled
water aboard the ship. (ECF No. 109 at 4) (ECF No. 186 at
30–31) He was denied. (ECF No. 109 at 4) Carter drank the

ship's tap water and became seriously ill. (ECF No. 109 at
4) Carter attributes his illness to "neurotoxic agents" in the
water. (ECF No. 109 at 4–5)

On April 4, 2019, Carter brought suit claiming, among other
things, that Paradise negligently failed to warn him about the
danger of drinking the unsafe water. [1] (ECF No. 1) (ECF No.
109 at 6) Carter seeks damages for accrued medical expenses,
future medical expenses, lost business opportunities, lost
earnings and income, and mental anguish. (ECF No. 188 at
12) (ECF No. 188-9 at 9) (ECF No. 188-11 at 7)

Paradise served its first set of discovery on January 24, 2020,
and Carter responded on March 3, 2020. (ECF No. 188 at
3–5) Carter's lawyer withdrew shortly after serving Carter's
responses, but before serving his initial disclosures. (ECF No.
113) Carter subsequently proceeded pro se from March 10,
2020 to December 8, 2020. (ECF No. 188 5–6) During that
period, the parties engaged in virtually no discovery. [2] (ECF
No. 188 at 6) On December 8, 2021, Carter's new counsel
entered an appearance. (ECF No. 155) The parties re-engaged
in discovery, and the discovery deadline, originally set for
February 19, 2021, was extended to March 31, 2021, and then
April 30, 2021. (ECF No. 188 at 6, 11) (ECF No. 223 at 2)

Paradise claims that Carter, throughout the discovery process,
engaged in a consistent pattern of abuse. (ECF No. 223 at 4)
According to Paradise, Carter failed to provide timely initial
disclosures under Rule 26(a). (ECF No. 188 at 2) When he
finally made the disclosures, Paradise claims that he failed
to provide a computation of his damages and identify the
documents upon which the computations were based. (ECF
No. 188 at 2, 11–14) Moreover, Paradise alleges that Carter
waited more than a year before revealing certain damages
and never supplemented prior interrogatory responses that
disclaimed such damages. (ECF No. 188 at 2, 11–14) Paradise
also argues that Carter refused to identify documents in
response to prior discovery requests. (ECF No. 188 at 7–
8) Finally, Paradise claims that Carter disclosed documents
in the weeks leading up to the discovery deadline that were
responsive to discovery requests lodged over a year ago. (ECF
No. 188 at 17–18) As a result of these violations, Paradise
states that it has been precluded from obtaining basic and
essential information needed to prepare its defense. (ECF No.
223 at 7) Accordingly, Paradise asks the Court to exclude
Carter from introducing evidence of damages or relying upon
the documents produced at the end of discovery. (ECF No.
188 at 18)

*Carter v. BPCL Management, LLC, Slip Copy (2021)*

2021 WL 7502558

## Discussion

### I. Legal Standard

**\*2** Federal Rule of Civil Procedure 26(a)(1) requires all parties to provide certain initial disclosures early in the proceedings. As relevant to this case, plaintiffs must provide a computation of each category of damages. Fed. R. Civ. P. 26(a)(1)(A)(iii). Plaintiffs must also make available for inspection and copying the documents upon which each computation is based. Id. Following this disclosure, Rule 26(e) imposes a continuing duty to supplement and correct the information in a timely fashion if the party learns that it is incomplete or incorrect. Fed. R. Civ. P. 26(e). The duty to supplement also applies to the parties' responses to interrogatories, requests for production, and requests for admission. Fed. R. Civ. P. 26(e).

If a party violates Rule 26(a) or (e), the evidence should be excluded unless the failure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1). In addition to or instead of exclusion, the Court may impose other appropriate sanctions. Id. In determining whether a violation was substantially justified or harmless, the court considers a number of factors, including (1) the non-disclosing party's explanation for its failure, (2) the importance of the undisclosed information to the case, and (3) any prejudice or surprise to the opposing party. Romero v. Drummond Co., 552 F.3d 1303, 1321 (11th Cir. 2008). The non-disclosing party bears the burden of proving that the violation was substantially justified or harmless. Mitchell v. Ford Motor Co., 318 F. App'x 821, 824 (11th Cir. 2009) (per curiam) (quoting Leathers v. Pfizer, Inc., 233 F.R.D. 687, 697 (N.D. Ga. 2006)).

### II. Lost business opportunities

Before his injuries, Carter wrote a script for a science-fiction series called "Dark Genesis." (ECF No. 223 at 3) Carter claims that in 2017, a Los Angeles production company offered him two contracts for the right to develop and produce "Dark Genesis." (ECF No. 209 at 11–12) Due to his injuries, however, Carter states that he can no longer go forward with the contracts. (ECF No. 186-1 at 99–100) (ECF No. 223 at 3) Carter, therefore, seeks damages for lost business opportunities. (ECF No. 188-13 at 3) [3]

Paradise claims that evidence of Carter's damages should be excluded. (ECF No. 188 at 18) According to Paradise,

Carter violated Rule 26(a)(1)(A)(iii) because he never provided a computation of his damages due to lost business opportunities. (ECF No 188 at 11) Additionally, Paradise claims that Carter violated Rule 26(e) because he failed to supplement previous interrogatory responses that disclaimed such damages. (ECF No. 223 at 7–8) Paradise claims the violations were not substantially justified or harmless. (ECF No. 188 at 15–16) Therefore, it asks the Court to exclude the evidence.

#### A. Carter violated Rules 26(a)(1)(A)(iii) and (e)(1)

The Court finds that Carter violated Rule 26(a)(1)(A)(iii) by failing to provide a computation of his damages due to lost business opportunities. Carter did not identify lost business opportunities as a category of damages in his initial disclosures or amended initial disclosures. (ECF No. 188-9 at 9) (ECF No. 188-11 at 7–8) Moreover, Carter repeatedly failed to provide a computation in response to Paradise's interrogatories. (ECF No. 188-1 at 11) (ECF No. 188-8 at 3) At no point did Carter set forth a computation of his damages for lost business opportunities; therefore, he violated Rule 26(a)(1)(A)(iii).

**\*3** Carter also violated Rule 26(e) by failing to timely supplement incorrect information in a prior interrogatory response. Paradise, in its First Set of Interrogatories served on January 24, 2020, asked Carter whether he was contending that he lost any future income, benefits, or earning capacity as a result of his injuries. (ECF No. 188 at 4) Carter stated "N/A." (ECF No. 188 at 4) At his deposition nearly a year later, Carter revealed for the first time that he was seeking damages for lost business opportunities because of the "Dark Genesis" contracts. (ECF No. 188 at 10) (ECF No. 223 at 3) Carter admits that his prior interrogatory response was not correct, and he never supplemented the response to inform Paradise about his damages. (ECF No. 188 at 10–11) (ECF No. 209 at 9) Accordingly, Carter violated Rule 26(e).

#### B. Carter's violations were neither substantially justified nor harmless

Carter offers no justification for his failure to compute his damages or supplement his interrogatories, and the evidence in the record shows that the violations were not harmless. Carter, by failing to compute his damages, precluded Paradise from critically examining his claim for lost business

opportunities. (ECF No. 188 at 14) Moreover, Carter's failure to supplement prevented Paradise from obtaining discovery from the production company who offered Carter the contracts. Indeed, even after Carter informed Paradise about the "Dark Genesis" contracts, he refused to identify the production company or produce the unredacted contracts until April 1, 2021, one day after the then-applicable discovery deadline. (ECF No. 180 at 2–3) (ECF No. 188 at 10, 18) When the discovery deadline was extended on April 6, 2021, Paradise immediately subpoenaed the production company. (ECF No. 223 at 3) The company produced responsive documents three days before the now-current April 30, 2021 deadline, and, at the time of the briefing, Paradise had not yet been able to conduct a deposition of the third party. (ECF No. 223 at 3–4) (ECF No. 209) Carter's violations prevented Paradise from obtaining relevant discovery; therefore, they were not harmless, and sanctions are warranted under Rule 37(c). Given the multitude and magnitude of Carter's infractions, the Court finds that evidence pertaining to his damages for lost business opportunities should be excluded. See In re Mirabilis Ventures, Inc., No. 6:09–cv–271–Orl–31DAB, 2011 WL 3236027, at *5 (M.D. Fla. July 28, 2011) ("Where a party fails to properly identify a category of damages or to provide the calculations underlying it, it is within the court's discretion to exclude evidence relating to those damages.") (citing 🔖 Mee Indus. v. Dow Chemical Co., 608 F.3d 1202, 1221–22 (11th Cir. 2010)).

### III. Future lost earnings and income

Prior to his injuries, Carter worked as a digital artist. (ECF No. 188-8 at 3) He also worked as a fire sprinkler contractor until 2009. (ECF No. 188-8 at 3) (ECF No. 186-1 at 94) As a result of his injuries, Carter claims he can no longer return to either career. (ECF No. 188-8 at 3) Therefore, Carter seeks $80,000 in future lost earnings per year for the remainder of his life or until retirement. (ECF No. 188-13 at 2)

Paradise claims that Carter's damages should be excluded because he did not provide a clear computation of damages. (ECF No 188 at 13) Additionally, Paradise claims that Carter violated Rule 26(e) because he failed to supplement previous interrogatory responses that disclaimed damages due to future lost earnings and income. (ECF No. 188 at 13) Paradise claims the violations were not substantially justified or harmless. (ECF No. 188 at 14) Therefore, it seeks exclusion.

#### A. Carter violated Rules 26(a)(1)(A)(iii) and (e)

The Court finds that Carter violated Rule 26(a)(1)(A)(iii) because he failed to provide a computation of his future lost earnings and income. "[T]o comply with the initial disclosure requirements of Rule 26, parties must perform some analysis, and cannot rely on general statements." Boldstar Tech., LLC v. Home Depot USA, Inc., No. 07-80435-CIV, 2008 WL 11320010, at *2 (S.D. Fla. Feb. 28, 2008) (cleaned up). Here, Carter did not provide a damage computation with any analysis in his initial disclosures; instead, he simply claimed lost work opportunities in an estimated amount of $80,000 for the remainder of his life. (ECF No. 188-9 at 9) Carter also failed to provide a computation in his amended disclosures. (ECF No. 188-11 at 7)

**\*4** On March 19, 2021, Carter served a document titled "Approximate Computation of Damages," where he provided an adequate computation of his future lost earnings and income. (ECF No. 188-13 at 2) However, Carter's counsel did not sign the document to certify that the information was complete and correct, as required for Rule 26 disclosures, nor did Carter provide the information under oath, as required for responses to interrogatories. Fed. R. Civ. P. 26(g)(1), 33(b)(2). (ECF No. 188-13) Accordingly, Carter violated Rule 26(a)(1)(A)(iii) by failing to provide a valid computation for his future lost earnings and income in a timely fashion and in the proper form.

The Court also finds that Carter violated Rule 26(e) by failing to supplement incorrect information in his prior interrogatories in a timely fashion. As mentioned above, Carter stated "N/A" in response to an interrogatory that asked whether he was contending that he lost any future income, benefits, or earning capacity as a result of his injuries. (ECF No. 188 at 4) During his deposition nearly a year later, Carter revealed for the first time that he was seeking future lost earnings and income because he could not return to the jobs he previously held. (ECF No. 188 at 10) (ECF No. 223 at 3) Carter acknowledges that the interrogatory answer was incorrect, and he failed to supplement the incorrect information. (ECF No. 209 at 9) Accordingly, Carter violated Rule 26(e).

#### B. Carter's violations were harmless

The Court finds that Carter's failure to provide a computation of damages in his initial disclosures was harmless. On March 19, 2021, two days after Carter served his amended initial disclosures, he served a document titled "Approximate Damages Computation," where he provided a sufficient computation of his future lost income and earnings. Fla. Transp. Serv., Inc. v. Miami-Dade Cnty., No. 05-22637-CIV, 2008 WL 11403207, at *2 (S.D. Fla. May 8, 2008) (finding inadequate initial computation harmless because the opposing party provided an expert report computing the damages). (ECF No. 188-13) (ECF No. 188 at 13) Carter provided the computation more than a month before the discovery deadline, and it does not appear that the delay prevented Paradise from seeking relevant discovery. Moreover, Paradise had sufficient time to seek Carter's deposition on the information prior to the deadline by either asking Plaintiff to do so or seeking leave of Court. Therefore, the Court finds the violation was harmless.

The Court also finds that Carter's failure to supplement his interrogatory response was harmless. At his deposition, Carter revealed his claim for future lost profits and income more than three months before the discovery deadline. [4] (ECF No. 186-1 at 97-98) There is no evidence that Carter's lack of supplementation prevented Paradise from seeking relevant discovery, and Paradise had ample time to re-depose Carter. Therefore, Carter's failure to supplement was harmless.

**IV. Accrued and future medical expenses**

In Carter's initial disclosures, he stated that his accrued medical expenses were $85,616.92, as evidenced by medical invoices. (ECF No. 188-9 at 9) On March 17, 2021, Carter amended his initial disclosures and provided a computation of his accrued medical expenses that amounted to $79,576.90. [5] (ECF No. 188-12 at 2–4) On March 19, 2021, Carter provided a computation of his future medical expenses in a document titled "Approximate Computation of Damages." (ECF No. 188-13 at 1) Carter sought $200,000.04 for 20 years of projected expenses. (ECF No. 188-13 at 1) Carter calculated his future expenses on the assumption that the proper amount of his accrued damages is $85,616.92, as stated in his initial disclosure, rather than $79,576.90, as stated in his computation. (ECF No. 188-13 at 1)

**\*5** Paradise seeks to exclude evidence of Carter's accrued and future medical expenses. Paradise claims that Carter violated Rule 26(a)(1)(A)(iii) because he did not provide a clearly defined computation of either category of damages.

(ECF No. 188 at 11–14) Paradise also argues that Carter violated Rule 26(a)(1)(A)(iii) by failing to identify the documents that evidence his computations. (ECF No. 188 at 11–14)

A. Carter violated Rule 26(a)(1)(A)(iii)

First, the Court finds that Carter did provide an adequate computation of his accrued medical damages and expenses. In his amended initial disclosures, Carter stated that he would provide a computation of damages in Response to Paradise's Second Set of Interrogatories. (ECF No. 188-11 at 8) Carter served the Response the same day as his amended initial disclosures, and the Response contained a sufficient computation that listed each item of expense or damage, amounting to $79,576.90. (ECF No. 188-12) The Court finds this computation sufficient to meet Paradise's obligations and will hold Plaintiff to his computed amount of $79,576.90.

The Court, however, finds that Carter violated Rule 26(a)(1)(A)(iii) because he failed to identify the documents that support his computation of accrued medical damages. Carter claimed in his initial disclosures that his damages were $85,616.92, as evidenced by medical invoices. (ECF No. 188-11 at 7–8) However, when asked by Paradise to identify which of the 2,200 documents produced supported the $85,616.92, he failed to do so. (ECF No. 188 at 12) (ECF No. 188-11 at 7–8) When Carter provided his computation of $79,576.90 in Response to Paradise's Second Set of Interrogatories, he did not identify the supporting documents. (ECF No. 188-12 at 2–4) Again, Paradise asked him to identify the documents. This time, Carter pointed to an "explanation of benefits" in a health insurance plan. (ECF No. 188 at 13–14) According to Paradise, however, the explanation of benefits does not demonstrate Carter's actual medical payments. (ECF No. 188 at 13) Finally, in the parties' most recent conferral on March 23, 2021, Paradise again asked Carter to identify the documents that support either his claim of $85,616.92 or his computation of $79,576.90. (ECF No. 188 at 14) Carter refused to identify responsive documents by Bates number or description; instead, he stated that the documents were produced in a self-evident, categorical manner. (ECF No. 188 at 14) Based on Carter's refusal to identify the documents that support his computation of accrued medical damages and expenses, the Court finds that he violated Rule 26(a)(1)(A)(iii).

2021 WL 7502558

The Court also finds that Carter failed to provide a proper computation of his future medical expenses. Carter did not provide a computation in his initial disclosures, amended initial disclosures, or Response to Paradise's Second Set of Interrogatories. (ECF No. 188-8) (ECF No. 188-11) (ECF No. 188-12) Instead, Carter provided the computation in a document titled "Approximate Computation of Damages." (ECF No. 188-13) Carter's counsel did not certify that the information was complete and correct, as required for disclosures under Rule 26, nor did Carter provide the information under oath, as required for responses to interrogatories. Fed. R. Civ. P. 33(b)(2). (ECF No. 188 at 13) Accordingly, Carter violated Rule 26(a)(1)(A)(iii) by failing to provide a valid computation of his future medical damages.

### B. Carter's violations were neither substantially justified nor harmless

**\*6** Carter offers no justification for his failure to identify the documents that evidence his computation of accrued medical damages or his failure to compute his future medical damages. (ECF No. 209) Moreover, the evidence in the record shows that the violations were not harmless.

Carter's failure to identify documents that support his computation of accrued medical damages was not harmless because it precluded Paradise from critically examining the documents, conducting follow-up discovery, and deposing Carter on the damages before the April 1, 2021 deadline. (ECF No. 188 at 13–14) Paradise was also forced to comb through thousands of documents in a failed attempt to piece together the evidentiary support for Carter's damages. (ECF No. 188 at 13) Accordingly, the violation was not harmless.

Likewise, Carter's failure to properly compute his future medical expenses was not harmless because it precluded Paradise from critically assessing his damage claim. What's more, the computation created confusion because Carter calculated the future medical expenses using the $85,616.92 in accrued damages that he claimed in his initial disclosures, rather than the $79,576.90 he calculated in his valid computation. Paradise was forced to expend time and resources as discovery ended in an attempt to identify the proper damage computation. (ECF No. 188 at 14) Therefore, Carter's violations were not harmless, and sanctions under Rule 37(c) are warranted.

Courts have discretion in fashioning sanctions under Rule 37(c). [6] The Court notes that there is "a strong preference for deciding cases on the merits." Perez v. Wells Fargo N.A., 774 F.3d 1329, 1332 (11th Cir. 2014); see also Vera v. Berkshire Life Ins. Co. of Am., No. 19-61360-CIV-DIMITROULEAS/SNOW, 2020 WL 8184335, at \*2 (S.D. Fla. Dec. 24, 2020). In an exercise of this discretion, the Court chooses not to exclude the evidence at this point. King v. Akima Glob. Servs., LLC, 323 F.R.D. 403, 410 (S.D. Fla. 2017) (finding that exclusion was an excessive sanction under Rule 37(c)).

Instead, the Court orders Carter, no later than May 17, 2021, to identify the specific documents by Bates number that support his computation of accrued medical expenses that he provided in response to Paradise's Second Set of Interrogatories. The Court cautions Carter against identifying batches of documents that contain hundreds of pages of non-responsive documents, as he has done multiple times in prior discovery requests. (ECF No. 188 at 8–9) The Court also orders Carter to amend his initial disclosure, no later than May 17, 2021, by providing a computation of his future medical expenses. In the amended response, Carter shall also identify the specific documents supporting his claim for future medical expenses. Once Carter identifies the documents and amends his computation for future medical expenses, Paradise may, if necessary, re-depose Carter after the discovery deadline on both categories of damages. Paradise may also, if necessary, conduct reasonable third-party discovery based upon any newly identified documents. Such limited discovery by Defendant shall be completed by May 31, 2021.

**\*7** If Carter fails to identify the specific documents that support his computation of medical damages or amend his initial disclosures by the dates indicated herein, the Court may exclude evidence of Carter's accrued and future medical expenses and damages. [7]

### V. Documents showing neurotoxins

On January 8, 2021, Paradise served a Request for Production that asked Carter to produce all documents reflecting the basis for Carter's assertion that the ship's water contained neurotoxins or any other toxic substance. (ECF No. 188 at 7) In response, Carter referred Paradise to 745 pages of material that included unresponsive documents like bank statements and drivers' licenses. (ECF No. 188 at 8) Three days later, when asked during his deposition whether he had any

documentation to suggest that he ingested a neurotoxic agent, Carter testified that he "wouldn't say neurotoxin." (ECF No. 186-1 at 163)

Given Carter's inadequate prior responses and deposition testimony, Paradise moved to compel better responses on February 11, 2021. (ECF No. 158) Carter subsequently served "Better Responses." (ECF No. 188 at 8) This time, Carter identified 572 pages of medical records, in addition to the 745 previously identified documents, totaling 1,317 pages of responsive documents. (ECF No. 188 at 9) Again, Paradise objected to the responses as false and misleading. (ECF No. 188 at 9) During the parties' subsequent conferral, Carter advised that "a few Parkland hospital records are responsive to this request, and the others simply demonstrate that Plaintiff was ill." (ECF No. 188 at 9) Carter, however, refused to correct the previous response to accurately identify only the documents that were responsive. (ECF No. 188 at 9)

On March 12, 2021, Paradise moved to compel Carter to identify only those specific documents that were responsive to the discovery request, and if none exist, state "none." (ECF No. 177) Carter, in response to the Motion, argued that in the time following the Motion, he had produced, named, and described the documents Paradise sought. (ECF No. 182 at 4–5) Paradise did not challenge the argument. (ECF No. 194 at 2) The Court, therefore, did not grant Paradise's requested relief because the issue appeared moot. (ECF No. 226) Here, however, Paradise claims that Carter still has not identified the responsive documents that form the basis for Carter's assertion that the water contained neurotoxins or other toxic substances. (ECF No. 223 at 4) Nor has Carter amended the response to state "none." (ECF No. 223 at 4) Carter does not challenge these arguments. (ECF No. 209) Given these latest assertions by Paradise, the Court finds that the issue is not moot. Accordingly, the Court orders Carter, no later than May 17, 2021, to supplement his response to Request 44 in Paradise's Second Request for Production by identifying the Bates numbers for the specific Parkland hospital documents referenced that reflect the basis for Carter's assertion that the shipboard water contained neurotoxins or any other toxic substance. The Court cautions Carter against identifying hundreds of non-responsive documents. If no responsive documents exist, Carter shall supplement his response by stating "none."

**VI. Documents produced March 19, and March 22, 2021**

**\*8** Paradise claims that Carter produced over 100 pages of documents on March 19, 2021, that were responsive to Paradise's First Request for Production, which was served more than a year prior. (ECF No. 188 at 17) Paradise also claims that Carter produced 65 more pages of documents on March 22, 2021, nine days before the then-discovery deadline. (ECF No. 188 at 17–18) As a result of the late disclosures, Paradise claims it had no opportunity to conduct follow up discovery or depose Carter on the information. (ECF No. 188 at 18)

The Court finds that Carter violated Rule 26(e) because he failed to timely produce documents in the year following his response to Paradise's First Request for Production. Moreover, the Court finds that the violation was not harmless. Carter produced more than 165 documents in the week before the then-applicable discovery deadline. Many of the documents were responsive to discovery requests Paradise made more than a year ago, and some documents had been in Carter's possession since 2017. Moreover, many of the documents were improperly redacted, forcing Paradise to either negotiate a confidentiality order or prepare a motion to compel. Paradise claims that the belated disclosure prevented it from following up with discovery or deposing Carter, and Carter offers no rebuttal to show that the violation was harmless. Accordingly, the Court will allow Paradise to re-depose Carter after the discovery deadline if necessary on the materials produced on March 19, 2021, and March 22, 2021, including documents related to his future lost income and earnings, his unredacted cell phone records, and his health insurance records. (ECF No. 188 at 16–17)

**VII. Mental anguish**

In his initial and amended initial disclosure, Carter claims to have suffered mental anguish as a result of Paradise's negligence. (ECF No. 188-9 at 9) (ECF No. 188-11 at 7) The record does not show that Carter ever provided a computation of his damages related to mental anguish.

The plain text of Rule 26 suggests that a computation of all damages is necessary, including non-economic, intangible damages. However, some Courts have recognized that due to the nature of intangible damages, a computation may not be feasible or necessary. Avrett v. Festival Fun Parks, LLC, No. 15-80526-CIV, 2016 WL 193805, at *3 (S.D. Fla. Jan. 15, 2016). In such a case, the plaintiff is not required to provide a computation of damages, and it is within the jury's discretion to determine a reasonable amount. E.g., 🔖 Id., Gray v. Florida

Dept. of Juvenile Justice, No. 3:06-cv-990, 2007 WL 295514 at *2 (M.D. Fla. 2007). The plaintiff, however, is precluded from suggesting any specific amount of intangible damages to the jury. Id.

Here, it does not appear that Carter has provided a computation of his damages due to mental anguish. Accordingly, to the extent that no computation has been provided, the Court finds that Carter has left the computation of intangible damages to the jury, and consequently, Carter is precluded from suggesting a specific amount.

CONCLUSION

Having carefully reviewed the Motion, the Response and Reply thereto, the court file and applicable law, it is hereby

ORDERED AND ADJUDGED that Defendant's Motion for Rule 37(c) Sanctions against Plaintiff for Failure to Amend Discovery Responses and Rule 26 Disclosures Concerning Plaintiff's Damages and for Late Disclosed Documents is GRANTED IN PART. (ECF No. 188)

The Motion is GRANTED to the extent that Paradise seeks to exclude evidence of Carter's lost business opportunities. (ECF No. 188 at 11, 18)

**\*9** The Motion is DENIED:

(a) to the extent that Paradise seeks to exclude evidence of Carter's future lost earnings and income; (ECF No. 188 at 13)

(b) to the extent that Paradise seeks to exclude evidence of Carter's accrued and future medical expenses. (ECF No. 188 at 11, 18) However, the Court orders Carter, no later than May 17, 2021, to identify the specific documents by Bates number that support his computation of accrued medical expenses that he provided in response to Paradise's Second Set of Interrogatories. The Court cautions Carter against identifying batches of documents that contain hundreds of pages of non-responsive documents, as he has done multiple times in prior discovery requests. (ECF No. 188 at 8–9) The Court also orders Carter to amend his initial disclosure, no later than May 17, 2021, by providing a computation of his future medical expenses. In the amended response, Carter shall identify by Bates number the specific documents that have been produced which support his claim for future medical damages. Once Carter

identifies the documents and amends his computation for future medical damages, Paradise may, if necessary, re-depose Carter no later than May 31, 2021, on both categories of damages. Paradise may also, if necessary, conduct reasonable third-party discovery based upon any newly identified documents which must be completed by May 31, 2021.

(c) To the extent that Paradise seeks to exclude documentary evidence of neurotoxins in the water. (ECF No. 188 at 9) (ECF No. 223 at 4–5) However, the Court orders Carter, no later than May 17, 2021, to supplement his response to Request 44 in Paradise's Second Request for Production by identifying the Bates numbers for the specific documents that reflect the basis for Carter's assertion that the shipboard water contained neurotoxins or any other toxic substance, including, but not limited to, the Parkland Hospital documents referenced. The Court cautions Carter against identifying hundreds of non-responsive documents. If no responsive documents exist, Carter shall supplement his response by stating "none."

(d) To the extent that Paradise seeks to exclude documents Carter produced on March 19, and March 22, 2021. (ECF No. 188 at 17–18) However, the Court will allow Paradise to re-depose Carter on or before May 31, 2021, on the materials produced on March 19, 2021, and March 22, 2021.

(e) To the extent that Paradise seeks to exclude evidence of mental anguish. (ECF No. 188 at 12, 18) However, to the extent that no computation has been provided, the Court finds that Carter has left the computation of intangible damages to the province of the jury, and consequently, Carter is precluded from suggesting a specific damage amount to the jury.

**(f) Paradise shall provide a copy of this Order to Carter and his wife's email addresses as previously ordered.**

**(g) Further, the Clerk is directed to enter a docket entry confirming mailing this Order to Plaintiff upon doing so.**

DONE AND ORDERED this 10th day of May, 2021, in Ft. Lauderdale, Florida.

**All Citations**

Slip Copy, 2021 WL 7502558

2021 WL 7502558

## Footnotes

1     Carter also brought claims for breach of contract, violation of Florida's Deceptive and Unfair Trade Practices Act, and violation of the Telephone Consumer Protection Act. (ECF No. 109 at 7, 9, 12) However, the facts underlying those claims are not relevant to this Order.

2     The parties met and conferred about Carter's earlier discovery responses; however, Carter did not supplement the responses. (ECF No. 188 at 6) Nor did Carter serve his initial disclosures. (ECF No. 188 at 6) Paradise did not serve any further requests for discovery. It appears that the only discovery between the parties occurred when Carter signed HIPPA forms that allowed Paradise to obtain his medical records. (ECF No. 188 at 6)

3     The Court notes that Carter also identified another script he wrote named "Our Favorite Giant." (ECF No. 234 at 2) (ECF No. 233 at 7) However, Carter has attached an email memorializing his discussion with Paradise where he stated that "Our Favorite Giant" is not a component of his damages due to lost business opportunities. (ECF No. 233 at 7)

4     Unlike Carter's claim for lost business opportunities, it does not appear that Carter continued to withhold relevant information after revealing that he was seeking future lost earnings and income. Nor does it appear that Paradise was precluded from seeking relevant discovery before the discovery deadline.

5     Carter did not provide the computation in his amended disclosures, but stated that they would be provided in Response to Paradise's Second Set of Interrogatories. (ECF No. 188-11) (ECF No. 188-12) Carter served the Response the same day, and the computation was contained therein. (ECF No. 188-12)

6     The Court recognizes that there is a split in authority as to whether the absence of substantial justification and harmlessness automatically results in exclusion. See Taylor v. Mentor Worldwide LLC, 940 F.3d 582, 603-604 (11th Cir. 2019) (J. Carnes, concurring); Circuitronix, LLC v. Kinwong Elec. (Hong Kong) Co., No. 19-12547, 2021 WL 1308336, at *7 (11th Cir. Apr. 8, 2021). Notably, the Eleventh Circuit has not squarely decided this issue.

