**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 1:18-cv-24190**

WILLIAM O. FULLER, and
MARTIN PINILLA, II,

       Plaintiffs,

  v.

JOE CAROLLO,

       Defendant.

_____/

## PLAINTIFFS' NOTICE OF FILING CASELAW IN SUPPORT OF PLAINTIFFS' ORAL MOTION FOR A JUDGMENT AS A MATTER OF LAW AND PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

      Plaintiffs Bill Fuller and Martin Pinilla hereby file for the record caselaw cited in support of their oral Motion for Judgment as a Matter of Law and Response to Defendant's Motion for Judgment as a Matter of Law, which was heard by the Court on May 31, 2023. This caselaw was provided to the Court and defense counsel in physical, printed copies on May 30, 2023.

      Dated: June 1, 2023

                        **AXS LAW GROUP, PLLC**
                        2121 NW 2nd Ave, Suite 201
                        Wynwood, Florida 33127
                        Telephone: (305) 297-1878

                        By: */s/ Jeffrey Gutchess*
                        Jeffrey W. Gutchess Esq. (FBN 702641)
                        jeff@axslawgroup.com
                        eservice@axslawgroup.com

**<u>CERTIFICATE OF SERVICE</u>**

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via CM/ECF on counsel of record of in this action on this 1st day of June 2023.


By: <u>*/s/ Jeffrey Gutchess*</u>

Jeffrey W. Gutchess Esq.

Bennett v. Hendrix, 423 F.3d 1247 (2005)

18 Fla. L. Weekly Fed. C 947

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by   Rager v. Augustine,   N.D.Fla.,   November 8, 2017

KeyCite Overruling Risk - Negative Treatment

Overruling Risk   Pearson v. Callahan,   U.S.,   January 21, 2009

423 F.3d 1247

United States Court of Appeals,

Eleventh Circuit.

Danny M. BENNETT, Danny L. Reid, Tammy R. Bennett, Plaintiffs–Appellees,

v.

Dennis Lee HENDRIX, Individually and in his Official capacity as Sheriff of Forsyth County, Earl A. Singletary,

Individually and in his Official Capacity as Chief Deputy Sheriff of Forsyth County, David W. Waters,

Individually and in his Official Capacity as a Deputy Sheriff of Forsyth County, Defendants–Appellants,

James L. Lockhart, Individually and in his Official Capacity as a Deputy Sheriff of

Forsyth County, John Does, 1–10, Individually and in their Official Capacities as Deputy

Sheriffs and/or Officers of the Forsyth County Sheriff's Department, et al., Defendants.

No. 04–12256.

|

Sept. 9, 2005.

**Synopsis**

**Background:** Supporters of referendum that would have diminished sheriff's power brought § 1983 action against sheriff and deputies, alleging campaign of retaliation and intimidation. The United States District Court for the Northern District of Georgia, No. 00–02520–CV–TWT–1, Thomas W. Thrash, Jr., J., denied officers' claim of qualified immunity, and they appealed.

**Holdings:** The Court of Appeals, Wilson, Circuit Judge, held that:

alleged misconduct violated supporters' right against retaliation for exercise of their free speech rights, and

supporters' right to be free from such retaliatory harassment was clearly established.

Affirmed.

**Procedural Posture(s):** On Appeal.

**Attorneys and Law Firms**

**\*1248** Phillip E. Friduss, Paul Robert Koster, Hall, Booth, Smith & Slover, PC, Atlanta, GA, for Defendants–Appellants.

Eric S. Chofnas, Alpharetta, GA, for Plaintiffs–Appellees.

Appeal from the United States District Court for the Northern District of Georgia.

Before BLACK and WILSON, Circuit Judges, and NANGLE [*], District Judge.

Bennett v. Hendrix, 423 F.3d 1247 (2005)

18 Fla. L. Weekly Fed. C 947

**Opinion**

WILSON, Circuit Judge:

Plaintiffs Danny M. Bennett and Danny L. Reid filed a complaint alleging that Dennis L. Hendrix, former Sheriff of Forsyth County, Georgia and Earl A. Singletary and David W. Waters, deputies who served under Hendrix, violated their civil rights. Plaintiffs alleged that these officers carried out a campaign of police harassment and retaliation after plaintiffs supported a county referendum opposed by the sheriff. After the district court entered an order denying the officers qualified immunity, they brought this appeal. We find no error in the district court's order, and therefore affirm.

I. BACKGROUND

In 1998, Forsyth County, Georgia voters considered a referendum that would have established a county-wide police force and diminished the power of the Forsyth County Sheriff's Department. [1] Most of **\*1249** the Department's powers would have been transferred to the county police, and the Sheriff would have been under the supervision of county officials. Sheriff Hendrix opposed the referendum. The plaintiffs are local business owners who supported the referendum. Along with other citizens, they formed a committee in support of the referendum and sponsored a debate on the matter.

The referendum was defeated at the polls, but the plaintiffs allege that Hendrix (along with the other defendants, fellow Sheriff's Department officers) engaged in a campaign of retaliation and intimidation against the plaintiffs because of their support of the referendum. The plaintiffs allege that Hendrix formed a "Strike Force" within the Department to carry out this process of intimidation.

Among many other acts of intimidation, they allege the defendants took down license tag numbers of cars at a forum in support of the referendum, surveilled the plaintiffs' homes and businesses, set up roadblocks near their homes, stopped their cars without reason and issued false traffic citations, accessed government databases to obtain confidential information on the plaintiffs, attempted to obtain a warrant for their arrest on trumped-up environmental charges, and mailed flyers to 35,000 homes in Forsyth County calling the plaintiffs the "real criminals," members of a "chain gang," and "the same type of criminals that terrorize Forsyth County."

According to the plaintiffs, most of these events occurred shortly before the 2000 election, and were designed to intimidate the plaintiffs from opposing Hendrix's re-election that year. The plaintiffs assert that the intimidation tactics were successful. Although the plaintiffs voted and made campaign contributions during the 2000 election cycle, they allege that the defendants' actions chilled them from engaging in further political activities like they did in 1998.

The plaintiffs sued under 42 U.S.C. § 1983 in 2000, alleging violations of the First, Fourth, and Fourteenth Amendments, as well as a conspiracy to violate their civil rights, along with several state tort laws. The district court granted summary judgment to the defendants on most of these claims, but denied summary judgment on the plaintiffs' claim of retaliation in violation of the First Amendment, their § 1983 conspiracy claim, and state law claims against Hendrix, Singletary, and Waters. The defendants moved for summary judgment based on the defense of qualified immunity. The court held that the defendants were not entitled to qualified immunity because they had violated the plaintiffs' constitutional rights, and those rights were clearly established at the time. Accordingly, the district court denied summary judgment. [2]

II. JURISDICTION AND STANDARD OF REVIEW

Although the defendants' appeal is interlocutory, we have jurisdiction to review the district court's decision on qualified immunity pursuant to 28 U.S.C. § 1291 and *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). We review *de novo* the district court's decision denying qualified immunity, drawing all factual inferences in the

nonmovant's favor. *Durruthy v. Pastor,* 351 F.3d 1080, 1084 (11th Cir.2003). Summary **\*1250** judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

III. DISCUSSION

Our procedure in assessing qualified immunity is well-established. Government officials acting within their discretionary authority are ineligible for qualified immunity from suit when the facts "[t]aken in the light most favorable to the party asserting the injury ... show the officer's conduct violated a constitutional right" and "the right was clearly established." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001).

We have already determined, in an earlier appeal in this case, that "it is apparent that the defendants were acting within the scope of their discretionary authority." *See Bennett v. Hendrix,* 77 Fed.Appx. 504 (11th Cir.2003) (unpublished). The defendants had to establish this fact to be able to claim qualified immunity. Once they satisfied that burden, the burden shifted to the plaintiffs to establish a constitutional violation. *Vinyard v. Wilson,* 311 F.3d 1340, 1346 (11th Cir.2002).

*A. Violation of a Constitutional Right*

The precise test for determining whether the defendants' actions violated the plaintiffs' rights against retaliation is an issue of first impression in this Circuit. We first survey the law of other Circuits. To state a retaliation claim, the commonly accepted formulation requires that a plaintiff must establish first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech. *Constantine v. Rectors and Visitors of George Mason Univ.,* 411 F.3d 474, 499 (4th Cir.2005); *Keenan v. Tejada,* 290 F.3d 252, 258 (5th Cir.2002). The only prong at issue here is the second. [3] We must determine the standard for demonstrating an adverse effect on protected speech.

The other Circuits apply an objective test: "a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Constantine,* 411 F.3d at 500; *see also Washington v. County of Rockland,* 373 F.3d 310, 320 (2d Cir.2004) ("In the context of a First Amendment retaliation claim, we have held that '[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action.' ") (quoting *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir.2001)); *Garcia v. City of Trenton,* 348 F.3d 726, 728 (8th Cir.2003) ("The ordinary-firmness test is well established in the case law ...."); *Mitchell v. Horn,* 318 F.3d 523, 530 (3d Cir.2003) (plaintiff must allege adverse action "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights") (alteration in original); *Keenan,* 290 F.3d at 258 (ordinary firmness **\*1251** test is the "settled law of other circuits"); *Toolasprashad v. Bureau of Prisons,* 286 F.3d 576, 585 (D.C.Cir.2002) ("The widely accepted standard for assessing whether harassment for exercising the right of free speech is actionable ... depends on whether the harassment is likely to deter a person of ordinary firmness from that exercise.") (internal quotations and alterations omitted); *Poole v. County of Otero,* 271 F.3d 955, 960 (10th Cir.2001) ("[T]he alleged injury should be one that would chill a person of ordinary firmness from continuing to engage in that activity.") (internal quotations omitted); *Mendocino Envtl. Ctr. v. Mendocino County,* 192 F.3d 1283, 1300 (9th Cir.1999) ("[T]he proper inquiry asks whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities.") (internal quotations omitted); *Thaddeus–X v. Blatter,* 175 F.3d 378, 396 (6th Cir.1999) (en banc) ("[A]n adverse action

is one that would deter a person of ordinary firmness from the exercise of the right at stake."); *Agosto–de–Feliciano v. Aponte–Roque,* 889 F.2d 1209, 1217 (1st Cir.1989) (retaliation cause of action is stated "only when the government's actions are sufficiently severe to cause reasonably hardy individuals to compromise their political beliefs and associations"); *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982) (harassment for exercising the right of free speech not actionable if it was "unlikely to deter a person of ordinary firmness from that exercise").

The defendants point to other cases applying a subjective test, under which the plaintiffs would have to show that they were actually chilled in the exercise of their First Amendment rights. *See* *Curley v. Village of Suffern,* 268 F.3d 65, 73 (2d Cir.2001) (plaintiff must show that First Amendment rights were "actually chilled") (quoting *Davis v. Vill. Park II Realty Co.,* 578 F.2d 461, 464 (2d Cir.1978)). [4] For the reasons that follow, we join our sister Circuits in adopting an objective test for proving a retaliation claim.

First, although their decisions are not binding on us, we find the fact that every other Circuit has adopted the objective "ordinary firmness" test to be persuasive. Even accepting the defendants' premise that a few scattered cases applying a subjective "actual chill" test amounts to a "circuit split," the vast majority of cases apply the objective test. [5] We agree with the courts that have called the "ordinary firmness" test "well established," *Garcia,* 348 F.3d at 728, "widely accepted," *Toolasprashad,* 286 F.3d at 585, and "settled law," *Keenan,* 290 F.3d at 258.

Second, we are persuaded not only by the number of courts applying the "ordinary firmness" test, but by the reasoning of those decisions as well. An objective standard provides notice to government officials of when their retaliatory actions violate a plaintiff's First Amendment rights. In contrast, "a subjective standard would expose public officials to liability in some cases, but not in others, for the very **\*1252** same conduct, depending upon the plaintiff's will to fight." *Constantine,* 411 F.3d at 500. "[I]t would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity ...." *Mendocino Envtl. Ctr.,* 192 F.3d at 1300. There is no reason to "reward" government officials for picking on unusually hardy speakers. At the same time, we recognize that government officials should not be liable when the plaintiff is unreasonably weak-willed or suffers only a "*de minimis* inconvenience to her exercise of First Amendment rights." *Constantine,* 411 F.3d at 500 (internal quotation omitted); *see also* *Bart,* 677 F.2d at 625 ("It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise ...."). The "ordinary firmness" test is therefore protective of the interests of both government officials and plaintiffs alleging retaliation.

The defendants contend that "something more than the mere retaliatory act is necessary to give rise to an actionable claim." *Appellants' Brief* at 12. They are correct, but as we have explained, the "something more" is an adverse affect, and "adverse effect" depends on context. Specifically, private citizens must establish that the retaliatory acts would deter a person of ordinary firmness from exercising his or her First Amendment rights. The defendants' reliance on retaliation cases in the public employment context is misplaced, because different interests are at stake there. In the employment context, the required adverse action in a retaliation claim is an "adverse employment action." *See* *Stavropoulos v. Firestone,* 361 F.3d 610, 616 (11th Cir.2004), *cert. denied,* 544 U.S. 976, 125 S.Ct. 1850, 161 L.Ed.2d 727 (2005). Plainly, private citizens cannot suffer adverse employment actions at the hands of public officials who are not their employers. As the Fourth Circuit explained,

Determining whether a plaintiff's First Amendment rights were adversely affected by retaliatory conduct is a fact intensive inquiry that focuses on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts. *See* *Thaddeus–X v. Blatter,* 175 F.3d 378, 398 (6th Cir.1999) ("[T]he definition of adverse action is not static across contexts."). For example, in the public employment context, the speaker is the

employee and the retaliator is the public employer. The employment relationship between the speaker and retaliator creates competing interests between "the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees."

*Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 686 (4th Cir.2002) (quoting *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968)) (alterations in original). As the Fifth Circuit pointed out, "[i]n the employment context, this court's requirement of an adverse employment action serves the purpose of weeding out minor instances of retaliation." *Keenan,* 290 F.3d at 258 n. 4. In other words, minor instances of retaliation would not chill a person of ordinary firmness because they did not even amount to an adverse employment action.

The balance of interests is different when the plaintiff is a private citizen, and those interests require at least as much protection against retaliation for a private citizen as they would for a public employee. **\*1253** [6] *See* *Thaddeus–X,* 175 F.3d at 398 ("[P]ublic employees ... may be required to tolerate more than average citizens, before an action taken against them is considered adverse."); *see also* *Keenan,* 290 F.3d at 258 (noting that "this case does not involve an employment or other contractual relationship between the plaintiffs and the governmental officials" and instead concerns "an ordinary citizen"); *Naucke v. City of Park Hills,* 284 F.3d 923, 927–28 (8th Cir.2002) (applying "ordinary firmness" test to private citizen's retaliation suit); *Poole,* 271 F.3d at 960 (same); *Suarez Corp.,* 202 F.2d at 686–87 (distinguishing between public employee and private citizen plaintiffs).

In sum, language from the cases, including our decision in *Stavropoulos,* requiring an adverse employment action in order for a public employee to state a retaliation claim does not necessitate that a private citizen plaintiff plead more than that the defendant's retaliatory acts are such as would chill a person of ordinary firmness. As we have stated, for private citizen plaintiffs, the objective test allows for a "weeding out" function when the injuries complained of are trivial or amount to no more than *de minimis* inconvenience in the exercise of First Amendment rights.

 The defendants next assert that the "ordinary firmness" test allows plaintiffs to state a claim even when they have not suffered an injury sufficient to give them standing to sue. We disagree. The plaintiffs' claim depends not on the denial of a constitutional right, but on the harassment they received for exercising their rights. "The reason why such retaliation offends the Constitution is that it threatens to inhibit exercise of the protected right." *Thaddeus–X,* 175 F.3d at 394 n. 9 (quotation omitted). "For Article III standing purposes, then, the 'plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.' As long as the injury is 'distinct and palpable' rather than abstract, conjectural, or hypothetical, it is sufficient to confer standing." *Id.* at 394 (quoting *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)).

The defendants' reliance on *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), is misplaced. In that case, the plaintiffs alleged a chilling effect based on the mere existence of the government's alleged program of surveillance of citizens. *Id.* at 2, 92 S.Ct. at 2320. The plaintiffs "freely admit[ted] that they complain of no specific action of the Army against them." *Id.* at 9, 92 S.Ct. at 2323. The Supreme Court held that this alleged injury was insufficient to confer standing. *Id.* at 13–14, 92 S.Ct. at 2325–26.

However, the *Laird* Court noted that, "[i]n recent years this Court has found in a number of cases that constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations **\*1254** that fall short of a direct prohibition against the exercise of First Amendment rights." *Id.* at 11, 92 S.Ct. at 2324 (collecting cases). Moreover, "[t]he decisions

in these cases fully recognize that governmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights." *Id. at 12–13, 92 S.Ct. at 2325.* The standard established in *Laird* is that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* at 13–14, 92 S.Ct. 2325–26. The standard we adopt today is consistent with *Laird.* The objective "ordinary firmness" test requires plaintiffs to allege that the retaliatory acts of the defendants adversely affected them, which is an injury sufficiently adverse to give rise to Article III standing. *See Thaddeus–X, 175 F.3d at 394.*

As a final reason for approving the objective standard, we note that it is consistent with statements in our own cases, even though we have not explicitly adopted the "ordinary firmness" test. In *Cate v. Oldham, 707 F.2d 1176 (11th Cir.1983),* we enjoined a malicious prosecution action filed by state officials in retaliation against a citizen's lawsuit against those officials. *Id. at 1190.* We noted that "petitioner-appellant alleges more than that his freedom to exercise his right to petition will be chilled in the future. He alleges current deprivation, in the form of penalization for having exercised his right to petition in the past." *Id. at 1188.* We went on to state, "[t]his does not mean, however, that only if a plaintiff can prove actual, current chill can he prove irreparable injury. On the contrary, direct retaliation by the state for having exercised First Amendment freedoms in the past is particularly proscribed by the First Amendment." *Id. at 1189.* Thus, we did not focus on the plaintiff's subjective, actual chilling. Instead, we objectively assessed the defendants' actions and declared that an actual chill is not necessary to state a First Amendment violation: "[T]he *source* of that chill ... provides the critical irreparable injury to those citizens, regardless of whether actual chill is proved." *Id.; see also Holloman v. Harland, 370 F.3d 1252, 1268–69* (verbal censure from school official for student's silent protest during recitation of Pledge of Allegiance was a punishment intended "to dissuade [student] from exercising a constitutional right" and "cannot help but have a tremendous chilling effect on the exercise of First Amendment rights").

For all of the foregoing reasons, today we expressly adopt the following standard: A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights.

We now apply this standard to the plaintiffs' allegations, and readily conclude that the plaintiffs have alleged facts that a jury could find would deter a person of ordinary firmness from the exercise of First Amendment rights. In Judge Posner's words, "[t]he effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." *Bart, 677 F.2d at 625.*

The alleged retaliatory acts complained of here include a prolonged and organized campaign of harassment by local police officers. Taken in the light most favorable to the plaintiffs, the record is replete with instances where the defendants allegedly followed, pulled over, cited, intimidated, or otherwise harassed the plaintiffs. The defendants allegedly accessed confidential government databases containing information on the plaintiffs, attempted to obtain arrest warrants against the plaintiffs without probable cause, and produced and mailed **\*1255** to Forsyth County residents flyers depicting the plaintiffs as criminals terrorizing the county.

Other courts applying the "ordinary firmness" test have concluded that similar or less harassing acts constitute an adverse effect. *See Garcia, 348 F.3d at 729* (the retaliatory issuance of parking tickets totaling $35 created a jury issue because the defendant "engaged the punitive machinery of government in order to punish Ms. Garcia for her speaking out"); *Keenan, 290 F.3d at 259* (one plaintiff stated a retaliation claim that would chill a person of ordinary firmness with allegations that officers stopped his car and detained him for an unreasonable time, "allegedly with their guns drawn during part of the traffic stop, and ultimately issued only a minor traffic citation that was later dismissed"); *Bloch v. Ribar, 156 F.3d 673, 680–81 (6th Cir.1998)* (in response to plaintiff's criticism, sheriff publicly released confidential and humiliating details of plaintiff's rape; such act

was sufficiently adverse to chill a person of ordinary firmness); *Bart,* 677 F.2d at 624–25 ("campaign of petty harassments" against the plaintiff including "[h]olding her up to ridicule for bringing a birthday cake to the office" stated a cause of action for retaliation). Likewise, we held in *Cate* that a civil malicious prosecution suit brought by public officials could be sufficiently retaliatory to chill the plaintiffs' exercise of First Amendment rights. *Cate,* 707 F.2d at 1189.

Additionally, the plaintiffs testified that they were, in fact, actually chilled in the exercise of their rights because they did not participate in the 2000 election to the degree they would have but for the defendants' alleged actions. We note that "[t]he question is not whether the plaintiff herself was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done." *Garcia,* 348 F.3d at 729; *see also* *Constantine,* 411 F.3d at 500 ("While the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity, it is not dispositive."). In sum, we conclude that the acts alleged here, if true, are sufficiently adverse that a jury could find they would chill a person of ordinary firmness from exercising his or her First Amendment rights.

## B. Clearly Established Law

The final step in the qualified immunity inquiry is determining whether the law was clearly established so as to put the defendants on notice that their behavior violated the plaintiffs' rights. A right is clearly established if, in light of already-existing law, the unlawfulness of the conduct is "apparent," *see* *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987), and if a constitutional rule applies with "obvious clarity" to give an official "fair warning" that violating that right is actionable. *Vinyard,* 311 F.3d at 1350–52. We conclude that the law was clearly established at the time of the defendants' alleged actions that retaliation against private citizens for exercising their First Amendment rights was actionable.

This Court and the Supreme Court have long held that state officials may not retaliate against private citizens because of the exercise of their First Amendment rights. *See* *Cate,* 707 F.2d at 1186 (punishment for exercise of First Amendment rights violates First Amendment); *see also* *City of Houston v. Hill,* 482 U.S. 451, 462–63, 107 S.Ct. 2502, 2510, 96 L.Ed.2d 398 (1987) ( "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."); *see also* **\*1256** *Leslie v. Ingram,* 786 F.2d 1533, 1537 (11th Cir.1986) ("An intentional and wrongful retaliation for the assertion of a constitutionally protected right is a substantive civil rights violation which may be prosecuted in a federal court pursuant to 42 U.S.C. § 1983 ...."), *abrogated on other grounds by* *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Ga. Ass'n of Educators v. Gwinnett County Sch. Dist.,* 856 F.2d 142, 145 (11th Cir.1988) ( "The Government may not retaliate against individuals or associations for their exercise of First Amendment rights 'by imposing sanctions for the expression of particular views it opposes.' ") (quoting *Smith v. Ark. State Highway Employees,* 441 U.S. 463, 464, 99 S.Ct. 1826, 1827–28, 60 L.Ed.2d 360 (1979)).

Because this Court has held since at least 1988 that it is "settled law" that the government may not retaliate against citizens for the exercise of First Amendment rights, *Ga. Ass'n of Educators,* 856 F.2d at 145, we hold that the defendants were on notice and had "fair warning" that retaliating against the plaintiffs for their support of the 1998 referendum would violate the plaintiffs' constitutional rights and, if the plaintiffs' allegations are true, would lead to liability under § 1983.

## IV. CONCLUSION

For the reasons stated above, we conclude that, taking the facts in the light most favorable to the plaintiffs, the defendants' "conduct violated a constitutional right" and that "the right was clearly established." *Saucier,* 533 U.S. at 201, 121 S.Ct. at

2156. Accordingly, we affirm the order of the district court denying summary judgment and denying the defendants qualified immunity from suit.

AFFIRMED.

**All Citations**

423 F.3d 1247, 18 Fla. L. Weekly Fed. C 947

## Footnotes

\*    Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri, sitting by designation.

1    We present the facts in the light most favorable to the plaintiffs, the party opposing summary judgment. *Young v. City of Palm Bay,* 358 F.3d 859, 860 (11th Cir.2004).

2    The court granted summary judgment for the defendants as to the claims brought by plaintiff Tammy Bennett, and she is not a party to this appeal. Likewise, the district court granted summary judgment on the plaintiffs' claims against the additional defendants. Thus, the only issue before us is the entitlement of Hendrix, Singletary, and Waters to qualified immunity.

3    In the district court, the defendants conceded the first prong, that the plaintiffs' support for the 1998 referendum was protected speech. In addition, the defendants have never pointed to any indication in the record that they would have undertaken their allegedly retaliatory actions even absent the plaintiffs' speech. Accordingly, we agree with the district court that the plaintiffs have shown that there exists at least a genuine issue of material fact as to the third (causation) prong.

4    The defendants also cite *Sullivan v. Carrick,* 888 F.2d 1 (1st Cir.1989), as adopting an "actual chill" standard. However, the plaintiff there failed to allege any adverse action, and thus could not show sufficient injury to create standing. *Id.* at 4. Moreover, the court noted that the proper standard was whether the plaintiff's "speech was in fact chilled *or intimidated.*" *Id.* (emphasis added). Therefore, we do not read *Sullivan* to adopt unequivocally a subjective test.

5    We note that cases from the Second Circuit appear to take contradictory positions. *Compare Washington v. County of Rockland,* 373 F.3d 310, 320 (2d Cir.2004) (objective standard) *with Curley v. Village of Suffern,* 268 F.3d 65, 73 (2d Cir.2001) (subjective standard). We leave it to that Court to settle this disparity.

6    We note that several courts have applied the "ordinary firmness" test even in the prison context. It follows that a private citizen, not subject to the expected deprivations of prison life, deserves at least as much protection from retaliation. *See Mitchell,* 318 F.3d at 530; *Toolasprashad,* 286 F.3d at 585; *Thaddeus–X,* 175 F.3d at 398. We have held that "[t]o state a First Amendment claim for retaliation, a prisoner need not allege violation of a separate and distinct constitutional right .... The gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech." *Farrow v. West,* 320 F.3d 1235, 1248 (11th Cir.2003) (alterations omitted) (quoting *Thomas v. Evans,* 880 F.2d 1235, 1242 (11th Cir.1989)). For example, a prisoner can state a claim of retaliatory transfer even though he does

**Bennett v. Hendrix, 423 F.3d 1247 (2005)**

18 Fla. L. Weekly Fed. C 947

not have a constitutional right not to be transferred. 🚩 *Bridges v. Russell,* 757 F.2d 1155, 1157 (11th Cir.1985). Thus, nothing in our prisoner retaliation cases is inconsistent with adopting an "ordinary firmness" test for private citizens.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Colonies Partners LP v. County of San Bernardino, Slip Copy (2020)

2020 WL 5102160
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

COLONIES PARTNERS LP

v.

COUNTY OF SAN BERNARDINO, et al.

Case No. EDCV 18-420 JGB (SHKx)

|

Filed 07/28/2020

**Attorneys and Law Firms**

Erica R. Graves, Jonathan E. Phillips, Koren L. Bell, Steven E. Bledsoe, Steven A. Haskins, Stephen Gerard Larson, Larson O'Brien LLP, Los Angeles, CA, for Colonies Partners LP.

Brian S. Ginter, Susan E. Coleman, Charles E. Slyngstad, Kyle Anne Piasecki, Lauren Talia Krapf, Burke Williams and Sorenson LLP, Los Angeles, CA, for County of San Bernardino, et al.

**Proceedings: Order (1) GRANTING IN PART AND DENYING IN PART Defendants'
Motions for Summary Judgment (Dkt. Nos. 277, 278, 279, 281, 282); (2) GRANTING
Defendant Cope's Motion for Summary Judgment (Dkt. No. 280); and (3) DENYING Plaintiff
James Howard Erwin's Motion for Summary Judgment (Dkt. No. 294) (IN CHAMBERS)**

The Honorable JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court are the following six motions [1] for summary judgment:

• Filed by Defendant County of San Bernardino ("the County"), ("County MSJ," Dkt. No. 277);

• Filed by Defendant James Hackleman ("Hackleman"), ("Hackleman MSJ," Dkt. No. 278);

• Filed by Defendant Michael A Ramos ("Ramos"), ("Ramos MSJ," Dkt. Nos. 279, 284);

• Filed by Defendant R. Lewis Cope ("Cope"), ("Cope MSJ," Dkt. No. 280);

• Filed by Defendant Robert Schreiber ("Schreiber"), ("Schreiber MSJ," Dkt. No. 281); and

\* Filed by Defendant Hollis Bud Randles ("Randles"), ("Randles MSJ," Dkt. Nos. 282, 285) (collectively, "MSJs").

A docket entry styled as a motion for summary judgment is also pending, filed by Plaintiff James Howard Erwin ("Erwin"), [2] ("Erwin Opposition," Dkt. No. 294.)

The Court held a hearing on these matters on July 13, 2020. After considering the oral argument and papers filed in support of, and in opposition to, the matters, the Court GRANTS IN PART AND DENIES IN PART Defendants' MSJs, except Cope's MSJ, which is GRANTED. The Court DENIES Erwin's Motion.

## I. BACKGROUND

**A. Overview of the Six Operative Complaints and Consolidation under the Lead Case, <u>Colonies</u>**

The Motions arise from six similar actions against the County and several County actors. Defendants allegedly investigated and maliciously prosecuted Plaintiffs in retaliation for Plaintiffs' protected first amendment activity. The actions have been gradually consolidated under this lead case, <u>Colonies.</u> This section summarizes the claims and parties in each operative complaint.

**1. <u>Colonies Partners LP v. County of San Bernardino, et al.</u>**

On March 1, 2018, Plaintiff Colonies Partners LP ("Colonies") filed a complaint against the County, the San Bernardino County Flood Control District ("the District"), Ramos, Cope, Hackleman, Randles, Schreiber, Josie Gonzales ("Gonzales"), Ruth Stringer ("Stringer"), Adam Aleman ("Aleman"), Edmund G. Brown, Jr., Kamala D. Harris, Melissa Mandel, and Gary Schons. (Dkt. No. 1.) On June 1, 2018, Defendants Edmund G. Brown, Jr., Kamala D. Harris, Melissa Mandel, and Gary Schons ("AG Defendants") moved to dismiss. (Dkt. Nos. 50, 57.) On July 12, 2018, the Court granted AG Defendants' motion and dismissed the Complaint with leave to amend. (Dkt. No. 62.) Colonies filed a First Amended Complaint on July 25, 2018. ("<u>Colonies</u> FAC," Dkt. No. 64.)

The <u>Colonies</u> FAC alleges six causes of action: (1) retaliation under 🚩42 U.S.C. § 1983 (against all "Individual Defendants"); (2) <u>Monell</u> municipal liability under 🚩42 U.S.C. § 1983 (against the County); (3) supervisorial liability under 🚩42 U.S.C. § 1983 (against Ramos, Cope, Hackleman, and certain AG Defendants); (4) conspiracy under 🚩42 U.S.C. § 1983 (against all Defendants); (5) breach of contract (against the County and the District); and (6) breach of implied covenant of good faith and fair dealing (against the County and the District). (<u>Id.</u>) On August 15, 2018, AG Defendants moved to dismiss all claims against them in the FAC. (Dkt. No. 67.) The Court Granted the motion and dismissed all claims against the AG Defendants, without leave to amend. (Dkt. No. 86.) The Court granted AG Defendants' request for entry of a final judgment in their favor. (Dkt. Nos. 215, 216.)

**\*2** The District and Colonies filed cross motions for summary judgment in October 2017. Colonies sought summary judgment on its fifth cause of action against the District, for breach of contract, and the District sought summary judgment on each of Colonies' claims against it, including conspiracy, breach of contract, and breach of the implied covenant of good faith and fair dealing. (Dkt. Nos. 221, 223.) On November 14, 2019, the Court denied Colonies' motion and granted in part and denied in part the District's motion. ("MSJ Order," Dkt. No. 247 (granting the District's motion with regard to certain claims of breach of contract, as well as conspiracy and the implied covenant).)

**2. <u>Jeffrey S. Burum v. County of San Bernardino, et al.</u>**

The facts and claims alleged in <u>Colonies</u> are nearly identical to those in <u>Jeffrey S. Burum v. County of San Bernardino, et. al,</u> No. 5:18-cv-672-JGB (SHKx) ("<u>Burum</u>"). On April 2, 2018, Plaintiff Jeffrey S. Burum ("Burum") filed a complaint against the County, Ramos, Cope, Hackleman, Randles, Schreiber, Gonzales, Stringer, Aleman, Edmund G. Brown, Jr., Kamala D. Harris, Melissa Mandel, and Gary Schons. (<u>Burum</u> Dkt. No. 1.) On July 25, 2018, the Court granted Plaintiff leave to file a Second Amended Complaint. (<u>Burum</u> Dkt. No. 52) On July 25, 2018 Plaintiff filed a Second Amended Complaint. ("<u>Burum</u> SAC," <u>Burum</u> Dkt. No. 53.)

The <u>Burum</u> SAC alleges eight cause of action: (1) retaliation under 🚩42 U.S.C. § 1983 (against Ramos, Cope, Hackleman, Randles, Schreiber, and certain AG Defendants); (2) malicious prosecution under 🚩42 U.S.C. § 1983 (against Cope, Randles, and Schreiber); (3) fabrication of evidence under 🚩42 U.S.C. § 1983 (against Randles and Schreiber); (4) <u>Monell</u> municipal liability under 🚩42 U.S.C. § 1983 (against the County); (5) supervisorial liability under 🚩42 U.S.C. § 1983 (against Ramos,

*Colonies Partners LP v. County of San Bernardino, Slip Copy (2020)*

Cope, Hackleman, and certain AG Defendants); (6) conspiracy under 42 U.S.C. § 1983 (against all Defendants); (7) negligence (against the County, Ramos, Cope, Hackleman, Randles, Schreiber, and certain AG Defendants); and (8) intentional infliction of emotional distress (against the County, Ramos, Cope, Hackleman, Randles, Schreiber, and certain AG Defendants). (Id.) On October 2, 2018, the Court Granted a motion to dismiss all claims against the AG Defendants in the Burum SAC, without leave to amend. (Dkt. No. 86.).

On September 17, 2018, the parties in Colonies and Burum appeared for a scheduling conference, at which the Court ordered the consolidation of Colonies and Burum, along with James Howard Erwin v. County of San Bernardino, et al., No. 5:18-cv-01216-JGB (SHKx) and Mark A. Kirk v. County of San Bernardino, et al., 5:18-cv-01597-JGB (SHKx). Colonies would remain the lead case.

### 3. James Howard Erwin v. County of San Bernardino, et al.

The facts and claims in Colonies and Burum are similar to those in James Howard Erwin v. County of San Bernardino, et al., No. 5:18-cv-01216-JGB (SHKx) ("Erwin"). Erwin commenced the action on June 6, 2018, (Erwin Dkt. No. 1), and filed a first amended complaint on November 2, 2018, after consolidation of the cases, ("Erwin FAC," Dkt. No. 97). The Erwin FAC names as Defendants the County, Ramos, Cope, Hackleman, Randles, Schreiber, Gonzales, Stringer, and Aleman, and asserts nine causes of action: (1) retaliation under 42 U.S.C. § 1983 (against Ramos, Cope, Hackleman, Randles, and Schreiber); (2) malicious prosecution under 42 U.S.C. § 1983 (against Cope, Randles, and Schreiber); (3) fabrication of evidence under 42 U.S.C. § 1983 (against Randles and Schreiber); (4) Monell municipal liability under 42 U.S.C. § 1983 (against the County); (5) supervisorial liability under 42 U.S.C. § 1983 (against Ramos, Cope, and Hackleman); (6) conspiracy under 42 U.S.C. § 1983 (against all Defendants); (7) malicious prosecution (California Law) (against Aleman and Gonzales); (8) negligence (against all Defendants); and (9) intentional infliction of emotional distress (against all Defendants). (Id.)

### 4. Mark A. Kirk v. County of San Bernardino, et al.

**\*3** The facts and claims in Colonies and Burum are similar to those in Mark A. Kirk v. County of San Bernardino, et al., 5:18-cv-01597-JGB (SHKx) ("Kirk"). Mark A. Kirk ("Kirk") commenced the action on July 30, 2018, (Kirk Dkt. No. 1), and filed a first amended complaint on February 6, 2019 after consolidation with Colonies, ("Kirk FAC," Dkt. No. 131). The Kirk FAC names the County, Ramos, Cope, Randles, Schreiber, Gonzales, and Aleman as Defendants, and asserts six causes of action: (1) malicious prosecution under 42 U.S.C. § 1983 (against Ramos, Cope, Randles, and Schreiber); (2) retaliation under 42 U.S.C. § 1983 (against Ramos, Cope, Randles, and Schreiber); (3) fabrication of evidence under 42 U.S.C. § 1983 (against Randles and Schreiber); (4) Monell municipal liability under 42 U.S.C. § 1983 (against the County); (5) supervisorial liability under 42 U.S.C. § 1983 (against Ramos and Cope); and (6) conspiracy under 42 U.S.C. § 1983 (against all Defendants). (Id.)

### 5. Paul Biane v. County of San Bernardino, et al.

The facts and claims in Colonies and Burum are similar to those in Paul Biane v. County of San Bernardino, et al., 5:18-cv-02202-JGB (SHKx) ("Biane"). Plaintiff Paul Biane ("Biane") commenced the action on October 15, 2018. (Biane Dkt. No. 1.) On February 8, 2019 the Court granted the parties' joint request to consolidate Biane with the other consolidated cases, under the lead case Colonies. (Dkt. No. 134.) On the same day, Biane filed a first amended complaint. ("Biane FAC," Biane Dkt. No. 19.) The Biane FAC names the County, Ramos, Cope, Randles, and Schreiber as Defendants, and asserts six causes of action: (1) malicious prosecution under 42 U.S.C. § 1983 (against Ramos, Cope, Randles, and Schreiber); (2) retaliation under 42 U.S.C. § 1983 (against Ramos, Cope, Randles, and Schreiber); (3) fabrication of evidence under 42 U.S.C.

Colonies Partners LP v. County of San Bernardino, Slip Copy (2020)

§ 1983 (against Randles and Schreiber); (4) <u>Monell</u> municipal liability under 📁42 U.S.C. § 1983 (against the County); (5) supervisorial liability under 📁42 U.S.C. § 1983 (against Ramos and Cope); and (6) conspiracy under 📁42 U.S.C. § 1983 (against Ramos Cope Randles, and Schreiber). (<u>Id.</u>)

**6. <u>John Dino DeFazio v. County of San Bernardino, et al.</u>**

The facts and claims in <u>Colonies</u> and <u>Burum</u> are similar to those in <u>John Dino DeFazio v. County of San Bernardino, et al.</u>, 5:19-cv-00554-JGB (SHKx) ("<u>DeFazio</u>"). John Dino DeFazio ("DeFazio") commenced the action on March 28, 2019. ("<u>DeFazio</u> Complaint," <u>DeFazio</u> Dkt. No. 1.) On August 15, 2019, the Court granted the parties' joint request to consolidate <u>DeFazio</u> with the other consolidated cases, under the lead case <u>Colonies.</u> (Dkt. No. 220). The <u>DeFazio</u> Complaint names the County, Ramos, Randles, Schreiber, Aleman, and John Goritz[3] ("Goritz") as Defendants, and asserts six causes of action: : (1) malicious prosecution under 📁42 U.S.C. § 1983 (against all Defendants); (2) retaliation under 📁42 U.S.C. § 1983 (against all Defendants); (3) fabrication of evidence under 📁42 U.S.C. § 1983 (against all Defendants); (4) <u>Monell</u> municipal liability under 📁42 U.S.C. § 1983 (against the County); (5) supervisorial liability under 📁42 U.S.C. § 1983 (against Ramos); and (6) conspiracy under 📁42 U.S.C. § 1983 (against all Defendants). (<u>DeFazio</u> Compl.)

**B. The Motions and Supporting Documents**

The County, Hackleman, Ramos, Cope, Schreiber, and Randles ("Defendants") filed the Motions on January 27, 2020. (County MSJ; Hackleman MSJ; Ramos MSJ; Cope MSJ; Schreiber MSJ; Randles MSJ.) The Motions are accompanied by identical statements of undisputed fact and requests for judicial notice. ("DSUF," Dkt. Nos. 277-2, 278-2, 284-3, 280-2, 281-2, 285-3; "RJN," Dkt. Nos 277-3, 279-2, 284-4, 280-3, 281-3, 285-4.)[4] In addition, Defendants compiled an appendix of 125 Exhibits, (<u>see</u> "Compendium," Dkt. Nos. 283, 283-1 to 283-7, 286, 304).

**\*4**  The Court notes significant verbatim repetition of arguments in the Motions, with the exception of the County MSJ, which is unique. In essence there is one "prosecutor" template brief (for Ramos, Hackleman, and Cope) and one "investigator" template brief (for Randles and Schreiber), with name substitutions throughout to match the particular Defendant.[5]

On February 18, 2020, Plaintiffs filed their oppositions. Burum filed a consolidated opposition, ("Consolidated Opposition," Dkt. No. 291), and with Colonies, filed a joint statement of genuine disputes of material fact in support of the Consolidated Opposition, ("Joint SGD," Dkt. No. 291-1). Burum and Colonies included a statement of additional material facts. ("Joint SAF," Dkt. No. 291-1 (starting at page 53).) Burum and Colonies filed joint consolidated evidentiary objections, ("Consolidated Objections," Dkt. No. 291-2), as well as the following supporting documents:

- Declaration of Bruce A. Green, ("Green Declaration," Dkt. No. 291-3 (attaching expert report as Exhibit 1));

- Declaration of Kathryane O. Foster, ("Foster Declaration I," Dkt. No. 291-5 (attaching Exhibits 1 to 134, at Dkt. Nos. 291-6 to 291-8, and 298)

Plaintiffs other than Burum opposed the Motions as follows:

- Colonies filed an opposition, ("Colonies Opposition," Dkt. No. 292), which joins the Introduction, Factual Background, and Sections A, B, E, and F of the Consolidated Opposition, (<u>id.</u>).

- Erwin filed an opposition, ("Erwin Opposition," Dkt. No. 294), which joins the same parts of the Consolidated Opposition as Colonies, and joins the SGD and supporting documents, (<u>id.</u>).

- Biane filed an opposition, ("Biane Opposition," Dkt. No. 295), which joins [6] the Consolidated Opposition with regard to everything but Part III (legal standard), and joins the Joint SAF, (id. at 6 n.2). Biane included in support of his Opposition the Declaration of Dale K. Galipo. ("Galipo Declaration," Dkt. No. 295-2 (attaching Exhibit A).)

- DeFazio filed an opposition, (DeFazio Opposition," Dkt. No. 296), which joins the Consolidated Opposition, Joint SAF, and supporting exhibits, and includes a separate SGD, ("DeFazio SGD," Dkt. No. 296-1), and statement of additional material facts, ("DeFazio SAF," Dkt. No. 296-1, starting at page 9). DeFazio also includes the Declaration of Darren M. Harris, in support of his Opposition. ("Harris Declaration," Dkt. No. 296-2 (attaching Exhibits A and B).)

- Kirk filed an Opposition, ("Kirk Opposition," Dkt. Nos. 293, 299), which joins the Consolidated Opposition and Objections, Joint SGD, and Foster Declaration. (Id.; Dkt. No. 300).

The Oppositions also include a great deal of verbatim repetition with name substitution. Accordingly, the Court primarily cites the Consolidated Opposition in the discussion to follow, noting differences of position only where necessary.

**\*5** The six Defendants replied on March 9, 2020. ("Ramos Reply," Dkt. No. 307; "Schreiber Reply," Dkt. No. 308; "Cope Reply," Dkt. No. 309; "Hackleman Reply," Dkt. No. 310; "Randles Reply," Dkt. No. 311; "County Reply," Dkt. No. 312.) Defendants filed a second compendium of evidence in support of the replies, (Dkt. No. 313 (attaching Exhibits 127 to 180 at Dkt. Nos. 313-1 to 313-5)), and a supplemental request for judicial notice, ("RJN II," Dkt. No. 314). Defendants also responded to the Joint SGD and SAF, ("Response to Joint SGD," and "Response to the Joint SAF," Dkt. Nos. 317, 319), and to the DeFazio SGD, (Dkt. No. 315), filed evidentiary objections to the Joint SGD and Joint SAF, ("Defendants' Objections," Dkt. No. 316), and filed a response to DeFazio's SGD, (Dkt. No. 315).

On March 19, 2020, Plaintiffs filed a supplemental opposition regarding an order of the magistrate judge, (Dkt. No. 326), to which Defendants replied, (Dkt. No. 328). On March 23, 2020, the Court granted the parties' stipulation to dismiss Josie Gonzales as a Defendant. On March 27, the Court accepted the order of the magistrate judge regarding sanctions ("Spoliation Order," Dkt. No. 305). (See Dkt. Nos. 331 (accepting R&R).) The Spoliation Order requires an instruction that the jury may presume information in lost text messages deleted by Ramos on Ramos's personal phone after March 2018 and emails deleted from Ramos's campaign email account was unfavorable to Defendants. (Spoliation Order at 2.) After the July 13, 2020 hearing, DeFazio filed a supplement, (Dkt. No. 406), which Kirk, Biane, and Erwin joined, (Dkt. Nos. 407, 408-409.)


## II. FACTS

The following material facts are sufficiently supported by admissible evidence and are uncontroverted, [7] unless otherwise noted. They are "admitted to exist without controversy" for purposes of the Motions. See Fed. R. Civ. P. 56(e)(2); L.R. 56-3. The Court considers the parties' objections only where necessary. [8] All other objections are OVERRULED AS MOOT.

This case challenges the County DA's investigation and prosecution of Plaintiffs. The parties act on a densely populated timeline, and some have fluid or disputed roles. In what follows, the Court takes a roughly chronological approach, detailing a 2006 settlement agreement and the investigation and prosecution of Plaintiffs for procuring the agreement. The Court then summarizes facts relevant to supervisory roles, and concludes by reviewing evidence of Defendants' potential retaliatory motives.


### A. 2002 Colonies Quiet Title Action, and 2006 Settlement for $102 Million

**\*6** In 2002, Colonies initiated civil litigation against the County and the District, regarding easements for flood control and for water conservation, affecting title to real property owned by Colonies. (Joint SAF ¶ 6.) After the litigation started, Colonies

and Burum [9] made public statements critical of the County and they publicly and successfully supported pro-development candidates for the Board of Supervisors, including Gary Ovitt ("Ovitt") and Plaintiff Biane. (Id.)

On November 28, 2006, the County Board of Supervisors voted 3 to 2 to settle the lawsuits brought by Colonies, and the County and the District entered into a $102 million agreement with Colonies ("Settlement Agreement" or "Settlement"). (DSUF ¶ 1; Joint SAF ¶ 15.) Then-Supervisors Ovitt, Biane, and Bill Postmus ("Postmus") voted in favor of the Settlement. (Id.)

**B. The Investigation**
At some point, the County District Attorney's Office ("DA's Office") began to investigate the circumstances of the Settlement Agreement, in particular, whether the Settlement was the result of corruption or perhaps a bribe. As described in greater detail below, the investigation paved the way to individual Plaintiffs' indictment, trial, dismissal or acquittal, and now to this civil suit for retaliatory investigation and malicious prosecution.

A key question in this case is exactly when and why the investigation began. The facts tending to support a view that the investigation began early are as follows. Prior to the Settlement, Hackleman, an assistant DA and prosecutor, sent emails that demonstrate he was at least aware of Burum and Colonies' settlement negotiations with the County. (Joint SAF ¶ 12.) Second, after the Settlement, the Public Integrity Unit ("PIU"), within the DA's Office, discussed the Settlement in departmental meetings. (Joint SAF ¶ 16.) Third, around August 4, 2008, Randles, a senior investigator, asked associates of Postmus (who had voted in favor of the Settlement) about Burum and the Settlement, and whether Postmus accepted a bribe. (Foster Decl., Ex. 17.)

In addition to the timing of the investigation, each Defendant's role is important to keep in mind. Ramos, the District Attorney —stated the PIU was created when he was elected district attorney in 2003, and that it was a "vertical prosecution" unit, where an investigator was assigned a DA, and they would handle the case from the investigation stage all the way through trial until the end of the case. (Foster Decl., Ex. 2 at 88-89.) Again, Hackleman was an Assistant DA. Lewis Cope, a prosecutor, helped jump start the PIU. (Joint SAF ¶ 12.; Foster Decl., Ex. 17.) Randles and Schreiber were PIU investigators.

**C. 2007 DA's Office Investigation into Another Matter, at the Assessor's Office**
After voting for the 2006 Settlement, Postmus moved from the Board of Supervisors to the County Assessor's Office. On August 8, 2007, the Board of Supervisors reported to the DA's Office allegations seemingly unrelated to the Settlement: that the County Assessor's Office, under Postmus, improperly utilized the services of a consulting firm. (Id. ¶ 2.) In 2008, the County Grand Jury also made a complaint to the DA Office's PIU regarding operations within the Assessor's Office. (Id. ¶¶ 2-3.) The PIU then initiated an investigation into the Assessor's Office. (Id.) In June 2008, in connection with this investigation, former Assistant Assessor Adam Aleman ("Aleman") was arrested and charged with six felony counts [10] alleging he falsified and destroyed County property and records. (Id. ¶ 4.)

 **\*7** The PIU began investigating conduct relating to the 2006 Settlement no later than November 1, 2008, when investigators interviewed Aleman about Postmus's activity at the Assessor's Office, and the 2006 Settlement became a topic of conversation. (SUF ¶ 6.) Before or during the interviews, the DA's Office provided typical notices to Aleman to provide truthful information. [11] (DSUF ¶ 7.) Thus, Defendants' view is the investigation into the Settlement Agreement began with the Aleman interview in November 2008. Plaintiffs' view is that a retaliatory investigation had already begun. [12]

**D. Aleman Interviews in November 2008**
Two Defendants participated in the Aleman interviews. Cope was present at the beginning of the Aleman interviews in November 2008, and Randles was one of the investigators actively questioning him. (Compendium, Ex. 2.)

*Colonies Partners LP v. County of San Bernardino, Slip Copy (2020)*

The parties supply transcripts and recordings of these and other interviews in the case. Aleman reported [13] to investigators: (1) that prior to the 2006 Settlement, Erwin (a perceived Burum ally) [14] showed him political hit pieces that would be released if the Colonies lawsuit was not settled; (2) that Postmus, Erwin, and Burum conducted pre-settlement "shuttle negotiations"; and (3) that Postmus, Erwin, Biane, and Kirk [15] each received $100,000 payments to political action committees ("PACs") they each effectively controlled, in exchange for voting or delivering BOS votes in favor of the 2006 settlement. (DSUF ¶¶ 8, 13.) Aleman also told investigators that Erwin threatened to expose Postmus's homosexuality and drug use and to expose Biane's financial difficulties if they did not vote to settle the Colonies lawsuit. (DSUF ¶ 9; Joint SGD ¶ 9 (disputing whether it was reasonable for Defendants to believe these statements).) Finally, Aleman told investigators that Burum took Erwin and another individual on a 2007 post-Settlement trip to New York City, where Burum bought Erwin a Rolex watch and provided $500 to spend on prostitutes. (DSUF ¶ 23.)

### E. 2008-2009 Follow-Up Investigation and Interview with Erwin

 **\*8**  In December 2008, Randles obtained search warrants for Burum's American Express account records and records confirming Burum's January 2007 purchases at a high-end watch store in New York. (DSUF ¶¶ 24-25.) Then in January 2009, Schreiber and other investigators served a search warrant at Erwin's residence, where Schreiber found a Rolex watch. (Id. ¶¶ 26-27.) Erwin participated in an interview at the time of the search warrant and stated that he was an intermediary during the Colonies settlement negotiations and agreed it would be "a fair statement" that Burum had discussions with him about "play[ing] hardball and get[ting] private investigators." (DSUF 28; Compendium, Exs. 11-12.)

At the November 2008 Aleman interviews, Aleman had told investigators Burum contributed to several PACs after the Settlement, and that the PACs were controlled by Postmus, Erwin, Biane, and Kirk. Investigators later seized documents from a third person pertaining to the PACs, (DSUF ¶ 29), and noted that Erwin's California Form 700 "Statement of Economic Interest" (filed February 8, 2007, April 1, 2008, and Sept. 30, 2008) did not disclose any benefits received in January 2007 from Colonies (PAC contribution) or from Burum, such as a Rolex or trip. (Id. ¶ 30.) In March 2009, Erwin was arrested and charged with perjury for his failure to disclose in the Form 700 benefits received from Colonies or Burum. (Id. ¶ 31.)

### F. April 2009 Interview with Kirk

On April 21, 2009, Randles and another investigator interviewed Kirk. (DSUF ¶ 32.) At the interview, Kirk denied he formed the Alliance for Ethical Government PAC and denied he directed its expenditures. (Id. ¶ 33.) Kirk told investigators Erwin gave him a file containing supposedly politically harmful information about Kirk. (Id. ¶ 34.)

In November 2009, in an email discussion about the process for naming a new County Chief Administrative Officer ("CAO"), Hackleman stated Kirk was "reportedly the ramrod" of the firing of the former CAO and that Kirk "intensely dislikes our County Counsel." (Joint SAF ¶ 30 (citing Foster Decl., Ex. 25).) Hackleman also stated "the boys" think "we come up short" on charging Kirk, but "it should go on our agenda for the meeting," and he had "the boys looking at it again." (Id.)

### G. October 2009 DeFazio Testimony Regarding PACs

In November 2008 Aleman had told investigators that he created an email address for Postmus to control expenditures of the Inland Empire PAC ("IE PAC"), and that he used the email to direct expenditures on behalf of Postmus. (DSUF ¶¶ 36-37; Joint SGD ¶ 36-37 (disputing the truth of those statements).) Yet on October 22, 2009, DeFazio testified before a grand jury that only four individuals (he, Mike Richman ("Richman"), Mike Gallagher ("Gallagher"), and Jeff Bentow ("Bentow")) had control of the IE PAC, that they had regular meetings about the IE PAC, and that no other person directed the IE PACs expenditures. (DSUF ¶ 38; DeFazio SGD ¶ 38.)

On October 30, 2009 Randles followed up with Bentow, who stated: (1) he was unaware he was an officer of the IE PAC, and (2) he hadn't spoken to DeFazio about the IE PAC other than to contribute. (DSUF ¶ 39.) The same day, Randles interviewed

Gallagher, who similarly stated he was unaware he was an officer and had merely spoken to DeFazio to contribute to the PAC. (Id. ¶ 40.) In November 2009, Richman began providing information to the DA's Office, and told investigators that Postmus and Aleman asked him to act as an executive director of the IE PAC but stated that Postmus would secretly control the PAC. [16] (Id. ¶¶ 41-43.)

### H. February 2010 Criminal Complaints Against Erwin, Postmus, and DeFazio

**\*9**  On February 9, 2010, the DA's Office filed a criminal complaint against Erwin and Postmus for their conduct related to the Settlement. [17] (Id. ¶ 44.) Erwin was arrested on February 10, 2010. [18] (Id. ¶ 45; RJN, Ex. 33.) On February 24, 2010, the DA's Office filed a criminal complaint against DeFazio, alleging two counts of perjury. (DSUF ¶ 46; RJN Ex. 34.)

### I. February and March 2011 Postmus Interviews

In February 2011, Postmus began providing information to the DA's Office. (DSUF ¶ 50.) Randles and Schreiber interviewed him on February 16, March 1, and March 10, 2011, after introductions with Cope present to answer questions. (Id. ¶ 53; Joint SAF ¶ 77.) On March 28, 2011, Postmus pleaded guilty to charges brought against him in connection with the 2006 Settlement, including asking for or receiving a bribe, and in connection with misconduct while he was serving as County Assessor. (DSUF ¶¶ 65, 66; Joint SAF ¶ 94.)

At the February 16, 2011 interview, Postmus told Randles and Schreiber that he agreed to and voted for the 2006 Settlement of the Colonies lawsuit because Erwin had threatened to expose Postmus's homosexuality and drug use. (DSUF ¶ 54; Joint SGD ¶ 54 (disputing extent to which Defendants reasonably believed Erwin was acting on behalf of Burum, based on Postmus's statements and background).) Postmus also told investigators he created two PACs specifically to receive the $100,000 Colonies contributions: Conservatives for a Public Majority PAC, and the Inland Empire PAC. (DSUF ¶ 60; Compendium Ex. 44)

The parties paint dueling caricatures of Postmus's statements at the interview. (DUSF ¶¶ 54-61.) For example, the transcript of the interview reflects that Postmus stated he had an interest in settling the Colonies lawsuit and "jump started" efforts with Biane to settle after he came back from a 2005 trip to China with Burum, during which he got to know Burum. (DSUF ¶ 55.) The transcript also shows Postmus stated he met Burum after the China trip in a series of meetings. (Id. (citing Compendium Exs. 39, at 117).) Plaintiffs cast doubt on the truth of these statements and imply investigators should not have believed them or may have manufactured them. Plaintiffs cite to Aleman's trial testimony to show that Postmus and Biane were spearheading efforts to settle prior to the China trip. (Joint SGD ¶ 55 (citing Foster Exs. 100, 153).) In another disputed example, Postmus told investigators that he and Burum discussed Postmus's sexuality and that Burum offered to either support him in political office or set him up in business if he got the settlement done. (DSUF ¶¶ 58, 59 (citing Compendium Ex. 42 at 45-46, 112-114).)

Thus, Defendants claim Postmus effectively stated Burum "extorted" or "bribed," him (DSUF ¶ 58), while Plaintiffs argue Defendants mischaracterize Postmus's vague statements as legal conclusions and Postmus never described a quid pro quo. (Joint SGD ¶ 58.) Plaintiffs repeatedly cite to Postmus's later statements at Burum's trial that he had memory lapses or may have gotten the facts or sequence of facts wrong. (Id. ¶¶ 55, 58.)

**\*10**  The parties also dispute whether investigators fabricated Postmus's statements by manipulating him. This much is clear: prior to the interviews, the DA's Office provided the typical notices. Postmus was instructed to respond truthfully and completely to interview questions. (DUSF ¶ 52.) While testifying in the later criminal trial, Postmus stated that he told the truth to the DA's Office investigators during the interviews. (DSUF ¶ 62.) But then on cross examination, Postmus stated it was clear to him now that the investigators put words in his mouth or filled in details when he had lapses in memory, and he began to believe those details. (Joint SGD ¶ 17, ¶ 62 (citing Foster Decl., Exs. 94, 97).) Postmus stated that one of those false beliefs was this deal he had with Burum. (Joint SGD ¶ 62 (citing Foster Decl., Ex. 94 at 8470-74).)

Plaintiffs also point to evidence that Randles and Schreiber knew Postmus had a drug addiction prior to the indictment of Biane, Kirk, Erwin, and Burum. (Joint SGD ¶ 58 (Foster Ex. 89 at 76, Ex. 94 at 8431 (showing the investigators knew of Postmus's substance abuse at the time of interviews)).) In an August 2010 email, long before the interviews, Hackleman mused in an email that Postmus's addition left him with an "addled brain" and "I cannot be confident that he will suddenly develop skills of logic." (Joint SAF ¶ 90.) However, after the first Postmus interview, a prosecutor in the AG's office stated in an email exchange, "I don't think anything [Postmus] said showed any indicia of reliability," and "we should use great caution in relying on the information he is providing." (Foster Decl., Ex. 137; Joint SAF ¶ 83; see also Joint SAF ¶¶ 123-28, 131-34 (adding further factual contentions about investigator's beliefs regarding Postmus's memory and actions to plant "false belief").) Defendants respond that Postmus did not show signs of being under the influence at the interviews. (Joint SAF Response ¶ 123.)

**J. May 2011 Indictment of Biane, Kirk, Erwin, and Burum, and Subsequent Proceedings**
In April 2011, Cope and other prosecutors from the DA and AG's Offices began presenting evidence and witnesses to the Grand Jury. (Joint SAF ¶ 95.) On May 9, 2011, a grand jury issued a 29-count indictment against Biane, Kirk, Erwin, and Burum. (DSUF ¶ 67; Compendium Ex. 48; Joint SAF ¶ 96.) The DA's Office and the California Attorney General's Office prosecuted the case. (DSUF ¶ 68.)

On May 19, 2014, Burum filed a Cal. Penal Code § 995 motion to dismiss the indictment based in part on alleged prosecutorial misconduct and alleged coercion of Postmus and Aleman by investigators, (DSUF ¶ 77; RJN Ex. 51), which was joined by Erwin, Biane, and Kirk, (DSUF ¶ 78; RJN Ex. 57). The Superior Court denied the motions. (DSUF ¶ 79; RJN Exs. 60-64.)

On July 5, 2017, Burum filed a motion pursuant to Cal. Penal Code § 1118.1 for judgment of acquittal, asserting there was insufficient evidence presented at trial to support the charges against Burum. (DSUF ¶ 80; RJN Ex. 67.) Erwin, Biane, and Kirk joined Burum's motion. (DSUF ¶¶ 81-82; RJN Exs. 68, 121.) Superior Court Judge Smith denied the motions as to several charges, for each criminal defendant. (DSUF ¶ 83; RJN Exs. 121, 71-73; Compendium Exs. 76-77.)

In January 2017, the prosecution made opening statements in the Erwin, Biane, Kirk, and Burum matters. (Joint SAF ¶ 112.) On August 28, 2017, a jury acquitted Burum of all charges. (Id. ¶ 116.)

**K. DeFazio Proceedings**
On February 9 and 14, 2012, a preliminary hearing was held regarding the charges against DeFazio. (DSUF ¶ 70; RJN 50.) At the conclusion of the hearing, the court ruled that there was probable cause to believe DeFazio was guilty of the charges. (Id. ¶ 71.) On April 4, 2012, DeFazio filed a Motion to Set Aside Information pursuant to Cal. Penal Code § 995, based on his assertion that the prosecution's evidence was insufficient or incomplete. (Id. ¶ 72.) The court denied the motion. (Id. ¶ 73.) In May 2012, DeFazio filed a Petition for Writ of Prohibition as to the denial, which was also denied. (Id. ¶¶ 74-75; see also DeFazio SGD ¶¶ 70-75.)

**L. Each Defendant's Role in the Investigation and Prosecution**
 **\*11**  The parties dispute the extent to which investigative and prosecutorial roles blurred within the PIU and DA's Office. (DSUF ¶ 87.) Nominally, Schreiber and Randles were investigators, Cope was a prosecutor and Deputy DA who helped "jump start" the PIU, (DSUF ¶ 19), Hackleman was a supervising prosecutor in charge of the PIU and was the assistant DA, (id.), and Ramos was the DA, (id. ¶ 69.) Cope was part of the joint DA-AG team that presented evidence and witnesses to the Grand Jury to secure the May 2011 indictments. (Joint SAF ¶ 95.)

From 2003-2009 Ramos was the District Attorney for the County. (DSUF ¶ 69.) The parties dispute whether Ramos directed or was apprised of the substance of PIU investigations into the Settlement. (DSUF ¶ 85; Joint SGD ¶ 85.) Plaintiffs highlight that Ramos received email and in-person updates from Hackleman on PIU activity generally, and on the Settlement investigation in particular. (Joint SGD ¶ 85; Foster Decl., Ex. 2 at 97.) Defendants underline Ramos's deposition. For example, Ramos stated

he understood Postmus's testimony was important to the case against Burum, not based on reading the interview, but because that's what Hackleman "told [him]." (Id. at 121; Joint SAF ¶ 81) Regardless, Hackleman regularly updated Ramos and others in the DA Office about the Settlement investigation from approximately May 1, 2010 to July 22, 2011. (Joint SAF ¶ 57.) In a March 8, 2012 email, Ramos emailed Cope and others, referencing the Burum case: "I will not allow our team to deviate until we are done[ ]. I have lived this case since day one." (Id. ¶ 107.)

The parties also dispute whether and to what extent Hackleman controlled the investigation. However, he described himself in a 2015 email as "heading the [PIU] during the criminal investigation and ultimate Grand Jury indictment" of Plaintiffs in the criminal case. (Joint SAF ¶ 60; Foster Decl., Ex. 4.) In reference to Hackleman's self-description, Michael Fermin wrote that Hackleman's "position was one that could control the investigation and prosecution," (id.), and at a later deposition stated Hackleman "had significant involvement in the review of it and the decision to file." (Compendium Ex. 169.) In addition, Ramos stated in a deposition that Hackleman "oversaw" the PIU "I think, weekly, perhaps." (Foster Decl., Ex. 2 at 97.)

Plaintiffs attach evidence suggesting that Hackleman was involved in planning and strategizing around the Postmus interviews. In a February 28, 2011 email, Hackleman told Schreiber and others that Postmus could help the DA's Office by explaining the details of the bribe he believed to have occurred. (Foster Decl., Ex. 131.) However, Hackleman also stated this was "in the mode of suggestions only" and he was sharing it "in case there is anything you find of value." (Id.) Hackleman also stated in a February 8, 2011 email that his prosecutors and investigators were working hard to get essential investigating done before indicting Biane, Kirk, Erwin, or Burum. (Foster Decl., Ex. 86.) In March 2011, just before indicting Burum and others, Hackleman and Schreiber emailed back and forth, copying investigators and prosecutors discussing "a case for the culpability of [Burum]," and their strategy for securing pleas. (Foster Decl., Ex. 137.) Hackleman proposed that prosecutors suggest areas of inquiry for the investigators to probe during their interview with Postmus. (Id.)

In January 2011, after Postmus, Erwin, and DeFazio had been charged, but before the charges against Biane, Kirk, and Burum were announced, Hackleman circulated to Cope, Schreiber, Randles, and others, the summary of a meeting between the DA's Office and the California AG Office. (Joint SAF ¶ 67.) At the meeting, parties discussed the Settlement investigation and the "AG Proposal to File Charges on Burum and Biane." (Id.) Hackleman wrote "[w]e need to act now" to bring charges, due statute of limitations concerns, and noted participants "agreed on the following process to make a final decision ... The DA PIU will confirm their position on bringing charges after study and a discussion with Ramos." (Id. (quoting Foster Decl., Ex. 83.).) Later in January 2011, Hackleman wrote that he "hope[ed] to present the bottom-line recommendation" to Ramos, regarding whether to broaden charges to include the Doe Defendants. (Id. ¶ 68.) On February 7, 2011, Hackleman wrote to Schreiber and Cope regarding the "Big Decision" and their "commitment to take a position" to join or oppose the recommendation from the California AG's Office, in the form of a memo. (Id. ¶ 69; Foster Decl. Ex. 93.)

 **\*12**  Randles participated in many of the interviews, including with Aleman, Kirk, and Postmus. Schreiber, while investigating the Settlement, reported to Hackleman. (DSUF ¶ 86.) Schreiber interviewed Erwin and Postmus. Cope was present at the beginning of interviews with Aleman in November 2008 and with Postmus in March 2011, but he left after making introductions. (DSUF ¶ 88.) He was copied on emails between prosecutors and investigators regarding areas of inquiry to be probed with Postmus. (Joint SGD ¶ 88.)


### M. Potential Retaliatory Motive, or County Policy, Custom, or Practice of Retaliating

Plaintiffs attach emails showing Ramos, at some point after being accused of womanizing and other misconduct by Neil Derry in 2009: (1) directed PIU to focus on filing a criminal complaint before the date candidates for countywide office could file to challenge him, (2) feared a rival would come from the "Burum camp," and (3) told the PIU team he could get more investigators or attorneys if needed. (Foster Decl., Ex. 33.) Hackleman "reiterated" to investigators Ramos's "goal of completing all this" before the February 2010 political season during which Ramos would run for reelection "and the importance of it." (SGD ¶ 85 (citing Foster Decl., Ex. 34); Joint SAF ¶ 41-42.) On February 10, 2010, Ramos and then Attorney General Jerry Brown held a press conference announcing the filing of the felony complaint against Postmus and Erwin, and naming Doe Defendants, and

making "characterizations of Burum." (Joint SAF ¶¶ 50, 51 (quoting Foster Decl., Ex. 36 at 37 (Assistant DA Michael Fermin testifying about the press conference)).)

In November and December 2009, in the context of discussing an open County CAO position, potential CAO candidates, and Biane and Burum, Hackleman stated, "I see this as a fight to the death. They will either get Ramos or he will get them. And the direction of our County may well be affected for years to come." Hackleman stated he would "run [ ] by the boss" a proposal to forestall any effort to make Greg Deveraux the CAO, by making a public referral to the Fair Political Practices Commission regarding Devereaux's Forms 700 for the years 2006, 2007, and 2008. (Joint SAF Response ¶ 35.) A few days later, Hackleman wrote that he "sure hop[ed]" that he upset plans to install Devereaux, and "we have some other potential options in that area." (Joint SAF ¶ 36.) In early 2010, Hackleman wrote an email referencing Burum and stating "[t]hese guys never stop scheming. And with Deveraux about to go in they have control of just about everything." (Joint SAF ¶ 39.)

On August 13, 2010, after Postmus was arrested on a drug possession charge, Hackleman described Postmus as "the key to getting $102 million out of Burum's pocket and back into the public treasury." (Joint SAF ¶ 61.) And in December 2010, Hackleman emailed Ramos and others, stating his belief that "we will need at least every pressure we can bring to bear on [Postmus] if we ever have any hopes of seeing him turn." (Id. ¶ 63.)

Hackleman wrote in a February 8, 2011, email regarding the decision to charge the Doe defendants that he remained "emotionally excited about going after these bastards," but intellectually, remained "short of being confident" due to a lack of significant evidence beyond Aleman's interview, and noting he hoped to conduct additional interviews. (Id. ¶ 72; Foster Decl., Ex. 82 ("I am not yet convinced we have enough to file [on Biane] ... we come up short on a viable case against Paul [Biane] or Jeff [Burum], as of this date.")) The February and March 2011 Postmus interviews had not yet occurred.

 **\*13** After the First Postmus interview, Hackleman wrote about budget cuts in the DA's Office, and noted "setting aside this theft of $102 million would have a powerful cheering effect and would hurt Burum badly." (Id. ¶ 91.) He also noted that Postmus's plea would "knock down ... Biane, Kirk, and Erwin" and eventually "absolutely ruin Burum as a political operator." (Id.) In the same email exchange, an AG Defendant referred to Burum as "Dr. Evil," and Ramos responded "[w]ell said." (Id. ¶ 92.)

A Deputy DA emailed Ramos on May 13, 2017, linking to news about a Colonies supporter donating to Ramos's opponent in the 2018 election. (Joint SAF ¶ 113.) Ramos forwarded the email to Ellis, his campaign advisor, who responded, "we'll stick it up his ass," and Ramos forwarded Ellis's response to members of the DA's Office. (Id.)

In September 2017, after Burum's acquittal, Ramos emailed DA Office staff expressing his belief that the Office "may need to keep a close eye" on a County Supervisor he perceived to be Burum-friendly. (Foster Decl., Ex. 59 ("The next step may be laundering campaign funds ... It will happen.").) Ramos's campaign advisor emailed Ramos asking about political contributions to the IE PAC he believed to be linked to Burum, and Ramos stated from his campaign email "we may need to refer to FPPC or start our own investigation. Their next step will be to launder money." (Joint SAF ¶ 121; Foster Decl. Ex. 60.) In a later deposition, Ramos stated that he did not renew his campaign email account, and with the knowledge that this would result in the loss of his campaign emails, after Plaintiffs had propounded discovery in this case. (Foster Decl., Ex. 2.)

On March 13, 2018 Hackleman emailed an AG attorney that "some good" resulted from the trials. Otherwise, Kirk would have become politically powerful, and would have formed an alliance with developers. (Joint SAF ¶ 121.)

In June 2018, Ramos lost his bid for reelection as the San Bernardino DA. (Spoliation Order at 6.) Ramos allowed his campaign emails located at mike@joinmikeramos.com to be deleted, and he deleted texts from his personal phone after March 2018. (Id. at 6, 9.) Ramos continued deleting text messages and allowed campaign emails to be deleted after this litigation commenced, and long after litigation was foreseeable. The Court has imposed and adverse inference instruction as a sanction. (Id. at 18.)

### III. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of informing the district court of the basis for its motion and identifying the portions of the pleadings and record that it believes demonstrate the absence of an issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. Celotex, 477 U.S. at 325. Instead, the moving party need only prove there is an absence of evidence to support the nonmoving party's case. Id.; In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010). The party seeking summary judgment must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

If the moving party has sustained its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial. Celotex, 477 U.S. at 324. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." In re Oracle Corp. Sec. Litig., 627 F.3d at 387 (citing Anderson, 477 U.S. at 252). The non-moving party must make this showing on all matters placed in issue by the motion as to which it has the burden of proof at trial. Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 252.

**\*14** When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991). Thus, summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the non-moving party based on the record taken as a whole. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### IV. DISCUSSION

The parties present a whirl of mutually implicative claims and doctrines: prosecutorial immunity, retaliatory investigation, municipal policy of retaliation, fabrication of evidence, malicious prosecution, and conspiracy to retaliate, among others. Rather than producing the typical linear progression of isolated causes of action, the claims are like spokes issuing from central hub: First Amendment retaliation. Accordingly, the Court focuses on whether a reasonable jury could conclude Defendants subjected each Plaintiff to a retaliatory investigation, and works out from there.

In Part IV.A, the Court opens discussion with the doctrine of absolute prosecutorial immunity, and concludes that much of Defendants' conduct is not absolutely immune. Whether a given act was directed primarily at advocacy (and is absolutely immune) or investigation (and is not) will continue to be an important question, and a potential bottleneck, in these proceedings.

The Court then evaluates in Part IV.B Plaintiffs' claims of retaliatory investigation: the heart of the case. The Court concludes the no-probable-cause pleading requirement articulated by the Supreme Court for a narrow class of such claims does not apply here. In other words, Plaintiffs do not need to establish the lack of probable cause to investigate in order to proceed. Instead, they must raise a triable question whether their protected First Amendment conduct "substantially motivated" a particular investigative action. Only two Plaintiffs—Burum and Colonies—manage to do so, and they do so only for two Defendants—Ramos and

Hackleman. In Part IV.C the Court considers, and rejects, their invocation of qualified immunity, because the right to be free from retaliatory official conduct was clearly established at the time of the investigation.

Part IV.D evaluates Plaintiffs' claim of a municipal policy, custom, or practice of retaliation under 🚩 Monell, 436 U.S. 658, 690-91 (1978), or in Plaintiffs' words, the County's "premeditated plan" to retaliate. The Court finds Burum and Colonies state a Monell claim under one or more theories. As to the other Plaintiffs, the asserted policy or practice was not sufficiently widespread or established, or the decision of a final policymaker for the County was not the moving force behind the asserted harm. In any case, those Plaintiffs did not provide enough evidence to support a retaliatory investigation, and their Monell claims of a policy of retaliation are similarly unsubstantiated.

Part IV.E takes up fabrication of evidence, a claim which requires direct or circumstantial proof that Defendants deliberately concocted false statements or other false proofs to prosecute Plaintiffs. The Court identifies a genuine dispute whether investigators Randles and Schreiber manipulated Postmus in the March and February 2011 interviews. The Postmus interviews were more than a trivial matter in the decision to pursue an indictment against Burum, Kirk, and Biane, but were not significant in the prosecution of claims against Erwin or DeFazio. As a result, the deliberate fabrication claims of the former withstand summary judgment. The claims of the latter do not.

**\*15** Part IV.F, on the subject of malicious prosecution, builds on the conclusion that the decision to indict may have been premised on false and fabricated evidence. Reliance on such false and fabricated evidence rebuts Defendants' asserted probable cause to prosecute. In addition, malicious prosecution requires deprivation of a specific constitutional right. There is no substantive due process right to be free from a prosecution without probable cause, and the only other right in play in this case is the First Amendment right against retaliation. Only Burum's retaliation claim remains, and so too with the claim of malicious prosecution.

Plaintiffs also assert a conspiracy to retaliate. Part IV.G finds a jury must resolve whether there was concerted action by Hackleman and Ramos to retaliate against Colonies and Burum.

Three areas remain for consideration. In Part IV.H, factual debate over the nature and extent of Hackleman and Ramos's oversight of the PIU precludes summary judgment on the supervisory claims. In Part IV.I, the Court grants summary judgment on the negligence and intentional infliction of emotional distress claims, which are time barred. Finally, in Part IV.J, the Court observes Colonies did not oppose the County's MSJ on the contract claims, and accordingly grants summary judgment on those claims.

## A. Absolute Immunity

Although the parties leave this issue towards the end of their respective briefs, the doctrine of absolute prosecutorial immunity exerts a gravitational pull on the causes of action in this case, and so the Court discusses it first. The Supreme Court held in Buckley v. Fitzsimmons that fabrication of evidence "during the early stages of [an] investigation" is not subject to absolute immunity. 🚩 509 U.S. at 262–63, 275–76 (1993). However, the line is difficult to draw between qualifiedly immune investigative functions and absolutely immune advocacy ones. In this Section, the Court sketches some of the boundaries. The Court reserves discussion of qualified immunity for later, because that two-step inquiry requires consideration of whether a constitutional violation occurred and whether the violation was clearly established.

### 1. Legal Standard

Under 🚩 Section 1983, certain government officials are entitled to absolute immunity from damages liability when performing certain functions. This "functional approach" looks to "the nature of the function performed, not the identity of the actor who performed it." 🚩 Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1993) (quoting 🚩 Forrester v. White, 484 U.S. 219, 229 (1988)). For prosecutors, the Supreme Court has concluded that activities "intimately associated with the judicial phase of the criminal

process" are entitled to absolute immunity. *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). Thus, a prosecutor is absolutely immune from liability for "initiating a prosecution" and "presenting the State's case." *Id.* at 431. Moreover, an attorney "supervising a trial prosecutor who is absolutely immune is also absolutely immune." *Garmon v. Cty. of Los Angeles*, 828 F.3d 837, 845 (9th Cir. 2016). However, a prosecutor's "administrative duties" and "investigatory functions" that do not relate to an "advocate's preparation for the initiation of a prosecution or for judicial proceedings" are not entitled to absolute immunity. *Buckley*, 509 U.S. at 273. Instead, qualified immunity applies to prosecutors performing investigative functions "normally performed by a detective or police officer." See *id.* at 273.

"Determining what functions are prosecutorial is an inexact science." *Lacey v. Maricopa Cty.*, 693 F.3d 896, 912 (9th Cir. 2012). Since *Imbler*, the Supreme Court has held absolute immunity applies when a prosecutor appears in court to apply for a search warrant, *Burns v. Reed*, 500 U.S. 478, 492 (1991), and to how supervisory prosecutors manage a trial-related information system, *Van de Kamp v. Goldstein*, 555 U.S. 335, 349 (2009). Conversely, absolute immunity does not apply when a prosecutor gives advice to police during a criminal investigation, *Burns*, 500 U.S. at 496, when a prosecutor makes statements to the press, *Buckley*, 509 U.S. at 277, or to a prosecutor's fabrication of false evidence during a preliminary investigation, *509 U.S. at 275*. Although the Supreme Court has resisted drawing a bright line between investigative and advocacy work, it has noted a prosecutor "neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Id.* at 274. Where absolute immunity is not applicable, courts assume that qualified immunity sufficiently protects government officials in the exercise of their duties. *Burns*, 500 U.S. at 486-87.

### 2. The Parties' Contentions

**\*16** The Prosecutor Defendants argue they are absolutely immune for "many of the acts" alleged. (Ramos MSJ at 26 (compiling immunity cases).) They also claim immunity for "quasi judicial activities" taken within the scope of their authority, such as gathering evidence after probable cause is established. (Id. at 26.) They argue that as to Erwin, they are absolutely immune from March 19, 2009 forward, because that is the date Erwin was first arrested and charged with perjury. (Ramos MSJ at 26.) For Burum, Biane, and Kirk, Defendants argue absolute prosecutorial immunity should attach "on the eve of the grand jury [convening]" in April 2009, but they do not provide a certain cutoff. (Id. (citing *Imbler*, 424 U.S. at 431 n.33).)

Defendants also contend that the activity of an investigator carried out in preparation for a prosecutor's case, after probable cause is established, enjoys absolute immunity. (Ramos MSJ at 23-24 n.17 (citing *Broam v. Bogan*, 320 F.3d 1023, 1033 (9th Cir. 2003)).) Depending on the function, and whether it is carried out pursuant to the preparation of the prosecution's case, investigators may be absolutely immune. (Schreiber MSJ at 28-29 (citing ⚠ *KRL v. Moore*, 384 F.3d 1105, 1113 (9th Cir. 2004)).) The Investigators Defendants also argue that once probable cause to arrest is established, the officer need not investigate independently every claim of innocence. (Id. (citing *Baker v. McCollan*, 443 U.S. 137, 145-46 (1979)).)

Plaintiffs concede prosecutors and investigators enjoy absolute immunity, but remark the doctrine applies only in narrow circumstances when the action is "intimately associated" with the "judicial phase of the criminal process." (Consolidated Opp'n at 48 (citing *Van de Kamp*, 555 U.S. at 341).) Biane urges that this narrow immunity should not apply to the alleged egregious misconduct. [19] (Biane Opp'n at 23.) Plaintiffs remind the Court it previously determined that conduct "before the 2009 grand jury was empaneled or between the 2011 grand jury proceedings" appeared to be investigative, and therefore unprotected by absolute immunity. (Id. (citing Dkt. No. 86 at 9).) Plaintiffs also argue that, using a conduct-based or functional approach, certain actions after the 2011 grand jury indictment is not off limits. (Id. (citing *Buckley*, 509 U.S. at 274 n.5; *Kalina v. Fletcher*, 522

*Colonies Partners LP v. County of San Bernardino, Slip Copy (2020)*

U.S. 118, 127 (1997)).) Even after the commencement of judicial proceedings, purely investigative or administrative functions, Plaintiffs reiterate, are not absolutely immune. As examples, they point to Cope and Randles' confirmation in 2012 of the inaccuracy of statements made by Gonzales to the grand jury, and Ramos's monitoring of Burum's donations and discussion of starting a new investigation, in 2018. (Id. (citing SAF ¶¶ 153, 119).)

**3. Discussion**

As an initial matter, the Court notes that the party asserting absolute immunity bears the burden to show that such protection is justified. See ⚑ Burns v. Reed, 500 U.S. 478, 486 (1991). The Court is therefore underwhelmed with Defendants' vague assertion that absolute immunity attaches for "many of the acts" alleged, with little detail regarding which specific acts—or functions—must be absolutely removed from consideration. (Ramos MSJ at 26.) The Court therefore declines to grant summary judgment on the grounds of absolute immunity, where Defendants have failed to apply the Supreme Court's functional approach to each act for which they seek that highest level of protection. Under Burns, it is the prosecutor defendants' burden—not the Court's—to establish "immunity is justified for the function in question." ⚑ 500 U.S. 478, 486 (1991) (collecting cases and noting that, at a time when qualified immunity was weaker than it is today, the presumption is that qualified immunity is sufficient to protect officials acting reasonably). Absolute immunity "is an extreme remedy, and it is justified only where 'any lesser degree of immunity could impair the judicial process itself.' " Garmon v. Cty. of Los Angeles, 828 F.3d 837, 843 (9th Cir. 2016) (quoting ⚑ Lacey v. Maricopa Cty., 693 F.3d 896, 912 (9th Cir. 2012) (en banc)). [20]

**\*17**  In Buckley, the Court stated that absolute immunity certainly does not attach before probable cause to arrest exists, and even after probable cause is established, absolute immunity might not apply to primarily administrative or investigative activity. [21] ⚑ 509 U.S. at 274 n.5. Under Buckley, then, the absence of probable cause to arrest would preclude absolute immunity. The Ninth Circuit reiterated this rule in ⚑ Genzler v. Longanbach, 410 F.3d 630, 639-40 (9th Cir. 2005). The timing is thus a "relevant, but not necessarily determinative" factor in determining if the character of an interview or action is quasi-judicial advocacy or police-type investigative work. Id. Here, Plaintiffs focus on actions taken at the investigative stage and actions chronologically or functionally remote from the judicial proceedings.

The chronology of interviews, charges, and judicial proceedings is as follows.

- November 1, 11, and 21, 2008: interviews with Aleman touch on the subject of the 2006 Settlement and whether Burum or Erwin acted illegally. (Compendium, Exs. 3, 5, 7.)

- January 15, 2009: Erwin participated in interview at the time of a search of his home. (Compendium, Ex. 11.)

- March 2009: Erwin arrested and charged with perjury for failure to disclose benefits received from Colonies or Burum. (DSUF ¶ 31.)

- April 21, 2009: Kirk interviewed. (Compendium, Ex. 15.)

- February 9, 2010: felony complaint filed against Postmus, Erwin, and John Does for conduct relating to the Settlement. (Id., Ex. 33.)

- February 10, 2010: Erwin is arrested on charges related to the Settlement. (Joint SAF ¶ 45.)

- February 24, 2010: felony complaint filed against DeFazio alleging two counts of perjury. (Compendium, Ex. 34.)

- February 15, March 1, and March 10, 2011: Postmus interviewed. (Compendium, Exs. 39, 41, 44.)

- March 28, 2011: Postmus agrees to plead guilty to misappropriation of funds. (Compendium, Exs. 44, 46.)

*Colonies Partners LP v. County of San Bernardino, Slip Copy (2020)*

---

- April 7, 2011: evidence and witnesses are presented to the Grand Jury against Biane, Kirk, Erwin, and Burum. (Joint SAF ¶ 95; DSUF ¶ 67.)

- May 9, 2011: the Grand Jury indicts Biane, Kirk, Erwin, and Burum, relating to the Settlement Agreement. (Compendium, Ex. 48.)

- February 9 and 14 2012: DeFazio's preliminary hearing. (Foster Decl., Ex. 95.)

Several difficulties arise in applying absolute immunity rules to these events, which the parties largely neglect. The Court feels bound to consider, if not decide, these issues for purposes of clarification and to benefit future proceedings in this matter.

The first difficulty is that there were multiple criminal suspects and multiple complaints. Thus, a question arises whether official actions were absolutely immune against all Plaintiffs' claims, if those actions were arguably supported by probable cause and intimately tied to the judicial phase of proceedings of any one Plaintiff. For example, Erwin was charged and arrested on March 19, 2009. Several interviews relevant to Erwin's case occurred after that date but may have veered into topics of a more "investigative" or acquisitive nature for the suspects who had yet to be arrested or charged.

**\*18** To resolve this problem, the Court looks to KRL v. Moore, which suggests the same prosecutorial action can be subject to absolute immunity as to one set of claims and merely qualified immunity as to another set. 384 F.3d 1105, 1110–12 (9th Cir. 2004) (concluding a post-indictment search was subject to absolute immunity, regarding crimes charged in indictment, and was only subject to qualified immunity to the extent officers searched for evidence of crimes not charged). It stands to reason that conduct during interviews in this case, even if excepted from consideration as to one suspect, would be fair grounds for a claim by another suspect for whom probable cause was not yet established.

A second difficulty is the presence of multiple investigators and prosecutors with slightly different "functions" or roles at different stages of the criminal investigation. The record suggests that within Ramos's "vertical prosecution" Public Integrity Unit, both prosecutors and investigators carried out investigative work, and roles merged. (Foster Decl., Ex. 2 at 88-89.) The quaint notion of a clear dividing line between prosecutorial and police work is hard to apply to such a unit. Defendants do not set forth the roles of each PIU team member in their statement of undisputed facts, provide PIU regulations or policy documents, or otherwise offer factual matter that would aid the Court in applying the functional approach to find them absolutely immune during the investigation stage.

Third, Buckley and progeny do not explicitly state how to determine whether probable cause exists to arrest a suspect. 509 U.S. 259, 274 ("A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested.") For example, Buckley is unclear whether probable cause to arrest is determined by reference to: (1) the perception of the official at the time, (2) the ruling or determination of third party in the eventual criminal proceeding (e.g. a grand jury or judge); or (3) whether probable cause it is an objective inquiry that must be assessed retrospectively by the court considering whether to grant absolute immunity from the suspect's claim of damages.

Broam suggests that the individual official's perception is one way of ascertaining probable cause to arrest for absolute immunity purposes. Broam v. Bogan, 320 F.3d 1023, 1033 (9th Cir. 2003) ("[W]e cannot determine whether the alleged constitutional violations were committed before or after [investigating Sergeant] Ingram concluded that probable cause existed to arrest ... ") (emphasis added). KRL v. Moore also supports a view that the goal or purpose of each official action is key: that court held a post-indictment search warrant could both prosecute the pending indictment (absolute immunity applies to that purpose) and investigate or uncover new crimes (absolute immunity does not apply). KRL v. Moore, 384 F.3d 1105, 1111 (9th Cir. 2004).

---

*Colonies Partners LP v. County of San Bernardino, Slip Copy (2020)*

In light of these difficulties, and viewing the evidence in the light most favorable to Plaintiffs, Defendants do not meet their burden to show they were performing functions "intimately associated" with the judicial phase of the criminal process" as to the Doe Defendants (Burum, Kirk, Biane) named in the May 9, 2011 indictment until, at the earliest, April 7, 2011, when evidence and witnesses were actively presented to the Grand Jury. The Court does not understand the mere filing of a complaint with Doe defendants in February 9, 2010 to be necessarily "intimately associated" with the judicial phase, especially in a felony case. [22] 🚩 Genzler v. Longanbach, 410 F.3d 630, 641 (9th Cir. 2005) ("... [W]e do not view the filing of the complaint as an event after which, by definition, all actions by the prosecutor and his staff are protected by absolute immunity.") Because Erwin was arrested the day after the February 9, 2010 felony complaint, however, it is more likely that Defendants' interviews after that point were quasi-judicial, with respect to Erwin only.

**\*19** After the February 9, 2010 felony complaint, and the closer one gets chronologically to the April 7, 2011 grand jury proceedings, the more difficult it becomes to determine the applicable function. Perhaps the most important question for Defendants is whether absolute immunity applies to the Postmus interviews, which occurred after the felony complaint but a month or so before presentation of evidence to the Grand Jury and indictment of the Does. The answer to this question turns on whether "a decision to seek an indictment ha[d] been made," by the time those interviews occurred, and whether the acts involved professional evaluation of the evidence assembled and appropriate preparation "before a grand jury." 🚩 Buckley, 509 U.S. at 273. Another way to frame the question is whether the purpose of the Postmus interviews, vis-à-vis Plaintiffs, was akin to organizing, evaluating, and marshalling, or was more like the activity of "acquiring" evidence. Garmon, 828 F.3d 837, 844 (9th Cir. 2016) (citations omitted).

Curiously, Defendants appear to cede the point, by invoking absolute immunity only on the "eve" of the April 2011 grand jury proceedings, for damages claims arising from the eventual May 2011 indictment. (Ramos MSJ at 26.) Even if Defendants did not mean to concede this point, Plaintiffs marshal enough evidence to show the Postmus interviews were more acquisition than advocacy oriented. 🚩 Buckley, 509 U.S. at 273–74, (stating that "the detective's role [is] searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested"). For example, prior to the Postmus interviews, Hackleman remained excited about prosecuting the Does but "short of being confident," and it does not appear the DA and AG offices reached a final decision to indict until after those interviews, [23] or after Postmus signed a plea deal. (Joint SAF ¶ 72.) Construing this evidence in the light most favorable to Plaintiffs, the purpose of the Postmus interviews was investigative, and accordingly, official actions during those interviews are not subject to absolute immunity.

The last topic for discussion in this Section is whether Defendants are immune for actions <u>after</u> the existence probable cause, and if so, for which actions. Defendants claim absolute immunity for quasi-judicial activities after this point in a conclusory and unhelpful manner. (Ramos MSJ at 26.) In future proceedings, Defendants will have to establish the quasi-judicial purpose of each official action, and cannot simply label the act as such without more, and expect the Court to blindly assume the action was closely associated with the judicial process. 🚩 Genzler, 410 F.3d 630, 637-38 (9th Cir. 2005) (citing 🚩 Milstein, 257 F.3d at 1011) ("If not done in a quasi-judicial capacity, the acquisition or manufacturing of evidence is not protected by absolute immunity.") 🚩 Buckley, 509 U.S. 259, 274 n.5. Plaintiffs provide two examples of what they deem non-judicial activity after the existence of probable cause: (1) Cope and Randles' confirmation in 2012 of the inaccuracy of statements made to the Grand Jury by a third person; and (2) Ramos's monitoring of Burum allies' donations and discussions of a new investigation in 2018, after Burum's acquittal. (Biane Opp'n at 23.) The Court does not decide the issue now, but is inclined to think the first action may be quasi-judicial (although it is hard to understand what action Plaintiffs are referring to), and the second likely is not. Unless the parties determine a system of mutually agreeing how to apply the quasi-judicial label, ad hoc absolute immunity determinations may become a recurring battleground in this litigation. [24]

## B. First Amendment – Retaliatory Investigation

**\*20**  Plaintiffs allege retaliation under 42 U.S.C. § 1983 as follows: Colonies against all individual defendants; Burum against Ramos, Cope, Hackleman, Randles, and Schreiber; Erwin against the same as Burum; Kirk against Ramos, Cope, Randles, and Schreiber; Biane against the same as Kirk; and DeFazio against the County, Ramos, Randles, Schreiber, and Aleman. (Colonies FAC; Burum SAC; Erwin FAC; Kirk FAC; Biane FAC; DeFazio Compl.)

### 1. Legal Standard

Official reprisal for protected speech "offends the Constitution [because] it threatens to inhibit exercise of the protected right," Crawford–El v. Britton, 523 U.S. 574, 588, n. 10 (1998). "[T]o demonstrate a First Amendment violation, a plaintiff must provide evidence showing that 'by his actions [the defendant] deterred or chilled [the plaintiff's] political speech and such deterrence was a substantial or motivating factor in [the defendant's] conduct.' " Mendocino Envtl. Ctr. v. Mendocino Cnty., 192 F.3d 1283, 1300 (9th Cir. 1999) (quoting Sloman v. Tadlock, 21 F.3d 1462, 1469 (9th Cir. 1994)). There is no requirement that the "speech [be] actually inhibited or suppressed." Id. Courts only consider "whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." Id. (quoting Crawford–El v. Britton, 93 F.3d 813, 826 (D.C. Cir. 1996)). The plaintiff must "prove the elements of retaliatory animus as the cause of injury," with causation being "understood to be but-for causation." Hartman v. Moore, 547 U.S. 250, 260 (2006).

The causation element in particular has generated much debate. In Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274 (1977), the Supreme Court considered the manner of proof of causation for a First Amendment retaliation claim, in the civil employment context. Id. Under Mt. Healthy, the plaintiff bears the burden of demonstrating that unconstitutional animus was a "substantial factor" or a "motivating factor" for an adverse action. 429 U.S. at 287. The burden then shifts to the defendant to demonstrate that, even without any impetus to retaliate, the defendant would have taken the action complained of. Id. (placing the burden on the employer to show it would have acted the same way even in the absence of the protected conduct).

Decades later, in Hartman, 547 U.S. 250 (2006), the Court held that a plaintiff alleging retaliatory prosecution must show the absence of probable cause for the underlying criminal charge, to satisfy the causation element. "If there was probable cause, the case ends. If the plaintiff proves the absence of probable cause, then the Mt. Healthy test governs." Lozman v. City of Riviera Beach, Fla., 138 S. Ct. 1945, 1952-53 (2018) (summarizing the holding in Hartman). Hartman remarks that a retaliatory prosecution case will not be brought against the prosecutor, due to absolute immunity for the decision to prosecute, but against a nonprosecutor official who "influenced the decision but did not himself make it." Hartman, 547 U.S. 250, 262 (2006). The lack of probable cause is thus required to strengthen the causal link between the improperly motivated official and the prosecutor and to give the claim "vitality." 547 U.S. at 264-65.

In Lozman, the Court was presented with a binary choice to apply Mt. Healthy or Hartman to a retaliatory arrest claim. Charting a third, narrower, way, the Supreme Court found that if the plaintiff alleges an official municipal policy of intimidation, then he need not prove the absence of probable cause with respect to that arrest. 138 S. Ct. at 1953-55. Then in a very recent case, Nieves v. Bartlett, the Supreme Court considered a retaliatory arrest claim not subject to the Lozman exception, and squarely held the plaintiff must plead and prove the absence of probable cause. 139 S. Ct. 1715, 1724 (2019). In both retaliatory prosecution and arrest cases, the Court found, it is "particularly difficult to determine whether the adverse government action was caused by the officer's malice or the plaintiff's potentially criminal conduct." Id. (citation omitted).

### 2. The Parties' Contentions

*Colonies Partners LP v. County of San Bernardino, Slip Copy (2020)*

**\*21**  Concentrating their firepower on this causation element, Ramos, Hackleman, Cope, Randles, and Schreiber [25] argue that the retaliation claims against them fail, because Defendants' supposed desire to chill First Amendment activity was not the "but for" cause of Plaintiffs' injury. (See Ramos MSJ at 2-3 (citing Nieves v. Bartlett, 139 S. Ct. 1715, 1722 (2019)).) In particular, Defendants urge that a finding of probable cause bars the suspect from bringing a retaliation claim. (Id.) A finding of probable cause shows the officers had an objectively reasonable basis for their actions, and strongly suggests alleged retaliatory motive did not "cause" the officer conduct. Defendants assert Plaintiffs must establish the objective unreasonableness of the decision to investigate or press charges as an element of their claim. (Id. at 3 (citing Hartman v. Moore, 547 U.S. 250, 263-65 (2006)).) In addition, Defendants invoke the doctrine of collateral estoppel to prevent the relitigation of prior findings of probable cause. (Id. at 4-5 (citing Greene v. Bank of Am., 236 Cal. App. 4th 922, 933 (2015)).)

Plaintiffs defend the viability of their retaliation claims in several ways. First, they breezily assert Defendants concede Plaintiffs satisfy all the other elements of retaliation. [26] (Consol. Opp'n at 24; see also Biane Opp'n at 7-8; DeFazio Opp'n at 12-15 (same, but setting forth argument on the protected speech and chilling of speech elements anyway).) Accordingly, Plaintiffs focus on the causation issue in the briefs. Plaintiffs contend that they are not required to show a lack of probable cause to establish causation, because this requirement appears only in retaliatory arrest and prosecution cases, (Hartman and Nieves, respectively), which have a "problem of multi-layered causation." The no-probable-cause requirement does not apply in an "ordinary retaliation case" where the individual who takes adverse action and the individual with retaliatory motive are one and the same. (Id. at 29-30 (citing Hartman, 547 U.S. at 259; Nieves, 139 S. Ct. at 1723).) Unlike Hartman and Nieves, Plaintiffs argue, there is no causal attenuation here, because Defendants alleged to have retaliatory motives also carried out the alleged retaliatory acts. (Id. at 31 (citing Denney, 508 F. Supp. 2d at 830, n.4 (retaliatory investigation case in which the court does not apply the probable cause standard); Skoog v. County of Clackamas, 469 F.3d 1221, 1234 (9th Cir. 2006).) Finally, an investigation does not require probable cause, and therefore, it would be nonsensical to extend a no-probable-cause requirement to claims of retaliatory investigation.

Next, Plaintiffs assert they need not demonstrate the objective unreasonableness of the investigation: instead the Court should consider whether there are sufficient "circumstantial" factors to show retaliation in this "ordinary" retaliation case. (Id. at 34-35 (citing 547 U.S. at 260).) Defendants' cases discussing objective reasonableness, Plaintiffs argue, are distinguishable as cases involving retaliatory arrest. (Id. at 34 n.11.) They also respond to circumstantial factors offered by Defendants' (e.g. proximity in time, etc.). Plaintiffs insist that employment retaliation factors are inapplicable, but in any case, there is a triable issue on those factors. [27] (Id. at 34 n.11, 38-39.)

**\*22**  Colonies argues separately that it has standing to pursue a Section 1983 claim, including retaliation, as long as there is a factual basis to assert the claim on its own behalf. (Colonies Opp'n at 3 (citing Outdoor Media Grp., Inc. v. City of Beaumont, 464 F. App'x 611, 613 (9th Cir. 2011)); Am. News & Info. Servs., Inc. v. Gore, 778 F. App'x 429, 432 (9th Cir. 2019)).) It contends the investigation team specifically focused on Colonies, as well as Burum individually, for example by seeking to harm Colonies financially and bringing a Section 1092 taxpayer lawsuit against Colonies. (Id. at 4-5.)

### 3. Discussion

#### a. Applicability of Hartman's No-Probable-Cause Requirement

The Court rejects Defendants' argument that Plaintiffs must establish a lack of probable cause in order to satisfy the but-for causation prong of their retaliation claims. It would be incongruous to extend Hartman and Nieves's severe rule on causation to officials' investigative or administrative acts. The causal complexity in Hartman arose primarily because of absolute immunity and the tenuous link between a biased investigator and an independent prosecutor, who ultimately decided to pursue the case.

547 U.S. 250, 262 n.7. The Supreme Court expressly reserved whether the adverse consequences of a retaliatory investigation would ever justify recognizing a distinct constitutional violation. 547 U.S. 250, 262 n.8.

Since then, several courts have recognized a cause of action for retaliatory investigation, and have not required the plaintiff to establish a lack of probable cause. *Lacey v. Maricopa Cty.*, 693 F.3d 896, 917 (9th Cir. 2012) (prosecutor's conduct—issuance of invalid subpoenas and authorization of warrantless arrests—was not absolutely immune and subjected him to first amendment retaliation claim, as did Sheriff's conduct during a years-long intrusive investigation); *Denney v. Drug Enf't Admin.*, 508 F. Supp. 2d 815, 830 (E.D. Cal. 2007) (recognizing cause of action for retaliatory investigation in the case of physician who alleged he was investigated in retaliation for speech concerning medical marijuana); see also *Gagliardi v. Fisher*, 513 F. Supp. 2d 457, 487 (W.D. Pa. 2007) ("*Hartman* does not foreclose plaintiff's retaliatory investigation claim notwithstanding the court's determination that the ensuing investigation, search, arrest and prosecution were supported by probable cause.").

Defendants rely on *Sterner* for the opposite result or to bootstrap a pleading requirement of "objective unreasonableness,"[28] (Ramos MSJ at 9), but the Court does not find this authority applicable or persuasive, at least for the conclusion urged by Defendants. *Sterner v. United States Drug Enf't Agency*, 2008 WL 11508384, at *5 (S.D. Cal. Sept. 8, 2008). *Sterner* presented a multi-tiered causation problem more similar to *Hartman:* the plaintiff alleged conspiracy between state actors, the DEA and the IRS, in criminal and administrative investigations. In addition, *Sterner* did not cite authority for what would be a significant extension of *Hartman's* no-probable cause requirement. Id.

**\*23** As a result, the Court finds that the no-probable-cause requirement does not apply in this case. The Court does not consider at this juncture whether exceptions to the requirement apply, such as the *Lozman* exception for "premeditated plans" of retaliation as a municipal policy or custom, or the false-or-fabricated-evidence exception. Nor is it necessary to determine at this time whether collateral estoppel applies to prior determinations of probable cause.

### b. But-For Causation

The Court's next task is to determine whether Plaintiffs raise an issue regarding a causal connection between each Defendants' "retaliatory animus" and Plaintiffs' "subsequent injury." *Hartman*, 547 U.S. 250, 259 (2006). Specifically, Plaintiffs must raise a triable issue that Defendants' retaliatory animus was "a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves*, 139 S. Ct. at 1722 (quoting *Hartman*, 547 U.S. at 259).

The parties' arguments about but-for causation are confused, and a few words of clarification are in order. The first needed clarification is the official's retaliatory animus or motive must cause the adverse action. (Id.) Defendants misstate the standard by asking whether the protected First Amendment activity caused the adverse action. (See Ramos MSJ at 12-22.) Naturally, the question of whether each Defendant was aware of the First Amendment activity blends into retaliatory motive, and motive blends into the question of causation: if no motive can be established, then the requisite causal connection is necessarily lacking. Although Defendants repeatedly state that Plaintiffs do not establish but-for cause, (id.), they mostly provide reasons that Plaintiffs fail to establish each Defendant's retaliatory motive.[29]

The second needed clarification relates to the burden of proof. The parties acknowledge the "but-for" causation requirement applies to retaliation cases, (Consol. Opp'n at 28), but the parties implicitly disagree whether it is Plaintiffs' burden to prove but-for causation as part of the prima facie case and what type of pleading would accomplish this. As Justice Ginsburg noted in her dissent in *Hartman*, the majority "assign[s] to the plaintiff the burden of pleading and proving the absence of probable cause

for the prosecution," whereas before, the assumption was that the burden of proving the absence of causation--which the lack of probable cause tends to establish—had fallen to the defendant prosecutor. Hartman v. Moore, 547 U.S. 250, 266 (2006) (Ginsburg, J., dissenting). Thus, in Hartman and now in Nieves-like cases, the burden of disproving what used to be a defense to causation now falls to plaintiffs, and "only entirely 'baseless prosecutions' [are] checked." Id. (citation omitted).

Capp v. County of San Diego illustrates the default burden allocation. In Capp, the Ninth Circuit held that the plaintiff need only plausibly allege retaliatory animus was a "substantial motivating factor" and explicitly noted Plaintiff was not required to plead but-for causation. [30] Capp, 940 F.3d 1046, 1058 (9th Cir. 2019). In essence, pleading that animus was a substantial motivating factor leads to an inference of but-for causation, which Defendants may later disprove. The exceptions are those cases (retaliatory prosecution or arrest) in which the no-probable-cause requirement falls on plaintiff's shoulders.


### c. Substantial Motivating Factor

**\*24**  The next question—squarely but perhaps not artfully raised by Defendants—is whether Plaintiffs establish that retaliatory animus was a substantial motivating factor in any of Defendants' actions during the investigation. (Ramos MSJ at 13-22.) Capp 940 F.3d 1046, 1055 (9th Cir. 2019). The intent to inhibit speech can be demonstrated through direct or circumstantial evidence. Mendocino, 192 F.3d at 1301–02. Circumstantial evidence of motive usually includes: (1) proximity in time between the protected action and the allegedly retaliatory response, from which a jury logically could infer retaliation speech; (2) evidence that the official expressed opposition to the speech; (3) evidence that the official's explanations for the action were false and pretextual. See Coszalter v. City of Salem, 320 F.3d 968, 977 (9th Cir. 2003) (discussing circumstantial factors in an adverse employment case). The Court observes that the second example seems rather like a type of direct evidence, [31] and that the third example to be a catch-all category allowing flexible application. The parties' feud about which circumstantial factors apply is therefore unnecessary.

The Court's task is to correlate speech to animus to action. Unfortunately, Plaintiffs tend to lump together their protected activities. Defendants are careful to distinguish the protected activity, (Ramos MSJ at 12-22), but as noted above, improperly allocate the burden of proof. In their Oppositions, Plaintiffs do not methodically name the direct and circumstantial factors that support an inference that each Defendant harbored animus towards each Plaintiff. (Consol. Opp'n at 38-39.) Instead Plaintiffs continue to characterize Defendants' individual actions within the PIU and DA's Office as part of the same global "conspiracy" that coalesced in August 2009 to take them out of politics. [32]

Even assuming a conspiracy to violate Plaintiffs' rights took shape at that time, however, this alone would not raise a triable issue on retaliatory investigation. A meeting of the minds to violate Burum's rights, for example, could be substantially motivated by any number of factors wholly unrelated to Burum's protected activity, such as aggrandizing the prosecutors, appearing tough on perceived corruption in the County, or submitting to exterior pressures. Moreover, the retaliatory investigation precedents upon which Plaintiffs have principally relied, especially Denney, painstakingly considered each investigative actor, his actions, and whether those official actions were motivated by speech-related animus.

In other words, where Plaintiffs insist they are bringing an "ordinary" retaliation claim that lacks multi-tiered causation problems, they cannot—in an about-face—rely on a sweeping conspiracy theory to prove that speech retaliation substantially motivated each Defendant. The relevant retaliatory actions taken by each Defendant must be more clearly defined, so the Court may consider which Defendant was responsible for the action, and whether he was potentially substantially motivated to act by animus relating to one or more examples of Plaintiffs' protected speech.

### d. Plaintiff and Speech; Defendant and Action; Direct or Circumstantial Evidence of Motive; and Result

### 1. Burum

**\*25** The Court begins with Burum, and his protected conduct. Burum asserts he engaged in the following protected conduct: (1) advocating for the 2006 Settlement and criticizing the County during the Settlement process; (2) advocating for Measure P [33] in the fall of 2006; (3) obtaining the Settlement on November 28, 2006; and (3) directing donations in 2007 [34] to "political to general purpose PACs affiliated with pro-development politicians, including members of the San Bernardino County Board of Supervisors and others who had supported the settlement." (Burum SAC at ¶ 3.) As discussed in the next subsection, Burum cannot claim retaliation based on Colonies' protected First Amendment conduct, and depend on his own protected activity. That does not include the Settlement (to which Burum was not a party). [35]

The Consolidated Opposition and Joint SAF mention for the first time several potentially protected actions that are not linked to advocacy in favor of the 2006 Settlement or 2007 PAC payments, such as the acquisition of 1200 acres around 2009, or other political influence Burum was perceived to exercise, directly or indirectly. (Joint SAF ¶¶ 28, 44, 54, 91.) That asserted protected activity is either so vague that it cannot be tied directly to Burum or pinned to any particular time, or it is not clearly or fairly delineated as protected in the SAC. A different set of facts would tend to prove or disprove whether and when that additional activity occurred, whether it was protected, and whether it was a substantial motivating factor in any Defendant's investigative actions. In addition, it would be highly prejudicial to Defendants to permit Burum to expand the scope of his asserted First Amendment activity at this late stage in the proceeding. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1291–92 (9th Cir. 2000) (holding the district court did not err when it refused to entertain a new theory of liability raised for first time at the summary judgment stage); *Apache Survival Coalition v. United States*, 21 F.3d 895, 910 (9th Cir. 1994) (when new issues or evidence supporting a legal theory outside scope of complaint are introduced in opposition to summary judgment, district court should construe matter as request to amend pleadings). [36] The Court therefore rules out protected activity materially distinct from the 2006 and 2007 activities clearly within the scope of the SAC. (Burum SAC ¶¶ 38-46, 119.)

The next step is to consider each Defendant and his or her actions and potential retaliatory motive, relative to Burum's speech. Burum asserts his First Amendment Retaliation claim against Ramos, Hackleman, Cope, Randles, and Schreiber. (Burum SAC at 45.) The Court beings with Hackleman and Ramos, then discusses the remaining Defendants.

**\*26** Burum offers adequate evidence of Hackleman's retaliatory animus to survive summary judgment. *See* Part II.L. For example, in June 2006, Hackleman expressed his opposition to Burum's Op-Ed discussing settlement negotiations. (Joint SAF ¶ 12.) In August 2010 Hackleman stated Postmus was the key to getting back the Settlement money from Burum's pocket. (Id. ¶ 61.) Hackleman wrote in February 8, 2011 he was "emotionally excited about going after these bastards," prior to the Postmus interviews, referencing Burum and the other Does. Id. And after the first Postmus interview, Hackleman expressed a desire to "absolutely ruin[ ] Burum as a political operator." Id. The same year, Hackleman sent a letter to the editor asking a local newspaper to reconsider its endorsement of a candidate who received political donations from Burum's partner. (Joint SAF ¶ 103.) A reasonable juror could infer from this evidence that Hackleman was moved largely by his dislike of Burum's 2006 and 2007 advocacy, political activity, or donations.

Burum's evidence against Ramos is also adequate to show substantial retaliatory motivation. The most direct examples are a Ramos email on July 30, 2011 that "[s]omething is not right, [Burum] still has influence," and an August 23, 2011 statement that "Burum is feeling cocky and is spreading his political power around." (Joint SAF ¶¶ 100, 104-105.) On the more circumstantial end of the spectrum, Ramos: (1) agreed that Burum was "Dr. Evil," (2) stated that "Burum is ... a dirty word," and (3) emailed DA's Office personnel they "may" need to keep an eye on "Burum & Co." because their next step "may be laundering campaign funds." (Joint SAF ¶¶ 44, 91, 100, 104-105, 118.)

*Colonies Partners LP v. County of San Bernardino, Slip Copy (2020)*

The question remains <u>which</u> investigative actions [37] by Hackleman or Ramos (or ratified by them) were motivated by retaliation. Against Hackleman, the Court finds a triable issue on any investigative action from the Settlement forward. Even before the Settlement, on June 22, 2006, Hackleman expressed (and later admitted) his opposition to Burum's speech in favor of the Settlement. (Joint SAF ¶¶ 12-13.) Against Ramos, however, the Court has difficulty locating any direct or circumstantial evidence of retaliatory motive tied to Burum's protected speech before 2011. (Joint SAF ¶ 24.) Despite the significant lapse in time, the Court finds a genuine dispute whether Ramos was substantially motivated to retaliate, because of (1) the disputed extent of Ramos's supervision of Hackleman, and (2) the fairly direct nature of Ramos's statements. However, "when?" and "which investigative acts?" remain key questions going forward. Accordingly, the Court DENIES Ramos and Hackleman's MSJs on Burum's retaliation claims against them.

Next, the Court considers Cope, Schreiber, and Randles' MSJs on Burum's retaliation claims. The Court has already enumerated the relevant protected conduct. The earliest investigative action directed at Burum by Randles or Cope was the November 2008 Aleman interview. (Compendium Ex. 2.) Cope, Schreiber, and Randles carried out numerous investigative acts over several years, from obtaining search warrants to conducting interviews. <u>See generally</u> Part II.

Plaintiffs fail to identify "more than the mere existence of a scintilla of evidence," <u>In re Oracle Corp. Sec. Litig.</u>, 627 F.3d at 38, that Cope, Schreiber, or Randles acted with any retaliatory motive specific to Burum. The fact that the PIU team discussed the Colonies settlement at departmental meetings in 2006 does not show retaliatory motive. (Joint SAF ¶ 16.) Nor does the fact that individuals in the PIU office viewed themselves as "elephant hunters" bear on their motive to chill speech. (<u>Id.</u> ¶ 19.) The Court takes for granted that Cope, Schreiber, and Randles knew of Burum or Colonies at the time of the Aleman interview in November 2008 and during subsequent investigative acts (such as obtaining search warrants or conducting interviews). But the speech of which they were aware occurred about two years prior to the vast majority of their investigative undertakings. [38] This mere awareness of Burum's protected activity is inadequate circumstantial proof to infer retaliatory animus "substantially" motivated their actions. The Court is also hesitant to find a triable issue on Cope, Schreiber, and Randles' "substantial" motivation to chill Burum's speech where the record points almost exclusively to Hackleman, and to a lesser extent, Ramos, as the instigators of the ill-fated investigation.

**\*27** Schreiber, Randles, and Copes' investigative actions are untethered to any motive to silence Burum. Plaintiffs imply Schreiber may have desired to block Burum's (or a perceived Burum associate's) purchase of a 1200-acre property, (Joint SAF ¶ 54 (referencing February 24, 2010 email)), but the evidence does not suggest Schreiber harbored any desire to chill Burum's participation in politics, which is the focus of the <u>Burum</u> SAC. The 1200-acre property is not referenced in the <u>Burum</u> SAC, and Plaintiffs do not elaborate why purchase of the property is a protected first amendment activity, or indeed whether it was Burum himself who sought to make the purchase. Next, Plaintiffs insist Randles, Schreiber, or Cope threatened and pressured Postmus in the March and February 2011 interviews. Assuming they did, however, it is far from obvious that they were "substantially" motivated to do so by a desire to silence Burum. Similarly unclear is why an asserted "cover-up," in which Randles and Schreiber wrote conflicting reports about authorizing Aleman to record Postmus, (Joint SAF ¶ 146), was motivated by retaliatory animus directed specifically at Burum.

The Court is mindful that "[q]uestions involving a person's state of mind ... are generally factual issues inappropriate for resolution by summary judgment." Braxton–Secret v. Robins Co., 769 F.2d 528, 531 (9th Cir. 1985). Nevertheless, the Court finds significant in this case—of five-foot-high-bank-box stack proportions—that Burum does not point to emails authored by Cope, Randles, or Schreiber, to deposition statements, or to interview excerpts, that would more strongly support the existence of retaliatory motive. [39] Anthonie v. North Central Counties Consortium, 605 F.3d 740, 753 (9th Cir. 2010) (where plaintiff relies on circumstantial evidence to show retaliation, that evidence must be specific to defeat the motion for summary judgment). Moreover, imputing Hackleman and Ramos's animus to each PIU inferior results in serious <u>Hartman-</u>like problem of attenuated causation. [40] Accordingly, the Court GRANTS Schreiber, Randles, and Cope's MSJs on Burum's retaliation claim.

*Colonies Partners LP v. County of San Bernardino, Slip Copy (2020)*

### 2. Colonies

Defendants argue that Colonies cannot assert a 🚩Section 1983 retaliatory investigation claim, because Colonies was not the subject of the allegedly retaliatory investigation or prosecution. (Ramos MSJ at 13 n.9.) Colonies replies that entity defendants have standing to assert constitutional injures. (Colonies Opp'n at 3.)

The Court agrees with Colonies that an entity can pursue a 🚩Section 1983 claim where it suffered financial loss as a result of unconstitutional conduct. (See id. (citing Outdoor Media Grp., Inc. v. City of Beaumont, 464 F. App'x 611, 613 (9th Cir. 2011)); MSJ Order at 16-20, Dkt. No. 247.) The question remains, however, whether Colonies raises a triable issue that it was the target of a retaliatory investigation and suffered financially as a result. The Court finds there is a triable issue on the first issue, because of the tendency of investigators to conflate Colonies and Burum, and the possibility that Defendants retaliated against both Plaintiffs simultaneously. (Colonies Opp'n at 4-5 (collecting examples).) The Court DENIES Ramos and Hackleman's MSJs on Colonies' retaliation claim and GRANTS Schreiber, Randles, and Copes' MSJs on the same.

 **\*28**  A related question is whether Burum may claim retaliation based on the protected conduct of Colonies, which is a separate entity, and vice versa. (Ramos MSJ at 13 n.9 (citing Van Leeuwen v. United States, 868 F.2d 300, 301 (8th Cir. 1989); Am. News & Info. Servs., Inc. v. Gore, 778 F. App'x 429, 432 (9th Cir. 2019) ("American News cannot vicariously assert claims based on Playford's Fourth Amendment rights."))) Colonies asserts that there is a separate factual basis for it to assert retaliation, because it too was targeted. (Colonies Opp'n at 3-4.) The response avoids the issue and fails to offer authority on whether one entity—harmed by retaliatory conduct directed at a third party's First Amendment conduct—may vicariously assert the rights of the third. The Court therefore agrees with Defendants that Plaintiffs cannot assert retaliation claims based on one-another's protected conduct, even if it is harmed by the asserted retaliation. (Reply at 24 n. 18 (citing Outdoor Media Grp., 464 F. App'x at 613 ("[A]ppellants are unable to assert the First Amendment rights of the third parties ....").)

### 3. Erwin

The Court agrees with Defendants that Erwin cannot "glom onto" Burum or Colonies' asserted First Amendment Activity. (Ramos MSJ at 17; Erwin Opp'n at 11 (failing to respond to this argument).) The Court therefore focuses on the protected activity Erwin alleges he engaged in himself. Erwin claims Defendants retaliated against him for: (1) directly petitioning government officials and obtaining a favorable settlement in the underlying civil litigation, (Erwin FAC ¶ 3); (2) commenting publicly on County intransigence during the settlement process, (id. ¶ 32); (3) sharing similar political interests and goals with Burum and Colonies and the prospect that these shared goals might find effective expression (id. ¶ 4); and (4) his own political activism and advocacy, (id. ¶ 34). Many of these asserted First Amendment activities are so vague, unbounded by time, or even prospective, that it is difficult to consider with any precision whether one or more of these factors "substantially motivated" Defendants to investigate.

Although Erwin was arrested on several occasions, he does not assert a retaliatory arrest claim, and essentially repeats Burum's retaliatory investigation claim verbatim. (Erwin Opp'n at 11-25.) Like Burum, Erwin is overbroad in characterizing the investigative acts that were retaliatory, and essentially claims that the investigation as a whole was motivated by a broad-based conspiracy.

Erwin's analysis of direct and circumstantial evidence of retaliatory motive directed at him is similarly unhelpful. He only repeats the same Joint SAF citations as Burum. (Erwin Opp'n at 25.) Closer examination of the Joint SAF as a whole does not reveal direct or circumstantial evidence of retaliatory motive against Erwin specifically. The record only shows that Defendants investigated Erwin, because they believed he had been acting on behalf of Burum (e.g. by threating to expose Postmus's homosexuality and drug use) or had received a Rolex or other gifts from Burum. Similarly, Hackleman's 2006 email arguably

expressed opposition to Burum's speech in favor of settlement, but Erwin fails to explain why this raises triable issue on his (unspecified, undated) speech acts in favor of Settlement. Other potential evidence is that in February 2010 Ramos replied "ARREST" to an email regarding the forthcoming felony complaint, which named Erwin. (Joint SAF ¶ 45.) Enthusiasm to arrest does not equate with substantial retaliatory motivation during the preliminary investigative phase. The evidence that Cope, Randles, or Schreiber were substantially motivated to act by retaliatory animus is similarly lacking.[41] As a result, a reasonable juror could not find that the investigation as a whole or any individual investigative act was substantially motivated by retaliation for Erwin's protected conduct. The Court therefore GRANTS Ramos, Hackleman, Cope, Randles, and Schreiber's MSJs on Erwin's retaliation claim against them.

#### 4. Biane

**\*29** Biane alleges Defendants were "motivated by personal enmity, political opportunism, and the pursuit of partisan advantages" and aimed to "punish and humiliate Colonies" and to "boost their own careers." (Biane FAC ¶ 3.) Of course, these asserted motivations have nothing to do with Biane, and tend to undermine any inference of retaliatory animus directed at him specifically. The year following the Settlement, Colonies made a contribution to a PAC with which Biane was merely associated, San Bernardino County Young Republicans.[42] (Id. ¶ 56; DSUF ¶ 13; Joint SAF ¶ 171.) When Biane was a County Supervisor, he voted in favor of the Settlement, and also claims retaliation on this basis. (Id. ¶¶ 35-36, 82, 91.)

Again, the Court cannot correlate Biane's vague assertions of protected conduct with retaliatory animus and investigative action, and the connection between Biane and the PAC here is particularly feeble. Biane's joinder does not add any arguments that have not already been considered. (Biane Opp'n.) For the same reasons described under the Subsection on Erwin, the Court GRANTS Ramos, Cope, Randles, and Schreiber's MSJs on Biane's retaliation claim against them.[43]

#### 5. Kirk

Kirk's asserted protected activity, likewise, is far removed from the apparent concerns of the investigation, and he raises no triable question that Defendants were ever "substantially motivated" by his protected conduct. Kirk states he was the Chief of Staff for Gary Ovitt, a member of the County Board of Supervisors, and was prominent in politics. (Kirk FAC ¶ 2.) Ovitt voted in favor of the settlement after consulting with Kirk. (Id. ¶ 4; DSUSF ¶ 1.)

Kirk asserts he was investigated for being "on the wrong side of the political line," with regard to the Settlement and vaguely "with regard to [his] associations with Mr. Burum ... and other like-minded political allies." (Id. ¶ 5.) Defendants investigated Colonies' 2007 donation to the Alliance for Ethical Government, (DSUF ¶ 171; Joint SAF ¶ 13), which Kirk states he founded and directed, (Kirk FAC ¶ 10; DSUF ¶¶ 18-20). However, it is undisputed that in his April 2009 interview with investigators, Kirk denied he founded the AEG PAC or that he directed its expenditures. (DSUF ¶ 33.)

In 2010, before he was charged, Kirk worked in the County Executive Office under a Chief Administrative Officer, Greg Devereux. (Kirk FAC ¶ 13.) Hackleman wrote that Kirk was reportedly the cause of the prior CAO's firing. (Joint SAF ¶ 30.) On December 4, 2009, Hackleman exchanged emails with an individual the AG's Office who observed "[p]erhaps we upset their plans to install Devereaux." (Joint SAF ¶ 36.) To this, Hackleman responded, "I sure hope so. And we have some other potential options in that area." (Id.)

**\*30** Kirk does not raise a triable issue on retaliation. As the previous paragraph demonstrates, it is not clear Kirk engaged in any protected speech in the first instance. The essence of Kirk's claim is that he was targeted on the basis of other individuals' actions, for example his former boss's vote in favor of the Settlement[44] or because he worked for Devereaux, who Hackleman and Ramos appear to have disliked. This does not show, however, that Defendants targeted Kirk primarily because of his own protected speech. (See also Ramos MSJ at 20 n.16 (to which Kirk offers no response).) Even if Ramos agreed with his campaign supervisor's sentiment that "at the end of the day, I will fuck over Mark Kirk if it's the last thing I do," (Joint SAF ¶ 62 (citing email by David Ellis to Ramos on October 4, 2010)), this would not create a triable issue on retaliation, because it is not tethered

to protected First Amendment conduct around the Settlement. [45]  For the same reasons described under the Subsection on Erwin and Biane, the Court GRANTS Ramos, Cope, Randles, and Schreiber's MSJs on Kirk's retaliation claim against them.

### 6. DeFazio

DeFazio was the founder and leader of the Inland Empire PAC, which received a contribution from Colonies in July 2007, after the Settlement. (DeFazio Compl. ¶ 2; DSUF ¶ 13.) He claims that the Colonies contribution motivated Defendants to investigate and prosecute him. (DeFazio Compl. ¶¶ 4,6.) DeFazio testified on October 22, 2009 before the Grand Jury. (DSUF ¶ 38.) He was arrested on charges of perjury in February 2009 for allegedly lying to the Grand Jury about his control of the PAC. (DeFazio Compl. ¶ 7.)

Neither direct nor circumstantial evidence supports the notion that Defendants were substantially motivated to investigate DeFazio for his own protected conduct. First, and as noted previously, Plaintiffs do not respond to the argument that receipt of funds is not a protected First Amendment activity. Second, the IE PAC received funds in July 2007, and DeFazio was not investigated for perjury until after his Grand Jury statements, more than two years later. Accordingly, the Court GRANTS the County, Ramos, Randles, Schreiber, and Aleman's MSJs on DeFazio's retaliation claim against them.

DeFazio's supplement, which Kirk, Biane, and Erwin join, (Dkt. No. 406), does not change the result. The Court will not allow Plaintiffs to rely on vague and generic allegations in their operative complaints and shift the asserted protected conduct without notice or amendment. Navajo Nation v. U.S. Forest Serv., 535 F.3d 1058, 1080 (9th Cir. 2008) ("[O]ur precedents make clear that where, as here, the complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court"); Patel v. City of Long Beach, 564 Fed. App'x 881, 882 (9th Cir. 2014) ("Allowing a plaintiff to proceed on a new theory [at the summary judgment stage] would prejudice defendants"). In addition, the Court cannot discern in the record any support for the view that Defendants were substantially motivated to retaliate against DeFazio, Kirk, Biane, or Erwin based on their spending of money, the new theory they assert. The PACs received the donations, not them, and the record does not contain information on how exactly the money was spent or why that spending motivated Defendants to retaliate.

## C. Qualified Immunity

### 1. Legal Standard

**\*31**  In analyzing whether qualified immunity applies, a court must determine "whether, taken in the light most favorable to [the plaintiff], Defendants' conduct amounted to a constitutional violation, and ... whether or not the right was clearly established at the time of the violation." Bull v. City and County of San Francisco, 595 F.3d 964, 971 (9th Cir. 2010) (internal quotation marks omitted; brackets in original). "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (internal quotation marks omitted). The Supreme Court has emphasized that a finding that a government official's conduct violates clearly established law requires that "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). A district court is not required to address these two inquiries in a particular order, but may instead "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 226; see also Bull, 595 F.3d at 971.

### 2. The Parties' Contentions

*Colonies Partners LP v. County of San Bernardino, Slip Copy (2020)*

Defendants argue that actions taken during the preliminary investigation phase by prosecutors are protected by qualified immunity. (Ramos MSJ at 27-28; Schreiber MSJ at 30-31.) They contend that at the time of the investigation, there was no clearly established First Amendment right to be free from an alleged retaliatory investigation, even if the investigation was otherwise objectively reasonable and supported by probable cause. (Id. (citing Reichle v. Howards, 566 U.S. 658, 664-65, 693 (2012).) They argue that the pursuit of an investigation supported by probable cause is not a clearly established violation, and the investigators here could reasonably believe their actions to be lawful. (Ramos MSJ at 29; Schreiber MSJ at 30.)

The Prosecutor Defendants also contend that they have qualified immunity for alleged supervision of imperfect investigations, because there was no right violated and the right was not clearly established. (Ramos MSJ at 29 (compiling cases regarding investigation suggesting there is no right to investigators following specific leads, asking certain questions, etc.).) The Investigator Defendants argue that the rules of the DA's office "allow for investigation once a report has been made," (Schreiber MSJ at 31 (citing Compendium Ex. 116)), and it is objectively reasonable for officers to rely on policy when beginning an investigation. (Id. citing Acosta v. City of Costa Mesa, 718 F.3d 800, 824 (9th Cir. 2013)); see also Ramos MSJ at 29 (making the same point).) They argue that during the investigation, their actions are qualifiedly immune, for example, because there is no right to be interviewed in a particular manner or have the investigation carried out in a particular way. (Schreiber MSJ at 31-32.)

Plaintiffs respond that Defendants are not entitled to qualified immunity on the retaliation claim. (Consolidated Opp'n at 49-50.) They argue Defendants only assert qualified immunity as to the retaliation claim and bear the burden of "invoking" the doctrine. (Id.) They contend that the right at issue is the First Amendment right to be free from a retaliatory investigation for speech based on partisan, political motivations rather than objective evidence. (Id. at 51.) As examples of precedent clearly establishing the right, Plaintiffs offer Lozman, 138 S. Ct. at 1954, Duran v. City of Douglas, Ariz., 904 F.2d 1372, 1378 (9th Cir. 1990), and Beck v. City of Upland, 527 F.3d 853, 871 (9th Cir. 2008). (Id. at 51.) They also assert that it was clearly established that government actors cannot subject individuals to criminal charges on the basis of false evidence that was deliberately fabricated by the government. (Id. (citing Abbey, 263 F.3d at 1074-77; Gantt, 717 F.3d at 707; Hall v. City of Los Angeles, 697 F.3d 1059, 1068 (9th Cir. 2012)).)

### 3. Discussion

**\*32** Plaintiffs have raised numerous genuine disputes of material fact. "[W]hen there are disputed factual issues that are necessary to a qualified immunity decision, these issues must first be determined by the jury before the court can rule on qualified immunity." Morales v. Fry, 873 F.3d 817, 824 (9th Cir. 2017) (citing commentary to Ninth Circuit Model Civil Jury Instruction 9.34 (2017)); see also Espinosa v. City & Cty. of San Francisco, 598 F. 3d 528, 532 (9th Cir. 2010).

Defendants argue that even assuming that "the investigation was less than perfect," (Schreiber MSJ at 31), it is reasonably arguable Defendants actions did not violate clearly established law, because they followed DA's Office policies and because investigative action after the existence of probable cause to arrest is protected, Baker, 443 U.S. at 145-46. However, the First Amendment right to be free from official action in reprisal for protected speech was clearly established as a more general proposition, see Duran v. City of Douglas, Ariz., 904 F.2d 1372, 1378 (9th Cir. 1990); Lozman, 138 S. Ct. at 1954, and the Court has determined that the Hartman and Nieves no-probable-cause requirement—which is an exception to the general First Amendment retaliation standard—does not extend to investigative action. Thus, Defendants seek qualified immunity based on a doubtful extension of an exception to a more clearly established rule.

Defendants lean heavily on Reichle v. Howards, 566 U.S. 658 (2012), for the proposition that where Hartman has cast doubt, the Court is bound to grant qualified immunity. (Schreiber Reply at 20-21.) In Reichle v. Howards, the Supreme Court considered whether a First Amendment retaliatory arrest claim may lie despite the presence of probable cause to support the

arrest, and whether clearly established law at the time of the plaintiff's arrest so held. 566 U.S. at 663. At the time of the arrest in Reichle, Hartman had been decided, but Nieves had not, and Tenth Circuit precedent prior to Hartman stated that retaliatory arrests violate the First Amendment regardless of probable cause. See 566 U.S. at 666. The Tenth Circuit held that the contours of the First Amendment right against retaliatory arrest were clearly established at the time of the arrest, and that Hartman's no-probable-cause requirement did not apply. Id. The Supreme Court reversed, because at the time of the arrest, "Hartman's impact on the Tenth Circuit's precedent governing retaliatory arrests was far from clear." Id. For example, the legal backdrop at the time of Hartman treated retaliatory arrests and retaliatory prosecutions similarly. Id.

Here, however, Plaintiffs point to no such legal backdrop. Hartman itself reserved the issue of retaliatory investigation, 547 U.S. 250, 262 n.9. As noted in the discussion on retaliatory investigation above, Part IV.B, it would be anomalous to apply probable cause in the context of investigative activity. In other words, the Court cannot conclude that any uncertainty created by Hartman or for that matter, Nieves, moves the retaliatory investigation claim here from "beyond debate" to within. 563 U.S. at 741. Defendants also do not account for the fact that the Lozman exception to the no-probable-cause requirement in retaliatory arrest cases was clearly established at the time. Therefore, the Court declines to rule on qualified immunity at this stage.

## D. Monell

**\*33** Each of the six Plaintiffs assert a Monell claim for municipal liability under 42 U.S.C. § 1983 against the County. (Colonies FAC; Burum SAC; Erwin FAC; Kirk FAC; Biane FAC; DeFazio Compl.)

### 1. Legal Standard

Under Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978), a municipality cannot be sued under a theory of respondeat superior for injuries inflicted by its employees or agents. Rather, municipalities are subject to damages under 42 U.S.C. § 1983 in three situations:

> First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity. Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy. Whether a particular official has final policy-making authority is a question of state law. Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.

Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) (quoting Gillette v. Delmore, 979 F.2d 1342, 1346–47 (9th Cir. 1992); Price v. Sery, 513 F.3d 962, 966 (9th Cir. 2008). A municipality can be liable under Section 1983 only where its policies are the "moving force [behind] the constitutional violation." City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989) (citing Monell, 436 U.S. at 694). Where the alleged policy or practice is a failure to act to preserve constitutional rights, the plaintiff must also establish the failure "amounts to deliberate indifference." City of Canton, 489 U.S. at 389–91.

### 2. The Parties' Contentions

*Colonies Partners LP v. County of San Bernardino, Slip Copy (2020)*

The County argues that Plaintiffs do not raise a triable <u>Monell</u> claim, because Plaintiffs only point to a single investigation (the one that involved them) that deprived them of their rights, and this does not support an official, widespread, or longstanding municipal custom or practice. (County MSJ at 2-5.) A custom or practice not authorized by written law or express municipal policy must be "so persistent and widespread that it constitutes a permanent and well settled city policy." (<u>Id.</u> (citing <u>Trevino v. Gates</u>, 99 F.3d 911, 918 (9th Cir. 1996); <u>Hunter v. Cty. Of Sacramento</u>, 652 F.3d 1225, 1233 (9th Cir. 2011); <u>Talib v. Guerrero</u>, 2016 WL 1470082, at *7 (C.D. Cal. Mar. 14, 2016); <u>Hoffman v. Cty. of Los Angeles</u>, 2017 WL 3476773, at *4, 5 (C.D. Cal. Feb. 15, 2017)).)

The County also anticipates an argument that it is liable due to the actions of a county official with final policymaking authority, who ordered or ratified unconstitutional conduct and the basis for it. (County MSJ at 5 (citing <u>Christie v. Iopa</u>, 176 F.3d 1231, 1239 (9th Cir. 1999)).) The County argues that Ramos, in so far as he took actions against Plaintiffs, was acting in his state-, and not his county-policymaking capacity, and so was not a final county policymaker. (<u>Id.</u> at 6.) The County reasons it cannot be liable for Ramos's actions taken in his capacity as a state actor, which include "investigating and proceeding with criminal prosecutions." (<u>Id.</u> at 6-7 (citing <u>Vasquez v. Rackauckas</u>, 734 F.3d 1025, 1041 (9th Cir. 2013); <u>Inman v. Anderson</u>, 294 F. Supp. 3d 907, 922 (N.D. Cal. 2018)).) Nor can the County be accountable for certain policies of the DA's Office that relate to judicial process. (<u>Id.</u> (citing <u>Reinhardt v. Santa Clara Cty.</u>, 2006 WL 3147691, at *4 (N.D. Cal. Nov. 1, 2006)).)

**\*34** Finally, the County argues that even if Ramos was deemed a county actor during the investigation, he did not direct or ratify his subordinates' conduct. (<u>Id.</u> at 8 (citing <u>Lytle v. Carl</u>, 382 F.3d 978, 987 (9th Cir. 2004); <u>Dougherty v. City of Covina</u>, 654 F.3d 892, 900 (9th Cir. 2011)).) The County concludes by tossing in an argument that Plaintiffs do not show the county policy, custom, or practice was the "moving force" behind their injuries, and hence fail to demonstrate the requisite causal link. (<u>Id.</u> at 8.)

Plaintiffs respond that there is a triable issue, first, on whether the County retaliated against them under an "official municipal policy" by engaging in a "premeditated plan" of retaliation. (Consolidated Opp'n at 39 (citing <u>Lozman</u>, 138 S. Ct. at 1951, 1954; <u>Aydelotte v. Town of Skykomish</u>, 757 Fed. App'x 582, 585 (9th Cir. 2018)).) Plaintiffs state that there is a "long record" of Defendants' retaliatory conduct or motives, and thus the County's contention that the <u>Monell</u> claim is based on a single decision is a mischaracterization. (<u>Id.</u> at 39-40.)

Second, Plaintiffs argue the County is liable for Ramos's actions as a final policymaker. (<u>Id.</u> 40 (citing <u>Christie v. Iopa</u>, 176 F.3d 1231, 1235 (9th Cir. 1999)).) Plaintiffs counter Defendants' point about the prosecutor being a state authority by referencing caselaw holding that a California DA is not a state officer for all purposes, (<u>id.</u> (citing <u>Weiner v. San Diego Cty.</u>, 210 F.3d 1025, 1031 (9th Cir. 2000))), for example engaging in investigative conduct or administrative functions, as opposed to preparing to prosecute or prosecuting, (<u>id.</u> (citing <u>Bishop Paiute Tribe v. Cty. of Inyo</u>, 291 F.3d 549, 565 (9th Cir. 2002); <u>Ceballos v. Garcetti</u>, 361 F.3d 1168, 1183 (9th Cir. 2004))).

Finally, Plaintiffs contend there is evidence creating a triable issue regarding Ramos's direction of the investigation, and ratification of his subordinates' illegal conduct. (<u>Id.</u> at 40.) Ramos ensured the investigation focused on Burum "from an administrative standpoint," Plaintiffs argue, by redistributing investigative resources, receiving updates, and directing others. (<u>Id.</u>)

### 3. Discussion

*Colonies Partners LP v. County of San Bernardino, Slip Copy (2020)*

Viewing the evidence in the light most favorable to Plaintiffs, the Court finds triable issues on one or more of Plaintiffs' Monell theories. Plaintiffs have narrowed the alleged municipal policy in their Oppositions, and focus on the allegation that the County engaged in a "premediated plan" of retaliation, similar to that in 🚩 Lozman, 138 S. Ct. 1945. (Consol. Opp'n at 39.)

In Lozman, the Ninth Circuit discussed whether a Monell claim could stand, where the plaintiff asserted the city council formed an official policy to retaliate against him and order his arrest, and where the plaintiff conceded there was probable cause for the arrest. 🚩 138 S. Ct. at 1951. However, the Ninth Circuit did not consider "whether there was such a policy and what its content may have been." [46] Id. The case is helpful to Plaintiffs in one respect: lack of probable cause is not an element of their Monell claim for "premeditated retaliation." However, Lozman does not provide guidance on how a plaintiff can establish the existence of a municipal policy (either by policy, custom, decision of a policymaker, or ratification), which is the County's main line of attack against the Monell claims. [47]

### a. Violation by Policy or Custom

**\*35** First, Plaintiffs submit enough evidence to sustain a claim of a longstanding municipal policy "so persistent and widespread that it constitute[d] a permanent and well settled [ ] policy." 🚩 Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) (citing 🚩 Monell 436 U.S. at 691). The legal battle between Burum/Colonies and the County stretches back to 2002, and—Plaintiffs establish with email anecdotes—continued after Burum's acquittal.

The County's argument that Plaintiffs seek to impose municipal liability on the basis of a "single" investigation is hard to credit. Plaintiffs show that members of the DA's office took interest in negotiations between Colonies and the County and in Burum's press statements even before the Settlement vote. After the Settlement, the PIU discussed the $102 million Settlement at department meetings. (SAF ¶ 12, 16). And by August 2008, an investigator was inquiring about Burum, Postmus, the Settlement, and potential bribes, (id. ¶ 16), months before the November 2008 interview with Aleman that Defendants claim started the Settlement investigation in earnest. Plaintiffs also attach evidence suggesting Defendants were focused on the criminal prosecution, because of concerns that the outcome would affect the "direction of our County ... for years to come." (Joint SAF ¶ 35 (emphasis added).) After Burum's acquittal, Ramos emailed DA Office staff expressing his belief that continued investigation or monitoring of PAC donations associated with him was necessary. [48] (Joint SAF ¶ 121.)

A reasonable juror could conclude that individual Defendants at the PIU and DA's Office acted pursuant to "a longstanding practice or custom" of retaliating against Burum or Colonies for protected speech activity. 🚩 Delia v. City of Rialto, 621 F.3d 1069, 1081–82 (9th Cir. 2010), rev'd on other grounds, 🚩 566 U.S. 377 (2012); 🚩 Lozman, 138 S. Ct. 1945 (2018). Perhaps the County could contextualize these statements to reduce their impact. And perhaps Plaintiffs exaggerate the importance of PIU emails. In addition, the County approved the $102 million Settlement with Colonies, which tends to negate the existence of a "permanent and well-settled" County policy of retaliation against Colonies, its managing partners, or their perceived allies. 🚩 Trevino v. Gates, 99 F.3d 911, 919 (9th Cir. 1996), holding modified by Navarro v. Block, 250 F.3d 729 (9th Cir. 2001). Nevertheless, the Court is bound to construe the evidence in the light most favorable to Plaintiffs, 🚩 Barlow, 943 F.2d at 1135, and finds that Plaintiffs have amassed "more than ... [a] scintilla" of evidence of a widespread custom. 🚩 Anderson, 477 U.S. at 252.

Defendants bank on Trevino for the argument that ad hoc and "isolated or sporadic" municipal activities cannot support the existence of a municipal custom under Monell. (County MSJ at 2-5.) However, as Trevino itself acknowledges, the question of whether a policy or custom exists is normally a jury question. 🚩 Trevino, 99 F.3d at 920. In addition, the alleged municipal

custom in Trevino—indemnifying LAPD officers against punitive liability and thereby ratifying their unconstitutional excessive use of force—was not shown to have existed at the time of the alleged use of force. 99 F.3d at 919 ("The record is virtually devoid of any direct evidence of council indemnification prior to the shooting ... If there is a pattern, it is more reflective of normal municipal claims adjusting with all its inconsistencies and imperfections than of subtle conspiracy to indemnify officers outside the public eye.") Here, the Court is swayed by the long litigation history between the parties, by the fact that Burum claims to have been swept up in the PIU's retaliatory investigation, and that the relevant conduct attributable to the County was not a single City Council vote (as in Trevino), but spanned many years. However, the Court agrees with the County that the alleged custom is not widespread or longstanding enough with regard to Plaintiffs other than Burum and Colonies.

### b. Violation by a Final Policymaker

**\*36** A jury could also conclude on this record that a "final policymaker" of the County— Ramos—took or ratified retaliatory action. Under Pembaur v. City of Cincinnati, 475 U.S. 469 (1986), municipal liability may be imposed for even a single action. However, in considering this alternate Monell theory, the Court must only consider acts Ramos took on behalf of the County. Whether a particular individual has "final policymaking authority" sufficient to impose liability under Monell for a decision is a question of state law. Praprotnik, 485 U.S. at 124. In California, a "district attorney is a state officer when deciding whether to prosecute an individual." Weiner v. San Diego County, 210 F.3d 1025, 1031 (9th Cir. 2000). Hence, Ramos's prosecutorial actions do not relate to County policies and do not impute liability to the County. Id. at 1028. However, "[d]etermining what functions are prosecutorial is an inexact science." (Dkt. No. 86 at 8 (citing Lacey v. Maricopa Cty., 693 F.3d 896, 912 (9th Cir. 2012)). See infra Part IV.A (discussing the characteristics of prosecutorial actions intimately associated with judicial proceedings).

In the lead case cited by Plaintiffs, Bishop Paiute Tribe v. Cty. of Inyo, the Ninth Circuit analogized the difference between investigative conduct (imputable to the County) and prosecutorial conduct (not imputable to the County) to the difference between prosecutorial conduct entitled to qualified versus absolute immunity. 291 F.3d 549, 565 (9th Cir. 2002), overruled on other grounds in Inyo Cty., Cal. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony, 538 U.S. 701 (2003). Bishop Paiute Tribe considered whether a district attorney obtaining and executing a search warrant engages in prosecutorial conduct or investigative conduct. (Id.) The Court determined the prosecutor was not "preparing to prosecute [or] prosecuting criminal violations," but was "investigating allegations," because at the time the DA served the search warrant, no criminal complaint had been filed. [49] (Id.) Prosecutors performing investigative functions "normally performed by a detective or police officer" are protected only by qualified immunity, Buckley, 509 U.S. at 273. By the Bishop Paiute Tribe analogy, those investigative functions would be imputable to the Country, rather than the State.

Plaintiffs raise a triable issue whether Ramos took investigative or administrative actions to retaliate against Burum or Colonies. As discussed in Part IV.A, actions taken before the existence of probable cause to arrest would certainly be "investigation" under Buckley, and therefore attributable to the County, rather than the State. Even after the establishment of probable cause, if the purpose or goal of the activity is investigative or administrative, then it would also be attributable to the County. Id.; Buckley, 509 U.S. at 274 n.5.

The record supports an inference that in his capacity as a County actor, Ramos directed the PIU to investigate Burum or Colonies and to file a criminal complaint prior to the 2010 political season. (SGD ¶ 85; Joint SAF ¶ 41-42.) Ramos's post-trial emails also suggest a willingness to direct investigation based on political contributions. (Foster Decl., Ex. 59 ("The next step may be laundering campaign funds ... It will happen.").)

*Colonies Partners LP v. County of San Bernardino, Slip Copy (2020)*

**\*37**  In addition, Plaintiffs point to several investigative actions by the PIU that may have been ratified by Ramos or Hackleman, or to which they may have been deliberately indifferent. Ratification is generally a fact question for the jury, but "a plaintiff must establish that there is a genuine issue of material fact regarding whether a ratification occurred." *Christie v. Iopa*, 176 F.3d 1231, 1238-39 (9th Cir. 1999). "To show ratification, a plaintiff must prove that the 'authorized policymakers approve a subordinate's decision and the basis for it.' " *Id.* at 1239 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. at 127).

Here, Hackleman's "position was one that could control the investigation and prosecution," including the "criminal investigation" phase. (Joint SAF ¶ 60.) Hackleman took an active role in planning interviews. (Foster Decl., Ex. 131.) Hackleman also made several statements about being excited about targeting Plaintiffs and reducing their political influence. (Joint SAF ¶ 72, 91-92.) Ramos, in turn, received email and in-person updates from Hackleman on the Settlement investigation. (Joint SGD ¶ 85; Foster Decl., Ex. 2 at 97.) And in a March 8, 2012 email, Ramos emailed Cope and others, stating "I will not allow our team to deviate until we are done with this case. I have lived this case since day one." (Id. ¶ 107.) Hackleman's role appears to have been an admixture of prosecutorial and purely investigative, detective-like functions, and he seems to have regularly apprised Ramos of the PIU team's actions, a fact which muddies the water enough to preclude summary judgment for the County on the Monell claims.

However, the Court, again, does not find a triable issue on a policy ratified by Ramos or Hackleman that relates to Plaintiffs other than Burum or Colonies. Accordingly, the Court DENIES the County's MSJ on the Monell claims brought by Burum and Colonies and GRANTS the County's MSJ on the Monell claims brought by the other Plaintiffs.

### E. Fabrication of Evidence

Plaintiffs assert fabrication of evidence in violation of 42 U.S.C § 1983 as follows: Burum, Erwin, Kirk, and Biane against Randles and Schreiber; and DeFazio against the County, Ramos, Randles, and Schreiber. (Burum SAC; Erwin FAC; Kirk FAC; Biane FAC; DeFazio Compl.)

#### 1. Legal Standard
There is a constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government. Devereaux, 263 F.3d 1074-75. A plaintiff can prove deliberate fabrication of evidence in three ways. [50] First, a plaintiff can produce direct evidence [51] of deliberate fabrication. See *Spencer v. Peters*, 857 F.3d 789, 793 (9th Cir. 2017). In cases involving direct evidence, the investigator's knowledge or reason to know of the plaintiff's innocence need not be proved. Id. Next, a plaintiff can "at a minimum," point to circumstantial evidence that supports at least one of the following two propositions: "(1) [d]efendants continued their investigation ... despite the fact that they knew or should have known that [the plaintiff] was innocent; or (2) [d]efendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). "Failing to follow guidelines or to carry out an investigation in a manner that will ensure an error-free result" does not rise to the level of a constitutional violation and "mere allegations that defendants used interviewing techniques that were in some sense improper, or that violated state regulations, without more, cannot serve as the basis for a claim under [Section] 1983." *Devereaux*, 263 F.3d at 1075-77.

#### 2. The Parties' Contentions
**\*38**  The Investigator Defendants argue that there is no direct evidence of fabrication, and both circumstantial theories of fabrication fail. As to any claim by Plaintiffs that investigators continued to investigate or manipulated Postmus because he was a drug addict and wanted to make a deal, these characteristics are not uncommon and fall short of fabrication of evidence. (Schreiber MSJ at 21 n. 18) At a hearing on Plaintiffs' motion to dismiss for prosecutorial conduct, Judge Smith found no

misconduct or coercion in exchange for Postmus's plea but found Plaintiffs' allegations to be "exaggerated." (Id. at 21 n. 19 (citing SUF ¶ 79).)

Defendants next attack any theory that the investigators used techniques so coercive and abusive that they knew or should have known they would yield false information. (Schreiber MSJ at 23.) The fact that Postmus recanted some of his earlier testimony is not enough to support a claim that interviewers coerced him. (Id. (citing Myers, 825 F. Supp. 2d at 369; Tekoh v. Cty. of Los Angeles, 270 F. Supp. 3d 1163, 1172–74, 1178 (C.D. Cal. 2017)).)

Plaintiffs oppose these arguments, first, by reviewing their separate statement of undisputed facts. In particular, they highlight what they take to be the "biggest bombshell" in the criminal proceeding: Postmus's cross examination, at which he "testified that Randles and Schreiber had taken advantage of his addiction to methamphetamines to plant false memories and to pressure and manipulate him into giving false testimony against Burum." (Consolidated Opp'n at 42-43.) Plaintiffs emphasize that Postmus testified that he informed Randles and Schreiber there was no "quid pro quo" between him and Burum in connection with his vote on the 2006 settlement, but that the investigators pressured him, by implying he would not secure a plea deal if he did not misstate the facts. (Id. at 43.)

Plaintiffs also argue that as a matter of law, Postmus's drug addiction and prior criminal charges are facts that—though not dispositive—tend to support a deliberate fabrication claim. (Id. at 45 (Trulove, 2016 WL 5930634, at *5; Gantt, 717 F.3d at 708).) Second they distinguish two cases, United States v. Ceron, 286 Fed. App'x 974, 977 (9th Cir. 2008), in which five cooperating witnesses and an officer testified consistently, and United States v. Alvarez, 358 F.3d 1194, 1201-02 (9th Cir. 2004), where the fabricated witness testimony was corroborated by physical evidence, from the instant case, in which Defendants relied on a few vulnerable witnesses. (Id. at 46.) Biane provides additional arguments to distinguish Defendants' cited authorities. (Biane Opp'n at 19-20.)

### 3. Discussion

Plaintiffs abandon in their Oppositions the argument that Defendants fabricated evidence during the Aleman interview. (Schreiber Reply at 10.) Drawing all inferences in Plaintiffs' favor, the Court finds a triable issue of fabrication of evidence at the Postmus interviews. The deliberate fabrication claim against Ramos or the County are meritless, because Ramos did not participate in the interviews, and Randles and Schreiber are already named in their official capacities. The focus of discussion is therefore limited to the Postmus interview. [52]

**\*39** Plaintiffs do not bring to light direct evidence of fabrication, which would typically consist of an intentional mischaracterization or fabrication of a witness statement in an investigative report. Spencer, 857 F.3d at 793; Costanich, 627 F.3d at 1111 ("Similarly, an investigator who purposefully reports that she has interviewed witnesses, when she has actually only attempted to make contact with them, deliberately fabricates evidence.") Indeed, the Postmus interviews were recorded, and if a material fabrication in Randles or Schreiber's reports existed, Plaintiffs surely would have raised this in their Oppositions. (DSUF ¶¶ 51-61.)

Instead, the theory here is "manipulation" of Postmus' s memory and "consequent fabrication of evidence." (Consol. Opp'n at 44.) Plaintiffs' evidence in support of this theory is circumstantial. As described in Part II.I, the evidence points in many directions. In light of the numerous factual disputes surrounding the interview and the uncertain significance of each fact, summary judgment is not proper. Reasonable jurors could disagree whether Postmus was manipulated. Some jurors might conclude the investigators deployed typical investigative techniques, did not and could not definitively "know" of Plaintiffs' innocence, and had to ask repetitive questions only because of Postmus's garbled, evasive, or confused manner of speaking. Others, focused more on DA's Office emails from before and after the interviews, on the tenor of the recorded interview, or on Postmus's vulnerabilities, could conclude Schreiber and Randles intentionally manipulated Postmus.

Cunningham v. City of Wenatchee does not change this result. 🚩⚠ 345 F.3d 802, 810 (9th Cir. 2003) (holding that under the Fourteenth Amendment, an interrogation is coercive only when, in light of the totality of the circumstances, an officer's tactics are so extreme as to undermine a suspect's ability to exercise free will). Although Plaintiffs do not dispute that Postmus was an adult, had an attorney present at each interview, was offered food and water breaks, and could end the interviews when he wanted, Plaintiffs raise a triable issue whether investigators knew Postmus was so weak minded that he could be compelled to agree with any view of the case the investigators desired.

Defendants suggest Burum's defense attorneys manipulated Postmus on the stand to recant, and so the "bombshell" testimony at trial was itself, ironically, a result of witness beguilement. (Schreiber MSJ at 21 n.19; DSUF ¶ 79 (undisputed that Superior Court denied Plaintiffs' Motions to Dismiss concerning alleged prosecutorial conduct in August 2014; Schreiber Reply at 14-16.) However, Postmus's extreme susceptibility to manipulation, including on the witness stand, could bolster the conclusion that investigators directed or controlled his initial statements.

Next, Defendants look to Postmus's motion to withdraw his plea (after his performance on the witness stand), which Judge Smith denied on November 13, 2018. Judge Smith did not find credible the claim that investigators manipulated Postmus into pleading guilty. (Supp. Compendium, Ex. 138 ("... [T]he Court finds the allegation[ ] that [Postmus] did not have an adequate memory of the events [at the time of the interviews] is not true. The Court finds that the allegation that the District Attorney investigators fed him a narrative which he adopted is not true ... to demonstrate that, I want to go through a couple of key points in the interviews.")

The Court rejects Defendants' appeal to rely on this prior hearing. First, Defendants raise the hearing on Postmus's motion to withdraw for the first time in Reply and the hearing transcript is attached as a supplement. [53] Second, the absence of clear and convincing evidence of good cause to withdraw Postmus's plea based on his asserted frailties or investigator manipulation, 🚩 Cal. Penal Code § 1018 (permitting withdrawal "for a good cause shown"); 🚩 People v. Ravaux, 142 Cal. App. 4th 914, 917 (holding good cause must be shown by clear and convincing evidence), does not establish the absence of a triable issue on fabrication of evidence, which is a lower standard.

**\*40** Plaintiffs must also establish the fabrication was the proximate cause of the deprivation of liberty. 🚩 Caldwell, 889 F.3d 1105, 1115 (9th Cir. 2018); 🚩⚠ Brittain v. Hansen, 451 F.3d 982, 991 (9th Cir. 2006)). For example, in McSherry, an officer allegedly fabricated some of the evidence after the prosecutor's initial decision to charge, and so the allegedly fabricated evidence could not have affected the prosecutor's decision. See 🚩 McSherry, 584 F.3d at 1133, 1136, 1142.

The Court also finds a triable issue on causation, because it is disputed when the decision to prosecute Burum, Kirk, and Biane took place. On February 9, 2010, the DA's Office filed criminal complaints against Erwin, Postmus, and DeFazio for their conduct related to the Settlement, but did not name Burum, Kirk, or Biane in the complaint, except indirectly as Doe defendants. (DSUF ¶ 44.) Postmus's testimony was more than a "trivial matter" to Hackleman, 🚩 Spencer, 857 F.3d at 798, and so was arguably the proximate cause of the prosecutor's decision to pursue an indictment against Burum, Kirk, and Biane. (Foster Decl., Ex. 82 (attaching email from Hackleman stating, "I am not yet convinced we have enough to file [on Biane] ... we come up short on a viable case against Paul [Biane] or Jeff [Burum], as of this date[, February 8, 2011].")

As a result, the Court finds Burum, Kirk, and Biane raise a genuine dispute whether the potentially fabricated evidence caused their deprivation of liberty, but Erwin and DeFazio [54] do not. The Court DENIES Randles and Schreiber's MSJs on Burum, Kirk, and Biane's fabrication of evidence claims, and GRANTS Randles, Schreiber, Ramos, and the County's MSJs on all other fabrication of evidence claims.

## F. Malicious Prosecution

Plaintiffs assert malicious prosecution claims as follows: Burum against Ramos, Cope, and Hackleman; Erwin against Cope, Randles, and Schreiber; Kirk against Ramos, Cope, Randles, and Schreiber; Biane against Ramos, Cope, Randles, and Schreiber. (Burum SAC; Erwin FAC; Kirk FAC; Biane FAC.)

### 1. Legal Standard

The relevant elements of the common law tort of malicious prosecution are incorporated into the analysis of a malicious prosecution claim under Section 1983. Awabdy v. City of Adelanto, 368 F.3d 1062, 1066 (9th Cir. 2004) (citing Usher v. City of Los Angeles, 828 F.2d 556, 562 (9th Cir. 1987).) California law requires a plaintiff claiming malicious prosecution to establish "that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor; (2) was brought without probable cause; and (3) was initiated with malice." Sheldon Appel Co. v. Albert & Oliker, 47 Cal. 3d 863, 871 (1989) (internal quotation marks omitted). Additionally, to maintain a Section 1983 action for malicious prosecution, "a plaintiff 'must show that the defendants prosecuted [him] ... for the purpose of denying [him] equal protection or another specific constitutional right.' " Awabdy, 368 F.3d at 1066 (quoting Freeman v. City of Santa Ana, 68 F.3d 1180, 1189 (9th Cir. 1995)). Malicious prosecution actions are not limited to suits against prosecutors but may be brought against other persons who have wrongfully caused the charges to be filed. Galbraith v. County of Santa Clara, 307 F.3d 1119, 1126–27 (9th Cir. 2002).

**\*41** Collateral estoppel [55] may bar a plaintiff from relitigating the no-probable-cause requirement in a subsequent Section 1983 claim. Haupt v. Dillard, 17 F.3d 285, 289 (9th Cir. 1994). In California, a decision by a judge or magistrate to hold a defendant to answer after a preliminary hearing constitutes prima facie—but not conclusive—evidence of probable cause. Awabdy, 368 F.3d at 1067 (9th Cir. 2004) (citations omitted). A plaintiff can rebut a prima facie finding of probable cause, among other ways, by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith. Id. (citations omitted). Similarly, collateral estoppel does not bar the Section 1983 claim when the decision to hold the defendant to answer was made on the basis of false or fabricated evidence presented at that hearing or as the result of other wrongful conduct by state or local officials. Id.

### 2. The Parties' Contentions

Defendants argue that the malicious prosecution claim fails for the same reason Plaintiffs' retaliation claims fail: there was probable cause for the prosecution, and the absence of probable cause is an element of malicious prosecution. (Ramos MSJ at 22; Schreiber MSJ at 27.) The Prosecutor Defendants also argue they are absolutely immune from malicious prosecution claims. (Ramos MSJ at 22 (citing Imbler v. Pachtman, 424 U.S. 409, 428 (1976)).) As to Biane's and Kirk's claims against Ramos (that he steered the investigation towards Biane and supervised the investigators), Ramos responds that he cannot be liable for malicious prosecution just for supervising investigators. (Ramos MSJ at 22 (citing Lacey v. Maricopa Cty., 693 F.3d 896, 919 (9th Cir. 2012)).) Moreover, Ramos contends he did not participate in or direct the investigations. (Id. (citing Compendium Ex. 100).)

Plaintiffs respond that there is a triable issue on malicious prosecution for the same reason there is a triable issue on retaliation: because of the false-or-fabricated-evidence exception to "any requirement" that they show a lack of probable cause. (Consol. Opp'n at 41 (citing Awabdy, 368 F.3d at 1067)).) They also argue that where there is a conspiracy, there is malicious

prosecution. (Id. (citing 🔶⚠️ Bretz v. Kelman, 773 F.2d 1026, 1031 (9th Cir. 1985)).) Thus, to the extent the conspiracy or fabrication of evidence claims survive summary judgment, the malicious prosecution claim must also remain. [56]

### 3. Discussion

To maintain a 🔶 Section 1983 action for malicious prosecution, "a plaintiff 'must show that the defendants prosecuted [him] ... for the purpose of denying [him] equal protection or another specific constitutional right.' " 🔶 Awabdy, 368 F.3d at 1066 (noting, however, that no substantive due process right exists to be free from prosecution without probable cause). As discussed in the previous Section, Part IV.B, the "specific" right in play is the First Amendment right to be free from official reprisal for protected speech.

**\*42** Plaintiffs and Defendants agree that the malicious prosecution claims rise and fall with the underlying First Amendment claims. (Ramos MSJ at 22 (Since Plaintiffs' retaliation claims fail ... so too do their malicious prosecution claims); Consol. Opp'n at 41 ("Because there is a triable issue on retaliation ... the same is true for malicious prosecution.").) False or fabricated evidence may rebut probable cause, and thus helps a plaintiff, but under Awabdy, the plaintiff must invoke a "specific" constitutional right other than substantive due process. 🔶 368 F.3d at 1069–70. If any Plaintiff is attempting to rely on procedural due process or a constitutional right other than the First Amendment, he has not so pleaded. (Erwin FAC ¶¶ 94-111; Biane FAC ¶¶ 80-88; Kirk FAC ¶ 85.) Kirk mentions in passing his right to equal protection under the Fourteenth Amendment only in the context of his conspiracy claim, (Kirk FAC ¶ 116), but never elaborates how this right was violated, (see Ramos MSJ at 20 n.16; Kirk Opp'n (failing to mention Equal Protection in any context)).

The Court is mindful that Kirk and Biane's false and fabricated evidence claims survive for now. But it is far from evident the two can state a malicious prosecution claim on that basis alone, or that such a novel formulation of their claim would be within the scope of their operative complaints: for example, malicious prosecution with the purpose of violating Fourteenth Amendment due process rights. 🔶 Costanich, 627 F.3d at 1113-12; Spengler v. Pomona Police Dep't, 2018 WL 10498558, at *3 (C.D. Cal. June 19, 2018) ("To the extent plaintiff intends to allege a procedural due process violation, he must allege a specific liberty or property interest and which process defendants intended to deprive him."). Assuming a procedural due process violation occurred due to false and fabricated evidence, this could negate probable cause, but would not necessarily lead to an inference Randles or Schreiber fabricated evidence "for the purpose" of violating Biane or Kirk's rights. 🔶 Awabdy, 368 F.3d at 1066. [57] Nor would it resolve the problem that Kirk and Biane's fabricated evidence claims are only against Randles and Schreiber, but those Defendants did not "commenc[e]" or "direct[ ]" the prosecution or "initiate[ ]" it "with malice." 🔶 Sheldon Appel Co., 47 Cal. 3d at 871.

Returning to the original point, the Court finds Plaintiffs must plead a specific constitutional violation—which in this case can only be the First Amendment—to proceed on their malicious prosecution claims. The Court granted Defendants' MSJs on the First Amendment retaliation claims asserted by Erwin, Kirk, and Biane. As a result, the Court also GRANTS Defendants' MSJs on malicious prosecution claims asserted by Erwin, Kirk, and Biane. The only pending malicious prosecution claim is therefore by Burum, against Ramos and Hackleman. The Court DENIES Ramos and Hackleman's MSJs on Burum's malicious prosecution claim.

The Court finds a triable issue on malicious prosecution, because the parties genuinely dispute when the decision to prosecute took place, who made it, and whether it was made independently. The record suggests some prosecutors were determined to pursue an indictment against Burum prior to the Postmus interview, but others did not resolve to pursue the indictment until later. [58] Second, the Court finds a triable issue on whether false or fabricated evidence from the February and March 2011

*Colonies Partners LP v. County of San Bernardino, Slip Copy (2020)*

Postmus interviews influenced the decision to pursue an indictment against Burum. See Part IV.E. As a result, the false and fabricated evidence exception to absolute immunity to malicious prosecution may apply. *Buckley,* 509 U.S. at 275.

## G. Conspiracy

**\*43** Each Plaintiff alleges conspiracy under 42 U.S.C. § 1983 against each Defendant named by that Plaintiff, including the County. (Colonies FAC; Burum SAC; Erwin FAC; Kirk FAC; Biane FAC; DeFazio Compl.)

### 1. Legal Standard

A civil conspiracy is "a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage." *Lacey,* 693 F.3d at 935 (quoting *Gilbrook v. City of Westminster,* 177 F.3d 839, 856 (9th Cir. 1999)). A plaintiff must show the conspiring parties "reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." Id. (quoting *Gilbrook,* 177 F.3d at 856). Conspiracy is not a constitutional tort under Section 1983. Id. "It does not enlarge the nature of the claims asserted by the plaintiff, as there must always be an underlying constitutional violation. [It] may, however, enlarge the pool of responsible defendants...." Id.

### 2. The Parties' Contentions

The County argues that the conspiracy to retaliate must fulfill additional requirements: Plaintiffs must show an agreement by a County policymaker with someone acting independently of the County. (County MSJ at 8-9 (citing *Avalos v. Baca,* 517 F. Supp. 2d 1156, 1170 (C.D. Cal. 2007) ("[S]ince a municipal entity cannot conspire with itself, plaintiff's claim against defendants in their official capacity fails.")).) The County also contends Plaintiffs fail to show a deprivation of constitutional rights. (Id. at 9.) To the County arguments, individual Defendants add that Plaintiffs do not point to concrete evidence of an agreement to violate their constitutional rights, or acts unlikely to be undertaken absent an agreement, and also fail to show the conspiracy caused any harm. (Ramos MSJ at 25 (citing *Radcliffe v. Rainbow Const. Co.,* 254 F.3d 772, 782 (9th Cir. 2001); *Mendocino Envtl. Ctr. v. Mendocino Cty.,* 192 F.3d 1283, 1301 (9th Cir. 1999)); Schreiber MSJ at 28 (same).)

Plaintiffs counter that "[w]hether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury." (Consolidated Opp'n at 48 (citing *Mendocino,* 192 F.3d 1283, 1301 (9th Cir. 1999)). They point to the Joint SAF, in particular evidence of meetings, updates, and emails regarding the investigation. (Id.) Biane adds that conspiracies are highly context-specific and best left to juries, where facts could lead to an inference of conspiracy, and plaintiffs are not required to provide direct evidence of the agreement. (Biane Opp'n at 20 (citing *Williams v. County of Santa Barbara,* 272 F. Supp. 2d 995 (C.D. Cal. 2003)).) Demonstrating the interconnected nature of Plaintiffs' claims, Biane argues that the malicious prosecution and fabrication of evidence show Defendants "worked together closely" and a jury must determine whether there was an express or tacit agreement to deprive Plaintiffs of their rights. (Id. at 22.)

### 3. Discussion

An actual constitutional deprivation is required for a conspiracy claim to succeed. *Hart,* 450 F.3d at 1071. The conspiracy claim may expand the pool of responsible defendants, but not the pool of plaintiffs. *Lacey,* 693 F.3d at 935. Here, the conspiracy alleged was to "retaliate" using "false and fabricated evidence, (Consol. Opp'n at 291), so the Court eliminates conspiracy claims arising out of asserted claims of retaliation that have also been denied on summary judgment. Thus, the only remaining conspiracy claims for consideration are by Burum and Colonies. [59]

**\*44** For the same reasons described in the Sections on First Amendment retaliation and on fabrication of evidence, the Court finds a triable issue on conspiracy. "[C]oncerted action" to accomplish an "unlawful objective" can be inferred on the basis of the same circumstantial evidence of Defendants' actions previously discussed. *See* Mendocino Cty., 192 F.3d 1283, 1301 (9th Cir. 1999.) Whether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury, "so long as there is a possibility that the jury can infer from the circumstances [that the alleged conspirators] had a meeting of the minds and thus reached a[n] understanding to achieve the conspiracy's objectives." *Id.* To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1541 (9th Cir. 1989). The asserted common objective of the conspiracy here was to retaliate against Plaintiffs. Evidence that "each Defendant participated directly in several aspects of unlawful investigative conduct," would be enough to infer that Defendants reached an understanding to achieve that common objective. Alcox v. City of Lompoc, 2019 WL 8013875, at \*13 (C.D. Cal. Nov. 27, 2019.)

Defendants assert there must be "concrete evidence" of an agreement to violate constitutional rights. (Ramos MSJ at 25.) That language, excerpted from Radcliffe, 254 F.3d at 782, can be traced to a discussion of the burden of proof on summary judgment in a libel case, Liberty Lobby, 477 U.S. 242, 256 (1986) (holding that on summary judgment, the court must consider the heightened "clear and convincing" standard of proof for actual malice in determining the quantum and quality of proof needed to support a claim of libel). Although Mendocino does not adopt a clear and convincing standard of proof, the reference to "concrete evidence" suggests a heightened standard. At least one court has required pleading "specific facts" to support the existence of the claimed conspiracy. Avalos v. Baca, 517 F. Supp. 2d 1156, 1169 (C.D. Cal. 2007) (quoting Burns v. County of King, 883 F.2d 819, 821 (9th Cir. 1989)), aff'd, 596 F.3d 583 (9th Cir. 2010). Without deciding the question, the Court is satisfied that the quantum and quality of evidence provided by Burum and Colonies in response to the MSJs would be adequate to satisfy that standard.

A question remains whether to "enlarge" the pool of Defendants to include Cope, Randles, or Schreiber. [60] For the reasons discussed in Part IV.B on retaliatory investigation, the Court finds the evidence of a substantial motivation to retaliate so lacking that a reasonable juror could not possibly conclude they participated in a conspiracy to retaliate.

Accordingly, the Court: (1) GRANTS Defendants' MSJs on Kirk, Biane, Erwin, and DeFazio's conspiracy claims, because these Plaintiffs have not demonstrated the investigation was substantially motivated by retaliatory animus against them and thus, no conspiracy to retaliate could have existed; (2) GRANTS the County's MSJs on the remaining conspiracy claims against it, because the County cannot conspire with itself; (3) GRANTS Cope's, Randles, and Schreiber's MSJs on remaining conspiracy claims against them; and (4) DENIES Ramos and Hackleman's MSJs on Burum and Colonies' conspiracy claims.

### H. Supervisory Liability

#### 1. Legal Standard

An official may be liable as a supervisor "only if either (1) he or she was personally involved in the constitutional deprivation, or (2) a sufficient causal connection exists between the supervisor's wrongful conduct and the constitutional violation." Felarca v. Birgeneau, 891 F.3d 809, 819-20 (9th Cir. 2018) (internal quotations omitted). The requisite causal connection can be established by "setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.*

#### 2. The Parties' Contentions

**\*45**  The prosecutor Defendants (Ramos, Hackleman, and Cope) contend that there is no triable issue on supervisory liability, to the extent Plaintiffs assert they are liable as supervisors under 42 U.S.C. § 1983 for the alleged acts of the investigators, including fabrication of evidence or retaliation. (Ramos MSJ at 24.) Ramos also notes separately that supervisory liability with regard to his supervision of prosecutors cannot be established, because the relevant conduct occurred during the prosecution stage, when prosecutors are absolutely immune. (Ramos MSJ at 23-24 n.17 (citing Van de Kamp v. Goldstein, 555 U.S. 335, 345-46 (2009)).)

Plaintiffs respond that there is a triable issue on the extent of Ramos, Hackleman, and Cope's supervision, again, by recapping their separate statement of facts. (Consolidated Opp'n at 47.) For example, Plaintiffs argue the supervisors: (1) participated in weekly investigative updates; (2) admitted to having supervisory roles; (3) played a role in coercing Postmus by being present at the interview (Cope); (4) emailed before the second interview (Hackleman), or consulted with Ramos on the plans. (Id. at 47.)

### 3. Discussion

Supervisors may be held liable in their individual capacities for constitutional violations under Section 1983 if the supervisor: (1) personally participated in the constitutional violation; (2) directed the violation; or (3) there is a "sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989) (citation omitted); see also Gravelet–Blondin v. Shelton, 728 F.3d 1086, 1096 (9th Cir. 2013) ("To meet this requirement, the plaintiff must show both causation-in-fact and proximate causation.").

Plaintiffs offer insufficient evidence to create a triable issue on Cope's supervisory liability, but more than enough for Ramos or Hackleman to be held accountable as supervisors. The Court discusses Cope first. Plaintiffs' Joint SAF and Joint SGD say little about Cope's role in the PIU. The record reflects that Cope appeared at the beginning of several interviews, and was "involved in scheduling them." (Joint SGD ¶ 88.) Although Cope may have helped to "jump start" the PIU in the early days of its operation, the record is devoid of evidence suggesting Cope played a significant supervisory role or was the proximate cause of the rights violations. (Joint SAF ¶ 19.)

Later emails and other evidence suggest a much more active supervisory role for Hackleman, and by extension Ramos. (Joint SAF ¶ 59.) Ramos received email and in-person updates from Hackleman on PIU activity generally, and on the Settlement investigation in particular. (Joint SGD ¶ 85; Foster Decl., Ex. 2 at 97.) He also testified that Hackleman was "right next door to my office and would give me updates in my office as well." (Joint SAF ¶ 58.) Ramos contends the updates were of a general nature and would not have notified him of misconduct by his subordinates. (Ramos Reply at 29.) The Court finds a genuine dispute on the extent of his awareness and ratification of the purported violations, however. This evidence, and the evidence supporting retaliatory motive, supports an inference that Hackleman and Ramos either directed the violations or that there is a causal connection between their action or inaction and the violations. Accordingly, the Court DENIES Ramos and Hackleman's MSJs on supervisory liability claims and GRANTS Cope's MSJs on the same.

### I. Negligence and IIED

Burum and Erwin assert claims of negligence and intentional infliction of emotional distress ("IIED") against all Defendants. (Burum SAC; Erwin FAC.) The claims are time barred.

**\*46**  The statute of limitations for IIED begins to run when "the effects of a defendant's conduct result in plaintiff's severe emotional distress." Kiseskey v. Carpenters' Trust for So. California, 144 Cal. App. 3d 222, 232 (1983). California courts have roughly equated this with when plaintiffs learned or should have learned of the "outrageous" conduct—essentially, when they were on notice of the conduct. See Unruh-Haxton v. Regents of University of California, 162 Cal. App. 4th 343, 356-358 (Cal. Ct. App. 2008) (noting that "the discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice

*Colonies Partners LP v. County of San Bernardino, Slip Copy (2020)*

of the cause of action," and holding that IIED statute of limitations was triggered "on the date the patients received letters from an attorney stating their names were on" the list of victimized patients).

The County argues that the state law negligence and IIED claims are barred by the statute of limitations. In particular, a claim must be presented within six months of the accrual of the cause of action. (County MSJ (citing Cal. Gov. Code §§ 905, 945.4.); Ramos MSJ at 32 (same).) The County claims the six-month period is not tolled by a criminal trial. (Id. at 10 nn.7-8 (citing

DeLeon v. City of Vista, 2019 WL 969544, at *5 (S.D. Cal. Feb. 28, 2019), and Nguyen v. Western Digital Corp., 229 Cal. App. 4th 1522, 1552 (2014) (holding accrual starts at the earlier of objective or subjective knowledge that the injury was caused by wrongdoing)).) Hence, the Defendants argue, Burum and Erwin's claims accrued in February 2010 and after Erwin's arrest. (Id. (citing SUF ¶¶ 90-91).)

Burum and Erwin respond that the outrageous nature of Defendants' conduct was not fully evident until after the criminal trial, so the equitable principles of delayed discovery apply. (Consol. Opp'n at 55.) They do not contest that six months is the appropriate period, and observe they were precluded from bringing a civil lawsuit so long as criminal charges against them were pending. (Id. (citing Cal. Gov. Code § 945.3).) As Cal. Gov. Code § 945.3 acknowledges, however, bringing a civil lawsuit for damages is not the same thing as "filing a claim with the board of a public entity," and there is no bar to filing such a claim while criminal charges are pending.

Consequently, the state law claims are barred. On May 19, 2014, long after the indictment and the commencement of criminal proceedings, Burum filed a motion to dismiss the indictment based on alleged prosecutorial misconduct and alleged coercion of Postmus and Aleman by investigators, which Erwin joined. (DSUF ¶¶ 77-78.) Thus, the IIED and negligence claims accrued as of May 19, 2014 at the latest. By that date, Burum and Erwin had begun experiencing the asserted harms or distress, (id. ¶¶ 90, 91), and were on inquiry notice of the asserted misconduct. Erwin and Burum did not file their state law claims until several months after the trial, however (Reply at 22-24 (implying Burum filed in January 2018); Joint SAF ¶ 116 (a jury acquitted Burum of all charges on August 28, 2017); Consol. Opp'n (not bothering to state when exactly Burum filed his claim); Erwin Opp'n at (same).) Accordingly, the Court GRANTS Defendants' MSJs on the IIED and negligence claims.

### J. Contract Claims

Colonies alleges that the County and the District breached the 2006 Agreement and breached the implied covenant of good faith and fair dealing. (Colonies FAC.) On November 14, 2019, the Court ruled on the Flood Control District ("District") and Colonies' cross motions for summary judgment on the contract claims, but did not directly address the question of County liability. (MSJ Order.) Now, the County asks for summary judgment on Colonies' claims of breach of ¶ 3.3 and ¶ 6.3 of the Agreement, as well as the implied covenant claim. (Colonies MSJ at 11-13.)

**\*47** Colonies did not oppose the MSJ on contractual claims under ¶ 3.3 and ¶ 6.3 or for breach of the implied covenant of good faith and fair dealing. "A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). As a result the Court deems the claims abandoned, and GRANTS the County's MSJ on the claims for breach of ¶¶ 3.3 and 6.3 of the Settlement and for breach of the implied covenant of good faith and fair dealing.

### V. CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART Defendants' motions for summary judgment, except Cope's motion for summary judgment, which is GRANTED, as detailed above. The Court DENIES Erwin's motion for summary judgment.

*Colonies Partners LP v. County of San Bernardino, Slip Copy (2020)*

---

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 5102160

## Footnotes

1    A motion for summary judgment filed by Defendant John Goritz, (Dkt. No. 275), was withdrawn, after the parties agreed to dismiss claims against him. (See Dkt. Nos. 302, 320).

2    The text for Dkt. No. 294 appears to notice a cross motion for summary judgment, but is in fact Erwin's "Consolidated Opposition to Defendants' Motion for Summary Judgment," so the Court DENIES Erwin's "motion" and treats the document as an opposition. (See Dkt. No. 294.)

3    On February 18, 2018, the parties stipulated to the dismissal of Goritz in DeFazio. (Dkt. No. 297.) Goritz then withdrew his motion for summary judgment. (Dkt. No. 320.) The motion is still a useful reference, because the Motions incorporate by reference Goritz's statement of facts.

4    The Court GRANTS the RJN, because their authenticity is not disputed and state court records are an appropriate object of judicial notice. See [⚑] Louis v. McCormick & Schmick Rest. Corp., 460 F. Supp. 2d 1153, 1156 n.4 (C.D. Cal. 2006); Fed. R. Evid. 201(b).

5    Ramos, Cope, and Hackleman advance virtually identical prosecutor-specific arguments, and Randles and Schreiber advance the same investigator-specific arguments (for example, on fabrication of evidence or investigator immunity). As a general rule, in instances of repetitive argument by Defendants, the Court cites to just one of the briefs, typically the Ramos MSJ as representative of the prosecutors, and the Schreiber MSJ as representative of the two investigators.

6    Biane filed a separate notice to clarify that he joins the Joint SGD, Consolidated Objections, and Green and Foster Declarations and Exhibits. (Dkt. No. 303.)

7    A summary of the factual allegations in this action may be found in the Court's October 2, 2019 Order. (Dkt. No. 86.)

8    Much of the evidence consists of witness statements about facts, circumstances, or other persons' statements in which the DA's Office investigators were interested. In response to this type of evidence, the parties often object on the grounds of foundation, or hearsay, etc. (See Consolidated Objections, Defs.' Objections.) But the significance of the statements is not typically the truth of the matter asserted by the witness, but the fact that the witness characterized the facts in such a manner at the time. In addition, "objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are thus "redundant" and unnecessary to consider here. [⚑] Burch v. Regents of Univ. California, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); see also [⚑] Anderson, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.") At the summary judgment stage, the Court focuses on the admissibility of the evidence's contents, not the admissibility of the evidence's form. [⚑] Fed. Deposit Ins. Corp. v. N.H. Ins. Co., 953 F.2d 478, 485 (9th Cir. 1991) ("the nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment.")

9    Burum is a co-managing member of Colonies' general partner.

10   Aleman was charged with three felony counts of preparing false documentary evidence, one felony count of providing false evidence, one felony count of public records violation, and one felony count of vandalism over $400. (Compendium, Ex. 1.)

11   The parties dispute the extent to which Defendants had reason to believe certain information Aleman provided was in fact truthful, either based on contradictory evidence, or Aleman's general character for untruthfulness based on his prior falsification of documents submitted to a grand jury. (Joint SGD ¶ 7.)

12   Colonies argues that the PIU began investigating the Settlement in December 2006, almost immediately after it was concluded, and long before Aleman's November 1, 2008 interview. (Joint SGD ¶ 5.) Randles testified that investigators and attorneys investigated the Settlement negotiations in 2005, and discussed the Settlement in meetings as early as December 2006. Thus, a reasonable juror could infer that the investigation began prior to the Aleman interview. (See Joint SGD ¶ 5.)

13   Whether investigators reasonably believed Aleman's statements is disputed. (Joint SGD ¶ 8; Response to the Joint SAF ¶ 144) (for example, investigator Randles confirmed that in 2007 Colonies made $100,000 payments to the relevant PACs (tending to corroborate Aleman's statements), but Aleman provided unreliable information about his prior meetings with Postmus and Burum (supporting an inference that his other statements in the interview were not truthful)); see also Joint SAF ¶ 136 (adding further contentions about investigators' and prosecutors' beliefs about the reliability of Aleman's statements).)

14   Around the time of the Settlement negotiations, Erwin states he was the Chief of Administration of the Safety Employee's Benefit Association, and that he was a staunch political ally of Burum. (Erwin Opp'n at 5.) In January 2007, Erwin was appointed Assistant Assessor under Bill Postmus. (Id. at 6.) Erwin resigned ten months later. (Id.) He previously identified himself as management or an extension of Colonies, but Burum denied Erwin acted as a consultant. (See Dkt. No. 229-1 at 19.)

15   Kirk states he was chief of staff for Supervisor Ovitt, who voted in favor of the Settlement. (Kirk Opp'n at 6.)

16   (See also DeFazio SGD ¶¶ 38-46 (not disputing the statements, but quarreling with characterization of the evidence).)

17   The charges were one count of Conspiracy to Commit a Crime (Penal Code section 182(a)(1)), two counts of Bribing a Legislative Body Member (Penal Code section 85), three counts of Bribery (Penal Code section 165), two counts of Extortion (Penal Code section 518), one count of Asking For/Receiving a Bribe (Penal Code section 86), one count of Conflict of Interest (Government Code section 1090), one count of Public Officer Crime (Penal Code section 424), and one count of Forgery (Penal Code section 470(a) and (d)). (DSUF ¶ 44.)

18   Recall that Erwin had previously been arrested and charged in March 2009, for perjury relating to the Form 700. (DSUF ¶ 31.)

19   Biane cites KRL v. Moore, 384 F.3d 1105, 1111 (9th Cir. 2004) ("[T]he functions of an advocate do not include ... fabricating evidence before probable cause has been established .... "), and Tennison v. City and County of San Francisco, 2006 WL 733470, at *23 (N.D. Cal. Mar. 22, 2006) ("Intimidating and coercing a witness to change her testimony are not advocacy and are not entitled to absolute immunity"). (Biane Opp'n at 23.)

20   This result is consistent with the Court's order on the AG defendants' motion to dismiss, (Dkt. No. 62), which noted that acts during the investigative phase are potentially not subject to absolute immunity, unless Defendants can show they interviewed Postmus and other witnesses in preparation for trial or the grand jury, (id at 9).

21    The Court therefore rejects Prosecutor Defendants' argument that they are <u>necessarily</u> absolute immune from March 19, 2009 forward, on Erwin's claims. First, it is unclear whether the filing of charges is the same as probable cause to arrest. Second, Erwin was charged multiple times. March 19, 2009 was the date he was charged with perjury for failure to disclose information in the Form 700 (benefits received from Colonies or Burum), but further charges would be forthcoming. Erwin was charged (with Postmus) for crimes relating to the Settlement on February 9, 2010 and arrested the next day. And Hackleman stated in a February 8, 2011 email that essential investigating was still being conducted before indicting Erwin (along with Biane, Kirk, and Burum) in April and May 2011.

22    The "Felony Complaint" is signed under penalty of perjury by Randles, the declarant and complainant. (Compendium, Ex. 33.) In California, the first pleading by the prosecution in felony cases is generally either an indictment or an information, however. 4 Witkin, Cal. Crim. Law 4th Pretrial § 199 (2020). A defendant is not "charged" with a felony within the meaning of Cal. Penal Code § 691 until an information or indictment is filed or a complaint is certified to the superior court by the magistrate under Penal Code § 859a (requiring the defendant to plead guilty or nolo contendere). <u>Id.</u> § 177. Thus, a defendant cannot be prosecuted for a felony on a complaint unless he pleads guilty or nolo contendere before the committing magistrate.

23    A series of emails between Defendants tends to show that a firm decision was supposed to be made in early March 2011, and that Hackleman believed more investigative work had yet to be accomplished. (Foster Decl., Ex. 86 ("we have no quotes nor documentary evidence that we can throw at the Does, as we can with Postmus and Erwin. Conspiracies are wonderful things, but we still need some 'good stuff' to get us to beyond a reasonable doubt.").) Hackleman also noted he would like to keep to that timeline, but wanted time to "gather more facts" and that his "prosecutors are not there yet" but were "working hard with the investigators to get the essential investigating done—including talking to Postmus." (<u>Id.</u>) He proposed meeting on February 28, 2011, which would give them time to "develop additional evidence," "get all on the same page," and "get a Grand Jury [e]mpaneled." (<u>Id.</u>)

24    The Court's previous order on the AG Defendants' motions to dismiss lists some of the clearer-cut categories of absolutely immune conduct. (Dkt. No. 86 at 8-9.) However, it is inadequate to invoke categories without applying them to the facts and specifying to which Defendant and which Plaintiff's claims the immunity applies.

25    These Defendants make nearly identical arguments on retaliation, and for ease of reference the Court will cite primarily to the Ramos MSJ and the Consolidated Opposition.

26    The Court disagrees with this characterization of the Motions. Defendants clearly raise the issue of retaliatory motivation, which is part and parcel of the causation inquiry.

27    Biane agrees that the "additional" circumstantial factors do not apply in this case, and argues separately that several circumstances support an inference that the Defendants would not have investigated and prosecuted him but for his constitutionally protected speech: his private and political affiliations, support from Colonies and Burum, vote in favor of settlement, association with San Bernardino Young Republicans PAC, and Defendants' personal enmity and opportunism. (Biane Opp'n at 8-9.) He argues, nevertheless, that each additional factor is met, because: the investigation began in December 2006 just after the settlement (proximity). (<u>Id.</u> at 9-10.)

28    In opposing the application of an "objective reasonableness" test, Plaintiffs notch one more argument worth highlighting. In a case without the causation problems mentioned, the existence of a legitimate motive does not defeat a retaliation claim, if the evidence also supports a view that the investigation would not have occurred without the impetus to retaliate.

(Consolidated Opp'n at 28 (citing ⚑ Hartman, 547 U.S. at 260; ⚑ Capp, 940 F.3d at 1056).)

29    For example, when <u>Capp</u> discusses whether protected "criticism" was a "substantial motivating factor" for official conduct, ⚑ 940 F.3d at 1055, it is discussing whether the plaintiff has established the motivation or animus prong, and by extension plausibly alleged "but-for" causation (which officials then have the burden of negating).

30    The "mixed motive" analysis for First Amendment claims under Mt. Healthy is not to be confused with the burden-shifting framework under McDonnel Douglas Corp., which applies in Title VII cases and allocates burdens of proof more favorably to Defendants. See Allen v. Iranon, 283 F.3d 1070, 1074 (9th Cir. 2002). By insisting on a requirement that Plaintiffs show a lack of objective reasonableness, Defendants are essentially attempting to use the McDonnel Douglas framework: the defendant cites a legitimate reason for its action, then it is the plaintiff's burden to establish this reason is pretextual. But that is not the standard. Although a requirement that the suspect show objective unreasonableness may be consistent with other decisions that have expanded Nieves and Hartman to other contexts, (Ramos MSJ at 10), the weight of authority appears to be against such a requirement in retaliatory investigation cases.

31    The parties do not discuss what constitutes direct evidence, but analogizing from the Title VII context, the Court considers direct evidence to be evidence which, if believed, proves the fact of retaliatory motive or animus without the need of inference, and typically consists of clear statements that the reason for the action is to retaliate against protected speech. Dominguez–Curry v. Nev. Transp. Dep't, 424 F.3d 1027, 1038 (9th Cir. 2005).

32    Burum maintains, for example, "[a]t the end of the day, while all of the various parties involved in the investigation may have entered the conspiracy with differing motives for retaliation, all of those motives merged into one overriding goal when the Defendants joined forces in August 2009." (Burum SAC ¶ 64.)

33    Burum alleges the measure purported to be a term-limit proposal but its passage would have increased by 50% the salary of County Supervisors. (Burum SAC ¶ 43.)

34    (Compendium, Exs. 91 to 94 (displaying checks from Colonies payable to the relevant PACs, dated June 29, 2007 through May 24, 2007), Ex. 106 at 67 (showing that investigators asked Aleman about the 2007 payments).)

35    The Consolidated Opposition ignores the argument, (Ramos MSJ n.9), that Burum cannot assert retaliation based on Colonies' protected right to receive just compensation for the uncompensated taking of land by the County and District. As a result, the Court deems any argument to the contrary waived. Pac. Dawn LLC v. Pritzker, 831 F.3d 1166, 1178 n.7 (9th Cir. 2016). Defendants do not explicitly argue—and the Court does not consider—whether Burum may assert that "directing" Colonies to make a PAC contribution qualifies as protected conduct.

36    The Court also notes allegations regarding Burum's broad-based political activity and contributions, (Burum SAC ¶ 58-59) (alleging Burum was widely understood to have contributed more than $1.2 million to PACs since 2003), but observes that the timing and scope of these contributions, and whether Burum made or simply directed them, is never clearly specified, either in the SAC or the Joint SAF.

37    For example, the parties dispute when precisely the investigation started. Another triable issue might be whether the investigation, once it got rolling, was revealed to be meritless, and so whether the continuation of the investigation at some moment became primarily motivated by retaliation. Finally, it is possible that discrete investigative actions, such as the Postmus interviews, were motivated by retaliatory animus.

38    Keyser, 265 F.3d at 752 (finding that, where there was a two-year gap between protected speech and an adverse action, the proximity in time did not in itself give rise to an inference of retaliation)

39    At most, the record would create a triable issue on whether Randles, Cope, or Schreiber were animated by a vague impression that "Burum is a bad guy" or "Burum is probably a criminal" or "we need to do our jobs, please our supervisors, and get Burum" or the like. That view of suspects is not adequate to establish a retaliatory investigation. The authorities discussed above are clear that knowledge of and desire to silence protected speech must be a "substantially motivating" factor for there to be a triable issue on causation.

40    And to the extent such a problem exists, some courts would require Plaintiffs to plead no-probable cause or perhaps the objective unreasonableness of each act. ⚠ Sterner v. United States Drug Enf't Agency, 2008 WL 11508384, at *5 (S.D. Cal. Sept. 8, 2008). Even without imposing those pleading requirements, the lack of retaliatory animus is clear enough for these Defendants to prevail on summary judgment.

41    Erwin does not offer an explanation why the investigator's conduct at the Aleman interview—for example, expanding the scope of conversation to include the Settlement and Burum—could have been substantially motivated by animus stemming from his speech acts.

42    Plaintiffs never respond to Defendants' argument that receipt of funds is not a free speech right, (Ramos MSJ at 21 (citing Receipt of funds is 🚩 McCutcheon v. Fed. Election Comm'n, 572 U.S. 185, 193 (2014) (holding that statutory aggregate limits on how much money a donor may contribute in total to all political candidates or committees violates the First Amendment)), and ignore that it was the PACs, not Plaintiffs, who received the funds from Colonies. Pac. Dawn LLC v. Pritzker, 831 F.3d 1166, 1178 n.7 (9th Cir. 2016) ("But the plaintiffs did not raise that argument to the district court in their ... opposition to the defendants' motion for summary judgment, so the argument was waived."). Biane appears to concede this, and in opposition only references his vote in favor of settlement and speech criticizing County actions to the press. (Biane Opp'n at 8 (failing to specify when the speech occurred).)

43    Biane does not name Hackleman in his FAC.

44    Defendants argue that the vote of a County Supervisor is not protected conduct in the first place, and is certainly not a protected action that Kirk may invoke vicariously. (Ramos MSJ at 20). Plaintiffs do not respond to this argument, and therefore waive it.

45    Ramos also referenced Kirk in an email in December 30, 2010, and observed Kirk was "getting more and more power" and "is now overseeing the redrawing of the Board's boundaries. A move that will help Derry and his merry men." However, Plaintiffs do not argue the exercise of a political function qualifies for First Amendment protection. Second, the insinuation is that Ramos was motivated to retaliate against Derry, who called for an investigation into Ramos's alleged sexual misconduct. (Joint SAF ¶ 27.) Once again, Kirk finds himself several steps removed from the relevant First Amendment activity and cannot establish the investigation was substantially motivated to retaliate against him.

46    Lozman is limited to discussion of an element in certain retaliatory arrest cases to that point: that the officer lack probable cause. Assuming there was such a policy or custom of retaliation against Lozman, the court found, he would not have to establish lack of probable cause to state a Monell claim for retaliatory arrest. 🚩 138 S. Ct. at 1953.

47    In their Reply, Defendants argue that the Lozman exception is narrow. (Ramos Reply at 19.) They insist Plaintiffs must provide "objective evidence of a policy motivated by retaliation." (Id. (citing 🚩 Lozman, 138 S. Ct. at 1954).) In addition, they contend that Lozman doesn't stand for proposition that individual government actors, as opposed to a public entity, can be liable for retaliation under this exception. (Id. at 19 n.11.) But it is unclear why the emails or audio recordings submitted by Plaintiffs would not constitute objective evidence. Second, the arguments would be more proper in the retaliation section of Individual Defendants' brief than the County's.

48    The Ninth Circuit has held that the behavior of policymakers after the constitutional violation is relevant to Monell liability insofar as it reveals the municipality's policies already in place at the time of the constitutional violation. 🚩 Larez v. City of Los Angeles, 946 F.2d 630, 647 (9th Cir. 1991).

49    In particular, the Court noted the "commencement of prosecution" for an offense had not yet occurred, because California law recognizes commencement of prosecution "in only four instances: (a) an indictment or information is filed; (b) a complaint is filed charging a misdemeanor or infraction; (c) a case is certified to the superior court; or (d) an arrest

warrant or bench warrant is issued, provided the warrant names or describes the defendant with the same degree of particularity required for an indictment, information, or complaint." 291 F.3d at 565 (citing Cal. Penal Code § 804).

50    See also  Costanich v. Dep't of Soc. & Health Servs., 627 F.3d 1101, 1111 (9th Cir. 2010) ("The Devereaux test envisions an investigator whose unlawful motivation is illustrated by her state of mind regarding the alleged perpetrator's innocence, or one who surreptitiously fabricates evidence by using coercive investigative methods. These are circumstantial methods of proving deliberate fabrication.").

51    An example of direct evidence of deliberate fabrication is "when an interviewer ... deliberately mischaracterizes witness statements in her investigative report." Spencer, 857 F.3d at 793.

52    Biane argues that Defendants menaced a confidential informant, Matt Brown, in an "attempt to get information against Mr. Biane." (Biane Opp'n at 19; Matt Brown Deposition, Galipo Decl., Ex. A at 32:22-33:7, 54:10-25.) Biane does not raise a triable issue on fabrication of evidence arising from the Brown interview, however. At most, Brown's statement's about his interactions with investigators would suggest the investigators knew or should have known of Biane's innocence, not that the investigators fabricated any evidence in the Brown interviews.

53    Reply papers should be limited to matters raised in the opposition papers, and the opposition papers did not raise the motion to withdraw plea hearing. It is improper for the moving party to "shift gears" and introduce new facts or different legal arguments in the reply brief than presented in the moving papers. See Lujan v. National Wildlife Federation, 497 U.S. 871, 894–895 (1990) (court has discretion to disregard late-filed factual matters); Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007) ("district court need not consider arguments raised for the first time in a reply brief").

54    DeFazio simply joins in Burum's Consolidated Opposition with respect to fabrication of evidence, and therefore only premises his response to the MSJs on fabrication of evidence at the Postmus interviews. (DeFazio Opp'n at 21.)

55    Under California law, collateral estoppel bars the relitigation of an issue in a subsequent proceeding when certain threshold requirements are fulfilled: (1) the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding; (2) this issue must have been actually litigated in the former proceeding; (3) it must have been necessarily decided in the former proceeding; (4) the decision in the former proceeding must be final and on the merits; and (5) the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. Mills v. City of Covina, 921 F.3d 1161, 1169 (9th Cir. 2019) (citing Gikas v. Zolin, 6 Cal. 4th 841, 849 (1993)), cert. denied sub nom. Mills v. City of Covina, California, 140 S. Ct. 388 (2019),.

56    Biane and DeFazio provide additional argument on the subject of malice. (Biane Opp'n at 14 (citing Sierra Club Found. v. Graham, 72 Cal. App. 4th 1135, 1157 (1999)); DeFazio Opp'n at 19.) They focus on evidence that Randles initiated the investigation based only on the dollar amount of the settlement and his suspicions. (DeFazio Opp'n at 19 (citing DeFazio SAF ¶¶ 104-109).)

57    See also Mishak v. Serazin, 2018 WL 5620091, at *14 (N.D. Ohio Oct. 30, 2018) ("Based on the Court's own research, it appears the Circuit Courts of Appeals are divided on the issue of whether a federal malicious prosecution claim may be premised on an alleged due process violation under the Fourteenth Amendment.") (collecting cases).

58    In January 2011, Hackleman wrote that he "hope[ed] to present the bottom-line recommendation" to Ramos, regarding whether to broaden charges to include the Doe Defendants. (Joint SAF ¶ 68.) On February 7, 2011, Hackleman wrote to Schreiber and Cope regarding the "Big Decision" and their "commitment to take a position" to join or oppose the recommendation from the California AG's Office, in the form of a memo. (Id. ¶ 69; Foster Decl. Ex. 93.)

Colonies Partners LP v. County of San Bernardino, Slip Copy (2020)

59      Burum and Colonies have a claim of retaliation and Burum, Kirk, and Biane have a claim of fabrication of evidence. However, because the Court concluded Kirk and Biane do not provide more than a scintilla of evidence Defendants were substantially motivated by animus against them, the Court also concludes they fail to state a claim that Defendants conspired to retaliate against them.

60      Notably, the asserted conspiracy was not to fabricate evidence, but to do so "for the purpose of retaliating." (See Burum SAC ¶ 158.)

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Connick v. Myers, 461 U.S. 138 (1983)

103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

KeyCite Yellow Flag - Negative Treatment

Not Followed as Dicta  Janus v. American Federation of State, County, and Mun. Employees, Council 31,   U.S.,   June 27, 2018

103 S.Ct. 1684
Supreme Court of the United States

Harry CONNICK, Individually and in His Capacity as District Attorney, etc., Petitioner,

v.

Sheila MYERS.

No. 81–1251.
|
Argued Nov. 8, 1982.
|
Decided April 20, 1983.

**Synopsis**

Former assistant district attorney brought civil rights action in which she contended that her employment was terminated because she exercised her constitutionally guaranteed right of free speech. The United States District Court for the Eastern District of Louisiana, Jack M. Gordon, J., 507 F.Supp. 752, held that attorney was entitled to reinstatement, back pay, and compensatory damages, and appeal was taken. The Court of Appeals, in an unpublished opinion, 654 F.2d 719, affirmed, and certiorari was granted. The Supreme Court, Justice White, held that discharge of former assistant district attorney did not violate attorney's constitutionally protected right of free speech.

Reversed.

Justice Brennan filed a dissenting opinion in which Justices Marshall, Blackmun and Stevens joined.

**\*\*1685**  *Syllabus* [*]

 **\*138**  Respondent was employed as an Assistant District Attorney in New Orleans with the responsibility of trying criminal cases. When petitioner District Attorney proposed to transfer respondent to prosecute cases in a different section of the criminal court, she strongly opposed the transfer, expressing her view to several of her supervisors, including petitioner. Shortly thereafter, she prepared a questionnaire that she distributed to the other Assistant District Attorneys in the office concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns. Petitioner then informed respondent that she was being terminated for refusal to accept the transfer, and also told her that her distribution of the questionnaire was considered an act of insubordination. Respondent filed suit in Federal District Court under 42 U.S.C. § 1983 (1976 ed., Supp. IV), alleging that she was wrongfully discharged because she had exercised her constitutionally protected right of free speech. The District Court agreed, ordered her reinstated, and awarded backpay, damages, and attorney's fees. Finding that the questionnaire, not the refusal to accept the transfer, was the real reason for respondent's termination, the court held that the questionnaire involved matters of public concern and that the State had not "clearly demonstrated" that the questionnaire interfered with the operation of the District Attorney's office. The Court of Appeals affirmed.

*Held:* Respondent's discharge did not offend the First Amendment. Pp. 1687–1693.

*Connick v. Myers,* 461 U.S. 138 (1983)

103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

(a) In determining a public employee's rights of free speech, the problem is to arrive "at a balance between the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811. P. 1687.

(b) When a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not **\*139** the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction **\*\*1686** to the employee's behavior. Here, except for the question in respondent's questionnaire regarding pressure upon employees to work in political campaigns, the questions posed do not fall under the rubric of matters of "public concern." Pp. 1687–1691.

(c) The District Court erred in imposing an unduly onerous burden on the State to justify respondent's discharge by requiring it to "clearly demonstrate" that the speech involved "substantially interfered" with the operation of the office. The State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression. P. 1691.

(d) The limited First Amendment interest involved here did not require petitioner to tolerate action that he reasonably believed would disrupt the office, undermine his authority, and destroy the close working relationships within the office. The question on the questionnaire regarding the level of confidence in supervisors was a statement that carried the clear potential for undermining office relations. Also, the fact that respondent exercised her rights to speech at the office supports petitioner's fears that the function of his office was endangered. And the fact that the questionnaire emerged immediately after a dispute between respondent and petitioner and his deputies, requires that additional weight be given to petitioner's view that respondent threatened his authority to run the office. Pp. 1691–1693.

654 F.2d 719 (CA5 1981), reversed.

**Attorneys and Law Firms**

*William F. Wessel* argued the cause for petitioner. With him on the brief was *Victoria Lennox Bartels.*

*George M. Strickler, Jr.,* argued the cause for respondent. With him on the brief were *Ann Woolhandler* and *Michael G. Collins.*\*

\* Briefs of *amici curiae* urging affirmance were filed by *Mark C. Rosenblum, Nadine Strossen,* and *Charles S. Sims* for the American Civil Liberties Union et al.; and by *Robert H. Chanin, Laurence Gold,* and *Marsha S. Berzon* for the National Education Association et al.

**Opinion**

**\*140** Justice WHITE delivered the opinion of the Court.

In *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), we stated that a public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment. We also recognized that the State's interests as an employer in regulating the speech of its employees "differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.,* at 568, 88 S.Ct., at 1734. The problem, we thought, was arriving "at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Ibid.* We return to this problem today and consider whether the First and Fourteenth Amendments prevent the discharge of a state employee for circulating a questionnaire concerning internal office affairs.

Connick v. Myers, 461 U.S. 138 (1983)
103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

I

The respondent, Sheila Myers, was employed as an Assistant District Attorney in New Orleans for five and a half years. She served at the pleasure of petitioner Harry Connick, the District Attorney for Orleans Parish. During this period Myers competently performed her responsibilities of trying criminal cases.

In the early part of October, 1980, Myers was informed that she would be transferred to prosecute cases in a different section of the criminal court. Myers was strongly opposed to the proposed transfer [1] and expressed her view to several of her supervisors, including Connick. Despite her objections, on October 6 Myers was notified that she was being transferred. **\*141** Myers again spoke with Dennis Waldron, one of the first assistant district attorneys, expressing her reluctance to accept the transfer. A number of other office matters were **\*\*1687** discussed and Myers later testified that, in response to Waldron's suggestion that her concerns were not shared by others in the office, she informed him that she would do some research on the matter.

That night Myers prepared a questionnaire soliciting the views of her fellow staff members concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns. [2] Early the following morning, Myers typed and copied the questionnaire. She also met with Connick who urged her to accept the transfer. She said she would "consider" it. Connick then left the office. Myers then distributed the questionnaire to 15 assistant district attorneys. Shortly after noon, Dennis Waldron learned that Myers was distributing the survey. He immediately phoned Connick and informed him that Myers was creating a "mini-insurrection" within the office. Connick returned to the office and told Myers that she was being terminated because of her refusal to accept the transfer. She was also told that her distribution of the questionnaire was considered an act of insubordination. Connick particularly objected to the question which inquired whether employees "had confidence in and would rely on the word" of various superiors in the office, and to a question concerning pressure to work in political campaigns which he felt would be damaging if discovered by the press.

Myers filed suit under 42 U.S.C. § 1983, contending that her employment was wrongfully terminated because she had exercised her constitutionally-protected right of free speech. The District Court agreed, ordered Myers reinstated, and awarded backpay, damages, and **\*142** attorney's fees. 507 F.Supp. 752 (E.D.La.1981). [3] The District Court found that although Connick informed Myers that she was being fired because of her refusal to accept a transfer, the facts showed that the questionnaire was the real reason for her termination. The court then proceeded to hold that Myers' questionnaire involved matters of public concern and that the state had not "clearly demonstrated" that the survey "substantially interfered" with the operations of the District Attorney's office.

Connick appealed to the United States Court of Appeals for the Fifth Circuit, which affirmed on the basis of the District Court's opinion. 654 F.2d 719 (1981). Connick then sought review in this Court by way of certiorari, which we granted. 455 U.S. 999, 102 S.Ct. 1629, 71 L.Ed.2d 865 (1982).

II

For at least 15 years, it has been settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression. *Keyishian v. Board of Regents,* 385 U.S. 589, 605–606, 87 S.Ct. 675, 684–685, 17 L.Ed.2d 629 (1967); *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *Branti v. Finkel,* 445 U.S. 507, 515–516, 100 S.Ct. 1287, 1293, 63 L.Ed.2d 574 (1980). Our task, as we defined it in *Pickering,* is to seek "a balance between

Connick v. Myers, 461 U.S. 138 (1983)
103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S., at 568, 88 S.Ct., at 1734. The District Court, and thus the Court of Appeals as well, misapplied our decision in *Pickering* and consequently, in our view, erred in striking the balance for respondent.

## *143   **1688   A

The District Court got off on the wrong foot in this case by initially finding that, "[t]aken as a whole, the issues presented in the questionnaire relate to the effective functioning of the District Attorney's Office and are matters of public importance and concern." 507 F.Supp., at 758. Connick contends at the outset that no balancing of interests is required in this case because Myers' questionnaire concerned only internal office matters and that such speech is not upon a matter of "public concern," as the term was used in *Pickering.* Although we do not agree that Myers' communication in this case was wholly without First Amendment protection, there is much force to Connick's submission. The repeated emphasis in *Pickering* on the right of a public employee "as a citizen, in commenting upon matters of public concern," was not accidental. This language, reiterated in all of *Pickering's* progeny, [4] reflects both the historical evolvement of the rights of public employees, and the common sense realization that government offices could not function if every employment decision became a constitutional matter. [5]

For most of this century, the unchallenged dogma was that a public employee had no right to object to conditions placed upon the terms of employment—including those which restricted the exercise of constitutional rights. The classic formulation of this position was Justice Holmes', who, when sitting on the Supreme Judicial Court of Massachusetts, observed: "A policeman may have a constitutional  *144  right to talk politics, but he has no constitutional right to be a policeman." *McAuliffe v. Mayor of New Bedford,* 155 Mass. 216, 220, 29 N.E. 517, 517 (1892). For many years, Holmes' epigram expressed this Court's law. *Adler v. Board of Education,* 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952); *Garner v. Board of Public Works,* 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317 (1951); *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947); *United States v. Wurzbach,* 280 U.S. 396, 50 S.Ct. 167, 74 L.Ed. 508 (1930); *Ex parte Curtis,* 106 U.S. 371, 1 S.Ct. 381, 27 L.Ed. 232 (1882).

The Court cast new light on the matter in a series of cases arising from the widespread efforts in the 1950s and early 1960s to require public employees, particularly teachers, to swear oaths of loyalty to the state and reveal the groups with which they associated. In *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), the Court held that a State could not require its employees to establish their loyalty by extracting an oath denying past affiliation with Communists. In *Cafeteria Workers v. McElroy,* 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), the Court recognized that the government could not deny employment because of previous membership in a particular party. See also *Shelton v. Tucker,* 364 U.S. 479, 490, 81 S.Ct. 247, 253, 5 L.Ed.2d 231 (1960); *Torcaso v. Watkins,* 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961); *Cramp v. Board of Public Instruction,* 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961). By the time *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), was decided, it was already "too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." **1689 *Id.,* at 404, 83 S.Ct., at 1794. It was therefore no surprise when in *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), the Court invalidated New York statutes barring employment on the basis of membership in "subversive" organizations, observing that the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, had been uniformly rejected. *Id.,* at 605–606, 87 S.Ct., at 684–685.

*Connick v. Myers,* 461 U.S. 138 (1983)
103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

In all of these cases, the precedents in which *Pickering* is rooted, the invalidated statutes and actions sought to suppress the rights of public employees to participate in public **\*145** affairs. The issue was whether government employees could be prevented or "chilled" by the fear of discharge from joining political parties and other associations that certain public officials might find "subversive." The explanation for the Constitution's special concern with threats to the right of citizens to participate in political affairs is no mystery. The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498; *New York Times Co. v. Sullivan,* 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–216, 13 L.Ed.2d 125 (1964). Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the "highest rung of the heirarchy of First Amendment values," and is entitled to special protection. *NAACP v. Claiborne Hardware Co.,* ⸺ U.S. ⸺, ⸺, 102 S.Ct. 3409, 3426, 73 L.Ed.2d 1215 (1982); *Carey v. Brown,* 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980).

*Pickering v. Board of Education, supra,* followed from this understanding of the First Amendment. In *Pickering,* the Court held impermissible under the First Amendment the dismissal of a high school teacher for openly criticizing the Board of Education on its allocation of school funds between athletics and education and its methods of informing taxpayers about the need for additional revenue. *Pickering's* subject was "a matter of legitimate public concern" upon which "free and open debate is vital to informed decision-making by the electorate." *391 U.S., at 571–572, 88 S.Ct., at 1736.*

Our cases following *Pickering* also involved safeguarding speech on matters of public concern. The controversy in *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), arose from the failure to rehire a teacher in the state college system who had testified before committees of the Texas legislature and had become involved in public disagreement over whether the college should be elevated to four-year status—a change opposed by the Regents. In *Mt. Healthy City Board of Ed. v.* **\*146** *Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), a public school teacher was not rehired because, allegedly, he had relayed to a radio station the substance of a memorandum relating to teacher dress and appearance that the school principal had circulated to various teachers. The memorandum was apparently prompted by the view of some in the administration that there was a relationship between teacher appearance and public support for bond issues, and indeed, the radio station promptly announced the adoption of the dress code as a news item. Most recently, in *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), we held that First Amendment protection applies when a public employee arranges to communicate privately with his employer rather than to express his views publicly. Although the subject-matter of Mrs. Givhan's statements were not the issue before the Court, it is clear that her statements concerning the school district's allegedly racially discriminatory policies involved a matter of public concern.

**\*\*1690** *Pickering,* its antecedents and progeny, lead us to conclude that if Myers' questionnaire cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge. [6] When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable. **\*147** *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Bishop v. Wood,* 426 U.S. 341, 349–350, 96 S.Ct. 2074, 2079–2080, 48 L.Ed.2d 684 (1976).

We do not suggest, however, that Myers' speech, even if not touching upon a matter of public concern, is totally beyond the protection of the First Amendment. "The First Amendment does not protect speech and assembly only to the extent it can be characterized as political. 'Great secular causes, with smaller ones, are guarded.' " *United Mine Workers v. Illinois State Bar Association,* 389 U.S. 217, 223, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967), *quoting* *Thomas v. Collins,* 323 U.S. 516, 531, 65 S.Ct. 315, 323, 89 L.Ed. 430 (1945). We in no sense suggest that speech on private matters falls into one of the narrow and well-defined classes of expression which carries so little social value, such as obscenity, that the State can prohibit and punish such expression by all persons in its jurisdiction. See *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). For example, an employee's false criticism of his employer on grounds not of public concern may be cause for his discharge but would be entitled to the same protection in a libel action accorded an identical statement made by a man on the street. We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior. *Cf.* *Bishop v. Wood,* 426 U.S. 341, 349–350, 96 S.Ct. 2074, 2079–2080, 48 L.Ed.2d 684 (1976). Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the state.

Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context **\*148** of a given statement, as revealed by the whole record. [7] In this case, with but one exception, the questions posed by Myers to her coworkers do not fall under the rubric of matters of "public concern." We view the questions pertaining to the confidence and trust that Myers' coworkers possess in various supervisors, the level of office morale, and the need for a grievance committee as mere extensions of Myers' dispute over her transfer to another section of the criminal court. Unlike the dissent, *post,* at 1698, we do not believe these questions are of public import in evaluating the performance of the District Attorney as an elected official. Myers did not seek to inform the public that the District Attorney's office was not discharging **\*\*1691** its governmental responsibilities in the investigation and prosecution of criminal cases. Nor did Myers seek to bring to light actual or potential wrongdoing or breach of public trust on the part of Connick and others. Indeed, the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo. While discipline and morale in the workplace are related to an agency's efficient performance of its duties, the focus of Myers' questions is not to evaluate the performance of the office but rather to gather ammunition for another round of controversy with her superiors. These questions reflect one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a cause célèbre. [8]

**\*149** To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

One question in Myers' questionnaire, however, does touch upon a matter of public concern. Question 11 inquires if assistant district attorneys "ever feel pressured to work in political campaigns on behalf of office supported candidates." We have recently noted that official pressure upon employees to work for political candidates not of the worker's own choice constitutes a coercion of belief in violation of fundamental constitutional rights. *Branti v. Finkel,* 445 U.S. 507, 515–516, 100 S.Ct. 1287, 1293, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). In addition, there is a demonstrated interest in this country that government service should depend upon meritorious performance rather than political service. *CSC v. Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). Given this history, we believe it apparent that the issue of whether assistant district

Connick v. Myers, 461 U.S. 138 (1983)
103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

attorneys are pressured to work in political campaigns is a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal.

### B

 Because one of the questions in Myers' survey touched upon a matter of public concern, and contributed to her discharge we must determine whether Connick was justified in discharging Myers. Here the District Court again erred in imposing an unduly onerous burden on the state to justify **\*150** Myers' discharge. The District Court viewed the issue of whether Myers' speech was upon a matter of "public concern" as a threshold inquiry, after which it became the government's burden to "clearly demonstrate" that the speech involved "substantially interfered" with official responsibilities. Yet *Pickering* unmistakably states, and respondent agrees [9], **\*\*1692** that the state's burden in justifying a particular discharge varies depending upon the nature of the employee's expression. Although such particularized balancing is difficult, the courts must reach the most appropriate possible balance of the competing interests. [10]

### C

The *Pickering* balance requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public. One hundred years ago, the Court noted the government's legitimate purpose in "promot[ing]

**\*151** efficiency and integrity in the discharge of official duties, and to maintain proper discipline in the public service." *Ex parte Curtis,* 106 U.S. 371, 373, 1 S.Ct. 381, 384, 27 L.Ed. 232 (1882). As Justice POWELL explained in his separate opinion in *Arnett v. Kennedy,* 416 U.S. 134, 168, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15 (1974):

> "To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency."

We agree with the District Court that there is no demonstration here that the questionnaire impeded Myers' ability to perform her responsibilities. The District Court was also correct to recognize that "it is important to the efficient and successful operation of the District Attorney's office for Assistants to maintain close working relationships with their superiors." 507 F.Supp., at 759. Connick's judgment, and apparently also that of his first assistant Dennis Waldron, who characterized Myers' actions as causing a "mini-insurrection", was that Myers' questionnaire was an act of insubordination which interfered with working relationships. [11] When close working relationships are essential to fulfilling public **\*152** responsibilities, a wide degree of deference to the employer's judgment is appropriate. Furthermore, we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action. [12] We caution that a stronger **\*\*1693** showing may be necessary if the employee's speech more substantially involved matters of public concern.

The District Court rejected Connick's position because "unlike a statement of fact which might be deemed critical of one's superiors, [Myers'] questionnaire was not a statement of fact, but the presentation and solicitation of ideas and opinions," which are entitled to greater constitutional protection because "under the First Amendment there is no such thing as a false idea." 507

103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

F.Supp., at 759. This approach, while perhaps relevant in weighing the value of Myers' speech, bears no logical relationship to the issue of whether the questionnaire undermined office relationships. Questions, no less than forcefully stated opinions and facts, carry messages and it requires no unusual insight to conclude that the purpose, if not the likely result, of the questionnaire is to seek to precipitate a vote of no confidence in Connick and his supervisors. Thus, Question 10, which asked whether or not the Assistants had confidence in and relied on the word of five named supervisors, is a statement that carries the clear potential for undermining office relations.

Also relevant is the manner, time, and place in which the questionnaire was distributed. As noted in *Givhan v. Western Line Consolidated School Dist., supra* at 415, n. 4, 99 S.Ct., at 696, n. 4, "Private expression ... may in some situations bring additional **\*153** factors to the *Pickering* calculus. When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered." Here the questionnaire was prepared, and distributed at the office; the manner of distribution required not only Myers to leave her work but for others to do the same in order that the questionnaire be completed. [13] Although some latitude in when official work is performed is to be allowed when professional employees are involved, and Myers did not violate announced office policy [14], the fact that Myers, unlike Pickering, exercised her rights to speech at the office supports Connick's fears that the functioning of his office was endangered.

Finally, the context in which the dispute arose is also significant. This is not a case where an employee, out of purely academic interest, circulated a questionnaire so as to obtain useful research. Myers acknowledges that it is no coincidence that the questionnaire followed upon the heels of the transfer notice. When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office. Although we accept the District Court's factual finding that Myers' reluctance to accede to the transfer order was not a sufficient cause in itself for her dismissal, and thus does not constitute a sufficient defense under *Mt. Healthy* **\*154** *City Board of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), this does not render irrelevant the fact that the questionnaire emerged after a persistent dispute between Myers and Connick and his deputies over office transfer policy.

III

Myers' questionnaire touched upon matters of public concern in only a most limited **\*\*1694** sense; her survey, in our view, is most accurately characterized as an employee grievance concerning internal office policy. The limited First Amendment interest involved here does not require that Connick tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships. Myers' discharge therefore did not offend the First Amendment. We reiterate, however, the caveat we expressed in *Pickering, supra,* at 569, 88 S.Ct., at 1735: "Because of the enormous variety of fact situations in which critical statements by ... public employees may be thought by their superiors ... to furnish grounds for dismissal, we do not deem it either appropriate or feasible to lay down a general standard against which all such statements may be judged."

Our holding today is grounded in our long-standing recognition that the First Amendment's primary aim is the full protection of speech upon issues of public concern, as well as the practical realities involved in the administration of a government office. Although today the balance is struck for the government, this is no defeat for the First Amendment. For it would indeed be a Pyrrhic victory for the great principles of free expression if the Amendment's safeguarding of a public employee's right, as a citizen, to participate in discussions concerning public affairs were confused with the attempt to constitutionalize the employee grievance that we see presented here. The judgment of the Court of Appeals is

*Reversed.*

Connick v. Myers, 461 U.S. 138 (1983)

103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

**\*155**  APPENDIX A

Questionnaire distributed by respondent on October 7, 1980

*PLAINTIFF'S EXHIBIT 2,* App. 191

Please take the few minutes it will require to fill this out. You can freely express your opinion *WITH ANONYMITY GUARANTEED.*

1. How long have you been in the Office? ...................................................................................................................................

2. Were you moved as a result of the recent transfers? ...........................................................................................................

3. Were the transfers as they effected [sic] you discussed with you by any superior prior to the notice of them being posted? ..

4. Do you think as a matter of policy, they should have been? ................................................................................................

5. From your experience, do you feel office procedure regarding transfers has been fair? .....................................................

6. Do you believe there is a rumor mill active in the office? ..................................................................................................

7. If so, how do you think it effects [sic] overall working performance of A.D.A. personnel? ..............................................

8. If so, how do you think it effects [sic] office morale? ......................................................................................................

9. Do you generally first learn of office changes and developments through rumor? ............................................................

10. Do you have confidence in and would you rely on the word of:

   Bridget Bane ...................................................................................................................................................................

   Fred Harper .....................................................................................................................................................................

   Lindsay Larson ...............................................................................................................................................................

   Joe Meyer ........................................................................................................................................................................

   Dennis Waldron ..............................................................................................................................................................

11. Do you ever feel pressured to work in political campaigns on behalf of office supported candidates? ...........................

12. Do you feel a grievance committee would be a worthwhile addition to the office structure? ..........................................

**\*156**  13. How would you rate office morale? .......................................................................................................................

14. Please feel free to express any comments or feelings you have. ......................................................................................

THANK YOU FOR YOUR COOPERATION IN THIS SURVEY.

**\*\*1695**  Justice BRENNAN, with whom Justice MARSHALL, Justice BLACKMUN, and Justice STEVENS join, dissenting.

Connick v. Myers, 461 U.S. 138 (1983)
103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

Sheila Myers was discharged for circulating a questionnaire to her fellow Assistant District Attorneys seeking information about the effect of petitioner's personnel policies on employee morale and the overall work performance of the District Attorney's Office. The Court concludes that her dismissal does not violate the First Amendment, primarily because the questionnaire addresses matters that, in the Court's view, are not of public concern. It is hornbook law, however, that speech about "the manner in which government is operated or should be operated" is an essential part of the communications necessary for self-governance the protection of which was a central purpose of the First Amendment. *Mills v. Alabama,* 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966). Because the questionnaire addressed such matters and its distribution did not adversely affect the operations of the District Attorney's Office or interfere with Myers' working relationship with her fellow employees, I dissent.

## I

The Court correctly reaffirms the long established principle that the government may not constitutionally compel persons to relinquish their First Amendment rights as a condition of public employment. *E.g.,* *Keyishian v. Board of Regents,* 385 U.S. 589, 605–606, 87 S.Ct. 675, 684–685, 17 L.Ed.2d 629 (1967); *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). *Pickering* held that the First Amendment protects the rights of public employees "as citizens to comment on matters of public interest" in connection with the operation of the government agencies for which they work. *391 U.S., at 568, 88 S.Ct., at 1734.* We recognized, however, that the **\*157** government has legitimate interests in regulating the speech of its employees that differ significantly from its interests in regulating the speech of people generally. *Ibid.* We therefore held that the scope of public employees' First Amendment rights must be determined by balancing "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Ibid.*

The balancing test articulated in *Pickering* comes into play only when a public employee's speech implicates the government's interests as an employer. When public employees engage in expression unrelated to their employment while away from the work place, their First Amendment rights are, of course, no different from those of the general public. See *id., at 574, 88 S.Ct., at 1737.* Thus, whether a public employee's speech addresses a matter of public concern is relevant to the constitutional inquiry only when the statements at issue—by virtue of their content or the context in which they were made—may have an adverse impact on the government's ability to perform its duties efficiently.[1]

The Court's decision today is flawed in three respects. First, the Court distorts the balancing analysis required under *Pickering* by suggesting that one factor, the **\*\*1696** context in which a statement is made, is to be weighed *twice*—first in **\*158** determining whether an employee's speech addresses a matter of public concern and then in deciding whether the statement adversely affected the government's interest as an employer. See *ante,* at 1690, 1693. Second, in concluding that the effect of respondent's personnel policies on employee morale and the work performance of the District Attorney's Office is not a matter of public concern, the Court impermissibly narrows the class of subjects on which public employees may speak out without fear of retaliatory dismissal. See *ante,* at 1690–1691. Third, the Court misapplies the *Pickering* balancing test in holding that Myers could constitutionally be dismissed for circulating a questionnaire addressed to at least one subject that *was* "a matter of interest to the community," *ante,* at 1691, in the absence of evidence that her conduct disrupted the efficient functioning of the District Attorney's Office.

## II

The District Court summarized the contents of respondent's questionnaire as follows:

103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

"Plaintiff solicited the views of her fellow Assistant District Attorneys on a number of issues, including office transfer policies and the manner in which information of that nature was communicated within the office. The questionnaire also sought to determine the views of the Assistants regarding office morale, the need for a grievance committee, and the level of confidence felt by the Assistants for their supervisors. Finally, the questionnaire inquired as to whether the Assistants felt pressured to work in political campaigns on behalf of office-supported candidates." 507 F.Supp., at 758.

After reviewing the evidence, the District Court found that "[t]aken as a whole, the issues presented in the questionnaire relate to the effective functioning of the District Attorney's Office and are matters of public importance and concern." *Ibid.* The Court of Appeals affirmed on the basis of **\*159** the District Court's findings and conclusions. App. to Pet. for Cert. A–23. The Court nonetheless concludes that Myers' questions about the effect of petitioner's personnel policies on employee morale and overall work performance are not "of public import in evaluating the performance of the District Attorney as an elected official." *Ante,* at 1690. In so doing, it announces the following standard: "Whether an employee's statement addresses a matter of public concern must be determined by the content, form and context of a given statement...." *Ibid.*

The standard announced by the Court suggests that the manner and context in which a statement is made must be weighed on *both* sides of the *Pickering* balance. It is beyond dispute that how and where a public employee expresses his views are relevant in the second half of the *Pickering* inquiry—determining whether the employee's speech adversely affects the government's interests as an employer. The Court explicitly acknowledged this in *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), where we stated that when a public employee speaks privately to a supervisor, "the employing agency's institutional efficiency may be threatened not only by the content of the ... message but also by the manner, time, and place in which it is delivered." *Id.,* at 415, n. 4, 99 S.Ct., at 696, n. 4. But the fact that a public employee has chosen to express his views in private has nothing whatsoever to do with the first half of the *Pickering* calculus—whether those views relate to a matter of public concern. This conclusion is implicit in *Givhan's* holding that the freedom of speech guaranteed by the First Amendment is not "lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public." *Id.,* at 415–416, 99 S.Ct., at 696–697.

The Court seeks to distinguish *Givhan* on the ground that speech protesting racial **\*\*1697** discrimination is "inherently of public concern." *Ante,* at 1691, n. 8. In so doing, it suggests that there are two classes of speech of public concern: statements "of public import" because of their content, form and context, **\*160** and statements that, by virtue of their subject matter, are "inherently of public concern." In my view, however, whether a particular statement by a public employee is addressed to a subject of public concern does not depend on where it was said or why. The First Amendment affords special protection to speech that may inform public debate about how our society is to be governed—regardless of whether it actually becomes the subject of a public controversy. [2]

"[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v.* **\*161** *Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–216, 13 L.Ed.2d 125 (1965). "The maintenance of the opportunity for free political discussion to the end that the government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system." *Stromberg v. California,* 283 U.S. 359, 369, 51 S.Ct. 532, 536, 75 L.Ed. 1117 (1931).

We have long recognized that one of the central purposes of the First Amendment's guarantee of freedom of expression is to protect the dissemination of information on the basis of which members of our society may make reasoned decisions about the government. *Mills v. Alabama,* 384 U.S., at 218–219, 86 S.Ct., at 1436–1437; *New York Times Co. v. Sullivan,* 376 U.S. 254, 269–270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). See A. Meiklejohn, Free Speech and Its Relation to Self-Government 22–27 (1948). "No aspect of that constitutional guarantee is more rightly treasured than its protection of the ability of our people

Connick v. Myers, 461 U.S. 138 (1983)

103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

through free and open debate to consider and resolve their own destiny." 🔖 *Saxbe v. Washington Post Co.,* 417 U.S. 843, 862, 94 S.Ct. 2811, 2821, 41 L.Ed.2d 514 (1974) (POWELL, J., dissenting).

Unconstrained discussion concerning the manner in which the government performs its duties is an essential element of the public discourse necessary to informed self-government.

"Whatever differences may exist about interpretations of the First Amendment, **1698 there is practically universal agreement that a major purpose of that Amendment was the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, *the manner in which government is operated or should be operated,* and all such matters relating to political processes." 🔖 *Mills v. Alabama, supra,* at 218–219, 86 S.Ct., at 1436–1437 (emphasis added).

**\*162** The constitutionally protected right to speak out on governmental affairs would be meaningless if it did not extend to statements expressing criticism of governmental officials. In *New York Times Co. v. Sullivan, supra,* we held that the Constitution prohibits an award of damages in a libel action brought by a public official for criticism of his official conduct absent a showing that the false statements at issue were made with "actual malice." 384 U.S., at 279–280, 84 S.Ct., at 725–726. We stated there that the First Amendment expresses "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." 🔖 *Id.,* at 270, 84 S.Ct., at 720. See 🔖 *Garrison v. Louisiana,* 379 U.S., at 76, 85 S.Ct., at 216.

In *Pickering* we held that the First Amendment affords similar protection to critical statements by a public school teacher directed at the Board of Education for whom he worked. 🔖 391 U.S., at 574, 88 S.Ct., at 1737. In so doing, we recognized that "free and open debate" about the operation of public schools "is vital to informed decision-making by the electorate." 🔖 *Id.,* at 571–572, 88 S.Ct., at 1736. We also acknowledged the importance of allowing teachers to speak out on school matters.

"Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allocated to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such matters without fear of retaliatory dismissal." 🔖 *Id.,* at 572, 88 S.Ct., at 1736.

See also 🔖 *Arnett v. Kennedy,* 416 U.S. 134, 228, 94 S.Ct. 1633, 1680, 40 L.Ed.2d 15 (1974) (MARSHALL, J., dissenting) (describing "[t]he importance of Government employees being assured of their right to freely comment on the conduct of Government, to inform the public of abuses of power and of the misconduct of their superiors ...").

**\*163** Applying these principles, I would hold that Myers' questionnaire addressed matters of public concern because it discussed subjects that could reasonably be expected to be of interest to persons seeking to develop informed opinions about the manner in which the Orleans Parish District Attorney, an elected official charged with managing a vital governmental agency, discharges his responsibilities. The questionnaire sought primarily to obtain information about the impact of the recent transfers on morale in the District Attorney's Office. It is beyond doubt that personnel decisions that adversely affect discipline and morale may ultimately impair an agency's efficient performance of its duties. See 🔖 *Arnett v. Kennedy, supra,* at 168, 94 S.Ct., at 1651 (Opinion of POWELL, J.). Because I believe the First Amendment protects the right of public employees to discuss such matters so that the public may be better informed about how their elected officials fulfill their responsibilities, I would affirm the District Court's conclusion that the questionnaire related to matters of public importance and concern.

The Court's adoption of a far narrower conception of what subjects are of public concern seems prompted by its fears that a broader view "would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case." *Ante,* at 1691. Obviously, not every remark directed at a public official by a public employee

Connick v. Myers, 461 U.S. 138 (1983)

103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

is protected by the First **1699 Amendment[3]. But deciding whether a particular matter is of public concern is an inquiry that, by its very nature, is a sensitive one for judges charged with interpreting a constitutional provision intended to put "the decision as to what views shall be *164 voiced largely into the hands of each of us...." *Cohen v. California,* 403 U.S. 15, 24, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971).[4] The Court recognized the sensitive nature of this determination in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), which held that the scope of the constitutional privilege in defamation cases turns on whether or not the plaintiff is a public figure, not on whether the statements at issue address a subject of public concern. In so doing, the Court referred to the "difficulty of forcing state and federal judges to decide on an *ad hoc* basis which publications address issues of 'general or public interest' and which do not," and expressed "doubt [about] the wisdom of committing this task to the conscience of judges." *Id.,* at 346, 94 S.Ct., at 3010. See also *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 79, 91 S.Ct. 1811, 1837, 29 L.Ed.2d 296 (1971) (MARSHALL, J., dissenting). In making such a delicate inquiry, we must bear in mind that "the citizenry is the final judge of the proper conduct of public business." *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 495, 95 S.Ct. 1029, 1046, 43 L.Ed.2d 328 (1975).

The Court's decision ignores these precepts. Based on its own narrow conception of which matters are of public concern, the Court implicitly determines that information concerning *165 employee morale at an important government office will not inform public debate. On the contrary, the First Amendment protects the dissemination of such information so that the people, not the courts, may evaluate its usefulness. The proper means to ensure that the courts are not swamped with routine employee grievances mischaracterized as First Amendment cases is not to restrict artificially the concept of "public concern," but to require that adequate weight be given to the public's important interests in the efficient performance of governmental functions and in preserving employee discipline and harmony sufficient to achieve that end. See part III, *infra.*[5]

*166 **1700 III

Although the Court finds most of Myers' questionnaire unrelated to matters of public interest, it does hold that one question—asking whether Assistants felt pressured to work in political campaigns on behalf of office-supported candidates—addressed a matter of public importance and concern. The Court also recognizes that this determination of public interest must weigh heavily in the balancing of competing interests required by *Pickering.* Having gone that far however, the Court misapplies the *Pickering* test and holds—against our previous authorities—that a public employer's mere apprehension that speech will be disruptive justifies suppression of that speech when all the objective evidence suggests that those fears are essentially unfounded.

*Pickering* recognized the difficulty of articulating "a general standard against which all ... statements may be judged," 391 U.S., at 569, 88 S.Ct., at 1735; it did, however, identify a number of factors that may affect the balance in particular cases. Those relevant here are whether the statements are directed to persons with whom the speaker "would normally be in contact in the course of his daily work"; whether they had an adverse effect on "discipline by intermediate supervisors or harmony among coworkers"; whether the employment relationship in question is "the kind ... for which it can persuasively *167 be claimed that personal loyalty and confidence are necessary to their proper functioning"; and whether the statements "have in any way impeded [the employee's] proper performance of his daily duties ... or ... interfered with the regular operations of the [office]." *Id.,* at 568–573, 88 S.Ct., at 1734–1737. In addition, in *Givhan,* we recognized that when the statements in question are made in private to an employee's immediate supervisor, "the employing agency's institutional efficiency may be threatened not only by the content of the ... message but also by the manner, time, and place in which it is delivered." 439 U.S., at 415, n. 4, 99 S.Ct., at 696, n. 4. See *ante,* at 1687–2688.

The District Court weighed all of the relevant factors identified by our cases. It found that petitioner failed to establish that Myers violated either a duty of confidentiality or an office policy. 507 F.Supp., at 758–759. Noting that most of the questionnaires

were distributed during lunch, it rejected the contention that the distribution of the questionnaire impeded **1701 Myers' performance of her duties, and it concluded that "Connick has not shown *any* evidence to indicate that the plaintiff's work performance was adversely affected by her expression." 🚩 *Id.,* at 754–755, 759 (emphasis supplied).

The Court accepts all of these findings. See *ante,* at 1692. It concludes, however, that the District Court failed to give adequate weight to the context in which the questionnaires were distributed and to the need to maintain close working relationships in the District Attorney's Office. In particular, the Court suggests the District Court failed to give sufficient weight to the disruptive potential of Question 10, which asked whether the Assistants had confidence in the word of five named supervisors. *Ante,* at 1693. The District Court, however, explicitly recognized that this was petitioner's "most forceful argument"; but after hearing the testimony of four of the five supervisors named in the question, it found that the question had no adverse effect on Myers' relationship with her superiors. 🚩 507 F.Supp., at 759.

 **\*168**  To this the Court responds that an employer need not wait until the destruction of working relationships is manifest before taking action. In the face of the District Court's finding that the circulation of the questionnaire had no disruptive effect, the Court holds that respondent may be dismissed because petitioner "reasonably believed [the action] would disrupt the office, undermine his authority and destroy close working relationships." *Ante,* at 1694. Even though the District Court found that the distribution of the questionnaire did not impair Myers' working relationship with her supervisors, the Court bows to petitioner's judgment because "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Ante,* at 1692.

Such extreme deference to the employer's judgment is not appropriate when public employees voice critical views concerning the operations of the agency for which they work. Although an employer's determination that an employee's statements have undermined essential working relationships must be carefully weighed in the *Pickering* balance, we must bear in mind that "the threat of dismissal from public employment is ... a potent means of inhibiting speech." 🚩 *Pickering, supra,* at 574, 88 S.Ct., at 1737. See 🚩 *Keyishian v. Board of Regents, supra,* 385 U.S., at 604, 87 S.Ct., at 684. If the employer's judgment is to be controlling, public employees will not speak out when what they have to say is critical of their supervisors. In order to protect public employees' First Amendment right to voice critical views on issues of public importance, the courts must make their own appraisal of the effects of the speech in question.

In this regard, our decision in 🚩 *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), is controlling. *Tinker* arose in a public school, a context similar to the one in which the present case arose in that the determination of the scope of the Constitution's guarantee of freedom of speech required consideration of the "special **\*169** characteristics of the ... environment" in which the expression took place. See 🚩 *id.,* at 506, 89 S.Ct., at 736. At issue was whether public high school students could constitutionally be prohibited from wearing black armbands in school to express their opposition to the Vietnam conflict. The District Court had ruled that such a ban "was reasonable because it was based on [school officials'] fear of a disturbance from the wearing of armbands." 🚩 *Id.,* at 508, 89 S.Ct., at 737. We found that justification inadequate, because "in our system, undifferentiated fear or apprehension of a disturbance is not enough to overcome the right to freedom of expression." *Ibid.* We concluded:

> "In order for the State ... to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany **\*\*1702** an unpopular viewpoint. *Certainly where there is no finding and no showing that engaging in the forbidden conduct would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school," the prohibition*

*cannot be sustained.*" 🚩 *Id.,* at 509, 89 S.Ct., at 738 (emphasis supplied) (quoting 🚩 *Burnside v. Byars,* 363 F.2d 744, 749 (CA5 1966)).

Because the speech at issue addressed matters of public importance, a similar standard should be applied here. After reviewing the evidence, the District Court found that "it cannot be said that the defendant's interest in promoting the efficiency of the public services performed through his employees was either adversely affected or substantially impeded by plaintiff's distribution of the questionnaire." 🚩 507 F.Supp., at 759. Based on these findings the District Court concluded that the circulation of the questionnaire was protected by the First Amendment. The District Court applied the proper legal standard and reached an acceptable accommodation between the competing interests. I would affirm its decision and the judgment of the Court of Appeals.

**\*170** IV

The Court's decision today inevitably will deter public employees from making critical statements about the manner in which government agencies are operated for fear that doing so will provoke their dismissal. As a result, the public will be deprived of valuable information with which to evaluate the performance of elected officials. Because protecting the dissemination of such information is an essential function of the First Amendment, I dissent.

## All Citations

461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

## Footnotes

\*  The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See 🚩 *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed.2d 499.

1  Myers' opposition was at least partially attributable to her concern that a conflict of interest would have been created by the transfer because of her participation in a counseling program for convicted defendants released on probation in the section of the criminal court to which she was to be assigned.

2  The questionnaire is reproduced as Appendix A.

3  Petitioner has also objected to the assessment of damages as being in violation of the Eleventh Amendment and to the award of attorney's fees. Because of our disposition of the case, we do not reach these questions.

4  See 🚩 *Perry v. Sindermann,* 408 U.S. 593, 598, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972); 🚩 *Mt. Healthy City School Dist. Board of Ed. v. Doyle,* 429 U.S. 274, 284, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977); 🚩 *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 414, 99 S.Ct. 693, 695, 58 L.Ed.2d 619 (1979).

5  The question of whether expression is of a kind that is of legitimate concern to the public is also the standard in determining whether a common-law action for invasion of privacy is present. See Restatement (Second) of Torts, §

652D. See also *Cox Broadcasting Co. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) (action for invasion of privacy cannot be maintained when the subject-matter of the publicity is matter of public record); *Time, Inc. v. Hill,* 385 U.S. 374, 387–388, 87 S.Ct. 534, 541–542, 17 L.Ed.2d 456 (1967).

6    See, *Clark v. Holmes,* 474 F.2d 928 (CA7 1972) cert. denied, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973); *Schmidt v. Fremont County School Dist.,* 558 F.2d 982, 984 (CA10 1977).

7    The inquiry into the protected status of speech is one of law, not fact. See n. 10, *infra.*

8    This is not a case like *Givhan, supra,* where an employee speaks out as a citizen on a matter of general concern, not tied to a personal employment dispute, but arranges to do so privately. Mrs. Givhan's right to protest racial discrimination —a matter inherently of public concern—is not forfeited by her choice of a private forum. 439 U.S., at 415–416, 99 S.Ct., at 696–697. Here, however, a questionnaire not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest. The dissent's analysis of whether discussions of office morale and discipline could be matters of public concern is beside the point—it does not answer whether *this* questionnaire is such speech.

9    See Brief for Respondent 9 ("These factors, including the degree of the 'importance' of plaintiff's speech, were proper considerations to be weighed in the *Pickering* balance."); Tr. of Oral Arg. 30 (Counsel for Respondent) ("I certainly would not disagree that the content of the questionnaire, whether it affects a matter of great public concern or only a very narrow internal matter, is a relevant circumstance to be weighed in the *Pickering* analysis.")

10    "The Constitution has imposed upon this Court final authority to determine the meaning and application of those words of that instrument which require interpretation to resolve judicial issues. With that responsibility, we are compelled to examine for ourselves the statements in issue and the circumstances under which they are made to see whether or not they ... are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect." *Pennekamp v. Florida,* 328 U.S. 331, 335, 66 S.Ct. 1029, 1031, 90 L.Ed. 1295 (1946) (footnote omitted).

      Because of this obligation, we cannot "avoid making an independent constitutional judgment on the facts of the case." *Jacobellis v. Ohio,* 378 U.S. 184, 190, 84 S.Ct. 1676, 1679, 12 L.Ed.2d 793 (1964) (Opinion of BRENNAN, J.). See *Edwards v. South Carolina,* 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963); *New York Times v. Sullivan,* 376 U.S. 254, 285, 84 S.Ct. 710, 728, 11 L.Ed.2d 686 (1964); *NAACP v. Claiborne Hardware Co.,* —— U.S. ——, ——, n. 50, 102 S.Ct. 3409, 3427, n. 50, 73 L.Ed.2d 1215 (1982).

11    Waldron testified that from what he had learned of the events on October 7, Myers "was trying to stir up other people not to accept the changes [transfers] that had been made on the memorandum and that were to be implemented." App. 167. In his view, the questionnaire was a "final act of defiance" and that, as a result of Myers' action, "there were going to be some severe problems about the changes." *Ibid.* Connick testified that he reached a similar conclusion after conducting his own investigation. "After I satisfied myself that not only wasn't she accepting the transfer but that she was affirmatively opposing it and disrupting the routine of the office by this questionnaire, I called her in ... [and dismissed her]." App. 130.

12    Cf. *Perry Ed. Assn. v. Perry Local Ed. Assn.,* ——U.S. ——, ——, 103 S.Ct. 948, 957, 74 L.Ed.2d 794 (1983) (proof of future disruption not necessary to justify denial of access to non-public forum on grounds that the proposed use may disrupt the property's intended function.); *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (same).

13    The record indicates that some, though not all, of the questionnaires were distributed during lunch. Employee speech which transpires entirely on the employee's own time, and in non-work areas of the office, bring different factors into the *Pickering* calculus, and might lead to a different conclusion. Cf. *NLRB v. Magnavox Co.,* 415 U.S. 322, 94 S.Ct. 1099, 39 L.Ed.2d 358 (1974).

14    The violation of such a rule would strengthen Connick's position. See *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S., at 284, 97 S.Ct., at 574.

1    Although the Court's opinion states that "if Myers' questionnaire cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge," *ante,* at 1689–1690 (footnote omitted), I do not understand it to imply that a governmental employee's First Amendment rights outside the employment context are limited to speech on matters of public concern. To the extent that the Court's opinion may be read to suggest that the dismissal of a public employee for speech unrelated to a subject of public interest does not implicate First Amendment interests, I disagree, because our cases establish that public employees enjoy the full range of First Amendment rights guaranteed to members of the general public. Under the balancing test articulated in *Pickering,* however, the government's burden to justify such a dismissal may be higher. See *infra,* at 1699, n. 4.

2    Although the parties offered no evidence on whether the subjects addressed by the questionnaire were, in fact, matters of public concern, extensive local press coverage shows that the issues involved are of interest to the people of Orleans Parish. Shortly after the District Court took the case under advisement, a major daily newspaper in New Orleans carried a seven-paragraph story describing the questionnaire, the events leading to Myers' dismissal, and the filing of this action. The Times Picayune/The States Item, Dec. 6, 1980, section 1, p. 21, col. 1. The same newspaper also carried a sixteen-paragraph story when the District Court ruled in Myers' favor, Feb. 11, 1981, section 1, p. 15, col. 2; a nine-paragraph story when the Court of Appeals affirmed the District Court's decision, July 28, 1981, section 1, p. 11, col. 1; a twelve-paragraph story when this Court granted Connick's petition for certiorari, March 9, 1982, section 1, p. 15, col. 5.; and a seventeen-paragraph story when we heard oral argument, Nov. 9, 1982, section 1, p. 13, col. 5.

In addition, matters affecting the internal operations of the Orleans Parish District Attorney's Office often receive extensive coverage in the same newspaper. For example, The Times Picayune/The States Item carried a lengthy story reporting that the agency moved to "plush new offices," and describing in detail the "privacy problem" faced by Assistant District Attorneys because the Office was unable to obtain modular furniture with which to partition its new space. January 25, 1981, section 8, p. 13, col. 1. It also carried a sixteen-paragraph story when a committee of the Louisiana State Senate voted to prohibit petitioner from retaining a public relations specialist. July 9, 1982, section 1, p. 14, col. 1.

In light of the public's interest in the operations of the District Attorney's Office in general, and in the dispute between the parties in particular, it is quite possible that, contrary to Court's view, *ante,* at 1690–1691, Myers' comments concerning morale and working conditions in the Office would actually have engaged the public's attention had she stated them publicly. Moreover, as a general matter, the media frequently carry news stories reporting that personnel policies in effect at a government agency have resulted in declining employee morale and deteriorating agency performance.

3    Perhaps the simplest example of a statement by a public employee that would not be protected by the First Amendment would be answering "No" to a request that the employee perform a lawful task within the scope of his duties. Although such a refusal is "speech," which implicates First Amendment interests, it is also insubordination, and as such it may serve as the basis for a lawful dismissal.

4    Indeed, it has been suggested that "a classification that bases the right to First Amendment protection on some estimate of how much general interest there is in the communication is surely in conflict with the whole idea of the First Amendment." T. Emerson, The System of Freedom of Expression 554 (1970). The degree to which speech is of

interest to the public may be relevant in determining whether a public employer may constitutionally be required to tolerate some degree of disruption resulting from its utterance. See *ante,* at 1692–1693. In general, however, whether a government employee's speech is of "public concern" must be determined by reference to the broad conception of the First Amendment's guarantee of freedom of speech found necessary by the Framers

"to supply the public need for information and education with respect to the significant issues of the times.... Freedom of discussion, if it would fill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." ⚑ *Thornhill v. Alabama,* 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1940) (footnote omitted).

See ⚑ *Wood v. Georgia,* 370 U.S. 375, 388, 82 S.Ct. 1364, 1371, 8 L.Ed.2d 569 (1962).

5    The Court's narrow conception of which matters are of public interest is also inconsistent with the broad view of that concept articulated in our cases dealing with the constitutional limits on liability for invasion of privacy. In ⚑ *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), we held that a defendant may not constitutionally be held liable for an invasion of privacy resulting from the publication of a false or misleading report of "matters of public interest" in the absence of proof that the report was published with knowledge of its falsity or reckless disregard for its truth. ⚑ *Id.,* at 389–391, 87 S.Ct., at 542–543. In that action, Hill had sought damages resulting from the publication of an allegedly false report that a new play portrayed the experience of him and his family when they were held hostage in their home in a publicized incident years earlier. We entertained "no doubt that ... the opening of a new play linked to an actual incident is a matter of public interest." ⚑ *Id.,* at 388, 87 S.Ct., at 542. See also ⚑ *Cox Broadcasting Co. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) (holding that a radio station could not constitutionally be held liable for broadcasting the name of a rape victim, because the victim's name was contained in public records). Our discussion in *Time, Inc. v. Hill* of the breadth of the First Amendment's protections is directly relevant here:

"The guarantees of speech and press are not the preserve of political expression or comment upon public affairs, essential as those are to healthy government. One need only pick up any newspaper to comprehend the vast range of published matter which exposes persons to public view, both private citizens and public officials.... 'Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed to cope with the exigencies of their period.' ⚑ *Thornhill v. Alabama,* 310 U.S. 88, 102 [60 S.Ct. 736, 744, 84 L.Ed. 1093]. 'No suggestion can be found in the Constitution that the freedom there guaranteed for speech and the press bears an inverse ratio to the timeliness and the importance of the ideas seeking expression.' ⚑ *Bridges v. California,* 314 U.S. 252, 269 [62 S.Ct. 190, 196, 86 L.Ed. 192]." ⚑ 385 U.S., at 388, 87 S.Ct., at 542.

The quoted passage makes clear that, contrary to the Court's view, *ante,* at 1688, n. 5, the subjects touched upon in respondent's questionnaire fall within the broad conception of "matters of public interest" that defines the scope of the constitutional privilege in invasion of privacy cases. See Restatement (Second) of Torts § 652D, comment *j* (1977):

"The scope of a matter of legitimate concern to the public is not limited to 'news,' in the sense of reports of current events or activities. It extends also to the use of names, likenesses or facts in giving information to the public for purposes of education, amusement or enlightenment, when the public may reasonably be expected to have a legitimate interest in what is published."

---

**End of Document**                                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 77 of 379
Constantine v. Rectors and Visitors of George Mason University, 411 F.3d 474 (2005)
199 Ed. Law Rep. 35, 16 A.D. Cases 1445, 30 NDLR P 157

KeyCite Yellow Flag - Negative Treatment

Disagreed With by  Doe v. Board of Trustees of University of Illinois,  N.D.Ill.,  April 20, 2006

411 F.3d 474
United States Court of Appeals,
Fourth Circuit.

Carin Manders CONSTANTINE, Plaintiff–Appellant,

v.

The RECTORS AND VISITORS OF GEORGE MASON UNIVERSITY; Mark F. Grady, in his individual
capacity and his official capacity as Dean of George Mason Law School; Daniel D. Polsby, in his individual
capacity and his official capacity as Associate Dean for Academic Affairs; Winston S. Moore, in his
individual capacity and his official capacity as Associate Dean for Student Academic Affairs; Nelson
Lund, in his individual capacity and his official capacity as a Professor of Law, Defendants–Appellees,
United States of America, Intervenor.
American Association of People with Disabilities; The Bazelon Center, for Mental Health Law; Disability
Rights Education and Defense Fund; Legal Aid Society, Employment Law Center; Training and Advocacy
Support Center of the National Association of Protection and Advocacy Systems, Amici Supporting Appellant.

No. 04–1410.
|
Argued Feb. 3, 2005.
|
Decided June 13, 2005.

**Synopsis**

**Background:** Law student brought action against state university and several members of its law school faculty, asserting a First Amendment retaliation claim under § 1983 and disability discrimination claims under the Americans with Disabilities Act (ADA) and the Rehabilitation Act. The United States District Court for the Eastern District of Virginia, Claude M. Hilton, Chief Judge, dismissed the complaint for failure to state a claim, and student appealed.

**Holdings:** The Court of Appeals, Shedd, Circuit Judge, held that:

Eleventh Amendment posed no bar to law student's claims under Title II of ADA;

university waived its Eleventh Amendment immunity with respect to law student's claims for damages under Rehabilitation Act when it accepted federal funds;

student adequately pleaded claims under federal disability discrimination statutes; and

student adequately pleaded First Amendment retaliation claim.

Reversed and remanded.

**Procedural Posture(s):** On Appeal; Motion to Dismiss; Motion to Dismiss for Failure to State a Claim.

199 Ed. Law Rep. 35, 16 A.D. Cases 1445, 30 NDLR P 157

**Attorneys and Law Firms**

**\*477  ARGUED:** Michael Jackson Beattie, Beattie & Associates, P.L.L.C., Fairfax, Virginia, for Appellant. Kevin Kendrick Russell, United States Department Of Justice, Washington, D.C., for Intervenor. William Eugene Thro, State Solicitor General, Office of the Attorney General of Virginia, Richmond, Virginia; Thomas Martin Beck, Jones Day, Washington, D.C., for Appellees. **ON BRIEF:** Jerry W. Kilgore, Attorney General of Virginia, Maureen Riley Matsen, Deputy State Solicitor General, Alison Paige Landry, Senior Assistant Attorney General, Jeffrey Brandwine, Assistant Attorney General, Brian E. Walther, Assistant Attorney General, **\*478**  Richmond, Virginia, for Appellees. R. Alexander Acosta, Assistant Attorney General, Jessica Dunsay Silver, United States Department of Justice, Civil Rights Division, Appellate Section, Washington, D.C., for Intervenor. Claudia Center, Lewis Bossing, The Legal Aid Society–Employment Law Center, San Francisco, California, for Amici Curiae Supporting Appellant.

Before TRAXLER, GREGORY, and SHEDD, Circuit Judges.

**Opinion**

Reversed and remanded by published opinion. Judge SHEDD wrote the opinion, in which Judge TRAXLER and Judge GREGORY joined.

SHEDD, Circuit Judge.

Carin Constantine sued The Rectors and Visitors of George Mason University ("GMU") and several members of GMU's law school faculty (the "individual defendants"), asserting a First Amendment retaliation claim under 42 U.S.C. § 1983 and disability discrimination claims under Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act. The defendants moved to dismiss the complaint on the grounds that (1) the Eleventh Amendment barred all claims against GMU and the individual defendants in their official capacities, and (2) the complaint failed to state a claim upon which relief could be granted. The district court declined to rule on the Eleventh Amendment issues but dismissed the complaint for failure to state a claim. For the reasons that follow, we reverse the district court's ruling and remand this case for further proceedings.

I.

Constantine was a student in Professor Nelson Lund's constitutional law course at GMU, a state university that receives federal funds. [1] Constantine suffered from "intractable migraine syndrome," for which she took prescription medication. While taking Professor Lund's final exam, Constantine suffered a migraine headache. She alerted exam administrators to her condition and requested additional time to complete the exam, but they refused. Constantine failed the exam. She then requested a grade appeal and re-examination, but those requests were denied as well.

Constantine complained to Professor Lund, the dean of the law school, and other law school officials about the construction of Professor Lund's exam and GMU's grade appeals process. She publicized her complaints in an article she wrote for the law school newspaper.

About three months after Constantine made her initial request for re-examination, and after she voiced criticism of the grade appeals process, the dean agreed to give Constantine a second chance to take Professor Lund's final exam. Because Constantine was carrying a full load of law school courses during the spring semester, the parties agreed that the re-examination would take place "sometime in June" 2003. On May 17, 2003, however, Constantine received an e-mail notifying her that she must present herself for the re-examination on May 21, 2003.

Case 1:18-cv-24190-RS Document 471 Entered on FLSD Docket 06/01/2023 Page 79 of 379
Constantine v. Rectors and Visitors of George Mason University, 411 F.3d 474 (2005)
199 Ed. Law Rep. 35, 16 A.D. Cases 1445, 30 NDLR P 157

Constantine notified the dean, the law school registrar, and two other administrators that she would not be able to take Professor Lund's exam at that time because she had a conflict related to another **\*479** law school course and, in any event, the dean had told her that she would be re-examined in June. These law school officials told Constantine that she should appear for re-examination at the time specified or forfeit her right to take the exam. Constantine requested an opportunity to take the exam in June, but that request was denied.

Constantine then filed this lawsuit and moved the district court for a temporary restraining order. After a hearing, the district court denied the motion. Constantine declined to take Professor Lund's exam on May 21, 2003. GMU later offered to give Constantine another chance to take Professor Lund's exam, but Constantine believes that in retaliation for her criticism of GMU's handling of her case, GMU decided in advance to give her an "F" on the exam. Constantine eventually took Professor Lund's exam, and she received an "F."

As a result of this failing grade in constitutional law, Constantine was not able to graduate on time. Delayed graduation compromised her ability to begin on time the judicial clerkship that she had previously accepted, so Constantine had to inform her judge of the failing grade and obtain special permission to start work a year later. According to Constantine, the "F" on her transcript continues to hamper her employment prospects.

Constantine sued GMU and the individual defendants in their official and individual capacities. She alleges that the defendants' failure to accommodate her physical disability violated her rights under the ADA and the Rehabilitation Act. She further alleges that the individual defendants retaliated against her for criticizing GMU's grade appeals policies and thus violated her First Amendment right to free speech. Constantine seeks monetary damages as well as declaratory and injunctive relief.

The defendants moved to dismiss Constantine's suit, arguing that the Eleventh Amendment bars her claims against GMU and against the individual defendants in their official capacities. Further, the defendants argued that Constantine had failed to state a claim upon which relief can be granted. The district court granted the motion to dismiss under Rule 12(b)(6), ruling only that Constantine had failed to state a claim upon which relief can be granted. This appeal followed.

II.

At the outset, the defendants contend that the district court should have considered their Eleventh Amendment arguments before ruling on the sufficiency of Constantine's allegations under Rule 12(b)(6). The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State." The Supreme Court has held that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State," *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), and the Eleventh Amendment protects "state agents and state instrumentalities" as well as the States themselves, *Regents of Univ. of Cal. v. Doe,* 519 U.S. 425, 429, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997).

According to the defendants, Eleventh Amendment immunity is a jurisdictional issue that must be decided at the earliest stage of litigation. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). The Court held in *Steel Co.* that a federal court must determine that it has **\*480** subject-matter jurisdiction over the case before it can pass on the merits of that case. *Id.* at 89–101, 118 S.Ct. 1003. Rejecting the practice of some appellate courts to decide the merits of a case based on "hypothetical jurisdiction," the Court reaffirmed the principle that subject-matter jurisdiction is a necessary prerequisite to any merits decision by a federal court: "The statutory and (especially) constitutional elements of jurisdiction are an essential ingredient of separation and equilibration of powers, restraining the courts from acting at certain times, and

even restraining them from acting permanently regarding certain subjects." *Id.* at 101, 118 S.Ct. 1003. Thus, a federal court necessarily acts *ultra vires* when it considers the merits of a case over which it lacks subject-matter jurisdiction. *Id.* [2]

"Subject-matter jurisdiction ... is an [Article] III as well as a statutory requirement; it functions as a restriction on federal power, and contributes to the characterization of the federal sovereign." *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). Because a federal court's subject-matter jurisdiction is created—and limited—by Article III and federal statutes, "no action of the parties can confer subject-matter jurisdiction upon a federal court," and ordinary principles of consent, waiver, and estoppel do not apply. *Id.* A federal court has an independent obligation to assess its subject-matter jurisdiction, and it will "raise a lack of subject-matter jurisdiction on its own motion." *Id.* Because subject-matter limitations "serve institutional interests," they "must be policed by the courts on their own initiative even at the highest level." *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 583, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999).

Personal jurisdiction differs from subject-matter jurisdiction in that it reflects an individual liberty interest rather than an institutional interest; thus, "a party may insist that the limitation be observed, or he may forgo that right, effectively consenting to the court's exercise of adjudicatory authority." *Id.* at 584, 119 S.Ct. 1563. The simple fact that subject-matter jurisdiction is nonwaivable, while personal jurisdiction may be waived, does not mean that subject-matter jurisdiction is somehow more fundamental: "The validity of an order of a federal court depends upon that court's having jurisdiction over *both* the subject matter *and* the parties." *Insurance Corp.,* 456 U.S. at 701, 102 S.Ct. 2099 (emphasis added). Thus, a federal court may decide a straightforward question concerning personal jurisdiction without first determining that it has subject-matter jurisdiction over the case. *Ruhrgas,* 526 U.S. at 588, 119 S.Ct. 1563.

As the Court has interpreted and applied it, Eleventh Amendment immunity has attributes of both subject-matter jurisdiction and personal jurisdiction. The text of the Eleventh Amendment suggests a limitation on subject-matter jurisdiction: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. *See also* **\*481** *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (stating that the "greater significance [of the Eleventh Amendment] lies in its affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III"). Like other issues relating to subject-matter jurisdiction, Eleventh Amendment immunity may be asserted at any time in litigation. *Edelman,* 415 U.S. at 678, 94 S.Ct. 1347 (stating that "the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court"); *In re Creative Goldsmiths of Washington, D.C., Inc.,* 119 F.3d 1140, 1144 (4th Cir.1997) (considering an Eleventh Amendment defense raised for the first time on appeal).

Like personal jurisdiction, however, Eleventh Amendment immunity need not be raised by a court *sua sponte, Patsy v. Board of Regents of Fla.,* 457 U.S. 496, 515 n. 19, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), [3] and may be waived by the State altogether, *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) (stating that "if a State waives its immunity and consents to suit in federal court, the Eleventh Amendment does not bar the action"); *Clark v. Barnard,* 108 U.S. 436, 447, 2 S.Ct. 878, 27 L.Ed. 780 (1883) (characterizing the State's sovereign immunity as "a personal privilege which it may waive at pleasure"). For example, the Court has consistently held that a State's voluntary appearance in federal court effects a waiver of Eleventh Amendment immunity. *Lapides v. Board of Regents of Univ. Sys. of Ga.,* 535 U.S. 613, 624, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002); *Gardner v. New Jersey,* 329 U.S. 565, 574, 67 S.Ct. 467, 91 L.Ed. 504 (1947); *Gunter v. Atlantic Coast Line R.R. Co.,* 200 U.S. 273, 284, 26 S.Ct. 252, 50 L.Ed. 477 (1906); *Clark,* 108 U.S.

199 Ed. Law Rep. 35, 16 A.D. Cases 1445, 30 NDLR P 157

at 447, 2 S.Ct. 878. Given the potential for waiver, the Court has stated that the Eleventh Amendment "does not automatically destroy original jurisdiction. Rather, the Eleventh Amendment grants the State a legal power to assert a sovereign immunity defense should it choose to do so." *Wisconsin Dep't of Corr. v. Schacht,* 524 U.S. 381, 389, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998); *see also Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997) ("The Amendment, in other words, enacts a sovereign immunity from suit, rather than a nonwaivable limit on the Federal Judiciary's subject-matter jurisdiction.").

The Court's treatment of an Eleventh Amendment question in *Calderon v. Ashmus,* 523 U.S. 740, 118 S.Ct. 1694, 140 L.Ed.2d 970 (1998), further indicates that Eleventh Amendment immunity does not limit a federal court's subject-matter jurisdiction. The question presented in that case was whether inmates could sue state officials for declaratory and injunctive relief to prevent application of certain expedited-review provisions of the Antiterrorism and Effective Death Penalty Act. *Id.* at 742, 118 S.Ct. 1694. The State had argued that the Eleventh Amendment barred any such suit and that granting an injunction would curtail state officials' First Amendment rights. Although the Court granted *certiorari* on both the Eleventh **\*482** Amendment and First Amendment questions, it decided to address first the question, raised *sua sponte,* whether the inmate's declaratory judgment action constituted a "case or controversy" under Article III. *Id.* at 745, 118 S.Ct. 1694. The fact that the Court deemed it necessary to raise and decide the Article III issue before addressing the Eleventh Amendment issue at least suggests that the Court did not consider the Eleventh Amendment issue to implicate subject-matter jurisdiction. *Cf. Ruhrgas,* 526 U.S. at 578, 119 S.Ct. 1563 (noting that among jurisdictional issues there is no priority).

Difficult as it may be to describe precisely the nature of Eleventh Amendment immunity, *see Schacht,* 524 U.S. at 394, 118 S.Ct. 2047 (Kennedy, J., concurring) (noting the "hybrid nature" of the Eleventh Amendment), it is at least clear that this immunity is not the kind of Article III limitation on subject-matter jurisdiction that the Court considered in *Steel Co.* Thus, we reject the defendants' contention that *Steel Co.* required the district court to consider Eleventh Amendment questions before addressing the sufficiency of the allegations under Rule 12(b)(6). *See In re: Hechinger Inv. Co. of Del., Inc.,* 335 F.3d 243, 249–51 (3d Cir.2003); *United States v. SCS Bus. & Technical Inst., Inc.,* 173 F.3d 890, 891 (D.C.Cir.1999); *Parella v. Retirement Bd. of R.I. Employees' Ret. Sys.,* 173 F.3d 46, 53–57 (1st Cir.1999); *but see United States v. Texas Tech Univ.,* 171 F.3d 279, 285–86 (5th Cir.1999); *Seaborn v. Florida Dep't of Corr.,* 143 F.3d 1405, 1407 (11th Cir.1998).

Our analysis does not end here, however, because although Eleventh Amendment immunity is not strictly an issue of subject-matter jurisdiction, neither is it merely a defense to liability. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 144–45, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993). "The very object and purpose of the [Eleventh] Amendment were to prevent the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." *Id.* at 146, 113 S.Ct. 684 (internal quotations omitted). Thus, like qualified immunity for state officers, "[t]he entitlement [conferred by the Eleventh Amendment] is an *immunity from suit* rather than a mere defense to liability; and ... it is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 144, 113 S.Ct. 684 (internal quotations omitted). In the qualified-immunity context, the Supreme Court has stressed "the importance of resolving immunity questions at the earliest possible stage in litigation." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (*per curiam* ). Given the States' unique dignitary interest in avoiding suit, *see Alden v. Maine,* 527 U.S. 706, 713, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999), it is no less important to resolve Eleventh Amendment immunity questions as soon as possible after the State asserts its immunity. [4]

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 82 of 379
Constantine v. Rectors and Visitors of George Mason University, 411 F.3d 474 (2005)
199 Ed. Law Rep. 35, 16 A.D. Cases 1445, 30 NDLR P 157

An exception to this general rule arises where the defendant asserts *both* that the federal statute at issue does not permit a suit against the State *and* if not, that Eleventh Amendment immunity bars the suit. *See* **\*483** *Vermont Agency of Nat. Res. v. United States,* 529 U.S. 765, 778, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000); *Strawser v. Atkins,* 290 F.3d 720, 729 (4th Cir.2002). "When these two questions are at issue, not only is the statutory question logically antecedent to the existence of the Eleventh Amendment question, but also there is no realistic possibility that addressing the statutory question will expand the [c]ourt's power beyond the limits that the jurisdictional restriction has imposed." *Vermont Agency,* 529 U.S. at 779, 120 S.Ct. 1858. Indeed, in such a case the statutory question is virtually identical to the Eleventh Amendment question: "The ultimate issue in the statutory inquiry is whether States can be sued under this statute; and the ultimate issue in the Eleventh Amendment inquiry is whether unconsenting States can be sued under this statute." *Id.* The Court in *Vermont Agency* bypassed the Eleventh Amendment question because the federal statute at issue—the False Claims Act—did not authorize *qui tam* actions against the States. *Id.* at 787–88, 120 S.Ct. 1858. Likewise, we avoided an Eleventh Amendment question in *Strawser* after concluding that the Medicaid statute did not authorize suits against the States for funds received as part of a global tobacco settlement. 290 F.3d at 729–30.

Independent of this *Vermont Agency* analysis, we avoided the Eleventh Amendment question in *Strawser* based on the defendants' equivocal assertion of immunity. 290 F.3d at 729–30. Although they were careful not to waive their immunity, the defendants in *Strawser* "did not insist on it," and we noted that they relied upon the Eleventh Amendment only to the extent necessary to prevent a judgment against them on the merits. *Id.* at 729. In other words, the State did not think its sovereign dignity required a ruling on Eleventh Amendment immunity if dismissal could be affirmed on statutory grounds.

Unlike *Vermont Agency* and *Strawser,* this case does not involve a challenge to the statutory basis for suit. Rather, the defendants in this case argue that the Eleventh Amendment bars the suit and if not, the allegations of the complaint are insufficient to make a *prima facie* case for relief. The question whether the allegations in the complaint are sufficient to satisfy Rule 12(b)(6) is not "logically antecedent" to the question whether the Eleventh Amendment bars this suit. Indeed, the Court in *Vermont Agency* specifically distinguished "[t]he question whether the statute provides for suits against the States" from "the broader question whether the statute creates any private cause of action whatever, or the question whether the facts alleged make out a 'false claim' under the statute." 529 U.S. at 779, 120 S.Ct. 1858. Moreover, this case is unlike *Strawser* in that the defendants here have insisted that their Eleventh Amendment defense be addressed.

For these reasons, *Vermont Agency* and *Strawser* are inapposite, and we shall first determine whether the Eleventh Amendment bars Constantine's claims against GMU and the individual defendants in their official capacities. Only if the Eleventh Amendment does not bar these claims shall we proceed to determine whether the allegations in Constantine's complaint state claims for relief under Title II of the ADA and § 504 of the Rehabilitation Act.[5]

**\*484**  III.

Constantine asserts a claim under Title II of the ADA, which forbids disability discrimination in the provision of public services. 42 U.S.C. § 12132. Constantine argues that Congress abrogated the States' Eleventh Amendment immunity when it enacted Title II. Congress may abrogate the States' Eleventh Amendment immunity, but only by stating unequivocally its desire to do so and only pursuant to a valid exercise of constitutional authority. *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

*Constantine v. Rectors and Visitors of George Mason University*, 411 F.3d 474 (2005)

199 Ed. Law Rep. 35, 16 A.D. Cases 1445, 30 NDLR P 157

A.

The ADA provides that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202. This provision clearly and unambiguously expresses congressional intent to abrogate the States' Eleventh Amendment immunity with respect to claims brought under the ADA. *See Tennessee v. Lane,* 541 U.S. 509, 124 S.Ct. 1978, 1985, 158 L.Ed.2d 820 (2004); *Board of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. 356, 363–64, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). "The question, then, is whether Congress had the power to give effect to its intent." *Lane,* 124 S.Ct. at 1985.

B.

The ADA purports to "invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101(b)(4). Although the commerce power conferred by Article I of the Constitution does not authorize Congress to abrogate the States' Eleventh Amendment immunity, *Seminole Tribe,* 517 U.S. at 72–73, 116 S.Ct. 1114, the Supreme Court has held that "the Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment," *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Thus, Title II of the ADA abrogates the States' Eleventh Amendment immunity only if its enactment represents a valid exercise of authority under § 5 of the Fourteenth Amendment. *Id.*

The Fourteenth Amendment provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Section 5 of the Fourteenth Amendment authorizes Congress to enact "appropriate legislation" to enforce these substantive guarantees. Congress is empowered by § 5 not only to codify the Supreme Court's holdings concerning the rights established by the Fourteenth Amendment, but also to deter future violations of the Fourteenth Amendment. *City of Boerne v. Flores,* 521 U.S. 507, 518, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). While Congress may, pursuant to § 5, enact prophylactic legislation prohibiting conduct that is "not itself unconstitutional," it may not substantively redefine Fourteenth Amendment protections. **\*485** *Id.* at 519, 117 S.Ct. 2157. To ensure that Congress merely enforces the Fourteenth Amendment and does not reinterpret it, the Supreme Court has held that "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 520, 117 S.Ct. 2157.

The Court in *Lane* recently applied this congruence-and-proportionality analysis to Title II of the ADA. 124 S.Ct. at 1988–94. The Court began by identifying *two* Fourteenth Amendment rights at issue in that case—the right to be free from irrational disability discrimination and the right of access to the courts. *Id.* at 1988. Importantly, the right of access to the courts is a fundamental due process right that triggers heightened judicial scrutiny. *Id.*

Having identified the relevant Fourteenth Amendment rights, the Court turned to the historical question whether Congress enacted Title II in response to a pattern of unconstitutional disability discrimination. *Lane,* 124 S.Ct. at 1988–92. Citing various federal court decisions and state statutes, the Court found that "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights."

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 84 of 379
Constantine v. Rectors and Visitors of George Mason University, 411 F.3d 474 (2005)
199 Ed. Law Rep. 35, 16 A.D. Cases 1445, 30 NDLR P 157

*Id.* at 1989. The legislative history of the ADA also included "hundreds of examples of unequal treatment of persons with disabilities by States and their political subdivisions," most of which involved discrimination in the administration of public services. *Id.* at 1990. Particularly with respect to access to the courts, the legislative history showed that "many individuals, in many States across the country, were being excluded from courthouses and court proceedings by reason of their disabilities." *Id.* [6] All this evidence suggested that "inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation." *Lane*, 124 S.Ct. at 1992. [7]

**\*486** In determining whether Title II was an appropriate response to this pattern of unconstitutional discrimination, the Court narrowed its focus and considered the validity of Title II only as it applies "to the class of cases implicating the accessibility of judicial services." *Id.* at 1993. Even if Title II, considered as a whole, might prohibit too much otherwise constitutional conduct, the Court held that "Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment." *Id.* at 1994. The Court specifically declined to address the question "whether Title II's duty to accommodate exceeds what the Constitution requires in the class of cases that implicate only [the] prohibition on irrational discrimination." *Id.* at 1994 n. 20.

By its own terms, *Lane* does not resolve the specific question presented here—whether the accommodation requirement of Title II, as it applies to cases involving the administration of higher education programs, represents a congruent and proportional response to a history and pattern of unconstitutional disability discrimination by States and nonstate government entities. Nevertheless, the analysis employed by the Court in *Lane* must guide our analysis in this case. [8]

### 1.

We begin by identifying the Fourteenth Amendment right that Congress purportedly sought to enforce when it enacted Title II. *See Lane,* 124 S.Ct. at 1988. The Court in *Lane* recognized that Title II seeks to enforce the Fourteenth Amendment's "prohibition on irrational disability discrimination." 124 S.Ct. at 1988. Importantly, the Fourteenth Amendment does not forbid *all* discrimination based on disability. Because classifications based on disability are subject to minimal scrutiny, *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 446, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), States may make distinctions on the basis of disability so long as "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose," *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Thus, the Fourteenth Amendment does not require States to "make special accommodations for the disabled, so long as their actions toward such individuals are rational." *Garrett,* 531 U.S. at 367, 121 S.Ct. 955. This rule applies even in the context of public education. *See* **\*487** *Plyler v. Doe,* 457 U.S. 202, 221–23, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (recognizing the "pivotal role of education" in our society but noting that education is not a fundamental right, such that "a State need not justify by compelling necessity every variation in the manner in which education is provided to its population"); *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 29–40, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (recognizing the "undisputed importance of education" but rejecting the argument that education is a fundamental right and applying rational-basis review to an equal-protection challenge to a State's system of school financing); *Sellers v. School Bd. of Manassas, Va.,* 141 F.3d 524, 531 (4th Cir.1998) (stating that a plaintiff challenging the disparate treatment of disabled students "would have to prove that a school board's decision was without any rational basis").

Case 1:18-cv-24190-RS Document 471 Entered on FLSD Docket 06/01/2023 Page 85 of 379
*Constantine v. Rectors and Visitors of George Mason University*, 411 F.3d 474 (2005)
199 Ed. Law Rep. 35, 16 A.D. Cases 1445, 30 NDLR P 157

2.

We next consider the extent to which Title II was "responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne,* 521 U.S. at 532, 117 S.Ct. 2157. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. According to Congress, this provision was necessary to address pervasive discrimination "in such critical areas as ... housing, public accommodations, *education*, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." *Id.* § 12101(a)(3) (emphasis added).

At this stage of the analysis, we consider whether Title II represents a legislative response to a pattern of unconstitutional disability discrimination in public "services, programs, or activities" generally. Although the Court in *Lane* cited examples of disability discrimination specifically with respect to unjustified commitment, abuse and neglect of persons committed to mental health hospitals, and irrational zoning decisions, 124 S.Ct. at 1989, as well as discriminatory state laws concerning marriage, jury service, the penal system, public education, and voting, *id.* at 1989–90, it was the cumulative effect of this evidence that mattered most. In light of all of this evidence, the Court found it "clear beyond peradventure that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation." *Id.* at 1992. After *Lane,* it is settled that Title II was enacted in response to a pattern of unconstitutional disability discrimination by States and nonstate government entities with respect to the provision of public services. This conclusion is sufficient to satisfy the historical inquiry into the harms sought to be addressed by Title II.[9] *See Miller v. King,* 384 F.3d 1248, 1271 n. 25 (11th Cir.2004) (noting that although "there was little documentation of a history and pattern of disability discrimination in prisons recited in *Lane,* ... the Supreme Court in *Lane* in effect decided the ... inquiry as to Title II"); *see also Cochran v. Pinchak,* 401 F.3d 184, 191 (3d Cir.2005) (agreeing with *Miller* ).

3.

The remaining question is whether the remedial measures contained in Title II **\*488** represent a congruent and proportional response to this demonstrated history and pattern of unconstitutional disability discrimination. *Lane,* 124 S.Ct. at 1992. Following *Lane,* we consider the remedial measures of Title II *only* as they apply to the class of cases implicating the right to be free from irrational disability discrimination in public higher education. *See id.* at 1992–94. Because the holding in *Lane* was limited to applications of Title II involving the fundamental right of access to courts—a Fourteenth Amendment right triggering heightened scrutiny—that holding does not control this case. *See id.* at 1994 n. 20 (stating that "we need not consider whether Title II's duty to accommodate exceeds what the Constitution requires in the class of cases that implicate only *Cleburne's* prohibition on irrational discrimination").[10]

Title II forbids public entities—including State and local governments and their departments, agencies, or instrumentalities, 42 U.S.C. § 12131(1)—from excluding disabled persons from programs, services, or benefits "by reason of" their disabilities. 42 U.S.C. § 12132. In the context of public higher education, Title II requires that disabled students not be excluded from educational programs or activities, or otherwise discriminated against, because of their disabilities. Title II also imposes an affirmative obligation to make "reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services" to enable disabled persons to receive services or participate in programs or activities. *Id.* § 12131(2). In the context of public higher education, Title II requires state

colleges and universities to make reasonable accommodations for disabled students to ensure that they are able to participate in the educational program. These provisions, taken together, target precisely the sort of discrimination that the evidentiary record described and that Congress sought to address.

We must also consider the limitations that Congress placed on the scope of Title II. *See* Hibbs, 538 U.S. at 738–39, 123 S.Ct. 1972; City of Boerne, 521 U.S. at 533, 117 S.Ct. 2157. First, Title II protects only a "qualified individual with a disability." A plaintiff must make this threshold showing before he or she can even invoke the nondiscrimination provisions of the statute. Second, although Title II forbids discrimination based on a person's disability, States remain free to limit participation in their programs or activities for other, lawful reasons. Third, the requirement that public entities make "reasonable modification[s]" to accommodate disabled citizens is limited in important respects. As the Court noted in *Lane,* "Title II does not require States to employ any and all means to make ... services accessible to **\*489** persons with disabilities, and it does not require States to compromise their essential eligibility criteria for public programs." 124 S.Ct. at 1993. Insofar as Title II requires States to make "reasonable" modifications to their educational programs in order to ensure that disabled citizens have access to those programs, this requirement is congruent with the constitutional imperative that States avoid *irrational* discrimination. *See* Garrett, 531 U.S. at 367, 121 S.Ct. 955.

Moreover, the implementing regulations provide the States several avenues to avoid liability under Title II. Since the States are required to operate their public programs so that those programs, "when viewed in [their] entirety," are accessible to and usable by disabled citizens, they are not necessarily required to "make each of [their] existing facilities accessible to and usable by individuals with disabilities," nor are they required to "take any action that would threaten or destroy the historic significance of an historic property." 28 C.F.R. § 35.150(a). Numerous alternatives are available for the States to consider in determining how to modify existing facilities to accommodate their disabled citizens. *Id.* § 35.150(b). Importantly, a State need not undertake what is probably the most expensive enterprise—structural changes in existing physical facilities—if other methods effectively make the program or service accessible. *Id.* Congress specifically found that such other methods of accommodation are less burdensome on public entities than are structural modifications of physical facilities. *See* S.Rep. No. 101–116, at 10–12, 89, 92 (1989); H.R.Rep. No. 101–485, pt. 2, at 34 (1990).

More generally, the States retain the right not to "take any action that [they] can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." 28 C.F.R. § 35.150(a). This regulation acknowledges the States' interests in preserving the essential characteristics of their public programs and monitoring public expenditures. The Court has noted that the "fundamental alteration" provision allows a State to "show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities." Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 604, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) (interpreting 28 C.F.R. § 35.130(b)(7)).

Undoubtedly, Title II imposes a greater burden on the States than does the Fourteenth Amendment. *See* Garrett, 531 U.S. at 367, 121 S.Ct. 955 (noting that under *Cleburne,* States are "not required by the Fourteenth Amendment to make special accommodations for the disabled"). Yet Title II and its implementing regulations limit the scope of liability in important respects and thus minimize the costs of compliance with the statute. *See* City of Boerne, 521 U.S. at 534, 117 S.Ct. 2157 (stating that congruence-and-proportionality concerns are most acute where compliance with the federal statute entails "substantial costs" that "far exceed any pattern or practice of unconstitutional conduct"). These limitations "tend to ensure Congress' means are proportionate to ends legitimate under § 5." Id. at 533, 117 S.Ct. 2157.

Title II presents fewer congruence-and-proportionality concerns than does Title I, which the Court in *Garrett* ruled was invalid § 5 legislation. First, the remedial measures described in Title I are aimed at discrimination by public entities acting as employers,

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 87 of 379
Constantine v. Rectors and Visitors of George Mason University, 411 F.3d 474 (2005)
199 Ed. Law Rep. 35, 16 A.D. Cases 1445, 30 NDLR P 157

not as sovereigns. The Court in *Garrett* noted that "it would be entirely  **\*490** rational (and therefore constitutional) for a state employer to conserve scarce financial resources by hiring employees who are able to use existing facilities." 531 U.S. at 372, 121 S.Ct. 955. Yet the Court has also noted (in a different context) that a State's "interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Waters v. Churchill,* 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). Thus, it is more likely that disability discrimination in the context of a State's operation of public education programs will be unconstitutional than discrimination in the context of public employment. [11] Second, the remedial measures employed in Title II are likely less burdensome to the States than those employed in Title I. Whereas Title I requires the States to "mak[e] existing facilities used by employees readily accessible to and usable by individuals with disabilities," 42 U.S.C. §§ 12112(5)(B), 12111(9), Title II imposes no such categorical requirement. Indeed, the regulations specifically permit the States to avoid making structural modifications to existing facilities in several circumstances. *See* 28 C.F.R. § 35.150(a).

The remedial measures employed in Title II may not be a perfect fit for the pattern of discrimination that Congress sought to remedy and deter, but they need not be. The Court has made it clear that prophylactic legislation such as Title II "can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional." *City of Boerne,* 521 U.S. at 518, 117 S.Ct. 2157. Thus, the question is not *whether* Title II exceeds the boundaries of the Fourteenth Amendment, but *by how much.* Considering the pattern of unconstitutional disability discrimination described by the Court in *Lane,* we cannot say that Title II is "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *Id.* at 532, 117 S.Ct. 2157. Accordingly, we conclude that Title II of the ADA is valid § 5 legislation, at least as it applies to public higher education. *See Association for Disabled Americans, Inc. v. Florida Int'l Univ.,* 405 F.3d 954, 959 (11th Cir.2005). Because Congress clearly expressed its intention to abrogate the States' Eleventh Amendment immunity, and did so pursuant to a valid exercise of constitutional authority, the Eleventh Amendment poses no bar to Constantine's claims under Title II of the ADA.

## IV.

In addition to her ADA claim, Constantine also alleges that GMU, a recipient  **\*491** of federal funds, violated § 504 of the Rehabilitation Act when it discriminated against her on the basis of her disability. *See* 29 U.S.C. § 794(a) (prohibiting disability discrimination in federally funded programs or activities). In response to the defendants' Eleventh Amendment defense, Constantine contends that GMU waived its immunity when it accepted federal funds.

A State may waive its Eleventh Amendment immunity and consent to suit in federal court. *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 675, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). "Generally, we will find a waiver either if the State voluntarily invokes [federal] jurisdiction, or else if the State makes a clear declaration that it intends to submit itself to [federal] jurisdiction." *Id.* at 675–76, 119 S.Ct. 2219 (internal quotations and citations omitted). More specifically, we have recognized two ways in which a State may waive its Eleventh Amendment immunity: (1) expressly in a state statute or constitutional provision, "as long as the provision explicitly specifies the state's intention to subject itself to suit in federal court," or (2) implicitly "by voluntarily participating in federal spending programs when Congress expresses a clear intent to condition participation in the programs ... on a State's consent to waive its constitutional immunity." *Litman v. George Mason Univ.,* 186 F.3d 544, 550 (4th Cir.1999).

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Thus, any "program or activity"—including all the operations of a university or other postsecondary institution, id. § 794(b)(2)(A)—that receives federal funding must not discriminate on the basis of disability. Section 504 is enforceable through private causes of action, *Barnes v. Gorman,* 536 U.S. 181, 185, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002), and the States are not immune from federal suits to enforce this provision, 42 U.S.C. § 2000d–7. Section 2000d–7 provides that "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance."

Like Title VI of the Civil Rights Act and Title IX of the Education Amendments, § 504 of the Rehabilitation Act "invokes Congress' power under the Spending Clause, U.S. Const. art. I., § 8. cl. 1, to place conditions on the grant of federal funds." *Barnes,* 536 U.S. at 186, 122 S.Ct. 2097. Such Spending Clause legislation is "much in the nature of a *contract:* in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Id.* (internal quotations omitted). Although Congress may exercise its spending power to impose such conditions, it must meet certain requirements in doing so: (1) "the exercise of the spending power must be for the general welfare," (2) the conditions must be stated unambiguously, (3) the conditions must "bear some relationship to the purpose of the federal spending," (4) the expenditure with its conditions must not violate some other constitutional command, and (5) "the financial inducement offered by Congress must not **\*492** be so coercive as to pass the point at which pressure turns into compulsion." *Litman,* 186 F.3d at 552–53.

We held in *Litman* that the Eleventh Amendment waiver condition in § 2000d–7, in the context of a Title IX action, represented a valid exercise of the spending power. *Id.* at 555. Specifically, we concluded that § 2000d–7 is an unambiguous and unequivocal condition requiring waiver of Eleventh Amendment immunity, *id.* at 554, and that such a condition does not violate any other constitutional command, *id.* at 555. Because § 2000d–7 applies equally to § 504 cases and Title IX cases, our holding in *Litman* forecloses GMU's initial argument that Congress may not exercise its spending power to condition receipt of federal funds on a waiver of Eleventh Amendment immunity. *Litman* does not address, however, the defendants' additional arguments that (1) the waiver condition is not related to the purpose of the federal spending, (2) the waiver condition is unduly coercive, and (3) any waiver was not knowing because GMU did not believe it had any immunity to waive when it accepted federal funds.

A.

The Supreme Court has acknowledged that "conditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs." *South Dakota v. Dole,* 483 U.S. 203, 207, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (internal quotations omitted). At issue in *South Dakota* was a federal statute conditioning receipt of federal highway funds on a State's adoption of a minimum drinking age of 21. *Id.* at 205, 107 S.Ct. 2793. Given indications in the legislative history that the lack of uniformity in minimum drinking ages adversely affected highway safety, the Court noted that "the condition imposed by Congress is directly related to one of the main purposes for which highway funds are expended— safe interstate travel." *Id.* at 208–09, 107 S.Ct. 2793. Although *amici* urged adoption of a rule holding that any condition must be related directly to the purpose of the particular expenditure to which it is attached, the Court declined to "define the outer bounds of the 'germaneness or relatedness' limitation on the imposition of conditions under the spending power." *Id.* at 208 n. 3, 107 S.Ct. 2793.

Case 1:18-cv-24190-RS Document 471 Entered on FLSD Docket 06/01/2023 Page 89 of 379
Constantine v. Rectors and Visitors of George Mason University, 411 F.3d 474 (2005)
199 Ed. Law Rep. 35, 16 A.D. Cases 1445, 30 NDLR P 157

The defendants argue that the waiver condition at issue here is invalid because it is not related to any *particular* spending program; rather, the waiver condition applies to any program or activity that accepts federal funds for *any* purpose. That much is true, but the Supreme Court has upheld other spending conditions equally broad. *See, e.g., Lau v. Nichols,* 414 U.S. 563, 569, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) (upholding the ban on race discrimination in federally funded programs under Title VI of the Civil Rights Act); [12] *Sabri v. United States,* 541 U.S. 600, 124 S.Ct. 1941, 1946, 158 L.Ed.2d 891 (2004) (upholding a ban on bribery of state, local, and tribal officials of entities that receive at least $10,000 in federal funds, even without a requirement that the alleged bribe be related to specific federal funds). As the Court stated in *Lau,* Congress may, under the spending power, "requir[e] that public funds, to which all taxpayers ... contribute, not be spent in any fashion which encourages, entrenches, subsidizes, or results in ... discrimination." 414 U.S. at 569, 94 S.Ct. 786 (internal citation omitted); *see also Sabri,* 124 S.Ct. at 1947 **\*493** (stating that "[t]he power to keep a watchful eye on expenditures and on the reliability of those who use public money is bound up with congressional authority to spend in the first place").

Although the waiver condition in § 2000d–7 is a blanket condition that applies regardless of the nature or amount of federal funds accepted, in this context it applies only with respect to the "program or activity" that receives those funds. *See* 29 U.S.C. § 794(a)–(b). We conclude that this waiver condition is sufficiently related to the purpose of the nondiscrimination rule stated in § 504 of the Rehabilitation Act, *i.e.,* to ensure that federal funds are not used to facilitate disability discrimination. *See Barbour v. Washington Metro. Area Transit Auth.,* 374 F.3d 1161, 1168–69 (D.C.Cir.2004), *cert. denied,* 544 U.S. 904, 125 S.Ct. 1591, 161 L.Ed.2d 277 (2005); *Nieves–Marquez v. Puerto Rico,* 353 F.3d 108, 128 (1st Cir.2003); *Lovell v. Chandler,* 303 F.3d 1039, 1051 (9th Cir.2002); *Koslow v. Pennsylvania,* 302 F.3d 161, 176 (3d Cir.2002).

## B.

The Supreme Court has also noted that "in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which pressure turns into compulsion." *South Dakota,* 483 U.S. at 211, 107 S.Ct. 2793 (internal quotations omitted). The Court in *South Dakota* concluded that the minimum-drinking-age condition on highway funding was not unduly coercive, at least as it applied to South Dakota, since "all South Dakota would lose if she adheres to her chosen course as to a suitable minimum drinking age is 5% of the funds otherwise obtainable under specified highway grant programs." *Id.* at 211, 107 S.Ct. 2793. Although there might be a federal funding condition that is unconstitutionally coercive, neither the Supreme Court nor any federal court of appeals has yet identified one.

We considered this coercion theory in *Virginia Department of Education v. Riley,* 106 F.3d 559 (4th Cir.1997) (*en banc* ). The Commonwealth of Virginia challenged the federal government's decision to withhold from Virginia all federal funding under the Individuals with Disabilities Education Act ("IDEA") for one year in response to Virginia's failure to provide educational services to 126 disabled students who had been disciplined for reasons unrelated to their disabilities. *Id.* at 560. A majority of the *en banc* court sustained Virginia's challenge on the ground that the IDEA does not unambiguously condition receipt of federal funds on provision of services under such circumstances. *Id.* at 561.

Although it was not necessary to the disposition of the case, six of thirteen judges agreed that the federal government's withholding 100% of an annual special education grant of $60 million in response to the Commonwealth's failure to provide private educational services to 126 students was unduly coercive. *Id.* at 569–70. According to these judges, "a Tenth Amendment claim of the highest order lies where, as here, the Federal Government ... withholds the entirety of a substantial

199 Ed. Law Rep. 35, 16 A.D. Cases 1445, 30 NDLR P 157

federal grant on the ground that the States refuse to fulfill their federal obligation in some insubstantial respect rather than submit to policy dictates of Washington in a matter peculiarly within their powers as sovereign States." *Id.* at 570.

We later characterized this *dicta* in *Riley* as indicating that "the coercion theory remains viable in this circuit, and that federal statutes that threaten the loss of an entire block of federal funds upon a relatively minor failing by a state are constitutionally suspect." *West Va. v. U.S.* **\*494** *Dep't of Health & Human Servs.,* 289 F.3d 281, 291 (4th Cir.2002). The State of West Virginia challenged, on Tenth Amendment grounds, the constitutionality of certain provisions in the federal Medicaid statute that required the State to adopt a program to recover certain expenditures from the estates of deceased Medicaid beneficiaries. *Id.* at 283–84. West Virginia argued that this requirement was unduly coercive because the State stood to lose more than $1 billion in federal Medicaid funds each year if it failed to implement an estate recovery program that would generate only about $2 million each year. *Id.* at 291. Because the federal government had not, in fact, withheld or threatened to withhold the State's entire Medicaid grant, we treated West Virginia's argument as a facial challenge to the requirement that States implement estate recovery programs. *Id.* at 292. We upheld the statute on the ground that it gives the Secretary of Health and Human Services discretion to impose a penalty for non-compliance that is less severe than withholding 100% of a State's Medicaid funding. *Id.* at 292–93. [13]

The waiver condition at issue here is unambiguous and unequivocal: If a "program or activity"—here, GMU—accepts federal funding, then it may not assert Eleventh Amendment immunity in defense against a claim for violation of § 504. While it is certainly true, as the defendants contend, that this waiver condition operates whenever a "program or activity" accepts *any* federal funds, that fact alone does not compel the conclusion that such a program or activity was coerced to accept the condition. The coercion inquiry focuses on the "financial inducement offered by Congress," and the Court in *South Dakota* held that the minimum-drinking-age condition was not unduly coercive based on the relatively small size of the federal grant that the State risked losing. 483 U.S. at 211, 107 S.Ct. 2793 (noting that the State would lose only 5% of available federal highway funds if it opted not to accept the condition). In this case, GMU has offered no estimate of the degree to which it actually relies upon federal funds, and we will not simply presume that the State's capacity for free choice was overcome by the prospect of financial assistance from the federal government. *See id.* Based on the record before us, we cannot say that the financial inducement of federal funding was so great as to coerce GMU's acceptance of the waiver condition in § 2000d–7. In sum, we conclude that GMU waived its Eleventh Amendment immunity with respect to Constantine's claims for damages under § 504 of the Rehabilitation Act.

C.

The defendants contend, however, that more is required to demonstrate that a State knowingly waived its Eleventh Amendment immunity. According to the defendants, a waiver of immunity is valid only if the State subjectively believed that it had immunity to waive. Relying upon the Second Circuit's decision in *Garcia v. SUNY Health Sciences Center,* 280 F.3d 98 (2d Cir.2001), the defendants argue that GMU's waiver was not "knowing" because it reasonably believed that Congress had already abrogated its immunity from suit under § 504 of the Rehabilitation Act.

The Second Circuit held in *Garcia* that New York had not knowingly waived its Eleventh Amendment immunity to a suit under § 504 because at the time it accepted **\*495** federal funds for the program at issue, *i.e.,* before the Supreme Court decided *Seminole Tribe,* "Title II [of the ADA] was reasonably understood to abrogate New York's sovereign immunity under Congress' Commerce Clause authority." *Id.* at 114. Because § 504 is virtually identical to Title II of the ADA, the Second Circuit concluded that New York at that time had no immunity to § 504 suits that it could possibly waive. Thus, its acceptance of federal funds expressly conditioned on a waiver of Eleventh Amendment immunity did not, in fact, constitute a knowing waiver. *Id.* at 114–15.

We decline to follow the Second Circuit's approach in *Garcia*. The Supreme Court has already held that a condition on federal spending must be clearly and unambiguously expressed so that the State accepting federal funds can be certain of its obligations upon receipt of such funds. *South Dakota,* 483 U.S. at 207, 107 S.Ct. 2793 (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), for the proposition that an unambiguous condition "enable[s] the States to exercise their choice knowingly, cognizant of the consequences of their participation" in the federal funding program). The Court has further held that Congress may not coerce the States into accepting federal funds with conditions. *Id.* at 211, 107 S.Ct. 2793. These requirements suffice to ensure that a State's agreement to federal funding conditions is both knowing and voluntary. *See* *Pace v. Bogalusa City Sch. Bd.,* 403 F.3d 272, 281–85, 2005 WL 546507, at *6–*9 (5th Cir. Mar.16, 2005) (*en banc* ); *Barbour,* 374 F.3d at 1166–68; *Doe v. Nebraska,* 345 F.3d 593, 601–02 (8th Cir.2003); *Garrett v. University of Ala. at Birmingham Bd. of Trs.,* 344 F.3d 1288, 1292–93 (11th Cir.2003) (*per curiam* ); *M.A. v. State–Operated Sch. Dist.,* 344 F.3d 335, 349–51 (3d Cir.2003). The Court has never suggested that anything more than voluntary acceptance of federal funds in the face of an unambiguous waiver condition is required to demonstrate a State's knowing agreement to that condition. *See* *College Sav. Bank,* 527 U.S. at 686, 119 S.Ct. 2219 (characterizing *South Dakota* as holding that "Congress may, in the exercise of its spending power, condition its grant of funds to the States upon their taking certain actions that Congress could not require them to take, and that acceptance of the funds entails an agreement to the actions"). [14]

In any event, the facts of this case do not support the defendants' argument that GMU did not know it had any Eleventh Amendment immunity to waive when it **\*496** accepted federal funds. When GMU accepted federal funds in 2003—the year during which Constantine's claims arose—it was already settled that Congress had no authority under Article I, and only limited authority under § 5 of the Fourteenth Amendment, to abrogate the States' Eleventh Amendment immunity. *See* *City of Boerne,* 521 U.S. at 517–20, 117 S.Ct. 2157; *Seminole Tribe,* 517 U.S. at 72–73, 116 S.Ct. 1114. By that time, the Supreme Court had specifically rejected Congress' attempts to abrogate Eleventh Amendment immunity with respect to Title I of the ADA and the ADEA. *See* *Garrett,* 531 U.S. at 374, 121 S.Ct. 955; *Kimel,* 528 U.S. at 91, 120 S.Ct. 631. The Court had made no pronouncement concerning abrogation under the Rehabilitation Act. In short, when GMU accepted federal funds in 2003, it was far from clear that Congress had validly abrogated Eleventh Amendment immunity with respect to suits brought under § 504. Even the Second Circuit in *Garcia* recognized that "an argument could be made that if there is a colorable basis for the state to suspect that an express congressional abrogation is invalid, then the acceptance of funds conditioned on the waiver might properly reveal a knowing relinquishment of sovereign immunity. This is because a state deciding to accept the funds would not be ignorant of the fact that it was waiving its possible claim to sovereign immunity." 344 F.3d at 114 n. 4. GMU waived whatever Eleventh Amendment immunity it had when it accepted federal funds under a statute that clearly and unambiguously conditioned receipt of such funds on a waiver of immunity.

V.

Constantine also seeks declaratory and injunctive relief under § 504 of the Rehabilitation Act, and the defendants again assert Eleventh Amendment immunity. [15] The Supreme Court held in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), that the Eleventh Amendment does not bar a suit against a State official for prospective injunctive relief. In order to determine whether this doctrine applies, we "need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Public Serv. Comm'n,* 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) (internal quotations omitted). We do not consider the merits of the plaintiff's claims; it is enough that the complaint *alleges* an ongoing violation of federal law. *Id.* at 646, 122 S.Ct. 1753.

*Constantine v. Rectors and Visitors of George Mason University, 411 F.3d 474 (2005)*
199 Ed. Law Rep. 35, 16 A.D. Cases 1445, 30 NDLR P 157

Constantine's complaint alleges that the defendants violated § 504 of the Rehabilitation Act by initially failing, and then later refusing, to make reasonable accommodations for her disability. The prayer for relief requests an order expunging the failing grade from Constantine's record or directing GMU to permit a re-examination under reasonable circumstances. The defendants do not contend that such relief would be impermissibly retroactive. Accordingly, the allegations in Constantine's complaint satisfy our "straightforward inquiry." *Id.* at 645–46, 122 S.Ct. 1753; *see McCarthy v. Hawkins,* 381 F.3d 407, 417 (5th Cir.2004).

The defendants argue, however, that the Rehabilitation Act effectively precludes *Ex parte Young* actions. Congress may displace **\*497** the *Ex parte Young* doctrine by creating specific remedies for violations by state actors. "[W]here Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young.*" *Seminole Tribe,* 517 U.S. at 74, 116 S.Ct. 1114. The Court in *Seminole Tribe* held that an *Ex parte Young* action was not appropriate in light of the comprehensive remedial scheme provided in the Indian Gaming Regulatory Act ("IGRA"). Where a court finds that a State breached its statutory duty to negotiate in good faith with an Indian tribe, the IGRA provides for a sort of forced mediation between the parties with the prospect of federal regulation in the event of an impasse. *Id.* at 74–75, 116 S.Ct. 1114. This "quite modest set of sanctions" evidenced Congress' intent to limit the States' exposure for violations of the statute, whereas an *Ex parte Young* action would leave the States vulnerable to "the full remedial powers of a federal court." *Id.* at 75, 116 S.Ct. 1114. Thus, the Court held that an *Ex parte Young* action is not appropriate to enforce the IGRA. *Id.* at 76, 116 S.Ct. 1114.

By contrast, the Court held in *Verizon* that the Telecommunications Act of 1996 did not foreclose an *Ex parte Young* action. 535 U.S. at 647–48, 122 S.Ct. 1753. That statute merely provides that an aggrieved party may sue in federal court to challenge certain determinations made by state commissions; it does not identify the proper party to be sued, nor does it restrict in any way the kinds of relief available. *Id.* at 647, 122 S.Ct. 1753. Merely authorizing federal courts to review commission decisions under the statute does not "impose upon the State a liability that is significantly more limited than would be the liability imposed upon the state officer under *Ex parte Young.*" *Id.* at 647–48, 122 S.Ct. 1753.

For violations of § 504, the Rehabilitation Act makes available all of the "remedies, procedures, and rights" provided in Title VI of the Civil Rights Act. 29 U.S.C. § 794a(a)(2). Title VI forbids discrimination on the basis of race, color, or national origin by any "program or activity" that receives federal funding. 42 U.S.C. § 2000d. Although Title VI does not expressly authorize a private right of action to enforce this nondiscrimination rule, "[i]t is well settled that there is an implied private right of action to enforce [the statute's] core prohibition on discrimination in federally-financed programs." *Peters v. Jenney,* 327 F.3d 307, 315 (4th Cir.2003). In any suit against a State for violation of Title VI, "remedies (including remedies both at law and in equity) are available ... to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State." 42 U.S.C. § 2000d–7(a)(2). "Title VI mentions no remedies" at all, and it certainly does not purport to limit the remedies available in a suit against a defendant other than a State. *Barnes,* 536 U.S. at 187, 122 S.Ct. 2097. [16] Thus, we conclude that the Rehabilitation Act (which incorporates the remedies provided in Title VI) does not suggest a congressional intent to foreclose an *Ex parte Young* action **\*498** for violation of § 504. *See Henrietta D. v. Bloomberg,* 331 F.3d 261, 288–89 (2d Cir.2003); *Miranda B. v. Kitzhaber,* 328 F.3d 1181, 1188–89 (9th Cir.2003); *Randolph v. Rodgers,* 253 F.3d 342, 346–49 & n. 13 (8th Cir.2001).

VI.

Because the Eleventh Amendment does not bar Constantine's claims under the ADA and the Rehabilitation Act, we next consider the district court's dismissal of those claims under Rule 12(b)(6). Dismissal is not appropriate under Rule 12(b)(6) "unless it appears certain that the plaintiff can prove no set of facts which would support [her] claim and would entitle [her] to relief." *Mylan Labs.,* 7 F.3d at 1134. Our review is *de novo,* and we "accept as true all well-pleaded allegations and ... view the complaint in a light most favorable to the plaintiff." *Id.*

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, § 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). In general, a plaintiff seeking recovery for violation of either statute must allege that (1) she has a disability, (2) she is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) she was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability. *Baird v. Rose,* 192 F.3d 462, 467–70 (4th Cir.1999); *Doe v. University of Md. Med. Sys. Corp.,* 50 F.3d 1261, 1264–65 & n. 9 (4th Cir.1995). [17] The district court ruled that Constantine's complaint failed to allege facts showing that (1) Constantine was "otherwise qualified" as a law student or (2) she was actually denied the benefits of an educational program or service. [18]

A plaintiff is "qualified" if she is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). According to the complaint, Constantine "is qualified to be a student at GMU and is able to perform all the essential functions of being a student with reasonable accommodations. If she received additional time as a reasonable accommodation for her disability, she would not have any problem complying [with] GMU's examination policy." J.A. **499** 16. The complaint further alleges that Constantine carried a full load of law school courses in the spring of 2003 and completed her other final exams "without incident." J.A. 12. Taken together, these allegations are sufficient to make a *prima facie* case that Constantine, with reasonable modifications to exam administration policies or practices, met the essential eligibility requirements for participation in GMU's law school programs.

Under the disability discrimination statutes, a plaintiff must show that she was excluded from participation in, or denied the benefits of, a program or service offered by a public entity, *or* subjected to discrimination by that entity. 42 U.S.C. § 12132; 29 U.S.C. § 794(a). Constantine's complaint alleges that she was unable to complete Professor Lund's exam because of her disability; that the defendants initially refused to accommodate her disability by giving her additional time to complete the exam, resulting in her failing the exam; that when the defendants agreed months later to allow a re-examination, they gave her only three days to prepare; that when she alerted the defendants to a conflict with other law school responsibilities, they refused to alter the date for re-examination; and that when she sought a temporary restraining order to prevent the re-examination on the date set by the defendants, they determined that she would fail any subsequent re-examination. If these allegations are true, then Constantine can demonstrate that the defendants excluded her from meaningful participation in Professor Lund's course or denied her the benefits of that course, or at least discriminated against her with respect to that course. Whatever may happen at summary judgment or trial, these allegations are sufficient to satisfy Rule 12(b)(6).

Case 1:18-cv-24190-RS Document 471 Entered on FLSD Docket 06/01/2023 Page 94 of 379
*Constantine v. Rectors and Visitors of George Mason University*, 411 F.3d 474 (2005)
199 Ed. Law Rep. 35, 16 A.D. Cases 1445, 30 NDLR P 157

VII.

Constantine also asserts a claim against the individual defendants for First Amendment retaliation in violation of 42 U.S.C. § 1983. Specifically, Constantine alleges that the defendants violated her First Amendment right to free speech by retaliating against her after she complained about Professor Lund's constitutional law exam and GMU's grade appeals policies.

"The First Amendment right of free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir.2000). A plaintiff seeking to recover for First Amendment retaliation must allege that (1) she engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected her First Amendment rights, and (3) there was a causal relationship between her protected activity and the defendants' conduct. *Id.* at 686.

A.

Constantine alleges that she complained to GMU officials about the construction of Professor Lund's exam and the procedures available to challenge her grade. She then repeated her complaints about the grade appeals process in an article printed in the law school newspaper. It is undisputed that Constantine engaged in protected First Amendment activity. *See Trulock v. Freeh,* 275 F.3d 391, 404–05 (4th Cir.2001) (holding that the plaintiff adequately alleged First Amendment retaliation based on government officials' response to his publication of an article criticizing the FBI and other federal agencies).

B.

Constantine further alleges that GMU, in response to these complaints, (1) denied **\*500** her initial request to re-take the exam, (2) denied her request to have a different professor determine whether the original exam was defective or graded unfairly, and (3) refused to grant her a hearing before the Academic Standing Committee to challenge her grade. The district court ruled, without any explanation, that the defendants' conduct did not adversely affect Constantine's First Amendment rights. The defendants contend that this ruling was correct because the complaint fails to allege that their actions actually prevented Constantine from exercising her First Amendment rights.

First Amendment retaliation is actionable because "retaliatory actions may tend to chill individuals' exercise of constitutional rights." *ACLU of Md., Inc. v. Wicomico County, Md.,* 999 F.2d 780, 785 (4th Cir.1993). Not all retaliatory conduct tends to chill First Amendment activity, however, *DiMeglio v. Haines,* 45 F.3d 790, 806 (4th Cir.1995), and a plaintiff seeking to recover for retaliation must show that the defendant's conduct resulted in something more than a "*de minimis* inconvenience" to her exercise of First Amendment rights, *ACLU of Md.,* 999 F.2d at 786 n. 6. Of course, conduct that tends to chill the exercise of constitutional rights might not itself deprive such rights, and a plaintiff need not actually be deprived of her First Amendment rights in order to establish First Amendment retaliation. *Id.*

We reject the defendants' suggestion that this inquiry depends upon the actual effect of the retaliatory conduct on a particular plaintiff. We have never held that a plaintiff must prove that the allegedly retaliatory conduct caused her to cease First Amendment activity altogether. The cause of action targets conduct that tends to *chill* such activity, not just conduct that *freezes* it completely. Moreover, such a subjective standard would expose public officials to liability in some cases, but not in others, for the very same conduct, depending upon the plaintiff's will to fight. We believe that an objective standard better instructs public officials as to their obligations under the First Amendment. Thus, for purposes of a First Amendment retaliation claim

Case 1:18-cv-24190-RS Document 471 Entered on FLSD Docket 06/01/2023 Page 95 of 379

Constantine v. Rectors and Visitors of George Mason University, 411 F.3d 474 (2005)
199 Ed. Law Rep. 35, 16 A.D. Cases 1445, 30 NDLR P 157

under § 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter "a person of ordinary firmness" from the exercise of First Amendment rights. *Washington v. County of Rockland,* 373 F.3d 310, 320 (2d Cir.2004); *Keenan v. Tejeda,* 290 F.3d 252, 258 (5th Cir.2002); *Carroll v. Pfeffer,* 262 F.3d 847, 850 (8th Cir.2001); *Smith v. Plati,* 258 F.3d 1167, 1176 (10th Cir.2001); *Suppan v. Dadonna,* 203 F.3d 228, 235 (3d Cir.2000); *Bloch v. Ribar,* 156 F.3d 673, 678 (6th Cir.1998); *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982); *cf. Suarez Corp.,* 202 F.3d at 688 (noting that retaliatory disclosure of information may constitute adverse action if it is "sufficiently embarrassing, humiliating, or emotionally distressful" and citing *Bloch's* "ordinary firmness" standard). While the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity, it is not dispositive.

Constantine alleges that in response to her public criticism of Professor Lund's exam and GMU's grade appeals policies, the defendants denied her requests to sit for a re-examination, to have another professor review her original exam, and even to have a hearing before an administrative committee. When the defendants finally allowed a re-examination, they gave Constantine only three days' notice and, according to the complaint, determined in advance that she would receive a failing grade. Because such conduct would tend to chill a reasonable  **\*501**  person's exercise of First Amendment rights, we conclude that Constantine has adequately alleged adverse action.

C.

Finally, Constantine must allege a causal connection between her First Amendment activity and the alleged adverse action. In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity. *Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 657 (4th Cir.1998). "Knowledge alone, however, does not establish a causal connection" between the protected activity and the adverse action. *Price v. Thompson,* 380 F.3d 209, 213 (4th Cir.2004). There must also be some degree of temporal proximity to suggest a causal connection. "A lengthy time lapse between the [public official's] becoming aware of the protected activity and the alleged adverse ... action ... negates any inference that a causal connection exists between the two." *Dowe,* 145 F.3d at 657.

The complaint alleges that Constantine made her complaints personally to several of the defendants and other GMU officials. The complaint also describes (somewhat vaguely) a chronology of events spanning roughly four months from the date of the initial exam to the filing of this lawsuit. Constantine initially took Professor Lund's exam in January 2003. Sometime later—the complaint does not specify the date—Constantine complained about the exam, and sometime after that she complained about the grade appeals process. For three months, the defendants made no response to Constantine's complaints. When they finally agreed to discuss these issues with Constantine, the defendants told her that she could re-take the exam "sometime in June." Then on May 17, 2003, the defendants notified Constantine that she would be allowed to sit for a re-examination on May 21, 2003. At most, four months elapsed from the time Constantine complained about Professor Lund's exam and the grade appeals process to the time of the defendants' alleged retaliatory conduct. Although we noted that a nine-month lapse created a "very close question" as to causal connection in *Price,* we nevertheless concluded that the plaintiff's claim survived a motion to dismiss. 380 F.3d at 213. Likewise, we are satisfied that Constantine's complaint adequately alleges a causal connection between her First Amendment activity and the defendants' alleged misconduct.

VIII.

We conclude that the Eleventh Amendment poses no bar to Constantine's claims because Congress validly abrogated the States' immunity to suit under Title II of the ADA; the State waived its immunity to suit under § 504 of the Rehabilitation Act with

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 96 of 379

Constantine v. Rectors and Visitors of George Mason University, 411 F.3d 474 (2005)
199 Ed. Law Rep. 35, 16 A.D. Cases 1445, 30 NDLR P 157

respect to GMU; and the *Ex parte Young* doctrine permits an action for prospective injunctive relief to remedy a violation of § 504. We further conclude that Constantine's complaint adequately alleges claims for disability discrimination in violation of Title II of the ADA and § 504 of the Rehabilitation Act, as well as a First Amendment retaliation claim under 🚩 § 1983. Accordingly, we reverse the judgment of the district court and remand this case for further proceedings. [19]

*REVERSED AND REMANDED*

**All Citations**

411 F.3d 474, 199 Ed. Law Rep. 35, 16 A.D. Cases 1445, 30 NDLR P 157

### Footnotes

1    Because we are reviewing the dismissal of Constantine's complaint, we accept as true all well-pleaded allegations and view the complaint in the light most favorable to her. 🚩 *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993).

2    Although the Court had granted *certiorari* to decide a substantive question arising under the 🚩 Emergency Planning and Community Right–to–Know Act, 523 U.S. at 88, 118 S.Ct. 1003, it vacated the court of appeals' judgment and remanded with instructions to dismiss the complaint because the plaintiff lacked Article III standing, 🚩 *id.* at 110, 118 S.Ct. 1003.

3    The Supreme Court has made it clear that federal courts are not *required* to raise Eleventh Amendment issues *sua sponte.* *See* 🚩 *Schacht,* 524 U.S. at 389, 118 S.Ct. 2047 ("Nor need a court raise the defect on its own. Unless the State raises the matter, a court can ignore it."). We have stated in *dicta,* however, that "because of its jurisdictional nature, a court ought to consider the issue of Eleventh Amendment immunity at any time, even *sua sponte.*" 🚩 *Suarez Corp. Indus. v. McGraw,* 125 F.3d 222, 227 (4th Cir.1997).

4    We recognize that certain merits issues are more easily resolved than Eleventh Amendment immunity issues. Nevertheless, the essence of the immunity is that the State cannot be sued in federal court at all, even where the claim has merit, and the importance of immunity as an attribute of the States' sovereignty is such that a court should address that issue promptly once the State asserts its immunity.

5    With respect to Constantine's First Amendment retaliation claim under 🚩 § 1983, that statute does not authorize an action against GMU or the individual defendants in their official capacities. *See* 🚩 *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). The statute does, however, authorize suit against the individual defendants in their individual capacities, and the Eleventh Amendment does not bar such a suit. *See* 🚩 *Hafer v. Melo,* 502 U.S. 21, 31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

6    Although the Court in *Lane* described evidence of disability discrimination with respect to a wide variety of public services, the issue of access to the courts was critical in the analysis. The Court likened *Lane* to 🚩 *Nevada Department of Human Resources v. Hibbs,* 538 U.S. 721, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003) (addressing the validity of the Family and Medical Leave Act under § 5 to remedy and deter sex discrimination in the workplace), and distinguished 🚩 *Kimel v. Florida Board of Regents,* 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (addressing the validity of the Age Discrimination in Employment Act under § 5 with respect to age discrimination in the workplace), and *Garrett*

(addressing the validity of Title I of the ADA under § 5 with respect to disability discrimination in the workplace), because the right of access to the courts triggers heightened scrutiny. *Lane,* 124 S.Ct. at 1992. Because "Title II is aimed at the enforcement of a variety of basic rights, including the right of access to the courts at issue in this case, that call for a standard of judicial review at least as searching, and in some cases more searching, than the standard that applies to sex-based classifications," less evidence was required to establish a pattern of unconstitutional conduct. *Id.*

7    In examining the backdrop of discrimination against which Congress enacted Title II, the Court specifically rejected the proposition that "a valid exercise of § 5 power must always be predicated solely on evidence of constitutional violations by the States themselves." *Lane,* 124 S.Ct. at 1991 n. 16. *Compare* *Garrett,* 531 U.S. at 369, 121 S.Ct. 955 (stating that "it would make no sense to consider constitutional violations [by local government units], as well as by the States themselves, when only the States are the beneficiaries of the Eleventh Amendment"); *Kimel,* 528 U.S. at 90–91, 120 S.Ct. 631 (stating that congressional findings of unconstitutional discrimination in the private sector was "beside the point" since "Congress made no such findings with respect to the States"). Although evidence of misconduct by the States is of special importance, "evidence of constitutional violations on the part of nonstate governmental actors is relevant to the § 5 inquiry." *Lane,* 124 S.Ct. at 1991.

8    The defendants contend that this case is controlled by our decision in *Wessel v. Glendening,* 306 F.3d 203 (4th Cir.2002), in which we held that Title II of the ADA does not abrogate the States' Eleventh Amendment immunity. In reaching this conclusion, we followed *Garrett* and limited our examination of the legislative history of Title II to evidence of "unconstitutional conduct by the states" and discounted other evidence of disability discrimination by nonstate entities. *Id.* at 210–13. While *Lane* specifically overrules *Wessel* only with respect to the application of Title II to cases involving the right of access to courts, the reasoning of *Lane* renders *Wessel* obsolete. Contrary to our conclusion in *Wessel* that "Congress did not have an adequate record of unconstitutional discrimination by states against the disabled to support abrogation," 306 F.3d at 213, the Court in *Lane* found that Congress enacted Title II of the ADA—considered as a whole—in response to a pattern of unconstitutional conduct by States and nonstate government entities, 124 S.Ct. at 1989–92. Moreover, *Lane* specifically rejects the proposition—crucial to our analysis in *Wessel*—that Congress may enact § 5 legislation only in response to unconstitutional conduct by the States themselves. *Id.* at 1991 n. 16. For these reasons, *Wessel* does not control our analysis in this case.

9    Although the Court's general conclusion on this point is sufficient to satisfy the historical inquiry into the purpose of the enactment of Title II, we note that the Court specifically identified public education as one of a number of "public services, programs, and activities" in which there was a documented pattern of unequal treatment. 124 S.Ct. at 1989.

10   Although *Garrett* implicates the prohibition on irrational discrimination, it does not control this case either. The Court in *Garrett* held that Title I of the ADA is not valid § 5 legislation because there was no demonstrated pattern of unconstitutional employment discrimination by the States against the disabled. 531 U.S. at 368–72, 121 S.Ct. 955. In *dicta,* the Court stated that "[e]ven were it possible to squeeze out of these examples a pattern of unconstitutional discrimination by the States," the remedial provisions of Title I would raise serious congruence-and-proportionality concerns. *Id.* at 372, 121 S.Ct. 955. The Court declined to address the constitutional question with respect to Title II, however, and noted specifically that Title II "has somewhat different remedial provisions from Title I." *Id.* at 360 n. 1, 121 S.Ct. 955. Moreover, the congruence and proportionality of Title II must be measured against a record of unconstitutional discrimination that is "clear beyond peradventure," *Lane,* 124 S.Ct. at 1992, while Title I was considered in light of a record that had to be "squeezed out," *Garrett,* 531 U.S. at 372, 121 S.Ct. 955.

11  We also note, as the Court in *Garrett* did, that Congress enacted the ADA in response to a finding that "[d]iscrimination still persists in such critical areas as *employment in the private sector,* public accommodations, public services, transportation, and telecommunications." 531 U.S. at 371, 121 S.Ct. 955. *See also id.* (noting that Congress found that "there exists a compelling need to establish a clear and comprehensive Federal prohibition of discrimination on the basis of disability in the areas of employment in the private sector, public accommodations, public services, transportation, and telecommunications"). This finding was crucial to the Court's conclusion that there was not a demonstrated pattern of disability discrimination in public-sector employment that warranted § 5 legislation. *Garrett,* 531 U.S. at 372, 121 S.Ct. 955. The same finding shows that Congress recognized a persistent problem in private-sector employment and a separate problem in the provision of public services. Thus, the remedial measures described in Title I and those described in Title II were enacted in response to different kinds of problems, and a conclusion about the congruence and proportionality of Title I does not control the analysis of Title II.

12  Although the Court subsequently rejected the interpretation of § 601 of the Civil Rights Act described in *Lau, see Alexander v. Sandoval,* 532 U.S. 275, 285, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), the Spending Clause analysis in *Lau* remains intact.

13  We did note, however, that "[i]f the government in fact withheld the entirety of West Virginia's [Medicaid funding] because of the [S]tate's failure to implement an estate recovery program, then serious Tenth Amendment questions would be raised." *Id.* at 291, 121 S.Ct. 1511.

14  Contrary to the defendants' argument, *College Savings Bank* does not compel the conclusion that GMU's waiver of immunity was unknowing. That case presented the question whether a State retains its Eleventh Amendment immunity to suit brought under the Trademark Remedy Clarification Act ("TRCA"), even after the State engages in advertising activities regulated by the Lanham Act. Expressly rejecting the doctrine of constructive waiver, the Court held that a State cannot be deemed to have waived its immunity merely by engaging in otherwise lawful conduct. *Id.* at 680–87, 119 S.Ct. 2219. For present purposes, it is important that the Court specifically distinguished conditional-spending cases such as *South Dakota*: "Congress has no obligation to use its Spending Clause power to disburse funds to the States; such funds are gifts. In the present case, however, what Congress threatens if the State refuses to agree to its condition is not the denial of a gift or gratuity, but a sanction: exclusion of the State from otherwise permissible activity." *Id.* at 686–87, 119 S.Ct. 2219. Because this case does not involve a constructive waiver at all, but involves the State's voluntary receipt of federal funds expressly conditioned on a waiver of Eleventh Amendment immunity, *College Savings Bank* is inapposite.

15  Since Constantine graduated from GMU's law school, all of her claims for injunctive relief are now moot, except for her request that GMU expunge the failing grade from her record. *See Mellen v. Bunting,* 327 F.3d 355, 364 (4th Cir.2003) (citing *Board of Sch. Comm'rs v. Jacobs,* 420 U.S. 128, 129, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975) (*per curiam* )).

16  The Court in *Barnes* held that punitive damages are not available for violation of Title VI, and thus not available for violation of Title II of the ADA or § 504 of the Rehabilitation Act either. 536 U.S. at 189, 122 S.Ct. 2097. Importantly, the Court based this conclusion on the fact that punitive damages ordinarily are not available in breach-of-contract actions. *Id.* at 188, 122 S.Ct. 2097. The same cannot be said of prospective injunctive relief.

17  Although "[t]he ADA and Rehabilitation Act generally are construed to impose the same requirements," we have recognized that the causation standards under Title II of the ADA and § 504 of the Rehabilitation Act are "significantly dissimilar." *Baird,* 192 F.3d at 469. A plaintiff seeking relief under Title II of the ADA must prove that disability

"played a motivating role" in the adverse action, while a plaintiff seeking relief under § 504 of the Rehabilitation Act must prove that the defendants' discriminatory conduct was "solely by reason" of the plaintiff's disability. *Id.* at 469–70.

18    Neither the district court nor the defendants on appeal have asserted that Constantine's complaint fails adequately to allege causation. Indeed, the complaint fairly may be read to allege that the defendants discriminated against Constantine because of her disability.

19    Since the individual defendants have asserted qualified immunity as a defense to Constantine's First Amendment retaliation claim, the district court should address that issue as soon as practicable on remand. *See Saucier,* 533 U.S. at 201, 121 S.Ct. 2151.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-22785-CIV-ALTONAGA/O'Sullivan

**ANTHONY CUEVAS**, and
**J.L.C. GROUP, INC.**,

       Plaintiffs,

v.

**CITY OF SWEETWATER**, and
**JOSE M. DIAZ**,

       Defendants.

_____/

## ORDER

    **THIS CAUSE** is before the Court on Defendant, Jose M. Diaz's ("Diaz['s]") Motion to Dismiss Amended Complaint . . . ("Motion") [ECF No. 28], filed September 2, 2015. Plaintiff, Anthony Cuevas ("Cuevas"), filed his Opposition . . . ("Opposition") [ECF No. 35] on September 21, 2015, to which Diaz filed a Reply . . . ("Reply") [ECF No. 37] on October 1, 2015. The Court has carefully considered the parties' written submissions, the Amended Complaint [ECF No. 24], and applicable law. For the reasons explained below, Diaz's Motion is denied.

### I.      BACKGROUND

    Cuevas is the owner and operator of Finishline Petroleum, a gas station that has operated in the City of Sweetwater ("Sweetwater") since 1993. (*See* Am. Compl. ¶ 8). Plaintiff, J.L.C. Group, Inc. ("JLC"), operates this gas station and truck rental company (*see id.* ¶ 5), it holds the permit to conduct this business in Sweetwater (*see id.* ¶ 9), and Cuevas is its president (*see id.* ¶ 5). Diaz is the former mayor of Sweetwater and is now a City Commissioner. (*See id.* ¶ 7).

Since late 2013, Plaintiffs have become "a target" of Diaz based on Cuevas's vocal support for Diaz's political opponent, Orlando Lopez ("Lopez"). (*Id.* ¶ 10).

Specifically, in late 2013 Lopez told Cuevas he intended to run against Diaz in the mayoral election and asked Cuevas to place a sign supporting Lopez's candidacy on the "property of his gas station." (*Id.* ¶ 11). Cuevas agreed, placing a large sign on the roadway and several signs on the windows of the business. (*See id.*). Within two to three days, at Diaz's direction, Sweetwater police officers, identified in the Amended Complaint by only their last names, Garsiga and Castro, approached the cashier and advised her to take down the signs. (*See id.* ¶ 12). She did so, fearing political and legal consequences. (*See id.* ¶ 13). Upon learning of this, Cuevas placed the window signs "back on his property." (*Id.*).

Three weeks later, and for the first time, JLC began receiving citations for code violations. (*See id.* ¶ 14). One violation was dismissed after Cuevas asserted the code was being selectively enforced. (*See id.* ¶ 15). Two weeks later, the same police officers approached Cuevas about the political advertisements asking, "if he didn't understand the message." (*Id.* ¶ 16). When Cuevas refused to take down the signs, the officers approached him on a third occasion and again at Diaz's direction, and stated Lopez was corrupt and Cuevas should not support his candidacy. (*See id.* ¶ 17). After Cuevas persisted in supporting Lopez, Diaz repeatedly sent city employee Yaima Vega to harass Cuevas at the gas station in an attempt to persuade Cuevas to remove the signs. (*See id.* ¶ 18).

Seeing his improper tactics aimed at violating Cuevas's constitutional right to free speech were not working, Diaz directed additional code violations be issued to the gas station. (*See id.* ¶ 19). Code enforcement alleged violations for parking trucks on the property used in the rental side of the business. (*See id.*). Under this theory, JLC was not permitted to store trucks "on his

property" under the City Code.  (*Id.*).  These violations were false and legally unsupported, and constituted selective enforcement, as other truck rental companies parked trucks on site and were not issued violations.  (*See id.* ¶ 20).  The violations, "ordered by former Mayor Diaz, were intended only to harass Cuevas for voicing his constitutional right to free speech when supporting Lopez's bid for Mayor."  (*Id.*).

To protect "his property" while appealing the citation, JLC removed the trucks from the property, only to have Diaz instruct the neighboring restaurant owner — who supported the Diaz campaign — to use "Cuevas'[s] property" as additional parking.  (*Id.* ¶ 21 (alteration added)).  Cuevas, in turn, began to tow unauthorized vehicles from his parking lot.  (*See id.* ¶ 22).  Thereupon, Diaz instructed the City police department to arrest Cuevas and any tow truck driver who engaged in removing the unauthorized cars.  (*See id.*).  Diaz also threatened to revoke licenses to work within the City limits of any tow truck company that agreed to work with Cuevas.  (*See id.*).

On the basis of these allegations, Cuevas asserts three claims for relief against Diaz and Sweetwater, only one of which is against Diaz and which is the subject of the Motion.  In Count I, titled "Violation of First Amendment Rights (Cuevas against Diaz)," Cuevas seeks damages pursuant to 42 U.S.C. section 1983 for Diaz's violation of Cuevas's First Amendment rights guaranteed under the First and Fourteenth Amendments to the U.S. Constitution.  (Am. Compl. 4, ¶ 24).  Cuevas alleges: he engaged in protected activity by voicing his support in a political race between Lopez and Diaz (*see id.* ¶ 25); Diaz retaliated against Cuevas by causing "his" business to be the subject of false code violations and a campaign of harassment by City police officers and other officials (*id.* ¶ 26); Cuevas's political speech was the moving force behind Diaz's actions, and Diaz would not have directed the unjustified and retaliatory action in the

3

absence of Cuevas expressing his support for Diaz's opponent (*see id.* ¶ 27); and the retaliatory activity was the direct result of Diaz's instruction and decision, and Diaz's retaliatory action was of such a degree that it would likely deter a person of ordinary firmness from engaging in such speech (*see id.* ¶ 28).

Diaz moves to dismiss Count I arguing it fails to state a constitutional claim against him, he is entitled to qualified immunity, and he cannot be sued in his official capacity when Sweetwater is also being sued. (*See generally* Mot.). In response, Cuevas acknowledges any official capacity claim against Diaz "is incorrect" and "should be dismissed or stricken." (Opp'n 3, n.1). The Court consequently does not address this issue and focuses solely on the sufficiency of the constitutional claim stated in Count I and Diaz's qualified immunity defense.

## II.    STANDARDS

Two standards of review are at issue. The first is the standard that governs motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). The second is the standard that governs the qualified immunity defense.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (alteration added) (quoting *Twombly*, 550 U.S. at 555). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). To meet this

"plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678 (alteration added) (citing *Twombly*, 550 U.S. at 556).

"[Q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Oliver v. Fiorino*, 586 F.3d 898, 904 (11th Cir. 2009) (alteration added) (quoting *McCullough v. Antonini*, 559 F.3d 1201, 1205 (11th Cir. 2009)). "Qualified immunity from suit is intended to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1254 (11th Cir. 2010) (citation and internal quotation marks omitted). Once a defendant establishes he was acting within the scope of his discretionary authority, plaintiff has the burden of showing qualified immunity is not appropriate. *See Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006) (quoting *Lumley v. City of Dade City, Fla.*, 327 F.3d 1186, 1194 (11th Cir. 2003)). Under the Supreme Court's two-part test for qualified immunity, a court must determine "whether plaintiff's allegations, if true, establish a constitutional violation," *Hope v. Pelzer*, 536 U.S. 730, 736 (2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); and whether the constitutional violation was "clearly established," *Saucier*, 533 U.S. at 201.

In suits brought under section 1983, such as this one, "the qualified immunity inquiry and the Rule 12(b)(6) standard become intertwined." *GJR Invs., Inc. v. Cnty. of Escambia, Fla.*, 132 F.3d 1359, 1366 (11th Cir. 1998) (citation omitted), *overruled on other grounds as recognized in Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010). A complaint alleging a section 1983 claim

"involving defendants who are able to assert qualified immunity as a defense shall now be held to comply with the standards described in *Iqbal*." *Randall*, 610 F.3d at 709. In other words, where a defendant raises the qualified immunity defense in a Rule 12(b)(6) motion, the court should grant the motion if the complaint does not allege a violation of a clearly established constitutional or statutory right. *See Williams v. Bd. of Regents of the Univ. Sys. of Ga.*, 477 F.3d 1282, 1300 (11th Cir. 2007) (citation omitted).

## III. DISCUSSION

"To survive a motion to dismiss based on retaliation for exercising rights under the First Amendment, [Plaintiff] had to allege facts establishing, first, that his speech or act was constitutionally protected; second, that the [Defendant's] retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." *Abella v. Simon*, 522 F. App'x 872, 874 (11th Cir. 2013) (alterations added; internal quotation marks omitted) (quoting *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005)). Political expression, including rights of speech and to petition for redress, receives the broadest protection under the First Amendment. *See id.* (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995)) (other citations omitted). With regard to the second prong, "[a] plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Bennett*, 423 F.3d at 1254 (alteration added). And as to the third prong, causal connection, a plaintiff must allege "his protected conduct was a 'motivating factor behind'" a defendant's alleged misconduct. *Abella*, 522 F. App'x at 874 (quoting *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008)). A plaintiff "must identify a sequence of events from which a retaliatory motive can be inferred, notwithstanding other non-retaliatory motives the defendant

may harbor." *Eisenberg v. City of Miami Beach*, 1 F. Supp. 3d 1327, 1344 (S.D. Fla. 2014) (citation, alteration and internal quotation marks omitted).

In his six-page Motion, Diaz challenges the second prong, given, he says, that Cuevas concedes he placed the window signs back on his property, refused to take down the signs weeks later, and persisted in his support of Lopez. (*See* Mot. 4). Diaz states the alleged retaliatory acts did not deter Cuevas from exercising his First Amendment rights, and further insists the third prong is not satisfied, as a causal connection does not exist between the retaliatory actions alleged and any adverse effect on speech given delays between the protected activity and the alleged adverse actions. (*See id.* 4–5). In his Reply, and after having been asked by the undersigned to address the *Abella* case (*see* Order [ECF No. 36]), Diaz raises for the first time the argument Cuevas is not the owner or operator of the Finishline Petroleum gas station, and so does not have standing to claim damages for whatever events involve the JLC property. (*See* Reply 2). Diaz also appears to take issue with the severity of the claimed harassing activities, asserting whatever alleged acts were directed to Cuevas personally rather than to JLC are insufficient to state a claim of First Amendment retaliation sufficient to withstand the qualified immunity defense. (*See id.* 3–6).

In making the argument the second prong is not satisfied, Diaz ignores the Eleventh Circuit carefully explained in *Bennett* why it was adopting the "ordinary firmness" test of other circuits, rather than the requirement a plaintiff show an actual adverse effect. The "ordinary firmness" test provides notice to government officials of when their retaliatory actions violate a plaintiff's First Amendment rights, while protecting government officials from claims involving mere *de minimis* inconvenience to the exercise of such rights. *See Bennett*, 423 F.3d at 1251–52. For example, in *Bennett*, plaintiff satisfied his burden of showing retaliatory conduct would

likely deter a person of ordinary firmness from the exercise of First Amendment rights where "[t]he alleged retaliatory acts complained of . . . include[d] a prolonged and organized campaign of harassment by local police officers," and "the record [was] replete with instances where the defendants followed, pulled over, cited, intimidated, or otherwise harassed the plaintiffs." *Id.* at 1254 (alterations added). In contrast, in *Thompson v. Hall*, the Eleventh Circuit found the "ordinary firmness" test was not satisfied where the harassment and intimidation alleged consisted, in part, of the intimidation of non-parties and allegations against unnamed police deputies who followed plaintiffs and patrolled their neighborhood. *See* 426 F. App'x 855, 859–60 (11th Cir. 2011).

The Amended Complaint amply states and describes activities constituting retaliatory conduct directed by Diaz that satisfy the second prong of the First Amendment retaliation claim. In response to Cuevas's exercise of constitutionally protected political speech, the cashier at the business of which Cuevas is president was advised by City police officers to take down the political signs Cuevas had put up, and when Cuevas placed those signs "back on his property," a mere three weeks later his business began receiving bogus citations for City code violations. (Am. Compl. ¶¶ 12–15). Two weeks later, the police officers asked Cuevas "if he didn't understand the message." (*Id.* ¶ 16). More harassing visits by police officers and a City employee ensued, "in an attempt to persuade Cuevas to remove the signs." (*Id.* ¶¶ 17–18).

Then, additional code violations ordered by Diaz to Cuevas's business followed. (*See id.* ¶¶ 19–20). During this time, Diaz instructed the neighboring business to park unauthorized cars on the gas station property, and further harassment and threats by Diaz to those who worked with Cuevas followed. (*See id.* ¶¶ 21–22). The facts alleged are similar to the harassing activities

described in *Bennett*, and are far removed from the insufficient acts directed to third parties and involving unnamed officers merely patrolling a neighborhood described in *Thompson*.

That some of the acts, such as code violations and directions given to the JLC cashier, involve JLC and not Cuevas directly does not defeat the sufficiency of the factual allegations supporting the second prong of the First Amendment retaliation claim.  A similar argument was raised by the defendant-town in *Ranize v. Town of Lady Lake, Florida*, No. 5:11-cv-646-Oc-32TBS, 2012 WL 4856749 (M.D. Fla. Oct. 12, 2012).  There, the plaintiff alleged the town violated his First Amendment rights by discharging his wife, a town police dispatcher, in retaliation for plaintiff's exercise of protected speech critical of the town's chief of police.  *See id.* at *1.  In answering the question whether the wife's termination from employment constituted an injury to the plaintiff-husband, the court noted "it is easy to understand how a spouse's termination could adversely affect the other spouse," and found plaintiff had alleged a sufficient injury.  *Id.* at *2.  The court relied on *Thompson v. North American Stainless, LP*, where the Supreme Court noted it was "obvious that a reasonable worker might be dissuaded from engaging in protected activity if she knew that her fianc[é] would be fired."  562 U.S. 170, 174 (2011) (alteration added).

Here, it is fairly obvious that Cuevas, as owner and operator of Finishline Petroleum, the gas station that JLC holds the permit for, and JLC's president, "might be dissuaded" from his continued support for Lopez in the face of the economic sanctions that began raining down upon the business.  Adverse effects upon the gas station in the form of bogus code violations and directives that the neighboring business park its cars on the gas station property would likely have adverse effects upon the person in charge of the gas station and its operations.

With regard to the third prong of the First Amendment retaliation claim, Cuevas clearly and plausibly alleges a causal connection between the described retaliatory actions and the adverse effects on speech. To establish a causal connection, Cuevas had to allege his protected conduct was a "motivating factor" behind Diaz's alleged misconduct. *See Gibbons v. McBride*, --- F. Supp. 3d ---, 2015 WL 5017021, at *23 (S.D. Ga. Aug. 21, 2015) (citations omitted). He was required in his pleading to "identify a sequence of events from which a retaliatory motive can be inferred, notwithstanding other non-retaliatory motives the defendant may harbor." *Id.* (citing *Eisenberg*, 1 F. Supp. 3d at 1344). Causation may be shown with "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory act, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lozman v. City of Riviera Beach*, 39 F. Supp. 3d 1392, 1405–06 (S.D. Fla. 2014) (citations omitted) (plaintiff's First Amendment retaliation claim relied on a series of retaliatory actions "of a very close temporal connection," including an arrest, multiple threatened arrests, repeated expulsion from city council hearings, an eviction action, an *in rem* action, and the destruction of his floating home).

Taken in the light most favorable to Cuevas, the Amended Complaint describes a number of instances in which Diaz directed police officers, a Sweetwater employee, and others, to cite, intimidate, and otherwise harass Cuevas and his cashier. The activities directed by Diaz all were undertaken in close temporal proximity with Cuevas's placement and replacement of political signs advertising Diaz's political opponent, Lopez. Officers Garsiga and Castro approached Cuevas's business within two to three days of the signs' original placement. (*See* Am. Compl. ¶ 12). Bogus code violations were issued within a few weeks (*see id.* ¶ 14), and the police officers returned within two weeks of the code violations, asking if Cuevas "didn't understand the

message" (*id.* ¶ 16). Cuevas alleges his political speech was the moving force behind these and other acts directed by Diaz. (*See id.* ¶ 27). "Numerous courts have found that harassment in the form of constant monitoring, investigating or issuance of violations can contravene First Amendment rights." *Hollywood Cmty. Synagogue, Inc. v. City of Hollywood, Fla.*, 430 F. Supp. 2d 1296, 1316 (S.D. Fla. 2006) (citing cases). Cuevas more than adequately alleges the necessary causal connection.

With regard to Diaz's qualified immunity defense, Cuevas plausibly alleges with supporting and detailed facts the three elements of a First Amendment retaliation claim. Further, "since at least 1988 . . . it is 'settled law' that the government may not retaliate against citizens for the exercise of First Amendment rights." *Bennett*, 423 F.3d at 1256 (alteration added; citation omitted). Cuevas's allegations conform to the Eleventh Circuit's requirements and are sufficient to abrogate Diaz's qualified immunity.

## IV.    CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** the Motion **[ECF No. 28]** is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 28th day of October, 2015.

_____

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

11

621 F.Supp.3d 233
United States District Court, D. New Hampshire.

Brett A. CURRIER & Brenda L. Currier

v.

TOWN OF GILMANTON & Marshall E. Bishop

Civil No. 18-cv-1204-LM
|
Signed August 15, 2022

**Synopsis**
**Background:** Former member of town board of selectmen and his spouse brought action against town and town selectman, who had defeated former member in an election, alleging various claims, including defamation under New Hampshire law, violation of New Hampshire's Right to Know Law, and § 1983 claim for First Amendment retaliation. Defendants moved for summary judgment.

**Holdings:** The District Court, Landya B. McCafferty, J., held that:

there was no evidence that certain alleged defamatory statements ever occurred, precluding defamation claim;

selectman was entitled to statutory government employee immunity under New Hampshire law;

former selectman and his wife were limited purpose public figures for purposes of defamation claims;

none of alleged defamatory statements were made with actual malice, precluding defamation claims; and

alleged instances of retaliation did not rise to the level of adverse action, precluding First Amendment retaliation claim.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion for Summary Judgment.

**Attorneys and Law Firms**

**\*240** Leslie H. Johnson, Law Office of Leslie H. Johnson PLLC, Center Sandwich, NH, for Brett A. Currier & Brenda L. Currier.

Brian J.S. Cullen, Jonathan M. Shirley, Cullen Collimore Shirley PLLC, Nashua, NH, Demetrio F. Aspiras, III, Drummond Woodsum, Manchester, NH, for Town of Gilmanton.

Dona Feeney, Friedman Feeney, PLLC, Concord, NH, Francis X. Quinn, Jr., Boynton Waldron Doleac Woodman & Scott PA, Portsmouth, NH, for Marshall E. Bishop.

**ORDER**

2022 DNH 098

Landya B. McCafferty, United States District Judge

 **\*241**  Brett and Brenda Currier filed suit against the Town of Gilmanton and one of its Selectmen, Marshall E. Bishop. The Curriers allege that defendants defamed them on numerous instances, violated New Hampshire's Right-to-Know law, and retaliated against them for exercising their constitutional rights to free speech under the First Amendment of the United States Constitution and Part I, Article 22 of the New Hampshire Constitution. Defendants move for summary judgment on all claims. Doc. no. 40. The Curriers object. For the following reasons, the court grants defendants' motion in part and denies it in part.


## BACKGROUND

Gilmanton is a rural town of fewer than 4,000 residents. A three-person Board of Selectmen runs the town. Each Selectman's term lasts three years, and elections are held in March.

Brenda and Brett Currier are longtime Gilmanton residents. Brenda is a fifth-generation resident, and Brett has lived in Gilmanton since 1981. Over the years, both Brett and Brenda have been active in the community. Brenda has worked as a secretary in the local police department, as a classroom aide and receptionist at Gilmanton School, as an EMT for the fire department, and as a ballot clerk. Brett has served on the town's Budget Committee and as a volunteer firefighter.


I. Gilmanton Board of Selectmen 2012-2016
In 2012, Brett was elected to a three-year term on the Board of Selectmen. He ran on a platform of keeping taxes low. The following year, in 2013, Gilmanton's residents elected Don Guarino. Brett supported Guarino's campaign because he agreed with Guarino's politics. Together, Brett and Guarino formed a voting majority on the three-person Board.

After the 2013 election, the Board made several changes to town operations. The Board hired Guarino's sister-in-law, Stephanie Fogg, to fill a part-time administrative position. The Board hired a new repairperson who had been recommended by Brett to work an hour or two per week. The Board also changed the composition of the Gilmanton Planning Board, choosing not to reappoint its longtime chairperson.

In 2014, Steven McCormack was elected to the Board, joining Brett and Guarino. Brett had not supported McCormack's candidacy, as McCormack was more liberal than Brett.

In 2015, Brett ran for reelection, but he lost to Michael Jean. Thus, by the summer of 2015, the Board consisted of McCormack, Guarino, and Jean. Among other actions, the Board elevated Stephanie Fogg's position to full-time with benefits.


II. The Leak
In the summer of 2015, the Gilmanton Chief of Police decided to retire. Brett and Brenda's son was a police officer in Gilmanton, and they felt he should be next in line for the Chief's position. Brett heard news of the impending retirement both from the Chief directly, and from his son.

The Chief informed the Board of his retirement in a nonpublic meeting. McCormack—a sitting Selectman—then came to the Curriers' camp where they were on  **\*242**  vacation and told them about the Chief's retirement, even though the news of the retirement was not yet public. McCormack further indicated that the job opening would be posted to the public. Brett was upset, both because McCormack leaked this information to him, and because the job would be posted to the public instead of automatically going to his son. Brenda, too, was upset, as she had not yet heard the news. Brett felt that the news "ruin[ed] [their] weekend." Doc. no. 40-13 at 12.

2022 DNH 098

and Brenda took action. Brenda wrote multiple letters to a local newspaper, the Laconia Daily Sun, and emailed directly with one of its reporters. Brett demanded that McCormack resign. When McCormack ultimately acquiesced, Brett volunteered to take his seat. The two remaining Board members, however, needed to agree on the appointment to fill McCormack's vacant seat. Guarino supported Brett's appointment, but Jean (who had just defeated Brett in the most recent election) opposed it. Thus, the Board appointed someone else to fill the temporary position for a year. Nonetheless, the Curriers' son was appointed Chief of Police in November 2015.

III. The 2016 Election and its Aftermath

Due to McCormack's resignation, there were two open Board seats in the 2016 election: the remaining one-year term of McCormack's seat, as well as the three-year seat held by Guarino. Guarino ran for reelection for the three-year term, and Brett ran for the one-year seat. Brett and Guarino supported each other in the campaign.

They both lost. Brett lost to Marshall Bishop, a relative newcomer to the town who owned and operated the Gilmanton Winery and Vineyard. Guarino lost to long-time resident Steve McWhinnie. Thus, after the election Bishop, McWhinnie, and Jean sat on the Board.

The new Board revisited some of the personnel matters decided by the previous administrations. Previously Stephanie Fogg had taken minutes in Board meetings, but the Board decided to have Heather Carpenter take minutes instead. In addition, the new Board voted to return Fogg's position to part time. Rather than work part time, Fogg went on leave and ultimately resigned. (Fogg later sued Gilmanton, asserting that she had been retaliated against for whistleblowing; the case settled with no admission of fault.) Finally, the Board terminated the repairperson who had been hired during Brett's tenure because the repairperson did not carry liability insurance.

The Curriers, Guarino, and Guarino's wife were angry at the personnel changes. They began appearing at Board meetings to question the new Board's agenda and at times made lengthy statements. [1]

The personnel dispute spilled over into the press. On June 10, Brenda sent a Laconia Daily Sun reporter audio of a Board meeting she had recorded. On June 13 the Daily Sun published a letter to the editor from Brett, entitled "Our selectmen are inexperienced & it's leading to many missteps." Doc. no. 40-15. Brett prefaced the letter by stating that contrary to the assertions of various letter writers and **\*243** comments in the paper, he was not upset about losing the 2016 election. Instead, he asserted that he was concerned about the personnel issues, arguing that various people—including Fogg—had lost their jobs because "they dared to speak up" and that the new Selectmen had "calculated vendettas against targeted people." Id. at 2.

On June 30, Brenda emailed the reporter what Brenda described as "a very brief summary of the goings on of the Selectmen and their illegal meetings regarding employees." Doc. no. 40-9 at 1. In the email, Brenda claimed that Fogg had been fired because of her relationship to the Guarinos. She also claimed that the Board had instituted various other personnel changes because of a "political vendetta." Id. Finally, Brenda claimed that the Board had been holding illegal meetings—that is, private meetings that had not been publicly posted. Brenda asked the reporter to keep Brenda's name out of the article.

IV. The Winery

In early May 2016, Brett visited Bishop at Bishop's winery. Brett wanted to talk to Bishop because he was concerned about the change to Fogg's position, and he also had a concern about Carpenter's meeting minutes. Brett advised Bishop "to be careful because he [was] not invincible in that position" and told him "not to get hung up and out to dry ... and get sued by Mrs. Fogg." Doc. no. 40-3 at 17. Brett pointed out that Bishop had "a lot to lose." Id. Brett says that the visit was "cordial." Id. Bishop, however, perceived the visit as a direct threat to his family's home and his livelihood.

Also that month, Brenda approached Bishop during a break in a public meeting and asked him to remove a sign advertising the winery from a property that she owned and where her mother lived. She asserted that her family wanted the sign removed

because they were unhappy with the Board's treatment of Fogg. After Bishop moved the sign to an adjacent property, Brenda challenged whether Bishop had the proper permits to display it.

The dispute over permits for Bishop's sign led Brenda to question whether Bishop had the proper permits for his restaurant. In June, Brenda made various Right-to-Know requests for documents related to the winery's permitting. Brenda then asked the Planning Board to research whether Bishop had the proper permits.

The Curriers also called into question the winery's septic system. Brett contacted the New Hampshire Department of Environmental Services to challenge the permitted use of the winery's septic system. Brenda wrote a letter to the Board in July stating that the septic system could not support the 40-seat restaurant and asserting that the winery was "potentially creating a health risk" that "could put the Town of Gilmanton in legal jeopardy if no action is taken." Doc. no. 40-20 at 1.

Against this backdrop, in late June, Gilmanton Town Administrator Paul Branscombe wrote to the County Attorney asking for review of the situation. Branscombe wrote: "We need the County Attorney to review a situation here in Town where a Selectman is being Harassed by a Resident ... the wife of the chap who lost in the running last March." Doc. no. 40-3.

After the County Attorney declined to intervene, Bishop wrote to the New Hampshire Attorney General. Bishop wrote that since the election, Brett and Brenda had "threatened [him] and [his] livelihood." Doc. no. 40-4. Bishop also outlined the Right-to-Know requests the Curriers had made, and asserted the Curriers were utilizing the law for harassment. Bishop asked the Attorney General if there was anything he could do to end the alleged threats and harassment.

 **\*244** Bishop also wrote a letter to the Department of Environmental Services explaining the winery's operation and capacity. Bishop then published a version of his letter as an open letter in the Daily Sun, entitled "Mr. Currier is not doing this over a concern for the environment." Doc. no. 40-6. Bishop asserted that since the 2016 election, Brett and Brenda "have tried in every way to disrupt the Board of Selectmen meetings and constantly [used] the 'Right to Know' law for other than the reason it was intended." Id. at 2.

In July, Brenda attended a Board meeting and asked the Board to issue a cease-and-desist order to close the winery. She also submitted a Right-to-Know request for town communications with any state agency regarding the winery.

In early August, the Daily Sun published an article reporting that Jean had been ousted as the head of the Board. The article said that Gilmanton's other two Selectmen had voted to oust Jean and had installed Steve McWhinnie as the new chairman. It noted that "[a]ccording to Jean, the ongoing complaints made by Brett and Brenda Currier about the way the selectmen handle themselves and their accusations against Selectmen Marshall Bishop and the Gilmanton Winery [were] behind the recent push." Doc. no. 42-14 at 2. Further, the article stated that "Jean said [Bishop], who made the motion to oust him, was tired of being 'beat up' in public by the Curriers, but Jean said he thinks getting tossed around a little bit is part of being a selectman and a publicly elected official." Id. at 3.

On August 12, Brenda contacted the New Hampshire Liquor Commission, stating that she believed the information Gilmanton gave the commission about the winery permitting was incorrect. That same day, she contacted the Planning Board's chairperson to ask about the winery's permits.

Around that time, a friend of the Curriers, Al Blake, wrote a series of letters critical of the winery that were published in the Daily Sun. On August 15, Bishop responded with a letter, also published in the Daily Sun, entitled, "I have all the permits needed to operate our winery & restaurant." Doc. no. 42-6. Bishop began the letter stating that although he generally believed "tit for tat" letters like this were not productive, he felt he needed "to set the record straight from [his] perspective and then the taxpayers and residents of the Town of Gilmanton can make their own judgments." Id. He wrote that since the 2016 election, "the incoming [B]oard has been inundated by constant remarks and threats against us by a small group of people, primarily from former selectmen Currier, Don [Guarino] and their wives, along with commentaries from Al Blake." Id. He admitted that

the new Board had made mistakes during its learning curve, but wrote that he "never expected former selectmen's wives calling us 'despicable,' liars, thieves and everything in-between at a town meeting." Id.

In late August, Brenda wrote a letter to the Daily Sun to correct what she viewed as inaccuracies in an earlier Daily Sun article about the winery dispute. Brenda discussed the Planning Board and the permitting process, and then wrote "I'm sure the public is just as sick of reading my letters as I am sick of writing them." Doc. no. 40-25.

Also in late August, a town resident named Carolyn Baldwin published a letter entitled "Restore decorum in Gilmanton" in the Concord Monitor. Doc. no. 42-7. She wrote that "defeated candidates for selectmen have engaged in concentrated efforts to undermine the work of sitting selectmen" and that "one sore loser and his spouse have engaged in open threats to selectman Marshall Bishop." Id.

**\*245**  Ultimately, the Planning Board issued a cease-and-desist order that would have closed the winery over Thanksgiving. Bishop then sued the town and obtained an injunction to prevent the closure. On November 30, the Daily Sun published an article quoting Bishop's claim that the Curriers were taking out "their own personal grudges on him and his business." Doc. no. 42-8 at 2. Bishop's suit against the town ultimately settled.

## V. "Support the Police" Signs

In the March 2017 election, Guarino challenged Bishop for his Board seat. Gilmanton's residents reelected Bishop for a full three-year term. In December of that year, the Board (still Jean, McWhinnie, and Bishop), directed the Chief of Police (the Curriers' son) to provide the Board information on hiring and schedules and proposed a budget that would move funds from the police department to legal expenses.

In response to the proposed cut to the police budget, the Curriers erected a sign on their property proclaiming, "Support the Police even if the Selectmen Don't." Other residents in town posted similar signs. At the time, a town zoning ordinance required permits for certain signs, and further provided that "[o]nly signs advertising a business or industry in the Town of Gilmanton shall be permitted." Doc. no. 40-27.

In January 2018, Heather Carpenter (who was then the Assistant Town Administrator) received a complaint from a resident about the signs, but the resident was reluctant to file a formal complaint. Carpenter states that the resident told her "he did not want to incur the wrath of one of the residents," which Carpenter interpreted as referring to Brenda. Doc. no. 40-34. Carpenter states that she therefore submitted the complaint in her own name because she was a resident and a complaint could only move forward if it was signed.

In early February, Brenda came to Town Hall to request a copy of the signed complaint. Carpenter met with Brenda and gave her a copy. Carpenter told Brenda that she "did not want to see [her] name slandered on Facebook." Doc. no. 40-34 at 2. Brenda then filed a formal complaint to the town about Carpenter, claiming that Carpenter had used "threatening words and tone of voice" during the interaction. Id. Carpenter later submitted a second complaint to the Code Enforcement Department about the signs. Id.

On February 14, Bill Tobin, the Town's Code Enforcement Officer, sent letters to several people with the "Support the Police" signs, including the Curriers and the Guarinos, stating that the signs violated the town zoning ordinance. Doc. no. 40-10. The letters asserted that state law defined a political sign as one which "expressly or implicitly advocates the success or defeat of any party, measure or person at any election" and that the Support the Police signs did not appear to fall into this definition. Id. The letters stated that the signs had to be removed by February 22, or the recipients would be fined $275/day.

The Curriers contacted the ACLU for help. The ACLU sent a letter to the town asserting that the Code Enforcement Officer's letters violated state and federal law and requested that they be retracted immediately. The ACLU's letter asserted that the signs were political, and that Gilmanton's ordinance banning individuals from placing political signs on their property violated the First Amendment. The ACLU also noted that the town appeared to have only sent letters to individuals with the anti-Board

*Currier v. Town of Gilmanton, 621 F.Supp.3d 233 (2022)*

2022 DNH 098

signs, and not to individuals with signs expressing other political views. The ACLU argued that such viewpoint discrimination was patently unconstitutional. **\*246** Finally, the ACLU stated that the town appeared to misunderstand the state law concerning political advertising, noting that it did not apply to signs erected by a private person on their private property.

In early March, the town acquiesced. The Curriers received a letter from Selectman McWhinnie stating that the Board had voted to retract the sign removal order. The Curriers had not been fined, though they had removed the sign for one night to add wording to attempt to make it conform to what the original letter had said about political signs.

VI. <u>Closure of Town Hall</u>

Throughout the sign dispute, Brenda continued to file Right-to-Know requests, including two on February 21 and 22, 2018. Brenda and Carpenter spoke on February 21 when Brenda went to Town Hall to obtain the second sign complaint. Brenda and Carpenter each described their interaction differently. Carpenter asserted that she "told Brenda again that [she] did not want to have [her] name slandered on Facebook." Doc. no. 40-34 ¶ 6. Brenda asserted that Carpenter had "acted in a hostile and threatening manner." <u>Id.</u> at ¶ 9.

Two days later, Carpenter complained to the Board that she felt unsafe working at Town Hall. She stated that there were no physical barriers to separate staff from the public, and "with the growing controversy about the police signs, [the employees] began to feel like things could easily boil over into physical violence against [them]." Doc. no. 40-34 at 2. In her declaration, Carpenter states that she believed a small group of residents—led by Brenda—were making Town Hall unsafe. She states that this group of residents was "visiting Town Hall multiple times a day on a rotating basis" to request public records, and that the "frequency and amount of requests convinced [her] that the requests were not being made for any genuine purpose, but rather to interrupt and interfere with the ability of staff to get work done." <u>Id.</u> at 2-3.

The Board held an emergency meeting that day and decided to close Town Hall for the remainder of the day. That evening, the Board conducted another emergency meeting and decided to renovate the building to add a physical barrier between staff and members of the public. In the meantime, the Board decided to keep the front door of Town Hall locked and require visitors to use the back entrance and buzzer system to access the building. The town posted a scrolling banner on its website stating that the front entrance of Town Hall was closed due to "safety concerns."

Brenda acknowledged that the website banner did not name her specifically, but states in her deposition that Bishop mentioned her by name at the emergency meeting and people then repeated what he had said.

In early March, the Board issued a press release about the closure of Town Hall entitled "Setting the Record Straight to Move Forward." Doc. no. 40-29. In it, the Board stated that on February 23, Town Hall employees "received an overwhelming number of requests for information" and that "[t]he volume of these requests essentially prevented these employees from performing their regular duties." <u>Id.</u> In addition to the volume of requests, the Board asserted that "the conduct of some of the individuals who came to the Town office to make requests, created an environment in which Town employees did not feel that they could effectively perform their duties." <u>Id.</u>

VII. <u>Ballot Clerk</u>

In the past, Brenda had frequently served as a town Ballot Clerk in local and national elections. As the March 2018 election rolled around, Brenda responded to a **\*247** request for ballot clerks stating she was available for the whole day. The town did not appear to respond. Brenda then wrote to confirm her hours for election day, and the town responded that it already had enough volunteers and did not need her help. Brenda returned as a ballot clerk the following year, in 2019.

VIII. <u>Damages</u>

*Currier v. Town of Gilmanton, 621 F.Supp.3d 233 (2022)*

2022 DNH 098

As a result of defendants' conduct, Brenda claims that she has suffered from stress and a lack of sleep, which have caused her to increase her prescription Xanax dosage. Brenda also states that she stopped going to Town Hall and Board meetings because of defendants' conduct, and thus her First Amendment rights were chilled. Both Brett and Brenda concede that the alleged harm to their reputations has not impacted their ability to work or find jobs.

IX. <u>Claims</u>

The Curriers bring the following legal claims:

   • Count I: Defamation

   • Count II: Violation of New Hampshire's Right to Know Law, RSA 91-A

   • Count III: First Amendment retaliation, 🚩 42 U.S.C. § 1983

   • Count IV: Retaliation under the New Hampshire Constitution's right to freedom of speech, N.H. Const. Pt. 1, Art. 22

They seek numerous types of relief, including compensatory damages, punitive damages, attorney fees, and various injunctions.

**LEGAL STANDARD**

The court must grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing the record, the court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. 🚩 Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 115 (1st Cir. 2013). "When the motion is premised upon the absence of any genuine issue of material fact, the burden shifts to the nonmovant to identify, by means of materials of evidentiary quality, an issue of fact that is 'more than merely colorable.' " Faiella v. Fed. Nat'l Mortg. Assoc., 928 F.3d 141, 145 (1st Cir. 2019).

**DISCUSSION**

Defendants move for summary judgment on all the Curriers' claims. As to Count I—defamation—defendants assert various legal arguments, including that some of the Curriers' allegations are not supported by evidence in the record, that various immunity doctrines protect defendants, and that the Curriers are limited-purpose public figures. The court agrees with defendants, and grants summary judgment for defendants on every instance of alleged defamation. As to Count II—violation of New Hampshire's Right-to-Know law—defendants argue that the Curriers are not entitled to any of the permissible statutory remedies. The court again agrees, and grants summary judgment on Count II. For Count III—First Amendment retaliation under § 1983—defendants argue that Bishop is not responsible for any of the alleged instances of retaliation, and that Gilmanton cannot be held vicariously liable for the actions of its employees. On this count, the court grants summary judgment in part and denies it in part, finding that a genuine issue of material fact exists as to whether some of the alleged instances of retaliation can be properly attributed to Gilmanton under 🚩 Pembaur v. City of Cincinnati, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Finally, as to the free speech claim premised on the New Hampshire Constitution—Count **\*248** IV—the court dismisses it without prejudice because this court is not the proper forum for a plaintiff to seek to expand the scope of remedies available for alleged violations of state constitutional rights.

**I. <u>Defamation</u>**

*Currier v. Town of Gilmanton, 621 F.Supp.3d 233 (2022)*

2022 DNH 098

Under New Hampshire law, a plaintiff proves defamation by showing that defendants failed to exercise reasonable care in publishing, without a valid privilege, a false and defamatory statement of fact about the plaintiff to a third party. Pierson v. Hubbard, 147 N.H. 760, 763, 802 A.2d 1162 (2002). Publication means communication of the statement to a third party. Duchesnaye v. Munro Enters., Inc., 125 N.H. 244, 253, 480 A.2d 123 (1984). A statement is defamatory if it "tends to lower plaintiff in the esteem of any substantial and respectable group of people." Moss v. Camp Pemigewassett, Inc., 312 F.3d 503, 507 (1st Cir. 2002) (quoting Nash v. Keene Publ'g Corp., 127 N.H. 214, 219, 498 A.2d 348 (1985)).

Though the elements of defamation are defined by state law, the United States Supreme Court has read the First Amendment to impose additional limitations in defamation cases. Gray v. St. Martin's Press, Inc., 221 F.3d 243, 248 (1st Cir. 2000). Two of those limitations are discussed below: nonactionable statements of opinion, and limited purpose public figures.

The Curriers allege 42 instances of defamation: 26 separate instances in their amended complaint, doc. no. 21 ¶¶ 244-46, and another 16 instances in their answers to interrogatories, doc. no. 40-32 at 3-5. Some of the additional 16, however, just repeat instances alleged in the complaint. The court grants summary judgment for defendants as to every alleged instance of defamation. The court outlines the various issues plaguing the alleged instances of defamation, noting that many of them fail for multiple reasons.

A. Many of the alleged instances of defamation suffer from lack of proof.

As a threshold matter, defendants argue that there is no evidence in the record that would permit a reasonable jury to conclude that many of the instances of defamation occurred.

As noted above, when a motion for summary judgment is "premised upon the absence of any genuine issue of material fact, the burden shifts to the nonmovant to identify, by means of materials of evidentiary quality, an issue of fact that is 'more than merely colorable.' " Faiella, 928 F.3d at 145; see also Fed. R. Civ. P. 56(c). "In seeking to forestall the entry of summary judgment, a nonmovant may not rely upon allegations in its pleadings." Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 174-75 (1st Cir. 1994).

Many of the instances of defamation alleged in the complaint are not supported by any evidence in the record. Moreover, these instances supposedly occurred during conversations at which the Curriers themselves were not present, and thus even had the Curriers attested to these allegations in their depositions or declarations, they would be hearsay that the court could not consider in deciding summary judgment. See Hannon v. Beard, 645 F.3d 45, 49 (1st Cir. 2011) ("It is black-letter law that hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted.").

For example, the Curriers allege that during the summer of 2016, someone identified only as "DW" overheard Bishop say "ya, the Curriers are causing me problems. The Curriers are used to being in power and now they are losing their power since **\*249** I beat Brett by 77 votes." Doc. no. 21 ¶ 244(C). Similarly, the Curriers allege that on February 27, 2018, Bishop had a conversation at a local restaurant where he stated, among other things, that "Heather [Carpenter] feels threatened by Mrs. Currier because she was talking over her and in her personal space." Id. at ¶ 244(N). In their complaint, the Curriers claim to have heard about this statement from someone named "Mrs. Smithers," but they offer no affidavit from "Mrs. Smithers" attesting to hearing it. Likewise, the Curriers allege that at Gilmanton Old Home Day, Bishop told someone referred to only as "RM" that the Curriers were to blame for "all of it." Id. at ¶ 244(P). Yet again the Curriers do not cite to any affidavit from RM or any other listener with personal knowledge of Bishop making this statement. The Curriers have not cited any evidence that any of these alleged statements by Bishop ever took place.

The court thus grants summary judgment in defendants' favor as to all the following alleged instances of defamation because they not supported by admissible evidence: doc. no. 21 ¶ 244(A); ¶ 244(C); ¶ 244(F); ¶ 244(G); ¶ 244(L); ¶ 244(N); ¶ 244(O);

¶ 244(P); ¶ 244(Q); ¶ 244(R); ¶255(S); ¶ 244(V); ¶ 244(X) [2] ; 244(Z); doc. no. 40-32 7(A)(1), 7(A)(2), 7(A)(4), 7(A)(5), 7(A) (6), 7(A)(9), 7(D).

   B. The claims against the Town of Gilmanton are barred by RSA 507-B.

Next, defendants contend that that the Curriers' defamation claims against the Town of Gilmanton are barred by RSA 507-B. "Various concepts of immunity exist under both common law and statutory law to protect governmental entities and public officials from liability for injury allegedly caused by official conduct." Everitt v. Gen. Elec. Co., 156 N.H. 202, 209, 932 A.2d 831 (2007). As relevant here, RSA 507-B:5 provides: "No governmental unit shall be held liable in any action to recover for bodily injury, personal injury or property damage except as provided by this chapter or as is provided or may be provided by other statute." The statute defines "personal injury" to include "libel, slander, or the publication or utterance of other defamatory or disparaging material." RSA 507-B:1. The New Hampshire Supreme Court has construed RSA 507-B:5 as providing immunity for municipal employees only where the official "acted within the scope of his official duties and ... 'reasonably believe[d], at the time of the acts or omissions complained of, that his conduct was lawful.' " Farrelly v. City of Concord, 168 N.H. 430, 448, 130 A.3d 548 (2015) (quoting RSA 541-B:19, I(d)).

The Curriers allege that Gilmanton is vicariously liable for various statements by town employees related to the February 2018 closure of Town Hall. The undisputed record reveals that, when Town Hall was closed, there was a sign on the door stating, "Due to Increased Safety Concerns for our Employees, Please Buzz in for Assistance." Doc. no. 42-28. Similarly, a banner on the front page of the town website read: "DUE TO SAFETY CONCERNS, FRONT ENTRANCE OF THE ACADEMY BUILDING IS CLOSED." Doc. no. 42-26. In the following weeks, the town issued a press release entitled "Setting the Record Straight to Move Forward," **250 explaining the closure of Town Hall. Doc. no. 40-29. Gilmanton's press release stated that on February 23, Town Hall employees "received an overwhelming number of requests for information" that "essentially prevented these employees from performing their regular duties." Id. It explained that the "volume of these requests, together with the conduct of some of the individuals who came to the Town office to make requests, created an environment in which Town employees did not feel that they could effectively perform their duties." Id. An article in the Union Leader later quoted the press release. Doc. no. 42-27.

The Curriers allege all these statements are defamatory. Yet they point to no evidence suggesting that the various employees did not reasonably believe that their conduct was lawful. See Farrelly, 168 N.H. at 448, 130 A.3d 548; Huckins v. McSweeney, 166 N.H. 176, 182, 90 A.3d 1236 (2014). Even construing the facts and reasonable inferences in the light most favorable to the Curriers, the court finds that Gilmanton is entitled to immunity under RSA 507-B:5. Accordingly, the court grants defendants' motion for summary judgment on the following alleged instances of defamation: Doc. no. 21 ¶ 244(T); ¶ 244(U); ¶ 244(W); doc. no. 40-32 ¶ 7(C).

   C. The claims against Bishop in his official capacity are barred by RSA 507-B:4, IV.

Next, defendants argue that the claims against Bishop in his official capacity are also barred by statutory immunity. Similar to immunity for local government entities, New Hampshire law also grants immunity to government employees acting in their official capacities. Specifically, the version of RSA 507-B:4, IV in effect during the relevant time period granted immunity for a present or former municipal employee "so long as said employee or official was acting within the scope of his office and in good faith." RSA 507-B:4, IV (2008) (amended May 29, 2018). As Judge DiClerico pointed out, the "statute does not define 'good faith,' and the New Hampshire Supreme Court has not addressed the meaning of 'good faith' for purposes of RSA 507–B:4, IV, in a published decision." Holm v. Town of Derry, No. 11-cv-32-JD, 2011 WL 6371792, at *3 (D.N.H. Dec. 20, 2011). "In the face of similar silence regarding the definition of the term 'good faith' in New Hampshire's Whistleblowers' Protection Act, ... the New Hampshire Supreme Court explained" that it gives "a statutory term that is not defined its plain and ordinary meaning." Crosby v. Strafford County Dept. of Corrs., No. 12-cv-383-LM, 2015 WL 3484912, at *6 (D.N.H. June 2, 2015). This court

previously concluded, therefore, that "if asked to do so in the context of RSA 507–B:4, IV, the New Hampshire Supreme Court would define 'good faith' as 'honesty in belief or purpose' and 'faithfulness to one's duty or obligation.' " Id. (citing Black's Law Dictionary 808 (10th ed. 2014)). Thus, to avoid summary judgment on the statements that Bishop made in his official capacity, the Curriers must produce evidence that he failed to act in conformity with the standard of conduct described above.

The statements the Curriers complain about relevant to RSA 507-B:4, IV are undisputed. They fall into two general categories: Bishop's statements describing the Curriers' conduct at board meetings, and his statements relating to the Town Hall closure. In the first category, for example, the Curriers assert that in an August 4, 2016 Laconia Daily Sun article, Bishop was quoted as saying that Brenda's comments at town meetings got "out of hand." Doc. no. 21 ¶ 71. In another Laconia Daily Sun article—this one dated August 15, 2016—Bishop was quoted as saying that the "incoming board has been **251** inundated by constant remarks and threats against us by a small group of people, primarily from former selectmen Currier, Don Guarino and their wives, along with commentaries from Al Blake." Doc. no. 40-7 at 1. Further, he stated that he "never expected former selectmen's wives calling us 'despicable,' liars, thieves and everything in-between at a town meeting." Id.

As to the second category—statements about the Town Hall closure—the Curriers allege that Bishop would "answer when asked if there had been a threat, by referring the person to the ["Setting the Record Straight to Move Forward" press release], still implying there were employee safety issues, after repeatedly publicly referencing Mrs. Currier as the cause." Doc. no. 21 ¶ 198.

Bishop is entitled to immunity if he was acting (1) within the scope of his office, and (2) in good faith. All of the relevant statements regarded town business—i.e., Board meetings and the status of Town Hall. The Curriers neither argued nor produced any evidence that Bishop was acting outside the scope of his office when he was describing official town business. Thus, Bishop is protected by governmental immunity so long as his statements were made in good faith.

The court finds that there are no material facts in dispute on the question of whether Bishop's statements about the Currier's conduct at board meetings and the closure of Town Hall were made with "honesty in belief or purpose" and with "faithfulness" to Bishop's duty as a Selectman. See Crosby, 2015 WL 3484912, at *6. Based on the undisputed evidence in the record, the court finds that Bishop acted honestly when describing that Board meetings got "out of hand" and stating that he did not expect to be called a liar or a thief at a town meeting. Notably, the Curriers concede that Brenda did make a statement calling the selectmen " 'despicable,' liars thieves and everything in-between"—which she asserts was her opinion about the selectmen and their job performance. Doc. no. 21 ¶ 81. The only contested part of the statement, then, is whether Bishop "never expected" Brenda to make that statement. The court finds that Bishop's statement was made with honesty in belief or purpose. See Crosby, 2015 WL 3484912, at *6. Similarly, the court finds that Bishop's statements about the closure of Town Hall—which indicated that Brenda was the reason for it—were made in good faith. Bishop referred questioners to the town's official press release, and stated that there had been employee safety issues. Heather Carpenter's declaration makes clear that she did feel unsafe at Town Hall. See doc. no. 40-34 ¶ 10. Thus, there is no dispute of fact that Bishop's statements on these issues were made in good faith. The court grants defendants' motion for summary judgment on the following alleged instances of defamation: doc no. 21 ¶ 244(F), (H), (V), (Y); doc. no. 40-32 ¶ 7(A)(3).

D. The Curriers are limited purpose public figures with respect to the winery dispute and they have not shown actual malice.

i. Public figure status

Next, defendants contend that the Curriers are limited purpose public figures with respect to the winery dispute, and therefore must prove that defendants acted with actual malice by clear and convincing evidence.

"Under the taxonomy developed by the Supreme Court, private plaintiffs can succeed in defamation actions on a state-set standard of proof (typically, negligence), whereas the Constitution imposes a higher hurdle for public figures and requires them

to prove actual malice." 🚩 **\*252** Pendleton v. City of Haverhill, 156 F.3d 57, 66 (1st Cir. 1998). "Actual malice" requires a showing that the statement was made with "knowledge that it was false or with reckless disregard of whether it was false or not." 🚩 Llubueres v. Uncommon Prods., LLC, 663 F.3d 6, 12 (1st Cir. 2011) (quoting 🚩 N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Private individuals, in contrast, enjoy a more lenient standard because they have "relinquished no part of [their] interest in the protection of [their] good name," and thus are "more deserving of recovery." 🚩 Thomas v. Tel. Publ'g Co., 155 N.H. 314, 341, 929 A.2d 993 (2007) (quoting 🚩 Gertz v. Robert Welch, Inc., 418 U.S. 323, 345, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)).

The U.S. Supreme Court "has created two subclassifications of public figures: (1) persons who are public figures for all purposes; and (2) so-called limited-purpose public figures who are public figures for particular public controversies." 🚩 Thomas, 155 N.H. at 340, 929 A.2d 993 (citing 🚩 Gertz, 418 U.S. at 351, 94 S.Ct. 2997). "As to the second group, individuals may become limited-purpose public figures when they 'have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.' " 🚩 Id. at 341, 929 A.2d 993 (quoting 🚩 Gertz, 418 U.S. at 345, 94 S.Ct. 2997). "Courts make the limited-purpose public figure determination 'by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation.' " 🚩 Id. (quoting 🚩 Gertz, 418 U.S. at 352, 94 S.Ct. 2997). Determining whether an individual is a public or private figure is a question of law. 🚩 Id.

The first step of the limited purpose public figure analysis is to isolate the public controversy. 🚩 Lassonde v. Stanton, 157 N.H. 582, 590, 956 A.2d 332 (2008). "Identification of the implicated public controversy is not a mere formality because the scope of the controversy in which the plaintiff involves himself defines the bounds of his public presence." 🚩 Id. (citations omitted). "A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." 🚩 Id. (quoting 🚩 Waldbaum v. Fairchild Publ'ns, Inc., 627 F.2d 1287, 1296 (D.C. Cir. 1980), cert. denied, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980)). "The [United States] Supreme Court has made clear that essentially private concerns or disagreements do not become public controversies simply because they attract attention. Rather, a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." 🚩 Id. (quoting 🚩 Waldbaum, 627 F.2d at 1296).

Here, the relevant public controversy is the dispute over the winery's permits. The undisputed facts show this was a "public controversy" because the status of the winery's permits and compliance with safety standards affected anyone who visited the winery. See 🚩 Lassonde, 157 N.H. at 590, 956 A.2d 332 (a public controversy must "affect the general public or some segment of it in an appreciable way"). Indeed, according to Brett himself, the winery posed an urgent public health risk and a liability risk for the town.

Moreover, the undisputed facts show that the Curriers "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," 🚩 Thomas, 155 N.H. at 341, 929 A.2d 993, by speaking at multiple town meetings, emailing a local reporter, and writing letters to the Board trying to spur action with respect to the winery. Specifically, Brett wrote to the Board that the winery was "potentially creating a health risk" that "could put the Town of Gilmanton **\*253** in legal jeopardy if no action is taken." Doc. no. 40-20 at 1. He argued that the winery did not have the proper septic system for the size of the restaurant. He sent copies of his letter to multiple town entities (the Town Administrator, the Planning Board, the Zoning Board, the Conservation Commission), and, notably, to the Laconia Daily Sun. Meanwhile, Brenda spoke at Board meetings and submitted multiple records requests related to the winery's permitting. See doc. no. 40-18; 40-19. The Curriers thrust themselves to the forefront both because they tried to influence the resolution of the issues involved (by

researching the permitting issues and writing to multiple town entities), and because they invited media attention by sending the letter to the local newspaper.

The Curriers argue that Brenda only wrote to the reporter "a few times." Doc. no. 42-1 at 8. Yet courts have found that even isolated contact with media is sufficient to confer limited purpose public figure status. See, e.g., 🚩 Pendleton, 156 F.3d at 69 (single interview for profile article); Bourne v. Arruda, No. 10-cv-393-LM, 2013 WL 93637, at *2 (D.N.H. Jan. 8, 2013) (single letter in local newspaper). In short, the court finds no genuine issue of material fact regarding the Curriers' "limited purpose public figure" status with respect to the winery dispute.

Finally, the Curriers assert that they were "just ask[ing] questions as citizens," and exercising their First Amendment rights. Doc. no. 42-1 at 24. But Bishop has First Amendment rights, too. Accordingly, to prove a claim against defendants, the Curriers must show the defendants acted with "actual malice." 🚩 N.Y. Times Co., 376 U.S. at 279, 84 S.Ct. 710.

### ii. Actual malice

As noted above, "actual malice" requires a showing that the statement was made with "knowledge that it was false or with reckless disregard of whether it was false or not." 🚩 Lluberes, 663 F.3d at 12 (quoting 🚩 N.Y. Times Co., 376 U.S. at 279, 84 S.Ct. 710). The court finds that none of the Curriers' winery-related allegations rises to this level. Specifically, the undisputed facts show that the following statements, among others, were neither false nor made with reckless disregard of falsity:

- Bishop's July 11, 2016 letter to the New Hampshire Department of Environmental Services regarding the winery dispute that stated, among other things, that the Curriers "tried in every way to disrupt the Board of Selectmen meetings and constantly using the 'right to know law' for other than the reason it was intended." Doc. no. 40-5.

- Bishop's statement in that same letter that "I believe Mr. Currier is not doing this because of his concern for the environment." Id.

- Bishop's August 15, 2016 letter to the Laconia Daily Sun that stated, among other things, that "the incoming board has been inundated by constant remarks and threats against us by a small group of people, primarily, from former selectmen Currier, Don Guarino and their wives, along with commentaries from Al Blake." Doc. no. 40-7.

- Bishop's statement in that same letter that "I never expected former selectmen's wives calling us 'despicable', liars, thieves, and everything in-between at a town meeting." Id.

- Bishop's statement in a November 30, 2016 Laconia Daily Sun article that that after the 2016 election, "[Brett] and his wife took out their personal grudges on [Bishop] and his business." Doc. no. 42-8.

- Bishop's statement in a December 1, 2017 Laconia Daily Sun article that **\*254** after the 2016 election "Brett and Brenda Currier began attacking the winery as 'operating illegally' and complained to the Planning Board that it was operating as a restaurant without a special exception from the Zoning Board of Adjustment." Doc. no. 42-10 at 2.

- Bishop's statement in a Laconia Daily Sun article regarding the winery dispute stating that the Curriers had a vendetta against him.

As discussed below, these statements are also plagued by other problems such as being nonactionable statements of opinion, but the lack of actual malice alone merits granting summary judgment for defendants. Accordingly, because the undisputed record lacks evidence of actual malice, the court grants defendants' motion with respect to the following alleged instances of defamation: Doc. no. 21 ¶¶ 244(D); 244(H); 244(I); 244(J); 244(K); 244(L); 244(M); doc. no. 40-32 ¶ 7(A)(7), (A)(10), (A)(11).

*Currier v. Town of Gilmanton*, 621 F.Supp.3d 233 (2022)

2022 DNH 098

E. Many of the alleged instances of defamation are nonactionable statements of opinion.

Another of defendants' arguments is that various of the alleged instances of defamation are nonactionable statements of opinion. One of the limitations the U.S. Supreme Court imposes on defamation law is that statements of opinion cannot give rise to a defamation claim. Gray, 221 F.3d at 248. "[O]nly statements that present or imply the existence of facts that can be proven true or false are actionable under state defamation law." Id. Merely prefacing a statement with "I think" is not enough to turn a fact into an opinion where what is supposedly "thought" is, or implies, a proposition of fact. Id. "Rather, the cases are likely to protect a statement as "opinion" where it involves expressions of personal judgment, especially as the judgments become more vague and subjective in character." Id. "Put together, the relevant question is not whether challenged language may be described as an opinion, but whether it reasonably would be understood to declare or imply provable assertions of fact." Piccone v. Bartels, 785 F.3d 766, 771 (1st Cir. 2015) (internal quotations and citations omitted). "Whether a statement is a verifiable fact or an opinion can be decided by the court as a matter of law." Id. "This task requires an examination of the totality of the circumstances in which the specific challenged statements were made, including the general tenor and context of the conversation and any cautionary terms used by the person publishing the statement." Id.

Many of the allegedly defamatory statements are non-actionable statements of opinion. For example, in a letter to the Laconia Daily Sun, Bishop wrote: "I never expected former selectmen's wives calling us 'despicable', liars, thieves, and everything in-between at a town meeting." Doc. no. 42-6 at 1. The Curriers admit that Brenda, who is a former selectman's wife, called Bishop and the other selectmen despicable, liars, and thieves. Doc. no. 21 ¶ 81. The fact that Bishop "never expected" that to happen is a statement of opinion because it is Bishop's subjective mental belief and personal judgment. The same is true for Bishop's alleged statements to a visitor at Town Hall that "the Curriers are causing me problems," and that "[t]he Curriers are used to being in power and now they are losing their power since [I] beat Brett by 77 votes." [3] Doc. no. 21 ¶¶ 54; 244(C). Finally, Bishop's statement that "I **255** believe Mr. Currier is not doing this because of a concern for the environment" in his letter to the Department of Environmental Services is also a statement of opinion. Though prefacing the statement with "I believe" is alone not enough to render the statement an opinion, Bishop's speculation about Brett's motivations—something vague and subjective in character—would not be "reasonably understood to declare or imply provable assertions of fact." Piccone, 785 F.3d at 771.

Accordingly, the court grants summary judgment for defendants with respect to the undisputed statements of opinion contained within doc. no. 21 ¶¶ 244(A); 244(C); 244(D); 244(H); 244(N); 244(O).

F. Absolute privilege protects defendants' statements to prosecuting authorities.

Defendants also argue that their undisputed statements to prosecuting authorities are protected by absolute privilege. Similar to immunity doctrines, certain types of absolute privilege can bar an injured party from recovering any compensation. McGranahan v. Dahar, 119 N.H. 758, 762, 408 A.2d 121 (1979). One such type of absolute privilege is for statements made during judicial proceedings. Id. at 763, 408 A.2d 121. This is one of the oldest absolute common-law privileges. 2 Law of Defamation § 8:5 (2d ed.). "[T]he general rule is that statements made in the course of judicial proceedings are absolutely privileged from civil actions, provided they are pertinent to the subject of the proceeding." McGranahan, 119 N.H. at 762, 408 A.2d 121. "The requirement of pertinence eliminates protection for statements made needlessly and wholly in bad faith." Id. "The rule reflects a determination that the potential harm to an individual is far outweighed by the need to encourage participants in litigation, parties, attorneys, and witnesses, to speak freely in the course of judicial proceedings." Id.

This privilege extends only to statements made in the course of judicial proceedings. Id. This includes statements made "preliminary to a proposed judicial proceeding"—i.e., complaints to prosecutors. 2 Law of Defamation § 8:17 (2d ed.).

Currier v. Town of Gilmanton, 621 F.Supp.3d 233 (2022)

2022 DNH 098

Statements made to the press, however, are not related to the proceeding and are not covered by absolute privilege. Id. Protecting statements to the press would not serve the purpose of the privilege, which is to "serve the judicial system itself" by "encouraging the pursuit of truth by freeing participants of the fear that what they say in a proceeding may render them subject to liability in a defamation or other tort suit." Id. Thus, "[e]ven an absolute privilege does not permit an individual to categorically republish possibly defamatory statements without consequence." Id.

Absolute privilege protects defendants' undisputed statements directly to prosecuting authorities. This includes Branscombe's email to the Belknap County Attorney, doc. no. 21 ¶ 244(B) [4]; Bishop's and Branscombe's complaints to the New Hampshire Attorney General's Office, id. ¶ 244(E); and Bishop's conversation with the New Hampshire Attorney General's Chief Investigator, id. ¶ 244(G).

The Curriers allege that Branscombe or Bishop additionally emailed **\*256** their letters to others outside of prosecuting offices. Yet the Curriers present no evidence that either Bishop or Branscombe actually circulated their letters to others. The email from Branscombe to the County Attorney's office does not show anyone was copied on the email. The letter from Bishop to the Attorney General states that only Branscombe was copied on it. In his deposition, Bishop was asked if he sent his letter to the Attorney General to anyone else in the community, and he answered that he did not remember doing so. He did acknowledge that it had been sent to others but he stated, "I don't know what happened, none of us do." Doc. no. 42-15. Thus, the record contains no evidence that any town employee circulated the letters more broadly. See Hannon, 645 F.3d at 49 ("A genuine issue of material fact can be created only by materials of evidentiary quality."). The court therefore grants Defendants' motion for summary judgment with respect to the defamation claims based on doc. no. 21 ¶¶ 244(B), (E); doc. no. 40-32 ¶ 7(A)(8), (B).

    G. <u>Bishop is not responsible for statements made by others.</u>

Defendants also note that some of the Curriers' allegations are based on the premise that Bishop would be somehow responsible for statements made by others. Specifically, the Curriers argue that the letter to the Concord Monitor editor entitled "Restore decorum in Gilmanton" written by Carolyn Baldwin contains misinformation that they think came from Bishop. The Curriers offer no evidence, however, that that the content of the letter came from Bishop. Similarly, the Curriers allege that "a member of the community" posted on the Town of Gilmanton's Facebook page that Brenda threatened to take away Bishop's livelihood. Doc. no. 21 ¶ 82. Yet the only connection the Curriers offer between this statement and Defendants is that the statement was "attributable to Bishop as it came from one of his employees, and he is responsible for republication of all of his slanderous statements." Id. Even setting aside the lack of evidence supporting this allegation, the mere fact that the unnamed Facebook commentator was one of Bishop's employees is not sufficient to raise a reasonable inference that Bishop was the original source of the statement. Thus, the court grants summary judgment for Defendants with respect to the defamation claims related to the statements in id. ¶¶ 244(I) and 244(Q) because there is no evidence they came from Bishop.

In sum, having reviewed each identified instance of defamation, found that no genuine disputes of material fact exist, and determined that Defendants are entitled to judgment as a matter of law, the court grants summary judgment for Defendants as to Count I.

## II. Right-to-Know law

In Count II, the Curriers assert that Gilmanton violated RSA 91-A, New Hampshire's Right-to-Know law. The facts relevant to the alleged violations are undisputed. Defendants move for summary judgment, arguing that the Curriers are not entitled to any of the permissible remedies outlined in the statute. The court agrees.

"The purpose of the Right-to-Know Law is to ensure both the greatest possible public access to the actions, discussions and records of all public bodies, and their accountability to the people." Taylor v. Sch. Admin. Unit #55, 170 N.H. 322, 326, 172 A.3d 534 (2017). Although the statute does not provide for unrestricted access to public records, New Hampshire courts construe it with "a view to providing the utmost information in order to best effectuate [the] statutory and constitutional objectives." Id.

**\*257** "The Right-to-Know Law, if violated, provides for three possible remedies: (1) an award of reasonable costs and attorney's fees, ⚑ RSA 91–A:8, I; (2) an order voiding action taken by a public body or agency, ⚑ RSA 91–A:8, II; and (3) an injunction, ⚑ RSA 91–A:8, III." ATV Watch v. N.H. Dep't of Res. & Econ. Dev., 155 N.H. 434, 437, 923 A.2d 1061 (2007). Attorney fees and costs are available "provided that the court finds that such lawsuit was necessary in order to enforce compliance with the provisions of this chapter or to address a purposeful violation of this chapter." ⚑ RSA 91-A:8, I. In addition, attorney fees—but not costs—require a finding that the agency "knew or should have known" that the conduct violated the law. Id.; ATV Watch, 155 N.H. at 439, 923 A.2d 1061.

The Curriers' arguments boil down to two categories: (1) inadequate responses to record requests, and (2) conduct of meetings. The court discusses each in turn.

A. Record requests

⚑ RSA 91-A:4 lays out citizens' rights to inspect governmental records. It states that "during the regular or business hours" and "on the regular business premises" of all public bodies and agencies, citizens have the right to inspect all governmental records "in the possession, custody, or control of such public bodies or agencies." ⚑ RSA 91-A:4. Upon a request for a governmental record reasonably described, a public body or agency must "make available for inspection and copying any such governmental record within its files when such records are immediately available for such release." ⚑ RSA 91-A:4, IV. If a public body or agency is unable to make the record available immediately, within five business days it must (1) make the record available, (2) deny the request, or (3) "[p]rovide a written statement of the time reasonably necessary to determine whether the request shall be granted or denied and the reason for the delay." ⚑ RSA 91-A:4, IV(b).

The Curriers detail various instances where Gilmanton allegedly either failed to provide information in response to Brenda's Right-to-Know requests or provided it late. At her deposition, Brenda testified that she did not receive responses to some of her requests because the requested documents did not exist. As for the documents that did exist, Brenda stated that she did eventually receive many of them, but received them late. Brenda could think of only one document that existed but that she had not received—an attachment to the settlement agreement between Bishop and Gilmanton.

The Curriers claim "all damages as allowed by law" including reasonable attorney fees and costs. Doc. no. 21 ¶ 263. They also claim "all equitable and injunctive relief to which they may be entitled." Id.

The court analyzes the Curriers' claim from the perspective of what relief they seek. First, the Curriers concede that they are not seeking an injunction because Gilmanton is no longer violating RSA 91-A. As for the single document Brenda never received (the attachment to the settlement agreement), the Curriers are not seeking an injunction ordering that it be released because Brenda retrieved it from the court.

The second statutory remedy—voiding an action taken at a public meeting—is clearly not applicable to records requests. Thus, the only statutory remedy potentially available to the Curriers is attorney fees.

But as noted above, attorney fees and costs are available only where "the court finds that such lawsuit was necessary in order to enforce compliance with the provisions of this chapter or to address a purposeful violation of this chapter." **\*258** RSA 91-A:8, I. Even construing reasonable inferences in the Curriers' favor, evidence in the record does not support a finding that this lawsuit was necessary to enforce compliance with the Right-to-Know law. In their objection to Defendants' motion for summary judgment, the Curriers argue only that "[i]t is perhaps due to this action, and also in part due to a change in Selectmen, that the violations appear to be no longer occurring." Doc. no. 42-1 at 35. Stating that the lawsuit "perhaps" spurred Gilmanton

*Currier v. Town of Gilmanton,* 621 F.Supp.3d 233 (2022)

2022 DNH 098

to comply with the law—without citation to any evidence in the record—does not support a reasonable inference that the lawsuit was "necessary in order to enforce compliance" with RSA 91-A. 🚩RSA 91-A:8, I. Thus, the Curriers are not entitled to attorney fees on this basis. In sum, the Curriers are not entitled to any of the forms of relief outlined in 🚩RSA 91-A:8.

#### B. Conduct of meetings

The Curriers' complaints related to the conduct of meetings fares no better. As a threshold matter, the Curriers argue they are entitled to "declaratory relief as to the conduct of meetings" and argue that certain past meetings "should be found to be illegally held." Doc. no. 42-1 at 34. Yet, as stated above, RSA 91-A provides only for specific remedies, and declaratory relief is not among them.

As to the conduct of meetings, the Curriers seek neither an injunction nor an order voiding an action taken at any purportedly improper meetings. See doc. no. 42 at 34. As with the records requests claim, then, the record does not support a finding that this lawsuit was necessary to enforce compliance with the Right-to-Know law with respect to the conduct of meetings. The Curriers are therefore not entitled to attorney fees on this basis. Because the relevant facts are undisputed and the Curriers are not entitled to any form of relief, the court grants summary judgment for Defendants on Count II.

### III. 🚩Section 1983

In Count III, the Curriers bring a claim for First Amendment retaliation against Bishop and Gilmanton pursuant to 🚩42 U.S.C. § 1983. To state a claim for relief under 🚩§ 1983, a plaintiff must satisfy two elements: first, that the defendant acted under the color of state law; and second, that his conduct deprived plaintiffs of rights secured by the Constitution or by federal law. See Gagliardi v. Sullivan, 513 F.3d 301, 306 (1st Cir. 2008) (citing Rodríguez-Cirilo v. García, 115 F.3d 50, 52 (1st Cir. 1997)).

Defendants do not contest that they were acting under color of state law. The court therefore assumes this element is met, and moves on to the second element—whether defendants' conduct deprived plaintiffs of constitutional rights.

The Curriers argue that defendants deprived them of their First Amendment rights by retaliating against them after they exercised their right to freedom of speech. To prevail on a First Amendment retaliation claim, a "plaintiff must first prove that (1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 43 (1st Cir. 2012). With regard to the second element, "an adverse action is an action that would deter a reasonably hardy person from exercising his or her constitutional rights." Id. at 43 n.11.

The Curriers engaged in constitutionally protected conduct—i.e., in numerous instances, the Curriers voiced their dissatisfaction with town government and related issues. There is no dispute that the Curriers' **\*259** speech in general was protected by the First Amendment. The question, then, is whether the Curriers suffered any "adverse action" resulting from their protected speech.

In their complaint, the Curriers cite 19 instances in which they were allegedly retaliated against for exercising their First Amendment rights. Doc. no. 21 ¶ 271(A)-(S). Specifically, they allege that they were (1) defamed in numerous instances, (2) Brenda was not allowed to speak at a Board meeting, (3) Brenda was mistreated by an employee at Town Hall, (4) a town employee threatened Brenda, (5) Gilmanton sent the Curriers cease-and-desist letters to take down their Support the Police signs, and (6) Gilmanton attempted to exclude Brenda from being a ballot clerk. [5] The Curriers argue that as a result of these acts, their First Amendment rights were chilled. For example, they state that absent the Defendants' conduct, Brenda would have continued to go to Town Hall more frequently and would have continued to be involved in town government. The court examines each alleged adverse action in turn.

A. Defamation as Retaliation

First, many of the adverse actions the Curriers allege are speech acts by defendants. In essence, the Curriers attempt to restate their defamation claims as First Amendment claims. For example, the Curriers again complain about the "Setting the Record Straight to Move Forward" press release, the sign on Town Hall stating it was closed due to "Safety Concerns" (which they argue implicates them), and numerous comments published in the Laconia Daily Sun.

"[C]ourts are not typically receptive to retaliation claims arising out of government speech." Najas Realty, LLC v. Seekonk Water Dist., 821 F.3d 134, 143 (1st Cir. 2016); see also Mulligan v. Nichols, 835 F.3d 983, 989 (9th Cir. 2016) ("Retaliation claims involving government speech warrant a cautious approach by courts."). This is because government officials themselves retain First Amendment rights and because "[r]estricting the ability of government decisionmakers to engage in speech risks interfering with their ability to effectively perform their duties." Mulligan, 835 F.3d at 989. Courts recognize that one of the overarching purposes of the First Amendment—promoting a marketplace of ideas—would hardly be promoted if public officials were "prevented from responding to speech of citizens with speech of their own." Id. Thus, courts impose a higher bar for stating a First Amendment retaliation claim based on government speech. See, e.g., Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 687 (4th Cir. 2000) ("[W]here a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow, such speech does not adversely affect a citizen's First Amendment rights, even if defamatory.").

For example, in Najas Realty, the First Circuit focused on the importance of government speech when affirming the dismissal of a First Amendment claim premised on retaliatory defamation by a government actor. 821 F.3d at 143. There, the plaintiff alleged that various statements by the state water district's superintendent regarding the **\*260** impact of a proposed development project were defamatory. Id. at 142-43. The court reasoned that these allegations did not state a claim for retaliation violating the First Amendment because "[n]ot only do public officials have free speech rights, but they also have an obligation to speak out about matters of public concern." Id. at 143 (citation omitted).

Similarly, in Goldstein v. Galvin, the First Circuit cited authority reasoning that " 'mere accusations' of wrongdoing and 'mere criticisms' [by a government official] d[o] not amount to adverse employment action for retaliation purposes." 719 F.3d 16, 30 (1st Cir. 2013). There, the plaintiff complained about the use of his name in a public announcement of an enforcement proceeding on the Secretary of the Commonwealth of Massachusetts's website. Id. The court dismissed the claim, noting that "[a]llowing a plaintiff to weave a First Amendment retaliation claim out of something so mundane as a government official's issuance of a true statement, not couched in inflammatory terms, about a matter of public concern would trivialize the Constitution." Id. at 31.

Here, similarly, the undisputed facts show that the alleged defamatory statements do not rise to the level of adverse action for the purposes of § 1983. For example, the Curriers argue that the sign on Town Hall stating that the front entrance was closed due to "safety concerns" constituted retaliation under the First Amendment. Similarly, the Curriers take issue with the "Setting the Record Straight to Move Forward" press release. The press release explained the reason for the closure of Town Hall, including the "overwhelming" number of Right-to-Know requests that "essentially prevented [town] employees from performing their regular duties." Doc. no. 40-29. These statements—as well as the numerous others about which the Curriers complain that are premised on government speech [6]—did not include threats, coercion, or intimidation. See Suarez Corp., 202 F.3d at 687. They were about matters of public concern, and not couched in inflammatory terms. Goldstein, 719 F.3d at 30. Moreover, given that the Curriers themselves spoke with the press on numerous occasions about their various grievances with the Selectmen, it did not rise to the level of a constitutional violation for the Selectmen to respond to those allegations publicly. As noted, the "marketplace of ideas is undermined if public officials are prevented from responding to speech of citizens with speech of their own." Mulligan, 835 F.3d at 989. Thus, none of the alleged instances of retaliation based only on government speech rises to the level of adverse action under the First Amendment.

B. <u>Remaining Claims</u>

The remaining claims allege violations only by Gilmanton, not by Bishop, as there is no evidence that Bishop had any role in the relevant conduct. Assessing liability against a town "requires two basic elements: first, that plaintiff's harm was caused by a constitutional violation, and second, that the [town] be responsible for that violation, an element which has its own components." Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 25-26 (1st Cir. 2005). With respect to the remaining claims, defendants make no argument regarding the first element—whether they comprised a constitutional violation. Instead, they argue only that Gilmanton is not responsible for any potential violation. Absent any briefing on the first element, the court assumes—for the purposes of this order—that it is met and proceeds to the second.

**\*261**  A municipality may not be held vicariously liable under § 1983 on account of its employees' unlawful conduct. Connick v. Thompson, 563 U.S. 51, 60-61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011). Rather, municipalities are held responsible under § 1983 only for their own illegal acts. Id. To succeed on a § 1983 claim against a municipality, the plaintiff must show that "action pursuant to official municipal policy" caused the plaintiff's injury. Id. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Id. at 61, 131 S.Ct. 1350. This principle ensures that municipalities will only be held liable for "action[s] taken with the requisite degree of culpability" where there is a "direct causal link between the municipal action and the deprivation of federal rights." Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

In cases where a plaintiff claims that a particular municipal action itself violates federal law—i.e., an act by a municipality's legislative body or authorized decision-maker—issues of fault and causation are relatively straightforward. Id. at 404-05, 117 S.Ct. 1382; see Pembaur, 475 U.S. at 480, 106 S.Ct. 1292 ("No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy."). This principle applies to acts both by the municipality's legislative body as well as certain other government officials. Pembaur, 475 U.S. at 480, 106 S.Ct. 1292. Where the allegations are based on decisions of high-ranking government officials, municipal liability "attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Id. at 483, 106 S.Ct. 1292 (decision by county prosecutor, acting as county's final decisionmaker, could be properly attributed to municipality).

On the other hand, "[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Bryan Cnty., 520 U.S. at 405, 117 S.Ct. 1382. In limited circumstances, "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." Connick, 563 U.S. at 61, 131 S.Ct. 1350. But a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Id. "To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.' " Id. (citing Canton v. Harris, 489 U.S.

378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). "Only then 'can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under ⚑ § 1983.' " ⚑ Id. (citing ⚑ Canton, 489 U.S. at 389, 109 S.Ct. 1197).

Turning to the facts of the case, the Curriers' remaining allegations of retaliation are that Carpenter and Brenda had a conversation at Town Hall that did not go well, doc. no. 21 ¶ 271(H); Carpenter told Brenda not to post something on Facebook, **\*262** id. ¶ 271(I), (J); Gilmanton attempted to exclude Brenda from being a ballot clerk, id. ¶ 271(Q); Brenda was not allowed to speak at a Selectmen's meeting, id. ¶ 271(G); Gilmanton prevented the public from accessing Town Hall, id. ¶ 271(M); and Gilmanton sent the Curriers cease-and-desist letters to take down their Support the Police signs, id. ¶ 271(K).

As to the first two allegations—pertaining to Carpenter and Brenda's conversation at Town Hall—there is no evidence that these acts were pursuant to official municipal policy. They did not fall into the type of policy outlined in ⚑ Pembaur—that is, "a deliberate choice to follow a course of action" made "by the official or officials responsible for establishing final policy with respect to the subject matter in question." ⚑ Pembaur, 475 U.S. at 483, 106 S.Ct. 1292. Moreover, the Curriers also lack evidence that the conduct evinces any failure to train by Gilmanton—i.e., the type of policy outlined in ⚑ Canton. See ⚑ Canton, 489 U.S. at 392, 109 S.Ct. 1197 (failure-to-train claims "can only yield liability against a municipality where that city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants"). For example, construing reasonable inferences in the Curriers' favor, the record shows neither that town employees "so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need," ⚑ id. at 390 n.10, 109 S.Ct. 1197, nor that "policymakers were aware of, and acquiesced in, a pattern of constitutional violations," ⚑ id. at 397, 109 S.Ct. 1197 (O'Connor, J., concurring in part and dissenting in part). The claimed violations were isolated instances, not a pattern of constitutional violations.

The Curriers make no substantive argument to the contrary. In their briefing opposing summary judgment, they cursorily state only that the conduct they complain about "meets the standard set forth in ... ⚑ Canton," doc. no. 42 at 36, but offer neither reasoning nor citation to evidence in the record in support. Because the defendants did not engage in the alleged "mistreat[ment]" and "threat[s]," doc. no. 21 ¶ 271(H),(I), pursuant to any official policy, the Curriers cannot hold Gilmanton liable under ⚑ § 1983 for this conduct.

As to the cease-and-desist letter, in contrast, a reasonable jury could find it was based on official policy because it stemmed from an act by an "official[ ] responsible for establishing final policy with respect to the subject matter in question." ⚑ Pembaur, 475 U.S. at 483, 106 S.Ct. 1292. Specifically, Gilmanton sent the Curriers a cease-and-desist letter to take down their Support the Police signs. The cease-and-desist letter was sent by Bill Tobin, the town's Building Inspector/Code Enforcement Officer. Doc. no. 42-23. The content of the letter shows that Tobin "possesse[d] final authority to establish municipal policy with respect to the action ordered." ⚑ Pembaur, 475 U.S. at 481, 106 S.Ct. 1292. Moreover, Tobin's letter evinced a "a deliberate choice to follow a course of action ... from among various alternatives," ⚑ id. at 483, 106 S.Ct. 1292, given that it attempted to enforce a town ordinance to threaten the Curriers with a fine if they did not take down their "Support the Police" sign. See doc. no. 42-23. Like the prosecutor in ⚑ Pembaur, Tobin "made a considered decision based on his understanding of the law" and acted to enforce that understanding. ⚑ 475 U.S. at 484, 106 S.Ct. 1292. Indeed, Tobin's cease-and-desist letter is one of those cases where "a plaintiff claims that a particular municipal action *itself* violates federal law" and thus "resolving ... issues of fault and causation is straightforward." ⚑ Bryan Cnty., 520 U.S. at 404, 117 S.Ct. 1382. Because a jury could **\*263** find that Tobin's letter directing the Curriers to take down their sign could be properly attributed to Gilmanton, Gilmanton has not shown it is entitled to judgment as a matter of law.

Currier v. Town of Gilmanton, 621 F.Supp.3d 233 (2022)
2022 DNH 098

Finally, there is a genuine issue of material fact as to whether Gilmanton's alleged attempt to exclude Brenda from being a ballot clerk, disallowing Brenda from speaking at a town meeting, and closure of Town Hall similarly stem from an act by an "official[ ] responsible for establishing final policy with respect to the subject matter in question." 🚩 Pembaur, 475 U.S. at 483, 106 S.Ct. 1292. In their motion for summary judgment, defendants make no argument as to why these alleged instances of retaliation do not fall under the type of policy outlined in 🚩 Pembaur. Further, defendants do not argue that these acts fail to not meet the elements of First Amendment retaliation, see D.B., 675 F.3d at 43, nor do they put forward any other legal basis for dismissal.

As such, the Curriers may proceed with their claim that Gilmanton retaliated against them by (1) issuing the cease-and-desist letter, doc. no. 21 ¶ 271(K), (P); (2) disallowing Brenda from speaking at a town meeting, id. ¶ 271(G); (3) attempting to exclude Brenda from being a ballot clerk; id. ¶ 271(Q); and (4) closing Town Hall, id. at ¶ 271(M). All the other alleged instances of retaliation fail for the reasons outlined above.

## IV. **New Hampshire Constitution**

Finally, the Curriers assert a state constitutional claim that is parallel to their First Amendment retaliation claim. "State constitutional provisions, however, unlike their federal counterparts, are not generally enforceable through a claim for damages, and this court is not the proper forum for a plaintiff to seek to expand the scope of remedies available for alleged violations of state constitutional rights." Ali v. N. N.H. Corr. Facility, Warden, No. 12-CV-364-SM, 2013 WL 3367098, at *4 (D.N.H. July 3, 2013). As this court noted in Bleish v. Moriarty, the New Hampshire Supreme Court has not addressed whether there is a cause of action under state law to vindicate the right protected by Part I, Article 22 of the New Hampshire Constitution—the provision protecting freedom of speech. No. 11-CV-162-LM, 2011 WL 6141271, at *2 (D.N.H. Dec. 9, 2011). As in that case, this court is not the proper forum to determine whether the New Hampshire Supreme Court would decline to recognize such a claim, as it has for other constitutional torts. See, e.g., 🚩 Khater v. Sullivan, 160 N.H. 372, 374-75, 999 A.2d 377 (2010) (declining to recognize a constitutional tort for violations of the Equal Protection Clause of the New Hampshire constitution). Thus, Count IV is dismissed without prejudice.

## CONCLUSION

In sum, the court grants summary judgment for defendants on Counts I and II. The court grants summary judgment for defendants in part and denies it in part on Count III. Only the claim in Count III that Gilmanton retaliated against the Curriers by (1) issuing the cease-and-desist letter, doc. no. 21 ¶ 271(K); (2) disallowing Brenda from speaking at a town meeting, id. ¶ 271(G); (3) attempting to exclude Brenda from being a ballot clerk, id. ¶ 271(Q); and (4) closing Town Hall, id. at ¶ 271(M), may proceed. The court dismisses Count IV without prejudice to the Curriers' ability to refile in state court.

SO ORDERED.

**All Citations**

621 F.Supp.3d 233, 2022 DNH 098

## Footnotes

1        Defendants, citing a declaration by Bishop, assert that the Curriers often dominated the meetings, arguing, for example, that on one occasion Brenda read aloud a four-page letter, including some 32 different questions she posed to various

Board members or the Town Administrator. The Curriers acknowledge that they did at times attend public meetings, but contend that they merely "ask[ed] reasonable questions" and "ma[de] observations in accord with their [First Amendment] rights." Doc. no. 42-1 ¶ G.3. They assert that they did not "dominate" the meetings. Id.

2      The allegation in ¶ 244(X) incorporates statements Bishop allegedly made to persons named only as "LO" and "RO" for which there is no admissible evidence. It also, however, incorporates ¶¶ 234-235 of the Amended Complaint, which describe statements Bishop made to Ralph Lavin at a restaurant in Loudon for which there is evidence (an affidavit by Lavin). Those statements to Lavin at the restaurant are also contained in ¶ 244(Y). For the purpose of clarity, the court refers to the "LO" and "RO" statements here as ¶ 244(X), but separately refers to the Lavin statements as ¶ 244(Y) below.

3      The Curriers acknowledge that Brett was defeated by 77 votes, and thus that portion of the statement was true. Doc. no. 21 ¶ 61.

4      The Curriers argue that this statement is not protected because defendants published it not to the County Attorney himself, but rather to someone in another office in Belknap County, Debra Shackett. This argument lacks merit. Though Shackett's precise role is unclear, the record shows she was an intermediary to reach the County Attorney—she responded by relaying the County Attorney's response. Publishing the statement to Shackett was nonetheless a statement "preliminary to a proposed judicial proceeding." 2 Law of Defamation § 8:17 (2d ed.).

5      The Curriers also allege various instances where Gilmanton supposedly infringed on the constitutional rights of others, doc. no. 21 ¶ 268(A)-(D), 271(E), yet they have not shown any reason they would have standing to enforce the rights of others. See 🚩 Penney v. Town of Middleton, 888 F. Supp. 332, 338 (D.N.H. 1994) ("[A] 🚩 § 1983 claim cannot be predicated on a violation of another person's protected rights.").

6      Specifically, doc. no. 21 ¶ 271(A), (B), (C), (D), (F), (L), (N), (O), (R), (S).

---

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Vital Pharmaceuticals v. PepsiCo, Inc.,   S.D.Fla.,   March 16, 2021

54 F.Supp.3d 1312
United States District Court, S.D. Florida.

Rod EISENBERG, et al., Plaintiffs,

v.

CITY OF MIAMI BEACH, Defendant.

Case No. 13–23620–CIV

|

Signed Sept. 19, 2014.

**Synopsis**

**Background:** Owner and operator of apartment hotel located in city's historic district brought action against city and city officials, asserting that various code enforcement actions against apartment hotel violated state and federal constitutional rights.

The District Court, Cecilia M. Altonaga, J., 1 F.Supp.3d 1327, granted in part and denied in part defendants' motion to dismiss. Defendants subsequently moved for judgment on the pleadings.

**Holdings:** The District Court, Cecilia M. Altonaga, J., held that:

city fire marshal's findings of city code violations did not collaterally estop constitutional claims;

city building official's determination did not collaterally estop constitutional claims;

quasi-judicial determination by city's historical task force did not collaterally estop constitutional claims;

lawful nature of city's conduct in taking code enforcement actions did not preclude owner and operator from maintaining First Amendment retaliation claim;

owner and operator was required to prove that his protected speech was motivating factor in city's alleged retaliatory conduct to support First Amendment retaliation claim; and

city's code enforcement actions did not support substantive due process claim.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss; Motion for Judgment on the Pleadings.

**Attorneys and Law Firms**

**\*1316** Jacob T. Cremer, David Smolker, Smolker Bartlett Schlosser Loeb & Hinds, P.A., Tampa, FL, for Plaintiffs.

Jason Patrick Kairalla, Richard J. Ovelmen, Carlton, Fields, Jorden, Burt, P.A., Rhonda Lee Montoya, Robert F. Rosenwald, Jr., City of Miami Beach, Miami, FL, for Defendant.

*ORDER*

<span style="color:blue">CECILIA M. ALTONAGA</span>, District Judge.

THIS CAUSE came before the Court on Defendant, City of Miami Beach's (the "City['s]") Motion for Judgment on the Pleadings ... ("Motion") [ECF No. 52]. Plaintiffs, Rod Eisenberg ("Eisenberg") and Eisenberg Development Corp. ("Eisenberg Development") (collectively, "Plaintiffs") filed their Response ... ("Response") [ECF No. 61], to which the City replied (*see* [ECF No. 67] ). The undersigned has carefully considered the parties' written submissions, the record, and applicable law.

## I. BACKGROUND [1]

Between 2004 and 2009, Plaintiffs and others voiced many complaints about the health and safety risks and Code compliance violations of an abandoned hotel in their neighborhood. (*See id.* ¶ 20). The City investigated some of these complaints but did not resolve the problems with the abandoned building. (*See id.*). In 2009, Eisenberg urged the City's Zoning Board of Adjustment to handle the Code violations more quickly, requesting the Board deny the abandoned hotel owner's request for a one-year extension to comply with the Code. (*See id.*). The Zoning Board ultimately required the abandoned hotel owner to board the building and remove loose debris before granting the extension. (*See id.*). In light of this, Eisenberg withdrew his objection, and the Zoning Board later approved the extension. (*See id.*).

Between 2006 and 2012, multiple City officials were investigated and prosecuted for corruption. In 2006, a City electrical inspector was arrested for soliciting bribes (*see id.* ¶ 14); in 2008, a City fire protection analyst was fired after reporting suspicions of kickbacks (*see id.* ¶ 15), and a City planner, examiner, and inspector were all caught accepting bribes (*see id.* ¶ 16); in 2012, City procurement director, Gus Lopez, was charged with sixty-three felony counts, including racketeering, bid-tampering, and illegal compensation (*see id.* ¶ 17), and seven City Code compliance and fire department inspectors, including the City's lead code compliance officer, Jose Alberto ("Alberto"), were arrested for **\*1317** extortion and accepting bribes in June 2011 to bypass City Code enforcement inspections and fines (*see id.* ¶¶ 18–19).

The Sadigo Court Apartment Hotel (the "Sadigo") is a "contributing historic structure" in the City's Museum Historic District. (*Id.* ¶ 6). The Sadigo opened in 1936 as an apartment with transient rentals, and it has continued operating in this fashion without objection by the City. (*See id.* ¶ 22). The Sadigo is located in a RM–2 zoning district, where the " 'main permitted uses' include apartments, apartment hotels, and hotels." (*Id.* ¶ 23 (quoting CITY OF MIAM I BEACH LAND DEV.CODE (the "City Code") §§ 142–212)). According to the City Code, "hotels" are only intended for occupancy by transient residents, and "apartments" require cooking facilities. (*Id.* (quoting City Code § 114–1)). The City Code permits transient rentals for apartment hotels and apartments in RM–2 zones. (*See id.* ¶ 24). The Sadigo's original City-issued certificates of use and occupancy ("CO[s]") were for use as an apartment building, and the Sadigo has maintained this status. (*See id.* ¶ 22). For a period of time, the Sadigo rented units on an annual basis. (*See id.* ¶ 25).

In 2006, after obtaining a state transient public lodging establishment license from the Florida Department of Business and Professional Regulation's Division of Hotels and Restaurants, the Sadigo resumed transient rentals, for which it is licensed. (*See id.* ¶¶ 25–26). Plaintiffs verified with the City that transient apartment rentals are legally permissible for the zoning district and the COs applicable to the Sadigo. (*See id.* ¶ 27). Plaintiffs obtained a City Resort Tax Registration Certificate for the Sadigo, required for transient (six months or less) rentals of hotel and apartment units. (*See id.* (citing City Code §§ 102–306)).

Upon renting to transient guests in late 2006, the Sadigo constructed a cold food preparation area in an interior courtyard "pursuant to a City-approved and issued building permit." (*Id.* ¶ 29). "After construction was completed and signed[-]off [ ] by the City, the City informed Plaintiffs that it was a 'hotel [,]' not an 'apartment' ...." (*Id.*). The City required the Sadigo to obtain

a new CO as a "hotel" because it rented apartments to transient guests and operated a food preparation area that was actually a "restaurant." (*Id.*). Plaintiffs complied and applied for a CO as a "hotel" (*id.* ¶ 31), and were later told the Sadigo must comply with the fire protection standards applicable to "brand new hotel structures" (*id.* ¶ 32 (internal quotation marks omitted)).

From 2006 to 2012, Plaintiffs received numerous notices of violation and cease and desist orders [2] from the City citing the Sadigo for violating City fire safety codes by allowing transient rentals of its apartments. (*See id.* ¶ 50). In March 2010, the Miami Beach Fire Marshal, Sonia Machen ("Machen"), sent Eisenberg and engineer, Thomas Maxwell ("Maxwell"), a letter in response to Maxwell's Engineer Equivalency **\*1318** Report on the Sadigo. (*See* MTD App., Ex. 9 [ECF No. 17–9] ). The letter explained the Report's shortcomings in addressing the Florida Fire Prevention Code and identifying the historic features at risk from an accidental discharge of fire sprinklers. (*See id.* 1). The City Building Official issued a decision requiring the installation of a fire sprinkler system and refused to accept the Engineer's Equivalency Report from the Sadigo explaining why a fire sprinkler system was unnecessary. (*See* MTD App., Ex. 8 [ECF No. 17–8] ). The City Board of Rules and Appeals (the "BORA") affirmed the Building Official's determination and notified Eisenberg of its decision in an April 21, 2010 letter. (*See id.*).

Plaintiffs objected to the City's classification of the Sadigo as a new hotel and attended a City Commission meeting on January 19, 2011. (*See id.* ¶ 29). At the meeting, Plaintiffs submitted materials explaining the various reasons the Sadigo should not be treated as a new hotel. (*See id.*). The Mayor, City Commissioners, City Manager, and City Attorney were indifferent, and the City Fire Chief took offense to Plaintiffs' claims of unfair treatment. (*See id.*). Plaintiffs believe the City Fire Marshal told the Sadigo's mortgagee the Sadigo was illegally operating as a hotel. (*See id.* ¶ 38). On January 21, 2011, that mortgagee advised it would not renew its loan after previously encouraging Plaintiffs to renew it. (*See id.* ¶ 37). Plaintiffs were left with no choice but to refinance the Sadigo at a higher interest rate—at enormous additional cost. (*See id.*).

In 2011, Eisenberg Development filed a petition in the state court seeking a temporary injunction against the City. (*See* MTD App., Ex. 4 at 2 [ECF No. 17–4] ); *see also Eisenberg Dev. Corp. v. City of Miami Beach,* No. 11–20234 CA 15, 4 (Fla. 11th Cir.Ct. Jan. 10, 2012) (order denying emergency temporary injunction). The state trial court held an evidentiary hearing regarding compliance with the Florida Fire Prevention Code ("Fire Code"). (*See id.*). On January 10, 2012, the court denied the request for a temporary injunction. (*See id.* 5). The trial court's decision was affirmed. *See Eisenberg Dev. Corp. v. City of Miami Beach,* 100 So.3d 702, 702 (Fla. 3d DCA 2012).

In April 2011, the City informed the Sadigo's longstanding client, the Art Basel Foundation, the Sadigo was illegally operating as a hotel, and as a result the Foundation severed its business relationship with Plaintiffs. (*See* Compl. ¶ 39). In June 2011, the City sent undercover police officers to the Sadigo to verify the Sadigo was renting to transient guests. (*See id.* ¶ 40). After observing transient rental activity, City police officers shut down the Sadigo for noncompliance with City fire codes, evicting the Sadigo's tenants and guests. (*See id.*). This shutdown caused the Sadigo's largest client to sever its business relationship with Plaintiffs. (*See id.* ¶ 41).

In December 2011, fifteen police offers, ten code enforcement officers (including Alberto), and five fire officials forcibly shut down the Sadigo a second time for violations of City fire codes. (*See id.* ¶ 42). The shut down occurred while the Sadigo was hosting the "Poo[l] Art Fair" during the Art Basel Miami Beach art show, forcing guests to vacate the premises. (*Id.* ¶¶ 42–43). Alberto offered to solve Eisenberg's problems "by using 'his people,' insinuating a bribe would be due from [ ] Eisenberg. When [ ] Eisenberg refused by stating he already had legal counsel working on it, Alberto stated ... Eisenberg would not get far using legal means." (*Id.* ¶ 44). Eisenberg was then arrested. (*See id.* ¶ 45). In April 2012, Alberto and **\*1319** other code compliance officers and fire department inspectors were arrested for accepting bribes. (*See id.* ¶ 46). Since these arrests, the Sadigo has not received any further code compliance notices or violations. (*See id.* ¶ 47).

The three remaining counts in the Complaint allege a First Amendment retaliation claim in Count II (*see* Compl. ¶¶ 71–78); violation of due process under 42 U.S.C. section 1983 in Count III (*see id.* ¶¶ 79–86); and violation of due process under Articles I and X of the Florida Constitution in Count IV (*see id.* ¶¶ 87–94). The City now moves for judgment on the pleadings.

## II. LEGAL STANDARD

Under 🚩 Federal Rule of Civil Procedure 12(c) "after the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). " 'Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law.' " 🚩 *Palmer & Cay, Inc. v. Marsh & McLennan Cos., Inc.,* 404 F.3d 1297, 1303 (11th Cir.2005) (quoting 🚩 *Riccard v. Prudential Ins. Co.,* 307 F.3d 1277, 1291 (11th Cir.2002)). In ruling on the motion, "[a]ll facts alleged in the complaint must be accepted as true and viewed in the light most favorable to the nonmoving party." 🚩 *Scott v. Taylor,* 405 F.3d 1251, 1253 (11th Cir.2005) (alteration added).

In resolving a motion for judgment on the pleadings, the Court considers the entire pleadings: the complaint, the answer, and any documents attached as exhibits. *McGath v. Hamilton Local School Dist.,* 848 F.Supp.2d 831, 836 (S.D.Ohio 2012) (citations omitted). If "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material...." 🚩 FED. R. CIV. P. 12(c). A court may consider documents attached to the complaint or incorporated by reference without converting the motion into a motion for summary judgment if the documents are: (1) central to the complaint, and (2) the documents' authenticity is not in dispute. 🚩 *Day v. Taylor,* 400 F.3d 1272, 1275–76 (11th Cir.2005). In particular, the Court may "take judicial notice of and consider documents which are public records...." *Id.* (alteration added).

## III. ANALYSIS

The City moves for judgment on the pleadings arguing much as it did in its Motion to Dismiss the Complaint [ECF No. 16], that the Court should judicially notice and give deference to prior determinations made by municipal officials and organizations. (*See* Mot. 10–11; Reply 2). Again, the City contends the doctrine of collateral estoppel precludes Plaintiffs from relitigating issues adjudicated in prior proceedings. (*See* Reply 2–4). Specifically with regard to Count II, the City maintains Plaintiffs do not state a plausible claim of First Amendment retaliation, challenging Plaintiffs' ability to establish a causal connection between the City's allegedly retaliatory actions and any adverse effect on Plaintiffs' speech. (*See* Mot. 11–14). As to Counts III and IV, the City argues Plaintiffs cannot state substantive due process claims under federal and state law, respectively, because an implied fundamental right is not at stake, and the City's efforts to enforce the Fire Code are rationally related to public health and safety. (*See* Mot. 15–17). The Court considers these issues, again, and in particular examines new authorities and arguments **\*1320** not addressed in the City's earlier briefing on the Motion to Dismiss which result in the City being afforded some of the relief it now seeks.

### A. Collateral Estoppel and Administrative Deference

Under Florida law, for Plaintiffs' claims to be precluded by the doctrine of collateral estoppel: "(1) an identical issue, (2) [must have] been fully [and fairly] litigated, (3) by the same parties or their privies, and (4) a final decision ... rendered by a court of competent jurisdiction." *Wingard v. Emerald Venture Florida LLC,* 438 F.3d 1288, 1293 (11th Cir.2006) (alterations added; citations omitted) (quoting 🚩 *Quinn v. Monroe Cnty.,* 330 F.3d 1320, 1329 (11th Cir.2003)). The litigated issue must also have been "a critical and necessary part of the prior determination." *Id.* (citations omitted).

The City describes three categories of agency determinations it considers final and binding because Plaintiffs' claims were withdrawn, or the findings were not appealed or overturned on appeal. (*See* Mot. 4–9). The first category includes Fire Marshal determinations resulting in notices of violation and cease and desist orders. (*See id.* 4–6). The second is City Building Official

determinations, including BORA appeals. (*See id.* 7–8). The third category encompasses determinations by the Florida Historical Task Force. (*See id.* 8–9). The City also contends essential issues of fact and law were adjudicated in the prior state court proceeding denying Eisenberg Development's request for a temporary injunction against the City. (*See id.* 9). Given these prior determinations, the City insists the present claims are precluded because they concern identical underlying issues previously decided, and Plaintiffs [3] had the opportunity to be heard and present evidence. (*See id.* 4–10; Reply 2–4).

Plaintiffs contend the prior determinations did not address the constitutional issues raised here, specifically the allegedly pretextual and retaliatory nature of the City's conduct. (*See* Resp. 4–10). They further argue the determinations are not final and challenge whether they had a full and fair opportunity to litigate issues before municipal agencies, including the BORA and the Historical Task Force. (*See id.* 7–8).

The factors at issue—whether the prior proceedings involved identical issues critical to the prior determination, were fairly litigated, and are final determinations [4]—make it inappropriate to preclude Plaintiffs' claims on the basis of collateral estoppel. The opportunity to fully and fairly litigate the issues to be estopped  ***1321**  is "the most significant consideration in determining whether to invoke collateral estoppel." *Hercules Carriers, Inc. v. Claimant State of Fla., Dept. of Transp.,* 768 F.2d 1558, 1580 (11th Cir.1985) (citation omitted). Regarding the Fire Marshal's determinations, it appears Plaintiffs received no notice nor was a hearing held prior to the issuance of notices of violation or cease and desist orders, and there is little evidence Plaintiffs formally exercised their right to appeal. [5]  In March 2010 Miami Beach Fire Marshal Machen sent Eisenberg and engineer Maxwell a letter in response to the Sadigo's equivalency report. (*See* MTD App., Ex. 9). After discussing the equivalency report's shortcomings, the Fire Marshal concluded an automatic fire sprinkler system was required absent an exemption from the Historical Task Force. (*See id.* 1–2). The letter also stated Eisenberg and Maxwell would receive a separate response from the City Building Official. (*See id.* 1).

The City Building Official, after refusing to accept Maxwell's equivalency report, issued a decision requiring the Sadigo to install a fire sprinkler system. (*See* Answer, Ex. 11 [ECF No. 51–11] ). Plaintiffs formally appealed the City Building Official's decision. The extent to which the BORA provided a full and fair opportunity to litigate is unclear. The only filings in the record related to the BORA determination include an April 7, 2010 memorandum regarding the Sadigo's "Change of Division Within Same Occupancy" from an R–2 to an R–1 designation, [6] and an April 21, 2010 letter to Eisenberg notifying him of the BORA's decision. (*See id.*) The memorandum and letter explain the BORA affirmed the Building Official's determination that the Sadigo was not in compliance with Florida Building Code, Existing Section 305.1 (2007). (*See* Answer, Ex. 11 at 1–2).

The BORA narrowly examined the issue whether "the Building Official is incorrect in his interpretation of the Florida Building Code (Existing), 2007 Edition; Existing Section 1106, that an evaluation report shows each existing safety feature is in compliance with the Historic Buildings Chapter and additional installation of safety features would damage the integrity of the historic structure." (*Id.* at 1). The BORA reviewed the submitted equivalency report, found it incomplete, and determined the report did not substantiate the Sadigo's existing alternative fire prevention systems were in fact equivalent to a fire sprinkler system. (*See id.* 2). Because the scope of the BORA review was limited to considering an incomplete equivalency report, the BORA's finding is not given preclusive effect. *See Hercules Carriers, Inc.,* 768 F.2d at 1581 n. 16 ("[W]hen the scope of the administrative hearing is much narrower than a subsequent lawsuit, collateral estoppel will not be applied." (citing *Garner v. Giarrusso,* 571 F.2d 1330, 1336 (5th Cir.1978))).

The most comprehensive, quasi-judicial hearings seem to have been held by the Historical Task Force. There, Eisenberg presented arguments and evidence in person in an adversarial proceeding,  ***1322**  including an expert's report and testimony, and the Task Force conducted an on-site tour of the Sadigo. (*See* Answer, Ex. 12 [ECF No. 51–12]; App., Exs. 1–4 [ECF Nos. 53–1–53–4] ). [7]  But the Task Force's findings are limited by the agency's narrow advisory role identifying whether certain actions (such as Fire Code compliance measures) undermine the preservation of historic buildings. (*See generally* App., Ex. 1 (suggesting alternative installation methods to input a Code-compliant fire sprinkler system that simultaneously would not

diminish the Sadigo's historic value)). Thus, the narrow scope of the Task Force's determinations do not support estoppel. *See Hercules Carriers, Inc.,* 768 F.2d at 1581 n. 16.

The present case involves constitutional law claims relating to the exercise of free speech and due process, none of which was ever fully and fairly litigated nor decided by a court of competent jurisdiction. Despite prior agency determinations regarding related underlying factual issues, Plaintiffs' constitutional claims are not precluded by collateral estoppel.

Finally, the denial of Plaintiffs' petition for a temporary injunction does not preclude Plaintiffs from "the subsequent grant of permanent equitable relief." *David Vincent, Inc. v. Broward Cnty., Fla.,* 200 F.3d 1325, 1331 (11th Cir.2000) (citations omitted). A preliminary injunction is "generally *not* considered final or conclusive." *Id.* (emphasis in original). The question before the state trial court was whether Plaintiffs had made the necessary showing to obtain a preliminary injunction allowing short-term rentals at the Sadigo without requiring alteration to the existing fire prevention systems. (*See generally* App., Exs. 19–20 [ECF Nos. 52–19–52–20] ). The court found Plaintiffs failed to satisfy the requirements for a preliminary injunction, explaining they had not exhausted their administrative remedies and could pursue a remedy at law for money damages. *See Eisenberg Dev. Corp.,* No. 11–20234 CA 15 at 4. In denying the injunction, the court also stated Plaintiffs lacked a substantial likelihood of success on the merits, and the public life safety considerations outweighed potential lost profits or goodwill by the Sadigo. *See id.* At issue in this case is whether the City's conduct was an abuse of discretion, was improper, pretextual, or retaliatory, or resulted in a constitutional law violation.

Admittedly, "[a]n agency's interpretation of the guidelines that it is charged with administrating is entitled to judicial deference, and should not be overturned as long as the interpretation is in the range of permissible interpretations." *Atl. Shores Resort, LLC v. 507 South Street Corp.,* 937 So.2d 1239, 1245 (Fla. 3d DCA 2006) (alteration added). To the extent City officials and municipal agencies have addressed discrete aspects regarding the underlying factual issues, the Court may have occasion to defer to municipal determinations where they are "within the range of possible permissible interpretations." *Id.* (quoting **\*1323** *Paloumbis v. City of Miami Beach,* 840 So.2d 297, 298–99 (Fla. 3d DCA 2003)); *see also Metro. Dade County v. P.J. Birds, Inc.,* 654 So.2d 170, 175 (Fla. 3d DCA 1995) (requiring a reviewing court to "defer to an agency's interpretation" if it "is consistent with legislative intent and is supported by substantial competent evidence" (citation omitted)). But such deference does not in itself satisfy the elements for collateral estoppel to bar the present constitutional law claims.

## B. First Amendment Retaliation

In Count II, Plaintiffs claim the City violated their rights under the First and Fourteenth Amendments to the U.S. Constitution and seek equitable relief. (*See* Compl. ¶ 72). The City asserts it acted properly to enforce local laws and Plaintiffs fail to show a causal connection. (*See* Mot. 11–14). Although the City contends its conduct was lawful, such "lawful conduct" does not preclude Plaintiffs' claim where "a retaliatory motive can be inferred" from a sequence of events, notwithstanding other non-retaliatory motives (here purportedly lawful grounds) the defendant may have. *Lippman v. City of Miami,* 719 F.Supp.2d 1370, 1374 (S.D.Fla.2010) (footnote call number omitted); *see also id.* n. 4; *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of New York,* 746 F.3d 538, 544 (2d Cir.2014) ("Royal Crown 'can prove First Amendment retaliation even if the measures taken by [defendants] were otherwise justified.' ... [T]hat defendants ... may have been justified in closing down Royal Crown based on their regulatory responsibilities to enforce the Health Code does not insulate them from being 'subject to a claim of improper motive,' if defendants retained some discretion in how they performed their regulatory enforcement functions." (quoting *Beechwood Restorative Care Ctr. v. Leeds,* 436 F.3d 147, 152–53 (2d Cir.2006))). Here, the fact that even a historic hotel may be required to install fire sprinklers absent an approved, equivalent alternative does not resolve whether the City's conduct was retaliatory or improperly motivated, particularly early on when the Sadigo was directed by the City to apply for a new CO as a hotel.

The City urges the Court to apply a modified causation test (requiring proof of selective enforcement) based on *Osborne v. Grussing,* 477 F.3d 1002, 1006 (8th Cir.2007), in lieu of the well-established burden-shifting test from *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), applied in the March 3 Order. (*See* Mot. 14–15; Reply 7). Since the *Osborne* decision was issued, the Eleventh Circuit has applied the *Mt. Healthy* test, and the Court sees no reason to depart from this precedent. *See Smith v. Mosley,* 532 F.3d 1270, 1278 (11th Cir.2008) (applying the *Mt. Healthy* burden-shifting formula to determine whether protected conduct is a motivating factor). The Court does not revisit its analysis under *Mt. Healthy,* and as the Court previously stated, conducting the burden-shifting analysis on a motion directed to the pleadings is premature, particularly as factual issues remain regarding the full timeline of events. (*See* Mar. 3 Order, 1 F.Supp.3d at 1344).

The City also challenges causation in terms of the sequence of events, explaining its enforcement efforts predated Eisenberg's free expression and the time between the protected speech and the City's allegedly retaliatory conduct is too attenuated. (*See* Mot. 12–13). To establish a causal connection, a plaintiff must demonstrate his or her protected conduct was a motivating factor behind the alleged retaliatory misconduct. *See* **\*1324** *Bennett v. Hendrix,* 423 F.3d 1247, 1250 (11th Cir.2005). "[A] plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Thampi v. Manatee Cnty. Bd. of Com'rs,* 384 Fed.Appx. 983, 990 (11th Cir.2010) (alteration added) (quoting *Shannon v. BellSouth Telecomm., Inc.,* 292 F.3d 712, 716 (11th Cir.2002)). In a similar vein, "[c]lose proximity in time between the protected activity and the adverse ... action 'is insufficient to create a genuine issue of fact as to causal connection when there is unrebutted evidence that the decision-maker did not have knowledge that the [plaintiff] engaged in protected conduct.' " *Id.* (alterations added) (quoting *Brungart v. BellSouth Telecomm., Inc.,* 231 F.3d 791, 799 (11th Cir.2000)).

The parties have submitted voluminous records in support of their competing positions, most of which date from 2010 to 2013. (*See generally* Exs. [ECF Nos. 17, 51, 53, 61] ). Missing are public documents predating 2010 that establish the timeline of events regarding Plaintiffs' protected activities and the City's enforcement efforts. [8] The motivation analysis—requiring an examination of what the decision-makers knew regarding the protected conduct—is not appropriate on a motion for judgment on the pleadings. (*See* Mar. 3 Order, 1 F.Supp.3d at 1344 (collecting cases)). And as Plaintiffs note, it is the City's pattern of conduct that should be considered in assessing a causal relationship rather than individual events. (*See* Resp. 11). [9] As previously stated, a retaliatory motive can be inferred from the City's alleged misconduct, which took place between 2006 and 2012 and includes a events in close proximity. (*See* Mar. 3 Order, 1 F.Supp.3d at 1344–45).

### C. Due Process

In Counts III and IV, Plaintiffs allege federal and state law due process claims. (*See* Compl. ¶¶ 79–94). The City argues Plaintiffs' substantive due process claims fail on multiple grounds because Plaintiffs' property interest in the Sadigo is not an implied fundamental right, the City's allegedly improper actions are not legislative in nature, and the City possesses a rational basis for enforcing the Fire Code. (*See* Mot. 15–16; Reply 9). For support, the City cites *McKinney v. Pate,* 20 F.3d 1550 (11th Cir.1994), a case in which a public employee terminated for allegedly pretextual reasons was permitted to raise only a procedural due process claim. *See id.*

The City's reliance on *McKinney* is new; the argument was not raised when the City moved to dismiss Plaintiffs' Complaint. In that briefing, the City did not contest whether "Plaintiffs have a constitutionally protected property and business interest in the Sadigo." (Mar. 3, 2014 Order, 1 F.Supp.3d at 1346). The Court previously found it plausible the City's actions were undertaken with an improper motive and were an abuse of discretion. **\*1325** (*See id.* at 1346–47). The City essentially

requests the Court reconsider its earlier decision in light of *McKinney,* as well as additional arguments regarding a rational basis analysis. (*See* Mot. 15–17). Relying on *McKinney,* the City challenges whether the protection Plaintiffs seek can be based on substantive due process claims. [10] (*See id.* 15–16).

To state a claim for a violation of substantive due process under 42 U.S.C. section 1983, a plaintiff must allege "a deprivation of a constitutionally protected interest" resulting from "an abuse of governmental power sufficient to raise an ordinary tort to the stature of a constitutional violation." *Executive 100, Inc. v. Martin Cnty.,* 922 F.2d 1536, 1541 (11th Cir.1991) (citation omitted). " '[C]onduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense.' " *Maddox v. Stephens,* 727 F.3d 1109, 1119 (11th Cir.2013) (alteration added) (quoting *Waddell v. Hendry Cnty. Sheriff's Office,* 329 F.3d 1300, 1305 (11th Cir.2003)).

In *McKinney,* a county building official sued his supervisors and members of the board of county commissioners alleging he was pretextually terminated, resulting in a violation of his "constitutional employment rights" and denial of substantive due process. 20 F.3d at 1555. At issue was "whether, under the Fourteenth Amendment, a government employee possessing a state-created property interest in his employment states a substantive due process claim, rather than a procedural due process claim, when he alleges that he was deprived of that employment interest by an arbitrary and capricious non-legislative government action." *Id.* at 1553. The Eleventh Circuit in *McKinney* explained the "substantive component of the Due Process Clause protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty.' " *Id.* at 1556 (quoting *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937)) (explaining most of the rights in the Bill of Rights are fundamental). [11] Rights "created only by state law (as is the case with tort law and employment law) are not subject to substantive due process protection under the Due Process Clause because 'substantive due process rights are created only by the Constitution.' " *Id.* (quoting *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 229, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (Powell, J., concurring)). *McKinney* held "in non-legislative cases, only procedural due process claims are available to pretextually terminated employees." *Id.* at 1560. Courts have extended *McKinney* to non-legislative, zoning and land use cases to preclude claims of substantive due process violations. [12] *See City of Pompano Beach v. Yardarm Restaurant, Inc.,* 834 So.2d 861, 870 (Fla. 4th DCA 2002) (finding "developer had no cognizable substantive due process claim because its property interest **\*1326** in the building permits was created by state law, not the Constitution, and both the issuance and revocation of the building permits constituted executive and not legislative acts").

Plaintiffs argue *McKinney* is inapplicable because this case involves liberty as well as property interests. (*See* Resp. 16). Plaintiffs allege "property rights and liberty interests in their real property, their rights to use their real property for renting apartment units ... and ... engag[ing] in the business of renting apartment units ...." [13] (Compl. ¶ 81 (alterations added); *see id.* ¶ 89). In addition to having property interests, [14] Plaintiffs allege they engaged in protected First Amendment activity. (*See id.;* Compl. ¶¶ 36–43, 57, 60). Plaintiffs' activities—petitioning the City and publicly commenting on disputes with the City over the Sadigo (*see id.* ¶ 73)—constitute constitutionally protected speech. (*See Mar. 3 Order, 1 F.Supp.3d at 1343*).

The City asserts Plaintiffs' substantive due process claim is subsumed by Count II, alleging First Amendment retaliation. (*See* Reply 9 (citing *Dingle v. Coleman,* No. 5:10–cv–53–Oc–10GRJ, 2010 WL 4366886, at \*2 n. 3 (M.D.Fla. Oct. 28, 2010))). This is true. Notwithstanding the described deprivations of liberty and property interests, Plaintiffs' substantive due process claims essentially rely on the same allegations supporting the First Amendment retaliation claim of Count II. The substantive due process claims are thus subsumed by the First Amendment claim because a " 'substantive due process right to free speech is duplicative of [a] First Amendment retaliation claim.' " *Lozman v. City of Riviera Beach,* 39 F.Supp.3d 1392, 1413, No.

08–CIV–80134, 2014 WL 4101514, at *15 (S.D.Fla. Aug. 19, 2014) (quoting *Brandenburg v. Hous. Auth. of Irvine,* 253 F.3d 891, 900 (6th Cir.2001)).

To the extent Plaintiffs' substantive due process claim is based on a First Amendment violation it fails because " 'a cause of action cannot be based in substantive due process where a more specific constitutional provision is applicable.' " *Id.* (quoting *Brandenburg,* 253 F.3d at 900); *see also* *Handy–Clay v. City of Memphis, Tenn.,* 695 F.3d 531, 547 (6th Cir.2012) (explaining Supreme Court case law "precludes reliance on substantive due process standards when evaluating claims covered by explicit constitutional protections" because "when a specific amendment 'provides an explicit textual source of constitutional protection ... that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.' " (alterations added and in original; internal citations omitted)). Consequently, the Court **\*1327** examines Plaintiffs' due process claim based solely on the deprivations of property alleged.[15]

In determining whether a deprivation of a state-created right constitutes a substantive due process violation rather than a procedural one, *McKinney* and its progeny distinguish between deprivations resulting from legislative acts and executive acts. *See* *McKinney,* 20 F.3d at 1557 n. 9. A substantive due process claim is not cognizable where it only involves a non-legislative or executive deprivation of a state-created right. *See* *DeKalb Stone, Inc. v. County of DeKalb, Ga.,* 106 F.3d 956, 960 (11th Cir.1997) (explaining deprivations by executive act of state-created rights, such as public education and land use, are "protected only by the guarantee of procedural due process" (citation omitted)) (collecting cases). "Executive acts characteristically apply to a limited number of persons (and often to only one person); executive acts typically arise from the ministerial or administrative activities of members of the executive branch.... Legislative acts, on the other hand, generally apply to a larger segment of—if not all of—society." *McKinney,* 20 F.3d at 1557 n. 9.

Plaintiffs do not challenge rulemaking or the enactment of City rules or regulations, but rather the City's enforcement of the City Code as applied to the Sadigo, including Plaintiffs' eligibility for a discretionary exemption to the Fire Code given the Sadigo's historic status. The City's enforcement actions are specific to Plaintiffs and the Sadigo and clearly do not affect the general population. Based on these alleged facts, Plaintiffs' substantive due process claims fail. *See id.;* *DeKalb Stone, Inc.,* 106 F.3d at 960 ("Where a property owner alleged that town executives arbitrarily and capriciously refused to issue a certificate of occupancy—another variety of state-created land use right—we held that no substantive due process claim had been stated." (citing *Boatman v. Town of Oakland,* 76 F.3d 341, 346 (11th Cir.1996) (other citation omitted))); *Reserve, Ltd. v. Town of Longboat Key,* 933 F.Supp. 1040, 1044 (M.D.Fla.1996) (finding plaintiffs did not possess a cognizable substantive due process claim for their state-created property interest in a revoked building permit where "both the issuance and revocation of the building permit constitute 'executive' and not 'legislative' acts." (citation and footnote call number omitted)); *cf. Lewis v. Brown,* 409 F.3d 1271, 1274 (11th Cir.2005) ("[F]or the purposes of substantive due process analysis, '[ ] enforcement of existing zoning regulations is an executive, not legislative act.... Acts of zoning enforcement rather than rulemaking are not legislative.' " (alterations added) (quoting *DeKalb Stone, Inc.,* 106 F.3d at 959)). Accordingly, Plaintiffs' substantive due process claims for constitutional deprivations of their liberty and/or property interests do not survive the City's Motion.[16]

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendant, the City of Miami Beach's Motion for Judgment on the Pleadings **[ECF No. 52]** is **GRANTED** in part and **DENIED** **\*1328** in part. The Motion is granted as to Counts III and IV of Plaintiffs' Complaint and denied as to Count II.

**All Citations**

54 F.Supp.3d 1312

## Footnotes

1   ⚑ The Background is largely reproduced from the March 3, 2014 Order, 1 F.Supp.3d 1327 (S.D.Fla.2014) [ECF No. 36] dismissing Counts I, V, VI, and VII of the Complaint [ECF No. 1].

2   The City issued the Sadigo a November 5, 2007 Fire Inspection Report and Cease and Desist Notice regarding an October 23, 2007 inspection (*see* Appendix to Motion to Dismiss ("MTD App."), Ex. 1 [ECF No. 17–1] ); a June 27, 2011 Fire Inspection Report and Cease and Desist Order (*see id.,* Ex. 5 [ECF No. 17–5] ); a September 23, 2011 Cease and Desist Order and Fire Inspection Report and September 29, 2011 Notice of Fire Violation (*see id.,* Ex. 6 [ECF No. 17–6] ); October 20, 2010, April 5, 2011, and September 27, 2011 Notices of Violation, and October 23, 2007 Fire Inspection Report (*see id.,* Ex. 7 [ECF No. 17–7] ). The City also issued a March 15, 2010 response letter (*see id.,* Ex. 9 [ECF No. 17–9] ) by the Fire Marshal regarding the Sadigo's engineering report, and a June 28, 2011 Plans Processing Approvals notice (*see id.,* Ex. 10 [ECF No. 17–10] ).

3   The City argues Eisenberg and Eisenberg Development can reasonably be said to be in privity because Eisenberg is the president of Eisenberg Development (*see* Compl. ¶¶ 1–2), and Eisenberg Development owns and operates the Sadigo (*see id.* ¶ 6). *See* ⚑ *Drier v. Tarpon Oil Co.,* 522 F.2d 199, 200 (5th Cir.1975) (finding corporate president and major stockholder, who made ultimate decisions on corporation's behalf, was in privity with corporation so that president was estopped from re-litigating issues already decided by state court against corporation); *see also United States v. Weiss,* No. 698CR99ORL19KRS, 2005 WL 1126663, at *10 (M.D.Fla. May 6, 2005) (collecting cases).

4   Where Plaintiffs declined to pursue their legal remedies or appeal, prior, un-appealed administrative and judicial decisions are considered final. *See Fla. Transp. Serv., Inc. v. Miami–Dade Cnty.,* 757 F.Supp.2d 1260, 1271 (S.D.Fla.2010) ("The administrative examiner's order affirming the denial of the January 2002 application constituted a final decision on the merits" and "failure to appeal, moreover, does not diminish the preclusive effect given to the administrative ruling." (citation omitted)).

5   Fire Marshal determinations may be appealed to the Fire Prevention and Safety Appeal Board. (*See* Mot. 6 (citing Miami —Dade County Code of Ordinances § 14–46(D) (2014))).

6   Plaintiffs do not dispute the authenticity or accuracy of the intra-agency document. To the extent Plaintiffs challenge the Court's ability to judicially notice the April 7, 2010 memorandum (*see* Resp. 3 n. 4), the Court considers the document only to frame the scope of the issues before the BORA. The memorandum is directed to Herminio F. Gonzalez, P.E., the same individual who sent Eisenberg the BORA's April 21, 2010 decision letter.

7   Plaintiffs challenge the authenticity of a May 27, 2010 Historical Task Force Committee Hearing transcript [ECF No. 53–1] because it was "not certified by a court reporter, so [sic] no way to ensure accuracy." (Resp. 3 n. 4). They do not object that a hearing took place on May 27, 2010, nor identify any portions of the transcript as inaccurate. The Court takes judicial notice that multiple Task Force hearings were held in 2010 and 2013 addressing the Sadigo's historic preservation in the context of fire prevention and safety. Plaintiffs do not contest the authenticity of the other Task Force hearing transcripts in the record. (*See* [ECF Nos. 53–2–53–4] ).

8    The few filings predating 2010 are a 1988 Warranty Deed and Certificate of Occupancy [ECF No. 51–14]; a Code
     Compliance Violation [ECF No. 61–4] from August 2007 regarding a sanitation and debris violation that was resolved;
     an October 2007 Report of Fire Violations issued by Fire Department Inspector Machen at the time (*see* MTD App.,
     Exs. 1, 7 at 4 [ECF Nos. 17–1 & 17–7] ); a December 2008 change of occupancy/work permit application for the Sadigo
     [ECF No. 51–16]; and the Sadigo's 1999 Florida Hotel License Application [ECF No. 51–3].

9    For example, the alleged retaliatory act by the City related to the Sadigo's financing presents questions of fact; the
     extent and timeline of the mortgagee's knowledge regarding the Sadigo' alleged hotel violations and its reasons for not
     renewing the loan are disputed. (*See* Mot. 13 n. 6; Resp. 12 n. 15).

10   Plaintiffs previously clarified they are not raising procedural due process claims. (*See* Mar. 3, 2014 Order, 1 F.Supp.3d
     at 1345).

11   Property interests " 'are not created by the Constitution. Rather they are created and their dimensions are defined by
     existing rules or understandings that stem from an independent source such as state law—rules or understandings that
     secure certain benefits and that support claims of entitlement to those benefits.' " *Coral Springs St. Sys., Inc. v. City
     of Sunrise,* 371 F.3d 1320, 1333 (11th Cir.2004) (quoting *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701,
     33 L.Ed.2d 548 (1972)).

12   This case does not specifically concern zoning or land use permits. (*See* Mar. 3, 2014 Order, 1 F.Supp.3d at 1349
     n. 15).

13   Counts III and IV incorporate allegations regarding the deprivation of Plaintiffs' liberty interest.

14   The March 3 Order states:

     Plaintiffs were denied their constitutionally protected right to utilize their property and engage in a legitimate rental
     business at the Sadigo. (*See* ... Compl. ¶¶ 22–25, 35–45, 81–86). Plaintiffs allege they had to refinance the Sadigo
     at enormous additional cost after the mortgagee decided not to renew the loan upon being informed the Sadigo was
     operating illegally as a hotel. (*See* [*id.*] ¶ 37). Plaintiffs also lost the Art Basel Foundation as a business client after
     the City informed the Foundation the Sadigo was operating illegally. (*See id.* ¶ 39).

     (*Id.* at 1346 (alterations added)). Plaintiffs allegedly suffered diminution in value, injury to the Sadigo's business
     reputation and good will, and interference with operating a legitimate business, resulting from the City's repeated cease
     and desist orders, targeting of the Sadigo's clients, and two forced shutdowns of the Sadigo.

15   In this respect, the Court departs from its analysis in the March 3 Order on the City's Motion to Dismiss.

16   *McKinney* does not prevent a plaintiff from maintaining a First Amendment retaliation claim even if the plaintiff lacks
     a protectable property interest or other state-created right. *See Beckwith v. City of Daytona Beach Shores, Fla.,* 58
     F.3d 1554, 1562 (11th Cir.1995).

---

End of Document                                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 6498974
Only the Westlaw citation is currently available.
United States District Court, M.D. Georgia, Macon Division.

Daniel Lilrod FORD, Plaintiff,

v.

Counselor Tina ZANDERS, et al., Defendant.

Case No. 5:18-cv-00412-TES-CHW
|
Signed 06/26/2020

**Attorneys and Law Firms**

Daniel Lilrod Ford, Macon, GA, pro se.

David M. Stewart, Kenneth D. Crowder, Augusta, GA, for Defendant.

## <u>REPORT AND RECOMMENDATION</u>

Charles H. Weigle, United States Magistrate Judge

**\*1**  Before the Court is the Defendants' motion for summary judgment. (Doc. 44). It is **RECOMMENDED** that the Defendants' motion be **GRANTED** as to Plaintiff's claims for compensatory and punitive damages, but otherwise **DENIED**. Also before the Court are three motions filed by Plaintiff Daniel Ford which are **DENIED**. (Docs. 60, 64, 65).

## BACKGROUND

This section 1983 action relates to three issues: Plaintiff's prison uniform, Plaintiff's procurement of transcripts on a flash drive, and alleged retaliation against Plaintiff for his use of the prison grievance process.

Plaintiff's prison-uniform claim is based on Plaintiff's allegation that at Central State Prison, he was provided with only "one uniform [that] has to be worn every day," and that this uniform became dirty from Plaintiff's work "cleaning the prisoners' showers and toilets." (Doc. 1, p. 7). Plaintiff further alleges that when he uses the prison laundry system, he is left naked and hence "can't go to the chow hall and eat on those days." (*Id.*). On screening under 28 U.S.C. § 1915A, the Court determined that Plaintiff's allegations were sufficient to support Eighth Amendment claims against Defendants Hinton and Thomas. (Doc. 7, p. 10).

Plaintiff also raises claims relating to his procurement of transcripts from his Fulton County murder trial. Plaintiff alleges that his attorney mailed the transcripts to Plaintiff on a flash drive, that the package containing the flash drive was opened in Plaintiff's presence, but that Defendants Patrick and McMillan confiscated the flash drive. (Doc. 1, p. 6). Plaintiff also alleges that Defendant Small later prevented Plaintiff from mailing the flash drive to his family so that the transcripts might be printed and returned to Plaintiff in an acceptable form. (Doc. 1, p. 7).

Plaintiff originally described the confiscation of the flash drive using the language of a court access claim, but Plaintiff failed to allege any "actual injury" arising from his inability to access his trial transcripts. [1] *See* Lewis v. Casey, 518 U.S. 343 (1996). Accordingly, Plaintiff was not permitted to proceed on a court access claim. However, Plaintiff's allegations separately implicate

the First Amendment right to attorney communication. *See, e.g.,* 📁⚠️ *Al-Amin v. Smith*, 511 F.3d 1317, 1334 (11th Cir. 2008). Accordingly, Plaintiff's First Amendment claims against Defendants Patrick, McMillan and Small remain before the Court.

Finally, Plaintiff raises a different First Amendment claim of retaliation against Defendant Zanders. [2] According to Plaintiff, Zanders threatened to retaliate "after Plaintiff filed his very first [grievance] appeal at Central State Prison." (Doc. 1, p. 6). Thereafter, Plaintiff filed another grievance about Zanders' retaliatory conduct or comments, and Plaintiff alleges that this grievance was "fully granted" by Defendant Thomas. (Doc. 1, p. 6; Doc. 9, p. 1). Notwithstanding Thomas's grant of this grievance, Plaintiff alleges that Zanders continued to retaliate in two ways: (1) by arranging the "total denial of administrative remedies," (Doc. 1, p. 6), and (2) by hindering Plaintiff from "obtain[ing] a decent [work] detail by claiming that he is a problem." (Doc. 9, p. 2).

## PLAINTIFF'S MOTIONS

**\*2**  Three motions from Plaintiff are currently pending before the Court. In one motion (Doc. 65), Plaintiff moves for leave to file a surreply brief regarding the Defendants' motion for summary judgment. "Surreply briefs are not favored," MDGA Local Rule 7.3.1, and Plaintiff has not identified sufficient grounds to warrant surreply briefing. Accordingly, Plaintiff's motion for leave to file a surreply is **DENIED**.

In a different motion (Doc. 64), Plaintiff asks the Court to strike as untimely the Defendants' response to Plaintiff's pending motion for discovery sanctions. This Court maintains a policy of encouraging litigants routinely to consent to extensions of time "as a matter of courtesy." MDGA Local Rules, Standard of Conduct (B)(1)(a). The Defendants have adhered to that policy by responding to Plaintiff's untimely filings, [3] and insofar as the Defendants' response is untimely, the Defendants are entitled to "reciprocal scheduling concessions." *Id.* at (B)(1)(e). Therefore, Plaintiff's motion to strike is **DENIED**.

Finally, Plaintiff moves for discovery sanctions relating to a prior discovery order. (Doc. 60). In that order, the Court directed the Defendants to produce any internal documentation on the subject of inadequate prisoner clothing, as well as any grievances or complaints filed by any prisoner against Defendant Hinton relating to the subject of inadequate prisoner clothing. (Doc. 51).

The Defendants complied with the Court's order by providing documents relating to prisoner clothing. (Doc. 63, p. 2). Some of those documents are included as attachments to Plaintiff's summary judgment response. The Defendants have further affirmed to the Court that upon reasonable search, and apart from Plaintiff's own grievance on the subject of inadequate clothing, "there are no grievances by other inmates against Ms. Hinton regarding clothing." (Doc. 63, p. 2). For Plaintiff's part, although Plaintiff is housed in an "open dorm" and contends that some of his fellow prisoners have "told me they [only] had one uniform," there is no indication that Plaintiff has polled his peers as to the existence of grievances from other prisoners relating to the subject of inadequate clothing. (Doc. 44-6, pp. 19–22). Instead, before this Court, Plaintiff simply asserts that the Defendants are engaged in an "act of deception." (Doc. 60, p. 2).

The Court cannot compel the disclosure of documents that do not exist, [4] and there is no basis for the Court to sanction the Defendants for failing to disclose non-existent documents. The Defendants have credibly affirmed that they have produced all available, relevant documentation, and that no prisoner grievances relating to clothing, apart from Plaintiff's own grievance, exist. By contrast, Plaintiff's unsupported assertions of deception are not credible. As a result, Plaintiff's motion for discovery sanctions is **DENIED**.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

**\*3**   Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of informing the Court of the basis for its motion, and of citing "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that support summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322–24 (1986). In resolving motions for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. Tolan v. Cotton, 572 U.S. 650, 657 (2014).

## ANALYSIS

As to Plaintiff's Eighth Amendment claim, as well as Plaintiff's First Amendment claims relating to attorney correspondence and retaliation, genuine disputes of material fact exist, and important questions of law remain unresolved. Plaintiff alleges no physical injury, and hence he may not recover compensatory or punitive damages. On the merits of Plaintiff's claims, however, the Defendants have not demonstrated that they are entitled to summary judgment.

### I. Eighth Amendment: Inadequate Clothing

The Eighth Amendment's Cruel and Unusual Punishment's Clause is held to require prison officials to "provide humane conditions of confinement" by ensuring that prisoners' basic needs are satisfied, including the need for clothing. Farmer v. Brennan, 511 U.S. 825, 832 (1994). The Eighth Amendment also requires "basic sanitary conditions." Brooks v. Warden, 800 F.3d 1295, 1304 (11th Cir. 2015).

Plaintiff's allegations in this case give rise to tension between his need for clothing and his need for hygienic clothing. Plaintiff's deposition testimony indicates that from the time of his entry into Central State Prison in May 2018, (Doc. 44-6, p. 11), Plaintiff had only a single prison uniform. (Doc. 44-6, p. 18) ("I only have one uniform") ("I've been wearing these same pants for like over a year"). This uniform became worn and soiled not only through ordinary use, but also from Plaintiff's work as a dorm orderly which required him to "clean the bathroom," during which "stuff splash[es] on your clothes." (Doc. 44-6, p. 31) ("I'm not saying crap, but crap be stuff"). If Plaintiff sent his uniform out for laundering, he was left with "no clothes all day." [5] (Doc. 44-6, p. 25). Finally, while Plaintiff sometimes tried to launder his uniform in his dorm sink, Plaintiff was not able properly to clean, (Doc. 44-6, p. 30) ("I can't even get the stains out"), or to repair his uniform. (Doc. 44-6, p. 30) ("this tear exposes my underclothes"). Moreover, the uniform would not dry by morning, forcing Plaintiff to wear wet clothes the next day. (Doc. 44-6, p. 25) ("I'll end up going to breakfast wet").

When adjudging an Eighth Amendment claim, courts must consider an "objective component" and a "subjective component." Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004). The objective component asks whether the condition complained of was "sufficiently serious" or "extreme." *Id.* The subjective component, in turn, asks whether the defendant "acted with a sufficiently culpable state of mind with regard to the condition at issue." *Id.* (internal quotations omitted).

Regarding the objective component of the Eighth Amendment inquiry in this case, at least two disputes of material fact remain unresolved. First, while the Defendants assert that Plaintiff "never made an administrative request for additional or replacement clothing," (Aff. of McMillan, Doc. 44-2, p. 2), Plaintiff asserts that he "submitted multiple clothing request[s] using the clothing request form." (Aff. of Pl., Doc. 61-9, ¶ 4). *See also* (Pl.'s Dep., Doc. 44-6, p. 21) ("I went through their procedure which was to notify the unit manager"). Second, while the Defendants assert that Plaintiff was "given the normal allotment of inmate uniforms (three sets) when he arrived at" Central State Prison, (Aff. of McMillan, Doc. 44-2, p. 1), internal prison correspondence suggests that Plaintiff was only "given two sets of uniforms," (Doc. 61-7, p. 1), and Plaintiff asserts that he only possessed a single prison uniform. (Pl.'s Dep, Doc. 44-6, p. 18). Summary judgment is not an appropriate vehicle for resolving these factual disputes.

**\*4**  Important questions of law also remain unresolved. The Defendants contend that the Eleventh Circuit's unpublished decision in *Jinks v. Owens*, 517 F. App'x 913 (11th Cir. 2013), requires the conclusion that Plaintiff was not exposed to an objectively "extreme" or "sufficiently serious" condition. In the *Jinks* case, summary judgment was affirmed where a prisoner's clothing was "cleaned weekly." *Id.* at 915. It is not clear that the prisoner-plaintiff in *Jinks*, though, had only one set of clothing such that his position was comparable to Plaintiff's. It is not clear, in other words, that the *Jinks* plaintiff had to choose between remaining clothed in a soiled uniform, or waiting naked while his only uniform was laundered. Moreover, and unlike the *Jinks* plaintiff, the Plaintiff in this case contends that his work detail exposed his uniform to human excrement. The Eleventh Circuit Court of Appeals has made clear that exposure to human waste implicates the "general standards of dignity" enshrined in the Eighth Amendment. *Brooks v. Warden*, 800 F.3d 1295, 1304 (11th Cir. 2015). Given these two material differences between this case and the *Jinks* case, *Jinks* does not support judgment as a matter of law.

Regarding the subjective component of the Eighth Amendment inquiry, the Defendants offer no particularized argument, but instead contend that they "made reasonable efforts to provide clothing to all prisoners." (Doc. 44-1, p. 10). Plaintiff's deposition testimony indicates that he sought a second uniform from Defendant Hinton, who "laughed at me," and said of Plaintiff's torn, dirty pants, "those are cute." (Pl.'s Dep., Doc. 44-6, pp. 26–27). Plaintiff further claims that he "spoke with Defendant Thomas about the clothing deprivation at least 3 times," but that Defendant Thomas neither provided Plaintiff with additional clothing nor responded to a grievance Plaintiff filed about the issue. (Pl.'s Aff., Doc. 61-9, p. 1). Construed in Plaintiff's favor, these facts support the conclusion that Defendants Hinton and Thomas were subjectively aware of Plaintiff's need for clothing, but that they failed to take corrective action. Because a reasonable jury could find for Plaintiff on these facts, summary judgment is not appropriate.

## II. First Amendment: Attorney Correspondence

"A prohibition on the use of the mails is a significant restriction of First Amendment rights." *Al-Amin v. Smith*, 511 F.3d 1317, 1333 (11th Cir. 2008) (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 427 (1993)). Moreover, and as explained by the Eleventh Circuit, "given their incarceration and often distance from their attorneys, prisoners' use of the mail to communicate with their attorneys about their criminal cases may frequently be a more important free speech right than the use of their tongues." *Al-Amin*, 507 U.S. at 1333–34.

The parties to this action agree, for purposes of summary judgment, that Plaintiff's attorney mailed to Plaintiff a flash drive containing a transcript of proceedings in Plaintiff's 2016 trial for murder in the Fulton County Superior Court. (Defs.' Statement of Facts, Doc. 44-7, ¶ 12). On screening, the Court determined that the mailing of this flash drive implicated Plaintiff's First Amendment right to attorney correspondence, and that the Defendants' alleged confiscation of the flash drive supported a First Amendment claim.

For at least four reasons, the Defendants have not shown that they are entitled to summary judgment on Plaintiff's First Amendment attorney correspondence claim. First, the Defendants assert that a two-factor test developed by the Third Circuit, and — according to the Defendants — adopted by the Eleventh Circuit in *Al-Amin*, governs the review of attorney correspondence claims. This assertion is not correct. By its plain terms, the Eleventh Circuit's *Al-Amin* opinion contemplates the application of a four-factor test articulated by the Supreme Court in *Turner v. Safley*, 482 U.S. 78, 84–85 (1987). *See, e.g.*, *Al-Amin v. Smith*, 511 F.3d 1317, 1330 (11th Cir. 2008) ("Applying *Turner*'s factors to this case ..."). The *Turner* factors are:

**\*5**  (1) [whether] a valid, rational connection [exists] between the prison regulation and the legitimate governmental interest; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact that accommodation of the asserted constitutional right will have on guards, inmates, and the allocation of prison resources; and (4) the absence of ready alternatives to the regulation.

*Al-Amin*, 511 F.3d at 1328 (internal quotations omitted)

Because the Defendants failed to provide an analysis of *Turner*'s factors as applied in this case, the Defendants have not demonstrated that they are entitled to summary judgment.

Second, the Defendants contend that the confiscation of Plaintiff's flash drive was a single, inadvertent incident, but the record belies this assertion. Rather, the record shows that, as a rule, "[i]nmates are not allowed to have possession of flash drives at Central State Prison." (Aff. of Thomas, Doc. 44-3, ¶ 3). At summary judgment, the Court must infer from this rule that Central State Prison correctional officers confiscate flash drives according to a pattern or practice, and without regard for the sender's status. The pertinent inquiry in this action is whether the Defendants' practice of confiscating flash drives sent to prisoners by their attorneys passes constitutional muster.

Third, the record is not sufficiently developed to permit the Court to perform, on its own, a *Turner* analysis of Central State Prison's no-flash-drive rule. While the Defendants assert, for the first time in a footnote in their reply brief, that flash drives pose a risk of "computer viruses" and "prohibited information being passed to prisoners," (Doc. 62, p. 5, n.2), the Defendants have provided no evidence relating to *Turner*'s third factor, impact of accommodation. Plaintiff's deposition testimony suggests that Central State Prison already has the hardware needed for prisoners to access flash drives, suggesting that the burden of accommodation is low. (Doc. 44-6, p. 35) ("There are computers in the law library ... that you can place flash drives in"). The Court has no access countervailing evidence or analysis relating either to the risks of computer viruses, or to the burdens of employing protective software.

Regarding the perceived problem of prisoners accessing prohibited content on flash drives, the Defendants offer no explanation as to why flash drives mailed by licensed attorneys present any greater risk than printed materials mailed by licensed attorneys. In both cases, the sender's attorney status should alleviate, to some degree, security concerns. *See, e.g.,* *Al-Amin v. Smith*, 511 F.3d 1317, 1327 (11th Cir. 2008) ("The Court dismissed concerns about inmates using attorneys to violate prison rules because attorneys are bound by professional standards and would face criminal sanctions").

Fourth and finally, the Defendants have failed to address two alternative means for Plaintiff to access the contents of his flash drive. Those alternative means, as proposed by Plaintiff, are: (1) the Defendants could have printed and provided the flash drive's contents to Plaintiff in paper form, (Doc. 61, p. 5), or (2) the Defendants, and Defendant Small specifically, could have allowed Plaintiff to mail the flash drive to his family so that they might have printed and return-mailed the contents to Plaintiff in paper form. (Doc. 1, p. 7). Even if the Court had before it the information needed to perform a meaningful *Turner* analysis of Central State Prison's flash drive prohibition, therefore, and even if that analysis weighed in favor of prohibiting the possession of flash drives by prisoners, the Defendants' failure to address these alternative means for Plaintiff to access his flash drive's contents would preclude summary judgment.

## III. Retaliation

**\*6** Last, Plaintiff also raises a First Amendment claim of retaliation arising from his use of the prison grievance process. Prisoners retain a First Amendment right to complain of their conditions, and "the gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech." *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003).

To make out a claim of retaliation, a plaintiff must show "(1) that his speech or act was constitutionally protected; (2) that the defendant's retaliatory conduct adversely affected the protected speech; and (3) that there is a causal connection between the retaliatory actions and the adverse effect on speech." *Pittman v. Tucker*, 213 F. App'x 867, 870 (11th Cir. 2007) (citing *Bennett v. Hendrix*, 423 F.3d 1247, 1250–51 (11th Cir. 2005)). The parties agree, for purposes of summary judgment, that Plaintiff's use of the grievance process was a constitutionally protected form of speech.

Plaintiff contends that Defendant Zanders retaliated in the following two ways. First, after Plaintiff filed his "first grievance or my second grievance" at Central State Prison, (Pl.'s Dep., Doc. 44-6, p. 45), Plaintiff claims that Defendant Zanders "extended ... my detail appointment," (*id.*, pp. 52–53), or informed Plaintiff "that he has been unable to get [a] detail/inmate job in the law library because they don't want trouble makers in there." (Pl.'s Resp., Doc. 61, p. 11). *Cf.* (Pl.'s Dep., Doc. 44-6, p. 47) ("I'm a trouble maker or something like that"). Plaintiff argues that given his masters-level education, (Pl.'s Dep, Doc. 44-6, p. 63), he is better suited for library work than for work as a dorm orderly. (Pl.'s Dep., Doc. 44-6, p. 64).

Second, Plaintiff's deposition testimony indicates that at some point, Defendant Zanders simply "stopped taking" or "wouldn't accept" Plaintiff's grievances. (Pl.'s Dep., Doc. 44-6, p. 45). Plaintiff was later able to file a grievance with a different correctional officer regarding Defendant Zanders' refusal to accept Plaintiff's grievances for processing. *See* (Pl.'s Resp., Doc. 61, pp. 10–11) (discussing a "Counselor Angela Christian"). According to Plaintiff, this grievance was "fully granted" by Defendant Thomas. (Pl.'s Dep., Doc. 44-6, pp. 47, 50). The Defendants do not contest Plaintiff's testimony that his grievance against Zanders was granted, and no party has submitted Plaintiff's grievances for review by the Court.

In light of Plaintiff's account of events, and based on the limited record before the Court, a record that must be construed in Plaintiff's favor, Defendant Zanders has not demonstrated that she is entitled to summary judgment. Zanders argues that she "has nothing to do with the staffing of the law library and therefore could not have retaliated against Plaintiff in that regard." (Reply, Doc. 62, p. 3). *See also* (Aff. of Zanders, Doc. 44-4, ¶ 19). This argument misses the mark. Just as threats of force, even if empty, may chill speech and hence amount to adverse action, Zanders' alleged statements regarding Plaintiff's work detail, even if empty, could amount to adverse action if they would "likely deter a [prisoner] of ordinary firmness." 🚩 *Pittman v. Tucker,* 213 F. App'x 867, 871 (11th Cir. 2007). The pertinent issue is whether a prisoner in Plaintiff's position reasonably should have known that Defendant Zanders had no influence, even indirectly, over Plaintiff's continued assignment to work detail as a dorm orderly. On that pertinent issue, the Court presently has before it no relevant evidence or argument.

 **\*7** Zanders also argues that prison policy "limits an offender to two active grievances at a time," and that Plaintiff "[ran] into a problem of numerosity on a regular basis." (Doc. 44-1, p. 4). The cited prison policy shows that prisoners are "limited to two (2) Active Grievances," and that attempts to file additional grievances should result not in automatic rejection, but rather in a choice to maintain the two prior grievances or instead to substitute the new grievance:

> If an Offender's new grievance would exceed the two (2) Active Grievances limit, the Grievance Coordinator will advise the Offender that he may voluntarily drop one (1) of the two (2) Active Grievances utilizing Attachment 10, Active Grievances Process Form. The Grievance Coordinator will keep a hard copy of the grievance and Attachment 10, Active Grievances Process Form, in the Grievance Coordinator's office.

GDC SOP 227.02 (IV)(B)(4)(a), (Doc. 44-5, p. 5)

There is no evidence before the Court to show that Defendant Zanders followed this policy, or indeed that Zanders refused to accept Plaintiff's grievances on any policy grounds. On the present record, in other words, the Court lacks a sufficient evidentiary basis to conclude as a matter of law that Plaintiff's grievances were "rejected because they did not comply with the Grievance SOP." (Reply, Doc. 62, p. 3).

Finally, Defendant Zanders argues that Plaintiff's later submission of additional grievances to a different correctional officer shows that Plaintiff was not deterred by Zanders' alleged refusal to accept Plaintiff's grievances, or by Zanders' alleged chilling statements regarding Plaintiff's work assignment. Plaintiff's deposition testimony, however, when construed in his favor suggests that Plaintiff was in fact subjectively deterred from filing grievances. [6] More importantly, the relevant inquiry is not subjective, but objective: it asks whether the asserted retaliatory conduct "would likely deter a prisoner of ordinary firmness." 🚩 *Smith v. Mosley,* 532 F.3d 1270, 1277 (11th Cir. 2008). On this record, Defendant Zanders has failed to show that the "factual inquiry" of

deterrence or adverse action may be resolved in her favor as a matter of law. *Id.* Accordingly, for all of these reasons, Defendant Zanders is not entitled to summary judgment on Plaintiff's First Amendment claim of retaliation.

## IV. The Prison Litigation Reform Act

The Prison Litigation Reform Act's "limitation on recovery" provision provides that "[n]o Federal civil action may be brought by a prisoner ... for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." 42 U.S.C. § 1997e(e). The record gives no indication that any of the wrongs complained of in this action caused a physical injury, or that they involved the commission of a sexual act. Therefore, under Eleventh Circuit precedent, Plaintiff is limited to a damages recovery of only nominal damages, including on his First Amendment claims. *See Brooks v. Warden*, 800 F.3d 1295, 1308 (11th Cir. 2015) ("§ 1997e(e) does not bar a prisoner from recovering nominal damages"). *See also Carter v. Allen*, 940 F.3d 1233 (11th Cir. 2019).

**\*8** Accordingly, insofar as the Defendants move for summary judgment on the basis of the PLRA's damages bar, it is recommended that the Defendants' motion be granted, and that Plaintiff's potential damages recovery in this action be limited to nominal damages.

## CONCLUSION

After a careful review of the record, it is **RECOMMENDED** that the Defendants' motion for summary judgment (Doc. 44) be **GRANTED** as to Plaintiff's claims for compensatory and punitive damages, but otherwise **DENIED**. Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this Recommendation, or seek an extension of time to file objections, WITHIN FOURTEEN (14) DAYS after being served with a copy thereof. The District Judge will make a de novo determination of those portions of the Recommendation to which objection is made. All other portions of the Recommendation may be reviewed for clear error.

The parties are further notified that, pursuant to Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."

**SO RECOMMENDED**, this 26th day of June, 2020.

## All Citations

Slip Copy, 2020 WL 6498974

## Footnotes

1    Plaintiff's filings suggest the transcripts were needed for new trial proceedings and that the presiding state court took steps to ensure that Plaintiff received a copy of his transcripts. *See* (Doc. 61-11, p. 3).

**Ford v. Zanders, Slip Copy (2020)**

2     The Court's screening Order did not permit a retaliation claim to proceed against Defendant Thomas. *See* (Doc. 11, pp. 4–5).

3     The deadline for Plaintiff's response to the Defendants' motion for summary judgment was April 13, 2020. (Doc. 51, p. 6). Plaintiff served that document on April 24, 2020. (Doc. 59).

4     *See, e.g., Coleman v. Danforth*, 2018 WL 985768 at *2 (S.D. Ga. Feb. 20, 2018); *Thermoset Corp. v. Building Materials Corp. of America*, 2014 WL 6473232 at *5 (S.D. Fla. Nov. 18, 2014); *Pensacola Beach Cmty. United Church, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2007 WL 737499 at *2 n.1 (N.D. Fla. Mar. 7, 2007).

5     *See also* (Aff. of Pl., Doc. 61-9, ¶ 2) ("Spikes refused to let Plaintiff eat lunch because he was not wearing a 'uniform' shirt").

6     *See* (Pl.'s Dep., Doc. 44-6, p. 44) ("How many grievances have you filed against Central State Prison employees in that twelve to thirteen months? A: I don't recall exactly, but I'm guessing five"); (*Id.*, p. 45) ("If they had taken all the grievances you wanted to file, how many would you have filed? A: Probably about six, seven, maybe").

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

Gazarkiewicz v. Town of Kingsford Heights, Indiana, 359 F.3d 933 (2004)

149 Lab.Cas. P 59,842, 20 IER Cases 1823

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Samuelson v. LaPorte Community School Corp.,   N.D.Ind.,   November 17, 2006

359 F.3d 933

United States Court of Appeals,

Seventh Circuit.

John A. GAZARKIEWICZ, Plaintiff–Appellant,

v.

TOWN OF KINGSFORD HEIGHTS, INDIANA, Kingsford Heights Town Council, Harry Morrison,

Individually and as Council President of Town of Kingsford Heights, Indiana, et al., Defendants–Appellees.

No. 03–2775.

|

Argued Dec. 2, 2003.

|

Decided March 8, 2004.

**Synopsis**

**Background:** Discharged town employee brought action alleging that his discharge violated his federal constitutional rights and that town refused to pay him vacation pay in violation of Indiana law. The United States District Court for the Northern District of Indiana, Christopher A. Nuechterlein, United States Magistrate Judge, 264 F.Supp.2d 735, entered judgment in favor of defendants, and employee appealed.

**Holdings:** The Court of Appeals, Ripple, Circuit Judge, held that:

employee established his First Amendment retaliation claim, and

employee was not entitled to vacation pay under Indiana's "wage payment statute."

Affirmed in part; reversed and remanded in part.

**Procedural Posture(s):** On Appeal.

**Attorneys and Law Firms**

**\*935**  Rebecca Wyatt (argued), Meyer & Wyatt, Gary, IN, for Plaintiff–Appellant.

Kristin A. Mulholland (argued), Polick & Associates, Highland, IN, for Defendant–Appellee.

Before RIPPLE, MANION and DIANE P. WOOD, Circuit Judges.

**Opinion**

RIPPLE, Circuit Judge.

On November 28, 2001, the Town Council for the Town of Kingsford Heights, Indiana, voted to remove John A. Gazarkiewicz from his position as a laborer in the Town's Public Utilities Department. As a result, on February 27, 2002, Mr. Gazarkiewicz

initiated this action in the United States District Court for the Northern District of Indiana against the Town of Kingsford Heights and its Town Council; the town council members, individually and in their official capacities; and Ralph Harmon, individually and in his official capacity as Utilities Superintendent of the Town (collectively "defendants"). Pursuant to 📄 42 U.S.C. § 1983, Counts I and V alleged that his discharge violated his federal constitutional rights to free speech and association under the First and Fourteenth Amendments, and Counts III and IV alleged deprivation of his rights to procedural and substantive due process under **\*936** the Fourteenth Amendment. Count II alleged that his discharge also violated his free-speech rights under the Indiana Constitution, and Count VI alleged the Town refused to pay him vacation pay in violation of Indiana law.

In April of 2003, the parties filed cross-motions for summary judgment. In an order dated May 27, 2003, the district court disposed of all Mr. Gazarkiewicz's claims in favor of the defendants. A final judgment was entered on May 28, 2003; Mr. Gazarkiewicz timely appealed. For the reasons set forth in the following opinion, we affirm in part and reverse in part the judgment of the district court, and we remand the case for further proceedings consistent with this opinion.

# I

# BACKGROUND

## A. Facts

The Town of Kingsford Heights administers its business through its five-person Town Council. Mr. Gazarkiewicz was hired on or about May 13, 2001, by the Town to work in its Public Utilities Department as a laborer. Also in 2001, the Town hired Ralph Harmon as Superintendent of the Public Utilities Department. Town employees levied numerous complaints regarding Mr. Harmon's performance, and this dissatisfaction with Mr. Harmon was a source of disharmony among town employees.

On October 31, 2001, the Council held a mandatory meeting for all of the town employees. The purpose of the meeting, according to various council members, was to allow the employees to air their grievances. At the meeting, the employees were told, apparently somewhat informally, of a new "grievance procedure." At the least, the employees were told that any future complaints regarding a superior were to be addressed in writing to that employee's supervisor, and any complaints regarding Mr. Harmon were to be made to the Council in writing. *See* Appellees' Br. at 4; Williamson Dep. at 17. The parties dispute what the employees were told regarding speaking publicly about grievances. Two council members, Frank Underwood and Evelyn Ballinger, did not remember any discussion at the meeting regarding public speech. *See* Underwood Dep. at 10; Ballinger Dep. at 17. Ms. Ballinger explained:

> I can't really say that we [the Council] ever told them they couldn't speak anything in public, but the common consensus was "what was said in this room should stay in this room." You know, you don't want all of your business out in the street. So that's basically it.

Ballinger Dep. at 17. A third council member, Kevin Williamson, explained that the employees were told that their "public display" regarding Mr. Harmon's and the Council's incompetence was "going to have to stop." Williamson Dep. at 17. The following addition to the employee handbook occurred as a result of the meeting: "The superintendent must be notified of the complaint by the council and the superintendent will follow up with a written report of the incident to each council member before the review."

Earlier in October of 2001, Mr. Gazarkiewicz typed a flyer written by Robert Reese, a citizen, but not an employee, of the Town. The flyer, in its final form, read:

WAKE UP CALL

149 Lab.Cas. P 59,842, 20 IER Cases 1823

### Is He Worth it, Are They Worth It?

I'm a homeowner in the Town of Kingsford Height's and have been for the past 11 years, recently our present Utility Superintendent was suspended with pay for not responding quickly about a hazardous spill involving a leaky transformer.

**\*937** After the property owners called the Environmental Protection Agency "EPA", the "EPA" in turn told them to call hazmat, this caring Superintendent had the dirt removed and it was tested negative for contamination, shame, shame, shame for the delay.

This Superintendent in the short time of employment here has had numerous complaints filed against him from property owners, nothing done, some serious enough to have him dismissed had it happened at another corporation or factory, he even has had a harassment complaint filed against him in the past from another town employee, still nothing done.

Why would this town employ a person to sit at a desk for 38K a year with no knowledge of utilities and not a person who has 25 years of experience and certified in every aspect of town utilities for roughly the same amount?

Is this what our Government calls "PORK BARREL SPENDING"?

Our current Town Council Board, which by the way have been appointed by proxy, and not elected by the people should consider what the town can and cannot afford in these times of tradgic events, factory closings, high fuel cost's, and budget cuts nation wide to better serve the people of Kingsford Height's in a more efficient way, and not to just please a few. I ask again to the people of Kingsford Height's, would you rather pay for experienced personel, qualified personel, or inexperienced personel? These decisions made recently will reflect on the decisions made come election day. GOD BLESS AMERICA, GOD BLESS FREE ELECTIONS!

The flyer was signed "Concerned Resident." It was posted at a local grocery store approximately two-and-one-half weeks after the October 31 meeting. The parties agree that Mr. Gazarkiewicz was aware that Reese was going to publish the flyer in some fashion, but Mr. Gazarkiewicz did not assist in its posting.

Upon learning of the flyer, Mr. Harmon immediately removed it and delivered it to the President of the Town Council. On November 28, 2001, the Council considered the flyer "incident." The minutes from that meeting state:

> Harry Morrison then read a letter from John Gazarkiewicz dated 11/21/2001, regarding an apology. The incident involved was discussed and it was the concensus [sic] of all Town Council members that there were major violations of the handbook concerning insubordination and that some sort of action should be taken. Disciplinary options were discussed. Following discussion, the motion to terminate the employment of John Gazarkiewicz for insubordination was made by Frank Underwood, seconded by Evelyn Ballinger. During further discussion, Mr. Gazarkiewicz stated that the Town would be "hearing from his attorney" if he is terminated. The motion carried 4–1, with Kevin Williamson opposed.

Some time after his employment ceased, Mr. Gazarkiewicz made a demand for vacation pay. The Town denied this demand because Mr. Gazarkiewicz had only worked for the Town from June of 2001 to November of 2001, and it interpreted Town of Kingsford Heights, Ind., Ordinance 2–16–020 to require a year of continuous service, or employment past January 1, in order to make an employee eligible for vacation pay.

### B. District Court Proceedings

**1. Procedural Due Process (Count III), Freedom of Association (Count V) & Defendant Harmon's Liability**

The district court first noted that Mr. Gazarkiewicz did not respond to the defendants' **\*938** motion for summary judgment on his procedural due process claim (Count III), his freedom of association claim (Count V), and all claims against Mr. Harmon in his individual and official capacities. Accordingly, the court granted the defendants' motion for summary judgment on these issues. On this appeal, Mr. Gazarkiewicz does not challenge this portion of the district court's holding.

**2. Freedom of Speech (Count I)**

 Mr. Gazarkiewicz alleged that his First Amendment free-speech rights were violated in two distinct ways. First, he alleged that he was discharged in retaliation for his constitutionally protected speech. Second, he alleged that the "grievance procedure" established at the October 31, 2001 meeting constituted a prior restraint inconsistent with the First Amendment. The district court began with Mr. Gazarkiewicz's First Amendment retaliation claim and held that the claim failed all three prongs of the test set out in *Vukadinovich v. Board of School Trustees of North Newton School Corp.,* 278 F.3d 693, 699 (7th Cir.2002). As to the first element, the court determined that Mr. Gazarkiewicz's speech [1] was not protected because, although it commented on a matter of public concern, the government's interest in efficiency as an employer outweighed Mr. Gazarkiewicz's interest in commenting on these matters. The court especially was persuaded by the fact that the speech took place at a time of disharmony among town employees.

The district court then held that, even assuming Mr. Gazarkiewicz's speech was protected, his claim failed the second and third prongs of the retaliation analysis. These prongs required Mr. Gazarkiewicz to produce evidence showing that his discharge was motivated by his protected activity and to rebut any neutral reason proffered by the defendants for his discharge. *See Vukadinovich,* 278 F.3d at 699. The court stated that Mr. Gazarkiewicz offered no evidence or analysis on either of these issues. Therefore, under Northern District of Indiana Local Rule 56.1(b), the court was required to accept the facts as provided by the defendants on these issues. The court explained that the defendants' motion alleged that Mr. Gazarkiewicz was fired due to a grudge he held against Mr. Harmon. Further, the court held, "the record is replete with examples of Plaintiff's poor job performance, affording Defendants numerous reasons to terminate **\*939** Plaintiff apart from his speech." R.47 at 15. Accepting these justifications as true, the court held that Mr. Gazarkiewicz's claim failed the second and third elements of the retaliation test.

The district court next held that the grievance procedure issued by the Town Council did not constitute an unconstitutional prior restraint on employee speech. First, the court explained, the grievance procedure was not a "total ban on employee speech, merely a ban on unfounded criticism outside the Town's chain of command." *Id.* at 20. Therefore, "[b]ecause Plaintiff has given no evidence that a blanket restriction on employee speech even existed," his prior restraint claim should fail on this ground alone. *Id.* at 21. Second, the court held that, even assuming the grievance procedure constituted a blanket ban, the Town's interest in preventing further employee disruption by restraining the speech outweighed Mr. Gazarkiewicz's interest in publicly complaining about town management. [2] Therefore, the court held, Mr. Gazarkiewicz's prior restraint claim must be dismissed.

**3. Substantive Due Process (Count IV)**

The court next held that Mr. Gazarkiewicz's substantive due process claim was not actionable because he had failed to show the defendants' actions in discharging him were so arbitrary and capricious as to "shock[ ] the conscience." *Id.* at 22 (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 855, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). The court further noted that the defendants had provided several reasons for Mr. Gazarkiewicz's termination, such as insubordination. This doomed his

claim, according to the court, because he failed to show that the termination was "unjustifiable by *any* governmental interest." *Id.* at 23 (quoting Lewis, 523 U.S. at 849, 118 S.Ct. 1708).

### 4. Vacation Pay (Count VI)

Finally, the district court dismissed Mr. Gazarkiewicz's state-law claim for vacation pay. The court noted that Indiana law establishes that an employee is entitled to vacation pay after termination only if he was otherwise entitled to it under the employer's policy at the time of his termination. R.47 at 24–25 (discussing Damon Corp. v. Estes, 750 N.E.2d 891, 892–93 (Ind.Ct.App.2001)). The court then determined that, under Town of Kingsford Heights, Ind., Ordinance 2–16–020, Mr. Gazarkiewicz was not eligible for vacation pay at the time of his discharge. Therefore, his claim for vacation pay must fail.

## II

### DISCUSSION

#### A. Standard of Review

This court reviews a district court's grant of a motion or cross-motion for summary judgment de novo. *See* Allen v. City of Chicago, 351 F.3d 306, 311 (7th Cir.2003). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering cross-motions for summary judgment, we are obliged to view all facts and draw all reasonable inferences in a light most favorable to the party against whom the motion under consideration is made. *See* Allen, 351 F.3d at 311.

#### *940  B. Freedom of Speech (Count I)

We first shall address Mr. Gazarkiewicz's claim that he was fired in retaliation for protected speech. The district court determined that this claim failed as a matter of law. We respectfully disagree and now hold that the record establishes that Mr. Gazarkiewicz was fired in retaliation for constitutionally protected speech in violation of the First and Fourteenth Amendments and 42 U.S.C. § 1983. [3]

A public employee retains First Amendment rights to free speech, including the right to criticize his employer. *See* Khuans v. Sch. Dist. 110, 123 F.3d 1010, 1016 (7th Cir.1997) ("Public criticism of a government employer's policies can be protected speech."). However, that right is not absolute; it must be weighed against the government's need as an employer to conduct its affairs effectively and efficiently. *See* Waters v. Churchill, 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). We conduct a three-part inquiry when faced with a claim that a public employee has been improperly retaliated against due to the exercise of his First Amendment rights:

> 1) Was [the plaintiff's] speech constitutionally protected? 2) If so, were the defendants' actions motivated by his constitutionally protected speech? 3) If [the plaintiff] can show that his constitutionally protected speech was a substantial or motivating factor in his termination, can the defendants show that they would have taken the same action in the absence of his exercise of his rights under the First Amendment? If [the plaintiff] can establish the first two prongs, the burden shifts to the defendants to prove by a preponderance of the evidence that [the plaintiff] would have been terminated regardless of his protected

149 Lab.Cas. P 59,842, 20 IER Cases 1823

speech. If the defendants carry that burden, [the plaintiff] bears the burden of persuasion to show that the defendants' proffered reasons were pretextual and that discrimination was the real reason that the defendants fired him.

*Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.,* 278 F.3d 693, 699 (7th Cir.2002) (citations omitted). In this case, the record compels a holding that Mr. Gazarkiewicz's speech was protected and that his discharge was motivated in substantial part by his protected speech.

### 1. Step 1: Constitutionally Protected Speech

"[D]etermining whether the plaintiff's speech was constitutionally protected ... is a question of law for the court." *Kokkinis v. Ivkovich,* 185 F.3d 840, 843 (7th Cir.1999). The Supreme Court's decisions in *Pickering v. Board of Education of Township High School District 205,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), establish a two-part inquiry to determine if speech is constitutionally protected. *See generally Wainscott v. Henry,* 315 F.3d 844, 848 (7th Cir.2003). First, we must determine whether the employee spoke as a citizen upon matters of public concern. *See id.* If this hurdle is cleared, then we must balance "the employee's interest in commenting upon such matters and the employer's interest in efficient public services." *Id.*

#### a. Matters of Public Concern

Speech is a matter of public concern if it relates to any matter of "political, **\*941** social, or other concern to the community." *Id.* at 849 (internal quotation and citation omitted). Conversely, speech is not a matter of public concern if it involves a "personal grievance of interest only to the employee." *Id.* We conduct this inquiry through a consideration of "the content, form, and context of [the speech] as revealed by the whole record." *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684. While due consideration must be given to all of these factors, content is the most important. *See Wainscott,* 315 F.3d at 850.

This case presents a paradigmatic example of speech of a public concern. The content of the flyer, which constitutes Mr. Gazarkiewicz's speech, highlights the mismanagement of a town official, questions the Council's decision to hire an official with inadequate experience and asks whether his salary is justified in light of the difficulties facing the Town. As we recently said in *Wainscott:*

Whether the city is run in an efficient and effective manner is clearly an important matter of public concern. An employee's ability to highlight the misuse of public funds or breaches of public trust is a critical weapon in the fight against government corruption and inefficiency. *See, e.g., Propst v. Bitzer,* 39 F.3d 148, 152 (7th Cir.1994); *Conner v. Reinhard,* 847 F.2d 384, 390–91 (7th Cir.1988). We would be remiss not to protect an employee's ability to expose such things. In addition, most people would likely have an interest in the possible incompetence of public officials. "Speech that seeks to expose improper operations of the government or questions the integrity of governmental officials clearly concerns vital public interests." *Conaway v. Smith,* 853 F.2d 789, 797 (10th Cir.1988). If the administration was truly running the city in a highly inefficient manner, it would constitute a " 'breach of public trust' which the Court in *Connick* suggested might qualify for protection." *Breuer v. Hart,* 909 F.2d 1035, 1038 (7th Cir.1990).

315 F.3d at 849. Furthermore, the flyer relates those inefficiencies to a matter at the core of our constitutional system: democratic elections. *See Zorzi v. County of Putnam,* 30 F.3d 885, 896 (7th Cir.1994) ("[P]olitical speech is clearly a matter of public concern ...."). The flyer notes that the Town Council was appointed and not publicly elected and warns that, when the council members do come up for elections, these decisions will be taken into account. To be sure, the flyer was not written in the finest Shakespearian prose, and it did not uncover publicly concealed secrets that would shake the Town's foundations. For good reason, however, these are not prerequisites to First Amendment protection. *See Wainscott,* 315 F.3d at 849 (noting that it is irrelevant, for purposes of the First Amendment analysis, that the plaintiff "did not apprise his audience of shocking revelations or insightful analysis as to why the administration is incompetent"); *Dishnow v. Sch. Dist. of Rib Lake,* 77 F.3d 194, 197 (7th Cir.1996) (explaining that matters of public concern do not necessarily involve matters of "transcendent importance, such as the origins of the universe or the merits of constitutional monarchy").

The defendants argue that, even if the content of Mr. Gazarkiewicz's speech does contain matters of "public importance," it is not a "matter of public concern" because it was motivated by Mr. Gazarkiewicz's personal interests. *See Kokkins,* 185 F.3d at 844 (holding that, even if speech addresses a matter of "public importance," it may nevertheless be deemed not of "public concern" if the point of the speech was to "further some purely private interest" (internal quotation and citation omitted)). This argument faces a high evidentiary burden as we have emphasized that **\*942** speech of public importance is only transformed into a matter of private concern when it is motivated *solely* by the speaker's personal interests. *See Gustafson v. Jones,* 290 F.3d 895, 908 (7th Cir.2002) (emphasizing that speech is transformed into a matter of private interest when it is "only motivated by private concerns" and further explaining that "even if [the police officers] were advancing some private interests when they raised concerns about [the Field Deputy Inspector's] orders, their claim survives as long as they also intended to bring to light what they believed to be the negative law enforcement consequences of the new policy").

The defendants characterize Mr. Gazarkiewicz's involvement with the flyer as merely an attempt to spread rumors about Mr. Harmon and the Council, motivated by Mr. Gazarkiewicz's personal animus against Mr. Harmon and the Council. The defendants claim that the two specific incidents regarding Mr. Harmon that the flyer discusses—the transformer leak and the sexual harassment claim—already had been addressed at a public council meeting and were found to be unsubstantiated by the Council. At the outset, we note the inconsistency of the defendants' reasoning with basic First Amendment principles. The defendants' reasoning implies that, because these two incidents were publicly discussed, they do not need to be brought further to the public's attention. However, employees that highlight publicly known inefficiencies in a call for democratic change implicate First Amendment values to the same extent as whistleblowers who expose those inefficiencies in the first instance. *See, e.g., New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (discussing the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials"). As to the validity of the two specific claims against Mr. Harmon discussed in the flyer, "[a] public employee is not required to prove the truth of his speech in order to secure the protections of the First Amendment." *Chappel v. Montgomery County Fire Prot. Dist. No. 1,* 131 F.3d 564, 576 (6th Cir.1997). Rather, speech of public importance only loses its First Amendment protection if the public employee knew it was false or made it in reckless disregard of the truth. *See Pickering,* 391 U.S. at 574, 88 S.Ct. 1731 ("[A]bsent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." (footnote omitted)); *Brenner v. Brown,* 36 F.3d 18, 20 (7th Cir.1994) ("[A]n employee's speech is not protected where it is ... made with a reckless disregard for the truth, or is otherwise profane and disparaging."). In this case, the defendants, who carry the burden on this issue, do not even attempt to prove Mr. Gazarkiewicz participated in the flyer knowing the falsity of the two claims against Mr. Harmon or in reckless disregard of their truth. *See Chappel,* 131 F.3d at 576 ("[A]lthough protection may not be available when a public

employee knowingly or recklessly makes false statements, it is the defendants' burden to establish that [the public employee] knew or was recklessly indifferent to the fact that his speech was false."). [4]

The content of the flyer, viewed as a whole, is about much more than the two  **943**  incidents related to Mr. Harmon on which the defendants narrowly focus. *See* ⚑ *Taylor v. Carmouche,* 214 F.3d 788, 792 (7th Cir.2000) (noting that a court is required to view the speech as a whole in determining whether it addresses a matter of public concern). The content of the flyer also goes well beyond matters of personal interest to Mr. Gazarkiewicz as a town employee and addresses matters that affect Mr. Gazarkiewicz as a town citizen. *See* ⚑ *Wainscott,* 315 F.3d at 850 ("Wainscott's expression did not concern the effect the city's alleged incompetence had upon him personally.... [O]ther than his interest as a taxpayer, he had no personal or pecuniary interest in the placement of dumpsters, or for that matter, in the management of the city as a whole."); *cf.* ⚑ *Wallscetti v. Fox,* 258 F.3d 662, 667 (7th Cir.2001) (holding speech addressed only matters of personal interest when "[t]he content of Wallscetti's complaints shows that she was complaining only about Fox and Laraia's [her supervisors'] hostility toward her personally, rather than more generally about her supervisors' effect on the morale of the office as a whole or some other issue of broader importance"). Furthermore, the additional two factors we are compelled to consider—the form and context of the speech—do not support the conclusion that Mr. Gazarkiewicz was merely rumor-spreading out of personal animus. That the speech came in the form of a flyer signed "Concerned Resident," was developed in conjunction with a town resident and non-employee of the Town and was posted at a local grocery store lends credence to the view that the speech was motivated by public concerns.

*Cf.* ⚑ *Wallscetti,* 258 F.3d at 667 ("The form of Wallscetti's speech, contacting her supervisors' internal superiors rather than attempting to bring the harassment into view of those outside the County's administrative structure, further supports finding that her complaints are not protected.").

 A fair reading of the record does reveal that Mr. Gazarkiewicz did not think highly of Mr. Harmon or of the Council, and we do not ignore the possibility that his participation in the flyer was motivated in part by that distaste. However, as we recently explained, "to use the nature of this relationship as the basis for the conclusion that this was a statement of personal interest is highly tenuous. An employee's speech on matters that might otherwise be protected cannot lose protection solely as a result of a history of animosity." ⚑ *Wainscott,* 315 F.3d at 850. In sum, therefore, we agree with the district court that Mr. Gazarkiewicz's speech addressed matters of public concern and was not motivated solely by personal interests.

### b. Balancing of Interests

 Even if an employee's speech addresses matters of public concern, it may be punished by the employer if the employer "can carry its burden of proving that the interest of the public employee as a citizen in commenting on the matter is outweighed by the interest of the [government], as employer, in promoting effective and efficient public service." ⚑ *Gustafson,* 290 F.3d at 909. This court has set forth seven interrelated elements for consideration in our balancing:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the  **944**  speaker should be regarded as a member of the general public.

*Greer v. Amesqua,* 212 F.3d 358, 371 (7th Cir.2000). Upon consideration of these factors in relation to the record before us, we must disagree with the district court's determination that the interest of the community in the orderly processes of government as employer outweighed the right of Mr. Gazarkiewicz to collaborate with his fellow citizen in stating his views on matters of public concern.

Mr. Gazarkiewicz was a laborer in the Town's Public Utilities Department. His position is not one in which "personal confidence and loyalty are necessary," and there is no evidence that his speech affected, much less "impeded," his "ability to perform [his] responsibilities." *Id.* Moreover, when Mr. Gazarkiewicz participated in the speech, he was acting as "a member of the general public" in a "time, place and manner" implicating less employment-related concerns. *Id.* As alluded to earlier, he was collaborating with a fellow citizen and non-employee of the Town regarding matters which ran more to his interests as a town taxpayer than his interests as a town employee. Further, Mr. Gazarkiewicz's part of the collaboration in forming the flyer took place on his own time and away from work premises, and, when the flyer was actually posted, it was done so off work premises at a local grocery store. *See Connick,* 461 U.S. at 153 & n. 13, 103 S.Ct. 1684 (explaining the fact that the employee "exercised her rights to speech at the office supports Connick's fears that the functioning of his office was endangered" and further noting that "[e]mployee speech which transpires entirely on the employee's own time, and in nonwork areas of the office, bring different factors into the *Pickering* calculus"). In sum, Mr. Gazarkiewicz was speaking more from the perspective of a town citizen, in his free time, off work premises and, as we held in the previous section, on matters of quintessential public importance. Taken together, these factors dictate that Mr. Gazarkiewicz's speech interest was strong, and "[t]he stronger the employee's interest in speaking, the more substantial a showing the [government] must make to justify its restriction of that speech." *Gustafson,* 290 F.3d at 909.

The defendants have produced no evidence that Mr. Gazarkiewicz's speech actually disrupted town affairs. Of course, the defendants are not required to produce actual evidence of disruption to prevail. The Supreme Court has instructed that we give "substantial weight to government employers' reasonable predictions of disruption," and that we are to look at the facts "as the employer *reasonably* found them to be," and not as the employee claims they occurred. *Waters v. Churchill,* 511 U.S. 661, 673, 677, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). However, to be "reasonable," that prediction must be supported with an evidentiary foundation and be more than mere speculation. *See Wainscott,* 315 F.3d at 851.

The defendants' prediction of disruption in this case is supported too thinly to be deemed anything other than speculation. The defendants contend that they were forced to curtail public criticism of the Council and Mr. Harmon, such as Mr. Gazarkiewicz's, in order to bring under control the disharmony among town employees that was affecting the Town's administration of business. This general disharmony continuously is noted in the defendants' argument, but it is detailed insufficiently in the record for us to conclude its potential to disrupt town affairs. The record in no way quantifies that disharmony, and more importantly, it contains not a single instance of how town administration was disrupted due to this disharmony. The defendants rely heavily, as did the district court, on council **945** member Frank Underwood's testimony that "ever since I took seat we've been dealing over half of our issues were from employees." Underwood Dep. at 7. This statement, and other similar statements we have located in the record,[5] merely supports that the council members had to work harder to address employee concerns; it is insufficient evidence to allow us to leap to the conclusion that public speech like Mr. Gazarkiewicz's was reasonably likely to cause the Town's functioning to be disrupted. We are not unsympathetic to the importance of workplace harmony and of the need for an employer such as the government to be proactive in solving workplace problems. As we recently said, "[a] government employer need not 'allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.' " *Greer,* 212 F.3d at 372 (quoting *Connick,* 461 U.S. at 152, 103 S.Ct. 1684). However, all workplaces contain some disharmony, and dissatisfaction with superiors is not uncommon. If a general claim of disharmony could be used by a government to insulate itself from public criticism by its employees, the First Amendment's guarantee that "[e]mployees of governmental entities generally should be able to complain or criticize" in order to promote governmental

Gazarkiewicz v. Town of Kingsford Heights, Indiana, 359 F.3d 933 (2004)

149 Lab.Cas. P 59,842, 20 IER Cases 1823

efficiency would be empty. *Wainscott,* 315 F.3d at 852; *see also Hulbert v. Wilhelm,* 120 F.3d 648, 655 (7th Cir.1997) ("*Connick* reiterated *Pickering* 's rule that the mere incantation of the phrase 'internal harmony in the workplace' is not enough to carry the day ...."). There must be a sufficient evidentiary basis from which we reasonably can conclude that the morale problem, if festered by the public criticism, would cause a serious disruption in municipal services in this area of town governance. That danger, moreover, must be sufficiently severe and imminent to override Mr. Gazarkiewicz's substantial interest in speech. The record simply will not support that conclusion. Therefore, we must hold that the defendants' speculative interests in efficiency are outweighed by Mr. Gazarkiewicz's right to collaborate with a fellow citizen to speak on matters of public concern.

### 2. Steps 2 & 3: Protected Speech as a Substantial or Motivating Factor in the Discharge

Having determined that Mr. Gazarkiewicz's speech was protected, we now must consider whether his protected speech was the motivation for his termination. Our case law establishes a road map to guide this fact-specific inquiry. First, Mr. Gazarkiewicz bears the burden of showing that his speech was "a substantial or motivating factor in his termination." *Vukadinovich,* 278 F.3d at 699. If he meets that burden, the defendants then must establish "by a preponderance of the evidence that [Mr. Gazarkiewicz] would have been terminated regardless of his protected speech." *Id.* Finally, if the defendants carry that burden, Mr. Gazarkiewicz "bears the burden of persuasion to show that the defendants' proffered reasons were pretextual and that discrimination **\*946** was the real reason that the defendants fired him." *Id.*

The record in this case makes clear that Mr. Gazarkiewicz's speech was "a substantial or motivating factor in his termination." *Id.* The minutes from the November 28, 2001 council meeting in which Mr. Gazarkiewicz was fired, standing alone, make this abundantly clear:

> Harry Morrison then read a letter from John Gazarkiewicz dated 11/21/2001, regarding an apology. The incident involved was discussed and it was the consensus [sic] of all Town Council members that there were major violations of the handbook concerning insubordination and that some sort of action should be taken. Disciplinary options were discussed. Following discussion, the motion to terminate the employment of John Gazarkiewicz for insubordination was made by Frank Underwood, seconded by Evelyn Ballinger. During further discussion, Mr. Gazarkiewicz stated that the Town would be "hearing from his attorney" if he is terminated. The motion carried 4–1, with Kevin Williamson opposed.

We give these meeting minutes substantial weight; they are contemporaneous, official notations regarding council action. *See Brademas v. St. Joseph County Comm'rs,* 621 N.E.2d 1133, 1137 (Ind.Ct.App.1993) ("Boards and commissions speak or act officially only through the minutes and records made at duly organized meetings."). Furthermore, they are more reliable than post hoc justifications given by the council members in deposition testimony once they are aware they are being sued. *Cf. Highway J Citizens Group v. Mineta,* 349 F.3d 938, 958 (7th Cir.2003) ("The purpose of confining judicial review to the administrative record is to ensure that agencies adequately evaluate their proposed course of action *before* they act and do not simply attempt to justify rash, uniformed actions through *post hoc* rationalizations once they are aware they are being sued" (internal quotations and citations omitted)).

The burden now shifts to the defendants "to prove by a preponderance of the evidence that [Mr. Gazarkiewicz] would have been terminated regardless of his protected speech." *Vukadinovich,* 278 F.3d at 699. The defendants argue, and the district court found,[6] that Mr. Gazarkiewicz was fired for insubordination and/or for his poor work performance. As **\*947** to insubordination, we find ample record evidence to support the proposition that Mr. Gazarkiewicz was fired for "insubordination." Indeed, the meeting minutes cite "insubordination" as the reason for his discharge. However, the minutes,

as well as the deposition testimony,[7] make clear that Mr. Gazarkiewicz's speech—the flyer—was a major part of that "insubordination." The defendants attempt to cast his insubordination as less about the flyer and more about a "bad attitude" or a "grudge" against Mr. Harmon. However, much of the testimony they rely on again equates a "bad attitude" with Mr. Gazarkiewicz's protected speech. *See, e.g.,* Underwood Dep. at 21 ("[T]his happened roughly about one to two weeks right after that meeting. And I—I made up my mind that, you know, John Gazarkiewicz should be terminated ... to me it was like defiance, like he didn't want to cooperate."). Other parts of the testimony on which the defendants rely equates a "bad attitude" with Mr. Gazarkiewicz's unobjectionable posture of standing on his rights at the council meeting in which he was fired and not being sufficiently apologetic for his protected speech. *See* Morrison Dep. at 24 (noting that he met with Mr. Gazarkiewicz personally and Mr. Gazarkiewicz stated that he didn't have a problem with the Council but "acted like he still had issues with Mr. Harmon and all"). To the extent the defendants imply that *prior instances* of bad attitude led to his firing, their evidentiary support of such prior instances is not strong. Regardless, the record as a whole leads to the unmistakable conclusion that the "insubordination" for which Mr. Gazarkiewicz was fired relates primarily to the flyer "incident"; any concerns of a prior "bad attitude" were secondary.[8] *See* Ballinger Dep. at 25.

**\*948** As to poor job performance, we agree with the district court that the instances of poor job performance in the record "afford[ed] Defendants numerous reasons to terminate Plaintiff apart from his speech." R.47 at 15 (citing Gazarkiewicz Dep. at 17; Harmon Dep. at 33, 35; Willis Dep. at 13). However, the question is not whether Mr. Gazarkiewicz *could have been discharged* for his job performance, but it is whether he *was in fact discharged* for his job performance. The issue is one of causation, not of hypothetical justification. *See* *Vukadinovich,* 278 F.3d at 699. The overwhelming weight of the evidence supports the determination that Mr. Gazarkiewicz's termination had very little to do with job performance and everything to do with his speech. The minutes, which, again, we accord great weight, are silent regarding his job performance. The deposition testimony also does not advance the defendants' position; one council member said she cannot remember being informed of any of Mr. Gazarkiewicz's prior poor work conduct. *See* Ballinger Dep. at 25. Finally, we cannot ignore that Mr. Gazarkiewicz's discharge took place contemporaneously with his speech, not any instances of poor job performance.

Because of this evidence, we must conclude that the defendants have not met their burden of proving "by a preponderance of the evidence that [Mr. Gazarkiewicz] would have been terminated regardless of his protected speech." *Vukadinovich,* 278 F.3d at 699. Even if they had, the same evidence discussed above would compel us to conclude that Mr. Gazarkiewicz had met his burden of showing that the "defendants' proffered reasons were pretextual." *Id.* Mr. Gazarkiewicz collaborated with his fellow citizen in producing a flyer that constituted constitutionally protected speech. He was then fired for that speech. Because his First Amendment rights were violated, we must reverse the judgment of the district court on Mr. Gazarkiewicz's First Amendment retaliation claim.

## C. Vacation Pay (Count VI)

The only other question that requires our disposition on this appeal concerns Mr. Gazarkiewicz's claim for vacation pay, which he alleges he earned during his employment but which the Town refused to pay to him after his discharge. The district court determined that Mr. Gazarkiewicz was not entitled to vacation pay. We agree.

Recent Indiana cases interpreting Ind.Code § 22–2–5–1, Indiana's "Wage Payment Statute,"[9] clarify that an employee is entitled to vacation pay upon termination only if his right to vacation pay had vested **\*949** at the time of his termination. *See* *Indiana Heart Assocs., P.C. v. Bahamonde,* 714 N.E.2d 309, 311–12 (Ind.Ct.App.1999).* These cases further make clear that the right to vacation pay vests upon labor in absence of an employer policy, but if the employer has a policy, that policy governs when an employee's right vests. For example, in *Damon Corp. v. Estes,* 750 N.E.2d 891 (Ind.Ct.App.2001), the court noted that the corporation's policy stated that "an employee does not earn vacation pay each year until his/her anniversary date" and concluded "[the plaintiff] was therefore not entitled to his vacation pay from Damon at his termination some three months prior to his anniversary date." *Id.* at 893 (citation and footnote omitted); *see also* *Indiana Heart Assocs.,* 714 N.E.2d at 311–12 ("An

employee's right to vacation pay under the [Wage Payment Statute] is not absolute. Rather, an employee is entitled to her accrued vacation pay at the time of termination 'provided no agreement or published policy exist[s] to the contrary.' " (quoting *Die & Mold, Inc. v. Western,* 448 N.E.2d 44, 48 (Ind.Ct.App.1983))); *id.* at 312–13 ("[I]n denying an employee accrued vacation pay *to which the employee would otherwise be entitled* on grounds that a written policy so provides, the employer has the burden of showing a violation of the policy." (emphasis added)).

Under Town of Kingsford Heights, Ind., Ordinance 2–16–020, Mr. Gazarkiewicz was not entitled to vacation pay at the time of his termination. The Ordinance explains:

**Vacation Time:** All full-time personnel are eligible for paid vacation time according to the following schedule:

| | |
|---|---|
| One full year of continuous service | Five (5) days |
| Three full years of continuous service | Ten (10) days |
| Ten full years of continuous service | Fifteen (15) days |

The hiring date is used for determining eligibility. All vacations must be taken within the applicable calendar year and cannot be accrued.

If a full-time employee does not have one complete year of service completed as of January 1st of any given year, (s)he will be eligible for one paid vacation day for each ten (10) weeks of employment completed. These vacation days can be used after his/her anniversary date and must be used before the end of the applicable calendar year and cannot be accrued.

Mr. Gazarkiewicz was hired on or about May 13, 2001, and fired on November 28, 2001. Thus, at the time of his discharge, he had not performed a year of continuous service from the date of his hire nor had he worked past January 1.

Mr. Gazarkiewicz argues that this Ordinance merely purports to govern vacation *time* that an employee may take, and is silent on vacation *pay;* therefore, the background rule that an employee earns vacation pay upon his labor applies. However, a more natural reading of that Ordinance is that it is intended to cover both. Mr. Gazarkiewicz's suggested vacation time versus vacation pay distinction is illogical for the purposes for which he is advancing it: Why would an employee be eligible for vacation pay when he is not eligible for "paid vacation time"? *See Veprinsky v. Fluor Daniel, Inc.,* 87 F.3d 881, 888 (7th Cir.1996) (explaining that statutes should be construed so as to avoid absurd results). In sum, we hold that, at the time of his discharge, Mr. Gazarkiewicz was not entitled to vacation pay, and therefore, his state-law claim for vacation pay must fail.

## Conclusion

For the foregoing reasons, we reverse the district court's grant of summary judgment in favor of the defendants on Mr. **\*950** Gazarkiewicz's First Amendment retaliation claim. The district court shall enter summary judgment in Mr. Gazarkiewicz's favor on this claim. We affirm the district court's judgment on Mr. Gazarkiewicz's state-law vacation pay claim. We remand for proceedings consistent with this opinion. Mr. Gazarkiewicz may recover his costs in this court.

AFFIRMED IN PART; REVERSED and REMANDED IN PART

149 Lab.Cas. P 59,842, 20 IER Cases 1823

**All Citations**

359 F.3d 933, 149 Lab.Cas. P 59,842, 20 IER Cases 1823

## Footnotes

1    As a threshold matter, the district court rejected the defendants' contention that Mr. Gazarkiewicz's involvement with the flyer did not constitute "speech" eligible for First Amendment protection. *See* Fogarty v. Boles, 121 F.3d 886, 890 (3d Cir.1997) (explaining that "speech" is necessary to state a cognizable First Amendment claim). The court explained that Mr. Gazarkiewicz, "while not composing the flyer, played a significant role in its publication. Further, [his] termination for insubordination was triggered by his involvement with the flyer regardless of whether Plaintiff composed the flyer or was merely Reese's instrument in drafting the document." R.47 at 9. The defendants did not object to this holding in their briefs to this court. In any event, we agree with the district court that Mr. Gazarkiewicz's participation in the flyer was sufficient to trigger First Amendment protection. His participation was not in the nature of a disinterested typist, but as an aider and abetter. We also agree with the district court that the defendants certainly perceived him as engaging in speech and dealt with him on that basis. This is a far cry from a case in which the plaintiff claims the speech did not actually occur or a case in which the plaintiff disclaims any involvement in the speech. *See* Barkoo v. Melby, 901 F.2d 613, 619 (7th Cir.1990) (holding the plaintiff's First Amendment retaliation claim was not actionable to the extent the plaintiff admitted the speech never actually occurred); Fogarty, 121 F.3d at 886–91 (holding the plaintiff's First Amendment retaliation claim not actionable when the plaintiff's employer *erroneously* believed the plaintiff contacted the press).

2    Having found that Mr. Gazarkiewicz's First Amendment claims failed as a matter of law, the court also dismissed his state free-speech claim under the Indiana Constitution.

3    Because of this disposition, we need not reach Mr. Gazarkiewicz's contention that the "grievance procedure" constituted a prior restraint inconsistent with the First Amendment or his claim that his rights to substantive due process under the Fourteenth Amendment were violated.

4    The defendants did not make this claim either before the district court or this court. Therefore, there was no occasion for the district court to reach the issue, and there is no occasion for this court to reach the issue.

5    *See* Underwood Dep. at 21 ("[E]ver since I've been on the board we've been dealing with employee issues over—I mean every meeting, and we were getting nowhere."); Underwood Dep. at 22 (noting that the Council had to deal with "accusations" against Mr. Harmon "day in, day out"); Willis Dep. at 15 ("I know there was a lot of turmoil.... [W]hen I first got back out there and I just wanted very much to see that curbed and to try it to be a functioning group, you know, instead of a divisive bunch, that's what was happening. It was just a lot of talk and, you know, stuff, and we didn't need that.").

6    The district court held: "Plaintiff's motion failed to address" this portion of the First Amendment analysis; therefore, "[u]nder N.D.L.R. 56.1(b) this Court accordingly accepts the facts as provided by Defendants on these matters." R.47 at 15 n. 3. At the time of the district court's disposition, the Northern District of Indiana's Local Rule 56.1(b) stated: "[T]he court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the 'Statement of Genuine Issues' filed." Mr. Gazarkiewicz's summary judgment memorandum does not have a section specifically addressing the last two prongs of the retaliation analysis. However, Mr. Gazarkiewicz specifically stated in his "Statement of Material Facts," which we construe to be the same as the "Statement of Genuine Issues" contemplated by N.D. Ind. Local R. 56.1(b), that his "employment was terminated for alleged insubordination because he did not follow th[e] directive." Plaintiff's

Rule 56.1(b) Statement ¶ 3. It continues: "The charge of insubordination was based on his willful assistance to another Town resident in the preparation and dissemination of a Flier critical of the Superintendent and the Council." *Id.* ¶ 4. He supported these contentions with multiple citations to the record. Moreover, the district court had before it the minutes from the November 28, 2001 meeting, as well as the other circumstantial evidence, which, taken together, conclusively establishes that Mr. Gazarkiewicz was fired, in substantial part, due to the flier. Indeed, the district court noted earlier in its opinion that Mr. Gazarkiewicz's "termination for insubordination was triggered by his involvement with the flier regardless of whether Plaintiff composed the flyer or was merely Reese's instrument in drafting the document." R.47 at 9.

7    For example, the defendants rely on the testimony of council member Harry Morrison. A critical portion of his testimony reads:

   Q:—is that what you're saying? What do you see as the insubordination?

   A: He didn't follow the chain of command. There was a complaint that he had which should have been aired out at the meeting.

   Q: And the complaint being the issues that are in the flyer?

   A: Right ....

Morrison Dep. at 23–24. We note that the form or manner of Mr. Gazarkiewicz's speech—posting a flyer at a local grocery store without going through the internal structure—is just as much a part of his protected "speech" as the content of that "speech." That is why we conduct the inquiry into whether speech addresses a matter of public concern with a consideration of the "content, *form, and context* of [the speech], as revealed by the whole record." *Connick v. Myers,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)(emphasis added). That is also why, when balancing the parties' respective interests, we take account of the "context" and "time, place and manner" of the speech. *Greer v. Amesqua,* 212 F.3d 358, 371 (7th Cir.2000). Therefore, to the extent Mr. Gazarkiewicz was fired for not just the content but also the form and manner of his speech, he still was fired for his constitutionally protected speech.

8    To support this argument, the defendants advance the contention that "[i]n his deposition, Gazarkiewicz claims that the Town Council had not even read the flyer at the time they decided to terminate his employment. [citing Gazarkiewicz Dep. at 42]. The contents of the flyer were not even at issue." Appellees' Br. at 19. Mr. Gazarkiewicz's testimony actually states that "at the meeting" the council members "[t]alked about the letter, [but] they never read it though, all they read was the apology one." Gazarkiewicz Dep. at 42. Further, the meeting minutes and other deposition testimony conclusively reveal that the Council was aware of the flyer's contents, and the manner of its posting, and were acting on the flyer at the meeting in which Mr. Gazarkiewicz was fired. *See* Harmon Dep. at 27 ("I sent a copy [of the flyer] to the council. The council all received a copy of it.").

9    The Indiana Court of Appeals court recently explained:

   Indiana Code § 22–2–5–1, sometimes referred to as the Wage Payment Statute, contains three distinct regulations: "(1) employee's wages must be paid in money; (2) if requested, employers must pay employees semi-monthly or bi-weekly; and (3) *employees, upon separation from employment, must be paid the amount due them at their next and usual payday* (unless their whereabouts are unknown)." *Huff v. Biomet, Inc.,* 654 N.E.2d 830, 835 (Ind.Ct.App.1995) (footnote omitted, emphasis added).

   *Indiana Heart Assocs., P.C. v. Bahamonde,* 714 N.E.2d 309, 311–12 (Ind.Ct.App.1999); *see also* Ind.Code § 22–2–4–4 ("Every corporation, limited liability company, company, association, firm, or person who shall fail for ten (10) days after demand of payment has been made to pay employees for their labor, in conformity with the provisions of this chapter, shall be liable to such employee for the full value of his labor, to which shall be added a penalty of one

**Gazarkiewicz v. Town of Kingsford Heights, Indiana, 359 F.3d 933 (2004)**

149 Lab.Cas. P 59,842, 20 IER Cases 1823

dollar ($1) for each succeeding day, not exceeding double the amount of wages due, and a reasonable attorney's fee, to be recovered in a civil action and collectable without relief.").

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by   Jack v. Trans World Airlines, Inc.,   N.D.Cal.,   April 25, 1994

817 F.2d 920
United States Court of Appeals,
First Circuit.

Bancroft Dudley HALL, et al., Plaintiffs, Appellees,
v.
Frederick J. OCHS, et al., Defendants, Appellees.
Frederick J. Ochs, S. Leo Judge, James P. Rogers, Thomas F. Murphy and Town of Milton, Defendants, Appellants.

No. 85–1993.
|
Argued Nov. 4, 1986.
|
Decided May 5, 1987.
|
As Amended May 26, 1987.

**Synopsis**

Arrestee and his daughter brought action against town and police officers for battery, false imprisonment, and violations of civil rights. The United States District Court for the District of Massachusetts, Robert E. Keeton, J., 623 F.Supp. 367, entered judgment on jury verdict for arrestee and his daughter, and appeal was taken. The Court of Appeals, Torruella, Circuit Judge, held that: (1) conditioning arrestee's release upon his signing of waiver of right to sue police officers violated arrestee's civil rights; (2) officers were not entitled to qualified immunity; (3) damages were not excessive; (4) hourly rate of attorney fees award was adequately supported; and (5) attorney fee multiplier was inappropriate.

Affirmed in part, reversed in part, and remanded.

Levin H. Campbell, Chief Judge, concurred and filed opinion.

**Procedural Posture(s):** On Appeal; Motion for Judgment as a Matter of Law (JMOL)/Directed Verdict.

**Attorneys and Law Firms**

**\*921** Philip M. Cronin with whom Michael P. Duffy, Withington, Cross, Park & Groden, Boston, Mass., and Robert D. O'Leary, Town Counsel, Milton, Mass., were on brief, for defendants, appellants.

Richard P. Ward with whom Eleanor D. Acheson and Ropes & Gray, Boston, Mass., were on supplemental brief, for defendant, appellant Thomas F. Murphy.

Michael Avery with whom Avery & Friedman and John Reinstein, Civil Liberties Union of Massachusetts, Boston, Mass., were on brief, for plaintiffs, appellees Bancroft Dudley Hall, et al.

Verne W. Vance, Jr., Foley, Hoag & Eliot and Robert P. Sherman, Boston, Mass., on brief for Lawyers' Committee, for Civil Rights Under Law of the Boston Bar Ass'n, amicus curiae.

Before CAMPBELL, Chief Judge, TORRUELLA, Circuit Judge, and PIERAS, [*] District Judge.

## Opinion

TORRUELLA, Circuit Judge.

This is an appeal from a jury verdict entered in a civil rights and pendent state tort suit brought by plaintiffs Bancroft Dudley Hall and Sandra Hall against four Milton police officers and the Town of Milton. The alleged errors on appeal relate to a directed verdict against the Town and one of the officers, the denial of qualified immunity, a jury instruction on joint liability, and the damage and attorneys' fees awards. We affirm in large part the decision of the trial court. We reverse, however, the district court's application of a multiplier to the attorneys' fees award.


I. *Background*

At trial the parties presented sharply conflicting versions of the events that led plaintiffs Sandra and Bancroft Hall to file their complaint. While the jury apparently credited the Halls' version and not the police officers', we will begin with only the uncontested facts because one of the important issues on appeal is the appropriateness of a directed verdict for plaintiffs.

On Sunday morning, October 26, 1980, Bancroft Hall arrived at the Sullivans' home at 167 Dudley Lane in Milton, a nearly all white suburb just south of Boston. Hall, who is black, was driving a 1972 Pinto described as "out of place" in the neighborhood by defendants' witness. Hall went to the Sullivans' front door, where he was met by his daughter, Sandra, and her friend Maura Sullivan. Sandra had stayed the night with Maura after a track meet where the two girls competed for their school. Sandra was not ready to go, so he returned to the car to wait and to read the Sunday paper.

Meanwhile, the daughter of a neighbor drove by the house, saw the car and Mr. Hall, and noticed that a ladder which had been outside the house was now gone. After she told this to her mother, her mother called the Sullivans' house and received no answer. The neighbor then called the Milton police to report a suspicious man parked in an old car in the Sullivans' driveway.

The police dispatcher sent out a call that there was a suspicious car at 167 Dudley Lane with a black male behind the wheel **\*922** and a possible breaking and entering in progress. Milton Police Officer Frederick Ochs (who, like the other individual appellants, is white) arrived first at the Sullivans and parked his cruiser immediately behind the Halls' Pinto, blocking the driveway. The time was 11:30 a.m. Officer Ochs got out of his car, drew his revolver, walked to the driver's side of the Pinto, pointed the gun at Hall and asked for Hall's driver's license and registration. Hall protested that he had done nothing wrong and asked why Ochs wanted to see his license.

Meanwhile Officer Judge arrived. A short time later, after an interchange described very differently by the respective parties, Officer Judge pushed Sandra, who was by this time in the car holding onto her father, out of the way, and the two officers forcibly removed Hall from the car. At some point during this time the police obtained Hall's license. They put Hall on the ground, rolled him over and handcuffed him.

The officers then drove Hall to the Milton Police Station, where he was informed he had been arrested for failure to produce his license when requested and for disorderly conduct, both misdemeanors under Massachusetts law. Booking officer James Rogers read Hall his rights, including his right to a bail hearing. Shortly after that, Lieutenant Thomas Murphy, the commanding officer at the station, arrived in the booking area and read Hall his rights again. Murphy then announced that, if Hall would sign a waiver giving up his right to sue the police officers, the charges would be dropped and he could leave. The waiver was on a preprinted form with the Town seal and had been in sporadic use for about 30 years. Hall refused to sign the waiver and Murphy instructed Rogers to book him and place him in a cell.

During the course of the next hour, Murphy asked Hall to sign the waiver two more times, Sandra pleaded with him to sign the waiver, and Dr. Sullivan, who had come to the station when he learned what happened, suggested that Hall sign the waiver.

Finally, Hall called a lawyer who had helped him with some real estate transactions. The lawyer recommended that he get out of there as fast as he could. Hall signed the waiver and left the station at 1:30 p.m.

II. *Proceedings Below*

Bancroft and Sandra Hall filed a complaint on February 6, 1981 charging appellants and three other officers (who were later dismissed) with federal civil rights violations, assault and battery, false arrest, and false imprisonment. They added a state civil rights count by amendment on April 22, 1981. Trial began on April 11, 1985. At the conclusion of all the evidence the trial judge directed a verdict for plaintiff Bancroft Hall against defendants Murphy and the Town on the false imprisonment and associated civil rights counts. The judge refused to charge that defendants were entitled to qualified immunity for their actions under 🔖 *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

The jury then returned a verdict for plaintiffs on nearly all the counts. The jury found that Judge committed a battery on Sandra Hall, that Ochs and Judge together falsely arrested and committed a battery on Bancroft Hall, and that Ochs, Judge and Rogers acted jointly with Murphy in falsely imprisoning Bancroft Hall. Because the officers acted under color of law these findings support 🔖 § 1983 judgments as well. The jury awarded Bancroft Hall $160,000 in compensatory and $200,000 in punitive damages. They awarded Sandra Hall $5,000 in compensatory and $10,000 in punitive damages.

The jury also granted Bancroft Hall $60,000 in prejudgment interest. The trial judge increased this prejudgment interest award to conform to that required by Massachusetts law for the damages awarded for the state tort violations (*i.e.,* everything except the award against the Town and the punitive damages). The trial judge then awarded plaintiffs attorneys' fees using the lodestar approach required in this circuit. *See* 🔖 *Grendels Den v. Larkin,* 749 F.2d 945, 950 (1st Cir.1984). He set the attorneys' fees at the rate of $175 an hour **\*923** for lead counsel, Michael Avery, and $125 an hour for assistant counsel John Reinstein, plus a 50% multiplier for both attorneys based on their "exceptional success" and a contingency factor. The fees awarded came to approximately $60,000.

Defendants appeal on a variety of grounds. They challenge the directed verdict as contrary to the evidence, and the qualified immunity decision as based on a mistaken understanding of the law. They point to a jury instruction on the joint liability of the defendants that is contrary to state law. And they contest both the damages and the attorneys' fees awards. We will examine each of these issues in turn.

III. *The Directed Verdict*

The directed verdict covered Hall's confinement at the station after he refused to sign the waiver form. The judge directed the verdict against Murphy, because he offered Hall the release and then confined Hall, and against the Town, because Murphy was acting pursuant to Town policy. Defendants challenge this ruling as contrary to the facts as seen in the light most favorable to them.

Murphy claims that he thought Hall was properly arrested and that offering the release was the act of a "Good Samaritan." Regardless of Murphy's intentions, however, he offered Hall a clear choice: either (1) stay in jail and go to court tomorrow, or (2) request bail, stay in jail until the Bail Commissioner comes (which the trial judge found would take substantial time on a Sunday afternoon) [1] then go to court tomorrow, or (3) sign a release waiving the right to sue and leave now, with the charges dropped. Reduced to its essence the choice was this: forfeit your liberty and face criminal charges or forfeit your right to bring suit. Confronted with this choice, Hall chose to keep his right to seek civil redress, so he remained imprisoned, until he broke down and signed the waiver.

The granting of a directed verdict for plaintiff is a chancy affair. However, where appropriate it should be granted. Based on the above uncontested facts the directed verdict was proper. Hall clearly had a fourth amendment right to be free from unreasonable

seizures of his person. *See, e.g.,* 🚩⚠️ *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). And just as clearly he had a first amendment right to access to the courts to vindicate his rights secured under state and federal law. *See, e.g.,* 🚩 *In re Primus,* 436 U.S. 412, 422–23, 98 S.Ct. 1893, 1899–1900, 56 L.Ed.2d 417 (1978); *see also* 🚩 *Johnson v. Avery,* 393 U.S. 483, 498 and n. 24, 89 S.Ct. 747, 755 and n. 24, 21 L.Ed.2d 718 (1968) (Douglas, J., concurring) (discussing right of "reasonable access to the courts"). Confining Hall because he wanted to exercise his right to seek civil redress violated his right to liberty.

While individual rights may be waived, such waivers must be *voluntary. See* 🚩 *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). In the circumstances of this case, no reasonable person could describe Hall's "waiver" as voluntary. He was coerced, pure and simple, by the threat of continued incarceration.

The Supreme Court recently rejected the proposition that the exchange of a covenant not to sue in return for dropping criminal charges is *per se* unenforceable; but the Court clearly stated that *such an exchange must be voluntary. See* 🚩 *Town of Newton v. Rumery,* 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987). The Court noted that the plaintiff in that case, Rumery, "was not in jail and was represented by an experienced criminal lawyer, who drafted the agreement," and furthermore, "Rumery considered the agreement for three days before signing it." 🚩 *Id.* 480 U.S. at ——, 107 S.Ct. at 1192–94. Bancroft Hall's situation was far more coercive. He was in jail after seeing that the raw power of the police department could humiliate him in front of his daughter and forcibly remove him from premises he was **\*924** lawfully on. And, until he signed a waiver, that power would keep him in jail, as he learned after his first, second and third refusals to sign.

Had Rumery been prosecuted for refusing to sign, he could have defended himself using all the protections due process provides. But Hall had no defense to his incarceration. Not surprisingly, after three refusals and well over an hour in jail, his resolve buckled. No waiver executed under such circumstances can be called voluntary.

Holding Hall under these circumstances violated his fourth amendment right to freedom from unreasonable seizures of his person. *See, e.g.,* 🚩⚠️ *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); 🚩 *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1960). Although we must assume, for purposes of the directed verdict, that there existed probable cause for the arrest and detention, Murphy testified that he had made up his mind to let Hall go if he signed the waiver. Accordingly, Hall was not being held to insure his appearance in court, or for any other reason related to the prosecution of the misdemeanors with which he was charged. Rather, Murphy held him for the sole purpose of gaining absolution for the prior violations. "[G]overnment may not condition access to even a gratuitous benefit ... upon the sacrifice of a constitutional right." 🚩 *Blackburn v. Snow,* 771 F.2d 556, 568 (1st Cir.1985). Conditioning Hall's freedom on the waiver of his first amendment right deprived him of his right to liberty. *Cf.* 🚩⚠️ *Brewer v. Blackwell,* 692 F.2d 387, 399 (5th Cir.1982) (noting that presenting the choice between signing "such a worthless document" and staying in custody is a deprivation of the "right to liberty").

 As a second defense, the Town claims that the *jury* should have been allowed to determine whether Murphy was acting pursuant to Town policy (if he was, of course, the Town would be liable). Nevertheless, the Town does not dispute that the release was on a preprinted form carrying the Town of Milton Seal. The Town, through the Chief of Police, admitted that the form had been in use since the 1950's, at least, and that the Town had obtained legal advice regarding that use. Furthermore, Murphy testified that he thought he was acting according to Town policy. There was absolutely no evidence presented at trial suggesting that the release was anything other than Town policy. In fact, the Town steadfastly maintained throughout the trial that the release was a valid defense to all the claims against it. Plaintiffs need not, as the Town contends, produce a resolution of the Board of Selectman, or similar official act, adopting the release. The directed verdict was proper.

IV. *Qualified Immunity*

We have had abundant opportunity recently to apply the law of qualified immunity in the context of political discharge cases. *See, e.g., De Abadia v. Izquierdo Mora,* 792 F.2d 1187 (1st Cir.1986). What we have said there is directly applicable to this case. Applying the test enunciated in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), we wrote:

> In sum, we are presently concerned not with the correctness of defendants' determination, on the one hand, nor their subjective state of mind, but of the "objective reasonableness" of their conduct.... *Harlow* demands not prescience, but objective good faith.

*De Abadia,* 792 F.2d at 1193. Despite appellants' protestations to the contrary, the objective reasonableness determination is for the judge to make, and not for the jury. *See id.* Since a reasonable public official, particularly a police officer, is expected to know the law, our inquiry is nothing more than an examination whether the events of October 26, 1980, violated "clearly established ... constitutional rights." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

*A. The Imprisonment*

With regard to the imprisonment, our task is to decide whether it was clearly established in October, 1980, that holding Bancroft Hall in custody solely because he refused to promise not to sue his captors violated his rights. In making this determination, **\*925** we need not find a ruling that considered the precise situation at hand. It is enough, rather, that there existed case law sufficient to clearly establish that, if a court *were* presented with such a situation, the court would find that plaintiffs' rights were violated. *See King v. Higgins,* 702 F.2d 18, 20 (1st Cir.1983). We find that the law was sufficiently established to put a reasonable police officer on notice that what he was doing violated Hall's right to be free from unreasonable seizure. [2]

Several decisions of the Supreme Court had treated access to court to redress civil wrongs as a First Amendment right. *See In re Primus,* 436 U.S. 412, 422–32, 98 S.Ct. 1893, 1899–1904, 56 L.Ed.2d 417 (1978); *United Mine Workers of America v. Illinois State Bar Ass'n,* 389 U.S. 217, 223, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967); *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *cf. Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1968) (protecting right to access to court on due process and equal protection grounds). And it was well established that a waiver of a constitutional right must not be coerced. *See Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). It was no less self evident in 1980 than it is today that holding someone in jail until he waived the right to sue was coercive.

The right to be free from unreasonable seizures of the person was similarly well established by 1980, *see, e.g., Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) and *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1960), [3] as was the principle that the government may not impose unconstitutional conditions on the granting of a benefit. *See, e.g., Frost v. Railroad Commission,* 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101 (1925). The fact that no court had put these pieces together in the precise manner we do today does not absolve defendants of liability. No police officer reasonably aware of the law could have failed to appreciate that confining Bancroft Hall until he agreed to forfeit the right to sue violated his civil rights.

*B. The arrest and battery*

Defendants Ochs and Judge claim that their qualified immunity should have been submitted to the jury as well. Both claim that, because they are entitled to immunity for the arrest as long as the probable cause was "at least arguable," *see Floyd v. Farrell,* 765 F.2d 1, 5 (1st Cir.1985), the issue of whether probable cause was "at least arguable" should have gone to the jury. They are mistaken.

The question of qualified immunity presented no separate fact finding for the jury. The plaintiffs and the defendants presented sharply conflicting versions of the events at 167 Dudley Lane. If plaintiffs were right, then there was no shred of probable cause. And if defendants were right, then there was probable cause. The jury believed plaintiffs and not defendants. The officers had no qualified immunity to act as the jury found they acted.

Defendants also claim that the issue of qualified immunity for excessive force used against plaintiffs presented a question of fact for the jury. While there are circumstances in which reasonable police officers, and, indeed, reasonable courts may differ as to whether the force used was excessive, this case presented no such circumstances.  **926**  Once again, the parties presented dramatically opposed testimony. If the jury believed the officers, plaintiffs would not recover. But if the jury believed the plaintiffs, the force used was clearly excessive, and the officers would have had no qualified immunity. Accordingly, the trial judge was proper in denying defendants' motion for qualified immunity.

V. *The Jury Instruction on Joint Liability for False Imprisonment*

With reference to joint liability for the arrest and imprisonment of Bancroft Hall, the trial judge instructed the jury that "when the defendants act together, the law permits the injured party to treat all concerned in the injury jointly; and all are liable to the plaintiff in a total sum as damages." While this instruction is a correct statement of joint liability under ⚑ § 1983, *see* Prosser and Keeton, *Law of Torts,* § 46 (5th ed. 1984), it mistates the law for the state law charges. By statute Massachusetts has limited joint liability of police officers as follows:

> No action, except for use of excessive force, shall lie against any officer other than the arresting officer, by reason of the fact that, in good faith and in the performance of his duties, he participates in the arrest or imprisonment of any person believed to be guilty of a crime *unless it can be shown that such other officer* in the performance of his duties *took an active part in the arrest or imprisonment* as aforesaid, either by ordering or directing that said arrest or imprisonment take place or be made, or by actually initiating the making and carrying out of said arrest and imprisonment.

Mass.Gen.L. ch. 263 § 3 (emphasis supplied). This error is largely harmless, however, (and may, in fact, have been wisely committed to avoid confusing the jury), although it will result in a small reduction of the judgment against defendants Rogers and Judge.

As a practical matter, the error affects only the prejudgment interest portion of the judgment, because the state tort and ⚑ § 1983 claims were completely overlapping; the acts causing the harm were both civil rights violations and torts under Massachusetts law. State law mandates a 12% prejudgment interest rate, while under ⚑ § 1983 plaintiffs get only the interest the jury awards. In this case the jury awarded less than 12% prejudgment interest. Thus, defendants prejudiced by the joint liability mistatement need only pay interest at the rate awarded by the jury.

Taking the defendants in turn, we find that the error is harmless as to Murphy, because his actions gave him such an "active part in the arrest or imprisonment" that the trial judge directed a verdict against him. And Ochs was the arresting officer, therefore he was not protected by the statute.

Judge and Rogers, on the other hand, present a less clear case. While the facts certainly would support a finding that Judge took an "active part in the arrest ... by actually initiating the making and carrying out of said arrest," the jury was not asked to make such a finding. Judge testified that Officer Ochs made the arrest and only then asked for assistance in removing Hall from the car. Taking this testimony in the light most favorable to defendant Judge, we cannot say that he "took an active part in the arrest" as meant by Mass.Gen.L. ch. 263 § 3. The evidence supporting Rogers' "active part" is even less clear, given his testimony that he acted at Lieutenant Murphy's direction. Accordingly, we vacate the finding that defendant Judge and defendant Rogers were jointly liable for the arrest or imprisonment of Bancroft Hall under state law. We repeat, however, that they are jointly liable under federal law and that our ruling will affect only the prejudgment interest portion of the monetary judgment against them. [4]

**\*927**  VI. *Damages*

We recently considered a similar claim for excessive damages. *See Brown v. Freedman Baking Co., Inc.,* 810 F.2d 6 (1st Cir.1987). In that case we wrote:

> We rarely will override the jury's judgment on the appropriate amount of damages to be awarded. "[T]he jury's otherwise supportable verdict stands unless [it is] 'grossly excessive' or 'shocking to the conscience.' " We accord broad discretion to the trial court's decision to affirm the jury's award of damages because of that court's greater familiarity with local community standards and with the witnesses' demeanor at the trial.

*Id.* 810 F.2d at 11 (citations omitted). Applying the same deferential standard to this case, we affirm the decision below.

*A. The Compensatory Damages Awarded to Bancroft Hall*

The jury awarded compensatory damages to Hall as follows:

1. For battery, against Ochs and Judge: $25,000.

2. For false arrest and imprisonment prior to the presentation of the waiver form, against Ochs and Judge: $10,000.

3. For false imprisonment after presentation of the waiver form, against all defendants: $25,000.

4. For emotional distress, against all defendants: $100,000.

Defendants claim that there is no rational relationship between the claimed injuries and the damage verdict. We disagree.

While Hall suffered only minor physical injuries, the harm to his mental and emotional well being was substantial. He received counseling from a psychiatric nurse. He had recurring nightmares and a continuing fear of police. And most importantly, the memory of this experience, in which the color of his skin triggered a chain of events that left him handcuffed, face down on the ground, will remain with him. The knowledge that such an incident of racial discrimination could happen to him in the 1980's, while sitting in his car reading the paper and waiting for his daughter, has to have had a profound and lasting effect on Bancroft Hall. So the jury found. In light of the testimony at trial we have no quarrel with the compensation awarded.

*B. The Punitive Damages Awarded to Bancroft Hall*

The jury awarded punitive damages to Hall as follows:

1. Against Ochs: $80,000.

2. Against Judge: $50,000.

3. Against Murphy: $60,000.

4. Against Rogers: $10,000.

Defendants claim these awards are excessive.

As we stated in *Freedman Baking Co.* "[p]unitive damages are an appropriate means of punishing [racially discriminatory] conduct and deterring defendants from future discriminatory actions." 810 F.2d at 11. In this case Bancroft Hall demonstrated to the jury that he was the victim of shocking and brutal racial discrimination. As the conscience of the community, the jury responded accordingly. Their award is justified not only by defendants' actions on October 26, 1980, but also by their subsequent behavior. The trial judge explained defendants' conduct at trial, and its relevance to the jury award, as follows:

> Defendants chose a hard-line strategy of trial, giving testimony that, at least implicitly if not explicitly, charged plaintiffs with lying both before trial and on the witness stand during trial. Also, defense counsel explicitly argued to the jury that plaintiffs' testimony was deliberately false. The jury verdict plainly **\*928** rejected defendants' testimony and argument in these respects.
>
> The evidence offered by defendants included a police report prepared promptly after the incident and testimony at trial of different defendants, relating separately in almost identical phrasing, that Bancroft Dudley Hall, a Black, made to the police officers a statement that any factfinder would consider demeaning and insulting toward less educated, less successful, and less fortunate Blacks. The jury, observing the demeanor, manner, and speech of the parties throughout the trial, had the responsibility of determining the truth or falsehood of this testimony of defendants and the plaintiff Bancroft Dudley Hall's denial. On this evidence, a factfinder might infer that the stark clash could not have resulted from innocent misrecollection, and that its *intentional* quality intensified any need the jury may have found for punishment and deterrence.

*Hall v. Ochs,* 623 F.Supp. 367, 377 (emphasis supplied). Defendants have continued to deny on appeal that their actions had anything to do with race, notwithstanding the clear import of the jury verdict.

### C. *The Damages Awarded to Sandra Hall*

The jury awarded Sandra Hall $5,000 in compensatory and $10,000 in punitive damages, assessed against defendant Judge. This relatively small award comports with the substantially lesser harm done to Sandra, as compared to her father, and illustrates the care the jury used to apportion the damages justly. Judge's claim that the award is excessive is frivolous. The jury found that an armed police officer struck a teenaged girl in the face in order to drag her father from his car in the course of an unjustified arrest. The trauma she suffered from that event was considerable. And Officer Judge's behavior was sufficiently shocking to justify punitive damages.

### VII. *Attorneys' Fees*

The trial judge awarded attorneys' fees to lead counsel Michael Avery at the rate of $175 an hour for 186.1 hours and to assistant counsel John Reinstein at the rate of $125 an hour for 75.7 hours. The trial judge then adjusted the fees award of the two attorneys upward by 50% for their pre-verdict work, primarily because of their "exceptional success," but also because of the contingent nature of recovery. Defendants do not challenge the hours claimed, but they do challenge the rates awarded and the multiplier. Defendants cloud the issue, however, by lumping the hourly rate with the upward adjustment to arrive at "hourly rates" of $262.50 for Avery and $187.50 for Reinstein. The appropriate analysis is the two-step lodestar approach used by the district court. *See* *Wildman v. Lerner Stores Corp.,* 771 F.2d 605, 610 (1st Cir.1985).

### A. *The Reasonable Hourly Rate*

The Supreme Court recently reaffirmed that in civil rights litigation reasonable hourly rates are determined by the "prevailing market rate." *Blum v. Stenson,* 465 U.S. 886, 892–896, 104 S.Ct. 1541, 1545–47, 79 L.Ed.2d 891. Plaintiffs presented an affidavit by an established Boston attorney and the American Lawyer's *Guide to Leading Law Firms,* which support the trial judge's conclusion that $140 to $175 an hour was the prevailing market rate for skilled litigation services. The trial judge

was justified in awarding Avery fees at the upper end of that range based on his extensive civil rights litigation experience and accomplishments in the field. [5]  We note that Avery appears to be at least as accomplished and experienced in his field as Professor Tribe was in his field at the time of the *Grendel's Den* litigation, **\*929**  in which we awarded Professor Tribe $175 an hour. *See* ⚑ *Grendel's Den,* 749 F.2d at 955–56.

The rate of $125 an hour for second chair John Reinstein is the same rate we approved for Professor Tribe's second chair, Professor Rosenberg. *See id.* Reinstein is an experienced and accomplished litigator in his own right and has specialized in civil rights for nearly as long as Avery. The district court found that this was a difficult case and that the work of the two attorneys was neither wasteful nor duplicative. We affirm the lodestar rate.

*B. The Upward Adjustment*

 The trial court based its 50% upward adjustment on the "exceptional results" achieved, and to a lesser degree, on the contingent nature of recovery. This adjustment is inconsistent with the recent Supreme Court opinion in ⚑ *Pennsylvania v. Delaware Valley Citizens' Council,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). That opinion makes clear that adjustments are not to be given in reward for stellar performance. The court wrote:

> Because considerations concerning the quality of a prevailing counsel's representation normally are reflected in the reasonable hourly rate, the overall performance ordinarily should not be used to adjust the lodestar, thus removing any danger of "double counting."

⚑ 106 S.Ct. at 3099. We fully accept the district court's finding that counsel performed extraordinarily well. But *Delaware Valley* says that exceptional performance is generally a function of the competence and experience that is reflected in the reasonable hourly rate and is not grounds for an upward adjustment. Here we cannot say that counsel performed disproportionately better than their quite impressive experience would suggest.

*Delaware Valley* leaves open the risk of loss or contingent nature of recovery as a possible ground for an upward adjustment, a ground that we recognized in ⚑ *Wildman v. Lerner Stores Corp.,* 771 F.2d 605, 612–13 (1st Cir.1985). But there is little basis for invoking that factor here. This case was complex, but the facts were sympathetic to plaintiffs and, in some respects, quite unfavorable to the police. Indeed, we know from the record that the press reported the incident in a light favorable to plaintiffs. To be sure, plaintiffs were fortunate in being represented by competent, intelligent and experienced counsel; there were hurdles; less able counsel might have become enmeshed in legal errors. But the same can be said of many other tort and civil rights cases. This was not, at the outset, a notably discouraging case.

The fact counsel chose to take the case upon the understanding that they would look solely to their right to recover fees under the statute speaks well of counsel, but it is not a strong argument for a multiplier. They chose to make this arrangement. Had they wished to insist on another arrangement they could have done so. The 50% upward multiplier is vacated.

VIII. *Prejudice*

Defendants claim that they were deprived of a fair trial due to prejudicial newspaper publicity and the bias of the trial judge. We have carefully reviewed these claims and find them to be without merit.

*Conclusion*

In summary, we conclude that the directed verdict was proper, that the defendants were not entitled to qualified immunity, that the damages were not excessive, and that the hourly rate of the attorneys' fees award was adequately supported. The attorneys' fee multiplier, however, was inappropriate. The jury instruction on joint liability was error as respects state law, but that error is harmless except with respect to the prejudgment interest liability of defendants Rogers and Judge. The appellants' remaining arguments lack merit.

Accordingly, *the decision of the trial court is affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.* Appellants shall bear the costs of appeal, including reasonable attorneys' fees, but not including those costs fairly attributable to the state law joint liability issue or the upward  **\*930**  adjustment of attorneys' fees. These costs shall be determined on remand.

LEVIN H. CAMPBELL, Chief Judge (concurring).

Although I agree fully with the result the court reaches, I write separately to express my doubts as to its reasoning in conjunction with Lt. Murphy's liability for false imprisonment.

My colleagues would hold that because Lt. Murphy conditioned Hall's release upon his executing an unconstitutional waiver, Hall's continued imprisonment became, then and there and solely for that reason, illegal and "false." In adopting this view, they do not discuss whether, at the time of Hall's continued imprisonment (after he had refused to sign the waiver), the state had probable cause to imprison him. In my judgment, simply because Murphy conditioned Hall's release upon the latter's execution of an unconstitutional waiver did not inevitably cause Hall's continued detention to constitute the tort of false imprisonment. Only if the police then lacked probable cause to hold Hall was that tort committed. *See, e.g., Doggett v. Hooper,* 306 Mass. 129, 133, 27 N.E.2d 737, 740 (1940) ("[t]he confinement of the plaintiff, having been authorized by law, would not furnish the basis for an action for false imprisonment"). My brothers' theory, based exclusively on the illegal waiver, is ingenious, but they can point to no Massachusetts or federal case in support of it.

I prefer the following analysis: I believe the district court initially erred when it directed a verdict against Murphy on the false imprisonment claim, since probable cause had yet to be determined. That error was later rendered harmless, however, by the jury's resolution of the probable cause issue against the police in a related claim.

For Hall to prevail under Massachusetts law on the false imprisonment claim, he needed to prove (1) that he was falsely imprisoned and (2) that Murphy assumed "an active part in the arrest or imprisonment." Mass.Gen.Laws ch. 263, § 3 (1984). Neither below nor on appeal has any party seriously disputed that Murphy was the central figure in the police decision to imprison Hall. By directing a verdict, however, the district court improperly took from the jury the question of whether Hall had been falsely imprisoned, *i.e.,* whether there was probable cause to imprison him. This was a disputed issue of fact which should have been left to the jury.

The error became harmless, however, because the jury's later verdict in context of the related false arrest claim made it clear that Hall was falsely imprisoned. By finding that Judge and Ochs had falsely arrested Hall, the jury necessarily rejected the officers' claim that they had probable cause to make the arrest. *See* Mass.Gen.Laws ch. 231, § 94A (1984) (probable cause a defense to suit for false imprisonment). Murphy has never contended, nor are there grounds for his doing so, that events at the station house provided additional information of Hall's alleged wrongdoing. Hall's detention at the station house was, therefore, without probable cause and was illegal. By taking an active role in Hall's station house detention, Murphy was liable for the false imprisonment pursuant to Mass.Gen.Laws ch. 263, § 3.

Murphy argues that he had no reason to know that Hall had been falsely arrested. I do not read Massachusetts law as providing him with a good faith defense. Up through the 1950's, an officer who arrested someone for a misdemeanor would be liable for false imprisonment if the arrestee did not actually commit the offense. "A mistaken belief on the part of the actor, whether induced by mistake of law or of fact and however reasonable ... does not confer a privilege to arrest." *Muniz v. Mehlman,* 327 Mass. 353, 358, 99 N.E.2d 37, 40 (1951). The Massachusetts legislature subsequently provided the arresting officer with a

greater degree of protection, allowing him to defend against a false imprisonment suit arising out of a misdemeanor arrest by asserting probable cause. Mass.Gen.Laws ch. 231, § 94A. This provision, however, does not speak in terms of good faith.

By contrast, Mass.Gen.Laws ch. 236, § 3, provides a narrow good faith defense to **931** those officers who, in the performance of their duties, participated in a false arrest. The statute, however, expressly carves out from the good faith protection those officers who assumed an "active part" in the arrest or imprisonment. Because Murphy falls into the latter category, Massachusetts law has not granted him a good faith defense to this false imprisonment suit. Due to the jury's finding that a false arrest had in fact occurred, Murphy was properly held accountable to Hall for the resulting damages. Thus, I concur in the court's upholding of the district court's judgment against Murphy even though I do not agree with its rationale.


## All Citations

817 F.2d 920


## Footnotes

\*      Of the District of Puerto Rico, sitting by designation.

1      Furthermore, Murphy admitted that he had not explained the bail procedure to Hall, who had never been arrested before and who could not be expected to have any idea how long it would take or what his bail would be.

2      In arguing for qualified immunity, defendants point to three decisions issued by the Massachusetts Supreme Judicial Court that upheld, under Massachusetts law, the validity of the same type of waivers at issue in the instant case. Without passing on the relevance of state law on the availability of qualified immunity, we note that the Massachusetts decisions do not support defendants' position. In *Wax v. McGrath,* 255 Mass. 340, 151 N.E. 317 (1926), the Supreme Judicial Court made clear that such waivers were valid only insofar as voluntarily given. "It was for the jury to determine whether the plaintiff voluntarily executed and delivered the release, or whether he was induced to act in the belief pressed upon him and reiterated by the officer, that *unless he signed he could not regain his freedom.*" *Id.* at 345, 151 N.E. at 319 (emphasis added).

3      *Cf. Blackburn v. Snow,* 556 F.2d at 569 ("[i]t hardly can be debated that [plaintiff] had, in 1977, a 'clearly established' Fourth Amendment right to be free of unreasonable searches").

4      In theory, Judge and Rogers are only entitled to a new trial on the state law arrest and imprisonment claims rather than reversal of these counts. Technically our judgment is a remittitur of the excess interest subject to plaintiff's right to insist

         upon a new trial in which, conceivably, he might demonstrate Judge's and Rogers' liability under state law. *See* *Kolb v. Goldring, Inc.,* 694 F.2d 869, 875 (1st Cir.1982) (exercising power of appellate court to order remittitur); *Betancourt v. J.C. Penney Co.,* 554 F.2d 1206, 1209 n. 5 (1st Cir.1977) (noting appellate power to order remittitur). In the unlikely event that plaintiff desires a new trial in lieu of accepting a reduction in the interest payable by Judge and Rogers, he may so indicate in a petition for rehearing, in which event we shall consider entering a revised order remanding for a new trial. Our current judgment, however, is to remand for a simple reevaluation of the interest.

5      Michael Avery submitted an uncontradicted affidavit stating the following. He has been a civil rights and "police misconduct" specialist for 15 years. He has been involved in hundreds of police conduct cases and has tried dozens of them to juries. He has taught civil rights courses at Yale Law School and Northeastern University School of Law. He is the coauthor of the leading text on police misconduct litigation, *Police Misconduct: Law & Litigation* (2d ed. 1980), and he has lectured on the subject across the United States.

**Hall v. Ochs, 817 F.2d 920 (1987)**

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

177 L.R.R.M. (BNA) 2539, 151 Lab.Cas. P 60,007, 23 IER Cases 1493

⚑ KeyCite Yellow Flag - Negative Treatment

Declined to Extend by   U.S. ex rel. Emanuele v. Medicor Associates,   W.D.Pa.,   March 15, 2017

411 F.3d 118
United States Court of Appeals, Third Circuit.

Phyllis HILL; Robert K. Murray; Donald Hickey; Paul W. Graham

v.

CITY OF SCRANTON; James P. Connors, Individually and as mayor,

City of Scranton Phyllis Hill and Paul Graham, Appellants—No. 02–3833

Phyllis Hill; Robert K. Murray; Donald Hickey; Paul W. Graham

v.

City of Scranton; James P. Connors, Individually and as Mayor, City of Scranton

Phyllis Hill, Donald Hickey and Paul W. Graham, Appellants—No. 03–1377

Phyllis Hill; Robert K. Murray; Donald Hickey; Paul W. Graham

v.

City of Scranton; James P. Connors, Individually and as mayor, City of Scranton Donald Hickey, AppellantNo. 02–3988

Nos. 02–3833, 02–3988, 03–1377
|
Argued on Sept. 3, 2003.
|
Opinion filed: June 9, 2005.

**Synopsis**

**Background:** Police officers brought civil rights actions alleging that municipality violated their First Amendment freedom to petition government and violated their right to equal protection of the laws by enforcing residency ordinance against them in retaliation for their participation in prior lawsuit. Cases were consolidated for all pretrial proceedings. The United States District Court for the Middle District of Pennsylvania, John E. Jones, III, J., granted summary judgment for municipality. Officers appealed.

**Holdings:** The Court of Appeals, Roth, Circuit Judge, held that:

partial final judgment was necessary to terminate some police officers' claims;

fact issue existed as to whether municipality used residency ordinance as pretext for retaliatory terminations;

fact issue existed as to whether municipality was willing to enforce residency ordinance without supplemental authority of collective bargaining agreement (CBA);

fact issue existed as to whether police officer changed his domicile out of municipality in violation of residency ordinance;

police officer made constructive motion to amend his complaint; and

police officer did not state claim that municipality violated his procedural due process rights.

Hill v. City of Scranton, 411 F.3d 118 (2005)

177 L.R.R.M. (BNA) 2539, 151 Lab.Cas. P 60,007, 23 IER Cases 1493

Reversed and remanded.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**Attorneys and Law Firms**

**\*121** Cynthia L. Pollick, Esquire (Argued), The Employment Law Firm, Pittston, PA, Counsel for Appellants.

Joseph G. Ferguson, Esquire (Argued), Rosenn, Jenkins & Greenwald, Scranton, PA, Counsel for Appellees.

Before: SLOVITER, NYGAARD and ROTH Circuit Judges.

OPINION

ROTH, Circuit Judge.

Since 1980, the city of Scranton, Pennsylvania, has maintained an ordinance requiring city employees to reside within the city. In 1997, a group of twenty-two police officers sought to have the ordinance declared unconstitutional. The U.S. District Court for the Middle District of Pennsylvania dismissed the suit and we affirmed. After an investigation in 2000, the city terminated four of these officers, as well as a police mechanic, who was not a party to the 1997 suit, for failing to comply with the ordinance. The terminated officers brought a new suit, alleging that the city had infringed their First Amendment freedom to petition the government and had violated their right to equal protection of the laws by enforcing the ordinance against them in retaliation for their participation in the 1997 suit. The mechanic also brought suit, alleging that he was terminated in retaliation for complaining about the condition of the Department of Public Works garage. Three of the four officers' cases were consolidated for pre-trial purposes with the mechanic's case. The District Court granted summary judgment in favor of the city on the three officers' claims but allowed the mechanic's claims to proceed to trial. [1]

We conclude that the District Court should not have granted summary judgment on the police officers' retaliation claim. The officers presented enough evidence to raise a dispute of material fact as to whether the city impermissibly targeted the 1997 plaintiffs. First and foremost, the officers presented evidence that other city employees, who were not parties to the 1997 suit, were permitted to keep their jobs despite the city's knowledge that they were not city residents. Further, it is undisputed that, prior to the officers' terminations in 2000, no city employee had ever been fired for non-compliance with the residency ordinance.

We further hold that the District Court did not abuse its discretion or otherwise err in denying Officer Hickey leave to amend his complaint to add a due process claim that his post-termination Municipal Service Commission hearing has been unreasonably delayed. We also reject the officers' contention that the District Court improperly and unnecessarily entered a final judgment on January 8, 2003. Finally, we reject without substantive discussion all of the remaining issues raised in these appeals. [2]

### \*122 I. Facts and Procedural History

In 1997, a group of twenty-two Scranton police officers filed a complaint alleging that the city's residency ordinance was unconstitutional on its face and as applied. With certain exceptions, the ordinance requires all city employees to maintain a "bona-fide residence" within the corporate limits of Scranton during their time of employment. *See* Scranton, Pa., File of the Council No. 17 § 2 (Feb. 27, 1980). [3] The District Court dismissed the complaint in December of 1997. The court rejected the officers' facial due process and equal protection challenges to the ordinance, holding, among other things, that the ordinance was rationally related to one or more legitimate government purposes and that the term "bona-fide residence" is

177 L.R.R.M. (BNA) 2539, 151 Lab.Cas. P 60,007, 23 IER Cases 1493

not unconstitutionally vague because it is synonymous with "legal domicile," a well-understood legal concept. [4]  The District Court also held that the officers' as-applied and procedural due process challenges were not ripe for adjudication. The officers alleged that, despite the ordinance's general applicability, only police officers had received threats of impending enforcement and requests for documents establishing residency. However, the District Court reasoned that none of these claims were ripe because the city had not yet formally enforced the ordinance against any employee or group of employees, nor had the officers alleged that waivers had been granted in an arbitrary or discretionary manner. We affirmed in an unpublished decision. *Kreischer v. City of Scranton,* No. 98–7439, 1999 WL 535771 (3d Cir. June 16, 1999).

In late December 1997, shortly after the District Court dismissed the police officers' challenge, the City Controller issued a memorandum to all city employees requesting documentation and affidavits verifying each employee's residency. [5]  In October 1999, several months after we had affirmed the dismissal, the city and the police union agreed to incorporate the residency ordinance into the new collective bargaining agreement (CBA), which was ratified later that month. The CBA specified that the term "bona fide residence" means "sole legal residence or domicile." It also provided for a six-month grace period for all police officers to come into compliance. While the precise language  **\*123**  varied, the residency ordinance was also incorporated into other collective bargaining agreements between the city and other unions representing city employees.

In May 2000, the city hired a private investigation firm to investigate certain employees who were suspected of living outside the city. The city initially sent a list of eight names to the investigator, seven of whom were police officers who had sued the city in 1997 and one of whom was a firefighter. Ultimately, between 2000 and 2001, the city investigated about 25 individuals but only terminated five: Donald Hickey, Phyllis Hill, Paul Graham, Jason Gnall, and Robert Murray. Hickey, Hill, Graham, and Gnall were police officers involved in the 1997 suit against the city. All were offered pre-termination hearings with the mayor. Hickey and Gnall sought post-termination hearings before the Municipal Service Commission of the City of Scranton but as of early 2004 had yet to receive their hearings.

In April 2001, Hickey, Hill, Graham, and Murray brought this suit under 42 U.S.C. § 1983 against the city of Scranton and Mayor James Connors (hereinafter the "city"), alleging among other things that the city selectively enforced the residency ordinance against them in retaliation for exercising their First Amendment rights. [6]  Hickey, Hill, and Graham alleged that the city retaliated against them for suing the city in 1997, while Murray alleged that the city terminated him for complaining about the condition of the Department of Public Works garage. In July 2001 the District Court consolidated these cases for all pretrial purposes. In July 2002, the parties filed cross-motions for summary judgment. In Hickey's brief opposing the city's motion for summary judgment, he argued for the first time that the lengthy delay in his post-termination Municipal Service hearing violated his right to procedural due process. In September, 2002 the District Court granted summary judgment in favor of the city against Hickey, Hill, and Graham but denied summary judgment with respect to Murray's claims. The court denied the plaintiffs' motions for summary judgment. The court treated Hickey's new argument concerning post-termination hearing delay as a constructive motion to amend his complaint and gave the parties additional time to brief the issue whether leave to amend should be granted. In October 2002, the court denied leave to amend after finding that the amendment would be futile and would be made in bad faith. Hill and Graham appealed the September 2002 order and Hickey appealed both the September and October orders. [7]

In November 2002 the city filed a motion for partial final judgment pursuant to Federal Rule of Civil Procedure 54(b). The District Court granted this motion over the plaintiffs' opposition, reasoning that a final judgment under Rule 54(b) was necessary to terminate Hickey, Hill, and Graham's claims because the September order was not final as to Murray's claims. Hill, Hickey, and Graham appealed this decision as well. We consolidated all of the appeals for purposes of oral argument and resolve all of them in this opinion.

## II. Jurisdiction

177 L.R.R.M. (BNA) 2539, 151 Lab.Cas. P 60,007, 23 IER Cases 1493

 The District Court had jurisdiction over the plaintiffs' federal claims and pendent state claims under 28 U.S.C. §§ 1331 **\*124**
and 1367, respectively. We have appellate jurisdiction to review the District Court's final decisions pursuant to 28 U.S.C.
§ 1291. As noted, this case involves consolidated appeals. Because the officers' appeal of the District Court's January 2003 Rule
54(b) order implicates our jurisdiction over the officers' other appeals we consider it in this section.

Federal Rule of Civil Procedure 54(b) provides a mechanism for rendering a partial final judgment as to some, but not all,
parties or claims in a single action. [8]  See Berkeley Inv. Group, Ltd. v. Colkitt, 259 F.3d 135, 140 (3d Cir.2001). Without a valid
Rule 54(b) order, we do not ordinarily have appellate jurisdiction over a district court order that resolves fewer than all the
claims of all the parties in a single action because such orders do not constitute "final decisions" per 28 U.S.C. § 1291. Id.
As explained below, we hold that the district court properly directed entry of partial final judgment in this case. Accordingly,
we have jurisdiction over all of the consolidated appeals.

The officers claim that Rule 54(b) is not applicable here because the three cases brought by the officers and Robert Murray's
case had been consolidated only "for discovery purposes." According to the officers, therefore, the September and October
2002 orders terminated three of these four cases and the District Court lacked jurisdiction to enter a separate final judgment
in these cases in January 2003. However, the officers' argument depends on what appears to be a deliberate misreading of the
record. In July 2001 the District Court ordered that "the four cases shall be consolidated for *all pretrial proceedings,* with a
determination to be made at the final pretrial conference as to whether there will be more than one trial." (Emphasis added.)
The court further provided that "all four cases are consolidated into 4:CV–01–0744 as the surviving case." Thus, the four cases
were not consolidated only for discovery purposes—they were consolidated for "all pretrial proceedings," including summary
judgment proceedings. Thus, as the city correctly argues, a partial final judgment under Rule 54(b) was necessary to terminate
Hickey, Hill, and Graham's claims because the September 2002 order granting summary judgment to the city was not final as to
Murray's claims. If the District Court had not entered partial final judgment pursuant to Rule 54(b) in January 2003, we would
not have had jurisdiction over the officers' appeals of the September and October 2002 orders. *See Berkeley Inv. Group,* 259
F.3d at 139–40; *see also In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.,* 242 F.3d 497, 502 (3d Cir.2001). We affirm
the district court's decision to enter partial final judgment in January 2003.

### III Standards of Review

We exercise plenary review over the District Court's order granting summary judgment to the city. *Assaf v. Fields,* 178 F.3d 170,
171 (3d Cir.1999). Accordingly, we apply the same test that the District Court should have applied. *Chipollini v. Spencer
Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.1987) (en banc). We review the record  **\*125**  as a whole, "draw[ing] all reasonable
inferences in favor of the non-moving party" but not weighing the evidence or making credibility determinations. *Reeves v.
Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citation omitted). If we determine
that "there is no genuine issue as to any material fact" and that the movant is entitled to judgment as a matter of law, we will
affirm the district court's grant of summary judgment. Fed.R.Civ.P. 56(c).

 We review the District Court's denial of leave to amend Hickey's complaint for abuse of discretion. *Lum v. Bank of America*
361 F.3d 217, 223 (3d Cir.2004). Whether the District Court properly entered final judgment pursuant to Fed.R.Civ.P. 54(b) is
a matter of law that we review *de novo. Berkeley Inv. Group,* 259 F.3d at 140.

### IV. Discussion

A. The Officers' First Amendment and Equal Protection Claims

Hill v. City of Scranton, 411 F.3d 118 (2005)

177 L.R.R.M. (BNA) 2539, 151 Lab.Cas. P 60,007, 23 IER Cases 1493

 The officers allege that the city terminated them not because they failed to comply with the residency ordinance but because they exercised their First Amendment right to petition the government by suing the city in 1997. We follow a well-established three-step test to evaluate a public employee's claim of retaliation for engaging in activity protected under the First Amendment. *See Baldassare v. State of New Jersey,* 250 F.3d 188, 195–96 (3d Cir.2001); *San Filippo v. Bongiovanni,* 30 F.3d 424, 430–31 (3d Cir.1994); *Holder v. City of Allentown,* 987 F.2d 188, 194 (3d Cir.1993). First, the employee must show that the activity is in fact protected. *Pickering v. Bd. of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Second, the employee must show that the protected activity "was a substantial factor in the alleged retaliatory action." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Third, the employer may defeat the employee's claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct. *Id.*

 The officers further allege that the city violated their right to equal protection of the laws under the Fourteenth Amendment by selectively enforcing the ordinance against them while failing to terminate other similarly situated city employees who did not bring suit in 1997. As noted above, we affirmed the District Court's dismissal of the 1997 claim that the residency ordinance violated the equal protection clause on its face. However, discriminatory enforcement of a facially valid law is also unconstitutional under the equal protection clause. *Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Holder,* 987 F.2d at 197 (applying *Yick Wo* to a claim of discriminatory enforcement of a residency ordinance). To establish their selective enforcement claim, the officers must demonstrate 1) that other similarly situated employees were not terminated despite their non-compliance with the ordinance and 2) that this selective treatment was based on an "unjustifiable standard, such as race, or religion, or some other arbitrary factor, ... or to prevent the exercise of a fundamental right." *Holder,* 987 F.2d at 197 (citing *United States v. Schoolcraft,* 879 F.2d 64, 68 (3d Cir.1989) (internal quotations omitted). Here, the officers seek to demonstrate that the city singled them out for exercising their fundamental First Amendment right to petition the government when they brought suit against the city in 1997.

The officers' First Amendment and Equal Protection claims are functionally  **\*126**  identical and it would be redundant to treat them separately. [9]  As a leading treatise explains, "[i]t is generally unnecessary to analyze laws which burden the exercise of First Amendment rights by a class of persons under the equal protection guarantee, because the substantive guarantees of the Amendment serve as the strongest protection against the limitation of these rights." Ronald Rotunda & John Nowak, 3 Treatise on Constitutional Law: Substance and Procedure § 18.40, at 796 (3d ed.1999). If a law passes muster under the First Amendment it is also likely to be upheld under the Equal Protection clause. *Id.* Likewise, if a law violates First Amendment rights there is no need to resort to the Equal Protection clause to redress the constitutional violation. *Id.; see also Sherbert v. Verner,* 374 U.S. 398, 410, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (no need to examine equal protection claim based on denial of unemployment benefits to individuals whose religious principles prohibit Saturday work where Court held same practice unconstitutional under free exercise clause). We will examine the officers' First Amendment retaliation claim directly rather than as a component of their derivative equal protection claim. [10]

 The first prong—whether the relevant activity is protected under the First Amendment—is not contested here. In this circuit, any lawsuit brought by an employee against a public employer qualifies as a protected "petition" under the First Amendment so long as it is not "sham litigation." *San Filippo,* 30 F.3d at 443. The city does not argue that the police officers' 1997 suit against the city was a sham. As for the second and third prongs, we will consider them together because we conclude that the same evidence is sufficient to defeat the city's summary judgment motion with respect to each prong. [11]  *See San Filippo,* 30 F.3d at 434, 444 (holding that evidence supporting professor's claim that his protected activities were a "substantial factor" in his termination  **\*127**  also rebutted employer's claim that the professor would have been terminated regardless of his protected activities).

Hill v. City of Scranton, 411 F.3d 118 (2005)
177 L.R.R.M. (BNA) 2539, 151 Lab.Cas. P 60,007, 23 IER Cases 1493

We reject the officers' contention that courts may never grant summary judgment on either the second or third steps of this analysis. Although we have often noted that the first prong of the First Amendment retaliation test presents questions of law for the court while the second and third prongs present questions of fact for the jury, *e.g.,* *Curinga v. City of Clairton,* 357 F.3d 305, 310 (3d Cir.2004) (citing *Baldassare,* 250 F.3d at 195), only *genuine* questions of fact should be determined by the jury. For example, in *Ambrose v. Township of Robinson, Pa.,* 303 F.3d 488, 496 (3d Cir.2002), we held that judgment as a matter of law under Rule 50(b) should have been granted to the defendant where the plaintiff failed to present sufficient evidence that his protected activity was a substantial factor in his suspension. The same principle applies in the summary judgment context under Rule 56. *E.g.,* *Watters v. City of Philadelphia,* 55 F.3d 886, 892 (3d Cir.1995) (noting District Court concluded that plaintiff made sufficient showing that speech was substantial factor motivating termination to submit question to jury).

In this case, the officers satisfied their evidentiary burden on the "substantial factor" prong and sufficiently rebutted the city's evidence that they would have been terminated anyway. The officers' strongest evidence suggests that several non-resident employees who did not participate in the 1997 lawsuit were not terminated despite the city's knowledge or unrebutted suspicions that they lived outside the city.

The District Court in its opinion gives an example of such an employee. After holding that the officers could not substantiate their claim that "similarly situated" employees were allowed to keep their jobs, the court held that Robert Murray had successfully done so. Murray alleged that his neighbor Robert Warner, a firefighter for the city, was not terminated even though they both lived outside the city. The court found that whether Warner actually lived outside the city and whether the city knew of Warner's possible non-compliance were genuine issues of fact for the jury. The court then determined, however, that neither Warner nor any other non-police officer could be "similarly situated" to the police officer plaintiffs because the language defining "bona-fide residence" in the police CBA made the CBA more strict than the residency ordinance itself. The court also found that the city terminated the police officers because of their non-compliance with the CBA, *not* because of their non-compliance with the residency ordinance. We conclude, however, that the court erred in reaching both conclusions.

First, based on the record on appeal, all city employees subject to the residency ordinance are "similarly situated" for purposes of the First Amendment analysis. The ordinance requires all city employees to establish a "bona-fide residence" in the city of Scranton, but does not define the term. The police CBA explicitly defines "bona-fide residence" to mean "sole legal residence or domicile." However, the police CBA does not purport to alter or augment the residency ordinance by providing this definition. In fact, the police CBA's definition of "bona-fide residence" appears to be lifted directly from *City of Meadville, Firemen's Civil Service Commission v. Neff,* a Pennsylvania Commonwealth Court decision construing a municipal residency ordinance. 69 Pa.Cmwlth. 259, 450 A.2d 1078, 1079–80 n. 3 (1982) ( "Reference to a bona fide residence in a municipal ordinance establishing a residency **\*128** requirement for municipal employees means the *sole legal residence or domicile* of the employee.") (citation omitted, emphasis added). *See also* *McCarthy v. Phila. Civil Serv. Comm'n,* 19 Pa.Cmwlth. 383, 339 A.2d 634, 636–37 (1975), *aff'd,* 424 U.S. 645, 96 S.Ct. 1154, 47 L.Ed.2d 366 (1976) (holding that "bona fide residence" in municipal residency ordinance means "domicile," and further explaining that a person can have more than one residence but only one domicile). Thus, the residency requirement in the police CBA is not more strict than the ordinance—it is exactly the same. [12] For that reason, the court erred in holding that other city employees were not similarly situated to the officers simply because they were not subject to the police CBA. [13]

Second, the District Court erred by finding that the officers were terminated because of their failure to comply with the police CBA rather than their failure to comply with the ordinance. As just explained, there is no difference between the residency requirements imposed by the police CBA and the ordinance. The distinction made by the District Court could still be relevant, however, to the extent it reflects the city's subjective intent. For example, the city might argue that it only investigated and terminated employees whose unions had agreed to include the residency ordinance in their CBA. This would supply a non-

Hill v. City of Scranton, 411 F.3d 118 (2005)

177 L.R.R.M. (BNA) 2539, 151 Lab.Cas. P 60,007, 23 IER Cases 1493

retaliatory explanation for any evidence that certain non-resident employees were not terminated if those employees' unions had not agreed to such inclusion.

Under the facts before the court, however, the question whether the city was willing to enforce the residency ordinance without the supplemental authority of a collective bargaining agreement is a genuine factual issue that the District Court should not have resolved at the summary judgment stage. In late May 2000, the city sent letters to eleven police officers and two firefighters threatening "immediate termination" if the recipients failed to provide updated documents and affidavits establishing their residency in the city. These letters referred to both the residency ordinance and the relevant CBA incorporating that ordinance. [14] However, the pre-termination letters issued to Hill, Hickey, and Graham cite only the residency ordinance. Further, other evidence in the record suggests that the city was willing to rely solely on the residency ordinance. For example, in 1987, long before the ordinance had been incorporated into any CBA, the city controller issued a city-wide request for documentation of residency that threatened termination for non-compliance.

In addition to Robert Warner, the officers provided evidence that at least three other city employees—all police officers who did not sue the city in 1997—were allowed to remain employed despite the city's knowledge or un-rebutted suspicions that they were not in compliance with the **\*129** residency ordinance. [15] In June 2000, Ray Mountford, the lead private investigator working on the residency investigation for the city, was asked to investigate police officers Donald Pettinato and Anthony Gillette. Just after the investigation of Pettinato got underway, however, Mountford was told by the city that Pettinato lived in Old Forge, Pennsylvania, that he was not moving back to the city, and that the investigation should be discontinued. Mountford also testified that his associate determined based on surveillance and public records that Gillette lived in Jessup, Pennsylvania. Mountford's notes from July 7, 2000, indicate that the city had decided to set hearings for Pettinato, Gillette, and Paul Graham, one of the appellants in this case. However, of these three only Graham was terminated for non-compliance with the residency ordinance and it appears that no hearings ever took place with respect to Pettinato and Gillette. [16]

The officers also showed that the city suspected police officer Patrick Tobin of residing outside the city but may have called off the investigation without adequately rebutting those suspicions. In June 2000, the city asked the private investigators to investigate Tobin, but Mountford and his associate were never able to determine Tobin's residence despite multiple days of surveillance over the course of four months. [17] City records custodian Conall Kolleen later averred that Tobin now resides at a specific address in Scranton. However, the investigators conducted surveillance on this address—which Mountford identified as Tobin's ex-wife's **\*130** house—and could not determine whether Tobin resided there.

For all the above reasons, the District Court's conclusion that the plaintiff police officers were "the only ones that did not come into compliance with the terms of their CBA" was an improper resolution of a genuine factual dispute.

 The officers further contend that they were actually in compliance with the residency ordinance. The officers certainly do not need to allege or prove compliance with the ordinance to prevail on their First Amendment claim. Discriminatory enforcement of a statute or ordinance is not justified simply because the enforcement is otherwise valid. *See* 🚩*Desi's Pizza, Inc. v. City of Wilkes–Barre,* 321 F.3d 411, 424–25 (3d Cir.2003). Evidence of the officers' compliance with the ordinance would nonetheless be powerful evidence that their termination was pre-textual. On this record, no reasonable fact-finder could conclude that either Hill or Hickey came into compliance with the ordinance within the time provided by the city. [18]

 Graham, however, should be permitted to argue his case for compliance to the jury. As discussed above, a Scranton employee's "bona-fide residence" is his domicile. In Pennsylvania "[t]he domicile of a person is the place where he has voluntarily fixed his habitation with a present intention to make it either his permanent home or his home for the indefinite future." 🚩*In re McKinley's Estate,* 461 Pa. 731, 734, 337 A.2d 851 (Pa.1975). "A new domicile can be acquired only by physical presence at a new residence plus intent to make that new residence the principal home." *In re Prendergast,* 543 Pa. 498, 673 A.2d 324, 327–28 (1996). Graham has established that he became domiciled in Scranton shortly after he was hired as a police officer in 1993.

*Hill v. City of Scranton, 411 F.3d 118 (2005)*

177 L.R.R.M. (BNA) 2539, 151 Lab.Cas. P 60,007, 23 IER Cases 1493

It is the city's burden to demonstrate that Graham changed his domicile to Nicholson, Pennsylvania, when he re-married in 1998. [19] *See In re Prendergast,* 673 A.2d at 327–28 (noting that the burden of showing changed domicile "rests upon whomever makes the allegation").

The city has introduced more than enough evidence to meet its burden. First and foremost, the city has shown that Graham's second wife and step-children were domiciled in Nicholson during all times relevant to this dispute. The location of an individual's family is very strong evidence of the location of his domicile. Indeed, the Pennsylvania Supreme Court has defined domicile as "the place at which an individual has fixed his family home and principal establishment for an indefinite period of time." *In re Prendergast,* 673 A.2d at 327 (citing 🚩 *In re Dorrance's Estate,* 309 Pa. 151, 163 A. 303 (1932)); *see also* 🚩 *In re Nomination Petitions of McIntyre,* 778 A.2d 746 (2001). The city also provided other evidence of changed domicile, including Mountford's testimony that Graham's **\*131** Scranton apartment was just a "mail drop" being used by both Graham and Hill in an attempt to achieve technical compliance with the residency ordinance despite actually living outside the city.

Nevertheless, Graham has introduced enough evidence to create a genuine factual dispute on this issue. Graham testified that he moved into Scranton within six months of being hired as a police officer in 1993 to come into compliance with the residency ordinance. He rented various apartments there until approximately six months after his termination in October 2000. Graham claims that he and his new wife lived apart from the time of his marriage until after his termination because of his job. [20] He explained that he never believed that merely renting an apartment and paying city taxes was sufficient to comply with the residency ordinance; rather, he thought he had to stay in his Scranton apartment "three to five" nights a week. At his pre-termination hearing Graham called four witnesses who attested that they were Graham's neighbors when he lived in the Scranton apartment also claimed by Phyllis Hill. Finally, Graham claims that his wife solely owned the Nicholson home.

 Graham's account is self-serving and somewhat unlikely. A person's intent to change domicile is based on "the actual state of facts, not what one declares them to be." *In re Prendergast,* 673 A.2d at 328. However, courts do not weigh evidence or determine credibility questions at the summary judgment stage. 🚩 *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citation omitted). Viewed in the light most favorable to Graham, a reasonable fact-finder could conclude that Graham made his home in Scranton when he moved there after being hired as a police officer and that he never made Nicholson his principal home after he re-married because he knew that if he did so he would be in violation of the residency ordinance. [21]

The officers also presented additional evidence of retaliation. Without the evidence regarding specific employees described above, we doubt whether this additional evidence would be sufficient to meet the officers' burden of rebuttal. However, we need not resolve this question because the sum of all the evidence supporting the officers is sufficient to carry their burden.

First, viewed in the light most favorable to the officers, the residency ordinance had been enforced half-heartedly and sporadically at best prior to the 2000 residency investigation. Since the ordinance's passage in 1980, the city has attempted only twice to collect residency information from all employees—in 1987 and 1997. [22] More **\*132** important, there is no evidence that prior to June 2000 any employee was disciplined or terminated for failure to comply with the ordinance. The city's sudden vigilance could suggest that the city was motivated at least in part by the officers' participation in the 1997 lawsuit. *See* 🚩 *Holder,* 987 F.2d at 197 (noting Holder's allegation that no other city employee had been fired for non-compliance with residency ordinance in ordinance's fourteen-year existence). [23]

Next, the officers showed that of the initial list of eight names sent to the private investigation firm in May 2000, seven were police officers who sued the city in 1997. The city could respond that shortly thereafter four more police officers were added to the list and that three of these four were not plaintiffs in the 1997 suit. [24] However, the officers' evidence could still reasonably suggest that the city prioritized and targeted the 1997 plaintiffs, especially considering the fact that no police officer who did not sue the city in 1997 was ever terminated for non-compliance with the ordinance.

177 L.R.R.M. (BNA) 2539, 151 Lab.Cas. P 60,007, 23 IER Cases 1493

The officers also showed that the 2000 investigation was not conducted in a systematic fashion. Despite the City Controller's attempt to gather residency information from all city employees in 1997, Mayor Connors was unsure whether his office used that information to determine which employees warranted further investigation. Rather, Mayor Connors and City Attorney James Mulligan testified that the lists of suspicious employees were generated largely from tips from the public or from other city employees. Mayor Connors testified that he was "very satisfied" that the 2000 investigation produced a "complete list" of suspected violators and explained that the city may have used the results of the 1997 request to eliminate from suspicion the majority of city employees. The officers presented evidence, however, that approximately two hundred employees failed to respond to the 1997 request for residency documentation—there were only 445 respondents out of approximately 650 city employees. The city makes no attempt to either contradict or explain this shortfall. The city's failure to conduct a systematic and thorough investigation of all employees, especially of those who raised red flags by failing to respond to the mandatory 1997 request, is consistent with the alleged retaliatory motive.

Further, the temporal proximity between the officers' protected activity and their termination supports an inference of retaliation. The officers lost their case in the District Court in December 1997, but we did not deny their appeal until June 1999. Hickey and Hill were fired within **\*133** one year of our decision, while Graham's termination followed four months later. We need not, however, decide whether a one-year gap is sufficient to support an inference of retaliation. We have explained that a retaliatory inference based on temporal proximity is strengthened where "the decisionmaker lacked a pretext on which to dismiss the plaintiff until shortly before the time of dismissal." *San Filippo,* 30 F.3d at 444. After the city prevailed in the District Court and before us, it apparently decided to strengthen its position by incorporating the residency ordinance into all of its collective bargaining agreements with the various unions representing city employees. [25] The police CBA containing the new residency provision was ratified on October 28, 1999, and included a six-month grace period to run from the date of ratification. Hickey and Hill were investigated in May 2000 and terminated in early June, just a few weeks after the expiration of this grace period. Further, although Graham was not terminated until October 2000, there is evidence that his pre-termination hearing was originally scheduled for July. Under these circumstances there is enough evidence to support a slight inference of retaliation. As in *San Filippo,* we need not determine whether this evidence would be sufficient absent the additional evidence of retaliation detailed in this opinion. 32 F.2d at 444.

Finally, the officers presented some evidence that Mayor Connors was particularly concerned with the officers who sued the city in 1997. Hickey testified that Connors asked him at his pre-termination hearing why he participated in the 1997 lawsuit. Further, another police officer testified that Connors had sought "stronger language" regarding residency in the police CBA to ensure that the officers would not be able to further resist the city's enforcement efforts. While these comments are amenable to a non-retaliatory interpretation, a reasonable fact-finder could also conclude, in light of all the other evidence discussed above, that Mayor Connors was unfavorably disposed towards the officers who participated in the 1997 lawsuit.

For all the above reasons, we conclude that the police officers have presented sufficient evidence that the city used the residency ordinance as a pretext for retaliatory terminations in violation of the officers' First Amendment right to petition the government.

### B. Hickey's Post–Termination Hearing Delay Claim

 As noted in Part II, Hickey argued in opposition to the city's motion for summary judgment that the lengthy delay in providing his post-termination Municipal Service hearing violated his right to procedural due process. The District Court treated Hickey's argument as a constructive motion to amend his complaint under Federal Rule of Civil Procedure 15(a), which it ultimately denied. We conclude that the District Court did not abuse its discretion or commit any legal error in reaching this decision.

First, we reject Hickey's frivolous argument that his complaint gave effective notice **\*134** to the city of his post-termination hearing delay claim. Hickey is correct that notice pleading requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a), but Hickey's complaint falls far short of this low threshold. Nowhere in the complaint does Hickey even allege that he requested a Municipal Service hearing, much less that the city failed to timely

provide such a hearing. In fact, Hickey's complaint does not allege any facts at all relating to the period after he was terminated in June 2000.

Next, we agree with the District Court that it would have been futile to allow Hickey to amend his complaint because his allegations before the District Court did not state a claim on which he could have obtained relief. While Rule 15(a) provides that leave to amend should be "freely given," a district court has discretion to deny a request to amend if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party. *See, e.g.,* *Grayson v. Mayview State Hosp.,* 293 F.3d 103, 108 (3d Cir.2002) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). Hickey is correct that the due process clause "requires provision of a [post-termination] hearing at a meaningful time." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 547, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Thus, "there is a point at which an unjustified delay in completing a post-deprivation proceeding would become a constitutional violation." *FDIC v. Mallen,* 486 U.S. 230, 242, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988) (internal citation omitted). The key point, however, is that the delay must be "unjustified." We have held that the "mere allegation of a ... twenty-month delay" without supplementary allegations concerning the cause of the delay does not state a constitutional claim. *Ritter v. Cohen,* 797 F.2d 119, 124 (3d Cir.1986). Before the District Court, Hickey simply stated in conclusory fashion that his due process rights had been violated by "the unwarranted delay of two and [a] half (2 ½) years." Rather than attempt to explain the cause of the delay, Hickey chose instead to devote the majority of his brief to re-arguing the merits of his First Amendment and equal protection claims. Accordingly, the District Court correctly followed *Ritter* and held that granting leave to amend would be futile.

Hickey now argues for the first time on appeal that the city caused the delay in the Municipal Service Commission proceeding by failing to comply with his legitimate discovery requests. Had this allegation been made in the District Court, the court might not have held that Hickey's attempted amendment was futile. However, the District Court reached the correct result based on the information provided at the time by the parties. [26] Accordingly, we conclude that the District Court did not abuse its discretion by denying leave to amend. [27]

## *135 V. Conclusion

For the foregoing reasons we will vacate the District Court's order granting summary judgment to the city on the officers' First Amendment claims and remand those claims for further proceedings. We will affirm the District Court's orders in all other respects.

### All Citations

411 F.3d 118, 177 L.R.R.M. (BNA) 2539, 151 Lab.Cas. P 60,007, 23 IER Cases 1493

### Footnotes

1    The District Court subsequently granted partial summary judgment in favor of the city in the fourth officer's case but that case is not before us.

2    Thus, we affirm the district court's decision to grant summary judgment on Hickey's claim under the Americans with Disabilities Act. We also hold that the officers waived their claim that the district court improperly dismissed as moot

various discovery motions pending at the time the district court rendered summary judgment in favor of the city. The officers' passing reference to this claim in the "Statement of Issues For Review" in their opening brief does not suffice to bring it before this court. *See* *Kopec v. Tate,* 361 F.3d 772, 775 (3d Cir.2004) (citations omitted).

3      The ordinance provides in relevant part:

> *Section 2.* On or after March 1, 1980, any new employee of the City of Scranton who is not a resident of the City of Scranton at the time of the commencement of employment shall have six (6) months from the time of commencement of employment to acquire a bona-fide residence within the corporate limits of the City. Such residence must be maintained during continuous employment by the city or be a cause for immediate termination of the employment relationship between the City of Scranton and the new employee.

4      The district court relied heavily on *McCarthy v. Philadelphia Civil Service Commission,* 424 U.S. 645, 96 S.Ct. 1154, 47 L.Ed.2d 366, (1976), *affirming* 19 Pa.Cmwlth. 383, 339 A.2d 634 (1975). The Supreme Court in *McCarthy* refused to consider a facial constitutional challenge to a similar residency requirement, concluding that the requirement was not irrational. 424 U.S. at 646–47, 96 S.Ct. 1154.

5      Section 5 of the residency ordinance provides that "[t]he Controller of the City of Scranton may, from time to time, ... require adequate proof of bona-fide residence within the City of Scranton." Scranton, Pa., File of Council No. 17, § 5.

6      Gnall brought a similar suit sometime later, but that case was not consolidated with the others.

7      The appellants do not claim that the District Court should have granted their motions for summary judgment, only that it should not have granted summary judgment against them.

8      Pursuant to Rule 54(b), "the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." However, "[i]n the absence of such determination and direction, any order ... which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." Fed.R.Civ.P. 54(b).

9      The officers seek to prove the second prong of their equal protection claim by proving their First Amendment claim. Conversely, the officers' most significant evidence supporting their First Amendment claim is that other similarly situated city employees who did not participate in the 1997 suit were not terminated. This same evidence would also satisfy the officers' burden of proof on the first prong of their equal protection claim.

10     We took the same approach in *San Filippo* but did not provide an explanatory discussion because in that case "the parties agree[d] that the analysis is the same under the first amendment and equal protection claims." 30 F.3d at 430 n. 6.

11     This is a case-specific determination based on the facts before us, not a general principle. There may well be cases in which evidence satisfying the "substantial factor" prong is insufficient to rebut evidence demonstrating that the same adverse employment action would have occurred notwithstanding the protected activity. *See, e.g.,* *Torres–Rosado v. Rotger–Sabat,* 335 F.3d 1, 13–14 (1st Cir.2003) (assuming plaintiff's evidence satisfied "substantial factor" test but granting summary judgment to defendants based on uncontested evidence that plaintiff would have been terminated anyway). As this court explained in *Suppan v. Dadonna,* "substantial factor" does not mean "dominant" or "primary" factor. 203 F.3d 228, 235 (3d Cir.2000) (citing *Village of Arlington Heights v. Metro. Housing Development Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). Thus, even if a plaintiff shows that activity protected by the First Amendment was a "substantial factor" in her termination, the defendant may show that some other factor unrelated

177 L.R.R.M. (BNA) 2539, 151 Lab.Cas. P 60,007, 23 IER Cases 1493

to the protected activity was the but-for cause of the termination. *Id.* Of course, because the defendant bears the burdens of proof and persuasion on the third prong, 🚩 *San Filippo,* 30 F.3d at 430 n.7, to prevail at summary judgment on this prong the defendant must present evidence of such quality that no reasonable juror could conclude that the protected activity was the but-for cause of the termination.

12    In fact, in 1997 the District Court held that "bona fide residence" as used in Scranton's residency ordinance was synonymous with "legal domicile," and we explicitly upheld this determination when we affirmed that decision in 1999. *Kreischer v. City of Scranton,* No. 98–7439, slip op. at n.2.

13    We further note that even if the police CBA imposed slightly different residency requirements than the ordinance, the police officers would still be "similarly situated" to other city employees so long as the core residency requirement was the same. *See* 🚩 *Bennun v. Rutgers State Univ.,* 941 F.2d 154, 178 (3d Cir.1991) (explaining that "similarly situated" does not mean "identically situated").

14    The firefighters' CBA also incorporated the residency ordinance.

15    The officers have also attempted to swell the ranks of "similarly situated" employees by listing several golf course employees and temporary summer employees who were not terminated despite city personnel records showing them to have non-Scranton addresses. However, neither of these groups are subject to the residency ordinance, and therefore the officers cannot reasonably argue that any of these employees are "similarly situated" to them. The golf course is operated by the Scranton Recreation Authority, an independent agency not subject to the control of the city of Scranton. *See Smith v. Athens Township Auth.,* 685 A.2d 651, 656 (1996) (citation omitted). The Recreation Authority has the sole authority to hire, fire, and set conditions of employment for its employees. *See* 📙 53 Pa. Cons.Stat. § 5607(d). Further, Scranton employees are only required to live in the city during "continuous employment by the city." Temporary summer employees are by definition not continuously employed by the city, and therefore they are not subject to the residency ordinance.

16    In sharp contradiction to Mountford's testimony, James Connors, the mayor of Scranton, testified that the 2000 investigation revealed that both Pettinato and Gillette lived in Scranton. Connors further testified that the city subsequently ordered a second investigation of Gillette based on a tip that he was living outside the city. According to Connors, Gillette retired during the second investigation. Mountford testified that he was asked to investigate Gillette a second time in August 2001, but that his associate had already determined in 2000 that Gillette lived in Jessup, PA. Even if Gillette ultimately retired under pressure, the fact that the city delayed enforcing the ordinance against him for over a year nonetheless supports the officers' position. Also, the only evidence of Gillette's forced retirement on this record comes from Mayor Connors, an interested witness. Therefore, this factual issue cannot be resolved on summary judgment. *See* 📙 *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 149–151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (explaining that when drawing all reasonable inferences in favor of the non-movant the courts must disregard evidence the jury is not required to believe, including testimony of interested witnesses) (citations omitted).

17    Mountford explained that Tobin was "playing a game" by purposefully eluding the investigators. Mountford's records indicate that Tobin was observed at three different Scranton addresses, including the homes of his ex-wife and daughter, but the investigators could not conclude that Tobin resided at any of these three addresses.

18    Hill was domiciled with her family in Factoryville, PA, at the time of her hire as a police officer in 1990, and no reasonable fact-finder could conclude that she changed her domicile merely by renting an apartment in Scranton and spending the night there "occasionally." Hickey claims that he received an oral waiver of the residency ordinance from the chief of police in 1995, but the ordinance provides that a waiver may only be obtained from the mayor, with the advice and consent of the city council. *See* Ordinance, § 4. Further, his attempt to come into compliance with the ordinance by moving into his house in the city the day before his pre-termination hearing on June 8, 2000, is insufficient. The May

26, 2000, threat letter adequately informed Hickey that he had until June 2, 2000, to come into compliance and supply the requested proof of compliance to the city.

19 Graham was divorced from his first wife in 1987.

20 Graham explained that after he met his second wife, Jacqueline, but before they were married, he might stay in his Scranton apartment three nights a week, at his parents' house in Clarks Summit once or twice a week, and with Jacqueline the remainder of the time. It appears Graham was never asked about his typical weekly routine after he was married.

21 Our conclusion on this issue does not compel a similar result in Hill's case. Hill was domiciled in Factoryville with her own family and children since she was hired as a police officer. Hill is listed with her husband on the deed associated with that property. When asked if she slept in her Scranton apartment on a regular basis Hill answered "no." She followed by stating that she slept there "occasionally," but refused to be more specific. She was equally vague when asked how often she ate meals there. Further, while Graham claims that he had a private bedroom in the shared apartment, Hill claims that she slept on a "sofa couch."

22 Roseann Novembrino, the City Controller, testified that she also collected residency information in 1991, but the city produced no records supporting this claim. The fact that the officers do not directly challenge Novembrino's testimony on this point is irrelevant. As noted above, *supra* note 16, when evaluating a summary judgment motion a court should not consider even uncontradicted testimony of an interested witness where that testimony supports the movant. *See*

🚩 *Reeves,* 530 U.S. at 149–151, 120 S.Ct. 2097 (citations omitted).

23 On the other hand, a reasonable fact-finder might conclude that this argument places the cart before the horse. The plaintiffs argued in their 1997 lawsuit that the city intended to begin enforcing the residency ordinance in earnest after years of inattention. In fact, the city's threats of imminent enforcement were the basis of the 1997 lawsuit. Nonetheless, the city did not initiate termination proceedings against anyone prior to the 1997 lawsuit, and a reasonable fact-finder could conclude that the city's vigilance in 2000 was motivated in part by the 1997 suit.

24 The city might also argue that it was most likely that the employees who had brought suit were in violation of the ordinance. For that reason, the city started with them. This argument was not, however, made by the city in the District Court.

25 The city's actions may have been motivated by the plaintiffs' claims in 1997 that the residency ordinance was not only unconstitutional but also inconsistent with the police CBA. The District Court acknowledged this claim but never addressed it, and we affirmed the District Court's order without mentioning the CBA claim. Thus, the city may have been concerned that the residency ordinance was still vulnerable to legal challenge, and hence may have sought to eliminate that vulnerability by incorporating the ordinance into all of its collective bargaining agreements.

26 We note that the District Court might have also relied on Hickey's lack of diligence in timely raising his post-termination due process claim. Hickey filed his original complaint in April 2001, and an amended complaint in December 2001, approximately one and a half years after he was terminated in June 2000. Yet Hickey did not mention any post-termination hearing delay until August 2002, more than two years after his termination. Hickey never attempted to explain to the District Court why he waited more than two years to raise this claim for the first time, nor has he offered any explanation for this delay on appeal.

27 We need not consider the District Court's alternative conclusion that Hickey's constructive motion to amend was made in bad faith.

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3561227
Only the Westlaw citation is currently available.
United States District Court, M.D. Georgia, Macon Division.

Clyde Franklin HOLLAND, Petitioner,

v.

Warden Gregory MCLAUGHLIN, Respondent.

CIVIL ACTION NO. 5:18-CV-178 (MTT)
|
Signed 08/11/2021

**Attorneys and Law Firms**

Clyde Franklin Holland, Macon, GA, Pro Se.

Jason H. Kang, Jordan Alexander Weber, Roger Allan Chalmers, Atlanta, GA, for Respondent.

## **ORDER**

MARC T. TREADWELL, CHIEF JUDGE

**\*1**  Before the Court is a motion for summary judgment filed by Defendant Gregory McLaughlin. For the reasons discussed below, that motion (Doc. 40) is **GRANTED** as to Holland's claim of deliberate indifference to medical needs but **DENIED** as to Holland's retaliation claim.

## **I. BACKGROUND**

This Section 1983 action involves claims of retaliation and deliberate indifference by Plaintiff Clyde Holland, a Georgia prisoner proceeding *pro se*, against Gregory McLaughlin, the former Warden of Macon State Prison. Holland alleges that McLaughlin retaliated against him based on two prior Section 1983 actions litigated in this Court.

On July 6, 2016, Holland filed *Holland v. McLaughlin, et al.*, No. 5:16-cv-331-TES-MSH (M.D. Ga.) ("*Holland I*"). In that case, Holland raised claims relating to (i) medical treatment for a variety of ongoing ailments (the need for dentures, digestive issues, and low blood sugar), (ii) the provision of Harvoni, a hepatitis C drug, (iii) injuries from hitting his head on a locker door, and (iv) treatment for injuries from a fall while being taken to the hospital. McLaughlin waived service of process on May 9, 2017 and filed an answer on June 9. *Holland I*, Docs. 16; 21. On March 25, 2019, the Court granted summary judgment as to all three claims, finding that the undisputed evidence revealed, as a matter of law, that Holland received appropriate medical care. *Holland I*, Docs. 61 at 4-6; 63.

On December 1, 2016, Holland filed a second case, *Holland v. Macon State Prison, et al.*, No. 5:16-cv-539-MTT-MSH (M.D. Ga.) ("*Holland II*"), in which he raised claims of deliberate indifference by prison staff, including McLaughlin, to a heart attack or stroke he allegedly suffered in November 2016. McLaughlin waived service of process on May 26, 2017 and filed an answer on June 23. *Holland II*, Docs. 18; 21. Because no evidence suggested that Holland suffered a heart attack or stroke, the Court granted summary judgment for the defendants on August 14, 2019. *Holland II*, Docs. 84 at 7; 88. An appeal of the judgment in that case remains pending.

In this action, Holland alleges that McLaughlin retaliated against him for his prior lawsuits by having him transferred from general population to segregation or an "isolation cell." Doc. 40-5 at 8:1-25. Holland was transferred from general population into segregation in early July 2017, the actual date is disputed, and he remained in segregation until the end of July. *Id.* at 38:6-25, 171-77.

Holland also alleges that McLaughlin was deliberately indifferent to his medical needs. According to Holland, McLaughlin knew about but failed to accommodate Holland's medical issues, causing Holland to suffer from high blood pressure and fluid buildup. Doc. 8 at 2.

## II. LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, " 'a reasonable jury could return a verdict for the nonmoving party.' " *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[ ]' in order to discharge this 'initial responsibility.' " *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.' " *Id.* (alterations in original) (quoting *Celotex*, 477 U.S. at 324). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

**\*2** The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing ... relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249-50). Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. ... The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## III. DISCUSSION

Based on the record, no reasonable jury could find that McLaughlin was deliberately indifferent to Holland's serious medical needs. However, a jury could infer from the chronology of events that McLaughlin transferred Holland to segregation, or was complicit in the transfer, in retaliation for Holland's prior litigation against McLaughlin. Thus, McLaughlin is entitled to summary judgment regarding Holland's deliberate indifference claim but not as to Holland's retaliation claim.

### A. Retaliation

Holland argues that McLaughlin engineered Holland's reassignment to segregation in retaliation for *Holland I* and *Holland II*. To establish a retaliation claim, Holland must demonstrate (i) constitutionally protected speech, (ii) that McLaughlin's retaliatory action adversely affected the speech, and (iii) a causal connection between the speech and the retaliation. *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). As a matter of law, filing a lawsuit is a constitutionally protected form of speech, and McLaughlin does not contest the "adverse effect" element. *Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986).

Instead, McLaughlin argues that no evidence demonstrates a sufficient causal connection between Holland's prior litigation and his transfer to segregation. Doc. 40-2 at 7-10. As to the causal connection, "most courts resolve this subjective motivation issue under the *Mt. Healthy* burden-shifting formula." *Smith v. Mosely*, 532 F.3d 1270, 1278 (11th Cir. 2008) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)). Under this formula, Holland has the initial burden of showing that his protected conduct was a motivating factor behind McLaughlin's adverse action. *Id.* (citations omitted). If Holland makes this showing, the burden shifts to McLaughlin to show that "he would have taken the same action in the absence of the protected activity." *Id.* (citations omitted).

Construing the evidence in the light most favorable to Holland, he has presented sufficient evidence of a "chronology of events from which retaliation may plausibly be inferred" to meet his initial burden under *Mt. Healthy*. *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995). First, there is temporal proximity between the segregation decision and McLaughlin receiving notice of Holland's lawsuits. [1] McLaughlin entered waivers of service on May 9, 2017 in *Holland I* and May 26 in *Holland II*, a little over one month before Holland's move to segregation. From this evidence, a jury could infer that McLaughlin became aware of Holland's lawsuits shortly before Holland's move to segregation.

**\*3** If Holland's testimony is believed, the temporal proximity is significantly tighter. Prison records suggest that Lt. Mark Charles ordered the assignment on July 11, 2017. Doc. 40-5 at 172. McLaughlin signed the order on July 12, ordering the Classification Committee to hold a hearing on the matter. *Id.* A record from the Classification Committee dated July 13, 2017, shows that Holland was assigned to segregation "for violation of facility rules/failure to follow instructions" and that Holland was afforded the chance to offer a rebuttal. *Id.* at 173. A deputy warden signed the Classification Committee report on July 14. *Id.* Prison movement logs similarly provide that Holland was moved to segregation on July 11. *Id.* at 169. In contrast to this weight of evidence, though, Holland testified that he was moved to segregation or "the hole" over a week earlier, on "July the 1st or 2nd." *Id.* at 62:11-19. It is undisputed that Holland was released from segregation on July 28, 2017. *Id.* at 169.

Holland's earlier date of July 1 or 2 corresponds to another alleged fact that is central to the causation analysis and which McLaughlin has failed to address—a visit by a fire marshal. In *Holland I*, Holland alleged that he injured his head due to an improperly located locker in his cell. Holland testified that he spoke to McLaughlin on five or six occasions regarding grievances he filed concerning the lockers and other similar matters. *Id.* at 37:8-38:2. Each time, McLaughlin replied, "put it on paper." *Id.* As part of his campaign to address the "illegal cell design" that included misplaced lockers and non-functioning emergency buttons, Holland wrote two letters to a fire marshal named Chris Fox, asking him to "come in and collect evidence." *Id.* at 45:9-47:15. According to Holland, Fox visited Holland "[t]he day before they put [him] in isolation." *Id.* at 47:8-22. This suggests that Holland was moved to segregation earlier than July 11.

Most importantly, evidence that Holland was moved to segregation immediately after Fox visited his cell to investigate issues raised in *Holland I* buttresses Holland's claim that his transfer was retaliatory.

In short, "the chronology of events" is sufficient to create a genuine issue of material fact as to whether Holland's prior litigation was a motivating factor behind his transfer into segregation quarters. Thus, Holland has met his initial burden under *Mt. Healthy*, and the burden shifts to McLaughlin to show that he would have ordered Holland's move to segregation in the absence of

Holland's prior lawsuits. McLaughlin is entitled to summary judgment if he "can show that he would have taken the same action in the absence of the protected activity." 🚩 *Smith*, 532 F.3d at 1278.

As to the second step of the *Mt. Healthy* inquiry, McLaughlin argues, and prison records provide, that Holland "was placed into segregation ... based on a violation of facility rules and/or a failure to follow instructions." Docs. 40-2 at 9; 40-3 at 4. According to prison records, Holland was moved to segregation for "violation of facility rules/failure to follow instructions." Doc. 40-5 at 172 (segregation assignment memo). Holland's alleged failure to follow instructions arose from his objection to being moved to a general population unit that Holland considered more dangerous. Doc. 40-5 at 64:7-65:19. Holland's segregation transfer was quickly ruled improper on procedural grounds, perhaps because Holland "was not served a [disciplinary report] within 24 hours." Docs. 40-5 at 176; 51-1 at 11. Alternatively, it could have been improper because the corresponding disciplinary report, not available to the Court, did not include the correct GDC identification number. Docs. 40-5 at 176; 51-1 at 11. It is just not clear. What is clear is that the disciplinary report did not warrant Holland's transfer to segregation, and he was returned to general population in late July on the Classification Committee's recommendation. Doc. 40-5 at 169, 176.

**\*4** Under these circumstances, the Court cannot say that McLaughlin would have approved Holland's transfer to segregation regardless of Holland's prior litigation. A jury might well credit McLaughlin's narrative. On the other hand, a reasonable jury could credit Holland's account that his claims in *Holland I* and *II* and the related visit from the fire marshal were catalysts for Holland's segregation transfer. A jury could also infer that the citation for failure to follow orders was baseless or pretextual; therefore, McLaughlin did not act out of lawful motivation. Given this dispute of material fact, summary judgment concerning Holland's retaliation claim would not be proper. [2]

### 1. Compensatory and punitive damages

McLaughlin also moves for summary judgment regarding any potential claim compensatory and punitive damages because Holland "cannot prove that he suffered a physical injury that is more than *de minimis.*" Doc. 40-2 at 16-17. First, Holland's complaint does not seek punitive damages. *See generally* Doc. 1; *see also Hoever v. Marks*, 993 F.3d 1353 (11th Cir. 2021). Second, there is no evidence that Holand suffered a physical injury because of McLaughlin's alleged retaliation. Accordingly, the Court grants McLaughlin's motion as to any claim for compensatory damages.

### B. Deliberate Indifference to Medical Needs
**\*5** McLaughlin is entitled to summary judgment on Holland's claims of deliberate indifference to serious medical needs. On screening under 28 U.S.C. § 1915A, the Court allowed Holland to proceed on a deliberate indifference claim based on his allegations that McLaughlin was "fully aware" of Holland's medical condition and failed to ensure that Holland had a "medical diet pack out." Doc. 10 at 2.

To prevail on a claim of deliberate indifference to medical needs, a plaintiff must establish that he had an objectively serious medical need and that the prison official acted with deliberate indifference to that need. 🚩 *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004). In his amended complaint, Holland cited as medical needs his "severe injuries," "heart problems," and "high blood pressure." Doc. 8 at 2. It is also evident from past litigation and his deposition in this action that Holland suffers from hepatitis C, which is a serious medical need. Doc. 40-5 at 23; *see also* 🚩 *Brown*, 387 F.3d at 1351. Thus, Holland's impairments rise to the level of a serious medical need.

That said, no reasonable jury could find deliberate indifference. To establish deliberate indifference, Holland must show that McLaughlin had subjective knowledge of a risk of harm and that McLaughlin disregarded that risk through more than mere negligence. 🚩 *Brown*, 387 F.3d at 1351. The undisputed evidence establishes that Holland received extensive medical care

during and after his temporary confinement in segregation quarters. According to the declaration of Kenneth Cowens, the medical director of Macon State Prison, Holland received medical attention on July 12, 15, 17, 21, 24, 27, August 3, and August 4, 2017, "in the same manner as medical care and attention are provided to inmates in general population." Doc. 40-4 at 2-3.

Additionally, the record indicates that a screening process ruled out any medical contraindications for Holland's initial placement into segregation quarters. *Id.* at 6. Finally, in between his formal medical appointments, the record shows that Holland was instructed to treat with an assortment of self-administered medications, including Prilosec, Naproxen, Triamcinolone, and Proscar. *Id.* at 3, 8-10.

Given the undisputed evidence relating to the extensive medical care Holland received in segregation quarters and McLaughlin's position as warden, as opposed to a trained medical-care provider, no reasonable jury could conclude that McLaughlin disregarded Holland's medical needs at a level rising to "more than mere negligence" simply by approving of Holland's temporary transfer into segregation quarters. *Cf. Reed v. Santiago*, 2020 WL 5868214, at *3 (N.D. Fla. Aug. 31, 2020) ("Generally speaking, the warden and any institutional staff who are not medical providers are not liable when they rely on the medical expertise of medical staff.") (citing *Keith v. DeKalb Cnty., Ga.*, 749 F.3d 1034, 1050 (11th Cir. 2014)).

Accordingly, McLaughlin is entitled to summary judgment regarding Holland's deliberate indifference to medical needs claim.

## IV. CONCLUSION

For the reasons discussed above, McLaughlin's motion for summary judgment (Doc. 40) is **GRANTED** as to Holland's claim of deliberate indifference to medical needs but **DENIED** as to Holland's retaliation claim. Regarding his retaliation claim, Holland can recover only nominal damages. Accordingly, this case shall proceed to trial for the resolution of Holland's remaining claim of retaliation.

 **\*6  SO ORDERED**, this 11th day of August, 2021.

**All Citations**

Slip Copy, 2021 WL 3561227

## Footnotes

1    The Eleventh Circuit has not formally adopted the use of temporal proximity in First Amendment retaliation cases, but it has used temporal proximity to establish causation in other contexts. *Stallworth v. Tyson*, 578 F. App'x 948, 951 (11th Cir. 2014) (citing *Stanley v. City of Dalton*, 219 F.3d 1280, 1282, 1291 & n.20 (11th Cir. 2000)). In Title VII retaliation cases, the Circuit has held that "mere temporal proximity, without more, must be 'very close.' " *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1327-28 (11th Cir. 2020) (citations omitted). A three-to-four-month disparity between the protected conduct and the adverse action is insufficient, but a two-week gap can be evidence that the proffered reason for the underlying action was pretextual. *Id.* at 1328 (citing *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007); *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006)). Even if the

disparity is only a couple of weeks, the Circuit has suggested that such a short gap alone is "probably insufficient to establish pretext by itself." *Id.* (citing 🚩 *Hurlbert*, 439 F.3d at 1298).

2     McLaughlin also argues that qualified immunity bars Holland's claims. Doc. 40-2 at 14-15. "Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' "
🚩 *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting 🚩 *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). " 'Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply.' " 🚩 *Edwards v. Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting 🚩 *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009)). To meet this burden, a plaintiff must establish that "the officer's conduct amounted to a constitutional violation" and "the right violated was 'clearly established' at the time of the violation." 🚩 *City of W. Palm Beach*, 561 F.3d at 1291. This two-step analysis may be done in whatever order deemed most appropriate for the case. *Id.* (citing 🚩 *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). McLaughlin argues that he acted under discretionary authority by performing his duties as warden of Macon State Prison. Doc. 40-2 at 14-15. Holland does not dispute that McLaughlin acted within his discretionary authority, so the burden shifts to Holland to establish that McLaughlin violated clearly established rights. For a constitutional right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." 🚩 *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). A plaintiff can show a right is clearly established in three ways: first, by pointing to "relevant case law at the time of the alleged violation that would have made it obvious to the officer that his actions violated federal law." *J W by & through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1259 (11th Cir. 2018). Second, a plaintiff "can identify a broader, clearly established principle that should govern the novel facts of the situation." *Id.* Third, the plaintiff "can show that the conduct at issue so obviously violated the Constitution that prior case law is unnecessary." *Id.* at 1259-1260. It is well-established that prison officials cannot retaliate against prison inmates for filing lawsuits or grievances in which the inmate complains about prison conditions.
*See* 🚩 *O'Bryant v. Finch*, 637 F.3d 1207, 1212 (11th Cir. 2011); 🚩 *Wright*, 795 F.2d at 968. McLaughlin does not dispute this. Rather, he argues that Holland's "conclusory allegations" are insufficient factually to establish a First Amendment violation. Docs. 40-2 at 15; 52 at 3. For now, that argument fails.

---

**End of Document**                                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

75 Fair Empl.Prac.Cas. (BNA) 1741, 72 Empl. Prac. Dec. P 45,258...

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by  Taylor v. ScottPolar Corp.,  D.Ariz.,  February 20, 1998

123 F.3d 1046
United States Court of Appeals, Eighth Circuit.

Jin Ku KIM, Appellant/Cross-appellee,

v.

NASH FINCH COMPANY, Appellee/Cross-appellant.

Nos. 95–2012, 95–2074
|
Submitted Dec. 14, 1995.
|
Decided Aug. 20, 1997.
|
Rehearing Denied Nov. 12, 1997.

**Synopsis**

Employee sued his former employer for race, color, national origin, and age discrimination and retaliation in violation of Title VII and § 1981. The United States District Court for the Northern District of Iowa denied employer's motion for judgment as a matter of law or, in the alternative, for new trial, reduced damages award, granted in part employee's motion for equitable relief, denied employee's motion for prejudgment interest, granted employee's motion for attorney fees and expenses, and entered judgment on jury verdict for employee. Employee appealed and employer cross-appealed. The Court of Appeals, McMillian, Circuit Judge, held that: (1) question of whether employer intentionally discriminated against employee was for jury; (2) question of whether employer's adverse employment action was causally connected to race discrimination charge that employee filed was for jury; (3) question of whether employer's adverse actions against employee were pretext for retaliation was for jury; (4) district court abused its discretion in denying employee's motion to amend pleadings to conform to evidence; (5) evidence was sufficient to support compensatory damage and front pay awards; but (6) jury's emotional distress and punitive damages awards were grossly excessive.

Affirmed.

Beam, Circuit Judge, filed opinion concurring in part and dissenting in part.

**Procedural Posture(s):** On Appeal; Motion for Judgment as a Matter of Law (JMOL)/Directed Verdict.

**\*1051**  Before McMILLIAN and BEAM, Circuit Judges, and PERRY, [*] District Judge.

**Opinion**

**\*1052**  McMILLIAN, Circuit Judge.

Jin Ku Kim appeals from a final judgment entered in the District Court [1] for the Northern District of Iowa, upon a jury verdict, finding in his favor and against Nash Finch Co. in his employment discrimination case but reducing the amount of damages awarded by the jury. For reversal, Kim argues the district court erred in denying his motion to amend the pleadings to conform to the evidence under Fed.R.Civ.P. 15(b) and in applying the Title VII cap, 42 U.S.C. § 1981a(b)(3), to limit compensatory and punitive damages. On cross-appeal, Nash Finch argues the district court erred in holding (1) Kim's claim that he was unlawfully

Kim v. Nash Finch Co., 123 F.3d 1046 (1997)
75 Fair Empl.Prac.Cas. (BNA) 1741, 72 Empl. Prac. Dec. P 45,258...

denied a promotion from leadman to foreman in November 1990 was actionable under 🚩 42 U.S.C. § 1981, (2) there was sufficient evidence of intentional discrimination, (3) there was sufficient evidence of retaliation, (4) there was sufficient evidence of malice or reckless indifference to support punitive damages, and (5) the jury verdict awarding damages for lost wages and compensatory damages was supported by sufficient evidence or, in the alternative, was not excessive. For the reasons discussed below, we affirm the judgment of the district court.


BACKGROUND FACTS

Nash Finch is a wholesale and retail food distributor. In 1978 Kim, an American citizen of Korean ancestry, began working as a grocery picker in Nash Finch's Cedar Rapids warehouse. A superintendent runs the warehouse. During the period of time at issue Bill Mund was the warehouse superintendent. The four warehouse departments—receiving, shipping, maintenance, and transportation—are each supervised by a salaried "foreman." By October 1979, Kim was one of six hourly "leadmen" who assisted the warehouse shipping foreman; Kim also acted as shipping foreman on Saturdays and filled in when the shipping foreman was absent. The shipping department has 80–90 employees; the full shipping crew can consist of up to 70 employees; on Saturdays, however, the shipping crew is smaller, about 25–40 employees. For more than 10 years, Kim received "superior" or "outstanding" annual performance evaluations.

The position of shipping foreman became vacant in November 1990 and in April 1992. Kim applied for both vacancies, but in each instance Nash Finch promoted someone else. The individual promoted in November 1990 was white, younger than Kim, had less than a year's experience as a leadman, had been trained by Kim, and had no formal education beyond high school. The individual promoted in April 1992 was white, younger than Kim, had not worked in the warehouse for 10 years, had been trained by Kim, and had no formal education beyond high school. In comparison, Kim was a college graduate and the senior leadman in the shipping department. Nash Finch told Kim that he had not been promoted because of his inability to control costs and manhours, lack of aggressiveness, difficulty in controlling large crews, and poor temperament. When Kim objected to being passed over for promotion, the Nash Finch EEO compliance officer advised Kim to file a complaint or consult a lawyer. In May 1992 Kim filed an employment discrimination charge against Nash Finch with the Iowa Human Rights Commission and the Equal Employment Opportunity Commission, alleging Nash Finch unlawfully failed to promote him in November 1990 and in April 1992 on the basis of race, national origin and age.

According to Kim, immediately after he filed his employment discrimination charge in May 1992, Nash Finch began to systematically retaliate against him. For example, Nash Finch supervisors no longer assigned Kim to fill in for the shipping foreman, gave him much lower performance evaluations, orally warned him about his poor "attitude" (toward management), characterized him as unwilling to assume more job responsibility when he declined a Sunday shipping crew assignment, placed him under constant surveillance at work, and excluded him from meetings at work. Nash Finch mischaracterized a September 1992 incident involving Kim and another employee as race-based, gave Kim a *1053 written reprimand about the incident, and placed the written reprimand in Kim's personnel file. Kim alleged Nash Finch fabricated the race basis of the incident in order to discredit him when the local civil rights commission was investigating his (Kim's) employment discrimination charge. In November 1992, after another incident involving a co-worker and another meeting with management, Nash Finch issued Kim a written reprimand about the incident. During the summer and fall of 1993, Nash Finch reviewed its warehouse operations with the assistance of a consultant and discovered what it regarded as productivity problems, particularly with respect to the Saturday shipping crew, which Kim supervised, and required Kim to attend special retraining in order to improve productivity on Saturdays. Kim regarded this special retraining as punitive and humiliating in light of his status as a leadman, seniority and experience.

Kim continues to work for Nash Finch and has not been discharged, demoted, reduced in compensation, or reassigned; however, as noted above, he has received oral and written reprimands and has been required to attend special retraining. Brief for Appellee/Cross–Appellant at 1.

Kim v. Nash Finch Co., 123 F.3d 1046 (1997)

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 199 of 379

75 Fair Empl.Prac.Cas. (BNA) 1741, 72 Empl. Prac. Dec. P 45,258...

DISTRICT COURT PROCEEDINGS

In November 1992 Kim received a right-to-sue letter and filed this lawsuit in federal district court. In count I Kim alleged that Nash Finch unlawfully discriminated against him on the basis of race, color, national origin, and age when it failed to promote him to the position of shipping foreman in April 1992 in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e, and the Age Discrimination in Employment Act (ADEA), as amended, 29 U.S.C. § 621 *et seq.* In count II Kim alleged that Nash Finch unlawfully discriminated against him on the basis of race, color, national origin, and age when it failed to promote him to the position of shipping foreman in November 1990 in violation of 42 U.S.C. § 1981.[2] In count III Kim alleged that Nash Finch unlawfully retaliated against him for filing an employment discrimination charge in violation of Title VII, 42 U.S.C. § 2000e–3(a). Kim sought back pay, promotion and other equitable relief, and compensatory and punitive damages, as well as attorney's fees and costs, including expert witness fees.

Nash Finch filed a motion for summary judgment, asserting that Kim had not been promoted because he had no transportation experience and because of his relatively weak management skills. The district court denied the motion for summary judgment and in September 1994 the case was tried to a jury. At trial Mund testified that he never seriously considered Kim for promotion because Kim lacked personal loyalty to him (Mund). Kim, his wife and his son testified about how Kim had suffered physically and emotionally from his adverse treatment by Nash Finch. Kim developed high blood pressure and headaches from stress and became anxious, withdrawn and depressed; he had difficulty sleeping and felt humiliated and ostracized at work.

In special verdicts, the jury found Nash Finch had discriminated against Kim on the basis of race but not age in failing to promote him to shipping foreman in November 1990 and in April 1992, and had retaliated against him for filing employment discrimination charges. The jury awarded Kim $15,000 in lost wages and benefits and $100,000 in non-economic damages (for emotional distress and loss of enjoyment of life) for the 1990 promotion claim, $21,000 in lost wages and benefits and $150,000 in non-economic damages for the 1992 promotion claim, and $1.5 million in non-economic damages for the retaliation claim. Finally, the jury awarded Kim $7 million in punitive damages. The special verdict permitted the jury to award punitive damages for either the 1992 promotion or the retaliation claim. Both parties filed post-trial motions.

The district court denied Nash Finch's motion for judgment as a matter of law or, in the alternative, for new trial, reduced the damages award, granted in part Kim's motion for equitable relief (for promotion to shipping foreman when available and front **\*1054** pay at the rate of $447 per month), denied Kim's motion for prejudgment interest, granted Kim's motion for attorney's fees and expenses, and entered judgment accordingly. *Jin Ku Kim v. Nash Finch Co.,* No. C92–0204 (N.D.Iowa Apr. 13, 1995) (opinion and order). The district court held the evidence was sufficient to support the jury's finding that Nash Finch had intentionally discriminated against Kim on the basis of race, color or national origin when it failed to promote him in November 1990 and in April 1992. Slip op. at 1052–53. The district court also held the evidence was sufficient to support the jury's finding that Nash Finch had retaliated against Kim for filing an employment discrimination charge. *Id.* at 1053–55. The district court also held that the evidence was sufficient to support the jury's finding that Nash Finch had acted with malice or reckless indifference to Kim's federally protected right not to be retaliated against for filing a civil rights complaint. *Id.* at 1055–56.

As discussed below, the parties disputed whether the 1992 promotion and retaliation claims were submitted under both Title VII and 42 U.S.C. § 1981 or only Title VII. The district court found that Kim had waived any argument that these claims had been brought under both statutes because Kim did not object to the jury instructions and the special verdict forms which submitted the 1992 promotion and retaliation claims under Title VII without referring to 42 U.S.C. § 1981. *Id.* at 1057 (noting plaintiff failed to object to jury instructions). The district court also held that the Title VII statutory damages cap applied, thus limiting the award for non-economic damages and punitive damages for those claims to a maximum of $300,000. *Id.* at 1057 (jury awarded $150,000 for the 1992 promotion claim and $1.5 million for the retaliation claim and $7 million in punitive damages; it was not disputed that Nash Finch has more than 500 employees; *see* 42 U.S.C. § 1981a(b)(4) ($300,000 maximum for compensatory and punitive damages)). The district court did not review the punitive damages award for excessiveness. *Id.* at 1056 (noting

75 Fair Empl.Prac.Cas. (BNA) 1741, 72 Empl. Prac. Dec. P 45,258...

nonetheless that $300,000 was not excessive in view of duration of discrimination, level of retaliation and financial well-being of employer). [3] This appeal and cross-appeal followed.

ACTIONABLE § 1981 CLAIM—1990 PROMOTION

Nash Finch argues the district court erred in denying its motion for judgment as a matter of law on the 1990 promotion claim.

Nash Finch argues the 1990 promotion claim is not actionable under ⚑ 42 U.S.C. § 1981 because the promotion from leadman to foreman did not involve a significant change in duties, compensation or responsibility. We disagree.

In ⚑ *Patterson v. McLean Credit Union,* 491 U.S. 164, 176–77, 182, 109 S.Ct. 2363, 2372–73, 2375–76, 105 L.Ed.2d 132 (1989) (*Patterson* ), the Supreme Court held ⚑ 42 U.S.C. § 1981 prohibited racial discrimination in the *formation* of an employment contract but did not apply to "problems that may arise later from the conditions of continuing employment," that is, in the employment relationship. After *Patterson,* courts held that claims alleging discriminatory discharge could not be brought under ⚑ § 1981. *E.g.,* ⚑ *Taggart v. Jefferson County Child Support Enforcement Unit,* 935 F.2d 947, 948 (8th Cir.1991) (banc). Congress later enacted the Civil Rights Act of 1991 in part to correct what it regarded as the Court's erroneous construction of the scope of ⚑ 42 U.S.C. § 1981 in *Patterson.* In § 101(2)(b) of the Act, ⚑ 42 U.S.C. § 1981(b), Congress redefined the term "make and enforce contracts" specifically to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." The 1991 Act became effective on November 21, 1991. However, in ⚑ *Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994), the Supreme Court held that § 101 should not be **\*1055** applied retroactively to pending cases or pre-enactment conduct. For this reason, *Patterson* and not the 1991 Act applies to the 1990 claim because it occurred before November 21, 1991, the effective date of the 1991 Act.

*Patterson* held that the denial of a promotion is not actionable under ⚑ § 1981 unless "the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer." ⚑ 491 U.S. at 185, 109 S.Ct. at 2377, *citing* ⚑ *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (challenging refusal of law firm to promote associate to partnership under Title VII). Not every refusal to promote violates *Patterson* because "each step down the path of one's career does not create a new and distinct relation with the employer for purposes of the *Patterson* test." ⚑ *Fray v. Omaha World Herald Co.,* 960 F.2d 1370, 1373 (8th Cir.1992) (footnote omitted). "[*Patterson* ] strongly suggests that, in addition to an increase in pay and duties, an actionable promotion claim must involve a meaningful, qualitative change in the contractual relationship." *Sitgraves v. Allied–Signal, Inc.,* 953 F.2d 570, 573 (9th Cir.1992) (noting as examples of actionable promotion claim moves from non-supervisory to supervisory position and from hourly to salaried compensation); *see Rodriguez v. General Motors Corp.,* 27 F.3d 396, 399–400 (9th Cir.1994) (holding essentially lateral change not actionable refusal to promote); ⚑ *Butts v. City of New York Department of Housing Preservation & Development,* 990 F.2d 1397, 1411–12 (2d Cir.1993) (*Butts* ) (noting inquiry should not be confined to job titles but should examine actual changes in responsibility and status); *cf.* ⚑ *Winbush v. Iowa,* 66 F.3d 1471, 1477 (8th Cir.1995) (issue noted but not decided).

We agree with the district court that the promotion from leadman to foreman involved a sufficiently new and fundamentally different contractual relationship to constitute an actionable promotion claim under ⚑ § 1981. This was not the kind of promotion "understood by the parties to be given routinely upon satisfactory job performance." ⚑ *Butts,* 990 F.2d at 1412. Nor was it the kind of promotion that involved merely "moving an employee from one position to another as part of a reallocation of personnel resources, not involving a substantial increase in status or responsibility." *Id.* The promotion involved a change from limited supervisory duties and limited authority over employees to additional supervisory duties and greater authority,

75 Fair Empl.Prac.Cas. (BNA) 1741, 72 Empl. Prac. Dec. P 45,258...

from hourly to salaried compensation, and from non-management to management status, as well as an increase in pay and a change of position in the chain of authority. There were many leadman positions (six in the shipping department alone) but only four foreman positions, each in charge of one department in the warehouse, who reported directly to the superintendent. Unlike leadmen, foremen performed traditional supervisory functions like making work assignments, planning and the hiring, evaluation and discipline of employees. The relatively modest difference in pay between the two positions and the supervisory nature of both positions did not outweigh the other factors. The district court did not err in denying Nash Finch's motion for judgment as a matter of law on the 1990 promotion claim.

INTENTIONAL DISCRIMINATION

Nash Finch next argues Kim failed as a matter of law to make a submissible case that he was not promoted in 1990 and 1992 because of intentional discrimination on the basis of race, color or national origin. This argument has two points. First, Nash Finch argues instruction No. 12 incorrectly permitted the jury to find in favor of Kim if it found only that Nash Finch's asserted legitimate, nondiscriminatory reason for not promoting him was false. Nash Finch argues that the instruction failed to require the jury to find that the asserted reason was a pretext for intentional discrimination. Nash Finch also argues there was insufficient evidence of intentional discrimination, that is, that it failed to promote Kim because of race, color or national origin. In sum, Nash Finch argues that Kim failed to show that its articulated legitimate, nondiscriminatory reason was false and that, even assuming it was false, such a finding alone cannot support a finding of intentional discrimination. Nash Finch's argument correctly states the applicable law; however, we hold the instruction was not erroneous and the evidence was sufficient to **\*1056** support the jury's verdict that Nash Finch intentionally discriminated against Kim.

The analysis applicable to Title VII disparate treatment and 42 U.S.C. § 1981 claims in employment cases is the familiar three-part framework initially set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800–06, 93 S.Ct. 1817, 1823–26, 36 L.Ed.2d 668 (1973) (*McDonnell Douglas* ), and further refined in Supreme Court cases, most recently *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (*Hicks* ). This court recently clarified the analysis in *Ryther v. KARE 11,* 108 F.3d 832, 836 (8th Cir.) (banc) (*Ryther* ), *cert. denied,* 521 U.S. 1119, 117 S.Ct. 2510, 138 L.Ed.2d 1013 (1997). The elements of a Title VII disparate treatment claim and a § 1981 claim are identical. *Hicks,* 509 U.S. at 506 n. 1, 113 S.Ct. at 2747 n. 1 (noting *McDonnell Douglas* framework also applies to claims of purposeful employment discrimination on the basis of race under 42 U.S.C. § 1983). First, the plaintiff must establish a prima facie case. Second, if the plaintiff establishes a prima facie case, the defendant must "rebut the presumption of discrimination [raised by the prima facie case] by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981) (*Burdine* ) (noting the employer must only articulate legitimate, nondiscriminatory reason, but need not persuade the factfinder that it was actually motivated by the proffered reasons). Third, if the defendant carries this burden, the plaintiff is entitled to the opportunity to show that the defendant's articulated reason was in fact "not the true reason for the employment decision" and a "pretext for discrimination." *Id.* at 256, 101 S.Ct. at 1095; *see Hicks,* 509 U.S. at 516 & n. 6, 113 S.Ct. at 2752 & n. 6 ("pretext for discrimination" means both that the proffered reason was false and that discrimination was the real reason).

"This burden [of demonstrating that the proffered reason was not the true reason for the employment decision] now merges with the ultimate burden of persuading the [trier of fact] that [the plaintiff] has been the victim of intentional discrimination." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. The plaintiff can establish that he or she has been the victim of intentional discrimination "either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.*

Kim v. Nash Finch Co., 123 F.3d 1046 (1997)

75 Fair Empl.Prac.Cas. (BNA) 1741, 72 Empl. Prac. Dec. P 45,258...

The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and ..., upon such rejection, "[n]o additional proof of discrimination is *required.*"

*Hicks,* 509 U.S. at 511, 113 S.Ct. at 2749 (footnote omitted).

Thus, according to *Hicks,* when the plaintiff's evidence ... challenges the defendant's articulated nondiscriminatory reason, such evidence may serve as well to support a reasonable inference that discrimination was a motivating reason for the employer's decision. As the Supreme Court has observed, "when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reasons, based [its] decision on an impermissible consideration such as [race]."

....

In sum, when the employer produces a nondiscriminatory reason for its actions, the prima facie case no longer creates a legal presumption of unlawful discrimination. The *elements* of the prima facie case remain, however, and if they are accompanied by evidence [showing that the defendant's proffered explanation is false] and disbelief of the defendant's proffered explanation, they may permit the jury to find for the plaintiff. This is not to say that, for the plaintiff to succeed, simply proving [that the defendant's proffered explanation **\*1057** is false] is necessarily enough. We emphasize that evidence [that the defendant's proffered explanation is false] will not be enough to make a submissible case if it is, standing alone, inconsistent with a reasonable inference of [unlawful] discrimination. [T]he plaintiff must still persuade the jury, from all the facts and circumstances, that the employment decision was based upon intentional discrimination.

*Ryther,* 108 F.3d at 836–38 (citation and footnotes omitted). "Thus, *Hicks* makes it clear that the plaintiff must show '*both* that the [proffered] reason was false, *and* that discrimination was the real reason.'" *Id.* at 838 n. 5, *citing* *Hicks,* 509 U.S. at 515, 113 S.Ct. at 2751–52. "It is not enough, in other words, to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Hicks,* 509 U.S. at 519, 113 S.Ct. at 2754.

*Jury Instructions*

We address the instruction issue first. "[W]e review the district court's jury instructions for abuse of discretion and on review must determine simply 'whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury.'" *Karcher v. Emerson Electric Co.,* 94 F.3d 502, 510 (8th Cir.1996) (citing *Sherbert v. Alcan Aluminum Corp.,* 66 F.3d 965, 968 (8th Cir.1995)), *cert. denied,* 520 U.S. 1210, ——, 117 S.Ct. 1692, 1693, 137 L.Ed.2d 820 (1997). "[W]e will not find error in instructions simply because they are technically imperfect or are not a model of clarity." *Hastings v. Boston Mutual Life Insurance Co.,* 975 F.2d 506, 510 (8th Cir.1992). We will reverse only if we find that "the jury instructions contained an error or errors that affected the substantial rights of the parties." *Id.*

Instruction No. 12 provided in part that "[a] false or pretextual reason for the decision not to promote the plaintiff is one form of evidence from which you may, but are not required, to find that the defendant discriminated against the plaintiff." Nash Finch argues that this part of instruction No. 12 improperly permitted the jury to find in favor of Kim if it found only that Nash Finch's asserted legitimate, nondiscriminatory reason for not promoting him was false. We disagree because, when read as a whole, instruction No. 12 correctly set forth the applicable law. The paragraph immediately preceding the sentence to which Nash Finch objected provided that "you may find Defendant Nash Finch intentionally discriminated against Plaintiff Jin Kim if you reject the Defendant's stated reasons for not promoting him and you find Defendant's stated reasons for its decision not to promote Plaintiff were given to hide an intent by Nash Finch to discriminate on the basis of his race, color or national origin." This part of instruction No. 12 correctly instructed the jury, as required by *Hicks,* that it had to find both that the stated reason was false and that intentional discrimination on the basis of race was the real reason in order to return a verdict in favor of

Kim v. Nash Finch Co., 123 F.3d 1046 (1997)

75 Fair Empl.Prac.Cas. (BNA) 1741, 72 Empl. Prac. Dec. P 45,258...

Kim, not only that the stated reason was false. *Ryther, 108 F.3d at 838 & n. 5* (noting *Hicks* makes it clear that the plaintiff must show *both* that the reason was *and* that intentional discrimination was the real reason). The instructions for the 1990 promotion claim (No. 9) and the ADEA claim (No. 14) similarly provided that the jury could find race or age was a determining factor if it found Nash Finch's stated reason for its decision was "not the true reason, but [was] a 'pretext' to hide discriminatory motivation." These instructions correctly premised liability on a finding of discrimination and not merely on a finding that Nash Finch's proffered reason was false.

*Sufficiency of the evidence—failure to promote*

Next, we address the sufficiency of the evidence. Nash Finch argues that it is entitled to judgment as a matter of law because Kim failed to make a submissible case that racial discrimination motivated the decisions not to promote him. Nash Finch argues that there was evidence that its proffered reason was false but no evidence of racial discrimination. We disagree.

"[W]e will not reverse a jury's verdict for insufficient evidence unless, after viewing the evidence in the light most favorable to the verdict, we conclude that no reasonable juror could have returned a verdict for the non-moving party." **\*1058** *Ryther, 108 F.3d at 836.* Our role on appeal is to determine whether there is an evidentiary basis for the jury's verdict. *Id. at 844–45.* "[W]hen that evidentiary basis becomes apparent, it [is] immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable." *Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946).*

"Whether an issue was properly before the jury, however, is a legal question which is reviewed de novo." *Kimzey v. Wal–Mart Stores, Inc., 107 F.3d 568, 573 (8th Cir.1997)* (citation omitted).

We have reviewed the evidence in the light most favorable to Kim as the prevailing party, assumed that all conflicts in the evidence were resolved in his favor, assumed as proved all facts that his evidence tended to prove, and given him the benefit of all reasonable inferences that may reasonably be drawn from the facts proved. We hold the record as a whole—specifically, the combination of the undisputed evidence as to the elements of the prima facie case and the strong evidence that Nash Finch's proffered reason was false, which, when considered with the strong evidence of retaliation—clearly provided sufficient evidence as a matter of law to allow the jury to find Nash Finch intentionally discriminated against Kim on the basis of race in failing to promote him. This reasonable inference is the logical result of the application to the evidence of the *McDonnell Douglas* analytical framework for the allocation of the burden of production and the order for the presentation of proof.

It was not disputed that Kim established a prima facie case: (1) Kim was a member of a racial minority, (2) he was qualified for promotion, (3) he was not promoted, and (4) Nash Finch promoted a non-minority. The prima facie case created a legal presumption of unlawful discrimination. Because Nash Finch articulated nondiscriminatory reasons for promoting someone else, the legal presumption of unlawful discrimination, created by the prima facie case, then dropped out of the case. However, the elements of the prima facie case remained in the case. The evidence refuted Nash Finch's articulated nondiscriminatory reasons and strongly suggested that Nash Finch had lied about those reasons. Nash Finch conceded at trial that Kim was qualified for promotion but argued the successful candidates were better qualified. There was evidence that Kim was relatively better qualified for promotion in terms of education, seniority and supervisory experience than the successful candidates. There was also evidence from which the jury could conclude that Nash Finch's managers were not particularly credible. Mund initially told Kim that the 1990 promotion had been made at a higher level even though Mund had made the decision himself. Mund then told Kim that he had not been promoted because he was not qualified. However, Mund testified at trial that he never seriously considered Kim for promotion because Kim lacked personal loyalty to him (Mund).

The evidence challenged Nash Finch's articulated nondiscriminatory reasons for not promoting Kim and supported a reasonable inference that unlawful discrimination was a motivating reason for Nash Finch's failure to promote Kim. This evidence was sufficient to permit the jury to infer the ultimate fact of intentional discrimination. *Hicks, 509 U.S. at 511, 113 S.Ct. at 2749; Ryther, 108 F.3d at 836–37.* This is because "when all legitimate reasons for rejecting an applicant have been eliminated as

possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reasons, based [its] decision on an impermissible consideration such as race." ⚑ *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978). This is not a case in which the evidence showing the employer's proffered reason was false was inconsistent with a reasonable inference of unlawful discrimination. Here, Nash Finch contended the real reason Kim was not promoted was that the successful candidates were better qualified. Kim's evidence showed that the proffered reason was false; it did not show that some reason other than unlawful discrimination was the real reason he was not promoted. *See* ⚑ *Ryther,* 108 F.3d at 837 n. 4 (discussing cases in which evidence showing employer's proffered reason was false was inconsistent with reasonable inference of unlawful discrimination and citing ⚑ **\*1059** *Rothmeier v. Investment Advisers, Inc.,* 85 F.3d 1328, 1337 (8th Cir.1996) (evidence showed real reason for discharge was confrontation about SEC violations), ⚑ *Barber v. American Airlines, Inc.,* 791 F.2d 658, 660 (8th Cir.) (evidence showed real reason for disparate treatment was not age discrimination), *cert. denied,* 479 U.S. 885, 107 S.Ct. 278, 93 L.Ed.2d 254 (1986), and ⚑⚠ *Visser v. Packer Engineering Assocs.,* 924 F.2d 655, 657 (7th Cir.1991) (banc) (explaining "pretext" in employment law means a reason that employer offers for action claimed to be discriminatory and that factfinder disbelieves, allowing inference that employer is trying to conceal a discriminatory reason and not some other unethical reason or even a mask for such a reason; evidence showed that plaintiff was fired because he was disloyal to CEO; thus real, albeit unethical, reason for firing was not age discrimination but plaintiff's loyalty to company rather than to CEO personally)).

In addition to the elements of the prima facie case and the evidence showing Nash Finch's proffered reason was false, there was also evidence that, out of more than 3,500 employees, only 2 management employees in 25 years were non-white. Those employees were not warehouse supervisory employees; they were assistant retail grocery store managers. There was also evidence that the only Asian–American employee at the Cedar Rapids warehouse other than Kim was employed as a janitor. There was also some evidence that Nash Finch disciplined Kim more severely than non-Asian employees for comparable incidents and that the disciplinary action was in retaliation for his filing discrimination charges. As noted above, direct evidence of intentional discrimination was not required; case law recognizes that intentional discrimination may be proven by circumstantial evidence because "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes." ⚑ *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). "After all, the *McDonnell Douglas* framework exists to provide discrimination plaintiffs a way to prove their case when they do not have 'explicit, inculpatory evidence of discriminatory intent.' " ⚑ *Shannon v. Ford Motor Co.,* 72 F.3d 678, 682 (8th Cir.1996), *citing* ⚠ *Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 776 (8th Cir.1995).

In sum, the record as a whole in this case—the evidence showing that Nash Finch's proffered reason was false, plus the evidence establishing the elements of the prima facie case—was sufficient to permit the jury reasonably to find that Nash Finch intentionally discriminated against Kim on the basis of race in refusing to promote him to shipping foreman in November 1990 and in April 1992. Consistent with *Hicks,* no additional evidence of discrimination was required. The evidence in this case presented inconsistent inferences to the jury, and the resolution of this conflicting evidence was a matter for the jury to resolve. *E.g.,* ⚑ *Ryther,* 108 F.3d at 845 (citing cases). The district court did not err in denying Nash Finch's motion for judgment as a matter of law on the discrimination claims.

RETALIATION

Nash Finch next argues Kim failed to make a submissible retaliation claim. Nash Finch argues that, as a matter of law, Kim suffered no adverse employment action because he was not demoted, terminated, reassigned, or suspended, did not lose any compensation or privileges, and in fact is still employed by Nash Finch. Nash Finch also argues that, assuming there was an adverse employment action, there was no evidence of a causal relationship between to Kim's filing a race discrimination charge and any adverse employment action. Nash Finch also argues that any adverse employment action was justified under the circumstances.

Kim v. Nash Finch Co., 123 F.3d 1046 (1997)

75 Fair Empl.Prac.Cas. (BNA) 1741, 72 Empl. Prac. Dec. P 45,258...

Like the substantive claim of racial discrimination, a claim of retaliation, in a racial discrimination context, can violate both Title VII and 42 U.S.C. § 1981. *Setser v. Novack Investment Co.,* 638 F.2d 1137, 1146–47 (8th Cir.1981) (*Setser* ) (subsequent history omitted) (holding retaliation by employer against plaintiff for filing race-based EEOC complaint would be based on racial discrimination for purposes of 42 U.S.C. § 1981 claim); *see also* Greenwood v. Ross, 778 F.2d 448, 455–56 (8th Cir.1985); Sisco v. J.S. Alberici Construction Co., 655 F.2d 146, 150 (8th Cir.1981) (applying *Setser* ), *cert. denied,* **\*1060** 455 U.S. 976, 102 S.Ct. 1485, 71 L.Ed.2d 588 (1982). We apply the same *McDonnell Douglas* analytical framework to a retaliation claim under § 1981 and Title VII. *See, e.g.,* Evans v. Kansas City, Missouri, School District, 65 F.3d 98, 101 (8th Cir.1995) (§ 1981 retaliation claim), *cert. denied,* 517 U.S. 1104, 116 S.Ct. 1319, 134 L.Ed.2d 472 (1996); Kobrin v. University of Minnesota, 34 F.3d 698, 704 (8th Cir.1994) (Title VII retaliation claim) (*Kobrin* ). The elements of a retaliation claim under § 1981 and Title VII are (1) protected activity, (2) subsequent adverse employment action, and (3) a causal relationship between the two. *See* Barge v. Anheuser–Busch, Inc., 87 F.3d 256, 259 (8th Cir.1996) (§ 1981 retaliation claim); Kobrin, 34 F.3d at 704 (Title VII retaliation claim).

*Adverse employment action*

Nash Finch argues that the district court erred in denying its motion for judgment as a matter of law because Kim failed to show any adverse employment action. Nash Finch argues Kim was not demoted, terminated, reassigned, or suspended, did not lose any compensation or privileges, and in fact is still employed by Nash Finch. We hold Nash Finch's actions did rise to the level of adverse employment action.

Typically, it is obvious whether an employer took adverse employment action when, for example, the employee has been terminated or discharged. However, retaliatory conduct may consist of "action less severe than outright discharge." Dortz v. City of New York, 904 F.Supp. 127, 156 (S.D.N.Y.1995) (allegations that employer's actions disadvantaged and interfered with employee's ability to perform her job). What happened to Kim was much " 'more disruptive than a mere inconvenience or an alteration of job responsibilities' [or][c]hanges in duties or working conditions that cause no materially significant disadvantage." Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir.1994) (citation omitted) (no adverse employment action where plaintiff was reassigned without diminution in title, salary or benefits); *see* Thomas v. St. Luke's Health Systems, Inc., 869 F.Supp. 1413, 1435 (S.D.Iowa 1994) (holding employer's initial demands that employee take drug test, which was subsequently withdrawn, and accept another position had no impact on continued employment and did not rise to level of adverse employment action), *aff'd,* 61 F.3d 908 (8th Cir.1995) (table) (No. 94–4081). Kim's duties had been reduced; he received much lower performance evaluations than he had received before filing his employment discrimination charge; he was required to undergo special remedial training. There was also evidence that Nash Finch had "papered" his personnel file with negative reports, including two written reprimands. These are the kind of serious employment consequences that adversely affected or undermined Kim's position, even if he was not discharged, demoted or suspended.

In any event, we need not decide in the present case whether each act in itself constituted actionable "adverse employment action" because Kim essentially claimed that Nash Finch had systematically retaliated against him, that is, that all the acts were taken in response to his filing the employment discrimination charge and were thus connected to one another. *Cf.* Caliendo v. Bentsen, 881 F.Supp. 44, 48 (D.D.C.1995) (alleging personnel actions such as removal from undercover operation, failure to receive monetary award, removal as acting group supervisor, receipt of letter of reprimand, etc. constituted series of adverse employment actions in retaliation for EEOC activities). We hold that, as a matter of law, Nash Finch's conduct, which included reduction of duties, disciplinary action and negative personnel reports, as well as required remedial training, constituted adverse employment action.

Kim v. Nash Finch Co., 123 F.3d 1046 (1997)

75 Fair Empl.Prac.Cas. (BNA) 1741, 72 Empl. Prac. Dec. P 45,258...

*Sufficiency of the evidence*

Nash Finch also argues that the district court erred in denying its motion for judgment as a matter of law because there was no evidence of a causal connection between Kim's filing a race discrimination charge and any adverse employment action and that any adverse employment action was justified under the circumstances. We have reviewed the evidence in the light most favorable to Kim as the prevailing party, assumed that all conflicts in the evidence were resolved in his favor, assumed as proved all facts that his evidence tended to prove, and given him the benefit of all reasonable inferences **\*1061** that may reasonably be drawn from the facts proved. We hold the record as a whole—specifically, the elements of the prima facie case and the evidence showing that Nash Finch's proffered reason was false—provided a sufficient basis from which reasonable jurors could find that Nash Finch retaliated against Kim for filing an employment discrimination charge. This permissible inference is the logical result of the application to the evidence of the *McDonnell Douglas* analytical framework for the allocation of the burden of production and the order for the presentation of proof.

Filing an employment discrimination charge is activity protected by Title VII, § 704(a), 42 U.S.C. § 2000e–3(a). Nash Finch knew in May 1992 that Kim had filed an employment discrimination charge. In fact, Nash Finch justified disclosure of Kim's personnel file, which contained a report of a disciplinary action based on a race-related incident, as part of its response to the local civil rights commission investigation. Kim had received high performance evaluations and had had no disciplinary problems. However, after Kim filed the employment discrimination charge, his Saturday and fill-in shipping foreman duties were immediately eliminated, he began to receive markedly lower performance evaluations, he was orally cautioned about a poor attitude toward management, he was placed under surveillance and excluded from meetings at work, he was disciplined following a September 1992 incident in which Nash Finch found Kim had made racial slurs against a co-worker, and in late 1993 he was required to participate in special remedial training. This circumstantial evidence—that the employer was aware of the protected activity and that adverse employment action "followed the protected activity so closely in time as to justify an inference of retaliatory motive"—was sufficient to establish the requisite causal connection between the protected activity and the adverse employment action. *Rath v. Selection Research, Inc.,* 978 F.2d 1087, 1090 (8th Cir.1992); *see Kobrin,* 34 F.3d at 704; *cf. Barge v. Anheuser–Busch, Inc.,* 87 F.3d at 259–60 (holding plaintiff failed to make prima facie case of retaliation because she produced no evidence connecting her prior EEOC claim to alleged harassment, denial of assistance with job-related tasks, or denial of disability benefits).

Nash Finch defended its post-May 1992 actions as a legitimate, continuing "dialogue" between an employee and management about adherence to company work rules and respect for company equal employment opportunity policies. However, Kim produced evidence that refuted the negative reports in his personnel file, including evidence that Nash Finch had "papered" his personnel file with negative reports. Some of the negative reports involved petty and insignificant incidents; however, some of the negative reports supported Nash Finch's claim that Kim lacked management ability and had refused opportunities for additional supervisory responsibility. More seriously, as noted above, there was evidence that the initial reports about the September 1992 incident did not include any reference to racial discrimination. However, in November 1992, after Kim had requested a right-to-sue letter, senior management issued a written reprimand to Kim about the September 1992 incident. This written reprimand specifically described the racial context of the incident and stated that the company would not tolerate discrimination which would be in violation of Title VII and that Kim's actions had probably violated his co-worker's civil rights. The jury could have reasonably found that Nash Finch placed the written reprimand in Kim's personnel file in order to discredit Kim when the local civil rights commission was investigating his employment discrimination charge. There was also evidence that Nash Finch did not handle in the same way a similar dispute about work assignments involving the same co-worker and another foreman and a complaint about sexual harassment by another employee. Unlike the incident involving Kim, these incidents did not result in written reprimands.

In sum, we hold the evidence as a whole—evidence that the employer's proffered reasons were false, as well as the evidence establishing the elements of the prima facie case—was sufficient to permit the jury to find the ultimate fact of retaliation. Consistent with *Hicks,* no additional evidence of retaliation was required. The evidence in **\*1062** this case presented

75 Fair Empl.Prac.Cas. (BNA) 1741, 72 Empl. Prac. Dec. P 45,258...

inconsistent inferences to the jury, and the resolution of this conflicting evidence was a matter for the jury to resolve. The district court did not err in denying Nash Finch's motion for judgment as a matter of law on the retaliation claim.


AMENDMENT OF PLEADINGS

This is Kim's principal contention on appeal. Kim argues the district court abused its discretion in denying his motion to amend his pleadings to conform to the evidence under Fed.R.Civ.P. 15(b) by adding 🚩42 U.S.C. § 1981 as a theory for recovery for the 1992 promotion and retaliation claims. Nash Finch, however, characterizes this issue as an instruction issue and argues the instructions and the special verdict forms submitted the 1992 promotion and retaliation claims to the jury under Title VII only. Nash Finch argues the district court correctly concluded that Kim's failure to object to the instructions or the special verdict forms under Fed.R.Civ.P. 51 waived any argument that those claims should have been submitted to the jury under 🚩§ 1981 as well as Title VII.

Whether the 1992 promotion and retaliation claims should have been (or actually were) submitted to the jury under 🚩§ 1981 as well as Title VII is critical because compensatory and punitive damages are "capped" under Title VII but not under 🚩§ 1981. Thus, under Title VII, Kim's compensatory and punitive damages would be limited to $300,000, but the amount of damages could be much greater under 🚩§ 1981. (The jury awarded Kim a total of $8,650,000 for compensatory and punitive damages for the 1992 promotion and retaliation claims.) This is because 🚩42 U.S.C. § 1981a(b)(3)—the statutory cap—limits the amount of any award of compensatory and punitive damages for Title VII claims for intentional discrimination. *Cf.* *Kimzey v. Wal–Mart Stores, Inc.,* 107 F.3d at 575–76 (applying statutory cap to Title VII claims but not to state anti-discriminatory claims); 🚩*Luciano v. Olsten Corp.,* 912 F.Supp. 663, 675 (E.D.N.Y.1996) (same), *aff'd,* ⚠110 F.3d 210 (2d Cir.1997). [4]

However, the Title VII statutory cap does not apply to 🚩§ 1981 claims; the 1991 Civil Rights Act, which made compensatory and punitive damages available under Title VII, specifically provides that "[n]othing in this section shall be construed to limit the scope of, or the relief available under, 🚩section 1981 of this title." 🚩42 U.S.C. § 1981a(b)(4)); *see* 🚩*Johnson v. Metropolitan Sewer District,* 926 F.Supp. 874, 876 (E.D.Mo.1996), *citing West v. Boeing Co.,* 851 F.Supp. 395, 399–401 & nn. 4, 5 & 7 (D.Kan.1994) (reviewing legislative history of 🚩§ 1981a(a)(1) as expanding remedies available under Title VII for intentional discrimination); *cf. Reynolds v. Octel Communications Corp.,* 924 F.Supp. 743, 747 (N.D.Tex.1995) (holding recovery of both liquidated damages under ADEA and punitive damages under Title VII would be double recovery for same conduct); *Bradshaw v. University of Maine System,* 870 F.Supp. 406, 407–08 (D.Me.1994) (holding plaintiff who could have but did not plead race discrimination claim under 🚩§ 1981 was not barred from bringing Title VII race discrimination claim for compensatory and punitive damages by 🚩§ 1981a).

 As a threshold matter, we do not agree that Kim waived this argument by failing to object to the instructions or the special verdict forms. The focus of Kim's argument is not on the jury instructions or the special verdict forms themselves (indeed, Kim argues he had no grounds to object to the jury instructions or the special verdict forms because they correctly stated the applicable law), but on the denial of his motion to amend the pleadings to conform to the evidence. *Cf.* 🚩*City of St. Louis v. Praprotnik,* 485 U.S. 112, 119–20, 108 S.Ct. 915, 921–22, 99 L.Ed.2d 107 (1988) (holding failure to timely object to jury instructions was no obstacle to appellate review of same legal issue raised in motions for summary judgment and directed verdict). Motions to amend the pleadings to conform to the evidence under Rule 15(b) can be made at any time, even after judgment. If the issue of 🚩§ 1981 liability was tried by implied consent, the district court should have considered it raised by the pleadings and should have allowed amendment upon Kim's request.

*Kim v. Nash Finch Co.*, 123 F.3d 1046 (1997)

75 Fair Empl.Prac.Cas. (BNA) 1741, 72 Empl. Prac. Dec. P 45,258...

**\*1063**  Amendments are allowed when the parties have had actual notice of an unpleaded issue and have been given an adequate opportunity to cure any surprise resulting from the change in the pleadings. And, when evidence relating to issues outside the pleadings is introduced and tried without objection, the parties will be deemed to have acquiesced.

*Nielson v. Armstrong Rubber Co.,* 570 F.2d 272, 275 (8th Cir.1978) (citations omitted).

An amended complaint that "merely amplifies some of the allegations that have been proven" should be allowed. On the other hand, however, a district court is not required to grant a motion to amend on the basis of some evidence that would be relevant to the new claim if the same evidence was also relevant to a claim originally pled. The introduction of such evidence does "not provide the defendant any notice" that the implied claim was being tried.

*Gamma–10 Plastics, Inc. v. American President Lines, Ltd.,* 32 F.3d 1244, 1256 (8th Cir.1994) (citations omitted), *cert. denied,* 513 U.S. 1198, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995).

 In the present case, the same evidence relevant to the new theory of recovery— § 1981—was relevant to the theory of recovery originally pled—Title VII. This is because, as discussed above, Title VII and § 1981 set forth parallel, substantially identical, legal theories of recovery in cases alleging intentional discrimination in employment on the basis of race. This is particularly so after the enactment of the 1991 Civil Rights Act. Before 1991, compensatory and punitive damages were available under § 1981 but not under Title VII. Among other things, the 1991 Civil Rights Act expanded the definition of "make and enforce contracts" in § 1981 to include the terms and conditions of employment, including discharge, added the right to jury trial Title VII, and, most importantly, expanded the remedies available to Title VII plaintiffs to include compensatory damages (for emotional pain, suffering, mental anguish, etc.) and punitive damages. Compensatory and punitive damages are only available under Title VII if the plaintiff cannot recover under § 1981. 42 U.S.C. § 1981a(a)(1). The elements of claims alleging disparate treatment on the basis of race under Title VII and intentional employment discrimination on the basis of race under § 1981 are identical. *Hicks,* 509 U.S. at 506 n. 1, 113 S.Ct. at 2747 n. 1. The standard for punitive damages is the same under Title VII, 42 U.S.C. § 1981a(b)(1) (malice or reckless indifference to federally protected rights), and § 1981. *E.g.,* ⚠ *Kolstad v. American Dental Ass'n,* 323 U.S.App. D.C. 402, 108 F.3d 1431, 1437 (1997) (holding standard of proof for punitive damages under 42 U.S.C. § 1981a is the same as that previously established for punitive damages under 42 U.S.C. §§ 1981 and 1983), *citing Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983) ( § 1983), *and Williamson v. Handy Button Machine Co.,* 817 F.2d 1290, 1296 (7th Cir.1987) ( § 1981). The elements of a retaliation claim under § 1981 and Title VII are the same as well. *See Barge v. Anheuser–Busch, Inc.,* 87 F.3d at 259 ( § 1981 retaliation claim); *Kobrin,* 34 F.3d at 704 (Title VII retaliation claim). However, there are still differences between the two statutes. They are not co-extensive in coverage (for example, Title VII does not cover all employers). Title VII requires exhaustion of administrative remedies, and the statutes of limitations are different. Most importantly, the amount of compensatory and punitive damages is limited under Title VII but not under § 1981.

 "We have held that the admission of evidence bearing on a pleaded issue cannot form the basis for an amendment under Rule 15(b) unless the defendant knew of the plaintiff's intent to inject the unpleaded issues." *McLaurin v. Prater,* 30 F.3d 982, 986 (8th Cir.1994). In the present case there is no doubt that Kim intended the evidence to support § 1981 in addition to Title VII because the complaint itself alleged that Nash Finch's conduct had violated both Title VII and § 1981 (as well as the ADEA and

75 Fair Empl.Prac.Cas. (BNA) 1741, 72 Empl. Prac. Dec. P 45,258...

state law). Counts I and II, the failure-to-promote counts, are broadly stated, but the parties and the district court treated count I as alleging the April 1992 failure-to-promote violated Title VII (as well as the ADEA and state law) and count II as alleging the November 1990 failure-to-promote violated 🚩 § 1981. Count III alleged Nash Finch retaliated against Kim for filing an administrative  **\*1064**  charge. The caption and text of Count I referred to Title VII; the caption and text of Count II referred to 🚩 § 1981 expressly and to Title VII by incorporation (the first paragraph of count II "repleaded" the paragraphs of count I; recovery under Title VII for the November 1990 failure-to-promote was precluded because Kim did not file his administrative charge within 300 days; the complaint was timely filed (within 2 years) for purposes of 🚩 § 1981). The caption and text of count III alleged retaliation in violation of only Title VII expressly, but, like count II, also incorporated the previous paragraphs, including the reference therein to 🚩 § 1981. The allegations in the complaint were sufficient to put Nash Finch on notice of Kim's claim that Nash Finch's conduct violated both Title VII & § 1981, certainly so that Nash Finch cannot claim surprise.

In addition, Kim moved several times to amend the pleadings, in pre-trial proceedings (opposing Nash Finch's motion for summary judgment), immediately before trial began and then during the trial. Each time Kim explained why he sought to amend the pleadings to add 🚩 § 1981 as a theory for recovery for the April 1992 failure-to-promote and retaliation claims, specifically referring to the statutory cap on damages under Title VII but not under 🚩 § 1981. Moreover, on the third day of trial, near the close of the evidence, in ruling on Kim's renewed motion, the district court found that the case had been tried on the basis of both § 1981 and Title VII and granted the motion to amend the pleadings to add 🚩 § 1981 as a theory of recovery. It was only after the case had been submitted to the jury (following an extensive instructions conference during which, among other issues, the standard of proof for punitive damages under Title VII and § 1981 was discussed) that the district court reconsidered and then denied the motion to amend the pleadings. It would seem that if any party was surprised by this turn of events, it was Kim.

We think the record shows that, even though 🚩 § 1981 as a theory of recovery was not pleaded, it was fairly tried by the parties. Moreover, because of the substantial identity of Title VII & § 1981 as theories of recovery for claims of intentional discrimination, Nash Finch was not prejudiced by the amendment because it had a fair opportunity to defend 🚩 § 1981 as a theory of recovery. We are satisfied that, given the substantial identity of Title VII and § 1981 as theories of recovery, the jury's finding of intentional discrimination under Title VII also constituted a finding of intentional discrimination under 🚩 § 1981, even though the instructions for the April 1992 promotion and retaliation claims (as well as the punitive damages instruction) did not refer to 🚩 § 1981. Thus, we hold the district court abused its discretion in denying the motion to amend the pleadings to conform to the evidence. *See, e.g., Gamma–10 Plastics, Inc. v. American President Lines, Ltd.,* 32 F.3d at 1255–57 (holding abuse of discretion to deny motion to amend complaint to add claim for punitive damages under general maritime law); 🚩 *McLaurin v. Prater,* 30 F.3d at 985–86 (suggesting on remand that district court should grant motion to amend complaint to add state law claims to constitutional claim based on same facts); *Corsica Livestock Sales, Inc. v. Sumitomo Bank,* 726 F.2d 374, 377–78 (8th Cir.1983) (holding abuse of discretion to deny motion to amend complaint to add contract theory of recovery to rule violation theory of recovery alleged in complaint); *Nielson v. Armstrong Rubber Co.,* 570 F.2d at 275–76 (holding abuse of discretion to deny motion to amend complaint to add strict products liability claim to negligence claim already alleged); *cf.* 🚩 *Oglala Sioux Tribe v. Andrus,* 603 F.2d 707, 714 (8th Cir.1979) (noting federal rules abolished "theory of the pleadings" doctrine under which plaintiff must succeed on those theories that are pleaded or not at all).

Because 🚩 § 1981 was a basis for recovery, the Title VII cap on compensatory and punitive damages does not apply. We turn next to Nash Finch's damages arguments.

COMPENSATORY DAMAGES

Case 1:18-cv-24190-RS Document 471 Entered on FLSD Docket 06/01/2023 Page 210 of 379

Kim v. Nash Finch Co., 123 F.3d 1046 (1997)
75 Fair Empl.Prac.Cas. (BNA) 1741, 72 Empl. Prac. Dec. P 45,258...

Nash Finch argues there was no evidence to support the award of $21,000 in back pay (lost wages). Nash Finch argues that the difference in pay between what Kim was paid as a leadman and what he would have been paid had he been promoted to foreman was at most $1932.81. Nash Finch bases this calculation on the salaries paid to **\*1065** the two employees who were promoted to the position of shipping foreman in 1990 and 1992. We hold there was evidence to support the award of $21,000 in back pay. Kim presented evidence showing that the salaries of comparable employees and evidence that there was no set pay scale for the position, that Nash Finch considered a number of facts in setting salaries, and that he had more seniority and more experience in the shipping department (including experience as the Saturday shipping foreman) than the two individuals who were promoted in 1990 and 1992.

Nash Finch also argues there was no evidence to support the award of $447 per month in front pay. Nash Finch argues that at most the difference in pay was about $360 per month. Nash Finch bases this calculation on the higher of the salaries paid to the two employees who were promoted to the position of shipping foreman in 1990 and 1992. (The lower difference in salary was about $240 per month.) The district court based the amount of the front pay award on the back pay award ($21,000 over 47 months (from November 1990 promotion to September 1994 verdict), or $447 per month). Slip op. at 16–19, 21. We have already held that the district court's calculation of back pay is supported by substantial evidence, and we cannot disapprove of the calculation of front pay based on the same evidence.

Nash Finch also argues there was no medical or other expert testimony to support the finding of emotional distress. The jury awarded Kim $100,000 for mental anguish and loss of enjoyment of life caused by the November 1990 failure-to-promote under 42 U.S.C. § 1981. Medical or other expert evidence is not required to prove emotional distress. *Turic v. Holland Hospitality, Inc.,* 85 F.3d 1211, 1215 (6th Cir.1996) (Title VII). "A plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden in this regard." *Id.* at 1215–16 (citing cases); *see, e.g., Wilmington v. J.I. Case Co.,* 793 F.2d 909, 922 (8th Cir.1986) ( 42 U.S.C. § 1981) (testimony of plaintiff and other witnesses about plaintiff's deterioration in health, mental anxiety, humiliation, and emotional distress resulting from working conditions and discharge); *Williams v. Trans World Airlines, Inc.,* 660 F.2d 1267, 1272–73 (8th Cir.1981) (testimony of plaintiff about humiliation or mental distress); *cf. Mardell v. Harleysville Life Insurance Co.,* 31 F.3d 1221, 1232–33 (3d Cir.1994) (violation of employee rights frequently results in significant injury to dignity and demoralizing impairment of self-esteem) (citing cases), *vacated on other grounds,* 514 U.S. 1034, 115 S.Ct. 1397, 131 L.Ed.2d 286 (1995); *Rush v. Scott Specialty Gases, Inc.,* 930 F.Supp. 194, 199 (E.D.Pa.1996) (testimony of plaintiff corroborated by friends, family and expert witnesses, plus evidence of physical suffering and need for professional care), *rev'd on other grounds,* 113 F.3d 476 (3d Cir.1997). Here, Kim, his wife and his son testified about the anxiety, sleeplessness, stress, depression, high blood pressure, headaches, and humiliation he suffered after he was not promoted and after he filed the employment discrimination charge. We hold that medical or other expert evidence was not required to prove emotional distress and that there was sufficient evidence of emotional distress.

## PUNITIVE DAMAGES

Nash Finch argues the district court erred in submitting the issue of punitive damages to the jury. Nash Finch argues the district court should have applied a heightened standard of proof for punitive damages because the 1991 Civil Rights Act, 42 U.S.C. § 1981a(b)(1), limits the availability of punitive damages to "exceptional circumstances of unusual bad motive that transcends ordinary intentional misconduct." Brief for Appellee/ Cross–Appellant at 46.

Under 42 U.S.C. § 1981a(b)(1) a complaining party may recover punitive damages if the defendant discriminates "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." We do not agree that the 1991 Civil Rights Act, 42 U.S.C. § 1981a(b)(1), limits the availability of punitive damages to "exceptional circumstances of unusual bad motive that transcends ordinary intentional misconduct." The Second Circuit rejected a similar argument in

Kim v. Nash Finch Co., 123 F.3d 1046 (1997)

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 211 of 379

75 Fair Empl.Prac.Cas. (BNA) 1741, 72 Empl. Prac. Dec. P 45,258...

*Luciano v. Olsten Corp.,* 110 F.3d at 219–20. In that case the employer argued punitive damages required "extraordinarily **\*1066** egregious" conduct. The court held that "[n]othing in the ... text [of § 1981a(b)(1) ] indicates that a heightened standard was meant to apply to Title VII cases." *Id.* at 220, *citing* *Rowlett v. Anheuser–Busch, Inc.,* 832 F.2d 194, 205 (1st Cir.1987) (punitive damages under 42 U.S.C. § 1981 available where defendant's conduct is motivated by evil motive or involves reckless indifference to federally protected rights), *Beauford v. Sisters of Mercy–Province of Detroit, Inc.,* 816 F.2d 1104, 1108–09 (6th Cir.) (same), *cert. denied,* 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 217 (1987), *and* *Smith v. Wade,* 461 U.S. at 55–56, 103 S.Ct. at 1639–40 (punitive damages under 42 U.S.C. § 1983 available under common law when conduct motivated by evil motive or intent or reckless or callous indifference to federally protected rights of others); *accord* *Kolstad v. American Dental Ass'n,* 108 F.3d at 1437–39. The court also noted the legislative history indicated that Congress intended to make punitive damages available under § 1981a "to the same extent and under the same standards that they are available to plaintiffs under 42 U.S.C. § 1981." 110 F.3d at 220, *citing* 137 Cong. Rec. H9527 (1991) (statement of Rep. Edwards), *and* H.R.Rep. No. 40(II), 102d Cong., 1st Sess. 24 (1991), *reprinted in* 1991 U.S.C.C.A.N. 717.

For this reason, we hold the district court correctly rejected Nash Finch's argument that a plaintiff must demonstrate something more than that required by the statute to recover punitive damages, that is, that the defendant acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). [5]

Nash Finch also argues that there was insufficient evidence to support the punitive damages award. Nash Finch argues there was no evidence of willfulness, malice or reckless indifference to the federally protected rights of others, much less "exceptional circumstances of unusual bad motive that transcends ordinary intentional misconduct." Nash Finch argues that, at most, there was only circumstantial evidence of discrimination consisting of "inconsistent explanations for the allocation of scarce employment opportunity." We hold that there was sufficient evidence to support the punitive damages award.

Based on the record as discussed above, a reasonable jury could have found that Nash Finch acted with reckless indifference to Kim's federally protected rights. There was evidence that Nash Finch knew what constituted unlawful employment practices. There was also evidence that Nash Finch systematically retaliated against Kim for filing an employment discrimination charge and attempted to discredit him by "papering" his personnel file. The intentional discrimination at issue—failure to promote and retaliation—involved disparate treatment, not disparate impact, and was undertaken by supervisors or management. "The requisite level of recklessness or outrageousness [required to support punitive damages] can be inferred from management's participation in the discriminatory conduct." *Kimzey v. Wal–Mart Stores, Inc.,* 107 F.3d at 575, *citing* *Kientzy v. McDonnell Douglas Corp.,* 990 F.2d 1051, 1062 (8th Cir.1993). Direct evidence of intentional discrimination is not required; circumstantial evidence may be sufficient. **\*1067** *United States Postal Service Board of Governors v. Aikens,* 460 U.S. at 714 n. 3, 103 S.Ct. at 1481 n. 3. Finally, the record contained more than merely evidence of inconsistent explanations for Nash Finch's conduct, that is, that Nash Finch had lied; as discussed above (at some length), there was also evidence that Nash Finch had intentionally discriminated against Kim on the bases of race or national origin.

EXCESSIVE VERDICT

Finally, Nash Finch argues the verdict was unreasonable because it was grossly excessive and grossly disproportionate to the kind of wrong and the actual damages. Nash Finch argues that the jury awarded $36,000 for back pay even though the difference in actual wages was less than $2,000, more than $1.5 million for emotional distress even though Kim continued to work and lead a normal life, and $7 million for punitive damages, an amount which is 3,500 times the actual loss of $2,000 and almost half of Nash Finch's annual earnings. Brief for Appellee/ Cross-appellant at 48; Reply Brief for Appellee/ Cross-appellant at 21 (citing Plaintiff's Ex. 26 at 2).

Kim v. Nash Finch Co., 123 F.3d 1046 (1997)

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 212 of 379

75 Fair Empl.Prac.Cas. (BNA) 1741, 72 Empl. Prac. Dec. P 45,258...

Because the district court applied the Title VII statutory cap, the district court limited the jury's award of $150,000 in compensatory damages for emotional distress for the 1992 failure-to-promote claim, the $1.5 million in compensatory damages for emotional distress for the retaliation claim, and the $7 million in punitive damages to a total of $ 300,000, slip op. at 1057, and did not "engage in an analysis as to the excessiveness of the award except to say that damages in the amount being awarded are certainly not excessive due to the length of time the discrimination continued, the level of retaliation by Nash Finch and the financial well-being of Nash Finch." *Id.* at 1057. Thus, as reduced by the district court, the judgment awarded Kim damages in the amount of $21,000 for lost wages, $100,000 for emotional distress for the 1990 failure-to-promote claim and $300,000, including punitive damages, for the 1992 failure-to-promote and retaliation claims. *Id.* at 1061.

As discussed above, because the district court abused its discretion in denying the Rule 15(b) motion to amend, 42 U.S.C. § 1981 was a basis of recovery for the 1992 failure-to-promote and retaliation claims. Because the Title VII statutory cap does not apply to limit the recovery under 42 U.S.C. § 1981, the district court should not have reduced the amount of damages awarded pursuant to the Title VII statutory cap. *See* 42 U.S.C. § 1981a(b)(4); *Johnson v. Metropolitan Sewer District,* 926 F.Supp. at 876. Nonetheless, we think the district court was correct to reduce the amount of damages awarded by the jury because the amount was grossly excessive. In effect, what the district court did amounted to remittitur, which we review for clear abuse of discretion. *See, e.g.,* *Kientzy v. McDonnell Douglas Corp.,* 990 F.2d at 1062. It is not possible to ascertain what portion of the $300,000 is attributable to compensatory or punitive damages, so we will assume for purposes of analysis that the entire amount was for punitive damages.

After carefully reviewing the evidence, we conclude that, although an award of $1.75 million for emotional distress is grossly excessive, an award of $100,000 is not. *See* *Kimzey v. Wal–Mart Stores, Inc.,* 107 F.3d at 570 ($35,000); *Turic v. Holland Hospitality, Inc.,* 85 F.3d at 1215–16 (listing cases in which damages for emotional distress ranged from $40,000 to $150,000); *Kientzy v. McDonnell Douglas Corp.,* 990 F.2d at 1054 ($150,000); *Rush v. Scott Specialty Gases, Inc.,* 930 F.Supp. at 199 ($100,000).

Similarly, we conclude that, although an award of $7 million for punitive damages is grossly excessive, an award of $300,000 is not. Factors to consider in determining the reasonableness of a punitive damages award include the degree of reprehensibility of the defendant's conduct, the ratio or relationship between the actual harm inflicted on the plaintiff and the punitive damages award, and civil penalties authorized or imposed for comparable misconduct. *BMW of North America, Inc. v. Gore,* 517 U.S. 559, —— – ——, 116 S.Ct. 1589, 1598–99, 134 L.Ed.2d 809 (1996); *see* *Pulla v. Amoco Oil Co.,* 72 F.3d 648, 659 (8th Cir.1995) (White, J.). Nash Finch's conduct was reprehensible and involved retaliation and at least reckless disregard of federal protected rights. It did not involve violence or the threat of violence, but it did involve trickery or deceit. The **\*1068** ratio or relationship between the reduced punitive damages award and the actual harm inflicted as measured by the reduced amount of back pay and compensatory damages is a relatively unremarkable 3:1. *See* *BMW of North America, Inc. v. Gore,* at ——, 116 S.Ct. at 1602 (noting 4:1 ratio of punitive damages to compensatory damages was described as "close to the line" in *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 23–24, 111 S.Ct. 1032, 1046, 113 L.Ed.2d 1 (1991), and that relevant ratio was not more than 10:1 in *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 462, 113 S.Ct. 2711, 2722–23, 125 L.Ed.2d 366 (1993)); *Kimzey v. Wal–Mart Stores, Inc.,* 107 F.3d at 577–78 (reducing punitive damages award from $5 million to $350,000, an amount 10 times the actual damages award of $35,000, which the court described as "low"). Finally, Title VII, which authorizes or imposes liability for comparable misconduct, caps compensatory and punitive damages at $300,000 (for the largest employers). 42 U.S.C. § 1981a(b)(3)(D); *see, e.g.,* *Rush v. Scott Specialty Gases, Inc.,* 930 F.Supp. at 202 (reducing punitive damages award from $3 million to $300,000). We think a $300,000 punitive damages award is an adequate sanction and sufficient to deter future similar conduct, considering the size and assets of Nash Finch.

Kim v. Nash Finch Co., 123 F.3d 1046 (1997)

75 Fair Empl.Prac.Cas. (BNA) 1741, 72 Empl. Prac. Dec. P 45,258...

CONCLUSION

In sum, we hold the district court should have granted the motion to amend the pleadings to conform to the evidence and thus should not have applied the Title VII cap, 42 U.S.C. § 1981a(b)(3), to limit compensatory and punitive damages. We also hold the district court did not err in holding the November 1990 failure-to-promote claim was actionable under 42 U.S.C. § 1981 under *Patterson,* there was sufficient evidence of intentional discrimination and retaliation, and there was sufficient evidence of malice or reckless indifference to support punitive damages. Finally, we hold the awards of back pay and compensatory and punitive damages, as reduced by the district court, were supported by sufficient evidence and were not excessive.

Accordingly, we affirm the judgment of the district court.

BEAM, Circuit Judge, concurring in part and dissenting in part.

I concur in the result reached by the court and in the opinion of the court except that I do not agree that the evidence was sufficient to submit the issue of punitive damages to the jury. Thus, any award for punitive damages was error. Since, as noted by the court, "[i]t is not possible to ascertain what portion of the $300,000 [award] is attributable to compensatory or punitive damages," infra at 33, I would assume, for purposes of analysis, that the entire amount was for compensatory purposes. Accordingly, my bottom line of damages is the same as that of the court.

**All Citations**

123 F.3d 1046, 75 Fair Empl.Prac.Cas. (BNA) 1741, 72 Empl. Prac. Dec. P 45,258, 39 Fed.R.Serv.3d 348

## Footnotes

\*    The Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri, sitting by designation.

1    The Honorable Michael J. Melloy, Chief Judge, United States District Court for the Northern District of Iowa.

2    This claim was not barred by the two-year statute of limitations under Iowa Code Ann. § 614.1(2) (West Supp.1997) because the failure-to-promote occurred on November 18, 1990, and the complaint was filed on November 16, 1992.

3    The district court reduced the jury verdict to a total of $421,000 ($21,000 for lost wages, $100,000 for compensatory damages for the 1990 promotion, and $300,000 for compensatory and punitive damages for the 1992 promotion and the retaliation claims). The district court also ordered front pay ($447 per month), promotion to the next available foreman position (plus seniority from November 1990), attorney's fees, costs and expenses, and post-judgment interest.

4    The Iowa civil rights statute does allow for compensatory damages but not punitive damages. *E.g., Chauffeurs, Teamsters and Helpers, Local Union No. 238 v. Iowa Civil Rights Com'n,* 394 N.W.2d 375, 382–84 (Iowa 1986).

5    We need not decide whether recovery of punitive damages under Title VII requires a "heightened" showing beyond intentional discrimination (that is, intentional discrimination based on disparate treatment as opposed to disparate impact), although the author would suggest that it does not. *See* 42 U.S.C. § 1981a(d)(2) (defining "discriminatory

75 Fair Empl.Prac.Cas. (BNA) 1741, 72 Empl. Prac. Dec. P 45,258...

practice" to mean disparate treatment and not disparate impact); *cf.* 🚩 *Rowlett v. Anheuser–Busch, Inc.,* 832 F.2d 194, 205–06 (1st Cir.1987) (rejecting in pre–1991 Civil Rights Act case argument that punitive damages under 🚩 § 1981 requires "aggravating circumstances" or "extraordinary or outrageous" misconduct, noting that it cannot really be disputed that intentional discrimination on basis of race is "worthy of some outrage"). *But see* 🚩 *Varner v. National Super Mkts., Inc.,* 94 F.3d 1209, 1214 (8th Cir.1996) (citing with approval 🚩 *Pandazides v. Virginia Bd. of Educ.,* 13 F.3d 823, 830 n. 9 (4th Cir.1994)) (construing "heightened" showing necessary to recover punitive damages under 🚩 § 1981a(b)(1)), *cert. denied,* —— U.S. ——, 117 S.Ct. 946, 136 L.Ed.2d 835 (1997); *Karcher v. Emerson Elec. Co.,* 94 F.3d 502, 509 (8th Cir.1996) (same), *cert. denied,* 520 U.S. 1210, ——, 117 S.Ct. 1692, 1693, 137 L.Ed.2d 820 (1997).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by   Vigil v. Tweed,   D.N.M.,   June 16, 2020

760 F.Supp.2d 1068
United States District Court, D. New Mexico.

Juan MATA, Plaintiff,

v.

Sgt. Ron ANDERSON, Defendant.

No. CIV 08–0046 JB/RLP
|
Jan. 24, 2009.

**Synopsis**
**Background:** Individual who brought prior civil rights lawsuit against police department and protested outside police station brought § 1983 action against police officer, alleging that officer retaliated against him by filing criminal charges against him, in violation of First Amendment. Officer moved for dismissal of complaint for failure to effect timely service and, in the alternative, for judgment on the pleadings.

**Holdings:** The District Court, James O. Browning, J., held that:

officer did not waive his argument that dismissal of action was appropriate based on insufficiency of process;

it would exercise its discretion to extend period of time for service of process;

it would not convert motion to dismiss into motion for summary judgment;

individual sufficiently stated claim for retaliatory prosecution;

as matter of first impression, state magistrate jury's conviction of individual on criminal charges was not conclusive evidence of probable cause for prosecution;

officer was not entitled to absolute immunity; and

officer was not entitled to qualified immunity.

Motion for judgment on the pleadings denied.

**Procedural Posture(s):** Motion to Dismiss; Motion for Judgment on the Pleadings; Motion to Dismiss for Failure to State a Claim.

**Attorneys and Law Firms**

**\*1076** Dennis W. Montoya, Montoya Law, Inc., Rio Rancho, NM, for Plaintiff.

Alex C. Walker, Lisa Mann, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, NM, for Defendant.

*MEMORANDUM OPINION AND ORDER*

JAMES O. BROWNING, District Judge.

**THIS MATTER** comes before the Court on the Defendant's Motion and Brief to Dismiss Plaintiff's Complaint for Failure to Timely Serve or, In the Alternative, Motion for Judgment on the Pleadings, filed July 7, 2008 (Doc. 9) ("Motion"). The Court held a hearing on October 23, 2008. The primary issues are: (i) whether the Court should dismiss the suit for failure to timely serve when the Complaint was not served within 120 days potentially had run during the 40 days after the 120 days passed; (ii) whether the Plaintiff Juan Mata has stated the essential element of lack of probable cause for a claim for First–Amendment retaliation where a magistrate court jury found him guilty and a district court judge submitted two of three counts to a jury that acquitted him; (iii) whether Defendant Ron Anderson, a police officer who signed the criminal complaint and the underlying statement of probable cause, enjoys absolute immunity; and (iv) whether Anderson enjoys qualified immunity. The Court will excuse Mata's failure to timely serve and will grant him an extension to complete service. The Court finds that, on the face of his Complaint, Mata has established a claim for First Amendment retaliation. The Court also finds that Anderson is not entitled to absolute or qualified immunity.

*FACTUAL BACKGROUND*

On a motion to dismiss, the Court must assume that the Complaint's allegations **\*1077** are true. Thus, the Court sets forth the relevant facts as the Complaint alleges them. This motion, however, also involves some facts that are not ascertainable from the face of the pleadings, but which are necessary to fully understand the context of this lawsuit. The Court will therefore refer at times to facts that appear in exhibits, briefing, and in the transcript of the hearing to provide context. At the same time, the Court remains mindful of the standard for deciding a motion to dismiss.

Mata was one of several Mata family members who filed a civil-rights lawsuit on November 28, 2004. *See Mata v. Briseno,* No. CIV 04–1334 ACT/RLP, Complaint, filed November 28, 2004 (Doc. 1) ("First Mata case"). Mata, his brother Renee Barraza, and his mother, Gregoria, sued certain agents of the Farmington Police Department. *See* First Amendment Complaint for Violation of Civil Rights Under Color of State Law ¶ 7, at 2, filed June 18, 2008 (Doc. 6) ("First Amended Complaint"). The First Mata case settled a year later, on November 14, 2005. *See Mata v. Briseno,* the Honorable Richard L. Puglisi, United States Magistrate Judge's Notice to Docket Clerk at 1, filed November 16, 2005 (Doc. 70) ("Settlement Notice"). [1] The lawsuit that led to the November 2005 settlement has some relationship to this lawsuit. According to Mata, Anderson, a law enforcement officer and employee of the Farmington Police Department, became "enraged" because of the news coverage that the settlement received. First Amended Complaint ¶¶ 2 & 8, at 1–2. Motivated by a desire to retaliate against Mata for his outspoken criticism of Farmington police officers, for his protest activities outside the police station, and for the settlement he and his family members obtained in the first lawsuit, Anderson filed a criminal complaint against Juan Mata listing, among other things, criminal libel. *See* First Amended Complaint ¶¶ 10–13.

Although the First Amended Complaint provides little detail of the criminal proceedings that resulted from the criminal complaint, it is apparent from the briefing, exhibits, and arguments presented at the hearing, that the criminal complaint contained three counts—harassment, stalking, and criminal libel. Mata was tried in a Magistrate Court in San Juan County, and the magistrate jury convicted Mata on all three counts. *See* Exhibit E to Answer, Magistrate Verdict Forms, filed July 7, 2008 (Doc. 8–6).

Judges who are not usually trained in the law preside over municipal and magistrate courts in New Mexico. [2] One of the safeguards against miscarriages of justice built into this structure is a defendant's entitlement to a trial de novo in the state district court. Mata availed himself of this proceeding and sought a trial de novo in the state district court. At the district court,

the district judge dismissed the criminal libel charge, finding it unconstitutional, and allowed the other two charges to proceed to the jury. *See* Transcript of Hearing at 15:19–25 (taken October 23, 2008) (Walker) ( "Tr."). [3] It is to this second trial that Mata refers in his First Amended Complaint, stating: "A jury, after **\*1078** deliberating only a few minutes after trial, declared Plaintiff Juan Mata not guilty of all charges brought against him by Sgt. Anderson." First Amended Complaint ¶ 20, at 4.

## *PROCEDURAL BACKGROUND*

Mata filed this case on January 11, 2008, asserting a 42 U.S.C. § 1983 claim for alleged retaliation in violation of the First Amendment. Anderson asserts that Mata's Complaint is premised on the impossible allegation that a desire to retaliate against Mata for the settlement of the First Mata case motivated Anderson's alleged act of filing the criminal charges. *See* First Amended Complaint ¶ 10, at 3. According to Mata, this retaliation violated his First–Amendment right of free speech. *See id.,* Count I, at 3. Mata filed his suit in this case for civil-rights violations three years to the day after the criminal charges against him were filed. *See State v. Mata,* M–47–MR–200500028, Farmington Magistrate Court, Copy of Docket Sheet at 1 (dated January 31, 2005). According to Anderson, the statute of limitations would have run on Mata's claims the day that Mata filed his original complaint. Mata was required to serve Anderson by May 10, 2008. *See* Fed. R. Civ. 4(m) ("If a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant....").

### 1. *Service of the First Amended Complaint.*

Mata filed his First Amended Complaint on June 18, 2008, which made no substantive change to his allegations and was identical to the original Complaint except that the Amended Complaint omitted an unnumbered prefatory paragraph that related to some other case. Mata filed the Amended Complaint outside of the 120–day period. Although Mata did not attach the criminal complaint to the Complaint or to the First Amended Complaint, the First Amended Complaint makes numerous references to that criminal complaint.

It is undisputed that Mata failed to serve Anderson within 120–days of filing the original Complaint. Mata did not served his Amended Complaint on Anderson until June 19, 2008, 160 days after he filed his Complaint and roughly 40 days after expiration of the 120–day deadline.

Anderson filed an Answer to Mata's First Amended Complaint. *See* Answer to Amended Complaint, filed July 7, 2009 (Doc. 8) ("Answer"). In his Answer, Anderson raises several equitable defenses, including the defense of unclean hands, *see* Answer, Affirmative Defense 4, at 4; waiver and estoppel, *see* Answer, Affirmative Defense 5, at 4, and laches, *see* Answer, Affirmative Defense 7, at 5. Anderson attached the criminal complaint, along with other exhibits, to his Answer.

Anderson moves the Court for dismissal of Mata's Complaint for failure to effect timely service under rule 12(b)(5) of the Federal Rules of Civil Procedure. *See* Motion at 1. Anderson alternatively requests that the Court enter judgment on the pleadings. Anderson requests that the Court dismiss Mata's First Amended Complaint with prejudice. In support of his Motion, Anderson raises several arguments: (i) the Court should dismiss due to the lack of timely service; (ii) the Court should dismiss on the merits because Mata fails to state a claim upon which relief can be granted; (iii) the Court should dismiss because Anderson is absolutely immune from suit in this case; or (iv) the Court should dismiss the case because Anderson enjoys qualified immunity under the circumstances of this case.

### **\*1079** 2. *Arguments Regarding Failure to Timely Serve and the Statute of Limitations.*

Anderson points out that rule 12(b)(5) permits a party to move for the dismissal of a complaint for "insufficiency of service of process." Motion at 2 (internal quotation marks omitted). He notes that the time limit that rule 4(m) lays out required Mata to complete service of process by May 10, 2008. Anderson quotes part of rule 4(m), and emphasizes the rule's command that,

if the 120–day deadline is missed, the Court "*must* dismiss the action without prejudice against the defendant...." Motion at 3 (quoting Fed.R.Civ.P. 4(m)) (internal quotation marks omitted) (emphasis added).

Anderson admits that the original filing came within the applicable statute of limitations and that Mata's filing the lawsuit tolled the statute of limitations for the 120–day period that rule 4(m) provides for effectuating service of process. *See* Motion at 3. Anderson argues, however, that, although the statute of limitations is tolled during the 120–period, once the 120 days have passed, the clock on the statute of limitations resumes and the statute of limitations again becomes applicable. *See id.* Anderson insists that the clock began running on Mata's claims on the day that the 120–day period expired and that, shortly thereafter, the limitations period ran out. According to Anderson, the result of Mata's missing the deadline for service of process, and the application of the statute of limitations, is to bar Mata's lawsuit. *See id.*

Although this result appears harsh, Anderson asks the Court to dismiss Mata's claim and allow the statute of limitations to operate to its full effect. Anderson reminds the Court that "[p]rocedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants." *Id.* (quoting *Baldwin County Welcome Center v. Brown,* 466 U.S. 147, 152, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984)) (internal quotation marks omitted). Moreover, Anderson points out that, "in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." Motion at 3 (quoting *Mohasco Corp. v. Silver,* 447 U.S. 807, 826, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980)). Thus, Anderson urges the Court to strictly adhere to procedural requirements. *See* Motion at 3. Anderson also calls to the Court's attention the fact that Mata presumably knows how to serve process on a police officer, given that he has successfully sued police officers in the past, and that Mata has offered no good cause for the delay. *See id.*

Mata counters that Anderson was served with the summons and Complaint in the case, albeit outside the prescribed time frame. *See* Plaintiff's Response to Sergeant Anderson's Motion to Dismiss for Failure to Timely Serve or in the Alternative for Judgment on the Pleadings at 2, filed July 21, 2008 (Doc. 11) ("Response"). Mata also maintains that the Court routinely issues notices to plaintiffs in civil actions advising them when a complaint has not been served and setting deadlines for service. *See id.* at 2. Mata states that he did not receive such a notice, but nevertheless sought to rectify the failure of service as soon as possible. *See id.* at 3.

Mata challenges the contention that, if the Court dismisses his claims, the statute of limitations will bar refiling by arguing that the cause of action did not accrue until his criminal conviction was invalidated. *See id.* at 5. Mata argues that, given that his acquittal came nearly a year after **\*1080** the initial filing of the criminal complaint, Mata would still be within the applicable statute of limitations and his claim would therefore not be barred. *See id.* at 6.

Mata also argues that by raising several equitable defenses, including the defense of unclean hands, Anderson has evoked the Court's jurisdiction. *See id.* According to Mata, by Anderson's "extensive participation in the litigation process," Anderson has waived the right to object to lack of timely service of process. *Id.* Mata contends that a waiver is not unjust in this case, because Anderson is not being asked to defend himself in a distant forum, and he cannot demonstrate true prejudice from the moderate delay in the service of process. *See id.* at 4.

Anderson replies that Mata did not attempt to demonstrate good cause for his failure to delay. *See* Reply in Support of Defendant's Motion and Brief to Dismiss Plaintiff's Complaint for Failure to Timely Serve or, In the Alternative, Motion for Judgment on the Pleadings at 2, filed July 28, 2008 (Doc. 12) ("Reply"). Anderson also disputes the suggestion that he has waived the ability to object to Mata's failure to timely serve and maintains that he has consistently asserted the defense that Mata failed to timely serve process. *See id.* Anderson notes that he filed his Answer, asserting lack of personal jurisdiction for failure to serve process, less than twenty days after he was served. *See* Reply at 3. Anderson therefore contends that his prompt and orderly conduct in responding to Mata's lawsuit cannot fairly constitute a waiver of the right to challenge the adequacy of service of process.

### 3. *Arguments Regarding Dismissal on the Pleadings.*

As an alternative to his argument that the Court should dismiss Mata's claim for untimely service of process, Anderson contends that Mata fails to state a cause of action for First Amendment retaliation. *See id.* at 4. Anderson asks the Court to take judicial notice of the fact that criminal charges were filed in January 2005. *See id.* Those charges, Anderson argues, came eleven months before the November 2005 settlement which, according to Mata, caused Anderson to retaliate. *See id.* It is this temporal discontinuity which compelled Anderson to note in his Answer that "the realities associated with the Earth's time-space continuum preclude any reasonable conclusion that the execution of the Statement of Probable Cause on January 11, 2005 was done 'to retaliate against' Plaintiff for settling [the first lawsuit] in November 2005." Answer ¶ 10, at 2–3.

Mata attributes Anderson's interpretation of his claim as being based on retaliation solely for the settlement of the first lawsuit as a product of inartful drafting in the First Amended Complaint. *See* Response at 6. Mata argues that his claim arises out of a broader allegation that Anderson retaliated against him for bringing a civil rights action and for his protest activities. *See id.* To the extent that the First Amended Complaint does not reflect such an allegation, Mata requests leave to amend. *See id.*

Anderson also argues that Mata has failed to allege lack of probable cause for the criminal complaint. *See* Motion at 6. Anderson contends that the Supreme Court of the United States has held lack of probable cause to be an essential element to a First Amendment retaliation claim. *See id.* (citing *Hartman v. Moore*, 547 U.S. 250, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006)). Anderson cites cases which stand for the proposition that probable cause requires less than the evidence needed for a conviction and that, even when a conviction is subsequently overturned, courts will find the existence of probable cause. *See* **\*1081** Motion at 7 (citations omitted). Anderson asserts that he had probable cause. At least, he argues, Mata has failed to allege a lack of probable cause in his First Amended Complaint. *See id.* at 8.

Mata states in his Response that he "does not dispute that his First Amendment Retaliation claim requires that he allege, and later prove, that the charges brought against him lacked probable cause." Response at 7. Mata insists, however, that the municipal court did not conduct a preliminary hearing and enter a finding of probable cause. *See id.* Mata criticizes the municipal and magistrate courts because the judges who preside over them are not typically trained in the law. *See id.* He asserts that trial de novo in the district court is designed to protect the miscarriages of justice that can occur in the municipal courts under such circumstances. Thus, the conviction by the magistrate jury is not sufficient at this stage to preclude his claim. *See id.*

In his Reply and at the hearing, Anderson brought to the Court's attention one federal case in which the United States District Court for the Northern District of Texas held that "a conviction was prima facie evidence of probable cause in a malicious prosecution suit, notwithstanding the fact that a new trial had been granted, and was conclusive on the issue of probable cause in the absence of evidence that the conviction was obtained by improper means or upon false arrest." Reply at 11 (citing *Adcox v. Safeway Stores, Inc.*, 512 F.Supp. 452, 454 (N.D.Tex.1980)). Anderson also cites the *Restatement (Second) of Torts* § 667(1) for the proposition that " 'the conviction of the accused by a magistrate or trial court, although reversed by an appellate tribunal, conclusively establishes the existence of probable cause, unless the conviction was obtained by fraud, perjury or other corrupt means.' " Reply at 11 (quoting *Restatement (Second) of Torts* § 667(1)). At the hearing, Anderson also asserted that the fact that the district judge allowed two of the criminal charges to go to the jury in the de novo trial suggests that the district judge made an implicit finding that there was probable cause. *See* Tr. at 16:17–23 (Court, Walker).

### 4. *Arguments Regarding Absolute Immunity.*

Referring to the process by which the criminal complaint was sworn, Anderson argues that, to the extent the First Amended Complaint is predicated on him "filing" the criminal case, his role was analogous to that of a prosecutor making or participating in the decision to prosecute. Motion at 5. Accordingly, he insists that he is entitled to absolute immunity in this case. *See id.* Mata counters that normally, police officers are not afforded absolute immunity. *See* Response at 10. Moreover, he notes that in *Roberts v. Kling*, 144 F.3d 710, 711 (10th Cir.1998), the United States Court of Appeals for the Tenth Circuit held that a prosecutor who executed a criminal complaint by which he affirmed the truth of the facts set forth in the complaint enjoyed only qualified immunity. *See* Response at 11. Although Mata does not explicitly say so, the Court interprets this citation to

mean that Anderson's conduct is analogous to that of the prosecutor in *Roberts v. Kling,* and that Anderson is consequently entitled, at most, to qualified immunity.

### 5. *Arguments Regarding Qualified Immunity.*

As a final defense, Anderson asserts qualified immunity because Mata did not sufficiently allege violation of a constitutional right, given that the supposed retaliation upon which the claim rests occurred **\*1082** before the alleged speech conduct that triggered the retaliation. *See* Motion at 9. Further, even if a constitutional violation occurred, Anderson maintains that Mata cannot establish that a reasonable person in Anderson's shoes would have known his conduct amounted to a constitutional violation. *See id.* Anderson contends that the existence of probable cause at the time of filing the criminal complaint is sufficient for him to have qualified immunity from suit. *See id.* Mata charges that the long and clearly established law is that the "warrant requirement is violated when a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit if the false statement is necessary to a finding of probable cause." Response at 12 (quoting

*Clanton v. Cooper,* 129 F.3d 1147, 1154 (10th Cir.1997)) (internal quotation marks omitted).

### 6. *The Hearing.*

At the hearing, Anderson conceded that the First Amended Complaint contains some allegations that are not rooted in the settlement. *See* Tr. at 12:10–13 (Walker). Specifically, he admitted that the First Amended Complaint alleges retaliation for protesting or picketing. *See id.* at 12:8–9 (Walker). Anderson reserved the argument, however, that, to the extent Mata's claim relies on allegations of retaliation for the settlement, the claim must fail.

While there has been some question whether Mata was alleging a Fourth–Amendment malicious-prosecution claim, Mata clarified at the hearing that, while he wished to amend his First Amended Complaint to include a malicious-prosecution claim, the current operative Complaint does not allege such a claim. *See* Tr. at 26:19–21 (Mata) ("I think the First Amended Complaint as it now stands brings only the First Amendment charges. We would seek to add a Fourth Amendment.").

Mata contended at the hearing that the conviction by the magistrate jury constituted, at most, evidence of the existence of probable cause and that the evidence created ambiguity regarding the existence of probable cause. *See* Tr. at 22:23 (Montoya). Anderson countered that, if there was indeed ambiguity regarding whether probable cause existed, then he would entitled to qualified immunity. *See id.* at 30:12–18 (Walker). At the end of the hearing, the Court also clarified that, while the parties have referenced various exhibits and evidence outside the First Amended Complaint, the Court considers this a motion to dismiss. *See* Tr. at 46:23–47:3 (Court, Walker).

### STANDARDS FOR DISMISSAL UNDER RULE 12(c)

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). A rule 12(c) motion is designed to provide a means of disposing of cases when the material facts are not in dispute between the parties. *See Kruzits v. Okuma Mach. Tool, Inc.,* 40 F.3d 52, 54 (3d Cir.1994) ("Under Rule 12(c), we will not grant judgment on the pleadings unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law.") (internal quotation marks omitted). A "[j]udgment on the pleadings should not be granted 'unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.' " *Park Univ. Enterprises, Inc. v. Am. Cas. Co. of Reading, PA,* 442 F.3d 1239, 1244 (10th Cir.2006) (citing *United States v. Any & All Radio Station Transmission Equip.,* 207 F.3d 458, 462 (8th Cir.2000)).

**\*1083**  "Any party may move for judgment on the pleadings if no material facts are in dispute and the dispute can be resolved on both the pleadings and any facts of which the Court can take judicial notice." *Ramirez v. Wal–Mart Stores, Inc.,* 192 F.R.D. 303, 304 (D.N.M.2000) (citing Fed.R.Civ.P. 12(c)). A motion pursuant to rule 12(c) is generally treated in the same manner as a motion to dismiss under rule 12(b)(6). *See Ramirez v. Wal–Mart Stores, Inc.,* 192 F.R.D. at 304 (citing Irish *Lesbian & Gay Org. v. Giuliani,* 143 F.3d 638, 644 (2d Cir.1998)). A motion for a judgment on the pleadings will be granted if the pleadings demonstrate that the moving party is entitled to judgment as a matter of law. *See Ramirez v. Wal–Mart Stores, Inc.,* 192 F.R.D. at 304.

A court considering a motion for judgment on the pleadings should "accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in favor of the same." *Park Univ. Enterprises, Inc. v. Am. Cas. Co. of Reading, PA,* 442 F.3d at 1244. The court must view the facts presented in the pleadings and draw the inferences therefrom in the light most favorable to the nonmoving party. *See Ramirez v. Wal–Mart Stores, Inc.,* 192 F.R.D. at 304. All of the nonmoving parties' allegations are deemed to be true, and all of the movants' contrary assertions are taken to be false. *See Nat'l Metro. Bank v. United States,* 323 U.S. 454, 456–57, 65 S.Ct. 354, 89 L.Ed. 383 (1945); *Ramirez v. Dep't of Corr.,* 222 F.3d 1238, 1240 (10th Cir.2000); *Freeman v. Dep't of Corr.,* 949 F.2d 360, 361 (10th Cir.1991).

The same standards that govern a motion to dismiss under rule 12(b)(6) also govern a motion for judgment on the pleadings under rule 12(c). *See Atl. Richfield Co. v. Farm Credit Bank,* 226 F.3d 1138, 1160 (10th Cir.2000). Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick,* 40 F.3d 337, 340 (10th Cir.1994). The sufficiency of a complaint is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. *See Moore v. Guthrie,* 438 F.3d 1036, 1039 (10th Cir.2006); *Hous. Auth. of Kaw Tribe v. City of Ponca City,* 952 F.2d 1183, 1187 (10th Cir.1991).

A complaint challenged by a rule 12(b)(6) motion to dismiss does not require detailed factual allegations, but a plaintiff's obligation to set forth the grounds of his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965 (internal citation omitted). "[T]he Supreme Court recently ... prescribed a new inquiry for us to use in reviewing a dismissal: whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.' " *Ridge at Red Hawk, L.L.C. v. Schneider,* 493 F.3d 1174, 1177 (10th Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* 127 S.Ct. at 1967, 1969). "The [Supreme] Court [of the United States] explained that a plaintiff must 'nudge his claims across **\*1084** the line from conceivable to plausible' in order to survive a motion to dismiss." *Ridge at Red Hawk, L.L.C. v. Schneider,* 493 F.3d at 1177 (quoting *Bell Atl. Corp. v. Twombly,* 127 S.Ct. at 1974) (alterations omitted). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, L.L.C. v. Schneider,* 493 F.3d at 1177. The Tenth Circuit has stated:

"[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line

from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

*Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir.2008) (quoting *Bell Atl. Corp. v. Twombly,* 127 S Ct. at 1974) (internal citations omitted).

This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them. "Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." [*Bell Atl. Corp. v. Twombly,* 127 S.Ct.] at 1965 n. 3. *See Airborne Beepers & Video, Inc. v. AT & T Mobility L.L.C.,* 499 F.3d 663, 667 (7th Cir.2007) ("[A]t some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8."). The *Twombly* Court was particularly critical of complaints that "mentioned no specific time, place, or person involved in the alleged conspiracies." *127 S.Ct. at 1971 n. 10.* Given such a complaint, "a defendant seeking to respond to plaintiffs' conclusory allegations ... would have little idea where to begin." *Id.*

*Robbins v. Oklahoma,* 519 F.3d at 1248.

In determining the sufficiency of a complaint, all well-pleaded factual allegations are to be taken as true. *See Timpanogos Tribe v. Conway,* 286 F.3d 1195, 1204 (10th Cir.2002). "Nevertheless, conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir.1991). "Moreover, in analyzing the sufficiency of the plaintiff's complaint, the court need accept as true only the plaintiff's well-pleaded factual contentions, not his conclusory allegations." *Id.* Only well-pleaded facts, as distinguished from conclusory allegations, are admitted when considering a motion to dismiss for failure to state a claim upon which relief can be granted. *See Smith v. Plati,* 258 F.3d 1167, 1174 (10th Cir.2001).

 A court must convert a motion to dismiss into a motion for summary judgment if "matters outside the pleading are presented to and not excluded by the court" and "all parties ... [are] given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(d). Facts subject to judicial notice may be considered without converting a motion to dismiss into a motion for summary judgment. *See* **\*1085** *Grynberg v. Koch Gateway Pipeline Co.,* 390 F.3d 1276, 1279, n. 1 (10th Cir.2004) (citing 27A *Fed. Proc., L.Ed.* § 62:520 (2003)). Furthermore, when considering a motion to dismiss, "the court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record." *Van Woudenberg v. Gibson,* 211 F.3d 560, 568 (10th Cir.2000) *abrogated on other grounds by McGregor v. Gibson,* 248 F.3d 946, 955 (10th Cir.2001). A court may consider documents to which the complaint refers if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity. *See Jacobsen v. Deseret Book Co.,* 287 F.3d 936, 941–42 (10th Cir.2002). If, however, a document is not incorporated by reference or attached to the complaint, but is referred to in the complaint and is central to the plaintiff's claim, the defendant may submit an "indisputably authentic copy to the court to be considered on a motion to dismiss." *GFF Corp. v. Assoc. Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384 (10th Cir.1997). *See* 5A C. Wright & A. Miller, Federal Practice & Procedure § 1327 (3d ed. 2004) ("[W]hen the plaintiff fails to introduce a pertinent document as part of her pleading ... the defendant may introduce the document as an exhibit to a motion attacking the sufficiency of the pleading.").

## *RULES 4(m) AND 12(b)(5)*

While rule 4 establishes the proper procedures and timing for service of process, rule 12(b)(5) presents litigants with a mechanism for raising a defense of insufficient service of process. "Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants." *Baldwin County Welcome Center v. Brown,* 466 U.S. at 152, 104 S.Ct. 1723. "[I]n the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." *Mohasco Corp. v. Silver,* 447 U.S. at 826, 100 S.Ct. 2486.

**1. *Rule 4(m).***

Anderson's motion is styled as a motion made pursuant to rule 12(b)(5) as informed by rule 4(m). Rule 4(m) provides the time limitation—120 days—within which service of process must be executed. Rule 4(m) provides that a district court must extend the time for service if a plaintiff shows good cause. *See Espinoza v. United States,* 52 F.3d 838, 841 (10th Cir.1995) (holding that, upon a showing of good cause, rule 4(m)'s exception is mandatory). Furthermore, "if the plaintiff fails to show good cause, the district court must still consider whether a permissible extension of time may be warranted. At that point the district court may in its discretion either dismiss the case without prejudice or extend the time for service." *Espinoza v. United States,* 52 F.3d at 841. The advisory committee notes to the 1993 amendment also state that rule 4(m) "authorizes the court to relieve a plaintiff of the consequences of an application of this subdivision even if there is no good cause shown." Fed.R.Civ.P. 4, Advisory Committee Notes at 56 (2008).

While a dismissal for failure to timely serve is without prejudice, rule 4(m) can interact with a statute of limitations, such that the dismissal without prejudice might, upon refiling, result in a defense that the statute of limitations on the claim has run. Some federal courts have held that, although the statute of limitations is tolled during the 120–days after filing, "if a plaintiff fails to effect service during the 120 days allotted by Rule 4(m), then the statute of limitations for the underlying claim again becomes applicable, and may **\*1086** serve to bar the claim if the statute runs before the plaintiff files another complaint." *Ocasio v. Fashion Inst. of Tech.,* 86 F.Supp.2d 371, 376 (S.D.N.Y.2000). *See Frasca v. United States,* 921 F.2d 450, 452, 453 (2d Cir.1990).

**2. *Rule 12(b)(5).***

Rule 12(b)(5) permits the dismissal of a complaint for "insufficiency of service of process." "Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived." *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 703, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). Extensive participation in the litigation process may constitute acceptance of the Court's jurisdiction over all claims and defenses. *See, e.g., Datskow v. Teledyne,* 899 F.2d 1298, 1303 (2d Cir.) (finding that, even though faulty-service-of-process defense was asserted in timely answer, the defendant waived objection by participating in scheduling discovery and motion practice and attending conference with magistrate), *cert. denied,* 498 U.S. 854, 111 S.Ct. 149, 112 L.Ed.2d 116 (1990). In *Datskow v. Teledyne,* the defendant attended a scheduling conference with the magistrate judge, and participated in scheduling discovery and motion practice, without mentioning defective service of process. *See* 899 F.2d at 1303.

The United States Court of Appeals for the Fifth Circuit has recognized the "well-established rule that parties who choose to litigate actively on the merits thereby surrender any jurisdictional objections." *PaineWebber, Inc. v. Chase Manhattan Private Bank (Switzerland),* 260 F.3d 453, 459 (5th Cir.2001). Further, "a party can be held to have waived a defense listed

in Rule 12(h)(1) through conduct, such as extensive participation in the discovery process or other aspects of the litigation of the case even if the literal requirements of Rule 12(h)(1) have been met...." 5C C. Wright & A. Miller, *Federal Practice & Procedure* § 1391 (3d ed. 2004).

**3. *Rule 12(h)(1)*.**

Rule 12 sets forth the requirements for a timely challenge to the Court's personal jurisdiction based on insufficiency of process. Pursuant to rule 12(h)(1), a party must include a defense of insufficiency of process in its first rule 12 motion or the defense is waived. Rule 12(h)(1) mandates that "[a] defense of lack of jurisdiction over the person, ... insufficiency of process, or insufficiency of service of process is waived (A) if omitted from a motion in the circumstances described in subdivision (g)...." Fed.R.Civ.P. 12(h)(1).

### STATUTE OF LIMITATIONS FOR 🚩 § 1983 CLAIMS

"While state law governs limitations and tolling issues, federal law determines the accrual of 🚩 section 1983 claims." *Fratus v. DeLand,* 49 F.3d 673, 675 (10th Cir.1995). "A civil rights action accrues when facts that would support a cause of action are or should be apparent." *Id.* "In general, under the federal discovery rule, claims accrue and [t]he statute of limitations begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action." 🚩 *Alexander v. Oklahoma,* 382 F.3d 1206, 1215 (10th Cir.2004) (internal quotations omitted), *cert. denied,* 544 U.S. 1044, 125 S.Ct. 2257, 161 L.Ed.2d 1080 (2005). The focus is "on whether the plaintiff knew of facts that would put a reasonable person on notice that wrongful conduct caused the harm. In this context, a plaintiff must use reasonable diligence in seeking to discover facts giving rise to a claim for relief." 🚩 **\*1087** *Alexander v. Oklahoma,* 382 F.3d at 1216 (internal citations omitted).

A three-year statute of limitations applies to Mata's claim under 🚩 42 U.S.C. § 1983 to enforce his First–Amendment rights. Federal law borrows the three-year statute of limitations from the statute of limitations for personal injury set forth in NMSA 1978 § 37–1–8. *See* 🚩 *Wilson v. Garcia,* 471 U.S. 261, 280, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985); 🚩 *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 661–62, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987).

### LAW REGARDING FIRST–AMENDMENT RETALIATION CLAIMS

"Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.' " 🚩 *Hartman v. Moore,* 547 U.S. 250, 256, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006) (quoting 🚩 *Crawford–El v. Britton,* 523 U.S. 574, 588 n. 10, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998)). It is therefore "settled that as a general matter, the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." 🚩 *Hartman v. Moore,* 547 U.S. at 256, 126 S.Ct. 1695 (citation omitted).

The Supreme Court of the United States has described at least two variations of First–Amendment retaliation claims. First are those claims that arise when a public employee alleges that he has been fired or otherwise punished for speech criticizing the government. *See* 🚩 *id.* at 260, 126 S.Ct. 1695 (citing 🚩 *Pickering v. Board of Education of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 566–67, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). In such cases, the Supreme Court has explained: "[O]ur discussions of the elements of the constitutional tort do not specify any necessary details about proof of a connection between the retaliatory animus and the discharge, which will depend on the circumstances." 🚩 *Hartman v. Moore,* 547 U.S.

at 260, 126 S.Ct. 1695. Rather, "[t]he cases have simply taken the evidence of the motive and the discharge as sufficient for a circumstantial demonstration that the one caused the other." *Id.*

 In contrast, when a plaintiff asserts that the retaliation for protected conduct is a criminal charge, the "constitutional tort action will differ from this standard case in two ways." *Id.* First, in retaliatory prosecution cases, there is always a "distinct body of highly valuable circumstantial evidence available and apt to prove or disprove retaliatory causation, namely evidence showing whether there was or was not probable cause to bring the criminal charge." *Id.* at 261, 126 S.Ct. 1695. Second, the existence of absolute prosecutorial immunity gives rise to an added layer of complexity in retaliatory prosecution suits. Specifically, § 1983 actions for retaliatory prosecution

> will not be brought against the prosecutor, who is absolutely immune from liability for the decision to prosecute.... [I]nstead, the defendant will be a non-prosecutor ... who may have influenced the prosecutorial decision but did not himself make it, and the cause of action will not be strictly for retaliatory prosecution, but for successful retaliatory inducement to prosecute.

*Hartman v. Moore,* 547 U.S. at 262, 126 S.Ct. 1695.

 As a consequence, plaintiffs in retaliatory-prosecution cases must demonstrate a causal connection between one person's retaliatory animus and that person's injurious conduct, and a causal connection between the retaliatory animus of one person and that of another. *See id.* **\*1088** The allegation needed "both to bridge the gap between the nonprosecuting government agent's motive and the prosecution's action, and to address the presumption of prosecutorial regularity," is "the absence of probable cause." *Id.* In retaliatory-prosecution cases, the Supreme Court requires that lack of probable cause be pleaded and proven. *See id.* at 266, 126 S.Ct. 1695.

In light of *Hartman v. Moore,* the Tenth Circuit has held that,

> [t]o establish a § 1983 retaliation claim against non-immune officials, [a plaintiff] must plead and prove (1) that she was engaged in a constitutionally protected activity; (2) that a defendant's action caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that a defendant's action was substantially motivated as a response to her exercise of her First Amendment speech rights. *Worrell v. Henry,* 219 F.3d 1197, 1212 (10th Cir.2000). She also must plead and prove the absence of probable cause for the prosecution. *Hartman* [*v. Moore* ], 126 S.Ct. at 1707.

*Becker v. Kroll,* 494 F.3d 904, 925 (10th Cir.2007).

 The probative weight that a conviction by a magistrate jury has on the existence or lack of probable cause is an open question in First–Amendment retaliatory-prosecution claims. The *Restatement (Second) of Torts* states: "(1) The conviction of the accused by a magistrate or trial court, although reversed by an appellate tribunal, conclusively establishes the existence of probable cause, unless the conviction was obtained by fraud, perjury or other corrupt means." *Restatement (Second) of Torts* § 667. In

support of the rule that a conviction can be conclusive evidence of probable cause, the *Restatement* cites numerous state-court decisions. *See, e.g.,* 🚩 *Alexander v. Laman,* 225 Ark. 498, 283 S.W.2d 345 (1955); 🚩 *Bealmear v. Southern Cal. Edison Co.,* 22 Cal.2d 337, 139 P.2d 20 (1943); 🚩 *Addington v. Bates,* 101 Colo. 293, 73 P.2d 529 (1937); 🚩 *Rodgers v. W.T. Grant Co.,* 326 So.2d 57 (Fla.App.1975); 🚩 *Hartshorn v. Smith,* 104 Ga. 235, 30 S.E. 666 (1898); 🚩 *Adams v. Bicknell,* 126 Ind. 210, 25 N.E. 804 (1890); 🚩 *Earley v. Harry's IGA, Inc.,* 223 Kan. 32, 573 P.2d 572 (1977); 🚩 *Taylor v. Nohalty,* 404 S.W.2d 448 (Ky.1966). In one of the earliest cases applying the rule that a properly obtained conviction is conclusive evidence of probable cause in a malicious prosecution case, the Supreme Court of Georgia explained the rule's underlying rationale: "Probable cause is defined to be the existence of such facts and circumstances as would excite the belief in a reasonable mind, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of the crime for which he was prosecuted."

🚩 *Hartshorne v. Smith (State Report Title: Hartshorn v. Smith),* 104 Ga.235, 30 S.E.666, 667 (1898). Given that standard for probable cause, the *Hartshorne v. Smith* court explained that,

> after a conviction by verdict, followed by sentence, it ceases to be a matter of conjecture, of argument, and of reasoning whether guilt could rationally be inferred from the facts admitted or proved; for such a state of things cannot occur but after full defense by the accused, with deliberation by the jury, aided by the court, upon all the evidence, as well explanatory as negative, offered by the accused, and, after all that, guilt was in fact inferred by a numerous body of men of competent understanding and integrity, and the court was also satisfied with it.

🚩 *Hartshorne v. Smith,* 30 S.E. at 667–68.

The Reporter's Notes to the *Restatement* show that other courts have adopted **\*1089** less severe versions of the rule. Some courts, for example, have found that a conviction creates a prima-facie case or a presumption that probable cause existed, and a plaintiff can overcome the presumption with competent evidence demonstrating a lack of probable cause. *See, e.g.,* 🚩 *J.C. Penney Co. v. Blush,* 356 So.2d 590 (Miss.1978). 🚩 *Goodrich v. Warner,* 21 Conn. 432, 1852 WL 635 (Conn.1852), expresses the notion that, while an undisturbed conviction may be conclusive evidence, the possibility exists that, where there is an appeal from a judgment, "if, upon a full and fair trial, the evidence against the plaintiff was sufficient to satisfy the court of his guilt, that circumstance will afford strong presumptive evidence of probable cause, existing at that time," but, in "a subsequent trial, and perhaps upon other and further testimony, a jury might be of opinion, that it was not sufficient to justify a conviction."

🚩 *Goodrich v. Warner,* 21 Conn. 432, 1852 WL 635 \*9. In other words, the possibility remains that further evidence and testimony might illuminate reasons why probable cause did not exist.

Yet other courts have held that, when a conviction that is subject to a de novo review is reversed on review, the conviction is not conclusive or prima-facie evidence of probable cause. *See Sestrich v. R.H. Macy & Co.,* 493 S.W.2d 52 (Mo.App.1973); 🚩 *Chapman v. City of Reno,* 85 Nev. 365, 455 P.2d 618 (1969). The rule discussed in *Sestrich v. R.H. Macy & Co.* specifically allowed an exception to the presumption of probable cause for a conviction if the conviction was obtained in "police court." 493 S.W.2d at 55. The "more appealing" justification for such a rule was that the police court suffered from various procedural irregularities and that the de novo trial was designed to protect litigants from those irregularities. Thus, where the original conviction was obtained in the police court, and later overturned, the presumption of probable cause should drop out. *See id.*

### *LAW REGARDING ABSOLUTE IMMUNITY*

Traditionally, the doctrine of prosecutorial immunity did not apply to other public officials. Police officers, governors, and other executive officials were entitled only to qualified immunity for actions performed in their official capacity. *See Imbler v. Pachtman,* 424 U.S. 409, 421, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). In *Imbler v. Pachtman,* the Supreme Court rejected the argument that qualified immunity would be adequate to protect prosecutors from the threat of litigation that affect their actions. Prosecutors are, however, absolutely immune only for those activities "intimately associated with the judicial phase of the criminal process." *Id.* at 430, 96 S.Ct. 984.

Absolute immunity does not extend to "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate." *Id.* at 430–31, 96 S.Ct. 984.

> We recognize that the duties of the prosecutor in his role as an advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom.... Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence. At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court....

*Id.* at 431 n. 33, 96 S.Ct. 984. Concluding that the challenged conduct in *Imbler v. Pachtman* fell on the advocacy side of the spectrum, the Supreme Court granted the **\*1090** prosecutors absolute immunity against the claim that they had procured false testimony during the course of a criminal trial.

The Supreme Court later extended the doctrine of absolute immunity to some prosecutorial conduct occurring before the trial.

In *Burns v. Reed,* 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991), a prosecutor was accused of: (i) eliciting false testimony in a probable-cause hearing that led to the issuance of a search warrant; and (ii) advising police on inappropriate methods of interrogating a suspect. Regarding the probable-cause hearing, the Supreme Court concluded that absolute immunity extended to "any hearing before a tribunal which performed a judicial function," and included the presentation of testimony in support of an application for a search warrant. *Id.* at 490, 111 S.Ct. 1934 (internal quotation marks omitted). Holding that the prosecutor's actions of appearing before a judge, and presenting evidence in support of a motion for a search warrant, involved the prosecutor's role as advocate for the State, rather than the role as administrator or investigative officer, the Supreme Court held that appearing at a probable-cause hearing was "intimately associated with the judicial phase of the criminal process." *Id.* at 479, 111 S.Ct. 1934 (internal citations and quotations omitted). The Supreme Court read the plaintiff's claim narrowly, however, and did not consider the prosecutor's motivations in seeking the search warrant or his actions outside the courtroom in relation to his procurement of the warrant. *See id.* at 487–89 & n. 5, 111 S.Ct. 1934.

*Burns v. Reed* did not, however, extend absolute immunity to every aspect of the prosecutor's legal advice to the police. The Supreme Court concluded that advising police in the investigative phase of a criminal case could be too far removed from the judicial process to warrant extending immunity on that basis. It thus rejected the argument that legal advice is categorically "of a judicial nature because the prosecutor is, like a judge, called upon to render opinions concerning the legality of conduct." *Id.* at 493, 111 S.Ct. 1934 (internal quotations omitted). Noting that it has previously rejected the extension of absolute immunity to police officers, the Supreme Court in *Burns v. Reed* found it "incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following [that] advice."

Mata v. Anderson, 760 F.Supp.2d 1068 (2009)

*Id.* at 495, 111 S.Ct. 1934. To qualify for absolute immunity, then, an action must be "closely associated with the judicial process." *Id.* at 495, 111 S.Ct. 1934.

"Immunity extends to those activities 'intimately associated with the judicial phase of the criminal process,' which undoubtedly includes initiating criminal proceedings." *Becker v. Kroll,* 494 F.3d 904, 925 (10th Cir.2007) (quoting *Imbler v. Pachtman,* 424 U.S. at 430, 96 S.Ct. 984). The court looks to the "nature of the function performed, not the identity of the actor who performed it." *Buckley v. Fitzsimmons,* 509 U.S. 259, 269, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). The Tenth Circuit recently confirmed the applicable analysis where the prosecutor allegedly brought criminal charges in retaliation for public protest:

A prosecutor's charging decisions are absolutely immune from civil suit for monetary damages. *Hartman v. Moore,* 547 U.S. 250, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006) (citing *Imbler v. Pachtman,* 424 U.S. 409, 431, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)); *see also Mink v. Suthers,* 482 F.3d 1244, 1258–59 (10th Cir.2007). Immunity extends to those activities "intimately associated with the judicial phase of the criminal **\*1091** process," which undoubtedly includes initiating criminal proceedings. *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). This immunity applies even if the prosecutor files charges knowing he lacks probable cause. *See id.* at 431 n. 34, 96 S.Ct. 984 (applying immunity even when prosecutor deliberately withholds exculpatory information from the court).

*Becker v. Kroll,* 494 F.3d 904, 925 (10th Cir.2007). Based on this reasoning, the Tenth Circuit held that a First Amendment retaliation claim could not proceed against the prosecutor who initiated criminal charges. *See Schenk v. Chavis,* 461 F.3d 1043, 1046 (8th Cir.2006) ("The acts of preparing, signing, and filing a criminal complaint constitute prosecutorial functions, as they are advocacy on behalf of the government.").

Given the functional analysis that the courts employ in determining whether absolute immunity attaches, the identity of the party asserting the immunity is not important. Thus, courts have found it necessary to confront when and whether police officers might, like a prosecutor, enjoy absolute immunity. The United States Court of Appeals for the Second Circuit has held that, "[w]here ... the constitutional tort is the action of a police officer in initiating a baseless prosecution, his role as a 'complaining witness' renders him liable to the victim under section 1983." *White v. Frank,* 855 F.2d 956, 961 (2nd Cir.1988). In reaching its conclusion, the Second Circuit explained that the "critical initial question [in determining the availability of an immunity defense in § 1983 suits] is 'whether an official claiming immunity under § 1983 can point to a common law counterpart to the privilege he asserts.'" *White v. Frank,* 855 F.2d at 961 (quoting *Malley v. Briggs,* 475 U.S. 335, 339–40, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). According to the Second Circuit, the common law "made subtle distinctions" between witnesses whose role was to provide testimony and witnesses who played a role in initiating a prosecution—i.e., complaining witnesses. *White v. Frank,* 855 F.2d at 961. While testimonial witnesses enjoyed immunity from suit, complaining witnesses did not. *See id.* Given the historical background out of which § 1983 immunities emerge, the Supreme Court has rejected the notion that a police officer should enjoy absolutely immune for swearing out an arrest warrant. *See Malley v. Briggs,* 475 U.S. at 340, 106 S.Ct. 1092. To the extent that an officer swearing out an arrest warrant resembles a complaining witness, complaining witnesses did not enjoy immunity, and neither should an officer. Rather, officers normally enjoy qualified immunity. *See id.* Based on the Supreme Court's explanation in *Malley v. Briggs,* the Second Circuit held that an officer who initiates a baseless prosecution is analogous to a complaining witness and does not enjoy absolute immunity. *White v. Frank,* 855 F.2d at 961.

### *LAW REGARDING QUALIFIED IMMUNITY*

As the Court has previously recognized in *Holguin v. City of Albuquerque,* No. CIV 05–0302 JB/RHS, 2006 WL 1228872, 2006 U.S. Dist. LEXIS 29489 (D.N.M. March 1, 2006), a case in which Mata's counsel was counsel of record:

Qualified immunity recognizes the legitimate "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow v. Fitzgerald,* 457 U.S. 800, 807 [102 S.Ct. 2727, 73 L.Ed.2d 396] (1982) (quoting *Butz v. Economou,* 438 U.S. 478, 506 [98 S.Ct. 2894, 57 L.Ed.2d 895] (1978)). "Qualified immunity therefore 'provides ample protection to all but **\*1092** the plainly incompetent or those who knowingly violate the law.' " *Malley v. Briggs,* 475 U.S. 335, 341 [106 S.Ct. 1092, 89 L.Ed.2d 271] (1986).

2006 WL 1228872, at \*6, 2006 U.S. Dist. LEXIS 29489, at \*15–16. Qualified immunity protects federal and state officials from liability for discretionary functions and from "the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit." *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). To balance the interests of the complaining individual, and the burden put upon the government official in defending such cases, "courts recognize the affirmative defense of qualified immunity, which protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Gross v. Pirtle,* 245 F.3d 1151, 1155 (10th Cir.2001) (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

### 1. *Rationale for Qualified–Immunity Doctrine.*

Qualified immunity is judicially created and rooted in public policy. The fear of suit may have a chilling effect on official decision-making, seriously deterring officials from exercising judgment with the decisiveness important to their office. *See Richardson v. McKnight,* 521 U.S. 399, 407, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997) (describing the purposes of qualified immunity "as protecting government's ability to perform its traditional functions by providing immunity where necessary to preserve the ability of government officials to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service.") (internal quotations omitted); *Wyatt v. Cole,* 504 U.S. 158, 165, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992) (detailing the public policy basis for the qualified immunity privilege). In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court of the United States stated:

It cannot be disputed seriously that claims frequently run against the innocent as well as the guilty—at a cost not only to the defendant officials, but to society as a whole.... [T]here is the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.

*Id.* at 814, 102 S.Ct. 2727. (internal citations and quotations omitted).

### 2. *Two–Part Test for Qualified Immunity.*

Until recently, courts were required to apply a two-step analysis in deciding whether a party is entitled to qualified immunity. The broad protection afforded by qualified immunity gives officials "a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such pretrial matters as discovery.' " *Holland ex rel. Overdorff v. Harrington,* 268 F.3d 1179, 1185

Mata v. Anderson, 760 F.Supp.2d 1068 (2009)

(10th Cir.2001) (quoting *Behrens v. Pelletier,* 516 U.S. 299, 308, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996)). When a defendant raises the affirmative defense of qualified immunity, "a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *overruled in part by Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 817–18, 172 L.Ed.2d 565 (2009). The qualified immunity privilege is " 'an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.' " *Id.* at 200–201, 121 S.Ct. 2151 **\*1093** (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

Once a defendant asserts the affirmative defense of qualified immunity, the burden then shifts to the plaintiff to establish a violation of a constitutional or statutory right by the defendant. *See Gross v. Pirtle,* 245 F.3d at 1155; *Currier v. Doran,* 242 F.3d 905, 917 (10th Cir.2001), *cert. denied,* 534 U.S. 1019, 122 S.Ct. 543, 151 L.Ed.2d 421 (2001); *Scull v. New Mexico,* 236 F.3d 588, 595 (10th Cir.2000).

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry.... In the course of determining whether a constitutional right was violated on the premise alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established. This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry. The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case.

*Saucier v. Katz,* 533 U.S. at 201, 121 S.Ct. 2151 (citations omitted).

If a plaintiff meets his or her burden of establishing a violation of a constitutional right, he or she must demonstrate that the right alleged to have been violated was clearly established at the time of the defendant's allegedly unlawful conduct. *See Holland ex rel. Overdorff v. Harrington,* 268 F.3d at 1186; *Gross v. Pirtle,* 245 F.3d at 1156; *Albright v. Rodriguez,* 51 F.3d 1531, 1534 (10th Cir.1995). If the plaintiff fails to satisfy either part of this two-part inquiry, the court must grant the defendant qualified immunity. *See Holland ex rel. Overdorff v. Harrington,* 268 F.3d at 1186; *Gross v. Pirtle,* 245 F.3d at 1156; *Albright v. Rodriguez,* 51 F.3d at 1535. "In short, although we will review the evidence in the light most favorable to the nonmoving party ... the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Holland ex rel. Overdorff v. Harrington,* 268 F.3d at 1186 (citing *Medina v. Cram,* 252 F.3d 1124, 1128 (10th Cir.2001)).

**3.** *Clearly Established Law.*

Qualified immunity shields federal officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. 2727. A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned." *Zweibon v. Mitchell,* 720 F.2d 162, 172–173

(D.C.Cir.1983), *cert. denied,* 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Strepka v. Miller,* 28 Fed.Appx. 823, 830 (10th Cir.2001) (citing *Currier v. Doran,* 242 F.3d at 923). *See Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir.1992). "In determining whether **\*1094** the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether the 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Holland ex rel. Overdorff v. Harrington,* 268 F.3d at 1186 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)); *See Mimics, Inc. v. Village of Angel Fire,* 394 F.3d 836 (10th Cir.2005).

As the Supreme Court has observed, it is generally not necessary to find a controlling decision declaring the "very action in question ... unlawful." *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. 3034. However, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 635, 107 S.Ct. 3034.

In the Tenth Circuit, to carry the burden of identifying a clearly established right, the plaintiff "must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." *Trotter v. Regents of the University of New Mexico,* 219 F.3d 1179, 1184 (10th Cir.2000) (quoting *Hannula v. City of Lakewood,* 907 F.2d 129, 131 (10th Cir.1990), *abrogated on other grounds by Dixon v. Richer,* 922 F.2d 1456, 1461 (10th Cir.1991)). Moreover, that an official action may be in violation of an agency's internal procedures does not, in itself, violate any clearly established constitutional right. *See Herring v. Keenan,* 218 F.3d 1171, 1180–81 (10th Cir.2000) (explaining "that the fact that an official discloses information in violation of his own internal procedures does not make the disclosure a violation of a clearly established constitutional right to privacy."), *cert. denied,* 534 U.S. 840, 122 S.Ct. 96, 151 L.Ed.2d 56 (2001); *Roska ex rel. Roska v. Peterson,* 328 F.3d 1230, 1251 (10th Cir.2003) ("In considering the 'objective legal reasonableness' of the state officer's actions, one relevant factor is whether the defendant relied on a state statute, regulation, or official policy that explicitly sanctioned the conduct in question.").

The plaintiff's burden to establish that the law is clearly established "must be undertaken in light of the case's specific context, not as a broad proposition." *Saucier v. Katz,* 533 U.S. at 201, 121 S.Ct. 2151. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation." *Id.* at 202, 121 S.Ct. 2151. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Mimics, Inc. v. Village of Angel Fire,* 394 F.3d at 842 (internal citations and quotations omitted). If a reasonable person could have believed that the actions were lawful, "defendants are entitled to dismissal before discovery." *Workman v. Jordan,* 958 F.2d 332, 336 (10th Cir.1992).

### 4. *Pearson v. Callahan.*

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified-immunity defense. In *Pearson v. Callahan,* the Supreme Court held that, "while the sequence set forth in [ *Saucier v. Katz* ] is often appropriate, it should no longer be regarded as mandatory." 129 S.Ct. at 818. Rather, lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified **\*1095** immunity analysis should be addressed first in

*Mata v. Anderson,* 760 F.Supp.2d 1068 (2009)

light of the circumstances of the particular case at hand." *Id.* The Supreme Court also noted that, while no longer mandatory, the protocol outlined in *Saucier v. Katz* would often be beneficial. *See* 🚩 *id.* at 818.

While leaving the determination whether to adhere to the *Saucier v. Katz* sequence in the lower courts' sound discretion, the Supreme Court mentioned various circumstances where such sequencing might be undesirable. For example, there are cases in which it is plain that a right is not clearly established, but less obvious whether such a right in fact exists. *See* 🚩 *Pearson v. Callahan,* 129 S.Ct. at 818. Under such circumstances, it might be considered a waste of resources to engage in analysis under the first prong—whether a constitutional right was violated—when it is already obvious that, even if such a right existed, it was not clearly established. *See id.*

Another concern arises out of the fact that qualified immunity is usually raised at the pleading stage. The Supreme Court in *Pearson v. Callahan* observed that the "two-step" inquiry can be an uncomfortable exercise where "the answer [to] whether there was a violation may depend on a kaleidoscope of facts not yet fully developed." 🚩 129 S.Ct. at 819 (brackets in original) (internal quotation marks and citation omitted). Under such circumstances, it may be more advantageous to analyze whether the asserted right was clearly established rather than reaching the merits.

Adherence to *Saucier v. Katz* also poses the potential to lead to bad decision-making. For example, in some cases that the district courts encounter, "the briefing of constitutional questions is woefully inadequate," and "constitutional questions may be prematurely and incorrectly decided in cases where they are not well presented." 🚩 *Pearson v. Callahan,* 129 S.Ct. at 820 (internal quotation marks and citations omitted). Moreover, while a court might adhere to the formalities of *Saucier v. Katz* in discussing the two prongs in sequence, the court's internal processes might involve making a decision based on whether the right was clearly established and only then turning to the more difficult question of the merits. *See* 🚩 *Pearson v. Callahan,* 129 S.Ct. at 820. In some such cases, there is a risk that the district court will not devote as much care as it should to deciding the constitutional issue. *See id.*

"Rigid adherence to the *Saucier* rule may make it hard for affected parties to obtain appellate review of constitutional decisions that may have a serious prospective effect on their operations." 🚩 *Pearson v. Callahan,* 129 S.Ct. at 820. For example, where a court holds that a constitutional violation occurred, but that the violation was not clearly established, there is an appearance of unappealability, because the defendant is the prevailing party on the issue of qualified immunity. At the same time, the prevailing party faces the choice of changing its operations to comport with the new finding that it violated a constitutional right, or of adhering to its established practice, even though that practice has now been held to result in a violation of constitutional rights. Such a choice is difficult to take for a defendant who, in effect, has no chance to appeal the determination that a constitutional right in fact occurred. *See* 🚩 *id.* at 820.

Finally, an obligation to strictly follow *Saucier v. Katz* runs up against the "general rule of constitutional avoidance and runs counter to the older, wiser counsel not to pass on questions of constitutionality ... unless such adjudication is unavoidable." 🚩 *Pearson v. Callahan,* 129 S.Ct. at 821 (internal quotation marks and citations omitted). Furthermore, the first prong's **\*1096** purpose of furthering the development of constitutional law might not be meaningfully advanced in cases where the determination whether a right was violated is so fact bound that it is unlikely to provide guidance in future cases. *See* 🚩 *id.* at 818–19.

*LAW REGARDING AMENDMENTS TO PLEADINGS*

Parties may request leave to amend their pleadings pursuant to rule 15(a) of the Federal Rules of Civil Procedure. While a party may amend its pleadings once, as a matter of course, in accordance with the procedure laid out in rule 15, a party may also request leave to amend at the court's discretion. Under such circumstances, rule 15(a) instructs courts to "freely give leave when justice requires." Fed.R.Civ.P. 15(a)(2). *See* Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). The Tenth Circuit has also stated that "[a] court should freely grant leave to amend when justice so requires." Gillette v. Tansy, 17 F.3d 308, 313 (1994). Moreover, when a court refuses to allow a party to amend its pleadings, the court must state the reasoning for its refusal. *See id.*

### ANALYSIS

After careful review of the facts surrounding Mata's failure to timely serve process and of the allegations in Mata's Complaint, the Court finds it appropriate to excuse Mata of the consequences of the delay in service. While Mata has not demonstrated good cause for the delay in service, the Court sees prudential reasons for excusing the delay. The Court also finds that Mata states a claim upon which relief can be granted. Namely, he has pled allegations that, if true, would establish the essential elements of a retaliatory-prosecution claim. His First Amended Complaint, fairly read, contains allegations that Anderson initiated a prosecution against him without probable cause. While the Court takes judicial notice of the underlying criminal case's record, which indicates that a magistrate jury convicted Mata, the Court does not consider that conviction to be conclusive proof of the existence of probable cause. Mata therefore has the opportunity to present evidence that probable cause was, in fact, lacking. Anderson, as the officer who initiated the criminal charges in the underlying criminal case, does not enjoy absolute immunity under the circumstances of this case. Moreover, he does not enjoy qualified immunity, because retaliatory prosecution has been clearly established as a constitutional violation, and the allegations in the First Amended Complaint, if taken as true, establish such a violation. The Court will therefore deny the motion to dismiss. Furthermore, the Court will grant Mata's request to amend his First Amendment Complaint.

### I. ANDERSON HAS NOT WAIVED HIS RULE 12(b)(5) DEFENSE.

In addition to arguing for a finding of "good cause," Mata argues that Anderson waived his 12(b)(5) defense. *See* Response at 3–4. In support of this argument, Mata cites to Datskow v. Teledyne, 899 F.2d at 1303. The circumstances of *Datskow v. Teledyne,* however, are different from those that this case presents. In *Datskow v. Teledyne,* the defendant moved for dismissal for lack of personal jurisdiction based on defective service of process only after it had participated in a conference before a magistrate, discovery scheduling, and motion practice. See 899 F.2d at 1303. Given the defendant's extensive participation in the litigation, the Second Circuit observed that the defendant had opportunities to complain about the defect in service, but allowed the statute of limitations **\*1097** to run on the plaintiff's claims before doing so. Under those circumstances, the Second Circuit found it improper to credit the defendant for seeking dismissal for defects in the service of process "that could have been readily cured during the limitations period if defendant had promptly complained." *Id.*

Anderson has not engaged in such gamesmanship. As Mata admits, Anderson has, at all times, asserted Mata's failure to accomplish timely service. Unlike the situation in *Datskow v. Teledyne,* Anderson filed an Answer and a rule 12 motion less than twenty days after he was served. Anderson's motion was the first rule 12 motion and included the challenge to personal jurisdiction based on insufficiency of process. There is no allegation that Anderson quietly allowed the statute of limitations to slip by while still participating in the litigation. Rather, Anderson acted as promptly as practicable and raised the defense of failure to timely serve in the first motion.

If the Court were to consider Anderson's conduct to constitute waiver, improperly served defendants would find it difficult to find a situation in which the rule 12(b)(5) defense could be raised. The Court believes it would be unfair to hold that Anderson's litigation conduct, which can be characterized as prompt, thorough, and forthright, as somehow constituting a waiver of the 12(b)(5) defense.

## II. *THE COURT WILL EXCUSE MATA'S FAILURE TO TIMELY SERVE PROCESS.*

Mata failed, without justification, to properly serve Anderson within the 120 days that rule 4(m) requires. Mata's Complaint and Amended Complaint were not timely served, and Mata has no good-cause explanation for the delay. Contrary to Anderson's assertions, however, there is justifiable reason for the Court to exercise its discretion to lengthen the time for effecting service.

### A. *SERVICE OF PROCESS WAS UNTIMELY.*

Mata does not dispute that service was not timely. Mata filed his suit on January 11, 2008. Mata was required to serve Anderson by May 10, 2008. *See* Fed.R.Civ.P. 4(m) ("If a defendant is not served within 120 days after the complaint is filed, the court —on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant...."). Mata waited until June 19, 2008 to serve Anderson, approximately forty days after the expiration of the 120–day deadline. Anderson contends that the Court should dismiss Mata's Complaint for untimely service. Anderson further asserts that the statute of limitations bars Mata's lawsuit because of his failure to effect timely service.

### B. *MATA HAS NOT ESTABLISHED GOOD CAUSE REQUIRING AN EXTENSION OF TIME TO SERVE ANDERSON.*

Mata suggests that the time for service can be extended: (i) if a litigant shows good cause; and (ii) in the Court's discretion. *See* Response at 1–2. Although he recognizes that a litigant's showing of "good cause" can excuse untimely service, Mata makes little effort to demonstrate that there was "good cause" for his month-and-a-half delay in serving Anderson. *See* Response at 2–6. At the hearing, Mata explained that he had asked his client for various pieces of evidence so that he could expand the First Amended Complaint to include more allegations and possibly more causes of action. *See* Tr. at 20:10–19 (Montoya). The Court does not view the excuse that Mata's counsel proffered **\*1098** as good cause. Rather, it gives the impression that Mata, through his attorney, was not completely vigilant in keeping up with the progress of this lawsuit. Counsel's "inadvertence" is not sufficient to establish good cause. *Wei v. State of Hawaii,* 763 F.2d 370, 372 (9th Cir.1985).

Anderson insists that the "good-cause exception" to rule 4 in the Tenth Circuit is narrow and protects "only those plaintiffs who have been meticulous in their efforts to comply with the Rule." *Despain v. Salt Lake Area Metro Gang Unit,* 13 F.3d 1436, 1438 (10th Cir.1994). The Tenth Circuit in *Despain v. Salt Lake Area Metro Gang Unit* was dealing with rule 4(j), which became rule 4(m) under the 1993 amendments to the Federal Rules of Civil Procedure. The Court is not certain what impact the amendments reflected in rule 4(m) would have on the holding expressed in *Despain v. Salt Lake Area Metro Gang Unit.* The Court need not decide that question because it finds that Mata has not demonstrated good cause and is therefore not entitled to avail himself of the good-cause exception.

### C. THE COURT WILL EXERCISE ITS DISCRETION TO EXTEND THE PERIOD OF TIME TO SERVE ANDERSON BY FORTY DAYS.

Anderson argues that Mata has not demonstrated any of the prudential reasons for extending the time for service that has caused the Court to grant limited extensions for service in prior cases. *See, e.g., Martinez–Jones v. Dulce Indep. Schs.,* 2008 WL 2229457, 2008 U.S. Dist. LEXIS 42321 (D.N.M. Mar. 14, 2008) (pro se plaintiff); *Davis v. San Juan County,* 2006 WL 1305033, 2006 U.S. Dist. LEXIS 27263 (D.N.M. Jan. 11, 2006) (San Juan College's closure for 12 days). Mata's counsel has filed numerous lawsuits against the City of Farmington, and knows how to serve the City and its employees. Mata is represented by counsel and offers no allegation that Anderson was evading service or that attempts to timely serve were ineffective. Indeed, Mata does not offer any reason for his failure to timely serve.

Nevertheless, the Court concludes that dismissal of this action is not appropriate. The delay was not inordinate, prejudicial, or intentional, and the First Amended Complaint has been served. Anderson has been, albeit untimely, properly served, and he has

filed an Answer. The argument that he raises is not one of invalidity of the service for any reason other than timeliness. The service was not effected within the 120 days that the rule requires, but was more timely effected than in many other cases in which the Court has issued warnings to plaintiffs and given a deadline within which to serve the complaint.

Anderson has now been served with the summons and the Complaint in this case. The Court routinely issues notices to plaintiffs in civil actions advising them when a complaint has not been served and setting a deadline in which to do so. Mata did not, however, wait for such an order to issue from the Court, but instead proceeded to attempt to rectify any delay in service by serving Anderson before any court-issued warning. In that sense, Mata has been more diligent that the plaintiffs in other cases who have effected service only after the Court issues them a notice that dismissal is imminent.

Anderson contends that the Court's exercise of its discretion to lengthen the time for effecting service will prejudice him, because it will deprive him of a statute of limitations defense that should otherwise be available to him if, in accordance with rule 4(m), the case is dismissed without prejudice. The parties have a legitimate dispute whether the statute of limitations **\*1099** would bar refiling. The Court would apply the three-year statute of limitations for personal injury set forth in NMSA 1978 § 37–1–8. *See* Wilson v. Garcia, 471 U.S. at 280, 105 S.Ct. 1938; Goodman v. Lukens Steel Co., 482 U.S. at 661–62, 107 S.Ct. 2617. The parties do not dispute that a three-year limitations period applies. Rather, they dispute when Mata's cause of action accrued. "In general, under the federal discovery rule, claims accrue and [t]he statute of limitations begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action." Alexander v. Oklahoma, 382 F.3d at 1215.

Anderson maintains that the cause of action accrued when the criminal charges upon which Mata sues were filed. If that indeed represents when the statute of limitations began to run, then the cause of action accrued on January 11, 2005, and Anderson would be correct in pointing out that Mata filed the original Complaint in this case the day before the statute of limitations period would have run. As Anderson has urged in his briefing, the limitations period may have been tolled for the 120–day period that Mata had to serve process. Anderson contends, however, that, once the 120–days past, the clock began running again. In this case, according to Anderson, the clock ran out.

Mata insists, however, that when a litigant seeks damages in a § 1983 suit and a favorable judgment would necessarily imply the invalidity of a criminal conviction or sentence, the cause of action does not accrue until the sentence or conviction is invalidated. Mata's draws support for his position from Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). Mata contends that *Heck v. Humphrey* adopted such a rule to prevent litigants from using a § 1983 action, with its more lenient pleading rules, to challenge their conviction or sentence without complying with the more stringent exhaustion requirements for habeas actions. The implication would be that Mata could not bring his retaliatory-prosecution claim until after the district court jury acquitted him of all charges. Because the acquittal came much later, Mata would still be well within the limitations period for his claim.

Admittedly, the date on which Mata's cause of action accrued is a complex question. The Court need not decide the statute-of-limitations issue at this time, because the Court will excuse Mata of the consequences of missing the deadline to serve process. If anything, the specter of Mata's claim being barred by the statute of limitations weighs against dismissal for failure to timely serve in this case. The Advisory Committee contemplated the circumstances presented in this case, in which the statute of limitations would potentially bar refiling of the lawsuit after dismissal without prejudice under rule 4(m). The Advisory Committee States: "Relief may be justified, for example, if the applicable statute of limitations would bar the refiled action, or if the defendant is evading service or conceals a defect in attempted service." Advisory Committee Notes to the 1993 Amendment at 56.

The Tenth Circuit has stated:

*Mata v. Anderson, 760 F.Supp.2d 1068 (2009)*

We need not decide whether the provisions of new Rule 4(m) apply to this case. Under the new rule, the grant of additional time remains discretionary with the district court. That a plaintiff's claims will be time-barred if an action is dismissed for failure to effect service within 120 days does not mandate an extension of time under new Rule 4(m). *See* Fed.R.Civ.P. 4(m) advisory committee's note ("Relief *may* be justified, for example, if the applicable statute of limitations would bar the refiled action....") (Emphasis added.).

**\*1100** *Cloyd v. Arthur Andersen & Co., Inc.,* 25 F.3d 1056 (Table)(10th Cir.1994). The Tenth Circuit affirmed the district court's dismissal for defects under rule 4(j), which was the predecessor to rule 4(m). The Tenth Circuit noted that its review was for abuse of discretion, and found that the district court had not abused its discretion in refusing to grant an extension. *See* *Cloyd v. Arthur Andersen & Co., Inc.,* 25 F.3d 1056 (Table) *3.

Courts in the other circuits appear to be in agreement that the potential running of the statute of limitations is a factor that weighs against dismissal. Citing the Advisory Committee Notes, the United States Court of Appeals for the Eleventh Circuit has held that district courts should consider the possible running of the statute of limitations when deciding whether to allow an extension for service of process. *See* *Lepone–Dempsey v. Carroll County Com'rs,* 476 F.3d 1277, 1282 (11th Cir.2007). In *Lepone–Dempsey v. Carroll County Com'rs,* the district court had dismissed without prejudice a plaintiff's claim for untimely service even though the statute of limitations had already run. *See* *id.* The Eleventh Circuit stated: "Although the running of the statute of limitations, which barred the plaintiffs from refiling their claims, does not require that the district court extend time for service of process under Rule 4(m), it was incumbent upon the district court to at least consider this factor." *Lepone–Dempsey v. Carroll County Com'rs,* 476 F.3d at 1282. *See* *Mann v. American Airlines,* 324 F.3d 1088, 1090–91(9th Cir.2003) (noting that district court has discretion to extend deadline for service of process when the statute of limitations might bar refiling) (citing Advisory Committee Notes to the 1993 Amendment); *Panaras v. Liquid Carbonic Industries Corp.,* 94 F.3d 338, 341 (7th Cir.1996) (stating that "it is incumbent" on district courts to consider the possible passage of the statute of limitations when considering whether to grant an extension under rule 4(m)). The United States Court of Appeals for the Third Circuit has explained that, "[i]nterpreting this rule, under which the court may extend the time for service to avoid the bar of limitations, to authorize the court to refuse to extend it so the defendant may gain the benefit of that bar appears to us to be inconsistent with its purpose." *Boley v. Kaymark,* 123 F.3d 756, 758 (3rd Cir.1997).

The Court agrees with the Advisory Committee and notes that, in this case, dismissing Mata's case for failure to serve process would be overly harsh. The Tenth Circuit has at least noted that a district court may grant an extension if the statute of limitations might bar refiling. Moreover, the plaintiff in *Cloyd v. Arthur Andersen & Co., Inc.* waited until the last minute to file his cause of action and then waited until the last minute to serve process. *See* *Cloyd v. Arthur Andersen & Co., Inc.,* 25 F.3d 1056 (Table) *3. Given that the plaintiff waited until the last minute, the Tenth Circuit agreed with the district court that the plaintiff should have taken care to make sure that the summons was not defective. *See id.* In this case, it is not clear that Mata waited until the last minute. Rather, Mata appears to have a good-faith basis for believing that his cause of action did not accrue until much later than when Anderson contends. The Court believes that Mata has not shown the same lack of diligence as the plaintiff in *Cloyd v. Arthur Andersen & Co., Inc.* If the statute of limitations would indeed bar Mata's claim—and the Court need not decide that question for purposes of making a determination on this motion—the rule 4(m) dismissal might result in total elimination of Mata's claims. That is a result that rule 4(m) typically does not contemplate.   **\*1101**   The Court therefore views the potential statute of limitations defense as a factor weighing against, rather than in favor, of dismissal.

### III. *THE COURT WILL CONSIDER CERTAIN EXHIBITS OUTSIDE THE COMPLAINT IN DECIDING ON THE MOTION TO DISMISS ON THE PLEADING.*

Normally, a court must convert a motion to dismiss into a motion for summary judgment if matters outside the pleadings are presented and not excluded. *See* Fed.R.Civ.P. 12(b). The Court may, however, take judicial notice of materials in the public record. *See* ⚑ *Van Woudenberg v. Gibson,* 211 F.3d at 568. The Court may also consider documents to which the complaint refers if the documents are central to the plaintiff's claim and the parties do not dispute their authenticity. *See* ⚑ *Jacobsen v. Deseret Book Co.,* 287 F.3d at 941–42.

 While the Court will rely on certain materials outside the First Amended Complaint to decide this motion, the Court will not treat the motion as a motion for summary judgment. The documents on which the Court relies are documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute. Accordingly, the Court relies on the following documents in deciding this motion for dismissal on the pleadings: (i) Exhibit A to the Answer, The Settlement Notice (ii) Exhibit B to the Motion, the criminal complaint and attached statement of probable cause, filed July 7, 2008 (Doc. 8–3); (iii) Exhibit C to Answer, Criminal Docket Sheet, filed July 7, 2008 (Doc. 8–4); and (iv) Exhibit E to Answer, Magistrate Verdict Forms. While the Court mentioned in the factual background of this opinion other documents that fall outside the pleadings and outside this list of documents that the Court has chosen to admit for purposes of this motion, the Court will not consider those other documents in deciding this motion. Such documents not admitted shall be considered as providing only background information for purposes of fully and clearly explaining the context of this lawsuit.

Each of the extra-pleading documents upon which the Court relies are court documents from the underlying criminal case and from the first lawsuit. They are therefore part of the public record. The Court can properly take judicial notice of such documents without converting the motion to dismiss into a motion for summary judgment. *See* ⚑ *Van Woudenberg v. Gibson,* 211 F.3d at 568. Moreover, in the First Amended Complaint, Mata alleges that Anderson "filed a criminal complaint against Juan Mata." First Amended Complaint ¶ 13, at 3. Mata also mentions Anderson's "act of filing criminal charges" against him. *Id.* ¶ 19, at 4. The criminal complaint's contents are central to Mata's claims, given that he is suing for retaliatory prosecution based on the alleged wrongfully brought criminal charges which the criminal complaint details. Given that the Complaint refers to the criminal complaint, that the criminal complaint is central to the claim, and that Anderson does not dispute the criminal complaint's authenticity—in fact, Anderson is the one who attached the criminal complaint and accompanying statement of probable cause—the Court will admit it for purposes of this motion without converting the motion to summary judgment. *See* ⚑ *Jacobsen v. Deseret Book Co.,* 287 F.3d at 941–42.

In refusing to convert this motion into one for summary judgment, the Court also notes that Anderson agreed with the Court at the hearing that the Court should view this motion as a motion to dismiss. *See* **\*1102** Tr. at 46:23–47:3 (Court, Walker). Anderson was the party to initially submit exhibits beyond the pleadings for the Court's consideration, but Anderson has not sought for the Court to convert this into a motion for summary judgment. Mata has similarly not attempted to have this motion converted into one for summary judgment. The Court therefore believes that the course of action which it has followed regarding the exhibits accompanying the pleadings and the Motion comports with the parties' expectations.

### IV. *MATA'S COMPLAINT SUFFICIENTLY ALLEGES A CAUSE OF ACTION FOR VIOLATION OF HIS FIRST–AMENDMENT RIGHTS.*

Anderson contends that Mata's Amended Complaint fails to state a cause of action for First–Amendment retaliation. The primary arguments Anderson marshals in support of this contention are: (i) that Mata's claim that Anderson retaliated for Mata's successful settlement of a prior lawsuit falls outside the realm of possibility because the settlement happened after the charges forming the basis of this lawsuit were brought; (ii) that Mata failed to allege lack of probable cause, which is an essential element to a retaliatory-prosecution claim under ⚑ 42 U.S.C. § 1983; and (iii) that, even if Mata had alleged lack of probable cause, the magistrate-jury conviction, although overturned at the de-novo trial, constitutes conclusive proof that probable cause existed. The Court does not find these arguments to be persuasive. Mata does not state in his First Amended Complaint merely that

Anderson retaliated against him for obtaining a settlement. Rather, Mata also makes broader allegations that can encompass more than just retaliation for the settlement. Furthermore, Mata's First Amended Complaint, fairly interpreted, sufficiently states a claim for retaliatory prosecution. The Court also finds good reason to reject the notion that the magistrate-jury conviction constituted conclusive proof of the existence of probable cause. Rather, although the conviction constitutes strong evidence that probable cause existed, Mata should be able to gather evidence and further testimony that probable cause was lacking at the time Anderson brought the charges.

### A. MATA'S ALLEGATIONS ENCOMPASS MORE CONDUCT THAN RETALIATION FOR SUCCESSFULLY OBTAINING A SETTLEMENT.

Mata has admitted that his First Amended Complaint is "inartfully drafted." Response at 6. Nevertheless, Mata's poor drafting does not prove fatal in this case. A Court considering a motion for judgment on the pleadings must "accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in favor of the same." *Park Univ. Enterprises, Inc. v. Am. Cas. Co. of Reading, PA,* 442 F.3d at 1244. At the same time, the standards for evaluating 12(b)(6) motions apply. *See Atl. Richfield Co. v. Farm Credit Bank,* 226 F.3d at 1160. Accordingly, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). The plaintiff must be able to "nudge his claims across the line from conceivable to plausible in order to survive a motion to dismiss." *Ridge at Red Hawk, L.L.C. v. Schneider,* 493 F.3d at 1177 (internal quotation marks and citations omitted).

Anderson contends that Mata's suit is premised on a faulty factual predicate—namely, **\*1103** that Anderson "filed" criminal charges against Mata to retaliate for Mata's successful settlement of the First Mata case. First Amended Complaint ¶¶ 6, 8, 17, at 2–4. The First Amended Complaint states: "In early January 2005, the Farmington Daily Times published an article that informed the public that a civil rights suit brought against several Farmington Police Officers had settled for $ 70,000." First Amended Complaint ¶ 6, at 2. The First Amended Complaint then goes on to state that "news coverage of the settlement by Juan Mata and his family members against the Farmington Police Department caused Defendant Anderson to become enraged." *Id.* ¶ 7, at 2. The criminal complaint indicates that charges were brought against Mata on January 11, 2005, *see* Criminal Complaint at 1, and that the first lawsuit settled in November 2005—over eleven months after the criminal charges underlying this lawsuit were filed, see Settlement Notice at 1. In other words, it appears, at first glance, that Mata's suit is based on Anderson retaliating for something—the settlement—that came nearly a year after the alleged retaliatory act occurred.

Aside from rendering Mata's claim somewhat ridiculous, Anderson's argument regarding the faulty time line to suggest that Mata cannot establish a required element of his First–Amendment retaliation claim—that Anderson had any intent to retaliate against him as a result of his First–Amendment protected activity. Anderson could not have intended to retaliate because of the settlement of the first Mata civil-rights case, because that first Mata case did not settle for some eleven months after Anderson initiated criminal charges against Mata.

If Anderson's supposed retaliation for the settlement were the extent of the allegations that the Court could fairly infer from the First Amended Complaint, Mata would not succeed in nudging his claim across the line from implausible to plausible. Such an interpretation of the First Amended Complaint, however, does not comport with the liberal construction of pleadings that rule 12(b)(6) requires. The First Amended Complaint, read as a whole, makes a broader set of allegations against Anderson. In paragraph ten, for example, Mata asserts that Anderson was motivated by a desire to retaliate against Juan Mata for his "outspoke criticism of Farmington Police officers, particularly Officer Mike Briseno." First Amended Complaint ¶ 10, at 3. In paragraph eleven, Mata further alleges that "Defendant knew that Juan Mata had protested against Mike Briseno outside the police department, which also angered Defendant." First Amended Complaint ¶ 11, at 3. Finally, in paragraph 13, Mata states that Anderson retaliated against him "for Mata's exercise of his First Amendment rights, including but not limited to protesting and petitioning the Court for redress." First Amended Complaint ¶ 13, at 3.

Viewed together, then, paragraphs ten through thirteen contain allegations of retaliation for protesting and First–Amendment activity unrelated to the settlement of the first lawsuit. There is no suggestion that the other First–Amendment activity occurred after the filing of charges, or that Anderson's retaliation for that activity is otherwise implausible. Moreover, paragraphs ten through thirteen contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action...."

🔖 *Bell Atl. Corp. v. Twombly,* 127 S.Ct. at 1965. Rather, in those paragraphs, Mata refers to specific facts, including protest activity targeting a Farmington police officer, that could plausibly be an impetus for Anderson to retaliate.

 **\*1104**  Anderson conceded at the hearing that the First Amended Complaint contains allegations that are rooted in First–Amendment activity not rooted in the November 2005 settlement. *See* Tr. at 12:10–13 (Walker). The time-line problem that Anderson so strenuously argues is consequently a non-issue. What is important on this motion to dismiss is that Mata has pled facts, that, if taken as true, establish retaliatory intent. Specifically, Mata alleges that Anderson "knew that Juan Mata had protested against [one of Anderson's fellow officers] outside the police department," that Anderson "was aware that Plaintiff had exercised his First Amendment rights in picketing the Farmington Police Department," that "Anderson was well aware that Plaintiff had engaged in no criminal activity," and that Anderson "decided to teach [Mata] a lesson" by filing criminal charges "motivated solely by a desire to retaliate against Juan Mata ... for his outspoken criticism of Farmington Police officers, particularly Officer Mike Briseno." First Amended Complaint ¶¶ 9–11, 16, 18.

Anderson maintains that, even if the "protected activity" is expanded beyond Mata's allegations to include the act of filing the first Mata case and/or Mata's October 2004 protests against Briseno, Mata can offer no more than his conjecture that Anderson, who was not named as a defendant in the first Mata case, and whose conduct was not the subject of any protests by Mata, nevertheless intended to retaliate against Mata for that protected activity. Anderson insists that the evidence is insufficient to establish Mata's claim. In light of the standard for deciding a motion to dismiss on the pleadings, however, the Court must take Mata's allegations as true. Those allegations, rather than amounting to mere conjecture, constitute a set of specific factual assertions that, if true, and if understood as a whole, state a claim for retaliatory prosecution. Sufficiency of the evidence is not the inquiry on a motion to dismiss.

The Court therefore believes that Mata has pled sufficient facts to survive Anderson's attack on the plausibility of the factual time line upon which this lawsuit is based. There is therefore no reason to find references to the January 2005 newspaper coverage or to the settlement as being the source of retaliation, to be fatal. The overall gist of the First Amended Complaint sufficiently establishes a plausible factual predicate, if the allegations are taken as true—as they must be for purposes of this motion to dismiss. Thus, while the realities of the space-time continuum might preclude a realistic possibility of the retaliation being for a settlement that occurred before the retaliatory acts, the space-time continuum appears to allow for the broader claim that the retaliation was a result of "outspoken criticism," "protest[ing] against Mike Briseno outside the police department," and "exercise of ... First Amendment rights." First Amended Complaint ¶¶ 10–11 & 13, at 3.

### B. MATA HAS ALLEGED ALL OF THE ESSENTIAL ELEMENTS OF HIS CLAIM, INCLUDING A LACK OF PROBABLE CAUSE.

To sustain a claim for First Amendment retaliatory prosecution, a plaintiff must allege and prove

> (1) that she was engaged in a constitutionally protected activity; (2) that a defendant's action caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that a defendant's action was substantially motivated as a response to her exercise of her First Amendment speech rights. 🔖 *Worrell v. Henry,* 219 F.3d 1197, 1212 (10th Cir.2000). She also

must plead  **\*1105**  and prove the absence of probable cause for the prosecution. 🚩 *Hartman* [*v. Moore* ]*, 126 S.Ct. at 1707.*

🚩 *Becker v. Kroll,* 494 F.3d 904, 925 (10th Cir.2007). Anderson focuses his attack on the last element, and insists that Mata bases his claim exclusively on retaliatory motive and fails to allege a lack of probable cause. The Court finds, however, that Mata has alleged—at least implicitly—lack of probable cause.

 While the Supreme Court has stated that the probable-cause standard is "incapable of precise definition," 🚩 *Maryland v. Pringle,* 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), "[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, ..., and that the belief of guilt must be particularized with respect to the person to be searched or seized ...," 🚩 *id.* at 371, 124 S.Ct. 795. In other words, probable cause at least presupposes that there be reasonable and particularized grounds for believe that a suspect is guilty of some crime.

While Mata never invokes the "magic words" of probable cause, he makes several factual assertions that are tantamount to a lack of probable cause. In paragraphs fifteen of the First Amended Complaint, Mata contends that he "engaged in no activity that would legitimately give rise to a criminal complaint." First Amended Complaint ¶ 15, at 4. In paragraph sixteen, Mata further asserts that "Defendant Anderson was well aware that Plaintiff had engaged in no criminal activity. *Id.* ¶ 16, at 4.

Paragraphs fifteen and sixteen of the First Amended Complaint are worded such that one of their necessary implications is that Anderson did not have probable cause. If an action cannot legitimately give rise to a criminal complaint, it follows that an officer, such as Anderson, could not articulate facts describing criminal conduct upon which to swear out a criminal complaint. Paragraph sixteen speaks more directly to probable cause. If Defendant Anderson was well aware that Mata engaged in no criminal activity, he was, or should have been aware, that he did not have grounds for believe that Mata was guilty of criminal activity. Without such grounds for belief, Anderson would have had no probable cause to initiate criminal charges against Mata. Simply stated, if paragraph sixteen of the First Amended Complaint is true, Anderson's awareness that Mata engaged in no criminal activity equates to an assertion that Anderson had no probable cause.

Finally, in paragraph twenty-one, Mata alleges that Anderson solicited the continued prosecution of Mata, "even though Anderson knew or had reason to know that the charges against Juan Mata were invalid." First Amended Complaint ¶ 21, at 4. Again, albeit without invoking any talismanic verbal formulas, Mata makes an allegation that, if taken as true, necessarily implicates a lack of probable cause. Mata has therefore sufficiently pled lack of probable cause. And Anderson has not contended, nor could he reasonably, that allegations establishing the other elements of retaliatory prosecution are missing from within the four corners of the First Amended Complaint.

### C. THE MAGISTRATE–JURY CONVICTION IS NOT CONCLUSIVE EVIDENCE THAT ANDERSON HAD PROBABLE CAUSE TO INITIATE CRIMINAL PROCEEDINGS AGAINST MATA.

Anderson argues that, even if Mata has sufficiently pled lack of probable cause, the Court should dismiss the First–Amendment retaliation claim because the magistrate-court jury conviction conclusively establishes that Anderson had probable  **\*1106** cause. [4]  The primary justification that Anderson offers for such a finding is the rule from the *Restatement (Second) of Torts,* which, in the context of malicious-prosecution lawsuits, states: "(1) The conviction of the accused by a magistrate or trial court, although reversed by an appellate tribunal, conclusively establishes the existence of probable cause, unless the conviction was obtained by fraud, perjury or other corrupt means." *Restatement (Second) of Torts* § 667. Anderson also cites one federal case in which a district court in the Northern District of Texas decided to follow the "great weight of authority" which, in its view, supports the *Restatement (Second) of Torts* rule. 🚩 *Adcox v. Safeway Stores, Inc.,* 512 F.Supp. at 454.

While the district court in *Adcox v. Safeway Stores, Inc.* approved of the *Restatement (Second) of Torts* rule, it did so in the context of projecting what the Texas courts would do in a malicious-prosecution case in that state. *See* 🚩 512 F.Supp. at 454. No federal courts appear to have decided whether, as a matter of federal constitutional law, in a First–Amendment retaliatory-prosecution claim brought under 🚩 42 U.S.C. § 1983, a conviction obtained in a state's magistrate court, which is later overturned in a de novo trial, constitutes conclusive evidence of probable cause, establishes a presumption, or is merely evidence of probable cause. At least under the circumstances of this case, the Court finds that the magistrate jury's conviction, which was overturned in a de novo trial, is not conclusive evidence of probable cause.

The New Mexico Court of Appeals suggested some persuasive reasons to reject the formulation of the *Restatement (Second) of Torts* in *Miera v. Waltemeyer,* 97 N.M. 588, 642 P.2d 191 (Ct.App.1982). The New Mexico Court of Appeals observed:

> The Restatement Rule is apparently bottomed on the assumption that the magistrate has upon a full and fair trial proceeded to conviction predicated upon evidence that would convince a prudent and reasonable man of the guilt of the accused. Therefore there must have been probable cause for the criminal proceeding. But the difficulty with the rationale is that the assumption may not be true. If the magistrate erred as a matter of law, should the plaintiff be deprived of his cause of action? If that trial court had acted correctly there would have been an acquittal. Then the plaintiff would have been able to maintain the malicious prosecution suit. The inequity of a rule which in that situation bars the cause of action is obvious.

*Miera v. Waltemeyer,* 97 N.M. at 591, 642 P.2d at 194. The Court sees wisdom in the New Mexico Court of Appeals' understanding that the Restatement (Second) of Torts rule might create inequity if a victim of a tort were barred from pursuing his cause of action because, for example, he could not question a legal error by a magistrate that led to the criminal charges against him improperly going before a jury in the first place. This reasoning applies equally—and perhaps even more forcefully —in the realm of constitutional law, where individuals suffering constitutional violations might be left without their **\*1107** 🚩 § 1983 action because the federal courts decided to unquestioningly accept at face value the results of proceedings in front of state magistrate courts with judges who are lay people and who may have committed legal errors.

Treating the results of a lower-court proceeding as conclusive can be alternatively characterized as a form of nearly absolute deference to that lower court. In this case, which involves a determination whether Anderson had probable cause, ab initio, to bring criminal charges against Mata, to assume the correctness of the magistrate court's determination that the criminal charges were sufficiently supported by evidence to go to a jury, and to assume that the jury verdict was supported by evidence, reflects a high level of deference to the magistrate court. At the same time, the Court recognizes that a state court's determination of probable cause—even if the determination is, as in this case, non-formal and implicit—cannot be completely discounted, given that it is evidence that at least one legal decision-maker apart from the prosecutor believed that there was probable cause. That a jury panel also returns a verdict of guilty constitutes additional evidence of the existence of probable cause. And, if the state court in which such a proceeding occurred were a district court, with a legally trained judge and full indicia of procedural regularity and neutrality, such a proceeding might deserve greater deference. The Court need not decide whether a jury conviction obtained in such a proceeding, even if overturned at the appellate level, is conclusive proof of the existence of probable cause. Rather, the Court sees good reason to draw a distinction between New Mexico's district courts and its magistrate courts in certain areas, such as San Juan County, where lay people are allowed to serve as magistrates. In other words, without denigrating the system which New Mexico chooses to employ in allowing lay people to sit as magistrates, the Court believes that there is justification for treating the guilty verdict against Mata, which was obtained in such a magistrate court, differently than one obtained in a district court of general jurisdiction presided over by a legally trained judge.

The Supreme Court has recognized that a distinction exists between courts of record and so-called inferior courts. For example, in *Ex Parte Watkins,* 28 U.S. 193, 3 Pet. 193, 7 L.Ed. 650 (1830), the Supreme Court, in reviewing a petition for a writ of habeas corpus, noted that the conviction being challenged came from a "court of record"—a fact that placed the conviction on "high ground." 28 U.S. at 209. Chief Justice John Marshall, writing for the court, explained: "[A] court martial was considered as one of those inferior courts of limited jurisdiction, where judgments may be questioned collaterally. They are not placed on the same high ground with the judgments of a court of record." *Id. See Boumediene v. Bush,* 553 U.S. 723, 128 S.Ct. 2229, 2268, 171 L.Ed.2d 41 (2008) ("In contrast to 'inferior' tribunals of limited jurisdiction ... courts of record had broad remedial powers, which gave the habeas court greater confidence in the judgment's validity.") (citations and internal quotation marks omitted).

As Chief Justice Marshall understood the distinction between courts of record and inferior courts, "a 'superior' court was a court of general jurisdiction, proceeding according to the common law, empowered to decide upon its own jurisdiction and to enter judgments that are entitled to a presumption of validity in subsequent litigation." Gerald L. Neuman, *Habeas Corpus, Executive Detention, and the Removal of Aliens,* 98 COLUM. L. REV. 961, 982 (1998).

   **\*1108**  In contrast, inferior courts (or, more generally, tribunals) proceeded "by force of particular statutes, out of the course of the common law." The judgments or orders of these tribunals of special and limited jurisdiction did not carry the same presumption of validity as the judgments of a superior court. An inferior court's determination of its own jurisdiction could be reexamined on habeas, and its proceedings must expressly demonstrate that it had acted within its jurisdiction. Examples of "inferior" tribunals have included justices of the peace in certain states, police courts, courts-martial, and executive tribunals.

*Id.* at 982–83 (footnotes omitted). While the discussion in *Ex Parte Watkins* arose out of the Supreme Court's habeas corpus jurisprudence, a sound principle emerges that federal courts, since their earliest days, have justifiedly seen fit at times to afford less weight to the dispositions of inferior courts, which are not of record and which do not exercise general jurisdiction in the state.

The fact that New Mexico provides a de novo trial in the event of a conviction in the magistrate court further supports the wisdom in finding that a conviction in a magistrate court is less than conclusive of the existence of probable cause. *See* N.M. Const. Art. 6, § 27 ("Appeals shall be allowed in all cases from the final judgments and decisions of the probate courts and other inferior courts to the district courts, and in all such appeals, trial shall be had de novo unless otherwise provided by law."). New Mexico courts interpret the de novo trial as "[a] new trial or retrial had in an appellate court in which the whole case is gone into as if no trial whatever had been had in the court below." *Miera v. Waltemeyer,* 97 N.M. at 592, 642 P.2d at 195 (citations and internal quotation marks omitted). The New Mexico Court of Appeals, in rejecting *Restatement (Second) of Torts* § 667, mentioned the case before it as illustrating the errors that can occur in the magistrate court: "The wisdom of the minority rule is apparent from the transcript of the municipal court hearing, which shows that the municipal judge did not understand that self-defense is a defense to battery.... He would not consider any action of the police officer towards plaintiff, but only allowed evidence of whether or not there was a battery by plaintiff on the officer." 97 N.M. at 591, 642 P.2d at 194.

Given the procedural safeguards that New Mexico puts up to guard against miscarriages of justice in its magistrate courts, it would seem proper for a federal court examining a conviction or a determination of probable cause made in such a magistrate court to be able to second-guess the magistrate court. Thus, the Court believes that a federal district court hearing a First Amendment retaliatory-prosecution claim should be able to give less weight to a state magistrate-court conviction that is overturned at a de novo trial in the state's district court. Specifically, when a state district court de novo trial results in a reversal of a conviction obtained in the magistrate court, the magistrate conviction is not sufficient evidence to warrant dismissal of a retaliatory prosecution claim for failure to establish want of probable cause. A federal court hearing a motion to dismiss on such grounds should instead review the complaint, and should deny the motion to dismiss if, on the face of the complaint, the plaintiff alleges facts that would otherwise survive a 12(b)(6) motion. The magistrate-court conviction may constitute evidence of probable cause, and it will ultimately be a plaintiff's burden to prove lack of probable cause, perhaps in the face of such

potential evidence. At the stage of a motion for dismissal on the pleadings, however, it is too early to say **\*1109** that Mata cannot rebut the evidence of the lower-court conviction if that evidence is admissible. [5]

### D. THE STATE DISTRICT COURT'S SENDING OF TWO OUT OF THREE COUNTS AGAINST MATA TO THE JURY DOES NOT CONSTITUTE CONCLUSIVE EVIDENCE OF PROBABLE CAUSE.

 At the hearing, Anderson argued that the fact that the state district court allowed two of the charges to go to a jury is sufficient proof of probable cause to warrant dismissal. *See* Tr. at 16:17–23 (Court, Walker). The Court agrees that it is at least evidence of probable cause that the district court allowed a jury to hear the case. Mata countered at the hearing that the district court never made a formal finding of probable cause. *See id.* at 23:8–9. Anderson's point is well taken, however, that a court sending a charge to the jury reflects that court's implicit belief that there is probable cause. Nevertheless, while the Court sees merit to Anderson's argument that the district court's act of sending two charges to the jury represents a finding of probable cause, the Court views the district court's actions as mere evidence of probable cause and not as conclusive. Mata may still be able to carry his burden of showing a lack of probable cause. Dismissal on the pleadings at this point for failure to establish lack of probable cause is therefore improper.

 To maintain a cause of action for malicious prosecution, a plaintiff must show not only that there was a lack of probable cause, but that the underlying criminal proceeding terminated in his favor. *See* *Heck v. Humphrey,* 512 U.S. at 484, 114 S.Ct. 2364 ("One element that must be alleged and proved in a malicious prosecution action is termination of the prior criminal proceeding in favor of the accused."). While Mata brings a First–Amendment retaliation claim, which does not have, as an element, favorable determination, the existence of that element in malicious-prosecution claims has relevance to the probable-cause requirement, which exists in both the First–Amendment retaliation and malicious-prosecution claims. The Second Circuit has noted that "[t]he requirement that a plaintiff show such a favorable termination is designed principally to ensure against inconsistent judgments, *see* *Janetka v. Dabe,* 892 F.2d 187, 189 (2d Cir.1989), and to avoid parallel litigation as to questions of probable cause." *Murphy v. Lynn,* 118 F.3d 938, 948 (2d Cir.1997).

The *Restatement (Second) of Torts* lists the dispositions which are generally considered to qualify as favorable terminations. *See Restatement (Second) of Torts* § 659. Among the list is "acquittal." While the Court need not adopt the entire list in § 659, and while the common law is not the definitive guide in deciding the contours of constitutional torts, the Court is not aware of authority finding that an acquittal by a jury would not satisfy the favorable-determination element of a malicious **\*1110** prosecution claim—at least when a final disposition on the merits has been entered in favor of the accused. *See Restatement (Second) of Torts* § 659 cmt. e.

An acquittal by a jury comes only if a court has either denied a directed verdict or has otherwise permitted the case to proceed to the jury. In sending the case to the jury, the Court, either explicitly or, as is argued in this case, implicitly determined there to be sufficient evidence of guilt that the jury could reasonably find guilt beyond a reasonable doubt. That belief includes an implicit belief that there was probable cause. If a court sending a case to the jury were conclusive evidence of probable cause, malicious-prosecution law would be at odds with itself, because, on the one hand, it would require a showing of lack of probable cause, and on the other hand, it would allow acquittal to satisfy another essential element—namely, favorable determination—even though acquittal also implicitly proved the existence of probable cause, given that a necessary condition of acquittal by jury is that the judge see probable cause sufficient to send the case to the jury in the first place. The Court believes that this tension is not a large concern in malicious-prosecution cases because it is understood that sending the case to the jury does not constitute conclusive evidence of probable cause. Rather, a litigant in a malicious prosecution claim may prove lack of probable cause even though the judge in the criminal proceeding sent the case to the jury.

Even though First–Amendment retaliatory prosecution and malicious prosecution do not have the same elements, they both require lack of probable cause. Proofs of lack of probable cause should usually be similar in either cause of action. At least there is no good reason to hold that probable cause is not conclusively proved when a judge has sent criminal counts to the

jury in a malicious-prosecution claim, but that the court sending the criminal counts to the jury is conclusive proof of probable cause in retaliatory-prosecution claims. The Court therefore finds that a court—even a state district court—sending a case to the jury is not conclusive of the existence of probable cause.

## V. *ANDERSON DOES NOT ENJOY ABSOLUTE IMMUNITY IN THIS CASE.*

Anderson argues that, even if Mata has otherwise stated a claim, the Court should dismiss the suit because Anderson enjoys absolute immunity. The Court finds that, under the circumstances of this case, Anderson does not have absolute immunity. His actions fall into the range of activities that are outside the sphere of absolute immunity.

"In evaluating an assertion of absolute immunity, the Supreme Court of the United States applies a functional approach, 'focus[ing] on the conduct for which immunity is claimed, not on the harm that the conduct may have caused or the question whether it was lawful.' " *Caputo v. Rio Ranche Police Dept.,* Slip Copy, 2006 WL 4063019 *2 (D.N.M.2006) (quoting *Buckley v. Fitzsimmons,* 509 U.S. 259, 271, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993)). "Immunity extends to those activities 'intimately associated with the judicial phase of the criminal process,' which undoubtedly includes initiating criminal proceedings." *Becker v. Kroll,* 494 F.3d 904, 925 (10th Cir.2007) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)). The court looks to the "nature of the function performed, not the identity of the actor who performed it." *Buckley v. Fitzsimmons,* 509 U.S. 259, 269, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993).

**\*1111** While the identity of the one who performed the function is not the heart of the inquiry in absolute immunity, as a practical matter, police officers are rarely extended absolute immunity. Rather, police officers typically have qualified immunity. And, "where ... the constitutional tort is the action of a police officer in initiating a baseless prosecution, his role as a 'complaining witness' renders him liable to the victim under section 1983." *White v. Frank,* 855 F.2d at 961. In this case, Anderson, as a police officer, initiated prosecution by swearing out and executing a criminal complaint and an accompanying statement probable cause. Anderson contends that such an action by the police officer is intimately associated with the judicial phase of the criminal process because, aside from swearing out the complaint and statement of probable cause, Anderson had to obtain the approval of the magistrate judge. There is, however, nothing novel about Anderson swearing out a criminal complaint and getting the magistrate's signature such that it should give rise to immunity for Anderson. The Court instead believes that Anderson acted in a capacity analogous to a complaining witness. The Supreme Court has held that complaining witnesses do not enjoy immunity from suit for their role in initiating prosecution. *See Malley v. Briggs,* 475 U.S. at 340–41, 106 S.Ct. 1092.

In *Malley v. Briggs,* the Supreme Court discussed whether a police officer seeking an arrest warrant, and who presented a judge with a complaint and supporting affidavit, was entitled to absolute immunity. Noting that an officer seeking an arrest warrant is functionally similar to a complaining witness, the Supreme Court held that such an officer does not enjoy absolute immunity. *See id.* In this case, like the officer in *Malley v. Briggs,* Anderson also was functionally equivalent to a complaining witness, because he swore out the factual allegations in the criminal complaint and in the statement of probable cause. His oath regarding the veracity of the criminal complaint and statement of probable cause formed the basis for initiation of prosecution. The magistrate approved the criminal complaint, but such approval by the magistrate does not convert Anderson into someone who would enjoy absolute immunity. The process is similar to swearing out a warrant, which also requires the ultimate approval of a magistrate. *See Kalina v. Fletcher,* 522 U.S. 118, 121, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997).

Anderson's contention that he is absolutely immune because his activities were analogous to those of a prosecutor must also fail because, even if he were a prosecutor, he performed a function to which absolute immunity is not afforded. In *Kalina v. Fletcher,* a prosecutor commenced a criminal proceeding by filing three documents, including two unsworn pleadings constituting the charging information and a motion for a warrant. 522 U.S. at 121, 118 S.Ct. 502. In *Kalina v. Fletcher,* the prosecutor, following her state's rules of criminal procedure satisfied the requirement that an arrest warrant be "supported by an affidavit

or 'sworn testimony establishing the grounds for issuing the warrant' " by attaching to her motion for an arrest warrant a certification for the determination of probable cause. 522 U.S. at 121, 118 S.Ct. 502. The certification for the determination of probable cause, which she swore out, summarized the evidence supporting a criminal charge. *See id.* While the Supreme Court in *Kalina v. Fletcher* considered the prosecutor's acts of filing the information and the motion for a warrant to be part of the advocates function which would afford immunity, the act of swearing to the factual allegations in the certification of determination of probable **\*1112** cause amounted to activity of a complaining witness for which there is no immunity. *See id.* at 129, 130–31, 118 S.Ct. 502.

Anderson's conduct is analogous to that of the prosecutor in *Kalina v. Fletcher.* Namely, he submitted a criminal complaint to which he attached a sworn statement laying out the essentials facts of the criminal charges and the reasons for probable cause. Given that the Supreme Court has held such activity, in which the individual commencing prosecution submits an affidavit swearing to the factual allegations in the criminal complaint, to be beyond the blanket of absolute immunity, even when taken by a prosecutor, Anderson cannot expect to receive immunity in this case. In light of the case law, the Court therefore concludes that Anderson did not enjoy absolute immunity under these circumstances.

## VI. *ANDERSON IS NOT ENTITLED TO QUALIFIED IMMUNITY.*

The Court is sensitive to the concerns raised in *Pearson v. Callahan* about slavish adherence to the two-step sequence of *Saucier v. Katz* in deciding the issue of qualified immunity. Nevertheless, the Court will exercise its discretion and apply the traditional approach. This case does not appear to one in which it would be appropriate to bypass examining the merits whether a constitutional violation occurred. The Court believes that it has adequate information before it to decide whether the First Amended Complaint alleges facts that, if true, would amount to a constitutional violation. The Court is also confident that it can give careful consideration to the merits of the constitutional claim without short-cutting the analytic process. It therefore makes sense in this case to first decide whether Mata has alleged a violation of a constitutional right. The Court will then proceed to determine whether such a right was clearly established at the time of the alleged violation.

Anderson argues that, even if Mata's Amended Complaint states a claim for a First Amendment violation, he would be entitled to qualified immunity from suit. Mata does not dispute that qualified immunity is proper if he failed to allege facts sufficient to demonstrate a constitutional violation. *See* Response at 12. Because Anderson has raised the defense of qualified immunity, Mata bears the burden of establishing that he suffered a constitutional violation. *See* *Gross v. Pirtle,* 245 F.3d at 1155; *Currier v. Doran,* 242 F.3d at 917; *Scull v. New Mexico,* 236 F.3d at 595. Mata must also show that the right violated was clearly established at the time the officer committed the alleged violation. *See* *Holland ex rel. Overdorff v. Harrington,* 268 F.3d at 1186. In making a ruling on qualified immunity, the Court must view the facts in the light most favorable to the party asserting the injury—in this case, Mata. Applying those standards, the Court finds that Anderson is not entitled to qualified immunity because Mata has made allegations which, if taken as true, amount to a constitutional violation. Moreover, the violation that Mata alleges occurred—First-Amendment retaliatory prosecution—constitutes a violation of clearly established law.

 Mata sufficiently alleges that Anderson violated a constitutional right. As discussed above, Mata properly pled all of the elements of a First Amendment retaliatory-prosecution claim. Within certain limits not applicable in this case, citizens have a clearly established right to engage in protests and other free-speech activities without fear of government reprisals. It is "settled that as a general matter, the First Amendment prohibits government officials from subjecting an individual **\*1113** to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore,* 547 U.S. at 256, 126 S.Ct. 1695 (citation omitted).

 Because the Court has determined that Mata has sufficiently alleged and can prove a violation of a constitutional right, Mata must also establish that the right allegedly violated was clearly established at the time so that a reasonable person in Anderson's position would have known that his conduct violated that right. *See* *Tonkovich v. Kansas Bd. of Regents,* 159 F.3d 504,

516 (10th Cir.1998). To show that a reasonable person in Anderson's shoes would not have known that his conduct violated a constitutional right, Anderson primarily argues that he had—or had reason to believe that he had—probable cause. In support of his argument, Anderson cites cases in which courts have examined allegations similar to those presented here, where an officer swears out a criminal complaint based on an affidavit of probable cause, and have found that the existence of probable cause at the time of filing the complaint establishes the officer's entitlement to qualified immunity even where, as here, the plaintiff alleges that the prosecution was undertaken in retaliation for the exercise of First–Amendment rights. *See, e.g.,* 🚩 *Barnes v. Wright,* 449 F.3d 709, 716, 720 (6th Cir.2006) (finding grand jury indictment was conclusive proof of probable cause); 🚩 *Gordy v. Burns,* 294 F.3d 722, 728 (5th Cir.2002) (holding that a court determines whether probable cause existed as of the time the government instituted criminal proceedings).

The Court is in agreement with Anderson that the existence of probable cause would eliminate Mata's claims because, in the first place, absence of probable cause is an essential element to a First–Amendment retaliatory-prosecution claim. If probable cause were lacking, the Court would therefore not see the need to reach the qualified-immunity question. The Court, however, has found that, on this motion to dismiss, taking the allegations in the First Amended Complaint as true, it is not possible to say that Anderson has conclusively shown that there was probable cause. Mata alleges a lack of probable cause, and he will be permitted to attempt to prove that element of his cause of action. In the meantime, because the Court has not found that probable cause existed, Anderson's argument on that point becomes moot.

Moreover, the cases that Anderson cites for the proposition that a finding of probable cause eliminates qualified immunity do not control the decision on this motion. In *Barnes v. Wright,* the United States Court of Appeals for the Sixth Circuit found that a plaintiff alleging both malicious prosecution and First–Amendment retaliatory prosecution could not state a claim because a properly constituted grand jury delivered an indictment against him, and he was convicted on one of the charges which he claimed was wrongfully brought. 🚩 449 F.3d at 716. The Sixth Circuit found the grand jury indictment to be conclusive evidence of probable cause. There is no such grand-jury indictment in this case, necessitating a consideration by the Court of its weight in the probable cause determination.

*Gordy v. Burns* involved an appeal from a trial for malicious prosecution. On appeal, the United States Court of Appeals for the Fifth Circuit found that there was sufficient evidence of probable cause and that the officers in the case were therefore entitled to judgment as a matter of law. 🚩 *See* 294 F.3d at 729. The Fifth Circuit in *Gordy v. Burns* stated that it did not need to decide whether there was qualified immunity. Given that *Gordy v. Burns* does  **\*1114**  not even address qualified immunity, it is inapposite.

The Court also sees merit in Mata's argument that the Tenth Circuit has held it to be "clearly established that the Fourth Amendment's warrant requirement is violated when 'a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit' if the false statement is necessary to a finding of probable cause." 🚩 *Clanton v. Cooper,* 129 F.3d 1147, 1154 (quoting 🚩 *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." 🚩 *Strepka v. Miller,* 28 Fed.Appx. at 830 (citing 🚩 *Currier v. Doran,* 242 F.3d at 923). *See* 🚩 *Medina v. City and County of Denver,* 960 F.2d at 1498. Admittedly, *Clanton v. Cooper* dealt with an alleged Fourth–Amendment violation. While Mata has, as of yet, not alleged a Fourth–Amendment violation, at the heart of the holding in *Clanton v. Cooper* is the notion that an officer who swears out facts supporting probable cause which he knows are false, for the purpose of obtaining a warrant, that officer commits a constitutional violation. It makes little sense to say that such conduct is unconstitutional if the victim of the violation seeking redress under 🚩 § 1983 frames up his or her claim under a Fourth–Amendment theory, but that the conduct was constitutional if the victim's claim for redress is premised upon First–Amendment retaliation. The key inquiry in determining whether a right was clearly established at the time of the alleged violation is "whether the 'the contours

of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.' "

*Holland ex rel. Overdorff v. Harrington,* 268 F.3d at 1186. The focus is therefore not on the legal theory that a plaintiff ultimately chooses to state his claim, but on the officer's conduct, and whether the officer reasonably should have known he was violating a constitutional right at the time he took the action leading to the alleged violation. The Court believes that the law is clear that, when an officer who, by affidavit, supports probable cause with information he knows to be false, or with reckless disregard for the truth of the allegations underlying his allegation of probable cause, a constitutional violation occurs.

In this case, Mata has alleged facts similar to those alleged in *Clanton v. Cooper*—albeit under a different theory of recovery. Namely, Mata asserts in his First Amended Complaint that Anderson "was well aware that Plaintiff had engaged in no criminal activity" and yet chose, with retaliatory motive, to bring charges against Mata. First Amended Complaint ¶¶ 16, 19 & 21, at 4–5. The implication of the allegations in the First Amended Complaint is that Anderson knew that Mata engaged in no criminal activity and thus knew that there was no probable cause to bring criminal charges against him. If Anderson knew there was no probable cause, his sworn statement of probable cause, which was attached to the criminal complaint, represents a violation of a clearly established constitutional right.

Anderson argues that he did not file any criminal charges, and that a Magistrate Court judge had to approve the criminal complaint before it could be filed. The implication of the need for magistrate approval, Anderson argues, is that independent judicial approval "breaks the chain" of causation and demonstrates that Anderson could not reasonably have known that he was violating any constitutional **\*1115** right by initiating criminal charges and swearing to facts in a Statement of Probable Cause. Such an argument, however, ignores the nature of the allegations in this case. The inquiry for determining qualified immunity in this case is properly characterized as whether Anderson had probable cause from the moment he initiated criminal charges against Mata. On the face of the First Amended Complaint, Mata has alleged that Anderson knew that Mata engaged in no criminal activity, and that he went after Mata to teach him a lesson. If those allegations are true, Anderson should have known that bringing criminal charges against someone whom he knew engaged in no criminal activity amounted to a violation, regardless of his ability to obtain a magistrate's signature. The magistrate's signature does not necessarily wash clean a criminal complaint that is supported by false factual allegations. The allegations in the First Amended Complaint give rise to inferences that Anderson acted improperly and violated Mata's First–Amendment rights. Moreover, the magistrate's signature does not constitute conclusive proof of probable cause. As the Court discussed earlier, courts presiding over criminal proceedings might send cases to the jury, and a jury might acquit. Nonetheless, a plaintiff might be able to prove a lack of probable cause. Similarly, the magistrate judge's signature is evidence and not conclusive proof. Anderson may be able to use such evidence to prove on summary judgment or at trial that probable cause in fact existed. Therefore, the "chain-of-causation" argument is misplaced to the extent that it is raised on the motion to dismiss.

In conclusion, Anderson is not entitled to qualified immunity. Mata has met his burden of showing that his First Amended Complaint contains sufficient facts that, if true, give rise to the inference that Anderson engaged in activity that violated Mata's clearly established rights.

## VII. *MATA MAY AMEND HIS COMPLAINT TO MORE FULLY SET FORTH HIS ALLEGATIONS AND ADD A FOURTH–AMENDMENT CLAIM FOR MALICIOUS PROSECUTION.*

Mata has requested leave to amend his First Amended Complaint to set forth his allegations in a more complete manner. He also wishes to include a claim for Fourth–Amendment malicious prosecution. Rule 15(a) instructs courts to "freely give leave when justice requires." Fed.R.Civ.P. 15(a)(2). *See* *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). The Tenth Circuit has also stated that "[a] court should freely grant leave to amend when justice so requires." *Gillette v. Tansy,* 17 F.3d 308, 313 (1994). The Court sees no reason not to permit Mata to amend his First Amended Complaint. The Court will therefore allow the amendment. Mata must file his amended complaint within ten days of the entry of this Memorandum Opinion and Order.

The Court realizes that Anderson might wish to pursue a defense based on the statute of limitations. The Court need not decide that issue at this time, but notes that rule 15(c) of the Federal Rules of Civil Procedure allows for amendments to relate back to the date of the original pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed.R.Civ.P. 15(c)(1)(B).

**IT IS ORDERED** that the Defendant's Motion and Brief to Dismiss Plaintiff's Complaint for Failure to Timely Serve or, In the Alternative, Motion for Judgment on the Pleadings is denied. Mata may file an amended complaint within ten days of **\*1116** the entry of this Memorandum Opinion and Order.

**All Citations**

760 F.Supp.2d 1068

## Footnotes

1    This document comes to the Court's attention as Exhibit A to Anderson's Answer.

2    Mata characterizes New Mexico's municipal and magistrate court system as anachronistic. The Court need not comment on or criticize New Mexico's use of lay people as judges in its traffic courts for purposes of this opinion.

3    The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

4    The relative probative weight that the magistrate-trial conviction should have on the existence of probable cause also has bearing whether Anderson should enjoy qualified immunity for his actions. The Court's perception of the briefing and argument at the hearing is that this issue weighs both on whether Mata states a claim and on whether any constitutional violation that Anderson might have committed was clearly established. The Court will discuss the two questions separately for the sake of clarity.

5    While the Court refuses to follow *Restatement (Second) of Torts* § 667 on the lack-of-probable-cause element of First Amendment retaliatory-prosecution claims, the Court believes that dismissal might not be proper in this case even under § 667. Section 667 has an exception for convictions "obtained by fraud, perjury or other corrupt means." *Id.* To the extent that the First Amended Complaint can be read to be alleging one of those exceptions, dismissal at this state would be improper. At the hearing, Mata argued that the First Amended Complaint can be read as alleging that Anderson brought charges against him by corrupt means. This conduct would likely fall under the exception to § 667.

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

McIntyre v. Ohio Elections Com'n, 514 U.S. 334 (1995)

115 S.Ct. 1511, 131 L.Ed.2d 426, 63 USLW 4279, 23 Media L. Rep. 1577

KeyCite Yellow Flag - Negative Treatment

Not Followed on State Law Grounds   Doe v. Mortham,   Fla.,   March 19, 1998

115 S.Ct. 1511

Supreme Court of the United States

Joseph McINTYRE, Executor of Estate of Margaret McIntyre, Deceased, Petitioner,

v.

OHIO ELECTIONS COMMISSION.

No. 93–986.

|

Argued Oct. 12, 1994.

|

Decided April 19, 1995.

**Synopsis**

Pamphleteer challenged fine imposed by Ohio Elections Commission for distributing anonymous leaflets opposing proposed school tax levy. The Court of Common Pleas, Franklin County, reversed. The Ohio Court of Appeals reinstated fine. The Ohio Supreme Court, 67 Ohio St.3d 391, 618 N.E.2d 152, affirmed. Pamphleteer's executor, who continued to pursue litigation upon death of pamphleteer, petitioned for writ of certiorari. The Supreme Court, Justice Stevens, held that Ohio's statutory prohibition against distribution of any anonymous campaign literature violated First Amendment.

Reversed.

Justice Ginsburg concurred and filed separate opinion.

Justice Thomas concurred in judgment with separate opinion.

Justice Scalia filed dissenting opinion, which Chief Justice Rehnquist joined.

**1512 *Syllabus* [*]

 *334   After petitioner's decedent distributed leaflets purporting to express the views of "CONCERNED PARENTS AND TAX PAYERS" opposing a proposed school tax levy, she was fined by respondent for violating § 3599.09(A) of the Ohio Code, which prohibits the distribution of campaign literature that does not contain the name and address of the person or campaign official issuing the literature. The Court of Common Pleas reversed, but the Ohio Court of Appeals reinstated the fine. In affirming, the State Supreme Court held that the burdens § 3599.09(A) imposed on voters' First Amendment rights were "reasonable" and "nondiscriminatory" and therefore valid. Declaring that § 3599.09(A) is intended to identify persons who distribute campaign materials containing fraud, libel, or false advertising and to provide voters with a mechanism **1513  for evaluating such materials, the court distinguished Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559, in which this Court invalidated an ordinance prohibiting all anonymous leafletting.

*Held:* Section 3599.09(A)'s prohibition of the distribution of anonymous campaign literature abridges the freedom of speech in violation of the First Amendment. Pp. 1516–1524.

McIntyre v. Ohio Elections Com'n, 514 U.S. 334 (1995)

115 S.Ct. 1511, 131 L.Ed.2d 426, 63 USLW 4279, 23 Media L. Rep. 1577

(a) The freedom to publish anonymously is protected by the First Amendment, and, as ⚐ *Talley* indicates, extends beyond the literary realm to the advocacy of political causes. Pp. 1516–1517.

(b) This Court's precedents make abundantly clear that the Ohio Supreme Court's reasonableness standard is significantly more lenient than is appropriate in a case of this kind. Although ⚐ *Talley* concerned a different limitation than § 3599.09(A) and thus does not necessarily control here, the First Amendment's protection of anonymity nevertheless applies. Section 3599.09(A) is not simply an election code provision subject to the "ordinary litigation" test set forth in ⚐ *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547, and similar cases. Rather, it is a regulation of core political speech. Moreover, the category of documents it covers is defined by their content—only those publications containing speech designed to influence the voters in an election need bear the required information. See, *e.g.,* ⚐ *First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 776–777, 98 S.Ct. 1407, 1415–1416, 55 L.Ed.2d 707. When a law burdens such speech, the Court applies "exacting scrutiny,"

**\*335**  upholding the restriction only if it is narrowly tailored to serve an overriding state interest. See, *e.g.,* ⚐ *id.,* at 786, 98 S.Ct., at 1421. Pp. 1517–1519.

(c) Section 3599.09(A)'s anonymous speech ban is not justified by Ohio's asserted interests in preventing fraudulent and libelous statements and in providing the electorate with relevant information. The claimed informational interest is plainly insufficient to support the statute's disclosure requirement, since the speaker's identity is no different from other components of a document's contents that the author is free to include or exclude, and the author's name and address add little to the reader's ability to evaluate the document in the case of a handbill written by a private citizen unknown to the reader. Moreover, the state interest in preventing fraud and libel (which Ohio vindicates by means of other, more direct prohibitions) does not justify § 3599.09(A)'s extremely broad prohibition of anonymous leaflets. The statute encompasses all documents, regardless of whether they are arguably false or misleading. Although a State might somehow demonstrate that its enforcement interests justify a more limited identification requirement, Ohio has not met that burden here. Pp. 1519–1522.

(d) This Court's opinions in ⚐ *Bellotti,* 435 U.S., at 792, n. 32, 98 S.Ct., at 1424, n. 32—which commented in dicta on the prophylactic effect of requiring identification of the source of corporate campaign advertising—and 🚩 *Buckley v. Valeo,* 424 U.S. 1, 75–76, 96 S.Ct. 612, 661–662, 46 L.Ed.2d 659—which approved mandatory disclosure of campaign-related expenditures —do not establish the constitutionality of § 3599.09(A), since neither case involved a prohibition of anonymous campaign literature. Pp. 1522–1524.

(1993) 🚩 67 Ohio St.3d 391, 618 N.E.2d 152, reversed.

STEVENS, J., delivered the opinion of the Court, in which O'CONNOR, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. GINSBURG, J., filed a concurring opinion, *post,* p. 1524. THOMAS, J., filed an opinion concurring in the judgment, *post,* p. 1525. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C.J., joined, *post,* p. 1530.

**Attorneys and Law Firms**

David A. Goldberger, Columbus, OH, for petitioner.

Andrew I. Sutter, Columbus, OH, for respondent.

**Opinion**

**\*\*1514   \*336**  Justice STEVENS delivered the opinion of the Court.

McIntyre v. Ohio Elections Comm'n, 514 U.S. 334 (1995)

115 S.Ct. 1511, 131 L.Ed.2d 426, 63 USLW 4279, 23 Media L. Rep. 1577

The question presented is whether an Ohio statute that prohibits the distribution of anonymous campaign literature is a "law ... abridging the freedom of speech" within the meaning of the First Amendment. [1]

*337  I

On April 27, 1988, Margaret McIntyre distributed leaflets to persons attending a public meeting at the Blendon Middle School in Westerville, Ohio. At this meeting, the superintendent of schools planned to discuss an imminent referendum on a proposed school tax levy. The leaflets expressed Mrs. McIntyre's opposition to the levy. [2]  There is no suggestion that the text of her message was false, misleading, or libelous. She had composed and printed it on her home computer and had paid a professional printer to make additional copies. Some of the handbills identified her as the author; others merely purported to express the views of "CONCERNED PARENTS AND TAX PAYERS." Except for the help provided by her son and a friend, who placed some of the leaflets on car windshields in the school parking lot, Mrs. McIntyre acted independently.

*338  While Mrs. McIntyre distributed her handbills, an official of the school district, who supported the tax proposal, advised her that the unsigned leaflets did not conform to the Ohio election laws. Undeterred, Mrs. McIntyre appeared at another meeting on the next evening and handed out more of the handbills.

The proposed school levy was defeated at the next two elections, but it finally passed on its third try in November 1988. Five months later, the same school official filed a complaint with the Ohio Elections Commission charging that Mrs. McIntyre's distribution of unsigned leaflets violated § 3599.09(A) of the Ohio Code. [3]  The commission agreed and imposed a fine of $100.

**1515  *339  The Franklin County Court of Common Pleas reversed. Finding that Mrs. McIntyre did not "mislead the public nor act in a surreptitious manner," the court concluded that the statute was unconstitutional as applied to her conduct. App. to Pet. for Cert. A–34 to A–35. The Ohio Court of Appeals, by a divided vote, reinstated the fine. Notwithstanding doubts about the continuing validity of a 1922 decision of the Ohio Supreme Court upholding the statutory predecessor of § 3599.09(A), the majority considered itself bound by that precedent. Id., at A–20 to A–21, citing State v. Babst, 104 Ohio St. 167, 135 N.E. 525 (1922). The dissenting judge thought that our intervening decision in Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960), in which we invalidated a city ordinance prohibiting all anonymous leafletting, compelled the Ohio court to adopt a narrowing construction of the statute to save its constitutionality. App. to Pet. for Cert. A–30 to A–31.

The Ohio Supreme Court affirmed by a divided vote. The majority distinguished Mrs. McIntyre's case from Talley on the ground that § 3599.09(A) "has as its purpose the identification of persons who distribute materials containing false statements." *340  67 Ohio St.3d 391, 394, 618 N.E.2d 152, 154 1993). The Ohio court believed that such a law should be upheld if the burdens imposed on the First Amendment rights of voters are " 'reasonable' " and " 'nondiscriminatory.' " Id., at 396, 618 N.E.2d, at 155, quoting Anderson v. Celebrezze, 460 U.S. 780, 788, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983). Under that standard, the majority concluded that the statute was plainly valid:

"The minor requirement imposed by R.C. 3599.09 that those persons producing campaign literature identify themselves as the source thereof neither impacts the content of their message nor significantly burdens their ability to have it disseminated. This burden is more than counterbalanced by the state interest in providing the voters to whom the message is directed with a mechanism by which they may better evaluate its validity. Moreover, the law serves to identify those who engage in fraud, libel or false advertising. Not only are such interests sufficient to overcome the minor burden placed upon such persons, these interests were specifically acknowledged in [First Nat. Bank of Boston v.] Bellotti [, 435 U.S. 765, 98 S.Ct. 1407,

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 252 of 379

McIntyre v. Ohio Elections Com'n, 514 U.S. 334 (1995)
115 S.Ct. 1511, 131 L.Ed.2d 426, 63 USLW 4279, 23 Media L. Rep. 1577

55 L.Ed.2d 707 (1978),] to be regulations of the sort which would survive constitutional scrutiny." 🚩 67 Ohio St.3d, at 396, 618 N.E.2d, at 155–156.

**\*\*1516**  In dissent, Justice Wright argued that the statute should be tested under a more severe standard because of its significant effect "on the ability of individual citizens to freely express their views in writing on political issues." 🚩 *Id.,* at 398, 618 N.E.2d, at 156–157. He concluded that § 3599.09(A) "is not narrowly tailored to serve a compelling state interest and is, therefore, unconstitutional as applied to McIntyre." 🚩 *Id.,* at 401, 618 N.E.2d, at 159.

Mrs. McIntyre passed away during the pendency of this litigation. Even though the amount in controversy is only $100, petitioner, as the executor of her estate, has pursued her claim in this Court. Our grant of certiorari, **\*341** 510 U.S. 1108, 114 S.Ct. 1047, 127 L.Ed.2d 370 (1994), reflects our agreement with his appraisal of the importance of the question presented.


## II

Ohio maintains that the statute under review is a reasonable regulation of the electoral process. The State does not suggest that all anonymous publications are pernicious or that a statute totally excluding them from the marketplace of ideas would be valid. This is a wise (albeit implicit) concession, for the anonymity of an author is not ordinarily a sufficient reason to exclude her work product from the protections of the First Amendment.

"Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind." 🚩 *Talley v. California,* 362 U.S., at 64, 80 S.Ct., at 538. Great works of literature have frequently been produced by authors writing under assumed names.[4] Despite readers' curiosity and the public's interest in identifying the creator of a work of art, an author generally is free to decide whether or not to disclose his or her true identity. The decision in favor of anonymity may be motivated by fear of economic or official retaliation, **\*342** by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible. Whatever the motivation may be, at least in the field of literary endeavor, the interest in having anonymous works enter the marketplace of ideas unquestionably outweighs any public interest in requiring disclosure as a condition of entry.[5] Accordingly, an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment.

The freedom to publish anonymously extends beyond the literary realm. In 🚩 *Talley,* the Court held that the First Amendment protects the distribution of unsigned handbills urging readers to boycott certain Los Angeles merchants who were allegedly engaging in discriminatory employment practices. 🚩 362 U.S. 60, 80 S.Ct. 536. Writing for the Court, Justice Black noted that "[p]ersecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all." 🚩 *Id.,* at 64, 80 S.Ct., at 538. Justice Black recalled England's abusive **\*\*1517**  press licensing laws and seditious libel prosecutions, and he reminded us that even the arguments favoring the ratification of the Constitution advanced in the Federalist Papers were published under fictitious names. 🚩 *Id.,* at 64–65, 80 S.Ct., at 538–539. On occasion, quite apart from any threat of persecution, an advocate may believe her ideas will be more persuasive if her readers are unaware of her identity. Anonymity thereby provides a way for a writer who may be personally unpopular to ensure that readers will not prejudge her message simply because they do not like its proponent. Thus, even in the field of **\*343**  political rhetoric, where "the identity of the speaker is an important component of many attempts to persuade," *City of Ladue v. Gilleo,* 512 U.S. 43, 56, 114 S.Ct. 2038, 2046, 129 L.Ed.2d 36 (1994) (footnote omitted), the most effective advocates have sometimes opted for anonymity. The specific holding in 🚩 *Talley* related to advocacy of an economic boycott, but the Court's reasoning

Case 1:18-cv-24190-RS Document 471 Entered on FLSD Docket 06/01/2023 Page 253 of 379

*McIntyre v. Ohio Elections Com'n*, 514 U.S. 334 (1995)
115 S.Ct. 1511, 131 L.Ed.2d 426, 63 USLW 4279, 23 Media L. Rep. 1577

embraced a respected tradition of anonymity in the advocacy of political causes. [6] This tradition is perhaps best exemplified by the secret ballot, the hard-won right to vote one's conscience without fear of retaliation.


### III

California had defended the Los Angeles ordinance at issue in *Talley* as a law "aimed at providing a way to identify those responsible for fraud, false advertising and libel." *362 U.S., at 64, 80 S.Ct., at 538.* We rejected that argument because nothing in the text or legislative history of the ordinance limited its application to those evils. [7] *Ibid.* We then made clear that **\*344** we did "not pass on the validity of an ordinance limited to prevent these or any other supposed evils." *Ibid.* The Ohio statute likewise contains no language limiting its application to fraudulent, false, or libelous statements; to the extent, therefore, that Ohio seeks to justify § 3599.09(A) as a means to prevent the dissemination of untruths, its defense must fail for the same reason given in *Talley.* As the facts of this case demonstrate, the ordinance plainly applies even when there is no hint of falsity or libel.

Ohio's statute does, however, contain a different limitation: It applies only to unsigned documents designed to influence voters in an election. In contrast, the Los Angeles ordinance prohibited all anonymous handbilling "in any place under any circumstances." *Id., at 60–61, 80 S.Ct., at 536–537.* For that reason, Ohio correctly argues that *Talley* does not necessarily control the disposition of this case. We must, therefore, decide **\*\*1518** whether and to what extent the First Amendment's protection of anonymity encompasses documents intended to influence the electoral process.

Ohio places its principal reliance on cases such as *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); and *Burdick v. Takushi,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), in which we reviewed election code provisions governing the voting process itself. See *Anderson, supra* (filing deadlines); *Storer, supra* (ballot access); *Burdick, supra* (write-in voting); see also *Tashjian v. Republican Party of Conn.,* 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) (eligibility of independent voters to vote in party primaries). In those cases we refused to adopt "any **\*345** 'litmus-paper test' that will separate valid from invalid restrictions." *Anderson,* 460 U.S., at 789, 103 S.Ct., at 1570, quoting *Storer,* 415 U.S., at 730, 94 S.Ct., at 1279. Instead, we pursued an analytical process comparable to that used by courts "in ordinary litigation": We considered the relative interests of the State and the injured voters, and we evaluated the extent to which the State's interests necessitated the contested restrictions. *Anderson,* 460 U.S., at 789, 103 S.Ct., at 1570. Applying similar reasoning in this case, the Ohio Supreme Court upheld § 3599.09(A) as a "*reasonable*" and "*nondiscriminatory*" burden on the rights of voters. *67 Ohio St.3d, at 396, 618 N.E.2d, at 155,* quoting *Anderson,* 460 U.S., at 788, 103 S.Ct. at 1570.

The "ordinary litigation" test does not apply here. Unlike the statutory provisions challenged in *Storer* and *Anderson,* § 3599.09(A) of the Ohio Code does not control the mechanics of the electoral process. It is a regulation of pure speech. Moreover, even though this provision applies evenhandedly to advocates of differing viewpoints, [8] it is a direct regulation of the content of speech. Every written document covered by the statute must contain "the name and residence or business address of the chairman, treasurer, or secretary of the organization issuing the same, or the person who issues, makes, or is responsible therefor." *Ohio Rev.Code Ann. § 3599.09(A)* (1988). Furthermore, the category of covered documents is defined by their content—only those publications containing speech designed to influence the voters in an election need bear the required markings. [9] *Ibid.* Consequently, we are not faced with an ordinary election restriction; **\*346** this case "involves a limitation

McIntyre v. Ohio Elections Com'n, 514 U.S. 334 (1995)

115 S.Ct. 1511, 131 L.Ed.2d 426, 63 USLW 4279, 23 Media L. Rep. 1577

on political expression subject to exacting scrutiny." *Meyer v. Grant,* 486 U.S. 414, 420, 108 S.Ct. 1886, 1891, 100 L.Ed.2d 425 (1988). [10]

Indeed, as we have explained on many prior occasions, the category of speech regulated by the Ohio statute occupies the core of the protection afforded by the First Amendment:

"Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange **1519 of ideas for the bringing about of political and social changes desired by the people.' *Roth v. United States,* 354 U.S. 476, 484 [77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498] (1957). Although First Amendment protections are not confined to 'the exposition of ideas,' *Winters v. New York,* 333 U.S. 507, 510 [68 S.Ct. 665, 667, 92 L.Ed. 840] (1948), 'there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs, ... of course includ[ing] discussions of candidates....' *Mills v. Alabama,* 384 U.S. 214, 218 [86 S.Ct. 1434, 1437, 16 L.Ed.2d 484] (1966). This no more than reflects our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,' *New York Times Co. v. Sullivan,* 376 U.S. 254, 270 [84 S.Ct. 710, 721, 11 L.Ed.2d 686] (1964). In a republic where the people are sovereign, the ability of the citizenry *347 to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation. As the Court observed in *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272 [91 S.Ct. 621, 625, 28 L.Ed.2d 35] (1971), 'it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office.' " *Buckley v. Valeo,* 424 U.S. 1, 14–15, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976) (per curiam).

Of course, core political speech need not center on a candidate for office. The principles enunciated in *Buckley* extend equally to issue-based elections such as the school tax referendum that Mrs. McIntyre sought to influence through her handbills. See *First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 776–777, 98 S.Ct. 1407, 1415–1416, 55 L.Ed.2d 707 (1978) (speech on income tax referendum "is at the heart of the First Amendment's protection"). Indeed, the speech in which Mrs. McIntyre engaged—handing out leaflets in the advocacy of a politically controversial viewpoint—is the essence of First Amendment expression. See *International Soc. for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992); *Lovell v. City of Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938). That this advocacy occurred in the heat of a controversial referendum vote only strengthens the protection afforded to Mrs. McIntyre's expression: Urgent, important, and effective speech can be no less protected than impotent speech, lest the right to speak be relegated to those instances when it is least needed. See *Terminiello v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949). No form of speech is entitled to greater constitutional protection than Mrs. McIntyre's.

When a law burdens core political speech, we apply "exacting scrutiny," and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest. See, *e.g.,* *Bellotti,* 435 U.S., at 786, 98 S.Ct., at 1421. Our precedents thus make abundantly clear that the Ohio Supreme Court applied a significantly more lenient standard than is appropriate in a case of this kind.

*348 IV

Nevertheless, the State argues that, even under the strictest standard of review, the disclosure requirement in § 3599.09(A) is justified by two important and legitimate state interests. Ohio judges its interest in preventing fraudulent and libelous statements

and its interest in providing the electorate with relevant information to be sufficiently compelling to justify the anonymous speech ban. These two interests necessarily overlap to some extent, but it is useful to discuss them separately.

 Insofar as the interest in informing the electorate means nothing more than the provision of additional information that may either buttress or undermine the argument in a document, we think the identity of the speaker is no different from other components of the document's content that the author is free to include or exclude. [11] We **1520 have already held that the State may not compel a newspaper that prints editorials critical of a particular candidate to provide space for a reply by the candidate. 📁 *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). The simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit. Moreover, in the case of a handbill written by a private citizen who is not known to the recipient, the name and address of the author add little, if anything, to the reader's ability to evaluate the *349 document's message. Thus, Ohio's informational interest is plainly insufficient to support the constitutionality of its disclosure requirement.

 The state interest in preventing fraud and libel stands on a different footing. We agree with Ohio's submission that this interest carries special weight during election campaigns when false statements, if credited, may have serious adverse consequences for the public at large. Ohio does not, however, rely solely on § 3599.09(A) to protect that interest. Its Election Code includes detailed and specific prohibitions against making or disseminating false statements during political campaigns. Ohio Rev.Code Ann. §§ 3599.09.1(B), 3599.09.2(B) (1988). These regulations apply both to candidate elections and to issue-driven ballot measures. [12] Thus, **1521 *350 Ohio's prohibition of anonymous leaflets plainly is not its principal weapon against fraud. [13] Rather, it serves as an aid to enforcement of the specific prohibitions and as a deterrent *351 to the making of false statements by unscrupulous prevaricators. Although these ancillary benefits are assuredly legitimate, we are not persuaded that they justify § 3599.09(A)'s extremely broad prohibition.

As this case demonstrates, the prohibition encompasses documents that are not even arguably false or misleading. It applies not only to the activities of candidates and their organized supporters, but also to individuals acting independently and using only their own modest resources. [14] It applies not only to elections of public officers, but also to *352 ballot issues that present neither a substantial risk of libel nor any potential appearance of corrupt advantage. [15] It applies not only to leaflets distributed on the eve of an election, when the opportunity for reply is limited, but also to those distributed months in advance. [16] It applies no matter what the **1522 character or strength of the author's interest in anonymity. Moreover, as this case also demonstrates, the absence of the author's name on a document does not necessarily protect either that person or a distributor of a forbidden document from being held responsible for compliance with the Election Code. Nor has the State explained why it can *353 more easily enforce the direct bans on disseminating false documents against anonymous authors and distributors than against wrongdoers who might use false names and addresses in an attempt to avoid detection. We recognize that a State's enforcement interest might justify a more limited identification requirement, but Ohio has shown scant cause for inhibiting the leafletting at issue here.

V

Finally, Ohio vigorously argues that our opinions in 📁 *First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), and 📁 *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), amply support the constitutionality of its disclosure requirement. Neither case is controlling: The former concerned the scope of First Amendment protection afforded to corporations; The relevant portion of the latter concerned mandatory disclosure of campaign-related expenditures. Neither case involved a prohibition of anonymous campaign literature.

McIntyre v. Ohio Elections Comm'n, 514 U.S. 334 (1995)

115 S.Ct. 1511, 131 L.Ed.2d 426, 63 USLW 4279, 23 Media L. Rep. 1577

In 🚩 *Bellotti,* we reversed a judgment of the Supreme Judicial Court of Massachusetts sustaining a state law that prohibited corporate expenditures designed to influence the vote on referendum proposals. 🚩 435 U.S. 765, 98 S.Ct. 1407. The Massachusetts court had held that the First Amendment protects corporate speech only if its message pertains directly to the business interests of the corporation. 🚩 *Id.,* at 771–772, 98 S.Ct., at 1413. Consistently with our holding today, we noted that the "inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual." 🚩 *Id.,* at 777, 98 S.Ct., at 1416. We also made it perfectly clear that we were not deciding whether the First Amendment's protection of corporate speech is coextensive with the protection it affords to individuals. [17] Accordingly, although we commented in dicta **\*354** on the prophylactic effect of requiring identification of the source of corporate advertising, [18] that footnote did not necessarily apply to independent communications by an individual like Mrs. McIntyre.

Our reference in the 🚩 *Bellotti* footnote to the "prophylactic effect" of disclosure requirements cited a portion of our earlier **\*\*1523** opinion in 🚩 *Buckley,* in which we stressed the importance of providing "the electorate with information 'as to where political campaign money comes from and how it is spent by the candidate.' " 🚩 424 U.S., at 66, 96 S.Ct., at 657. We observed that the "sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office." 🚩 *Id.,* at 67, 96 S.Ct., at 657. Those comments concerned contributions to the candidate or expenditures authorized by the candidate or his responsible agent. They had no reference to the kind of independent activity pursued by Mrs. McIntyre. Required disclosures about the level of financial support a candidate has received from various sources are supported by an interest in avoiding the appearance of corruption that has no application to this case.

**\*355** True, in another portion of the 🚩 *Buckley* opinion we expressed approval of a requirement that even "independent expenditures" in excess of a threshold level be reported to the Federal Election Commission. 🚩 *Id.,* at 75–76, 96 S.Ct., at 661–662. But that requirement entailed nothing more than an identification to the Commission of the amount and use of money expended in support of a candidate. See 🚩 *id.,* at 157–159, 160, 96 S.Ct., at 699–700, 701 (reproducing relevant portions of the statute [19]). Though such mandatory reporting undeniably impedes protected First Amendment activity, the intrusion is a far cry from compelled self-identification on all election-related writings. A written election-related document— particularly a leaflet—is often a personally crafted statement of a political viewpoint. Mrs. McIntyre's handbills surely fit that description. As such, identification of the author against her will is particularly intrusive; it reveals unmistakably the content of her thoughts on a controversial issue. Disclosure of an expenditure and its use, without more, reveals far less information. It may be information that a person prefers to keep secret, and undoubtedly it often gives away something about the spender's political views. Nonetheless, even though money may "talk," its speech is less specific, less personal, and less provocative than a handbill—and as a result, when money supports an unpopular viewpoint it is less likely to precipitate retaliation.

**\*356** Not only is the Ohio statute's infringement on speech more intrusive than the 🚩 *Buckley* disclosure requirement, but it rests on different and less powerful state interests. The Federal Election Campaign Act of 1971, at issue in 🚩 *Buckley,* regulates only candidate elections, not referenda or other issue-based ballot measures; and we construed "independent expenditures" to mean only those expenditures that "expressly advocate the election or defeat of a clearly identified candidate." 🚩 *Id.,* at 80, 96 S.Ct., at 664. In candidate elections, the Government can identify a compelling state interest in avoiding the corruption that might result from campaign expenditures. Disclosure of expenditures lessens the risk that individuals will spend money to support a candidate as a *quid pro quo* for special treatment after the candidate is in office. Curriers of favor will be deterred by the knowledge that all expenditures will be scrutinized by the Federal Election Commission and by the public for just this

McIntyre v. Ohio Elections Com'n, 514 U.S. 334 (1995)
115 S.Ct. 1511, 131 L.Ed.2d 426, 63 USLW 4279, 23 Media L. Rep. 1577

sort of abuse. [20]   Moreover, the federal Act contains numerous legitimate disclosure requirements for campaign organizations; the similar requirements for independent  **1524  expenditures serve to ensure that a campaign organization will not seek to evade disclosure by routing its expenditures through individual supporters. See ⚑ *Buckley,* 424 U.S., at 76, 96 S.Ct., at 662. In short, although ⚑ *Buckley* may permit a more narrowly drawn statute, it surely is not authority for upholding Ohio's open-ended provision. [21]

**\*357  VI**

 Under our Constitution, anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent. Anonymity is a shield from the tyranny of the majority. See generally J. Mill, On Liberty and Considerations on Representative Government 1, 3–4 (R. McCallum ed. 1947). It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society. The right to remain anonymous may be abused when it shields fraudulent conduct. But political speech by its nature will sometimes have unpalatable consequences, and, in general, our society accords greater weight to the value of free speech than to the dangers of its misuse. See *Abrams v. United States,* 250 U.S. 616, 630–631, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting). Ohio has not shown that its interest in preventing the misuse of anonymous election-related speech justifies a prohibition of all uses of that speech. The State may, and does, punish fraud directly. But it cannot seek to punish fraud indirectly by indiscriminately outlawing a category of speech, based on its content, with no necessary relationship to the danger sought to be prevented. One would be hard pressed to think of a better example of the pitfalls of Ohio's blunderbuss approach than the facts of the case before us.

The judgment of the Ohio Supreme Court is reversed.

*It is so ordered.*

 **\*358**  Justice GINSBURG, concurring.
The dissent is stirring in its appreciation of democratic values. But I do not see the Court's opinion as unguided by "bedrock principle," tradition, or our case law. See *post,* at 1532–1534, 1534–1535. Margaret McIntyre's case, it seems to me, bears a marked resemblance to Margaret Gilleo's case [1]  and Mary Grace's. [2]  All three decisions, I believe, are sound, and hardly sensational, applications of our First Amendment jurisprudence.

In for a calf is not always in for a cow. The Court's decision finds unnecessary, overintrusive, and inconsistent with American ideals the State's imposition of a fine on an individual leafleteer who, within her local community, spoke her mind, but sometimes not her name. We do not thereby hold that the State may not in other, larger circumstances require the speaker to disclose its interest by disclosing its identity. Appropriately leaving open matters not presented by McIntyre's handbills, the Court recognizes that a State's interest in protecting an election process "might justify a more limited identification requirement." *Ante,* at 1522. But the Court has convincingly explained  **1525  why Ohio lacks "cause for inhibiting the leafletting at issue here." *Ibid.*

Justice THOMAS, concurring in the judgment.
I agree with the majority's conclusion that Ohio's election law, Ohio Rev.Code Ann. § 3599.09(A) (1988), is inconsistent with the First Amendment. I would apply, however, a different  **\*359**  methodology to this case. Instead of asking whether "an honorable tradition" of anonymous speech has existed throughout American history, or what the "value" of anonymous speech might be, we should determine whether the phrase "freedom of speech, or of the press," as originally understood, protected anonymous political leafletting. I believe that it did.

McIntyre v. Ohio Elections Com'n, 514 U.S. 334 (1995)

115 S.Ct. 1511, 131 L.Ed.2d 426, 63 USLW 4279, 23 Media L. Rep. 1577

I

The First Amendment states that the government "shall make no law ... abridging the freedom of speech, or of the press." U.S. Const., Amdt. 1. When interpreting the Free Speech and Press Clauses, we must be guided by their original meaning, for "[t]he Constitution is a written instrument. As such its meaning does not alter. That which it meant when adopted, it means now." *South Carolina v. United States,* 199 U.S. 437, 448, 26 S.Ct. 110, 111, 50 L.Ed. 261 (1905). We have long recognized that the meaning of the Constitution "must necessarily depend on the words of the constitution [and] the meaning and intention of the convention which framed and proposed it for adoption and ratification to the conventions ... in the several states." *Rhode Island v. Massachusetts,* 37 U.S. (12 Pet.) 657, 721, 9 L.Ed. 1233 (1838). See also *INS v. Chadha,* 462 U.S. 919, 959, 103 S.Ct. 2764, 2788, 77 L.Ed.2d 317 (1983). We should seek the original understanding when we interpret the Speech and Press Clauses, just as we do when we read the Religion Clauses of the First Amendment. When the Framers did not discuss the precise question at issue, we have turned to "what history reveals was the contemporaneous understanding of [the Establishment Clause's] guarantees." *Lynch v. Donnelly,* 465 U.S. 668, 673, 104 S.Ct. 1355, 1359, 79 L.Ed.2d 604 (1984). "[T]he line we must draw between the permissible and the impermissible is one which accords with history and faithfully reflects the understanding of the Founding Fathers." *School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 294, 83 S.Ct. 1560, 1609, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring); see also *Lee v. Weisman,* 505 U.S. 577, 632–633, 112 S.Ct. 2649, 2679, 120 L.Ed.2d 467 (1992) (SCALIA, J., dissenting).

**\*360**  II

Unfortunately, we have no record of discussions of anonymous political expression either in the First Congress, which drafted the Bill of Rights, or in the state ratifying conventions. Thus, our analysis must focus on the practices and beliefs held by the Founders concerning anonymous political articles and pamphlets. As an initial matter, we can safely maintain that the leaflets at issue in this case implicate the freedom of the press. When the Framers thought of the press, they did not envision the large, corporate newspaper and television establishments of our modern world. Instead, they employed the term "the press" to refer to the many independent printers who circulated small newspapers or published writers' pamphlets for a fee. See generally B. Bailyn & J. Hench, The Press & the American Revolution (1980); L. Levy, Emergence of a Free Press (1985); B. Bailyn, The Ideological Origins of the American Revolution (1967). "It was in this form—as pamphlets—that much of the most important and characteristic writing of the American Revolution occurred." 1 B. Bailyn, Pamphlets of the American Revolution 3 (1965). This practice continued during the struggle for ratification. See, *e.g.,* Pamphlets on the Constitution of the United States (P. Ford ed. 1888). Regardless of whether one designates the right involved here as one of press or one of speech, however, it makes little difference in terms of our analysis, which seeks to determine only whether the First Amendment, as originally understood, protects anonymous writing.

There is little doubt that the Framers engaged in anonymous political writing. The essays in the Federalist Papers, published **\*\*1526**  under the pseudonym of "Publius," are only the most famous example of the outpouring of anonymous political writing that occurred during the ratification of the Constitution. Of course, the simple fact that the Framers engaged in certain conduct does not necessarily prove that they forbade its prohibition by the government. See *post,* at 1532  **\*361**  SCALIA, J., dissenting). In this case, however, the historical evidence indicates that Founding-era Americans opposed attempts to require that anonymous authors reveal their identities on the ground that forced disclosure violated the "freedom of the press."

For example, the earliest and most famous American experience with freedom of the press, the 1735 Zenger trial, centered around anonymous political pamphlets. The case involved a printer, John Peter Zenger, who refused to reveal the anonymous authors of published attacks on the Crown Governor of New York. When the Governor and his council could not discover the

identity of the authors, they prosecuted Zenger himself for seditious libel. See J. Alexander, A Brief Narrative of the Case and Trial of John Peter Zenger 9–19 (S. Katz ed. 1972). Although the case set the Colonies afire for its example of a jury refusing to convict a defendant of seditious libel against Crown authorities, it also signified at an early moment the extent to which anonymity and the freedom of the press were intertwined in the early American mind.

During the Revolutionary and Ratification periods, the Framers' understanding of the relationship between anonymity and freedom of the press became more explicit. In 1779, for example, the Continental Congress attempted to discover the identity of an anonymous article in the Pennsylvania Packet signed by the name "Leonidas." Leonidas, who actually was Dr. Benjamin Rush, had attacked the Members of Congress for causing inflation throughout the States and for engaging in embezzlement and fraud. 13 Letters of Delegates to Congress 1774–1789, p. 141, n. 1 (G. Gawalt & R. Gephart eds. 1986). Elbridge Gerry, a delegate from Massachusetts, moved to haul the printer of the newspaper before Congress to answer questions concerning Leonidas. Several Members of Congress then rose to oppose Gerry's motion on the ground that it invaded the freedom of the press. Merriweather Smith of Virginia rose, quoted from **\*362** the offending article with approval, and then finished with a declaration that "[w]hen the liberty of the Press shall be restrained ... the liberties of the People will be at an end." Henry Laurens, Notes of Debates, July 3, 1779, *id.,* at 139. Supporting Smith, John Penn of North Carolina argued that the writer "no doubt had *good designs,*" and that "[t]he liberty of the Press ought not to be restrained." *Ibid.* In the end, these arguments persuaded the assembled delegates, who "sat mute" in response to Gerry's motion. *Id.,* at 141. Neither the printer nor Dr. Rush ever appeared before Congress to answer for their publication. D. Teeter, Press Freedom and the Public Printing: Pennsylvania, 1775–83, 45 Journalism Q. 445, 451 (1968).

At least one of the state legislatures shared Congress' view that the freedom of the press protected anonymous writing. Also in 1779, the upper house of the New Jersey State Legislature attempted to punish the author of a satirical attack on the Governor and the College of New Jersey (now Princeton) who had signed his work "Cincinnatus." R. Hixson, Isaac Collins A Quaker Printer in 18th Century America 95 (1968). Attempting to enforce the crime of seditious libel, the State Legislative Council ordered Isaac Collins—the printer and editor of the newspaper in which the article had appeared—to reveal the author's identity. Refusing, Collins declared: " 'Were I to comply ... I conceive I should betray the trust reposed in me, and be far from acting as a faithful guardian of the Liberty of the Press.' " *Id.,* at 96. Apparently, the State Assembly agreed that anonymity was protected by the freedom of the press, as it voted to support the editor and publisher by frustrating the council's orders. *Id.,* at 95.

By 1784, the same Governor of New Jersey, William Livingston, was at work writing anonymous articles that defended the right to publish anonymously as part of the freedom of the press. Under the pseudonym "Scipio," **\*363** Livingston wrote several articles attacking the legislature's failure to lower **\*\*1527** taxes, and he accused a state officer of stealing or losing state funds during the British invasion of New Jersey. *Id.,* at 107–109; Scipio, Letter to the Printer, Feb. 24, 1784, The New–Jersey Gazette. Responding to the allegations, the officer called upon Scipio "to avow your publication, give up your real name." S. Tucker, To Scipio, Mar. 2, 1784, The New–Jersey Gazette. Livingston replied with a four-part series defending "the Liberty of the Press." Although Livingston at first defended anonymity because it encouraged authors to discuss politics without fear of reprisal, he ultimately invoked the liberty of the press as the guardian for anonymous political writing. "I hope [Tucker] is not seriously bent upon a total subversion of our political system," Scipio wrote. "And pray may not a man, in a free country, convey thro' the press his sentiments on publick grievances ... without being obliged to send a certified copy of the *baptismal register* to prove his name." Scipio, On the Liberty of the Press IV, Apr. 26, 1784, The New–Jersey Gazette.

To be sure, there was some controversy among newspaper editors over publishing anonymous articles and pamphlets. But this controversy was resolved in a manner that indicates that the freedom of the press protected an author's anonymity. The tempest began when a Federalist, writing anonymously himself, expressed fear that "emissaries" of "foreign enemies" would attempt to scuttle the Constitution by "fill[ing] the press with objections" against the proposal. Boston Independent Chronicle, Oct. 4, 1787, in 13 Documentary History of the Ratification of the Constitution 315 (J. Kaminski & G. Saladino eds. 1981) (hereinafter Documentary History). He called upon printers to refrain from publishing when the author "chooses to remain concealed." *Ibid.* Benjamin Russell, the editor of the prominent Federalist newspaper the Massachusetts Centinel, immediately adopted a policy of refusing to publish Anti–Federalist pieces unless the **\*364** author provided his identity to be "handed to the

publick, if required." Massachusetts Centinel, Oct. 10, 1787, *id.,* at 312, 315–316. A few days later, the Massachusetts Gazette announced that it would emulate the example set by the Massachusetts Centinel. Massachusetts Gazette, Oct. 16, 1787, *id.,* at 317. In the same issue, the Gazette carried an article claiming that requiring an anonymous writer to leave his name with the printer, so that anyone who wished to know his identity could be informed, "appears perfectly reasonable, and is perfectly consistent with the liberty of the press." A Citizen, Massachusetts Gazette, Oct. 16, 1787, *id.,* at 316. Federalists expressed similar thoughts in Philadelphia. See A Philadelphia Mechanic, Philadelphia Independent Gazetteer, Oct. 29, 1787, *id.,* at 318–319; Galba, Philadelphia Independent Gazetteer, Oct. 31, 1787, *id.,* at 319. The Jewel, Philadelphia Independent Gazetteer, Nov. 2, 1787, *id.,* at 320.

Ordinarily, the fact that some founding-era editors as a matter of policy decided not to publish anonymous articles would seem to shed little light upon what the Framers thought the *government* could do. The widespread criticism raised by the Anti–Federalists, however, who were the driving force behind the demand for a Bill of Rights, indicates that they believed the freedom of the press to include the right to author anonymous political articles and pamphlets. [1] That most other Americans shared this understanding is reflected in the Federalists' hasty retreat before the withering criticism of their assault on the liberty of the press.

Opposition to Russell's declaration centered in Philadelphia. Three Philadelphia papers published the "Citizen" piece that had run in the Massachusetts Gazette. **\*365** *Id.,* at 318–320. [2] In response, one of the leading **\*\*1528** Anti–Federalist writers, the "Federal Farmer," attacked Russell's policy: "What can be the views of those gentlemen in Boston, who countenanced the Printers in shutting up the press against a fair and free investigation of this important system in the usual way?" Letters From the Federal Farmer No. 5, Oct. 13, 1787, 2 The Complete Anti–Federalist 254 (H. Storing ed. 1981). Another Anti–Federalist, "Philadelphiensis," also launched a substantial attack on Russell and his defenders for undermining the freedom of the press. "In this desperate situation of affairs ... the friends of this despotic scheme of government, were driven to the last and only alternative from which there was any probability of success; namely, the abolition of *the freedom of the Press.*" Philadelphiensis, Essay I, Independent Gazetteer, Nov. 7, 1787, in 3 *id.,* at 102. In Philadelphiensis' eyes, Federalist attempts to suppress the Anti–Federalist press by requiring the disclosure of authors' identities only foreshadowed the oppression permitted by the new Constitution. "Here we see pretty plainly through [the Federalists'] excellent regulation of the press, how things are to be carried on after the adoption of the new constitution." *Id.,* at 103. According to Philadelphiensis, Federalist policies had already ruined freedom in Massachusetts: "In Boston the liberty of the press is now completely abolished; and hence all other privileges and rights of the people will in a short time be destroyed." *Id.,* at 104.

Not limited to Philadelphia, the Anti–Federalist attack was repeated widely throughout the States. In New York, one writer exclaimed that the Federalist effort to suppress anonymity **\*366** would "REVERSE the important doctrine *of the freedom of the press,*" whose "truth" was "universally acknowledged." Detector, New York Journal, Oct. 25, 1787, in 13 Documentary History 318. "Detector" proceeded to proclaim that Russell's policy was "the introduction of this first trait of slavery into your country!" *Ibid.* Responding to the Federalist editorial policy, a Rhode Island Anti–Federalist wrote: "The Liberty of the Press, or the Liberty which *every Person* in the United States *at present* enjoys ... is a Privilege of infinite Importance ... for which ... we have fought and bled," and that the attempt by "our aristocratical Gentry, to have every Person's Name published who should write against the proposed Federal Constitution, has given many of us a just Alarm." Argus, Providence United States Chronicle, Nov. 8, 1787, *id.,* at 320–321. Edward Powars, editor of the Anti–Federalist Boston American Herald, proclaimed that *his* pages would remain "FREE and OPEN to all parties." Boston American Herald, Oct. 15, 1787, *id.,* at 316. In the Boston Independent Chronicle of Oct. 18, 1787, "Solon" accused Russell of attempting to undermine a "*freedom* and *independence* of *sentiments*" which "should never be *checked* in a *free* country" and was "so *essential* to the *existance* of free Governments." *Id.,* at 313.

The controversy over Federalist attempts to prohibit anonymous political speech is significant for several reasons. First, the Anti–Federalists clearly believed the right to author and publish anonymous political articles and pamphlets was protected by the liberty of the press. Second, although printers' editorial policies did not constitute state action, the Anti–Federalists believed that the Federalists were merely flexing the governmental powers they would fully exercise upon the Constitution's ratification. Third, and perhaps most significantly, it appears that the Federalists agreed with the Anti–Federalist critique. In Philadelphia, where opposition to the ban was strongest, there is no record that any newspaper adopted the nonanonymity policy, nor that

of **\*367** any city or State aside from Russell's Massachusetts Centinel and the Federalist Massachusetts Gazette. Moreover, these two papers' bark was worse than their bite. In the face of widespread criticism, it appears that Russell retreated from his policy and, as he put it, " 'readily' " reprinted several anonymous Federalist and Anti–Federalist essays to show that claims that he had suppressed freedom of the press " 'had not any foundation in truth.' " 13 Documentary History 313–314. Likewise, the Massachusetts Gazette refused to release the names of Anti–Federalist writers when requested. *Ibid.* When Federalist attempts to ban anonymity are followed by a sharp, widespread Anti–Federalist defense in the **\*\*1529** name of the freedom of the press, and then by an open Federalist retreat on the issue, I must conclude that both Anti–Federalists and Federalists believed that the freedom of the press included the right to publish without revealing the author's name.


III


The historical record is not as complete or as full as I would desire. For example, there is no evidence that, after the adoption of the First Amendment, the Federal Government attempted to require writers to attach their names to political documents. Nor do we have any indication that the federal courts of the early Republic would have squashed such an effort as a violation of the First Amendment. The understanding described above, however, when viewed in light of the Framers' universal practice of publishing anonymous articles and pamphlets, indicates that the Framers shared the belief that such activity was firmly part of the freedom of the press. It is only an innovation of modern times that has permitted the regulation of anonymous speech.


The large quantity of newspapers and pamphlets the Framers produced during the various crises of their generation show the remarkable extent to which the Framers relied upon anonymity. During the break with Great Britain, the **\*368** revolutionaries employed pseudonyms both to conceal their identity from Crown authorities and to impart a message. Often, writers would choose names to signal their point of view or to invoke specific classical and modern "crusaders in an agelong struggle against tyranny." A. Schlesinger, Prelude to Independence 35 (1958). Thus, leaders of the struggle for independence would adopt descriptive names such as "Common Sense," a "Farmer," or "A True Patriot," or historical ones such as "Cato" (a name used by many to refer to the Roman Cato and to Cato's letters), or "Mucius Scaevola." *Id.,* at xii-xiii. The practice was even more prevalent during the great outpouring of political argument and commentary that accompanied the ratification of the Constitution. Besides "Publius," prominent Federalists signed their articles and pamphlets with names such as "An American Citizen," "Marcus," "A Landholder," "Americanus"; Anti–Federalists replied with the pseudonyms "Cato," "Centinel," "Brutus," the "Federal Farmer," and "The Impartial Examiner." See generally 1–2 Debate on the Constitution (B. Bailyn ed. 1993). The practice of publishing one's thoughts anonymously or under pseudonym was so widespread that only two major Federalist or Anti–Federalist pieces appear to have been signed by their true authors, and they may have had special reasons to do so. [3]


If the practice of publishing anonymous articles and pamphlets fell into disuse after the Ratification, one might infer that the custom of anonymous political speech arose only in response to the unusual conditions of the 1776–1787 period. **\*369** After all, the Revolution and the Ratification were not "elections," *per se,* either for candidates or for discrete issues. Records from the first federal elections indicate, however, that anonymous political pamphlets and newspaper articles remained the favorite media for expressing views on candidates. In Pennsylvania, for example, writers for or against the Federalist and Anti–Federalist candidates wrote under the names "Numa," "Pompilius," "A Friend to Agriculture, Trade, and Good Laws," "A Federal Centinel," a "Freeman," "Centinel," "A Real Patriot to All True Federalists," "A Mechanic," "Justice," "A German Federalist," and so on. See generally 1 Documentary History of the First Federal Elections 1788–1790, pp. 246–362 (M. Jensen & R. Becker eds. 1976). This appears to have been the practice in all of the major States of which we have substantial records today. See 1 *id.,* at 446–464 (Massachusetts); 2 *id.,* at 108–122, 175–229 (Maryland); 2 *id.,* at 387–397 **\*\*1530** (Virginia); 3 *id.,* at 204–216, 436–493 (New York). It seems that actual names were used rarely, and usually only by candidates who wanted to explain their positions to the electorate.


The use of anonymous writing extended to issues as well as candidates. The ratification of the Constitution was not the only issue discussed via anonymous writings in the press. James Madison and Alexander Hamilton, for example, resorted to pseudonyms

in the famous "Helvidius" and "Pacificus" debates over President Washington's declaration of neutrality in the war between the British and French. See Hamilton, Pacificus No. 1, June 29, 1793, in 15 Papers of Alexander Hamilton 33–43 (H. Syrett ed. 1969); Madison, Helvidius No. 1, Aug. 24, 1793, in 15 Papers of James Madison 66–73 (T. Mason, R. Rutland, J. Sisson eds. 1985). Anonymous writings continued in such Republican papers as the Aurora and Federalists organs such as the Gazette of the United States at least until the election of Thomas Jefferson. See generally J. Smith, Freedom's Fetters (1956).


**\*370**  IV

This evidence leads me to agree with the majority's result, but not its reasoning. The majority fails to seek the original understanding of the First Amendment, and instead attempts to answer the question in this case by resorting to three approaches. First, the majority recalls the historical practice of anonymous writing from Shakespeare's works to the Federalist Papers to Mark Twain. *Ante,* at 1516, n. 4, and 1517 and n. 6. Second, it finds that anonymous speech has an expressive value both to the speaker and to society that outweighs public interest in disclosure. Third, it finds that § 3599.09(A) cannot survive strict scrutiny because it is a "content-based" restriction on speech.

I cannot join the majority's analysis because it deviates from our settled approach to interpreting the Constitution and because it superimposes its modern theories concerning expression upon the constitutional text. Whether "great works of literature"— by Voltaire or George Eliot have been published anonymously should be irrelevant to our analysis, because it sheds no light on what the phrases "free speech" or "free press" meant to the people who drafted and ratified the First Amendment. Similarly, whether certain types of expression have "value" today has little significance; what *is* important is whether the Framers in 1791 believed anonymous speech sufficiently valuable to deserve the protection of the Bill of Rights. And although the majority faithfully follows our approach to "content-based" speech regulations, we need not undertake this analysis when the original understanding provides the answer.

While, like Justice SCALIA, I am loath to overturn a century of practice shared by almost all of the States, I believe the historical evidence from the framing outweighs recent tradition. When interpreting other provisions of the Constitution, this Court has believed itself bound by the text of the Constitution and by the intent of those who drafted and ratified it. It should hold itself to no less a standard when  **\*371**  interpreting the Speech and Press Clauses. After reviewing the weight of the historical evidence, it seems that the Framers understood the First Amendment to protect an author's right to express his thoughts on political candidates or issues in an anonymous fashion. Because the majority has adopted an analysis that is largely unconnected to the Constitution's text and history, I concur only in the judgment.


Justice SCALIA, with whom THE CHIEF JUSTICE joins, dissenting.

At a time when both political branches of Government and both political parties reflect a popular desire to leave more decisionmaking authority to the States, today's decision moves in the opposite direction, adding to the legacy of inflexible central mandates (irrevocable even by Congress) imposed by this Court's constitutional jurisprudence. In an opinion which reads as though it is addressing some peculiar law like the Los Angeles municipal ordinance at issue in ⚑ *Talley v. California,* 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960), the Court invalidates a species of protection for the election process that exists, in a variety of forms, in every State except California, and that has a pedigree dating back to the end of the 19th  **\*\*1531**  century. Preferring the views of the English utilitarian philosopher John Stuart Mill, *ante,* at 1524, to the considered judgment of the American people's elected representatives from coast to coast, the Court discovers a hitherto unknown right-to-be-unknown while engaging in electoral politics. I dissent from this imposition of free-speech imperatives that are demonstrably not those of the American people today, and that it is inadequate reason to believe were those of the society that begat the First Amendment or the Fourteenth.

McIntyre v. Ohio Elections Comm'n, 514 U.S. 334 (1995)
115 S.Ct. 1511, 131 L.Ed.2d 426, 63 USLW 4279, 23 Media L. Rep. 1577

I

The question posed by the present case is not the easiest sort to answer for those who adhere to the Court's (and the **\*372** society's) traditional view that the Constitution bears its original meaning and is unchanging. Under that view, "[o]n every question of construction, [we should] carry ourselves back to the time when the Constitution was adopted; recollect the spirit manifested in the debates; and instead of trying [to find] what meaning may be squeezed out of the text, or invented against it, conform to the probable one in which it was passed." T. Jefferson, Letter to William Johnson (June 12, 1823), in 15 Writings of Thomas Jefferson 439, 449 (A. Lipscomb ed. 1904). That technique is simple of application when government conduct that is claimed to violate the Bill of Rights or the Fourteenth Amendment is shown, upon investigation, to have been engaged in without objection at the very time the Bill of Rights or the Fourteenth Amendment was adopted. There is no doubt, for example, that laws against libel and obscenity do not violate "the freedom of speech" to which the First Amendment refers; they existed and were universally approved in 1791. Application of the principle of an unchanging Constitution is also simple enough at the other extreme, where the government conduct at issue was *not* engaged in at the time of adoption, and there is ample evidence that the *reason* it was not engaged in is that it was thought to violate the right embodied in the constitutional guarantee. Racks and thumbscrews, well-known instruments for inflicting pain, were not in use because they were regarded as cruel punishments.

The present case lies between those two extremes. Anonymous electioneering was not prohibited by law in 1791 or in 1868. In fact, it was widely practiced at the earlier date, an understandable legacy of the revolutionary era in which political dissent could produce governmental reprisal. I need not dwell upon the evidence of that, since it is described at length in today's concurrence. See *ante,* at 1525–1530 (THOMAS, J., concurring in judgment). The practice of anonymous electioneering may have been less general in 1868, **\*373** when the Fourteenth Amendment was adopted, but at least as late as 1837 it was respectable enough to be engaged in by Abraham Lincoln. See 1 A. Beveridge, Abraham Lincoln 1809–1858, pp. 215–216 (1928); 1 Uncollected Works of Abraham Lincoln 155–161 (R. Wilson ed. 1947).

But to prove that anonymous electioneering was used frequently is not to establish that it is a constitutional right. Quite obviously, not every restriction upon expression that did not exist in 1791 or in 1868 is *ipso facto* unconstitutional, or else modern election laws such as those involved in 📒 *Burson v. Freeman,* 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992), and 🚩 *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), would be prohibited, as would (to mention only a few other categories) modern antinoise regulation of the sort involved in 📒 *Kovacs v. Cooper,* 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949), and 📒 *Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), and modern parade-permitting regulation of the sort involved in 📒 *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941).

Evidence that anonymous electioneering was regarded as a constitutional right is sparse, and as far as I am aware evidence that it was *generally* regarded as such is nonexistent. The concurrence points to "freedom of the press" objections that were made against the refusal of some Federalist newspapers to publish unsigned essays opposing the proposed Constitution (on the ground that they might be the work of foreign **\*\*1532** agents). See *ante,* at 1527–1528 (THOMAS, J., concurring in judgment). But, of course, if every partisan cry of "freedom of the press" were accepted as valid, our Constitution would be unrecognizable; and if one were to generalize from these particular cries, the First Amendment would be not only a protection *for* newspapers, but a restriction *upon* them. Leaving aside, however, the fact that no governmental action was involved, the Anti–Federalists had a point, inasmuch as the editorial proscription of anonymity applied only to *them,* and thus had the vice of viewpoint discrimination. (Hence the comment by Philadelphiensis, **\*374** quoted in the concurrence: " 'Here we see pretty plainly through [the Federalists'] excellent regulation of the press, how things are to be carried on after the adoption of the new constitution.' " *Ante,* at 1528 (quoting Philadelphiensis, Essay I, Independent Gazetteer, Nov. 7, 1787, in 3 Complete Anti–Federalist 103 (H. Storing ed. 1981)).)

McIntyre v. Ohio Elections Com'n, 514 U.S. 334 (1995)

115 S.Ct. 1511, 131 L.Ed.2d 426, 63 USLW 4279, 23 Media L. Rep. 1577

The concurrence recounts other pre- and post-Revolution examples of defense of anonymity in the name of "freedom of the press," but not a single one involves the context of restrictions imposed in connection with a free, democratic election, which is all that is at issue here. For many of them, moreover, such as the 1735 Zenger trial, *ante,* at 1526, the 1779 "Leonidas" controversy in the Continental Congress, *ante,* at 1526, and the 1779 action by the New Jersey Legislative Council against Isaac Collins, *ibid.,* the issue of anonymity was incidental to the (unquestionably free-speech) issue of whether criticism of the government could be *punished* by the state.

Thus, the sum total of the historical evidence marshaled by the concurrence for the principle of *constitutional entitlement* to anonymous electioneering is partisan claims in the debate on ratification (which was *almost* like an election) that a viewpoint-based restriction on anonymity by newspaper editors violates freedom of speech. This absence of historical testimony concerning the point before us is hardly remarkable. The issue of a governmental prohibition upon anonymous electioneering in particular (as opposed to a government prohibition upon anonymous publication in general) simply never arose. Indeed, there probably never arose even the abstract question whether electoral openness and regularity was worth such a governmental restriction upon the normal right to anonymous speech. The idea of close government regulation of the electoral process is a more modern phenomenon, arriving in this country in the late 1800's. See *Burson v. Freeman, supra,* 504 U.S., at 203–205, 112 S.Ct., at 1852–1854.

 **\*375**  What we have, then, is the most difficult case for determining the meaning of the Constitution. No accepted existence of governmental restrictions of the sort at issue here demonstrates their constitutionality, but neither can their nonexistence clearly be attributed to constitutional objections. In such a case, constitutional adjudication necessarily involves not just history but judgment: judgment as to whether the government action under challenge is consonant with the concept of the protected freedom (in this case, the freedom of speech and of the press) that existed when the constitutional protection was accorded. In the present case, *absent other indication,* I would be inclined to agree with the concurrence that a society which used anonymous political debate so regularly would not regard as constitutional even moderate restrictions made to improve the election process. (I would, however, want further evidence of common practice in 1868, since I doubt that the Fourteenth Amendment time-warped the post-Civil War States back to the Revolution.)

But there *is* other indication, of the most weighty sort: the widespread and longstanding traditions of our people. Principles of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness. A governmental practice that has become general throughout the United States, and particularly one that has had the validation of long, accepted usage, bears a strong presumption of constitutionality. And that is what we have before us here. Ohio Rev. Code Ann. § 3599.09(A) (1988) was enacted by the General Assembly of the State of Ohio almost 80 years ago. See Act of May 27, 1915, 1915 Ohio Leg. Acts 350. Even at  **\*\*1533**  the time of its adoption, there was nothing unique or extraordinary about it. The earliest statute of this sort was adopted by Massachusetts in 1890, little more than 20 years after the Fourteenth Amendment was ratified. No  **\*376**  less than 24 States had similar laws by the end of World War I,[1]  and today every State of the Union except California has one,[2]  as does the District of Columbia, see  **\*377**  D.C.Code Ann. § 1–1420 (1992), and as does the Federal Government where advertising relating to candidates for federal office is concerned, see 2 U.S.C. § 441d(a). Such a universal[3]  and long-established American legislative practice must be given precedence, I think, over historical and academic speculation regarding a restriction that assuredly does not go to the heart of free speech.

It can be said that we ignored a tradition as old, and almost as widespread, in *Texas v.*  **\*\*1534**  *Johnson,* 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), where we held unconstitutional a state law prohibiting desecration of the United States flag. See also *United States v. Eichman,* 496 U.S. 310, 110 S.Ct. 2404, 110 L.Ed.2d 287 (1990). But those cases merely  **\*378**  stand for the proposition that postadoption tradition cannot alter the core meaning of a constitutional guarantee. As we said in *Johnson,* "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." 491 U.S., at 414, 109 S.Ct.,

**McIntyre v. Ohio Elections Com'n, 514 U.S. 334 (1995)**

115 S.Ct. 1511, 131 L.Ed.2d 426, 63 USLW 4279, 23 Media L. Rep. 1577

at 2545. Prohibition of expression of contempt for the flag, whether by contemptuous words, see *Street v. New York,* 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969), or by burning the flag, came, we said, within that "bedrock principle." The law at issue here, by contrast, forbids the expression of no idea, but merely requires identification of the speaker when the idea is uttered in the electoral context. It is at the periphery of the First Amendment, like the law at issue in *Burson,* where we took guidance from tradition in upholding against constitutional attack restrictions upon electioneering in the vicinity of polling places, see 504 U.S., at 204–206, 112 S.Ct., at 1854–1855 (plurality opinion); *id.,* at 214–216, 112 S.Ct., at 1859–1861 (SCALIA, J., concurring in judgment).

## II

The foregoing analysis suffices to decide this case for me. Where the meaning of a constitutional text (such as "the freedom of speech") is unclear, the widespread and long-accepted practices of the American people are the best indication of what fundamental beliefs it was intended to enshrine. Even if I were to close my eyes to practice, however, and were to be guided exclusively by deductive analysis from our case law, I would reach the same result.

Three basic questions must be answered to decide this case. Two of them are readily answered by our precedents; the third is readily answered by common sense and by a decent regard for the practical judgment of those more familiar with elections than we are. The first question is whether protection of the election process justifies limitations upon speech that cannot constitutionally be imposed generally. (If not, *Talley v. California,* which invalidated a flat ban on **\*379** *all* anonymous leafletting, controls the decision here.) Our cases plainly answer that question in the affirmative—indeed, they suggest that no justification for regulation is more compelling than protection of the electoral process. "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964). The State has a "compelling interest in preserving the integrity of its election process." *Eu v. San Francisco County Democratic Central Comm.,* 489 U.S. 214, 231, 109 S.Ct. 1013, 1024, 103 L.Ed.2d 271 (1989). So significant have we found the interest in protecting the electoral process to be that we have approved the prohibition of political speech *entirely* in areas that would impede that process. *Burson, supra,* 504 U.S., at 204–206, 112 S.Ct., at 1854–1855 (plurality opinion).

The second question relevant to our decision is whether a "right to anonymity" is such a prominent value in our constitutional system that even protection of the electoral process cannot be purchased at its expense. The answer, again, is clear: no. Several of our cases have held that *in peculiar circumstances* the compelled disclosure of a person's identity would unconstitutionally deter the exercise of First Amendment associational rights. See, *e.g., Brown v. Socialist Workers '74 Campaign Comm. (Ohio),* 459 U.S. 87, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982); *Bates v. Little Rock,* 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). But those cases did not acknowledge any general right to anonymity, or even any right on the part of *all* citizens to ignore the particular laws under challenge. Rather, they recognized a right to an *exemption* from otherwise valid disclosure requirements on the part of someone who could show a "reasonable probability" that the compelled disclosure would result in "threats, harassment, or reprisals from either Government officials or private **\*\*1535** parties." This last quotation is from *Buckley v. Valeo,* 424 U.S., at 74, 96 S.Ct., at 661 *(per curiam),* which prescribed the safety valve of a similar exemption in upholding the disclosure requirements of the Federal Election Campaign Act. That is the answer our case law provides **\*380** to the Court's fear about the "tyranny of the majority," *ante,* at 1524, and to its concern that " '[p]ersecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all,' " *ante,* at 1516 (quoting *Talley,* 362 U.S., at 64, 80 S.Ct., at 538). Anonymity can still be enjoyed by those who require it, without utterly destroying useful

McIntyre v. Ohio Elections Com'n, 514 U.S. 334 (1995)
115 S.Ct. 1511, 131 L.Ed.2d 426, 63 USLW 4279, 23 Media L. Rep. 1577

disclosure laws. The record in this case contains not even a hint that Mrs. McIntyre feared "threats, harassment, or reprisals"; indeed, she placed her name on some of her fliers and meant to place it on all of them. See App. 12, 36–40.

The existence of a generalized right of anonymity in speech was rejected by this Court in *Lewis Publishing Co. v. Morgan*, 229 U.S. 288, 33 S.Ct. 867, 57 L.Ed. 1190 (1913), which held that newspapers desiring the privilege of second-class postage could be required to provide to the Postmaster General, and to publish, a statement of the names and addresses of their editors, publishers, business managers, and owners. We rejected the argument that the First Amendment forbade the requirement of such disclosure. *Id.,* at 299, 33 S.Ct., at 869. The provision that gave rise to that case still exists, see 39 U.S.C. § 3685, and is still enforced by the Postal Service. It is one of several federal laws seemingly invalidated by today's opinion.

The Court's unprecedented protection for anonymous speech does not even have the virtue of establishing a clear (albeit erroneous) rule of law. For after having announced that this statute, because it "burdens core political speech," requires " 'exacting scrutiny' " and must be "narrowly tailored to serve an overriding state interest," *ante,* at 1519 (ordinarily the kiss of death), the opinion goes on to proclaim soothingly (and unhelpfully) that "a State's enforcement interest might justify a more limited identification requirement," *ante,* at 1522. See also *ante,* at 1524 (GINSBURG, J., concurring) ("We do not ... hold that the State may not in other, larger circumstances require the speaker to disclose its interest by disclosing its identity"). Perhaps, then, not   **\*381**  *all* the state statutes I have alluded to are invalid, but just *some* of them; or indeed maybe *all* of them remain valid in "larger circumstances"! It may take decades to work out the shape of this newly expanded right-to-speak-incognito, even in the elections field. And in other areas, of course, a whole new boutique of wonderful First Amendment litigation opens its doors. Must a parade permit, for example, be issued to a group that refuses to provide its identity, or that agrees to do so only under assurance that the identity will not be made public? Must a municipally owned theater that is leased for private productions book anonymously sponsored presentations? Must a government periodical that has a "letters to the editor" column disavow the policy that most newspapers have against the publication of anonymous letters? Must a public university that makes its facilities available for a speech by Louis Farrakhan or David Duke refuse to disclose the on-campus or off-campus group that has sponsored or paid for the speech? Must a municipal "public-access" cable channel permit anonymous (and masked) performers? The silliness that follows upon a generalized right to anonymous speech has no end.

The third and last question relevant to our decision is whether the prohibition of anonymous campaigning is effective in protecting and enhancing democratic elections. In answering this question no, the Justices of the majority set their own views— on a practical matter that bears closely upon the real-life experience of elected politicians and *not* upon that of unelected judges —up against the views of 49 (and perhaps all 50, see n. 4, *supra*) state legislatures and the Federal Congress. We might also add to the list on the other side the legislatures of foreign democracies: Australia, Canada, and England, for example, all have prohibitions upon anonymous campaigning. See, *e.g.,* Commonwealth Electoral Act 1918, § 328 (Australia); Canada Elections Act, R.S.C., ch. E–   **\*\*1536**  2, § 261 (1985); Representation of the People Act, 1983, § 110 (England). How is it, one must wonder, that   **\*382**  all of these elected legislators, from around the country and around the world, could not see what six Justices of this Court see so clearly that they are willing to require the entire Nation to act upon it: that requiring identification of the source of campaign literature does not improve the quality of the campaign?

The Court says that the State has not explained "why it can more easily enforce the direct bans on disseminating false documents against anonymous authors and distributors than against wrongdoers who might use false names and addresses in an attempt to avoid detection." *Ante,* at 1522. I am not sure what this complicated comparison means. I am sure, however, that (1) a person who is required to put his name to a document is much less likely to lie than one who can lie anonymously, and (2) the distributor of a leaflet which is unlawful because it is anonymous runs much more risk of immediate detection and punishment than the distributor of a leaflet which is unlawful because it is false. Thus, people will be more likely to observe a signing requirement than a naked "no falsity" requirement; and, having observed that requirement, will then be significantly less likely to lie in what they have signed.

But the usefulness of a signing requirement lies not only in promoting observance of the law against campaign falsehoods (though that alone is enough to sustain it). It lies also in promoting a civil and dignified level of campaign debate—

McIntyre v. Ohio Elections Com'n, 514 U.S. 334 (1995)

115 S.Ct. 1511, 131 L.Ed.2d 426, 63 USLW 4279, 23 Media L. Rep. 1577

which the State has no power to command, but ample power to encourage by such undemanding measures as a signature requirement. Observers of the past few national elections have expressed concern about the increase of character assassination —"mudslinging" is the colloquial term—engaged in by political candidates and their supporters to the detriment of the democratic process. Not all of this, in fact not much of it, consists of actionable untruth; most is innuendo, or demeaning characterization, or mere disclosure of items of personal life that have no bearing upon suitability for office.  **\*383**  Imagine how much all of this would increase if it could be done anonymously. The principal impediment against it is the reluctance of most individuals and organizations to be publicly associated with uncharitable and uncivil expression. Consider, moreover, the increased potential for "dirty tricks." It is not unheard-of for campaign operatives to circulate material over the name of their opponents or their opponents' supporters (a violation of election laws) in order to attract or alienate certain interest groups. See, *e.g.,* B. Felknor, Political Mischief: Smear, Sabotage, and Reform in U.S. Elections 111–112 (1992) (fake United Mine Workers' newspaper assembled by the National Republican Congressional Committee); *New York v. Duryea,* 76 Misc.2d 948, 351 N.Y.S.2d 978 (Sup.1974) (letters purporting to be from the "Action Committee for the Liberal Party" sent by Republicans). How much easier—and sanction free!—it would be to circulate anonymous material (for example, a *really* tasteless, though not actionably false, attack upon one's own candidate) with the hope and expectation that it will be attributed to, and held against, the other side.

The Court contends that demanding the disclosure of the pamphleteer's identity is no different from requiring the disclosure of any other information that may reduce the persuasiveness of the pamphlet's message. See *ante,* at 1519–1520. It cites *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), which held it unconstitutional to require a newspaper that had published an editorial critical of a particular candidate to furnish space for that candidate to reply. But it is not *usual* for a speaker to put forward the best arguments against himself, and it is a great imposition upon free speech to make him do so. Whereas it is quite usual—it is expected—for a speaker to *identify* himself, and requiring that is (at least when there are no special circumstances present) virtually no imposition at all.

We have approved much more onerous disclosure requirements in the name of fair elections. In  **\*384**  *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), we upheld provisions of the Federal Election Campaign Act that required private individuals to  **\*\*1537**  report to the Federal Election Commission independent expenditures made for communications advocating the election or defeat of a candidate for federal office. *Id.,* at 80, 96 S.Ct., at 664. Our primary rationale for upholding this provision was that it served an "informational interest" by "increas[ing] the fund of information concerning those who support the candidates." *Id.,* at 81, 96 S.Ct., at 664. The provision before us here serves the same informational interest, as well as more important interests, which I have discussed above. The Court's attempt to distinguish *Buckley,* see *ante,* at 1523–1524, would be unconvincing, even if it were accurate in its statement that the disclosure requirement there at issue "reveals far less information" than requiring disclosure of the identity of the author of a specific campaign statement. That happens not to be accurate, since the provision there at issue required not merely "[d]isclosure of an expenditure and its use, without more." *Ante,* at 1523. It required, among other things:

"the identification of *each person to whom expenditures have been made* ... within the calendar year in an aggregate amount or value in excess of $100, the amount, date, *and purpose* of each such expenditure and the name and address of, and office sought by, *each candidate on whose behalf* such expenditure was made." 2 U.S.C. § 434(b)(9) (1970 ed., Supp. IV) (emphasis added).

See also 2 U.S.C. § 434(e) (1970 ed., Supp. IV). (Both reproduced in Appendix to *Buckley, supra,* 424 U.S., at 158, 160, 96 S.Ct., at 700, 701.) Surely in many if not most cases, this information will readily permit identification of the particular message that the would-be-anonymous campaigner sponsored. Besides which the burden of complying with this provision, which includes the filing of quarterly reports, is infinitely more onerous than Ohio's simple requirement for signature of  **\*385**  campaign literature. If *Buckley* remains the law, this is an easy case.

\* \* \*

I do not know where the Court derives its perception that "anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent." *Ante,* at 1524. I can imagine no reason why an anonymous leaflet is any more honorable, as a general matter, than an anonymous phone call or an anonymous letter. It facilitates wrong by eliminating accountability, which is ordinarily the very purpose of the anonymity. There are of course exceptions, and where anonymity is needed to avoid "threats, harassment, or reprisals" the First Amendment will require an exemption from the Ohio law. Cf. *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). But to strike down the Ohio law in its general application—and similar laws of 49 other States and the Federal Government—on the ground that all anonymous communication is in our society traditionally sacrosanct, seems to me a distortion of the past that will lead to a coarsening of the future.

I respectfully dissent.

**All Citations**

514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426, 63 USLW 4279, 23 Media L. Rep. 1577

## Footnotes

\*      The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1      The term "liberty" in the Fourteenth Amendment to the Constitution makes the First Amendment applicable to the States. The Fourteenth Amendment reads, in relevant part: "No State shall ... deprive any person of life, liberty, or property, without due process of law...." U.S. Const., Amdt. 14, § 1. Referring to that Clause in his separate opinion in *Whitney v. California,* 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927), Justice Brandeis stated that "all fundamental rights comprised within the term liberty are protected by the Federal Constitution from invasion by the States. The right of free speech, the right to teach and the right of assembly are, of course, fundamental rights." *Id.,* at 373, 47 S.Ct., at 647 (concurring opinion). Although the text of the First Amendment provides only that "*Congress* shall make no law ... abridging the freedom of speech ...," Justice Brandeis' view has been embedded in our law ever since. See *First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 779–780, 98 S.Ct. 1407, 1417–1418, 55 L.Ed.2d 707 (1978); see also Stevens, The Bill of Rights: A Century of Progress, 59 U.Chi.L.Rev. 13, 20, 25–26 (1992).

2      The following is one of Mrs. McIntyre's leaflets, in its original typeface:

<u>VOTE NO</u>

<u>ISSUE 19 SCHOOL TAX LEVY</u>

Last election Westerville Schools, asked us to vote yes for new buildings and expansions programs. We gave them what they asked. We knew there was crowded conditions and new growth in the district.

Now we find out there is a 4 million dollar deficit—WHY?

We are told the 3 middle schools must be split because of over-crowding, and yet we are told 3 schools are being closed—WHY?

A magnet school is not a full operating school, but a specials school.

Residents were asked to work on a 20 member commission to help formulate the new boundaries. For 4 weeks they worked long and hard and came up with a very workable plan. Their plan was totally disregarded —WHY?

WASTE of tax payers dollars must be stopped. Our children's education and welfare must come first. <u>WASTE CAN NO LONGER BE TOLERATED.</u>

PLEASE VOTE NO

ISSUE 19

THANK YOU.

CONCERNED PARENTS

AND

TAX PAYERS

3   Ohio Rev.Code Ann. § 3599.09(A) (1988) provides:

"No person shall write, print, post, or distribute, or cause to be written, printed, posted, or distributed, a notice, placard, dodger, advertisement, sample ballot, or any other form of general publication which is designed to promote the nomination or election or defeat of a candidate, or to promote the adoption or defeat of any issue, or to influence the voters in any election, or make an expenditure for the purpose of financing political communications through newspapers, magazines, outdoor advertising facilities, direct mailings, or other similar types of general public political advertising, or through flyers, handbills, or other nonperiodical printed matter, unless there appears on such form of publication in a conspicuous place or is contained within said statement the name and residence or business address of the chairman, treasurer, or secretary of the organization issuing the same, or the person who issues, makes, or is responsible therefor. The disclaimer 'paid political advertisement' is not sufficient to meet the requirements of this division. When such publication is issued by the regularly constituted central or executive committee of a political party, organized as provided in Chapter 3517. of the Revised Code, it shall be sufficiently identified if it bears the name of the committee and its chairman or treasurer. No person, firm, or corporation shall print or reproduce any notice, placard, dodger, advertisement, sample ballot, or any other form of publication in violation of this section. This section does not apply to the transmittal of personal correspondence that is not reproduced by machine for general distribution.

"The secretary of state may, by rule, exempt, from the requirements of this division, printed matter and certain other kinds of printed communications such as campaign buttons, balloons, pencils, or like items, the size or nature of which makes it unreasonable to add an identification or disclaimer. The disclaimer or identification, when paid for by a campaign committee, shall be identified by the words 'paid for by' followed by the name and address of the campaign committee and the appropriate officer of the committee, identified by name and title."

Section 3599.09(B) contains a comparable prohibition against unidentified communications uttered over the broadcasting facilities of any radio or television station. No question concerning that provision is raised in this case. Our opinion, therefore, discusses only written communications and, particularly, leaflets of the kind Mrs. McIntyre

distributed. Cf. *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 637–638, 114 S.Ct. 2445, 2456–2457, 129 L.Ed.2d 497 (1994) (discussing application of First Amendment principles to regulation of television and radio).

The complaint against Mrs. McIntyre also alleged violations of two other provisions of the Ohio Code, but those charges were dismissed and are not before this Court.

4    American names such as Mark Twain (Samuel Langhorne Clemens) and O. Henry (William Sydney Porter) come readily to mind. Benjamin Franklin employed numerous different pseudonyms. See 2 W. Bruce, Benjamin Franklin Self–Revealed: A Biographical and Critical Study Based Mainly on His Own Writings, ch. 5 (2d ed. 1923). Distinguished French authors such as Voltaire (Francois Marie Arouet) and George Sand (Amandine Aurore Lucie Dupin), and British authors such as George Eliot (Mary Ann Evans), Charles Lamb (sometimes wrote as "Elia"), and Charles Dickens (sometimes wrote as "Boz"), also published under assumed names. Indeed, some believe the works of Shakespeare were actually written by the Earl of Oxford rather than by William Shakster of Stratford–on–Avon. See C. Ogburn, The Mysterious William Shakespeare: The Myth & the Reality (2d ed. 1992); but see S. Schoenbaum, Shakespeare's Lives (2d ed. 1991) (adhering to the traditional view that Shakster was in fact the author). See also Stevens, The Shakespeare Canon of Statutory Construction, 140 U.Pa.L.Rev. 1373 (1992) (commenting on the competing theories).

5    Though such a requirement might provide assistance to critics in evaluating the quality and significance of the writing, it is not indispensable. To draw an analogy from a nonliterary context, the now-pervasive practice of grading law school examination papers "blindly" (*i.e.,* under a system in which the professor does not know whose paper she is grading) indicates that such evaluations are possible—indeed, perhaps more reliable—when any bias associated with the author's identity is prescinded.

6    That tradition is most famously embodied in the Federalist Papers, authored by James Madison, Alexander Hamilton, and John Jay, but signed "Publius." Publius' opponents, the Anti–Federalists, also tended to publish under pseudonyms: prominent among them were "Cato," believed to be New York Governor George Clinton; "Centinel," probably Samuel Bryan or his father, Pennsylvania judge and legislator George Bryan; "The Federal Farmer," who may have been Richard Henry Lee, a Virginia member of the Continental Congress and a signer of the Declaration of Independence; and "Brutus," who may have been Robert Yates, a New York Supreme Court justice who walked out on the Constitutional Convention. 2 H. Storing, ed., The Complete Anti–Federalist (1981). A forerunner of all of these writers was the pre-Revolutionary War English pamphleteer "Junius," whose true identity remains a mystery. See Encyclopedia of Colonial and Revolutionary America 220 (J. Faragher ed. 1990) (positing that "Junius" may have been Sir Phillip Francis). The "Letters of Junius" were "widely reprinted in colonial newspapers and lent considerable support to the revolutionary cause." *Powell v. McCormack,* 395 U.S. 486, 531, n. 60, 89 S.Ct. 1944, 1969, n. 60, 23 L.Ed.2d 491 (1969).

7    In his concurring opinion, Justice Harlan added these words:

"Here the State says that this ordinance is aimed at the prevention of 'fraud, deceit, false advertising, negligent use of words, obscenity, and libel,' in that it will aid in the detection of those responsible for spreading material of that character. But the ordinance is not so limited, and I think it will not do for the State simply to say that the circulation of all anonymous handbills must be suppressed in order to identify the distributors of those that may be of an obnoxious character. In the absence of a more substantial showing as to Los Angeles' actual experience with the distribution of obnoxious handbills, such a generality is for me too remote to furnish a constitutionally acceptable justification for the deterrent effect on free speech which this all-embracing ordinance is likely to have." 362 U.S., at 66–67, 80 S.Ct., at 539–540 (footnote omitted).

McIntyre v. Ohio Elections Comm'n, 514 U.S. 334 (1995)

115 S.Ct. 1511, 131 L.Ed.2d 426, 63 USLW 4279, 23 Media L. Rep. 1577

8       Arguably, the disclosure requirement places a more significant burden on advocates of unpopular causes than on
        defenders of the status quo. For purposes of our analysis, however, we assume the statute evenhandedly burdens all
        speakers who have a legitimate interest in remaining anonymous.

9       Covered documents are those "designed to promote the nomination or election or defeat of a candidate, or to promote
        the adoption or defeat of any issue, or to influence the voters in any election...." § 3599.09(A).

10      In 📁 *Meyer,* we unanimously applied strict scrutiny to invalidate an election-related law making it illegal to pay petition
        circulators for obtaining signatures to place an initiative on the state ballot. Similarly, in 📁*Burson v. Freeman,* 504
        U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992), although the law at issue—forbidding campaign-related speech within
        100 feet of the entrance to a polling place—was an election-related restriction, both the plurality and dissent applied
        strict scrutiny because the law was "a facially content-based restriction on political speech in a public forum." 📁*Id.,*
        at 198, 112 S.Ct. at 1851; see also 📁*id.,* at 212–213, 112 S.Ct. at 1858 (KENNEDY, J., concurring); 📁*id.,* at 217,
        112 S.Ct. at 1861 (STEVENS, J., dissenting).

11      "Of course, the identity of the source is helpful in evaluating ideas. But 'the best test of truth is the power of the thought
        to get itself accepted in the competition of the market' (*Abrams v. United States,* [250 U.S. 616, 630, 40 S.Ct. 17, 22,
        63 L.Ed. 1173 (1919)] (Holmes, J., dissenting) ] ). Don't underestimate the common man. People are intelligent enough
        to evaluate the source of an anonymous writing. They can see it is anonymous. They know it is anonymous. They can
        evaluate its anonymity along with its message, as long as they are permitted, as they must be, to read that message.
        And then, once they have done so, it is for them to decide what is 'responsible', what is valuable, and what is truth."

        📁*New York v. Duryea,* 76 Misc.2d 948, 966–967, 351 N.Y.S.2d 978, 996 (1974) (striking down similar New York
        statute as overbroad).

12      Section 3599.09.1(B) provides:

        "No person, during the course of any campaign for nomination or election to public office or office of a political party,
        by means of campaign materials, including sample ballots, an advertisement on radio or television or in a newspaper
        or periodical, a public speech, press release, or otherwise, shall knowingly and with intent to affect the outcome of
        such campaign do any of the following:

        "(1) Use the title of an office not currently held by a candidate in a manner that implies that the candidate does
        currently hold that office or use the term 're-elect' when the candidate has never been elected at a primary, general,
        or special election to the office for which he is a candidate;

        "(2) Make a false statement concerning the formal schooling or training completed or attempted by a candidate; a
        degree, diploma, certificate, scholarship, grant, award, prize, or honor received, earned, or held by a candidate; or the
        period of time during which a candidate attended any school, college, community technical school, or institution;

        "(3) Make a false statement concerning the professional, occupational, or vocational licenses held by a candidate, or
        concerning any position the candidate held for which he received a salary or wages;

        "(4) Make a false statement that a candidate or public official has been indicted or convicted of a theft offense,
        extortion, or other crime involving financial corruption or moral turpitude;

        "(5) Make a statement that a candidate has been indicted for any crime or has been the subject of a finding by the
        Ohio elections commission without disclosing the outcome of any legal proceedings resulting from the indictment
        or finding;

"(6) Make a false statement that a candidate or official has a record of treatment or confinement for mental disorder;

"(7) Make a false statement that a candidate or official has been subjected to military discipline for criminal misconduct or dishonorably discharged from the armed services;

"(8) Falsely identify the source of a statement, issue statements under the name of another person without authorization, or falsely state the endorsement of or opposition to a candidate by a person or publication;

"(9) Make a false statement concerning the voting record of a candidate or public official;

"(10) Post, publish, circulate, distribute, or otherwise disseminate a false statement, either knowing the same to be false or with reckless disregard of whether it was false or not, concerning a candidate that is designed to promote the election, nomination, or defeat of the candidate. As used in this section, 'voting record' means the recorded 'yes' or 'no' vote on a bill, ordinance, resolution, motion, amendment, or confirmation."

Section 3599.09.2(B) provides:

"No person, during the course of any campaign in advocacy of or in opposition to the adoption of any ballot proposition or issue, by means of campaign material, including sample ballots, an advertisement on radio or television or in a newspaper or periodical, a public speech, a press release, or otherwise, shall knowingly and with intent to affect the outcome of such campaign do any of the following:

"(1) Falsely identify the source of a statement, issue statements under the name of another person without authorization, or falsely state the endorsement of or opposition to a ballot proposition or issue by a person or publication;

"(2) Post, publish, circulate, distribute, or otherwise disseminate, a false statement, either knowing the same to be false or acting with reckless disregard of whether it was false or not, that is designed to promote the adoption or defeat of any ballot proposition or issue." § 3599.09.2(B).

We need not, of course, evaluate the constitutionality of these provisions. We quote them merely to emphasize that Ohio has addressed directly the problem of election fraud. To the extent the anonymity ban indirectly seeks to vindicate the same goals, it is merely a supplement to the above provisions.

13    The same can be said with regard to "libel," as many of the above-quoted Election Code provisions prohibit false statements about candidates. To the extent those provisions may be underinclusive, Ohio courts also enforce the common-law tort of defamation. See, *e.g., Varanese v. Gall,* 35 Ohio St.3d 78, 518 N.E.2d 1177 (1988) (applying the standard of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), to an Ohio public official's state-law libel claim arising from an election-related advertisement). Like other forms of election fraud, then, Ohio directly attacks the problem of election-related libel; to the extent that the anonymity ban serves the same interest, it is merely a supplement.

14    We stressed the importance of this distinction in *Buckley v. Valeo,* 424 U.S. 1, 37, 96 S.Ct. 612, 643, 46 L.Ed.2d 659 (1976):

"Treating these expenses [the expenses incurred by campaign volunteers] as contributions when made to the candidate's campaign or at the direction of the candidate or his staff forecloses an avenue of abuse without limiting actions voluntarily undertaken by citizens independently of a candidate's campaign." (Footnote omitted.)

Again, in striking down the independent expenditure limitations of the Federal Election Campaign Act of 1971, 18 U.S.C. § 608(e)(1) (1970 ed., Supp. IV) (repealed 1976), we distinguished another section of the statute (§ 608(b), which we upheld) that placed a ceiling on contributions to a political campaign.

"By contrast, § 608(e)(1) limits expenditures for express advocacy of candidates made totally independently of the candidate and his campaign. Unlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive. The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate. Rather than preventing circumvention of the contribution limitations, § 608(e)(1) severely restricts all independent advocacy despite its substantially diminished potential for abuse." 424 U.S., at 47, 96 S.Ct., at 648.

15  "The risk of corruption perceived in cases involving candidate elections, *e.g., United States v. Automobile Workers,* [352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957) ]; *United States v. CIO,* [335 U.S. 106, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948) ], simply is not present in a popular vote on a public issue." *First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 790, 98 S.Ct. 1407, 1423, 55 L.Ed.2d 707 (1978) (footnote omitted).

16  As the Illinois Supreme Court explained in *People v. White,* 116 Ill.2d 171, 180, 107 Ill.Dec. 229, 234, 506 N.E.2d 1284, 1288 (1987), which struck down a similar statute:

> "Implicit in the State's ... justification is the concern that the public could be misinformed and an election swayed on the strength of an eleventh-hour anonymous smear campaign to which the candidate could not meaningfully respond. The statute cannot be upheld on this ground, however, because it sweeps within its net a great deal of anonymous speech completely unrelated to this concern. In the first place, the statute has no time limit and applies to literature circulated two months prior to an election as well as that distributed two days before. The statute also prohibits anonymous literature supporting or opposing not only candidates, but also referenda. A public question clearly cannot be the victim of character assassination."

The temporal breadth of the Ohio statute also distinguishes it from the Tennessee law that we upheld in *Burson v. Freeman,* 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992). The Tennessee statute forbade electioneering within 100 feet of the entrance to a polling place. It applied only on election day. The State's interest in preventing voter intimidation and election fraud was therefore enhanced by the need to prevent last-minute misinformation to which there is no time to respond. Moreover, Tennessee geographically confined the reach of its law to a 100–foot no-solicitation zone. By contrast, the Ohio law forbids anonymous campaign speech wherever it occurs.

17  "In deciding whether this novel and restrictive gloss on the First Amendment comports with the Constitution and the precedents of this Court, we need not survey the outer boundaries of the Amendment's protection of corporate speech, or address the abstract question whether corporations have the full measure of rights that individuals enjoy under the First Amendment." *Bellotti,* 435 U.S., at 777–778, 98 S.Ct., at 1416.

In a footnote to that passage, we continued:

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 274 of 379

McIntyre v. Ohio Elections Com'n, 514 U.S. 334 (1995)
115 S.Ct. 1511, 131 L.Ed.2d 426, 63 USLW 4279, 23 Media L. Rep. 1577

"Nor is there any occasion to consider in this case whether, under different circumstances, a justification for a restriction on speech that would be inadequate as applied to individuals might suffice to sustain the same restriction as applied to corporations, unions, or like entities." 🚩 *Id.,* at 777–778, n. 13, 98 S.Ct., at 1416, n. 13.

18    "Corporate advertising, unlike some methods of participation in political campaigns, is likely to be highly visible. Identification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected. See 🚩 *Buckley,* 424 U.S., at 66–67 [96 S.Ct., at 657]; 🏳 *United States v. Harriss,* 347 U.S. 612, 625–626 [74 S.Ct. 808, 815–816, 98 L.Ed. 989] (1954). In addition, we emphasized in 🚩 *Buckley* the prophylactic effect of requiring that the source of communication be disclosed. 🚩 424 U.S., at 67 [96 S.Ct., at 657]." 🏳 *Id.,* 435 U.S., at 792, n. 32, 98 S.Ct., at 1424, n. 32.

19    One of those provisions, addressing contributions by campaign committees, required:

"the identification of each person to whom expenditures have been made by such committee or candidate or on behalf of such committee within the calendar year in an aggregate amount or value in excess of $100, the amount, date, and purpose of each such expenditure and the name and address of, and office sought by, each candidate on whose behalf such expenditure was made." 🏳 2 U.S.C. § 434(b)(9) (1970 ed., Supp. IV) (reprinted in 🚩 *Buckley,* 424 U.S., at 158, 96 S.Ct., at 700).

A separate provision, 🏳 2 U.S.C. § 434(e) (1970 ed., Supp. IV) (reprinted in 🚩 *Buckley,* 424 U.S., at 160, 96 S.Ct., at 701), required individuals making contributions or expenditures to file statements containing the same information.

20    This interest also serves to distinguish 🏳 *United States v. Harriss,* 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954), in which we upheld limited disclosure requirements for lobbyists. The activities of lobbyists who have direct access to elected representatives, if undisclosed, may well present the appearance of corruption.

21    We note here also that the federal Act, while constitutional on its face, may not be constitutional in all its applications. Cf. 🏳 *Brown v. Socialist Workers '74 Campaign Comm. (Ohio),* 459 U.S. 87, 88, 103 S.Ct. 416, 418, 74 L.Ed.2d 250 (1982) (holding Ohio disclosure requirements unconstitutional as applied to "a minor political party which historically has been the object of harassment by government officials and private parties"); 🚩 *Buckley,* 424 U.S., at 74, 96 S.Ct., at 661 (exempting minor parties from disclosure requirements if they can show "a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties").

1    See 🏳 *City of Ladue v. Gilleo,* 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994), in which we held that the city of Ladue could not prohibit homeowner Gilleo's display of a small sign, on her lawn or in a window, opposing war in the Persian Gulf.

2    Grace was the "lone picketer" who stood on the sidewalk in front of this Court with a sign containing the text of the First Amendment, prompting us to exclude public sidewalks from the statutory ban on display of a "flag, banner, or device" on Court grounds. 🏳 *United States v. Grace,* 461 U.S. 171, 183, 103 S.Ct. 1702, 1710, 75 L.Ed.2d 736 (1983).

1    The Anti–Federalists recognized little difficulty in what today would be a state-action problem, because they considered Federalist conduct in supporting the Constitution as a preview of the tyranny to come under the new Federal Government.

2    As noted earlier, several pieces in support appeared in the Federalist newspaper, the Philadelphia Independent Gazetteer. They were immediately answered by two Anti–Federalists in the Philadelphia Freeman's Journal. These Anti–Federalists

accused the Federalists of "preventing that freedom of enquiry which truth and honour never dreads, but which tyrants and tyranny could never endure." 13 Documentary History 317–318.

3    See Mason, Objections to the Constitution, Virginia Journal, Nov. 22, 1787, 1 Debate on the Constitution 345 (B. Bailyn ed. 1993); Martin, The Genuine Information, Maryland Gazette, Dec. 28, 1787–Feb. 8, 1788, *id.,* at 631. Both men may have made an exception to the general practice because they both had attended the Philadelphia Convention, but had refused to sign the Constitution. As leaders of the fight against ratification, both men may have believed that they owed a personal explanation to their constituents of their decision not to sign.

1    See Act of June 19, 1915, No. 171, § 9, 1915 Ala.Acts 250, 254–255; Act of Mar. 12, 1917, ch. 47, § 1, 1917 Ariz.Sess.Laws 62, 62–63; Act of Apr. 2, 1913, No. 308, § 6, 1913 Ark.Gen.Acts 1252, 1255; Act of Mar. 15, 1901, ch. 138, § 1, 1901 Cal.Stats. 297; Act of June 6, 1913, ch. 6470, § 9, 1913 Fla.Laws 268, 272–273; Act of June 26, 1917, § 1, 1917 Ill.Laws 456, 456–457; Act of Mar. 14, 1911, ch. 137, § 1, 1911 Kan.Sess.Laws 221; Act of July 11, 1912, No. 213, § 14, 1912 La.Acts 447, 454; Act of June 3, 1890, ch. 381, 1890 Mass.Acts 342; Act of June 20, 1912, Ex.Sess. ch. 3, § 7, 1912 Minn.Laws 23, 26; Act of Apr. 21, 1906, S.B. No. 191, 1906 Miss.Gen.Laws 295 (enacting Miss.Code Ann. § 3728 (1906)); Act of Apr. 9, 1917, § 1, 1917 Mo.Laws 272, 273; Act of Nov. 1912, § 35, 1912 Mont.Laws 593, 608; Act of Mar. 31, 1913, ch. 282, § 34, 1913 Nev.Stats. 476, 486–487; Act of Apr. 21, 1915, ch. 169, § 7, 1915 N.H.Laws 234, 236; Act of Apr. 20, 1911, ch. 188, § 9, 1911 N.J.Laws 329, 334; Act of Mar. 12, 1913, ch. 164, § 1(k), 1913 N.C.Sess.Laws 259, 261; Act of May 27, 1915, 1915 Ohio Leg. Acts 350; Act of June 23, 1908, ch. 3, § 35, 1909 Ore.Laws 15, 30; Act of June 26, 1895, No. 275, 1895 Pa.Laws 389; Act of Mar. 13, 1917, ch. 92, § 23, 1917 Utah Laws 258, 267; Act of Mar. 12, 1909, ch. 82, § 8, 1909 Wash.Laws 169, 177–178; Act of Feb. 20, 1915, ch. 27, § 13, 1915 W.Va.Acts 246, 255; Act of July 11, 1911, ch. 650, §§ 94–14 to 94–16, 1911 Wis.Laws 883, 890.

2    See Ala.Code § 17–22A–13 (Supp.1994); Alaska Stat.Ann. § 15.56.010 (1988); Ariz.Rev.Stat.Ann. § 16–912 (Supp.1994); Ark.Code Ann. § 7–1–103 (1993); Colo.Rev.Stat. § 1–13–108 (Supp.1994); Conn.Gen.Stat. § 9–333w (Supp.1994); Del.Code Ann., Tit. 15, §§ 8021, 8023 (1993); Fla.Stat. §§ 106.143 and 106.1437 (1992); Ga.Code Ann. § 21–2–415 (1993); Haw.Rev.Stat. § 11–215 (1988); Idaho Code § 67–6614A (Supp.1994); Ill.Comp.Stat. ch. 10, § 5/29–14 (1993); Ind.Code § 3–14–1–4 (Supp.1994); Iowa Code § 56.14 (1991); Kan.Stat.Ann. §§ 25–2407 and 25–4156 (Supp.1991); Ky.Rev.Stat.Ann. § 121.190 (Baldwin Supp.1994); La.Rev.Stat.Ann. § 18:1463 (West Supp.1994); Me.Rev.Stat.Ann., Tit. 21–A, § 1014 (1993); Md.Ann.Code, Art. 33, § 26–17 (1993); Mass.Gen.Laws, ch. 53, § 41 (1990); Mich.Comp.Laws Ann. § 169.247 (West 1989); Minn.Stat. § 211B.04 (1994); Miss.Code Ann. § 23–15–899 (1990); Mo.Rev.Stat. § 130.031 (Supp.1994); Mont.Code Ann. § 13–35–225 (1993); Neb.Rev.Stat. § 49–1474.01 (1993); Nev.Rev.Stat. § 294A.320 (Supp.1993); N.H.Rev.Stat.Ann. § 664:14 (Supp.1992); N.J.Stat.Ann. § 19:34–38.1 (West 1989); N.M.Stat.Ann. §§ 1–19–16 and 1–19–17 (1991); N.Y.Elec.Law § 14–106 (McKinney 1978); N.C.Gen.Stat. § 163–274 (Supp.1994); N.D.Cent.Code § 16.1–10–04.1 (1981); Ohio Rev.Code Ann. § 3599.09(A) (1988); Okla.Stat., Tit. 21, § 1840 (Supp.1995); Ore.Rev.Stat. § 260.522 (1991); 25 Pa.Cons.Stat. § 3258 (1994); R.I.Gen.Laws § 17–23–2 (1988); S.C.Code Ann. § 8–13–1354 (Supp.1993); S.D.Comp.Laws Ann. § 12–25–4.1 (Supp.1994); Tenn.Code Ann. § 2–19–120 (Supp.1994); Tex.Elec.Code Ann. § 255.001 (Supp.1995); Utah Code Ann. § 20–14–24 (Supp.1994); Vt.Stat.Ann., Tit. 17, § 2022 (1982); Va.Code Ann. § 24.2–1014 (1993); Wash.Rev.Code

McIntyre v. Ohio Elections Com'n, 514 U.S. 334 (1995)

115 S.Ct. 1511, 131 L.Ed.2d 426, 63 USLW 4279, 23 Media L. Rep. 1577

§ 42.17.510 (Supp.1994); W.Va.Code § 3–8–12 (1994); Wis.Stat. § 11.30 (Supp.1994); Wyo.Stat. § 22–25–110 (1992).

Courts have declared some of these laws unconstitutional in recent years, relying upon our decision in *Talley v. California,* 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960). See, e.g., *State v. Burgess,* 543 So.2d 1332 (La.1989); *State v. North Dakota Ed. Assn.,* 262 N.W.2d 731 (N.D.1978); *People v. Duryea,* 76 Misc.2d 948, 351 N.Y.S.2d 978 (Sup.), aff'd, 44 App.Div.2d 663, 354 N.Y.S.2d 129 (1974). Other decisions, including all pre-*Talley* decisions I am aware of, have upheld the laws. See, e.g., *Commonwealth v. Evans,* 156 Pa.Super. 321, 40 A.2d 137 (1944); *State v. Freeman,* 143 Kan. 315, 55 P.2d 362 (1936); *State v. Babst,* 104 Ohio St. 167, 135 N.E. 525 (1922).

3    It might be accurate to say that, insofar as the judicially unconstrained judgment of American legislatures is concerned, approval of the law before us here is universal. California, although it had enacted an election disclosure requirement as early as 1901, see Act of Mar. 15, 1901, ch. 138, § 1, 1901 Cal. Stats. 297, abandoned its law (then similar to Ohio's) in 1983, see Act of Sept. 11, 1983, ch. 668, 1983 Cal.Stats. 2621, after a California Court of Appeal, relying primarily on our decision in *Talley,* had declared the provision unconstitutional, see *Schuster v. Imperial County Municipal Court,* 109 Cal.App.3d 887, 167 Cal.Rptr. 447 (1980), cert. denied, 450 U.S. 1042, 101 S.Ct. 1760, 68 L.Ed.2d 239 (1981).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 196920
Only the Westlaw citation is currently available.
United States District Court, N.D. Georgia, Atlanta Division.

Tomas MIKO, Plaintiff,

v.

Representative Vernon JONES, in his individual and official capacities, Defendant.

Civil Action No. 1:20-cv-02147-SDG
|
Signed January 17, 2023

**Attorneys and Law Firms**

Amith Gupta, American Trial Law Litigators LLC, Atlanta, GA, Craig Lewis Goodmark, Goodmark Law Firm, Atlanta, GA, Gerald R. Weber, Atlanta, GA, for Plaintiff.

**OPINION AND ORDER**

Steven D. Grimberg, United States District Court Judge

**\*1**  This matter is before the Court following an evidentiary hearing on Plaintiff Tomas Miko's damages resulting from a default judgment against Defendant Vernon Jones. The Court incorporates by reference its statement of facts as set out in the February 17, 2022 Order granting Miko's motion for default judgment. [1]  For purposes of this Order, it is sufficient to note that Jones, then a Georgia state representative, blocked Miko, his constituent, from Jones's Facebook pages after a sharp exchange of political speech between them. Miko asserted a claim under 42 U.S.C. § 1983 to vindicate the resulting violation of his First Amendment rights, which Jones admitted by virtue of his default. The Court entered judgment against Jones on February 17, 2022, and, on March 14, 2022, it held an evidentiary hearing on Miko's damages.

Between his motion for default judgment and the damages hearing, Miko requested nominal damages; presumed damages ranging between $500 and $5,000; actual damages ranging between $3,000 and $5,000, including all applicable damages for emotional distress; and attorneys' fees and costs. Miko's counsel waived any request for punitive damages during the damages hearing. The Court addresses each remaining category of requested damages and fees.

**I. Nominal Damages**

The Court previously concluded that Miko is entitled to nominal damages. [2]  Such damages are appropriately awarded on default judgment for a constitutional violation. Uzuegbunam v. Preczewski, 141 S. Ct. 792, 800 (2021); Slicker v. Jackson, 215 F.3d 1225, 1231 (11th Cir. 2000) ("We have held unambiguously that a plaintiff whose constitutional rights are violated is entitled to nominal damages even if he suffered no compensable injury."); see also Slicker, 215 F.3d at 1230–33. However, nominal damages merely signify a party's vindication in court and are "awarded by default until the plaintiff establishes entitlement to some other form of damages, such as compensatory or statutory damages." Uzuegbunam, 141 S. Ct. at 800. Because Miko has established his entitlement to compensatory damages as detailed below, the Court need not award nominal damages here. Id.; see also Furman v. Warden, 827 F. App'x 927, 935 (11th Cir. 2020) (citations omitted) ("[A] plea for compensatory damages or for general damages[ ] includes nominal damages: the greater includes the lesser.").

## II. Compensatory Damages

Compensatory damages are "mandatory" upon a finding of liability. *Smith v. Wade*, 461 U.S. 30, 52 (1982) (noting that by contrast, punitive damages are discretionary). Compensatory damages in a Section 1983 suit must be "based on actual injury caused by the defendant rather than on the 'abstract value' of the constitutional rights that may have been violated." *Slicker*, 215 F.3d at 1230 (citations omitted) (determining that a jury could award compensatory damages for pain and suffering without proof of medical bills, missed work, or lost income); *accord Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299 (1986) (citation omitted). Miko's presumed damages (*i.e.*, those compensatory damages tied to the violation of his First Amendment rights) and actual damages (*e.g.*, compensatory damages for his emotional pain and suffering) are awarded in the amount of $8,000.

### A. Presumed Damages

**\*2**  Miko is plainly entitled to presumed damages. *Slicker*, 215 F.3d at 1230. During the damages hearing, Miko clarified that he requests between $500 and $5,000 in presumed damages for the violation of his First Amendment rights consistent with settlements his counsel has obtained in other cases involving social media blocking. Miko further offered two reasons why an award at the higher end of that range is warranted: (1) the COVID-19 pandemic created conditions in which the Georgia General Assembly was not in session, constituents could not readily communicate with their legislators, and social media platforms like Facebook provided the only feasible forum for constituents to engage with their legislators; and (2) Miko's heritage as an immigrant to the United States informs his political view, so the immigration policies Jones then deliberated "came very close to [Miko's] heart" and went "far beyond just a general political interest of his."

Here, Miko has demonstrated an interest in communicating with Jones, his elected representative, and that Jones's Facebook accounts were the best (and possibly the only) vehicle for that communication. The Court recognizes Miko's exercise of his First Amendment rights and lauds his engagement with the political process, but those rights and that engagement are no more or less privileged than that of any other American. The Court knows of no legal authority (and Miko offers none) supporting the idea that he is entitled to greater presumed damages based on his demonstrated personal connection to immigration issues or any other topic. However, the COVID-19 global pandemic presented heretofore unique circumstances that made constituents' in-person, telephonic, or other non-social media communication with their elected officials temporarily impracticable. Those circumstances were exacerbated by the uncontroverted fact that Jones regularly used his online presence to voice his political opinions and initially exchange barbs with Miko before blocking him from those fora. The Court is thus persuaded that Jones's restriction of Miko's access to Jones's Facebook pages under these exceptional facts and circumstances was an especially severe curtailment of Miko's First Amendment rights. The Court awards Miko $5,000 in presumed damages for this unique violation of his rights.

### B. Actual Damages

During the damages hearing, Miko requested $3,000 to $5,000 in actual damages. In addition to actual damages based on monetary loss or physical pain and suffering, the plaintiff in a Section 1983 action may be awarded actual compensatory damages for any demonstrated mental and emotional distress, impairment of reputation, and personal humiliation. *Slicker*, 215 F.3d at 1230 (citing *Wright v. Sheppard*, 919 F.2d 665, 669 (11th Cir. 1990) (holding that non-physical injuries such as humiliation, emotional distress, and mental anguish and suffering are all within the ambit of compensatory damages under Section 1983)). Such damages "need not be proven with a high degree of specificity" and "may be inferred from the circumstances as well as proved by the testimony." *Ferrill v. The Parker Group, Inc.*, 168 F.3d 468, 476 (11th Cir. 1999).

Miko did not claim a monetary loss or physical pain and suffering. Indeed, Miko conceded that he neither sought help from a counselor, nor incurred any medical or other expense associated with medical or psychological treatment. Nevertheless, he testified that, upon getting "blocked" from Jones's Facebook pages, he became anxious, stigmatized, lost his ability to socialize with others, and suffered significant emotional distress. In his counsel's words, Miko suffered a "moderate-level impact" on his emotional wellbeing. Thus, a correspondingly "moderate-level" award of actual damages is in order. The Court finds that $3,000 in actual damages for Miko's mental and emotional pain and suffering is appropriate.

The Court finds that a combined award of $8,000 in compensatory damages compensates for Miko's injuries and is sufficient to deter Jones and other public officials from engaging in similar misconduct—particularly during any future public health emergency that renders other public fora for political speech ineffectual or unfeasible. [3]

### III. Attorneys' Fees and Costs

**\*3**  Miko also seeks $37,678 in attorneys' fees, supported by declarations from his legal counsel that detail each task performed and their hourly rates. [4]  Having entered judgment against Jones and in favor of Miko, the Court finds that Miko is entitled to recover reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and costs of litigation pursuant to Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920. *Hensley v. Eckerhart*, 461 U.S. 424, 429 ("[A] prevailing plaintiff should ordinarily recover an attorney's fee [under 42 U.S.C. § 1988] unless special circumstances would render such an award unjust.") (cleaned up); *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441–42 (1987) ("Section 1920 enumerates expenses that a federal court may tax as a cost under the discretionary authority found in Rule 54(d).").

"Determining a reasonable attorney's fee is a matter that is committed to the sound discretion of a trial judge." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 558 (2010) (cleaned up). In the Eleventh Circuit, "the starting point in any determination for an objective estimate of the value of a lawyer's services is to multiply hours reasonably expended by a reasonable hourly rate," commonly referred to as the "lodestar" approach. *Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988). "[T]here is a 'strong presumption' that the lodestar is the reasonable sum the attorneys deserve." *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1350 (11th Cir. 2008) (per curiam) (citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565–66 (1986)).

Miko accounts for the requested $37,678 in fees and costs as follows: Attorney Gerry Webber completed 28.3 hours of work at a rate of $540 per hour for a total of $15,282; Attorney Craig Goodmark completed 26.6 hours of work at a rate of $435 per hour and paid the $400 filing fee for this case for a total of $11,705; Attorney Amith Gupta completed 38.2 hours of work at a rate of $250 per hour and accumulated $26 in postage and PACER costs for a total of $9,576; and Miko accumulated costs of service, including $215 for service of the summons and $900 for a private investigator to help effectuate service, for a total of $1,115.

Regarding these fees, Miko's unrefuted argument at the damages hearing was that the requested fees are justified for two reasons: (1) the default posture of this case was relatively unusual in counsel's experience requiring additional research, and (2) his counsel tried to eliminate multiplicity of work. Considering counsel's experience and qualifications, the prevailing market rate in Atlanta for similar services by lawyers of reasonably comparable skills and experience, *Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994) (citing *Norman* 836 F.2d at 1299), and the efforts counsel made to litigate this case expeditiously, the Court finds that the proposed fees are reasonable.

Regarding costs, two items give the Court pause. First, Miko is not entitled to collect the $26 for postage and unexplained "PACER" costs included in Attorney Gupta's invoice. [5]  Miko's counsel does not sufficiently explain the purpose of these costs, and amounts merely incidental to trial or preparation for it are not considered necessary for purposes of Section 1920.

⚑ *Duckworth v. Whisenant*, 97 F.3d 1393, 1399 (11th Cir. 1996) (noting that costs for "computerized legal research" and "postage" are "clearly nonrecoverable" under Section 1920).

Second, while costs for private investigators are not covered under Section 1920 and there is an apparent split of authority in this Circuit regarding whether costs for private investigators are recoverable, *Diamond Heads, LLC v. Everingham*, 2011 WL 3269685, at *2 (M.D. Fla. July 29, 2011), the Court finds that the costs of the private investigator in this case were necessary to effect service of process after Jones refused to accept service of the complaint and summons and evaded attempts at service. [6] Costs of a private investigator to locate and serve on a dodging defendant are materially different from those paid to investigate the facts of a case in preparation for trial. Under these circumstances, the Court finds that Miko is entitled to recover $900 in costs for the private investigator. Thus, the Court concludes that Miko is entitled to $37,652 in costs and fees—the amount he requested less the postage and "PACER" costs.

## IV. Conclusion

**\*4** The Court **AWARDS** Miko $8,000 in damages and $37,652 in costs and fees. The Clerk is **DIRECTED** to enter judgment in favor of Miko and against Jones in the total amount of $45,652 and close this case. [7]

**SO ORDERED** this 17th day of January, 2023.

## All Citations

Slip Copy, 2023 WL 196920

## Footnotes

1    ECF 29, at 1–4.

2    *Id.* at 15.

3    This sum is consistent with Miko's request for compensatory damages in his motion for default judgment. ECF 27-2, at 19 ("Plaintiff submits that the appropriate damages for this prolonged campaign of viewpoint discrimination by a public official for an eight-month period is $8,000.").

4    *Id.* at 21.

5    ECF 34-4, at 7.

6    ECF 34-1, at 1.

7    Undersigned regrets and apologizes to Miko and his counsel for the delay in entering this order on damages following the damages hearing in March 2022, which was due to the unanticipated press of other matters.

---

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

483 Fed.Appx. 956

This case was not selected for publication in West's Federal Reporter.

See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir. Rule 32.1.

United States Court of Appeals, Sixth Circuit.

George T. PAETH; Margaret C. Paeth, Plaintiffs–Appellees Cross–Appellants,

v.

WORTH TOWNSHIP, a Michigan municipal corporation, Defendant–Appellant Cross–Appellee,

Barbara Cutcher, Building and Zoning Official for Worth Township, in her official capacity, Defendant.

Nos. 10–2548, 10–2612

|

June 8, 2012.

**Synopsis**

**Background:** Homeowners brought action against town and its zoning administrator, asserting claims arising out of defendants' alleged interference with and delay of their efforts to renovate their home. The United States District Court for the Eastern District of Michigan, granted in part and denied in part the parties' cross-motions for summary judgment, 705 F.Supp.2d 753, and after a jury found for homeowners, denied town's motion for a new trial, or in the alternative remittitur, 2010 WL 4822890, and granted in part homeowners' motion for attorney's fees, 2010 WL 4867406. Both parties appealed.

**Holdings:** The Court of Appeals held that:

homeowners' due process rights were not violated by posting of stop work order;

sufficient evidence supported homeowners' First Amendment retaliation claim;

district court did not abuse its discretion when it denied town's motion for a new trial or for remittitur; and

district court did not abuse its discretion in awarding only a portion of attorneys fees requested by homeowners.

Affirmed in part, and reversed and vacated in part.

Rogers, Circuit Judge, filed an opinion concurring in part and dissenting in part.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

 **\*958**  On Appeal from the United States District Court for the Eastern District of Michigan.

BEFORE: GUY, COLE, and ROGERS, Circuit Judges.

**Opinion**

PER CURIAM.

George and Margaret Paeth faced many hurdles from Worth Township in trying to **\*959** renovate their home. Eventually, they took the Township to court, where a jury awarded them $600,000 on First Amendment retaliation and procedural due process claims. The Paeths did not establish a procedural due process violation, because the process they were afforded was constitutionally sufficient. There was, however, sufficient evidence to support their First Amendment retaliation claim, and the damages awarded on the First Amendment claim were not excessive. Finally, the district court's partially reduced grant of attorneys fees was not an abuse of discretion.

## I.

In 1998, George and Margaret Paeth purchased a house in Worth Township. Though they had originally planned to renovate and resell it, they instead decided to prepare it for their own habitation. Their renovation plans included adding enclosed areas to the first floor and replacing the roof. The plans meant that the house's footprint would expand slightly on the northeast and northwest corners. The northwest corner already did not conform with a five-foot setback requirement in place for the site.

The Paeths applied for a land use permit, which necessitated a survey of the property that revealed the nonconforming northwest corner. The Paeths claim that they notified Barbara Cutcher, Worth Township's zoning administrator, who said that the nonconformity would not be a problem and that they could continue their development plans. The Paeths obtained a land use permit from the Township on April 27, 1999, and then a building permit from the county's building department on June 17, 1999. The county's building department inspected and approved the house's foundation, and the house was then framed.

In 2002, the Township formed its own building department, which assumed the responsibilities that had previously rested on the county. Cutcher became the Township's zoning and building administrator. Soon after, she declared that the county inspector had informed her that the Paeths' building permit had expired in 2002. The Paeths disagreed, but obtained a new building permit from the Township on July 7, 2003.

In June 2004, Cutcher notified the Paeths that their house did not comply with the Township's setback ordinance, which by then was eight feet, not five, and told them to contact zoning administrator Lynn Laughlin as "[t]his is a serious problem." Cutcher's letter also extended the Paeths' permit into July 2004. Cutcher later testified that former Township supervisor Janice Putz had instructed her to write the letter, though Cutcher agreed that the contents were accurate and the letter should have been sent.

On June 22, 2004, the Paeths submitted a variance application, prompting Laughlin to request another property survey. The new survey showed that the 1999 survey significantly underestimated the distance between the house and property line; the Township claims that this meant Cutcher relied on inaccurate information when she approved the land use permit. After some additional filings by the Paeths explaining their reliance on representations made by Township officials, the Zoning Board of Appeals (ZBA) held a hearing on the variance request on May 18, 2005. The ZBA voted unanimously to deny the variance, meaning that the Paeths would have to bring their house back into compliance by removing the problematic portions.

The Paeths appealed the ZBA's decision to the county's circuit court, which found that the ZBA had applied the wrong standard **\*960** to the request and so remanded for further proceedings. The ZBA upheld its denial of the request on May 24, 2006; the Paeths never received notice of the hearing, which was required by law. It appears that the letter sent notifying them had the wrong address. The Paeths again appealed, this time to the state circuit court, and they obtained a third heading. The ZBA again denied the variance request on November 13, 2006, at which point the Paeths again appealed to the circuit court. This time, the circuit court reversed the decision of the ZBA and granted the variance. The Township unsuccessfully appealed to the Michigan Court of Appeals, which dismissed the claim for lack of jurisdiction on July 13, 2007.

On November 5, 2007, Cutcher posted a stop work order on the Paeths' property. She insisted that the Paeths needed to obtain a new permit to continue work, and provided an application for one. The Paeths received no notice of a hearing before the order was posted, a requirement under Mich. Comp. Laws § 125.1512(3): "If construction is being undertaken contrary to a

*Paeth v. Worth Tp.*, 483 Fed.Appx. 956 (2012)

building permit, ... the enforcing agency shall give written notice to the holder of the building permit ... notifying him of the violation of this act ... and to appear and show cause why the construction should not be stopped." Cutcher testified that she posted the order on instruction from Marcy Bartniczak, the Township Clerk, and against her better judgment. A number of Township officials corroborated Cutcher's account that she did not want to post the order, but also testified that they did nothing to stop her from doing so.

Cutcher testified that had the Paeths requested a new permit, the matter could have been resolved in a day or two. Instead, the Paeths contacted the State of Michigan Office of Local Government and Consumer Services to confirm that their 2003 permit was still valid. After some confusion, the office issued a letter on May 22, 2008, stating that the Paeths could begin working "upon meeting the conditions set forth within the letter for code compliance." Cutcher wrote to the Paeths on May 24, 2008, confirming the Paeths had a valid permit, but also demanding that they contact her before beginning work so that she could inspect the property for code compliance. The Paeths did not contact her. The stop work order was not removed from the property until October, pursuant to a district court order.

On September 11, 2008, the Paeths sued Cutcher and Worth Township on four counts, all brought under 📁 42 U.S.C. § 1983: (1) violation of their First Amendment rights when Cutcher and the Township retaliated against them for appealing the ZBA's variance decision; (2) violation of the Equal Protection Clause; (3) violation of substantive and procedural due process because of the issuance of the stop work order without notice or an opportunity to respond; and (4) a request for mandamus and superintending control. Count Four was rendered moot, and both sides moved for summary judgment.

The district court found in favor of the Township on Count 2 and the substantive due process prong of Count 3, and the Paeths have not appealed those decisions. On Count 1, the district court found that there was enough conflicting evidence regarding the Township's motives to send the issue to trial. The district court found that the Paeths had established a procedural due process violation as a matter of law and so granted summary judgment in their favor on the second prong of Count 3. It found that the Paeths had a property interest in continuing construction on their home. The district court rejected the **\*961** Township's argument that the building permit conferring that interest had been invalidated by the Paeths' suspending work under 2003 Mich. Residential Code R105.5, because that suspension was caused by the case's litigation, and so the permit remained valid. The district court concluded that the ZBA's stop work order deprived the Paeths of that right without prior notice contrary to state law.

The district court also found that Cutcher was not entitled to qualified immunity, and that the Township was eligible for municipal liability. The district court found that the ZBA is a final decision-making body, and so its decision to deny the Paeths a variance constituted the official policy of the Township, thus making it liable. As for Cutcher's posting of the stop work order, the district court found that though Cutcher was not the final authority, evidence that higher-up board officials approved was enough for a fact finder to conclude "that the action represented the official position of the township."

The trial on Count 1 lasted five days. At the conclusion of trial, the Township moved for judgment as a matter of law, arguing that the Paeths had not presented sufficient evidence to prove the second and third elements of a First Amendment claim, namely, the presence of an adverse action and a causal link to protected conduct. The district court denied the motion, and the jury found for the Paeths. The jury awarded the Paeths $600,000 in damages—$275,000 on their First Amendment retaliation claim and $325,000 on their procedural due process claim. Worth Township moved for a new trial, or in the alternative remittitur, which the district court denied. The district court held that the damages were not excessive, the trial was not unfair, and the verdict was not against the weight of the evidence.

The district court granted in part the Paeths' motion for attorneys fees. The Paeths had requested $342,294.00, and were granted $201,097.79. The decrease resulted from three factors. First, the district court decreased the hourly rates for each of the three attorneys on the case. Second, the district court decreased the number of hours billed. Finally, the district court refused to include the hours billed by a law student filling the role of a clerk or paralegal. To the original lodestar amount calculated as $191,521.70, the district court added 5%, or $9,576.09, because counsel had been compelled to shoulder the expenses for the span of the litigation, as the Paeths had been unable to pay their fees.

The Township timely appealed on a number of grounds detailed below, and the Paeths cross appealed the grant of attorneys fees.


II.

A. Grant of summary judgment on procedural due process violation

We need not determine whether the Paeths had a property interest in continuing construction on their home, because even if they did, they received sufficient process when the stop work order was issued.[1]  What process is due under the Constitution is not equivalent to the procedures  **\*962**  outlined by statutes or ordinances, and so a violation of them does not automatically point to a due-process violation. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541–42, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), *DePiero v. City of Macedonia,* 180 F.3d 770, 788 (6th Cir.1999); *see also Chandler v. Village of Chagrin Falls,* 296 Fed.Appx. 463, 470–72 (6th Cir.2008). Rather, there is a federal constitutional framework that needs to be followed in determining whether there is a federal procedural due process violation. Assuming that there is a property interest protected by state law, there are three factors to be weighed, as set forth definitively by the Supreme Court in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976):

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Under these factors, the Paeths' constitutional rights were not violated by the posting of the stop work order without notice. Even assuming the Paeths had a valid permit and an attendant property interest in continuing construction on their home, that interest was not an extremely weighty one. At most, the Paeths were engaging in part-time construction at the time the stop work order was issued. The order came with instructions for how to apply for a new permit, a process that could have taken less than a day and that involved affording the Paeths an opportunity to be heard. Had the Paeths performed these steps, they would have been briefly inconvenienced by the stop work order, but the issue would have been resolved quickly. In fact, the Paeths encountered a similar situation back in 2003, when they did apply for and receive a new permit. The idea that their choice to ignore the proffered procedure this time can create a federal cause of action resulting in $325,000 in damages makes little sense. See *Herwins v. City of Revere,* 163 F.3d 15, 20 (1st Cir.1998), where the First Circuit reversed a grant of summary judgment on similar grounds.

In addition, the Township's interest in prompt posting of the order was not insignificant. No work had been done on the property for several years, and no inspections had taken place. Whether or not this inactivity invalidated the building permit, it does raise the probability that the conditions of the house had changed in such a way that it could have rendered further work dangerous to those involved or to the surrounding environment. There was also evidence that the house was not compliant with various provisions of the building code, evidence that came to light only after the original permit was issued. The Township therefore had an interest in preventing *any* further work from taking place until such concerns could be addressed, and the fact that the stop work order may have also been posted with a retaliatory motive does not negate these concerns. Temporary inconvenience does not hold up against such concerns, and so the Paeths received sufficient process such that no constitutional deprivation occurred.

In ⚑ *3883 Connecticut LLC v. District of Columbia,* 336 F.3d 1068 (D.C.Cir.2003), the D.C. Circuit confronted a situation remarkably similar to the one in this case. There, a local building administration issued a stop work order without notice. **\*963** The court found that though there was a property interest in the building permits at issue, there was no due process violation "because the procedures available to [the plaintiff] to challenge the SWO afforded it due process." ⚑ *Id.* at 1073. These procedures consisted of the right to "an expeditious appeal process with three levels of review." ⚑ *Id.* The court analyzed the procedures under ⚑ *Eldridge* and concluded that despite the fact that a permit holder "has a substantial interest in the continued effect of the permit and in proceeding with a project without delay," this interest must be balanced against the municipality's "significant interest in maintaining its capability to act swiftly to bring an immediate halt to construction work that poses a threat to public health and safety or to the environment." ⚑ *Id.* at 1074. Under these circumstances, the court held, a speedy post-deprivation review satisfied due process requirements.

A balancing of the ⚑ *Mathews v. Eldridge* factors leads inescapably to the conclusion that there was no procedural due process violation in this case. For this reason, the damages awarded by the jury, after being instructed that there was a due process violation, must be vacated.

B. First Amendment retaliation claim

1. Sufficiency of evidence

There was however sufficient evidence for the jury to conclude that the Paeths had satisfied the elements of their First Amendment retaliation claim. The district court was therefore correct to deny the Township's motion for judgment as a matter of law. Of the three-part showing necessary for a retaliation claim, the Township disputes the second and third elements— adverse action and a causal connection between the action and protected conduct—with regard to two actions by the Township: the issuance of the stop work order, and the failure to provide notice regarding the variance hearing. The Township's argument on these points is unconvincing.

Both the Township's issuance of the stop work order and its failure to provide notice on the variance hearing were adverse actions that satisfied the second element of a retaliation showing. Such actions would "deter a person of ordinary firmness from continuing to engage in [protected] conduct." ⚑⚠ *Thaddeus–X v. Blatter,* 175 F.3d 378, 394 (6th Cir.1999). The order was the latest action in a line of continuing interference with the Paeths' construction plans. It was publicly humiliating and rendered continuing work illegal, as George Paeth, well versed in the building laws, would know. The fact that the ZBA hearing was held with no notice was an adverse action precisely because notice was required under law. From the Paeths' perspective, whenever they tried to make use of legal means to have their claims adjudicated, the Township responded by moving outside the law. Lack of notice could dissuade them from continuing to seek adjudication, because they were being denied access to that adjudication.

The level of deterrence necessary for a First Amendment claim shifts according to the circumstances of the case. *See* ⚑ *Fritz v. Charter Tp. of Comstock,* 592 F.3d 718, 724 (6th Cir.2010). Here, there is enough that the jury could find it satisfied.

The Paeths also offered enough evidence to support the inference of a causal connection between these adverse actions and the Paeths' protected act of appealing the ZBA's decisions to the circuit court. With regard to the issuance of the stop work order, this evidence included testimony from Cutcher that she was instructed to issue the order because the Township was **\*964** not going to appeal the Michigan court's decision against it and that she did not think the action was right, and an excerpt from Cutcher's notebook with similar content. There was also testimony from ZBA member Thomas Gilbert that Bartniczak had a history of using her position to make things difficult out of spite for others and "would go to great lengths to get her way." There must be a very high showing before a jury's verdict will be discarded and judgment declared as a matter of law. Here, the jury could conclude that the posting of the stop work order was retaliatory.

The evidence regarding the lack of notice is somewhat weaker, but still enough to support the jury's verdict. The intentionality of the act is in dispute, as the lack of notice resulted from a miswritten address on the envelope sent to the Paeths informing them of the hearing (7344 Maplewood instead of 7433) and the late date on which the letter was sent, seven days before the hearing. However, no member of the Board followed up on the lack of notice, which was supposed to involve newspaper publication and notice to neighbors as well. The failure to provide these other forms of notice is harder to attribute to accident or oversight. The jury was also informed that after the Paeths won their first appeal in January 2006, the next step should have been prompt further proceedings. Instead, five months later, a hearing without notice was conducted. One could draw an inference of a causal connection not only because of the temporal proximity of the actions, but also their related content. There was enough evidence that a juror could infer that the failure to provide notice was intentional, and done in retaliation for the Paeths' appeal.


2. Municipal liability

Municipal liability could attach to the ZBA's decision to deny the Paeths a variance. The ZBA is a policymaking body within the Township, because its decisions are not reviewed by any superior officials. *See* 🚩 *Adair v. Charter County of Wayne,* 452 F.3d 482, 493 (6th Cir.2006) (reciting standard). Its decision to deny the Paeths a variance falls under the definition offered in 🚩 *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), of municipal policy: "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [a local governing] body's officers." This is not a situation where a single officer made a decision absent the knowledge or approval of her peers. The ZBA acted as a unit. It was composed of municipal officers, and its decision represented the official policy of the Township as regarded the Paeths' request. So long as "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question," municipal liability can attach. 🚩 *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Here, that requirement has been satisfied.


The stop work order issued by Cutcher is a closer question, but there was enough evidence offered that municipal liability might attach such that the question could withstand summary judgment. Testimony was offered that Cutcher was operating under the instructions of Bartniczak, a member of the Township Board, and with the knowledge of another member of the Board, Jonathan Rundels, who did nothing to stop the action. Township Board members are officials high enough in the municipality that their actions, like **\*965** those of the officers in 🚩 *Ford,* "may fairly be said to represent official policy." 🚩 *Ford v. County of Grand Traverse,* 535 F.3d 483, 495 (6th Cir.2008) (internal citation omitted). The circumstances of this case allow a reasonable juror to conclude that the Board was in tacit agreement that if Bartniczak wanted to retaliate against the Paeths through official channels, no one would stand in her way. If the stop work order was posted with the knowledge of at least two Board members, a reasonable fact finder could conclude that it represented official Township policy.


C. Denial of motion for new trial or remittitur

The district court did not abuse its discretion when it denied Worth Township's motion for a new trial or for remittitur, because the damages awarded were not inordinately excessive. As the district court pointed out, in addition to roughly $67,000 of chronicled costs for insurance, mortgage, taxes, and legal fees, the Paeths also testified that they endured much more: time off from work to deal with both the Township's administrative processes and the circuit court litigation; the inability to procure additional financing; the need to exhaust their personal savings and cash in their life insurance policy and retirement plans; the paralysis of not being able to live in their home, but also not to sell it or buy another property; personal humiliation and reputational harm from the community continuing to believe that they flagrantly violated the law; marital strain from living in close quarters and the inability to resolve the housing issues; and the constant and crippling uncertainty about what would happen on a daily basis for years. The jury's assigning of roughly $210,000 for these factors is high, and it is possible that another district court may have found the amount too high if a narrow focus were kept on the actual violative acts, but it was not an abuse of discretion on the part of the district court to accept it in this case.

A district court examining the record could reasonably conclude that the verdict was not clearly excessive; district courts are instructed only to remit if the verdict "resulted from passion, bias, or prejudice; or is so excessive or inadequate to shock the conscience of the court" *Sykes v. Anderson,* 625 F.3d 294, 322 (6th Cir.2010). We in turn offer an additional layer of deference to the jury award since we will only reverse if we find that the district court's assessment was an abuse of discretion. The Township's argument is that the testimony of George and Margaret Paeth was insufficient to account for the damages awarded. Under our deferential scope of review, this argument is unavailing, and the cases cited to the contrary do not counsel otherwise.

In *Rodgers v. Fisher Body Division,* 739 F.2d 1102, 1106–07 (6th Cir.1984), this court overturned the verdict because it concluded that the jury had not received adequate guidance in calculating the damages. In *Davis v. Mansfield Metropolitan Housing Authority,* 751 F.2d 180, 186 (6th Cir.1984), there was a higher standard of proof mandated by statute before damages could be issued. In *Sykes,* this court expressed no opinion on the appropriateness of the damages, and instead remanded the case because the district court failed to explain its reasons for denying the motion. *625 F.3d at 323.* The district court did so, and its judgment was affirmed. *Sykes v. Anderson,* 419 Fed.Appx. 615, 617 (6th Cir.2011). Here, the district court provided ample explanation.

### D. Cross appeal on attorneys fees

The district court also did not abuse its discretion when it awarded only a portion of the attorneys fees requested by the **\*966** Paeths. The district court laid out its reasoning clearly, applied proper legal standards, and made mathematically sound calculations. The Paeths' arguments to the contrary amount to nothing more than disagreement with the district court's conclusions, which does not merit reversal.

The district court acted within its discretion when it decreased the hourly rates for each of the three attorneys on the case, as well as the hours billed. The district court explained that it calculated reasonable rates for each of the attorneys by referring to the prevailing market rates in the area, a practice recommended by *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). The district court also offered adequate explanation for why it reduced the hours worked, explaining that it found some of the hours billed excessive, redundant, or unnecessary, all factors that allow a district court to find hours not to be reasonable. The Paeths sought the fees, and so the burden of proof was on them to substantiate the hours worked and rate claimed. *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The district court determined that they had not, and so lowered the rates accordingly.

It was also not an abuse of discretion for the district court to decline to assess separately the hours worked by a law student. The district court acknowledged that the law student did engage in legal research and drafting, but noted that "the majority of his time was devoted to clerical and delivery tasks." The district court relied on *Missouri v. Jenkins,* 491 U.S. 274, 288 n. 10, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989), to conclude that any work done by the law student that could be billed was already taken into account in the attorneys' rates, who presumably reviewed it. The Paeths had offered no documentation to support their request that the student's work be covered, nor did they explain why it should be billed at $110 per hour beyond saying that such a practice was customary. It was within the district court's discretion to decline that request.

III.

We reverse the grant of summary judgment on the procedural due process violation and vacate the award of damages for that violation. We affirm the judgment of the district court with regard to the First Amendment violation, the award of damages for that violation, and the award of attorneys fees.

ROGERS, Circuit Judge, concurring in part and dissenting in part.

I concur with the majority's opinion except to the extent that it affirms the damages granted to the Paeths. The district court should have granted Worth Township's motion for a new trial or for remittitur, because the damages awarded were grossly excessive. The proven unlawful actions by Worth Township consisted of two things: the failure to provide notice for the second variance hearing, and the posting of the stop work order without notice. The consequences of these actions lasted at most a few months, and the latter could have been resolved much more quickly had the Paeths simply reapplied for their building permit. Damages in both instances seem to involve preventing the Paeths from continuing construction and compelling them to file another appeal with the circuit court. There is no way that $275,000 worth of damages could be shown on the record.

The jury's assigned damages cannot be justified when looking only at what resulted from the activity at issue here, as opposed **\*967** to the decade-long saga outlined in the briefs and to the jury. When George and Margaret Paeth testified about the financial and emotional strain they underwent, these injuries resulted only in small part from the proven unlawful activity. Nowhere is there mention of how any of the damages they mention relate to these two particular acts. Nor, as the Township points out, do the damages they claim for the decade have many fixed amounts attached to them. Perhaps if the entire tale were under consideration such an award could have been reasonable, but the district court's instructions make it clear that the jury should only have looked to the proven unlawful activity of the Township; the jury does not seem to have listened. District courts are instructed only to remit if the verdict "resulted from passion, bias, or prejudice; or is so excessive or inadequate to shock the conscience of the court" *Sykes v. Anderson,* 625 F.3d 294, 322 (6th Cir.2010). This is an instance of a damages award that likely resulted from passion, and the amount should have shocked the conscience of the court. I would remand for the district court to enter a remittitur in the largest amount that the district court determines could reasonably be found as a result of the particular actions found by the jury to be First Amendment violations.

**All Citations**

483 Fed.Appx. 956

## Footnotes

1    Our reasoning for reversing the judgment of the district court was not presented in the same terms to the court below, although it appears in Worth Township's brief on appeal. This issue is still properly before the court, however, because Worth Township did challenge the Paeths' procedural due process claim below, albeit with some different reasoning. Changing the framing of the argument does not change its crux: that the Paeths did not satisfy the elements of a procedural due process claim. *See Chandler v. Village of Chagrin Falls,* 296 Fed.Appx. 463, 467–68 (6th Cir.2008).

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 11475269
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Fort Myers Division.

James R. PESCI, Plaintiff,

v.

Craig BELOFF, Defendant.

Case No: 2:10-cv-428-FtM-PAM-MRM
|
Signed 12/14/2017

**Attorneys and Law Firms**

Bryan E. DeMaggio, William J. Sheppard, Matthew R. Kachergus, Jesse B. Wilkison, Camille Elizabeth Sheppard, Elizabeth Louise White, Sheppard, White, Kachergus, & DeMaggio PA, Jacksonville, FL, for Plaintiff.

Craig Beloff, Lake Placid, FL, pro se.

Jessie Grace Pulitzer, Critton, Luttier & Coleman, West Palm Beach, FL, for Defendant.

**REPORT AND RECOMMENDATION**

MAC R. MCCOY, UNITED STATES MAGISTRATE JUDGE

 **\*1**  Pending before the Court is Plaintiff James R. Pesci's Motion for Entry of Default Judgment Against Defendant Craig Beloff (Doc. 178) filed on May 9, 2017 and his Supplemental Briefing in Support (Doc. 180) filed on June 9, 2017. For the reasons explained herein, the Undersigned recommends that Plaintiff's Motion (Doc. 178) be **GRANTED IN PART** and **DENIED IN PART**.

**I. Background**

Plaintiff James R. Pesci is civilly detained at the Florida Civil Commitment Center ("FCCC") under Florida's Involuntary Civil Commitment of Sexually Violent Predators ("SVP") Act, Fla. Stat. § 394.910, *et seq.* On July 6, 2010, Plaintiff filed his Civil Rights Complaint (Doc. 1) pursuant to a 42 U.S.C. § 1983, challenging the FCCC's rules regarding FCCC detainee-authored publications. (*See id.*); *see also Pesci v. Budz*, 730 F.3d 1291, 1292-95 (11th Cir. 2013) (describing history of the case). Plaintiff's original Complaint asserted claims only against Defendant Tim Budz. (*Id.* at 1). On February 8, 2012, this Court granted Defendant Budz's motion for summary judgment. (Doc. 48 at 24); *see also Pesci v. Budz*, No. 2:10-cv-428-FtM-36DNF, 2012 WL 397848, at \*10 (M.D. Fla. Feb. 8, 2012). Plaintiff appealed. (Doc. 50). The case was reversed and remanded for further proceedings. *See Pesci*, 730 F.3d at 1300.

Upon remand, Plaintiff filed an Amended Complaint adding several new Defendants and new claims. (Doc. 60). On March 25, 2015, the Court granted in part and denied in part Defendants' Motion to Dismiss the Amended Complaint. (Doc. 95 at 24-25). [1] Plaintiff subsequently filed a Second Amended and First Supplemental Complaint with Demand for Jury Trial and Injunctive Relief ("Second Amended Complaint"). (Doc. 108). Defendants answered. (Docs. 110-13). Ultimately, after more than six years of litigation, the Honorable Paul A. Magnuson entered a Memorandum and Order on March 8, 2017 granting

Case 1:18-cv-24190-RS Document 471 Entered on FLSD Docket 06/01/2023 Page 290 of 379

Pesci v. Beloff, Not Reported in Fed. Supp. (2017)

motions for summary judgment filed on behalf of all Defendants except Defendant Beloff. (Doc. 174 at 17). Judgment was entered as to those Defendants on March 8, 2017. (Doc. 176).

Following the Order, the sole defendant remaining was Craig Beloff, the former Director of Security at the FCCC. (*See* Doc. 108 at ¶ 17). The Court's March 8, 2017 Order noted that Defendant Beloff, proceeding without counsel, failed to join any motion for summary judgment and failed to appear at the Court's March 3, 2017 hearing. (Doc. 174 at 3 n.3). Because Defendant Beloff failed to defend himself, the Court directed the Clerk of Court to enter default pursuant to 🔖 Fed. R. Civ. P. 55(a). (*Id.* at 16). The Clerk of Court entered default against Beloff on March 8, 2017. (Doc. 175). The Court then administratively closed the case, subject to Plaintiff filing a motion for default judgment as to Defendant Beloff. (Doc. 177 at 1).

**\*2** On May 9, 2017, Plaintiff filed his Motion for Entry of Default Judgment Against Defendant Craig Beloff (Doc. 178). On May 10, 2017, the Undersigned ordered Plaintiff to file a supplemental brief in support of the Motion for Entry of Default Judgment to include: (1) the elements of the cause of action and allegations that satisfy each element; (2) an unequivocal statement from Plaintiff as to whether he (a) waives his request to a jury trial on the issue of damages or (b) persists in his request for a jury trial on the issue of damages; and (3) if Plaintiff persists in his demand for a jury trial on the issue of damages, then Plaintiff was directed to include legal authority in support of the proposition. (Doc. 179 at 4). Plaintiff filed his Supplemental Briefing in Support of Motion for Entry of Default Judgment (Doc. 180) on June 9, 2017. In his brief, Plaintiff confirmed that he no longer requested a jury trial on damages. (*Id.* at 8). Beloff did not respond to Plaintiff's Motion.

Upon review of Plaintiff's submissions, the Undersigned found that an evidentiary hearing on Motion for Entry of Default Judgment Against Defendant Craig Beloff (Doc. 178) was necessary. (Doc. 181 at 2). The Undersigned conducted an evidentiary hearing on July 28, 2017. (Doc. 185). Beloff did not appear for the evidentiary hearing. A transcript of the evidentiary hearing is filed with the Court. (Doc. 186).

## II. Legal Standard

The Court may enter a default judgment against a properly served defendant who fails to defend or otherwise appear pursuant to 🔖 Federal Rule of Civil Procedure 55(b)(2). *Cohan v. Sparkle Two, LLC*, 309 F.R.D. 665, 666 (M.D. Fla. 2015); *see also Directv, Inc. v. Griffin*, 290 F. Supp. 2d 1340, 1343 (M.D. Fla. 2003). The effect of the entry of a default is that all factual allegations in the complaint are taken as true, save for the amount of unspecified damages. *Cohan*, 309 F.R.D. at 666 (citing 🔖 *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987)). "[I]f liability is well-pled in the complaint, it is established by the entry of a default." *Id.*

Default judgment, however, may only be entered "if the factual allegations of the complaint, which are assumed to be true, provide a sufficient legal basis for entry of a default judgment." *Id.* (citing 🔖 *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). [2] While the Court "must accept well-pled facts as true, the court is not required to accept a plaintiff's legal conclusions." *De Lotta v. Dezenzo's Italian Rest., Inc.*, No. 6:08-cv-2033-ORL-22-KRS, 2009 WL 4349806, at \*2 (M.D. Fla. Nov. 24, 2009) (citing 🔖 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Defendants are not held to admit facts that are not well-pled or to admit conclusions of law. 🔖 *Nishimatsu*, 515 F.2d at 1206.

To be well-pled, a complaint does not need detailed factual allegations, but a complaint must provide the grounds for entitlement to relief. 🔖 *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Iqbal*, 556 U.S. 678. This standard – derived from motions to dismiss pursuant to 🔖 Fed. R. Civ. P. 12(b)(6) – is "equally applicable to a motion for default judgment." *Cohan*, 309 F.R.D. at 667. Thus, a complaint requires more than labels and conclusions, and "a formulaic recitation of the elements of a cause of action will not do." 🔖 *Iqbal*, 556 U.S. at 678. A complaint will not suffice if "it tenders 'naked assertion[s]' devoid of 'further

Case 1:18-cv-24190-RS Document 471 Entered on FLSD Docket 06/01/2023 Page 291 of 379

*Pesci v. Beloff, Not Reported in Fed. Supp. (2017)*

factual enhancement.' " *Id.* "The well-pled allegations must nudge the claim 'across the line from conceivable to plausible.' " *De Lotta*, 2009 WL 4349806, at *2 (quoting *Twombly*, 550 U.S. at 570).

Once liability is established, federal courts then address the terms of the judgment. *Cohan*, 309 F.R.D. at 667. "A default judgment must not differ in kind from or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). Moreover, "[i]f unspecified monetary damages are sought, the party moving for default judgment has the burden to prove the unliquidated sums in a hearing on damages or otherwise." *Cohan*, 390 F.R.D. at 667 (citing Fed. R. Civ. P. 55(b)(1)-(2)). Pursuant to Rule 55(b)(2), "[t]he court may conduct hearings ... when, to enter or effectuate judgment, it needs to ... determine the amount of damages." Fed. R. Civ. P. 55(b)(2)(B). "The court has 'an obligation to assure that there is a legitimate basis for any damage award it enters, and to assure that damages are not awarded solely as the result of an unrepresented defendant's failure to respond.' " *Lofrisco v. Gulf Coast Health Care*, No. 8:13-cv-3159-T-36MAP, 2014 WL 4674323, at *1 (M.D. Fla. Sept. 15, 2014) (quoting *Anheuser-Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2003)). Well-pled allegations as to damages, however, are also admitted by a default. *Giovanno v. Fabec*, 804 F.3d 1361, 1366 (11th Cir. 2015) (citing *SEC v. Smyth*, 420 F.3d 1225, 1232 n.13 (11th Cir. 2005)).

## III. Default Judgment

**\*3** Plaintiff's claims as set forth in the Second Amended Complaint (Doc. 108) must be evaluated to determine whether the factual allegations set forth therein provide a sufficient legal basis for entry of default judgment against Craig Beloff.

### A. Section 1983 Actions and Color of State Law

As an preliminary matter, because the present case is a § 1983 action, the Court must initially focus on the presence of two essential elements: "(1) whether the person engaged in the conduct complained of was acting under color of state law; and (2) whether the alleged conduct deprived a person of rights, privileges or immunities guaranteed under the Constitution or laws of the United States." (Doc. 95 at 6 (citing *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001)). Additionally, § 1983 actions require "a plaintiff [to] allege and establish an affirmative causal connection between the defendant's conduct and the constitutional deprivation." (*Id.* (citing *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1059 (11th Cir. 2001), *abrogated on other grounds*, *Twombly*, 550 U.S. at 544; *Swint v. City of Wadley*, 51 F.3d 988 (11th Cir. 1995); *Tittle v. Jefferson County Comm'n*, 10 F.3d 1535, 1541 n.1 (11th Cir. 1994)).

As to the first part of the inquiry, whether Defendant Beloff was acting under color of state law, "[a] person acts under color of state law when he acts with authority possessed by virtue of his employment with the state," *Myers v. Bowman*, 713 F.3d 1319, 1329-30 (11th Cir. 2013) (quoting *Griffin*, 261 F.3d at 1303), "or when 'the manner of his conduct ... makes clear that he was asserting the authority granted him and not acting in the role of a private person," *id.* (quoting *Williams v. United States*, 341 U.S. 97, 100 (1951)). "The dispositive issue is whether the official was acting pursuant to the power he/she possessed by state authority or acting only as a private individual." *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1523 (11th Cir. 1995).

In this case, Plaintiff alleges that Defendant Beloff was the Director of Security at the FCCC. (Doc. 108 at ¶ 14). Moreover, Plaintiff alleges that Defendant Beloff took actions against him in his capacity as Director of Security at the FCCC. (*See e.g.*, *id.* at ¶¶ 35-40). The Undersigned finds that these allegations demonstrate that Defendant Beloff acted with authority possessed by virtue of his employment with the state and that he was not acting in the role of a private person. *See Myers*, 713 F.3d at

Case 1:18-cv-24190-RS Document 471 Entered on FLSD Docket 06/01/2023 Page 292 of 379

Pesci v. Beloff, Not Reported in Fed. Supp. (2017)

1329-30; Edwards, 49 F.3d at 1523. Accordingly, the Undersigned finds that Plaintiff's Second Amended Complaint alleges sufficient facts to establish that Beloff was acting under color of state law. *See id.*

Turning to the second inquiry, whether the alleged conduct deprived Plaintiff of rights, privileges or immunities guaranteed under the Constitution or laws of the United States, *see* Griffin, 261 F.3d at 1303, the Undersigned addresses this element by examining the individual claims asserted in Plaintiff's Second Amended Complaint.

### B. First Amendment Retaliation (Count I)

In Count I, Plaintiff alleges violations of his First and Fourteenth Amendment Rights concerning the publication of his newsletters at the FCCC. (Doc. 108 at ¶¶ 68-87). As to Defendant Beloff, however, only Plaintiff's First Amendment retaliation claim remains. (Doc. 95 at 18; *see also* Doc. 108 at ¶ 81).

**\*4** To state a First Amendment retaliation claim, a plaintiff must establish: (1) his speech or act was constitutionally protected; (2) the defendant's retaliatory conduct adversely affected that protected speech; and (3) there was a causal connection between the retaliatory actions and the adverse effect on speech. Marsh v. Fla. Dep't of Corr., 330 F. App'x 179, 183 (11th Cir. 2009) (affirming district court's denial of a retaliation claim alleged by FCCC resident; citing Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005)). The Undersigned addresses these three factors in turn.

#### i. Constitutionally Protected Conduct

The first question is whether Plaintiff's speech or act was constitutionally protected. *See id.* In this case, Plaintiff alleges that Defendant Beloff retaliated against him (1) for a letter he wrote to Governor Charlie Crist and (2) due to the filing of instant civil rights lawsuit. (Doc. 108 at ¶ 81; Doc. 186 at 35). Plaintiff argues that both acts are protected conduct under the First Amendment. (Doc. 180 at 5; Doc. 186 at 35).

As an initial matter, the Undersigned notes that the FCCC is not a prison, and Plaintiff is not a prisoner. *See* Troville v. Venz, 303 F.3d 1256, 1260 (11th Cir. 2002). Instead, Plaintiff is involuntarily, civilly committed. The Eleventh Circuit has held that "the due process rights of the involuntarily civilly committed are 'at least as extensive' as the Eighth Amendment 'rights of the criminally institutionalized.' " Lavender v. Kearney, 206 F. App'x 860, 862-63 (11th Cir. 2006) (citing Youngberg v. Romeo, 457 U.S. 307, 322 (1982)). Accordingly, "relevant case law in the Eighth Amendment context also serves to set forth the contours of the due process rights of the civilly committed." Id. at 863 (citing Dolihite v. Maughon By and Through Videon, 74 F.3d 1027, 1041 (11th Cir. 1996)).

With this in mind, Plaintiff first alleges that Defendant Beloff took his actions in retaliation for the letter Plaintiff wrote to Governor Crist. (Doc. 108 at ¶ 81). The Supreme Court has recognized that prisoners and their correspondents have an interest "in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment. As such, it is protected from arbitrary governmental invasion." Procunier v. Martinez, 416 U.S. 396, 418 (1974) (other citations omitted), *overruled by* Thornburgh v. Abbott, 490 U.S. 401 (1989) (changing analysis of prison regulation to whether regulation infringing on First Amendment is reasonably related to legitimate penological interests); *see also* Barker v. Wilkins, No. 2:09-cv-795-FTM-36, 2011 WL 3167069, at *4 (M.D. Fla. July 27, 2011).

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 293 of 379

Pesci v. Beloff, Not Reported in Fed. Supp. (2017)

Here, because Plaintiff's due process rights are at least as extensive as the due process rights of prisoners, Plaintiff also has an interest in uncensored communication by letter under the First and Fourteenth Amendments. *See* Martinez, 416 U.S. at 418. Given this interest, the Undersigned finds that the letter Plaintiff wrote to Governor Crist is constitutionally protected conduct. *See* Martinez, 416 U.S. at 418; *Barker*, 2011 WL 3167069, at \*4.

Similarly, Plaintiff also alleges that Defendant Beloff's actions were taken in retaliation for his filing of the present lawsuit. (Doc. 108 at ¶ 81). On this point, the Eleventh Circuit has held that retaliation against an inmate for filing lawsuits or administrative grievances violates both an inmate's right of access to courts and an inmate's First Amendment rights. *Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986) (citations omitted). Similarly, courts within the Eleventh Circuit have held that "[s]uing ... is a form of petitioning the government for a redress of grievances and is thus protected by the First Amendment." *O'Boyle v. Sweetapple*, 187 F. Supp. 3d 1365, 1370 (S.D. Fla. 2016). Here, because the filing of a lawsuit is protected under the First Amendment, Plaintiff has adequately alleged that he engaged in constitutionally protected conduct by his filing of the instant lawsuit. *See* Wright, 795 F.2d at 968; *O'Boyle*, 187 F. Supp. 3d at 1370.

 **\*5** In sum, Plaintiff's Second Amended Complaint adequately sets forth allegations that Plaintiff engaged in constitutionally protected conduct. *See* Marsh, 330 F. App'x at 183. Accordingly, the Undersigned finds that Plaintiff has sufficiently pled the first element of a First Amendment retaliation claim. *See id.*


### ii. Defendant's Allegedly Retaliatory Conduct and Whether It Adversely Affected the Protected Speech

Having found that Plaintiff's conduct was protected under the First Amendment, the Undersigned next addresses whether Defendant Beloff's allegedly retaliatory conduct adversely affected the protected speech. *See* Marsh, 330 F. App'x at 183. In evaluating this issue, the Undersigned notes that in *Bennett v. Hendrix*, the Eleventh Circuit determined that "[a] plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of his First Amendment rights." 423 F.3d at 1254. Under this standard, a plaintiff need not show that his own exercise of First Amendment rights have been chilled but, instead, can establish an injury if he can show that the retaliatory acts are sufficiently adverse that a jury could find that the acts would chill a person of ordinary firmness from exercising his First Amendment rights. *See* id. at 1254-55; *see also* Pittman v. Tucker, 213 F. App'x 867, 870 (11th Cir. 2007).

To see what kinds of retaliatory conduct would likely deter a person of ordinary firmness from the exercise of his First Amendment rights, the Court looks to case law. In *Potter v. Williford*, for example, the Eleventh Circuit held that the district court properly denied the defendant's summary judgment motion directed at the plaintiff's First Amendment retaliation claims. No. 16-13030, 2017 WL 4422461, at \*2 (11th Cir. Oct. 5, 2017). In *Potter*, the plaintiff – an EMT – asserted her First Amendment right to political association when she supported an opponent of the sheriff to replace him. *Id.* The plaintiff presented evidence that the sheriff banned her from a law enforcement center in retaliation, which created a negative atmosphere at her workplace. *Id.* In denying summary judgment, the court noted that even a small deterrent effect can create a genuine issue of material fact. *Id.* Thus, the court found that the plaintiff's evidence presented a genuine issue of material fact as to whether the defendant's actions would deter a person from exercising their First Amendment rights. *Id.*

Another example can be found in Garcia v. City of Trenton, 348 F.3d 726, 729 (8th Cir. 2003). In *Garcia*, the court reversed and remanded the district court's decision granting judgment as a matter of law in favor of the defendant as to the plaintiff's First Amendment retaliation claims. *Id.* At trial, a jury had found that the issuance of parking tickets totaling $35.00 in retaliation for the plaintiff's complaints to the city mayor about city's failure to enforce a sidewalk ordinance would chill the speech of a person of ordinary firmness. *Id.* In reversing the district court's order granting judgment as a matter of law in favor of the mayor,

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 294 of 379

Pesci v. Beloff, Not Reported in Fed. Supp. (2017)

the appellate court noted that the defendant "engaged the punitive machinery of government in order to punish [plaintiff] for her speaking out." *Id.* While the charges made by a parking ticket were typically only petty offenses, the court noted that they had "concrete consequences." *Id.* Thus, the court found that evidence was sufficient to support the jury's verdict. *Id.*

**\*6** In this case, Plaintiff alleges that Defendant Beloff charged him with a rule violation after he wrote a letter to Governor Crist. (Doc. 108 at ¶¶ 35, 37, 81). [3] Plaintiff further alleges that Defendant Beloff then presided over the disciplinary hearing for the Crist letter writing infraction, did not permit Plaintiff to present any witnesses, found Plaintiff guilty, and sentenced Plaintiff to thirty (30) days in wing restriction as punishment. (*Id.* at ¶ 37). Plaintiff also alleges that Defendant Beloff's actions, including Plaintiff's placement in wing restriction, were taken in retaliation for Plaintiff having filed the instant litigation. (*Id.* at ¶¶ 35-38, 81).

Upon consideration, the Undersigned finds that Plaintiff's allegations are sufficient to establish that Defendant Beloff's retaliatory conduct would likely deter a person of ordinary firmness from the exercise of his First Amendment rights. *See Bennett*, 423 F.3d at 1254. Here, charges were levied against Plaintiff, which resulted in Plaintiff's placement in wing restriction. (Doc. 108 at ¶ 35, 37, 81). By taking these actions, it is clear that Defendant, acting under color of state law, engaged the punitive machinery of government in order to punish Plaintiff for his actions. *See Garcia*, 348 F.3d at 729. Moreover, even a small deterrent effect can create a genuine issue of material fact. *See Potter*, 2017 WL 4422461, at \*2. In this instance, however, the effects on Plaintiff from Defendant's alleged conduct were not small. Instead, Plaintiff was subjected to disciplinary proceedings, which resulted in physical confinement. (*See* Doc. 108 at ¶ 37). The Undersigned finds that these effects were at least as significant as the effects resulting from the retaliatory issuance of parking tickets or the creation of a hostile work environment, which were found could deter a person of ordinary firmness from the exercise of his or her First Amendment rights. *See Potter*, 2017 WL 4422461, at \*2; *Garcia*, 348 F.3d at 729. As such, the Undersigned finds that Plaintiff's Second Amended Complaint adequately alleges that Defendant Beloff's retaliatory conduct adversely affected Plaintiff's protected speech and, therefore, satisfies the second element of a First Amendment retaliation claim. *See Marsh*, 330 F. App'x at 183.

*iii. Causal Connection Between the Retaliatory Actions and the Adverse Effect on Speech*

The final factor in determining whether Plaintiff has sufficiently alleged a First Amendment retaliation claim is whether there is a causal connection between the retaliatory actions and effects on speech. *Marsh*, 330 F. App'x at 183. On this point, Plaintiff affirmatively alleges that Defendant Beloff's actions were taken in retaliation for the letter he wrote to Governor Crist and for filing the instant litigation. (Doc. 108 at ¶ 81). The Undersigned finds that these allegations sufficiently establish a causal connection between Defendant's retaliatory actions and the effects on Plaintiff's speech. *See Marsh*, 330 F. App'x at 183.

Furthermore, the Undersigned notes that, typically, a defendant may disprove causation by showing that he or she would have undertaken the allegedly retaliatory actions even absent the plaintiff's speech. *Bennett*, 423 F.3d at 1250 n.3. Here, however, due to his default, Defendant Beloff cannot prove that he would have undertaken his allegedly retaliatory actions even absent the Plaintiff's protected conduct. *See id.* Accordingly, the Undersigned finds that the Second Amended Complaint sets forth sufficient allegations showing a causal connection between Defendant Beloff's retaliatory actions and the effects on Plaintiff's speech. *See Marsh*, 330 F. App'x at 183.

*iv. Conclusion as to Count I*

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 295 of 379

Pesci v. Beloff, Not Reported in Fed. Supp. (2017)

**\*7** Plaintiff's Second Amended Complaint alleges sufficient facts to establish a claim for First Amendment retaliation against Defendant Beloff. The Undersigned, therefore, recommends that the Court enter default judgment in favor of Plaintiff and against Defendant Beloff as to Count I. The Undersigned addresses damages for Count I separately.

### C. Procedural Due Process Under the Fourteenth Amendment (Count II)

In Count II of the Second Amended Complaint, Plaintiff alleges that Defendant Beloff violated his procedural due process rights under the Fourteenth Amendment of the United States Constitution. (Doc. 108 at ¶¶ 88-97).

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To sufficiently state a § 1983 claim alleging a denial of procedural due process, a plaintiff must prove three elements: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003) (citation omitted).

As an initial matter, as indicated above, the Undersigned finds that Plaintiff's Second Amended Complaint sufficiently alleges that Defendant Beloff was acting under color of state law. Thus, the Undersigned finds that the second factor of a procedural due process claim – state action – has been sufficiently pled in the Second Amended Complaint. The Undersigned addresses the remaining factors in turn below.

### i. Deprivation of a Constitutionally Protected Liberty or Property Interest

In evaluating the first factor, whether there was deprivation of a constitutionally protected liberty or property interest, the Undersigned once again notes that Plaintiff is involuntarily civilly committed. As a civilly committed detainee, Plaintiff has "liberty interests under the due process clause of the Fourteenth Amendment to reasonably safe conditions of confinement, freedom from unreasonable bodily restraints, and such minimally adequate training as might be required to ensure safety and freedom from restraint." Dolihite, 74 F.3d at 1041 (citing Youngberg, 457 U.S. at 324).

Additionally, the Supreme Court has stated that "due process requires that the conditions and duration of confinement [for civilly committed persons] bear some reasonable relation to the purpose for which persons are committed." Seling v. Young, 531 U.S. 250, 265 (2001). Such purposes include incapacitation and treatment, but – critically – not punishment. See id. at 265. In fact, the Supreme Court has noted that that the involuntarily committed may not be punished at all. See Youngberg, 457 U.S. at 316. Under this framework, this Court has held that the Fourteenth Amendment requires that civilly committed persons not be subjected to conditions that amount to punishment. Burke v. Haynes, 2:09-cv-635-FtM-29SPC, 2012 WL 4339290, at *7 (M.D. Fla. Sept. 20, 2012) (citing Bell v. Wolfish, 441 U.S. 520, 536 (1979)). To determine whether a certain action is punitive, the Court evaluates whether the action caused an "atypical significant deprivation" in which a State might conceivably have created a liberty interest. See Kleparek v. Carroll, No. 2:14-cv-725-FtM-29MRM, 2015 WL 6750743, at *2 (M.D. Fla. Nov. 5, 2015) (citing Sandin v. Conner, 515 U.S. 472, 486 (1995)). Nevertheless, not every disability imposed during detention amounts to punishment in the constitutional sense. See Bell, 441 U.S. at 537 (noting that a state may not punish a detainee for the crime for which he was indicted via preconviction holding conditions). Instead, "[w]hether a particular restriction is considered punitive is determined by whether the restriction imposed is for the purpose of punishment or whether it is incidental to some other legitimate governmental purpose." Burke, 2012 WL 4339290, at *7 (citing Bell, 441 U.S. at 538).

**\*8**  In this case, Plaintiff argues that Defendant violated his Fourteenth Amendment procedural due process rights "by placing him in wing restriction." (*Id.* at 7). Plaintiff further argues that his "allegations regarding wing restriction demonstrate a significant departure from his ordinary conditions of confinement." (*Id.*). Specifically, Plaintiff alleges that he was strip-searched and that his civilian clothing was confiscated. (*Id.* (citing Doc. 108 at ¶ 42)). Plaintiff further alleges that he was placed in an orange jump suit and that he was deprived of several jump drives containing legal work, news items, and personal pictures of friends and family. (*Id.* (citing Doc. 108 at ¶¶ 42, 55)). Moreover, Plaintiff alleges that when he returned from wing restriction, various toiletry items were missing. (*Id.* at ¶ 59).

Additionally, according to the Second Amended Complaint, Plaintiff was placed in wing restriction for four days before receiving any notice of his disciplinary charges. (*Id.* at ¶ 91). During that time, Plaintiff alleges that he was isolated from the general FCCC resident population. (*Id.* at ¶ 89). Plaintiff further alleges that, at the disciplinary hearing, Plaintiff was not allowed to present witnesses, and Defendant Beloff refused to look into Plaintiff's proffered evidence. (*Id.* at ¶ 91). Plaintiff alleges that Defendant Beloff then found him guilty of the charges and sentenced him to thirty (30) days of wing restriction. (*Id.* at ¶ 96).

Upon review of Plaintiff's allegations and accepting his well-pled facts as true, the Undersigned finds that Plaintiff has sufficiently pled a deprivation of a constitutionally-protected liberty interest. Specifically, the Undersigned finds that Plaintiff's allegations adequately demonstrate that his placement in wing restriction was an "atypical significant deprivation" in which a State might conceivably have created a liberty interest and, therefore, was punitive. *See Kleparek*, 2015 WL 6750743, at \*2. Because the Fourteenth Amendment requires that civilly committed persons not be subjected to conditions that amount to punishment, the Undersigned finds that Plaintiff's placement in wing restriction was a deprivation of a constitutionally protected liberty interest. *See Burke*, 2012 WL 4339290, at \*7.

In coming to this conclusion, this Court's previous decision in *Burke v. Haynes* is instructive. *See* 2012 WL 4339290, at \*7. In *Burke*, the plaintiff – a civilly committed resident of the FCCC – sued various FCCC officials for substantive and procedural due process claims. *Id.* at \*1. The Court denied a motion to dismiss filed by the Chairperson of the Behavior Management Committee and Program Services Committee at the FCCC directed at the plaintiff's substantive and procedural due process claims against him. *Id.* at \*7-8. In pertinent part, the plaintiff alleged that he had previously advised the defendant that a shank had been planted under his mattress, he had been labeled a "snitch," and residents were making threatening remarks to him. *Id.* at \*7. The plaintiff alleged that the defendant agreed to report and investigate the incident. *Id.* Nonetheless, the plaintiff was subsequently charged for possessing the shank, confined, and then ultimately placed in wing restriction. *See id.* at \*2. Additionally, the plaintiff alleged that, soon after his placement in secure management confinement, he wrote to the defendant requesting that the defendant come and see him, but the defendant did not contact him at any time during his ten-day confinement or fourteen-day wing restriction. *Id.* at \*7. In fact, the plaintiff alleged that he never received a hearing to which he could defend against the charges. *Id.* Based on these allegations, the Court found that the plaintiff's complaint alleged sufficient facts to support his claim against the defendant that "his placement in secure management and wing restriction was done for punitive purposes." *Id.* at \*7 (citing 📁 *Twombly*, 550 U.S. at 556). The Court, therefore, denied the defendant's motion. *Id.* at \*8.

**\*9**  In this case, similar to *Burke*, Plaintiff alleges that he was charged for his actions at the FCCC. (*See* Doc. 108 at ¶ 37). Before he was charged, however, Plaintiff states that he was placed in wing restriction for four days. (*Id.* at ¶¶ 89, 91). Unlike *Burke*, Plaintiff ultimately had a hearing on the charges. (*See id.* at ¶ 92). Nonetheless, similar to *Burke*, Plaintiff alleges that he proffered witnesses and evidence for Defendant to look into regarding the Crist letter, but Defendant Beloff refused to allow witnesses or look into Plaintiff's evidence. (*See id.*). Ultimately, Plaintiff alleges that, without the evidence he proffered, Defendant Beloff found him guilty of the charges and sentenced him thirty (30) days in wing restriction. (*Id.*). Here, because Plaintiff was placed in wing restriction before charges were served and because Plaintiff was ultimately sentenced to wing restriction in response to the charges against him, the Undersigned finds that – like the plaintiff in *Burke* – Plaintiff has sufficiently alleged that his placement in wing restriction was done for punitive purposes. *See Burke*, 2012 WL 4339290, at \*7. Moreover, while Defendant could normally show that Plaintiff's placement in wing restriction was imposed for some reason other than to punish or that

it was incidental to some other legitimate governmental purpose, Defendant cannot make such a showing due to his default. *See id.* (citing 🚩 *Bell*, 441 U.S. at 538).

Accordingly, based on the foregoing, the Undersigned finds that Plaintiff has adequately pled a deprivation of a constitutionally protected liberty interest. *See* 🚩🔺*Grayden*, 345 F.3d at 1232.

### ii. Constitutionally Inadequate Process

Having found that Plaintiff was deprived of a constitutionally protected liberty interest, the Undersigned now addresses whether Plaintiff had constitutionally inadequate process. *See* 🚩🔺*Grayden*, 345 F.3d at 1232. Here, Plaintiff alleges that Defendant Beloff's disciplinary proceedings did not provide him adequate process. (*See* Doc. 108 at ¶¶ 88-97).

In evaluating this issue, the Undersigned again notes that "the due process rights of the involuntarily civilly committed are 'at least as extensive' as the Eighth Amendment 'rights of the criminally institutionalized,' and therefore, 'relevant case law in the Eighth Amendment context also serves to set forth the contours of the due process rights of the civilly committed.' " 🚩 *Lavender*, 206 F. App'x at 863 (citing 🚩 *Dolihite*, 74 F.3d at 1041). Thus, as a civilly committed person, Plaintiff is entitled to at least as much protection with regard to disciplinary proceedings as prisoners. *See id.*

With regard to disciplinary proceedings for prisoners, the Supreme Court has held that "[p]rison disciplinary proceedings are not part of a criminal prosecution, and therefore the full panoply of rights that are due a defendant in a criminal proceeding does not apply." 🚩 *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (citation omitted). Instead, "there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Id.* Nonetheless, in *Wolff v. McDonnell*, the Supreme Court established that a prisoner is entitled to three minimal procedural protections. 🚩*Id.* at 564-66. These protections include: (1) advance, written notice of the charges against him and at least 24 hours to prepare a defense; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his own behalf; and (3) a written statement by the fact finder of the evidence relied upon and the reasons for the disciplinary action. *Id.*; *see also Kleparek*, 2015 WL 6750743, at *3. In addition, the decision-maker must be sufficiently impartial as not to present "a hazard of arbitrary decision making." *See* 🚩*id.* at 571.

Upon consideration, given all of Plaintiff's allegations, the Undersigned finds that Plaintiff has sufficiently alleged that the process afforded to him in the disciplinary proceedings was constitutionally insufficient.

First, Plaintiff alleges that he was placed in wing restriction without advance notice of the disciplinary charges against him. (*See* Doc. 108 at ¶ 91). In fact, Plaintiff claims that notice of the disciplinary charges came four days *after* he was placed in wing restriction. (*Id.*). Under *Wolff*, Plaintiff was due *advance*, written notice of the charges against him. *See* 418 U.S. at 564. Thus, because Plaintiff alleges he received notice of the disciplinary charges after he was placed in wing restriction, the Undersigned finds that this part of the process afforded to Plaintiff was insufficient. *See id.*

**\*10**  Next, *Wolff* also requires that an inmate be given at least 24 hours to prepare a defense. *Id.* On this point, Plaintiff alleges that he was served with disciplinary charges on October 7, 2013 and that the disciplinary hearing occurred on October 16, 2013. (Doc. 108 at ¶¶ 91-92). Because Plaintiff had nine (9) days between being served with charges and the hearing, it appears that Plaintiff had sufficient time to prepare a defense. *See* 🚩*Wolff*, 418 U.S. at 564. Thus, this part of the process afforded to Plaintiff was sufficient. *See id.*

Nonetheless, after this point, Plaintiff alleges that Defendant Beloff refused to allow him to present witnesses in his defense and refused to look into Plaintiff's proffered evidence. (*Id.* at ¶ 92). Without this evidence, Plaintiff alleges that he was found guilty of the infractions. (*Id.*). Under *Wolff*, Plaintiff should have been allowed to call witnesses and present documentary evidence in his defense, when doing so would not be unduly hazardous to institutional safety or correctional goals. *See* 418 U.S. at 566. While the decision to allow or not allow such evidence is usually left to the sound discretion of the institution's officials, *see* id. at 567, 569, here, by way of his default, Defendant cannot show that preventing Plaintiff from calling witnesses was unduly hazardous to institutional safety or correctional goals, *see* id. at 566. Furthermore, by refusing to allow witnesses or to look into Plaintiff's proffered evidence, the Undersigned finds that Plaintiff has adequately alleged that Defendant was not sufficiently impartial as to present "a hazard of arbitrary decision making." *See* id. at 571. Thus, the Undersigned finds these aspects of the process afforded to Plaintiff were insufficient under *Wolff. See id.*

Taking Plaintiff's allegations as true, the circumstances surrounding Plaintiff's disciplinary hearing reveal an arbitrary process attributable to Defendant Beloff's actions. While Plaintiff apparently had sufficient time to prepare a defense, Plaintiff was not afforded adequate notice, nor was he permitted to adequately prepare his defense with witnesses or proffered evidence. (*See* Doc. 108 at ¶ 92). Accordingly, the Undersigned finds that the Second Amended Complaint adequately alleges that Plaintiff was afforded constitutionally inadequate process in his disciplinary proceedings. *See* Wolff, 418 U.S. at 564-71.

### *iii. Conclusion as to Procedural Due Process Claims*

In sum, Plaintiff's Second Amended Complaint sets forth sufficient facts showing a deprivation of a constitutionally protected liberty interest, state action, and constitutionally inadequate process. *See* Grayden, 345 F.3d at 1232. The Undersigned, therefore, recommends that default judgment be entered in favor of Plaintiff and against Defendant Beloff as to Count II. The Undersigned addresses damages for Count II separately.

### D. Substantive Due Process (Count III)

Plaintiff's final claim for relief against Defendant Beloff is a violation of Plaintiff's right to substantive due process under the Fourteenth Amendment. (Doc. 108 at ¶¶ 98-104).

As stated above, the Due Process Clause provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In evaluating a substantive due process claim, the Undersigned notes that "the Due Process Clause's substantive component 'provides heightened protection against government interference with certain fundamental rights and liberty interests.' " *Wean v. Budz*, 589 F. App'x 488, 489 (11th Cir. 2014) (citing Troxel v. Granville, 530 U.S. 57, 65 (2000)).

**\*11**   As indicated above, "the involuntarily civilly committed have liberty interests under the due process clause of the Fourteenth Amendment to safety, freedom from bodily restraint, and minimally adequate or reasonable training to further the ends of safety and freedom from restraint." Dolihite, 74 F.3d at 1041 (citing Youngberg, 457 U.S. at 324). As to the right to freedom from bodily restraint, however, "a civilly committed individual's right to freedom from bodily restraint is not absolute." *Wean*, 589 F. App'x at 489-90 (citing Youngberg, 457 U.S. at 319-20). Instead, "in considering whether a substantive due process right has been violated, courts must balance the individual's liberty interests and the State's stated reasons for restricting the liberty." *Id.* (citing Youngberg, 457 U.S. at 320-21).

Case 1:18-cv-24190-RS Document 471 Entered on FLSD Docket 06/01/2023 Page 299 of 379

Pesci v. Beloff, Not Reported in Fed. Supp. (2017)

In this instance, as the Undersigned found above, Plaintiff has sufficiently pled a deprivation of a constitutionally protected liberty interest. According to the Second Amended Complaint, Plaintiff was placed in wing restriction for four days before receiving any notice of his disciplinary charges. (Doc. 108 at ¶ 91). During that time, Plaintiff alleges that he was isolated from the general FCCC resident population. (*Id.* at ¶ 89). Plaintiff further alleges that he was confined for thirteen (13) days before a disciplinary hearing took place. (*Id.* at ¶ 99). In addition, based on the procedural due process violations discussed above, Plaintiff alleges that Beloff found Plaintiff guilty of the three disciplinary infractions and sentenced him to thirty (30) days in wing restriction, resulting in confinement in wing restriction for an additional twenty (20) days. (*Id.* at ¶¶ 101-102). Plaintiff alleges that he was placed in wing restriction for thirty-two (32) continuous days in total. (*Id.* at ¶ 103).

As discussed above, Plaintiff's allegations sufficiently demonstrate that his placement in wing restriction was done for punitive purposes, *see Burke*, 2012 WL 4339290, at *7, because Plaintiff's placement in wing restriction was an "atypical significant deprivation" in which a State might conceivably have created a liberty interest. *See Kleparek*, 2015 WL 6750743, at *2. Moreover, by way of Defendant's default, Defendant cannot show that Plaintiff's placement in wing restriction was imposed for some purpose other than to punish, nor can Defendant show Plaintiff's placement in wing restriction was incidental to some other legitimate governmental purpose. *See Burke*, 2012 WL 4339290, at *7 (citing 🚩 *Bell*, 441 U.S. at 538). Accordingly, because Plaintiff has shown government interference with a liberty interest, the Undersigned finds that Plaintiff's Second Amended Complaint sets forth sufficient facts to establish a substantive due process violation by Defendant. *See Wean*, 589 F. App'x at 489. The Undersigned, therefore, recommends that default judgment be entered in favor of Plaintiff and against Defendant Beloff as to Count III.

## IV. Damages

Having determined that Plaintiff is entitled to default judgment on his First and Fourteenth Amendment claims against Defendant Beloff, the Undersigned now turns to damages. As to the claims remaining against Defendant Beloff, Plaintiff states in the Second Amended Complaint that he seeks "damages for the loss of protected First and Fourteenth Amendment rights," "full costs and attorney's fees arising out of this litigation pursuant to 🚩 42 U.S.C. § 1988," and "such other relief as this Court may deem just and appropriate." (Doc. 108 at 16-17). [4] Because Plaintiff previously indicated that his damages are not a sum certain, (Doc. 178 at 4), the Undersigned held an evidentiary hearing to determine damages. At the evidentiary hearing, Plaintiff stated that he was seeking $20,000.00 in monetary damages for the loss of his freedoms. (Doc. 186 at 43:12). Plaintiff did not allocate a specific dollar amount between his three counts. (*Id.* at 43:17-18). Plaintiff argued that it is not possible to make such an allocation. (*Id.*). The Undersigned addresses Plaintiff's potential damages below.

**\*12** First, in evaluating the potential damages from Plaintiff's First Amendment retaliation claim, Plaintiff did not allocate a specific amount of his request for $20,000.00 to his damages from the violation of his First Amendment rights. (*Id.*). Nonetheless, Plaintiff argued during the evidentiary hearing that "the ensuing injury is irreparable." (*Id.* at 41:1-2). Plaintiff further argued that the Court should consider the "significant interest[s]" at stake in the First Amendment. (*Id.* at 41:3-5).

On this point, however, while Plaintiff's First Amendment rights are undoubtedly important, the Supreme Court has rejected the view that damage awards should be for the "value" or "importance" of First Amendment freedoms. 🚩 *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 310 (1986). Instead, the Supreme Court has indicated that " 'the basic purpose' of 🚩 § 1983 damages is 'to *compensate persons for injuries* that are caused by the deprivation of constitutional rights.' " 🚩 *Id.* at 307 (emphasis in original; quoting 🚩 *Carey v. Piphus,* 435 U.S. 247, 254 (1978)). Because the "value" or "importance" of First Amendment freedoms do not justify a significant award of damages, the Undersigned declines to recommend an award of damages solely for the "significant interests" at stake regarding Plaintiff's First Amendment freedoms. *See* 🚩 *id.* at 310.

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 300 of 379

*Pesci v. Beloff*, Not Reported in Fed. Supp. (2017)

Nonetheless, "[a] violation of constitutional rights is never *de minimis*, a phrase meaning so small or trifling that the law takes no count of it." *Lewis v. Woods*, 848 F.2d 649, 651 (5th Cir. 1988). Moreover, Plaintiff's Second Amended Complaint sufficiently establishes a violation of Plaintiff's constitutional rights. Typically, nominal damages are an appropriate award where constitutional rights have been violated but a plaintiff has not sustained, or proven, actual damages. *See Carey*, 435 U.S. at 266-67. In this instance, however, Plaintiff's First Amendment retaliation claim includes allegations that Plaintiff was placed in wing restriction as a result of Defendant Beloff's actions. (*See* Doc. 108 at ¶ 79). Stated differently, Plaintiff alleges that Defendant's retaliatory actions resulted in Plaintiff being placed in wing restriction. (*See id.*). As explained in greater detail below, Plaintiff's placement in wing restriction resulted in actual injuries. Because Plaintiff suffered actual injuries from the violation of his First Amendment rights, an award of nominal damages is unnecessary. *See Carey*, 435 U.S. at 266-67.

At this point, the Undersigned notes that all three Counts against Defendant Beloff include allegations that Plaintiff was unlawfully placed in wing restriction. (Doc. 108 at ¶¶ 79, 96, 103). Accordingly, the Undersigned finds that it is appropriate to address these damages collectively for all three Counts.

Regarding the specific injuries Plaintiff sustained from his thirty-two (32) day placement in wing restriction, Plaintiff analogizes his situation to a false arrest. (*Id.* at 42:6-11). Plaintiff argues that he "lost substantial amounts of freedoms" and "suffered greatly as a result of [his placement in wing restriction]." (*Id.* at 42:10-11). Moreover, Plaintiff argues that "you can't put a price tag on false arrest." (*Id.* at 42:6). Even so, Plaintiff stated at the hearing that he was aware of verdicts and settlements in "one-day-in-jail" false arrest cases in the range of $30,000.00 to $50,000.00. (*Id.* at 42:7-8). Plaintiff, however, did not contend that his damages were at that level "because he was not free to begin with." (*Id.* at 42:9-10).

**\*13** In reviewing Plaintiff's arguments, the Undersigned is not persuaded that the instant case is sufficiently analogous to a false arrest case. Here, there is no dispute that Plaintiff is lawfully and civilly confined at the FCCC under Florida's SVP Act. Moreover, Plaintiff provided no citation to legal authority supporting that his claims are directly analogous to false arrest cases or that the violations of his First and Fourteenth Amendment rights should result in an award of damages in the specific amount he requested—$20,000.00. Thus, the Undersigned declines to recommend an award of $20,000.00 in damages based on Plaintiff's arguments.

Instead, the Undersigned finds that the instant case is more directly analogous and similar to cases where federal courts have awarded damages to inmates who are otherwise lawfully detained, but subsequently unlawfully placed in segregated confinement. In those cases, courts have reached varying conclusions regarding an appropriate award.

For instance, in *Bressman v. Farrier*, the court awarded the plaintiff $40.00 for each of the two days the plaintiff spent in solitary confinement in violation of the First Amendment right to free speech. 825 F. Supp. 231, 235, 238 (N.D. Iowa 1993). Similarly, in *Nettles v. Griffith*, the court found that an award of $50.00 was appropriate for each day of the plaintiff's unconstitutional administrative segregation. 883 F. Supp. 136, 145 (E.D. Tex. 1995). In another example, *Lowrance v. Coughlin*, the court found that an award of $100.00 per day was appropriate for the 115 days the plaintiff unlawfully spent in segregated confinement. 862 F. Supp. 1090, 1120 (S.D.N.Y. 1994). Finally, in *Nolley v. County of Erie*, the court awarded the plaintiff $125.00 per day for each of the 310 days of unlawful confinement. 802 F. Supp. 898, 908 (W.D.N.Y. 1992). The Undersigned finds that these cases establish an approximate range for an appropriate award in the instant case.

In evaluating where Plaintiff's injuries fall within this range, the Undersigned has evaluated Plaintiff's testimony from the hearing. Upon review, it is clear from Plaintiff's testimony that Plaintiff suffered actual injuries while placed in wing restriction. For instance, Plaintiff testified that his time in wing restriction resulted in diminished privileges, loss of freedom of movement around the FCCC, a strip search, placement in an orange jumpsuit, confiscation of personal property, loss of access to news media, diminished access to therapy, and less protection from other residents. (Doc. 186 at 14-18). Plaintiff also testified that

Case 1:18-cv-24190-RS Document 471 Entered on FLSD Docket 06/01/2023 Page 301 of 379

Pesci v. Beloff, Not Reported in Fed. Supp. (2017)

he feared writing freely, lost trust in FCCC officials, and feared he would not receive a fair disciplinary hearing. (*Id.* at 28-31). The Undersigned finds Plaintiff's testimony in this regard credible.

Given Plaintiff's injuries and evaluating the range of damages awarded in the above-referenced cases, the Undersigned finds that a reasonable award to compensate Plaintiff in this case is $100.00 per day for his time in wing restriction. In reaching this conclusion, the Undersigned notes that Plaintiff's confinement was not as short as the two-day confinement in *Bressman* that supported an award of $40.00 per day, nor was it as long as the 310 day confinement in *Nolley* that supported an award of $125.00 per day. *See* 🚩 *Bressman,* 825 F. Supp. at 238; 🚩 *Nolley,* 802 F. Supp. at 908.

Plaintiff spent thirty-two (32) days in wing restriction. (Doc. 108 at ¶ 103). Multiplying the appropriate award per day ($100.00 per day) with the number of days in wing restriction (32 days), the Undersigned finds that $3,200.00 ($100 per day × 32 days = $3,200.00) is an appropriate award for Plaintiff's placement in wing restriction. Additionally, because all three Counts against Defendant Beloff include allegations that Plaintiff was unlawfully confined in wing restriction, the Undersigned finds that $3,200.00 is an appropriate award for Plaintiff as to all three counts against Defendant Beloff.

## V. Conclusion

**\*14** In sum, Plaintiff's Second Amended Complaint alleges sufficient facts to support a default judgment against Defendant Beloff and in favor of Plaintiff as to Counts I, II, and III. Additionally, after an evidentiary hearing, and being otherwise fully informed in this case, the Undersigned recommends that Plaintiff be awarded damages in the amount of $3,200.00 for his unconstitutional confinement as to Counts I, II, and III.

Accordingly, for the reasons explained above, the Undersigned hereby **RESPECTFULLY RECOMMENDS**:

1) That Plaintiff James R. Pesci's Motion for Entry of Default Judgment Against Defendant Craig Beloff (Doc. 178) be **GRANTED IN PART** and **DENIED IN PART**.

2) That the Motion for Entry of Default Judgment be granted insofar as the Undersigned recommends that default judgment entered against Defendant Beloff and in favor of Plaintiff James Pesci in the amount of $3,200.00 as to Counts I, II, and III.

3) That Plaintiff's Motion be denied in all other respects, including the specific amount of damages Plaintiff requested at the evidentiary hearing.

<u>**NOTICE TO PARTIES**</u>

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual finding and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 11475269

**Footnotes**

1    The Court's March 25, 2015 Opinion and Order is also available on electronic databases. *See Pesci v. Budz*, No. 2:10-CV-428-FTM-38DNF, 2015 WL 1349711 (M.D. Fla. Mar. 25, 2015). For ease of reference, the Undersigned cites to the relevant docket entry (Doc. 95) on CM/ECF.

2    In    *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit Court of Appeals adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

3    Plaintiff's letter to Governor Crist concerned the suicide death of fellow FCCC resident, Michael Munion, and alleged that GEO covered-up Munion's death by suicide. (Doc. 108 at ¶ 32).

4    As of the date of this Report and Recommendation, Plaintiff has not filed a motion for attorney's fees or costs.

---

**End of Document**                                                  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Potter v. Williford, 712 Fed.Appx. 953 (2017)

130 Fair Empl.Prac.Cas. (BNA) 860, 2017 IER Cases 357,233

712 Fed.Appx. 953

This case was not selected for publication in West's Federal Reporter.

See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also U.S. Ct. of App. 11th Cir. Rule 36-2.

United States Court of Appeals, Eleventh Circuit.

Lorie POTTER, Plaintiff–Appellee,

v.

Don WILLIFORD, in his individual and official capacities, Defendant–Appellant.

Lorie Potter, Plaintiff–Appellee,

v.

The Estate of Lucius Van Peavy, Defendant–Appellant.

No. 16–13030, No. 16–15743

|

Non–Argument Calendar

|

October 5, 2017

**Synopsis**

**Background:** Former part-time county emergency medical technician (EMT) filed § 1983 action against sheriff and her supervisor alleging race discrimination and retaliation for political association. The United States District Court for the Middle District of Georgia, No. 5:14–cv–00315–MTT, Marc T. Treadwell, J., 🚩 2016 WL 1677291, denied officials' motion for summary judgment on qualified immunity grounds, and they filed interlocutory appeal.

**Holdings:** The Court of Appeals held that:

fact issues remained as to whether supervisor denied plaintiff promotion to full-time EMT because of her race, and

fact issues remained as to whether sheriff banned plaintiff from law enforcement center because of her support for his political opponent.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**Attorneys and Law Firms**

Eleanor Mixon Attwood, Legare Attwood & Wolfe, LLC, Paul Chichester, IV, Buckley Beal, LLP, Atlanta, GA, for Plaintiff–Appellee.

Kimberly A. Reid, Douglas Dean, Lawson & Reid, LLC, Cordele, GA, for Defendant–Appellant.

Appeals from the United States District Court for the Middle District of Georgia, D.C. Docket No. 5:14–cv–00315–MTT

Before WILSON, JULIE CARNES, and JILL PRYOR, Circuit Judges.

130 Fair Empl.Prac.Cas. (BNA) 860, 2017 IER Cases 357,233

**Opinion**

PER CURIAM:

Don Williford and the Estate of Lucius Van Peavy (Van Peavy) (collectively, the Appellants) appeal the district court's denial of their joint motion for summary judgment based on qualified immunity in Lorie Potter's action alleging (1) race discrimination

**\*954**  in violation of the Equal Protection Clause against Williford in his individual capacity, pursuant to ⚑ 42 U.S.C. §§ 1981, ⚑ 1983; and (2) retaliation for political association in violation of the First Amendment against Van Peavy, pursuant to ⚑ 42 U.S.C. § 1983. On appeal, the Appellants argue that the district court should have granted summary judgment in their favor on Potter's claims against Williford and Van Peavy, because both were entitled to qualified immunity.

### I. Race Discrimination Claim Against Williford

We review de novo a district court's denial of summary judgment based upon qualified immunity. *See* ⚑ *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012) (per curiam). In doing so, we "resolv[e] all issues of material fact in favor of the plaintiff." ⚑ *Id.*

Qualified immunity completely protects individual public officers from liability when performing their "discretionary functions[, so long] as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person in their position would have known." *See* ⚑ *id.* (internal quotation marks omitted). Generally, whether an official is entitled to qualified immunity is analyzed by looking to (1) whether the plaintiff established the violation of a constitutional right, and (2) whether that right was clearly established. *See* ⚑ *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 815–16, 172 L.Ed.2d 565 (2009).

A right is clearly established when it was "earlier [ ] developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that [the defendant was] violat[ing] federal law." *See* ⚑ *Sherrod*, 667 F.3d at 1363 (internal quotation marks omitted). The Equal Protection Clause right to be free from race discrimination in public employment is clearly established. *See* ⚑ *Smith v. Lomax*, 45 F.3d 402, 407 (11th Cir. 1995). Discrimination claims under the Equal Protection Clause are subject to the "same analytical framework" as intentional discrimination claims brought under Title VII and ⚑ § 1981. *See* ⚑ *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009). Accordingly, a plaintiff may satisfy the burden to produce evidence of race discrimination and establish a prima facie case by showing that: (1) she is a member of a protected class; (2) she was qualified and applied for a promotion; (3) she "was rejected in spite of h[er] qualifications;" and (4) "the individual who received the promotion is not a member of the protected group and had lesser or equal qualifications." *See* ⚑ *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998). After the plaintiff establishes a prima facie case, "[t]he burden then shifts to the employer to articulate legitimate nondiscriminatory reasons for the failure to promote." ⚑ *Id.* at 643. Satisfying this burden shifts the burden back to the plaintiff to show that the employer's articulated reasons are pretextual. ⚑ *Id.* An employer may not use subjective evaluations, but only objective criteria, to show that a plaintiff failed to illustrate that she was qualified for the position as part of her prima facie case. *See* ⚑ *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768–69 (11th Cir. 2005) (per curiam).

The district court properly denied summary judgment to Williford based on qualified immunity as to Potter's race discrimination claim, because Potter showed that, drawing all factual determinations in her favor, Williford violated her constitutional rights

130 Fair Empl.Prac.Cas. (BNA) 860, 2017 IER Cases 357,233

to be free from racial discrimination in public employment. *See* 📁 *Sherrod, 667 F.3d at 1363;* 📁 *Smith, 45 F.3d at 407.* First, Potter met her burden to present a **\*955** prima facie case because she met the objective qualifications for the full-time EMT position. *See* 📁 *Carter, 132 F.3d at 642.* Williford's argument that Potter was not qualified for a full-time position fails because Williford's conclusion that Potter had a negative relationship with other EMTs is a subjective evaluation, which is irrelevant to the prima facie element of being qualified for the position. *See* 📁 *Vessels, 408 F.3d at 768–69.*

Potter also presented genuine issues of material fact as to whether Williford's reason for the promotion of Woodson over Potter —that the other EMTs disliked Potter—was a pretext for race discrimination. *See* 📁 *Carter, 132 F.3d at 643.* Williford's own statements to Potter that the decision was based on the need to "diversify the department" and that he would hire a Hispanic EMT next time "to cover all the bases" rebuts Williford's insistence that his decision was based on the other EMTs negative impressions of Potter.

Finally, the district court was correct to hold that the Equal Protection Clause's protection against race discrimination in public employment is clearly established, so Williford is not entitled to qualified immunity.

## II. First Amendment Retaliation Claim Against Van Peavy

==We have held that it is clearly established that public officials may not retaliate against private citizens for exercising their First Amendment rights. *See* 📁⚠ *Bennett v. Hendrix,* 423 F.3d 1247, 1255 (11th Cir. 2005). To establish retaliation in violation of the First Amendment, a private-citizen plaintiff must show that (1) her speech or act was constitutionally protected; (2) the defendant's retaliatory conduct was likely to "deter a person of ordinary firmness from the exercise of their First Amendment rights;" and (3) "there is a causal connection between the retaliatory conduct and the adverse effect on the speech." 📁⚠*Id.* at 1250–51 (internal quotation marks omitted). Even when the deterrent is small, the retaliation may still be actionable. *See* 📁⚠*id.* at 1254.==

The district court properly denied summary judgment to Van Peavy based on qualified immunity as to Potter's First Amendment retaliation claim, because Potter showed that, drawing all factual determinations in her favor, Van Peavy violated her constitutional right to be free from retaliation for exercising her First Amendment right to political association. *See* 📁⚠*id.* at 1250–51, 1254–55. Van Peavy did not challenge that Potter engaged in protected political speech when she supported Williams's campaign to replace Van Peavy as Sheriff. Potter presented a genuine issue of material fact as to whether Van Peavy's actions were likely to deter a person from exercising their First Amendment rights because she presented evidence that when Van Peavy banned her from the Law Enforcement Center, it created a negative atmosphere at her workplace, and even a small deterrent effect can create a genuine issue of material fact. *See* 📁⚠*id.* at 1254. Potter also presented a genuine issue of material fact that Van Peavy's asserted reason for the ban—that Potter had an incident of inappropriate behavior—was not legitimate because another EMT was also listed as engaging in the exact same conduct as Potter in the incident report, but was not banned. Resolving all disputed facts in favor of Potter, the district court was correct to conclude a reasonable jury could find that Van Peavy's asserted reason for the ban was not based, even in part, on a legitimate reason. Finally it is clearly established that public officials may not retaliate against private citizens for exercising their First Amendment rights, so the district court **\*956** was correct to deny Van Peavy qualified immunity. *See* 📁⚠*id.* at 1250, 1254–55.

In conclusion, because Potter sufficiently showed that Williford violated her constitutional right to be free from race discrimination in public employment, Van Peavy violated her constitutional right to be free from retaliation for exercising her First Amendment right to political association, and those rights were both clearly established, we affirm.

130 Fair Empl.Prac.Cas. (BNA) 860, 2017 IER Cases 357,233

**AFFIRMED.**

**All Citations**

712 Fed.Appx. 953, 130 Fair Empl.Prac.Cas. (BNA) 860, 2017 IER Cases 357,233

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

KeyCite Yellow Flag - Negative Treatment

Distinguished by Lozman v. City of Riviera Beach,  S.D.Fla.,  November 4, 2014

746 F.3d 538

United States Court of Appeals, Second Circuit.

ROYAL CROWN DAY CARE LLC, Plaintiff–Appellee,

v.

DEPARTMENT OF HEALTH AND MENTAL HYGIENE OF the CITY OF NEW YORK, Frank Cresciullo, Individually and as Assistant Commissioner of the Department of Health and Mental Hygiene of the City of New York, James Morriss, Individually and as Director of Field Operations and Regulatory Enforcement for the Bureau of Child Care, Aurora Villareal, Borough Manager, Individually and in Her Official Capacity, Defendants–Appellants. *

Docket No. 12–4959–CV
|
Argued: Oct. 3, 2013.
|
Decided: March 19, 2014.

**Synopsis**

**Background:** Day care operator brought § 1983 action against city health department officials, alleging officials violated day care center operator's First Amendment and substantive due process rights by closing down day care facility in retaliation for a letter of complaint that operator sent to a state senator. Officials moved for summary judgment on basis of qualified immunity. The United States District Court for the Eastern District of New York, Margo K. Brodie, J., 2012 WL 2992124, denied motion. Officials filed interlocutory appeal.

**Holdings:** The Court of Appeals, Pooler, Circuit Judge, held that:

Court of Appeals lacked jurisdiction over issue of whether officials were motivated by retaliatory animus;

Court of Appeals had jurisdiction to hear claims arising out of denial of qualified immunity; and

officials were not entitled to qualified immunity.

Affirmed.

**Procedural Posture(s):** Motion for Summary Judgment.

**Attorneys and Law Firms**

**\*540** Salvatore John Bate, Staten Island, N.Y., for Plaintiff–Appellee.

Victoria Scalzo, Assistant Corporation Counsel (Michael A. Cardozo, Corporation Counsel of the City of New York, Kristin M. Helmers, Louise A. Moed, Diana Murray, on the brief), New York City Law Department, New York, N.Y., for Defendants–Appellants.

Before: POOLER, LYNCH, and DRONEY, Circuit Judges.

**Opinion**

POOLER, Circuit Judge:

Defendants–Appellants Department of Health and Mental Hygiene of the City of New York ("DOHMH"), Frank Cresciullo, James Morriss, and Aurora Villareal (collectively, "defendants") appeal from the July 20, 2012 Memorandum and Order of the United States District Court for the Eastern District of New York (Margo K. Brodie, J.), denying the individually named defendants' motion for summary judgment on qualified immunity grounds. Defendants also appeal from the November 20, 2012 Memorandum and Order of the district court denying their motion for reconsideration. We conclude that the individually **\*541** named defendants have not established that they are entitled to qualified immunity as a matter of law and, therefore, the district court did not err in denying their motion for summary judgment and motion for reconsideration. Accordingly, the orders of the district court are AFFIRMED.

## BACKGROUND

Plaintiffs below, Royal Crown Day Care LLC ("Royal Crown"), Boris Rey, Irina Gafina, and Irina Pritsker, brought this case under ⚑ 42 U.S.C. § 1983. They alleged, among other things, that defendants violated their First Amendment and substantive due process rights by closing down Royal Crown's day care facility in retaliation for a letter of complaint that Royal Crown sent to a New York State senator.

We set forth only a limited set of facts relevant to this interlocutory appeal, which are presented in the light most favorable to Royal Crown, the party opposing summary judgment. *See* ⚑ *Tierney v. Davidson,* 133 F.3d 189, 192 (2d Cir.1998). Royal Crown is a day care center that was formed under the laws of New York in 2006. It was issued a permit by DOHMH on August 20, 2009, to perform child care services. In July of 2009, a rival day care owner and operator named Liudmila Umarov told Royal Crown that she had connections at DOHMH and that if Royal Crown did not pay her money she would have it "shut down." Joint App'x at 416. Boris Rey, who was an owner/manager at Royal Crown and originally a plaintiff in this case, informed defendant Aurora Villareal, a manager at DOHMH, about Umarov's threat. Villareal was subsequently indicted for conspiracy to commit mail fraud and honest services fraud, and pleaded guilty to that charge. The factual basis for Villareal's plea was that she had accepted payments from Umarov in exchange for taking official actions to benefit day care centers that were affiliated with Umarov.

Royal Crown sent an undated letter to State Senator Martin Golden seeking his help on various issues, alleging: (1) that rival day care centers were trying to harm Royal Crown's business; (2) that the Health Department was harassing Royal Crown and threatening to shut it down; and (3) that there was corruption in the Health Department. Senator Golden's office forwarded Royal Crown's letter to DOHMH on June 7, 2010. On June 10, 2010, defendant James Morriss, a director at DOHMH, wrote an internal memorandum instructing four DOHMH employees to inspect Royal Crown and write reports with the objective that their findings would be used in DOHMH's consideration of whether to revoke Royal Crown's licenses and permits. On June 11 and 14, 2010, DOHMH conducted inspections of Royal Crown. On June 15, 2010, defendant Frank Cresciullo, an assistant commissioner at DOHMH, notified Royal Crown that it was required to cease operations based on violations of the New York City Health Code. *See* New York City, N.Y., Rules, tit. 24 (the "Health Code").

In the district court, defendants moved for summary judgment on all of plaintiffs' claims, and plaintiffs cross-moved for summary judgment on their procedural due process claim. In an oral decision, the district court: (1) granted defendants' motion for summary judgment on plaintiffs' procedural due process claim, unconstitutional taking claim, state law claims, and all the claims against the Board of Health of the City of New York; (2) denied defendants' motion for summary judgment on plaintiffs' First

Amendment retaliation claim and on qualified immunity grounds; (3) denied plaintiffs' motion for summary **\*542** judgment on their procedural due process claim; and (4) reserved decision on (a) defendants' motion for summary judgment on plaintiffs' substantive due process claim and (b) whether the individual plaintiffs had standing. *See* ▯ *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of the City of N.Y.,* No. 10–CV–5442 (MKB), 2012 WL 2992124, at \*1 & n. 1 (E.D.N.Y. July 20, 2012)* ("*Royal Crown I* "). In a written decision, the district court denied defendants' motion for summary judgment on plaintiffs' substantive due process claim, and concluded that the individual plaintiffs did not have standing. *See* ▯ *id.* at \*4–5. Accordingly, the only plaintiff before us is Royal Crown.

Defendants moved for reconsideration of the portions of the aforementioned decisions that were adverse to them, and the district court denied that motion. *See Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of the City of N.Y.,* No. 10–CV–5442 (MKB), 2012 WL 5873331, at \*318 (E.D.N.Y. Nov. 20, 2012).

The individually named defendants—Cresciullo, Morriss, and Villareal—appeal from the district court's denial of their motion for summary judgment on qualified immunity grounds and from the denial of their motion for reconsideration. DOHMH requests that our Court dismiss the claims against it if we conclude that the individual defendants are entitled to qualified immunity.

## DISCUSSION

### I. Appellate Jurisdiction and Standard of Review

We first must address our jurisdiction to hear this interlocutory appeal of the district court's denial of Cresciullo, Morriss, and Villareal's motion for summary judgment on qualified immunity grounds.

"Although the denial of a motion for summary judgment is generally not appealable, an exception applies where, as here, the challenged denial is based on the rejection of qualified immunity." ▯ *DiStiso v. Cook,* 691 F.3d 226, 239 (2d Cir.2012). However, "[s]uch a denial is appealable only to the extent that resolution of the qualified immunity defense turns on issues of law." ▯ *Id.* Accordingly, a defendant who raises a qualified immunity defense "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." ▯ *Johnson v. Jones,* 515 U.S. 304, 319–20, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995); *accord* ▯ *DiStiso,* 691 F.3d at 239. That is to say, " 'determinations of evidentiary sufficiency at summary judgment are not immediately appealable ... if what is at issue in the sufficiency determination is nothing more than whether the evidence could support a finding that particular conduct occurred.' " ▯ *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996) (alteration omitted) (ellipsis in *alim* ) (quoting ▯ *Behrens v. Pelletier,* 516 U.S. 299, 313, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996)).

"This does not mean that a district court can fully insulate a qualified immunity denial from appellate review simply by declaring that genuine issues of fact exist." ▯ *DiStiso,* 691 F.3d at 239 (brackets and internal quotation marks omitted). Rather, where a district court denies a defendant qualified immunity, there is appellate jurisdiction over that defendant's interlocutory appeal if the defendant "contests the existence of a dispute or the materiality thereof as a matter of law, or contends that he is entitled to qualified immunity even under plaintiff's version of the facts." ▯ *Id.* (internal quotation marks omitted).

In this case, the district court denied the individual defendants' motion for summary **\*543** judgment based on the existence of genuine disputes of fact. With respect to Royal Crown's First Amendment retaliation claim, the district court concluded that "there is an issue of fact as to whether defendants retaliated against plaintiff[ ] by suspending and then revoking plaintiff's day care permit because of the letter plaintiff[ ] wrote to Senator Golden." Special App'x at 60; *see also* ▯ *Royal Crown I,* 2012 WL 2992124, at \*3 ("As the Court held at the July 13 argument, Plaintiffs have provided sufficient evidence from which a jury could

infer that Defendants' suspension of their day care permit was motivated by retaliatory animus."). With regard to Royal Crown's substantive due process claim, the court decided that "a jury could reasonably find that Defendants' decision to suspend Royal Crown's permit was motivated by retaliatory animus and was therefore irrational." *Royal Crown I,* 2012 WL 2992124, at *4.

On this interlocutory appeal, we do not have jurisdiction to review those portions of the district court's decisions in which it concluded that there was sufficient evidence for a reasonable jury to find that defendants acted based on retaliatory animus. *See Johnson,* 515 U.S. at 313, 319–20, 115 S.Ct. 2151; *DiStiso,* 691 F.3d at 239; *Salim,* 93 F.3d at 89. However, the individual defendants argue on appeal that, even accepting as true Royal Crown's allegations concerning defendants' retaliatory motivation, they are entitled to qualified immunity as a matter of law. Defendants maintain that, notwithstanding their retaliatory motivation, they did not violate Royal Crown's constitutional rights because the Health Code mandated that defendants close down Royal Crown based on the existence of "critical violations at the daycare center." Defs.' Sept. 30, 2013 Letter at 2. That is to say, defendants' position is that their motivation for closing down Royal Crown is immaterial. Accepting Royal Crown's version of the facts, we have jurisdiction to hear defendants' legal arguments on this interlocutory appeal. *See DiStiso,* 691 F.3d at 239; *Tierney,* 133 F.3d at 194; *Salim,* 93 F.3d at 89–91. Our standard of review in these circumstances is de novo. *See DiStiso,* 691 F.3d at 240.

## II. Defendants' Qualified Immunity Defense

"The defendants are entitled to qualified immunity if they can establish either that (1) 'a constitutional right was [not] violated' or (2) 'the right was [not] clearly established.' " *Bailey v. Pataki,* 708 F.3d 391, 404 (2d Cir.2013) (alterations in *Bailey* ) (quoting *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *overruled in part on other grounds by Pearson v. Callahan,* 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). Part of this analysis consists of an inquiry into "whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Id.* (quoting *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151). [1]

As noted earlier, defendants primarily argue on appeal that they are entitled to qualified immunity because, even accepting as true Royal Crown's allegations about defendants' retaliatory motivation, the closure of the day care facility was mandated by the Health Code. Therefore, defendants' argument goes, their motivation **\*544** in closing the facility was immaterial and they did not violate Royal Crown's constitutional rights. We find defendants' argument unavailing.

Royal Crown "can prove First Amendment retaliation even if the measures taken by [defendants] were otherwise justified." *Beechwood Restorative Care Ctr. v. Leeds,* 436 F.3d 147, 152 (2d Cir.2006). That is to say, the fact that defendants in this case may have been justified in closing down Royal Crown based on their regulatory responsibilities to enforce the Health Code does not insulate them from being "subject to a claim of improper motive," if defendants retained some discretion in how they performed their regulatory enforcement functions. *Id.* at 153.

Contrary to defendants' argument, they did have some discretion in deciding whether to close down Royal Crown or take other action with regard to any violations of the Health Code that they found at plaintiff's facility. Defendants assert that Section 47.01(k) of the Health Code required them to shut down Royal Crown because Rey, who was an owner/manager at Royal Crown, admitted that he did not have the money to remedy some of Royal Crown's violations. Section 47.01(k) provides that certain serious violations constituting "imminent or public health hazards ... require the Commissioner or designee to order [their] immediate correction or to order the child care service to cease operations immediately and institute such corrective action as may be required by the Department or provided by this Code." New York City, N.Y., Rules, tit. 24, Health Code, § 47.01(k). Notwithstanding defendants' interpretation of Rey's comment about Royal Crown's inability to remedy certain violations based

on its financial situation, under Section 47.01(k) defendants had the discretion to "order [the] immediate correction" of Royal Crown's violations, rather than requiring it to cease operations. *Id.* [2] Defendants' exercise of their discretion in deciding to close down Royal Crown means that they can be held liable on plaintiff's claims that defendants violated Royal Crown's First Amendment and substantive due process rights by acting based on improper motive. *See* Beechwood Restorative Care Ctr.,
436 F.3d at 153. [3]

On a motion for summary judgment, a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "To survive summary judgment on a section 1983 First Amendment retaliation claim a plaintiff must demonstrate that he engaged in protected speech, and that the speech was a substantial *or motivating factor* in an adverse decision taken by the defendant." Beechwood Restorative Care Ctr., 436 F.3d at 152 (emphasis added). In Beechwood Restorative Care Center, we vacated the district court's grant of summary judgment to certain defendants in part based on evidence that those defendants were **\*545** "motivated by an intent to punish the [plaintiff] for exercising First Amendment rights of speech and petition." *Id.* at 154. Thus, defendants' motivation here for closing down Royal Crown just days after receiving the letter to Senator Golden is material to Royal Crown's First Amendment retaliation claim.

Under the law governing substantive due process, Royal Crown has to prove that: (1) it had a valid property interest in its permit to operate a day care center; and (2) "defendants infringed on that property right in an arbitrary or irrational manner." *Cine SK8, Inc. v. Town of Henrietta,* 507 F.3d 778, 784 (2d Cir.2007). Royal Crown can satisfy the second prong of that analysis by showing that defendants acted based on unlawful animus. *See* id. at 785–90 (concluding that evidence of a defendant's racial animus can allow a plaintiff's substantive due process claim to survive a motion for summary judgment). Accordingly, defendants' motivation is also material with respect to Royal Crown's substantive due process claim.

In sum, defendants are not entitled to qualified immunity solely because closing down Royal Crown may have been justified under the Health Code. [4] Defendants' motivation in closing down Royal Crown is material to Royal Crown's First Amendment and substantive due process claims, and we do not have jurisdiction to consider whether the dispute about defendants' motivation was genuine. The existence of that genuine dispute of material fact with respect to defendants' violations of Royal Crown's First Amendment and substantive due process rights precludes the entry of summary judgment on behalf of defendants unless they can show that their action was objectively legally reasonable or that the rights they violated were not clearly established. *See* Bailey, 708 F.3d at 404 & n. 8.

Properly assuming on this interlocutory appeal that defendants retaliated against Royal Crown for speech protected by the First Amendment, defendants' action was not objectively reasonable. Royal Crown's First Amendment and substantive due process rights to be free from retaliation and irrational government action in response to its letter to Senator Golden were clearly established at the time that defendants closed down plaintiff's day care facility. *See* Beechwood Restorative Care Ctr., 436 F.3d at 153–54 (holding that employees of a regulatory agency can be liable under the First Amendment for allegedly retaliating against a regulated entity in response to the regulated entity's complaints about the regulator's policies and practices); Cine SK8, Inc., 507 F.3d at 785–90 (holding that defendants could be liable on a substantive due process claim for amending the plaintiff's permit based on alleged racial animus). Accordingly, defendants are not entitled to summary judgment on the basis of qualified immunity.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's Memorandum and Order denying the individual defendants' motion **\*546** for summary judgment on qualified immunity grounds, and its Memorandum and Order denying those defendants' motion for reconsideration.

### All Citations

746 F.3d 538

## Footnotes

\*      The Clerk of Court is directed to amend the caption as above.

1      The Court in 🚩*Bailey* acknowledged that there is some tension in our decisions concerning "whether the 'reasonable officer' inquiry is part of step two—the 'clearly established' prong—or whether it is a separate, third step in the analysis." 🚩*708 F.3d at 404 n. 8.* In line with the approach in 🚩*Bailey,* we need not resolve that debate because under either formulation defendants here are not entitled to qualified immunity. *See* 🚩*id.*

2      To the extent that defendants argue that Section 47.77(a) of the Health Code mandated the closure of Royal Crown, their contention is belied by the discretionary language of that provision. Section 47.77(a) states that in certain serious circumstances "the Commissioner *may* order [a] child care service to close and to discontinue operations." New York City, N.Y., Rules, tit. 24, Health Code, § 47.77(a) (emphasis added).

3      While 🚩*Beechwood Restorative Care Center* concerned, among other things, a claim of First Amendment retaliation, we see no reason why the logic in that case should not apply to Royal Crown's substantive due process claim which, as discussed below, can also be proved by showing that defendants acted based on unlawful animus. *See* 🚩*Cine SK8, Inc. v. Town of Henrietta,* 507 F.3d 778, 785–90 (2d Cir.2007).

4      In support of defendants' argument that they are immune from suit because they were mandated to close Royal Crown based on the Health Code, defendants rely on cases involving allegedly retaliatory arrests and prosecutions where there existed probable cause for the government action. *See, e.g.,* 🚩*Reichle v. Howards,* —— U.S. ——, 132 S.Ct. 2088, 2091, 182 L.Ed.2d 985 (2012); 🚩*Mozzochi v. Borden,* 959 F.2d 1174, 1175, 1180 (2d Cir.1992). Defendants' reliance on those cases is unpersuasive because this Court has concluded that cases involving allegedly retaliatory arrests "do not extend ... to other variations of retaliation claims." 🚩*Blue v. Koren,* 72 F.3d 1075, 1083 n. 5 (2d Cir.1995).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by   Mobley v. Palm Beach County Sheriff Dept.,   11th Cir.(Fla.),   April 15, 2015

215 F.3d 1225

United States Court of Appeals,

Eleventh Circuit.

Howard V. SLICKER, Jr., Plaintiff–Appellant,

v.

JACKSON, Officer, Fulmer, Officer, et al., individually and in their official capacities

as police officers for the Summerville Police Department, Defendants–Appellees,

No. 99–10592.

|

June 21, 2000.

**Synopsis**

Arrestee brought § 1983 action against police officers, alleging unlawful seizure and use of excessive force. The United States District Court for the Northern District of Georgia, No. 97-00248-4- CV-RLV,   Robert L.  Vining Jr.,   J., granted judgment as matter of law for officers, and arrestee appealed. The Court of Appeals,   Marcus,   Circuit Judge, held that: (1) arrestee was not required to present evidence of direct monetary loss to establish compensable injury, and (2) officers were not entitled to qualified immunity on excessive force claim.

Reversed and remanded.

**Procedural Posture(s):** On Appeal; Motion for Judgment as a Matter of Law (JMOL)/Directed Verdict.

**Attorneys and Law Firms**

 **\*1226**  Adrian Francis Lanser, III, Cartersville, GA, for Plaintiff–Appellant.

Stephen Bair Moseley,  J. Anderson Davis, Brinson, Askew, Berry, Seigler, Richardson & Davis, Rome, GA, for Defendants– Appellees.

Appeal from the United States District Court for the Northern District of Georgia.

Before  TJOFLAT,  MARCUS  and  KRAVITCH,  Circuit Judges.

**Opinion**

MARCUS,  Circuit Judge:

This is an appeal of a district court order granting judgment as a matter of law in favor of defendants, Officers Clifford  **\*1227** D. Jackson, Roger T. Fulmer, and Thomas H. Kendricks, of the Summerville, Georgia Police Department, at the close of plaintiff Howard V. Slicker, Jr.'s civil rights case prosecuted under   42 U.S.C. § 1983. In essence, Slicker alleged that the officers violated his rights under the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution by subjecting him to an unlawful seizure when they placed him under arrest and by using excessive force in the process of arresting him. The central issue on appeal is whether the district court erred in entering judgment as a matter of law on the grounds that Slicker failed to produce evidence that he suffered a monetary loss as a result of the officers' conduct. [1] Because a   § 1983 plaintiff alleging excessive force may receive compensatory damages for such things as physical pain and suffering and mental and emotional

Slicker v. Jackson, 215 F.3d 1225 (2000)

13 Fla. L. Weekly Fed. C 784

anguish, and because a 🚩 § 1983 plaintiff whose constitutional rights are violated is entitled to receive nominal damages even if he fails to produce any evidence of compensatory damages, we hold that the district court erred in granting judgment as a matter of law, we vacate the judgment, and remand for further proceedings consistent with this opinion.

## I.

The procedural history and relevant facts are straightforward. Slicker brought suit against the officers based on an incident that occurred on August 2, 1995. On this date, Slicker accompanied his friend, Patricia Snead Montgomery, to the Summerville Police Department to inquire as to why Ray Teague, against whom Montgomery had filed a criminal complaint, alleging he had illegally entered her home, had been released on bond. At trial, Slicker testified that Officer Jackson refused to tell him why Teague had been released. He also testified that as he was leaving the police station building, Officer Kendricks arrested him for disorderly conduct, at which time the officers slammed his head against the pavement and knocked him unconscious. Specifically, he testified in these words:

A: I was leaving the city building, the police station and Kendricks said I was under arrest for disorderly conduct.

Q: Then what happened?

A: He put the handcuffs on my arm and tried to put my arm over my head which I can't do. I was like let me put them behind my back. And he grabbed ahold of my head and Fulmer had the cuffs on my hands and he put it behind my back and Kendricks grabbed ahold of the top of my head up here and slammed my head in the pavement.

....

Q: What happened next?

A: They hit my head on the pavement and I was out. Then I came to, felt like I was in la-la land and I felt two blows to the top of my head. I was worrying about please don't hurt my neck and Kendricks said this is tough shit.

....

Q: After you were down on the ground, what happened next?

A: My hands were cuffed and they picked me up, laid me on the hood of the car and I was having problems I couldn't feel my arms. So I slid off to the side of the car so it would relax the back of my neck and that's where I laid handcuffed facing up.

Q: Were you kicked?

A: I was kicked in the leg and kicked in the back and I ended up—kicked in the back of the head too because I had too [sic] big large knots.

Q: Were you still in handcuffs?

A: Yes, sir.

**\*1228** Q: When were you first placed in handcuffs?

A: When he said I was arrested for disorderly conduct.

Q: Did the handcuffs ever come off you during the time they were beating you?

A: No, sir.

Slicker v. Jackson, 215 F.3d 1225 (2000)

13 Fla. L. Weekly Fed. C 784

Slicker said that after the officers dragged him inside the police station and took off his handcuffs, he was treated at a hospital emergency room, although he did not offer into evidence any medical bills. He also testified that he sought medical treatment after he left the emergency room. Slicker did not claim that he missed work or that he incurred any other direct monetary loss as a result of the officers' conduct.

Ms. Patricia Snead Montgomery's trial testimony amplified the plaintiff's account. She said that Officer Jackson asked Slicker to leave the police station because the matter did not involve him. She added that as Slicker left the building, Officer Jackson went out after him and that Officers Fulmer and Kendricks were also outside. Ms. Montgomery testified about the critical encounter in these terms:

Q: Then what happened?

A: That's when Howard was placed on the hood of the patrol car and handcuffed.

Q: Who placed him on the hood of the car?

A: Officer Jackson.

Q: How did he place him?

A: Grabbed him from behind and pushed on the hood of the car and handcuffed him.

Q: Did Howard struggle?

A: Not that I recall.

Q: Could you see?

A: Yes

Q: Didn't see him struggle?

A: No.

Q: Then what happened?

A: Howard went limp. He kind of slithered off the hood of the patrol car onto the ground. That's when I saw Officer Jackson grab Howard from behind, back here and what appeared to [sic] he was beating his head on the ground and the other two officers looked as though they were kicking at Howard's ribs or in that general area.....

Q: Did it appear as if his right hand had a clump of Howard's hair in his hand?

A: I couldn't say. I just know he had him like this. I won't say clump. He had his hand in Howard's hair holding it.

Q: And was he using it to strike Howard's head on the pavement?

A: It appeared to me that way, yes.

....

Q: How many times did Officer Jackson strike Howard's head to the ground that you could see?

A: I saw his head hit the ground approximately two to three times.

Q: What were the other officers—what were the other two officers doing at that time?

A: They were to the front of Howard. What appeared to me they were kicking at his rib cage. I was more to the back of Mr. Jackson and to Howard, and I was seeing it from not a clear, as clear, as clear a view, but it appeared they were kicking his rib cage.

Q: Both of the officers looked to be kicking?

A: Yes.

Q: They looked to be kicking in the direction of Howard?

A: Yes.

Q: Was Howard handcuffed the whole time?

A: Yes, he was.

Although she said that she never saw the officers beat him on the head, she testified that she knew that they had because she saw the knots on his head that resulted from the beating. Several minutes later, the officers brought Slicker inside and an ambulance was called. According to **\*1229** Montgomery, Slicker's eyes were open but he had a starry-eyed look and was unresponsive. Slicker was taken off on a stretcher to the hospital.

At the close of Slicker's case, the officers moved for judgment as a matter of law on the grounds that they were entitled to qualified immunity and, in the alternative, because Slicker failed to present any evidence of damages. The district court found that the officers were not entitled to qualified immunity because Slicker presented enough evidence to raise a question of fact as to whether the officers used excessive force in arresting Slicker. However, the court entered judgment as a matter of law in favor of the officers because it found that Slicker had failed to present any evidence in support of his claim for damages. Specifically, the district court held that under *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), Slicker was required to prove actual injury in order to be entitled to compensatory damages. Moreover, the court observed that under *Memphis Community School District v. Stachura,* 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986), compensatory damages may not be awarded based on the "abstract value" or "importance" of constitutional rights. Finally, the court noted that punitive damages may be awarded only where a plaintiff shows that there are aggravating circumstances such as reckless indifference, ill will, or malice. The district court concluded that because Slicker did not present any evidence that he suffered a monetary loss in the form of "medical bills," "missed work," or "lost wages," and because he did not present any evidence of aggravating circumstances permitting the award of punitive damages, the officers were entitled to judgment as a matter of law.


## II.

We review *de novo* a district court's grant of judgment as a matter of law under *Fed.R.Civ.P. 50*, applying the same standards as the district court. *Morris v. Crow,* 117 F.3d 449, 455 (11th Cir.1997). In evaluating a defendant's *Rule 50* motion, made at the close of the plaintiff's case, we consider all of the evidence in a light most favorable to the plaintiff and grant the plaintiff the benefit of all reasonable inferences. We may affirm a judgment as a matter of law only if the facts and inferences " 'point so overwhelmingly in favor of the movant ... that reasonable people could not arrive at a contrary verdict.' " *Bogle v. Orange County Board of County Commissioners,* 162 F.3d 653, 656 (11th Cir.1998)(quoting *Richardson v. Leeds Police Dep't,* 71 F.3d 801, 805 (11th Cir.1995)).

In finding that Slicker was required to present evidence of monetary loss in the form of medical bills, missed work, or lost income, we think the district court misapprehended the "actual injury" requirement set forth in *Carey v. Piphus* and *Memphis Community School District v. Stachura.* In both of these cases the Supreme Court held that compensatory damages under §

*Slicker v. Jackson*, 215 F.3d 1225 (2000)

13 Fla. L. Weekly Fed. C 784

1983 may be awarded only based on *actual injuries* caused by the defendant and cannot be presumed or based on the abstract value of the constitutional rights that the defendant violated. *Carey,* 435 U.S. at 264, 98 S.Ct. at 1052, *Stachura,* 477 U.S. at 309–10, 106 S.Ct. at 2544. The Court did not hold, however, that a § 1983 plaintiff can only satisfy the "actual injury" requirement through evidence of *direct* monetary loss. In fact, the Court specifically found that compensatory damages may include more than out-of-pocket loss and other monetary harms. *Carey,* 435 U.S. at 264, 98 S.Ct. at 1052; *Stachura,* 477 U.S. at 307, 106 S.Ct. at 2543. Moreover, the Supreme Court has held that in the absence of actual injury entitling the plaintiff to compensatory damages, a § 1983 plaintiff whose constitutional rights are violated by the defendant is entitled to nominal damages. *Carey,* 435 U.S. at 266–67, 98 S.Ct. at 1054, *Stachura,*  **\*1230**   477 U.S. at 308, n. 11, 106 S.Ct. at 2543, n. 11.

We explicate the facts and holdings surrounding *Carey* and *Stachura* to illustrate the point. *Carey* involved two consolidated suits by students seeking damages and other relief against school board members who allegedly violated their procedural due process rights. One of the students had been suspended for smoking marijuana on school property and the other was suspended for violating a school rule prohibiting male students from wearing earrings. The district court held that the students were not entitled to damages because the students failed to offer any evidence "to quantify their damages, and the record is completely devoid of any evidence which could even form the basis of a speculative inference measuring the extent of their injuries." *Carey,* 435 U.S. at 251–52, 98 S.Ct. at 1046. On appeal, the Seventh Circuit reversed, holding that even if the suspensions were ultimately justified, the plaintiffs would be entitled to recover substantial nonpunitive damages for the denial of procedural due process, even though they failed to present proof of actual injury.

The Supreme Court reversed the Circuit Court, holding that a plaintiff alleging that his procedural due process rights were violated is only entitled to compensatory damages based on *actual injury* caused by the defendant and that damages cannot be presumed based on the inherent value of the right that was violated. The Court explained that the basic purpose of § 1983 damages is "to compensate persons for injuries that are caused by the deprivation of constitutional rights" and that our conception of damages drawn from tort law is often helpful in awarding damages in § 1983 cases. *Carey,* 435 U.S. at 253–54, 98 S.Ct. at 1047. It rejected the plaintiffs' argument that because the denial of a "feeling of just treatment" inherently gives rise to mental and emotional distress, they should not have to show actual damages. *Id.* at 260–61, 98 S.Ct. at 1051. The Court noted, however, that damages may be based on demonstrable mental and emotional distress resulting from the deprivation of due process. *Id.* at 264, 98 S.Ct. at 1052. Finally, the Supreme Court found that in the absence of evidence of actual injury, the plaintiffs were entitled to nominal damages. 435 U.S. at 266–67, 98 S.Ct. at 1053–54.

In *Stachura,* a tenured seventh-grade school teacher brought suit under § 1983 against the school district alleging that his First and Fourteenth Amendment rights were violated when he was suspended for teaching a unit on human reproduction. At the close of trial, the district court instructed the jury that if it found the defendants liable, it should award sufficient damages to compensate Stachura for his injuries and that it could also award punitive damages. In addition, the court charged that damages could be awarded based on the value or importance of the constitutional rights that were violated. The Supreme Court held that the district court's instruction was erroneous under the rule it had set forth in *Carey* that § 1983 damages should be based on *actual* injuries suffered and that the abstract value of a constitutional right may not form the basis for § 1983 damages. *Stachura,* 477 U.S. at 310, 106 S.Ct. at 2544–45. The Court explained that if juries were allowed to award damages based on the "value" of constitutional rights, "[s]uch damages would be too uncertain to be of any great value to plaintiffs, and would inject caprice into determinations of damages in § 1983 cases." *Stachura,* 477 U.S. at 310, 106 S.Ct. at 2544–45.

*Carey* and *Stachura* plainly require that compensatory damages in a 🏷 § 1983 suit be based on actual injury caused by the defendant rather than on the "abstract value" of the constitutional rights that may have been violated. Simply put, this means that if Slicker prevails on his claim that the officers violated his constitutional rights, he may receive compensatory damages only for actual injuries that were **\*1231** caused by the defendants' illegal conduct and not based on the abstract value of his right under the Fourth and Fourteenth Amendments to be free from the use of excessive force. Contrary to the district court's order, however, neither *Carey* nor *Stachura* limits proof of actual injury, and compensatory damages based on actual injury, to such things as medical expenses, missed work, and lost income. Instead, the Supreme Court expressly recognized that compensatory damages may be awarded once actual injury is shown despite the fact that the monetary value of the injury is difficult to calculate.
🏷 *Stachura,* 477 U.S. at 307, 106 S.Ct. at 2543.

Indeed, it is by now well settled that compensatory damages may be awarded based on physical pain and suffering caused by a defendant's use of excessive force, apart from any damages based on monetary loss. *See* 🏷 *Atkins v. New York City,* 143 F.3d 100, 104 (2d Cir.1998)(holding that "[a] beating severe enough to leave marks is sufficient proof of a compensable injury."); 🏷 *Haywood v. Koehler,* 78 F.3d 101, 105 n. 2 (2d Cir.1996)(holding that if prisoner was assaulted in his cell in an excessive use of force, such an assault could warrant some compensatory damages, at least for pain and suffering, even if no laceration or other observable injuries resulted). Slicker presented evidence, if credited, that he was kicked in the ribs and beaten on his head by the officers, that he received two knots on his head, was knocked unconscious, and sought medical attention as a result of excessive force. From this evidence, a jury *could* have awarded Slicker compensatory damages for pain and suffering without proof of medical bills, missed work, or lost income.

In addition to damages based on monetary loss or physical pain and suffering, under the law a 🏷 § 1983 plaintiff also may be awarded compensatory damages based on demonstrated mental and emotional distress, impairment of reputation, and personal humiliation. *See* 🏷 *Carey,* 435 U.S. at 264, 98 S.Ct. at 1052; 🏷 *Stachura,* 477 U.S. at 307, 106 S.Ct. at 2543. *See also,* 🏷 *Wright v. Sheppard,* 919 F.2d 665, 669 (11th Cir.1990)(holding that non-physical injuries such as humiliation, emotional distress, and mental anguish and suffering are all within the ambit of 🏷 § 1983 compensatory damages); 🏷 *O'Neill v. Krzeminski,* 839 F.2d 9, 13 (2d Cir.1988)(holding that 🏷 § 1983 plaintiff alleging excessive force by a police officer was entitled to full compensation for his physical and emotional pain, in addition to any lost wages, suffered as a result of the defendant's conduct). We think Slicker was entitled to present evidence and seek damages based on any monetary loss, as well as any physical pain and suffering or mental and emotional anguish that he may have incurred as a result of the officers' alleged misconduct. The district court therefore erred in entering judgment in favor of the officers simply on the grounds that Slicker failed to present evidence of medical expenses, missed work, or lost income.

We add, however, that even if Slicker were unable to demonstrate that he suffered any actual injury, under controlling case law the district court erred in not allowing Slicker to seek nominal damages. We have held unambiguously that a plaintiff whose constitutional rights are violated is entitled to nominal damages even if he suffered no compensable injury. *See* 🏷 *Kelly v. Curtis,* 21 F.3d 1544, 1557 (11th Cir.1994)(holding that a 🏷 § 1983 plaintiff alleging false arrest, malicious prosecution, and illegal detention is entitled to receive nominal damages if he demonstrates that the defendants violated his constitutional rights even if he is unable to prove that he suffered a specific, actual injury as a result of the defendants' conduct); *see also* 🏷 *Carey,* 435 U.S. at 266, 98 S.Ct. at 1054.

Although we have never addressed the appropriateness of nominal damages in the context of an excessive force claim, we agree with the reasoning of our sister circuits which have held that a 🏷 § 1983 plaintiff alleging excessive use of force is entitled **\*1232** to nominal damages even if he fails to present evidence of compensable injury. *See e.g.,* 🏷 *Gibeau v. Nellis,* 18 F.3d

107, 110 (2d Cir.1994); *Butler v. Dowd,* 979 F.2d 661, 669 (8th Cir.1992)(en banc); *Briggs v. Marshall,* 93 F.3d 355, 360 (7th Cir.1996). These cases acknowledge that the typical § 1983 plaintiff alleging excessive force may be entitled to compensatory damages. They identify, however, several circumstances under which a § 1983 plaintiff alleging excessive use of force may be entitled to receive only nominal damages.

First, the jury may award nominal damages where there is evidence that both justifiable and unjustifiable force might have been used and the injury may have resulted from the use of justifiable force. *See Gibeau v. Nellis,* 18 F.3d 107, 110–11 (2d Cir.1994)(holding that the district court erred in not instructing jury that it must award nominal damages if it were to find that the plaintiff's Eighth Amendment rights were violated by the defendants' use of excessive force but that plaintiff did not prove his injuries were proximately caused by the excessive force). Second, nominal damages may be appropriate where a jury reasonably concludes that the plaintiff's evidence of injury is not credible. *See Butler v. Dowd,* 979 F.2d 661, 669 (8th Cir.1992)(en banc) (holding that award of nominal damages to inmates who brought suit against prison officials for permitting them to be raped by other inmates in violation of their Eighth Amendment rights was not inadequate as a matter of law because the jury could have believed that plaintiffs' actions were the cause in fact of most of their injuries or the jury could have disbelieved the plaintiffs' testimony regarding the extent of their injuries). Finally, an award of nominal damages may be appropriate when the plaintiff's injuries have no monetary value or when they are not quantifiable with reasonable certainty. *See Briggs v. Marshall,* 93 F.3d 355, 360 (7th Cir.1996)(holding that award of nominal damages was not error where nearly all of the damages evidence consisted of the plaintiffs' testimony, the plaintiffs failed to produce medical testimony regarding their physical injuries, and there was evidence in the record from which the jury could have disbelieved the extent of the plaintiffs' physical and emotional injuries). Therefore, if on remand the jury does indeed find that the officers used excessive force in violation of Slicker's constitutional rights but that he failed to present any evidence of a compensable injury, Slicker must be awarded nominal damages.

The officers argue, however, that even if the district court erred in granting their motion for judgment as a matter of law on the grounds that Slicker failed to present any evidence of damages, the judgment still should be affirmed because they are entitled to qualified immunity since Slicker failed to present any evidence that the officers' conduct was not objectively reasonable under the circumstances. Notably, the district court held that the officers were not entitled to qualified immunity because Slicker presented enough evidence to raise a question of fact as to whether the officers used excessive force. The district court did not err in finding that the officers were not entitled to qualified immunity.

"Qualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Nolin v. Isbell,* 207 F.3d 1253, 1255 (11th Cir.2000)(quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Moreover, in an excessive force case, "qualified immunity applies unless application of the standard would inevitably lead every reasonable officer ... to conclude the force was unlawful." *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1559 (11th Cir.1993), modified 14 F.3d 583 (11th Cir.1994). In determining whether an officer's use of force was objectively reasonable, thereby **\*1233** entitling the officer to qualified immunity, we consider a variety of factors including "(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and, (4) whether the force was applied in good faith or maliciously and sadistically." *Moore v. Gwinnett County,* 967 F.2d 1495, 1498 (11th Cir.1992)(quoting *Leslie v. Ingram,* 786 F.2d 1533, 1536 (11th Cir.1986)). A court should also consider "the severity of the crime, whether the suspect pose[d] an immediate threat, and whether the suspect [was] resisting or fleeing." *Post,* 7 F.3d at 1559 (citation omitted). We also have had occasion to observe recently that "this Circuit has established the principle that the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin,* 207 F.3d at 1257.

Slicker v. Jackson, 215 F.3d 1225 (2000)

13 Fla. L. Weekly Fed. C 784

As we've noted, Slicker presented two witnesses, himself and Patricia Snead Montgomery, who provided ample testimony, if credited, in support of Slicker's claim that the police used excessive force. Ms. Montgomery testified that once Slicker was arrested and handcuffed, he did not struggle or resist the officers in any way. In addition, she testified that it appeared to her that the officers kicked him in the ribs and beat his head on the ground. And Slicker testified, unambiguously, that after he was handcuffed, the officers repeatedly hit his head on the pavement, kicked him, and knocked him unconscious. If credited by the fact finder, this evidence suggests the officers used excessive force in beating Slicker even though he was handcuffed and did not resist, attempt to flee, or struggle with the officers in any way. This evidential foundation is sufficient to raise a question of fact as to whether the officers' actions constituted excessive and not de minimis force. On this record, we think the district court properly concluded that the officers were not entitled to qualified immunity.

In sum, if the jury were to find that the officers did indeed use excessive force, Slicker may be entitled to compensatory damages based on any injuries he incurred as a result of their misconduct, including damages based on monetary loss, physical pain and suffering, or demonstrable mental and emotional distress. Moreover, if the jury were to find excessive force but that Slicker suffered no compensable damages, Slicker still would be entitled to an award of nominal damages.

REVERSED AND REMANDED.

**All Citations**

215 F.3d 1225, 13 Fla. L. Weekly Fed. C 784

## Footnotes

1    The district court granted the officers' motion for judgment as a matter of law on Slicker's unlawful arrest claim on the grounds that they were entitled to qualified immunity because the officers had probable cause to arrest Slicker. Slicker does not appeal this ruling.

                © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 685037

Only the Westlaw citation is currently available.

United States District Court, N.D. Alabama, Southern Division.

Seron SMITH, Plaintiff,

v.

Capt. CALDWELL, et al., Defendants.

Case No. 2:20-cv-810-ACA-GMB

|

Signed 02/09/2022

**Attorneys and Law Firms**

Seron Smith, Clio, AL, Pro Se.

Bettie J. Carmack, Jason Matthew Bledsoe, Terrie Scott Morgan, Laura E. Howell, Office of the Attorney General State of Alabama, Montgomery, AL, for Defendants Mohammed Jenkins, Trenton Matthews, Shaun Mechalske.

## REPORT AND RECOMMENDATION

GRAY M. BORDEN, UNITED STATES MAGISTRATE JUDGE

**\*1** Plaintiff Seron Smith filed a *pro se* complaint pursuant to 🚩 42 U.S.C. § 1983 alleging violations of his rights under the Constitution or laws of the United States. Doc. 1. Smith names the following defendants in the complaint: Captain Shannon Caldwell, Lieutenant Mohammad Jenkins, Officer Trenton Matthews, and Sergeant Shaun Mechalske. Doc. 1 at 2–3; Doc. 18. Smith seeks monetary damages and the termination of Jenkins' and Matthews' employment with the Alabama Department of Corrections ("ADOC"). Doc. 1 at 7. Consistent with the usual practices of this court and 🚩 28 U.S.C. § 636(b)(1), the court referred the complaint to a Magistrate Judge for a preliminary report and recommendation. For the reasons to follow, the Magistrate Judge recommends that the defendants' motion for summary judgment be granted in part and denied in part.

### I. PROCEDURAL HISTORY

The court entered an Order for Special Report directing the Clerk of Court to forward copies of the complaint to the defendants and directing them to file a special report addressing Smith's factual allegations. Doc. 6. The court advised the defendants that the special report could be submitted under oath or accompanied by affidavits and, if appropriate, the court would consider it to be a motion for summary judgment filed pursuant to Federal Rule of Civil Procedure Rule 56. Doc. 6.

The defendants filed a special report supplemented by affidavits and other evidence. Doc. 20. The court notified the parties that it would construe the special report as a motion for summary judgment and notified Smith that he had 21 days to respond to the motion with affidavits or other evidence. Doc. 21. Smith filed a response to the motion for summary judgment (Doc. 24) and also filed a motion requesting the production of additional discovery materials (Doc. 23). The court granted the motion and ordered the defendants to produce any video recordings in their possession and the complete Intelligence and Investigative ("I&I") reports. Doc. 25 at 2; *see also* Doc. 34.

In response to the court's orders, the defendants filed an affidavit from Arnaldo Mercado, Director of the ADOC's Law Enforcement Services Division ("LESD")[1]; an Investigative Report related to Smith's claim of a sexual assault on January 2, 2020; and an Investigative Report related to Smith's claim of sexual assault on May 26, 2020. Doc. 35. The court also ordered the defendants to produce video recordings of witness interviews related to the incident on May 26, 2020. Doc. 36. The defendants filed a Notice of Compliance.[2] Doc. 37.

Smith also filed a "Motion of Rebuttal to Defendants' Response to Court's Order (Nov. 15, 2021)," in which he responded to many of the exhibits attached to the defendants' special report. Doc. 38. In that motion, Smith requested an "evidentiary hearing and/or a careful look at the many [discrepancies] in the statements and dates" and "false facts" in the defendants' exhibits. Doc. 38 at 1–2. Smith did not request or receive leave of court to file a second response to the special report, nor did he provide an explanation for failing to identify the alleged discrepancies and false facts in his initial response to the special report. Even so, the defendants produced evidence after Smith filed his initial response and the court finds that he is entitled to respond to this new evidence. Accordingly, the court has considered this filing in deciding the motion for summary judgment. The request for an evidentiary hearing therefore is due to be denied.

## II. STANDARD OF REVIEW

**\*2**  Because the court has construed the defendants' special report as a motion for summary judgment, Federal Rule of Civil Procedure 56 governs the resolution of the motion. Under Rule 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In making that assessment, the court must view the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). The burden of proof is upon the moving party to establish his *prima facie* entitlement to summary judgment by showing the absence of genuine issues of material fact and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence establishing each element of his claim, all other issues of fact become immaterial and the moving party will be entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1532–33 (11th Cir. 1990). As the Eleventh Circuit has explained, [f]acts in dispute cease to be "material" facts when the plaintiff fails to establish a *prima facie* case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial. *Bennett*, 898 F.2d at 1532 (citations omitted).

However, any "specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in opposition to summary judgment. *See Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)). Additionally, because the plaintiff is *pro se*, the court must construe the complaint more liberally than it would construe pleadings drafted by lawyers. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980). A pro se pleading "is held to a less stringent standard than a pleading drafted by an attorney." *Jones v. Fla. Parole Comm'n*, 787 F.3d 1105, 1107 (11th Cir. 2015).

## III. SUMMARY JUDGMENT FACTS [3]

### A. December 2019 Incidents

On December 29, 2019, defendant Jenkins walked into the N-Dorm of Donaldson Correctional Facility and stated, "You [all] killed one (referring to inmates) at Holman, we (D.O.C.) killed one in the 'hot bay,' now we even." Doc. 1 at 5. Smith and several inmates complained to Warden Givens about this comment, and Smith contends that Jenkins began to retaliate against him after he complained. Doc. 1 at 5.

### B. Incident on January 2, 2020

Smith alleges that on January 2, 2020, Jenkins "handcuffed [him] for no reason, took [him] to a shower (J-Block shower), sprayed [his] eyes with pepper spray while cuffed, broke [his] eye glasses and stomped on them, beat [him] in the head [and] back, and tried to insert [a] mop handle into [his] anus." Doc. 1 at 5. The incident report tells a different story. The report reflects that Smith refused to follow Jenkins' order to take his tray to the dish room after he finished eating. Doc. 20-9 at 3. Jenkins repeated his order and Smith replied, "F*ck you, make me take it!" Doc. 20-9 at 3. Smith reluctantly complied with Jenkins' third order. Doc. 20-9 at 3. While at the dish room window, Smith told Jenkins, "F*ck you, I will stab you in your face n*gga!" Doc. 20-9 at 3. Jenkins then approached Smith to take him into custody. Doc. 20-9 at 3. In response, Smith began acting erratically, swinging his arms towards Jenkins, and yelled, "Crips help! Crips up!" to approximately 60 inmates in the dining hall. Doc. 20-9 at 3; *see also* Doc. 20-9 at 2. Jenkins "dispersed a one second burst [of pepper spray] to [Smith's] facial area." Doc. 20-9 at 3. Sergeant Godsey, Sergeant Patrick, and Officer Oden assisted Jenkins in handcuffing Smith.[4] Doc. 20-9 at 3. Smith denies that he refused to comply with any order from Jenkins, that his actions were threatening, and any implication that he is in a gang. Doc. 38 at 2, 4.

 **\*3**  Although Smith maintains that he was taken to the J-Block dormitory shower (Doc. 38 at 23), the incident report reflects that Smith went to the infirmary for decontamination and medical evaluation. Doc. 20-9 at 3. According to a body chart completed at the infirmary, Smith reported that he "was assaulted by Lt. Jenkins in the chow hall [and] sprayed twice with mace while handcuffed too." Doc. 20-9 at 5. His chart shows that the right side of his neck and his eyes were red, but "[n]o other markings or injury noted on exam." Doc. 20-9 at 5.[5] Smith refused to provide a written statement but made a self-referral to the mental health unit immediately after the medical examination. Doc. 20-9 at 4, 6. The mental health staff placed Smith in a crisis cell under non-acute suicide watch for suicidal ideations. Doc. 20-9 at 3.

Two days later, Smith returned to the infirmary because he was "bleeding from his eye." Doc. 20-10 at 3, 6. During the infirmary visit, Smith spoke to the nurse about the January 2, 2020 incident with Jenkins. Doc. 20-10 at 1, 3. Smith now reported that Jenkins sexually assaulted him while transporting him from the kitchen to the shower of J-Unit and "sprayed [him] and grabbed a mop and started po[k]ing [him] with the end of it on my lower back and buttock" while he was fully clothed. Doc. 20-10 at 1, 3; Doc. 20-13 at 6. Smith was transported to the Sexual Assault Nurse Examiner ("SANE") Crisis Clinic for a rape examination.[6] *See* Doc. 35-1 at 4. On his return, Smith was placed on non-acute suicide watch. Doc. 20-10 at 1, 4–5; Doc. 20-13 at 7.

During the investigation of Smith's sexual assault allegations, Agent Harris interviewed Smith, who now reported that Jenkins "started poking [him] in his 'butt' with a broomstick," punched him twice, maced him twice, broke his glasses, and left him in the shower for an hour, but later returned with two gang members, Earl Manassa and Quinton Brown, who helped to transport Smith to the infirmary. Doc. 35-1 at 4. Agent Harris interviewed Manassa and Brown, who denied transporting Smith anywhere and said they did not witness any altercation between Jenkins and Smith. Doc. 35-1 at 4–5. Agent Harris also interviewed Jenkins, who described Smith's disruptive behavior, threats, and failure to comply with orders. Doc. 35-1 at 5. Jenkins reported that he sprayed Smith with mace, handcuffed him, and "escorted [him] to the J-side lockup shower."[7] Doc. 35-1 at 5. The investigation did not substantiate Smith's sexual assault claim. Doc. 35-1 at 5.

### C. Incident on January 16, 2020

Smith contends that Jenkins beat him again in his cell in D-Block on January 16, 2020. Doc. 1 at 5. There is no record of this incident or any evidence that Smith received medical care for any injuries around this time.

### D. Incident with Inmate Jones

Smith contends that Jenkins told inmates that he had been " 'snitching' ratting on them." Doc. 1 at 5. Smith states that inmate Jack Jones assaulted him on March 11, 2020 because of Jenkins' statements. Doc. 1 at 5. Smith further alleges that he received disciplinary action for filing a grievance about the assault, that Jones told Smith that Jenkins had ordered the assault, that Jenkins placed a $5,000 bounty on Smith's head, and that Jenkins had two other inmates working for him. Doc. 1 at 5. Although there is no record of an assault on March 11, 2020, the record includes a body chart dated on April 8, 2020, which reflects that Smith reported he had been assaulted by Jones in D-Dorm. Doc. 20-13 at 9. The body chart shows that Smith had an abrasion on his left arm. Doc. 20-13 at 9.

### E. Incident with Inmate Knight

 **\*4**  Smith asserts that inmate Edward Knight assaulted him on May 17, 2020 because of Jenkins' "snitching" comment. Doc. 1 at 5. Like inmate Jones, Smith claims that Knight said Jenkins ordered the assault, had placed a $5,000 bounty on Smith's head, and had two other inmates working for him. Doc. 1 at 5.

The incident report gives a different account of the altercation between Knight and Smith. According to the report, Smith and Knight were cleaning up water in a dorm when they began arguing about the amount of water on the floor. Doc. 20-11 at 1. A fight ensued. Doc. 20-11 at 1. Officer Pickens ordered them to stop fighting and he sprayed mace on them when they did not comply. Doc. 20-11 at 1. Both Smith and Knight were decontaminated and received medical assessments. Doc. 20-11 at 1. Smith reported that "Knight swung at him for putting too much water on the floor while cleaning." Doc. 20-11 at 1. Smith explained that the reason Knight assaulted him was to "try to get [him] fired as a runner" because someone offered Knight "$50 to get them a runner job in G-Block." Doc. 20-11 at 5. Knight confirmed that Smith became hostile when Knight asked him why he was using so much water on the floor. Doc. 20-11 at 1. Both men received disciplinary action for fighting. Doc. 20-11 at 1.

### F. Incident on May 26, 2020

On May 26, 2020, Smith claims that defendant Matthews moved him from a single cell to a segregation cell with a known rapist nicknamed "Monster" even though he was not supposed to be moved. Doc. 1 at 6; Doc. 24 at 4. Smith admits he did not want to be transferred. Doc. 24 at 4. After he "became defiant," Smith contends that Matthews handcuffed him, sprayed him with mace, beat his head on the floor, squeezed his testicles, and pulled off his toenail [8] while forcing him to release his hold on his cell door. Doc. 1 at 6; Doc. 24 at 4.

At some point during this encounter, Matthews "radio[ed] for backup assistance" and defendant Mechalske "arrived on the scene." Doc. 24 at 4. Smith states that Matthews sprayed him with mace "after being told by ... Mechalske to 'spray that n\*gger snitch.' " Doc. 1 at 6. He also alleges that Matthews and Mechalske "beat [him] while handcuffed on the floor and squeezed [his] testicles and tore [his] toe nail off." Doc. 24 at 4.

The body chart completed after this incident shows that Smith had abrasions on his right big toe and left bicep and his eyes were red. Doc. 20-12 at 4. During his infirmary visit, Smith stated that he "fear[ed] for [his] life" and complained that his right big toe scraped against the door during the altercation. Doc. 20-12 at 4; Doc. 20-13 at 13. Smith also reported that Matthews sexually assaulted him during the incident (Doc. 20-12 at 15), specifically that Matthews "stuck his finger in [Smith's] anus." Doc. 35-1 at 7. Smith returned to the SANE Crisis Clinic (Doc. 20-14 at 2–4; Doc. 1 at 6) for an investigation into this sexual assault allegation. During the investigation, Smith recanted his previous claim and stated that Matthews did not sexually assault him. Doc. 35-1 at 8. [9]  Smith's sexual assault case against Matthews was closed as "unfounded." Doc. 35-1 at 8.

## IV. ANALYSIS

## A. Captain Caldwell

**\*5** Caldwell contends that Smith has not asserted any cause of action against him. Doc. 20 at 12. The court agrees. Smith's complaint contains no factual allegations related to Caldwell, and Smith has not addressed Caldwell's argument that he is due to be dismissed. Doc. 24. Accordingly, the motion for summary judgment is due to be granted as it relates to Caldwell.

## B. Official Capacity Claims Against Jenkins, Matthews, and Mechalske

The Eleventh Amendment bars § 1983 claims against the state or an agency of the state. *See Pennhurst St. Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Eleventh Amendment immunity "has also been extended to state officials, acting in their official capacity, where an agency or individual may 'be treated as an arm of the State partaking of the Eleventh Amendment Immunity.' " *Melton v. Abston*, 841 F.3d 1207, 1233 (11th Cir. 2016), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)). "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity or Congress has abrogated the state's immunity." *Id.* Congress has not waived, and Alabama has not abrogated, the state's Eleventh Amendment immunity. *Id.* at 1234. "Consequently, Alabama state officials are immune from claims brought against them in their official capacities." *Id.* For this reason, Jenkins, Matthews, and Mechalske are immune from suit in their official capacities for Smith's claims seeking monetary damages. [10]

## C. Individual Capacity Claims [11]

The Eleventh Amendment does not immunize state officials from § 1983 claims against them in their individual capacities. *Melton*, 841 F.3d at 1234. Smith claims that the remaining defendants subjected him to cruel and unusual punishment in violation of the Eighth Amendment and that Jenkins retaliated against him in violation of his First Amendment right to freedom of speech. Doc. 1 at 4. The court will address the excessive force claims and then the retaliation claims.

### 1. Excessive Force

The Eighth Amendment's proscription of cruel and unusual punishments protects prisoners from prison officials' excessive use of force. *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999). The federal courts analyze excessive force claims under the standards set forth in *Hudson v. McMillian*, 503 U.S. 1 (1992), and *Whitley v. Albers*, 475 U.S. 312 (1986). This analysis includes both a subjective and an objective component: (1) whether "the 'officials act[ed] with a sufficiently culpable state of mind' " and (2) whether "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." *Hudson*, 503 U.S. at 8 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 303 (1991)).

**\*6** For the subjective component of the analysis, "the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 7. Relevant factors include: (1) the need for any application of force, (2) the relationship between that need and the amount of force used, (3) the threat reasonably perceived by the responsible official, (4) any efforts to temper the severity of a forceful response, and (5) the extent of the injury suffered by the inmate. *Id.* at 6; *see also Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007).

The objective component of an excessive force claim "focuses on whether the official's actions were harmful enough ... or sufficiently serious to violate the Constitution." *Sconiers v. Lockhart*, 946 F.3d 1256, 1265 (11th Cir. 2020) (internal quotation marks and citations omitted). The Supreme Court has "rejected the notion that 'significant injury' is a threshold requirement for

stating an excessive force claim." 🔖 *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). Instead, "the Eighth Amendment prohibits force that offends 'contemporary standards of decency,' regardless of whether 'significant injury is evident,' though the extent of injury may shed light on the amount of force applied or 'whether the use of force could plausibly have been thought necessary.'
" 🔖 *Sconiers*, 946 F.3d at 1265 (quoting 🔖 *Wilkins*, 559 U.S. at 37). Although the Eleventh Circuit has rejected a bright-line standard mandating a more-than-*de-minimis* injury, the Eighth Amendment still "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." 🔖 *Sconiers*, 946 F.3d at 1265–67 (citing 🔖 *Wilkins*, 559 U.S. at 37–38).

"Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520 (1979). Generally, courts "do not second-guess prison officials on matters that they are better equipped to handle under the exigencies of an internal disturbance." *Wilson v. Blankenship*, 163 F.3d 1284, 1295 (11th Cir. 1998). With these legal principles in mind, the court turns to Smith's claims of excessive force against each remaining defendant.

### a. Jenkins

Smith makes three allegations of excessive force against Jenkins. He first asserts that Jenkins assaulted him on January 2, 2020 "for no reason," and second that Jenkins sexually assaulted him in the shower on the same day. Doc. 1 at 5. He also contends that Jenkins "beat [him] and swoll [sic] [his] eyes" in his cell on January 16, 2020. Doc. 1 at 5. For the following reasons, summary judgment is due to be denied as to each of these claims.

### i. January 2, 2020

There is a genuine issue of material fact as to whether Jenkins used excessive force against Smith during the incident on January 2, 2020. Smith claims that Jenkins handcuffed him for no reason and then took him to the J-Block shower where he sprayed his eyes with mace, broke his glasses, beat his head and back, and attempted to insert a mop handle into his anus. Doc. 1 at 5. When he went to the infirmary, Smith reported that he "was assaulted by Lt. Jenkins in the chow hall [and] sprayed twice with mace while handcuffed." Doc. 20-9 at 5. The medical chart shows that Smith's neck and eyes were red. Doc. 20-9 at 5.

Jenkins presents an incompatible picture of the day's events, but at summary judgment the court must take Smith's sworn claims as true. And under Smith's version of the events, a reasonable juror could conclude that Jenkins used excessive force against him. The law of the Eleventh Circuit "prohibit[s] the use of excessive force by a prison guard against an inmate" who is restrained and "pose[s] no continuing threat." *Davis v. Locke*, 936 F.2d 1208, 1213 (11th Cir. 1991) (citations omitted) (threatening a handcuffed inmate with slurs and punishment and then pulling him by his ankles from a cage, causing him to fall, constitutes excessive force); *see also* *Harris v. Chapman*, 97 F.3d 499, 505–06 (11th Cir. 1996) (holding that evidence a group of officers restrained an inmate with a towel and then beat and verbally harassed him after he refused to submit to a haircut is sufficient to support a jury's finding of an Eighth Amendment violation); 🔖 *Williams v. Cash-C.O.I.*, 836 F.2d 1318, 1320 (11th Cir. 1988) (holding allegations that officers "deliberately broke [inmate's] elbow after he had ceased to resist their efforts to return him to his cell" were sufficient to support an Eighth Amendment excessive force claim at summary judgment); *Harris v. Whitehead*, 2007 WL 23900964, at *7–8 (M.D. Ala. Jul. 30, 2007) (finding unconstitutional force where the defendants used physical force on an inmate after he was handcuffed and had ceased physical resistance but remained verbally uncooperative). In short, "[i]t is excessive force for a jailer to continue using force against a prisoner who already has been subdued." 🔖 *Nasseri v. City of Athens*, 373 F. App'x 15, 19 (11th Cir. 2010).

**\*7**  Jenkins highlights certain discrepancies in the record relating to this incident, such as the lack of visible injuries to Smith's head and back (Doc. 20-9 at 5), [12] but these are issues for Smith to explain to a jury. This is "a classic swearing match, which is the stuff of which jury trials are made." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013). Accordingly, summary judgment is due to be denied as to Smith's January 2, 2020 excessive force claim against Jenkins.

There also is a genuine dispute of fact as to the alleged sexual assault by Jenkins on the same date. Viewing the evidence in the light most favorable to Smith, this attack would have occurred while Smith was handcuffed and after Jenkins removed him from the dining hall and took him to a shower in the J-Block. Specifically, Smith claims that Jenkins "stuck a broom stick up [his] butt" while he was fully clothed. Doc. 20-10 at 3. Smith also reported to an officer that Jenkins took him from the kitchen to the shower of J-Block, sprayed him with mace, and "grabbed a mop and started poking [him] with the end of it on [his] lower back and buttock." Doc. 20-10 at 1; Doc. 20-13 at 6.

Jenkins denies the sexual assault and highlights Smith's contradictory statements about the incident. Again, any contradictions must be addressed at trial because the court views the facts in the light most favorable to Smith at this stage in the litigation. Construing the January 2, 2020 sexual assault allegations in the light most favorable to Smith, summary judgment is due to be denied.

### ii. January 16, 2020

Summary judgment also is due to be denied as to Smith's claim of excessive force against Jenkins on January 16, 2020. Smith alleges that Jenkins "beat [him] and swoll [sic] [his] eye" while he was in his cell. Doc. 1 at 5. Jenkins denies the event occurred and points to the lack of record evidence substantiating Smith's allegations. The lack of a record or documented medical care does not necessarily confirm Jenkins' denial in the face of Smith's sworn allegations. Instead, Jenkins' general denial creates a question of fact for a jury to decide. Construing Smith's allegations relating to the assault on January 16, 2020 in the light most favorable to him, summary judgment is due to be denied.

### b. Matthews and Mechalske

On May 26, 2020, Smith asserts that Matthews attempted to move him from a single cell to a cell shared with an inmate nicknamed "Monster," who was known to be a rapist. Doc. 1 at 6; Doc. 24 at 4. Smith admits that he "became defiant after learning that [Matthews] was trying to put [him] in a segregation cell with ... 'Monster.'" Doc. 24 at 4. Smith claims Matthews then handcuffed him, sprayed him with mace, beat his head on the floor, squeezed his testicles, and pulled off his toenail to force him to release his hold on his cell door. Doc. 1 at 6; Doc. 24 at 4. Smith also told an investigator that Matthews stuck a finger in his anus. Doc. 35-1 at 7.

The defendants rely on a body chart and other medical evidence to refute Smith's allegations. The body chart reflects that Smith's eyes were red and he had abrasions on his right big toe and left inner arm. Doc. 20-12 at 4. The chart does not note any head injuries or that Smith complained about a head injury. Doc. 20-12 at 4. As to his toenail, Smith told the nurse that his right big toe scraped against the door during the altercation. Doc. 20-12 at 4; Doc. 20-13 at 13. Additionally, three days before the incident, Smith had completed a sick call request complaining about his "toenail hanging halfway off," which was confirmed by a body chart indicating his "right big toenail falling off" and a nurse's note that a portion of his right big toenail was separated from the nail bed with a scabbed area at the separation site. Doc. 20-13 at 11–12.

**\*8**  Drawing all reasonable inferences in Smith's favor, he has created a question of fact as to whether Matthews used excessive force in removing him from his cell on May 26, 2020. Although Matthews was justified in using some amount of force since

Smith admits that he was "defiant," Smith has created a jury question as to whether the amount of force Matthews used was excessive. Specifically, Smith alleges that Matthews sprayed him with mace, beat his head on the floor, and pulled off his toenail after he was handcuffed. Doc. 1 at 6. The evidence may not reflect a visible injury to Smith's head or a verbal complaint about a head injury, and again Smith will have to explain to the jury his conflicting statements and previous treatment for his toenail, but this record does not justify a wholesale rejection of Smith's sworn testimony about the incident. This is especially true when it is undisputed that Matthews sprayed Smith with mace, [13] and Smith has claimed that Matthews did so after he was secured and handcuffed. Taking Smith's version of the events as true, a reasonable juror could find that Matthews' use of force against Smith while he was handcuffed constitutes excessive force in violation of the Eighth Amendment.

The result is the same for Smith's excessive force allegations against Mechalske. Doc. 1 at 6. While the record does not establish precisely when Mechalske arrived to help Matthews, Smith's affidavit in response to the special report appears to allege that Mechalske arrived after the incident as backup to help move Smith to the new cell. Doc. 24 at 4. But Smith also claims that Matthews sprayed him with mace after Mechalske told Matthews to "spray that n*gger snitch" (Doc. 1 at 6) and that both Matthews and Mechalske "beat [him] while handcuffed on the floor and squeezed [his] testicles and tore my toe nail off." Doc. 24 at 4. Taking these claims as true, a reasonable juror could find that Mechalske used excessive force against Smith such that summary judgment is due to be denied on this claim.

Smith has failed to create a genuine dispute of material fact, however, as to the claim that Matthews sexually assaulted him. Although Smith alleges in his complaint that Matthews put his finger in his anus, Smith recanted this claim during the SANE investigation. Doc. 35-1 at 7–8. The video recording of Smith's interview confirms Smith's admission that Matthews did not sexually assault him. Doc. 35 at 3, second video at 1:12–1:19; 2:12–2:29. And the SANE examination did not find any injuries consistent with a sexual assault. Doc. 20-14 at 2–4.

Although sworn allegations may create genuine disputes of material fact precluding summary judgment, *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018), "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Based on Smith's recorded statements recanting his earlier allegations, combined with the absence of any physical evidence of a sexual assault, summary judgment is due to be granted on Smith's claim of sexual assault against Matthews.

### *2. First Amendment Retaliation*

"The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech." *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003). "An inmate may maintain a cause of action for retaliation under 42 U.S.C. § 1983 by showing that a prison official's actions were 'the result of the inmate's having filed a grievance concerning the conditions of his imprisonment.' " *O'Bryant v. Finch*, 637 F.3d 1207, 1212 (11th Cir. 2011) (emphasis omitted).

To prevail on a claim for retaliation under the First Amendment, a prisoner must establish that "(1) he engaged in constitutionally protected conduct; (2) the defendant's retaliatory act adversely affected the protected conduct; and (3) there is a causal connection between the retaliatory act and the adverse effect on the conduct." *Smith v. Fla. Dep't of Corr.*, 713 F.3d 1059, 1063 (11th Cir. 2013). If the plaintiff satisfies his burden of demonstrating that his protected conduct was a motivating factor behind the harm, the burden shifts to the defendant to demonstrate that he would have taken the same action regardless of the protected activity. *Id.*

**\*9**  Smith has established the first element. The evidence establishes that Smith reported Jenkins' comment about killing an inmate to Warden Givens on December 29, 2019. Doc. 1. at 5. This complaint to Jenkins' supervisor qualifies as protected activity. *See* 🚩 *O'Bryant*, 637 F.3d at 1212.

As to the second element, Smith must establish that the retaliatory acts adversely affected him. 🚩⚠️ *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005). In this analysis, the court must determine whether the discipline the prisoner received "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.*; *see also* 🚩 *Pittman v. Tucker*, 213 F. App'x 867, 870 (11th Cir. 2007). The Eleventh Circuit has instructed that a "prolonged campaign of harassment ... could have such a chilling effect." 🚩 *Pittman*, 213 F. App'x at 870. Smith alleges the following retaliatory acts by Jenkins: (1) filing false disciplinary reports; (2) beating and sexually assaulting him on January 2, 2020; (3) reassigning him to a cell with a known rapist; and (4) directing assaults by other inmates. Doc. 1 at 5; Doc. 24 at 4. The court addresses each retaliatory act in turn below.

### a. False Disciplinary Report

Smith first claims that Jenkins charged him with a false disciplinary infraction on January 2, 2020.[14] Doc. 1 at 5. The record does not reflect the outcome of this disciplinary infraction. And Smith makes no factual allegations about the discipline he received, including whether he was found guilty or any adverse impact for him. Therefore, even assuming that the disciplinary infraction was retaliation for his December 2019 complaint to the warden, Smith has not established any injury flowing from the false accusation.

Because there is no evidence Smith suffered a loss of privileges or some other sort of punishment because of the disciplinary infraction, a reasonable juror could not find that an ordinary prisoner would be deterred from exercising his First Amendment rights under similar circumstances. *See* 🚩 *Pittman*, 213 F. App'x at 870 (11th Cir. 2007) ("[A] plaintiff need not show that his own exercise of First Amendment rights have been chilled, but instead a plaintiff can establish an injury if he can show that the retaliatory acts are sufficiently adverse that a jury could find that the acts would chill a person of ordinary firmness from exercising his First Amendment rights."). With no evidence that Smith was disciplined or injured because of Jenkins' disciplinary infraction, this claim is due to be dismissed.

### b. Incidents of January 2 and 16, 2020

Smith next asserts that Jenkins assaulted him on January 2 and 16, 2020. As discussed above, Smith alleges that Jenkins handcuffed him for no reason, took him to the J-Block shower where he sprayed his eyes with mace, broke and stomped on his glasses, beat his head and back, and attempted to insert a mop handle into his anus. Doc. 1 at 5. He contends that Jenkins did this in retaliation for Smith's complaint to Warden Givens a few days earlier. Doc. 1 at 5. If true, Jenkins' actions "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." ⚠️ *Bennett*, 423 F.3d at 1254. The same can be said for the allegations that Jenkins visited Smith's cell on January 16, 2020 and beat him. *See* Doc. 1 at 5. Smith has established the second prong of a retaliation claim as to both incidents.

**\*10**  To establish causation, Smith must produce evidence supporting a finding that Jenkins was subjectively motivated by the December 29, 2019 complaint to Warden Givens. 🚩 *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008) (citing 🚩⚠️ *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999)). "In other words, the prisoner must show that, as a subjective matter, a motivation for the defendant's adverse action was the prisoner's grievance or lawsuit." *Jemison v. Wise*, 386 F. App'x

961, 965 (11th Cir. 2010) (citing 🚩*Mosley*, 532 F.3d at 1278). This causal connection may be shown by a "chronology of events from which retaliation may plausibly be inferred." 🚩*Cain v. Lane*, 857 F.2d 1139, 1143 n.6 (7th Cir. 1988).

Taking the evidence in the light most favorable to Smith, the timing of the events creates a question of fact as to whether his complaint to the warden motivated Jenkins to assault him. Smith made the complaint and four days later Jenkins allegedly assaulted Smith. The second assault occurred two weeks after the first. Drawing all reasonable inferences in Smith's favor, the close temporal proximity between the complaint and the assaults is sufficient to create an inference of causation. *See* 🚩*Cain*, 857 F.2d at 1143 n.6.

Under the burden-shifting formula established in 🚩*Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), "[o]nce the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any, the burden of production shifts to the defendant." 🚩*O'Bryant*, 637 F.3d at 1217 (citation omitted). "Then, if the defendant can show that he would have taken the same action in the absence of protected activity, he is entitled to prevail on his motion for summary judgment as a matter of law...." *Id.* (alternations omitted). "In other words, if the official can show that he would have taken the disciplinary action in the absence of the prisoner's protected conduct, he cannot be held liable." *Id.* (citation omitted).

The special report does not address the burden-shifting formula. Doc. 20 at 12–13. Instead, the defendants contend only that Smith cannot establish a causal connection between Jenkins' alleged actions and the complaint to Warden Givens. Doc. 20 at 12–13. Because the court determines that Smith has created a question of fact as to causation, summary judgment is due to be denied as to these claims.

### c. Cell Reassignment

Smith also contends that the motivation for his May 26, 2020 cell reassignment was "Jenkins' plot to further his retaliation and malice attempt to get [Smith] raped and possibl[y] killed from a crazy man." Doc. 24 at 4. This claim does not survive summary judgment. A prisoner has no right to any particular classification or assignment, 🚩*Wilkinson v. Austin*, 545 U.S. 209, 221 (2005), and a transfer to a more restrictive environment falls within the ordinary incidents of prison life. *Turner v. Warden, GDCP*, 650 F. App'x 695, 699 (11th Cir. 2016). Because a cell block transfer, standing alone, does not demonstrate a retaliatory action rising to a constitutional level, Smith cannot establish that Jenkins violated his constitutional rights.

Moreover, even if a cell assignment could be a retaliatory action, there is no evidence that Jenkins played any role in the decision to reassign Smith other than his own self-serving statement. In fact, there is no evidence Jenkins had the ability to reassign an inmate or initiate a cell transfer, much less that he reassigned Smith or even had any input in the decision. Accordingly, Smith's retaliation claim related to his cell reassignment is due to be dismissed.

### d. Assaults by Inmates Jones and Knight

**\*11**  Smith contends that Jenkins "put his life in danger" by telling other inmates he was a "snitch" and that Jenkins put a bounty on his head and sent Jones and Knight to attack him. Doc. 1 at 5. It is undisputed that both Jones and Knight attacked and injured Smith. These attacks satisfy the second element of a claim for retaliation. Here, however, Smith cannot establish the requisite causal connection.

Other than Smith's assumptions, there is nothing linking the two inmate-on-inmate attacks to the complaint Smith made about Jenkins in December 2019. As a result, there is no evidence from which a reasonable jury could infer that Jenkins ordered the

inmates to attack Smith. This is especially true with respect to the altercation between Smith and Knight. The record belies Smith's unsupported assertion that Jenkins ordered Knight to attack him. Instead, the evidence, including Smith's statements at the time of the incident, shows that the two began fighting over the amount of water Smith used in cleaning the floors. Doc. 20-11 at 1, 6. And both Smith and Knight received disciplinary action for the incident. Doc. 20-11 at 1. As for the first attack, Smith has not even attempted to establish Jenkins' subjective motivation. There is nothing linking the attack to Jenkins outside of Smith's speculation. Without any evidence of subjective intent linking these two events, the leap is too great for a reasonable juror to make the inferences necessary to establish causation.

Furthermore, the temporal proximity connecting Smith's complaint and Jenkins' alleged assaults is not present with the two inmate assaults. The Jones attack occurred almost four months after the complaint to Warden Givens and the altercation with Knight occurred almost five months later. For these reasons, Smith has failed to establish causation, and summary judgment is due to be granted on his retaliation claim against Jenkins based on the assaults by Jones and Knight.

### *3. Qualified Immunity*

In the alternative, Jenkins, Matthews, and Mechalske contend that they are entitled to qualified immunity because Smith "cannot show that the named officers used force against him maliciously and sadistically or retaliated against him for exercising his free speech." Doc. 20 at 15–16. Qualified immunity protects governmental officials who are sued under ⚑ 42 U.S.C. § 1983 for money damages in their individual capacities, but only if "their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Fish v. Brown*, 838 F.3d 1153, 1162 (11th Cir. 2016) (citation omitted). As explained above, Smith has created a question of fact as to whether the defendants violated his constitutional rights under the First and Eighth Amendments. The defendants do not argue that these constitutional violations were not clearly established. The three remaining defendants thus are not entitled to qualified immunity at this stage in the proceedings.

## V. RECOMMENDATION

For the reasons stated above, the Magistrate Judge RECOMMENDS that the motion for summary judgment be GRANTED in part and DENIED in part as follows:

1. The motion for evidentiary hearing (Doc. 38) be DENIED;

2. The motion for summary judgment as to all claims against defendant Caldwell be GRANTED;

3. The motion for summary judgment as it relates to all claims against defendants Jenkins, Matthews, and Mechalske in their official capacities, as well as on Smith's request for the termination of their employment, be GRANTED;

**\*12** 4. The motion for summary judgment as it relates to Smith's claims for excessive force and sexual assault on January 2, 2020 against Jenkins be DENIED;

5. The motion for summary judgment as it relates to Smith's claim for excessive force on January 16, 2020 against Jenkins be DENIED;

6. The motion for summary judgment as it relates to Smith's claims for excessive force on May 26, 2020 against defendants Matthews and Mechalske be DENIED;

7. The motion for summary judgment as it relates to Smith's claim for sexual assault against defendant Matthews be GRANTED;

8. The motion for summary judgment as it relates to Smith's claims for retaliation against defendant Jenkins be DENIED as to the January 2 and 16, 2020 incidents and GRANTED as to the remaining allegations.

## VI. NOTICE OF RIGHT TO OBJECT

Any party may file specific written objections to this report and recommendation. A party must file any objections with the Clerk of Court within 14 calendar days from the date the report and recommendation is entered. Objections should specifically identify all findings of fact and recommendations to which objection is made and the specific basis for objecting. Objections also should specifically identify all claims contained in the complaint that the report and recommendation fails to address. Objections should not contain new allegations, present additional evidence, or repeat legal arguments. An objecting party must serve a copy of its objections on each other party to this action.

Failing to object to factual and legal conclusions contained in the magistrate judge's findings or recommendations waives the right to challenge on appeal those same conclusions adopted in the district court's order. In the absence of a proper objection, however, the court may review on appeal for plain error the unobjected to factual and legal conclusions if necessary in the interests of justice. 11th Cir. R. 3-1.

On receipt of objections, a United States District Judge will review *de novo* those portions of the report and recommendation to which specific objection is made and may accept, reject, or modify in whole or in part, the undersigned's findings of fact and recommendations. The district judge must conduct a hearing if required by law. Otherwise, the district judge may exercise discretion to conduct a hearing or otherwise receive additional evidence. Alternately, the district judge may consider the record developed before the magistrate judge, making an independent determination on the basis of that record. The district judge also may refer this action back to the undersigned with instructions for further proceedings.

A party may not appeal the magistrate judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. A party may only appeal from a final judgment entered by a district judge.

DONE and ORDERED on February 9, 2022.

**All Citations**

Slip Copy, 2022 WL 685037

## Footnotes

1       The division formerly known as I&I is now the LESD.

2       A few weeks later, Smith complained that he was not provided video recordings related to the January incident, only video recordings of the May incident. Doc. 39. However, LESD Director Mercado attested that LESD has no video recordings of the January incident. Doc. 35-1 at 2. The defendants thus have complied with the court's orders.

3       Consistent with the summary judgment standard, the following facts are undisputed or, if disputed, taken in a light most favorable to the non-moving party. That being said, the record reflects many different versions of the events relevant to this lawsuit. The court has noted discrepancies where appropriate.

4        Although the incident report states that Smith would receive disciplinary action for "Failure to Obey an ADOC Official and Intimidation—Threatening gathering around staff" (Doc. 20-9 at 3), the record does not contain any evidence of disciplinary action corresponding with this incident.

5        Although the defendants submitted photographs of Smith with their special report (Doc. 20-7), there is no evidence establishing the timing of these photos and the defendants do not discuss the photos in their motion for summary judgment. *See* Doc. 20.

6        Although the investigative notes state that the SANE examination "did not reveal any visible signs of injury" (Doc. 35-1 at 4), the results from the examination otherwise are not in the record.

7        This statement is inconsistent with Jenkins' previous claim that he took Smith to the infirmary for decontamination.

8        Two days before this incident, Smith completed a sick call request complaint of his "toenail hanging halfway off." Doc. 20-13 at 12. A body chart indicated that Smith complained of his "right big toenail falling off" and the nurse noted that a portion of Smith's right big toenail was separated from the nail bed and had scabbed over. Doc. 20-13 at 11.

9        In compliance with the court's order, the defendants produced the video recordings of Matthews' and Smith's interviews. Doc. 35 at 3. Document 35 consists of three separate interview videos so the court will identify the relevant video in citations for clarity. In the second video, Smith explicitly states that Matthews did not sexually assault him and that the nurse misunderstood him. Doc. 35 at 3, second video at 1:12–1:19; 2:12–2:29. Smith further states that Matthews did not coerce him to make the statement. Doc. 35 at 3, second video at 3:42. Finally, Smith states that he does not want to prosecute Matthews for sexual assault. Doc. 35 at 3, third video at 00:12.

10       In addition to damages, Smith requests that the court terminate Jenkins' and Matthews' employment. Doc. 1 at 7. However, "federal courts have no authority to address state officials out of office or to fire state employees." 🚩*Newman v. Alabama*, 559 F.2d 283, 288 (5th Cir. 1977), *reversed in part on other grounds,* 🚩*Alabama v. Pugh*, 438 U.S. 781 (1978).

11       Although Smith did not check the box on his complaint indicating individual capacity claims (Doc. 1 at 3), the court construes the complaint to include individual capacity claims due to the nature of his factual allegations.

12       There also are inconsistencies in Jenkins' version of events, including his contradicting statements about whether he took Smith for decontamination at the infirmary or instead took him to the J-Block shower.

13       In his recorded investigative interview, Matthews admitted to spraying Smith with mace but denied all other allegations. Doc. 35 at 3, first video at 3:40.

14       There is no disciplinary infraction in the record regarding this incident. However, the incident report states that Smith would receive disciplinary action for "Failure to Obey an ADOC Official and Intimidation—Threatening gathering around staff." Doc. 20-9 at 3. For purposes of summary judgment only, the court assumes Jenkins did initiate the disciplinary infraction described in the incident report.

---

End of Document                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Snyder v. Phelps, 580 F.3d 206 (2009)

37 Media L. Rep. 2377

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Price v. City of Rock Hill,   D.S.C.,   March 16, 2022

580 F.3d 206

United States Court of Appeals,

Fourth Circuit.

Albert SNYDER, Plaintiff–Appellee,

v.

Fred W. PHELPS, Sr.;  Westboro Baptist Church, Incorporated; Rebekah

A. Phelps–Davis; Shirley L. Phelps–Roper, Defendants–Appellants,

and

Jane Doe; John Doe, Jr., Defendants.

Thomas Jefferson Center for the Protection of Free Expression; American Civil Liberties

Union; American Civil Liberties Union of Maryland, Amici Supporting Appellants,

and

Jeffrey Ira Shulman, Amicus Supporting Appellee.

No. 08–1026.

|

Argued: Dec. 2, 2008.

|

Decided: Sept. 24, 2009.

**Synopsis**

**Background:** Father of deceased service member brought action against fundamentalist church and its members, stemming from defendants' anti-homosexual demonstration near service's member's funeral, alleging claims for intentional infliction of emotional distress (IIED), invasion of privacy by intrusion upon seclusion, and conspiracy. Following judgment for father, the United States District Court for the District of Maryland,  Richard D. Bennett, J.,  533 F.Supp.2d 567, remitted aggregate punitive damages award, but otherwise denied post-trial motions. Defendants appealed.

**Holdings:** The Court of Appeals,  King, Circuit Judge, held that:

it would not address issue of sufficiency of evidence;

jury instruction impermissibly authorized jury to determine legal issue;

district court erred when it utilized incorrect legal standard in its post-trial opinion;

signs were protected by First Amendment; and

defendants' self-styled written "epic" was protected by First Amendment.

Reversed.

Snyder v. Phelps, 580 F.3d 206 (2009)

37 Media L. Rep. 2377

Shedd, Circuit Judge, concurred in judgment and filed opinion.

**Procedural Posture(s):** On Appeal.

**Attorneys and Law Firms**

*210 **ARGUED:** Margie Jean Phelps, Topeka, Kansas, for Appellants. Sean E. Summers, Barley & Snyder, LLC, York, Pennsylvania, for Appellee. **ON BRIEF:** Craig T. Trebilcock, Shumaker Williams, PC, York, Pennsylvania, for Appellee. J. Joshua Wheeler, The Thomas Jefferson Center For The Protection Of Free Expression, Charlottesville, Virginia, for The Thomas Jefferson Center for the Protection of Free Expression, Amicus Supporting Appellants. Joel Kleinman, David Schur, Ranga Sourirajan, Dickstein Shapiro, L.L.P., Washington, D.C., for American Civil Liberties Union and American Civil Liberties Union of Maryland; Steven R. Shapiro, American Civil Liberties Union Foundation, New York, New York, for American Civil Liberties Union; Deborah A. Jeon, ACLU Foundation of Maryland, Baltimore, Maryland, for American Civil Liberties Union of Maryland, Amici Supporting Appellants. Jeffrey I. Shulman, Georgetown University Law Center, Washington, D.C., Amicus Supporting Appellee.

Before KING, SHEDD, and DUNCAN, Circuit Judges.

Judgment reversed and bonds discharged by published opinion. Judge KING wrote the opinion, in which Judge DUNCAN joined. Judge SHEDD wrote a separate opinion concurring in the judgment.

## OPINION

KING, Circuit Judge:

In June 2006, Albert Snyder instituted this diversity action in the District of Maryland against Westboro Baptist Church, Incorporated (the "Church"), and several of its members (collectively, the "Defendants"). Snyder's lawsuit is predicated on two related events: a protest the Defendants conducted in Maryland near the funeral  *211  of Snyder's son Matthew (an enlisted Marine who tragically died in Iraq in March 2006), and a self-styled written "epic" (the "Epic") that the Defendants posted on the Internet several weeks after Matthew's funeral. Snyder's complaint alleged five state law tort claims, three of which are implicated in this appeal: invasion of privacy by intrusion upon seclusion, intentional infliction of emotional distress ("IIED"), and civil conspiracy. After a trial in October 2007, the jury found the Defendants liable for $2.9 million in compensatory damages and a total of $8 million in punitive damages. Although the district court remitted the aggregate punitive award to $2.1 million, it otherwise denied the post-trial motions. See Snyder v. Phelps, 533 F.Supp.2d 567 (D.Md.2008) (the "Post–Trial Opinion"). The Defendants have appealed, contending that the judgment contravenes the First Amendment of the Constitution. As explained below, we reverse on that basis.

I.

A.

The facts of this case as presented at trial are largely undisputed, and they are detailed in the district court's Post–Trial Opinion:

On March 3, 2006, Marine Lance Corporal Matthew A. Snyder was killed in Iraq in the line of duty. Shortly thereafter, two United States Marines came to the home of the Plaintiff, Albert Snyder, and told him that his son had died. As Matthew Snyder had lived in Westminster, Maryland, and graduated from Westminster High School, St. John's Catholic Church in

Westminster was selected as the site for his funeral, which was scheduled for March 10, 2006. Obituary notices were placed in local newspapers providing notice of the time and location of the funeral.

Defendant Fred W. Phelps, Sr., founded Defendant Westboro Baptist Church, Inc. in Topeka, Kansas, in 1955. For fifty-two years, he has been the only pastor of the church, which has approximately sixty or seventy members, fifty of whom are his children, grandchildren, or in-laws. Among these family members are Defendants Shirley L. Phelps–Roper and Rebekah A. Phelps–Davis. There are approximately ten to twenty members of the church who are not related to Phelps by blood or marriage. According to the testimony of Defendants' expert, the members of this church practice a "fire and brimstone" fundamentalist religious faith. Among their religious beliefs is that God hates homosexuality and hates and punishes America for its tolerance of homosexuality, particularly in the United States military. Members of the church have increasingly picketed funerals to assert these beliefs. Defendants have also established a website identified as www.godhatesfags.com in order to publicize their religious viewpoint.

Defendants' testimony at trial established that their picketing efforts gained increased attention when they began to picket funerals of soldiers killed in recent years. Members of the Phelps family prepare signs at an on-site sign shop at their Kansas church to take with them in their travels. They also utilize an on-site production facility to produce videos displayed on the church's website.

Phelps testified that members of the Westboro Baptist Church learned of Lance Cpl. Snyder's funeral and issued a news release on March 8, 2006, announcing that members of the Phelps family intended to come to Westminster, Maryland, and picket the funeral. On March 10, 2006, Phelps, his daughters Phelps–Roper and Phelps–Davis, and four of his grandchildren arrived in **\*212** Westminster, Maryland, to picket Matthew Snyder's funeral. None of the Defendants ever met any members of the Snyder family.

Defendants' rationale was quite simple. They traveled to Matthew Snyder's funeral in order to publicize their message of God's hatred of America for its tolerance of homosexuality. In Plaintiff's eyes, Defendants turned the funeral for his son into a "media circus for their benefit." By notifying police officials in advance, Defendants recognized that there would be a reaction in the community. They carried signs which expressed general messages such as "God Hates the USA," "America is doomed," "Pope in hell," and "Fag troops." The signs also carried more specific messages, to wit: "You're going to hell," "God hates you," "Semper fi fags," and "Thank God for dead soldiers." Phelps testified that it was Defendants' "duty" to deliver the message "whether they want to hear it or not." Lance Cpl. Snyder's funeral was thus utilized by Defendants as the vehicle for this message.

It was undisputed at trial that Defendants complied with local ordinances and police directions with respect to being a certain distance from the church. Furthermore, it was established at trial that Snyder did not actually see the signs until he saw a television program later that day with footage of the Phelps family at his son's funeral.

Defendants' utilization of Matthew Snyder's funeral to publicize their message continued after the actual funeral on March 10, 2006. After returning to Kansas, Phelps–Roper published an "epic" on the church's website, www. godhatesfags.com. In "The Burden of Marine Lance Cpl. Matthew Snyder," Phelps–Roper stated that Albert Snyder and his ex-wife "taught Matthew to defy his creator," "raised him for the devil," and "taught him that God was a liar." In the aftermath of his son's funeral, Snyder learned that there was reference to his son on the Internet after running a search on Google. Through the use of that search engine, he read Phelps–Roper's "epic" on the church's website.

🚩⚠️ *Snyder v. Phelps,* 533 F.Supp.2d 567, 571–72 (D.Md.2008) (internal citation omitted). [1]

B.

1.

When Albert Snyder filed his complaint in June 2006, he sued Fred W. Phelps, Sr., and the Church, later adding its members Shirley L. Phelps–Roper and Rebekah A. Phelps–Davis as defendants. The complaint alleged five state law tort claims: defamation, intrusion upon seclusion, publicity given to private life, IIED, and civil conspiracy. The Defendants moved for summary judgment on those claims, contending, inter alia, that their challenged words "constitute [ ] expressions of opinion, which are not actionable." J.A. 239. [2] They asserted that their words "are clearly **213** rhetorical, hypothetical, religious and laced with opinion," and that "it is impossible to prove or disprove these things, particularly given that doctrinal viewpoints drive the opinions." *Id.*

On October 15, 2007, the district court granted summary judgment to the Defendants on two of the five tort claims: defamation and publicity given to private life. [3] The court awarded summary judgment on the defamation claim because the Defendants' speech was "essentially ... religious opinion" and "would not realistically tend to expose Snyder to public hatred or scorn." *Snyder,* 533 F.Supp.2d at 572–73. On the publicity given to private life claim, the court awarded summary judgment because the Defendants had not made public any private information. In so ruling, the court explained that the Defendants had published only information gleaned from a newspaper obituary and that such publication would not be highly offensive to a reasonable person, because the information was already a matter of public record.

In October 2007, the parties proceeded to trial on the remaining three claims of the complaint: intrusion upon seclusion, IIED, and civil conspiracy. At trial, Snyder testified, "recount[ing] fond memories of his son ... and the traumatic news of his passing." *Snyder,* 533 F.Supp.2d at 588. In its Post–Trial Opinion, the district court summarized Snyder's testimony:

He described the severity of his emotional injury, stating that he is often tearful and angry, and that he becomes so sick to his stomach that he actually physically vomits. He testified that Defendants placed a "bug" in his head, such that he is unable to separate thoughts of his son from the [Defendants'] actions: "there are nights that I just, you know, I try to think of my son at times and every time I think of my son or pass his picture hanging on the wall or see the medals hanging on the wall that he received from the [M]arine [C]orps, I see those signs." He testified also that "I want so badly to remember all the good stuff and so far, I remember the good stuff, but it always turns into the bad."

Plaintiff also testified as to the permanency of the emotional injury. He testified that "I think about the sign [i.e., Thank God for dead soldiers] every day of my life.... I see that sign when I lay in bed at nights. I [had] one chance to bury my son and they took the dignity away from it. I cannot re-bury my son. And for the rest of my life, I will remember what they did to me and it has tarnished the memory of my son's last hour on earth." He stated also that "somebody could have stabbed me in the arm or in the back and the wound would have healed. But I don't think this will heal."

Throughout trial, Plaintiff demonstrated significant emotion, appearing visibly shaken and distressed, and was often reduced to tears. On occasion during the trial, Plaintiff requested and was granted leave from the courtroom to compose himself. The jury witnessed firsthand Plaintiff's anguish and the unresolved grief he harbors because of the failure to conduct a normal burial.

*Id.* at 588–89 (second and third alterations in original) (internal citations omitted).

Snyder called several expert witnesses to testify concerning the injuries the Defendants had caused him, including the worsening of his diabetes and severe depression. Snyder's treating physician confirmed that the Defendants' actions had **214** exacerbated Snyder's depression, thereby preventing him from going through the normal grieving process. *See Snyder,* 533 F.Supp.2d at 588. Snyder's psychologist testified "that the demonstration and the things that [Plaintiff] talked about [seeing] in the website ... have made the depression worse and lengthened it." *Id.* (alterations in original).

During the summary judgment proceedings and the trial, the Defendants repeatedly contended that the First Amendment protects their actions. [4]  In that regard, the district court recognized that certain signs carried by the Defendants—such as "America Is Doomed" and "God Hates America"—"express[ed] general points of view" that may have merited First Amendment protection. *Snyder, 533 F.Supp.2d at 578.* But the court ruled that certain other signs—such as "Thank God for Dead Soldiers," "Semper Fi Fags," "You're Going to Hell," and "God Hates You"—created issues of fact for the jury because they "could be interpreted as being directed at the Snyder family." *Id.* Likewise, the court concluded that statements published in the Epic on the Church website "created similar issues to be addressed by the finder of fact." *Id.*

At trial, the Defendants challenged the propriety of the proposed jury instructions regarding the First Amendment. [5]  During a hearing on jury instructions, the Defendants specifically objected to Instruction No. 21, which provided in full as follows:

> The Defendants in this case claim that their actions were protected by the First Amendment of the United States Constitution, which provides that Congress shall make no law ... prohibiting the free exercise [of religion]; or abridging the freedom of speech. The Defendants have a right under the First Amendment to engage in picketing, and to publish their religious message, no matter how much you may disagree with that message. The First Amendment applies to action at the state and local level through the Fourteenth Amendment.

> As a general matter, the fact that society may find speech offensive is not a sufficient reason for suppressing it. Speech that is called hateful, or speech that is unpopular, or speech with which you strongly disagree, may still be protected speech. The government, including the courts, can place reasonable time, place, and manner restrictions on how protected speech may be expressed. These restrictions must be narrowly tailored, and should balance the interests of all the people involved. Speech that is vulgar, offensive, and shocking ... is not entitled to absolute constitutional protection under all circumstances.

> The United States Supreme Court has long recognized that not all speech is of equal First Amendment protection. When speech gives rise to civil tort liability, the level of First Amendment protection varies depending on the nature and subject matter of the speech.

> As to the particular subject matter of the speech, a distinction has been drawn between matters of public and private concern. Where the speech is directed at private people and matters of private   **\*215**  concern, the Supreme Court has held that the First Amendment interest in protecting particular types of speech must be balanced against a state's interest in protecting its residents from wrongful injury. You must balance the Defendants' expression of religious belief with another citizen's right to privacy and his or her right to be free from intentional, reckless, or extreme and outrageous conduct causing him or her severe emotional distress. As I have previously indicated to you at the start of this case, you as the judges of the facts in this case must determine whether the Defendants' actions were directed specifically at the Snyder family. If you do so determine, you must then determine whether those actions would be highly offensive to a reasonable person, whether they were extreme and outrageous and whether these actions were so offensive and shocking as to not be entitled to First Amendment protection.

J.A. 3113–14 (alteration and omissions in original) (internal quotation marks omitted). In objecting to Instruction No. 21, the Defendants asserted that "the First Amendment has more of a heavy balance even in civil cases than just anybody not wanting to be offended." *Id.* at 2883. Phelps–Roper, who was defending herself on a pro se basis, further objected, stating: "I just want to say that ... it has never been clear in the record or to me what of our words are actionable and ... [the court has] not limited the evidence to those words that you would say were directed to a specific family." *Id.* at 2884. The court overruled the objections to Instruction No. 21, observed that the constitutional issues were preserved, and gave the instruction to the jury.

2.

On October 31, 2007, the jury found for Snyder on the three tort claims, awarding him $2.9 million in compensatory damages and a total of $8 million in punitive damages. After the district court entered judgment on November 5, 2007, the Defendants filed post-trial motions seeking judgment as a matter of law, judgment notwithstanding the verdict, reconsideration and rehearing, a new trial, relief from judgment, and relief of law and equity. The district court denied each of these motions by its Post–Trial Opinion. The Defendants also moved for a remittitur, contending that the verdict was grossly excessive.

In its Post–Trial Opinion of February 4, 2008, the district court disposed of the Defendants' various legal challenges. The Post–Trial Opinion explained that this case "involves balancing [the Defendants' First Amendment rights of religious expression] with the rights of other private citizens to avoid being verbally assaulted by outrageous speech and comment during a time of bereavement." *Snyder,* 533 F.Supp.2d at 579. As to the "content of the signs," the court was satisfied that it had "instructed the jury on the First Amendment, specifically the balance between Defendants' First Amendment rights and Maryland's interest in protecting its citizens," such that there "was sufficient evidence in the trial record for a reasonable jury to conclude that Defendants' conduct was so extreme and outrageous as to cause Plaintiff's injury." *Id.* at 581. The court also rejected the Defendants' post-trial contention that the court "should have held as a matter of law that [the Defendants] were entitled to First Amendment protection." *Id.* at 582. The court emphasized that it had permitted the jury to decide if the Defendants' conduct was sufficient to hold them liable on the three Maryland tort claims, and the jury had found the Defendants liable. *See id.* at 580–82.

Finally, by its Post–Trial Opinion, the district court upheld the compensatory **\*216** damages award but remitted the punitive damages award to a total of $2.1 million, resulting in an aggregate judgment of $5 million. The Defendants have now appealed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291. [6]

## II.

The Defendants' primary appellate contention is that the judgment contravenes the First Amendment. In addition to their First Amendment contentions, the Defendants raise the following other issues: that the district court lacked personal and subject matter jurisdiction; that Snyder had no privacy right in Matthew's funeral; that the punitive damages award contravenes due process; that the jury was impermissibly biased; that the district court made prejudicial evidentiary errors at trial; that the civil conspiracy verdict is inconsistent with state law; and that Maryland's statutory cap on compensatory damages applies to the damages award. We are content to reject each of these non-First Amendment contentions without further discussion because they are all plainly without merit. [7]

Notably, the Defendants do *not* challenge the sufficiency of the evidence, although an amicus brief seeks to raise that issue. Our good colleague Judge Shedd would reverse the judgment against the Defendants on the issue of evidence sufficiency that is asserted only by the amicus submission. In that respect, we agree that, although the Defendants properly raised the sufficiency issue in the district court, they have abandoned that contention on appeal. Thus, the Defendants and their counsel have exercised their discretion and voluntarily waived the sufficiency issue. Notwithstanding such waiver, however, Judge Shedd would reverse the judgment because he agrees with the amicus that the supporting evidence was insufficient.

We respectfully reject our good friend's reliance on the amicus contention, because the evidentiary issue has plainly been waived by the only party entitled to pursue it. As a result, the First Amendment contention must be addressed. Put simply, our Court and our sister circuits have consistently been wary, even prohibitive, of addressing an issue raised solely by an amicus. *See United States v. Buculei,* 262 F.3d 322, 333 n. 11 (4th Cir.2001) (" 'An issue waived by appellant cannot be raised by amicus curiae.' ") (quoting *Christopher M. v. Corpus Christi Indep. Sch. Dist.,* 933 F.2d 1285, 1293 (5th Cir.1991)); *Cavallo v. Star Enter.,* 100 F.3d 1150, 1152 n. 2 (4th Cir.1996) (declining to address issue not raised in opening brief, as it would be "unfair to the

appellee and would risk an improvident or ill-advised opinion on the legal issues" (internal quotation marks omitted)). Indeed, " '[a]n appellant and an amicus may not split up the issues and expect the court to consider that they have all been raised on appeal.' " *Buculei,* 262 F.3d at 333 n. 11 (quoting *Amoco Oil Co. v. United States,* 234 F.3d 1374, 1378 (Fed.Cir.2000)). *But see Spicer v. Hilton,* 618 F.2d 232, 240 (3d Cir.1980) (concluding that constitutional issues should yield to nonconstitutional ones, even where nonconstitutional issues were not raised by **\*217** parties). As the Federal Circuit has aptly described such a situation, "[i]t is the appellant's case, not a joint appeal by the appellant and amicus. Appellant must raise in its opening brief all the issues it wishes the court to address." *Amoco Oil,* 234 F.3d at 1378.

On the other hand, we acknowledge that the Supreme Court has seen fit, in narrow and circumscribed circumstances of its own choosing, to address and dispose of an issue raised solely by an amicus. *See Teague v. Lane,* 489 U.S. 288, 300, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (addressing retroactivity issue on appeal because "th[e] question is not foreign to the parties," who addressed retroactivity with respect to another claim); *see also Davis v. United States,* 512 U.S. 452, 457 n. * (1994) (recognizing that Supreme Court may assess contentions raised only in amicus brief, but declining to do so). With all respect to the Supreme Court's treatment of the waiver issue in *Teague* and *Davis,* this situation does not warrant an exception to our post-*Teague* circuit precedent.[8] Because the Defendants have voluntarily waived any contention that the evidence is insufficient to support the verdict, we are obligated to grapple with and resolve the First Amendment issues presented by the judgment.[9]

### III.

With respect to the First Amendment issue, the Defendants maintain that they were entitled to judgment as a matter of law because the First Amendment fully protects their speech at the Maryland protest and in the written Epic they published on the Internet. We will first address the Defendants' assertion that the court erroneously permitted the jury to decide legal issues reserved to the court. Such an error would garner the Defendants a new trial, but there is no need for a new trial if the Defendants were entitled to prevail under the First Amendment. Thus, after describing the general legal frame-work applicable here, we specifically address the application of that legal framework to the Defendants' various protest signs and their written Epic.

### A.

It is well established that tort liability under state law, even in the context of litigation between private parties, is circumscribed by the First Amendment. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 264–65, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).[10] Although the Supreme Court in New York Times specifically addressed the common law tort of defamation, the Court explained that its reasoning did not **\*218** turn on the precise "form in which state power has been applied." *Id.* at 265, 84 S.Ct. 710. Accordingly, the Court later applied the First Amendment to other torts not involving reputational damages, *see Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 53, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (IIED), and we have applied the Court's controlling principles to other state law torts, *see Food Lion v. Capital Cities/ABC, Inc.,* 194 F.3d 505, 511, 522 (4th Cir.1999) (fraud, breach of duty of loyalty, and trespass). Thus, regardless of the specific tort being employed, the First Amendment applies when a plaintiff seeks damages for reputational, mental, or emotional injury allegedly resulting from the defendant's speech. *See id.* at 523.[11]

Where, as here, the First Amendment is implicated by the assertion of tort claims arising from speech, we have the obligation "to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a

forbidden intrusion on the field of free expression.' " *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (quoting *New York Times,* 376 U.S. at 284–86, 84 S.Ct. 710); *see also Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (referring to the review required by Bose Corp. as "enhanced appellate review"). We review de novo a district court's conclusions of law with respect to a First Amendment issue. *See United States v. Bly,* 510 F.3d 453, 457 (4th Cir.2007).

In its *New York Times* decision, the Supreme Court established a rule barring public officials from recovering damages for the common law tort of defamation unless the allegedly defamatory statement was made with "actual malice," and the Court defined such malice as knowing falsity or reckless disregard for the truth. 376 U.S. at 279–80, 84 S.Ct. 710. The Court later expanded that constitutional standard to speech concerning "public figures" as well as "public officials," *Curtis Publ'g Co. v. Butts,* 388 U.S. 130, 164, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring in the result), but stopped short of extending its protective rule to speech targeting private figures, *see Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 344–46, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

Nevertheless, in a distinct but related line of decisions, the Court has recognized that there are constitutional limits on the *type* of speech to which state tort liability may attach. *See Milkovich,* 497 U.S. at 16, 110 S.Ct. 2695; *Hustler Magazine,* 485 U.S. at 50, 108 S.Ct. 876; *see also Deupree v. Iliff,* 860 F.2d 300, 304–05 (8th Cir.1988) (recognizing that certain types of speech are protected regardless of plaintiff's status as private or public figure). Thus, although there is no categorical constitutional defense for statements of "opinion," the First Amendment will fully protect "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Milkovich,* 497 U.S. at 20, 110 S.Ct. 2695 (alteration in original) (quoting *Hustler Magazine,* 485 U.S. at 50, 108 S.Ct. 876). [12]

In *Milkovich,* which is a crucial precedent in our disposition of this appeal, the **\*219** Supreme Court declined to adopt an artificial dichotomy between "opinion" and "fact," and it specifically eschewed the multifactor tests that several lower courts (including this Court) had utilized to categorize speech. *See* 497 U.S. at 19, 110 S.Ct. 2695; *see also Biospherics, Inc. v. Forbes, Inc.,* 151 F.3d 180, 183–84 (4th Cir.1998) (explaining that *Milkovich* rejected our multifactor test). In *Milkovich,* the Court assessed whether a newspaper enjoyed First Amendment protection for a column that referred to a wrestling coach as a "liar," based on his allegedly deceitful testimony before a state athletics council. 497 U.S. at 4–5 & n. 2, 110 S.Ct. 2695. The newspaper maintained that the column merely stated its author's opinion, and was thus subject to categorical First Amendment protection. *Id.* at 17–18, 110 S.Ct. 2695. The Court rejected this contention, ruling instead that the "dispositive question" was "whether a reasonable factfinder could conclude that the statements in the [newspaper] column imply an assertion that [the coach] perjured himself in a judicial proceeding." *Id.* at 21, 110 S.Ct. 2695. Concluding that the column's assertions were "susceptible of being proved true or false," the Court determined that they were not protected by the First Amendment. *Id.*

In light of *Milkovich,* and as carefully explained by Judge Motz in our Biospherics decision, we are obliged to assess how an objective, reasonable reader would understand a challenged statement by focusing on the plain language of the statement and the context and general tenor of its message. *See Biospherics,* 151 F.3d at 184. And we must emphasize the "verifiability of the statement," because a statement not subject to objective verification is not likely to assert actual facts. *Chapin v. Knight–Ridder, Inc.,* 993 F.2d 1087, 1093 (4th Cir.1993); *see also Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1227 (7th Cir.1993)

*Snyder v. Phelps,* 580 F.3d 206 (2009)

37 Media L. Rep. 2377

("[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.").

There are two subcategories of speech that cannot reasonably be interpreted as stating actual facts about an individual, and that thus constitute speech that is constitutionally protected. First, the First Amendment serves to protect statements on matters of public concern that fail to contain a "provably false factual connotation." *Milkovich,* 497 U.S. at 20, 110 S.Ct. 2695. [13] We assess as a matter of **\*220** law whether challenged speech involves a matter of public concern by examining the content, form, and context of such speech, as revealed by the whole record. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 761, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Kirby v. City of Elizabeth City, N.C.,* 388 F.3d 440, 446 (4th Cir.2004). [14] In order to be treated as speech involving a matter of public concern, the interested community need not be especially large nor the relevant concern of "paramount importance or national scope." *Levinsky's, Inc. v. Wal–Mart Stores, Inc.,* 127 F.3d 122, 132 (1st Cir.1997).

Second, rhetorical statements employing "loose, figurative, or hyperbolic language" are entitled to First Amendment protection to ensure that "public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Milkovich,* 497 U.S. at 20–21, 110 S.Ct. 2695. The general tenor of rhetorical speech, as well as the use of "loose, figurative, or hyperbolic language" sufficiently negates any impression that the speaker is asserting actual facts. *Id.* at 21, 110 S.Ct. 2695; *see also Letter Carriers v. Austin,* 418 U.S. 264, 284–86, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) (concluding that reference to worker who crossed picket line as "traitor" was not actionable); *Greenbelt Coop. Publ'g Ass'n v. Bresler,* 398 U.S. 6, 13–14, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) (treating description of negotiating position as "blackmail" as epithet not conveying commission of actual crime). We assess as a matter of law whether speech contains rhetorical hyperbole protected by the First Amendment. *See CACI Premier Tech., Inc. v. Rhodes,* 536 F.3d 280, 294 (4th Cir.2008).

We had occasion to apply these legal principles just last year in our *CACI* decision. *See* 536 F.3d at 293. CACI was a civilian defense contractor that performed interrogation services for the military at Abu Ghraib prison in Iraq. CACI claimed that it had been defamed by a talk radio host who had made on-air statements blaming CACI for the mistreatment of detainees at the prison and criticizing the use of wartime contractors in general. *See id.* at 288–92. Judge Michael's opinion affirmed the summary judgment award to the radio host, based in part on the determination that her statements were protected by the First Amendment because they "did not state actual facts about CACI." *Id.* at 304. [15]

The radio host, for example, had claimed that CACI and other defense contractors employed "[m]ercenaries all over the country, killing people," and she had characterized CACI and other contractors as "hired killers." *CACI,* 536 F.3d at 301 (alteration in original). Judge Michael explained that no reasonable listener would understand the challenged statements to assert actual **\*221** facts about CACI, but rather would understand them as "exaggerated rhetoric intended to spark the debate about the wisdom of the use of contractors in Iraq." *Id.* at 301–02. The radio host had twice mentioned that certain individuals working for contractors in Iraq fought for apartheid in South Africa. *See id.* at 302. Those statements also could not reasonably be interpreted as stating actual facts about CACI: they were properly understood as referring to individual employees of the contractors, as opposed to the contractors themselves, and the host had simply used "loose and hyperbolic terms" to press her case against the government's use of military contractors. *Id.*

B.

In this proceeding, Snyder was awarded judgment against the Defendants on three of the tort claims asserted in the Amended Complaint: intrusion upon seclusion, IIED, and civil conspiracy. By these claims, Snyder sought damages for injuries to his state of mind only, and not for pecuniary loss. Thus, the verdict in favor of Snyder can only be sustained if it is consistent with the Defendants' First Amendment guarantees. *See* *Food Lion,* 194 F.3d at 522 (foreclosing any attempt to recover damages under "non-reputational tort claims, without satisfying the stricter (First Amendment) standards of a defamation claim"). As explained below, the Defendants correctly contend that the district court erred in permitting the jury to decide legal issues reserved to the court, and then by denying the Defendants' request for judgment as a matter of law.

1.

Assuming that the district court otherwise applied the proper legal standards to its analysis of the Defendants' First Amendment contentions, it fatally erred by allowing the jury to decide relevant legal issues. Instruction No. 21, to which Defendants carefully objected at trial, explained to the jury that certain speech, including that which is "vulgar, offensive, and shocking," is not entitled to "absolute constitutional protection." J.A. 3113. It also explained that the protections accorded under the First Amendment vary with the "nature and subject matter of the speech," and the instruction suggested that, when speech on matters of private concern is directed at private figures, the First Amendment "must be balanced against" the state's interest in protecting its citizens. *Id.* at 3114.

The district court thus decided that it was for the jury—not the court—to assess the preliminary issue of the nature of the speech involved, and to then decide whether such speech was protected by the Free Speech Clause. Thus, the jury was erroneously tasked with deciding whether the Defendants' speech was "directed specifically at the Snyder family," and, if so, whether it was so "offensive and shocking as to not be entitled to First Amendment protection." J.A. 3114; *see also id.* ("You must balance the Defendants' expression of religious belief with another citizen's right to privacy and his or her right to be free from intentional, reckless, or extreme and outrageous conduct causing him or her severe emotional distress."). At the least, therefore, the judgment must be vacated and a new trial awarded, in that Instruction No. 21 authorized the jury to determine a purely legal issue, namely, the scope of protection afforded to speech under the First Amendment. [16]

As previously noted, however, a new trial is unnecessary if the Defendants can **\*222** prevail as a matter of law after our independent examination of the whole record. *See* *Milkovich,* 497 U.S. at 17, 110 S.Ct. 2695. We are thus obliged to apply the applicable legal framework to the Defendants' various protest signs and written Epic, and decide if the Defendants are entitled to judgment as a matter of law.

2.

The district court also erred when it utilized an incorrect legal standard in its Post–Trial Opinion. In assessing the Defendants' First Amendment contentions, the court focused almost exclusively on the Supreme Court's opinion in *Gertz,* which it read to limit the First Amendment's protections for "speech directed by private individuals against other private individuals." *Snyder v. Phelps,* 533 F.Supp.2d 567, 577 (D.Md.2008). The court therefore assessed whether Snyder was a "public figure" under *Gertz* and whether Matthew's funeral was a "public event." *See* *id.* [17]

The Supreme Court has created a separate line of First Amendment precedent that is specifically concerned with the constitutional protections afforded to certain *types* of speech, and that does not depend upon the public or private status of the speech's target. *See* 🚩 *Milkovich,* 497 U.S. at 16, 110 S.Ct. 2695; 🚩 *Hustler Magazine,* 485 U.S. at 50, 108 S.Ct. 876. Thus, even if the district court (as opposed to the jury) concluded that Snyder and his son were not "public figures," such a conclusion alone did not dispose of the Defendants' First Amendment contentions. In focusing solely on the status of the Snyders and the funeral, and not on the legal issue concerning the nature of the speech at issue, the court failed to assess whether the pertinent statements could reasonably be interpreted as asserting "actual facts" about an individual, or whether they instead merely contained rhetorical hyperbole. *See* 🚩 *Milkovich,* 497 U.S. at 20, 110 S.Ct. 2695; 🚩 *CACI,* 536 F.3d at 293. Whether a statement can reasonably be interpreted as stating actual facts about an individual is a question of law for the court, *see* 🚩 *CACI,* 536 F.3d at 293–94, and the district court failed to consider that issue in its Post–Trial Opinion. Consequently, we must assess the content of the Defendants' protest signs as well as the Epic, and determine whether such speech is entitled to constitutional protection.

### a.

The following signs displayed by the Defendants, which are similar in both their message and syntax, can readily be assessed together: "America is Doomed," "God Hates the USA/Thank God for 9/11," "Pope in Hell," "Fag Troops," "Semper Fi Fags," "Thank God for Dead Soldiers," "Don't Pray for the USA," "Thank God for IEDs," "Priests Rape Boys," and "God Hates Fags." [18] As a threshold matter, as **\*223** utterly distasteful as these signs are, they involve matters of public concern, including the issue of homosexuals in the military, the sex-abuse scandal within the Catholic Church, and the political and moral conduct of the United States and its citizens. Such issues are not subjects of "purely private concern," 🚩 *Dun & Bradstreet,* 472 U.S. at 759, 105 S.Ct. 2939, but rather are issues of social, political, or other interest to the community, *see, e.g.,* 🚩 *Acanfora v. Bd. of Educ. of Montgomery County,* 491 F.2d 498, 500–01 (4th Cir.1974) (holding that speech concerning homosexuality was matter of public concern). As explained in one of the amicus submissions, for example, a public firestorm erupted in 2001 after two prominent religious figures, Jerry Falwell and Pat Robertson, alleged that the September 11th terrorist attacks represented God's punishment for our country's attitudes regarding homosexuality and abortion. *See* John F. Harris, "God Gave U.S. 'What We Deserve,' Falwell Says," Wash. Post, Sept. 14, 2001, at C3.

Additionally, no reasonable reader could interpret any of these signs as asserting actual and objectively verifiable facts about Snyder or his son. The signs reading "God Hates the USA/Thank God for 9/11" and "Don't Pray for the USA," for example, are not concerned with any individual, but rather with the nation as a whole. Other signs (those referring to "fags," "troops," and "dead soldiers") use the plural form, which would lead a reasonable reader to conclude that the speaker is referring to a group rather than an individual. Additional signs are concerned with individuals, such as the Pope, who are entirely distinct from Snyder and his son, or with groups, such as priests, to which neither Snyder nor his son belong. Finally, those signs stating "Thank God for Dead Soldiers" and "Thank God for IEDs" only constitute a reference to Snyder's son if the reader makes the assumption that their only object is Matthew Snyder and not the thousands of other soldiers who have died in Iraq and Afghanistan, often as a result of IEDs.

Even if the language of these signs could reasonably be read to imply an assertion about Snyder or his son, the statements are protected by the Constitution for two additional reasons: they do not assert provable facts about an individual, and they clearly contain imaginative and hyperbolic rhetoric intended to spark debate about issues with which the Defendants are concerned. *See* 🚩 *CACI,* 536 F.3d at 301. Whether "God hates" the United States or a particular group, or whether America is "doomed," are matters of purely subjective opinion that cannot be put to objective verification. The statement "Thank God," whether taken as an imperative phrase or an exclamatory expression, is similarly incapable of objective verification. And, as heretofore explained, a reasonable reader would not interpret the signs that could be perceived as including verifiable facts, such as "Fag Troops" and

"Priests Rape Boys," as asserting actual facts *about* Snyder or his son. To the contrary, these latter statements, as well as others in this category, consist of offensive and hyperbolic rhetoric designed to spark controversy and debate. By employing God, the strong verb "hate," and graphic references to terrorist attacks, the Defendants used the sort of "loose, figurative, or hyperbolic language" that seriously negates any impression that the speaker is asserting actual facts about an individual. 🚩 *Milkovich,* 497 U.S. at 21, 110 S.Ct. 2695. Accordingly, we are constrained to agree that these signs—"America is Doomed," "God Hates the USA/Thank God for 9/11," "Pope in Hell," "Fag Troops," "Semper Fi Fags," "Thank God for Dead Soldiers," "Don't Pray for the USA," "Thank God for IEDs," "Priests Rape Boys," and "God  **224**  Hates Fags"—are entitled to First Amendment protection.

b.

 The reasonable reader's reaction to two other signs—"You're Going to Hell" and "God Hates You"—also must be specifically addressed, as these two signs present a closer question. We must conclude, however, that these two signs cannot reasonably be interpreted as stating actual facts about any individual. The meaning of these signs is ambiguous because the pronoun "you" can be used to indicate either the second person singular or plural form. [19] A reasonable reader could interpret these signs, therefore, as referring to Snyder or his son only, or, on the other hand, to a collective audience (or even the nation as a whole).

We need not resolve this question of usage, however, because a reasonable reader would not interpret the statements on these two signs as asserting actual and provable facts. Whether an individual is "Going to Hell" or whether God approves of someone's character could not possibly be subject to objective verification. Thus, even if the reasonable reader understood the "you" in these signs to refer to Snyder or his son, no such reader would understand those statements ("You're Going to Hell" and "God Hates You") to assert provable facts about either of them.

Additionally, as with the other signs, both of these signs contain strong elements of rhetorical hyperbole and figurative expression. As we have recognized, the "context and tenor" of the speech at issue, as well as the speaker's use of "irreverent and indefinite language," can serve to negate any impression that he is asserting actual facts about an individual. 🚩 *Biospherics,* 151 F.3d at 184–85. The general context of the speech in this proceeding is one of impassioned (and highly offensive) protest, with the speech at issue conveyed on handheld placards. A distasteful protest sign regarding hotly debated matters of public concern, such as homosexuality or religion, is not the medium through which a reasonable reader would expect a speaker to communicate objectively verifiable facts. In addition, the words on these signs were rude, figurative, and incapable of being objectively proven or disproven. Given the context and tenor of these two signs, a reasonable reader would not interpret them as asserting actual facts about either Snyder or his son.

c.

 Finally, the written Epic published on the website of the Church is also protected by the First Amendment, in that a reasonable reader would understand it to contain rhetorical hyperbole, and not actual, provable facts about Snyder and his son. The First Amendment issue concerning the Epic presents a somewhat more difficult question, however, because it is entitled "The Burden of Marine Lance Cpl. Matthew A. Snyder." J.A. 3788. Such a title could lead a reasonable reader to initially conclude that the Epic asserts facts about this particular soldier. The Epic's subtitle, however, immediately connects its contents to the Defendants' protest and the various signs displayed there: "The Visit of Westboro Baptist Church to Help the Inhabitants of Maryland Connect the Dots! This Epic Adventure Took Place on Friday, March 10, 2006." *Id.* The Epic has a photograph of the funeral protest immediately below its title, followed by nearly two pages of verbatim Bible verses. *Id.* at 3788–89.

 **225**  The Epic then discusses Matthew's life: "Twenty years ago, little Matthew Snyder came into the world.... God created him and loaned/entrusted him to Albert and Julie Snyder." J.A. 3790. The Epic states that the Snyders "had a DUTY to prepare

that child to serve the LORD his GOD—PERIOD! You did JUST THE OPPOSITE—you raised him for the devil. You taught him that God was a liar." *Id.* at 3791. The Epic also focuses on Matthew's upbringing, asserting that "Albert and Julie ... taught Matthew to defy his Creator, to divorce, and to commit adultery. They taught him how to support the largest pedophile machine in the history of the entire world, the Roman Catholic monstrosity.... They also, in supporting satanic Catholicism, taught Matthew to be an idolater." *Id.* After interspersing additional excerpts from the Bible, the Epic refers to Matthew's service in the military, noting that he fought for

> the United States of Sodom, a filthy country that is in lock step with his evil, wicked[,] and sinful manner of life, putting him in the cross hairs of a God that is so mad He has smoke coming from his nostrils and fire from his mouth! How dumb was that?

*Id.* The Epic then links Matthew's death to the Defendants' protest activities, stating:

> God rose up Matthew for the very purpose of striking him down, so that God's name might be declared throughout all the earth. He killed Matthew so that His servants would have an opportunity to preach His words to the U.S. Naval Academy at Annapolis, the Maryland Legislature, and the whorehouse called St. John Catholic Church at Westminster where Matthew Snyder fulfilled his calling.

*Id.* at 3973.

Notwithstanding the foregoing, the Epic cannot be divorced from the general context of the funeral protest. Indeed, it is patterned after the hyperbolic and figurative language used on the various signs. Again, in assessing the First Amendment issue, we must evaluate a reasonable reader's reaction to the Epic, in light of its context and general tenor. *See* 🚩 *Biospherics,* 151 F.3d at 184–85. In context, the Epic is a recap of the protest and was distributed through the Church website, which would not lead the reasonable reader to expect actual facts about Snyder or his son to be asserted therein.

The general tenor of the Epic also serves to negate any impression that it was the source of any actual facts. In preparing it, the Defendants interspersed strong, figurative language with verses from the Bible. They utilized distasteful and offensive words, atypical capitalization, and exaggerated punctuation, all of which suggest the work of a hysterical protestor rather than an objective reporter of facts. Despite referring to the Snyder family by name, the Epic is primarily concerned with the Defendants' strongly held views on matters of public concern. Indeed, the Epic explains that Matthew's death in Iraq gave the Defendants the "opportunity to preach [God's] words to the U.S. Naval Academy at Annapolis [and] the Maryland Legislature," J.A. 3973, where they protested on the very day of Matthew's funeral. Finally, the Defendants' extensive funeral picketing activities predated Matthew's funeral and continue to this day throughout the country, with many of the signs displayed at Matthew's funeral also being displayed in other protests.

Thus, even when the Snyders are mentioned in the Epic, a reasonable reader would understand its contents to be primarily focused on the more general message to which their protests are directed. The Defendants assert in the Epic, for **\*226** example, that the Snyders had incurred God's wrath by raising Matthew as a Catholic and allowing him to serve in the military—assertions a reasonable reader would take as focused on the Defendants' concerns with the policies and activities of the Roman Catholic Church and the military. Furthermore, a reasonable reader would take as rhetorically hyperbolic a text describing the "United States of Sodom" as a "filthy" country, labelling the Catholic Church as a "pedophile machine," and equating the Maryland Legislature with the Taliban. In that context, the reasonable reader would understand the other assertions of the Epic—that the Snyders raised their son "for the devil," and taught him to "defy his Creator, to divorce, and to commit adultery"—as simply

"loose, figurative, or hyperbolic language" not connoting actual facts about Matthew or his parents. *Milkovich,* 497 U.S. at 21, 110 S.Ct. 2695. Thus, a reasonable reader would not understand the Epic to assert actual facts about either Snyder or his son. [20]

## C.

 Notwithstanding the distasteful and repugnant nature of the words being challenged in these proceedings, we are constrained to conclude that the Defendants' signs and Epic are constitutionally protected. To paraphrase our distinguished colleague Judge Hall, judges defending the Constitution "must sometimes share [their] foxhole with scoundrels of every sort, but to abandon the post because of the poor company is to sell freedom cheaply. It is a fair summary of history to say that the safeguards of liberty have often been forged in controversies involving not very nice people." *Kopf v. Skyrm,* 993 F.2d 374, 380 (4th Cir.1993) (internal quotation marks omitted).

 Nonetheless, the various states and localities, as well as grieving families, may yet protect the sanctity of solemn occasions such as funerals and memorials. Indeed, governmental bodies are entitled to place reasonable and content-neutral time, place, and manner restrictions on activities that are otherwise constitutionally protected. Some "breathing space" for contentious speech is essential, however, under the Free Speech Clause. *See New York Times,* 376 U.S. at 272, 84 S.Ct. 710. As the Court long ago emphasized:

> To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of citizens of a democracy.

*Cantwell v. Connecticut,* 310 U.S. 296, 310, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Because the judgment attaches tort liability to constitutionally protected speech, the district court erred in declining to award judgment as a matter of law.

## IV.

Pursuant to the foregoing, the judgment of the district court is reversed and the various appeal bonds are hereby discharged.

*JUDGMENT REVERSED AND BONDS DISCHARGED*

 **\*227** SHEDD, Circuit Judge, concurring in the judgment:

Although I agree with the majority that the judgment below must be reversed, I would do so on different grounds. As I explain below, I would hold that Snyder failed to prove at trial sufficient evidence to support the jury verdict on any of his tort claims. Because the appeal can be decided on this non-constitutional basis, I would not reach the First Amendment issue addressed by the majority.

I.

A.

Under the doctrine of constitutional avoidance, we are to avoid constitutional determinations when other grounds exist for the disposition of the case. *See* 🚩 *Ashwander v. Tenn. Valley Auth,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.") (internal citation and quotations marks omitted); *see also* 🚩 *Bell Atl. Md., Inc. v. Prince George's County,* 212 F.3d 863, 866 (4th Cir.2000) (holding that "by deciding the constitutional question of preemption in advance of considering the state law questions upon which the case might have been disposed of, the district court committed reversible error"). Because the viability *vel non* of the state torts is dispositive as a nonconstitutional ground on which to decide this case, I would proceed to consider that issue in the first instance. To do otherwise would turn the principle of constitutional avoidance on its head; rather than avoiding unnecessary constitutional issues, we allow the parties to structure the case in order to force us to reach constitutional issues.

Neither the Phelps nor Snyder argue on appeal that the torts are deficient as a matter of law. Ordinarily, where a party fails to raise an issue in its opening brief, we deem the issue to be waived. *See* 🚩 *Cavallo v. Star Enterprise,* 100 F.3d 1150, 1152 n. 2 (4th Cir.1996). Moreover, where an issue is raised only in an amicus brief, we generally decline to consider it. *See* 🚩 *United States v. Buculei,* 262 F.3d 322, 333 n. 11 (4th Cir.2001). However, that rule is not absolute, and I believe it is within our authority to consider an issue not raised by the parties.

Our judicial power to decide a case is not limited by the arguments and actions of the parties. Moreover, while we "normally" decline to decide an issue not raised by the parties, "normally" necessarily implies that we are not precluded from doing so under certain circumstances. *See Carter v. Lee,* 283 F.3d 240, 252 (4th Cir.2002) (noting that "this Court normally views contentions not raised in an opening brief to be waived") (emphasis added); *see also* 🚩 *Cousin v. Trans Union Corp.,* 246 F.3d 359, 373 n. 22 (5th Cir.2001) (noting that although issues not raised in initial brief are normally waived, the court has discretion to decide the issue); 🚩 *Bridges v. City of Bossier,* 92 F.3d 329, 335 n. 8 (5th Cir.1996) (electing to examine purely legal issue not raised by party in opening brief, but raised by amicus curiae in its initial brief); 🚩 *Estate of Lisle v. CIR,* 341 F.3d 364, 384 (5th Cir.2003) (holding that "[w]hile we may in our discretion decline to consider issues not raised in an initial brief, we choose to address the issue here"). Indeed, the Supreme Court has approved this practice. *See* 🚩 *Teague v. Lane,* 489 U.S. 288, 300, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion); *see also* 🚩 *Davis v. United States,* 512 U.S. 452, 457 n. 1, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

A case from the United States Court of Appeals for the District of Columbia Circuit is instructive on this point. *See* 🚩 *Independent* **\*228** *Ins. Agents of America, Inc. v. Clarke,* 955 F.2d 731 (D.C.Cir.1992) (disposing of a case on a basis not advanced by the parties), *rev'd on other grounds sub nom.* 🚩 *U.S. Nat. Bank of Oregon v. Independent Ins. Agents of America, Inc.,* 508 U.S. 439, 445–47, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993). In denying rehearing *en banc,* a judge of that court noted

> Our colleagues question the "judicial power" of a federal court to decide an issue of law concededly dispositive of the case where parties have not raised the issue. *I think it most apparent that federal courts do possess this power. The alternative is that the parties could force a federal court to render an advisory opinion.* What the dissenters in effect argue is that the parties can stipulate to the state of underlying law;

frame a law suit, assuming that stipulation; and obtain from the court a ruling as to what the otherwise dispositive law would be if the stipulated case were in fact the law. Indeed, that is precisely what would have occurred in this case had the panel not, sua sponte, raised the question....

*Independent Ins. Agents of America, Inc. v. Clarke,* 965 F.2d 1077, 1078 (D.C.Cir.1992) (Sentelle, J., concurring)(emphasis added). Following the denial of rehearing *en banc,* the Supreme Court granted a writ of certiorari and specifically noted that the circuit court did have the authority to raise and decide an issue not raised by the parties. *See* 🚩 *Independent Ins. Agents of America,* 508 U.S. at 447, 113 S.Ct. 2173 (noting that "[t]he contrary conclusion would permit litigants, by agreeing on the legal issue presented, to extract the opinion of a court on hypothetical Acts of Congress or dubious constitutional principles, an opinion that would be difficult to characterize as anything but advisory"). Thus, I believe we have the power to decide issues not raised by the parties and should exercise that power under certain circumstances.

Here, moreover, the dispositive nonconstitutional ground is already before us as the Thomas Jefferson Center for the Protection for Free Expression ("the Center"), which we permitted to file an amicus curiae brief, argues that the underlying state law torts are legally deficient. *See* Brief of the Thomas Jefferson Center for the Protection of Free Expression, at 15–30. Specifically, the Center contends that Snyder failed to establish that the Phelps intruded upon his seclusion or that the Phelps' activities are outrageous under Maryland law.

Thus, I am persuaded that we should consider the issues raised by the Center for several reasons. First, the Phelps clearly challenged the legal sufficiency of the state law torts in the district court by way of a motion for summary judgment and later in their post-trial motions. Second, Snyder has directly responded in this appeal to the issues that the Center raises. Third, and most importantly, the principle of constitutional avoidance requires us to avoid constitutional determinations when other grounds exist for the disposition of the case. Here, because the state law torts are not supported by the evidence presented at trial, I would reverse under state law and not under the First Amendment.

### B.

Under Count One, the jury found the Phelps liable for the state law tort of "invasion of privacy by intrusion upon seclusion" because the Phelps invaded Albert Snyder's privacy during his time of bereavement. The jury was instructed that the elements of this claim are: "(1) An intentional (2) intrusion or prying upon (3) something which is and is entitled to be private (4) in a manner which is highly **\*229** offensive to a reasonable person." J.A. 3110. Snyder apparently claims an intrusion upon seclusion occurred because of the Phelps' funeral protest and the television coverage thereof, and because of the "epic" which he found on the Internet several weeks after the funeral.

Under Maryland law, an "intrusion" occurs when there has been some act that interferes "into a private place or the invasion of a private seclusion that the plaintiff has thrown about his person or affairs." *Furman v. Sheppard,* 130 Md.App. 67, 744 A.2d 583, 586 (2000) (internal citation and quotation marks omitted). Expounding on the types of "intrusion" Maryland law recognizes, the Maryland Court of Appeals has stated:

> [this tort] consists of intrusion upon the plaintiff's physical solitude or seclusion, as by invading his home or other quarters, or an illegal search of his shopping bag in a store. The principle has, however, been carried beyond such physical intrusion, and extended to eavesdropping upon private conversations by means of wire tapping and microphones; and there are decisions indicating that it is to be applied to peering into the windows of a home, as well as persistent and unwanted telephone calls. The tort has been found in the case of unauthorized prying into the plaintiff's bank account, and the same principle has been used to invalidate a blanket subpoena duces tecum requiring the production of all his books and documents, and an illegal compulsory blood test.

It is clear, however, that there must be something in the nature of prying or intrusion....

*Hollander v. Lubow,* 277 Md. 47, 351 A.2d 421, 425–26 (1976) (internal citations and quotation marks omitted). Several cases illustrate the type of conduct which constitutes an "intrusion upon seclusion" under Maryland law.

In *Furman,* a private club member who had been a plaintiff in an earlier lawsuit in which he claimed to be injured, brought suit against a private investigator who worked for the defense counsel in that lawsuit and who trespassed into a private club to videotape the plaintiff sailing on his yacht. *Furman,* 744 A.2d at 585. The club was surrounded by a security fence with conspicuously posted "Trespassers will be Prosecuted" signs. *Id.* The Maryland Court of Special Appeals held that "[t]here is no liability for observing [the plaintiff] in public places since he is not then in seclusion." *Id.* at 586. Even though he was in a private club, the court concluded that the plaintiff was in public because he was exposed to "public view by his neighbors and passers by." *Id.* at 587. Accordingly, the court ruled that there was no intrusion into his seclusion. *Id.*

In *Hollander,* the plaintiff sued several individuals and a bank for their revealing the fact that the plaintiff was a partner in a mortgage firm. *Hollander,* 351 A.2d at 422. For this, the plaintiff brought a claim for invasion of privacy by intrusion upon seclusion, among other claims. *Id.* The Maryland Court of Appeals held that there were no private facts revealed and, therefore, there was no intrusion upon seclusion. *Id.* at 426. The court elaborated:

> [t]he plaintiff cannot complain when an occupation in which he publicly engages is called to public attention, or when publicity is given to matters such as the date of his birth or marriage, or his military service record, which are a matter of public record, and open to public inspection. It seems to be generally agreed that anything visible in a public place can be recorded and given circulation by means of a photograph, to the same extent as by a written description, since this amounts to nothing more than giving publicity to what is already public and what anyone present would be free to see. *The contention that when an* **\*230** *individual is thus singled out from the public scene and undue attention is focused upon him, there is an invasion of his private rights, has not been borne out by the decisions.* On the other hand, it is clear that when a picture is taken without the plaintiff's consent in a private place, or one already made is stolen, or obtained by bribery or other inducement of breach of trust, the plaintiff's appearance which is thus made public is still a private thing, and there is an invasion of a private right, for which an action will lie.

*Id.* (internal citation and quotation marks omitted) (emphasis added).

Additionally, where Maryland courts have recognized this cause of action, I find nothing analogous to Snyder's claim. For example, in *Mitchell v. Baltimore Sun Co.,* 164 Md.App. 497, 883 A.2d 1008 (2005), a former congressman brought a cause of action for invasion of privacy by intrusion upon seclusion. His claim was based on two newspaper reporters who came to his nursing home room uninvited to purportedly investigate some of his unpaid bills. *Id.* at 1012. The reporters were aware that Mitchell was elderly and in failing health, and the nursing home had a sign that stated "NO TRESPASSING NO SOLICITING." *Id.* The reporters asked him a series of questions, and when he asked them repeatedly to leave, they refused. *Id.* at 1012. Finally, the congressman asserted "that one of the reporters looked through some files that he had in a filing cabinet, box, or on a desk near his bed." *Id.* 1012–13. In deciding to reverse summary judgment, the court held that these actions could constitute an intrusion upon seclusion under Maryland law. *Id.* at 1023–24.

In 🚩 *Pemberton v. Bethlehem Steel Corp.,* 66 Md.App. 133, 502 A.2d 1101 (1986), a local union president filed suit for intrusion upon seclusion based upon various types of surveillance the defendants conducted on him. The Maryland Court of Special Appeals held that placing a surveillance microphone on a hotel door in order to hear private conversations inside a hotel room may be actionable as an intrusion upon seclusion. However, the court further stated that other surveillance, such as watching the plaintiff's home from the street is not actionable as an intrusion upon seclusion because "there is no liability for observing [a person] in public places, since he is not then in seclusion." 🚩 *Id.* at 1116–17 (internal quotation marks omitted).

In light of these cases, it is clear that there was no type of "intrusion" under any of the bases that Snyder asserts. First, as to the funeral protest itself, the Phelps did not "intrude" or "pry" upon any private seclusion. The Phelps never intruded upon a private place because their protest occurred at all times in a public place that was designated by the police and located approximately 1,000 feet from the funeral. Further, the Phelps never confronted Snyder, and Snyder admits he could not see the protest. Finally, there was no intrusion because the evidence is undisputed that the church service was never disrupted. The Phelps never entered the church, and they stopped protesting when the church service began. In sum, I would hold the funeral protest did not intrude upon Snyder's seclusion. [1]

**\*231** Likewise, I would hold that the Phelps' posting of the "epic" on their church Internet website is not, as a matter of law, an intrusion upon Albert Snyder's seclusion under Maryland law. In posting the "epic," the Phelps did not do anything to direct it to Snyder's attention, such as email or transmit it to him. *Cf.* 🚩 *Hollander,* 351 A.2d at 426 (noting that repeated phone calls may give rise to an intrusion upon seclusion claim). Instead, Snyder learned of the "epic" during an Internet search, and upon finding it he chose to read it. By doing so, any interference with Snyder's purported interest in seclusion was caused by Snyder himself rather than the Phelps.

In short, I conclude that the verdict on Count One cannot stand. The evidence is insufficient under Maryland law for the jury to have found that the Phelps committed any act that intruded upon Snyder's right to seclusion.


C.

Under Count Two, the Phelps were held liable for intentional infliction of emotional distress. As charged to the jury, the elements for this tort are: (1) the Phelps' conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) the conduct caused emotional distress to Snyder; and (4) the emotional distress was severe. J.A. 3111.

Under Maryland law, the second element requires conduct "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." 🚩 *Pemberton,* 502 A.2d at 1115 (internal citation and quotation marks omitted). The Maryland Court of Special Appeals has held that "[t]he tort of intentional infliction of emotional distress is rarely viable, and is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct." 🚩 *Bagwell v. Peninsula Regional Medical Center,* 106 Md.App. 470, 665 A.2d 297, 319 (1995) (internal citation and quotation marks omitted). [2] A review of Maryland cases illustrates the exacting burden of this element.

In 🚩 *Figueiredo–Torres v. Nickel,* 321 Md. 642, 584 A.2d 69 (1991), the Maryland Court of Appeals upheld a claim for intentional infliction of emotional distress by a plaintiff whose psychologist had sexual relations with the plaintiff's wife. The court concluded that there was evidence of extreme and outrageous conduct "where a psychologist who is retained to improve a marital relationship implements a course of extreme conduct which is injurious to the patient and designed to facilitate a romantic, sexual relationship between the therapist and the patient's spouse." 🚩 *Id.* at 75.

37 Media L. Rep. 2377

In *B.N. v. K.K.,* 312 Md. 135, 538 A.2d 1175, 1177 (1988), the Maryland Court of Appeals upheld a claim for intentional infliction of emotional distress where the defendant failed to disclose to the plaintiff that he had a sexually transmitted disease prior to having sexual relations with her. The plaintiff thereafter contracted this disease. *Id.* The court noted that the element of extreme and outrageous conduct was supported because of the risks and side effects of the disease the plaintiff contracted from the defendant. *Id.* at 1180.

In a final case where the Maryland Court of Appeals has upheld a claim of intentional infliction of emotional distress, **\*232** the plaintiff had suffered physical and emotional trauma from being assaulted at work. *See Young v. Hartford Accident & Indent. Co.,* 303 Md. 182, 492 A.2d 1270, 1271 (1985). After making disability payments, the defendant refused to pay certain doctor's bills and insisted the plaintiff undergo another psychological evaluation despite a doctor's warning of her fragile condition. *Id.* The court held that "[i]f [the plaintiff] proves that the sole purpose of [the psychologist's] examination was to harass the Plaintiff into abandoning her claim, or into committing suicide," the behavior would be extreme and outrageous. *Id.* at 1278 (internal quotation marks omitted).

On the other hand, Maryland has refused to uphold the tort in the context of other types of egregious conduct. In *Mitchell,* the two reporters entered a former congressman's nursing home room uninvited, and looked through his files without permission. *See* 883 A.2d at 1012–13. Even though the congressman was in failing health and the reporters had been asked to leave, the court held that these facts did not show extreme and outrageous conduct and stated that "[w]e are not persuaded that the reporters' questioning of Mitchell, even if conducted while trespassing, exceeded all possible bounds of decency, as to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* at 1025 (internal citation and quotation marks omitted).

In *Batson v. Shiflett,* 325 Md. 684, 602 A.2d 1191 (1992), the president of a local union was continually harassed by the defendants in an attempt to remove him from local office and to undermine his position. The plaintiff alleged that the defendants defamed him and committed the tort of intentional infliction of emotional distress. *Id.* at 1195. The court upheld the defamation claim but held that even though the defendant's conduct was defamatory, it "in no way satisfies our exacting standard for 'extreme and outrageous conduct.' " *Id.* at 1217.

In this case, Snyder asserts that the protest was extreme and outrageous because the funeral was disrupted by having the procession re-routed; his grieving process was disrupted by his having to worry about his daughters observing the Phelps' protest; and the Phelps' messages on their protest signs were focused on his family. As earlier noted, the protest was confined to a public area under supervision and regulation of local law enforcement and did not disrupt the church service. Although reasonable people may disagree about the appropriateness of the Phelps' protest, this conduct simply does not satisfy the heavy burden required for the tort of intentional infliction of emotional distress under Maryland law. Further, to the extent Snyder asserts the "epic" as a basis for this tort, I would find the "epic," which the district court found to be non-defamatory as a matter of law, is not sufficient to support a finding of extreme and outrageous conduct. Therefore, I believe the verdict on Count Two must be reversed. [3]

## II.

In sum, I find the evidence cannot support the state torts at issue in this appeal and, therefore, I would not reach the First Amendment analysis the majority implores. **\*233** Accordingly, I concur only in the result the majority reaches—the reversal of the judgment below.

37 Media L. Rep. 2377

**All Citations**

580 F.3d 206, 37 Media L. Rep. 2377

# Footnotes

1    The Defendants have a substantial history of protesting at venues other than soldiers' funerals. For example, on the day of Matthew Snyder's funeral, they also protested in Annapolis at the Maryland State House and at the Naval Academy. The Defendants have also been involved in litigation throughout the country relating to their protests. *See, e.g., Phelps–Roper v. Nixon,* 545 F.3d 685 (8th Cir.2008); *Phelps–Roper v. Strickland,* 539 F.3d 356 (6th Cir.2008). As a result of such activities, approximately forty states and the federal government have enacted legislation addressing funeral picketing. *See* Stephen R. McAllister, *Funeral Picketing Laws and Free Speech,* 55 U. Kan. L.Rev. 575, 576 (2007).

2    Citations herein to "J.A. ____" refer to the contents of the Joint Appendix filed by the parties in this appeal.

3    Snyder has not cross-appealed the district court's summary judgment awards to the Defendants on his tort claims for defamation and publicity given to private life. Thus, whether the court erred in making those rulings is not implicated in this appeal.

4    The Free Speech Clause of the First Amendment specifically guarantees that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. The Free Speech Clause applies to the various states as a result of the Fourteenth Amendment. *See Stromberg v. California,* 283 U.S. 359, 368, 51 S.Ct. 532, 75 L.Ed. 1117 (1931).

5    In objecting to a proposed instruction on the intrusion upon seclusion claim, the Defendants sought to limit the jury's consideration to three specific signs. The trial court, however, authorized the jury to consider all of the signs as well as the Epic.

6    Each of the Defendants requested a stay of execution of judgment pending appeal, which the district court conditionally granted. Phelps and the Church were then required to post property bonds, and Phelps–Roper and Phelps–Davis had to post substantial cash bonds. On May 19, 2008, we denied the requests of Phelps–Roper and Phelps–Davis to stay the judgment without bond pending appeal.

7    The Defendants also assert on appeal that we improperly denied the requests of Phelps–Roper and Phelps–Davis to stay the judgment without bond pending appeal. As explained below, we discharge the various bonds as a corollary to reversing the judgment.

8    In this regard, we further observe that recognition of the right of an amicus to present an issue that the parties have no desire to further litigate would constitute judicial recognition of a lawyer relief rule—inviting lawyers and nonparties otherwise without standing to seek out and engage in mischief that would readily be likened to barratry, champerty, or maintenance.

9    Because the sufficiency of the evidence issue was waived, the *Ashwander* principle—that a court should not "decide questions of a constitutional nature unless absolutely necessary"—is inapplicable here. *See Ashwander v. Tenn. Valley Auth.,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (internal quotation marks omitted). The resolution of the First Amendment issues is absolutely necessary, as it is the sole appropriate means for disposing of this appeal.

10     The district court properly distinguished these proceedings, where the Defendants contend that the First Amendment immunizes them from tort liability, from other decisions relied on by the Defendants addressing the constitutionality of *statutory* prohibitions affecting funeral pickets. *See  Snyder v. Phelps,* 533 F.Supp.2d 567, 578–79 (D.Md.2008) (distinguishing certain "successful attacks by the [Defendants] upon *statutory* restrictions" that have not met constitutional muster).

11     The Supreme Court has deemed the First Amendment defense inapplicable to a state law tort claim only when the plaintiff seeks damages for actual pecuniary loss, as opposed to injury to reputation or state of mind. *See  Cohen v. Cowles Media Co.,* 501 U.S. 663, 671, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991) (concluding that First Amendment did not bar economic damages resulting from defendant's tortious breach of promise).

12     There is no suggestion that the speech at issue falls within one of the categorical exclusions from First Amendment protection, such as those for obscenity or "fighting words." *See, e.g.,  Miller v. California,* 413 U.S. 15, 20, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973);  *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571–72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

13     Neither the Supreme Court nor this Court has specifically addressed the question of whether the constitutional protections afforded to statements not provably false should apply with equal force to both media and nonmedia defendants. *See  Milkovich,* 497 U.S. at 20 n. 6, 110 S.Ct. 2695. The Second and Eighth Circuits, however, have rejected any media/ nonmedia distinction. *See  Flamm v. Am. Ass'n of Univ. Women,* 201 F.3d 144, 149 (2d Cir.2000);  *In re IBP Confidential Bus. Documents Litig.,* 797 F.2d 632, 642 (8th Cir.1986); *see also  Foretich v. Capital Cities/ABC, Inc.,* 37 F.3d 1541, 1563 n. 39 (4th Cir.1994) (implying in dicta that Milkovich applies equally to media and nonmedia defendants). Like those two circuits, we believe that the First Amendment protects nonmedia speech on matters of public concern that does not contain provably false factual assertions. Any effort to justify a media/nonmedia distinction rests on unstable ground, given the difficulty of defining with precision who belongs to the "media." And, more importantly, the Supreme Court has concluded that the "inherent worth of speech ... does not depend upon the identity of its source, whether corporation, association, union, or individual."  *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 777, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). Thus, for our purposes, the status of the Defendants as media or nonmedia is immaterial.

14     In our  *Kirby* decision, we assessed whether the words at issue involved a matter of public concern in the context of a public employment retaliation action. *See*  388 F.3d at 444. Both the Supreme Court and the courts of appeals have borrowed from that context for purposes of analyzing tort liability under the First Amendment. *See, e.g.,  Dun & Bradstreet,* 472 U.S. at 759, 105 S.Ct. 2939;  *Levinsky's, Inc. v. Wal–Mart Stores, Inc.,* 127 F.3d 122, 132 (1st Cir.1997).

15     The  *CACI* opinion also concluded that other statements made by the radio host were protected by the First Amendment because they were not made with "actual malice," as defined in the New York Times decision, i.e., those statements had not been made with knowing falsity or reckless disregard for the truth. *See  CACI,* 536 F.3d at 294–300.

16     The Post–Trial Opinion confirms that the jury assessed legal issues that were reserved to the court. *See  Snyder,* 533 F.Supp.2d at 578 ("While signs expressing general points of view are afforded First Amendment protection, [certain] additional signs, which could be interpreted as being directed at the Snyder family, created issues for the finder of fact."). Thus, the district court permitted the jury to determine the nature of the speech (i.e., as containing assertions of actual

fact specifically directed at and concerning the Snyders), and indicated that the jury should decide whether the signs should be afforded First Amendment protection.

17    The district court failed to distinguish between Snyder and his deceased son for purposes of the "public figure" analysis. *See* *Snyder,* 533 F.Supp.2d at 577. Because the speech at issue cannot reasonably be interpreted as stating actual facts about *any* individual, we need not decide whether the court should have drawn a distinction.

18    The district court did not specifically discuss four of these signs ("Don't Pray for the USA," "Thank God for IEDs," "Priests Rape Boys," and "God Hates Fags") in its Post–Trial Opinion. It also did not mention other signs displayed at the funeral—those reading "Maryland Taliban," "Fags Doom Nations," and "Not Blessed Just Cursed"—that further support our conclusion that the signs contained generally directed rhetorical hyperbole, and not actual, provable facts about Snyder or his son.

19    Historically, the pronoun "you" was used only in the plural form; the word "thou" was used to refer to a single person. *See Webster's Third New International Dictionary* 2380–81 (1976).

20    The district court recognized the nonfactual basis of the Epic when it dismissed Snyder's defamation claim. In so ruling, the court observed that the statements found therein were "essentially [the Defendants'] religious opinion and would not realistically tend to expose Snyder to public hatred or scorn." *Snyder,* 533 F.Supp.2d at 572–73.

1    To the extent Snyder's claim is based on his viewing the Phelps' pro-test on television, I would find that television coverage of a public protest that occurred in a public area is not an "intrusion." *Cf.* *Hollander,* 351 A.2d at 426 (noting that "[i]t seems to be generally agreed that anything visible in a public place can be recorded and given circulation by means of a photograph, to the same extent as by a written description, since this amounts to nothing more than giving publicity to what is already public and what anyone present would be free to see").

2    A 1997 case of the Maryland Court of Special Appeals noted that the tort of intentional infliction of emotional distress had been upheld on only three occasions since Maryland began recognizing the tort in 1977. *See* *Penhollow v. Cecil County,* 116 Md.App. 265, 695 A.2d 1268, 1285 (1997).

3    The Phelps were also held liable for civil conspiracy under Count Three. Because the unlawful activity required for this count was the substantive offense of Count 1 or Count 2, this count must also be reversed. *See Green v. Washington Suburban Sanitary Commission,* 259 Md. 206, 269 A.2d 815, 824 (1970) (noting that "[a] civil conspiracy is a combination of two or more persons by an agreement or understanding to accomplish an unlawful act").

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 356 of 379
Sweet Sage Cafe, LLC v. Town of North Redington..., 380 F.Supp.3d 1209...
28 Fla. L. Weekly Fed. D 51

380 F.Supp.3d 1209
United States District Court, M.D. Florida,
Tampa Division.

SWEET SAGE CAFÉ, LLC, John Messmore, Shermee, LLC, and SS16725, LLC, Plaintiffs,

v.

TOWN OF NORTH REDINGTON BEACH, FLORIDA, and Sheriff Bob
Gualtieri in his official capacity as Pinnelas County Sheriff, Defendants.

Case No. 8:18-cv-01080-T-02CPT
|
Signed 03/29/2019

**Synopsis**

**Background:** Restaurant and owner brought action against town and sheriff alleging First Amendment retaliation and Fourth Amendment unreasonable search and seizure arising out of administrative code inspections, and challenging the constitutionality of revised city ordinance authorizing such inspections. Parties filed cross-motions for summary judgment.

**Holdings:** The District Court, William F. Jung, J., held that:

relevant policymaker for town was town attorney in conjunction with governing commission;

town and sheriff did not conduct unreasonable search and seizure;

constitutional challenge was ripe;

revised business tax code sections that authorized administrative searches of establishments in a closely regulated industry were unconstitutional;

town was enjoined from inspecting restaurant;

town could not rely on section to search restaurant; and

code did not violate Florida law.

Motions granted in part and denied in part.

**Procedural Posture(s):** Motion for Summary Judgment.

**Attorneys and Law Firms**

**\*1213**  Joseph P. Kenny, Timothy W. Weber, Weber, Crabb & Wein, PA, St. Petersburg, FL, for Plaintiffs.

Robert M. Eschenfelder, Jay Daigneault, Trask, Metz & Daigneault LLP, Clearwater, FL, for Defendants.

28 Fla. L. Weekly Fed. D 51

**ORDER**

WILLIAM F. JUNG, UNITED STATES DISTRICT JUDGE

This case concerns alleged First Amendment retaliation through administrative code inspections and the constitutionality of a revised city ordinance authorizing such inspections. The matter comes to the Court on cross-motions for summary judgment from Plaintiffs, Dkt. 71, Defendant Town of North Redington Beach (the "Town"), Dkt. 73, and Defendant Sheriff Bob Gualtieri in his official capacity as Pinellas County Sheriff (the "Sheriff"), Dkt. 81. The parties have filed responses to the opposing motions. The Court **GRANTS** Plaintiffs' motion for partial summary judgment, **GRANTS** the Sheriff's motion, and **GRANTS** and **DENIES** in part the Town's motion.

**BACKGROUND**

Incorporated in 1953, the Town is a beachside community, one square mile in size, with approximately 1,427 full-time residents. Dkt. 82-6 at 48. A five-member Commission, including Mayor Queen, governs the Town. *Id.* at 53. The Town has four employees: Town Clerk Campbell, Deputy Clerk Schmader, Public Works Projects employee Lewis, and a groundskeeper. *Id.* at 48. Since 2013, the law firm Trask Daigneault has been "the retained Town Attorney," and Jay Daigneault of the firm has been appointed as the Town Attorney. Dkt. 82-8 at 3.

Plaintiff Sweet Sage Café, LLC ("Sweet Sage") operates a restaurant named Sweet Sage Café (the "Café") in the Town. Dkt. 56 at ¶ 3. Plaintiff Messmore owns and manages the Café with his wife. *Id.* The Café, which closes at 2:00 p.m., offers breakfast and lunch in a "casual Florida beach-themed setting." *Id.* It also features a gift shop. Dkt. 82-4 at 2.

The Café displayed various signs outside, including some for which Sweet Sage was issued a Notice of Violation (NOV) of a sign ordinance. Complaint, *Sweet Sage Cafe, LLC v. Town of N. Redington Beach, Florida*, 8:15-CV-2576-T-30JSS (M.D. Fla. **\*1214** Nov. 2, 2015), ECF: 1 at 3, 9. In November 2015, Sweet Sage sought a declaration that the Town's sign ordinance, adopted in June 2015, violated the First Amendment. *Id.* at 9. On January 27, 2017, the district court entered summary judgment, agreeing that the ordinance was unconstitutional. *Sweet Sage Café v. Town of North Redington Beach, Florida , LLC*, 2017 WL 385756, at *1 (M.D. Fla. Jan. 27, 2017).

Sweet Sage has contested other Town ordinances as well. To confront its shortage of public parking, the Town has an off-street parking ordinance, Ordinance 2009-685, that requires at least one parking space for every four seats in an establishment. Dkt. 73-8 at 2-3. Before 2009, one space was required for every three seats. *Id.*; Dkt. 82-6 at 66. The new ordinance grandfathered the number of nonconforming seats as of September 10, 2009 but did not allow additional seats without additional on-site parking. Dkt. 73-8 at 3. To determine the grandfathered numbers, the Town's former code enforcement officer, Mr. Lewis, counted seats at the existing bars, lounges, and restaurants. Dkt. 82-6 at 67. The Town Clerk created a typed chart from the handwritten results, which was then included as an attachment to the ordinance. *Id.* at 18-20, 68. Mr. Lewis, along with Mr. Messmore, counted 61 seats at the Café. Dkt. 82-1 at 22.

In 2016, the Town contracted with the Sheriff to enforce code violations, including the parking ordinance. Dkt. 56-1. Deputy Clerk Schmader serves as the secretary for code enforcement, which includes typing up forms for the officer and taking and forwarding complaints. Dkt. 84-1 at 12. Beginning in July 2016, Deputy Joshua Short was the Town's code enforcement officer. Dkt. 82-3 at 2. In March or April 2017, Corporal Chris Kohmann assumed code enforcement duties for the Town. Dkt. 82-2 at 2.

The code enforcement officer exercises some discretion in enforcing code violations. For example, only the officer is authorized to determine that a code violation has occurred and to issue a NOV. Dkt. 84-1 at 3, 25. The officer also determines the method

by which notice is served, the length of time for compliance before the case is set for an enforcement hearing before the Special Magistrate, and whether compliance is met upon re-inspection. Dkt. 84-1 at 6. Deputy Short and Corporal Kohmann have visited the Café a number of times to assess compliance with the parking ordinance.

To apply for an annual business tax receipt (basically a business permit) from the Town, a restaurant, bar, or lounge must list its number of seats on the application. Dkt. 56-4 at 3. There is also an annual inspection. Dkt. 84-1 at 12. For seat counts at grandfathered establishments, Deputy Clerk Schmader gives the code enforcement officer a copy of the parking ordinance and "a copy of their business tax receipts to go to every restaurant." *Id.* at 12-13. Until the most recent application, since 2010 Mr. Messmore had attested on his business tax receipt applications that the Café has 61 seats, Dkt. 74-4 at 2-12, and had been issued an occupational license for the same, Dkt. 75-1 at 9-17.

A Special Magistrate hearing followed an April 19, 2018 NOV issued to the Café for noncompliance with the parking ordinance. Dkt. 75-2. On May 29, 2018, the Magistrate found that the Town failed to prove that the Café had exceeded its designated 61 seats. *Id.* at 14. The order "noted that nothing in the Town ... Code ... specifies a formula for calculating the number of seats based on the length of a bench seat." *Id.* at 10-11. In response, the Town adopted Ordinance 2018-801, which did not alter the grandfathered seating allotments. Dkt. 75-3; Dkt. 82-6 at 30-31;   **\*1215**  Dkt. 82-8 at 12-13. As represented by counsel at oral argument, litigation concerning the Town's parking ordinance is ongoing in the Florida state courts.

In 2016 Mr. Messmore, through Plaintiff Shermee, LLC, purchased a vacant lot approximately 150 feet north of the Café. Dkt. 82-5 at 14. He hoped to use the property as off-site parking for Café customers. *Id.*; Dkt. 82-4 at 5. "[H]e said that after 2:00 when [the Café] closed, then anybody could use it to park there to go to the beach. It was definitely for Sweet Sage up until 2:00 when they closed." Dkt. 82-6 at 65.

The Town's zoning code, however, did not allow parking as a primary use of property at the location. Dkt. 83-1 at 2. Mr. Messmore sought to rezone the lot. *Id.* at 6. The Town directed Mr. Messmore to section 98-3 of the Town Code, noting "You may want to check with your attorney for procedural steps." *Id.* At a November 10, 2016 Commission meeting, Mr. Messmore presented materials in support of the rezoning. *Id.* at 20. According to a memorandum by the Town Attorney, no action was required based on the presentation.[1] *Id.* at 18-19. The Mayor scheduled a workshop for January 5, 2017 to discuss the proposal. *Id.* at 30.

At the workshop, the Commission conditioned the rezoning of the property on Mr. Messmore not adding "statuary, trellis[es], art or anything that draws attention to the parking area" to the lot. Dkt. 83-1 at 41. Mr. Messmore returned to the Commission on January 12, 2017 with paperwork including a draft of a rewritten ordinance. *Id.* at 42; Dkt. 82-6 at 59. The Mayor initially scheduled another workshop for February 7, 2017 that was later canceled. Dkt. 82-6 at 28. "[A]s the Commissioners came in and said, what's the workshop about and [Town Clerk Campbell] told them, they were like, why are we doing this, he's already said he doesn't agree to [the conditions] and he's already showed us at the last meeting he doesn't agree to it. So, they didn't want to do [another workshop]." *Id.* at 59-60.

Mr. Messmore abandoned the parking lot proposal and sought to build a new business on the lot called the Sugar Shack. Dkt. 82-6 at 62-63. This required two variances and the approval of a site plan, which was eventually completed. *Id.* at 63-64. The Commission approved the site plan with conditions, and Mr. Messmore has begun construction. Dkt. 82-5 at 14-15.

## PROCEDURAL HISTORY

On May 3, 2018, Plaintiffs filed their original complaint for First Amendment retaliation against the Town and unreasonable search and seizure against the Town and Sheriff. Dkt. 1 at 7-8. The next day Plaintiffs sent a letter to the Town advising it that officers could no longer enter the Café to conduct code enforcement inspections without a lawfully issued warrant. Dkt. 75-4 at 18. On May 10, 2018, the Town Attorney responded with a letter stating the Town's Business Tax Code permitted the officers

to enter without a warrant. Dkt. 56-2. In response, Plaintiffs amended their complaint to challenge the constitutionality of the warrantless search provisions of the Business Tax Code. Dkt. 23 at 12. Plaintiffs also added a state law trespass claim against the Town and the Sheriff. Dkt. 23 at 14.

On October 11, 2018, the Town adopted Ordinance 2018-804 which amended the Town's Business Tax Code. Dkt. 75-4 at 2-11. **\*1216** According to the Town, the amendment's purpose was to address the warrantless inspection provisions subjected to constitutional challenge. Dkt. 82-8 at 32. The amendment authorizes, among others things, warrantless administrative inspections of businesses:

> [e]ngaged in a closely-regulated industry and where the inspector has a reasonable good faith belief, based upon a record of non-compliance or other verifiable evidence of probable non-compliance to include citizen complaints, that providing advance notice of the inspection may allow the business to conceal the code violation which is the subject of the inspection.

Code of the Town of North Redington Beach, Florida, § 66-45(c)(3). The Code defines the term "closely regulated industry" as: "[a] firearms retailer...; [a] business which is licensed and regulated by the Florida Beverage Law as defined in Florida Statutes § 561.01(6); and [a] public food service establishment licensed under Florida Statutes Chapter 509." § 66-45(g). The record is clear there is no firearms dealer in the Town and the Town does not actually regulate gun dealers or the Florida Beverage Law.

The Town also modified its business tax receipt application (effectively a business permit) to require businesses to consent to warrantless inspections as a condition of the "privilege of conducting business within the Town." Dkt. 84-1 at 19. The Town Attorney's office provided the revised application's language, which is a mandatory component of the business tax receipt. *Id.* at 19-20; Dkt. 82-6 at 32-34; Dkt. 82-8 at 34:

> By signing the below, the business owner/manage[r] acknowledges that all of the information on this Business Tax Receipt Application is true, and that as a condition of the privilege of conducting business within the Town, consent[s] to the Town's Code Enforcement Officer to periodically conduct inspections of the business premises during business hours to confirm the information provided in this Application is true, and to verify that the business is complying with Town code provisions governing the business's condition, conduct and operations, is hereby given.

Dkt. 84-1 at 18-19. Sweet Sage's most recent application did not include the seat number as required and was therefore rejected. Dkt. 56-4 at 3. Mr. Messmore has not refiled because he does not approve of the above consenting language. *Id.* ¶¶ 38-39.

On November 13, 2018, Plaintiffs once more amended their complaint to lastly challenge the constitutionality of the Town's Business Tax Code as amended by Ordinance 2018-804, both facially and as applied. Dkt. 56. After exhaustive discovery, Plaintiffs filed summary judgment on only the constitutionality of the Business Tax Code and business tax receipt application. The Town and the Sheriff move for summary judgment on all claims.

### SUMMARY JUDGMENT STANDARD

Under Rule 56, Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 360 of 379

Sweet Sage Cafe, LLC v. Town of North Redington..., 380 F.Supp.3d 1209...

28 Fla. L. Weekly Fed. D 51

*see also* 🚩 *Mize v. Jefferson City Bd. of Educ.,* 93 F. 3d 739, 742 (11th Cir. 1996). If met, the burden shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial." 🚩 *Shaw v. City of Selma,* 884 F. 3d 1093, 1098 (11th Cir. 2018) (citation omitted).

"A fact is 'material' if it has the potential of 'affect[ing] the outcome of the case.' " **\*1217** 🚩 *Shaw,* 884 F.3d at 1098. "And to raise a 'genuine' dispute, the nonmovant must point to enough evidence that 'a reasonable jury could return a verdict for [him].' " 🚩 *Id.* (citation omitted) (alteration in original). The Eleventh Circuit further teaches that "[w]hen considering the record on summary judgment 'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.' " 🚩 *Id.* (citations omitted).

## DISCUSSION

Because factual issues on the First Amendment retaliation claim remain, summary judgment is inappropriate. Prospective relief against the Town and Sheriff for any Fourth Amendment or state law trespass violations is unwarranted. The Court finds that portions of the revised Business Tax Code in tandem with the business tax receipt application suffer constitutional defects. Lastly, the ordinance does not violate Florida law. The Court will handle Plaintiffs' claims in turn.

### Count I. First Amendment Retaliation Against the Town

Plaintiffs first claim the Town violated 🚩 42 U.S.C. § 1983 "by retaliating against Plaintiffs for the exercise and assertion of their rights under the First ... Amendment[ ]." Dkt. 56 ¶ 41. Specifically, Plaintiffs "engaged in constitutionally protected speech through the posting of signs on the premises of [the Café], speaking at public hearings and communicating with the Town Clerk concerning code enforcement matters," petitioning for "the redress of grievances by filing the Sign Ordinance Litigation," and "when they asked the Town to change the permitted uses for the vacant lot and applied for a variance from the Town's lot size regulations." *Id.* ¶¶ 42-44. The alleged retaliatory actions included "repeated, and often disruptive, code enforcement inspections" and amending its parking ordinance and Business Tax Code. *Id.* ¶¶ 45-46. Plaintiffs seek damages, injunctive relief, attorney's fees, and costs. *Id.* at 12.

#### 1. The Relevant Policymaker Under 🚩 *Monell*

A municipality is subject to 🚩 § 1983 liability "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." 🚩 *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A plaintiff must demonstrate: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." 🚩 *McDowell v. Brown,* 392 F.3d 1283, 1289 (11th Cir. 2004).

Liability may also be imposed for a "course of action tailored to a particular situation" by municipal policymakers where "the decisionmaker possesses *final authority* to establish municipal policy with respect to the action ordered." 🚩 *Scala v. City of Winter Park,* 116 F.3d 1396, 1399 (11th Cir. 1997) (citations omitted) (emphasis in original); *see also* 🚩 *Carter v. City of Melbourne, Fla.,* 731 F.3d 1161, 1167 (11th Cir. 2013). Indeed, "municipal liability under 🚩 § 1983 attaches where— and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." 🚩 *Pembaur v. City of Cincinnati,* 475

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 361 of 379

Sweet Sage Cafe, LLC v. Town of North Redington..., 380 F.Supp.3d 1209...

28 Fla. L. Weekly Fed. D 51

U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (citation omitted). To identify the relevant policymaking officials, "the court should examine not only **\*1218** the relevant positive law, including ordinances, rules and regulations, but also the relevant customs and practices having the force of law." *Rosario v. Miami-Dade Cty.*, 490 F.Supp.2d 1213, 1221-22 (S.D. Fla. 2007) (citation omitted). This is a question of law for the Court. *Id.* (citation omitted).

The Court finds that, for the conduct complained of, the relevant policymaker for the Town is the Town Attorney in conjunction with the five-member Commission. Part of the Court's analysis is informed by the unique circumstances of the case: the Town has but four employees, a Commission of five members including the Mayor, and a Town Attorney who is very involved in the Town's affairs and provided for in the Town's Code. According to the Town Attorney, by charter his position makes him a city officer. Dkt. 90-4 at 7. Section 2-61 of the Town's Code further provides that the Town Attorney "shall either be counsel to the [code] enforcement board or shall represent the Town by presenting cases before the board ...."

There is record evidence that the Town Attorney represented, spoke on behalf of, and made discretionary decisions for the Town. In fact, the Town Attorney was designated and deposed as the corporate representative of the Town for a 30(b)(6) deposition under the Federal Rules of Civil Procedure related to this matter. Dkt. 82-8 at 2. There is, moreover, evidence that the Town Attorney was aware of the timing of some of the code enforcement against the Café, which coincided with his deposition, and that his firm "handled" code enforcement matters. He and his firm also had the authority to draft ordinances, which were later passed by the Commission, to allegedly target Mr. Messmore. The Commission, in turn, had the authority to pass ordinances as well as cancel workshops on zoning matters. Code of the Town of North Redington Beach, Florida §§ 1-12, 1-13.

The Town's reliance on 🚩 *Singhal v. City of Wilton Manors*, No. 06-61653-CIV, 2006 WL 8433166 (S.D. Fla. Dec. 14, 2006), which requires the absence of "meaningful administrative review" of a final policyholder, is misplaced. The gravamen of the claim there was the searches themselves, not as they related to a First Amendment retaliation claim. 🚩 *Id.* at \*4. Rather, the more nuanced municipal action alleged here is the decision to inspect for code violations in an unconstitutional manner, not necessarily enforcement. Indeed, if coupled with a retaliatory animus and causation, this behavior would be all that is necessary to make out a First Amendment claim; it would not matter if a Special Master did not ultimately find a violation.

Furthermore, there is no record evidence that there was meaningful administrative review of the Town Attorney's alleged decision to retaliate through code inspections. Though the contract for services provided that the Sheriff would be tasked with most aspects of code enforcement, the Sheriff nonetheless agreed to confer with the Mayor and the Town Commission regarding code enforcement problems within the Town. Under the contract, the Sheriff "shall accept from the Town Commission general policy direction on how law enforcement and code enforcement services are delivered and to what portion of the municipality a particular type or level of service should be delivered to counteract law and codes enforcement problems within the TOWN." Dkt. 56-1 at 6-7. Arguably the Deputies could have raised the issue of any selective enforcement with the Sheriff for a second opinion, but this hardly constitutes "administrative review."

It moreover defies common sense to argue the Town Attorney possessed no authority **\*1219** in code enforcement matters when there is record evidence he was involved in the matter. Indeed, emails were sent to and from the Town Attorney and Tom Trask, another lawyer at the law firm retained by the Town, and the Town employees about enforcing code violations at the Café. Dkt. 61-2 at 85-87, 91-93, 103-104. Town Attorney Daigneault further testified he was aware of code enforcement action against Sweet Sage at the time of his deposition on September 30, 2016, and that his partner, Mr. Trask, is "handling [code enforcement against Sweet Sage] from the town attorney's perspective." Dkt. 90-4 at 76-77. Mr. Daigneault also withdrew from the sign ordinance litigation because a previous code enforcement official stated the Town Attorney made enforcement decisions at issue in the case. Dkt. 61-2 at 70-71.

Equally unavailing is the Town's argument that because "ultimately, the Code Enforcement Officer is responsible for deciding whether an issue is a violation or not," Dkt. 82-8 at 4, the enforcement actions were not by policymakers. But an NOV and eventual enforcement action is certainly not an unexpected outcome of an inspection. A reasonable jury could find that implicit

in the instruction to inspect is also an instruction to enforce compliance. Such a limited analysis also ignores the fact that, again, the inspections themselves are problematic.

The facts presented here are closer to *Costello v. Town of Huntington*, No. 14-CV-2061(JS)(GRB), 2015 WL 1396448 (E.D.N.Y. Mar. 25, 2015). Allegations in that case concerned retaliation by, among other things, inspections for town code provisions. *Id.* at *2-3. The court went on to find that the allegations of concerted action by "multiple building inspectors, the Town attorney, and [a] Councilman" plausibly stated a claim for a municipal custom or policy. *Id.* at *7 (citation omitted); *see also Hurley v. Town of Southampton*, No. CV175543(JS)(AKT), 2018 WL 3941944, at *22 (E.D.N.Y. Aug. 13, 2018) (collecting cases in finding complaint sufficiently alleged the town attorney "is a [t]own official who has final policymaking authority with respect to enforcement of ... the Town code generally[.]"). This is distinct, of course, from a code enforcement officer or even town attorney who possesses no policymaking authority. *See, e.g.,* 🚩*Staten v. Vill. of Monticello*, No. 14-CV-4766(KMK), 2015 WL 6473041, at *11 (S.D.N.Y. Oct. 26, 2015); 🚩*Norton v. Town of Islip*, 678 F. App'x 17, 22 (2d Cir. 2017).

Indeed, it is the record evidence pointing to concerted action between the Town Attorney and the Commission—and even extending to other government officials—that is most suggestive of 🚩*Monell* liability. It is for the jury to determine whether their actions have violated Plaintiffs' First Amendment rights.

### 2. The Merits of First Amendment Retaliation

A First Amendment retaliation claim requires a plaintiff to establish: "(1) his speech or conduct was constitutionally protected; (2) the retaliatory conduct of the defendant adversely affected the protected speech, in that the retaliation 'would likely deter a person of ordinary firmness' from engaging in the protected speech; and (3) there is a causal connection between the retaliatory conduct and the protected speech." 🚩*Indigo Room, Inc. v. City of Fort Myers*, 589 F. App'x 938, 947 (11th Cir. 2014) (citations omitted). "The causal-connection inquiry asks whether the defendants were subjectively motivated to retaliate because the plaintiffs engaged in protected speech," which in turn requires that the defendants had "actual knowledge" of the protected speech. 🚩*Id.* (citations omitted). **\*1220** "Circumstantial evidence of temporal proximity alone is insufficient when there is unrefuted testimony from the defendant that he knew nothing of the protected conduct." 🚩*Id.* (citations omitted).

It is undisputed that Mr. Messmore's vocal participation in Town meetings and the litigation concerning the unconstitutional sign ordinance are protected speech. *See, e.g.,* *O'Boyle v. Sweetapple*, 187 F.Supp.3d 1365, 1370-71 (S.D. Fla. 2016). As for speech related to the vacant lot, the Town cites to 🚩*Ridgeview Partners, LLC v. Entwhistle*, 227 F. App'x 80, 82 (2d Cir. 2007) and another out-of-circuit case for the proposition that the "informal zoning change 'discussions' and formal variance and site plan applications were not First Amendment 'petitions.' " Dkt. 73 at 19.

The more analogous case, however, is 🚩⚠️*Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83 (2d Cir. 2002), relied upon by 🚩*Ridgeview*, where a plaintiff alleged that a zoning board revoked a previously issued permit because of continued litigation on a related matter. 🚩⚠️*Id.* at 86-87. The Second Circuit granted him leave to amend his complaint to include a First Amendment retaliation claim. 🚩⚠️*Id.* at 91-92.

Indeed, Plaintiff's argument is not that the Commission refused to move on his request for rezoning because of the request. Rather, the sign ordinance litigation was the relevant petition and protected speech. Furthermore, the Town sets forth no authority for the proposition that the Town's conduct with the vacant lot is irrelevant as evidence of retaliatory intent more broadly.

Viewed as a whole, the alleged retaliation manifested in code enforcement, a refusal to grant a request for rezoning of the vacant lot, and the drafting and passing of Town ordinances. More specifically:

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 363 of 379

Sweet Sage Café, LLC v. Town of North Redington..., 380 F.Supp.3d 1209...

28 Fla. L. Weekly Fed. D 51

- Between September 2016 and April 2018, the Town conducted numerous inspections of the Café. *See* Dkt. 73-6. Seating inspections are typically conducted once a year in connection with business tax receipt applications. Dkt. 84-1 at 12.

- The Clerk or Deputy Clerk told Deputy Short to conduct seat counts of the restaurants. Dkt. 82-3 at 4-5.

- The Town instructed Deputies to review Sweet Sage's business tax receipt during the pendency of the sign ordinance litigation. Dkt. 82-8 at 28.

- On September 27, 2016, the Deputy Clerk forwarded information to Deputy Short for a recheck of the Café. Dkt. 61-2 at 107; Dkt. 82-8 at 27. This was days before the Town Attorney's deposition on September 30. This inspection was made. Dkt. 82-8 at 28.

- Though on a prior inspection Deputy Kohmann had determined that the Café was in compliance, the Town Attorney's office instructed him to shorten the time between inspections of the Café. Dkt. 82-2 at 14.

- Deputy Kohmann explained, "It seemed like there was a lot of past issues, you know, going on." Dkt. 82-2 at 19.

- At least one NOV was delivered by hand, which, during Deputy Clerk Schmader's employment, was "the first few times that [the Town had] hand delivered any [NOVs]." Dkt. 61-2 at 108; *see also* Dkt. 82-2 at 14. Deputy Short believed this idea came from the "discretion of the city attorney." Dkt. 82-3 at 8.

- The Town Clerk arranged for Deputy Short to work on a weekend to handle parking enforcement at the vacant lot. *Id.*; Dkt. 82-6 at 9-12.

**\*1221**  - The Town proceeded with the failed code enforcement proceeding against the Café in May 2018 when only three other enforcement hearings had occurred since 2007, apparently none of which for parking matters. Dkt. 84-1 at 7.

- After the filing of the sign ordinance litigation, the Commission was frustrated with Mr. Messmore's statements about the case and wanted to ensure that the Town's side of the story was being heard by the public. Dkt. 90-1 at 26-30.

- Notwithstanding a scheduled workshop on Mr. Messmore's request to rezone the vacant lot, the Commission canceled the workshop. This followed summary judgment in the sign ordinance litigation. Dkt. 82-8 at 36-37.

- The Commission also met shortly after summary judgment in the case to discuss appeal. A portion of the transcript, Dkt. 90-2 at 64, reads:

MAYOR QUEEN: We got it. You know, it's – it's the idea of it that's -- we have the money.

COMMISSIONER CURTIS: I know. It stinks.

MAYOR QUEEN: Yeah, it does. It does. But what are we left with? Are we going to give up our town or are we going to try and fight this thing? Because we're going to -- you already see it. You see what could happen. Here's our man. You know, I'm --

MR. DAIGNEAULT: Tough call.

COMMISSIONER CURTIS: Is there another lawsuit on the heels of this parking thing because we weren't able to --

MR. DAIGNEAULT: I'm going to stop you there.

COMMISSIONER CURTIS: Not at this meeting, okay. I just -- like I said, are we an escalator?

MR. DAIGNEAULT: All right. I'm going to close the executive session.

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 364 of 379
Sweet Sage Cafe, LLC v. Town of North Redington..., 380 F.Supp.3d 1209...
28 Fla. L. Weekly Fed. D 51

- The Town's current counsel, an attorney with the law firm retained by the Town, sent an email to the Town Attorney concerning a proposed ordinance. He wrote, "As to having the [American with Disabilities Act] regs and such, yes, I looked them up last evening to be sure, and we can be sure to print them out and make them part of the backup materials. Just for your info, I didn't need the ADA finding since my actual regulation does not incorporate the ADA standard. So why, you ask, did I add the finding? Because I want him to see that in addition to the count violation, it is likely that his seating does not meet the ADA standards either." The Town Attorney confirmed that "he" refers to Mr. Messmore. Dkt. 82-8 at 41.

- When Plaintiffs challenged the constitutionality of the Business Tax Code, the Town amended it in a way that would still allow unwarranted, unnoticed inspections of the Café. Dkt. 75-4.

In response to the above, the Town suggests it delegated all code enforcement responsibilities to the Sheriff, that enforcement was not selective and indeed other establishments saw repeat inspections (and, most persuasively, that the Café had been repeatedly out of compliance with the parking ordinance), that decisions related to the vacant lot were justified, and that the overlap of inspections with key moments in litigation was coincidental. In this way, the Town attempts to minimize each individual instance but misses the bigger picture. A reasonable jury could, from the **\*1222** entirety of the evidence Plaintiffs have put forward, infer that the Town Attorney and the Commission acted with a retaliatory motive against Mr. Messmore and Sweet Sage. At some point mere coincidence morphs into something else. Where precisely is a question for the jury.

The Town also argues that no conduct "adversely affected" Mr. Messmore. Indeed, he is still vocal at meetings, the sign ordinance litigation was successful, and, to the extent it is or is not relevant as protected speech, the vacant lot is now under construction for another business. But this injects a subjective element into the inquiry, which instead asks whether the retaliation "would likely deter a person of ordinary firmness" from engaging in the protected speech. Mr. Messmore has given every indication that he is not a person of ordinary firmness. This factual question is another for the jury. Summary judgment is not appropriate on Plaintiffs' Count I.

Count II. Unreasonable Search and Seizure Against the Town and the Sheriff

Plaintiffs Sweet Sage and SS16725 next claim that "[s]ince August 2016, Pinellas County Sheriff's deputies, at the direction of the Town, have conducted approximately thirteen warrantless searches of the Sweet Sage Café and the threat of additional warrantless searches remains ongoing." Dkt. 56 ¶ 50. Plaintiffs seek injunctive relief prohibiting warrantless searches or inspections of the Café, an award of attorney's fees, and costs. *Id.* at 14.

"[T]he Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises, as well as to private homes" and extends to "administrative inspections designed to enforce regulatory statutes," *New York v. Burger,* 482 U.S. 691, 699, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). Putting aside the Town's reliance on the original Business Tax Code as justification for the Deputies' entry, this record establishes that, during each of the inspections, the Deputies entered a public restaurant during open hours, did not stray to an "employees only" or "no trespassing" section of the building, did not inspect any books or business records, and were not disruptive.[2]

There is some record evidence that at times patrons were disturbed by the visiting officers. But it is also clear that until May 2018, Mr. and Mrs. Messmore consented or acquiesced. *See United States v. Kapperman,* 764 F.2d 786, 794 (11th Cir. 1985); *see also United States v. Thriftimart, Inc.,* 429 F.2d 1006, 1009 (9th Cir. 1970) (noting that, unlike a criminal case, consent in an administrative inspection is not "inherently suspect"). Mr. Messmore admits he never told the Deputies that they were not allowed to enter the Café to count seats. Dkt. 82-5 at 18. Nor did he or his staff ever tell the Deputies they were not welcome. *Id.* at 22. In fact, after Plaintiffs sent the May 4, 2018 letter "trespassing" Defendants, no officer returned to the Café for code enforcement.

Sweet Sage Cafe, LLC v. Town of North Redington..., 380 F.Supp.3d 1209...

28 Fla. L. Weekly Fed. D 51

The consent or acquiescence of Plaintiffs means there is no past Fourth Amendment violation to recompense. [3] Nor is prospective **\*1223** injunctive relief appropriate when untethered to a past violation, and the Court fashions appropriate relief for Plaintiffs below concerning Count III. Judgment for the Town and the Sheriff on Count II is granted.

Count III <u>Whether the Prior Business Tax Code and Revised Business Tax Code Violate the Fourth Amendment</u>
Plaintiffs Sweet Sage and SS16725 challenge the constitutionality of the Town's prior Business Tax Code and revised Business Tax Code. Dkt. 56 ¶¶ 78-81. Plaintiffs seek a declaration that the Codes are unconstitutional on their face and as applied, as well as injunctive relief, attorney's fees, and costs. *Id.* at 18.

In its prior form, Section 66-45 of the Business Tax Code provided that:

(a) All persons authorized in this section to inspect holders of business tax receipt and businesses shall have the authority to enter, with or without search warrant, at all reasonable times, the following premises:

(1) Those for which a business tax receipt is required;

(2) Those for which a business tax receipt was issued and which, at the time of inspection, are operating under such business tax receipt;

(3) Those for which the business tax receipt has been revoked or suspended.

Dkt. 75-4 at 9. In response to Plaintiffs' challenge to the ordinance (and after reading the U.S. Supreme Court's opinion in

*City of Los Angeles, Cal. v. Patel,* —— U.S. ——, 135 S.Ct. 2443, 192 L.Ed.2d 435 (2015), *See* Dkt. 73 at 41), the Town amended the provision.

Section 66-43 of the Business Tax Code now requires businesses to "permit all reasonable regulatory inspections of the licensed premises and business records by federal, state, county and town inspectors as provided for in section 66-45 of this article or as otherwise authorized by county, state or federal law." Dkt. 75-4 at 7. As revised, Section 66-45(b) authorizes "regulatory inspections ... at all reasonable times, to ensure compliance with town codes":

(c)(1) Where the code inspector has been invited or has otherwise been permitted to enter the premises by the owner, manager, employee or other agent with actual or apparent authority to control the premises;

(c)(2) Where the code inspector enters a licensed business premises during a time when that business is open for business and the code inspector inspects only areas of the business which are otherwise open to or viewable by customers, delivery personnel, or other persons who are invitees of the business;

(c)(3) Where the code inspector is inspecting a licensed business engaged in a closely-regulated industry, and where the inspector has a reasonable good faith belief, based upon a record of non-compliance or other verifiable evidence of probable non-compliance to include citizen complaints, that providing advanced notice of the inspection may allow the business to conceal the code violation which is the subject of the inspection;

(c)(4) Where the code inspector presents an inspection warrant.

Dkt. 75-4 at 9. The Business Tax Code goes on to define the term "closely-regulated industry" as: "[a] firearms retailer **\*1224** ...; [a] business which is licensed and regulated by the Florida Beverage Law as defined in Florida Statutes § 561.01(6); and [a] public food service establishment licensed under Florida Statutes Chapter 509." *Id.* at 10 (§ 66-45(g) ).

These subsection (c)(3) inspections may be conducted four times in twelve months excluding "follow up inspections." *Id.* at 9 (§ 66-45(e) ). The section further limits all inspections "to the regulatory purposes for which the inspector is seeking to conduct the inspection." *Id.* (§ 66-45(d) ). Additionally, through Section 66-40(a)(1), the Town revised its license or business tax receipt

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 366 of 379

Sweet Sage Cafe, LLC v. Town of North Redington..., 380 F.Supp.3d 1209...

28 Fla. L. Weekly Fed. D 51

application to require businesses to "attest[ ]to the truthfulness of the information contained therein and acknowledge[ ]the requirements of this article." Dkt. 75-4 at 5.

Plaintiffs complain of many features of the revised Business Tax Code, Dkt. 56 ¶¶ 72-80, and bring both a facial and as applied constitutional challenge, *id.* ¶ 81. A facial challenge seeks to invalidate a statute or regulation itself. *Jacobs v. Florida Bar,* 50 F.3d 901, 905-06 (11th Cir. 1995). While facial Fourth Amendment ordinance challenges are not barred, *Patel,* 135 S.Ct. 2443, the Supreme Court has established that a "facial challenge to a legislative [a]ct is ... the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [a]ct would be valid." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

The Court finds that the issue is ripe and that, on its face, subsections (c)(3) and (g) of Section 66-45 are unconstitutional. As applied to the Café that has now revoked consent, warrantless inspections under subsection (c)(2) are unconstitutional. Summary judgment in favor of Plaintiffs is thus appropriate.

1. Ripeness

Article III's ripeness doctrine requires courts to weigh: "(1) the fitness of the issues for judicial decision; and (2) the hardship to the parties of withholding court consideration." *Beaulieu v. City of Alabaster,* 454 F.3d 1219, 1227 (11th Cir. 2006) (citation and quotation marks omitted). Relevant to the fitness and hardship prongs are: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Id.* (citations omitted).

In analyzing the above, the Court is mindful of the unique circumstances of the case. Though the Town has not yet invoked Section 66-45 of the revised Business Tax Code, there is nonetheless a long history of inspections of the Café. This suggests the certain likelihood of future inspections.

These prior inspections were purportedly justified by the Code's precursor. Dkt. 82-8 at 31. What is more, that precursor was amended in direct response to Plaintiffs' challenge to its constitutionality. The Town has further represented that code enforcement officers in the future will be obligated to conduct administrative inspections pursuant to the Code. Dkt. 82-8 at 42. Why else, after all, pass the ordinance? Put simply, the Town is unable to render a constitutional challenge to an ordinance unripe simply by amending the ordinance and waiting until the dust of litigation settles to use it.

More tangibly, the Town has decided to tie its amended business tax receipt applications (basically the Town's business permit) to the administrative inspections. Mr.  **\*1225**  Messmore has objected to the practice and has thus not reapplied after his most recent application's rejection. Plaintiffs have thus suffered—and continue to suffer—a concrete harm. *See, e.g.*, Dkt. 75-4 at 7 ("Any person who engages in or manages any business ... without first obtaining a local business license ... is subject to a penalty of 25 percent of the business license tax due, in addition to any other penalty provided by law or ordinance ...."); *see also* Dkt. 75-4 at 3 ("It shall be unlawful for any person ... to engage in or manage any business ... without a business license.").

Delay in resolving the constitutionality of the ordinance would merely put off the inevitable and cause hardship to Plaintiffs. The above considerations distinguish this case from one like *Bayside Enterprises, Inc. v. Carson,* 450 F.Supp. 696 (M.D. Fla. 1978) that was decided in a near factual vacuum. *see also* *Free Speech Coal., Inc. v. Attorney Gen. United States,* 825 F.3d 149, 167 n.15 (3d Cir. 2016) (noting that ripeness turns on "whether the threat of future harm under the Statutes is sufficiently immediate to constitute a cognizable injury" and finding ripeness where "the threat of future inspections has caused Plaintiffs to incur ongoing costs to comply with the regulations").

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 367 of 379

*Sweet Sage Cafe, LLC v. Town of North Redington...*, 380 F.Supp.3d 1209...

28 Fla. L. Weekly Fed. D 51

The second and third ripeness factors are also satisfied. Judicial review would not interfere with administrative action, much less "inappropriately." And the factual development of the issue, with voluminous discovery, is comprehensive enough for the Court to rule. Because Plaintiffs' challenge of Section 66-45 of the revised Business Tax Code is fit for review and withholding consideration would cause hardship, the issue is ripe. [4]

2. Plaintiffs' Facial Attack on Subsections (c)(3) and (g)

"Search regimes where no warrant is ever required may be reasonable where 'special needs' ... make the warrant and probable-cause requirement impracticable" and the "primary purpose of the searches is distinguishable from the general interest in crime control." *Patel*, 135 S.Ct. at 2452 (citations, alterations, and some quotation marks omitted). Here it is clear that the administrative searches authorized by the revised Business Tax Code serve a "special need" other than conducting criminal investigations. *See id.*

But "absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Id.* (citations omitted). *Patel* involved a city ordinance that required hotels to maintain certain information of guests and provide that information to law enforcement upon request. *Id.* at 2447-48. The hotel owner could face criminal penalties and be "arrested on the spot" for failing to comply. *Id.* at 2452. The Supreme Court held "only that a hotel owner must be afforded an *opportunity* to have a neutral decisionmaker review an officer's demand to search the registry before he or she faces penalties for failing to comply," and that "[a]ctual review need only occur in those rare instances where a hotel operator objects to turning over the registry." *Id.* at 2453 (emphasis in original).

 **\*1226**  While it is true that the Code itself provides no criminal sanctions for failing to comply, any violation of the Business Tax Code can result in the Town declining to issue or renew, or revoke or suspend a business license. *See* Dkt. 75-4 at 3. Moreover, aspects of Section 66-45 of the Town's Business Tax Code provide no opportunity for neutral, precompliance review.

Section 66-45 attempts to sidestep this point and *Patel* entirely by its very design. Indeed, for the most part, its subsections merely codify acceptable behavior under the Fourth Amendment. [5] Subsection (c)(1) inspections, for example, are consent-based. Dkt. 75-4 at 9. Subsection (c)(2) allows for inspectors to enter a business that is open to the public and inspect only areas that are open and viewable by customers. Subsection (c)(4) allows for an inspection via warrant. And, among other things, subsection (d) codifies the plain-view search doctrine.

Plaintiffs mainly take issue with subsection (c)(3), which picks up where (c)(2) left off by allowing inspectors to also access businesses that are not open to the public (though apparently only during working hours or when occupied, as addressed by subsection (f) ). It would also allow inspectors of businesses open to the public to inspect areas that are otherwise not accessible —for example, a concealed kitchen of a restaurant.

The Town, no doubt aware that such broad powers would implicate the Fourth Amendment, expressly limited subsection (c)(3) to establishments in a "closely-regulated industry" for which no precompliance review under *Patel* is required. *Patel*, 135 S.Ct. at 2454. Subsection (g) further defines "closely-regulated industry" as firearms retailers, restaurants, and businesses licensed for alcohol. Dkt. 75-4 at 10.

The "closely regulated industry," however, is "the exception." *Patel*, 135 S.Ct. at 2455 (citation omitted). Indeed, the Supreme Court has noted only four industries that "have such a history of government oversight that no reasonable expectation of

privacy ... could exist for a proprietor over the stock of such an enterprise." *Id.* at 2454 (citation omitted). In *Patel*, the Court observed that "[s]imply listing these industries refutes petitioner's argument that hotels should be counted among them. Unlike liquor sales, *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970), firearms dealing, *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), mining, *Donovan v. Dewey,* 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981), or running an automobile junkyard, *New York v. Burger,* 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987), nothing inherent in the operation of hotels poses a clear and significant risk to the public welfare." *Patel,* 135 S.Ct. at 2454 (some citations omitted).

As an initial matter, the Town is unable to circumvent the Fourth Amendment's mandate simply by designating a given **\*1227** industry as closely regulated. Though the parties did not fully brief the Court on the extent of the regulatory framework for restaurants, caselaw is instructive, beginning with *Patel.* Regulations require "hotels to, *inter alia,* maintain a license, collect taxes, conspicuously post their rates, and meet certain sanitary standards." *Patel,* 135 S.Ct. at 2455. The same—and not much more—can be said of restaurants. *See generally* Fla. Stat. Ch. 509. And as feared by the Court in *Patel,* finding that a restaurant, or more broadly an establishment that sells food, is part of a closely-regulated industry would allow the exception to swallow the rule. *Id.* at 2454-55.

In contrast, the Town chiefly relies on out-of-circuit, pre-*Patel* cases. *See, e.g.,* *Khurana v. N. Cent. Dist. Health Defendants' Dep't,* No. 3:10-cv-00579-BLW, 2012 WL 1288746 (D. Idaho Apr. 16, 2012); *Aida Food and Liquor, Inc. v. City of Chicago,* No. 03-C-4341, 2005 WL 736015 (N.D. Ill. Mar. 29, 2005); *Players, Inc. v. City of New York,* 371 F.Supp.2d 522 (S.D.N.Y. 2005). Another common trait among these cases is their reliance on *Contreras v. City of Chicago,* 119 F.3d 1286 (7th Cir. 1997), but the appellate court there did not directly address the district court's finding that restaurants operate in a closely-regulated industry. 119 F.3d at 1290. The district court, meanwhile, was not presented with any argument to the contrary and relied on two cases: one made no mention of the amount of regulation of the food industry, much less as it relates to the Fourth Amendment, *See* *United States v. Acri Wholesale Grocery Co.,* 409 F.Supp. 529, 533 (S.D. Iowa 1976) ("[T]he Court believes that once the validity of the inspection is established, the propriety of a photographic 'search' is coextensive with the validity of the inspection[.]"), and the other looked to the "food and drug industry" as a single entity yet cited no actual regulations, *United States v. New England Grocers Supply Co.,* 488 F.Supp. 230, 238 (D. Mass. 1980). *Contreras v. City of Chicago,* 920 F. Supp. 1370, 1389 (N.D. Ill. 1996).

The fact that a restaurant might sell some alcoholic beverages does not change the calculus. As such, the Town's reliance on *Indigo Room, Inc.* is misplaced. A restaurant is by no means a "liquor establishment." *Indigo Room, Inc.,* 589 F. App'x at 945. In fact, the original source of the alcohol industry's "closely regulated" designation, *Colonnade Catering Corp.,* 397 U.S. 72, 90 S.Ct. 774, involved a catering establishment whose operator was a licensee authorized to serve alcohol and the holder of a retail liquor dealer's occupational tax stamp. *Id.* at 72, 90 S.Ct. 774. The Supreme Court, moreover, had before it evidence of "the long history of the regulation of the liquor industry" dating back to England and the American Colonies, which has included laws granting federal officers "broad powers to inspect distilling premises and the premises of the importer without a warrant," and "to make warrantless searches and seizures of articles under the liquor laws." *Id.* at 75, 90 S.Ct. 774.

Yet even a finding that a restaurant is in a closely-regulated industry would not end the Court's inquiry. For a warrantless search of such a business to be valid: (1) "there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "the warrantless inspections must be 'necessary' to further [the] regulatory scheme"; and

(3) "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." *Burger*, 482 U.S. at 702-703, 107 S.Ct. 2636 (citation omitted) (alterations in original). The **\*1228** *Burger* Court went on to explain the third factor:

> [T]he regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers. To perform this first function, the statute must be sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes. In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be carefully limited in time, place, and scope.

*Id.* at 703, 107 S.Ct. 2636. (citations and quotation marks omitted). "The primary purpose of the Fourth Amendment in this context is to protect citizens from the unbridled discretion [of] executive and administrative officers." *Indigo Room, Inc.*, 589 F. App'x at 945 (citation omitted) (alteration in original).

But unlike the finely-tuned regulatory schemes in the above cases, with roughly one page the Town's ordinance purports to apply equally to all licensed businesses in three discrete industries. *Compare* Dkt. 75-4 at 9 *with* *Burger*, 482 U.S. 691, 107 S.Ct. 2636 (New York law targeted at vehicle industry); *Biswell*, 406 U.S. 311, 92 S.Ct. 1593 (the Gun Control Act of 1968); *Dewey*, 452 U.S. 594, 101 S.Ct. 2534 (the Federal Mine Safety and Health Act of 1977); *Colonnade*, 397 U.S. 72, 90 S.Ct. 774 (federal law targeted at alcohol industry). If that were not enough, the inspections can be for enforcement of any provision of the code. Dkt. 75-4 at 9. This runs the gamut from animal control and burning garbage to planting trees and hedges, not to mention parking. Code of the Town of North Redington Beach, Florida (available at https://library.municode.com/fl/redington_beach/codes/code_of_ordinances?nodeId=COORTOREBEFL). This unprecedented breadth is a flaw that infects all of subsection (c)(3), not just as applied to restaurants.

No matter how "severe" the Town's shortage of parking, it is unconvincing to compare this and likely most other code provisions to the dangers of mining and firearms. But even assuming the Town has a "substantial interest" in enforcing its code writ large, it is not clear that warrantless inspections are "necessary" to further this scheme. This is partly because Florida already has a comprehensive procedure to allow for state or local officials to obtain an inspection warrant to check non-residential structures for code compliance. Fla. Stat. §§ 933.20-933.30.

An inspection warrant requires "cause, supported by affidavit particularly describing the place, dwelling, structure, or premises to be inspected and the purpose for which the inspection is to be made. In addition, the affidavit shall contain a statement that consent to inspect has been sought and refused or a statement setting forth facts or circumstances reasonably justifying the failure to seek such consent." § 933.21. A judge issues the warrant, which is effective for up to 14 days without extension. §§ 933.23-933.25. "When prior consent has been sought and refused, notice that a warrant has been issued shall be given at least 24 hours before the warrant is executed," though immediate execution is available "when necessary to prevent loss of life or property." § 933.26. Willfully refusing a warranted inspection is a second-degree misdemeanor. § 933.27.

Of course, the availability of a statutory regime for inspection does not necessarily invalidate a different one. *See* § 933.29 **\*1229** ("Nothing contained herein shall be construed to restrict ... inspections with or without warrant as authorized by general law."). The Town also stresses that the State's mechanism is ineffective because, with 24 hours' notice, an offending business

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 370 of 379

Sweet Sage Cafe, LLC v. Town of North Redington..., 380 F.Supp.3d 1209...

28 Fla. L. Weekly Fed. D 51

could simply bring itself into compliance (in Plaintiffs' case, by removing a few chairs) before the inspection, pass inspection, then fall outside of compliance immediately thereafter.

Courts have rejected similar arguments. *See, e.g.,* Patel, 135 S.Ct. at 2453, 2456 (collecting cases). The Town is correct, however, that the Eleventh Circuit in Crosby v. Paulk, 187 F.3d 1339 (11th Cir. 1999) looked to Supreme Court precedent in finding that, for inspections to root out underage drinking, "[r]equiring inspectors or other law enforcement agents to obtain warrants before conducting an investigation might alert nightclub and bar owners to the impending inspection, which would defeat the purpose of the inspection." 187 F.3d at 1347; *see also* Burger, 482 U.S. at 710, 107 S.Ct. 2636; Dewey, 452 U.S. at 603, 101 S.Ct. 2534; Biswell, 406 U.S. at 316, 92 S.Ct. 1593. But the government actors in Crosby were operating pursuant to a tailored regulatory regime—the Georgia Alcoholic Beverage Code—and their search was in furtherance of that scheme.

This brings the Court back to the third factor in Burger. The Town's ordinance provides no check on unbridled discretion by defining the scope of any inspection. Because of this, it is not a constitutionally adequate substitute for a warrant.

The Court does commend the ordinance's internal limitations. It requires, for instance, "a reasonable good faith belief, based upon a record of non-compliance or other verifiable evidence of probable non-compliance ... that providing advance notice of the inspection may allow the business to conceal the code violation which is the subject of the inspection." Dkt. 75-4 at 9. Inspections can only be conducted during reasonable times. *Id.* And officials can only invoke (c)(3) four times in twelve months. [6] *Id.*

But, as mentioned above, there is nothing in the provision that restricts an inspection of an establishment in a closely-regulated industry to matters relevant to that regulation. It allows, in other words, for a general search or inspection that is not properly defined. The facts presented here paint a vivid example of this fatal infirmity.

The Café serves some alcoholic beverages, though it closes at 2:00 p.m. Because alcohol is a closely-regulated industry, the Town argues, code enforcement officers can enter the Café to count its seats—a matter entirely unrelated to alcohol. Contrary to the Town's assertion at oral argument, this kind of bootstrapping is not sanctioned by Indigo Room, Inc. See 589 F. App'x at 946 (finding no evidence "to support Appellants' contention that the inspections were for a purpose other than **\*1230** learning whether the [bar] was conforming to the alcoholic-beverage laws, including the Ordinance"). Even if the Court were to deem restaurants to be in a closely-regulated industry, enforcing a parking ordinance is still unrelated to alcohol or to food.

Rather, there must exist some nexus between the heavy regulation that diminishes a business's reasonable expectation of privacy and the ensuing inspection. *Cf.* Dewey, 452 U.S. at 601, 101 S.Ct. 2534 (noting that fatal to the statute in [ Marshall v. Barlow's, Inc., 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) ] was its failure to "tailor the scope and frequency of ... administrative inspections to the particular health and safety concerns posed by the numerous and varied businesses regulated by the statute"); Burger, 482 U.S. at 711-12, 107 S.Ct. 2636; (upholding inspections in closely-regulated vehicle-dismantling industry where statute limited examinations to vehicles, parts, and records); Biswell, 406 U.S. at 316, 92 S.Ct. 1593 ("When a dealer chooses to engage in this pervasively regulated business [of firearms] and to accept a federal license, he does so with the knowledge that his *business records, firearms, and ammunition* will be subject to effective inspection.") (emphasis added).

In a similar vein, whether a business consents for inspection as part of an alcohol licensing scheme is irrelevant. In applying for alcohol licensure, for instance, Mr. Messmore agreed that the Café "may be inspected and searched during business hours or at any time business is being conducted on the premises without a search warrant by officers of the Division of Alcoholic Beverages and Tobacco, the Sheriff, his Deputies, and Police Officers *for the purposes of determining compliance with the*

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 371 of 379

*Sweet Sage Cafe, LLC v. Town of North Redington...*, 380 F.Supp.3d 1209...

28 Fla. L. Weekly Fed. D 51

*beverage and retail tobacco laws.*" Dkt. 83-2 at 104 (emphasis added); *see also Crosby*, 187 F.3d at 1347 (quoting O.C.G.A. § 3-2-32) ). As admitted by counsel at oral argument, the Town is not involved in alcohol code enforcement. *see also Watson v. Abington Twp.*, 478 F.3d 144, 152 (3d Cir. 2007) (noting that statute allowed liquor control board to inspect a tavern and cite a violation of any law, including the liquor code, but that there was no proof the board was involved in the challenged inspections).

Rather, a business owner subject to an unnoticed inspection under subsection (c)(3) is "left to wonder about the purposes of the inspector or the limits of his task." *Biswell*, 406 U.S. at 316, 92 S.Ct. 1593. The only restraint on an inspection's scope appears to be subsection (d)'s limit "to the regulatory purposes for which the inspector is seeking to conduct the inspection," but this vague clause cannot singlehandedly save subsections (c)(3) and (g).

Nor is the Town able to extract from its business owners a waiver of their Fourth Amendment rights through the mandatory business tax receipt application. *See Thorobred, Inc. v. Louisville/Jefferson Cty. Metro. Gov't*, No. 3:04CV-193-JDM, 2005 WL 2429079, at *4 (W.D. Ky. Sept. 30, 2005) (finding ordinance requiring consent for a liquor license unconstitutional where it does not expressly limit inspections and searches "for violations of the applicable alcoholic beverages laws and regulations"); *Float-Rite Park, Inc. v. Vill. of Somerset*, 2001 WI App 113, ¶ 15, 244 Wis. 2d 34, 46, 629 N.W.2d 818, 824 (citation omitted) (finding consent for inspection invalid "because a state actor cannot constitutionally condition the receipt of a benefit, such as a ... business license, on an agreement to refrain from exercising one's constitutional rights"); *Makula v. Vill. of Schiller Park, IL*, No. 95 C 2400, 1998 WL 246043, at *7 (N.D. Ill. Apr. 30, 1998) (striking as unconstitutional license's requirement of consent **\*1231** to administrative inspections); *Cf. Pentco, Inc. v. Moody*, 474 F.Supp. 1001, 1009 (S.D. Ohio 1978) ("Nor does this Court question the city's ability to require an inspection as a condition precedent to the issuance of a license and 'prior to operating a business.' Once an inspection has been had and a license issued, however, the Court believes that further searches require a warrant absent consent."). This aspect of the business tax receipt application similarly falls.

### 3. The Remedy

The Court does not take its task lightly. Ordinance 2018-804 does include a severability provision should any part of the Ordinance be found unconstitutional or otherwise legally invalid. Dkt. 75-4 at 10. There is, moreover, a presumption for severability so long as "what remains after severance is fully operative as a law." *INS v. Chadha*, 462 U.S. 919, 931, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (citation omitted). Indeed, apart from subsections addressed above, the ordinance seems innocuous. This is not a case like *Wal Juice Bar, Inc. v. City of Oak Grove, Ky.*, No. 5:02CV-252-R, 2008 WL 1730293, at *20-21 (W.D. Ky. Apr. 10, 2008) where essential portions of the law were stricken.

The Court finds that the appropriate remedy is to strike the offending language from the ordinance and the business tax receipt applications; the rest remains intact. Because of this, the Court need not determine the constitutionality of the prior Business Tax Code. The Town is enjoined from inspecting the Café or any business under subsection (c)(3) of Section 66-45.

### 4. Inspections of the Café Under Subsection (c)(2)

At least as applied to the Café, the Constitution also precludes inspections pursuant to subsection (c)(2). This brings the Court to two companion cases, *Camara v. Mun. Court of City & Cty. of San Francisco*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) and *See v. City of Seattle*, 387 U.S. 541, 545, 87 S.Ct. 1741, 18 L.Ed.2d 930 (1967). *Camara* involved a leaseholder's refusal to allow housing inspectors to enter without a warrant. 387 U.S. at 540, 87 S.Ct. 1727. The U.S. Supreme Court held that the leaseholder "had a constitutional right to insist that the inspectors obtain a warrant to search and that appellant may not constitutionally be convicted for refusing to consent to the inspection." *Id.*

28 Fla. L. Weekly Fed. D 51

The commercial inspection in *See*, meanwhile, was "part of a routine, periodic city-wide canvass to obtain compliance with Seattle's Fire Code." 387 U.S. at 541, 87 S.Ct. 1727. The Court in *See* "conclude[d] that administrative entry, without consent, upon the portions of commercial premises which are not open to the public may only be compelled through prosecution or physical force within the framework of a warrant procedure." *Id.* at 545, 87 S.Ct. 1727; *see also Patel v. City of Los Angeles*, 738 F.3d 1058, 1063 (9th Cir. 2013), *aff'd*, ——— U.S. ———, 135 S.Ct. 2443, 192 L.Ed.2d 435 ("When the government seeks access to non-public areas of a business to enforce health and safety regulations, an administrative search warrant is generally required before that greater level of intrusion is permitted."). The unanswered question is whether a business owner can object to a warrantless administrative inspection or search in the area of a business open to the public. As applied on these facts to the Sweet Sage Café, the answer is yes.

As feared by the Supreme Court in the hotel context of *Patel*, there is a risk that continued inspections—whether or not they rise to the level of a "search"— can be "used as a pretext to harass" business **\*1232** owners and their customers. *Patel*, 135 S.Ct. at 2452-53; *Cf. Lesser v. Espy*, 34 F.3d 1301, 1309 (7th Cir. 1994) ("[O]nce an individual begins to receive distinctive treatment without apparent justification (such as more inspections than the regular schedule would indicate) oversight such as that provided by the warrant process may be required to assure that the inspected's Fourth Amendment guarantees are met.") (citations omitted).

This precise issue is captured by Sweet Sage's First Amendment retaliation claim. To again borrow language from *Patel*, there is no limiting force in the Town's ordinance to prevent (c)(2) inspections "10 times a day, every day, for three months." *Patel*, 135 S.Ct. at 2452-53. It would be absurd to allow such a practice simply because counting seats does not rise to a "search"; rather, it is the repeated entry and inspection over the owner's objection—inconsistent with Florida's existing statutory regime for inspections—that offends the Fourth Amendment. In other words, Mr. Messmore has a reasonable expectation of privacy against such inspections.

Although fairly unique to the Town/Sweet Sage dispute, this is not as novel as it might seem. In *Toledo v. Bateson*, 83 Ohio App.3d 195, 614 N.E.2d 824, 827 (1992), for example, a city inspector cited a business owner for failing to display a "no smoking" sign in her beauty salon. 614 N.E.2d at 825. The inspection of the salon, which was open to the public, was conducted over the owner's objection. *Id.* Affirming suppression of evidence, the court noted the relevant authorizing code section: "The Administrator or other member of the Agency *may enter at any reasonable time, with reasonable notice* into or upon any private or public property ... for the purpose of inspection...." *Id.* at 826 (emphasis in original). The court reasoned that "the fact that [the code] permits entry onto premises for inspection only 'with reasonable notice' makes patent the intention of the drafters of the ordinance that [the owner] is to be afforded a privacy interest for her place of business." *Id.* at 827.

The officer, in this sense, "stands in no better position than a member of the public." *Barlow's, Inc.*, 436 U.S. at 315, 98 S.Ct. 1816. At least on the facts of this case, so too is he unable to enter for inspection over an owner's notice of trespass and without an administrative or other warrant.

This finding is in accord with opinions by the Office of the Florida Attorney General. *See Am. Home Assur. Co. v. Nat'l R.R. Passenger Corp.*, 908 So. 2d 459, 473 (Fla. 2005) (noting that an Attorney General opinion "is entitled to careful consideration and generally should be regarded as highly persuasive"). Citing *See v. City of Seattle*, 387 U.S. 541, 87 S.Ct. 1741, and Florida's state inspection regime, the Florida Attorney General has more than once opined that "a municipal code inspector is without authority to *enter onto* any private, commercial, or residential property to assure compliance with or to enforce the various technical codes of the county or to conduct any administrative inspections or searches without the consent of the owner or the operator or occupant of such premises, or without a duly issued search or administrative inspection warrant." Fla. Att'y Gen. Op. 2002-27 (2002), 2002 WL 508796 (emphasis added); Fla. Att'y Gen. Op. 1984-32; *Cf. Beverly v. Div. of Beverage of Dep't*

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 373 of 379

Sweet Sage Cafe, LLC v. Town of North Redington..., 380 F.Supp.3d 1209...

28 Fla. L. Weekly Fed. D 51

*of Bus. Regulation*, 282 So. 2d 657, 660 (Fla. 1st DCA 1973) ("The fact that two different Attorney Generals have reached the same conclusion with respect to the exact issue now before us lends considerable persuasive influence to their opinions and weighs heavily in favor of our conclusion herein.").

**\*1233** The persuasive Florida Attorney General opinions are certainly most applicable and cogent when they apply to the conduct of low-level state actors such as the Town. *See* 🚩 *State v. Family Bank of Hallandale*, 623 So. 2d 474, 478 (Fla. 1993) (citation omitted) ("The official opinions of the Attorney General, the chief law officer of the state, are guides for state executive and administrative officers in performing their official duties until superseded by judicial decision."). The opinions further highlight a thread that runs throughout the U.S. Supreme Court's administrative search jurisprudence: an unconsented administrative inspection (with rare exceptions) must be subject to precompliance review. 🚩 *Patel*, 135 S.Ct. at 2451-52. As Professor LaFave has noted, under *See v. City of Seattle*, "in the absence of consent to conduct such an [administrative] inspection [for an unsafe condition/code violation] a warrant would be required, albeit one issued under a "flexible standard of reasonableness." 5 W. LaFave, Search and Seizure at 59 (5th ed. 2012). Fortunately, Florida's statutory administrative inspection scheme provides for such review, while the Town's ordinance does not.

The full panoply of Florida administrative inspection remedies is available to the Town. Consistent with the Florida Attorney General opinions and at least as applied to the nonconsenting Café on these facts, the Town must follow the Florida statutory scheme for inspections and may not rely on subsection (c)(2) to inspect the Sweet Sage Café.

Count IV. <u>Common Law Trespass Against the Town and the Sheriff</u>

Plaintiffs Sweet Sage and SS16725 next bring a claim of trespass under Florida common law. Reciting language from Count II, Plaintiffs allege that Defendants have "repeatedly, without permission and in disregard for the property rights of [Plaintiffs], entered the Sweet Sage Café causing substantial disturbance to the business." Dkt. 56 ¶ 85. Though a trespass action does not necessarily require a "search," the same considerations guide the Court's analysis.

"Civil trespass to real property occurs when there is an injury to or use of the land of another by one having no right or authority." *Gunning v. Equestleader.com, Inc.*, 253 So.3d 646, 648 (Fla. 2d DCA 2017) (citation omitted). Consent is a defense to trespass. *See* 🚩 *Fla. Pub. Co. v. Fletcher*, 340 So. 2d 914, 917 (Fla. 1976).

As mentioned above, the Deputies entered the Café to count seats in the area open to the public. No one at the Café ever told them to leave. Mr. Messmore even admitted that, prior to the May 2018 letter, he had "never accused them of trespassing" and did not believe they had committed trespass. Dkt. 82-5 at 19. Again, in the absence of any liability, prospective injunctive relief is inappropriate. Judgment in favor of Defendants is granted on Count IV.

Count V. <u>Declaratory Relief on Revised Business Tax Receipt Ordinance</u>

In their final count, Plaintiffs seek a declaration that Ordinance 2018-804 violates Florida law. Dkt. 56 at 22. Plaintiffs observe that, "[p]ursuant to Section 205.042, Florida Statutes, prior to adopting an ordinance levying a business tax, a municipality must publish a notice between the first and last reading of [the] ordinance in a newspaper of general circulation within its jurisdiction and the notice must contain the proposed classifications and rates applicable to the business tax." *Id.* ¶92. Plaintiffs argue that the Town's notice on the new ordinance did not include the classifications and rates as required.

**\*1234** Plaintiffs additionally allege that the Town lacks authority to do the following: levy taxes outside the authority delegated to municipalities by statute under Chapter 205, *Id.* ¶94; reinstate the use of the term "business license" after it has been eliminated by the Florida legislature, ¶ 95; require businesses to provide information irrelevant for the computation of business, such as the number of seats, ¶¶ 97-98; require businesses to attest to the truthfulness of information that will be utilized in the enforcement of the Town Code, ¶ 99; or require businesses to consent to inspections of business records, by federal state, county and Town inspectors, ¶ 100.

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 374 of 379

Sweet Sage Cafe, LLC v. Town of North Redington..., 380 F.Supp.3d 1209...

28 Fla. L. Weekly Fed. D 51

The Court agrees with the Town that Ordinance 2018-804 did not itself levy a business tax that, indeed, had existed before the ordinance. Ordinance 2018-804 merely clarifies on whom the prior existing tax applies and revises the process and standards of applying for a business tax receipt. *See* Dkt. 75-4 at 3. Because no rates or classifications were created or changed, the additional requirements of Chapter 205 do not apply. Plaintiffs' reliance on *Broward Cty., Fla. Bd. of Cty. Comm'rs. v. Burnstein*, 470 So.2d 793, 794 (Fla. 4th DCA 1985), a case where a new ordinance doubled levied taxes, is inapplicable.

As a general matter, Florida municipalities possess broad authority to enact ordinances. *City of Hollywood v. Mulligan*, 934 So. 2d 1238, 1243 (Fla. 2006) (citing Florida Constitution, Art. VIII, § 2(b); Fla. Stat. § 166.021(1), (3)(c), (4) ). "Under its broad home rule powers, a municipality may legislate concurrently with the Legislature on any subject which has not been expressly preempted by the State." *Id.* (citations omitted). Preemption may also be implied "when the state legislative scheme is pervasive and the local legislation would present a danger of conflict with that pervasive scheme." *D'Agastino v. City of Miami*, 220 So.3d 410 (Fla. 2017) (citation omitted).

The provisions of Ordinance 2018-804 do not seem to implicate matters either expressly or implicitly preempted by the State. Plaintiffs, moreover, do not cite persuasive authority in support of most complaints against the Ordinance. For example, it is not immediately clear to the Court why a municipality cannot require seating information, which is relevant to a code provision, on an application for a business tax receipt. While Plaintiffs argue that nothing in Chapter 205, Florida Statutes, authorizes this and other requirements the ordinance imposes, it is equally true that nothing expressly forbids such conditions. [7] As for the nomenclature of "license" to replace "tax receipt," the Court finds that such a technical point cannot invalidate the entire Ordinance. Summary judgment is granted on Count V in favor of the Town.


## CONCLUSION

The Court GRANTS and DENIES in part the Town's motion for summary judgment, Dkt. 73, GRANTS the Sheriff's motion for summary judgment, Dkt. 81, and GRANTS Plaintiffs' motion for summary judgment, Dkt. 71. The Clerk is directed to enter judgment in favor of Defendants on Counts II and IV of the Second Amended Complaint, thereby closing the case against the Sheriff. The Clerk is further directed to enter judgment in favor of Plaintiffs on Count III. Subsection (c)(3) of Section 66-45 of the Town's Business Tax Code is deemed unconstitutional. The Town is hereby enjoined from inspecting **\*1235** the Café or any business under subsection (c)(3) of Town Code Section 66-45. The Town is also ordered to remove the following language from its business tax receipt application:

> and that as a condition of the privilege of conducting business within the Town, consent to the Town's Code Enforcement Officer to periodically conduct inspections of the business premises during business hours to confirm information provided in this Application is true, and to verify that the business is complying with Town code provisions governing the business's condition, conduct and operations, is hereby given.

The Town is further enjoined from inspecting the Café pursuant to Town Code Section 66-45, subsection (c)(2). The Clerk is further directed to enter judgment in favor of the Town on Count V. Only Count I against the Town remains for trial. This Order has no limiting effect upon any administrative searches/inspections under the Florida Statutes by whomever performed, nor proper warrantless searches or inspections under the beverage laws, appropriate criminal laws, etc.

**DONE AND ORDERED** at Tampa, Florida, on March 29, 2019.

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 375 of 379

Sweet Sage Cafe, LLC v. Town of North Redington..., 380 F.Supp.3d 1209...
28 Fla. L. Weekly Fed. D 51

**All Citations**

380 F.Supp.3d 1209, 28 Fla. L. Weekly Fed. D 51

**Footnotes**

1    Under the Town's code, rezoning could be initiated by the Commission, recommended by the Planning and Zoning Board, or the owner could obtain signatures of support from 51% of the owners in the affected area. *Id.*; Dkt. 82-8 at 36.

2    And as for the posting of a citation on the vacant lot, this entry does not constitute a search because it is not designed to "find[ ]something." *See* *Singhal v. City of Wilton Manors*, No. 06-61653-CIV, 2006 WL 8433166, *2 (S.D. Fla. Dec. 14, 2006)* (citation omitted).

3    Also irrelevant is the constitutionality of the previous iteration of the Business Tax Code that was relied upon by the Town's Attorney. *See* *Sosa v. Hames*, 581 F.Supp.2d 1254, 1269 (S.D. Fla. 2008) (finding an officer's inspection pursuant to statutory authority did not require a warrant as it occurred during normal business hours and was conducted for the purposes set out in the authorizing statute).

4    The Court finds no contradiction in holding that the constitutional challenge to the revised Business Tax Ordinance is ripe, though injunctive relief for alleged Fourth Amendment violations inappropriate. As the Court noted, there has not yet been a constitutional violation, which here precludes prospective injunctive relief but not necessarily a constitutional challenge to the ordinance.

5    Be that as it may, the existence of constitutional alternatives—indeed, that are precisely in line with Fourth Amendment jurisprudence—will not save a separate unconstitutional provision from facial attack. *Cf.* *Patel*, 135 S.Ct. at 2451 ("[W]hen addressing a facial challenge to a statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant. If exigency or a warrant justifies an officer's search, the subject of the search must permit it to proceed irrespective of whether it is authorized by statute. Statutes authorizing warrantless searches also do no work where the subject of a search has consented.").

6    Perhaps counterintuitively, this last limitation might actually militate against Fourth Amendment reasonableness because the ordinance's language does not put business owners on notice that their business will be inspected regularly. *See, e.g.,* *Dewey*, 452 U.S. at 605, 101 S.Ct. 2534 (noting the statute "clearly notifies the operator that inspections will be performed on a regular basis" in finding no constitutional violation); *Burger*, 482 U.S. at 711, 107 S.Ct. 2636 (statute stating that inspections occur on a regular basis shows owner that inspections are not discretionary); *but see* *Patel*, 135 S.Ct. at 2463 (Scalia, J., dissenting) ("But the warrantless police searches of a business '10 times a day, every day, for three months' that the Court envisions under Los Angeles's regime ... are entirely consistent with the regimes in *Dewey* and *Burger*; 10 times a day, every day, is 'at least four times a year,' and on a (much too) 'regular basis.' ").

7    The Court need not address the ordinance provisions that implicate the Fourth Amendment and have been stricken, thereby mooting Plaintiffs' complaints at paragraphs 96 and 101.

---

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 10688077

Only the Westlaw citation is currently available.

United States District Court, N.D. Georgia, Atlanta Division.

George Mark TUGGLE, Plaintiff,

v.

Victor HILL, Clayton County Sheriff, in his individual capacity, and Kemuel
Kimbrough, Clayton County Sheriff, in his official capacity, Defendants.

CIVIL ACTION NO. 1:06-CV-272-ODE

|

Signed 05/04/2009

**Attorneys and Law Firms**

Allan Leroy Parks, Jr., Parks Chesin & Walbert, P.C., Eleanor Mixon Attwood, Legare, Attwood & Wolfe, LLC, William J.S. Atkins, Atkins & Fife, LLC, Atlanta, GA, James Attwood, The Attwood Firm, LLC, Decatur, GA, for Plaintiff.

James Edward Dearing, Jr., James E. Dearing, Jr., P.C., Atlanta, GA, Emilia C. Walker, Steven Martin Fincher, Winston A. Denmark, Fincher, Denmark & Williams & Minnifield, LLC, Jonesboro, GA, for Defendants.

<u>ORDER</u>

ORINDA D. EVANS, UNITED STATES DISTRICT JUDGE

**\*1**  This civil action is before the Court on Defendant Victor Hill's Motion for Judgment as a Matter of Law, Motion for a New Trial, and/or in the alternative, Motion to Amend the Jury Verdict and Motion to Alter the Clerk's Judgement [Doc. #130]. Plaintiff has filed a response in opposition to Defendant's motion [Doc. #139]. Defendant Victor Hill ("Hill") has filed a supplement to his motion [Doc. #176], to which Plaintiff has also filed a response in opposition [Doc. #178]. Hill has filed a reply to Plaintiff's responses [Doc. #184]. For the following reasons, Hill's Motion [Doc. #130] is denied.

I. <u>Procedural and Factual Background</u>

In November 2004, Hill won election as Clayton County Sheriff, beating Plaintiff George Tuggle's brother, the incumbent. Upon assuming the office of sheriff in January 2005, Hill fired a number of employees. When Plaintiff George Tuggle ("Tuggle") learned of the firings, he made two phone calls to Hill's office, expressing his displeasure in strong language. [1]  After Hill heard the messages left by Tuggle, he ordered him to be arrested. Tuggle ultimately surrendered himself to the Clayton County jail, where he spent approximately twenty-nine hours in custody. During his time in custody, Tuggle's blood pressure was high. Tuggle's "book-in" picture was released to the news media.

On February 7, 2006, Tuggle filed this lawsuit against Hill alleging violations of his rights under the First and Fourth Amendments to the United States Constitution, as well as pendant state law claims. [Doc. #1 at 1]. Specifically, Tuggle brought claims of retaliatory prosecution, false arrest, and malicious prosecution. The case proceeded to trial on all three claims. The jury found for Tuggle on the retaliatory prosecution and false arrest claims, and found for Hill on the malicious prosecution claim. [Doc. #126]. The jury awarded Tuggle $250,000 in compensatory damages and $225,000 in punitive damages. <u>Id.</u>

II. <u>Discussion</u>

Case 1:18-cv-24190-RS   Document 471   Entered on FLSD Docket 06/01/2023   Page 377 of 379

Tuggle v. Hill, Not Reported in Fed. Supp. (2009)

In his Motion for Judgment as a Matter of Law, Motion for a New Trial, and/or in the alternative, Motion to Amend the Jury Verdict and Motion to Alter the Clerk's Judgment ("Defendant's motion"), Defendant does not argue that the jury's finding on liability should be put aside. See [Doc. #130]. Rather, Defendant argues that the jury's award of compensatory and punitive damages was excessive, and the Court should therefore set aside the damages award, grant a new trial, or reduce the amount of the award. Id. at 2.

Defendant's motion is brought under Federal Rules of Civil Procedure 50 and 59. Id. at 2-3. A motion under Rule 50 should be granted when, viewing the facts and inferences in the light most favorable to the non-moving party, "the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes reasonable men could not arrive at a contrary verdict." United States v. Vahlco Corp., 720 F.2d 885, 889 (5th Cir. 1983) (internal quotation marks omitted). A motion for a new trial pursuant to Rule 59 may be granted if the trial judge believes that the jury's verdict was contrary to the great weight of the evidence. Williams v. City of Valdosta, 689 F.2d 964, 973, (11th Cir. 1982).

*2 As an initial matter, the Court finds that the trial was well-litigated on both sides and that there is no justification for granting Defendant judgment as a matter of law or a new trial on the liability verdict. The jury's verdict in regard to liability was not contrary to the great weight of the evidence presented at trial. The damages portion of the verdict and Defendant's arguments in regard to it are addressed below.

A. Compensatory Damages Award

Hill argues that the jury's compensatory damages award was excessive because, at trial, Tuggle introduced no evidence of direct monetary loss or physical injury. [Doc. #176 at 8-9]. Hill also argues that there is insufficient evidence supporting Tuggle's claims of mental and emotional injury. Id. at 11. Accordingly, Hill contends that his motion for judgment as a matter of law should be granted, or in the alternative, that the Court should reduce Tuggle's compensatory damages. [2] Id. at 12.

The Supreme Court has held that a plaintiff seeking damages under § 1983 may recover only for actual injuries. Carey v. Piphus, 435 U.S. 247, 263-64, 98 S.Ct. 1042, 1052 (1978). Compensatory damages "cannot be presumed or based on the abstract value of the constitutional rights that defendant violated." Slicker v. Jackson, 215 F.3d 1225, 1229 (11th Cir. 2000). As the United States Court of Appeals for the Eleventh Circuit has explained, this does not require a plaintiff show direct monetary loss. Id. Rather, a § 1983 plaintiff may recover for "demonstrated mental and emotional distress, impairment of reputation, and personal humiliation." Id. at 1231.

In this case, Tuggle presented evidence of mental distress, impairment of his reputation, and personal humiliation. Tuggle testified that when he went through the intake process at the jail, his blood pressure was extremely high and the nurses were concerned. Trial Trans. Vol. III at 596. Tuggle also testified that, in connection with his employment as an RV salesman, he attended the Atlanta Camping Show the day after his release. Id. at 600. However, Tuggle was unable to conduct business as normal because many people had heard about his arrest and stopped by to speak to him about it. Id. Tuggle testified that several customers called his house after seeing news reports that he had been arrested. Id. These news reports showed footage from Tuggle's bond hearing and also his book-in photograph, in which Tuggle is wearing an orange jumpsuit. Id. at 598, 602-03, 605.

Thus, the evidence presented by Tuggle at trial establishes more than an abstract violation of his constitutional rights; the evidence supports a finding of actual injury. The jury was entitled to credit this evidence and to award compensatory damages accordingly. Because the jury's damages award is not against the great weight of the evidence, the Court may not disturb it.

B. Punitive Damages Award

Hill also argues that the punitive damages awarded in this case are excessive. [Doc. #130 at 4-7]. The Supreme Court has "instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's

misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418, 123 S.Ct. 1513, 1520 (2003). Neither party has identified any civil penalties that would apply in this case, or presents an argument regarding how the third factor should be applied here. See [Doc. #130, #139, #176, #178]. Accordingly, the Court restricts its analysis to the first two factors.

 **3** Hill argues that, because his conduct did not cause Tuggle physical or economic loss and because the conduct was lawful when it occurred, Hill's conduct was not reprehensible. [Doc. #176 at 13-14]. The Supreme Court has stated that the relevant considerations under the reprehensibility factor are: whether the harm was physical or economic, whether the conduct demonstrated an indifference to or reckless disregard of the health and safety of others, whether the conduct was an isolated incident or repeated, and whether the harm was the result of intentional malice or mere accident. State Farm, 538 U.S. at 419, 123 S.Ct. at 1521. Here, the harm caused to Tuggle was primarily mental and emotional. Hill's conduct evinced a reckless disregard for Tuggle's safety and health; Tuggle spent twenty-nine hours in jail. The arrest was an isolated event, but Hill's actions were not mere accident. Although the jury found for Hill on the malicious prosecution claim, Hill's actions, again, were clearly not accidental. Finally, the jury found that Hill violated Tuggle's First and Fourth Amendment rights. On balance, these considerations weigh in favor of an award of punitive damages.

The second factor, the ratio between the award of compensatory damages and the award of punitive damages, supports upholding the jury's verdict here. While reluctant to establish a bright-line ratio between compensatory and punitive damage awards, the Supreme Court has generally approved of single-digit multipliers. State Farm, 538 U.S. at 425, 123 S.Ct. at 1524. Here, the ratio between the compensatory damages ($250,000) and the punitive damages ($225,000) is less than 1:1, falling well within the range that is generally acceptable. Accordingly, the Court finds that the jury's punitive damages award should not be altered.

III. Conclusion
The Court has carefully considered the parties' submissions. Defendant's Motion for Judgment as a Matter of Law, Motion for New Trial, and/or in the alternative, Motion to Amend the Jury Verdict and Motion to Alter the Clerk's Judgment and Supplement to Motion [#130, 176] are DENIED.

SO ORDERED, this 4 day of May, 2009.

**All Citations**

Not Reported in Fed. Supp., 2009 WL 10688077

**Footnotes**

1    Tuggle called the sheriff's office and left a voice message on January 3, 2005, calling Hill a "little, short lil' bastard sheriff." [Doc. #178 at 4]. Tuggle called back several minutes later and spoke to an officer, saying that anyone who would fire people around Christmas is scum. Id. at 5.

2    Tuggle contends that Hill has waived this argument because he did not raise it in the initial 50(a) motion for judgment as a matter of law at the close of the evidence. [Doc. #139 at 3-4]. Because it is clear that the jury's damages award is not against the great weight of the evidence, the Court declines to address Tuggle's waiver argument.

**Tuggle v. Hill, Not Reported in Fed. Supp. (2009)**

---

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.