## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No.: 1:18-cv-24190

WILLIAM O. FULLER, and
MARTIN PINILLA, II,
              Plaintiffs,

     v.

JOE CAROLLO,
           Defendant.

_____/

## MOTION TO CLARIFY JUDGMENT

Defendant Joe Carollo has repeatedly acknowledged that he was sued in both his individual and official capacities. *See, e.g.*, May 5, 2023 Trial Tr. at 147 (Carollo admitting during trial that he understood that he was "sued in [his] individual capacity"); DE 201 at 2, 65 (Carollo admitting in his Answer that he was "sued in his official capacity as an elected representative of the citizens of the City of Miami"). While the Court's Final Judgment reflects a verdict rendered against Carollo in his individual capacity (including an award of punitive damages), it is necessary to clarify that the Final Judgment also pertains to Carollo in his official capacity as well (including its award of compensatory damages), consistent with the parties' pleadings and the course of proceedings through trial.

Carollo was not alone in admitting that he was sued in both his individual and official capacities. In fact, the City of Miami accepted the legal bills submitted by Carollo's attorneys, which it paid through an insurance policy, and affirmatively supported Carollo's position that he was sued in his official capacity by directing its own counsel to attend every day of the six-week trial and volunteering its most senior policymaking officials to testify in Carollo's defense. *See* **Exhibit A**. The testimony of those senior officials (including City Manager Art Noriega)

dovetailed with the testimony of other former top officials (including former City Manager Emilio Gonzalez and former Chiefs of Police Art Acevedo and Jorge Colina), all of whom explained that Carollo was acting in his official capacity because his First Amendment retaliation campaign (a) reflected official City or Miami policy that was enacted through resolutions, ordinances and the actions of the City Manager designed to make it more difficult for Plaintiffs and their tenants to do business; (b) constituted the widespread and pervasive custom of the City of Miami; and (c) was ratified by City Manager Arthur Noriega who helped carry out Carollo's efforts to target the Plaintiffs in violation of their First Amendment rights.

The Final Judgment which was entered on the same day as the verdict without input by the parties is understandably silent on this issue. The parties did not dispute that Carollo acted in his official capacity (in addition to his individual capacity), and the evidence and testimony relating to Carollo's official-capacity liability came to light for the first time at trial after Carollo obtained a series of stays over Plaintiffs' objections that precluded virtually all pretrial discovery. Thus, to remove any potential doubt or confusion, Plaintiffs file this motion to clarify the judgment under Federal Rule 60(a), or alternatively to amend the judgment under Rule 59(e), and/or to amend the complaint to conform to the evidence under Federal Rule 15(b)(1), in order to reflect that the Court's Final Judgment and award of compensatory damages pertains to Carollo both in his individual capacity and in his official capacity as a Commissioner of the City of Miami.

A.    **The Parties' Pleadings and the Course of Proceedings Establish that Carollo Was Sued in His Individual Capacity and His Official Capacity**

Under 42 U.S.C. § 1983, government officials can be sued in their individual capacity, their official capacity, or both, and "plaintiffs are not required to designate with specific words in the pleadings that they are bringing a claim against defendants in their individual or official capacities, or both." *Young Apartments, Inc. v. Town of Jupiter, FL*, 529 F.3d 1027, 1047 (11th

Cir. 2008). If it is not clear from the pleadings "in which capacity the defendant" is being sued—or whether he is being sued in both capacities—then "the course of proceedings typically indicates the nature of the liability sought to be imposed." *Id.*; *accord Colvin v. MacDougal*, 62 F.3d 1316, 1317 (11th Cir. 1996) ("In trying to determine in what capacity Sheriff McDougall was sued, we look at the complaint and the course of proceedings").

At the outset, there is no dispute Carollo was sued individually. To take just a few examples: (a) the parties, this Court and the Eleventh Circuit spent several years litigating Carollo's qualified immunity defense, which is **only** available for individual-capacity claims, and **not** available for official-capacity claims; (b) the Court's Final Judgment imposes an award of punitive damages, which is **only** available for individual-capacity claims, and **not** for official-capacity claims; and (c) Carollo testified under oath throughout that he understood he was sued individually.

Clarification is necessary and appropriate, however, to specify that the parties' pleadings and course of proceedings also reflect that the Final Judgment was rendered against Carollo in his official capacity as well. *See Jones v. Barlow*, 2020 WL 5797653, at *2 (M.D. Fla. Sept. 29, 2020) ("Applying the course-of-proceedings test . . ., the Court determines that the Defendants are being sued in both their individual and official capacities"); *Hobbs v. Roberts,* 999 F.2d 1526, 1529-30 (11th Cir. 1993) ("We think the course of proceedings shows that Hobbs sued the named defendants in their official *and* individual capacities").

