

# City of Miami Commission Districts

PLAINTIFF'S EXHIBIT

1

## LEASE

THIS LEASE (the "Lease"), dated the 1st day of December, 2016, is made between CALLE OCHO MARKET PLACE, LLC, a Florida limited liability company (the "Landlord"), and ~~Calle Ocho Distillery~~ Destileria Caneca, LLC , a Florida Limited Liability Company (the "Tenant").

**Commented [JW1]:** Update date.

### Lease Summary

The following is a summary of basic lease provisions with respect to the Lease. It is an integral part of the Lease, and terms defined or dollar amounts specified in this Summary shall have the meanings or amounts as stated, unless expanded upon in the text of the Lease and its Exhibits, which are attached to and made a part of this Summary.

1. Date of Lease

Execution: September 1, 2017

**Commented [JW2]:** Update Date.

2. "Landlord":

CALLE OCHO MARKET PLACE, LLC, a Florida limited liability company

3. Landlord's Address for Notices:

1637 SW 8th Street, Suite 200 Miami, FL 33135

4. Landlord's Wiring Instructions for Rent Payments:

To be attached hereto as Exhibit "E"

5. "Tenant":

Destile~~ria Canéc~~a, LLC, a FLORIDA limited liability company

6. Tenant's Address:

6470 NW 77th Ct., Miami, Florida 33166

7. Tenant's Address for Notices (prior to occupancy):

1386 SW 8th Street Miami, FL 33145

8. "Premises" (Section 1.1):

The Premises consist of approximately 1200 square feet of space (the "Tenant Square Footage") on two parcels at 1380 SW 8th Street "REAR" (600 SF) and 827 SW 14th Avenue "CASITA"(600 SF)(collectively, the "Property"), in City of Miami, Miami-Dade County, Florida, as more specifically described in Exhibit A, attached hereto and made a part hereof, and improvements thereon now existing or hereafter made by either party, if any.

9. Permitted Use of Premises (Section 3.1):

Tenant may use the Premises solely for a rum distillery and museum, cocktail tasting room, rum cake bakery, and gift shop.

10. Initial Term of Lease (Section 1.23):

The 36-month period commencing on the ~~Date of Lease Execution~~Rent Commencement Date and ending 3 (three) years after the ~~Date of Lease Execution~~Rent Commencement Date (the "~~Expiration Date~~Initial Term"), subject to the Option to Renew.

11. "Rent Commencement Date":

November 1, 2017.

12. "Option to Renew" (Section 1.3) (Rider 1):

Two (2) Five-Year Options pursuant to the terms described in ~~the attached Rider 1~~Section 1.3.

13. "Percentage Rent" (Section 2.2):

The Percentage Rent shall be ten percent 10% of the gross sales of Tenant, as further described in Paragraph 2.2.

PLAINTIFF'S EXHIBIT

**3**

CONFIDENTIAL

14. Security Deposit (Section 1.4):    $7,500.00 (due upon Tenant's execution of Lease).

15. Minimum Hours of Operation:    10:00am – 5:00pm Monday - Sunday (Tenant may extend hours of operation as permitted by law at its sole discretion)

16. Tenant's Share of Expenses:    16.84% (approx. 1244 sq. ft. of 7385 sq. ft). Tenant's Share of Expenses shall be adjusted in the event the rentable area of the Property is increased or decreased.

<u>ARTICLE I. GRANT; TERM; CONDITIONS PRECEDENT.</u>

1.1 In consideration of the performance by Tenant of its obligations under this Lease, Landlord leases to Tenant, and Tenant leases from Landlord, for the Term, the "Premises" described in the Lease Summary.

1.2 Term. The "Term" of the Lease is the period from the Rent Commencement Date as specified in the Lease Summary, through the ~~Expiration Date~~Initial Term, as specified in the Lease Summary, and any Option to Renew exercised by Tenant, as described in Section 1.3 of this Agreement.

1.3 Option to Renew. Tenant may, at its option, renew the Lease for up to two (2) additional five (5) year term(s) (each, a "Renewal Term") for the Percentage Rent. Upon any such renewal, the Lease shall continue in full force and effect for each Renewal Term upon the same terms and conditions as are contained herein. Tenant shall exercise each option to extend the Term by delivering written notice thereof to Landlord at least thirty (30) days prior to the end of the Initial Term or the then current Renewal Term ("Renewal Notice").

1.4 Security Deposit. The security deposit shall secure the performance of the Tenant's obligations hereunder. Landlord may, but shall not be obligated to apply all or portions of the Security Deposit on account of Tenant's obligations hereunder. In the event that Landlord applies all or a portion of the Security Deposit to Tenant's obligations hereunder, Tenant shall be obligated within 10 days of receipt of notice from Landlord, to deposit cash with Landlord in an amount sufficient to restore the Security Deposit to the full amount stated in Lease Summary above. Failure to deposit such cash shall be a default under the terms of this Lease. Provided Tenant is not in default, any balance remaining upon the termination of this Lease shall be returned to Tenant. Tenant shall not have the right to apply the Security Deposit in payment of the last month's rent. No interest shall be paid by Landlord on the Security Deposit. In the event of a transfer or assignment of Landlord's rights hereunder, Landlord shall have the right to transfer the Security Deposit to the transferee or assignee, and upon such transfer or assignment, Landlord shall have no further liability with respect thereto, and Tenant agrees to look solely to such transferee or assignee for the return of the Security Deposit. Landlord shall not be required to keep the Security Deposit in a segregated account.

<u>ARTICLE II. RENT.</u>

2.1 Covenant to Pay. Commencing on the Rent Commencement Date, Tenant shall pay to Landlord all sums due hereunder as they come due from time to time without prior demand, together with all applicable Florida sales tax thereon. All sums due from Tenant shall be deemed to be "rent" whether or not specifically designated as such. All rent required to be paid by Tenant to Landlord shall be payable per the wiring instructions to be supplied by Landlord simultaneously with the execution of this Lease. Percentage Rent for any "Lease Year" consisting of less than twelve (12) months shall be prorated on a per diem basis, based upon a period of 365 days. "Lease Year" means the twelve (12) full calendar months commencing on the Rent Commencement Date. However, the final Lease Year may contain less than twelve (12) months due to expiration or sooner termination of the Term. ~~Tenant agrees that its covenant to pay rent is an independent covenant and that all such amounts are payable without counterclaim, set-off, deduction, abatement, or reduction whatsoever, except as otherwise expressly provided for in this Lease.~~

2.2 Percentage Rent. Percentage Rent is defined as ten percent (10%) of the total sales and other revenue derived directly or indirectly from or though Tenant's use of the Premises. Tenant shall pay Percentage Rent for the Term in monthly installments on or before the fifth (5th) day of each calendar month of each year of the Term. Tenant shall deliver, with each payment of Percentage Rent, a statement of Gross Sales, certified as correct by Tenant, showing the computations of gross sales. Landlord will have the right to audit and examine the books and records of Tenant for a period of up to five (5) years after Tenant delivers its monthly statements to Landlord and all such books and records will be kept available for such purpose. If such an audit shows that any Tenant's statement as to Percentage Rent understated the amount actually due from Tenant, Tenant will pay the amount of such underpayment, plus (if the audit shows that Tenant's statement of Percentage Rent due for the audited period understated the amount actually due from Tenant by up to three percent (3%)) the reasonable costs of the audit, within thirty (30) days after receiving the audit results. If such audit shows that Tenant's statement of Percentage Rent due for the audited

> **Commented [JW3]:** We need to specify what revenue this 10% will be based on.  Will it be the $ paid at the door to go inside, sales that occur inside, and bottles ordered there and shipped outside? What if an order is placed online to order a bottle for shipment, does that go towards the % rent?

{30802985;1} 2

period understated the amount actually due from Tenant by more than three percent (3%) Tenant shall, in addition to paying the underpayment and the cost of the audit, pay to Landlord a fee of ten percent (10%) of such understatement. If such an audit shows that the monthly statement overstated the amount actually due from Tenant, Landlord shall, at Tenant's option, either (1) apply the overpayment to the next installments of the Rent or other amounts due under this Lease or (2) return such overpayment to Tenant within thirty (30) days after Landlord's receipt of such request from Tenant.

2.3 Utilities; Waste Disposal; HVAC. Tenant shall pay to the applicable utility company or third-party vendor (as may be designated by the Landlord at the Landlord's discretion) all electricity, water, telephone, and other utility charges applicable to the Premises, including deposits, janitorial and trash disposal services at the Premises. To the extent possible, Tenant, at its expense, shall cause all utilities to be placed in Tenant's name. In addition to the Percentage Rent, Tenant shall also pay Landlord on a monthly basis along with the Percentage Rent, its proportionate 16.84% share of all Common Area Expenses based on the Tenant's Share of Expenses (the "Common Area Reimbursement"), such Common Area Expenses which may include, without limitation: (i) any insurance covering the Property that Landlord deems prudent, in its sole discretion, (ii) the cost of security, janitorial, landscaping, garbage removal, and trash removal services; (iii) the cost of all fuel, water, electricity, telephone, and any other utilities used at the Property and not billed directly to a tenant; (iv) management fees, salaries, wages, and any other amounts paid or payable for all personnel involved in the repair, maintenance, operation, security, supervision, or cleaning of the Property. Tenant shall not be entitled to any abatement or other adjustment of the rent payable under this Lease as the result of the failure, interruption, diminution, or other impairment of any services, including those specifically set out in this Subsection 2.3.

2.4 Real Property Taxes. Tenant shall pay to the applicable governmental authorities before they become delinquent (or to the Landlord at the sole discretion of the Landlord), the Tenant's 16.84% share of Expenses of all real estate taxes (both real and personal), assessments (both general and special), and other governmental impositions of every kind and nature whether ordinary or extraordinary, foreseen or unforeseen, assessed against the Property, Premises or any part thereof during the Term hereof (collectively, "Taxes"). Tenant shall deliver to Landlord receipts or other reasonable satisfactory evidence of payment of all such Taxes so paid by Tenant. Notwithstanding anything herein to the contrary, if at any time during the Term there shall be levied or assessed in substitution of real estate taxes, in whole or in part, a tax, assessment, or governmental imposition (other than a general gross receipts or income tax) on the rents received from the Premises or the rents reserved herein, and said tax, assessment, or governmental imposition shall be imposed upon Landlord, Tenant shall pay same as hereinabove provided. Tenant shall also pay, when due, all taxes attributable to the personal property, trade fixtures, business, occupancy, or sales of Tenant or any other occupant of the Premises and to the use of the Premises by Tenant or such other occupant.

2.5 Rent Past Due. If any payment due from Tenant shall be overdue by more than 5 days, a late charge of five (5%) percent of the delinquent sum may be charged by Landlord. If any payment due from Tenant shall remain overdue for more than fifteen (15) days, an additional late charge in an amount equal to the lesser of the highest rate permitted by law or one and one-half (1 1/2%) percent per month (eighteen (18%) percent per annum) of the delinquent amount may be charged by Landlord, such charge to be computed for the entire period for which the amount is overdue and which shall be in addition to and not in lieu of the five (5%) percent late charge or any other remedy available to Landlord.

2.6 "Triple" Net Lease. This Lease is a completely "triple net lease" to Landlord. Landlord is not responsible for any expenses or outlays of any nature arising from or relating to the Premises, the use or occupancy thereof, the contents thereof, or the business carried on therein other than as part of the Common Are Reimbursement. Tenant shall pay all charges, impositions, and outlays of every nature and kind relating to the Premises, excluding Excessive Repairs, as defined in Section 5.3 of this Agreement.

ARTICLE III. USE OF PREMISES.

3.1 Permitted Use. The Premises shall be used and occupied only for the use specified in the Lease Summary. Tenant shall carry on its business on the Premises in a reputable manner and shall not do, omit, permit, or suffer to be done or exist upon the Premises anything which shall result in a nuisance, hazard, or bring about a breach of any provision of this Lease or any applicable present or future governmental or quasigovernmental laws, ordinances, rules, regulations, codes, or orders ("Legal Requirements"), including without limitation the Americans with Disabilities Act and the regulations promulgated with respect thereto. Tenant shall observe all reasonable rules and regulations found in this Lease Agreement. and amendments thereto established by Landlord from time to time for the Premises and shall not place anything on, or otherwise obstruct, any portion of the Common Areas or use the Mercado, corridor or any other Common Areas adjacent to the Premises for the sale or display of any merchandise or for any other business, occupation or undertaking except as permitted in this Lease.

3.2 Business Operations. Tenant shall not leave the Premises unoccupied or vacant and shall continuously conduct and carry on the Premises the type of business for which the Premises are leased. Tenant shall keep in stock in the Premises a full and

{30802985;1}  3

**Commented [JW4]:** We need a copy of property taxes over past 3 years.

ample line of merchandise for the purposes of carrying on the business permitted under this Lease, stock mix and values to be determined by Tenant's in its sole discretion. Tenant shall maintain an adequate staff to properly carry on its business and operate Tenant's business in an efficient and diligent manner, staffing levels to be determined by Tenant's in its sole discretion. Tenant agrees to be continuously open for business during the Minimum Hours set forth in the Lease Summary above, except for holidays and when Tenant is prevented from doing so by strikes, lockouts or other causes beyond the reasonable control of Tenant. Tenant shall also have its window displays and exterior advertising displays adequately illuminated during the hours set forth in the Lease Summary.

3.3 Compliance with Legal Requirements. The Premises shall be used and occupied in a safe, careful, and proper manner so as not to contravene any Legal Requirements, or the requirements of Landlord's or Tenant's insurers. If due to Tenant's use of the Premises, repairs, improvements, or alterations are necessary to comply with any of the foregoing, Tenant shall pay the entire cost thereof.

3.4 Signs. Except with the prior written consent of Landlord, which shall not be unreasonably withheld, Tenant shall not erect, install, display, inscribe, paint, or affix any signs, lettering, or advertising medium on the Premises including without limitation upon or above any exterior portion of the improvements. Any exterior signage that may be approved by Landlord shall be installed by Tenant at Tenant's expense, and such signage shall comply with all applicable Legal Requirements. The design and specification of such signage shall be submitted for Landlord's prior written approval, which shall not be unreasonably withheld.

3.5 Environmental Provisions. Tenant warrants and represents that Tenant will not use or employ any portion of the Premises and/or the improvements, facilities, or equipment to handle, transport, store, treat, or dispose of any hazardous waste or hazardous substance, except as would normally be found in a Distilled Spirits Plant, whether or not it was generated or produced on the Premises; and, Tenant further warrants and represents that any activity on or relating to the Premises shall be conducted in full compliance with all applicable environmental Legal Requirements. Tenant agrees to defend, indemnify, and hold harmless Landlord and other tenants at the Property against any and all claims, costs, expenses, damages, liability, and the like, including without limitation reasonable attorneys' fees, which Landlord and other tenants at the Property may hereafter be liable for, suffer, incur, or pay arising under any applicable environmental Legal Requirements and resulting from or arising out of any breach of the warranties and representations contained in this Section 3.5, or out of any act, activity, or violation of any applicable environmental Legal Requirements on the part of Tenant, its agents, employees, or assigns. Tenant's liability under this Section 3.5 shall survive the expiration or any termination of this Lease. Landlord shall require all other tenants at the Property to execute provisions similar to this Section 3.5.

3.6 Common Areas: Common Areas shall mean those areas of the Property devoted to corridors, restrooms, mechanical rooms, janitorial closets, electrical and telephone closets, and other similar facilities, including, but not limited to the "Mercado", provided for the common use or benefit of tenants of the Property generally and/or the general public and other common areas or space, improvements, utility systems, equipment (as such Common Areas may be enlarged, reduced, replaced, increased, removed or otherwise altered by Landlord in its sole discretion) of the Property, and any other areas and improvements on the Property that are made available from time to time by Landlord for the common use or benefit of Landlord and tenants, occupants and users of the Property, and the general public. The "Common Area Expenses" are all those expenses incurred by the Landlord directly or indirectly relating to the maintenance and repair of the Common Areas.

