Message

| | |
|---|---|
| **From**: | Blom, Richard [RBlom@miamigov.com] |
| **Sent**: | 3/5/2019 8:15:59 AM |
| **To**: | Quintana, Tanjha [TQuintana@miamigov.com] |
| **Subject**: | Fwd: Code violations update |
| **Attachments**: | Properties.docx; Re: Assistance with carrying out this Commission resolution; Re: Follow up: 521 SW 8 St |

Please print with all the attachments. Thank you.

Get Outlook for iOS

**From:** Napoli, Joe
**Sent:** Monday, March 4, 2019 6:31:12 PM
**To:** Carollo, Joe (Commissioner); Gonzalez, Emilio T.; Blom, Richard
**Cc:** Suarez, Jose; Barcena, Anthony; Quintana, Tanjha; Casamayor, Fernando; Valencia, Adele
**Subject:** RE: Code violations update

Richie,

Attached is an update on all the properties that the City Attorney directed our staff to inspect (also attached).  Of the 11 properties, directed by the City Attorney, all were inspected except for 521 SW 8th Street and 1513 SW 8th Str. in which entry was denied on Feb 26th when inspectors were presented with the attached letter by the owner's attorneys. The City Attorneys office has a meeting scheduled for tomorrow to discuss this.  521 SW 8th Str however **was** inspected by the Fire Department on the evening of February  14th following the Commission meeting for fire and life safety (attached).

Our staff is diligently working to provide all of the data and records requested in your most recent public records request.

We will continue to provide you any updates.

Thanks, Joe

**From:** Carollo, Joe (Commissioner)
**Sent:** Wednesday, February 27, 2019 11:48 AM
**To:** Gonzalez, Emilio T. <ETGonzalez@miamigov.com>
**Cc:** Napoli, Joe <JNapoli@miamigov.com>; Carollo, Joe (Commissioner) <JCarollo@miamigov.com>; Suarez, Jose <JosSuarez@miamigov.com>; Barcena, Anthony <ABarcena@miamigov.com>; Quintana, Tanjha <TQuintana@miamigov.com>
**Subject:** Code violations update

Mr. Manager,

Commissioner Carollo has asked that I request from you an update on the status the of all code violations that he brought up during the last commission meeting.

Thank you

Richard Blom

Get Outlook for iOS



PLAINTIFF'S EXHIBIT
171
EXHIBIT
28

## **1450 SW 7 STREET**

**Alleged Violation**: "in particular work done without permits [windows, ACs, plumbing, elevators, electrical] as this was an Unsafe structure"

**Owner:** Tower Hotel LLC

**Zoning**: T5-O

**Active Certificate(s) of Use/Business Tax Receipt(s) ("BTR")**
1. Tower Hotel LLC d/b/a Tower Hotel
   - Certificate Number: 0121166
   - Issue Date: 05/30/12
   - Approved Use: Hotel with 4 COPS, 50 rooms
   - FEIN: 455286054
   - Zoning Hold: No Hauler (Garbage Pickup) Information on File however, previous CU shows Progressive Waste. Appears to be an error in the system.
   - BTR: Paid; Pending State License

**Valet Parking Permit:** Residential Building/No Valet or Valet Storage

**Fire:** No active violations

**Code:** No active violations

**Building:**
**Demolition Order**
> **Action:** Complaint received from a citizen on May 31, 2012.
> June 5, 2012; first Notice of Violation issued.
> August 1, 2012, Final Notice issued and August 24, 2012; Electrical disconnected and Notice of Lien recorded.
> Repair permits were processed.
> Work continued to be performed without a permit.
> January 9, 2018 Final Notice on the property again and Electrical disconnect was issued again.
> January 22, 2018, Notice of Hearing posted.
> February 23, 2018, Hearing took placed, repair or demolish order issued.
> July 23, 2018, Compliance Agreement executed with Bond collateral.
> July 26, 2018, Special Assessment Lien was placed on the property. Liens were paid.
> October 12, 2018 Plans submitted and approved pending obtaining permit issuance.

> **Pending:**
> Permit issuance and start of construction.

1

## <u>1551 SW 8 STREET</u>

<u>**Alleged Violation**</u>: "illegal parking lot particularly at night; NOV as parking not allowed; status of code case: CE 2019001689."

<u>**Owner**</u>: Yo Amo Calle Ocho, LLC

<u>**Zoning**</u>: T6-8-O

<u>**Active Certificate(s) of Use/Business Tax Receipt(s) ("BTR")**</u>

1. <u>Top Cigar Corporation</u>
   - Certificate Number: 100222
   - Issue Date:  1/29/10
   - Approved Use: Bar/Lounge with Live Entertainment/Cigar
   - Special Permit: Class II Permit 09-0162
   - FEIN:  260665668
   - 500 Sq. Ft. Alcohol & Beverage Establishment / 1000 Sq. Ft. General Commercial
   - BTR not issued for liquor, bars or taverns
     BTR for Cigars and Tobacco Retail Dealers Paid, Issued 10/1/18

2. <u>Jim Burgers Inc. (Pending)</u>
   - Certificate Number: N/A
   - Application Date: 2/4/19
   - FEIN: Not Provided
   - Proposed Use: Commercial - Food Service Establishment (Restaurant)
   - 1100 Sq. Ft., 20 Seats
   - **BTR:** Restaurant BTR issued 3/4/2019, pending payment.

<u>**Valet Parking Permit**</u>:  No Valet or Valet Storage

<u>**Fire:**</u> No active violations

<u>**Code:**</u> Case was opened for non-conforming parking lot (2019001689).  Counsel for property owner requested and was granted thirty (30) day extension.  Compliance due date is now March 13, 2019.

<u>**Planning:**</u>
Class II Special Permit No. 09-0162
Issue Date: 7/13/09
Issued To: Cristobal Mena/Top Cigars Corp.
Description: Bar/Cigar Lounge w/live entertainment on "Cultural Specialty District"

2

MADROOM0142108

## 1512 SW 8 STREET

**Alleged Violation**: "unsafe wood structure built over an existing alley made to blend with buildings on either side."

**Owner:** Avigdor Landman Revocable Living Trust

**Zoning**: T6-8-O

**Active Certificate(s) of Use/Business Tax Receipt(s) ("BTR")**

1. Havana Food Investment LLC d/b/a D' Asis Guayaberas
   - Certificate Number: 1706-001265
   - Issue Date: 6/14/17
   - Approved Use: General Commercial [Clothing store; excluded shoes (522) and fur stores (525)]
   - FEIN: 815117790
   - 800 Sq. Ft.
   - BTR: Paid; Issued 10/1/18

2. Siempre Tax +
   - Certificate Number: 1603-000640
   - Issue Date: 03/29/16
   - Approved Use: General Commercial – Office (General Business Office)
   - FEIN: 470886778
   - 800 Sq. Ft.
   - Notes: Pending CU and BTR Payments for Years 2017, 2018, and 2019 (Determining if Closed)

3. Latin Cash Joyeria/ Latin Cash Jewelry, Inc.
   - Certificate Number: 070629
   - Issue Date: 2/22/2007
   - Approved Use: General Commercial
   - FEIN: 592743494 (Inactive)
   - 1000 Sq. Ft.
   - Notes: Pending CU and BTR Payments for Years 2016, 2017, 2018, and 2019 (Determining if closed)

**Valet Parking Permit**: No Valet or Valet Storage

**Fire:** No active violations

**Code:** Notice of violation issued 2/26/19 for work completed without a finalized permit (2019003386 Correct address 1518 SW 8 St.). Compliance date March 8[th,] 2019.

**Building:**

A visual inspection revealed the structure between the two building is there. A violation with Unsafe Structure was open under BB 2019 003532.

3

On 1518 SW 8 St (alternate address) a demolition permit was issued for a shed at the rear of Exquisito Restaurant, under permit BD17012484001 B001.  This was completed and closed on November 14, 2017.



MADROOM0142110

## 1742 NW 7 STREET

**Alleged Violation**: "illegal parking lot particularly at night."

**Owner:** 1742 NW 7 Street, LLC

**Zoning**: T6-8-O

**Active Certificate(s) of Use/Business Tax Receipt(s) ("BTR")**
- CU: No CU at this address.
- BTR: No BTR at this address.

**Valet Parking Permit**: No Valet or Valet Storage

**Fire:** NA

**Code:** Property was inspected on the evenings of February 25th and 26[th.] There were no vehicles parked or any signs of any parking business at the time of either inspection.



5

## 1700 NW 7 STREET

**Alleged Violation**: "illegal parking lot particularly at night."

**Owner:** Eladio Godoy Revocable Living Trust

**Zoning**: T6-8-O

**Active Certificate(s) of Use/Business Tax Receipt(s) ("BTR")**
1. Bowl Bar & Package
   - Certificate Number: 051452
   - Issue Date: 4/20/05
   - Approved Use: General Commercial and Alcohol & Beverage Establishment
   - FEIN: 651099411
   - 2400 Sq. Ft. General Commercial/1700 Sq. Ft., 45 Seats Alcohol & Beverage Establishment
   - **BTR** is not issued for liquor, bars or taverns; Multiple BTR's billed; not paid: Merchant Retail, Food Retail, ATM and Coin-Op Music Machine

**Valet Parking Permit**: No Valet or Valet Storage

**Fire:** Due to hours of operation, inspection has been scheduled to occur at night

**Code:** Property was inspected on the evenings of February 25th and 26th On both nights two vehicles were legally parked. There were no signs of an illegal parking lot.

6

MADROOM0142112

## 601 NW 17 AVENUE

**Alleged Violation**: "illegal parking lot particularly at night."

**Owner:** Eladio Godoy Revocable Living Trust

**Zoning**: T6-8-O

### Active Certificate(s) of Use/Business Tax Receipt(s) ("BTR")

- CU:  No CU at this address.
- BTR: No BTR at this address.
- Notes: Inactive Certificate of Use for Bullpen Parking, LLC for "[p]arking lot for Bullpen Restaurant employees."

**Valet Parking Permit**: No Valet or Valet Storage

**Fire:** NA

**Code:**  Property was inspected on the evenings of February 25th and 26th. On the night of the 25th two vehicles were parked and on the 26th there were three.  There were no signs of an illegal parking lot.

MADROOM0142113

## 1530 SW 7 STREET

**Alleged Violation**: "illegal parking lot particularly at night; illegal storage in residential home."

**Owner**: Little Havana Arts Too, LLC

**Zoning**: T5-O

**Active Certificate(s) of Use/Business Tax Receipt(s) ("BTR")**
- CU:  No CU at this address.
- BTR:  No BTR at this address.

**Valet Parking Permit:**  Residential Building/No Valet or Valet Storage

**Fire:** NA

**Code:** Property was issued a ticket for parking on unimproved surfaces on February 8th, 2019.  The property was re-inspected on February 27th, 2019, at the time of inspection no vehicles were parked on unimproved surfaces. Permit from 1991 on file (P91-4408) for paving of rear of property.



8

## <u>1780 SW 7 STREET</u>
## <u>(1747 SW 8 St.)</u>

<u>**Alleged Violation**</u>: "illegal parking lot particularly at night/weekends."

<u>**Owner**</u>:  1780 LLC

<u>**Zoning**</u>:  T4-L

<u>**Active Certificate(s) of Use/Business Tax Receipt(s) ("BTR")**</u>
1. <u>1780 LLC</u>
   - Certificate Number: 032887
   - Issue Date: 9/18/03
   - Approved Use: Multi-Family Housing < 9 FL, 6 Units
   - FEIN:  05-0552631
   - BTR: Paid; Pending state license.

<u>**Valet Parking Permit**</u>:  Residential Building/No Valet or Valet Storage

<u>**Fire**</u>: No active violations

<u>**Code**</u>: No signs of illegal parking; pending building permit history for verification of parking area.



9

MADROOM0142115

## 521 SW 8 STREET

**Alleged Violation**: "illegal lounge; work without permits (bathrooms, plumbing, bar, seating, electrical; illegal occupancy; possible sprinkler system needed; possible alcohol license required by exception at city commission."

**Owner**: La Gran Fiesta LLC

**Zoning**: T6-8-O

**Active Certificate(s) of Use/Business Tax Receipt(s) ("BTR")**
1.  Altos Mexicanos LLC d/b/a Taquerias El Mexicano
    - Certificate Number: 1712-002617
    - Issue Date: 12/20/17
    - Approved Use: Commercial Food Service Establishment (Restaurant) – 4 COP SFS
        o  Amended to 4 COP Quota on 2/1/19
    - FEIN: 821657174
    - 6000 Sq. Ft., 200 Seats
    - **BTR:** Paid; Issued 12/17/18 for Restaurant and 02/13/19 for Merchant Retail

**Valet Parking Permit:** Altos Mexicanos/Valet Location

**Fire:** No active violations

**Code:** Case was opened December 18th, 2018. Property complied with BTR violation; the violations for outside seating and C/U is scheduled to appear before the Code Enforcement Board on March 13th, 2019. An LSR has been submitted to the Law Department for clarification on the C/U violation. (Access for inspection was denied on February 27th, 2019 via letter from property owners attorney.

**Building:**
October 5, 2017; partial interior demolition permit. Final on November 30, 2017.
March 5, 2018; Electrical service upgrade. Final on Sept. 21, 2018.

February 26, 2019 inspection was coordinated but no access was granted.

**Planning:**
- PZ-19-710 – Warrant application for Outdoor Dining submitted by applicant on 1/14/19.
- Pending completion of initial review cycle.

MADROOM0142116

## 1380 SW 8 STREET

**Alleged Violation**: "illegal outdoor café-no warrant OR illegal sidewalk cafe no permit- may require immediate removal letter pursuant to chapter 55."

**Owner**: Calle Ocho Marketplace, LLC

**Zoning**: T6-8-O

**Active Certificate(s) of Use/Business Tax Receipt(s) ("BTR")**
1. Havana Market Corp.
   - Certificate Number: 1808-001956
   - Issue Date: 8/23/18
   - Approved Use: General Commercial 2APS/Commercial – Food Service Establishment (Restaurant) Incidental 2 COP
   - FEIN: 814131505
   - 4000 Sq. Ft. General Commercial 2APS/ 800 Sq. Ft. – 20 Seats - Commercial – Food Service Establishment (Restaurant) Incidental 2 COP
   - Notes: Pending BTR Payment for Year 2018 and Pending CU Payment for 2019

2. El Taquito II Corp
   - Certificate Number: 1801-000022
   - Issue Date: 1/5/18
   - Approved Use: Food Service Establishment (Restaurant) Incidental Beer and Wine 2 COP
   - 500 Sq. Ft., 28 Seats
   - BTR: Paid; Pending State License.

**Valet Parking Permit:** Overflow Valet Storage lot for Ball & Chain.

**Fire:** No active violations

**Code:** Property was issued a notice of violation on February 26th, 2019 for failure to obtain a warrant for the outside seating (2019003374) Compliance due March 8th.

**Building:**
Demolition permit issued on February 4, 2019.  Permit still active pending final Building and Unsafe Structures.

A visit to the site showed that the trellis and structure was demolished.

MADROOM0142117

## <u>1513 SW 8 STREET</u>

<u>**Alleged Violation**</u>: "work without a permit-compare to plans for Casa de Tula, prior business on site-potential full unpermitted remodel."

<u>**Owner**</u>:  Little Havana Arts Building, LLC

<u>**Zoning**</u>: T6-8-O

<u>**Active Certificate(s) of Use/Business Tax Receipt(s) ("BTR")**</u>
1.  <u>Ball and Chain</u>
    - Certificate Number: 1405-001154
    - Issue Date: 5/7/14
    - Approved Use: Alcohol & Beverage Establishment (Tavern)
    - Restrictions: Class II Special Permit 08-0198
    - FEIN:  463642581
    - 2700 Sq. Ft., 70 seats
    - BTR not issued for liquor, bars or taverns

<u>**Valet Parking Permit**</u>:  Ball & Chain/Valet Location

<u>**Fire**</u>: No active violations

<u>**Code**</u>: No active violations (Access for inspection was denied on February 27th, 2019 via letter from property owners attorney.)

<u>**Building**</u>:

March 5, 2018 Permit applied for Electrical Service repair. Permit still open.

February 26, 2019 inspection was coordinated but no access was granted.

12

MADROOM0142118

Message

| | |
|---|---|
| **From:** | Mendez, Victoria [VMendez@miamigov.com] |
| **Sent:** | 2/20/2019 5:40:42 PM |
| **To:** | Gonzalez, Emilio T. [ETGonzalez@miamigov.com]; Ihekwaba, Nzeribe [NIhekwaba@miamigov.com]; Pons, Maurice [MPons@miamigov.com]; Gomez, Marta [martagomez@miamigov.com]; Orta, Lazaro [LOrta@miamigov.com]; Ruiz, Joseph A. [jaruiz@miamigov.com]; Camero, Jose [jcamero@miamigov.com]; Napoli, Joe [JNapoli@miamigov.com]; Garcia, Francisco [fgarcia@miamigov.com]; Casamayor, Fernando [FCasamayor@miamigov.com]; Gibbs, Domini [DGibbs@miamigov.com]; Green, Christopher [CAgreen@miamigov.com]; Campana, Carlos [CCampana@miamigov.com]; Min, Barnaby [bmin@miamigov.com]; Paschal, Erica [EPaschal@miamigov.com]; Zahralban, Joseph (Joe) [JZahralban@miamigov.com]; Garcia, Eloy [elgarcia@miamigov.com]; Colina, Jorge (Chief of Police) [1126@miami-police.org]; Attorneys [Attorneys@miamigov.com]; Alvarez, Valentin J [VJAlvarez@miamigov.com]; Diez, Sergio (Executive Officer) [1484@miami-police.org]; Papier, Ronald (Deputy Chief) [5475@miami-police.org]; Valencia, Adele [avalencia@miamigov.com]; Dodd, Alan M. [AMDodd@miamigov.com]; Santana Jr., Juvenal [jsantana@miamigov.com]; Nunez, Mario F. [MFNunez@miamigov.com]; Schwarz, Jeremy [JSchwarz@miamigov.com]; anoriega@miamiparking.com |
| **Subject:** | Re: Assistance with carrying out this Commission resolution |

Please add 1513 SW 8 ST (work without a permit-compare to plans for Casa de Tula, prior business on site-potential full unpermitted remodel)

Thanks!

**Victoria Méndez, City Attorney**



Board Certified, City, County and
Local Government
City of Miami Office of the City Attorney
Telephone:  305-416-1832
Facsimile:  305-416-1801
victoriamendez@miamigov.com

**Assistant: Marta Gomez (305) 416-1844**

On Feb 20, 2019, at 5:00 PM, Mendez, Victoria <VMendez@miamigov.com> wrote:

A RESOLUTION OF THE MIAMI CITY COMMISSION DIRECTING THE CITY ATTORNEY TO RESEARCH PROPERTIES DESCRIBED AT THE FEBRUARY 14, 2019 CITY COMMISSION MEETING DURING DISCUSSION ITEM "D3.1 – CODE ENFORCEMENT" REGARDING VIOLATIONS RELATED TO NO CERTIFICATE OF USE, CERTIFICATE OF USE OBTAINED UNDER FALSE PRETENSES, AND/OR PROPERTIES WITH VIOLATIONS THAT POSE LIFE-SAFETY ISSUES, AND INITIATE INJUNCTIVE PROCEEDINGS AGAINST SAID PROPERTIES UNTIL THE PROPERTIES ARE BROUGHT INTO COMPLIANCE.

Team
Hello. I need your assistance (please) in carrying out the above mentioned resolution.  I need some new site  inspections and review of all city   records for comparisons to existing site improvements/ site uses/ violations vs. the existing city records, permits, CUs, COs, BTRs, warrants, waivers, occupancies, etc.,  we have on file for the sites, by all the city disciplines/ departments for the following properties discussed at Commission last week:

1450 SW 7 ST (in particular work done without permits [windows, ACs, plumbing, elevators, electrical] as this was an Unsafe structure)

1551 SW 8 ST (illegal parking lot particularly at night; NOV as parking not allowed; status of code case: CE 2019001689)

1512 SW 8 ST (unsafe wood structure built over an existing alley made to blend with buildings on either side)

1742 NW 7 ST (illegal parking lot particularly at night)

1700 NW 7 ST (illegal parking lot particularly at night)

601 NW 17 AVE (illegal parking lot particularly at night)

1530 SW 7 ST (illegal parking lot particularly at night; illegal storage in residential home)

1780 SW 7 ST (illegal parking lot particularly at night/weekends)

521 SW 8 ST  (illegal lounge; work without permits (bathrooms,plumbing, bar, seating, electrical; illegal occupancy; possible sprinkler system needed; possible alcohol license required by exception at city commission)

1380 SW 8 ST (illegal outdoor café-no warrant OR illegal sidewalk cafe no permit- may require immediate removal letter pursuant to chapter 55)

These are the only addresses I recall. I will confirm, but at least we can get started so we can report progress at the next commission meeting. There is a code enforcement discussion and I would like to be ready with any updates.

Thank you.


**Victoria Méndez, City Attorney**

Board Certified, City, County and
Local Government
City of Miami Office of the City Attorney
Telephone:  305-416-1832
Facsimile:  305-416-1801
victoriamendez@miamigov.com

**Assistant: Marta Gomez (305) 416-1844**

MADROOM0142120

Message

| | |
|---|---|
| **From:** | Zahralban, Joseph (Joe) [JZahralban@miamigov.com] |
| **Sent:** | 2/15/2019 4:14:45 PM |
| **To:** | Plasencia, Adrian [APlasencia@miamigov.com]; Gonzalez, Emilio T. [ETGonzalez@miamigov.com]; Napoli, Joe [JNapoli@miamigov.com] |
| **CC:** | Garcia, Eloy [elgarcia@miamigov.com] |
| **Subject:** | Re: Follow up: 521 SW 8 St |

Thank you AFC Plasencia.

Mr. Manager / Mr. Deputy Manager,
Please see below.

Joseph Zahralban, Fire Chief
City of Miami
Department of Fire-Rescue

On Feb 15, 2019, at 4:08 PM, Plasencia, Adrian <APlasencia@miamigov.com> wrote:

Good afternoon Chief,

Today at 13:00 hours we visited the structure located at 521 SW 8 Street as a follow up to the inspection that occurred last night. Upon arrival, Chief Garcia, you, and I met with Mr. Fuller and his group to discuss the violations administered last night and their progress in complying. We walked the structure with the group, where the following was observed as it relates to the violations administered last night.

• We were informed that the hood system is scheduled to be cleaned on Monday. Mr.Fuller also provided documentation exhibiting the hood was last cleaned on November 21,2018.

• Vertical and horizontal penetrations in 1st and 2nd floor offices had been remedied. They were informed they need to address any remaining voids, which were minor, with fire caulking, where they committed to actuating this in an expeditious manner.

• Mr. Fuller committed to having the doors installed at the top and bottom of the stairs in the stairwell by Monday.

• All storage, objects, decorations, and other combustibles were removed from the stairwell.

• Occupant load signs were being moved to proper locations.

• Smoke detectors had been uncovered.

• An electrician was scheduled for today to repair the emergency lights noted in the violation.

• Mr. Fuller committed to submitting an updated floor plan of the second floor in the next few weeks to acquire a revised occupant load.

During our walkthrough Mr. Fuller also committed to removing the deadbolt lock from the rear exit door on second floor. Additionally, while we were in the outside area, he expressed his commitment to install an additional exit in the outside area, and asserted that the outside area is not being utilized.

With the above information, actions, and commitments, I am comfortable with allowing the business to continue to operate from a fire and life safety standpoint.

Please let me know if you would like any additional information.

Regards,

Adrian Plasencia, MPA
Fire Marshal/Assistant Fire Chief
City of Miami Fire Rescue

Office: 305 416-1678 / Fax: 305 416-1665 / e-mail: Aplasencia@miamigov.com

This communication may contain confidential and/or otherwise proprietary material and is thus for use only by the intended recipient. If you received this in error, please contact the sender and delete the e-mail and its attachments from all computers.

MADROOM0142122

PLAINTIFF'S
EXHIBIT

**173**

MADROOM0184181

**From:** Carollo, Joe (Commissioner) [mailto:JCarollo@miamigov.com]
**Sent:** Wednesday, March 06, 2019 4:06 PM
**To:** Larry, Damon
**Cc:** Blom, Richard
**Subject:** Information Requested: 521 SW 8 ST

Mr. Larry,

As requested, the ABT agent's name that visited the above-listed establishment was Agent Maqueira. I'm also including documentation for your review, including notices of violation and tickets as well as after action reports from City Miami Police and Code Compliance departments and correspondence. Please see the following:

- Notice of Violations and Tickets/Citations issued

- City of Miami PD After Actions Report – Please see #10

- City of Miami Code Compliance After Actions Report – Please see #11

- Email from ABT Agent Archie Moore to City of Miami Code Compliance Supervisor Francisco Marcos

Please let me know if you have any questions.

Respectfully,

Joe Carollo
Commissioner | District 3
3500 Pan American Drive | Miami, FL
T: 305.250.5380 | F: 305.250.5386
E: JCarollo@miamigov.com

**Barcena, Anthony**

| | |
|---|---|
| **From:** | Napoli, Joe |
| **Sent:** | Friday, December 21, 2018 4:01 PM |
| **To:** | Carollo, Joe (Commissioner); Blom, Richard |
| **Subject:** | FW: Dry Hour Operation 12/15/18 CODE After Action Report *****UPDATED***** |

Commissioner,

As requested, please see the below report on the Operation this past weekend. Please note we do not have ABT's report yet.

Sincerely, Joe

---

**From:** Casamayor, Fernando
**Sent:** Friday, December 21, 2018 2:06 PM
**To:** Napoli, Joe <JNapoli@miamigov.com>
**Subject:** Fwd: Dry Hour Operation 12/15/18 CODE After Action Report *****UPDATED*****

Please see below. The Mexican restaurant is the last location in the list. ABT usually takes a while to do their after action report. We will follow up with ABT, but we cannot rush them.

Fernando Casamayor
Assistant City Manager
City of Miami

Get Outlook for Android

---

> **From:** "Marcos, Francisco" <FMarcos@miamigov.com>
> **Date:** December 18, 2018 at 5:47:34 PM EST
> **To:** "Laurenceau, Robert" <3898@miami-police.org>
> **Cc:** "Bernat, James (Sr Exec Asst)" <28410@miami-police.org>, "Orta, Lazaro" <LOrta@miamigov.com>, "Adams, Kristopher" <KAdams@miamigov.com>, "Morua, Scarlet" <SMorua@miamigov.com>, "Gonzalez, Joviel" <jgonzalez@miamigov.com>, "'Moore, Archie'" <Archie.Moore@myfloridalicense.com>, "'Gerald, Shelia'" <Shelia.Gerald@myfloridalicense.com>, "'roberto.Maqueira@myfloridalicense.com'" <roberto.Maqueira@myfloridalicense.com>, "'Orbeta, Jorge'" <Jorge.Orbeta@myfloridalicense.com>, "Coss, Atila" <43029@miami-police.org>
> **Subject: Dry Hour Operation 12/15/18 CODE After Action Report *****UPDATED*****
>
> Lieutenant Laurenceau, below is CODE's after action report on the Dry Hour Operation conducted Saturday December 15, 2018.
> Joviel, can you forward FIRE's findings on each establishment so it can be added to the final after-action report?
> Agent Maqueira, can please forward a brief after-action report on behalf of ABT?
>
> 1. M & B Market - 1539 NW 3 AV
>    *******(3) ILLEGAL GAMBLING MACHINES $500 X 3 = $1500.00 TICKET******UPDATED
> 2. Hole in the Wall - 742 NW 5 AV
>    NOTICE OF VIOLATION (NO CU FOR REST.) NOV

1

3. 1306 Lounge - 1306 N Miami AV
   NOTICE OF VIOLATION (WORKING W/O A PERMIT) NOV

4. Hanger – 60 NE 11 ST
   NO VIOLATIONS FOUND

5. SQL – 30 NE 14 ST
   NO VIOLATIONS FOUND

6. El Aguila - 2291 NW 36 Street
   ALCOHOL SERVED W/O FOOD $500.00 TICKET
   UNABLE TO PROVIDE DOCUMENTATION FOR SALES $500.00 TICKET
   (3) ILLEGAL GAMBLING MACHINES $500 X 3 = $1500.00 TICKET
   NO BTR FOR ATM $250.00 TICKET

7. La Nueva Era - 3517 NW 35 Street
   UNABLE TO PROVIDE DOCUMENTATION FOR SALES $500.00 TICKET
   ALCOHOL SERVED W/O FOOD $500.00 TICKET
   NO BTR FOR ATM $250.00 TICKET

8. Madelis Restaurant - 1279 NW 29 Street
   NO BTR FOR JUKEBOX (NOTICE OF VIOLATION)
   ALCOHOL SERVED W/O FOOD $500.00 TICKET

9. La Ceniza - 2450 NW 36 Street
   ALCOHOL SERVED W/O FOOD $500.00 TICKET
   UNABLE TO PROVIDE DOCUMENTATION FOR SALES $500.00 TICKET

10. Maecy Rest/Cafeteria - 1466 SW 6 ST
    NOT VISITED

11. Los Altos Mexicanos – 521 SW 8 T
    NOTICE OF VIOLATION FOR NOT HAVING A CU FOR ILLEGAL LOUNGE
    NOTICE OF VIOLATION FOR ILLEGAL OUTSIDE PATIO SEATING. ZONING WARRAND NEEDED
    ALCOHOL SERVED W/O FOOD $500.00 TICKET
    UNABLE TO PROVIDE DOCUMENTATION FOR SALES $500.00 TICKET
    NO BTR FOR SOUVENEER SHOP

Regards,

*Frank Marcos, MPS*
*Code Compliance Supervisor*
*City of Miami*
*tel. 305.329.4820*

MADROOM0184184

MADROOM0184185





# CITY OF MIAMI POLICE DEPARTMENT
## AFTER ACTION REPORT

## OPERATION DRY HOUR

**Operation:**   **Dry-Hour**
**District(s):**   **Central & South District**
**Date:**   **Saturday 12/15/18**   **Hours:**   **2300 - 0500 hours**
**Command Post:**   **Central District**

## EVENT COMMANDER

**COMMANDER:**   **Lt. Robert Laurenceau**   **IBM#   3898**   **Contact#   305-603-6630**

## OPERATIONAL SUMMARY

### POLICE DEPT. TOTALS

| | |
|---|---|
| **Felony Arrests** | |
| **Misdemeanor Arrests** | |
| **Traffic Arrests** | |
| **Total Arrests** | |
| **Businesses Closed** | 5 |
| **FIVO** | |
| **Summons** | |
| **Citation** | |

### OTHER AGENCY BREAKDOWN

| | |
|---|---|
| **Fire Dept. Violations** | 23 |
| **Code Citations** | 16 |
| **Code NOVs** | 6 |
| **ABT Violations** | 8 |

**NET Area(s) addressed: Allapattah, Overtown, Downtown, Little Havana**

**Locations Inspected:**

**1. M & B Market - 1539 NW 3 AVE**

**Fire Dept. violations**: Missing fire extinguisher, no emergency lighting, exit door blocked.

**Code Violations:** (3) illegal gambling machines $500 x 3 = $1500.00 ticket

**ABT Violations:** (2) FSS 849 Illegal Gambling & FSS 562.12 selling alcoholic beverages with no alcohol license

**2. Hole in the Wall - 742 NW 5 AVE**

**Fire Dept. violations**: Expired fire extinguisher, commercial cooking without hood system.

**Code Violations:** Notice of violation (no cu for rest.) NOV

**ABT Violations:** no action taken

MADROOM0184186

### 3. 1306 Lounge - 1306 N Miami AVE

**Fire Dept. violations**: Illegal remodeling of kitchen without a new construction permit. Was not shut down because area of construction was separate from lounge area. Lounge area had no issues. New Construction will be advised.

**Code Violations:** notice of violation (working w/o a permit) NOV

**ABT Violations:** no action taken

### 4. The Hanger - 60 NE 11 ST –

**Fire Dept. violations**: Main Control Sprinkler System tag expired, Fire Alarm panel in Trouble. Shut down because of multiple visits/warnings and no compliance

**Code Violations:** No Code violations found

**ABT Violations:** (1) FSS 562.11 underage drinking

### 5. SQL - 30 NE 14 ST

**Fire Dept. violations**: Electrical non-conforming

**Code Violations:** No Code violations found

**ABT Violations:** (1) FSS 562.11 underage drinking

### 6. El Aguila - 2291 NW 36 ST –

**Fire Dept. Violations:** Missing hood system, electrical not conforming, means of egress obstructed, fire extinguishers missing.

**Code Violations:** alcohol served w/o food $500.00 ticket, unable to provide documentation for sales $500.00 ticket, (3) illegal gambling machines $500 x 3 = $1500.00 ticket, no BTR for ATM $250.00 ticket

**ABT Violations:** (1) FSS 562.131 Solicitation for sale of Alcoholic beverage

### 7. La Nueva Era - 3517 NW 17 AVE –

**Fire Dept. Violations:** Kitchen Hood needs service and cleaning, exit doors blocked.

**Code Violations:** unable to provide documentation for sales $500.00 ticket, alcohol served w/o food $500.00 ticket, no BTR for ATM $250.00 ticket

**ABT Violations:** (1) FSS 562.02 - selling alcoholic beverages with no alcohol license

### 8. Madelis Restaurant - 1279 NW 29 ST –

**Fire Dept. Violations:** No occupant Load, hood system needs service, expired hood system, no extinguishers.

**Code Violations:** no BTR for jukebox (notice of violation), alcohol served w/o food $500.00 ticket

**ABT Violations:** no action taken

2

MADROOM0184187

**9. La Ceniza - 2450 NW 36 ST – Shut Down**

    **Fire Dept. Violations:** Means of egress blocked

    **Code violations:** alcohol served w/o food $500.00 ticket, unable to provide documentation for sales $500.00 ticket

    **ABT Violations:** no action taken

**10. Altos Mexicanos - 521 SW 8 ST**

    **Fire Dept. Violations:** No occupant load for patio area, missing clickers.

    **Code Violation:** notice of violation for not having a CU (for illegal lounge), notice of violation for illegal outside patio seating (zoning warrant needed), no BTR for souvenir shop (notice of violation), alcohol served w/o food $500.00 ticket, unable to provide documentation for sales $500.00 ticket

    **ABT Violations:** no action taken

---

## Miami Police Department Personnel Detail Hours:

Lt. R. Laurenceau #3898 / 2300-0500

Sgt. W. Gonzalez #27043 / 2300-0500

Officer J. Acuna #43587 / 2300-0500

Officer J. Galvez #28644 / 2300-0500

Officer O. Del Valle #25552 / 2300-0500

Officer J. Oquendo #43803 / 2300-0500

Officer J. Cobo #42824 / 2300-0500

Officer A. Coss #43029

**Detail Comments:**
**See above comments for individual location action taken. City of Miami Code Enforcement, Fire Department's Fire Prevention Bureau and the Florida Division of Alcoholic Beverages and Tobacco issued several violations at the above locations. The persons on premises were provided with information and instructions to assist in resolving all issues. A total of 5 businesses were directed to cease operations. The operation was successful and without incident.**

---

**PREPARED BY:**    **Lt. Robert Laurenceau #3898**

3

MADROOM0184189

**Orta, Lazaro**

| | |
|---|---|
| **From:** | Marcos, Francisco |
| **Sent:** | Wednesday, February 13, 2019 10:54 AM |
| **To:** | Orta, Lazaro |
| **Subject:** | FW: 521 SW 8 ST - Los Altos Mexicanos |

This is what I got from ABT Special Agent Archie Moore who is in charge of this case.

Let me know,

*Frank Marcos, MPS*
*Code Compliance Supervisor*
*City of Miami*
*tel. 305.329.4820*

---

**From:** Marcos, Francisco
**Sent:** Thursday, January 31, 2019 10:14 AM
**To:** Bernat, James (Sr Exec Asst) <28410@miami-police.org>
**Subject:** FW: 521 SW 8 ST - Los Altos Mexicanos

*Frank Marcos, MPS*
*Code Compliance Supervisor*
*City of Miami*
*tel. 305.329.4820*

---

**From:** Moore, Archie [mailto:Archie.Moore@myfloridalicense.com]
**Sent:** Wednesday, January 30, 2019 11:59 AM
**To:** Marcos, Francisco <FMarcos@miamigov.com>
**Subject:** Re: 521 SW 8 ST - Los Altos Mexicanos

CAUTION: This is an email from an external source. Do not click links or open attachments unless you recognize the sender and know the content is safe

Not right now but I will be going back out there to discuss their outside patio area and whether drinks are being served there. I will let you know what we find.

Sent from my iPhone

On Jan 30, 2019, at 9:21 AM, Marcos, Francisco <FMarcos@miamigov.com> wrote:

Good morning Archie/Shelia,

I have been asked to get information regarding the subject property 521 SW 8 ST from you guys.  I would like to know if ABT has any open violations on the subject establishment.

1

Regards,

*Frank Marcos, MPS*
*Code Compliance Supervisor*
*City of Miami*
*tel. 305.329.4820*

MADROOM0184191

MADROOM0184192

# City of Miami



February 05, 2019

THE CITY OF MIAMI vs.
Owner/Dueño/ Pwopryetè:
LA GRAN FIESTA LLC
1637 SW 8 ST 200
MIAMI, FL 33135

FULLER, WILLIAM O
1637 SW 8TH STREET SUITE 200
MIAMI, FL 33135

CODE ENFORCEMENT BOARD/ CUMPLIMIENTO
DEL CÓDIGO/
KOMITE DEGZEKISYON

CITY OF MIAMI, FLORIDA

Case No: CE2018025718

Address: 521 SW 8 ST
Zoning: 35
Folio: 0102040801180

Legal: CITY OF MIAMI SOUTH PB B-41 LOT 18
LESS ST BLK 48 LOT SIZE 50.000 X 140 OR 17595-
0597 0397 1

## NOTICE OF VIOLATION SUMMONS TO APPEAR

Subject Property: 521 SW 8 ST          Folio: 0102040801180

You are hereby notified that an inspection of the above property discloses that you are in violation the following
laws, including
VIOL REF# 2111-Failure to Obtain a valid certificate of use for the type of business being conducted.
    Miami 21 Article 4 Table3,7.1.2
VIOL REF# 2151-Failure to obtain a business tax receipt for the type of business conducted.          City Code
Chapter 31
VIOL REF# 2181-FAILURE TO OBTAIN (Warrant)          Miami 21 Zoning ORD ART 7
    Correction: Need to obtain a warrant for Patio located in the back
Need to obtain "BTR" for the Souvenir shop
Need to obtain "CU" for the type of business being conducted upstairs Lounge

You were directed to correct said violation(s) by December 28, 2018 and to notify the Inspector that the violation
(s) has been corrected. Failure to do so will result in charges being filed against you with the Code Enforcement
Board of the City of Miami.
If the violation(s) is (are) not corrected with the approval of the inspector within the specified time period, you are
hereby commanded to appear before the Code Enforcement Board for a hearing at the following time and place:

        Date/Fecha/Dat:          March 13, 2019,
        Time/Hora/Lè:          05:00 PM
        Place/Lugar/Kote a:          Commission Chambers, City Hall / Despacho del Concejo, Ayuntamiento
                        3500 Pan American Drive, Miami, Florida

If you cannot communicate in English, you are responsible for bringing a translator, 18 years of age or over, to the
Code Enforcement Board Hearing.

In accordance with the Americans with Disabilities Act of 1990, all persons who require special accommodations
in order to participate in this meeting should contact the Office of the City Clerk at (305) 250-5360 at least three
business days prior to the proceeding.

THIS IS YOUR NOTICE TO APPEAR AT THAT TIME AND PLACE. FAILURE TO APPEAR WILL
RESULT IN THIS MATTER BEING HEARD IN YOUR ABSENCE. IF YOU ARE FOUND GUILTY AND
YOU FAIL TO CORRECT SAID VIOLATION, THE CODE ENFORCEMENT BOARD CAN IMPOSE FINES
AGAINST YOU OF UP TO $250 PER DAY, OR $500 PER DAY FOR A REPEAT VIOLATION.
UNPAID FINES WILL BECOME LIENS AGAINST THIS PROPERTY AND ALL PROPERTIES YOU OWN,
AND WILL BE RECORDED IN THE

# City of Miami



December 18, 2018

LA GRAN FIESTA LLC

1637 SW 8 ST 200
MIAMI, FL 33135

CR: CE2018025720

LA GRAN FIESTA LLC

1637 SW 8 ST 200
MIAMI, FL 33135

## TICKET / CITATION

Subject Property: 521 SW 8 ST        Folio: 0102040801180

Name of Violator(s): LA GRAN FIESTA LLC,
Ticket Number: 296405

Location of Violation: 521 SW 8 ST
Folio: 0102040801180

Legal Description of Property:
CITY OF MIAMI SOUTH PB B-41 LOT 18 LESS ST BLK 48 LOT SIZE 50.000 X 140 OR 17595-0597 0397 1

Violation Date: Dec 16, 2018  Violation Time: 12:48 AM
Code Section(s) Violated: VIOL REF# 1615-BEER AND WINE BEING SOLD,AND CONSUMED WITHOUT
THE PRINCIPLE, AND PRIMARY CONSUMPTION OF MEALS. City Code SEC 4-14, SEC 4-13

Fine Amount: 500.00 * 1 = 500.00

Name of Inspector: Scarlet Morua
Division: South West
Office Address: 444 SW 2 AV Miami, FL 33130
Office Phone Number: (305) 329-4770
Email: SMorua@miamigov.com

If you have any questions, please contact the inspector at the above listed office phone number Monday through
Friday.

Scarlet Morua
City of Miami Code Enforcement Inspector

MADROOM0184194

# City of Miami



December 18, 2018

FULLER, WILLIAM O
1637 SW 8TH STREET SUITE 200

MIAMI, FL 33135

CR: CE2018025722

LA GRAN FIESTA LLC

1637 SW 8 ST 200
MIAMI, FL 33135

### TICKET / CITATION

Subject Property: 521 SW 8 ST        Folio: 0102040801180

Name of Violator(s): LA GRAN FIESTA LLC,
Ticket Number: 296406

Location of Violation: 521 SW 8 ST
Folio: 0102040801180

Legal Description of Property:
CITY OF MIAMI SOUTH PB B-41 LOT 18 LESS ST BLK 48 LOT SIZE 50.000 X 140 OR 17595-0597 0397 1

Violation Date: Dec 16, 2018  Violation Time: 12:48 AM
Code Section(s) Violated: VIOL REF# 1618-RESTAURANT,CAFETRIA,COFFEE SHOP WITHOUT PROPER
DOCUMENTATION INDICATING DAILY SALES OF FOOD VS ALCOHOLIC BEVERAGES.        City
Code SEC 4-14

Fine Amount: 500.00 * 1 = 500.00

Name of Inspector: Scarlet Morua
Division: South West
Office Address: 444 SW 2 AV Miami, FL 33130
Office Phone Number: (305) 329-4770
Email: SMorua@miamigov.com

If you have any questions, please contact the inspector at the above listed office phone number Monday through
Friday.

Scarlet Morua
City of Miami Code Enforcement Inspector

MADROOM0184195

| | |
|---|---|
| **Date:** | Thu, 7 Mar 2019 4:36:44 PM -0500 |
| **Sent:** | Thu, 7 Mar 2019 4:36:40 PM -0500 |
| **Subject:** | Fwd: Public Records Request |
| **From:** | Papier, Ronald (Deputy Chief) <5475@miami-police.org> |
| **To:** | Colina, Jorge (Chief of Police) <1126@miami-police.org>; |
| **CC:** | Martinez, Natalie (Executive Officer) <28566@miami-police.org>; |
| **Attachments:** | op plan 521 sw 8 st.pdf |

For your review.
Ronald L. Papier
Deputy Chief of Police
City of Miami Police Department
400 NW 2nd Ave, Miami, FL 33128
Office (305) 603-6400

---

**From:** Verdin, Michelle <27984@miami-police.org>
**Sent:** Thursday, March 7, 2019 12:29 PM
**To:** Papier, Ronald (Deputy Chief)
**Subject:** Re: Public Records Request

Chief,

Attached please find the after action report for Operation Dry Hour dated, Saturday, 12/15/2018. This is the
only after action report from 3/3/2018 - 3/7/2019 depicting an inspection at the location 521 SW 8th ST.
Respectfully,
Michelle Verdin
Sergeant
Office of the Deputy Chief
City of Miami Police Department
305-603-6400
305-607-7473
27984@miami-police.org

---

**From:** Papier, Ronald (Deputy Chief)
**Sent:** Monday, March 4, 2019 12:21:07 PM
**To:** Verdin, Michelle
**Subject:** FW: Public Records Request

Ronald L. Papier



Deputy Chief of Police
City of Miami Police Department
400 Nortwest 2nd Avenue
Miami, Fl 33128
Office (305) 603-6400

**From:** Napoli, Joe
**Sent:** Friday, March 1, 2019 5:26 PM
**To:** Valencia, Adele <avalencia@miamigov.com>; Orta, Lazaro <LOrta@miamigov.com>; Garcia, Eloy <elgarcia@miamigov.com>; Zahralban, Joseph (Joe) <JZahralban@miamigov.com>; Papier, Ronald (Deputy Chief) <5475@miami-police.org>; Colina, Jorge (Chief of Police) <1126@miami-police.org>
**Cc:** Casamayor, Fernando <FCasamayor@miamigov.com>; Schloss-Sassi, Stephanie <SSchloss-Sassi@miamigov.com>; Alban, Xavier E. <XEAlban@miamigov.com>
**Subject:** FW: Public Records Request

Adele, Eloy, Ron,

Please see below. Please let me know when you have your portion available. If you have nothing please let me know.

Thanks, Joe

**From:** Carollo, Joe (Commissioner)
**Sent:** Thursday, February 28, 2019 3:45 PM
**To:** Gonzalez, Emilio T. <ETGonzalez@miamigov.com>
**Cc:** Mendez, Victoria <VMendez@miamigov.com>; Napoli, Joe <JNapoli@miamigov.com>; Suarez, Jose < JosSuarez@miamigov.com>; Blom, Richard <RBlom@miamigov.com>; Barcena, Anthony <ABarcena@miamigov.com>
**Subject:** Public Records Request

Good afternoon,

Pursuant to Article I, section 24 of the Florida Constitution, and chapter 119, F.S., I am requesting copies of the following public records: Inspections or attempted inspections by any city employee of 521 SW 8th ST from March 3rd, 2018 to the date this request is answered. This is to include any notice of violations, tickets of violations, reports, notes, or any matter put into writing or any digital format whatsoever.

Should you deny my request, or any part of the request, please state in writing the basis for the denial, including the exact statutory citation authorizing the denial as required by s.119.07(1)(d), F.S.

Please fulfill this request by close of business Thursday, March 7, 2019 as per City Commission resolution. If you have any questions in the interim, you may contact me or my staff. Thank you.

Respectfully,

Joe Carollo

MIA-SFED23485-00037985




# CITY OF MIAMI POLICE DEPARTMENT
## AFTER ACTION REPORT

## OPERATION DRY HOUR

**Operation:** **Dry-Hour**
**District(s):** **Central & South District**
**Date:** **Saturday 12/15/18** **Hours:** **2300 - 0500 hours**
**Command Post:** **Central District**

## EVENT COMMANDER

**COMMANDER:** Lt. Robert Laurenceau       IBM# 3898       Contact# 305-603-6630

## OPERATIONAL SUMMARY

### POLICE DEPT. TOTALS

| | |
|---|---|
| Felony Arrests | |
| Misdemeanor Arrests | |
| Traffic Arrests | |
| Total Arrests | |
| Businesses Closed | 5 |
| FIVO | |
| Summons | |
| Citation | |

### OTHER AGENCY BREAKDOWN

| | |
|---|---|
| Fire Dept. Violations | 23 |
| Code Citations | 16 |
| Code NOVs | 6 |
| ABT Violations | 8 |

**NET Area(s) addressed:** Allapattah, Overtown, Downtown, Little Havana

**Locations Inspected:**

**1. M & B Market - 1539 NW 3 AVE**

**Fire Dept. violations:** Missing fire extinguisher, no emergency lighting, exit door blocked.

**Code Violations:** (3) illegal gambling machines $500 x 3 = $1500.00 ticket

**ABT Violations:** (2) FSS 849 Illegal Gambling & FSS 562.12 selling alcoholic beverages with no alcohol license

**2. Hole in the Wall - 742 NW 5 AVE**

**Fire Dept. violations:** Expired fire extinguisher, commercial cooking without hood system.

**Code Violations:** Notice of violation (no cu for rest.) NOV

**ABT Violations:** no action taken

MIA-SFED23485-00037986

### 3. 1306 Lounge - 1306 N Miami AVE

Fire Dept. violations: Illegal remodeling of kitchen without a new construction permit. Was not shut down because area of construction was separate from lounge area. Lounge area had no issues. New Construction will be advised.

Code Violations: notice of violation (working w/o a permit) NOV

ABT Violations: no action taken

### 4. The Hanger - 60 NE 11 ST – Shut Down

Fire Dept. violations: Main Control Sprinkler System tag expired. Fire Alarm panel in Trouble. Shut down because of multiple visits/warnings and no compliance

Code Violations: No Code violations found

ABT Violations: (1) FSS 562.11 underage drinking

### 5. SQL - 30 NE 14 ST

Fire Dept. violations: Electrical non-conforming

Code Violations: No Code violations found

ABT Violations: (1) FSS 562.11 underage drinking

### 6. El Aguila - 2291 NW 36 ST – Shut Down

Fire Dept. Violations: Missing hood system, electrical not conforming, means of egress obstructed, fire extinguishers missing.

Code Violations: alcohol served w/o food $500.00 ticket, unable to provide documentation for sales $500.00 ticket, (3) illegal gambling machines $500 x 3 = $1500.00 ticket, no BTR for ATM $250.00 ticket

ABT Violations: (1) FSS 562.131 Solicitation for sale of Alcoholic beverage

### 7. La Nueva Era - 3517 NW 17 AVE – Shut Down

Fire Dept. Violations: Kitchen Hood needs service and cleaning, exit doors blocked.

Code Violations: unable to provide documentation for sales $500.00 ticket, alcohol served w/o food $500.00 ticket, no BTR for ATM $250.00 ticket

ABT Violations: (1) FSS 562.02 - selling alcoholic beverages with no alcohol license

### 8. Madelis Restaurant - 1279 NW 29 ST – Shut Down

Fire Dept. Violations: No occupant Load, hood system needs service, expired hood system, no extinguishers.

Code Violations: no BTR for jukebox (notice of violation), alcohol served w/o food $500.00 ticket

ABT Violations: no action taken

MIA-SFED23485-00037987

9. **La Ceniza - 2450 NW 36 ST – Shut Down**

   **Fire Dept. Violations:** Means of egress blocked

   **Code violations:** alcohol served w/o food $500.00 ticket, unable to provide documentation for sales $500.00 ticket

   **ABT Violations:** no action taken

10. **Altos Mexicanos - 521 SW 8 ST**

    **Fire Dept. Violations:** No occupant load for patio area, missing clickers.

    **Code Violation:** notice of violation for not having a CU (for illegal lounge), notice of violation for illegal outside patio seating (zoning warrant needed), no BTR for souvenir shop (notice of violation), alcohol served w/o food $500.00 ticket, unable to provide documentation for sales $500.00 ticket

    **ABT Violations:** no action taken

---

### Miami Police Department Personnel Detail Hours:

**Lt. R. Laurenceau #3898 / 2300-0500**

**Sgt. W. Gonzalez #27043 / 2300-0500**

**Officer J. Acuna #43587 / 2300-0500**

**Officer J. Galvez #28644 / 2300-0500**

**Officer O. Del Valle #25552 / 2300-0500**

**Officer J. Oquendo #43803 / 2300-0500**

**Officer J. Cobo #42824 / 2300-0500**

**Officer A. Coss #43029**

**Detail Comments:**
See above comments for individual location action taken. City of Miami Code Enforcement, Fire Department's Fire Prevention Bureau and the Florida Division of Alcoholic Beverages and Tobacco issued several violations at the above locations. The persons on premises were provided with information and instructions to assist in resolving all issues. A total of 5 businesses were directed to cease operations. The operation was successful and without incident.

---

**PREPARED BY:**       **Lt. Robert Laurenceau #3898**

MIA-SFED23485-00037988



MADROOM0185164

MADROOM0185165

**From:** Carollo, Joe (Commissioner) [mailto:JCarollo@miamigov.com]
**Sent:** Wednesday, March 06, 2019 4:06 PM
**To:** Larry, Damon
**Cc:** Blom, Richard
**Subject:** Information Requested: 521 SW 8 ST

Mr. Larry,

As requested, the ABT agent's name that visited the above-listed establishment was Agent Maqueira. I'm also including documentation for your review, including notices of violation and tickets as well as after action reports from City Miami Police and Code Compliance departments and correspondence. Please see the following:

- Notice of Violations and Tickets/Citations issued

- City of Miami PD After Actions Report – Please see #10

- City of Miami Code Compliance After Actions Report – Please see #11

- Email from ABT Agent Archie Moore to City of Miami Code Compliance Supervisor Francisco Marcos

Please let me know if you have any questions.

Respectfully,

Joe Carollo
Commissioner | District 3
3500 Pan American Drive | Miami, FL
T: 305.250.5380 | F: 305.250.5386
E: JCarollo@miamigov.com



**From:** Carollo, Joe (Commissioner) [mailto:JCarollo@miamigov.com]
**Sent:** Monday, March 11, 2019 7:57 PM
**To:** Barry, Tom
**Subject:** 521 SW 8th St - 809 SW 5th Ave

Good evening,

Enclosed please find the name and address of the religious facility you asked me to send you that is less than 300 feet from 521 SW 8th Street, Miami, FL 33130:

Ministerio De Juan 3:16
809 SW 5th Avenue
Miami, FL 33130



PLAINTIFF'S
EXHIBIT

**182**

MADROOM0184092

Respectfully,

Joe Carollo

MADROOM0184093



# Ministerio De Juan 3:16

Directions    Save

5.0 ★★★★★ 1 Google review

Religious institution in Miami, Florida

**Address:** 809 SW 5th Ave, Miami, FL 33130

**Phone:** (786) 223-4702

MADROOM0184094

| | |
|---|---|
| **Date:** | Wed, 13 Mar 2019 4:58:13 PM -0400 |
| **Subject:** | FW: 521 SW 8th Street |
| **From:** | Casamayor, Fernando <FCasamayor@miamigov.com > |
| **To:** | Gonzalez, Emilio T. <ETGonzalez@miamigov.com >; Napoli, Joe <JNapoli@miamigov.com >; |
| **Attachments:** | city audit letter 031319.pdf; ATT00001.htm; altos backup.pdf; ATT00002.htm |

FYI

Fernando Casamayor
Assistant City Manager,
City of Miami
(305) 416-1009
fcasamayor@miamigov.com

**From:** Valencia, Adele
**Sent:** Wednesday, March 13, 2019 4:52 PM
**To:** Gibbs, Domini <DGibbs@miamigov.com >
**Cc:** Orta, Lazaro <LOrta@miamigov.com >; Casamayor, Fernando <FCasamayor@miamigov.com >
**Subject:** Fwd: 521 SW 8th Street

FYI



Begin forwarded message:

>   **From:** Bill Fuller <bill@barlingtongroup.com >
>   **Date:** March 13, 2019 at 4:25:05 PM EDT
>   **To:** "Valencia, Adele" <avalencia@miamigov.com >, "Casamayor, Fernando" <FCasamayor@miamigov.com >, "Orta,
>   Lazaro" <LOrta@miamigov.com >
>   **Subject:** RE: 521 SW 8th Street

>   CAUTION: This is an email from an external source. Do not click links or open attachments unless you recognize the
>   sender and know the content is safe.

>   Adele:
>     I am in receipt of your email from last evening. To say that I am frustrated is an understatement. Based on the
>   opinion of the City Attorney in the LSR, I once again repeat my belief that the violation is unsubstantiated and without
>   both merit and legal support in the Code. As stated by the City Attorney in the LSR and pursuant to Section 4-4(h) of the
>   City Code, there must be an audit to establish that there must be an audit to establish compliance with the 51-49
>   percent ratio of food to alcohol sales. That is the only reason that the City would be able to validly issue the citation.

>     While the business operating at 521 SW 8th Street meets and will continue to meet the code requirements for being a
>   "restaurant," prior to your email of last evening, I have never received a request from the City for an audit, nor has one
>   ever been conducted by the City on this business. As such, it is crystal clear that the violation was issued without a
>   scintilla of evidence to support the allegation that the business was operating as a lounge rather than as a restaurant as
>   the City contends. As I read it, and as I believe a court will read it, there is nothing in the City Code that allows the City
>   to issue a violation subject to an audit review. It is an absolute deprivation of due process and my rights to have been
>   placed in this position.

>     To be clear, the actions of the city have placed me under tremendous duress and I have had to move mountains to
>   produce an audit within a 12 hour window while the violation has been pending for over three months and an audit
>   could have been performed at any time during that period. Now, on the eve of the Code Enforcement Hearing, I had to
>   request that my CPA drop everything to produce the documents requested. Accordingly, please find attached our

**PLAINTIFF'S**
**EXHIBIT**

**184**

MIA-SFED23485-00225517

financial data and an accompanying letter from our CPA certifying the results of the audit and reaffirming our compliance with the City Code.

I would request that the City move to immediately close the case and cease from causing any further harm or damage to my business. With regards to the site visits to the properties listed in your email, I would like to consult with my partners and legal counsel and I will get back to you early next week. I look forward to resolving any open matters once and for all so that this continued and intentional pattern of targeted harassment will finally come to its much overdue end.

Bill Fuller
305-525-7662

-----Original Message-----
From: Valencia, Adele <avalencia@miamigov.com>
Sent: Tuesday, March 12, 2019 11:52 PM
To: Bill Fuller <bill@barlingtongroup.com>; Casamayor, Fernando <FCasamayor@miamigov.com>; Orta, Lazaro < LOrta@miamigov.com>
Subject: 521 SW 8th Street

Dear Mr. Fuller,

Based on your conversation earlier today with the Assistant City Manager about bringing your property (521 SW 8th Street) into compliance, we are respectfully requesting a time to visit your properties (521 SW 8th Street and 1513 SW 8th Street).

There are two issues that will go before the hearing board tomorrow. The first is a violation for failure to have an outside seating warrant. I requested as an act of good faith that the seating be removed pending a warrant and you agreed during our February 21, 2019 meeting. It would be helpful to confirm this with a visual inspection.

The second item before the hearing board is an outstanding violation regarding the alleged improper Certificate of Use (CU) for operating a lounge with a CU for a restaurant.

Yesterday afternoon, I received the response to the legal service request I made after our meeting on February 21, 2019. Based on the legal advice of the City Attorney, I am respectfully requesting an audit of the last 12-months to ascertain whether 521 SW 8th Street meets the requirements of a "restaurant" based on applicable City laws (particularly, the criterion that the restaurant derives 51 percent of gross revenues from food and non-alcoholic beverages).

You have represented and inspectors (from Code Compliance and ABT during the December 2018 bar check) have confirmed that your property meets the other four requirements to be in compliance with our Code (licensed by the state, selling alcohol in accordance with the license, capacity to seat at lest 20 patrons at one time, and not selling alcohol after the hours of serving food or consumption have elapsed.

We would like to address the allegations of 1) work without permits, and 2) failure to have adequate parking at 521 SW 8th Street. For 1513 SW 8th Street, we would like to investigate the issue of alleged work without permits.

Please let me know if it will be possible for the Assistant City Manager and the Assistant Director of Code Compliance to meet you at your properties to investigate tomorrow.

Thank you.

Sincerely,

Adele Valencia

# IMBER & COMPANY P.A.

Certified Public Accountants

6100 Hollywood Boulevard, Suite 515
Hollywood, Florida 33024

Phone:  (305) 949-8361
(800) 829-3279
Fax:  (305) 956-5131
Email: imber@imberandcompany.com

March 13, 2019

Re:     Altos Mexicano, LLC
        521 SW 8th Street,
        Miami, FL 33130
        Gross Revenue Audit trailing twelve months

To whom it may concern:

My name is Jeremy Bernstein and I am the President of Imber & Company, PA and the CPA for
Altos Mexicano, LLC.

We have analyzed the product mix of sales over the trailing 12 months in order to provide
information as to the percentage of sales arising from food and non-alcoholic beverages.  We
have utilized the company's POS systems to obtain this data, which are the same systems we use
to prepare the monthly Florida Department of Revenue sales and use tax returns and Miami-
Dade County tourist development tax returns.

The data shows that covering the period of 3/12/18-3/12/19, 65.11% of sales were from food and
non-alcoholic beverages, 32.26% of sales were from alcoholic beverages, and 2.63% of sales
were from miscellaneous other goods. Please do not hesitate to contact me if you need any
additional information.

Very truly yours,

IMBER & COMPANY, P.A.

Jeremy Bernstein
Certified Public Accountant

MIA-SFED23485-00225519

MIA-SFED23485-00225520

**Altos Mexicano, LLC**
**Sales Summary**
**3/12/18 - 3/12/19**

|  | Sales per POS | % Total Sales |
|---|---|---|
| Food & Non-Alcoholic Beverages | $1,100,582.05 | 65.11% |
| Other | $44,441.39 | 2.63% |
| *Subtotal* | $1,145,023.44 | 67.74% |
| Alcoholic Beverages | $545,295.04 | 32.26% |
| **Total Sales** | **$1,690,318.48** | |

MIA-SFED23485-00225521

Altos Mexicano, LLC
Sales by Category
3/12/18 - 3/12/19

| Category | Square Net Sales | Toast Net Sales | TOTAL Net Sales |
|---|---|---|---|
| **Food & Non-Alcoholic Beverages** | | | |
| Combo | $6,871.50 | - | 6,871.50 |
| Desayuno | $1,687.00 | - | 1,687.00 |
| Dulces | $336.03 | - | 336.03 |
| Especialidades | $18,875.42 | - | 18,875.42 |
| Extras | $2,140.97 | - | 2,140.97 |
| Lunch | $993.50 | - | 993.50 |
| Burritos | $7,225.63 | - | 7,225.63 |
| Chiquis | $846.00 | - | 846.00 |
| Postres | $1,003.75 | - | 1,003.75 |
| Salad & Soup | $5,440.50 | - | 5,440.50 |
| Spices | $248.63 | - | 248.63 |
| Tacos | $28,753.93 | - | 28,753.93 |
| Tortas | $1,081.63 | - | 1,081.63 |
| Tortillas | $486.35 | - | 486.35 |
| Tostadas | $1,130.50 | - | 1,130.50 |
| Antojitos | $16,842.99 | - | 16,842.99 |
| Catering | $993.77 | - | 993.77 |
| Bebidas | $8,491.12 | - | 8,491.12 |
| Ventanita | $2,207.75 | $13,909.57 | 16,117.32 |
| Food | - | $906,043.16 | 906,043.16 |
| NA Beverages | - | $74,972.35 | 74,972.35 |
| *Subtotal* | $105,656.97 | $994,925.08 | $1,100,582.05 |
| | | | |
| **Other** | | | |
| Bodega (retail) | $202.41 | - | 202.41 |
| Merchandise | $69.00 | - | 69.00 |
| Non-Grat Svc Charges | - | $60.12 | 60.12 |
| Event Sales | - | $1,290.00 | 1,290.00 |
| Retail | - | $4,775.66 | 4,775.66 |
| Uncategorized | $506.09 | $37,538.11 | 38,044.20 |
| *Subtotal* | $777.50 | 43,663.89 | 44,441.39 |
| | | | |
| **Alcoholic Beverages** | | | |
| Tequila | $663.00 | - | 663.00 |
| Cervezas | $10,313.50 | - | 10,313.50 |
| PM | $6,530.45 | - | 6,530.45 |
| Cocteles | $6,362.00 | - | 6,362.00 |
| Vinos | $204.00 | - | 204.00 |
| Wine | - | $4,228.42 | 4,228.42 |
| Beer | - | $122,609.71 | 122,609.71 |
| Draft Beer | - | $108.40 | 108.40 |
| Liquor | - | $394,158.06 | 394,158.06 |
| Event Liquor | - | $117.50 | 117.50 |
| *Subtotal* | $24,072.95 | $521,222.09 | 545,295.04 |
| | | | |
| **TOTAL SALES** | $130,507.42 | $1,559,811.06 | $1,690,318.48 |

MIA-SFED23485-00225522

Altos Mexicano, LLC
Square POS
3/12/18 - 4/26/18

| Category | Gross Sales | Refunds | Discounts & Comps | Net Sales |
|---|---|---|---|---|
| **Food & Non-Alcoholic Beverages** | | | | |
| Combo | $6,975.50 | ($45.00) | ($59.00) | $6,871.50 |
| Desayuno | $1,783.00 | $0.00 | ($96.00) | $1,687.00 |
| Dulces | $337.03 | $0.00 | ($1.00) | $336.03 |
| Especialidades | $19,395.00 | ($96.00) | ($423.58) | $18,875.42 |
| Extras | $2,194.50 | ($17.00) | ($36.53) | $2,140.97 |
| Lunch | $1,006.00 | $0.00 | ($12.50) | $993.50 |
| Burritos | $7,579.00 | ($40.00) | ($313.37) | $7,225.63 |
| Chiquis | $920.00 | $0.00 | ($74.00) | $846.00 |
| Postres | $1,210.00 | ($10.00) | ($196.25) | $1,003.75 |
| Salad & Soup | $5,705.00 | ($35.00) | ($229.50) | $5,440.50 |
| Spices | $277.41 | $0.00 | ($28.78) | $248.63 |
| Tacos | $30,086.50 | ($264.50) | ($1,068.07) | $28,753.93 |
| Tortas | $1,266.50 | $0.00 | ($184.87) | $1,081.63 |
| Tortillas | $507.50 | ($8.00) | ($13.15) | $486.35 |
| Tostadas | $1,317.50 | ($25.50) | ($161.50) | $1,130.50 |
| Antojitos | $17,656.00 | ($121.00) | ($692.01) | $16,842.99 |
| Catering | $1,326.00 | ($72.00) | ($260.23) | $993.77 |
| Bebidas | $8,613.50 | ($25.00) | ($97.38) | $8,491.12 |
| Ventanita | $2,232.75 | ($3.50) | ($21.50) | $2,207.75 |
| *Subtotal* | $110,388.69 | ($762.50) | ($3,969.22) | $105,656.97 |
| | | | | |
| **Other** | | | | |
| Bodega (retail) | $210.29 | $0.00 | ($7.88) | $202.41 |
| Merchandise | $84.00 | ($15.00) | $0.00 | $69.00 |
| Uncategorized | $561.09 | ($55.00) | $0.00 | $506.09 |
| *Subtotal* | $855.38 | ($70.00) | ($7.88) | $777.50 |
| | | | | |
| **Alcoholic Beverages** | | | | |
| Tequila | $669.00 | $0.00 | ($6.00) | $663.00 |
| Cervezas | $10,424.00 | ($70.00) | ($40.50) | $10,313.50 |
| PM | $6,636.00 | ($78.50) | ($27.05) | $6,530.45 |
| Cocteles | $6,485.00 | ($60.00) | ($63.00) | $6,362.00 |
| Vinos | $216.00 | $0.00 | ($12.00) | $204.00 |
| *Subtotal* | $24,430.00 | ($208.50) | ($148.55) | $24,072.95 |
| | | | | |
| **TOTAL SALES** | $135,674.07 | ($1,041.00) | ($4,125.65) | $130,507.42 |

MIA-SFED23485-00225523

Square Dashboard

https://squareup.com/dashboard/sales/reports/category-sales

03/12/2018–04/26/2018

| Category | Items Sold | Gross Sales |
|---|---|---|
| Uncategorized | 80 | $561.09 |
| Antojitos | 2,620 | $17,656.00 |
| Bebidas | 3,717 | $8,613.50 |
| Bodega | 72 | $210.29 |
| Burritos | 866 | $7,579.00 |
| Catering | 75 | $1,326.00 |
| Cervezas | 2,009 | $10,424.00 |
| Chiquis | 134 | $920.00 |
| Cocteles | 642 | $6,485.00 |
| Combo | 602 | $6,975.50 |
| Desayuno | 223 | $1,783.00 |
| Dulces | 263 | $337.03 |
| Especialidades | 1,270 | $19,395.00 |
| Extras | 911 | $2,194.50 |
| Lunch | 100 | $1,006.00 |
| Merchandise | 11 | $84.00 |
| PM | 988 | $6,636.00 |
| Postres | 242 | $1,210.00 |
| Salad & Soup | 606 | $5,705.00 |
| Spices | 149 | $277.41 |
| Tacos | 3,351 | $30,086.50 |
| Tequila | 86 | $669.00 |
| Tortas | 149 | $1,266.50 |
| Tortillas | 100 | $507.50 |
| Tostadas | 155 | $1,317.50 |
| Ventanita | 1,907 | $2,232.75 |
| Vinos | 36 | $216.00 |
| Total | 21,364 | $135,674.07 |

3/13/2019, 12:28 PM

MIA-SFED23485-00225524

Altos Mexicano, LLC
Toast POS
4/25/18 - 3/12/19

| Sales Category | Gross Sales | Discounts | Net Sales |
|---|---|---|---|
| *Food & Non-Alcoholic Beverages* | | | |
| Food | $955,056.36 | ($49,013.20) | $906,043.16 |
| Ventana | $13,993.37 | ($83.80) | $13,909.57 |
| NA Beverage | $76,503.19 | ($1,530.84) | $74,972.35 |
| *Subtotal* | $1,045,552.92 | ($50,627.84) | $994,925.08 |
| | | | |
| *Other* | | | |
| Non-Grat Svc Charges | $60.12 | $0.00 | $60.12 |
| Event Sales | $1,290.00 | $0.00 | $1,290.00 |
| Retail | $4,817.62 | ($41.96) | $4,775.66 |
| No Sales Category | $40,036.81 | ($2,498.70) | $37,538.11 |
| | $46,204.55 | ($2,540.66) | $43,663.89 |
| *Alcoholic Beverages* | | | |
| Wine | $4,404.42 | ($176.00) | $4,228.42 |
| Beer | $125,710.10 | ($3,100.39) | $122,609.71 |
| Draft Beer | $112.00 | ($3.60) | $108.40 |
| Liquor | $420,251.41 | ($26,093.35) | $394,158.06 |
| Event Liquor | $117.50 | $0.00 | $117.50 |
| | $550,595.43 | ($29,373.34) | $521,222.09 |
| | | | |
| TOTAL SALES | $1,642,352.90 | ($82,541.84) | $1,559,811.06 |

MIA-SFED23485-00225525

**Toast Analytics**
Sales Summary

| Sales Report ▼ | 📅 Apr 25, 2016 - Mar 10, 2019 | | Update |
|---|---|---|---|

**Selected Locations:**
Taquerias El Mexicano

### Top Numbers

| Net Sales | Discounts | Gross Sales | Tax Amount | Gratuity | Tips | Void Amount | Refund Amount | Deferred Amount |
|---|---|---|---|---|---|---|---|---|
| $1,552,694.64 | $82,512.26 | $1,635,206.90 | $127,300.71 | $85,593.81 | $128,769.25 | $53,531.87 | $39.81 | $23,103.96 |

Summary    Payment Types    Sales Categories    Revenue Centers    Dining Options    Discounts

### Sales Categories

| Sales Category | Item Qty | Net Sales | Discounts | Gross Sales | % Net Sales |
|---|---|---|---|---|---|
| NA Beverage | 32,012 | $74,514.63 | $1,489.63 | $76,004.26 | 5% |
| Retail | 2,525 | $4,741.56 | $36.76 | $4,778.32 | 0% |
| Wine | 504 | $4,220.42 | $176.00 | $4,396.42 | 0% |
| Beer | 21,672 | $122,190.71 | $3,085.39 | $125,276.10 | 8% |
| Draft Beer | 66 | $108.40 | $3.60 | $112.00 | 0% |
| Food | 128,347 | $900,464.56 | $48,785.53 | $949,250.09 | 58% |
| No Sales Category | 1,870 | $37,538.11 | $2,498.70 | $40,036.81 | 2% |
| Ventana | 11,764 | $13,909.57 | $83.80 | $13,993.37 | 1% |
| Non-Grat Svc Charges | 3 | $60.12 | $0.00 | $60.12 | 0% |
| Liquor | 30,554 | $393,539.06 | $26,077.35 | $419,616.41 | 25% |
| Event Sales | 2 | $1,290.00 | $0.00 | $1,290.00 | 0% |
| Event Liquor | 5 | $117.50 | $0.00 | $117.50 | 0% |
| Total | 229,324 | $1,552,694.64 | $82,236.76 | $1,634,931.40 | . |

1 of 1

MIA-SFED23485-00225526

Sales Reports                                                      https://www.toasttab.com/restaurants/admin/reports/home

View  ～ Sales ▾ for  | Custom Date ▾ | Days 03-11-2019  through 03-12-2019  All Hours ▾ for  All Employees ▾  More ▾  Update  Email Export

Summary  Orders  Order Details  Payments  Shifts  Cash  Cash Drawers



Day: Mar 12, 2019
Net Sales: 3,211.73
# Orders: 135
# Guests: 202

| | |
|---|---|
| Net Sales | $7,116.42 |
| Gratuity | $167.95 |
| Tax Amount | $559.52 |
| Tips | $833.26 |
| Tips Withheld | $25.02 |
| Deferred Amount | $0.00 |
| Total Amount | $8,677.15 |

| Sales Category | Items | Net |
|---|---|---|
| Food | 811 | $5,578.60 |
| NA Beverage | 233 | $457.72 |
| Liquor | 67 | $619.00 |
| Beer | 83 | $419.00 |
| Wine | 1 | $8.00 |
| Retail | 30 | $34.10 |

| Revenue Centers | Items | Net |
|---|---|---|
| Take out | 69 | $497.79 |
| Window | 119 | $268.39 |
| Dining Room | 790 | $4,898.90 |
| Bar | 247 | $1,451.34 |

| Dining Option | Orders | Net Sales |
|---|---|---|
| Dine In | 210 | $6,139.14 |
| Take Out | 49 | $977.28 |

| Tax Rate | Tax | Net |
|---|---|---|
| Retail Tax | $2.35 | $34.10 |
| State Tax | $557.17 | $6,934.66 |
| Non Taxable | N/A | $117.66 |

| Service Charge | Count | Amount |
|---|---|---|
| Optional 18% Gratuity | 23 | $167.95 |
| Total | 23 | $167.95 |

| Discount | Count | Amount |
|---|---|---|
| Manager Comp - Item | 1 | $0.00 |
| Open $ Item | 1 | $2.00 |
| Comp % Check | 2 | $53.38 |
| Employee Discount - Check | 6 | $35.00 |
| Manager Comp - Check | 9 | $159.50 |
| Police Discount | 2 | $3.75 |
| Open % Check | 2 | $46.25 |
| Owner Comp | 1 | $5.20 |
| Discount Total | 24 | $305.08 |

| | |
|---|---|
| Gross Sales | $7,421.50 |
| Discount Total | $305.08 |
| Net Sales | $7,116.42 |

| Service | Orders | Net |
|---|---|---|
| Breakfast | 34 | $274.06 |
| Lunch | 95 | $2,519.76 |

| | | |
|---|---|---|
| Expected Closeout Cash ⓘ | | $2,010.26 |
| Actual Closeout Cash ⓘ | | $1,974.62 |
| Cash Overage/Shortage | | -$35.64 |
| Expected Deposit ⓘ | | $1,774.62 |
| Actual Deposit ⓘ | | N/A |
| Deposit Overage/Shortage | | N/A |

| | |
|---|---|
| Total Cash Payments | $1,810.26 |
| - Cash adjustments | -$35.64 |
| (Excludes tip outs and cash collected) | |
| Cash before Tipouts | $1,774.62 |
| Total Cash | $1,774.62 |

| | Count | Amount | Tips | Grat | Tips/Grat % | Total |
|---|---|---|---|---|---|---|
| Credit | 166 | $5,445.02 | $833.26 | $167.95 | 19.7% | $6,446.23 |
| Amex | 11 | $440.40 | $46.98 | $23.23 | 17.2% | $510.61 |
| Discover | 1 | $51.84 | $9.00 | $0.00 | 18.8% | $60.84 |
| Mastercard | 47 | $1,642.90 | $257.73 | $69.00 | 21.4% | $1,969.63 |
| Visa | 107 | $3,309.88 | $519.55 | $75.72 | 19.3% | $3,905.15 |
| Gift Card | 0 | $0.00 | $0.00 | $0.00 | 0.0% | $0.00 |
| Cash | 113 | $1,810.26 ⓘ | $0.00 | $0.00 | 0.0% | $1,810.26 |
| Other | 20 | $420.66 | $0.00 | $0.00 | 0.0% | $420.66 |
| GRUBHUB | 3 | $81.00 | $0.00 | $0.00 | 0.0% | $81.00 |
| POSTMATES | 6 | $143.64 | $0.00 | $0.00 | 0.0% | $143.64 |
| UBEREATS | 11 | $196.02 | $0.00 | $0.00 | 0.0% | $196.02 |
| TOTAL | 299 | $7,675.94 | $833.26 | $167.95 | 18.3% | $8,677.15 |

| | TOTAL |
|---|---|
| Net Sales: | $7,116.42 |
| Total Guests: | 445 |
| Avg/Guest: | $15.99 |
| Total Payments: | 299 |
| Avg/Payment: | $25.67 |
| Total Orders: | 299 |
| Avg/Order: | $27.48 |
| Turn Time: | 57:59 |

1 of 2

MIA-SFED23485-00225527

MIA-SFED23485-00225528

| | |
|---|---|
| **Date:** | Mon, 15 Apr 2019 12:13:05 AM -0400 |
| **Subject:** | Questions |
| **From:** | Blom, Richard <RBlom@miamigov.com> |
| **To:** | Suarez, Jose <JosSuarez@miamigov.com>; |
| **Attachments:** | Los Altos.docx |

Fyi, questions attached in Los Altos document.



MIA-SFED23485-00231595

## Los Altos (521 SW 8 St)

Fire occupancy load certificates and/ or drawings, sketches or diagrams.

Liens on the property (past or current)

Receipts and/or invoices regarding any construction equipment, material and/or labor.

Certificate of Use

Business Tax Receipt

Daily sales invoices for both food and beverage

All notices, tickets, complaints from  City, State or Federal authorities.

All construction / renovation permits or permit applications (Electrical, plumbing, structural, etc.)

All temporary use permit applications

All surveys regarding building set-backs, property lines and distance to church's, religious facilities, schools or Day Care Centers.

Liquor and/or beer and wine licenses and license applications (past and/or current)

Daily Valet Parking receipts

All business and/or promotional advertising for this property (Print, video, radio television, internet) Newspapers, magazines, internet)

Any receipts and/or canceled checks or record of any payments from The Barlington Group or William Fuller to Steven Miro or Al Crespo.

MIA-SFED23485-00231596

## **Ball & Chain (1513 SW 8 ST)**

Fire occupancy load certificates and/ or drawings, sketches or diagrams.

Liens on the property (past or current)

Receipts and/or invoices regarding any construction equipment, material and/or labor.

Certificate of Use

Business Tax Receipt

Daily sales invoices for both food and beverage

All notices, tickets, complaints from City, State or Federal authorities.

All construction / renovation permits or permit applications (Electrical, plumbing, structural, etc.)

All temporary use permit applications

All surveys regarding building set-backs, property lines and distance to church's, religious facilities, schools or Day Care Centers.

Liquor and/or beer and wine licenses and license applications (past and/or current)

Daily Valet Parking receipts

All business and/or promotional advertising for this property (Print, video, radio television, internet) Newspapers, magazines, internet)

Any receipts and/or canceled checks or record of any payments from The Barlington Group or William Fuller to Steven Miro or Al Crespo.

## Union Beer (1547 SW 8 St)

Fire occupancy load certificates and/ or drawings, sketches or diagrams.

Liens on the property (past or current)

Receipts and/or invoices regarding any construction equipment, material and/or labor.

Certificate of Use
Business Tax Receipt

Daily sales invoices for both food and beverage

All notices, tickets, complaints from  City, State or Federal authorities.

All construction / renovation permits or permit applications (Electrical, plumbing, structural, etc.)

All temporary use permit applications

All surveys regarding building set-backs, property lines and distance to church's, religious facilities, schools or Day Care Centers.

Liquor and/or beer and wine licenses and license applications (past and/or current)

Daily Valet Parking receipts

Business Advertising Literature (Newspapers, magazines, internet)

MIA-SFED23485-00231598

## Azucar (1503 SW 8 St)

Fire occupancy load certificates and/ or drawings, sketches or diagrams.

Liens on the property (past or current)

Receipts and/or invoices regarding any construction equipment, material and/or labor.

Certificate of Use

Business Tax Receipt

Daily sales invoices for both food and beverage

All notices, tickets, complaints from City, State or Federal authorities.

All construction / renovation permits or permit applications (Electrical, plumbing, structural, etc.)

All temporary use permit applications

All surveys regarding building set-backs, property lines and distance to church's, religious facilities, schools or Day Care Centers.

Liquor and/or beer and wine licenses and license applications (past and/or current)

Daily Valet Parking receipts

Permit for "ice cream cone" hanging over sidewalk at 1503 SW 8 St.

Permit to close the sidewalk during the hoisting and securing of the large Ice Cream Cone replica over the sidewalk at 1503 SW 8 St.

Copy of Final Inspection denoting that "Ice Cream Cone" replica is securely affixed to the building.

All business and/or promotional advertising for this property (Print, video, radio television, internet) Newspapers, magazines, internet)

Any receipts and/or canceled checks or record of any payments from The Barlington Group or William Fuller to Steven Miro or Al Crespo.

## El Taquito Mexican Restaurant 1380 SW 8 St)

Fire occupancy load certificates and/ or drawings, sketches or diagrams.

Liens on the property (past or current)

Receipts and/or invoices regarding any construction equipment, material and/or labor.

Certificate of Use

Business Tax Receipt

Daily sales invoices for both food and beverage

All notices, tickets, complaints from City, State or Federal authorities.

All construction / renovation permits or permit applications (Electrical, plumbing, structural, etc.)

All temporary use permit applications

All surveys regarding building set-backs, property lines and distance to church's, religious facilities, schools or Day Care Centers.

Liquor and/or beer and wine licenses and license applications (past and/or current)

Daily Valet Parking receipts

Permit for utility pole

All business and/or promotional advertising for this property (Print, video, radio television, internet) Newspapers, magazines, internet)

Any receipts and/or canceled checks or record of any payments from The Barlington Group or William Fuller to Steven Miro or Al Crespo.

MIA-SFED23485-00231600

## Tower Hotel (1450 SW 7 St)

Fire occupancy load certificates and/ or drawings, sketches or diagrams.

Liens on the property (past or current)

Receipts and/or invoices regarding any construction equipment, material and/or labor.

Certificate of Use

Business Tax Receipt

Daily sales invoices for both food and beverage

All notices, tickets, complaints from  City, State or Federal authorities.

All construction / renovation permits or permit applications (Electrical, plumbing, structural, etc.)

All temporary use permit applications

All surveys regarding building set-backs, property lines and distance to church's, religious facilities, schools or Day Care Centers.

Liquor and/or beer and wine licenses and license applications (past and/or current)

Daily Valet Parking receipts

All business and/or promotional advertising for this property (Print, video, radio television, internet) Newspapers, magazines, internet)

Any receipts and/or canceled checks or record of any payments from The Barlington Group or William Fuller to Steven Miro or Al Crespo.

MIA-SFED23485-00231601

# "Sanguich"



Pls' Ex 197

# "Sanguich"



Pls' Ex 197

July 1, 2019

Joe,

My role as your Chief of Staff this past year has been confusing, frustrating and disturbing. Although there's no comprehensive job description that would describe or encompass all the duties and responsibilities for Chief of Staff positions, there are some tasks that are universally acknowledged as primary job functions. I've listed below some of these primary job functions coupled with examples of the challenges I've faced in my efforts to fulfill them.

- To serve as an advisor in areas where the Chief of Staff has an expertise.
- To create and maintain relationships to enable and/or enhance initiatives.
- To assume day-to-day responsibility for projects and tasks.
- To assist with the hiring of key personnel.

**To serve as an advisor in areas where the Chief of Staff has an expertise:**
Immediately after adjourning the Bayfront Park Trust meeting on April 23, 2019, you instructed newly-promoted Director Jose Solano to cancel the security guard services at Museum Park. Mr. Solano was quick to agree with your assessment that no security was needed at that park because it "only contained buildings".
At that time, I opined that not only should security remain at the park but that we could probably bolster existing security at both parks at no cost.
Not only did you not take the time to listen to my logic and proposal but you abruptly ended the discussion by citing your experience in law enforcement.

Let me remind you that I have 37 years of law enforcement experience and was one of the first in Florida to earn the designation of "Crime Prevention Practitioner". As a lieutenant I was in command of Miami's Crime Prevention Unit. Throughout my law enforcement career, I taught crime prevention classes, interviewed victims of crime and personally interrogated or sat in on hundreds of criminal interrogations and am considered a Subject Matter Expert in this area.

Your decision to remove security was, in my opinion, a potentially dangerous one. Your reluctance to listen to different viewpoints in this regard was both perplexing and disappointing. Not being able to weigh in and offer my views on this issue, where I clearly have an expertise, eliminates one of the key duties and responsibilities that the Chief of Staff position calls for.

PLAINTIFF'S EXHIBIT

**200**

MIA-SFED23485-00028671

**To create and maintain relationships to enable and/or enhance district initiatives:**

As I pointed out previously, I've witnessed your profanity laden rants when I've greeted people in the District 3 office who, for whatever reason, were not welcome there. One was a city department director and the other individual was a representative of the Miami Marlins. I continued to work closely with these individuals but made it a point to meet at a location other than our city hall office in order to avoid the unpleasantness that I've had to endure in the past. I also do my best to keep up with your "persona non grata" list.

**To assume day-to-day responsibility for projects and tasks:**

If you recall, in June of 2018, I designated Mr. Anthony Barcena, Deputy Chief of Staff, to assume the duties as Office Manager and hold weekly office meetings. The purpose of these meetings was to allocate assignments, ensure activities were coordinated and to keep everyone informed of pertinent issues.

It was also agreed that as office manager Mr. Barcena would give guidance and direction and if necessary, initiate any corrective actions regarding office personnel. It was relayed to you at that time that any issues or concerns you had with office procedure or personnel was to be relayed to Mr. Barcena or myself for resolution.

However, this system never functioned as intended. I attribute this to your reluctance to give these meetings and the structured office operation the support and priority needed from the top. In addition, your reprimanding or scolding of office employees in public undermined the authority of senior staff personnel and further diminished efforts to operate in a structured manner.

**To assist with the hiring of key personnel:**

I mentioned in a previous letter to you the importance of using relevant criteria when interviewing potential employees, as well as the importance informing applicants of conditions of employment before making a job offer. It's probably best that I've not been included in the recent interviews that you held as I would not feel comfortable participating in a process that did not include these essential components.

I hope that I've made it clear that absent cooperation and support from the top achieving favorable results in any of the areas I've listed becomes more than

MIA-SFED23485-00028672

challenging. I'm also hopeful that you realize that the unwelcome obstacles that you regularly put in my path hampered me in my role as Chief of Staff and arguably at times did a disservice to those people living and working in the district.

The one area that I received your wholehearted support was in the area of researching properties owned by William Fuller. If you recall you mandated on Friday afternoon, April 19th, 2019, that I review a list of several of his properties and examine the various applications, permits and licenses associated with them over the weekend. You suggested that I, as well as Jose Suarez, come over to your home on Saturday to accomplish this work. I advised that I could accomplish this work from my own home and spent time on Friday evening, part of the day on Saturday and Sunday reviewing several Fuller properties. This is just one of numerous occasions that you notified me on a Friday that you required me to put in additional work hours on the weekend. I'm not comfortable doing this type of research for a variety of reasons but find that I am being assigned more of this type of work focusing on this one individual.

It's obvious that we have different views on the Chief of Staff duties.
In that regard I will be presenting you with a new role where I believe I can have a greater impact on the residents, better utilize my skill sets, work closer with community members and avoid much of the unpleasantness that I was exposed to in the past.


Richie

MIA-SFED23485-00028673

**Date:**  Sun, 4 Aug 2019 1:12:19 PM -0400

**Subject:**  Fwd: D3 Correspondence

**From:**  Gonzalez, Emilio T. <ETGonzalez@miamigov.com>

**To:**  etgonzalez@aol.com;

**Attachments:**  d3 interview.docx; ATT00001.htm; duties of chief of staff.docx; ATT00002.htm; accommodation req.docx; ATT00003.htm; handdellet.pdf; ATT00004.htm

Sent from my iPhone
Begin forwarded message:

> **From:** "Napoli, Joe" <JNapoli@miamigov.com>
> **Date:** August 4, 2019 at 12:59:55 PM EDT
> **To:** "Gonzalez, Emilio T." <ETGonzalez@miamigov.com>
> **Subject: Fwd: D3 Correspondence**

Emilio - FYI. We will need to inform HR and staff this week.

**From:** Richard Blom <blom4@aol.com>
**Sent:** Sunday, August 4, 2019 9:53 AM
**To:** Napoli, Joe
**Subject:** D3 Correspondence

**CAUTION:** This is an email from an external source. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Joe,
Attached are four documents. Three written by me and the last one is the letter that the Commissioner had hand delivered to my home. I hope these letters are able to provide you with some clarity as to the challenges that I faced during my tenure in the D3 office.
Richie



PLAINTIFF'S
EXHIBIT

**202**

MIA-SFED23485-00223649

EXHIBIT
**32** dg
9-16-2?
PENGAD 800-631-6989

June 16, 2019

Joe,

It's my understanding that interviews were conducted last week for positions under your tutelage. Although I have not been asked to participate in the interview process let me share with you my experience and observations in regards to District 3 personnel and remind you of some of the concerns that you've expressed in this area over the past year.

On numerous occasions you have mentioned to me that the District 3 office is currently filled with "people who don't do shit". On every occasion when you've mentioned that to me my response has been "What is it that you want done that isn't being addressed?".
You have never provided me specific instances as to what was not being accomplished but you were quick to criticize the individuals that comprise the office staff on a personal level.

Let me remind you of two things regarding our current District 3 office personnel.

First, no one that was hired had any experience working in an elected official's office. Through their experience during the past year, the office staff are finding out that normal guidelines employed in a typical business office do not necessarily apply in the District 3 office. They are realizing the need to keep up with current events in order to be aware of individuals or organizations not welcome in the District 3 office.

You have personally taken issue with me for exchanging pleasantries and meeting with a City department director in the District 3 office (January 8, 2019). If you recall, I responded to your outburst of profanities with a request that you provide me with a list of City employees not welcome in the District 3 office. This would enable me to share it with current staff and not have to rely on my memory to recall the numerous individuals and/or organizations not welcome in the office. Although you have yet to provide me with that list let me suggest that you furnish it to any new employees that you bring on board so they'll be well oriented with your preferences.

MIA-SFED23485-00223650

Second, you hired all the current District 3 personnel. I don't know what process was used to ascertain the skill sets, personal traits or other criteria you felt was needed to for them function effectively in these positions but you're the one that hired them. I suggest that you give that some thought and hopefully this will give pause to your personal criticisms of them.

In regards to vacation usage, I presented you with a vacation schedule/matrix on February 28, 2019, which outlined all staff vacations from March through July. Although there were no overlapping vacation days, you indicated at that time that vacations could only be taken during the month of August.

When I mentioned that Spring Break was coming up and traditionally people used vacation during this period, your response was "Nobody here has kids". Aside from that statement being factually incorrect the granting of earned vacation time shouldn't be contingent on whether you have children. In any case, if you choose to enforce this unreasonable policy please ensure that it's relayed to all applicants as a condition of employment.

I offer this document as a reminder of just a few of the personnel issues that have occurred in the past year. I hope you see value in it and that it will serve as a template for you to use when making personnel decisions going forward.

Please let me know if an electronic copy of this document will be more convenient for your use.

Thanks

Richie

MIA-SFED23485-00223651

July 1, 2019

Joe,

My role as your Chief of Staff this past year has been confusing, frustrating and disturbing. Although there's no comprehensive job description that would describe or encompass all the duties and responsibilities for Chief of Staff positions, there are some tasks that are universally acknowledged as primary job functions. I've listed below some of these primary job functions coupled with examples of the challenges I've faced in my efforts to fulfill them.

- To serve as an advisor in areas where the Chief of Staff has an expertise.
- To create and maintain relationships to enable and/or enhance initiatives.
- To assume day-to-day responsibility for projects and tasks.
- To assist with the hiring of key personnel.

**To serve as an advisor in areas where the Chief of Staff has an expertise:**
Immediately after adjourning the Bayfront Park Trust meeting on April 23, 2019, you instructed newly-promoted Director Jose Solano to cancel the security guard services at Museum Park. Mr. Solano was quick to agree with your assessment that no security was needed at that park because it "only contained buildings".
At that time, I opined that not only should security remain at the park but that we could probably bolster existing security at both parks at no cost.
Not only did you not take the time to listen to my logic and proposal but you abruptly ended the discussion by citing your experience in law enforcement.

Let me remind you that I have 37 years of law enforcement experience and was one of the first in Florida to earn the designation of "Crime Prevention Practitioner". As a lieutenant I was in command of Miami's Crime Prevention Unit. Throughout my law enforcement career, I taught crime prevention classes, interviewed victims of crime and personally interrogated or sat in on hundreds of criminal interrogations and am considered a Subject Matter Expert in this area.

Your decision to remove security was, in my opinion, a potentially dangerous one. Your reluctance to listen to different viewpoints in this regard was both perplexing and disappointing. Not being able to weigh in and offer my views on this issue, where I clearly have an expertise, eliminates one of the key duties and responsibilities that the Chief of Staff position calls for.

**To create and maintain relationships to enable and/or enhance district initiatives:**

As I pointed out previously, I've witnessed your profanity laden rants when I've greeted people in the District 3 office who, for whatever reason, were not welcome there. One was a city department director and the other individual was a representative of the Miami Marlins. I continued to work closely with these individuals but made it a point to meet at a location other than our city hall office in order to avoid the unpleasantness that I've had to endure in the past. I also do my best to keep up with your "persona non grata" list.

**To assume day-to-day responsibility for projects and tasks:**

If you recall, in June of 2018, I designated Mr. Anthony Barcena, Deputy Chief of Staff, to assume the duties as Office Manager and hold weekly office meetings. The purpose of these meetings was to allocate assignments, ensure activities were coordinated and to keep everyone informed of pertinent issues.

It was also agreed that as office manager Mr. Barcena would give guidance and direction and if necessary, initiate any corrective actions regarding office personnel. It was relayed to you at that time that any issues or concerns you had with office procedure or personnel was to be relayed to Mr. Barcena or myself for resolution.

However, this system never functioned as intended. I attribute this to your reluctance to give these meetings and the structured office operation the support and priority needed from the top. In addition, your reprimanding or scolding of office employees in public undermined the authority of senior staff personnel and further diminished efforts to operate in a structured manner.

**To assist with the hiring of key personnel:**

I mentioned in a previous letter to you the importance of using relevant criteria when interviewing potential employees, as well as the importance informing applicants of conditions of employment before making a job offer. It's probably best that I've not been included in the recent interviews that you held as I would not feel comfortable participating in a process that did not include these essential components.

I hope that I've made it clear that absent cooperation and support from the top achieving favorable results in any of the areas I've listed becomes more than

MIA-SFED23485-00223654

challenging. I'm also hopeful that you realize that the unwelcome obstacles that you regularly put in my path hampered me in my role as Chief of Staff and arguably at times did a disservice to those people living and working in the district.

The one area that I received your wholehearted support was in the area of researching properties owned by William Fuller. If you recall you mandated on Friday afternoon, April 19th, 2019, that I review a list of several of his properties and examine the various applications, permits and licenses associated with them over the weekend. You suggested that I, as well as Jose Suarez, come over to your home on Saturday to accomplish this work. I advised that I could accomplish this work from my own home and spent time on Friday evening, part of the day on Saturday and Sunday reviewing several Fuller properties. This is just one of numerous occasions that you notified me on a Friday that you required me to put in additional work hours on the weekend. I'm not comfortable doing this type of research for a variety of reasons but find that I am being assigned more of this type of work focusing on this one individual.

It's obvious that we have different views on the Chief of Staff duties.
In that regard I will be presenting you with a new role where I believe I can have a greater impact on the residents, better utilize my skill sets, work closer with community members and avoid much of the unpleasantness that I was exposed to in the past.


Richie

MIA-SFED23485-00223655

July 14, 2019

Joe,

I have been advised that a reduction in work hours may be helpful towards my overall health.

In that regard I am proposing to you that I relinquish my duties as Chief of Staff and undertake the responsibilities as district liaison for The Roads and Silver Bluff neighborhoods. I would also remain as the Miami Marlins liaison. I will be working closely with Katie Gant, Beba Mann and Elisa Padilla or Alfie Mesa respectively.

My duties will require me to monitor pertinent e-mails and follow-up on any issues or concerns in these areas. I would be present at any meetings that directly involve these areas including traffic calming, storm drainage, park design and neighborhood gatherings.

My work hours will be reduced to 15 hours per work week. I will not be utilizing the office complex other than the conference room for meetings should circumstances dictate.

If this work proposal meets with your approval, I will begin in this new role effective Monday, August 5th and we can reevaluate this work configuration in six months. Should you not be comfortable with this arrangement please advise me prior to August 5th so I can plan accordingly.

Richie

MIA-SFED23485-00223657

# City of Miami, Florida

**JOE CAROLLO**
COMMISSIONER - DISTRICT 3



CITY HALL
3500 PAN AMERICAN DRIVE
MIAMI, FLORIDA 33133
(305) 250-5380

August 2, 2019

**VIA COURIER AND U.S. MAIL DELIVERY**
Richard Blom
7875 SW 141 Terrace
Miami, FL 33158

Richie:

This letter is to acknowledge that you have been absent from the office for seven weeks and have relinquished your position as Chief of Staff. Your proposal for a new role with even less hours of work is denied for reasons you are aware. Therefore, you are deemed to have resigned immediately.

You will soon be contacted so that arrangements can be made to secure the City's property that remains in your possession.

Respectfully,

Joe Carollo

Enclosures: 2

MIA-SFED23485-00223659

MIA-SFED23485-00223660



PLAINTIFF'S EXHIBIT

204





| Date: | Mon, 7 Oct 2019 3:53:14 PM -0400 |
|---|---|
| Sent: | Mon, 7 Oct 2019 3:53:06 PM -0400 |
| Subject: | RE: Code Update |
| From: | Valencia, Adele <avalencia@miamigov.com > |
| To: | Casamayor, Fernando <FCasamayor@miamigov.com >; Orta, Lazaro <LOrta@miamigov.com >; |
| Attachments: | image001.jpg; image003.jpg; Code Compliance - Final Case Number Memo 17 - 18.docx; Cases By Violation Type 18-19 District 5.xlsx; Cases By Violation Type 18-19 District 4.xlsx; Cases By Violation Type 18-19 District 3.xlsx; Cases By Violation Type 18-19 District 2.xlsx; Cases By Violation Type 18-19 District 1.xlsx; Cases By Violation Type - 17-18 District 5.xlsx; Cases By Violation Type - 17-18 District 4.xlsx; Cases By Violation Type 17-18 District 3.xlsx; Cases By Violation Type 17-18 District 2.xlsx; Cases By Violation Type 17-18 District 1.xlsx |

Dear Fernando,

Please see attached and let us know if you need any further information.

Best,

**Adele Valencia, Director**



City of Miami
Department of Code Compliance
444 SW 2nd Avenue, 7th Floor
Miami, FL 33130
Telephone: 305-416-2089
AValencia@miamigov.com

**AFTER HOURS CODE COMPLIANCE HOTLINE: (786) 457-0995**
Monday-Thursday 5:00 – 10:00 pm
Friday & Saturday: 24 Hours
Sunday: 10: 00 am- 5:00 pm

**From:** Casamayor, Fernando <FCasamayor@miamigov.com >
**Sent:** Monday, October 7, 2019 2:20 PM
**To:** Valencia, Adele <avalencia@miamigov.com >; Orta, Lazaro <LOrta@miamigov.com >
**Subject:** FW: Code Update

Hello folks,

Can you guys update this report with the latest numbers?  Can we have it by COB tomorrow?

Fernando Casamayor
Assistant City Manager.
City of Miami
(305) 416-1009
fcasamayor@miamigov.com



PLAINTIFF'S
EXHIBIT
**205**

EXHIBIT
4

**From:** Orta, Lazaro <LOrta@miamigov.com>
**Sent:** Wednesday, January 23, 2019 8:23 PM
**To:** Casamayor, Fernando <FCasamayor@miamigov.com>
**Cc:** Bernat, James <JBernat@miamigov.com>
**Subject:** Code Update

Good evening Assistant City Manager Casamayor,
Please find below the requested update for code issues. I have also attached the memo and code totals up to January 8th, 2019.
Should you need any further information please let me know.

1637 SW 8 St. – Cited for C/U and BTR – complied.
1641 SW 8 St. – Cited for outdoor advertising – complied.
1530 SW 7 St. – Cited for no C/U and illegal business – complied.
1322 (1336) SW 7 St. - Parking lot unpaved – complied (new owner).
1780 SW 7 St. - Illegal parking – complied.
827 SW 14 Av. - Illegal storage, failure to maintain lot and failure to maintain exterior – complied.
1700 NW 7 St. - Illegal parked vehicles – complied.
601 NW 17 Av. - Illegal parked vehicles, failure to maintain, outside storage, no C/U, no BTR – complied.
1380 SW 8 St. – Illegal containers – complied.
337 SW 8 St. – Several citations issued for noise violations – business is currently closed.
521 SW 8 St. – Inspected with ABT, fire and code – cited for no warrant, C/U and BTR – under investigation.
1380 SW 8 St. - Complaint of outside sales – no sales being conducted.


Lazaro-Daniel Orta:.
Assistant Director of Code Compliance
City of Miami
444 SW 2nd Avenue, 7th Floor
305-329-4777

Tell us how we're doing. CLICK HERE to complete our Customer Satisfaction Survey.


This communication, together with any attachments, may contain legally privileged and confidential information. It is intended only for the use of the above person or persons. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately either by telephone, 305-329-4777 or reply e-mail and immediately destroy all copies of this communication and any attachments.
*Please Note:
Due to Florida's very broad public records law, most written communications to or from City of Miami employees regarding City business are public records, available to the public and media upon request. Therefore, this e-mail communication may be subject to public disclosure.

MIA-SFED23485-00325451

**Honorable Mayor Suarez & Commissioners**          **10/7/2019**

**Code Compliance Totals**


**Emilio T. Gonzalez**
**City Manager**


Attached are the total cases for the Department of Code Compliance from: October 1, 2016 -October 1, 2017; October 1, 2017 - October 1, 2018; and October 1, 2018 - October 1, 2019. The reports are divided by commission district and include open, closed, extension requested, pending, complied, and voided cases.

Below you will find a breakdown of cases by District over three years.

|  | 16/17 | 17/18 | 18/19 |
|---|---|---|---|
| **District 1:** | 1,428 cases | 2,941 cases | 2,638 cases |
| **District 2:** | 1,121 cases | 1,714 cases | 1,567 cases |
| **District 3:** | 1,328 cases | 2,182 cases | 1,686 cases |
| **District 4:** | 1,832 cases | 3,032 cases | 2,082 cases |
| **District 5:** | 2,721 cases | 3,915 cases | 4,158 cases |


ETG/JN/FC/JB/LO

MIA-SFED23485-00325452

**Native Placeholder**

MIA-SFED23485-00325453

**Native Placeholder**

MIA-SFED23485-00325454

**Native Placeholder**

MIA-SFED23485-00325455

**Native Placeholder**

MIA-SFED23485-00325456

Native Placeholder

MIA-SFED23485-00325457

**Native Placeholder**

MIA-SFED23485-00325458

**Native Placeholder**

MIA-SFED23485-00325459

**Native Placeholder**

MIA-SFED23485-00325460

**Native Placeholder**

MIA-SFED23485-00325461

**Native Placeholder**

MIA-SFED23485-00325462

EXHIBIT
0009
Joseph Carollo
02.06.2023

| | |
|---|---|
| **From:** | Steven M |
| **To:** | Joe Carollo |
| **Date:** | Tuesday, December 19, 2017 12:50:23 PM |
| **Attachments:** | PROPERTIES-new.xlsx |

PLAINTIFF'S
EXHIBIT

**208**

MADROOM0132763

Document Produced As Native

MADROOM0132764

| ADDRESS | BUILDING SIZE | LOT SIZE | FOLIO | ZONING | SALE PRICE | DATE SOLD | PROPERTY OWNER |
|---|---|---|---|---|---|---|---|
| 1393 SW 1 ST | 28,726 Sq.Ft | 14,000 Sq.Ft | 01-4102-006-0880 | T5 O | $1,450,000 | 12/28/2012 | 1393 LLC |
| 120 SW 14 AVE | | 6,750 Sq.Ft | 01-4102-010-0010 | T5 O | | | 1393 LLC |
| 1020 NW 1 ST | 1,551 Sq.Ft | 7,500 Sq.Ft | 01-4102-005-2420 | T4 R | $245,000 | 6/1/2004 | WILLIAM FULLER |
| 36 NW 10 AVE | 1,816 Sq.Ft | 5,000 Sq.Ft | 01-4102-005-2400 | T4 R | $283,500 | 4/1/2006 | WILLIAM O FULLER |
| 1378 SW 8 ST | 6,791 Sq.Ft | 11,700 Sq.Ft | 01-4111-014-0170 | T6-8 O | $1,060,000 | 6/15/2015 | CALLE OCHO MARKETPLACE LLC |
| 2608 SW 8 ST | 17,036 Sq.Ft | 9,884 Sq.Ft | 01-4110-009-0010 | T6-8 O | $1,325,000 | 11/1/2006 | PIEDRA VILLAS LLC |
| 8002 SW 49 AVE (PONCE DE LEON RD) | 6,507 Sq.Ft | 31,031 Sq.Ft | 30-4131-051-0010 | EU-1 | 1,883,500 | 10/28/2016 | WILLIAM FULLER |
| 160 W SUNRISE AVE | 2,377 Sq.Ft | 8,900 Sq.Ft | 03-4129-040-0510 | SFR | 678,030 | 10/7/2011 | 160 SUNRISE LLC |
| 1040 BISCAYNE BLVD   UNIT: 300 7 | 1,123 Sq.Ft | 0 Sq.Ft | 01-3231-062-1450 | T6-8 O | $240,000 | 2/7/2017 | JESSICA M FULLER |
| | | | | | | | p/owner william fuller |
| 44 NW 10 AVE | 3,172 Sq.Ft | 5,000 Sq.Ft | 01-4102-005-2390 | T4 R | $240,800 | 2/9/2017 | US BANK NA TRS |
| | | | | | | | p/owner william fuller |
| 6451 sw 16 ter | 1,308 Sq.Ft | 7,000 Sq.Ft | 15-4012-007-1080 | R-1 | $0 | 3/1/2004 | MIRIAM M FULLER |
| 136 NW 7 AVE | 0 | 5,000 Sq.Ft | 01-0200-070-1020 | T6-8 | $125,000 | 10/15/2015 | SEVEN NORTHWEST LLC |
| | | | | | | | p/owner william fuller |
| 300 MANOR PL | 1,564 Sq.Ft | 5,000 Sq.Ft | 03-4129-024-0370 | SFR | $100 | 2/7/2016 | JESSICA M FULLER |
| total: | 68,799 | 106,765 | | | $4,265,130 | | |

** except new owner

| | |
|---|---|
| Date: | Tue, 29 Dec 2020 11:51:45 AM -0500 |
| Subject: | FW: Tacquerias el Mexicano Parking Requirements  CE2020000754 |
| From: | Valencia, Adele <avalencia@miamigov.com > |
| To: | Noriega, Art <anoriega@miamigov.com >; |
| Attachments: | image001.png; image003.jpg; image005.jpg; image006.png; image001.jpg |

FYI

**Adele Valencia, Director**
City of Miami
Department of Code Compliance
444 SW 2nd Avenue, 7th Floor
Miami, FL 33130
Direct Line:  (305) 416-2089
Departmental Line: (305) 416-2087
AValencia@miamigov.com
Website: https://www.miamigov.com/Government/Departments- Organizations/Code-Compliance



**Please Share Your Thoughts With Us**:
https://www.surveymonkey.com/r/2BYD2MZ

**AFTER HOURS CODE COMPLIANCE HOTLINE: (786) 457-0995**
Monday-Thursday 5:00 – 10:00 pm
Friday & Saturday: 24 Hours
Sunday: 10: 00 am- 5:00 pm

**From:** Dooley, Rachel S. <RSDooley@miamigov.com >
**Sent:** Wednesday, December 23, 2020 3:01 PM
**To:** Ruiz, Joseph A. <jaruiz@miamigov.com >
**Cc:** Frost, Tamara <TFrost@miamigov.com >; Cerrato, Julia <JCerrato@miamigov.com >; Mendez, Victoria <VMendez@miamigov.com >; Valencia, Adele <avalencia@miamigov.com >; Salvatierra, Yacmany <YSalvatierra@miamigov.com >; Torres, Catalina <CaTorres@miamigov.com >
**Subject:** Re: Tacquerias el Mexicano Parking Requirements CE2020000754

Soo, are they currently in compliance so as to close out the Code case?

Rachel S.Glorioso Dooley
Senior Assistant City Attorney
444 SW 2 Avenue, Suite 945
Miami, Florida 33130
305.416.1886 (d)
305.416.1800 (m)

Sent from iPhone

On Dec 23, 2020, at 1:53 PM, Ruiz, Joseph A. <jaruiz@miamigov.com> wrote:



MIA-SFED23485-00072203

Good Afternoon All,

The applicant availed themselves Article 4, Table 4 of the Zoning Code entitled *"Density, Intensity and Parking (T6)"*, which states that except for sites within 500 feet from an ungated T3 Transect Zone, which this is not, the parking requirements may be reduced within a TOD area or within a Transit Corridor area "by one hundred percent (100%) for any Structure with a Floor Area of ten thousand (10,000) square feet or less." The subject property is located within a Transit Corridor area and has a Floor Area of approximately 5,432 square feet.

Please let me know if I may be of additional assistance.

Sincerely,

Joe

Joseph A. Ruiz, Esq.
**Director // Zoning Administrator**
Office of Zoning City of Miami
444 SW 2nd Ave, 2nd Floor
jaruiz@miamigov.com

**From:** Dooley, Rachel S.
**Sent:** Friday, December 18, 2020 12:27 PM
**To:** Ruiz, Joseph A. <jaruiz@miamigov.com>; Frost, Tamara <TFrost@miamigov.com>; Cerrato, Julia < JCerrato@miamigov.com>
**Cc:** Mendez, Victoria <VMendez@miamigov.com>; Valencia, Adele <avalencia@miamigov.com>; Salvatierra, Yacmany <YSalvatierra@miamigov.com>
**Subject:** RE: Tacquerias el Mexicano Parking Requirements CE2020000754
**Importance:** High

Good Afternoon;

This case has been set for January and the property owner's counsel is stating the violation is in compliance. Pelase assist.

Thank you.

**Regards,**

**Rachel S. Glorioso Dooley, Senior Assistant City Attorney**

City of Miami Office of the City Attorney
Telephone: 305-416-1886
Facsimile: 305-416-1801
Electronic Facsmile 305-400-5071
rsdooley@miamigov.com

Assistant: Monique Griffin 305-416-1810

*Please note during the COVID-19 pandemic our office is following social distancing protocol and most of our staff, including myself, is working remotely. All calls are being forwarded and email messages received as normal. I apologize for any undue delay and thank you for your patience and assistance.*

**Disclaimer**: This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect the attorney-client or work product privileges. Should the intended recipient forward or disclose this message to another person or party, that action could constitute a waiver of the attorney-client privilege. If the reader of this message is *not* the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. section 2510-2521. If this communication was received in error we apologize for the intrusion. Please notify us by reply e-mail and delete the

original message. Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

**From:** Dooley, Rachel S.
**Sent:** Tuesday, December 15, 2020 12:31 PM
**To:** Ruiz, Joseph A. <jaruiz@miamigov.com>
**Cc:** Mendez, Victoria <VMendez@miamigov.com>; Valencia, Adele <avalencia@miamigov.com>; Salvatierra, Yacmany <YSalvatierra@miamigov.com>
**Subject:** FW: Tacquerias el Mexicano Parking Requirements CE2020000754

Good Afternoon Director;

Code still has an open matter for the above business located at 521 SW 8 ST for violating their required parking requirements. Counsel for the owner in the email below has said these violations were complied. Is that the case?

Thank you.

**Regards,**

**Rachel S. Glorioso Dooley, Senior Assistant City Attorney**

<image001.png> City of Miami Office of the City Attorney
Telephone: 305-416-1886
Facsimile: 305-416-1801
Electronic Facsmile 305-400-5071
rsdooley@miamigov.com

Assistant: Monique Griffin 305-416-1810

*Please note during the COVID-19 pandemic our office is following social distancing protocol and most of our staff, including myself, is working remotely. All calls are being forwarded and email messages received as normal. I apologize for any undue delay and thank you for your patience and assistance.*

Disclaimer: This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect the attorney-client or work product privileges. Should the intended recipient forward or disclose this message to another person or party, that action could constitute a waiver of the attorney-client privilege. If the reader of this message is *not* the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. section 2510-2521. If this communication was received in error we apologize for the intrusion. Please notify us by reply e-mail and delete the original message. Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

**From:** Valerie Haber <Valerie.Haber@gray-robinson.com>
**Sent:** Tuesday, December 15, 2020 12:13 PM
**To:** Dooley, Rachel S. <RSDooley@miamigov.com>
**Subject:** Tacquerias Code Enforcement Matter

**CAUTION:** This is an email from an external source. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Rachel,

Brian Dombrowski from Greenberg Traurig had been working with the Zoning Administrator on the parking comments, which were all cleared from the warrant application. Please let me know you need anything further to close this citation out. This is CE2020000754.

Thanks,
Val

T 305-913-0356
D 305-913-0356
F 305-416-6887

<image003.jpg>
<image003.jpg>
<image003.jpg>
<image003.jpg>
<image003.jpg>

**Valerie Haber**
Shareholder

GrayRobinson, P.A. • 333 S.E. 2nd Avenue, Suite 3200, Miami, Florida 33131
<image005.jpg>

This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect the attorney-client or work product privileges. Should the intended recipient forward or disclose this message to another person or party, that action could constitute a waiver of the attorney-client privilege. If the reader of this message is not the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. section 2510-2521. If this communication was received in error we apologize for the intrusion. Please notify us by reply e-mail and delete the original message without reading same. Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

Begin forwarded message:

**From:** dombrowskib@gtlaw.com
**Date:** July 16, 2020 at 1:17:29 PM EDT
**Subject: RE: Taquerias update**

I spoke with the Zoning Administrator this morning who advised that he has instructed his reviewer to clear the parking comment when the plans get to her.

**Brian A. Dombrowski**
Associate

Greenberg Traurig, P.A.
333 S.E. 2nd Avenue | Miami, FL 33131
T +1 305.579.0630
dombrowskib@gtlaw.com | www.gtlaw.com | View GT Biography

<image006.png>

postmaster@gtlaw.com, and do not use or disseminate the information.

**EXHIBIT**

**13**

| | |
|---|---|
| Date: | Wed, 28 Apr 2021 3:46:00 PM -0400 |
| Sent: | Wed, 28 Apr 2021 3:46:21 PM -0400 |
| Subject: | Operation Dry Hour Ops plan May 1 2021 |
| From: | Chin-Quee, Conrad (Lt.) |
| To: | Mogro, Daniel G. <40821@miami-police.org>; |
| Attachments: | Operation Dry Hour Ops plan May 1 2021.docx; image001.png |

Tentative plan fill in with your ofc call me later heading to a quick meeting now.

Kind Regards,

Conrad

**DR. CONRAD CHIN-QUEE,  Ed.D, MBA**
**POLICE LIEUTENANT**
**FTO & CIT PROGRAM COMMANDER**
**OFFICE OF THE ASSISTANT CHIEF**
**FIELD OPERATIONS  DIVISION**
**CITY OF MIAMI POLICE DEPARTMENT**
*1049@MIAMI-POLICE.ORG*



**SPI 78**

PLAINTIFF'S
EXHIBIT

**246**




# Miami Police Department
# Field Operations Division

## Art Acevedo
## Chief of Police

## Business Compliance/Operation Dry Hour



## SITUATION

On Saturday May 1, 2021, the City of Miami Police Department in conjunction with the City of Miami Code Compliance, Building Department, Fire Department, and the Florida Division of Alcoholic Beverages and Tobacco (ABT) will be conducting business inspections to ensure each establishment is in legal compliance with all laws, codes, and ordinances. Periodically, we team up with the different departments in the city as well as our partners in state law enforcement to conduct these inspections, to ensure that each one of the businesses are operating legally and, within the guidelines of city ordinances. We select our locations based on ongoing issues that may be occurring, as well as complaints received. The mission of the City of Miami Police Department is to ensure a safe environment for all persons that work at or visit these establishments.

## DELIBERATE ACTION PLAN

The City of Miami Police Officers assigned to this operation, will first enter the business establishment. Once the location is deemed safe and illuminated, the City of Miami Fire Department Inspectors, Code Compliance Officers, City of Miami Building Department Inspectors, and the Florida Division of Alcoholic Beverages and Tobacco personnel will enter the establishment to begin their inspection. Once the inspection is completed, if necessary, the owner / manager / designee on scene will be instructed and educated, on what needs to be done to his / her establishment so that they are in compliance with, all Florida State Statutes, and Miami-Dade County and City of Miami Ordinances.

## EVENT INFORMATION

**Date:** May 1, 2021 Saturday

**Time:** 2200-0400 Hours

**Operation Commanding Officer:** Lieutenant Robert Laurenceau

**Command Post:** Central District Sub Station 400 NW 2 Avenue

**Roll Call Location:** 444 SW 2 Avenue MRC parking lot

**Communications Channel:** Working Channel and or Dispatch 11 as needed

**Equipment:** Class "B" Uniform

## PERSONNEL ASSIGNMENTS

- Lieutenant - 1
- Sergeant -1
- City of Miami Police Officers – 5
- City of Miami Fire Department - 2
- City of Miami Code Enforcement Officers – 1
- City of Miami Building Department -2
- Florida Division of Alcoholic Beverage and Tobacco (ABT) – * N/A for this date- 0

| Commanding Officer | Unit | IBM | Location | Duty Hours | Detail Assignment |
|---|---|---|---|---|---|
| Lieutenant R. Laurenceau | 6903 | 3898 | Coral Way | 2200-0400 | Commanding Officer |
| Sergeant Daniel Mogro | | | Little Haiti | 2200-0400 | PST Sergeant |

| Allapattah PST Officers | Unit | IBM | Location | 2200-0200 | Assignment |
|---|---|---|---|---|---|
| Guzman, Jonathan | 4192 | 42843 | CDSS | 2200-0200 | PST Officer |
| Baez, Stephanie | 4195 | 44532 | CDSS | 2200-0200 | PST Officer |

| Patrol Officer | Unit | IBM | Location | Duty Hours | Detail Assignment |
|---|---|---|---|---|---|
| | | | CDSS | 2200-0400 | Officer |
| | | | CDSS | 2200-0400 | Officer |
| | | | CDSS | 2200-0400 | Officer |

| Fire Department | IBM | Duty Hours | Assignment | Contact # |
|---|---|---|---|---|
| Pons, Euraclio | 105 | 2200-0400 | Fire Lieutenant | 305-342-7137 |
| Eduardo Cagnin | UNK | 2200-0400 | Fire Fighter | |

| Code Compliance | IBM | Duty Hours | Assignment | Contact # |
|---|---|---|---|---|
| Dennis Uriarte | N/A | 2200-0400 | Code Compl. Inspector | 786-696-0095 |

| Building Department | IBM | Duty Hours | Assignment | Contact # |
|---|---|---|---|---|
| Taylor Reid | N/A | 2200-0400 | Sr. Building Inspector | 305-413-0609 |
| Frantzy Sillery | N/A | 2200-0400 | Sr. Plumbing Inspector | 305-413-0733 |

| Alcoholic Beverages & Tobacco | Duty Hours | Assignment | Contact # |
|---|---|---|---|
| TBA | 2200-0400 | ABT Duties | |
| TBA | 2200-0400 | ABT Duties | |

## ACTION PLAN

The City of Miami Police Officers will be the first units inside the establishment, to ensure that they are safe for Code Compliance, Building Department, Fire Department and, ABT personnel to enter and conduct inspections. Once the inspection is done, if any arrests are to be made, the detail units will make said arrests and transport the prisoners accordingly. Code Compliance, Building Department, Fire Department, and ABT will have their own reports and citations to issue. The entire detail will then conduct an on scene debriefing to exchange information prior to departing each inspected location.

**Event Locations:**

| | | |
|---|---|---|
| 1. Los Altos | 521 SW 8 St | Little Havana |
| 2. Fronton Bar | 1106 W Flagler St, | Little Havana |
| 3. Los Brothers L.A. Restaurant | 503 SW 17th Ave, | Little Havana |
| 4. Fiesta Café | 1715 SW 1St St, | Little Havana |
| 5. Bricks Lounge | 1702 W Flagler St, | Little Havana |
| 6. Restaurante La Esquina Centroamericana | 140 SW 16th Ave A, | Little Havana |

**Prepared by:** Lieutenant Conrad Chin-Quee    I.B.M. # 1049    Date: 04/21/21

**NET Commander:** N/A    I.B.M. N/A    Date: N/A

**District Major:** N/A    I.B.M. N/A    Date: N/A

**Assistant Chief:** Manuel A. Morales    I.B.M. # 4886    Date: 04/21/21

## MEMORANDUM

**TO:** MANAGER ARTHUR NORIEGA
MAYOR FRANCIS SUAREZ

**FROM:** CHIEF ART ACEVEDO

**SUBJECT:** RECENT ACTIVITIES BY CITY OFFICIALS

**DATE:** SEPTEMBER 24, 2021

This memorandum is to confirm my recent reports to you of misconduct of certain City Commissioners and to disclose additional misconduct to you in your leadership capacities with the City of Miami (City).

As you know, on April 5, 2021, I was sworn in as Chief of Police of the Miami Police Department (MPD). I came to Miami from the City of Houston, TX, Police Department after being recruited by you as the Mayor and City Manager. Both of you indicated there was a need to reform the MPD and to change the culture of the agency.

Early on in my tenure I learned the task of reforming the department would be arduous and the resistance to change from some in the department, including the FOP (MPD police union), and others, was intense. Despite this challenge, I have quickly come to love the spirit of most of the hard-working men and women of MPD, both sworn and support personnel. Unfortunately, certain City commissioners have interfered with the reform efforts and have interfered with a confidential internal investigation.

Interference with MPD Internal Affairs Division (IAD) investigation.

On or about June 3, 2021, I ordered the IAD to initiate an internal investigation after the department identified a breach of operational security involving the Sergeant-At-Arms Detail (SAAD), which is the detail tasked with providing executive protection to the Mayor and City Commissioners. Commissioner Alex Díaz de la Portilla and other commissioners have publicly identified Luis Camacho as the SAAD member involved in the investigation. I understand that Camacho is very close to Commissioner Díaz de la Portilla and is well-liked by Commissioners Joe Carollo and Manolo Reyes.

Subsequently, on or about June 24, 2021, a regular City Commission meeting was held during which I was called before the commission to be questioned in relation to a "pocket item" submitted by one of the commissioners related to the SAAD. I believe Commissioner Diaz

1



de la Portilla placed the pocket item on the agenda, and when the item came up, he asked for "the honor" of assuming the role of commission chair.

Incredibly, Commissioners Diaz de la Portilla, Reyes, and Carollo, who are civilians and not law enforcement officers, each proceeded to openly discuss the IAD investigation, despite its confidential manner and even though as commissioners they have no authority under the City charter or under the law to direct the MPD or interfere with its actions.

Commissioner Diaz de la Portilla led off the discussion by asking about the SAAD staffing. Commissioner Diaz de la Portilla then started making comments about the confidential investigation. De La Portilla stated, in essence:

> "**without going into all of the details of what has really happened here which to me is disgusting to be honest with you**, I think it is lack of due process, I think it is arbitrary in nature, and I am not happy with it. **And I was clear with you when I spoke with you** but I am very clear publicly because I think it is important to be clear and honest, I am very direct. I think it was arbitrary, I think you pulled the trigger too quickly . . . I think before you tarnish somebody's reputation, you need to do due diligence and go through an investigation because once you tag someone as something, even if they are exonerated at the end, they are tarnished. And to me that is not the right way to do things, my opinion, I am one commissioner. I am one commissioner, there's 5 here, there's the mayor, it is what it is."

Commissioner Reyes stated, in essence: "The only thing I have to add is 'Amen.' The only thing I have to add is I feel the same way and keep on sir" (referring to Commissioner Diaz de la Portilla).

Commissioner Carollo subsequently stated, in essence:

> "**I would like to keep things in house**, but I will say this to you publicly chief, and please understand where I am coming from. **While I have been walking very softly, I carry a hell of a big stick,** and it don't matter what time of the year it is, whether it is election time, or not election time. And let that other character [unknown to whom he was referring] know too.
>
> But if someone has breached a vow in their law enforcement position and you can prove it to me and show it to me, it is one thing, but if you are going to go on speculation and on the way something might look, that at the end might not be anywhere near what you thought it might look like, or what you were told it looked like, that's a different story. And **I don't want to see because of some of the end games of the Miami Police Department, any one officer be dealt with unjustly. And I am telling you now chief, unless you show me something different, I am beginning to think this is what happened. When we meet personally, I can give you several other roads that are even more believable than maybe something that the one you are looking at**. I am not happy that this come by, because Officer Camacho has been a professional, just like Commissioner Reyes said, he never talked to

anyone or got involved in anything, he did his job period. You have to show me, I have been around the block in this area for a long time and I think you know that. I don't want to be told, no no, it looks this way or that I want real evidence. If you don't have that I am going to expect that he comes back to the position he has."

After Commissioner Diaz de la Portilla spontaneously stated "absolutely," Carollo continued, "You're the chief, you can do whatever you want, **but I want you to know that from up here, we can do a heck of a lot more. I will leave it at that.**"

Commissioner Reyes then stated, "I support what Commissioner Carollo says about Sergeant Camacho, and I am also not happy about it."

Commissioner Diaz de la Portilla then stated:

> "**I am going to ditto what Commissioners Carollo and Reyes, said, Luis Camacho is a man, a man's man, he is discreet, he has been on this force for 23 years, with all due respect chief, you just got here, his history in this town, our town, is very well known, and before you crucify somebody or tarnish somebody's reputation, the proof better be there.** And it has to be ironclad, and it can't be somebody made a phone call by coincidence. It can't be circumstantial, because you are talking about somebody's livelihood, you're talking about somebody's reputation, and the three of us before we got here he has always been discrete . . . ."

Commissioner Reyes added the Commissioners were not telling me what to do because it is prohibited by the City charter, but Commissioner Reyes then addressed the City Manager and directed to look into the matter and "do the right thing."

Subsequently, Commissioner Carollo asked how long the investigation would take, and Commissioner Diaz de la Portilla then stated: "**how long did it take you to decide to relieve him of duty. How long did that investigation last? How many days did it take for you to decide to tag him as a bad guy**"? De La Portilla ultimately stated that he was "99.9 percent convinced" that Camacho had done nothing wrong and that he would stake a lot on that.

These public remarks confirm the three Commissioner's improper efforts to influence the IAD investigation and reverse MPD personnel decisions. They are also consistent with what those three commissioners have said to me in private. Each of them has questioned me about the ongoing investigation in their offices, have falsely accused me in private of carrying out a vendetta against Camacho, and have demanded that I bring Camacho back to work and reappoint him to the SAAD. In one such private meeting, Commissioner Diaz de la Portilla told me in his office that I should consider running in the upcoming Miami-Dade Sheriff race. I told him I am not interested in running for office and he replied that "you are the most experienced and qualified candidate and would easily win. I run campaigns and will get you in." He then added "**that's assuming you do the right thing on Camacho and get him back.**"

Shortly after the conclusion of the June 24th commission meeting, I expressed my concerns over the actions described above to my staff, and to both of you, the City Manager and Mayor, as my superiors. I felt compelled to do so due to the fact that in a career spanning over 35 years, including in the three of the most populous states in the Union and leading three of the largest law enforcement agencies in the United States, I have never personally experienced such interference in a confidential law enforcement investigation.

Today, in a related development, September 24, 2021, at approximately 10:57 a.m., I received notification that a felony warrant had been signed by a judge in Monroe County, Florida for the arrest of Frank Pichel for impersonating a law enforcement officer. I understand that Pichel works or has worked as a Private Investigator gathering "dirt" for Commissioner Carollo and other elected officials. In light of Carollo and Diaz de la Portilla's pattern of continued attacks on MPD and me, the complexity of the web we have begun to untangle, the multiple jurisdictions involved, and the safety issues at stake, I called and informed you both on a three-way cell phone call on September 24, 2021, at approximately 11:29 a.m., and advised you of the pending arrest of Mr. Pichel. I did so to ensure both of you are situationally aware for your own safety, and to also advise you of my intent to request assistance from the Federal Bureau of Investigation, and the United States Department of Justice. I also reminded you of the fact I had spoken to high level DOJ Officials in Washington, D.C., and have requested assistance in reviewing MPD internal affairs processes, and several non-fatal use of force incidents. Considering what has occurred to date, our MPD and the City has no choice.

Unfortunately, the Commissioners' interference in the confidential IAD investigation is not their only misconduct.

<u>Interference with Reform Efforts and MPD Staffing.</u>

On or about August 2, 2021, former Houston Police Department (HPD) Assistant Chief Heather R. Morris was sworn in as the first female Deputy Chief (DC) of the Miami Police Department. DC Morris previously worked with me for 4 ½ years at HPD as the Robbery Division Commander, Internal Affairs Division Commander, and as Assistant Chief overseeing Criminal Investigations Command (Homicide Division, Special Investigations Unit, Robbery Division, Major Assaults/Family Violence Division, Victim Services Unit, and the Burglary and Theft Division). At HPD she was highly regarded and successfully performed her duties. It is important to note she has over 22 years of sustained excellence in a department well over five times the size of the MPD and served a community nearly five times larger than the City of Miami. In fact, that department's budget is on par with the entire budget of the City of Miami and the workforce she helped lead is larger than the City of Miami workforce.

DC Morris and her family, like me and my family, came to Miami with the best of intentions and in the hope of helping to reform and improve the culture of MPD, which is the mission given to me by you as my superiors at the City of Miami and by certain Commissioners including Commissioners Diaz de la Portilla and Carollo, who had previously encouraged me to bring police executives from outside of the MPD to assist me in my reform efforts. Unfortunately, these Commissioners have changed their tune and have eliminated her position in the 2021/22 FY budget. It is clear to me that they are doing so as part of their efforts to meddle in the affairs of the MPD and to improperly influence the ongoing IAD investigation.

Specifically, on or about September 13, 2021, the City Commission held a budget reading. During the beginning of the meeting, the Commissioners discussed eliminating a position (Director of Constitutional Policing) that I told you I needed to help me reform MPD before accepting the Chief position. Commissioners Carollo, Reyes and Diaz de la Portilla voted to remove the funding for that position from the budget and instead provide it to the City Attorney for additional staffing, as part of the Commissioners' continued retaliation and effort to harass and intimidate me and my team, and to hamper my efforts at reform.

Throughout the discussion of the MPD budget during the September 13, 2021, budget meeting, Commissioners Carollo, Diaz de la Portilla, and Reyes targeted me and MPD, and manipulated the budget process to further their vendetta against me and other members of the department for refusing to succumb to their unlawful interference and obstruction.

The Commissioners made the following statements from the dais:

Carollo stated, in essence, "that position (Deputy Director of Constitutional Policing) or and whatever other names that he ( referring to me) wants use for, so we aren't being played with later on, is eliminated."

Carollo then addressed Jorge Blanco, Civilian Commander of the MPD Budget Office, and stated, "Mr. Bean Counter, if there are games played, with that position later on where you know, you try to move the cups, and hide the bean, I will call immediately for a budget amendment hearing and the new budget amendment, your position (referring to Blanco) we are going to dust also. And if I have to up the ladder, I will keep doing that. So, I don't want any games like I saw here a few minutes ago, because I am reading to peoples' minds. You know in my prior life; you know I was a mind reader"

Carollo made the following misleading statements about positions he knew full well were requested by him and other commissioners:

> "Mr. Manager, I am not used to having this ever, and Mr. Manager, can you come up, I'd appreciate it. Mr. Manager, I am sitting back here, I can't believe what is going on here. You're the City Manager, you set the budget that you are proposing to us, and now, they're telling me that the request that they have made to you that you did not approve, there coming directly to us to ask for that request. This is what this gentleman here (Blanco) is telling me. I have never seen something like that done before in all the years that I have been sitting in budget hearings on this commissioner or any other commission. If a department director had pulled this on me when I was City Manager before, he wouldn't be around. He wouldn't be around. So, what the heck is going on here, are you in charge? Are they in charge? Who is in charge? You told them [MPD/me] this is the budget you are going to propose. I had no problems with that, if I would tell you. But now they are telling me, that they are proposing this to us up here to see

> if we would overrule you. And you know, there has to be a chain of command, this is not the way things are done."

> He later continued, "this the part that is starting to scare me, I am seeing actions that I have never seen before. And, it is going to be one voice, and you are the manager. You are the one that I am listening to."

I believe these misleading public statements by Commissioner Carollo were made to create the false appearance that the MPD and I were somehow insubordinate to the City Manager.

Furthermore, since my arrival at MPD in April, I have uncovered a pattern of unlawful use of force by officers, and in some instances the chain of command has covered up the unlawful use of force by some officers. I have discussed my concern regarding the failure of some MPD supervisors and managers to hold officers accountable for the unlawful use of force. I have begun the process of addressing this issue with the assistance of Deputy Chief Morris, who has extensive experience as the former Commander of Internal Affairs at HPD, and I looked forward to obtaining additional help with the position slated for Policy and Constitutional Poling, to help reform the department. However, during this September 13th Commissioner meeting, Commissioners Carollo, Reyes, and Diaz de la Portilla manipulated the budget process to hamper my reform by eliminating the funding for the two aforementioned positions, which are critical to any serious reform efforts.

It is important to note that the Commissioners chose not to eliminate the newly created position of Assistant Chief (currently occupied by Assistant Chief Carroll). Instead, Commissioners Carollo, Diaz de la Portilla, and Reyes led the charge to eliminate the long-standing position of Deputy Chief as part of their efforts to interfere with the MPD's affairs including the IAD investigation, hamper my given mission to reform the MPD, and retaliate for refusing to succumb to their collective efforts to influence the outcome of the ongoing IAD investigation and operations.

These Commissioners have gone so far as to threaten to fire the City Manager if he does not do their bidding and have directed the City Manager to order me not to take any disciplinary action against any employee until after a Special City Commission meeting, which they have called for September 27, 2021. These actions are clearly meant to improperly direct and control the MPD, including the attempts to influence an ongoing and confidential investigation, and are disturbing and unprecedented in my career.

After the September 13th Commission meeting, I again discussed the actions of these Commissioners with my executive team, and with you as my superiors at the City of Miami. I made it clear that the actions of these three Commissioners are part of a pattern of interference and intimidation, designed to obstruct an open and confidential investigation and an effort to improperly manage and direct the activities of the MPD for the Commissioners' personal and political purposes. I have discussed these sustained efforts and the Commissioners' violations of the City Charter and governing law with you as my superiors.

On September 23, 2021, during the regular City Commissioner hearing, the City Manager met briefly with me and told me in essence, "I understand you are transferring someone named

Blanco into internal affairs. Carollo just jumped on me and went off stating he knows you are transferring Blanco and he is livid because Blanco is close to SAAD Senior Sergeant Lamprou, and he is threatening to blow up your budget further." This is additional evidence of Commissioner Carollo improperly interfering with the activities and staffing of the MPD.

It is important to note that at the conclusion of the regular Commission meeting on September 23, 2021, Carollo went into his Commission Office, and neither he nor Diaz de la Portilla took the dais during the second budget meeting. Moreover, shortly after the end of the regular meeting and start of the Budget hearing, MPD FOP Union President Tommy Reyes entered Carollo's office, where I believe they remained throughout the budget hearing.

<u>Interference With and Improper Use of MPD Resources.</u>

Furthermore, Commissioner Carollo is targeting me, in part, for my refusal to allow him to use the MPD as his personal enforcer against anyone he perceives as offensive. My refusal to allow Commissioner Carollo to dictate the actions of members of the MPD has led him to engage in a pattern of retaliation and threats.

Specifically, on June 25, 2021, I received a call from Commissioner Carollo telling me he was at the monthly Calle Ocho event. He insisted there were "agitators" in the crowd and demanded I dispatch Special Investigations Section Detectives. This is an example of Carollo's pattern of using and directing MPD. I contacted Major Thomas Carroll and told him that Carollo was insisting "these son of a bitches are here at the event and they are agitating and we need to arrest them and get them out of here." Major Carroll told me he would take care of it, and I later learned that MPD personnel did not locate any "agitators" after an extended period of observation.

Carollo also has complained on numerous occasions to me and the City Manager about alleged corruption in the City Code Enforcement Department. Because of Carollo's harassment of the City Manager on this issue, and at the direction of the City Manager, MPD investigated the matter. The MPD investigation did not uncover any evidence of corruption. Nevertheless, Carollo continues to insist that City Code Enforcement is corrupt and continues to demand that MPD take enforcement action. Carollo has not provided any evidence of his insistent claims of corruption, and as previously stated, the MPD investigation did not uncover any evidence to support Carollo's claims. Carollo continues to attempt to influence the MPD and City Code Enforcement deployment decisions. In fact, Carollo and Diaz de la Portilla provided the MPD with a target list of establishments which *they* claim are engaged in criminal activity and have pointed the finger at establishments in each other's districts, causing the MPD to investigate business establishments based on nothing more than the whims of Commissioners Carollo and Diaz de la Portilla.

The MPD SIS/Vice Division has wasted untold hours investigating business establishments because of the improper political influence of, and intimidation by, these two commissioners. Unfortunately, Commissioner Reyes frequently joins Carollo and Diaz de la Portilla in their pattern of official misconduct. After five months of observing these two commissioners, and the negative impact they are having on MPD and our business community, coupled with their unlawful obstruction of the IAD investigation involving Camacho, I feel compelled to memorialize and report their unlawful and retaliatory conduct.

Another example of Commissioner Carollo's malfeasance occurred on July 31, 2021, a "Patria y Vida" event held at Bayfront Park. During this event I worked all day. Commissioner Carollo became upset because, according to him, there were "agitators" in the crowd. Carollo told me to "arrest those communists and get them the hell out of here." I immediately directed investigators to keep an eye on the area that Carollo was complaining about. I now understand that Carollo was incensed that MPD did not immediately make arrests as he directed. In fact, Commissioner Carollo has publicly accused me of being too busy taking selfies with the crowd and spending time in crowds in retaliation for my refusal to arrest and remove his enemies and those who were exercising their First Amendment rights. Carollo has made numerous appearances on Spanish radio and has engaged in a sustained attack on me in his attempt to harm my professional reputation with the community and in his continued effort to intimidate, harass, and retaliate against me for not carrying out his unlawful requests.

These events are deeply troubling and sad. I have no choice but to memorialize and report the above series of improper acts, because the men and women of the MPD, and the wonderful community we serve, deserve leadership that is committed to the rule of law. I want to note that I absolutely love the men and women of MPD.

I close by saying that I have been told on numerous occasions that, if I just give these commissioners what they want on the IAD investigation, they may very well leave me alone for now. However, my sworn duty is to uphold the rule of law and follow the evidence wherever it may lead, and to work for the wellbeing of the men and women of the MPD, the lawful independence of MPD, and the people of the City of Miami. If I or MPD give in to the improper actions described herein, as a Cuban immigrant, I and my family might as well have remained in communist Cuba, because Miami and MPD would be no better than the repressive regime and the police state we left behind. It is for these reasons, and more, that I will be providing this information to the proper authorities.

With Great Respect and Heavy Heart,

Art Acevedo

Chief of Police

Miami Police Department

**Date:** Tue, 5 Oct 2021 6:46:45 PM -0400

**Subject:** Fwd: Miami Police Department 90-Day Plan

**From:** Noriega, Art <anoriega@miamigov.com>

**To:** Jcolina@jorgecolinagroup.com;

**Attachments:** image001.png; MPD 90 Day Plan - Final October 4, 2021.pdf

Get Outlook for iOS

**From:** Fernandez-Stiers, Melissa <mfstiers@miamigov.com>
**Sent:** Tuesday, October 5, 2021 3:59:54 PM
**To:** Suarez, Francis (Mayor) <fsuarez@miamigov.com>; Diaz de la Portilla, Alex (Commissioner)
<adiazdelaportilla@miamigov.com>; Russell, Ken (Commissioner) <krussell@miamigov.com>; Carollo, Joe (Commissioner)
<JCarollo@miamigov.com>; Reyes, Manolo (Commissioner) <MReyes@miamigov.com>; Watson, Jeffrey (Commissioner)
<JWatson@miamigov.com>
**Cc:** Pascual, Nikolas <NPascual@miamigov.com>; Fortuny, Karla <KFortuny@miamigov.com>; Mahony, Abigael
<AMahony@miamigov.com>; Suarez, Jose <JosSuarez@miamigov.com>; Ferreiro, Esteban <EFerreiro@miamigov.com>;
Shiver, Cornelius <CShiver@miamigov.com>; Sangster, Natalya <NSangster@miamigov.com>; Noriega, Art
<anoriega@miamigov.com>; Ihekwaba, Nzeribe <NIhekwaba@miamigov.com>; Casamayor, Fernando
<FCasamayor@miamigov.com>; Colebrook-Williams, Natasha <NColebrook-Williams@miamigov.com>; Mendez, Victoria
<VMendez@miamigov.com>; Severino, Stephanie <SSeverino@miamigov.com>
**Subject:** Miami Police Department 90-Day Plan

Honorable Mayor and Members of the City Commission:

Please see attached.

Respectfully,

**Melissa Fernandez-Stiers, Esq.**
Chief of Staff to the City Manager
City of Miami
3500 Pan American Drive | Miami, FL 33133
Tel: 305-250-5400 | Fax: 305-250-5410
Email: MFStiers@miamigov.com




EXHIBIT
0018
Jorge Colina
08.29.22


PLAINTIFF'S
EXHIBIT
**258**

MIA-SFED23485-00175124

CITY OF MIAMI, FLORIDA

## INTER-OFFICE MEMORANDUM

| TO : | | DATE : | | FILE : |
|---|---|---|---|---|
| Art Noriega | | | October 4, 2021 | |
| City Manager | | SUBJECT : | Miami Police Department | |
| | | | 90-Day Plan | |
| FROM : Art Acevedo | | REFERENCES : | | |
| Chief of Police | | ENCLOSURES: | | |

Dear City Manager Noriega,

As directed, I am pleased to provide you with the plan of action you requested me to submit. While this entire document speaks to my self-evaluation of my first six months of service to the people of Miami and the men and women of the Miami Police Department (MPD), I believe the first six months of my administration, on balance, has been successful as it relates to operations, crime-fighting, employee relations, and community relations. MPD is the third municipal police department I have had the privilege of leading after coming from the outside. As was the case when Chief John Timoney took over MPD many years ago, and whenever a chief comes into a police department from the outside, there will always be a certain level of friction and some missteps. Effecting organizational change is always challenging, and in the policing profession, change is never easy.

Having honestly and openly discussed my leadership style with you and Mayor Suarez prior to my selection as chief, you both assured me my style of public service would work well in Miami and at MPD. Our city leaders have a unique operational style of their own and are much different than what I have previously encountered. As such, I probably moved too quickly to affect change and engage publicly, and I have experienced some friction with members of the City Commission and some employees. I have since adjusted my approach and will continue to do so to ensure I meet the expectations of City Commissioners, our community, and our MPD family.

As you know, I made a comment that was offensive to our community when discussing the lack of diversity within the ranks of MPD, and expressed my concern for the safety of our workforce and the people we serve due to the low vaccination rates within our ranks, in a manner that rightfully upset MPD members. I have apologized to the community and members of MPD and will continue to strive to be mindful of the way I address issues moving forward.

MIA-SFED23485-00175125

While there have been bumps in the road, I have hit the reset button and look forward to working diligently to accomplish my given mission of building on the successes of my predecessors.

## Policing Plan

Please keep in mind this plan includes the melding of previous, new, and future initiatives and strategies, and my entire executive team assisted with its preparation. Our agency is a professional, value-based organization built upon the foundation of community partnerships. Our department is committed to providing exceptional public safety services and taking a leadership role in strengthening these partnerships through Relational Policing. Each encounter an officer has with an individual is an opportunity to engage, communicate openly, and build trust. Miami is rich in diversity, and Relational Policing requires we ensure the safety and well-being of each person is addressed equitably. This is accomplished through transparency, respect, engagement with the community, accountability, and trust. We are committed to upholding ethical standards and adhering to the true meaning of the Law Enforcement Code of Ethics. Providing excellent public safety service and keeping our community and workforce safe is the cornerstone of policing, so much in the City of Miami that it is part of our mission statement; To work together with Miami's diverse residents, visitors, and businesses to constitutionally, transparently, and accountably reduce crime and enhance public safety. Upon my arrival in the Magic City, I gathered input from departmental members and our community to develop my policing safety plan. The reduction of gun violence, the increased safety of motorists, cyclists, and pedestrians, and enhanced focus on the quality of life issues quickly became a reoccurring topic. As a result of our priorities, the MPD has initiated and will further enhance the below-listed initiatives:

1. Gun Violence Reduction Summer Initiative – A review of the crime stats upon my arrival on April 1, 2021, revealed that overall Part 1 crimes were down 21% when compared to the same period in 2020; however, homicides had doubled during the same time frame (8 cases in 2020 and 16 cases in 2021). MPD is committed to the safety of its citizens and visitors, and as such, we have made it a priority to safeguard the sanctity of human life. On May 15, 2021, MPD embarked on a multi-divisional initiative that brought together elements from across our department and joined forces with our partners from the Miami-Dade Police, the State Attorney's Office, and state and federal law enforcement agencies to reduce incidents of gun violence, robbery, assaults, and homicides along with other criminal acts to include illegal weapons possession. Currently, 86% of all gun violence incidents this year have disproportionally impacted five of our neighborhoods; Little Haiti, Model City, Allapattah, Little Havana, and Overtown. This initiative focuses on these areas utilizing hot-spot policing and laser-focused enforcement based on data-driven strategies that ensure constitutional policing of our neighborhoods in need of relief from incidents of repeat violence by achieving an overall reduction in violent crime, with an overall emphasis on the drop in total homicides. Below is the comprehensive course of action dedicated to the reduction of gun violence and

MIA-SFED23485-00175126

shootings through a joint proactive enforcement plan. The operational period started on May 15, 2021, and the current, positive statistical impact is as follows:

| Homicides Citywide January 1 – March 31 | 2020 | 2021 | +/- |
|---|---|---|---|
| Total | 8 | 16 | +8 |

| Homicides Citywide May 15 – September 30 | 2020 | 2021 | +/- |
|---|---|---|---|
| Total | 27 | 21 | -6 |

| Shootings Citywide January 1 – March 31 Gun Discharge | 2020 | 2021 | +/- | % Change |
|---|---|---|---|---|
| Fatal | 7 | 15 | +8 | 114% |
| Hit | 31 | 30 | -1 | -3% |
| Missed | 21 | 29 | +8 | 38% |
| Total | 59 | 74 | 15 | 25% |

| Shootings Citywide May 15 – September 30 Gun Discharge | 2020 | 2021 | +/- | % Change |
|---|---|---|---|---|
| Fatal | 18 | 13 | -5 | -28% |
| Hit | 48 | 47 | -1 | -2% |
| Missed | 81 | 56 | -25 | -31% |
| Total | 147 | 116 | -31 | -21% |

| Shooting Incidents GVR NET Areas January 1 – March 31 NET Areas | 2020 | 2021 | +/- | % Change |
|---|---|---|---|---|
| Allapattah | 9 | 8 | -1 | -11% |
| Fatal | 0 | 0 | 0 | 0 |
| Hit | 5 | 2 | -3 | -60% |
| Missed | 4 | 6 | +2 | 50% |
| Little Haiti | 13 | 15 | 2 | 15% |
| Fatal | 0 | 2 | +2 | 200% |
| Hit | 7 | 8 | +1 | 14% |
| Missed | 6 | 5 | -1 | 17% |
| Little Havana | 0 | 6 | 6 | 600% |
| Fatal | 0 | 0 | 0 | 0 |
| Hit | 0 | 4 | +4 | 400% |
| Missed | 0 | 2 | +2 | 200% |
| Model City | 20 | 21 | 1 | 5% |
| Fatal | 3 | 5 | +2 | 67% |
| Hit | 11 | 8 | -3 | -27% |
| Missed | 6 | 8 | +2 | 33% |
| Overtown | 6 | 8 | 2 | 33% |
| Fatal | 2 | 3 | +1 | 50% |
| Hit | 4 | 3 | -1 | -25% |
| Missed | 0 | 2 | +2 | 200% |
| GVR Top 5 NET Areas | 48 | 58 | +10 | 21% |

| Shooting Incidents GVR NET Areas May 15 – September 30 NET Areas | 2020 | 2021 | +/- | % Change |
|---|---|---|---|---|
| Allapattah | 15 | 23 | 8 | 53% |
| Fatal | 1 | 3 | +2 | 200% |
| Hit | 7 | 4 | -3 | -43% |
| Missed | 7 | 16 | +9 | 129% |
| Little Haiti | 45 | 23 | -22 | -49% |
| Fatal | 4 | 2 | -2 | -50% |
| Hit | 13 | 9 | -4 | -31% |
| Missed | 28 | 12 | -16 | 57% |
| Shots Fired | | | | |
| Little Havana | 5 | 6 | 1 | 20% |
| Fatal | 0 | 0 | 0 | 0% |
| Hit | 0 | 4 | +4 | 400% |
| Missed | 5 | 2 | -3 | -60% |
| Model City | 35 | 36 | 1 | 3% |
| Fatal | 3 | 5 | +2 | 66% |
| Hit | 14 | 17 | +3 | 21% |
| Missed | 18 | 14 | -4 | -22% |
| Overtown | 15 | 10 | -5 | -33% |
| Fatal | 3 | 1 | -2 | -66% |
| Hit | 6 | 5 | -1 | -16% |
| Missed | 6 | 4 | -2 | -33% |
| GVR Top 5 NET Areas | 115 | 98 | -17 | -15% |

MIA-SFED23485-00175127

Miami Police Department 90-Day Plan                                4 | P a g e

| MPD Arrests January 1 – March 31 | | | |
|---|---|---|---|
| NET Area | 2020 | 2021 | % Change |
| Allapattah | 567 | 583 | 3% |
| Felony | 234 | 246 | 5% |
| Misdemeanor | 333 | 337 | 1% |
| Little Haiti | 142 | 153 | 8% |
| Felony | 61 | 76 | 25% |
| Misdemeanor | 81 | 77 | -5% |
| Little Havana | 127 | 178 | 40% |
| Felony | 41 | 58 | 41% |
| Misdemeanor | 86 | 120 | 40% |
| Model City | 398 | 453 | 14% |
| Felony | 180 | 231 | 28% |
| Misdemeanor | 218 | 222 | 2% |
| Overtown | 208 | 248 | 20% |
| Felony | 74 | 81 | 9% |
| Misdemeanor | 134 | 167 | 25% |
| Total Felonies | 590 | 692 | 17% |
| Total Misdemeanor | 852 | 923 | 8% |
| Grand Total | 1442 | 1615 | 12% |

| MPD Arrests May 15 – September 30 | | | |
|---|---|---|---|
| NET Area | 2020 | 2021 | % Change |
| Allapattah | 417 | 549 | 32% |
| Felony | 205 | 265 | 29% |
| Misdemeanor | 212 | 284 | 34% |
| Little Haiti | 220 | 326 | 48% |
| Felony | 118 | 178 | 51% |
| Misdemeanor | 102 | 148 | 45% |
| Little Havana | 519 | 565 | 9% |
| Felony | 263 | 229 | -13% |
| Misdemeanor | 256 | 336 | 31% |
| Model City | 611 | 797 | 30% |
| Felony | 252 | 244 | -3% |
| Misdemeanor | 359 | 553 | 54% |
| Overtown | 279 | 447 | 60% |
| Felony | 166 | 149 | -10% |
| Misdemeanor | 113 | 298 | 164% |
| Total Felonies | 1004 | 1065 | 6% |
| Total Misdemeanor | 1042 | 1619 | 55% |
| Grand Total | 2046 | 2684 | 31% |

To achieve the goals outlined above, the MPD will strive to meet the following goals within the next 30, 60, and 90 days:

- 30 days:
    - To reduce overall Gun Violence incidents by 2%, with an emphasis on reduction in homicides. Conduct an analysis review to determine the effectiveness of the operational plan and adjust deployment and tactics as needed.
- 60 days:
    - To reduce overall Gun Violence incidents by 5%, with an emphasis on reduction in homicides. Conduct an analysis review to determine the effectiveness of the operational plan and adjust deployment and tactics as needed.
- 90 days:
    - To reduce overall Gun Violence incidents by 7%, with an emphasis on reduction in homicides. Conduct an analysis review to determine the effectiveness of the operational plan and adjust deployment and tactics as needed. At the end of the 90-day operational period, a determination to continue the operation beyond the initial time frame will be made.

2. Quality of life issues

Operation Dry Hour – MPD is committed to addressing community concerns and ensure our community is a place where our residents, businesses, and visitors can conduct their daily affairs safely. On April 17th, 2021, MPD began the collaborative

"Operation Dry Hour," a comprehensive multi-disciplinary task force that brings together police officers with members of the City of Miami Code Compliance, Building Department, Fire Department, and the Florida Division of Alcoholic Beverages and Tobacco (ABT) to conduct business inspections to ensure each establishment that serves alcohol is in legal compliance with all laws, codes, and noise ordinances. To date, "Operation Dry Hour" yielded the following:

- o 217 Businesses visited, 40 Businesses Shutdown, 4 Felony arrests, 31 Misdemeanor arrests, 2 Traffic arrests, 5 Traffic summonses
- o 667 Fire Dept. Violations, 237 Code Violations, 46 Building Violations, 22 ABT Violations

To achieve the goals outlined above, the MPD hopes to achieve the following within the next 30, 60, and 90 days:

- 30 days:
  - o To continue to address locations of concern as identified via complaints to educate and ensure compliance with alcoholic beverage laws.
- 60 days:
  - o Conduct a business community survey of businesses that received a violation to verify the task force's effectiveness in bringing violators into compliance.
- 90 days:
  - o To assess the task force effectiveness and determine the need to move into a permanent model and away from an overtime-driven model.

Homeless Empowerment Assistance Team (HEAT) - On Monday, August 2, 2021, MPD established the "Homeless Empowerment Assistance Team" (HEAT), a collaborative effort in conjunction with the City of Miami Solid Waste and Homeless Outreach Team. HEAT was designed as a task force to work together to mitigate homelessness through outreach services that enable the homeless community to overcome their barriers and empower them to take advantage of varying services. The team aims to address issues involving homelessness, mental crisis, and substance abuse using a referral first model to build necessary rapport and encourage individuals in need to enter the continuum of care.

Locations are selected based on referrals from NET area police personnel, the information provided by the Homeless Outreach Team regarding "hot spots" for encampments, and personal observation by HEAT members while scouting the city for areas to address. The mission of MPD is to ensure a safe environment for all persons that live, work, and visit within our city and that the homeless community has a dedicated team that will compassionately assist in these efforts.

During the assessment period of August 2, 2021, through September 26, 2021, the HEAT task force outreach achieved the following:

- 44 Details

MIA-SFED23485-00175129

- 48 Locations
- 461 Homeless Contacts (FIVOs)
- 183 Shelter Placements
- 7 Mental Health Referrals
- 9 Substance Abuse Referrals
- 15 Arrests (warrants & narcotics)

During the assessment period of January 1, 2021, through August 1, 2021, **prior** to the implementation of the HEAT task force, police-initiated action resulted in the following:

- 1,536 Homeless Arrests
- 850 Homeless Baker Acts
- 40 Shelter Placements

*Please note our HEAT Taskforce has greatly reduced the number of arrests.

To achieve the goals outlined above, the MPD hopes to achieve the following within the next 30, 60, and 90 days:

- 30 days:
  - Continue to strive to implement a co-responder model to minimize the need to dispatch police officers to address issues involving homelessness, mental crisis, and substance abuse calls.
- 60 days:
  - Enhance the program logistically to expand the team's ability to service the repeat encampment locations up to 3 times a week. Continue to aim at increasing the referral into shelter and treatment.
- 90 days:
  - Assess the task force effectiveness and determine the need to move into a permanent model that allows 3 teams to service each of our 3 police districts to increase the services and opportunities for shelter and recovery to the homeless.

3. Special Operations Division

Assistant Chief Thomas Carroll was appointed to the newly created Special Operations Division (SOD) effective August 1, 2021. Before creating SOD, the Specialized Operations Section operated under the auspices of the Field Operations Division. Having the Special Operations Division with its chief allows the MPD to streamline its response to the community's needs and crime trends within the City of Miami. This change enables the Department to provide a better focus on the day-to-day operations of its specialized and high liability units. Having a Division Chief focus only on SOD allows MPD to deploy the resources of the division's units effectively, and greatly enhances executive oversight.

- The Traffic Enforcement Detail (Motors) was centralized and reassigned to the Special Operations Division under the Traffic Unit.
- The Bicycle Response Team was created as a full-time unit and assigned to the Special Operations Division. BRT will be deployed to our city's high crime net areas and will be used as a crime reduction tool.
- The Canine Unit was centralized within the Special Operations Division. Two additional officers will be added to the Canine Unit.
- The Marine Patrol Detail will be expanded to two squads and will be providing 7-day coverage to better serve and patrol the waterways within the City of Miami. The Marine Patrol Detail will target the high-volume locations, including the Miami River, Margaret Pace Picnic Island, Miami Marine Stadium, Watson/Downtown area, and will conduct derelict vessel removals.
- The Tactical Robbery Unit was revamped to two squads and reassigned within the Special Operations Division and provides 7-day coverage to combat violent crime within the City of Miami.

Special Operations Division 90 Day Policing Plan:

The proactive units within the Specialized Operations Section will be deployed citywide in an enforcement plan for traffic offenses, quality of life crimes, boating violations, apprehension of violent crime offenders, and the recovery of illegal firearms.

To complete these tasks, the Special Operations Division will audit the action plan at the 30 days, 60 days, and 90 days marks.

- 30-Days
  - Analyze the productivity statistics for the division for the initial 30 days of the plan and compare the data to the previous 30 days.
  - Make any adjustments needed to ensure the plan is being executed on the right track.
- 60-Days
  - Compile and analyze statistical data for the productivity of the units assigned to the division and compare in two sections. First, in comparison to the previous two months individually and second, in comparison to the previous two months.
- 90-Day Review
  - The statistical data of the SOD units for the three months will be evaluated and compared to the current year-to-date figures. This will allow the MPD to properly assess the functionality of the division and identify the need to implement any additional changes to further support to the specialized units.

## Management Plan

When proper management plans are in place, there is little room for hidden complacencies. Management plans also improve accountability and provide clear guidelines for those in key positions, defining their role in achieving the department's vision and mission.

### Vision

The Miami Police Department will maintain the highest standards of professional ethics and integrity. We are committed to the philosophy of community and neighborhood policing. We will build partnerships and coalitions with the business, corporate, and residential communities to identify and recommend solutions to problems to improve the quality of life in our neighborhoods. We will employ time-tested police methods and promising innovative approaches to protect our communities better. We value the cultural unity and differences of our communities, recognizing that there is strength in both. Our commitment is to provide professional service to our citizens, residents, and visitors.

### Mission

To work together with Miami's diverse residents, visitors, and businesses to constitutionally, transparently, and accountably reduce crime and enhance public safety.

### Overview

MPD follows a paramilitary organizational structure and is headed by the Chief of Police. The Chief of Police oversees the four operational divisions of the agency, and an Assistant Chief leads each division: Field Operations Division, Criminal Investigations Division, Administration Division, and Special Operations Division. Each Assistant Chief oversees the day-to-day operation of the sections under their command. The Internal Affairs Section, Professional Compliance Section, Special Investigation Section, and Public Information Office report directly to the Chief of Police. Executives are called upon to make a myriad of decisions. These decisions are made individually and collaboratively, with the primary goal of fulfilling the department's mission and vision. Education, training, ethical motivations, liability, precedent are all aspects considered during the decision-making process. The ultimate decision to hire, promote, appoint, transfer, terminate, relieve of duty, return a member to a former classification, negotiate grievances, and imposing discipline lies with the Chief of Police.

Upon my appointment, the Command Staff structure consisted of forty-two sworn staff members and two civilian staff members. The current structure is thirty-seven sworn staff members and three civilian staff members. Two Major positions and one Executive Officer position were converted to create three new positions: Assistant Chief, NET Commander, and Chief of Staff, respectively. The Assistant Chief commands the Special Operations Division, and the NET Commander is assigned to Internal Affairs.

I requested a resume, SWOT Analysis, and biography from each staff member. Over several months, I interviewed each staff member and asked them to elaborate on their

MIA-SFED23485-00175132

work history with MPD and their assessment of the department and fellow staff members. I requested feedback from the Executive Staff regarding the reorganization of the department and possible rollbacks that would result in the reconfiguration of the organizational chart. The reorganization resulted in three Majors and one Executive Officer being returned to former classifications.

| As of 4/5/21 | # of Positions | As of 10/4/21 | # of Positions | Difference |
|---|---|---|---|---|
| Chief of Police | 1 | Chief of Police | 1 | 0 |
| Deputy Chief of Police | 1 | Deputy Chief of Police | 0 | -1 |
| Assistant Chief | 3 | Assistant Chief | 4 | 1 |
| Major | 15 | Major | 10 | -5 |
| Commander | 13 | Commander | 14 | 1 |
| Executive Officer | 3 | Executive Officer | 1 | -2 |
| Senior Sgt. at Arms | 1 | Senior Sgt. at Arms | 1 | 0 |
| Sgt. at Arms | 5 | Sgt. at Arms | 6 | 1 |
| Chief of Staff | 0 | Chief of Staff | 1 | 1 |
| Police Budget Mgr. | 1 | Police Budget Mgr. | 1 | 0 |
| Police IT Mgr. | 1 | Police IT Mgr. | 1 | 0 |
| **Total Positions** | **44** | **Total Positions** | **40** | **-4** |

**30-Day Timeframe**

- Meet with City of Miami department directors to establish open lines of communication.

  Measure:  Total number of meetings attended.

- Solicit input and/or feedback from executive staff and/or City departments that may be impacted prior to making final decisions.

  Measure:  Assess the method of tracking feedback received by departments.

- Implement Decision-Making Metrics including, but not limited to, who participated in each decision, alignment with the department's vision, alternatives considered, how well decisions were communicated, and outcome of the decision.

  Measure: Track the above-referenced metrics.

- Weekly meeting with Internal Affairs Commander.

Measure: Total number of meetings and outcome of discussions.

- Weekly Chief's meeting to keep Executive Staff apprised of decisions.

  Measure: Total number of meetings and outcome of discussions.

- Weekly meeting with City Manager to provide an update on personnel actions.

  Measure: Total number of meetings and outcome of discussions.

**60-Day Timeframe**

- Establish a quarterly meeting with department directors.

**90-Day Timeframe**

- Conduct follow-up with all parties to measure the effectiveness of the plan.

### *Employee Morale Plan*

One tool that I used to assess areas of opportunity and areas that were doing well from the employees' perspective was to conduct an anonymous Department-wide survey. This is the message that was sent out via MPD Mailer to all employees:

Since arriving in Miami to assume my duties as Chief of Police, I have been very impressed by the professionalism and support of the employees of MPD. As with any great organization, we must continuously strive to improve in all operations areas, including customer service, public safety, and how we, as MPD employees, support and assist each other.

In assessing our organization, we must determine our strengths and weaknesses. An employee survey is an excellent tool to use as a starting point for evaluating these qualities. To obtain the most accurate and valuable information, I encourage all employees to respond to an anonymous five-question survey that will be accessible through a link that will be sent to your department email account shortly. Once launched, the survey will run for 14 days.

The few minutes that you invest in completing this anonymous survey will greatly assist me in determining how I will prioritize needed changes to MPD operations. Overall, this is an opportunity for our workforce to weigh in on the past, the present and the future of this organization. While completion of the survey is not mandatory, it will be appreciated and is highly encouraged.

I hope you are as excited as I am about the future of this department. Please take this opportunity to let your voice be heard.

As always, be safe and do not hesitate to call me if I can be of service.

Art Acevedo

Chief of Police

Additionally, a reminder was sent out five days prior to the survey being closed:

The MPD Operations Survey has been out for a little over a week and we have received more than 650 responses so far. While this is an encouraging level of participation, I hope to hear from as many employees as possible by the time the survey closes next Tuesday. If you have not yet completed this anonymous survey, please take a few moments to do so – your survey response will be a valuable resource for me as I prioritize future changes to MPD operations. Again, I am excited about the future of this agency and look forward to reading your input. As always, be safe and do not hesitate to call me if I can be of service.

Art Acevedo

Chief of Police

In the department-wide survey, conducted from April 6, 2021 to April 20, 2021, participants were as follows: 553 Sworn and 164 Civilian members of MPD. The overall number of participants represents 42% of MPD.

The participants responded to the following questions:

1. Are you sworn or civilian employee?
2. Are you a supervisor?
3. Name three things that you like about the Miami Police Department.
4. Name three things that you dislike about the Miami Police Department.
5. If you could make any change to the department, what would you change?

Of the 553 Sworn respondents, 166 are supervisors (30%), and out of the 164 Civilian participants, 22 are supervisors (13.4%). While there were a total of 754 entries into the survey (those that clicked on the link to the survey, only 717 responded to any questions on the survey. Ergo, the blank responses were not counted into the totals of the survey. Questions 3 and 4 elicited a descriptive response regarding three responses that described the likes and disliked of MPD. To analyze each question and the responses, the question's responses were divided into Sworn and Civilian responses to discern any patterns within each group. Additionally, the grouping of the responses into different categories was coded by systematically categorizing the responses to find common themes and patterns. Within the survey, participants varied in their number of responses between filling in one to three responses. All the filled-in answers were counted in the coding of this information.

### *Sworn Survey Responses*

For sworn officer's answers to Question 3, the responses fell into 14 different categories:

1. **Department Pride/Community** – Refers to MPD's history, the reputation of the department, pride in the department, and the ability to help the Community.
2. **Co-Workers** – Denotes liking working with co-workers as well those in MPD.
3. **Advancement/Unit Assignment** – Represents the ability to advance and the flexibility to change Units or NET Area Assignments.
4. **Pay & Benefits** – Covers primarily benefits, particularly pension benefits and take-home cars.

5. **Schedule** – refers primarily to the 4/10 work week and having three days off.
6. **Training & Equipment** – refers predominantly to the on-site training availability and miscellaneous pieces of equipment
7. **Diversity** – Denotes the diversity of the police department and the community primarily.
8. **Off-Duty Details** – Represents the availability of Off-Duty jobs and the ease and availability to work Off-Duty jobs.
9. **Job Satisfaction** – Covers the opportunity to serve as well as having a career at MPD.
10. **Nothing/Negative** – Refers to either negative traits or nothing to like about working at MPD.
11. **New Chief** – Sworn officers are happy to have an outside Chief with fresh eyes and no connections to the Department.
12. **Future** – Represents advances in thinking, technology, and possible changes coming to the department.
13. **Other**



Sworn: Q3. Name three things that you like about MPD



Sworn: Q3. Name three things that you like about MPD

Question 4 of the survey asked participants to describe three things that they disliked about MPD. Sworn members answers fell into 15 different categories:

1. **Friends & Family/Morale** – Responses in this category discuss the nepotism, cronyism, favoritism, backstabbing, and overall low morale of the Department
2. **Equipment & Training** – Refers to the need for various types of equipment like vehicles, radios, rifles, and various types of training that officers would like to attend.
3. **Leadership** – Discusses the need for leadership from the top down, including the need for less micromanagement, increase in professionalism, lack of accountability for leadership decisions, a host of issues with Staff members, including criticisms that Staff is disconnected, disrespectful, arrogant, and do not follow the Department Orders.
4. **Organizational & Operational Structure & Policies** – Covers any issue within the Divisions related to staffing, roles, responsibilities, workforce, hiring practices, or any administrative matters as it pertains to the organization and operation structure or policies.
5. **Uniform** – Responses in this category discuss the comfort, material, breathability, and other issues pertaining to uniforms.
6. **Pay & Benefits** – Discusses the pay rate as not being comparable to other regional departments, the lack of maternity/paternity leave, and other miscellaneous issues.
7. **Accountability & Discipline** – Describes lack of accountability, issues with discipline, and how discipline is enforced.
8. **Corruption & Racism** – Refers to corruption (internal and external influences) and racism.
9. **Schedule & Overtime** – Speaks to changes in regard to schedules and lack of overtime for different departments.

10. **Communication & Transparency** – Covers lack of communication between units and supervisors and a lack of transparency in making decisions regarding a unit.
11. **Equality & Diversity** – Denotes the lack of diversity in units and the unequal opportunities afforded to different people.
12. **Other**
13. **Promotional Exam** – Discusses the promotional exams and the subjective nature of the exam.
14. **Person** – Several specific people are identified.
15. **Nothing**



Sworn: Q4. Name three things that you dislike about MPD



Sworn: Q4. Name three things that you dislike about MPD

Question 5 asks, "If you could make any change to the Department, what would you change?" Response from Sworn members ranged from changing the nepotism and putting checks and balances in place for the Staff members to changing the uniform, structural changes within the department, including understaffing, and issues regarding pay and benefits. Communication issues, claims of micromanagement, lack of leadership, and equipment and training deficits were also contained in the comments.

Sample responses include:

- "Eliminate micromanagement and lack of confidence in supervisors and investigators coming from staff level"
- "Start with the restructure of some staff member and place members in positions based on work ethics and not who they are connected with."
- "Hold Command Staff responsible for breaking rules as everyone else"
- "Definitely the staff. It is like a mafia where they do what they want, cover who they want, and never give chances to others regardless of qualification or seniority."
- "Have executive staff participate in ride alongs and round table discussions before creating inefficient policies"
- "Better pay and allow off duty jobs to be pensionable."
- "Pay increase. I would also grant an hour of fitness to all sworn employees (Not just those in SOS). I believe it would encourage all officers to prioritize their fitness as it plays an important role in the line of work we do."
- "Equal or better salary to neighboring agencies"
- "Transfers should be earned not given because of friends and family hookups."
- "Transparency, Fairness, Moral, and train behavior & Ethics"
- "The nepotism and family and friends plan would be a good place to start. Allowing those that deserve units through their work and not who they know. Showing officers, they can be proactive to protect their community without the fear of being a scapegoat for political reasons."
- "I would like a new staff based on merit and competency. Most up there are do as I say and don't as I do. Select people for specialized units based on an interview, qualifications, and evaluations. Change the uniform material to reflect our environment."
- "I would remove GPS from specialized units vehicles. this is setting us up for failure and opening the door to liability and lawsuits. GPS location can be subpoenaed and it won't be hard for media and offenders to figure out where we live. It's a waste of money and resources."
- "I would start to weed out the top staff who are there for all the wrong reasons. Many are there for selfish reasons. Most are incompetent and don't care about the police officer. The rest just go along with the program. We really need the right people who care and are competent. The lack of knowledge is staggering. The lack of real training is also a huge problem. We have a really young and inexperienced department, yet the training is nowhere near where it should be. Boosting up the training staff should be priority. Ensuring that the uniform is cool

and comfortable, not just for the top brass. LET THE TROOPS WHERE COMFORTABLE AND COOL UNIFORMS TO WEAR NOT ONLY FOR TOP BRASS. The top brass is TOATALLY DISCONNECTED WITH THE REST OF THE DEPARTMENT. THEY SIMPLY DONT CARE AND ARE TOO BUSY TRYING TO SERVE THE INTERTES OF POLITICIANS."

- "I would work to fix the morale of the department. Morale is at an all time low. The staff needs to be reviewed and revamped. The department is extremely top heavy, which is taxing to this department's budget. The in-fighting and backstabbing amongst the staff is disturbingly unprofessional and filters down to the members. As leaders of this department, it is our responsibility to not only lead by example but also be mentors to the younger generations of officers. Staff addresses its personnel only when something goes wrong; when they want to discuss and/or enforce discipline. This is a very difficult and stressful job as it is and especially under the climate of today's society. It is well understood that this job was chosen freely by each and every one of us; however, there is zero positivity ever spoken. The hammer is continually dropped, while there is little to no acknowledge of hard work or proper response. Additionally, I would ensure the officers had proper functioning equipment, that their training was sufficient for the job they were doing, that the members of the department were treated fairly and justly across the board."

### Civilian Survey Responses

Question 3, as responded to by civilians, overlapped common themes that sworn officers identified.

1. **Co-Workers** – Denotes liking working with co-workers as well those in MPD.
2. **Department Pride/Community** – Refers to MPD's history, the reputation of the department, pride in the department, and the ability to help the Community.
3. **Pay & Benefits** – Covers primarily benefits, particularly pension benefits.
4. **Schedule** – Discusses liking working either 4/10s or 12-hour shifts.
5. **Diversity** – Denotes the diversity of the police department and the community primarily.
6. **Advancement** – Represents the ability to advance.
7. **Job Satisfaction** – Covers the opportunity to have a career at MPD.
8. **Person** – Mentions specific people.
9. **Location** – Refers to the short commute and location of MPD.
10. **Uniform** – Represents the ability to have free uniforms.
11. **Nothing/Negative** – Refers to there is nothing to like about working at MPD.
12. **Future** – Represents advances in thinking, technology, and possible changes coming to the department.
13. **New Chief** – Sworn officers are happy to have an outside Chief
14. **Other**

MIA-SFED23485-00175140





Question 4 of the survey asked participants to describe three things that they disliked about MPD. Civilian's answers fell into 15 different categories:

1. **Organizational & Operational Structure & Policies** – Covers any issue within the Divisions related to staffing, roles, responsibilities, workforce, hiring practices, or any administrative matters as it pertains to the organization and operation structure or policies. Specific Department calls outs as it pertains to Crime Scene Unit, Communications, and Victim Advocates.

MIA-SFED23485-00175141

2. **Friends & Family/Morale** – Responses in this category discuss the nepotism, cronyism, favoritism, backstabbing, and overall low morale of the Department
3. **Recognition & Respect** – Describes the lack of recognition given to civilians and the amount of disrespect by sworn members of MPD.
4. **Leadership** – Discusses the need for leadership from the top down, including the need for less micromanagement, increase in professionalism, lack of accountability for leadership decisions, a host of issues with Staff members, including criticisms that Staff is disconnected, disrespectful, arrogant, and do not follow the Department Orders.
5. **Pay & Benefits** – Discusses the pay rate as not comparable to other regional departments, the lack of hazard pay for those in the Crime Scene, and miscellaneous issues.
6. **Equipment & Training** – Refers the need for various types of equipment like vehicles for PSAs, several issues with stations, and various types of training that they would like to attend.
7. **Accountability & Discipline** – Describes lack of accountability, discipline issues, and how discipline is enforced.
8. **Other**
9. **Communication & Transparency** – Covers lack of communication between units and supervisors and a lack of transparency in making decisions regarding a unit.
10. **Schedule & Overtime** – Speaks to changes regarding schedules and lack of overtime for different departments.
11. **Equality & Diversity** – Denotes the lack of diversity in units and the unequal opportunities afforded to different people.
12. **Corruption & Racism** – Refers to corruption and racism.
13. **Person** – Several specific people are identified.
14. **Uniform** – Responses in this category discuss the uniforms.



Civilian: Q4. Name 3 things that you dislike about MPD



Question 5 poses, "If you could make any change to the Department, what would you change?" Response from the Civilians ranged from leadership and staff issues to nepotism, staffing of units, and lack of upward advancement for Civilians. Additionally, multiple issues regarding the lack of communication, issues with the building, and pay scale also were addressed.

Sample responses:

- "Staff Need to be changed. People are stuck up. Handed positions instead of earned."
- "The blatant favoritism throughout the department."
- "Fairness. Equality. Opportunities for those who are qualified-not those who have friends and family with power."
- "If it could be easier to get a fair salary so some us would not do two jobs to support our family and spend more time with our family."
- "Better compensation."
- "Decisions and systems are implemented without consultation with stakeholders and subject matter experts. Once these systems are in place and do not fulfill the needs of the unit there is little to no progress made, these changes need to be made in collaborations so relevant points and insight are brought to the forefront before a change is made. When stakeholders are not involved in the process it impacts the results and leads to ambiguity and a lack basic understanding of the system and its purpose."
- "The history of promotion based on the friends and family plan or on the, 'it's not who you know, it's who you blow' plan.  How complaints on staff members go nowhere. How red line memos go nowhere, how there's a lack of information from officers/staff, which is critical to performing my job well."

MIA-SFED23485-00175143

- "Better building. This station is always under repair. The AC doesn't work the same on every floor. It's either hot or cold. More parking. Better health insurance, vision and dental. Better budgeting so we aren't constantly having our jobs threatened. CLEAN THE AIR VENTS! The air here gives everyone allergies and if you look at the vents, they are full of dust! Fix the divide between sworn and civilian. I come from a law enforcement family. And every department my family works for (Hialeah, ABT, Dade county, West Miami, West New York PD) do not have such a big divide like the City of Miami does."
- "Expand the opportunities for civilian staff, this will keep the great employees in house instead of losing them to other City Departments. Creating new positions and focusing some time in the advancement, reshaping and reclassification of predominantly staffed civilian units. Expanding the Peer support program beyond the volunteer concept, creating a Psych Services unit similar to the County and other departments nationwide. Mental Health is a topic that should be in the forefront of departments nationwide and will make a huge difference in the caliber of life for employees and the results our department provides our community."
- "I would adapt IACP (International Association of Chiefs of Police) guidelines for best practices and bring in professionals to train officers, detectives, commanders, at every level on evidence-based best practices. Reverse the approach taken on victims (victims have repeatedly stated they felt like they had to prove they were victims). Hold those in positions of power and that are responsible for ensuring accountability of those they oversee, accountable for being stagnant. I'd basically, raise the standard and hold those resisting or remaining stagnant accountable."

Based on these survey results, I met with my executive team and solicited feedback for possible changes, including but not limited to:

- Restructuring of the overall organization regarding Staff members due to the top-heavy command structure format of MPD.
- Bearing the results of the survey in mind, continue to conduct one-on-one interviews with all Staff members.
- Met with Internal Affairs and City Attorneys to get up to speed regarding existing discipline cases and pending reprimands.
- Required the existing Staff members to attend a Leadership Retreat where three different leadership experts presented various ways of leading, boosting morale, and discussing overcoming communication issues.
- Requested to procure different options as it pertains to officer's uniforms.
- Formed a working group of Lieutenants to address the selection process into Specialized Units.
- Opened applications to sworn and civilian members to serve on the Chief's Advisory Committee to share ideas, priorities, and concerns directly to me.

- Published the Lieutenant's Exam materials as soon as they were approved and allowed by Human Resources, to eliminate the perception in the past that "friends and family: were given the materials early.
- Established a paper reduction committee.
- I write a hand written note on all commendations.

### 30, 60, and 90 Days Employee Morale Plan

To address morale for our sworn and support staff, addressing the survey response items is of utmost importance as they speak directly to the concerns of the department.

- 30-Days
    - Assemble and meet with the Chief's Advisory Committee to consist of 10 sworn and civilian employees from different units and divisions.
    - Conduct Shift meetings monthly where a sworn representative from each shift (A, B, & C) and each District (North, Central, & South) can address any issues or concerns officers in Patrol directly have.
    - Meet with Command Staff to discuss the importance of recognition to ensure that we recognize as many employees as possible in the Monthly Award Ceremony, including civilian employees.
    - Conduct Virtual Roll-Calls to address both sworn and civilian employees to go over these changes.
    - Conduct bi-weekly meetings with Staff members to address any concerns that were brought up in the previous meetings with employees.
    - Apprise the City Manager of the discussions within these meetings and next steps, if applicable.
    - Measurement of these pieces will be the number of meetings held in the 30 days.
- 60-Days
    - Meet with the Chief's Advisory Committee.
    - Conduct Shift meetings.
    - Conduct Monthly Award Ceremony.
    - Conduct bi-weekly meetings with Staff members to address any concerns that were brought up in the previous meetings with employees.
    - Meet with Staff to go over the in-depth results of the survey to discuss anything that we, as an organization, can rectify or address in the short term and identify long-term goals.
    - Apprise the City Manager of the discussions within these meetings and next steps, if applicable.
    - Measurement of these pieces will be the number of meetings held in the 30 days.
- 90-Days
    - Meet with the Chief's Advisory Committee.
    - Conduct Shift meetings.
    - Conduct Monthly Award Ceremony.
    - Conduct bi-weekly meetings with Staff members to address any concerns that were brought up in the previous meetings with employees.

     o  Apprise the City Manager of the discussions within these meetings and next steps, if applicable.

     o  Conduct an employee survey at the end of 90-Days and turn in the coded results to the Mayor, City Manager, and Commission within 14 days of completing the survey.

### *Media/Public Relations Plan*

Proactive, transparent, and professional media and public relations are a cornerstone of MPD's community- and problem-oriented policing mission. It is often said that "[f]amiliarity breeds trust." In order for the community to trust *their* Police Department, they must feel a connection to the Department, its leadership, and its members. While attendance at community meetings/events and positive on-the-job interactions with community members are critical in delivering the MPD's message, they provide the Department with a limited audience to whom our message may be delivered.

If we are to employ an effective media and public relations plan, we need to meet people (i.e., our stakeholders) where they are: the average American spends over 7 hours a day looking at a screen.[1] Twenty-first-century law enforcement agencies which forgo a visible presence in traditional and social media do so at their peril and the peril of their community- and problem-oriented goals and objectives. Therefore, the MPD's message should be delivered to local, national, and international audiences so that we may both reach our stakeholders locally and market our City to a broader audience as a safe place to invest and visit.

However, the MPD's messaging should be focused on promoting public safety and unity, highlighting the accomplishments of the MPD and its members, and fostering a spirit of calm and transparency during times of crisis. The MPD's messaging on all platforms must always remain consistent with the mission, vision, and values of the MPD and the City of Miami. The expression of personal opinions inconsistent with the framework outlined above must be avoided. Moreover, when addressing national media on behalf of the Major City Chiefs Association, I will strive to wear civilian attire when feasible

To achieve the goals outlined above, the MPD will deliver the following within the next 30, 60, and 90 days:

- 30 days:
     o  Revise the MPD's media relations and social media policies to ensure that they conform to the framework outlined above and submit a draft for your Office for approval.

---

[1] Moody, R. (2021, June 8). *Screen Time Statistics: Average Screen Time in US vs. the rest of the world.* Comparitech. https://www.comparitech.com/tv-streaming/screen-time-statistics/

- o Ensure that all appointed Staff and Public Information Office personnel understand and conform to the framework above, even before adopting formal policies.
- o Invitations for pre-planned press conferences and community events will be sent to all City elected officials and the City Manager. Pre-planned press conferences and events will take place no less than 10 days after they are announced.
- 60 days:
  - o Deliver to your Office a comprehensive media and public relations plan to enhance the MPD's public image.
- 90 days:
  - o Conduct an analysis of all media coverage of the MPD during the preceding 90 days and quantify the number of positive, negative, and neutral pieces. Pieces that portray the MPD at odds with elected officials, City administration, or other City departments should be considered "negative," as they do not depict the MPD speaking in one voice with the City government.
  - o Seek candid feedback from elected officials of the MPD's progress in achieving the goals outlined above during the preceding 90 day period.
  - o Survey Miami residents about their perception of the MPD's public image.

### *Mending Ties with Elected Officials*

While our City government consists of over 4,000 dedicated public servants, only six, i.e., our Honorable Mayor and the Members of the City Commission, are elected by the people we serve. Our elected officials speak for the people of our City, and as law enforcement officers, we swear an oath to serve – without fear or favor – the people of our City. Therefore, as the representatives of the people, our City's elected officials are owed the utmost respect and collegiality. Our only greater loyalty is to the Constitution and laws of the State of Florida and the United States of America and the Charter of the City of Miami. While I, the Chief of Police, may not always agree with the Mayor and individual Members of the City Commission, my respect for them as an elected body and for the people they represent must be unwavering, and my disagreements should be expressed in the context of issues, not personalities.

To help repair relationships with our City's elected officials, I will do the following within the next 30, 60, and 90 days:

- 30 days
  - o Meet with the Mayor and each Member of the City Commission in the spirit of finding common ground and conducting a candid self-assessment of my performance as Chief of Police.

- o Solicit candid feedback from each elected official, identifying areas for which there is room for improvement in my performance as Chief of Police.
- o If my request for a meeting with a particular elected official(s) is declined, I will offer that on of my Staff members attend on my behalf. If both the former and the latter are declined, I will act upon the feedback provided by the elected officials who opted to meet with me (or my designee).
- o Ensure improved communication between the MPD and elected officials, particularly in public events (See 30-day benchmark for the *Media/Public Relations Plan.*).
- o Keep your Office apprised of the outcomes of all meetings.
- 60 days
  - o Conduct follow-up meetings with elected officials to discuss progress in each identified area for improvement.
  - o Keep your Office apprised of the outcomes of all meetings.
- 90 days
  - o Conduct final follow-up meetings with elected officials to discuss progress in each identified area for improvement.
  - o Discuss a strategy for ensuring sustained, long-term productive relationships with our Honorable Mayor and Members of the City Commission with each elected official.
  - o Keep your Office apprised of the outcomes of all meetings.

I hope you find this plan informative as it highlights many achievements to keep our department and city on the move toward a better tomorrow. Please do not hesitate to contact me if you have suggestions, or concerns. Why we cannot guarantee 100% success or perfection, we will continue to strive to do our very best.

Respectfully,

Art Acevedo

Chief of Police Miami Police Depart

MIA-SFED23485-00175148

LEASE AGREEMENT


Between


TOWER HOTEL LLC,
a Florida limited liability company,

Landlord,


and


SELINA ~~OPERATIONS~~OPERATION LITTLE HAVANA LLC,
a Delaware limited liability company,

Tenant

Style Definition: Normal: Left
Style Definition: Heading 1,h1: Tab stops: Not at  0"
Style Definition: Heading 2,h2: Left, Indent: Left:  0", Tab stops: Not at  1.38"
Style Definition: Heading 3,h3: Left, Indent: Left:  0", Tab stops: Not at  1.69"
Style Definition: Heading 5,h5
Style Definition: Heading 6,h6
Style Definition: Heading Cont 4
Style Definition: Heading_L2
Style Definition: Heading_L3
Style Definition: Heading_L4
Style Definition: Flush Left,fl,flush,left
Style Definition: List Bullet,*
Style Definition: Body,b
Style Definition: Body 1",b1
Style Definition: List Bullet 3
Style Definition: TOC 1
Style Definition: TOC 2
Style Definition: TOC 3
Style Definition: TOC 4
Style Definition: TOC 5
Style Definition: TOC 6
Style Definition: TOC 7
Style Definition: TOC 8
Style Definition: TOC 9
Style Definition: OutlineLegal2
Style Definition: Trailer
Style Definition: *LBFileStampAtEnd,FSE
Style Definition: Heading3.5,35
Style Definition: Heading3.6,36
Style Definition: Article_L5: Tab stops: Not at  2.5"
Style Definition: Article_L6: Tab stops: Not at  3"
Style Definition: Article_L7: Tab stops: Not at  3.5"
Style Definition: Article_L8: Tab stops: Not at  4"
Style Definition: Article_L9: Tab stops: Not at  4.5"
Style Definition: Standard_L4
Style Definition: Witness Signature
Style Definition: msonormal

Formatted: Font: 8 pt

**PLAINTIFF'S EXHIBIT**

**262**

CONFIDENTIAL

**TABLE OF CONTENTS**

Page

ARTICLE 1 - DEMISED PREMISES; TERM ........................................................................ 1

ARTICLE 2 - DEFINITIONS ........................................................................ 4

ARTICLE 3 - BASE RENT ........................................................................ 8

ARTICLE 2 - DEFINITIONS ........................................................................ 4

ARTICLE 3 – BASE RENT ........................................................................ 8

ARTICLE 4 – REPAIRS AND MAINTENANCE; CAPITAL IMPROVEMENTS .......... 1110

ARTICLE 5 – TAXES ........................................................................ 1312

ARTICLE 6 – USE AND OPERATION ........................................................ 1413

ARTICLE 7 – ALTERATIONS AND ADDITIONS .......................................... 1918

ARTICLE 8 – INSURANCE, LIABILITY AND INDEMNITY .............................. 2019

ARTICLE 9 – DAMAGE AND DESTRUCTION ............................................... 2321

ARTICLE 10 - EMINENT DOMAIN ........................................................... 2422

ARTICLE 11 – TRANSFER ....................................................................... 2523

ARTICLE 12 – ESTOPPEL CERTIFICATES ................................................. 2624

ARTICLE 13 - INTENTIONALLY DELETED ................................................ 2725

ARTICLE 14 – EVENTS OF DEFAULT; REMEDIES ...................................... 2725

ARTICLE 15 – CONDITIONS PRECEDENT ................................................. 3021

ARTICLE 16 – REPRESENTATIONS ........................................................... 3022

ARTICLE 15 – CONDITIONS PRECEDENT .................................................. 30

ARTICLE 16 – REPRESENTATIONS ........................................................... 30

ARTICLE 17 – TERMINATION RIGHTS AND OBLIGATIONS .......................... 3230

ARTICLE 18 – MISCELLANEOUS ............................................................. 3325

ARTICLE 18 - MISCELLANEOUS ............................................................. 33

-i-

**CONFIDENTIAL**

**FULLER000093**

## LEASE AGREEMENT

THIS LEASE AGREEMENT (this "**Lease**") is made and entered into as of the _____ day of ~~September, 2020 ("Effective  Date"),~~April, 2022 by and between **TOWER HOTEL LLC**, a Florida limited liability company, whose address is 1637 SW 8th Street, Suite 200, Miami, FL 33135 ("**Landlord**") and **SELINA** ~~OPERATIONS~~**OPERATION LITTLE HAVANA  LLC**, a Delaware limited liability company, whose address is ~~Calle 5a Oeste, Casa 8-38, Casco, Antiguo, San Felipe, Ciudad de Panama ("~~437 SW 2nd Street, Miami, FL 33130. ("**Tenant**") .

## W I T N E S E T H

A.     Landlord is the fee simple owner of the real property described on **Exhibit "A"** attached hereto (the "**Land**"), which includes: (i) that certain hotel known as the Tower Hotel containing approximately 50 guest rooms and other amenities located at 1450 SW 7th Street, Miami, Florida 33135 (the "**Tower Hotel**"); (ii) that certain parcel of land located at 1444 SW 7th Street, Miami, Florida 33135, and the improvements thereon (the ~~"~~"**Tower House**~~"),~~"); (iii) that certain parcel of land located at 1460 SW 7th Street, Miami, Florida 33135, and the improvements thereon (the ~~"~~"**F&B House**~~"),~~"), including a swimming pool (the ~~"~~"**Pool**~~"),~~"); and (iv) that certain undeveloped parcel of land located at 717 SW 15th Avenue, Miami, Florida 33135, other than the Remaining 15th Avenue Parcel, on which an entrance walkway to the Tower Hotel is located (the ~~"~~"**15th Avenue Parcel**~~"),~~"). The Land, Tower Hotel, Tower House, F&B House and Pool are collectively referred to as the "**Demised Premises**~~"~~".

B.     Tenant is experienced in the operation and management of lodging and food and beverage establishments.

C.     Landlord and Tenant desire to enter into a lease pursuant to which Tenant shall lease the Demised Premises  and operate and manage a lodging facility, restaurant, bar, co-working space and related facilities and amenities (collectively, the "**Business**") located thereon pursuant to the terms set forth herein.

D.     This Lease is conditioned on and shall not become effective unless and until the Global Settlement Agreement and General Release by and between Landlord, Tenant and Botanica Partners, LLC is fully executed and filed in the court docket for Case No. 2020-014386-CA-01 ("Effective Date").

In furtherance of the consummation of the above-described transaction, Landlord and Tenant wish to enter into this Lease.

## A G R E E M E N T

### ARTICLE 1  - DEMISED PREMISES; TERM

1.1     Demised Premises.  Subject to the terms and conditions hereof, Landlord shall lease to Tenant, and Tenant shall lease from Landlord, Landlord's interest in the Demised Premises, including, without limitation, the following:

#51334939 v13
4320045 v1 - 07879 / 003

(a)      all buildings, structures and other improvements of every kind, including, but not limited to, the alleyways, walkways, sidewalks, utility pipes, conduits and lines (on-site and off-site), parking areas, if applicable, and any such other buildings and structures presently situated upon the Land, (collectively, the "**Demised Improvements**");

(b)      all easements, rights and appurtenances relating to the Land or the Demised Improvements; and

(c)      all fixtures and equipment, machinery, and all other items attached to or located in the Demised Premises, including all components thereof, now and hereafter permanently affixed to or incorporated into the Demised Improvements, including, without limitation, all furnaces, boilers, heaters, electrical equipment, heating, plumbing, lighting, ventilating, refrigerating, incineration, air and water pollution control, waste disposal, air-cooling and air-conditioning systems and apparatus, sprinkler systems and fire and theft protection equipment, all of which to the greatest extent permitted by law are hereby deemed by the parties hereto to constitute real estate, together with all replacements, modifications, alterations and additions thereto (collectively, the "**Fixtures**").

(d)      Intentionally Omitted.Notwithstanding anything contained herein to the contrary the Demised Premises shall not include, and thus, shall not be leased to Tenant, any transferable development rights, excess density rights or any other development rights associated with or derived from any part of the Land or the Demised Premises.

1.2

1.21.3  Initial Term; Extended Term.  The initial term of this Lease (the "**Initial Term**") shall commence on the date that is the earlier of (a) sixty (60) days after the Delivery Date, or (b) the date Tenant opens for business in the Demised Premises (the "**Commencement Date**").") and shall end on the tenth anniversary of the last day of the month in which the Commencement Date occurs ("**Initial Term Expiration Date**"), unless sooner terminated in accordance with the provisions hereof.  Notwithstanding the foregoing, and provided Tenant is not in default of this Lease, the Initial Term shall automatically be extended for one (1) additional ten (10) year period (the "**Extended Term**") commencing on the day immediately following the Initial Term Expiration Date and ending on the tenth (10th) anniversary of the last day of the month in which the Extended Term begins, unless Tenant delivers written notice to Landlord of its election to terminate this Lease no less than eighteen months (18) months prior to the Initial Term Expiration Date. The Base Rent for the Extended Term shall be in accordance with Section 3.1 of this Lease.  Notwithstanding anything contained herein to the contrary, in the event the permit for the Pool is not closed by the Commencement Date, due to no fault of Tenant, the Base Rent shall be abated until such time as the Pool permit is closed, however all other fees and payments due hereunder shall remain due and payable in accordance herewith.

1.31.4  Additional Security for Lease.  As a condition to Landlord entering into this Lease, within five (5) Business Days after the Effective Date, Tenant shall deliver to Landlord on the Effective Date a cash security deposit in the amount of $100,000 (the "**Cash Deposit**"), to secure its obligations under this Lease, which Cash Deposit shall not be required to be held by Landlord in a separate account and may be applied by Landlord toward any amounts due to

CONFIDENTIAL                    FULLER000095

~~Landlord by Tenant upon a default by Tenant under this Lease~~. If Tenant defaults in any of its obligations under this Lease, Landlord may, at its option, without prejudice to any other rights or remedies which Landlord may have, apply all or any part of the Cash Deposit to satisfy any obligations and liabilities of Tenant under this Lease.  If all or any part of the Cash Deposit is so applied, Tenant shall, within ten (10) days after written notice from Landlord, restore the Cash Deposit to the amount it was immediately prior to the date on which Landlord so applied the Cash Deposit. If Tenant is not in default under this Lease, the Cash Deposit shall be returned to Tenant upon the <u>later of the</u> expiration of the Initial Term, ~~regardless of whether Tenant exercises its right to~~ <u>or that of</u> the Extended Term. If this Lease is terminated prior to the Cash Deposit being fully applied and Tenant is not in default, the remaining Cash Deposit shall be fully refunded to Tenant in accordance with Florida law.

~~1.4     Delivery of Demised Premises.  The Demised Premises have been delivered to and accepted by Tenant, subject to the Punch List Items attached hereto as Exhibit "C".  The term "**Punch List Items**" shall mean details of construction, decoration, and mechanical adjustment which in the aggregate, are minor in character and do not materially interfere with the Tenant's use or enjoyment of the Demised Premises.  Landlord agrees to use reasonable diligence to complete all Punch List Items within thirty (30) days after.~~

<u>The Demised Premises will be delivered and deemed accepted by Tenant upon issuance of the Certificates of Use ("Hotel and House CUs") for 1444 and 1450 SW 7th Street, Miami, Florida ("**Delivery Date**") at which time Parties will execute, in recordable form, a memorandum of lease which will confirm the Delivery Date and Commencement Date of this Lease.  Landlord shall also provide a full set of all open and closed Building Department Permits for the Demised Premises to Tenant on or before the Effective Date. Landlord agrees to use reasonable diligence to complete all Punch List Items within the time frames contained therein.  Should Landlord be unable to obtain the Hotel and House CUs within seventy-four (74) days from Effective Date, Tenant may elect to either (i) obtain the Hotel and House CUs itself, in which case the Commencement Date shall be the date on which they are issued and all costs incurred by Tenant in furtherance thereof shall be deducted from Base Rent, or (ii) terminate this Lease, in which case both Parties shall be fully and completely released of any further obligations or liability under the Lease, other than those that specifically survive termination.  Should Tenant be unable to obtain the Hotel and House CUs within seventy-five (75) days from Tenant's election to obtain same, either Party may terminate this Lease, in which case both Parties shall be fully and completely released of any further obligations or liability under the Lease, other than those that specifically survive termination.  In the event Tenant terminates this Lease pursuant to this Section 1.4, then Landlord shall be responsible for, and shall pay within thirty (30) days following written demand to Landlord, all reasonable out of pocket costs and expenses actually incurred by Tenant arising from Landlord's failure to complete such corrections as provided herein (which written demand shall be accompanied by invoices, receipts and other evidence reasonably acceptable to Landlord reflecting such costs and expenses) up to a maximum amount of $100,000.00, in addition to the Cash Deposit.</u>

<u>Tenant shall deliver the Punch List to Landlord within thirty (30) days of the Effective Date.  The Punch List shall specify, for each item, the amount of time permitted for delivery of the repair thereof, which shall be either 30, 90 or 180 days, and the cost to repair such item ("Punch List Item Value") to be attached hereto as **Exhibit "B"**.  Landlord shall have fifteen</u>

**CONFIDENTIAL**                                          **FULLER000096**

(15) days from receipt of the Punch List to object to any items contained therein.  It is understood and acknowledged that any improvement or work that has previously been approved the City of Miami shall not be considered a Punch List item and Landlord will not be required to object to same, provided however, Tenant shall not be responsible to cure or comply with any violations arising out of same. The Parties shall work in good faith to resolve any Landlord objections to the Punch List.  At any time prior to the expiration of an item's delivery date, Landlord may elect to cure such item by crediting to Tenant's next payment of Base Rent the Punch List Item Value.

### ARTICLE 2 - DEFINITIONS

2.1     <u>Definitions</u>.  For all purposes of this Lease, except as otherwise expressly provided or unless the context otherwise requires, (a) the terms defined in this <u>Article 2</u> have the meanings assigned to them in this Article and include the plural as well as the singular, (b) all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles as are at the time applicable, (c) all references in this Lease to designated "**Articles**," "**Sections**" and other subdivisions are to the designated Articles, Sections and other subdivisions of this Lease, and (d) the words "**herein**," "**hereof**" and "**hereunder**" and other words of similar import refer to this Lease as a whole and not to any particular Article, Section or other subdivision:

Acceptable Operator shall mean an entity (i) with a minimum of five (5) years' experience in managing food and beverage operations, (ii) with at least $5 Million Gross Sales Revenue derived from one location, not in the aggregate, and (iii) a minimum google review of 4 across all of such operator's locations, as of the date Tenant notifies Landlord of such transfer.

<u>Affiliate</u>. An "Affiliate" of a person means any person which, directly or indirectly, controls, is controlled by or is under common control with, such person.

<u>Annual Statement</u> shall have the meaning set forth in <u>Section 3.2</u>.

<u>Base Rent</u> shall have the meaning set forth in <u>Section 3.1</u>.

<u>Business</u> shall have the meaning set forth in the recitals.

<u>Business Day</u>:  Each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which national banks in the City of Miami, Florida are legally obligated to be closed.

<u>Capital Improvements</u> shall have the meaning set forth in <u>Section 5.4</u>.

<u>Code</u>: The Internal Revenue Code of 1986, as amended.

<u>Commission</u>: A sum of money paid to Tenant as a result of either: (a) Tenant selling goods or services on behalf of a Third Party at the Demised Premises, or (b) a Third Party selling goods or services on behalf of Tenant at the Demised Premises, whether paid to Tenant as

CONFIDENTIAL                    FULLER000097

a flat fee or as a percentage of the sale. For purposes of this Lease, a Commission shall be considered a "net" amount to Tenant.

Default Rate~~:~~. An annual rate of interest equal to the lesser of ~~eighteen~~twelve percent (~~18~~12%) per annum, or the maximum rate allowed by law.

> Formatted: No underline
>
> Formatted: Normal, Indent: Left: -0.06", First line: 1.06"

Delivery Date~~:~~. The ~~date on which Landlord delivers~~Delivery Date shall have the ~~Demised Premises to Tenant~~meaning set forth in Section 1.3.

Environmental Laws. All applicable federal, state, local and foreign laws and regulations relating to pollution of the environment (including without limitation, ambient air, surface water, ground water, land surface or subsurface strata), including without limitation laws and regulations relating to emissions, discharges, releases or threatened releases of Hazardous Materials or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials.

Force Majeure Event or Force Majeure,  shall mean any prevention, delay or stoppage due to  fire, casualty, terrorist act, changes in legislature, strike, lockouts, acts of God, acts of war, pandemic, epidemic, Order from Governmental Authorities, inability to obtain services, labor or materials or reasonable substitutes therefore, labor dispute, uncommon adverse weather or any other event, cause or circumstance beyond the reasonable control of the party obligated to perform (collectively "Force Majeure"), notwithstanding anything to the contrary contained in this Lease, shall excuse the performance of such party for a period equal to any such prevention, delay or stoppage and, therefore, if this Lease specifies a time period for performance of an obligation of either party, that time period shall be extended by the period of any delay in such party's performance caused by a Force Majeure, provided that the party claiming a Force Majeure Event notifies the other party in writing within five (5) days after notice or knowledge of such Force Majeure Event.  Further, a Force Majeure event will not extend any period of time related to the payment of any money required under this Lease.

Governmental Authorities. shall mean, collectively, the United States of America, the State, the County, the City, and any agency, department, commission, board, bureau, instrumentality or political subdivision of any of the foregoing, now existing or hereafter created, having jurisdiction over the design and performance of the Business, the Demised Premises or any portion thereof.

Gross Income from Operations.  All income and proceeds of any kind derived from operations at the Demised Premises, including, without limitation, the income, rent ~~or fees paid to Tenant from such sublessees, less eight and one half of one percent (8.5%) of Gross Sales Revenues, as defined in that certain Food and Beverage Management Agreement of even date herewith (the "F&B Agreement"), generated from the F&B Operations (as defined in the F&B Agreement) (the "Management Fee Deduction"). The Management Fee Deduction shall only be applicable for such time that a third party, who is not an Affiliate of Tenant, is managing the F&B House.~~and fees paid to Tenant from, and income generated by, any sublessees, subtenants or any other Third Party.  Notwithstanding the foregoing, Gross Income from Operations shall not include: (a) (intentionally deleted), (b) proceeds from the sale of trade Fixtures, (c) income and proceeds from the sale or other disposition of goods, capital assets and other items not in the

4320045 v1 - 07879 / 003

5

CONFIDENTIAL

FULLER000098

ordinary course of the operation of the Demised Premises, (d) any cash or credit refunds upon any sale made in or from the Demised Premises, (e) any federal, state and municipal excise, sales, hotel and use taxes collected directly from patrons or guests of the Demised Premises as a part of or based on the sales price of any goods, services or other items, (f) the proceeds of sales that are made at a discount to employees, or to non-profit, charitable or religious organizations, not to exceed two percent (2%) of Gross Income from Operations per year; (g) direct expenses of credit cards that are paid to the issuers of such credit cards; (h) insurance proceeds; (i) advance deposits made for reservations until such deposits are recognized as income by Tenant; (j) gift cards unless and until they are redeemed at the Demised Premises; (k) custodial funds, including any gratuities or service charges collected by or for the benefit of employees at the Demised Premises; and (m) any credits or refunds made to customers, guests or patrons in the form of allowances or adjustments to previously recorded revenues.  Gross Income shall not be reduced by any franchise, occupancy, capital stock, income or similar tax based on income or profits.  With regard to income generated by Third Parties or on behalf of Third Parties, including OTA Bookings and Outsourced Tours, at the Demised Premises, the only amounts included in Gross Income from Operations shall be the net amount received by Tenant.

Hazardous Materials. All chemicals, pollutants, contaminants, wastes and toxic substances, including without limitation: (a) solid or hazardous waste, hazardous substances, toxic substances and insecticides, fungicides, or rodenticides, as defined in any Environmental Law; (b) gasoline or any other petroleum product or byproduct, polychlorinated biphenyls, asbestos and urea formaldehyde; (c) asbestos or asbestos containing materials; (d) urea formaldehyde foam insulation; and (e) radon gas.

Inventory.  All inventories of merchandise, supplies and consumables used in connection with the Business including, but not limited to, linens, food, liquor and other non-depreciable personal property.

Lease Year.  The first Lease Year shall be the period commencing on the Commencement Date and ending upon the expiration of twelve (12) full calendar months thereafter.  Commencing upon the expiration of twelve (12) full calendar months following the Commencement Date, each Lease Year shall consist of consecutive twelve (12) full calendar month periods occurring within the Term.

Legal Requirements.  All federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions, including the American with Disabilities Act affecting either the Demised Premises or the maintenance, construction, use or alteration thereof (whether by Tenant or otherwise), whether or not hereafter enacted and in force, including (a) all laws, rules or regulations pertaining to the environment, occupational health and safety and public health, safety or welfare, and (b) any laws, rules or regulations that may (1) require repairs, modifications or alterations in or to the Demised Premises, or (2) in any way adversely affect the use and enjoyment thereof; and all permits, licenses and authorizations and regulations relating thereto and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Tenant, at any time in force affecting the Demised Premises.

CONFIDENTIAL                                    FULLER000099

Lender~:~.  Such lender as may be designated by Landlord to Tenant from time to time, and such lender's successors and assigns.

License~shall~.  Shall have the meaning set forth in <u>Section 6.4</u> hereof.

Loan~:~.  Any loan made by Lender to Landlord pursuant to which Landlord executes in favor of Lender a mortgage encumbering Landlord's fee simple interest in the Demised Premises.

Monthly Statement. shall have the meaning set forth in <u>Section 3.2.</u>

Mortgage~:~.  Any mortgage, deed of trust, deed to secure debt or similar security instrument from time to time existing on the Business and any indebtedness of Landlord owed to Lender and other obligations secured thereby, and all renewals, modifications, consolidations, replacements and extensions of, and substitutions thereof.

Operating Standard~:~.  The management, maintenance, repair and operation of the Business shall be consistent with the requirements of this Lease, the standard of a limited amenity hostel-style hotel operated by Tenant or its Affiliates under the "Selina" brand, and the Legal Requirements.

OTA Booking~:~.  Any hotel/hostel room at the Demised Premises that is booked or reserved through an online travel agency or online booking company, or a Third Party, that takes a fee or percentage of such booking.

Other Property~:~.  A property within the Restricted Area that is not owned by Landlord or its Affiliates, where Tenant expands the operation of the Business.

Outsourced Tours~:~.  Any tour or excursion that is provided by a Third Party to Tenant's guests or occupants at the Demised Premises, for which such tour company pays a fee or percentage of such sale to Tenant.

Payment Date~:~.  Any due date for the payment of any installment of Base Rent and any Additional Charges.

Percentage Rent. shall have the meaning set forth in <u>Section 3.2.</u>

~~Permits:  All governmental or quasi-governmental licenses and permits necessary for the operation of and issued in connection with the Business, including but not limited to liquor licenses all of which Tenant shall procure in its name on or prior to the Commencement Date.  As of the Commencement Date, Tenant represents that it maintains and holds all Permits currently required for the operation of the Business including the restaurant and bar located thereon.~~

Punchlist Items. shall mean, collectively, unfinished or improperly finished items of work for the Demised Premises, the non-completion of which would not materially affect Tenant's and/or its guests' ability to occupy the Tower House and Tower Hotel (and use and operate the Business in accordance with the Operating Standard).

4320045 v1 - 07879 / 003

7

CONFIDENTIAL

FULLER000100

Taking.  A taking by a public body or voluntary conveyance in lieu thereof during the Term hereof of all or part of the Demised Premises, or any interest therein or right accruing thereto or use thereof, as the result of, or in settlement of, any condemnation or other eminent domain proceeding affecting the Demised Premises whether or not the same shall have actually been commenced.

Term.  The Initial Term, together with the Extended Term, if applicable, as such term is defined in Section 1.2.

Third Party.  Any individual or entity, not an Affiliate of Tenant or Landlord.

Third-Party Agreement.  shall mean a Sublease, operating agreement or management agreement.

Third-Party Operators.  shall mean third parties with whom Tenant may enter into agreements or subleases for certain areas of the Demised Premises or for the management or operation of the Business.

Trade Name.  shall have the meaning set forth in Section 6.4 hereof.

Unavoidable Delays:  Delays due to strikes, lock-outs, labor unrest, inability to procure materials, power failure, acts of God, governmental restrictions, enemy action, civil commotion, fire, terrorist acts, unavoidable casualty or other causes beyond the control of the party responsible for performing an obligation hereunder, provided that lack of funds shall not be deemed a cause beyond the control of either party hereto unless such lack of funds is caused by the failure of the other party hereto to perform any obligations of such party under this Lease or the Guaranty.

## ARTICLE 3 - RENT

3.1   Base Rent.  Commencing on the Commencement Date, and on each Payment Date thereafter during the Term, Tenant shall pay base rent plus all applicable sales tax (the "Base Rent") per annum for the use and occupancy of the Demised Premises in the amount of Six Hundred Thousand and No/100 Dollars ($600,000.00) for the Initial Term (except as described below), and Six Hundred Seventy Five Thousand and No/100 Dollars ($675,000.000) for the Extended Term, if applicable. Base Rent shall be payable in advance commencing on the first day of each calendar month of the Term following the Commencement Date in the amount of Fifty Thousand and No/100 ($50,000.00) (except as described below) and shall continue to be paid on the first day of each month during the Term, without offset, counterclaim, or deduction whatsoever, except as otherwise expressly set forth in this Lease; provided, however, that the first and last monthly payments of Base Rent shall be prorated as to any partial month.  The first installment of Base- Rent shall be due and payable to Landlord within five (5) days after the first day of the month following the Commencement Date and each subsequent monthly installment shall be payable to Landlord by the fifth (5th) day of the applicable month with respect to such month.  All Base Rent payments shall be made by wire transfer to Landlord's account (as

CONFIDENTIAL                                    FULLER000101

designated by Landlord in writing). Notwithstanding the foregoing, for the first twelve (12) full months following the Commencement Date, the monthly Base Rent shall be reduced to $~~18,750.00 per month, and the annual Base Rent for Lease Year 1 will therefore be $225,000.00. For the second twelve (12)~~ months following the Commencement Date ~~(months 13-24), the monthly Base Rent shall be reduced to $37~~,500.00 per month, and the annual Base Rent for Lease Year ~~2~~1 will therefore be $~~450~~150,000.00. ~~The preceding are referred to herein as the Rent Abatement Years.~~ During the entire Term, including the first ~~two~~ Lease ~~Years~~Year, Tenant agrees to pay to Landlord it's prorata share of Taxes, Insurance ~~and,~~ common area maintenance~~,~~ and any other Additional Charges, it being the intent of the Parties that this is a "triple net lease" and Tenant shall pay all charges, impositions, and outlays of every nature and kind relating to the Premises as Additional Charges. The term Base Rent shall increase by rent payable by Tenant to Landlord for the 15th Avenue Parcel (defined below)~~. The first installment of Base Rent shall be tendered concurrently with the execution of this Lease~~, if applicable. Notwithstanding anything herein to the contrary, there shall be no rent abatement after ~~year 2. For the avoidance of doubt, the Percentage Rent calculations for Leas Year's 1 and 2 shall use the abated rent amount of $225,000.00 and $450,000.00, respectively.~~Lease Year One.

3.2    <u>Percentage Rent.</u>

(a)    Tenant shall provide monthly statements of Gross Income from Operations ("**Monthly Statements**") within thirty (30) days after the end of each calendar month which occurs during the Term, as well as year-to-date amounts for the current Lease Year. In addition to such regular monthly statements, Tenant shall provide an annual statement of Gross Income from Operations ("**Annual Statement**") within thirty (30) days after the end of each Lease Year, which shall show the total amount of Gross Income from Operations for such Lease Year. Tenant shall pay to Landlord, within sixty (60) days of the end of each Lease Year, an amount equal to the difference by which eight and one half of one percent (8.5%) of the Gross Income from Operations exceeds Base Rent ("**Percentage Rent**"~~).~~") plus all applicable sales tax. By way of example, if Gross Income for a Lease Year is $10,000,000 the Percentage Rent would be calculated as follows: $10,000,000.00 * 8.5% = 850,000.00 – 600,000.00 [Base Rent] = $250,000.00 and Base Rent plus Percentage Rent for that Lease Year would be a total of $850,000.00.

(b)    Notwithstanding the reduced Base Rent paid by Tenant during the ~~Rent Abatement Years~~first, Lease Year, for purposes of calculated Percentage Rent during ~~the Rent Abatement Years~~such year, Base Rent shall be equal to $600,000.00.

(c)    In addition to Gross Income from Operations from the Demised Premises, Percentage Rent shall include Gross Income from Operations for any Expansion Property (defined below)~~ or Other Property or the 15th Avenue Parcel, if Tenant exercises its Right to Require Development,~~), less any rents paid by Tenant to the landlords of such properties~~.~~ For clarification, the calculation of Percentage Rent in cases where Tenant is leasing the Expansion Property and/or Other Property, Percentage Rent shall be the difference by which eight and one half of one percent (8.5%) of the sum of Gross Income from Operations for the Demised Premises, Expansion Property and Other Property exceeds the sum of Base Rent plus any rents paid by Tenant to the landlords of any Expansion Property or Other Property.

CONFIDENTIAL                                    FULLER000102

(c)

> **Formatted:** Heading 2,h2, Indent: Left:  0.5"

(d)     Each statement of gross sales furnished by Tenant will be certified as correct by Tenant and will show the computations of Gross Income from Operations and shall show the computations for each of Tenant's subtenants, licensees, and concessionaires separately.  Tenant will keep and maintain on the Demised Premises or at its headquarters elsewhere in the State of Florida full, complete and appropriate books of account and records of the Gross Income from Operations in accordance with sound accounting principles as reasonably accepted in the industry, as the same may be revised from time to time, which books and records will be available for inspection by Landlord, its auditors or other authorized representatives during normal business hours upon reasonable prior notice by Landlord.  Landlord will have the right to audit, at Landlord's sole cost and expense, except in the event of an underpayment as further described below, and examine the books and records of Tenant for a period of up to two (2) years after Tenant delivers its Monthly Statements to Landlord and all such books and records will be kept available for such purpose. If such an audit shows that any Tenant's statement as to Percentage Rent understated the amount actually due from Tenant, Tenant will pay the amount of such underpayment, plus (if the audit shows that Tenant's statement of Percentage Rent due for the audited period understated the amount actually due from Tenant by up to five percent (5%)) the reasonable costs of the audit, within thirty (30) days after receiving the audit results. If such audit shows that Tenant's statement of Percentage Rent due for the audited period understated the amount actually due from Tenant by more than five percent (5%) Tenant shall, in addition to paying the underpayment and the cost of the audit, pay to Landlord a fee of ten percent (10%) of such understatement. If such an audit shows that the Annual Statement overstated the amount actually due from Tenant, Landlord shall, at Tenant's option, either (1) apply the overpayment to the next installments of the Base Rent or other amounts due under this Lease or (2) return such overpayment to Tenant within thirty (30) days after Landlord's receipt of such request from Tenant.

> **Formatted:** English (United States)

3.3     Additional Charges.  In addition to the Base Rent  and Percentage Rent, (a) Tenant also shall pay and discharge as and when due and payable all other amounts, liabilities, obligations and impositions that Tenant assumes or agrees to pay under this Lease, (b) in the event of any failure on the part of Tenant to pay any of those items referred to in clause (a) of this Section 3.3, Tenant also shall promptly pay and discharge every fine, penalty, interest and cost that may be added for non-payment or late payment of such items, and (c) if any installment of Base Rent, or Additional Charges (but only as to those Additional Charges that are payable directly to Landlord) shall not be paid on its due date (subject to any applicable notice, grace and cure periods), Tenant will pay Landlord on demand a late charge (to the maximum extent permitted by law) computed at the Default Rate on the amount of such installment, from the due date of such installment to the date of payment thereof (the items referred to in clauses (a), (b) and (c)) of this Section 3.3 are additional rent hereunder and are referred to herein collectively as the "**Additional Charges**").  Landlord shall have all legal, equitable and contractual rights, powers and remedies provided either in this Lease or by statute or otherwise in the case of non-payment of the Additional Charges as in the case of non-payment of the Base Rent.  To the extent that Tenant pays any Additional Charges to Landlord pursuant to any requirement of this Lease, Tenant shall be relieved of its obligation to pay such Additional Charges to the entity to which they would otherwise be due and Landlord shall pay same from monies received from Tenant.

CONFIDENTIAL                                          FULLER000103

3.4     Rent Schedule.  Below is a summary of the monthly rents and charges due under this Lease:

| Year | Base Rent | Tenant Improvement Recapture | Additional Charges | Percentage Rent | Sales Tax (subject to change) |
|---|---|---|---|---|---|
| 1 | $12,500.00 | $13,763.58 | TBD | 8.5%     of Gross Income exceeding Base Rent | 6.8% |
| 2-9 | $50,000.00 | $13,763.58 | TBD | 8.5%     of Gross Income exceeding Base Rent | 6.8% |
| 10-20 | $56,250.00 | $13,763.58 | TBD | 8.5%     of Gross Income exceeding Base Rent | 6.8% |

**ARTICLE 4 – REPAIRS AND MAINTENANCE; CAPITAL IMPROVEMENTS**

4.1     Repairs and Maintenance By Tenant.  Except as set forth in Section 4.2 and Section 4.5 hereof, Tenant shall, from time to time, make such expenditures for repairs and maintenance including service contracts ("**Repairs and Maintenance**") as are reasonably necessary to maintain the Business and Demised Premises, as it pertains to non-structural portions of the Demised Premises, in good operating condition and in material compliance with the Operating Standard, without contribution from Landlord.  If any such Repairs and Maintenance shall be made necessary by any condition against the occurrence of which Landlord has received the guaranty or warranty of a builder or of any supplier of labor or materials for the Business or its construction, Tenant may invoke said guarantees or warranties in Landlord's or Tenant's name, and Landlord will cooperate in all reasonable respects with Tenant in the enforcement thereof; provided, however, that Tenant shall perform all such Repairs and Maintenance irrespective of whether it receives or is promised reimbursement from any third party guarantor or warrantor.

**CONFIDENTIAL**                                        **FULLER000104**

4.2     Repairs and Maintenance By Landlord.  Landlord, at its expense, shall be responsible for (i) the Repairs and Maintenance of interior and exterior of the Demised Premises as it relates to all structural items (including, but not limited to the roof, exterior walls, interior load-bearing walls, foundation, floor slab and the utility lines servicing the Demised Premises). Further, Landlord shall be responsible for the repair of any construction defects, except where damage was created by Tenant's willful actions, inaction or negligence.

4.3     Construction Warranties.  Landlord shall assign any and all Construction Warranties from all contractors, construction managers, material suppliers and material subcontractors retained for the improvements performed by Landlord to the Demised Premises. The Construction Warranties shall be in the name of or assignable to Tenant, it being understood that Landlord shall continue to have the right to enforce any Construction Warranties that relate to any items that Landlord is or may be required to repair or replace pursuant to the terms of this Lease.

4.3 4.4  Service Contracts.  Tenant, without requiring the consent of Landlord, shall enter into any contract for cleaning, maintaining, repairing or servicing the Demised Premises or the Business or any of the constituent parts of the Demised Premises or the Business as Tenant deems necessary for the operation of the Business (each, a "**Service Contract**" and collectively, the "**Service Contracts**") provided that all Service Contracts will be cancellable upon termination of this Lease.

> Formatted: Condensed by 0.1 pt

4.4 4.5  Liens.  Tenant shall use its best efforts to prevent any liens from being filed against the Demised Premises which arise from any maintenance, changes, repairs, alterations, improvements, renewals or replacements in or to the Demised Premises by or on behalf of Tenant and, if any such liens are filed, the failure of Tenant shall to bond or obtain the release thereof prior to the institution of legal proceedings in connection therewith but in no event later than 30 days from the date such lien is filed shall be considered a Default.

4.5 4.6  Capital Improvements.  Provided such repairs, changes or replacements are not made necessary through negligence or willful misconduct of Tenant, its employees, agents, servants, guests or invitees, then if repairs, changes and/or replacements to the roof, load-bearing walls, support beams, floor slabs, support columns and other major structural components of the Business and the Demised Premises (collectively, "**Capital Improvements**") shall be required at any time during the Term to maintain the Demised Premises or to undertake the Business in accordance with the Operating Standard, as and when reasonably determined by Tenant, or by order of any governmental or municipal power, department, agency, authority or officer, then in such event, Landlord shall make any and all such repairs, changes or replacements at Landlord's expense.  Such repairs, changes and replacements shall be made with as little hindrance to the operation of the Business as reasonably possible.  Should any Capital Improvements be required because of a change in the Business or Operating Standards, Tenant shall be solely responsible for the costs and expenses thereof.

4.6 4.7  Mutual Indemnification.  Tenant shall indemnify and hold Landlord harmless from all costs, expenses, damages, charges and penalties arising in any way from Tenant's failure to perform its maintenance and repair obligations set forth above including all damages related to or imposed for any violations of law or ordinance. Landlord shall indemnify and hold

CONFIDENTIAL                              FULLER000105

Tenant harmless from all costs, expenses, damages, charges and penalties arising in any way from Landlord's failure to perform any Capital Improvements required by Legal Requirements (including all damages related to or imposed for any violations of law or ordinance), or specifically agreed to be performed by Landlord in writing.

## ARTICLE 5 – TAXES

5.1     Taxes and Governmental Charges.  During the Initial Term and the Extended Term, if applicable, Tenant shall be responsible for and shall pay when due as Additional Charges all ad valorem taxes pertaining to the Demised Premises including without limitation all special and other assessments reflected on the ad valorem tax bill issued by the Miami-Dade Tax Assessor's Office.  Promptly upon receipt thereof from the taxing authority, Landlord shall provide Tenant with paid copies of the ad valorem tax bills. Tenant shall only be responsible for paying ad valorem taxes during the term of the Lease and the ad valorem bills shall be prorated accordingly between Landlord and Tenant for any partial calendar year in which the Term commences and/or ends within 30 days of demand by either party.

5.2     If separate tax folio number(s) are not available for the Premises, Landlord shall provide Tenant with a statement of real estate taxes due for the Demised Premises, and Tenant shall pay directly to Landlord the amount due within 30 days of Tenant's receipt of a Real Estate Tax statement from Landlord.

5.3     Tenant shall have the sole right to appeal ad valorem taxes and assessments for the Demised Premises and Landlord shall reasonably cooperate in connection with any such tax appeals.

5.4     Real Estate Tax Increases Upon a Sale.  In no event shall Tenant be responsible for the portion (if any) of any increase in ad valorem taxes pertaining to the Demised Premises which (i) is directly attributable to a change of ownership involving the Demised Premises during the Term, and (ii) exceeds 120% of the ad valorem taxes for the calendar year immediately prior to the year of ownership change. Tenant's obligations for payment of ad valorem taxes for each subsequent year shall increase by 20% over the prior year until such time as Tenant is paying 100% of the actual ad valorem taxes. Thereafter, Tenant shall only be obligated to pay actual ad valorem taxes. For avoidance of doubt any increase in ad valorem taxes following a change in ownership which is otherwise consistent with the historic rate of increases in ad valorem taxes for the Demised Premises shall not be deemed to be directly attributable to any change in ownership.

5.45.5  Sales Tax on Rent; Personal Property Taxes; Other Taxes.  Tenant hereby agrees to pay all taxes on personal property located at the Demised Premises, taxes on any trade fixtures placed in the Demised Premises and used in connection with the Business, and all other tax and other governmental charges incurred with respect to its business operations at the Demised Premises during the Term hereof, pay any tax in the form of sales tax, rent tax or service charges with respect to the payment of any Base Rent, Percentage Rent and Additional Charges as may be required by Legal Requirements and which payment by Tenant shall constitute Base Rent under this Lease, and any and all excise taxes, gross receipt taxes, admission taxes, entertainment taxes, tourist taxes and all other charges whatsoever payable with

4320045 v1 - 07879 / 003                                    13

CONFIDENTIAL                                    FULLER000106

respect to the operation of the Business at the Demised Premises, during the Term hereof. Tenant shall pay each bill in full on or prior to delinquency, which payment shall be made directly to the taxing authority (with evidence of such payment submitted concurrently to Landlord at the same address as for payments of Base Rent). Tenant shall indemnify and hold harmless Landlord from and against any and all interest, penalties and other charges assessed against Landlord due to Tenant's failure to pay in a timely manner taxes required to be paid by it hereunder, unless such interest, penalties or other charges are incurred as a result of Landlord's failure to timely forward to Tenant a notice or bill that is  delivered only to Landlord and is not otherwise available to Tenant upon request of the applicable taxing authority or by consulting its website.

<strong>ARTICLE 6 – USE AND OPERATION</strong>

6.1     <u>Use</u>.  Tenant shall use the Demised Premises for the Business and operate the Business in a manner consistent with the Operating Standard.

6.2     <u>Permits</u>.  The parties acknowledge that it is in their best interest to continue using the Permits for the Demised Premises and the Business to the extent possible and permitted by applicable Legal Requirements.  Landlord shall transfer ~~all~~any Occupational and Operational Permits held by Landlord in connection with the operation of the Demised Premises.  Landlord, at Tenant's sole expense, shall also reasonably cooperate with Tenant with respect to Tenant obtaining any new Operational Permits.

6.3     <u>Utility Services</u>.  Landlord shall not be required to furnish to Tenant any facilities or services of any kind, such as, but not limited to, water, steam, gas, telephone, heat, hot water, electricity, garbage and sanitary services, light or power; however, Landlord shall ensure that such facilities are available for use by Tenant in the Demised Premises and in good working order and repair and with sufficient capacity to operate the Business as of the Commencement Date.  Tenant shall pay or cause to be paid all charges for the utilities or any other communication or utility service used in or rendered to the Business throughout the Term of this Lease.  Landlord shall not be liable to Tenant for any damage or inconvenience, and Tenant shall not be entitled to any abatement or reduction of Base Rent, by reason of any interruption in the provision of utilities to the Demised Premises.

6.4     <u>Tenant's FF&E</u>.  Tenant shall install such furniture, fixtures and equipment in the Demised Premises ("**Tenant's FF&E**") during the Term, as necessary for Tenant to operate the Business at Tenant's sole cost and expense. Tenant shall place or install Tenant's FF&E within the Demised Premises at its own risk, and Tenant expressly acknowledges by execution hereof that Landlord shall not be liable for any loss or damage to Tenant's FF&E.

6.5     <u>Inventory</u>.  Tenant shall be required to purchase and maintain its own Inventory in connection with the operation of its Business.  All Inventory and operating supplies existing on or in the Demised Premises as of the Effective Date shall automatically become the property of the Tenant.

6.6     <u>Name of Business</u>.  The name "Tower Hotel" and any variation or permutation of that name is intellectual property owned or licensed by Landlord and is made available for use by

<span style="color:red"><strong>CONFIDENTIAL</strong></span>

<strong>FULLER000107</strong>

Tenant pursuant to this Lease. Landlord hereby grants to Tenant, and Tenant hereby accepts a limited, non-exclusive, non-transferable, conditional license ("**License**"), without the right to sublicense, to use the name "Tower Hotel" and any variation or permutation of that name, along with any and all related service marks, logos, trademarks, copyrights, domain names and other identifications or elements used in electronic commerce, together with the goodwill symbolized thereby (collectively, the "**Trade Name**") solely in connection with its operation and management of the Business under this Lease and for no other purpose. Such License is applicable only to the Business and only for the Term.  No other person or entity other than Tenant shall have any right or claim to the use of the Trade Name under this Lease.  All use of the Trade Name by Tenant under this Lease shall inure to the benefit of Tenant and its Affiliates. Landlord retains all rights in all Trade Names subject to this License.  The License is exclusive to the location of the Business and the License does not include any exclusive territory or protected area surrounding the Business.

6.7  Business Employees.  Landlord represents and warrants to Tenant that it has terminated all employees of the Tower Hotel and paid all compensation due to them, and all costs and expenses incurred with respect to (or resulting from) the termination of said employees.

6.8  Compliance with Law.  Tenant's use and operation of the Business and the Demised Premises shall comply with all terms and conditions of this Lease and all Legal Requirements, including but not limited to all federal, state, county, municipal, and other statutes, laws, ordinances, rules, regulations, and orders now or in the future affecting the Business and/or the Demised Premises from and after the Commencement Date and each and all of the provisions of this Lease, including, without limitation, all laws relating to the physical condition, except for any structural elements that the Landlord is responsible for under Section 4.2, of the Business and the Demised Premises, the Americans With Disabilities Act (or any similar legislation), and any law regarding the fire or life safety systems of the Business and the Demised Premises.

6.8(a)  Landlord shall reasonably assist Tenant with such compliance at no material out of pocket cost to Landlord except in connection with Landlord's obligations set forth in Section 4.5; provided, however, that within the first five (5) years of issuance thereof but no longer, Landlord shall be solely responsible for the response to and compliance with (and all the costs associated with) the implementation and enforcement against the Demised Premises of any new federal, state, county, municipal, and other statutes and ordinances, rules, regulations, and orders affecting the Business and/or Demised Premises promulgated and put into force after the Lease Commencement  (collectively, "the New Regulations") which results in a forced closure of the Business or the Demised Premises (a "Closure") by way of the revocation or cancellation of the Certificate of Use, Certificate of Occupancy or any other Operational Permits (a "Revocation") unless such Closure is the result of Tenant's negligence, willful misconduct, or failure to comply with any law or regulation, including any New Regulation, where such non-compliance is due to the action or inaction of Tenant or otherwise results from some activity or condition within the control or responsibilities of Tenant.

(b)  In the event of a Closure for which Tenant is not responsible, Landlord shall indemnify Tenant as follows:  (a) Tenant shall not be obligated to pay the amount of Rent

CONFIDENTIAL                                          FULLER000108

due for any single day of Rent otherwise due under this Lease prorated for any day Tenant does not operate the Business in the ordinary course (meaning that Tenant does not remain open for business to the public) due to a Closure (a "Day of Closure"); (b) Landlord shall reimburse Tenant for the following agreed upon operating costs, also prorated per day for any Day of Closure: (i) utilities expenses actually incurred by Tenant, to include electric, water/sewer, telephony and internet services, and waste collection services; (ii) actually incurred and unavoidable vendor costs, such as POS system subscription charges; (iii) the actual salary and benefits costs associated with retention of a single key employee responsible for management of the property, such as a general manager of hotel operations; and (iv) payment of up to $20,000 actually incurred by Tenant to retain and train new staff for re-opening (but only in the event Tenant re-opens.

(c)     With the exception of the charges due under (b)(iv) of this section, the total of such payments from Landlord to Tenant for any single month shall not exceed, and shall be limited to a maximum of $15,000, and all such amounts shall be prorated per Day of Closure. Together, all such costs are defined as "Reimbursable Operating Costs" and shall be payable monthly.

(d)     Tenant shall assist Landlord with such compliance at no material out of pocket cost to Tenant or cost to Landlord.

(e)     Except for the amounts payable under clause (b)(iv) of this section, which shall be payable within 15 days of Selina providing to Landlord adequate supporting documentation of the nature and amount of such retention and retraining costs and proof that such costs were actually incurred, Reimbursable Operating Costs shall be paid by Landlord to Selina in the form of an equal monthly credit against Rent over the course of a 6 month period once Rent obligations resume if the Lease continues, or, if Tenant terminates the Lease pursuant to the terms of this section, payable directly by Landlord to Tenant on or before the 5th day of each month over the 6 consecutive months following such termination.

(f)     In the event that any Closure triggering Landlord's indemnity obligations herein shall continue for ninety (90) days, Tenant shall have the right, in its discretion, to terminate the Lease upon written notice delivered to the Landlord not later than 10 business days following the ninetieth day of such Closure.  In the event that Tenant invokes its right of termination under this section, Landlord shall be fully and completely released of any further obligations or liability under the Lease, or stemming in any way from the Closure other than the following: (a) payment of any Reimbursable Operating Costs due in the manner provided under (e) of this section; (b) payment to Tenant of its $100,000 cash deposit within 30 days of termination, subject to any valid claim against the deposit Landlord may be entitled to assert.  If Tenant does not invoke its right to terminate the Lease in the manner provided herein, Tenant shall be deemed to have reaffirmed the Lease and shall be thereafter required to resume payment of Rent and to otherwise perform under the terms of the Lease without modification, and without any further notice or other triggering action or event.

(g)     The remedies created for and vested in Tenant in this section are exclusive to all other remedies. Tenant is deemed to waive any other form of remedy or right of relief for the circumstances contemplated in this section, including any harm Tenant may claim to have

4320045 v1 - 07879 / 003

16

CONFIDENTIAL

FULLER000109

suffered as the result of any New Regulation. For the avoidance of doubt, Tenant understands and accepts that it may not invoke its right of termination provided for herein and also file suit against Landlord for damages or other relief or seek any other form of relief against Landlord for any injury alleged to stem from or be related to any Closure or related event/status/circumstance (other than the relief set out in clause 2 of this Section). Likewise, Tenant may not decline to invoke its right of termination, thereby reaffirming the Lease, and also file suit against Landlord for damages or other relief or seek any other form of relief against Landlord for any injury alleged to stem from or be related to any Closure or related event/status/circumstance (other than the relief set out in clause 2 of this Section). The remedies in this section are explicitly intended to be exclusive and to operate as a limitation of liability to both parties.

6.9     Covenant to Comply with Environmental Laws.  Tenant hereby agrees that all operations or activities upon, or any use or occupancy of the Demised Premises, or any part thereof, by Tenant, its assignees, subtenants, and their respective permittees, throughout the Term of this Lease, shall be in all respects in compliance with all federal, state and local laws then governing or in any way relating to the generation, handling, manufacturing, treatment, storage, use, transportation, release, spillage, leakage, dumping, discharge, or disposal of any Hazardous Material.  Notwithstanding the foregoing, in the event that Landlord determines that any aspect of the operations, activities, use or occupancy of the Demised Premises or any part thereof fails to comply with any such federal, state or local law, then Landlord shall provide Tenant with written notice thereof and Tenant shall have a reasonable amount of time to remediate the same in accordance with the applicable Legal Requirements.   If Tenant fails to remediate the same within sixty (60) days after receipt of written notice from Landlord (or commence to remediate and use diligent efforts to complete the same if it would reasonably take more than sixty (60) days to remediate the same), Landlord shall  have the right to take such actions as are appropriate, in Landlord's reasonable discretion, to effect such compliance with the applicable Legal Requirements, and Tenant shall reimburse Landlord within thirty (30) days following Landlord's written demand therefor together with back up documentation regarding the expenses actually incurred.

6.10    Environmental Indemnity.

(a)     Landlord  agrees to indemnify, defend (with legal counsel reasonably approved by Tenant), and hold Tenant  harmless from any and all claims, actions, administrative proceedings (including informal proceedings), judgments, damages, punitive damages, penalties, fines, costs, liabilities, interest, and losses, including reasonable attorneys' fees and expenses, consultant fees, and expert fees, together with all other costs and expenses of any kind or nature that arise prior to the Term directly or indirectly from or in connection with the presence, suspected presence, release or suspected release, of any Hazardous Material in or into the air, soil, surface water, or groundwater, or any portion thereof, at, on, about, under, or within the Demised Premises on or before the Commencement Date  or were later placed or released therein by Landlord, its agents, contractors, or employee.

(b)     Tenant agrees to indemnify, defend (with legal counsel reasonably approved by Landlord), and hold Landlord harmless from any and all claims, actions, administrative proceedings (including informal proceedings), judgments, damages, punitive damages, penalties, fines, costs, liabilities, interest, and losses, including reasonable attorneys'

4320045 v1 - 07879 / 003                                    17

fees and expenses, consultant fees, and expert fees, together with all other costs and expenses of any kind or nature that arise during or after the Term directly or indirectly from or in connection with the presence, suspected presence, release or suspected release, of any Hazardous Material in or into the air, soil, surface water, or groundwater, or any portion thereof, at, on, about, under, or within the Demised Premises, except if the same (a) is not caused or permitted by Tenant or its use of the Demised Premises, or (b) existed prior to the Commencement Date.

(c)       In the event any Hazardous Material is discovered within the Demised Premises in violation of applicable Legal Requirements and the same were present therein prior to the Commencement Date, or were later placed or released therein by Landlord, its agents, contractors, or employees, then Landlord shall immediately, at its sole cost and expense, remove such Hazardous Material from the Demised Premises, to the extent required by applicable Legal Requirements, and restore the Demised Premises, to the condition existing therein immediately prior to such removal. For purposes of this <u>Section 6.11</u>, Landlord shall bear the burden of demonstrating when any such Hazardous Material first existed upon, arose in or began migrating to the Demised Premises and the identity of the person or parties responsible for causing any violation of applicable Legal Requirements resulting from the presence of such Hazardous Material within the Demised Premises. The provisions of this <u>Section 6.11</u> shall survive the expiration or earlier termination of this Lease.

6.11    <u>Tenant's Covenant of Continuous Operation</u>.  At all times during the Term, Tenant shall: (a) continuously, actively and diligently use, occupy and operate the Business in accordance with the Operating Standard. Except for temporary closures resulting from remodeling or renovations approved by Landlord in advance, <s>force majeure, casualty</s>Force Majeure, Casualty, or other circumstances beyond Tenant's reasonable control, if Tenant ceases operating the Business for thirty (30) consecutive days any time after the Tenant initially opens for business, then Landlord may elect to recapture the Demised Premises.  Prior to exercising any recapture rights or any other rights or remedies provided hereunder or under applicable law, Landlord shall provide Tenant written notice that it must resume continuous operation (the "**Continuous Operation Notice**").  If Tenant fails to resume operations in the Demised Premises within thirty (30) days after its receipt of the Continuous Operation Notice, such failure to resume operating the Business shall be an Event of Default hereunder, and in addition to any rights and remedies available to Landlord under <u>Section 6.12</u>  hereof or under applicable law, Landlord may elect to recapture the Demised Premises by providing written notice thereof to Tenant (the "**Recapture Notice**").  Within twenty (20) days after Tenant's receipt of the Recapture Notice, Tenant shall be obligated to vacate the space, remove all of its personal property or it shall be deemed a holdover tenant pursuant to <u>Section 18.5</u> hereof. Upon termination of this Lease as a result of a recapture, each party shall be released and relieved of any further liability and obligation under this Lease except as otherwise provided hereunder. Landlord's failure to exercise any recapture right shall not limit Landlord's ability to enforce any other of its remedies under this Lease.

6.12    <u>Landlord's Right to Access</u>.  Landlord and all of its duly authorized officers and representatives and other persons duly authorized by Landlord are entitled to have access to the Demised Premises upon reasonable written advance notice.  Landlord and its duly authorized persons shall use reasonable care not to disrupt the operation of the Business in any material respect. For purposes of this <u>Section 6.12</u> only, an electronic mail sent to <s>both</s>

CONFIDENTIAL                                     FULLER000111

~~Steveo@selina.com~~glennv@selina.com and ~~lesliew@selina.com~~karyt@selina.com shall be considered written notice.

6.13    Parking.  No on-site or off-site parking is available at or in connection with the Demised Premises.  Tenant shall be responsible for making any parking or valet arrangements related to the operation of the Business, which arrangements shall be in compliance with the terms of this Lease.

### ARTICLE 7 – ALTERATIONS AND ADDITIONS

7.1    Alterations and Additions.  Except for (i) ~~Tenants~~Tenant Work, as described in Exhibit "E" attached hereto, (ii) Tenant's right to install Tenant's FF&E subject to the terms and conditions of Article 6 hereof, and (iii) non-structural alterations that do not affect utility services or building or life safety systems, change the character or quality or the flooring, require a building permit, or the cost of which does otherwise exceeds $25,000 in any given Lease Year (which Alterations shall be subject to the indemnification provision in Section 4.6), Tenant shall not make or permit to be made any improvements, alterations, fixed decorations or modifications or additions, structural or otherwise, to the Demised Premises, including, but not limited to, any modifications to any of the plumbing, electrical, heating, ventilating and air conditioning, elevator or life safety systems of the Demised Premises (collectively, the "**Alterations**") without the prior written consent of Landlord, provided that such consent shall not be unreasonably withheld, conditioned or delayed. Any Alterations shall be made at Tenant's expense (except to the extent the costs of such Alterations are Landlord's obligation under Section 4.5), by its contractors and subcontractors and in accordance with complete plans and specifications approved in advance in writing by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed. In connection with any Alterations, Tenant shall obtain all necessary permits from governmental authorities having jurisdiction thereover and shall furnish copies thereof to Landlord and shall otherwise comply with all applicable laws and regulations in completing and constructing any such Alterations and in having them approved by the applicable permitting authorities. Any Alterations permitted hereunder shall be constructed and performed by Tenant in a good and workmanlike and lien-free manner by a licensed and insured contractor who is reasonably acceptable to Landlord.  Upon completion of any Alterations, Tenant will provide Landlord with a full set of as-built plans and specification and copies of all building permits and final lien waivers.

7.2    Mechanic's Liens.  Tenant agrees (a) that it will promptly pay for all costs of Alterations or other work done or permitted by it or caused to be done by it in or about the Demised Premises, (b) that it will keep the Demised Premises free and clear of any liens arising out of any such Alterations or otherwise, and (c) that should any such lien be made or filed against the Demised Premises on account of such Alterations or other work done or permitted by Tenant, Tenant shall, at its sole cost and expense, bond against (in a form and issued by a surety acceptable to Landlord) or discharge such lien within thirty (30) days after such lien is filed.

7.3    Title.  All right, title, and interest in and to the Demised Premises and any Alterations (~~other than~~excluding Tenant's FF&E ~~removed from the Demised Premises at the end of the Term, which shall remain the property of Tenant~~) shall be held and retained by Landlord and shall be free and clear of any claim or interest of Tenant upon the expiration or earlier

CONFIDENTIAL

termination of this Lease.  Tenant shall not waste, destroy, or remove any improvements, fixtures, or other property affixed to the Demised Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld.

## ARTICLE 8 – INSURANCE, LIABILITY AND INDEMNITY

8.1  ~~Tenant~~ **Insurance** ~~Coverage~~.

(a)  ~~Tenant.  During~~**Requirements**.  From and after the ~~Initial~~ Delivery Date until the end of the Term ~~and Extended Term, if applicable,~~ Tenant ~~agrees to procure and maintain adequate insurance coverage in relation to the Business and its operation against risks determined by Landlord with the advice of Tenant and in all respects consistent with any Lender.  Such insurance may include, without limitation, commercial general liability, umbrella and excess liability, general public liability (which policy shall not include a Sexual Abuse or Assault and Battery exclusion), automobile, liquor liability, appropriate workers' compensation, business interruption, and such other insurance (including fidelity/crime coverage and employment practices liability) against other insurable risks which,~~ at ~~the time, are commonly insured against by owners of similar hotel premises in the Business's market area, with due regard being or to be given to the then existing circumstances and to the type, construction, design, use and occupancy of the Business.~~

~~In connection with all construction at the Business being managed by Tenant, Tenant will cause the general contractor to maintain, with a reputable insurer, general liability insurance and with regard to significant construction, builder's risk.~~

~~(b)~~8.1  ~~Landlord.  Landlord, at Tenant's~~ its sole cost and expense ~~not to exceed $25,000 (the "**Insurance Cap**") annually for the Initial Term, which Insurance Cap shall increase by 5% each year thereafter, shall, throughout the Term, carry (in such amounts as reasonably necessary insure the Demised Premises):  (i) all risks (special form or equivalent) insurance on the Demised Premises and the machinery and equipment contained therein or servicing the Demised Premises  and owned by Landlord, including  but not limited to the perils of fire, theft, windstorm, water damage and  flood,  in an amount not less than the full replacement cost therefore (excluding any property with respect to which Tenant is  obligated to insure);  and (ii) public liability and property damage insurance with respect to Landlord's operations at the Demises Premises.  Such insurance shall be in amounts and with deductibles as would be carried by a prudent owner of a similar project, having regard to size, age, and location of the Demises Premises.  Except for windstorm and flood insurance coverages which may require high deductibles based upon the insurance that is commercially available in the market at any given time, Landlord's insurance deductibles shall not be more than five percent (5%), or $25,000 for named windstorm.~~, shall provide (or cause to be provided) and keep in full force and effect:

a.   insurance against loss or damage by fire and other casualty to the Demised Premises under the special form insurance policy approved by the Insurance Commission of the State, including coverage for

CONFIDENTIAL          FULLER000113

water damage (including backup of sewers and drains), flood, windstorm and general boiler and machinery insurance (if applicable), in an amount equal to one hundred percent (100%) of the full replacement value of the Demised Premises (excluding the value of the Land) with co-insurance value of not less than eighty percent (80%);

b.   commercial general liability insurance, on occurrence form, with a minimum combined single limit of liability of at least One Million and No/100 Dollars ($1,000,000.00) and a general aggregate limit of at least Two Million and No/100 Dollars ($2,000,000.00), which policy shall be written to apply to all bodily injury, property damage, personal injury and other covered loss, however occasioned, occurring during the policy term;

c.   workers' compensation insurance, if required, pursuant to any applicable Legal Requirements and subject to the statutory limits of the State;

d.   "all risk" property insurance covering the FF&E, OS&E and any other of Tenant's machinery, goods, wares, merchandise, and improvements/betterments for the full replacement value thereof;

e.   business income (formerly "business interruption") insurance written on an actual loss sustained form or with sufficient limits to address reasonably anticipated business interruption losses for a minimum of one (1) year;

f.   business automobile liability insurance to cover all owned, hired and non-owned automobiles owned or operated by Tenant providing a minimum combined single limit of $1,000,000; and

g.   liquor liability or so-called "dram-shop" insurance with minimum limits of $2,000,000, if the sale of alcohol is permitted or alcohol is served from the Demised Premises.

**8.2     Landlord's Insurance Requirements.**

a.      Tenant acknowledges and agrees that Landlord's existing insurance policy for the Demised Improvements is acceptable. A certificate evidencing the aforesaid insurance coverage shall be delivered to Tenant on or prior the Effective Date and, thereafter, until the Delivery Date, certificates evidencing renewals or replacements thereof (and any material changes to the policies) shall be delivered to Tenant at least five (5) days prior to the expiration of any policy.

4320045 v1 - 07879 / 003

21

CONFIDENTIAL                                                    FULLER000114

8.28.3   Insurance Policies.

(a)     All insurance provided for under this Article 8 shall be effected by policies issued by insurance companies of good reputation who maintain an AM Best rating of AIV or greater and shall be subject to Landlord's and Landlord's lender's approval, not to be unreasonably withheld or delayed.  Such insurance may be carried under blanket policies covering the Demised Premises and other locations provided such policies otherwise comply with Landlord's requirements.

(b)     Certificates of Insurance shall be delivered to Landlord and Tenant on or before the Commencement Date.  All insurance policies shall be renewed, and proof of such renewals shall be delivered to Landlord and Tenant at least ten (10)five (5) days prior to their respective expiration dates.

(c)     All insurance policies procured by Tenant under this Article 8 shall be written in the name of Tenant with Landlord being named thereon as additional named insured, and any Lender and any other appropriate parties designated by Landlord being named thereon as additional insured on liability policies and as owner, loss payee and additional interest holder on property policies (as their respective interests may appear), except for workers' compensation insurance and other insurance with respect to which it is impractical and inappropriate to name other parties as additional insureds.

(d)     All property insurance policies shall be endorsed specifically to the effect that the proceeds of any building, contents or business interruption losses shall be made payable to Landlord, any Lender and Tenant jointly, as their interests may appear, unless otherwise required by any Lender.  All such policies of insurance shall also be endorsed specifically to the effect that such policies shall not be canceled or materially changed without at least ten (10) days' prior written notice to Landlord, the Lender and Tenant.  Each party shall use all reasonable efforts to cause any policy which it is responsible to obtain to provide that the insurer shall not have any rights of subrogation to any claim which either party hereto may have or acquire against the other.  Neither Landlord nor its Lender shall have any claim against the other with respect to the failure of any insurance carrier to provide the coverage or protection placed with such carrier as contemplated by this Lease.

(e)     Certificates of Insurance (and copies of policies, to the extent required) shall be sent to Landlord and Tenant at their respective addresses in accordance with the requirements of Section 18.1 hereof and to any Lender at such addressees as the Lender shall designate.

(f)     All insurance coverage, coverage limits and deductible amounts shall be reviewed by Landlord and Tenant from time to time for the purpose of determining the insurance coverage, coverage limits and deductible amounts then appropriate for properties similar in type and construction to the Demised Premises and for the nature of the business being conducted. Landlord and Tenant shall cooperate in good faith to arrive at an agreement on such matters.

CONFIDENTIAL                              FULLER000115

(f)    If Landlord has not received satisfactory written evidence that the Tenant maintains all required insurance, Landlord may force place any required coverage to protect its interest in the Demised Premises, at Tenants sole cost and expense..

.

8.38.4  Waiver of Subrogation.  Landlord and Tenant each hereby release each other and waive any and all rights of recovery against the other, and against the officers, directors, employees, agents, and representatives of the other, for loss of or damage to such waiving party or its Demised Premises or the Demised Premises of the other under its control to the extent that the nature of the loss or damage is covered by the insurance which is required by this Article 8 to be obtained or by any other valid and collectible insurance policy in force at the time of such loss or damage.  Tenant shall exercise commercially reasonable efforts to ensure that each policy of property damage insurance obtained by Tenant with respect to the Demised Premises shall include a clause or endorsement denying the insurer any rights of subrogation against the other party.

**ARTICLE 9 – DAMAGE AND DESTRUCTION**

9.1    Damage or Destruction.  If during the Term the Demised Premises is totally or partially destroyed by fire or other casualty ("**Casualty**"), Landlord shall restore the Demised Premises to substantially the same condition as existed immediately before the damage or destruction and otherwise in accordance with the terms of this Lease within one hundred eighty (180) days of insurance proceeds becoming available to Landlord for purposes of restoration following such Casualty, unless either party elects to terminate this Lease in accordance with Section 9.3 below, such damage or destruction shall not terminate this Lease.

9.2    Proceeds Distribution.  Subject to the requirements of Lender under the loan documents executed by Landlord in connection with any Loan, all insurance proceeds payable with respect to the Casualty, excluding the proceeds payable to Tenant under any separate policy of Demised Premises insurance maintained by Tenant, shall belong to and shall be payable to Landlord.  If this Lease is not terminated as provided in Section 9.3 below, following Landlord's obtaining any and all necessary permits and approvals to complete the necessary restoration work upon the occurrence of a Casualty and following Tenant's approval of all final plans and specifications and construction drawings relating to the restoration work, Landlord shall diligently proceed to restore the Demised Premises to the condition it was in prior to the casualty.

9.3    Termination Option.  If (i) the Demised Premises or any or all of the Business are damaged or destroyed by any casualty not covered by any policy of insurance maintained by Tenant, or (ii) the casualty is so covered but the insurance proceeds (including any applicable deductible amount) are insufficient or unavailable to cover Tenant's restoration obligations (e.g., if any Lender requires that the proceeds be applied to the outstanding balance of any Loan), then either party shall have the option in all of such cases, to terminate this Lease by giving the other party written notice any time within ninety (90) days after the occurrence of the Casualty.  In the event of any termination under this Section 9.3, this Lease shall terminate at the end of the calendar month in which the notice of termination is given, and Landlord shall refund to Tenant

CONFIDENTIAL

FULLER000116

any Base Rent or other charges previously paid by Tenant and pertaining to the period after the date of the Casualty.

      9.4    <u>Continuous Operation; No Base Rent Abatement</u>.  Tenant agrees that during any period of reconstruction or repair of the Demised Premises, it will continue the operation of the Business to the extent reasonably practicable. Following the occurrence of the Casualty, the Base Rent and any other charges payable under this Lease shall be equitably abated.

      9.5    <u>Tenant's Personal Property</u>.  Landlord shall have no obligation to insure Tenant's FF&E or other personal property against any loss of or damage to any of such property.  Tenant may separately insure its personal property.

      9.6    <u>Damage Near End of Term</u>.  Notwithstanding any provision of this Article 9 to the contrary, if a total Casualty occurs during the last twelve (12) months of the Term, then either party shall have the right to terminate this Lease by delivering written notice to the other party within thirty (30) days after the date of the Casualty, whereupon all accrued Base Rent due under this Lease shall be paid immediately to Landlord, and Landlord shall refund to Tenant any Base Rent or other charges previously paid by Tenant and pertaining to the period after the date of the Casualty, following which this Lease shall automatically terminate.

## ARTICLE 10 - EMINENT DOMAIN

      If the whole of the Demised Premises, or such portion thereof as will make the Demised Premises unsuitable for the operation of the Business, as determined by Tenant in its reasonable judgment, shall be taken by any public authority under the power of eminent domain or sold to any public authority under threat or in lieu of such taking, the Term shall cease as of the day possession or title shall be taken by such public authority, whichever is earlier ("**Taking Date**"), whereupon the Base Rent shall be paid up to the Taking Date with a proportionate refund by Landlord of any Base Rent paid for a period subsequent to the Taking Date.  If less than the whole of the Demised Premises, or less than such portion thereof as will make the Demised Premises unusable or unsuitable for the operation of the Business, shall be taken, then subject to the rights of any Lender under the loan documents executed by Landlord in connection with any Loan, the Term shall cease only as to the part so taken as of the Taking Date, and Tenant shall pay all Base Rent accruing up to the Taking Date, with appropriate credit by Landlord (toward the next installment of Base Rent due from Tenant) of any Base Rent paid for a period subsequent to the Taking Date. Base Rent and other Additional Charges payable to Landlord shall be reduced in proportion to the amount of the Demised Premises taken and the negative impact on the Business.  All compensation awarded or paid upon a total or partial taking of the Demised Premises or Business including the value of the leasehold estate created hereby shall belong to and be the Demised Premises of Landlord without any participation by Tenant. Tenant shall have no claim to any such award based on Tenant's leasehold interest in the Demised Premises. However, nothing contained herein shall be construed to preclude Tenant, at its cost, from independently prosecuting any claim directly against the condemning authority in such condemnation proceeding for the value of its leasehold estate, and/or for damage to, or cost of removal of, stock, trade fixtures, furniture, and other personal Demised Premises belongings to Tenant; provided, however, that no such claim shall diminish or otherwise adversely affect Landlord's award.

CONFIDENTIAL      FULLER000117

## ARTICLE 11 – TRANSFER

~~11.1   Assignment and Subletting.  Tenant shall not either voluntarily or by operation of law, including, but not limited to the foreclosure of any tenant leasehold financing, assign this Lease or any interest therein or allow any other person (the employees, agents, servants, guests, transient occupants of the hotel or Business, and invitees of Tenant excepted) to occupy or use the said Demised Premises or any portion thereof (collectively, a "**Transfer**") to any entity or person without first obtaining the prior written consent of Landlord, which may be withheld by Landlord in its sole and absolute discretion, if Tenant requests to be released from liability in connection with said assignment, if Tenant does not request to be release from liability hereunder, Landlord's approval shall be at its reasonable discretion.  Consent to one Transfer or use by another person shall not be deemed to be consent to any subsequent Transfer.  Consent to any such Transfer shall in no way relieve Tenant of any liability under this Lease.  Any such Transfer without the prior written consent of Landlord shall be void and shall, at Landlord's option, constitute an Event of Default under the terms and conditions of this Lease.  Tenant shall have the right to sublet or hire a company to manage portions of the Demised Premises with Landlord's reasonable consent.  In the case of a sublease or management agreement of the F&B House and/or the Pool, Tenant shall provide Landlord with a copy of the executed sublease(s) and or management agreement(s).~~

11.1   **Assignments Generally Prohibited.** Except as specifically provided to the contrary in this Lease, this Lease and the interest of Tenant in this Lease (or any portion thereof) shall not be sold, assigned, mortgaged, encumbered or otherwise transferred or encumbered, directly or indirectly, whether by operation of law or otherwise, without the prior written consent of Landlord, which consent shall be in Landlord's sole and absolute discretion.

11.2   **Permitted Transfers**. Notwithstanding anything to the contrary set forth herein Tenant may assign or transfer this Lease, without the consent of Landlord, provided Tenant is not then in default under this Lease:  (i)  to a Person who acquires all or substantially all of the business and assets of any direct or indirect parent company of Tenant, (ii) to a Person pursuant to a merger, consolidation or reorganization involving any direct or indirect parent company of Tenant, (iii) an Affiliate of Tenant, or (iv) an Acceptable Operator; provided that Tenant provides Landlord with written notice of such assignment or transfer and such assignment or transfer shall not relieve Tenant or Guarantor from any liability or obligations contained in this Lease or the Guaranty.

11.3   **Agreements with Managers or Operators**. Tenant may enter into agreements or subleases for certain areas of the Demised Improvements or for the management or operation of the Business by Third-Party Operators under a Third-Party Agreement without the prior written consent of Landlord. Tenant shall give Landlord a copy of any Third-Party Agreement and any revenues derived directly or indirectly from any Third-Party Agreement, including, but not limited to, any rent received from, or sales or income generated by such Third Parties, shall be added to Gross Income and shall be included in the Monthly Statements.

11.4   **Release of Tenant**.  In the case of a permitted assignment of this Lease, the Tenant shall be released from all liability under this Lease arising from and after the date of such assignment so long as the assignee assumes in writing Tenant's obligations under this Lease, and any Guarantor of Tenant's obligations under this Lease shall be released from its liability under

25

CONFIDENTIAL

FULLER000118

its Guaranty provided that (i) the assignee provides to Landlord an identical guaranty from the parent company of the assignee or other replacement guarantor reasonably acceptable to Landlord and (ii) such new guarantor executes a guaranty in favor of Landlord in the form of the Guaranty. Except as otherwise specifically provided herein, and notwithstanding anything to the contrary in any Sublease or Third-Party Agreement, Tenant shall continue to be responsible to Landlord for all obligations of Tenant under this Lease.

11.211.5    Landlord Assignment.  No consent of Tenant shall be required prior to (i) Landlord assigning this Lease to any third party, (ii) the sale of any stock or direct or indirect ownership interest in Landlord, or (iii) the sale of the Land or any portion thereof (each, a "**Permitted Transfer**"); provided however that Landlord shall provide notice to Tenant of the occurrence of any Permitted Transfer within thirty (30) days following the date of same and any assignee shall take subject to and otherwise recognize the interests of Tenant under this Lease.

11.311.6    Mortgaging of Demised Premises.

(a)    Landlord shall have the right, which shall be exercisable in its sole and absolute discretion, to mortgage the Demised Premises provided that: (i) the total debt secured by the Demised Premises or any direct or indirect interest therein does not exceed 75% of the then fair market value of the Demised Premises and (ii) Tenant shall not be required to subordinate its interest in the Demised Premises without first obtaining a non-disturbance agreement in form and content reasonably satisfactory to Tenant. ("SNDA") in form and content reasonably satisfactory to Tenant. Landlord shall use its reasonable business efforts to cause its mortgagee to execute and deliver to Tenant a SNDA.  The subjection and subordination of this Lease and Tenant's leasehold interest hereunder, as the same may be modified, amended, renewed or replaced, to any Mortgage above shall be conditioned upon Tenant's receipt of an SNDA from such Mortgagee.

(b)(a)    Tenant shall be permitted to secure leasehold financing secured by its interest in this Lease provided that the total debt secured by Tenant's leasehold interest does not exceed 70% of the then fair market value of the Demised Premises.  Upon request of Tenant, Landlord shall execute an agreement in favor of Tenant and Tenant's lender with respect to Landlord's waiver of such liens and the rights of Tenant and Tenant's lender with respect to Tenant's fixtures and personal property.  Such agreement shall be in a form reasonably acceptable to Tenant's lender.

**ARTICLE 12 – ESTOPPEL CERTIFICATES**

12.1    Estoppel Certificates.  Each party agrees to execute, acknowledge, and deliver to the other, from time to time during the Term and within ten (10) Business Days after the requesting party provides the other party with written notice to do so, an estoppel certificate certifying in writing to those facts for which certification has been requested, including, without limitation, (a) that this Lease is in full force and effect, unmodified or modified solely as set forth in such estoppel certificate, including, without limitation, a confirmation of the expiration date of the Term of this Lease, (b) the dates to which Base Rent and other charges hereunder have been paid, (c) that each has, as of the date of such estoppel certificate, to the best of the certifying party's knowledge, fully performed all of its obligations under this Lease, without exception or

4320045 v1 - 07879 / 003

26

except only as set forth in such estoppel certificate, and (d) that any such estoppel certificate may be relied upon by such party of the Demised Premises.

**ARTICLE 13 – INTENTIONALLY DELETED**

**ARTICLE 13 - Liquor License, Botanica Plans**

13.1 **Liquor License.** The Parties acknowledge that Tenant intends to use that certain 4COP Liquor License No. _____ ("Liquor License") at the Demised Premises. In the event the Liquor License is revoked or withdrawn, for any reason, other than due to the actions or inactions of Tenant, Tenant shall have 365 days from the revocation of the Liquor License to terminate this Lease by providing Landlord written notice thereof. Should Tenant elect to terminate this Lease, both Parties shall be fully and completely released of any further obligations or liability under the Lease, other than those that specifically survive termination.

13.2 **Botanica Plans**. Landlord is currently pursuing the issuance of a building permit, under application number _____ ("Botanica Plans"). Should Landlord be unable, in Landlord's reasonable determination, to obtain approval of the Botanica Plans, Tenant shall have the right to either (i) attempt to obtain the Botanica Plans itself, in which case Tenant shall be permitted to use the non FF&E portion of the Tenant Improvement Allowance in furtherance thereof, (ii) accept the Demised Premises without approval of the Botanica Plans, or (iii) terminate this Lease. Tenant shall provide its election to Landlord within ten (10) days after receipt of notice from Landlord that it is unable to obtain the Botanica Plans. Should Tenant elect to terminate this Lease, both Parties shall be fully and completely released of any further obligations or liability under the Lease, other than those that specifically survive termination.

13.3 **Tenant Improvement Allowance.** In the event that Tenant terminates this Lease pursuant to Sections 13.1 or 13.2 above, Tenant shall be released from the obligation to repay any part of the Tenant Improvement Allowance that has been advanced to Tenant and not used for Tenants FF&E, up to $800,000.00.

**ARTICLE 14 – EVENTS OF DEFAULT; REMEDIES**

14.1 Events of ~~Defaults~~Default. A default by Tenant shall be deemed to have occurred hereunder (each, an "**Event of Default**"), if and whenever:

(a) Any Base Rent, or other amount is not paid within five (5) days following written notice from Landlord that the same is past due; or

(b) Tenant makes a general assignment for the benefit of creditors or Tenant becomes bankrupt or insolvent, or a receiver or trustee shall be appointed for Tenant's leasehold interest in the Demised Premises or for all or a substantial part of the assets of Tenant and is not discharged within 90 days; or

(c) Tenant fails to maintain insurance as required by this Lease and it is not replaced within ten (10) days after written notice from Landlord provided such coverage is commercially available in Miami- Dade County, Florida; or

4320045 v1 - 07879 / 003                                     27

(d)      Tenant misrepresents any information required to be furnished to Landlord pursuant to this Lease; or

(e)      Tenant dissolves, winds up, or otherwise terminates the existence of the Tenant or of any guarantor of the Tenant's obligations; or

(f)      Tenant has failed to observe or perform any other term, covenant or condition of this Lease, or has breached any of its obligations in this Lease (other than as specifically enumerated in subparagraphs (a) through (c) of this Section) and Tenant fails to remedy such breach within thirty (30) days after written notice from Landlord (provided, however, that if such default reasonably requires more than thirty (30) days to cure, Tenant shall have a reasonable time to cure such default, provided Tenant commences to cure such default within such thirty (30) day period and thereafter diligently prosecutes such cure to completion), unless such default involves life/safety issues, in which event, Tenant shall immediately cure such default.

14.2    Remedies.  Upon an Event of Default, without prejudice to any other rights which it has pursuant to this Lease or at law or in equity, Landlord shall have the following rights and remedies, which are cumulative and not alternative:

(a)      Landlord may cancel this Lease and retake possession of the Demised Premises, or may terminate Tenant's right to possession (without terminating this Lease), for the account of Tenant.  In either event, Tenant shall then quit and surrender the Demised Premises to Landlord.  Tenant's liability under all of the provisions of this Lease shall continue notwithstanding any expiration and surrender, or any re-entry, repossession, or disposition hereunder.

(b)      Landlord may enter the Demised Premises as agent of Tenant to take possession of any Demised Premises of Tenant on the Demised Premises, including Tenant's FF&E, which shall automatically become the property of Landlord upon an Event of Default, to store such Demised Premises at the expense and risk of Tenant or to sell or otherwise dispose of such Demised Premises in such manner as Landlord may see fit.  Landlord shall not be liable in any way in connection with its actions pursuant to this Section, to the extent that its actions are in accordance with applicable law.

(c)      If Tenant's right to possession is terminated (without terminating this Lease) under subsection (a) above, Tenant shall remain liable (in addition to accrued liabilities) to the extent legally permissible for all Base Rent, Percentage Rent and Additional Charges Tenant would have been required to pay until the date this Lease would have expired had such cancellation not occurred.  Tenant's liability for Base Rent, Percentage Rent and Additional Charges shall continue notwithstanding re-entry or repossession of the Demised Premises by Landlord.

(d)      Landlord shall use commercially reasonable efforts to relet all or any part of the Demised Premises for all or any part of the unexpired portion of the Term of this Lease or for any longer period, and may accept any rent then attainable, grant any concessions of rent,

CONFIDENTIAL                                                          FULLER000121

and agree to paint or make any special repairs, alterations, and decorations for any new tenant as it may deem advisable in its sole and absolute discretion.

> Formatted: Font color: Text 1

(d)(e)   Hardship. A "Hardship" is an event which makes the continued performance of a Party's contractual duties excessively onerous due to an event beyond such Party's reasonable control and which it could not reasonably have been expected to have taken into account on the Effective Date, and that such Party could not reasonably have avoided or overcome. If such hardship arises, either Party may give notice in writing that it wishes to review the provisions of this Lease in light of such a Hardship. The Parties agree that within fifteen (15) days of the giving of such notice ("Hardship Notice"), the Parties shall negotiate in good faith modifications to this Lease to relieve such hardship in a manner equitable to both Parties. If within forty-five (45) days after receipt of the Hardship Notice, the Parties are unable to agree upon modification to this Lease, Tenant shall have the right to reduce the Base Rent by the percentage of the reduction in profit as compared with the same month(s) of the preceding year ("Rent Reduction") until the Hardship ends however, at no time with the Base Rent be less than any payments required to be made by Landlord to its lender. In addition, Landlord shall use reasonable business efforts to negotiate with their Lender for a reduction or modification in their payments due to the lender. In the event, the Hardship Event continues for more than six months it shall be deemed a Force Majeure Event and either Party may terminate the Lease Agreement without any penalty or liability.  Notwithstanding anything contained herein, should Tenant receive any funds from any sources related to the Hardship, all such funds shall be assigned and delivered to Landlord, up to the amount of the Rent Reduction, and, thereafter, the Hardship shall be considered ended and Base Rent shall return to its pre-Hardship level.

> Formatted: Font color: Text 1

14.3   Additional Remedies; Waiver.  The rights and remedies of Landlord set forth herein shall be in addition to any other right and remedy now and hereinafter provided by law. All rights and remedies of Landlord shall be cumulative and non-exclusive of each other.  No delay or omission by Landlord in exercising a right or remedy shall exhaust or impair the same or constitute a waiver of, or acquiescence to, an Event of Default.

14.4   Default by Landlord.

(a)   Generally.  In the event of any default and failure to cure by Landlord within thirty (30) days of receipt of written notice of such default from Tenant, except as provided in Section 14.4(b) below, Tenant's exclusive remedies shall be to: (i) terminate this Lease upon thirty (30) days prior written notice to Landlord whereupon Tenant shall be released of all of its future financial and other obligations hereunder or (ii) file an action for actual damages (not consequential, special or punitive) or  injunction but prior to any such action Tenant will give Landlord written notice specifying such default with particularity, and Landlord shall have a period of thirty (30) days following the date of such notice in which to cure the default (provided, however, that if such default reasonably requires more than thirty (30) days to cure, Landlord shall have a reasonable time to cure such default, provided Landlord commences to cure within such thirty (30) day period and thereafter diligently prosecutes such cure to completion).

(b)   Capital Repair.  If Landlord fails to perform its obligations under Section 4.5 of this Lease after two written demands from Tenant and such failure on the part of Landlord

CONFIDENTIAL                                             FULLER000122

materially and negatively impairs or is reasonably likely to materially and negatively impair the operation of the Business, Tenant may: (i) terminate this Lease upon 30 days prior written notice to Landlord whereupon Tenant shall be released of all of its future financial and other obligations hereunder or (ii) repair such item itself and charge Landlord the actual cost thereof. If Landlord fails to pay Tenant within ten (10) days of written demand together with reasonable backup documentation showing such costs Tenant may offset such costs against the next payment(s) of Base Rent and Percentage Rent due hereunder.

## ARTICLE 15 – CONDITIONS PRECEDENT

15.1    Intentionally Deleted.

15.2    Intentionally Deleted.

15.3    Condition of Demised Premises. The Demised Premises and all fixtures and furniture and equipment shall be habitable and in good working condition and repair.

15.4    Delivery of Additional Security for Lease. Tenant has delivered to Landlord the Cash Deposit as contemplated by Section 1.3 above.

## ARTICLE 16 – REPRESENTATIONS

16.1    Tenant's Representations.    In order to induce Landlord to enter into this Lease, Tenant makes the following representations and warranties:

(a)    The execution of and performance under this Lease has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Tenant enforceable in accordance with the terms hereof.

(b)    Neither the consummation of the transactions contemplated by this Lease on the part of Tenant or be performed, nor the fulfillment of the terms, conditions and provisions of this Lease, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Tenant is a party or by which it is bound.

(c)    (i) Neither Tenant nor any person or entity that directly or indirectly owns an interest in it nor any of its officers, directors, or managing members is a person or entity (each, a "Prohibited Person") with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including Executive Order 13224 (the "Executive Order") signed on September 24, 2001 and entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"), or other governmental action, (ii) Tenant's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder (as amended from time to time, the "Money Laundering Act") (i.e., Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and

CONFIDENTIAL                                    FULLER000123

Obstruct Terrorism Act of 2001 (the "Patriot Act"), and (iii) throughout the Term of this Lease, Tenant shall comply with the Executive Order, the Money Laundering Act, and the Patriot Act.

16.2     Landlord's Representations.   In order to induce Tenant to enter into this Lease, Landlord makes the following representations and warranties:

(a)     Tenant shall, upon paying the rent reserved hereunder and observing and performing all of the terms, covenants and conditions on Tenant's part to be observed and performed, peaceably and quietly have and hold, the Demised Premises, without hindrance or molestation by any person or persons, subject, however, to the terms of this Lease

(b)     Landlord has full right and authority to enter into this Lease and perform Landlord's obligations under this Lease, and is the fee simple owner of the entire Demised Premises.

(c)     Landlord shall at all times comply with all applicable laws, ordinances, rules and regulations governing the division or parcelization of real property for purposes of lease, sale or financing, so that this Lease shall constitute a lawful conveyance to Tenant of a leasehold estate in the Premises.

(d)     The execution of and performance under this Lease has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Landlord enforceable in accordance with the terms hereof.

(e)     Neither the consummation of the transactions contemplated by this Lease on the part of Landlord to be performed nor the fulfillment of the terms, conditions and provisions of this Lease, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Landlord is a party or by which it is bound.

(f)     No action, suit or other proceeding (including, but not limited to, any condemnation action) is pending or, to Landlord's knowledge, has been threatened in writing against Landlord that would be binding upon Tenant as of the Effective Date.

(g)     Landlord -has not granted any option or right of first refusal to any party to purchase the- Demised Premises or any interest therein or any portion thereof. No leases exist or as of the Commencement Date will exist with respect to the Demised Premises except for this Lease.

(h)     Other than as disclosed to Tenant, which is more particularly described on **Exhibit "C" attached hereto** Landlord has not received written notice (i) from any governmental authority of any violation of any federal or municipal laws, ordinances, orders, regulations and requirements affecting the Demised Premises  or any portion thereof (including the conduct of business operations thereon) that is unresolved, (ii) that there are Hazardous Materials on the Demised Premises in violation of Environmental Laws and has no knowledge of the existence of the same, or (iii) from any governmental authorities with respect to any condemnation or eminent domain proceedings affecting the Demised Premises.

4320045 v1 - 07879 / 003                                        31

(i)     Landlord has filed, or will have filed prior to the Commencement Date, all personal property tax returns due prior to the date hereof and all such personal property taxes have been paid.  Landlord has timely paid any federal, state, local or foreign, real property, personal property, sales or use taxes, and room, occupancy, ad valorem or similar taxes.  Landlord  (i) has not received any written notice from a governmental authority for an audit of any business and occupation taxes, retail sales taxes, gross receipts taxes, tourist development taxes, and other special lodging or hotel taxes and assessments (collectively, "**Business Taxes**"), which has not been resolved or completed; and (ii) is not currently contesting any Business Taxes.

(j)     All utilities water, sewer, gas, and electric, will be available for use on or before the Delivery Date.  ~~Intentionally Omitted.~~

(k)     None of Landlord, the Demised Premises or the Tower Hotel is subject to any Union Agreement with respect to any Employees.

(l)     (i) Neither Landlord nor any prohibited Person with whom U.S.  persons or entities are restricted from doing business under regulations of OFAC (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute or the Executive Order, or other governmental action, (ii) Tenant's activities do not violate the Money Laundering Act or the Patriot Act, and (iii) throughout the Term of this Lease, Landlord shall comply with the Executive Order, the Money Laundering Act, and the Patriot Act.

(m)     Landlord has not (i) made a general assignment for the benefit of creditors, (ii) filed any involuntary petition in bankruptcy or suffered the filing of any involuntary petition by Landlord's creditors, (iii) suffered the appointment of a receiver to take possession of all or substantially all of Landlord's assets, (iv) suffered the attachment or other judicial seizure of all, or substantially all, of Landlord's assets, (v) admitted in writing its inability to pay its debts as they come due, or (vi) made an offer of settlement, extension or composition to its creditors generally.

(n)     There is no agreement, whether written or oral, between Landlord and any party as to the graffiti art located on the exterior of the Demised Premises and no other party has any rights in  or to such art, to require that such  graffiti art remain displayed on the Demised Premises or any right to receive payment for the graffiti art.

(o)     There is no agreement currently in effect, whether written or oral, between Landlord and any party which grants any right of first refusal or other right to operate a food and beverage business or any other business within the Demised Premises.

**ARTICLE 17 – TERMINATION RIGHTS AND OBLIGATIONS**

17.1     ~~Early Termination of Lease.~~ Termination Procedures.   Upon the effective date of termination of this Lease by Landlord pursuant to Section 14.2 or on the last day of the Term, Tenant shall (a) cease to operate the Business, (b)  assign, surrender or turn over to Landlord (or its designee) all of Tenant's FF&E and Inventory remaining at the Demised Premises after the end of the Term, (c) cooperate in the transfer of any operating licenses, Permits and other authorizations specific to the operation of the Business at the Demised Premises  in accordance

4320045 v1 - 07879 / 003

32

with applicable law; and (d) terminate (or at Landlord's election, assign to Landlord to the extent permitted) all Property Operating Agreements. Tenant shall, at its sole cost and expense, excepting reasonable ordinary wear and tear, promptly surrender up and deliver possession of the Demised Premises to Landlord in broom clean condition, however, any Tenant's FF&E remaining in the Demised Premises shall be conveyed to Landlord at the expiration or earlier termination of the Term at no cost to Landlord. Landlord and Tenant shall fully cooperate with each other in connection with all matters relating to the turnover of the Demised Premises which are necessary for the transfer of the Demised Premises to Landlord or its designee. The respective obligations of the Parties under this Section 17.1 shall survive the termination of this Lease or last date of the Term.

**ARTICLE 18 EARLY TERMINATION OF LEASE**

~~17.1~~ Notwithstanding anything to the contrary contained herein, Tenant shall have the right to terminate this Lease (each, a "**Termination Right**") (a) with the termination effective during Lease Years 5 through 10 by providing Landlord, no earlier than the first (1st) day of the fifth (5th) Lease Year, with at least two (2) years' prior written notice of Tenant's intent to terminate this Lease (in which case Tenant will owe a termination fee equal to twelve (12) months of the then current Base Rent, including all Additional Charges); (b) with the termination effective during Lease Years 11 through 20 by providing Landlord with at least one (1) year's prior written notice of Tenant's intent to terminate this Lease (in which case Tenant will owe a termination fee equal to six (6) months of the then current Base Rent, including all Additional Charges). Tenant's notice of termination to Landlord shall be referred to as a "**Termination Notice**" and the period of time between the giving of the Termination Notice and the termination date shall be referred to as the "**Termination Notice Period**". The termination date of this Lease shall be set forth in the Termination Notice. A Termination Notice shall not be effective unless accompanied by the payment to Landlord of one half of the termination fee with the remainder of such fee due and payable on the termination date. ~~In the event Tenant exercises its termination right as provided in this **Article 18**,~~ all of the terms of this Lease, including, but not limited to Tenant's obligation to pay Base Rent, Percentage Rent and Additional Rent shall continue to be applicable through the Termination Notice Period. Upon the effective date of termination of this Lease by Landlord pursuant to this **Article 18**, Tenant shall surrender the Premises in accordance with the terms and conditions of **Article 17.1** as though the termination date set forth in the Termination Notice were the Expiration Date under this Lease and shall pay to Landlord, in addition to the Termination Fee, any outstanding amounts due Landlord as of the termination date.

~~17.2 Termination Procedures. Upon the effective date of termination of this Lease by Landlord pursuant to Section 14.2 or Section 17.1 above, or on the last day of the Term, Tenant shall (a) cease to operate the Business, (b) assign, surrender or turn over to Landlord (or its designee) all of Tenant's FF&E and Inventory remaining at the Demised Premises after the end of the Term, (c) cooperate in the transfer of any operating licenses, Permits and other authorizations specific to the operation of the Business at the Demised Premises in accordance with applicable law; and (d) terminate (or at Landlord's election, assign to Landlord to the extent permitted) all Property Operating Agreements. Tenant shall, at its sole cost and expense, excepting reasonable~~

**CONFIDENTIAL**                                           FULLER000126

~~ordinary wear and tear, promptly surrender up and deliver possession of the Demised Premises to Landlord in broom-clean condition, however, any Tenant's FF&E remaining in the Demised Premises shall be conveyed to Landlord at the expiration or earlier termination of the Term at no cost to Landlord. Landlord and Tenant shall fully cooperate with each other in connection with all matters relating to the turnover of the Demised Premises which are necessary for the transfer of the Demised Premises to Landlord or its designee.~~ The respective obligations of the Parties under this ~~Section 17.2~~ shall survive the termination of this Lease or last date of the Term.

**~~ARTICLE 18~~ARTICLE 19 –MISCELLANEOUS**

~~18.1~~19.1      Notices.  Any notice which either party to this Lease desires to give to the other must be made in writing and may be affected by personal delivery or by nationally recognized overnight mail carrier such as FedEx or DHL to the address of Landlord and Tenant as set forth on Page 1 of the Lease.  It shall be deemed to have been delivered when received or refused by the party to whom it is addressed.  Nothing herein contained shall be construed as forbidding Landlord or Tenant from changing the place for giving notice to itself by; provided, however, that no such change shall be effective unless and until notice of the change shall have been given in accordance with the aforesaid notice provision. Copies of any notices to Tenant shall also be sent to ~~yoav@selina.com~~karyt@selina.com and sp@selina.com in order to be effective. Copies of any notice to Landlord shall also be sent to bill@barlingtongroup.com and martin@barlingtongroup.com in order to be effective.

~~18.2~~19.2      Binding on All Parties. Each and all of the provisions hereof shall be binding up and shall inure to the benefit of the heirs, executors, administrators, successors or assignees of Landlord, and the heirs, executors, administrators or assigns of Tenant, if any assignment be made by Tenant with the prior written consent of Landlord.

~~18.3~~19.3      Time. Time is of the essence with respect to each and every provision of this Lease in which time is a factor.

~~18.4~~19.4      Attorneys' Fees; Venue.  Notwithstanding anything to the contrary contained in this Lease, in the event of any litigation between Landlord and Tenant arising out of this Lease or Tenant's use and occupancy of the Demised Premises, the prevailing party shall be entitled to recover its costs and expenses incurred in such litigation, including reasonable attorneys' fees, at all levels, including appeals. Any legal action or proceeding arising out of or in any way connected with this Lease shall be instituted in a court (federal or state) located in Miami-Dade County, Florida, which shall be the exclusive jurisdiction and venue for litigation concerning this Lease.

~~18.5~~19.5      Holding Over.  If Tenant remains in possession of the Demised Premises or any part thereof after the expiration of the Term without any written agreement of the parties authorizing Tenant to do so, Tenant shall be only a tenant at will, at a rent equal to one hundred ~~twenty-five~~fifty percent (~~125~~150%) of the Base Rent in effect immediately prior to the expiration of the Term, together with the Additional Charges and any other charges set forth in this Lease, and no renewal of this Lease or exercise of an option may occur by operation of law. The foregoing provisions in this Section ~~18~~19.5 shall not prejudice any rights of Landlord in the event Tenant remains in possession of the Demised Premises after the expiration of the Term

4320045 v1 - 07879 / 003                                    34

without Landlord's acquiescence, including, without limitation, the right to dispossess Tenant or to recover any damages Landlord might have by virtue of Tenant's holding over.

~~18.6~~19.6    Nature and Extent of Agreement.  This Lease contains the complete agreement of the parties hereto regarding the terms and conditions of the lease of the Demised Premises, and there are no oral or written conditions, terms, understandings or other agreements pertaining thereto which have not been incorporated in this Lease.  Landlord and Tenant agree that the fact either one of them may have drafted this Lease or any portion thereof shall not be used to construct such provisions against its author.  Nothing in this Lease shall in any way be construed to impose upon either Landlord or Tenant any obligations or restrictions that are not expressly set forth in this Lease.  The laws of the State of Florida in which the Demised Premises is located shall govern the validity, interpretation, performance and enforcement of this Lease.  The captions and the table of contents used in this Lease are for convenience only and do not in any way limit or amplify the terms and provisions hereof.  Whenever the singular number is used, the same shall include the plural, and words of any gender shall include each other gender.

~~18.7~~19.7    Waivers.  One or more waivers of any covenant, term or condition of this Lease by Landlord shall not be construed as a waiver of any subsequent breach of the same covenant, term or condition.  The consent or approval by Landlord to or of any act by Tenant requiring such consent or approval shall not be deemed to waive or render unnecessary consent to or approval of any subsequent similar act.

~~18.8~~19.8    No Partnership.  All debts and liabilities incurred by Tenant in the course of its management and operation of the Business and the Demised Premises shall be the debts and liabilities of the Tenant only and Landlord shall not be liable therefore.  Nothing in this Lease shall be construed as creating a partnership between the parties hereto, or a relationship other than that of Landlord and Tenant.

~~18.9~~19.9    Counterparts.  This Lease may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

~~18.10~~19.10    Waiver of Jury Trial.   EACH OF THE PARTIES HERETO WAIVE ANY RIGHT TO A TRIAL BY JURY IN CONNECTION WITH ANY MATTER ARISING UNDER OR IN ANY WAY RELATING TO THIS AGREEMENT.

~~18.11~~19.11    Right of Expansion.

(a)    So long as no Event of Default exists, should Tenant desire to expand the operation of the Business beyond the Demised Premises, but within the Restricted Area, Tenant shall provide written notice to Landlord specifying its desire to expand the operation of the Business ("**Expansion Trigger Notice**").  Within thirty (30) days from Landlord's receipt of the Expansion Trigger Notice, Landlord shall provide (each an "**Expansion Property Notice**") Tenant with a list of properties within the Restricted Area (as defined below) that Landlord is willing to lease to Tenant (each an "**Expansion Property**") along with the terms (the "**Expansion Property Terms**") under which Landlord is willing to lease the Expansion Property to Tenant (the "**Expansion Option**") or confirm that Landlord does not presently have an

CONFIDENTIAL                                                           FULLER000128

Expansion Property with which to provide Expansion Property Terms (each a "**Notice of Lack of Expansion Properties**"). If Landlord fails to timely deliver an Expansion Property Notice, Landlord shall be deemed to have delivered a Notice of Lack of Expansion Properties. Tenant shall have five (5) days after receipt of the Expansion Property Terms from Landlord to notify Landlord of its willingness to enter into a lease based substantially in conformance with the Expansion Property Terms (an "**Expansion Property Acceptance Notice**"). Tenant and Landlord shall, within thirty (30) days after Landlord's receipt of an Expansion Property Acceptance Notice, enter into a definitive written agreement to lease the applicable Expansion Property. If Tenant does not provide the Expansion Property Acceptance Notice within such five (5) day period, Landlord shall be under no obligation to provide said Expansion Property; provided, however, before executing a lease on terms materially different from those provided in the Expansion Property Notice, Landlord shall again offer the Expansion Property to Tenant on such materially different terms as Landlord intends to accept from the third party (the "**ROFR Notice**"). Tenant shall have five (5) days after receipt of the ROFR Notice in which to notify Landlord of its willingness to enter into a lease based substantially in conformance with the terms set forth in the ROFR Notice. Likewise, if Landlord delivers or is deemed to have delivered a Notice of Lack of Expansion Properties, Tenant shall be under no obligation to lease any Expansion Properties from Landlord.

(b)     If Tenant desires to expand the operation of the Business by purchasing or leasing an Other Property, Tenant shall provide Landlord with a copy of the purchase contract or lease agreement for such Other Property within five (5) days of its execution (the "**Other Property Contract**"). Within five (5) days of Landlord's receipt of the Other Property Contract from Tenant, Landlord shall notify Tenant of its willingness to enter into an agreement with Tenant to purchase and own, or lease, and operate the Other Property. Within thirty (30) days of Tenant's receipt of the Other Property Contract, Landlord and Tenant shall enter into a definitive written agreement on terms and conditions ~~substantially similar to those terms and conditions listed on "Exhibit ___". If~~ mutually agreeable to the Parties. If, Landlord does not notify Tenant within five (5) days of receipt of the Other Property Contract from Tenant of its willingness to entire into an agreement with Tenant to purchase or lease the Other Property, or if Landlord notifies Tenant that it does not wish to enter into an agreement with Tenant to purchase or lease the Other Property, then Tenant may not proceed with the purchase or lease of such Other Property.

~~18.12~~   Right of First Offer~~.~~

~~(a)~~19.12       for 15th Avenue Parcel.   The portion of the 15th Avenue Parcel that is not currently part of the Demised Premises (the "**Remaining 15th Avenue Parcel**"), which is more particularly described on **Exhibit "~~B~~A"** attached hereto, is currently undeveloped. In the event Landlord decides to develop the Remaining 15th Avenue Parcel, Tenant shall have a right of first offer to lease the Remaining 15th Avenue Parcel so long as no Event of Default exists. Landlord shall provide Tenant with written notice identifying the terms under which Landlord is willing to lease the Remaining 15th Avenue Parcel to Tenant ("**15th Avenue ROFO Terms**"). Tenant shall have ten (10) days after receipt of the 15th Avenue ROFO Terms from Landlord to notify Landlord of its willingness to enter into a Lease based substantially in conformance with the 15th Avenue ROFO Terms (the "**15th Avenue ROFO Acceptance Notice**"). Tenant and Landlord shall, within thirty (30) days after Landlord's receipt of the 15th Avenue ROFO Acceptance

> Formatted: Heading 2,h2

**CONFIDENTIAL**                                                        **FULLER000129**

Notice, enter into a written agreement to lease the Remaining 15th Avenue Parcel. If Tenant does not provide the 15th Avenue ROFO Acceptance Notice within such ten (10) day period, Landlord shall have the right to lease the Remaining 15th Avenue Parcel to a third party on the same terms.  Before accepting lower terms, Landlord shall provide a right of first offer for the Remaining 15th Avenue Parcel to Tenant on such lower terms as set forth in the 15th Avenue ROFO Terms.  Unless and until Landlord commences construction on the Remaining 15th Avenue Parcel, Tenant and any subtenant of the F&B House shall have the right to use the entire 15th Avenue Parcel for the Business or any other business approved by Landlord within Landlord's reasonable discretion.

~~18.13   Right to Require Development of the Remaining 15th Avenue Parcel.   At any time during the first Lease Year, Tenant shall have the right to require the Landlord to develop the Remaining 15th Avenue Parcel (the "**Right to Require Development**") in accordance with the 15th Avenue Plans (defined below) and the 15th Avenue Budget (defined below) (the "**15th Avenue Development**") so long as no Event of Default exists. Tenant shall exercise its Right to Require Development by delivering written notice to Landlord at any time prior to the end of the first Lease Year (the "**15th Avenue Development Notice**"). Within sixty (60) days from Landlord's receipt of the 15th Avenue Development Notice, Landlord shall provide Tenant with a set of plans (the "**15th Avenue Plans**") and a cost budget (the "**15th Avenue Budget**") with regard to the 15th Avenue Development, reasonably acceptable to Tenant. Within fifteen (15) days of Tenant's receipt of the 15th Avenue Plans and the 15th Avenue Budget, Tenant shall provide Landlord with notice as to whether Tenant will exercise Tenant's Right to Require Development. The rent for the 15th Avenue Development shall be equal to (a) 37.00 per square foot NNN, increased by 3% annually starting with the second Lease Year (as to the ground floor), plus (b) 8% of the cost to build the upper floors (including 8% of Landlord's original acquisition cost of the Remaining 15th Avenue Parcel) in accordance with the 15th Avenue Annual Budget, determined at the time the 15th Avenue Development is delivered to Tenant  (the "**15th Avenue Development Delivery Date**"). Rent payment for the 15th Avenue Development shall commence on the 15th Avenue Development Delivery Date. Should Tenant fail to accept the 15th Avenue Plans and/or the 15th Avenue Budget, Tenant shall reimburse Landlord for all Landlord's reasonable costs and expenses related thereto.~~

~~18.14~~19.13   Right of First Offer.  In the event Landlord decides to sell the Demised Premises, or any part thereof, Tenant shall have a right of first offer to purchase same so long as no Event of Default exists.  Landlord shall provide Tenant with written notice identifying the terms under which Landlord is willing to sell the Demised Premises, or any part thereof to Tenant ("**Demised Premises ROFO Terms**").  Tenant shall have ten (10) days after receipt of the Demised Premises ROFO Terms from Landlord to notify Landlord of its willingness to purchase the Demised Premises, or part thereof, on the terms and conditions contained in the Demised Premises ROFO Terms (the "**Demised Premises Acceptance Notice**").  Tenant and Landlord shall, within ten (10) days after Landlord's receipt of the Demised Premises Acceptance Notice, enter into a written agreement to sell the Demised Premises, or part thereof. If Tenant does not provide the Demised Premises ROFO Acceptance Notice within such ten (10) day period, Landlord shall have the right to sell the Demised Premises, or any part thereof, to a third party on substantially similar terms.  Before accepting lower terms, Landlord shall provide a right of first offer for the Demised Premises, or part thereof to Tenant on such lower terms as Landlord would be willing to accept.

CONFIDENTIAL                                    FULLER000130

~~18.15   Right of First Refusal.   In addition to the right of first offer described in subsection 14, Tenant shall have the right of first refusal to purchase the Demised Premises during the Term. In the event that Landlord receives a contract for the sale of the Demised Premises or any portion or interest therein that Landlord is willing to accept, Landlord shall deliver a copy of said contract to Tenant. The contract shall require cash or a letter of credit deposit and shall be entered into by Landlord in good faith without any present or future intent to circumvent Tenant's right of first refusal, as herein set forth. Tenant shall have a period of thirty (30) days from the date of delivery of the contract to elect to purchase the Demises Premises on the same terms and conditions as are contained in said contract. If Tenant shall elect to so purchase the Demised Premises, Tenant shall deliver a notice to that effect to Landlord and Tenant shall deliver a check or letter of credit in the amount of the deposit which is required from the purchaser under the terms of said contract. Landlord and Tenant will be bound by the terms of the contract and the transaction will close in accordance with the terms of the contract. If Tenant does not elect to purchase the Demised Premises pursuant to the terms and conditions contained in said contract, Landlord may proceed to close with the purchaser thereunder and the right of first refusal shall, under such circumstances, become null and void and have no further force or effect; provided, however, if such purchaser fails to close the transaction, this right of first refusal shall remain in full force and effect. If Tenant shall elect to exercise the right of first refusal and thereafter Landlord shall fail or refuse to close the transaction pursuant to the terms of the contract, Tenant shall be entitled to seek damages against Landlord or specific performance for the performance of the contract.~~

19.14   Intentionally Omitted.

~~18.16~~19.15     Radius Restriction.  During the Lease Term, neither Landlord nor any of its affiliates shall operate a hostel or lease to any third party any space for use as a hostel within that geographic area that is located within the following boundaries:  From SW 16th Street to NW 1st Street and between 8th Avenue and 27th Avenue, Miami, FL 33135 (the "**Restricted Area**").

~~18.17~~19.16     Tower Hotel Name.  Tenant may operate is Business under any name it chooses, but must maintain the existing signage outside of the Tower Hotel, and must state in any tagline, description, or freehand text that the Business and/or hostel, as the case may be, that it is located at the Tower Hotel (in one form or another reasonably acceptable to Landlord and Tenant).

~~18.18~~19.17     Lease Guaranty. This Lease is expressly conditioned upon ~~Dekel Hostel Holdings, S.A~~SELINA HOSPITALITY PLC., as guarantor (the "Guarantor"), executing that certain Guaranty of Amended and Restated Lease Agreement with respect to this Lease in the form attached hereto as **Exhibit "~~E~~D"** and by this reference made a part hereof (the "**Guaranty**").  Upon execution and delivery of the Guaranty by Guarantor, the prior Guaranty of Lease Agreement executed and delivered to Landlord in connection with the Original Lease shall be terminated and of no further force and effect.

**(Signatures begin on following page)**

CONFIDENTIAL                                        FULLER000131

IN WITNESS WHEREOF, we have hereunto set our hands and seals this _____ day of January, ~~2018~~2022.

WITNESSES:                                  LANDLORD:

_____                  TOWER HOTEL LLC, a Florida limited
Signature                                   liability company

_____
Print Name                                  By: _____
                                                Print Name: _____
                                                Its: _____

_____
Signature

_____
Print Name

(Signatures continue on following page)

~~#51334939_v13~~4320045 v1 - 07879 / 003

WITNESSES:

TENANT:

_____
Signature

SELINA ~~MIAMI OPERATIONS~~OPERATION LITTLE HAVANA, LLC,
a Delaware limited liability company

_____
Print Name

_____
Signature

By: _____
    Print Name: _____
    Its: _____

_____
Print Name

~~#51334939_v13~~4320045 v1 - 07879 / 003

**EXHIBIT "A"**

**LEGAL DESCRIPTION AND SKETCH OF PROPERTY**

**Tower Hotel - 1450 SW 7th Street, Miami, Florida 33135**

Lot 7, Block 104, LAWRENCE ESTATE LAND CO'S SUBDIVISION, according to the Plant thereof, as recorded in Plat Book 2, Page 46, of the Public Records of Miami-Dade County, Florida.

**F&B House and Pool – 1460 SW 7th Street, Miami, Florida 33135**

Lot 8, Block 104, LAWRENCE ESTATE LAND CO'S SUBDIVISION, according to the Plant thereof, as recorded in Plat Book 2, Page 46, of the Public Records of Miami-Dade County, Florida.

**Tower House – 1444 SW 7th Street, Miami, Florida 33135**

Lot 6, Block 104, LAWRENCE ESTATE LAND CO'S SUBDIVISION, according to the Plant thereof, as recorded in Plat Book 2, Page 46, of the Public Records of Miami-Dade County, Florida.

**15th Avenue Parcel – 717 SW 15th Avenue, Miami, Florida 33135**

The South 45 feet of Lots 9 and 10, Block 104, LAWRENCE ESTATE LAND CO'S SUBDIVISION, according to the Plant thereof, as recorded in Plat Book 2, Page 46, of the Public Records of Miami-Dade County, Florida.

NOTE: The Remaining 15th Avenue Parcel (as shown on Exhibit "B" attached hereto) is not part of the Demised Premises although it is included in the above legal description.

4320045 v1 - 07879 / 003

CONFIDENTIAL

**EXHIBIT "B"**

~~Remaining 15th Avenue Parcel~~

**30 Days**
**Flooring in Co-Work building to be corrected and decking to be corrected**
**Railings surrounding pool deck to be code compliant**

> Formatted: No underline

> Formatted: Normal, Left

> Formatted: Default Paragraph Font

4320045 v1 - 07879 / 005

**CONFIDENTIAL**

FULLER000135

**EXHIBIT "C"**

~~PUNCH LIST ITEMS~~

Formatted: Body Text

Formatted: Default Paragraph Font

4320045 v1 - 07879 / 005

**CONFIDENTIAL**

FULLER000136

**Open Permits/Violations**

Formatted: Default Paragraph Font

4320045 v1 - 07879 / 005

**EXHIBIT "D"**

<u>**GUARANTY OF LEASE AGREEMENT**</u>

In consideration of and as a material inducement to TOWER HOTEL LLC, a Florida limited liability company (hereinafter called "**Landlord**") executing and delivering simultaneously herewith, in reliance upon this Guaranty that certain Amended and Restated Lease Agreement (the "**Lease**") dated January ____, ~~2018~~2022 between Landlord and SELINA ~~OPERATIONS~~OPERATION LITTLE HAVANA, LLC, a Delaware limited liability company (hereinafter called "**Tenant**"), the undersigned ~~DEKEL HOSTEL HOLDINGS, S.A.~~SELINA HOSPITALITY PLC. (hereinafter called "**Guarantor**") hereby unconditionally and absolutely guarantees unto Landlord, it successors and assigns, the payment by Tenant (and Affiliates of Tenant, if this Lease is assigned to an Affiliate of Tenant) of any unpaid portion of the Termination Fee, as well as any unpaid Base Rent and Additional Charges, through the later of (i) last day of Lease Year six (6), or (ii) the expiration of the Termination Notice Period.  Should Tenant vacate the Premises or otherwise cease doing business therefrom ~~without complying with Section 17.1 of the Lease~~, Tenant will be deemed, for purposes of this Guaranty only, to have given a Termination Notice upon such date.

Guarantor does hereby waive notice of any non-payment of the Termination Fee or Base Rent or Additional Charges on the part of Tenant, waives acceptance and notice of acceptance of this Guaranty, and waives all demands for payment or performance. Guarantor agrees that no delay on the part of Landlord in enforcing any of its rights or remedies or insisting thereupon, nor any extension of time nor any charges or modifications in or to, or in connection with the Lease, shall in any way limit, affect or impair the liability of Guarantor hereunder; and Guarantor hereby expressly consents to and approves thereof with the same force and effect as though its written consent had been given to each of such delays, extensions, changes and modifications.

This Guaranty is independent of and in addition to any security or other remedies which landlord has or may have for the performance of any of the obligations on the part of Tenant. Guarantor agrees that Landlord shall not be required to resort to any other security or other remedies before proceeding upon this Guaranty, but that Landlord may proceed hereunder against Guarantor at any time it sees fit, independently of or concurrently with any other remedies it may have.

The undersigned agree that in the event of insolvency, bankruptcy, or reorganization of Tenant, any liquidation, dissolution, winding-up or cancellation of the legal status of Tenant, any composition or arrangement by Tenant with its creditors, and irrespective of any rejection, assignment or termination of the Lease or any of the terms and conditions thereof by Tenant or any trustee of Tenant in connection with any petition for bankruptcy or reorganization filed by

Tenant under the Bankruptcy Code or any other applicable federal or state law, the undersigned shall, nonetheless, remain liable hereunder for the full and complete performance of

4320045 v1 - 07879 / 003

**CONFIDENTIAL**

FULLER000138

the terms and conditions of the Lease to be complied with or performed by Tenant during the entire Lease Term designated in the Lease.

No set-off, counterclaim, reduction or diminution of any obligation, or any defense of any kind or nature which the Guarantor has or may have against Landlord shall limit or in any way affect the obligations of the Guarantor hereunder.

If this Guaranty is executed by two (2) or more corporation, individuals, firms, partnerships (general or limited) or other entities (or any combination thereof) the liability of said parties executing this Guaranty shall be joint and several.

In the event of any litigation between Landlord and Guarantor arising out of this Guaranty, the prevailing party shall be entitled to recover its costs and expenses incurred in such litigation, including reasonable attorneys' fees, at all levels, including appeals. Any legal action or proceeding arising out of or in any way connected with this Guaranty shall be instituted in a court (federal or state) located in Miami-Dade County, Florida, which shall be the exclusive jurisdiction and venue for litigation concerning this Guaranty.

This Guaranty shall be binding upon the undersigned, the undersigned's successors and assigns, and shall inure to the benefit of Landlord, its successors and assigns and to the benefit of any successor to the interest of Landlord under the Lease.

Signed And Acknowledged
In The Presence Of:

GUARANTOR:

SELINA HOSPITALITY PLC

DEKEL HOSTEL HOLDINGS, S.A.

_____     _____
Name: _____

_____     Date:_____
Name : _____

Formatted: Default Paragraph Font

4320045 v1 - 07879 / 005

**EXHIBIT "E"**

**TENANT WORK**

This Work Letter (~~"("Work Letter")~~ is a part of that certain Lease Agreement (the ~~"~~**Lease**~~"),~~") between TOWER HOTEL, LLC, a Florida limited liability company (the ~~"~~**Landlord**~~"),~~"), and SELINA ~~OPERATIONS Little Havana~~OPERATION LITTLE HAVANA LLC, a Delaware ~~corporation~~limited liability company (the ~~"~~**Tenant**~~"),~~"), relating to the Demised Premises fully identified in the Lease.  Capitalized terms used herein, unless otherwise defined in this Work Letter, shall have the respective meanings ascribed to them in the Lease.  ~~For~~In the event of any inconsistencies between this Work Letter and the Lease, the terms of this Work Letter shall control for and in consideration of the agreement to lease the Demised Premises and the mutual covenants contained herein and, in the Lease, Landlord and Tenant hereby agree as follows:

1.  **The Plans; the Work.**  ~~The Parties agree and acknowledge that any work to be performed by~~Promptly after the ~~Landlord has been completed and accepted to the satisfaction of Tenant.~~ Delivery Date, Tenant shall ~~perform~~commence and diligently pursue, certain leasehold improvement work in the Demised Premises ~~as described on the final plans~~substantially in accordance with the Final Plans attached hereto as **Schedule 1** (the "**Final Plans**").  The leasehold improvement work as shown in the Final Plans shall be hereinafter referred to as the "~~Work" and shall include any landscaping plans.~~"**Tenant Work**".  Neither the approval by Landlord of the Work or the Final Plans or any other plans, drawings, specifications or other items associated with the Work nor Landlord's performance, supervision or monitoring of the Work shall constitute any warranty by Landlord to Tenant of the adequacy of the design for Tenant's intended use of the Demised Premises or its compliance with all applicable laws.  Tenant shall be fully responsible for all operational activities pertaining to the Tenant Work, including, but not limited to, conducting a legitimate bid proposal process and managing the project, obtaining permits, license and certificates of use, and otherwise taking responsibility for scheduling, delivery, and all other aspects of the Tenant Work.  Within five (5) business days from the receipt of all approvals from the City of Miami necessary for the permit for Tenant's Work, Tenant shall pay all required permit fees related thereto.  Should Tenant's Work not be substantially completed within twelve (12) months from the issuance of permits for the F&B House ("Completion Date"), Base Rent shall increase by $10,000.00 for each month, or portion thereof, past the Completion Date, that the Tenant's Work is not substantially complete.

Tenant shall reimburse Landlord for certain costs incurred by Landlord on behalf of Tenant in accordance with **Schedule 3** attached hereto ("**Landlord's Costs**") upon Tenant's first Advance.  Within sixty (60) days of the Commencement Date, Tenant shall (a) commence Tenant's Work, and (b) provide Landlord with the following: (i) detailed cost breakdown of Tenants Work, including a complete and detailed list of all hard and soft costs, (ii) additional project costs estimates for any tenant or Third Party build outs, not included in (i) above, including any applicable FF&E, (iii) final plans and specifications for the project, (iv) copies of executed contracts with Tenant's general contractor and architect, the later to be on A1A standard form, (v) if applicable, a detailed list of all expenses related to Tenant Work or Tenant's FF&E incurred by Tenant prior to the Effective Date, including copies of any invoices marked paid and cashed checks, and (v) a detailed project configuration, including the number and size

4320045 v1 - 07879 / 003

of units, model plans, descriptions of commons areas, amenities and parking and any other specifications reasonable requested by Landlord.

2.   -**Payment for Work**.  Tenant shall cause the Tenant Work to be performed, at Tenant's sole cost and expense, substantially in accordance with the Final Plans.  Landlord shall loanprovide to Tenant a total of FourOne Million Two Hundred Fifty Thousand and No/00 Dollars ($4501,250,000.00)("TI Funds) ("**Tenant Improvement Allowance**") to be funded and used in accordance herewith. Tenant agrees and acknowledges it will spend a minimum of $450,000, in addition to the TI Funds, to complete the Final Plans. The Final Plans will include a construction scope and schedule which will provide for the funding scheduled for the TI Funds.  In accordance therewith, and upon execution hereof, Tenant Improvement Allowance.   The Tenant Improvement Allowance shall be used as follows: (i) $50,000.00 shall be used for improvements to the 15th Avenue Parcel; (ii) $800,000.00 shall be used for the improvements described on attached Schedule 1 and in accordance with permit number              ; and (iii) $400,000.00 shall be used in Tenant's discretion for Tenant's FF&E at the Demised Premises.

3.   **Conditions of each** Party shall fund such **Advance**.

a.   Advances.  The Tenant Improvement Allowance, less the Landlord's Costs, shall be held in a reserve account by Landlord's lender in ("**Escrow Agent**") and disbursed as follows: (i) $800,000.00 within ten (10) Business Days of receipt by all necessary parties of Tenant's complete request, (ii) $200,000.00 within five (5) Business Days of by all necessary parties of Tenant's complete request.   Prior to any draw from the Tenant Improvement Allowance requested by Tenant (each an "**Advance**"), Tenant shall supply Landlord, Escrow Agent, Escrow Agent's counsel and Escrow Agent's inspector with a written request, on Tenant's letterhead (in form reasonably acceptable to Landlord and Escrow Agent) for an Advance, which request shall set forth the amount as is required insought, shall constitute a covenant and affirmation of Tenant that the warranties and representations in this Lease are correct and true, that all the covenants, terms and conditions of this Lease are being complied with, similar to the form on " **Schedule "4"** attached hereto. The form for Advances must be executed by Tenant's general contractor and architect, and all requests for Advances must be accompanied by such other evidence as may from time to time be reasonably requested by Landlord or Escrow Agent including, but not limited to, invoices, receipts, applications, surveys, releases, agreements, waivers of liens from all subcontractors and materialmen indicating the dollar amount received from previous draw, waiver of liens from the general contractor for the total amount of the previous draw and indicating that all outstanding claims for labor, materials and fixtures through the date of the last Advance have been paid and liens therefor waived in writing, and written certification signed by Tenant's architect that the construction has been performed substantially in accordance with the Final Plans.  Upon receipt of the above, Escrow Agent shall inspect the work done relative to the Advance requested to determine compliance with the Final Plans directly to                      who shall act as escrow agent to the Parties and shall disburse the TI Funds in accordance with the Final Plans and .  Submittal of the above, an approved inspection and a title endorsement acceptable to Escrow Agent shall be required to consider Tenant's request complete.  Any costs associated with each Advance disbursement from the Escrow Agent, shall be split in half by Landlord and Tenant. Each Advance will be reduced by all costs associated with such inspection and issuance and review of updated title for Tenant's portion

Formatted: Font: Bold, Underline

Formatted: Expanded by  0.1 pt

Formatted: Expanded by  0.1 pt

Formatted: Default Paragraph Font

4320045 v1 - 07879 / 003

of the cost.  Notwithstanding anything contained herein to the contrary, no Advance shall be payable prior to the Delivery Date and there shall be no more than 4 Advances made in total.

b.   FF&E Advances.  Within three (3) days of the Effective Date, Landlord shall deposit $250,000.00 of the Tenant Improvement Allowance ("FF&E Escrow") with the Alhadeff Law Group, P.L. to hold in accordance with a separate escrow agreement to be executed contemporaneously hereto.and to be used exclusively for Tenant's FF&E.  Advances requested from the FF&E Escrow shall be disbursed by Landlord within five (5) days of receipt of a Tenant's request, along with a copy of Tenant's purchase orders comprising such request. Within thirty (30) days from the Commencement Date, Tenant shall provide to Landlord an itemized list of all Tenant's FF&E, which list shall include delivery receipts and pictures of each item in the Demised Premises.  In the event that any part of the FF&E Escrow was used to purchase an item not located on the Demised Premises, the amount disbursed for such item shall be immediately due and payable by Tenant to Landlord.

c.    3.   Additional Charges.Notwithstanding the foregoing, should Landlord or Landlord's lender delay any Advances related to Tenants FF&E and 15th Avenue Parcel, after a receipt of a complete request from Tenant, the Base Rent shall be reduced by $2,000.00 for every day an Advance related to Tenant's FF&E is withheld.  Should Landlord or Landlord's lender delay any other Advances, after a receipt of a complete request from Tenant, the Base Rent shall be reduced by $2,000.00 for every day such Advances are withheld, but such reduction in Base Rent shall not commence until the Completion Date of the F&B House.

4.   Disbursements.  Upon approval of each Advance, Escrow Agent will promptly disburse such Advance to Tenant or Tenant's general contractor.

5.   Tenant Improvement Allowance Payments.  The Tenant Improvement Allowance shall accrue interest at ten percent (10%) per annum, based on a 20 year amortization and shall be due in full upon the expiration or early termination of this Lease, Tenant shall repay Landlord for the TI Funds as an Additional ChargeTenant Improvement Allowance in the amount of $4,333.6613,763.58 per month ("TI PaymentTenant Improvement Recapture"), for 20 years, beginning on the Commencement Date in accordance with the amortization schedule attached hereto as Schedule 2.  Upon termination of thisthe Lease for any reason, including non-renewal, which, for this paragraph will be treated as a termination, all unpaid TI PaymentsTenant Improvement Recapture payments will be immediately due and payable.  Should Tenant elect to terminate the Lease in accordance therewith, such termination notice shall be accompanied by the remaining unpaid TI Payments.Tenant Improvement Recapture payments.  Notwithstanding anything contained herein to the contrary, TI PaymentsTenant Improvement Recapture payments are not considered Base Rent and will be treated as Additional Charges.

45.Representatives.  Landlord hereby appoints and Tenant hereby approves the following persons as Landlord's representative to act for Landlord in all matters covered by this Work Letter.  Tenant hereby appoints and Landlord hereby approves the following persons as Tenant's representative to act for Tenant in all matters covered by this Work Letter.

Landlord Representative                    Tenant Representative

4320045 v1 - 07879 / 005

1.  William Fuller, or                    ~~1.   Steven Ohayon, or~~

2.  Martin Pinilla                         ~~2.   Rafael Museri~~

                                            1.   Christian Darlington
                                                 (christian.darlington@selina.com), or

                                            2.   John Gil (johng@selina.com)

All inquiries, requests, instructions, authorizations and other communications with respect to the matters covered by this Work Letter shall be made to Landlord's Representative or Tenant's Representative as the case may be.  Authorization made by Tenant's Representative shall be binding and Tenant shall be responsible for all cost authorized by Tenant's Representative.  Either party may change its representative under this Work Letter at any time by written notice to the other party.

~~5.~~ **6. Final Advance.**  Upon reaching completion of the Tenant Work, in addition to satisfying all of the conditions and supplying all the documents required in Paragraph 3 above, Tenant shall supply Landlord, prior to disbursement of the final Advance:

**a)** Certificates from Tenant's architect and general contractor, certifying that the Tenant Work has been completed in accordance with, and as completed comply with, the Final Plans and all Laws and governmental requirements; and Landlord shall have received two (2) sets of detailed "as built" plans approved in writing by Tenant, Tenant's architect and general contractor;

**b)** Final affidavits (in a form approved by Landlord and any lender with a mortgage interest in the Demised Premises), from Tenant's architect, general contractor and each contractor certifying that each of them and their subcontractors, laborers, and materialmen has been paid in full for all labor and materials for construction of the Tenant Work; and final lien releases or waivers (in a form approved by Landlord) by Tenant's architect, general contractor, and all subcontractors, materialmen, and other parties who have supplied labor, materials, or services for the construction of the Tenant Work, or who otherwise might be entitled to claim a contractual, statutory or constitutional lien against the Demised Premises;

**c)** Evidence that all applicable laws and governmental requirements have been satisfied, including receipt by Tenant of all necessary governmental licenses, certificates and permits (including certificates of occupancy) with respect to the completion, use, occupancy and operation of the Tenant Work, together with evidence satisfactory to Landlord that all such licenses, certificates, and permits are in full force and effect and have not been revoked, canceled or modified; and,

**d)** A schedule of all of Tenant's FF&E purchased with Advance funds and all other instruments and documents reasonable required by Landlord.

Formatted: Default Paragraph Font

4320045 v1 - 07879 / 005

7.  **Miscellaneous**.

    (a)  This Work Letter shall be subject to the governing law, jurisdiction, and venue provisions set forth in the Lease.

    (b)  This Work Letter may not be amended except by a written instrument signed by Landlord and Tenant.

    (c)  Notices under this Work Letter shall be given in the same manner as under the Lease, except that such notices shall be directed to the parties set forth in this Work Letter.

    (d)  The headings set forth herein are for convenience only and form no substantive or binding part of this Work Letter.

    (e)  This Work Letter sets forth the entire agreement of Tenant and Landlord regarding the Work.

Formatted: Default Paragraph Font

CONFIDENTIAL

FULLER000144

**SCHEDULE 1 TO WORK LETTER**
**<u>FINAL PLANS</u>**

Formatted: Default Paragraph Font

CONFIDENTIAL

FULLER000145

**SCHEDULE 2 TO WORK LETTER**
**AMORTIZATION ~~SHEDULE~~SCHEDULE**

Formatted: Font: Not Bold, No underline

| # | Month | Interest | Principal | Balance |
|---|---|---|---|---|
| 1 | ~~Dec~~Nov 2020 | $~~3,738.75~~12,500.00 | $~~594.91~~1,263.58 | $~~449,405.09~~1,248,736.38 |
| 2 | ~~Jan 2021~~Dec 2020 | $~~3,733.81~~12,487.36 | $~~599.85~~1,276.22 | $~~448,805.25~~1,247,460.12 |
| 3 | ~~Feb~~Jan 2021 | $~~3,728.82~~12,474.60 | $~~604.84~~1,288.98 | $~~448,200.41~~1,246,171.25 |
| 4 | ~~Mar~~Feb 2021 | $~~3,723.80~~12,461.71 | $~~609.86~~1,301.87 | $~~447,590.53~~1,244,869.38 |
| 5 | ~~Apr~~Mar 2021 | $~~3,718.73~~12,448.69 | $~~614.93~~1,314.89 | $~~446,975.59~~1,243,554.50 |
| 6 | ~~May~~Apr 2021 | $~~3,713.62~~12,435.54 | $~~620~~1,328.04 | $~~446,355.59~~1,242,226.50 |
| 7 | ~~Jun~~May 2021 | $~~3,708.47~~12,422.26 | $~~625.19~~1,341.32 | $~~445,730.38~~1,240,885.00 |
| 8 | ~~Jul~~Jun 2021 | $~~3,703.28~~12,408.85 | $~~630.38~~1,354.73 | $~~445,100.00~~1,239,530.38 |
| 9 | ~~Aug~~Jul 2021 | $~~3,698.04~~12,395.30 | $~~635.62~~1,368.28 | $~~444,464.38~~1,238,162.12 |
| 10 | ~~Sep~~Aug 2021 | $~~3,692.76~~12,381.62 | $~~640.90~~1,381.96 | $~~443,823.47~~1,236,780.12 |
| 11 | ~~Oct~~Sep 2021 | $~~3,687.43~~12,367.80 | $~~646.23~~1,395.78 | $~~443,177.25~~1,235,384.38 |
| 12 | ~~Nov~~Oct 2021 | $~~3,682.06~~12,353.84 | $~~651.60~~1,409.74 | $~~442,525.66~~1,233,974.62 |
| 13 | ~~Dec~~Nov 2021 | $~~3,676.65~~12,339.75 | $~~657.01~~1,423.83 | $~~441,868.66~~1,232,550.75 |
| 14 | ~~Jan 2022~~Dec 2021 | $~~3,671.19~~12,325.51 | $~~662.47~~1,438.07 | $~~441,206.19~~1,231,112.62 |
| 15 | ~~Feb~~Jan 2022 | $~~3,665.69~~12,311.13 | $~~667.97~~1,452.45 | $~~440,538.22~~1,229,660.25 |
| 16 | ~~Mar~~Feb 2022 | $~~3,660.14~~12,296.60 | $~~673.52~~1,466.98 | $~~439,864.66~~1,228,193.25 |
| 17 | ~~Apr~~Mar 2022 | $~~3,654.54~~12,281.93 | $~~679.12~~1,481.65 | $~~439,185.56~~1,226,711.62 |

Formatted: Default Paragraph Font

4320045 v1 - 07879 / 005

| | | | | |
|---|---|---|---|---|
| 18 | ~~May~~Apr 2022 | $~~3,648.90~~12,267.12 | $~~684.76~~1,496.46 | $~~438,500.81~~1,225,215.12 |
| 19 | ~~Jun~~May 2022 | $~~3,643.21~~12,252.15 | $~~690.45~~1,511.43 | $~~437,810.38~~1,223,703.88 |
| 20 | ~~Jul~~Jun 2022 | $~~3,637.47~~12,237.04 | $~~696.19~~1,526.54 | $~~437,114.16~~1,222,177.25 |
| 21 | ~~Aug~~Jul 2022 | $~~3,631.69~~12,221.77 | $~~701.97~~1,541.81 | $~~436,412.19~~1,220,635.50 |
| 22 | ~~Sep~~Aug 2022 | $~~3,625.86~~12,206.35 | $~~707.80~~1,557.23 | $~~435,704.38~~1,219,078.12 |
| 23 | ~~Oct~~Sep 2022 | $~~3,619.98~~12,190.78 | $~~713.68~~1,572.80 | $~~434,990.72~~1,217,505.38 |
| 24 | ~~Nov~~Oct 2022 | $~~3,614~~12,175.05 | $~~719.61~~1,588.53 | $~~434,271.09~~1,215,916.88 |
| 25 | ~~Dec~~Nov 2022 | $~~3,608.07~~12,159.17 | $~~725.59~~1,604.41 | $~~433,545~~1,214,312.50 |
| 26 | ~~Jan 2023~~Dec 2022 | $~~3,602.04~~12,143.12 | $~~731.62~~1,620.46 | $~~432,813.88~~1,212,692.00 |
| 27 | ~~Feb~~Jan 2023 | $~~3,595.96~~12,126.92 | $~~737.70~~1,636.66 | $~~432,076.22~~1,211,055.38 |
| 28 | ~~Mar~~Feb 2023 | $~~3,589.83~~12,110.55 | $~~743.83~~1,653.03 | $~~431,332~~1,209,402.38 |
| 29 | ~~Apr~~Mar 2023 | $~~3,583.65~~12,094.02 | $~~750.01~~1,669.56 | $~~430,582.38~~1,207,732.75 |
| 30 | ~~May~~Apr 2023 | $~~3,577.42~~12,077.33 | $~~756.24~~1,686.25 | $~~429,826.12~~1,206,046.50 |
| 31 | ~~Jun~~May 2023 | $~~3,571.14~~12,060.46 | $~~762.52~~1,703.12 | $~~429,063.59~~1,204,343.38 |
| 32 | ~~Jul~~Jun 2023 | $~~3,564.80~~12,043.43 | $~~768.86~~1,720.15 | $~~428,294.75~~1,202,623.25 |
| 33 | ~~Aug~~Jul 2023 | $~~3,558.42~~12,026.23 | $~~775.24~~1,737.35 | $~~427,519.50~~1,200,885.88 |
| 34 | ~~Sep~~Aug 2023 | $~~3,551.97~~12,008.86 | $~~781.69~~1,754.72 | $~~426,737.81~~1,199,131.12 |
| 35 | ~~Oct~~Sep 2023 | $~~3,545.48~~11,991.31 | $~~788.18~~1,772.27 | $~~425,949.62~~1,197,358.88 |
| 36 | ~~Nov~~Oct 2023 | $~~3,538.93~~11,973.59 | $~~794.73~~1,789.99 | $~~425,154.91~~1,195,568.88 |

Formatted: Default Paragraph Font

**CONFIDENTIAL**          **FULLER000147**

| # | Date | | | |
|---|---|---|---|---|
| 37 | ~~Dec~~Nov 2023 | $~~3,532.33~~11,955.69 | $~~801.33~~1,807.89 | $~~424,353.56~~1,193,761.00 |
| 38 | ~~Jan 2024~~Dec 2023 | $~~3,525.67~~11,937.61 | $~~807.99~~1,825.97 | $~~423,545.56~~1,191,935.00 |
| 39 | ~~Feb~~Jan 2024 | $~~3,518.96~~11,919.35 | $~~814.70~~1,844.23 | $~~422,730.91~~1,190,090.75 |
| 40 | ~~Mar~~Feb 2024 | $~~3,512.19~~11,900.91 | $~~821.47~~1,862.67 | $~~421,909.41~~1,188,228.12 |
| 41 | ~~Apr~~Mar 2024 | $~~3,505.36~~11,882.28 | $~~828~~1,881.30 | $~~421,081.12~~1,186,346.88 |
| 42 | ~~May~~Apr 2024 | $~~3,498.48~~11,863.47 | $~~835.18~~1,900.11 | $~~420,245.94~~1,184,446.75 |
| 43 | ~~Jun~~May 2024 | $~~3,491.54~~11,844.47 | $~~842.12~~1,919.11 | $~~419,403.81~~1,182,527.62 |
| 44 | ~~Jul~~Jun 2024 | $~~3,484.55~~11,825.28 | $~~849.11~~1,938.30 | $~~418,554.69~~1,180,589.38 |
| 45 | ~~Aug~~Jul 2024 | $~~3,477.49~~11,805.89 | $~~856.17~~1,957.69 | $~~417,698.53~~1,178,631.50 |
| 46 | ~~Sep~~Aug 2024 | $~~3,470.38~~11,786.32 | $~~863.28~~1,977.26 | $~~416,835.25~~1,176,654.38 |
| 47 | ~~Oct~~Sep 2024 | $~~3,463.21~~11,766.54 | $~~870.45~~1,997.04 | $~~415,964.78~~1,174,657.38 |
| 48 | ~~Nov~~Oct 2024 | $~~3,455.97~~11,746.57 | $~~877.69~~2,017.01 | $~~415,087.12~~1,172,640.25 |
| 49 | ~~Dec~~Nov 2024 | $~~3,448.68~~11,726.40 | $~~884.98~~2,037.18 | $~~414,202.16~~1,170,603.12 |
| 50 | ~~Jan 2025~~Dec 2024 | $~~3,441.33~~11,706.03 | $~~892.33~~2,057.55 | $~~413,309.78~~1,168,545.62 |
| 51 | ~~Feb~~Jan 2025 | $~~3,433.92~~11,685.46 | $~~899.74~~2,078.12 | $~~412,410.06~~1,166,467.50 |
| 52 | ~~Mar~~Feb 2025 | $~~3,426.44~~11,664.67 | $~~907.22~~2,098.91 | $~~411,502.84~~1,164,368.62 |
| 53 | ~~Apr~~Mar 2025 | $~~3,418.90~~11,643.68 | $~~914.76~~2,119.90 | $~~410,588.09~~1,162,248.62 |
| 54 | ~~May~~Apr 2025 | $~~3,411.30~~11,622.49 | $~~922.36~~2,141.09 | $~~409,665.75~~1,160,107.50 |
| 55 | ~~Jun~~May 2025 | $~~3,403.64~~11,601.08 | $~~930.02~~2,162.50 | $~~408,735.69~~1,157,945.00 |

Formatted: Default Paragraph Font

**CONFIDENTIAL**

**FULLER000148**

| | | | | |
|---|---|---|---|---|
| 56 | ~~Jul~~Jun 2025 | $~~3,395.91~~11,579.45 | $~~937.75~~2,184.13 | $~~407,797.97~~1,155,760.88 |
| 57 | ~~Aug~~Jul 2025 | $~~3,388.12~~11,557.61 | $~~945.54~~2,205.97 | $~~406,852.44~~1,153,554.88 |
| 58 | ~~Sep~~Aug 2025 | $~~3,380.27~~11,535.55 | $~~953.39~~2,228.03 | $~~405,899.03~~1,151,327.00 |
| 59 | ~~Oct~~Sep 2025 | $~~3,372.34~~11,513.27 | $~~961.32~~2,250.31 | $~~404,937.72~~1,149,076.62 |
| 60 | ~~Nov~~Oct 2025 | $~~3,364.36~~11,490.77 | $~~969.30~~2,272.81 | $~~403,968.41~~1,146,803.75 |
| 61 | ~~Dec~~Nov 2025 | $~~3,356.30~~11,468.04 | $~~977.36~~2,295.54 | $~~402,991.06~~1,144,508.25 |
| 62 | ~~Jan 2026~~Dec 2025 | $~~3,348.18~~11,445.08 | $~~985.48~~2,318.50 | $~~402,005.59~~1,142,189.75 |
| 63 | ~~Feb~~Jan 2026 | $~~3,340.00~~11,421.90 | $~~993.66~~2,341.68 | $~~401,011.91~~1,139,848.12 |
| 64 | ~~Mar~~Feb 2026 | $~~3,331.74~~11,398.48 | $~~1,001.92~~2,365.10 | $~~400,010~~1,137,483.00 |
| 65 | ~~Apr~~Mar 2026 | $~~3,323.42~~11,374.83 | $~~1,010.24~~2,388.75 | $~~398,999.75~~1,135,094.25 |
| 66 | ~~May~~Apr 2026 | $~~3,315.02~~11,350.94 | $~~1,018~~2,412.64 | $~~397,981.12~~1,132,681.62 |
| 67 | ~~Jun~~May 2026 | $~~3,306.56~~11,326.82 | $~~1,027.10~~2,436.76 | $~~396,954.03~~1,130,244.88 |
| 68 | ~~Jul~~Jun 2026 | $~~3,298.03~~11,302.45 | $~~1,035.63~~2,461.13 | $~~395,918.38~~1,127,783.62 |
| 69 | ~~Aug~~Jul 2026 | $~~3,289.42~~11,277.84 | $~~1,044.24~~2,485.74 | $~~394,874.12~~1,125,297.88 |
| 70 | ~~Sep~~Aug 2026 | $~~3,280.75~~11,252.98 | $~~1,052.91~~2,510.60 | $~~393,821.25~~1,122,787.38 |
| 71 | ~~Oct~~Sep 2026 | $~~3,272.00~~11,227.87 | $~~1,061.66~~2,535.71 | $~~392,759.56~~1,120,251.62 |
| 72 | ~~Nov~~Oct 2026 | $~~3,263.18~~11,202.52 | $~~1,070.48~~2,561.06 | $~~391,689.09~~1,117,690.50 |
| 73 | ~~Dec~~Nov 2026 | $~~3,254.28~~11,176.90 | $~~1,079.38~~2,586.68 | $~~390,609.72~~1,115,103.88 |
| 74 | ~~Jan 2027~~Dec 2026 | $~~3,245.32~~11,151.04 | $~~1,088.34~~2,612.54 | $~~389,521~~1,112,491.38 |

Formatted: Default Paragraph Font

CONFIDENTIAL

FULLER000149

| | | | | |
|---|---|---|---|---|
| 75 | ~~Feb~~Jan 2027 | $~~3,236.27~~11,124.91 | $1,097.39~~2,638.67~~ | $~~388,424.00~~1,109,852.75 |
| 76 | ~~Mar~~Feb 2027 | $~~3,227.16~~11,098.53 | $1,106.50~~2,665.05~~ | $~~387,317.47~~1,107,187.62 |
| 77 | ~~Apr~~Mar 2027 | $~~3,217.96~~11,071.88 | $~~1,115~~2,691.70 | $~~386,201.78~~1,104,495.88 |
| 78 | ~~May~~Apr 2027 | $~~3,208.69~~11,044.96 | $1,124.97~~2,718.62~~ | $~~385,076.81~~1,101,777.25 |
| 79 | ~~Jun~~May 2027 | $~~3,199.35~~11,017.77 | $1,134.31~~2,745.81~~ | $~~383,942~~1,099,031.50 |
| 80 | ~~Jul~~Jun 2027 | $~~3,189.92~~210,990.31 | $1,143.74~~2,773.27~~ | $~~382,798.75~~1,096,258.25 |
| 81 | ~~Aug~~Jul 2027 | $~~3,180.42~~10,962.58 | $1,153.24~~2,801.00~~ | $~~381,645.50~~1,093,457.25 |
| 82 | ~~Sep~~Aug 2027 | $~~3,170.84~~10,934.57 | $1,162.82~~2,829.01~~ | $~~380,482.69~~1,090,628.25 |
| 83 | ~~Oct~~Sep 2027 | $~~3,161.18~~10,906.28 | $1,172.48~~2,857.30~~ | $~~379,310.22~~1,087,771.00 |
| 84 | ~~Nov~~Oct 2027 | $~~3,151.44~~10,877.71 | $1,182.22~~2,885.87~~ | $~~378,128~~1,084,885.00 |
| 85 | ~~Dec~~Nov 2027 | $~~3,141.61~~10,848.85 | $1,192.05~~2,914.73~~ | $~~376,935.97~~1,081,970.25 |
| 86 | ~~Jan 2028~~Dec 2027 | $~~3,131.71~~10,819.70 | $1,201.95~~2,943.88~~ | $~~375,734.00~~1,079,026.38 |
| 87 | ~~Feb~~Jan 2028 | $~~3,121.72~~10,790.26 | $1,211.94~~2,973.32~~ | $~~374,522.06~~1,076,053.12 |
| 88 | ~~Mar~~Feb 2028 | $~~3,111.65~~10,760.53 | $1,222.01~~3,003.05~~ | $~~373,300.06~~1,073,050.12 |
| 89 | ~~Apr~~Mar 2028 | $~~3,101~~10,730.50 | $1,232.16~~3,033.08~~ | $~~372,067.88~~1,070,017.00 |
| 90 | ~~May~~Apr 2028 | $~~3,091.26~~10,700.17 | $1,242.40~~3,063.41~~ | $~~370,825.47~~1,066,953.62 |
| 91 | ~~Jun~~May 2028 | $~~3,080.94~~10,669.54 | $1,252.72~~3,094.04~~ | $~~369,572.78~~1,063,859.62 |
| 92 | ~~Jul~~Jun 2028 | $~~3,070.53~~10,638.59 | $1,263.13~~3,124.99~~ | $~~368,309.62~~1,060,734.50 |
| 93 | ~~Aug~~Jul 2028 | $~~3,060.04~~10,607.34 | $1,273.62~~3,156.24~~ | $~~367,036.00~~1,057,578.25 |

Formatted: Default Paragraph Font

CONFIDENTIAL

FULLER000150

| # | Date | | | |
|---|---|---|---|---|
| 94 | ~~Sep~~Aug 2028 | $~~3,049.46~~10,575.78 | $~~1,284.20~~3,187.80 | $~~365,751.81~~1,054,390.62 |
| 95 | ~~Oct~~Sep 2028 | $~~3,038.79~~10,543.90 | $~~1,294.87~~3,219.68 | $~~364,456.94~~1,051,170.88 |
| 96 | ~~Nov~~Oct 2028 | $~~3,028.03~~10,511.71 | $~~1,305.63~~3,251.87 | $~~363,151.31~~1,047,919.00 |
| 97 | ~~Dec~~Nov 2028 | $~~3,017.18~~10,479.19 | $~~1,316.48~~3,284.39 | $~~361,834.84~~1,044,634.62 |
| 98 | ~~Jan 2029~~Dec 2028 | $~~3,006.24~~10,446.35 | $~~1,327.42~~3,317.23 | $~~360,507.41~~1,041,317.38 |
| 99 | ~~Feb~~Jan 2029 | $~~2,995.22~~10,413.17 | $~~1,338.44~~3,350.41 | $~~359,168.97~~1,037,967.00 |
| 100 | ~~Mar~~Feb 2029 | $2,984.10~~.~~379.67 | $~~1,349.56~~3,383.91 | $~~357,819.41~~1,034,583.00 |
| 101 | ~~Apr~~Mar 2029 | $~~2,972.88~~10,345.83 | $~~1,360.78~~3,417.75 | $~~356,458.62~~1,031,165.31 |
| 102 | ~~May~~Apr 2029 | $~~2,961.58~~10,311.65 | $~~1,372.08~~3,451.93 | $~~355,086.53~~1,027,713.38 |
| 103 | ~~Jun~~May 2029 | $~~2,950.18~~10,277.13 | $~~1,383.48~~3,486.45 | $~~353,703.06~~1,024,226.94 |
| 104 | ~~Jul~~Jun 2029 | $~~2,938.68~~10,242.27 | $~~1,394.98~~3,521.31 | $~~352,308.09~~1,020,705.62 |
| 105 | ~~Aug~~Jul 2029 | $~~2,927.09~~10,207.06 | $~~1,406.57~~3,556.52 | $~~350,901.50~~1,017,149.12 |
| 106 | ~~Sep~~Aug 2029 | $~~2,915.41~~10,171.49 | $~~1,418.25~~3,592.09 | $~~349,483.25~~1,013,557.00 |
| 107 | ~~Oct~~Sep 2029 | $~~2,903.62~~10,135.57 | $~~1,430.04~~3,628.01 | $~~348,053.22~~1,009,929.00 |
| 108 | ~~Nov~~Oct 2029 | $~~2,891.74~~10,099.29 | $~~1,441.92~~3,664.29 | $~~346,611.31~~1,006,264.69 |
| 109 | ~~Dec~~Nov 2029 | $~~2,879.76~~10,062.65 | $~~1,453.90~~3,700.93 | $~~345,157.41~~1,002,563.75 |
| 110 | ~~Jan 2030~~Dec 2029 | $~~2,867.68~~10,025.64 | $~~1,465.98~~3,737.94 | $~~343,691.44~~998,825.81 |
| 111 | ~~Feb~~Jan 2030 | $~~2,855.50~~9,988.26 | $~~1,478.16~~3,775.32 | $~~342,213.28~~995,050.50 |
| 112 | ~~Mar~~Feb 2030 | $~~2,843.22~~9,950.50 | $~~1,490.44~~3,813.08 | $~~340,722.81~~991,237.44 |

Formatted: Default Paragraph Font

**CONFIDENTIAL**  **FULLER000151**

| | | | | |
|---|---|---|---|---|
| 113 | ~~Apr~~Mar 2030 | $~~2,830.84~~9,912.37 | $~~1,502.82~~3,851.21 | $~~339,220.00~~987,386.19 |
| 114 | ~~May~~Apr 2030 | $~~2,818.35~~9,873.86 | $~~1,515.31~~3,889.72 | $~~337,704.69~~983,496.50 |
| 115 | ~~Jun~~May 2030 | $~~2,805.76~~9,834.96 | $~~1,527.90~~3,928.62 | $~~336,176.78~~979,567.88 |
| 116 | ~~Jul~~Jun 2030 | $~~2,793.07~~9,795.68 | $~~1,540.59~~3,967.90 | $~~334,636.22~~975,600.00 |
| 117 | ~~Aug~~Jul 2030 | $~~2,780.27~~9,756.00 | $~~1,553.39~~4,007.58 | $~~333,082.81~~971,592.38 |
| 118 | ~~Sep~~Aug 2030 | $~~2,767.36~~9,715.92 | $~~1,566.30~~4,047.66 | $~~331,516.50~~967,544.75 |
| 119 | ~~Oct~~Sep 2030 | $~~2,754.35~~9,675.45 | $~~1,579.31~~4,088.13 | $~~329,937.22~~963,456.56 |
| 120 | ~~Nov~~Oct 2030 | $~~2,741.23~~9,634.57 | $~~1,592.43~~4,129.01 | $~~328,344.78~~959,327.56 |
| 121 | ~~Dec~~Nov 2030 | $~~2,728.00~~9,593.28 | $~~1,605.66~~4,170.30 | $~~326,739.12~~955,157.25 |
| 122 | ~~Jan 2031~~Dec 2030 | $~~2,714.66~~9,551.57 | $~~1,619.00~~4,212.01 | $~~325,120.12~~950,945.25 |
| 123 | ~~Feb~~Jan 2031 | $~~2,701.21~~9,509.45 | $~~1,632.45~~4,254.13 | $~~323,487.66~~946,691.12 |
| 124 | ~~Mar~~Feb 2031 | $~~2,687.64~~9,466.91 | $~~1,646.02~~4,296.67 | $~~321,841.62~~942,394.44 |
| 125 | ~~Apr~~Mar 2031 | $~~2,673.97~~9,423.94 | $~~1,659.69~~4,339.64 | $~~320,181.97~~938,054.88 |
| 126 | ~~May~~Apr 2031 | $~~2,660.18~~9,380.55 | $~~1,673.48~~4,383.03 | $~~318,508.47~~933,671.88 |
| 127 | ~~Jun~~May 2031 | $~~2,646.27~~9,336.72 | $~~1,687.39~~4,426.86 | $~~316,821.09~~929,244.94 |
| 128 | ~~Jul~~Jun 2031 | $~~2,632.25~~9,292.45 | $~~1,701.41~~4,471.13 | $~~315,119.66~~924,773.81 |
| 129 | ~~Aug~~Jul 2031 | $~~2,618.12~~9,247.74 | $~~1,715.54~~4,515.84 | $~~313,404.16~~920,258.00 |
| 130 | ~~Sep~~Aug 2031 | $~~2,603.87~~9,202.58 | $~~1,729.79~~4,561.00 | $~~311,674.34~~915,697.00 |
| 131 | ~~Oct~~Sep 2031 | $~~2,589.49~~9,156.97 | $~~1,744.17~~4,606.61 | $~~309,930.16~~911,090.38 |

Formatted: Default Paragraph Font

CONFIDENTIAL

FULLER000152

| | | | | |
|---|---|---|---|---|
| 132 | ~~Nov~~Oct 2031 | $~~2,575.00~~9,110.90 | $~~1,758.66~~4,652.68 | $~~308,171.50~~906,437.69 |
| 133 | ~~Dec~~Nov 2031 | $~~2,560.39~~9,064.38 | $~~1,773.27~~4,699.20 | $~~306,398.22~~901,738.44 |
| 134 | ~~Jan 2032~~Dec 2031 | $~~2,545.66~~9,017.38 | $~~1,788.00~~4,746.20 | $~~304,610~~896,992.25 |
| 135 | ~~Feb~~Jan 2032 | $~~2,530.80~~8,969.92 | $~~1,802.86~~4,793.66 | $~~302,807.41~~892,198.56 |
| 136 | ~~Mar~~Feb 2032 | $~~2,515.82~~8,921.99 | $~~1,817.84~~4,841.59 | $~~300,989.53~~887,357.00 |
| 137 | ~~Apr~~Mar 2032 | $~~2,500.72~~8,873.57 | $~~1,832.94~~4,890.01 | $~~299,156.62~~882,467.00 |
| 138 | ~~May~~Apr 2032 | $~~2,485.49~~8,824.67 | $~~1,848.17~~4,938.91 | $~~297,308.47~~877,528.06 |
| 139 | ~~Jun~~May 2032 | $~~2,470.14~~8,775.28 | $~~1,863.52~~4,988.30 | $~~295,444.91~~872,539.81 |
| 140 | ~~Jul~~Jun 2032 | $~~2,454.66~~8,725.40 | $~~1,879.01~~5,038.18 | $~~293,565.94~~867,501.56 |
| 141 | ~~Aug~~Jul 2032 | $~~2,439.04~~8,675.02 | $~~1,894.62~~5,088.56 | $~~291,671.31~~862,413.06 |
| 142 | ~~Sep~~Aug 2032 | $~~2,423.30~~8,624.13 | $~~1,910.36~~5,139.45 | $~~289,760.97~~857,273.56 |
| 143 | ~~Oct~~Sep 2032 | $~~2,407.43~~8,572.74 | $~~1,926.23~~5,190.84 | $~~287,834.72~~852,082.75 |
| 144 | ~~Nov~~Oct 2032 | $~~2,391.43~~8,520.83 | $~~1,942.23~~5,242.75 | $~~285,892.50~~846,840.00 |
| 145 | ~~Dec~~Nov 2032 | $~~2,375.29~~8,468.40 | $~~1,958.37~~5,295.18 | $~~283,934.12~~841,544.81 |
| 146 | ~~Jan 2033~~Dec 2032 | $~~2,359.02~~8,415.45 | $~~1,974.64~~5,348.13 | $~~281,959.47~~836,196.69 |
| 147 | ~~Feb~~Jan 2033 | $~~2,342.61~~8,361.97 | $~~1,991.05~~5,401.61 | $~~279,968.44~~830,795.06 |
| 148 | ~~Mar~~Feb 2033 | $~~2,326.07~~8,307.95 | $~~2,007.59~~5,455.63 | $~~277,960.84~~825,339.44 |
| 149 | ~~Apr~~Mar 2033 | $~~2,309~~8,253.39 | $~~2,024.27~~5,510.19 | $~~275,936.53~~819,829.25 |
| 150 | ~~May~~Apr 2033 | $~~2,292.57~~8,198.29 | $~~2,041.09~~5,565.29 | $~~273,895.47~~814,263.94 |

Formatted: Default Paragraph Font

4320045 v1 - 07879 / 005

| | | | | |
|---|---|---|---|---|
| 151 | ~~Jun~~May 2033 | $~~2,275.61~~8,142.64 | $~~2,058.05~~5,620.94 | $~~271,837.44~~808,643.06 |
| 152 | ~~Jul~~Jun 2033 | $~~2,258.52~~8,086.43 | $~~2,075.14~~5,677.15 | $~~269,762.28~~802,965.88 |
| 153 | ~~Aug~~Jul 2033 | $~~2,241.27~~8,029.66 | $~~2,092.39~~5,733.92 | $~~267,669.91~~797,231.94 |
| 154 | ~~Sep~~Aug 2033 | $~~2,223.89~~7,972.32 | $~~2,109.77~~5,791.26 | $~~265,560.09~~791,440.75 |
| 155 | ~~Oct~~Sep 2033 | $~~2,206.36~~7,914.41 | $~~2,127.30~~5,849.17 | $~~263,432.81~~785,591.56 |
| 156 | ~~Nov~~Oct 2033 | $~~2,188.69~~7,855.92 | $~~2,144.97~~5,907.67 | $~~261,287.84~~779,683.81 |
| 157 | ~~Dec~~Nov 2033 | $~~2,170.87~~7,796.84 | $~~2,162.79~~5,966.74 | $~~259,125.06~~773,717.12 |
| 158 | ~~Jan 2034~~Dec 2033 | $~~2,152.90~~7,737.17 | $~~2,180.76~~6,026.41 | $~~256,944.30~~767,690.69 |
| 159 | ~~Feb~~Jan 2034 | $~~2,134.78~~7,676.91 | $~~2,198.88~~6,086.67 | $~~254,745.42~~761,604.06 |
| 160 | ~~Mar~~Feb 2034 | $~~2,116.51~~7,616.04 | $~~2,217.15~~6,147.54 | $~~252,528.27~~755,456.44 |
| 161 | ~~Apr~~Mar 2034 | $~~2,098.09~~7,554.56 | $~~2,235.57~~6,209.02 | $~~250,292.69~~749,247.50 |
| 162 | ~~May~~Apr 2034 | $~~2,079.52~~7,492.47 | $~~2,254.15~~6,271.11 | $~~248,038.55~~742,976.38 |
| 163 | ~~Jun~~May 2034 | $~~2,060.79~~7,429.76 | $~~2,272.87~~6,333.82 | $~~245,765.67~~736,642.56 |
| 164 | ~~Jul~~Jun 2034 | $~~2,041.90~~7,366.43 | $~~2,291.76~~6,397.15 | $~~243,473.92~~730,245.50 |
| 165 | ~~Aug~~Jul 2034 | $~~2,022.86~~7,302.45 | $~~2,310.80~~6,461.13 | $~~241,163.12~~723,784.31 |
| 166 | ~~Sep~~Aug 2034 | $~~2,003.66~~7,237.84 | $~~2,330.00~~6,525.74 | $~~238,833.12~~717,258.56 |
| 167 | ~~Oct~~Sep 2034 | $~~1,984.31~~7,172.59 | $~~2,349.35~~6,590.99 | $~~236,483.77~~710,667.56 |
| 168 | ~~Nov~~Oct 2034 | $~~1,964.79~~7,106.68 | $~~2,368.87~~6,656.90 | $~~234,114.89~~704,010.69 |
| 169 | ~~Dec~~Nov 2034 | $~~1,945.10~~7,040.11 | $~~2,388.56~~6,723.47 | $~~231,726.33~~697,287.19 |

Formatted: Default Paragraph Font

**CONFIDENTIAL**  **FULLER000154**

| | | | | |
|---|---|---|---|---|
| 170 | ~~Jan 2035~~Dec 2034 | $~~1,925.26~~6,972.87 | $~~2,408.40~~6,790.71 | $~~229,317.92~~690,496.50 |
| 171 | ~~Feb~~Jan 2035 | $~~1,905.25~~6,904.96 | $~~2,428.41~~6,858.62 | $~~226,889.52~~683,637.88 |
| 172 | ~~Mar~~Feb 2035 | $~~1,885.07~~6,836.38 | $~~2,448.59~~6,927.20 | $~~224,440.92~~676,710.69 |
| 173 | ~~Apr~~Mar 2035 | $~~1,864.73~~6,767.11 | $~~2,468.93~~6,996.47 | $~~221,971.98~~669,714.19 |
| 174 | ~~May~~Apr 2035 | $~~1,844.22~~6,697.14 | $~~2,489~~7,066.44 | $~~219,482.55~~662,647.75 |
| 175 | ~~Jun~~May 2035 | $~~1,823.53~~6,626.48 | $~~2,510.13~~7,137.10 | $~~216,972.42~~655,510.62 |
| 176 | ~~Jul~~Jun 2035 | $~~1,802.68~~6,555.11 | $~~2,530.98~~7,208.47 | $~~214,441.44~~648,302.12 |
| 177 | ~~Aug~~Jul 2035 | $~~1,781.65~~6,483.02 | $~~2,552.01~~7,280.56 | $~~211,889.42~~641,021.56 |
| 178 | ~~Sep~~Aug 2035 | $~~1,760.45~~6,410.22 | $~~2,573.21~~7,353.36 | $~~209,316.20~~633,668.19 |
| 179 | ~~Oct~~Sep 2035 | $~~1,739.07~~6,336.68 | $~~2,594.59~~7,426.90 | $~~206,721.61~~626,241.31 |
| 180 | ~~Nov~~Oct 2035 | $~~1,717.51~~6,262.41 | $~~2,616.15~~7,501.17 | $~~204,105.47~~618,740.12 |
| 181 | ~~Dec~~Nov 2035 | $~~1,695.78~~6,187.40 | $~~2,637.88~~7,576.18 | $~~201,467.58~~611,163.94 |
| 182 | ~~Jan 2036~~Dec 2035 | $~~1,673.86~~6,111.64 | $~~2,659.80~~7,651.94 | $~~198,807.78~~603,512.00 |
| 183 | ~~Feb~~Jan 2036 | $~~1,651.76~~6,035.12 | $~~2,681.90~~7,728.46 | $~~196,125.88~~595,783.56 |
| 184 | ~~Mar~~Feb 2036 | $~~1,629.48~~5,957.84 | $~~2,704.18~~7,805.74 | $~~193,421.69~~587,977.81 |
| 185 | ~~Apr~~Mar 2036 | $~~1,607.01~~5,879.78 | $~~2,726.65~~7,883.80 | $~~190,695.03~~580,094.00 |
| 186 | ~~May~~Apr 2036 | $~~1,584.36~~5,800.94 | $~~2,749.30~~7,962.64 | $~~187,945.73~~572,131.38 |
| 187 | ~~Jun~~May 2036 | $~~1,561.52~~5,721.31 | $~~2,772.14~~8,042.27 | $~~185,173.59~~564,089.12 |
| 188 | ~~Jul~~Jun 2036 | $~~1,538.48~~5,640.89 | $~~2,795.18~~8,122.69 | $~~182,378.42~~555,966.44 |

Formatted: Default Paragraph Font

CONFIDENTIAL

FULLER000155

| | | | | |
|---|---|---|---|---|
| 189 | ~~Aug~~Jul 2036 | $~~1,515.26~~5,559.66 | $~~2,818.40~~8,203.92 | $~~179,560.00~~547,762.50 |
| 190 | ~~Sep~~Aug 2036 | $~~1,491.84~~5,477.62 | $~~2,841.82~~8,285.96 | $~~176,718.19~~539,476.56 |
| 191 | ~~Oct~~Sep 2036 | $~~1,468.23~~5,394.77 | $~~2,865.43~~8,368.81 | $~~173,852.77~~531,107.75 |
| 192 | ~~Nov~~Oct 2036 | $~~1,444.43~~5,311.08 | $~~2,889.23~~8,452.50 | $~~170,963.52~~522,655.25 |
| 193 | ~~Dec~~Nov 2036 | $~~1,420.42~~5,226.55 | $~~2,913.24~~8,537.03 | $~~168,050.30~~514,118.22 |
| 194 | ~~Jan 2037~~Dec 2036 | $~~1,396.22~~5,141.18 | $~~2,937.44~~8,622.40 | $~~165,112~~505,495.84 |
| 195 | ~~Feb~~Jan 2037 | $~~1,371.81~~5,054.96 | $~~2,961.85~~8,708.62 | $~~162,151.00~~496,787.25 |
| 196 | ~~Mar~~Feb 2037 | $~~1,347.20~~4,967.87 | $~~2,986.46~~8,795.71 | $~~159,164.55~~487,991.53 |
| 197 | ~~Apr~~Mar 2037 | $~~1,322.39~~4,879.92 | $~~3,011.27~~8,883.66 | $~~156,153.27~~479,107.91 |
| 198 | ~~May~~Apr 2037 | $~~1,297.37~~4,791.08 | $~~3,036.29~~8,972.50 | $~~153,116.97~~470,135.38 |
| 199 | ~~Jun~~May 2037 | $~~1,272.15~~4,701.35 | $~~3,061.51~~9,062.23 | $~~150,055.45~~461,073.16 |
| 200 | ~~Jul~~Jun 2037 | $~~1,246.71~~4,610.73 | $~~3,086.95~~9,152.85 | $~~146,968.52~~451,920.28 |
| 201 | ~~Aug~~Jul 2037 | $~~1,221.06~~4,519.20 | $~~3,112.60~~9,244.38 | $~~143,855.94~~442,675.88 |
| 202 | ~~Sep~~Aug 2037 | $~~1,195.20~~4,426.76 | $~~3,138.46~~9,336.82 | $~~140,717.48~~433,339.06 |
| 203 | ~~Oct~~Sep 2037 | $~~1,169.13~~4,333.39 | $~~3,164.53~~9,430.19 | $~~137,552.94~~423,908.88 |
| 204 | ~~Nov~~Oct 2037 | $~~1,142.84~~4,239.09 | $~~3,190.82~~9,524.49 | $~~134,362.11~~414,384.38 |
| 205 | ~~Dec~~Nov 2037 | $~~1,116.33~~4,143.84 | $~~3,217.33~~9,619.74 | $~~131,144.80~~404,764.62 |
| 206 | ~~Jan 2038~~Dec 2037 | $~~1,089.59~~4,047.65 | $~~3,244.07~~9,715.93 | $~~127,900.72~~395,048.69 |
| 207 | ~~Feb~~Jan 2038 | $~~1,062.64~~3,950.49 | $~~3,271.02~~9,813.09 | $~~124,629.70~~385,235.59 |

Formatted: Default Paragraph Font

CONFIDENTIAL

FULLER000156

| | | | | |
|---|---|---|---|---|
| 208 | ~~Mar~~Feb 2038 | $~~1,035.46~~3,852.36 | $~~3,298.20~~9,911.22 | $~~121,331.49~~375,324.41 |
| 209 | ~~Apr~~Mar 2038 | $~~1,008.06~~3,753.24 | $~~3,325.60~~10,010.34 | $~~118,005.91~~365,314.03 |
| 210 | ~~May~~Apr 2038 | $~~980.43~~3,653.14 | $~~3,353.23~~10,110.44 | $~~114,652.68~~355,203.62 |
| 211 | ~~Jun~~May 2038 | $~~952.57~~3,552.04 | $~~3,381.09~~10,211.54 | $~~111,271.60~~344,992.09 |
| 212 | ~~Jul~~Jun 2038 | $~~924.48~~3,449.92 | $~~3,409.18~~10,313.6 | $~~107,862~~334,678.41 |
| 213 | ~~Aug~~Jul 2038 | $~~896.16~~3,346.78 | $~~3,437.50~~10,416.80 | $~~104,424.91~~324,261.56 |
| 214 | ~~Sep~~Aug 2038 | $~~867.60~~3,242.62 | $~~3,466.06~~10,520.96 | $~~100,958.84~~313,740.59 |
| 215 | ~~Oct~~Sep 2038 | $~~838.80~~3,137.41 | $~~3,494.86~~10,626.17 | $~~97,463.98~~303,114.44 |
| 216 | ~~Nov~~Oct 2038 | $~~809.76~~3,031.14 | $~~3,523.90~~10,732.44 | $~~93,940.07~~292,382.00 |
| 217 | ~~Dec~~Nov 2038 | $~~780.49~~2,923.82 | $~~3,553.17~~10,839.76 | $~~90,386.89~~281,542.25 |
| 218 | ~~Jan 2039~~Dec 2038 | $~~750.96~~2,815.42 | $~~3,582.70~~10,948.16 | $~~86,804.18~~270,594.09 |
| 219 | ~~Feb~~Jan 2039 | $~~721.20~~2,705.94 | $~~3,612.46~~11,057.64 | $~~83,191.73~~259,536.42 |
| 220 | ~~Mar~~Feb 2039 | $~~691.18~~2,595.36 | $~~3,642.48~~11,168.22 | $~~79,549.24~~248,368.22 |
| 221 | ~~Apr~~Mar 2039 | $~~660.92~~2,483.68 | $~~3,672.74~~11,279.90 | $~~75,876.51~~237,088.36 |
| 222 | ~~May~~Apr 2039 | $~~630.41~~2,370.88 | $~~3,703.25~~11,392.70 | $~~72,173.25~~225,695.67 |
| 223 | ~~Jun~~May 2039 | $~~599.64~~2,256.96 | $~~3,734.02~~11,506.62 | $~~68,439.23~~214,189.06 |
| 224 | ~~Jul~~Jun 2039 | $~~568.62~~2,141.89 | $~~3,765.04~~11,621.69 | $~~64,674.18~~202,567.38 |
| 225 | ~~Aug~~Jul 2039 | $~~537.33~~2,025.67 | $~~3,796.33~~11,737.91 | $~~60,877.86~~190,829.47 |
| 226 | ~~Sep~~Aug 2039 | $~~505.79~~1,908.29 | $~~3,827.87~~11,855.29 | $~~57,050.01~~178,974.22 |

Formatted: Default Paragraph Font

CONFIDENTIAL

FULLER000157

| | | | | |
|---|---|---|---|---|
| 227 | ~~Oct~~Sep 2039 | $~~473.99~~1,789.74 | $~~3,859.67~~11,973.84 | $~~53,190.33~~167,000.41 |
| 228 | ~~Nov~~Oct 2039 | $~~441.92~~1,670.00 | $~~3,891.74~~12,093.58 | $~~49,298.61~~154,906.80 |
| 229 | ~~Dec~~Nov 2039 | $~~409.59~~1,549.07 | $~~3,924.07~~12,214.51 | $~~45,374.52~~142,692.23 |
| 230 | ~~Jan 2040~~Dec 2039 | $~~376.99~~1,426.92 | $~~3,956.67~~12,336.66 | $~~41,417.86~~130,355.59 |
| 231 | ~~Feb~~Jan 2040 | $~~344.11~~1,303.56 | $~~3,989.55~~12,460.02 | $~~37,428.30~~117,895.60 |
| 232 | ~~Mar~~Feb 2040 | $~~310.97~~1,178.96 | $~~4,022.69~~12,584.62 | $~~33,405.62~~105,311.00 |
| 233 | ~~Apr~~Mar 2040 | $~~277.55~~1,053.11 | $~~4,056.11~~12,710.47 | $~~29,349.51~~92,600.53 |
| 234 | ~~May~~Apr 2040 | $~~243.85~~926.01 | $~~4,089.81~~12,837.58 | $~~25,259.69~~79,762.92 |
| 235 | ~~Jun~~May 2040 | $~~209.87~~797.63 | $~~4,123.79~~12,965.95 | $~~21,135.89~~66,796.92 |
| 236 | ~~Jul~~Jun 2040 | $~~175.60~~667.97 | $~~4,158.06~~13,095.61 | $~~16,977.85~~53,701.27 |
| 237 | ~~Aug~~Jul 2040 | $~~141.06~~537.01 | $~~4,192.60~~13,226.57 | $~~12,785.24~~40,474.68 |
| 238 | ~~Sep~~Aug 2040 | $~~106.22~~404.75 | $~~4,227.44~~13,358.83 | $~~8,557.81~~27,115.79 |
| 239 | ~~Oct~~Sep 2040 | $~~71.10~~271.16 | $~~4,262.56~~13,492.42 | $~~4,295.25~~13,623.33 |
| 240 | ~~Nov~~Oct 2040 | $~~35.69~~136.23 | $~~4,295.25~~13,623.38 | $0.00 |

Formatted: Font: Bold, Underline

Formatted: Default Paragraph Font

CONFIDENTIAL

FULLER000158

## SCHEDULE 3 TO WORK LETTER
### Landlord Incurred Costs

Impact Fees    $40,000.00

Underground pipes – $10,000.00

Footers for Trellis - $15,000.00

Miscellaneous - $10,000.00

Formatted: Default Paragraph Font

4320045 v1 - 07879 / 005

CONFIDENTIAL

FULLER000159

## SCHEDULE 4

### Lender's Drawdown Request Form

[Tenant Letterhead]

"Dear _____:

I am hereby requesting draw # ____ for work on the property located at _____. Following is a list of the work we are requesting to be reimbursed for:
(List of items).

Formatted: Default Paragraph Font

4320045 v1 - 07879 / 005

CONFIDENTIAL

FULLER000160

**SCHEDULE 5**

Tenant's FF&E

Formatted: Font: Not Bold, No underline

Formatted: Centered

Formatted: Default Paragraph Font

4320045 v1 - 07879 / 005



Matt



Sat, Nov 19 at 11:26 AM

GM Bill,
If I may assist in any way, I'd like to
help. I lost time, lost opportunity, and
some hard $$ where he clearly told
me "I'd support you anyplace but not
in Bill Fuller's building"... among many
other ridiculous things.

Thank you Matt, I might take you up
on this 👊

Delivered



PLAINTIFF'S
EXHIBIT
265

FULLER CONFIDENTIAL

# City of Miami

# Department of Code Compliance Process Manual





**EXHIBIT**

DIEZ

1

8/12/22

0

PLAINTIFF'S
EXHIBIT

**275**

MIA-SFED23485-00068237

## City of Miami Code Compliance Process Manual

**Purpose**: The purpose of this document is to provide an overview of the City of Miami Code Compliance Department (the Department) and the Policies/Procedures that apply to the Department's efforts to obtain correction of code violations. This document may be supplemented from time to time.

**Overall Philosophy**: This Code Compliance Process Manual (CCPM) shall serve as a tool for Code Compliance Inspectors in performing their normal duties related to the goal of obtaining compliance. Code Compliance Inspectors strive to achieve several objectives.

Code Compliance Inspectors work promote health and safety, safeguard civic and community assets, and elevate quality of life and aesthetics in the City of Miami by educating the public about and fairly enforcing our City's codes. They conduct themselves as a model for the community, are accountable, and take professional and personal ownership of their work. They make decisions free from prejudice, honor the spirit and letter of the law, and conduct themselves in a manner that maintains public trust.

Our role regularly places us in the homes and businesses of residents where we are often asking property owners to do something, to stop doing something, or to spend money, time, and energy bringing something into compliance. Given the sensitive nature of this work, it is imperative that every Code Compliance Inspector in the City of Miami conduct inspections in a standardized way, documenting all of their work and actions, for maximum transparency, consistency, effectiveness, and accountability.

Additionally, the CCPM provides guidance to Departmental employees regarding the processing of code violations. The Code Compliance Department shall use various techniques to assure compliance with State and local laws relating to building and zoning requirements, health and safety concerns, property maintenance standards, and other land use laws and regulations. This manual is also designed to empower proper referrals to the relevant City, County, and State agencies. The Department's goal is to obtain voluntary compliance from citizens. Several studies have shown that a good code compliance program promotes safer neighborhoods, increased land values, and pride in ownership. Education of the public regarding applicable laws can be an effective tool in obtaining immediate compliance, and a long-term solution to ongoing nuisances. Efficient code compliance is best accomplished by direct communication with members of the community through a variety of methods. These include respectful face-to-face discussions with property owners, participation in community meetings, and education via the Department's website and social media. Code Compliance staff shall maintain ethical standards and strive to be fair, firm, and friendly.

1

MIA-SFED23485-00068238

## Table of Contents

Mission of the Department of Code Compliance ................................................................................ Page 4

Department Directory ............................................................................................................... Page 5 – 9

The City of Miami By the Numbers ........................................................................................... Page 10

Miami Neighborhood Map........................................................................................................ Page 11

City of Miami Commission District Map.................................................................................. Page 12

Code Compliance Zone Maps.................................................................................................... Pages 13-16

Inspector Roles and Responsibilities throughout the City of Miami ........................................ Page 17

Process Overview ...................................................................................................................... Page 18

Code Compliance Citizen Road Map ........................................................................................ Page 19

Inspiring Words on Ethical Leadership .................................................................................... Page 20

Overview of Legal Authority .................................................................................................... Pages 21-22

Supervisor and Inspector Responsibilities ............................................................................... Pages 23-26

Inspector Safety ........................................................................................................................ Pages 27-28

Interacting with the Public ........................................................................................................ Pages 29-30

Inspiring Words......................................................................................................................... Page 31

Case Development, Preparing a Case for Hearing..................................................................... Pages 32-34

Pre-Hearing Checklist................................................................................................................ Page 36

Extensions of Time.................................................................................................................... Page 37

How to Testify at a Hearing....................................................................................................... Page 38

Final Zoning Inspection Checklist ............................................................................................ Pages 39-40

Certificate of Use Inspection Checklist .................................................................................... Page 41

Construction site inspections .................................................................................................... Page 42

Tree Protection and Tree Cheat Sheet ...................................................................................... Pages 43-47

Swale Maintenance ................................................................................................................... Page 48

Abandoned /Vacant Structures .................................................................................................. Page 49

Failure to maintain .................................................................................................................... Page 50

Graffiti ...................................................................................................................................... Page 51

Animals...................................................................................................................................... Page 52

Lot Clearing............................................................................................................................... Page 53

Shopping Carts .......................................................................................................................... Page 54

Historic Preservation................................................................................................................. Pages 55-56

Bar check/Quality of Life Inspection ....................................................................................... Page 57

After-hours protocol/Common violations.................................................................................. Page 58

Assigned Zone and Interdepartmental Communications .......................................................... Page 59

Performance of the Duties of an Employee, Professional Behavior.......................................... Pages 59-60

Professional Attire and Appearance, Computers and Printers................................................... Page 61

Phone Etiquette and Cellular Phone Policy............................................................................... Page 62

MIA-SFED23485-00068239

Appropriate Language ........................................................................................ Page 63

Public Records Requests ..................................................................................... Page 64

Hurricane procedures ......................................................................................... Page 65

Quality Control.................................................................................................Page 66

Service Aides' Guide for Interactions with the Public...................................................... Page 67

Partners in our Work and Useful Resources................................................................ Pages 70-72

Highlights of the Miami-Dade County Ethics Code.........................................................Page 73

MIA-SFED23485-00068240

# MISSION OF THE DEPARTMENT OF CODE COMPLIANCE

The mission of the Department of Code Compliance is to work in partnership with our community to promote health and safety, safeguard civic and community assets, and elevate quality of life and aesthetics in the City of Miami by educating the public about and fairly enforcing our City's codes.

The Department of Code Compliance is responsible for educating residents about and ensuring compliance with a universe of 350+ civil infractions. Some of the most common violations include: failure to maintain a lot in a safe clean condition, outside storage, graffiti on property, failure to maintain the exterior of a commercial or residential property, parking or storage of inoperable or untagged vehicles, work performed without a finalized permit, illegally parking a commercial vehicle in a residential zone, failure to obtain a Certificate of Use or Business Tax Receipt for the type of business conducted, illegal dumping, improper stationing of a recreational watercraft, erection, construction, posting, etc. of a sign without a finalized permit, parking on unimproved surfaces, failure to register a vacant structure, illegal units, vacant, blighted, unsecured or abandoned structure, among many others.

Our inspectors are divided into four geographic sectors (North, Central, Southwest, Southeast) that encompass 40 distinct Code Compliance zones of roughly 1.5 miles each. In addition to the geographically-based inspectors, we have a team of After-Hours inspectors who respond to complaints Citywide and report to the Miami Riverside Center (MRC, 444 SW 2nd Avenue, 7th Floor) and work Monday-Thursday until 10:00 pm, 24 hours on Fridays and Saturdays, and until 5:00 pm on Sundays. We also have a Code Revenue Task Force responsible for ensuring compliance with local business licensing (Certificates of Use and Business Tax Receipts) for roughly 22,000 Certificates of Use (CU), and 42,000 Business Tax Receipts (BTR) Citywide. We have a Code Response Team (CRT) carrying out special projects and assignments as needed, particularly around education about new legislative initiatives and in response to community complaints.

Our Service Aides report daily to the MRC and respond to calls and visits from the public. Service Aides send all correspondence to residents via Certified Mail. Service Aides also process Business Tax Receipt applications.

Code Compliance inspectors may issue a ticket or open a Notice of Violation (NOV) if a property is found to be in violation of one of the civil infractions for which our team is responsible. Both tickets and NOVs require due process. Every violation is adjudicated by an independent, quasi-judicial body. A resident may pay or appeal a ticket through the ticket appeals process for ticketed offenses. If a resident does not bring their property into compliance, when cited for an NOV, a hearing is held before the Code Enforcement Board, an independent, adjudicative Board comprised of volunteers appointed by the Commission. If found guilty, a per diem lien will be assessed against the property. Once a lien is assessed it can only be removed by complying the violation and then seeking mitigation and/or submitting payment for satisfaction of the lien. After bringing the property into compliance, a property owner can request to appear before the Code Enforcement Board to seek mitigation of the lien.

4

MIA-SFED23485-00068241

| Departmental Phone Number: (305) 416-2087 |
|---|
| Departmental Email: CodeCompliance@MiamiGov.com |
| After-Hours Hotline: (786) 457-0995 |

| Team | Office | Staff | Hours | Supervisor | Zone | Contact |
|---|---|---|---|---|---|---|
| **NORTH TEAM – CODE COMPLIANCE** | | | | | | |
| North | **Upper Eastside NET 6599 Biscayne Blvd. and MRC, 7th Floor** | **Frank Marcos FMarcos@miamigov.con Supervisor** | 8 am – 5 pm | **Asst. Dir. Orta Dpty. Dir. Ortiz Dir. Valencia** | 1-9 | **(305) 416-2116 Direct Line** |
| North | Upper Eastside NET 6599 Biscayne Blvd. | Theresa Rochelin Inspector | 8 am – 5 pm | Frank Marcos | 1 | (305) 416-2087 |
| North | Upper Eastside NET 6599 Biscayne Blvd. | Jacqueline Haley Inspector | 8 am – 5 pm | Frank Marcos | 2 | (305) 416-2087 |
| North | Upper Eastside NET 6599 Biscayne Blvd. | Deneisha Smith Inspector | 8 am – 5 pm | Frank Marcos | 3 | (305) 416-2087 |
| North | Upper Eastside NET 6599 Biscayne Blvd. | Ricardo Franqui Inspector | 8 am – 5 pm | Frank Marcos | 4 | (305) 416-2087 |
| North | Upper Eastside NET 6599 Biscayne Blvd. | Anishka Anderson Inspector | 8 am – 5 pm | Frank Marcos | 5 | (305) 416-2087 |
| North | Upper Eastside NET 6599 Biscayne Blvd. | Suzann Nicholson Inspector | 8 am – 5 pm | Frank  Marcos | 6 &7 | (305) 416-2087 |
| North | Upper Eastside NET 6599 Biscayne Blvd. | Hejbert Point du Jour Inspector | 8 am – 5 pm | Frank Marcos | 8 | (305) 416-2087 |
| North | Upper Eastside NET 6599 Biscayne Blvd. | Camesuze Quetant Inspector | 8 am – 5 pm | Frank Marcos | 9 | (305) 416-2087 |
| **CENTRAL TEAM– CODE COMPLIANCE** | | | | | | |
| Central | **Allapattah NET 1901 NW 24th Ave. and MRC, 7th Floor** | **Luis Fernandez L.Fernandez@miamigov. Supervisor** | 8 am – 5 pm | **Asst. Dir. Orta Dpty. Dir. Ortiz Dir. Valencia** | 10-20 | **(305) 416-2010 Direct Line** |
| Central | Allapattah NET 1897 NW 20th St. | Dennis Uriarte Inspector | 8 am – 5 pm | Luis Fernandez | 10 | (305) 416-2087 |
| Central | Allapattah NET 1897 NW 20th St. | Gina Marquez Inspector | 8 am – 5 pm | Luis Fernandez | 11 | (305) 416-2087 |
| Central | Allapattah NET 1897 NW 20th St. | Daniel Tovar Inspector | 8 am – 5 pm | Luis Fernandez | 12 | (305) 416-2087 |
| Central | Allapattah NET 1897 NW 20th St. | Andrea Aquino Inspector | 8 am – 5 pm | Luis Fernandez | 13 | (305) 416-2087 |
| Central | Allapattah NET 1897 NW 20th St. | Mauricio Lezama Inspector | 8 am – 5 pm | Luis Fernandez | 14 | (305) 416-2087 |
| Central | Allapattah NET 1897 NW 20th St. | Joel Ramirez Inspector | 8 am – 5 pm | Luis Fernandez | 15 | (305) 416-2087 |
| Central | Allapattah NET 1897 NW 20th St. | Jovani Castillo Inspector | 8 am – 5 pm | Luis Fernandez | 16 & 17 | (305) 416-2087 |
| Central | Allapattah NET 1897 NW 20th St. | Michael Lytle Inspector | 8 am – 5 pm | Luis Fernandez | 18 | (305) 416-2087 |
| Central | Allapattah NET 1897 NW 20th St. | Magalie Gibbons Inspector | 8 am – 5 pm | Luis Fernandez | 19 | (305) 416-2087 |
| Central | Allapattah NET 1897 NW 20th St. | Osvaldo de la Cruz Inspector | 8 am – 5 pm | Luis Fernandez | 20 | (305) 416-2087 |
| **SOUTHWEST TEAM– CODE COMPLIANCE** | | | | | | |
| Southwest | **NET Admin. 151 NW 27 Ave. and MRC, 7th Floor** | **Luis Gomez LGomez@miamigov.com Supervisor** | 8 am – 5 pm | **Asst. Dir. Orta Dpty. Dir. Ortiz Dir. Valencia** | 21-31 | (305) 416-1351 |
| Southwest | NET Admin. 151 NW 27 Ave. | Jonathan Morales Inspector | 8 am – 5 pm | Luis Gomez | 21 & 22 | (305) 416-2087 |

5

MIA-SFED23485-00068242

| Southwest | NET Admin.<br>151 NW 27 Ave. | Josseline Castillo<br>Inspector | 8 am – 5 pm | Luis Gomez | 23 | (305) 416-2087 |
|---|---|---|---|---|---|---|
| Southwest | NET Admin.<br>151 NW 27 Ave. | Maria Zeine<br>Inspector | 8 am – 5 pm | Luis Gomez | 24 & 25 | (305) 416-2087 |
| Southwest | NET Admin.<br>151 NW 27 Ave. | Roberto Morejon<br>Inspector | 8 am – 5 pm | Luis Gomez | 26 | (305) 416-2087 |
| Southwest | NET Admin.<br>151 NW 27 Ave. | Juky-Ann Jones<br>Inspector | 8 am – 5 pm | Luis Gomez | 27 | (305) 416-2087 |
| Southwest | NET Admin.<br>151 NW 27 Ave. | Teresa Guevara<br>Inspector | 8 am – 5 pm | Luis Gomez | 28 | (305) 416-2087 |
| Southwest | NET Admin.<br>151 NW 27 Ave. | Kristopher Adams<br>Inspector | 8 am – 5 pm | Luis Gomez | 29 | (305) 416-2087 |
| Southwest | NET Admin.<br>151 NW 27 Ave. | Jonathan Morales<br>Inspector | 8 am – 5 pm | Luis Gomez | 30 | (305) 416-2087 |
| Southwest | NET Admin.<br>151 NW 27 Ave. | Yacmany Salvatierra<br>Inspector | 8 am – 5 pm | Luis Gomez | 31 | (305) 416-2087 |

## SOUTHEAST TEAM– CODE COMPLIANCE

| Southeast | East Little Havana NET<br>1300 SW 12th Ave. | Daniel Sierra<br>Supervisor | 8 am – 5 pm | Asst. Dir. Orta<br>Dpty. Dir. Ortiz<br>Dir. Valencia | 32-40 | (305) 416-1694<br>Direct Line |
|---|---|---|---|---|---|---|
| Southeast | East Little Havana NET<br>1300 SW 12th Ave. | Alex Diez<br>Inspector | 8 am – 5 pm | Daniel Sierra | 32 | (305) 416-2087 |
| Southeast | East Little Havana NET<br>1300 SW 12th Ave. | Roberto Martinez<br>Inspector | 8 am – 5 pm | Daniel Sierra | 33 | (305) 416-2087 |
| Southeast | East Little Havana NET<br>1300 SW 12th Ave. | Lazaro Perez<br>Inspector | 8 am – 5 pm | Daniel Sierra | 34 | (305) 416-2087 |
| Southeast | East Little Havana NET<br>1300 SW 12th Ave.. | Gustavo Meregildo<br>Inspector | 8 am – 5 pm | Daniel Sierra | 35 | (305) 416-2087 |
| Southeast | East Little Havana NET<br>1300 SW 12th Ave. | Vanessa Pino<br>Inspector | 8 am – 5 pm | Daniel Sierra | 36 | (305) 416-2087 |
| Southeast | East Little Havana NET<br>1300 SW 12th Ave. | Genesis Troutman<br>Inspector | 8 am – 5 pm | Daniel Sierra | 37 | (305) 416-2087 |
| Southeast | East Little Havana NET<br>1300 SW 12th Ave. | Christopher Pierre<br>Inspector | 8 am – 5pm<br>Sunday-Thursday | Daniel Sierra | 38 | (305) 416-2087 |
| Southeast | East Little Havana NET<br>1300 SW 12th Ave. | Ebony Comer<br>Inspector | 8 am – 5 pm | Daniel Sierra | 39 | (305) 416-2087 |
| Southeast | East Little Havana NET<br>1300 SW 12th Ave. | Daniel Gamarra<br>Inspector | 8 am – 5 pm | Daniel Sierra | 40 | (305) 416-2087 |

## AFTER-HOURS TEAM– CODE COMPLIANCE

| MRC | Mia. Riverside Center<br>444 SW 2nd Ave., 7th | Trelana Haines<br>Supervisor | Mon.-Thu until 10 pm<br>Fri. & Sat. 24 Hours<br>Sunday until 5 pm | Asst. Dir. Orta<br>Dpty. Dir. Ortiz<br>Dir. Valencia | Citywide | Hotline:<br>(786) 457-0995 |
|---|---|---|---|---|---|---|
| MRC | Mia. Riverside Center<br>444 SW 2nd Ave., 7th | Randy Cesar<br>Inspector | Mon.-Thu until 10 pm<br>Fri. & Sat. 24 Hours<br>Sunday until 5 pm | Trelana Haines | Citywide | Hotline:<br>(786) 457-0995 |
| MRC | Mia. Riverside Center<br>444 SW 2nd Ave., 7th | Jason Mignot<br>Inspector | Mon.-Thu until 10 pm<br>Fri. & Sat. 24 Hours<br>Sunday until 5 pm | Trelana Haines | Citywide | Hotline:<br>(786) 457-0995 |
| MRC | Mia. Riverside Center<br>444 SW 2nd Ave., 7th | Levi Tyler<br>Inspector | Mon.-Thu until 10 pm<br>Fri. & Sat. 24 Hours<br>Sunday until 5 pm | Trelana Haines | Citywide | Hotline:<br>(786) 457-0995 |
| MRC | Mia. Riverside Center<br>444 SW 2nd Ave., 7th | Erik Encinosa<br>Inspector | Mon.-Thu until 10 pm<br>Fri. & Sat. 24 Hours<br>Sunday until 5 pm | Trelana Haines | Citywide | Hotline:<br>(786) 457-0995 |
| MRC | Mia. Riverside Center<br>444 SW 2nd Ave., 7th | Zastrow Perkins<br>Inspector | Mon.-Thu until 10 pm<br>Fri. & Sat. 24 Hours<br>Sunday until 5 pm | Trelana Haines | Citywide | Hotline:<br>(786) 457-0995 |

6

MIA-SFED23485-00068243

| MRC | Mia. Riverside Center 444 SW 2nd Ave., 7th | Guerson Louis Inspector | Mon.-Thu until 10 pm Fri. & Sat. 24 Hours Sunday until 5 pm | Trelana Haines | Citywide | **Hotline:** (786) 457-0995 |
|---|---|---|---|---|---|---|
| **MRC** | 444 SW 2nd Ave., 7th | Nicole Sanders Inspector | Fri. & Sat. 24 Hours Sunday until 5 pm | Trelana Haines | Citywide | **Hotline:** (786) 457-0995 |
| **MRC** | 444 SW 2nd Ave., 7th | Steven Jimenez Inspector | Fri. & Sat. 24 Hours Sunday until 5 pm | Trelana Haines | Citywide | **Hotline:** (786) 457-0995 |

## CODE COMPLIANCE REVENUE TASK FORCE

| MRC | Mia. Riverside Center 444 SW 2nd Ave., 7th | Noel Chavez Supervisor | 8 am-5 pm | Asst. Dir. Orta Dpty. Dir. Ortiz Dir. Valencia | Citywide | (305) 416-1974 |
|---|---|---|---|---|---|---|
| **MRC** | Mia. Riverside Center 444 SW 2nd Ave., 7th | Frank Chacon Inspector | 8 am-5 pm | Noel Chavez | Citywide | (305) 416-2087 |
| **MRC** | Mia. Riverside Center 444 SW 2nd Ave., 7th | Milena Gaitan Inspector | 8 am – 5 pm | Noel Chavez | Citywide | (305) 416-2087 |
| **MRC** | Mia. Riverside Center 444 SW 2nd Ave., 7th | Jacqueline Bertrand Inspector | 5 am – 2 pm | Noel Chavez | Citywide | (305) 416-2087 |
| **MRC** | Mia. Riverside Center 444 SW 2nd Ave., 7th | Jessica Angel-Capo Inspector | 5 am – 2 pm | Noel Chavez | Citywide | (305) 416-2087 |
| **MRC** | Mia. Riverside Center 444 SW 2nd Ave., 7th | Hilda Riera Inspector | 8 am – 5 pm | Noel Chavez | Citywide | (305) 416-2087 |
| **MRC** | Mia. Riverside Center 444 SW 2nd Ave., 7th | Vacant Inspector | 8 am – 5 pm | Noel Chavez | Citywide | (305) 416-2087 |

## CODE COMPLIANCE RESPONSE TEAM

| MRC | Mia. Riverside Center 444 SW 2nd Ave., 7th | Lazaro Orta Assistant Director | | Dpty. Dir. Ortiz Dir. Valencia | Citywide | (305) 416-2087 |
|---|---|---|---|---|---|---|
| **MRC** | Mia. Riverside Center 444 SW 2nd Ave., 7th | Cornelius Pierre Inspector | 8 am – 5 pm | Lazaro Orta | Citywide | (305) 416-2073 |
| **MRC** | Mia. Riverside Center 444 SW 2nd Ave., 7th | Peter Melchor Inspector | 8 am – 5 pm | Lazaro Orta | Citywide | (305) 416-2073 |

## CODE COMPLIANCE ADMINISTRATIVE TEAM

| Mia. Riverside Center 444 SW 2nd Ave., 7th | Guerson Louis Administrative Aide | (305) 416-1730 GLouis@miamigov.com |
|---|---|---|
| Mia. Riverside Center 444 SW 2nd Ave., 7th | Anna McKnight Executive Assistant | (305) 416-2083 AMcKnight@miamigov.com |
| Mia. Riverside Center 444 SW 2nd Ave., 7th | Lazaro Orta Assistant Director | (305) 329-4777 LOrta@miamigov.com |
| Mia. Riverside Center 444 SW 2nd Ave., 7th | William Ortiz Deputy Director | (305) 329-4778 WOrtiz@miamigov.com |
| Mia. Riverside Center 444 SW 2nd Ave., 7th | Adele Valencia Director | (305) 416-2089 AValencia@miamigov.com |

## CODE COMPLIANCE SERVICE AIDES

| MRC | Mia. Riverside Center 444 SW 2nd Ave., 7th | Noel Chavez Supervisor | (305) 416-1974 |
|---|---|---|---|
| **MRC** | Mia. Riverside Center 444 SW 2nd Ave., 7th | Erica Bermudez Service Center Aide | (305) 416-2137 |
| **MRC** | Mia. Riverside Center 444 SW 2nd Ave., 7th | Lizeth Carpio Service Center Aide | (305) 329-4770 |
| **MRC** | Mia. Riverside Center 444 SW 2nd Ave., 7th | Vacant Service Center Aide | (305) 329-4820 |
| **MRC** | Mia. Riverside Center 444 SW 2nd Ave., 7th | Roberto Gonzalez Service Center Aide | (305) 329-4800 |
| **MRC** | Mia. Riverside Center 444 SW 2nd Ave., 7th | Vacant Business Tax Receipt Specialist | (305) 416-2087 |

MIA-SFED23485-00068244

| Inspector Contact Information – Departmental-Issued Cell Phone List | | |
|---|---|---|
| K. Adams | 786-696-0371 | Kadams@miamigov.com |
| H. Andelo de Armas | 786-696-0232 | hdearmas@miamigov.com |
| A. Anderson | 786-696-0109 | aanderson@miamigov.com |
| J. Angel-Capo | 786-696-0173 | jcapo@miamigov.com |
| A. Aquino | 786-696-0182 | aaquino@miamigov.com |
| J. Bertrand | 786-696-0176 | jabertrand@miamigov.com |
| Josseline Castillo | 786-696-0494 | jocastillo@miamigov.com |
| Jovani Castillo | 786-696-0046 | jcastillo@miamigov.com |
| R. Cesar | 786-696-0495 | rcesar@miamigov.com |
| F. Chacon | 786-696-0344 | fchacon@miamigov.com |
| E. Comer | 786-696-0275 | ecomer@miamigov.com |
| O. De La Cruz | 786-696-0288 | odelacruz@miamigov.com |
| Alex Diez | 786-696-0322 | alexdiez@miamigov.com |
| E. Encinosa | 786-696-0198 | eencinosa@miamigov.com |
| R. Franqui | 786-696-0110 | rfranqui@miamigov.com |
| M. Gaitan | 786-696-0236 | Gmilena@miamigov.com |
| D. Gamarra | 786-696-0228 | dgamarra@miamigov.com |
| T. Guevara | 786-696-0230 | TGuevara@miamigov.com |
| J. Haley | 786-696-0342 | JJHaley@miamigov.com |
| M. Jeancine Gibbons | 786-696-0339 | MGibbons@miamigov.com |
| S. Jimenez | 786-696-0083 | SJimenez@miamigov.com |
| J. Jones | 786-696-0338 | JaJones@miamigov.com |
| M. Lezama | 786-696-0234 | MJLezama@Miamigov.com |
| G. Louis | 786-696-0348 | GLouis@miamigov.com |
| M. Lytle | 786-696-0252 | MLytle@Miamigov.com |
| R. Martinez | 786-696-0084 | RoMartinez@miamigov.com |

MIA-SFED23485-00068245

| G. Marquez | 786-696-0253 | GiMarquez@miamigov.com |
|---|---|---|
| P. Melchor | 786-696-0090 | PeMelchor@miamigov.com |
| G. Meregildo | 786-696-0253 | GMeregildo@miamigov.com |
| J. Mignott | 786-696-0221 | JaMignott@miamigov.com |
| J. Morales | 786-696-0325 | JMorales@miamigov.com |
| R. Morejon | 786-696-0092 | RMorejon@miamigov.com |
| S. Nicholson | 786-696-0110 | SNicholson@miamigov.com |
| Z. Perkins | 786-696-0355 | ZPerkins@miamigov.com |
| L. Perez | 786-696-0484 | LPerez@miamigov.com |
| Christopher Pierre | 786-696-0337 | ChPierre@Miamigov.com |
| Cornelius Pierre | 786-696-0086 | cpierre@Miamigov.com |
| V. Pino | 786-696-0479 | vpino@miamigov.com |
| H. Point-du-Jour | 786-696-0448 | HPointduJour@miamigov.com |
| C. Quetant | 786-696-0035 | cquetant@miamigov.com |
| J. Ramirez | 786-696-0346 | joramirez@miamigov.com |
| H. Riera | 786-696-0089 | HRiera@miamigov.com |
| T. Rochelin | 786-696-0488 | tgrochelin@miamigov.com |
| N. Sanders | 786-696-0085 | NSanders@miamigov.com |
| Y. Salvatierra | 786-696-0034 | YSalvatierra@miamigov.com |
| D. Smith | 786-696-0489 | desmith@miamigov.com |
| D. Tovar | 786-696-0191 | dtovar@miamigov.com |
| G. Troutman | 786-696-0493 | gtroutman@miamigov.com |
| L. Tyler | 786-696-0112 | LTyler@miamigov.com |
| D. Uriarte | 786-696-0095 | Duriarte@Miamigov.com |
| M. Zeinc | 786-696-0185 | MZeinc@miamigov.com |

MIA-SFED23485-00068246



MIA-SFED23485-00068247



**CITY OF MIAMI**
NEIGHBORHOODS

11

MIA-SFED23485-00068248



City of Miami Commission Districts

12

MIA-SFED23485-00068249



MIA-SFED23485-00068250

13



14

MIA-SFED23485-00068251



CITY OF MIAMI
CODE COMPLIANCE
AREAS - CENTRAL ZONE

Biscayne Bay

**Streets**
— City
— County
— State
▬ Code Enforcement Areas (10-20) - Central Zone

0   0.5   1        2 Miles

MIA-SFED23485-00068252

15



16

MIA-SFED23485-00068253



# Inspectors

Roles and Responsibilities throughout the City of Miami

| Building | Code Compliance | Fire | Public Works | Solid Waste | Police |
|---|---|---|---|---|---|

MIA-SFED23485-00068254



# City of Miami
## Department of
## Code Compliance

### *Process Overview*

**Step One**
**Receiving a Complaint or Observing a Violation**

Code Compliance Inspectors receive complaints through a variety of sources, including: in person, 311, email, by phone, other Departments. Inspectors also proactively address violations in their assigned geographic area. If you would like to report a potential code violation, please call 311 or (305) 416-2087, or (786) 457-0995 after normal business hours. You may also email complaints to: CodeEnforcement@MiamiGov.Com

**Step Two**
**Investigation**

An inspector must personally investigate the property in question. Inspectors use a variety of resources to evaluate compliance, including tax cards, permit history, waivers, covenants, and surveys, etc. If an inspector finds evidence of a violation, they must document their findings via photographs a written account, and open a case.

**Step Three**
**Providing Notice**

If a violation has been found, the Code Compliance inspector must post a Notice of Violation on the property, and send notice of the violation via Certified Mail. The property owner is given 10 days to bring their property into compliance or contact the inspector for more time.

**Step Four**
**Preparing a Case**

An inspector must compile all relevant evidence in preparation for evaluation of "legal sufficiency" by the Assistant City Attorney assigned to represent the City in Code Compliance cases. "Legal sufficiency" means that the inspector has compiled enough evidence to establish that a violation exists, including evidence that proper notice has been given to the owner

**Step Five**
**Requesting a Hearing**

Anyone receiving a Code violation is entitled to adjudication by an independent, quasi-judicial body. In the City of Miami, the Code Enforcement Board adjudicates Code violations. A property owner may appeal a ticket. A property owner with a Notice of Violation may be summoned to appear at the Code Enforcement Board Hearing if the owner does not timely comply or request additional time to comply.

**Step Six**
**Adjudication**

In the City of Miami, the Code Enforcement Board is the independent, quasi-judicial body empowered to adjudicate Code violations for the Department of Code Compliance. The Code Enforcement Board is made up of volunteers appointed by the City Commissioners. Tickets are adjudicated by Special Magistrates.

**Step Seven**
**Mitigation or Lien Collection**

A property owner may request a hearing before the Code Enforcement Board to mitigate their fines once they have obtained an affidavit of compliance. The Code Enforcement Board is the only entity at the City empowered to mitigate a fine amount. After adjudication, the City Attorney's Office may seek foreclosure on a lien, a money judgment, or injunctive relief

18

MIA-SFED23485-00068255



City of Miami

# Code Compliance Citizen Road Map

**1. I have received a Citation, now what?**

Please contact the Inspector at the phone number listed on the letter you received with any questions you may have about your violation, how to come into compliance, and if you need more time to comply.

**2. What can I do to achieve compliance?**

The Code Compliance Inspector is a helpful resource to guide you through the correct process for compliance. Stay in touch with the Inspector to keep them apprised of your efforts and progress. You may also check our website or call our Department.

**3. What should I do when I achieve compliance?**

Once you have brought your property into compliance, reach out to the Inspector or general Department line (305) 416-2087 to request a re-inspection as soon as you are able. The more quickly you are able to bring the property into compliance, the better

**4. What if I need more time?**

If you own a **residential** property, a Code Compliance Inspector may grant a 30-day extension of time to comply from the original compliance date in the Notice of Violation. Based upon good-faith efforts and progress, a Code Compliance Supervisor may grant an additional 30-day extension, and finally, the Director, Deputy Director, or Assistant Director may grant an additional 30-day extension. At the expiration of the 90-days, the case will be set for the next available Code Enforcement Board Hearing

**5. What happens at a hearing?**

The independent, quasi-judicial body responsible for adjudicating Code Compliance cases is the Code Enforcement Board. A resident may request more time to bring the property into compliance from the Board at a hearing, and it is in the sole discretion of the Board to grant or deny the request. The Code Enforcement Board adjudicates the case.

**6. What if I am adjudicated in violation of the Code?**

The Code Enforcement Board may impose fines, including a daily lien on the property for each day until compliance is obtained and verified. The goal of the City is to obtain compliance with the relevant Codes.

**7. What is the penalty?**

In addition to the financial cost of of a fine or lien, there are other penalties associated with having an open Code violation. The City Attorney's Office may seek an injunction to obtain compliance, may seek foreclosure on the property, or file to obtain a money judgment in court.

**8. How can I request to mitigate the fine?**

A property owner must obtain an Affidavit of Compliance from a Code Compliance Inspector prior to requesting a hearing with the Code Enforcement Board for mitigation. Hearings may be requested online through the Hearing Boards division of the Planning Department.

**9. When is the case closed?**

Once the property is in compliance, and there is no fine outstanding, the Code Compliance case is closed.

MIA-SFED23485-00068256

## Inspiring Words
# On Ethical Leadership

Each of us is a servant leader. As part of our local government, our relationship to the residents whom we serve is a sacred one. "To give real service you must add something which cannot be bought or measured with money, and that is sincerity and integrity."
– Douglas Adams

"

Moral authority comes from following universal and timeless principles like honesty, integrity, and treating people with respect.

STEVEN COVEY

In life, we must all face the choice between what is right and what is easy.

ALBUS DUMBLEDORE

It is not the critic who counts; not the [one] who points out how the strong [person] stumbles, or where the doer of deeds could have done them better. The credit belongs to the [person] who is actually in the arena, whose face is marred by dust and sweat and blood; who strives valiantly; who errs, who comes short again and again, because there is no effort without error and shortcoming; but who does actually strive to do the deeds; who knows great enthusiasms, the great devotions; who spends him/herself in a worthy cause; who at the best knows in the end the triumph of high achievement, and who at the worst, if s/he fails, at least fails **daring greatly**, so that his/her place shall never be with those cold and timid souls **who neither know victory nor defeat**.

THEODORE ROOSEVELT

20

MIA-SFED23485-00068257

## Overview of Legal Authority

We live in a democracy and property rights are protected. In order to impact someone's property rights, that individual property owner must be afforded due process. In the City of Miami, Code Compliance Inspectors gather evidence and present violations. Property owners have the right to a fair hearing before an independent, quasi-judicial body.

Chapter 162 of the Florida Statutes, the Local Government Code Enforcement Boards Act, provides the legal authority for Code Enforcement Boards, procedures, administrative fines, liens, appeals and notices. The intent of the Chapter is to "promote, protect, and improve the health, safety, and welfare of the citizens of the counties and municipalities of [Florida] by authorizing the creation of administrative boards with authority to impose administrative fines and other noncriminal penalties to provide an equitable, expeditious, effective, and inexpensive method of enforcing any codes and ordinances in force in counties and municipalities where pending or repeated violation continues to exist."

The Code Enforcement Board is a quasi-judicial body, the creation of which is enabled by Chapter 162 of the Florida Statutes. The Board functions as a panel to hear the facts and determine, under the law, whether or not the alleged violator committed the alleged violation.

The role of the Board is to adjudicate cases that are presented by a Code Inspector. This limitation on the function of the Board is also reflected in Section 162.06(1) which states "…no member of a board shall have the power to initiate such enforcement proceedings."

Chapter 2, Article X of the City of Miami Code of Ordinances establishes the local enforcement procedure, conduct of a hearing, and notices (Section 2-814 – 2-819). Section 2-823 of the City of Miami Code establishes civil infraction enforcement procedures.

### Repeat Violation

"Repeat violation" is defined in Section 162.04(5) as "a violation of a provision of a code or ordinance by a person who has been previously found through a code enforcement board or any other quasi-judicial or judicial process, to have violated or who has admitted violating the same provision within 5 years prior to the violation, notwithstanding the violations occur at different locations."

### Liens and Foreclosure

Code Compliance liens come into existence when a property owner 1) receives notice of a violation; 2) fails to correct the violation; 3) has a hearing before the Code Enforcement Board, and the Board determines that the property owner must bring the property into compliance by a specific date or a fine may be imposed; 4) the violator fails to come into compliance in the specified time frame, and a certified copy of the Order from the Board is recorded in the public records, which constitutes a lien.

Once the lien remains unpaid for three months, the City may foreclose on the lien. There are both statutory and practical limitations on the foreclosure process. Some considerations include:

- Homestead: The Florida Constitution prohibits foreclosure on real property to which the Homestead Exemption applies, which in simple terms is an owner-occupied house.
- Superior Encumbrances: Although a junior lien holder has the right to foreclose, practical reasons may exist so that the junior lien holder may not want to exercise this right. If the City forecloses and takes the property subject to superior interests, then the City must pay of the superior interests in full.

MIA-SFED23485-00068258

- Taxes: Sometimes, when property owners disregard notices of Code violations and let the property exist in a state of disrepair, the property owner may also have neglected to pay property taxes. If the City decides to foreclose its lien on the property, the City will be responsible for paying any back property taxes.
- Duration of Lien: Code Compliance liens expire as a matter of law after 20 years (Florida Statutes, Chapter 162.10).
- Other Governments: Code Compliance liens are not enforceable as a matter of law on other government-owned properties.

## Entering Private Property

Citizens have a reasonable expectation of privacy in their homes. Code Compliance Inspectors may only enter private property with 1) permission of the occupant; or 2) an administrative warrant.

Florida Attorney General Advisory Legal Opinion (AGO 84-32) addresses the subject of inspectors entering private property in Florida, and states:

- The Fourth Amendment to the United States Constitution made applicable to the states through the Due Process Clause of the Fourteenth Amendment guarantees to all persons the right to privacy free from unreasonable state intrusion and provides protection from unreasonable searches and seizures.
- Both business or commercial premises and private residences are afforded protection from unreasonable searches.
- No statutory authority for warrantless searches exists with regard to local code inspectors.
- Administrative searches or inspections may be constitutionally conducted with 1) consent of the owner/operator/occupant, or 2) a duly issued search/administrative warrant.

22

MIA-SFED23485-00068259



## CITY OF MIAMI DEPARTMENT OF CODE COMPLIANCE
## SUPERVISOR AND INSPECTOR RESPONSIBILITIES

The mission of the Department of Code Compliance is to work in **partnership with the community** to **promote health** and **safety, safeguard civic and community assets**, and **elevate quality of life** and **aesthetics** in the City of Miami.

Each member of our Department is given a great deal of public trust and responsibility. Therefore, we remain accountable to the public and each other for effectively, impartially, and thoroughly carrying out our duties. Our Department is tasked with educating residents about the City's codes, and, when necessary, issuing tickets and Notices of Violation to achieve compliance. In light of the sensitive nature of our work, it is essential that every member of the Department display at all times honesty, integrity, and professionalism, and faithfully document all investigations and actions. It is also important that every inspector adhere to the same protocols for the same violations across our City. The following checklists are designed to ensure accountability, clarity, and consistency in our Department.

At all times, **every member** of the Department must:

1. **Act with integrity.**
2. **Treat everyone they encounter with respect, kindness, professionalism, and objectivity.**
3. **Document their work.**

### Departmental Priorities

As a Code Compliance inspector, your time is a valuable City resource. Make the highest and most efficient use of each day. Timely responding to all complaints and inspection requests is a foundational expectation of your role. Our Department also requires proactively patrolling your area in an efficient manner to address violations. Consider the following factors in evaluating priorities:

1. Are you receiving community complaints about a site?
2. Is the violation a threat to health, or safety?
3. Is the violation in a highly visible area or main thoroughfare?
4. Is the violation deteriorating quality of life?

As the person most knowledgeable about your assigned zone, the Department looks to you to speak up about issues you are seeing, and to weekly report out violations in your area that may have running liens in place yet remain in violation. For properties that have been adjudicated in violation, but continue to remain out of compliance, please notify your Supervisor so that we can enlist the support of our City Attorney's Office to evaluate additional legal remedies at the City's disposal to bring the property into compliance.

MIA-SFED23485-00068260

**Code Compliance Supervisors' Responsibilities:** Code Compliance Supervisors play a critical role in leading our Department. Supervisors serve as sources of substantive guidance for their reports and the public, maintain accountability with established protocols, and are responsible for the performance of the inspectors on their teams. To better collaborate with each other, the following is a list of tasks Supervisors must carry out daily, weekly, and monthly.

| Supervisor Checklist | |
|---|---|
| **Daily** | |
| **Task** | **Status** |
| Timely lead roll-call at 8:00 am each morning or ensure that an inspector is designated to lead roll call in their absence. | |
| Email daily attendance to the Director, Deputy Director, Assistant Director, Administrative Assistant & Administrative Aide. | |
| Facilitate a productive start to the day, answering any questions that may arise. | |
| Ensure a professional work environment, maintaining a collegial tone in the office and in the field. | |
| Ensure that inspectors manage their time in accordance with stated objectives and assignments. | |
| Ensure that office work takes place between 8:00-9:30 am, and then again between 4:00-5:00 pm so that adequate time is spent by each inspector proactively addressing issues in their assigned area. | |
| Ensure that inspectors are in the field daily in their assigned area, proactively addressing violations. | |
| Make sure that iBuild, final Certificate of Use Inspections, responding to 311 complaints, and other activities are conducted in a timely fashion. | |
| Supervisors serve as the main point of contact for the public, and internal City Departments, for their area, responding to inquiries and assigning inspections as needed. | |
| **Weekly** | **Status** |
| Review overdue activities, closed cases, and cases that need to be set for hearing with each inspector on their team. **(Provide email to Director/ Deputy Director with overdue activities).** | |
| Identify positive aspects of the inspector's performance and opportunities for improvement, providing constructive, actionable feedback. | |
| Attend any inspections with an inspector who requests assistance. | |
| Ensure timely responsiveness of each inspector to their emails and voicemails. | |
| Respond timely to all communications directed to the Supervisor **(no later than 48 hours).** | |
| Timely respond to requests for Lien Certification. | |
| Timely review cases in advance of the pre-hearing meeting with the Assistant City Attorney to ensure legal sufficiency. | |
| Participate in the Supervisors staff meeting and communicate any issues to the Director, Deputy Director, and Assistant Director. | |
| **Monthly** | **Status** |
| Conduct a team meeting to discuss persistent Code issues inspectors are observing and report out any trends, unmet needs, or recommended training or legislation to address issues in the field. | |
| Attend a community meeting in the area at least once a month to get citizen feedback on Code Compliance issues and educate the public. Ensure consistent coverage throughout their geographic area of responsibility, engaging as many residents as possible. | |
| Review the number of cases taken to the Code Enforcement Board by each inspector and review the quality of the pre-hearing preparation. | |
| Review the overall productivity and effectiveness of each inspector to ensure consistency and best efforts. | |
| Draft a memorandum to the Director /Deputy Director/Asst. Director for properties that have been adjudicated in violation, are running liens, but represent ongoing violations. This report will be the basis for a monthly request to the City Attorney's Office for review of any remaining legal remedies | |

24

MIA-SFED23485-00068261

| | Status |
|---|---|
| (e.g. foreclosure on the property, injunctive relief, etc.) to bring the property into compliance. The properties to refer are those 1) generating ongoing community complaints; 2) highly visible/in a major thoroughfare; 3) negatively impacting quality of life. | |
| Supervisors must monthly inspect vehicles and equipment to ensure proper maintenance. | |
| **Quarterly** | **Status** |
| Conduct a **Guide and Assist (GA) Ride-Along** with each inspector in their area focusing on main thoroughfares, reviewing any visible violations, and ensuring that the inspector has addressed them. If violations remain unaddressed, engage the inspector to understand what is impeding productivity and assist in ensuring coverage. Provide guidance on how to conduct inspections and assist the inspector with the investigation. This is important for the following reasons: a) the supervisor can observe how the inspector carries out daily duties and suggest more efficient methods when needed, b) it allows for ongoing training on procedures and codes, c) it creates an opportunity for the supervisor to identify problems with a process and make suggestions for improvement and d) the supervisor can identify problems with equipment and address immediately. | |

25

MIA-SFED23485-00068262

**Code Compliance Inspectors' Responsibilities:** Code Compliance Inspectors are the backbone of our Department. Inspectors are in the City's neighborhoods daily ensuring quality of life in our community. Often, a Code Compliance inspector may be the first in-person interaction a citizen has with our local government, making our professionalism and consistency even more important. To better collaborate with each other, the following is a list of tasks the Inspectors must carry out daily, weekly, and monthly.

| Inspector Checklist | |
| --- | --- |
| **Daily** | |
| **Task** | **Status** |
| Day shift inspectors must timely attend roll-call at 8:00 am each morning in the proper uniform and with working equipment, prepared for a successful and productive day. (Any equipment not properly functioning should be reported to the supervisor immediately). All inspectors must timely attend shifts and clock-in at the beginning of the shift, clocking out at the end of each shifts. | |
| Review all assigned tasks for the day and plan accordingly for timely completion. | |
| Review and respond to voicemails and emails as soon as possible, and not later than two business days after they have been left in your voicemail or inbox. Respond politely and professionally. | |
| Accomplish office work between 8:00 – 9:30 am and then again between 4:00 – 5:00 pm. Request permission from the Supervisor if more office time is needed in the office on any given day for hearing preparation or citizen meetings. Inspectors on the Code Revenue Task Force, Code Response Team, After-Hours Team, or special assignment **should spend no more than one-and-a-half (1.5) hours completing tasks in the office at the beginning of each shift and one (1) hour at the end of each shift doing office work**, if necessary. The rest of the shift should be spent proactively conducting inspections, responding to complaints, and addressing violations. If additional time is needed in the office, it must be requested in writing to your immediate supervisor. Lunch breaks should be timed to occur in a one-hour time frame within the middle two hours of your shift (e.g. if your start time is 8 am, your lunch should be taken for one hour between 12-2 pm; if you begin at 1 pm, your lunch hour should be taken between 5-7 pm). | |
| Work at a healthy and productive pace each day, managing time in accordance with stated objectives. | |
| Proactively address violations in their assigned area. | |
| Make sure that iBuild inspections, final Certificate of Use requests, 311 complaints, and other activities are conducted in a timely fashion. | |
| **Thoroughly document all work in our system**. When a complaint is received, open a case, take photographs of the violation/postings, and include comments that describe what has taken place, even if the violation is not ultimately found. Preserve enough evidence in the system to be able to accurately tell the story of the investigation. | |
| **Weekly** | **Status** |
| Prepare relevant cases for pre-hearing and raise any questions with the Supervisor. Utilize the Departmental Pre-Hearing checklist to ensure success. | |
| At the pre-hearing, raise any questions with our Assistant City Attorney, and prepare to testify competently at the Code Enforcement Board or Ticket Appeal Hearing. | |
| Drive main thoroughfares in their assigned zone to ensure that as many violations as possible are addressed. | |
| Plan ahead for upcoming scheduled absences and communicate clearly with the Supervisor so that requests for iBuild inspections and other assignments can be handled accordingly without inconveniencing the public. | |
| Check all equipment, including vehicles, and ensure that everything is in working order. Communicate with the Supervisor if anything is not working properly. | |
| **Monthly** | **Status** |
| Attend the monthly staff-wide training and meaningfully participate. Add trainings to their office manual. | |

26

MIA-SFED23485-00068263

| Review any persistent cases that remain out of compliance, in spite of having been adjudicated. Prepare a list monthly and refer these cases to the Supervisor. Consider any property that generates 1) ongoing community complaints; 2) is highly visible/in a major thoroughfare; 3) deteriorates quality of life | |
| --- | --- |
| **Quarterly** | **Status** |
| Bring Supervisor on a ride-along in their area on a quarterly basis, reviewing any visible violations that have been addressed and describing actions taken. | |

## Inspector Safety

When you become a Code Compliance Inspector, you begin a journey of professional development. Each case you encounter is unique and presents different challenges. How you respond to these challenges is critical to your safety. Here are some principles that will help keep you safe:

1. Before you approach the door, do as much preparation as you can.

   Prepare your notice(s) before approaching and initiating contact when violations are clearly visible from the public right-of-way to keep your concentration on your surroundings instead of your clipboard. This may not always be possible, especially if the alleged violations are not visible from the public right-of-way or neighboring property.

2. Take your documentation photos before initiating contact whenever possible.

   This helps keep your eyes on your surroundings instead of your camera. There are other advantages to doing this such as capturing evidence before it is tampered with and having an unobstructed view of the violation, but it is especially important for officer safety.

3. Do not walk in front of the property owner; let them lead the way.

   Having the property owner lead you through the inspection puts the inspector in a position of advantage. You have a better view from behind them, in most cases, and can easily escape if you see or sense it is time to retreat. When walking into or around a property, do not walk in front of the property owner.

4. Avoid property owner distractions.

   You should always remain in command of the scene. If the property owner unleashes a barrage of questions as you initiate your inspection, ask the property owner to write down their questions while you perform your inspection and let them know you will allow ample time to answer them. This method not only keeps the distractions down, it keeps the property owner's hands and minds occupied with something other than distracting or attacking you.

5. Maintain situational awareness.

   While getting out of your vehicle, look around you and identify any potential dangers. During conversation, take a look around you every minute or so. Maintaining awareness of events developing around you will help you determine if you should move to another location and keep you safe.

6. Practice reflective listening.

   People like to be heard and understood. If they feel their message may not have been received, they may feel compelled to repeat it. In the process of preparing to repeat themselves, they are too preoccupied to carefully listen to what you are telling them. This can lead to frustration and an unproductive dialogue. The best way

27

MIA-SFED23485-00068264

to avoid this problem is to paraphrase back what the citizen is telling you; not just the words, but also the emotion. Begin with stating your understanding of the emotion, followed by a summary of the message. For example, "I understand that you are very upset that applying for a permit and going through the legalization process is going to create hardships for you and your family. Do I understand this correctly?" Note the pattern: First, reflect the emotion. Then, state your understanding. Stating that you understand both the message and the emotion behind it tells the citizen that: 1) He or she does not need to repeat the message. 2) You are listening. 3) You understand the message. 4) You care about the person's situation. This simple act of reflective listening can often be accomplished in just a couple of sentences. It saves time, de-escalates emotions and sets the stage for productive and collaborative dialogue. When a person feels understood and respected, he or she is not inclined to act out against you. This is a great way to de-escalate a hostile situation.

7. Maintain a barrier.

Much of our work will require close interactions with citizens. An aggressor can eliminate your personal space in an instant and strike you. Creating any type of barrier can help protect you from being struck. Holding up your clipboard can offer a minimal amount of protection as it occupies and creates space between you and the citizen. While inside a house, furniture can also serve as a barrier. Vehicles also make good physical barriers in times of need.

8. Anticipate and plan for an animal attack.

You may encounter an animal during your inspections. All animals are unpredictable and can attack without notice. One of the most common animals you will encounter that can pose an immediate threat is a dog. When entering a property, carry your clipboard with you. If you encounter a vicious dog on your way to the front door, offering the dog your clipboard to bite down on could save you from a nasty dog bite. Do not hesitate to ask the owner to secure the dog until you are finished with your site inspection.

9. Always think safety.

Use the best resource you have to avoid harm: common sense. A heightened state of awareness is necessary at all times when on duty.

10. Come back to the property if necessary

Do not feel pressured to continue an inspection if circumstances have changed and the location is no longer safe. Leave the property and come back when the situation is more favorable. Ask another inspector or your Field Supervisor to assist with the inspection.

MIA-SFED23485-00068265

### Interacting with the Public

As a Code Compliance Inspector, you are an ambassador for our City government. Every interaction is an opportunity to build trust, and it is essential that you conduct yourself at all times with professionalism, integrity, and tact. We are public servants charged with improving quality of life in our City. Customer service is required in this role. Our scope of authority can impact a person's property ownership, and it is essential that we treat our roles with the respect and weight they are due given the potential consequences of our actions.

#### Context

"At one point, empathy was the default. It's safe to say that we are now operating in an era of empathy deficit, not only in business, but also in politics and in life. The default state is no longer warmth and caring, it is knives out. Consequently, if you can be disproportionately empathetic in your [work], it is noticeable…and can create customer conversations accordingly." – Jay Baer

To add to the challenges of the broader context in which we are all working, our role is one in which we frequently ask residents and property owners to do something, stop doing something, or spend money, time, and energy fixing something. Few residents understand Code Compliance's scope or authority or process, and so it is imperative that we explain clearly and consistently who we are and what we do.

According to the 2018 United Way ALICE (Asset Limited, Income Constrained, Employed) Report about financial hardship in Miami-Dade County, 40% of households in Miami-Dade County fall into the category of hard-working members of the community who are employed, yet cannot keep up with the rising cost of living. In short, we live in a City where a significant number of our residents are struggling financially. In this context, it is even more important that we approach our work with empathy and respect. Our goal is to achieve compliance through education, not to be punitive or disrespectful. The Code Enforcement Board imposes liens and other fines where compliance cannot be obtained in a timely fashion, and the implications of a lien for any property owner are very serious.

#### Active Listening

Active listening is a technique to build trust and establish rapport, de-escalate tense situations, and to ensure productive interactions. Inspector safety is always first, so use your best judgment. The techniques enumerated below can assist in making difficult conversations constructive. The acronym below, L-I-S-T-E-N can help you remember these key elements of active listening.

**L**: Look interested – get interested. Pay attention, listen for the feelings behind what is being shared. Observe body language, make eye contact, face the speaker.

**I**: Involve yourself by responding. Demonstrate concern. Nod your head to show understanding. Wait for the speaker to stop talking before speaking, ignore distractions. Tell the speaker if you do not understand something they are saying. Use neutral verbal affirmations like, "I see," to demonstrate that you are attentively following what is being said.

**S**: Stay on Target. Withhold judgment. Do not personalize public frustration. Remain neutral. Our goal is to educate the public about and achieve compliance with our City codes.

**T**: Test your understanding. Summarize what is being said by using phrases like, "I understand that you feel…" Ask specific questions to clarify.

29

MIA-SFED23485-00068266

**E**: Evaluate the message. Reflect on what is being said. Address what is within your scope of authority. If you feel you may need additional support, do not hesitate to say that you will need to review the case with your Supervisor before responding.

**N**: Neutralize your feelings. This can be particularly challenging if a resident is agitated or aggressive.

## Customer Service

Working in the Department of Code Compliance requires excellent customer service skills. In addition to relying upon active listening to encourage constructive communications, Code Compliance employees must demonstrate patience, professionalism, time management skills, willingness to take initiative, communication skills, knowledge of our processes and the ability to guide residents through other City processes, the ability to maintain a positive attitude and language, accepting personal responsibility, adaptability, confidence, and consistency, The ability to not personalize or internalize public frustration is also key to success in the Department of Code Compliance.

## Bad Faith

It is common for residents and property owners to attribute bad faith to the person who they believe may have reported the Code violation against their property. Frequently, feuding neighbors or business owners with long personal histories report code violations on each other. The key in these situations is that whether or not a complaint of violation was made in good or bad faith, **our team responds fairly and impartially to each situation and evaluates the merits of the case objectively and impartially**. The inspector must **personally investigate** every alleged violation. If a violation is found, it is incumbent upon the inspector to establish a legally-sufficient case. Every property owner receives notice of the violation and a reasonable amount of time to correct said violation. Every property owner is entitled to due process, and a neutral hearing before the Code Enforcement Board or Special Magistrate. Do not get drawn in to private civil disputes. Maintain neutrality and impartiality at all times. **Our goal as a Department is to educate the public and achieve compliance**.

MIA-SFED23485-00068267



"

I've learned that people will forget what you said, people will forget what you did, but they will never forget how you made them feel.

MAYA ANGELOU

It is still best to be honest and truthful; to make the most of what we have; to be happy with simple pleasures; and have courage when things go wrong.

LAURA INGALLS WILDER

The most beautiful people we have known are those who have known defeat, known loss, and have found their way out of the depths. These persons have an appreciation, a sensitivity, and an understanding of life that fills them with compassion, gentleness, and a deep loving concern. Beautiful people do not just happen.

ELIZABETH KUBLER-ROSS

"



"

Whoever is careless with the truth in small matters cannot be trusted with important matters.

ALBERT EINSTEIN

May today there be peace within. May you trust that you are exactly where you are meant to be. May you not forget the infinite possibilities that are born of faith in yourself and others. May you use the gifts you have received, and pass on the love that has been given to you. May you be content with yourself just the way you are. Let this knowledge settle into your bones, and allow your soul the freedom to sing, dance, praise, and love. It is there for each and every one of us.

MOTHER THERESA

It is in your hands to make of our world a better one for all.

NELSON MANDELA

"

31

MIA-SFED23485-00068268

## Case Development

### Investigation and Initiation of a Code Enforcement Case

#### Personal Investigation

Section 162.21 of the Florida Statutes requires a "personal investigation" by an inspector in order to establish "reasonable cause" to believe a violation has occurred. Even if other third parties corroborate or confirm the presence of a violation, such "statements of alleged violation" are most likely not legally sufficient proof, in and of themselves, for a "violation." The Code Enforcement Board determines legal sufficiency initially (and, if on appeal, then legal sufficiency is determined by the Circuit Court).

Code inspectors should diligently establish and maintain their credibility before the Board. Diligent investigation, documentation and consistently establishing legal sufficiency is critical to credibility and success as a Code Compliance Inspector.

#### Documentation of Violation

Documentation is **essential** to success as a Code Compliance Inspector. Once the inspector has observed the violation, they must document in writing the violation to memorialize those facts upon which he or she relied to determine the violation.

Documentation should include 1) date; 2) time of violation; 3) the persons with whom the inspector spoke or with whom he or she inspected the property; 4) a written narrative of the facts that the inspector observed; 5) the application section of the City code; and 6) the determination or conclusion that the facts observed by the Code Compliance Inspector constitute a violation of that section of the City code.

In the narrative, the inspector should specify the facts sufficiently to be able to refresh his or her memory at public hearing. The use of photography or video is appropriate and helpful in documenting the violation. Ensure that you have the time-stamping function on your photographs.

**Every time you respond to a complaint or conduct an inspection, you must open a case in City View**. If the violation is **not found**, please select that option from the drop-down bar, and then provide in the "comments" section all of the relevant information as to why no violation was found, what you did observe. If the violation is found, detail all of the information as to why the violation is found, and what you observe.

#### Cite All Violations

It is important to evaluate the property holistically and to cite all relevant violations at the time of inspection. This gives the property owner the best opportunity to address all violations in a timely, efficient manner. Code Enforcement has been established because of concerns of the citizenry and the governing body of our community. The ultimate reason to enforce codes is a policy reason, and it will not reflect well if an inspector observed a violation but has not cited the same. It is best to cite all observed violations, including those situations where proof may be difficult or time consuming.

#### Refer Violations to the Relevant Department

It is critical to make appropriate referrals if you observe violations in the field that may fall within the scope of the Building Department (electrical, mechanical, plumbing, unsafe structures, building generally), Public Works (sidewalks, streets, stormwater drains, Maintenance of Traffic Permits (MOT) violations), Solid Waste, Fire Department (life safety violations for commercial buildings or multi-family dwellings), and Police (Nuisance Abatement when you observe any potential illegal activity).

32

MIA-SFED23485-00068269

**Statement of Violation, Service of Process, and Notice of Hearing**

The Florida and United States Constitutions require that procedural due process of law be granted to all parties. Procedural due process of law requires: 1) Notice, 2) an Opportunity to be Heard and to Defend, 3) before a competent tribunal vested with the jurisdiction of the subject matter. Due process notice requires the following items be completed by the Code Inspector in order to adequately notify and put the alleged violator on Notice:

1. Sufficient description of the violation (Section 162.06(2) Fla. Stat.). The description of violation should be as specific as possible in order to adequately put the person on notice as to the alleged violation. The purpose of Notice is to reasonably inform the alleged violator as to 1) the specific condition on the property that is in 2) violation of what specific code, and 3) what specifically has to be done to correct the violation.
2. Determination of the person to cite, the alleged violator or the landowner if the landowner is not the alleged violator.
3. Reasonable time period from the date in which the Notice of Violation is received by the alleged violator and the date of the hearing.
4. Completion of service of process of the violation on the alleged violator. In our Department, service of process include both Certified Mail and physical posting of the alleged violator's place of residence. (Section 16212(2) Fla. Stat.).

**Key Takeaways**

Our overarching goal is to achieve compliance with our City Codes. All Code Compliance processes follow the 6 simple principles of Code Compliance:

1. **Investigate** the alleged violation.
2. Gather **evidence**, **document** findings.
3. If a violation is found, **notify the violator** of what needs correction and the steps needed to achieve compliance.
4. If compliance is not achieved through education and notice in a reasonable time, **schedule the case** for hearing before the Code Enforcement Board.
5. If compliance is not achieved after hearing and adjudication of the Code Enforcement Board, a **lien** may be assessed on the property by the Code Enforcement Board.
6. If the property remains in violation after adjudication by the Code Enforcement Board and a running lien exists on the property, **request additional legal action by notifying your Supervisor**.
7. Additional legal remedies may include **foreclosure** on the property, a **money judgment**, or an **injunction** to require the property owner to take some action or refrain from some action.

MIA-SFED23485-00068270

### Preparing a Case for Hearing

As a Code Compliance Inspector, you have a meaningful and unique opportunity to truly improve **quality of life** in the area you serve, and to prevent health and safety hazards from festering. Your time is a City resource, and it is critical that you use your time well. Creating a **legally-sufficient case** is part of making the best use of your time and energy.

Remember that the actions you take **impact your colleagues**, other City Departments, the Code Enforcement Board volunteers and attorney, and most of all, **the residents and property owners facing violations**.

Preparing a case for hearing is a foundational aspect of the role of Code Compliance Inspector. The checklist below is designed to ensure **clarity**, **efficiency**, and **consistency**. Utilize the checklist below to prepare a case for hearing. It is critical that each element specified below is present to establish the legal sufficiency of the case before it goes before the Code Enforcement Board.

MIA-SFED23485-00068271



# City of Miami Department of Code Compliance

## Case History Fact Sheet

Property Address: _____ Case Number: _____

CCI Name: _____ CCI Signature: _____

CC Office: _____ Transect Zone: _____

Assessed Value: _____ Homestead Exemption: _____

Violation Reference Number (s): _____

\_\_ NOV/SUM (Photo of posting with property address visible, notarized affidavit of posting, proof of mailing with green slip or USPS printout)

\_\_ TKT/TSM/TAH (Photo of posting with property address visible, notarized affidavit of posting, proof of mailing with green slip or USPS printout)

\_\_ CityView Certified Mail printout

\_\_ Ownership info (Tax Deed, Miami-Dade County printout)

\_\_ Sunbiz information with Registered Agent (if applicable)

\_\_ Evidence (Time-stamped or signed and dated photographs, emails, violation-specific evidence)

### Violation Narrative & Required Corrections

|  |
| --- |
|  |
|  |
|  |
|  |
|  |
|  |

CC Supervisor Approval   Name: _____   Signature: _____

35

MIA-SFED23485-00068272

## Scheduling Cases for Hearing

It is a legal requirement to afford property owners due process in the Code Compliance process. This includes making sure that property owners are properly notified of violations that exist on their property and that they are afforded the opportunity to be heard before an impartial board regarding the violations. In the City of Miami, the neutral, quasi-judicial body that adjudicates Code violations is the Code Enforcement Board. The Code Enforcement Board is made up of volunteers appointed by the City Commission. The Code Enforcement Board has legal counsel, and our Department is assisted by an assigned Assistant City Attorney responsible for prosecuting the Code violation cases.

Scheduling of cases is an important component of this process because justice delayed is justice denied, and efficient adjudication of our cases is critical to quality of life in our community.

As soon as a case is ready to be scheduled for a hearing, the Code Compliance Inspector must schedule the case for the next available hearing. If the inspector is unsure of the next available hearing, the Supervisor is available to assist. Taking ownership of moving cases ahead is critical to success as a Code Compliance Inspector. Ultimately, our City expects that the area inspector is the most knowledgeable authority about Code violations in that particular area, and our Department expects each inspector to take ownership of their cases.

If the inspector wishes to schedule a case for a hearing other than the next available hearing, the inspector must request approval from the inspector's immediate supervisor by submitting a written explanation as to the reason for the request. If the inspector wishes to reschedule a case, the inspector must submit a written request to his/her supervisor and the request must be approved prior to any changes.

The City Attorney's Office, Hearing Boards division of the Planning Department, and the Department of Code Compliance work together to bring cases before the board. The inspector should be mindful of such and avoid scheduling time off on hearing dates. In addition, the inspector should schedule cases for hearings so that it does not conflict with approved time off or any personal matters. If the inspector has any questions regarding this process, the inspector should speak with their immediate Supervisor.

Always place yourself in the shoes of the resident being asked to attend the hearing. Act with an abundance of respect and forethought, planning in advance for pre-hearing and notifying your Supervisor of any schedule changes so that the impacted resident may also receive timely notice.

On a weekly basis, review cases that have been scheduled for an upcoming hearing and have already complied. You must play an active role in ensuring the highest and best use of each Code Enforcement Board Hearing, recalling that the Board is made up of volunteers who generously share their time to assist in improving our community.

### Key Takeaways:

- Always schedule the case for the next available hearing.
  - If, for any reason, you cannot schedule for the next available hearing, you must obtain approval from your Supervisor in writing beforehand.
- Plan ahead and treat your pre-hearings and hearings as the important obligations they are, placing yourself in the shoes of the property owner impacted by the case.
- When in doubt, ask your Supervisor.
- Do your part to make the highest and best use of each pre-hearing by coming prepared, and each Code Enforcement Board hearing by speaking up as soon as scheduled cases have complied.

MIA-SFED23485-00068273

## Extensions of Time

Upon a good faith showing of effort to comply, a Code Compliance Inspector may grant a 30-day extension of time to comply to the property owner. If efforts toward compliance continue to be made by the property owner, the Supervisor may grant an additional 30-day extension of time to comply. If the property owner requests additional time and demonstrates progress towards compliance, the Director/Deputy Director/Assistant Director may authorize a final 30-day extension of time to comply.

Please note that pursuant to the City Commission Directive of the March 14, 2019 Commission meeting, commercial and other non-residential properties may have no more than 30 days to comply with any violations. Furthermore, any commercial and other non-residential property that is a repeat violator must be scheduled to appear at the next available Code Enforcement Board hearing. Finally, any commercial or non-residential property with three (3) violations in a five (5) year period must be referred directly to the Code Enforcement Board.

37

MIA-SFED23485-00068274

## How to Testify

While formal rules of evidence do not strictly apply, the Code Enforcement Board process is a quasi-judicial proceeding and must be treated with the level of deference and decorum afforded to a court. Proper case presentation requires testimony by the Code Compliance Inspector before an impartial board. When testifying, it is important that the inspector focuses on the facts of the case. The inspector may be asked questions by the Assistant City Attorney, the board members, other City staff, and members of the public. While providing testimony at a hearing, the following should be observed:

1. **Dress appropriately.** Come to the hearing clean, well-groomed, and in your appropriate uniform.

2. **Tell the truth.** Avoid temptation to exaggerate the truth. It's not necessary and if you're caught it makes your whole testimony suspicious. Being clear, consistent, and honest is the most important aspect of testifying in a hearing.

3. **Be respectful.** A hearing is not the forum for joking around, speaking out of turn, or using jargon. Recall that for the property owners awaiting adjudication, the process can be a foreign and intimidating experience. Wait patiently until your case is called. Avoid chewing gum while testifying. Stand up straight and make eye contact during your testimony.

4. **Know your case.** Study the relevant details of your case prior to providing your testimony. Standing at the podium and fumbling through your file to answer basic questions about the case may weaken your credibility.

5. **Answer questions.** Answer questions calmly, clearly, and one at a time. Avoid volunteering information unless you are asked for it directly. Answer each question honestly and completely, and avoid saying anything else. You do not need to talk for several minutes after each question. For some questions, a simple yes or no may suffice.

6. **Do not talk over someone else.** If a board member or an attorney starts talking during your testimony, stop talking. If you feel that what you have to say is important, ask to resume your statement after the person finishes.

7. **Remain calm.** You cannot provide testimony in a respectful manner if you lose your temper. In fact, it could get you into trouble and harm the credibility of your testimony. Show respect for everyone at the hearing, even if you have strong feelings about the case.

8. **Modify your statement, if needed.** If you believe that your statement did not accurately reflect what happened, correct it as soon as possible. Ask if you can correct something that you said, and give a reason for the mistake.

MIA-SFED23485-00068275



# Final Zoning Inspection Checklist



## Before the Inspection

Check iBuild for pending inspections. Contact the property owner/contractor to determine that the property is inspection-ready. Once at the property, locate the approved/stamped plans and/or survey, these should be onsite and may also be available in iBuild. Review each of the relevant items to ensure the work was done per the plans and/or survey. The site should be free of debris, litter, and construction materials.



## Driveway

1. Verify the approved dimensions
2. Confirm the approved design (e.g. pavers, stamped concrete)
3. Check for driveway location
4. Check for sod as required



## Fence

1. Check for approved design
2. Verify the approved dimensions
3. Check for placement on property
4. Check for visibility requirements



## Single-Family Home

1. Number/location of windows/doors
2. Verify interior (floor plan)/exterior layout
3. Check that all interior and exterior surfaces are finished and painted
4. Check driveway location
5. Check landscaping requirements, placement, and number of trees. If tree was removed, confirm a tree removal permit was issued prior to approving the final inspection.



## Multi-Family/ Commercial

1. Number/location of windows/doors
2. Verify required parking spaces
3. Check landscaping requirements, placement, and number of trees. If tree was removed, confirm a tree removal permit was issued prior to approving the final inspection.
4. Check number of units (floor plan)



## Signs

1. Check if the sign requires an electrical permit
2. Check if it is a single or double face sign
3. Check location of sign
4. Check language/graphics on the sign and approximate letter height and style



## Pool

1. Check deck/pool dimensions
2. Check pool equipment location
3. Check the sod/landscaping requirements



## Parking Lot Resurfacing/ Restriping

1. Check required handicap space(s)
2. Check number of parking spaces
3. Check for landscaping requirements
4. Check for lighting requirements
5. Verify fencing requirements



## Remodeling

Review floor plan/scope of work matches the approved permit

39

MIA-SFED23485-00068276

## Final Zoning Inspection Checklist

- Before the Inspection
  - o Check iBuild for pending inspections.
  - o Contact the property owner/contractor to determine that the property is inspection-ready.
  - o Once at the property, locate the approved/stamped plans and/or survey; these should be onsite.
  - o Review each of the relevant items to ensure the work was done per the plans and/or survey.
  - o The site should be free of debris, litter, and construction materials.
- Driveway
  - o Verify the approved dimensions.
  - o Confirm the approved design (e.g. pavers, stamped concrete, etc.).
  - o Check for driveway location.
  - o Check for sod as required.
- Fence
  - o Check for approved design.
  - o Verify the approved dimensions.
  - o Check for placement on property.
  - o Check for visibility requirements.
- Single-Family Home
  - o Number/location of windows/doors.
  - o Verify the interior (floor plans)/exterior layout.
  - o Check that all interior and exterior surfaces are finished and painted.
  - o Check driveway location.
  - o Check landscaping requirements, placement, and number of trees. If a tree was removed, confirm a tree removal permit was issued prior to approving the final inspection.
- Multi-Family/Commercial
  - o Verify the number and location of windows and doors.
  - o Verify required parking spaces.
  - o Check landscaping requirements/placement, and the number of trees. If a tree was removed, confirm that a tree removal permit was issued prior to approving the final inspection.
  - o Check the number of units (floor plan).
- Signs
  - o Check if the sign requires an electrical permit.
  - o Check if it is a single or double face sign.
  - o Check the location of the sign.
  - o Check the language/graphics on the sign and approximate letter height and style.
- Pool
  - o Check the deck/pool dimensions.
  - o Check the pool equipment location.
  - o Check the sod/landscaping requirements.
- Parking Lot Resurfacing/Re-striping
  - o Check the required handicap spaces.
  - o Check the number of parking spaces.
  - o Check for landscaping requirements.
  - o Check for lighting requirements.
  - o Verify fencing requirements.
- Remodeling
  - o Review floor plan/scope of work matches the approved permit.

40

MIA-SFED23485-00068277

## Certificate of Use Inspection Checklist

Requests for Certificate of Use inspections are received via 311, walk-ins, and over the phone.

1. Prior to the inspection, the inspector must:
   a. Check MiamiBiz to make sure the payment has cleared before scheduling the inspection.
   b. Research the address to determine if there are any open Code Compliance cases, which must be brought into compliance prior to completing the Certificate of Use inspection.
   c. Contact the applicant to determine if the applicant has proof of hauler and is ready to operate.

The inspector should schedule and complete the inspection within 48 hours of the request.


During the inspection, the inspector will:

2. Check the application to ensure the following information is accurate:
   a. address (including the suite number)
   b. business name
   c. number of seats (for restaurants)
   d. number of units (for apt buildings)
   e. all other relevant information.

3. Verify that the use listed on the application is accurate. If the use listed on the application is different from the actual use, the inspector will fail the inspection and advise the applicant to amend the application as required.

4. Look for work done without a permit. If any work is observed and no permit was obtained, the inspector will fail the inspection and cite accordingly.

5. Verify that all signage is within code. If a violation is found, the inspector will fail the inspection and cite accordingly.

6. Verify parking requirements (if included on application)

7. Verify square footage is accurate (measure as necessary)

8. Verify outdoor seating.


If inspecting for a Temporary Certificate of Use (TCU), verify that the Temporary Certificate of Occupancy (TCO) has been issued.

The inspector can research MiamiBiz for additional information/notes regarding the Certificate of Use application. If the business owner will not be ready for inspection within the 10 days provided to the inspector in CityView, the 311 request should be closed out using the activity outcome CU Inspection Not Scheduled with comments explaining why.

41

MIA-SFED23485-00068278

## Construction Site Inspections

To ensure thorough inspections of construction sites, please inspect for the following during a construction site inspection:

1. Is there an active permit for the scope of work? (If there is no active permit, email Unsafe Structures at UStructures@miamigov.com with photos and details.)
2. Is there an active permit to close the street/portion of the public right-of-way?
3. Are there any vehicles or equipment obstructing the right-of-way?
4. Is there any debris? Is there a roll off container at the location?
5. Is tree protection in place?
6. Is there any stagnant water?
7. Is the temporary construction fence in place? Is the fence in good condition?
8. Is there overgrown grass?
9. Is there any graffiti at the site?
10. Is address posted at the site?
11. Is work taking place before/after normal construction hours? (If yes, check for noise waiver by contacting the NET office.)

Construction sites shall provide temporary fencing to secure the site during construction and non-construction hours to mitigate the effects of vagrant activity, noise and dust upon the surrounding community. (CC 10-23)

"Construction sites" shall include all sites where demolition (except city unsafe structures demolitions), new construction take place, other than just interior work which is not visible to the exterior of the premises. This shall not include affordable housing residential units as defined by the United States Department of Housing and Urban Development for rental projects and the city first-time homebuyer program using the area median income as published annually by the state housing finance corporation for homeownership projects.

"Secure," as applied to site access, includes protecting the construction site, during construction and non-construction hours by way of a locked fence surrounding the perimeter of the site.

These sites must also have posted and visible "No Trespassing" signs:

a. If any commercial property is vacant for more than 15 days, all glass surfaces visible to the public shall be kept clean and the interior of such vacant store shall be screened from public view in one of the following ways until the property is occupied.

b. All glass surfaces visible to the public shall be covered with white 60-pound weight paper.

c. Decorative displays of merchandise currently available within the city, merchandise of the future tenant of the vacant store, public service displays or festival and current holiday displays extending as much as three feet into the vacant store shall be located in display windows, provided that screening of the remainder of the vacant store shall be placed immediately behind the decorative display. All sidewalk overhangs attached to commercial buildings shall be structurally sound and free of rust, discoloration, peeling, chipping, cracking, fading, sagging or dirt.

A sign shall be placed on the construction site with the following language: "This area is a designated construction site. Anyone who trespasses on this property commits a third-degree felony pursuant to Florida Statutes 810.09."

MIA-SFED23485-00068279

## Tree Protection

Trees are vital to quality of life in our community, and our unique natural environment is part of what makes life in Miami so desirable. In addition to improving the aesthetic value of a neighborhood, trees

- Reduce pollution entering waterways by intercepting and slowing stormwater runoff, which may be polluted, and help mitigate flood risk by absorbing water.
- Reduce cooling costs through the shade of their canopies and also via emissions of moisture into the air.
- Remove carbon dioxide from the air.
- Increase property values by an average of 7%.
- Improve public health by cleaning the air, alleviating heat and mental stress, and boosting activity levels.
- Provide essential wildlife habitat by serving as both food and shelter for mammals and birds.
- Serve as buffers for noise and pollution.
- Boost levels of success in business districts. (Source: Urban Forestry Institute).

Our Department works closely with the Environmental Resources division of the Planning Department to enforce our tree protection codes. Under section 17-7 of the City code, trees must be protected during construction activity by protective barriers in accordance with the landscape manual. Trees that are to remain shall be clearly identified with tags. Tree protection barriers shall be maintained in accordance with the City-approved tree protection plan.

Prior to and during demolition, development, or construction, including installation of irrigation systems or any other underground installations, protective barriers must be placed around the perimeter of each tree's tree protection zone (TPZ) and must remain in place in order to prevent the destruction or damaging of roots, stems or crowns of such trees. Tree protection zone (TPZ) is defined in our code as an area defined by a certified arborist surrounding the trunk of a tree to protect roots and soil within at least the critical root zone (CRZ) area. The critical root zone (CRZ) is defined in our code as a large or larger than the minimum recommended root area for a tree as stated in the ANSI A-300 Standards for transplanting trees, usually measured and presented as root ball diameter. This area is necessary to protect tree health and stability. The TPZ is an area within which certain activities are prohibited or restricted, especially during construction or development activity. The barriers shall remain in place and intact until approved landscape operations begin; however, barriers may be removed temporarily to accommodate construction needs, provided that the manner and purpose for such temporary removal will not harm the trees. The trees shall be properly irrigated throughout the building process. Trees damaged during construction shall be subject to section 17-9.

A tree permit is required for removal of the tree and tree pruning of more than 25 percent of the canopy, crown, or living foliage of a tree (CC Chapter 17). Any removal of roots one inch in diameter or greater and/or the removal of more than ten percent of a tree's root system shall require a tree pruning permit. Under section 8.1.10 of our City code, any person, or agent thereof, who removes a tree without a tree removal permit, shall receive a fine of one thousand dollars ($1,000.00) per violation, per day for the first violation, and shall be fined five thousand dollars ($5,000.00) per tree for every repeat violation of this ordinance, or a greater penalty as provided by law, and in addition undergo the tree replacement process in the form of replacement trees pursuant to section 8.1.6. City residents with proof of current residency and homestead status shall be fined five hundred dollars ($500.00) for the first violation. Each tree removed without a tree removal permit shall constitute a separate and distinct violation, subject to a separate fine and tree replacement pursuant to section Chapter 17 of the City code.

The planting of replacement trees shall be required, in addition to the monetary fines assessed pursuant to this article. The number of trees required as replacement for each tree that was removed without a permit is provided in Chart 17.10.2.1, the tree replacement chart, for trees removed without a permit.

MIA-SFED23485-00068280



**Critical Root Zone**
Roots usually extend at least as far as the extent of the limbs, and often two or three times as far. Trees are healthiest when this area is undisturbed.

44

MIA-SFED23485-00068281

### TREE PROTECTION AND SUPPORT



- **Minimum Tree Sizes**
  - _Hardwoods:_ 2" DBH x 12' Height
  - _Palms:_ 6" DBH x 16' Height
- _Any_ landscape/tree activity in the right-of-way requires a permit
- **Pruning more than 25% annually requires a permit**
- **Violation/Fees**
  - $1,000 per tree for non-homesteaded properties
  - $500 per tree for homesteaded properties



MIA-SFED23485-00068282



MIA-SFED23485-00068283



Gumbo Limbo

Royal Poinciana

Sapodilla

Sabal Palm

Coconut Palm

47

MIA-SFED23485-00068284

## Swale Maintenance

Sidewalks and swales are community assets that can promote or prevent a neighborhood from becoming a safe, healthy place for pedestrians to enjoy an active lifestyle, or even walk safely. In the City of Miami, property owners have an obligation to keep the swales and sidewalks abutting their property clean and free of debris. Our Department works closely with the Department of Public Works to ensure that our sidewalks and swales are clean and safe, and we play an important role in educating the public about their responsibilities to maintain the sidewalk and swale areas.

Chapter 54 or the City Code requires that the swale area be kept free of litter/debris. It shall be unlawful for any owner of any property to which a sidewalk, swale or curb is contiguous, to place or remove any materials or allow overgrowth of trees, shrubs and plants upon such sidewalk, swale or curb as to be dangerous or detrimental to the general public as determined by the director of resilience and public works. (CC 54-54)

It shall be unlawful for any owner of any property to which a swale is contiguous, to pave or install any materials, trees, shrubs or plants, except sod, within the swale without first having obtained a permit from the resilience and public works department. The director of the resilience and public works department shall promulgate the rules and regulations establishing the standards pertaining to the construction, improvement and repair of swales.

An abutting property owner is responsible for the repair or replacement of the existing sidewalk, driving lanes, parking lanes, swales, curbs, and gutter where damage is caused by the act or inaction of the abutting owner, its agent or contractor, or where the damage is the result of tree roots from trees located on the abutting private property. (CC 54-55)

Violation References:

1553 Failure to maintain a lot in a safe, clean condition; not allowing accumulation of debris, trash, or dense growth of grass, including swale area.

4412 Dumping, littering on public rights-of-way/alleys/sidewalks or on private property

1748 Obstruction or blockage of a street, sidewalk, or public-right-of-way

1745 Allowing sidewalks to remain in a dangerous condition.

MIA-SFED23485-00068285

### Abandoned/Vacant Structures

Blighted and unsecured/abandoned structures can easily become magnets for criminal activity in a neighborhood creating significant health and safety risks to a community and deteriorating quality of life. Our City Code establishes that "no owner shall maintain a blighted, unsecured or abandoned structure." (CC 10-63). An owner of a blighted, unsecured or abandoned structure shall comply with the following requirements:

An owner of a blighted, unsecured or abandoned structure shall secure and maintain all entrances and all other openings of the structure, including but not limited to windows and doorways. Such blighted, unsecured or abandoned structure shall be secured as follows: All entrances, windows and other openings shall be secured with approved materials, provided that such materials completely seal all entrances, windows and other openings, thereby protecting the interior of the structure from wind, rain, and other naturally occurring elements. Entrances and windows above the ground floor shall be regarded as secure if the entrances and windows are locked and not otherwise open to entry and the windows contain glass that is not cracked or broken or shutters that prevent entry.

If a violation of this section is discovered by a Code Compliance Inspector, the inspector is authorized to issue a notice of violation (NOV) requiring the structure to be secured. If the structure remains unsecured after the time period enumerated in the notice, the city, at its option, shall present a case based on the violation to the code enforcement board. As part of its case, or at any subsequent properly noticed hearing, the city may present evidence showing that criminal activities or incidents presenting a threat to life and safety are occurring on the property where the unsecured structure is located. If such evidence is presented and the code enforcement board or special master determines that this section has been violated, the owner of the structure at issue may be required to secure all openings with commercial quality, 14-gauge, rust proof metallic coverings.

Such metallic coverings shall consist of steel sheet metal, excluding alumimum and copper, which allow for ventilation. Said metallic coverings must have an exterior finish that allows for easy graffiti removal, and be designed to prevent removal from the exterior with a crowbar or other prying device. In addition, the metallic coverings must consist of threaded rods or cables attached on the interior of the structure to a steel cross-brace that spans the opening.

Failure to comply with the requirements of this section of this article shall subject the owner to code enforcement action, as provided in City Code section 10-66.

All owners of a vacant, blighted, unsecured or abandoned structure shall be responsible for removing unauthorized signs, posters and graffiti from the structure's exterior unless exempted by this article or the city's zoning ordinance. Every owner of a vacant, blighted, unsecured or abandoned structure shall keep the premises free from rodents, insects, vermin, and other wild animals. The roof of every structure shall be well drained of rain water. All materials used to secure blighted, unsecured or abandoned structures shall be painted in a skillful fashion in the same color as its other exterior walls.

After any structure in the city becomes a blighted, unsecured, vacant or abandoned structure which is in default and for which a notice of lis pendens, is filed and recorded, as defined in this article, the owner shall register the property (CC 10-65).

49

MIA-SFED23485-00068286

### Failure to Maintain

Regarding residential properties, the exterior of every structure used for human habitation shall be so maintained with reasonable attractiveness so as not, in the case of scaling of paint or excessive mildew, to cause or contribute to a depreciation in property values in the immediate neighborhood.

The exterior wall surfaces shall be kept free from materials, objects, and conditions which will have an adverse effect on adjacent premises. All exterior building surfaces shall be free of chipping, pitting, cracking, discoloration, peeling or fading. All awnings shall be without tears or holes and be free of dirt, discoloration, fading or cracking. All walls or fences shall be maintained in good condition, free of cracking, discoloration, peeling or fading. All awnings, walls or fences shall be kept free of debris, clothes, and/or any other material that may have an adverse effect on adjacent properties.

Regarding commercial/nonresidential properties, the exterior of all commercial property shall be maintained so as to prevent deterioration or blight from inadequate maintenance. All exterior building surfaces shall be free of chipping, pitting, cracking, peeling, fading or discoloration. All exterior signs shall be in good repair and free of chipping, pitting, cracking, peeling, fading or discolorations. Lighted signs shall have all lights working. Doors and windows shall be free of cracked or discolored glass or corroded frames. All awnings shall be without tears and holes and be free of dirt, discoloration, fading or cracking. Any lettering or painted surfaces on awnings shall conform to subsection (2) above. All hardware, supports and poles shall be straight, free of rust, and if painted shall be free of chipping, pitting, cracking, peeling, fading or discoloration, and in good condition. All building surfaces shall be free of any advertising signs, or posters, painted or attached to the walls unless a permit has been acquired. If any commercial property is vacant for more than 15 days, all glass surfaces visible to the public shall be kept clean and the interior of such vacant store shall be screened from public view in one of the following ways until the property is occupied:

a. All glass surfaces visible to the public shall be covered with white 60-pound weight paper.

b. Decorative displays of merchandise currently available within the city, merchandise of the future tenant of the vacant store, public service displays or festival and current holiday displays extending as much as three feet into the vacant store shall be located in display windows, provided that screening of the remainder of the vacant store shall be placed immediately behind the decorative display. All sidewalk overhangs attached to commercial buildings shall be structurally sound and free of rust, discoloration, peeling, chipping, cracking, fading, sagging or dirt.

50

MIA-SFED23485-00068287

## Graffiti

Graffiti is a challenge in most major urban areas, and the City of Miami is unfortunately no exception. Graffiti is a crime, and the Police Department has the authority over criminal activity. The Neighborhood Enhancement Team (NET) has a "graffiti busters" team that cleans graffiti off of public property. Our Department plays a critical role in educating the public, and notifying private property owners of the need to clean up graffiti.

City Code establishes that it is unlawful for any person to willfully and maliciously or without the knowledge and consent of the owner to mar, deface, damage or destroy by writing, painting or drawing any inscription, figure or mark of any type on public or private property.

Whenever the city becomes aware of the existence of graffiti on any property, including structures or improvements within the city, a Code Compliance Inspector is authorized to give notice to remove or effectively obscure such graffiti within 5 days, to the owner, agent or manager who shall cause the graffiti to be removed or effectively obscured by any means so long as it is completely obliterated, painted or touched up with the same or substantially similar color of existing paint or texture of the original wall, fence, siding or part of the structure afflicted. The time period enumerated in the notice shall not be less than five days. Persons needing information or assistance in curing a graffiti violation may contact the city graffiti mitigation program.

The phone number to the city graffiti mitigation program shall appear conspicuously in bold numerals on the notice issued pursuant to this subsection for purposes of providing assistance to those who receive such notice. Persons not responsible for causing graffiti but responsible for curing it, who cannot afford to obliterate, paint or touch up such graffiti with the same color of existing paint of the original wall, fence, siding or part of the structure affected and who receive paint or assistance from the city graffiti mitigation program shall obliterate, paint or touch up graffiti on the property with paint as substantially similar in color as can be provided to the wall, fence, siding or part of the structure afflicted. No penalties, fines, or costs shall be imposed on persons owning property, acting as manager or agent for the owner of property, or in possession or control of property who utilize the city graffiti mitigation program to remove or effectively obscure such graffiti. Persons who request to receive assistance from the city graffiti mitigation program and are qualified to receive such assistance but do not receive such assistance shall not be subjected to penalties, fines, or costs pursuant to this section.

- If anyone witnesses graffiti in the act, they may call to report the crime to the non-emergency police line (305) 579-6111.
- If a property owner receives a violation for graffiti, they may be eligible for the City's Graffiti Mitigation Program and should contact their local Neighborhood Enhancement Team (NET) office to learn more.
- If a property owner is repeatedly the victim of graffiti on their property, they may want to speak to the neighborhood Police Commander to learn more about measures they may undertake for Crime Prevention Through Environmental Design (CPTED), including lighting and landscaping measures.
- If graffiti is on public property, contact the local NET office so that the Graffiti Busters team may clean it up.
- If graffiti is on private property, the Code Compliance inspector for the area may cite the property owner to put them on notice of their obligation to remove the graffiti in a timely fashion.

51

MIA-SFED23485-00068288

## Animals

The Department of Code Compliance has a limited role in addressing animal issues in the City of Miami. In particular, the Department of Code Compliance may cite for the following violations:

- Violation Reference 1501: Illegally harboring, breeding, or maintaining poultry, fowl or grazing animals in a residential zone.
- Violation Reference 2271: Bee hives or the breeding or raising of any insects, reptiles or animals other than customary pets not allowed.
- Violation Reference 1812: Failure of removal and proper disposition of animal fecal matter
- Violation Reference 2180: Failure to maintain lot in a safe, clean condition

Miami-Dade County Animal Services is the proper entity to which any suspected animal abuse should be reported (via 311, the mobile app, or online).

Regarding how the public may contact the appropriate party for dead animal removal issues, these are the options:

1. Call 311
2. Email solidwastecustomerservice@miamigov.com or call 305-960-2801 to contact the Department of Solid Waste (for small size carcasses located within the public right of way, not private properties, easements such as rail lines, private parking lots etc.).
3. Contact the Miami-Dade County Animal Services Department, which responds to abandoned animals. By dialing 311 or 305-468-5900 you can get one-on-one personal customer service in English, Spanish, or Creole. You can call Monday through Friday from 7 a.m. - 7 p.m. and Saturday 8 a.m. - 5 p.m. Closed on Sunday & holidays. Individuals with a hearing or speech disability can contact us by calling Florida Relay at 711.
4. Call Code Compliance for dead animal matters related to private properties. Code Compliance may visit the property owner, educate them about their obligation to maintain their lot in a safe, clean condition and cite as appropriate.

52

MIA-SFED23485-00068289

## Lot Clearing

Overgrown lots with grass and debris are magnets for all manner of quality-of-life deteriorating issues. In the City of Miami, our climate makes it easy for mosquito-borne diseases to thrive. For this reason, it is imperative that you proactively patrol your area for lots that need clearing. The lot clearing process may be initiated by assembling a lot clearing package. The inspector must gather evidence and issue a lot clearing notice. If compliance is not achieved, submit the lot clearing package to the Administrative Aide and seek guidance from your Supervisor for assistance. Always open a Notice of Violation simultaneous to initiating the lot clearing package. Ensure that you regularly re-visit lots that have been cleared in the past to ensure that they remain in compliance.

MIA-SFED23485-00068290

## Shopping Carts

Shopping carts abandoned on our City streets create an unsightly and unsafe condition for pedestrians and neighbors. To better ensure that shopping carts stay in the store to which they belong, the City Commission passed a measure in 2018 requiring that all stores in the City that use shopping carts submit a "shopping cart retention plan" to their local NET office.

Any owner failing to submit a plan or failing to properly install and maintain an approved on-site cart retention system pursuant to the plan is in violation. Any owner violating the provisions of this article shall be subject to a $250.00 fine per day for failure to sustain a cart retention system and subject to enforcement proceedings (CC 31-85).

An owner may comply with this article by creating and carrying out a plan to address the retention or collection of carts ("plan") using any one or more of the following methods: (1) An electronic wheel locking mechanism; (2) A physical barrier to prevent the removal of carts from the premises; (3) An alarm mechanism attached to each cart to prevent removal from the premises; (4) Implementation of a policy of not allowing the customer to exit the store with a cart; (5) Providing an employee to carry or wheel the customer merchandise to the customer's vehicle; (6) Implementation of a daily program for the collection of carts that are illegally removed; and/or (7) Any other measure approved by the city as a means of preventing carts from being removed from the premises.

If the owner is not identified on the cart (in other words, it is an unmarked cart), then before collecting the cart, an agent or employee of the city will place notice on the cart indicating that it is unlawfully upon public property and must be removed within eighteen (18) hours. A cart without identification markings and which has been noticed pursuant to the requirements of this section shall be considered abandoned after 18 hours from the date and time of the notice to retrieve the cart and the abandoned cart may be sold if still uncollected in accordance with the City Code and F.S. Ch. 705, or may be disposed of in any manner (including discarded) as determined by the code compliance department or NET.

The city may remove and place into storage all carts found on public property. After the city has removed identifiable carts from public property, the code compliance department or NET shall promptly provide written notice by regular mail to the owner at the address designated on the cart's identification markings. If the cart has no identification markings but the owner can otherwise be readily determined by other distinguishing characteristics or notice to the city, the code compliance department or NET shall mail the notice to the determined owner. The notice shall be deemed complete upon mailing and posting by the code compliance department or NET and receipt of the notice by the owner is not required.

### Key Takeaways

- If you see a shopping cart where it is not supposed to be, stop and investigate.
- If the shopping cart is unmarked, tag it with a time, date, and your name, and then report the precise location and description to the NET Administrator for the area, copying your Supervisor.
- If the shopping cart is marked, report the precise location and description to the NET Administrator for the area, copying your Supervisor.
- If the shopping cart is blocking the sidewalk or creating a traffic hazard, please relocate it to a safer place nearby.

MIA-SFED23485-00068291

## Historic Preservation

The soul of a City is felt through its history, and preserving the unique heritage of the City of Miami's built environment is important to preserving our legacy for generations to come. Chapter 23 of the City of Miami Code describes historic preservation. There are 11 historically-designated neighborhoods in the City of Miami, including over 1600 structures, and has more than 150 individually-listed resources and sites. Code Compliance plays an important role in ensuring that historic neighborhoods are preserved and maintained, and that property owners adhere to design standards. Our Department works closely with the Historic Preservation division of the Planning Department.

The listing of historically-designated neighborhoods includes:

- Spring Garden Historic District
- Miami Modern (MiMo) Historic District
- Bayside Historic District
- Beverly Terrace Historic District
- Palm Grove Neighborhood Historic District
- Buena Vista East Historic District
- Lummus Park Historic District
- Morningside Historic District
- Riverview Historic District (approximately between SW 6th Street and SW 2nd Street and SW 8th Avenue and SW 11th Avenue)
- South River Drive Historic District
- Downtown Miami Historic District

"Sec. 23-1. Intent and purpose. (a) The intent of this chapter is to preserve and protect the heritage of the city through the identification, evaluation, rehabilitation, adaptive use, restoration, and public awareness of Miami's historic, architectural, and archeological resources. This chapter is further intended to: (1) Effect and accomplish the protection, enhancement, perpetuation, and use of structures, landscape features, archeological and paleontological resources, areas, neighborhoods, and scenic vistas which represent distinctive elements of the city's historic, cultural, archeological, paleontological, aesthetic, and architectural heritage. (2) Foster civic pride in the accomplishments of the past. (3) Protect and enhance the aesthetic and environmental character, diversity, and interest of neighborhoods. (4) Stabilize and improve property values in neighborhoods and in the city as a whole. (5) Protect and enhance the city's attraction to residents, tourists, and visitors and thereby serve as a support and stimulus to the economy. (6) Promote the use of historic sites, historic districts, and archeological zones for the education, pleasure, and welfare of the people of the city."

### 23-5 Certificate of Appropriateness

A certificate of appropriateness shall be required for any new construction, alteration, relocation, or demolition within a designated historic site or historic district. A certificate of appropriateness shall be required for any ground disturbing activity within a designated archeological site or archeological zone or within an archeological conservation area. All certificates of appropriateness shall be subject to the applicable criteria in section 23-5(c) and any other applicable criteria specified in this chapter, as amended. No permits shall be issued by the building department for any work requiring a certificate of appropriateness unless such work is in conformance with such certificate.

Violation Reference 1595: Failure to have a Certificate of Appropriateness

MIA-SFED23485-00068292

## Demolition by Neglect

Chapter 23-6(3)i(1): *Demolition by neglect prohibited; affirmative maintenance required.* The owner(s) of a property designated historic pursuant to this chapter, which includes a property either individually designated, designated as a contributing property within a historic district or designated as a thematically-related historic resource within a multiple property designation as defined by this chapter, shall comply with all applicable codes, laws, and regulations governing the maintenance of the property. It is the intention of this section to preserve from deliberate negligence, or inadvertent neglect the exterior features of property designated historic and the interior portions thereof when maintenance is necessary to prevent deterioration and decay of the property. All such properties shall be preserved against such decay and deterioration and shall be free from structural defects through prompt corrections of any of the following defects:

A. Facades which may fall or damage the subject property, adjoining property, or injure members of the public.
B. Deteriorated or inadequate foundation, defective or deteriorated flooring or floor supports, deteriorated walls, or other vertical structural supports.
C. Members of ceilings, roofs, or other horizontal members which sag, split, or buckle due to defective material or deterioration.
D. Deteriorated or ineffective waterproofing of exterior walls, roofs, foundations, or floors, including broken or missing windows or doors.
E. Any fault or defect in the property which renders it structurally unsafe, insufficiently protected from weathering, or not properly watertight.
F. Defective or insufficient weather protection which jeopardizes the integrity of exterior or interior walls, roofs, or foundation, including lack of paint or weathering due to lack of paint or protective covering.
G. Any structure designated historic which is not properly secured under the Florida Building Code or other technical codes and is accessible to the general public; or, any fault or defect on the property designated historic that renders it structurally unsafe or not properly watertight.
H. Spalling of the concrete of any portion of the interior or exterior of the structure designated historic.

## Failure to Comply with Design Standards

The City of Miami's Historic Design Guidelines were adopted by the Historic and Environmental Preservation Board on June 7, 2016, pursuant to Chapter 23. In addition to the Preservation Office Historic Design Guidelines (you can review a copy in the Departmental shared drive), some neighborhoods (Spring Garden, Bayside, MiMo, and Morningside) have promulgated their own particular variations on the design guidelines (also available in the Departmental shared drive).

MIA-SFED23485-00068293

## Bar Check/Quality of Life Inspections

Bar/Quality of Life inspections will be conducted with the Police Department, Fire Department, Florida Department of Business and Professional Regulation (DBPR) Division of Alcoholic Beverages and Tobacco (ABT). These inspections are conducted to ensure each establishment is in legal compliance with all state laws, City codes and Miami-Dade County ordinances. Locations are selected based on ongoing issues that may be occurring as well as complaints received. The purpose of the collaboration is to ensure a safe environment for all persons that work at or visit these establishments. These operations take place in the evening, to see the businesses when they are operating at or near maximum capacity.

Police lead the Bar/Quality of Life/Dry Hour operations. Each Police Commander may elect to organize an operation in their respective area. Police participation and leadership is to ensure the safety of inspectors while conducting inspections in alcohol service establishments at night.

The Department of Code Compliance reviews any potential Code violations during these inspections. Common violations during these inspections include:

- Failure to have a Certificate of Use/Business Tax Receipt
- Operating outside of the scope of the Certificate of Use
- Noise
- Mingling
- Illegal Gambling Machines

Prior to conducting Bar/Quality of Life inspections, review our system to determine if the locations on the list provided by the Police Department have a valid Certificate of Use and Business Tax Receipt(s). When you arrive at the location, you should document:

1. The business name and address.
2. The name of the business owner/manager and contact information.
3. If there are any items at the location that require a B.T.R. and are not in our system.
4. Any other code violations.

All violations should be cited, and all photos should be uploaded within 2 business days.

MIA-SFED23485-00068294

### After-Hours Protocol/Common Violations

The After-Hours team was created by Director James Bernat (who was Director of the Department from March 2018-January 2019). The purpose of the After-Hours team is to address Code Compliance violations that occur in the evening and on the weekends that may not be visible during the day, and also, to generally increase productivity of our Department. It is critical that the After-Hours inspectors take **initiative**, **ownership**, and do **proactive** work, in addition to responding to complaints. The focus of proactive work is to address main thoroughfares and high-traffic corridors, prioritizing violations that **denigrate quality of life and are highly visible**. Our expectation is that After-Hours Inspectors bring the cases they initiate to realization, including testifying at the Code Enforcement Board or Special Magistrate, if necessary.

**Safety**: If at any time you feel unsafe, find a safe location and call the After-Hours Supervisor for further instructions. Overnight inspectors must respond to complaints in pairs. Do not enter or inspect private property after sundown and before sun up if doing so creates an unsafe situation. Violations that are discovered from the public right-of- way and can be safely addressed should be addressed immediately.

**Code Compliance After-Hours Hotline**: The hotline must be answered Monday through Thursday from 5 pm to 10 pm and Friday from 5 pm through 5 pm on Sunday. All hotline calls will be answered and addressed on the shift received. If a hotline call is received during shift change, the incoming inspector will take over and respond accordingly. All hotline calls are to be logged and emailed to the Afterhours Supervisor and the Deputy Director at the end of each shift. Calls requiring additional resources (referrals to other departments or shifts) should be forwarded to the Afterhours Supervisor and the Deputy Director. Once calls are addressed, the complainant must be contacted with the inspection results.

**Common Violations**: All complaints must be investigated. All complaints and inspection results are to be emailed to the After-Hours Supervisor and the Deputy Director near the end of each shift and entered into the technological platform (City View currently). Remember to tell the story of your inspection in the comments section.

**Noise/Music**: Noise shall be measured with measuring wheel provided and photographed. High-rise noise violations are to be measured from a common area inside a neighboring high-rise. Photos should be taken to indicate the location of the violation and the distance from the violation. Thoroughly document inspection results in our system and include comments that describe what has taken place, even if the violation is not ultimately found.

**Construction After-Hours**: Construction noise waivers are applied for through the NET office. Normal construction hours without a waiver are 8 am – 6 pm. Use appropriate equipment as needed to evaluate violations. Photos depicting the violations should be taken. Thoroughly document inspection results in our system and include comments that describe what has taken place, even if the violation is not ultimately found.

**Commercial Vehicles**: Photos depicting the violations should be taken. Thoroughly document inspection results in our system and include comments that describe what has taken place, even if the violation is not ultimately found.

**Peddlers**: It shall be unlawful to sell, or offer for sale, any food, beverage, service or merchandise on any street, alley, sidewalk, or public park within the city from any wagon, truck, auto, pushcart, vehicle or by any other means upon the streets, sidewalks, or alleys of the city until the proper BTR has been issued. Photos depicting the violations should be taken. Thoroughly document inspection results in our system and include comments that describe what has taken place. If the Peddler does not have a BTR, document, refer to the Supervisor for further action and consideration by Police. Vending without a BTR is a misdemeanor crime.

MIA-SFED23485-00068295

### Assigned Zone

To make the most efficient use of their work day, Code Compliance Inspectors must remain in their assigned zone(s) while on duty. If an inspector wishes to leave his/her assigned zone while on duty, the inspector must contact the Field Supervisor for approval. If the Field Supervisor is not available, the inspector must contact the next available supervisor to approve the action.

### Interdepartmental Communication

Working together with the Police Department and the Neighborhood Enhancement Team (NET) offices is critical for effective enforcement of our codes. Collaborating with these departments and others results in an amazing level of service for our citizens. To ensure the best use of the Code Compliance staff's time, all Police personnel, NET Administrators, and other departmental staff should direct communications to the Field Supervisor for the relevant area when requesting assistance from the Department of Code Compliance.

- After-Hours Supervisor, Trelana Haines
- North Supervisor, Frank Marcos
- Central Supervisor, Luis Fernandez
- Southwest Supervisor, Luis Gomez
- Southeast Supervisor, Daniel Sierra
- Code Revenue Task Force and Business Tax Receipts Supervisor, Noel Chavez

If you are contacted by Police personnel, NET personnel, or any other City employee and asked to perform a specific task, please direct the person to contact your Field Supervisor. Having Police personnel, NET Administrators or staff, or any other City employee contact the Field Supervisor directly will ensure that the Field Supervisor is aware of any Police/NET/other matters involving Code Compliance and that the inspector is using his/her time efficiently.

This protocol ensures transparency and accountability for all actions taken by our Department.

Inspectors should assist other City departments as needed. If another department requests a joint inspection, please advise your Field Supervisor before participating in said inspection. In addition, please advise your Field Supervisor when you are asked to provide assistance to another department and the work does not involve an inspection or the work will occupy more than 15 minutes of your time.

If you are asked by a staff member of another Department to make a decision for them about their professional duties in a certain circumstance, please respectfully decline and direct them to their own chain of command. Please do not give or accept directives from other departments outside of your chain of command.

Finally, if you are unclear about a rule, please refer the other staff member to your supervisor.

### Performance of the Duties of an Employee

As part of a high-functioning team, every individual must take responsibility for timely, consistent performance.

The nature of our work is sensitive. Code Compliance employees are ambassadors for our City government. Code Compliance employees are frequently in public, in residents' private homes and businesses educating residents and property owners about and requesting compliance with our City's codes. Through the course of our official duties, Code Compliance employees request that a property owner stop engaging in a violation, or spend precious money, time, and energy correcting a violation.

59

MIA-SFED23485-00068296

Employees shall refuse to accept gifts, presents, subscriptions, favors, gratuities, or promises that violate State or local law. Employees must not receive private or special advantage from their official status. Code Compliance employees must also work to avoid any appearance of impropriety.

Employees shall act with integrity at all times. Employees shall not engage in acts of corruption, or bribery, nor will they condone such acts by fellow employees. All acts of corruption or briery shall be reported immediately to one's direct Supervisor either verbally or in writing. The public demands that the integrity of Code Compliance employees be above reproach. Employees must therefore, avoid any conduct that might compromise integrity and thus undercut the public confidence in the Department of Code Compliance.

Employees of the Department of Code Compliance shall not, at any time, use or attempt to use his or her official position, badge, or official identification card for personal financial gain. They shall not permit any other person to use his or her badge, official uniform, or identification card.

### Professional Behavior

Code Compliance employees are expected to maintain the highest standard of customer service, efficiency, and professionalism. It is the policy of the Department of Code Compliance to treat all individuals in a professional manner with dignity and respect. The Department of Code Compliance will not tolerate discrimination against any person based on gender, identity, sexual orientation, or any other basis. Moreover, the Department does not tolerate gossip or personal attacks. Respectful, professional communication should be deployed at all times.

It is essential to arrive at work on time consistently. Tardiness is not tolerated. Seek clarification from your immediate supervisor if you are unclear about a particular issue. All Departmental employees must clock in to and out of the Kronos system and email their respective Supervisors and assigned payroll liaison for any variations from their regular schedule.

### Professional Attire and Appearance

Code Compliance employees shall maintain a professional appearance at all times. No unofficial, offensive, inappropriate or non-approved items will be worn by an employee while working. Dress should be neat, clean, and professional.

### Attire Generally

Everyone in our Department interacts with the public and our City colleagues daily. Professional appearance is often the first impression we give and critical for all of us to effectively carry out our duties and to properly represent the City. Code Compliance employees who are not inspectors should dress in business casual attire. Shorts, beach sandals, and flip-flops are not to be worn at any time. Office employees may elect to wear denim on casual Fridays only, and must wear professional shirts and shoes.

### Attire for Code Compliance Inspectors

To testify before the Code Enforcement Board or Special Magistrate, Code Compliance Inspectors must wear the Department-issued white-button down shirt with Departmental patches (this may be short- or long-sleeved), along with the Department-issued navy-blue pants. Outside of the Code Enforcement Board or Special Magistrate Hearings, Code Compliance Inspectors may wear the button-down Departmental-issued shirts with patches, or the white or navy-blue Department-issued polo shirts.

**Trousers:** Department issued dark blue long trousers (dark blue shorts no more than two (2) inches above or below the knee while standing will be allowed only May 1st through September 30th of every year, unless the

60

MIA-SFED23485-00068297

inspector is participating in the Bike Unit bike ride that day). **Skirts:** Department issued dark blue long skirts no more than (2) inches above the knee while standing.

**Foot Wear:** Department issued black steel or composite-toe shoes. **Socks:** Dark blue or white.

**Belt:** Department-issued black belt. **Head-Wear:** Caps with City of Miami Code Compliance logos, special head wear for religious purposes or head-wear for medical purposes.

**Name Tag:** The Department-issued name tags must be worn or sewn in to the shirt one-eighth of an inch below seam of the employee's right pocket. **Badge:** The Department-issued Badge must be worn above the employee's left pocket.

### Computers and Printers

No Code Compliance employee shall use any workplace computer or printer unless such use is work related to their job function. Non-work-related activities are things such as browsing the internet for shopping, surveys, movies, buying or selling personal items, uploading or downloading personal photos, watching movies, personal video teleconferencing, or downloading non-work-related digital files online.

### Phone Etiquette

Professionalism is essential, especially when interacting with the public by phone. Every employee must have a professional voicemail ("Thank you for calling the Department of Code Compliance, you have reached (name and title), please leave a detailed message and I will return you call as soon as possible." All calls must be answered within one business day of the time messages are left. Good customer service starts with responsiveness to the public. Inspectors must check their City-issued cell phone voicemail daily. All other Code Compliance employees must check their office voicemails daily and return calls as quickly as possible and no later than one business day after messages are left. Use good judgment when determining whether and when to take a personal phone call. It is generally not appropriate to take work calls while interacting with the public during work hours. It is not appropriate to conduct personal video chats while on duty.

### Cellular Phone Policy

This policy establishes procedures for the management of Departmentally issued cell phones.

Issuance: Each Code Compliance Inspector and other staff, as determined by the Director, will be issued a cell phone. Phone accessories may be provided at the Director's discretion.

Purpose: The purpose in providing the inspectors with cell phones is to 1) reduce public frustration in wasted time trying to reach inspectors by giving each resident with a Code Compliance violation a direct line of communication to the inspector responsible for their case, 2) free up capacity from the Service Aides currently responsible for all of the incoming calls as well as walk-in clients, and every Business Tax Receipt application in the City; 3) allow inspectors to replace their digital cameras with an easier to carry and more agile cell phone; 4) allow inspectors to replace their radios in most inspections; and 5) provide greater efficiency for each inspector as they will be able to use the phone as a back-up hotspot when in the field, have access to their work email on their person at all times, and potentially, be able to access a mobile version of any new technological platform in the future.

Reissuance: Any person responsible for loss or damage to the cell phone due to carelessness or negligence will be held accountable for repair/replacement of the phone.

MIA-SFED23485-00068298

Notice of lost or damaged phone: Written notice of a lost or damaged cell phone must be submitted to the employee's supervisor immediately after the equipment is lost or damaged.

Users are reminded that the cell phone is a tool to enhance their efficient use of communications within their related professional function. Users will reimburse the City for usage of the phone that incurs additional costs beyond the standard monthly plan cost if the activity that resulted in the additional costs was not approved by the Department Director.

Inspectors and staff that are issued a cell phone should adhere to the Department policy, all City APMs involving cell phone usage, and all laws involving cell phone usage while driving at all times.

**Appropriate Language**

Our Department serves the public and it is critical that we approach every interaction with respect. Using appropriate language is an important foundation to respectful interactions, both with the public and our colleagues. No foul language shall be used.

**Administrative Policies (APMs)**

Our Department abides by the Administrative Policies set by the City Manager's Office. There is a listing of critical administrative policies on the City of Miami Human Resources website under "Administrative Policies." You are expected to familiarize yourself and abide by all City of Miami Administrative Policies.

MIA-SFED23485-00068299

## Public Records Requests

Government in the Sunshine is an important and foundational aspect of working in local government in the State of Florida. Most of the information we receive and produce may be subject to a public records request. This may include notes scribbled by the inspector on the case file, post-it notes, and comments entered into our system. According to Florida State Statutes, Chapter 119, "Public records" means all documents, papers, letters, maps, books, tapes, photographs, films, sound recordings, data processing software, or other material, regardless of the physical form, characteristics, or means of transmission, made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency.

If a person wishes to make a public records request regarding the Code Compliance Department or a Code Compliance matter, please direct the request to the public records custodian for our Department, Anna McKnight at (305) 416-2073, AMcKnight@MiamiGov.com, and copy PublicRecords@Miamigov.com.

Recall that it is our obligation to fulfill public records requests, and that we cannot ask the requestor to make their request in another format. If you have any doubt as to whether a public records request has been made, review with your Supervisor for further direction.

When a property owner requests information/notice(s)/photo(s) in reference to an open Code Compliance case at the owner's property in order to understand what he/she needs to do to achieve compliance, this should not be treated as a public records request as it may delay compliance.

All other requests should be treated as public records requests in order to ensure that exempt information is not given out to the requestor.

63

MIA-SFED23485-00068300

## Hurricane Procedures

Code Compliance staff are not first responders, but we are public servants and we play a valuable role in helping our City recover fully and safely after a natural disaster. When hurricane season begins, it is best to make sure that you and your family have necessary supplies on hand in case we are hit by a storm. In preparation for an oncoming storm, please be sure to fuel your vehicle fully, keep your radios/phones charged, and safeguard your laptops. Our Department is considered essential personnel and is expected to work before, during, and after a storm. We must stay in contact with each other, checking in with your Supervisor if possible, and/or the Employee Hotline.

Inspectors will be chosen to participate in different teams. The Alpha Team will weather the storm in an assigned Fire station. The Bravo Team will relieve them as soon as it is safe to move following the storm. If you are on either team, monitor your phones and radios closely as we will need to respond quickly to changing circumstances. When you report for duty, it is critical that you have your essential supplies on your person to keep yourself comfortable during the storm (snacks, water, cash, sleeping bag and pillow, chargers, etc.).

The principle duties of the Alpha and Bravo teams will include playing an active role in the IDAT (Immediate Damage Assessment Teams). IDAT include a City Fire Inspector, Code Compliance Inspector, Public Works Employee, and Police Officer. Our role in this response is to document damage so that the City can accurately assess, activate relevant teams, report back, respond, and be reimbursed by FEMA for any damages incurred, if appropriate. Immediately following the storm, we may also participate in life-safety inspections, and general safety checks for vulnerable populations. Again, our role is to document damage, areas of need, and expenditures by the City and support our fellow employees and residents.

The Ready MDC app should be downloaded onto your mobile device as it provides County Emergency Operations Center updates before, during, and after a storm. The app also includes information on how to prepare for a storm, areas that are in danger of storm surge, what to do with pets, and more.

MIA-SFED23485-00068301

## Quality Control

In an ongoing effort to assure the highest performance standards, consistency, and professionalism, our Department has established professional protocols for execution of our duties. To ensure adherence to Departmental protocols, the Department will rely on the following measures, which may evolve over time:

- Review of case activity of each inspector
- Review of timeliness of activities
- Review of the quality of case files and hearing preparation, including review of compliance with the Departmental Case History Fact Sheet
- Review of closed cases to ensure that all internal protocols are followed, the reasons for actions taken are documented, and that the cases are properly closed
- Ride-along field inspections with the area Supervisor
- Ensuring that phone calls and emails are responded to in a timely fashion (no later than one business day from the time they are left/sent)
- Overall review that the employee is adhering to scheduled office hours, engaging in proactive work in the field, and generally making the most efficient use of their day
- Vehicle and equipment inspections to ensure responsible stewardship of City property

65

MIA-SFED23485-00068302

## Service Aides' Guide for Interactions with the Public

Your role as Service Aides is critical to the functioning of our Department. Often, the first impression of our Department our community receives is speaking with you. Moreover, there are many issues you may be able to resolve by asking thoughtful questions and taking diligent notes. Every interaction we have is an opportunity to build public trust. All interactions must be professional, respectful, informative, and courteous.

In light of this, please use the helpful guide below to better assist all of us in working together. This script is meant to give you a road map to navigate conversations and provide helpful phrases and information.

### For a Call or Walk-In Interaction:

Thank you for calling the Department of Code Compliance, my name is _, how may I help you?

With <u>whom am I speaking</u> please? Take down their name and ask for spelling, if necessary.

May I have the <u>best number</u> to reach you in case we are disconnected?

To best assist you, may I please have the <u>address</u> or <u>case number</u> you are calling about?

Do you have the name of the inspector who issued the violation/warning letter/ticket?

Do you have a question related to the <u>status of this violation</u> or <u>how to come into compliance</u> that I may be able to help you with?

Please allow me just a moment to search our system for more records related to this matter.

May I please have your <u>email address</u> to follow-up with more detailed information?

Would you like to report a Code violation? Please give me the details so that I may refer the case to the area inspector for further investigation.

If you are able to resolve the case during the call, please do so. Your intervention can save critical hours of time and energy and also prevent a great deal of frustration from the public.

At this time, I can share the direct cellular phone number of the inspector and transfer you to that inspector. If they are unable to answer you at this time because they are in the field or attending to another resident, please leave your voicemail and provide your best contact information. They will return your call by the next business day. If for any reason, you do not hear back from them, please do call back on this line and ask for me and I will be sure to assist you.

Thank you for your call and have a nice day.

If you must contact the inspector for further information or communication, **please generate an email to the inspector, copying your Supervisor and the Deputy Director**. Please put the physical address in the subject line and include the name of the caller, the phone number to reach them, and the resident's email in the body of the message.

MIA-SFED23485-00068303

If you leave your work station and no one else is available, or we have a staff-wide meeting, please be sure to post the sign in the window informing the public and asking them to call (305) 416-2089 if they need immediate assistance.

**Important Information**:

Our Department's responsibility is to educate the public about our City's Code and to gain voluntary compliance from as many property owners as possible. Our inspectors are responsible for a universe of civil infractions, each of which has an accompanying due process to allow the property owner time to cure the violation. Inspectors may not go on to private property without permission, enter any business or residence if not invited in by the owner, nor may they remove or alter private property. Inspectors do not have the power to arrest or anyone or "shut down" any business. Complaints may come to us through a variety of channels, including: 311, phone calls to any number of team members, emails to any number of team members, referrals from fellow Departments or elected officials.

When a Code violation is brought to our attention, we diligently investigate and proceed according to the findings of the investigation. In addition to educating the resident who may be in violation of the Code, we do our very best to respond to residents who have complained about an issue so that they understand what they can expect from our Department.

In order to gain compliance from a property owner, Code Compliance inspectors may issue warnings, tickets or violations. If the property continues to be out of compliance with the Code, the case may ultimately be set for a hearing before the Code Enforcement Board, a separate, quasi-judicial proceeding.

The role of the Department of Code Compliance at the Code Enforcement Board (Board) is to prepare cases for hearing, attend, testify and make recommendations for consideration by the members of the Board, who ultimately determine the outcome of the case.

If a property does not come into compliance and is found in violation by the Code Enforcement Board, the City may assess a lien against the property.

Please note that there are a number of other types of inspectors across various departments within the City of Miami. For example, the Solid Waste Department has solid waste inspectors, who may ticket for solid waste offenses. The Fire Department has life-safety inspectors, who are empowered to investigate commercial businesses and multi-unit dwellings (but not single-family homes or duplexes). Fire inspectors investigate life-safety concerns and may close down a business or residence if they are found to be in violation of City Code regarding life safety issues. The Building Department also has a number of specialized inspectors (mechanical, elevator, unsafe structures, electrical, plumbing, etc.). Building inspectors may issue stop-work orders for ongoing construction and may address unsafe structures through a process that could ultimately lead to the structure being demolished. Public Works has some inspectors on staff as well.

67

**How to Search City View**:

As we work to transition to the new system that will replace City View, we must continue to use the system we have. In order to access information relevant to inquiries from residents, you may log in to City View, and then click "Case Initiation," in the upper left-hand corner of the screen. In the lower left-hand portion of the screen, you must enter the address carefully (house number, street, then the street type, exactly as City View specifies). Recall that "enter" does not work in City View, and you must click on "Go." Once you do, you will be able to pull up the correct property from the tab in the lower portion of the scree and see any open or closed violations. Under the "Comments" section, the system specifies the inspector who took action in the case.

**Common Code Compliance Violations**: Our Department frequently handles complaints about overgrown lots, abandoned structures, illegal dumping, outside storage, abandoned or inoperable vehicles, façade violations, graffiti, illegal signs, broken awnings, noise, short-term rental issues, and other complaints.

MIA-SFED23485-00068305

## Partners in our Work

"The professionalism and approach of the Code Enforcement Officer has the potential to shape community notion of local government and municipal experience. Building relationships and knowledge of the community is so integral to a proactive and professional code enforcement approach." The American Association of Code Enforcement

Being knowledgeable about the City we serve and the other government resources available to solve problems is a key aspect of succeeding as a Code Compliance Inspector. Please familiarize yourself with the information below.

### Useful Resources:

In order to effectively perform our duties, we interface with a number of other entities. Within the City, our Department works closely with NET, Zoning, Building, Public Works, Planning, Police, and others. The scope of our jurisdiction in Code Compliance is civil in nature. There are a number of items we refer to other fellow City departments, as well as County, State and Federal regulatory entities:

- **Neighborhood Enhancement Team (NET)**:
  - **Construction Noise Waivers**: The NET Department receives applications for and sends notice of Construction Noise Waivers to residents in the area of impact. A construction project seeking a noise waiver to conduct work outside of normal working hours (Monday-Saturday 8 am- 6pm), must seek permission through the NET office, who then notifies all nearby residents of the request. The City Manager is responsible for approval or denials. Our Department receives a weekly Excel spreadsheet of active noise waivers from the NET Department from the Special Project Assistant.
  - **Chicken Busters**: The NET has a "chicken busters" team that wrangles chickens in the field managed by the Assistant Director of NET. If there is a complaint about loose chickens roaming in your area, notify your Code Compliance Supervisor in writing so that they may alert the appropriate NET Administrator of the request.
  - **NET Service Workers (NSW)**: NET employs Solid Waste collectors that assist with smaller collections of litter. Please notify your Supervisor so that they may alert the NET administrator of the request.
  - **Shopping Carts**: The NET Department receives shopping cart retention plans from local businesses. The NET Department also retrieves abandoned shopping carts. As a Code Compliance inspector, if you see an abandoned shopping cart in the field, you must take action. If the cart is unmarked, tag the cart with your name, the date, the time, and alert your Supervisor of the location so that they can alert the appropriate NET administrator. If the cart is marked, alert your Supervisor of the location for immediate collection by the appropriate NET personnel.
  - **Graffiti Mitigation Program and Graffiti Busters**: The NET Department administers the graffiti mitigation program. If a property owner is cited for graffiti, they may contact their local NET Office to see whether they qualify for graffiti mitigation assistance. The Graffiti Busters Team removes graffiti from public property. If you encounter graffiti on public property, email your Supervisor to let them know.
- **Solid Waste**: If you observe a large pile of waste or debris that is not manageable by the NET Service Workers, please request a Special Pick-Up by emailing solidwastecustomerservice@miamigov.com, and copy your Supervisor.

69

MIA-SFED23485-00068306

- **Building Department**: Florida Building Code: The Building Department has a number of specialized inspectors trained in various disciplines (Electrical, Mechanical, Plumbing, Structural, and Unsafe Structures) and is empowered to issue stop-work orders for construction projects, conduct setback inspections, and demolish unsafe structures. Our Department is not authorized to address active construction projects. Our Department does cite for completed work without permits. We must report and refer issues as we see them to the appropriate section of the Building Department. To report ongoing work without a permit, you may send an email to UnsafeStructures@miamigov.com, copying our Supervisor. The public may call (305) 416-1177, or 311. If there is an issue with a permitted active construction site, the appropriate section is managed by the Chief Building Inspector and you should email the issue to your Supervisor for referral to the appropriate staff member within the Building Department. Elderly residents may receive assistance from the Building Concierge Service by calling (305) 416-2000, or emailing Concierge@miamigov.com.
- **Police Department**: Criminal violations are handled by our Police Department or other relevant law enforcement authority. Police may ticket and arrest individuals. This may include graffiti, illegal dumping, prostitution, gang activity, theft, drug-dealing, trading in stolen goods, and other crimes. Citizens may call 911 or the non-emergency police line (305) 579-6111.
- **Fire Department**: Life Safety Issues in commercial buildings and multi-family residences are handled the Fire Department. To report a suspected violation of the Fire Code please call: (305) 416-1600 or write to: FirePreventionBureauStaff@MiamiGov.com
- **Public Works** inspectors address 1100 linear miles of sidewalks, stormwater drains, public right–of–way and permits and construction on the same, and roadways. We work closely with their National Pollution Discharge Elimination System (NPDES) Inspector team to investigate and address alleged violations impacting our stormwater drains and waterways. Citizens may report a pothole, or sidewalk issue to 311 or internetpublicworks@miamigov.com.
- State Inspectors address restaurant sanitation and health violations. To report unsafe or unsanitary conditions in a **restaurant**, caterer, or mobile food unit, contact the **Florida Department of Business and Professional Regulation at (850) 487-1395** or submit a complaint online. To report unsafe or unsanitary conditions in a **grocery**, convenience store, bakery, or food processor, contact the **Florida Department of Agriculture Consumer Services at (850) 245-5520**. To report unsafe or unsanitary conditions at a **school**, **assisted living facility**, **correctional facility**, civic and fraternal organization, or movie theatre, please contact the Miami-Dade County Health Department at (305) 575-3800 or email contact.miamidade@FLHealth.gov. To report unsafe or unsanitary conditions in a childcare facility, contact (786) 314-6103, visit www.MyFLFamilies.com/childcare or contact the Florida Abuse Hotline at 1-800-96ABUSE (2873). To report unsafe or unsanitary conditions in a hospital or nursing home, contact the Florida Agency for Health Care Administration at (888) 419-3456.
- The Americans with Disabilities Act is a federal law and the Department of Justice accepts complaints via: ADA.Complaint@USDOJ.Gov, or via 1-800-514-0301. Miami-Dade County has a designated departmental ADA coordinator listed here: https://www8.miamidade.gov/global/ada-coordinators.page and an online grievance process.
- Air Quality: Contact the Department of Health AskEH@FLHealth.gov , or call (850) 245-4444.
- Indoor Mold: Contact: Phtoxicology@FLHealth.org or call (850) 245-4288.
- Miami-Dade County also addresses environmental complaints: (305) 372-6955, EnvtlComplaints@MiamiDade.gov. Miami-Dade County's Environmental Protection Ordinance, listed in Chapter 24 of the Miami-Dade County Code, was established to provide and maintain standards to ensure protection of our air quality, drinking water and vital natural resources.

70

MIA-SFED23485-00068307

**Other Helpful Contact Information**:

- 311 is a useful place to find out information about City and County services and to report a variety of complaints. You may also email 311@MiamiDade.Gov.
- City of Miami Police Department: (305) 579-6111 to report any crimes, or loitering/aggressive panhandling.
- City of Miami Department of Zoning: (305) 416-1495 for questions about Certificates of Use, zoning variances, and waivers, temporary event permits, temporary use permits and other issues.
- City of Miami Department of Public Works: (305) 416-1200 to report broken sidewalks, curbs, broken or inoperable traffic/crosswalk signal, street lights, damaged signs or banners, clogged storm drains or storm-sewer back-ups, damaged newsracks, damaged/broken telephone booths, damaged bush shelters, damaged or broken tree grates, bike racks, potholes, damaged Americans with Disabilities Act ramps on sidewalks, missing grates or storm drain covers.
- City of Miami Office of Transportation: (406) 416-1132 for trolley information.
- Miami-Dade County Department of Transportation and Public Works: (305) 468-5900 for information on Metrorail, Metromover, and County Buses.
- City of Miami Department of Solid Waste: trash on sidewalk, overflowing/damaged trash receptacles, illegal dumping, dead animals.
- Miami Parking Authority: (305) 579-4900 to report illegal parking, blocked loading zones, broken parking meters
- Florida Power & Light (FPL): 1-800-468-8243 to report downed power lines.
- Downtown Development Authority: (305) 579-6675
- Downtown Miami Business Concierge: for permitting assistance and business resources downtown (305) 579-6675
- TECO People's Gas Company: 1-877-832-6747 to report gas leaks.
- Miami-Dade County Public Works: (305) 592-3580 to report broken or damaged street signs, broken or inoperable traffic or crosswalk signals.
- Miami-Dade County Health Department: (305) 324-2400
- Miami-Dade County Zoning, Permitting and Inspection Center: 786-315-2660
- Miami-Dade Water and Sewer Department: (305) 274-9272 to report a water leak on street or sidewalk 24-hours a day.
- U.S. Postal Service Flagler Station: 1-877-876-2455 to report a damaged mailbox.

MIA-SFED23485-00068308

## Highlights of the Miami-Dade County Ethics Code

- The Miami-Dade Commission on Ethics and Public Trust is a useful and important resource for guidance and training on the obligations of public employees and those doing business with, or lobbying governments.
- The Miami-Dade Commission on Ethics and Public Trust can be reached via phone at (305) 579-2594, Hotline: 786 314-9560, email: ethics@miamidade.gov, or website: www.ethics.miamidade.gov
- Please familiarize yourself with the highlights of the Miami-Dade Ethics Code below and govern yourself accordingly.
- **KEY RESPONSIBILITIES** The Conflict of Interest and Code of Ethics Ordinance (Miami-Dade County Code at Sec. 2- 11.1) establishes **minimum standards of ethical conduct** for County and municipal elected officials, employees, members of advisory boards and quasi-judicial bodies and designated County contract workers. Certain requirements may also affect immediate family members, defined as a spouse, domestic partner, parents, stepparents, children and stepchildren.
    - o Specific questions should be sent to the Ethics Commission. Exploitation of official position.
    - o A person cannot use his or her public position to obtain a special privilege or exemption for him- or herself or for others.
    - o Confidentiality: A person cannot disclose confidential information acquired through his or her public position.
    - o Financial disclosure: Elected officials, members of advisory boards and quasi-judicial bodies, certain employees and contract staff must file financial disclosure statements every year.
- **LOYALTY TO ONE'S GOVERNMENT**: Recommendations of services prohibited. Elected officials, public employees and members of advisory boards and quasi-judicial bodies may not recommend the services of another to assist in any transaction involving one's government. Outside employment must be approved annually. Supervisors must ensure that outside employment will not impair an employee's independence of judgment in the performance of his or her public duties. If approved, the employee must file a statement of income earned from outside employment each year.
- **GIFTS**: A gift is anything of value that the recipient has not paid for. Examples include tickets or passes to events, entertainment performances and charitable galas, holiday baskets, flowers, lodging, meals, beverages, rebates or discounts, if not also offered to the general public. Prohibited gifts. Elected officials, public employees and members of advisory boards and quasi-judicial bodies may never request or accept gifts intended to persuade them to take (or not take) an official action or to perform (or not perform) a duty required by their government service. Travel expenses. Vendors and service providers may not pay the travel expenses of elected officials and public employees. Typically, these include costs associated with transportation, lodging, meals, registrations fees and incidental expenses. Acceptable gifts, if disclosed. Gifts that are not intended to influence an official action and that are not travel expenses paid for by a government vendor may be accepted. If the total value of a gift from one person or entity exceeds $100 during a calendar quarter, the gift must be disclosed in the quarter after it is received. Acceptable solicitations of gifts. Gifts may be solicited if used solely—
    - o by the government to conduct official business or
    - o to benefit nonprofit organizations, but only if solicited by commissioners and their staffs when the commissioners and their staffs receive no compensation for the solicitation.
- **GOVERNMENT PROCUREMENT**: Cone of Silence. Oral communications are prohibited between bidders for County contracts and County officers and employees, from the time a bid has been advertised until the County Manager issues a written recommendation to the Board of County Commissioners. Numerous other provisions related to the Cone of Silence can be found in the County Ethics Code.
- **DOING BUSINESS WITH GOVERNMENT**: Employees may do business with their government, individually or through a private company. But not with the employee's department, if the employee or

72

immediate family have an ownership interest in the company. Elected officials, managers, department heads and local government attorneys may not do business with their respective governments. Nor may their immediate family members do business with their respective governments. Members of advisory boards and quasi-judicial bodies may do business with their governments. But not through a company in which the board member has an ownership interest, if the company is regulated by the member's board. Disclosure of private business associations. If public officers and employees, members of advisory boards and quasi-judicial bodies or immediate family members are employed by a private firm with substantial business relationships to, or regulation by, their respective governments, the private employment must be disclosed. Transactions with private companies that do business with one's government. Local elected officials and their staffs, managers, senior assistant managers and department heads may transact business with these private companies, but only at arm's length, as in ordinary commercial dealings between equal parties. Two-year rule for former employees of private entities. Government employees may not perform contract-related duties regarding their former private employers for two years following departure from that employer. The prohibition does not apply to County or municipal managers or to directors of procurement departments. Conflicting personal investments. Elected officials, members of advisory boards and quasi-judicial bodies, public employees and designated contract workers may not — • own personal investments directly or through an immediate family member that would create a substantial conflict between private interests and the public interest, • participate in any official action, directly or indirectly, involving a business in which they or an immediate family member has a financial interest of 10% or more, • acquire a financial interest in an entity directly or through an immediate family member that may be affected by their official actions.

- **LOBBYISTS**: Elected officials and government personnel must determine whether persons seeking to influence them have registered as lobbyists. Meetings with unregistered individuals are prohibited. Prohibition on lobbying one's own government. Elected officials, public employees and designated contract staff may not represent third parties before their respective governments. Members of advisory boards and quasi-judicial bodies may not represent third parties before their respective boards. Two-year rule for former officers and employees. Public officers and employees may not lobby or appear before their respective governments for two years following departure from public service, except if employed by another government or a nonprofit or educational entity.

- **VOTING CONFLICTS**: Commissioners and council members. Elected officials may not vote if either of the following were to occur: the vote would affect them differently than it would affect the public generally or the vote would directly or indirectly affect a person with whom they have certain business relationships. Board members. Members of advisory boards and quasi-judicial bodies may not vote if both of the following were to occur: they will be directly affected by the action of their board and they have certain business relationships with the persons or entities appearing before their board on the matter.

MIA-SFED23485-00068310