

PLAINTIFF'S
EXHIBIT

283



PLAINTIFF'S EXHIBIT

285

Subpart A - THE CHARTER

---

*Footnotes:*

*--- (2) ---*

***Editor's note—*** *The present charter of the City of Miami, excepting the later amendments and additions thereto, was prepared and proposed by a charter board of 15 citizens elected at a charter board election, held January 21, 1921. The charter prepared and proposed by such board was adopted by the electors of the city at an election held May 17, 1921; and Laws of Fla., ch. 9024(1921) validated, legalized and confirmed the proceedings in the election of the charter board and the adoption of the city charter, but did not enact the charter in full. The charter was amended by the legislature in its regular session in 1923, and the amendment was confirmed by the electorate of the city at an election held July 17, 1923. At the session of the legislature in 1925, the entire charter was reenacted as contained in Laws of Fla., ch. 10847(1925). The charter as contained in Laws of Fla., ch. 10847(1925) has been amended at subsequent sessions of the legislature, and by the electorate pursuant to the provisions of section 5.03 of the Dade County Charter. This version of the charter represents the text as amended by Ord. No. 9861 and approved by referendum on September 4, 1984, which amended the charter in its entirety, and as approved by final judgment in the case of the Rolle v. City of Miami Circuit Court Case No. 84-07522. Amendments to the charter are indicated by parenthetical history notes following amended provisions. The absence of a history note indicates that the provision remains unchanged from the original. Obvious misspellings have been corrected without notation. For stylistic purposes, a uniform system of headings, catchlines and citations to state statutes has been used. Additions made for clarity are indicated by brackets.*

*County Charter reference—Municipal charters, § 5.03.*

***State Law reference—*** *Home rule powers of municipalities generally, F.S. § 166.021; charter amendments, F.S. § 166.031.*

## Citizens' Bill of Rights

(A) This government has been created to protect the governed, not the governing. In order to provide the public with full and accurate information, to promote efficient administrative management, to make government more accountable, and to insure to all persons fair and equitable treatment, the City of Miami adopts the provisions of the Miami-Dade County Citizens' Bill of Rights as applied to municipal governments located within Miami-Dade County and guarantees the following additional rights to its Citizens:

1. To Be Governed By The Rule of Law. The City of Miami Charter is the Constitution of the City of Miami and the City shall abide by all of its express provisions.

2. Religion and Conscience. The City shall not interfere with the freedom of each person in the city to follow the dictates of his or her own conscience concerning religious worship, nor shall the city support any religion.

3. Speech, Assembly and Press. The City shall not interfere with the rights: (i) of freedom of speech; (ii) of freedom of the press; (iii) to petition the government, or (iv) to peaceable assembly.

4. Unreasonable Searches and Seizures. The City shall not authorize any unreasonable search or seizure.

PLAINTIFF'S EXHIBIT

303

5. Nondiscrimination. The City shall not, directly or indirectly, discriminate among persons because of race, color, creed, religion, sex, domestic relationship status, parental status, familial status, sexual orientation, national origin, political affiliation, gender identity and expression, or racial profiling. Nothing herein shall prevent the City of Miami from remedying present discrimination or the present effects of past discrimination by a race-conscious affirmative action program which is in compliance with the Constitution and laws of the United States of America and the State of Florida.

6. Environmental Protection. The City shall promote the right of the people to clean air, pure water, freedom from excessive and unnecessary noise, and the natural, scenic, historic and aesthetic qualities of the environment.

7. Natural Resources and Scenic Beauty. It shall be the policy of the City to conserve and protect its natural resources and scenic beauty, which policy shall include the abatement of air and water pollution, and excessive and unnecessary noise.

(B) The foregoing enumeration of citizens' rights vests large and pervasive powers in the citizenry of the City of Miami. Such power necessarily carries with it responsibility of equal magnitude for the successful operation of government in the City. The orderly, efficient and fair operation of government requires the intelligent participation of individual citizens exercising their rights with dignity and restraint so as to avoid any sweeping acceleration in the cost of government because of the exercise of individual prerogatives, and for individual citizens to grant respect for the dignity of public office.

(C) Remedies for violations. Residents of the City shall have standing to bring legal actions to enforce the City Charter, the Citizens' Bill of Rights, and the Miami-Dade County Citizens' Bill of Rights as applied to the City. Such actions shall be filed in Miami-Dade County Circuit Court pursuant to its general equity jurisdiction and, if successful, the plaintiff shall be entitled to recover costs, but not attorney's fees, as fixed by the court. Any public official, or employee who is found by the court to have willfully violated this section shall forthwith forfeit his or her office or employment.

(D) Construction. All provisions of this article shall be construed to be supplementary to and not in conflict with the general laws of Florida or the provisions of the Florida Constitution. If any part of this article shall be declared invalid, it shall not affect the validity of the remaining provisions.

(Res. No. 07-0625, § 2, 10-25-07; Res. No. 16-0352, § 2, 7-29-16)

## LAWS OF FLORIDA, CHAPTER 10847

An act to amend and reenact the Charter of the City of Miami, in the County of Dade, and to fix the boundaries and provide for the government, powers and privileges of said city and means for exercising the same; and to authorize the imposition of penalties for the violation of ordinances; and to ratify certain acts and proceedings of the commission and of the officers of the city.

*Be It Enacted by the Legislature of the State of Florida:*

Sec. 1. - Creation and existence.

The inhabitants of the City of Miami, Florida, within the boundaries hereinafter designated, or within such boundaries as may hereafter be established, shall continue to be a body politic and corporate under the name the "City of Miami," and as such shall have perpetual succession and may use a common seal.

(Res. No. 01-843, § 2, 8-9-01)

**Editor's note—** Res. No. 01-843, § 2, adopted August 9, 2001, amended § 1 in its entirety to read as herein set out. Formerly, § 1 pertained to body politic and corporate; name; seal; right to contract, sue, and be sued, and derived from original codification.

**Case Law reference—** The city is a governmental entity created by the state. It is a public institution designed to promote the common interests of the inhabitants in their organized capacity as a local government, and its objects are governmental, not commercial. Miami Water Works Local No. 654 v. City of Miami, 157 Fla. 445, 26 So. 2d 194, 165 A.L.R. 967.

The city is a municipal corporation and is not exempt from paying interest on its obligations. Highway Construction Co. v. City of Miami, 126 F.2d 777.

Sec. 2. - Corporate limits.

The corporate limits of the City of Miami shall include all the territory and inhabitants within the following area, and no other:

[For the latest legal description of the city boundaries, the user is referred to exhibit A of this Charter, on file in the office of the city clerk.]

(Res. No. 01-843, § 2, 8-9-01)

**Editor's note—** The territorial limits of the City of Miami were fixed pursuant to Laws of Fla., ch. 15687(1931). Further special acts extending, enlarging, or otherwise changing the corporate limits include Laws of Fla., ch. 15821(1931); Laws of Fla., ch. 18685(1937); Laws of Fla., chs. 21393, 21396(1941); Laws of Fla., chs. 23405, 23409(1945); Laws of Fla., ch. 26021(1949); Laws of Fla., ch. 57-1583.

The board of county commissioners of Dade County further extended the boundaries of the city (Primrose Park) by Dade County Ordinance No. 63-6, adopted March 5, 1963.

**County Charter reference—**Method of changing city boundaries, § 5.04.

**State Law reference—** Municipalities within Dade County to adopt annexation or contraction ordinances pursuant to provisions of county home rule charter, F.S. § 171.071.

Sec. 3. - Powers.

The City of Miami shall have the governmental, corporate, and proprietary powers to enable it to conduct municipal government, perform municipal functions and render municipal services and may exercise any power for municipal purposes, except when expressly prohibited by law.

The city shall have the extraterritorial powers granted to the city by general and special law and including Laws of Florida, ch. 10847 (1925), as amended.

The City of Miami shall have power to:

(a)—(e).  [Reserved.]

(f)  *Acquisition and disposition of property and services:*

(i)  To acquire by purchase, gift, devise, condemnation or otherwise, real or personal property or any estate or interest therein, inside or outside the city, for any of the purposes of the city; and to improve, sell, lease, mortgage, pledge, or otherwise dispose of such property or any part thereof.

(ii)  To acquire or dispose of services inside or outside the city, by purchase, gift, or otherwise for any purposes of the city.

(iii)  To lease to or contract with entities for the management of any of the city's waterfront property, but only in compliance with the other requirements of this charter and on condition that:

(A)  the terms of the contract allow reasonable public access to the water and reasonable public use of the property, and comply with other charter waterfront setback and view-corridor requirements; and

(B)  the terms of the contract result in a fair return to the city based on two independent appraisals; and

(C)  the use is authorized under the then existing master plan of the city;

(D)  the procurement methods prescribed by ordinances are observed;

(E)  the contract does not exceed five years and does not contain an automatic renewal or termination penalty.

Any such lease or management agreement or proposed extension or modification of an existing such lease or management agreement which does not comply with each of the above conditions shall not be valid unless it has first been approved by a majority of the voters of the city.

> Nothing herein contained shall in any manner affect or apply to any project the financing of which has been provided by the authorization of bonds to be issued by the city.

(g)—(l).   [Reserved.]

(m)   *Harbor and shipping facilities:* To establish, construct, maintain, and operate, both inside and outside the city, public landings, wharves, docks, and warehouses; to dredge or deepen harbors and rivers, or any branch or portion thereof; to install turning basins, build jetties, and otherwise improve the harbor and shipping facilities of the city, inside and outside the city and inside and outside harbor lines where such improvements outside of harbor lines are approved by the United States Government or its proper agencies; to acquire by condemnation or otherwise all lands, riparian, and other rights and easements [necessary for the purposes aforesaid; to lay and collect] reasonable duties or fees on vessels coming through or using said landings, wharves, docks or warehouses; to regulate the manner of using other landings, wharves, docks, and warehouses within the city; to prescribe and enforce reasonable rules and regulations for the protection and use of said property; to advance to the Government of the United States, with or without interest, funds to be expended in harbor improvements to be made by the government in or near the city, or directly affecting the city within Miami Harbor and the approaches thereto, if such work has been duly authorized by laws of the United States; and to issue bonds or notes to obtain funds for such advances.

(n)—(ll).   [Reserved.]

(mm)   *Building and zoning:*

(i)   To provide by ordinance building, planning, and zoning regulations and restrictions governing the height, number of stories, method of construction, type, and size of buildings and other structures; the percentage and portion of the lot or site that may be occupied; the size of the front, rear, and side yards, courts, and other open spaces; the location, use of buildings, structures, and land for trade, industry, residences, apartment houses, and other purposes; and the widening and future widening of streets in zoned street areas that the city may establish. Such regulations may provide that a board of appeals or the city commission may determine and vary the application of building, planning, or zoning ordinances in harmony with their general purpose and intent.

(ii)   In order to preserve the city's natural scenic beauty, to guarantee open spaces, and to protect the waterfront, anything in this Charter or the ordinances of the city to the contrary notwithstanding, neither the city nor any of its agencies shall issue building permits for any surface parking or enclosed structures located on Biscayne Bay or the Miami River from its mouth to the N.W. 5th Street Bridge,

(A)   which are not set back at least 50 feet from the seawall (where the depth of the lot is less than 200 feet, the setback shall be at least 25 percent of the lot depth), and

(B) which do not have average side yards equal in aggregate to at least 25 percent of the water frontage of each lot based on average lot width.

(iii) The above setback and side-yard requirements may be modified by the city commission after design and site-plan review and public hearing only if the city commission determines that the modifications requested provide public benefits such as direct public access, public walkways, plaza dedications, covered parking up to the floodplain level, or comparable benefits which promote a better urban environment and public advantages, or which preserve natural features. Wherever setback, side-yard, or site-plan review requirements of zoning ordinances are greater than the foregoing requirements, such greater requirements shall govern.

(iv) These requirements shall not apply to docks and appurtenant structures, single-family residences and appurtenant structures, and waterfront industrial uses along the Miami River and at the Port of Miami. Nothing herein contained shall in any manner affect or apply to: the City of Miami/University of Miami James L. Knight International Center and hotel facility, including all improvements thereon, or to lands and projects which the city commission has approved prior to September 18, 1979, by development order pursuant to F.S. ch. 380 of a planned area development pursuant to article XXI-1, City of Miami Comprehensive Zoning ordinance or which have received site and development plan approval, including Plaza Venetia, Phase II, Resolution No. 72-113, April 20, 1972; Resolution No. 72-114, April 20, 1972; and Resolution No. 72-416, July 20, 1972.

(Res. No. 01-841, § 2, 8-9-01; Res. No. 01-843, § 2, 8-9-01)

**Editor's note—** The department of neighborhood rehabilitation of the city and all functions involved therein were abolished pursuant to Ord. No. 7576, § 1, adopted July 17, 1967, and effective on the date of transfer of said department to Dade County. At the direction of the city, § 3(vv), added to the charter by Char. Amend. No. 2, effective Jan. 1, 1963, is not set forth herein.

Sec. 4. - Form of government; nomination and election.

(a) *General description.* The form of government of the City of Miami, Florida, provided for under this Charter shall be known as the "mayor-city commissioner plan," and the city commission shall consist of five citizens, who are qualified voters of the city and who shall be elected from districts in the manner hereinafter provided. The city commission shall constitute the governing body with powers (as hereinafter provided) to pass ordinances adopt regulations and exercise all powers conferred upon the city except as hereinafter provided. The mayor shall exercise all powers conferred herein and shall appoint as provided in section 4(g)(6) of this Charter a chief administrative officer to be known as the "city manager."

(b)

*Election of mayor and city commission; terms of office; recall.* There shall be elected by the qualified electors of the city at large a mayor who shall be a qualified elector residing within the city at least one (1) year before qualifying and must maintain a residence in the city for the duration of his or her term. The mayor shall not serve as a member of the city commission.

The city commission shall consist of five members who shall be elected from districts within the city, numbered 1 through 5. All persons desiring to run for the office of city commissioner shall file in the district, numbered 1 through 5, for which they are qualified as provided in subsection (c) of this section of the Charter. City commissioners in districts numbered 3 and 5 shall be elected at the general municipal election or runoff election to be held in the year 2001 and at the general municipal election or runoff election each four years thereafter. City commissioners in districts numbered 1, 2, and 4 shall be elected at the general municipal election or runoff election to be held in the year 2003 and at the general municipal election or runoff election each four years thereafter.

The mayor shall be elected at large by the electors of the city and shall hold office for a term of four years.

The mayor and all city commissioners [are] to hold office from twelve o'clock noon five days after the canvass of the vote by the supervisor of elections and the declaration of the result of either 1) the general municipal election or 2) runoff election and until their successors are elected and qualified. Commencing with the election to be held in November 2001, and all elections subsequent thereto, no mayor or city commissioner elected and qualified for two consecutive full terms shall be eligible for reelection in the next succeeding term. The mayor and all other members of the city commission shall be subject to recall. Vacancies shall be filled as provided in section 12[.] of the.

If a candidate for office of mayor or city commissioner receives a majority of votes in the general municipal election for that office, the candidate shall be considered elected upon and after the canvass of the vote and the declaration of the result of the election as provided. If no candidate receives a majority of the votes for that office, the two candidates for the respective office who received the greatest number of votes for that office in the general municipal election shall be placed on the ballot at the runoff election. The candidate receiving the greatest number of votes in the runoff election, shall be considered elected to the office for which the candidate has qualified.

(c)  *Qualifications of mayor and city commission; mayor, city commissioners, and other officers and employees not to be interested in contracts, etc.; franks, free tickets, passes or service.* Candidates for mayor shall be residents of the city for at least one (1) year prior to qualifying and shall be electors therein. Further, candidates for the city commission shall have resided within the

district at least one (1) year before qualifying and be electors in that district, and shall maintain residence in that district for the duration of their term of office. The mayor, city commissioners, and other officers and employees shall not be interested in the profits or emoluments of any contract, job, work or service for the municipality. The mayor or any city commissioner who shall cease to possess any of the qualifications herein required shall forthwith forfeit his or her office, and any such contract in which any member is or may become interested may be declared void by the city commission.

No mayor, city commissioner, or other officer or employee of said city shall accept any frank, free ticket, pass or service directly or indirectly, from any person, firm or corporation upon terms more favorable than are granted to the public generally. Any violation of the provisions of this section shall be a misdemeanor. Such prohibition of free service shall not apply to police or fire personnel in uniform or wearing their official badges, where same is provided by ordinance.

(d)  *City commission to be judge of its own elections; neither mayor nor city commission nor any committees nor members thereof to dictate appointments by or interfere with city manager.* The city commission shall be the judge of the election and qualifications of the mayor and its own members, subject to review by the courts. Neither the mayor nor the city commission, nor any committees nor members thereof shall direct, request, take part in or dictate the appointment or removal of any person in office or employment by the city manager or subordinates or in any manner interfere with the city manager or prevent the city manager from exercising his/her own judgment in the appointment of officers and employees in the administrative service. Except for the purpose of inquiry and as may be necessary as provided in section 14, the mayor, the city commission, any committees and members thereof shall deal with the administrative service solely through the city manager, and neither the mayor nor the city commission, nor any committees nor members thereof shall give orders to any of the subordinates of the city manager, city attorney, city clerk and independent auditor general, either publicly or privately. Any such dictation, prevention, orders or other interference or violation of this section on the part of the mayor or a member of the city commission or committees shall be deemed to be violation of the Charter, and upon conviction before a court of competent jurisdiction any individual so convicted shall be subject to a fine not exceeding five hundred dollars ($500.00) or imprisonment for a term of not exceeding sixty days or both, and in the discretion of the court shall forfeit his or her office. Any willful violation of the provisions to this section by the mayor or any city commissioner shall be grounds for his or her removal from office by an action brought in the Circuit Court by the state attorney of this county.

(e)  *Election of officers by city commission; rules of city commission; quorum.* The city commission shall elect a city clerk and a city attorney. No member of the city commission or the mayor shall be chosen as city manager or as a member of the civil service board or appointed to any other city office or employment. The city commission may determine its own rules of procedure, may

punish its own members for misconduct and may compel attendance of members. A majority of all the members of the city commission shall constitute a quorum to do business, but a smaller number may adjourn from time to time.

(f) *Meetings of city commission; ordinance to be read by title only.* At twelve o'clock noon on the day the mayor or city commissioners take office, they shall meet at the city hall. Thereafter, the city commission shall meet at such time and place as may be prescribed by ordinance or resolution. The meetings of the city commission and all sessions of committees of the city commission shall be public. Ordinances shall be read by title only. No member shall be excused from voting except on matters involving the consideration of his or her own official conduct, or where his or her financial interests are involved.

(g) *Powers and duties of mayor.* The mayor shall serve as the chief executive officer and head of the city government with the following specific powers and duties:

(1) The mayor shall be the presiding officer of the city commission with the authority to designate another member of the city commission to serve as presiding officer.

(2) The mayor shall be recognized as the official head of the city for all ceremonial purposes, by the courts for the purpose of serving civil process, and by the governor for military purposes.

(3) In time of public danger or emergency, the mayor may declare a state of emergency as provided in state law and may with the consent of the city commission, take command of the police and maintain order and enforce the laws.

(4) During the temporary absence or disability, the mayor shall appoint a member of the city commission to perform the duties of the mayor. However, in the event that the mayor does not or is unable to make such designation, the city commission shall designate a member of the city commission to perform the duties of the mayor during the temporary absence or disability of the mayor by a four-fifths vote of the city commissioners then in office.

(5) The mayor shall, within ten days of final adoption by the city commission, have veto authority over any legislative, quasi-judicial, zoning, master plan or land use decision of the city commission, including the budget or any particular component contained therein which was approved by the city commission; provided, however that if any revenue item is vetoed, an expenditure item in the same or greater dollar amount must also be vetoed. The city commission may, at its next regularly scheduled or special meeting after the veto occurs, override that veto by a four-fifths vote of the city commissioners present, notwithstanding any provisions to the contrary contained in the Charter and city code. Said veto power shall include actions pursuant to sections 29-B through 29-D of the Charter.

(6) When one person succeeds another in the position of mayor, the successor shall have the right to appoint the city manager, subject to the approval within 14 days of a majority of the city commissioners then in office. In the event of a vacancy in the office of city manager, the

mayor shall appoint the city manager, subject to the approval within 14 days of a majority of the city commissioners then in office. The mayor may remove the city manager subject to the city commission's conducting a hearing within 10 days of said removal and the city commission's overriding the mayor's action by a four-fifths vote of those city commissioners then in office. Additionally, the city commission by a four-fifths vote of those city commissioners then in office shall be able to remove the city manager.

(7) The mayor shall establish and appoint the members of all standing and special committees of the city commission and the chairperson and vice-chairperson of each committee. There shall be as many standing and special committees of the city commission as deemed necessary by the Mayor. Standing or special committees of the city commission shall mean those comprised of city commission members only.

(8) The mayor shall prepare and deliver a report on the state of the city to the people of the city between November 1 and January 31 annually. Such report shall be prepared after consultation with the city commissioners and the city manager.

(9) The mayor shall prepare and deliver a budgetary address annually to the people of the city between July 1 and September 30. Such report shall be prepared after consultation with the city manager.

(h) *Salaries of the mayor and commission.* Effective on November 4, 2003, there shall be paid to the city commissioners the sum of $58,200, which is equal to sixty percent of the mayor's salary in effect on July 16, 2003. Such salary shall be paid per year for each commissioner, in twelve equal installments. The compensation of the mayor shall be determined by the commission.

(Laws of Fla., ch. 15344(1931); Laws of Fla., ch. 23401(1945); Laws of Fla., ch. 26022(1949); Laws of Fla., ch. 31000(1955); Char. Amend. No. 2, § 1, 1-1-60; Char. Amend. No. 1, 12-1-63; Char. Amend. No. 1, 12-1-65; Ord. No. 88-541, § 2a, 6-9-88/9-6-88; Res. No. 97-447, § 2, 7-3-97; Res. No. 99-613, § 3, 8-2-99; Res. No. 01-843, § 2, 8-9-01; Res. No. 03-918, § 3, 9-5-03)

**Editor's note—** Res. No. 01-843, § 2, adopted August 9, 2001, amended § 4 in its entirety to read as herein set out. Formerly, § 4 pertained to form of government. The historical notation has been retained for reference purposes.

**Case Law reference—** Officials provided for in subsection (e) shall be elected and none of them shall hold office at the will of the city commission when elected, but the city manager when appointed shall hold office subject to the will of the commission. State v. Bloodworth, 134 Fla. 369, 184 So. 1.

Where resolution adopted by the city commission appointing the city clerk failed to fix or state the period of time he was to hold the said office, clerk was entitled to hold office until the next regular city election provided for in this charter unless lawfully removed. *Id.* See also, State v. Bloodworth, 135 Fla. 525, 185 So. 339.

Sec. 5. - The initiative.

(a) *Power to adopt ordinances.* The electors shall have power at their option to adopt ordinances, excluding ordinances relating to subjects that would be precluded by law and to adopt the same at the polls, such power being known as the "initiative". A petition meeting the requirements hereinafter provided and requesting the city commission to pass an ordinance therein set forth or attached shall be termed an "initiative petition" and shall be acted upon as hereinafter provided.

Any five registered voters may commence initiative proceedings by filing with the city clerk an affidavit stating they will constitute the committee of the petition and be responsible for circulating the petition and filing it in proper form. The affidavit shall state the names and addresses of the members of the committee of the petition and shall specify the name and address of the member to whom all notices are to be sent. The affidavit shall set out in full the proposed initiative ordinance.

(b) *Preparation of initiative petition; affidavit of genuineness of signatures.* Signatures of 10 percent of the electors of the city registered at the last general municipal election are required for initiative petitions. The signatures need not all be on one paper, but must be in ink or indelible pencil and include the printed name and residence address of each signer and date signed. The proposed ordinance in full should be attached to the petition for review of the signer. The circulator of every such paper shall make an affidavit on each page in substantially the following form:

STATE OF FLORIDA )

            ss.

COUNTY OF MIAMI-DADE )

_____ being duly sworn, deposes and says that he or she is the circulator of the foregoing petition paper containing signatures, and that said signatures were made in his or her presence and are the signatures of the persons whose names they purport to be.

(Signed) _____

Subscribed and sworn to before me this _____ day of _____ 19___.

____

Notary Public

All papers pertaining to any one ordinance shall be filed in the office of the City Clerk as one instrument and shall have written or printed thereon the names and addresses of the committee of the petition who shall be officially regarded as filing the petition and who shall constitute the committee of the petition for the purposes hereinafter named.

(c) *Filing of petitions.* Within 20 days after the filing of a petition, the city clerk shall ascertain by examination the number of registered voters in the city whose signatures are appended thereto and whether said number is at least 10 percent of the total number of registered voters as shown by the registration records. The city clerk shall attach to said petition a certificate showing the result of said examination and give notice thereof in writing to one or more of the members of the committee of the petition. If the number of signatures supporting the petition is shown to be insufficient, the petition may be amended once within 10 days from the date of said certificate by the filing of additional signatures.

The city clerk shall, with 10 days after such amendments, make examination of the amended petition. The final finding of the insufficiency of a petition shall not prejudice the filing of a new petition for the same purpose.

(d) *Submission of petition to city commission.* Upon ascertaining that a petition is supported by a sufficient number of signatures, the city clerk shall so certify, and the city clerk shall submit the proposed ordinance to the city commission at its next meeting. Upon receiving the proposed, the city commission shall proceed to consider it and shall take final action thereon within 30 days from the date the petition is certified by the city clerk.

(e) *Election on initiated ordinances.* If the city commission fails to pass the proposed ordinance, or if it passes it in a form different from that set forth in the petition, then the ordinance shall be submitted in its original form by the city commission to the vote of the electors at the next election occurring not fewer than 30 days from the date of the final action by the city commission. If no election is to be held within six months from such date, the city commission shall call a special election to be held not fewer than 30 days nor more than 120 days from such date.

(f) *Initiative ballots.* The ballots used when voting upon any such proposed ordinance shall state the substance thereof in clear, concise language, without argument or prejudice, and shall provide only for a vote "for the ordinance" or "against the ordinance". If a majority of the electors voting on any such ordinance vote in favor thereof, it shall thereupon become an ordinance of the city. When a ordinance proposed by initiative petition is passed by the city commission, but not in its original form, the ordinance as passed by the city commission shall not take effect until after the vote of the electors; if the ordinance so submitted is approved by a majority of electors voting thereon, it shall thereupon become an ordinance of the city, and the ordinance as passed by the city commission shall be deemed repealed.

The following title shall be substantially the form of the ballot:

TITLE OF WITH GENERAL

STATEMENT OF SUBSTANCE THEREOF

____

FOR THE ORDINANCE.

____

AGAINST THE ORDINANCE.

(g) *Number of ordinances to be initiated.* Any number of proposed ordinances may be voted upon at the same election in accordance with the provisions of this Charter.

(Res. No. 01-843, § 2, 8-9-01)

Sec. 6. - The referendum.

