**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 1:18-cv-24190**

WILLIAM O. FULLER, and
MARTIN PINILLA, II,
               Plaintiffs,

      v.

JOE CAROLLO,
          Defendant.

_____/

### PLAINTIFFS' RESPONSE TO DEFENDANT'S *SEALED* MOTION FOR NEW TRIAL AND JUDGMENT AS A MATTER OF LAW [DE 498]

As is customary for a party disappointed by an adverse judgment, Defendant Joe Carollo now attempts to raise every imaginable objection to the jury's unambiguous determination that he carried out a relentless vendetta to retaliate against Plaintiffs for exercising their First Amendment rights. Carollo not only fails to identify any trial error in the first instance, but he also fails to come close to satisfying his heavy burden to identify any purported error—or combination of errors—that was so severe that it would entitle him to a new trial or a judgment as a matter of law. *See Rubio v. Bengal Properties, Inc.*, 2023 WL 2734223, at *2 (S.D. Fla. Mar. 31, 2023) (Smith, J.) ("To assure that the judge does not simply substitute his or her judgment for the jury, new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely—the greater weight of the evidence," and "only where the error has caused substantial prejudice to the affected party (or, stated, somewhat differently, affected the party's 'substantial rights' or resulted in 'substantial injustice')") (quoting cases; cleaned up). The jury spoke with a clear voice after a six-week trial, and Carollo's mere dissatisfaction with the product of its deliberations does not warrant a do-over.

### DISCUSSION

Despite criticizing Plaintiffs, their counsel, this Court, the jury, and the wide variety of witnesses arrayed against him, Carollo fails to raise any meritorious basis to complain about the trial in this case, in which both sides were presented with a fair opportunity to present their claims and defenses to a jury that proved to be remarkably attentive and conscientious throughout its six-week term of service. It is unnecessary and hardly possible to summarize the overwhelming

weight of evidence showing that Plaintiffs exercised their First Amendment rights to support Carollo's election opponent and to resist Carollo's political policies, which caused Carollo to spend five years abusing virtually every lever of government authority to conduct a brutal harassment campaign against them. In short, the evidence at trial corresponded with the allegations in the complaint, which the Eleventh Circuit at least implicitly (if not explicitly) recognized as depicting a textbook example of illegal First Amendment retaliation, consistent with the jury's verdict. *See Fuller v. Carollo*, 2022 WL 333234, at \*3 (11th Cir. Feb. 4, 2022), *cert. denied*, 214 L. Ed. 2d 77, 143 S. Ct. 203 (2022) ("Carollo identifies no legal error in the ruling that the complaint against him alleges that he violated settled law prohibiting officials from retaliating against constituents who engage in political activities protected by the First Amendment.").

Indeed, the evidence was particularly striking in this case, as it not only included Carollo's own former employees and several high-ranking career public servants who testified under oath about the contours of Carollo's blatantly unlawful targeting of Plaintiffs, but it also included Carollo's own admissions and internal emails documenting the scheme and his efforts to conceal it. Carollo's post-trial motion does little more than rehash meritless defenses, objections, and appeals that Carollo has unsuccessfully pursued to cause inordinate delay and expense over the past five years. *See, e.g.*, Mar. 10, 2023 Hr'g Tr. at 14-16 (Judge Louis: "I am really trying to choose my words carefully in describing" Carollo's exhaustive pre-trial motions—raising similar issues as his post-trial motions—and urging Carollo's counsel to "[g]ive it a minute" and "please take the hints I am trying to give you" when imploring him to forego a more comprehensive "written order" given that she was struggling to find "a reason why [she] shouldn't shift fees and require [Carollo] to compensate the plaintiffs for responding" to the motions).

A.   **Carollo Fails to Establish that the Great Weight of the Evidence Prohibited the Jury from Finding that Plaintiffs Engaged in First Amendment Activity**

There is no merit to Carollo's primary post-trial argument that Plaintiffs supposedly "fail[ed] to prove they engaged in protected activity." DE 498 at 1-4. To the contrary, Plaintiffs exercised their First Amendment rights both by supporting Carollo's opponent in an election and by opposing Carollo's policies after he took office. Even if it were appropriate for Carollo to limit the inquiry to only two discrete "instances of protected activity"—i.e., two political rallies and an ethics complaint—that would still be more than enough to fulfill the first element of Plaintiffs' claim. DE 498 at 2. Indeed, Carollo's own motion details the litany of grounds for this jury—or any other rational objective observer, for that matter—to conclude that Plaintiffs engaged in

protected political expression. *See McIntyre v. Ohio Elections Com'n*, 514 U.S. 334, 345-46 & n.9 (1995) ("[Speech] 'designed to promote the nomination or election or defeat of a candidate, or to promote the adoption or defeat of any issue, or to influence the voters in any election" "occupies the core of the protection afforded by the First Amendment").

To begin, even Carollo acknowledges that Plaintiff Pinilla "attended the rallies," DE 498 at 2, which itself constitutes an act of "peaceabl[e] assembl[y]" protected by the Constitution. U.S. CONST. amend. I; *accord Mata v. Anderson*, 760 F. Supp. 2d 1068, 1112-13 (D.N.M. 2009) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)) ("Within certain limits not applicable in this case, citizens have a clearly established right to engage in protests and other free-speech activities without fear of government reprisals"). But there is much more, as Carollo is also forced to admit that the evidence presented at trial—both direct and circumstantial—supports the jury's reasonable conclusion that Plaintiffs exercised their First Amendment rights, including by: making direct expenditures to support the political campaign of Carollo's election opponent, *see* DE 498 at 3; organized political rallies that were held on properties owned by their corporate entities, *see id.* at 2 (citing May 8, 2023 Trial Tr. at 215); authorized an ethics complaint to be filed by their corporate entities, *see id.* (citing, *inter alia*, May 9, 2023 Trial Tr. at 79-80; May 10, 2023 Trial Tr. at 42); and "reimbursed" others who organized the rallies. *See id.* at 3 (citing, *inter alia*, May 9, 2023 Trial Tr. at 80-81). Indeed, beyond Carollo's admissions in his own post-trial brief, the evidence and testimony in the trial record further supports the jury's finding that Plaintiffs engaged in protected political expression by supporting Carollo's election opponent in a variety of ways, including by organizing rallies and by making personal contributions to the production of videos and other parts of his campaign. May 8, 2023 Trial Tr. at 43-49; May 9, 2023 Trial Tr. at 171-72.

