## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No.: 1:18-cv-24190

WILLIAM O. FULLER, and
MARTIN PINILLA, II,

        Plaintiffs,

   v.

JOE CAROLLO,

        Defendant.

_____/

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR REMITTITUR [DE 499]

The evidence and presented over the course of this six-week trial vividly demonstrated Defendant Joe Carollo's extreme abuse of government authority that was not only damaging to Plaintiffs but also had expansive collateral consequences for innocent bystanders. In addition to harming Plaintiffs and unjustifiably targeting Plaintiffs' family, employees, tenants, and business associates, Carollo's First Amendment retaliation campaign also struck a damaging blow against our system of participatory democratic governance. The widespread relentless harm caused by Carollo's rampant misconduct over five and a half years warranted the jury's award of compensatory damages of $8.6 million for Plaintiff Fuller and $7.3 million for Plaintiff Pinilla, as well as a deterrent award of punitive damages (almost) triple the amount of compensatory damages for each Plaintiff. There is no basis for Carollo to diminish the computation of damages that the jury deemed necessary to vindicate Plaintiffs' exercise of their fundamental constitutional rights and to deter similarly situated government officials from abusing their power to seek vengeance against citizens who engage in political activity to oppose their candidacy or agenda.

In fact, ever since the jury rendered its verdict, Carollo has continued to make matters worse by demeaning the jury, thumbing his nose at the Court, and taunting Plaintiffs by publicly asserting that the judgment against him is illegitimate and by engaging in maneuvers designed to evade it. *See, e.g.*, Jay Weaver & Charles Rabin, *Who will pay Carollo's $63.5 million judgment? Probably not Joe, who wasn't got the dough*, MIAMI HERALD, at https://tinyurl.com/35c2nm3b (June 1, 2023) ("Carollo told the Miami Herald" the day **after** the verdict that "[t]oday is the first

day of this trial" because an appellate court will provide "a more level playing field"); Steve Litz, *"I don't have that kind of money": Joe Carollo says $63M verdict will be overturned*, NBC6.COM, at https://tinyurl.com/5yb9c4hf (June 7, 2023) ("Joe Carollo believes a $63 million verdict against him in a civil political retaliation lawsuit will be overturned on appeal, an dsaid he has no plans to pay [it]," stating that "'I have done nothing wrong'").

## DISCUSSION

Carollo's motion for remittitur is designed to miss the forest for the trees by nitpicking the Court's administration of the proceedings and flyspecking the jury's verdict against out-of-context quotes from inapposite cases cherry-picked among the skewed sample of outlying cases that warranted a published decision in the federal reports. But, by any standard, the jury's award of compensatory and punitive damages was reasonable and appropriate considering the uniquely egregious circumstances presented in this case. The only thing that would shock the conscience of a rational objective observer is the prolonged viciousness of Carollo's First Amendment retaliation campaign, not the reasonable computation of damages reflected in the jury's verdict.

In short, over the course of a six-week trial, the jury was bombarded with the testimony of numerous high-profile career public servants who described their dismay with the disproportionate retaliation campaign waged by a tyrannical government official who could not tolerate the political opposition of two ordinary citizens. Merely because Plaintiffs had the nerve to support Carollo's election opponent and expose Carollo's actions to the City's ethics commission, Carollo devoted essentially his entire term in office to destroying Plaintiffs' lives and livelihoods—harming their families, tenants, and business associates in the process—while also setting a dangerous precedent for like-minded (abusive) government officials bent on chilling the civic activity of individuals who might otherwise want to contribute their unique voices to our dynamic political system. Thus, even if Carollo were not capable of evading this Court's judgment, as he publicly announced he aims to do, there would be no basis to reduce it even further. The jury's award is not excessive, but rather represents a fair and appropriate amount to compensate Plaintiffs for Carollo's relentless campaign of retaliation that they endured for over five years, to punish Carollo for his egregious abuse of power, and to deter other elected officials from betraying their sacred oath of office and violating the most foundational principles enshrined in the United States Constitution.

A.     <u>Carollo Fails to Establish Any Basis to Reduce the Jury's Compensatory Award</u>

Given that courts "are particularly deferential to the fact finder's determination of compensatory damage awards for intangible, emotional harms because the harm is so 'subjective and evaluating it depends considerably on the demeanor of the witnesses,'" Carollo cannot challenge the amount of compensatory damages awarded by the jury in this case. *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1315 (11th Cir. 2001) (quoting *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 476 (11th Cir.1999)). The only purported error relating to the jury's award of compensatory damages that Carollo identifies with any specificity in his motion for remittitur was not an error in the first instance and would not justify reconsideration of the jury's award of compensatory damages in any event. Specifically, there is no legal or factual support for Carollo's erroneous argument that Plaintiffs supposedly "failed to *quantify*" or to provide a "*computation* of damages" before trial "and were therefore precluded from suggesting a specific amount to the jury" during trial. DE 499 at 2-3 (emphases in original).

