```
 1                   UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                         (FORT LAUDERDALE)

 3                      CASE NO. 18-CV-24190

 4   WILLIAM FULLER and
     MARTIN PINILLA, II,
 5
              Plaintiffs,            Fort Lauderdale, Florida
 6   vs.                             April 21, 2023

 7   JOE CAROLLO,                    9:43 a.m. to 4:57 p.m.

 8            Defendant.             Pages 1 - 251
     ------------------------------------------------------------
 9
                            Trial Day 6
10
                 BEFORE THE HONORABLE RODNEY SMITH
11                  UNITED STATES DISTRICT JUDGE

12
     APPEARANCES:
13   FOR THE PLAINTIFFS:          AXS LAW GROUP, by:
                                  Jeffrey W. Gutchess, Esq.,
14                                Courtney Anna Caprio, Esq.,
                                  Joanna Niworowski, Esq.,
15                                Amanda Suarez, Esq.
                                  2121 NW 2nd Avenue, Suite 201
16                                Miami, Florida  33127

17
     FOR THE DEFENDANT:           KRINZMAN, HUSS, LUBETSKY,
18                                FELDMAN & HOTTE, by:
                                  Mason A. Pertnoy, Esq.
19                                169 E. Flagler Street, Suite 500
                                  Miami, Florida  33131
20

21                                KUEHNE DAVIS LAW, by:
                                  Benedict P. Kuehne, Esq.
22                                100 S.E. 2nd Street, Suite 3105
                                  Miami, Florida  33131
23

24                                SHUTTS & BOWEN, by:
                                  Marc D. Sarnoff, Esq.
25                                200 S. Biscayne Blvd, Suite 4100
                                  Miami, Florida  33131
```

```
 1    APPEARANCES (CONTINUED):

 2

 3    FOR THE DEFENDANT:              COLE, SCOTT & KISSANE, by:
                                     Thomas E. Scott, Esq.,
 4                                   Amber C. Dawson, Esq.
                                     9150 South Dadeland Boulevard
 5                                   Suite 1400
                                     Miami, Florida  33156
 6

 7

 8

 9    STENOGRAPHICALLY
      REPORTED BY:                   GLENDA M. POWERS, RPR, CRR, FPR
10                                   Official Court Reporter
                                     United States District Court
11                                   400 North Miami Avenue
                                     Miami, Florida  33128
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2

 3                     PLAINTIFFS' EVIDENCE

 4    WITNESS:                                    PAGE:

 5

 6    STEVEN MIRO (CONTINUED)

 7        Direct Examination by Ms. Suarez          16

 8        Cross-Examination by Mr. Kuehne           36

 9        Redirect Examination by Ms. Suarez       144

10

11    MICHAEL KUNERT

12        Direct Examination by Ms. Suarez         173

13        Cross-Examination by Mr. Pertnoy         211

14        Redirect Examination by Ms. Suarez       217

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      E X H I B I T S

 2

 3   EXHIBIT                                    RECEIVED

 4                    PLAINTIFFS' EXHIBITS

 5

 6   Exhibit 37                                     16

 7   Exhibit 19                                     21

 8   Exhibit 312                                    29

 9   Exhibit 7 (previously received)                31

10   Exhibit 23                                     92

11   Exhibit 408                                   130

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    E X H I B I T S

2

3   EXHIBIT                                    RECEIVED

4                  DEFENDANT'S EXHIBITS

5

6   Exhibit 593                                    88

7   Exhibit 387                                   110

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Call to the order of the Court:)

2          COURTROOM DEPUTY:  Calling Case Number 18-24190, United

3    States {sic} of America {sic} versus Joe Carollo.

4          Counsel, please state your names, starting with the

5    plaintiff.

6          MS. SUAREZ:  Good morning, Your Honor.

7          Amanda Suarez, Jeff Gutchess, and Courtney Caprio on

8    behalf of the plaintiffs.

9          THE COURT:  Good morning.

10         MR. PERTNOY:  Good morning, Your Honor.

11         Mason Pertnoy, Leah Gardner, Ben Kuehne, Amber Dawson,

12    and Marc Sarnoff on behalf of Commissioner Joe Carollo.

13         THE COURT:  Good morning as well.

14         MR. KUEHNE:  Good morning.

15         THE COURT:  All right, we could bring in the jurors,

16    please.

17         MS. SUAREZ:  Your Honor, before we bring them in, if we

18    could address something with you sidebar to minimize any

19    interruptions once the jurors are in.

20         THE COURT:  Sure.

21         (Sidebar discussion held as follows:)

22         MS. SUAREZ:  The first issue I want to address is the

23    ordinance that we discussed yesterday.  We don't want to show

24    the e-mail.  All we want to do is show the enacted ordinance

25    and ask Mr. Miro who it applies to.  I believe they still have

1    an objection, that is, that the ordinance only passed, this is

2    the active ordinance.

3          THE COURT:  When was the issue?  What is active?

4          MR. KUEHNE:  Same issue, Your Honor.

5          The Court determined that this TUP ordinance was

6    protected by that, went up to the Court of Appeals.

7          The Court's dismissal offer makes it clear that they

8    adopted your ruling that the TUP ordinance was protected by

9    legislative privilege, and we have acted pursuant to those two

10   rules throughout the course of this case, that the TUP was not

11   part of this case.

12         They've not sought to -- by a motion for -- I don't

13   know what they would do after the Eleventh Circuit.  They did

14   not review that -- or sought review, they did not seek to

15   review, challenge the finality of that ordinance, to bring to

16   our attention to believe that the ruling is not compensative on

17   the 10th.

18         We did this case based on Your Honor's decision, taking

19   that out of the complaint -- and the Eleventh Circuit decision.

20   And you know the decision, but I can give you the citation:

21         22 WL 333234, Eleventh Circuit, February 4, 2022.

22   We've prepared this case with the recommendation that as a

23   matter of law the rule of this case, that TUP ordinance, is not

24   part of this case, and it's, we believe, not part of this case,

25   no aspect of that TUP is part of this case at all.

1          It shouldn't be mentioned, period.

2          And that was the effect of this Court's order,

3    otherwise, it's a back-door effort to bring into this case the

4    legislative privilege, essentially, to vacate the legislative

5    privilege with regard to TUP that has been taken out of this

6    case from the very beginning.

7          MS. SUAREZ:  Your Honor, if I may.  Frankly, that's

8    just the widest interpretation of the rule I've ever seen.

9          Your Honor wrote that what is disallowed, if anything,

10   directly relating to the passage of Ordinance 1 through 733,

11   the ordinance is enacted.  I'm not asking about the passage, I

12   just want to know who did the ordinance, that's it.

13         THE COURT:  Was she referring to -- I discussed the

14   passage of it.  No one discussed as to why it was passed.

15         It was enacted, the law is the law, it's the law.

16         MR. KUEHNE:  Your Honor, two things.

17         "Passage" means passing, that means the TUP passed.

18         THE COURT:  Why are we dwelling to why was it passed?

19   When was it passed?  -- that's an issue.  When was this --

20         MS. SUAREZ:   January 11th, 2018.

21         THE COURT:  January what?

22         MS. SUAREZ:  11th, 2018.

23         THE COURT:  And you said that proves, in particular,

24   there was something in effect at the time.

25         MS. SUAREZ:  It applies to Sanguich, the property we

1    were talking about yesterday with Mr. Miro, the storage shop.

2        THE COURT:  If there was -- there's an issue about it,

3    you're going to open up the door.  I don't want you to comment

4    on anything else throughout this trial.

5        You make any issue about this particular property, it's

6    going to be, door is open --

7        MR. KUEHNE:  I --

8        THE COURT:  I'm not done yet, sir.

9        MR. KUEHNE:  I apologize.

10        THE COURT:  On cross-examination, any issues brought up

11    with respect to attack that in any way, you happen to go to

12    allow this to be an issue, so I don't know what you're going to

13    do on cross-examining -- I'm going to sustain it --

14    intentionally, if you -- don't address that issue.  Okay?

15        MR. KUEHNE:  Yes, Judge.  So here, this is my question,

16    it's really designed to clarify the Court's ruling, so I

17    understand that.

18        Sanguich is an issue that the plaintiffs have raised in

19    this case.  We believe, based on this Court's ruling and the

20    Eleventh Circuit rule, that the TUP aspect of Sanguich is no

21    longer part of this case.  That's the law of the case, as I

22    think the Court has at least determined.

23        We intend to ask no questions about the TUP.  We've not

24    even mentioned the TUP.  We've not even mentioned the ordinance

25    and don't plan to whatsoever.

1    Our examination, which you've seen already with regard

2    to Sanguich, is the code violations that existed, having

3    nothing at all to do with the TUP ordinance.

4        And we will not mention that in any way.

5        THE COURT:  How does the code violation affect this

6    ordinance?

7        MR. KUEHNE:  It doesn't, Judge.

8        MS. SUAREZ:  Yes, it does, Judge.

9        THE COURT:  How so?

10       MS. SUAREZ:  I applied for temporary, and then it was

11   revoked, and this ordinance was passed during that time about

12   Sanguich.

13       THE COURT:  Look, it's relative.

14       Definitely, if you go there about some type of code

15   violation with respect to this property they could address the

16   ordinance, it's just an ordinance in effect, they don't have to

17   go into passage of it or when it was available.

18       I mean, they can address that, it's part of the record,

19   ask if TUP applies, regardless.  If you want to draw on that

20   line and cross that, then you're opening up the door; if you

21   don't address this violation, they're not going to bring it in.

22       MR. KUEHNE:  Yes, Judge.  And I want the Court to

23   understand that no violation whatsoever was made with regard to

24   a TUP ordinance that wasn't litigated, wasn't the code

25   violation, that came after the fact, the Sanguich being closed

1    down for it being an illegal container dropped on the property,

2    not allowed by the code, had nothing to do with the TUP.

3         That TUP came later when the city was looking, "What do

4    we do with containers, and how do we deal with containers?"

5    And that was a completely different issue that dealt with the

6    City of Miami.

7         THE COURT:  No, no.  Again, I already made my ruling,

8    if you go in that area, you're suggesting to opening it up,

9    sir.  I'm not going to tell you how to try your case.

10        I just mean, as it stands now, it's not coming in.

11        But based on your cross-examination, if I think the

12   door is open to address that, I'm going to allow the ordinance,

13   if not passage, then I don't discuss anything beyond that this

14   is the ordinance that applies in this matter.  That's simple.

15        Anything else we need to address?

16        MS. SUAREZ:  Yes, Your Honor.  One other issue.

17        Yesterday we spoke about the sexual harassment issue

18   with Mr. Miro.  I just want to be in with the Court what we can

19   and cannot do.  My worry is this will turn into a mini trial on

20   the termination of Mr. Miro.

21        Yesterday they mentioned to you he was fired for sexual

22   harassment.  Mr. Miro filed a lawsuit against the City that was

23   settled, and in that case they took a deposition of one of

24   these women who they are talking about, who, under oath, I feel

25   -- I can show you her deposition -- said that Mr. Carollo told

 1    her to make those allegations.

 2         So if we could bring this up, we should be allowed to

 3    bring up all the issues and call her as rebuttal.

 4         MS. CAPRIO:  Bring that up -- if they bring it up in

 5    cross-examination, we have a right to bring it up on direct.

 6         THE COURT:  To my understanding, he was going to --

 7    what did he say with respect to the City, not anything else in

 8    respect to the city.

 9         MS. SUAREZ:  Yes, that was in respect --

10         THE COURT:  As to why he was terminated, did they

11    give -- did the City say why he got fired?

12         MS. SUAREZ:  He was fired because of wrongful

13    termination.

14         THE COURT:  Is that in writing?

15         MR. KUEHNE:  Yes, Judge, that was revised by the Civil

16    Service Board.

17         THE COURT:  You can go into that, and that will clear

18    up any other issue about speculation.

19         He shouldn't be writing they terminated him.

20         MR. KUEHNE:  Sir, the letter of termination simply says

21    -- and the testimony disputed -- that H.R. said this is the way

22    you terminate, and all it is, is a thank you for your services,

23    period.

24         THE COURT:  Okay.

25         MR. KUEHNE:  He then challenged -- as he's allowed to

1   do -- Civil Service Board.  I'm not planning to go into that,

2   but he challenges through the Civil Service Board his illegal

3   firing and the person who fired him through chief of staff

4   testified without contradiction, I made a decision to fire him,

5   that's why Lisette came to me crying, explained about the

6   sexual harassment.

7           I then conferred with H.R. and they said we've got a

8   sexual harassment policy.  Then he spoke to the Commissioner

9   and said, I want to recommend the firing.

10          The Commissioner said, If that's what you have to do,

11  that's what you have to do, period, so...

12          THE COURT:  And you have evidence of that, what was --

13  that's in writing?

14          MR. KUEHNE:  That's the testimony at the Civil Service

15  Board.  I would say it's usndisputed, but, nonetheless, the

16  Civil Service Board are allowed to do that.

17          I am not going to go into the Civil Service Board

18  resolution, I don't know that that's legitimate, why it is to

19  the City.  I don't think he's going to contest it.  I think he

20  has the right.

21          THE COURT:  Well, you have a right to contest it.

22          MR. KUEHNE:  In trial, now, that's definitely something

23  decided --

24          MS. SUAREZ:  On the record, that's not true, it's not

25  completely.  He filed a lawsuit.  I can show you the

1    deposition, one of the women that testified,

2    Commissioner Carollo made her lie and say that she's been

3    sexually harassed.

4            THE COURT:  The plaintiff says he basically assaulted

5    her; the one that recanted, yes.

6            MS. SUAREZ:  One of them, yes.

7            MR. KUEHNE:  To do with Lisette.

8            THE COURT:  Do you have any evidence he was fired for

9    that particular reason?  However, it's passed the person who

10   made the allegations that someone else gave a deposition is

11   rebuttal.

12           They can go ahead and bring that witness in to dispute

13   it, because, otherwise, you have just one statement here saying

14   this person alleged sexual harassment, and this is the reason

15   why I did so; and you've got the evidence to show otherwise, so

16   they would be allowed to do so.

17           However, I want to be clear, we're not going to mention

18   anything about his other previous employment or anything else

19   related to that, but anything related to the City of Miami that

20   you're allowed, the manager, whomever, gave you the ultimate

21   decision, and given what they based it on, absolutely, you can

22   bring that out.

23           MR. KUEHNE:  The chief of staff, Judge.

24           THE COURT:  Whatever, it's not my case, you guys know

25   your case; right?

1          MR. KUEHNE:  Of course, yes, sir.

2          THE COURT:  It's fair game, whatever you have.

3          MS. CAPRIO:  Just to be clear, we want to bring that up

4   on direct, so that isn't the first time.

5          THE COURT:  You don't have to wait until

6   cross-examination.  You can ask him that, all right.

7          MS. CAPRIO:  Thank you.

8          MR. KUEHNE:  Yes, Judge.

9          THE COURT:  Anything else?

10          MS. SUAREZ:  That's it, thank you so much.

11          (Sidebar concluded and the following was held in open

12   court.)

13          THE COURT:  You can bring the jurors, please.

14          Thank you.

15          COURTROOM DEPUTY:  All rise for the jury.

16          THE COURT:  Mr. Miro, have him sitting.

17          (Witness resumes stand.)

18          COURTROOM DEPUTY:  All rise for the jury.

19          (Jury entered courtroom at 9:57 a.m.)

20          THE COURT:  Good morning, ladies and gentlemen.

21          You may be seated.  Ready to -- have a seat.

22          Everyone ready to go?

23          (Jury collectively said, "Yes.")

24          THE COURT:  All right, I know it's Friday.  All right.

25          With that said, plaintiff, you may continue with your

 1    direct examination.

 2              MS. SUAREZ:  Thank you, Your Honor.

 3              THE COURT:  Mr. Miro, you're still under oath, sir.

 4              THE WITNESS:  Yes, Your Honor.  Thank you.

 5              (STEVEN MIRO, being previously sworn, continued to

 6    testify as follows:)

 7                    DIRECT EXAMINATION (CONTINUED)

 8    BY MS. SUAREZ:

 9    Q.  Good morning, Mr. Miro.

10    A.  Good morning, Ms. Suarez.

11    Q.  I'd like to discuss a few more things about the walkalongs

12    we were talking about yesterday.  If we could put up

13    Plaintiffs' Exhibit 37, I don't believe there's an objection.

14              MR. KUEHNE:  I'm sorry, I did not hear the number.

15              MS. SUAREZ:  Plaintiffs' Exhibit 37.

16              MR. KUEHNE:  No objection to Plaintiffs' Exhibit 37.

17              THE COURT:  All right, submitted.

18              MS. SUAREZ:  If we could publish as well, please.

19              THE COURT:  Yes.

20              (Plaintiffs' Exhibit 37 received into evidence.)

21    BY MS. SUAREZ:

22    Q.  Can you see it on your screen, Mr. Miro?  There we go.

23        Do you recognize this document?

24    A.  Yes.

25    Q.  And what is it?

```
1    A.   It's an e-mail I sent to Carollo's personal e-mail,
2    subject:  Communication with the city administrative services.
3    It was sent from Emilio to the Commissioner, cc'ing several
4    staff members to ensure the city charter wasn't violated, to go
5    through the proper chain of command.
6    Q.   And why did you send that to Commissioner Carollo?
7    A.   So he's aware of that e-mail.
8         Now, in that e-mail there should be an attachment with the
9    memo format that Mr. Carollo really got upset in the middle --
10             MR. KUEHNE:  Objection, Your Honor.
11        He's now referring to something that I don't believe is
12   part of what he's being shown.
13             THE COURT:  What is it?
14             MS. SUAREZ:  I believe he's talking about a related
15   memo, Your Honor.
16             THE COURT:  Overruled.  Go ahead.
17             THE WITNESS:  In the memo down below it says if you
18   violate the city charter you could be removed from office.
19   BY MS. SUAREZ:
20   Q.   And did you say that Commissioner Carollo was upset?
21   A.   Yes, he was very upset.
22   Q.   Did he say anything to you?
23   A.   Yeah, he didn't -- he didn't like that Emilio put a paper
24   trail on that.
25   Q.   And how did you usually communicate with
```

1   Commissioner Carollo?

2   A.   Obviously, I sent him e-mails, but it's one-way street,

3   text messages are also one-way street.   Mainly, by phone call.

4       Carollo doesn't like anything that has to do with public

5   records or anything that could show any type of trail.

6           MR. KUEHNE:   Objection, Your Honor.

7           THE COURT:   Your objection?

8           MR. KUEHNE:   Responsiveness, as well as opinion.

9           THE COURT:   Overruled.

10  BY MS. SUAREZ:

11  Q.   Go ahead, Mr. Miro.

12  A.   I thought I finished.   Sorry.

13      Anything to do with any type of trail, he doesn't like that

14  whatsoever.

15  Q.   And does the city have a policy on how records should be

16  retained?

17  A.   Of course.

18          MR. KUEHNE:   Objection.

19          THE COURT:   The objection?

20          MR. KUEHNE:   Foundation and scope.

21          THE COURT:   All right, sustained.

22  BY MS. SUAREZ:

23  Q.   Were you an employee of the city, Mr. Miro?

24  A.   Yes.

25  Q.   And were you aware of a city policy of how to maintain

1   records throughout your employment?

2   A.   Yes.

3   Q.   And what was that policy?

4   A.   It says those be preserved.

5   Q.   And at some point before you stopped being district

6   liaison, did your relationship with Commissioner Carollo become

7   strained?

8   A.   Yes.

9   Q.   Why?

10  A.   I think it started with the ethics complaint that we

11  received.

12  Q.   And when you say the "ethics complaint," which complaint

13  are you referring to?

14  A.   The one in March.

15  Q.   Who filed that complaint?

16  A.   It was the plaintiffs.

17  Q.   And who was it against?

18  A.   It was against Joe Carollo, myself, Mary Lugo, and the

19  assistant city manager, Albert Parjus, Parjus -- or something.

20  Q.   And why did your relationship become strained when

21  discussing the ethics complaint?

22  A.   Well, when I received it, I received it at City Hall.

23      Then I forgot who reached out to who, but I then -- me and

24  Carollo spoke.  Carollo said, This complaint is bullshit, we'll

25  talk about it later.  Okay.

1          I then reached out to the city attorney, Tori Mendez, to

2    see how to proceed with this.

3          She said, Look, it's a conflict of interest, I can't

4    represent both of you, so, therefore, you're going to have to

5    seek outside counsel, in which I found a friend that was

6    willing to take on the case.

7          And Carollo -- me and Carollo, we met two days later in the

8    back of the office in the conference room.

9          Carollo reiterated, you know, this complaint is bullshit.

10   I -- you know, we get anonymous complaints.

11         And then I told him:  Look, I hired outside counsel.

12         You know, he got upset at that.  He's like:  Why did you?

13         And I'm like -- and I explained him the situation, that,

14   Victoria Mendez, you know, cannot represent both of us.

15         So he then proceeded to say, You know, we received

16   anonymous complaints.

17         And I said:  Look, I have counsel for this.

18         He said:  But what are you going to say?

19         I said:  Whatever the truth is.

20         He said:  But what's the truth?

21         I said:  I don't know, Joe.  Whatever questions they ask

22   me, I'm going to say the truth.

23   Q.   And had you received anonymous complaints?

24   A.   No.  Every complaint I received was from Joe Carollo.

25   Q.   So would you have been uncomfortable saying that you

1   received anonymous complaints?

2         MR. KUEHNE:  Objection.

3         THE COURT:  Grounds?

4         MR. KUEHNE:  Speculation.

5         THE COURT:  Sustained.

6   BY MS. SUAREZ:

7   Q.  Mr. Miro, why did you, personally, not want to say that

8   there was anonymous complaints?

9         MR. KUEHNE:  Objection.  Speculation, hypothetical.

10  He wasn't even asked that question.

11        THE COURT:  Overruled.

12        THE WITNESS:  I'm sorry, Ms. Suarez, can you repeat it?

13  BY MS. SUAREZ:

14  Q.  Yes.  Why did you, personally, not want to say that there

15  were anonymous complaints?

16  A.  Oh, then I'll be lying under oath.

17  Q.  And if we could put up Plaintiffs' Exhibit 19.

18      I believe there's no objection.

19        MR. KUEHNE:  You said 19?  No objection.

20        MS. SUAREZ:  Move to admit and publish, Judge.

21        THE COURT:  Granted.

22        (Plaintiffs' Exhibit 19 received into evidence.)

23  BY MS. SUAREZ:

24  Q.  Do you recognize this document, Mr. Miro?

25  A.  Yes.

1   Q.   What is it?

2   A.   I guess it's a statement or memo I wrote.

3   Q.   And why did you write this statement?

4   A.   Under duress, Joe Carollo wanted me to write this.

5   Q.   What's the date of this statement?

6   A.   3-12-2018.

7   Q.   And what day was the ethics complaint filed?

8   A.   I believe that's the same date.

9   Q.   And what is this statement about?

10  A.   It's my interactions with the plaintiff that day.

11       Again, this is the final draft of this.

12  Q.   And when you say "that day," what interaction was this

13  from?

14  A.   The Gay 8 Festival that occurred February 18th of 2018.

15  Q.   So was this memo written about three weeks later from that

16  date?

17  A.   Yes, that's correct.

18  Q.   And you said this is the first -- the last version.

19       What do you mean by that?

20  A.   It was amended several times.

21  Q.   What were the amendments?

22  A.   That I don't recall.  It's probably in my computer

23  somewhere with the city.

24  Q.   Did you feel pressured to write this statement?

25  A.   Carollo's my boss at that time.

1   Q.   And how long did you work as district liaison for

2   Commissioner Carollo?

3   A.   December 2nd until June 6th, I believe.

4   Q.   And why did you leave that position?

5   A.   Well, 'cause I reported improprieties, and I went up the

6   chain of command, I went to the mayor and then I went to the

7   city manager.

8   Q.   Were you terminated?

9   A.   Yes, I was.

10   Q.   By who?

11   A.   Richie Blom gave me a memo and signed by Carollo, stating

12   at this date, this time, your services are no longer required.

13   Q.   And after you were terminated, were there allegations made

14   about why you were terminated?

15   A.   Yes.  Carollo held a press conference in which, I guess,

16   three -- there were three reasons why I was terminated:

17       I gave myself a raise, I sexually -- it wasn't sexual

18   harassment, I guess, something to do with sexual allegations,

19   or so, and the third one, that I was campaigning on city dime

20   for a candidate.  The three were debunked.  My case was

21   settled, and I received a six-figure sum in the settlement.

22   Q.   Okay, I want to break that down a little bit.

23       You previously said that you reported Mr. Carollo's

24   improper actions; is that what you said?

25   A.   Yes, ma'am.

1    Q.   Who did you report that to?

2             MR. KUEHNE:  Objection.

3             THE COURT:  What's the objection?

4             MR. KUEHNE:  We've gone through this issue before with

5    regard to other agencies.

6             THE COURT:  All right, sustained.

7    BY MS. SUAREZ:

8    Q.   In terms of -- what did you think Commissioner Carollo was

9    doing that was improper?

10            MR. KUEHNE:  Objection.  Speculation and foundation,

11   beyond the scope of this particular complaint.

12            THE COURT:  Sustained, as to the question as phrased.

13   BY MS. SUAREZ:

14   Q.   Not talking about anyone outside the City of Miami,

15   Mr. Miro, did you communicate concerns about

16   Commissioner Carollo within the City of Miami?

17   A.   Yes.

18   Q.   To who?

19   A.   To the Mayor, Francis Suarez, and to city manager Emilio

20   Gonzalez.

21   Q.   And were those concerns before you were terminated?

22   A.   Before, yes.

23   Q.   And you mentioned three different reasons that

24   Commissioner Carollo said you were terminated for; was that

25   right?

1    A.   Yes.

2    Q.   The first one was giving yourself a raise?

3    A.   Yes.

4    Q.   Can you expand on that a little bit?

5    A.   I don't know much of it, no.

6    Q.   Did you, in fact, give yourself a raise?

7    A.   If I would have, I would have done a lot more than what I

8    was getting paid.

9    Q.   Did you ever hack into Commissioner Carollo's computer to

10   give yourself a raise?

11   A.   I'm not computer savvy, no.

12   Q.   And what was the concern that you communicated to the mayor

13   and the city manager?

14   A.   Improper use of funds.

15            MR. KUEHNE:  Objection.

16            THE COURT:  State grounds.

17            MR. KUEHNE:  Beyond the scope of this lawsuit.

18            THE COURT:  Overruled.

19   BY MS. SUAREZ:

20   Q.   And the second allegation, you said had to do with sexual

21   harassment; is that right?

22   A.   Yes.

23   Q.   Did you file a lawsuit about your termination?

24   A.   I did.

25   Q.   And in that lawsuit, did your attorneys take depositions?

1    A.   Yes.

2    Q.   And did they take a deposition of Ms. Tanjaha Quintana?

3    A.   They did.

4    Q.   And was that one of the individuals that had said something

5    about sexual harassment regarding you?

6          MR. KUEHNE:  Objection.

7          THE COURT:  State grounds.

8          MR. KUEHNE:  Both, number one, sidebar; and number two,

9    hearsay.

10          THE COURT:  I'm going to sustain that this morning.

11   BY MS. SUAREZ:

12   Q.   Did you settle your case, Mr. Miro?

13   A.   Yes.

14   Q.   And what did you receive?

15   A.   $170,000.

16          MR. KUEHNE:  Objection, Your Honor.

17          THE COURT:  Grounds?

18          MR. KUEHNE:  The grounds is the nature of that

19   particular matter and the conditions that are imposed with

20   regard to that particular matter.

21          THE COURT:  I sustained this objection.  Right now,

22   we'll reserve.

23          Go ahead.  Move on, Ms. Suarez.

24          MS. SUAREZ:  Thank you.

25   BY MS. SUAREZ:

```
 1   Q.   Did you, yourself, ever file any ethics complaints against
 2   the city?
 3   A.   I did.  I filed two.
 4   Q.   And what were they about?
 5   A.   One was the targeting of businesses, and the other one was
 6   regarding my whistle-blower.
 7   Q.   Regarding your what, I'm sorry?
 8   A.   My whistle-blower.
 9   Q.   And when you say that, do you mean your termination?
10   A.   Yes.
11   Q.   And around what time did you file them?
12   A.   The time, I don't recall, but shortly after.
13   Q.   Shortly after you stopped working as District 3 liaison?
14   A.   Yes, ma'am.
15   Q.   So sometime in 2018; does that sound right?
16   A.   Yes.
17   Q.   And what was the outcome of those complaints?
18            MR. KUEHNE:  Objection.
19            THE COURT:  Grounds?
20            MR. KUEHNE:  Beyond the scope of this matter, as well
21   as separate litigation.
22            THE COURT:  Sustained.
23   BY MS. SUAREZ:
24   Q.   Mr. Miro, is there any truth to the allegation that you
25   sexually harassed employees at the City Commissioner's Office?
```

 1   A.   Absolutely not.  I'm happily married for nine years.

 2   Q.   And to your knowledge, did city employees have a certain

 3   view of Commissioner Carollo?

 4          MR. KUEHNE:  Objection.

 5          THE COURT:  What's the grounds?

 6          MR. KUEHNE:  I believe it's opinion, Your Honor.

 7          It's also 403, and it's an effort to establish

 8   reputation without any foundation.

 9          THE COURT:  All right, I will sustain it.  You can lay

10   the foundation, if you can.

11   BY MS. SUAREZ:

12   Q.   Mr. Miro, did you work at the City of Miami?

13   A.   Yes.

14   Q.   Did you speak to employees at the City of Miami?

15   A.   Yes.

16   Q.   And did you become aware of a certain view that employees

17   had of Commissioner Carollo?

18   A.   Yes.

19   Q.   What was that view?

20          MR. KUEHNE:  Objection.  Same thing --

21          THE COURT:  Overruled.

22          MR. KUEHNE:  -- this is classic hearsay, Your Honor, as

23   well as 403.

24          THE COURT:  Overruled.

25   BY MS. SUAREZ:

1   Q.   Go ahead.

2   A.   They tried to avoid him, they didn't like to deal with him.

3   Q.   If we could pull up Plaintiffs' Exhibit 312.

4        I believe there's no objection.

5        MR. KUEHNE:  Can I just see if it's on my list?

6        MS. SUAREZ:  Uh-huh.

7        MR. KUEHNE:  Judge, with 312, we raised a relevance

8   issue.

9        THE COURT:  Do you want to show it to me on my screen?

10       MS. SUAREZ:  Yes, Your Honor.  If we could turn off the

11  jury's screen.

12       THE COURT:  And that's it for 312?

13       MS. SUAREZ:  That's it.

14       THE COURT:  Overruled.

15       MS. SUAREZ:  Move to admit and publish, Your Honor.

16       THE COURT:  Granted.

17       (Plaintiffs' Exhibit 312 received into evidence.)

18       MS. SUAREZ:  And if we can just scroll through these

19  photos for Mr. Miro, please, and the jury.

20       THE WITNESS:  Alfie Leon sign.

21       MS. SUAREZ:  We can leave it on that.

22  BY MS. SUAREZ:

23  Q.   Mr. Miro -- Mr. Miro --

24  A.   Go ahead, I'm sorry.

25  Q.   Do these appear to be photos from the rally on November

1   17th -- 18th and 19th of 2017?

2   A.  Those I don't know of --

3          MR. KUEHNE:  Objection.  Foundation.

4          THE COURT:  Sustained.

5          MS. SUAREZ:  Can we go to the photo of the food,

6   please.

7   BY MS. SUAREZ:

8   Q.  Does this appear to be the set-up that they had at the

9   rallies on those dates, Mr. Miro?

10  A.  Yes.

11         MR. KUEHNE:  Objection.

12         THE COURT:  What's the objection?

13         MR. KUEHNE:  Foundation and speculation.

14         THE COURT:  Overruled.

15  BY MS. SUAREZ:

16  Q.  Mr. Miro, just to be clear, you went out to the rallies

17  yourself; right?

18  A.  Yes.

19  Q.  Can you go to the next picture, please.

20      Does this also appear to be the area where the rallies were

21  held?

22  A.  Yes.

23  Q.  Can we go to the next picture.

24      What does this picture show?

25  A.  The one prior is the code enforcement officer that arrived

1    on scene to cite them.

2    Q.   And is this his business card?

3    A.   I believe so.  If you could go back to the other picture.

4    Q.   Could we go back to the prior picture?

5    A.   Yes.

6    Q.   And so these photos are from that weekend of the rally; is

7    that right?

8    A.   That's right, yes.

9    Q.   And can we go up to the first couple photos.

10        What does "leon" mean in English?

11   A.   Lyon.

12   Q.   And so did Mr. Alfie Leon have these mascots walking around

13   at the rally?

14   A.   At one time, yes.

15   Q.   And do they appear to be the same type of signs that were

16   at the rally as well?

17   A.   Yes.

18   Q.   And if we can pull up Plaintiffs' Exhibit 7.

19        I believe there's no objection.

20        MR. KUEHNE:  No objection, Your Honor.

21        MS. SUAREZ:  Move to admit and publish, Your Honor.

22        THE COURT:  Granted.

23        (Plaintiffs' Exhibit 7 previously received into

24   evidence.)

25        MS. SUAREZ:  If you can play the video, please.

1          (Videotape played for the judge and jury.)

2          MS. SUAREZ:  If we can pause the video on six seconds,

3     please.  A little bit before that.

4          A little bit before that.  You can pause it at three.

5          (Videotape paused, then resumed.)

6          MS. SUAREZ:  A little more.

7          (Videotape paused, then resumed.)

8          MS. SUAREZ:  Right there.

9     BY MS. SUAREZ:

10    Q.  Mr. Miro, is that you walking in the jeans and the blue

11    shirt?

12    A.  Yes.

13    Q.  And does this appear to be the rally that you saw on that

14    weekend in 2017?

15    A.  Yes.

16    Q.  You can hear the music?

17    A.  Yes, you could hear the music.  There's also Carollo right

18    there.

19    Q.  And on the right-hand side, that tent, is that where they

20    were giving out the food?

21    A.  Yes.

22    Q.  And that's where the Alfie Leon supporters were?

23    A.  Yes.

24    Q.  And this parking lot belonged to the plaintiffs; is that

25    right?

1    A.   Correct.

2    Q.   And, in your opinion, while you were District 3 liaison,

3    did you see a pattern of targeting properties owned by the

4    plaintiffs?

5           MR. KUEHNE:  Objection.

6           THE COURT:  Grounds?

7           MR. KUEHNE:  Opinion, pattern, Rule 403, 404.

8           THE COURT:  Overruled.

9           THE WITNESS:  Can you repeat the question?

10   BY MS. SUAREZ:

11   Q.   Yes.  In your opinion, while you were a District 3 liaison,

12   did you see a pattern of targeting properties owned by the

13   plaintiffs?

14   A.   Yes.

15   Q.   And who was that done by?

16   A.   Commissioner Joe Carollo.

17   Q.   And while you were a District 3 liaison, did you feel that

18   Commissioner Joe Carollo was targeting any properties that were

19   not owned by the plaintiffs?

20           MR. KUEHNE:  Objection.

21           THE COURT:  Grounds?

22           THE WITNESS:  Personal belief, foundation, speculation,

23   Rule 403.

24           THE COURT:  Sustained.  You can rephrase the question.

25   BY MS. SUAREZ:

 1   Q.   While you were District 3 liaison, were you Commissioner

 2   Carollo's right-hand man?

 3   A.   Up until March.

 4   Q.   Did you -- up until March, did you spend most of your day

 5   with him?

 6   A.   Yes.

 7   Q.   Did you see the things that he did?

 8   A.   Yes.

 9   Q.   Did you go on the walkalongs with him?

10   A.   Yes.

11   Q.   Did you ever see a repeated pointing out of violations or

12   alleged violations on anyone else's property besides Mr. Bill

13   Fuller and Mr. Martin Pena?

14        MR. KUEHNE:   Objection.   First, it's leading; number

15   two, it's beyond the scope of this person's knowledge; and

16   three, it's beyond the scope of this lawsuit.

17        THE COURT:   Overruled.   You can answer.

18        MS. SUAREZ:   Do you need me to repeat the question?

19        THE WITNESS:   Yes, please.

20   BY MS. SUAREZ:

21   Q.   Okay.   Did you ever see on these walkalongs, or at any

22   other time that you spent with Commissioner Carollo, did you

23   ever see him repeatedly pointing out alleged code violations on

24   any properties that were not owned by Bill Fuller or Martin

25   Pinilla?

```
1   A.   It's only the plaintiffs' properties that he selectedly
2   pointed out, along with murals that he didn't quite like.
3   Q.   And where were those murals?
4   A.   On the plaintiffs' properties.
5   Q.   And what were they of?
6        MR. KUEHNE:  Objection, Your Honor, and request a
7   sidebar.
8        THE COURT:  Denied.  Overruled.
9        You may answer the question.
10        THE WITNESS:  They were -- they're not
11   African American, they're Afro Cuban.
12        MR. KUEHNE:  Objection, Your Honor, and request an
13   opportunity to make a motion.
14        THE COURT:  Denied.
15        You may answer.  Go ahead, sir.
16        THE WITNESS:  Can you repeat the question?
17   BY MS. SUAREZ:
18   Q.   What were the murals of?
19   A.   Afro Cubans, but Carollo stated that he doesn't want
20   Liberty City to come down to Little Havana.
21        MR. KUEHNE:  Objection, Your Honor.  Move to strike.
22        Rule 403, we request an opportunity to make a motion.
23   This matter has been raised before.
24        THE COURT:  The motion is denied.
25        MS. SUAREZ:  I have no further questions.
```

```
 1              Thank you, Mr. Miro.

 2              THE WITNESS:  Thank you.

 3              THE COURT:  Any cross-examination?

 4              MR. KUEHNE:  Yes, Judge, one moment.

 5              (Brief pause in the proceedings.)

 6                    CROSS-EXAMINATION

 7  BY MR. KUEHNE:

 8  Q.   Good morning, Mr. Miro.  We know each other?

 9  A.   Yes.

10  Q.   I am Ben Kuehne, you know, and I am Joe Carollo's --

11  Commissioner Carollo's lawyer; right?

12  A.   You asked me if I know you, I said yes.

13  Q.   And you knew me during the time that Joe Carollo was

14  running again for City of Miami commission?

15              MS. SUAREZ:  Objection.  Relevance.

16              THE COURT:  Overruled.  You can answer it.

17              THE WITNESS:  Again?

18              MR. KUEHNE:  Yes.

19              THE WITNESS:  I just know him running one time.

20  BY MR. KUEHNE:

21  Q.   In 2017, Joe Carollo ran for District 3 commissioner?

22  A.   Yes.

23  Q.   And he had been a commissioner years before for the

24  City of Miami, same area, and the mayor of the City of Miami?

25  A.   They were -- back then, they ran city-wide, now, they're
```

1    districts.

2    Q.   So the answer is yes, he had been a city commissioner for

3    the City of Miami; isn't that right?

4    A.   Yes.

5    Q.   And he had been the mayor of the City of Miami?

6    A.   Yes.

7    Q.   And he ran in 2017 and won that election?

8    A.   Yes.

9    Q.   There were seven candidates who ran for District 3, and

10   Commissioner Carollo was the highest vote-getter?

11   A.   Yes.

12   Q.   There was a run-off between the two highest vote-getters,

13   Joe Carollo and Alfie Leon?

14   A.   Yes.

15   Q.   And Joe Carollo won by over 60 percent in the two-person

16   run-off?

17   A.   I believe so, if you're saying it, yes.

18   Q.   And as a result Joe Carollo was sworn in as city

19   commissioner December 2, 2017?

20   A.   Yes.  December 2nd, yes.

21   Q.   And all the time before December 2, 2017, Joe Carollo was a

22   private citizen?

23           MS. SUAREZ:  Objection.  Relevance.

24           THE COURT:  Sustained.

25   BY MR. KUEHNE:

1   Q.   Joe Carollo did not hold elective office during the time

2   you described as starting to work on his campaign in 2017 until

3   he was sworn in December 2, 2017; isn't that right?

4   A.   Yes.

5   Q.   And during the course of that time, you worked on the

6   Joe Carollo campaign?

7   A.   Yes.

8   Q.   Now, you've described yourself as campaign manager?

9   A.   Campaign manager, adviser, yes.

10   Q.   Well, it's not even close to campaign manager; was it?

11   A.   What was it then?

12   Q.   You were a staffer, you were paid $500 a week to work on

13   the campaign, along with others; weren't you?

14           MS. SUAREZ:  Objection.  Facts not in evidence.

15           THE COURT:  Overruled.  You can answer.

16           THE WITNESS:  Sounds about right, yes.

17   BY MR. KUEHNE:

18   Q.   And you had mentioned -- the team that you've described

19   when you were asked who else, you mentioned some -- let me call

20   it heavy-hitters assisting Joe Carollo with his campaign?

21   A.   They asked me about the staff, and I answered the question.

22   Q.   Well, not really staff.  You mentioned that I, Ben Kuehne,

23   was the lawyer for the campaign; right?

24   A.   You were.

25   Q.   And you've mentioned that two other lawyers, Tania Cruz and

1  C.J. Jimenez, assisted with the campaign?

2  A.  They did, yes.

3  Q.  And Marc Sarnoff, a former City of Miami commissioner,

4  assisted with the campaign?

5  A.  He did.

6  Q.  And at no time -- by the way, prior to your working on

7  Joe Carollo's campaign in 2017, you'd never been campaign

8  manager of any campaign; had you?

9  A.  No.  I helped out other campaigns.

10  Q.  As a staffer, as a volunteer; right?

11  A.  Personal friends of mine.

12  Q.  And with Joe Carollo, you actually started out as a

13  volunteer --

14  A.  Yes.

15  Q.  -- for the campaign?

16  A.  Yes, I said that.

17  Q.  And you worked your way into a full-time job as a campaign

18  aide, not as campaign manager?

19  A.  If that's what you want to call it.

20  Q.  What documentation do you have that shows you're campaign

21  manager?  Did you show up on any of the reports, the many

22  reports that are required to be filed by campaigns as campaign

23  manager?

24  A.  I'm pretty sure I was paid through the campaign, and it

25  says my stature on the campaign.

1    Q.   So you're telling us that your stature on the campaign is

2    recorded and reported?

3    A.   If not, then it's a violation of the law.

4    Q.   Okay.  And so what document is it that you can tell this

5    jury that says I was campaign manager?

6    A.   I was -- I was paid by the Joe Carollo for commissioner

7    campaign.

8    Q.   $500 a week as a campaign staffer; right?

9    A.   I was paid -- again, I was paid $2,000 a month.  I was paid

10   once a month.

11   Q.   Once a month, $500 a week, as a campaign staffer; isn't

12   that right?

13   A.   If that's how you want to say it, I was paid $2,000 a

14   month.

15   Q.   And it's your effort in this case to inflate your

16   responsibilities, starting with just being a campaign staffer,

17   but elevating yourself to campaign manager, a position of

18   importance; isn't it?

19   A.   No, I don't want to be important.

20        I want to be a private citizen.

21   Q.   And you worked as a campaign staffer for the campaign

22   until Joe Carollo what was elected; right?

23   A.   That's correct.

24   Q.   And Joe worked pretty hard as a candidate during the time

25   you were a campaign staffer; right?

```
1   A.   He worked, yes, work.

2   Q.   And you said that was from -- I think you said February of

3   2017 to the election in November of 2017 through early

4   December, 2017?

5   A.   Sounds about right, yes.

6   Q.   And you did not handle the campaign platform or the

7   campaign messaging; did you?

8   A.   No.  The messaging came before I came on.

9   Q.   And the messaging team included people like Alex Diaz, de

10  La Portia, a former Florida Senator Pro Tem who had run

11  countless campaigns in South Florida; right?

12       MS. SUAREZ:  Objection, Judge.  Bolstering.

13       THE COURT:  Sustained.

14  BY MR. KUEHNE:

15  Q.   The messaging team was headed by Alex Diaz de la Portia;

16  wasn't it?

17  A.   Alex came in, in the run-off.

18  Q.   Oh, not before?

19  A.   He came on, if I'm not mistaken, sometime in November.

20  Q.   And based on your recollection of Alex Diaz de la Portia --

21  by the way, when you were asked on direct examination who was

22  the campaign, you mentioned Alex Diaz de la Portia; didn't you?

23  A.   Alex, yes, Alex Portia, yes.

24  Q.   You didn't tell this jury that, "Oh, Alex was not part of

25  the campaign team until, gee, the run-off back late in
```

1  November"; did you?

2  A.   No, I said the team.

3  Q.   So Alex Diaz de la Portia's specialty in the campaign was

4  messaging; wasn't it?

5  A.   Alex run several campaigns.  I don't know if his was

6  messaging or not.

7  Q.   I'm asking you about the Joe Carollo campaign, when Joe

8  Carollo was a candidate, that's what I'm asking you about.

9  A.   I don't know.  He did the messaging.

10  Q.   Oh, you don't know?

11  A.   All I know, he did the messaging.

12  Q.   And you're aware that Joe Carollo, in the run-off, let's

13  say, in the run-off campaigned almost exclusively on quality of

14  life, improving the quality of life for residents in

15  District 3?

16  A.   We campaigned in the Section 8 housing, that's where we

17  mainly focused on.

18  Q.   And the focus was quality of life issues over and over and

19  over again; wasn't it?

20  A.   Well, those folks at the Section 8 housing, they already

21  have quality of life, they live in nice buildings.

22  Q.   Oh, is that right?

23  A.   Yeah.

24  Q.   So the low income community in District 3, Little Havana

25  area, you call it Section 8 housing, were happy with their

1   quality of life; that's your testimony?

2   A.   They had -- they have good apartments, they're very nice.

3   Q.   So when you claimed that -- on direct examination that

4   Joe Carollo as a candidate never talked about code issues and

5   quality of life issues, that's just not true; isn't it?

6   A.   Code issues, I never heard that come out of his mouth

7   during the campaign.

8   Q.   Never heard of that?

9   A.   Quality of life, we stuck to the platform of building

10   10,000 homes, enhance police, and cleanup the streets.

11   Q.   So when Joe -- by the way, did you go with Joe Carollo

12   during the campaign to the area around the Little Havana

13   business district?

14   A.   That's the district we ran in, so yes.

15   Q.   Okay.  And lots of people living there?

16   A.   In what part?

17   Q.   In the residential areas.

18   A.   I guess, yes.

19   Q.   Many seniors?

20   A.   That's what we focused on, yes.

21   Q.   Cuban Americans, primarily?

22   A.   It's a mix now.

23   Q.   And Joe Carollo was interested in getting every vote of

24   every legitimate, eligible voter; wasn't he?

25   A.   That's the goal always, but we specifically targeted a

1   certain base.

2   Q.   And among the campaign handshaking that Joe Carollo did was

3   constantly trying to find out what is of interest to the people

4   in my community?

5   A.   That should be the goal, yes.

6   Q.   That was his goal; wasn't it?

7   A.   If you say so.

8   Q.   You saw him do it, shaking hands, after shaking hands,

9   after shaking hands; right?

10  A.   Not much shaking hands, no.

11       We held events in which he was the speaker of however many

12  folks show up.  It could have been 30, 40, 50.

13  Q.   Okay.

14  A.   Shaking hands, though, I never saw it.

15  Q.   So Joe Carollo didn't walk the streets --

16  A.   No.

17  Q.   -- of the district campaigning?

18  A.   I never said he didn't walk.  We did walk, also.

19  Q.   So he just waved to people, didn't shake their hands?

20  A.   I told you, he knocked on doors.

21       MS. SUAREZ:  Objection, Judge.  Relevance.

22       THE WITNESS:  Knocked on doors.

23  BY MR. KUEHNE:

24  Q.   Knocked on doors, okay.  And you saw that that's what Joe

25  Carollo did, he walked the streets of District 3 to meet people

1    and, hopefully, get their vote?

2    A.   Yes.

3    Q.   So during the time that you were a campaign staffer for

4    Joe Carollo, you did whatever you thought a campaign staffer

5    should do; right?

6    A.   Can you elaborate?

7    Q.   Well, did you plan events?

8    A.   Yes.

9    Q.   Did you get lists of people to do -- get out the vote or to

10   do meet-and-greets?

11   A.   Yes.

12   Q.   You got lists of businesses in the area to identify what

13   businesses were working in that little strip in Little Havana?

14   A.   We never did that 'cause Joe said people that owned the

15   businesses aren't voters, so we didn't do that.

16   Q.   Okay.  So your testimony is that you focused on getting

17   lists of people and voters so that Joe Carollo could get to

18   know them?

19   A.   Correct.

20   Q.   And, by the way, when you did that as a campaign staffer,

21   did you write that stuff down?

22   A.   Yes.

23   Q.   Okay.  And where is that stuff?

24   A.   Oh, I threw it out.

25   Q.   You threw it out, okay.

1       So the time comes along and Joe Carollo wins as the highest

2   vote-getter at the November election; right?

3   A.   Correct, he's one of two.

4   Q.   And then one of two, and there's a run-off two weeks later?

5   A.   Yes.

6   Q.   And Joe Carollo wins re-soundingly on the run-off; right?

7   A.   It was by 251 votes.

8   Q.   60 percent of the vote; right?

9   A.   I don't know, if you say so, yes.

10  Q.   You're a campaign staffer, you know that he won by 60

11  percent of the vote; don't you?

12  A.   That's right.

13       MS. SUAREZ:  Objection.  Asked and answered.

14       THE COURT:  Overruled.  You can answer.

15  A.   Sir, I know he won.  I know we won.  I was happy for that.

16  I don't know the percentage.  It's been five years or six

17  years, it's been a long time.  I try not to dwell on the past.

18  Q.   Well, let me try to focus you then on the election.

19       He wins resoundingly in the run-off.

20       But Leon and his supporters are not very happy with the

21  outcome of that election and sued Joe Carollo; right?

22  A.   Alfie Leon campaign did sue, yes.

23  Q.   So Alfie Leon and his supporters, despite the election

24  results being certified in favor or Joe Carollo, immediately

25  after the election, November run-off, sued Joe Carollo to say

1   Joe Carollo was not properly elected, as you understood it?

2   A.   I don't know if it was immediately after, then I apologize,

3   I don't know.

4   Q.   Well, you are aware that the entire month of December and

5   most of January was consumed with an expedited litigation

6   challenging Joe Carollo's election; right?

7   A.   Yes.

8   Q.   Right.

9   A.   I believe I was a witness to that.  I was never called.

10  Q.   And in the course of that challenge -- by the way, that

11  challenge was rejected by the courts January 22, 2018; wasn't

12  it?

13  A.   If that's the date.

14  Q.   Well, to your recollection, it sounds about right?

15  A.   Ben, it's been a long time.  I apologize, I don't know.

16  Q.   And during the time of that litigation -- by the way, there

17  was a trial; wasn't there?

18  A.   Yes, in which --

19        MS. SUAREZ:  Objection, Judge.  Relevance.

20        THE COURT:  Sustained.

21  BY MR. KUEHNE:

22  Q.   And during the time of that litigation, Joe Carollo was

23  actively involved in defending himself and his election for the

24  D-3; right?

25  A.   He was defending himself.  He hired you, yes.

1   Q.   And you're aware that during that time there was an

2   extensive amount of document production and research to assist

3   Joe Carollo in showing that he was properly elected; right?

4   A.   I can't speak to that, I'm not an attorney.

5   Q.   You were part of the Joe Carollo staff and were actively

6   assisting in defending that litigation; weren't you?

7   A.   No, I was a witness to it.  I was never called.

8   Q.   So you were a witness, you were aware that the challenge

9   was going on and Joe Carollo was actively involved in defending

10  his election?

11  A.   Correct.

12  Q.   And during the course of that election lawsuit brought by

13  Leon and his supporters, there was an issue about illegal

14  voting; wasn't there?

15  A.   I wasn't in the courtroom.

16  Q.   In the course of what you understood, being prepared as a

17  witness, one of the issues there was illegal voting; wasn't it?

18  A.   I wasn't prepared for the case.  I was a witness.  I had to

19  stay outside, and I worked for the staff of Joe Carollo at the

20  time.  And after, I believe they released me, or what have you,

21  I was going to City Hall, not the courthouse.

22  Q.   And one of the things you did during that litigation was to

23  assist the litigation team in looking at records of properties

24  and voters to determine the propriety of the vote count, which

25  had been challenged; right?

```
 1   A.   His residency was under issue.  I don't think it was

 2   anything to do with.

 3   Q.   And the validly of the voting for that election; right?

 4        MS. SUAREZ:  Objection, Your Honor.

 5        Asked and answered.

 6        THE COURT:  All right, sustained.

 7   BY MR. KUEHNE:

 8   Q.   So you asked Joe Carollo to work for him in the District,

 9   D-3, to get a City of Miami job?

10   A.   Correct, yes.

11   Q.   You had not been a City of Miami employee before?

12   A.   Never, no.

13   Q.   You had had other Government employment experience, but not

14   with the City of Miami?

15   A.   Correct.

16   Q.   So when you start December 2, 2017, Joe Carollo is putting

17   together his staff?

18   A.   Sir, I don't start December 2nd.  I start December 4th.

19   Q.   December 4th.  Okay.  He gets elected on -- sworn in on

20   December 2.  You start on December 4?

21   A.   Yes, that's correct.

22   Q.   And he starts the process of putting together his staff?

23   A.   Yes.

24   Q.   And during this time, now you're a staff member, you work

25   in the district office?
```

```
1   A.   There's no district office.

2   Q.   You work in Commissioner Carollo's office; don't you?

3   A.   City Hall, yes.  There's one --

4   Q.   That's the District 3 office; isn't it?

5   A.   A District 3 office, yes, but it's not a district office.

6   There's district offices now.

7   Q.   Okay.  So during the time you actually worked in

8   Joe Carollo's office?

9   A.   That's correct.

10  Q.   You had your own space?

11  A.   Yes.

12  Q.   And you worked with whatever staff members were there,

13  including, at some point, the chief of staff, former Chief Blom

14  arrives?

15  A.   What date are you referring to?

16  Q.   Well, you worked for Commissioner Carollo December 4, and

17  at some point in that process Commissioner Carollo appoints a

18  chief of staff, Chief Blom; right?

19  A.   In February, yes.

20  Q.   February.  And prior to that time, prior to February,

21  that's -- the litigation is going on; right?

22  A.   Yes.  It's just me and Sophia is the receptionist that's

23  working at the office.

24  Q.   Okay.  So when you start with Commissioner Carollo, you get

25  involved in various district activities; right?
```

1    A.   Can you elaborate?

2    Q.   Well, one of the things that you did and liked to do was go

3    onto the internet and research different issues that might be

4    of importance to the district or the commissioner; right?

5    A.   I don't understand.  Sorry.

6    Q.   Let me try it this way:

7         Part of the job of Joe Carollo doing his job as a

8    commissioner was to be active in District 3; right?

9    A.   Yes.

10   Q.   To be aware of what was going on that impacted District 3?

11   A.   Correct.

12   Q.   To help guide District 3, and really the whole city, in

13   matters of importance to the public?

14   A.   Correct.

15   Q.   To get involved in projects that helped enhance the

16   district or the city?

17   A.   Yes.

18   Q.   And those projects were fairly wide-ranging; weren't they?

19   A.   Yes, as a commissioner, you're on vote to any projects,

20   correct.

21   Q.   So let me ask you about some of the projects.

22        During your days when you talked about working for

23   Commissioner Carollo and what you spent time on, let me ask you

24   about some of the projects that you got involved in on behalf

25   of D-3 and the Commissioner.

1          Could we pull up Defense Exhibit 220.

2               MS. SUAREZ:  No objection.

3               MR. KUEHNE:

4     Q.   Do you see Defense Exhibit 220 on the screen?

5     A.   Yes.

6     Q.   This is January 2, 2018?

7     A.   Yes.

8     Q.   Steven M is you, Steve Miro?

9     A.   Yes.

10    Q.   To Joe Carollo?

11    A.   Yes.

12    Q.   And you're sending him something about the Derik Jeter

13    business plan.  So this is a sports project that deals with the

14    Marlins and the Marlins stadium; right?

15    A.   That's an article, I believe, in the Herald from my

16    personal account to Joe's personal account.

17    Q.   And you send that to Joe Carollo because that sports, and

18    Marlins Park, and what's going on with the business of baseball

19    in the district, as well as in the city, is an issue of

20    interest and importance to the City of Miami?

21    A.   The stadium's in the district, yes.

22    Q.   But that's not the only project that you're working on for

23    Joe Carollo.  There are other sports projects that you got

24    involved in; right?

25    A.   Can you elaborate on the projects I've worked on?

 1   Q.   Sure.  Let's take a look at Defense Exhibit 195.  This is

 2   January 15th, 2018.  So the next week, January 15th, 2018.

 3   Defense Exhibit 195.

 4        MS. SUAREZ:  No objection.

 5   BY MR. KUEHNE:

 6   Q.   So we see similar, from Steve M, you're sending Joe Carollo

 7   an e-mail, "Article on Beckham's stadium."  That's the proposed

 8   soccer team for the City of Miami now called Inter Miami?

 9   A.   Yes, I sent Joe Carollo that e-mail, yes.

10   Q.   And this was an effort to bring Major League Soccer into

11   the City of Miami, into South Florida?

12   A.   It's an article from the Herald that I copy and pasted and

13   I sent to Joe Carollo.  I subscribe to the Herald, I pay the

14   membership, Carollo does not, so he can't get these articles.

15   Q.   So you sent this to Joe Carollo in his capacity as

16   Commissioner on an issue of importance, not just to D-3, but to

17   the City of Miami?

18   A.   Correct, yes, I sent this.

19   Q.   Lets take a look so we do January -- let's go to DX 193,

20   Defense Exhibit 193.

21        MS. SUAREZ:  Your Honor, my only objection is relevance

22   at this point.

23        THE COURT:  Overruled.

24   BY MR. KUEHNE:

25   Q.   So this is, again, an e-mail, now we're in March 21.

1      And here you send over to Joe Carollo, as the Commissioner,

2  an issue about soccer, trying to figure out where and maybe in

3  the City of Miami its stadium is going to be built; right?

4  A.   Correct.  I sent Joe an article that I copy and pasted from

5  the Miami Herald, yes.

6  Q.   Pretty important issue for D-3 and the City of Miami?

7  A.   I would assume, yes, it's an important issue for the

8  City of Miami.

9  Q.   And that issue on soccer and stadium and location was an

10  important pressing issue for the City of Miami and Joe Carollo

11  in the early days of his tenure once the litigation was

12  resolved; right?

13  A.   Can you repeat the question?

14  Q.   Let me show up defense Exhibit 194.  I have just a couple

15  others that I'm going to show you on this.

16      So this deals with -- strike that, defense Exhibit 194.

17      Do you see that?

18  A.   Yes.

19  Q.   Now we're at -- oh, this was actually a little earlier,

20  March 2, 2018.  So we have January through March, you're

21  sending Joe Carollo another article about stadium location

22  within the City of Miami for Major League Soccer?

23  A.   Correct.

24  Q.   A big deal and a big project, public-private project,

25  potentially, for the City of Miami?

1    A.   Correct.

2    Q.   Creating jobs, and also, from this article, potentially,

3    creating affordable housing; right?

4    A.   That's what's in the article, yes.

5    Q.   Another important issue for D-3, the residents of

6    District 3, as well as the whole City of Miami; right?

7    A.   Is that a question?  Yes.

8    Q.   And let me go to -- I think I will close with just a couple

9    others.  Let's go to Defense Exhibit 295.

10        Do you see this, Defense Exhibit 295?

11   A.   Yes.

12   Q.   It starts out with a "from Steve Miro" e-mail?

13   A.   Yes.

14   Q.   And here it's to smiro@countywidepi.com, do you see that,

15   on March 16th, 2018?

16   A.   Okay.

17   Q.   Do you see that, right at the top?

18   A.   Yes.

19   Q.   And you are a liaison for Joe Carollo at the time, right,

20   you're working for Joe Carollo -- actually, the City of Miami?

21   A.   Correct.

22   Q.   And this article you're sending over, thanks you for

23   meeting on the Jose Marti Park RFQ, request for qualifications;

24   right?

25   A.   Okay.

1  Q.   A re-do of the park for beautification purposes, the

2  esteemed Jose Marti Park; right?

3  A.   Yes.

4  Q.   Important to the district?

5  A.   I would say so.

6  Q.   Important to Joe Carollo?

7       MS. SUAREZ:  Speculation, Your Honor.  Objection.

8       THE COURT:  Sustained.

9  BY MR. KUEHNE:

10  Q.   Important to the citizens of the City of Miami?

11       MS. SUAREZ:  Objection.  Speculation.

12       THE COURT:  Sustained.

13  BY MR. KUEHNE:

14  Q.   And you're sending this, you're getting this material to

15  keep the Commissioner informed of what's going on with the Jose

16  Marti Project; right?

17  A.   I believe so.

18  Q.   But you send the e-mail to Steve Miro at some other e-mail

19  address, countywidepi.com; right?

20  A.   Correct.

21  Q.   On City of Miami time, you sent it to your separate

22  company; right?

23  A.   Correct, I used the City of Miami computer to send myself

24  an e-mail, same way I was doing it to Carollo's personal

25  e-mail.

1   Q.   To countywidepi.  Now, that's a company that you have a
2   long-time relationship with; didn't you?
3   A.   I would say so.
4   Q.   You would say so?
5   A.   Yes.
6   Q.   Yes?
7   A.   Yes.
8   Q.   And, in fact, it's a company that you had an ownership
9   interest in?
10  A.   My --
11           MS. SUAREZ:  Objection, Your Honor.  Relevance.
12           THE COURT:  Overruled.
13           THE WITNESS:  Yes.
14  BY MR. KUEHNE:
15  Q.   And, by the way, when you were hired by the City of Miami,
16  you knew that your job was with the City of Miami, and that was
17  to be your employer; right?
18  A.   Yes.
19  Q.   And that if you wanted to have any other job, any other
20  position, you had to obtain disclosure of that?
21  A.   That's correct.
22  Q.   And you never disclosed to the City of Miami that you had
23  an active position with Countywide Investigations and Process
24  Servers; did you?
25  A.   I just had their e-mail address at the time.  I wasn't

1   collecting any type of salary.  I just used their e-mail, like
2   my personal e-mail.
3   Q.   You used that private company's e-mail, and you didn't
4   disclose to the City of Miami any relationship that you had
5   with Countywide Process Servers and Investigations; right?
6   A.   Same e-mail I used, I used that as my personal e-mail.
7       I wasn't getting any money, compensation from them.
8   Q.   Okay.  So, let me go to one last e-mail on this, Defense
9   Exhibit 230, yet another project.  This is May 9, 2018.
10      You're still employed May 9, 2018?
11  A.   Yes.
12  Q.   And this is a Steve Miro e-mail to Joe Carollo, and this
13  deals with Formula One, which is another event and preparation
14  for a City of Miami Commission Meeting; right?
15  A.   Yeah.
16  Q.   To help prepare Commissioner Carollo for something that's
17  going to be on the agenda at the commission meeting?
18  A.   I believe so.
19  Q.   And that's part of what staff did to assist Joe Carollo as
20  a Commissioner?
21  A.   Correct.
22  Q.   Now, during that time, doing these e-mails, doing the
23  research on projects, you mentioned that you said your job was
24  to handle citizen complaints?
25  A.   Correct.

1   Q.   Now, that's just not true; is it?

2   A.   How so?

3   Q.   The receptionist took all complaints that were sent in --

4   all citizen contact that came into the office; right?

5   A.   Okay.

6   Q.   Isn't that right, that's the process?

7   A.   Right, the receptionist answers the phone.

8   Q.   And all of those matters were then sent to either the chief

9   of staff, or the assistant deputy chief of staff, to determine

10  who in the staff should handle those matters?

11  A.   Correct.  And Anthony Barcena assigned me.

12  Q.   So Anthony Barcena is -- at the time, he was the assistant

13  chief or deputy chief of staff?

14  A.   I believe so, yes.

15  Q.   Certainly in the line, much higher up in supervision than

16  you were?

17  A.   No -- I don't understand what that means.

18  Q.   All right.  He held the title of deputy chief of staff, and

19  was responsible for the work of the staff members; wasn't he?

20  A.   Correct.

21  Q.   And he's the one who took citizen complaints to determine

22  who among the staff members would handle something?

23  A.   No.

24  Q.   He didn't determine if a citizen complaint -- citizen

25  inquiry dealt with a particular issue, who on staff was best

1  suited for that?

2  A.   Mr. Kuehne, Anthony Barcena assigned me with the

3  complaints, any complaints, I would receive them, I guess, he

4  and Richard Blom would do whatever else they have to do within

5  the office scope.

6  Q.   So you got some assignment.  Do you have an e-mail to that

7  effect?  Do you have a list of responsibilities?

8  A.   I don't have anything with me.

9  Q.   And your testimony is that almost nobody called the office?

10 A.   Correct, when it comes to complaints.

11 Q.   The Commissioner District 3 office, in your testimony, that

12 wasn't a regular, busy, active part of that job, people calling

13 City Hall to complain?

14 A.   No, people call to schedule meetings or projects that they

15 had, obvious calling.

16 Q.   Okay.  Did you handle any of those?

17 A.   In the beginning, yes.

18 Q.   Because you're certainly, based on your testimony, didn't

19 spend any time with citizen complaints?

20 A.   Because there wasn't any; the only complaints I got was

21 from Joe Carollo.

22 Q.   Okay, that's your testimony.

23     So you've looked through city records and you're telling

24 this jury absolutely, positively, without equivocation, there's

25 no records of citizens calling to complain about noise,

1    complain about code violations; is that your testimony?

2    A.   No, Mr. Kuehne.  I did receive complaints and calls, but it

3    came from Commissioner Joe Carollo.

4    Q.   Okay.  So let's be real clear with this jury, that your

5    testimony is that no citizens complained about noise, music,

6    parking, code violations, quality of life issues, during the

7    short time you were with the commissioner's office?

8    A.   Well, when commissioner knocked on that lady's door and we

9    knocked on her door, also, he gave a complaint, yes.

10   Q.   Who was that lady?

11   A.   We could go back to her house, if you want.

12   Q.   The answer is, you don't know?  That's a nice, smart

13   you-know-what answer, but the answer is you don't know; right?

14            MS. SUAREZ:  Objection, Your Honor.

15            Counsel's testifying.

16            THE COURT:  Sustained.

17   BY MR. KUEHNE:

18   Q.   So you could go back to her house, real, live person;

19   right?

20   A.   I'm sure you can.

21   Q.   You could?

22   A.   Me, no, I no longer work for the City of Miami.

23   Q.   Real voter in the City of Miami; right?

24   A.   I didn't check her voter status, sorry.

25   Q.   Real complaint about all the business activity that's going

1  on right behind her residence; right?

2  A.   I'm sorry, I didn't understand the question.

3  Q.   She had real concerns about what was going on, disrupting

4  her life, right behind her residence?

5  A.   She had a concern.  After the fact, Commissioner Carollo

6  knocked on her door, then I, along with Mara Toman and Esella

7  Martri, went to that property and they knocked on her door, and

8  then she had a complaint.

9  Q.   And she reported a legitimate complaint about legitimate

10  activity going on that she thought was of concern?

11  A.   Yes.

12  Q.   By the way, did they live in an ALF?

13  A.   I don't know if that's an ALF.

14  Q.   But you are aware that an ALF in the district, right behind

15  the Little Havana business district, had multiple complaints

16  about these senior residents couldn't sleep because of all the

17  unpermitted noise in the district; right?

18  A.   I don't know any of that.

19  Q.   Oh.  In charge of complaints, and you're not aware of

20  owners and residents of an ALF right behind the business

21  district complaining that they couldn't sleep because of this

22  incessant noise, parking of cars in their neighborhood?

23        MS. SUAREZ:  Objection, Your Honor.  Asked and answered

24  and counsel is testifying.

25        THE COURT:  Sustained.

1  BY MR. KUEHNE:

2  Q.  You talked at the end about something that was at the

3  beginning, and you were shown some pictures of the Leon

4  campaign rally.  Do you remember that, it came toward the end?

5  A.  Yes.

6  Q.  Exhibit 7.  So you are aware there was a campaign rally

7  while Commissioner Carollo was running for office, and that was

8  the issue that you pointed out code compliance came to -- code

9  enforcement came to?

10  A.  I believe so, yes.

11  Q.  And Joe Carollo's not a city commissioner; right?

12  A.  Correct, at the time.

13  Q.  And whether this rally was permitted or not, you don't know

14  'cause you're not a city official?

15  A.  Correct.

16  Q.  And what you know is that there's a political rally taking

17  place -- by the way, was it right next to an early voting site?

18  A.  I said that, yes.

19  Q.  And issues about whether that rally is within the right

20  distance statutorily to an early voting site?

21        MS. SUAREZ:  Objection, Your Honor.  Speculation.

22        THE COURT:  Overruled, if he knows.

23        THE WITNESS:  That part, I don't know.

24  By MR. KUEHNE:

25  Q.  Okay.  So you go to this rally, and you see that it's a

```
 1    political rally, and you see a code compliance person there,

 2    right?  And you have no ability to enforce the law of the

 3    City of Miami?

 4    A.   No.  But in my testimony, I recalled Mary Lugo, which she

 5    has influence over code enforcement, and that's not an issue.

 6    Q.   Oh, Mary Lugo, who is a City of Miami staffer who is, I

 7    think you said -- did you say --

 8    A.   She's not a staffer.  She's the vice president of the

 9    union, and she also works in the City of Miami.

10    Q.   Right, so she's a City of Miami employee who's released to

11    the union to work full-time for its ASME; right?

12    A.   Correct.

13    Q.   Now, ASME -- by the way, you're aware that the four major

14    unions in the City of Miami all endorsed Joe Carollo's

15    candidacy?

16              MS. SUAREZ:  Objection.  Relevance.

17              THE COURT:  Sustained.

18    BY MR. KUEHNE:

19    Q.   ASME, Mary Lugo's union from which she's released to the

20    City of Miami, was part of the supporters of Joe Carollo;

21    wasn't she?

22    A.   Yes.

23    Q.   And somehow you associate Mary Lugo with this Leon campaign

24    rally?

25    A.   Yes.
```

1    Q.   You had nothing to do with code enforcement coming to the

2    Leon campaign rally?

3    A.   I don't know if I had anything to do with it, but I did

4    reach out to her.

5    Q.   You made no calls to anyone?

6    A.   I called Mary Lugo.

7    Q.   You made no calls to anybody in code compliance?

8    A.   No.

9    Q.   Or code enforcement?

10   A.   No.

11   Q.   And you made no inquiry to anybody in the City of Miami,

12   other than this ASME representative, Mary Lugo?

13   A.   No.

14   Q.   But you did have some contact with Bill Fuller about this

15   rally; didn't you?

16   A.   Yes.

17   Q.   And you can put up Plaintiffs' Exhibit 6, I think it was

18   shown to you earlier in your testimony.

19        This is a text that you're having with Fuller?

20   A.   Yes.

21   Q.   And, by the way, it starts out June 9th, 2017, so that's

22   during the campaign?

23   A.   Yes.

24   Q.   And you text Fuller, you had his text number?

25   A.   Correct.

1    Q.   And so you have some dealings with him in June, and then,

2    according to this text, the next is during the campaign, and

3    he's telling you, they should be leaving the site, please let

4    me know if they don't; right?

5    A.   Yes.

6    Q.   And you reach out to Fuller?

7    A.   Correct.

8    Q.   And you tell him there's music, there's this campaign site,

9    and he tells you, "Whoa, that's not supposed to be there, I'll

10   take care of it"; right?

11   A.   I believe he said something to that effect, yes.

12   Q.   And then you actually tell him, "Hey, the music's still

13   playing."

14        And he responds by saying, "Is it off now?" -- as though

15   have I taken care of it; right?

16   A.   Yes.

17   Q.   Now, you had mentioned that you got associated, introduced

18   to Joe Carollo through your Godfather; right?

19   A.   Yeah.

20   Q.   So sort of a family member?

21   A.   I consider him family, yes.

22   Q.   So your Godfather, and that's a Victor De Yurre?

23   A.   Correct.

24   Q.   Victor De Yurre is a former City of Miami Commissioner;

25   right?

```
 1    A.   Yes.
 2    Q.   And Victor De Yurre actually was beaten for the
 3    City of Miami commission by Joe Carollo; wasn't he?
 4         MS. SUAREZ:  Objection, Judge.  Relevance.
 5         THE COURT:  Sustained.
 6    BY MR. KUEHNE:
 7    Q.   Wasn't Victor De Yurre the one responsible for putting you
 8    in touch with Joe Carollo?
 9    A.   Yes.
10    Q.   And you knew their relationship was that Victor De Yurre
11    and Joe Carollo had been political enemies; didn't you?
12         MS. SUAREZ:  Objection, Judge.  Relevance.
13         THE COURT:  Sustained.
14    BY MR. KUEHNE:
15    Q.   But Victor De Yurre had a relationship with Fuller; didn't
16    he?
17    A.   I didn't know that.  I know my Godfather beat Carollo in
18    '87 and Carollo beat him in '95.
19    Q.   Okay.  And what you did know is that Victor De Yurre during
20    the time that you were working for the City of Miami sat on a
21    board for the City of Miami; right?
22    A.   Yes.  I don't know what board he sat on.
23    Q.   Let me just take a moment.
24         And Victor De Yurre was a Special Master or Magistrate for
25    the city; that's what you recall?
```

1   A.   You're talking about capacity, I don't know if that's the

2   capacity he had or not.

3   Q.   Correct.  And what you do know is that you informed

4   Fuller -- you told Fuller that Victor De Yurre, your Godfather,

5   did him a favor when he was a special magistrate; didn't you?

6   A.   I don't know.

7   Q.   You didn't tell Fuller:  You know, Look, my Godfather is a

8   magistrate, I mean, he helped you the last time, which was

9   August 5th, the day I was -- I was terminated the 4th of June.

10  The 5th, it was code enforcement hearing that Joe showed up at

11  that hearing, my Godfather was the magistrate in that hearing.

12       And Fuller says:  No way.

13       And you say:  Yes.

14       And then you say:  And he gave you guys a 30-day extension.

15       And then you said:  He saw -- he saw Carollo walk in, and

16  you know --

17       MS. SUAREZ:  Your Honor, I'm going to object.  I have

18  no idea what counsel's reciting off of.

19       THE COURT:  You don't need to know what he's reciting

20  off of, he can ask a question.  Go ahead, Mr. Kuehne.

21  Q.   You said this to Bill Fuller:  He saw Carollo walk in and,

22  you know, he saw Carollo sitting next to the two people and he

23  didn't think much of it, you know, and after he rendered his

24  decision, Joe Carollo, he's like, Commissioner Carollo -- out

25  of respect, he brought him up -- is there anything you want to

1  say?

2      And he's like:  Yeah, absolutely, I came here to talk about

3  the case, but the case was already closed.

4      You told Fuller that; didn't you?

5  A.  I don't know what you're reading, Mr. Kuehne.

6  Q.  Do you deny telling Fuller this, under oath, exactly what I

7  told you?

8  A.  I'm not denying anything.  I just don't know what you're

9  reading.

10  Q.  So tell this jury, you, in fact, told that to Fuller;

11  didn't you?

12  A.  I don't want to be misquoted, I can't do that.

13  Q.  Okay.  So, Victor De Yurre, who introduced you to

14  Joe Carollo, who, despite they're having election battles,

15  recommends you for the position for the campaign and

16  Joe Carollo hires you; fair enough?

17  A.  Joe Carollo, when he was at Doral, hired my Godfather to be

18  on that board -- or some board there, so that their

19  relationship was on good terms.

20  Q.  A Doral board?  You mean a City of Miami board?

21  A.  No, in Doral.

22  Q.  Oh, in Doral.  Oh.

23      So, Fuller, you're telling this jury, had an issue with

24  Doral?

25          MS. SUAREZ:  Objection, Your Honor.

1          Misstates the testimony.

2          THE COURT:  Sustained.

3    BY MR. KUEHNE:

4    Q.   Fuller had an issue with the City of Miami and your

5    Godfather as magistrate; didn't he?

6    A.   Right.  But I want to rectify, you said that my Godfather

7    and Carollo are political enemies.

8          There was no problem with them.

9    Q.   Right.

10   A.   And then Carollo, as city manager of Doral, appointed my

11   Godfather to some type of position in the City of Doral.

12   Q.   Precisely.  Political opponents in politics and life moves

13   on; right?

14   A.   That's how it should be, yes.

15   Q.   So now you were asked about your activities during the time

16   you were with the city, and you mentioned a number of different

17   activities you did.

18         You mentioned that you went on two walk-throughs -- is that

19   what you called them?  -- walk-throughs or walk-alongs?

20   A.   Yes.

21   Q.   While you were with the city?  So this is not walk through

22   the district with Commissioner Carollo during the election time

23   that he did, this was now as city commissioner?

24   A.   What dates are those?

25   Q.   Well, you tell me.  You went on one walk-along with -- do

1    you remember James Bernat, the director of code?

2    A.   Yes, we walked through with him, yes.

3    Q.   And you walked through the Little Havana business district?

4    A.   Yes.

5    Q.   And then you did one other walk-along, and you said that

6    was an abbreviated one with the mayor of the City of Miami?

7    A.   No, I never said we did a walk-along with the mayor.

8         We did a drive-along.

9    Q.   A drive-along, I apologize.

10        So you did one walk-along that you've described, and I will

11   call that the code director Bernat's walk-along; right?

12   A.   Okay, yeah.

13   Q.   And then the other thing was a drive-along with the mayor?

14   A.   I did one, yes.

15   Q.   And that describes your involvement in walk-alongs or

16   drive-alongs?

17   A.   I think we did one more, if I'm not mistaken.

18   Q.   Oh, you did another one?

19   A.   Yes.

20   Q.   And what was that other one?

21   A.   It had the same route, it's the same route of the two-block

22   radius in Little Havana.  I don't recall with who that was.

23   Q.   Okay.  And you didn't do any follow-up whatsoever, did you,

24   on what the results were, if anything, from the walk-along with

25   code director Bernat?

A.   No.

Q.   So you're not aware that the records of the City of Miami
show that following that walk-along in the business district a
number of businesses were inspected and cited if they had
violations?

A.   I don't know any of the businesses that were cited or not.

Q.   So you don't know from the records of City of Miami that
multiple businesses were cited, only one of which had anything
to do with the plaintiffs' company's properties?

        MS. SUAREZ:  Objection, Your Honor.  Speculation.

        THE COURT:  Overruled, if he knows.

        THE WITNESS:  No, I don't know.

        MR. KUEHNE:

Q.   Because code was not your -- I think you testified to the
jury, code was not your area?

A.   Correct.

Q.   So whatever the city did with regard to enforcing its code
issues, following James Bernat, the co-director, walking with
Commissioner Carollo in the city, you had no involvement with
him?

A.   No.  My involvement was I walked.

Q.   You walked?

A.   Yes.

Q.   Just to be there as a staff member?

A.   Correct, and I saw Carollo point out the plaintiffs'

1    properties.

2    Q.  Well, you've said that --

3    A.  Yes, I did.

4    Q.  -- but the fact of the matter is, when code followed up on

5    that business district that abuts the residences, code went to

6    numerous properties and cited numerous properties for

7    violations, only one of which happened to be plaintiffs'

8    company policy; right?

9    A.  I don't know.

10           MS. SUAREZ:  Objection, Your Honor.  Speculation.

11           THE COURT:  He said he didn't know.

12           Next question, counsel.

13           MR. KUEHNE:  Okay.

14   BY MR. KUEHNE:

15   Q.  And the second time with the drive-along with the mayor,

16   you didn't do any follow-up?

17   A.  The second time -- we only did it once with the mayor.

18   Q.  I'm sorry, I meant the second thing; the first one was a

19   walk-along, the second one was a drive-along?

20   A.  Right.

21   Q.  That one, no follow-up as to what happened?

22   A.  No.

23   Q.  Was code part of that drive-along?

24   A.  No, it was myself, Carollo, the mayor, I think two staff

25   members from the mayor's office, and the Sergeant in arms.

1    Q.   And this was the elected officials taking a look through

2    the Little Havana business district; right?

3    A.   If you say that.

4    Q.   Well, isn't that what happened?

5    A.   We drove from Jose Marti Park, and we drove all the way

6    Southwest 7th, hung a left on 17th, came back on 8th Street,

7    drove from 17th back to Jose Marti Park.

8         Carollo showed the mayor some properties of the

9    plaintiffs', including the one on Fifth Avenue and between 7th

10   and 8th Street.

11   Q.   And it's your testimony, as you tell this jury, that the

12   only properties that Carollo pointed out to the mayor of the

13   City of Miami were properties associated with the plaintiffs'

14   companies?

15   A.   Yes.

16   Q.   Did the mayor's staff members take any notes?

17   A.   I don't know if they did or not.

18   Q.   You didn't take any notes?

19   A.   Absolutely not, no.

20   Q.   And you don't know if code compliance did any follow-up to

21   whatever was looked at?

22   A.   I don't know.

23   Q.   But what you do know is that the mayor got involved because

24   at the time of this drive-along, there had been repeated

25   complaints to City Hall, to the mayor's office, to the net

1   offices that the business district in Little Havana was out of

2   control; right?

3   A.   Never got any of those complaints.

4   Q.   But that's why the mayor was there?

5   A.   No, the mayor was there because Carollo wanted to do a

6   ride-along with the mayor, so the mayor showed up.  He didn't

7   have much time, and the mayor dropped us off within 10, 15

8   minutes, and that was it.

9   Q.   And your testimony was that the mayor was not there because

10  the mayor had gotten complaints about the goings-on in

11  District 3 and wanted to get information from the District 3

12  hands-on commissioner what was going on?

13  A.   I don't know what the mayor's office does, Mr. Kuehne.

14  Q.   Okay.  And you certainly didn't deal at that level?

15  A.   What level?

16  Q.   Of the mayor's office.

17  A.   I don't know what happens up there.

18  Q.   On your direct examination you were asked a number of

19  questions about different e-mails and communications that you

20  had with Commissioner Carollo.

21       And let me ask you to look at Plaintiffs' Exhibit 208.

22       You were shown that exhibit?

23       In other words -- no, it's a Plaintiffs' Exhibit, it's in.

24  BY MR. KUEHNE:

25  Q.   So you see this, this is December 19, 2017, and you were

1    asked some questions about this.

2        Soon after Joe Carollo was installed as mayor -- as city

3    commissioner, right, that was December 2, so this follows two

4    weeks later.

5    A.   I see the e-mails, yes.

6    Q.   And it's your e-mail that says, "properties new"?

7    A.   Yes.

8    Q.   Now, this was while the --

9    A.   Wait, wait -- I'm sorry, you said new, I don't see the new.

10   Q.   See attachment, it says property dash new; am I reading it

11   correctly?

12   A.   Yes.

13   Q.   And this was during the active litigation of the election

14   challenge by Leon's supporters; right?

15   A.   There's a residency issue to my knowledge, I don't know,

16   can't speak to.

17   Q.   But this was during that time that litigation was going on?

18   A.   Yes, but the litigation for residency, to my knowledge.

19   I don't know anything about what you just mentioned.

20   Q.   Okay.  So let's go to the next page, next.

21       So here's a list of properties, and you said that these

22   properties are all associated with the plaintiffs' companies or

23   some affiliation with the plaintiffs; right?

24   A.   Yes.

25   Q.   And this is all information that's gleaned from official

1    property records available by going onto the computer and just

2    getting it from official county property records?

3    A.   Yes.

4    Q.   And among these records include records of residences --

5    A.   Yes.

6    Q.   -- for -- owned by these companies, 1393, LLC, William

7    Fuller, Calle Ocho Marketplace, business and residences; right?

8    A.   Yes.

9    Q.   And at the time while the Leon litigation was going on,

10   Fuller and Fuller's family voted in D-3 for that election;

11   right?

12         MS. SUAREZ:  Objection.  Speculation.

13         THE COURT:  Overruled, if you know.

14   BY MR. KUEHNE:

15   Q.   If you're aware.

16   A.   I know we saw -- when I say we, me and Joe Carollo, we saw

17   Bill and his father voting -- I don't know about his family, I

18   don't want to --

19   Q.   All right, so his father.

20        And a question arose in that Leon litigation, how could

21   voters who have mega mansions in Coral Gables be voting in

22   District 3 for District 3, City of Miami; right?

23   A.   I don't know.

24         MS. SUAREZ:  Objection.

25         Counsel's testifying, and asked and answered.

1          THE COURT:  Overruled, if he knows.

2    BY MR. KUEHNE:

3    Q.  And this printout that we're looking at, this Plaintiffs'

4    Exhibit, identifies the different properties, residences, and

5    status of Fuller and properties associated with plaintiffs'

6    companies?

7    A.  Yes.

8    Q.  And isn't it a fact that the issue with this exhibit is how

9    could a voter who lives in Coral Gables -- in a property listed

10   here in Coral Gables be voting at Robert King High for the

11   District 3 race?

12   A.  I don't know.

13          MS. SUAREZ:  Objection, Your Honor.

14          Can we go sidebar, please?

15          (Sidebar discussion held as follows:)

16          MR. GUTCHESS:  The printout involved Carollo's

17   residence when he moved to Brickell in 2017 in order to be

18   qualified to run with the D-3.

19          It had nothing to do with Mr. Fuller's residency.

20          There's nothing in the litigation to (inaudible) for

21   the property.  Mr. Kuehne is, once again, trying to make false

22   statements to confuse these issues; and if he's going to do

23   that, he should pull out records from that litigation to prove

24   what he's saying, because I'm not going to allow somebody to

25   make a false statement to the Court that he can't prove.

1        THE COURT:  Let Mr. Kuehne respond.

2        MR. KUEHNE:  The witness said he doesn't know anything

3   about this a couple of times, twice, so we're not going to go

4   on this line of questioning anymore.

5        THE COURT:  Move on to another topic.

6        MR. GUTCHESS:  Okay.

7        MR. KUEHNE:  I'm asking in good faith, he should know,

8   so if he wants --

9        MR. GUTCHESS:  I will start another line of

10  questioning.

11       MR. KUEHNE:  I will accept his answer, even though I

12  believe that further questioning with different documents

13  should refresh his recollection that he knew about this, but if

14  the Court says move on, I'll move on.

15       THE COURT:  Talk to your client at that time and even

16  to another witness.  All right.

17       MR. KUEHNE:  Thank you.

18       (Sidebar concluded and the following was held in open

19  court:)

20       MR. KUEHNE:  May I continue, Judge?

21       THE COURT:  Yes, sir.

22  BY MR. KUEHNE:

23  Q.  Let's finish with this exhibit, Mr. Miro.

24      Please pull up Plaintiffs' Exhibit 314.  Do you see this?

25  A.  Yes.

1   Q.   This purports to be a Leon campaign rally?

2   A.   It's a flier.

3   Q.   A flier for November 18, that's the day after your e-mail

4   about -- with Fuller about shutting off the music; right?

5   A.   Okay.

6   Q.   And that's another pre-election rally right before the

7   run-off election; right?

8   A.   Okay.

9   Q.   And you're aware of that Leon campaign rally on the 17th

10  and the 18th?

11  A.   Yes.

12  Q.   Okay, so this is the 18th.

13       Now, you notice on this rally, down at the bottom of this,

14  there's something called a "political disclaimer?"

15  A.   Yes.

16  Q.   And you're familiar with that, a political disclaimer is a

17  rule, a law that says when there's a political advertisement,

18  you have to identify who --

19  A.   Paying.

20  Q.   -- essentially, is paying for that political advertisement?

21  A.   Yes.

22  Q.   Can you read what this says?

23  A.   "Independent expenditure paid for by Jennie Lee Molina,

24  1549 Southwest 8th Street Miami, Florida 33345, independent of

25  any candidate or committee."

1   Q.   And Jennie Lee Molina, do you know who that is?

2   A.   No idea.

3   Q.   But based on what you understood, having done your campaign

4   staff work, the person who pays for a political advertisement

5   is required to correctly identify who's paying for it?  Right?

6   A.   I believe so.

7   Q.   And JennyLee Molina is actually paying for, as the sponsor

8   this Alfie Leon event that is shown here for November 18th?

9   A.   I don't know if she actually paid for it or not, I don't

10   know.

11   Q.   But that's what she says, right?

12   A.   That's what states there, yes.

13   Q.   That's -- I apologize, George.

14          THE COURT:  Let him finish asking the question first.

15   All right, restate the answer so we have an accurate record.

16   Go ahead.

17   A.   Yes, sir, thank you.

18          I don't know if she paid for this or not, I wasn't with the

19   Alfie Leon campaign.

20   Q.   Right.  So what you know is what's on the flier?

21   A.   I didn't know about any flier.

22   Q.   You can read it like all of us can read it?

23   A.   Now, but I don't recall this flier.

24   Q.   And it -- the flier doesn't have anywhere paid for by

25   Fuller or paid for by ball and chain, or paid for by

1  plaintiffs' companies, not that you see on the flier?

2  A.   In this particular -- this flier right here, no, I don't

3  see that.

4  Q.   For that Leon campaign rally right before the election?

5  A.   Correct, if it's authentic, this flier, I don't see it, no.

6  Q.   That's a Plaintiffs' Exhibit.

7  A.   I don't know which flier it is, I never saw it.

8  Q.   Plaintiffs' Exhibit 314.

9       So, by the way, what happened at this rally, November 8th?

10  A.   Is that the Saturday or the Sunday?

11  Q.   No, we've already went -- we've already gone through your

12  testimony about the 17th, which had the text, Mr. Fuller said

13  he's taking care of and shutting down the music; right?

14  A.   Okay.

15  Q.   So this is the next day, the 18th, what happened?

16  A.   Just like that, I don't know, I got a bunch of specifics of

17  that day of voting.

18  Q.   Right.  And as far as your knowledge goes, whatever

19  happened at this rally, if they had the rally, et cetera, you

20  had no involvement whatsoever an a campaign staffer or anything

21  else?

22  A.   No.  I showed up and -- I'll reiterate my statement.

23      I showed up.  I saw Alfie Leon.  I saw events.  I saw

24  chairs.  I saw music.  I saw food trucks.  I might have seen

25  the line -- that day or not, dancing, or what have you, and Joe

1  knew about it already, and I notified Mary Lugo about this

2  matter.

3  Q.   On the 17th, that's what your testimony is, on the 17th?

4  A.   Okay.

5  Q.   Right.

6  A.   I might be getting confused with dates, I don't know.

7  Q.   Oh, so the text that you just wrote to Fuller that you

8  identified as legitimate and accurate -- I can give you the

9  exhibit -- says the 17th, now you're not sure for this jury it

10  was the 17th?

11  A.   No, I know it's the 17th, if it's accurate, I just don't

12  want to get wrong the dates.

13  Q.   Okay.  Do you need me to show you your text again?

14  A.   That would be great.  Thank you, yes.

15  Q.   Okay.  I'm showing you PX 6, Plaintiffs' Exhibit 6.

16       Do you see what it says here, November 19th?

17  A.   Okay, I got it now.

18  Q.   So that's the date that the activity happened that you're

19  talking about Mary Lugo, the picture of code, coming by --

20  A.   Right.

21  Q.   -- whatever happened there, you don't know, but Fuller

22  shutting down the property -- shutting down the rally --

23  A.   The 19th, yes.

24  Q.   -- telling you -- on the 19th.

25       And that's the one rally you know about?

1    A.    No, I know it happened two days.

2    Q.    Okay.  And the second day?

3    A.    If that was a Sunday, then it was a Saturday.

4    Q.    You didn't go there?

5    A.    Of course I went there.

6    Q.    All right.  And what happened?

7    A.    On the 18th?  That was the voter precinct, we were taking

8    people to go vote, at the rally.

9    Q.    Okay.

10   A.    I don't know if it was shutdown that day also or not.

11   I know the same concept, Carollo, Mary were involved as well.

12   Q.    Correct.  And as far as whether anything happened, you

13   aren't aware of it?

14   A.    In what sense?

15   Q.    Other than voters voting that day?

16   A.    Voters voted, and there was an event held on the

17   plaintiffs' property.

18   Q.    Okay.  And at neither event, neither Leon event, whatever

19   day those were, did you contact anybody at code?

20   A.    If you're referring to Mary Lugo code, I just notified her.

21   Q.    Is that what you're referring to, Mary Lugo as code?

22   A.    No, I'm asking you.

23   Q.    Did you talk to anybody at code in the City of Miami about

24   that rally?

25   A.    When, Mr. Kuehne?  When are you saying?

1    Q.   When you went to the rally and when you were communicating
2    with Fuller about the music, did you talk -- did you call, did
3    you contact code?
4    A.   No.
5    Q.   There was the video of the rally, Plaintiffs' Exhibit 7.
6         Do you recall that, you were shown it, I think there was
7    some stop action there?
8    A.   You're referring to the six-second video that I just
9    watched?
10   Q.   Something like that.  I think they were looking for
11   section -- the second six, do you remember that?  I can pull it
12   up if you need to remind yourself of it.
13   A.   No.  I know it's a six-second video, I know, we just
14   watched that.
15   Q.   Okay.  And that's the video -- as far as whether that event
16   was permitted, not permitted, that's not something that you
17   were aware of?
18   A.   Correct.
19   Q.   And that's something that you would expect as then a
20   campaign staffer, that's what the City of Miami takes care of,
21   whether something's permitted, whether something's not
22   permitted, whether something's allowed, whether something's not
23   allowed under the code?
24   A.   I don't know the code when it comes to code enforcement,
25   but in campaign events, you see them all the time, current.

1   Q.   And whether they're permitted or not permitted is not

2   something that you're aware of?

3   A.   Correct.

4   Q.   And so, with regard to how the sponsors of the Leon rally

5   handled it, you have no idea?

6         MS. SUAREZ:  Objection.  Asked and answered.

7         THE COURT:  All right, sustained.

8   BY MR. KUEHNE:

9   Q.   But you would expect that Mr. De Armas, the code compliance

10  person whose business card you identified would be able to make

11  a determination?

12  A.   He would, yes.

13  Q.   Okay.  And that's, presumably, his responsibility?

14  A.   He works the area.

15  Q.   Now, one of the things that the plaintiffs showed you was

16  Plaintiffs' Exhibit 37.  That was a March 16th, 2018 e-mail

17  that you said was an Emilio Gonzalez e-mail regarding the lines

18  of communication.

19        Do you remember those questions in that exhibit?  I can put

20  up the exhibit on the screen if that would help you?

21  A.   Please.

22  Q.   Okay.  So you were shown this exhibit, Plaintiffs' Exhibit

23  37.  So this is Emilio Gonzalez.

24        Emilio Gonzalez was the city manager; right?

25  A.   Yes.

1   Q.   And you were working with the city when Emilio Gonzalez

2   took office as city manager; right?

3   A.   Yes.

4   Q.   And Joe Carollo opposed Mr. Gonzalez's appointment as city

5   manager?

6   A.   Yes.

7   Q.   So the city manager writes this memo to a whole bunch of

8   people, including every commissioner and the mayor, and it

9   deals with communication with the city administrative service

10  and cites the charter provision -- and we've seen the charter

11  provision before -- but cites that; right?

12  A.   Yes.

13  Q.   Now, within the commissioner's offices, including

14  Commissioner Carollo's office, there was much ambiguity and

15  misunderstanding of what that meant; wasn't there?

16  A.   This e-mail --

17  Q.   Yes.

18  A.   -- is that what you're referring to?  I don't recall that.

19  Q.   Well, let me pull up Defense Exhibit 593.  And this is an

20  April 4th, 2018, April 4th, 2018 e-mail, City of Miami e-mail.

21       Do you see this?

22  A.   Okay.

23           MR. KUEHNE:  This is Defense Exhibit 593.

24           Your Honor, we move this into evidence.

25           MS. SUAREZ:  No objection.

 1           THE COURT:  All right, admitted.  Thank you.

 2           (Defendant's Exhibit 593 received into evidence.)

 3           MR. KUEHNE:  And, Your Honor, just so that the record's

 4  clear, I showed a number of exhibits, published them to the

 5  jury; to the extent that I did not formally move them into

 6  evidence, so the record is clear, any of the items that I

 7  showed to the jury that I've identified, I have moved into

 8  evidence, if they are not already moved into evidence.

 9           THE COURT:  All right, you can clarify that with the

10  clerk, too, when we go on break; okay?

11           MR. KUEHNE:  Of course.

12  BY MR. KUEHNE:

13  Q.  So, April 4th, 2018, Fernando Casamayor, assistant city

14  manager, writes to a number of people, including the manager,

15  and he's referring to Director Bernat.

16       That's the same person you went on the walk-along, the code

17  director, James Bernat?

18  A.  Yes.

19  Q.  And you see up at the top, Casamayor sends that e-mail to

20  Richard Blom, who is the chief of staff in D-3?

21  A.  Yes.

22  Q.  And this e-mail -- and I'm going to, let's make the text a

23  little bit bigger.  Down here, "Hello, Director Bernat."

24       He writes:  As per our previous conversations, I'm giving

25  you some written clarity regarding my interpretation of the

1    charter language addressing directives from elected officials.

2         If an elected official contacts you or your staff in order

3    to provide information or share a constituent

4    complaint/concern, it is perfectly within your purview to

5    respond directly and address those concerns without seeking

6    prior approval from the manager's office.

7         If, however, an elected official or their staff directs you

8    to provide a special service, implement a new policy, change an

9    existing policy, make a personnel change, et cetera, then you

10   must seek manager's approval before responding.

11        Please share with your staff and, of course, I'm always

12   available to assist if there's anything that falls in the gray

13   area not covered by the text above.  Hope this helps.

14        And then deputy assistant city manager CFO, Casamayor signs

15   off; right?

16   A.   That's what the e-mails says, yes.

17   Q.   And this e-mail goes up to the chain of command at the D-3

18   office, Richard Blom, the chief of staff?

19   A.   It goes to Richard Blom, yes, sir

20   Q.   And as far as how those interworkings go of the charter and

21   what the charter means, that's way above, if I can be so bold

22   to say, your pay grade?

23   A.   Yes, I don't know anything about the e-mail.

24   Q.   Now, among issues that came up during the course of the

25   District 3 time, the short time that you were there,

1   included -- were you involved in any valet parking issues?

2   A.   What are you referring to?

3   Q.   Did any of your Commission 3 activities have to do with

4   valet parking within the business district?

5   A.   I first got involved with the valets on that Sunday night

6   hiatus that we went out, the Commissioner and I --

7   Q.   And you mentioned --

8   A.   -- and Mary Lugo.

9   Q.   You mentioned the recording and the communication and saw a

10   transcript of that brief recording?

11   A.   Yes, that was my first involvement ever with valet parking.

12   Q.   Other than perhaps using it yourself as a customer?

13   A.   Yes.

14   Q.   And you're aware, when you were a D-3 staff member that the

15   City of Miami regulates valet parking; right?

16   A.   I don't know that.  I don't know if it's Miami parking or

17   City of Miami.

18   Q.   Okay.  You're aware that there is some regulations for

19   valet parking, commercial valet parking in the city?

20   A.   I'm pretty sure there's regulations on valet parkers.

21   Q.   And valet parkers, valet companies, as far as you know, are

22   supposed to register and get approval for their valet service?

23   A.   I would assume so.

24         MS. SUAREZ:  Objection.  Speculation.

25         THE COURT:  Overruled, if he knows.

1  BY MR. KUEHNE:

2  Q.  I don't want you to assume; if you don't know, that's okay.

3  A.  Yeah, I don't know.

4  Q.  So on that night when you were with Commissioner Carollo in

5  his district looking at valet parking, you had no idea what the

6  rules and regulations were?

7  A.  Correct.

8  Q.  And probably today still don't?

9  A.  Correct.

10  Q.  And you have no idea if the valet parking -- by the way, it

11  was in a church lot, a church grassy area; is that right?

12  A.  I believe so, yes.

13  Q.  You have no idea if that was an allowable valet parking

14  lot?

15  A.  Right, I do not know.

16  Q.  And you have no idea if there had been complaints by the

17  residents in that area about parking on a church grass in the

18  middle of the night in their neighborhood?

19  A.  Again, I was in charge of complaints in the office.

20     I never received any complaints.

21     The only complaints I ever received was from Commissioner

22  Joe Carollo.

23  Q.  So your testimony to this jury is that there were no

24  complaints about the valet parking that you looked at?

25  A.  That's correct.

```
 1   Q.   Okay.  And let me ask you to pull up Plaintiffs'
 2   Exhibit 23.  Plaintiffs' Exhibit 23.
 3        And you see this Steve Miro e-mail?
 4   A.   I do.  It's sent from my e-mail address from the city
 5   to fpablo@miamiparking.com.  Please send over the approved lots
 6   tomorrow or -- I guess there's a typo there -- the valet
 7   company's on 8th Street.
 8             MR. KUEHNE:  Let me get there -- first, Your Honor, if
 9   this is not already into evidence, I move Plaintiffs' 23 into
10   evidence.
11             MS. SUAREZ:  No objection.
12             THE COURT:  Admit it.
13             (Plaintiffs' Exhibit 23 received into evidence.)
14   BY MR. KUEHNE:
15   Q.   So, on March 3, you're asking Miamiparking.com -- that is
16   known as MPA?
17   A.   The abbreviations, yes.
18   Q.   For a list of all approved lots for the valet companies on
19   Southwest 8th Street; correct?
20   A.   That's correct, yes.
21   Q.   And Southwest 8th Street is what you'll call, generally,
22   the Little Havana business district?
23   A.   Correct.
24   Q.   And as far as how many valet companies there were, that's
25   what your request was asking for?
```

1    A.   Not how many valet companies from defendant company, it's

2    --

3    Q.   I don't mean to stop you, but let me just read this out

4    loud:

5         Please send over the approved lots to/from the valet

6    companies on 8th Street.

7    A.   Okay.

8    Q.   That's what it says, other than the typo in there?

9    A.   Yes.

10   Q.   So approved lots, valet companies, 8th Street.

11   A.   Right.

12   Q.   So you as the D-3 staff member liaison are asking Miami

13   Parking Authority through authorized channels, give me a list;

14   right?

15   A.   I send e-mails, I don't know if it's a he or she, but I

16   sent the e-mail, yes.

17   Q.   And as far as what the response was, you don't know?

18   A.   I don't know, if you have another e-mail to show me.

19   Q.   There's nothing attached to this.

20        Whatever the response was, you responded, if there was, by

21   giving it to the Commissioner?

22   A.   If I did receive a response, I would have, yes.

23   Q.   Now, to the Commissioner or to the chief of staff?

24   A.   I'll give it to the Commissioner.

25   Q.   Okay.  And by the way, did this e-mail come before or after

1   the video of the parking on the church lawn?

2   A.   I believe it was after.

3   Q.   After?

4   A.   I believe.

5   Q.   So your testimony is that after that, Commissioner Carollo,

6   through you, wanted to find out what lots were approved, what

7   valet companies are operating in that business district?

8   A.   Correct, yes.

9   Q.   And as far as what Miami Parking Authority did, you're

10  unaware of it?

11  A.   Correct.

12  Q.   As far as whether the parking on the church lawn was

13  authorized, you never saw any documentation of that?

14  A.   I don't know anything, how that works.

15  Q.   You were not aware of any citations by the City of Miami,

16  inspections, audits of any of the parking lots?

17  A.   Correct, I don't know any of that.

18  Q.   Not aware of Miami Parking Authority having gone to all the

19  different lots, vendors, companies to determine their status?

20       MS. SUAREZ:   Objection.   Asked and answered.   The

21  witness --

22       THE COURT:   Sustained.

23  BY MR. KUEHNE:

24  Q.   Now, one of the items that the plaintiff showed you in your

25  examination was Plaintiffs' 16, and it was introduced into

 1    evidence.  Could we pull that up, this is one that you were

 2    shown, Plaintiffs' Exhibit 16.

 3         Do you recall being shown this, February 16th, 2018?

 4    A.   Vague, yes.

 5    Q.   And this is something dealing with this company -- I'm

 6    going to call it the container called Sanguich, and you were

 7    asked a lot of questions on direct about Sanguich.

 8         Do you recall that?

 9    A.   I was asked questions.

10    Q.   Right.  And I think there was a video shown that maybe

11    we'll get to --

12    A.   Yes.

13    Q.   -- right, during your examination?

14    A.   Correct.

15    Q.   And Sanguich, as best you could describe it, it was a

16    container, one of those things that's trucked along from the

17    Port of Miami to other places that contain stuff, that's why

18    it's called a "container"?

19    A.   I don't know if it was from Port of Miami or not.

20    Q.   But it looked like that; right?

21    A.   It's a container.

22    Q.   One of those commercial containers?

23    A.   I don't know if it's a commercial container.  It's a

24    container, as I know it.

25    Q.   All right, so we'll call it a container.  You never seen

1   something like that before?

2   A.   Of course I have, but I'm not specialized in saying it came

3   from the Port of Miami or it came from Cape Canaveral.

4   Q.   Okay.  And how it got to Little Havana, you don't know

5   about it?

6   A.   Correct.

7   Q.   When it got to Little Havana, you don't know about it?

8   A.   Correct.

9   Q.   Whether it had authorization to be there, you don't know

10  about that?

11  A.   Correct.

12  Q.   But you do know that there were issues during the time that

13  you worked for Commissioner Carollo, whether a container

14  plopped down next to the sidewalk in Little Havana was allowed?

15  A.   Correct, I don't know.

16  Q.   But that was an issue, right, for District 3?

17  A.   I believe it was not plopped on the sidewalk, like you

18  said.

19  Q.   No, next to the sidewalk.

20       Do you need to see a picture of where it is?

21  A.   No, I know, it was on the plaintiffs' property.

22  Q.   And what permits it had or didn't have was not your issue

23  'cause you're not the permitter code person?

24  A.   Correct.

25  Q.   And you do know that on the day that you were there, I

1    think you referenced the Gay 8 Festival, which was a festival,

2    an approved City of Miami festival approved, going on in the

3    City of Miami; right?

4    A.   Yes.

5    Q.   That code inspectors came because in addition to the tents

6    that were in the streets that we can see, the container was

7    occupied and being used; right?

8    A.   I don't know that.

9    Q.   Well, the video shows that; doesn't it?

10   A.   Can we play the video again?

11   Q.   Sure.  Let's bring up -- I believe it was Plaintiffs'

12   Exhibit 295.

13            (Videotape played for the judge and jury.)

14            MR. KUEHNE:  Let's back up a little bit, let's back up

15   a little bit more, a little bit more.

16            Let's see what seconds we're on.  Okay.  So 14.

17   BY MR. KUEHNE:

18   Q.   This is a picture, you see the front of it is actually a

19   tent on the street, and that's part of the Gay 8 Festival;

20   right?

21   A.   A tent, yes.

22   Q.   And like you said, there were a bunch of other tents on the

23   street that were part of the Gay 8 Festival, people selling

24   things from the tents?

25   A.   Yes.  Yes.

1    Q.   You see a police officer, that's obviously a City of Miami

2    police officer walking on the sidewalk behind?

3    A.   Yes, sir.

4    Q.   And then behind the officer is -- and you can see it in the

5    upper left, the part of the sign that says "Sanguich" --

6    A.   Yes.

7    Q.   -- that's the container you're talking about; right?

8    A.   That's the container, yes.

9    Q.   It's got a -- I don't know what you call the platform, it's

10   a little platform right abutting the sidewalk.

11        Do you see that?

12   A.   Yes.

13   Q.   And you see that, I think you called it a ventanita, the

14   window?

15   A.   Right.

16   Q.   It's open, you see it's open.  You can actually see that

17   the --

18   A.   Okay.

19   Q.   -- I guess you call it the hardware is opened on the

20   window; right?

21   A.   Yes.

22   Q.   And there's somebody inside there?

23   A.   Yeah, there's -- yes.

24   Q.   Right.  So, and you were there that day at exactly this

25   time because you're pictured here?

```
1    A.  Correct.
2    Q.  So the Sanguich is open, and that's not -- the Sanguich is
3    not a tent; right, that's the separate container --
4    A.  Right.
5    Q.  -- container business of Sanguich?
6    A.  Right.
7    Q.  It's open and there's somebody inside -- actually, it looks
8    like the lights are on; doesn't it?
9    A.  It's daylight.
10   Q.  You can't tell that the lights are on inside?
11   A.  I see the lights outside, I don't know about inside.
12   Q.  Okay.  And so, maybe it's just the sun, but it doesn't look
13   like the Sanguich sign is lighted up?
14   A.  I said the outside is lit up.  I don't know about the
15   inside of the container, whether it's lit or not.
16   Q.  And you see the outside with lights there on the top right
17   by the window, so, plainly, electricity is being delivered to
18   this; and you had no idea at the time, even though you walked
19   by, how electricity is delivered to a container; right?
20   A.  Correct.
21   Q.  You didn't see the extension cord that went from the
22   fenced-in property and was snaked through to go into the
23   Sanguich to provide electricity?
24          MS. SUAREZ:  Objection, Your Honor.  Counsel is
25   testifying to facts not in evidence.
```

1        THE COURT:  Sustained.

2  BY MR. KUEHNE:

3  Q.   You didn't see the source of electricity; did you?

4  A.   I didn't look for a panel or any electrical hardware.

5  Q.   Okay.  And you don't know whether there was any panel or

6  electrical hardware to light up that container?

7  A.   No, I don't know.

8  Q.   So it's open, the container's open, a police officer --

9  this officer looks like he's walking the streets.

10       And then let's continue with the video portion.

11            (Videotape played for the judge and jury.)

12            MR. KUEHNE:  Stop.  And here you are with other people.

13  It happens to be you, it looks like you're in a

14  driveway/sidewalk area, talking to City of Miami.

15            Is that police and code and fire?

16  A.   Yes, I'm on the sidewalk.

17  Q.   You're on the sidewalk.  Fire is wearing a red palm tree

18  badge and police, obviously, is in blue?

19  A.   Correct.

20  Q.   Let's continue.  Stop.  Up a little.

21       Let's get the tree out of the way.  Stop.

22       Now, here you can see a little bit better, there's

23  electricity on the property; right?

24  A.   Yes.

25  Q.   And whatever code is doing, that man that looks like you're

1   talking to, who's facing us, right in the middle, that's a code

2   person?

3   A.  Can you point with the mouse where you're referring to?

4   Q.  If you look from the left, the third person, it looks like

5   he's looking at a cell phone?

6   A.  I don't know who I'm speaking to at that time.

7   Q.  But wearing a palm tree, that signifies a City of Miami

8   employee?

9   A.  Yes, sir, that's --

10   Q.  That's the badge?

11   A.  Yes.

12   Q.  And generally, it's referred to by City of Miami employees,

13   you wear a palm tree, that signifies that you're a City of

14   Miami employee?

15   A.  You wear an emblem; you don't wear a palm tree.

16   Q.  An emblem.  The emblem is noted, typically identified as

17   the palm tree; right?

18   A.  Correct.

19   Q.  Okay.  So you're there, the police, the inspectors are

20   there, fire marshal are there, and there's some controversy

21   going on; right?

22   A.  The group of us, I don't recall what was said.

23   Q.  Well, the owner of Sanguich is complaining about the police

24   presence; right?

25   A.  That she is, yes.

```
 1              MR. KUEHNE:  Let's continue.
 2              (Videotape being played, then paused.)
 3  BY MR. KUEHNE:
 4  Q.  And are you talking business with the police officials?
 5  A.  I'm speaking, yes, I don't know to which one, I can't
 6  recall that.
 7  Q.  Okay.  Let's continue.
 8              (Videotape being played, then paused.)
 9  BY MR. KUEHNE:
10  Q.  Now you're on your cell phone?
11  A.  Yes, it appears so.
12  Q.  Now here are the tents that are in operation; right?
13  A.  Yes.
14  Q.  And all these tents are doing all of their work at the
15  tents; right?
16  A.  Yes.
17  Q.  You see the little cooking, like here there's a cooking
18  stove there; right?
19  A.  Yes.
20  Q.  This is not a Gay 8 Festival where the businesses are using
21  their business property; instead, the festival is the tents
22  with all the activity going on, that's the permitted event?
23  A.  Some businesses are open.
24  Q.  Okay.  And we saw that Sanguich was open?
25  A.  We saw them with the lights on, yes --
```

1   Q.   And somebody inside?

2   A.   -- the interior; and someone inside.

3   Q.   All right, let's keep going.

4        So, this is the visual, without the person, the narrator,

5   talking; and that's what you recall that time that you were at

6   the festival; right?

7   A.   I was there for longer than a minute and seven seconds.

8   Q.   Okay.  But that was, essentially, what it looked like?

9   A.   Correct.

10  Q.   No -- let's put it this way.

11       No rough stuff involving you, no arrests, in your presence?

12  A.   I didn't see any arrests, no.

13  Q.   No orders issued closing down anything?

14  A.   I left -- I was there for quite a bit of time.  I don't

15  recall how long, but I did leave, at some point.

16  Q.   And you then -- let's go -- so that's 295.  You left and

17  you let the code people, the city people, the people who know

18  the rules to do whatever it was that they were supposed to do?

19  A.   I left, yes.

20  Q.   Figuring that's their job?

21  A.   I left, yes.

22  Q.   Now, you mentioned that -- was this the day that the

23  commissioner said he was going to come by and never did?

24  A.   Correct.

25  Q.   Now, you were aware that at the time, and the Commissioner

1    had told you, that he was dealing with his elderly mother,

2    Graciella, who was having a health issue, and he wasn't sure

3    that he'd be able to get by, but would try?

4    A.   I know he never told me that he had an elderly mother.

5    Q.   And your testimony is he didn't tell you, I'm dealing with

6    my mom, by the way, who was in her late 80s; right?

7    A.   I believe she was in her 90s.

8    Q.   In her 90s, and didn't tell you I've got to handle that

9    priority, but if I can get over there, I will?

10   A.   I don't recall that, no.  That never happened.

11   Q.   So it's not that you don't recall it, that never happened?

12   A.   No -- correct.  I know his wife took care of the mother,

13   so...

14   Q.   Oh, Mr. Carollo, Commissioner Carollo did not take care of

15   his 90-plus-year-old mother?

16           MS. SUAREZ:  Objection, Judge.  Relevance.

17           THE COURT:  I sustain.

18   BY MR. KUEHNE:

19   Q.   But you did do a follow-up on this, and that's Plaintiffs'

20   Exhibit 19.  I think you were shown that.  Let's pull that up.

21           THE COURT:  Counsel, Mr. Kuehne and Ms. Suarez, may I

22   see you all briefly for scheduling purposes only, for the time.

23           MR. KUEHNE:  Sidebar?

24           THE COURT:  Yes.

25           (Sidebar discussion held as follows:)

 1          THE COURT:  How much longer, Mr. Kuehne, do you have on

 2   your cross-examination?

 3          MR. KUEHNE:  I have a while to go, Judge.

 4          THE COURT:  "A while" is not answering the question.

 5          How much time do you have?

 6          MR. KUEHNE:  I expected my cross would be the same

 7   amount of time as the plaintiffs.

 8          THE COURT:  How much time is 30 minutes, one hour,

 9   45 minutes?  I want to know.  It's 12:10, for lunch, I'm not

10   going to keep the jurors long, and that's why I was asking a

11   specific time.  It's fine, I'm not asking at all, that's right.

12          MS. SUAREZ:  I will try to be as brief as possible,

13   probably 30 minutes.

14          THE COURT:  What's the motion after this witness --

15          MR. GUTCHESS:  We have a couple of witnesses, Michael

16   Konig --

17          THE COURT:  -- for scheduling purposes?

18          I know the jurors are complaining about being kind of

19   cold.  I'm going to try to warm it up, even though I'm wearing

20   a jacket, I sense it's cold.

21          I will bring somebody to manage it.

22          MR. GUTCHESS:  What time will we be ending today?

23          THE COURT:  5:00.

24          MR. GUTCHESS:  We talked earlier about taking the

25   screens down.

1          THE COURT:  This is not my courtroom, and I don't want
2     to -- it's not my courtroom, so I'm not going to bother anyone.
3          MS. SUAREZ:  Thank you, Judge.
4          (Sidebar concluded and the following was held in open
5     court:)
6          THE COURT:  All right, ladies and gentlemen, we're
7     going to be in recess for lunch until what, 1:15.
8          Again, please remember my instructions.  Do not discuss
9     this case with anyone, even among yourselves.
10          And also, I know we have a lot of people in this
11     courtroom as well.  While I gave the attorneys instructions,
12     please do not approach or have any conversation directly or
13     indirectly around jurors, when you see their badge.
14          I know when you're walking in the hallways and people
15     may have conversation, if you were to overhear anything, please
16     disregard anything that has been said as well.
17          All right, with that said, we will see everyone here at
18     1:15.
19          COURTROOM DEPUTY:  All rise for the jury.
20          (Jury exited courtroom at 12:27 p.m.)
21          (Witness steps down.)
22          (Luncheon recess taken from 12:27 p.m. to 1:24 p.m.)
23
24
25

1

2          (Call to the order of the Court:)

3          (Witness resumes stand.)

4          (Jury entered courtroom at 1:24 p.m.)

5          THE COURT:  Ladies and gentlemen of the jury are all

6    present and accounted for.  Please be seated, everyone.

7          You may resume, Mr. Kuehne.

8          MR. KUEHNE:  Welcome back.  I think when we broke I was

9    asking about Plaintiffs' Exhibit 19.

10                         CROSS-EXAMINATION (CONTINUED)

11   BY MR. KUEHNE:

12   Q.   So Plaintiffs' Exhibit 19, Mr. Miro, you were shown this

13   during your direct examination.

14   A.   Yes.

15   Q.   And it is -- you described it, March 12, 2018, but

16   referring to the Gay 8 Festival, 2-18-2018, right, that's what

17   the document says at the top?

18   A.   Yes.

19   Q.   You've identified the -- I think we showed a video of a

20   portion, although it was a short portion of the Gay 8 Festival

21   on 8th Street; right?

22   A.   Yes, you showed a video.

23   Q.   So Steven Miro writes to Commissioner Joe Carollo, and this

24   is in your capacity as a City of Miami staff member working for

25   Commissioner District 3; right?

1    A.   (Nods head affirmatively.)

2    Q.   Yes?

3    A.   Yes.

4    Q.   And it's also part of what you understand to be when

5    something is in writing, as part of the city function that you

6    do, it's part of the public record; right?

7    A.   It should be, yes.

8    Q.   It should be, so that's -- so when you do writings that are

9    part of your City business, you understand that those are

10   public records -- should be public records?

11   A.   Should be public records, yes.

12   Q.   So here Steven Miro writes to Commissioner Joe Carollo

13   about the Gay 8 Festival, February 18, the video we saw.

14        And let's make this a little bit bigger, please, the text.

15        Steve Miro writes -- and you said this was multiple drafts,

16   so presumably all of your drafts are public records and are in

17   the public record of your materials at the city?

18   A.   Should be, yes.

19   Q.   Because all your drafts were done on city time and city

20   business?

21   A.   Yes.

22   Q.   So you write:  While on the scene to make sure the violator

23   of Sanguich de Miami had proper documentation to operate their

24   illegal unit, I was approached by Mr. Bill Fuller.

25        Mr. Fuller stated, "You know what's funny?  Your boss was

1    hiding wearing a cap at one of my valet lots."

2         I said, "Yes, I was with him."

3         It appeared he got upset and then went to the owner of the

4    container, Daniel, and started asking why the police were

5    harassing the business.

6         He had several exchanges with Daniel, in which I observed

7    them speak, but couldn't hear what they were saying.

8         Mr. Fuller then came about five feet from me and started to

9    say, quote, "Is your boss coming to this great event," end

10   quote.

11        I just looked at him without a reply.

12        Mr. Fuller stated, "This is a great family event, your boss

13   should she the good he -- Mr. Fuller -- has made this

14   community, end quote.

15        I again stayed silent.

16        Mr. Fuller proceeded to try to gain a reaction from me.

17   Quote:  He then screamed while carrying his daughter in his

18   arms that I am a pussy and Carollo is a pussy several times.

19        The police told Mr. Fuller to back away.

20        Mr. Fuller complied and left.

21        Mr. Fuller came back, approximately, 15 minutes later,

22   apologized to the officer and handed out his business cards to

23   the officers on the scene.

24        Nothing further.

25        That's the complete text of your -- you can take it off

1   large -- complete text of your letter narrative memo to

2   Commissioner Joe Carollo; right?  Nothing missing?

3   A.   It doesn't say memo.  Yes, right.

4   Q.   I'll call it a letter, a document.

5   A.   Okay.

6   Q.   So, 2-18-2012 -- I'm sorry, 2-18-2018.

7        And by the way, this letter is dated March 12, it refers to

8   2-18, so let me ask you to pull up -- you can take that down --

9   DX 387.  DX 387.  Defendant Exhibit 387, if it's not in

10  already, Your Honor, I move into evidence.

11          THE COURT:  All right.

12          (Defendant's Exhibit 387 received into evidence.)

13  BY MR. KUEHNE:

14  Q.   This is one of your texts with pictures; right?

15  A.   It says my name.

16  Q.   S.M., Steve, this is yours; right?  Yes?  Steve Miro?

17  A.   S.M., yes.

18  Q.   February 21, so right after the Gay 8 Festdival that had

19  that video where you were -- which you wrote about in the

20  previous exhibit, you send two pictures of the container open

21  for business and you say "unreal, unbelievable;" right?

22       Two days later?

23          MS. SUAREZ:  Your Honor, I'm going to object.  There's

24  one person sending the photos and one person responding.

25          THE COURT:  Sustained.  Rephrase the question.

1  BY MR. KUEHNE:

2  Q.  Wednesday, February 21, two pictures of Sanguich; right?

3  A.  Yes.

4  Q.  Open for business; right?

5      MS. SUAREZ:  Objection.  Speculation.

6      THE COURT:  Sustained.

7  BY MR. KUEHNE:

8  Q.  Two people standing at the ventanita window with somebody

9  inside -- you can see the person inside -- and these two people

10  are hanging on the open window; is that a fair description?

11  A.  That's fair.

12  Q.  And underneath the two pictures, the words "unreal,

13  unbelievable," that's what's on that text; right?

14  A.  Yes.

15  Q.  Now, right after that February 21 text, right after the

16  Gay 8 Festival on February 26, 2018 -- and let's pull up

17  Defense Exhibit 125.  So you see the date on this, 2-28-2018?

18  A.  Yes.

19  Q.  So that's within the week after the Gay 8 Festival; right?

20  A.  I don't know if it's a week.  It says the 26th.

21  Q.  Okay, so the 26th.  Bill Fuller is writing to the city

22  manager -- and if we could make this bigger -- no, the text.

23      It deals with a reference to Sanguich, and it says:

24      Good afternoon, Mr. Manager.  My company owns the property

25  located at 16741 Southwest 8th Street.  A tenant at the

1  property, Sanguich de Miami, was operating under special event

2  permit 18-000, which was approved by the various city

3  departments on January 6th, 2018.

4      It has been brought to our attention that the special event

5  permit has now expired.  As such, we have informed Sanguich de

6  Miami that they must vacate the property due to the expiration

7  of the special event permit.

8      Sanguich de Miami may not operate from the premises, and we

9  have asked that they vacate immediately.

10     With some contact information for Bill Fuller.

11     That's what it says?

12  A.   That's what it says.

13  Q.   You can take that down.

14  A.   That e-mail wasn't addressed to me.  I don't know what that

15  e-mail is, besides what you read.

16  Q.   The e-mail that you see is addressed to Emilio Gonzalez,

17  the city manager of the City of Miami; right?

18  A.   Right, but it's not addressed to me, so I don't know what

19  it is.

20  Q.   But I read it correctly; didn't I?

21  A.   Yeah, you read it correctly, yes.

22  Q.   And that was February 26th, 2018, shortly after the ending

23  of the Gay 8 Festival; right?

24  A.   That, I don't know the dates again, that the date was on

25  the 18th -- or the 26th.

1  Q.   Okay, so I get it.  We showed you the Gay 8 Festival with

2  the date information right before lunch, and you don't know the

3  date of it.  Fair enough.

4       So, it is -- by the way, you mentioned in your -- I believe

5  you mentioned in your direct examination that a complaint was

6  filed by Fuller against Commissioner Carollo with ethics;

7  right?

8  A.   Commissioner, myself, Mary Lugo and assistant city manager,

9  yes.

10 Q.   And that was on -- that was filed on March 12, 2018; wasn't

11 it?

12 A.   Sounds about right.

13      You got to give me the dates, Mr. Kuehne.

14 Q.   So with regard to your tenure with the city, you start

15 December 4, there's still litigation against

16 Commissioner Carollo by Leon's supporters against Mr. Carollo.

17 That case gets finished, you think, in January, or so; is that

18 right?

19 A.   When you say supporters of, the lawsuit says Alfie Leon, it

20 doesn't say "supporters" at all, if I'm not mistaken.

21 Q.   It's the Alfie Leon campaign against Commissioner

22 Joe Carollo; right?

23 A.   I beg to differ; was never the campaign, it was Alfie Leon.

24 Q.   Individually?

25 A.   I believe so.

1    Q.   The loser of that election files this lawsuit that gets

2    finished after a trial around January of 2018; right?

3    A.   Yes.

4    Q.   Then there's an appeal after the loser loses again, takes

5    an appeal, and that doesn't get resolved until around March;

6    right?

7    A.   I don't recall.

8    Q.   And when that gets finished, Fuller files a complaint

9    against Carollo, Commissioner, and you and others; right?

10   A.   Yes.

11   Q.   And is there any time in your tenure with the City of Miami

12   working for District 3 that there wasn't the complaint that

13   you've mentioned, the ethics complaint by Fuller or this Leon

14   lawsuit pending active against Joe Carollo?

15   A.   I don't know.

16   Q.   You don't know.  Okay.

17        But you do know that after you left the city, after you

18   left the city -- and we'll talk about that -- but when you were

19   terminated June 4th, 2018; fair enough?

20   A.   If that's the date, yes.

21   Q.   Well, isn't that the date?  You when you were terminated,

22   June 4th, 2018?

23   A.   I don't know if it's the 4th or the 6th, you have to give

24   me the date.

25   Q.   But we do know that you told Fuller that the date you were

1    terminated, and then shortly after that your Godfather did a

2    favor to Fuller in connection with a Special Master issue;

3    right, we -- you agreed that that was what you said?

4         MS. SUAREZ:  Objection, Your Honor.  Facts not in

5    evidence.

6         THE COURT:  Sustained.

7    BY MR. KUEHNE:

8    Q.  All right.  That part of the trial, your recollection, you

9    testified as you did.

10        So the city terminates you, and you then initiate an ethics

11   complaint against Commissioner Carollo on June 29, 2018; right?

12   A.  I want to clarify.  It wasn't the city that terminated me.

13   It was Commissioner Joe Carollo signed the termination paper.

14   Q.  Oh.  You're working for the City of Miami, you are paid by

15   the City of Miami, the chief of staff of Commissioner Carollo's

16   office fires you.

17        The termination letter is signed by Joe Carollo as city

18   manager on city letterhead, but your testimony is you weren't

19   fired by the city?

20   A.  City manager's letterhead, the city manager had -- didn't

21   opine on my termination.

22        It was signed by Commissioner Joe Carollo.

23   Q.  So shortly after you get fired for cause, you file your own

24   ethics commission complaint against Joe Carollo; right?

25   A.  I filed a lawsuit first, then I filed the ethics complaint.

1  Q.   Let me be very clear.

2       I'm asking you about your complaint against Commissioner

3  Joe Carollo, and no other matter that you raised.

4       You filed your ethics complaint under oath against Joe

5  Carollo soon after you got fired; right?

6  A.   I'm trying to lay the foundation of the day I was

7  terminated, I filed a lawsuit, then I filed two ethics

8  complaints, yes.

9  Q.   All right, thank you for the gratuitous information.

10      Please listen to my questions.  If you don't understand my

11 questions, you can ask the Judge to have me clarify or ask a

12 different question; fair enough?

13      MS. SUAREZ:  Objection, Your Honor.

14      The witness is allowed to answer the question.

15      THE COURT:  Sustained.

16 BY MR. KUEHNE:

17 Q.   So, in this sworn complaint, June 2018, after you get

18 fired, you tell the ethics commissioner that as part of your

19 sworn complaint, in some cases, Carollo would exaggerate issues

20 that he assumed would be violations in order to go after these

21 individuals, William Fuller of Ball & Chain and Cecil Milton of

22 Stadium Tower, that's what you wrote; right?

23 A.   Yes.

24 Q.   And, in fact, you agree that that was a lie; right?

25 A.   No.

1  Q.   So let's talk about this name that you included that I just

2  told you in your complaint against Carollo.

3       Cecil Milton, you know the name Cecil Milton; don't you?

4          MS. SUAREZ:  Objection, Your Honor.  Relevance.

5          THE COURT:  Overruled.

6          THE WITNESS:  I know of the name, yes.

7  BY MR. KUEHNE:

8  Q.   You included it in your sworn complaint against

9  Commissioner Carollo?

10 A.   I understand that, Mr. Kuehne.

11 Q.   And you know that the Milton family, including Cecil

12 Milton, were among the biggest supporters of Joe Carollo's

13 campaign to win District 3; don't you?

14         MS. SUAREZ:  Objection, Your Honor.  Relevance.

15         THE COURT:  Sustained.

16 BY MR. KUEHNE:

17 Q.   Didn't you testify that you brought a complaint against

18 Commissioner Carollo?

19 A.   Yes.

20 Q.   And this is part of that complaint?

21 A.   Yes.

22 Q.   And during the campaign, were you aware of the supporters

23 of Commissioner Carollo during the time you were a campaign

24 staffer?

25 A.   I didn't know every single one, no.

1    Q.   But you did know the Miltons; didn't you?

2         MS. SUAREZ:  Objection, Your Honor.  Relevance.

3         THE COURT:  Overruled.

4         THE WITNESS:  I know of them.

5    BY MR. KUEHNE:

6    Q.   And you know that as part of the campaign function, their

7    names, along with all the names of all the supporters who made

8    financial contributions, are filed in the public record for all

9    the world to see; right?

10   A.   Should be, yes.

11   Q.   That's called CTR, campaign treasurer's reports, part of

12   campaign financing, you know about that?

13   A.   I know about that, yes.

14   Q.   And so this complaint that you asserted under oath that

15   Commissioner Carollo went after these individuals, including

16   William Fuller and Cecil Milton, the commissioner on ethics

17   dismissed that complaint; right?

18   A.   I believe so, yes.

19   Q.   And that was based on your sworn and only your sworn

20   complaint; right?

21   A.   Yes.

22   Q.   By the way, you are not familiar with the interworkings of

23   the ethics commission; are you?

24   A.   No, Mr. Kuehne, I'm not.

25   Q.   But you knew enough right after you got fired to file an

1    ethics complaint under oath on the appropriate documentation

2    with the commission on ethics?

3    A.   Correct.

4    Q.   So when you left the city, when you were terminated, you

5    rather immediately became Facebook friends with Fuller; didn't

6    you?

7    A.   I believe we became Facebook friends sometime, I don't know

8    the date.

9    Q.   And you stayed in touch with Fuller after you were fired

10   from Commissioner Carollo's office?

11   A.   Yes.

12   Q.   By the way, when you were working commissioner Carollo's

13   office, you know that at City Hall you enter the office through

14   the reception area; right?

15        And then on the wall that is right in front of the

16   reception area, behind the reception area, as you walk in,

17   there's a big mural painting of the carnival in Havana?

18   A.   I don't recall.

19   Q.   You walked in and out of that office everyday, you said?

20        Were you there everyday?

21   A.   I was there.

22   Q.   And you don't recall this big mural painting of the

23   carnival in Little Havana that anybody who comes into the

24   office and everybody's sees?

25        MS. SUAREZ:  Objection.  Asked and answered,

 1    irrelevant.

 2            THE COURT:  Sustained.

 3            MR. KUEHNE:

 4    Q.   While you were working at the office, Jose Suarez, you

 5    mentioned, I think you agreed, that he was somebody who held

 6    the title of assistant chief of staff or deputy chief of staff;

 7    is that right?

 8    A.   No.

 9    Q.   You know Jose Suarez; right?

10    A.   Yes, I know of him.

11    Q.   Of him.  Did you work with him?

12    A.   I did.

13    Q.   In the D-3 office?

14    A.   He was there, yes.

15    Q.   And he routinely questioned you and counseled you about

16    doing political work for other candidates while you were in the

17    D-3 office on City of Miami time; didn't he?

18    A.   Never.

19    Q.   Mr. Suarez brought to your attention and the chief's

20    attention that on numerous occasions you were outside the

21    office, the City Hall, talking to lobbyists about matters that

22    had nothing to do with the D-3 activity; isn't that right?

23    A.   No.

24    Q.   So when you were -- you were not counseled by the chief,

25    Mr. Blom, about your attendance to the work you were supposed

1    to do?

2    A.   Never.

3    Q.   Well, let me ask you then.

4        When you were terminated, the termination by -- you were

5    told that you were terminated by Chief Blom?

6    A.   Never.

7    Q.   Chief of Staff Blom?

8    A.   No.

9    Q.   Right?

10   A.   No.

11   Q.   No?

12   A.   No.

13   Q.   And reason for your termination was told to you by Chief

14   Blom that you engaged in conduct that one of the women at the

15   office, Lisette Pailette, P-A-I-L-E-T-T-E -- Lisette Pailette

16   found extremely uncomfortable; right?

17   A.   No.

18   Q.   No?

19   A.   These are -- what you're referring to are memos that I

20   didn't know anything about.  Richard Blom brought me in the

21   office and he handed me a letter that stated Joe Carollo

22   terminated you at this date and time.  That was it.

23   Q.   And Chief Blom, in your termination, told you it was based

24   on terrorizing Lisette Pailette in your conduct with her that

25   not only made her uncomfortable, she was very fearful, and she

 1   couldn't be alone in the office if you were the only man there;

 2   isn't that right?

 3   A.   No.

 4   Q.   Well, you know that Chief Blom said exactly that at your

 5   Civil Service Board Hearing where you were present; right?

 6   A.   I don't recall what he said.

 7   Q.   But after you were fired for wrongdoing in office, creating

 8   a hostile sexual environment, you challenged that in a civil

 9   service action; didn't you?

10   A.   Mr. Kuehne, I had a settlement, I think it's

11   confidentiality.  Those complaints are invalid.  And that's why

12   the city settled my case, it was unfounded, those allegations.

13   Q.   It may be that you're a little bit confused, so let me try

14   to clarify.

15        As a City of Miami employee, you challenged your

16   termination through a Civil Service Board Hearing, a trial;

17   didn't you?

18   A.   Sir, it's a Civil Service Board.  It's not a trial.  It's

19   the proper elements to go into.  You have to do that court

20   proceeding -- or not even a court proceeding, it's an

21   administrative process, because I'm a non-exempt employee.

22        So, therefore, you have to do that process first before you

23   can file a lawsuit.  The lawsuit can't be filed before you do

24   the proper steps and elements that you got to meet before you

25   can file a lawsuit.

1    Q.   So you go through the Civil Service Board Hearing where

2    you're allowed to testify before the Civil Service Board;

3    right?

4    A.   Yes, it's part of the process.

5    Q.   And, in fact, you did testify before the Civil Service

6    Board?

7    A.   I did.

8    Q.   And Chief Blom testified before the Civil Service Board?

9    A.   Yes.

10   Q.   And in your presence related this conduct that terrorized

11   Lisette Pailette sufficient that he determined you had to be

12   fired; right?

13   A.   He gave the recommendation based on the statements, to my

14   knowledge, and, therefore, Carollo then terminated me.  But the

15   termination is vague, it said at this date and time your

16   services are no longer required.

17   Q.   And the reason that Chief Blom was so officially concerned

18   is another commissioner had reported very similar misconduct by

19   you to their staff member, Rebecca Wakefield; right?

20   A.   It was brought to my attention coming like that, but it

21   wasn't brought through Richard Blom.

22        Joe Carollo sat with me in the back of the conference room.

23   He brought up about some concerns about some issue, it was very

24   vague, and Carollo himself told me don't worry about it, it's

25   bullshit, he's running for Congress, he just wants to get a

1   me-too movement going on.

2       There was no complaint, I mean, nothing was ever filed or

3   anything, so I don't know why you're bringing that up.

4   Q.   So this is your explanation for action to -- with

5   commissioner Russell's chief of staff, Rebecca Wakefield, who

6   reported that you, in a leering manner, referred to a frozen

7   candy bar, a Snickers, and what you would love to do with that

8   with her; right?

9   A.   That's incorrect.  Totally incorrect.

10  Q.   So Rebecca Wakefield making this report to Commissioner

11  Russell about the misconduct of a D-3 staffer, in connection

12  with the actual misconduct that was reported to Chief Blom by

13  Lisette, is not what led to your firing?

14          MS. SUAREZ:  Objection.  Asked and answered.

15          THE COURT:  Overruled.

16          THE WITNESS:  I remember that day vividly.

17          Sophie told me it was Rebecca's birthday.  I said, Oh,

18  that's nice.  I purchased a Snickers bar.  I went to Karen

19  Wilson's office, I gave it to James Jackson.

20          In no way, shape, or form did I ever see Rebecca

21  Wakefield.  I don't know where that story came up or who

22  concocted that story.

23          It could have been Carollo, for all I know.

24  Q.   So somebody else, you don't know who, concocted a story

25  that was told under oath to the Civil Service Board that upheld

1   your firing; right?

2   A.   Yes.  And mind you, the Civil Service Board members are

3   City of Miami employees themselves, so they're in a tight

4   predicament.

5   Q.   Mmm-Hhh, interesting, very...

6        So one of the things that you did when you became a

7   City of Miami employee is, like all city employees, you're

8   required to fill out an application; right?

9   A.   Yes.

10  Q.   And the application is an application that asks for

11  information, as well as prior work history?

12  A.   Yes.

13  Q.   And that prior work history included, did it, your time

14  with the Key Biscayne Police Department?

15            MS. SUAREZ:  Objection, Your Honor.

16            Sidebar conversation?

17            THE COURT:  All right.

18            (Sidebar discussion held as follows:)

19            MS. SUAREZ:  I'm sorry, Judge, I didn't mean to call a

20  sidebar.  I just meant to say this is the prior employment that

21  Your Honor said could not be talked about at the prior sidebar.

22            THE COURT:  Where are you going with this, Mr. Kuehne?

23            MR. KUEHNE:  One, he did not, of course, include it,

24  I'm not going to ask him about how; two, he never said he was

25  not eligible to be rehired by his employer; and this was on his

1     official City of Miami application.

2          THE COURT:  I'm going to sustain the objection.

3          As I said before, we're not going to go here to create

4     interest here of a mistrial.  I understand it's a hotly

5     contested issue, I don't want to have to sanction either party

6     or go beyond that.

7          What I want to do, we are going to skirt around this

8     issue.  I have already addressed this once, you're going to

9     move on, and there's not going to be any further discussion

10    about this.  Thank you.

11         (Sidebar concluded and the following was held in open

12    court:)

13    BY MR. KUEHNE:

14    Q.   So I asked you about and you referred to a company called

15    Countywide, remember that?

16    A.   Yes.

17    Q.   A company that you're a partner in?

18    A.   Correct.

19    Q.   And you were a partner in that business, Countywide, from

20    at least November 2015 through May of 2018; right?

21    A.   Sounds about right.

22    Q.   Never disclosed that to Chief Blom or anybody who was part

23    of your supervisory staff at the City of Miami?

24    A.   Again, Mr. Kuehne, I was the first hire in Coral Gables

25    staff.  I filled out the application -- the employment

1    application, it's like about four pages.

2        They even told me I didn't have to include anything

3    whatsoever.  It's just for them to have something on record.

4    I could have put my first name, my last name and turned it in.

5        And they told me that same reason, because since I worked

6    for commission staff, I'm an at-will employee; so, therefore,

7    they don't really need to know my employment history 'cause I'm

8    already hired.

9        The commissioner picks you and, therefore, you're hired,

10   you just got to go through the administrative process, which is

11   having that employment with your name and you could have just

12   left your social.

13       Then go through the medical part.  The medical part is done

14   at Mount Sinai, it's your medical.  They always have to have

15   that and, therefore, you're hired, that's it.  You don't get

16   put through the ringer with an interview or anything of that

17   sort of thing.

18   Q.  So you, while you are working with the City of Miami in

19   2018, are a partner with Countywide and disclosed that to

20   nobody?

21       MS. SUAREZ:  Objection, Your Honor.  Asked and

22   answered, relevance.

23   Q.  And that was during --

24       THE COURT:  Sustained.  I sustained the question.

25       Move on to the next subject area, Mr. Kuehne.

1    BY MR. KUEHNE:

2    Q.   Among the responsibilities you had with Countywide were --

3         MS. SUAREZ:  Objection, Your Honor.  Relevance.

4         THE COURT:  Sustained.

5    BY MR. KUEHNE:

6    Q.   You did talk with Fuller after you were fired; right?

7    A.   Yes.

8    Q.   And, in fact, you went to an office request by Fuller so

9    that you could give some information; right?

10   A.   Yes, I believe so.

11   Q.   And you recall that was around August of 2018?

12   A.   If that's what you're saying, yes.

13   Q.   And one of the people who attended that meeting where you

14   gave a statement was Michael Machete; right?

15   A.   Yes.

16   Q.   And Michael Machete was one of the owners and partners of

17   Countywide Investigations; wasn't he?

18   A.   What's the date again?  August, you said?

19        And I left in May?

20   Q.   I don't know when you left, but you were certainly working

21   there, you agree, through May of 2018; right?

22        MS. SUAREZ:  Objection, Your Honor.  Mischaracterizes

23   testimony.

24        THE COURT:  Overruled.

25   BY MR. KUEHNE:

1    Q.   So you showed up at Fuller's request on August 3, 2018,

2    after you had been fired, and talked to Fuller, and Michael

3    Machete was present; right?

4    A.   I believe I did a deposition, yes.

5    Q.   You did a deposition.  Well, I wasn't there; was I?

6    A.   No.

7             MS. SUAREZ:  Objection, Your Honor.  Relevance.

8             THE COURT:  Sustained.

9    BY MR. KUEHNE:

10   Q.   And Mr. Machete had -- was associated with the company that

11   you had been employed by and a partner of Countywide; right?

12   A.   I don't know when Mr. Machete was hired.  I never met him.

13   Q.   And at the time he -- you were with him, he was with

14   Countywide; right?

15   A.   He was with Countywide, yes.

16   Q.   So, when you -- you were asked some questions about

17   Cultural Fridays, Culturales Viernes; right?

18   A.   Yes.

19   Q.   Now, you were present -- let's pull up Plaintiffs'

20   Exhibit 408.  Do see this, it's an e-mail from Steve Miro to

21   Joe Carollo, and then there's some e-mail traffic below that?

22   A.   I see that, yes.

23   Q.   March 19, 2018, you're working for Commissioner Carollo's

24   staff?

25   A.   Yes.

1        MR. KUEHNE:  Your Honor, I move Plaintiffs'

2   Exhibit 408.

3        THE COURT:  It's admitted.

4        (Plaintiffs' Exhibit 408 received into evidence.)

5   BY MR. KUEHNE:

6   Q.   So this is, as you see -- let's go to the third part of it,

7   from Viernes Culturales.  No.  Let's go back to the first page.

8        So you see that last e-mail part, it says:

9        "From Viernes Culturales," and it's an invitation to the

10  next board meeting.  Do you see that?

11  A.   I see that, yes.

12  Q.   Okay.  And it is to Joe Carollo, and it's an invitation to

13  attend a board meeting, and the date of the invitation is March

14  19, 2018.

15  A.   That's what it says.

16  Q.   And then the next page, there's probably two pages after

17  that, but the next page has the invitation:

18       "Dear Commissioner Carollo, to attend the meeting on March

19  29, 2018" -- do you see that?

20  A.   Yes.

21  Q.   And let's go to the last page.

22       And it's signed by Pati Vargas, the director of Viernes

23  Culturales?

24  A.   I see that.

25  Q.   Now, that is 3-19-2018.  And, by the way, you understand

 1   that Fuller contends that he was associated with Viernes

 2   Culturales?

 3   A.   My understanding, yes.

 4   Q.   A week after he files an ethics complaint against Joe

 5   Carollo, the organization that he says that is his is inviting

 6   him to attend a board meeting?

 7        MS. SUAREZ:  Objection, Your Honor.  Assumes facts not

 8   in evidence.

 9        THE COURT:  Overruled.

10   BY MR. KUEHNE:

11   Q.   Is that the timing?

12   A.   Can you repeat the question?

13   Q.   A week after Bill Fuller files an ethics complaint against

14   Joe Carollo, his organization, Viernes Culturales, is inviting

15   Joe Carollo to attend one of their board meetings?

16   A.   It appears so.

17   Q.   And Joe Carollo didn't attend that; did he?

18   A.   I don't recall.

19   Q.   So when you were talking about Viernes Culturales and you

20   explained to the jury what you understood about it, you had no

21   information about how Viernes Culturales got established; did

22   you?

23   A.   No.

24   Q.   How they were allowed at a time to have street parties in

25   the Domino Park area of Little Havana?

```
1    A.   No.
2    Q.   Whether they were doing this without permits or with
3    permits?
4    A.   That, I don't know.
5    Q.   But you did know that when Joe Carollo was the mayor of the
6    city he's the one who actually initiated the program that was
7    Viernes Culturales as a city program; right?
8    A.   I don't know that, no.
9    Q.   That was before your time, you didn't know that?
10   A.   I didn't know that Mr. Kuehne, no, I don't know.
11   Q.   And Viernes Culturales became over time disassociated from
12   the City of Miami, it was no longer a City of Miami event;
13   right?
14   A.   I don't know.  I never knew it was a City of Miami event.
15   Q.   Okay.  And during the time -- then you were asked some --
16   you described -- you described your recollection of Viernes
17   Culturales, and then you talked about something else, Little
18   Havana Fridays; right?
19   A.   Which one are you referring to?
20   Q.   The not Viernes Culturales event.
21   A.   Okay.  Now you say "not."
22        There's two other ones, the Que Pasa Little Havana that
23   you're the registered agent, or the new one that Carollo
24   created?  I don't know.
25   Q.   So let me try to be really clear.
```

1  A.   Okay, thank you.

2  Q.   You're familiar with an event called "Little Havana

3  Fridays"; aren't you?  Are you?

4  A.   I don't know which one you're referring to.

5  Q.   Okay.  You testified to this jury that Joe Carollo, through

6  the District 3 office, got City of Miami permits for an event,

7  a public event, on Fridays in the Little Havana Domino Park

8  area; right?

9  A.   That's the Habana, with a "B," is that the one you were

10  referring to?

11  Q.   Oh, was I -- I apologize if I was mispronouncing it.

12      So, what do you call it, so that there will be no mistakes

13  that you understand I'm asking about that, that you've

14  testified to on direct examination?

15  A.   It's Viernes Little Habana, with a "B."

16  Q.   Okay.  Now, you told the jury that you had never been to

17  it, but you knew about the permitting, and you knew that it was

18  too loud and there were noise complaints.

19      Was that your testimony?

20  A.   Yes.

21  Q.   In fact, let's pull up Defense Exhibit 384.

22      MS. SUAREZ:  No objection.

23      MR. KUEHNE:  Thank you.  I did not hear that.

24  BY MR. KUEHNE:

25  Q.   Sorry.  Let's put up Defense Exhibit 384.

1       So, Defense Exhibit 384, you see that this is a text.  You

2   see that yellow section that's in a picture in this text?

3   A.   Yes.

4   Q.   Okay.  Do you notice the date of this, 11-28-2018, do you

5   see that down at the bottom, 11-28-2018?

6   A.   Yes.

7   Q.   You're no longer with the City of Miami; are you?

8   A.   Correct.

9   Q.   Long gone, months have gone by?

10  A.   Yes.

11  Q.   And -- by the way, you see at the top, this is either a

12  Tweet or a text, some social messaging, from Pit Bull; right?

13  A.   Yes.

14  Q.   Pit Bull is known as "Mr. 305?"  Yes?  You've never heard

15  Pit Bull described as --

16  A.   Mr. Worldwide, I guess, Mr. 305.

17  Q.   Okay, Mr. Worldwide.

18       You've never heard him referred to as "Mr. 305?"

19       THE COURT:  And also, 10 minutes remaining, counsel,

20  for the record.

21       MR. KUEHNE:  Your Honor, that was just my best

22  estimate.

23       THE COURT:  Ten minutes remaining.

24  BY MR. KUEHNE:

25  Q.   So, Pit Bull, very well-known in South Florida?

```
 1   A.   Yes.

 2   Q.   A real Ambassador for the City of Miami?

 3   A.   I think he's very well for Miami, yes.

 4   Q.   So the fact is, Little Havana Fridays, the event that

 5   pulled permits for the Domino Park area on Southwest 8th Street

 6   that you say was Joe Carollo's event, in fact, the first time

 7   they had that event was November of 2018 -- actually, November

 8   30th of 2018; isn't that right?

 9   A.   That's what it says there.

10   Q.   Well, let's put that picture part in a blow-up.

11        "The City of Miami, Welcome to Little Havana" is the

12   picture, you see -- by the way, that's a picture of

13   Commissioner Joe Carollo and the other one is Commissioner

14   Manolo Reyes; right?

15   A.   Yes.

16   Q.   Both elected City of Miami Commissioners.

17        And let's see what they say:

18        "City of Miami Commissioners Joe Carollo and Manolo Reyes

19   cordially invite you to the launching of Little Havana's

20   official flag, as well as the first Little Havana Fridays with

21   a special appearance by our very own Mr. 305, Pit Bull."

22        "There will also be many other well-known celebrities and

23   special guests accompanied by the AmericaTEVE team, led by the

24   popular Carlucho and the Happy Hour Show."

25        And it tells Friday, November 30th, 2018, Domino Square
```

1  Park, location, 7:00 p.m.; right?

2  A.  You read it well.

3  Q.  So this event, the truth is, this event happened months

4  after you left the City of Miami, and you had no idea except

5  how you were prepared for your testimony today about what

6  happened leading up to Little Havana Fridays; isn't that right?

7  A.  This is probably the first event from Little Havana

8  Fridays.  I don't know how many name changes it went through,

9  but I know that permits were pulled and it took every Friday.

10  Q.  During the time that you were in the City of Miami,

11  District 3, fired on June 4th, 2018?

12  A.  Yes.

13  Q.  That's your testimony?

14  A.  That's my testimony, Mr. Kuehne, yes.

15  Q.  You can make that smaller now.

16     And you understand from at least reading this that Pit Bull

17  was the opening act, the special guest; right?

18  A.  It doesn't say anywhere he was a special guest.

19  Q.  Oh.

20  A.  "Special appearance."

21  Q.  So let's see what Pit Bull says:

22     "It's an honor to be part of this historical event,

23  especially since Little Havana was one of my old neighborhoods

24  and helped shape who I am today."

25     And then it's got a hashtag, Viernes Pequina Habana;

1   hashtag, Little Havana Fridays; hashtag Miami; and then, at

2   Joe Carollo now, right, I read that correctly?

3   A.   You read it well.

4   Q.   Okay.  You also claim that there was this group called "Que

5   Pasa Little Havana" that I was the lawyer for?

6   A.   I never said you were the lawyer.

7   Q.   Oh.

8   A.   I said you're the registered agent.

9   Q.   The registered agent, okay.

10      And that was a company not-for-profit.

11      Did it put on a single Domino Park event?

12  A.   I don't know if it did or not.

13  Q.   And the people who organized Que Pasa Little Havana, were

14  women business owners in the Southwest 8th Street business

15  district trying to promote that aspect of business; wasn't it?

16  A.   I don't know the function of the Que Pasa Little Havana.

17  I don't know if it's still active or not.

18      I just know that we did meet a couple times, Mr. Kuehne.

19  Q.   And Joe Carollo, Commissioner Carollo, never met with them?

20  A.   I don't know.

21  Q.   Well, you say that you met with them.

22      That was organized in April of 2018.  You get fired less

23  than -- you get fired within two months; right?

24  A.   Yes.  Mr. Kuehne, we met, you were present that day in the

25  cigar shop in the back office, there's a conference room.  It

1   was the woman, it was Gus Garcia there.  You were sitting down

2   with a notepad, and I showed up.  Yes.

3   Q.   And no Commissioner Carollo?

4   A.   No Commissioner Carollo.

5   Q.   No event on Fridays that took permits or not took permits?

6   A.   That part, I don't know if they pulled permits for

7   anything.  I don't know the function of that organization.

8   Q.   And you know that that organization had nothing to do with

9   the very successful Little Havana Fridays that was opened by

10  Commissioner Carollo and Commissioner Reyes in November of

11  2018; right?

12  A.   Correct.  I don't know their function whatsoever.

13  Q.   So you had mentioned during your direct examination the

14  Christmas party or holiday party at the Tower Hotel.

15       Did you mention that --

16           MS. SUAREZ:  Objection, Your Honor.

17  Q.   -- in your examination?

18           THE COURT:  What's the objection?

19           MS. SUAREZ:  Misstates testimony.

20           THE COURT:  Sustained.

21  BY MR. KUEHNE:

22  Q.   Well, let me ask.

23       Did you talk about the Tower Hotel during your testimony?

24  A.   I don't think so.

25  Q.   Did you go to the Tower Hotel for a holiday party in

1   November of 2018 -- 2017?

2   A.   No, we didn't, no.

3   Q.   You did not.  And you've never -- during your time as a

4   City of Miami staff member, you've never gone into the Tower

5   Hotel?

6   A.   No.

7   Q.   You've never looked at the stop-work orders that had been

8   constantly in place since 2014 at the Tower Hotel?

9        MS. SUAREZ:  Objection, Your Honor.

10       Counsel is testifying.

11       THE COURT:  Overruled.

12       THE WITNESS:  No.

13  BY MR. KUEHNE:

14  Q.   You've never been involved in any code enforcement and

15  stop-work orders for unpermitted construction at the Tower

16  Hotel?

17  A.   No.

18       MS. SUAREZ:  Objections, Judge.

19       THE COURT:  Overruled.

20  A.   No.

21  BY MR. KUEHNE:

22  Q.   You did testify that you went on those two occasions to the

23  Little Havana Southwest 8th Street District with the

24  Commissioner; right?

25  A.   Yes.

1    Q.   Just those two times?

2    A.   What two times are you referring to?  Is that the

3    drivethrough and the walkthrough?

4    Q.   You mentioned a walkthrough with Director Bernat.

5    A.   Yes.

6    Q.   You mentioned the drivethrough, drive around with the

7    mayor?

8    A.   Yes.

9    Q.   Right.  So those are the two times you mentioned?

10   A.   Okay.

11   Q.   Any other times?

12   A.   I believe there was one more occasion that we did a

13   walkthrough.

14   Q.   You don't remember much about that?

15   A.   I remember we did a walkthrough.  I don't remember what

16   staff members were present.

17   Q.   All right.  And did you -- by the way, did you keep

18   notes --

19   A.   Never.

20   Q.   -- of the walkthrough?

21   A.   No.

22   Q.   And besides that, those three occasions, did you do any

23   walkthroughs without Commissioner Carollo in the Little Havana

24   Business District?

25   A.   Can you elaborate more?

1   Q.   Did you, during the December 4, when you get hired, to

2   June 4 when you get fired, did you go there with others -- not

3   Commissioner Carollo -- to walk the district?

4   A.   In my capacity as a city employee or --

5   Q.   During that time, as a city employee, sure.

6   A.   Probably went there, 'cause I eat lunch there, I live by

7   there.

8   Q.   Okay.  So not for any purpose of looking at businesses,

9   reporting to anybody in the city administration?

10  A.   I'm not understanding.

11  Q.   You didn't go there any other times, besides the two times,

12   or maybe the third time, as a staff member of Commissioner

13   Carollo to inspect the Little Havana area?

14  A.   That question is vague.  But if I did go there to do any

15   unsanctioned inspections, it was because Commissioner Carollo

16   sent me there.

17  Q.   Okay.  And you say "unsanctioned inspections."

18     When you went there, did you inspect anything?

19  A.   I don't know what an inspection entails.

20  Q.   Your words, not mine.  "Unsanctioned inspections."

21     Were you an inspector?

22  A.   Mr. Kuehne, you said about if I did any walkthroughs,

23   inspections, and I answered your question; that if I did go,

24   was because Commissioner Carollo sent me there.

25     Do you want me to re-phrase?  I'll say observe or send me

1   to a specific location of one of the plaintiffs' properties,

2   and I will go; and, if anything, I'll take a picture of it,

3   send it back to him.

4   Q.   Now, you've had occasion to meet with the plaintiffs'

5   lawyers in connection with this case?

6   A.   Yes.

7   Q.   On how many occasions?

8   A.   I don't recall.

9   Q.   Give it a stab.

10  A.   This is a five-year-old case, Mr. Kuehne, I don't recall.

11  Q.   So you've met with Fuller with -- on some occasions; right?

12  A.   To be fair, yes.

13  Q.   And you've met with the lawyers --

14  A.   Yes.

15  Q.   -- for the plaintiff on some occasions, but you don't

16  remember how many?

17  A.   Correct.

18  Q.   So before you testified yesterday, had you met with the

19  plaintiffs' lawyers?

20  A.   Yes.

21  Q.   When?

22  A.   Horrible with dates, Mr. Kuehne, sorry.

23  Q.   So let's say Wednesday.  Let's not do dates.

24       Let's do days of the week, a little easier?

25  A.   I don't know, you got to give me specific dates, I'm not

1    good with dates.

2    Q.   Today's Friday, yesterday was Thursday.

3    A.   No, that part, I understand that, and I know weekdays,

4    weekends.

5    Q.   The day before was Wednesday, so in relation to your

6    testimony, when did you meet with them?

7    A.   I believe it was via Zoom on Sunday night, or so, maybe

8    Monday.

9    Q.   Okay.  And before that?

10   A.   We met, yes, I just don't know when.

11   Q.   All right.  And occasions you don't know 'cause you're not

12   good with dates?

13   A.   Correct.

14   Q.   And you talked about your testimony, and you were shown

15   documents and photographs and videos?

16   A.   Yes.

17   Q.   Through Zoom or in person?

18   A.   Correct.

19   Q.   And with regard to this case, have you ever met with me?

20   A.   No.

21           MR. KUEHNE:  Your Honor, could I have just a moment?

22           THE COURT:  Sure.

23           (Brief pause in the proceedings.)

24           MR. KUEHNE:  I have nothing further, Your Honor.

25           THE COURT:  All right, thank you.

1          Any redirect?

2          MS. SUAREZ:  Yes, Your Honor.

3                    REDIRECT EXAMINATION

4    BY MS. SUAREZ:

5    Q.  Good afternoon, Mr. Miro.

6    A.  Good afternoon, Ms. Suarez.

7    Q.  Do you recall saying that before, while you were

8    campaigning for Mr. Carollo that he wanted to meet with

9    Mr. Fuller?

10   A.  Yes.

11   Q.  And, in fact, did he meet with Mr. Fuller?

12   A.  I don't recall.

13   Q.  After the rally happened, did Commissioner Carollo meet

14   with Mr. Fuller?

15   A.  No.

16   Q.  And despite Mr. Kuehne's assertions -- in fact, the run-off

17   election, Mr. Carollo only won by 250 votes; right?

18   A.  That's what I said, yes.

19         MR. KUEHNE:  Objection, Your Honor, to form.

20         THE COURT:  Overruled.

21   BY MS. SUAREZ:

22   Q.  And at some point while you were the District 3 liaison the

23   relationship between Mr. Fuller and Mr. Carollo was hostile;

24   right?

25   A.  Correct, there was no relationship whatsoever.

1   Q.   And, in fact, in the exhibit that Mr. Kuehne pulled up for

2   you again, the statement you wrote about the Gay 8 Festival,

3   there was, obviously, a heated argument between you and

4   Mr. Fuller; right?

5   A.   Yes.  Mr. Fuller was mad, yes.

6   Q.   So were you looking to do Mr. Fuller any favors at that

7   time?

8   A.   No.

9   Q.   Did you have any interest in helping Mr. Fuller at that

10  time?

11  A.   No.

12  Q.   And the relationship stayed that way until after you left

13  the city; right?

14  A.   Yes.

15  Q.   And after you left the city in June of 2018, do you recall

16  apologizing to Mr. Fuller?

17  A.   I did, yes.

18  Q.   And what was that about?

19  A.   I called him to truly apologize that his businesses are

20  being effected, and he's getting the wrath of the entire City

21  of Miami, including Miami Parking Authority, that are closing

22  his businesses and are hampering his progress that he attempted

23  to do; and to this day, I still apologize.

24  Q.   And I want to show you now the statement that Mr. Kuehne

25  was reading from, from August the 3rd of 2018.

1       Permission to approach the witness, Your Honor?

2          THE COURT:  Sure.

3   BY MS. SUAREZ:

4   Q.  So, August 3rd, 2018, how many months is that after you

5   left the city?

6   A.  Two, roughly.

7   Q.  And Mr. Kuehne only read some parts of the interview for

8   you, so I'd like to read to you on page 28, starting on line 7,

9   you say:

10      I was terminated the 4th of June.  The 5th, it was a code

11  enforcement hearing that Joe showed up to that hearing.

12      My Godfather was the magistrate in that hearing.

13      Mr. Fuller:  No way.

14      You:  Yes?

15      Mr. Fuller:  Wow.

16      You:  And he gave you guys a 30-day extension.

17      Mr. Fuller:  Right, we heard that in the audio tape.

18      You answered:  He saw Carollo walk in and, you now, he saw

19  Carollo sitting next to the two people and he didn't think much

20  of it, you know.  After he rendered his decision, Joe

21  Carollo -- he's like, Commissioner Carollo, is there anything

22  you want to say or --

23      And he's like, yeah, absolutely.  I came here to talk about

24  that case, but the case was already closed.

25      Mr. Fuller:  Right.

1       Answer by you:  And he wanted to reopen the case, and my

2  Godfather, obviously, ethically, he can't do that.  He did it

3  to it, and now, with Joe Carollo, got rid of all the

4  magistrates.  Do you see that, Mr. Miro?

5  A.   Yes.

6  Q.   So, Mr. Kuehne talks about your Godfather, Mr. Victor De

7  Yurre; right?

8  A.   Yes.

9  Q.   But, in fact, in this transcript Mr. Fuller says there's no

10  way.

11         MR. KUEHNE:  Objection, Your Honor.

12         THE COURT:  Wait.  What's the objection?

13         MR. KUEHNE:  Your Honor, I've never referenced a

14  transcript.  I have only asked the witness if he said

15  something, and he admitted that he said that.

16         THE COURT:  Sustained.  Sustained.

17  BY MS. SUAREZ:

18  Q.   Does this appear to be what Mr. Kuehne was referring to

19  when he asked you the question, Mr. Miro?

20         MR. KUEHNE:  Objection.  Speculation.

21         THE COURT:  Overruled, if he knows.

22         THE WITNESS:  It appears so.

23  BY MS. SUAREZ:

24  Q.   And in this transcript that I just showed you, Mr. Fuller

25  says:  No way.  Correct?

1          MR. KUEHNE:  Objection.  Objection.

2          THE COURT:  What's the objection?

3          MR. KUEHNE:  Now it's hearsay.  I asked him about his

4   statements.  He confirmed them.  Not about what anybody else

5   said, what a non-present witness said.  It's hearsay, Judge.

6          THE COURT:  Overruled.

7          THE WITNESS:  That's correct, after I was terminated,

8   my Godfather didn't know I was terminated, and I guess he's a

9   magistrate, and he, you know, he listened to that case.

10         It just so happens it fell on his docket, I guess.

11         And being that extension, Carollo was there.  What he

12  told me is he never has seen a commissioner ever show up --

13         MR. KUEHNE:  Objection.  Now we're talking about some

14  non-party who's not a part of these proceedings and what he

15  told this witness.

16         THE COURT:  Sustained.

17  BY MS. SUAREZ:

18  Q.   Mr. Miro, does that statement indicate to you that

19  Mr. Fuller had any relationship with your Godfather whatsoever?

20         MR. KUEHNE:  Objection.  Opinion, speculation.

21         THE COURT:  Overruled.

22         THE WITNESS:  No, he never had any dealings with my

23  Godfather.

24         MS. SUAREZ:  If we could pull up Plaintiffs'

25  Exhibit 392.

 1          THE COURT:  And also, ladies and gentlemen, we will be

 2     taking a break in another 25 minutes, is that fine with

 3     everyone?  Yes?  All right.

 4          MR. KUEHNE:  Objection to 392, Judge.

 5          THE COURT:  What's the objection?

 6          MR. KUEHNE:  It has nothing to do with this individual.

 7     It shows nothing about him.  It's after the time he was with

 8     the City of Miami.  And it's not anything that I brought up on

 9     direct examination.  I didn't show this.  I didn't refer to it

10     -- on cross-examination, didn't refer to it, so it's beyond the

11     scope, as well as outside the knowledge of this individual.

12          MS. SUAREZ:  Your Honor, he referenced it directly when

13     he was talking about the witness's Godfather.

14          THE COURT:  The objection is overruled.

15          THE WITNESS:  I see the Tweet, yes.

16          MS. SUAREZ:  Move to admit and publish, Judge.

17          THE COURT:  Granted.

18     BY MS. SUAREZ:

19     Q.   Is that Commissioner Carollo in that photo?

20     A.   Yes.

21     Q.   And, in fact, is it a Tweet from his account?

22     A.   Yes.

23     Q.   AND can you read the date at the bottom there?

24     A.   June 5th, 2018.

25     Q.   And is that the same date that you were saying your

1   Godfather was overseeing the hearing?

2   A.   Yes.

3   Q.   So does it, in fact, appear as though Commissioner Carollo

4   went out to that hearing to speak?

5        MR. KUEHNE:  Objection.

6   A.   Yes.

7        THE COURT:  What's the objection?

8        MR. KUEHNE:  His Godfather is shown nowhere on this.

9        THE COURT:  Overruled.

10  BY MS. SUAREZ:

11  Q.   Are you aware of Commissioner Carollo ever appearing to

12  testify at a Special Master's code hearing against any other

13  business owner?

14       MR. KUEHNE:  Objection, Your Honor.  Beyond the scope of

15  cross-examination, beyond the scope of his knowledge.

16       THE COURT:  Sustained.

17       MS. SUAREZ:  If we could pull up the video of the rally

18  again, please.

19  BY MS. SUAREZ:

20  Q.   Now, Mr. Miro, in this photo do` you see --

21       MR. KUEHNE:  Excuse me, which one is this so I can make

22  a note?

23       MS. SUAREZ:  Plaintiffs' 7.

24       MR. KUEHNE:  Plaintiffs' 7?

25       MS. SUAREZ:  Yes.

 1    BY MS. SUAREZ:

 2    Q.   Do you see in this photo that there are some Carollo signs

 3    in the grass area?

 4    A.   Yes.

 5    Q.   And are you aware that that's not permitted?

 6           MR. KUEHNE:  Objection, Your Honor.

 7           Number one, not the scope of cross-examination; number

 8    two, beyond the scope of this person's individual knowledge.

 9           THE COURT:  Sustained.

10    BY MS. SUAREZ:

11    Q.   And Mr. Kuehne showed you a video from the rally, this

12    video from the rally, on November the 18th; right?

13    A.   Yes.

14    Q.   And then he showed you a text where you were asking

15    Mr. Fuller to turn the music down on the next day, November

16    19th; right?

17    A.   Yes.

18    Q.   And you see yourself in this video, I think you testified

19    earlier, right, right there, in the blue shirt?

20    A.   Yes.

21    Q.   And this is on the 18th?

22    A.   Yes.

23    Q.   And the text was on the 19th; right?

24    A.   Yes.

25    Q.   So, in fact, you went out to the rally both days; does that

1    sound right?

2    A.  Yes, it's correct.

3    Q.  And Mr. Kuehne asked you some questions about who was

4    working on Carollo's campaign; right?

5    A.  He did.

6    Q.  And, in fact, he was the attorney; right?

7    A.  Yes.

8    Q.  And Mr. Sarnoff, who is also in this courtroom, was also

9    working on the campaign; correct?

10   A.  Yes.

11   Q.  Now, after you were terminated, did you file a lawsuit?

12   A.  Yes.

13   Q.  What was it about?

14   A.  It was a whistle-blower lawsuit.

15           MR. KUEHNE:  Objection.

16           THE COURT:  What's the grounds?

17           MR. KUEHNE:  Beyond the scope of examination.

18           THE COURT:  Overruled.

19           MR. KUEHNE:  As well as beyond the scope of this

20   particular complaint.

21           THE COURT:  Overruled.

22   BY MS. SUAREZ:

23   Q.  You can answer, Mr. Miro.

24   A.  Yes, I filed a lawsuit.

25   Q.  What was it about?

1   A.   Whistle-blower, retaliation.  It's a retaliation lawsuit.

2   Q.   And during that time did your lawyer take depositions?

3   A.   He did.

4   Q.   Did he take a deposition of a Ms. Tanjaha Quintana?

5   A.   Yes.

6        MR. KUEHNE:  Objection, Your Honor.

7        THE COURT:  What's the objection?

8        MR. KUEHNE:  We discussed it at sidebar, beyond the

9   scope of any examination, raising a name that has not been

10  raised at all in any cross-examination; raises issues that are

11  not germane to this particular case; is not appropriately cross

12  from the -- redirect from my cross; and Judge ultimately ruled

13  403; and I would move -- request permission to make a motion.

14       THE COURT:  Anything else?

15       MR. KUEHNE:  No, sir.

16       THE COURT:  Motion is denied.  Overruled.

17       You may proceed, counsel.

18  BY MS. SUAREZ:

19  Q.   Did your lawyer during that time take depositions,

20  Mr. Miro?

21  A.   Yes, ma'am.

22  Q.   Of Ms. Tanjaha Quintana?

23  A.   Yes.

24  Q.   Is that deposition under oath?

25  A.   Yes.

1    Q.   And did she reveal anything in her deposition about

2    Commissioner Carollo and the allegations of sexual harassment

3    against you?

4    A.   Yes.

5         MR. KUEHNE:  Objection, Your Honor.  It's hearsay.

6    She's testifying what somebody else testified to in a matter

7    that is not before this Court.  The witness is not present.

8         THE COURT:  Overruled.  You brought this issue up on

9    cross-examination, sir.

10        MR. KUEHNE:  I did not.

11        THE COURT:  Overruled.

12        MR. KUEHNE:  Your Honor, I did not -- I did not raise

13   this person at all on cross-examination.

14        MS. SUAREZ:  May I proceed, Judge?

15        THE COURT:  Give me a moment.

16        (Cellular phone interruption.)

17        THE COURT:  Can I see the lawyers briefly sidebar?

18        (Sidebar discussion held as follows:)

19        THE COURT:  Before this is brought up, sexual

20   allegations against this witness here -- and they clearly put

21   you on notice, as I mentioned before, you brought up the sexual

22   avenues to rebut any charge revocation or to clarify what was

23   happening, otherwise, it leaves the jury with the impression

24   that everything was taken as true, that's why he was fired.

25        It's fair play to allow him to read this statement to

1    rebut any charge or allegation because on this he sexually

2    harassed, not once, but twice, people, in addition to the

3    Snickers and other forms of harassment.

4         It's fair play, and you opened the door to do so.

5         You cannot now use it as a shield on re-direct and as a

6    sword.  I warned you, and you did it, and that's strategy -- I

7    don't question your strategies, how they decide the case and

8    trying to couch the case for appeal.

9         This is the defense strategy that had been chosen, and

10   if the defense had not asked those questions, I would not allow

11   her to go, so she did respond to that on cross-examination.

12        That's the Court decision.

13        MR. KUEHNE:  Your Honor, first, they brought up over my

14   objection on direct examination the lawsuit against the City,

15   not against Carollo.

16        They brought up on direct examination, over my

17   objection, a lawsuit against the city, that's what he's

18   referring to.

19        I did not raise that issue.  They did.

20        When it came to his termination, I was very specific

21   and followed the exact contours as well as what Your Honor said

22   in ruling.

23        I have raised the issue of a named person, what the

24   allegation was about that named person, and I asked about

25   another person, specific tailored, nothing about anybody else.

1          You were very clear that I was not to raise any issue
2   about the complaint by this person who -- let's just say, gave
3   a different statement, whether credible or not, remains to be
4   seen.  We have -- if that opened the door, I understand
5   Your Honor's ruling.
6          THE COURT:  It didn't open up the door.  You took the
7   hinges off the door when you went there, sir, not once, but
8   twice, and you certainly knew not to ask questions -- you came
9   before this Court and went on about them, Mr. Kuehne, you asked
10   the questions and now you cannot use it as a shield at this
11   point on direct.  It's not fair.
12          Right now, at least in governing questioning, she said
13   she had one or two different women and brought up the next
14   (inaudible) and anything else, and then you entitled to ask
15   questions about that, and you said it was a trial, and it was
16   not a trial.
17          You said it was a hearing for -- 403, so you're
18   entitled to alert the employee about this confrontation we had.
19   That's a serious allegation that has been brought in this case,
20   and it leaves a dangerous, also daggering impression on the
21   reference -- whether it's true or not, believe the jury on what
22   you presented and what they presented and a statement here in
23   which plaintiff is entitled to inquire about that, and I had to
24   be here sidebar, so if you're going to go there to ask the
25   questions, I told you what district's posture to put yourself

1    in, you have done that, sir.

2         MR. KUEHNE:  As the record reflects what your ruling

3    was, but I specifically did not raise any issue involving this

4    person, any allegation involving this person, any lawsuit where

5    this person testified or didn't testify.

6         I have not raised any issue about some unknown

7    previously undisclosed person, at least as far as this jury

8    goes, who's now going to -- we don't even know what she said

9    because that's not before the jury, and she's going to say

10   whatever she said -- "I blame it all on Joe Carollo"-- in a

11   completely different lawsuit, having nothing to do with this,

12   and a lawsuit where Joe Carollo was not a party.

13        It was a lawsuit against the City of Miami, and at no

14   time was Joe Carollo a party represented at that proceeding,

15   represented in any deposition or anything else.

16        I specifically asked this witness:

17        Were you present when so-and-so testified about this,

18   or said this, was that in your presence?

19        Yes, it was.  He gave his explanation.  That's great.

20        I didn't ask anything else about somebody else, another

21   lawsuit, and I followed the Court's instructions.

22        THE COURT:  Mr. Kuehne, I'm getting the impression that

23   these young ladies -- what were that they should arrest him on

24   two different occasions; that came out of your mouth on

25   cross-examination.

1          MR. KUEHNE:  Yes, Judge.

2          THE COURT:  Rebut the sworn testimony, if they have the

3     charges that's only fair to let this jury hear, you're not

4     going to give someone a piece of - it's leading and

5     (inaudible).

6          MR. KUEHNE:  It's unfair to Mr. Carollo that I asked

7     questions of individuals and now they're trying to rebut that

8     through somebody else who's not a part of this case.

9          THE COURT:  Which particular individual did you refer

10    to?

11         MR. KUEHNE:  I asked about Lisette Pailette.

12         MS. SUAREZ:  At the civil service, Tanjaha is one of

13    them, he has chose to reference the other one also at that same

14    hearing he's talking about, making the same allegations against

15    Mr. Carollo and making -- forced her to make that statement.

16         MS. CAPRIO:  The City referenced multiple witnesses on

17    cross-examination.

18         MR. KUEHNE:  Your Honor, we move for a mistrial only

19    based on 403.

20         THE COURT:  That is denied.

21         You cannot set this up as a sword for one and shield as

22    another.  You specifically went there and the lady is accusing

23    the issue, you asked him about two sexual harassments and now

24    they have another person that denies that.

25         MR. KUEHNE:  Judge, I asked about sexual harassment, so

1   to prove -- to prove -- I just want to make sure I understand

2   this for my motion.

3          THE COURT:  Everything is you chose to pick two

4   different people and know there was another individual that

5   said no; now they're not entitled -- did they make allegations

6   against them as well?

7          MS. SUAREZ:  The individuals -- four women at the

8   hearing, and she's one of the four women that said he forced

9   her to make that statement.

10         THE COURT:  What happened to the other two?

11         MS. SUAREZ:  The other two that -- Mr. Kuehne

12  referenced all four of them at the hearing that talked about

13  this.

14         MR. GUTCHESS:  The same thing happened to Mr. Blom.

15         THE COURT:  These allegations, you were cross-examined

16  by those other three, and one says no.

17         I only asked about the three -- I can't talk about the

18  other one, the deposition, you have one.

19         MR. KUEHNE:  There's nothing before this jury based on

20  the careful instructions that the Court --

21         THE COURT:  You did not indicate it.

22         MR. KUEHNE:  -- why Mr. Miro was terminated, he was

23  terminated because of Lisette Garcia's statement.

24         THE COURT:  And not the other statement?

25         Listen to me -- he was not --

1          MR. KUEHNE:  The statement --

2          THE COURT:  -- this other witness has nothing to do

3    with it.

4          MR. KUEHNE:  Not for this trial, Judge.

5          THE COURT:  You brought that up, he's arrested, you

6    can't cherry-pick this issue, it's all inextricably

7    intertwined; fair for you on the one hand and damaging on the

8    other hand.  I understand.

9          I'm going to overrule, respectfully.

10         MR. KUEHNE:  And the motion as well?

11         THE COURT:  You're the one who told the jury, exactly.

12   You put yourself in this position and now you're asking the

13   Court -- trying to protect yourself from one answer, and

14   finally, deliberately before this Court, and now you're saying

15   this statement should not come in.  He's the one that's being

16   accused of sexual harassment.

17         Mr. Carollo is not being -- this defendant -- not this

18   defendant -- this witness, these two women you're saying

19   prejudicial, he's being accused of sexual harassment, too.

20         Wait a minute.  And you have an allegation here that

21   woman said that's not true.  The jury, whether they believe it

22   or not, that's the jury discussion.  It doesn't matter to me

23   whether they believe or disbelieve, they're entitled to do so.

24         MR. KUEHNE:  My client was not in attendance.

25         THE COURT:  I don't know.

1          MR. KUEHNE:  He had no opportunity to confront, and her

2    testimony is coming in here because her name never came up, and

3    that's somewhere to be -- the way I'm looking, I know you have

4    said I didn't follow your instructions.  I believe I did.

5          But having said that, I contoured my argument somewhere

6    specifically, so that if there was going to be a confrontation

7    issue, we knew who the people were, we knew what the

8    allegations were.

9          Now we have no idea what the allegations are of this

10   other person, no testimony about what came out, no testimony

11   that it was part of his firing and his -- and I guess his

12   credibility is going to be established because somebody else

13   says, "Oh, Carollo made me do it" -- even though there's no

14   testimony that she was involved in anything Carollo did

15   regarding his termination.  None.

16         MS. SUAREZ:  Your Honor, if I may briefly address this.

17   Yesterday I brought this up, and if (inaudible) is going to say

18   I was not terminated and they wanted to bring this up, I told

19   them yesterday that there was a statement by this woman saying

20   this to the contrary.

21         We addressed it again this morning.  They still chose

22   -- they brought this up, all four women testified in the

23   hearing, in fact, this woman went to Carollo's office and he

24   told her what to say at the hearing, and he had cherry-picked

25   the other two of the four and now wants to say that we can't

1   bring up the one that says something bad, as far as -- we will

2   call as rebuttal witness.

3           THE COURT:  I reserve that you call her, you don't need

4   to bring her in now.  Okay.

5           MR. KUEHNE:  Yes, sir.

6           (Sidebar concluded and the following was held in open

7   court:)

8   BY MS. SUAREZ:

9   Q.   Now, Mr. Miro, Mr. Kuehne talked a little bit about Little

10  Havana Fridays.  Do you remember that?

11  A.   Yes.

12  Q.   Do you have any reason to believe that Pit Bull knew the

13  background of Mr. Carollo's event?

14  A.   No.

15  Q.   Any reason to believe that Pit Bull knew that Viernes

16  Culturales could no longer operate in that space?

17  A.   No.

18  Q.   If we could pull up Plaintiffs' Exhibit 208, please.

19       Can we scroll down to -- well, actually, can we stay on the

20  first page.  There was some discussion about how the Alfie Leon

21  lawsuit took up all of Commissioner Carollo's time; right?

22  A.   Okay, yes.

23  Q.   Around December and through January, do you remember that?

24  A.   Mr. Kuehne said through March.

25  Q.   Okay.  And what's the date of this e-mail?

1    A.   December 19th.

2    Q.   So that was during the time that Commissioner Carollo was

3    supposedly super busy; right?

4    A.   Yes.

5    Q.   And Mr. Kuehne tried to link this property list to the

6    Alfie Leon lawsuit.  Do you remember that?

7            MR. KUEHNE:  Objection, Your Honor.

8            THE COURT:  What's the objection?

9            MR. KUEHNE:  I never said anything like that and now --

10           THE COURT:  Sustained.

11   BY MS. SUAREZ:

12   Q.   What was Alfie Leon's lawsuit about, Mr. Miro?

13   A.   To my knowledge, it was a residency issue.

14   Q.   Whose residency issue?

15   A.   Carollo's.

16   Q.   Did it have anything to do with Mr. Bill Fuller?

17   A.   Nothing.

18   Q.   So is there any reason at all why you would be researching

19   properties for the Alfie Leon lawsuit?

20           MR. KUEHNE:  Objection.  Foundation, speculation.

21           THE COURT:  Overruled.  You can answer.

22           THE WITNESS:  Can you repeat the question, Ms. Suarez?

23           MS. SUAREZ:  Yes.

24   BY MS. SUAREZ:

25   Q.   Is there any reason at all, whatsoever, why you would be

1    researching Mr. Fuller and his family's properties in

2    connection with the Alfie Leon lawsuit?

3    A.   No.

4    Q.   Can we scroll down to the properties, please.

5         And what does this list have on it?  Can you just read the

6    names that are on the side, all the way to the right?

7    A.   1393, LLC, William O. Fuller, Calle Ocho Marketplace,

8    Piedra Villas, LLC, William O. Fuller, 160 Sunrise, LLC,

9    Jessica Fuller, the owner, William Fuller, USA Bank NA TRS,

10   William Fuller, Miriam Fuller, Seven N.W., LLC, William Fuller,

11   Jessica M. Fuller.

12   Q.   Do those all appear to be related to Mr. Fuller and his

13   family?

14   A.   Yes.

15   Q.   Why did you compile this list?

16   A.   Carollo told me to.

17   Q.   And during your time as District 3 liaison, did

18   Commissioner Carollo tell you to research Mr. Fuller and

19   Mr. Pinilla on more than one occasion?

20   A.   Yes.

21   Q.   And did you see that their properties got a lot of

22   attention from Commissioner Carollo?

23   A.   Extremely.

24        MS. SUAREZ:  I have no further questions.

25        THE COURT:  Jury, we will be in recess until 3:15.

 1    Again, please do not discuss this case with anyone, do not form

 2    any opinion.  We will see everyone here at 3:15.  Thank you.

 3            COURTROOM DEPUTY:  All rise for the jury.

 4            (Jury exited courtroom at 2:55 p.m.)

 5            (Recess taken from 2:57 p.m. to 3:22 p.m.)

 6            COURTROOM DEPUTY:  All rise.

 7            THE COURT:  I need the witness to take the stand.

 8            MR. KUEHNE:  Judge, before he can take the stand, we're

 9    going to need to go sidebar for this witness.

10            THE COURT:  Sure.  Are you done with Mr. Miro?

11            That's why I was asking, that same witness.

12            MS. SUAREZ:  Yes.

13            (Witness excused.)

14            (Sidebar discussion held as follows:)

15            MR. PERTNOY:  So they're bring on Mr. Kunert, who's

16    expected to testify how Commissioner Carollo used the Alcohol,

17    Beverage and Tobacco Unit to raid and -- relating to Taquerias

18    -- without cause.

19            This witness was never disclosed until the pre-trial

20    stip.  I raised this issue with you at the calendar call.  You

21    allowed me to take his deposition.  I took it during trial,

22    which is prejudicial in and of itself, but putting that issue

23    aside, I then asked him about the entire amended second

24    complaint in this case.  He had no personal knowledge of that.

25            I then asked him about a declaration that he prepared

1    in the Madeline (phonetic) case, the other litigation between

2    the plaintiffs and the City, and he testified that he has no

3    personal knowledge of any of the information in it, and it's

4    all based off of other reports.

5           I have his deposition here where I can flag every

6    single item.  Now the allegations that they want to show had --

7    this guy testified about a December 15th, 2018, ABT dry-hour

8    raid and an either ABT raid, including Lartroy (phonetic), it's

9    Alcohol, Beverage, and Tobacco.

10          THE COURT:  What is ABT?

11          MR. PERTNOY:  This is the amended complaint in the

12   other litigation with the City.  If you turn to page 54, I have

13   it right here for you all.

14          The allegations of the documents they're going to use,

15   all that information are only in this complaint.

16          They're about to use this man as a non-disclosed

17   expert, who, to give fact testimony where he has no personal

18   knowledge of anything based on what he testified at his

19   deposition.  And they're going to ask him:

20          Was Commissioner Carollo targeting the plaintiffs?

21          And his testimony was he has no personal knowledge of

22   it, other than what he read in the newspaper.

23          If they're going to have --

24          THE COURT:  Show me the deposition transcript that he

25   stated he has no particular knowledge of it.

 1          MR. GUTCHESS:  Your Honor, if I may?

 2          THE COURT:  Wait a moment.

 3          Do you have any personal knowledge or any knowledge

 4   whatsoever of page 18, and is this regard to language?

 5          MR. GUTCHESS:  No, sir.

 6          THE COURT:  So you're not questioning the

 7   not-about-this topics, he has no personal knowledge?

 8          MR. GUTCHESS:  Yeah -- no, go ahead.

 9          MS. SUAREZ:  The way that Mr. Pertnoy was asking the

10   questions of the deposition, personally, you went out to

11   Taquerias -- he personally been to Taquerias.

12          He has knowledge of agents that he supervised as

13   captain of ABT.  He has a lot to note.

14          He was already seen corresponding --

15          MR. GUTCHESS:  This is what Chief Colina testified.

16   Carollo and Colina was these Taquerias raid.  This was the

17   gentleman from the ABT raid.  Hold on, this is targeting

18   their -- no violations there.

19          We're not going to go back because some politicians --

20   this is firsthand, possibly.  We're not going to ask him about

21   the Gay 8 raid limited to Taquerias and targeting on the

22   alleged alcohol license violations.

23          THE COURT:  You're not going to question related to the

24   Gay 8, that's the rule, or anything related to.

25          MS. SUAREZ:  Other than Taquerias.

1          THE COURT:  What about Taquerias?

2          MS. SUAREZ:  Agents reported to him on multiple

3    occasions that ABT had gone on -- there were no violations.

4          There were multiple e-mail exchanges between him and

5    superiors with direct communications between Commissioner

6    Carollo asking ABT to investigate.

7          And when his captain would reach out, Mr. Kuehne would

8    say, Captain, we've already gone out there, we're done.  Let me

9    send you a timeline before ABT has gone out there.

10         THE COURT:  That's not what he just told me 45 minutes

11   ago.  You tell me he's going to testify that his agency

12   investigated nothing regarding code violations?

13         MS. SUAREZ:  There's multiple instances.

14         MR. GUTCHESS:  There's multiple times, going out, going

15   out.  This is nonsense.  No violation.

16         Why are we being sent out there?  We got --

17         THE COURT:  Where in the deposition?

18         MR. PERTNOY:  If you look at page three --

19         MR. GUTCHESS:  Counsel, can you give me a copy of the

20   deposition?  If you're going to make an argument, you should

21   have made me a copy.

22         MR. PERTNOY:  You can look at page 31 as well.

23         Well, Your Honor, at the end we talk all about his

24   personal knowledge.

25         MR. GUTCHESS:  Everything I flagged, Your Honor, it's

1    something you can add to objections; his own personal

2    knowledge, willing to admit that.

3            MR. PERTNOY:  You're going to have him testify from the

4    reports?

5            MR. GUTCHESS:  He's going to testify from his -- from

6    what he saw, we're showing the e-mails.

7            MR. PERTNOY:  Which contain the reports.

8            THE COURT:  Does he have e-mails that he written

9    himself?

10           MR. GUTCHESS:  He wrote the e-mails, he wrote the

11   timeline.

12           THE COURT:  I think testimony on what he wrote and

13   based on what he knows, that's it.  It doesn't seem to be a

14   45-minute examination; as I said before, Gay 8 Festival, and

15   others, that's not coming in.

16           MR. GUTCHESS:  No, we're not going to ask him anything

17   about that, Your Honor.

18           We've been very focused in our examinations.

19           MR. PERTNOY:  Your Honor, all the allegations in this

20   complaint --

21           MR. GUTCHESS:  No, we're not.

22           THE COURT:  I'm going to terminate the direct

23   examination immediately.

24           MR. GUTCHESS:  Fair.  We're not going --

25           THE COURT:  I want to make this clear.

1      You state on the record you're not going to ask those

2  things about the allegations in the first complaint; if you do

3  it once, that's going to be the end of your direct examination.

4      MR. PERTNOY:  Judge, so we're clear, November 15th,

5  2018, dry-hour investigation, and that's in the first amended

6  complaint.

7      MR. GUTCHESS:  There's even language.

8      THE COURT:  Show it to me, in this complaint.

9      MR. GUTCHESS:  This is the whole Carollo ABT that we

10  have in the evidence repeatedly from different people.

11      THE COURT:  In trial, the evidence may conform to the

12  pleadings.  That's all right, it's perfectly fine at any trial,

13  but you're not going to go in and talk about --

14      MR. GUTCHESS:  We're not going in or anything like

15  that.

16      THE COURT:  -- gay or straight, Gay 8 Festival, and

17  other matters.  This is not a 45-minute examination, so I don't

18  think that's where we're going on how we get to the point.

19      MR. GUTCHESS:  I think it is.

20      THE COURT:  Get to the point, stop dragging it out

21  multiple times.  We're not going to do objection, objection

22  sustained, and I'm going to terminate his direct examination.

23      Clearly, you go beyond what you're supposed to do -- I

24  don't know who's going to do the direct.

25      MS. SUAREZ:  Me, Your Honor.

1          THE COURT:  If you do that, end of direct examination,

2    go the point asking -- or show him the e-mail, if you need to

3    do so, I have no personal knowledge on certain subject areas.

4          MS. SUAREZ:  This is multiple about Taquerias.  I will

5    not be asking him about things you just mentioned, but there

6    are multiple conversations with --

7          THE COURT:  That he has e-mails.

8          MR. PERTNOY:  Your Honor, his knowledge on all of it, I

9    asked him about it from reading a report about a different

10   officer, about two different officers, who then went and did

11   it.  All he's doing is regurgitating information he has no

12   personal knowledge on.

13         MR. GUTCHESS:  That's his job responsibility, to look

14   at the report.  He's saying there's nothing here.  There's no

15   violations, why do they keep sending us out, this is

16   problematic.

17         THE COURT:  Response to a request?  You can ask him

18   that, that's fine; what he did.

19         MS. SUAREZ:  He asks the captain:  "Ever sue the agents

20   that went on these rides?"

21         And when the report was going on, he asked him out

22   again to litigate, "Why are we doing this when he just went

23   out?"

24         THE COURT:  He can do that, that's fine.

25         MR. PERTNOY:  We're opening the door to the other

1   litigation by doing this, which we believe is wholly

2   inappropriate.

3        THE COURT:  Try it again.  It's going to be limited to

4   that, and we're done.

5        MS. SUAREZ:  Yes, Judge.

6        And one other matter, I believe, in the deposition,

7   they also tried to introduce questions about different memos

8   while he was in Florida, ABT, about recommendation.  He's

9   retired.  He resigned.  He was not fired, and I believe that

10  was completely relevant to this testimony as well.

11       MR. PERTNOY:  I don't remember if they were going to

12  put him on as an expert and not disclose him.

13       THE COURT:  This is not an expert.

14       MR. PERTNOY:  ABT policies and procedures on how they

15  do things.

16       THE COURT:  It's not an expert, that's the police

17  officer, his or her job, there is nothing scientific about it.

18       This is not an expert.

19       MR. PERTNOY:  Regardless of this, bolster him, this,

20  that, and the other of ABT, I get to show what his employment

21  was and how it ended.

22       I think that's fair, to challenge the credibility.

23       THE COURT:  That's fine.  Every witness' credibility is

24  also -- every single witness' credibility is always an issue.

25       I have no -- fine, thank you.  Yes, sir?

1    MR. PERTNOY:  May I take that back?

2    THE COURT:  Yes.

3    MR. PERTNOY:  Thank you, Your Honor.

4    (Sidebar concluded and the following was held in open

5  court:)

6    THE COURT:  You can bring in the jurors.

7    COURTROOM DEPUTY:  Please remain standing for the jury.

8    (Jury entered courtroom at 3:34 p.m.)

9    THE COURT:  Members of the jury are all present and

10  accounted for.

11    Plaintiff, call your next witness.

12    MS. SUAREZ:  Yes, Your Honor.

13    The plaintiffs call Mr. Michael Kunert to the stand.

14    COURTROOM DEPUTY:  Do you solemnly swear or affirm to

15  tell the truth, the whole truth, and nothing but the truth, so

16  help you God?

17    THE WITNESS:  I do.

18    COURTROOM DEPUTY:  Please state your name and spell it

19  for the record.

20    THE WITNESS:  Michael Kunert, K-U-N-E-R-T.

21    THE COURT:  Have a seat.

22    (MICHAEL KUNERT, being sworn, testified as follows:)

23                        DIRECT EXAMINATION

24  BY MS. SUAREZ:

25  Q.  Good afternoon, Mr. Kunert.

1    A.   Good afternoon.

2    Q.   Can you tell us little bit about your educational

3    background?

4    A.   I have a Bachelor's degree in Homeland Security and a

5    Master's degree in forensic psychology with a specialty on the

6    legal process.

7    Q.   And what about your professional background?

8    A.   So I have nearly three decades of law enforcement

9    experience, and I started in June of 1988 with Escambia County

10   Sheriff's Office up in the panhandle, Pensacola, Florida.

11       My first six years there, I was assigned to patrol

12   division.  Three years of that -- I was also a field training

13   officer, so I was part of a cadre of deputies that would train

14   new hires to become police officers.

15       1994 -- well, I did that for six years.  In 1994, I was

16   called up to investigations, so I started working in fraud and

17   forgery and then moved over to -- they call it crimes against

18   persons.  You all probably know it as robbery/homicide, I

19   worked there for a couple of years.

20       Same time that that happened, I was also selected for the

21   SWAT team.  Now, up there, it's a little different than it is

22   down here.  The SWAT team or SRT down here, it's not a

23   dedicated, full-time team, so I have my regular duties of being

24   an investigator, but if there was a reason for us to be called

25   out, then I would switch hats and then I would become a SWAT

1    officer.

2        I started -- when I was with SWAT, I started off as a

3    spotter, moved to sniper, eventually moved down to the ground,

4    was number one going through the door on -- I don't know how

5    many high-risk search warrants, raids, apprehensions of armed

6    or dangerous people.  We did that -- I did that for eight

7    years.  Pretty much, yeah, that was it.

8        And then I started with -- well, I went to Afghanistan in

9    2006 to 2000 -- May 2006 to May 2007 as an international police

10   advisor.  Our task there was to help train up the Afghan Police

11   Department and border police for more modern policing, more

12   western-style policing.

13       So we worked with the international community, so we worked

14   with the Danes, the Brits, the Germans -- a lot with the

15   Germans.  I was a liaison with the U.S. military, so we did

16   that for a little bit.

17       At one point, we had a base commander down in heart, there

18   was an allegation of sexual harassment, so I was sent down to

19   oversee the base until they could get a commander down there.

20   My job was to make sure that everything was still good to go,

21   that people were doing their jobs, training was going on.

22       They pulled me back to Kabul.  I was assigned to the border

23   patrol at that point.  I was supposed to go to flip over to

24   Blackwater, but there was an incident.  We won't go into that.

25       I started with ABT, the Florida Division of Alcoholic

1    Beverages and Tobacco.  I was assigned to the Miami District

2    Office.  I started there in February of 2010 as an agent.

3        My role as an agent was to -- we did inspections.  Back

4    then we did a lot of site inspections because we didn't have as

5    many inspectors as we do now.  But we conducted site

6    inspections.  We conducted regular inspections.

7        And there's two different types of inspections.  We did

8    investigations, covert and overt investigations.  We also did

9    compliance checks for Alcohol and Tobacco.

10       When I first started, right around that time, we had a real

11   problem with counterfeit cigarettes, gray-market cigarettes,

12   and it's a thing called "diversion," where duty-free cigarettes

13   make it back into the general economy here and people are

14   avoiding paying state and federal taxes.

15       So I pretty much specialized in that.  At one point, the

16   major at the time, she asked me to author some training

17   material on counterfeit products, so I did that.

18       In 2012, I was promoted to lieutenant.

19       So to kind of give you an idea, ABT kind of shifted.

20       We can investigate criminal allegations, as well as

21   regulatory allegations, and sometimes we have an administration

22   that wants to focus heavily on the criminal part.

23       So we're more interested in crimes that are occurring

24   inside licensed locations, okay.  And it's more of a safety

25   issue for patrons that are going inside these locations.

1        So, in 2012, a new administration came in.  They wanted to
2    focus on the criminal aspect of what was going on.  Because I
3    had so much -- I had 10 years of criminal investigations, I
4    kind of knew where they wanted to go.
5        So I got promoted, and we started doing vice-related
6    crimes.  So we were mostly focused on prostitution, drugs.
7        There's a statute in the beverage law, it's called
8    Solicitation of Alcoholic Beverages, okay.  That's a crime.
9        The slang term or the internal term that we call it was
10   "B girls" "beverage girls" or "bar girls," because, typically,
11   what would happen is these places would not employ females.
12   We could always tell when they were because it's -- I won't get
13   into that.
14       But anyway, the scheme was, the girls would get men to --
15   they would solicit the guys to buy drinks.  So a guy would buy
16   a small beer for $15.  The girl got 7.50 and the store got
17   7.50, and we're talking about a small seven ounce.  His beer
18   was $2.  So we investigated a lot of those types of crimes.
19       At that point, what was happening was, I was pretty much a
20   subject matter expert on the counterfeit cigarettes, because I
21   already did the training.
22       So ABT has what's called Basic Beverage School or Basic
23   Beverage Course that all new agents or inspectors go through
24   when they first get hired on.
25       And what that does is that kind of gives them an overview

1    of how to enforce the beverage laws, how licensing works, how

2    auditing works.  It's a very broad overview.

3         So, starting when I was a lieutenant, I was invited to come

4    up and teach a portion, which was the counterfeit cigarette

5    market.  When I became captain, in 2016, they had me still

6    teaching, but not nearly as much.

7         So, in 2017, we started an investigation, and it was the

8    first type of investigation that had been launched anywhere in

9    the United States at that point.

10        Our federal partners in alcohol and tobacco is the -- it's

11   the U.S. Tax and Trade Bureau, so it's TTB.

12        So if you hear me, that's what that is, it's TTB.

13        So we got with them in 2017, and we started looking at the

14   distributors and the vendors down here for what the Federal

15   Government calls "trade practice."

16        And in Florida it's referred to as "Tied House Evil."

17   Okay.  It's kind of a complicated thing, but the gist of it is,

18   manufacturers and distributors cannot give money to a vendor

19   for a benefit.

20        So, in other words, they can't pay a vendor to be able to

21   put their product on a certain shelf so that you can see it.

22   They can't put their -- they can't pay a vendor to have more

23   taps on the bar.

24   Q.  And, Mr. Kunert, as captain --

25   A.  I'm sorry.

1  Q.  -- did you do more administrative work or were you still

2  out in the field?

3  A.  No, by that time, I was doing the administrative work.

4     As a lieutenant, I was doing a little bit of both.

5     So my daytime job was I would review reports, get

6  equipment, or whatever we needed for my guys to go out at

7  night; so then when we went out at night, I would typically

8  work as like as an assistant to them, a cover team to them,

9  provide security for them when they were working undercover.

10     As a captain, my role was more of overseeing reports,

11  overseeing operations, letting them do their job, that was the

12  way the operation was.

13     Agents would work the complaints, the investigations, brief

14  up my lieutenants and them brief up me.

15     And then decisions would be made as to whether or not

16  Tallahassee would have to be advised of whatever was going on,

17  if it was high profile -- or if it was going to be a high

18  profile or high-risk type of situation, we brief them up.

19     But my role was -- as a matter of fact, there's a policy

20  that prevented me from actually working investigations or being

21  involved on the ground.

22     I could review reports, and I could, you know, whatever

23  preliminary, but I could not go to the ground and physically

24  witness it.

25  Q.  And as captain, how many licensees did you oversee?

1  A.   Our jurisdiction, area of responsibility, was Miami-Dade

2  and Monroe County, and we had, roughly, 8900 licensed

3  locations, give or take, but it was usually -- we were third in

4  the state behind Orlando and Tampa, so we had about 8900 to

5  9,000.

6  Q.   And how many agents did you supervise?

7  A.   Well, when I first became captain, we had 12 agents and six

8  to seven inspectors.  When I retired in December, I only had

9  six agents, still doing the same number of work, as a matter of

10 fact, we had more complaints, but I only had six.

11 Q.   And would your agents keep you updated in realtime?

12 A.   Yes, mostly, if the case was a high profile or if it was a

13 high risk, or something outside of the normal, I'm doing

14 inspections, or they're going to do complaints, checks, or

15 something like that, they would just brief up their

16 lieutenants, and usually that was the result of whatever.

17     But if we received something that was -- that I would think

18 that Tallahassee would be involved in or would want -- may have

19 to answer to, like I said, the governor or the secretary, then

20 I would go to -- typically, go right to the agent to find out,

21 tell me what happened here so that I can brief up my higher-ups

22 because they need to get in front of it, you know, for the

23 media.

24 Q.   And did you say you retired in December of 2021?

25 A.   December of 2021.

1  Q.   And why did you leave?

2  A.   Well, I was -- so, the agency -- so, during COVID, okay,

3  there was a push internally to kind of do away with the agency,

4  that's the reason why I only had six agents.

5       There was a -- I think, when Tallahassee, when it goes to

6  legislatures it's called an LVR.  And what they do is they're

7  explaining to the legislature why they need a budget, right.

8       The administrative staff up there in Tallahassee decided

9  they wanted to kind of get away from the agents, they didn't

10 want us doing our job anymore, and so they had put in a request

11 to --

12          MR.  PERTNOY:  Objection, Your Honor.  Hearsay,

13 speculation.

14          THE COURT:  Sustained.

15 BY MS. SUAREZ:

16 Q.   Mr. Kunert, why did you personally make the decision to

17 retire?

18 A.   I was already retired.  I was in what was called DROP, a

19 Deferred Retirement Option Program, so I was already retired.

20 And one day the chief walked in and he slid two pieces of

21 paper -- it was two days after Christmas -- three days after

22 Christmas -- he slid two pieces of paper and said you have two

23 options.

24       So I said, I'll take the third option, I'll just go ahead

25 and just retire.  I was not giving a reason.  I didn't ask for

```
 1    a reason, because whatever they were going to say was not true.
 2    I gave them no reason to do what they did, they just walked in
 3    and said you have two options.
 4    Q.   And are you familiar with the plaintiffs in this case?
 5    A.   I am not.
 6    Q.   Have you heard of an establishment called "Taquerias"?
 7    A.   I have, yes.
 8    Q.   Have you ever met Mr. Bill Fuller?
 9    A.   No, ma'am.
10    Q.   Have you ever met Mr. Martin Pinilla?
11    A.   No, ma'am.
12    Q.   So talk to me about how you became aware of Taquerias.
13    A.   In December of '17 -- December of '17, one of my agents
14    received a phone call from an FDLE agent --
15            MR.  PERTNOY:  Objection.  Hearsay.
16            THE COURT:  Overruled.
17    BY MS. SUAREZ:
18    Q.   You can go ahead.
19    A.   Oh, I'm sorry.  He received a phone call from an agent --
20    from an agent with FDLE about a complaint that they had
21    received from Commissioner --
22            MR. PERTNOY:  Objection.  Now double hearsay.
23            THE COURT:  Overruled.
24            THE WITNESS:  They received a complaint from
25    Commissioner Carollo regarding an alcoholic beverage complaint.
```

1   That's not in their purview, it's not in their lane, so this

2   agent contacted Agent Moore.

3            MR. PERTNOY:  Objection.  Hearsay.

4            THE COURT:  Overruled.

5            THE WITNESS:  And he took the complaint, because it --

6   the commissioner's issue was that this establishment, this

7   license location --

8            MR. PERTNOY:  Objection.  Hearsay.  He doesn't have

9   personal knowledge of what the complaint was.

10           He's -- no foundation.

11           THE COURT:  All right.  Sustained.

12  BY MS. SUAREZ:

13  Q.   Did Mr. Moore communicate with you about what the issue was

14  at Taquerias?

15  A.   Yes, he did.

16           MR. PERTNOY:  Objection.  Hearsay.

17           THE COURT:  Overruled.

18  BY MS. SUAREZ:

19  Q.   What was the issue at Taquerias?

20           MR. PERTNOY:  Objection.  Hearsay.

21           THE COURT:  Overruled.

22           THE WITNESS:  The issue with Taquerias was they were

23  operating the location without a valid alcohol beverage

24  license.  That was the initial complaint.

25           His complaint was that the location had two floors, a

1   ground floor and a second floor, and that they were operating

2   the second floor more as a nightclub.

3   Q.   And was there any issue actually with the Taquerias and the

4   way that it was laid out?

5        MR. PERTNOY:  Objection.  Lack of foundation.  Calls

6   for speculation, and as a -

7        THE COURT:  Sustained.

8        MR.  PERTNOY:  -- and as --

9   BY MS. SUAREZ:

10  Q.   Did you review the reports that your agents created after

11  going out to Taquerias?

12       MR. PERTNOY:  Objection.  Calls for hearsay.

13       THE COURT:  Overruled.

14  BY MS. SUAREZ:

15  Q.   You can answer.

16  A.   Yes, I did review the reports.

17  Q.   And was there any issue with the second floor of Taquerias?

18       MR. PERTNOY:  Objection.  Calls for speculation,

19  hearsay.

20       THE COURT:  Sustained.

21  BY MS. SUAREZ:

22  Q.   Are there two types of licenses that ABT issues?

23  A.   Yes, there are.  Well, there's actually more, but two are

24  prevalent.

25  Q.   And can you talk to me about the 4COP SFS license?

1   A.   Okay.  So, the 4COP -- and it's Consumption On Premises --

2   and you'll hear me say "4COP," that's what it means,

3   Consumption On Premises.

4        That license is designed for when you go inside and you

5   order an alcoholic beverage, you must drink it inside the

6   location.

7        The other one is an APS, and that's a package license.

8        So think of your convenience stores, okay.  They can only

9   sell alcoholic beverages to go.  You can't consume them inside.

10       So, on a 4COP, you must consume the beverages inside.

11  Okay.  Now, there are two types of 4COPS.  So you have a 4COP

12  quota, which is a bar -- and we'll get into that later, I'm

13  sure -- and SFS is a Special Food Service license, all right.

14       That's a restaurant that has a bar there, so think of your

15  Applebee's, your Chili's, and Cheesecake Factory, you can go

16  and get a meal and you can get beer, wine, or a cocktail,

17  liquor drink.  Okay.

18  BY MS. SUAREZ:

19  Q.   Go ahead.

20  A.   Okay.  So the provisions of an SFS license is that it must

21  be 2500 square feet or more, it must be able to serve 150

22  people, okay, and that it must take place inside the license

23  location.  Those are pretty much the provisions of an SFS.

24       Oh, excuse me.  51 percent -- 51 percent of their gross

25  revenue must come from the sale of food and non-alcoholic

1   beverages, okay.

2   Q.   So does that mean that every person that has a drink there

3   also has to eat something?

4   A.   Not by State law.  Not by State law.

5       That's the reason why you can go to one of these

6   restaurants and you can go to the bar and have a drink and not

7   eat.  They may ask you, you know, would you like to see a menu,

8   but you don't have to eat there.

9   Q.   And did you say it also includes the ability to serve food?

10  A.   Yes.

11  Q.   And what does that mean?

12  A.   Just that, they have to be able to serve 150 people, okay.

13  It doesn't say they have to be able to prepare it.  It just

14  says they have to be able to serve it.

15      Now, most places have a kitchen and can do just that, but

16  there are sometimes when service doesn't necessarily mean

17  preparing the food.

18  Q.   And then what about a 4COP quota license, what are the

19  restrictions on that license?

20  A.   Pretty much the restrictions are, it has to take place

21  inside the licensed premises, whatever is on the sketch, and it

22  has to be open 210 days out of -- eight hours a day for 210

23  days out of the year.

24      So that's pretty much your bar, okay.

25  Q.   And is there any restriction on the amount of food, as far

1  as ABT is concerned?

2  A.  No, there's no restriction on it.  They have to get a

3  special food permit, because you have what's called a

4  "stand-alone bar," and typically that's bar snacks and stuff.

5       But if you wanted to be able to serve food there, then you

6  would just apply for -- it's an SSF -- and I don't know what it

7  means, but I forget.

8       But it's just like a rider that you can put on, and say,

9  Hey, not only are we going to have a bar, but we're also going

10  to be able to serve food, beyond bar food, you know, like

11  snacks, peanuts, or something like that.

12  Q.  And 2017, initially, did you become aware of what type of

13  license Taquerias had?

14  A.  Yes, I was.

15           MR. PERTNOY:  Objection.  Foundation.

16           THE COURT:  Sustained.

17  BY MS. SUAREZ:

18  Q.  How did you become aware?

19  A.  Through Agent Moore's report.

20  Q.  And what type of license was that?

21  A.  At the time, it was a 4COP SFS.

22  Q.  And did that change at some point?

23  A.  It did.  It was March of 2018.

24  Q.  And what did it change to?

25  A.  It went from an SFS --

1        MR. PERTNOY:  Objection.  Foundation.

2        THE COURT:  Overruled.

3   A.   It went from an SFS to a 4COP quota.

4   Q.   And is that the one you were just describing that has less

5   restrictions?

6   A.   That's correct.

7   Q.   And when a business changes from one license to another is

8   there any type of inspection that's done by ABT?

9   A.   Yes.  Any time you get a beverage license, we send

10  inspectors out, or agents -- back when I first started it was

11  mostly agents, but now it's mostly inspectors -- and they do

12  what's called a "site inspection," okay.

13       The site inspection is for them to get the license, so in

14  the case of an SFS, if the inspector goes out -- or the agent

15  goes out to do a site inspection, they want to make sure -- of

16  the 2500 square feet, they want to make sure they're ready or

17  they can serve 150 people, right.

18       There's a few others things, they want to make sure, you

19  know, like there's a kitchen, yeah, you got food inside there.

20       But that's pretty much what that site inspection is.

21       Once we get the site inspection done, we turn that over to

22  licensing, and then licensing will approve it.

23       Now, it's possible that they could buy what's called a

24  "temporary permit," which allows them -- and it makes our job a

25  little bit easier -- a temporary permit allows them to go ahead

1    and conduct business until they get the permanent license.

2         And, typically, what happens there is -- and it makes our

3    job easier -- is because they're already serving food.  So we

4    can go in and we can look and we can see, okay, can you serve

5    150 people?  Yeah.  Are you ready to serve food?  Yeah.

6         Okay.  So now it's just a matter, Do you have the square

7    footage, and that's usually very easy, I mean, you can measure

8    it, but usually that's done pretty easily.

9    Q.  And so when Taquerias switched from an SFS license to the

10   4COP quota license, did ABT inspect the premesis?

11   A.  We did.

12        MR. PERTNOY:  Objection.  Foundation.

13        THE COURT:  Overruled.

14        THE WITNESS:  We had to go out and conduct a second

15   site inspection.  So even though we already had an inspection

16   on the location, because it was a different license, we had to

17   go back out and make sure that, okay, it was pretty much the

18   same building structure, and they didn't really do too much

19   changing of what was on the sketch.

20   Q.  And did ABT find any violations in that inspection?

21        MR. PERTNOY:  Objection.  Foundation, calls for

22   speculation.

23        THE COURT:  Overruled.

24        THE WITNESS:  No, there were no violations found on

25   either site inspection.

1  BY MS. SUAREZ:

2  Q.  And you talked a little bit about a sketch.

3     So does the sketch need to be updated every time, for

4  example, a table was moved to a different location?

5  A.  No.

6           MR. PERTNOY:  Objection.

7           THE COURT:  What grounds?

8           MR. PERTNOY:  Speculation, foundation.

9           THE COURT:  Overruled, if he knows.

10          THE WITNESS:  Now, the only time -- the only time a --

11  I'm sorry -- a sketch needs to be updated, or what we call

12  "amended," is if there is a -- like a gross change.

13          So, for instance, you're going to allow a courtyard.

14  You're going to allow -- you're going to knock out this wall

15  and you're going to open up what used to be a storage room,

16  you're going to make that another room.  Something that was a

17  major change would require an amended sketch.

18          There's a couple of other things.

19          For instance, sometimes there's -- the city or county

20  will have an event, right.  Let's take Calle Ocho, for

21  instance.  When they have a Calle Ocho event, sometimes the

22  city will allow certain restaurants to serve alcoholic

23  beverages or food on the sidewalk, right.

24          Typically, you wouldn't see that, but on these certain

25  events, you will see that, Oh, they're allowing them to serve

1   outside.  When that happens, they have to go to the local

2   zoning department in that jurisdiction, county or city, right,

3   and get it signed off.

4        Then what they have to do is bring that to our office

5   and amend the sketch for that particular event that says we are

6   now allowed to serve on the sidewalk, or the patio, or

7   whatever.  The only restriction there is it has to be

8   contiguous with the property.

9        So, in other words, they can't say my building is here

10  and 150 feet away I'm going to be able to serve it.  It has to

11  be in some way connected.  So sometimes you'll see like a

12  courtyard or something in between two buildings, or something

13  like that.  As long as it's contiguous with that building and

14  the local jurisdiction signs off on it, then we will sign off

15  on it for that event.

16       That also applies to, like if, for instance, they want

17  to get an inspection.

18       MR. PERTNOY:  Objection, Your Honor.  We're now into a

19  narrative, 403.

20       THE COURT:  Sustained.

21  BY MS. SUAREZ:

22  Q.  Okay, Mr. Kunert, so you mentioned a complaint about an

23  illegal lounge earlier.

24       Did you review the reports of that inspection?

25  A.  I did.

1    Q.   And was there any ABT violation at Taquerias?

2         MR. PERTNOY:  Objection.

3         Lack of personal knowledge, hearsay.

4         THE COURT:  Sustained.

5    BY MS. SUAREZ:

6    Q.   Do you know what a "dry-hour operation" is?

7    A.   I do.

8    Q.   What is it?

9    A.   So the city police department conducts what's called

10   "dry-hour," and it's typically with their neighborhood

11   enhancement team.  And what they do is they get police

12   department -- and I'm going to speak generally because

13   sometimes it changes, whatever the dry hours are.

14        But generally, it's the police department, city police

15   department, it is the fire department; and when I say fire

16   department, it's like a fire chief, or somebody, not the entire

17   department, and they'll bring a person from like code

18   enforcement.  And they ask us to come along to look for

19   beverage law violations.

20        And so what happens is when they decide they want to do a

21   dry-hour, they contact us and see if we're available; if we

22   are, we get a list of those locations, because there is some

23   preliminary investigations that we can do before we go.

24        So we can review a license file to make sure it's a license

25   that's current and valid.  Are there any pending administrative

1  cases against them?  Is there a current investigation going on,

2  or something along those lines, that the agent can say, Hey,

3  we're going to go to this place on dry hour, do you need me to

4  look for any violations, specifically, to your investigation?

5       So we wanted a head's-up as to what those dry hours were

6  and the location where they were.

7  Q.   And did ABT ever participate in dry-hour operations where

8  Taqueria was a listed location?

9           MR.  PERTNOY:  Objection.  Foundation.

10          THE COURT:  I will sustain.  Rephrase the question.

11 BY MS. SUAREZ:

12 Q.   Throughout your employment, did you review documents that

13 showed you what operations ABT participated in, in the

14 City of Miami?

15 A.   Yes.

16 Q.   And did those include Taquerias?

17 A.   Yes, they did.

18 Q.   Did ABT find any violations at Taquerias during these

19 dry-hour inspections?

20          MR. PERTNOY:  Objection.  Hearsay, lack of personal

21 knowledge, foundation.

22          THE COURT:  Sustained.  Rephrase the question.

23 Q.   Throughout your employment at ABT, did you become aware of

24 violations of these dry-hour inspections?

25 A.   No, there were no violations.

 1   Q.   If we can pull up Plaintiffs' Exhibit 173 for the witness

 2   and opposing counsel.

 3        MR. PERTNOY:  Your Honor, I object, based on the

 4   reasons set forth in sidebar.

 5        THE COURT:  What is it?

 6        MR. PERTNOY:  What's that?

 7        THE COURT:  Is that the exhibit you intend to

 8   introduce, do you have a copy of it?

 9        MS. SUAREZ:  Yes, Your Honor.

10        THE COURT:  All right, objection is noted for the

11   record, it's overruled.

12        MR. PERTNOY:  Your Honor, just so, for the record, it's

13   a 15-page document.

14        THE COURT:  All they're showing is just one page.

15        MS. SUAREZ:  They're scrolling right now, Judge, it's a

16   whole e-mail thread.

17        MR. PERTNOY:  Again, we're raising the same objections

18   of relevance, hearsay, and what was raised in sidebar.

19        THE COURT:  Can we have a brief sidebar regarding this

20   issue.

21        (Sidebar discussion held as follows:)

22        THE COURT:  It's my understanding we were showing an

23   e-mail to this witness, an e-mail, and now there's some other

24   documents attached to it.  What is that about?  That wasn't

25   explained to this Court here, you can comment about an e-mail

1    that he sent.

2         MR. GUTCHESS:  The e-mails are the attachment.

3         MS. SUAREZ:  So he's sending the e-mail to his

4    supervisor, where all of the attachments of the report go to

5    (inaudible) to talk with them.

6         MR. KUEHNE:  That's not admissible.

7         MS. SUAREZ:  That's fine, Your Honor, I'll ask about

8    the e-mail and all the complaints in the thread.

9         THE COURT:  They are not admissible and not to be shown

10   to this jury.

11        MS. SUAREZ:  We can redact --

12        THE COURT:  Last time:  Those reports are not

13   admissible.  Do not show them to this jury.  All right?

14        MS. SUAREZ:  Yes, Your Honor.

15        (Sidebar concluded and the following was held in open

16   court:)

17   BY MS. SUAREZ:

18   Q.  Can you show the witness the first page?

19        Do you see this, Mr. Kunert?

20   A.  I do.

21   Q.  And what is it?

22   A.  It is an e-mail that I received from -- well, it's an

23   e-mail that I received from my chief at the time, Tom Barry,

24   and also an e-mail that I sent to my Major at the time.

25   Q.  Can we go to the second page.

1          MR. PERTNOY:  Objection, Your Honor.

2          THE COURT:  Mr. --

3          MR. PERTNOY:  Based on what we discussed at sidebar,

4    everything below the second e-mail of March 6th is what's the

5    problem.

6          THE COURT:  Sustained.

7    BY MS. SUAREZ:

8    Q.   What was this e-mail thread about, Mr. Kunert?

9          MR. PERTNOY:  Objection.

10         THE COURT:  Overruled.

11         MR. PERTNOY:  Lack of personal knowledge.

12         THE COURT:  Overruled.  You may answer.

13         THE WITNESS:  This e-mail was -- I can only speak to

14   this page?

15   BY MS. SUAREZ

16   Q.   Yes.

17   A.   Okay, to this page, this e-mail started from the director

18   at the time.  He's still director, Sterling.  He received an

19   e-mail from Damon Larry, who was the chief of licensing.

20        He was responding -- he was writing an e-mail to my --

21         MR. PERTNOY:  Objection.  Hearsay, calls for

22   speculation, lack of foundation.

23         THE COURT:  Overruled.

24         THE WITNESS:  He's e-mailing my chief.  Let me see if I

25   can -- one second, this doesn't have a timeline -- he e-mailed

1  my chief saying that --

2         MR. PERTNOY:  Objection.  Hearsay.

3         THE COURT:  Sustained.

4  BY MS. SUAREZ:

5  Q.  Let's move to Plaintiffs' Exhibit 178, please.

6         MR. PERTNOY:  Your Honor, I'm going to have the same,

7  similar objections.  Do you want to review this?

8         THE COURT:  I haven't seen it.

9         MR. PERTNOY:  Okay.

10        THE COURT:  I'm just reading it.

11        MR. PERTNOY:  Okay.

12        HE COURT:  What's the objection?

13        MR. PERTNOY:  If I can approach sidebar, Your Honor?

14        THE COURT:  Sure.

15        (Sidebar discussion held as follows:)

16        MR. PERTNOY:  So, two things, Your Honor.

17        First of all, the documentation and timeline is based

18  not off his personal knowledge, but documents or hearsay that

19  he doesn't -- that he testified he received from reports and

20  documents.

21        The second thing is he now attaches these Miami Herald

22  articles and Miami New Times articles -- and this is the

23  deposition.

24        Remember, you asked me to show you what I asked about

25  the media stuff?  So if you start here, where I highlighted,

1   here, read through there, all the way to there, you will see my

2   concern.

3           THE COURT:  The question, someone sent this e-mail?

4           MR. PERTNOY:  He prepared this e-mail not based on his

5   own personal knowledge, but based the reporting time and

6   records and reported this timeline, and did the research

7   publications in the Miami New Times and Herald from Tom Barry,

8   who, I remember, is his supervisor.

9           But this says the issue -- this is how he's going to

10  say they're targeting.  This is the -- I have -- it continues

11  to the next page, and it continues to the next page,

12  Your Honor, just so that we have --

13          MS. SUAREZ:  I can speak to it, Judge.

14          In his job he was the captain.  He reviewed what his

15  agent does, that was how he become aware of it; that's how he

16  did it; to prepare forms, agents, they go out and inspect to

17  see what was there.

18          That's the hierarchy of command organizations, which I

19  supervised, too, when his agents go out.  He reported this

20  timeline himself after reviewing this agent's work.

21          THE COURT:  You cannot show -- and I said, in a news

22  clip, news clip article, you're not going to show this to the

23  jury, that he has a news arrangement of some media, all those

24  things as well.

25          Ask him what he knows about it, if anything, what he

1    has done. You're not going to show this e-mail, what it did, it

2    showed they moved this video, what happened.  Anybody can click

3    on paper news media.  God knows that they print things that

4    aren't accurate.

5          Just ask him his knowledge based on his investigation

6    what he has discovered about the finality of some news media --

7    source of news.  That's it.

8          MS. SUAREZ:  That's fine, Your Honor.

9          You can redact the media part.  It's not the timeline

10   of incidents that establishes what he knows.

11         THE COURT:  No, you can ask him, if you would need to

12   refresh your recollection, that's fine.  You're not going to

13   show it to him.  I'm not going to let you introduce them into

14   evidence.

15         MS. SUAREZ:  All right.  Thank you.

16         (Sidebar concluded and the following was held in open

17   court:)

18   BY MS. SUAREZ:

19   Q.   Okay.  Mr. Kunert, tell me what you remember about the

20   inspections of Taquerias.

21   A.   The site inspections?

22   Q.   Yes.

23         MR. PERTNOY:  Objection.  Lack of foundation.

24         THE COURT:  Overruled.

25         THE WITNESS:  They were negative  -- I mean, there was

1    no violation.  They were given the license.  That's how I know

2    they were negative.

3    Q.   Can you walk me through kind of the different occasions

4    where ABT went out?

5              MR. PERTNOY:  Objection.  Lack of foundation.  Lack of

6    personal knowledge.

7              THE COURT:  Overruled.

8              THE WITNESS:  Why we went out?

9    BY MS. SUAREZ:

10   Q.   Just walk me through kind of a timeline.

11   A.   Okay.  So we initially got the complaint regarding -- the

12   one from Commissioner Carollo regarding the location not having

13   a license.  We went out with dry-hour with the city during a

14   dry-hour inspection.

15        When the agents got there, they found no violations.

16        One agent told me --

17             MR. PERTNOY:  Objection.  Hearsay.

18             THE COURT:  Sustained.

19             MR. PERTNOY:  And, Your Honor --

20             THE COURT:  I sustained the objection, counsel.

21             MR. PERTNOY:  There was a different issue.  I believe

22   the document is still being shown to the witness.  I don't

23   think he said that his recollection needs to be refreshed.

24             THE COURT:  Okay, you can remove that from the witness.

25   Thank you.

1   Q.   Mr. Kunert, as captain, do you supervise your agents?

2   A.   Yes, I do.

3   Q.   And do they report to you different things that occur on

4   the ground?

5   A.   They do.

6   Q.   And did --

7   A.   Most of it goes through the lieutenant, but in cases where

8   I need to know straightaway, so I can report back to

9   Tallahassee.  Then I will go to them directly and ask:

10       "Tell me what happened so I can report."

11  Q.   And was Taquerias one of those cases?

12       MR. PERTNOY:  Objection.  Lack of foundation.

13       THE COURT:  Overruled.

14       THE WITNESS:  Yes, it was.

15  BY MS. SUAREZ:

16  Q.   So can you tell me what you would know about the different

17  inspections that ABT performed on Taquerias?

18  A.   We went out with dry-hour because the complaint was that

19  they did not have a license -- an active license for that

20  location.  Under the Florida Statute for no license, it's

21  562.12, 562.12, that's operating without a license, sales of

22  alcoholic beverage without a license.

23       There's a second component to that statute that we refer to

24  as manner not permitted, okay.  Manner not permitted would be

25  on a 4COP license, what we talked about earlier, if they

 1    allowed someone to go outside with a beverage -- an alcoholic

 2    beverage, okay.

 3        So if you were in a convenience store and you bought a beer

 4    and the clerk popped it now and let you drink, that's a manner

 5    not permitted.

 6        If you're inside a restaurant and you have a glass of wine

 7    and you decide I want to go outside, and they permit you to go

 8    outside with your glass of wine, that's a manner not permitted.

 9    Okay.

10        The agents, when they went out to do the inspection,

11    already knew that the license was valid.

12            MR. PERTNOY:  Objection, he doesn't have to set a

13    foundation as to how he knows what the agents that went out

14    knew.

15            THE COURT:  Sustained.  Rephrase the question.

16    BY MS. SUAREZ:

17    Q.  Mr. Kunert, did you read the report of what the agents did

18    that first time that they went out to the Taquerias?

19    A.  I did.

20    Q.  And what did the agents tell you about the Taquerias?

21            MR. PERTNOY:  Objection.  Hearsay, lack of personal

22    knowledge.

23            THE COURT:  Sustained.

24    BY MS. SUAREZ:

25    Q.  Why was Taquerias a location that needed your direct

1    attention?

2         MR. PERTNOY:  Objection.  Lack of foundation.

3         THE COURT:  Overruled.

4         THE WITNESS:  It needed my attention because it came

5    from the commissioner.

6    BY MS. SUAREZ:

7    Q.  And why would that indicate that the captain needed to

8    review it?

9    A.  Because I was getting questions from my chief based on

10   e-mails that he sent to them.

11   Q.  And are you aware of the outcome of whether Taquerias was

12   an illegal nightclub?

13        MR. PERTNOY:  Objection.

14        THE COURT:  Overruled.

15        THE WITNESS:  It was not illegal.  There was no

16   violations found.

17   BY MS. SUAREZ:

18   Q.  And did you become aware of any other investigation done at

19   Taquerias?

20        MR. PERTNOY:  Objection.  Foundation.

21        THE COURT:  Sustained.  Rephrase the question.

22   BY MS. SUAREZ:

23   Q.  As captain, did you become aware of a complaint about

24   Taquerias being too close to a religious facility?

25        MR. PERTNOY:  Objection.  Lack of foundation.

1          THE COURT:  Overruled.

2          THE WITNESS:  I received an e-mail from my chief

3   regarding an e-mail from --

4          MR. PERTNOY:  Objection.  Hearsay.

5          THE COURT:  Overruled.

6          THE WITNESS: -- regarding an e-mail from Commissioner

7   Carollo to my chief regarding this religious location.

8   BY MS. SUAREZ:

9   Q.  And was this after there was no violation previously found

10  at Taquerias?

11         MR. PERTNOY:  Objection.  Time frame, lack of personal

12  knowledge, hearsay.

13         THE COURT:  Sustained.  Rephrase the question.

14  BY MS. SUAREZ:

15  Q.  What year was the request for, just to see if it was too

16  close to a religious facility?

17  A.  March of 2018, after we hit on it.

18  Q.  And what did you do at that point?

19  A.  I did nothing.  I was given an order from my chief that we

20  did not need to address that.

21  Q.  And why not?

22  A.  I don't know, I didn't ask.  I was told not to do anything.

23  I did nothing.

24  Q.  Typically, if ABT finds no violations, do they go back out

25  to the same location?

1        MR. PERTNOY:  Objection.  Leading.

2        THE COURT:  Overruled.

3        THE WITNESS:  No.  If there's -- if there is no

4    violations found, then there's no reason for us to go back out

5    there.

6        Now, if somebody called in a complaint regarding a

7    different violation, like, let's say, now they're selling to

8    kids, okay.  Then we would send somebody out to investigate

9    that.

10       But once we go and we don't find a violation, there's

11   no reason to go back to that location; and typically, we won't

12   conduct another inspection for a year, two or three.  It

13   depends on our workload at that time.

14       But once we find that there's no violation, there's no

15   reason for us to go back out.  There's no reason to harasses

16   the business owner.  They're just doing their job.

17       MR. PERTNOY:  Objection.

18       THE COURT:  What's the objection?

19       MR. PERTNOY:  Argumentative and putting in an opinion,

20   harassing.

21       THE COURT:  Overruled.

22   BY MS. SUAREZ:

23   Q.  And while you were captain, did you instruct your agents to

24   stop visiting Taquerias at some point?

25   A.  Yes, I did.

1    Q.   Why?

2    A.   We started to see a pattern, like I had before, we were

3    getting the -- they're called operational plans.  So we were

4    getting the ops plans from the city, and we started to notice

5    that this location kept coming up.

6         And so, at some point, I explained to my lieutenants, who

7    filtered it down to the agents, that we've already been there.

8    We don't need to keep going back.

9         We will assist with the dry-hour because there were other

10   locations, okay, but when we came to this particular location,

11   our agents would not go inside.

12        Once we've done an inspection, or a site inspection, or a

13   search, or whatever, we don't need to keep going back.  So I

14   put the word out, "We're not going back.  We'll assist the

15   city, but don't go inside."

16   Q.   And in 2020, did you become aware of another complaint

17   about Taquerias regarding the same illegal nightclub?

18            MR. PERTNOY:  Objection.  Argumentative, foundation.

19            THE COURT:  Overruled.  Overruled.

20            THE WITNESS:  I received an e-mail from another chief.

21   So the first chief Tom Barry that e-mails went to, he left in

22   -- I want to say it was October, October of '20, and we had a

23   new chief came in and had no idea what was going on.

24            So when they received an e-mail from somebody from the

25   city -- I don't remember the name -- but they received an

1  e-mail from the city regarding this location.  I then had to

2  brief-up the new chief on the history of what was going on and

3  the fact that they now had a new license -- 4COP license -- and

4  that the complaint that was being made for the -- I guess, the

5  allegations being made in that e-mail were not valid.

6  Q.   And would looking at a copy of the e-mail refresh your

7  recollection as to who from the city made the complaints?

8  A.   Yes, it would.

9       MS. SUAREZ:  Can we show only the witness Plaintiffs'

10 Exhibit 235.

11 BY MS. SUAREZ:

12 Q.   Does this refresh your recollection as to who from the city

13 sent you the e-mail?

14 A.   This e-mail went to Michael Johnson.  He was the deputy

15 secretary at the time.  I received this e-mail via a thread

16 from my chief.

17 Q.   Right.  So who from the city complained about the Taquerias

18 being an illegal nightclub?

19      MR. PERTNOY:  Objection.

20      THE COURT:  What's the objection?

21      MR. PERTNOY:  It misstates the document.  Nothing about

22 it in this document says "illegal."

23      THE COURT:  Sustained.

24 BY MS. SUAREZ:

25 Q.   Who in the city sent you an e-mail about it being used as a

1    nightclub/lounge without the appropriate license?

2         MR. PERTNOY:  Objection.  Lacks personal knowledge.

3         He didn't receive this e-mail.

4         MS. SUAREZ:  Yes, he did, Your Honor.  He's up top on

5    the thread.  Can you go up, up.

6         THE COURT:  Overruled.

7         THE WITNESS:  I'm sorry, what was the question again?

8    BY MS. SUAREZ:

9    Q.   Who from the city made the complaint?

10   A.   Oh.  Melissa Fernandez -- I'm going to take a guess --

11   Stiers, S-T-I-E-R-S, Esquire, senior advisor to the city

12   manager of the City of Miami.

13   Q.   And at this point, what type of license did Taquerias have?

14   A.   They had a Four --

15        MR. PERTNOY:  Objection.  Foundation.

16        THE COURT:  Overruled.

17        THE WITNESS:  They had a 4COP license -- 4COP quota

18   license.

19   BY MS. SUAREZ:

20   Q.   So, could they, in fact, operate as a bar with the 4COP

21   quota license?

22   A.   That's what the license is for.

23   Q.   And in all your time as an officer at ABT, did you find it

24   unusual to have a commissioner reporting issues with a

25   location?

1          MR. PERTNOY:  Objection.  Speculation.

2          THE COURT:  Sustained.

3   BY MS. SUAREZ:

4   Q.   Did you get complaints in your time at ABT?

5   A.   We did.  We received a lot of complaints.

6   Q.   And usually, who were they from?

7   A.   They were either from the auditing division for

8   administrative cases or from just private citizens; most of the

9   time business owners, like that.

10  Q.   Would you ever get complaints directly from commissioners?

11         MR. PERTNOY:  Objection.  Lack of personal knowledge,

12  beyond him personally.

13         THE COURT:  Overruled, if he knows.

14         THE WITNESS:  No, I never received a complaint from a

15  city commissioner, county commissioner, any politician.

16  BY MS. SUAREZ:

17  Q.   And did receiving one concern you in any way?

18         MR. PERTNOY:  Objection.

19         THE COURT:  Sustained.

20  BY MS. SUAREZ:

21  Q.   Did you find it unusual that a commissioner would reach out

22  directly to ABT?

23         MR. PERTNOY:  Objection.

24         THE COURT:  Sustained.

25  BY MS. SUAREZ:

1    Q.   Mr. Kunert, how long did you work at ABT?

2    A.   Almost 12 years.

3    Q.   Did you ever see a commissioner reach out to Tallahassee

4    with a complaint?

5         MR. PERTNOY:  Objection.  Asked and answered.

6         THE COURT:  Overruled.

7         THE WITNESS:  Not that I'm aware of.  It never happened

8    while I was captain.

9    BY MS. SUAREZ:

10   Q.   So, with your experience at ABT, would you find it unusual

11   for a commissioner to report something to Tallahassee?

12        MR. PERTNOY:  Objection.  Calls for an opinion,

13   speculation.

14        THE COURT:  Overruled.

15        THE WITNESS:  I'm sorry, what was it again?

16   BY MS. SUAREZ:

17   Q.   So, based on your experience at ABT for 11 years, would you

18   find it unusual for a commissioner to directly report something

19   to Tallahassee?

20   A.   On a status location, yes.

21        MS. SUAREZ:  I have no further questions, Judge.

22        THE COURT:  Cross-examination?

23        MR. PERTNOY:  Your Honor, can I get a restroom break

24   real quick?

25        THE COURT:  Sure.

1          MR. PERTNOY:  Thank you.

2          THE COURT:  Does the jury need a break, too, as well?

3   Wait -- remember my rules on Day 1, you've got to -- I told you

4   -- do you remember? -- that I can't read your mind?

5          THE JURY:  We need to take advantage of the

6   opportunity.

7          THE COURT:  All right, take advantage of the

8   opportunity.  All right, we will see you in about five

9   minutes -- more like 10 minutes.

10         (Jury exited courtroom at 4:27 p.m.)

11         (Recess taken from 4:27 p.m. to 4:43 p.m.)

12         (Jury entered courtroom at 4:43 p.m.)

13         THE COURT:  Members of the jury is all present and

14   accounted for.  Please be seated.

15         Is the air fine for you all now?

16         I see the jackets off and everything now.

17         Mr. Pertnoy, you may proceed, sir.

18         MR. PERTNOY:  Thank you, Your Honor.

19                      CROSS-EXAMINATION

20   BY MR. PERTNOY:

21   Q.  Good afternoon, Mr. Kunert.  You and I have met before.

22   You and I met last week where I took your deposition.

23       Do you recall that?

24   A.  I do.  Yes, sir.

25   Q.  And in an effort to save a little bit of time, you recall

1  that I went through the second amended complaint with you, and

2  you told me that you didn't have personal knowledge regarding

3  those issues; correct?

4  A.  Based on your definition, yes, sir.

5  Q.  Okay.  And I want to talk to you about your testimony.

6  A.  Okay.

7  Q.  So one of the things -- I just want to make sure that I

8  heard it correctly, and the like -- is you indicated that you

9  left ABT in December of 2021, and you were presented with an

10  option to either quit or be fired, and you chose option

11  Number 3, which was to retire; is that correct?

12  A.  That's correct.

13  Q.  Now, another thing that you testified about was that the --

14  you were aware of a singular complaint by Commissioner Carollo

15  in December of 2021; correct?

16  A.  I'm sorry?

17  Q.  I think you indicated -- sorry, not December '21.

18      You indicated that you were aware of a -- your testimony

19  was you were aware of a complaint from Commissioner Carollo

20  sometime in December of 2000 -- I think it was '18 -- or '17?

21  A.  '17.

22  Q.  '17, thank you for the clarification.

23      And you're aware that Commissioner Carollo, like everybody

24  else, is a citizen of Miami, in Florida; correct?

25  A.  I am.

1  Q.  And so whether he's a commissioner or whether he is just a

2  regular citizen, everybody has a right to make a complaint;

3  correct?

4  A.  That's correct.

5  Q.  And I think you testified that regardless of who makes the

6  complaint, ABT takes all complaints serious and goes and checks

7  out what the complaint is about and then makes its own

8  independent determination of yeah or nay on that complaint;

9  correct?

10  A.  That is correct.

11  Q.  And Commissioner Carollo didn't tell you what to do;

12  correct?

13  A.  He did not, correct.

14  Q.  Okay.  You also talked a little bit about dry-hour

15  operations, and those are pretty standard, routine, and common

16  things that occur between the various law enforcement agencies,

17  whether it be fire, code, ABT, and the like; correct?

18  A.  I have --

19  Q.  Let me see if I can rephrase that to be a little bit more

20  clear.

21      So dry-hour operations, those occur frequently and

22  regularly throughout the City of Miami during your tenure;

23  correct?

24  A.  They started up when I was captain.  I don't know if they

25  were doing it before, because when I was a lieutenant, we never

1   went out with them.

2   Q.   Sure.

3   A.   So they started right around that time in 2017.

4        There was a lull during COVID because nobody was open, and

5   then it picked back up after COVID.

6   Q.   Sure.  And but those were -- when you were a captain in

7   2017, those were operations that occurred city-wide, as far as

8   you understood it; correct?

9   A.   No -- well -- I'm not sure what the city's jurisdiction is.

10  They occurred mostly in the entertainment district, so that's

11  within the city, but not all over the city.

12       There were sometimes we went to Coconut Grove.

13  Q.   Okay.  Or you may have gone to Brickell or maybe Wynwood?

14  A.   I don't remember going to Brickell.

15       We may have gone to Wynwood.

16  Q.   Okay.

17  A.   But mostly it was in the entertainment district, because

18  those places were opened a lot later.

19  Q.   And I imagine that when you go, the team that's assembled,

20  there's six or seven officers of varying -- from fire to code

21  to ABT, who are part of that team; correct?

22  A.   I was never on the ground to witness that.

23  Q.   Okay, no problem.  But they would have a list of locations

24  and they would go to various and multiple locations; correct?

25  A.   That's correct.

1    Q.   Now, you also testified -- or sorry -- I should say that

2    you were shown, to refresh your recollection, an e-mail in 2020

3    regarding some complaints that were received from -- I think it

4    was a Ms. Stiers from the City of Miami; correct?

5    A.   I was; yes, sir.

6    Q.   And to be clear, that was coming from Ms. Stiers from the

7    city manager's office, city administration, not from

8    Commissioner Carollo; correct?

9    A.   I wouldn't know.   I just know that that e-mail, it was

10   attached to the e-mail that I received came from her.

11   Q.   Now, finally, you talked a little bit about this idea of

12   4COP SFX and quota license, and I want to kind of focus on the

13   4COP SFX for a moment.

14        You said, if I heard it correctly, that you have to have

15   2500 square feet.   You have to have the ability to serve 150

16   people, and then 51 percent of your revenue has to be from

17   non-alcoholic and food service; correct?

18   A.   That's correct.

19   Q.   And I think you even gave the example of, like, Applebee's

20   and Chile's as being examples of that; correct?

21   A.   Those are SFS licenses, yes.

22   Q.   Okay.   And so I just wanted to better understand the

23   parameters of what that universe looks like.

24        So, for example, you have an Applebees or a Chile's or --

25   strike that.

1        Let's assume you have, just say, a 2500 square foot

2   commercial space, you know, that has -- by city standards is

3   able to be a restaurant to bar license and the like, as long as

4   it has 2500 square feet and, let's say, its kitchen is, you

5   know,  hot plates and microwaves, but there's a McDonald's

6   nearby where they can bring in Happy Meals and serve those

7   McDonald's Happy Meals to 150 people, as long as those Happy

8   Meals are up-charged to be 100 and -- to be 51 percent of their

9   gross receipts, that would work for an SFX license?

10  A.   It's been done.  It's been done, and I explained that to my

11  chief in one of my e-mails.

12  Q.   And I think when I took your deposition, I think you said

13  that you didn't think that was appropriate, but that's how it

14  is; correct?

15  A.   I don't remember saying I didn't think it was appropriate.

16  It's a business model that we don't get involved in.

17  Q.   Okay.  And then, finally, you mentioned something about --

18  distances, where you got an e-mail about -- or somebody got an

19  e-mail about distances, and you -- but you have no knowledge

20  about distances, and you, personally, don't do any measuring of

21  distances; correct?  -- between the bar and other locations for

22  zoning; correct?

23  A.   I don't recall getting an e-mail regarding those instances,

24  but no, we don't -- I never measured.

25        MR. PERTNOY:  Your Honor, let me check my notes for a

 1   minute.  I might be done with the witness.

 2            THE COURT:  Sure.  Thank you.

 3            (Brief pause in the proceedings.)

 4            MR. PERTNOY:  Thank you for your time, Mr. Kunert.

 5   It was nice seeing you again.  No further questions.

 6            THE COURT:  Any redirect?

 7            MS. SUAREZ:  Yes, briefly, Your Honor.

 8                     REDIRECT EXAMINATION

 9   BY MS. SUAREZ:

10   Q.  Mr. Kunert, did you become aware of a complaint on December

11   11th of 2018 about Taquerias being an illegal lounge?

12   A.  I was aware of that complaint.

13   Q.  Where did that complaint come from?

14   A.  Commissioner Carollo.

15   Q.  Did ABT find any violations in that inspection?

16   A.  There were no violations found in that inspection.

17   Q.  On March 6th, 2019, did you become aware of a complaint

18   about Taquerias being too close to a church?

19   A.  I was, through the e-mail from my chief.

20   Q.  Who did that complaint come from?

21   A.  Commissioner Carollo.

22   Q.  Did these complaints come from Commissioner Carollo's

23   personal e-mail?

24   A.  No, they came from his -- Miami-Dade -- I'm sorry, the

25   Miami.gov.  And on the one e-mail, if I remember correctly, the

1   signature box had Commissioner Carollo -- and I think it's

2   District 3, I think that's his district.

3       So it came from -- those particular e-mails came from his

4   office; the authority of his office, not a personal e-mail

5   address.

6   Q.   And is that why you were looped in as captain of ABT?

7            MR. PERTNOY:  Objection.

8            THE COURT:  What's the objection?

9            MR. PERTNOY:  It's beyond the scope, and it also lacks

10  foundation and calls for speculation.

11           THE COURT:  Sustained.

12  BY MS. SUAREZ:

13  Q.   When would you be alerted to complaints as captain of ABT?

14           MR. PERTNOY:  Objection.  Beyond the scope of my cross.

15           THE COURT:  Sustained.

16  BY MS. SUAREZ:

17  Q.   Mr. Pertnoy talked about dry-hour; do you remember that?

18  A.   Yes.

19  Q.   Why did you tell your agent to stop going into Taquerias

20  for dry-hour?

21           MR. PERTNOY:  Objection.  Beyond the scope of my cross.

22           THE COURT:  Sustained.

23  BY MS. SUAREZ:

24  Q.   Did ABT participate in dry-hour?

25  A.   Yes, we did, numerous times.

1    Q.   For Taquerias?

2    A.   Yes, we did.

3    Q.   Numerous times as well?

4         MR. PERTNOY:  Objection.  Beyond the scope of my cross,

5    lacks foundation, he said he didn't participate.

6         THE COURT:  Sustained.

7    BY MR. PERTNOY:

8    Q.   To your knowledge, did ABT ever find any violations at

9    Taquerias?

10        MR. PERTNOY:  Objection.  Beyond the scope of my cross

11   and calls for lack of personal knowledge.

12        THE COURT:  Sustained.

13   BY MS. SUAREZ:

14   Q.   Just to recap, Mr. Kunert, in your time at ABT, did you

15   ever see two requests from a commissioner like the ones that

16   Mr. Mason brought up to you?

17        MR. PERTNOY:  Objection.  Beyond the scope of my cross.

18        THE COURT:  Overruled.

19        THE WITNESS:  I'm sorry?

20   BY MS. SUAREZ:

21   Q.   In your time at ABT, did you ever see complaints from a

22   commissioner, like the ones that Mr. Pertnoy talked to you

23   about, on cross?

24   A.   I was never made aware of any such e-mails from a city or

25   county official.

1          MS. SUAREZ:  No further questions.

2          THE COURT:  All right.  You may step down, sir.

3     Thank you.

4          (Witness excused.)

5          THE COURT:  Ladies and gentlemen, I will see you on

6     Monday.  Again, make sure you do not watch the news or the

7     media; do not read anything about this case; do not form any

8     opinions; keep my same instructions that I instructed you as

9     well.  I will be seeing you Monday morning, here, at nine a.m.

10    That's it.  Have a wonderful weekend.  Be safe.  Thank you.

11         COURTROOM DEPUTY:  All rise for the jury.

12         (Jury exited courtroom at 4:57 p.m.)

13         THE COURT:  The plaintiffs' next witness, are there any

14    exhibits you intend to introduce, make sure you go over

15    them with the defendants to see what's going to be stipulated

16    to or not.

17         How many witnesses on Monday?

18         MS. CAPRIO:  We believe four, Your Honor.

19         THE COURT:  Thank you.

20         COURTROOM DEPUTY:  All rise.

21         (Proceedings adjourned at 4:57 p.m.)

22

23

24

25

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

August 15th, 2023

S/Glenda M. Powers

GLENDA M. POWERS, RPR, CRR, FPR
United States District Court
400 North Miami Avenue
Miami, Florida  33128

**$**

**$15** [1] - 177:16
**$170,000** [1] - 26:15
**$2** [1] - 177:18
**$2,000** [2] - 40:9, 40:13
**$500** [3] - 38:12, 40:8, 40:11

**'**

**'17** [5] - 182:13, 212:20, 212:21, 212:22
**'18** [1] - 212:20
**'20** [1] - 206:22
**'21** [1] - 212:17
**'87** [1] - 67:18
**'95** [1] - 67:18

**1**

**1** [3] - 1:8, 8:10, 211:3
**10** [4] - 75:7, 134:19, 177:3, 211:9
**10,000** [1] - 43:10
**100** [2] - 1:22, 216:8
**10th** [1] - 7:17
**11** [1] - 210:17
**11-28-2018** [2] - 134:4, 134:5
**110** [1] - 5:7
**11th** [3] - 8:20, 8:22, 217:11
**12** [5] - 107:15, 110:7, 113:10, 180:7, 210:2
**125** [1] - 111:17
**12:10** [1] - 105:9
**12:27** [2] - 106:20, 106:22
**130** [1] - 4:11
**1393** [2] - 77:6, 164:7
**14** [1] - 97:16
**1400** [1] - 2:5
**144** [1] - 3:9
**15** [2] - 75:7, 109:21
**15-page** [1] - 194:13
**150** [7] - 185:21, 186:12, 188:17, 189:5, 191:10, 215:15, 216:7
**1549** [1] - 80:24
**15th** [5] - 53:2, 166:7, 170:4, 221:7
**16** [4] - 3:7, 4:6, 94:25, 95:2
**160** [1] - 164:8
**16741** [1] - 111:25
**169** [1] - 1:19

**16th** [3] - 55:15, 86:16, 95:3
**173** [2] - 3:12, 194:1
**178** [1] - 197:5
**17th** [10] - 30:1, 74:6, 74:7, 80:9, 82:12, 83:3, 83:9, 83:10, 83:11
**18** [3] - 80:3, 108:13, 167:4
**18-000** [1] - 112:2
**18-24190** [1] - 6:2
**18-CV-24190** [1] - 1:3
**18th** [10] - 22:14, 30:1, 80:10, 80:12, 81:8, 82:15, 84:7, 112:25, 151:12, 151:21
**19** [10] - 4:7, 21:17, 21:19, 21:22, 75:25, 104:20, 107:9, 107:12, 129:23, 130:14
**193** [2] - 53:19, 53:20
**194** [2] - 54:14, 54:16
**195** [2] - 53:1, 53:3
**1988** [1] - 174:9
**1994** [2] - 174:15
**19th** [7] - 30:1, 83:16, 83:23, 83:24, 151:16, 151:23, 163:1
**1:15** [2] - 106:7, 106:18
**1:24** [2] - 106:22, 107:4

**2**

**2** [8] - 37:19, 37:21, 38:3, 49:16, 49:20, 52:6, 54:20, 76:3
**2-18** [1] - 110:8
**2-18-2012** [1] - 110:6
**2-18-2018** [2] - 107:16, 110:6
**2-28-2018** [1] - 111:17
**200** [1] - 1:25
**2000** [2] - 175:9, 212:20
**2006** [2] - 175:9
**2007** [1] - 175:9
**201** [1] - 1:15
**2010** [1] - 176:2
**2012** [2] - 176:18, 177:1
**2014** [1] - 139:8
**2015** [1] - 126:20
**2016** [1] - 178:5
**2017** [22] - 30:1, 32:14, 36:21, 37:7, 37:19,

37:21, 38:2, 38:3, 39:7, 41:3, 41:4, 49:16, 65:21, 75:25, 78:17, 139:1, 178:7, 178:13, 187:12, 214:3, 214:7
**2018** [51] - 8:20, 8:22, 22:14, 27:15, 47:11, 52:6, 53:2, 54:20, 55:15, 58:9, 58:10, 86:16, 87:20, 88:13, 95:3, 107:15, 111:16, 112:3, 112:22, 113:10, 114:2, 114:19, 114:22, 115:11, 116:17, 126:20, 127:19, 128:11, 128:21, 129:1, 129:23, 130:14, 130:19, 135:7, 135:8, 135:25, 136:11, 137:22, 138:11, 139:1, 145:15, 145:25, 146:4, 149:24, 166:7, 170:5, 187:23, 204:17, 217:11
**2019** [1] - 217:17
**2020** [2] - 206:16, 215:2
**2021** [4] - 180:24, 180:25, 212:9, 212:15
**2022** [1] - 7:21
**2023** [2] - 1:6, 221:7
**208** [2] - 75:21, 162:18
**21** [8] - 1:6, 4:7, 53:25, 110:18, 111:2, 111:15
**210** [2] - 186:22
**211** [1] - 3:13
**2121** [1] - 1:15
**217** [1] - 3:14
**22** [2] - 7:21, 47:11
**220** [2] - 52:1, 52:4
**23** [5] - 4:10, 92:2, 92:9, 92:13
**230** [1] - 58:9
**235** [1] - 207:10
**25** [1] - 149:2
**250** [1] - 144:17
**2500** [5] - 185:21, 188:16, 215:15, 216:1, 216:4
**251** [2] - 1:8, 46:7
**26** [1] - 111:16
**26th** [4] - 111:20, 111:21, 112:22,

112:25
**28** [1] - 146:8
**29** [3] - 4:8, 115:11, 130:19
**295** [4] - 55:9, 55:10, 97:12, 103:16
**2:55** [1] - 165:4
**2:57** [1] - 165:5
**2nd** [5] - 1:15, 1:22, 23:3, 37:20, 49:18

**3**

**3** [36] - 27:13, 33:2, 33:11, 33:17, 34:1, 36:21, 37:9, 42:15, 42:24, 44:25, 50:4, 50:5, 51:8, 51:10, 51:12, 55:6, 60:11, 75:11, 77:22, 78:11, 89:25, 90:3, 92:15, 96:16, 107:25, 114:12, 117:13, 129:1, 133:6, 136:11, 144:22, 164:17, 212:11, 218:2
**3-12-2018** [1] - 22:6
**3-19-2018** [1] - 130:25
**30** [3] - 44:12, 105:8, 105:13
**30-day** [2] - 68:14, 146:16
**305** [1] - 134:14, 134:16, 134:18, 135:21
**30th** [2] - 135:8, 135:25
**31** [2] - 4:9, 168:22
**3105** [1] - 1:22
**312** [5] - 4:8, 29:3, 29:7, 29:12, 29:17
**314** [2] - 79:24, 82:8
**33127** [1] - 1:16
**33128** [2] - 2:11, 221:12
**33131** [3] - 1:19, 1:22, 1:25
**33156** [1] - 2:5
**333234** [1] - 7:21
**33345** [1] - 80:24
**36** [1] - 3:8
**37** [7] - 4:6, 16:13, 16:15, 16:16, 16:20, 86:16, 86:23
**384** [2] - 133:21, 133:25, 134:1
**387** [5] - 5:7, 110:9, 110:12
**392** [2] - 148:25, 149:4

**3:15** [2] - 164:25, 165:2
**3:22** [1] - 165:5
**3:34** [1] - 173:8
**3rd** [2] - 145:25, 146:4

**4**

**4** [6] - 7:21, 49:20, 50:16, 113:15, 141:1, 141:2
**40** [1] - 44:12
**400** [2] - 2:11, 221:11
**403** [9] - 28:7, 28:23, 33:7, 33:23, 35:22, 153:13, 156:17, 158:19, 191:19
**404** [1] - 33:7
**408** [4] - 4:11, 129:20, 130:2, 130:4
**4100** [1] - 1:25
**45** [2] - 105:9, 168:10
**45-minute** [2] - 169:14, 170:17
**4:27** [2] - 211:10, 211:11
**4:43** [2] - 211:11, 211:12
**4:57** [3] - 1:7, 220:12, 220:21
**4COP** [16] - 184:25, 185:1, 185:2, 185:10, 185:11, 186:18, 187:21, 188:3, 189:10, 201:25, 207:3, 208:17, 208:20, 215:12, 215:13
**4COPS** [1] - 185:11
**4th** [11] - 49:18, 49:19, 68:9, 87:20, 88:13, 114:19, 114:22, 114:23, 136:11, 146:10

**5**

**50** [1] - 44:12
**500** [1] - 1:19
**51** [4] - 185:24, 215:16, 216:8
**54** [1] - 166:12
**562.12** [2] - 201:21
**593** [4] - 5:6, 87:19, 87:23, 88:2
**5:00** [1] - 105:23
**5th** [4] - 68:9, 68:10, 146:10, 149:24

**6**

**6** [4] - 1:9, 65:17, 83:15
**60** [3] - 37:15, 46:8, 46:10
**6th** [5] - 23:3, 112:3, 114:23, 196:4, 217:17

**7**

**7** [8] - 4:9, 31:18, 31:23, 63:6, 85:5, 146:8, 150:23, 150:24
**7.50** [2] - 177:16, 177:17
**733** [1] - 8:10
**7:00** [1] - 136:1
**7th** [2] - 74:6, 74:9

**8**

**8** [21] - 22:14, 42:16, 42:20, 42:25, 97:1, 97:19, 97:23, 102:20, 107:16, 107:20, 108:13, 110:18, 111:16, 111:19, 112:23, 113:1, 145:2, 167:21, 167:24, 169:14, 170:16
**80s** [1] - 104:6
**88** [1] - 5:6
**8900** [2] - 180:2, 180:4
**8th** [14] - 74:6, 74:10, 80:24, 82:9, 92:7, 92:19, 92:21, 93:6, 93:10, 107:21, 111:25, 135:5, 137:14, 139:23

**9**

**9** [2] - 58:9, 58:10
**9,000** [1] - 180:5
**90-plus-year-old** [1] - 104:15
**90s** [2] - 104:7, 104:8
**9150** [1] - 2:4
**92** [1] - 4:10
**9:43** [1] - 1:7
**9:57** [1] - 15:19
**9th** [1] - 65:21

**A**

**a.m** [3] - 1:7, 15:19,
220:9
**abbreviated** [1] - 71:6
**abbreviations** [1] - 92:17
**ability** [3] - 64:2, 186:9, 215:15
**able** [11] - 86:10, 104:3, 178:20, 185:21, 186:12, 186:13, 186:14, 187:5, 187:10, 191:10, 216:3
**above-entitled** [1] - 221:5
**absolutely** [6] - 14:21, 28:1, 60:24, 69:2, 74:19, 146:23
**ABT** [45] - 166:7, 166:8, 166:10, 167:13, 167:17, 168:3, 168:6, 168:9, 170:9, 172:8, 172:14, 172:20, 175:25, 176:19, 177:22, 184:22, 187:1, 188:8, 189:10, 189:20, 192:1, 193:7, 193:13, 193:18, 193:23, 200:4, 201:17, 204:24, 208:23, 209:4, 209:22, 210:1, 210:10, 210:17, 212:9, 213:6, 213:17, 214:21, 217:15, 218:6, 218:13, 218:24, 219:8, 219:14, 219:21
**abuts** [1] - 73:5
**abutting** [1] - 98:10
**accept** [1] - 79:11
**accompanied** [1] - 135:23
**according** [1] - 66:2
**account** [3] - 52:16, 149:21
**accounted** [3] - 107:6, 173:10, 211:14
**accurate** [5] - 81:15, 83:8, 83:11, 199:4, 221:4
**accused** [2] - 160:16, 160:19
**accusing** [1] - 158:22
**act** [1] - 136:17
**acted** [1] - 7:9
**action** [3] - 85:7, 122:9, 124:4

**actions** [1] - 23:24
**active** [9] - 7:2, 7:3, 51:8, 57:23, 60:12, 76:13, 114:14, 137:17, 201:19
**actively** [3] - 47:23, 48:5, 48:9
**activities** [4] - 50:25, 70:15, 70:17, 90:3
**activity** [5] - 61:25, 62:10, 83:18, 102:22, 120:22
**actual** [1] - 124:12
**add** [1] - 169:1
**addition** [2] - 97:5, 155:2
**address** [15] - 6:18, 6:22, 9:14, 10:15, 10:18, 10:21, 11:12, 11:15, 56:19, 57:25, 89:5, 92:4, 161:16, 204:20, 218:5
**addressed** [5] - 112:14, 112:16, 112:18, 126:8, 161:21
**addressing** [1] - 89:1
**adjourned** [1] - 220:21
**administration** [4] - 141:9, 176:21, 177:1, 215:7
**administrative** [9] - 17:2, 87:9, 122:21, 127:10, 179:1, 179:3, 181:8, 192:25, 209:8
**admissible** [3] - 195:6, 195:9, 195:13
**admit** [6] - 21:20, 29:15, 31:21, 92:12, 149:16, 169:2
**admitted** [3] - 88:1, 130:3, 147:15
**adopted** [1] - 7:8
**advantage** [2] - 211:5, 211:7
**advertisement** [3] - 80:17, 80:20, 81:4
**advised** [1] - 179:16
**adviser** [1] - 38:9
**advisor** [2] - 175:10, 208:11
**affect** [1] - 10:5
**affiliation** [1] - 76:23
**affirm** [1] - 173:14
**affirmatively** [1] - 108:1
**affordable** [1] - 55:3
**Afghan** [1] - 175:10
**Afghanistan** [1] -

175:8
**African** [1] - 35:11
**Afro** [2] - 35:11, 35:19
**afternoon** [6] - 111:24, 144:5, 144:6, 173:25, 174:1, 211:21
**agencies** [2] - 24:5, 213:16
**agency** [3] - 168:11, 181:2, 181:3
**agenda** [1] - 58:17
**agent** [15] - 132:23, 137:8, 137:9, 176:2, 176:3, 180:20, 182:14, 182:19, 182:20, 183:2, 188:14, 193:2, 198:15, 200:16, 218:19
**Agent** [2] - 183:2, 187:19
**agent's** [1] - 198:20
**agents** [26] - 167:12, 168:2, 171:19, 177:23, 179:13, 180:6, 180:7, 180:9, 180:11, 181:4, 181:9, 182:13, 184:10, 188:10, 188:11, 198:16, 198:19, 200:15, 201:1, 202:10, 202:13, 202:17, 202:20, 205:23, 206:7, 206:11
**ago** [1] - 168:11
**agree** [2] - 116:24, 128:21
**agreed** [2] - 115:3, 120:5
**ahead** [14] - 14:12, 17:16, 18:11, 26:23, 29:1, 29:24, 35:15, 68:20, 81:16, 167:8, 181:24, 182:18, 185:19, 188:25
**aide** [1] - 39:18
**air** [1] - 211:15
**Albert** [1] - 19:19
**Alcohol** [3] - 165:16, 166:9, 176:9
**alcohol** [3] - 167:22, 178:10, 183:23
**Alcoholic** [2] - 175:25, 177:8
**alcoholic** [8] - 182:25, 185:5, 185:9, 185:25, 190:22, 201:22, 202:1,

215:17
**alert** [1] - 156:18
**alerted** [1] - 218:13
**Alex** [10] - 41:9, 41:15, 41:17, 41:20, 41:22, 41:23, 41:24, 42:3, 42:5
**ALF** [4] - 62:12, 62:13, 62:14, 62:20
**Alfie** [17] - 29:20, 31:12, 32:22, 37:13, 46:22, 46:23, 81:8, 81:19, 82:23, 113:19, 113:21, 113:23, 162:20, 163:6, 163:12, 163:19, 164:2
**allegation** [8] - 25:20, 27:24, 155:1, 155:24, 156:19, 157:4, 160:20, 175:18
**allegations** [19] - 12:1, 14:10, 23:13, 23:18, 122:12, 154:2, 154:20, 158:14, 159:5, 159:15, 161:8, 161:9, 166:6, 166:14, 169:19, 170:2, 176:20, 176:21, 207:5
**alleged** [4] - 14:14, 34:12, 34:23, 167:22
**allow** [8] - 9:12, 11:12, 78:24, 154:25, 155:10, 190:13, 190:14, 190:22
**allowable** [1] - 91:13
**allowed** [15] - 11:2, 12:2, 12:25, 13:16, 14:16, 14:20, 85:22, 85:23, 96:14, 116:14, 123:2, 131:24, 165:21, 191:6, 202:1
**allowing** [1] - 190:25
**allows** [2] - 188:24, 188:25
**almost** [3] - 42:13, 60:9, 210:2
**alone** [2] - 122:1, 187:4
**alongs** [3] - 70:19, 71:15, 71:16
**Amanda** [2] - 1:15, 6:7
**Ambassador** [1] - 135:2
**Amber** [2] - 2:4, 6:11
**ambiguity** [1] - 87:14
**amend** [1] - 191:5

**amended** [7] - 22:20, 165:23, 166:11, 170:5, 190:12, 190:17, 212:1
**amendments** [1] - 22:21
**America** [1] - 6:3
**American** [1] - 35:11
**Americans** [1] - 43:21
**AmericaTEVE** [1] - 135:23
**amount** [3] - 48:2, 105:7, 186:25
**AND** [1] - 149:23
**Anna** [1] - 1:14
**anonymous** [6] - 20:10, 20:16, 20:23, 21:1, 21:8, 21:15
**answer** [20] - 34:17, 35:9, 35:15, 36:16, 37:2, 38:15, 46:14, 61:12, 61:13, 79:11, 81:15, 116:14, 147:1, 152:23, 160:13, 163:21, 180:19, 184:15, 196:12
**answered** [13] - 38:21, 46:13, 49:5, 62:23, 77:25, 86:6, 94:20, 119:25, 124:14, 127:22, 141:23, 146:18, 210:5
**answering** [1] - 105:4
**answers** [1] - 59:7
**Anthony** [3] - 59:11, 59:12, 60:2
**anyway** [1] - 177:14
**apartments** [1] - 43:2
**apologize** [8] - 9:9, 47:2, 47:15, 71:9, 81:13, 133:11, 145:19, 145:23
**apologized** [1] - 109:22
**apologizing** [1] - 145:16
**appeal** [3] - 114:4, 114:5, 155:8
**Appeals** [1] - 7:6
**appear** [8] - 29:25, 30:8, 30:20, 31:15, 32:13, 147:18, 150:3, 164:12
**appearance** [2] - 135:21, 136:20
**APPEARANCES** [2] - 1:12, 2:1
**appeared** [1] - 109:3
**appearing** [1] - 150:11

**Applebee's** [2] - 185:15, 215:19
**Applebees** [1] - 215:24
**application** [6] - 125:8, 125:10, 126:1, 126:25, 127:1
**applied** [1] - 10:10
**applies** [5] - 6:25, 8:25, 10:19, 11:14, 191:16
**apply** [1] - 187:6
**appointed** [1] - 70:10
**appointment** [1] - 87:4
**appoints** [1] - 50:17
**apprehensions** [1] - 175:5
**approach** [3] - 106:12, 146:1, 197:13
**approached** [1] - 108:24
**appropriate** [4] - 119:1, 208:1, 216:13, 216:15
**appropriately** [1] - 153:11
**approval** [3] - 89:6, 89:10, 90:22
**approve** [1] - 188:22
**approved** [8] - 92:5, 92:18, 93:5, 93:10, 94:6, 97:2, 112:2
**April** [5] - 1:6, 87:20, 88:13, 137:22
**APS** [1] - 185:7
**area** [22] - 11:8, 30:20, 36:24, 42:25, 43:12, 45:12, 72:15, 86:14, 89:13, 91:11, 91:17, 100:14, 119:14, 119:16, 127:25, 131:25, 133:8, 135:5, 141:13, 151:3, 180:1
**areas** [2] - 43:17, 171:3
**argument** [3] - 145:3, 161:5, 168:20
**argumentative** [2] - 205:19, 206:18
**Armas** [1] - 86:9
**armed** [1] - 175:5
**arms** [2] - 73:25, 109:18
**arose** [1] - 77:20
**arrangement** [1] - 198:23
**arrest** [1] - 157:23
**arrested** [1] - 160:5

**arrests** [2] - 103:11, 103:12
**arrived** [1] - 30:25
**arrives** [1] - 50:14
**article** [8] - 52:15, 53:12, 54:4, 54:21, 55:2, 55:4, 55:22, 198:22
**Article** [1] - 53:7
**articles** [3] - 53:14, 197:22
**aside** [1] - 165:23
**ASME** [4] - 64:11, 64:13, 64:19, 65:12
**aspect** [4] - 7:25, 9:20, 137:15, 177:2
**assaulted** [1] - 14:4
**assembled** [1] - 214:19
**asserted** [1] - 118:14
**assertions** [1] - 144:16
**assigned** [5] - 59:11, 60:2, 174:11, 175:22, 176:1
**assignment** [1] - 60:6
**assist** [6] - 48:2, 48:23, 58:19, 89:12, 206:9, 206:14
**assistant** [8] - 19:19, 59:9, 59:12, 88:13, 89:14, 113:8, 120:6, 179:8
**assisted** [2] - 39:1, 39:4
**assisting** [2] - 38:20, 48:6
**associate** [1] - 64:23
**associated** [6] - 66:17, 74:13, 76:22, 78:5, 129:10, 131:1
**assume** [4] - 54:7, 90:23, 91:2, 216:1
**assumed** [1] - 116:20
**assumes** [1] - 131:7
**at-will** [1] - 127:6
**attached** [3] - 93:19, 194:24, 215:10
**attaches** [1] - 197:21
**attachment** [3] - 17:8, 76:10, 195:2
**attachments** [1] - 195:4
**attack** [1] - 9:11
**attempted** [1] - 145:22
**attend** [5] - 130:13, 130:18, 131:6, 131:15, 131:17
**attendance** [2] - 120:25, 160:24

**attended** [1] - 128:13
**attention** [8] - 7:16, 112:4, 120:19, 120:20, 123:20, 164:22, 203:1, 203:4
**attorney** [2] - 20:1, 48:4, 152:6
**attorneys** [2] - 25:25, 106:11
**audio** [1] - 146:17
**auditing** [2] - 178:2, 209:7
**audits** [1] - 94:16
**August** [7] - 68:9, 128:11, 128:18, 129:1, 145:25, 146:4, 221:7
**authentic** [1] - 82:5
**author** [1] - 176:16
**authority** [1] - 218:4
**Authority** [4] - 93:13, 94:9, 94:18, 145:21
**authorization** [1] - 96:9
**authorized** [2] - 93:13, 94:13
**available** [4] - 10:17, 77:1, 89:12, 192:21
**Avenue** [4] - 1:15, 2:11, 74:9, 221:11
**avenues** [1] - 154:22
**avoid** [1] - 29:2
**avoiding** [1] - 176:14
**aware** [44] - 17:7, 18:25, 28:16, 42:12, 47:4, 48:1, 48:8, 51:10, 62:14, 62:19, 63:6, 64:13, 72:2, 77:15, 80:9, 84:13, 85:17, 86:2, 90:14, 90:18, 94:15, 94:18, 103:25, 117:22, 150:11, 151:5, 182:12, 187:12, 187:18, 193:23, 198:15, 203:11, 203:18, 203:23, 206:16, 210:7, 212:14, 212:18, 212:19, 212:23, 217:10, 217:12, 217:17, 219:24
**AXS** [1] - 1:13

**B**

**Bachelor's** [1] - 174:4
**back-door** [1] - 8:3
**background** [3] - 162:13, 174:3, 174:7

**bad** [1] - 162:1
**badge** [3] - 100:18, 101:10, 106:13
**Ball** [1] - 116:21
**ball** [1] - 81:25
**Bank** [1] - 164:9
**bar** [15] - 124:7, 124:18, 177:10, 178:23, 185:12, 185:14, 186:6, 186:24, 187:4, 187:9, 187:10, 208:20, 216:3, 216:21
**Barcena** [3] - 59:11, 59:12, 60:2
**Barry** [3] - 195:23, 198:7, 206:21
**base** [3] - 44:1, 175:17, 175:19
**baseball** [1] - 52:18
**based** [24] - 7:18, 9:19, 11:11, 14:21, 41:20, 60:18, 81:3, 118:19, 121:23, 123:13, 158:19, 159:19, 166:4, 166:18, 169:13, 194:3, 196:3, 197:17, 198:4, 198:5, 199:5, 203:9, 210:17, 212:4
**Basic** [2] - 177:22
**battles** [1] - 69:14
**beat** [2] - 67:17, 67:18
**beaten** [1] - 67:2
**beautification** [1] - 56:1
**became** [7] - 119:5, 119:7, 125:6, 132:11, 178:5, 180:7, 182:12
**Beckham's** [1] - 53:7
**become** [14] - 19:6, 19:20, 28:16, 174:14, 174:25, 187:12, 187:18, 193:23, 198:15, 203:18, 203:23, 206:16, 217:10, 217:17
**beer** [4] - 177:16, 177:17, 185:16, 202:3
**BEFORE** [1] - 1:10
**beg** [1] - 113:23
**beginning** [3] - 8:6, 60:17, 63:3
**behalf** [3] - 6:8, 6:12, 51:24

**behind** [8] - 62:1, 62:4, 62:14, 62:20, 98:2, 98:4, 119:16, 180:4
**belief** [1] - 33:22
**belonged** [1] - 32:24
**below** [3] - 17:17, 129:21, 196:4
**Ben** [4] - 6:11, 36:10, 38:22, 47:15
**Benedict** [1] - 1:21
**benefit** [1] - 178:19
**Bernat** [7] - 71:1, 71:25, 72:18, 88:15, 88:17, 88:23, 140:4
**Bernat's** [1] - 71:11
**best** [3] - 59:25, 95:15, 134:21
**better** [2] - 100:22, 215:22
**between** [10] - 37:12, 74:9, 144:23, 145:3, 166:1, 168:4, 168:5, 191:12, 213:16, 216:21
**Beverage** [4] - 165:17, 166:9, 177:22, 177:23
**beverage** [11] - 177:7, 177:10, 178:1, 182:25, 183:23, 185:5, 188:9, 192:19, 201:22, 202:1, 202:2
**beverages** [4] - 185:9, 185:10, 186:1, 190:23
**Beverages** [2] - 176:1, 177:8
**beyond** [23] - 11:13, 24:11, 25:17, 27:20, 34:15, 34:16, 126:6, 149:10, 150:14, 150:15, 151:8, 152:17, 152:19, 153:8, 170:23, 187:10, 209:12, 218:9, 218:14, 218:21, 219:4, 219:10, 219:17
**big** [4] - 54:24, 119:17, 119:22
**bigger** [3] - 88:23, 108:14, 111:22
**biggest** [1] - 117:12
**Bill** [11] - 34:12, 34:24, 65:14, 68:21, 77:17, 108:24, 111:21, 112:10, 131:13, 163:16, 182:8

**birthday** [1] - 124:17
**Biscayne** [2] - 1:25, 125:14
**bit** [22] - 23:22, 25:4, 32:3, 32:4, 88:23, 97:14, 97:15, 100:22, 103:14, 108:14, 122:13, 162:9, 174:2, 175:16, 179:4, 188:25, 190:2, 211:25, 213:14, 213:19, 215:11
**Blackwater** [1] - 175:24
**blame** [1] - 157:10
**block** [1] - 71:21
**Blom** [20] - 23:11, 50:13, 50:18, 60:4, 88:20, 89:18, 89:19, 120:25, 121:5, 121:7, 121:14, 121:20, 121:23, 122:4, 123:8, 123:17, 123:21, 124:12, 126:22, 159:14
**blow** [1] - 135:10
**blow-up** [1] - 135:10
**blower** [4] - 27:6, 27:8, 152:14, 153:1
**blue** [3] - 32:10, 100:18, 151:19
**Blvd** [1] - 1:25
**Board** [15] - 12:16, 13:1, 13:2, 13:15, 13:16, 13:17, 122:5, 122:16, 122:18, 123:1, 123:2, 123:6, 123:8, 124:25, 125:2
**board** [10] - 67:21, 67:22, 69:18, 69:20, 130:10, 130:13, 131:6, 131:15
**bold** [1] - 89:21
**bolster** [1] - 172:19
**bolstering** [1] - 41:12
**border** [2] - 175:11, 175:22
**boss** [4] - 22:25, 108:25, 109:9, 109:12
**bother** [1] - 106:2
**bottom** [3] - 80:13, 134:5, 149:23
**bought** [1] - 202:3
**Boulevard** [1] - 2:4
**BOWEN** [1] - 1:24
**box** [1] - 218:1
**break** [5] - 23:22,

88:10, 149:2, 210:23, 211:2
**Brickell** [3] - 78:17, 214:13, 214:14
**brief** [9] - 90:10, 105:12, 179:13, 179:14, 179:18, 180:15, 180:21, 194:19, 207:2
**Brief** [3] - 36:5, 143:23, 217:3
**brief-up** [1] - 207:2
**briefly** [4] - 104:22, 154:17, 161:16, 217:7
**bring** [25] - 6:15, 6:17, 7:15, 8:3, 10:21, 12:2, 12:3, 12:4, 12:5, 14:12, 14:22, 15:3, 15:13, 53:10, 97:11, 105:21, 161:18, 162:1, 162:4, 165:15, 173:6, 191:4, 192:17, 216:6
**bringing** [1] - 124:3
**Brits** [1] - 175:14
**broad** [1] - 178:2
**broke** [1] - 107:8
**brought** [22] - 9:10, 48:12, 68:25, 112:4, 117:17, 120:19, 121:20, 123:20, 123:21, 123:23, 149:8, 154:8, 154:19, 154:21, 155:13, 155:16, 156:13, 156:19, 160:5, 161:17, 161:22, 219:16
**budget** [1] - 181:7
**building** [4] - 43:9, 189:18, 191:9, 191:13
**buildings** [2] - 42:21, 191:12
**built** [1] - 54:3
**Bull** [9] - 134:12, 134:14, 134:15, 134:25, 135:21, 136:16, 136:21, 162:12, 162:15
**bullshit** [3] - 19:24, 20:9, 123:25
**bunch** [3] - 82:16, 87:7, 97:22
**Bureau** [1] - 178:11
**Business** [1] - 140:24
**business** [36] - 31:2, 43:13, 52:13, 52:18,

61:25, 62:15, 62:20, 71:3, 72:3, 73:5, 74:2, 75:1, 77:7, 86:10, 90:4, 92:22, 94:7, 99:5, 102:4, 102:21, 108:9, 108:20, 109:5, 109:22, 110:21, 111:4, 126:19, 137:14, 137:15, 150:13, 188:7, 189:1, 205:16, 209:9, 216:16
**businesses** [12] - 27:5, 45:12, 45:13, 45:15, 72:4, 72:6, 72:8, 102:20, 102:23, 141:8, 145:19, 145:22
**busy** [2] - 60:12, 163:3
**buy** [3] - 177:15, 188:23
**BY** [141] - 2:9, 16:8, 16:21, 17:19, 18:10, 18:22, 21:6, 21:13, 21:23, 24:7, 24:13, 25:19, 26:11, 26:25, 27:23, 28:11, 28:25, 29:22, 30:7, 30:15, 32:9, 33:10, 33:25, 34:20, 35:17, 36:20, 37:25, 38:17, 41:14, 44:23, 47:21, 49:7, 53:5, 53:24, 56:9, 56:13, 57:14, 61:17, 63:1, 64:18, 67:6, 67:14, 70:3, 73:14, 77:14, 78:2, 79:22, 86:8, 88:12, 91:1, 92:14, 94:23, 97:17, 100:2, 102:3, 102:9, 104:18, 107:11, 110:13, 111:1, 111:7, 115:7, 116:16, 117:7, 117:16, 118:5, 126:13, 128:1, 128:5, 128:25, 129:9, 130:5, 131:10, 133:24, 134:24, 138:21, 139:13, 139:21, 144:4, 144:21, 146:3, 147:17, 147:23, 148:17, 149:18, 150:10, 150:19, 151:1, 151:10, 152:22, 153:18, 162:8, 163:11, 163:24, 173:24, 181:15,

182:17, 183:12, 183:18, 184:9, 184:14, 184:21, 185:18, 187:17, 190:1, 191:21, 192:5, 193:11, 195:17, 196:7, 196:15, 197:4, 199:18, 200:9, 201:15, 202:16, 202:24, 203:6, 203:17, 203:22, 204:8, 204:14, 205:22, 207:11, 207:24, 208:8, 208:19, 209:3, 209:16, 209:20, 209:25, 210:9, 210:16, 211:20, 217:9, 218:12, 218:16, 218:23, 219:7, 219:13, 219:20

**C**

**C.J** [1] - 39:1
**cadre** [1] - 174:13
**calendar** [1] - 165:20
**Calle** [4] - 77:7, 164:7, 190:20, 190:21
**campaign** [70] - 38:2, 38:6, 38:8, 38:9, 38:10, 38:13, 38:20, 38:23, 39:1, 39:4, 39:7, 39:8, 39:15, 39:17, 39:18, 39:20, 39:22, 39:24, 39:25, 40:1, 40:5, 40:7, 40:8, 40:11, 40:16, 40:17, 40:21, 40:25, 41:6, 41:7, 41:22, 41:25, 42:3, 42:7, 43:7, 43:12, 44:2, 45:3, 45:4, 45:20, 46:10, 46:22, 63:4, 63:6, 64:23, 65:2, 65:22, 66:2, 66:8, 69:15, 80:1, 80:9, 81:3, 81:19, 82:4, 82:20, 85:20, 85:25, 113:21, 113:23, 117:13, 117:22, 117:23, 118:6, 118:11, 118:12, 152:4, 152:9
**campaigned** [2] - 42:13, 42:16
**campaigning** [3] - 23:19, 44:17, 144:8
**campaigns** [4] - 39:9,

39:22, 41:11, 42:5
**Canaveral** [1] - 96:3
**candidacy** [1] - 64:15
**candidate** [5] - 23:20, 40:24, 42:8, 43:4, 80:25
**candidates** [2] - 37:9, 120:16
**candy** [1] - 124:7
**cannot** [7] - 11:19, 20:14, 155:5, 156:10, 158:21, 178:18, 198:21
**cap** [1] - 109:1
**capacity** [5] - 53:15, 68:1, 68:2, 107:24, 141:4
**Cape** [1] - 96:3
**Caprio** [2] - 1:14, 6:7
**CAPRIO** [5] - 12:4, 15:3, 15:7, 158:16, 220:18
**captain** [18] - 167:13, 168:7, 171:19, 178:5, 178:24, 179:10, 179:25, 180:7, 198:14, 201:1, 203:7, 203:23, 205:23, 210:8, 213:24, 214:6, 218:6, 218:13
**Captain** [1] - 168:8
**card** [2] - 31:2, 86:10
**cards** [1] - 109:22
**care** [6] - 66:10, 66:15, 82:13, 85:20, 104:12, 104:14
**careful** [1] - 159:20
**Carlucho** [1] - 135:24
**carnival** [2] - 119:17, 119:23
**Carollo** [224] - 6:3, 6:12, 11:25, 14:2, 17:6, 17:9, 17:20, 18:1, 18:4, 19:6, 19:18, 19:24, 20:7, 20:9, 20:24, 22:4, 23:2, 23:11, 23:15, 24:8, 24:16, 24:24, 28:3, 28:17, 32:17, 33:16, 33:18, 34:22, 35:19, 36:13, 36:21, 37:10, 37:13, 37:15, 37:18, 37:21, 38:1, 38:6, 38:20, 39:12, 40:6, 40:22, 42:7, 42:8, 42:12, 43:4, 43:11, 43:23, 44:2, 44:15, 44:25, 45:4, 45:17, 46:1, 46:6,

46:21, 46:24, 46:25, 47:1, 47:22, 48:3, 48:5, 48:9, 48:19, 49:8, 49:16, 50:16, 50:17, 50:24, 51:7, 51:23, 52:10, 52:17, 52:23, 53:6, 53:9, 53:13, 53:14, 53:15, 54:1, 54:10, 54:21, 55:19, 55:20, 56:6, 58:12, 58:16, 58:19, 60:21, 61:3, 62:5, 63:7, 64:20, 66:18, 67:3, 67:8, 67:11, 67:17, 67:18, 68:15, 68:21, 68:22, 68:24, 69:14, 69:16, 69:17, 70:7, 70:10, 70:22, 72:19, 72:25, 73:24, 74:8, 74:12, 75:5, 75:20, 76:2, 77:16, 84:11, 87:4, 91:4, 91:22, 94:5, 96:13, 104:14, 107:23, 108:12, 109:18, 110:2, 113:6, 113:16, 113:22, 114:9, 114:14, 115:11, 115:13, 115:17, 115:22, 115:24, 116:3, 116:5, 116:19, 117:2, 117:9, 117:18, 117:23, 118:15, 121:21, 123:14, 123:22, 123:24, 124:23, 129:21, 130:12, 130:18, 131:5, 131:14, 131:15, 131:17, 132:5, 132:23, 133:5, 135:13, 135:18, 137:2, 137:19, 138:3, 138:4, 138:10, 140:23, 141:3, 141:13, 141:15, 141:24, 144:8, 144:13, 144:17, 144:23, 146:18, 146:19, 146:21, 147:3, 148:11, 149:19, 150:3, 150:11, 151:2, 154:2, 155:15, 157:10, 157:12, 157:14, 158:6, 158:15, 160:17, 161:13, 161:14, 163:2, 164:16, 164:18,

164:22, 165:16, 166:20, 167:16, 168:6, 170:9, 182:25, 200:12, 204:7, 212:14, 212:19, 212:23, 213:11, 215:8, 217:14, 217:21, 218:1
**CAROLLO** [1] - 1:7
**Carollo's** [28] - 17:1, 22:25, 23:23, 25:9, 34:2, 36:10, 36:11, 39:7, 47:6, 50:2, 50:8, 56:24, 63:11, 64:14, 78:16, 87:14, 115:15, 117:12, 119:10, 119:12, 129:23, 135:6, 152:4, 161:23, 162:13, 162:21, 163:15, 217:22
**carrying** [1] - 109:17
**cars** [1] - 62:22
**Casamayor** [3] - 88:13, 88:19, 89:14
**CASE** [1] - 1:3
**Case** [1] - 6:2
**case** [46] - 7:10, 7:11, 7:18, 7:22, 7:23, 7:24, 7:25, 8:3, 8:6, 9:19, 9:21, 11:9, 11:23, 14:24, 14:25, 20:6, 23:20, 26:12, 40:15, 48:18, 69:3, 106:9, 113:17, 122:12, 142:5, 142:10, 143:19, 146:24, 147:1, 148:9, 153:11, 155:7, 155:8, 156:19, 158:8, 165:1, 165:24, 166:1, 180:12, 182:4, 188:14, 220:7
**cases** [5] - 116:19, 193:1, 201:7, 201:11, 209:8
**cc'ing** [1] - 17:3
**Cecil** [5] - 116:21, 117:3, 117:11, 118:16
**celebrities** [1] - 135:22
**cell** [2] - 101:5, 102:10
**cellular** [1] - 154:16
**certain** [7] - 28:2, 28:16, 44:1, 171:3, 178:21, 190:22, 190:24

**certainly** [5] - 59:15, 60:18, 75:14, 128:20, 156:8
**certified** [1] - 46:24
**certify** [1] - 221:3
**cetera** [2] - 82:19, 89:9
**CFO** [1] - 89:14
**chain** [4] - 17:5, 23:6, 81:25, 89:17
**Chain** [1] - 116:21
**chairs** [1] - 82:24
**challenge** [6] - 7:15, 47:10, 47:11, 48:8, 76:14, 172:22
**challenged** [4] - 12:25, 48:25, 122:8, 122:15
**challenges** [1] - 13:2
**challenging** [1] - 47:6
**change** [6] - 89:8, 89:9, 187:22, 187:24, 190:12, 190:17
**changes** [3] - 136:8, 188:7, 192:13
**changing** [1] - 189:19
**channels** [1] - 93:13
**charge** [4] - 62:19, 91:19, 154:22, 155:1
**charged** [1] - 216:8
**charges** [1] - 158:3
**charter** [7] - 17:4, 17:18, 87:10, 89:1, 89:20, 89:21
**check** [2] - 61:24, 216:25
**checks** [3] - 176:9, 180:14, 213:6
**Cheesecake** [1] - 185:15
**cherry** [2] - 160:6, 161:24
**cherry-pick** [1] - 160:6
**cherry-picked** [1] - 161:24
**Chief** [11] - 50:13, 50:18, 121:5, 121:13, 121:23, 122:4, 123:8, 123:17, 124:12, 126:22, 167:15
**chief** [35] - 13:3, 14:23, 50:13, 50:18, 59:8, 59:9, 59:13, 59:18, 88:20, 89:18, 93:23, 115:15, 120:6, 120:24, 121:7, 124:5, 181:20, 192:16, 195:23, 196:19,

196:24, 197:1, 203:9, 204:2, 204:7, 204:19, 206:20, 206:21, 206:23, 207:2, 207:16, 216:11, 217:19
**chief's** [1] - 120:19
**Chile's** [2] - 215:20, 215:24
**Chili's** [1] - 185:15
**chose** [3] - 158:13, 159:3, 161:21, 212:10
**chosen** [1] - 155:9
**Christmas** [3] - 138:14, 181:21, 181:22
**church** [6] - 91:11, 91:17, 94:1, 94:12, 217:18
**cigar** [1] - 137:25
**cigarette** [1] - 178:4
**cigarettes** [4] - 176:11, 176:12, 177:20
**Circuit** [4] - 7:13, 7:19, 7:21, 9:20
**citation** [1] - 7:20
**citations** [1] - 94:15
**cite** [1] - 31:1
**cited** [4] - 72:4, 72:6, 72:8, 73:6
**cites** [2] - 87:10, 87:11
**citizen** [9] - 37:22, 40:20, 58:24, 59:4, 59:21, 59:24, 60:19, 212:24, 213:2
**citizens** [4] - 56:10, 60:25, 61:5, 209:8
**city** [99] - 11:3, 12:8, 17:2, 17:4, 17:18, 18:15, 18:23, 18:25, 19:19, 20:1, 22:23, 23:7, 23:19, 24:19, 25:13, 27:2, 28:2, 36:25, 37:2, 37:18, 51:12, 51:16, 52:19, 60:23, 63:11, 63:14, 67:25, 70:10, 70:16, 70:21, 70:23, 72:17, 72:19, 76:2, 86:24, 87:1, 87:2, 87:4, 87:7, 87:9, 88:13, 89:14, 90:19, 92:4, 103:17, 108:5, 108:17, 108:19, 111:21, 112:2, 112:17, 113:8, 113:14, 114:17, 114:18, 115:10,

115:12, 115:17, 115:18, 115:19, 115:20, 119:4, 122:12, 125:7, 132:6, 132:7, 141:4, 141:5, 141:9, 145:13, 145:15, 146:5, 155:17, 190:19, 190:22, 191:2, 192:9, 192:14, 200:13, 206:4, 206:15, 206:25, 207:1, 207:7, 207:12, 207:17, 207:25, 208:9, 208:11, 209:15, 214:7, 214:11, 215:7, 216:2, 219:24

**City** [118] - 11:6, 11:22, 12:7, 12:11, 13:19, 14:19, 19:22, 24:14, 24:16, 27:25, 28:12, 28:14, 35:20, 36:14, 36:24, 37:3, 37:5, 39:3, 48:21, 49:9, 49:11, 49:14, 50:3, 52:20, 53:8, 53:11, 53:17, 54:3, 54:6, 54:8, 54:10, 54:22, 54:25, 55:6, 55:20, 56:10, 56:21, 56:23, 57:15, 57:16, 57:22, 58:4, 58:14, 60:13, 61:22, 61:23, 64:3, 64:6, 64:9, 64:10, 64:14, 64:20, 65:11, 66:24, 67:3, 67:20, 67:21, 69:20, 70:4, 70:11, 71:6, 72:2, 72:7, 74:13, 74:25, 77:22, 84:23, 85:20, 87:20, 90:15, 90:17, 94:15, 97:2, 97:3, 98:1, 100:14, 101:7, 101:12, 101:13, 107:24, 108:9, 112:17, 114:11, 115:14, 115:15, 119:13, 120:17, 120:21, 122:15, 125:3, 125:7, 126:1, 126:23, 127:18, 132:12, 132:14, 133:6, 134:7, 135:2, 135:11, 135:16, 135:18, 136:4, 136:10, 139:4, 145:20, 149:8, 155:14, 157:13,

158:16, 166:2, 166:12, 193:14, 208:12, 213:22, 215:4
**city's** [1] - 214:9
**city-wide** [2] - 36:25, 214:7
**civil** [2] - 122:8, 158:12
**Civil** [15] - 12:15, 13:1, 13:2, 13:14, 13:16, 13:17, 122:5, 122:16, 122:18, 123:1, 123:2, 123:5, 123:8, 124:25, 125:2
**claim** [1] - 137:4
**claimed** [1] - 43:3
**clarification** [1] - 212:22
**clarify** [6] - 9:16, 88:9, 115:12, 116:11, 122:14, 154:22
**clarity** [1] - 88:25
**classic** [1] - 28:22
**cleanup** [1] - 43:10
**clear** [15] - 7:7, 12:17, 14:17, 15:3, 30:16, 61:4, 88:4, 88:6, 116:1, 132:25, 156:1, 169:25, 170:4, 213:20, 215:6
**clearly** [2] - 154:20, 170:23
**clerk** [2] - 88:10, 202:4
**click** [1] - 199:2
**client** [2] - 79:15, 160:24
**clip** [2] - 198:22
**close** [5] - 38:10, 55:8, 203:24, 204:16, 217:18
**closed** [3] - 10:25, 69:3, 146:24
**closing** [2] - 103:13, 145:21
**co** [1] - 72:18
**co-director** [1] - 72:18
**cocktail** [1] - 185:16
**Coconut** [1] - 214:12
**code** [53] - 10:2, 10:5, 10:14, 10:24, 11:2, 30:25, 34:23, 43:4, 43:6, 61:1, 61:6, 63:8, 64:1, 64:5, 65:1, 65:7, 65:9, 68:10, 71:1, 71:11, 71:25, 72:14, 72:15, 72:17, 73:4, 73:5, 73:23, 74:20, 83:19, 84:19, 84:20, 84:21,

84:23, 85:3, 85:23, 85:24, 86:9, 88:16, 96:23, 97:5, 100:15, 100:25, 101:1, 103:17, 139:14, 146:10, 150:12, 168:12, 192:17, 213:17, 214:20
**cold** [2] - 105:19, 105:20
**COLE** [1] - 2:3
**Colina** [2] - 167:15, 167:16
**collecting** [1] - 58:1
**collectively** [1] - 15:23
**coming** [9] - 11:10, 65:1, 83:19, 109:9, 123:20, 161:2, 169:15, 206:5, 215:6
**command** [4] - 17:5, 23:6, 89:17, 198:18
**commander** [2] - 175:17, 175:19
**comment** [2] - 9:3, 194:25
**commercial** [4] - 90:19, 95:22, 95:23, 216:2
**commission** [7] - 36:14, 58:17, 67:3, 115:24, 118:23, 119:2, 127:6
**Commission** [2] - 58:14, 90:3
**Commissioner** [113] - 6:12, 13:8, 13:10, 14:2, 17:3, 17:6, 17:20, 18:1, 19:6, 23:2, 24:8, 24:16, 24:24, 25:9, 28:3, 28:17, 33:16, 33:18, 34:1, 34:22, 36:11, 37:10, 50:2, 50:16, 50:17, 50:24, 51:23, 51:25, 53:16, 54:1, 56:15, 58:16, 58:20, 60:11, 61:3, 62:5, 63:7, 66:24, 68:24, 70:22, 72:19, 75:20, 87:14, 90:6, 91:4, 91:21, 93:21, 93:23, 93:24, 94:5, 96:13, 103:25, 104:14, 107:23, 107:25, 108:12, 110:2, 113:6, 113:16, 113:21, 114:9, 115:11, 115:13, 115:15, 115:22, 116:2, 117:9,

117:18, 117:23, 118:15, 119:10, 124:10, 129:23, 130:18, 135:13, 137:19, 138:3, 138:4, 138:10, 139:24, 140:23, 141:3, 141:12, 141:15, 141:24, 144:13, 146:21, 149:19, 150:3, 150:11, 154:2, 162:21, 163:2, 164:18, 164:22, 165:16, 166:20, 168:5, 182:21, 182:25, 200:12, 204:6, 212:14, 212:19, 212:23, 213:11, 215:8, 217:14, 217:21, 217:22, 218:1
**commissioner** [35] - 36:21, 36:23, 37:2, 37:19, 39:3, 40:6, 51:4, 51:8, 51:19, 61:8, 63:11, 70:23, 75:12, 76:3, 87:8, 103:23, 113:8, 116:18, 118:16, 119:12, 123:18, 124:5, 127:9, 148:12, 203:5, 208:24, 209:15, 209:21, 210:3, 210:11, 210:18, 213:1, 219:15, 219:22
**Commissioner's** [1] - 27:25
**commissioner's** [3] - 61:7, 87:13, 183:6
**Commissioners** [2] - 135:16, 135:18
**commissioners** [1] - 209:10
**committee** [1] - 80:25
**common** [1] - 213:15
**communicate** [3] - 17:25, 24:15, 183:13
**communicated** [1] - 25:12
**communicating** [1] - 85:1
**communication** [4] - 17:2, 86:18, 87:9, 90:9
**communications** [2] - 75:19, 168:5
**community** [4] -

42:24, 44:4, 109:14, 175:13
**companies** [13] - 74:14, 76:22, 77:6, 78:6, 82:1, 90:21, 92:18, 92:24, 93:1, 93:6, 93:10, 94:7, 94:19
**company** [11] - 56:22, 57:1, 57:8, 73:8, 93:1, 95:5, 111:24, 126:14, 126:17, 129:10, 137:10
**company's** [3] - 58:3, 72:9, 92:7
**compensation** [1] - 58:7
**compensative** [1] - 7:16
**compile** [1] - 164:15
**complain** [2] - 60:13, 60:25, 61:1
**complained** [2] - 61:5, 207:17
**complaining** [3] - 62:21, 101:23, 105:18
**complaint** [76] - 7:19, 19:10, 19:12, 19:15, 19:21, 19:24, 20:9, 20:24, 22:7, 24:11, 59:24, 61:9, 61:25, 62:8, 62:9, 113:5, 114:8, 114:12, 114:13, 115:11, 115:24, 115:25, 116:2, 116:4, 116:17, 116:19, 117:2, 117:8, 117:17, 117:20, 118:14, 118:17, 118:20, 119:1, 124:2, 131:4, 131:13, 152:20, 156:2, 165:24, 166:11, 166:15, 169:20, 170:2, 170:6, 170:8, 182:20, 182:24, 182:25, 183:5, 183:9, 183:24, 183:25, 191:22, 200:11, 201:18, 203:23, 205:6, 206:16, 207:4, 208:9, 209:14, 210:4, 212:1, 212:14, 212:19, 213:2, 213:6, 213:7, 213:8, 217:10,

217:12, 217:13, 217:17, 217:20
**complaint/concern** [1] - 89:4
**complaints** [43] - 20:10, 20:16, 20:23, 21:1, 21:8, 21:15, 27:1, 27:17, 58:24, 59:3, 59:21, 60:3, 60:10, 60:19, 60:20, 61:2, 62:15, 62:19, 74:25, 75:3, 75:10, 91:16, 91:19, 91:20, 91:21, 91:24, 116:8, 122:11, 133:18, 179:13, 180:10, 180:14, 195:8, 207:7, 209:4, 209:5, 209:10, 213:6, 215:3, 217:22, 218:13, 219:21
**complete** [2] - 109:25, 110:1
**completely** [4] - 11:5, 13:25, 157:11, 172:10
**compliance** [6] - 63:8, 64:1, 65:7, 74:20, 86:9, 176:9
**complicated** [1] - 178:17
**complied** [1] - 109:20
**component** [1] - 201:23
**computer** [5] - 22:22, 25:9, 25:11, 56:23, 77:1
**concept** [1] - 84:11
**concern** [5] - 25:12, 62:5, 62:10, 198:2, 209:17
**concerned** [2] - 123:17, 187:1
**concerns** [5] - 24:15, 24:21, 62:3, 89:5, 123:23
**concluded** [8] - 15:11, 79:18, 106:4, 126:11, 162:6, 173:4, 195:15, 199:16
**concocted** [2] - 124:22, 124:24
**conditions** [1] - 26:19
**conduct** [6] - 121:14, 121:24, 123:10, 189:1, 189:14, 205:12
**conducted** [2] - 176:5, 176:6

**conducts** [1] - 192:9
**conference** [4] - 20:8, 23:15, 123:22, 137:25
**conferred** [1] - 13:7
**confidentiality** [1] - 122:11
**confirmed** [1] - 148:4
**conflict** [1] - 20:3
**conform** [1] - 170:11
**confront** [1] - 161:1
**confrontation** [2] - 156:18, 161:6
**confuse** [1] - 78:22
**confused** [2] - 83:6, 122:13
**Congress** [1] - 123:25
**connected** [1] - 191:11
**connection** [4] - 115:2, 124:11, 142:5, 164:2
**consider** [1] - 66:21
**constantly** [2] - 44:3, 139:8
**constituent** [1] - 89:3
**construction** [1] - 139:15
**consume** [2] - 185:9, 185:10
**consumed** [1] - 47:5
**Consumption** [2] - 185:1, 185:3
**contact** [6] - 59:4, 65:14, 84:19, 85:3, 112:10, 192:21
**contacted** [1] - 183:2
**contacts** [1] - 89:2
**contain** [2] - 95:17, 169:7
**container** [19] - 11:1, 95:6, 95:16, 95:18, 95:21, 95:23, 95:24, 95:25, 96:13, 97:6, 98:7, 98:8, 99:3, 99:5, 99:15, 99:19, 100:6, 109:4, 110:20
**container's** [1] - 100:8
**containers** [3] - 11:4, 95:22
**contends** [1] - 131:1
**contest** [2] - 13:19, 13:21
**contested** [1] - 126:5
**contiguous** [2] - 191:8, 191:13
**continue** [6] - 15:25, 79:20, 100:10, 100:20, 102:1, 102:7
**CONTINUED** [4] - 2:1,

3:6, 16:7, 107:10
**continued** [1] - 16:5
**continues** [2] - 198:10, 198:11
**contoured** [1] - 161:5
**contours** [1] - 155:21
**contradiction** [1] - 13:4
**contrary** [1] - 161:20
**contributions** [1] - 118:8
**control** [1] - 75:2
**controversy** [1] - 101:20
**convenience** [2] - 185:8, 202:3
**conversation** [3] - 106:12, 106:15, 125:16
**conversations** [2] - 88:24, 171:6
**cooking** [2] - 102:17
**copy** [6] - 53:12, 54:4, 168:19, 168:21, 194:8, 207:6
**Coral** [4] - 77:21, 78:9, 78:10, 126:24
**cord** [1] - 99:21
**cordially** [1] - 135:19
**correct** [98] - 22:17, 33:1, 40:23, 45:19, 46:3, 48:11, 49:10, 49:15, 49:21, 50:9, 51:11, 51:14, 51:20, 53:18, 54:4, 54:23, 55:1, 55:21, 56:20, 56:23, 57:21, 58:21, 58:25, 59:11, 59:20, 60:10, 63:12, 63:15, 64:12, 65:25, 66:7, 66:23, 68:3, 72:16, 72:25, 82:5, 84:12, 85:18, 86:3, 91:7, 91:25, 92:19, 92:20, 92:23, 94:8, 94:11, 94:17, 95:14, 96:6, 96:8, 96:11, 96:15, 96:24, 99:1, 99:20, 100:19, 101:18, 103:9, 103:24, 104:12, 119:3, 126:18, 134:8, 138:12, 142:17, 143:13, 143:18, 144:25, 147:25, 148:7, 152:2, 152:9, 188:6, 212:3, 212:11, 212:12, 212:15, 212:24, 213:3, 213:4, 213:9,

213:10, 213:12, 213:13, 213:17, 213:23, 214:8, 214:21, 214:24, 214:25, 215:4, 215:8, 215:17, 215:18, 215:20, 216:14, 216:21, 216:22
**Correct** [1] - 91:9
**correctly** [8] - 76:11, 81:5, 112:20, 112:21, 137:2, 212:8, 215:14, 217:25
**corresponding** [1] - 167:14
**couch** [1] - 155:8
**counsel** [14] - 6:4, 20:5, 20:11, 20:17, 62:24, 73:12, 99:24, 104:21, 134:19, 139:10, 153:17, 168:19, 194:2, 200:20
**counsel's** [3] - 61:15, 68:18, 77:25
**counseled** [2] - 120:15, 120:24
**count** [1] - 48:24
**counterfeit** [4] - 176:11, 176:17, 177:20, 178:4
**countless** [1] - 41:11
**county** [5] - 77:2, 190:19, 191:2, 209:15, 219:25
**County** [2] - 174:9, 180:2
**Countywide** [10] - 57:23, 58:5, 126:15, 126:19, 127:19, 128:2, 128:17, 129:11, 129:14, 129:15
**countywidepi** [1] - 57:1
**countywidepi.com** [1] - 56:19
**couple** [8] - 31:9, 54:14, 55:8, 79:3, 105:15, 137:18, 174:19, 190:18
**Course** [1] - 177:23
**course** [13] - 7:10, 15:1, 18:17, 38:5, 47:10, 48:12, 48:16, 84:5, 88:11, 89:11, 89:24, 96:2, 125:23
**court** [10] - 15:12,

79:19, 106:5, 122:19, 122:20, 126:12, 162:7, 173:5, 195:16, 199:17
**COURT** [317] - 1:1, 6:9, 6:13, 6:15, 6:20, 7:3, 8:13, 8:18, 8:21, 8:23, 9:2, 9:8, 9:10, 10:5, 10:9, 10:13, 11:7, 12:6, 12:10, 12:14, 12:17, 12:24, 13:12, 13:21, 14:4, 14:8, 14:24, 15:2, 15:5, 15:9, 15:13, 15:16, 15:20, 15:24, 16:3, 16:17, 16:19, 17:13, 17:16, 18:7, 18:9, 18:19, 18:21, 21:3, 21:5, 21:11, 21:21, 24:3, 24:6, 24:12, 25:16, 25:18, 26:7, 26:10, 26:17, 26:21, 27:19, 27:22, 28:5, 28:9, 28:21, 29:14, 29:16, 30:4, 30:12, 30:14, 31:22, 33:6, 33:8, 33:21, 33:24, 34:17, 35:8, 35:14, 35:24, 36:3, 36:16, 37:24, 38:15, 41:13, 46:14, 47:20, 49:6, 53:23, 56:8, 56:12, 57:12, 61:16, 62:25, 63:22, 64:17, 67:5, 67:13, 68:19, 70:2, 72:11, 73:11, 77:13, 78:1, 79:1, 79:5, 79:15, 79:21, 81:14, 86:7, 88:1, 88:9, 90:25, 92:12, 94:22, 100:1, 104:17, 104:21, 104:24, 105:1, 105:4, 105:8, 105:14, 105:17, 105:23, 106:1, 106:6, 107:5, 110:11, 110:25, 111:6, 115:6, 116:15, 117:5, 117:15, 118:3, 120:2, 124:15, 125:17, 125:22, 126:2, 127:24, 128:4, 128:24, 129:8, 130:3, 131:9, 134:19, 134:23, 138:18, 138:20, 139:11, 139:19,

143:22, 143:25,
144:20, 146:2,
147:12, 147:16,
147:21, 148:2,
148:6, 148:16,
148:21, 149:1,
149:5, 149:14,
149:17, 150:7,
150:9, 150:16,
151:9, 152:16,
152:18, 152:21,
153:7, 153:14,
153:16, 154:8,
154:11, 154:15,
154:17, 154:19,
156:6, 157:22,
158:2, 158:9,
158:20, 159:3,
159:10, 159:15,
159:21, 159:24,
160:2, 160:5,
160:11, 160:25,
162:3, 163:8,
163:10, 163:21,
164:25, 165:7,
165:10, 166:10,
166:24, 167:2,
167:6, 167:23,
168:1, 168:10,
168:17, 169:8,
169:12, 169:22,
169:25, 170:8,
170:11, 170:16,
170:20, 171:1,
171:7, 171:17,
171:24, 172:3,
172:13, 172:16,
172:23, 173:2,
173:6, 173:9,
173:21, 181:14,
182:16, 182:23,
183:4, 183:11,
183:17, 183:21,
184:7, 184:13,
184:20, 187:16,
188:2, 189:13,
189:23, 190:7,
190:9, 191:20,
192:4, 193:10,
193:22, 194:5,
194:7, 194:10,
194:14, 194:19,
194:22, 195:9,
195:12, 196:2,
196:6, 196:10,
196:12, 196:23,
197:3, 197:8,
197:10, 197:12,
197:14, 198:3,
198:21, 199:11,
199:24, 200:7,

200:18, 200:20,
200:24, 201:13,
202:15, 202:23,
203:3, 203:14,
203:21, 204:1,
204:5, 204:13,
205:2, 205:18,
205:21, 206:19,
207:20, 207:23,
208:6, 208:16,
209:2, 209:13,
209:19, 209:24,
210:6, 210:14,
210:22, 210:25,
211:2, 211:7,
211:13, 217:2,
217:6, 218:8,
218:11, 218:15,
218:22, 219:6,
219:12, 219:18,
220:2, 220:5,
220:13, 220:19
**Court** [19] - 2:10, 2:10,
6:1, 7:5, 7:6, 9:22,
10:22, 11:18, 78:25,
79:14, 107:2, 154:7,
155:12, 156:9,
159:20, 160:13,
160:14, 194:25,
221:11
**Cross** [2] - 3:8, 3:13
**CROSS** [3] - 36:6,
107:10, 211:19
**cross-examination**
[16] - 9:10, 11:11,
12:5, 15:6, 36:3,
105:2, 149:10,
150:15, 151:7,
153:10, 154:9,
154:13, 155:11,
157:25, 158:17,
210:22
**CROSS-
EXAMINATION** [3] -
36:6, 107:10, 211:19
**Cross-Examination**
[2] - 3:8, 3:13
**cross-examined** [1] -
159:15
**cross-examining** [1] -
9:13
**CRR** [2] - 2:9, 221:10
**Cruz** [1] - 38:25
**crying** [1] - 13:5
**CTR** [1] - 118:11
**Cuban** [2] - 35:11,
43:21
**Cubans** [1] - 35:19
**Cultural** [1] - 129:17
**Culturales** [13] -
129:17, 130:7,
130:9, 130:23,
131:2, 131:14,
131:19, 131:21,
132:7, 132:11,

creating [3] - 55:2,
55:3, 122:7
**credibility** [4] -
161:12, 172:22,
172:23, 172:24
**credible** [1] - 156:3
**crime** [1] - 177:8
**crimes** [4] - 174:17,
176:23, 177:6,
177:18
**criminal** [4] - 176:20,
176:22, 177:2, 177:3
**cross** [28] - 9:10, 9:13,
10:20, 11:11, 12:5,
15:6, 36:3, 105:2,
105:6, 149:10,
150:15, 151:7,
153:10, 153:11,
153:12, 154:9,
154:13, 155:11,
157:25, 158:17,
159:15, 210:22,
218:14, 218:21,
219:4, 219:10,
219:17, 219:23

132:17, 132:20,
162:16
**current** [3] - 85:25,
192:25, 193:1
**customer** [1] - 90:12

# D

**D-3** [16] - 47:24, 49:9,
51:25, 53:16, 54:6,
55:5, 77:10, 78:18,
88:20, 89:17, 90:14,
93:12, 120:13,
120:17, 120:22,
124:11
**Dade** [2] - 180:1,
217:24
**Dadeland** [1] - 2:4
**daggering** [1] - 156:20
**damaging** [1] - 160:7
**Damon** [1] - 196:19
**dancing** [1] - 82:25
**Danes** [1] - 175:14
**dangerous** [2] -
156:20, 175:6
**Daniel** [2] - 109:4,
109:6
**dash** [1] - 76:10
**date** [24] - 22:5, 22:8,
22:16, 23:12, 47:13,
50:15, 83:18,
111:17, 112:24,
113:2, 113:3,
114:20, 114:21,
114:24, 114:25,
119:8, 121:22,
123:15, 128:18,
130:13, 134:4,
149:23, 149:25,
162:25
**dated** [1] - 110:7
**dates** [11] - 30:9,
70:24, 83:6, 83:12,
112:24, 113:13,
142:22, 142:23,
142:25, 143:1,
143:12
**daughter** [1] - 109:17
**DAVIS** [1] - 1:21
**Dawson** [2] - 2:4, 6:11
**daylight** [1] - 99:9
**days** [11] - 20:7,
51:22, 54:11, 84:1,
110:22, 142:24,
151:25, 181:21,
186:22, 186:23
**daytime** [1] - 179:5
**de** [10] - 41:9, 41:15,
41:20, 41:22, 42:3,
86:9, 108:23, 112:1,

112:5, 112:8
**De** [11] - 66:22, 66:24,
67:2, 67:7, 67:10,
67:15, 67:19, 67:24,
68:4, 69:13, 147:6
**deal** [4] - 11:4, 29:2,
54:24, 75:14
**dealing** [3] - 95:5,
104:1, 104:5
**dealings** [2] - 66:1,
148:22
**deals** [5] - 52:13,
54:16, 58:13, 87:9,
111:23
**dealt** [2] - 11:5, 59:25
**dear** [1] - 130:18
**debunked** [1] - 23:20
**decades** [1] - 174:8
**December** [31] - 23:3,
37:19, 37:20, 37:21,
38:3, 41:4, 47:4,
49:16, 49:18, 49:19,
49:20, 50:16, 75:25,
76:3, 113:15, 141:1,
162:23, 163:1,
166:7, 180:8,
180:24, 180:25,
182:13, 212:9,
212:15, 212:17,
212:20, 217:10
**decide** [3] - 155:7,
192:20, 202:7
**decided** [2] - 13:23,
181:8
**decision** [9] - 7:18,
7:19, 7:20, 13:4,
14:21, 68:24,
146:20, 155:12,
181:16
**decisions** [1] - 179:15
**declaration** [1] -
165:25
**dedicated** [1] - 174:23
**Defendant** [1] - 1:8
**defendant** [4] - 93:1,
110:9, 160:17,
160:18
**DEFENDANT** [2] -
1:17, 2:3
**DEFENDANT'S** [1] -
5:4
**defendant's** [2] - 88:2,
110:12
**defendants** [1] -
220:15
**defending** [4] - 47:23,
47:25, 48:6, 48:9
**defense** [5] - 53:3,
54:14, 54:16, 155:9,
155:10

**Defense** [13] - 52:1, 52:4, 53:1, 53:20, 55:9, 55:10, 58:8, 87:19, 87:23, 111:17, 133:21, 133:25, 134:1
**Deferred** [1] - 181:19
**definitely** [2] - 10:14, 13:22
**definition** [1] - 212:4
**degree** [2] - 174:4, 174:5
**deliberately** [1] - 160:14
**delivered** [2] - 99:17, 99:19
**denied** [5] - 35:8, 35:14, 35:24, 153:16, 158:20
**denies** [1] - 158:24
**deny** [1] - 69:6
**denying** [1] - 69:8
**Department** [2] - 125:14, 175:11
**department** [8] - 191:2, 192:9, 192:12, 192:14, 192:15, 192:16, 192:17
**departments** [1] - 112:3
**deposition** [23] - 11:23, 11:25, 14:1, 14:10, 26:2, 129:4, 129:5, 153:4, 153:24, 154:1, 157:15, 159:18, 165:21, 166:5, 166:19, 166:24, 167:10, 168:17, 168:20, 172:6, 197:23, 211:22, 216:12
**depositions** [3] - 25:25, 153:2, 153:19
**deputies** [1] - 174:13
**DEPUTY** [11] - 6:2, 15:15, 15:18, 106:19, 165:3, 165:6, 173:7, 173:14, 173:18, 220:11, 220:20
**deputy** [6] - 59:9, 59:13, 59:18, 89:14, 120:6, 207:14
**Derik** [1] - 52:12
**describe** [1] - 95:15
**described** [8] - 38:2, 38:8, 38:18, 71:10, 107:15, 132:16,

134:15
**describes** [1] - 71:15
**describing** [1] - 188:4
**description** [1] - 111:10
**designed** [2] - 9:16, 185:4
**despite** [3] - 46:23, 69:14, 144:16
**determination** [2] - 86:11, 213:8
**determine** [5] - 48:24, 59:9, 59:21, 59:24, 94:19
**determined** [3] - 7:5, 9:22, 123:11
**Diaz** [5] - 41:9, 41:15, 41:20, 41:22, 42:3
**differ** [1] - 113:23
**different** [27] - 11:5, 24:23, 51:3, 70:16, 75:19, 78:4, 79:12, 94:19, 116:12, 156:3, 156:13, 157:11, 157:24, 159:4, 170:10, 171:9, 171:10, 172:7, 174:21, 176:7, 189:16, 190:4, 200:3, 200:21, 201:3, 201:16, 205:7
**dime** [1] - 23:19
**direct** [23] - 12:5, 15:4, 16:1, 41:21, 43:3, 75:18, 95:7, 107:13, 113:5, 133:14, 138:13, 149:9, 155:5, 155:14, 155:16, 156:11, 168:5, 169:22, 170:3, 170:22, 170:24, 171:1, 202:25
**DIRECT** [2] - 16:7, 173:23
**Direct** [2] - 3:7, 3:12
**directives** [1] - 89:1
**directly** [8] - 8:10, 89:5, 106:12, 149:12, 201:9, 209:10, 209:22, 210:18
**director** [8] - 71:1, 71:11, 71:25, 72:18, 88:17, 130:22, 196:17, 196:18
**Director** [3] - 88:15, 88:23, 140:4
**directs** [1] - 89:7

**disallowed** [1] - 8:9
**disassociated** [1] - 132:11
**disbelieve** [1] - 160:23
**disclaimer** [2] - 80:14, 80:16
**disclose** [2] - 58:4, 172:12
**disclosed** [5] - 57:22, 126:22, 127:19, 165:19, 166:16
**disclosure** [1] - 57:20
**discovered** [1] - 199:6
**discuss** [4] - 11:13, 16:11, 106:8, 165:1
**discussed** [5] - 6:23, 8:13, 8:14, 153:8, 196:3
**discussing** [1] - 19:21
**discussion** [11] - 6:21, 78:15, 104:25, 125:18, 126:9, 154:18, 160:22, 162:20, 165:14, 194:21, 197:15
**dismissal** [1] - 7:7
**dismissed** [1] - 118:17
**dispute** [1] - 14:12
**disputed** [1] - 12:21
**disregard** [1] - 106:16
**disrupting** [1] - 62:3
**distance** [1] - 63:20
**distances** [4] - 216:18, 216:19, 216:20, 216:21
**distributors** [2] - 178:14, 178:18
**District** [38] - 2:10, 27:13, 33:2, 33:11, 33:17, 34:1, 36:21, 37:9, 42:15, 42:24, 44:25, 49:8, 50:4, 50:5, 51:8, 51:10, 51:12, 55:6, 60:11, 75:11, 77:22, 78:11, 89:25, 96:16, 107:25, 114:12, 117:13, 133:6, 136:11, 139:23, 140:24, 144:22, 164:17, 176:1, 218:2, 221:11
**district** [34] - 19:5, 23:1, 43:13, 43:14, 44:17, 49:25, 50:1, 50:5, 50:6, 50:25, 51:4, 51:16, 52:19, 52:21, 56:4, 62:14, 62:15, 62:17, 62:21,

70:22, 71:3, 72:3, 73:5, 74:2, 75:1, 90:4, 91:5, 92:22, 94:7, 137:15, 141:3, 214:10, 214:17, 218:2
**DISTRICT** [3] - 1:1, 1:1, 1:11
**district's** [1] - 156:25
**districts** [1] - 37:1
**diversion** [1] - 176:12
**division** [2] - 174:12, 209:7
**Division** [1] - 175:25
**docket** [1] - 148:10
**document** [10] - 16:23, 21:24, 40:4, 48:2, 107:17, 110:4, 194:13, 200:22, 207:21, 207:22
**documentation** [5] - 39:20, 94:13, 108:23, 119:1, 197:17
**documents** [7] - 79:12, 143:15, 166:14, 193:12, 194:24, 197:18, 197:20
**Domino** [5] - 131:25, 133:7, 135:5, 135:25, 137:11
**done** [19] - 9:8, 25:7, 33:15, 81:3, 108:19, 127:13, 157:1, 165:10, 168:8, 172:4, 188:8, 188:21, 189:8, 199:1, 203:18, 206:12, 216:10, 217:1
**door** [15] - 8:3, 9:3, 9:6, 10:20, 11:12, 61:8, 61:9, 62:6, 62:7, 155:4, 156:4, 156:6, 156:7, 171:25, 175:4
**doors** [3] - 44:20, 44:22, 44:24
**Doral** [7] - 69:17, 69:20, 69:21, 69:22, 69:24, 70:10, 70:11
**double** [1] - 182:22
**down** [30] - 11:1, 17:17, 23:22, 35:20, 45:21, 80:13, 82:13, 83:22, 88:23, 96:14, 103:13, 105:25, 106:21, 110:8, 112:13, 134:5,

138:1, 151:15, 162:19, 164:4, 174:22, 175:3, 175:17, 175:18, 175:19, 178:14, 206:7, 220:2
**draft** [1] - 22:11
**drafts** [3] - 108:15, 108:16, 108:19
**dragging** [1] - 170:20
**draw** [1] - 10:19
**drink** [5] - 185:5, 185:17, 186:2, 186:6, 202:4
**drinks** [1] - 177:15
**drive** [9] - 71:8, 71:9, 71:13, 71:16, 73:15, 73:19, 73:23, 74:24, 140:6
**drive-along** [7] - 71:8, 71:9, 71:13, 73:15, 73:19, 73:23, 74:24
**drive-alongs** [1] - 71:16
**drivethrough** [2] - 140:3, 140:6
**driveway/sidewalk** [1] - 100:14
**DROP** [1] - 181:18
**dropped** [2] - 11:1, 75:7
**drove** [3] - 74:5, 74:7
**drugs** [1] - 177:6
**dry** [20] - 166:7, 170:5, 192:6, 192:10, 192:13, 192:21, 193:3, 193:5, 193:7, 193:19, 193:24, 200:13, 200:14, 201:18, 206:9, 213:14, 213:21, 218:17, 218:20, 218:24
**dry-hour** [17] - 166:7, 170:5, 192:6, 192:10, 192:21, 193:7, 193:19, 193:24, 200:13, 200:14, 201:18, 206:9, 213:14, 213:21, 218:17, 218:20, 218:24
**due** [1] - 112:6
**duress** [1] - 22:4
**during** [49] - 10:11, 36:13, 38:1, 38:5, 40:24, 43:7, 43:12, 45:3, 47:16, 47:22, 48:1, 48:12, 48:22, 49:24, 50:7, 51:22,

58:22, 61:6, 65:22,
66:2, 67:19, 70:15,
70:22, 76:13, 76:17,
89:24, 95:13, 96:12,
107:13, 117:22,
117:23, 127:23,
132:15, 136:10,
138:13, 138:23,
139:3, 141:1, 141:5,
153:2, 153:19,
163:2, 164:17,
165:21, 181:2,
193:18, 200:13,
213:22, 214:4
**duties** [1] - 174:23
**duty** [1] - 176:12
**duty-free** [1] - 176:12
**dwell** [1] - 46:17
**dwelling** [1] - 8:18
**DX** [3] - 53:19, 110:9

**E**

**e-mail** [88] - 6:24,
17:1, 17:7, 17:8,
53:7, 53:9, 53:25,
55:12, 56:18, 56:24,
56:25, 57:25, 58:1,
58:2, 58:3, 58:6,
58:8, 58:12, 60:6,
76:6, 80:3, 86:16,
86:17, 87:16, 87:20,
88:19, 88:22, 89:17,
89:23, 92:3, 92:4,
93:16, 93:18, 93:25,
112:14, 112:15,
112:16, 129:20,
129:21, 130:8,
162:25, 168:4,
171:2, 194:16,
194:23, 194:25,
195:3, 195:8,
195:22, 195:23,
195:24, 196:4,
196:8, 196:13,
196:17, 196:19,
196:20, 198:3,
198:4, 199:1, 204:2,
204:3, 204:6,
206:20, 206:24,
207:1, 207:5, 207:6,
207:13, 207:14,
207:15, 207:25,
208:3, 215:2, 215:9,
215:10, 216:18,
216:19, 216:23,
217:19, 217:23,
217:25, 218:4
**e-mailed** [1] - 196:25
**e-mailing** [1] - 196:24

**e-mails** [16] - 18:2,
58:22, 75:19, 76:5,
89:16, 93:15, 169:6,
169:8, 169:10,
171:7, 195:2,
203:10, 206:21,
216:11, 218:3,
219:24
**early** [4] - 41:3, 54:11,
63:17, 63:20
**easier** [3] - 142:24,
188:25, 189:3
**easily** [1] - 189:8
**easy** [1] - 189:7
**eat** [4] - 141:6, 186:3,
186:7, 186:8
**economy** [1] - 176:13
**educational** [1] -
174:2
**effect** [5] - 8:2, 8:24,
10:16, 60:7, 66:11
**effected** [1] - 145:20
**effort** [5] - 8:3, 28:7,
40:15, 53:10, 211:25
**eight** [2] - 175:6,
186:22
**either** [7] - 59:8,
126:5, 134:11,
166:8, 189:25,
209:7, 212:10
**elaborate** [4] - 45:6,
51:1, 52:25, 140:25
**elderly** [2] - 104:1,
104:4
**elected** [9] - 40:22,
47:1, 48:3, 49:19,
74:1, 89:1, 89:2,
89:7, 135:16
**election** [21] - 37:7,
41:3, 46:2, 46:18,
46:21, 46:23, 46:25,
47:6, 47:23, 48:10,
48:12, 49:3, 69:14,
70:22, 76:13, 77:10,
80:6, 80:7, 82:4,
114:1, 144:17
**elective** [1] - 38:1
**electrical** [2] - 100:4,
100:6
**electricity** [5] - 99:17,
99:19, 99:23, 100:3,
100:23
**elements** [2] - 122:19,
122:24
**elevating** [1] - 40:17
**Eleventh** [4] - 7:13,
7:19, 7:21, 9:20
**eligible** [2] - 43:24,
125:25
**emblem** [3] - 101:15,

101:16
**Emilio** [8] - 17:3,
17:23, 24:19, 86:17,
86:23, 86:24, 87:1,
112:16
**employ** [1] - 177:11
**employed** [2] - 58:10,
129:11
**employee** [12] - 18:23,
49:11, 64:10, 101:8,
101:14, 122:15,
122:21, 125:7,
127:6, 141:4, 141:5,
156:18
**employees** [7] - 27:25,
28:2, 28:14, 28:16,
101:12, 125:3, 125:7
**employer** [2] - 57:17,
125:25
**employment** [10] -
14:18, 19:1, 49:13,
125:20, 126:25,
127:7, 127:11,
172:20, 193:12,
193:23
**enacted** [3] - 6:24,
8:11, 8:15
**end** [7] - 63:2, 63:4,
109:9, 109:14,
168:23, 170:3, 171:1
**ended** [1] - 172:21
**ending** [2] - 105:22,
112:22
**endorsed** [1] - 64:14
**enemies** [2] - 67:11,
70:7
**enforce** [2] - 64:2,
178:1
**enforcement** [12] -
30:25, 63:9, 64:5,
65:1, 65:9, 68:10,
85:24, 139:14,
146:11, 174:8,
192:18, 213:16
**enforcing** [1] - 72:17
**engaged** [1] - 121:14
**English** [1] - 31:10
**enhance** [2] - 43:10,
51:15
**enhancement** [1] -
192:11
**ensure** [1] - 17:4
**entails** [1] - 141:19
**enter** [1] - 119:13
**entered** [5] - 15:19,
107:4, 173:8, 211:12
**entertainment** [2] -
214:10, 214:17
**entire** [4] - 47:4,
145:20, 165:23,

192:16
**entitled** [6] - 156:14,
156:18, 156:23,
159:5, 160:23, 221:5
**environment** [1] -
122:8
**equipment** [1] - 179:6
**equivocation** [1] -
60:24
**Escambia** [1] - 174:9
**Esella** [1] - 62:6
**especially** [1] - 136:23
**Esq** [9] - 1:13, 1:14,
1:14, 1:15, 1:18,
1:21, 1:24, 2:3, 2:4
**Esquire** [1] - 208:11
**essentially** [3] - 8:4,
80:20, 103:8
**establish** [1] - 28:7
**established** [2] -
131:21, 161:12
**establishes** [1] -
199:10
**establishment** [2] -
182:6, 183:6
**esteemed** [1] - 56:2
**estimate** [1] - 134:22
**et** [2] - 82:19, 89:9
**ethically** [1] - 147:2
**ethics** [19] - 19:10,
19:12, 19:21, 22:7,
27:1, 113:6, 114:13,
115:10, 115:24,
115:25, 116:4,
116:7, 116:18,
118:16, 118:23,
119:1, 119:2, 131:4,
131:13
**event** [32] - 58:13,
81:8, 84:16, 84:18,
85:15, 102:22,
109:9, 109:12,
112:1, 112:4, 112:7,
132:12, 132:14,
132:20, 133:2,
133:6, 133:7, 135:4,
135:6, 135:7, 136:3,
136:7, 136:22,
137:11, 138:5,
162:13, 190:20,
190:21, 191:5,
191:15
**events** [5] - 44:11,
45:7, 82:23, 85:25,
190:25
**eventually** [1] - 175:3
**everyday** [2] - 119:19,
119:20
**EVIDENCE** [1] - 3:3
**evidence** [26] - 13:12,

14:8, 14:15, 16:20,
21:22, 29:17, 31:24,
38:14, 87:24, 88:2,
88:6, 88:8, 92:9,
92:10, 92:13, 95:1,
99:25, 110:10,
110:12, 115:5,
130:4, 131:8,
170:10, 170:11,
199:14
**Evil** [1] - 178:16
**exact** [1] - 155:21
**exactly** [4] - 69:6,
98:24, 122:4, 160:11
**exaggerate** [1] -
116:19
**EXAMINATION** [7] -
16:7, 36:6, 107:10,
144:3, 173:23,
211:19, 217:8
**examination** [39] -
9:10, 10:1, 11:11,
12:5, 15:6, 16:1,
36:3, 41:21, 43:3,
75:18, 94:25, 95:13,
105:2, 107:13,
113:5, 133:14,
138:13, 138:17,
149:9, 149:10,
150:15, 151:7,
152:17, 153:9,
153:10, 154:9,
154:13, 155:11,
155:14, 155:16,
157:25, 158:17,
169:14, 169:23,
170:3, 170:17,
170:22, 171:1,
210:22
**Examination** [6] - 3:7,
3:8, 3:9, 3:12, 3:13,
3:14
**examinations** [1] -
169:18
**examined** [1] - 159:15
**examining** [1] - 9:13
**example** [3] - 190:4,
215:19, 215:24
**examples** [1] - 215:20
**except** [1] - 136:4
**exchanges** [2] -
109:6, 168:4
**exclusively** [1] - 42:13
**excuse** [2] - 150:21,
185:24
**excused** [2] - 165:13,
220:4
**exempt** [1] - 122:21
**EXHIBIT** [2] - 4:3, 5:3
**Exhibit** [64] - 4:6, 4:7,

4:8, 4:9, 4:10, 5:6,
5:7, 16:13, 16:15,
16:16, 16:20, 21:17,
21:22, 29:3, 29:17,
31:18, 31:23, 52:1,
52:4, 53:1, 53:3,
53:20, 54:14, 54:16,
55:9, 55:10, 58:9,
63:6, 65:17, 75:21,
75:23, 78:4, 79:24,
82:6, 82:8, 83:15,
85:5, 86:16, 86:22,
87:19, 87:23, 88:2,
92:2, 92:13, 95:2,
97:12, 104:20,
107:9, 107:12,
110:9, 110:12,
111:17, 129:20,
130:2, 130:4,
133:21, 133:25,
134:1, 148:25,
162:18, 194:1,
197:5, 207:10
**exhibit** [11] - 4:11,
75:22, 78:8, 79:23,
83:9, 86:19, 86:20,
86:22, 110:20,
145:1, 194:7
**exhibits** [2] - 88:4,
220:14
**EXHIBITS** [2] - 4:4,
5:4
**existed** [1] - 10:2
**existing** [1] - 89:9
**exited** [4] - 106:20,
165:4, 211:10,
220:12
**expand** [1] - 25:4
**expect** [2] - 85:19,
86:9
**expected** [2] - 105:6,
165:16
**expedited** [1] - 47:5
**expenditure** [1] -
80:23
**experience** [4] -
49:13, 174:9,
210:10, 210:17
**expert** [6] - 166:17,
172:12, 172:13,
172:16, 172:18,
177:20
**expiration** [1] - 112:6
**expired** [1] - 112:5
**explained** [6] - 13:5,
20:13, 131:20,
194:25, 206:6,
216:10
**explaining** [1] - 181:7
**explanation** [2] -

124:4, 157:19
**extension** [4] - 68:14,
99:21, 146:16,
148:11
**extensive** [1] - 48:2
**extent** [1] - 88:5
**extremely** [2] -
121:16, 164:23

**F**

**Facebook** [2] - 119:5,
119:7
**facility** [2] - 203:24,
204:16
**facing** [1] - 101:1
**fact** [27] - 10:25, 25:6,
57:8, 62:5, 69:10,
73:4, 78:8, 116:24,
123:5, 128:8,
133:21, 135:4,
135:6, 144:11,
144:16, 145:1,
147:9, 149:21,
150:3, 151:25,
152:6, 161:23,
166:17, 179:19,
180:10, 207:3,
208:20
**Factory** [1] - 185:15
**facts** [4] - 38:14,
99:25, 115:4, 131:7
**fair** [15] - 15:2, 69:16,
111:10, 111:11,
113:3, 114:19,
116:12, 142:12,
154:25, 155:4,
156:11, 158:3,
160:7, 169:24,
172:22
**fairly** [1] - 51:18
**faith** [1] - 79:7
**falls** [1] - 89:12
**false** [2] - 78:21, 78:25
**familiar** [4] - 80:16,
118:22, 133:2, 182:4
**family** [7] - 66:20,
66:21, 77:10, 77:17,
109:12, 117:11,
164:13
**family's** [1] - 164:1
**far** [13] - 82:18, 84:12,
85:15, 89:20, 90:21,
92:24, 93:17, 94:9,
94:12, 157:7, 162:1,
186:25, 214:7
**father** [2] - 77:17,
77:19
**favor** [3] - 46:24, 68:5,
115:2

**favors** [1] - 145:6
**FDLE** [2] - 182:14,
182:20
**fearful** [1] - 121:25
**February** [14] - 7:21,
22:14, 41:2, 50:19,
50:20, 95:3, 108:13,
110:18, 111:2,
111:15, 111:16,
112:22, 176:2
**federal** [2] - 176:14,
178:10
**Federal** [1] - 178:14
**feet** [6] - 109:8,
185:21, 188:16,
191:10, 215:15,
216:4
**FELDMAN** [1] - 1:18
**fell** [1] - 148:10
**females** [1] - 177:11
**fenced** [1] - 99:22
**fenced-in** [1] - 99:22
**Fernandez** [1] -
208:10
**Fernando** [1] - 88:13
**Festdival** [1] - 110:18
**festival** [4] - 97:1,
97:2, 102:21, 103:6
**Festival** [15] - 22:14,
97:1, 97:19, 97:23,
102:20, 107:16,
107:20, 108:13,
111:16, 111:19,
112:23, 113:1,
145:2, 169:14,
170:16
**few** [2] - 16:11, 188:18
**field** [2] - 174:12,
179:2
**Fifth** [1] - 74:9
**figure** [2] - 23:21, 54:2
**figuring** [1] - 103:20
**file** [9] - 25:23, 27:1,
27:11, 115:23,
118:25, 122:23,
122:25, 152:11,
192:24
**filed** [17] - 11:22,
13:25, 19:15, 22:7,
27:3, 39:22, 113:6,
113:10, 115:25,
116:4, 116:7, 118:8,
122:23, 124:2,
152:24
**files** [4] - 114:1, 114:8,
131:4, 131:13
**fill** [1] - 125:8
**filled** [1] - 192:24
**filtered** [1] - 206:7
**final** [1] - 22:11

**finality** [2] - 7:15,
199:6
**finally** [3] - 160:14,
215:11, 216:17
**financial** [1] - 118:8
**financing** [1] - 118:12
**fine** [11] - 105:11,
149:2, 170:12,
171:18, 171:24,
172:23, 172:25,
195:7, 199:8,
199:12, 211:15
**finish** [2] - 79:23,
81:14
**finished** [4] - 18:12,
113:17, 114:2, 114:8
**fire** [9] - 13:4, 100:15,
100:17, 101:20,
192:15, 192:16,
213:17, 214:20
**fired** [22] - 11:21,
12:11, 12:12, 13:3,
14:8, 115:19,
115:23, 116:5,
116:18, 118:25,
119:9, 122:7,
123:12, 128:6,
129:2, 136:11,
137:22, 137:23,
141:2, 154:24,
172:9, 212:10
**fires** [1] - 115:16
**firing** [5] - 13:3, 13:9,
124:13, 125:1,
161:11
**first** [33] - 6:22, 15:4,
22:18, 25:2, 31:9,
34:14, 73:18, 81:14,
90:5, 90:11, 92:8,
115:25, 122:22,
126:24, 127:4,
130:7, 135:6,
135:20, 136:7,
155:13, 162:20,
170:2, 170:5,
174:11, 176:10,
177:24, 178:8,
180:7, 188:10,
195:18, 197:17,
202:18, 206:21
**firsthand** [1] - 167:20
**five** [4] - 46:16, 109:8,
142:10, 211:8
**five-year-old** [1] -
142:10
**flag** [2] - 135:20, 166:5
**flagged** [1] - 168:25
**Flagler** [1] - 1:19
**flier** [10] - 80:2, 80:3,
81:20, 81:21, 81:23,

81:24, 82:1, 82:2,
82:5, 82:7
**flip** [1] - 175:23
**floor** [4] - 184:1,
184:2, 184:17
**floors** [1] - 183:25
**FLORIDA** [1] - 1:1
**Florida** [19] - 1:5,
1:16, 1:19, 1:22,
1:25, 2:5, 2:11,
41:10, 41:11, 53:11,
80:24, 134:25,
172:8, 174:10,
175:25, 178:16,
201:20, 212:24,
221:12
**focus** [5] - 42:18,
46:18, 176:22,
177:2, 215:12
**focused** [5] - 42:17,
43:20, 45:16,
169:18, 177:6
**folks** [2] - 42:20, 44:12
**follow** [6] - 71:23,
73:16, 73:21, 74:20,
104:19, 161:4
**follow-up** [5] - 71:23,
73:16, 73:21, 74:20,
104:19
**followed** [3] - 73:4,
155:21, 157:21
**following** [10] - 15:11,
72:3, 72:18, 79:18,
106:4, 126:11,
162:6, 173:4,
195:15, 199:16
**follows** [11] - 6:21,
16:6, 76:3, 78:15,
104:25, 125:18,
154:18, 165:14,
173:22, 194:21,
197:15
**food** [16] - 30:5, 32:20,
82:24, 185:25,
186:9, 186:17,
186:25, 187:3,
187:5, 187:10,
188:19, 189:3,
189:5, 190:23,
215:17
**Food** [1] - 185:13
**foot** [1] - 216:1
**footage** [1] - 189:7
**FOR** [3] - 1:13, 1:17,
2:3
**forced** [2] - 158:15,
159:8
**foregoing** [1] - 221:3
**forensic** [1] - 174:5
**forgery** [1] - 174:17

**forget** [1] - 187:7
**forgot** [1] - 19:23
**form** [4] - 124:20, 144:19, 165:1, 220:7
**formally** [1] - 88:5
**format** [1] - 17:9
**former** [4] - 39:3, 41:10, 50:13, 66:24
**forms** [2] - 155:3, 198:16
**Formula** [1] - 58:13
**FORT** [1] - 1:2
**Fort** [1] - 1:5
**forth** [1] - 194:4
**foundation** [30] - 18:20, 24:10, 28:8, 28:10, 30:3, 30:13, 33:22, 116:6, 163:20, 183:10, 184:5, 187:15, 188:1, 189:12, 189:21, 190:8, 193:9, 193:21, 196:22, 199:23, 200:5, 201:12, 202:13, 203:2, 203:20, 203:25, 206:18, 208:15, 218:10, 219:5
**four** [8] - 64:13, 127:1, 159:7, 159:8, 159:12, 161:22, 161:25, 220:18
**Four** [1] - 208:14
**fpablo@ miamiparking.com** [1] - 92:5
**FPR** [2] - 2:9, 221:10
**frame** [1] - 204:11
**Francis** [1] - 24:19
**frankly** [1] - 8:7
**fraud** [1] - 174:16
**free** [1] - 176:12
**frequently** [1] - 213:21
**Friday** [4] - 15:24, 135:25, 136:9, 143:2
**Fridays** [12] - 129:17, 132:18, 133:3, 133:7, 135:4, 135:20, 136:6, 136:8, 137:1, 138:5, 138:9, 162:10
**friend** [1] - 20:5
**friends** [3] - 39:11, 119:5, 119:7
**front** [3] - 97:18, 119:15, 180:22
**frozen** [1] - 124:6
**full** [3] - 39:17, 64:11, 174:23

**full-time** [3] - 39:17, 64:11, 174:23
**fuller** [1] - 70:4
**Fuller** [81] - 34:13, 34:24, 65:14, 65:19, 65:24, 66:6, 67:15, 68:4, 68:7, 68:12, 68:21, 69:4, 69:6, 69:10, 69:23, 77:7, 77:10, 78:5, 80:4, 81:25, 82:12, 83:7, 83:21, 85:2, 108:24, 108:25, 109:8, 109:12, 109:13, 109:16, 109:19, 109:20, 109:21, 111:21, 112:10, 113:6, 114:8, 114:13, 114:25, 115:2, 116:21, 118:16, 119:5, 119:9, 128:6, 128:8, 129:2, 131:1, 131:13, 142:11, 144:9, 144:11, 144:14, 144:23, 145:4, 145:5, 145:6, 145:9, 145:16, 146:13, 146:15, 146:17, 146:25, 147:9, 147:24, 148:19, 151:15, 163:16, 164:1, 164:7, 164:8, 164:9, 164:10, 164:11, 164:12, 164:18, 182:8
**FULLER** [1] - 1:4
**Fuller's** [3] - 77:10, 78:19, 129:1
**function** [5] - 108:5, 118:6, 137:16, 138:7, 138:12
**funds** [1] - 25:14
**funny** [1] - 108:25

## G

**Gables** [4] - 77:21, 78:9, 78:10, 126:24
**gain** [1] - 109:16
**game** [1] - 15:2
**Garcia** [1] - 138:1
**Garcia's** [1] - 159:23
**Gardner** [1] - 6:11
**Gay** [18] - 22:14, 97:1, 97:19, 97:23, 102:20, 107:16, 107:20, 108:13, 110:18, 111:16,

111:19, 112:23, 113:1, 145:2, 167:21, 167:24, 169:14, 170:16
**gay** [1] - 170:16
**gee** [1] - 41:25
**general** [1] - 176:13
**generally** [4] - 92:21, 101:12, 192:12, 192:14
**gentleman** [1] - 167:17
**gentlemen** [5] - 15:20, 106:6, 107:5, 149:1, 220:5
**George** [1] - 81:13
**germane** [1] - 153:11
**Germans** [2] - 175:14, 175:15
**getter** [2] - 37:10, 46:2
**getters** [1] - 37:12
**girl** [1] - 177:16
**girls** [4] - 177:10, 177:14
**gist** [1] - 178:17
**given** [3] - 14:21, 200:1, 204:19
**glass** [2] - 202:6, 202:8
**gleaned** [1] - 76:25
**GLENDA** [2] - 2:9, 221:10
**goal** [3] - 43:25, 44:5, 44:6
**God** [2] - 173:16, 199:3
**Godfather** [20] - 66:18, 66:22, 67:17, 68:4, 68:7, 68:11, 69:17, 70:5, 70:6, 70:11, 115:1, 146:12, 147:2, 147:6, 148:8, 148:19, 148:23, 149:13, 150:1, 150:8
**goings** [1] - 75:10
**goings-on** [1] - 75:10
**Gonzalez** [6] - 24:20, 86:17, 86:23, 86:24, 87:1, 112:16
**Gonzalez's** [1] - 87:4
**governing** [1] - 156:12
**Government** [2] - 49:13, 178:15
**governor** [1] - 180:19
**Graciella** [1] - 104:2
**grade** [1] - 89:22
**granted** [4] - 21:21, 29:16, 31:22, 149:17
**grass** [2] - 91:17,

151:3
**grassy** [1] - 91:11
**gratuitous** [1] - 116:9
**gray** [2] - 89:12, 176:11
**gray-market** [1] - 176:11
**great** [4] - 83:14, 109:9, 109:12, 157:19
**greets** [1] - 45:10
**gross** [3] - 185:24, 190:12, 216:9
**ground** [6] - 175:3, 179:21, 179:23, 184:1, 201:4, 214:22
**grounds** [11] - 21:3, 25:16, 26:7, 26:17, 26:18, 27:19, 28:5, 33:6, 33:21, 152:16, 190:7
**group** [2] - 101:22, 137:4
**GROUP** [1] - 1:13
**Grove** [1] - 214:12
**guess** [13] - 22:2, 23:15, 23:18, 43:18, 60:3, 92:6, 98:19, 134:16, 148:8, 148:10, 161:11, 207:4, 208:10
**guest** [2] - 136:17, 136:18
**guests** [1] - 135:23
**guide** [1] - 51:12
**Gus** [1] - 138:1
**GUTCHESS** [25] - 78:16, 79:6, 79:9, 105:15, 105:22, 105:24, 159:14, 167:1, 167:5, 167:8, 167:15, 168:14, 168:19, 168:25, 169:5, 169:10, 169:16, 169:21, 169:24, 170:7, 170:9, 170:14, 170:19, 171:13, 195:2
**Gutchess** [2] - 1:13, 6:7
**guy** [2] - 166:7, 177:15
**guys** [5] - 14:24, 68:14, 146:16, 177:15, 179:6

## H

**H.R** [2] - 12:21, 13:7
**Habana** [3] - 133:9,

133:15, 136:25
**hack** [1] - 25:9
**Hall** [7] - 19:22, 48:21, 50:3, 60:13, 74:25, 119:13, 120:21
**hallways** [1] - 106:14
**hampering** [1] - 145:22
**hand** [4] - 32:19, 34:2, 160:7, 160:8
**handed** [2] - 109:22, 121:21
**handle** [4] - 41:6, 58:24, 59:10, 59:22, 60:16, 104:8
**handled** [1] - 86:5
**hands** [7] - 44:8, 44:9, 44:10, 44:14, 44:19, 75:12
**hands-on** [1] - 75:12
**handshaking** [1] - 44:2
**hanging** [1] - 111:10
**happily** [1] - 28:1
**Happy** [4] - 135:24, 216:6, 216:7
**happy** [3] - 42:25, 46:15, 46:20
**harassed** [3] - 14:3, 27:25, 155:2
**harasses** [1] - 205:15
**harassing** [2] - 109:5, 205:20
**harassment** [14] - 11:17, 11:22, 13:6, 13:8, 14:14, 23:18, 25:21, 26:5, 154:2, 155:3, 158:25, 160:16, 160:19, 175:18
**harassments** [1] - 158:23
**hard** [1] - 40:24
**hardware** [3] - 98:19, 100:4, 100:6
**hashtag** [3] - 136:25, 137:1
**hats** [1] - 174:25
**Havana** [35] - 35:20, 42:24, 43:12, 45:13, 62:15, 71:3, 71:22, 74:2, 75:1, 92:22, 96:4, 96:7, 96:14, 119:17, 119:23, 131:25, 132:18, 132:22, 133:2, 133:7, 135:4, 135:11, 135:20, 136:6, 136:7, 136:23, 137:1,

137:5, 137:13,
137:16, 138:9,
139:23, 140:23,
141:13, 162:10
**Havana's** [1] - 135:19
**HE** [1] - 197:12
**head** [1] - 108:1
**head's** [1] - 193:5
**head's-up** [1] - 193:5
**headed** [1] - 41:15
**health** [1] - 104:2
**hear** [8] - 16:14,
32:16, 32:17, 109:7,
133:23, 158:3,
178:12, 185:2
**heard** [8] - 43:6, 43:8,
134:14, 134:18,
146:17, 182:6,
212:8, 215:14
**Hearing** [3] - 122:5,
122:16, 123:1
**hearing** [15] - 68:10,
68:11, 146:11,
146:12, 150:1,
150:4, 150:12,
156:17, 158:14,
159:8, 159:12,
161:23, 161:24
**hearsay** [24] - 26:9,
28:22, 148:3, 148:5,
154:5, 181:12,
182:15, 182:22,
183:3, 183:8,
183:16, 183:20,
184:12, 184:19,
192:3, 193:20,
194:18, 196:21,
197:2, 197:18,
200:17, 202:21,
204:4, 204:12
**heart** [1] - 175:17
**heated** [1] - 145:3
**heavily** [1] - 176:22
**heavy** [1] - 38:20
**heavy-hitters** [1] -
38:20
**held** [22] - 6:21, 15:11,
23:15, 30:21, 44:11,
59:18, 78:15, 79:18,
84:16, 104:25,
106:4, 120:5,
125:18, 126:11,
154:18, 162:6,
165:14, 173:4,
194:21, 195:15,
197:15, 199:16
**Hello** [1] - 88:23
**help** [5] - 51:12, 58:16,
86:20, 173:16,
175:10

**helped** [4] - 39:9,
51:15, 68:8, 136:24
**helping** [1] - 145:9
**helps** [1] - 89:13
**Herald** [6] - 52:15,
53:12, 53:13, 54:5,
197:21, 198:7
**hereby** [1] - 221:3
**Hhh** [1] - 125:5
**hiatus** [1] - 90:6
**hiding** [1] - 109:1
**hierarchy** [1] - 198:18
**High** [1] - 78:10
**high** [6] - 175:5,
179:17, 179:18,
180:12, 180:13
**high-risk** [2] - 175:5,
179:18
**higher** [2] - 59:15,
180:21
**higher-ups** [1] -
180:21
**highest** [3] - 37:10,
37:12, 46:1
**highlighted** [1] -
197:25
**himself** [5] - 47:23,
47:25, 123:24,
169:9, 198:20
**hinges** [1] - 156:7
**hire** [1] - 126:24
**hired** [10] - 20:11,
47:25, 57:15, 69:17,
127:8, 127:9,
127:15, 129:12,
141:1, 177:24
**hires** [2] - 69:16,
174:14
**historical** [1] - 136:22
**history** [4] - 125:11,
125:13, 127:7, 207:2
**hit** [1] - 204:17
**hitters** [1] - 38:20
**hold** [2] - 38:1, 167:17
**holiday** [2] - 138:14,
138:11
**Homeland** [1] - 174:4
**homes** [1] - 43:10
**Honor** [104] - 6:6,
6:10, 6:17, 7:4, 8:7,
8:9, 8:16, 11:16,
16:2, 16:4, 17:10,
17:15, 18:6, 26:16,
28:6, 28:22, 29:10,
29:15, 31:20, 31:21,
35:6, 35:12, 35:21,
49:4, 53:21, 56:7,
57:11, 61:14, 62:23,
63:21, 68:17, 69:25,
72:10, 73:10, 78:13,

87:24, 88:3, 92:8,
99:24, 110:10,
110:23, 115:4,
116:13, 117:4,
117:14, 118:2,
125:15, 125:21,
127:21, 128:3,
128:22, 129:7,
130:1, 131:7,
134:21, 138:16,
139:9, 143:21,
143:24, 144:2,
144:19, 146:1,
147:11, 147:13,
149:12, 150:14,
151:6, 153:6, 154:5,
154:12, 155:13,
155:21, 158:18,
161:16, 163:7,
167:1, 168:23,
168:25, 169:17,
169:19, 170:25,
171:8, 173:3,
173:12, 181:12,
191:18, 194:3,
194:9, 194:12,
195:7, 195:14,
196:1, 197:6,
197:13, 197:16,
198:12, 199:8,
200:19, 208:4,
210:23, 211:18,
216:25, 217:7,
220:18
**honor** [1] - 136:22
**Honor's** [2] - 7:18,
156:5
**HONORABLE** [1] -
1:10
**hope** [1] - 89:13
**hopefully** [1] - 45:1
**horrible** [1] - 142:22
**hostile** [2] - 122:8,
144:23
**hot** [1] - 216:5
**Hotel** [6] - 138:14,
138:23, 138:25,
139:5, 139:8, 139:16
**hotly** [1] - 126:4
**HOTTE** [1] - 1:18
**Hour** [1] - 135:24
**hour** [19] - 105:8,
166:7, 170:5, 192:6,
192:10, 192:21,
193:3, 193:7,
193:19, 193:24,
200:13, 200:14,
201:18, 206:9,
213:14, 213:21,
218:17, 218:20,

218:24
**hours** [3] - 186:22,
192:13, 193:5
**House** [1] - 178:16
**house** [2] - 61:11,
61:18
**housing** [4] - 42:16,
42:20, 42:25, 55:3
**hung** [1] - 74:6
**HUSS** [1] - 1:17
**hypothetical** [1] - 21:9

---

**I**

**idea** [13] - 68:18, 81:2,
86:5, 91:5, 91:10,
91:13, 91:16, 99:18,
136:4, 161:9,
176:19, 206:23,
215:11
**identified** [5] - 83:8,
86:10, 88:7, 101:16,
107:19
**identifies** [1] - 78:4
**identify** [3] - 45:12,
80:18, 81:5
**II** [1] - 1:4
**illegal** [12] - 11:1,
13:2, 48:13, 48:17,
108:24, 191:23,
203:12, 203:15,
206:17, 207:18,
207:22, 217:11
**imagine** [1] - 214:19
**immediately** [5] -
46:24, 47:2, 112:9,
119:5, 169:23
**impacted** [1] - 51:10
**implement** [1] - 89:8
**importance** [5] -
40:18, 51:4, 51:13,
52:20, 53:16
**important** [8] - 40:19,
54:6, 54:7, 54:10,
55:5, 56:4, 56:6,
56:10
**imposed** [1] - 26:19
**impression** [3] -
154:23, 156:20,
157:22
**improper** [3] - 23:24,
24:9, 25:14
**improprieties** [1] -
23:5
**improving** [1] - 42:14
**inappropriate** [1] -
172:2
**inaudible** [4] - 78:20,
156:14, 161:17,
195:5

**inaudible)** [1] - 158:5
**incessant** [1] - 62:22
**incident** [1] - 175:24
**incidents** [1] - 199:10
**include** [4] - 77:4,
125:23, 127:2,
193:16
**included** [5] - 41:9,
90:1, 117:1, 117:8,
125:13
**includes** [1] - 186:9
**including** [9] - 50:13,
74:9, 87:8, 87:13,
88:14, 117:11,
118:15, 145:21,
166:8
**income** [1] - 42:24
**incorrect** [2] - 124:9
**Independent** [1] -
80:23
**independent** [2] -
80:24, 213:8
**indicate** [3] - 148:18,
159:21, 203:7
**indicated** [3] - 212:8,
212:17, 212:18
**indirectly** [1] - 106:13
**individual** [5] - 149:6,
149:11, 151:8,
158:9, 159:4
**individually** [1] -
113:24
**individuals** [5] - 26:4,
116:21, 118:15,
158:7, 159:7
**inextricably** [1] -
160:6
**inflate** [1] - 40:15
**influence** [1] - 64:5
**information** [12] -
75:11, 76:25, 89:3,
112:10, 113:2,
116:9, 125:11,
128:9, 131:21,
166:3, 166:15,
171:11
**informed** [3] - 56:15,
68:3, 112:5
**initial** [1] - 183:24
**initiate** [1] - 115:10
**initiated** [1] - 132:6
**inquire** [1] - 156:23
**inquiry** [2] - 59:25,
65:11
**inside** [21] - 98:22,
99:7, 99:10, 99:11,
99:15, 103:1, 103:2,
111:9, 176:24,
176:25, 185:4,
185:5, 185:9,

185:10, 185:22,
186:21, 188:19,
202:6, 206:11,
206:15
**inspect** [4] - 141:13,
141:18, 189:10,
198:16
**inspected** [1] - 72:4
**inspection** [20] -
141:19, 188:8,
188:12, 188:13,
188:15, 188:20,
188:21, 189:15,
189:20, 189:25,
191:17, 191:24,
200:14, 202:10,
205:12, 206:12,
217:15, 217:16
**inspections** [16] -
94:16, 141:15,
141:17, 141:20,
141:23, 176:3,
176:4, 176:6, 176:7,
180:14, 193:19,
193:24, 199:20,
199:21, 201:17
**inspector** [2] - 141:21,
188:14
**inspectors** [7] - 97:5,
101:19, 176:5,
177:23, 180:8,
188:10, 188:11
**installed** [1] - 76:2
**instance** [4] - 190:13,
190:19, 190:21,
191:16
**instances** [2] -
168:13, 216:23
**instead** [1] - 102:21
**instruct** [1] - 205:23
**instructed** [1] - 220:8
**instructions** [6] -
106:8, 106:11,
157:21, 159:20,
161:4, 220:8
**intend** [3] - 9:23,
194:7, 220:14
**intentionally** [1] - 9:14
**Inter** [1] - 53:8
**interaction** [1] - 22:12
**interactions** [1] -
22:10
**interest** [6] - 20:3,
44:3, 52:20, 57:9,
126:4, 145:9
**interested** [2] - 43:23,
176:23
**interesting** [1] - 125:5
**interior** [1] - 103:2
**internal** [1] - 177:9

**internally** [1] - 181:3
**international** [2] -
175:9, 175:13
**internet** [1] - 51:3
**interpretation** [2] -
8:8, 88:25
**interruption** [1] -
154:16
**interruptions** [1] -
6:19
**intertwined** [1] - 160:7
**interview** [2] - 127:16,
146:7
**interworkings** [2] -
89:20, 118:22
**introduce** [4] - 172:7,
194:8, 199:13,
220:14
**introduced** [3] -
66:17, 69:13, 94:25
**invalid** [1] - 122:11
**investigate** [3] -
168:6, 176:20, 205:8
**investigated** [2] -
168:12, 177:18
**investigation** [7] -
170:5, 178:7, 178:8,
193:1, 193:4, 199:5,
203:18
**investigations** [7] -
174:16, 176:8,
177:3, 179:13,
179:20, 192:23
**Investigations** [3] -
57:23, 58:5, 128:17
**investigator** [1] -
174:24
**invitation** [4] - 130:9,
130:12, 130:13,
130:17
**invite** [1] - 135:19
**invited** [1] - 178:3
**inviting** [2] - 131:5,
131:14
**involved** [16] - 47:23,
48:9, 50:25, 51:15,
51:24, 52:24, 74:23,
78:16, 84:11, 90:1,
90:5, 139:14,
161:14, 179:21,
180:18, 216:16
**involvement** [5] -
71:15, 72:19, 72:21,
82:20, 90:11
**involving** [3] - 103:11,
157:3, 157:4
**irrelevant** [1] - 120:1
**issue** [63] - 6:22, 7:3,
7:4, 8:19, 9:2, 9:5,
9:12, 9:14, 9:18,

11:5, 11:16, 11:17,
12:18, 24:4, 29:8,
48:13, 49:1, 52:19,
53:16, 54:2, 54:6,
54:7, 54:9, 54:10,
55:5, 59:25, 63:8,
64:5, 69:23, 70:4,
76:15, 78:8, 96:16,
96:22, 104:2, 115:2,
123:23, 126:5,
126:8, 154:8,
155:19, 155:23,
156:1, 157:3, 157:6,
158:23, 160:6,
161:7, 163:13,
163:14, 165:20,
165:22, 172:24,
176:25, 183:6,
183:13, 183:19,
183:22, 184:3,
184:17, 194:20,
198:9, 200:21
**issued** [1] - 103:13
**issues** [20] - 9:10,
12:3, 42:18, 43:4,
43:5, 43:6, 48:17,
51:3, 61:6, 63:19,
72:18, 78:22, 89:24,
90:1, 96:12, 116:19,
153:10, 184:22,
208:24, 212:3
**item** [1] - 166:6
**items** [2] - 88:6, 94:24
**itself** [1] - 165:22

## J

**jacket** [1] - 105:20
**jackets** [1] - 211:16
**Jackson** [1] - 124:19
**James** [4] - 71:1,
72:18, 88:17, 124:19
**January** [13] - 8:20,
8:21, 47:5, 47:11,
52:6, 53:2, 53:19,
54:20, 112:3,
113:17, 114:2,
162:23
**jeans** [1] - 32:10
**Jeff** [1] - 6:7
**Jeffrey** [1] - 1:13
**Jennie** [2] - 80:23,
81:1
**JennyLee** [1] - 81:7
**Jessica** [2] - 164:9,
164:11
**Jeter** [1] - 52:12
**Jimenez** [1] - 39:1
**Joanna** [1] - 1:14
**job** [19] - 39:17, 49:9,

51:7, 57:16, 57:19,
58:23, 60:12,
103:20, 171:13,
172:17, 175:20,
179:5, 179:11,
181:10, 188:24,
189:3, 198:14,
205:16
**jobs** [2] - 55:2, 175:21
**Joe** [120] - 6:3, 6:12,
19:18, 20:21, 20:24,
22:4, 33:16, 33:18,
36:10, 36:13, 36:21,
37:13, 37:15, 37:18,
37:21, 38:1, 38:6,
38:20, 39:7, 39:12,
40:6, 40:22, 40:24,
42:7, 42:12, 43:4,
43:11, 43:23, 44:2,
44:15, 44:24, 45:4,
45:14, 45:17, 46:1,
46:6, 46:21, 46:24,
46:25, 47:1, 47:6,
47:22, 48:3, 48:5,
48:9, 48:19, 49:8,
49:16, 50:8, 51:7,
52:10, 52:17, 52:23,
53:6, 53:9, 53:13,
53:15, 54:1, 54:4,
54:10, 54:21, 55:19,
55:20, 56:6, 58:12,
58:19, 60:21, 61:3,
63:11, 64:14, 64:20,
66:18, 67:3, 67:8,
67:11, 68:10, 68:24,
69:14, 69:16, 69:17,
76:2, 77:16, 82:25,
87:4, 91:22, 107:23,
108:12, 110:2,
113:22, 114:14,
115:13, 115:17,
115:22, 115:24,
116:3, 116:4,
117:12, 121:21,
123:22, 129:21,
130:12, 131:4,
131:14, 131:15,
131:17, 132:5,
133:5, 135:6,
135:13, 135:18,
137:2, 137:19,
146:11, 146:20,
147:3, 157:10,
157:12, 157:14
**JOE** [1] - 1:7
**Joe's** [1] - 52:16
**Johnson** [1] - 207:14
**Jose** [7] - 55:23, 56:2,
56:15, 74:5, 74:7,
120:4, 120:9

**judge** [6] - 29:7, 32:1,
97:13, 100:11,
158:25, 170:4
**JUDGE** [1] - 1:11
**Judge** [33] - 9:15,
10:7, 10:8, 10:22,
12:15, 14:23, 15:8,
21:20, 36:4, 41:12,
44:21, 47:19, 67:4,
67:12, 79:20,
104:16, 105:3,
106:3, 116:11,
125:19, 139:18,
148:5, 149:4,
149:16, 153:12,
154:14, 158:1,
160:4, 165:8, 172:5,
194:15, 198:13,
210:21
**June** [14] - 23:3,
65:21, 66:1, 68:9,
114:19, 114:22,
115:11, 116:17,
136:11, 141:2,
145:15, 146:10,
149:24, 174:9
**jurisdiction** [4] -
180:1, 191:2,
191:14, 214:9
**jurors** [7] - 6:15, 6:19,
15:13, 105:10,
105:18, 106:13,
173:6
**Jury** [5] - 106:20,
165:4, 211:10,
211:12, 220:12
**JURY** [1] - 211:5
**jury** [46] - 15:15,
15:18, 15:19, 15:23,
29:19, 32:1, 40:5,
41:24, 60:24, 61:4,
69:10, 69:23, 72:15,
74:11, 83:9, 88:5,
88:7, 91:23, 97:13,
100:11, 106:19,
107:4, 107:5,
131:20, 133:5,
133:16, 154:23,
156:21, 157:7,
157:9, 158:3,
159:19, 160:11,
160:21, 160:22,
164:25, 165:3,
173:7, 173:8, 173:9,
195:10, 195:13,
198:23, 211:2,
211:13, 220:11
**jury's** [1] - 29:11

## K

**K-U-N-E-R-T** [1] - 173:20
**Kabul** [1] - 175:22
**Karen** [1] - 124:18
**keep** [9] - 56:15, 103:3, 105:10, 140:17, 171:15, 180:11, 206:8, 206:13, 220:8
**kept** [1] - 206:5
**Key** [1] - 125:14
**kids** [1] - 205:8
**kind** [11] - 105:18, 176:19, 177:4, 177:25, 178:17, 181:3, 181:9, 200:3, 200:10, 215:12
**King** [1] - 78:10
**KISSANE** [1] - 2:3
**kitchen** [3] - 186:15, 188:19, 216:4
**knock** [1] - 190:14
**knocked** [7] - 44:20, 44:22, 44:24, 61:8, 61:9, 62:6, 62:7
**knowledge** [40] - 28:2, 34:15, 76:15, 76:18, 82:18, 123:14, 149:11, 150:15, 151:8, 163:13, 165:24, 166:3, 166:18, 166:21, 166:25, 167:3, 167:7, 167:12, 168:24, 169:2, 171:3, 171:8, 171:12, 183:9, 192:3, 193:21, 196:11, 197:18, 198:5, 199:5, 200:6, 202:22, 204:12, 208:2, 209:11, 212:2, 216:19, 219:8, 219:11
**known** [4] - 92:16, 134:14, 134:25, 135:22
**knows** [12] - 63:22, 72:11, 78:1, 90:25, 147:21, 169:13, 190:9, 198:25, 199:3, 199:10, 202:13, 209:13
**Konig** [1] - 105:16
**KRINZMAN** [1] - 1:17
**KUEHNE** [186] - 1:21, 6:14, 7:4, 8:16, 9:7, 9:9, 9:15, 10:7,

10:22, 12:15, 12:20, 12:25, 13:14, 13:22, 14:7, 14:23, 15:1, 15:8, 16:14, 16:16, 17:10, 18:6, 18:8, 18:18, 18:20, 21:2, 21:4, 21:9, 21:19, 24:2, 24:4, 24:10, 25:15, 25:17, 26:6, 26:8, 26:16, 26:18, 27:18, 27:20, 28:4, 28:6, 28:20, 28:22, 29:5, 29:7, 30:3, 30:11, 30:13, 31:20, 33:5, 33:7, 33:20, 34:14, 35:6, 35:12, 35:21, 36:4, 36:7, 36:18, 36:20, 37:25, 38:17, 41:14, 44:23, 47:21, 49:7, 52:3, 53:5, 53:24, 56:9, 56:13, 57:14, 61:17, 63:1, 63:24, 64:18, 67:6, 67:14, 70:3, 72:13, 73:13, 73:14, 75:24, 77:14, 78:2, 79:2, 79:7, 79:11, 79:17, 79:20, 79:22, 86:8, 87:23, 88:3, 88:11, 88:12, 91:1, 92:8, 92:14, 94:23, 97:14, 97:17, 100:2, 100:12, 102:1, 102:3, 102:9, 104:18, 104:23, 105:3, 105:6, 107:8, 107:11, 110:13, 111:1, 111:7, 115:7, 116:16, 117:7, 117:16, 118:5, 120:3, 125:23, 126:13, 128:1, 128:5, 128:25, 129:9, 130:1, 130:5, 131:10, 133:23, 133:24, 134:21, 134:24, 138:21, 139:13, 139:21, 143:21, 143:24, 144:19, 147:11, 147:13, 147:20, 148:1, 148:3, 148:13, 148:20, 149:4, 149:6, 150:5, 150:8, 150:14, 150:21, 150:24, 151:6, 152:15, 152:17, 152:19, 153:6, 153:8, 153:15, 154:5, 154:10, 154:12,

155:13, 157:2, 158:1, 158:6, 158:11, 158:18, 158:25, 159:19, 159:22, 160:1, 160:4, 160:10, 160:24, 161:1, 162:5, 163:7, 163:9, 163:20, 165:8, 195:6
**Kuehne** [44] - 1:21, 3:8, 6:11, 36:10, 38:22, 60:2, 61:2, 68:20, 69:5, 75:13, 78:21, 79:1, 84:25, 104:21, 105:1, 107:7, 113:13, 117:10, 118:24, 122:10, 125:22, 126:24, 127:25, 132:10, 136:14, 137:18, 137:24, 141:22, 142:10, 142:22, 145:1, 145:24, 146:7, 147:6, 147:18, 151:11, 152:3, 156:9, 157:22, 159:11, 162:9, 162:24, 163:5, 168:7
**Kuehne's** [1] - 144:16
**KUNERT** [2] - 3:11, 173:22
**kunert** [1] - 181:16
**Kunert** [16] - 165:15, 173:13, 173:20, 173:25, 178:24, 191:22, 195:19, 196:8, 199:19, 201:1, 202:17, 210:1, 211:21, 217:4, 217:10, 219:14

## L

**lack** [15] - 184:5, 192:3, 193:20, 196:11, 196:22, 199:23, 200:5, 201:12, 202:21, 203:2, 203:25, 204:11, 209:11, 219:11
**lacks** [3] - 208:2, 218:9, 219:13
**ladies** [6] - 15:20, 106:6, 107:5, 149:1, 157:23, 220:5
**lady** [2] - 61:10, 158:22

**lady's** [1] - 61:8
**laid** [1] - 184:4
**lane** [1] - 183:1
**language** [3] - 89:1, 167:4, 170:7
**large** [1] - 110:1
**Larry** [1] - 196:19
**Lartroy** [1] - 166:8
**last** [8] - 22:18, 58:8, 68:8, 127:4, 130:8, 130:21, 195:12, 211:22
**late** [2] - 41:25, 104:6
**LAUDERDALE** [1] - 1:2
**Lauderdale** [1] - 1:5
**launched** [1] - 178:8
**launching** [1] - 135:19
**LAW** [2] - 1:13, 1:21
**law** [14] - 7:23, 8:15, 9:21, 40:3, 64:2, 80:17, 174:8, 177:7, 186:4, 192:19, 213:16
**lawn** [2] - 94:1, 94:12
**laws** [1] - 178:1
**lawsuit** [1] - 11:22, 13:25, 25:17, 25:23, 25:25, 34:16, 48:12, 113:19, 114:1, 114:14, 115:25, 116:7, 122:23, 122:25, 152:11, 152:14, 152:24, 153:1, 155:14, 155:17, 157:4, 157:11, 157:12, 157:13, 157:21, 162:21, 163:6, 163:12, 163:19, 164:2
**lawyer** [6] - 36:11, 38:23, 137:5, 137:6, 153:2, 153:19
**lawyers** [5] - 38:25, 142:5, 142:13, 142:19, 154:17
**lay** [2] - 28:9, 116:6
**leading** [4] - 34:14, 136:6, 158:4, 205:1
**League** [2] - 53:10, 54:22
**Leah** [1] - 6:11
**least** [5] - 9:22, 126:20, 136:16, 156:12, 157:7
**leave** [4] - 23:4, 29:21, 103:15, 181:1
**leaves** [2] - 154:23, 156:20

**leaving** [1] - 66:3
**led** [2] - 124:13, 135:23
**Lee** [2] - 80:23, 81:1
**leering** [1] - 124:6
**left** [20] - 74:6, 98:5, 101:4, 103:14, 103:16, 103:19, 103:21, 109:20, 114:17, 114:18, 119:4, 127:12, 128:19, 128:20, 136:4, 145:12, 145:15, 146:5, 206:21, 212:9
**legal** [1] - 174:6
**legislative** [3] - 7:9, 8:4
**legislature** [1] - 181:7
**legislatures** [1] - 181:6
**legitimate** [5] - 13:18, 43:24, 62:9, 83:8
**Leon** [29] - 29:20, 31:12, 32:22, 37:13, 46:20, 46:22, 46:23, 48:13, 63:3, 64:23, 65:2, 77:9, 77:20, 80:1, 80:9, 81:8, 81:19, 82:4, 82:23, 84:18, 86:4, 113:19, 113:21, 113:23, 114:13, 162:20, 163:6, 163:19, 164:2
**leon** [1] - 31:10
**Leon's** [3] - 76:14, 113:16, 163:12
**less** [2] - 137:22, 188:4
**letter** [6] - 12:20, 110:1, 110:4, 110:7, 115:17, 121:21
**letterhead** [2] - 115:18, 115:20
**letting** [1] - 179:11
**level** [2] - 75:14, 75:15
**liaison** [1] - 19:6, 23:1, 27:13, 33:2, 33:11, 33:17, 34:1, 55:19, 93:12, 144:22, 164:17, 175:15
**Liberty** [1] - 35:20
**license** [42] - 167:22, 183:7, 183:24, 184:25, 185:4, 185:7, 185:13, 185:20, 185:22, 186:18, 186:19, 187:13, 187:20,

188:7, 188:9,
188:13, 189:1,
189:9, 189:10,
189:16, 192:24,
200:1, 200:13,
201:19, 201:20,
201:21, 201:22,
201:25, 202:11,
207:3, 208:1,
208:13, 208:17,
208:18, 208:21,
208:22, 215:12,
216:3, 216:9
**licensed** [3] - 176:24,
180:2, 186:21
**licensees** [1] - 179:25
**licenses** [2] - 184:22,
215:21
**licensing** [4] - 178:1,
188:22, 196:19
**lie** [2] - 14:2, 116:24
**lieutenant** [5] -
176:18, 178:3,
179:4, 201:7, 213:25
**lieutenants** [3] -
179:14, 180:16,
206:6
**life** [10] - 42:14, 42:18,
42:21, 43:1, 43:5,
43:9, 61:6, 62:4,
70:12
**light** [1] - 100:6
**lighted** [1] - 99:13
**lights** [5] - 99:8,
99:10, 99:11, 99:16,
102:25
**limited** [2] - 167:21,
172:3
**line** [6] - 10:20, 59:15,
79:4, 79:9, 82:25,
146:8
**lines** [2] - 86:17, 193:2
**link** [1] - 163:5
**liquor** [1] - 185:17
**Lisette** [9] - 13:5,
14:7, 121:15,
121:24, 123:11,
124:13, 158:11,
159:23
**list** [10] - 29:5, 60:7,
76:21, 92:18, 93:13,
163:5, 164:5,
164:15, 192:22,
214:23
**listed** [2] - 78:9, 193:8
**listen** [2] - 116:10,
159:25
**listened** [1] - 148:9
**lists** [3] - 45:9, 45:12,
45:17

**lit** [2] - 99:14, 99:15
**litigate** [1] - 171:22
**litigated** [1] - 10:24
**litigation** [20] - 27:21,
47:5, 47:16, 47:22,
48:6, 48:22, 48:23,
50:21, 54:11, 76:13,
76:17, 76:18, 77:9,
77:20, 78:20, 78:23,
113:15, 166:1,
166:12, 172:1
**live** [4] - 42:21, 61:18,
62:12, 141:6
**lives** [1] - 78:9
**living** [1] - 43:15
**LLC** [5] - 77:6, 164:7,
164:8, 164:10
**lobbyists** [1] - 120:21
**local** [2] - 191:1,
191:14
**located** [1] - 111:25
**location** [24] - 54:9,
54:21, 136:1, 142:1,
183:7, 183:23,
183:25, 185:6,
185:23, 189:16,
190:4, 193:6, 193:8,
200:12, 201:20,
202:25, 204:7,
204:25, 205:11,
206:5, 206:10,
207:1, 208:25,
210:20
**locations** [8] - 176:24,
176:25, 180:3,
192:22, 206:10,
214:23, 214:24,
216:21
**long-time** [1] - 57:2
**look** [14] - 10:13, 53:1,
53:19, 74:1, 75:21,
99:12, 100:4, 101:4,
168:18, 168:22,
171:13, 189:4,
192:18, 193:4
**Look** [4] - 20:3, 20:11,
20:17, 68:7
**looked** [7] - 60:23,
74:21, 91:24, 95:20,
103:8, 109:11, 139:7
**looking** [11] - 11:3,
48:23, 78:3, 85:10,
91:5, 101:5, 141:8,
145:6, 161:3,
178:13, 207:6
**looks** [6] - 99:7, 100:9,
100:13, 100:25,
101:4, 215:23
**looped** [1] - 218:6
**loser** [2] - 114:1,

114:4
**loses** [1] - 114:4
**loud** [2] - 93:4, 133:18
**lounge** [2] - 191:23,
217:11
**love** [1] - 124:7
**low** [1] - 42:24
**LUBETSKY** [1] - 1:17
**Lugo** [12] - 19:18,
64:4, 64:6, 64:23,
65:6, 65:12, 83:1,
83:19, 84:20, 84:21,
90:8, 113:8
**Lugo's** [1] - 64:19
**lull** [1] - 214:4
**lunch** [4] - 105:9,
106:7, 113:2, 141:6
**Luncheon** [1] - 106:22
**LVR** [1] - 181:6
**lying** [1] - 21:16
**lyon** [1] - 31:11

## M

**ma'am** [5] - 23:25,
27:14, 153:21,
182:9, 182:11
**Machete** [3] - 128:14,
128:16, 129:3
**machete** [2] - 129:10,
129:12
**mad** [1] - 145:5
**Madeline** [1] - 166:1
**Magistrate** [1] - 67:24
**magistrate** [6] - 68:5,
68:8, 68:11, 70:5,
146:12, 148:9
**magistrates** [1] -
147:4
**mail** [88] - 6:24, 17:1,
17:7, 17:8, 53:7,
53:9, 53:25, 55:12,
56:18, 56:24, 56:25,
57:25, 58:1, 58:2,
58:3, 58:6, 58:8,
58:12, 60:6, 76:6,
80:3, 86:16, 86:17,
87:16, 87:20, 88:19,
88:22, 89:17, 89:23,
92:3, 92:4, 93:16,
93:18, 93:25,
112:14, 112:15,
112:16, 129:20,
129:21, 130:8,
162:25, 168:4,
171:2, 194:16,
194:23, 194:25,
195:3, 195:8,
195:22, 195:23,
195:24, 196:4,

196:8, 196:13,
196:17, 196:19,
196:20, 198:3,
198:4, 199:1, 204:2,
204:3, 204:6,
206:20, 206:24,
207:1, 207:5, 207:6,
207:13, 207:14,
207:15, 207:25,
208:3, 215:2, 215:9,
215:10, 216:18,
216:19, 216:23,
217:19, 217:23,
217:25, 218:4
**mailed** [1] - 196:25
**mailing** [1] - 196:24
**mails** [16] - 18:2,
58:22, 75:19, 76:5,
89:16, 93:15, 169:6,
169:8, 169:10,
171:7, 195:2,
203:10, 206:21,
216:11, 218:3,
219:24
**maintain** [1] - 18:25
**major** [3] - 64:13,
176:16, 190:17
**Major** [3] - 53:10,
54:22, 195:24
**man** [4] - 34:2, 100:25,
122:1, 166:16
**manage** [1] - 105:21
**manager** [29] - 14:20,
19:19, 23:7, 24:19,
25:13, 38:8, 38:9,
38:10, 39:8, 39:18,
39:21, 39:23, 40:5,
40:17, 70:10, 86:24,
87:2, 87:5, 87:7,
88:14, 89:14,
111:22, 111:24,
112:17, 113:8,
115:18, 115:20,
208:12
**manager's** [4] - 89:6,
89:10, 115:20, 215:7
**manner** [5] - 124:6,
201:24, 202:4, 202:8
**Manolo** [2] - 135:14,
135:18
**mansions** [1] - 77:21
**manufacturers** [1] -
178:18
**Mara** [1] - 62:6
**Marc** [3] - 1:24, 6:12,
39:3
**March** [21] - 19:14,
34:3, 34:4, 53:25,
54:20, 55:15, 86:16,
92:15, 107:15,

110:7, 113:10,
114:5, 129:23,
130:13, 130:18,
162:24, 187:23,
196:4, 204:17,
217:17
**market** [2] - 176:11,
178:5
**Marketplace** [2] -
77:7, 164:7
**Marlins** [3] - 52:14,
52:18
**married** [1] - 28:1
**marshal** [1] - 101:20
**Marti** [5] - 55:23, 56:2,
56:16, 74:5, 74:7
**Martin** [3] - 34:13,
34:24, 182:10
**MARTIN** [1] - 1:4
**Martri** [1] - 62:7
**Mary** [14] - 19:18,
64:4, 64:6, 64:19,
64:23, 65:6, 65:12,
83:1, 83:19, 84:11,
84:20, 84:21, 90:8,
113:8
**mascots** [1] - 31:12
**Mason** [3] - 1:18, 6:11,
219:16
**Master** [2] - 67:24,
115:2
**Master's** [2] - 150:12,
174:5
**material** [2] - 56:14,
176:17
**materials** [1] - 108:17
**matter** [17] - 7:23,
11:14, 26:19, 26:20,
27:20, 35:23, 73:4,
83:2, 116:3, 154:6,
160:22, 172:6,
177:20, 179:19,
180:9, 189:6, 221:5
**matters** [5] - 51:13,
59:8, 59:10, 120:21,
170:17
**mayor** [24] - 23:6,
25:12, 36:24, 37:5,
71:6, 71:7, 71:13,
73:15, 73:17, 73:24,
74:8, 74:12, 74:23,
75:4, 75:5, 75:6,
75:7, 75:9, 75:10,
76:2, 87:8, 132:5,
140:7
**Mayor** [1] - 24:19
**mayor's** [5] - 73:25,
74:16, 74:25, 75:13,
75:16
**McDonald's** [2] -

216:5, 216:7
**me-too** [1] - 124:1
**meal** [1] - 185:16
**Meals** [3] - 216:6, 216:7, 216:8
**mean** [15] - 10:18, 11:10, 22:19, 27:9, 31:10, 68:8, 69:20, 93:3, 124:2, 125:19, 186:2, 186:11, 186:16, 189:7, 199:25
**means** [6] - 8:17, 59:17, 89:21, 185:2, 187:7
**meant** [3] - 73:18, 87:15, 125:20
**measure** [1] - 189:7
**measured** [1] - 216:24
**measuring** [1] - 216:20
**media** [7] - 180:23, 197:25, 198:23, 199:3, 199:6, 199:9, 220:7
**medical** [3] - 127:13, 127:14
**meet** [9] - 44:25, 45:10, 122:24, 137:18, 142:4, 143:6, 144:8, 144:11, 144:13
**meet-and-greets** [1] - 45:10
**Meeting** [1] - 58:14
**meeting** [7] - 55:23, 58:17, 128:13, 130:10, 130:13, 130:18, 131:6
**meetings** [2] - 60:14, 131:15
**mega** [1] - 77:21
**Melissa** [1] - 208:10
**member** [9] - 49:24, 66:20, 72:24, 90:14, 93:12, 107:24, 123:19, 139:4, 141:12
**members** [9] - 17:4, 50:12, 59:19, 59:22, 73:25, 74:16, 125:2, 140:16, 173:9
**Members** [1] - 211:13
**membership** [1] - 53:14
**memo** [9] - 17:9, 17:15, 17:17, 22:2, 22:15, 23:11, 87:7, 110:1, 110:3
**memos** [2] - 121:19,

172:7
**men** [1] - 177:14
**Mendez** [2] - 20:1, 20:14
**mention** [3] - 10:4, 14:17, 138:15
**mentioned** [30] - 8:1, 9:24, 11:21, 24:23, 38:18, 38:19, 38:22, 38:25, 41:22, 58:23, 66:17, 70:16, 70:18, 76:19, 90:7, 90:9, 103:22, 113:4, 113:5, 114:13, 120:5, 138:13, 140:4, 140:6, 140:9, 154:21, 171:5, 191:22, 216:17
**menu** [1] - 186:7
**messages** [1] - 18:3
**messaging** [9] - 41:7, 41:8, 41:9, 41:15, 42:4, 42:6, 42:9, 42:11, 134:12
**met** [14] - 20:7, 129:12, 137:19, 137:21, 137:24, 142:11, 142:13, 142:18, 143:10, 143:19, 182:8, 182:10, 211:21, 211:22
**Miami** [132] - 1:16, 1:19, 1:22, 1:25, 2:5, 2:11, 2:11, 11:6, 14:19, 24:14, 24:16, 28:12, 28:14, 36:14, 36:24, 37:3, 37:5, 39:3, 49:9, 49:11, 49:14, 52:20, 53:8, 53:11, 53:17, 54:3, 54:5, 54:6, 54:8, 54:10, 54:22, 54:25, 55:6, 55:20, 56:10, 56:21, 56:23, 57:15, 57:16, 57:22, 58:4, 58:14, 61:22, 61:23, 64:3, 64:6, 64:9, 64:10, 64:14, 64:20, 65:11, 66:24, 67:3, 67:20, 67:21, 69:20, 70:4, 71:6, 72:2, 72:7, 74:13, 77:22, 80:24, 84:23, 85:20, 87:20, 90:15, 90:16, 90:17, 93:12, 94:9, 94:15, 94:18, 95:17, 95:19, 96:3, 97:2, 97:3, 98:1, 100:14, 101:7, 101:12,

101:14, 107:24, 108:23, 112:1, 112:6, 112:8, 112:17, 114:11, 115:14, 115:15, 120:17, 122:15, 125:3, 125:7, 126:1, 126:23, 127:18, 132:12, 132:14, 133:6, 134:7, 135:2, 135:3, 135:11, 135:16, 135:18, 136:4, 136:10, 137:1, 139:4, 145:21, 149:8, 157:13, 176:1, 180:1, 193:14, 197:21, 197:22, 198:7, 208:12, 212:24, 213:22, 215:4, 217:24, 221:11, 221:12
**Miami-Dade** [2] - 180:1, 217:24
**Miami.gov** [1] - 217:25
**Miamiparking.com** [1] - 92:15
**MICHAEL** [1] - 3:11
**Michael** [7] - 105:15, 128:14, 128:16, 129:2, 173:13, 173:20, 207:14
**mICHAEL** [1] - 173:22
**microwaves** [1] - 216:5
**middle** [3] - 17:9, 91:18, 101:1
**might** [4] - 51:3, 82:24, 83:6, 217:1
**military** [1] - 175:15
**Milton** [6] - 116:21, 117:3, 117:11, 117:12, 118:16
**Miltons** [1] - 118:1
**mind** [2] - 125:2, 211:4
**mine** [2] - 39:11, 141:20
**mini** [1] - 11:19
**minimize** [1] - 6:18
**minute** [3] - 103:7, 160:20, 217:1
**minutes** [11] - 75:8, 105:8, 105:9, 105:13, 109:21, 134:19, 134:23, 149:2, 168:10, 211:9
**Miriam** [1] - 164:10
**MIRO** [2] - 3:6, 16:5
**Miro** [48] - 6:25, 9:1,

11:18, 11:20, 11:22, 15:16, 16:3, 16:9, 16:22, 18:11, 18:23, 21:7, 21:24, 24:15, 26:12, 27:24, 28:12, 29:19, 29:23, 30:9, 30:16, 32:10, 36:1, 36:8, 52:8, 55:12, 56:18, 58:12, 79:23, 92:3, 107:12, 107:23, 108:12, 108:15, 110:16, 129:20, 144:5, 147:4, 147:19, 148:18, 150:20, 152:23, 153:20, 159:22, 162:9, 163:12, 165:10
**mischaracterizes** [1] - 128:22
**misconduct** [3] - 123:18, 124:11, 124:12
**mispronouncing** [1] - 133:11
**misquoted** [1] - 69:12
**missing** [1] - 110:2
**misstates** [3] - 70:1, 138:19, 207:21
**mistaken** [3] - 41:19, 71:17, 113:20
**mistakes** [1] - 133:12
**mistrial** [2] - 126:4, 158:18
**misunderstanding** [1] - 87:15
**mix** [1] - 43:22
**mmm-Hhh** [1] - 125:5
**model** [1] - 216:16
**modern** [1] - 175:11
**Molina** [3] - 80:23, 81:1, 81:7
**mom** [1] - 104:6
**moment** [6] - 36:4, 67:23, 143:21, 154:15, 167:2, 215:13
**Monday** [4] - 143:8, 220:6, 220:9, 220:17
**money** [2] - 58:7, 178:18
**Monroe** [1] - 180:2
**month** [5] - 40:9, 40:10, 40:11, 40:14, 47:4
**months** [4] - 134:9, 136:3, 137:23, 146:4
**Moore** [2] - 183:2, 183:13
**Moore's** [1] - 187:19

**morning** [12] - 6:6, 6:9, 6:10, 6:13, 6:14, 15:20, 16:9, 16:10, 26:10, 36:8, 161:21, 220:9
**most** [5] - 34:4, 47:5, 186:15, 201:7, 209:8
**mostly** [6] - 177:6, 180:12, 188:11, 214:10, 214:17
**mother** [4] - 104:1, 104:4, 104:12, 104:15
**motion** [9] - 7:12, 35:13, 35:22, 35:24, 105:14, 153:13, 153:16, 159:2, 160:10
**Mount** [1] - 127:14
**mouse** [1] - 101:3
**mouth** [2] - 43:6, 157:24
**move** [19] - 21:20, 26:23, 29:15, 31:21, 35:21, 79:5, 79:14, 87:24, 88:5, 92:9, 110:10, 126:9, 127:25, 130:1, 149:16, 153:13, 158:18, 197:5
**moved** [8] - 78:17, 88:7, 88:8, 174:17, 175:3, 190:4, 199:2
**movement** [1] - 124:1
**moves** [1] - 70:12
**MPA** [1] - 92:16
**MR** [302] - 6:10, 6:14, 7:4, 8:16, 9:9, 9:15, 10:7, 10:22, 12:15, 12:20, 12:25, 13:14, 13:22, 14:7, 14:23, 15:1, 15:8, 16:14, 16:16, 17:10, 18:6, 18:8, 18:18, 18:20, 21:2, 21:4, 21:9, 21:19, 24:2, 24:4, 24:10, 25:15, 25:17, 26:6, 26:8, 26:16, 26:18, 27:18, 27:20, 28:4, 28:6, 28:20, 28:22, 29:5, 29:7, 30:3, 30:11, 30:13, 31:20, 33:5, 33:7, 33:20, 34:14, 35:6, 35:12, 35:21, 36:4, 36:7, 36:18, 36:20, 37:25, 38:17, 41:14, 44:23, 47:21, 49:7, 52:3, 53:5, 53:24, 56:9, 56:13, 57:14,

61:17, 63:1, 63:24, 64:18, 67:6, 67:14, 70:3, 72:13, 73:13, 73:14, 75:24, 77:14, 78:2, 78:16, 79:2, 79:6, 79:7, 79:9, 79:11, 79:17, 79:20, 79:22, 86:8, 87:23, 88:3, 88:11, 88:12, 91:1, 92:8, 92:14, 94:23, 97:14, 97:17, 100:2, 100:12, 102:1, 102:3, 102:9, 104:18, 104:23, 105:3, 105:6, 105:15, 105:22, 105:24, 107:8, 107:11, 110:13, 111:1, 111:7, 115:7, 116:16, 117:7, 117:16, 118:5, 120:3, 125:23, 126:13, 128:1, 128:5, 128:25, 129:9, 130:1, 130:5, 131:10, 133:23, 133:24, 134:21, 134:24, 138:21, 139:13, 139:21, 143:21, 143:24, 144:19, 147:11, 147:13, 147:20, 148:1, 148:3, 148:13, 148:20, 149:4, 149:6, 150:5, 150:8, 150:14, 150:21, 150:24, 151:6, 152:15, 152:17, 152:19, 153:6, 153:8, 153:15, 154:5, 154:10, 154:12, 155:13, 157:2, 158:1, 158:6, 158:11, 158:18, 158:25, 159:14, 159:19, 159:22, 160:1, 160:4, 160:10, 160:24, 161:1, 162:5, 163:7, 163:9, 163:20, 165:8, 165:15, 166:11, 167:1, 167:5, 167:8, 167:15, 168:14, 168:18, 168:19, 168:22, 168:25, 169:3, 169:5, 169:7, 169:10, 169:16, 169:19, 169:21, 169:24, 170:4,

170:7, 170:9, 170:14, 170:19, 171:8, 171:13, 171:25, 172:11, 172:14, 172:19, 173:1, 173:3, 181:12, 182:15, 182:22, 183:3, 183:8, 183:16, 183:20, 184:5, 184:8, 184:12, 184:18, 187:15, 188:1, 189:12, 189:21, 190:6, 190:8, 191:18, 192:2, 193:9, 193:20, 194:3, 194:6, 194:12, 194:17, 195:2, 195:6, 196:1, 196:3, 196:9, 196:11, 196:21, 197:2, 197:6, 197:9, 197:11, 197:13, 197:16, 198:4, 199:23, 200:5, 200:17, 200:19, 200:21, 201:12, 202:12, 202:21, 203:2, 203:13, 203:20, 203:25, 204:4, 204:11, 205:1, 205:17, 205:19, 206:18, 207:19, 207:21, 208:2, 208:15, 209:1, 209:11, 209:18, 210:5, 210:12, 210:23, 211:18, 211:20, 216:25, 217:4, 218:7, 218:9, 218:14, 218:21, 219:4, 219:7, 219:10, 219:17
**MS** [219] - 6:6, 6:17, 6:22, 8:7, 8:20, 8:22, 8:25, 10:8, 10:10, 11:16, 12:4, 12:9, 12:12, 13:24, 14:6, 15:3, 15:7, 15:10, 16:2, 16:8, 16:15, 16:18, 16:21, 17:14, 17:19, 18:10, 18:22, 21:6, 21:13, 21:20, 21:23, 24:7, 24:13, 25:19, 26:11, 26:24, 26:25, 27:23, 28:11, 28:25, 29:6, 29:10, 29:13, 29:15, 29:18, 29:21, 29:22, 30:5,

30:7, 30:15, 31:21, 31:25, 32:2, 32:6, 32:8, 32:9, 33:10, 33:25, 34:18, 34:20, 35:17, 35:25, 36:15, 37:23, 38:14, 41:12, 44:21, 46:13, 47:19, 49:4, 52:2, 53:4, 53:21, 56:7, 56:11, 57:11, 61:14, 62:23, 63:21, 64:16, 67:4, 67:12, 68:17, 69:25, 72:10, 73:10, 77:12, 77:24, 78:13, 86:6, 87:25, 90:24, 92:11, 94:20, 99:24, 104:16, 105:12, 106:3, 110:23, 111:5, 115:4, 116:13, 117:4, 117:14, 118:2, 119:25, 124:14, 125:15, 125:19, 127:21, 128:3, 128:22, 129:7, 131:7, 133:22, 138:16, 138:19, 139:9, 139:18, 144:2, 144:4, 144:21, 146:3, 147:17, 147:23, 148:17, 148:24, 149:12, 149:16, 149:18, 150:10, 150:17, 150:19, 150:23, 150:25, 151:1, 151:10, 152:22, 153:18, 154:14, 158:12, 158:16, 159:7, 159:11, 161:16, 162:8, 163:11, 163:23, 163:24, 164:24, 167:9, 167:25, 168:2, 168:13, 170:25, 171:4, 171:19, 172:5, 173:12, 173:24, 181:15, 182:17, 183:12, 183:18, 184:9, 184:14, 184:21, 185:18, 187:17, 190:1, 191:21, 192:5, 193:11, 194:9, 194:15, 195:3, 195:7, 195:11, 195:14, 195:17, 196:7, 196:15, 197:4, 198:13, 199:8,

199:15, 199:18, 200:9, 201:15, 202:16, 202:24, 203:6, 203:17, 203:22, 204:8, 204:14, 205:22, 207:9, 207:11, 207:24, 208:4, 208:8, 208:19, 209:3, 209:16, 209:20, 209:25, 210:9, 210:16, 210:21, 217:7, 217:9, 218:12, 218:16, 218:23, 219:13, 219:20, 220:1, 220:18
**multiple** [12] - 62:15, 72:8, 108:15, 158:16, 168:2, 168:4, 168:13, 168:14, 170:21, 171:4, 171:6, 214:24
**mural** [2] - 119:17, 119:22
**murals** [3] - 35:2, 35:3, 35:18
**music** [9] - 32:16, 32:17, 61:5, 66:8, 80:4, 82:13, 82:24, 85:2, 151:15
**music's** [1] - 66:12
**must** [8] - 89:10, 112:6, 185:5, 185:10, 185:20, 185:21, 185:22, 185:25

## N

**N.W** [1] - 164:10
**NA** [1] - 164:9
**name** [12] - 110:15, 117:1, 117:3, 117:6, 127:4, 127:11, 136:8, 153:9, 161:2, 173:18, 206:25
**named** [2] - 155:23, 155:24
**names** [4] - 6:4, 118:7, 164:6
**narrative** [2] - 110:1, 191:19
**narrator** [1] - 103:4
**nature** [1] - 26:18
**nay** [1] - 213:8
**nearby** [1] - 216:6
**nearly** [2] - 174:8, 178:6
**necessarily** [1] -

186:16
**need** [22] - 11:15, 34:18, 68:19, 83:13, 85:12, 96:20, 127:7, 162:3, 165:7, 165:9, 171:2, 180:22, 181:7, 190:3, 193:3, 199:11, 201:8, 204:20, 206:8, 206:13, 211:2, 211:5
**needed** [4] - 179:6, 202:25, 203:4, 203:7
**needs** [2] - 190:11, 200:23
**negative** [2] - 199:25, 200:2
**neighborhood** [3] - 62:22, 91:18, 192:10
**neighborhoods** [1] - 136:23
**net** [1] - 74:25
**Never** [2] - 49:12, 140:19
**never** [49] - 39:7, 43:4, 43:6, 43:8, 44:14, 44:18, 45:14, 47:9, 48:7, 57:22, 71:7, 75:3, 82:7, 91:20, 94:13, 95:25, 103:23, 104:4, 104:10, 104:11, 113:23, 120:18, 121:2, 121:6, 125:24, 126:22, 129:12, 132:14, 133:16, 134:14, 134:18, 137:6, 137:19, 139:3, 139:4, 139:7, 139:14, 147:13, 148:12, 148:22, 161:2, 163:9, 165:19, 209:14, 210:7, 213:25, 214:22, 216:24, 219:24
**New** [2] - 197:22, 198:7
**new** [12] - 76:6, 76:9, 76:10, 89:8, 132:23, 174:14, 177:1, 177:23, 206:23, 207:2, 207:3
**news** [7] - 198:21, 198:22, 198:23, 199:3, 199:6, 199:7, 220:6
**newspaper** [1] - 166:22
**next** [23] - 30:19,

30:23, 53:2, 63:17, 66:2, 68:22, 73:12, 76:20, 82:15, 96:14, 96:19, 127:25, 130:10, 130:16, 130:17, 146:19, 151:15, 156:13, 173:11, 198:11, 220:13

**nice** [5] - 42:21, 43:2, 61:12, 124:18, 217:5

**night** [6] - 90:5, 91:4, 91:18, 143:7, 179:7

**nightclub** [4] - 184:2, 203:12, 206:17, 207:18

**nightclub/lounge** [1] - 208:1

**nine** [2] - 28:1, 220:9

**Niworowski** [1] - 1:14

**NO** [1] - 1:3

**nobody** [3] - 60:9, 127:20, 214:4

**noise** [5] - 60:25, 61:5, 62:17, 62:22, 133:18

**non** [6] - 122:21, 148:5, 148:14, 166:16, 185:25, 215:17

**non-alcoholic** [2] - 185:25, 215:17

**non-disclosed** [1] - 166:16

**non-exempt** [1] - 122:21

**non-party** [1] - 148:14

**non-present** [1] - 148:5

**none** [1] - 161:15

**nonetheless** [1] - 13:15

**nonsense** [1] - 168:15

**normal** [1] - 180:13

**North** [2] - 2:11, 221:11

**not-about-this** [1] - 167:7

**not-for-profit** [1] - 137:10

**note** [2] - 150:22, 167:13

**noted** [2] - 101:16, 194:10

**notepad** [1] - 138:2

**notes** [4] - 74:16, 74:18, 140:18, 216:25

**nothing** [26] - 10:3, 11:2, 65:1, 78:19, 78:20, 93:19,

109:24, 110:2, 120:22, 124:2, 138:8, 143:24, 149:6, 149:7, 155:25, 157:11, 159:19, 160:2, 163:17, 168:12, 171:14, 172:17, 173:15, 204:19, 204:23, 207:21

**notice** [4] - 80:13, 134:4, 154:21, 206:4

**notified** [2] - 83:1, 84:20

**November** [19] - 29:25, 41:3, 41:19, 42:1, 46:2, 46:25, 80:3, 81:8, 82:9, 83:16, 126:20, 135:7, 135:25, 138:10, 139:1, 151:12, 151:15, 170:4

**nowhere** [1] - 150:8

**Number** [2] - 6:2, 212:11

**number** [14] - 16:14, 26:8, 34:14, 65:24, 70:16, 72:4, 75:18, 88:4, 88:14, 151:7, 175:4, 180:9

**numerous** [5] - 73:6, 120:20, 218:25, 219:3

**NW** [1] - 1:15

## O

**oath** [9] - 11:24, 16:3, 21:16, 69:6, 116:4, 118:14, 119:1, 124:25, 153:24

**object** [3] - 68:17, 110:23, 194:3

**objection** [171] - 7:1, 16:13, 16:16, 17:10, 18:6, 18:7, 18:18, 18:19, 21:2, 21:9, 21:18, 21:19, 24:2, 24:3, 24:10, 25:15, 26:6, 26:16, 26:21, 27:18, 28:4, 28:20, 29:4, 30:3, 30:11, 30:12, 31:19, 31:20, 33:5, 33:20, 34:14, 35:6, 35:12, 35:21, 36:15, 37:23, 38:14, 41:12, 44:21, 46:13, 47:19, 49:4, 52:2, 53:4, 53:21, 56:7,

56:11, 57:11, 61:14, 62:23, 63:21, 64:16, 67:4, 67:12, 69:25, 72:10, 73:10, 77:12, 77:24, 78:13, 86:6, 87:25, 90:24, 92:11, 94:20, 99:24, 104:16, 111:5, 115:4, 116:13, 117:4, 117:14, 118:2, 119:25, 124:14, 125:15, 126:2, 127:21, 128:3, 128:22, 129:7, 131:7, 133:22, 138:16, 138:18, 139:9, 144:19, 147:11, 147:12, 147:20, 148:1, 148:2, 148:13, 148:20, 149:4, 149:5, 149:14, 150:5, 150:7, 150:14, 151:6, 152:15, 153:6, 153:7, 154:5, 155:14, 155:17, 163:7, 163:8, 163:20, 170:21, 181:12, 182:15, 182:22, 183:3, 183:8, 183:16, 183:20, 184:5, 184:12, 184:18, 187:15, 188:1, 189:12, 189:21, 190:6, 191:18, 192:2, 193:9, 193:20, 194:10, 196:1, 196:9, 196:21, 197:2, 197:12, 200:5, 200:17, 200:20, 201:12, 202:12, 202:21, 203:2, 203:13, 203:20, 203:25, 204:4, 204:11, 205:1, 205:17, 205:18, 206:18, 207:19, 207:20, 208:2, 208:15, 209:1, 209:11, 209:18, 209:23, 210:5, 210:12, 218:7, 218:8, 218:14, 218:21, 219:4, 219:10, 219:17

**Objection** [1] - 199:23

**objections** [4] - 139:18, 169:1,

194:17, 197:7

**observe** [1] - 141:25

**observed** [1] - 109:6

**obtain** [1] - 57:20

**obvious** [1] - 60:15

**obviously** [5] - 18:2, 98:1, 100:18, 145:3, 147:2

**occasion** [3] - 140:12, 142:4, 164:19

**occasions** [10] - 120:20, 139:22, 140:22, 142:7, 142:11, 142:15, 143:11, 157:24, 168:3, 200:3

**occupied** [1] - 97:7

**occur** [3] - 201:3, 213:16, 213:21

**occurred** [3] - 22:14, 214:7, 214:10

**occurring** [1] - 176:23

**Ocho** [4] - 77:7, 164:7, 190:20, 190:21

**October** [2] - 206:22

**OF** [1] - 1:1

**offer** [1] - 7:7

**office** [49] - 17:18, 20:8, 38:1, 49:25, 50:1, 50:2, 50:4, 50:5, 50:8, 50:23, 59:4, 60:5, 60:9, 60:11, 61:7, 63:7, 73:25, 74:25, 75:13, 75:16, 87:2, 87:14, 89:6, 89:18, 91:19, 115:16, 119:10, 119:13, 119:19, 119:24, 120:4, 120:13, 120:17, 120:21, 121:15, 121:21, 122:1, 122:7, 124:19, 128:8, 133:6, 137:25, 161:23, 191:4, 215:7, 218:4

**Office** [3] - 27:25, 174:10, 176:2

**officer** [12] - 30:25, 98:1, 98:2, 98:4, 100:8, 100:9, 109:22, 171:10, 172:17, 174:13, 175:1, 208:23

**officers** [4] - 109:23, 171:10, 174:14, 214:20

**offices** [3] - 50:6, 75:1, 87:13

**official** [8] - 63:14,

76:25, 77:2, 89:2, 89:7, 126:1, 135:20, 219:25

**Official** [1] - 2:10

**officially** [1] - 123:17

**officials** [3] - 74:1, 89:1, 102:4

**old** [2] - 136:23, 142:10

**once** [14] - 6:19, 40:10, 40:11, 54:11, 73:17, 78:21, 126:8, 155:2, 156:7, 170:3, 188:21, 205:10, 205:14, 206:12

**One** [1] - 58:13

**one** [106] - 8:14, 11:16, 11:23, 14:1, 14:5, 14:6, 14:13, 18:2, 18:3, 19:14, 23:19, 25:2, 26:4, 26:8, 27:5, 30:25, 31:14, 36:4, 36:19, 46:3, 46:4, 48:17, 48:22, 50:3, 51:2, 58:8, 59:21, 67:7, 70:25, 71:5, 71:6, 71:10, 71:14, 71:17, 71:18, 71:20, 72:8, 73:7, 73:18, 73:19, 73:21, 74:9, 83:25, 86:15, 94:24, 95:1, 95:16, 95:22, 102:5, 105:8, 109:1, 110:14, 110:24, 117:25, 121:14, 125:6, 125:23, 128:13, 128:16, 131:15, 132:6, 132:19, 132:23, 133:4, 133:9, 135:13, 136:23, 140:12, 142:1, 150:21, 151:7, 156:13, 158:12, 158:13, 158:21, 159:8, 159:16, 159:18, 160:7, 160:11, 160:13, 160:15, 162:1, 164:19, 172:6, 175:4, 175:17, 176:15, 181:20, 182:13, 185:7, 186:5, 188:4, 188:7, 194:14, 196:25, 200:12, 200:16, 201:11, 209:17, 212:7, 216:11, 217:25

**one-way** [2] - 18:2,

18:3
**ones** [3] - 132:22,
219:15, 219:22
**open** [26] - 9:3, 9:6,
11:12, 15:11, 79:18,
98:16, 99:2, 99:7,
100:8, 102:23,
102:24, 106:4,
110:20, 111:4,
111:10, 126:11,
156:6, 162:6, 173:4,
186:22, 190:15,
195:15, 199:16,
214:4
**opened** [5] - 98:19,
138:9, 155:4, 156:4,
214:18
**opening** [4] - 10:20,
11:8, 136:17, 171:25
**operate** [4] - 108:23,
112:8, 162:16,
208:20
**operating** [5] - 94:7,
112:1, 183:23,
184:1, 201:21
**operation** [3] - 102:12,
179:12, 192:6
**operational** [1] - 206:3
**operations** [6] -
179:11, 193:7,
193:13, 213:15,
213:21, 214:7
**opine** [1] - 115:21
**opinion** [9] - 18:8,
28:6, 33:2, 33:7,
33:11, 148:20,
165:2, 205:19,
210:12
**opinions** [1] - 220:8
**opponents** [1] - 70:12
**opportunity** [5] -
35:13, 35:22, 161:1,
211:6, 211:8
**opposed** [1] - 87:4
**opposing** [1] - 194:2
**ops** [1] - 206:4
**Option** [1] - 181:19
**option** [3] - 181:24,
212:10
**options** [2] - 181:23,
182:3
**order** [8] - 6:1, 8:2,
78:17, 89:2, 107:2,
116:20, 185:5,
204:19
**orders** [3] - 103:13,
139:7, 139:15
**ordinance** [19] - 6:23,
6:24, 7:1, 7:2, 7:5,
7:8, 7:15, 7:23, 8:11,

8:12, 9:24, 10:3,
10:6, 10:11, 10:16,
10:24, 11:12, 11:14
**Ordinance** [1] - 8:10
**organization** [4] -
131:5, 131:14,
138:7, 138:8
**organizations** [1] -
198:18
**organized** [2] -
137:13, 137:22
**Orlando** [1] - 180:4
**otherwise** [4] - 8:3,
14:13, 14:15, 154:23
**ounce** [1] - 177:17
**outcome** [3] - 27:17,
46:21, 203:11
**outside** [14] - 20:5,
20:11, 24:14, 48:19,
99:11, 99:14, 99:16,
120:20, 149:11,
180:13, 191:1,
202:1, 202:7, 202:8
**overhear** [1] - 106:15
**overrule** [1] - 160:9
**overruled** [71] - 17:16,
18:9, 21:11, 25:18,
28:21, 28:24, 29:14,
30:14, 33:8, 34:17,
35:8, 36:16, 38:15,
46:14, 53:23, 57:12,
63:22, 72:11, 77:13,
78:1, 90:25, 117:5,
118:3, 124:15,
128:24, 131:9,
139:11, 139:19,
144:20, 147:21,
148:6, 148:21,
149:14, 150:9,
152:18, 152:21,
153:16, 154:8,
154:11, 163:21,
182:16, 182:23,
183:4, 183:17,
183:21, 184:13,
188:2, 189:13,
189:23, 190:9,
194:11, 196:10,
196:12, 196:23,
199:24, 200:7,
201:13, 203:3,
203:14, 204:1,
204:5, 205:2,
205:21, 206:19,
208:6, 208:16,
209:13, 210:6,
210:14, 219:18
**oversee** [2] - 175:19,
179:25
**overseeing** [3] -

150:1, 179:10,
179:11
**overt** [1] - 176:8
**overview** [2] - 177:25,
178:2
**own** [6] - 50:10,
115:23, 135:21,
169:1, 198:5, 213:7
**owned** [6] - 33:3,
33:12, 33:19, 34:24,
45:14, 77:6
**owner** [5] - 101:23,
109:3, 150:13,
164:9, 205:16
**owners** [4] - 62:20,
128:16, 137:14,
209:9
**ownership** [1] - 57:8
**owns** [1] - 111:24

**P**

**p.m** [16] - 1:7, 106:20,
106:22, 107:4,
136:1, 165:4, 165:5,
173:8, 211:10,
211:11, 211:12,
220:12, 220:21
**package** [1] - 185:7
**PAGE** [1] - 3:4
**page** [18] - 76:20,
130:7, 130:16,
130:17, 130:21,
146:8, 162:20,
166:12, 167:4,
168:18, 168:22,
194:14, 195:18,
195:25, 196:14,
196:17, 198:11
**Pages** [1] - 1:8
**pages** [2] - 127:1,
130:16
**paid** [15] - 25:8, 38:12,
39:24, 40:6, 40:9,
40:13, 80:23, 81:9,
81:18, 81:24, 81:25,
115:14
**Pailette** [5] - 121:15,
121:24, 123:11,
158:11
**PAILETTE** [1] - 121:15
**painting** [2] - 119:17,
119:22
**palm** [5] - 100:17,
101:7, 101:13,
101:15, 101:17
**panel** [2] - 100:4,
100:5
**panhandle** [1] -
174:10

**paper** [5] - 17:23,
115:13, 181:21,
181:22, 199:3
**parameters** [1] -
215:23
**Parjus** [2] - 19:19
**Park** [10] - 52:18,
55:23, 56:2, 74:5,
74:7, 131:25, 133:7,
135:5, 136:1, 137:11
**park** [1] - 56:1
**parkers** [2] - 90:20,
90:21
**parking** [18] - 32:24,
61:6, 62:22, 90:1,
90:4, 90:11, 90:15,
90:16, 90:19, 91:5,
91:10, 91:13, 91:17,
91:24, 94:1, 94:12,
94:16
**Parking** [4] - 93:13,
94:9, 94:18, 145:21
**part** [45] - 7:11, 7:24,
7:25, 9:21, 10:18,
17:12, 41:24, 43:16,
48:5, 51:7, 58:19,
60:12, 63:23, 64:20,
73:23, 97:19, 97:23,
98:5, 108:4, 108:5,
108:6, 108:9, 115:8,
116:18, 117:20,
118:6, 118:11,
123:4, 126:22,
127:13, 130:6,
130:8, 135:10,
136:22, 138:6,
143:3, 148:14,
158:8, 161:11,
174:13, 176:22,
199:9, 214:21
**participate** [3] - 193:7,
218:24, 219:5
**participated** [1] -
193:13
**particular** [15] - 8:23,
9:5, 14:9, 24:11,
26:19, 26:20, 59:25,
82:2, 152:20,
153:11, 158:9,
166:25, 191:5,
206:10, 218:3
**parties** [1] - 131:24
**partner** [4] - 126:17,
126:19, 127:19,
129:11
**partners** [2] - 128:16,
178:10
**parts** [1] - 146:7
**party** [7] - 126:5,
138:14, 138:25,

148:14, 157:12,
157:14
**Pasa** [4] - 132:22,
137:5, 137:13,
137:16
**passage** [6] - 8:10,
8:11, 8:14, 8:17,
10:17, 11:13
**passed** [7] - 7:1, 8:14,
8:17, 8:18, 8:19,
10:11, 14:9
**passing** [1] - 8:17
**past** [1] - 46:17
**pasted** [2] - 53:12,
54:4
**Pati** [1] - 130:22
**patio** [1] - 191:6
**patrol** [2] - 174:11,
175:23
**patrons** [1] - 176:25
**pattern** [4] - 33:3,
33:7, 33:12, 206:2
**pause** [5] - 32:2, 32:4,
36:5, 143:23, 217:3
**paused** [4] - 32:5,
32:7, 102:2, 102:8
**pay** [4] - 53:13, 89:22,
178:20, 178:22
**paying** [5] - 80:19,
80:20, 81:5, 81:7,
176:14
**pays** [1] - 81:4
**peanuts** [1] - 187:11
**Pena** [1] - 34:13
**pending** [2] - 114:14,
192:25
**Pensacola** [1] -
174:10
**people** [39] - 41:9,
43:15, 44:3, 44:19,
44:25, 45:9, 45:14,
45:17, 60:12, 60:14,
68:22, 84:8, 87:8,
88:14, 97:23,
100:12, 103:17,
106:10, 106:14,
111:8, 111:9,
128:13, 137:13,
146:19, 155:2,
159:4, 161:7,
170:10, 175:6,
175:21, 176:13,
185:22, 186:12,
188:17, 189:5,
215:16, 216:7
**Pequina** [1] - 136:25
**per** [1] - 88:24
**percent** [7] - 37:15,
46:8, 46:11, 185:24,
215:16, 216:8

**percentage** [1] - 46:16
**perfectly** [2] - 89:4,
170:12
**performed** [1] -
201:17
**perhaps** [1] - 90:12
**period** [3] - 8:1, 12:23,
13:11
**permanent** [1] - 189:1
**permission** [2] -
146:1, 153:13
**permit** [7] - 112:2,
112:5, 112:7, 187:3,
188:24, 188:25,
202:7
**permits** [9] - 96:22,
132:2, 132:3, 133:6,
135:5, 136:9, 138:5,
138:6
**permitted** [13] - 63:13,
85:16, 85:21, 85:22,
86:1, 102:22, 151:5,
201:24, 202:5, 202:8
**permitter** [1] - 96:23
**permitting** [1] -
133:17
**person** [30] - 13:3,
14:9, 14:14, 37:15,
61:18, 64:1, 81:4,
86:10, 88:16, 96:23,
101:2, 101:4, 103:4,
110:24, 111:9,
143:17, 154:13,
155:23, 155:24,
155:25, 156:2,
157:4, 157:5, 157:7,
158:24, 161:10,
186:2, 192:17
**person's** [2] - 34:15,
151:8
**personal** [33] - 17:1,
33:22, 39:11, 52:16,
56:24, 58:2, 58:6,
165:24, 166:3,
166:17, 166:21,
167:3, 167:7,
168:24, 169:1,
171:3, 171:12,
183:9, 192:3,
193:20, 196:11,
197:18, 198:5,
200:6, 202:21,
204:11, 208:2,
209:11, 212:2,
217:23, 218:4,
219:11
**personally** [7] - 21:7,
21:14, 167:10,
167:11, 181:16,
209:12, 216:20

**personnel** [1] - 89:9
**persons** [1] - 174:18
**PERTNOY** [95] - 6:10,
165:15, 166:11,
168:18, 168:22,
169:3, 169:7,
169:19, 170:4,
171:8, 171:25,
172:11, 172:14,
172:19, 173:1,
173:3, 181:12,
182:15, 182:22,
183:3, 183:8,
183:16, 183:20,
184:5, 184:8,
184:12, 184:18,
187:15, 188:1,
189:12, 189:21,
190:6, 190:8,
191:18, 192:2,
193:9, 193:20,
194:3, 194:6,
194:12, 194:17,
196:1, 196:3, 196:9,
196:11, 196:21,
197:2, 197:6, 197:9,
197:11, 197:13,
197:16, 198:4,
199:23, 200:5,
200:17, 200:19,
200:21, 201:12,
202:12, 202:21,
203:2, 203:13,
203:20, 203:25,
204:4, 204:11,
205:1, 205:17,
205:19, 206:18,
207:19, 207:21,
208:2, 208:15,
209:1, 209:11,
209:18, 209:23,
210:5, 210:12,
210:23, 211:1,
211:18, 211:20,
216:25, 217:4,
218:7, 218:9,
218:14, 218:21,
219:4, 219:7,
219:10, 219:17
**Pertnoy** [7] - 1:18,
3:13, 6:11, 167:9,
211:17, 218:17,
219:22
**phone** [7] - 18:3, 59:7,
101:5, 102:10,
154:16, 182:14,
182:19
**phonetic** [2] - 166:1,
166:8
**photo** [4] - 30:5,

149:19, 150:20,
151:2
**photographs** [1] -
143:15
**photos** [5] - 29:19,
29:25, 31:6, 31:9,
110:24
**phrase** [1] - 141:25
**phrased** [1] - 24:12
**physically** [1] - 179:23
**pick** [2] - 159:3, 160:6
**picked** [2] - 161:24,
214:5
**picks** [1] - 127:9
**picture** [13] - 30:19,
30:23, 30:24, 31:3,
31:4, 83:19, 96:20,
97:18, 134:2,
135:10, 135:12,
142:2
**pictured** [1] - 98:25
**pictures** [5] - 63:3,
110:14, 110:20,
111:2, 111:12
**piece** [1] - 158:4
**pieces** [2] - 181:20,
181:22
**Piedra** [1] - 164:8
**Pinilla** [3] - 34:25,
164:19, 182:10
**PINILLA** [1] - 1:4
**Pit** [9] - 134:12,
134:14, 134:15,
134:25, 135:21,
136:16, 136:21,
162:12, 162:15
**place** [5] - 63:17,
139:8, 185:22,
186:20, 193:3
**places** [4] - 95:17,
177:11, 186:15,
214:18
**plainly** [1] - 99:17
**plaintiff** [8] - 6:5, 14:4,
15:25, 22:10, 94:24,
142:15, 156:23,
173:11
**Plaintiffs** [1] - 1:5
**plaintiffs** [14] - 6:8,
9:18, 19:16, 32:24,
33:4, 33:13, 33:19,
76:23, 86:15, 105:7,
166:2, 166:20,
173:13, 182:4
**PLAINTIFFS** [1] - 1:13
**Plaintiffs'** [40] - 16:13,
16:15, 16:16, 16:20,
21:17, 21:22, 29:3,
29:17, 31:18, 31:23,
65:17, 75:21, 75:23,

78:3, 79:24, 82:6,
82:8, 83:15, 85:5,
86:16, 86:22, 92:1,
92:2, 92:9, 92:13,
94:25, 95:2, 97:11,
104:19, 107:9,
107:12, 129:19,
130:1, 130:4,
148:24, 150:24,
162:18, 194:1,
197:5, 207:9
**plaintiffs'** [17] - 35:1,
35:4, 72:9, 72:25,
73:7, 74:9, 74:13,
76:22, 78:5, 82:1,
84:17, 96:21, 142:1,
142:4, 142:19,
150:23, 220:13
**PLAINTIFFS'** [2] - 3:3,
4:4
**plan** [3] - 9:25, 45:7,
52:13
**planning** [1] - 13:1
**plans** [2] - 206:3,
206:4
**plates** [1] - 216:5
**platform** [4] - 41:6,
43:9, 98:9, 98:10
**play** [4] - 31:25, 97:10,
154:25, 155:4
**played** [5] - 32:1,
97:13, 100:11,
102:2, 102:8
**playing** [1] - 66:13
**pleadings** [1] - 170:12
**plopped** [2] - 96:14,
96:17
**point** [22] - 19:5,
50:13, 50:17, 53:22,
72:25, 101:3,
103:15, 144:22,
156:11, 170:18,
170:20, 171:2,
175:17, 175:23,
176:15, 177:19,
178:9, 187:22,
204:18, 205:24,
206:6, 208:13
**pointed** [3] - 35:2,
63:8, 74:12
**pointing** [2] - 34:11,
34:23
**Police** [2] - 125:14,
175:10
**police** [19] - 43:10,
98:1, 98:2, 100:8,
100:15, 100:18,
101:19, 101:23,
102:4, 109:4,
109:19, 172:16,

174:14, 175:9,
175:11, 192:9,
192:11, 192:14
**policies** [1] - 172:14
**policing** [2] - 175:11,
175:12
**policy** [8] - 13:8,
18:15, 18:25, 19:3,
73:8, 89:8, 89:9,
179:19
**political** [11] - 63:16,
64:1, 67:11, 70:7,
70:12, 80:14, 80:16,
80:17, 80:20, 81:4,
120:16
**politician** [1] - 209:15
**politicians** [1] -
167:19
**politics** [1] - 70:12
**popped** [1] - 202:4
**popular** [1] - 135:24
**Port** [3] - 95:17, 95:19,
96:3
**Portia** [5] - 41:10,
41:15, 41:20, 41:22,
41:23
**Portia's** [1] - 42:3
**portion** [4] - 100:10,
107:20, 178:4
**position** [7] - 23:4,
40:17, 57:20, 57:23,
69:15, 70:11, 160:12
**positively** [1] - 60:24
**possible** [2] - 105:12,
188:23
**possibly** [1] - 167:20
**posture** [1] - 156:25
**potentially** [2] - 54:25,
55:2
**POWERS** [2] - 2:9,
221:10
**Powers** [1] - 221:9
**practice** [1] - 178:15
**pre** [2] - 80:6, 165:19
**pre-election** [1] - 80:6
**pre-trial** [1] - 165:19
**precinct** [1] - 84:7
**precisely** [1] - 70:12
**predicament** [1] -
125:4
**prejudicial** [2] -
160:19, 165:22
**preliminary** [2] -
179:23, 192:23
**premesis** [1] - 189:10
**premises** [2] - 112:8,
186:21
**Premises** [2] - 185:1,
185:3
**preparation** [1] -

58:13
**prepare** [3] - 58:16, 186:13, 198:16
**prepared** [6] - 7:22, 48:16, 48:18, 136:5, 165:25, 198:4
**preparing** [1] - 186:17
**presence** [4] - 101:24, 103:11, 123:10, 157:18
**present** [11] - 107:6, 122:5, 129:3, 129:19, 137:24, 140:16, 148:5, 154:7, 157:17, 173:9, 211:13
**presented** [3] - 156:22, 212:9
**preserved** [1] - 19:4
**president** [1] - 64:8
**press** [1] - 23:15
**pressing** [1] - 54:10
**pressured** [1] - 22:24
**presumably** [2] - 86:13, 108:16
**pretty** [14] - 39:24, 40:24, 54:6, 90:20, 175:7, 176:15, 177:19, 185:23, 186:20, 186:24, 188:20, 189:8, 189:17, 213:15
**prevalent** [1] - 184:24
**prevented** [1] - 179:20
**previous** [3] - 14:18, 88:24, 110:20
**previously** [6] - 4:9, 16:5, 23:23, 31:23, 157:7, 204:9
**primarily** [1] - 43:21
**print** [1] - 199:3
**printout** [2] - 78:3, 78:16
**priority** [1] - 104:9
**private** [5] - 37:22, 40:20, 54:24, 58:3, 209:8
**privilege** [3] - 7:9, 8:4, 8:5
**Pro** [1] - 41:10
**problem** [4] - 70:8, 176:11, 196:5, 214:23
**problematic** [1] - 171:16
**procedures** [1] - 172:14
**proceed** [4] - 20:2, 153:17, 154:14, 211:17

**proceeded** [2] - 20:15, 109:16
**proceeding** [1] - 122:20, 157:14
**proceedings** [6] - 36:5, 143:23, 148:14, 217:3, 220:21, 221:4
**Process** [2] - 57:23, 58:5
**process** [8] - 49:22, 50:17, 59:6, 122:21, 122:22, 123:4, 127:10, 174:6
**product** [1] - 178:21
**production** [1] - 48:2
**products** [1] - 176:17
**professional** [1] - 174:7
**profile** [3] - 179:17, 179:18, 180:12
**profit** [1] - 137:10
**Program** [1] - 181:19
**program** [2] - 132:6, 132:7
**progress** [1] - 145:22
**project** [5] - 52:13, 52:22, 54:24, 58:9
**Project** [1] - 56:16
**projects** [9] - 51:15, 51:18, 51:19, 51:21, 51:24, 52:23, 52:25, 58:23, 60:14
**promote** [1] - 137:15
**promoted** [2] - 176:18, 177:5
**proper** [4] - 17:5, 108:23, 122:19, 122:24
**properly** [2] - 47:1, 48:3
**properties** [24] - 33:3, 33:12, 33:18, 34:24, 35:1, 35:4, 48:23, 72:9, 73:1, 73:6, 74:8, 74:12, 74:13, 76:6, 76:21, 76:22, 78:4, 78:5, 142:1, 163:19, 164:1, 164:4, 164:21
**property** [22] - 8:25, 9:5, 10:15, 11:1, 34:12, 62:7, 76:10, 77:1, 77:2, 78:9, 78:21, 83:22, 84:17, 96:21, 99:22, 100:23, 102:21, 111:24, 112:1, 112:6, 163:5, 191:8
**proposed** [1] - 53:7

**propriety** [1] - 48:24
**prostitution** [1] - 177:6
**protect** [1] - 160:13
**protected** [2] - 7:6, 7:8
**prove** [4] - 78:23, 78:25, 159:1
**proves** [1] - 8:23
**provide** [4] - 89:3, 89:8, 99:23, 179:9
**provision** [2] - 87:10, 87:11
**provisions** [2] - 185:20, 185:23
**psychology** [1] - 174:5
**public** [11] - 18:4, 51:13, 54:24, 108:6, 108:10, 108:11, 108:16, 108:17, 118:8, 133:7
**public-private** [1] - 54:24
**publications** [1] - 198:7
**publish** [5] - 16:18, 21:20, 29:15, 31:21, 149:16
**published** [1] - 88:4
**pull** [18] - 29:3, 31:18, 52:1, 78:23, 79:24, 85:11, 87:19, 92:1, 95:1, 104:20, 110:8, 111:16, 129:19, 133:21, 148:24, 150:17, 162:18, 194:1
**pulled** [5] - 135:5, 136:9, 138:6, 145:1, 175:22
**purchased** [1] - 124:18
**purports** [1] - 80:1
**purpose** [1] - 141:8
**purposes** [3] - 56:1, 104:22, 105:17
**pursuant** [1] - 7:9
**purview** [2] - 89:4, 183:1
**push** [1] - 181:3
**pussy** [2] - 109:18
**put** [20] - 16:12, 17:23, 21:17, 65:17, 86:19, 103:10, 127:4, 127:16, 133:25, 135:10, 137:11, 154:20, 156:25, 160:12, 172:12, 178:21, 178:22, 181:10, 187:8,

206:14
**putting** [5] - 49:16, 49:22, 67:7, 165:22, 205:19
**PX** [1] - 83:15

**Q**

**qualifications** [1] - 55:23
**qualified** [1] - 78:18
**quality** [8] - 42:13, 42:14, 42:18, 42:21, 43:1, 43:5, 43:9, 61:6
**Que** [4] - 132:22, 137:4, 137:13, 137:16
**questioned** [1] - 120:15
**questioning** [5] - 79:4, 79:10, 79:12, 156:12, 167:6
**questions** [25] - 9:23, 20:21, 35:25, 75:19, 76:1, 86:19, 95:7, 95:9, 116:10, 116:11, 129:16, 152:3, 155:10, 156:8, 156:10, 156:15, 156:25, 158:7, 164:24, 167:10, 172:7, 203:9, 210:21, 217:5, 220:1
**quick** [1] - 210:24
**Quintana** [3] - 26:2, 153:4, 153:22
**quit** [1] - 212:10
**quite** [2] - 35:2, 103:14
**quota** [7] - 185:12, 186:18, 188:3, 189:10, 208:17, 208:21, 215:12
**quote** [4] - 109:9, 109:10, 109:14, 109:17

**R**

**race** [1] - 78:11
**radius** [1] - 71:22
**raid** [6] - 165:17, 166:8, 167:16, 167:17, 167:21
**raids** [1] - 175:5
**raise** [8] - 23:17, 25:2, 25:6, 25:10, 154:12, 155:19, 156:1, 157:3

**raised** [9] - 9:18, 29:7, 35:23, 116:3, 153:10, 155:23, 157:6, 165:20, 194:18
**raises** [1] - 153:10
**raising** [2] - 153:9, 194:17
**rallies** [1] - 30:9, 30:16, 30:20
**rally** [35] - 29:25, 31:6, 31:13, 31:16, 32:13, 63:4, 63:6, 63:13, 63:16, 63:19, 63:25, 64:1, 64:24, 65:2, 65:15, 80:1, 80:6, 80:9, 80:13, 82:4, 82:9, 82:19, 83:22, 83:25, 84:8, 84:24, 85:1, 85:5, 86:4, 144:13, 150:17, 151:11, 151:12, 151:25
**ran** [5] - 36:21, 36:25, 37:7, 37:9, 43:14
**ranging** [1] - 51:18
**rather** [1] - 119:5
**re** [4] - 46:6, 56:1, 141:25, 155:5
**re-direct** [1] - 155:5
**re-do** [1] - 56:1
**re-phrase** [1] - 141:25
**re-soundingly** [1] - 46:6
**reach** [5] - 65:4, 66:6, 168:7, 209:21, 210:3
**reached** [2] - 19:23, 20:1
**reaction** [1] - 109:16
**read** [20] - 80:22, 81:22, 93:3, 112:15, 112:20, 112:21, 136:2, 137:2, 137:3, 146:7, 146:8, 149:23, 154:25, 164:5, 166:22, 198:1, 202:17, 211:4, 220:7
**reading** [7] - 69:5, 69:9, 76:10, 136:16, 145:25, 171:9, 197:10
**ready** [4] - 15:21, 15:22, 188:16, 189:5
**real** [8] - 61:4, 61:18, 61:23, 61:25, 62:3, 135:2, 176:10, 210:24
**really** [7] - 9:16, 17:9, 38:22, 51:12, 127:7,

132:25, 189:18
**realtime** [1] - 180:11
**reason** [19] - 14:9,
14:14, 121:13,
123:17, 127:5,
162:12, 162:15,
163:18, 163:25,
174:24, 181:4,
181:25, 182:1,
182:2, 186:5, 205:4,
205:11, 205:15
**reasons** [3] - 23:16,
24:23, 194:4
**Rebecca** [4] - 123:19,
124:5, 124:10,
124:20
**Rebecca's** [1] -
124:17
**rebut** [4] - 154:22,
155:1, 158:2, 158:7
**rebuttal** [3] - 12:3,
14:11, 162:2
**recalled** [1] - 64:4
**recanted** [1] - 14:5
**recap** [1] - 219:14
**receipts** [1] - 216:9
**receive** [5] - 26:14,
60:3, 61:2, 93:22,
208:3
**RECEIVED** [2] - 4:3,
5:3
**received** [37] - 4:9,
16:20, 19:11, 19:22,
20:15, 20:23, 20:24,
21:1, 21:22, 23:21,
29:17, 31:23, 88:2,
91:20, 91:21, 92:13,
110:12, 130:4,
180:17, 182:14,
182:19, 182:21,
182:24, 195:22,
195:23, 196:18,
197:19, 204:2,
206:20, 206:24,
206:25, 207:15,
209:5, 209:14,
215:3, 215:10
**receiving** [1] - 209:17
**reception** [3] - 119:14,
119:16
**receptionist** [3] -
50:22, 59:3, 59:7
**recess** [4] - 106:7,
106:22, 164:25,
211:11
**Recess** [1] - 165:5
**reciting** [2] - 68:18,
68:19
**recognize** [2] - 16:23,
21:24

**recollection** [10] -
41:20, 47:14, 79:13,
115:8, 132:16,
199:12, 200:23,
207:7, 207:12, 215:2
**recommend** [1] - 13:9
**recommendation** [3] -
7:22, 123:13, 172:8
**recommends** [1] -
69:15
**record** [14] - 10:18,
13:24, 81:15, 88:6,
108:6, 108:17,
118:8, 127:3,
134:20, 157:2,
170:1, 173:19,
194:11, 194:12
**record's** [1] - 88:3
**recorded** [1] - 40:2
**recording** [2] - 90:9,
90:10
**records** [18] - 18:5,
18:15, 19:1, 48:23,
60:23, 60:25, 72:2,
72:7, 77:1, 77:2,
77:4, 78:23, 108:10,
108:11, 108:16,
198:6
**rectify** [1] - 70:6
**red** [1] - 100:17
**redact** [2] - 195:11,
199:9
**REDIRECT** [2] - 144:3,
217:8
**redirect** [5] - 3:9, 3:14,
144:1, 153:12, 217:6
**refer** [4] - 149:9,
149:10, 158:9,
201:23
**reference** [3] - 111:23,
156:21, 158:13
**referenced** [5] - 97:1,
147:13, 149:12,
158:16, 159:12
**referred** [5] - 101:12,
124:6, 126:14,
134:18, 178:16
**referring** [19] - 8:13,
17:11, 19:13, 50:15,
84:20, 84:21, 85:8,
87:18, 88:15, 90:2,
101:3, 107:16,
121:19, 132:19,
133:4, 133:10,
140:2, 147:18,
155:18
**refers** [1] - 110:7
**reflects** [1] - 157:2
**refresh** [5] - 79:13,
199:12, 207:6,

207:12, 215:2
**refreshed** [1] - 200:23
**regard** [10] - 8:5, 10:1,
10:23, 24:5, 26:20,
72:17, 86:4, 113:14,
143:19, 167:4
**regarding** [20] - 26:5,
27:6, 27:7, 86:17,
88:25, 161:15,
168:12, 182:25,
194:19, 200:11,
200:12, 204:3,
204:6, 204:7, 205:6,
206:17, 207:1,
212:2, 215:3, 216:23
**regardless** [3] - 10:19,
172:19, 213:5
**register** [1] - 90:22
**registered** [3] -
132:23, 137:8, 137:9
**regular** [4] - 60:12,
174:23, 176:6, 213:2
**regularly** [1] - 213:22
**regulates** [1] - 90:15
**regulations** [3] -
90:18, 90:20, 91:6
**regulatory** [1] - 176:21
**regurgitating** [1] -
171:11
**rehired** [1] - 125:25
**reiterate** [1] - 82:22
**reiterated** [1] - 20:9
**rejected** [1] - 47:11
**related** [8] - 14:19,
17:14, 123:10,
164:12, 167:23,
167:24, 177:5
**relating** [2] - 8:10,
165:17
**relation** [1] - 143:5
**relationship** [11] -
19:6, 19:20, 57:2,
58:4, 67:10, 67:15,
69:19, 144:23,
144:25, 145:12,
148:19
**relative** [1] - 10:13
**released** [4] - 48:20,
64:10, 64:19
**relevance** [18] - 29:7,
36:15, 37:23, 44:21,
47:19, 53:21, 57:11,
64:16, 67:4, 67:12,
104:16, 117:4,
117:14, 118:2,
127:22, 128:3,
129:7, 194:18
**relevant** [1] - 172:10
**religious** [3] - 203:24,
204:7, 204:16

**remain** [1] - 173:7
**remaining** [2] -
134:19, 134:23
**remains** [1] - 156:3
**remember** [25] - 63:4,
71:1, 85:11, 86:19,
106:8, 124:16,
126:15, 140:14,
140:15, 142:16,
162:10, 162:23,
163:6, 172:11,
197:24, 198:8,
199:19, 206:25,
211:3, 211:4,
214:14, 216:15,
217:25, 218:17
**remind** [1] - 85:12
**remove** [1] - 200:24
**removed** [1] - 17:18
**rendered** [1] - 68:23,
146:20
**reopen** [1] - 147:1
**repeat** [7] - 21:12,
33:9, 34:18, 35:16,
54:13, 131:12,
163:22
**repeated** [2] - 34:11,
74:24
**repeatedly** [2] - 34:23,
170:10
**rephrase** [8] - 33:24,
110:25, 193:10,
193:22, 202:15,
203:21, 204:13,
213:19
**reply** [1] - 109:11
**report** [13] - 24:1,
124:10, 171:9,
171:14, 171:21,
187:19, 195:4,
201:3, 201:8,
201:10, 202:17,
210:11, 210:18
**REPORTED** [1] - 2:9
**reported** [10] - 23:5,
23:23, 40:2, 62:9,
123:18, 124:6,
124:12, 168:2,
198:6, 198:19
**Reporter** [1] - 2:10
**reporting** [3] - 141:9,
198:5, 208:24
**reports** [14] - 39:21,
39:22, 118:11,
166:4, 169:4, 169:7,
179:5, 179:10,
179:22, 184:10,
184:16, 191:24,
195:12, 197:19
**represent** [2] - 20:4,

20:14
**representative** [1] -
65:12
**represented** [2] -
157:14, 157:15
**reputation** [1] - 28:8
**request** [11] - 35:6,
35:12, 35:22, 55:23,
92:25, 128:8, 129:1,
153:13, 171:17,
181:10, 204:15
**requests** [1] - 219:15
**require** [1] - 190:17
**required** [5] - 23:12,
39:22, 81:5, 123:16,
125:8
**research** [5] - 48:2,
51:3, 58:23, 164:18,
198:6
**researching** [2] -
163:18, 164:1
**reserve** [2] - 26:22,
162:3
**residence** [3] - 62:1,
62:4, 78:17
**residences** [4] - 73:5,
77:4, 77:7, 78:4
**residency** [6] - 49:1,
76:15, 76:18, 78:19,
163:13, 163:14
**residential** [1] - 43:17
**residents** [5] - 42:14,
55:5, 62:16, 62:20,
91:17
**resigned** [1] - 172:9
**resolution** [1] - 13:18
**resolved** [2] - 54:12,
114:5
**resoundingly** [1] -
46:19
**respect** [6] - 9:11,
10:15, 12:7, 12:8,
12:9, 68:25
**respectfully** [1] -
160:9
**respond** [3] - 79:1,
89:5, 155:11
**responded** [1] - 93:20
**responding** [3] -
89:10, 110:24,
196:20
**responds** [1] - 66:14
**response** [4] - 93:17,
93:20, 93:22, 171:17
**responsibilities** [3] -
40:16, 60:7, 128:2
**responsibility** [3] -
86:13, 171:13, 180:1
**responsible** [2] -
59:19, 67:7

**responsiveness** [1] - 18:8
**restate** [1] - 81:15
**restaurant** [3] - 185:14, 202:6, 216:3
**restaurants** [2] - 186:6, 190:22
**restriction** [3] - 186:25, 187:2, 191:7
**restrictions** [3] - 186:19, 186:20, 188:5
**restroom** [1] - 210:23
**result** [2] - 37:18, 180:16
**results** [2] - 46:24, 71:24
**resume** [1] - 107:7
**resumed** [2] - 32:5, 32:7
**resumes** [2] - 15:17, 107:3
**retained** [1] - 18:16
**retaliation** [2] - 153:1
**retire** [3] - 181:17, 181:25, 212:11
**retired** [5] - 172:9, 180:8, 180:24, 181:18, 181:19
**Retirement** [1] - 181:19
**reveal** [1] - 154:1
**revenue** [2] - 185:25, 215:16
**review** [12] - 7:14, 7:15, 179:5, 179:22, 184:10, 184:16, 191:24, 192:24, 193:12, 197:7, 203:8
**reviewed** [1] - 198:14
**reviewing** [1] - 198:20
**revised** [1] - 12:15
**revocation** [1] - 154:22
**revoked** [1] - 10:11
**Reyes** [3] - 135:14, 135:18, 138:10
**RFQ** [1] - 55:23
**Richard** [6] - 60:4, 88:20, 89:18, 89:19, 121:20, 123:21
**Richie** [1] - 23:11
**rid** [1] - 147:3
**ride** [1] - 75:6
**ride-along** [1] - 75:6
**rider** [1] - 187:8
**rides** [1] - 171:20
**right-hand** [2] - 32:19, 34:2
**ringer** [1] - 127:16

**rise** [7] - 15:15, 15:18, 106:19, 165:3, 165:6, 220:11, 220:20
**risk** [3] - 175:5, 179:18, 180:13
**robbery/homicide** [1] - 174:18
**Robert** [1] - 78:10
**RODNEY** [1] - 1:10
**role** [3] - 176:3, 179:10, 179:19
**room** [5] - 20:8, 123:22, 137:25, 190:15, 190:16
**rough** [1] - 103:11
**roughly** [2] - 146:6, 180:2
**route** [2] - 71:21
**routine** [1] - 213:15
**routinely** [1] - 120:15
**RPR** [2] - 2:9, 221:10
**Rule** [3] - 33:7, 33:23, 35:22
**rule** [5] - 7:23, 8:8, 9:20, 80:17, 167:24
**ruled** [1] - 153:12
**rules** [4] - 7:10, 91:6, 103:18, 211:3
**ruling** [8] - 7:8, 7:16, 9:16, 9:19, 11:7, 155:22, 156:5, 157:2
**run** [15] - 37:12, 37:16, 41:10, 41:17, 41:25, 42:5, 42:12, 42:13, 46:4, 46:6, 46:19, 46:25, 78:18, 80:7, 144:16
**run-off** [12] - 37:12, 37:16, 41:17, 41:25, 42:12, 42:13, 46:4, 46:6, 46:19, 46:25, 80:7, 144:16
**running** [4] - 36:14, 36:19, 63:7, 123:25
**Russell** [1] - 124:11
**Russell's** [1] - 124:5

**S**

**S.E** [1] - 1:22
**S.M** [2] - 110:16, 110:17
**s/Glenda** [1] - 221:9
**safe** [1] - 220:10
**safety** [1] - 176:24
**salary** [1] - 58:1
**sale** [1] - 185:25
**sales** [1] - 201:21
**sanction** [1] - 126:5

**Sanguich** [23] - 8:25, 9:18, 9:20, 10:2, 10:12, 10:25, 95:6, 95:7, 95:15, 98:5, 99:2, 99:5, 99:13, 99:23, 101:23, 102:24, 108:23, 111:2, 111:23, 112:1, 112:5, 112:8
**Sarnoff** [4] - 1:24, 6:12, 39:3, 152:8
**sat** [3] - 67:20, 67:22, 123:22
**Saturday** [2] - 82:10, 84:3
**save** [1] - 211:25
**savvy** [1] - 25:11
**saw** [25] - 32:13, 44:8, 44:14, 44:24, 68:15, 68:21, 68:22, 72:25, 77:16, 82:7, 82:23, 82:24, 90:9, 94:13, 102:24, 102:25, 108:13, 146:18, 169:6
**scene** [3] - 31:1, 108:22, 109:23
**schedule** [1] - 60:14
**scheduling** [2] - 104:22, 105:17
**scheme** [1] - 177:14
**School** [1] - 177:22
**scientific** [1] - 172:17
**scope** [21] - 18:20, 24:11, 25:17, 27:20, 34:15, 34:16, 60:5, 149:11, 150:14, 150:15, 151:7, 151:8, 152:17, 152:19, 153:9, 218:9, 218:14, 218:21, 219:4, 219:10, 219:17
**SCOTT** [1] - 2:3
**Scott** [1] - 2:3
**screamed** [1] - 109:17
**screen** [5] - 16:22, 29:9, 29:11, 52:4, 86:20
**screens** [1] - 105:25
**scroll** [3] - 29:18, 162:19, 164:4
**scrolling** [1] - 194:15
**search** [2] - 175:5, 206:13
**seat** [2] - 15:21, 173:21
**seated** [3] - 15:21, 107:6, 211:14
**second** [20] - 25:20,

73:15, 73:17, 73:18, 73:19, 84:2, 85:8, 85:11, 85:13, 165:23, 184:1, 184:2, 184:17, 189:14, 195:25, 196:4, 196:25, 197:21, 201:23, 212:1
**seconds** [3] - 32:2, 97:16, 103:7
**secretary** [2] - 180:19, 207:15
**section** [2] - 85:11, 134:2
**Section** [3] - 42:16, 42:20, 42:25
**security** [1] - 179:9
**Security** [1] - 174:4
**see** [99] - 16:22, 20:2, 29:5, 33:3, 33:12, 34:7, 34:11, 34:21, 34:23, 52:4, 53:6, 54:17, 55:10, 55:14, 55:17, 63:25, 64:1, 75:25, 76:5, 76:9, 76:10, 79:24, 82:1, 82:3, 82:5, 83:16, 85:25, 87:21, 88:19, 92:3, 96:20, 97:6, 97:16, 97:18, 98:1, 98:4, 98:11, 98:13, 98:16, 99:11, 99:16, 99:21, 100:3, 100:22, 102:17, 103:12, 104:22, 106:13, 106:17, 111:9, 111:17, 112:16, 118:9, 124:20, 129:20, 129:22, 130:6, 130:8, 130:10, 130:11, 130:19, 130:24, 134:1, 134:2, 134:5, 134:11, 135:12, 135:17, 136:21, 147:4, 149:15, 150:20, 151:2, 151:18, 154:17, 164:21, 165:2, 178:21, 186:7, 189:4, 190:24, 190:25, 191:11, 192:21, 195:19, 196:24, 198:1, 198:17, 204:15, 206:2, 210:3, 211:8, 211:16, 213:19, 219:15, 219:21,

220:5, 220:15
**seeing** [2] - 217:5, 220:9
**seek** [3] - 7:14, 20:5, 89:10
**seeking** [1] - 89:5
**seem** [1] - 169:13
**sees** [1] - 119:24
**selected** [1] - 174:20
**selectedly** [1] - 35:1
**sell** [1] - 185:9
**selling** [2] - 97:23, 205:7
**Senator** [1] - 41:10
**send** [14] - 17:6, 52:17, 54:1, 56:18, 56:23, 92:5, 93:5, 93:15, 110:20, 141:25, 142:3, 168:9, 188:9, 205:8
**sending** [8] - 52:12, 53:6, 54:21, 55:22, 56:14, 110:24, 171:15, 195:3
**sends** [1] - 88:19
**senior** [2] - 62:16, 208:11
**seniors** [1] - 43:19
**sense** [2] - 84:14, 105:20
**sent** [23] - 17:1, 17:3, 18:2, 53:9, 53:13, 53:15, 53:18, 54:4, 56:21, 59:3, 59:8, 92:4, 93:16, 141:16, 141:24, 168:16, 175:18, 195:1, 195:24, 198:3, 203:10, 207:13, 207:25
**separate** [3] - 27:21, 56:21, 99:3
**Sergeant** [1] - 73:25
**serious** [2] - 156:19, 213:6
**serve** [15] - 185:21, 186:9, 186:12, 186:14, 187:5, 187:10, 188:17, 189:4, 189:5, 190:22, 190:25, 191:6, 191:10, 215:15, 216:6
**Servers** [2] - 57:24, 58:5
**service** [7] - 87:9, 89:8, 90:22, 122:9, 158:12, 186:16, 215:17
**Service** [16] - 12:16,

13:1, 13:2, 13:14, 13:16, 13:17, 122:5, 122:16, 122:18, 123:1, 123:2, 123:5, 123:8, 124:25, 125:2, 185:13
**services** [4] - 12:22, 17:2, 23:12, 123:16
**serving** [1] - 189:3
**set** [4] - 30:8, 158:21, 194:4, 202:12
**set-up** [1] - 30:8
**settle** [1] - 26:12
**settled** [3] - 11:23, 23:21, 122:12
**settlement** [2] - 23:21, 122:10
**Seven** [1] - 164:10
**seven** [5] - 37:9, 103:7, 177:17, 180:8, 214:20
**several** [5] - 17:3, 22:20, 42:5, 109:6, 109:18
**sexual** [18] - 11:17, 11:21, 13:6, 13:8, 14:14, 23:17, 23:18, 25:20, 26:5, 122:8, 154:2, 154:19, 154:21, 158:23, 158:25, 160:16, 160:19, 175:18
**sexually** [4] - 14:3, 23:17, 27:25, 155:1
**SFS** [10] - 184:25, 185:13, 185:20, 185:23, 187:21, 187:25, 188:3, 188:14, 189:9, 215:21
**SFX** [3] - 215:12, 215:13, 216:9
**shake** [1] - 44:19
**shaking** [5] - 44:8, 44:9, 44:10, 44:14
**shape** [2] - 124:20, 136:24
**share** [2] - 89:3, 89:11
**shelf** [1] - 178:21
**Sheriff's** [1] - 174:10
**shield** [3] - 155:5, 156:10, 158:21
**shifted** [1] - 176:19
**shirt** [2] - 32:11, 151:19
**shop** [2] - 9:1, 137:25
**short** [3] - 61:7, 89:25, 107:20
**shortly** [5] - 27:12, 27:13, 112:22,

115:1, 115:23
**show** [31] - 6:23, 6:24, 11:25, 13:25, 14:15, 18:5, 29:9, 30:24, 39:21, 44:12, 54:14, 54:15, 72:3, 83:13, 93:18, 145:24, 148:12, 149:9, 166:6, 166:24, 170:8, 171:2, 172:20, 195:13, 195:18, 197:24, 198:21, 198:22, 199:1, 199:13, 207:9
**Show** [1] - 135:24
**showed** [20] - 68:10, 74:8, 75:6, 82:22, 82:23, 86:15, 88:4, 88:7, 94:24, 107:19, 107:22, 113:1, 129:1, 138:2, 146:11, 147:24, 151:11, 151:14, 193:13, 199:2
**showing** [5] - 48:3, 83:15, 169:6, 194:14, 194:22
**shown** [17] - 17:12, 63:3, 65:18, 75:22, 81:8, 85:6, 86:22, 95:2, 95:3, 95:10, 104:20, 107:12, 143:14, 150:8, 195:9, 200:22, 215:2
**shows** [3] - 39:20, 97:9, 149:7
**shutdown** [1] - 84:10
**shutting** [4] - 80:4, 82:13, 83:22
**SHUTTS** [1] - 1:24
**sic** [2] - 6:3
**side** [2] - 32:19, 164:6
**sidebar** [18] - 6:18, 26:8, 35:7, 78:14, 104:23, 106:4, 125:16, 125:20, 125:21, 153:8, 154:17, 156:24, 165:9, 194:4, 194:18, 194:19, 196:3, 197:13
**Sidebar** [15] - 6:21, 15:11, 78:15, 79:18, 104:25, 125:18, 126:11, 154:18, 162:6, 165:14, 173:4, 194:21, 197:15, 199:16
**sidewalk** [9] - 96:14,

96:17, 96:19, 98:2, 98:10, 100:16, 100:17, 190:23, 191:6
**sign** [4] - 29:20, 98:5, 99:13, 191:14
**signature** [1] - 218:1
**signed** [6] - 23:11, 115:13, 115:17, 115:22, 130:22, 191:3
**signifies** [2] - 101:7, 101:13
**signs** [4] - 31:15, 89:14, 151:2, 191:14
**silent** [1] - 109:15
**similar** [3] - 53:6, 123:18, 197:7
**simple** [1] - 11:14
**simply** [1] - 12:20
**Sinai** [1] - 127:14
**single** [4] - 117:25, 137:11, 166:6, 172:24
**singular** [1] - 212:14
**site** [15] - 63:17, 63:20, 66:3, 66:8, 176:4, 176:5, 188:12, 188:13, 188:15, 188:20, 188:21, 189:15, 189:25, 199:21, 206:12
**sitting** [4] - 15:16, 68:22, 138:1, 146:19
**situation** [2] - 20:13, 179:18
**six** [13] - 23:21, 32:2, 46:16, 85:8, 85:11, 85:13, 174:11, 174:15, 180:7, 180:9, 180:10, 181:4, 214:20
**six-figure** [1] - 23:21
**six-second** [2] - 85:8, 85:13
**sketch** [7] - 186:21, 189:19, 190:2, 190:3, 190:11, 190:17, 191:5
**skirt** [1] - 126:7
**slang** [1] - 177:9
**sleep** [2] - 62:16, 62:21
**slid** [2] - 181:20, 181:22
**small** [2] - 177:16, 177:17
**smaller** [1] - 136:15
**smart** [1] - 61:12

smiro@ countywidepi.com [1] - 55:14
**SMITH** [1] - 1:10
**snacks** [2] - 187:4, 187:11
**snaked** [1] - 99:22
**Snickers** [3] - 124:7, 124:18, 155:3
**sniper** [1] - 175:3
**so-and-so** [1] - 157:17
**so..** [2] - 13:11, 104:13
**soccer** [3] - 53:8, 54:2, 54:9
**Soccer** [2] - 53:10, 54:22
**social** [2] - 127:12, 134:12
**solemnly** [1] - 173:14
**solicit** [1] - 177:15
**Solicitation** [1] - 177:8
**someone** [5] - 14:10, 103:2, 158:4, 198:3, 202:1
**something's** [4] - 85:21, 85:22
**sometime** [4] - 27:15, 41:19, 119:7, 212:20
**sometimes** [7] - 176:21, 186:16, 190:19, 190:21, 191:11, 192:13, 214:12
**somewhere** [3] - 22:23, 161:3, 161:5
**soon** [2] - 76:2, 116:5
**Sophia** [1] - 50:22
**Sophie** [1] - 124:17
**sorry** [24] - 16:14, 18:12, 21:12, 27:7, 29:24, 51:5, 61:24, 62:2, 73:18, 76:9, 110:6, 125:19, 133:25, 142:22, 178:25, 182:19, 190:11, 208:7, 210:15, 212:16, 212:17, 215:1, 217:24, 219:19
**sort** [2] - 66:20, 127:17
**sought** [2] - 7:12, 7:14
**sound** [2] - 27:15, 152:1
**soundingly** [1] - 46:6
**sounds** [5] - 38:16, 41:5, 47:14, 113:12, 126:21
**source** [2] - 100:3, 199:7

**South** [4] - 2:4, 41:11, 53:11, 134:25
**SOUTHERN** [1] - 1:1
**Southwest** [8] - 74:6, 80:24, 92:19, 92:21, 111:25, 135:5, 137:14, 139:23
**space** [3] - 50:10, 162:16, 216:2
**speaker** [1] - 44:11
**speaking** [2] - 101:6, 102:5
**Special** [4] - 67:24, 115:2, 150:12, 185:13
**special** [11] - 68:5, 89:8, 112:1, 112:4, 112:7, 135:21, 135:23, 136:17, 136:18, 136:20, 187:3
**specialized** [2] - 96:2, 176:15
**specialty** [2] - 42:3, 174:5
**specific** [5] - 105:11, 142:1, 142:25, 155:20, 155:25
**specifically** [6] - 43:25, 157:3, 157:16, 158:22, 161:6, 193:4
**specifics** [1] - 82:16
**speculation** [26] - 12:18, 21:4, 21:9, 24:10, 30:13, 33:22, 56:7, 56:11, 63:21, 72:10, 73:10, 77:12, 90:24, 111:5, 147:20, 148:20, 163:20, 181:13, 184:6, 184:18, 189:22, 190:8, 196:22, 209:1, 210:13, 218:10
**spell** [1] - 173:18
**spend** [2] - 34:4, 60:19
**spent** [2] - 34:22, 51:23
**sponsor** [1] - 81:7
**sponsors** [1] - 86:4
**sports** [3] - 52:13, 52:17, 52:23
**spotter** [1] - 175:3
**square** [6] - 185:21, 188:16, 189:6, 215:15, 216:1, 216:4
**Square** [1] - 135:25
**SRT** [1] - 174:22

**SSF** [1] - 187:6
**stab** [1] - 142:9
**Stadium** [1] - 116:22
**stadium** [5] - 52:14, 53:7, 54:3, 54:9, 54:21
**stadium's** [1] - 52:21
**staff** [48] - 13:3, 14:23, 17:4, 38:21, 38:22, 48:5, 48:19, 49:17, 49:22, 49:24, 50:12, 50:13, 50:18, 58:19, 59:9, 59:10, 59:13, 59:18, 59:19, 59:22, 59:25, 72:24, 73:24, 74:16, 81:4, 88:20, 89:2, 89:7, 89:11, 89:18, 90:14, 93:12, 93:23, 107:24, 115:15, 120:6, 123:19, 124:5, 126:23, 126:25, 127:6, 129:24, 139:4, 140:16, 141:12, 181:8
**Staff** [1] - 121:7
**staffer** [17] - 38:12, 39:10, 40:8, 40:11, 40:16, 40:21, 40:25, 45:3, 45:4, 45:20, 46:10, 64:6, 64:8, 82:20, 85:20, 117:24, 124:11
**stand** [6] - 15:17, 107:3, 165:7, 165:8, 173:13, 187:4
**stand-alone** [1] - 187:4
**standard** [1] - 213:15
**standards** [1] - 216:2
**standing** [2] - 111:8, 173:7
**stands** [1] - 11:10
**start** [8] - 49:16, 49:18, 49:20, 50:24, 79:9, 113:14, 197:25
**started** [21] - 19:10, 39:12, 109:4, 109:8, 174:9, 174:16, 175:2, 175:8, 175:25, 176:2, 176:10, 177:5, 178:7, 178:13, 188:10, 196:17, 206:2, 206:4, 213:24, 214:3
**starting** [5] - 6:4, 38:2, 40:16, 146:8, 178:3
**starts** [3] - 49:22, 55:12, 65:21

**State** [2] - 186:4
**state** [7] - 6:4, 25:16, 26:7, 170:1, 173:18, 176:14, 180:4
**statement** [2] - 14:13, 22:2, 22:3, 22:5, 22:9, 22:24, 78:25, 82:22, 128:14, 145:2, 145:24, 148:18, 154:25, 156:3, 156:22, 158:15, 159:9, 159:23, 159:24, 160:1, 160:15, 161:19
**statements** [3] - 78:22, 123:13, 148:4
**States** [4] - 2:10, 6:3, 178:9, 221:11
**STATES** [2] - 1:1, 1:11
**states** [1] - 81:12
**stating** [1] - 23:11
**stature** [2] - 39:25, 40:1
**status** [4] - 61:24, 78:5, 94:19, 210:20
**statute** [2] - 177:7, 201:23
**Statute** [1] - 201:20
**statutorily** [1] - 63:20
**stay** [2] - 48:19, 162:19
**stayed** [3] - 109:15, 119:9, 145:12
**STENOGRAPHICAL LY** [1] - 2:9
**step** [1] - 220:2
**steps** [2] - 106:21, 122:24
**Sterling** [1] - 196:18
**Steve** [10] - 52:8, 53:6, 55:12, 56:18, 58:12, 92:3, 108:15, 110:16, 129:20
**STEVEN** [2] - 3:6, 16:5
**Steven** [3] - 52:8, 107:23, 108:12
**Stiers** [3] - 208:11, 215:4, 215:6
**STIERS** [1] - 208:11
**still** [15] - 6:25, 16:3, 58:10, 66:12, 91:8, 113:15, 137:17, 145:23, 161:21, 175:20, 178:5, 179:1, 180:9, 196:18, 200:22
**stip** [1] - 165:20
**stipulated** [1] - 220:15
**stop** [10] - 85:7, 93:3,

100:12, 100:20, 100:21, 139:7, 139:15, 170:20, 205:24, 218:19
**stop-work** [2] - 139:7, 139:15
**stopped** [2] - 19:5, 27:13
**storage** [2] - 9:1, 190:15
**store** [2] - 177:16, 202:3
**stores** [1] - 185:8
**story** [3] - 124:21, 124:22, 124:24
**stove** [1] - 102:18
**straight** [1] - 170:16
**straightaway** [1] - 201:8
**strained** [2] - 19:7, 19:20
**strategies** [1] - 155:7
**strategy** [2] - 155:6, 155:9
**Street** [15] - 1:19, 1:22, 74:6, 74:10, 80:24, 92:7, 92:19, 92:21, 93:6, 93:10, 107:21, 111:25, 135:5, 137:14, 139:23
**street** [5] - 18:2, 18:3, 97:19, 97:23, 131:24
**streets** [5] - 43:10, 44:15, 44:25, 97:6, 100:9
**strike** [3] - 35:21, 54:16, 215:25
**strip** [1] - 45:13
**structure** [1] - 189:18
**stuck** [1] - 43:9
**stuff** [6] - 45:21, 45:23, 95:17, 103:11, 187:4, 197:25
**style** [1] - 175:12
**Suarez** [16] - 1:15, 3:7, 3:9, 3:12, 3:14, 6:7, 16:10, 21:12, 24:19, 26:23, 104:21, 120:4, 120:9, 120:19, 144:6, 163:22
**SUAREZ** [215] - 6:6, 6:17, 6:22, 8:7, 8:20, 8:22, 8:25, 10:8, 10:10, 11:16, 12:9, 12:12, 13:24, 14:6, 15:10, 16:2, 16:8, 16:15, 16:18, 16:21,

17:14, 17:19, 18:10, 18:22, 21:6, 21:13, 21:20, 21:23, 24:7, 24:13, 25:19, 26:11, 26:24, 26:25, 27:23, 28:11, 28:25, 29:6, 29:10, 29:13, 29:15, 29:18, 29:21, 29:22, 30:5, 30:7, 30:15, 31:21, 31:25, 32:2, 32:6, 32:8, 32:9, 33:10, 33:25, 34:18, 34:20, 35:17, 35:25, 36:15, 37:23, 38:14, 41:12, 44:21, 46:13, 47:19, 49:4, 52:2, 53:4, 53:21, 56:7, 56:11, 57:11, 61:14, 62:23, 63:21, 64:16, 67:4, 67:12, 68:17, 69:25, 72:10, 73:10, 77:12, 77:24, 78:13, 86:6, 87:25, 90:24, 92:11, 94:20, 99:24, 104:16, 105:12, 106:3, 110:23, 111:5, 115:4, 116:13, 117:4, 117:14, 118:2, 119:25, 124:14, 125:15, 125:19, 127:21, 128:3, 128:22, 129:7, 131:7, 133:22, 138:16, 138:19, 139:9, 139:18, 144:2, 144:4, 144:21, 146:3, 147:17, 147:23, 148:17, 148:24, 149:12, 149:16, 149:18, 150:10, 150:17, 150:19, 150:23, 150:25, 151:1, 151:10, 152:22, 153:18, 154:14, 158:12, 159:7, 159:11, 161:16, 162:8, 163:11, 163:23, 163:24, 164:24, 165:12, 167:9, 167:25, 168:2, 168:13, 170:25, 171:4, 171:19, 172:5, 173:12, 173:24, 181:15, 182:17, 183:12, 183:18, 184:9, 184:14, 184:21, 185:18, 187:17,

190:1, 191:21, 192:5, 193:11, 194:9, 194:15, 195:3, 195:7, 195:11, 195:14, 195:17, 196:7, 196:15, 197:4, 198:13, 199:8, 199:15, 199:18, 200:9, 201:15, 202:16, 202:24, 203:6, 203:17, 203:22, 204:8, 204:14, 205:22, 207:9, 207:11, 207:24, 208:4, 208:8, 208:19, 209:3, 209:16, 209:20, 209:25, 210:9, 210:16, 210:21, 217:7, 217:9, 218:12, 218:16, 218:23, 219:13, 219:20, 220:1
**subject** [4] - 17:2, 127:25, 171:3, 177:20
**submitted** [1] - 16:17
**subscribe** [1] - 53:13
**successful** [1] - 138:9
**sue** [2] - 46:22, 171:19
**sued** [2] - 46:21, 46:25
**sufficient** [1] - 123:11
**suggesting** [1] - 11:8
**Suite** [5] - 1:15, 1:19, 1:22, 1:25, 2:5
**suited** [1] - 60:1
**sum** [1] - 23:21
**sun** [1] - 99:12
**Sunday** [4] - 82:10, 84:3, 90:5, 143:7
**Sunrise** [1] - 164:8
**super** [1] - 163:3
**superiors** [1] - 168:5
**supervise** [2] - 180:6, 201:1
**supervised** [2] - 167:12, 198:19
**supervision** [1] - 59:15
**supervisor** [2] - 195:4, 198:8
**supervisory** [1] - 126:23
**supporters** [12] - 32:22, 46:20, 46:23, 48:13, 64:20, 76:14, 113:16, 113:19, 113:20, 117:12,

117:22, 118:7
**supposed** [6] - 66:9,
90:22, 103:18,
120:25, 170:23,
175:23
**supposedly** [1] -
163:3
**sustain** [6] - 9:13,
26:10, 28:9, 104:17,
126:2, 193:10
**sustained** [65] - 18:21,
21:5, 24:6, 24:12,
26:21, 27:22, 30:4,
33:24, 37:24, 41:13,
47:20, 49:6, 56:8,
56:12, 61:16, 62:25,
64:17, 67:5, 67:13,
70:2, 86:7, 94:22,
100:1, 110:25,
111:6, 115:6,
116:15, 117:15,
120:2, 127:24,
129:8, 138:20,
147:16, 148:16,
150:16, 151:9,
163:10, 170:22,
181:14, 183:11,
184:7, 184:20,
187:16, 191:20,
192:4, 193:22,
196:6, 197:3,
200:18, 200:20,
202:15, 202:23,
203:21, 204:13,
207:23, 209:2,
209:19, 209:24,
218:11, 218:15,
218:22, 219:6,
219:12
**Sustained** [1] - 128:4
**SWAT** [4] - 174:21,
174:22, 174:25,
175:2
**swear** [1] - 173:14
**switch** [1] - 174:25
**switched** [1] - 189:9
**sword** [2] - 155:6,
158:21
**sworn** [11] - 16:5,
37:18, 38:3, 49:19,
116:17, 116:19,
117:8, 118:19,
158:2, 173:22

## T

**table** [1] - 190:4
**tailored** [1] - 155:25
**talks** [1] - 147:6
**Tallahassee** [8] -

179:16, 180:18,
181:5, 181:8, 201:9,
210:3, 210:11,
210:19
**Tampa** [1] - 180:4
**Tania** [1] - 38:25
**Tanjaha** [4] - 26:2,
153:4, 153:22,
158:12
**tape** [1] - 146:17
**taps** [1] - 178:23
**Taqueria** [1] - 193:8
**Taquerias** [40] -
165:17, 167:11,
167:16, 167:21,
167:25, 168:1,
171:4, 182:6,
182:12, 183:14,
183:19, 183:22,
184:3, 184:11,
184:17, 187:13,
189:9, 192:1,
193:16, 193:18,
199:20, 201:11,
201:17, 202:18,
202:20, 202:25,
203:11, 203:19,
203:24, 204:10,
205:24, 206:17,
207:17, 208:13,
217:11, 217:18,
218:19, 219:1, 219:9
**targeted** [1] - 43:25
**targeting** [8] - 27:5,
33:3, 33:12, 33:18,
166:20, 167:17,
167:21, 198:10
**task** [1] - 175:10
**Tax** [1] - 178:11
**taxes** [1] - 176:14
**teach** [1] - 178:4
**teaching** [1] - 178:6
**team** [15] - 38:18,
41:9, 41:15, 41:25,
42:2, 48:23, 53:8,
135:23, 174:21,
174:22, 174:23,
179:8, 192:11,
214:19, 214:21
**Tem** [1] - 41:10
**temporary** [3] - 10:10,
188:24, 188:25
**ten** [1] - 134:23
**tenant** [1] - 111:25
**tent** [4] - 32:19, 97:19,
97:21, 99:3
**tents** [7] - 97:5, 97:22,
97:24, 102:12,
102:14, 102:15,
102:21

**tenure** [4] - 54:11,
113:14, 114:11,
213:22
**term** [2] - 177:9
**terminate** [3] - 12:22,
169:22, 170:22
**terminated** [26] -
12:10, 12:19, 23:8,
23:13, 23:14, 23:16,
24:21, 24:24, 68:9,
114:19, 114:21,
115:1, 115:12,
116:7, 119:4, 121:4,
121:5, 121:22,
123:14, 146:10,
148:7, 148:8,
152:11, 159:22,
159:23, 161:18
**terminates** [1] -
115:10
**termination** [15] -
11:20, 12:13, 12:20,
25:23, 27:9, 115:13,
115:17, 115:21,
121:4, 121:13,
121:23, 122:16,
123:15, 155:20,
161:15
**terms** [2] - 24:8, 69:19
**terrorized** [1] - 123:10
**terrorizing** [1] -
121:24
**testified** [22] - 13:4,
14:1, 72:14, 115:9,
123:8, 133:5,
133:14, 142:18,
151:18, 154:6,
157:5, 157:17,
161:22, 166:2,
166:7, 166:18,
167:15, 173:22,
197:19, 212:13,
213:5, 215:1
**testify** [11] - 16:6,
117:17, 123:2,
123:5, 139:22,
150:12, 157:5,
165:16, 168:11,
169:3, 169:5
**testifying** [6] - 61:15,
62:24, 77:25, 99:25,
139:10, 154:6
**testimony** [41] - 12:21,
13:14, 43:1, 45:16,
60:9, 60:11, 60:18,
60:22, 61:1, 61:5,
64:4, 65:18, 70:1,
74:11, 75:9, 82:12,
83:3, 91:23, 94:5,
104:5, 115:18,

128:23, 133:19,
136:5, 136:13,
136:14, 138:19,
138:23, 143:6,
143:14, 158:2,
161:2, 161:10,
161:14, 166:17,
166:21, 169:12,
172:10, 212:5,
212:18
**text** [21] - 18:3, 65:19,
65:24, 66:2, 82:12,
83:7, 83:13, 88:22,
89:13, 108:14,
109:25, 110:1,
111:13, 111:15,
111:22, 134:1,
134:2, 134:12,
151:14, 151:23
**texts** [1] - 110:14
**THE** [371] - 1:10, 1:13,
1:17, 2:3, 6:9, 6:13,
6:15, 6:20, 7:3, 8:13,
8:18, 8:21, 8:23, 9:2,
9:8, 9:10, 10:5, 10:9,
10:13, 11:7, 12:6,
12:10, 12:14, 12:17,
12:24, 13:12, 13:21,
14:4, 14:8, 14:24,
15:2, 15:5, 15:9,
15:13, 15:16, 15:20,
15:24, 16:3, 16:4,
16:17, 16:19, 17:13,
17:16, 17:17, 18:7,
18:9, 18:19, 18:21,
21:3, 21:5, 21:11,
21:12, 21:21, 24:3,
24:6, 24:12, 25:16,
25:18, 26:7, 26:10,
26:17, 26:21, 27:19,
27:22, 28:5, 28:9,
28:21, 28:24, 29:9,
29:12, 29:14, 29:16,
29:20, 30:4, 30:12,
30:14, 31:22, 33:6,
33:8, 33:9, 33:21,
33:22, 33:24, 34:17,
34:19, 35:8, 35:10,
35:14, 35:16, 35:24,
36:2, 36:3, 36:16,
36:17, 36:19, 37:24,
38:15, 38:16, 41:13,
44:22, 46:14, 47:20,
49:6, 53:23, 56:8,
56:12, 57:12, 57:13,
61:16, 62:25, 63:22,
63:23, 64:17, 67:5,
67:13, 68:19, 70:2,
72:11, 72:12, 73:11,
77:13, 78:1, 79:1,
79:5, 79:15, 79:21,

81:14, 86:7, 88:1,
88:9, 90:25, 92:12,
94:22, 100:1,
104:17, 104:21,
104:24, 105:1,
105:4, 105:8,
105:14, 105:17,
105:23, 106:1,
106:6, 107:5,
110:11, 110:25,
111:6, 115:6,
116:15, 117:5,
117:6, 117:15,
118:3, 118:4, 120:2,
124:15, 124:16,
125:17, 125:22,
126:2, 127:24,
128:4, 128:24,
129:8, 130:3, 131:9,
134:19, 134:23,
138:18, 138:20,
139:11, 139:12,
139:19, 143:22,
143:25, 144:20,
146:2, 147:12,
147:16, 147:21,
147:22, 148:2,
148:6, 148:7,
148:16, 148:21,
148:22, 149:1,
149:5, 149:14,
149:15, 149:17,
150:7, 150:9,
150:16, 151:9,
152:16, 152:18,
152:21, 153:7,
153:14, 153:16,
154:8, 154:11,
154:15, 154:17,
154:19, 156:6,
157:22, 158:2,
158:9, 158:20,
159:3, 159:10,
159:15, 159:21,
159:24, 160:2,
160:5, 160:11,
160:25, 162:3,
163:8, 163:10,
163:21, 163:22,
164:25, 165:7,
165:10, 166:10,
166:24, 167:2,
167:6, 167:23,
168:1, 168:10,
168:17, 169:8,
169:12, 169:22,
169:25, 170:8,
170:11, 170:16,
170:20, 171:1,
171:7, 171:17,
171:24, 172:3,

172:13, 172:16,
172:23, 173:2,
173:6, 173:9,
173:17, 173:20,
173:21, 181:14,
182:16, 182:23,
182:24, 183:4,
183:5, 183:11,
183:17, 183:21,
183:22, 184:7,
184:13, 184:20,
187:16, 188:2,
189:13, 189:14,
189:23, 189:24,
190:7, 190:9,
190:10, 191:20,
192:4, 193:10,
193:22, 194:5,
194:7, 194:10,
194:14, 194:19,
194:22, 195:9,
195:12, 196:2,
196:6, 196:10,
196:12, 196:13,
196:23, 196:24,
197:3, 197:8,
197:10, 197:14,
198:3, 198:21,
199:11, 199:24,
199:25, 200:7,
200:8, 200:18,
200:20, 200:24,
201:13, 201:14,
202:15, 202:23,
203:3, 203:4,
203:14, 203:15,
203:21, 204:1,
204:2, 204:5, 204:6,
204:13, 205:2,
205:3, 205:18,
205:21, 206:19,
206:20, 207:20,
207:23, 208:6,
208:7, 208:16,
208:17, 209:2,
209:13, 209:14,
209:19, 209:24,
210:6, 210:7,
210:14, 210:15,
210:22, 210:25,
211:2, 211:5, 211:7,
211:13, 217:2,
217:6, 218:8,
218:11, 218:15,
218:22, 219:6,
219:12, 219:18,
219:19, 220:2,
220:5, 220:13,
220:19
**themselves** [1] - 125:3
**therefore** [6] - 20:4,

122:22, 123:14,
127:6, 127:9, 127:15
**they've** [1] - 7:12
**third** [6] - 23:19,
101:4, 130:6,
141:12, 180:3,
181:24
**thomas** [1] - 2:3
**thread** [5] - 194:16,
195:8, 196:8,
207:15, 208:5
**three** [15] - 22:15,
23:16, 23:20, 24:23,
32:4, 34:16, 140:22,
159:16, 159:17,
168:18, 174:8,
174:12, 181:21,
205:12
**threw** [2] - 45:24,
45:25
**throughout** [6] - 7:10,
9:4, 19:1, 193:12,
193:23, 213:22
**throughs** [2] - 70:18,
70:19
**Thursday** [1] - 143:2
**Tied** [1] - 178:16
**tight** [1] - 125:3
**timeline** [8] - 168:9,
169:11, 196:25,
197:17, 198:6,
198:20, 199:9,
200:10
**timing** [1] - 131:11
**title** [2] - 59:18, 120:6
**to/from** [1] - 93:5
**Tobacco** [4] - 165:17,
166:9, 176:1, 176:9
**tobacco** [1] - 178:10
**today** [4] - 91:8,
105:22, 136:5,
136:24
**today's** [1] - 143:2
**together** [2] - 49:17,
49:22
**Tom** [3] - 195:23,
198:7, 206:21
**Toman** [1] - 62:6
**tomorrow** [1] - 92:6
**took** [14] - 11:23, 59:3,
59:21, 87:2, 104:12,
136:9, 138:5, 156:6,
162:21, 165:21,
183:5, 211:22,
216:12
**top** [6] - 55:17, 88:19,
99:16, 107:17,
134:11, 208:4
**topic** [1] - 79:5
**topics** [1] - 167:7

**Tori** [1] - 20:1
**totally** [1] - 124:9
**touch** [2] - 67:8, 119:9
**toward** [1] - 63:4
**Tower** [7] - 116:22,
138:14, 138:23,
138:25, 139:4,
139:8, 139:15
**Trade** [1] - 178:11
**trade** [1] - 178:15
**traffic** [1] - 129:21
**trail** [3] - 17:24, 18:5,
18:13
**train** [2] - 174:13,
175:10
**training** [4] - 174:12,
175:21, 176:16,
177:21
**transcript** [5] - 90:10,
147:9, 147:14,
147:24, 166:24
**transcription** [1] -
221:4
**treasurer's** [1] -
118:11
**tree** [6] - 100:17,
100:21, 101:7,
101:13, 101:15,
101:17
**Trial** [1] - 1:9
**trial** [15] - 9:4, 11:19,
13:22, 47:17, 114:2,
115:8, 122:16,
122:18, 156:15,
156:16, 160:4,
165:19, 165:21,
170:11, 170:12
**tried** [3] - 29:2, 163:5,
172:7
**TRS** [1] - 164:9
**trucked** [1] - 95:16
**trucks** [1] - 82:24
**true** [7] - 13:24, 43:5,
59:1, 154:24,
156:21, 160:21,
182:1
**truly** [1] - 145:19
**truth** [8] - 20:19,
20:20, 20:22, 27:24,
136:3, 173:15
**try** [11] - 11:9, 46:17,
46:18, 51:6, 104:3,
105:12, 105:19,
109:16, 122:13,
132:25, 172:3
**trying** [8] - 44:3, 54:2,
78:21, 116:6,
137:15, 155:8,
158:7, 160:13
**TTB** [2] - 178:11,

178:12
**TUP** [15] - 7:5, 7:8,
7:10, 7:23, 7:25, 8:5,
8:17, 9:20, 9:23,
9:24, 10:3, 10:19,
10:24, 11:2, 11:3
**turn** [5] - 11:19, 29:10,
151:15, 166:12,
188:21
**turned** [1] - 127:4
**Tweet** [3] - 134:12,
149:15, 149:21
**twice** [2] - 79:3, 155:2,
156:8
**two** [60] - 7:9, 8:16,
20:7, 26:8, 27:3,
34:15, 37:12, 37:15,
38:25, 46:3, 46:4,
68:22, 70:18, 71:21,
73:24, 76:3, 84:1,
110:20, 110:22,
111:2, 111:8, 111:9,
111:12, 116:7,
125:24, 130:16,
132:22, 137:23,
139:22, 140:1,
140:2, 140:9,
141:11, 146:6,
146:19, 151:8,
156:13, 157:24,
158:23, 159:3,
159:10, 159:11,
160:18, 161:25,
171:10, 176:7,
181:20, 181:21,
181:22, 182:3,
183:25, 184:22,
184:23, 185:11,
191:12, 197:16,
205:12, 219:15
**two-block** [1] - 71:21
**two-person** [1] - 37:15
**type** [12] - 10:14, 18:5,
18:13, 31:15, 58:1,
70:11, 178:8,
179:18, 187:12,
187:20, 188:8,
208:13
**types** [4] - 176:7,
177:18, 184:22,
185:11
**typically** [10] - 101:16,
177:10, 179:7,
180:20, 187:4,
189:2, 190:24,
192:10, 204:24,
205:11
**typo** [1] - 92:6, 93:8

## U

**U.S** [2] - 175:15,
178:11
**ultimate** [1] - 14:20
**ultimately** [1] - 153:12
**unaware** [1] - 94:10
**unbelievable** [2] -
110:21, 111:13
**uncomfortable** [3] -
20:25, 121:16,
121:25
**under** [14] - 11:24,
16:3, 21:16, 22:4,
49:1, 69:6, 85:23,
112:1, 116:4,
118:14, 119:1,
124:25, 153:24,
201:20
**undercover** [1] - 179:9
**underneath** [1] -
111:12
**understood** [5] - 47:1,
48:16, 81:3, 131:20,
214:8
**undisclosed** [1] -
157:7
**unfair** [1] - 158:6
**unfounded** [1] -
122:12
**union** [3] - 64:9,
64:11, 64:19
**unions** [1] - 64:14
**unit** [1] - 108:24
**Unit** [1] - 165:17
**United** [3] - 6:2, 178:9,
221:11
**united** [1] - 2:10
**UNITED** [2] - 1:1, 1:11
**universe** [1] - 215:23
**unknown** [1] - 157:6
**unpermitted** [2] -
62:17, 139:15
**unreal** [2] - 110:21,
111:12
**unsanctioned** [3] -
141:15, 141:17,
141:20
**unusual** [4] - 208:24,
209:21, 210:10,
210:18
**up** [114] - 7:6, 9:3,
9:10, 10:20, 11:8,
12:2, 12:3, 12:4,
12:5, 12:18, 15:3,
16:12, 21:17, 23:5,
29:3, 30:8, 31:9,
31:18, 34:3, 34:4,
39:21, 44:12, 52:1,
54:14, 59:15, 65:17,

68:10, 68:25, 71:23, 73:4, 73:16, 73:21, 74:20, 75:6, 75:17, 79:24, 82:22, 82:23, 85:12, 86:20, 87:19, 88:19, 89:17, 89:24, 92:1, 95:1, 97:11, 97:14, 99:13, 99:14, 100:6, 100:20, 104:19, 104:20, 105:19, 110:8, 111:16, 123:23, 124:3, 124:21, 129:1, 129:19, 133:21, 133:25, 135:10, 136:6, 138:2, 145:1, 146:11, 148:12, 148:24, 149:8, 150:17, 154:8, 154:19, 154:21, 155:13, 155:16, 156:6, 156:13, 158:21, 160:5, 161:2, 161:17, 161:18, 161:22, 162:1, 162:18, 162:21, 174:10, 174:16, 174:21, 175:10, 178:4, 179:14, 179:18, 180:15, 180:21, 181:8, 190:15, 193:5, 194:1, 206:5, 207:2, 208:4, 208:5, 213:24, 214:5, 216:8, 219:16
**up-charged** [1] - 216:8
**updated** [3] - 180:11, 190:3, 190:11
**upheld** [1] - 124:25
**upper** [1] - 98:5
**ups** [1] - 180:21
**upset** [5] - 17:9, 17:20, 17:21, 20:12, 109:3
**USA** [1] - 164:9
**usndisputed** [1] - 13:15

### V

**vacate** [3] - 8:4, 112:6, 112:9
**vague** [4] - 95:4, 123:15, 123:24, 141:14
**valet** [22] - 90:1, 90:4, 90:11, 90:15, 90:19,

90:20, 90:21, 90:22, 91:5, 91:10, 91:13, 91:24, 92:6, 92:18, 92:24, 93:1, 93:5, 93:10, 94:7, 109:1
**valets** [1] - 90:5
**valid** [4] - 183:23, 192:25, 202:11, 207:5
**validly** [1] - 49:3
**Vargas** [1] - 130:22
**various** [4] - 50:25, 112:2, 213:16, 214:24
**varying** [1] - 214:20
**vendor** [3] - 178:18, 178:20, 178:22
**vendors** [2] - 94:19, 178:14
**ventanita** [2] - 98:13, 111:8
**version** [1] - 22:18
**versus** [1] - 63:1
**very..** [1] - 125:5
**via** [2] - 143:7, 207:15
**vice** [2] - 64:8, 177:5
**vice-related** [1] - 177:5
**Victor** [11] - 66:22, 66:24, 67:2, 67:7, 67:10, 67:15, 67:19, 67:24, 68:4, 69:13, 147:6
**Victoria** [1] - 20:14
**video** [20] - 31:25, 32:2, 85:5, 85:8, 85:13, 85:15, 94:1, 95:10, 97:9, 97:10, 100:10, 107:19, 107:22, 108:13, 110:19, 150:17, 151:11, 151:12, 151:18, 199:2
**videos** [1] - 143:15
**videotape** [7] - 32:1, 32:5, 32:7, 97:13, 100:11, 102:2, 102:8
**Viernes** [1] - 129:17, 130:7, 130:9, 130:22, 131:1, 131:14, 131:19, 131:21, 132:7, 132:11, 132:16, 132:20, 133:15, 136:25, 162:15
**view** [3] - 28:3, 28:16, 28:19
**Villas** [1] - 164:8
**violate** [1] - 17:18
**violated** [1] - 17:4

**violation** [13] - 10:5, 10:15, 10:21, 10:23, 10:25, 40:3, 168:15, 192:1, 200:1, 204:9, 205:7, 205:10, 205:14
**violations** [28] - 10:2, 34:11, 34:12, 34:23, 61:1, 61:6, 72:5, 73:7, 116:20, 167:18, 167:22, 168:3, 168:12, 171:15, 189:20, 189:24, 192:19, 193:4, 193:18, 193:24, 193:25, 200:15, 203:16, 204:24, 205:4, 217:15, 217:16, 219:8
**violator** [1] - 108:22
**visiting** [1] - 205:24
**visual** [1] - 103:4
**vividly** [1] - 124:16
**volunteer** [2] - 39:10, 39:13
**vote** [11] - 37:10, 37:12, 43:23, 45:1, 45:9, 46:2, 46:8, 46:11, 48:24, 51:19, 84:8
**vote-getter** [2] - 37:10, 46:2
**vote-getters** [1] - 37:12
**voted** [2] - 77:10, 84:16
**voter** [5] - 43:24, 61:23, 61:24, 78:9, 84:7
**voters** [6] - 45:15, 45:17, 48:24, 77:21, 84:15, 84:16
**votes** [2] - 46:7, 144:17
**voting** [10] - 48:14, 48:17, 49:3, 63:17, 63:20, 77:17, 77:21, 78:10, 82:17, 84:15
**vs** [1] - 1:6

### W

**wait** [7] - 15:5, 76:9, 147:12, 160:20, 167:2, 211:3
**Wakefield** [4] - 123:19, 124:5, 124:10, 124:21
**walk** [24] - 44:15,

44:18, 68:15, 68:21, 70:18, 70:19, 70:21, 70:25, 71:5, 71:7, 71:10, 71:11, 71:15, 71:24, 72:3, 73:19, 88:16, 119:16, 141:3, 146:18, 200:3, 200:10
**walk-along** [9] - 70:25, 71:5, 71:7, 71:10, 71:11, 71:24, 72:3, 73:19, 88:16
**walk-alongs** [2] - 70:19, 71:15
**walk-throughs** [2] - 70:18, 70:19
**walkalongs** [3] - 16:11, 34:9, 34:21
**walked** [9] - 44:25, 71:2, 71:3, 72:21, 72:22, 99:18, 119:19, 181:20, 182:2
**walking** [6] - 31:12, 32:10, 72:18, 98:2, 100:9, 106:14
**walkthrough** [5] - 140:3, 140:4, 140:13, 140:15, 140:20
**walkthroughs** [2] - 140:23, 141:22
**wall** [2] - 119:15, 190:14
**wants** [4] - 79:8, 123:25, 161:25, 176:22
**warm** [1] - 105:19
**warned** [1] - 155:6
**warrants** [1] - 175:5
**watch** [1] - 220:6
**watched** [2] - 85:9, 85:14
**waved** [1] - 44:19
**wear** [3] - 101:13, 101:15
**wearing** [4] - 100:17, 101:7, 105:19, 109:1
**Wednesday** [3] - 111:2, 142:23, 143:5
**week** [10] - 38:12, 40:8, 40:11, 53:2, 111:19, 111:20, 131:4, 131:13, 142:24, 211:22
**weekdays** [1] - 143:3
**weekend** [3] - 31:6, 32:14, 220:10
**weekends** [1] - 143:4
**weeks** [3] - 22:15,

46:4, 76:4
**welcome** [1] - 107:8
**Welcome** [1] - 135:11
**well-known** [2] - 134:25, 135:22
**western** [1] - 175:12
**western-style** [1] - 175:12
**whatsoever** [11] - 9:25, 10:23, 18:14, 71:23, 82:20, 127:3, 138:12, 144:25, 148:19, 163:25, 167:4
**whistle** [4] - 27:6, 27:8, 152:14, 153:1
**whistle-blower** [4] - 27:6, 27:8, 152:14, 153:1
**Whoa** [1] - 66:9
**whole** [6] - 51:12, 55:6, 87:7, 170:9, 173:15, 194:16
**wholly** [1] - 172:1
**wide** [3] - 36:25, 51:18, 214:7
**wide-ranging** [1] - 51:18
**widest** [1] - 8:8
**wife** [1] - 104:12
**WILLIAM** [1] - 1:4
**William** [8] - 77:6, 116:21, 118:16, 164:7, 164:8, 164:9, 164:10
**willing** [2] - 20:6, 169:2
**Wilson's** [1] - 124:19
**win** [1] - 117:13
**window** [5] - 98:14, 98:20, 99:17, 111:8, 111:10
**wine** [3] - 185:16, 202:6, 202:8
**wins** [3] - 46:1, 46:6, 46:19
**witness** [39] - 14:12, 15:17, 47:9, 48:7, 48:8, 48:17, 48:18, 79:2, 79:16, 94:21, 105:14, 107:3, 116:14, 146:1, 147:14, 148:5, 148:15, 154:7, 154:20, 157:16, 160:2, 160:18, 162:2, 165:7, 165:9, 165:11, 165:13, 165:19, 173:11, 179:24, 194:1,

194:23, 195:18,
200:22, 200:24,
207:9, 214:22,
217:1, 220:13
**WITNESS** [52] - 3:4,
16:4, 17:17, 21:12,
29:20, 33:9, 33:22,
34:19, 35:10, 35:16,
36:2, 36:17, 36:19,
38:16, 44:22, 57:13,
63:23, 72:12, 117:6,
118:4, 124:16,
139:12, 147:22,
148:7, 148:22,
149:15, 163:22,
173:17, 173:20,
182:24, 183:5,
183:22, 189:14,
189:24, 190:10,
196:13, 196:24,
199:25, 200:8,
201:14, 203:4,
203:15, 204:2,
204:6, 205:3,
206:20, 208:7,
208:17, 209:14,
210:7, 210:15,
219:19
**Witness** [2] - 106:21,
220:4
**witness'** [2] - 172:23,
172:24
**witness's** [1] - 149:13
**witnesses** [3] -
105:15, 158:16,
220:17
**WL** [1] - 7:21
**woman** [4] - 138:1,
160:21, 161:19,
161:23
**women** [9] - 11:24,
14:1, 121:14,
137:14, 156:13,
159:7, 159:8,
160:18, 161:22
**won** [6] - 37:7, 37:15,
46:10, 46:15, 144:17
**wonderful** [1] - 220:10
**word** [1] - 206:14
**words** [5] - 75:23,
111:12, 141:20,
178:20, 191:9
**workload** [1] - 205:13
**works** [5] - 64:9,
86:14, 94:14, 178:1,
178:2
**world** [1] - 118:9
**Worldwide** [2] -
134:16, 134:17
**worry** [2] - 11:19,

123:24
**wow** [1] - 146:15
**wrath** [1] - 145:20
**write** [5] - 22:3, 22:4,
22:24, 45:21, 108:22
**writes** [6] - 87:7,
88:14, 88:24,
107:23, 108:12,
108:15
**writing** [6] - 12:14,
12:19, 13:13, 108:5,
111:21, 196:20
**writings** [1] - 108:8
**written** [3] - 22:15,
88:25, 169:8
**wrongdoing** [1] -
122:7
**wrongful** [1] - 12:12
**wrote** [9] - 8:9, 22:2,
83:7, 110:19,
116:22, 145:2,
169:10, 169:12
**Wynwood** [2] -
214:13, 214:15

## Y

**year** [4] - 142:10,
186:23, 204:15,
205:12
**years** [12] - 28:1,
36:23, 46:16, 46:17,
174:11, 174:12,
174:15, 174:19,
175:7, 177:3, 210:2,
210:17
**yellow** [1] - 134:2
**yesterday** [9] - 6:23,
9:1, 11:17, 11:21,
16:12, 142:18,
143:2, 161:17,
161:19
**you-know-what** [1] -
61:13
**young** [1] - 157:23
**yourself** [13] - 25:2,
25:6, 25:10, 27:1,
30:17, 38:8, 40:17,
85:12, 90:12,
151:18, 156:25,
160:12, 160:13
**yourselves** [1] - 106:9
**Yurre** [11] - 66:22,
66:24, 67:2, 67:7,
67:10, 67:15, 67:19,
67:24, 68:4, 69:13,
147:7

## Z

**zoning** [2] - 191:2,
216:22
**Zoom** [2] - 143:7,
143:17