7     Carter, in his response, references Legionella disease. (ECF No. 209 at 16–18) In its Reply, Paradise claims that Carter has never before disclosed that he suffered from Legionella as a result of drinking water on the ship. (ECF No. 223 at 2) The Court does not have sufficient information before it to determine whether evidence related to Legionella disease should be excluded.

---

**End of Document**        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:18-cv-24190-RS Document 465 Entered on FLSD Docket 05/31/2023 Page 21 of 79

Jimenez v. Deutsche Bank, Not Reported in Fed. Supp. (2012)

2012 WL 13148767
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, El Paso Division.

Diego JIMENEZ and Lori A. Zavala, Plaintiffs,
v.
DEUTSCHE BANK, Defendant.

EP-12-CA-89-FM
|
Signed 12/12/2012

**Attorneys and Law Firms**

Mark Taylor Davis, Law Office of Mark T. Davis, El Paso, TX, for Plaintiffs.

John L. Verner, Jeffrey R. Seewald, McGlinchey Stafford, PLLC, Houston, TX, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

FRANK MONTALVO, UNITED STATES DISTRICT JUDGE

**\*1** On this day, the court considered Defendant Deutsche Bank's ("Defendant") "Defendant's Motion for Judgment on the Pleadings" ("Motion") [ECF No. 11No. 11], filed October 18, 2012; Plaintiff Diego Jimenez and Plaintiff Lori A. Zavala's (collectively "Plaintiffs") "Plaintiff [sic] Response to Defendants [sic] Motion for Judgment on the Pleadings" ("Response") [ECF No. 16No. 16], filed November 9, 2012; and "Defendant's Reply to Plaintiffs' Response to Defendant's Motion for Judgment on the Pleadings" ("Reply") [ECF No. 17No. 17], filed November 16, 2012. After considering the parties' arguments, the applicable law, and the Record as a whole, the court will grant Defendant's Motion.

## I. BACKGROUND

*A. Factual Background*[1]
Plaintiffs purchased real property in El Paso County on or about October 13, 2006, executing a $ 151,050.00 note and deed of trust in the process.[2] On November 5, 2012, Plaintiffs allege they applied and were granted consideration for a loan modification on their existing loan.[3] Plaintiffs contend that they continued to make mortgage payments on the home as they were directed to do, and Defendant accepted trial loan payments from Plaintiffs.[4] In December 2011, the note and deed of trust was assigned to Deutsche Bank.[5] On January 3, 2012, Plaintiffs received a Notice of Acceleration and Notice of Sale.[6] Plaintiffs assert that–until receiving the notices– they believed their home was still under consideration for loan modification by Defendant and that they were current in payments.[7]

*B. Procedural History*
Plaintiffs filed their "Plaintiffs' Original Petition for Declaratory Judgment, Requests for Disclosure" ("Petition") in state court on February 3, 2012.[8] Plaintiffs' Petition alleges they had not been "given the notice of default and opportunity to cure prior to acceleration within the strict time limits imposed by the Deed of Trust and the Texas Property Code regarding the foreclosure of the homestead."[9] Plaintiffs further allege that "[t]he Notice of [S]ale was not posted as required by law, depriving the plaintiffs of a public sale."[10] As a result, Plaintiffs' Petition requests the court to declare "the Foreclosure to be without force and effect and that the foreclosure is invalid and in violation of the Plaintiffs' rights" pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code.[11] Additionally, Plaintiffs bring a breach of contract claim, and seek injunctive relief and relief pursuant to the doctrine of promissory estoppel.[12] The state court also issued a Temporary Restraining Order enjoining the foreclosure on February 3, 2012.[13] On February 16, 2012, the state court signed a Temporary Injunction further enjoining the foreclosure.[14] Plaintiffs filed their First Amended Petition on February 24, 2012, which added a revised registered agent, but otherwise repeated the allegations and claims in the Original Petition.[15]

**\*2** On March 14, 2012, Defendant removed the case to federal court on the basis of diversity jurisdiction.[16] Defendant moves for judgment on the pleadings under Rule 12(c).[17]

*C. Parties' Arguments*
Defendant contends judgment on Plaintiffs' claims is warranted because (1) Plaintiffs cannot recover for breach of

contract because they have no damages and their pleadings admit their own prior breach; (2) Plaintiffs' breach of contract claim amounts to a claim for attempted wrongful foreclosure, which is not recognized under Texas law; (3) Plaintiffs are not entitled to injunctive relief because they fail to plead a tender of the amount of their unpaid loan; and (4) Plaintiffs have failed to plead a cognizable claim for promissory estoppel because an existing contract exists between the parties. [18]

#### 1. *Breach of Contract Claim*

In response, Plaintiffs contend that violations of provisions in the Deed of Trust and Promissory Note "will cause Plaintiffs to lose their home," and further that they incurred attorneys' fees and expenses in the underlying forcible detainer action, in addition to mental anguish damages. [19] Plaintiffs fail to address Defendant's contention that the admission of their own breach of the parties' contract defeats any breach of contract claim, even if Defendant later breached the same contract.

Plaintiffs further contend that the trial modification plan expressly states in writing that foreclosure would not occur during said trial period if payments were timely made. [20] Plaintiffs contend they fully performed under the trial plan but were denied the benefits of a permanent loan modification allegedly signed by Defendant. [21] Plaintiffs generally allege they have sufficiently pleaded the elements of a breach of contract claim.

Defendant points out that Plaintiffs still do not allege any damages caused by the contractual breaches they aver, and therefore maintain that Plaintiffs' breach of contract claim fails. [22]

#### 2. *Wrongful Foreclosure Claim*

Plaintiffs allege that their wrongful foreclosure claim is sufficiently pleaded in their First Amended Petition and contains all elements of a wrongful foreclosure claim. [23] Defendant asserts Plaintiffs' First Amended Petition does not allege a cause of action for wrongful foreclosure. [24] Defendant alleges there is no cause of action for wrongful foreclosure, in the absence of an actual foreclosure. [25] Further, Defendant contends that inadequacy of price at a foreclosure sale is an essential element of a claim for wrongful foreclosure, and that Plaintiffs' pleadings fail to

allege inadequacy in price consequently causing their claim for wrongful foreclosure to fail. [26]

#### 3. *Equitable Relief/Injunctive Relief*

Plaintiffs allege they bring well-founded claims for breach of contract and wrongful foreclosure, and that they have presented sufficient evidence to show the invalidity of Defendant's foreclosure proceedings. [27] As such, Plaintiffs request the court to declare the foreclosure invalid and in violation of the Plaintiffs' rights.

**\*3** Defendant argues that there is no allegation in the First Amended Petition that Plaintiffs are current on their debt, and that this defect is not cured by allegations in Plaintiffs' Response. [28] Further, Defendant argues that Plaintiffs' request for declaratory relief is devoid of any substance, because they have not pleaded any cognizable cause of action. [29]

#### 4. *Promissory Estoppel*

Plaintiffs argue they detrimentally relied on Defendant's written statements and oral representations that foreclosures would not occur during the trial period so long as payments were timely made. [30] Defendant asserts that promissory estoppel is not applicable if there exists a legally valid contract between the parties. [31] Defendant alleges that Plaintiffs acknowledged in their First Amended Petition that a claim for promissory estoppel requires that all the elements of a written agreement be alleged. [32] Defendant asserts that Plaintiffs do not allege the actual terms of any unsigned contract that would support a claim for promissory estoppel. [33]

### II. <u>APPLICABLE LAW</u>

Plaintiffs claim "[b]ecause this case was removed from state court, Texas rules apply, and determine whether plaintiff stated a claim." [34] However, since this case is a removed diversity action, it is now subject to the Federal Rules of Civil Procedure. [35] Rule 81 of the Federal Rules of Civil Procedure specifically provides that, "[t]hese rules apply to a civil action after it is removed from a state court." [36] While Texas substantive law defines the causes of action in this matter, the Federal Rules of Civil Procedure govern this motion pursuant to Rule 12(c).

Case 1:18-cv-24190-RS   Document 465   Entered on FLSD Docket 05/31/2023   Page 23 of 79

Jimenez v. Deutsche Bank, Not Reported in Fed. Supp. (2012)

### A. Federal Rule of Civil Procedure Rule 12(c) Standard

Under Federal Rule of Civil Procedure 12(c), the court " 'must 'accept all material allegations of the complaint and ... construe the complaint in favor of the complaining party.' " [37] A motion under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6). [38] The court must limit its inquiry to facts stated in the complaint and documents either attached to or incorporated into the complaint. [39] Consequently, factual allegations or claims which are presented in a memorandum of law or a brief in support of or opposition of the motion but not contained in the pleadings may not be considered by the court. [40]

Federal Rule of Civil Procedure 8(a)(2) provides, "[a] pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." When a district court reviews a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), it must construe the complaint in favor of the plaintiff and take all well-pleaded facts as true. [41] "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations ... a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do ...". [42] "Factual allegations must be enough to raise a right to relief above the speculative level." [43] "*Twombly* requires that a complaint allege enough facts to state a claim that is plausible on its face." [44] "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [45] "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" under Rule 12(b). [46] The plaintiff must plead specific facts, not merely conclusory allegations, to avoid dismissal. [47]

**\*4** On a Rule 12(b)(6) review, although generally the court may not look beyond the pleadings, the court may examine the complaint, documents attached to the complaint, and documents attached to the motion to dismiss to which the complaint refers and which are central to the plaintiff's claim(s), as well as matters of public record. [48]

Taking judicial notice of public records directly relevant to the issue in dispute is proper on a Rule 12(b)(6) review and does not transform the motion into one for summary judgment. [49] "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." [50]

## III. DISCUSSION

The allegations and factual assertions in Plaintiffs' Response may not be considered for purposes of this Motion. However, even if Plaintiffs' Response is considered, Plaintiffs' claims are not viable.

### A. Breach of Contract Claim

Plaintiffs contend that Defendant breached the Deed of Trust and Promissory Note by failing to give them the opportunity to cure under section 51.002(d) of the Texas Property Code, and failing to meet the notice of sale requirements pursuant to the aforementioned documents before commencing foreclosure proceedings. [51] Section 51.002 of Texas Property Code sets forth the requirements for conducting a sale of real property under a contract lien. Section 51.002(b) requires that notice of the foreclosure sale be given at least 21 days before the sale, [52] and section 51.002(d) requires mortgage servicers to provide the debtor with notice of default and opportunity to cure, 20 days in advance of providing any notice of sale. [53]

To state a claim for breach of contract under Texas law, a plaintiff must allege facts showing that: (1) a valid contract existed between plaintiff and defendant; (2) the plaintiff adequately performed or tendered performance of its own obligations; (3) the defendant breached the contract; and (4) the plaintiff suffered damages as a result of the breach. [54]

Plaintiffs allege that the Deed of Trust and Promissory Notice they signed to secure the indebtedness on the Property constitute an enforceable contract. [55] As noted above, Plaintiffs claim Defendant breached the terms of the Deed of Trust and Promissory Note by commencing a foreclosure sale without performing its obligations under the Deed of Trust

Case 1:18-cv-24190-RS   Document 465   Entered on FLSD Docket 05/31/2023   Page 24 of 79

Jimenez v. Deutsche Bank, Not Reported in Fed. Supp. (2012)

and Promissory Note.[56] Plaintiffs further allege such breach caused them injury, specifically that "Defendant's breach will cause Plaintiffs to lose their home."[57]

**\*5** Defendant seeks to preempt Plaintiffs' breach of contract claim on the premise that they, themselves, are in breach and thus cannot complain of any alleged breach by the Defendant.[58] Defendant argues that, upon default, Plaintiffs lost their right to complain of the terms of the contract that are triggered by the default: Defendant's duty to provide proper notice of default, notice of intent to accelerate, notice of acceleration, and notice of sale. However, "[t]his argument is unsound because the very nature of the provision under the contract regarding notice commences if there is a default by the Debtor ... [a] party to a loan agreement may enforce the terms of that agreement that arise upon the debtor's default."[59]

Alternatively, Defendant argues that Plaintiffs do not have a breach of contract claim "because they do not have any damages, an essential element of an action for breach of contract under Texas law."[60] The court agrees.[61] Plaintiffs' claims are based on a foreclosure sale that could occur sometime in the future. To date, Plaintiffs have suffered no injury as a result of the breach because they are still in possession of the property, and the property was never sold at a foreclosure sale.[62] Accordingly, the court will dismiss Plaintiffs' claim for breach of contract with regard to the Deed of Trust and Promissory Note.

Similarly, to the extent that the alleged loan modification could be interpreted as a separate contract, Plaintiffs fail to plead the necessary damages to establish a breach of contract claim. Furthermore, to be enforceable, the alleged loan modification agreement is required to be in writing and signed, unless an exception to the statute of fraud applies.[63] Plaintiffs have not pleaded that they entered into a written loan modification agreement with Defendant. Thus, any breach of contract claim regarding the alleged loan modification agreement is dismissed. The court addresses the alternative promissory estoppel argument further below.

### B. Wrongful Foreclosure Claim

**\*6** Under Texas law, to state a claim for wrongful foreclosure a plaintiff must allege (1) a defect in the foreclosure proceedings, (2) a grossly inadequate selling price, and (3) a causal connection between the defect

and the grossly inadequate selling price.[64] Plaintiffs' Response unequivocally states that Plaintiffs still reside in their home.[65] "Individuals never losing possession of the property cannot recover on the theory of wrongful foreclosure ... courts in Texas do not recognize an action for attempted wrongful foreclosure."[66] Furthermore, "even if a mortgage holder wrongfully attempts foreclosure, there is no claim for wrongful foreclosure if the mortgagor does not lose possession of the home."[67] "Recovery for wrongful foreclosure is conditioned on the disturbance of the mortgagor's possession based on the theory that the mortgagee has committed a wrong similar to the conversion of personal property."[68] Accordingly, because Plaintiffs are still in possession of the real property, they cannot assert a claim for wrongful foreclosure.

### C. Promissory Estoppel Claim

Promissory estoppel does not apply to a promise covered by a valid contract between the parties, but it does apply to a promise outside the contract.[69] Here, Plaintiffs argue they relied on Defendant's written statements, as well as oral representations, that foreclosure would not occur during the trial modification period so long as payments were timely made.[70] Consequently, this is a promise outside the contract to which promissory estoppel would ordinarily apply.

"Promissory estoppel is normally asserted as a defense but is also available as a cause of action to a promisee who has reasonably relied to his or her detriment on an otherwise unenforceable promise."[71] In the present matter, Defendant raises the affirmative defense of statute of frauds given that the alleged loan modification agreement is not alleged to be in writing or have been signed.[72] "[B]oth Texas state and federal courts have concluded that, generally, both the original loan and any alleged agreement to modify the original loan ... must be in writing."[73]

**\*7** The doctrine of promissory estoppel bars the application of the statute of frauds and permits a court to enforce an otherwise unenforceable oral agreement when "(1) the promisor makes a promise he or she should have expected would lead the promisee to some definite and substantial injury; (2) such an injury occurred; and (3) the court must enforce the promise to avoid the injury."[74] To fall within this exception when there is an oral promise to sign an agreement, "the agreement that is the subject of the promise must comply

with the statute of frauds," that is, "the agreement must be in writing at the time the promise is made." [75] Thus, there must have been a promise to sign a written agreement that had been prepared and that would satisfy the requirements of the statute of frauds. [76] "Promissory estoppel sufficient to remove a contract from the statute of frauds requires that the promisor agree to sign a documents that had already been prepared or 'whose wording had been agreed upon' that would satisfy that statute of frauds." [77] "A mere promise to prepare a written contract is not sufficient." [78]

Although Plaintiffs have alleged that Defendant assured them that it would not foreclose on their property during the trial payment period, they have not alleged that Defendant promised to execute a written document incorporating any agreed-upon terms satisfying the statute of frauds. [79] Because Plaintiffs have not alleged that all material terms of the loan modification had been agreed-upon or that a loan modification had already been prepared only awaiting signature, Defendant is not estopped from raising the statute of frauds. [80] Accordingly, any relief based on promissory estoppel is dismissed.

*D. Equitable Relief*

Declaratory relief is a procedural device for granting a remedy. [81] Declaratory relief does not create any substantive rights or causes of action, and a request for declaratory relief cannot stand alone. [82]

Because Plaintiffs' underlying claims for breach of contract, wrongful foreclosure, and relief under the promissory estoppel doctrine fail, their request for injunctive relief is without basis. [83] Accordingly, Plaintiffs' request for declaratory and injunctive relief is dismissed.

## IV. CONCLUSION AND ORDERS

**\*8** Accordingly, the court enters the following Orders:

1. "Defendant's Motion for Judgment on the Pleadings" [ECF No. 11No. 11] is **GRANTED**.

2. Plaintiffs' claims against Defendant are **DISMISSED WITHOUT PREJUDICE**.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2012 WL 13148767

---

## Footnotes

1    Except where noted, the following facts are undisputed.

2    *See* "Plaintiffs' Original Petition for Declaratory Judgment, Requests for Disclosure," at 6-7, Exhibit A [ECF No. 1-1No. 1-1]; *see also* "Plaintiffs' First Amended Original Petition for Declaratory Judgment, Requests for Disclosure," at 37, Exhibit A [ECF No. 1-1No. 1-1].

3    "Plaintiff's Response to Defendants Motion for Judgment on the Pleadings," at 2, Exhibit A [ECF No. 16No. 16]; *see also* "Plaintiffs' First Amended Original Petition for Declaratory Judgment, Requests for Disclosure," at 39, Exhibit A [ECF No. 1-1No. 1-1].

4    *Id.*; *see also* "Plaintiff's Response to Defendants Motion for Judgment on the Pleadings," at Exhibit B [ECF No. 16No. 16] (Affidavit of Diego Jimenez explaining that every requirement sought in the loan modification letter was fulfilled and every payment was submitted as requested).

5    *See* "Plaintiff's Response to Defendants Motion for Judgment on the Pleadings," at 2 [ECF No. 16No. 16].

6    *Id.*

7       *Id.*

8       *See* ECF No. 1-1, at 6No. 1-1, at 6.

9       *Id.* at 7; *see also* "Plaintiffs' First Amended Original Petition for Declaratory Judgment, Requests for Disclosure," at 37, Exhibit A [ECF No. 1-1No. 1-1].

10      *Id.*

11      *Id.*

12      *See* "Plaintiffs' Original Petition for Declaratory Judgment, Requests for Disclosure," at 7-10 [ECF No. 1-1No. 1-1].

13      *See* "Temporary Restraining Order," at 4-5 [ECF No. 1-1No. 1-1].

14      *See* "Temporary Injunction," at 32-33 [ECF No. 1-1No. 1-1].

15      "Plaintiffs' First Amended Original Petition for Declaratory Judgment, Requests for Disclosure," at 36-41 [ECF No. 1-1No. 1-1].

16      *See* "Defendant's Notice of Removal" [ECF No. 1No. 1].

17      "Defendant's Motion for Judgment on the Pleadings" ("Mot.") [ECF No. 11No. 11].

18      Mot., at 1.

19      Resp., at 5,7.

20      *Id.* at 7.

21      *Id.*

22      Reply, at 4.

23      Resp., at 8.

24      Reply, at 4.

25      *Id.*

26      *Id.* at 5.

27      Resp., at 9.

28      Reply, at 5.

29      *Id.*

30      Resp., at 10.

31      Reply, at 5.

32      *Id.*

33      *Id.*

Case 1:18-cv-24190-RS   Document 465   Entered on FLSD Docket 05/31/2023   Page 27 of 79

Jimenez v. Deutsche Bank, Not Reported in Fed. Supp. (2012)

34    Resp., at 4.

35    *See* 🚩*Robinson v. Roxy Investments, L.P.*, 249 F.R.D. 485, 487 (S.D. Miss. 2008) (citing 🚩*Hanna v. Plumer*, 380 U.S. 460, 473-74 (1965)).

36    *Id.* (citing Fed. R. Civ. P. 81).

37    🚩*Association of American Physicians & Surgeons, Inc. v. Texas*, 627 F.3d 547, 550 (5th Cir. 2010) (quoting 🚩*Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988)).

38    🚩*Doe v. MySpace, Inc.*, 528 F.3d 413, 419 (5th Cir. 2008); 🚩*Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004).

39    🚩*Wilson v. Birnberg*, 667 F.3d 591, 600 (5th Cir. 2012) (quoting 🚩*Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996) (internal quotations omitted)).

40    *Id.*

41    🚩*Randall D. Wolcott, MD, PA v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (citing 🚩*Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009)).

42    🚩*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and internal quotations omitted).

43    *Id.* (citations omitted).

44    🚩*St. Germain v. Howard*, 556 F.3d 261, 263 n. 2 (5th Cir. 2009) (citing 🚩*In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)).

45    *Montoya v. FedEx Ground Package System, Inc.*, 614 F.3d 145, 148 (5th Cir. 2010) (quoting 🚩*Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009)).

46    🚩*Iqbal*, 556 U.S. at 678.

47    🚩*Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

48    🚩*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing 🚩*Collins*, 224 F.3d at 498–99; *see also* 🚩*Cinel v. Connick*, 15 F.3d 1338, 1341, 1343 n. 6 (5th Cir. 1994); 🚩*United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 379 (5th Cir. 2003)).

49    🚩*Funk v. Stryker Corp.*, 631 F.3d 777, 780 (5th Cir. Jan. 25, 2011).

50    Fed. R. Evid. 201(b).

51    "Plaintiffs' First Amended Original Petition for Declaratory Judgment, Requests for Disclosure," at 37-38 [ECF No. 1-1No. 1-1].

52    🚩Tex. Prop. Code § 51.002(b).

Case 1:18-cv-24190-RS Document 465 Entered on FLSD Docket 05/31/2023 Page 28 of 79

Jimenez v. Deutsche Bank, Not Reported in Fed. Supp. (2012)

53 &#9873; Tex. Prop. Code § 51.002(d).

54 *See American Exp. Centurion Bank v. Minckler*, 345 S.W.3d 204, 208 (Tex. App.–Dallas 2011); *see also James M. Clifton, Inc. v. Premillenium, Ltd.*, 229 S.W.3d 857, 859 (Tex.App.–Dallas 2007, no pet.); &#9873; *Barnett v. Coppell N. Tex. Ct. Ltd.*, 123 S.W.3d 804, 815 (Tex.App.–Dallas 2003, pet. denied); &#9873; *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 593 (Tex.App.–Houston [14th Dist.] 2000, no pet.).

55 Resp., at 5.

56 *Id.*

57 *Id.*; *see also* "Plaintiffs' First Amended Original Petition for Declaratory Judgment, Requests for Disclosure," at 39 [ECF No. 1-1No. 1-1].

58 Mot., at 4; Reply, at 3.

59 *See Carrisalez v. Bank of America, N.A.*, Civil Action No. C-12-87, 2012 WL 5377788, at *2 (S.D. Tex. 2012) (citing &#9873; *Shumway v. Horizon Credit Corp.*, 801 S.W.2d 890 (Tex. 1991); *see also* &#9873; *Abraham v. Ryland Mortg. Co.*, 995 S.W.2d 890, 894 (Tex.App.–El Paso 1999, no pet); &#9873; Tex. Prop. Code § 51.002 (lender required to provide borrower with notice of the foreclosure sale)); *but see Hill v. Wells Fargo Bank, N.A.*, Civil Action No. V-12-11, 2012 WL 2065377, at *4-5 (S.D. Tex. 2012); &#9873; *Mitchell v. Chase Home Fin. LLC*, 2008 WL 623395, *4 (N.D. Tex. 2008) (holding that, because a plaintiff admitted that he/she defaulted on his/her mortgage loan, a plaintiff is precluded from bringing a breach of contract action for its alleged subsequent breach in the context of HUD regulations).

60 Mot., at 4.

61 The court notes that Plaintiffs, in their response, allege they have suffered damages by incurring attorneys's fees, and expenses in the underlying forcible detainer action, in addition to mental anguish damages. However, attorneys' fees are in the nature of costs, not damages. *See* &#9873; *Alma Group, LLC v. Palmer*, 143 S.W.3d 840, 845-46 (Tex. App.–Corpus Christi 2004). Similarly, any litigation expenses, including litigant's loss of time, are not recoverable as damages unless expressly provided for by statute or contract. *See* &#9873; *Eberts v. Businesspeople Personnel Services, Inc.*, 620 S.W.2d 861 (Tex. Civ. App.–Dallas 1981). Further, mental anguish damages are generally not recoverable in an action for breach of contract, or in a tort action from a contractual breach. *See* &#9873; *Latham v. Castillo*, 972 S.W.2d 66 (Tex. 1998); *see also* &#9873; *Stewart Title Guar. Co. v. Aiello*, 941 S.W.2d 68 (Tex. 1997). Plaintiffs have not pleaded any facts that would place this matter within any exceptions to this general rule.

62 *See Mortberg v. Litton Loan Servicing, L.P.*, No. 4:10-CV-668, 2011 WL 4431946, at *7 (E.D. Tex. 2011).

63 Tex. Bus. & Com. Code § 26.02(b); *see also* &#9873; *Bank of Tex., N.A. v. Gaubert*, 286 S.W.3d 546, 555 (Tex.App.–Dallas 2009, pet. dism'd).

64 &#9873; *Sauceda v. GMAC Mortg. Corp.*, 268 S.W.3d 135, 139 (Tex.App.–Corpus Christi 2008, no pet.) (citations omitted).

65 Resp., at 9.

66    *Baker v. Countrywide Home Loans, Inc.*, No. 3:08-CV-0916-B, 2009 WL 1810336, *4 (N.D. Tex. 2009) (citation omitted); *see also Sander v. Citimortgage, Inc.*, Civ. A. No. 4:09CV566, 2011 WL 1790732, *2 (E.D. Tex. 2011) ("Recovery [for wrongful foreclosure] is premised upon loss of possession of real property, and individuals never losing possession of that property cannot recover on a theory of wrongful foreclosure.") (citations omitted).

67    *Smith v. J.P. Morgan Chase Bank N/A*, Civ. A. No. H-10-3730, 2010 WL 4622209, *2 (S.D. Tex. 2010).

68    *Motten v. Chase Home Finance*, 831 F.Supp.2d 988, 1007-08 (S.D. Tex. 2011) (quoting *Peterson v. Black*, 980 S.W.2d 818, 823 (Tex. App.–San Antonio 1998)).

69    *Richter v. Wagner Oil Co.*, 90 S.W.3d 890, 899 (Tex.App.–San Antonio 2002, no pet.); *see also El Paso Healthcare System, Ltd. v. Piping Rock Corp.*, 939 S.W.2d 695, 699 (Tex.App.–El Paso, 1997, writ denied).

70    Resp., at 9.

71    *Rhodes v. Wells Fargo Bank, N.A.*, Civil Action No. 3:10-CV-02347-L, 2012 WL 5363424, at *18 (N.D. Tex. 2012) (citing *Gold Kist Inc. v. Carr*, 886 S.W.2d 425, 431 (Tex.App.–Eastland 1994, pet. denied); *Kelly v. Rio Grande Computerland Grp.*, 128 S.W.3d 759, 769 (Tex.App.–El Paso 2004, no pet.)); *see also Kenney v. Porter*, 604 S.W.2d 297, 303 (Tex.Civ.App.–Corpus Christi 1980, ref. n.r.e.); *Fretz Const. Co. v. Southern Nat. Bank, Etc.*, 626 S.W.2d 478, 481-83 (Tex. 1981).

72    Reply, at 5; Under Texas law, "[a] loan agreement in which the amount involved ... exceeds $ 50,000 in value is not enforceable unless the agreement is in writing and signed by the party to be bound or by that party's authorized representative." Tex. Bus. & Com. Code § 26.02(b).

73    *See Wiley v. U.S. Bank, N.A.*, No. 3:11-CV-1241-B, 2012 WL 1945614, at *6 (N.D. Tex. May 30, 2012) (quoting *Montalvo v. Bank of Am. Corp.*, No. SA-10-CV-360-XR, 2012 WL 1078093, at *13 (W.D. Tex. March 30, 2012)); *see also McDonald v. Deutsche Bank Nat. Trust Co.*, Civil Action No. 3:11-CV-2691-B, 2012 WL 2122168, at *5 (N.D. Tex. 2012).

74    *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 438 (Tex.App.–Dallas 2002, pet. denied) (citing *Nagle v. Nagle*, 633 S.W.2d 796, 800 (Tex. 1982); *"Moore" Burger Inc. v. Phillips Petrol. Co.*, 492 S.W.2d 934, 936 (Tex. 1972)); *see also Casey v. Federal Home Loan Mortg. Ass'n*, Civil Action No. H-11-3830, 2012 WL 1425138, at *6 (S.D. Tex. 2012) (citing *Bank of Tex., N.A. v. Gaubert*, 286 S.W.3d 546, 553 (Tex.App.–Dallas 2009, pet. dism'd)).

75    *Id.* (citations omitted); *see also Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 549 (5th Cir. 2010) ("Under Texas law, promissory estoppel requires that agreement that is subject of the promise must comply with the statute of frauds. That is, the agreement must be in writing at the time of the oral promise to sign it.") (citation and internal quotations omitted).

76    *Nagle*, 633 S.W.2d at 800.

Case 1:18-cv-24190-RS   Document 465   Entered on FLSD Docket 05/31/2023   Page 30 of 79

Jimenez v. Deutsche Bank, Not Reported in Fed. Supp. (2012)

77 ⚑ *Rhodes*, 2012 WL 5363424, at *18 (quoting ⚑ *Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 769 (5th Cir. 1998)).

78 *Id.* (citing ⚑ *Beta Drilling Inc. v. Durkee*, 821 S.W.2d 739, 741 (Tex.App.–Houston [14th Dist.] 1992, writ denied)).