1.    *The Parties' Pleadings*

The Second Amended Complaint clearly alleged that Carollo was liable for engaging in First Amendment retaliation against Plaintiffs in both his individual and official capacities. For example, it alleged that Carollo "flash[ed] his City of Miami identification" and claimed "he was performing an 'official investigation' . . . **in his official capacity as a City of Miami**

**Commissioner**." DE 125 at ¶ 125 (emphasis added); *accord id*. at ¶¶ 124-34 (Carollo responding, "I am the law," after being told that he did not have authority to conduct an investigation); *id*. at 2 ("Carollo has also managed to amend key provisions of the Miami City Code to target Plaintiffs' businesses"); *id*. at ¶ 106 ("When receiving these repeated calls from Carollo personally or from a person acting at his direction, the City understood and continued to support Carollo's unconstitutional campaign"); *id*. at ¶¶ 157-58 ("Carollo arranged for a 'park and walk'" to stalk Plaintiffs' businesses "as a City Commissioner with City employees"); *id*. at ¶¶ 217-19 ("Carollo ordered that Domino Plaza be shut down . . . at the order of the Commissioner" to interfere with a "nonprofit . . . art, music, and culture festival" associated with Plaintiffs"); *id*. at ¶¶ 276-82 ("Carollo has . . . direct[ed] City officials to utilize City resources and funds . . . to attempt to purchase properties adjacent to Plaintiff's current properties" and "harm[ ] Plaintiffs overall business strategy" by "artificially inflating the market" for real estate).

It is Carollo's Answer, however, that is essentially determinative of the legal inquiry because it begins by recognizing that Carollo was sued "in his official capacity as an elected representative of the citizens of the City of Miami," DE 201 at 2, and concludes with an affirmative defense stating that "**all the facts surrounding the S[econd] A[mended] C[omplaint] are alleged actions taken by Commissioner Carollo while acting as a City Commissioner in his official capacity**." DE 201 at 64-65 (emphasis added). As Carollo further explained in his Answer, this action encompassed his "conduct in the course and furtherance of his official responsibilities as an elected City Commissioner," and related to activities that he performed "in his official role as City Commissioner," expressly noting that countless specific allegations in Plaintiffs' complaint pertained to "official City enforcement action [which] is a matter of public record that speaks for itself." DE 201 at 4, 31, 37-41.

2.        *The Course of Proceedings*

To the extent that the parties' pleadings left room for any doubt, the course of the proceedings confirmed that Plaintiffs asserted a claim against Carollo in both his individual and his official capacities. For example, in his motion to dismiss the original complaint, Carollo characterized Plaintiffs' allegations as conduct "alleged to have occurred during the scope of [Defendant's] **official authority** as a City of Miami elected public official." DE 51 at 1 (emphasis added). Similarly, in his motion to dismiss the Second Amended Complaint, Carollo argued that Plaintiffs, were seeking to prevent Carollo "from faithfully discharging his duties and authority as a commissioner," and to interfere with "his discretionary authority to engage in fact-finding for the purpose of protecting the quality of life for his constituent resident" as "a legitimate and protected exercise of municipal authority"). DE 154 at 2, 11; *accord id.* at 1 (id. at 13). Likewise, after denial of his motions to dismiss, Carollo continued to argue the action was  intended "to silence the City of Miami." (DE 251-1). And, as detailed at length below, the entire course of the trial was replete with additional evidence that Carollo over the course of the past five years acted in both his individual and official capacities. *See, infra*, at 10-20.

3.        *Notice to, and Participation by, the City of Miami*

Consistent with official-capacity liability, the City of Miami (a) received the bills for the legal fees submitted by Carollo's lawyers; (b) assumed the cost of Carollo's defense in this litigation through an insurance policy; (c) had notice of the proceedings by virtue their attorneys filing notices of appearance and receiving every filing on the docket; and (d) had an opportunity to respond through the lawyers that it directed to attend every day of trial and paid to assist in the preparation of Carollo's defense. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985) ("[A] judgment

against a public servant "in his official capacity" imposes liability on the entity that he represents provided, of course, the public entity received notice and an opportunity to respond").