ARTICLE IV. ACCESS AND ENTRY.

4.1 Right of Examination; Right to Show Premises. Landlord shall be entitled at all reasonable times and upon reasonable notice to enter the Premises to examine them, and to show the Premises to prospective purchasers, lenders, or anyone having a prospective interest in the Premises, including prospective Tenants. Landlord shall exercise its rights under this Section in such a manner so as to minimize interference with Tenant's use and enjoyment of the Premises.

ARTICLE V. CONSTRUCTION; MAINTENANCE, REPAIRS, AND ALTERATIONS.

5.1 As-Is. Tenant acknowledges and agrees that Tenant has had the opportunity for full and complete examination and inspection of the Premises and that Tenant is accepting the Premises in "as-is" condition on the date of this Lease and Landlord shall have no obligation whatsoever to furnish, render, or supply any money, work, labor, fixture, material, decoration, or equipment in order to prepare the Premises for Tenant's occupancy, except as specifically indicated in the Work Letter (as referenced in Section 5.2 herein). Tenant's acceptance of this lease is conditioned upon Landlord has not made and does not make any representations or warranties, express or implied, of any type, including, without limitation, the physical or

{30802985;1} 4

~~environmental condition of the Premises, its fitness for any particular use, or the compliance of the Premises with any applicable Legal Requirements. Tenant~~<u>Landlord's</u> guarantee that the ~~is aware that the~~ current zoning of the Property ~~does not~~ <u>allows for permit</u> the Permitted Use and that (i) Tenant ~~is solely responsible,~~ at Tenant's sole cost and expense, <u>shall be able</u> to obtain all necessary permits to operating the Permitted Use, and (ii) this Lease i~~s not~~ contingent on Tenant being able to use the Premises for the Permitted Use. Further, there are no parking spaces on the Premises and Tenant shall be solely responsible, at its own cost, for fulfilling any parking requirements related to the Permitted Use.

5.2 Work Letter. Tenant and Landlord shall construct Tenant's Intended Improvements in accordance with the Work Letter Agreement attached hereto and made a part hereof as Exhibit "B" (the "Work Letter").

5.3 Maintenance and Repairs. Tenant shall, at its sole cost, keep the Premises in good repair, Tenant shall maintain and make all repairs, replacements and alterations of every kind with respect to the Premises to keep it in good condition, including the storefront glass, all interior and exterior doors, signs, ceilings, interior walls, interior side of perimeter walls, floors, floor coverings, plumbing, electric, heating, and air conditioning and all ducts, vents, lines, pipes, conduits, refrigerant lines, exhausts, sprinklers and light fixtures, and other non-structural interior portions of the Premises including such portions within the demising or exterior walls or the ceiling that are adjacent to or within the Premises (the "Tenant Facilities")_ , and do all repairs required by any laws, ordinances, or requirements of public authorities. In addition, Tenant shall be responsible for routine maintenance of the HVAC system exclusively serving the Premises and shall maintain a monthly contract with such HVAC system vendor. At the discretion of Landlord, Tenant shall maintain a monthly pest control contract. At the expiration or earlier termination of the Term, Tenant shall surrender the Premises to Landlord in as good condition and repair as Tenant is required to maintain the Premises throughout the Term, reasonable wear and tear excepted. <u>Notwithstanding any other provision of this Section, or Agreement in general, Tenant shall not be responsible for making repairs to the Premises that are made necessary by any cause other than the intentional actions or gross negligence of the Tenant if the cost of making said repairs would not be reasonably expected to be profitably recovered by Tenant through the ongoing use of the Premises for business purposes during the remainder of the then-current Term (hereinafter, "Excessive Repairs").</u>

5.4 Approval of Tenant's Alterations. No alterations (including, without limitation, repairs, replacements, additions, or modifications to the Premises by Tenant) shall be made to the Premises without Landlord's written approval, which approval, as to interior, nonstructural alterations, will not be unreasonably withheld, and which approval, as to exterior or structural alterations, may be withheld in Landlord's sole discretion. Any alterations by Tenant shall be performed at the sole cost of Tenant, by contractors and workers approved by Landlord, which will not be unreasonably withheld, in a good and workmanlike manner, and in accordance with all applicable Legal Requirements. Tenant shall give Landlord at least 10 days' written notice prior to commencement of any alteration work.

5.5 Removal of Improvements and Fixtures. All leasehold improvements (other than unattached, movable trade fixtures which can be removed without damage to the Premises) shall at the expiration or earlier termination of this Lease become Landlord's property. Tenant may, during the Term, in the usual course of its business, remove its trade fixtures, provided that Tenant is not in default under this Lease; and Tenant shall, at the expiration or earlier termination of the Term, at its sole cost, remove such of the leasehold improvements and trade fixtures in the Premises as Landlord shall require to be removed and restore the Premises to the condition existing prior to such removal. Tenant shall at its own expense repair any damage caused to the Premises by such removal. If Tenant does not remove its trade fixtures at the expiration or earlier termination of the Term, the trade fixtures shall, at the option of Landlord, become the property of Landlord and may be removed from the Premises and sold or disposed of by Landlord in such manner as it deems advisable without any accounting to Tenant.

5.6 Liens. Tenant shall promptly pay for all materials supplied and work done in respect of the Premises so as to ensure that no lien is recorded against any portion of the Premises or against Landlord's or Tenant's interest therein. If a lien is so recorded, Tenant shall discharge it promptly by payment or bonding. If any such lien against the Premises and/or Landlord's interest therein is recorded and not discharged by Tenant as above required within fifteen (15) days following recording, Landlord shall have the right to remove such lien by bonding or payment and the cost thereof shall be paid immediately from Tenant to Landlord. Landlord and Tenant expressly agree and acknowledge that no interest of Landlord in the Premises shall be subject to any lien for improvements made by Tenant in or for the Premises, and Landlord shall not be liable for any lien for any improvements made by Tenant, such liability being expressly prohibited by the terms of this Lease. In accordance with applicable law, Landlord may file in the appropriate public records a public notice containing a true and correct copy of this paragraph, and Tenant hereby agrees to inform all contractors, subcontractors, and material suppliers performing work in or for or supplying materials to the Premises of the existence of said notice.

ARTICLE VI. INSURANCE AND INDEMNITY.

{30802985;1}  5

6.1 Tenant's Insurance. Tenant shall, throughout the Term (and any other period when Tenant is in possession of the Premises), maintain at its sole cost the following insurance:

(a) Casualty insurance for the replacement value of the Tenant's essential equipment, furnishing, fixtures, and property owned by the Tenant with such replacement value to be adjusted no less than annually, with no coinsurance penalty provision, naming Tenant and Landlord as insured parties, containing a waiver of subrogation rights which Tenant's insurers may have against Landlord and against those for whom Landlord is in law responsible including, without limitation, its directors, officers, agents, and employees. Such insurance shall insure the Premises for property damage, wind and hurricane damage, water damage, plate glass damage, and sprinkler leakage legal liability.

(b) Commercial general liability insurance. Such policy shall contain inclusive limits of $1,000,000 per occurrence; $2,000,000 general aggregate for bodily injury, personal injury and property damage; and shall include Landlord as additional insured.

(c) Worker's compensation and employer's liability insurance in compliance with applicable Legal Requirements.

(d) Business interruption insurance sufficient to provide at least one (1) years' of rent payments under this Lease.

(e) Liquor liability insurance, if the Premises will be serving alcohol.

(f) Any other form of insurance which Landlord, acting reasonably, requires from time to time in form, in amounts, and for risks against which a prudent Tenant would insure.

6.2 Loss or Damage. Landlord shall not be liable for any death or injury arising from or out of any occurrence in, upon, at, or relating to the Premises or damage to property of Tenant or of others located on the Premises, nor shall it be responsible for any loss of or damage to any property of Tenant or others from any cause, unless such death, injury, loss, or damage results from the gross negligence or willful misconduct of Landlord. Without limiting the generality of the foregoing, Landlord shall not be liable for any injury or damage to persons or property resulting from fire, explosion, falling plaster, falling ceiling tile, falling fixtures, steam, gas, electricity, water, rain, flood, natural disasters, or leaks from any part of the Premises or from the pipes, sprinklers, appliances, plumbing works, roof, windows, or subsurface of any floor or ceiling of the improvements or from the street or any other place or by dampness, or by any other cause whatsoever, unless caused by the gross negligence or willful misconduct of Landlord. Tenant agrees to indemnify Landlord and hold it harmless from and against any and all loss (including loss of Percentage Rent payable in respect to the Premises), claims, actions, damages, liability, and expense of any kind whatsoever (including reasonable attorneys' fees and costs at all tribunal levels), unless caused by the gross negligence or willful misconduct of Landlord, arising from any occurrence in, upon, or at the Premises, or the occupancy, use, or improvement by Tenant or its agents or invitees of the Premises or any part thereof, or occasioned wholly or in part by any act or omission of Tenant its agents, employees, and invitees or by anyone permitted to be on the Premises by Tenant.

6.3 Landlord's Insurance. Landlord may, but is not obligated to, carry property, liability, and such other forms of insurance as Landlord desires.

6.4 Waiver of Recovery/Subrogation. Notwithstanding anything to the contrary contained in this Lease, Landlord and Tenant each hereby waives on behalf of itself and its insurers (none of which shall ever be assigned any such claim or be entitled thereto due to subrogation or otherwise) any and all rights of recovery, claim, action, or cause of action, against the other, its agents, officers, or employees, for any loss or damage that may occur to the Premises, or any improvements thereon, or any personal property of such party therein, by reason of fire, the elements, or any other causes which are, or could or should be insured against under the terms of the standard property insurance policies referred to in this Lease, regardless of whether such insurance is actually maintained and regardless of the cause or origin of the damage involved, including negligence of the other party hereto, its agents, officers, or employees. Landlord and Tenant shall cause each of their respective property insurance policies hereunder to contain, or be endorsed with, a provision by which the insurer shall waive its right of subrogation against the other party hereto.

All policies referred to above shall: (i) be taken out with insurers licensed to do business in Florida and reasonably acceptable to Landlord; (ii) be in a form reasonably satisfactory to Landlord; (iii) be non-contributing with, and shall apply only as primary and not as excess to any other insurance available to Landlord or any mortgagee of Landlord; (iv) contain an undertaking by the insurers to notify Landlord by certified mail not less than thirty (30) days prior to any material change, cancellation, or termination. Certificates or Evidence of Insurance acceptable to Landlord or, if required by a mortgagee, copies of such insurance policies certified by an authorized officer of Tenant's insurer as being complete and current, shall be delivered to Landlord promptly upon request. If (A) Tenant fails to take out or to keep in force any insurance referred to in this Section 6.1, or should any such insurance not be approved by either Landlord or any mortgagee, and (B) Tenant does not commence and continue to diligently cure such default within two (2) business days after written notice by Landlord to Tenant specifying the nature of such default, then Landlord has the right, without assuming any obligation in connection therewith, to effect such insurance at the sole cost of Tenant and all outlays by Landlord shall be paid by Tenant to Landlord without prejudice to any other rights or remedies of Landlord under this Lease. Tenant shall not keep or use in the Premises any article which may be prohibited by any fire or casualty insurance policy in force from time to time covering the Premises or any improvements.

{30802985;1} 6

**CONFIDENTIAL**

**FULLER000006**

ARTICLE VII. DAMAGE AND DESTRUCTION.

7.1 Damage to Premises. If the Premises (including any improvements thereon) are at any time destroyed or damaged in whole or in part as a result of fire or any other occurrence, then Tenant shall promptly give notice to Landlord. Landlord shall cooperate with Tenant to obtain maximum insurance benefits by endorsement or otherwise in a timely manner, in order to pay for the cost of restoration, repairs, replacement, rebuilding, or alterations due to damage to Premises. Should either Landlord or Tenant, in its sole and absolute discretion, determine that the Premises are unable to be adequately rebuilt or repaired, or if Excessive Repairs are necessitated for the continued use of the Premises for the business operations of the Tenant, Landlord either Party may terminate this lease upon 15 days written notice to Tenantthe other Party.

ARTICLE VIII. ASSIGNMENT, LEASES, AND TRANSFERS.

8.1 Transfer by Tenant. Tenant shall not enter into, consent to, or permit any Transfer, as hereinafter defined, without the prior written consent of Landlord in each instance, which consent shall be made at Landlord's sole and absolute discretion with or without causenot be unreasonably withheld. For purposes of this Lease, "Transfer" means an assignment of this Lease in whole or in part; a Lease of all or any part of the Premises; any transaction whereby the rights of Tenant under this Lease or to the Premises are transferred to another; or any mortgage or encumbrance of this Lease or the Premises or any part thereof or other arrangement under which either this Lease or the Premises become security for any indebtedness or other obligations; and if Tenant is a corporation or a partnership, the transfer of a controlling interest in the stock of the corporation or partnership interests, as applicable. If there is a permitted Transfer, Landlord may collect rent or other payments from the transferee and apply the net amount collected to the rent or other payments required to be paid pursuant to this Lease but no acceptance by Landlord of any payments by a transferee shall be deemed a waiver of any provisions hereof regarding Tenant. Notwithstanding any Transfer, Tenant shall not be released from any of its obligations under this Lease. In connection with Landlord's review of any proposed Transfer, Tenant shall pay to Landlord the reasonable attorneys' fees incurred by Landlord. Landlord's consent to any Transfer shall be subject to the further condition that if the Percentage Rent pursuant to such Transfer exceeds the Percentage Rent payable under this Lease, the amount of such excess shall be paid to Landlord. If, pursuant to a permitted Transfer, Tenant receives from the transferee, either directly or indirectly, any consideration other than Percentage Rent for such Transfer, either in the form of cash, goods, or services, Tenant shall, upon receipt thereof, pay to Landlord an amount equivalent to such consideration.

8.2 Assignment by Landlord. Landlord shall have the unrestricted right to sell, lease, convey, or otherwise dispose of the Premises and this Lease or any interest of Landlord in this Lease. To the extent that the purchaser or assignee from Landlord assumes the obligations of Landlord under this Lease, Landlord shall thereupon and without further agreement be released of all further liability under this Lease. If Landlord sells its interest in the Premises, it shall deliver any security deposit to the purchaser and Landlord will thereupon be released from any further liability with respect to the security deposit or its return to Tenant and the purchaser shall become directly responsible to Tenant. Landlord shall give Tenant reasonable notice of any assignment of this Lease.

ARTICLE IX. DEFAULT.

9.1 Defaults. A default by Tenant shall be deemed to have occurred hereunder, if and whenever: (i) any Percentage Rent is not paid within ten (10) days after due; (ii) any other additional rent is in arrears and is not paid within ten (10) days after written demand by Landlord; (iii) Tenant has breached any of its obligations in this Lease (other than the payment of rent) and Tenant fails to remedy such breach within thirty (30) days (or such shorter period as may be provided in this Lease) after written notice from Landlord, or if such breach cannot reasonably be remedied within thirty (30) days (or such shorter period) after written notice from Landlord, then if Tenant fails to immediately commence to remedy and thereafter proceed diligently to remedy such breach, in each case after notice in writing from Landlord; (iv) Tenant becomes bankrupt or insolvent; (v) any of Landlord's policies of insurance with respect to the Premises are cancelled or adversely changed as a result of Tenant's use or occupancy of the Premises; or (vi) the business operated by Tenant in the Premises shall be closed by governmental or court order for any reason.

**CONFIDENTIAL**                                                    **FULLER000007**

9.2 Remedies. In the event of any default hereunder by Tenant, then without prejudice to any other rights which it has pursuant to this Lease or at law or in equity, Landlord shall have the following rights and remedies, which are cumulative and not alternative:

(a) Landlord may cancel this Lease and retake possession of the Premises for Landlord's account, or may terminate Tenant's right to possession (without terminating this Lease), for the account of Tenant. In either event, Tenant shall then quit and surrender the Premises to Landlord. Tenant's liability under all of the provisions of this Lease shall continue notwithstanding any expiration and surrender, or any re-entry, repossession, or disposition hereunder.