(a) *Power of referendum.* The electors shall have power at their option to approve or reject at the polls any measure passed by the city commission or measure submitted by the city commission to a vote of the electors excluding measures relating to subjects that would be precluded by law. Such power shall known as the "referendum". Measures submitted to the city commission by initiative petition and passed by the city commission without change or passed in an amended form shall be subject to the referendum in the same manner as other measures.

Any five registered voters may commence referendum proceedings by filing with the city clerk an affidavit stating they will constitute the committee of the petition and be responsible for circulating the petition and filing it in proper form. The affidavit shall state the names and addresses of the members of the committee of the petition and shall specify the name and address of the member to whom all notices are to be sent. The affidavit shall set out in full the referred measure.

(b) *Referendum petition.* If within not less than ten days nor more than 30 days after the final passage of any measure by the city commission, a petition signed by 15 percent of the total number of voters registered at the last general municipal election as shown by the city registration records, is filed with the city clerk requesting that such measure or any part thereof be repealed or be submitted to a vote of the electors, that measure or part shall not, except in the case of an emergency measure, become operative until the steps indicated herein have been taken.

(c) *Signatures to petition.* The signatures of the 15 percent of the electors of the city registered at the last general municipal election are required for referendum petitions. The referred measure in full shall be attached to the petition for review of the signer. The signatures of referendum petitions need not all be on one paper, but the circulator of every such paper shall make an

affidavit that each signature appended thereto is the genuine signature of the person whose name it purports to be. Each signature shall be in ink or indelible pencil and shall include the date signed, the printed name and address of the signer. All such papers shall be filed in the office of the city clerk as one instrument. A referendum petition need not contain the text of the measure or part of which repeal is sought, but shall briefly describe the ordinance or part sought to be repealed and such measure shall be attached to the petition for review of the signer.

The circulator of every such paper shall make an affidavit on each page in substantially the following form:

STATE OF FLORIDA )

ss.


COUNTY OF MIAMI-DADE )

_____ being duly sworn, deposes and says that he (or she) is the circulator of the foregoing petition paper containing _____ signatures, and that said signatures were made in his (or her) presence and are the signatures of the persons whose names they purport to be.

(Signed) _____

Subscribed and sworn to before me this _____ day of _____ 20___.

_____

Notary Public

All papers pertaining to any one measure shall be filed in the office of the city clerk as one instrument and shall have written or printed thereon the names and addresses of the committee of the petition who shall be officially regarded as filing the petition and who shall constitute the committee of the petition for the purposes hereinafter named.

(d)  *Certification of petition.* Within 20 days after the filing of the petition, the city clerk shall ascertain by examination the number of registered voters whose signatures are appended thereto and whether said number is at least 15 percent of the total number of registered voters as shown by the city registration records. The city clerk shall attach to such petition his or her certificate showing the result of such examination and give notice thereof in writing to the person designated to receive notices by the committee of the petition. If the number of signatures supporting the petition is shown to be insufficient, the petition may be amended once within 10

days from the date of said certificate by the filing an amended petition with additional signatures. The city clerk shall, within 10 days after such amendment, make examination of the amended petition.

(e) *Referendum election.* If the petition is found sufficient, the city commission shall proceed to reconsider such measure or such section thereof as the petition shall specify. If upon such reconsideration such measure, or such part thereof, is not repealed or amended as demanded in the petition, the city commission shall provide for submitting the same, by the method herein provided, to a vote of the electors at the next general municipal election occurring not less than thirty days after the receipt by the city commission of the city clerk's certificate, and such measure, or such part thereof, shall thereupon be suspended from going into effect until said election and shall then be deemed repealed unless approved by a majority of those voting thereon. The city commission by a four-fifths vote may submit such measure or part thereof with like effect to the electors at a special election to be called by said city commission not less than thirty days after the receipt of the city clerk's certificate.

(f) *Limitations on enforcement of ordinances.* No measure shall go into effect until thirty days after its passage unless it is declared in such ordinance to be an emergency measure on the ground of urgent public need for the preservation of peace, health, safety, or property and the measure being passed by a vote of not less than four-fifths of the members of the city commission. No measure amending or repealing any measure adopted by the people at the polls or by the city commission in compliance with an initiative petition shall be regarded as an emergency measure.

(g) *Form of ballot.* The ballots used when voting upon such referendum shall state the substance of the measure in clear, concise language, without argument or prejudice, and shall specify whether the measure is being submitted for approval or for repeal. If the measure is being submitted for approval, the ballot shall provide only for a vote "for the measure" or "against the measure". If the measure is being submitted for repeal, the ballot shall provide only for a vote "for repeal" or "against repeal".

(h) *Emergency measures.* Measures passed as emergency measures shall be subject to referendum like other measures, except that they shall not be suspended from going into effect while referendum proceedings are pending. An emergency measure subsequently repealed shall be deemed sufficient authority for any payment made or expense incurred in accordance with the measure previous to the repeal.

(i) *Conflict of referred measures.* If two or more measures adopted or approved at the same election conflict with respect to any of their provisions, all nonconflicting provisions shall go into effect. The provisions of the measure receiving the highest affirmative vote shall prevail over the conflicting provisions of other measures.

(j)

*Adoption or repeal.* If a majority of the electors voting on any referendum vote to adopt or repeal any measure or part thereof, such measure or part shall thereupon be deemed adopted or repealed, as the case may be.

(Res. No. 01-843, § 2, 8-9-01)

Sec. 7. - Election of city commissioners and mayor.

A general municipal election for the mayor and city commissioners shall be held on the first Tuesday after the first Monday in November in odd-numbered years. A runoff election for the mayor and city commissioners shall be held on the third Tuesday after the first Monday in November in odd-numbered years. All elections held in said city shall be conducted and held according to the provisions of the general election laws of the State of Florida, except as otherwise provided for in the Charter. The name of any person qualified as provided in section 4 of this Charter shall be printed upon the ballot as a candidate for the office of mayor or city commissioner upon paying to the City of Miami the sum as prescribed by ordinance to be accepted by the city clerk as a qualifying fee along with the sum for election assessment as prescribed by state law during the qualifying period as prescribed in this Charter prior to the date of such general municipal election or special election to fill a vacancy. Any person qualified to run for mayor or city commissioner shall file an affidavit of candidacy in the form provided by the city clerk including his or her name, address, occupation and willingness to serve if elected, accompanied by the requisite documents and fees as provided in state law and section 7 of this Charter. An affidavit of candidacy shall be filed not earlier than 60 days and not later than 45 days prior to the date of the general municipal election or during the qualifying period for a special election to fill a vacancy.

All such qualifying documents and fees shall be deposited with the city clerk no later than 6:00 pm. on the forty-fifth day prior to the general municipal election or the last day for qualifying in a special election to fill a vacancy.

(Laws of Fla., ch. 15339(1931); Laws of Fla., ch. 19974(1939); Laws of Fla., ch. 21387(1941); Laws of Fla., ch. 22395(1943); Laws of Fla., ch. 23408(1945); Char. Amend. No. 1, 3-14-72; Char. Amend. No. 6, 11-6-73; Res. No. 97-447, § 2, 7-3-97; Res. No. 01-843, § 2, 8-9-01; Res. No. 16-0350, § 2, 7-29-16)

**Editor's note—** Res. No. 01-843, § 1, adopted August 9, 2001, amended § 7 in its entirety to read as herein set out. Formerly, § 7 pertained to regular and primary elections of commissioners. The historical notation has been retained for reference purposes.

Sec. 8. - Form of ballots.

All ballots used in any general municipal election, runoff election or special election to fill a vacancy held under authority of this Charter shall be without party mark or designation and without any insignia or mark of any association or organization thereon, and shall be substantially in the same form as the election ballot

used in all general state elections.

(Laws of Fla., ch. 15339(1931); Res. No. 97-447, § 2, 7-3-97; Res. No. 01-843, § 2, 8-9-01)

**Editor's note—** Res. No. 01-843, § 2, adopted August 9, 2001, amended § 8 in its entirety to read as herein set out. Formerly, § 8 pertained to form of ballots; what candidates in primary election for mayor and commissioners placed on ballot. The historical notation has been retained for reference purposes.

Sec. 9. - Declaration of election; how tie vote decided.

At any runoff election or special election to fill a vacancy held under the provisions of this Charter, the candidates for the office of city commissioner, who shall have received the greatest number of votes cast, shall be declared elected after the canvass of the vote by the supervisor of elections as provided in section 4. A tie between two or more candidates for the office of city commissioner shall be decided by lot under the supervision of the chair of the canvassing board in the presence of the candidates.

At any runoff election or election to fill a vacancy for the office of mayor held under the provisions of this Charter, the candidate for the office of mayor, who shall have received the greatest number of votes cast, shall be declared elected after the canvass of the vote by the supervisor of elections as provided in Section 4. A tie between the candidates for the office of mayor shall be decided by lot under the supervision of the chair of the canvassing board in the presence of the candidates.

(Res. No. 97-447, § 2, 7-3-97; Res. No. 01-843, § 2, 8-9-01)

Secs. 10, 11. - [Reserved.]

**Editor's note—** Res. No. 01-843, § 2, adopted August 9, 2001, repealed §§ 10, 11 in their entirety. Formerly, §§ 10, 11 pertained to distinction between general and special municipal election and the recall, respectively, and derived from Laws of Fla., ch. 14616(1929); Res. No. 97-47, § 2, adopted July 3, 1997.

Sec. 12. - Filling vacancies for mayor and commission.

(a)   A vacancy on the city commission or in the office of mayor caused by death, resignation, forfeiture, suspension, removal, or other action or causes shall be filled within ten days after such vacancy occurs by a majority of the remaining city commissioners. The person appointed must meet the qualifications of the office as required in section 4 of this Charter. The term of office of the person so appointed, except in the circumstances detailed in section (c) below, shall be until the successor in office is elected and qualified at whichever of the following occurs first:

(1)   the odd-year general municipal election for mayor and city commissioners held pursuant to section 4 of the Charter, or

(2)   the even-year State of Florida general election, at which election national, state and county

offices are filled,

The candidates for such election shall be qualified as provided in section 4 of this Charter and the qualifying period and requirements for such election shall be as provided in section 7 of this Charter. The person elected as provided in (a)(1) or (a)(2) of this Section shall serve for the remainder of the unexpired term of that office.

(b) If the remaining city commissioners shall fail or refuse to fill such vacancy within ten days after it occurs, as provided herein, the city commission shall call a special election to fill the vacancy to be held at a date not less than thirty-eight or more than forty-five days after the expiration of the ten-day period and the five day qualifying period. The qualifying period for such special election shall be for the five days not including Saturday, Sunday or legal holidays before the thirty-eighth day before the date of the election and the procedure for the election not otherwise provided for in this section shall be as provided in section 7 of this Charter. Except in the circumstances detailed in section (c), effective November 7, 2017, the person who receives the greatest number of votes for the office in said special election is elected to fill the vacancy for the remainder of the unexpired term of that office.

(c) If a vacancy in any elected office is caused by forfeiture, suspension, or removal, the vacancy shall be filled in the same manner as described in sections (a) and (b) above, provided that if the elected official who has so vacated his or her seat is later absolved of the allegations of wrong-doing, that elected official shall be entitled to resume his or her elected position for the remainder of the unexpired term, if any. The term of the individual who assumed the position previously vacated by that elected official shall automatically terminate upon the restoration to office of the original seat-holder.

(d) If the city commissioners shall fail to comply with their duties as set forth in this section, then, and in that event, the court is hereby empowered and authorized to enforce compliance with this act or to call an election itself to fill such vacancy or vacancies on the city commission or in the office of mayor.

(Laws of Fla., ch. 22393(1943); Laws of Fla., ch. 27724(1951); Ord. No. 8287, 11-5-74; Res. No. 97-447, § 2, 7-3-97; Res. No. 01-843, § 2, 8-9-01; Res. No. 17-0318, § 2, 7-13-17)

Sec. 13. - [Reserved.]

**Editor's note—** Res. No. 01-843, § 2, adopted August 9, 2001, repeal § 13 in its entirety. Formerly, § 13 pertained to election when terms of four or more commissioners expire simultaneously, and derived from Laws of Fla., ch. 22393(1943); Laws of Fla., ch. 27724(1951).

Sec. 14. - Commission may investigate official transactions, acts and conduct.

The mayor, city commission, or any committee thereof may investigate the financial transactions of any office or department of the city government and the official acts and conduct of any city official, and by similar investigations may secure information upon any matter. In conducting such investigations the mayor, city commission, or any committee thereof, may require the attendance of witnesses and the production of books, papers and other evidence, and for that purpose may issue subpoenas which shall be signed by the presiding officer of the city commission or the chair of such committee, as the case may be, which may be served and executed by any police officer.

(Res. No. 97-447, § 2, 7-3-97; Res. No. 01-843, § 2, 8-9-01)

Sec. 15. - City manager—Qualifications; appointment; term; salary; sickness or absence; removal.

The city manager shall be the head of the administrative branch of the city government. The city commission shall fix the city manager's compensation, and the city manager shall serve as provided in section 4(g). The city manager shall be chosen on the basis of the city manager's executive and administrative qualifications. At the time of the city manager's appointment the city manager need not be a resident of the state. Neither the mayor nor any city commissioner shall be eligible for the position of city manager during or within two years after the expiration of their respective terms.

The mayor, subject to the approval of the city commission, may designate a qualified administrative officer of the city to assume the duties and authority of the city manager during periods of temporary absence or disability of the city manager.

The city manager shall be responsible for the administration of all units of the city government under the city manager's jurisdiction, and for carrying out policies adopted by the city commission. The city manager or designee shall execute contracts and other instruments, sign bonds and other evidences of indebtedness.

(Char. Amend. No. 2, 1-1-62; Res. No. 97-447, § 2, 7-3-97; Res. No. 01-843, § 2, 8-9-01)

Sec. 16. - Same—Powers and duties.

The powers and duties of the city manager shall be to:

(a) See that the laws and ordinances are enforced.

(b) Appoint and remove, except as otherwise provided in this Charter, all directors of the departments and all subordinate officers and employees in the departments in both the classified and unclassified service; all appointments to be upon merit and fitness alone, and in the classified service all appointments and removals to be subject to the civil service provisions of this Charter.

(c)

Exercise control over all departments and divisions created herein or that may be hereafter created by the city commission.

    (d) Attend all meetings of the city commission with the right to take part in the discussion but having no vote.

    (e) Recommend to the mayor and city commission for adoption such measures as the city manager may deem necessary or expedient.

    (f) Keep the mayor and city commission fully advised as to the financial condition and needs of the city; and

    (g) Perform such other duties as may be prescribed by this Charter or be required by the mayor or ordinance or resolution of the city commission.

(Res. No. 97-447, § 2, 7-3-97; Res. No. 01-843, § 2, 8-9-01)

**Editor's note—** As to removal and suspension of chief of police, see annotation to charter § 26.

**Case Law reference—** It was the intention of the legislature to make the city manager at all times hold office subject to the will of the commission upon whom rested the administrative affairs of the city government, which could be speedily checked and corrected if necessary at the will of the commission by a change in the office of the city manager. State v. Bloodworth, 134 Fla. 369, 184 So. 1.

*Subsection (b)*—The phrase "except as herein provided," employed in subsection (b) of this section, qualifies or limits every provision of the city charter providing for removals in specific cases, and such other provisions must be construed with the subsection. Bryan v. Landis, 106 Fla. 19, 142 So. 650.

The city manager has no summary power of appointment under civil service rules, and all appointments and promotions by the city manager must be within the requirements of such rules. Bloodworth v. Suggs, 60 So. 2d 768.

Police officers may be demoted during probationary period after accepting probationary promotion in rank. Clarke v. City of Miami, 81 So. 2d 217.

The city manager is not required as a matter of law to promote civil service employees when a vacancy occurs. His refusal to fill vacancies due to economic conditions is a matter within his discretion. City of Miami v. Elmore, 131 So. 2d 517.

Where city manager opts to utilize advisory group to directly assist him in the decision-making process to select a new police chief, the advisory group is a "board" within the meaning of F.S. § 286.011, the city manager is an "agency" within the meaning of said statute, and meetings of the advisory group must be open meetings pursuant to said statute. State v. Krause, 47 Fla. Supp. 36, *aff'd* Krause v. Reno, 366 So. 2d 1244.

Sec. 17. - Same—Examination of affairs of departments, officers or employees.

The city manager may, without notice, cause the affairs of any department or the conduct of any officer or employee to be examined. Any person or persons appointed by the city manager to examine the affairs of any department or the conduct of any officer or employee shall have the same right to require the attendance of witnesses and production of books and papers and other evidence as is conferred upon the mayor and city commission by this Charter.

(Res. No. 01-843, § 2, 8-9-01)

Sec. 18. - Departments established.

The following administrative departments are hereby established by this Charter:

(1) Department of law.

(2) Reserved.

(3) Reserved.

(4) Department of public safety.

(5) Department of finance.

(Res. No. 01-843, § 2, 8-9-01)

> Footnotes:
>
> --- (3) ---
>
> **Note—** *Pursuant to authority granted in section 19 of this charter, the departments of public service, public welfare and public safety have been discontinued and numerous new departments have been created by ordinance. The user's attention is directed to ch. 2 of the Code of Ordinances for existing departments and functions thereof.*

Sec. 19. - Creation of new departments; discontinuance of departments.

The city commission may, by ordinance adopted by vote of at least three members of the city commission, create new departments or discontinue any department and determine, combine, and distribute the functions and duties of departments and subdivisions thereof.

(Laws of Fla., ch. 21391(1941); Res. No. 01-843, § 2, 8-9-01)

Sec. 19-A. - [Reserved.]

**Editor's note—** Res. No. 01-843, § 2, adopted August 9, 2001, repealed § 19-A in its entirety. Formerly, § 19-A pertained to authority to create and discontinue departments by ordinance not limited to other charter provisions and derived from Laws of Fla., ch. 21391(1941).

Sec. 20. - Directors of departments.

The city manager shall appoint a director for each department and, in the city manager's discretion, may consolidate two departments under one director. Each such director shall serve until removed by the city manager or until a successor has been appointed and qualified, shall conduct the affairs of his or her department in accordance with rules and regulations made by the city manager, shall be responsible for the conduct of the officers and employees of his or her department, for the performance of its business, and for the custody and preservation of the books, records, papers and property under its control, and, subject to the supervision and control of the city manager in all matters, shall manage the department. None of the provisions of this section, however, shall be applicable to the department of law, city clerk or office of independent auditor general. [4]

(Laws of Fla., ch. 21388(1941); Res. No. 01-843, § 2, 8-9-01)

> *Footnotes:*
>
> --- *(4)* ---
>
> **Note**— *Transfer of the operations of the city's department of water and sewers to Metropolitan Dade County was authorized by Res. No. 73-225, adopted March 22, 1973.*

## Sec. 21. - Department of law.

The city attorney shall be the director of the department of law and an attorney-at-law admitted to the practice in the State of Florida. The city attorney shall be the legal advisor of and attorney and counsel for the city, and for all officers and departments thereof in matters relating to their official duties. The city attorney shall prosecute and defend all suits for and in behalf of the city, and shall prepare all contracts, bonds and instruments in writing in which the city is concerned and shall endorse on each approval of the form and correctness thereof.

The city attorney shall be the prosecuting attorney of the municipal court. The city attorney shall have such number of assistants as the city commission by ordinance may authorize. The city attorney shall prosecute all cases brought before such court and perform the same duties, so far as they are applicable thereto, as are required of the prosecuting attorney of the county.

When required to do so by the resolution of the city commission, the city attorney shall prosecute or defend for and in behalf of the city all complaints, suits and controversies in which the city is a party, and such other suits, matters and controversies as he shall, by resolution or ordinance, be directed to prosecute or defend.

The mayor, city commission, the city manager, the director of any department, or any officer or board not included within a department, may require the opinion of the city attorney upon any question of law involving their respective powers and duties.

The city attorney shall be a full-time governmental employee; shall not engage in the private practice of law; and upon his or her election by the city commission shall serve until the time for the election of the city officials specified in section 4 of the Charter which follows the next general municipal election.

(Char. Amend. No. 1, 11-6-73; Res. No. 97-447, § 2, 7-3-97; Res. No. 01-843, § 2, 8-9-01)

Secs. 22—22-C. - [Reserved.]

**Editor's note—** Res. No. 01-843, § 2, adopted August 9, 2001, repealed §§ 22—22-C in their entirety. Formerly, §§ 22—22-C pertained to department of public service, department of water and sewers; water and sewer board, department of public welfare, and board of trustees of Jackson Memorial Hospital, respectively.

Sec. 23. - Department of off-street parking; off-street parking board.

(a) There is hereby created and established as an agency and instrumentality of the City of Miami, a new department to be named and known as the "Department of Off-Street Parking of the City of Miami" (hereinafter sometimes called the "department of off-street parking" or the "department"), and by that name it may sue and be sued, plead and be impleaded, contract and be contracted with and have an official seal; provided, however, that the department shall not commence business or exercise any of the powers granted by this act unless and until the city commission of the City of Miami shall by ordinance declare the need for the department and for the off-street parking board of the City of Miami hereinafter created. The department, which shall operate and function under the supervisory control of the board created and established in subsection (b) hereof, shall consist of a chief executive officer to be known as the "director of the department of off-street parking" (hereinafter sometimes called the "director of the department" or the "director") and such other officers and employees as shall be necessary to exercise the powers and perform the duties and functions of the department.

(b) There is hereby created and established a board to be known as the "Off-Street Parking Board of the City of Miami" (hereinafter sometimes called the "off-street parking board" or the "board") which shall consist of five members. Each member of the board shall either reside or have his or her principal place of business in the city and shall be an individual of outstanding reputation for integrity, responsibility and business ability, but no officer or employee of the city shall serve as a member of the board while employed as such officer or employee of the city.

Within thirty days after the city commission shall have adopted an ordinance declaring the need for the department and for the board, it shall appoint the members of the board, two of whom shall hold office for a term of two years, two of whom shall hold office for a term of three years, and one of whom shall hold office for a term of four years, and thereafter each member shall be appointed for a term of five years, as herein provided.

At least twenty days prior to the date of expiration of the term of any member of the board, or within ten days after the death, resignation or removal of any such member, such member's successor shall be named and appointed by the remaining members of the board, subject to confirmation by the city commission of the city. In the event that any appointment so made shall not be confirmed by the city commission within ten days after notice of such appointment has been served upon the city commission, the appointment shall be null and void, and thereupon the remaining members of the board shall make a new appointment, or appointments, which shall likewise be subject to confirmation by the city commission and each member of the board shall be eligible for reappointment. The successor in each case shall be appointed and shall hold office for a term of five years from the date of expiration of the term of his or her predecessor, except that any person appointed to fill a vacancy shall serve only for the unexpired term.

Upon the effective date of his or her appointment, or as soon thereafter as practicable, each member of the board shall enter upon his or her duties, but before doing so he or she shall take the oath prescribed by law and shall execute a bond in the penal sum of ten thousand dollars ($10,000.00) payable to the department and conditioned upon the faithful performance of the duties of his or her office, which bond shall be approved by the city commission of the city and filed with the city clerk, the cost of the premium on any such bond to be treated as part of the cost of operating the department.

The members of the board shall each be paid a salary of fifty dollars ($50.00) per annum, or such larger sum as the city commission may establish by ordinance, payable in monthly installments.

Any member of the board may be removed by the city commission of the city for good cause and after proper hearing by the city commission, but if so removed, may apply to the Circuit Court of the Eleventh Judicial Circuit in and for Dade County, Florida, for a review of the action of the city commission.

(c) The board shall have the powers, duties and responsibilities customarily invested in the board of directors of a private corporation, and shall exercise supervisory control over the operation of the off-street parking facilities of the city, and all acts of the department and of the director with respect to such facilities shall be subject to the approval of the board. The board shall elect one of its members to serve as chair of the board, shall make appropriate rules and regulations for its own government and procedure, and shall hold a regular meeting at least once a month and such special meetings as it may deem necessary, and all such meetings shall be open to the public.

(d) From and after the date of appointment of the first member of the board, the department shall operate, manage and control the off-street parking facilities of the city and all properties pertaining thereto now owned or hereafter acquired or constructed by the city or by the

department and shall succeed to and exercise all powers vested in and succeed to and perform all functions and duties imposed upon the department of off-street parking of the city by and under the provisions of this act.

Upon the adoption by the city commission of an ordinance declaring the need for the department and the board, all powers, functions and duties relating to such off-street parking facilities and properties pertaining thereto then vested in the city or any of its departments officers, including but not limited to the exercise of the power of eminent domain, shall be and are hereby transferred to the department, and all books, records and papers now existing or hereafter acquired in the operation and maintenance of said facilities or relating thereto shall be the property of and under the jurisdiction and control of the department; provided, however, that nothing contained in this section shall be deemed to vest in the department the power to establish and fix rates and charges for off-street parking service furnished by the off-street parking facilities of the city or the power to issue revenue bonds. The department shall have full power and authority to acquire, own, use, hire, lease, operate and dispose of real property and personal property and of any interest therein, including the power to acquire by eminent domain proceedings lands or any interest therein and rights-of-way and easements upon, in, along or across any public street, road or highway for the purpose of constructing, maintaining or operating off-street parking facilities as shall be necessary in the judgment of the off-street parking board, and to make and enter into all contracts necessary or incidental to the exercise of its powers and the performance of its duties and functions with respect to the operation, management and control of said facilities, and to promulgate and enforce appropriate rules and regulations governing the utilization of the services of the off-street parking facilities of the city.

(e) The director shall be appointed by and shall hold office at the will of the board. Such person shall be of good moral character and have an excellent reputation for integrity, responsibility and business ability, but no member of the board shall be eligible for appointment as director. The director shall receive such salary, payable to him or her in equal semi-monthly installments, as shall be fixed by the board. Before entering upon his or her duties, the director shall take any oath and execute any bond prescribed by law. The director shall act as the chief executive officer of the department, shall devote his or her entire time and attention to the duties of his or her office and shall not engage actively in any other business or profession. Subject to the direction and approval of the board, the director shall have general supervision over and be responsible for the operation and maintenance of the off-street parking facilities of the city and shall exercise the powers vested in and perform the functions and duties imposed upon him or her as herein provided. The director shall attend all meetings of the board, shall furnish to the board and the city commission of the city a monthly report with respect to the operation, maintenance and

financial condition of the department of off-street parking, and shall from time to time have prepared and shall furnish such reports, audits and other information relating to said facilities as may be required by the board.

In the event that the director shall for any reason be temporarily incapable of exercising the powers and of performing the duties and functions of his or her office, the board may appoint an acting director to exercise such powers and to perform such functions and duties until such incapacity of the director shall be terminated.

(f) Subject to the approval of the board, the director shall employ such additional executive and operating assistance, including engineering and other experts and professional assistance, as shall be necessary to provide for the efficient operation of the department. Included in the personnel to be employed, there shall be the following subordinate officers whose positions shall be in the unclassified service of the city:

(1) A treasurer, who shall perform the functions and duties customarily performed by the treasurer of a private corporation. The treasurer shall be responsible for all funds of the department, for all accounts and accounting records relating to the department and its operation, and for the preparation of all checks and vouchers requisite to the operation of the department.