Against this backdrop of established fact, it is especially absurd for Carollo to argue that a rational jury could not conclude that Plaintiffs were the driving force behind this politically expressive conduct, because that is exactly what Carollo himself concluded at the time. DE 498 at 2-3. For instance, contemporaneous text messages from the day of the election reflect that Plaintiff Fuller "saw Carollo at the polls," who pointedly asked him why he was not wearing his "'blue and yellow' shirt"—colors signifying support of Carollo's election opponent—and thus removed any doubt that Carollo reasonably attributed the First Amendment activity at issue in this case to Plaintiffs. Pls.' Ex. 553. In addition, Carollo's own assessment at the relevant time was also corroborated by multiple members of Carollo's staff. According to Carollo's then-district

liaison, Steve Miro, Plaintiff Fuller wished him "congratulations" on the election and expressed his hope that they could "work together," to which Carollo responded, "f-uck you, f-uck him," and considered Plaintiffs "an enemy" based on their First Amendment activities. Apr. 20, 2023 Trial Tr. at 78-79. Likewise, Carollo's former chief of staff, Richard Blom, unequivocally testified that Carollo's "search for code violations stem[med]" from Carollo's "personal animus" towards Plaintiff Fuller based on his First Amendment activities. Apr. 19, 2023 Trial Tr. at 106.

To the extent that Carollo suggests that only Plaintiffs or their affiliated entities—but not both—could engage in First Amendment activity, he is clearly mistaken. DE 498 at 4-5. For instance, even Carollo's post-trial motion recognizes that the jury was authorized to conclude that Plaintiffs "adopted the speech" that their entities expressed at their direction and under their control. DE 498 at 2 (citing *Gaithright v. Portland*, 439 F.3d 573, 577-78 (9th Cir. 2006) ("[T]he Supreme Court made clear that" the participants in a parade could comprise an "expressive message attributable to the parade's organizer")). And at least one other case cited in Carollo's post-trial motion confirms that the jury was permitted to find that both Plaintiffs and their entities were responsible for engaging in protected political activity by expressly rejecting the notion that First Amendment retaliation requires such a pick-and-choose approach where speech can only be disseminated by an individual or his entity, but not both. *See Colonies Partners LP v. County of San Bernadino*, 2020 WL 5102160, at *27 (C.D. Cal. July 28, 2020) (cited in DE 498 at 8) ("The Court finds there is a triable issue" pertaining to "the tendency . . . to conflate [the entity] and [the individual], and the possibility that Defendants retaliated against both Plaintiffs simultaneously"). As a third federal court put it, "[t]his case is a far cry from a case in which . . . the plaintiff disclaims any involvement in the speech," and thus a viable retaliation claim existed where the plaintiff "played a significant role in [a] publication" which was produced by a third-party entity and defendants retaliated against "him on that basis." *Gazarkiewicz v. Town of Kingsford Heights, Ind.*, 359 F.3d 933, 938 n.1 (7th Cir. 2004) ("reject[ing] the defendants' contention that [plaintiff's] involvement with the flyer" published by a third party "did not constitute 'speech' eligible for First Amendment protection" because the defendants' retaliation was "triggered by his involvement with the flyer" regardless of who actually published it).

In sum, no evidence sheds any doubt on the jury's determination that Plaintiffs represented the driving force behind the First Amendment activity at issue in this case, as confirmed by Carollo himself and by Carollo's own staff members both at the relevant time and in their testimony at

trial. Particularly given that Carollo himself, as well as his staff, reached the reasonable conclusion that Plaintiffs were involved at all levels of supporting his election opponent, filing an ethics complaint against him, and opposing his political policies, Carollo cannot explain why a reasonable jury could not arrive at the same conclusion as a matter of law.

**B.**    **Carollo Fails to Establish that the Great Weight of the Evidence Prohibited the Jury from Finding a Causal Link Between Plaintiffs' Speech and Carollo's Retaliation**

Carollo also forgets or omits the litany of trial evidence and testimony supporting the jury's finding that Plaintiffs' protected speech was "a 'motivating factor' of [his] retaliatory conduct." DE 498 at 4-6. Carollo has unsuccessfully attempted to raise variations of this argument at several points in the proceedings, all of which have been roundly rejected as misstating the law and facts because his retaliatory animus has always been so clear. For example, this Court expressly denied Carollo's motion to dismiss based on allegations in the complaint—and ultimately proven at trial— which were sufficient to support a jury's finding that Plaintiffs' "protected speech was a motivating factor behind the . . . retaliatory conduct." DE 99 at 16-17 (R&R); DE 108 (Order adopting R&R).

Citing allegations in the complaint that were ultimately established as facts during the trial, this Court denied Carollo's motion to dismiss, observing that the "close temporal proximity" between Plaintiffs' protected speech and Carollo's retaliatory conduct was indicative of a causal connection in light of the numerous instances in which Carollo, among other things, "orchestrated Code Enforcement officers to investigate Plaintiffs' holiday party"; "intimidated Plaintiffs' tenant[s]"; personally "investigated [Plaintiffs'] business[es]" and organized targeted "drive-bys" of Plaintiffs' properties; and even "admit[ted] that he was targeting" Plaintiffs. DE 99 at 16-17. This Court similarly rejected Carollo's argument that his retaliation campaign is supposedly not actionable because he purportedly did not "order[ ] any retaliatory action," and "the entire City Commission" was permitted to enforce code violations against Plaintiffs. DE 498 at 4-5. Specifically, this Court emphasized that "numerous courts have found" that the "constant monitoring, investigating or issuance of violations" that Carollo spearheaded "can contravene First Amendment rights." DE 99 at 17 (citing *Cuevas v. City of Sweetwater*, No. 15-22785-CIV, ECF No. 38 (S.D. Fla. Oct. 28, 2015) (quoting *Hollywood Cmty. Synagogue, Inc. v. City of Hollywood, Fla.*, 430 F. Supp. 2d 1296, 1316 (S.D. Fla. 2006))).

Undeterred, Carollo continued to repeatedly raise this argument throughout the proceedings to no avail, based on the same incidents that were proven at trial and thus likewise support the jury's finding that Plaintiffs' protected speech was what motivated Carollo's retaliatory

conduct. *See, e.g.*, DE 324 at 1-6 (Court Order denying Carollo's pretrial motion for JML "selectively target[ing]" Plaintiffs by instructing City employees "in an indirect way" to carry out pretextual raids for the purposes of harassment); DE 268 at 4 (Carollo's pretrial motion for judgment on the pleadings); DE 324 (Order denying Carollo's pretrial motion for judgment on the pleadings). Indeed, there can hardly be any question about Carollo's animus towards Plaintiffs in light of his persistent defamatory commentary from the Dais of the City Commission falsely characterizing them as money launderers and communists. May 10, 2023 Trial Tr. at 183.