In fact, Plaintiffs' second amended initial disclosures described the "years long emotional distress damages" that stemmed "from Carollo's targeting and attempts to shut down their businesses and ruin their livelihoods and destroy their reputations." DE 315-2 at 33. Plaintiffs described the millions of dollars of business prospects that had already been lost as a result of Carollo's misconduct, including "attempting to characterize Plaintiffs as organized crime leaders and associated with Venezuelan corruption," all of which provided a basis for "ask[ing] the jury to value" their emotional distress and reputational damages in excess of $10 million for each Plaintiff." *Id.* at 33-34. Plaintiffs then voluntarily provided additional documents to support their compensatory damages claims, which was consistent with the evidence and testimony that they introduced at trial. *See* DE 318-1.[1]

---

[1] Carollo's argument on this score does not identify any error in the proceedings, but rather reflects a dissatisfaction with his own tactical decision-making. In attempting to draw unwarranted comparisons between this case and other distinguishable cases, it appears that Carollo expected the parties to exchange a greater volume of discovery materials relating to Plaintiffs' damages claim before trial. And Carollo's expectations might have been fulfilled if he had not demanded a series of inordinate stays of the proceedings over Plaintiffs' unsuccessful objections, and refused to participate in any voluntary discovery during the pendency of the stays that he obtained. Plaintiffs repeatedly explained at the time that Carollo's strategy of delay was uniquely prejudicial to them since it allowed him to spend over five years continuing his retaliation campaign while the litigation remained stalled. And so, when all of Carollo's interlocutory appeals proved to be

Indeed, this Court already emphatically rejected the same argument that Carollo raises in his motion for remittitur, describing it as "bizarre" and characterizing it as an "unnecessar[y] strain[ ]" on "the Court's resources." DE 363 at 2. Specifically, Carollo repeatedly demanded that this Court strike Plaintiffs' second amended initial disclosures, insisting that they "utterly fail[ed] to provide any substantiated basis for the computation" of their emotional distress and reputation damages. DE 315 at 2; DE 349 at 2. Magistrate Judge Louis succinctly denied Carollo's motion on the record at a status conference while strongly implying that it was sufficiently frivolous to warrant the imposition of sanctions. Mar. 10, 2023 Hr'g Tr. at 15-16. When Carollo then had the temerity to raise the same argument again in an amended motion, Magistrate Judge Louis underscored that his argument that was not only "premised on an incomplete and outdated set of facts," but also "contradicted by [Carollo's] own reply . . ., wherein he clarified that Plaintiffs *have* provided the documents" necessary to justify their claim for emotional distress and reputation damages. DE 363 at 2 (emphasis in original); *accord* DE 316 at 4-8 (Plaintiffs' response, citing cases and explaining that they had "computed the specific amounts sought for their individual damages . . . and provid[ed] supporting documentation").

Consistent with their initial disclosures, Plaintiffs firmly supported their reputational and emotional distress damages with evidence and testimony presented at trial. For instance, Plaintiffs' reputational harm was proven by Carollo's own admissions, in which he admitted to making multiple defamatory statements about them, including unsubstantiated and devastating assertions that they are connected to the Venezuelan Communist government, involved with the mafia, and engaged in money laundering and fraud. *See* May 1, 2023 Trial Tr. at 69-72, 77, 89-90, 148; May 2, 2023 Trial Tr. at 67. Moreover, Carollo harmed Plaintiffs' reputations by delivering illegal, *ultra vires* orders to City employees outside his chain of command to target Plaintiffs' properties and businesses for constant harassment and chasing away their business associates and tenants. As Matt Malone, one of Plaintiffs' former business associates testified, Carollo directly informed him

---

meritless, he could not have possibly been surprised that—as a result of his own choices and despite Plaintiffs' repeated warnings—the case was promptly set for trial. Even so, Carollo had plenty of opportunity to seek any additional discovery on Plaintiffs' damages claim before trial but he elected not to do so. Accordingly, Carollo received exactly what he asked for, and cannot complain after-the-fact about the adequacy of the discovery that he obtained about Plaintiffs' damages before trial.

that he would not support his relationship with Plaintiffs, which caused their business venture to cease. Apr. 14, 2023 Trial Tr. at 174-77. Rosa Romero, one of Plaintiffs' former tenants, similarly testified that Carollo directly threatened to withdraw his support of the small business she ran with her husband, compelling them to move the business to a new location. Apr. 24, 2023 Trial Tr. at 54-55, 73, 109.

Plaintiffs also established a baseline for calculating the damages stemming from the reputational harm that Carollo inflicted, leading to their emotional distress. For example, as Plaintiff Pinilla explained, potential tenants had become "very much aware of the targeting that [Plaintiffs] are being imposed upon by Commissioner Carollo," and had thus grown "concerned that their projects are going to take long" and began "asking for more time to complete construction" in their draft leases. May 8, 2023 Trial Tr. 143-145. Ultimately, Plaintiffs have never "been able to get a tenant into the Tower Hotel" and have lost "[m]illions of dollars" as a result of Carollo's interference with this one aspect of their business. *Id.* at 145-46.  Plaintiffs, of course, were engaged in several different business ventures when Carollo began his retaliation campaign. But, as Darius Green, an employee of Plaintiffs, summarized, Plaintiffs and their business partners have been forced to "avoid the city of Miami because of the harassment from Carollo directly" and "will not open up another venue in the City of Miami." Apr. 25, 2023 Trial Tr. at 25-26 (Mr. Green explaining that "he has "brought different opportunities" to Plaintiffs, which they cannot pursue because it is "too risky" to cross Carollo).