79 *See* ⚑ *Miller v. BAC Home Loans Servicing LP*, No. 6:11-CV-22, 2012 WL 1206510, at *6-7 (E.D. Tex. Mar. 23, 2012) (quoting ⚑ *Ford v. City Bank of Palacios*, 44 S.W.3d 121, 139 (Tex.App.–Corpus Christi 2001, no pet.)) (when seeking to circumvent the statute of frauds, a plaintiff must plead that the " 'promisor promised to sign a written document complying with the statute of frauds' to create an exception.").

80 *See* ⚑ *EP Operating Co. v. MJC Energy Co.*, 883 S.W.2d 263, 269 (Tex.App.–Corpus Christi 1994, writ denied) ("[P]romissory estoppel does not apply to promises concerning an agreement the terms of which are still uncertain and subject to negotiation.").

81 ⚑ *Sid Richardson Carbon & Gasoline Co. v. Interenergy Res., Ltd.*, 99 F.3d 746, 752 n.3 (5th Cir. 1996)

82 *Id.*

83 *See* ⚑ *Valdez v. Federal Home Loan Mortg. Corp.*, Civil Action No. 3:11-cv-1363, 2011 WL 7068386, at *3 (N.D. Tex. 2011) (citing ⚑ *DSC Comm. Corp. v. DGI Techs, Inc.*, 81 F.3d 597, 600 (5th Cir. 1996)).

---

**End of Document**                                           © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 7864100
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

MARINE DEPOT, INTERNATIONAL, INC., Plaintiff,

v.

JAMES RIVER GROUP, INC., Defendant.

CASE NO.: 19-CV-24821-CANNON/LOUIS

|

Signed 12/30/2020

**Attorneys and Law Firms**

Alice Ferot, Joshua Shore, Rossana Arteaga-Gomez, Andrew Edward Beaulieu, Jeffrey W. Gutchess, Axs Law Group PLLC, Miami, FL, Anthony Vicken Narula, Axs Law Group, PLLC, Wynwood, FL, for Plaintiff.

Barry L. Davis, Daniel R. Lever, Clyde & Co. US LLP, Miami, FL, for Defendant.

## ORDER ON MOTION FOR SANCTIONS

LAUREN F. LOUIS, UNITED STATES MAGISTRATE JUDGE

**\*1** **THIS MATTER** comes before the Court on Defendant James River Group, Inc.'s ("James River") Motion for Sanctions and Dismissal (ECF No. 75) to which Plaintiff Marine Depot International, Inc. ("MDI") responded in opposition (ECF No. 87) and Defendant replied (ECF No. 94). This Matter has been referred to the undersigned by the Honorable Aileen Cannon, United States District Judge (ECF No. 174). [1] A hearing was held on the Motion on August 28, 2020. Having reviewed the Motion, the evidence provided at the hearing, the record and being otherwise duly advised in the matter, the undersigned hereby finds that the Motion should be **GRANTED, in part** as follows.

### I. BACKGROUND

This lawsuit stems from the alleged breach of a contract for James River's failure to purchase an India-based IT service company called Ayassure, which was established by Plaintiff at the behest of, and run jointly with, Defendant (ECF No. 17). Since the filing of this lawsuit, the Parties have appeared before the undersigned nine times regarding various

discovery disputes (ECF Nos. 52; 70; 73; 81; 83; 102; 124; 134; 168). [2] At these hearings, the undersigned has largely found that Plaintiff has failed to comply with the rules of discovery and/or with her previous discovery orders (*id.*). These discovery violations included Plaintiff's unjustified and untimely cancelation of a deposition (ECF No. 70), failure to produce documents in a useable format (ECF No. 81), and Federal Rule of Civil Procedure Rule 26 violations regarding its expert disclosure (ECF No. 83), among other issues. As a result of these failures, Plaintiff has already twice been ordered to pay fees to Defendant pursuant to Federal Rule of Civil Procedure Rule 37(a)(5)(A) (ECF Nos. 70; 83).

The hearing held on August 28, 2020, addressed Defendant's Motion for Sanctions (ECF No. 75), which seeks dismissal of Plaintiff's Complaint based on three categories of discovery violations: (1) that Plaintiff's initial disclosures failed to properly identify specific monetary amounts for each damage category and failed to identify any materials from which the computations were derived; (2) that Plaintiff has failed to search for and produce relevant documents stored on Plaintiff's computers and servers in violation of its discovery obligation; and (3) that Plaintiff failed to organize and label the first 50 documents produced with bates numbers to correspond to the categories in the request for production, as required for they were not produced in manner kept in the normal course of business. At the August 28th hearing, Defendant also raised an additional discovery issue related to the production of corrupted WhatsApp message files.

**\*2** At the time of the hearing, the issue regarding the first 50 documents produced had already been resolved. The Court addressed the remaining issues and ordered that Plaintiff amend its initial disclosures to comply with Federal Rule of Civil Procedure Rule 26, and produce a log that would allow Defendant to identify by bates number the uncorrupted version of each WhatsApp message that was also produced as a corrupted file, by no later than September 2, 2020 (ECF No. 102). As to the sought-after sanctions, the undersigned grants the Motion in part as follows.

### II. DISCUSSION

Federal Rule of Civil Procedure Rule 37 governs a party's failures to make disclosures or participate in discovery, and the imposition of sanctions related to discovery violations. Specifically, Rule 37(b) provides courts with the authority to impose sanctions for a party's failure to comply with a court

order to permit or provide discovery. Fed. R. Civ. P. 37(b)(2)(A). Rule 37(b)(2) authorizes the following sanctions orders:

    i. directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

    ii. prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

    iii. striking pleadings in whole or in part;

    iv. staying further proceedings until the order is obeyed;

    v. dismissing the action or proceeding in whole or in part;

    vi. rendering a default judgment against the disobedient party; or

    vii. treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

*Id.* While sanctions pursuant to Rule 37(b) may include the striking of pleadings or rendering a default judgment against the disobedient party, such sanctions should not be imposed if a lesser sanction would adequately ensure compliance with future court orders. *Allstate Ins. Co. v. Palterovich*, No. 04-21402-CIV, 2008 WL 2741119, at *1 (S.D. Fla. Jul. 12, 2008) (citing *Immuno Vital, Inc. v. Telemundo Grp., Inc.*, 203 F.R.D. 561, 571 (S.D. Fla. 2001)).

### i. Dismissal

As explained at the August 28th hearing, the violations about which Defendant complains do not warrant the sanction of dismissal. "While Federal Rule of Civil Procedure Rule 37(b)(2)(A)(v) permits the district court to dismiss an action in whole or in part against a party who fails to comply with court orders regarding discovery, in imposing that sanction, the district court must make a finding of willful or bad faith failure to comply with court orders." *Aranda v. Pashkevich*, No. 11-60492-CIV, 2012 WL 12859817, at *1 (S.D. Fla. Feb. 22, 2012); *see also Jenkins v. Sec. Engineers, Inc.*, 798 F. App'x 362, 369 n.5 (11th Cir. 2019) ("A district court may dismiss a case for abuse of the discovery process only when (1) a party has wilfully or with bad faith failed to obey a discovery order, and (2) less drastic sanctions would not ensure compliance with the court's orders.") (citing

*Malautea v. Suzuki Motor Co. Ltd.*, 987 F.2d 1536, 1542 (11th Cir. 1993)). While there has been an ongoing pattern of discovery issues and violations, the undersigned does not find that Plaintiff has acted in bad faith or with willful intent. Thus, Defendant's request for Dismissal is **DENIED**. However, the undersigned finds the imposition of lesser sanctions to be appropriate.

### ii. Plaintiff's Initial Disclosures

Pursuant to Federal Rule of Civil Procedure Rule 26(a)(1)(A)(iii), a party must provide as part of its initial disclosure "a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered." By its very definition, the disclosure required by the Rule is one that is capable of computation.

**\*3** Plaintiff filed its initial disclosures on January 6, 2020, listing the following in lieu of a computation of each category of damages: "1. All damages resulting from James River's refusal to purchase Ayassure, including damages in the amount of the capital, resources, labor, expenditures contributed by MDI to Ayassure, as well as its the lost opportunities foregone by MDI to establish Ayassure, and the lost profits from the sale that never happened; 2. Pre-judgment and post-judgment interests; and 3. Any other damages to which MDI is entitled." Failing to assign any value or calculation of damages to each category, Defendant first raised issue with Plaintiff's initial disclosures in its notice of a June 25, 2020 discovery hearing (ECF No. 50). Following that June 25th hearing, the Court ordered Plaintiff to amend its initial disclosures to include specific monetary amounts (ECF No. 52, ¶ 3).

On July 2, 2020, Plaintiff provided amended initial disclosures broadly claiming "1. All damages resulting from James River's refusal to purchase Ayassure, including: (a) Damages in the amount of $7.5 million as agreed between the parties for the purchase of Ayassure; (b) Damages in excess of $4 million for unjust enrichment; (c) Damages resulting from the capital, resources, labor, expenditures contributed by MDI to Ayassure, as well as its lost opportunities foregone by MDI to establish Ayassure, and the lost profits from the sale that never happened; 2. Pre-judgment and post-judgment interests; and 3. Any other damages to which MDI

is entitled." Plaintiff again failed to comply with Rule 26(a)(1)(A)(iii), and the Court's Order, for it failed to provide a monetary amount for the damages claimed in section 1(c), and provided no basis for the computation of the amount demanded in section 1(b) for unjust enrichment. Moreover, Plaintiff failed to provide or identify any materials on which their computations were based. Thus, at the July 23, 2020 hearing, the Court again ordered, *ore tenus*, Plaintiff to amend its initial disclosures.

The second amended initial disclosures, dated August 11, 2020, still failed to provide a monetary value for the damages resulting from "the capital, resources, labor, expenditures contributed by MDI to Ayassure, as well as its the lost opportunities foregone by MDI to establish Ayassure, and the lost profits from the sale that never happened" and again failed to provide any substantiated basis for the computation for the monetary amount claimed for unjust enrichment. For a third time, Defendant brought this deficiency before the Court in its Motion for Sanctions.

At the August 28 th hearing, Plaintiff (through counsel) conceded that it has no intention of advancing a damages theory resulting from "the capital, resources, labor, expenditures contributed by MDI to Ayassure, as well as its the lost opportunities foregone by MDI to establish Ayassure, and the lost profits from the sale that never happened." Yet Plaintiff's counsel attempted to defend its disclosures, with respect to damages claimed, as not inaccurate.

"Rule 26(a)'s purposes are to allow for adequate case preparation and foreclose unfair surprises ... The initial disclosure requirement should be applied with common sense keeping in mind the salutary purposes that the rule is intended to accomplish." *Sec. & Exch. Comm'n v. Montano*, No. 618CV1606ORL31GJK, 2019 WL 2254946, at *2 (M.D. Fla. Mar. 5, 2019) (citations omitted). If a party fails to make a disclosure required by Rule 26(a), any other party may move to compel disclosure and for appropriate sanctions. Fed. R. Civ. P. 37(a)(3)(A).

Rule 37(c) also permits sanctions for failing to adequately disclose witnesses or to supplement initial disclosures without a court order. *Kendall Lakes Towers Condo. Ass'n, Inc. v. Pac. Ins. Co.*, No. 10-24310-CIV, 2011 WL 6190160, at *6 n.3 (S.D. Fla. Dec. 2, 2011). Plaintiff indisputably failed to supplement its disclosures without court order, and counsel's failure to appreciate or acknowledge that failure was troubling. Nonetheless, the failure sounds in neglect,

not willfulness, and a lesser sanction is available to deter the conduct and cure the prejudice to Defendant. Plaintiff will be precluded from introducing at trial any evidence of damages not specifically described in its second amended disclosures and for which Plaintiff has failed to produce evidentiary support. *Ctr. for Individual Rights v. Chevaldina*, No. 16-20905-CIV, 2018 WL 2432109, at *11 (S.D. Fla. May 30, 2018).

**\*4** Moreover, because Defendant has had to bring this issue before the Court no less than three times in an attempt to obtain initial disclosures that comply with Rule 26, Defendant will be compensated for the fees incurred in doing so.

### iii. Plaintiff's Servers

Defendant avers that Plaintiff failed to search its computers and servers for responsive documents, and that this failure is a blatant violation of Plaintiff's ESI discovery obligation. Defendant primarily supports this argument with the absence of documents that Defendant contends should exist, but which have not been produced. For example, Defendant argues that if Plaintiff anticipated imminent purchase of the contested business by Defendant, as alleged, there should be some communication and/or business plans contemplating such a sale, yet none have materialized. Plaintiff insists—and presented two witness to testify at the sanctions hearing—that all relevant documents created by the principle actors were saved on web-based applications, namely email accounts, and documents from these email accounts were collected for production to Defendant. Likewise, Plaintiff avers that all Ayassure documents were required to be saved on web-based applications per Defendant's own policy. Thus, Plaintiff contends they have no reason to believe that any non-duplicative responsive documents reside on Plaintiff's computers and servers and, in turn, its decision not to search them does not violate its ESI discovery obligation.

Plaintiff has an obligation under Federal Rule of Civil Procedure Rule 34 to either provide all documents responsive to Defendant's request, or to object to providing certain documents Plaintiff intends to withhold. However, Rule 34 is silent as to how a party must locate these responsive documents, and the measures a party must take in conducting its search. Nor has any case law been brought to the Court's attention that would require Plaintiff to search a location that it has no reason to believe responsive documents would be located. This Court recognizes the "enormous burden and expense of electronic discovery." *Finnerty v. Stiefel Labs., Inc.*, 900 F. Supp. 2d 1317, 1321 (S.D. Fla. 2012). Thus,

as expressed at the August 28th hearing, the Court will not require Plaintiff to conduct additional discovery where Defendant has not provided any factual basis for its belief that the additional search of Plaintiff's server is necessary, or to rebut Plaintiff's sworn testimony that there are no relevant, non-duplicative documents stored there. For this same reason, the Court finds sanctions are not appropriate based on this alleged issue at this time.

### iv. Attorney's Fees

After the hearing, Defendant was instructed to submit evidence on the issue of fees incurred in pursuit of the Motion for Sanctions. In total, defense counsel verified a total of 67.4 hours of his time incurred in the drafting of the Motion, reply, preparation for and attendance at the hearing on the Motion. At an hourly rate of $290.00, Defendant seeks sanctions in the amount of $19,546.00. Plaintiff opposes any award, arguing that Defendant failed to seek fees as a sanction, and because dismissal was denied, Defendant lost the Motion and is entitled to no fee shifting under Rule 37(a)(5)(A). Plaintiff further argues that Defendant failed to confer about the initial disclosures before bringing the third deficient disclosures to the Court's attention, and moreover that Defendant's counsel was not prejudiced by the deficient disclosures because Plaintiff's damages expert had since given his opinion, which does not include a calculation for the contested categories of loss. Finally, Plaintiff challenges the amount of fees sought as unreasonable, but without specifically challenging any particular time entry or the hourly rate; and urges the Court to withhold an order of sanctions against Plaintiff because it cannot afford to pay them.

**\*5**  Plaintiff's objections are not well placed. Defendant's demand for fees is in tandem with its request for dismissal, and the Court's authority to award fees as a sanction draws not from Defendant's success on the Motion but Plaintiff's violation of a Court Order. Moreover, I find an award of sanctions in the form of attorney's fees appropriate here because until the Motion was heard, Plaintiff's discovery violations ran rampant; even at the hearing, *another* deficiency was raised and though not considered for purposes of awarding sanctions, Plaintiff was ordered to correct yet another deficient production. In short, Plaintiff's persistent failure to meet its discovery obligations necessitated Defendant's pursuit of the present Motion, and the fees reasonably incurred in its prosecution should be borne by the offending party. And though Plaintiff's objections to the reasonableness of the amount of fees sought are too general

for the Court to meaningfully entertain, the undersigned has conducted her own examination of counsel's time diaries, and makes the following findings.

I find defense counsel's hourly rate to be reasonable in this market for an attorney of similar skill and experience in a comparable case, and will base this award on his rate of $290.00 per hour. Counsel's time may be broken into the following categories of tasks: drafting the motion; reviewing the Plaintiff's response; preparing a reply; preparing for the hearing and attending the hearing. The time incurred by defense counsel is proportional to the gravity of the ask, that is, his time is reflective of pursuing a motion that seeks dismissal of the action. Considering the very settled law in this Circuit that "dismissal is justified only in extreme circumstances and as a last resort," *Wouters v. Martin Cty., Fla.*, 9 F.3d 924, 933 (11th Cir. 1993), dismissal was an unreasonable expectation here. And similarly, the time incurred exceeded that which was reasonable under the circumstances.

Having scrutinized defense counsel's time diaries and being otherwise familiar with this case, I find that Plaintiff be sanctioned in an amount of $9,715.00. This total is based on 8 hours of time for drafting the Motion and reply (each); 4.5 hours of attending the evidentiary hearing; 1 hour spent in conferral with Plaintiff's counsel over admissibility of exhibits; and 12 hours of hearing preparation, for a total of 33.5 hours of counsel's time.

In making this finding, I have afforded little consideration to Plaintiff's unsubstantiated averment that it lacks the ability to pay any award. Plaintiff's repeated discovery deficiencies and indeed violation of this Court's Order have unnecessarily increased the cost of discovery in this dispute and as noted above, necessitated the pursuit of this Sanctions Motion. Finally, I will note that following the hearing on the Motion, discovery disputes raised in this case focused on the merits, not the procedural deficiency of Plaintiff, further supporting my conclusion that the Motion was necessitated by Plaintiff's own misconduct. For all the reasons stated, I order an award of sanctions to Defendant in the amount of $9,715.00.

### III. CONCLUSION

For the forgoing reasons, the undersigned hereby orders that Defendant's Motion for Sanctions and Dismissal be **GRANTED, in part**, and that Defendant be awarded, as

sanctions, fees in the amount of $9,715.00, and that Plaintiff
be required to satisfy that award within 14 days of this Order.

**DONE** and **ORDERED** in Chambers at Miami, Florida this
30th day of December, 2020.

**All Citations**

Slip Copy, 2020 WL 7864100

## Footnotes

1       This Motion was initially referred to the undersigned by the Honorable Kathleen M. Williams, United States
        District Court Judge, for a report and recommendation (ECF No. 76); upon reassignment, Judge Cannon has
        referred all pretrial dispositive and non-dispositive matters for all necessary and proper actions as required
        by law. Because the relief granted herein is not dispositive, and arises from violations of discovery obligations
        and orders, an order is appropriate to dispose of the Motion.

2       Three of these discovery hearings were held subsequent to the hearing on this Motion.

---

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

929 F.3d 1334
United States Court of Appeals, Eleventh Circuit.

PIER 1 CRUISE EXPERTS, a Brazil corporation, Plaintiff-Appellee-Cross-Appellant,

v.

REVELEX CORPORATION, a Florida corporation, Defendant-Appellant-Cross-Appellee.

Nos. 17-13956; 17-15623
|
(July 11, 2019)

**Synopsis**

**Background:** Travel agency brought action against software contractor for breach of contract and negligent misrepresentation. The United States District Court for the Southern District of Florida, No. 9:16-cv-80567-WPD, William P. Dimitrouleas, J., 2017 WL 7355328, entered judgment as a matter of law in favor of contractor on agency's lost profits claim, entered judgment on jury verdict in favor of agency on other claims, and denied agency's request for attorney fees. Both parties appealed.

**Holdings:** The Court of Appeals, Newsom, Circuit Judge, held that:

[1] contractor waived its argument on appeal that its scope of work agreement with agency was not independent of its service agreement with agency;

[2] evidence was too speculative to support award of lost profit damages under Florida law;

[3] Florida statute permitting courts to engraft a reciprocity condition onto contractual attorneys'-fee provisions did not permit travel agency to collect fees for its breach of contract and negligent misrepresentation claims; and

[4] Court of Appeals would certify to Florida Supreme Court questions concerning the enforceability of a contractual exculpatory clause.

Affirmed in part; questions certified.

**Procedural Posture(s):** On Appeal; Motion for Judgment as a Matter of Law (JMOL)/Directed Verdict; Judgment; Motion for Attorney's Fees; Certified Question.

West Headnotes (17)

**[1]** Federal Courts ⚖ Taking case or question from jury; judgment as a matter of law

Federal Courts ⚖ Contracts

The Court of Appeals reviews de novo questions of contract interpretation, as well as a district court's entry of judgment as a matter of law.

**[2]** Federal Courts ⚖ Defenses

Software contractor waived its argument on appeal that its scope of work agreement with travel agency was not independent of its service agreement with the agency, and thus did not survive district court's invalidation of the service agreement, where contractor stipulated at trial that the scope of work agreement had survived as a valid agreement.

**[3]** Contracts ⚖ Construing instruments together

Under Florida law, documents executed by the same parties, on or near the same time, and concerning the same transaction or subject matter are generally construed together as a single contract.

2 Cases that cite this headnote

**[4]** Contracts ⚖ Construing instruments together

Under Florida law, where a writing expressly refers to and sufficiently describes another document, the other document, or so much of it as is referred to, is to be interpreted as part of the writing.

1 Case that cites this headnote

**[5]** Damages ⚖ Loss of Profits

To recover lost profits under Florida law, a plaintiff must prove that 1) the defendant's

action caused the damage and 2) there is some standard by which the amount of damages may be adequately determined.

**[6]**    **Damages** 🔑 Loss of profits

To recover lost profits under Florida law, the precise amount of lost profits need not be definitively proven, but it must be established with reasonable certainty; there must, in short, be a reasonable yardstick by which to estimate the damages.

1 Case that cites this headnote

**[7]**    **Damages** 🔑 Loss of profits

Under Florida law, an award of lost profits must be supported by evidence and cannot be based on mere speculation or conjecture.

1 Case that cites this headnote

**[8]**    **Damages** 🔑 Loss of profits

Lay testimony of travel agency's financial manager and evidence of agency's historical revenues and expenses was too speculative to support award of lost profit damages under Florida law in agency's breach of contract action against software contractor; manager projected that agency would have doubled the number of cruises sold through online sales alone if the contractor's cruise booking software had worked and that the agency's expenses would have increased by 10%, but never explained why it was reasonably certain that the agency's sales would increase or adequately justify her 10% expense increase figure, and agency did not provide basis for jury to determine its profits from missed online sales based on its existing offline sales.

**[9]**    **Costs, Fees, and Sanctions** 🔑 Requisites and validity; reciprocity

Florida statute permitting courts to engraft a reciprocity condition onto contractual attorney-fee provisions did not permit travel agency to collect fees for its breach of contract

and negligent misrepresentation claims against software contractor, where parties' service agreement only permitted contractor to collect attorney fees incurred in collecting delinquent fees. 🚩 Fla. Stat. Ann. § 57.105(7).

1 Case that cites this headnote

**[10]**    **Contracts** 🔑 Exemption from liability

Although "not looked upon with favor" by Florida courts, an exculpatory clause is enforceable so long as (1) the contracting parties have equal bargaining power and (2) the clause's provisions are clear and unambiguous.

1 Case that cites this headnote

**[11]**    **Contracts** 🔑 Exemption from liability

Under Florida law, the intention to be relieved from liability pursuant to an exculpatory clause must be made clear and unequivocal and the wording must be so clear and understandable that an ordinary and knowledgeable person will know what he is contracting away.

**[12]**    **Contracts** 🔑 Exculpatory contracts

Under Florida law, exculpatory clauses are strictly construed against the party seeking to be relieved of liability.

**[13]**    **Contracts** 🔑 Exemption from liability

Exculpatory clause in service agreement between software contractor and travel agency, expressly insulating the contractor from any damages, whether in contract, tort, or otherwise, was not invalid as a matter of public policy under Florida law; parties had equal bargaining power, and clause unambiguously communicated contractor's intent to disclaim all liability.

2 Cases that cite this headnote

**[14]**    **Contracts** 🔑 Certainty as to Subject-Matter
           **Contracts** 🔑 Offer and acceptance in general

**Contracts** 👈 Necessity in general

Under the law of Florida, there are several basic requirements of a valid contract: offer, acceptance, consideration, and sufficient specification of essential terms.

2 Cases that cite this headnote

[15] **Contracts** 👈 Mutuality of Obligation

Under Florida law, where one party retains to itself the option of fulfilling or declining to fulfill its obligations under the contract, there is no valid contract and neither side may be bound.

1 Case that cites this headnote

[16] **Federal Courts** 👈 Particular questions

Court of Appeals would certify to Florida Supreme Court questions of whether a contractual exculpatory clause that purported to insulate one of the signatories from "any ... damages regardless of kind or type ... whether in contract, tort (including negligence), or otherwise" was enforceable, and alternatively, whether clause conferred such sweeping immunity that it rendered the entire contract in which it appeared illusory, or, whether it could be plausibly construed so as to bar some but not all claims and thus save the contract from invalidation. Fla. Const. art. 5, § 3; Fla. R. App. P. 9.150(a).

[17] **Courts** 👈 Highest appellate court

**Courts** 👈 Decisions of United States Courts as Authority in State Courts

The Florida Supreme Court is the ultimate arbiter of Florida law; both federal courts and the lower state courts are bound by its determinations of state law.

1 Case that cites this headnote

**Attorneys and Law Firms**

**\*1336** Humberto H. Ocariz, Michael Aaron Holt, Daniel B. Rogers, Shook Hardy & Bacon, LLP, MIAMI, FL, for Plaintiff-Appellee-Cross Appellant.

Thomas L. Hunker, Cole Scott & Kissane, PA, PLANTATION, FL, Olga Butkevich, Barry Adam Postman, Justin C. Sorel, WEST PALM BEACH, FL, for Defendant-Appellant-Cross Appellee.

Appeals from the United States District Court for the Southern District of Florida, D.C. Docket No. 9:16-cv-80567-WPD

Before WILLIAM PRYOR and NEWSOM, Circuit Judges, and VRATIL, [*] District Judge.

**Opinion**

NEWSOM, Circuit Judge:

**\*1337** Dear Florida Supreme Court: We need your help. Among other much simpler issues, this case presents a knotty and important state-law contract question that is more appropriately answered by you than by us. Accordingly, after clearing away some underbrush, we will respectfully certify to you the following question:

> Is a contractual "exculpatory clause" that purports to insulate one of the signatories from "any ... damages regardless of kind or type ... whether in contract, tort (including negligence), or otherwise" enforceable? Or, alternatively, does the clause confer such sweeping immunity that it renders the entire contract in which it appears illusory? Or, finally, might the clause plausibly be construed so as to bar some but not all claims and thus save the contract from invalidation?

Each possibility finds at least some support in Florida law, each comes with its own equitable pros and cons, and each has dramatically different implications for the case before us.

**I**

**A**

Pier 1 Cruise Experts is a Brazilian travel agency that specializes in cruises and cruise packages. Pier 1 sells both

through sub-agencies—approximately 300 individual travel agencies located around Brazil—and directly to customers. Hoping to grow its business, Pier 1 wanted a first-of-its-kind website with an online distribution channel for booking options in Portuguese and payment in Brazilian reais.

To build the website, Pier 1 hired Revelex Corporation, a Florida-based company that provides customized software to travel companies. Revelex promised to deliver on each of Pier 1's requirements—content in Portuguese, prices in reais, and sub-agent booking capabilities—and indicated that, once work started, the website software could be completed in approximately six months.

Almost a year later, following multiple rounds of negotiations, the two companies executed a Service Agreement. The Service Agreement was dated August 6, 2013—for reasons we'll explain, the date could turn out to matter—and in general, it stated that Revelex would provide Pier 1 access to a proprietary booking engine in exchange for licensing fees. Section 12 of the Service Agreement, titled "Limitation of Liability," is at the heart of this litigation, so we'll pause to take a closer look at its three constituent provisions. First, and most importantly here, § 12.1 sets forth an unusually broad exculpatory clause. In relevant part, that clause reads as follows:

> Revelex shall not be liable ... for any direct, special, indirect, incidental, consequential, punitive, exemplary or any other damages regardless of kind or type (whether in contract, tort (including negligence), or otherwise), including but not limited to loss of profits, data, or goodwill, regardless of whether Revelex knew or should have known of the possibility of such damages.... Customer waives any and all claims, now known or later discovered, that it may have against Revelex and its licensors and vendors arising out of this agreement and the services.

**\*1338** Second, § 12.2 provides that "[i]n any event, Revelex's total cumulative liability to customer or any third party for all damages, losses, and causes of action (whether

in contract, tort (including negligence), or otherwise) relating in any way to this agreement exceed one hundred dollars ($100.00)." If § 12.2 seems a little clunky, that's because it is. No matter how you read it, the grammar just doesn't work, and the parties here dispute whether the provision is missing a "shall not" between the words "agreement" and "exceed." Finally, § 12.3 states, in relevant part, that "[t]he limitations of liability and disclaimers of warranties provided in this agreement form an essential basis of the bargain between the parties."

Separately (but alongside) the Service Agreement, the parties also negotiated and executed a Scope of Work, which we'll (inelegantly) call the "SOW." The SOW memorialized the necessary customizations for the website and indicated that the total cost of the software was $100,097. It explained that the website would entail two primary components—a business-to-business feature that would allow travel agents to book and manage cruise reservations, and a direct-to-consumer feature that would enable customers to book and pay for cruises online. Notably—and potentially importantly, for reasons we'll explain—the Service Agreement and the SOW included reciprocal cross-references. Section 5.1 of the Service Agreement contemplated that the parties would "enter into written Statement(s) of Work ... for the performance of certain professional services by Revelex." Section 7 of the SOW, in turn, stated that it was "issued pursuant to the terms and conditions of the Contract"—*i.e.*, the Service Agreement—and that "the services set forth within this [SOW] are within the scope of the services authorized in the Contract." Also notably—again, for reasons that will become clear—discussions concerning the SOW overlapped the negotiations and execution of the Service Agreement; the parties began conferring about the SOW on April 22, 2013, executed the Service Agreement on August 6, 2013, and then finalized the SOW on January 15, 2014.