Indeed, the City Attorney herself attended the very first hearing in this case together with Carollo. And, immediately after Plaintiffs indicated at the hearing that they intended to call then-City Manager Emilio Gonzalez as a witness to tell the truth about Carollo's retaliation campaign—which caused Carollo to turn white—the City Attorney called Mr. Gonzalez to ask him to "*pasar la mano,*" which Mr. Gonzalez interpreted as an "inappropriate" attempt to affect his testimony. *See* Apr. 11, 2023 Trial Tr. at 30-31 ("I was so concerned" about the City Attorney's instructions to "stroke [Carollo] so that I could get him off my back" that "I sat with my chief of staff who's also an attorney, and I decided to put down a memo for record" because "I just thought it was inappropriate and it would be better for me to just write this down").

While the City was dismissed as a named defendant in 2018 based on the lack of allegations at that time of official City policies or customs, which did not arise until at least a year later, the City Attorney's Office had filed a notice of appearance in the case and continued to receive notice of service of all filings throughout the case and participate in the proceedings to support Carollo against Plaintiffs. For example, the City Attorney actively supported a motion to preclude Plaintiffs from meeting with the former City Manager Emilio Gonzalez as well as "other former Apex City employees including former Deputy City Manager Joseph Napoli, the Chief Operating Officer of the City, and former City of Miami Chief of Police Art Acevedo." DE 252. In the Court's ruling on that motion, Judge Louis noted that "Defendant called City Attorney Victoria Mendez" who "testified that she anticipated litigation with Plaintiff Fuller" and "explained that when Defendants were originally sued in this case, she retained outside counsel and understood that Defendants had

a common interest to defend the City and the named employees against a common enemy." DE 338 at 6.

At trial, the City of Miami sent its own in-house attorneys and also its outside counsel from the firm of Buchanan Ingersoll to every single day of the trial. In addition, invoices produced by the City of Miami in response to a public records request also show that the City of Miami paid its outside counsel, Buchanan Ingersoll, for purposes of assisting with the defense of this case. *See* **Exhibit B**. Throughout the course of the six weeks of trial, the City's attorneys coordinated with Carollo's attorneys, including providing a photograph from inside the Courtroom to Carollo's lawyers for filing in a memorandum.

Even after the trial, the City of Miami confirmed that the parties' pleadings and the course of proceedings, including trial, implicated Carollo's liability in his official capacity. Specifically, in a formal public statement issued following the jury's verdict, the City of Miami stated that "the necessity to appeal this jury verdict is significant, in that it ensures the City's ability to enforce our code, protect our quality of life, and guarantee the safety and well-being of our residents and visitors." Brian Hamacher, NBC MIAMI, "City of Miami Clarifies who's responsible for $63M Carollo verdict, who pays legal fees," at https://tinyurl.com/h7avxv3n (June 7, 2023).

**B.**    **A Clarification or Amendment Is Necessary and Appropriate to Reflect that Carollo Is Liable in His Individual Capacity and His Official Capacity**

Based on the parties' pleadings and the course of proceedings—including the six-week trial which the City of Miami attended and assisted in Carollo's defense—there is no genuine despite that the Final Judgment reflects that Carollo was sued, and is therefore liable, in both his individual and official capacities. *See Heard v. Martin County Sheriff's Office*, 20214 WL 12770093, at *10 (S.D. Fla. Aug. 8, 2014) (citing, *inter alia*, *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)) ("The

U.S. Supreme Court has indicated that both personal- and official-capacity suits may be brought against defendants acting under the color of law, pursuant to § 1983").

Accordingly, there is no apparent impediment under the Federal Rules to prevent this Court from "amending its judgment . . . simply to clarify [its] intended disposition of the case" by imposing both individual-capacity and official-capacity liability consistent with the parties' pleadings and the course of proceedings. *Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525, 527 (2d Cir. 1990); *accord Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403, 407 (4th Cir. 1998) ("[W]e hold that the district court did not abuse its discretion in granting [a] Rule 59(e) motion to alter or amend the . . . judgment," "sparing the parties and the appellate courts the burden of unnecessary appellate proceedings"); *Garamendi v. Henin*, 683 F.3d 1069, 1079 (9th Cir. 2012) ("Other circuits generally agree that Rule 60(a) relief is proper" within district courts' "broad discretion . . . in order to correct a 'failure to memorialize part of its decision,' to reflect the 'necessary implications' of the original order, to 'ensure that the court's purpose is fully implemented,' or to 'permit enforcement'"); *United States v. Mansion House Center N. Redevelopment Co.*, 855 F.2d 524, 527 (8th Cir. 1988) ("We find no abuse of discretion in the district court's modification and clarification of its . . . judgment" to "merely clarify the court's intentions and the parties' understandings").