(b) Landlord may enter the Premises as agent of Tenant to take possession of any property of Tenant on the Premises, to store such property at the expense and risk of Tenant or to sell or otherwise dispose of such property in such manner as Landlord may see fit. Landlord shall not be liable in any way in connection with its actions pursuant to this Section, to the extent that its actions are in accordance with applicable Legal Requirements.

(c) If Tenant's right to possession is terminated (without terminating this Lease) under subsection (a) above, Tenant shall remain liable (in addition to accrued liabilities) to the extent legally permissible for all rent and all of the charges Tenant would have been required to pay until the date this Lease would have expired had such cancellation not occurred. Tenant's liability for rent shall continue notwithstanding re-entry or repossession of the Premises by Landlord.

(d) Landlord may relet all or any part of the Premises for all or any part of the unexpired portion of the Term of this Lease or for any longer period, and may accept any rent then attainable; grant any concessions of rent, and agree to paint or make any special repairs, alterations, and decorations for any new Tenant as it may deem advisable in its sole and absolute discretion. Landlord shall be under no obligation to relet or to attempt to relet the Premises, except as expressly set forth below.

(e) If Tenant's right to possession is terminated (without terminating this Lease) under subsection (a) above, and Landlord so elects, the rent hereunder shall be accelerated and Tenant shall pay Landlord damages in the amount of any and all sums which would have been due for the remainder of the Term (reduced to present value using a discount factor equal to the stated prime lending rate on the date of Tenant's default as published in the Wall Street Journal). Prior to or following payment in full by Tenant of such discounted sum promptly upon demand, Landlord shall use good faith efforts to relet the Premises. If Landlord receives consideration as a result of a reletting of the Premises relating to the same time period for which Tenant has paid accelerated rent, such consideration actually received by Landlord, less any and all of Landlord's cost of repairs, alterations, additions, redecorating, and other expenses in connection with such reletting of the Premises, shall be a credit against such discounted sum, and such discounted sum shall be reduced if not yet paid by Tenant as called for herein, or if Tenant has paid such discounted sum, such credited amount shall be repaid to Tenant by Landlord (provided said credit shall not exceed the accelerated amount).

(f) Landlord may remedy or attempt to remedy any default of Tenant under this Lease for the account of Tenant and to enter upon the Premises for such purposes. Landlord shall not be liable to Tenant for any loss or damage caused by acts of Landlord in remedying or attempting to remedy such default and Tenant shall pay to Landlord all expenses incurred by Landlord in connection with remedying or attempting to remedy such default. Any expenses incurred by Landlord shall accrue interest from the date of payment by Landlord until repaid by Tenant at the highest rate permitted by law.

CONFIDENTIAL

FULLER000008

**Formatted:** Indent: First line:  0.5", Page break before

CONFIDENTIAL                                         FULLER000009

(e) If Tenant's right to possession is terminated (without terminating this Lease) under subsection (a) above, and Landlord so elects, the rent hereunder shall be accelerated and Tenant shall pay Landlord damages in the amount of any and all sums which would have been due for the remainder of the Term (reduced to present value using a discount factor equal to the stated prime lending rate on the date of Tenant's default as published in the Wall Street Journal). Prior to or following payment in full by Tenant of such discounted sum promptly upon demand, Landlord shall use good faith efforts to relet the Premises. If Landlord receives consideration as a result of a reletting of the Premises relating to the same time period for which Tenant has paid accelerated rent, such consideration actually received by Landlord, less any and all of Landlord's cost of repairs, alterations, additions, redecorating, and other expenses in connection with such reletting of the Premises, shall be a credit against such discounted sum, and such discounted sum shall be reduced if not yet paid by Tenant as called for herein, or if Tenant has paid such discounted sum, such credited amount shall be repaid to Tenant by Landlord (provided said credit shall not exceed the accelerated amount).

(f) Landlord may remedy or attempt to remedy any default of Tenant under this Lease for the account of Tenant and to enter upon the Premises for such purposes. Landlord shall not be liable to Tenant for any loss or damage caused by acts of Landlord in remedying or attempting to remedy such default and Tenant shall pay to Landlord all expenses incurred by Landlord in connection with remedying or attempting to remedy such default. Any expenses incurred by Landlord shall accrue interest from the date of payment by Landlord until repaid by Tenant at the highest rate permitted by law. 9.3 Costs. Tenant shall pay to Landlord on demand all costs incurred by Landlord, including reasonable attorneys' fees and costs at all tribunal levels, incurred by Landlord in enforcing any of the obligations of Tenant under this Lease. In addition, upon any default by Tenant, Tenant shall be also liable to Landlord for the expenses to which Landlord may be put in re-entering the Premises; repossessing the Premises; painting, altering, or dividing the Premises; putting the Premises in proper repair; protecting and preserving the Premises by placing watchmen and caretakers therein; reletting the Premises (including reasonable attorneys' fees and disbursements, Marshall's fees, and brokerage fees, in so doing); and any other expenses reasonably incurred by Landlord.

9.4 Additional Remedies; Waiver. The rights and remedies of Landlord set forth herein shall be in addition to any other right and remedy now and hereinafter provided by law. All rights and remedies shall be cumulative and non-exclusive of each other. No delay or omission by Landlord in exercising a right or remedy shall exhaust or impair the same or constitute a waiver of, or acquiescence to, a default.

9.5 Default by Landlord. In the event of any default by Landlord, Tenant's exclusive remedy shall be an action for damages or injunction, but Pprior to any such action for default by Landlord, Tenant will give Landlord written notice specifying such default with particularity, and Landlord shall have a period of thirty (30) days following the date of such notice in which to cure such default (provided, however, that if such default reasonably requires more than thirty (30) days to cure, Landlord shall have a reasonable time to cure such default, provided Landlord commences to cure within such thirty (30) day period and thereafter diligently prosecutes such cure to completion). Notwithstanding any provision of this Lease, Landlord shall not at any time have any personal liability under this Lease. In the event of any breach or default by Landlord of any term or provision of this Lease, Tenant agrees to look solely to the equity or interest then owned by Landlord in the Premises (including the proceeds of insurance, condemnation, and sale), and in no event shall any deficiency judgment be sought or obtained against Landlord.

9.6 Prevailing Party. Notwithstanding anything to the contrary contained in this Lease, in the event of any litigation between Landlord and Tenant arising out of this Lease or Tenant's use and occupancy of the Premises, the prevailing party shall be entitled to recover its costs and expenses incurred in such litigation, including reasonable attorneys' fees, at all levels, before during, and after trial, and on appeal.

ARTICLE X. ESTOPPEL CERTIFICATE; SUBORDINATION.

10.1 Estoppel Certificate. Within ten (10) business days after written request by Landlord, Tenant shall deliver in a form supplied by Landlord, an estoppel certificate to Landlord as to the status of this Lease, including whether this Lease is unmodified and in full force and effect (or, if there have been modifications, that this Lease is in full force and effect as modified and identifying the modification agreements); the amount of Percentage Rent then being paid and the dates to which same have been paid; whether there is any existing or alleged default by either party, or whether any facts exist which, with the passing of time or giving of notice, would constitute a default and if there is any such default or facts, specifying the nature and extent thereof; and any other matters pertaining to this Lease as to which Landlord shall request such certificate. Any prospective purchaser, lender, or ground lessor shall have the right to rely on such certificate. An example of an acceptable form of estoppel certificate is attached hereto and made a part hereof as Exhibit "C". Such form is not meant to be the exclusive form of estoppel certificate that Tenant will deliver; it is intended to be an example of an acceptable form.

10.2 Subordination; Attornment.

{30802985;1}   10

**Formatted:** Indent: First line: 0.5", No bullets or numbering

**Commented [JW6]:** NO, we do not know how much equity the LL has in the property.

(a) This Lease and all rights of Tenant shall be subject and subordinate to any and all mortgages, security agreements, or like instruments resulting from any financing, refinancing, or collateral financing (including renewals or extensions thereof), and to any and all ground leases, made or arranged by Landlord or any person or entity claiming through Landlord, of its interests in all or any part of the Premises), from time to time in existence against the Premises, whether now existing or hereafter created. Such subordination shall not require any further instrument to evidence such subordination. However, on request, Tenant shall further evidence its agreement to subordinate this Lease and its rights under this Lease to any and all documents and to all advances made under such documents. The form of such subordination shall be made as required by Landlord, its lender, or ground lessor. Tenant shall, if requested by such mortgagee, owner, or purchaser, or by any person succeeding to the interest of such mortgagee, owner, or purchaser, as the result of the enforcement of the remedies provided by law or the applicable security instrument held by such mortgagee, owner, or purchaser, automatically become Tenant of any such mortgagee, owner, purchaser, or successor-in-interest, without any change in the terms or other provisions of this Lease; provided, however, that said mortgagee, owner, purchaser, or successor shall not be bound by (a) any payment of rent or additional rent for more than one month in advance, or (b) any security deposit not actually received by such mortgagee, owner, purchaser, or successor, or (c) any amendment or modification in this Lease made without the consent of such mortgagee, or (d) any construction obligation, free rent, or other concession or monetary allowance, or (e) any set-off, counterclaim, or the like otherwise available against Landlord, or (f) any act or omission of any prior Landlord (including Landlord). Upon request by said mortgagee, owner, purchaser, or successor, Tenant shall execute and deliver an instrument or instruments confirming its attornment.

(b) Notwithstanding the foregoing, Landlord may make efforts to request a Subordination, Non-Disturbance and Attornment Agreement ("SNDA") from each mortgagee and ground lessor, such SNDA to be in the standard form of the applicable mortgagee and ground lessor.

~~11.1 Additional Use Restrictions. Tenant acknowledges and agrees to any restrictions and covenants recorded among the Public Records as of the date hereof, in addition to any restrictions and covenants that may be set forth in this Lease. Unless specifically allowed in this Lease (or any amendments thereto), no alcohol of any kind shall be permitted to be sold, served, or distributed on or about the Premises.~~

ARTICLE XI. ADDITIONAL USES AND RESTRICTIONS.

~~11.1 Exclusive Uses.~~

11.1 Additional Use Restrictions. The Parties acknowledge that the Tenant's business purpose in renting the Premises includes the operation of a distillery and the sale and consumption of alcoholic beverages and food items.  In the event that any current or future use restrictions or covenants, whether or not available in public record, inhibit the aforementioned business purposes, Tenant shall be permitted to terminate the Agreement upon written notice to Landlord and shall be entitled to a return of any portion of the Security Deposit that is not appropriately withheld in accordance with the terms of this Agreement. ~~Tenant acknowledges and agrees to any restrictions and covenants recorded among the Public Records as of the date hereof, in addition to any restrictions and covenants that may be set forth in this Lease. Unless specifically allowed in this Lease (or any amendments thereto), no alcohol of any kind shall be permitted to be sold, served, or distributed on or about the Premises.~~

> **Formatted:** Numbered + Level: 1 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 0" + Indent at: 0"

ARTICLE XII. CONDEMNATION.

12.1 Total or Partial Taking. If the whole of the Premises, or such portion thereof as will make the Premises unusable for the purposes leased hereunder, shall be taken by any public authority under the power of eminent domain or sold to public authority under threat or in lieu of such taking, the Term shall cease as of the day possession or title shall be taken by such public authority, whichever is earlier ("Taking Date"), whereupon the rent shall be paid up to the Taking Date with a proportionate refund by Landlord of any rent paid for a period subsequent to the Taking Date. If less than the whole of the Premises, or less than such portion thereof as will make the Premises unusable for the purposes leased hereunder, the Term shall cease only as to the part so taken as of the Taking Date, and Tenant shall pay rent up to the Taking Date, with appropriate credit by Landlord (toward the next installment of rent due from Tenant) of any rent paid for a period subsequent to the Taking Date.

12.2 Taking for Temporary Use. If there is a taking of the Premises for temporary use (less than thirty days), this Lease shall continue in full force and effect, and Tenant shall continue to comply with Tenant's obligations under this Lease, except to the extent compliance shall be rendered impossible or impracticable by reason of the taking.

12.3 Award. All compensation awarded or paid upon a total or partial taking of the Premises including the value of the leasehold estate created hereby shall belong to and be the property of Landlord without any participation by Tenant; Tenant shall have no claim to any such award based on Tenant's leasehold interest; provided, however, that (a) if the Premises shall be restored as herein provided, Tenant shall first be entitled to recover the costs and expenses incurred in such restoration out of any such award, and the balance shall be paid as aforesaid, and (b) nothing contained herein shall be construed to preclude Tenant, at its cost, from independently prosecuting any claim directly against the condemning authority in such condemnation proceeding for damage to, or cost of removal of, stock, trade fixtures, furniture, and other personal property belonging to Tenant, and the

CONFIDENTIAL

FULLER000011

unamortized value of leasehold improvements paid for by Tenant; provided, however, that no such claim shall diminish or otherwise adversely affect Landlord's award or the award of any mortgagee.

## ARTICLE XIII. GENERAL PROVISIONS.

13.1 Time; Force Majeure. Time is of the essence of this Lease. However, whenever a period of time is herein prescribed for the taking of any action by Landlord or Tenant, then Landlord or Tenant, as applicable, shall not be liable or responsible for, and there shall be excluded from the computation of such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war or any other cause whatsoever beyond the control of Landlord or Tenant, as applicable. The foregoing force majeure provisions of this paragraph are inapplicable to any payments of money due under this Lease.

13.2 Holding Over. If Tenant remains in possession of the Premises after the end of the Term without having executed and delivered a new lease or an agreement extending the Term, there shall be no tacit renewal of this Lease or the Term, and Tenant shall be deemed to be occupying the Premises as a Tenant at sufferance at a monthly Percentage Rent payable in advance on the first day of each month equal to a minimum of twice the monthly amount of Percentage Rent payable during the last month of the Term, and otherwise upon the same terms as are set forth in this Lease, so far as they are applicable to a tenancy at sufferance.

13.3 Waiver; Partial Invalidity. If either Landlord or Tenant excuses or condones any default by the other of any obligation under this Lease, this shall not be a waiver of such obligation in respect of any continuing or subsequent default and no such waiver shall be implied. All of the provisions of this Lease are to be construed as covenants even though not expressed as such. If any such provision is held or rendered illegal or unenforceable it shall be considered separate and severable from this Lease and the remaining provisions of this Lease shall remain in force and bind the parties as though the illegal or unenforceable provision had never been included in this Lease.

13.4 Recording. Neither Tenant nor anyone claiming under Tenant shall record this Lease or any memorandum hereof in any public records without the prior written consent of Landlord.

13.5 Notices. Any notice, consent, or other instrument required or permitted to be given under this Lease shall be in writing and shall be delivered in person, or sent by certified mail, return receipt requested, or overnight express mail courier, postage prepaid, addressed (i) if to Landlord, at the address set forth in the Lease Summary; and (ii) if to Tenant, at the Premises or, prior to Tenant's occupancy of the Premises, at the address set forth in the Lease Summary. Any such notice or other instruments shall be deemed to be effective upon receipt or refusal of delivery. Either party may give notice to the other of any change of address and after the giving of such notice, the address therein specified is deemed to be the address of such party for the giving of notices. If postal service is interrupted or substantially delayed, all notices or other instruments shall be delivered in person or by overnight express mail courier.

13.6 Successors; Joint and Several Liabilities. The rights and liabilities created by this Lease extend to and bind the successors and assigns of Landlord and the heirs, executors, administrators, and permitted successors and assigns of Tenant. No rights, however, shall inure to the benefit of any transferee unless such Transfer complies with the provisions of Article VIII. If there is at any time more than one Tenant or more than one person constituting Tenant, their covenants shall be considered to be joint and several and shall apply to each and every one of them.