(2) A secretary, who shall perform the functions and duties customarily performed by the secretary of a private corporation. The secretary shall have charge and custody of the official seal and of all books, records, documents and papers of the department other than those required to be in the custody of the treasurer. He or she shall attend in person all meetings of the board, and shall keep a correct record of all the proceedings of the board, and shall perform such other duties as may be assigned to him or her as secretary by the board.

(g) The city attorney shall act as general counsel for the department and for the board in all matters of law which may arise, and shall prosecute or defend all suits brought by or against the city or the department or the board which relate to the off-street parking facilities of the city. Special counsel as shall be deemed necessary by the city attorney may be employed by the director subject to the approval of the board, city attorney and city commission. Such special counsel shall serve under the direct supervision and control of the city attorney.

(h) All budgets, funds and accounts pertaining to the off-street parking facilities of the city shall be segregated from all other budgets, funds and accounts of the city and shall be so kept that they shall reflect the financial condition and the operation of each off-street parking facility of the city separately. Not later than one month before the end of each fiscal year the director, with the approval of the board, shall prepare and submit to the city commission of the city a budget estimate of expenditures and revenues for the ensuing fiscal year in the same form and like

manner as all other departments of the city for approval by the city commission with the exception, however, that such budget estimate will be submitted directly to the city commission of the city for its approval.

(i) All expenses incurred by the department and by the board in exercising their powers and performing their functions and duties shall be paid solely from the revenues of the off-street parking facilities of the city and no liability or obligation not payable from the revenues of said facilities shall at any time be incurred in connection with the operation thereof.

(j) Should there occur in any fiscal year an excess of revenue over expenditures required for operation, maintenance, required reserves and debt service, then such excess revenues shall, subject to the provisions of any ordinance of the city commission of the city authorizing the issuance of parking facilities revenue bonds of the city, and to the provisions of any trust indenture or trust agreement securing such bonds, be paid into the general funds of the city.

(k) All powers and rights conferred by this section shall be in addition and supplemental to those conferred by any other general or special law and shall be liberally construed to effectuate the purposes hereof; and the department and the board shall have power, in addition to exercising the powers expressly conferred in and by this section, to do all things necessary or convenient to carry out the purposes hereof.

(Laws of Fla., ch. 30997(1955); Res. No. 88-535, 6-9-88/9-6-88; Res. No. 01-843, § 2, 8-9-01)

Sec. 24. - Department of public safety.

The head of the department of public safety shall be known as the director of public safety.

Subject to the supervision and control of the city manager in all matters, the head of the department of public safety shall be the executive head of the division of police and fire. He or she shall be the chief administrative authority in all matters pertaining to the erection, maintenance, repair, removal, razing, occupancy and inspection of buildings under such regulations as may be ordained by the city commission.

(a) *Division of police.* The police force shall be composed of a chief and such officers and other employees as the city manager may determine. The chief of police shall have the immediate direction and control of the police force, subject to the supervision of the director of public safety, and to such rules, regulations and orders as the said director may prescribe, and through the chief of police, the director of public safety shall promulgate all orders, rules and regulations for the government of the police force. The chief of police shall devote his or her entire time to the discharge of his or her official duties and shall not be absent from the city except in the performance of his or her official duties, unless granted a written leave of absence by the city manager. His or her office shall be kept open at all hours, day or night, and either the chief of police or a subordinate shall be in constant attendance. In case of the disability of the chief of police by reason of sickness, absence from the city or other cause, the

director of public safety shall designate one of the captains or lieutenants of police to act as chief of police during such disability, and the officer so designated shall serve without additional compensation. The members of the police force, other than the chief, shall be selected from the list of eligibles prepared by the civil service board, and in accordance with such rules as the said board may prescribe; provided, that in case of riot or emergency, the director of public safety may appoint additional patrolmen for temporary service, who need not be in the classified service. Each member of the police force, both rank and file, shall have receive a warrant of appointment signed by the city manager, in which the date of the appointment shall be stated, and such shall be that member's commission.

No person, except as otherwise provided by general law or this Charter, shall act as special police or special detective except upon written authority from the director of public safety. Such authority, when conferred, shall be exercised only under the direction and control of the chief of police and for a time specified in the appointment.

The members of the police force of said city shall be invested with all the power and authority necessary for enforcing the ordinances of said city.

The chief of police or any police officer of the City of Miami, may arrest without warrant, any person violating any of the ordinances of the city committed in the presence of such officer, and when knowledge of the violation of any ordinance of said city shall come to the said chief of police or police officer, not committed in his or her presence, he or she shall make affidavit before the judge or clerk of municipal court against the person charged with such violation, whereupon, said judge or clerk shall issue a warrant for the arrest of such person.

(b) *Division of fire.* The fire force shall be composed of a chief and such other officers, firemen and employees as the city manager may determine. The fire chief shall have immediate direction and control of the said department, subject to the supervision of the director of public safety and to such rules, regulations and orders as the said director may prescribe and through the fire chief the director of public safety shall promulgate all orders, rules and regulations for the government of the fire department.

The members of the fire department, other than the chief, shall be appointed from the list of eligibles prepared by the civil service board and in accordance with such rules and regulations as may be prescribed by said board; provided, that in case of riot, conflagration or emergency, the director of public safety may appoint additional firemen and officers for temporary service who need not be in the classified service.

The chief of the fire department and his or her assistants are authorized to exercise the powers of police officers while going to, attending or returning from any fire or alarm of fire. The fire chief and each of his or her assistants shall have issued to him or her a warrant of

appointment signed by the city manager, in which the date of his or her appointment shall be stated, and such warrant shall be his or her commission.

Whenever any building in said city shall be on fire, it shall be lawful for the chief of the fire department to order and direct such building or any other building which he or she may deem hazardous and likely to communicate fire to other buildings, or any part of such buildings, to be pulled down or destroyed and no action shall be maintained against said chief or any person acting under his or her authority therefor.

(Res. No. 01-843, § 2, 8-9-01)

**Editor's note—** This section and sections 25 and 26 were purportedly repealed by chapter 27719, Special Acts of 1951. However, that act, together with chapters 27720 and 27721, which established the departments of police and fire, was held invalid in the case of City of Miami v. Headley, 61 So. 2d 321, and, consequently, this section and sections 25 and 26 remained in effect. Also, chapter 27722, Special Acts of 1951, which added a section creating the department of communications, is deemed to have been held invalid by implication by the same case and has been omitted.

Although this section has never been expressly repealed, the department of public safety and all divisions thereof were discontinued pursuant to the exercise of the authority contained in the provisions of charter section 19 (Laws of Fla., ch. 21391(1941)) by the adoption of ordinances establishing separate departments of fire, police and communications.

Sec. 25. - Supervision in divisions of police and fire.

The chief of police and fire chief shall have the right and power to suspend any of the officers and employees in their respective division who may be under their management and control for incompetence, neglect of duty, immorality, drunkenness, failure to obey orders given by proper authority, or for any other just and reasonable cause. If any officer or employee be suspended as herein provided, the chief of the division concerned shall forthwith in writing certify the fact together with the cause of suspension, to the director of public safety, who shall render judgment thereon, which judgment, if the charge be sustained, may be a reprimand, fine, suspension, reduction in rank or dismissal.

The director of public safety in any investigation shall have the power to administer oaths and secure the attendance of witnesses and the production of books and papers.

The employee shall be allowed the same appeal procedure as set forth in section 36(f) of the Charter, provided, however, in the event the offices of city manager and director of public safety are held by the same person, the city manager-director of public safety, before passing upon the guilt or innocence of the person suspended, may authorize the civil service board to conduct a hearing upon the suspension charges

preferred by the chiefs of fire or police and to report its findings and recommendations back to said city manager-director of public safety. The city manager-director of public safety then shall pass judgment upon the person suspended, after considering the findings and recommendations of the civil service board.

(Laws of Fla., ch. 24695(1947); Res. No. 01-843, § 2, 8-9-01)

**Editor's note—** See the editor's note following § 24. Also, although this section has never been expressly repealed, the department of public safety and all divisions thereof were discontinued pursuant to the exercise of the authority contained in the provisions of charter section 19 (Laws of Fla., ch. 21391(1941)) by the adoption of ordinances establishing separate departments of fire, police and communications.

**Case Law reference—** In Rosenfelder v. Huttoe, 156 Fla. 682, 24 So. 2d 108, a mandamus proceeding by a civil service member of the police force, arising before the amendment, to cancel an order dismissing him from the division of police, it was held that while a court might not under all circumstances substitute its judgment for that of the director, it was competent to determine whether jurisdictional charges were brought against accused and whether or not the requirements of the charter preliminary to his suspension were complied with.

Sec. 26. - Suspension and removal of chief of police and fire chief.

The city manager shall have the exclusive right to suspend the chief of police and fire chief for incompetence, neglect of duty, immorality, drunkenness, failure to obey orders given by proper authority, or for any other just and reasonable cause. If either of such chiefs be so suspended the city manager shall forthwith certify the fact, together with the cause of suspension, to the commission who within five (5) days from the date of receipt of such notice, shall proceed to hear such charges and render judgment thereon, which judgment shall be final.

**Editor's note—** See note to § 24.

**Case Law reference—** This section provides the sole and exclusive means for suspending and removing the chief of police. Bryan v. Landis, 106 Fla. 19, 142 So. 650, 653.

The chief of police may be suspended by the city manager only for one or more of the causes enumerated in this section, and when such suspension has been certified to the city commission and the cause thereof examined by them and found after a full hearing to be well grounded, then the commission enters its affirmative judgment which is final. When the affirmative judgment of the commission is entered, the suspension of the chief of police *eo instante* becomes a removal, but, if the judgment of the commission is in the negative, the suspension ceases, and he is *eo instante* reinstated. Bryan v. Landis, 106 Fla. 19, 142 So. 650, 653.

The city manager may not summarily remove from office the chief of police without notice or opportunity to be heard in his defense. Bryan v. Landis, 106 Fla. 19, 142 So. 650, 651.

Pursuant to charter section 19 the department of public safety and the divisions thereof, police and fire, were discontinued. Subsequent ordinances established a department of police and department of fire with each department having a director. Section 16 of this charter authorizes the city manager to remove all department directors in accordance with the provisions set forth in this charter.

Sec. 27. - Finance, department of finance.

    (a) *Department director.* Subject to the supervision and control of the city manager, the director of finance shall have charge of the department of finance and shall administer the financial affairs of the city, including the keeping and supervision of all accounts, the levy, assessment and collection of revenues, the making and collection of special assessments, the custody and disbursement of city funds and monies, the control over expenditures, and such other duties as the city manager may direct.

    (b) *Form and manner of keeping accounts and making reports.* Accounts shall be kept by the department of finance showing the financial transactions of all departments and offices of the city. The forms of all such accounts and the financial reports rendered to or by the department of finance shall be prescribed by the director of finance with the approval of the city manager. The accounts and accounting procedure of the city shall be consistent with the pronouncements of the Governmental Accounting Standards Board and accounting principles as generally accepted in the United States.

(Res. No. 01-843, § 2, 8-9-01)

Secs. 27-A—28. - [Reserved.]

**Editor's note—** Res. No. 01-843, § 2, adopted August 9, 2001, repealed §§ 27-A—28 in their entirety. Formerly, §§ 27-A—28 pertained to limitation as to levy of ad valorem taxes for public library and library systems; levy of taxes; tax assessor; board of equalization; assessor to have power of county assessor, general assessment roll; signing and endorsing general assessment roll, return and presumption of validity; copy of assessment roll annexed to warrant commanding collection; state law as to taxes applies; discounts if taxes paid before certain time; when taxes become delinquent, interest rates on delinquent taxes; tax certificates, interest rate thereon; and chief procurement officer, respectively.

Sec. 29-A. - Contracts for, unified development projects, and real property; safeguards.

    (a) *Unified development projects.* A unified development project shall mean a project where an interest in real property is owned or is to be acquired by the city, is to be used for the development of improvements, and as to which the city commission determines that for the

development of said improvements it is most advantageous to the city to procure from a private person, as defined in the Code of the City of Miami, one or more of the following integrated packages:

(1)  planning and design, construction, and leasing; or

(2)  planning and design, leasing, and management; or

(3)  planning and design, construction, and management; or

(4)  planning and design, construction, leasing, and management.

So long as the person from whom the city procures one of the above-mentioned integrated packages provides all of the functions listed for that package, such person need not provide each listed function for the entire unified development project nor for the same part of the unified development project.

As many members of the public having expertise in the field of real estate development or in other relevant technical areas or who reside within the vicinity of a proposed unified development project site as deemed appropriate by the city manager shall be invited by the city manager to provide input during the preparation of documents for competitive processes of the unified development project.

If deemed appropriate by the city manager, the unified development project process shall include a request for qualifications process prior to the issuance of a request for proposals. Qualifications shall be evaluated by the city manager or designee(s) and only those deemed qualified in accordance with the specified evaluation criteria shall be invited to participate in the subsequent request for proposal process for said unified development project.

Requests for proposals for unified development projects shall generally define the nature of the uses the city is seeking for the unified development project and the estimated allocations of land for each use. They shall also state the following:

(1)  the specific parcel of land contemplated to be used or the geographic area the city desires to develop pursuant to the unified development project;

(2)  the specific evaluation criteria to be used by the below-mentioned certified public accounting firm;

(3)  the specific evaluation criteria to be used by the below-mentioned review committee;

(4)  the extent of the city's proposed commitment of funds, property, and services;

(5)  the definitions of the terms "substantial increase" and "material alteration" that will apply to the project pursuant to subsection (e)(4) hereof; and

(6)  a reservation of the right to reject all proposals and of the right of termination referred to in subsection (e)(4), below.

After public notice there shall be a public hearing at which the commission shall consider:

(1)   the contents of the request for proposals for the subject unified development project;

(2)   the selection of a certified public accounting firm, which shall include at least one member with previous experience in the type of development in question; and

(3)   the recommendations of the city manager for the appointment of persons to serve on the review committee. Said review committee shall consist of an appropriate number of city officials or employees and an equal number plus one of members of the public, whose names shall be submitted by the city manager no fewer than five days prior to the above-mentioned public hearing.

At the conclusion of the public hearing the city commission shall authorize the issuance of a request for proposals, select a certified public accounting firm, and appoint the members of the review committee only from among the persons recommended by the city manager.

The procedure for the selection of an integrated package proposals shall be as follows:

(1)   all proposals shall be analyzed by a certified public accounting firm appointed by the commission based only on the evaluation criteria applicable to said certified public accounting firm contained in the request for proposals. Said certified public accounting firm shall render a written report of its findings to the city manager.

(2)   the review committee shall evaluate each proposal based only on the evaluation criteria applicable to said review committee contained in the request for proposals. Said review committee shall render a written report to the city manager of its evaluation of each proposal, including any minority opinions.

(3)   taking into consideration the findings of the aforementioned certified public accounting firm and the evaluations of the aforementioned review committee, the city manager shall recommend one or more of the proposals for acceptance by the city commission, or, alternatively, the city manager may recommend that all proposals be rejected. If there are three or more proposals and the city manager recommends only one, or if the city manager recommends rejection of all proposals, the city manager shall state in writing the reasons for such recommendation.

In transmitting his or her recommendation or recommendations to the commission, the city manager shall include the written reports, including any minority opinions, rendered to by the aforementioned certified accounting firm and review committee.

(4)   all contracts for unified development projects shall be awarded to the person whose proposal is most advantageous to the city, as determined by the city commission.

The commission may accept any recommendation of the city manager by an affirmative vote of a majority of its members. In the event the commission does not accept a proposal recommended by the city manager or does not reject all proposals, the commission shall seek recommendations directly from the

aforementioned review committee, which shall make a recommendation or recommendations to the
commission taking into account the report of the aforementioned certified public accounting firm and the
evaluation criteria specified for the review committee in the request for proposals.

After receiving the direct recommendations of the review committee, the commission shall, by an
affirmative vote of a majority of its members:

(1)  accept any recommendation of the review committee; or

(2)  accept any previous recommendation of the city manager; or

(3)  reject all proposals.

All contracts for unified development projects shall be signed by the city manager or designee after
approval thereof by the commission. The city manager or designee shall be responsible for developing a
minority procurement program as may be prescribed by ordinance and permitted by law in conjunction
with the award of contracts for unified development projects. The provisions of this charter section shall
supersede any other charter or code provision to the contrary.

(b)  *Sales and leases of real property; prohibition.* Except as otherwise provided in this section, there
shall be no sale, conveyance, or disposition of any interest, including any leasehold, in real
property owned by the city, the department of off-street parking, or the downtown development
authority, unless there has been prior public notice and a prior opportunity given to the public to
compete for said real property or interest. Any such sale, conveyance, or disposition shall be
conditioned upon compliance with: the provisions of this section; such procurement methods as
may be prescribed by ordinance; and any restrictions that may be imposed by the city, the
department of off-street parking, or the downtown development authority, as appropriate.
Further, no right, title, or interest shall vest in the transferee of such property unless the sale,
conveyance, or disposition is made to the highest responsible bidder, as is determined by the city
commission, or the off-street parking board, or the downtown development authority board of
directors. The city commission or the off-street parking board or the downtown development
authority board of directors, as appropriate, may by resolution waive the requirement of sale,
conveyance, or disposition to the highest responsible bidder by means of the following
procedure: the city manager, the director of the off-street parking authority, or the director of the
downtown development authority, as appropriate, must make a written finding that a valid
emergency exists, which finding must be ratified by an affirmative vote of two-thirds of the city
commission after a properly advertised public hearing. When the requirement of sale,
conveyance, or disposition to the highest responsible bidder is waived, other procurement
methods as may be prescribed by ordinance shall be followed. The city or the department of off-
street parking or the downtown development authority shall have the power to reject all offers.
All invitations for bids, requests for proposals, or other solicitations shall contain a reservation of

the foregoing right to reject all offers. This section shall not apply to transfers to the United States or any department or agency thereof, to the State of Florida, or to any political subdivision or agency thereof.

(c)  *Safeguards.*

(1)  All persons contracting with the city under this section shall be required to certify their compliance with the antitrust laws of the United States and of the State of Florida and to hold harmless, defend, and indemnify the city for any noncompliance by said persons with the above laws.

(2)  All persons contracting with the city under this section shall be obligated to pay whichever is the greater of the following: (i) all applicable ad valorem taxes that are lawfully assessed against the property involved or (ii) an amount to be paid to the city equal to what the ad valorem taxes would be if the property were privately owned and used for a profit-making purpose. Such taxes shall not be credited against any revenues accruing to the city under any contract that may be awarded under this section.

(3)  Any proposal by a potential bidder or contractor that contemplates more than the estimated extent of the city's proposed commitment of funds, property, or services shall be ineligible for acceptance by the city commission.

(4)  Any substantial increase in the city's commitment of funds, property, or services, or any material alteration of any contract awarded under subsection (c) of this section shall entitle the city commission to terminate the contract after a public hearing. Prior to such public hearing, the city commission shall seek and obtain a report from the city manager and from the review committee that evaluated the proposals for the project, concerning the advisability of exercising that right.

(Char. Amend. No. 3, 11-6-79; Ord. No. 9507, § 1, 10-28-82/11-2-82; Res. No. 86-656, § 2.a, 7-24-86/11-4-86; Res. No. 87-678, § 2(a), 7-9-87/11-3-87; Res. No. 01-841, § 2, 8-9-01; Res. No. 01-843, § 2, 8-9-01)

**Editor's note—** Res. No. 01-843, § 2, adopted August 9, 2001, amended § 29-A in its entirety to read as herein set out. Formerly, § 29-A pertained to contracts for personal property, public works or improvements, unified development projects, and real property; safeguards. The historical notation has been retained for reference purposes.

Ord. No. 9489, adopted by the commission on Sept. 17, 1982, set forth Charter Amendment No. 1 for approval/rejection at election on Nov. 2, 1982. On Oct. 28, 1982, Ord. No. 9507 amended the language of subsections (a) and (c) of § 53 as proposed by Ord. No. 9489. The election was to approve the language of Charter Amendment No. 1, as amended by Ord. No. 9507. Subsequently, in light of Charter Amendment No. 2 of Nov. 3, 1987, the city attorney directed the codifier to delete paragraph (ii) of subsection (d) as superseded by § 29-B.

**Case Law reference—** For case decided prior to enactment by Charter Amendment No. 3 of 1979 of a competitive-bidding requirement for disposition of city property, see Mahoney v. Givens, 64 So. 2d 926. Said case held that competitive bidding is not required to lease city real estate.

Material variance between plans bid upon and plans submitted and adopted renders contract void, Glatstein v. City of Miami, 399 So. 2d 1005.

Sec. 29-B. - City-owned property sale or lease—Generally.

Notwithstanding any provision to the contrary contained in this Charter or the City Code, and except as provided below, the city commission is prohibited from favorably considering any sale or lease of property owned by the city unless there is a return to the city of fair market value under such proposed sale or lease. The city commission is also prohibited from favorably considering any sale or lease of city-owned property unless (a) there shall have been, prior to the date of the city commission's consideration of such sale or lease, an advertisement soliciting proposals for said sale or lease published in a daily newspaper of general paid circulation in the city, allowing not less than ninety (90) days for the city's receipt of proposals from prospective purchasers or lessees, said advertisement to be no less than one-fourth (¼) page and the headline in the advertisement to be in a type no smaller than 18-point and, (b) except as provided below, there shall have been at least three (3) written proposals received from prospective purchasers or lessees; however, if there are less than three (3) such proposals received and if the guaranteed return under the proposal whose acceptance is being considered is equal to fair market value the city commission determines that the contemplated sale or lease will be in the city's best interest then, subject to the approval of a majority of the votes cast by the electorate at a referendum, the sale or lease may be consummated. Any lease for the development of improvements of city-owned property which has been approved by voter referendum shall require additional voter referendum approval for a development on City-owned property where the developer has not obtained the necessary building permits within four (4) years of the effective date of the lease. Such section shall not be applicable when the delay in the performance of any obligation is as a result of force majeure, or litigation that questions the validity of the vote, or the City Commission action to place the question for referendum, then the performance of such obligation shall be extended by the length of the delay. In the case of city-owned property which is not waterfront, when the value of such property to be sold or leased (individual leaseholds within a single city-owned property shall not be considered as a single parcel of property for such valuation purposes) is five hundred thousand dollars ($500,000) or less, based on an appraisal performed by a state-certified appraiser, the city commission, by a ⅘ths affirmative vote, may sell or lease said city-owned property after compliance with the advertisement requirements set forth above but without the necessity of a referendum.

The above provisions and any other city requirements for competitive bidding shall not apply when:

(a)

conveying property to implement housing programs or projects which are intended to benefit persons or households with low and/or moderate income, the criteria of which to be provided for by federal and/or state law or by the city commission;

(b) conveying property to implement projects authorized under the Florida Community Redevelopment Act of 1969, as amended;

(c) conveying property to implement projects of any governmental agency or instrumentality;

(d) disposing of property acquired as a result of foreclosure;

(e) disposing of property acquired in connection with delinquent taxes which properties were conveyed to the city by the Miami-Dade board of county commissioners under the provisions of Section 197.592 Florida Statutes, as amended; and

(f) disposing of non-waterfront property to the owner of an adjacent property when the subject property is 7,500 square feet or less or the subject non-waterfront property is non-buildable.

Notwithstanding anything herein to the contrary, the city commission, by a ⅘ths affirmative vote, may:

(a) grant a lessee of city-owned property a one-time extension during the last five years of its lease, without the necessity of a referendum, for the purpose of funding additional capital improvements. The extended term shall not exceed twenty-five percent of the original term or ten years, whichever is less. The granting of such an extension is subject to the lessee paying fair market rent as determined by the city at the time of such extension and not being in default of its lease with the city nor in arrearage of any monies due the city; and

(b) amend the Lease Agreement between the City of Miami and Biscayne Bay Restaurant Corp., d/b/a Rusty Pelican, dated February 13, 1970, as amended, to (i) extend the lease for an additional term of fifteen (15) years, with the option to renew for two (2) additional five (5) year periods, (ii) increase the amount of the minimum guarantee to the City to at least $360,000 per lease year effective upon execution of the lease amendment, and (iii) require Rusty Pelican to complete capital improvements to the property, including a public baywalk, in the amount of not less than $3 Million, within twenty-four (24) months of the effective date of the lease amendment; and

(c) waive competitive bidding and execute a lease with Dade Heritage Trust, Inc. for the City-owned building located at 190 Southeast 12th Terrace, for a term of thirty (30) years, with two (2) thirty (30) year renewals, for minimum annual rent of $600.00 with Consumer Price Index adjustments, with restrictions, reversions, and retention by the City of all other rights; and

(d) waive competitive bidding and execute a Fifth Amendment to the Lease Agreement with Aligned Bayshore Marina, LLC, also known as Monty's, to extend the current lease term by an additional term of approximately thirty-two (32) years (to expire May 31, 2067), with two (2) ten (10) year options to renew for a total term of fifty-two (52) years (to expire May 31, 2087); which will increase minimum rent payment by an additional two hundred thousand dollars

($200,000.00) per lease year, for a minimum of ten million dollars ($10,000,000.00) over the base term of the amended Lease Agreement, or one and three quarters percent (1.75%) of gross rent receipts from the Property, whichever is greater, as additional rent due to the City and, commencing January 1, 2019, minimum annual total rent (inclusive of the additional minimum rent) shall be one million five hundred thousand dollars ($1,500,000.00), plus an additional twenty five thousand dollars ($25,000.00) to be paid on an annual basis for the full amended term to a special fund to be established by the City for the benefit of low income housing renovation; further providing capital improvements to the Property of a minimum of seven million five hundred thousand dollars ($7,500,000.00) to be spent within three (3) years of the electorate's approval of the Fifth Amendment to the Lease Agreement; further creating a capital account requiring a minimum additional investment in the Property of four million dollars ($4,000,000.00) over the amended Lease term, inclusive of the renewal options; requiring a Transfer Fee payment to the City if the Property is transferred or assigned; and further requiring a Refinancing Fee payment to the City should the Property be refinanced after the initial refinancing.