In summary, the evidence presented at trial—including Carollo's own statements— confirmed Plaintiffs' allegation that Carollo was motivated by a desire to retaliate against them. *See* Apr. 19, Trial Tr. at 174-75; Apr. 24, 2023 Trial Tr. at 53-54, 113 (Plaintiffs' tenants confirming that Carollo said he "loved what we were doing," but that they were nevertheless "targeted" for "pick[ing] the wrong landlord" because Carollo "had it out for" Plaintiffs). In addition to recounting Carollo's own admissions, numerous trial witnesses, including well-respected career public servants, consistently testified under oath that Carollo acted on his retaliatory animus against Plaintiffs by giving *ultra vires* orders to City employees outside his chain of command, which is a crime under the City of Miami Charter, and even a small fraction of this evidence and testimony would have been far more than necessary to support the jury's verdict. *See* City of Miami Charter at § 4(D) ("Except for the purpose of inquiry ... the mayor, the city commission, any committees and members thereof shall deal with the administrative service solely through the city manager, and neither the mayor nor the city commission, nor any committees nor members thereof shall give orders to any of the subordinates of the city manager, city attorney, city clerk and independent auditor general, either publicly or privately").

To take one example out of many, former City Manager Emilio Gonzalez recounted how he had "never been asked to perform" an audit of a business similar to the one ordered by Carollo, and that his CFO "couldn't find anything on file in the city of another business that had an audited in this way." Apr. 11, 2023 Trial Tr. at 52-53. Likewise, former City Commissioner Ken Russell testified about City officials threatening restaurant employees "with being arrested" because of "Ball & Chain and Commissioner Carollo." Apr. 19, 2023 Trial Tr. at 130. Moreover, former Captain of Alcoholic Beverages & Tobacco Michael Kunert recalled that one of Plaintiffs' properties had already been inspected and approved by the ABT, until Carollo ordered another retaliatory inspection that resulted in the business being shut down on a discretionary basis. Apr.

21, 2023 Trial Tr at 80-81. In addition, an independent valet attendant for one of Plaintiffs' properties explained the basis for his belief that that he was subject to an investigation and audit based on a retaliatory order issued by Carollo. Apr. 19, 2023 Trial Tr. at 243-244.

Moreover, despite subtly attempting to shift the burden of proof in his post-trial motion, Carollo is not entitled to second-guess the jury's finding that Carollo failed to carry his burden of proving that he would have "taken the same actions notwithstanding [his] retaliatory animus." DE 498 at 4-5. The jury was already properly instructed on this element of Carollo's defense, and its conclusive determination that he failed to satisfy his burden of proof is not subject to any second-guessing. *See* DE 475 at 8-9 ("[Y]ou must consider Joe Carollo's contention that he would have engaged in the same activity . . . anyway," which would require him to prove "that he would have done the same thing if [Plaintiffs] had not exercised their First Amendment rights").

In addition to mountains of other direct and circumstantial evidence supporting the jury's verdict, at least two credible witnesses addressed the topic directly: Carollo's former Chief of Staff Richard Blom succinctly answered this question when asked whether "Carollo's personal animus towards [Plaintiffs] stem[med] from his belief that there may be code violations, or did his search for code violations stem from his personal animus," and responded that Carollo's retaliatory conduct stemmed "from his personal animus" and "[n]ot necessarily code violations." Apr. 19, 2023 Trial Tr. at 106. Former City Commissioner Ken Russell echoed this sentiment in his own testimony, observing that Carollo's conduct "went way beyond simple code infraction items" and seemed to be based on "a personal animus" against Plaintiffs. Apr. 19, 2023 Trial Tr. at 121.

As another federal court in Florida recently observed, "the entirety of the evidence Plaintiffs have put forward" would allow a "reasonable jury [to] infer that the [Defendant] acted with a retaliatory motive," despite his arguments that he had "delegated all code enforcement responsibilities," and that Plaintiffs were "repeatedly out of compliance with the ... ordinance." *Sweet Sage Café, LLC v. Town of N. Redington Beach, Fla.*, 380 F. Supp. 3d 1209 (M.D. Fla. 2019). In other words, Carollo cannot "minimize each individual instance" of selective enforcement "but miss[ ] the bigger picture" that includes his shining a government spotlight on Plaintiffs to retaliate against them for engaging in protected political activity. *Id*. "At some point mere coincidence morphs into something else," and the precise location of that line "is a question for the jury." *Id*.; *accord Smith v. Caldwell*, 2022 WL 685037, at \*8-10 (N.D. Ala. Feb. 9, 2022) (citing *Smith v. Fla. Dep't of Corr.*, 713 F.3d 1059, 1063 (11th Cir. 2013)) ("If the plaintiff satisfies

his burden of demonstrating that his protected conduct was a motivating factor behind the harm, the burden shifts to the defendant to demonstrate that he would have taken the same action regardless of the protected activity").

Finally, if it were possible to harbor any remaining doubt about the existence of a straight line between Plaintiffs' political expression and Carollo's retaliatory conduct, Carollo confirmed it by engaging in improper machinations in an effort to disguise that glaring nexus. Just as flight can be indicative of a "consciousness of guilt" in a criminal case, Carollo's attempts at concealment reflect his awareness that his actions were motivated by a retaliatory animus, providing further support for the jury's findings to that effect. *United States v. Hood*, 846 F. App'x 825, 830 (11th Cir. 2021). For example, after Carollo was advised that his "hit list" of Plaintiffs' businesses and properties that he had unlawfully ordered City employees to target for retaliatory raids, inspections, and audits was indicative of his illegal retaliatory motive, he clumsily attempted to conceal his misconduct by merely adding other properties to the list. *See* Apr. 11, 2023 Trial Tr. at 50-51. When former City Commissioner Ken Russell heard about this plan to conceal Carollo's retaliation campaign against Plaintiffs he accurately characterized it as an attack on "all businesses to justify the attack on one business" owned by Plaintiffs, stated that "this is wrong," and lodged his opposition to Carollo's effort to "hurt[ ] businesses around the city just to cover" up Carollo's First Amendment retaliation against Plaintiffs. Apr. 19, 2023 Trial Tr. at 130.