Plaintiffs and their families also testified under oath about the emotional and psychological effects of Carollo's relentless First Amendment retaliation campaign, which destroyed their reputation and ability to earn a living in their community. In short, by falsely accusing Plaintiffs of being money launderers and fraudsters and by making it clear that anyone associated with Plaintiffs would be targeted for harassment and retribution, Carollo made it virtually impossible for Plaintiffs to conduct business by deterring banks, tenants, and potential investors and partners from working with them. May 8, 2023 Trial Tr. at 107-08, 112, 140-49, 153, 170, 183; May 9, 2023 Trial Tr. at 39; May 10, 2023 Trial Tr. at 38-39, 104-05. In turn, Plaintiffs suffered severe stress, anxiety, emotional distress, and personal humiliation that manifested itself in the form of deteriorating physical health. May 8, 2023 Trial Tr. at 160; May 10, 2023 Trial Tr. at 28, 48, 75, 124, 182.  Plaintiff Fuller, for instance, experienced pain and suffering in the form of heightened psychological stress, deteriorating physical health, increased emotional distress, and personal

humiliation that manifested itself in the form of anxiety, high blood pressure, heart palpitations, and lack of sleep that forced him to seek medical care and damaged his relationship with his wife and four young children. See May 5, 2023 Trial Tr. at 195-99. Plaintiff Fuller testified that Carollo's savage and relentless attacks on him were "devastating" to him and his family, and it made him feel "[h]elpless" that the effects of Carollo's harassment began "impacting our vendors, our relationships. It was extremely difficult." May 10, 2023 Trial Tr. at 15.

> You become frightened, scared that what's happening? . . . Again, when is the next shoe going to drop? What are they actually doing to us? How could the commissioner be so bold to show up at the property at night like this? … Okay. It's not just the attacks. But so it's anxiety. It's a constant fear of destruction that's coming your way. And it's overwhelming, extremely overwhelming.

May 10, 2023 Trial Tr. at 28.

Plaintiff Pinilla similarly testified that he is constantly anxious, stressed, and has catastrophic thoughts because of Carollo's constant targeting. May 8, 2023 Trial Tr. at 151-53. Specifically, Plaintiff Pinilla testified: "Every time [Carollo] crushes a lease, every time he takes a tenant away, every time he closes down one of our business, he's -- he's attacking our vision." May 8, 2023 Trial Tr. at 158. He further described how Plaintiffs have been through "five and a half years of constant anguish every day" and "don't know where the next attack is coming from." May 8, 2023 Trial Tr. at 160.

Plaintiff Fuller's wife corroborated the extensive testimony of both Plaintiff Fuller and Plaintiff Pinilla by explaining the severe emotional distress that was the foreseeable result of a retaliation campaign by a powerful government official designed to destroy their reputations, decimate their ability to conduct business, and diminish their ability to earn a livelihood and provide for their families: "–[A]ll the optimism and the happiness that I knew [Plaintiff Fuller] to always have had just gone away and it was affecting him and his relationship with me and the kids. He has been paranoid for his own safety – He has become paranoid for his own safety. He fears false arrest like what happened to one of his managers.  He does not go to his office in Little Havana anymore, may be once, twice a month. He -- which is so sad. He doesn't feel comfortable there. He's afraid to be ‑ there and he -- it's just -- he's not the same person anymore." May 5, 2023 Trial Tr. at 196.

Though Carollo attempts to imply that the jury's award of compensatory damages for Plaintiffs' combined severe emotional **and** reputational harm was inappropriate or excessive under

the circumstances, federal courts—at both the trial and appellate level—have repeatedly rejected similar arguments to uphold jury awards in excess of millions of dollars for these same damages based solely on the testimony of plaintiffs and (in some cases) their family members.  In the Section 1983 civil rights context, courts have sustained similar damages based on facts far less egregious than the evidence adduced at trial. In *Harper v. City of Los Angeles,* for example, the Ninth Circuit affirmed a jury's award of over $5 million in compensatory emotional and reputational harm damages for each plaintiff in a Section 1983 civil rights case stemming from the wrongful arrest of police officers, due to the "'impairment of reputation, personal humiliation, and mental anguish and suffering.'" 533 F.3d 1010, 1028-29 (9th Cir. 2008) (quoting *Memphis Cmty. Sch. Dist. V. Stachura*, 477 U.S. 299, 307 (1986)). The appellate court rejected arguments similar to those Carollo raises here, emphasizing that the plaintiffs' testimony "about the adverse physical and emotional effects" of their experience alone was sufficient to sustain the award, without the need for any additional "'objective' evidence,'" such as "medical expenses or lost income." *Id*. at 1029-30.