As of December 2015, the software still wasn't complete. Pier 1 ceased making its ongoing licensing payments, and Revelex terminated Pier 1's access to the software.

**B**

Pier 1 sued Revelex in the Southern District of Florida, raising four claims: breach of contract, fraudulent misrepresentation, negligent misrepresentation, and unjust enrichment. Pier 1 eventually dropped its fraudulent-misrepresentation and

unjust-enrichment claims, so we focus here on breach of contract and negligent misrepresentation.

The parties filed dueling motions for summary judgment, each contending that § 12.1 of the Service Agreement should be read in its favor. For its part, Revelex argued that the exculpatory clause—which, again, purported to shield it from "any ... damages regardless of kind or type ... whether in contract, tort (including negligence), or otherwise"—barred Pier 1's claims. The breadth of the clause's language, Revelex's president explained in his deposition, was intentional: "Revelex is priced in the manner with which we cannot afford to take on any liability. It is a pay-as-you-go service. So the customers that use our service benefit from paying less. What that means is that we are not going to be financially liable. Your remedy with us is to not do business with us." Alternatively, Revelex asked the district court to correct a scrivener's error in § 12.2—so as to insert the phantom "shall not"—and cap its exposure at $100, or, as a last resort, to construe the exculpatory clause to limit its liability to direct damages only. Finally, **\*1339** Revelex asserted that the SOW couldn't stand independently of the Service Agreement and, therefore, that Pier 1's SOW-based claims provided no stand-alone basis for relief.

Pier 1, by contrast, principally asserted that the Service Agreement's broad exculpatory clause rendered the contract unenforceable against Revelex and thus illusory. Separately, and in response to Revelex, Pier 1's managing director testified that he believed § 12.1 merely shielded Revelex from liability to third parties for damages caused by Pier 1 or its sub-agencies. As for § 12.2, he testified that it actually limited Pier 1 to seeking damages *in excess* of $100—which, he said, "seemed reasonable" because "any problems less than $100 would not be worth pursuing."

The district court granted partial summary judgment for Pier 1 and held that, as a matter of law, the exculpatory clause rendered the entire Service Agreement illusory. As the court explained it, "the Service Agreement binds [Pier 1] to perform certain duties," but Revelex "is free to breach the contract because there will never be recourse for the breach"; accordingly, the court concluded, the "arrangement does not create a binding contract." Without mutuality of obligation, the court reasoned, "there is no valid contract and neither side may be bound." The court refused to reform or sever § 12.1, because it said that it could not "re-write or sever th[e] provision in a way that would achieve the intent of the parties."

Both parties sought clarification with respect to whether the SOW was part and parcel of the (now nonexistent) Service Agreement or, instead, survived independently. The district court issued a supplemental order reiterating that the entire Service Agreement was unenforceable both (1) because § 12.1 rendered the contract illusory, and (2) in the alternative, because it was "an unenforceable agreement to agree." The court clarified, though, that its earlier order "didn't speak to the claim for breach of contract related to the SOW," which the court explained survived as a separate contract independent of the Service Agreement.

The case then proceeded to trial on a SOW-related breach-of-contract claim and a negligent-misrepresentation claim. At trial, Pier 1 presented a live demonstration of the software, which revealed that key functionalities were never completed. For example, Pier 1 showed that although the website logged more than 10,000 visits, not a single potential customer was able to purchase a cruise. Revelex nonetheless asserted that it had satisfied its contractual obligations—pointing, for instance, to an email from Pier 1's principal stating that "I'm hereby to confirm that all services described on SOW were done." Pier 1 countered that it sent the email because Revelex had requested it for its auditors—not because Pier 1 actually believed that Revelex had fulfilled its contractual duties.

Through its financial manager, Mariana Peres, Pier 1 presented damages evidence pertaining to alleged lost profits. Using Pier 1's financial reports and general economic conditions, Peres determined that Pier 1's expected revenue during the damages period was $12.7 million. She estimated that total expenses would have increased by 10% annually over the same timeframe, and then compared that to the inflation rate in Brazil. Peres calculated that, on average, each cruise that Pier 1 sold generated $1,000 in revenue. Pier 1 was selling 50 cruises per month before the advent of online booking capabilities, Peres said, and she estimated that a properly functioning website would have increased sales by at least 100 cruises per month, to a total of 150.

Having heard Peres's testimony, the district court asked her to clarify her methodology. **\*1340** When Peres explained that her estimates were based, in part, on the e-commerce market in Brazil, Revelex objected that she, as a lay witness, was impermissibly offering expert testimony. The court held that although Peres could "give an opinion as to what her company is worth, or what the expenses were," it was "too speculative" for her to "pick a number out of thin air" and determine

*Pier 1 Cruise Experts v. Revelex Corporation, 929 F.3d 1334 (2019)*

27 Fla. L. Weekly Fed. C 2161

that sales would double "based on looking on the internet and looking at e-commerce." Because Pier 1 introduced no additional evidence pertaining to lost profits, the court granted judgment as a matter of law for Revelex with respect to Pier 1's lost-profits claim.

Pier 1's SOW-based breach-of-contract claim and its negligent-misrepresentation claim were submitted to the jury. The jury found that Revelex (1) breached the SOW and (2) made negligent misrepresentations to Pier 1. It awarded Pier 1 $100,097 in damages—the software cost as specified in the SOW. Because the district court had concluded that the Service Agreement was void—and because there was therefore no valid contract clause on which to predicate attorneys' fees—it denied Pier 1's request for $485,779.50 in fees.

Revelex appealed the district court's entry of judgment against it, and Pier 1 cross-appealed the court's rejection of its lost-profits claim and its fee request.

## II

**[1]** There's a lot going on here. We have an appeal and a cross appeal, and together the parties have presented a series of interconnecting issues. Three of those issues are pretty straightforward, and we feel well-equipped to decide them. The fourth issue, however—in candor, the biggest and hardest one—is better resolved by the Florida Supreme Court than by us, and so we will certify it. [1]

### A

We can make relatively quick work of three issues: (1) Revelex's contention that the district court erred in concluding that the SOW is independent of, and therefore survived that court's invalidation of, the Service Agreement; (2) Pier 1's contention that the district court erred in rejecting its claim for lost profits; and (3) Pier 1's contention that it is entitled to recover attorneys' fees. In short, we reject all three arguments.

#### 1

**[2]** First up: The district court held that the SOW was an independent, stand-alone contract that survived the Service

Agreement's demise. Revelex disagrees; it says that the SOW is bound up with the Service Agreement and therefore must fall with it. Revelex has a pretty good story to tell, and if we were writing on a clean slate we might be inclined to agree that the district court erred in treating the SOW as wholly independent of the Service Agreement. But for reasons we'll explain, we aren't, and so we can't.

**[3]** **[4]** Under Florida law, "[d]ocuments executed by the same parties, on or near the same time, and concerning the same transaction or subject matter are generally construed together as a single contract." *Quix Snaxx, Inc. v. Sorensen,* 710 So. 2d 152, 153 (Fla. 3d Dist. Ct. App. 1998). Moreover, "[w]here a writing expressly refers to and sufficiently describes another document, the other document, or so much **\*1341** of it as is referred to, is to be interpreted as part of the writing." *Id.* (citing *United States Rubber Prods., Inc. v. Clark,* 145 Fla. 631, 200 So. 385, 388 (1941)).

Applying those principles here would seem to suggest that the SOW is indeed part and parcel of the Service Agreement. As we have explained, the two contracts were negotiated and executed during the same basic timeframe. The chronology, again, is essentially as follows: Pier 1 and Revelex began negotiating the Service Agreement in mid-2012, commenced negotiations on the SOW in April 2013, executed the Service Agreement in August 2013, and finalized the SOW in January 2014. What's more, the two contracts cross-reference one another, further suggesting interdependency. Section 5 of the Service Agreement expressly contemplates "Statement(s) of Work," and § 7 of the SOW provides that it was "issued pursuant to the terms and conditions of" the Service Agreement.

The problem for Revelex, and it's a fatal one, is that it has waived any argument that the SOW can't stand alone—or, what amounts to the same thing, it invited the district court's error in concluding otherwise, or is judicially estopped from now contesting that court's determination. At trial, when it sought judgment as a matter of law on Pier 1's unjust-enrichment claim, Revelex *expressly conceded* that the SOW was a valid agreement. Here's the full colloquy:

> [REVELEX'S COUNSEL]: Judge, there's three theories that ... currently exist. ... There's a breach of contract relative to the scope of work, negligent misrepresentation, and a third alternative theory on unjust enrichment. Under the law, if there is a contract, there can't, by definition, be unjust enrichment.

I think, in all fairness, there's been an established contract in the scope of work, and we're no longer contesting that the scope of work is not a contract. Therefore, if there is —the question is gonna be whether there's a breach of that contract ....

THE COURT: So, what you're saying is, I can tell the jury that a valid contract was entered, and if I do that, then it eliminates the unjust enrichment alternative?

[REVELEX'S COUNSEL]: Yes, Judge.

Based on its stipulation that the SOW had survived as a valid contract, the district court granted Revelex's motion for judgment as a matter of law and dismissed Pier 1's unjust-enrichment claim. Having led the district court down the primrose path—and, in doing so, having succeeded in knocking out one of Pier 1's three remaining claims— Revelex cannot now ask us to hold the district court in error for following. *See Pensacola Motor Sales Inc. v. Eastern Shore Toyota, LLC*, 684 F.3d 1211, 1231 (11th Cir. 2012) ("A party that invites an error cannot complain when its invitation is accepted."); *cf. also New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." (alteration adopted) (citation omitted)).

However strong its position may be that the Service Agreement and the SOW should rise or (more accurately) fall together, Revelex walked away from it, and it can't now walk back its walk-away. [2]

### *1342  2

Next up: The district court granted Revelex judgment as a matter of law on Pier 1's claim for lost profits, concluding that Pier 1's supporting proof was impermissibly speculative and thus legally insufficient. Pier 1 contests that conclusion, but we find no error in the district court's determination.

**[5]  [6]  [7]** To recover lost profits under Florida law, a plaintiff "must prove that 1) the defendant's action caused the damage and 2) there is some standard by which the amount

of damages may be adequately determined." *W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So. 2d 1348, 1351 (Fla. 1989). The precise amount of lost profits needn't be definitively proven, but it must be "established with reasonable certainty." *Twyman v. Roell*, 123 Fla. 2, 166 So. 215, 217 (1936). There must, in short, be "a reasonable yardstick by which to estimate the damages." *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1217 (11th Cir. 2006); *see also Twyman*, 166 So. at 218. In any event, Florida law is clear that an award of lost profits "must be supported by evidence and cannot be based on mere speculation or conjecture." *Sampley Enters., Inc. v. Laurilla*, 404 So. 2d 841, 842 (Fla. 5th Dist. Ct. App. 1981). If "the terms conjecture and surmise too grandly describe the plaintiff's lost profits claim, the cases are legion that none can be recovered." *Stensby v. Effjohn Oy Ab*, 806 So. 2d 542, 544 (Fla. 3d Dist. Ct. App. 2001) (collecting cases).

**[8]**  Pier 1's lost-profits claim rested on the testimony of its financial manager, Mariana Peres, who was not tendered as an expert but rather appeared as a lay witness. Peres projected that if Revelex's software had worked, Pier 1 would "actually [have] double[d] the number of cruises" sold through online channels alone, which would have meant selling about one additional cruise per month either directly or through its sub-agents. Peres further testified that Pier 1 brings in revenue, on average, of $1,000 per cruise. She also predicted a 10% increase in Pier 1's expenses. Peres based her calculation on Pier 1's historical sales and its experience in the Brazilian cruise industry. When Revelex objected that Peres, as a lay witness, was attempting to offer expert testimony, the district court agreed and cut off her testimony. Pier 1 presented no other evidence pertaining to lost profits, and the district court later granted judgment as a matter of law against its lost-profits claim.

We agree with the district court's determination that Pier 1's lost-profits calculation was too speculative to proceed and that, without it, the evidence regarding lost profits was legally insufficient. The district court correctly concluded that Peres seemed to have "decided to pick a number out of thin air" to conclude that Pier 1 could have sold "double[ ]" the number of cruises that sold through conventional means. Peres's lone justification for her assertion that Pier 1 would have doubled its sales was that "[she] considered [it] a very reasonable [estimate] because [Pier 1] would have a new market" and "other distribution channels" with the new software. To be sure, she testified that she did some "market research" on

27 Fla. L. Weekly Fed. C 2161

"e-commerce in Brazil," but she never explained why it was reasonably certain that Pier 1 would sell twice as many cruises online as it had sold offline. [3]

**\*1343** Peres's calculation of Pier 1's increased expenses—10%—was also impermissibly speculative. She projected that expenses would grow as a result of both the costs of marketing the software's benefits and inflation in Brazil. With respect to her particular number, she testified that she "went ahead and added ten percent to all of [Pier 1's] expenses" because it "would be reasonable to have an additional ten percent in order to include all of the different market variations"—meaning "inflation and anything else that might come up." Peres testified that "it was [her] intent to be conservative with respect to the calculations," but her choice to peg the expense increase at 10% also seems to have come out of "thin air."

Because the district court cut Peres's testimony short, Pier 1's only surviving evidence of lost profits was its historical revenues and expenses. But from Pier 1's past *offline* sales the jury could only speculate about the profits it might have lost from missed *online* opportunities. For example, Pier 1 didn't establish how the jury could have concluded that the hypothetical individuals who would have bought cruises online were new customers, rather than old customers who had switched from offline to online purchasing. And because Pier 1 acknowledged that no comparable businesses existed—it said that it would have been the first Brazilian travel agency to offer online bookings in Portuguese—it provided no "yardstick" by which the jury could calculate lost online sales. Finally, as the district court explained, unlike the ordinary lost-profits case, "[i]n this case, we're not talking about losing business; we're talking about not gaining business." Pier 1, that is, wasn't being denied existing sales as a result of Revelex's failure to deliver the customized software; customers could continue to book cruises over the phone or in person. Instead, Pier 1 had hoped to add a new method of distribution through online bookings, which it claimed Revelex had failed to deliver. Again, though, Pier 1 didn't present sufficient evidence by which the jury could calculate the resulting lost profits with reasonable certainty.

The district court correctly granted Revelex judgment as a matter of law on Pier 1's lost-profits claim.

**[9]** Finally: Pier 1 contends that it is entitled to attorneys' fees. The district court denied Pier 1's fees motion because it held that the Service Agreement's exculpatory clause rendered the entire contract illusory and unenforceable—much more on that below—and, therefore, that § 4.3 of the Agreement, which speaks to fees, provided no basis for recovery.

The way we see it, no matter how the Service Agreement is interpreted, Pier 1 can't get attorneys' fees. If, in response to our certified question, the Florida Supreme Court concludes that the exculpatory clause rendered the Service Agreement unenforceable, then Pier 1 isn't entitled to fees for the reason the district court identified. *See Katz v. Van Der Noord, 546 So. 2d 1047, 1049 (Fla. 1989)* (holding that a party cannot recover attorneys' fees based on a provision of a contract that is deemed never to have been formed). And what if the Florida Supreme Court goes the other way and concludes that the Service Agreement is (in the main, anyway) enforceable? As to attorneys' fees, same result; the particular phrasing and scope of the Agreement's attorneys'-fees provision precludes Pier 1's fee request.

Pier 1 grounds its attorneys'-fees claim in § 4.3 of the Service Agreement. That provision commits Pier 1 "to pay all court **\*1344** costs, fees, expenses and reasonable attorneys' fees incurred by Revelex in collecting delinquent fees." On its face, anyway, § 4.3 doesn't operate in reverse—it doesn't require Revelex to pay fees to Pier 1 under any circumstances. Happily for Pier 1, the one-sidedness of § 4.3 isn't fatal, because Florida law permits courts to engraft a reciprocity condition onto contractual attorneys'-fee provisions. In particular, Florida Statute § 57.105(7) provides that—

> [i]f a contract contains a provision allowing attorney's fees to a party when he or she is required to take any action to enforce the contract, the court may also allow reasonable attorney's fees to the other party when that party prevails in any action, whether as plaintiff or defendant, with respect to the contract.

3

Fla. Stat. § 57.105(7). The Florida courts have held that § 57.105(7) aims "to even the playing field," which inures to Pier 1's benefit here. *Fla. Hurricane Prot. & Awning, Inc. v. Pastina*, 43 So. 3d 893, 895 (Fla. 4th Dist. Ct. App. 2010).

Sadly for Pier 1, Florida courts have also emphasized—in the same breath—that § 57.105(7) doesn't authorize them, in the name of enforcing reciprocity, to "expand ... the terms of the agreement." *Id.* At most, then, § 4.3 can be read to provide a reciprocal right to collect attorneys' fees "incurred ... in collecting delinquent fees." Reading § 4.3 to permit recovery of fees for breach-of-contract and negligent-misrepresentation, as Pier 1 asks, would be "tantamount to re-writing the contract between the parties"—which, Florida law makes clear, "we [may] not do." *Pastina*, 43 So. 3d at 895.

Accordingly, we hold that no matter how the Service Agreement is interpreted—that is, whether its exculpatory clause renders the entire Agreement illusory or not—Pier 1 is not entitled to recover attorneys' fees.

### B

Which brings us to the biggie: How to handle the Service Agreement's exculpatory clause? That question tees up two subsidiary issues, which we'll address in turn: First, when and under what circumstances are exculpatory clauses enforceable as a general matter? And second, what is the effect of the particular—and particularly broad—exculpatory clause at issue in this case?

### 1

 **[10]**    **[11]**    **[12]**   Although "not looked upon with favor" by Florida courts, *Ivey Plants, Inc. v. FMC Corp.*, 282 So. 2d 205, 208 (Fla. 4th Dist. Ct. App. 1973), an exculpatory clause is enforceable so long as (1) the contracting parties have equal bargaining power and (2) the clause's provisions are clear and unambiguous, *see Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1168 n.9 (11th Cir. 2009) (citing *Key Biscayne Divers, Inc. v. Marine Stadium Enters., Inc.*, 490 So. 2d 137, 138 (Fla. 3d Dist. Ct. App. 1986)). With respect to the latter

requirement, "the intention to be relieved from liability [must be] made clear and unequivocal and the wording must be so clear and understandable that an ordinary and knowledgeable person will know what he is contracting away." *Cain v. Banka*, 932 So. 2d 575, 578 (Fla. 5th Dist. Ct. App. 2006). In the same vein, exculpatory clauses are "strictly construed against the party seeking to be relieved of liability." *Id.* at 580.

 **[13]**   So far as we can tell—and we've been given no reason to think otherwise—Pier 1 and Revelex had equal bargaining power. And the exculpatory clause that they executed as part of the Service Agreement provision is crystal clear. Section 12.1 expressly insulates Revelex from "any ... damages regardless of kind or type ... whether in contract, tort (including **\*1345** negligence), or otherwise." Moreover, as we have emphasized, the record reflects that the clause's language was no accident; rather, it unambiguously communicated Revelex's intent to disclaim all liability. Recall that Revelex's president explained that his company "c[ould not] afford to take on any liability" and thus was "not going to be financially liable."

We accept, therefore, that the Service Agreement's exculpatory clause is not invalid as a matter of public policy.

### 2

The much tougher question, to which we now turn—and which we will certify to the Florida Supreme Court—is whether the exculpatory clause is enforceable here. We see three possibilities, all of which find some support in Florida law and (or really *but*) have dramatically different consequences for this case. First, there is Revelex's position: The clause should simply be enforced according to its terms to bar all of Pier 1's claims. Second, there is Pier 1's (and the district court's) position: Read for all it's worth, the exculpatory clause immunizes Revelex from essentially all liability and thereby renders the entire Service Agreement illusory and void *ab initio*. Finally, there is an in-between position: To avoid the illusoriness problem, the clause should be construed to bar only negligence claims, not breach-of-contract claims. We will explore each possibility briefly before formally certifying the question to the Florida Supreme Court. [4]

27 Fla. L. Weekly Fed. C 2161

**a**

The way Revelex sees it, this is an easy case. The Service Agreement's exculpatory clause should simply be enforced according to its plain terms—which, again, both (1) insulate Revelex from "any ... damages regardless of kind or type ... whether in contract, tort (including negligence), or otherwise," and (2) clarify that Pier 1 has "waive[d] any and all claims ... that it may have against Revelex ... arising out of this agreement and the services." Enforcement of the exculpatory clause could take either of two slightly different forms: broad and broader. On the first (broad) reading, the clause would knock out both Pier 1's negligent-misrepresentation claim and any breach-of-contract claim grounded in the Service Agreement—but not necessarily a contract claim grounded in a separate agreement, such as the SOW.[5]  On this reading, the exculpatory clause's second sentence—noting Pier 1's waiver of claims "arising out of this agreement and the services"—cabins the clause's reach vis-à-vis **\*1346** contract claims to those emanating from the Settlement Agreement, in which the clause resides. There is also, though, a second, more sweeping interpretation. The clause's first sentence—immunizing Revelex from "any ... damages regardless of kind or type ... whether in contract, tort (including negligence), or otherwise"—is framed broadly enough that it might be understood to reach beyond the Service Agreement's four corners to cover and negate Pier 1's SOW-based contract claim, as well.

In either event, in support of its position that the court should enforce the clause, Revelex points to a number of cases in which Florida courts have enforced some pretty broad exculpatory clauses without suggesting that they rendered illusory or otherwise invalidated (or even undermined) the contracts in which they appeared. *See* Br. of Appellant at 16–17 (citing, *e.g.*, *L. Luria & Son, Inc. v. Honeywell, Inc.*, 460 So. 2d 521, 522 (Fla. 4th Dist. Ct. App. 1984), *Ace Formal Wear v. Baker Protective Serv.*, 416 So. 2d 8, 9 (Fla. 3d Dist. Ct. App. 1982), and *Windstar Club, Inc. v. WS Realty, Inc.*, 886 So. 2d 986, 986–87 (Fla. 2d Dist. Ct. App. 2004)). In *Ace Formal Wear*, for instance, a business brought breach-of-contract and negligence claims against the company that had installed its alarm system. After the system had been installed, burglars entered the customer's store through a window that hadn't been wired "even though the wiring of that window was required by the [installation] contract." 416 So. 2d at 9. In rejecting the customer's claims against the installer, the

court pointed to and applied the following exculpatory clause, which was contained in the installation agreement:

> Subscriber agrees that [the installer] shall not be liable for any of Subscriber's losses or damages, irrespective of origin, to person or to property, whether directly or indirectly caused by performance or nonperformance of obligations imposed by this contract or by negligent acts or omissions of [the installer], its agents or employees. The Subscriber does hereby waive and release any rights of recovery against [the installer] that it may have hereunder.

*Id.* In a short opinion, the court enforced the clause, observing that "[t]he parties were at liberty to contract as they pleased." *Id.*

We make two brief observations, without in any way meaning to prejudge matters. First, the decisions that Revelex cites don't formally control here, if only because, so far as we can tell, the illusoriness issue that Pier 1 raises—and to which we'll turn next—wasn't presented, addressed, or decided in any of them. Second, there is a certain oddity (and perhaps inequity) in Revelex's position, in that it permits a contracting party simultaneously (1) to promise to perform some particular duty and (2) to immunize itself from any failure to perform that very duty.[6]  Which leads us to Pier 1's (and the district court's) position.

**b**

Pier 1 argues, and the district court held, that the Service Agreement's exculpatory clause was so broad—again, insulating Revelex from liability for "any ... damages regardless of kind or type ... whether in contract, tort (including negligence), or otherwise"—that it had the effect of rendering the entire contract illusory, and thus void *ab initio*.

**\*1347**  **[14]**  It seems to us that there is likewise support in Florida law for this view. Under the law of Florida, there are several "basic requirements" of a valid contract: "offer, acceptance, consideration[,] and sufficient specification of essential terms." *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004). Consideration, Florida courts have held, is "the primary element moving the execution of a contract," *Frissell v. Nichols*, 94 Fla. 403, 114 So. 431, 434 (Fla. 1927), and "absolutely necessary to the forming of a good contract," *Jones v. McCallum*, 21 Fla. 392, 392 (Fla. 1885). Put simply, absent consideration there is no contract—never was. Rather, "[t]he law aptly terms an agreement to do an act or to pay money or other thing where there is no consideration for it a *nudum pactum*—a naked agreement—a promise without legal support, which the law will not enforce, no matter whether verbal or written, or however earnestly and solemnly made." *Jones*, 21 Fla. at 395.

 **[15]**  It seems equally well-settled that "[w]here an illusory promise is made, that is, a promise merely in form, but in actuality not promising anything, it cannot serve as consideration." 3 Williston on Contracts § 7:7 (4th ed. 2010). So, when is a contract illusory under Florida law, and thus incapable of supplying the necessary consideration? When "one of the promises appears on its face to be so insubstantial as to impose no obligation at all on the promisor—who says, in effect, 'I will if I want to.' " *Princeton Homes, Inc. v. Virone*, 612 F.3d 1324, 1331 (11th Cir. 2010) (quoting *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1311 (11th Cir. 1998)). Put slightly differently, "[w]here one party retains to itself the option of fulfilling or declining to fulfill its obligations under the contract, there is no valid contract and neither side may be bound." *Pan-Am Tobacco Corp. v. Dep't of Corr.*, 471 So. 2d 4, 6 (Fla. 1984). In particular—and closer to home here—Florida courts have held that "to prevent the contract from being illusory," the non-breaching party must have both "[t]he ability to sue for damages" and "the ability to collect on the resulting judgment." *Fla. Dep't of Envtl. Prot. v. ContractPoint Fla. Parks, LLC*, 986 So. 2d 1260, 1270 (Fla. 2008). The reasoning seems to be that absent a viable threat of liability, a contracting party could "breach with impunity." *Port Largo Club, Inc. v. Warren*, 476 So. 2d 1330, 1333 (Fla. 3d Dist. Ct. App. 1985).

The district court's conclusion—following Pier 1's lead—was that by insulating Revelex from "any ... damages regardless of kind or type ... whether in contract, tort (including negligence), or otherwise," the exculpatory clause here denied Pier 1 "[t]he ability to sue for damages" and "collect on [any] resulting judgment," *ContractPoint*, 986 So. 2d at 1270, and thereby rendered the Service Agreement illusory. That conclusion left Pier 1's negligent-misrepresentation claim intact—because the exculpatory clause couldn't be enforced to bar it—but wiped out its breach-of-contract claim—there being no valid contract on which to sue.

That result, we think, suggests that there is a certain oddity inherent in this position, as well. In the district court's (and perhaps more strangely, Pier 1's) view, the beneficiary of a sweeping exculpatory clause like the one at issue here would seem—at least with respect to breach-of-contract claims—to be in a "heads I win, tails you lose" situation. Either (1) the court enforces the clause, thereby immunizing the beneficiary from liability on the contract, or (2) the court invalidates the entire contract, thereby ... you guessed it, immunizing the beneficiary from liability on the contract. Weird. (Here, of course, the inequity of that result is masked by the fact that Pier 1 brought a negligent-misrepresentation claim that **\*1348**  survived that Service Agreement's invalidation, but that won't always or necessarily be the case.)

**c**

There is a third option, suggested by the decisions in *Ivey Plants Inc. v. FMC Corp.*, 282 So. 2d 205 (Fla. 4th Dist. Ct. App. 1973), and *Sniffen v. Century National Bank of Broward*, 375 So. 2d 892 (Fla. 4th Dist. Ct. App. 1979). In each case, the court addressed the effect of an exculpatory clause in a lease agreement on a claim-by-claim basis, concluding that it barred a party's negligence-based claim *but not* his breach-of-contract claim. In *Ivey Plants*, the court observed that "[a] determination of the applicability of [an exculpatory clause] requires an analysis of its language in relation to the [s]ubject matter of the lease as well as the [d]ifferent causes of action" in the case, and held that "[t]he function of the exculpatory clause [at issue there was] to deprive one of the contracting parties of his right to recover damages suffered due to the negligent act of the other" but that the clause "d[id] not operate to exculpate or exonerate [the] defendant from performing under the terms of the lease agreement." 282 So. 2d at 207–08. So too, in *Sniffen*, the court left open the possibility

that a broad exculpatory clause could "preclude recovery for [the defendant's] negligence," but held that the clause "c[ould not] be employed ... to negate the specific contractual undertaking ...." 375 So. 2d at 893 & n.2. Exonerating the defendant from contractual liability, the court emphasized, "would render the agreement between the parties entirely nugatory" in that the plaintiff would "have received nothing whatever in return for his rental fee." *Id.* at 893–94.

What would be the effect of following *Ivey Plants* and *Sniffen* here? Seemingly, just the opposite of (as just discussed) invalidating the entire Service Agreement as illusory: Pier 1 would lose its negligent-misrepresentation claim to the exculpatory clause, but would retain its breach-of-contract claim. *Ivey Plants* and *Sniffen* seem to make good equitable sense—but they are not quite on point, and the distinction between those cases and this one arguably calls for a different result. Recall that *Ivey Plants* (whose analysis *Sniffen* followed) repeatedly emphasized the "language" of the particular "provisions" of the exculpatory clause there at issue, concluding that it was "not applicable" to the plaintiff's breach-of-contract claim. 282 So. 2d at 207–10. And that was true; the clause at issue there was broadly written, but it did *not* explicitly address breach-of-contract claims. *See* *id.* at 207. (The same was true of the clause at issue in *Sniffen. See* 375 So. 2d at 893.) Here, the exculpatory clause's "language" is not only broad but also specific; it forecloses all liability, for "any ... damages" of any "kind or type"—expressly including those sounding in "contract." Accordingly, whereas the *Ivey Plants* and *Sniffen* courts had the luxury of being able to interpret their clauses' terms in a manner that preserved breach-of-contract liability and thus avoided illusoriness, a court interpreting the Service Agreement's exculpatory clause—and the contracting parties' intent underlying it—arguably doesn't have the same freedom.