Moreover, to the extent that the Court deems a post-judgment amendment of the complaint to be a necessary prerequisite to specify the existence of official-capacity liability in this case, the United States Supreme Court and the Eleventh Circuit have both affirmed such a practice. Indeed, the title of the relevant Federal Rule expressly governs "Amendments During and After Trial," provides that "an issue not raised by the pleadings [but] tried by the parties' express or implied consent . . . must be treated in all respects as if raised in the pleadings," and states that "a party

may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue." Fed. R. Civ. P. 15(b)(2) ("[F]ailure to amend does not affect the result of the trial of that issue"). The Federal Rules allow for such post-judgment amendments "when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits." Fed. R. Civ. P. 15(b)(1). Given that Carollo has argued for five years that he was sued in his official capacity, and thus consented to the trial of this issue, he would not be prejudiced by a post-judgment amendment to the complaint that memorializes his own litigation position.

In *Brandon v. Holt,* 469 US 464 (1985), the Supreme Court permitted a similar post-judgment amendment of the pleadings to specify that a Section 1983 action against E. Winslow Chapman, the Director of the Memphis Police Department, sought to impose official-capacity liability. Because Plaintiffs did not plead whether Chapman was sued in his individual or official capacity, the Sixth Circuit reversed the judgment that the trial court entered against him in his official capacity, concluding that Chapman had been sued in his individual capacity and that, "in reality, plaintiffs are attempting to amend their complaint so as to treat the Police Director as though he were the City in order to avoid the qualified immunity which shields Director Chapman [in his individual capacity]," an outcome that the Sixth Circuit characterized as "without support in precedent or reason." *Brandon v. Allen*, 719 F. 2d 151, 153 (1983). The Supreme Court reversed, holding that "[t]he course of proceedings … make it abundantly clear that the action against Chapman was in his official capacity" and, "[g]iven this state of the record, even at this late stage of the proceedings, petitioners are entitled to amend their pleadings to conform to the proof and to the District Court's findings of fact." Accordingly, the Supreme Court held that such a judgment against an individual in his official capacity provides "a right to recover

damages from the city of Memphis" because "a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents provided, of course, the public entity received notice and an opportunity to respond." *Id.* at 471-72.

Likewise, in *Brown v. Georgia Dept. of Revenue*, 881 F.2d 1018 (11th Cir. 1989), the Eleventh Circuit approved another post-judgment amendment of the pleadings to encompass official-capacity liability. In that case, Plaintiff named as a defendant the State Personnel Board, but not the individual members of the Board in either their individual or official capacities. After the judgment was entered, the plaintiff moved to amend the complaint to name as additional defendants the members of the State Personnel Board in their official capacities. The Eleventh Circuit allowed the late amendment because serving the complaint "on the Personnel Board as an entity was sufficient notice to the individual members sued in their official capacity" and, "[s]ince the Personnel Board had been a party to the case, there was no prejudice from the late amendment naming the Board members," particularly since "the individual Board members should have known that they were the correct defendants." *Id.*

**C.**    **Carollo Is Liable In Both His Individual Capacity And Official Capacity**

In addition to proving that Carollo carried out a First Amendment retaliation campaign in his individual capacity, the evidence and testimony at trial was consistent with Carollo's repeated judicial admissions that his unconstitutional activity was (a) part of an official city policy, such as a resolution, ordinance or policy statement; or (b) part of a pervasive or well-known custom of the city "even though such a custom has not received formal approval through the body's official decision making channels"; or (c) carried out by an individual who is an official policy maker of the City. *Monell*, 436 U.S. at 691.

Though it was only necessary for Plaintiffs to satisfy **any** single one of the *Monell* factors to trigger official-capacity liability, there is no genuine dispute that the evidence and testimony presented over the course of the six-week trial was sufficient to fulfill **all** three of the *Monell* factors, in accord with Carollo's repeated judicial admissions on this score. *See Steinway v. Village of Pontoon Beach*, 2009 WL 1940431, at *5 (S.D. Ill. July 7, 2009) ("[T]he Court finds, as a matter of law, that . . . the Defendants were acting in an 'official . . .' capacity"). And, imposing official-capacity liability is perfectly consistent with the jury's verdict imposing individual-capacity liability for the First Amendment retaliation campaign that Carollo carried out "'under color' of state law." DE 470 at 1. *Cf. Belfast v. United States*, 2012 WL 7149532, at *11 (S.D. Fla. Oct. 17, 2012) ("There is no material difference between this notion of official conduct" conducted "under color of state law" and that imparted by the phrase 'in an official capacity.'"); *Day v. Vivet*, 2012 WL 1977960, at *7 (W.D. Wash. June 1, 2012) ("All parties agree that the officers acted in their official capacities and, thus, 'under the color of law'").