13.7 Captions and Section Numbers. The captions, Section numbers, and article numbers appearing in this Lease are inserted only as a matter of convenience and in no way affect the substance of this Lease.

13.8 Extended Meanings. The words "hereof," "hereto," "hereunder," and similar expressions used in this Lease relate to the whole of this Lease and not only to the provisions in which such expressions appear. This Lease shall be read with all changes in number and gender as may be appropriate or required by the context. Any reference to Tenant includes, when the context allows, the employees, agents, contractors, invitees, and licensees of Tenant and all others over whom Tenant might reasonably be expected to exercise control. This Lease has been fully reviewed and negotiated by each party and their counsel and shall not be more strictly construed against either party by virtue of this Lease having been drafted by one of the parties.

13.9 Entire Agreement; Governing Law. This Lease and the exhibits and riders, if any, attached hereto are incorporated herein and set forth the entire agreement between Landlord and Tenant concerning the Premises and there are no other agreements or understandings between them. This Lease and its exhibits and riders may not be modified except by agreement in writing executed by Landlord and Tenant. This Lease shall be construed in accordance with and governed by the laws of the State of Florida.

CONFIDENTIAL

FULLER000012

13.10 No Partnership. Nothing in this Lease creates any relationship between the parties other than that of lessor and lessee and nothing in this Lease constitutes Landlord a partner of Tenant or a joint venture or member of a common enterprise with Tenant.

13.11 Quiet Enjoyment. If Tenant pays the rent and fully observes and performs all of its obligations under this Lease, Tenant shall be entitled to peaceful and quiet enjoyment of the Premises for the Term without interruption or interference by Landlord or any person claiming through or under Landlord.

13.12 Brokerage. Tenant represents and warrants that Tenant has not employed any broker in connection with the negotiations of the terms of this Lease or the execution thereof, except for Tenant's Broker. Tenant hereby agrees to indemnify and to hold Landlord harmless against any loss, expense, or liability (including without limitation reasonable attorney's fees) with respect to any claims for commissions or brokerage fees arising from or out of any breach of the foregoing representation and warranty.

13.13 Tenant Cooperation. At the end of the Term or any extensions thereof, Tenant agrees to execute all documents reasonably required for recording in the public records of Miami-Dade County to evidence the termination of this Lease and any further claim thereunder.

13.14 Memorandum of Lease. Landlord and Tenant may enter into a recordable Memorandum of Lease within 60 days from the execution of this Lease at the Landlord's discretion, setting forth, but not limited to, the following: legal description of the Premises, the Term, any Options available to the Tenant, and the Rent Commencement Date.

13.15 Radon Notice. Florida law requires the following notice to be provided with respect to the contract for sale and purchase of any building, or a rental agreement for any building: "RADON GAS: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department."


IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the date first above written.
WITNESSES:
LANDLORD: CALLE OCHO MARKET PLACE, LLC, a Florida Limited Liability Company

By:_____
Print Name:
Title:


TENANT:
Destilería Canéca, LLC


By:_____
Print Name: James "Matt" Malone
Title: Manager

**CONFIDENTIAL**                                                    **FULLER000013**

EXHIBIT A

The Premises consist of approximately 1200 square feet of space (the "Tenant Square Footage") on two parcels at 1380 SW 8th Street "REAR" (600 SF) and 827 SW 14th Avenue "CASITA"(600 SF)(collectively, the "Property"), in City of Miami, Miami-Dade County, Florida, including the use of the "exterior garden area" between the "REAR" and the "CASITA", and "exterior garden space" extending from the west-facing wall of the "CASITA" westward to a line parallel to the western most exterior wall of the "REAR" building space.

CONFIDENTIAL

FULLER000014

EXHIBIT B

WORK LETTER

Landlord's Improvement Obligations:

- ELECTRIC PANEL AND SERVICE- MINIMUM REQUIREMENTS (REAR & CASITA) SUFFICIENT FOR TENANT'S SPECIFIED USE
- BATHROOMS FINISHED AS-IS (REAR and CASITA)
- HVAC (REAR and CASITA)

CONFIDENTIAL

FULLER000015

- (1) The lease has not been cancelled, modified, assigned, extended, or amended, and there are no other agreements written or oral between Tenant and the Landlord with respect to the lease and/or the Premises, except as follows (if None, state "None"): . (2) Rent has been paid to the first day of the current month. There is no prepaid rent, except $ .
- (3) The Rent Commencement Date of the Lease occurred on , 201 . Rent is currently payable in the monthly amount of $ .
- (4) The Expiration Date of the Lease is , 20 .
- (5) Tenant has the following renewal option(s): _____ ( ) terms of _____ ( years each.
- (6) The Lease is: (a) in full force and effect; (b) free from default (and no condition exists which with the passing of time or the giving of notice or both would constitute a default); and (c) Tenant has no claims against the Landlord or offsets against rent.
- (7) The undersigned has received no notice of prior sale, transfer, assignment, hypothecation, or pledge of the Lease or of the rents received therein, except as follows (if None, state "None"): .
- _____
- _____

**Formatted:** No bullets or numbering

**CONFIDENTIAL**

**FULLER000016**

**EXHIBIT C**

Form of Estoppel Certificate

To:

Re: Property Address: ("Premises")

Lease Date:

Between , as Landlord and

, as Tenant

The undersigned Tenant under the above-referenced lease, hereby certifies to Landlord and to _____ the following:

The original lease, and the instruments referenced above (if any), are hereinafter collectively referred to as the "Lease."

- (1) The lease has not been cancelled, modified, assigned, extended, or amended, and there are no other agreements written or oral between Tenant and the Landlord with respect to the lease and/or the Premises, except as follows (if None, state "None"): .
- (2) Rent has been paid to the first day of the current month. There is no prepaid rent, except $ .
- (3) The Rent Commencement Date of the Lease occurred on , 201 . Rent is currently payable in the monthly amount of $ .
- (4) The Expiration Date of the Lease is , 20 .
- (5) Tenant has the following renewal option(s): _____ ( ) terms of _____ ( years each.
- (6) The Lease is: (a) in full force and effect; (b) free from default (and no condition exists which with the passing of time or the giving of notice or both would constitute a default); and (c) Tenant has no claims against the Landlord or offsets against rent.
- (7) The undersigned has received no notice of prior sale, transfer, assignment, hypothecation, or pledge of the Lease or of the rents received therein, except as follows (if None, state "None"): .

- (8) Tenant has not assigned the Lease or sublet all or any part of the Premises, nor does the Tenant hold the Premises under an assignment or a Lease, except as follows (if None, state "None"): .
- (9) Tenant has no right of refusal or option to expand the Premises, and Tenant has no right or option pursuant to the Lease or otherwise to purchase all or any part of the Premises.
- (10) Tenant has, in full force and effect, all insurance coverage required of Tenant under the Lease.
- (11) The statements contained herein may be relied upon by the Landlord and by any prospective purchaser of the fee of the Premises and by any current or prospective mortgagee of the Landlord or any prospective purchaser.

If Tenant is a corporation, the undersigned is a duly appointed officer of the corporation signing this certificate and is the incumbent in the office indicated under his/her name. In any event, the undersigned individual is duly authorized to execute this certificate.

Dated this day of , 20____

Tenant:

By:

Name:

Title:

CONFIDENTIAL

FULLER000017

{30802985;1}  18

CONFIDENTIAL

FULLER000018

EXHIBIT E

WIRING INSTRUCTIONS

{30802985;1}  19

CONFIDENTIAL

FULLER000019

## Florida Commercial Lease Agreement

This Commercial Lease Agreement ("Lease") is made and effective March   , 2017 by and between FUTURAMA, LLC ("Landlord") and Brush and Bristle Corp. (Tenant").

Landlord is the owner of land and improvements commonly known and numbered as 1637 SW 8 Street, Miami, FL 33135 and legally described as follows (the "Building"):

Landlord makes available for lease a portion of the Building designated as Storage container in the West Lot at 1637 SW 8 Street (the "Leased Premises"), as seen in Exhibit A.

Landlord desires to lease the Leased Premises to Tenant, and Tenant desires to lease the Leased Premises from Landlord for the term, at the rental and upon the covenants, conditions and provisions herein set forth.

THEREFORE, in consideration of the mutual promises herein, contained and other good and valuable consideration, it is agreed:

1. **Term**.

A. Landlord hereby leases the Leased Premises to Tenant, and Tenant hereby leases the same from Landlord, for an "Initial Term" of Five (5) Years commencing on the Tenants business opening. Landlord shall deliver space upon completion of Landlord's work. Landlord's work, at Landlords expense, shall include electrical, water, and sewer utility connections, and bring all hook-ups to the Tenant's site. Tenant shall make no other claim against Landlord for any such delay. Rent is considered late 5 days after the due date and if delivered late, rent shall increase by 10% if delivered after the 5th day of the month

Tenant shall have the option to exercise one additional 5 year terms as per the rents below

2. **Rent**

A. Tenant shall pay to Landlord during the Initial Term rental of $12,000 + Sales Tax for year one, payable in installments of $1,000 + Sales Tax per month, with 3% annual increases in Years 2-5. Each installment payment shall be due in advance on the first day of each calendar month during the lease term to Landlord at 1637 SW 8th Street, Ste 200 Miami, FL 33135 or at such other place designated by written notice from Landlord or Tenant. The rental payment amount for any partial calendar months included in the lease term shall be prorated on a daily basis. Tenant shall also pay to landlord a "Security Deposit" in the amount of $2,000.00 to be paid upon execution of this agreement

Year 1: $1,000.00 per month ($12,000 per year)

Years 2-5: Three (3) percent annual increases over previous years base rent

Option period

Years 6-10: Three (3) percent annual increases over previous year's base rent

* 7% Sales Tax Additional

In addition to base rent, a percentage rent of 8% of gross annual sales over the natural break-even point of $200,000.00, with a cap at $500,000.00, therefore it shall only be applicable from $201,001.00 to $500,000.00



PLAINTIFF'S
EXHIBIT
**5**

**CONFIDENTIAL**                                                          **FULLER000023**

3. **Use**

Notwithstanding the forgoing, Tenant shall not use the Leased Premises for the purposes of storing, manufacturing or selling any explosives, flammables or other inherently dangerous substance, chemical, thing or device.

Tenant is using space for a sandwich shop in a shipping container

4. **Sublease and Assignment**.

Tenant shall have the right without Landlord's consent, to assign this Lease to a corporation with which Tenant may merge or consolidate, to any subsidiary of Tenant, to any corporation under common control with Tenant, or to a purchaser of substantially all of Tenant's assets. Except as set forth above, Tenant shall not sublease all or any part of the Leased Premises, or assign this Lease in whole or in part without Landlord's consent, such consent not to be unreasonably withheld or delayed.

5. **Repairs**.

During the Lease term, Tenant shall make, at Tenant's expense, all necessary repairs to the Leased Premises. Repairs shall include such items as routine repairs of floors, walls, ceilings, HVAC and other parts of the Leased Premises damaged or worn through normal occupancy, except for roof structure or exterior walls, subject to the obligations of the parties otherwise set forth in this Lease.

6. **Alterations and Improvements**.

Tenant, at Tenant's expense, shall have the right following Landlord's consent to remodel, redecorate, and make additions, improvements and replacements of and to all or any part of the Leased Premises from time to time as Tenant may deem desirable, provided the same are made in a workmanlike manner and utilizing good quality materials. Tenant shall have the right to place and install personal property, trade fixtures, equipment and other temporary installations in and upon the Leased Premises, and fasten the same to the premises. All personal property, equipment, machinery, trade fixtures and temporary installations, whether acquired by Tenant at the commencement of the Lease term or placed or installed on the Leased Premises by Tenant thereafter, shall remain Tenant's property free and clear of any claim by Landlord. Tenant shall have the right to remove the same at any time during the term of this Lease provided that all damage to the Leased Premises caused by such removal shall be repaired by Tenant at Tenant's expense.

7. **Property Taxes**.

Landlord shall pay all general real estate taxes and installments of special assessments coming due during the Lease term on the Leased Premises, and all personal property taxes with respect to Landlord's personal property, if any, on the Leased Premises. Tenant shall be responsible for paying all personal property taxes with respect to Tenant's personal property at the Leased Premises.

8. **Insurance**.

A. If the Leased Premises or any other part of the Building is damaged by fire or other casualty resulting from any act or negligence of Tenant or any of Tenant's agents, employees or invitees, rent shall not be diminished or abated while such damages are under repair, and Tenant shall be responsible for the costs of repair not covered by insurance.

**CONFIDENTIAL**                                                                 **FULLER000024**

B. *Landlord* shall maintain fire and extended coverage insurance on the Building and the Leased Premises in such amounts as Landlord shall deem appropriate. Tenant shall be responsible, at its expense, for fire and extended coverage insurance on all of its personal property, including removable trade fixtures, located in the Leased Premises.

C. Tenant shall maintain a policy or policies of comprehensive general liability insurance with respect to the respective activities of each in the Building with the premiums thereon fully paid on or before due date, issued by and binding upon some insurance company approved by Landlord, such insurance to afford minimum protection of not less than $500,000 combined single limit coverage of bodily injury, property damage or combination thereof. Landlord shall be listed as an additional insured on Tenant's policy or policies of comprehensive general liability insurance, and Tenant shall provide Landlord with current Certificates of Insurance evidencing Tenant's compliance with this Paragraph. Tenant shall obtain the agreement of Tenant's insurers to notify Landlord that a policy is due to expire at least (10) days prior to such expiration. Landlord shall not be required to maintain insurance against thefts within the Leased Premises or the Building.

## 9. **Utilities.**

Tenant shall pay to applicable utility company or third-party vendor all electricity, water, telephone, and other utility charges applicable to Premises, including deposits, janitorial and trash disposal services at the Premises.

## 10. **Signage**

Any exterior signage that may be approved by Landlord shall be installed by Tenant at Tenants expense, and such signage shall comply with all applicable Legal Requirements. The design and specification of such signage shall be submitted for Landlords prior written approval, which shall not be reasonably withheld.

## 11. **Entry**.

Landlord shall have the right to enter upon the Leased Premises at reasonable hours to inspect the same, provided Landlord shall not thereby unreasonably interfere with Tenant's business on the Leased Premises.

## 12. **Damage and Destruction**.

Subject to Section 8 A. above, if the Leased Premises or any part thereof or any appurtenance thereto is so damaged by fire, casualty or structural defects that the same cannot be used for Tenant's purposes, then Tenant shall have the right within ninety (90) days following damage to elect by notice to Landlord to terminate this Lease as of the date of such damage. In the event of minor damage to any part of the Leased Premises, and if such damage does not render the Leased Premises unusable for Tenant's purposes, Landlord shall promptly repair such damage at the cost of the Landlord. In making the repairs called for in this paragraph, Landlord shall not be liable for any delays resulting from strikes, governmental restrictions, inability to obtain necessary materials or labor or other matters which are beyond the reasonable control of Landlord. Tenant shall be relieved from paying rent and other charges during any portion of the Lease term that the Leased Premises are inoperable or unfit for occupancy, or use, in whole or in part, for Tenant's purposes. Rentals and other charges paid in advance for any such periods shall be credited on the next ensuing payments, if any, but if no further payments are to be made, any such advance payments shall be refunded to Tenant. The provisions of this paragraph extend not only to the matters aforesaid, but also to any occurrence which is beyond Tenant's reasonable control and which renders the Leased Premises, or any appurtenance thereto, inoperable or unfit for occupancy or use, in whole or in part, for Tenant's purposes.

13. **Default**.

If default shall at any time be made by Tenant in the payment of rent when due to Landlord as herein provided, and if said default shall continue for fifteen (15) days after written notice thereof shall have been given to Tenant by Landlord, or if default shall be made in any of the other covenants or conditions to be kept, observed and performed by Tenant, and such default shall continue for thirty (30) days after notice thereof in writing to Tenant by Landlord without correction thereof then having been commenced and thereafter diligently prosecuted, Landlord may declare the term of this Lease ended and terminated by giving Tenant written notice of such intention, and if possession of the Leased Premises is not surrendered, Landlord may reenter said premises. Landlord shall have, in addition to the remedy above provided, any other right or remedy available to Landlord on account of any Tenant default, either in law or equity. Landlord shall use reasonable efforts to mitigate its damages.