(e)   waive competitive bidding and approve the Fifth Modification to the Lease with ESJ JI Leasehold, LLC, which modifies the remaining term of approximately forty three (43) years and extends the Term from the year 2060 to the year 2099 and includes a Fifteen (15) year option to extend the Lease to the year 2114; providing an additional annual rent payment of Two Hundred Fifty Thousand Dollars ($250,000.00) increasing, once the proposed hotel has stabilized, to the greater of One Million Two Hundred Twenty Thousand Dollars ($1,220,000.00) or Five Percent (5%) of annual hotel gross revenues from a new privately funded hotel development with a minimum cost of Fifty Million Dollars ($50,000,000.00) with a maximum of Three Hundred (300) rooms and a maximum height of One Hundred Thirty (130) feet, at ESJ's expense and option, and a design subject to City approval and successful land use and zoning changes, as necessary, with said rent being in addition to the currently received greater of annual rent of Five Hundred Two Thousand One Hundred Sixty Eight Dollars ($502,168.00) and percentage rent from Jungle Island revenue; with parking spaces sufficient to meet zoning ordinance requirements; ancillary improvements consisting of retail and/or restaurant space of up to ten thousand (10,000) square feet and meeting room space of up to thirty thousand (30,000) square feet; with an aggregate payment of Seven Hundred Thousand Dollars ($700,000.00) towards the Ichimura-Miami Japanese Gardens for construction of a walkway to Jungle Island and necessary repairs and maintenance of the Ichimura-Miami Japanese Gardens; payments totaling Seven Hundred Fifty Thousand Dollars ($750,000.00) over a ten (10) year period to be used for affordable housing; establishing a reserve account for capital repairs of Two Hundred Thousand Dollars ($200,000.00) per year;

implementing a transfer fee of Three Percent (3%) of gross sales proceeds if the Property is transferred or assigned; implementing a refinancing fee of One Percent (1%) of refinancing loan proceeds if the Property is refinanced after the initial refinancing.

(f) waive competitive bidding to negotiate and execute a Ground Lease and Master Development Agreement with Miami Freedom Park, LLC, for a total lease term of ninety-nine (99) years, for approximately seventy-three (73) acres of City-owned property located generally at 1400 Northwest 37th Avenue, Miami, Florida 33125, also known as Melreese County Club, with a minimum annual base rent payable to the City equal to the greater of (a) fair market value as determined by state certified appraisers or (b) five percent (5.0%) of rent from the retail, office, and hotel development within the Demised Property, but annual base rent of no less than three million five hundred seventy-seven thousand three hundred sixty-five dollars ($3,577,365.00), in addition to a contribution to the City of twenty million dollars ($20,000,000.00) payable over thirty (30) years in annual installments, and any rent increases and/or additional rents negotiated by the parties; authorizing the use of the Demised Property for a soccer stadium; with at least one (1) million square feet of art and entertainment center including food and beverage venues, offices, retail, and a hotel with at least 750 units and conference center with ancillary commercial uses, guaranteeing a living wage for all on-site employees, further requiring MFP to undertake the remediation and Site development for a public park of approximately fifty-eight (58) acres to be developed on property adjacent to the Demised Property as MFP's sole cost, with any restrictions, reversions, and retention by the City of all other rights including at least a one (1%) transfer fee payable to the City, with such Lease and Master Development Agreement requiring City Commission approval by a four-fifths (⅘ths) vote.

**Note—** See editor's note at the end of this section.

Notwithstanding anything in this Charter to the contrary, the City may enter into leases or management agreements, for any City-owned submerged lands, with entities having a possessory or ownership interest in the abutting riparian uplands for building marinas, docks or like facilities, using methods adopted by ordinance on the condition that such leases or management agreements result in a return to the City of at least fair market value.

(Res. No. 87-678, § 2(a), 7-9-87/11-3-87; Res. No. 01-841, § 2, 8-9-01; Res. No. 01-843, § 2, 8-9-01; Res. No. 03-855, § 2, 7-24-03; Res. No. 14-0184, § 1, 5-8-14; Res. No. 14-0225, § 1, 6-12-14; Res. No. 16-0348, § 3, 7-29-16; Res. No. 17-0351, § 3, 7-27-17; Res. No. 18-0232, § 3, 6-8-18; Res. No. 18-0309, § 3, 7-18-18)

**Editor's note—** Res. No. 18-0309, § 3, adopted July 18, 2018, enacted provisions intended for use as subsection (e). Inasmuch as there are already provisions so designated, and at the discretion of the editor, said provisions have been redesignated as subsection (f).

Sec. 29-C. - Same—Watson Island.

Notwithstanding any provision to the contrary contained in the Charter or Code of the City of Miami, no sale, conveyance, lease or management agreement may be entered into for the management, occupancy or use of the area known as Watson Island for periods greater than one year unless (1) there shall have been, prior to the date of the city commission's consideration of such sale, lease, management agreement, an advertisement soliciting proposals for said sale, lease or management agreement, published in a daily newspaper of general paid circulation in the city, allowing not less than ninety (90) days for the city's receipt of proposals from prospective purchasers or lessees, said advertisement to be no less than one-fourth page and the headline in the advertisement to be in a type no smaller than 18-point; and, (2) the proposed transaction be approved by a majority of the votes cast by the electorate at a referendum. The procedures for selection of proposals shall be those provided by Charter section 29-A(c) or (d) as appropriate and/or by applicable City Code provisions. Nothing herein shall affect the existing rights or privileges, if any, of any lessee, permittee, licensee or concessionaire currently situated in said area; however, any enlargement, amendment, transfer, or increase in those rights or privileges as may be in existence at the time this amendment is adopted shall require compliance with the provisions of this amendment. This Charter Amendment shall not affect the city's use or occupancy of the area, nor shall it apply to contracts for the construction of any city facilities or improvements in the area; further, nothing contained herein shall apply to projects of any governmental agency or instrumentality.

The city commission, by a ⅘ ths affirmative vote, may authorize issuance of a license or concession agreement for a period not exceeding one (1) year, without the necessity of a referendum, for the use of Watson Island.

(Res. No. 87-677, § 2(a), 7-9-87/11-3-87; Res. No. 01-841, § 2, 8-9-01; Res. No. 01-843, § 2, 8-9-01)

Sec. 29-D. - City-owned waterfront property; leases with nonprofit organizations; authorization to waive competitive bidding and referendum requirements; terms of lease.

Notwithstanding any provision to the contrary contained in the Charter or Code of the City of Miami, the city commission is authorized to waive all competitive bidding and referendum requirements, if applicable, when entering into a lease or extending an existing lease with a nonprofit, noncommercial, water-dependent organization which provides or seeks to provide marine-recreational services and/or activities to the community at any city-owned waterfront property, provided all of the following conditions are met:

(A)  The terms of the lease allow reasonable public access to the water and reasonable public use of the property, and complies with all waterfront setback and view-corridor requirements set forth in the Charter and Code;

(B)  The use is authorized under the then existing comprehensive plan of the city;

(C)  The terms of the lease require that the property be used for public purposes only;

(D) The terms of the lease result in a return to the city based on fair market value pursuant to two (2) independent appraisals; and

(E) The terms of the lease comply with all requirements pertaining to membership prescribed by ordinance for organizations using city facilities.

(Res. No. 93-485, § 2, 7-22-93; Res. No. 01-841, § 2, 8-9-01; Res. No. 01-843, § 2, 8-9-01)

Secs. 30—35. - [Reserved.]

**Editor's note—** Res. No. 01-843, § 2, adopted August 9, 2001, repealed §§ 30—35 in their entirety. Formerly, §§ 30—35 pertained to local improvements, temporary bonds, general bonds, bond anticipation notes, execution of bonds, and municipal court, respectively.

Sec. 36. - Civil service.

(a) *Creation of board; appointment; terms of office; vacancies; rules and regulations.* A civil service board of the city is hereby created and established. There shall be five members constituting the said civil service board. Three shall be appointed by the city commission, and two shall be elected by the employees of the city with civil service status, from said employees with such civil service status. The two so elected shall become members of the board when confirmed by the city commission. All members of the said civil service board shall serve for two years, and they shall take office as soon as appointed and qualified. The city commission may remove any member of the board for cause, upon stating in writing the reasons for the removal, after allowing him or her to be heard by the city commission in his or her own defense. Any vacancy shall be filled by the city commission for the unexpired term. The city manager shall be authorized to prescribe the rules, regulations, and procedure for the holding of election for the purpose of electing the two members of the civil service board by the city employees with civil service status.

(b) *Chairperson; examiner; subordinates.* Immediately after appointment, the board shall organize by electing one of its members chairperson. The board shall appoint a chief examiner who shall be a member of the board and who shall also act as secretary. The board may appoint such other subordinates as may by appropriation be provided for.

(c) *Unclassified and classified service.* The civil service of the city is hereby divided into the unclassified and the classified service.

(1) The unclassified service shall include:

(A) The city manager, his or her assistants, and secretarial staff;

(B) The heads of departments, members of appointive boards, judges of the city court, the city clerk, chief of police, chief of fire division, and the superintendent of communications division;

(C) Assistants to department heads:

Assistant chiefs of the police division;

All ranks in the police division above the classified position of police captain;

Assistant chiefs of the fire division;

Chief of fire prevention;

Director of training in the fire division;

Battalion chiefs;

Chief of fire rescue;

Assistant to the superintendent of the division of communications;

Director of corrections.

(D)  All attorneys employed by the city. The city attorney shall be the supervisor of all attorneys employed by the city. The city attorney shall have exclusive authority regarding, but not limited to appointment, removal and salary as to assistant city attorneys. The foregoing provisions of subsection (D) shall not apply to those attorneys in the classified service of the city on November 1, 1972.

Attorneys with permanent civil service rights appointed by the city attorney to any applicable unclassified position above, shall retain civil service rights in the position from which selected as may have accrued.

(E)  All employees employed by the City and working within the Office of the Independent Auditor General.

Personnel with permanent civil service rights appointed by the city manager to unclassified positions shall retain said civil [service] rights in the position from which selected as may have accrued.

(2)  The classified services shall include all positions not specifically included by this Charter in the unclassified service. There shall be in the classified service three classes, to be known as the competitive class, noncompetitive class, and labor class.

(A)  The competitive class shall include all positions and employment for which it is practicable to determine the merit and fitness of applicants by competitive examinations.

(B)  The noncompetitive class shall consist of all positions requiring peculiar and exceptional qualifications of a scientific, city managerial, professional, or educational character, as may be determined by the rules of the board.

(C)  The labor class shall include ordinary unskilled labor.

(d) *Rules; examinations; eligible lists; certification of vacancies.* Subject to the approval of the city commission, the board shall adopt, amend, and enforce a code of rules and regulations which shall have the force and effect of law providing for appointment and employment in all positions in the classified service, based on merit, efficiency, character, and industry; shall make investigations concerning the enforcement and effect of this article and of the rules adopted; and shall make an annual report to the city commission. The chief examiner shall provide examinations in accordance with regulations of the board and maintain lists of eligibles of each class of the services of those meeting the requirements of said regulations. Positions in the classified service shall be filled from such eligible lists upon requisition from and after consultation with the city manager. When positions are filled, the employment officer shall so certify, by proper and prescribed form, to the director of finance and to the director of the department in which the vacancy exists.

(e) *Promotion.* The board shall provide uniform rules for promotion to all positions in the classified service.

(f) *Power of suspension, removal, fine, or demotion.*

(1) Any officer or employee in the classified service may be removed, suspended, fined, laid off, or demoted by the city manager or by the head of the department in which such person is employed, for any cause which will promote the efficiency of the service; but such person must be furnished with a written statement of the reasons therefor within five days from the date of the removal, suspension, fine, layoff, or demotion, and be allowed a reasonable time for answering such reasons in writing, which answer shall be made a part of the records of the board, with the suspension to take effect as of the date that such written statement is furnished. No trial or examination of witnesses shall be required except in the discretion of the city manager or the head of the department. Any employee in the classified service who deems that he or she has been suspended, removed, fined, laid off, or demoted without just cause may, within 15 days of such action, request in writing a hearing before the civil service board to determine the reasonableness of the action. The board shall, within 30 days after appeal of the employee disciplined, proceed to hear such appeal. After hearing and considering the evidence for and against the employee, the board shall report in writing to the city manager its findings and recommendations. The city manager shall then sustain, reverse, or modify the action of the department director. Any member of the civil service board and the director of personnel may administer an oath to witnesses appearing before said board or before said director in an investigation, disciplinary or appeal proceedings, and they shall have the power to issue witness subpoenas and to compel the attendance of witnesses.

(2)

The civil service board shall also have the right to remove or demote any official or employee in the classified service upon written charges of misconduct made by any citizen, but only after reasonable notice to the officer or employee and after a full hearing. It shall also be the duty of the board to fix a minimum standard of conduct and efficiency for each grade in the service. Whenever it appears from the reports of efficiency made to said board for a period of six months that the conduct or efficiency of any employee has fallen below such minimum standard, that employee shall be called before the board to show cause why he or she should not be disciplined. If upon hearing no reason is shown satisfactory to the board, the employee shall be removed, suspended, or demoted, as the board may determine.

(g) *Present employees.* All persons in the employ of the city holding positions in the classified service, as established by this Charter, at the time it takes effect, shall, unless their position is abolished, retain same until discharged, demoted, promoted, or transferred, in accordance herewith.

(h) *Certificate of board on payroll account necessary before payment of classified service member.* The treasurer or other public disbursing officer shall not pay any salary or compensation for service to any person holding a position in the classified service unless the payroll or account for such salary or compensation bears the certificate of the board, by its secretary, that the persons named therein have been appointed or employed and are performing service in accordance with the provisions of this Charter and of the rules established thereunder.

(i) *Investigations and hearings.* In any investigation conducted by the board, it shall have the power to subpoena and require the attendance of witnesses and the production thereby of books and papers pertinent to the investigation and to administer oaths to such witnesses.

(j) *No discrimination in classified service.* No person in the classified service or seeking admission thereto shall be appointed, demoted, removed, or in any way favored or discriminated against because of political opinions or affiliations. No person holding a position in the classified service shall take part in political management or affairs or in political campaigns during city working hours or with personal property belonging to the city.

(k) *Penalties.* The civil service board, subject to the approval of the city commission, shall determine the penalties for the violation of the civil service provisions of this Charter.

(l) *Salaries of board and employees.* The salaries of the civil service board and its employees shall be determined by the city commission, and a sufficient sum shall be appropriated each year to carry out the civil service provisions of this Charter.

(Res. No. 01-843, § 2, 8-9-01; Res No. 17-0319, § 2, 7-13-17)

Sec. 37. - Pension funds.

(a) The city commission shall establish a fund or funds for the relief or pension of persons in the classified service of the city. The city commission, on behalf of the city, may receive gifts, devises, and bequests of money or property for the benefit of such fund or funds; may make contributions of public money thereto on such terms and conditions as it may see fit; and shall make rules and regulations for the management, investment, and administration of such fund or funds.

(b) The city commission shall have power to make contracts of insurance with any insurance company authorized to transact business in this state, insuring its employees or any class or classes thereof under a policy or policies of group insurance covering life or health or accident insurance or any two or more of such classes of insurance and may contract with any company granting annuities or pensions and authorized to transact business within the state for the pensioning of such employees or any class or classes thereof; for any and all such purposes the city commission may appropriate the funds necessary to pay premiums or charges incident to the carrying on of such policies or contracts.

(Res. No. 01-843, § 2, 8-9-01)

Sec. 38. - City planning and zoning board.

(a) *Comprehensive planning.* The city commission is empowered to plan for the future development of the city and, as an integral part of the planning process, to take all lawful actions necessary to implement plans made.

In furtherance of this authority, the city commission may undertake continuing comprehensive planning programs and may adopt comprehensive plans to guide the future development of the city in order to preserve and enhance the present advantages of the city, to overcome present handicaps, and to prevent or minimize future problems. Continuing comprehensive planning programs and comprehensive plans that may be adopted may include, but are not to be deemed as limited to:

(1) principles and policies to be followed in future development of the city;

(2) location, relocation, and character of the various uses of land and water;

(3) location, relocation, and character of public and private open spaces for recreation, amenity, and cultural life;

(4) modes and means of travel and transportation;

(5) location and character of public buildings, services, and facilities;

(6) provision of necessary utilities;

(7) conservation, rehabilitation, or replacement of housing;

(8) density of population;

(9) methods and policies for encouragement of cooperation of private persons and groups in the accomplishment of adopted comprehensive plans;

(10) taxing and financial arrangements and long-range capital improvement programs deemed necessary to implement the planning program; and

(11) land-use control and regulatory measures and other instruments deemed necessary to accomplish the aims and objectives of adopted comprehensive plans.

(b) *Authority to implement comprehensive plans.* The city commission is authorized to use all lawful powers conferred upon the city to implement comprehensive plans that may be adopted and to provide for the status of such adopted plans. Particularly, but not in limitation thereof, the city commission is authorized to adopt and enforce:

(1) controls on the use of lands and waters;

(2) zoning of lands and waters;

(3) regulations for the development or subdivision of land;

(4) building, plumbing, electrical, gas, fire, safety, sanitary, and other codes; and

(5) minimum housing codes.

(c) *Creation of implementing boards.* The city commission shall by ordinance create such appropriate board or boards as it may deem necessary to carry out the functions as set out in subsections (a) and (b) above.

The city commission may by ordinance provide for the establishment and method of composition of the board or boards; the number of members; the qualifications of members; the staggering of terms to insure board continuity; the method of filling vacancies; the method of removal; the compensation, if any; the participation of alternate members, if any, in board business; the general rules of organization, procedures, and conduct of business; the giving of notice and necessary public hearings on matters relating to the functions of the board or boards; and other matters deemed necessary by the city commission to the proper functioning of such board or boards.

The city commission may by ordinance make provision for the functions, responsibility, advisory or quasijudicial duties, and authority of the board or boards created by the city commission. The city commission may by ordinance set out the standards and limitations under which such board or boards shall operate; the relationship of the board or boards to each other, to the city commission, or to the courts as provided by law; and the method of review of any decisions of such board or boards.

(d) *Administrative support and appropriations.* The city commission shall provide such administrative arrangements, support, and appropriations as it may deem necessary to enable the board or boards established under this section properly to perform their functions and meet their responsibilities and to insure that proper and necessary liaison is maintained between them and with the city commission.

(e) *Task forces or committees.* The city commission may by resolution appoint task forces or committees to serve as advisory or recommendatory agents to the board or boards established under this section on particular problems relating to the areas of responsibility and authority of the particular board.

(Res. No. 01-843, § 2, 8-9-01)

Sec. 39. - [Reserved.]

**Editor's note—** Res. No. 01-843, § 2, adopted August 9, 2001, repealed § 39 in its entirety. Formerly, § 39 pertained to franchises and public utilities—Ordinance requires four-fifths vote of commission; approval of ordinance by voters; limitation on duration of grant.

Sec. 40. - Subdivisions.

(a) *Plat requirements.* Any owner of lots or grounds within the city who subdivides same for sale shall cause to be made an accurate plat of said subdivision describing with certainty all grounds laid out or granted for streets or other public uses. Lots intended for sale shall be numbered by progressive numbers or described by the squares in which situated, and the precise length and width shall be given of each lot sold or intended for sale; such plat shall be subscribed by the owner, acknowledged before an officer authorized to take the acknowledgement of deeds, approved by the director of public works, and recorded in the office of the clerk of circuit court in and for Dade County, Florida. No such plat shall be approved unless it clearly gives an accurate description of the property showing section corners or quarter-section corners or at least tying the property to one or more sections or quarter-section corners or government monuments.

(b) *Supervisor of plats.* The director of public works shall be supervisor of plats of the city and shall provide regulations governing the platting of all lands so as to require all streets and alleys to be of proper width, to be coterminous with adjoining streets and alleys, and otherwise to conform to the regulations prescribed. Whenever said director shall deem it expedient to plat any portion of territory within the city limits, within which the necessary streets or alleys have not already been accepted by the city, so as to become public streets or alleys, or when any person plats land within the corporate limits or within two miles thereof, the director of public works shall, if such plats are in accordance with the prescribed regulation, endorse his or her written approval thereon. No plat subdividing lands within the corporate limits of the city or within two miles thereof shall be entitled to record in the office of the clerk of the circuit court in and for Dade County, Florida, without such written approval.

(c) *Streets or alleys not accepted unless laid down on plat.* No streets or alleys except those laid down on the plats referred to in this section and bearing the approval of the director of public works, as hereinbefore provided for, shall subsequently in any way be accepted as public streets or alleys by the city, nor shall any public funds be expended in the repair or improvement of

streets and alleys subsequently laid out and not on such plat. This restriction shall not apply to a street or alley laid out by the city nor to streets, alleys, or public grounds laid out on a plat by or with the approval of the director of public works.

(d) *Acceptance and confirmation of street or alley dedication.* No streets or alleys hereafter dedicated to public use by the owner of ground in the city shall be deemed a public street or alley, or under the care and control of the city commission, unless the dedication be provided in the plat or by warranty deed or other instrument of grant; unless the grant be accepted and confirmed by resolution passed for that purpose; and unless the provisions of this Charter relating to subdivisions shall have been complied with.

(Res. No. 01-843, § 2, 8-9-01)

Secs. 41, 42. - [Reserved.]

**Editor's note—** Res. No. 01-843, § 2, adopted August 9, 2001, repealed §§ 41 and 42 in their entirety. Formerly, §§ 41 and 42 pertained to conduct of a city business, compensation, duties, and oaths or officers and employees and power to appoint boards or commissions of citizens, respectively, and derived from Res. No. 97-447, § 2, adopted July 2, 1997.

Sec. 43. - Continuity.

(a) All city ordinances, resolutions, and regulations in force at the time this Charter takes effect, and not inconsistent with the provisions hereof, are hereby continued in force until the same shall be duly amended or repealed.

(b) *Present officers and powers.* All persons holding office in or employed by the city at the time this charter goes into effect shall continue in such office or employment and in the performance of their duties until provisions shall have been otherwise made in accordance with the provisions of this charter for the performance or discontinuance of the duties of any such office or employment. When such provisions are made the term of any such officer shall expire, and the office shall be abolished. The powers which are conferred and the duties which are imposed upon any officer, board, commission, or department of the city under the laws of the state, shall, if such officer, board, commission, or department is abolished by this charter, be thereafter exercised and discharged by the officer, board, or department upon whom are imposed corresponding functions, duties, and powers under the provisions of this charter.

(c) *Present contracts and proceedings.* All rights, actions, proceedings, prosecutions, and contracts of the city or of any of its departments or officers, pending or unexecuted when this charter goes into effect, and not inconsistent therewith, shall be enforced, continued, or completed, in all respects, as though begun or executed hereunder.

(d)

*Present titles and rights.* The title, rights, and ownership of property, uncollected taxes, dues, claims, judgments, decrees, and choses in action held or owned by the city at the time of the adoption of this Charter shall continue.

(e) *Acts under former charters.* All acts and proceedings of the commission or of any officer of the city done or taken pursuant to the provisions of the previous city charter are hereby ratified.

(Res. No. 01-843, § 2, 8-9-01)

Sec. 44. - [Reserved.]

**Editor's note—** Res. No. 01-843, § 2, adopted August 9, 2001, repealed § 44. Formerly, § 44 pertained to suits against the city.

Sec. 45. - General provisions.

(a) *Codification of ordinances.* The city commission may at any time appoint a person or persons and authorize them to arrange and codify the ordinances of the city and to publish such codification in appropriate volume or volumes, which shall become the laws of the city upon adoption by ordinance; provided, that in the exercise of the power by the city commission to adopt said codification, it shall not be necessary to publish said codification, the publication of the ordinance adopting the same being sufficient to make said publication binding as the law of the city.

(b) *Record of ordinances; evidence.* It shall be the duty of the city clerk to record all ordinances adopted by the city commission within 10 days after their passage in a book kept for that purpose, properly indexed. A copy of any ordinance therefrom, certified by the city clerk under the seal of the city, shall be received in evidence in all courts of this state.

(c) *Ordaining clause.* The ordaining clause of every ordinance shall be as follows: "Be It Ordained by the City Commission of the City of Miami".

(d) *Enumeration of powers not exclusive.* The enumeration of particular powers in this Charter shall not be deemed or held to be exclusive, but additional to the powers enumerated herein, implied thereby, or appropriate to the exercise thereof; the city shall have and may exercise all other powers which are now, or may hereafter be, possessed or enjoyed by cities under the constitution and general laws of this state; and all the powers of the city, whether express or implied, shall be exercised and embraced in the manner prescribed in this Charter, or when not so prescribed, then in such manner as may be provided by ordinance or resolution of the city commission.

(e) *General laws to apply.* All general laws of the state, applicable to municipal corporations, heretofore or hereafter enacted and which are not in conflict with the provisions of this Charter or with ordinances or resolutions hereafter enacted by this city commission pursuant to authority conferred by this Charter shall be applicable to the city; provided, however, that nothing

contained in this Charter shall be construed as limiting the power of the city commission to enact any ordinance or resolution not in conflict with the constitution of the state or with the express provisions of this Charter.

(f) *Effect of state law and present ordinances.* Nothing in this act shall be so construed as to alter, abolish, affect or amend any of the laws of this state now in force or which may hereafter be enacted relative to towns and cities of the state incorporated under the general law, nor any of the ordinances of the city now in force, except such as are in conflict with the provisions of this Charter; all such laws and ordinances are hereby declared to be in full force and effect.

(g) *Unconstitutionality of part of Charter.* If any section or part of this Charter is declared invalid or unconstitutional, such declaration shall not be held to invalidate or impair the validity, force, or effect of any other section or part of this Charter, unless it clearly appears that such other section or part is wholly and necessarily dependent for its operation upon the section or part declared invalid or unconstitutional.

(h) *Effective Date.* This Charter shall take effect immediately upon being approved by a majority of the electors of the city voting at an election called for the purpose of approving this Charter.

(Res. No. 01-843, § 2, 8-9-01)

**State Law reference—** Minimum procedural requirements for adoption of ordinances, F.S. § 166.041.

Secs. 46, 47. - [Reserved.]

**Editor's note—** Res. No. 01-843, § 2, adopted August 9, 2001, repealed §§ 46 and 47 in their entirety. Formerly, §§ 46 and 47 pertained to bureau of legal aid and credit to prisoners for work, costs in criminal prosecutions, respectively.

Sec. 48. - Office of independent auditor general.

(a) *Created; responsibility.* There is hereby created the Office and position of Independent Auditor General to provide the City Commission with independent oversight of audit and analytical functions of the City. The Office of the Independent Auditor General shall report directly to the City Commission.

(b) *Appointment, qualifications and term of Independent Auditor General.* The city commission shall appoint an auditor, who shall be a Certified Public Accountant, to serve as the director of the Office of the Independent Auditor General and to be known as the Independent Auditor General ("IAG"). At the time of appointment, the IAG shall have and maintain an active license, shall be certified under the public accountancy law in Florida, shall have a degree in public administration or in lieu of such degree shall have at least five years experience in public administration and shall have sufficient experience in governmental accounting and auditing practices. The initial appointment shall begin January 1, 2000, and shall end with the election in November 2001.

3/17/23, 9:54 PM

Thereafter, the appointment shall be for a term of four (4) years. During the initial and any subsequent term, the IAG shall be subject to suspension and/or removal by the city commission for incompetence, neglect of duty, immorality, drunkenness, failure to obey orders given by proper authority, or for any other just and reasonable cause.

(c) *Duties and powers.* The IAG shall be responsible to provide independent oversight of audit functions, and for the performance of such other duties as may be assigned by the city commission or any member of the city commission. To the degree necessary to fulfill the responsibilities of the office, the IAG shall have the power and authority to:

    (1) Examine city audit functions and accounting systems, provide budget and legislative analysis, conduct financial, operational, compliance, single act and performance audits of city government, officials, and independent agencies, with reports submitted to the city commission as deemed necessary by the IAG or as may be required by the city commission, from time to time, and copied to the administration.