In short, Carollo's admissions, the consistent testimony of countless witnesses, and the unrebutted evidentiary record all exceed the allegations in the complaint and operate in concert to support the jury's finding that Plaintiffs' political speech was the "motivating factor" behind Carollo's retaliation that followed soon thereafter, as even the cases Carollo cites in his post-trial motions confirm. *See, e.g.*, *Eisenberg v. City of Miami Beach*, 1 F. Supp. 3d 1327, 1344 (S.D. Fla. 2014) (cited in DE 498 at 4) ("[T]he . . . facts . . . illustrating the City acted in retaliation to Plaintiffs' exercise of free speech, . . . taken as a whole[,] are sufficient to infer a retaliatory motive"); *Smith v. Caldwell*, 2022 WL 685037, at *10 (N.D. Ala. Feb. 9, 2022) ("Drawing all reasonable inferences in [Plaintiff's] favor, the close temporal proximity between the complaint and the assaults is sufficient to create an inference of causation").[1]

---

[1] Because these facts so overwhelmingly establish a causal connection between Plaintiffs' First Amendment expression and Carollo's retaliatory conduct, Carollo cannot possibly explain how he is entitled to a new trial based on the harmless admission of any testimony suggesting that Carollo's

**C.**     **Carollo Fails to Establish that the Great Weight of the Evidence Prohibited the Jury from Awarding Damages**

The computation of damages is a core jury function, and Carollo fails to provide any justifiable reason to displace the jury's prudent award of compensatory and punitive damages based on six weeks of staggering evidence and testimony demonstrating the devastating effects of Carollo's violation of Plaintiffs' constitutional rights. *See Munoz v. Oceanside Resorts, Inc*., 223 F.3d 1340, 1349 (11th Cir. 2000) (quoting *Ferrill v. Parker Group, Inc*., 168 F.3d 468, 476 (11th Cir.1999)) ("'[T]he standard of review for awards of compensatory damages for intangible, emotional harms is deferential to the fact finder because the harm is subjective and evaluating it depends considerably on the demeanor of the witnesses'") (brackets omitted). In fact, Carollo's damages-based arguments are particularly misguided because they rely on inapposite cases in which proof of an actual injury comprises an element of the claim, rather than § 1983 cases like this one in which both "nominal damages" and "punitive damages" are recoverable "for constitutional violations without a showing of compensable injury." *Hoever v. Marks*, 993 F.3d 1353, 1361 (11th Cir. 2021) (quoting, *inter alia*, *Carey v. Piphus*, 435 U.S. 247, 266 (1978));

---

animus towards Plaintiffs was "widely" or "openly" known throughout the City. DE 498 at 5. **First**, this testimony was consistent with other direct and circumstantial evidence of Carollo's animus, and properly admissible for other purposes—e.g., to illustrate how City employees were likely to interpret Carollo's ***implicit*** orders to engage in retaliatory acts against Plaintiffs. **Second**, in some instances, Carollo either did not object to the admission of such testimony or even elicited it himself. *See* May 8, 2023 Trial Tr. at 144 (no objection); Apr. 24, 2023 Trial Tr. at 133-34 (Carollo challenging a third-party witness's knowledge as being "based off of [her] opinion" without "actual facts," eliciting the witness to testify that Carollo's desire to retaliate was not only "very clear" after speaking directly to Carollo but also because "it was well known" to "[e]veryone in the city" that Carollo "had it out for" Plaintiffs, and it was "common knowledge" that Carollo was "targeting" Plaintiffs' tenants, and the witness was "not making that up"). **Third**, in addition to sustaining an objection to the admission of such testimony, the Court also issued a curative instruction to disregard all instances in which such testimony was admitted, which was far greater than necessary to ameliorate any potential prejudice. *See, e.g.*, Apr. 24, 2023 Trial Tr. at 72; May 9, 2023 Trial Tr. at 171:4-8; May 31, Trial Tr. at 8:14-18 ("Any testimony throughout this trial that have been said as to what anyone knew of what everyone knows shall be stricken as regards to whether it was directed towards the plaintiff or towards the defendant, and shall not be considered as inadmissible evidence").

*accord Slicker v. Jackson*, 215 F.3d 1225, 1231-32 (11th Cir. 2000) ("[W]e agree with the reasoning of our sister circuits which have held that a § 1983 plaintiff . . . is entitled to nominal damages even if he fails to present evidence of compensable injury").

And, to the extent that Carollo's damages-based arguments are premised on any purportedly improper statements delivered in Plaintiffs' closing argument, Carollo failed to preserve his objections by lodging any contemporaneous objection and does not satisfy his heavy burden of proving that his "substantial rights at trial" were affected in any way. *Bratt v. Genovese*, 2018 WL 5111910, at *4 (M.D. Fla. Oct. 19, 2018) (quoting *McWhorter v. City of Birmingham*, 906 F.2d 674, 677 (11th Cir. 1990), and *Christopher v. Florida*, 449 F.3d 1360, 1367 (11th Cir. 2006)) ("When no [contemporaneous] objections are raised [during closing argument], the standard for a new trial is plain error, but a finding of plain error 'is seldom justified in reviewing argument of counsel in a civil case.'"); *accord Rosa v. City of Fort Myers, FL*, 297 F. App'x 830, 835 (11th Cir. 2008) ("Statements made in oral arguments must be plainly unwarranted and clearly injurious to constitute reversible error. Having thoroughly reviewed the record, we agree with the district court that all of the comments—most of which were challenged after-the-fact, and not objected to contemporaneously—either were not prohibited by the district court's prior rulings, were a fair response to statements by plaintiff's counsel, were based on evidence that was in fact introduced on the record, or were cured by the district court's jury instructions") (cleaned up).

Thus, as an initial matter, there is no basis to overturn the jury's award of compensatory damages based on the severe emotional distress, reputational harm, and other injuries that Carollo's illegal activity inflicted on Plaintiff Fuller and Plaintiff Pinilla. While the foundation of Carollo's argument misleadingly states that Judge Louis initially "struck 'Plaintiffs' amended initial disclosures'" for failing to sufficiently substantiate their damages claim, DE 498 at 6-7 & n.5 (citing DE 313), he neglects to inform the Court that Plaintiffs subsequently filed a second amended initial disclosure in accordance with the Court's instructions which provided a computation of their damages, including the bases for seeking "emotional distress damages in excess of $10 million for each Plaintiff," and subsequently provided additional documents to substantiate their claim for damages. DE 315-2 at 33-34; *accord* DE 348 (Order denying Carollo's motion to strike Plaintiffs' second amended initial disclosure); DE 363 (Order denying Carollo's amended motion to strike, and reiterating that it is "contradicted by Defendant's own reply," "[b]izarrely" framed, and "premised on an incomplete and outdated set of facts").