Likewise, in *Greisen v. Hanken*, a federal district court rejected a "challenge[ ] [to] the jury's award of $3,000,000 in non-economic damages" in a Section 1983 civil rights case. *Greisen v. Hanken*, 252 F. Supp. 3d 1042, 1065 (D. Or. 2017), *aff'd*, 925 F.3d 1097 (9th Cir. 2019).  The court underscored that the plaintiff "presented ample evidence, both through his own testimony and with testimony from his wife, concerning the emotional distress that [he] suffered as a result of [the defendant's] actions," and that there was "no legal authority" requiring "evidence from a psychologist, psychiatrist or other mental health professional" before " a jury may award non-economic damages for emotional distress." *Id*.  Other cases similarly support the amount of compensatory damages the jury deemed appropriate for reputational and emotional harm damages. *See, e.g.*, *Cantu v. Flanigan*, 705 F.Supp. 2d 220, 226-231 (E.D.N.Y. 2010) (upholding a $150 million defamation verdict based on false statements accusing Plaintiff of associating with the Mexican cartel and on "evidence demonstrating that the injury to [plaintiff's] reputation led to lost contracts valued at" millions of dollars); *Sweeney v. Westvaco Co.*, 926 F.2d 29, 35-36 (1st Cir. 1991) (rejecting challenge to an award of $1.5 million for emotional distress damages); *Tuli v. Brigham & Women's Hosp.*, 656 F.3d 33, 44-45 (1st Cir. 2011) (rejecting challenge to an award of $1.6 million for emotional distress damages based on the plaintiff's testimony "about the emotional impact" of the "anxiety, anger, fear, and nervousness" stemming from illegal

7

retaliation); *Prozeralik v. Cap. Cities Commc'ns, Inc.*, 222 A.D.2d 1020, 1020, 635 N.Y.S.2d 913, 914 (1995) (finding that jury award of $6,000,000 for injury to reputation and $3,500,000 for emotional and physical injury was not excessive).

**B.    Carollo Fails to Establish Any Basis to Reduce the Jury's Punitive Award**

There is no reason to disturb the jury's decision to award punitive damages based on the reprehensibility of Carollo's conduct and the need to deter similarly situated defendants from chilling the constitutional rights of similarly situated plaintiffs in the future. *Doe v. Sch. Bd. of Miami-Dade Cnty., Fla.*, 624 F. Supp. 3d 1292, 1300-01 (S.D. Fla. 2022) ("[I]n considering whether a remittitur is appropriate, the Court is bound to allow Plaintiffs the maximum possible recovery, keeping in mind that 'the Court is not to substitute its judgment for the jury's") (cleaned up).

**First**, the jury's award did not shock the conscience or violate due process considering Carollo's reprehensible, illegal and unconstitutional conduct, including his efforts to cover up his actions, the severe damage he caused to Plaintiffs individually, and the wide-ranging collateral consequences for a slew of Plaintiffs' family, employees, tenants, and business associates, as well as the public at large. Thus, in addition to the extensive evidence of the severe harm that Carollo's First Amendment retaliation campaign inflicted on Plaintiffs, *see, supra*, at 4-7, a substantial award of punitive damages was warranted because the record established by a preponderance of the evidence Carollo was either "shown to be motivated by evil motive or intent" or that he demonstrated a "reckless or callous indifference to [Plaintiffs'] federally protected rights," with any single one of those factors (or both) meriting an award of punitive damages. *See Smith v. Wade*, 461 U.S. 30, 56 (1983).

To put it another way, Carollo not only shamelessly defamed Plaintiffs and destroyed their reputations from a position of power and influence (warranting the jury's appropriate measure of compensatory damages), but he also admitted under oath that he did not have a shred of evidence to support his false and defamatory statements (warranting the award of punitive damages). May 1, 2023 Trial Tr. at 69. And numerous other characteristics of Carollo's retaliation were indicative of either his evil motive/intent or reckless/callous disregard for Plaintiffs' rights. For instance, Carollo not only repeatedly attempted to report Plaintiff Fuller to the Florida Department of Law Enforcement, but he confirmed he was not aware of any enforcement action that had been taken against them.  May 9, 2023 Trial Tr. at 153; May 10, 2023 Trial Tr. at 54, 56, 80-81. Carollo not

only personally carried out his retaliation campaign, he did so by lurking in the shadows, often late at night behind Plaintiffs' businesses and hiding behind a baseball cap attempting to be "covert." Apr. 19, 2023 Trial Tr. at 229-30; May 9, 2023 Trial Tr. at 258-60. And, Carollo not only targeted Plaintiffs' properties and businesses for raids, inspections, and audits, but he clumsily attempted to conceal his retaliatory motives by merely adding other innocent victims to whitewash his "hit list" of Plaintiffs' properties that he singled out for unconstitutional targeting and harassment. *See* Apr. 11, 2023 Trial Tr. at 50:4-8, 51:18-25; *accord* Apr. 19, 2023 Trial Tr. at 130 (Commissioner Ken Russell stating that Carollo was "wrong" to conduct an attack on "all businesses to justify the attack" on Plaintiffs, and to "hurt[ ] businesses around the city just to cover" up Carollo's First Amendment retaliation against Plaintiffs).

Five highly respected career public servants (former Miami City Manager Emilio Gonzalez, former Chief of Miami Police Jorge Colina, former Chief of Miami Police Art Acevedo, former Chief of Doral Police Richard Blom, and former Miami City Commissioner Ken Russell) testified under oath at length during the trial about Carollo's unjustifiable evil motive that animated his disproportionate and relentless campaign of retaliation that has persisted for over five years. For instance, Carollo's former chief of staff and a former City Commissioner agreed that Carollo's misconduct stemmed from his "personal animus" against Plaintiffs and "went way beyond simple code infraction items." Apr. 19, 2023 Trial Tr. at 106 (Richard Blom); *id.* at 121 (Ken Russell). And Former Police Chief Art Acevedo added, consistent with the testimony of other witnesses, that he was warned to stay away from any business Bill Fuller was associated with or he would experience "the wrath of Joe Carollo." Apr. 18, 2023 Trial Tr. at 86-87; *accord* Apr. 26, 2023 Trial Tr. at 52 (Carollo's receptionist testifying that Carollo prohibited her from going "to Ball & Chain or any property that Bill Fuller owned").