\* \* \*

[16] Having framed and briefly explored the issue as we see it, we certify the following (admittedly compound) question to the Florida Supreme Court:

Is a contractual "exculpatory clause" that purports to insulate one of the signatories from "any ... damages regardless of kind or type ... whether in contract, tort (including negligence), or otherwise" enforceable? Or, alternatively, does the clause confer such sweeping immunity that it renders the entire contract in which it appears illusory? Or, **\*1349** finally, might the clause plausibly be construed so as to bar some but not all claims and thus save the contract from invalidation? [7]

We are satisfied that the question meets the requirements of Fla. R. App. P. 9.150(a). *See also* Fla. Const. art. V, § 3(6); Fla. Stat. § 25.031. First, it is a "question[ ] of law," Rule 9.150(a), whose answer depends on the discernment and application of Florida contract principles. Second, the question is "determinative of the cause." *Id.* For reasons already explained, depending on how the question is resolved, Pier 1 will be left either (1) with a breach-of-contract claim but no negligent-misrepresentation claim, or (2) with a negligent-misrepresentation claim but no breach-of-contract claim, or (3) with neither claim. Finally, "there is no controlling precedent of the Supreme Court of Florida." *Id.* As we've said, Florida law arguably supports any of three different answers to the question, but none of the decisions that have been cited to us (or that we have found ourselves) is quite on point.

We are also satisfied that the question meets our own standard for certifying questions of state law. There is, we think, clearly "doubt in the interpretation of [Florida] law" here, such that we may—and we believe should—"certify [a] question to the state supreme court [so that we] avoid making unnecessary *Erie* guesses and ... offer the state court the opportunity to interpret or change existing law." *Union Planters Bank, N.A. v. New York*, 436 F.3d 1305, 1306 (11th Cir. 2006) (citation omitted).

[17] Finally, we are confident that a proper respect for the principles of federalism counsels certification here. By virtue of the diversity jurisdiction conferred on federal courts under 28 U.S.C. § 1332, we are empowered to answer questions of Florida law. But doing so is hardly our specialty, whereas it *is* the Florida Supreme Court's. Any resolution that we could provide regarding the question(s) that we have identified wouldn't bind the Florida courts, who would be free (as they should be) to come to their own conclusions. The Florida Supreme Court, by contrast, is the ultimate arbiter of Florida law; both we and the lower state courts are bound by its

determinations of state law. *See, e.g., Mullaney v. Wilbur,* 421 U.S. 684, 691, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). Particularly where, as here, we are faced with a common-law question that is, at once, so knotty and weighty, we see no sound reason not to facilitate the Florida Supreme Court's consideration and resolution of it. *Cf. Trail Builders Supply Co. v. Reagan,* 409 F.2d 1059, 1060–61 (5th Cir. 1969) ("As an *Erie*-bound Court, we are obliged to follow the Florida appellate decisions in diversity matters, and if there are no decisions on point, we may make an educated guess as to what the Florida courts would decide.... However, there is available to us the right to submit by certification the ... issues raised by this case."). [8]

### III

For the foregoing reasons, we hold as follows:

> **\*1350** 1. We affirm the district court's decision that the Scope of Work exists independently of the Service Agreement on the ground that Revelex has waived any argument to the contrary (or, alternatively, invited any alleged error or is judicially estopped from now contesting the district court's determination).

> 2. We likewise affirm the district court's decision that Pier 1's lost-profits claim fails as a matter of law and that Revelex is entitled to judgment as a matter of law on that claim.

> 3. We hold that Pier 1 is not entitled to recover attorneys' fees.

> 4. We certify to the Florida Supreme Court the following question, in whatever form that court chooses to address it:

Is a contractual "exculpatory clause" that purports to insulate one of the signatories from "any ... damages regardless of kind or type ... whether in contract, tort (including negligence), or otherwise" enforceable? Or, alternatively, does the clause confer such sweeping immunity that it renders the entire contract in which it appears illusory? Or, finally, might the clause plausibly be construed so as to bar some but not all claims and thus save the contract from invalidation?

**AFFIRMED IN PART, and QUESTION CERTIFIED.**

**All Citations**

929 F.3d 1334, 27 Fla. L. Weekly Fed. C 2161

### Footnotes

\*    Honorable Kathryn H. Vratil, United States District Judge for the District of Kansas, sitting by designation.

1    We review *de novo* questions of contract interpretation, *Hegel v. First Liberty Ins. Corp.,* 778 F.3d 1214, 1219 (11th Cir. 2015), as well as a district court's entry of judgment as a matter of law, *Connelly v. Metro. Atlanta Rapid Transit Auth.,* 764 F.3d 1358, 1363 (11th Cir. 2014). As the parties agree, Florida law governs the contracts between Pier 1 and Revelex.

2    While we can conclude without assistance that the SOW is a stand-alone, independent contract—or at least that Revelex is estopped from arguing otherwise here—we cannot conclude with any confidence that any SOW-based claim survives the Service Agreement's exculpatory clause. Maybe so; maybe not. *See infra* at 1345-46.

3    To be clear, Peres testified that Pier 1 was selling 50 cruises per month before the website, and that the website would "double" sales to 100 per month, independent of the existing offline sales. All told, that is actually a prediction that gross sales would *triple* to 150 per month.

4    We said that there were three possibilities. There is perhaps a fourth. In the district court, Pier 1 contended that the Settlement Agreement's exculpatory clause should be severed, and the remainder of the contract

enforced, pursuant to § 16.7, which states in relevant part that "[i]f any provision of this Agreement is held to be invalid or unenforceable for any reason ... the remaining provisions ... shall remain in full force and effect and shall be binding on the parties hereto." Pier 1 mentions but does not press its severance argument on appeal, and Revelex vigorously contends that severance would be improper because the Settlement Agreement states that the exculpatory clause is "an essential basis of the bargain between the parties ...." Settlement Agreement § 12.3. We are inclined to agree with Revelex that severance would be improper here, *see, e.g.*, ⚑ *Local No. 234 v. Henley & Beckwith, Inc.*, 66 So. 2d 818, 821–22 (Fla. 1953) (holding that severance is appropriate only "where the illegal portion of the contract does not go to its essence" and that severability "depends upon the intention of the parties" as discerned, in part, "by a fair construction of the terms and provisions of the contract itself"), but we leave the final determination of the issue to the Florida Supreme Court.

5       Revelex has conceded that the exculpatory clause doesn't cover intentional torts, but Pier 1 long ago dropped its fraudulent-misrepresentation claim, so that issue doesn't arise.

6       The oddity is magnified if (as explained above) the exculpatory clause is read to reach beyond the Service Agreement and negate contract-based claims arising under other agreements, including the SOW. *See supra* at 1345-46.

7       As is always the case when we certify questions, our phrasing is not intended to restrict, in any way, the Florida Supreme Court's consideration or resolution of the issue. *See, e.g.*, *Altman Contractors, Inc. v. Crum & Forster Specialty Ins. Co.*, 832 F.3d 1318, 1326 (11th Cir. 2016).

8       *See* ⚑⚠ *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (holding that decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in the Eleventh Circuit).

---

**End of Document**                                            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Fed. Carr. Cas. P 85,006

555 F.Supp.3d 1246
United States District Court, M.D. Florida,
Fort Myers Division.

SCOTLYNN USA DIVISION, INC., Plaintiff,

v.

TITAN TRANS CORPORATION, Defendant.

Case No: 2:18-cv-521-JLB-NPM
|
Signed 08/20/2021

**Synopsis**
**Background:** Motor freight brokerage company brought action against motor carrier under Carmack Amendment to recover for damage to cargo of raw beef. Bench trial was held.

**Holdings:** The District Court, John L. Badalamenti, J., held that:

[1] there was sufficient circumstantial evidence that cargo was damaged on arrival at consignee's facility to support Carmack Amendment claim;

[2] there was insufficient evidence of amount of damage to cargo to support Carmack Amendment claim;

[3] carrier established by preponderance of evidence that manner in which shipper loaded containers, rather than carrier's negligence, was proximate cause of loss;

[4] recoverable damages would not include damages resulting from shipper's and consignee's failure to dispose of beef before its "use by" date;

[5] company's contract-based indemnity claim was preempted by Carmack Amendment; and

[6] company was not entitled to indemnification for attorney fees and costs.

Ordered accordingly.

**Procedural Posture(s):** Judgment.

West Headnotes (22)

**[1]** **Carriers** 🔑 Care required of carrier in general

Something more than extreme braking or mere fact that cargo shifted is required to find that driver was negligent.

**[2]** **Carriers** 🔑 Nature of liability as common carrier

Carmack Amendment makes common carriers liable for actual loss of or damage to shipments in interstate commerce. 49 U.S.C.A. § 14706(a)(1).

**[3]** **Carriers** 🔑 Nature of liability as common carrier

**States** 🔑 Carriers; railroads

Carmack Amendment preempts state and common law claims against carrier for loss or damage to goods during shipment, and only claims based on conduct separate and distinct from delivery, loss of, or damage to goods escape preemption. 49 U.S.C.A. § 14706(a)(1).

**[4]** **Carriers** 🔑 Nature of liability as common carrier

Plaintiff asserting claim under Carmack Amendment must establish prima facie case by demonstrating that: (1) goods were delivered to carrier in good condition, (2) goods arrived at destination in damaged condition, and (3) specified amount of damage resulted. 49 U.S.C.A. § 14706(a)(1).

**[5]** **Carriers** 🔑 Presumptions and burden of proof

If plaintiff establishes prima facie case under Carmack Amendment, burden shifts to carrier to prove (1) that it was free from negligence, and (2) that damage to cargo was caused by one of five excusable factors: (a) act of God; (b)

public enemy; (c) act of shipper itself; (d) public authority; (e) or inherent vice or nature of goods. 49 U.S.C.A. § 14706(a)(1).

**[6]    Brokers** 🔑 **Actions by or against principals or brokers**

Broker cannot sue motor carrier on its own behalf under Carmack Amendment, but it can bring Carmack Amendment claim as assignee of person entitled to recover under receipt or bill of lading. 49 U.S.C.A. § 14706(a)(1).

**[7]    Assignments** 🔑 **Effect of transfer in general**

**Assignments** 🔑 **By Assignee**

In order to assign with retroactive effective date to be valid for standing purposes, assignee must possess assigned right on day it filed complaint.

**[8]    Carriers** 🔑 **Sufficiency of evidence**

To establish damaged condition of goods upon delivery, plaintiff asserting claim against motor carrier under Carmack Amendment may rely on direct or circumstantial evidence. 49 U.S.C.A. § 14706(a)(1).

**[9]    Carriers** 🔑 **Sufficiency of evidence**

Whether cargo was damaged on arrival, as required to establish claim under Carmack Amendment, can be shown by substantial and reliable circumstantial evidence alone. 49 U.S.C.A. § 14706(a)(1).

**[10]    Carriers** 🔑 **Sufficiency of evidence**

There was sufficient circumstantial evidence that cargo of fresh beef was damaged on arrival at consignee's facility to support Carmack Amendment claim against motor carrier, even though no witness described from personal observation condition of beef upon its arrival at facility, there was no evidence that inner plastic bags were torn or unsealed, and there

was no evidence that inspection by food safety expert was performed, in light of evidence that cargo containers had shifted forward and partially tipped over, with outer packaging damaged on two containers, that containers had to be unloaded using methods unavailable to consignee, and that time required to rework cargo would likely have resulted in diminution in beef's value. 49 U.S.C.A. § 14706(a)(1).

**[11]    Carriers** 🔑 **Sufficiency of evidence**

There was insufficient evidence of amount of damage to cargo of fresh beef to support Carmack Amendment claim against motor carrier, despite evidence that cargo had sustained some damage during transit, and that consignee rejected entire cargo; consignee rejected beef not because it was contaminated, unfit for human consumption, or worthless, but because it could not be unloaded at its facility in condition in which it was delivered under consignee's standard forklift unloading procedures, and vast majority of containers could have been reworked and redelivered, with loss of only very small percentage of beef and cost of reworking containers. 49 U.S.C.A. § 14706(a)(1).

**[12]    Carriers** 🔑 **Character and value of goods**

For purposes of evaluating Carmack Amendment claim against motor carrier, damaged goods are deemed "worthless" when they are worthless for their intended purpose or worth only their salvage value. 49 U.S.C.A. § 14706(a)(1).

**[13]    Carriers** 🔑 **Proximate cause of loss or injury**

**Carriers** 🔑 **Sufficiency of evidence**

Motor carrier established by preponderance of evidence that manner in which shipper loaded containers of fresh beef, rather than carrier's negligence, was proximate cause of loss by cargo shifting during transit, and thus that carrier was not liable under Carmack Amendment for damage to cargo; driver had no meaningful opportunity to inspect cargo after

Scotlynn USA Division, Inc. v. Titan Trans Corporation, 555 F.Supp.3d 1246 (2021)

Fed. Carr. Cas. P 85,006

it was loaded, evidence showed that, while uncommon, shipments of beef combos had in past shifted forward in truck, and that shipper's loaders left empty space in front of trailer, and there was no evidence that damage was caused by truck driver driving in improper manner. 49 U.S.C.A. § 14706(a)(1).

**[14]** **Carriers** 👈 Damages

**Damages** 👈 Breach of contract

Even if shipper proves its Carmack Amendment claim, recoverable damages may be limited due to its failure to mitigate damages. 49 U.S.C.A. § 14706(a)(1).

**[15]** **Carriers** 👈 Presumptions and burden of proof

**Damages** 👈 Mitigation of damages and reduction of loss

In Carmack Amendment action, carrier bears burden to prove that shipper did not exercise reasonable diligence in mitigating its damages. 49 U.S.C.A. § 14706(a)(1).

**[16]** **Carriers** 👈 Termination of liability

**Carriers** 👈 Damages

When damaged but salvageable goods are tendered to owner, carrier's liability for further damages under Carmack Amendment terminates. 49 U.S.C.A. § 14706(a)(1).

**[17]** **Carriers** 👈 Duties of consignee or owner as to delivery

**Carriers** 👈 Damages

**Damages** 👈 Breach of contract

When damaged goods arrive at shipper's destination, consignee has duty to accept them and mitigate damages unless goods are deemed totally worthless. 49 U.S.C.A. § 14706(a)(1).

**[18]** **Carriers** 👈 Damages

**Damages** 👈 Breach of contract

Motor carrier had no obligation to return cargo to shipper or otherwise attempt to mitigate consignee's damages after consignee rejected shipment of fresh beef, and thus recoverable damages against carrier under Carmack Amendment would be limited to damage to cargo during its transit and upon delivery to consignee, and would not include damages resulting from shipper's and consignee's failure to dispose of beef before its "use by" date. 49 U.S.C.A. § 14706(a)(1).

**[19]** **Carriers** 👈 Nature of liability as common carrier

**States** 👈 Carriers; railroads

Separate and distinct conduct rather than injury must exist for claim to fall outside of Carmack Amendment's preemptive scope. 49 U.S.C.A. § 14706(a)(1).

**[20]** **Indemnity** 👈 Costs and expenses

**Indemnity** 👈 Attorney fees

**States** 👈 Particular cases, preemption or supersession

Motor freight brokerage company's contract-based indemnity claim against motor carrier for attorney fees and costs incurred as result of consignee's rejection of cargo was not premised on conduct separate and distinct from loss of cargo, and thus was preempted by Carmack Amendment. 49 U.S.C.A. § 14706(a)(1).

**[21]** **Indemnity** 👈 Contract liability

**Indemnity** 👈 Costs and expenses

**Indemnity** 👈 Attorney fees

Under Florida law, motor freight brokerage company was not entitled to indemnification pursuant to its agreement with motor carrier for attorney fees and costs incurred as result of consignee's rejection of cargo; neither shipper nor consignee had been shown to be without fault in loss of cargo, and neither faced liability founded on carrier's liability.

Case 1:18-cv-24190-RS  Document 465  Entered on FLSD Docket 05/31/2023  Page 53 of 79

Scotlynn USA Division, Inc. v. Titan Trans Corporation, 555 F.Supp.3d 1246 (2021)
Fed. Carr. Cas. P 85,006

[22]  **Indemnity** 🔑 Relative culpability

Under Florida law, indemnitor need not indemnify indemnitee unless indemnitee is found to be without fault, or in other words, indemnitee's liability is founded on indemnitor's liability, not its own.

**Attorneys and Law Firms**

**\*1248** Katy Koestner Esquivel, Esquivel Law, Chartered, Naples, FL, Michael J. Connick, Pro Hac Vice, Michael J. Connick Co., LPA, Zanesville, OH, for Plaintiff.

Kristen Marie Johnson, Elena Pauline Adang, Taylor & Associates, Attorneys at Law, Pl, Winter Haven, FL, for Defendant Titan Trans Corporation.

## ORDER

JOHN L. BADALAMENTI, United States District Judge

This matter is before the Court after a three-day bench trial on a claim brought under the Carmack Amendment to the Interstate Commerce Act. See 49 U.S.C. § 14706. Plaintiff Scotlynn USA Division, Inc. ("Scotlynn") is a motor freight brokerage company, which contracts with others to transport freight throughout the country. Defendant Titan Trans Corporation ("Titan") is a motor carrier, which, from at least May 12, 2014 through September 30, **\*1249** 2016, transported freight by truck. The issue is whether Titan is liable to Scotlynn for damage to a cargo of raw beef (the "Cargo"), where the cardboard containers in which the beef was packaged tipped over inside the trailer of Titan's truck during transportation.

The Court has considered the pleadings, the testimony of the witnesses, the documents in evidence, and the parties' joint stipulations. Being fully advised in the premises, the Court now makes its findings of facts and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.[1] The Court finds that Scotlynn has not established a prima facie case under the Carmack Amendment to recover for the Cargo because there is no evidence that the delivered beef was worthless, and Scotlynn has also failed to prove up a specified amount of damage to the beef. Further, even if Scotlynn has shown a specified amount of damage to the beef, the damage to the Cargo was caused by the manner in which the shipper loaded the Cargo. Finally, efforts to mitigate the loss were not reasonable. For the foregoing reasons, as discussed below, final judgment will be entered in favor of Titan.

# I. FINDINGS OF FACT [2]

## A. CONTRACTUAL RELATIONSHIPS

### 1. SCOTLYNN AND TITAN

1. Scotlynn is a Florida corporation with its principal place of business in Fort Myers, Florida. Scotlynn provides transportation brokering services and holds a property broker license issued by the Federal Motor Carrier Safety Administration ("FMCSA").

2. Titan is an Illinois corporation with its principal place of business in Hanover Park, Illinois. At all relevant times, Titan operated as a motor carrier under a license issued by the FMCSA.

3. On May 12, 2014, Scotlynn and Titan entered into a Broker-Carrier Agreement pursuant to which Titan provided cargo transportation for Scotlynn's customers.

4. The Broker-Carrier Agreement did not include terms as to specific shipments, such as the identity of shippers or descriptions, origins, destinations, or values of items to be transported. Instead, the Broker-Carrier Agreement governed the relationship between Scotlynn and Titan by, among other things, establishing non-exclusivity, delineating various delivery terms, and establishing billing arrangements and insurance requirements.

5. Pursuant to the agreement, Scotlynn and Titan waived inconsistent rights and obligations under the Carmack Amendment. (Doc. 147-1 at 7-8, ¶¶ 7, 11.) Titan agreed to be liable for any loss to a shipment as follows:

> Carrier shall be responsible for the proper care and handling of freight moving under this Agreement, and shall be liable to Broker and Broker's Customers for the full actual

Case 1:18-cv-24190-RS   Document 465   Entered on FLSD Docket 05/31/2023   Page 54 of 79

Scotlynn USA Division, Inc. v. Titan Trans Corporation, 555 F.Supp.3d 1246 (2021)
Fed. Carr. Cas. P 85,006

loss, damage, or injury to property occurring while in the custody, possession or under the control of Carrier, its employees, or its contractors and agents. For purposes of this Agreement, **\*1250** the term "full actual loss" shall mean the value of the cargo as determined by Shipper.

(Id. at 8, ¶ 11.)

6. The Broker-Carrier Agreement also required Titan to indemnify Scotlynn and its customers for any "[l]oss, damage or delay in transit as to all goods which Carrier receives for transport under this Agreement (to wit: cargo), until Carrier delivers such goods and the same are signed for and accepted by the consignee." (Id. at 9, ¶ 12(c).) The provision excluded indemnification "contrary to any government law that prohibits indemnification against loss, liability, costs or expenses incident thereto caused by the negligence of such indemnity." (Id. at ¶ 12.)

## 2. SCOTLYNN AND CARGILL

7. Cargill, Inc. ("Cargill") is a global food corporation, which owns and operates a facility in Butler, Wisconsin that produces frozen ground beef patties and other food products.

8. Cargill Meat Logistics Solutions Brokerage Division ("Cargill Logistics") is a division of Cargill that provides transportation, transportation brokering, and related logistical services within Cargill and to outside customers.

9. On September 25, 2009, Cargill Logistics and Scotlynn [3] entered into a Contract Carrier Agreement, pursuant to which Cargill Logistics as "Broker" agreed to "offer for shipment," and Scotlynn as "Carrier" agreed "to transport in its own equipment" shipments of freight in such amounts and quantities as Cargill Logistics "may tender, subject to availability of suitable equipment." (Doc. 147-68 at ¶ 1.)

10. Pursuant to the agreement, Cargill Logistics and Scotlynn waived inconsistent rights and obligations under the Carmack Amendment. (Id. at ¶ 5.) The agreement further provided that Scotlynn would be "liable to the customer or to [Cargill Logistics] as the agent of a claim of a customer, for loss,

damage or delay of a shipment received by [Scotlynn] for transportation under the terms of this Agreement." (Id. at ¶ 8.)

11. Pursuant to the Contract Carrier Agreement, Scotlynn "warrant[ed] ... that no operations w[ould] be conducted as a ... broker," and that it would not "assign ... any of its respective rights or obligations under th[e] Agreement except with prior written consent of [Cargill Logistics]." (Id. at ¶¶ 5, 19.)

12. Because Cargill Logistics brokers transportation for Cargill, Cargill typically does not require an outside transportation broker. (Doc. 147-141 at 8, Tr. at 26–27.) Cargill does not "double broker loads" to maintain a direct line of communication with, and control over, the transporting carrier. (Id. at 8, Tr. at 27–28.)

13. Cargill ceased its relationship with Scotlynn after discovering that Scotlynn had brokered shipments without authorization. (Doc. 147-130 at 8, Tr. at 26–27; Doc. 147-141 at 3, Tr. at 8–9.) [4]

## 3. CARGILL AND FPL

14. FPL Foods, LLC ("FPL") is a processor of fresh beef products located in Augusta, Georgia.

15. In 2016, FPL sought to build and expand its relationship with Cargill.

**\*1251** 16. FPL executed a contract with Cargill whereby FPL agreed to supply, and Cargill agreed to purchase, approximately 1.2 million pounds of beef (about thirty to thirty-five truckloads) per week.

17. On September 21, 2016, Cargill purchased 42,147 pounds of beef trim from FPL for $89,823.68. Beef trimmings are pieces of meat remaining after steaks, roasts, and other cuts are removed. Cargill intended to use the beef trimmings to make ground beef for hamburger patties at its facility in Butler, Wisconsin. A "Dispatch Print" prepared by FPL shows that the September 21, 2016 shipment contained eleven combos of one type of beef trim and ten combos of another type. [5] (Doc. 147-27 at 2.) A "Detailed Pallet Report," also prepared by FPL, listed the twenty-one combos individually, indicating each combo's weight (between 1,780 and 2,166 pounds) and pack date (either September 20 or 21, 2016). (Id. at 3.)

18. FPL prepares the bill of lading for its shipments to Cargill using its Straight Bill of Lading Form.[6] FPL's September 21, 2016 Straight Bill of Lading for the Cargo (the "Bill of Lading") named FPL as the "shipper" and Cargill as both the consignee[7] and the "carrier." (Id. at 1.) Essentially, this arrangement required Cargill to provide its own transportation from FPL's facility in Georgia to Cargill's facility in Wisconsin.

### B. TRANSPORTATION ARRANGEMENTS

19. Cargill hired Scotlynn to transport the Cargo pursuant to the Contract Carrier Agreement. Richard Miller, a Cargill Logistics senior logistics broker, contacted Richard Sowell, a Scotlynn logistics account manager, to arrange transportation.

20. Mr. Miller believed that Scotlynn would transport the Cargo itself. Unbeknownst to Mr. Miller or anyone at Cargill, however, Mr. Sowell hired Titan to transport the Cargo on Scotlynn's behalf.

21. Cargill became aware of Scotlynn's brokering of the Cargo after Cargill rejected the Cargo and a claim was filed to recover for the loss.

### C. FPL'S PACKAGING AND LOADING OF THE CARGO[8]

22. FPL packages its beef for shipment in cardboard bins called combos.

23. To make the outer packaging of a combo, an FPL employee connects interlocking flaps on a flat piece of cardboard to create the bottom of a barrel-shaped container. The pieces of cardboard are pre-banded with horizontal black fiber or plastic straps woven into the cardboard for reinforcement around the sides of the bin. The bottom of a combo has no additional reinforcement; the combo's design relies on the weight of the meat to keep the interlocking flaps connected.

24. A plastic liner or bag is placed inside the assembled cardboard container, and **\*1252** the meat is sealed inside the bag. The containers are then capped with plastic pieces (sometimes a double layer is used), which are secured to the outside of the container with white tape.

25. The assembled combos are placed on wooden pallets, 40 x 48 inches in size, one combo per pallet. Pallets allow the combos to be loaded onto and unloaded from a truck using a forklift. The size of a combo varies, and its circumference may reach the outer edges of the pallet or leave as much as four inches between it and the edge of the pallet. No additional anchors or straps are used to secure the combos to the pallets. The combos are free-standing, relying on their weight (about 2,000 pounds) to prevent them from shifting on top of the pallet it occupies during transit.

26. FPL stages shipments of beef inside an enclosed refrigerated warehouse. Each combo/pallet combination in the shipment is arranged on the floor of the staging area in the position in which it will be loaded onto the truck. FPL uses a loading diagram form to identify each pallet in the shipment and map out the location inside the trailer in which it will be placed.

27. For safety reasons, the transporting truck driver is not allowed in FPL's enclosed loading area. The truck driver is instructed to back the trailer up to the loading dock and remain either in the cab of the truck or outside the enclosed loading area while FPL employees load the shipment.

28. When the loading process is complete, an FPL employee will instruct the driver to pull away from the loading dock and meet the FPL employee at the rear of the truck. The doors of the trailer will be open, and the driver has the opportunity to look inside the truck's trailer. The doors of the trailer are then closed, and the FPL employee will place a seal on them. Once the trailer is sealed, the driver is not permitted to open it or break the seal prior to the receiving entity instructing the driver to do so at the destination.

29. After the trailer is sealed, the FPL employee will hand the truck driver documentation, which includes the bill of lading, and direct him to proceed to the check-out gate.

### D. TITAN'S PICK-UP OF THE CARGO FROM FPL

30. Scotlynn issued Titan a Carrier Confirmation for pick-up of the Cargo on Wednesday, September 21, 2016. (Doc. 147-21 at 1.) The confirmation indicated that the Cargo was "Fresh Meat," that it required a 53-foot reefer truck, that the temperature in the reefer had to be at a specified level and "continuous," and that the trailer must be sealed with the seal number written on the bill of lading. (Id.) No requirements as to the securing of the Cargo were included in the Carrier Confirmation. (Id.)

31. Titan's truck driver was the only testifying witness with personal knowledge as to what occurred when he picked up the Cargo at FPL's facility. The Court finds the truck driver's testimony credible. His testimony was generally consistent with FPL's standard operating procedures, as testified to by FPL employees and described above. [9]

 **\*1253** 32. The truck driver testified that he was instructed to back the trailer to the loading dock and remain outside the enclosed loading area while FPL loaded and secured the Cargo in the trailer. The truck driver remained inside the cab of the truck and was unable to observe the loading process.

33. When loading was completed, the driver was instructed to pull the trailer away from the loading dock. He did so, exited the cab of the truck, and walked to the rear of the trailer where an FPL employee was waiting. The doors were ajar when the driver arrived at the back of the trailer, but an FPL employee was in the process of closing the door on one side. The driver helped the employee by shutting the door on the other side. [10]

34. The driver testified that he looked briefly inside the truck before the doors were closed and saw that the trailer contained cardboard packages. He could not see how the Cargo was loaded or what was inside the cardboard containers. He did not attempt to inspect how the Cargo had been loaded because: (1) he believed the FPL employee intended for him to close the doors immediately; (2) he would have had to enter the trailer and believed that was not allowed by FPL; and (3) he did not think the circumstances required him to inspect the manner in which the Cargo was loaded because experienced FPL employees performed the task and did not allow him to participate or even observe as the Cargo was loaded.

35. The gist of the driver's testimony was that he never had a meaningful opportunity to inspect the Cargo or the manner in which it was loaded during the brief period in which the doors were open before the seal was placed by FPL's employee, and that he relied on FPL's assumption of responsibility for the loading by virtue of its policies that excluded him from participating in the loading. The Court finds that testimony both credible and reasonable.