1.  *Carollo Created Unconstitutional City Policy in His Official Capacity*

First, the evidence at trial showed that Carollo acted in his official capacity to create formal City policy targeting Plaintiffs for political retaliation. While some aspects of Carollo's campaign were carried out in his individual capacity, Carollo's own counsel argued that "[t]he commissioner was doing his job"—and thus acting in his official capacity—by making targeted and retaliatory "[p]ublic records requests," "[g]aining information," "[g]oing on ride-alongs," "[p]ointing out concerns," "[s]peaking from the dais to voice those concerns, to build a consensus in order to legislate on behalf of the City of Miami. That's the evidence." May 31, 2023 Trial Tr. at 126 (characterizing Carollo as the "voice of his community doing his job").

For example, Carollo testified at trial about his leading role in what became known as the "Valentine's Day Massacre." Specifically, on February 14, 2019, Carollo devoted two hours of a City Commission meeting to a tirade that he launched against Plaintiffs from the City of Miami Commission dias, culminating in his proposal to pass a resolution asking the state governor to appoint a special prosecutor to criminally investigate City employees for their failure to issue code citations to Plaintiffs' properties.

While Defendant's initial proposed resolution failed, he ultimately convinced the City Commission—over objection—to adopt an alternate Resolution [4-1], designed to retaliate against Plaintiffs in response to their protected First Amendment activity:

> A resolution of the Miami City Commission Directing the City Attorney to Research Properties Described at the February 14, 2019 City Commission Meeting During Discussion item 'D3.1 – Code Enforcement' regarding violations relating to no certificate of use, certificate of use obtained under false pretenses and/or properties with violations that pose life-safety issues, and initiate injunctive proceedings against said properties until the properties are brought into compliance.

Pls.' Trial Ex. 150. Commissioner Carollo himself confirmed that this Resolution [4.1] became official city policy:

Q. At this point, Commissioner Carollo, this become city policy, correct?

A. What becomes city policy?

Q. This resolution.

                                    * * *

A. Any resolution that is passed by the commission is city policy.

May 1, 2023 Trial Tr. at 197.

The only properties described at that meeting were Plaintiffs' properties, and so targeting Plaintiffs' properties became official City Policy over the protests of both Commissioner Ken Russell and Mayor Francis Suarez. At that time, Mayor Suarez expressed his concern that Carollo was "selectively enforcing or weaponizing code enforcement against particular property owners,"

Pls.' Trial Ex 433. The City senior staff (most of which would be replaced within a year) lodged similar objections to this new official City policy spearheaded by Carollo. The Deputy City Manager sent an email stating that what "the City Attorney is directing our staff to do … can be interpreted as targeting businesses." Pls.' Trial Ex. 135. This concern was echoed by another Assistant City Manager, Zerry Ihekwaba, who wrote: "We ought to be enforcing the Code citywide and not just targets. And the City Charter has provision on lines of communicating directions to staff." Pls.' Trial Ex. 150.

Perhaps the most vocal opposition to the City policy advanced by Carollo came from the Chief of Police, who responded to an email from the City Attorney about the new policy by pointing out that it inappropriately "targets the particular business owner which gives the impression that the city is selectively targeting his business for new investigations," and concluded that this new City policy was "selective enforcement against the business owner's properties using city ordinance." Pls.' Trial Ex. 146. As one former City Manager, Mr. Gonzalez, explained at trial, "my deputy city manager, my assistant city manager, the police chief, in writing objected that this was tantamount to targeting a business …  It's just wrong. There's just no way that this is right." Apr. 11, 2023 Trial Tr. at 43. "[W]e're being asked to look at these properties, we're being asked to look at them with the intention of essentially finding a way to shut them down and it's wrong … We need to run a city. We don't need to ruin a business and my staff was adamant that this was going way, way too far." Apr. 11, 2023 Trial Tr. at 47.