14. **Quiet Possession**.

Landlord covenants and warrants that upon performance by Tenant of its obligations hereunder, Landlord will keep and maintain Tenant in exclusive, quiet, peaceable and undisturbed and uninterrupted possession of the Leased Premises during the term of this Lease.

15. **Condemnation**.

If any legally, constituted authority condemns the Building or such part thereof which shall make the Leased Premises unsuitable for leasing, this Lease shall cease when the public authority takes possession, and Landlord and Tenant shall account for rental as of that date. Such termination shall be without prejudice to the rights of either party to recover compensation from the condemning authority for any loss or damage caused by the condemnation. Neither party shall have any rights in or to any award made to the other by the condemning authority.

16. **Subordination**.

Tenant accepts this Lease subject and subordinate to any mortgage, deed of trust or other lien presently existing or hereafter arising upon the Leased Premises, or upon the Building and to any renewals, refinancing and extensions thereof, but Tenant agrees that any such mortgagee shall have the right at any time to subordinate such mortgage, deed of trust or other lien to this Lease on such terms and subject to such conditions as such mortgagee may deem appropriate in its discretion. Landlord is hereby irrevocably vested with full power and authority to subordinate this Lease to any mortgage, deed of trust or other lien now existing or hereafter placed upon the Leased Premises of the Building, and Tenant agrees upon demand to execute such further instruments subordinating this Lease or attorning to the holder of any such liens as Landlord may request. In the event that Tenant should fail to execute any instrument of subordination herein require d to be executed by Tenant promptly as requested, Tenant hereby irrevocably constitutes Landlord as its attorney-in-fact to execute such instrument in Tenant's name, place and stead, it being agreed that such power is one coupled with an interest. Tenant agrees that it will from time to time upon request by Landlord execute and deliver to such persons as Landlord shall request a statement in recordable form certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as so modified), stating the dates to which rent and other charges payable under this Lease have been paid, stating that Landlord is not in default hereunder (or if Tenant alleges a default stating the nature of such alleged default) and further stating such other matters as Landlord shall reasonably require.

17. **Security Deposit**.

The Security Deposit shall be held by Landlord without liability for interest and as security for the performance by Tenant of Tenant's covenants and obligations under this Lease, it being expressly understood that the Security Deposit shall not be considered an advance payment of

CONFIDENTIAL

FULLER000026

*rental or* a measure of Landlord's damages in case of default by Tenant. Unless, otherwise provided by mandatory non-waivable law or regulation, Landlord may commingle the Security Deposit with Landlord's other funds. Landlord may, from time to time, without prejudice to any other remedy, use the Security Deposit to the extent necessary to make good any arrearages of rent or to satisfy any other covenant or obligation of Tenant hereunder. Following any such application of the Security Deposit, Tenant shall pay to Landlord on demand the amount so applied in order to restore the Security Deposit to its original amount. If Tenant is not in default at the termination of this Lease, the balance of the Security Deposit remaining after any such application shall be returned by Landlord to Tenant. If Landlord transfers its interest in the Premises during the term of this Lease, Landlord may assign the Security Deposit to the transferee and thereafter shall have no further liability for the return of such Security Deposit.

18. **Notice**.

Any notice required or permitted under this Lease shall be deemed sufficiently given or served if sent by United States certified mail, return receipt requested, addressed as follows:


If to Landlord to:

Futurama, LLC

1637 SW 8ᵗʰ Street, Ste 200 Miami, FL 33135

 If to Tenant to:

Brush and Bristle Corp

Address  1537D SW 800st. Homestead FL. 33033

Landlord and Tenant shall each have the right from time to time to change the place notice is to be given under this paragraph by written notice thereof to the other party.

19. **Brokers**.

Landlord and Tenant acknowledge that Tenant is represented by Fernando Arencibia (hereinafter "Tenant's Broker") in connection with this transaction.

20. **Waiver**.

No waiver of any default of Landlord or Tenant hereunder shall be implied from any omission to take any action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the default specified in the express waiver and that only for the time and to the extent therein stated. One or more waivers by Landlord or Tenant shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition.

21. **Memorandum of Lease**.

The parties hereto contemplate that this Lease should not and shall not be filed for record, but in lieu thereof, at the request of either party, Landlord and Tenant shall execute a Memorandum of Lease to be recorded for the purpose of giving record notice of the appropriate provisions of this Lease.

22. **Headings**.

CONFIDENTIAL

FULLER000027

The *headings* used in this Lease are for convenience of the parties only and shall not be considered in interpreting the meaning of any provision of this Lease.

23. **Successors**.

The provisions of this Lease shall extend to and be binding upon Landlord and Tenant and their respective legal representatives, successors and assigns.

25. **Consent**.

Landlord shall not unreasonably withhold or delay its consent with respect to any matter for which Landlord's consent is required or desirable under this Lease.

25. **Performance**.

If there is a default with respect to any of Landlord's covenants, warranties or representations under this Lease, and if the default continues more than fifteen (15) days after notice in writing from Tenant to Landlord specifying the default, Tenant may, at its option and without affecting any other remedy hereunder, cure such default and deduct the cost thereof from the next accruing installment or installments of rent payable hereunder until Tenant shall have been fully reimbursed for such expenditures, together with interest thereon at a rate equal to the lessor of twelve percent (12%) per annum or the then highest lawful rate. If this Lease terminates prior to Tenant's receiving full reimbursement, Landlord shall pay the unreimbursed balance plus accrued interest to Tenant on demand.

26. **Compliance with Law**.

Tenant shall comply with all laws, orders, ordinances and other public requirements now or hereafter pertaining to Tenant's use of the Leased Premises. Landlord shall comply with all laws, orders, ordinances and other public requirements now or hereafter affecting the Leased Premises.

27. **Final Agreement**.

This Agreement terminates and supersedes all prior understandings or agreements on the subject matter hereof. This Agreement may be modified only by a further writing that is duly executed by both parties.

28. **Governing Law**.

This Agreement shall be governed, construed and interpreted by, through and under the Laws of the State of Florida.

**CONFIDENTIAL**

**FULLER000028**

IN WITNESS WHEREOF, the parties have executed this Lease as of the day and year first above written.

_____        __4/4/2017_____
FUTURAMA, LLC                           Date

_____        __4.4.2017_____
Brush and Bristle Corp.                 Date

**CONFIDENTIAL**                                        **FULLER000029**

Exhibit A
Site Plan



CONFIDENTIAL



PLAINTIFF'S
EXHIBIT

6





6:19    5G+ 68

‹ 64

J

Joe Carollo ›

iMessage
Nov 27, 2017 at 7:20 PM

Hi Joe,

I congratulate you on your commission win. You are taking the leadership at a very exciting time for our neighborhood. I look forward to working with you. Please do not hesitate to reach out to me if I can be of assistance to your or your staff.

Best,
Bill Fuller
305-525-7662

Read



PLAINTIFF'S
EXHIBIT

**8**



iMessage



| | |
|---|---|
| **From:** | Steven M |
| **To:** | Joe Carollo |
| **Subject:** | ben bush 521 sw 8 st |
| **Date:** | Saturday, December 16, 2017 8:33:53 PM |

# BEN BUSH

Ben Bush



Ben is currently a partner in South Florida Title Service and has 20+ years of business expertise in the Miami area.

After graduating from Washington University in St. Louis, Ben worked with his brother at their family's Miami-based waste management and recycling company where he helped build the small business from a six truck operation to a fleet over 20 vehicles before selling to a competitor in 2011. One of Ben's greatest accomplishments during this time was working with hundreds of South Florida businesses to help them find solutions that made sense to their individual operations.

In 2013, Ben became one of three partners in the Ball & Chain, a historic music venue on Calle Ocho in the heart of Little Havana. Ben helped restore the nearly forgotten gem famous for hosting 20th century jazz greats such as Chet Baker, Count Basie, and Billie Holiday and the venue's intimate yet sophisticated Pineapple Stage is quickly becoming a fixture for live performances by Miami musicians as well as special guests from around the world. Locals and travelers are always welcome to come enjoy the music and the classic Cuban-inspired cocktails.

Ben currently participates with various charitable and educational organizations in the community and he and his wife, Giovanna, reside in Miami Beach.



PLAINTIFF'S
EXHIBIT

**9**

MADROOM0115477

Message

**From:** Salvatierra, Yacmany [YSalvatierra@miamigov.com]
**Sent:** 12/26/2017 4:56:59 PM
**To:** Miro, Steven [SMiro@miamigov.com]
**Subject:** RE: please give me a call



Greetings,

As per our earlier conversation, business establishment doesn't have a CU/BTR licenses, Cargo container was converted into a cooking prep station without pulling any building permits, and failure to obtain a warrant for outside seating.

Regards,

**Yacmany Salvatierra**
Code Compliance Inspector – South West District
**City of Miami**
*305-329-4770*
Tell us how we're doing.  **CLICK HERE** to complete our Customer Satisfaction Survey.

**From:** Miro, Steven
**Sent:** Tuesday, December 26, 2017 10:29 AM
**To:** Salvatierra, Yacmany <YSalvatierra@miamigov.com>
**Subject:** please give me a call

My extension is 5384

Thank you



MADROOM0149200

**Steven Miro**
**District Liasion**
**Office of Commissioner Joe Carollo – District 3**
**Office 305-250-5380**
Smiro@miamigov.com

MADROOM0149201

| | |
|---|---|
| **From:** | Reyes, Karla L. |
| **To:** | Dooley, Rachel S. |
| **Subject:** | Call from Comm. Carollo"s Office |
| **Date:** | Monday, January 29, 2018 10:28:14 AM |
| **Attachments:** | image001.png |
| | image002.gif |
| **Importance:** | High |

Hi Rachel:

Steven Miro from Commissioner Carollo's Office called and wanted to speak to you about a concern that Carollo has with a container that should be removed because it still has electricity from the adjacent store and it can be fire hazard and could be liable for it. He asked if you can please call 305-250-5381 or his cell at ▮▮▮▮▮▮▮▮▮

Best Regards,

**Karla L. Mejia, Legal Assistant to:**
**Rachel S. Dooley, Assistant City Attorney**
**Barbara Diaz, Assistant City Attorney**



City of Miami – Office of the City Attorney
Telephone: (305) 416-1863
Facsimile: (305) 416-1801
KLReyes@miamigov.com

**Disclaimer**: This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect the attorney-client or work product privileges. Should the intended recipient forward or disclose this message to another person or party, that action could constitute a waiver of the attorney-client privilege. If the reader of this message is **not** the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. section 2510-2521. If this communication was received in error we apologize for the intrusion. Please notify us by reply e-mail and delete the original message. Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender. **Under Florida law, e-mail addresses are public records. If you do not want your e-mail address released in response to a public records request, do not send electronic mail to this entity. Instead, contact this office by phone or in writing.**

Please consider the environment before printing this e-mail.



**PLAINTIFF'S EXHIBIT**

**15**

MADROOM0148288

Message

| | |
|---|---|
| **From**: | Mendez, Victoria [VMendez@miamigov.com] |
| **Sent**: | 2/17/2018 10:19:09 PM |
| **To**: | Carollo, Joe (Commissioner) [JCarollo@miamigov.com]; Miro, Steven [SMiro@miamigov.com] |
| **Subject**: | Fwd: Sanwichiere Sw 8 st. |

**Victoria Méndez, City Attorney**

Board Certified, City, County and Local Government
City of Miami Office of the City
Attorney
Telephone: 305-416-1832
Facsimile:  305-416-1801
E-mail:     vmendez@miamigov.com
Assistant:  Marta Gomez (305) 416-1844

Begin forwarded message:

**From:** "Parjus, Alberto N." <AParjus@miamigov.com>
**Date:** February 16, 2018 at 8:52:46 PM EST
**To:** "Mendez, Victoria" <VMendez@miamigov.com>
**Subject: Fwd: Sanwichiere Sw 8 st.**

Fyi

Get Outlook for iOS

**From:** Sierra, Daniel
**Sent:** Friday, February 16, 2018 7:54:51 PM
**To:** Morua, Scarlet
**Cc:** Parjus, Alberto N.; Gomez Jr., Luis; Salvatierra, Yacmany; Papier, Nerly (Cmdr); Wagner, Antonio
**Subject:** Fwd: Sanwichiere Sw 8 st.

Thank you Scarlet.

Sent via the Samsung Galaxy S8, an AT&T 4G LTE smartphone

-------- Original message --------
From: "Morua, Scarlet" <SMorua@miamigov.com>
Date: 2/16/18 7:40 PM (GMT-05:00)
To: "Sierra, Daniel" <dsierra@miamigov.com>, "Orta, Lazaro" <LOrta@miamigov.com>, "Gomez Jr., Luis" <LGomez@miamigov.com>
Subject: Re: Sanwichiere Sw 8 st.

PLAINTIFF'S
EXHIBIT

**16**

MADROOM0151559

Good evening,
I conducted an inspection at 0740 hrs on the The Sanguich  De Miami location at this time it's close please see attach pictures.

MADROOM0151560



MADROOM0151561

Thank you
V/r
Scarlet Morua
Code Compliance Inspector
Sent from my iPhone

On Feb 16, 2018, at 19:19, Sierra, Daniel <dsierra@miamigov.com> wrote:


Good evening Scarlet,

Please be advised that I just received a complaint that Sandwichiere as well other food trucks are currently operating on 8st. Without proper permits and or CU or BTR.

Please investigate and cite accordingly if violations are found and compliance is not achieved. Please email your findings and actions.

Thank you,


Sent via the Samsung Galaxy S8, an AT&T 4G LTE smartphone

MADROOM0151562

Message

| | |
|---|---|
| **From**: | Miro, Steven [SMiro@miamigov.com] |
| **Sent**: | 2/18/2018 12:29:43 PM |
| **To**: | Gomez, Gilberto (Lt.) [2369@miami-police.org] |
| **Subject**: | Fwd: Building steel structures def and minimum requirements for building a structure |

Get Outlook for Android

---

**From:** Mendez, Victoria
**Sent:** Sunday, February 18, 2018 12:26:53 PM
**To:** Miro, Steven; Betancourt, Vicente; Carollo, Joe (Commissioner); Parjus, Alberto N.; Dooley, Rachel S.; Papier, Ronald; Sierra, Daniel; Wysong, George; Cejas, Devin; Camero, Jose
**Subject:** Building steel structures def and minimum requirements for building a structure


### 10-7. - Minimum requirements for contractors.

Prior to the issuance of a building permit for a structure to be built, constructed, or demolished, except for city unsafe structure demolitions, the contractor for such construction or demolition shall, prior to the commencement of any work, sign a contractor's code of ethics which shall be affixed to the building permit and shall read in substantially the attached form:

1.

I will be fair, honest, impartial, respectful and professional, and act in good faith in all my business relationships with my clients and the public, including employees, subcontractors and suppliers.

2.

I will always act in the interests of the client unless doing so violates an ordinance, statute or this Code of Ethics.

3.

I will not discriminate in any business activities on the basis of race, national origin, religion, gender, sexual orientation, familial status or handicap, and will comply with all federal, state and local laws concerning discrimination and fair housing.

4.

I will be truthful regarding my training, experience, qualifications and services.

5.

I will be truthful regarding my licenses and certifications, and will provide documentation upon request.

6.

I will be truthful regarding my bonding and insurance coverage.

7.

I will accept only assignments and projects for which my skills and licensing are commensurate.

8.

**PLAINTIFF'S EXHIBIT**

**18**

MADROOM0151568

I will uphold and comply with all applicable statute, laws, ordinances, codes, and professional licensing requirements of the jurisdiction in which I conduct business, especially those related to safety.