    (2) Have free and unrestricted access to city government employees, officials, records and reports and where appropriate, require all branches, departments, agencies and officials of city government to provide oral and written reports and to produce documents, files and other records.

    (3) Render assistance to external auditors retained by the city commission. Such assistance shall be limited to special audits or limited examinations ordered by the city commission.

(d) *Staffing.* The Office of Independent Auditor General shall be staffed by such professional assistants and support personnel as shall be designated by the IAG and as are approved in the city's annual budget, as may be amended from time to time by the City Commission. The IAG shall be the supervisor for all auditors and support personnel employed by the Office of the Independent Auditor General. The IAG shall have exclusive authority regarding, but not limited to, appointment/hiring, removal, and salary as to all employees of the Office of Independent Auditor General.

(e) *Establishment of operating procedures and responsibilities.* The IAG may, from time to time, issue directives setting forth the operating procedures to be followed and responsibilities to be discharged by the Office.

(Res. No. 99-608, § 2, 8-2-99; Res. No. 01-843, § 2, 8-9-01; Res. No. 17-0320, § 2, 7-13-17)

Sec. 49. - Office of the City Clerk.

(a) There is established the office of the city clerk. The director of the office of the city clerk shall be the city clerk. The city clerk shall be appointed as provided in Charter section 4(e). The city clerk shall be the custodian of the seal of the city.

(b) The office of the city clerk shall have the following duties:

    (1)  Prepare and distribute notice of all public meetings as required by law and the minutes of such meetings;

    (2)  Be custodian of inactive, archived and vital records of the city and maintain a records management system;

    (3)  Conduct, supervise and certify all city elections;

    (4)  Be custodian of all legislation, lobbyist registration, contracts and bids;

    (5)  Perform such other duties as required in this Charter or as directed by the city commission.

(Res. No. 01-843, § 2, 8-9-01)

Sec. 50. - Certain former Charter provisions to become ordinances.

All provisions of the present charter, Laws of Florida, ch. 10847 (1925), as amended and as compiled and printed in the Code of Ordinances, 1996, which are not included in this Charter or amended by or inconsistent with this Charter shall become ordinances of the city and continued in effect as ordinances and not new enactments and shall be subject to amendment or repeal in the same manner as other ordinances of the city. The provisions of this Charter where they are the same as the provisions in the former charter are to be considered continuations of the former charter provisions and not new enactments.

(Res. No. 01-843, § 2, 8-9-01)

Sec. 51. - Civilian investigative panel.

The city commission shall, by ordinance, create and establish a civilian investigative panel to act as independent citizens' oversight of the sworn police department, to be:

    (A)  Composed of: (i) twelve (12) civilian members who shall be nominated by the civilian investigative panel and approved by the city commission and (ii) a thirteenth (13th) member who shall be an appointee of the Chief of Police who is not a City of Miami Police Officer;

    (B)  Staffed with professional personnel, including but not limited to: (i) an executive director who shall serve as chief executive officer and (ii) an independent legal counsel who is an experienced and competent member of the Florida Bar with at least seven years membership in the Florida Bar and is generally knowledgeable in municipal law, both of whom shall be appointed by and subject to removal by the panel with the approval of the City Commission;

    (C)  Operated on an annual budget established by the City Commission, by ordinance, that will allow the panel to maintain its independence and perform its Charter mandated functions, with sufficient professional staff, while taking into account the City Manager's declaration of a fiscal emergency, a financial urgency, or financial emergency in the City;

    (D)

Authorized by vote of the CIP and in "consultation" with the state attorney of Miami-Dade County, to issue subpoenas for allegations which are criminal in nature, provided that the CIP may not confer immunity and must advise all city employees appearing before it that no adverse employment consequences will result from the valid exercise of their right to be free from self-incrimination, and, further, that no actions of the CIP may interfere with any pending or potential criminal investigation or prosecution; and

(E) Authorized to:

(1) Conduct independent investigations of allegations of police misconduct and police uses of force resulting in death or great bodily harm to a person;

(2) Conduct independent investigations of other matters pertaining to repeated issues of conduct by City of Miami Police Officers;

(3) Review police department policies and practices; and

(4) Make written requests and recommendations regarding the CIP's reviews and investigations to the city manager and the police chief, to which the Police shall issue a written response within forty-five (45) days.

(Res. No. 01-844, § 2, 8-9-01; Res. No. 16-0351, § 2, 7-29-16)

| Property | Address | Building Size | Lot Size | Folio | Zoning | Sale price | Date Sold | Property search Owner |
|---|---|---|---|---|---|---|---|---|
| 1 | 90 SW 8th Street | 45,564 | 21,210 | 01-0205-060-1050 | T6-48b O | NA | NA | GAZIT HORIZONS BRICKELL LLC |
| 2 | 521 SW 8th Street | 4,327 | 7,000 | 01-0204-080-1180 | T6-8 O | NA | NA | LA GRAN FIESTA LLC |
| 3 | 83 SW 8th Street | 9,343 | 13,866 | 01-0205-030-2020 | T6-48b O | $ 1,500,000.00 | 6/3/2011 | BRICKELL STATION PARTNERS LLC |
| 4 | 824 SW 9th Ct | 0 | 7,000 | 01-4138-011-0090 | T4-L | | | CONCH HILL MARKET TOO LLC |
| 4 | 968 SW 8th Street | 10,280 | 15,600 | 01-4138-011-0060 | T6-8 O | $ 1,800,000.00 | 1/27/2012 | CONCH HILL MARKET TOO LLC |
| 4 | 982 SW 8th St | 7,879 | 10,000 | 01-4111-001-0030 | T6-8 O | $ 700,000.00 | 9/6/2011 | CONCH HILL MARKET TOO LLC |
| 4 | 980 SW 8th St | 7,769 | 7,500 | 01-4111-001-0020 | T6-8 O | | | CONCH HILL MARKET TOO LLC |
| 4 | 976 SW 8th St | 7,025 | 7,125 | 01-4111-001-0010 | T6-8 O | | | CONCH HILL MARKET TOO LLC |
| 4 | 966 SW 8th St | 1,980 | 14,800 | 01-4138-011-0050 | T6-8 O | $ 1,300,000.00 | 10/31/2013 | CALLE OCHO SPECIAL LLC |
| 5 | 1637 SW 8th Street | 7,746 | 6,750 | 01-4102-012-0110 | T6-8 O | $ 812,500.00 | 10/24/2011 | FUTURAMA LLC C/O WILLIAM FULLER |
| 5 | 1641 SW 8th St | 587 | 4,500 | 01-4102-012-0100 | T6-8 O | | | FUTURAMA LLC C/O WILLIAM FULLER |
| 6 | 533 SW 12th Ave | 16,230 | 21,000 | 01-4102-005-4650 | T5-O | $ 882,000.00 | 9/30/2009 | VILLAGE SHOPPES LITTLE HAVANA LLC |
| 7 | 701 NW 12th Ave | 0 | 5,335 | 01-3135-034-0020 | D1 | $ 565,000.00 | 6/2/2012 | LA BOHEMIA LLC |
| 7 | 735 NW 12th Ave | 4,031 | 12,881 | 01-3135-034-0010 | D1 | | | LA BOHEMIA LLC |
| 7 | 1180 NW 8th St | 796 | 2,640 | 01-3135-000-0270 | D1 | $ 130,000.00 | 6/11/2012 | LA BOHEMIA LLC |
| 8 | 1356 SW 8th street | 4,335 | 5,850 | 01-4111-014-0010 | T6-8 O | $ 805,000.00 | 4/15/2016 | THE DANCING INSURANCE MAN YEAH BABY LLC |
| 8 | 818 SW 13th Ct | 194 | 6,500 | 01-4111-014-0030 | T6-8 O | $ 687,100.00 | 12/8/2016 | THE DANCING INSURANCE MAN YEAH BABY LLC |
| 8 | 1360 SW 8th St | 3,285 | 5,850 | 01-4111-014-0020 | T6-8 O | | | THE DANCING INSURANCE MAN YEAH BABY LLC |
| 8 | 827 SW 14th Ave | 594 | 6,562 | 01-4111-014-0150 | T4-R | $ 355,000.00 | 7/24/2015 | CALLE OCHO MARKETPLACE LLC |
| 8 | 1380 SW 8th St | 6,791 | 11,050 | 01-4111-014-0170 | T6-8 O | $ 1,060,000.00 | 6/15/2015 | CALLE OCHO MARKETPLACE LLC |
| 9 | 300 NW 27th Ave | 7,947 | 8,976 | 01-4104-012-0920 | T6-8 O | $ 260,000.00 | 8/23/2012 | GROSSE POINTE MARKET LLC |
| 10 | 3670 Grand Ave | 5,080 | 6,550 | 01-4121-007-4160 | T5-O | $ 350,000.00 | 9/24/2012 | THE PENTS AND THE FROWS LLC |
| 11 | 1450 SW 7th Street | 19,945 | 6,650 | 01-4102-006-6270 | T5-O | $ 500,000.00 | 5/21/2012 | TOWER HOTEL LLC |
| 11 | 1444 SW 7th St | 3,445 | 6,650 | 01-4102-006-6260 | T5-O | | | TOWER HOTEL LLC |
| 11 | 1460 SW 7th St | 1,044 | 6,650 | 01-4102-006-6280 | T5-O | | | TOWER HOTEL LLC |
| 11 | 717 SW 15 AVE | 0 | 4,500 | 01-4102-006-6310 | T5-O | $ 200,000.00 | 5/21/2012 | TOWER HOTEL LLC |
| 13 | 300 SW 12th Ave | 11,499 | 15,000 | 01-4102-006-3850 | T5-O | $ 6,900,000.00 | 7/11/2014 | CAPIRO VENTURE LLC |
| 13 | 1220 SW 3rd St | 66,887 | 42,375 | 01-4102-006-4010 | T5-O | | | CAPIRO VENTURE LLC |
| 13 | 1217 SW 4th St | 19,746 | 6,975 | 01-4102-006-4000 | T5-O | | | CAPIRO VENTURE LLC |
| 13 | 1229 SW 4th St | 0 | 7,500 | 01-4102-006-3990 | T5-O | | | CAPIRO VENTURE LLC |
| 13 | 1247 SW 4th St | 0 | 7,500 | 01-4102-006-3970 | T4-L | | | CAPIRO VENTURE LLC |
| 13 | 1244 SW 3rd St | 0 | 7,500 | 01-4102-006-3860 | T4-L | | | CAPIRO VENTURE LLC |
| 13 | 1253 SW 4th st | 0 | 7,500 | 01-4102-006-3960 | T4-L | $ 172,500.00 | 1/23/2015 | CV4 PROPERTIES 3 LLC |
| 14 | 1049 W Flagler St | 7,497 | 7,000 | 01-4102-005-2510 | T6-12 O | $ 1,425,000.00 | 7/11/2014 | FLAGLER TREE LLC |
| 14 | 1043 W Flagler St | 6,850 | 7,000 | 01-4102-005-2520 | T6-12 O | | | FLAGLER TREE LLC |
| 14 | | 0 | 7,500 | 01-4102-005-2440 | T4 -R | $ 500,000.00 | 7/11/2014 | FLAGLER TREE LLC |
| 14 | | 0 | 7,500 | 01-4102-005-2450 | T4 -R | | | FLAGLER TREE LLC |
| 15 | 1549 SW 8th St | 1,939 | 3,690 | 01-4102-006-6170 | T6-8 O | $ 1,890,000.00 | 4/22/2015 | DOMINO SQUARE PARTNERS LLC |
| 15 | 1551 SW 8th St | 4,657 | 9,225 | 01-4102-006-6160 | T6-8 O | | | DOMINO SQUARE PARTNERS LLC |
| 15 | 1568 SW 7th St | 4,526 | 13,300 | 01-4102-006-6130 | T5 O | $ 1,150,000.00 | 4/17/2015 | DOMINO SQUARE PARTNERS LLC |
| 16 | 1501 SW 8th Street | 8,798 | 12,500 | 01-4102-006-6210 | T6-8 O | $ 1,400,000.00 | 12/1/2007 | LITTLE HAVANA ARTS BLDG LLC |
| 16 | 1521 SW 8th St | 3,113 | 6,200 | 01-4102-006-6200 | T6-8 O | $ 2,100,000.00 | 2/8/2016 | LITTLE HAVANA ARTS TOO LLC |
| 16 | 1530 SW 7th St | 1,417 | 6,650 | 01-4102-006-6070 | T5 O | | | LITTLE HAVANA ARTS TOO LLC |

PLAINTIFF'S EXHIBIT

304

Scanned by CamScanner



Document Produced As Native



MADROOM0614895



**Transcription / Translation of Audio File**

**"231_MADROOM0614895"**

**Spanish into English**

**Speakers:**

**Various Radio Ad Announcers**
**Raúl Martínez**
**Joe Carollo**
**Ronald Hacha**

**January 9, 2023**



U.S. Legal Support, Inc. – Translations Services Department – 855-538-3099
translations@uslegalsupport.com

MADROOM0642483

[U/A] – Unintelligible Audio          [O/V] – Overlapping Voices

| | ORIGINAL AUDIO (Spanish & English) | Translation (Spanish into English) |
|---|---|---|
| [00:00] Radio ad: | […] ellos o a sus esposas.<br><br>Viernes de Visión con Pedro Ferriz, esta noche a las 10:30 por Estrellas TV Miami, canal 8. | […] they or their wives.<br><br>*Viernes de Visión* [Vision Fridays] with Pedro Ferriz, tonight at 10:30 on *Estrellas TV Miami*, channel 8. |
| [00:10] Radio ad: | Aviso importante: si sufre de impotencia sexual y las pastillas no funcionan, llame a Miami Lakes Medical Center, 3-0-5-6-2-1-8-0-5-1. Tratamiento sin dolor, sin cirugía, no invasivo, llame al 3-0-5-6-2-1-8-0-5-1. Tendrá su primera consulta gratis y verás el resultado en tres minutos en la misma clínica. No importa su condición médica. Pase de impotente a potente, llame ahora mismo al 3-0-5-6-2-1-8-0-5-1. 3-0-5-6-2-1-8-0-5-1. | Important announcement: If you are impotent, and the pills aren't working, call Miami Lakes Medical Center, 3-0-5-6-2-1-8-0-5-1. Painless, non-surgical, non-invasive treatment, call 3-0-5-6-2-1-8-0-5-1. You will have your first free consultation and you will see results in three minutes right at the clinic. No matter your medical condition. Go from impotent to powerful, call 3-0-5-6-2-1-8-0-5-1 now. 3-0-5-6-2-1-8-0-5-1. |
| [00:42] Radio ad: | "Sabía que podría salir por mí misma de esto, solo necesitaba un poco de esperanza y ayuda."<br><br>"Di el primer paso hacia la recuperación cuando hice la llamada."<br><br>Si está deprimido, bebiendo y tomando pastillas, usted podría necesitar ayuda y la Ley de Asistencia Asequible ahora tiene cobertura de abuso de sustancias. Llame a la Línea de esperanza y ayuda contra la adicción para una evaluación gratuita con alguien que se interesa por usted.<br><br>"Siento que estoy perdiendo el control. Temo que voy a perder mi trabajo, incluso a mi familia." | "I knew I could get out of this on my own, I just needed a little hope and help."<br><br>"I took the first step toward recovery when I made the call."<br><br>If you are depressed, drinking and taking pills, you may need help and the Affordable Care Act now has substance abuse coverage. Call the Hope and Addiction Help Line for a free evaluation with someone who cares about you.<br><br>"I feel like I'm losing control. I'm afraid I'm going to lose my job, even my family." |

MADROOM0642484

| | | |
|---|---|---|
| | ¿Está perdiendo la esperanza? Usted puede recuperarse y volver a la normalidad. Llame ahora y obtenga esperanza y ayuda con sutiles y comprobados programas de recuperación.<br><br>"Nunca pensé que podía llegar a ser alguien que no bebiera y consumiera drogas."<br><br>"Estoy en rehabilitación, teniendo la ayuda que necesito."<br>800-680-6697. 800-680-6697. | Are you losing hope? You can recover and get back to normal. Call now and get hope and help with subtle and proven recovery programs.<br><br>"I never thought I could become someone who didn't drink and use drugs."<br><br>"I'm in rehab, getting the help I need."<br>800-680-6697. 800-680-6697. |
| [01:42] Radio announcer: | La Hora del Regreso.<br>[brief music] | La Hora del Regreso. [show name]<br>[brief music] |
| [02:04] Raúl Martínez: | Son las 4:22 de la tarde, la Hora del regreso con Raúl Martínez, en Caracol 1260. Me acompaña Ronald Hacha y un oyente me escribe y me dice que en Panamá, el Día de las madres se celebra el día 8 de diciembre. Si hay alguna-, alguna persona de otro país que celebra el día de las madres diferente a nosotros el segundo domingo de mayo, que nos los dejen saber. Pero ya tenemos en la línea al comisionado Joe Carollo. Joe, te agradezco mucho que hayas estado con nosotros. Me hubiera gustado más que estuvieras aquí en el estudio, hubiéramos hecho mucho más a menos y quizás más larga la-, la comunicación, pero, bueno, primero, eh, antes que todo, quisiera preguntarte cómo va el caso legal. Eh, sé que estuviste un tiempo involucrado en-, en el caso, lo ganaste a- a nivel del circuito y fueron a apelación. ¿Todavía se sabe o no se sabe nada de la apelación? | It's 4:22 in the afternoon, La Hora del Regreso with Raúl Martínez, on Caracol 1260. I am accompanied by Ronald Hacha, and a there is a listener who wrote telling me that in Panama, Mother's Day is celebrated on December 8th. If there is any- anyone from another country that celebrates Mother's Day different from us on the second Sunday of May, let us know. But now we have Commissioner Joe Carollo on the line. Joe, I thank you so much for being with us. I would have liked it more if you were here in the studio, we would have had much more and maybe a longer communication, but, well, first, uh, first of all, I would like to ask you how the legal case is going. Uh, I know that for a while, you were involved in- in the case, you won at- at the circuit level and they went to appeal. Do we know anything as to the appeal yet or do we not know anything? |

PAGE 2

MADROOM0642485

| | | |
|---|---|---|
| [02:55] Joe Carollo: | Raúl, muy buenas tardes. A mí me hubiera gustado también estar en persona, pero, como sabes, se me hizo imposible porque entre ayer y hoy me he estado mudando, eh, para el corazón de la Pequeña Habana, eh así que en eso estoy todavía. Pero, eh, hablando del caso- | Raul, a very good afternoon to you. I would have liked to be in person too, but, as you know, it turned out impossible for me because, between yesterday and today, I have been moving, uh, to the heart of Little Havana, uh, so I'm still doing that. But, uh, talking about the case- |
| [03:14] Raúl Martínez: | Oye, dame-, ¿te puedo decir algo? Que el corazón ese no vaya ser de unos de esos edificios, Joe, que yo sé que tú has estado muy al tanto de eso, esos edificios que tienen tantas cucarachas y tantas cosas. | Hey, give me-, can I tell you something? Don't let that heart be in one of those buildings, Joe, I know you've been very aware of that, those buildings that have all those cockroaches and so many things. |
| [03:25] Ronald Hacha: | Y hasta ratas. | And even rats. |
| [03:26] Raúl Martínez: | Exacto, entonces que- | Exactly, so what- |
| [03:27] Joe Carollo: | No. No, no, no, es una- | No. No, no, no, it's a- |
| [03:28] Raúl Martínez: | [*laughing*] | [*laughing*] |
| [03:29] Joe Carollo: | Es una casa. | It's a house. |
| [03:30] Raúl Martínez: | Ah, bueno, está bien. | Oh, alright, that's good. |
| [03:31] Joe Carollo: | Eh, que está a una cuadra más o menos del Parque No. 12 que- | Uh, that's more or less one block from Park No. 12, that- |
| [03:33] Raúl Martínez : | Ah, bueno. Perfecto. | Oh, good. Perfect. |
| [03:35] Joe Carollo: | Eh, voy a estar cerca de- [del] gran porcentaje de las personas de este distrito que han votado por mí. Eh, así que, ah…eh, en cuanto a lo que me habías, eh, preguntado, bueno, mira…eh, la-, la corte, eh, de este circuito, eh, dio dos fallos. Uno fue que no había razón ninguna, eh, para que ellos pudieran demandar porque | Uh, I'm going to be close to the-, to the large percentage of people in this district who voted for me. Uh, so, uh…uh, as to what you had, uh, asked me, well, look…uh, the-, the court, uh, of this circuit, uh, issued two rulings. One was that there was no reason, uh, for them to be able to sue because they should have |

MADROOM0642486

| | esa demanda la tuvieron que hacer antes, no esperar pa' perder y después decir, "no, no, no, él no podía." Pero, también fallaron por si acaso, eh, en el juicio. En el juicio fallaron totalmente a favor mío, eh, porque los únicos dos testigos que ellos trajeron, dijeron que no tenían credibilidad ninguna. Uno fue un electricista de no sé de dónde, que al final no era ningún experto de nada, era un simple electricista. Y el otro era un señor que lo pusieron como experto de torres que cuando lo único que se ha visto últimamente es en la televisión en español, un señor experto de asuntos de-, de refugiados de [U/A], así que por eso el juez dijo que no tenían credibilidad. Eh, no trajeron ni un solo testigo como habían puesto en todos los papeles de ellos, que iban a traer testigos, que-<br><br>[*recording ends*] | brought that lawsuit before, not waited and then said, "no, no, no, he couldn't." But they also ruled, just in case, uh, at the trial. At the trial, they ruled entirely in my favor, uh, because the only two witnesses that they brought, they said they had no credibility at all. One was an electrician I don't know from where, who in the end turned out not to be an expert in anything, he was a simple electrician. And the other one was a gentleman that they put as an expert in towers who has lately been on Spanish-language television, who was an expert in matters of- of refugees from [U/A], so that's why the judge said that they had no credibility. Uh, they didn't bring a single witness as they had put in their papers, that they were going to bring witnesses, that-<br><br>[*recording ends*] |

MADROOM0642487

Document Produced As Native

MADROOM0614896



**Transcription / Translation of Audio File**

**"232_MADROOM0614896"**

**Spanish into English**

**Speakers:**

**Various Radio Ad Announcers**
**Raúl Martínez**
**Joe Carollo**
**Ronald Hacha**

**January 9, 2023**

U.S. Legal Support, Inc. – Translations Services Department – 855-538-3099
translations@uslegalsupport.com

MADROOM0642488

[U/A] – Unintelligible Audio          [O/V] – Overlapping Voices

|  | ORIGINAL AUDIO (Spanish & English) | Translation (Spanish into English) |
|---|---|---|
| [00:00] Joe Carollo: | -del edificio mío, que yo no viví allí, y no pudieron traerlo porque no es la verdad. | -of my building, that I didn't live there, and they couldn't bring them, because that's not true. |
| [00:03] Raúl Martínez: | Claro. | Of course. |
| [00:04] Joe Carollo: | Eh, sin embargo, dijo el juez que mis, eh, testigos sí tenían credibilidad. La corte de apelación oyó el caso hace unas tres semanas, esperamos un fallo, eh, pronto. Y pasaron todas las preguntas que se hicieron. Yo no creo que ellos pueden tener ninguna esperanza, absolutamente ninguna esperanza- | Uh, however, the judge said that my, uh, witnesses did have credibility. The court of appeals heard the case about three weeks ago, we are awaiting a ruling, uh, soon. And they passed all of the questions that were asked. I don't think that they can have any hope, absolutely any hope- |
| [00:24] Raúl Martínez: | Joe, perdóname- | Joe, excuse me- |
| [00:25] Joe Carollo: | -de ningún- ningún fallo diferente. | -for any- any different ruling. |
| [00:27] Raúl Martínez: | Joe, yo lo dije en el programa. Yo oí, eh, de personas que estaban en la corte que me contaron algunas de las preguntas que hicieron los jueces de apelación y dije esa tarde que, de acuerdo a las preguntas que el- la-, la-, eh, que hicieron en-, eh, las preguntas que hicieron los jueces, no lucía que iba a haber algo que cambiara la decisión de la corte. Así que en eso tenemos- | Joe, I said it on the show. I heard, uh, from people who were at the court who told me a few of the questions that the appeals judges asked and I said that afternoon that, based on the questions that the- the- the-, uh, that the judges asked, it didn't seem that there would be anything to change the court's decision. So on that we have- |
| [00:48] Joe Carollo: | [U/A – O/V] | [U/A – O/V] |
| [00:50] Raúl Martínez: | [U/A – O/V] Joe Carollo para- para el rato. Ahora, la pregunta es- | [U/A – O/V] Joe Carollo for- for the time being. Now, the question is- |

MADROOM0642489

| | | |
|---|---|---|
| [00:54] Joe Carollo: | [U/A] No, no, pero espera, espera, cuando yo en-, [U/A] te voy a dar una exclusiva, ¿está bien? | [U/A] No, no, but wait, wait, when I- [U/A] I'll give you something exclusive, alright? |
| [01:00] Raúl Martínez: | Eh… | Uh… |
| [01:01] Joe Carollo: | Una exclusiva que ya la- la gente que estuviera involucrada en esto lo sabe, por eso, pero…a ver. En un futuro no muy lejano, van a poder saber, eh, quien y como trataron de comprar testigos para que fueran a testificar falsamente en contra mía durante ese juicio y como incluso trataron de pagar para ver si podían entrar adentro del apartamento mío. Así que denle tiempo al tiempo, que van a ver la clase de demento, eh, como dicen en Venezuela, maleantes, eh, que tenemos aquí. Que están dispuestos a hacer cualquier cosa, incluso hasta ser reunidos y trabajando con delincuentes de los peores que puede haber en una sociedad para ver como hacen daño a otro y falsamente eh, eh, lo- lo tratan de dañar. | Something exclusive that the- the people who would be involved in this already know, that's why, but…let's see. In a not-so-distant future, you'll be able to know, uh, who and how they tried to buy witnesses to go testify against me falsely during that trial and how they even tried to pay to see if they could get inside my apartment. So let time do its work, and you'll see what type of demented individuals, uh, as they say in Venezuela, wrongdoers, uh, that we have here. Who are willing to do anything, even meet and work with criminals of the worst kind that can exist in a society, to see how they can cause harm to someone and falsely uh, uh, they- they try to cause him harm. |
| [02:01] Raúl Martínez: | Pero Joe, a eso- a eso- | But Joe, that's- that's- |
| [02:02] Joe Carollo: | Sí… | Yes… |
| [02:02] Raúl Martínez: | Joe, a eso voy. Yo te conozco a ti desde ganaste la- … ser comisionado, ah, creo que tenías 24 o 25 años, y he seguido tu carrera y- y ha sido una gran carrera. Te- te considero amigo y- y- y te puedo decir esto, que ha sido una- una carrera de sube y baja. En momentos has tenido tus- tus temas controversiales, eh, muchas veces has dicho cosas, eh, en- o has dejado ver ciertas cosas, y muchas se han dado ciertas y otras, como es natural, no se han dado. Pero en este caso yo vi, eh, la última reunión que tuvieron ustedes en la Comisión de Miami y | Joe, that's what I'm getting at. I've known you since you won the-…being commissioner, uh, I think you were 24 or 25 years old, and I've followed your career and- and it's been a great career. I- I consider you a friend and- and- and I can tell you this, that it's been a- an up-and-down career. At times, you've had your- your controversial topics, uh, many times you've said things, uh, in- or you've let certain things show, and many have turned out true and others, as is natural, have not worked out. But in this case I saw, uh, the last meeting |