Because Plaintiffs properly amended and supplemented their initial disclosures, they were not precluded from "suggest[ing] specific amounts" in their closing statement, DE 498 at 6-7, and Carollo's remaining challenges to the jury's award of compensatory damages are all baseless for the reasons explained in more detail in Plaintiffs' response in opposition to Carollo's duplicative motion for remittitur. *See generally* DE 539 at 3-7. In short, Plaintiffs did not engage in speculation or ask the jury "to pick a number out of thin air," DE 498 at 6-7, but rather presented overwhelming evidence and testimony that was more than enough to sustain the jury's award of compensatory damages while consistently underscoring that it was the jury's responsibility to ultimately determine the appropriate amount. *See, e.g.*, *Greisen v. Hanken*, 252 F. Supp. 3d 1042, 1065 (D. Or. 2017), *aff'd*, 925 F.3d 1097 (9th Cir. 2019) (affirming $3 million jury award for non-economic damages where "[a]t trial, Greisen presented ample evidence, both through his own testimony and with testimony from his wife, concerning the emotional damage that Greisen suffered as a result of Hanken's actions"); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1065 (8th Cir. 1997) ("Medical or other expert evidence is not required to prove emotional distress. A plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden in this regard") (cleaned up); *Miko v. Jones*, 2023 WL 196920, at *2 (N.D. Ga. Jan. 17, 2023) ("[T]he plaintiff in a Section 1983 action may be awarded actual compensatory damages for any demonstrated mental and emotional distress, impairment of reputation, and personal humiliation," including based on plaintiff's testimony that "he became anxious, stigmatized, lost his ability to socialize with others, and suffered significant emotional distress"); *Tuggle v. Hill*, 2009 WL 10688077, at *2 (N.D. Ga. May 4, 2009) ("The jury was entitled to credit this evidence" of plaintiff's "mental distress, impairment of his reputation, and personal humiliation," as well as plaintiff's testimony that he was "unable to conduct business as normal," and "to award compensatory damages accordingly").

Finally, even if there were any basis to question the jury's award of compensatory damages (which there is not), there would still be no basis to overturn the jury's award of punitive damages, which could be premised on a finding of mere nominal damages. *Smith v. Wade*, 461 U.S. 30, 56 (1983) ("We hold that a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."). Once again, Carollo's motion for new trial and judgment as a matter of law repeats the same baseless objections

that he raises in his motion for remittitur. Thus, to avoid duplication, Plaintiffs incorporate the arguments that they set forth in more detail in their opposition to Carollo's motion for remittitur, including the fact that the jury's award of punitive damages is fully appropriate in light of: (a) the reprehensibility of Carollo's First Amendment retaliation campaign and the strong public interest in deterring similarly situated misconduct in the future; (b) the fact that the punitive damages assessed are merely three times greater than the amount of actual harm; and (c) the proportionality of this award compared with other similar cases. *See generally* DE 539 at 7-11.[2]

**D.**   **Carollo Fails to Establish that a New Trial Is Warranted Based on Any Trial Rulings**

None of the remaining miscellaneous complaints that Carollo lodges about the conduct of the trial—which encompass the virtual entirety of the Court's evidentiary rulings, jury instructions, and handling of the in-court misconduct of Carollo's counsel—satisfies any applicable legal standard for granting a new trial or the entry of judgment in his favor. DE 498 at 10-20. To begin, Carollo is hard-pressed to identify a single purported error that he did not directly cause, invite, or engineer in an attempt to generate a pretext for appealing an inevitable adverse judgment, forfeiting his right to any relief. *See United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009) ("Where a party invites error, the Court is precluded from reviewing that error on appeal," which is a "doctrine [that] stems from the common sense view that where a party invites the trial court to commit error, he cannot later cry foul on appeal") (cleaned up). But, even if Carollo had clean hands, which he does not, the "Supreme Court has long held that 'a litigant is entitled to a fair trial, not a perfect one.'" *Broadnax v. City of New Haven*, 2004 WL 491069, at *2 (D. Conn. Mar. 2, 2004) (quoting *Lutwak v. United States*, 344 U.S. 604, 619 (1953)); *accord Michigan Abrasive Co. v. Poole*, 805 F.2d 1001, 1008 (11th Cir. 1986) (citing *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 553 (1984)) ("A litigant is entitled to a fair trial—not a perfect one").

---

[2] Carollo does not—and could not—argue that three-to-one ratio between the jury's award of punitive damages and compensatory damages is presumptively disproportionate, nor could he sustain a similar argument even if Plaintiff were only awarded nominal damages in lieu of compensatory damages. This is because the Eleventh Circuit has cautioned that "a court should not rigidly rely on the ratio" between punitive damages and nominal damages to the extent that it "subvert[s] traditional purposes of punitive damages," and instead "should compare the amount of [punitive] damages to the actual harm that has occurred, [and] not necessarily" the amount of compensatory damages that are ultimately awarded. *See Davis v. White*, 2022 WL 3083458, at * 2 (N.D. Ala. Aug. 3, 2022) (quoting, *inter alia*, *S.E. Prop. Holdings, LLC v. Judkins*, 882 F. App'x 929, 937 (11th Cir. 2020)) ("[T]o compare the punitive damages to the awarded **nominal damages** . . . misconstrues" the proportionality analysis).

At the outset, Carollo raises countless duplicative arguments in support of his motion for a new trial and judgment as a matter of law that are copied-and-pasted from his motion for remittitur. *Compare* DE 498 at 6-7, *with* DE 499 at 2-4 (specific amounts); *compare* DE 498 at 8-9, *with* DE 499 at 3-4 (golden rule); *compare* DE 498 at 9-10, *with* DE 499 at 8-10 (salary); *compare* DE 498 at 10, *with* DE 499 at 1-2 (shock the conscience); *compare* DE 498 at 16-17, *with* DE 499 at 10-11 (probable cause instruction); *compare* DE 498 at 17-18, *with* DE 499 at 11 (verdict form). Because Carollo is not entitled to a remittitur based on any of these arguments, he necessarily fails to meet the more stringent standard for a new trial or judgment as a matter of law on such grounds. Thus, in the interest of judicial economy, and to avoid unnecessary repetition, Plaintiffs reiterate that Carollo is wrong to argue that the jury's verdict was infected by any trial error that would merit a new trial or the entry of a judgment in his favor for exactly the same reasons that Carollo is not entitled to a remittitur, all of which are incorporated herein by reference. *See* DE 539 at 12-13 (specific amounts); *id.* at 13 (golden rule); *id.* at 14 (salary); *id.* at 15 (probable cause instruction); *id.* at 17 (verdict form).