Carollo's animus is further showcased by his mission to destroy Viernes Culturales, a non-profit organization that has nothing to do with purported code violations, but had Plaintiff Fuller on its board. Carollo reserved the space that Viernes Culturales had been using for their festival every last Friday of the month for 20 years, blocking it from happening. May 10, 2023 Trial Tr. at 66-74. He then created his own festival named Little Havana Friday's, forcing Viernes Culturales to downsize its cultural festival and hold it on a different day on a much smaller property in a parking lot. May 10, 2023 Trial Tr. at 78-79.

9

If Carollo's relentless attack on Plaintiffs' First Amendment rights were permissible, no rational citizen would dare to support the candidacy of his election opponent or oppose his political agenda. After all, under Carollo's view of the law, it would not be sensible to engage in political expression at the risk of enraging a powerful politician—who many in the community take seriously—and becoming the focus of his egregious defamatory statements, including accusing them of crimes they did not commit and destroying the very essence of the hard work they put into developing their community. May 10, 2023 Trial Tr. at 183. In fact, Carollo's emotional manipulation of Plaintiffs grew so severe over the course of his five-year harassment campaign that Plaintiffs eventually came to fear for the safety in the neighborhood that they called home. May 10, 2023 Trial Tr. at 93. By engaging in such disproportionate and inexecusable misconduct, which included decimating Plaintiffs' ability to function in society and earn a livelihood by scaring away their banks, lawyers, partners, tenants, and customers, Carollo evinced a degree of reprehensibility that is properly reflected in the jury's award of punitive damages. May 8, 2023 Trial Tr. at 107-12, 149-55, 170, 185-86; May 10, 2023 Trial Tr. at 80-82, 104-105. *See Bogle v. McClure,* 332 F.3d 1347, 1362 (11th Cir. 2003) (upholding a punitive damages award of $13.3 million in a Section 1983 case where the defendants' wrongful actions were intentional, and defendants demonstrated efforts to cover up their wrongful conduct).

**Second**, the (almost) three-to-one ratio between punitive damages and compensatory damages is on the low end of multipliers approved by courts across the country. *See Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1339 (11th Cir. 1999) (reducing a punitive damage award to a "100:1 ratio of the punitive to the actual damages [which] is at the upper limits of the Constitution, but is justified by the need to deter"); *Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302, 1321 (11th Cir. 2007) (affirming a 5:1 ratio because, "[u]nder the circumstances of this case," a "punitive damages award of $17.5 million is proportionally related to the compensatory damage award of approximately $3.2 million").

Nor would this ratio be subject to a meritorious challenge even if Carollo were somehow capable of reducing—or eliminating—the jury's compensatory award based on a legal technicality (which he is not). To the contrary, an award of mere nominal damages in a civil rights case would authorize the jury to impose a substantial award of punitive damages because the relevant denominator is the amount of actual harm, and not the amount of compensatory damages ultimately awarded. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 581 (1996) (citing *TXO Prod.*

*Corp. v. All. Res. Corp.*, 509 U.S. 443, 460 (1993)) ("[The] proper inquiry is whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred") (emphasis in original; quotation marks omitted).

   In other words, "a court should not rigidly rely on the ratio" between punitive damages and nominal damages to the extent that it "subvert[s] traditional purposes of punitive damages," and instead "should compare the amount of [punitive] damages to the actual harm that has occurred, [and] not necessarily" the amount of compensatory damages that are ultimately awarded. *See Davis v. White*, 2022 WL 3083458, at * 2 (N.D. Ala. Aug. 3, 2022) (quoting, *inter alia*, *S.E. Prop. Holdings, LLC v. Judkins*, 882 F. App'x 929, 937 (11th Cir. 2020)) ("[T]o compare the punitive damages to the awarded nominal damages . . . misconstrues" the proportionality analysis).

   **Third**, there is no disparity between the jury's award in this case and the amounts awarded in other cases, much less a disparity that raises constitutional concerns. In addition to its award of compensatory damages which fits comfortably within the range of acceptable verdicts for emotional distress and reputational harm, *see, supra,* at 7-8 (citing cases), the jury's decision to award (almost) three times that amount in punitive damages was similarly appropriate.

   In fact, courts across the country, including the Supreme Court, have approved punitive damages awards that exceed the amount of compensatory damages by even larger amounts without "cross[ing] the line into the area of constitutional impropriety." *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23-24 (1991) (affirming judgment where punitive damages award was more than four times the amount of compensatory damages); *accord TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 453, 113 S. Ct. 2711, 2718, 125 L. Ed. 2d 366 (1993) (affirming "a $10 million punitive damages award—an award 526 times greater than the actual damages awarded by the jury"); *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1338 (11th Cir. 1999) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 584, 116 S. Ct. 1589, 1603, 134 L. Ed. 2d 809 (1996)) ("The Supreme Court recognized . . . that there would be times when a substantial disparity between actual damages and the punitive award would be expected and, therefore, not constitutionally excessive," including "in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine'").