36. According to Jerry Lowe, FPL's shipping manager, FPL's standard practice of not allowing the driver to be present during the loading process did not mean the driver had no opportunity to inspect the manner in which the Cargo was loaded. For instance, Mr. Lowe suggested **\*1254** that if a driver could not discern how cargo was loaded from his eye-level position as he looked into the trailer through the open doors, a driver could climb on top of the truck and lie on his stomach with his head hanging over the edge to look inside the trailer.

37. After the trailer doors were closed, the FPL employee attached the seal. [11] The FPL employee handed the driver the Bill of Lading. [12] While the Bill of Lading designated FPL as the "Shipper" and Cargill as the "Consignee (Sold To)" and "Carrier," it did not reference Scotlynn or Titan. (Doc. 147-27 at 1; Doc. 147-31.)

38. Whether the driver signed the Bill of Lading is disputed. The copy of the Bill of Lading admitted as evidence does not have the driver's signature, and the driver testified that he did not sign the Bill of Lading. Scotlynn, however, presented testimony that FPL's standard practice was to require all truck drivers to sign a bill of lading before they could leave FPL's facility. [13] Scotlynn argues the Court should infer from this standard practice that the driver signed the Bill of Lading and that the reason his signature does not appear on the admitted Bill of Lading is that the signature was inadvertently cut-off from the bottom of the original Bill of Lading when a copy was made for FPL's files.

39. The Court finds the testimony regarding FPL's standard procedures insufficient to establish that the driver signed the Bill of Lading since he testified he did not, and the Court credits the driver's testimony. Furthermore, the original Bill of Lading is not in evidence, and the driver's signature does not appear on the copy that is in evidence. There was no witness with personal knowledge to dispute the driver's testimony that he did not sign the Bill of Lading. Absent such evidence, the Court finds that it would be speculation to conclude based on FPL's standard procedures that the driver signed the Bill of Lading.

40. It is industry custom for a carrier to insert in the bill of lading the words "shipper load and count," or "SLC," when the cargo is loaded by the shipper. The driver did not do so here.

41. There is no evidence to the contrary, and Titan concedes, that all twenty-one combos were in good condition at the time FPL loaded them onto the truck.

**\*1255  E. THE CONDITION OF THE CARGO WHEN REJECTED BY CARGILL**

42. The Cargo arrived at Cargill's facility in Butler, Wisconsin between 12:00 p.m. and 1:00 p.m., Friday, September 23, 2016.

43. A Cargill employee in the shipping and receiving department of the facility directed the truck driver to break the seal and open the trailer doors. When the doors were opened, it was discovered that some of the combos had tipped toward the front of the truck. As a result, Cargill refused to accept delivery of the Cargo.

44. It is undisputed that the decision to reject the Cargo was made by unidentified Cargill personnel in the shipping and receiving department of the Butler facility. The unidentified Cargill personnel took photographs of the Cargo as seen from the open doorway at the rear of the truck. [14]

45. Tamara Stegman, manager of Cargill's OS&D Department, [15] testified that Cargill rejected the Cargo because there was damage to some of the cardboard packaging containing the beef due to the combos shifting during transport. This damage and shifting made it impossible for Cargill to use a forklift to unload all the combos without further damaging the packaging and risking contamination of the beef inside. This testimony is supported by the photographs and emails and claim forms prepared around the time of Cargill's rejection. (See, e.g., Doc. 147-60 (FPL Claim Form describing the loss as "[a]ll combos were shifted forward/partially off pallets," and "[s]ome or all combos have busted bottoms").)

46. As discussed below, the Court finds that the evidence shows damage to the packaging of some combos, but there is no evidence that the beef inside any of the combos was damaged as a result of the damage to the packaging.

**1. THE ONLY DAMAGE SHOWN IN PHOTOGRAPHS IS TO THE COMBOS' OUTER PACKAGING**

47. The photographs and related witness testimony does not establish by a preponderance of the evidence that the outer cardboard packaging was ripped or damaged other than on the two combos described below, that any of the plastic bags inside the cardboard packaging were punctured, torn, or ripped, or that any beef was exposed or otherwise contaminated:

(a) The photographs of the Cargo show that the combo to the right side of the trailer closest to the door did not shift and appears to be completely intact **\*1256**  with no damage to any part of the packaging.

(b) The photographs show that many of the remaining combos (although specifically how many is unclear) had shifted on their pallets toward the front of the truck, and some were tipped forward rather than standing straight on the pallets. The pictures also show that the plastic inside some of the combos may have been protruding slightly over the top of the cardboard container, likely from the sides of those containers having been compressed by the weight of other combos falling against them. (See, e.g., Doc. 147-139 at 20, Tr. at 73–76.) The fact that the plastic was protruding over the top suggests that the plastic caps on those combos were loosened or no longer completely secured with the white tape, but this is not clear from the photographs, except as to the two combos described below.

(c) Damage to the outer cardboard packaging is observable as to two combos: (i) the combo to the left side of the trailer closest to the door, which tipped forward to such a degree that the interlocking flaps on the bottom of the outer cardboard packaging came undone, exposing the blue inner plastic bag containing the beef; and (ii) a combo located in the second row from the back on the right side, which is tipped forward and its outer cardboard packaging split open at the bottom, exposing the blue inner plastic bag containing the beef. (Docs. 147-34, 147-38.) The photographs also show that the white tape securing the plastic caps on these combos was broken.

48. The photographs do not show whether any of the sealed bags inside the containers were broken, torn, or ripped.

49. No witness testified that they personally viewed the Cargo when it first arrived at Cargill's facility. Thus, the testimony concerning whether any of the cardboard boxes were saturated with moisture or were broken was based on the witness looking at the photographs taken at the time of delivery. Several witnesses testified—and the Court agrees—that what appears in one or two photographs to be discoloration of the cardboard on the damaged combo to the right could just as easily be a shadow rather than moisture. [16] Similarly, some witnesses testified that the photographs showed leakage of blood from the meat, while others testified

they could not discern whether there was blood on the floor of the trailer or areas of darkness or shadows from the lighting. There is no evidence as to whether it is possible for moisture or blood to leak from plastic bags that remain sealed and intact, or whether the refrigeration unit in the truck could have been the source of moisture or liquid accumulation on the floor of the trailer.

### 2. CARGILL DID NOT HAVE THE BEEF INSPECTED FOR CONTAMINATION BY A FOOD SAFETY EXPERT

50. Cargill's on-site quality assurance team and inspectors from the United States Department of Agriculture ("USDA") can assess whether a particular shipment is potentially or actually contaminated as a result of transportation. Cargill employee, Ms. Stegman, testified that she would expect that an inspection was done here, but no food safety report concerning the Cargo was presented at trial. Jason Middleton, Manager of Cargill Logistics, also testified that shipping and receiving personnel would normally consult with a "regulatory group to decide if the load can be accepted or if it needs to be rejected." (Doc. 147-141 at 5, Tr. at 16.) [17] But there is no evidence that the unidentified Cargill personnel who actually rejected the Cargo sought out a food safety expert or other regulatory group before or after making that decision.

 **\*1257** 51. Ms. Stegman and others testified that the beef was potentially exposed, which presented a contamination issue. But the facts do not establish that a seal was broken on every combo or that easily spoiled perishables were exposed to improper temperatures over a lengthy period of time. In those circumstances, it might not be possible to determine with any degree of certainty whether the condition of the goods presents a risk of contamination or spoilage. Here, the risk could be determined upon further investigation into whether the plastic bags in which the beef had been sealed were still intact.

52. In sum, the Court credits Mr. Middleton's testimony, which best summarizes the condition of the Cargo on delivery: the outer packaging of some combos was damaged, but whether the damaged packaging presented a food safety concern required further investigation to determine if there was any exposed beef, and, if so, a food safety report regarding the risk of contamination.

### 3. MOST OF THE BEEF COULD HAVE BEEN REDELIVERED AFTER REWORKING THE PACKAGING

53. In addition to the absence of evidence showing damage to or contamination of the beef, the record includes evidence affirmatively showing that the beef was not damaged when it was delivered to Cargill.

54. This evidence includes the testimony of Scotlynn's witnesses, Messrs. Sowell, Kollker, and Marrapese, [18] all of whom testified that if Titan's driver had returned the Cargo to FPL on Friday there would have been no loss to the Cargo. From this testimony the Court infers that the beef was salvageable for human consumption, and that it was not the shifting that occurred during transit that caused the loss but rather the failure to timely return the Cargo to FPL.

55. The Court also gives great weight to the testimony of Jerry Lowe, a former FPL employee, on this point. Mr. Lowe testified that the load of beef as shown in the photographs was not "damaged, because you could salvage that load." (Doc. 147-139 at 21, Tr. at 79.) Mr. Lowe testified that, so long as it was done in a timely manner, almost all the beef in the combos could be removed and repackaged for human consumption, with a loss of about 20 to 30 pounds per combo. (Id. at 21, Tr. at 78–80.)

56. FPL had the ability to "rework" the Cargo in the manner described above at its facility in Georgia. The Court accepts Ms. Stegman's testimony that Cargill did not have the same capability. But the Court rejects as not credible any inference from Ms. Stegman's testimony that the only option for reworking was to return the Cargo to FPL, as that would ignore other options available to Cargill, such as obtaining the services of a local company to unload or rework the combos. (See note 25, infra (discussing Doc. 147-61); Doc. 147-75 at 30-31.)

### F. DISPOSITION OF THE REJECTED CARGO

### 1. UNEXECUTED PLAN TO RETURN THE CARGO TO FPL

57. After unidentified Cargill personnel rejected the Cargo, the doors of the trailer were closed and Cargill personnel placed a new seal on the trailer. They wrote "Rejected" and

"Load Shifted" on the Bill of Lading and returned it to Titan's driver. (Doc. 147-31.)

 **\*1258** 58. Cargill's rejection of the Cargo was finalized at about 4:30 p.m. on the day it was delivered, Friday, at which time the driver communicated with Titan's dispatcher for instructions about what to do with the Cargo. Titan's dispatcher instructed the driver to bring the trailer to Titan's yard in Batavia, Illinois.

59. The Court finds that Scotlynn's employee, Mr. Sowell, knew or could have discovered the location of the Cargo on Friday evening, and rejects as lacking in credibility any testimony to the contrary. Mr. Sowell was in charge of directing Titan as to the Cargo once it was rejected by Cargill. He spoke with Titan's dispatcher around 4:30 p.m., which was before he received any instructions from Cargill about the Cargo. The Court finds that he therefore likely directed Titan's dispatcher to have the driver take the truck to Titan's yard while details regarding the Cargo's disposition were decided. Even absent instructions from Mr. Sowell to bring the truck to Titan's yard, Titan's actions were reasonable. Mr. Sowell testified that he knew the Cargo was in Titan's truck and that the truck was parked in Titan's yard. At trial, the Court observed Mr. Sowell giving evasive responses when asked whether he knew where Titan's yard was located, but there is no evidence that, if he did not know, he could not have found out from Titan's dispatcher if he had asked. In fact, the Court intervened at one point and squarely asked Mr. Sowell to answer the questions being asked, as he continually evaded answering seemingly straightforward questions. In all events, Mr. Sowell eventually admitted that the Cargo was under his control from Friday evening through the weekend.

60. Upon being notified that the Cargo had shifted in transit, FPL agreed to accept redelivery of the Cargo. As a result of communication with FPL, Ms. Stegman made the decision to return the Cargo to FPL. It is undisputed that, at about 6:00 p.m. on Friday, either Ms. Stegman or Mr. Miller directed Mr. Sowell to return the Cargo to FPL in Georgia. [19]

61. After receiving Cargill's instruction to return the Cargo to FPL, Mr. Sowell instructed Titan to do the same. Titan informed Mr. Sowell, however, that the driver who delivered the Cargo could not return to Georgia until Monday, September 26, because he reached the limit for the number of hours he could legally drive without a rest. [20] Titan had no other drivers available to leave for Georgia earlier than Monday afternoon. [21]

62. By his own admission, Mr. Sowell did not know on Friday or over the weekend that there would be a shelf-life issue if the Cargo did not arrive in Georgia by Monday.  **\*1259** Messrs. Kollker and Marrapese also testified as to their lack of knowledge on this issue. Because Messrs. Sowell, Kollker, and Marrapese did not know about the shelf-life issue that ultimately caused FPL to refuse redelivery of the Cargo, the Court finds that their collective, and somewhat spurious, testimony that Titan was warned by Scotlynn on Friday that the Cargo would be a total loss if the driver waited until Monday to leave for Georgia is simply not credible. [22]

63. As a motor carrier, Titan was not an expert in the use or processing of raw beef and did not have independent knowledge of the shelf-life of the contents of the Cargo. The Court finds that Titan reasonably believed there was no need to leave before Monday to return the Cargo to FPL, so long as the refrigeration unit in the trailer continued to run. Mr. Sowell did not tell Titan otherwise on Friday or over the weekend. Nor did he tell Titan that FPL would refuse redelivery if the Cargo did not arrive by Monday, because, as previously noted, Mr. Sowell was unaware of that fact at that time.

64. Titan reasonably believed from its dispatcher's conversations with Mr. Sowell on Friday evening that Mr. Sowell agreed with Titan's proposal to return the Cargo to Georgia when its driver was available, which meant departing on Monday and arriving at FPL on Tuesday.

65. Mr. Sowell's testimony that Titan refused to cooperate with returning the Cargo to FPL by leaving on Friday is not, in the Court's judgment, credible. Titan did not refuse to take Mr. Sowell's phone calls. [23] Nor did Titan refuse to cooperate in Scotlynn repowering the trailer. [24]

66. While there is some evidence that Scotlynn was frustrated with Titan over  **\*1260** plans for the return trip to FPL, that frustration was expressed internally in an email discussion a few days later, on Monday morning. But Scotlynn's frustration with Titan as shown in the email discussion related not to Titan's purported refusal to return the Cargo to FPL on Friday, but with Titan's expectation that it would get paid an additional fee for the return trip. (Doc. 147-61.) Significantly, and it bears repeating, the discussion occurred before Messrs. Sowell, Marrapese, and Kollker learned from Ms. Stegman that it was too late to return the Cargo to FPL. Mr. Marrapese suggested several options for the Cargo's disposition that

would not have included a return trip to FPL or required payment to Titan. [25] Ultimately deciding not to risk a total loss to the Cargo by playing "hardball" with Titan over the terms of a return trip to Georgia, Mr. Kollker took steps on Monday morning toward redelivery by issuing Titan a formal rate confirmation to return the Cargo to FPL for $2,600, leaving that Monday afternoon with arrival at FPL on Tuesday afternoon.

67. Shortly after Scotlynn made these arrangements with Titan, Ms. Stegman emailed Mr. Sowell for an update of the driver's location and expected arrival time, apparently under the belief that the driver had left Friday or over the weekend to return the Cargo to FPL. Mr. Sowell told Ms. Stegman that the truck was about to leave and would arrive at FPL the next day. Mr. Sowell's response clearly shows that he was unaware that Cargill's redelivery arrangements with FPL required the Cargo to arrive at FPL by Monday.

68. When Ms. Stegman received Mr. Sowell's response, she instructed him to put a hold on the return trip. She then reached out to FPL, which responded that it would not accept a return of the Cargo on Tuesday. Ms. Stegman was told to send FPL a blank claim form so FPL could submit a claim to Cargill for the Cargo loss and that Cargill, in turn, should notify its insurance carrier of the loss. Upon receiving this information from FPL, Ms. Stegman instructed Mr. Sowell to cancel the return trip to Georgia, stating that "the meat will be too old upon arrival."

## 2. EFFORTS TO MITIGATE ONCE FPL REFUSED REDELIVERY OF THE CARGO

69. Following cancellation of the Cargo's return to FPL, Ms. Stegman instructed Mr. Marrapese to attempt to find a buyer for the Cargo. The evidence shows that Mr. Marrapese's mitigation efforts on Monday afternoon were minimal.

70. Having not found a buyer for the Cargo on Monday afternoon, Mr. Marrapese informed Titan on Tuesday that Scotlynn was submitting a claim against Titan for total loss of the Cargo, explaining that the Cargo "needed to be brought back to GA" but because it "sat over the weekend its shelf life became a factor, which resulted in the inability to salvage." (Doc. 147-70 at 1.) Mr. Marrapese directed Titan to take responsibility for disposing of the Cargo. [26] (Id.)

**\*1261** 71. Titan reported a cargo loss claim to its insurance carrier, Lancer, on Wednesday, September 28. The insurance adjuster instructed Titan to keep the Cargo in the resealed trailer in its yard with the cooling unit running.

72. FPL's Senior Vice President of Sales and Supply Chain, Antoine Bernier, testified that FPL's shelf-life guarantee, reflected in its declared "use by" date, is seven days from the date on which the beef was packaged. If the beef is not consumed by that date, it may still be used for human consumption, but typically is sold at a discounted price. The amount of the discount varies, and usually a USDA or quality control person performs organoleptic testing to determine whether the meat was still useable, in which case the meat would be frozen and resold at a discount. (Doc. 147-140 at 5–6, Tr. at 16–17.)

73. On September 27, 2016, when Mr. Marrapese declared the Cargo a total loss and abandoned it to Titan, he did not know and had not sought out information about FPL's guaranteed shelf-life for the Cargo. Had he done so, he would have learned that eight of the combos in the Cargo had an FPL "use by" date of September 27 and thirteen had a "use by" date of September 28. (Doc. 147-88 at 2-3.) In other words, on the date Scotlynn declared the Cargo a total loss, the beef was likely still fit for human consumption, although perhaps worth less than its original invoice price due to the passage of time.

74. On Thursday, September 29, Lancer communicated with Mr. Marrapese about federal regulations that Lancer believed required Cargill to accept the Cargo in its damaged condition. Lancer requested Mr. Marrapese to arrange to have the Cargo redelivered so that Cargill could mitigate its damages as required by law before filing a claim with the insurance carrier. Mr. Marrapese declined Lancer's request, responding that the Cargo was a total loss and therefore Cargill had no duty to mitigate.

75. On Friday, September 30, following unsuccessful efforts to have Scotlynn and Cargill take over mitigation efforts, Lancer retained a salvage company to find an appropriate disposition for the Cargo. On October 4, 2016, the salvage company sold the Cargo to a third party for use as animal food at a price of $7,586.46. On or about October 18, 2016, the insurance company received $4,636.17 from the salvage company as the salvage net proceeds. (Doc. 147-75 at 24.)

## G. CLAIMS AND PAYMENTS RELATED TO THE CARGO LOSS

76. On or about Monday, September 26, 2016, FPL, as the "owner of the cargo," submitted a claim for the Cargo's full invoice price of $89,823.68 to Cargill, which it designated the "carrier."

77. Ms. Stegman testified that Cargill paid FPL $89,823.68 for the Cargo. She provided no further details, but it appears that payment might have been made on or about September 28, 2016. (Doc. 147-23.)

78. The parties have stipulated that Cargill submitted a claim to Scotlynn for the Cargo in the amount of $89,823.68. (Doc. 144 at ¶ 12.) There is no evidence in the record showing when the claim was submitted. The evidence shows that Scotlynn issued a check to Cargill in the amount of $89,823.68 on November 4, 2016. (Id. at ¶ 13; Doc. 147-86.)

79. The record contains an FPL "Debit Memo," dated November 25, 2016, in the amount of $89,823.68, listing a transaction date of November 23, 2016 and the description "Cargill Claim." (Doc. 147-96.) Mr. Bernier testified that the Debit Memo was an internal document generated by **\*1262** FPL's accounting department for the purpose of giving Cargill a credit for the Cargo loss. (Doc. 147-140 at 6, 8, Tr. at 17–19, 26–28.)

80. On or about February 27, 2017, Lancer sent Cargill or Scotlynn a check for $4,636.17, representing the salvage payment Lancer received for the Cargo. (Doc. 147-75 at 28.)

81. In March 2017, the check was returned to Lancer with "void" written on the back.

82. In April 2017, Lancer requested Mr. Marrapese to provide instructions on where to send the salvage proceeds. The parties have stipulated that "Lancer paid FPL $4,636.17 for the salvage." (Doc. 144 at ¶ 10.)

83. Based on the above facts, it appears that Cargill may have recovered for the Cargo twice—from Scotlynn's check on or about November 4, 2016 and as credit from FPL on or about November 25, 2016. It also appears that Mr. Marrapese directed Lancer to pay the salvage proceeds to FPL because FPL credited Cargill for the Cargo. Although the salvage check represents partial payment for the Cargo loss and Scotlynn appeared to direct the partial payment to FPL, Scotlynn has not credited Titan for that partial payment. Instead, Scotlynn seeks recovery of the full $89,823.68 invoice value of the Cargo.

## H. CAUSE OF THE CARGO DAMAGE

84. Scotlynn contends that the combos shifted and tipped during transit because the truck driver applied excessive or extreme pressure to the brakes. The driver testified that nothing unusual happened during the drive from Georgia to Wisconsin and that he never felt any movement inside the trailer.

 [1]  85. There is no evidence that Titan's truck driver used the brakes in an unusual fashion because of improper or reckless driving on his part. The Court finds that hard, and possibly even extreme, braking is a normal part of driving in circumstances beyond the driver's control, such as when encountering an unanticipated event. Something more than extreme braking or the mere fact that the combos shifted is required to find that the driver was negligent. Cf. Lapuyade v. Pac. Emp. Ins. Co., 202 F.2d 494, 497 (5th Cir. 1953) ("Evidence that the truck swerved slightly when the brakes were suddenly applied in an emergency does not of itself establish negligence on the part of the truck driver.").

86. Thus, while basic laws of physics support a finding that the Cargo shifted because of driver braking, there is no evidence from which the Court can infer that any excessive braking was the result of the driver's negligence or improper driving.

87. Several witnesses testified that the weight of the combos would prevent them from shifting in the truck, even without straps or other methods to secure them to the pallets. Other witnesses, including Mr. Middleton, testified that was not necessarily true, and that hard braking could cause the combos to move despite their weight. Obviously, the weight of the combos was insufficient in this instance to prevent the Cargo from shifting. Braking is necessary during transportation. It would make sense that, to prevent forward shifting of cargo, bracing or straps would be added to the combos to secure them to the pallets. But the testimony in general supported a finding that it was within normal industry practices to rely on the weight of the combos to prevent shifting during transit.

88. Despite an industry practice to rely on the weight of beef to prevent combos from shifting on pallets, Cargill and FPL personnel testified that the weight of combos alone does not always prevent shifting. The testimony showed that both entities had previously experienced shipments of **\*1263** beef combos that shifted, including other shipments from FPL to Cargill. These shipments, however, constituted only a small

Fed. Carr. Cas. P 85,006

fraction of the shipments of beef that FPL had shipped to Cargill.

89. The Court can infer from the fact that only a small fraction of FPL shipments of beef have shifted that FPL's standard method of loading is reasonable. But the Court cannot infer from that same fact that, in this instance, FPL followed its standard method of loading or that the loading of this particular Cargo did not cause the loss.

90. Instead, the Court can infer from the evidence that FPL did not follow its standard method of loading here. Specifically, the shipment contained twenty-one combos—an odd number. The combos were loaded two per row in every row that is visible in the photographs. But the rows at the front of the trailer cannot be seen in the photographs. Because there was an odd number of combos, at some point not visible from the photographs there must have been a row with only one combo. A row with a single combo creates an empty space in the trailer. The empty space means that, if the driver must brake hard, the combos, notwithstanding their weight, may very well shift forward into that empty space.

91. Mr. Lowe testified that to prevent this from happening FPL fills the void created by an odd number of combos with a stack of empty pallets. [27] Scotlynn argues that, based on this testimony, the Cargo was loaded properly. But Mr. Lowe only testified as to FPL's standard practices. He did not have personal knowledge about the manner in which this particular shipment was loaded, and there is no direct evidence that FPL followed its standard procedure. [28] More importantly, the very fact that the Cargo shifted is circumstantial evidence that FPL did not follow its standard loading procedures in this instance and that the loaders made a mistake. As Titan's expert witness testified, if FPL had followed its standard procedure here, the Cargo would not have shifted forward because there would not have been any empty space that would have allowed the Cargo to shift. [29] Even more, *1264 there is no evidence that any empty pallets were found in the trailer and none are visible in any of the photographs in evidence. Accordingly, because the Cargo did shift forward, there must have been an empty space that allowed for the load to shift during transit in normal driving conditions. The Court agrees with this analysis and infers that FPL's loaders left an empty space at the front of the truck when they loaded the odd number of combos and failed to follow FPL's standard practices of filling that void with a stack of pallets.

92. The truck driver could not see the combos that were loaded at the front of the truck as he looked into the trailer from the rear and therefore had no personal knowledge of the space that must have been left when FPL loaded the Cargo. No one from Cargill, FPL, or Scotlynn had personal knowledge as to how the combos at the front were loaded either. Mr. Borawski is the only witness who had any personal knowledge of how the combos at the front were loaded. And the Court credits his testimony. His knowledge is based on his personal observations when the combos were transloaded off the trailer for salvage. He testified that there was a space at the front of the trailer, which could not be seen until the combos at the back had been removed. Mr. Borawski's testimony supports the self-evident proposition that there must have been a space to allow the combos to shift when the driver braked during transit.

93. The empty space that allowed the combos to shift was in the front of the truck, which the driver could not see from the ground looking into the back of the trailer. The driver had no reasonable opportunity to inspect how the front of the trailer was loaded when the FPL employee called him to rear of the truck and immediately started closing one side of the doors. Unlike FPL, he had no particular or specialized experience in loading combos of beef. There is no evidence the driver had any general knowledge of proper loading methods for beef combos or had notice of any specific defect in FPL's loading. He was not allowed to observe the loading of the Cargo, and there is no reason to infer that, had he climbed on top of the trailer to look at its interior, he would have been able to see the empty space or identify it as a potential problem.

94. The Court also notes the testimony of Amber Kritsch, who worked for FPL for almost fourteen years and was the transportation and logistics manager for FPL from October 2014 through August 2017. Her job responsibilities included booking trucks to ship meat loads and investigating and resolving claims related *1265 to transportation. Ms. Kritsch testified that she had handled several other cargo loss claims where combos had shifted. She was no longer employed by FPL at the time of her testimony. The Court's impression was that she was an unbiased and neutral witness.

95. Ms. Kritsch testified that, in her experience, shifted cargo was "rarely" a driver issue. Ms. Kritsch also testified that, if the white straps on a tipped combo broke or popped off, it was FPL's custom and practice to assume that the cause of the tipping was improperly placed strapping. Ms. Kritsch was shown photographs of the shifted Cargo upon arrival in

Case 1:18-cv-24190-RS Document 465 Entered on FLSD Docket 05/31/2023 Page 63 of 79

Scotlynn USA Division, Inc. v. Titan Trans Corporation, 555 F.Supp.3d 1246 (2021)
Fed. Carr. Cas. P 85,006

Wisconsin. Pointing to the broken white straps on a tipped combo at the front of the trailer, and then to the bottom of a combo that had "busted out," Ms. Kritsch testified that, in her opinion, the pictures indicated that the cause of the tipped combos was "a shipping issue," as opposed to a driver slamming on the brakes or making an evasive maneuver.[30]

96. Scotlynn's attorney attempted to discredit Ms. Kritsch's testimony on this point by showing her the written claim form she prepared and submitted to Cargill on FPL's behalf for loss of the Cargo, asking whether she would have submitted that claim to Cargill if she had thought at the time that the loss was caused by FPL. The Court finds that this questioning did not credibly refute Ms. Kritsch's testimony because it is undisputed that FPL had agreed to accept timely redelivery of the Cargo. Ms. Kritsch prepared and submitted the full loss claim to Cargill <u>after</u> FPL declined to accept redelivery of the Cargo due to an untimely redelivery date. Therefore, FPL's submission of a claim to Cargill to recover for the Cargo loss is not evidence that FPL, or at least Ms. Kritsch, did not believe it was a loading error that caused the Cargo to shift.

97. The Court does not make any finding as to whether Ms. Kritsch's testimony is sufficient to establish by a preponderance of the evidence that FPL improperly packaged the combos, which contributed to their shifting. Mr. Lowe's testimony seemed inconsistent with Ms. Kritsch's regarding the role played by the white straps on the combos. Although Mr. Lowe did not specifically testify as to the white straps seen in the photographs of the Cargo, he described FPL's process for packaging the combos as including white tape, not straps, placed horizontally around the top of the combo to hold the plastic caps in place. Ms. Kritsch testified that one of the reasons combos might shift toward the front of the trailer was incorrect strapping: if the straps on a combo broke, the weight of the beef inside the packaging would cause the combo to shift during transportation. Shifting attributable to broken or improper strapping would be the fault of FPL, not the carrier. But if the straps are instead tape as Mr. Lowe testified, it seems unlikely that improperly placed or broken tape, the purpose of which was merely to hold the plastic caps in place, could cause the combos to shift.

98. Nevertheless, the Court does credit Ms. Kritsch's more general testimony that FPL typically would assume responsibility for damage to combos that appeared at the delivery destination in the condition shown in the photographs. This testimony was credible because, in her position at FPL, **\*1266** Ms. Kritsch investigated and dealt

with damaged shipment claims, and because FPL had agreed to accept redelivery of the Cargo when it was contacted by Cargill and shown photographs of the shifted combos.