Despite these objections, Carollo enforced the City's new policy after it was enacted in February 2019, leading to the resignation of multiple experienced government officials. Carollo first unleashed a flurry of public records requests for every single city record on all of Plaintiffs' properties (but no other property owner), and then forced his Chief of Staff, the former Chief of

Police of Doral, Mr. Richard Blom, to devote the entire weekend of April 19, 2019, to flyspecking these records. Two months later, this incident was cited in Mr. Blom's resignation letter, protesting that—in his role as a government official—he was "not comfortable doing this type of research for a variety of reasons," despite Carollo "assig[ing] more and more of this type of work focusing on this one individual," Plaintiff Fuller, and forcing him to examine "various applications, permits and licenses associated with [Plaintiffs] over the weekend." Pls.' Trial Ex. 202. A few short months later, Carollo similarly managed to bully the City Manager, Mr. Gonzalez, into resigning, as memorialized in a resignation letter explaining that Carollo "was trying to terminate me because I would not weaponize city government against [Plaintiff] Fuller." Apr. 11, 2023 Trial Tr. at 60.

As a result of these resignations, Carollo was able to implement his unconstitutional policies much more effectively. For instance, Carollo succeeded in replacing Mr. Gonzalez (a Ph.D and distinguished Army veteran who previously taught at West Point, served as the Director of the United States Citizenship and Immigration Services, and was CEO of the Miami International Airport) with Art Noriega (the former 20-year head of the Miami Parking Authority who supported Carollo's election campaigns and donated tens of thousands of dollars to Carollo's Friday night parties) as the City Manager. A. Noriega Dep. Tr. at 39 (Nov. 23, 2022). And, upon the start of Mr. Noreiga's tenure, Carollo pointedly instructed City employees to follow his directives and to ignore any contrary instructions they might receive from the City Manager, despite the express provisions of the City Charter:

> One of us is going to be out of here before the other. And it ain't gonna be me. …
> I have no right to hire or fire any of you or give any directions. And I certainly
> would not do that. But the manager is one we have the right to hire and fire. And I
> don't need to go any further.

Pls.' Trial Ex. 643. But, rather than stand up to Carollo, as his predecessor, Mr. Gonzalez, had done, Mr. Noriega has spent his time as City Manager coaching his City of Miami employees to

"Be a Goldfish"—even printing t-shirts with that slogan—because goldfish have only a ten-second memory, and thus City employees should forget the "really bad, very bad" things that the Commissioners (e.g., Carollo) did so that they could keep their job, their salaries, and their pensions. May 30, 2023 Trial Tr. at 58-59.

After assuming office in February 2020, City Manager Noriega and his subordinates helped entrench the City's new policy, personally meeting with Carollo, Carollo's staff, and the City Attorney to discuss Plaintiffs literally dozens of times, with no email trail. *See* May 30, 2023 Trial Tr. at 62-63. On May 27, 2020, just two months after Noriega took office, the Director of the City of Miami Building Department, Ace Marerro, wrote an email detailing how to more effectively enforce and update the City policy that Carollo enacted to retaliate against Plaintiffs for exercising their First Amendment rights:

> **Just had a lengthy meeting with the manager and almost the entire City Attorney office plus Adele talking about Bill Fuller.** The Manager wants us to **revise and update our policies to be more stringent** when it comes to work without permit, clearly define what are unsafe conditions, **and shut down all structures that don't comply**. . . . I would like for us to spend the day tomorrow brainstorming about these issues. We need to circle back with [Assistant City Attorney] Rachel [Dooley] if we need to **update any of our ordinances** as well as I have a follow up meeting with the manager next week to provide an update on these issues.

Pls.' Trial Ex. 601 (emphasis added). The very next day, on May 28, 2020, an email circulated among City staff with a subject line of "**Copy of Fuller Properties**" containing an attachment that had all of Mr. Fuller's properties listed along with whether each property had any code violations, and the status of any such violations. These lists of the Fuller properties then continued to be updated and circulated throughout the summer of 2020, culminating in an email on October 19, 2020, with the City staff providing updates on the "**progress of Carollo Investigation**" which was limited to Fuller's properties. Pls.' Trial Ex 610.

Then, on October 22, 2020, consistent with the discussions and emails about tailoring City policy in order to appease Carollo and more effectively target Plaintiffs, Carollo sponsored a pair of new ordinances. The first ordinance provided "for inclusion of building violations as a reason for revocation of certificates of use," which caused the City Manager to send an email at 8:00 a.m. that morning telling the Building Director and the City Attorney to "let's get this done today before noon today."  Pls.' Trial Ex. 720. What the City Manager wanted to "get . . . done today before noon" was to revoke the certificate of use for one of Plaintiffs' prominent properties—the historic Ball & Chain nightclub—the first time a certificate of use has ever been revoked in the history of the City of Miami. That revocation would then set the stage for the second ordinance that Carollo sponsored on the same day, which banned outdoor music in any restaurants that did not have a certificate of use, and thus applied only to Ball & Chain and no other establishment.