For any lot or site on which a structure is being built, constructed, or demolished, except for city unsafe structure demolitions, the contractor for such construction or demolition, prior to the commencement of any work, shall provide the following:

(a)

A posted notice, not to exceed four square feet, attached to a temporary construction fence, or staked into the ground, and visible from the public right-of-way, at a minimum 168-point type that shall read in substantially the attached form:

THIS IS AN ACTIVE CONSTRUCTION SITE. THE CONTRACTOR IS [insert contractor]. FOR ANY COMPLAINTS OR CONCERNS PLEASE CALL [insert telephone number] OR E-MAIL [insert e-mail address].

A contractor may incorporate this required language into an already existing sign at the lot or site provided the requirements above are followed.

(b)

The contractor, if a corporate entity, shall provide its registered name, and not a fictitious name on the notice.

(c)

The telephone number provided must be active and answered by a live person from 9:00 a.m. to 5:00 p.m. on weekdays, or at any time during active construction activity, whichever is greater.

(d)

The e-mail address provided must be active and all complaints or concerns regarding the site acknowledged within 24 hours of receipt.

(e)

Enforcement of this section shall be as proscribed by chapter 2, article X, Code enforcement, and any other remedies as provided by law.

(Ord. No. 13569, § 1, 10-22-15)


10-27 Definitions

*Steel* structure means any structure that is not a building and which has exterior surfaces made of steel or other metal, such as bridges, billboards, walkways, water towers, steel tanks and roadway or railway overpasses.


**Victoria Méndez, City Attorney**

Board Certified, City, County and Local Government
City of Miami Office of the City
Attorney
Telephone: 305-416-1832
Facsimile:  305-416-1801
E-mail:     vmendez@miamigov.com
Assistant:  Marta Gomez (305) 416-1844

On Feb 18, 2018, at 11:56 AM, Mendez, Victoria <VMendez@miamigov.com> wrote:

**Sec. 39-32. - Vending prohibited in certain locations.**

Vending is prohibited in the following locations:

(1)
Within special vending districts or restaurant arcade vending zones, except within designated vending zones of said areas.

(2)
**From a public parking lot**, metered or unmetered parking space, on-street parking space, or loading zone.

(3)
Within 500 feet of any property used for school purposes (preschool, elementary, secondary) on all school days between the hours of 7:00 a.m. and 4:30 p.m. [2]

(4)
On any combination sidewalk and curb width less than six feet in width.

(5)
Within five feet of the entranceway to any building.

(6)
Within 100 feet of any driveway entrance to a police or fire station, or within 20 feet of any other driveway.

(7)
Within 20 feet of any bus stop zone.

**(8)**
**Within five feet of the pedestrian crosswalk at any intersection, or designated pedestrian crossing point.**

(9)
Within ten feet of any handicapped parking space, or access ramp.

(10)
**Within 20 feet of a sidewalk cafe permitted pursuant to chapter 54of the city Code.**

**Victoria Méndez, City Attorney**
Board Certified, City, County and Local Government
City of Miami Office of the City
Attorney
Telephone: 305-416-1832
Facsimile:  305-416-1801
E-mail:     vmendez@miamigov.com
Assistant:  Marta Gomez (305) 416-1844

On Feb 18, 2018, at 11:52 AM, Mendez, Victoria <VMendez@miamigov.com> wrote:

MADROOM0151570

- 

- **Sec. 39-28. - BTR required.**

It shall be unlawful to sell, or offer for sale, any food, beverage, service or merchandise on any street, alley, sidewalk, or public park within the city from any wagon, truck, auto, pushcart, vehicle or by any other means upon the streets, sidewalks, or alleys of the city until the proper BTR has been issued by the department of finance, at which time a metal or plastic tag shall be furnished, upon which tag shall be the words describing the kind of vendor, and the year for which the BTR is paid. Such tag shall be, at all times during the period for which the BTR is paid, securely affixed and attached in a conspicuous place on the left side and upon the stand, wagon, truck, auto, pushcart, or other vehicle used in the business by the vendor or wholesale peddler.

(Ord. No. 9880, § 1, 9-13-84; Code 1980, § 39-12; Ord. No. 13105, § 2, 10-8-09)

**Editor's note—** Ord. No. 13105, § 2, adopted Oct. 8, 2009, changed the title of § 39-28 from "License required" to "BTR required." The historical notation has been preserved for reference purposes.

**Charter reference—** Authority of city to license, regulate peddlers, § 3(gg).

**City Code cross reference—** License fees for peddlers, § 31-50.

- 

**Victoria Méndez, City Attorney**
Board Certified, City, County and Local Government
City of Miami Office of the City
Attorney
Telephone: 305-416-1832
Facsimile:  305-416-1801
E-mail:     vmendez@miamigov.com
Assistant:  Marta Gomez (305) 416-1844

Commissioner Joe Carollo                    3/12/2018

                                           Gay 8 Festival (2/18/2018)

 Steven Miro

While on scene to make sure the violator of sanguich de Miami had proper documentation to operate there illegal unit, I was approached by Mr. Bill Fuller. Mr. Fuller stated "you know what's funny your boss was hiding wearing a cap at night at one of my valet lots". I stated "yes, I was with him". It appeared he got upset, and then went to the owner of the container (Daniel) and started asking why the police were harassing the business, he had several exchanges with Daniel in which I observed them speak ,but couldn't hear what they were saying. Mr. Fuller then came about 5 feet from me and started to say "is your boss coming to this great event"? I just looked at him without a reply. Mr. Fuller stated "this is a great family event your boss should see the good he (Mr. Fuller), has made this community". I again stayed silent. Mr Fuller proceeded to try to gain a reaction from me " he then Scream while caring his daughter in his arms, that "I am a pussy, and Carollo is a pussy" several times" the police told Mr. Fuller to back away. Mr. Fuller complied and left. Mr. Fuller came back approximately 15 minutes later, and apologized to the officer and handed out his business cards to the officers on scene.

Nothing Further


PLAINTIFF'S
EXHIBIT

**19**

MIA-SFED23485-00231416

Message

---

**From**:       Miro, Steven [SMiro@miamigov.com]
**Sent**:       3/3/2018 12:02:26 AM
**To**:         fvalerio@miamiparking.com
**Subject**:    Approved lots

Please send over the approved lots tmfrom the valet companies on 8 st.

Thank you

Get Outlook for Android



MADROOM0152897

Message

---

**From:** Mendez, Victoria [VMendez@miamigov.com]
**Sent:** 3/6/2018 9:09:49 AM
**To:** Miro, Steven [SMiro@miamigov.com]; Carollo, Joe (Commissioner) [JCarollo@miamigov.com]; Min, Barnaby [bmin@miamigov.com]; Betancourt, Vicente [VBetancourt@miamigov.com]
**Subject:** Fwd: Viernes Culterales/Cultural Fridays Research

**Victoria Méndez, City Attorney**



Board Certified, City, County and
Local Government
City of Miami Office of the City Attorney
Telephone: 305-416-1832
Facsimile: 305-416-1801
victoriamendez@miamigov.com

**Assistant: Marta Gomez** (305) 416-1844

Begin forwarded message:

**From:** "Dooley, Rachel S." <RSDooley@miamigov.com>
**Date:** March 6, 2018 at 9:03:55 AM EST
**To:** "Mendez, Victoria" <VMendez@miamigov.com>
**Cc:** "Gomez, Marta" <martagomez@miamigov.com>
**Subject: Re: Viernes Culterales/Cultural Fridays Research**

Yes. They need permits.

Rachel S.Glorioso Dooley
Assistant City Attorney
City of Miami
444 SW 2 Avenue
Miami, Florida 33130
305.416.1800

Sent from iPhone

On Mar 6, 2018, at 8:29 AM, Mendez, Victoria <VMendez@miamigov.com> wrote:

We agree they need permits if not associated with the city correct?

**Victoria Méndez, City Attorney**

&lt;image001.jpg&gt;

Board Certified, City, County and
Local Government
City of Miami Office of the City Attorney
Telephone: 305-416-1832
Facsimile: 305-416-1801
victoriamendez@miamigov.com

**Assistant: Marta Gomez** (305) 416-1844



PLAINTIFF'S EXHIBIT
25

On Mar 2, 2018, at 5:46 PM, Dooley, Rachel S. <RSDooley@miamigov.com> wrote:

Here is what I found.  The organization initially started in 2001 with a much larger board and at that time held events that the City would sponsor with others.  The organization sought and received the necessary permits and/or waivers at that time for events.   Over the years the board has shrunk considerably and now consists of four (4) people. The only records that I could find for the events held at the address were through Legistar tracking of a Commission discussion and waivers in 2000 and permits/waivers requested and given by the Office of Film and Entertainment for the City of Miami on September 30, 2016 and December 28, 2016.

**Respectfully,**

**Rachel S. Glorioso Dooley, Assistant City Attorney**

**<image001.jpg>**
City of Miami Office of the City Attorney
Telephone:  305-416-1886
Facsimile:  305-416-1801
rsdooley@miamigov.com

Assistant: Karla Reyes 305-416-1863

Disclaimer:  This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information.  If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect the attorney-client or work product privileges.  Should the intended recipient forward or disclose this message to another person or party, that action could constitute a waiver of the attorney-client privilege.  If the reader of this message is _not_ the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. section 2510-2521.  If this communication was received in error we apologize for the intrusion.  Please notify us by reply e-mail and delete the original message.  Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

Please consider the environment before printing this e-mail. **<image002.jpg>**

MADROOM0153018

**Date:** Tue, 13 Mar 2018 11:26:20 AM -0400

**Subject:** Fwd: Updates on complaints received from Commissioner Carollo

**From:** Sierra, Daniel <dsierra@miamigov.com>

**To:** Diez, Orlando <odiez@miamigov.com>;

**Attachments:** Fwd_ COMMISSIONER CAROLLO JOINT INSPECTION #5.eml (1.23 MB).msg; Fwd_ COMMISSIONER CAROLLO JOINT INSPECTION #4.eml (1.92 MB).msg; Fwd_ COMMISSIONER CAROLLO JOINT INSPECTION #3.eml (3.04 MB).msg; Fwd_COMMISSIONER CAROLLO JOINT INSPECTION #2.eml (1.08 MB).msg; Fwd_ COMMISSIONER CAROLLO JOINT INSPECTION #1.eml (168 KB).msg

As requested.

Sent via the Samsung Galaxy S8, an AT&T 4G LTE smartphone

-------- Original message --------

From: "Sierra, Daniel" <dsierra@miamigov.com>

Date: 3/8/18 8:51 AM (GMT-05:00)

To: "Bernat, James (Sr Exec Asst)" <28410@miami-police.org>

Cc: "Gomez Jr., Luis" <LGomez@miamigov.com>, "Uriarte, Dennis" <duriarte@miamigov.com>, "Franqui, Ricardo" <RFranqui@miamigov.com>, "Meregildo, Gustavo" <gmeregildo@miamigov.com>, "Salvatierra, Yacmany" <YSalvatierra@miamigov.com>, "Morua, Scarlet" <SMorua@miamigov.com>

Subject: Updates on complaints received from Commissioner Carollo

Good morning Director Bernat,

I received a phone call on my cell phone yesterday in the evening from Commissioner Carollo requesting updates on the complaints he gave Inspector Dennis Uriarte last Saturday during their ride along. Attached please find the complaints received. Below please see the updates for each complaint.

1. **1380 SW 8 st.** – El Taquito Restaurant (Complaint regarding outside seating for restaurant in an alley/easement between 2 properties under electrical wires)
(Field Supervisor- Daniel Sierra) Inspector Ricardo Franqui sent email to Public Works for clarification on the area. Per Public Works the area was an alley converted into a utility easement. Inspector Franqui Cited the property for the following violations:
Case# CE2018004156 opened by Inspector Franqui and Notice of Violation issued to the property. In order to have Outside seating a Warrant would need to be obtained. However, I am not sure if one would be issued for a utility easement. **Inspector will need to follow up with Planning and Zoning and proceed accordingly.**

2. **821 SW 8 st.** – Taquerias el Mexicano (Complaint regarding Junk in Yard, trash, and debris in the back.) (Field Supervisor- Daniel Sierra) Inspector Gustavo Meregildo inspected the property and the junk and trash was removed at time of inspection.

3. **337 SW 8 st.** – Side Bar – (Complaint regarding CU and BTR, state liquor license, outside storage of food truck/ container and illegal valet parking at night.)
(Field Supervisor- Daniel Sierra) Inspector Gustavo Meregildo opened case # CE2018004209 opened an NOV issued for Failure to have a valid BTR (pending payment) and Outside storage of miscellaneous materials, equipment, and/or debris. As far as the liquor license that needs to be addressed by state (ABT under DBPR). **I would suggest the night inspector check the business for the valet parking complaint.**

4. **427 SW 8 st.** – (Complaint regarding a food truck parked on this empty lot which operates in the evening.) (Field Supervisor- Daniel Sierra) Inspector Gustavo Meregildo opened case # CE2018004206 opened and NOV issued for Outside storage of miscellaneous materials, equipment, and/or debris, and Failure to obtain a special permit/ TUP for the food truck.

5. **1227 SW 8 st.** – (Complaint regarding unauthorized construction and that the property is working outside of the scope of the permits) (Field Supervisor- Luis Gomez) Supervisor Gomez forward complaint to the Building Department since this is an ongoing construction. Building's response: The plans show the entire property that is composed of

**EXHIBIT**

DIEZ 5

8/12/22

**PLAINTIFF'S EXHIBIT**

**35**

1221, 1225, 1233, 1229 SW 8 St and all the structures within the same folio number. Permits and plans show a comprehensive remodeling valued at $1,369,026.00 that includes structural, storefronts, interior remodeling and M.E.P's. Building will have and inspector check the plans and the ongoing permitted work.

Thank you sir,

**Daniel Sierra**
**Field Supervisor (South District)**
**City of Miami Code Compliance**
**444 S.W. 2nd Avenue - 7th Floor**
**305-416-1964**
**dsierra@miamigov.com**

Tell us how we're doing. **CLICK HERE** to complete our Customer Satisfaction Survey.

MIA-SFED23485-00268946

MIA-SFED23485-00268945

**Date:** Wed, 7 Mar 2018 9:52:22 PM -0500

**Subject:** Fwd: COMMISSIONER CAROLLO JOINT INSPECTION #5

**From:** Sierra, Daniel <dsierra@miamigov.com>

**To:** Sierra, Daniel <dsierra@miamigov.com>;

**Attachments:** image002.png; image001.png; 1227 SW 8 ST (1).JPG; 1227 SW 8 ST (2).JPG; 1227 SW 8 ST (3).JPG; 1227 SW 8 ST (4).JPG; 1227 SW 8 ST (5).JPG; 1227 SW 8 ST (6).JPG; 1227 SW 8 ST (7).JPG; 1227 SW 8 ST (8).JPG; 1227 SW 8 ST (9).JPG

Sent via the Samsung Galaxy S8, an AT&T 4G LTE smartphone
-------- Original message --------
From: "Uriarte, Dennis" <duriarte@miamigov.com >
Date: 3/4/18 9:21 AM (GMT- 05:00)
To: "Sierra, Daniel" <dsierra@miamigov.com >, "Gomez Jr., Luis" <LGomez@miamigov.com >
Subject: COMMISSIONER CAROLLO JOINT INSPECTION #5
Good Morning Luis:

The following pictures illustrate a construction going on at 1227 SE 8 ST. Commissioner Carollo believes this construction work is an unauthorized work and they are doing much more of what they were allowed on a possible Active Permit for 1221 SW 8 St . Commissioner Carollo believes that the Permit for 1221 does not apply for 1227 SW 8 St. The construction site is not clean and there is Graffiti painted on the site walls.

Thank You, Sir.