PAGE 2

MADROOM0642490

| | | |
|---|---|---|
| | allí tú dijiste unas palabras extremadamente, pero extremadamente fuertes. Desde que tú regresaste, tú, eh te has encontrado una ciudad llena de corrupción y que te has visto obligado hasta cierto punto darle la mano a personas que tú nunca hubieras estado a menos de no sé cuántos pies, o no sé cuántas millas de esa persona. Joe, yo creo que…yo creo que si- si tú piensas de esta forma, eh, debemos de comenzar y decir, ¿qué tipo de corrupción? ¿Qué es lo que tú has visto en los cuatro o cinco meses que llevas allí que el pueblo de Miami, los ciudadanos de Miami deben de saber para poder, eh, evaluar a los oficiales electos o a las personas que trabajan en la- en la ciudad de Miami? | you guys had at the Miami Commission and you said some extremely, well extremely strong words there. Since you came back, you, uh, you've found a city filled with corruption and that you've found yourself obligated to a certain extent to shake the hands of people that you wouldn't have been less than I don't know how many feet, or I don't know how many miles from that person. Joe, I think that…I think that if- if you think that way, uh, we should start and say, what type of corruption? What is it that you've seen in the four or five months that you've been there that the people of Miami, the citizens of Miami should know to be able to, uh, evaluate the elected officials or the people who work in the- in the City of Miami? |
| [03:20] Joe Carollo: | Yo, mira, eh…este, te voy a empezar por el Departamento de Código, de Zonificación, eh, de *Building*. Eh, la- las cosas que yo he visto con mis propios ojos, eh, que se las he llevado al administrador, pa' que caminara conmigo y los viera, llevo al propio nuevo alcalde pa' que lo viera, llevo al nuevo jefe de Código pa' que lo viera, y sigo viendo las cosas iguales. Pero al contrario, eh, lo que estoy oyendo son otras cosas. Es claramente, eh, alarmante para mí. Mira, aquí se ve que ha habido un abandono total de enforzar el reglamento de código. Yo no te digo, Raúl, de la [U/A] que se encuentra. Estamos hablando de las cosas grandes y serias. Sobre todo, cuando se trata de grupos grandes que están tratando de comprar eh, la- la parte histórica entera de la Pequeña Habana pa' controlarla y compo-, y compartirla en algo muy diferente de lo que es hoy. Eh, que la quieren des-cubanizar, la quieren de-latinizar, o sea, que estoy hablando no solo de sacar a los cubanos de aquí, pero todo lo que sea hispano, eh, con la excepción de, eh, un grupito pequeño de enchufados | I, look, uh... well, I'm going to start with the Code Department, Zoning, uh, Building. Uh, the- the things that I have seen with my own eyes, uh, that I have taken to the administrator, to walk with me and see them, I took the new mayor himself to see, I took the new head of Code to see, and I continue to see the same things. But on the contrary, uh, what I'm hearing are other things. It's clearly, uh, alarming to me. Look, we see here that there has been a total abandonment in enforcing code regulations. I'm not talking about, Raul, the [U/A] that exists. We are talking about the big and serious things. Especially when it comes to large groups that are trying to buy the entire historical part of Little Havana to control and split it into something very different from what it is today. Uh, they want to de-Cubanize it, they want to de-Latinize it, that is, I'm talking not only about getting Cubans out of here, but everything that is Hispanic, uh, with the exception of, uh, a small group of well-connected Venezuelans who they're then allowing to open something in their places, |

MADROOM0642491

| | | |
|---|---|---|
| | venezolanos que están dejando entonces abrir algo en los lugares de ellos, que tienen compañías en, eh, todas clases de compañías de Panamá, o que el padre de una era embajador de Venezuela en Cuba, eh, eso es lo que me he estado encontrando aquí yo. Eh, que debido a todo esto- [recording ends] | who have companies in, uh, all kinds of companies from Panama, or one whose father was a former Venezuelan ambassador to Cuba, uh, that's what I've been finding here. Uh, because of all this- [recording ends] |

MADROOM0642492

Document Produced As Native

MADROOM0614897



**Transcription / Translation of Audio File**

**"233_MADROOM0614897"**

**Spanish into English**

**Speakers:**

**Various Radio Ad Announcers**
**Raúl Martínez**
**Joe Carollo**
**Ronald Hacha**

**January 9, 2023**

U.S. Legal Support, Inc. – Translations Services Department – 855-538-3099
translations@uslegalsupport.com

MADROOM0642493

[U/A] – Unintelligible Audio          [O/V] – Overlapping Voices

| | ORIGINAL AUDIO (Spanish & English) | Translation (Spanish into English) |
|---|---|---|
| [00:00] Joe Carollo: | Lo están dejando como si fuera un padrino, eh, operar comprando lugar y comprando lugar lleno de las clases peores de- de violaciones de código de edificios y nada pasa. Aquí tenemos, por ejemplo, la- la- la Pequeña Habana, lugares que están operando sin licencia de licor. Eh, y no los quieren cerrar, no quieren hacer nada, no quieren mirar. Eh… | They're letting him, as though he were a godfather, uh, operate, buying places and buying places filled with the worst types of- of violations of the building code and nothing happens. Here we have, for example, the- the- the Little Havana, places that are operating with no liquor license. Uh, and they don't want to close them down, they don't want to do anything, they don't want to look. Uh… |
| [00:30] Raúl Martínez: | Joe, y la oficina- y la oficina, la que es oficina de NET que se crearon para las bar- barriadas, ¿qué ha pasado con eso? | Joe, and the office- the office that's the NET office that was created for the ne- neighborhoods, what happened with that? |
| [00:38] Joe Carollo: | No los dejan operar, eh, cuando, o sea…el administrador recientemente mandó que, ah – tengo entendido que lo cambió ya, eso me dijo mi-, eh, mi *chief of staff*, o sea, mi jefe de oficina – mandó una orden cuando ya me estaba acercando yo a muchas cosas y no tenían excusa de darme más, eh, el día entrante que el alcalde le dio- llegó de otros viajes al extranjero, en ese caso, a Paraguay. Me imagino que muchos negocios, eh, que la ciudad de Miami va a tener en Paraguay. Eh, el día siguiente pone una orden que no quería que ningún empleado pudiera hablar con ningún comisionado que sea electo, que- y que podía ser si hablaban con nosotros, con algún oficial, eh, de la ciudad, para pedir información, que fuera una obligación de- de la ley, que es algo absurdo, porque nosotros, el alcalde, cuando le digo la ciudad de Miami, podemos hacer todas clases de preguntas, eh, necesarias. Lo que no podemos dar órdenes, eh, y yo- | They don't let them operate, uh, when, I mean... the administrator recently ordered that, uh – I understand that he changed it already, that is what I was told by my-, uh, my chief of staff, that is, the head of my office – he issued an order once I was getting close to many things and they had no more excuses to give me, uh, the next day that the mayor gave– came back from other trips abroad, in that case, to Paraguay. I figure that many businesses, uh, that the city of Miami is going to have are in Paraguay. Uh, the next day he issues an order that he didn't want any employee to be able to talk to any commissioner who is elected, which- and that could be if they talked to us, to some official, uh, of the city, to ask for information, that it was an obligation under- under the law, which is something absurd, because we, the mayor, when I say the city of Miami, we can ask all kinds of questions, uh, necessary. What we can't do is issue orders, uh, and I- |

PAGE 1

MADROOM0642494

| [01:50] Raúl Martínez: | Sí, pero ustedes pueden- | Yes, but you can- |
|---|---|---|
| [01:51] Joe Carollo: | [U/A – O/V] | [U/A – O/V] |
| [01:52] Raúl Martínez: | -ustedes- ustedes dan-...fíjate. A- aquí hay un- aquí hay un error y- y le están dando un sentido, ¿no? A- al sistema de gobierno para decir que el sistema de gobierno no funciona. Si- tú no le puedes dar una orden al administrador ni a ningún empleado, pero tú sí puedes mandar – o cuando digo tú es porque eres que está aquí – cuando cualquier comisionado puede enviarle al manager una queja y es la función del manager de atender esa queja y si no, lo llevan entonces como un asunto ante la Comisión y traen a ese jefe de departamento y hacen lo que tienen que hacer con él. | -you- you give-...look. Th- there's a- there's a mistake here and- and they're giving it a sense, right? To- to the system of government like to say that the system of government is not working. If- you can't give an order to the administrator nor to any employee, but you can issue – or when I say you, it's because you're the one who's here – when any Commissioner can send a complaint to a manager and it's that manager's duty to deal with that complaint and if not, then they take it as a matter before the Commission and they bring that head of department and do what they have to do with him. |
| [02:26] Joe Carollo: | Sí, eso- eso es cierto, eh, o sea aún- aunque de verdad en todos los años que yo he estado, han sido pocas las veces que se ha tenido que llevar algo [U/A], aunque creo que- | Yes, that- that's true, uh, I mean, even- even though the truth is that in all the years I've been here, there have been few times when something's had to be brought to [U/A], although I think that- |
| [02:37] Raúl Martínez: | Joe, tengo que hacer- tengo que hacer- | Joe, I have to- I have to take- |
| [02:38] Joe Carollo: | [U/A – O/V] | [U/A – O/V] |
| [02:39] Raúl Martínez: | Joe, perdóname, tengo que hace una pausa bien breve, pero quiero- quiero llegar y concretar ciertas cosas contigo, por ejemplo, tú eres más, quizás correcto que yo. Tú dices los enchufados, y tal lugar, yo he dicho específicamente en un edificio, creo que era el 1020 SW de la 2 calle, dije, ¿quiénes eran los- el nombre de los dueños? ¿Quién era una persona? Y dije, y este señor es un frente pa' cualquier grupo, yo en eso no me callo | Joe, forgive me, I have to take a very brief break, but I want- I want to get to flesh out certain things with you, for example, you are more, maybe more correct than me. You say the well-connected, and such place, I said a specific building, I think it was 1020 SW 2nd street, I said, who were the- the name of the owners? Who was a person? And I said, and this man is a front for some group, I don't shut my mouth much about that. Come |

MADROOM0642495

| | | |
|---|---|---|
| | mucho la boca. Vamos- ahora paso ahora, y si tú me dices, vamos a donde ellos, yo voy y lo digo. | on- I'll go by now, and if you tell me, we'll go to where they are, I'll go and I'll say it. |
| [03:07] Radio ad: | [*brief music*]<br><br>Estas son algunas de las razones por las que más y más oyentes de Caracol confían en la abogada Jany Martinez-Ward al ser víctimas de un accidente.<br>No importa tu estado legal si eres víctima de un accidente de tráfico. Junto a mi esposo, con 18 años de experiencia como abogados, investigamos cada detalle y vamos a la corte si es necesario para pelear por ti.<br>Por eso si eres víctima de un accidente, ¡haz como yo! Confía en tu abogada hispana de accidentes Jany Martinez-Ward 8-5-5-D-O-L-O-R-5-5. 8-5-5-3-6-5-6-7-5-5. | [*brief music*]<br><br>These are some of the reasons why more and more Caracol listeners trust attorney Jany Martinez-Ward when they are victims of an accident. Your legal status doesn't matter if you are the victim of a traffic accident. Together with my husband, with 18 years of experience as lawyers, we investigate every detail and go to court if necessary to fight for you. So if you're the victim of an accident, do as I did! Trust your Hispanic accident attorney Jany Martinez-Ward 8-5-5-D-O-L-O-R-5-5. 8-5-5-3-6-5-6-7-5-5 |
| [03:11] Radio ad: | ¿Te recuerdas el sentimiento de venir a los Estados Unidos para luchar por tus objetivos que siempre has soñado? Tienes la capacidad, y con los programas en español de la Universidad Kiefer [ph.], tendrás la preparación para hacer la diferencia. Los programas abarcan desde negocios hasta el área de salud, y ahora ofrece maestría y doctorado en educación. Tendrás lo que necesitas para convertirte en un líder en instrucciones educativas que se habla en español, desde la escuela secundaria hasta la universitaria. Ayudando a formar las mentes de nuestro futuro. Las clases son en línea, así que hay flexibilidad para que puedas estudiar y trabajara. Así que avanza y no te conformes con menos. Cambia tu destino profesional. Llama al 1-8-8-3-0-7-6-8-8. 1-8-8-3-0-7-6-8-8-8.  La Universidad Kiefer [ph.] te entiende. 1-8-8-3-0-7-6-8-8-8. | Do you remember the feeling of coming to the United States to fight for your goals you've always dreamed of? You have the ability, and with Kiefer [ph.] University's Spanish-language programs, you'll have the training to make a difference. The programs range from business to healthcare, and now offer master's and doctoral degrees in education. You'll have what it takes to become a leader in Spanish-speaking educational instruction, from high school through college. Helping to shape the minds of our future. Classes are online, so there's flexibility for you to study and work. So go ahead and don't settle for less. Change your professional destiny. Call 1-8-8-3-0-7-6-8-8. 1-8-8-3-0-7-6-8-8-8. Kiefer[ph.] University understands you. 1-8-8-3-0-7-6-8-8-8 |

MADROOM0642496

| [04:47] Radio ad: | Inmigración, noticias y consejos todos los martes de 7 a 7:30 aquí en Caracol 1260 AM con la abogada Marta Arias, el nuevo horario, recuerde, su programa, La Vida en los Estados Unidos tiene un nuevo horario-<br><br>[*recording ends*] | Immigration, news, and advise every Tuesday 7 to 7:30 here on Caracol 1260 AM, with attorney Marta Arias, the new schedule, remember, your show, *La Vida en los Estados Unidos*, [Life in the United States], has a new schedule-<br><br>[*recording ends*] |

MADROOM0642497

Document Produced As Native

MADROOM0614898



Transcription / Translation of Audio File
"234_MADROOM0614898"

Spanish into English

Speakers:

**Various Radio Ad Announcers**
**Raúl Martínez**
**Joe Carollo**
**Ronald Hacha**

**January 9, 2023**

U.S. Legal Support, Inc. – Translations Services Department – 855-538-3099
translations@uslegalsupport.com

MADROOM0642498

[U/A] – Unintelligible Audio          [O/V] – Overlapping Voices

| | ORIGINAL AUDIO (Spanish & English) | Translation (Spanish into English) |
|---|---|---|
| [00:00] Radio ad: | -martes de 7 a 7:30 PM. | -Tuesdays 7 to 7:30 PM. |
| [00:06] Radio ad: | "Yo le debo 10 mil dólares al IRS." <br> "El IRS embargó mi sueldo." <br> "El IRS embargó mi casa." <br><br> El IRS es la agencia de cobro más poderosa del mundo. Ellos no dejan de seguirte hasta que les pagues. <br> "Yo no podía dormir. Nos iban a hacer una auditoría. Llamé a Tax Solutions Now y me saqué un gran peso de encima." <br> "Llamé a Tax Solutions Now y ellos lograron quitarme el IRS de encima. En 48 horas, Tax Solutions Now logró que se levantara el embargo de mi sueldo." <br> Tax Solutions Now te puede ayudar. Nuestros agentes conocen las leyes, podrán poner al [U/A] y podrán lograr el mejor arreglo de pago. Nosotros lo conectamos con exagentes del IRS y profesionales en taxes quienes le quitarán el IRS de encima. <br> "Nosotros recuperamos nuestra casa. Y vencimos a la agencia de cobros más poderosa del mundo." <br> Se está acabando el tiempo. ¡Llame a Tax Solutions Now! 800-821-4480.  800-821-4480. 800-821-4480. | "I owe the IRS $10,000." <br> "The IRS garnished my wages." <br> "The IRS placed a lien on my house." <br><br> The IRS is the most powerful collection agency in the world. They don't stop chasing you until you pay them. <br> "I couldn't sleep. They were going to audit us. I called Tax Solutions Now and took a big weight off my shoulders." <br> "I called Tax Solutions Now, and they managed to get the IRS off my back. Within 48 hours, Tax Solutions Now got my wage garnishment lifted." <br> Tax Solutions Now can help you. Our agents know the laws, they will be able to put in the [U/A] and they will be able to work out the best payment arrangement. We connect you with former IRS agents and tax professionals who will get the IRS off your back. <br> "We recovered our house. And we beat the most powerful collection agency in the world." <br> Time is running out. Call Tax Solutions Now! 800-821-4480. 800-821-4480. 800-821-4480 |
| [01:07] Radio ad: | Hoy pasa la tarde con Mario Andrés Moreno. Entérate de los beneficios de la medicina natural. Nuestro invitado es el Dr. Lemus, de Lemus Natural Medicine. Más informes al 305-223-7393. | Today, spend the afternoon with Mario Andrés Moreno. Learn about the benefits of natural medicine. Our guest is Dr. Lemus, from Lemus Natural Medicine. More information at 305-223-7393. |
| [01:23] Raúl Martínez: | La Hora del Regreso. <br> [*brief music*] | *La Hora del Regreso* [*show name*] <br> [*brief music*] |

MADROOM0642499

| | | |
|---|---|---|
| [01:27] Raúl Martínez: | Son las 4 y 36 minutos de la tarde, La Hora del Regreso, tuvimos un *break* bien rápido en Caracol 1260. Raúl Martínez, Ronald Hacha, y tenemos en la línea al comisionado Joe Carollo que le agradecemos que esté con nosotros. Eh, comisionado, te decía y te digo te decía porque eres más joven que yo y nos conocemos por mucho tiempo – de que, eh, hace un par de semanas hubo un caso en- creo que el número era 1020 SW 2 Calle que tú tuviste, y yo dije, ¿quién eran los dueños? ¿Dónde se podían localizar esos dueños? Y esa gente ha comprado como 14 - 15 propiedades, algunas en Miami, algunas en Hialeah. Estas personas que tú hablas, de los enchufados, y la gente que sí está en conexión, yo creo que nosotros tenemos una responsabilidad de decir quiénes son esta gente. No es acusándolos de nada, pero decir quiénes son, donde están, para que el público sepa. | It's 4:36 in the afternoon. *La Hora del Regreso,* we had a very quick break on Caracol 1260. Raúl Martínez, Ronald Hacha, and with us on the line we have Joe Carollo, whom we thank for being with us. Uh, Commissioner, I was telling you, and I'm saying I was telling you [*informal pronoun used*] because you're younger than me and we've known each other for a long time – since, uh, a few weeks ago there was a case at- I think the number was 1020 SW 2nd Street that you had, and I said, who were the owners? Where could these owners be located? And these people have bought like 14 - 15 properties, some in Miami, some in Hialeah. These people you talk about, the well-connected, and the people who are connected, I think that we have a responsibility to say who these people are. It's not accusing them of anything, but to say who they are, where they are, so that the people know. |
| [02:15] Joe Carollo: | Eh, yo creo que estás correcto, eh, Raúl, eh, pero hay que hacerlo de una forma correcta, eh, inteligente, y [U/A]. Por eso, mira, te puedes tomar la oportunidad en el programa tuyo de hablar de, eh, como yo le digo cariñosamente – porque me gusta siempre, eh, hablar de las personas por el último título más alto que tuvieron – aquí tenemos la que yo llamo la primera secretaria, eh, de la embajada de Venezuela en las Naciones Unidas que de buena primera ha llegado aquí los últimos tres años y tiene un negocito adentro del lu- lugar del que yo llamo el padrino, que está comprando todo, y empezó a comprar todo hace unos cuatro años más o menos, eh, en- en esos tiempos. Eh, esta señora, eh, el padre de ella, eh, no de sangre, que la crio de niña cuando se casó con su madre, es, eh, nada más y nada menos que la persona que en diciembre del año pasado, o sea, hace unos | Uh, I think you're right, uh, Raul, uh, but you have to do it the right way, uh, intelligently, and [U/A]. So, look, you can take the opportunity on your program to talk about, uh, as I affectionately call her – because I always like, uh, to talk about people using the last highest title they had – here we have what I call the first secretary, uh, of the Venezuelan embassy to the United Nations who came here the last three years and has a little business in the place of the one that I call the godfather, who is buying everything, and started buying everything about four years ago or so, uh, in- in that time. Uh, this lady, uh, her father, uh, not by blood, who raised her since she was a child when he married her mother, is, uh, nothing more and nothing less than the person who in December of last year, that is, about four months ago, Maduro appointed, uh, as the honorary president of |

MADROOM0642500

| | | |
|---|---|---|
| | cuatro meses, Maduro nombró, eh, el presidente honorario de PDVSA, la compañía de petróleo de ellos. Eh, ¿por qué lo hizo? Porque este es el individuo más allegado a Raúl Castro, eh, en toda Venezuela, porque este es el único que Raúl cuenta en él para que le siga mandando petróleo. Pero el trabajo que [U/A] ese señor es embajador de Venezuela a Cuba comunista. Y, ¿quién es, eh, ese señor- | PDVSA, their oil company. Uh, why did he do it? Because this is the individual closest to Raúl Castro, uh, in all of Venezuela, because this is the only one that Raúl counts on to continue sending him oil. But the job that [U/A] that gentleman is Venezuela's ambassador to communist Cuba. And who is, uh, that gentleman- |
| [03:57] Raúl Martínez: | Sí, pero- pero fíjate, Joe- | Yes, but- but look, Joe- |
| [03:58] Joe Carollo: | Sí. | Yes. |
| [03:58] Raúl Martínez: | Joe, yo te agradezco y te- y te brindo los micrófonos estos pa' que vengas todos los días que tú quieras para poder hablar, pero cuando tú me dices una se- señora que fue secretaria y no sé qué cosa, y el padrino, por ejemplo- | Joe, I thank you and I offer you these microphones for you to come any day you want to be able to talk, but when you tell me a lady who was a secretary and I-don't-know-what, and the godfather, for example- |
| [04:09] Joe Carollo: | Era secretaria. | She was a secretary. |
| [04:10] Raúl Martínez: | Sí, pero tú sabes quién es el padrino. Quien es el- el famoso- no hay que acusar a nadie de ser comunista, no que acusar a nadie de nada, si yo menciono el nombre de del dueño o- | Yes, but you know who the godfather is. Who is the- the famous- we don't have to accuse anyone of being a communist, it's not about accusing anyone of anything, if I mention the name of the owner or- |
| [04:18] Joe Carollo: | [U/A – O/V] Raúl, mira, aquí nadie está acusando a nadie- | [U/A – O/V] Raul, look, no one here is accusing anyone- |
| [04:22] Raúl Martínez: | Por eso. | So there. |
| [04:23] Joe Carollo: | -de comunista, pues. Pero ¿tú sabes qué? Vamos a esperar [U/A] por aquí el propio gobierno americano ha arrestado a muchos comunistas, incluso en universidades. Entonces yo tampoco voy a caer en esos | -of being a communist. But, you know what? Let's wait [U/A] around here the American government itself has arrested many communists, even in universities. So I'm not going to get into those games either where you can't say the name communist because it's a taboo. |

MADROOM0642501

| | juegos que no se pueden mencionar el nombre comunista porque es un tabú. | |
|---|---|---|
| [04:39] Raúl Martínez: | No, pero yo no- | No, but I don't- |
| [04:40] Joe Carollo: | [U/A – O/V] | [U/A – O/V] |
| [04:40] Raúl Martínez: | -no, no, no no. | -no, no, no no. |
| [04:41] Joe Carollo: | [U/A – O/V] | [U/A – O/V] |
| [04:41] Raúl Martínez: | No, no. Yo lo que- lo que estoy buscando, tú sabes quién es el padrino. Yo al padrino aquí le decía Jose Miguel Battle, que hicieron una- un- una- un libro hace poco de- de la corporación, a quien tú sabes. Joe, Joe hemos vivido mucho tiempo, pero el padrino venezolano, ¿quién es? Para poder- | No, no. What I- what I'm looking for, you know who the godfather is. I was calling the godfather here Jose Miguel Battle, [about whom] they made a- a- a- a book about- about the corporation, who you know Joe. Joe, we've lived a long time, but the Venezuelan godfather, who is he? So we can- |
| [04:58] Joe Carollo: | No, yo- yo- yo no me- yo no-<br><br>[*recording ends*] | No, I- I- I don't- I don't-<br><br>[*recording ends*] |

PAGE 4

MADROOM0642502

Document Produced As Native

MADROOM0614899



Transcription / Translation of Audio File

"235_MADROOM0614899"


Spanish into English




Speakers:

**Various Radio Ad Announcers**
**Raúl Martínez**
**Joe Carollo**
**Ronald Hacha**




**January 9, 2023**

U.S. Legal Support, Inc. – Translations Services Department – 855-538-3099
translations@uslegalsupport.com

MADROOM0642503

[U/A] – Unintelligible Audio          [O/V] – Overlapping Voices

| | ORIGINAL AUDIO (Spanish & English) | Translation (Spanish into English) |
|---|---|---|
| [00:00] Joe Carollo: | Yo no me refería al padrino venezolano por sí. | I wasn't referring to the Venezuelan godfather as such. |
| [00:02] Raúl Martínez: | Oh. | Oh. |
| [00:03] Joe Carollo: | Yo estoy hablando de un padrino, en el nombre del padrino porque el tipo es del tipo que el tipo de buena primera cuando no tenía dinero a sacar dinero, eh, este sobra con *deep pockets* como dicen allí, bolsillos bien, bien anchos, para estar comprando toda la parte principal de la Pequeña Habana, eh, de, eh, y otras partes acá, eh, entonces este señor puede tener todos esos lugares con las violaciones más grandes que puede haber, de código, de edificio, y es protegido y ha sido protegido en la ciudad de Miami. Eh, sin embargo, eh, los negocios que traen para acá son negocios que se ven claramente que quieren convertir eso en un Wynwood en esteroides. Eh, quieren quitarle la identidad cubana, la identidad latina acá, con la excepción de un par de gente escogidos de él, sobre todo, eh, los elementos venezolanos enchufados que está trayendo, y esto es algo muy preocupante, Raúl, porque mira- | I'm talking about a godfather, by the name of godfather, because it's the guy who from the very beginning when there was no money came up with money, uh, he has more than enough, with *deep pockets*, as they say out there, very, very deep pockets, to be buying the whole main part of Little Havana, uh, of, uh, and other parts here, uh, so this gentleman can have all those places with the biggest violations there can be, code, building, and he's protected, and he has been protected in the city of Miami. Uh, however, uh, the businesses that they are bringing here are businesses that clearly look like they want to convert that into a Wynwood on steroids. Uh, they want to take away its Cuban identity, the Latin identity here, with the except of a couple of people chosen by him, above all, uh, the well-connected Venezuelan elements that he is brining, and this is something very concerning, Raul, because look- |
| [01:12] Raúl Martínez: | Sí, Joe, pero- | Yes, Joe, but- |
| [00:13] Joe Carollo: | [U/A – O/V] | [U/A – O/V] |
| [01:14] Raúl Martínez: | -fíjate, pero, mira, Joe- | -see, but, look, Joe- |
| [00:14] Joe Carollo: | [U/A – O/V] | [U/A – O/V] |