Similar to the meritless arguments that Carollo copied-and-pasted from his motion to remittitur, all of Carollo's remaining arguments fall far short of establishing any basis for granting him a new trial or a judgment in his favor notwithstanding the jury's verdict. For instance, Carollo cannot contort the record to support his fabricated assertion that the trial evidence painted him as a "racist" based on a few passing remarks that in fact conveyed no such thing. DE 498 at 11. Take, for example, the testimony of former Chief of Police Art Acevedo, who remarked that his efforts to reform the police department were "impeded" by Carollo. Apr. 18, 2023 Trial Tr. at 114. Carollo cannot take that isolated comment out of context, jam it together with approximately 60 pages— **60 pages!**—of disjointed trial transcripts expressing Acevedo's support for minority citizens in general, and claim that Acevedo meant to imply (or that a rational jury would conclude) that that Carollo had a racially motivated reason for impeding his reform efforts. DE 498 at 11 (misquoting, out of context, Apr. 18, 2023 Trial Tr. at 108-166). What Acevedo actually said was that Carollo's objections to hiring Acevedo were based on his status as an "outsider," which occurred during "a public meeting" and is "all on video." Apr. 18, 2023 Trial Tr. at 112.

Nor were there any other accusations of racism—either implied by any witnesses or reasonably inferred by the jury—inherent in the testimony recounting Carollo's own statements about the development of the Little Havana neighborhood. The genesis of Carollo's First

Amendment retaliation campaign did not arise in a vacuum but instead reflected a fundamental difference of political opinion between the parties. Plaintiffs were motivated to exercise their First Amendment rights to advance their strongly held vision to empower a diverse coalition of local residents to foster the organic growth of a vibrant community that honored its Afro-Cuban roots. Meanwhile, Carollo was motivated to retaliate against Plaintiffs' political expression because it diverged with his own plan to engage in restrictive, planned development designed to solidify the existing political hierarchy and primarily cater to entrenched interests and investors. This stark difference in political opinion—which gave rise to this litigation—was reflected in Carollo's own statements expressing distaste for a mural on one of Plaintiffs' properties that celebrated Afro-Cuban figures and in Carollo's stated objection to "Liberty City . . . com[ing] to Miami." Apr. 11, 2023 Trial Tr. at 21-22; Apr. 21, 2023 Trial Tr. at 29-30. Because Carollo's own statements about the mural on Plaintiffs' property were germane to the political dispute at the heart of Plaintiffs' claim for illegal political retribution, Carollo fails to draw any apt relationship between this case and any case cited in his post-trial motion involving irrelevant racial slurs.[3]

Carollo's remaining critiques of this Court's prudent supervision of this high-profile, six-week trial—going so far as to stridently accuse the Court of supposedly "not call[ing] balls and strikes equally"—are all baseless and false. DE 498 at 11-16. For instance, Carollo erroneously argues that the Court somehow exhibited bias by excluding 17 additional witnesses who were not identified in his pretrial witness list and based on a request that he did not make until Sunday, April 23, 2023, after nearly a month of trial had already passed, after opening statements had been delivered, and after Plaintiffs' case-in-chief was well underway. DE 498 at 11-12. That is absurd, and there is no meaningful comparison to be drawn to the fact that Plaintiffs were permitted to call two witnesses who were identified in a witness list that they timely filed on March 30, 2023, over a month before trial. DE 369. There are numerous additional reasons why Carollo's apples-to-

---

[3] Because Carollo's statements about the parties' political difference of opinion did not constitute "racial slurs," there is no merit to Carollo's post-trial argument that the Court was obligated to permit him to introduce "counterbalancing" evidence of the artwork in his office that supposedly proves "he is not a racist." DE 498 at 11. There was no error in the Court's determination that a tour of Carollo's office artwork would represent a time-wasting frolic, particularly given the leeway that Carollo was granted in order to offer testimony describing what he believed were his positive deeds on behalf of racial minorities in order to quell any imaginary implication that the evidence at trial suggested that he is a racist. *See* May 1, 2023 Trial Tr. at 79-86.

oranges comparison is obviously specious, as explained in written briefing resulting in the denial of Carollo's motion. *See* DE 400 (citing, *inter alia*, *Bronk v. Ineichen*, 54 F.3d 425, 431-32 (7th Cir. 1995) (Appellate courts "have little difficulty in approving the decisions" of trial courts that "exclud[e] testimony [of] a rebuttal witness after" a party "fail[s] to name him on their pre-trial witness list pursuant to the district court's order"); *accord Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1245-46 (7th Cir. 1982) ("[T]he district court did not abuse its discretion" in "refusing to permit" the testimony of a witness who "was not listed as a defense witness on the final pretrial witness list" because it gave the opposing party "only three days' notice" which failed to provide "sufficient time to prepare to cross-examine" the witness).

With respect to other witnesses named in Carollo's post-trial motion—including Tanjha Quintana, Art Acevedo, and Carollo himself—the Court properly exercised its wide discretion to manage its docket and schedule the orderly presentation of the evidence in response to Carollo's own tactical decisions. For instance, Carollo was repeatedly and expressly warned about the consequences of creating a mini-trial over the grounds for Steve Miro's termination. Specifically, Carollo was repeatedly told that alleging that Mr. Miro was fired for supposedly "terrorizing" employees and engaging in sexual misconduct would impel Plaintiffs to set the record straight by calling Ms. Quintana to testify that she had been coerced by Carollo to falsely testify that Mr. Miro (and Mr. Blom) sexually assaulted her. Apr. 21, 2023 Trial Tr. at 17-18. In the face of those clear admonitions, Carollo nevertheless wrongfully accused Mr. Miro of nonexistent sexual misconduct, opening the door to Ms. Quintana's rebuttal testimony to explain that those bogus accusations were fabricated by Carollo, who forced her to provide false testimony to support them. This Court correctly ruled that Plaintiffs had "clearly put [Carollo] on notice" that Carollo's cross-examination of Mr. Miro would open the door to Ms. Quintana's rebuttal testimony, and the Court also ensured that her testimony was appropriately tailored to the occasion. *Id.* at 47-51.

Carollo was similarly warned about the consequences of attempting to use the disputed grounds for former Police Chief Acevedo's termination as both a sword and a shield. *See* Apr. 21, 2023 Trial Tr. at 51 (Quintana); Apr. 18, 2023 Trial Tr. at 150-55. By falsely accusing Acevedo of having been fired for other reasons, Carollo opened the door to Acevedo's truthful testimony that he had actually been terminated for reporting Carollo's First Amendment retaliation campaign against Plaintiffs. And, to the extent that Carollo suggests otherwise in his post-trial motion, DE 498 at 12-13, he provides no valid reason to question the admission of Acevedo's testimony

recounting his first-hand observations of Carollo's ongoing five-year retaliation campaign against Plaintiffs based on his personal knowledge.[4]