   Thus, in *Zhang v. Am. Gem Seafoods, Inc.*, for example, the Ninth Circuit rejected a challenge to a $2.6 million punitive damages award in a civil rights case, holding that it was "not

11

constitutionally excessive" given that the defendants' conduct "was highly reprehensible, and the punitive award exceeded the compensatory award by a single-digit multiplier." *Id*., 339 F.3d 1020, 1044-45 (9th Cir. 2003). Similarly, in *Estate of Moreland v. Dieter*, the Seventh Circuit found that a "jury award[ of] $15 million in punitive damages against" on defendant, and "$12.5 million against" another defendant, "in addition to assessing compensatory damages at $29 million" was not unconstitutionally excessive. *Id.*, 395 F.3d 747, 756 (7th Cir. 2005).

**C.    Carollo Fails to Establish Any Trial Error, Much Less Any Trial Error Requiring a Reduction of the Jury's Award of Damages**

Particularly considering the reprehensibility of Carollo's illegal and unconstitutional actions—including his efforts to cover them up—and the damage they caused to Plaintiffs individually as well as to the public more than five years, the jury's award of compensatory and punitive damages was reasonable and appropriate for the reasons explained above. Not a single one of the patchwork of reasons that Carollo advances for reducing the jury's award of damages in this case has any merit, especially considering the lack of any indication that any complaint— or any combination of complaints—that Carollo raises in his post-trial motions had any effect on the jury's deliberations, which instead were guided by an overwhelming amount of evidence and testimony presented over the course of the six-week trial. *See Reis v. Thierry's Inc*., 2010 WL 11505827, at *3 (S.D. Fla. Jan. 19, 2010) (quoting *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1447 (11th Cir. 1985)) ("'[A] new trial should be ordered only where the verdict is so excessive as to shock the conscience of the court.'").[2]

1.    *Carollo Fails to Establish Any Error in Plaintiffs' Closing Argument*

Particularly given the evidence and testimony supporting the jury's award of compensatory damages, there was no error in Plaintiffs' closing argument despite Carollo's contention that it supposedly incorporated an "impermissible presentation of damages amounts" based on the evidence in this case and other similar cases, or any so-called "golden rule arguments." DE 499 at 2-4; *accord* DE 498 at 8-9.

---

[2] Because Carollo copied-and-pasted numerous arguments in the two post-trial motions that he filed on the same date, *compare* DE 498 (motion for new trial and judgment as a matter of law), *with* DE 499 (motion for remittitur), in the interest of judicial economy and to avoid duplication, Plaintiffs incorporate by reference the arguments they raised in opposition to Carollo's motion for new trial that overlap with the arguments raised in Carollo's motion for remittitur. *See generally* DE 538.

To begin, even Carollo acknowledges that the leading out-of-District case that he cites in his brief "declined to grant a new trial" for referencing a potential range of damages awarded in other cases. DE 498 at 8; 499 at 4 (citing *Nichols v. Fannin*, 2018 WL 2220872, at *16 (N.D. Ga. Apr. 16, 2018); *accord Fox v. Pittsburg State Univ.*, 257 F. Supp. 3d 1112, 1152 (D. Kan. June 26, 2017) ("Plaintiff . . . suggest[ing] to the jury that it should compensate her . . . based on other cases" was not "'extraneous matter' that warrants reversible error"). In fact, courts underscore that the threshold for obtaining relief based on an allegedly improper closing argument "is hard to meet," and even making "several statements [that] were objectionable"—or even "clearly objectionable"—during closing arguments is "harmless" in the absence of any other conduct that "'impair[ed] gravely the calm and dispassionate consideration of the case by the jury.'" *Nichols*, *supra*, at *16 (quoting *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1474 (11th Cir. 1992)).

Likewise, Carollo fails to establish that Plaintiffs made any other statement in their closing argument that was so outrageous as to gravely impair the jury's ability to engage in dispassionate deliberations, including any so-called "golden rule" statements. *See* DE 498 at 7-9; DE 499 at 3-4. Indeed, the lead case cited in Carollo's brief inadvertently bolsters Plaintiffs' point by juxtaposition. For one thing, Plaintiffs in this case did not make a "golden rule" statement in the first place, but rather merely permissibly emphasized the importance of deterring First Amendment violations by similarly situated public official defendants in the future when awarding punitive damages in this case, without ever "ask[ing] the jurors to 'put themselves in the shoes of the plaintiff and do unto him as they would have him do unto them under similar circumstances" for purposes of awarding compensatory damages. DE 498 at 9 (citing *Cooper v. Miami-Dade County*, 2004 WL 2044288, at *15 (S.D. Fla. July 9, 2004)).[3]

Finally, this Court delivered an unequivocal curative instruction that unquestionably vitiated any potential prejudice. *See* May 31, 2023 Trial Tr. at 96 ("[W]hat the attorneys say is not

---

[3] And, even if Plaintiffs' closing argument could be construed as having mentioned a "golden rule" statement (which it cannot), this was not such a "thin and/or weak case" for Plaintiffs, "composed primarily (if not exclusively) of circumstantial evidence," so as to suggest that the jury's deliberations could have been swayed by such an off-hand remark during closing arguments, as opposed to the staggering volume of direct evidence and testimony establishing the severity of Carollo's misconduct over several years. *Cooper*, at *15.

evidence and any statements that the plaintiff may have [been] perceived to send any message as to liability shall not be considered by you.").