## II. CONCLUSIONS OF LAW

### A. JURISDICTION

The Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the suit arises under the Carmack Amendment, 49 U.S.C. § 14706. The Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties. Scotlynn is a citizen of Florida and Titan is a citizen of Illinois (Findings of Fact ¶¶ 1-2), and the amount in controversy exceeds $75,000 (<u>id.</u> ¶ 83).[31]

### B. GENERAL PRINCIPLES OF CARMACK AMENDMENT LIABILITY

The Carmack Amendment was enacted in 1906 as an amendment to the Interstate Commerce Act of 1887. Ward v. Allied Van Lines, Inc., 231 F.3d 135, 138 (4th Cir. 2000). The Carmack Amendment provides:

**(a) General liability**.—

**(1) Motor carriers and freight forwarders.—**A carrier providing transportation or service subject to jurisdiction under subchapter I or III of chapter 135 shall issue a receipt or bill of lading for property it receives for transportation under this part. That carrier and any other carrier that delivers the property and is providing transportation or service subject to jurisdiction under subchapter I or III of chapter 135 or chapter 105 are <u>liable to the person entitled to recover under the receipt or bill of lading ... for the actual loss or injury to the property caused by [the delivering or receiving carrier]</u> .... Failure to issue a receipt or bill of lading does not affect the liability of a carrier ....

49 U.S.C. § 14706(a)(1) (emphasis added).

**[2]** **[3]** In short, the Carmack Amendment "makes common carriers liable for actual loss of or damage to shipments in interstate commerce." A.I.G. Uruguay Compania de Seguros, S.A. v. AAA Cooper Transp., 334 F.3d 997, 1003 (11th Cir. 2003); Ward, 231 F.3d at 138. Further, "[t]he Carmack Amendment was adopted to achieve uniformity in rules governing interstate shipments, including the rules governing

Fed. Carr. Cas. P 85,006

injury or loss to property shipped." UPS Supply Chain Sol., Inc. v. Megatrux Transp., Inc., 750 F.3d 1282, 1285 (11th Cir. 2014) (citation omitted). Accordingly, the Carmack Amendment preempts state and common law claims against a carrier for loss or damage to goods during shipment. See Smith v. United Parcel Serv., 296 F.3d 1244, 1246 (11th Cir. 2002) (citations omitted). "[O]nly claims based on conduct separate and distinct from the delivery, loss of, or damage to goods escape preemption." Id. at 1248–49 (citation omitted).

[4] [5] A burden-shifting framework applies to a claim under the Carmack Amendment. A.I.G. Uruguay, 334 F.3d at 1003. First, the plaintiff must establish a prima facie case by demonstrating that: "(1) the goods were delivered to the carrier in good condition, (2) the goods arrived at the destination in damaged condition, and (3) a specified amount of damage resulted." *1267 Id. (citing Fine Foliage of Fla., Inc. v. Bowman Transp., Inc., 901 F.2d 1034, 1037 (11th Cir. 1990)). If the plaintiff establishes a prima facie case, "the burden shifts to the carrier to prove (1) that it was free from negligence, and (2) that the damage to the cargo was caused by one of five excusable factors: (a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods." Id. (internal quotation marks and citations omitted). "If the carrier cannot meet this burden, then liability is established." Id. [32]

### C. THE LEGAL STATUS OF SCOTLYNN

As a threshold matter, the Court addresses the basis on which Scotlynn can assert a Carmack Amendment claim against Titan. Scotlynn initially brought suit under the Broker-Carrier Agreement. (Doc. 1 at ¶¶ 15-16.) But the judge previously assigned to this matter held that Scotlynn's breach of contract claim was preempted by the Carmack Amendment, and Scotlynn elected not to revisit the issue before trial. [33] (Doc. 61 at 11-13.)

[6] Further, Scotlynn's claim at trial was not a direct claim under the Carmack Amendment. As a broker in its dealings with Titan, Scotlynn cannot sue Titan on its own behalf under the Carmack Amendment. See Essex Ins. Co. v. Barrett Moving & Storage, Inc., 885 F.3d 1292, 1299 (11th Cir. 2018) ("If [the defendant] was a 'broker,' the Carmack Amendment does not apply ..."); see also Mecca & Sons

Trucking Corp. v. White Arrow, LLC, 763 F. App'x 222, 225 (3rd Cir. 2019) ("[T]he Carmack Amendment does not grant brokers a right to sue[.]"). [34] Notwithstanding, Scotlynn can bring a Carmack Amendment claim as the assignee of "a person entitled to recover under the receipt or bill of lading." 49 U.S.C. § 14706(a)(1); *1268 UPS Supply, 750 F.3d at 1285 (logistics provider brought action against carrier as shipper's assignee).

[7] The parties have stipulated that "Scotlynn is the assignee of Cargill's rights related to the load at issue in this case, including its claims under the Carmack Amendment." (Doc. 144 ¶ 14.) However, the stipulation does not specify the date of the assignment. There is a written assignment in evidence, which purports to assign the Cargo loss claim to Scotlynn "effective as of September 26, 2016." (Doc. 147-87.) That written assignment was not executed until April 1, 2021, less than three weeks before trial. "In order for an assignment with a retroactive effective date to be valid for standing purposes, the assignee must possess the assigned right on the day it filed the complaint." MSP Recovery Claims, Series LLC v. QBE Holdings, Inc., 965 F.3d 1210, 1219 (11th Cir. 2020) (internal quotation marks and citation omitted). Further, Scotlynn asserted in its trial brief without evidentiary support that Cargill "orally assigned" its Carmack Amendment claim, which was "memorialized in [the] written assignment." (Doc. 139 at 3.) But rather than acknowledge any oral assignment, the April 1, 2021 written assignment purports to effect an assignment nunc pro tunc.

In any event, the Court has before it the parties' stipulation that Cargill assigned its Carmack Amendment claim to Scotlynn. While the parties did not stipulate as to the date of the assignment, Titan has not challenged Scotlynn's ability to bring a Carmack Amendment claim pursuant to the assignment. The Court infers from this failure that the stipulation includes the fact that the assignment occurred prior to the filing of the complaint. As a result, Scotlynn, as Cargill's assignee, can seek relief under the Carmack Amendment against Titan. [35]

### D. SCOTLYNN'S PRIMA FACIE CASE

To establish its prima facie case under the Carmack Amendment, Scotlynn must prove by a preponderance of the evidence that (1) the Cargo was delivered to Titan in good condition, (2) the Cargo arrived at Cargill's facility in damaged condition, and (3) a specified amount of damages

Scotlynn USA Division, Inc. v. Titan Trans Corporation, 555 F.Supp.3d 1246 (2021)

Fed. Carr. Cas. P 85,006

resulted. A.I.G. Uruguay, 334 F.3d at 1003. It is undisputed that the first element is satisfied here. (Findings of Fact ¶ 41.) Therefore, the Court will address only the second and third elements.

### 1. Arrival of the Cargo in damaged condition

[8] To establish the damaged condition of goods upon delivery, a plaintiff may rely **\*1269** on direct or circumstantial evidence. Fuente Cigar, Ltd. v. Roadway Express, Inc., 961 F.2d 1558, 1560–61 (11th Cir. 1992). "It takes very little direct evidence to satisfy the second element while it takes a much greater degree of circumstantial evidence." Id. at 1561 n.6.

The only evidence in the trial record as to Cargill's rejection of the beef upon delivery is the testimony of Ms. Stegman, but that testimony provided no direct evidence that the beef was exposed or otherwise damaged or unfit for human consumption as a result of the shifting of the combos during its transit from Georgia to Wisconsin. Ms. Stegman did not personally see or inspect the Cargo. No witness described from personal observation the condition of the beef upon its arrival at Cargill's facility. And there was no evidence that an inspection by a food safety expert was performed, despite the fact that further investigation could have revealed whether there was a risk of or actual contamination. (Findings of Fact ¶¶ 50-51.) Cargill's policy to reject shipments based on an unsubstantiated potential of contamination is not evidence that the Cargo was actually contaminated—and to what extent —and thus damaged. See Fraser-Smith Co. v. Chi., Rock Island & Pac. R.R. Co., 435 F.2d 1396, 1400 (8th Cir. 1971) (finding failure of proof on issue of damage to a shipment of corn where the only witness who testified as to its condition on arrival did so based on hearsay and did not himself see the corn or inspect it, and that evidence that goods were "unmarketable" did not establish that the goods were "totally worthless"); Mecca & Sons Trucking Corp., 2016 WL 5859018, at \*4 (holding that shipment of cheese properly rejected due to repeated exposure to unsafe temperatures).

[9] Whether the Cargo was damaged on arrival can be shown "by substantial and reliable circumstantial evidence alone." Fuente Cigar, Ltd., 961 F.2d at 1561. However, the only circumstantial evidence of damage to the beef is that the combos had shifted forward and partially tipped over, with the outer packaging damaged on two of the combos. There is no evidence that the inner plastic bags were torn or unsealed, and the photographs are insufficient for the Court to infer that the beef was exposed. See, e.g., Penske Logistics, Inc. v. KLLM, Inc., 285 F. Supp. 2d 468, 472 (D.N.J. 2003) (finding evidence insufficient to prove that cargo was damaged where admission that refrigeration unit was not on "does not shed any light on whether not having the refrigeration unit on actually damaged the product").

[10] Nevertheless, despite the absence of evidence that the beef was damaged, the evidence showed that the Cargo as delivered needed to be reworked to fulfill its intended purpose. The evidence demonstrated that the combos had to be unloaded using methods unavailable to Cargill, inspected for breakage that could have exposed the beef sealed in the inner plastic bags, and, if there was no exposure, repackaged for redelivery. To perform these services, the cost of paying a third party would have been incurred, and some amount of beef would likely have been lost. In addition, the time required to rework the Cargo would likely have resulted in diminution in value to the beef. These facts are sufficient to satisfy Scotlynn's burden of showing that the Cargo was damaged when it was delivered. See Fuente Cigar, Ltd., 961 F.2d at 1561 (noting that to satisfy the second element, the plaintiff "must prove only that some damage occurred during" transit).

### 2. Specified amount of damage to the Cargo

[11] Scotlynn's prima facie case falters on the third element, which requires proof **\*1270** of "a specified amount of damages." A.I.G. Uruguay, 334 F.3d at 1003 (emphasis added); see also Fuente Cigar, Ltd., 961 F.2d at 1561 n.7 ("The amount of recoverable damages becomes relevant only when analyzing the third element."). Even though the Cargo sustained some damage during transit, due to Cargill's immediate rejection of the Cargo as worthless, Cargill's failure to have the load inspected at its facility by its on-site USDA inspector, and Cargill and Scotlynn's other stumbling actions over the next several days, the Court is without a sufficient evidentiary basis to ascertain the extent of the damage to the beef when the Cargo arrived at Cargill's facility. Simply stated, Scotlynn has failed to establish a specified amount of damages here.

Fed. Carr. Cas. P 85,006

Scotlynn's request for the entirety of the invoice price and contention that the Cargo was "worthless" are unavailing. In this regard, 🚩 Fraser-Smith Co., which involved a brokered shipment of corn, is instructive. There, a delay in transit caused the corn to heat up and turn sour, and the shipment was rejected on arrival. 🚩 435 F.2d at 1398. Although the carrier's delay damaged the corn, the court found "the more troublesome issue" to be "the rejection of the goods and the damages that were found against the carrier." 🚩 Id. at 1399. The court explained:

> The law is well settled that where goods are shipped by common carrier and become damaged in transit, the consignee nevertheless has the duty to accept the shipment. Under such circumstances the consignee's obligation is not affected by the fact that the goods have been injured or damaged during transit, unless they are considered to be "totally worthless."

🚩 Id. (citations omitted).

[12]  Damaged goods are deemed "worthless" when they "are worthless for their intended purpose or worth only their salvage value." 🚩 Paper Magic Grp., Inc. v. J.B. Hunt Transp., Inc., 318 F.3d 458, 463 (3d Cir. 2003) (internal quotation marks and citation omitted). The evidence refutes Scotlynn's contention that the Cargo was "worthless" and that Cargill was therefore not obligated to accept the Cargo. Indeed, Cargill rejected the beef not because the beef was contaminated, unfit for human consumption, or worthless; it rejected the Cargo because the Cargo could not be unloaded at its facility in the condition in which it was delivered under Cargill's standard forklift unloading procedures. Cargill's cursory inspection of the outer packaging of a few combos was insufficient to establish a total loss of a shipment. See Allied Tube & Conduit Corp. v. S. Pac. Transp. Co., 211 F.3d 367, 372 (7th Cir. 2000). Further, there is no evidence or authority supporting a finding that any difficulty in unloading the combos due to their shifting rendered the Cargo worthless. To the contrary, the Court finds that, as discussed above, the vast majority of the beef combos could have been reworked and redelivered, with loss of only a very small percentage of

the beef and the cost of reworking the containers. Indeed, the very fact that FPL had agreed to accept the return of the Cargo undermines Scotlynn's contention that the Cargo as delivered by Titan was worthless. [36]

Ultimately, because of the improper rejection of the Cargo as "worthless," there **\*1271** is no evidence from which the Court can infer the market value of, or any other measure of damage to, the Cargo. The salvage price obtained by Titan's insurer weeks later certainly did not represent the fair market value of the Cargo on the date that Cargill rejected it. Indeed, this is supported by FPL's willingness on Friday to accept redelivery of the Cargo. See 🚩 Fraser-Smith Co., 435 F.2d at 1401 (finding that "the evidence conclusively shows that the ultimate salvage price obtained ... at least two weeks after its delivery to the consignee ... did not represent the fair market value of the corn on the date" the shipment was rejected).

In sum, unlike in 🚩 Fraser-Smith Co., "the record does [not] establish a range of discount values which would allow a trier of fact to ascertain the reasonable market value of the shipment at the time of its delivery" without resorting to conjecture and mere speculation. 🚩 435 F.2d at 1402. Rather, due to Cargill's rejection of the Cargo as worthless and its and Scotlynn's subsequent actions, there is no basis to determine a specified amount of damages, absent conjecture or speculation. [37]  Accordingly, the Court concludes that Scotlynn has not met its burden of proving a specified amount of damages suffered as a result of the delivery to Cargill. [38]

### E. TITAN'S SHOWING OF SHIPPER ERROR

[13]  Even if Scotlynn has established a prima facie case, its claim fails because Titan was free of negligence and the damage to the Cargo was caused by shipper error. See A.I.G. Uruguay, 334 F.3d at 1003. The first question is whether Titan has shown by a preponderance of the evidence that the proximate cause of the loss by the Cargo shifting during transit was the manner in which FPL loaded it. See Specialty Prods. Int'l, Ltd. v. Con-Way Transp. Servs., Inc., 410 F. Supp. 2d 423, 430 (M.D.N.C. 2006) (observing that the shipper's fault must be the "sole proximate cause of the loss" (citation omitted)). The Court finds that Titan has met its burden. (See Findings of Fact ¶¶ 84-97.)

To rebut this showing, Scotlynn offered evidence that Cargill had received tens of thousands of shipments from FPL in which the combos had not shifted. Some courts have relied on

Fed. Carr. Cas. P 85,006

similar evidence in rejecting a carrier's evidence of an error in shipper loading. See, e.g., Specialty Prods. Int'l, 410 F. Supp. 2d at 431. But the evidence here showed that, while uncommon, shipments of beef combos had in the past shifted forward in the truck. Moreover, the evidence showed that FPL has accepted responsibility for loading errors in the past, and that FPL agreed to accept redelivery of the Cargo when it first learned that the combos had shifted. Only later did FPL reject the beef due to the passage of time. Finally, the evidence showed that the only way the Cargo could have shifted was that the unidentified individuals who loaded the trailer failed to **\*1272** follow proper procedures by filling the void created by the odd number of combos.

The truck driver's failure to write the notation "shipper load and count" on the Bill of Lading does not affect whether Titan has shown shipper error. His admission that FPL handed him the Bill of Lading, even if he did not sign it, establishes carrier receipt of the Cargo and creates a rebuttable presumption that the items listed were in good condition when received. See Johnson & Johnson v. Chief Freight Lines Co., 679 F.2d 421, 422 (5th Cir. 1982); (Doc. 147-2 at 1, ¶ 8). "If no shipper load and count or similar notations appear on the face of the bill of lading, that bill should establish the presumption that the damage or loss was not occasioned by an act of the owner or shipper, and the carrier should have the affirmative burden of establishing that the loss or damage was, in fact, so caused." Johnson & Johnson, 679 F.2d at 422 (internal quotation marks and citation omitted). As noted, Titan has met this burden, and the absence of a "shipper load and count" notation does not preclude a showing of shipper error. [39]

Finally, Titan has shown that its truck driver was not negligent or otherwise at fault in failing to conduct a sufficient inspection and discover FPL's loading error or in the manner in which he transported the Cargo. The primary duty as to safe loading of cargo belongs to the carrier. United States v. Savage Truck Line, Inc., 209 F.2d 442, 445 (4th Cir. 1953); see 49 C.F.R. § 392.9(a)(1), (b)(1)–(3) (requiring the driver of a commercial motor vehicle to inspect cargo and confirm it is secure before and during transport). An exception is where the driver "of a sealed commercial motor vehicle ... has been ordered not to open it to inspect its cargo" or where the vehicle "has been loaded in a manner that makes inspection of its cargo impracticable." 49 C.F.R. § 392.9(b)(4); see also Ala. & V. Ry. Co. v. Am. Cotton Oil Co., 249 F. 308, 311 (5th Cir. 1918) (finding carrier not liable where defect in rail car could not have been ascertained); Savage Truck

Line, Inc., 209 F.2d at 445 ("When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper."); White v. Dietrich Metal Framing, No. 1:06-cv-554, 2007 WL 7049797, at *7–8 (E.D. Tex. July 5, 2007).

The evidence shows that FPL assumed the sole responsibility for loading the Cargo and that Titan's driver had no meaningful opportunity to inspect the Cargo. Further, to the extent necessary, the Court finds that the empty space at the front of the trailer constituted a latent or concealed defect that could not have been discovered by a reasonable investigation of the load. (Findings of Fact ¶¶ 34-36, 91-92);

see Lobdell v. Masterbrand Cabinets, Inc., No. 06-10948, 2008 WL 2224094, at *3 (E.D. Mich. May 29, 2008) (finding sufficient evidence that loading error was not apparent to driver where "[t]he cargo filled the entire length of the trailer and was stacked from top to bottom and from side to side," and there was "no evidence that there were apparent defects in the stacking").

The Court concludes that Titan was not negligent or otherwise at fault in failing to uncover FPL's loading error. There is also no evidence that the damage to the Cargo was caused by the truck driver driving in an improper manner. (Findings of Fact ¶¶ 84-85.) In summary, even if Scotlynn **\*1273** established its prima facie case, Titan has met its burden of proving shipper error, and Scotlynn's Carmack Amendment claim thus fails. The Court therefore enters judgment in favor of Titan on Count II.

### F. MITIGATION OF DAMAGES

[14] [15] Even if Scotlynn proved its Carmack Amendment claim, the recoverable damages would be limited due to its failure to mitigate damages. See Hector Martinez & Co. v. S. Pac. Transp. Co., 606 F.2d 106, 109 n.4 (5th Cir. 1979) [40]; see also Paper Magic Grp., Inc., 318 F.3d at 462–63; Fraser-Smith Co., 435 F.2d at 1399. Titan bears the burden to prove that Cargill, or Scotlynn acting on Cargill's behalf, did not exercise reasonable diligence in mitigating its damages. Eastman Kodak Co. v. Westway Motor Freight, Inc., 949 F.2d 317, 320 (10th Cir. 1991).

Fed. Carr. Cas. P 85,006

As to this issue, Scotlynn's evidence at trial focused on Titan's purported refusal to cooperate in returning the Cargo to FPL, which resulted in FPL refusing redelivery and a total loss of the Cargo. The Court, however, has rejected the asserted factual bases of Scotlynn's contention that Titan refused to cooperate. (Findings of Fact ¶¶ 59-68.) In any event, Titan had no duty to cooperate in the redelivery of the Cargo to FPL.

[16]  [17]  "It is well established ... that when damaged but salvageable goods are tendered to the owner, the carrier's liability for further damages terminates." Oak Hall Cap & Gown Co., Inc. v. Old Dominion Freight Line, Inc., 899 F.2d 291, 294 (4th Cir. 1990). Further, "when the damaged goods arrive at the shipper's destination, the consignee has a duty to accept them and mitigate damages unless the goods are deemed 'totally worthless.' " Id. (citations omitted); see also Fraser-Smith Co., 435 F.2d at 1401 ("We are unaware of any rule that a carrier must attempt to mitigate the consignee's damage once the consignee has given notice to the carrier that it intends to abandon the shipment."); S.C. Johnson & Son, Inc., 695 F.2d at 258 (noting that rejection did not require carrier to return cargo to shipper).

[18]  Accordingly, Titan had no obligation to return the Cargo to FPL or otherwise attempt to mitigate Cargill's damages. Further, it was Scotlynn that failed to ensure the Cargo was returned to FPL by Monday or inform Cargill on Friday that the return trip could not be made until Monday. [41] And Cargill or Scotlynn should have taken immediate, reasonable steps to mitigate the Cargo loss if a Friday return trip was required but not possible. For example, the combos could have been inspected and reworked locally. The beef in the combos had a guaranteed "use by" date of Tuesday or Wednesday of the following week, meaning it would likely still be fit for human consumption even accounting for any additional time —albeit, sold at a discount. Unlike in *1274 Swift-Eckrich, Inc. v. Advantage Sys., Inc., 55 F. Supp. 2d 1280, 1288 (D. Kan. 1999), where the shipper's "determination that it was singularly unwise to sell the meat for human consumption [was] insufficiently controverted," the evidence here indicates that, notwithstanding the "use by" date, the beef was not necessarily unfit for human consumption or worthless beyond salvage value. Yet the record reflects no effort by Mr. Marrapese to determine the Cargo's fitness for human consumption and only a single email on Monday indicating that he may have contacted two possible options. (Doc. 147-64.)

In short, Cargill and Scotlynn failed to reasonably mitigate damages after FPL refused to accept redelivery of the Cargo. Put differently, any damage that occurred to the Cargo as a result of the failure to timely return the Cargo to FPL was not "caused" by the Cargo shifting during transit. See Atl. Specialty Ins. Co. v. Digit Dirt Worx, Inc., 793 F. App'x 896, 900–01 (11th Cir. 2019) (noting that common carriers are liable for the "actual loss or injury to the property caused by the carrier" (internal quotation marks and citations omitted)). [42] To conclude, even if Scotlynn proved Titan is liable, the recoverable damages would be limited to the damage to the beef during its transit and upon delivery to Cargill. As previously discussed, there is simply no record evidence of that specified amount of damages.

## G. SCOTLYNN'S CLAIM FOR ATTORNEY'S FEES AND COSTS

In Count I, Scotlynn raises a claim titled "Indemnity," in which Scotlynn first alleges that the Broker-Carrier Agreement requires Titan to "indemnify Scotlynn in the event of any '[l]oss, damage or delay in transit as to all goods which Carrier receives for transport under this Agreement (to wit: cargo), until Carrier delivers such goods and the same are signed for and accepted by the consignee.' " (Doc. 62 at 3, ¶ 15 (quoting Doc. 147-1 at 9 ¶ 12(c)).) As discussed, however, Scotlynn's claim for indemnification as to the Cargo loss was previously determined to be preempted by the Carmack Amendment by a prior judge assigned to this case. Nonetheless, that order noted a possible exception to preemption for "an intermediary's contract-based indemnity claim for attorney's fees and costs," and allowed Scotlynn to amend its complaint to seek attorney's fees and costs pursuant to the Broker-Carrier Agreement. (Doc. 61 at 12-13.)

In Count I, Scotlynn does just that. Specifically, in support of its request for "entry of a judgment against Titan ... for costs, expenses and attorney fees," Scotlynn cites the following provision:

> Carrier shall pay all costs, expenses and attorney fees which may be expended or incurred by Broker or Broker's Customers in enforcing this Agreement or any provision thereof, including but not limited to Paragraph 12 above, or in exercising any right

Fed. Carr. Cas. P 85,006

or remedy of Broker or Broker's Customers against Carrier, or in any litigation incurred by Broker because of any act of omission of Carrier under this Agreement.

(Doc. 62 at 3-4; Doc. 147-1 at 10, ¶ 22.) Upon review, judgment in Titan's favor is also due on this claim.

First, although 🚩 Scotlynn was granted leave to amend its complaint to seek attorney's **\*1275** fees and costs, that grant of leave did not constitute a final determination that Scotlynn's claim was not preempted or otherwise meritorious. To the contrary, Scotlynn has failed to present evidence that shows the indemnification claim as to attorney's fees and costs is not also preempted by the Carmack Amendment.

[19]  [20]  Indeed, the Eleventh Circuit instructs that "separate and distinct conduct rather than injury must exist for a claim to fall outside the preemptive scope of the Carmack Amendment." 🚩 UPS Supply, 750 F.3d at 1289 (quotation and alterations omitted). Put simply, Scotlynn has not established separate and distinct conduct to support its claim for attorney's fees and costs under the indemnification provision. Rather, the basis of this claim is the same as the Carmack Amendment claim: the loss of the Cargo. Relying on 🚩 UPS Supply, other courts in this district have found this insufficient to save a claim for attorney's fees and costs from preemption. See, e.g., League Logistics, LLC v. Windy City Carriers, Inc., No. 6:20-cv-369-ACC-LRH, 2021 WL 2907761, at *5 (M.D. Fla. Apr. 5, 2021) ("To the extent Plaintiff's claim relates to recovery of its attorney's fees and costs pursuant to indemnification under the parties' Broker/Carrier Agreement, Plaintiff has not met its burden of establishing that this claim is not preempted by the Carmack Amendment as a matter of law."); 🚩 Scotlynn USA Div., Inc. v. Cold Ground Transp., LLC, No. 2:15-cv-152-FtM-38CM, 2016 WL 6066682, at *3 (M.D. Fla. Oct. 14, 2016). By contrast, the separate and distinct conduct in 🚩 UPS Supply was premised on a "direct violation of express terms" of a "separate and ongoing agreement," namely alleged subcontracting with another entity, which, if proven, could expose the intermediary to "legal jeopardy with its customer." 🚩 750 F.3d at 1294–95. There is no such conduct "separate and distinct from the loss of cargo" here. 🚩 Id.

at 1295. Accordingly, although 🚩 Scotlynn was allowed to pursue the claim beyond summary judgment, the evidence at trial demonstrates that Count I is preempted.

[21]  [22]  And even if the claim for attorney's fees and costs under the Broker-Carrier Agreement's indemnification provision is not preempted, Scotlynn has not shown that indemnification as to attorney's fees and costs is warranted here. In Florida, an indemnitor need not indemnify an indemnitee unless the indemnitee is found to be without fault, or in other words, the indemnitee's liability is founded on the indemnitor's liability, not its own. 🚩 Houdaille Indus., Inc. v. Edwards, 374 So. 2d 490, 492–93 (Fla. 1979); 🚩 SEFC Bldg. Corp. v. McCloskey Window Cleaning, Inc., 645 So. 2d 1116, 1117 (Fla. 3d DCA 1994); see also 🚩 Maseda v. Honda Motor Co., 861 F.2d 1248, 1257 n.15 (11th Cir. 1988) (observing that the "Florida Supreme Court has indicated that indemnity is appropriate only in situations where the indemnitee is wholly without fault and is haled into court solely due to the fault of another"); (Doc. 147-1 at 10, ¶ 25 (providing that the Broker-Carrier Agreement is to be construed according to Florida law)). Further, indemnification of a party for its own wrongful acts requires that the contract "express[es] such intent in clear, unequivocal terms." 🚩 SEFC Bldg., 645 So. 2d at 1117 (citations omitted).

Here, Cargill and Scotlynn have not shown to be without fault in the loss of the Cargo, and neither faces liability founded on Titan's liability. Further, the text of the Broker-Carrier Agreement did not express an intent in clear and unequivocal terms for indemnification as to attorney's fees and costs to apply in circumstances such as these. [43] And Scotlynn points to no authority **\*1276** supporting the proposition that such an indemnification provision requires Titan to pay attorney's fees and costs to Scotlynn, despite Titan prevailing as to the underlying, assigned claim.

In summary, indemnification as to attorney's fees and costs is not warranted, and judgment is due to be entered in Titan's favor on Count I. [44]

## CONCLUSION

In the words of the Seventh Circuit, "[t]he interstate shipment of goods is a complicated business." 🚩 REI Transport, Inc.

v. C.H. Robinson Worldwide, Inc., 519 F.3d 693, 695 (7th Cir. 2008). This case illustrates the point. One cargo of raw beef shifted in transit and, over the ensuing years, gave rise to conflicting claims among four entities, each potentially with its own duties and obligations under statute, common law principles, and contractual relationships. Sorting through these layers has not been an easy task. With this order, the case may finally come to an end. Following a bench trial and extensive review of the thousands of pages of record evidence, the Court finds that Titan is not liable to Scotlynn for the loss of the Cargo or indemnification as to attorney's fees and costs.

Accordingly, the Clerk of Court is **DIRECTED** to enter final judgment as to all counts against Plaintiff Scotlynn USA Division, Inc., and in favor of Defendant Titan Trans Corporation.

**DONE AND ORDERED** this 20th day of August, 2021.

**All Citations**

555 F.Supp.3d 1246, Fed. Carr. Cas. P 85,006

## Footnotes

1    To the extent that any findings of fact are deemed conclusions of law, they are incorporated herein as conclusions of law. Conversely, to the extent that any conclusions of law are deemed findings of fact, they are incorporated herein as findings of fact.

2    The Court finds all facts established by a preponderance of the evidence. The Court's citations to the record are not exhaustive; additional portions of the record were considered and relied upon. To the extent that portions of the record not specifically cited or addressed might support findings contrary to those of the Court, those portions were considered and rejected as not credible or against the weight of the evidence.

3    The carrier named in the Contract Carrier Agreement is Scotlynn Commodities, but neither party has suggested that this distinction is relevant. (Doc. 147-68 at 6.)