2.   *Carollo Created an Unconstitutional City Custom in His Official Capacity*

In addition to acting in his official capacity to make it formal City policy to target Plaintiffs, Carollo's First Amendment retaliation campaign also became entrenched as an informal yet pervasive City custom. A "longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Brown v. City of Ft. Lauderdale,* 923 F.2d 1474, 1481 (11th Cir. 1991). *Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926; *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68 (1970)).

For example, Carollo persistently cultivated a longstanding and pervasive City custom to violate Plaintiffs' First Amendment rights. As the former Director of Code Compliance, Orlando Diez, testified, as early as December 2018, Defendant "wanted [him] to issue, or [his] inspectors [to] issue violations," and to "shut down the business" associated with Plaintiffs. O. Diez Dep. Tr. at 118 (Aug. 20, 2022). Mr. Diez explained that he was afraid that he would lose his job if he did

not comply with this City custom to target Plaintiffs for retaliatory reasons, and that "Commissioner Carollo still directing code enforcement through other people like Steven Miro, Mary Lugo, to target Mr. Fuller's businesses." *Id.* at 189.

In conjunction with the official City policy that he spearheaded, Carollo also advanced a parallel unofficial policy and custom that singled out Plaintiffs for First Amendment retaliation. For instance, Carollo directed City Manager Noriega to closely monitor all of the City's dealings with two private businesses associated with Plaintiffs—namely, Taquerias and Los Altos Mexicano. Thus, in one email, dated December 14, 2020, it was reported to Noriega that a separate governmental agency, the Florida Alcohol Beverage & Tobacco Agency, had agreed that it would not approve a permit for outdoor seating for Taquerias without first obtaining approval from the City, which of course would be denied.  See Pls.' Trial Ex. 726.  Two weeks later, on December 29, 2020, when the City's Zoning Director determined that the parking lot for Taquerias was in compliance with the City Code, City Manager Noriega again intervened, writing "Call me about this.  Do not call Joe.  Call me first."  Pls.' Trial Ex. 725. That Zoning Director, Joe Ruiz, was soon replaced by a zoning attorney who had worked for Carollo's trial counsel, Marc Sarnoff, and considers Sarnoff his mentor, without City Manager Noriega ever interviewing him for the position.

In April 2021, this unofficial but widespread custom continued, with City Manager Noriega personally visiting Taquerias on Good Friday, measuring the distance between Taquerias and a retail space that rented to a religious organization while Carollo hid in a corner, in an effort to generate a basis to shut down the business. May 30, 2023 Trial Tr. at 82-84. The next day, Saturday, April 3, 2021, City Manager Noriega was back at Taquerias, this time at 11:30 at night, to accompany a raid by police. At that time, the new Police Chief, Art Acevedo, had just arrived in town and, before being sworn in, met Noriega under circumstances that he described as "very

unusual." Apr. 18, 2023 Trial Tr. at 83. As Mr. Acevedo explained, this nighttime raid was when he "first learned from them about Mr. Fuller by name. They talked very openly about Mr. Fuller . . . and they very openly talked about the disdain this defendant [Carollo] had for Bill Fuller[.]" *Id.* At trial, Noriega tried to deny this conversation, despite testifying under oath at a prior deposition that he "remember[ed] talking to Chief Acevedo about the history there with regards to . . . the relationship between Fuller and Commissioner Carollo and … [the] bitterness between the two of them," as a result of Carollo considering Plaintiff Fuller to be his "political enemy." A. Noriega Dep. Tr. at 188-89 (Nov. 23, 2022).

According to Acevedo's trial testimony, the informal custom of retaliating against Plaintiffs could hardly be more pervasive or widespread, as it is "openly known throughout the city," and constituted "wide open knowledge in Miami that [Plaintiff Fuller] was being targeted" for his protected First Amendment activity. May 30, 2023 Trial Tr. at 103. For example, Acevedo testified that it was understood that Plaintiffs and their businesses were to be targeted in retaliation for exercising their "Constitutional rights," which was not "speculation," but rather "well known, spoken about openly in the city government." *Id.* at 84-86. He was warned that he and the Police Department would "be very busy dealing with Mr. Carollo and his obsession with Mr. Fuller, and it will be basically required to inspect and to be going into his businesses on a regular basis," subject to "the wrath of Joe Carollo" if they refused to fall in line with this unofficial custom and practice of First Amendment retaliation. *Id*. at 86-88.