**Dennis Rene Uriarte / Code Compliance Inspector**
Code Compliance Department
444 SW 2nd Ave, 7th Floor, Miami, FL 33130
(305) 329-4770 | duriarte@miamigov.com

MIA-SFED23485-00268948

MIA-SFED23485-00268948



MIA-SFED23485-00268949

MIA-SFED23485-00268949

MIA-SFED23485-00268950

MIA-SFED23485-00268950

MIA-SFED23485-00268951

MIA-SFED23485-00268951

MIA-SFED23485-00268952

MIA-SFED23485-00268952



MIA-SFED23485-00268953

MIA-SFED23485-00268953



MIA-SFED23485-00268954

MIA-SFED23485-00268954



MIA-SFED23485-00268955

MIA-SFED23485-00268955



MIA-SFED23485-00268956

MIA-SFED23485-00268956



MIA-SFED23485-00268957

MIA-SFED23485-00268957

**Date:** Wed, 7 Mar 2018 9:50:04 PM -0500

**Subject:** Fwd: COMMISSIONER CAROLLO JOINT INSPECTION #4

**From:** Sierra, Daniel <dsierra@miamigov.com >

**To:** Sierra, Daniel <dsierra@miamigov.com >;

**Attachments:** image002.png; image001.png; 427 SW 8 ST (1).JPG; 427 SW 8 ST (2).JPG; 427 SW 8 ST (3).JPG; 427 SW 8 ST (4).JPG; 427 SW 8 ST (5).JPG; 427 SW 8 ST (6).JPG; 427 SW 8 ST (7).JPG; 427 SW 8 ST (8).JPG; 427 SW 8 ST (9).JPG; 427 SW 8 ST (10).JPG; 427 SW 8 ST (11).JPG

Sent via the Samsung Galaxy S8, an AT&T 4G LTE smartphone

-------- Original message --------

From: "Uriarte, Dennis" <duriarte@miamigov.com >

Date: 3/4/18 9:11 AM (GMT-05:00)

To: "Sierra, Daniel" <dsierra@miamigov.com >, "Gomez Jr., Luis" <LGomez@miamigov.com >

Subject: COMMISSIONER CAROLLO JOINT INSPECTION #4

Good Morning Luis:

The following pictures illustrated a parked food truck at an empty lot located at 427 SW 8 St. Commissioner Carollo said the Truck operates at night out of this empty lot. The lot has a No Trespassing Sign posted on the Perimeter Fence.

Thank You, Sir.



**Dennis Rene Uriarte / Code Compliance Inspector**
Code Compliance Department
444 SW 2nd Ave, 7th Floor, Miami, FL 33130
(305) 329-4770 | duriarte@miamigov.com

MIA-SFED23485-00268959

MIA-SFED23485-00268959



03/03/2016  14:34

MIA-SFED23485-00268960

MIA-SFED23485-00268960



MIA-SFED23485-00268961

MIA-SFED23485-00268961



MIA-SFED23485-00268962

MIA-SFED23485-00268962



MIA-SFED23485-00268963

MIA-SFED23485-00268963



MIA-SFED23485-00268964

MIA-SFED23485-00268964



MIA-SFED23485-00268965

MIA-SFED23485-00268965



03/03/2018 14:33

MIA-SFED23485-00268966

MIA-SFED23485-00268966



03/03/2018 14:33

MIA-SFED23485-00268967

MIA-SFED23485-00268967



MIA-SFED23485-00268968

MIA-SFED23485-00268968



MIA-SFED23485-00268969

MIA-SFED23485-00268969



MIA-SFED23485-00268970

MIA-SFED23485-00268970

| | |
|---|---|
| **Date:** | Wed, 7 Mar 2018 9:48:11 PM -0500 |
| **Subject:** | Fwd: COMMISSIONER CAROLLO JOINT INSPECTION #3 |
| **From:** | Sierra, Daniel <dsierra@miamigov.com > |
| **To:** | Sierra, Daniel <dsierra@miamigov.com >; |
| **Attachments:** | image003.png; image001.png; 337 SW 8 ST (1).JPG; 337 SW 8 ST (2).JPG; 337 SW 8 ST (3).JPG; 337 SW 8 ST (4).JPG; 337 SW 8 ST (5).JPG; 337 SW 8 ST (6).JPG; 337 SW 8 ST (7).JPG; 337 SW 8 ST (8).JPG; 337 SW 8 ST (9).JPG; 337 SW 8 ST (10).JPG; 337 SW 8 ST (11).JPG; 337 SW 8 ST (12).JPG; 337 SW 8 ST (13).JPG; 337 SW 8 ST (14).JPG; 337 SW 8 ST (15).JPG; 337 SW 8 ST (16).JPG; 337 SW 8 ST (17).JPG |

Sent via the Samsung Galaxy S8, an AT&T 4G LTE smartphone
-------- Original message --------
From: "Uriarte, Dennis" <duriarte@miamigov.com >
Date: 3/4/18 9:07 AM (GMT-05:00)
To: "Sierra, Daniel" <dsierra@miamigov.com >, "Gomez Jr., Luis" <LGomez@miamigov.com >
Subject: COMMISSIONER CAROLLO JOINT INSPECTION #3
Good Morning Luis:

The following pictures are from an illegal business occurring at a warehouse located at: 337 SW 8 ST. The Business name is Side Bar. Commissioner Carollo said that the Bar is lacking the correspondence City and State Licenses to operate at this location. These licenses include Certificate of Uses , BTR's, and State Liquor Licenses. There is also an unauthorized permanent food truck selling food in the back of the warehouse , on 8th St. The Bar is also operating an illegal valet parking at night without proper licenses on 7th St. Permanent storage containers are placed in front of the warehouse also on 7th St. Junk in yard, trash and debris is also present throughout the entire property.

Thank You, Sir.



**Dennis Rene Uriarte / Code Compliance Inspector**
Code Compliance Department
444 SW 2nd Ave, 7th Floor, Miami, FL 33130
(305) 329-4770 | duriarte@miamigov.com

MIA-SFED23485-00268971

MIA-SFED23485-00268971

MIA-SFED23485-00268972

MIA-SFED23485-00268972



MIA-SFED23485-00268973

MIA-SFED23485-00268973



MIA-SFED23485-00268974

MIA-SFED23485-00268974



MIA-SFED23485-00268975

MIA-SFED23485-00268975



MIA-SFED23485-00268976

MIA-SFED23485-00268976

03/03/2018 14:16

MIA-SFED23485-00268977

MIA-SFED23485-00268977

MIA-SFED23485-00268978

MIA-SFED23485-00268978



MIA-SFED23485-00268979

MIA-SFED23485-00268979



MIA-SFED23485-00268980

MIA-SFED23485-00268980



MIA-SFED23485-00268981

MIA-SFED23485-00268981



MIA-SFED23485-00268982

MIA-SFED23485-00268982



MIA-SFED23485-00268983

MIA-SFED23485-00268983



MIA-SFED23485-00268984

MIA-SFED23485-00268984



MIA-SFED23485-00268985

MIA-SFED23485-00268985

MIA-SFED23485-00268986

MIA-SFED23485-00268986



03/03/2018 14:28

MIA-SFED23485-00268987

MIA-SFED23485-00268987



MIA-SFED23485-00268988

MIA-SFED23485-00268988



MIA-SFED23485-00268989

MIA-SFED23485-00268989

| **Date:** | Wed, 7 Mar 2018 9:48:05 PM -0500 |
|---|---|
| **Subject:** | Fwd: COMMISSIONER CAROLLO JOINT INSPECTION #2 |
| **From:** | Sierra, Daniel <dsierra@miamigov.com > |
| **To:** | Sierra, Daniel <dsierra@miamigov.com >; |
| **Attachments:** | image002.png; image001.png; 521 SW 8 ST (1).JPG; 521 SW 8 ST (2).JPG; 521 SW 8 ST (3).JPG; 521 SW 8 ST (4).JPG; 521 SW 8 ST (5).JPG; 521 SW 8 ST (6).JPG |

Sent via the Samsung Galaxy S8, an AT&T 4G LTE smartphone
-------- Original message --------
From: "Uriarte, Dennis" <duriarte@miamigov.com >
Date: 3/4/18 8:55 AM (GMT- 05:00)
To: "Sierra, Daniel" <dsierra@miamigov.com >, "Gomez Jr., Luis" <LGomez@miamigov.com >
Subject: COMMISSIONER CAROLLO JOINT INSPECTION #2
Good Morning Luis:

The following pictures illustrate Junk in Yard, trash, and debris in the back of the Taquerias El Mexicano Restaurant located at 821 SW 8 ST. Commissioner Carollo said that a Constituent complained of trash accumulated in the back of this Restaurant and it started causing nuisance to the neighbors. The debris, the constituent said, are coming from a possible illegal roof construction/ inside the restaurant.

Thank You, Sir.



**Dennis Rene Uriarte / Code Compliance Inspector**
Code Compliance Department
444 SW 2nd Ave, 7th Floor, Miami, FL 33130
(305) 329-4770 | duriarte@miamigov.com

MIA-SFED23485-00268990

MIA-SFED23485-00268990

MIA-SFED23485-00268991

MIA-SFED23485-00268991



MIA-SFED23485-00268992

MIA-SFED23485-00268992



MIA-SFED23485-00268993

MIA-SFED23485-00268993



MIA-SFED23485-00268994

MIA-SFED23485-00268994



03/03/2018 14:03

MIA-SFED23485-00268995

MIA-SFED23485-00268995



MIA-SFED23485-00268996

MIA-SFED23485-00268996



MIA-SFED23485-00268997

MIA-SFED23485-00268997

| | |
|---|---|
| **Date:** | Wed, 7 Mar 2018 9:47:12 PM -0500 |
| **Subject:** | Fwd: COMMISSIONER CAROLLO JOINT INSPECTION #1 |
| **From:** | Sierra, Daniel <dsierra@miamigov.com> |
| **To:** | Sierra, Daniel <dsierra@miamigov.com>; |
| **Attachments:** | image003.png; image001.png; 1380 SW 8 ST.JPG |

Sent via the Samsung Galaxy S8, an AT&T 4G LTE smartphone
------- Original message -------
From: "Uriarte, Dennis" <duriarte@miamigov.com>
Date: 3/4/18 8:48 AM (GMT- 05:00)
To: "Sierra, Daniel" <dsierra@miamigov.com>, "Gomez Jr., Luis" <LGomez@miamigov.com>
Subject: COMMISSIONER CAROLLO JOINT INSPECTION #1
Good Morning Danny:

The following picture illustrates a possible encroachment of the El Taquito Restaurant into what appears to be a driveway . Commissioner Carollo believes that this driveway is in fact a FPL easement that has been used for the expansion of the Restaurant to the left. He believes that the Restaurant patrons are being exposed to these possible dangerous electrical wires coming from the Electrical pole in the middle of the driveway.

Thank You, Sir.

**Dennis Rene Uriarte / Code Compliance Inspector**
Code Compliance Department
444 SW 2nd Ave, 7th Floor, Miami, FL 33130
(305) 329-4770 | duriarte@miamigov.com

MIA-SFED23485-00268999

MIA-SFED23485-00268999



MIA-SFED23485-00269000

MIA-SFED23485-00269000

Message

| | |
|---|---|
| **From**: | Miro, Steven [SMiro@miamigov.com] |
| **Sent**: | 3/16/2018 10:55:36 AM |
| **To**: | carollojoe@hotmail.com |
| **Subject**: | FW: COMMUNICATION WITH THE CITY ADMINISTRATIVE SERVICE |
| | |
| **Importance**: | High |

FYI....

---

**From:** Gonzalez, Emilio T.
**Sent:** Friday, March 16, 2018 10:54 AM
**To:** Suarez, Francis (Mayor) <fsuarez@miamigov.com>; Hardemon, Keon (Commissioner)
<khardemon@miamigov.com>; Russell, Ken (Commissioner) <krussell@miamigov.com>; Gort, Wifredo (Commissioner)
<wgort@miamigov.com>; Carollo, Joe (Commissioner) <JCarollo@miamigov.com>; Reyes, Manolo (Commissioner)
<MReyes@miamigov.com>
**Cc:** Ruiz, Joseph A. <jaruiz@miamigov.com>; McQueen, James <JMcQueen@miamigov.com>; Wakefield, Rebecca
<RWakefield@miamigov.com>; Castaneda, Frank <FCastaneda@miamigov.com>; Miro, Steven
<SMiro@miamigov.com>; Ferreiro, Esteban <EFerreiro@miamigov.com>; Ortiz-Petit, Ignacio <IOrtiz-
Petit@miamigov.com>; Casamayor, Fernando <FCasamayor@miamigov.com>; Ihekwaba, Nzeribe
<NIhekwaba@miamigov.com>; Mendez, Victoria <VMendez@miamigov.com>; Roberts, Angela
<ARoberts@miamigov.com>; Perez, Ofelia <OPerez@miamigov.com>
**Subject:** COMMUNICATION WITH THE CITY ADMINISTRATIVE SERVICE
**Importance:** High

Honorable Mayor and Members of the City Commission,

In order to ensure that all of your respective concerns are addressed in a timely manner and in order to fully comply
with the requirements of Section 4(d) of the City Charter, I respectfully request that all communications to the city
administrative service be filtered through the Office of the City Manager and not directly submitted to department
directors or other city staff.

I want to ensure that nothing gets overlooked or slips through the cracks, thus I ask for your indulgence in this regard.

Thank you.



Emilio T. Gonzalez, Ph.D.
CITY MANAGER

Main: (305) 250-5400 Fax: (305) 250-5410
E-mail: etgonzalez@miamigov.com



PLAINTIFF'S
EXHIBIT

**37**

MADROOM0153425

Message

| | |
|---|---|
| **From:** | Mendez, Victoria [VMendez@miamigov.com] |
| **Sent:** | 4/24/2018 10:51:36 AM |
| **To:** | Gonzalez, Luciana L. [lgonzalez@miamigov.com]; Calleros Gauger, Jeremy [JCallerosGauger@miamigov.com]; Min, Barnaby [bmin@miamigov.com]; Gomez, Marta [martagomez@miamigov.com]; Garcia, Francisco [fgarcia@miamigov.com]; Cejas, Devin [DCejas@miamigov.com]; Rawlins, Tracy [TPRawlins@miamigov.com]; Dooley, Rachel S. [RSDooley@miamigov.com]; Ellis, Jacqueline [JEllis@miamigov.com] |
| **CC:** | Barcena, Anthony [ABarcena@miamigov.com]; Suarez, Jose [JosSuarez@miamigov.com]; Carollo, Joe (Commissioner) [JCarollo@miamigov.com]; Miro, Steven [SMiro@miamigov.com]; Gonzalez, Emilio T. [ETGonzalez@miamigov.com]; Napoli, Joe [JNapoli@miamigov.com]; Ortiz-Petit, Ignacio [IOrtiz-Petit@miamigov.com] |
| **Subject:** | Planning and zoning approvals for all permits warrants etc. |

Planning and zoning colleagues,

Please add Commissioner Carollo's office, copied on the cc line here in, to all your planning and zoning permit courtesy emails and memos and notices on special permits (waivers, variances, warrants, exceptions, etc.) and the like which are sent out.  The district 3 office would like to be more informed of the planning and zoning issues that are happening  in District 3. Thank you.

**Victoria Méndez, City Attorney**



Board Certified, City, County and
Local Government
City of Miami Office of the City Attorney
Telephone:  305-416-1832
Facsimile:  305-416-1801
victoriamendez@miamigov.com

**Assistant: Marta Gomez (305) 416-1844**

PLAINTIFF'S
EXHIBIT

**39**

Message

| | |
|---|---|
| **From**: | Mendez, Victoria [VMendez@miamigov.com] |
| **Sent**: | 4/25/2018 10:24:57 PM |
| **To**: | Carollo, Joe (Commissioner) [JCarollo@miamigov.com]; Blom, Richard [RBlom@miamigov.com]; Barcena, Anthony [ABarcena@miamigov.com]; Suarez, Jose [JosSuarez@miamigov.com]; Miro, Steven [SMiro@miamigov.com] |
| **Subject**: | Fwd: Pending - Calle Ocho Marketplace application and site plan for temporary farmers market |
| **Attachments**: | image001.jpg; ATT00001.htm; image002.jpg; ATT00002.htm; image003.jpg; ATT00003.htm; image004.jpg; ATT00004.htm; image002.jpg; ATT00005.htm; ATT00006.htm |

Please see application from November 2017 and discipline reviews and site plan. I will send you the regs it goes with it from Chapter 62. Certain Conditions have to be met from building before approval.