MADROOM0642504

| | | |
|---|---|---|
| [01:15] Raúl Martínez: | -pero- | -but- |
| [00:15] Joe Carollo: | Pero, óyeme, en cuatro años más, eh, el 80-90% de todos locales estos, de la parte sobre todo principal turística de la Pequeña Habana van a ser controlados por ese, eh, eh, eh, eh, de seguro por esta gente. Y aquí no- | But, listen, in four more years, uh, 80-90% of all these establishments, mainly in the tourist part of Little Havana will be controlled by this, uh, uh, uh, certainly by these people. And here it's not- |
| [01:30] Raúl Martínez: | Joe, Joe, yo entiendo- | Joe, Joe, I understand- |
| [01:31] Joe Carollo: | [U/A – O/V] | [U/A – O/V] |
| [01:31] Raúl Martínez: | Yo-, Joe yo entiendo eso. | I-, Joe, I understand that. |
| [01:33] Joe Carollo: | Ningunos de los- de los lugares típicos cubanos u otros latinos, de paraguayos, etc., que hemos tenido- porque lo van a controlar, van a ser esta gente los que van a decir quién puede tener un negocio aquí, van a ser ellos porque van a ser dueños de eso, y lo que van a poner [U/A – O/V] | None of the- of the typical Cuban or other Latin places, Paraguayan, etc. that we've had- because they're going to control it. It will be these people who say who can have a business there, it will be them because they will be the owners of that, and they'll put [U/A – O/V] |
| [01:49] Raúl Martínez: | Pero, Joe- | But, Joe- |
| [01:50] Joe Carollo: | [U/A – O/V] | [U/A – O/V] |
| [01:51] Raúl Martínez: | Joe, pero-, Joe, perdón, pero el público tiene el derecho y nosotros como hombres públicos tenemos la obligación de decir quiénes son estas personas porque ahora tú me dices a mí el nombre de una persona y yo lo puedo buscar entre todas las personas que están donando dinero aquí, y poder asociar el dinero de campaña, el dinero de los PACs con la compra de estos edificios, en el caso específico de este edificio, tengo entendido que lo han ido a arreglar, eh, la persona- | Joe, but-, Joe, sorry, but the public has the right and we as public figures have an obligation to say who these people are because now you tell me the name of a person and I can look it up among all the people who are donating money here, and be able to associate the campaign money,  the money from the PACs with the purchase of these buildings, in the specific case of this building, I understand that they have gone to fix it, uh, the person- |
| [02:15] Joe Carollo: | Pero- pero- pero que- ¿quién- a quién te estás refiriendo tú en este edificio, Raúl? | But- but- but what- who- who are you referring to in this building, Raul? |

MADROOM0642505

| | | |
|---|---|---|
| [02:19] Raúl Martínez: | El edificio de 10- yo te digo, el edificio 1020, te lo vuelvo a repetir, 1020 SW 2 Calle. La persona que representa los intereses se llama Alex Ruiz, tiene una oficina en la 59 avenida allá cerca de Hialeah, a quien yo lo conozco, entonces volvemos de nuevo, yo sí digo las cosas específicas- | The building at 10- I'll tell you, the building at 1020, I repeat, 1020 SW 2 Street. The person who represents the interests is named Alex Ruiz, he has an office on 59th Avenue there near Hialeah, who I know, so going back again, I do say things in specifics- |
| [02:35] Joe Carollo: | Sí, pero qué- | Yes, but what- |
| [02:36] Raúl Martínez: | -porque no soy- | -because I'm not- |
| [02:37] Joe Carollo: | ¿Quién es la persona esa, me dijiste Alex Ruiz? | Who is that person, you said Alex Ruiz? |
| [02:38] Raúl Martínez: | Alex Ruiz es un muchacho joven que estaba involucrado en la política, después se metió en negocios de *real estate*, y ahora tiene cualquier cantidad, ha comprado cualquier cantidad. Vi el nombre de una corporación, empecé a buscar la corporación y vi que él era la persona encargada de esa corporación, vi el abogado, llamé al abogado, el abogado me dijo, "no, eh, la persona que tú crees que es el que está detrás de esto no está. Yo no te puedo decir quién es que está con Alex Ruiz," pero ya yo sé que Alex Ruiz es una persona. | Alex Ruiz is a young guy who was involved in politics, then got into the *real estate* business, and now he has some amount, he has bought some amount. I saw the name of a corporation, I started looking for the corporation and I saw that he was the person in charge of that corporation, I saw the lawyer, I called the lawyer, the lawyer told me, "No, uh, the person you think is the one behind this is not there. I can't tell you who is with Alex Ruiz," but I already know that Alex Ruiz is one person. |
| [03:05] Joe Carollo: | ¿El- el abogado que tú llamaste por alguna casualidad que él- él es el representante de *registration agent,* el agente registrado ese Villaredo [ph.]? | The- the lawyer you called by chance, is that the representative of the *registration agent*, the registered agent, that Villaredo [ph.]? |
| [03:13] Raúl Martínez: | Sí, señor. | Yes, sir. |
| [03:15] Joe Carollo: | Okay, entonces ya- ya sé el lugar que me estás refiriendo que estuvo, pero [U/A – O/V] | Okay, then, now-, now I know the place you're referring to that it was, but [U/A – O/V] |
| [03:18] Raúl Martínez: | Yo no- yo no- yo- | I don't- I don't- I- |

MADROOM0642506

| | | |
|---|---|---|
| [03:20] Joe Carollo: | [U/A – O/V] | [U/A – O/V] |
| [03:20] Raúl Martínez: | Yo sí te digo los nombres. Yo llamé a Alex Villaredo [ph.] | I do tell you names. I called Alex Villaredo [ph.] |
| [03:22] Joe Carollo: | [U/A – O/V] eh, algunas veces tengo que mirar más pa' ver a quien te refieres, pero yo ya- ya estoy ubicado, eh, en donde- | [U/A – O/V] uh, sometimes I have to look into it more to see whom you're referring to, but now- now I got it, uh, where- |
| [03:30] Raúl Martínez: | Tú estuviste- | You were- |
| [03:31] Joe Carollo: | -donde- | -where- |
| [03:31] Raúl Martínez: | -en el edificio ese- tú estuviste en el edificio ese un par de días [U/A] | -at that building- you were in that building for a couple of days [U/A] |
| [03:34] Joe Carollo: | Claro que sí. [U/I – O/V] | Of course. [U/A – O/V] |
| [03:36] Raúl Martínez: | Por eso te digo que- pero yo- pero yo busco- | That's why I'm saying that- but I- but I'm looking for- |
| [03:38] Joe Carollo: | [U/A – O/V] | [U/A – O/V] |
| [03:38] Raúl Martínez: | -los nombres. Mira, el decir el nombre de quien aparece en una corporación, eso no es legal. El decir el nombre de una persona que está cooperando políticamente si lo reportan, no es ilegal. Entonces, lo que tenemos que decir, aquí hay una- aquí me siguen diciendo las personas que hay un complot de crear la parte de la Pequeña Habana y de crear el [U/A] crearlo como el Brickell West, porque ya no hay tierra en el- en la- el área de Brickell Avenue, perfecto, pero entonces tenemos que salir y pasear a ver- | -the names.  Look, saying the name of someone who appears in a corporation, that's not legal. Saying the name of a person who is cooperating politically if reported is not illegal. So, what we have to say, here's one- here's one -- people keep telling me that there's a plot to create the Little Havana part and to create the [U/A] make it like Brickell West, because there's no land anymore in the-- in the- the Brickell Avenue area, perfect, but then we have to go out and see- |
| [04:04] Joe Carollo: | [U/A – O/V] Yo- yo-, mira, eh, eh, ese complot que te quieren poner es para tapar lo que está pasando aquí de verdad, eh, que no es para convertirlo en Brickell [U/A] sino es porque Brickell West [U/A] Eso es pa' crear, eh, | [U/A – O/V] I-, look, uh, uh, that's the plot they want to give you is to cover up what's really happening here, uh, it's not to turn it into Brickell [U/A] but it's because Brickell West [U/A] That's to create, uh, the- the- the |

MADROOM0642507

| | | |
|---|---|---|
| | el- el- el complot de otra parte pa' que no vean lo que están haciendo aquí, eh, [U/A]. Mira, eh, la Maria Waleska es la primera secretaria y si eso no te ha alarmado a ti, Raúl, caramba, perdona, pero que- ¿qué hace aquí una primera secretaria de las Naciones Unidas de Venezuela hace unos tres años y pico? Cual padre es nada más y nada menos que el individuo que Maduro nombra de presidente honorario de PDVSA y que es el embajador de Venezuela en Cuba, un exguerrillero, que fue el individuo que Chavez-<br><br>[*recording ends*] | plot of another part so that you don't see what they're doing here, uh, [U/A]. Look, uh, Maria Waleska is the first secretary and if that hasn't alarmed you, Raul, gosh, I'm sorry, but what- what is a first secretary of Venezuela to the United Nations doing here about three and a half years ago? Whose father is no more and no less than the individual that Maduro appoints as honorary president of PDVSA and who is the ambassador of Venezuela in Cuba, a former guerrilla member, who was the individual that Chavez-<br><br>[*recording ends*] |

MADROOM0642508

Document Produced As Native

MADROOM0614900



Transcription / Translation of Audio File

"236_MADROOM0614900"


Spanish into English



Speakers:

**Various Radio Ad Announcers**
**Raúl Martínez**
**Joe Carollo**
**Ronald Hacha**



**January 9, 2023**


U.S. Legal Support, Inc. – Translations Services Department – 855-538-3099
translations@uslegalsupport.com

MADROOM0642509

[U/A] – Unintelligible Audio          [O/V] – Overlapping Voices

| | ORIGINAL AUDIO (Spanish & English) | Translation (Spanish into English) |
|---|---|---|
| [00:00] Joe Carollo: | -nombra- | -appoints- |
| [00:01] Raúl Martínez: | ¿Cómo se llama el señor? | What is the man's name? |
| [00:02] Joe Carollo: | -presidente de PDVSA en el 2002 y bota más de 20,000 eh, venezolanos de todos los puertos- | -president of PDVSA in 2002 and he kicks out more than 20,000 uh, Venezuelan from all the ports- |
| [00:07] Raúl Martínez: | Pero ¿cómo se llama? ¿Cómo se llama el papá de María Waleska? | But, what's his name? What is the name of Maria Waleska's father? |
| [00:11] Joe Carollo: | ¿Cómo? | What? |
| [00:11] Raúl Martínez: | ¿Cómo se llama el papá? | What's the father's name? |
| [00:13] Joe Carollo: | Te digo, te lo voy a decir antes. El padre de ella es Alex Rodríguez Araqué- Araque. Eh- | I'll tell you, I'll tell you first. Her father is Alex Rodríguez Araqué- Araque. Uh- |
| [00:21] Raúl Martínez: | ¿Araqué? | Araqué? |
| [00:21] Joe Carollo: | Es el padre de ella. Así que lo busquen pa' que vean que- quien es el individuo ese, eh, un guerrillero del partido comunista venezolano que se hizo muy amigo de Fidel, del Che y de Raúl durante la revolución cubana, porque estuvo con ellos allá. Un individuo que fue entrenado en dos cosas, tanto en Cuba como en la Unión Soviética, en explosivos e inteligencia. | He is her father. So look him up, so that you can see who is the individual that, uh, a guerrilla member of the Venezuelan Communist Party who became very close friends with Fidel, Che and Raúl during the Cuban revolution, because he was there with them. An individual who was trained in two things, both in Cuba and in the Soviet Union, in explosives and intelligence |
| [00:52] Raúl Martínez: | Ya tenemos nombres, ya ten- ya tengo el nombre, ahora me- ahora me toca a mí ir a Sunbiz, ahora me toca a mí ir a los- a los récords públicos de *real estate* a nombre de | We have names now, I have- I now have the name, now I- now it's my turn to go to Sunbiz, now it's my turn to go to the- to the *real estate* public records with the name |

MADROOM0642510

|  | María Waleska y Alex Rodríguez Araqué pa' saber que edificio, si tienen la dirección es más fácil porque entonces ligo la dirección con el abogado, ligo la dirección con lo- lo- los agentes que representan la corporación y empiezo, mira, después voy a mirar las contribuciones a los políticos a ver cuáles de esos políticos están ligados- | of María Waleska and Alex Rodríguez Araqué to know what building, if they have the address it's easier because then I can link the address with the lawyer, I link the address with the agents who represent the corporation and I start, look, then I'm going to look at the contributions to the politicians to see which of those politicians are linked. |
|---|---|---|
| [01:18] Joe Carollo: | [U/A – O/V] | [U/A – O/V] |
| [01:18] Raúl Martínez: | ¿Por qué? Porque cuando tú compras una propiedad, tú ya lo sabes, y tú puedes poner diez unidades, y pagas mucho dinero. Tienes que poner entonces 30 unidades o 40 unidades y allí es donde viene el cambio de zonificación, allí es donde viene donde a la- a las personas de bajo ingreso, las personas que fueron los que hicieron la Pequeña Habana remontándonos del área de cuando empezaron los cubanos, ahora son los centro americanos o suramericanos que están allí, que van a ser movidos pa' otros lugares. Entonces, eh, el- con los nombres- con los nombres en este pa-, en este país, se pueden buscar todas esas cosas, por eso te estaba preguntando de los nombres, no es por- | Why? Because when you buy a property, you already know it, and you can put ten units, and you pay a lot of money. You have to then put 30 units or 40 units and that's where the zoning change comes in, that's where it comes, where the low-income people, the people who were the ones who made Little Havana going back from the area when the Cubans started it, now it's the Central Americans or South Americans who are there.  They will be moved to other places. So, uh, the- with the names- with the names in this country- in this country, you can look for all those things, that's why I was asking you about the names, it's not to- |
| [01:48] Joe Carollo: | Sí, sí, sí. | Yes, yes, yes. |
| [01:49] Raúl Martínez: | [U/A – O/V] | [U/A – O/V] |
| [01:50] Joe Carollo: | [U/A – O/V] -tú y yo tanto, los dos sabemos, que no siempre tú va a encontrar, eh, la conexión de dinero como tú estás hablando, porque si quieren donar, sobre todo ahora en el mundo este de los comités políticos, que es lo peor que pasó en la historia de Estados Unidos, cuando la corte suprema de ellos que compañías e | [U/A – O/V] -you just as I, both of us know, that you won't always find, uh, the connection of the money as you're saying because if they want to donate, above all, now in the world of political committees, which is the worst thing that happened in the history of the United States, when their Supreme Court said that companies |

MADROOM0642511

| | individuos podían dar cantidades que quisieran a un candidato político. | and individuals could give the amounts they want to a political candidate. |
|---|---|---|
| [02:16] Raúl Martínez: | Claro. | Of course. |
| [02:17] Joe Carollo: | Eh, eso cambió, eh, totalmente la política de Estados Unidos a lo peor, desde la Casa Blanca hasta gobiernos locales. | Uh, that totally changed U.S. politics for the worse, from the White House to local governments. |
| [02:24] Raúl Martínez: | Claro. | Of course. |
| [02:25] Joe Carollo: | Todo eso tú sabes muy bien. | You know all that very well. |
| [02:27] Raúl Martínez: | Joe, déjame-, déjame ir a una pausa- | Joe let me-, let me go to a break- |
| [02:27] Joe Carollo: | [U/A – O/V] | [U/A – O/V] |
| [02:28] Raúl Martínez: | -déjame ir- | -let me go- |
| [02:29] Joe Carollo: | [U/A – O/V] compañías se pueden esconder pa' dar dinero. | [U/A – O/V] companies can hide to give money. |
| [02:31] Raúl Martínez: | Ah, bueno, perdón, no, me van a extender- me van a extender para-, para terminar la- esta hora contigo, Joe, pa' no interrumpirte más, perdóname. Eh, termina. No, termina, termina, Joe. Perdona, es que ya- | Ah, well, sorry, no, they're going to extend me- they're going to extend me to-, to finish up the- this hour with you, Joe, so I don't interrupt you anymore, forgive me. Uh, go ahead. No, finish, finish, Joe. Sorry, it's that- |
| [02:43] Joe Carollo: | Sí, pero lo que te decía, eh, Raúl, eh, los dos sabemos bien que esto se ha sofisticado mucho más, que mucha de esa gente no se ve ahora porque pueden dar mil vueltas, como pueden dar dinero para que no se vea. Es más, estamos viendo un fenómeno que nunca se vio antes, eh, eh, y sobre todo al extremo este, en la política local, que estamos viendo- que estamos viendo como de Tallahassee- esto empezó en la campaña mía, los superativos de eh partidos, eh, están viniendo, trayendo | Yes, but what I was telling you, uh, Raul, uh, we both know well that this has become much more sophisticated, that many of those people are not seen now because they can go around a thousand times, and they can give money so that it's not seen. What's more, we're seeing a phenomenon that you've never seen before, uh, uh, and especially to this extreme, in local politics, which we're seeing- we're seeing as Tallahassee- this started in my campaign, the surpluses |

MADROOM0642512

| | | |
|---|---|---|
| | dinero de afuera que no se sabe quién lo ha puesto porque todos brincan por diez comités políticos hasta que lleguen al último, eh, y están metiendo dinero fuerte, cientos de miles de dólares en campañas políticas, ah, aquí en Miami. Eso pasó en la campaña mía, y está pasando de nuevo. Entonces, esto está cambiando ya, eh, eh, el terreno político, o sea, cambiando como nunca. Con todo ese dinero que uno no sabe de dónde viene ya, de vez en cuando puedes encontrar, pero no siempre, Raúl. | of, uh parties, uh, they're coming, bringing money from outside that you don't know who put it there, because they all jump through ten political committees until they reach the last one.  Uh, and they're putting in big money, hundreds of thousands of dollars into political campaigns, uh, here in Miami. That happened in my campaign, and it's happening again. So, this is already changing, uh, uh, the political terrain, that is, changing like never before. With all that money that we don't know where it comes from anymore, from time to time you can find out, but not always, Raúl. |
| [03:51] Raúl Martínez: | Mira, ahora me manda- me manda un amigo, bueno, en realidad me lo mandan dos personas – pero un amigo que es un oficial electo en una ciudad me manda y me dice el de Venezuela, los apellidos es Rodríguez Araqué. | Look, right now a friend is sending me- a friend is sending me-, well, it's really two people sending me-, but a friend who is an elected official is sending me a message saying that the one from Venezuela, his last names are Rodríguez Araqué. |
| [04:03] Joe Carollo: | Mm-hm. Exacto. | Mm-hm. Exactly. |
| [04:05] Raúl Martínez: | Rodríguez Araqué, eso- eso me lo manda- | Rodríguez Araqué, that- that's what he sends me- |
| [04:06] Joe Carollo: | [U/A – O/V] | [U/A – O/V] |
| [04:06] Raúl Martínez: | Me lo mandaron- me lo mandó el- la productora mía- | They sent it to me- it was sent to me by my producer- |
| [04:09] Joe Carollo: | Sí. | Yes. |
| [04:09] Raúl Martínez: | -y me lo manda un amigo que no voy a mencionar su nombre, así que puede seguir mandando los nombres para aclarar los nombres quienes son. Porque yo creo- yo creo que el pueblo tiene- tiene, eh- | -and sent to me by a friend who I will not mention his name, so he can continue sending the names to clarify the names who they are. Because I believe- I think the people have- have, uh- |
| [04:17] Ronald Hacha: | Derecho. | A right. |

PAGE 4

MADROOM0642513

| [04:18] Raúl Martínez: | -tiene derecho a saber que está pasando. | -have a right to know what's going on. |
|---|---|---|
| [04:21] Joe Carollo: | Pero por eso- por eso lo estoy dando. Oye, mira, eh, eso es algo que- que te he dicho- | But that's why- that's why I'm giving it to you. Listen, look, uh, that's something that- that I've told you- |
| [04:27] Raúl Martínez: | Mira, tengo otro amigo ahora que me dice, oye tengo otro amigo que me dice, lo busco. Ve, estamos, mira, el- Joe, lo que te digo, y estos nombres están aquí disponibles para ti, disponibles para todas las personas que quieren y pueden contribuir a lo que puede ser beneficio pa' esta comunidad. Yo el día de mañana, que no esté aquí, quiero irme con mi conciencia tranquila que si- no- no puedo decir, "tuve la oportunidad, y me callé la boca." Y- | Look, I have another friend now saying, hey, I have another friend who says, I'll look him up. See, we are, look, the- Joe, what I'm saying, and these names are here available to you, available to all people who want and can contribute to what can be beneficial to this community. Tomorrow, when I won't be here, I want to leave with a clear conscience and not-, I cannot say, "I had the opportunity, and I shut my mouth." And- |
| [04:54] Ronald Hacha: | Saludos justamente, Comisionado Carollo, le saluda Ronald Hacha. | Greeting you just now, Commissioner Carollo, Greetings from Ronald Hacha. |
| [04:55] Joe Carollo: | Hola, ¿cómo estás? | Hi, how are you? |
| [04:56] Ronald Hacha: | Era para decirle, y- y en todo caso, estuve un poco chequeando, estaba viendo el nombre que es más-<br><br>[recording ends] | It was to say-, and- and in any case, I was checking a bit, I was looking up the name that's most-<br><br>[recording ends] |

MADROOM0642514

Document Produced As Native

MADROOM0614901



Transcription / Translation of Audio File

"237_MADROOM0614901"


Spanish into English



Speakers:

**Various Radio Ad Announcers**
**Raúl Martínez**
**Joe Carollo**
**Ronald Hacha**



**January 9, 2023**

U.S. Legal Support, Inc. – Translations Services Department – 855-538-3099
translations@uslegalsupport.com

MADROOM0642515

[U/A] – Unintelligible Audio          [O/V] – Overlapping Voices

| | ORIGINAL AUDIO (Spanish & English) | Translation (Spanish into English) |
|---|---|---|
| [00:00] Ronald Hacha: | María, eh, Waleska Vivas Mendoza. ¿No es cierto? | Maria, uh, Waleska Vivas Mendoza. Isn't that right? |
| [00:00] Joe Carollo: | María Waleska- | María Waleska- |
| [00:02] Ronald Hacha: | Walesk- | Walesk- |
| [00:04] Joe Carollo: | Vivas Mendoza. | Vivas Mendoza. |
| [00:05] Ronald Hacha: | Vivas Mendoza. | Vivas Mendoza. |
| [00:05] Joe Carollo: | María Waleska Vivas Mendoza. | María Waleska Vivas Mendoza. |
| [00:07] Ronald Hacha: | Aquí- | Here- |
| [00:07] Joe Carollo: | Es un nombre que el que sepa un poco de historia no se olvida ese nombre, María que esa era  la amante de Napoleon. Así que es un nombre, ya lo sé, ¿verdad? Era el nombre de la amante de Napoleon si te recuerdas de eso y sabes eso- | It's a name that anyone who knows a little history won't forget that name, María, that was Napoleon's lover. So, it's a name, I know, right? It was the name of Napoleon's mistress if you remember that, and you know that- |
| [00:20] Ronald Hacha: | Mm-hm. | Mm-hm. |
| [00:21] Joe Carollo: | -nunca te olvidas el primer nombre de ella. | -you'll never forget her first name. |
| [00:22] Ronald Hacha: | Y- y una pregunta. Y en todo caso, ¿hay manera – porque yo recuerdo que en todo caso el senador Marco Rubio señalaba que se iban a perseguir estas personas de Venezuela, los enchufados que usted siempre dice, esas personas que en fondo son criminales que se han valido un poco de lo que se está sufriendo en este momento el | And- and a question. And in any case, is there a way- because I remember that in any case Senator Marco Rubio pointed out that these people from Venezuela were going to be persecuted, the well-connected people as you always say, those people who are basically criminals who have taken advantage of what |

PAGE 1

MADROOM0642516

| | | |
|---|---|---|
| | pueblo, y que son testaferros, o sea, vienen con el dinero de los- de las personas allá que se dedican también a las drogas, de los oficiales de allá de- de Venezuela - ¿hay manera que se pueda hacer una investigación, que el FBI que pueda incluirse en todas esas averiguaciones que usted hace- ha estado haciendo de una manera muy directa y que siempre ha salido a la prensa y nos ha contado lo que está sucediendo? | the people are suffering through at this moment, and who are front men, that is, they come with the money of the people there who are involved with drugs, of the officers from there- of Venezuela - is there a way that an investigation can be done, that the FBI that can become involved in all those inquiries that you do- have been doing in a very direct way and always gone to the press and has told us what is going on? |
| [00:59] Joe Carollo: | Claro, mira, eh, espero que estén haciendo algo, pero te digo la verdad… | Sure, look, uh, I hope they're doing something, but I'll tell you the truth… |
| [01:08] Ronald Hacha: | Mm-hm. | Mm-hm. |
| [01:09] Joe Carollo: | Yo me- me siento extremadamente mal viendo tantos de estos elementos acá y sobre todo cuando estoy viendo que de buena primera hay dinero que sobra que quieren comprar a las buenas o a las malas toda la parte comercial principal de la Calle 8, la Pequeña Habana… | I feel extremely bad seeing so many of these elements here and especially when I am seeing that there is an overflow of money, that they want to buy by hook or by crook the whole main commercial part of Calle 8, Little Havana... |
| [01:26] Ronald Hacha: | Mm-hm. | Mm-hm. |
| [01:26] Joe Carollo: | Eh, y que lo único que dicen, no, no, no, es que tenemos dinero de inversionistas, inversionistas, ¿pero de dónde? Si el tipo que está comprando, él mismo aquí en los Estados Unidos hace cuatro años dice que antes de eso él no tenía ese dinero ni nada. Y de buena primera se ve que tiene su dinero. ¿De dónde está viniendo ese dinero? | Uh, and all they say, no, no, no, it's that we have money from investors, investors, but from where? If the guy is buying, he himself here in the United States four years ago says that before that he didn't have that money or anything. And from the very beginning we see that he's got his money. Where is that money coming from? |
| [01:48] Ronald Hacha: | Son testaferros. | They're front men. |
| [01:49] Joe Carollo: | Eh, entonces cuando me- me cuentan a mí su historia, eh comerciantes que ya van pa' la tercera generación que tienen negocios aquí, cubanos, otros no cubanos que son hispanos, que tienen sus negocios que como les están | Uh, so when they tell me their story, uh, merchants who are already going to the third generation who have businesses here, Cubans, other non-Cubans who are Hispanic, who have their businesses, they're sending |