As for Carollo himself, he was given wide latitude to testify for two full days under friendly questioning from his own attorneys during Plaintiffs' case-in-chief (and provided a litany of unresponsive narrative responses when questioned for an additional two days by Plaintiffs' counsel as a hostile witness). As this Court noted, Plaintiffs had provided Carollo ample room to cover all of the potential areas of testimony that he might wish to cover in his defense case, letting him "go on like a ship sailing never reaching its port." May 30, 2023 Trial Tr. at 23. Contrary to Carollo's argument that he was "denied . . . an opportunity to testify in his case-in-chief," DE 498 at 13, Court expressly invited him to take the stand, but merely prohibited from repeating the testimony that had already been covered during his friendly round of questioning that had already lasted two full days (not including the two additional days that he provided narrative responses to Plaintiffs' questions). May 30, 2023 Trial Tr. at 114. Carollo's decision to refuse to testify unless he were

---

[4] Carollo's baseless challenge to Acevedo's testimony appears to stem from Carollo's inchoate argument that Plaintiffs were somehow prohibited from introducing any evidence or testimony that was not explicitly spelled out in the complaint, including any evidence or testimony about ongoing incidents that occurred after the complaint was filed or any other facts that are inextricably intertwined with the pleadings. *See* DE 498 at 12-14. Carollo is misguided as to both the facts and the law. **First**, as a matter of fact, the complaint made it clear that Carollo's retaliation campaign was ongoing until the present day, and even sought permanent injunctive relief to remedy Carollo's misconduct which persisted through trial. *See, e.g.*, DE 125 at ¶ 237 ("Undeterred by the filing of the Complaint in his action, . . . Carollo['s] retaliatory action . . . has continued"); *id*. at ¶¶ 275-282 ("[S]ince late 2018," after the filing of the complaint, Carollo has engaged in a campaign" comprising a "new plan of attack" to harm "Plaintiffs['] overall business strategy"); *id*. at ¶¶ 288-89 ("Carollo and the City are seeking to fabricate evidence, complaints, and violations, all with the sole purpose of . . . destroying [Plaintiffs'] lives"); *id*. at ¶ 320 ("Plaintiffs also seek a permanent injunction against further retaliation against them"). **Second**, as a matter of law, Plaintiffs were only subject to the notice-pleading requirement, and there is no legal principle that prohibited them from introducing evidence and testimony relating to ongoing misconduct and intertwined facts relevant to their claims and damages. *See, e.g.*, *Cartagena v. Serv. Source, Inc.*, 2019 WL 355728, at *2–3 (M.D. Pa. Jan. 29, 2019) ("A plaintiff need not plead each and every act of discrimination that contributed to the alleged hostile work environment," and "is not precluded from presenting evidence and testimony of post-complaint allegations of sexual harassment in accordance with the Federal Rules of Evidence"); *Haitayan v. 7-Eleven, Inc.*, 2021 WL 1034152, at *3–4 (C.D. Cal. Mar. 8, 2021) ("Plaintiffs are not barred from seeking damages occurring post-complaint," and "[a]ny violations that are encompassed within the [complaint's] allegations but occurred after the complaint was filed are ... within 'the scope of litigation.'").

permitted to hijack several additional days of a trial that had already spanned six weeks by retreading old ground constitutes a tantrum on his part, not reversible error on the Court's part.

There is likewise no merit to Carollo's argument that the Court erred or evinced any bias in its countless heat-of-battle evidentiary rulings. DE 498 at 12, 15-16. At the outset, most—if not all—of the purported disparities that Carollo identifies in the Court's reception of evidence can be readily explained by the fact that Plaintiffs lodged timely, meritorious objections whereas Carollo did not. For instance, although Carollo accuses the Court of unfairness by allowing former City Manager Gonzalez and former Chief of Police Acevedo to recount their military service and employment history, he neglects to mention that he never objected to such testimony. *See* DE 498 at 15-16 (citing Apr. 11, 2023 Trial Tr. at 9-15 (Gonzalez); Apr. 18, 2023 Trial Tr. at 72-81 (Acevedo)). Carollo does not explain why his tactical decision not to object to certain testimony could have possibly precluded the Court from sustaining Plaintiffs' well-founded contemporaneous objections to the testimony of other witnesses on similar subjects.

Moreover, even if Carollo had neither waived his objections nor invited the so-called errors, his remaining arguments require him to misrepresent or misconstrue the record. For instance, Carollo states that that the Court supposedly "prohibited [him] from eliciting" certain testimony or making certain arguments about Plaintiffs' business practices and reputation. DE 498 at 12. But the Court in fact permitted Carollo to elicit such testimony and make such arguments. *See, e.g.*, May 16, 2023 Trial Tr. at 138 (Daniel Goldberg testifying, over Plaintiffs' objection, that Plaintiffs "seemed to collect unsafe structures because I kept seeing them pop up on the title searches that we would pull"); May 31, 2023 Trial Tr. at 114, 132 (Carollo's counsel arguing that "[t]his is [Plaintiffs'] pattern and practice. This is business as usual for the plaintiffs"; "they made their bed when they chose not to follow the rules as their business practice").

And, although Carollo argues in hindsight that the Court erred by limiting similar testimony and argument on a small handful of occasions, the Court's exclusion of irrelevant, cumulative, or otherwise improper testimony represented a garden-variety exercise of its discretionary authority to administer the proceedings and provides no basis to erase the results of a six-week trial. *United States v. Gerald*, 365 F. App'x 188, 192 (11th Cir. 2010) ("Given the district court's wide discretion in limiting repetitive or irrelevant testimony and its curative instructions, we cannot say that the district court abused its discretion in this case."); *United States v. Day*, 405 F.3d 1293, 1297 (11th Cir. 2005) (citing *United States v. Hawkins*, 661 F.2d 436, 450 (5th Cir. Unit B 1981)) ("A district

court judge has 'wide discretion in managing the proceedings,' he may comment on the evidence, question witnesses, elicit facts not yet adduced or clarify those previously presented, and maintain the pace of a trial by interrupting or cutting off counsel as a matter of discretion").

Similarly, Carollo attempts to deceive the Court by claiming that the number of witnesses that each side called to testify over a certain number of trial days was somehow unfair. DE 498 at 15. But, as Carollo and his experienced counsel well know, such a misleading accounting of bare numbers is not indicative of whether a trial was conducted fairly. The issues covered at trial were not neatly divided between the witnesses that each party called to the stand nor were they dependent on whether the evidence was presented before or after Plaintiffs rested. Rather, Carollo was granted broad latitude to address his defenses through Plaintiffs witnesses, weave the presentation of his defenses into Plaintiffs' case-in-chief, and consumed more than his fair share of time making his presentation to the jury throughout the trial.

To take one example in particular, Plaintiffs may have called Carollo to testify as an adverse witness in their case-in-chief, but it is misleading in the extreme for Carollo to now attribute the entire four days of his testimony to Plaintiffs when constructing a tit-for-tat accounting intended to suggest that the sides were not given an equal opportunity to present their respective cases to the jury. And that pattern holds in general, as Plaintiffs as a rule conducted brisk and focused direct examinations, while Carollo favored extended, meandering cross-examinations seemingly designed to confuse and exhaust the jury. In the end, Carollo was not prevented from calling any of the 15 witnesses that he had identified in his witness list, and the Court's rules and time limits were enforced fairly against both sides.