2.    _Carollo Fails to Establish Any Error in the Pattern Jury Instructions and Verdict Forms_

**First**, after delivering the Eleventh Circuit's Pattern Instruction that the jury "may consider the evidence regarding Joe Carollo's financial resources in fixing the amount of punitive damages to be awarded," DE 475 at 11, the Court properly responded to the jury's question about how to "determine Joe Carollo's financial resources" by directing them to "rely on the evidence and instructions given in court." DE 469 at 3. It is impossible for Carollo to argue that these standard instructions were in any way improper, or that he was entitled to a jury instruction that contradicted the evidence in the record.

Carollo's counsel misstated during his closing argument that Joe Carollo's annual salary is $57,000, and so the Court properly delivered yet another standard instruction striking the erroneous statement by Carollo's counsel during his closing argument and reminding the jury that the statements of the lawyers "shall not be considered . . . as evidence in this case." May 31, 2023 Trial Tr. at 144; _accord_ Eleventh Circuit Pattern Jury Instruction (Civil Cases) 3.3. Then, the next day after the closing arguments were delivered and the jury retired to deliberate its verdict, Carollo's counsel discovered that hidden in the long city charter was a general statement that commissioners make $58,200 a year and attempted to have the Court give a new curative instruction. But even Carollo's after-the-fact discovery does not change the fact that—as he admits to this day—the record evidence indicating his actual "salary of **$58,200**" still constitutes a deviation from his lawyer's closing argument suggesting that his salary was only "**$57,000**." Given this discrepancy, it was both necessary and appropriate for the Court to deliver the standard instructions directing the jury to rely on the evidence in the record rather than the statements of the lawyers during their closing argument in order to establish Carollo's salary. _United States v. Smith_, 918 F.2d 1551, 1562 (11th Cir. 1990) ("Because statements and arguments of counsel are not evidence, improper statements can be rectified by the district court's instruction to the jury that only the evidence in the case be considered.")

**Second**, Carollo was not entitled to deviate from the Eleventh Circuit's Pattern Instructions and Verdict form for a standard First Amendment retaliation case like this one. In short, the Court properly instructed the jury, in accordance with the Eleventh Circuit's Pattern Instructions, about the burden-shifting framework to establish causation. In particular, the Court accurately instructed

14

the jury that, if Plaintiffs "proved each of the facts they must prove, then" the jury was required to "consider Joe Carollo's contention that he would have engaged in the same [allegedly retaliatory] activity . . . anyway," by proving that "he would have done the same thing if [Plaintiffs] had not exercised their First Amendment rights." DE 475 at 8-9.

As this Court observed, "numerous courts have found" that the "constant monitoring, investigating or issuance of violations" that Carollo spearheaded "can contravene First Amendment rights," and thus provides more than sufficient support for the findings that underpin the jury's verdict. DE 99 at 17 (citing *Cuevas v. City of Sweetwater*, No. 15-22785-CIV, ECF No. 38 (S.D. Fla. Oct. 28, 2015) (quoting *Hollywood Cmty. Synagogue, Inc. v. City of Hollywood, Fla.*, 430 F. Supp. 2d 1296, 1316 (S.D. Fla. 2006))). Carollo is wrong to miscite a single inapposite case in support of his demand for a so-called "probable cause instruction" that does not appear in the Eleventh Circuit's Pattern instructions, and uniquely applies to forms of officially sanctioned retaliation that are not at issue in this case. DE 498 at 16-17; DE 499 at 10-11 (citing *O'Boyle v. Commerce Grp., Inc.,* 2023 WL 2579134 (11th Cir. Mar. 21, 2023)).

*O'Boyle*—the only case that Carollo cites in favor of his demand for a probable cause instruction—is plainly distinguishable from, and inapplicable to, this case for several reasons. In short, Carollo does not cite a single case invoking the "probable cause" standard where the alleged retaliation did not comprise a formal adjudicatory proceeding, such as the filing of a lawsuit or the initiation of a prosecution by a municipality. Seemingly understanding this point, the Eleventh Circuit Pattern Instructions does not include Carollo's requested "probable cause" instruction.

In other words, the alleged retaliation in *O'Boyle* consisted of formal, official government action—including the filing of lawsuits and retaliatory prosecutions—by which probable cause represented a meaningful yardstick. In this case, probable cause is not a reasonable metric by which to assess Carollo's informal, off-the-books harassment, which included commandeering City employees and giving them illegal instructions, lurking in disguise on Plaintiffs' properties late at night, and conducting a campaign from his position of public authority on the dais as well as on radio and television broadcast to destroy Plaintiffs' reputations and livelihoods in the community. *See O'Boyle*, *supra*, at *2 ("[T]he complaint identified three forms of alleged retaliation: (1) the town's RICO lawsuit, (2) the bar complaints filed against [plaintiffs], and (3) [plaintiff's] prosecution").