4    In its trial brief, Titan argued that Scotlynn violated 49 U.S.C. § 14916 by knowingly participating in an unlawfully brokered shipment. (Doc. 138 at 6-7.) Scotlynn moved to strike the purported defense because it was outside the scope of discovery and the legal issues presented in the final pretrial statement, and the Court granted Scotlynn's motion. (Docs. 142, 146.)

5    Briefly, a "combo" is a type of cargo container. A combo is fully described in Section I, C, <u>infra.</u>

6    "A bill of lading records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage." 🚩Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 18–19, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004). A "straight" bill of lading is a non-negotiable bill of lading, which provides that the transported goods are the property of a specified individual or entity, usually the buyer. <u>See</u> BUSINESS TRANSACTIONS SOLUTIONS § 123:4.

7    A "consignee" is the "party designated to receive a shipment of goods." 🚩Norfolk S. Ry. Co. v. Groves, 586 F.3d 1273, 1281 (11th Cir. 2009).

8    The findings in this section are based primarily on the testimony of Jerry Lowe, FPL's shipping manager, but also incorporate testimony from several other witnesses.

9    Scotlynn attempted to discredit the truck driver on cross-examination by addressing an affidavit he signed in support of Titan's motion for summary judgment, purportedly in contradiction with his later deposition

testimony. In the affidavit, the driver averred that: (1) FPL "load[ed], secure[d], and seal[ed] the beef cargo onto the trailer without [the driver's] supervision or participation"; (2) the driver "could not view the loading of the beef, could not verify how it was secured, and could not open the trailer after loading"; and (3) the driver had "no personal knowledge of loading and securing techniques used by FPL Food and was not permitted to partake in securing the load." (Doc. 147-122 at ¶¶ 5-9.) The Court finds that, with one minor ambiguity (note 10, infra), the driver's affidavit is consistent with his deposition testimony and the testimony of Jerry Lowe regarding FPL's standard procedures.

Additionally, Scotlynn questioned the truck driver and the notary public who notarized the affidavit, the wife of Titan's owner, about purported improprieties in the affidavit's drafting and execution. The Court finds no evidence of impropriety: the notary worked in Titan's office; the driver's native language is Polish, and he does not read or write English; and the notary, who speaks English and Polish, explained to the driver in his native language the contents of the affidavit before he signed it. Scotlynn's cross-examination did not reveal any reason to question either witness's testimony that a good faith effort was made to explain the substance of the affidavit, even if a word-for-word translation was not attempted or possible due to language differences. Further, Scotlynn's suggestion of impropriety based on the possibility that Titan's attorney drafted the affidavit is unpersuasive. See 🚩 Russell v. Acme-Evans Co., 51 F.3d 64, 67 (7th Cir. 1995) ("Almost all affidavits submitted in litigation are drafted by the lawyers rather than by the affiants....").

10   The only inaccuracy in the driver's affidavit, as demonstrated by his later deposition testimony, relates to when and how the trailer doors were closed. The affidavit stated that the driver "could not open the trailer after loading," suggesting that the doors were already shut when the driver was called back by the FPL employees after loading was completed. But the affidavit contained only an ambiguity as to whether the doors were open for any length of time between loading and sealing, and that ambiguity was later clarified at the driver's deposition.

11   One of the pictures taken upon the Cargo's delivery to Cargill shows a device called a load lock at the back of the truck, which had fallen on one side. (Doc. 147-38.) No testimony was presented to establish who placed the load lock in the trailer or when it was placed. FPL's standard policies and practices require the truck driver to provide the load lock, and FPL personnel would install it during the loading process. If the load lock is not in place when the trailer is turned over to the driver after loading is completed, the driver is supposed to either install it himself or request FPL personnel to do so. A load lock is a securing device used to prevent cargo from shifting to the back of the trailer during transportation and possibly falling onto the receiver when the trailer doors are opened. The weight of the testimony, however, reflects that load locks are not necessary for shipments of beef, and neither party presented evidence reflecting that the Cargo loss was caused by an improperly installed load lock.

12   There was testimony that, in addition to the Bill of Lading, the truck driver would have been given a copy of the Dispatch Print and Detailed Pallet Report. But there was no testimony as to whether that occurred here. The driver only mentioned receipt of the Bill of Lading.

13   The truck driver further testified that although he would sometimes sign a bill of lading, for instance, if the shipper asked him to, the shipper would not always ask him to sign. (Doc. 147-123 at 9, Tr. at 30–32; Doc. 147-124 at 4, Tr. at 62–63.)

14   The record contains eight photographs of the Cargo at the time of delivery, and three photographs taken by Titan's driver with his cell phone. (Docs. 147-32, 147-33, 147-34, 147-35, 147-36, 147-37, 147-39, 147-40, 147-41, 147-42, 147-43.) Scotlynn made an oral motion at trial to compel Titan to produce additional photographs of the Cargo, which were purportedly taken by Titan's owner, Walter Borawski, on or about the Friday after the Cargo was rejected but were withheld during discovery. Scotlynn believed additional

photographs existed because of a notation in the insurance adjuster's file indicating that the adjuster had directed Mr. Borawski to open the re-sealed trailer while in Titan's yard and take photographs to send to the adjuster. An email to the adjuster from Mr. Borawski around this time had three photographs attached, but they were the photographs taken by the driver on the day of delivery. Mr. Borawski's testimony as to whether he had taken additional photographs was somewhat confused. The Court finds that any discrepancies in his testimony on that issue were due to faulty memory and not intentional deception. Because all the record evidence suggests that the photographs Mr. Borawski sent to the adjuster were the three photographs taken by Titan's driver, the Court found that there were no additional photographs and, accordingly, denied Scotlynn's oral motion to compel.

15   "OS&D" stands for Overage, Shortage, and Damage, the department within Cargill that handles delivery issues.

16   This is especially true given that the discoloration is not apparent in photographs taken from different angles where the lighting may have been different.

17   Mr. Middleton was asked what he would "expect Cargill's Receiving Department to do" if he "saw the beef arrive looking like it does" in the photographs in this case, and his response was that he "would have to definitely call in a team and decide whether the load could be accepted or not." (Doc. 147-141 at 6, Tr. at 18.)

18   Joe Marrapese is Scotlynn's claims director, while Kevin Kollker is Scotlynn's Director of Operations, who was responsible for overseeing and monitoring claims.

19   Mr. Sowell testified he was instructed to return the Cargo to FPL by Mr. Miller, but Mr. Miller denied he did so, stating that he only turned the matter over to OS&D. (Doc. 147-130 at 11, 22, Tr. at 38–40, 83–84.) There is no testimony from Ms. Stegman regarding communications on Friday with Mr. Sowell or any other Scotlynn employee. Ms. Stegman would not have communicated with Titan because she, like Mr. Miller, did not know of Titan's involvement in the shipment at the time.

20   Hours of service regulations can be found on the FMCSA's website, https://www.fmcsa.dot.gov/regulations/hours-of-service. Scotlynn challenged the asserted basis of the driver's unavailability by noting that Titan had not retained the driver's driving logs to prove he reached the hours limit. The Court will not draw any unfavorable inference on this basis, however, because the evidence showed that Titan disposed of those logs as part of its routine procedures once the retention period required by federal law had expired, and there is no evidence that any issue as to those logs had been raised before that time.

21   Scotlynn attempted to discredit Titan on the issue of driver availability with testimony that the reset period after a driver reaches the hours limit is thirty-six hours, and that Titan's driver therefore could have left for Georgia over the weekend. This testimony was speculative as there was no evidence to prove the applicable federal rules regarding driver hours or to demonstrate the particular driver's availability over the weekend. In any event, there was neither evidence that Scotlynn discussed this possibility with Titan nor, if so, that Titan rejected it.

22   An internal dispatch note created by Mr. Sowell stated that he told Titan on Friday that if Titan did not return the Cargo by Monday there would be a full loss claim. This statement was added to Scotlynn's dispatch notes on September 30, a week after the purported conversation. The note is not credible because, by September 30, FPL had refused to accept redelivery and Mr. Sowell had a motive to blame Titan for the Cargo loss.

23   The truck driver did not speak English, was not the decision-maker for Titan, and was not working that evening. Under these circumstances, the driver's failure to answer Mr. Sowell's calls to his cell phone did not constitute a refusal to take Mr. Sowell's calls. The fact that Titan's owner was also not available to speak with Mr. Sowell on Friday similarly does not show lack of cooperation by Titan. Cargill's senior logistics broker

Fed. Carr. Cas. P 85,006

testified that shippers typically communicate with dispatchers (Doc. 147-130 at 25, 29, Tr. at 94, 112), and the evidence shows that Mr. Sowell spoke with Titan's dispatcher on at least four occasions between 5:55 p.m. and 10:30 p.m. Friday evening.

24    According to Scotlynn, "repowering the trailer" meant hiring a driver from a different carrier to return the Cargo to Georgia by connecting the trailer containing the Cargo to the other carrier's truck. Mr. Marrapese testified unconvincingly that Titan was hiding the location of the truck from Mr. Sowell, which prevented Scotlynn from arranging for the trailer to be repowered, an assertion the Court finds to be untrue. Mr. Borawski testified that Titan could not repower the trailer because doing so would require trailer interchange insurance, which Titan did not have. Mr. Sowell testified that if Titan would have agreed to repowering the trailer, he could have obtained the necessary insurance for Titan. The Court rejects this testimony as speculative as there is no evidence that Mr. Sowell made any effort to obtain the insurance. In any event, the Court finds this testimony not credible as to Titan's purported lack of cooperation because there is no evidence that Mr. Sowell offered Titan the option of Scotlynn purchasing the necessary insurance for Titan, let alone that Titan rejected such an offer.

25    The options included: (1) finding a local company to rework the Cargo for redelivery; (2) salvaging the product; and (3) insisting that Titan transport the Cargo to Georgia at no charge, with the risk that Titan would refuse and the Cargo would be declared a total loss. (Doc. 147-61 at 1.)

26    Mr. Marrapese's abandonment of the Cargo to Titan appears to have violated Cargill procedures, which provide that carriers are not permitted to dispose of product without Cargill's supervision due to food safety concerns associated with introducing rejected loads into the market. (Doc. 147-141 at 7, Tr. at 24.)

27    Other witnesses testified as to the use of airbags rather than stacked pallets, with at least one witness testifying that a stack of pallets was misguided because of the added weight of the pallets. But because there is no evidence that added weight caused the load shift, so as long as the empty space was filled with something to prevent the pallets from shifting forward when braking occurred, the Court must assume that FPL's standard procedure as testified to by Mr. Lowe would have prevented the damage to the Cargo here.

28    FPL's standard practice is to gather all documents related to a shipment that sustains damage during transit as part of its investigation into the cause of the damage. The documents that FPL produced in discovery, however, did not include the load diagram or any document identifying the employees who loaded the Cargo, both of which typically would have been gathered as part of FPL's investigation.

29    Scotlynn and Titan presented expert testimony of Michael Laws and Roger Shore, respectively. Before trial, both parties moved to exclude the competing expert testimony under Federal Rule of Evidence 702 and

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). (Docs. 108, 109.) The Court denied the motions without prejudice, finding that the objections related to the weight, not the admissibility, of the evidence, and allowing the parties to raise the issues at trial. (Doc. 123 at 2; Doc. 125.) At trial, both parties objected to the testimony of the competing experts on a similar basis, and the Court reserved its ruling, noting that the weight accorded to the testimony would be explained in its order. (Doc. 152 at 2-3; Doc. 153 at 1-2.) At the outset, the Court finds that the parties satisfied the requirements of

Rule 702 and Daubert as to any expert opinions of Messrs. Laws and Shore, and the motions to exclude or strike any opinions are due to be denied.

Further, as to the weight of the evidence, Mr. Laws opines that the combos shifted forward due to "repeated extreme and sudden braking" and that the "palletized packaging" suffered "severe lacerations." (Doc. 108 at 9-13; Doc. 108-1 at 4-5; Doc. 147-115 at 82:1–84:3.) However, as noted, even sudden or extreme braking would not establish negligence of the truck driver. And despite damage to the outer packaging of the combos,

Scotlynn USA Division, Inc. v. Titan Trans Corporation, 555 F.Supp.3d 1246 (2021)

Fed. Carr. Cas. P 85,006

there was no evidence of damage to the inner plastic bags or contamination of the beef. Any other opinions as to causation and mitigation of damages are against the weight of the evidence and, in any event, insufficient to establish Scotlynn's claim under the Carmack Amendment.

As to Mr. Shore, as noted, the Court credits his testimony that the void created by the odd number of pallets caused the combos to shift. (Doc. 147-120 at 21, 23; Doc. 110-3; Doc. 110-20.) In any event, even if Mr. Shore's qualifications or opinions do not satisfy 🚩Daubert, or exceeded the scope of the subject matter of Mr. Laws's opinions, see Fed. R. Civ. P. 26(a)(2)(D)(ii), his opinions were consistent with, and supported by, other record evidence. Accordingly, the exclusion of his opinions would not affect the disposition of Scotlynn's claims.

30   At one point in Ms. Kritsch's testimony, she agreed with Scotlynn's attorney's statement that, from the photographs, she could not see that FPL did anything that would have caused the combos to shift. The Court does not believe this general admission negates or raises significant doubts as to Ms. Kritsch's more specific testimony that the photographs suggested to her that the Cargo shifted because the white straps had not been placed on the combos properly.

31   The Court does not make any findings as to whether venue was proper in the Middle District of Florida. To the extent that venue may have been improper, see 49 U.S.C. § 14706(d)(2); Pacer Glob. Logistics, Inc. v. Nat'l Passenger R.R. Corp., 272 F. Supp. 2d 784, 788-91 (E.D. Wis. 2003); 🚩Burger King Corp. v. Thomas, 755 F. Supp. 1026, 1029 (S.D. Fla. 1991), Titan waived that challenge, see Fed. R. Civ. P. 12(b), 12(h)(1); (Doc. 63 at ¶ 2).

32   Titan argues in its trial brief that it is not liable because the damage to the Cargo was caused by Scotlynn's conduct. (Doc. 138 at 8.) Scotlynn's conduct, however, would not constitute one of the five excusable factors. Scotlynn's conduct, however, is relevant insofar as Scotlynn was acting on behalf of Cargill.

33   The Eleventh Circuit has not yet decided whether a broker's claim against a carrier to recover for loss of cargo under the terms of a broker-carrier agreement is preempted by the Carmack Amendment. Several courts have held that such claims are not preempted by the Carmack Amendment. See, e.g., 🚩Exel, Inc. v. S. Refrigerated Transp., Inc., No. 2:10-cv-994, 2012 WL 3064106 (S.D. Ohio July 27, 2012); 🚩InTransit, Inc. v. Excel N. Am. Rd. Transp., Inc., 426 F. Supp. 2d 1136 (D. Ore. 2006); 🚩Edwards Bros., Inc. v. Overdrive Logistics, Inc., 260 Ga.App. 222, 581 S.E.2d 570 (2003); cf. Razipour v. Joule Yacht Transp., Inc., No. 8:20-cv-729, 2020 WL 4904456 (M.D. Fla. Aug. 20, 2020) (claim for contribution against carrier with whom shipper contracted to prepare ship for transportation held preempted, distinguishing 🚩InTransit and 🚩Edwards because those cases involved contractual agreements between the broker and the carrier); but see Mecca & Sons Trucking Corp. v. White Arrow, LLC, Civil Action No. 14-7915, 2016 WL 5859018 (D.N.J. Sept. 16, 2016) (holding that broker's claims against carrier for negligence and indemnification were preempted by Carmack Amendment), aff'd on other grounds, 763 F. App'x 222 (3d Cir. 2019).

34   The Carmack Amendment defines "broker" as "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2). The Eleventh Circuit has held that, notwithstanding this definition, "a party is not a broker under the Carmack Amendment if it has agreed with the shipper to accept legal responsibility for that shipment." 🚩Essex Ins. Co., 885 F.3d at 1301. But 🚩Essex Insurance Co. does not

affect the conclusion that Scotlynn cannot bring its own Carmack Amendment claim against Titan because its relationship to Titan was as a broker.

35   As an additional wrinkle, the evidence shows that on November 4, 2016 Scotlynn issued a check to Cargill, and that on November 23, 2016 FPL credited Cargill for the Cargo loss. (Findings of Fact ¶¶ 78, 79.) There is no evidence, however, establishing that either act made Cargill whole or that the damages Scotlynn seeks as Cargill's assignee would constitute double recovery. To the extent Cargill was completely reimbursed by either Scotlynn or FPL, after November 4 or 23, 2016, Cargill would have no Carmack Amendment claim against Titan to assign to Scotlynn. (Findings of Fact ¶¶ 80-83); see Nova Info. Sys., Inc. v. Greenwich Ins. Co., 365 F.3d 996, 1004 (11th Cir. 2004) (finding that individuals had "no rights to assign to" a party where they were reimbursed prior to assignment); cf. Ameriswiss Tech., LLC v. Midway Line of Ill., Inc., 890 F. Supp. 2d 189, 193 (D.N.H. 2012) (observing that award of market value of goods, while allowing party to retain the goods "and thus their salvage value," would result in impermissible partial double recovery under Carmack Amendment). Titan does not raise this as a basis to reject Scotlynn's Carmack Amendment claim. In any event, the Court finds the stipulation includes that the assignment preceded Scotlynn's issuance of a check for the Cargo to Cargill on November 4, 2016.

36   The court explained in Fraser-Smith Co. that "[t]he proper measure of damage ... is the difference between the market value of the undamaged goods as shipped ... and the reasonable market value of the damaged product as delivered to the consignee[.]" 435 F.2d at 1402. Delivery generally means "spotting of a shipment at the consignee's place of business ... regardless of whether the consignee has accepted or rejected the goods. See Intech, Inc. v. Consol. Freightways, Inc., 836 F.2d 672, 674 (1st Cir. 1987).

37   See also S.C. Johnson & Son, Inc. v. Louisville & Nashville R.R. Co., 695 F.2d 253, 261 (7th Cir. 1982) ("Concededly there was some indication of damage [when delivered to the consignee], but damages may not be awarded on the basis of conjecture or speculation and the admitted fact of damage is insufficient to prove the amount of damage." (quotation and citation omitted)); Hams Exp., Inc. v. Joseph Land & Co., Inc., 506 F. Supp. 209, 213 (E.D. Pa. 1980) (stating that, while " 'the quantum of proof required to establish the amount of damage is not as great as that required to establish the fact of damage," it is also "elementary that purely speculative damages cannot be recovered"), aff'd, 661 F.2d 914 (3d Cir. 1981).

38   Cargill is, of course, free to establish its own business practices and procedures. But its business practices do not dictate the rule of law that this Court is bound to apply.

39   See, e.g., Allied Tube & Conduit Corp., 211 F.3d at 370 (observing that the notation relates to shifting the burden of proof).

40   Decisions of the Fifth Circuit decided prior to October 1, 1981 are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

41   The Broker-Carrier Agreement provided that "[i]n the event a shipment is rejected, in part or in whole, by the consignee, the Carrier shall immediately contact Broker and shall immediately follow Broker's instructions as to where to transport and/or otherwise dispose of the goods." (Doc. 147-2 at 1, ¶ 4.) However, Scotlynn does not explain how this provision relates to mitigation of damages as to a Carmack Amendment claim. In any event, this provision cannot reasonably be interpreted as imposing a duty on Titan to return the Cargo on Friday when it had no available drivers until Monday. (Id. ("Carrier shall transport and carry [the] goods without delay caused by anything within Carrier's control."); Id. at 4, ¶ 25 ("This Agreement is to be construed according to federal law governing transportation ....")).

Scotlynn USA Division, Inc. v. Titan Trans Corporation, 555 F.Supp.3d 1246 (2021)
Fed. Carr. Cas. P 85,006

42    See, e.g., M. Golodetz Exp. Corp. v. S/S Lake Anja, 751 F.2d 1103, 1112 (2d Cir. 1985) (where shipper

      allowed goods to sit after rejection, carrier not liable for "diminution in value between the moment [shipper]

      learned of [the consignee's] rejection and the time of the eventual sale"); 🚩Pilgrim Distrib. Corp. v. Terminal

      Transp. Co., 383 F. Supp. 204 (S.D. Ohio 1974) (carrier not liable under Carmack Amendment for damage
      to wine incurred during storage following rejection).

43    Although the Broker-Carrier Agreement required Titan to "defend" Scotlynn, (Doc. 147 at 9, ¶ 12), Scotlynn

      brought suit against Titan, as Cargill's assignee. See 🚩⚠Nat'l R.R. Passenger Corp. v. Rountree Transp.

      & Rigging, Inc., 286 F.3d 1233, 1261 (11th Cir. 2002) (noting distinction between indemnification and duty to
      defend claims). In any event, as pleaded in Count I, Scotlynn has not sought to enforce any such contractual
      duty. Rather, Scotlynn does not rely upon the agreement's language relating to a duty to defend, and the
      indemnification claim is limited to a request for attorney's fees and costs.

44    The issue of whether Titan is entitled to attorney's fees and costs is not before this Court. Any such request
      must comply with the Local Rules of the United States District Court for the Middle District of Florida.

---

**End of Document**                                         © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 2254946

2019 WL 2254946
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Orlando Division.

SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,
v.
Ronald C. MONTANO, Travis Stephenson,
Antonio Giacca, & Michael Wright, Defendants.

Case No: 6:18-cv-1606-Orl-31GJK
|
Signed 03/05/2019

**Attorneys and Law Firms**

Kenneth W. Donnelly, Samantha M. Williams, US Securities & Exchange Commission, Washington, DC, Christian W. Waugh, Waugh Law, P.A, Orlando, FL, for Plaintiff.

Michael Wright, Seattle, WA, pro se.

John Joseph Bennett, Michael A. Nardella, Nardella & Nardella, PLLC, Orlando, FL, for Defendants.

### ORDER

GREGORY J. KELLY, UNITED STATES MAGISTRATE JUDGE

**\*1** This cause came on for consideration without oral argument on the following motion:

> MOTION: DEFENDANT'S MOTION TO DISMISS, MOTION TO STRIKE PLAINTIFF'S INITIAL DISCLOSURE RESPONSES, AND MOTION TO COMPEL DISCOVERY (Doc. No. 40)
>
> FILED: February 8, 2019
>
> THEREON it is ORDERED that the motion is GRANTED IN PART AND DENIED IN PART.

On September 27, 2018, Plaintiff Securities and Exchange Commission (the "SEC") filed a Complaint against Defendants Ronald C. Montano, Travis Stephenson, Antonio Giacca, and Michael Wright, alleging numerous violations of the Securities Act of 1933 and the Exchange Act of 1934.

Doc. No. 1. The SEC alleges the following in Claims Seven and Eight:

> Wright knowingly or recklessly provided substantial assistance to violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), [and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5] by Montano, assisting Montano by creating marketing materials for at least nine of his campaigns during the Relevant Period.

*Id.* at ¶¶ 145, 148. On October 17, 2018, Wright, appearing pro se, filed his Answer and Affirmative Defenses. Doc. No. 10.

On February 8, 2019, Wright filed a motion to dismiss this action, or, in the alternative, to strike the SEC's Initial disclosures under Federal Rule of Civil Procedure 26(a)(1), and to compel the SEC to file proper Initial disclosures (the "Motion"). Doc. No. 40. Wright argues that the SEC's Initial disclosures evidence an intent to threaten and harass him, and therefore this action should be dismissed under Federal Rule of Civil Procedure 37(b)(2)(A)(v). *Id.* at 1. In the alternative, he moves to strike the Initial disclosures under Rule 37(b)(2)(A)(iii) and compel the SEC to file amended initial disclosures. *Id.* On February 14, 2019, the SEC filed its response to the Motion. Doc. No. 41.

Wright claims that the Initial disclosures constitute harassment for five reasons. Doc. No. 40. First, the SEC listed approximately 120 possible witnesses, plus general categories of people. *Id.* at 2-3. Wright argues that this is disproportionate to the issues in this case and would be impossible for Defendants to manage. *Id.* at 3. Second, Wright points to the SEC not providing a disclosure of the damages it seeks. *Id.* at 3-4. Third, Wright takes issue with the SEC listing his bankruptcy as a possible topic at trial. *Id.* at 4. Fourth, the SEC lists Wright's wife and daughter as possible witnesses, and Wright contends that their testimony is irrelevant. *Id.* at 4-5. Fifth, Wright complains that the SEC is copying and pasting from the case filed against Wright in this Court by the Commodity Futures Trading Commission. *Id.* at 5.

2019 WL 2254946

Wright's requests that this action be dismissed or that the Initial disclosures be stricken are denied. Rule 37(b) applies only to a failure to comply with a court order. The Initial disclosures were not served pursuant to a court order, but under Rule 26(a)(1). Thus, the relief Wright seeks is unavailable under Rule 37(b).

**\*2** The Court may, however, compel the SEC to serve amended initial disclosures. The SEC's initial disclosures list approximately 120 witnesses in addition to general categories, such as the following: "the affiliates, sub-affiliates, brokers, broker intermediaries, clients, and creators of marketing materials with whom Defendants worked regarding events alleged in the [SEC's] Complaint ...." Doc. No. 40-2 at 2.

"The initial disclosure obligation of subdivisions (a)(1)(A) and (B) has been narrowed to identification of witnesses and documents that the disclosing party may use to support its claims or defenses." Fed R. Civ. P. 26 advisory committee's note to 2000 amendment. There is no obligation "to disclose witnesses or documents, whether favorable or unfavorable, that [a party] does not intend to use." *Id.*

In *United States ex rel. Brown v. Celgene Corp.*, No. CV 10-3165 GHK (SS), 2015 WL 12731923, at \*2 (C.D. Cal. July 24, 2015), the plaintiff listed over 130 witnesses in addition to general categories of witnesses. In ordering the plaintiff to serve an amended initial disclosure, the court noted that Rule 26(a)'s purposes are to allow for adequate case preparation and foreclose unfair surprises. *Id.* Rule 26(a)'s goal is to quicken exchanging basic information and remove the paperwork in asking for that information. *Id.* There are two purposes for disclosing the witness information under Rule 26(a): enabling direct interviews or depositions or collecting evidence from the witness, and allowing " 'a party to develop its own evidence through available sources, such as its own employees, to rebut the witness's statements.' " *Id.* at \*3 (quoting *F.T.C. v. Sysco Corp.*, 308 F.R.D. 19, 22 (D.D.C. Mar. 31, 2015) ). "The initial disclosure requirement should be applied 'with common sense ... keeping in mind the salutary purposes that the rule is intended to accomplish.' " *Id.* (quoting *Fitz, Inc. v. Ralph Wilson Plastics Co.*, 174 F.R.D. 587, 589 (D. N.J. 1997) ). The plaintiff's list, which omitted a description of the witnesses' anticipated testimony, did not further Rule 26(a)'s purposes. *Id.*

> The Rule does not require a comprehensive listing of all persons with any possible knowledge about the facts at issue. Nor does it require, in the first iteration, a list of all witnesses a party intends to call at trial. Instead, the Rule requires the disclosing party to identify those witnesses whom the party believes in good faith, at an early stage of the litigation, it "may use" to support its claims or defenses. The initial list is intended to be a preliminary identification, subject to supplementation or correction "in a timely manner" pursuant to Rule 26(e) as facts develop.

*Id.* The initial disclosure should be "a preliminary, reasonable assessment, based on [the party's] knowledge at the time she initiated this lawsuit and whatever facts she has learned since then, of individuals [the party] currently believes she may use in support of her claims, subject to supplementation." *Id.*

The SEC's initial disclosures are substantially similar to the ones in *United States ex rel. Brown*. Although the SEC did list the subjects that the witnesses have knowledge of, the witness list exceeds one hundred, in addition to the generalized categories. Doc. No. 40-2. This fails to enable Wright to either adequately prepare his case or quickly receive basic information. Thus, the SEC is ordered to serve "a revised witness list pursuant to Rule 26(a)(1)(A)(i) narrowing the list of witnesses to those [it] now believes in good faith [it] 'may use' to support [its] claims." *United States ex rel. Brown*, No. CV 10-3165 GHK (SS), 2015 WL 12731923, at \*3.

**\*3** Wright also complains that the SEC did not provide a disclosure of the damages it seeks. Doc. No. 40 at 3-4. The SEC argues that it is not seeking damages; although it is seeking disgorgement and civil penalties, those are not damages. Doc. No. 41 at 4-6. In its response to the Motion, the SEC also states that it believes that co-Defendant Ronald C. "Montano received approximately \$6.9 million in ill[-]gotten gains and that Defendants' conduct risked over \$2.5 million in losses, which is the amount that the SEC estimates customers deposited in the hopes of obtaining access to automatic, wealth-generating software." *Id.* at 5.

2019 WL 2254946

Rule 26(a)(1)(A)(iii) does not apply to disgorgement or civil penalties, as neither are a damages remedy. *United States v. Stinson*, No. 6:14-CV-1534-ORL-22TBS, 2016 WL 8488241, at *7 (M.D. Fla. Nov. 22, 2016); 🚩*S.E.C. v. Razmilovic*, No. CV-04-2276 (SJFWDW), 2010 WL 2540762, at *2 (E.D.N.Y. June 14, 2010). Thus, the Court will not require the SEC to amend its initial disclosures to include a computation of each category of damages it claims.

Accordingly, it is **ORDERED** that the Motion (Doc. No. 40) is **GRANTED IN PART AND DENIED IN PART** as follows:

1. On or before March 19, 2019, the SEC shall serve a revised witness list pursuant to Rule 26(a)(1)(A)(i) narrowing the list of witnesses to those it now believes in good faith it may use to support its claims; and

2. In all other respects, the Motion is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida, on March 5, 2019.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2254946

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.