Consistent with those warnings, shortly after Acevedo was sworn in as Police Chief, Noriega arranged an in-person meeting at which Carollo delivered to Acevedo a list of establishments associated with Plaintiffs for inspection. Acevedo "was incredulous" over this "open[ ] violat[ion]" of the City Charter, which prohibits Commissioners like Carollo from "giving

direction to the police department," outside the presence and without the involvement of the City Manager. Apr. 18, 2023 Trial Tr. at 98-99. As Acevedo explained, the City Manager and Commissioners adopted an informal custom that facilitated Carollo's retaliation by attempting to fabricate a "work around" that was nothing more than "a big game . . . being played in violation of the charter." *Id.* Specifically, after expressing his frustration that he could not do the same "bar checks" that "began when [he] was mayor," because he is "not supposed to go with the police . . . and point out to them, like I do, places they should look at," Carollo asked Noriega: "Mr. Manager, would you have any problems whatsoever if I could sit down with the police chief, and give him a list of places that he should begin going to in my district and even if they want to invite me to happily go with them?" to which Noriega responded, "of course not" Pls.' Trial Ex. 735; *accord* Apr. 18, 2023 Trial Tr. at 93 ("They violate the city charter on a regular basis, I used to watch the commission meetings. You can see it for yourself.").

3.    *Carollo's Unconstitutional Acts Were Ratified by a Final Decisionmaker*

Ratification occurs when a public official acts unconstitutionally, and then the final policymaker "approve[s] a subordinate's decision *and the basis for it.*" *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."); *accord Gattis v. Brice*, 136 F.3d 724, 727 (11th Cir. 1998). In other words, the final policymaking authority must ratify the actions and understand the motive for the unconstitutional behavior. *Matthews v. Columbia County*, 294 F.3d 1294, 1297-98 (11th Cir. 2002).

With respect to the formal and informal policies, practices, and customs that Carollo used to carry out a First Amendment retaliation campaign against Plaintiffs in his official capacity, the

final policymaker was the City Manager. In contrast to former City Manager Emilio Gonzalez, who refused to ratify Carollo's conduct based on its unconstitutional underpinnings, City Manager Art Noriega ratified all of Carollo's actions despite their unconstitutional roots. Consistent with the testimony of several other distinguished former City officials, Noriega himself admits that he was aware of Carollo's animus towards Plaintiffs based on their protected political activities. May 30, 2023 Trial Tr. at 89; *accord* Apr. 18, 2023 Trial Tr. at 85-86 (former Police Chief Acevedo explaining that Noriega "talked very openly about the disdain [Carollo] had for" Plaintiffs, and that Carollo's retaliation was based on Plaintiff Fuller "exercising his Constitutional rights"). Yet, Noriega acted immediately to ratify and implement Carollo's unconstitutional targeting of Plaintiffs, including by holding numerous lengthy meetings at which he instructed other City officials to "revise and **update our policies** to … **shut down**" Plaintiffs' properties and businesses. Pls.' Trial Ex. 601.

WHEREFORE, Plaintiffs respectfully request that this Court alter or correct the Final Judgment—and, if necessary, permit an amendment of pleadings—to remove any doubt that Carollo was sued both in his individual capacity and in his official capacity as City of Miami Commissioner.

Respectfully submitted,

**AXS LAW GROUP, PLLC**
2121 NW 2nd Ave, Suite 201
Wynwood, Florida 33127
Telephone: (305) 297-1878

By: */s/ Jeff Gutchess*
Jeffrey W. Gutchess Esq. (FBN702641)
jeff@axslawgroup.com
eservice@axslawgroup.com

*Counsel for Plaintiffs William Fuller and Martin Pinilla*

## **CERTIFICATE OF CONFERRAL**

Undersigned counsel for Plaintiffs, Jeffrey Gutchess, certifies that he conferred with Defendant's Counsel via Zoom on June 27th, 2023, in a good faith effort to resolve the issues raised in the motion. Defendant's Counsel advised they are not in agreement with the relief sought but the parties will continue to discuss the issues raised herein in an effort to narrow or resolve the issues.

## **CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that a true and correct copy of the forgoing was served via CM/ECF on counsel of record of in this action on this 29th day of June 2023.

By: */s/ Jeffrey Gutchess*
Jeffrey W. Gutchess Esq.