**Victoria Méndez, City Attorney**

Board Certified, City, County and
Local Government
City of Miami Office of the City Attorney
Telephone: 305-416-1832
Facsimile: 305-416-1801
victoriamendez@miamigov.com

**Assistant:** Marta Gomez (305) 416-1844

Begin forwarded message:

**From:** "Min, Barnaby" <bmin@miamigov.com>
**Date:** April 25, 2018 at 3:03:31 PM EDT
**To:** "Mendez, Victoria" <VMendez@miamigov.com>
**Cc:** "Gomez, Marta" <martagomez@miamigov.com>
**Subject: FW: Pending - Calle Ocho Marketplace**

Barnaby L. Min
Deputy City Attorney
City of Miami

**From:** Dooley, Rachel S.
**Sent:** Wednesday, April 25, 2018 3:01 PM
**To:** Min, Barnaby <bmin@miamigov.com>
**Subject:** RE: Pending - Calle Ocho Marketplace

This is it. I sent it to Victoria yesterday afternoon and thought I included you.

**From:** Min, Barnaby
**Sent:** Wednesday, April 25, 2018 2:51 PM
**To:** Dooley, Rachel S. <RSDooley@miamigov.com>
**Subject:** FW: Pending - Calle Ocho Marketplace

Can you try and get this please?

Barnaby L. Min



**EXHIBIT**
4

PLAINTIFF'S
EXHIBIT

**40**

MADROOM0163471

Deputy City Attorney
City of Miami

**From:** Prada, Barbara
**Sent:** Wednesday, April 25, 2018 2:50 PM
**To:** Min, Barnaby <bmin@miamigov.com>
**Subject:** RE: Pending - Calle Ocho Marketplace

If you like...getting something from Zoning now a days is like sending a crew for search and rescue!

**From:** Min, Barnaby
**Sent:** Wednesday, April 25, 2018 2:47 PM
**To:** Prada, Barbara <BPrada@miamigov.com>
**Subject:** RE: Pending - Calle Ocho Marketplace

Is it easier if I go to Zoning?

Barnaby L. Min
Deputy City Attorney
City of Miami

**From:** Prada, Barbara
**Sent:** Wednesday, April 25, 2018 2:39 PM
**To:** Min, Barnaby <bmin@miamigov.com>; Dooley, Rachel S. <RSDooley@miamigov.com>
**Subject:** RE: Pending - Calle Ocho Marketplace

Hello,

Let me retrieve it from Zoning and forward it to you...give me a few minutes.

**From:** Min, Barnaby
**Sent:** Wednesday, April 25, 2018 2:32 PM
**To:** Prada, Barbara <BPrada@miamigov.com>; Dooley, Rachel S. <RSDooley@miamigov.com>
**Subject:** RE: Pending - Calle Ocho Marketplace

Can you send me the full permit please?

**From:** Prada, Barbara
**Sent:** Tuesday, April 24, 2018 3:09 PM
**To:** Dooley, Rachel S. <RSDooley@miamigov.com>
**Cc:** Min, Barnaby <bmin@miamigov.com>
**Subject:** RE: Pending - Calle Ocho Marketplace

Mr. B. Min trained me well ! ☺

**From:** Dooley, Rachel S.
**Sent:** Tuesday, April 24, 2018 3:00 PM
**To:** Quintero, Lazaro <LQuintero@miamigov.com>
**Cc:** Prada, Barbara <BPrada@miamigov.com>
**Subject:** RE: Pending - Calle Ocho Marketplace

MADROOM0163472

Thanks for finding out so fast.

**From:** Quintero, Lazaro
**Sent:** Tuesday, April 24, 2018 2:43 PM
**To:** Dooley, Rachel S. <RSDooley@miamigov.com>
**Cc:** Prada, Barbara <BPrada@miamigov.com>
**Subject:** FW: Pending - Calle Ocho Marketplace

Rachel,

Per your request, the original application is at Zoning...

MADROOM0163473



MADROOM0163474

Your link to the Magic City

**Laz Quintero | Assistant Director**

NET Administration | City of Miami

151 NW 27 Ave | Miami, FL. 33125

Off: 305.960.5112

lquintero@miamigov.com

Please consider your environmental responsibility before printing this e-mail.

---

**From:** Prada, Barbara
**Sent:** Tuesday, April 24, 2018 12:05 PM
**To:** dombrowskib@gtlaw.com; lagoc@gtlaw.com
**Cc:** Rawlins, Tracy <TPRawlins@miamigov.com>; Cejas, Devin <DCejas@miamigov.com>; Cerrato, Julia <JCerrato@miamigov.com>; Gomez Jr., Luis <LGomez@miamigov.com>; rodriguezms@gtlaw.com; Camero, Jose <jcamero@miamigov.com>
**Subject:** RE: Pending - Calle Ocho Marketplace

Good afternoon,

Please, be advised that the department that issues your permit is Zoning, NET's involvement is solely to assist in the walk through.  Per the last update I received from Zoning, your application was on hold pending additional documentation requested by the Building department (see emails below).  Zoning will finalize the approval of your application If what you have just provided (BD18-002904-001-SE001) is indeed what was needed to complete the process.

A copy of the permit will be provided to you via email with a starting date commencing the day of final approval.  I hope this will suffice your inquiry.

Kindest regards,



MADROOM0163476

Barbara Prada

Special Projects Assistant

**NET Administration**

151 NW 27 AVE

Miami, FL  33125

(305) 960-5110 office

bprada@miamigov.com

---

**From:** dombrowskib@gtlaw.com [mailto:dombrowskib@gtlaw.com]
**Sent:** Tuesday, April 24, 2018 11:44 AM
**To:** lagoc@gtlaw.com; Prada, Barbara <BPrada@miamigov.com>
**Cc:** Rawlins, Tracy <TPRawlins@miamigov.com>; Cejas, Devin <DCejas@miamigov.com>; Cerrato, Julia <JCerrato@miamigov.com>; Gomez Jr., Luis <LGomez@miamigov.com>; rodriguezms@gtlaw.com; Camero, Jose <jcamero@miamigov.com>
**Subject:** RE: Pending - Calle Ocho Marketplace

Good morning Barbie,

Our permit was issued late last week, please see below:



City of Miami
BUILDING DEPARTMENT

**Permit Record**

Permit Number: DD18-092904-001-SE001          Folio Number: 0141110140170

Job Address: 1380 SW 8 ST                        Job Category: SPECIAL EVENTS

Job Description:
    TEMPORARY TENTS/STRUCTURES (FOR TUP)

Applicant: CALLE OCHO MARKET PLACE              Issued Date: Apr/17/2018

Contractor: Hurricane Development & Construction   Total Square Feet:
Inc./Randy Pope

Required Certificate:                            Estimated Cost: $10,000.00

Property Additional Info:

This card **MUST BE DISPLAYED PROMINENTLY** on the front door of the premises the entire time the work authorized by this Permit is in Progress.

**WARNING TO OWNER**

Your failure to record a **NOTICE OF COMMENCEMENT** may result in you paying twice for the improvements to your property. If you intend to obtain financing, consult with your lender or an attorney before recording your **NOTICE OF COMMENCEMENT**

Rev. Dec. 22, 2010                               Generated on Apr/17/2018 1:55 pm

MADROOM0163478

As such, the Farmer's Market Permit should be issued by your department. Please advise when I can pick up a copy. Thanks.

Brian A. Dombrowski
Associate
Greenberg Traurig, P.A. | 333 S.E. 2nd Avenue | Miami, FL 33131
Tel 305.579.0630

DombrowskiB@gtlaw.com | www.gtlaw.com

MADROOM0163479



MADROOM0163480

**From:** Lago, Carlos R. (Shld-Mia-LDZ-RE)
**Sent:** Thursday, February 1, 2018 10:56 PM
**To:** Prada, Barbara <BPrada@miamigov.com>
**Cc:** Dombrowski, Brian A. (Assoc-Mia-RE) <dombrowskib@gtlaw.com>; Rawlins, Tracy <TPRawlins@miamigov.com>; Cejas, Devin <DCcjas@miamigov.com>; Cerrato, Julia <JCerrato@miamigov.com>; Gomez Jr., Luis <LGomez@miamigov.com>; Rodriguez, Marisol (Para-Mia-LDZ-RE) <rodriguezms@gtlaw.com>; Camero, Jose <jcamero@miamigov.com>
**Subject:** Re: Pending - Calle Ocho Marketplace

Thank you, Barbie. We are working on the building permit for submittal. We will keep you updated.

Thank you,


Carlos R. Lago

Greenberg Traurig


Sent from my iPhone


On Feb 1, 2018, at 12:15 PM, Prada, Barbara <BPrada@miamigov.com> wrote:

Good afternoon,


Please, be advised that your application is pending final approval. The following requirements need to be met in order for completion…


Building requirements:  Plans must be submitted with anchorage details, electricity and ADA requirements.


Once Building Director, Mr. Jose Camero, has approved these plans…you will receive your permit with a starting date as of day of final approval.


Thanking you in advance,

MADROOM0163481



MADROOM0163482

Barbara Prada

Special Projects Assistant

**NET Administration**

151 NW 27 AVE

Miami, FL 33125

(305) 960-5110 office

bprada@miamigov.com

---

**From:** Cerrato, Julia
**Sent:** Thursday, February 1, 2018 11:52 AM
**To:** Prada, Barbara <BPrada@miamigov.com>
**Cc:** Cejas, Devin <DCejas@miamigov.com>; Rawlins, Tracy <TPRawlins@miamigov.com>
**Subject:** RE: Pending - Calle Ocho Marketplace

Hi Barby,

See attached.  Please note that Devin signed for Zoning, however, they must comply with all other comments before Zoning signs off on behalf of the City Manager.

Thank you,

**Julia D. Cerrato, Assistant Director**

<image006.png>City of Miami

Office of Zoning

444 SW 2nd Avenue, 4th Floor

Miami, FL 33130

Telephone:  305-416-1006

jcerrato@miamigov.com

*"Serving, Enhancing, and Transforming our Community"*

MADROOM0163483

\<MX-M364N_20180201_115529.pdf\>

---

If you are not an intended recipient of confidential and privileged information in this email, please delete it, notify us immediately at postmaster@gtlaw.com, and do not use or disseminate such information.

MADROOM0163484

Message

| | |
|---|---|
| **From:** | Suarez, Jose [JosSuarez@miamigov.com] |
| **Sent:** | 5/1/2018 2:45:00 PM |
| **To:** | Miro, Steven [SMiro@miamigov.com] |
| **CC:** | Blom, Richard [RBlom@miamigov.com] |
| **Subject:** | 20 May March |

Steven – We need to pull a mailing list of all business and residents from 17th Ave. to 4th Ave on SW 8th Street and residents along SW$7^{th}$ and 9th St. in between the avenues mentioned. Please try to get this list by Friday or provide an update as soon as possible as to when we can expect the list.

Thanks!

José Suárez
Special Assistant | District 3
Office of Commissioner Carollo | 3500 Pan American Drive | Miami, FL
T: 305.250.5380 | M: 305.985.2636 | F: 305.250.5386
E: jossuarez@miamigov.com



Confidentiality Notice: This electronic mail message and any attached files contain information intended for the exclusive use of the individual or entity to whom it is addressed and may contain information that is proprietary, privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any viewing, copying, disclosure or distribution of this information may be subject to legal restriction or sanction. Please notify sender, by electronic email or telephone, of any unintended recipients and delete the original message without making any copies.



PLAINTIFF'S EXHIBIT

45

EXHIBIT

14

tabbies

MADROOM0170099

Message

| | |
|---|---|
| **From**: | Mendez, Victoria [VMendez@miamigov.com] |
| **Sent**: | 5/21/2018 2:00:27 PM |
| **To**: | Blom, Richard [RBlom@miamigov.com]; Barcena, Anthony [ABarcena@miamigov.com]; Suarez, Jose [JosSuarez@miamigov.com] |
| **Subject**: | Fwd: 1380 SW 8 ST Open Violations for Code and Building |

**Victoria Méndez, City Attorney**

Board Certified, City, County and
Local Government
City of Miami Office of the City Attorney
Telephone:  305-416-1832
Facsimile:  305-416-1801
victoriamendez@miamigov.com

Assistant: Marta Gomez (305) 416-1844

Begin forwarded message:

**From:** "Dooley, Rachel S." <RSDooley@miamigov.com>
**Date:** May 4, 2018 at 5:00:22 PM EDT
**To:** "Mendez, Victoria" <VMendez@miamigov.com>
**Cc:** "Gomez, Marta" <martagomez@miamigov.com>
**Subject: 1380 SW 8 ST  Open Violations for Code and Building**

Open Cases:

CE2018009457: Work without a permit – work done between the 2 structures in the alleyway.  There is a roof overhang and structure support overhand on left hand side.  Set for hearing 6/13/18

BB2018002766: Modified containers without building permits as well as the roof permitting issue.  Set for hearing in June 29, 2018

Graffiti on property was cleaned up and the alley use not a r-o-w issue due to it being vacated by the City (this I checked with Rene about yesterday).

The City abandoned the alley so there is no issue as to that, this has been confirmed by Public Works.

There is an encroachment for the restaurant for the construction in the alley way.  That address is 1378 SW 8 ST but is in same parcel as 1380.

1380 and 1360 may an encroachment if they are not a zero lot line.  Different corporate names, but same owner.  I am checking with Zoning on this matter.

Section 10-4(b)(6) of the City Code does not allow new permits for non-homestead properties to be issued if there are outstanding code enforcement violations, building violations etc… unless they are the permits to comply the violation or for life safety purposes.

**EXHIBIT**

tabbies®

1 1

PLAINTIFF'S
EXHIBIT
**52**

MADROOM0171000

10-4(b)(6)

*New permits prohibited, non-homestead properties.* Permits shall not be issued for a non-homestead property with any outstanding code enforcement violations, building violations, or any relevant city lien or invoice due and owing to the city. Permits required to cure life safety issues, permits which are required to bring outstanding violations into compliance, or permits for any properties owned by a governmental entity are exempted from this prohibition.

**Regards,**

**Rachel S. Glorioso Dooley, Assistant City Attorney**



City of Miami Office of the City Attorney
Telephone:  305-416-1886
Facsimile:  305-416-1801
rsdooley@miamigov.com

Assistant: Karla Reyes 305-416-1863

Disclaimer: This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect the attorney-client or work product privileges. Should the intended recipient forward or disclose this message to another person or party, that action could constitute a waiver of the attorney-client privilege. If the reader of this message is *not* the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. section 2510-2521. If this communication was received in error we apologize for the intrusion. Please notify us by reply e-mail and delete the original message. Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

Please consider the environment before printing this e-mail. 

MADROOM0171001

## Olmo, Nilda (COE)

| | |
|---|---|
| **From:** | +17864479815@tmomail.net |
| **Sent:** | Friday, July 20, 2018 12:07 PM |
| **To:** | Olmo, Nilda (COE) |
| **Attachments:** | text_1532102813647.txt |

This is an EXTERNAL email. Exercise caution. DO NOT open attachments or click links from unknown senders or unexpected emails. Please click here if this is a suspicious message reportspam@miamidade.gov **Enterprise Security Office**

Make sure your inspectors and supervisor be on top of violations on District 3 Or there will be consequences

T · ·Mobile·

This message was sent to you by a T-Mobile wireless phone.



1



PLAINTIFF'S
EXHIBIT

**58**

MADROOM0247836