MADROOM0642517

| | | |
|---|---|---|
| | mandando, eh, inspectores, eh, otra forma pa' presionarlos pa' que le vendan sus negocios a ellos. Oye, es un- esto está feo. | them, uh, inspectors, uh, another way to pressure them to sell their businesses to them. Listen, it's a- this is ugly. |
| [02:15] Raúl Martínez: | Mira, Joe- me están- tengo la línea y- y- y vamos a tener- tengo que ir a- a una pausa en- en unos dos o tres minutos, pero tengo las líneas llenas de personas que me están llamando con nombres. Lo que yo le digo, yo no estoy poniendo ninguna de esas llamadas al aire, porque si van a acusar a alguien de narcotraficante o van a acusar algo, yo necesito saber quiénes son porque no vamos tampoco a utilizar este programa para atacar y acusar a alguien sin tenerlo. Yo lo único que le pido es que me mande- | Look, Joe- they're- I've got the line and- and- and we're going to have- I've got to- take a break in- in about two or three minutes, but I've got the lines full of people who are calling me with names. What I'm saying, I'm not putting any of those calls on the air, because if they're going to accuse someone of being a drug trafficker or they're going to accuse something, I need to know who they are because we're not going to use this program to attack and accuse someone without having them here. All I ask is that you send me- |
| [02:38] Joe Carollo: | Okay. | Okay. |
| [02:39] Raúl Martínez: | -los nombres que se los den a la productora, y yo los voy a verificar. Este nombre, ya hay tres- | -the names, give them to the producer, and I'll check them. This name, and there are already three- |
| [02:43] Joe Carollo: | [U/A – O/V] | [U/A – O/V] |
| [02:39] Raúl Martínez: | -o cuatro personas que lo han mandado decir que el apellido ese, Rodríguez Araqué. | -or four people who have sent word of that last name, Rodríguez Araqué. |
| [02:48] Joe Carollo: | Mm-hm. Exactamente, Alex Rodríguez Araqué, eh, y la señora-, señorita- | Mm-hm. Exactly, Alex Rodríguez Araqué, uh, and Mrs.-, Miss- |
| [02:56] Raúl Martínez: | María Waleska. | María Waleska. |
| [02:57] Joe Carollo: | -su hija no de sangre que la crio cuando se casó con su mamá, es, ah, María Waleska Vivas, eh, Mendoza. | -his daughter, not by blood, but who raised her when he married her mother, is, uh, María Waleska Vivas, uh, Mendoza. |

MADROOM0642518

| [03:06] Raúl Martínez: | Pero, fíjate, Joe, una de las cosas- una de las cosas que- que tenemos que ver, para que estas personas compren estas propiedades, paguen los dineros que están- | But, look, Joe, one of the things- one of the things that- that we have to see, for these people to buy these properties, to pay the money that they're- |
|---|---|---|
| [03:14] Joe Carollo: | Eh, e- | Uh, it- |
| [03:16] Raúl Martínez: | -pagando… | -paying… |
| [03:16] Joe Carollo: | Ellos no han comprado nada… | They haven't bought anything. |
| [03:17] Ronald Hacha: | No, ella no- ella no aparece, ya la busqué en- | No, she doesn't- she doesn't show up, I already looked her up in- |
| [03:18] Joe Carollo: | [U/A - O/V] | [U/A - O/V] |
| [03:18] Raúl Martínez: | -Sunbiz y no aparece. | -Sunbiz and she doesn't come up. |
| [03:19] Joe Carollo: | Ella tiene un negocito de chocolate- | She has a little business with chocolate- |
| [03:22] Ronald Hacha: | Sí. | Yes. |
| [03:22] Joe Carollo: | -de Venezuela. | -from Venezuela. |
| [03:23] Ronald Hacha: | Chocolate y- y [U/A] | Chocolate and- and [U/A] |
| [03:24] Joe Carollo: | -adentro de uno de los lugares eh, que sí se han comprado aquí, eh, últimamente – ella no tiene un lugar, es más, eh, creo que ni tienen licencia de la ciudad ni más nada, ¿qué te parece eso, eh? | -inside one of the places uh, that have been bought here, uh, lately- she does not have a place, in fact, uh, I don't think they even have a license from the city or anything else, what do you think about that, huh? |
| [03:43] Raúl Martínez: | Bueno, y lo otro- y lo otro que tiene que ver, Joe- | Well, and the other- and the other thing you have to look at, Joe- |
| [03:44] Joe Carollo: | [U/A - O/V] arriba por esa gente. | [U/A - O/V] up by these people. |

PAGE 4

MADROOM0642519

| | | |
|---|---|---|
| [03:46] Raúl Martínez: | No, y lo otro que tú estás hablando del tema, y a ti te toca la Pequeña Habana, las condiciones- las condiciones de ese barrio del cual yo me crie… un día cuando estamos en el auto te voy a llevar y te voy a llevar por todos los callejones, todas las cosas que yo me crie y los caminé. Cada vez que veo u oigo de un edificio de esto y voy y visito el lugar, es bochornoso que esta ciudad, con todo el énfasis que le están poniendo al *downtown*, a todo el énfasis que le están poniendo a lo que es Brickell Avenue, el- el- el- la autoridad esta de *downtown,* el *Downtown Development Authority* que- que gasta 12 millones de dólares, tiene 28 empleados, entonces venir ahora y quiere decirme, no, esas cosas son las que ustedes como comisionado o como alcalde tienen que estar presentes y tienen que estar- Joe, me encantaría que tú vinieras aquí conmigo para dedicarte mucho más tiempo, tengo que ir a unos- unos comerciales, eh, si- si- si te quieres quedar más rato, pero tengo- ahora sí tengo que ir a comerciales. Eh, si no, dame una fecha, ven, y nos sentamos aquí con mucho gusto, eh, hablamos de los temas importantes, porque hay un tema que no lo he tocado todavía, y es el famoso tema de alcalde fuerte. | No, and the other thing you're talking about it, and you have Little Havana, the conditions- the conditions of that neighborhood from which I grew up... One day when we're in the car I'm going to take you and I'm going to take you through all the alleys, all the things where I grew up and walked through. Every time I see or hear of a building like this and I go and visit the place, it's embarrassing that this city, with all the emphasis they're putting on downtown, all the emphasis they're putting on what Brickell Avenue is, the- the- the-this downtown authority, the      Downtown Development Authority   that- which spends $12 million, has 28 employees, so coming and telling me, no, those things are the things that you as commissioner or as mayor have to be present and you have to be- Joe, I'd love for you to come here with me to spend a lot more time with you, I have to go to some- some commercials,  uh, if- if- if you want to stay longer, but I have- now I have to go to commercials. Uh, if not, give me a date, come, and I'd be glad to sit here and, uh, talk about the important issues, because there is a topic that I have not touched on yet, and that is the famous issue of strong mayor. |
| [04:58] Joe Carollo: | Mm-hm, sí. | Mm-hm, yes. |
| [04:59] Raúl Martínez: | Ya yo tuve a Francis-<br><br>[*recording ends*] | I already had Francis-<br><br>[*recording ends*] |

MADROOM0642520

Document Produced As Native

MADROOM0614902



**Transcription / Translation of Audio File**

**"238_MADROOM0614902"**

**Spanish into English**

**Speakers:**

**Various Radio Ad Announcers**
**Raúl Martínez**
**Joe Carollo**
**Ronald Hacha**

**January 9, 2023**

U.S. Legal Support, Inc. – Translations Services Department – 855-538-3099
translations@uslegalsupport.com

MADROOM0642521

[U/A] – Unintelligible Audio          [O/V] – Overlapping Voices

| | ORIGINAL AUDIO (Spanish & English) | Translation (Spanish into English) |
|---|---|---|
| [00:00] Joe Carollo: | Eh, tú te imaginas con todo lo que hemos logrado ahora, lo que está pasando en esta Pequeña Habana, eh, como tenemos miles y miles y miles de personas viviendo peor que en el tercer mundo. Eh, y lo más importante para Francis Suarez es más poder, super poderes, ¿por qué no habló de eso en la elección que- que hubo hace meses atrás- | Uh, can you imagine, with everything we've accomplished now, what's going on in this Little Havana, uh, like we have thousands and thousands and thousands of people living worse than in the third world. Uh, and what's most important to Francis Suarez is more power, superpowers, why didn't he talk about that in the election that- that was held months ago- |
| [00:21] Raúl Martínez: | Joe, cuando quieren hablar- cuando quieren haba- hablar de un alcalde, administrador responsable, que me hablen a mí y yo encantado de la vida discuto eso cuando usted quiera. Si quieres, te puedes quedar conmigo y seguimos a la 5 de la tarde, y si no, prométeme que vas a venir personalmente aquí y nos vamos a- a- | Joe, whenever you want to talk- whenever you want to talk- talk about a mayor, administrator in charge, talk to me and I will be happy as ever to discuss that whenever you want. If you want, you can stay with me and we'll continue at 5 in the afternoon, and if not, promise me that you'll come here personally and we'll- |
| [00:36] Joe Carollo: | Eh, Raúl, eh, podemos hablar en estas semanas para ver que podemos- | Uh, Raúl, uh, we can talk during these weeks to see what we can- |
| [00:40] Raúl Martínez: | Que Sonia se ponga de acuerdo con- | Have Sonia work it out with- |
| [00:41] Joe Carollo: | [U/I – O/V] | [U/I – O/V] |
| [00:42] Raúl Martínez: | Que Sonia se ponga de acuerdo con Marjorie y con mucho gusto nos gustaría tenerte aquí y si cualquier otro comisionado quiere venir, pero fíjense en lo que siempre les digo – vengan listos para discutir, debatir y buscar soluciones. En el caso de Joe Carollo, él mencionaba de esto, por lo menos le saqué los nombres. Vamos a ver si le saco los otros. Gracias, Joe. | Sonia can work it out with Marjoie, and we'd be glad to have you here, and if any other Commissioner wants to come, but look at what I always say – come ready to discuss, debate, and look for solutions. In Joe Carollo's case, he was mentioning this, at least I got the names out of him. Let's see if I get the others out of him. Thanks, Joe. |

MADROOM0642522

| [01:01] Radio ad: | [*brief music*] | [*brief music*] |
|---|---|---|
| | Matricúlese lo antes posible para que pueda aprender inglés, que siempre ha querido, pero lo ha dejado para última hora. Ahora que vive en los Estados Unidos, esa debe ser una de sus prioridades. El método es de Justi Language, que es único y garantizado. Usted podrá ser bilingüe. El profesor Justiniani nos enseña con clases como esta: | Sign up as soon as possible so you can learn English, which you've always wanted, but left until the last minute. Now that you live in the United States, that should be one of your priorities. The Justi Language method is unique and guaranteed. You will be able to be bilingual. Professor Justiniani teaches us with classes like this: |
| | La "O" del inglés tiene cuatro pronunciaciones. Algunas veces se pronuncia igual que la "A" del español, como en la palabra "*government*," "*money*," y "*problem*." Sin embargo, otras veces se pronuncia "O-U", la palabra "*post*," P-O-S-T, se pronuncia "*po-u-st*" a pesar de que muchas personas dicen "*p-o-st*" y por ejemplo cuando hablan del periódico Washington Post, dicen Washington "*p-o-st*". También la oficina de correos se llama "*p-ou-st office*," y no "*p-o-st office*"[*phonetic description*] Cosas como estas le enseñamos en Justi Language con nuestro curso, "Secretos de la pronunciación del inglés para el hispano," una vez que usted lo adquiera, resolverá para siempre sus problemas con el inglés. | The "O" in English has four pronunciations. Sometimes it is pronounced the same as the "A" in Spanish, as in the word "*government*," "*money*," and "*problem.*" However, other times it is pronounced "O-U", the word "*post*", P-O-S-T, it is pronounced "*po-u-st*" even though many people say "p-o-st" and for example when they talk about the Washington Post, they say Washington "*p-o-st*". Also the post office is called "p-ou-st office," and not "*p-o-st office*"[*phonetic description*] Things like these we teach you at Justi Language with our course, "Secrets of English pronunciation for Spanish," once you acquire it, it will solve forever your problems with English. |
| | Para nosotros, los hispanos, Justi Language tiene el método especifico, le ayudan a quitar esos malos hábitos a pronunciar como es correcto, no con su propio estilo. Además, si decides a estudiar, te vas a dar cuenta de la diferencia. Marque el 305-553-5222. 305-553-5222. ¿Te quieres hacer ciudadano de los Estados Unidos? Pregunte, porque hay una promoción que le prepara para que pueda pasar el examen para aprender inglés, no hay edad límite. Los cursos a propósito son personalizados. ¿Qué significa eso? Hay pocos alumnos en el aula, y | For us Hispanics, Justi Language has the specific method, they help you get rid of those bad habits so you can pronounce the correct way, not in your own style. In addition, if you decide to study, you will see the difference. Dial 305-553-5222. 305-553-5222. Do you want to become a citizen of the United States? Ask us about a promotional class that prepares you to pass the exam to learn English, there is no age limit. By the way, courses are personalized. What does that mean? There are few students in the classroom, and you progress as |

MADROOM0642523

| | | |
|---|---|---|
| | usted va avanzando a medida que va aprendiendo. Justi Language lo sabe llevar pacientemente. Cambie su vida, aumente su memoria, y su autoestima con el método de Justi Language, donde le van a enseñar y le van a enseñar bien. Pregunte como en el 305-553-5222. 305-553-5222. A propósito, tienen el curso autodidacta de conversación y pronunciación y que vale solo $48. 305-553-5222. 305-553-5222 | you learn. Justi Language knows how to move things along patiently. Change your life, improve your memory, and raise your self-esteem with the Justi Language method, where you will be taught and taught well. Ask as at 305-553-5222. 305-553-5222. By the way, they have the self-taught conversation and pronuniction course that costs  only $48. 305-553-5222. 305-553-5222 |
| [03:07] Radio ad: | [*brief music*]

Mi nombre es Omar Claro. Sí, aquí estoy de vuelta en mi nueva casa, Radio Caracol 1260 AM.

Claro en deportes, de lunes a viernes en vivo a partir de las 8 de la noche por Radio Caracol 1260 AM. ¡Somos Miami! | [*brief music*]

My name is Omar Claro. Yes, here I am back at my new home, Radio Caracol 1260 AM.

Claro on sports, Monday through Friday live from 8 in the evening on Radio Caracol 1260 AM. We are Miami! |
| [03:27] Radio ad: | [*brief music*]

¡Haga su cita hoy con la abogada de inmigración Johana Herrero y Asociados! 786-500-1200. Escucha la abogada Johana Herrero en su programa Inmigración al Momento, todos los lunes a las 7 de la noche por Caracol. | [*brief music*]

Schedule your appointment today with immigration attorney Johana Herrero & Associates! 786-500-1200. Listen to attorney Johana Herrero on her show, *Inmigración al Momento* [*show name* – Up-to-date Immigration], every Monday at 7 in the evening on Caracol. |
| [03:43] Radio ad: | [*brief music*]

América Hoy. El semanario de todos los hispanos. América Hoy. La verdad hecha noticia. Periódico América Hoy, gratis en todo el sur de la Florida.  América Hoy. | [*brief music*]

América Hoy. The weekly publication for all Hispanics. América Hoy. Truth made into news. America Hoy newspaper, free throughout South Florida.   América Hoy. |

MADROOM0642524

| [04:00] Radio ad: | Gracias al liderazgo del congresista Carlos Cordero, se logró la reforma fiscal y ya estamos viendo los resultados. Los empleados han visto aumentos de sueldos, bonos, mejores beneficios para ausencias por razones de familia, mayores aportes para el retiro, y [U/A] ¡Y habrá más! Las empresas grandes y pequeñas ahora tienen más oportunidades para invertir en innovaciones y crecer gracias a la nueva ley fiscal. Eso representa más empleo y mejores sueldos para las familias de la Florida. Dele las gracias al congresista Carlos Cordero enviando un texto hoy mismo con la palabra "REFORMA" al número 528-86. Las tarifas de mensajes de texto pueden aplicar. Pagado por el [U/A].<br><br>[*brief music*]<br><br>[*recording ends*] | Thanks to Congressman Carlos Cordero's leadership, the fiscal reform was attained, and we are already seeing results. Employees have seen pay increases, bonuses, better benefits for family-related leave, increased retirement contributions, and [U/A] And there will be more! Companies large and small now have more opportunities to invest in innovations and grow thanks to the new tax law. That means more jobs and better wages for Florida families. Thank Congressman Carlos Cordero by sending a text today with the word "REFORMA" to number 528-86. Text message rates may apply. Paid for by [U/A].<br><br>[*brief music*]<br><br>[*recording ends*] |

MADROOM0642525



**CERTIFICATE OF ACCURACY**

I, Andreea I. Boscor, declare that I have provided Transcription and Translation Services, executed on this 9th day of January of 2023.

Furthermore, I declare that I am a professional translator from Spanish into English, and that I am competent to translate between those two languages.

I hereby certify that I have transcribed and translated audio into the attached document from Spanish into English to the best of my knowledge and ability and believe this translation to be a true, accurate and complete translation of the original audio provided to me with titles:

> **231_MADROOM0614895**
> **232_MADROOM0614896**
> **233_MADROOM0614897**
> **234_MADROOM0614898**
> **235_MADROOM0614899**
> **236_MADROOM0614900**
> **237_MADROOM0614901**
> **238_MADROOM0614902**

I also hereby certify that I have transcribed audio into the attached document from English to the best of my knowledge and ability and believe this transcription to be a true, accurate and complete transcription of the original audio provided to me with titles:

> **239_MADROOM0615113**
> **240_MADROOM0627404**

Sincerely,

_____          __January 9, 2023____

Andreea I. Boscor                                                   Date

U.S. Legal Support, Inc. – Translations Services Department – 855-538-3099
translations@uslegalsupport.com



# We mine opportunities, curate properties, uncover their potential, **and create value.**

Barlington Group was founded by Bill Fuller and Martin Pinilla in 2004 as a real estate investment and development company committed to identifying value by restructuring real estate assets.

Since its inception, Barlington Group has acquired, developed, and managed commercial projects with a value exceeding $250 million.

Our projects have focused on asset repositioning, ranging from multi-family, retail, office, hotel, and mixed-use buildings.

LEARN MORE

# We see value
## where others don't.

OUR
TENANTS

OUR
PROJECTS

# Our Team.

Led by partners, Bill and Martin, Barlington Group owns and manages more than 1.5 million square feet of property in Miami's urban core.



**Bill Fuller**

**Managing Partner**



**Martin Pinilla II**

**Managing Partner**

OUR TEAM

# Little Havana's revival is interwoven with **Barlington Group.**

GET IN TOUCH

**Barlington Group**

1637 Calle Ocho,
Suite 200
Miami, FL 33135

305.407.1677
info@barlingtongroup.cor

©2021 Barlington Group All Rights Reserved
Terms & Conditions | Privacy Policy | Site Credits

About Us | Barlington Group | Miami Real Estate Development and Investment Group



**$200**M+

**17**+

**1.5**M+

Assets under Managem ent

Years in Business

Square Feet Owned

The Barlington Group was founded by Bill Fuller and Martin Pinilla in 2004, as an urban real estate development company

Over the last two decades, Barlington has acquired, developed and managed commercial projects with a value exceeding $250 million. Projects have focused on asset repositioning, ranging from hotel, retail, multi-family, office and mixed-use buildings.

Barlington specializes in buying properties that allow for value creation by improving structures and programming them with curated tenants – creating a sum greater than the individual parts.

# committed to revitalizing neighborhoods within Greater Miami and across 24 states.

Adaptive re-use projects include: Copper Door BNB in Overtown, Kroma Arts Space in Coconut Grove and Futurama Arts Marketplace, Calle Ocho Goodwill and the soon to open Tower Hotel – all in Little Havana.

The company has active investments in local hospitality experiences and local businesses: Blackbird Ordinary, Union Beer, Toasted Bagelry, Taquerias El Mexicano and Brickell Mattress.



Creating value through neighborhood curation.

# Barlington builds value by investing in legacy properties and businesses in historic neighborhoods in Greater Miami and across 24 states.

The firm's investment in and dedication to the culture, people, and energy of Little Havana has resulted in an unprecedented revitalization of the once-neglected neighborhood. Barlington's success stories have not only sparked huge increases in value along the famous Calle Ocho corridor but have also garnered national broadcast and print coverage of both Barlington's winning approach and the culturally-rich neighborhood.

Barlington Group owns and manages over 1.5 million square feet of retail, office, and hotel properties in Greater Miami. Most recently, with the execution of a NNN Investment Strategy, Barlington has acquired 45 freestanding Dollar General stores

across 24 states, bringing their assets under management to over 1.5 million across the United States.

It continues to add value to assets by finding unique tenants for properties and growing eclectic small businesses that add character to revitalized corridors. Barlington's principals are proficient in all aspects of real estate including: acquisitions, financing, development and management.

The Barlington Team further benefits from Principal Bill Fuller's experience as co-founder of Madroom Hospitality, which has combined twenty-first-century food & beverage expertise with historic preservation to create a trio of winning concepts. The reinvented Ball & Chain – a Little Havana nightclub dating back to the 1930s that hosted Billie Holiday, Count Basie and Chet Baker – is the beating heart of Calle Ocho tourism. Madroom also preserved Taquerias El Mexicano, a Calle Ocho landmark since 1985, and developed the Los Altos lounge space above it.

In fewer than two decades, Barlington has written the book on buying undervalued properties and repositioning them as hospitality, art, and culture hubs spurring revitalization in historically Cuban American Little Havana, African American Overtown, and Bahamian-American Coconut Grove.

## Tenants

## Projects

**Barlington Group**

1637 Calle Ocho,
Suite 200
Miami, FL 33135

305.407.1677
info@barlingtongroup.com

©2021 Barlington Group All Rights Reserved
Terms & Conditions | Privacy Policy | Site Credits

Tenants | Barlington Group | Miami Real Estate Development and Investment Group



Home   Company   Tenants
Projects   Contact

   LOG IN

# Our Tenants

# The Barlington Group's Tenant Portfolio features an array of businesses, from local beloved small businesses to Fortune 500 brands.

# Tenant Portfolio

            

            

            

            

    

# National Tenants












# Local Tenants



















**Barlington Group**

1637 Calle Ocho,
Suite 200
Miami, FL 33135

305.407.1677
info@barlingtongroup.com

©2021 Barlington Group All Rights Reserved

Terms & Conditions | Privacy Policy | Site Credits



Home Company Tenants Projects Contact

 LOG IN

# Deal History









 

**Barlington Group**

1637 Calle Ocho,
Suite 200
Miami, FL 33135

305.407.1677
info@barlingtongroup.com



PLAINTIFF'S
EXHIBIT
312















# City of Miami



## HENRY ANDELO DE ARMAS
### Code Compliance Inspector

## OFFICE OF CODE COMPLIANCE
444 S.W. 2nd Avenue, 7th Floor, Miami, FL 33130
(305) 329-4770 / E-Mail: hdearmas@miamigov.com



# LA PEQUEÑA HABANA



# ALFIE LEON

**Ven a Disfrutar En Comunidad y Un Ambiente Familiar
Este Sábado y Vote Temprano!**

Arroz Con Pollo, Música, y Celebración

**Sábado, 18 de noviembre 10 a.m. - 2 p.m.**

140 SW 14th Avenue, Miami, FL 33145
(Cerca de Hispanic Branch Library / Biblioteca Hispana)

**Vote temprano a partir del viernes,
17 de septiembre en el Distrito 3!**

Votar en Hispanic Library o Shenandoah Library

| **Viernes,** | **Sábado,** | **Domingo,** |
| **17 de noviembre** | **18 noviembre** | **19 noviembre** |
| 7 a.m. - 7 p.m. | 8 a.m. - 4 p.m. | 8 a.m. - 4 p.m. |

**Vote Temprano en Estas Dos Bibliotecas
de Viernes a Domingo:**

**Hispanic Branch Library**
1398 SW 1st Street, Miami, FL 33135

**Shenandoah Branch Library**
2111 SW 19th Street, Miami, FL 33145

**Martes, 21 de noviembre 7 a.m. - 7 p.m.**
Vote en su precinto del Distrito 3

Independent Expenditure Paid for by Jennylee Molina, 1549 SW 8th Street,
Independent of any Candidate or Committee.

PLAINTIFF'S
EXHIBIT
**314**



# Promote Event



| NOV 18 | **Pledge to Vote for Alfie Leon: Early Voting Neighborhood Rally this Saturd...** |
| --- | --- |

You like Ambassadors for Alfie Leon



 Like       Comment       Share

---

 **Results From Your Promotion**

| **171** | **0** |
| --- | --- |
| People Reached | Event Response |

View Detailed Results >

---

☰ **Overview**

Status                                     Active

End Date                          Tuesday at 1:33 PM >

Amount Spent                    $5.53 / $150 >

Male/Female, 18-65+



# Boost Post

 **Results From Your Promotion**   ?

| | |
|---|---|
| **923** | **21** |
| People Reached | Link Clicks |

View Detailed Results  ›

☰ Overview

| Status | ⬤ Active |
|---|---|
| End Date | Monday at 5:49 PM › |
| Amount Spent | $13.83 / $50 › |
| Audience | Male/Female, 18-65+ 1 location |
| Boosted By | JennyLee Molina |
| Payment Method | Paypal account (jennylee@jl-pr.com) |

Increase Budget

👥 **Audience Details**    Edit



Fuller/Pinilla v. Carollo Spanish to English video translation

# Transcription / Translation of Audio File

"Fuller/Pinilla v. Carollo Spanish to English video translation"

## Spanish into English

### Man 1: First man speaking
### Man 2: second man speaking

### March 23, 2023



PLAINTIFF'S
EXHIBIT

**316**

| | ORIGINAL AUDIO (Spanish & English) | Translation (Spanish into English) |
|---|---|---|
| 00:01 M1: | No luchar contra los millonarios, luchar contra los pobres. Es lo más fácil. | Not fight the millionaires, fight the poor. It's easier. |
| 00:05 M2: | Si, pero estabas trabajando con millonarios. | Yes, but you were working with millionaires. |
| 00:07 M1: | Pero es lo más fácil. | But it is easier. |
| 00:08 M2: | Si. | Yes. |
| 00:10 M1: | Hay problemas. | There are problems. |
| 00:11 M2: | Si, no, sí, sí, mira, toma la acción que tienes que tomar. | Yes, no, yes, yes, look, take the action you have to take. |
| 00:15 M1: | No, no es qué yo no tengo que tomar acción, yo lo que estoy es hablando. | No, it's not that I have to take action, what I'm doing is just talking. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |





PLAINTIFF'S EXHIBIT

335



PLAINTIFF'S
EXHIBIT

339



PLAINTIFF'S
EXHIBIT

**343**



PLAINTIFF'S
EXHIBIT

**344**



PLAINTIFF'S
EXHIBIT

353



VOTE NOV. 7

ALFIE
**LEON**
*for* MIAMI COMMISSIONER
**DISTRICT 3**
ALFIELEON.COM

PLAINTIFF'S
EXHIBIT
**356**



PLAINTIFF'S
EXHIBIT
357



PLAINTIFF'S
EXHIBIT

358





PLAINTIFF'S
EXHIBIT

360