Indeed, Carollo often requested, and received, additional time to cross-examine witnesses in excess of his allotted time limits. Apr. 25, 2023 Trial Tr. at 195, 201; May 11, 2023 Trial Tr. at 157, 197-199, 230; May 17, 2023 Trial Tr. at 263. The Court even granted Carollo additional time to complete the presentation of his defense case, in contravention of the time limits that it had set. May 17, 2023 Trial Tr. at 263. As a result of Carollo's deliberate trial strategy, the trial which was expected to last only two weeks ultimately dragged on for over six weeks, and the Court was both diligent and even-handed in managing its docket and schedule in accordance with its expansive discretionary authority.

Finally, Carollo does not bother to cite any legal authority or to explain his basis for rehashing a variety of the Court's pretrial rulings and claiming that they somehow reflect the

Court's so-called "disparate treatment" of the parties. DE 498 at 16. Particularly after Carollo managed to delay the case through a series of stays extending for five years which unquestionably prejudiced Plaintiffs, it was permissible for the Court to deny any further continuances. And the Court's reasoning behind that ruling, as well as its refusal to relocate the trial that had always been docketed as a Fort Lauderdale case, and its Orders *in limine* are all correct and stated clearly on the record. DE 355 (Order denying motion for continuance); DE 360 (Order denying motions to transfer); DE 365 (Order *in limine*).

For example, Carollo offers no legitimate basis to revisit the Court's adept handling of the rampant disobedience perpetrated by Carollo and his counsel, as well as their persistent efforts to engineer a mistrial. Although Carollo complains that the Court evinced bias in its numerous (correct) rulings throughout the proceedings, including its denial of his motions for mistrial and/or disqualification, Carollo fails to state any basis for reconsidering the Court's rulings other than the fact that he would have preferred a different result. Accordingly, Carollo's various motions have no merit for the reasons that have already been exhaustively addressed in the record and are incorporated herein by reference. *See, e.g.*, DE 419; May 30, 2023 Trial Tr. at 123-27 (the Court denying Carollo's motion for mistrial and accurately characterizing it as intentionally "misrepresent[ing] evidence" and, "in essence, fabricated in terms of what this Court had said and [w]hat was done right within the hours before this motion was filed" and "submitted in open court and . . . released to the media and everyone else" with "statements [that] were not true").

In short, a party and its counsel obviously cannot repeatedly engage in grave, obstructive misconduct warranting sanctions up to and including a term of imprisonment, and then cite the Court's exercise of its authority to administer order in its courtroom as a basis for demanding his disqualification. *See Harris v. Geico Gen. Ins. Co.*, 961 F. Supp. 2d 1223, 1230 (S.D. Fla. 2013) (quoting *United States v. S. Fla. Water Mgmt. Dist.*, 290 F. Supp. 2d 1356, 1360 (S.D. Fla. 2003)) (denying motion to disqualify "which merely restates in conclusory fashion" the party's "belief that the undersigned comments . . . are indicative of bias"; the "Court, having sat through the entire trial, is certainly entitled to 'formulate opinions on the basis of . . . events occurring in the course of the proceedings'") (brackets omitted); *Holmes v. NBC/GE*, 925 F. Supp. 198, 201-02 (S.D.N.Y. 1996) (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)) (denying motion to disqualify where "the points raised in [the] motion can be disposed of outright because of the fact that they are directed to this court's judicial rulings, which, standing alone, 'almost never constitute valid

basis for a bias or partiality motion'"; "each of [the] arguments complain of either 'judicial rulings' or 'routine trial administration efforts' which all occurred in the course of judicial proceedings") (brackets omitted); *United States v. Anderson*, 433 F.2d 856, 860 (8th Cir. 1970) ("Bias and prejudice must stem from some extrajudicial source and result in an opinion on the merits on some basis other than what the judge has learned from his participation in the case," and when a motion and "affidavit does not meet the[se] requirements imposed by law, the judge has an obligation not to disqualify himself").

By the same token, Carollo misrepresents that he supposedly learned of "further disparate treatment" after the trial. DE 498 at 20. Each night during trial, the parties received rough transcripts of the preceding day's proceedings. Carollo complains that, after 7:00 p.m. the night before their closing argument, Plaintiffs' counsel were inadvertently emailed a copy of an "*in camera* conversation regarding defense closing" which would have provided them a so-called prejudicial advantage the next morning. *Id*. But Plaintiffs and their counsel were busy preparing their own closing argument, and never realized that they had received the *in camera* conversation until Carollo mentioned it in his post-trial motion, much less did they review it to obtain any strategic windfall for their closing argument. *See* **Exhibit A** (C. Caprio Decl.). Plaintiffs' closing argument "reference[d]" Mr. Noreiga's testimony (without quoting any portion of the testimony or citing any page number) merely because they had remembered it from the day before, and not because they reviewed the transcript that included the *in camera* conversation. *Id*. Likewise for Plaintiffs' unremarkable ability to "anticipate[ ]" that Carollo would raise the same issues in his closing argument that he had persistently raised throughout the five-year lifespan of the case, including in repetitive fashion during the trial, beginning with his opening statement. *Id*.; *accord, e.g.*, Apr. 10, 2023 Trial Tr. at 31-45 (Carollo's opening statement referencing all of the defense themes that Plaintiffs' counsel "anticipated" in Plaintiffs' closing argument). In short, Carollo's latest fanciful narrative has no basis in fact, and it shares a place alongside all of the other arguments raised in his post-trial motion that do not provide any basis for the extraordinary remedy he seeks in the form of relief from the jury's well-reasoned verdict consistent with the evidence and testimony presented over the course of a six-week trial.

WHEREFORE, Plaintiffs respectfully request that this Court deny Defendant's Motion for New Trial and Renewed Motion for Judgment as a Matter of Law.

Dated: August 7, 2023

Respectfully submitted,

**AXS LAW GROUP, PLLC**
2121 NW 2nd Ave, Suite 201
Wynwood, Florida 33127
Telephone: (305) 297-1878

By: */s/ Jeff Gutchess*
Jeffrey W. Gutchess Esq. (FBN#702641)
jeff@axslawgroup.com
eservice@axslawgroup.com
*Counsel for Plaintiffs William Fuller and Martin Pinilla*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of August, 2023, I electronically filed the foregoing with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record.

By: */s/ Jeff Gutchess*
Jeffrey W. Gutchess Esq.