15

As a consequence of that fundamental difference between this case and *O'Boyle*, there was not an "added . . . layer of independent judgment between" Carollo's "retaliatory motive and the" retaliatory acts" in this case, which is the reason why probable cause would be a "necessary element" in a case involving an official government action, such as a "retaliatory prosecution," but not a necessary element of a standard First Amendment retaliation claim like the one in this case. *O'Boyle*, *supra*, at \*5 (explaining that, even if a municipal official "wanted to retaliate" against the plaintiff, it "was the State Attorney who filed the information . . . to trigger the prosecution," and not the municipal official targeted by the plaintiff's lawsuit). In this case, the jury found Carollo to be liable for his informal, unofficial, and illegal retaliation campaign against Plaintiffs that violated the express terms of the City of Miami Charter, as well as federal civil rights laws. City of Miami Charter at § 4(d).

And, even if *O'Boyle* could somehow be contorted to apply to the facts of this case, it would still not entitle Carollo to a so-called "probable cause instruction" because "the existence of probable cause does not defeat a First Amendment retaliation claim" where the Plaintiffs are either subject to selective enforcement or an "official municipal policy of intimidation" resulting in a retaliatory response that has "little relation [to] the protected speech." *O'Boyle*, *supra*, at \*4 (cleaned up). Thus, to the extent that it would have been permissible to apply *O'Boyle* to the facts of this case in the first instance, both of its exceptions would disqualify Carollo from receiving a so-called "probable cause instruction" in any event.

**Third**, there is no merit to Carollo's contention that the Eleventh Circuit Pattern Instructions and Verdict Form somehow "bake in" Plaintiffs' allegations. At the outset, Carollo clearly waived this objection by failing to lodge a contemporaneous objection to the phrasing of Carollo's alleged retaliatory acts during a lengthy charging conference in which he stridently objected to the phrasing of Plaintiffs' alleged First Amendment activity. May 30, 2023 Trial Tr. at 127-64.

Pattern Instruction 5.1, however, specifically asks for a specific recitation of the plaintiff's First Amendment Retaliation claim and the inclusion of case-specific details in the instruction. Moreover, the jury instructions clearly indicate that they were allegations and left the claim up to the jury to decide. The instructions also treated Carollo's defense in the same manner. Carollo also takes issue with the first question of the verdict form for each Plaintiff. The question presented to the jury was taken from the Eleventh Circuit Pattern instructions and was completely proper. In

16

order to answer the pattern question, the jury necessarily had to first decide whether Plaintiffs engaged in protected speech or conduct. Simply put, there were no errors in the jury instructions or verdict form that give Carollo grounds for a new trial.

**Fourth**, Carollo presents no basis for remittitur of the jury's award based on the harmless introduction of any testimony suggesting that Carollo's animus towards Plaintiffs was "widely" or "openly" known throughout the City. DE 498 at 5. First, this testimony was consistent with other direct and circumstantial evidence of Carollo's animus, and properly admissible for other purposes—e.g., to illustrate how City employees were likely to interpret Carollo's implicit orders to engage in retaliatory acts against Plaintiffs. Second, in some instances, Carollo either did not object to the admission of such testimony, resulting in waiver, or even elicited it himself. See May 8, 2023 Trial Tr. at 144 (no objection); Apr. 24, 2023 Trial Tr. at 133-34 (Carollo eliciting testimony that "[i]t's very clear, it was well known. Everyone in the city knew that he had it out for Bill Fuller, his organizations and for their – therefore, because we were on that property, we were targeted. Everyone knew it, it was common knowledge I'm not making that up.") Apr. 24, 2023 Trial Tr. at 133-34. Third, in addition to sustaining an objection to the admission of such testimony, the Court also issued a curative instruction to disregard all of this testimony as "inadmissible evidence," which ameliorated any potential prejudice. *See, e.g.*, Apr. 24, 2023 Trial Tr. at 72; May 9, 2023 Trial Tr. at 171:4-8; May 31, Trial Tr. at 8:14-18 ("Any testimony throughout this trial that have been said as to what anyone knew of what everyone knows shall be stricken as regards to whether it was directed towards the plaintiff or towards the defendant, and shall not be considered as inadmissible evidence").

## CONCLUSION

Plaintiffs cited cases demonstrating that the jury's award in this case was not excessive relative to comparable cases. But even if Carollo were correct in arguing that this case has few comparators, he would still be wrong to characterize the jury's verdict as a so-called "runaway" award. DE 499 at 4. Instead, there are not more cases with comparable awards only because there are so few instances in which a powerful political official engages in such reprehensible conduct that causes so much harm to so many varied individuals and interests. The jury's award accurately reflects the singular nature and extent of Carollo's destructive, anti-democratic misbehavior.

WHEREFORE, Plaintiffs respectfully request that this Court deny Defendant's Motion for Remittitur.

Respectfully submitted,


**AXS LAW GROUP, PLLC**
2121 NW 2nd Ave, Suite 201
Wynwood, Florida 33127
Telephone: (305) 297-1878

By: */s/ Jeff Gutchess*
Jeffrey W. Gutchess Esq. (FBN#702641)
jeff@axslawgroup.com
eservice@axslawgroup.com

*Counsel for Plaintiffs William Fuller and
Martin Pinilla*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of August, 2023, I electronically filed the foregoing with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record.


By: */s/ Jeff Gutchess*

Jeffrey W. Gutchess Esq.