```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                       (FORT LAUDERDALE)

 3                     CASE NO. 18-CV-24190

 4   WILLIAM FULLER and
     MARTIN PINILLA, II,
 5
              Plaintiffs,        Fort Lauderdale, Florida
 6   vs.                         May 12, 2023

 7   JOE CAROLLO,                9:07 a.m. to 1:16 p.m.

 8          Defendant.           Pages 1 - 165
     ------------------------------------------------------------
 9
                          Trial Day 18
10
              BEFORE THE HONORABLE RODNEY SMITH
11               UNITED STATES DISTRICT JUDGE

12
     APPEARANCES:
13   FOR THE PLAINTIFFS:         AXS LAW GROUP, by:
                                 Jeffrey W. Gutchess, Esq.,
14                               Courtney Anna Caprio, Esq.,
                                 Joanna Niworowski, Esq.,
15                               Amanda Suarez, Esq.
                                 2121 NW 2nd Avenue, Suite 201
16                               Miami, Florida  33127

17
     FOR THE DEFENDANT:          KRINZMAN, HUSS, LUBETSKY,
18                               FELDMAN & HOTTE, by:
                                 Mason A. Pertnoy, Esq.
19                               169 E. Flagler Street, Suite 500
                                 Miami, Florida  33131
20

21                               KUEHNE DAVIS LAW, by:
                                 Benedict P. Kuehne, Esq.
22                               100 S.E. 2nd Street, Suite 3105
                                 Miami, Florida  33131
23

24                               SHUTTS & BOWEN, by:
                                 Marc D. Sarnoff, Esq.
25                               200 S. Biscayne Blvd, Suite 4100
                                 Miami, Florida  33131
```

```
 1   APPEARANCES (CONTINUED):

 2


 3   FOR THE DEFENDANT:            COLE, SCOTT & KISSANE, by:
                                   Thomas E. Scott, Esq.,
 4                                 Amber C. Dawson, Esq.
                                   9150 South Dadeland Boulevard
 5                                 Suite 1400
                                   Miami, Florida  33156
 6

 7

 8

 9   STENOGRAPHICALLY
     REPORTED BY:
10                                 GLENDA M. POWERS, RPR, CRR, FPR
                                   Official Court Reporter
                                   United States District Court
11                                 400 North Miami Avenue
                                   Miami, Florida  33128
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                         I N D E X

2

3                    PLAINTIFFS' EVIDENCE

4    WITNESS:                                      PAGE:

5

6

7    WILLIAM FULLER
```

```
8       Cross-Examination by Mr. Kuehne (Continued)    6
9       Redirect Examination by Ms. Caprio            10

10

11   ASAEL "ACE" MARRERO
12      Voir Dire Examination by Mr. Gutchess          90
13      Voir Dire Examination by Mr. Sarnoff           91

14

15   PLAINTIFFS REST                                   98
```

```
16

17

18

19                   DEFENDANT'S EVIDENCE

20

21   ASAEL "ACE" MARRERO
```

```
22      Direct Examination by Mr. Sarnoff             99
```

```
23

24

25
```

```
 1                     E X H I B I T S

 2

 3  EXHIBIT                                    RECEIVED

 4                PLAINTIFFS' EXHIBITS

 5

 6  Exhibits 9, 10, 11                          132

 7  Exhibit 32                                  136

 8

 9

10

11

12

13             DEFENDANT'S EXHIBITS

14

15  Exhibit 652                                 113

16

17

18

19

20

21

22

23

24

25
```

1          (Call to the order of the Court:)

2          COURTROOM DEPUTY:  All rise.

3          THE COURT:  You may be seated, please.

4          Good morning, everyone.

5          COURTROOM DEPUTY:  Fuller, et al. versus Carollo,

6  18-24190-Civil.

7          Counsel, state your appearances for the record.

8          MS. CAPRIO:  Good morning.

9          Courtney Caprio, Jeff Gutchess, and Amanda Suarez on

10  behalf of plaintiffs.

11          THE COURT:  Good morning.

12          MR. PERTNOY:  Good morning, Your Honor.

13          Mason Pertnoy, Leah Gardner, Amber Dawson, Marc

14  Sarnoff, and Ben Kuehne on behalf of Commissioner Joe Carollo.

15          THE COURT:  Good morning.

16          MS. CAPRIO:  Just one housekeeping matter, Your Honor.

17          THE COURT:  Yes.

18          MS. CAPRIO:  In connection with the motion we discussed

19  at sidebar, permission to file it under seal and get an ore

20  tenus motion for that.

21          THE COURT:  You filed it?

22          MS. CAPRIO:  Correct.  Under seal?

23          THE COURT:  Yes.

24          MS. CAPRIO:  Apparently, we need an ECF docket number.

25          THE COURT:  Patricia will give you one.

 1          With that said, you can bring the jurors in, please.

 2          (Jury entered courtroom at 9:07 a.m.)

 3          THE COURT:  Everyone listened to my instructions not to

 4   watch the news, or read the newspaper, searching the internet.

 5          If that's it, Mr. Kuehne, you may pick up, sir.

 6          MR. KUEHNE:  Thank you, Judge.

 7          (WILLIAM FULLER, being previously sworn, continued to

 8   testify as follows:

 9                    CROSS-EXAMINATION (CONTINUED)

10   BY MR. KUEHNE:

11   Q.   Good morning.

12        The topic of gentrification.  You've testified you were

13   asked some questions on direct about gentrification?

14   A.   Yes.

15   Q.   And you've told this jury of your vision -- I think you

16   called it your story -- your vision for Little Havana business

17   district?

18   A.   I've discussed some of it.

19   Q.   And that's the vision that you and your partner have

20   devised for what you want to turn this resource into; isn't

21   that right?

22   A.   Well, as I stated before, our partnership is a

23   collaboration.  It's the merging of different visions, and we

24   try to move the Ouija board collectively.

25        So without him speaking, I can tell you that I speak

1    clearly as to what my vision is.

2    Q.   But Commissioner Carollo ran on a very different vision.

3    His platform was a very different vision, to serve the people,

4    the residents, and that vision led to his being re-elected by

5    65 percent of the voters; isn't that right?

6             MS. CAPRIO:  Objection.  Assumes facts not in evidence.

7             THE COURT:  Sustained.

8             THE WITNESS:  I think he gave out like 80,000 turkeys.

9             THE COURT:  The objection was sustained, Mr. Fuller.

10            THE WITNESS:  I'm sorry.

11   BY MR. KUEHNE:

12   Q.   And you're aware that in Commissioner Carollo's vision and

13   the vision of the people who are elected in 2017 code

14   compliance across the City of Miami, every district increased

15   exponentially in 2018, 2019 --

16            MS. CAPRIO:  Objection.  Calls for speculation.

17   Q.   -- aren't you?

18            THE COURT:  Sustained.

19   BY MR. KUEHNE:

20   Q.   So your business practice seems to be that you start work,

21   you do renovations without permits, and then when you're caught

22   by code compliance, you work on a compliance agreement, you

23   admit to your violations --

24            MS. CAPRIO:  Objection.

25   Q.   -- isn't that right?

```
 1              MS. CAPRIO:  Assumes facts not in evidence.
 2    Argumentative.
 3              THE COURT:  Sustained.
 4    BY MR. KUEHNE:
 5    Q.  And yet, virtually every one of the violations that you've
 6    testified to that you were targeted resulted in violations
 7    being sustained, upheld --
 8              MS. CAPRIO:  Objection.  Assumes facts not in evidence.
 9    Q.  -- you admitting --
10              THE COURT:  The objection is sustained.
11    Q.  -- you admitting to the violations and entering into code
12    compliance agreements?
13              MS. CAPRIO:  Objection.  Assumes facts not in evidence.
14              THE COURT:  The objection is sustained.
15    BY MR. KUEHNE:
16    Q.  You've seen the evidence before this case of code
17    compliance agreements, after agreements, signed by you; haven't
18    you?  That's a question.
19              THE COURT:  You can answer it, Mr. Fuller.
20    A.  Sorry.  You've been very selective in the agreements you've
21    showed and you've left out the ones you haven't; you're not
22    telling the complete story, are you?
23    BY MR. KUEHNE:
24    Q.  Well, let's talk about the story that you've told.
25         You've got multiple properties, I think your testimony was
```

1   20, 30 properties?

2   A.   Over 20 properties.

3   Q.   Yet -- over 20 properties, yet a tiny few have been cited

4   for code violations that you've testified about in virtually

5   every --

6        MS. CAPRIO:  Objection.  Outside the scope, assumes

7   facts not in evidence.

8        THE COURT:  Sustained, one minute remaining, counsel.

9   Q.   -- that you've testified about and virtually every one of

10   them was sustained?

11        MS. CAPRIO:  Objection.  Objection.  Assumes facts not

12   in evidence, outside the scope.

13        THE COURT:  Sustained.  The objection is sustained.

14   BY MR. KUEHNE:

15   Q.   Do you take any responsibility for not pulling permits, not

16   complying with the code for your business properties?

17        MS. CAPRIO:  Objection.  Compound.

18        THE COURT:  Sustained.

19   BY MR. KUEHNE:

20   Q.   Do you take any responsibility for not pulling permits on

21   your properties when construction is done?

22        MS. CAPRIO:  Objection.  Assumes facts not in evidence.

23        THE COURT:  Sustained.

24   BY MR. KUEHNE:

25   Q.   We've heard testimony about construction at property after

1    property that you testified about without permits being

2    pulled --

3             MS. CAPRIO:  Objection.  Assumes facts not in evidence.

4    Q.   -- do you assume responsibility for that?

5             THE COURT:  The objection is sustained.

6             Well, Mr. Kuehne, your time is up, sir.

7             You may have a seat.  Thank you.

8             MR. KUEHNE:  Thank you, Judge.

9             I have no further questions of the witness.

10            THE COURT:  And I appreciate that.

11            Do we have any redirect?

12            MS. CAPRIO:  Yes, Your Honor, briefly.

13                     REDIRECT EXAMINATION

14   BY MS. CAPRIO:

15   Q.   Good morning, Mr. Fuller.

16        Good morning to the ladies and gentlemen of the jury.

17   A.   Good morning.

18   Q.   If we could please call up Plaintiff's Exhibit 344.

19            COURTROOM DEPUTY:  Has this been admitted?

20            MS. CAPRIO:  It's been admitted, yes, ma'am.

21   BY MS. CAPRIO:

22   Q.   Mr. Fuller, do you recall testifying about this photograph

23   on your cross-examination yesterday?

24   A.   Yes.

25   Q.   Okay.  And, Mr. Fuller, did you witness this photograph of

1    Joe Carollo being taken around midnight at your property?

2    A.   Yes, around 17130, I was driving the vehicle.

3    Q.   Okay.  And while this photograph was being taken, were you

4    observing Joe Carollo?

5    A.   Observing, him?  Yes, I was -- our purpose was -- or my

6    purpose was to identify him, essentially, hanging out at our

7    parking lot where the valet was happening, Ball & Chain, as a

8    result of the lots being shutdown the day before.

9         MR. KUEHNE:  Objection.

10        THE COURT:  What's the grounds?

11        MR. KUEHNE:  Nonresponsive.

12        THE COURT:  Overruled.

13   BY MS. CAPRIO:

14   Q.   And just to refresh our memory, what are you referring to

15   when you testified just now that the Ball & Chain valet lots

16   were shutdown the night before?

17   A.   The night that the church lot was shutdown, I had to

18   identify a new lot the following day.  I spoke with Art

19   Noriega.  We -- he said to me, Please identify another lot.

20        MR. KUEHNE:  Objection.

21        THE COURT:  Grounds?

22        MR. KUEHNE:  Objection.  Hearsay from a...

23        THE COURT:  Sustained.

24   BY MS. CAPRIO:

25   Q.   Without talking about what you spoke with Mr. Noriega, and

1    when you refer -- let's jump -- just one second, let's step
2    back.
3         And the valet operator was Alain Garcia; correct?
4    A.   Yes.
5    Q.   Okay.  And then, so you had to find a new parking lot for
6    your Ball & Chain guests, and that's when this photograph was
7    being taken?
8    A.   Yes, I was concerned that Mr. Carollo was going to come
9    again that night and, as expected -- I was at the Ball & Chain
10   and, as expected, I got a call that he was following in his
11   vehicle one of the cars that had been taken off the valet ramp
12   to this new lot location.
13        So I immediately got in the vehicle and went to take this
14   photograph in front -- in fact, he was outside scoping out the
15   parking lot.
16   Q.   Okay.  And while you -- during the time that this
17   photograph was taken, let's just focus on that time frame, what
18   did you observe Joe Carollo doing?
19   A.   He was monitoring the activities of the lot.
20   Q.   And while this photograph was being taken, did you observe
21   Joe Carollo tried to cover his face when this photograph was
22   being taken?
23   A.   Oh, spec --
24        MR. KUEHNE:  Objection.  Leading questions.
25        THE COURT:  Sustained.

BY MS. CAPRIO:

Q.   While this photograph was being taken, what did you observe
Joe Carollo doing?

A.   He did not want to be seen.

          MR. KUEHNE:  Objection.

          THE COURT:  What grounds?

          MR. KUEHNE:  Speculation, what Commissioner Carollo
wanted.

          THE COURT:  Overruled.

          THE WITNESS:  He did not want to be seen.  It was clear
that he was trying to be in disguise and covering his face.

          MR. KUEHNE:  Objection.

          THE COURT:  Grounds.

          MR. KUEHNE:  Speculation.  It's was clear, he's not
testifying as to his observations.

          THE COURT:  Overruled.

          THE WITNESS:  They certainly were my observations,
because we were trying to identify him, and this is the shot
that we were able to capture his face.

          The rest of it was covered.

BY MS. CAPRIO:

Q.   So did you take this photograph right before he got his
hand over his face?

A.   Yes.

          MR. KUEHNE:  Objection.  Leading.

1          THE COURT:  Overruled.

2    BY MS. CAPRIO:

3    Q.   What was the answer?

4    A.   Yes, ma'am.

5    Q.   Thank you.  So, Mr. Fuller, do you recall testifying on

6    direct about a building official whose name is Maurice Ponz?

7    A.   Yes.

8    Q.   Okay.  And who is Maurice Ponz again, just to refresh the

9    jury and His Honor's recollection?

10   A.   Maurice Ponz, for almost all the time I've been doing

11   business in the City of Miami, was the building official.

12   Q.   Okay.  And do you recall Mr. Kuehne asked you about Maurice

13   Ponz's brother and your relationship with him?

14   A.   Yes.

15   Q.   Okay.  And could you explain to the jury and His Honor what

16   your relationship is with Maurice Ponz's brother?

17   A.   My understanding is that Mario Ponz and his father -- this

18   is Maurice's brother -- the father had started a contracting

19   business in 1978 in the City of Miami; and as the father got

20   older, Mario took over the contracting business.

21        And, in fact, I have hired Mario Ponz in the past to do

22   services for us.

23   Q.   And is your work with Mario Ponz in any way related to your

24   relationship with Maurice Ponz at the City of Miami Building

25   Department?

1    A.   Absolutely not.  And there's absolutely no impropriety.

2    And the suggestion that somehow --

3         MR. KUEHNE:  Objection.  Nonresponsive, not testimony.

4         THE COURT:  Overruled.  Does someone have a phone that

5    is vibrating in this Court?

6         MS. CAPRIO:  It's not from here.

7         THE COURT:  All right.

8         THE WITNESS:  And the suggestion that Maurice Ponz,

9    who's given over 20 years of his life to the City of Miami was

10   disrespected yesterday in this Court, that he was somehow

11   involved in some impropriety --

12        MR. KUEHNE:  Objection.

13        THE COURT:  What was the objection?

14        MR. KUEHNE:  Commenting on a question --

15        THE COURT:  Sustained.

16        MR. KUEHNE:  -- not testimony.

17        THE COURT:  Sustained.

18        MS. CAPRIO:  Thank you, Mr. Fuller.

19   BY MS. CAPRIO:

20   Q.   Let's move on.

21        Let's please call up Plaintiffs' 35, which has already been

22   admitted into evidence.  Okay.

23        So if we could enlarge this for the witness and Mr. Fuller.

24        Do you recall testifying about this document on your

25   cross-examination?

1    A.   Yes.

2    Q.   Okay.  And I would like for you to read what that subject

3    line -- the attachments -- say, into the record, please, sir.

4    A.   "Attachments, forward.  Commissioner Carollo joint

5    inspection -- or Commissioner Carollo -- I'm sorry, forward

6    Commissioner Carollo joint inspection number five, forward

7    Commissioner Carollo joint inspection number four, forward

8    Commissioner Carollo joint inspection number three, forward

9    Commissioner Carollo joint inspection number two, forward

10   Commissioner Carollo joint inspection number one.

11   Q.   Okay.  Thank you very much.

12        And are all those properties that are listed under those

13   attachments of the five Commissioner Carollo joint inspections

14   your properties, sir?

15   A.   They are either our properties through the ownership of the

16   real estate, through our ownership of the business that

17   occupies the real estate, or in the case of Mr. Marcus Lapchick

18   unfortunately, he was a victim because he supported our bid and

19   was part of the package I gave Mr. Carollo.

20        MR. KUEHNE:  Objection.  Objection.  Nonresponsive.

21        THE COURT:  Overruled.

22   BY MS. CAPRIO:

23   Q.   And by business, you mean the business improvement district

24   that you and I went over with the jury and His Honor?

25   A.   Yes.  And Mr. Marcus Lapchick confirmed for me this, that

```
 1    it was, in fact, Carollo that had done this.
 2              MR. KUEHNE:  Objection.  Hearsay.
 3              THE COURT:  Sustained.
 4    BY MS. CAPRIO:
 5    Q.   And you talked about with Mr. Kuehne an inspector by the
 6    name of Dennis Uriarte.  Do you recall that testimony, sir?
 7    A.   Yes.
 8    Q.   And this was a result of the Dennis Uriarte ridealong with
 9    Mr. Carollo; is that right?
10    A.   That's correct.
11    Q.   Okay.  And did you ever personally meet Mr. Uriarte?
12    A.   No.
13    Q.   And why did you think he was a younger man?
14              MR. KUEHNE:  Objection.
15              THE COURT:  Grounds?
16              MR. KUEHNE:  Nonresponsive to the cross-examination.
17              THE COURT:  Overruled.  You can answer.
18              THE WITNESS:  I was explain -- my understanding was
19    that Mr. Orlando Diaz had advised after he was the director of
20    code --
21              MR. KUEHNE:  Objection.  Hearsay, Orlando Diaz.
22              MS. CAPRIO:  Affect on the listener, Your Honor.
23              MR. KUEHNE:  -- no personal knowledge.
24              THE COURT:  Overruled.  You can answer.
25              THE WITNESS:  -- had advised Mr. Uriarte after
```

1    discussion that he thought it was best to document very clearly

2    the sequence of events --

3             MR. KUEHNE:  Objection.

4             THE WITNESS:  -- that happened.

5             MR. KUEHNE:  Objection.  That's hearsay, what a

6    nontestifying witness is saying.

7             THE COURT:  Understand.

8             MS. CAPRIO:  Affects the listener.

9             THE COURT:  Overruled.

10            THE WITNESS:  -- to document very clearly the sequence

11   of events, and it was my misinterpretation, because Mr. Orlando

12   Diaz was an older man, that I felt that he was, in a sense,

13   mentoring or guiding this gentleman to this.

14            And I incorrectly assumed that the man was younger;

15   clearly, he was not, but he still sought the advice of

16   Mr. Orlando Diaz as --

17            MR. KUEHNE:  Objection.

18            THE WITNESS:  -- to what to do in this case.

19            MR. KUEHNE:  Objection --

20            THE COURT:  Sustained.

21            MR. KUEHNE:  -- hearsay, no personal knowledge.

22            THE COURT:  Sustained.

23   BY MS. CAPRIO:

24   Q.  So it's fair to say that you assumed that Mr. Uriarte was a

25   younger man?

1          MR. KUEHNE:  Objection.  Leading.

2          THE COURT:  Over -- I mean, sustained.

3    BY MS. CAPRIO:

4    Q.   What were your assumptions about Mr. Uriarte and his age?

5          MR. KUEHNE:  Objection to assumption, speculation, not

6    facts.

7          THE COURT:  Overruled.  You can answer that question.

8          THE WITNESS:  I assume that he was younger because he

9    was seeking the advice and mentorship of Mr. Orlando Diaz.

10         MR. KUEHNE:  Objection.  No personal knowledge --

11         MS. CAPRIO:  Thank you.

12         MR. KUEHNE:  -- based on hearsay.

13         THE COURT:  I understand.  Overruled.

14         THE WITNESS:  And I commend him for his marine service.

15         MR. KUEHNE:  Objection.  It's nonresponsive.

16         THE COURT:  Sustained.

17         MS. CAPRIO:  All right.

18         THE COURT:  Next question, Ms. Caprio.

19         MS. CAPRIO:  Yes, Your Honor.

20   BY MS. CAPRIO:

21   Q.   Okay.  So let's move to your ethics complaint that you

22   filed against Joe Carollo, can we please call that up, it's

23   Plaintiffs' 425, and it's already been admitted into evidence.

24         Mr. Fuller, do you recognize this document?

25   A.   Yes.

1   Q.   And is this the ethics complaint that you and Mr. Pinilla

2   filed against Joe Carollo?

3   A.   Yes, it is.

4          MR. KUEHNE:  Objection.  Foundation.  "Bill Fuller in

5   care of the Barlington Group" is what the document says.

6          THE COURT:  Overruled.

7   BY MS. CAPRIO:

8   Q.   What was the answer, Mr. Fuller?

9   A.   Yes, it was filed.

10         I filed it on behalf of the Barlington Group.

11  Q.   And yourself, individually?

12  A.   Yes.

13  Q.   And Mr. Pinilla?

14  A.   Yes.

15  Q.   Okay.  And now let's go down to the actual complaint, the

16  substance of it, and if you could please go to the fact section

17  and let's enlarge that first -- if you could please read number

18  one and then also just keep reading, starting on November 18th,

19  2017, please, sir.

20         MR. KUEHNE:  Objection, Your Honor.  Unproven

21  allegations that were dismissed by the Commission on Ethics.

22         THE COURT:  This is in evidence; right?

23         MS. CAPRIO:  Yes, sir, it's in evidence.

24         THE COURT:  Overruled.

25         MR. KUEHNE:  We request an opportunity to submit the

1    response to this that was filed with the ethics commissioner.

2            MS. CAPRIO:  Your Honor's already ruled on that.

3            We discussed that yesterday at sidebar.

4            THE COURT:  It's in evidence.

5            MS. CAPRIO:  Okay.  Thank you, sir.

6    BY MS. CAPRIO:

7    Q.   And, Mr. Fuller, if you would please read number one into

8    the record and then read that first paragraph, please.

9    A.   Number one:  Commissioner Carollo's pre-election illicit

10   interference with complainant.

11           On November 18th, 2017, Alfie Leon, Commissioner Carollo's

12   opponent in the run-off election for the commission seat,

13   parenthesis, Mr. Leon, for District 3, held a rally on a lot

14   owned by complainant.

15           At, approximately, one p.m. Steve Miro, Commissioner

16   Carollo's current chief of staff, arrived at the rally and

17   began taking photos of the event.

18           Mr. Miro eventually confronted attendees of the rally

19   questioning the nature and legality of the event.

20           Shortly thereafter, at approximately two p.m.,

21   representatives of the City of Miami Code Enforcement

22   Department and the police arrived at the rally and shut it

23   down, forcing everyone to leave.

24   Q.   Go to on to the second paragraph, please, Mr. Fuller.

25   A.   Upon learning of the event shutdown, complainant began

1   questioning the city employee contacts and learned that then

2   candidate Joe Carollo, both personally and with the assistance

3   of Mr. Miro, Albert Parjus, P-A-R-J-U-S, and Mary Lugo, had

4   been calling the City of Miami special events department and

5   code enforcement to demand the shutdown of the rally.

6        This was, in fact, confirmed on Sunday, November 19th,

7   2017, in a call from Mr. Miro to complainant, wherein Mr. Miro

8   confirmed that Carollo camp was responsible for the shutdown of

9   the rally the day before; and wherein he further expressed

10  outrage over the possibility that a group had gathered at the

11  lot again to have a spontaneous rally for Mr. Leon.

12       Complainant has documented text messages evidencing

13  Mr. Miro's involvement in this unlawful activity on behalf of

14  all the aforementioned parties.

15       MS. CAPRIO:  Okay, thank you, Your Honor.

16       MR. KUEHNE:  Objection.  Move to strike all hearsay

17  statements.

18       THE COURT:  As to hearsay statements, stricken.

19       All right, next.

20  BY MS. CAPRIO:

21  Q.  So this was you and Mr. Pinilla's ethics complaint that you

22  filed against Joe Carollo; correct?

23  A.  Yes.

24  Q.  And here you alerted the ethics commission regarding the

25  Alfie Leon rally that was held on your property; correct?

```
 1              MR. KUEHNE:  Objection.  Leading question.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  Yes.

 4    BY MS. CAPRIO:

 5    Q.   Okay.  And sir, did you file an ethics complaint with the

 6    City of Miami so that the city could adjudicate your first

 7    amendment rights as mentioned here?

 8              MR. KUEHNE:  Objection.  Leading, calls for a legal

 9    conclusion, speculation.

10              THE COURT:  Overruled.

11              THE WITNESS:  For a point of clarification, it wasn't

12    with the City of Miami.  It was Miami-Dade County.

13              MS. CAPRIO:  Okay, thank you.

14              THE WITNESS:  But no, that is not the venue to file

15    such a complaint.

16              MR. KUEHNE:  Objection.  Nonresponsive and --

17              THE COURT:  Overruled.

18              MR. KUEHNE:  -- requires legal knowledge, personal

19    opinion.

20              THE COURT:  Overruled.

21    BY MS. CAPRIO:

22    Q.   So let's ask that again so we can get that clear.

23         Did you --

24              MR. KUEHNE:  Objection.

25              THE COURT:  What's the objection?
```

1          MR. KUEHNE:  Asked and answered.  She's going to ask it

2    again.

3          THE COURT:  Sustained.

4    BY MS. CAPRIO:

5    Q.  Okay.  Did you know when you filed the ethics complaint

6    that you could sue for first amendment retaliation in a federal

7    lawsuit?

8          MR. KUEHNE:  Objection.  Leading question.

9          THE COURT:  Overruled.

10         THE WITNESS:  I did not.

11   BY MS. CAPRIO:

12   Q.  Okay.  And when did you first learn that you had recourse

13   in the courts for a violation of your first amendment rights?

14         MR. KUEHNE:  Objection.  Lack of personal knowledge

15   based on hearsay, speculation, foundation, opinion evidence.

16         THE COURT:  Overruled.  Overruled.

17         MR. KUEHNE:  Also states facts not in evidence.

18         THE COURT:  Overruled, Mr. Kuehne.  Thank you.

19         THE WITNESS:  Mr. Pinilla and myself met with several

20   attorneys and Mr. Gutchess explained --

21         MR. KUEHNE:  Objection.  Now we're talking about a

22   lawyer's statement, counsel in this case, to the witness.

23         THE COURT:  Sustained.

24   BY MS. CAPRIO:

25   Q.  The question is when did you first -- did you learn about

```
 1              THE COURT:  I sustained the objection.

 2              MS. CAPRIO:  I'm rephrasing.

 3   BY MS. CAPRIO:

 4   Q.  My question is when, okay.  When did you first learn?

 5   A.  In 2018, it was understanding, later in 2018, that the --

 6   I'm sorry?

 7              THE COURT:  You need to use the microphone.  Continue.

 8              MS. CAPRIO:  I'm sorry, let's ask that again.

 9              I'm sorry, because we were interrupted.

10   BY MS. CAPRIO:

11   Q.  When did you first learn, Mr. Fuller, that you had recourse

12   in these federal courts for a violation of your first amendment

13   rights?

14              MR. KUEHNE:  Objection.  Leading.

15              THE COURT:  Overruled.

16   A.  In the summer of 2018.

17   BY MS. CAPRIO:

18   Q.  And is this ethics complaint an example of your first

19   amendment speech, sir?

20              MR. KUEHNE:  Objection to the characterization.

21              THE COURT:  Overruled.

22              THE WITNESS:  Absolutely.

23   BY MS. CAPRIO:

24   Q.  And did Joe Carollo continue his campaign of retaliation

25   and targeting against you after you filed this ethics
```

```
1    complaint?
2              MR. KUEHNE:  Objection.  Leading and speech by counsel.
3              THE COURT:  Sustained.  Rephrase the question.
4              MS. CAPRIO:  Sure.
5    BY MS. CAPRIO:
6    Q.   What did Joe Carollo do after you filed this ethics
7    complaint?
8              MR. KUEHNE:  Objection.  Time, place, vague question.
9              THE COURT:  Overruled.
10             THE WITNESS:  Each and every time that we tried to
11   defend our businesses, our properties, our rights, Mr. Carollo
12   racheted it up.
13             It was an escalation of the attacks on everything, on
14   our character, on our businesses, on our properties, on our
15   nonprofits.
16             MR. KUEHNE:  Objection.
17             THE COURT:  Overruled.
18             MR. KUEHNE:  Nonresponsive.
19             THE COURT:  Overruled, counsel.
20             MR. KUEHNE:  The question was what did Mr. Carollo do.
21             THE COURT:  Mr. Kuehne, have a seat, please.
22             Overruled.
23             You may continue.
24             THE WITNESS:  Yes.  It was a show of force to be able
25   to stop us, to be able to stop us in our tracks so that we
```

1    would never get our day in this Court; to destroy us

2    financially; to destroy our character so that we cannot

3    continue forward; to destroy us emotionally.

4           MR. KUEHNE:  Objection.

5           THE COURT:  What's the objection?

6           MR. KUEHNE:  Nonresponsive as to what did --

7           THE COURT:  Overruled.

8           MR. KUEHNE:  -- Commissioner Carollo do.

9           THE COURT:  Overruled.

10          THE WITNESS:  It was an entire effort by Mr. Carollo

11   and several individuals in the City of Miami that helped him

12   execute this plan to be able to destroy us.

13          MR. KUEHNE:  Objection.  Nonresponsive, Rule 403.

14          THE COURT:  Overruled.

15          THE WITNESS:  Those that did his bidding were promoted,

16   and those that did not do his bidding were either terminated or

17   demoted, they're no longer there.

18          MR. KUEHNE:  Objection.  Nonresponsive, speculation,

19   foundation, not based on any evidence, and Rule 403.

20          THE COURT:  Overruled.

21          MS. CAPRIO:  Thank you, Mr. Fuller.

22   BY MS. CAPRIO:

23   Q.  Now, do you recall testifying about the Tower Hotel during

24   your cross-examination?

25   A.  Yes.

1    Q.   Okay.  And when, approximately, did you and Mr. Pinilla

2    purchase the Tower Hotel?

3    A.   We purchased it in 2012.

4    Q.   Okay.  And do you recall looking at a lot of photographs of

5    the construction in the Tower Hotel shortly after you purchased

6    it in 2012 with Mr. Kuehne?

7    A.   Yes.

8    Q.   And let's call up Defendant's 63.

9         This is already in evidence.

10        This is a June 5th, 2012, repair or demolish first notice.

11        Do you recall testifying about this Mr. Fuller?

12   A.   Yes.

13   Q.   Can you please explain to the jury and His Honor the

14   circumstances surrounding this repair or demolish first notice

15   violation?

16   A.   This is the violation that Mr. Rey Benetiz, he came to the

17   property on Friday, the date was June 4th, and I believe that

18   was a Friday, and he was concerned that the work would --

19        MR. KUEHNE:  Objection.  Hearsay, what concern, absent

20   witness.

21        THE COURT:  Sustained.

22   BY MS. CAPRIO:

23   Q.   We're not talking about what someone else told you; just

24   describe the events that happened, please.

25   A.   He came on Friday, and then he came back on Monday with the

1    fire marshal, with two building officials, himself, and they

2    walked the entire property, and the fire marshal and the senior

3    building official all determined that, in fact, the work had

4    not --

5          MR. KUEHNE:  Objection.  Hearsay, what somebody else

6    absent said or determined.

7          THE COURT:  Overruled.

8          THE WITNESS:  Had, in fact, not revealed any life

9    safety issues or any concerns, and they guided us as to which

10   permit they thought was the best fit for the walls that had

11   been illegally improved by the previous owner to be removed,

12   and we commenced with that permit.

13   BY MS. CAPRIO:

14   Q.   That was in 2012; correct?

15   A.   That was three days after this violation.

16   Q.   Okay.  And how was your relationship with the City of Miami

17   in 2012 in connection with addressing these types of

18   violations, sir?

19   A.   I admit that it took us 10 years to develop the Tower

20   Hotel, but it was a long battle, the last five years being the

21   most difficult, but it was long because Martin and I

22   self-funded it and we wanted it to be part of our passion

23   legacy collection.

24         MR. KUEHNE:  Objection.  Rule 403, that's not the

25   question pending, nonresponsive.

1        THE COURT:  Sustained.  Sustained.

2        MR. KUEHNE:  And it's beyond the scope of --

3        THE COURT:  I sustained the objection, counsel.

4        MR. KUEHNE:  Yes, sir.

5   BY MS. CAPRIO:

6   Q.   My question is, what was your relationship with the City of

7   Miami like in 2012 in connection with addressing these

8   violations and bringing them into compliance?

9   A.   We had an excellent working relationship, and we were often

10  commended by the great work we were doing in the City of Miami

11  by them.  Many of the officials that worked in the city grew up

12  in these neighborhoods, and they were so proud of the work we

13  were doing to restore and bring back their childhood

14  neighborhood.

15        MR. KUEHNE:  Objection.  The last part is nonresponsive

16  and based on hearsay, Rule 403.

17        THE COURT:  Sustained.

18  BY MS. CAPRIO:

19  Q.   All right.  And now, let's move forward in time to after

20  Joe Carollo takes office as District 3 commissioner in December

21  of 2017.

22        And do you recall on your cross-examination, sir, that you

23  looked at a lot of different notices and pictures and -- of

24  events surrounding the Tower Hotel during that time frame?

25  A.   The time frame after, I'm sorry?

1    Q.   Post-Carollo.

2    A.   Yes.

3    Q.   So let's call up -- all of these are admitted into evidence

4    already.  Let's please call up Defendant's 67.  Okay.

5         Mr. Fuller, what's the date of this notice of hearing?

6    A.   January 22nd, 2018.

7    Q.   And when did Commissioner Carollo take office as District 3

8    commissioner?

9    A.   In December of '17.

10   Q.   This is one month afterwards; correct?

11   A.   Yes.

12   Q.   And at this point in time had Joe Carollo begun targeting

13   you and Mr. Pinea's businesses?

14          MR. KUEHNE:  Objection.  Leading, foundation.

15          THE COURT:  Sustained.

16          MR. KUEHNE:  Assumes facts not in evidence.

17          THE COURT:  Sustained.

18   BY MS. CAPRIO:

19   Q.   At this point in time, what was your -- strike that.

20        As of January of 2018, what was your relationship with the

21   City of Miami like?

22   A.   We still had a working relationship, except that we -- this

23   was after the Christmas party, inundation of violations started

24   to come on all of our properties.

25   Q.   And Joe Carollo was in office at that time; correct?

1   A.   Yes.

2   Q.   Let's call up Defendant's Exhibit 70.  This is another

3   document that we looked at on cross-examination with

4   Mr. Kuehne.  And this is a -- could you please read the date of

5   that into the record, sir.

6   A.   This is January 9th, 2018.

7   Q.   Okay.  And is that after Joe Carollo took office?

8   A.   Yes.

9   Q.   We can take that down.  And now let's look at Defense 71.

10       What is the date of that notice of hearing?

11   A.   January 22, '18, the notice.

12   Q.   And is that date -- and this is the Tower Hotel as well?

13   A.   Yes.

14   Q.   And is January 22nd, 2018, after Joe Carollo took office as

15   District 3 commissioner?

16   A.   Yes, that's correct.

17   Q.   Take that down.  Let's go to Defense 72.  72, thank you.

18       Mr. Fuller, what is the date -- this is for the Tower

19   Hotel; correct?

20   A.   Yes.

21   Q.   And what is the date of this document?

22   A.   February 13th, 2018.

23   Q.   And is this after Joe Carollo took office?

24   A.   Yes.

25   Q.   We can take that down.  Let's call up Defendant's 74, go to

1    the right page.  Mr. Fuller, is this for the Tower Hotel?

2    A.   Yes.

3    Q.   And what is the date of this document?

4    A.   July 2-20, three months after COVID started.

5    Q.   And is July 2nd, 2020 after Joe Carollo took office as

6    District 3 commissioner?

7    A.   Yes.

8    Q.   Let's call up Defendant's 75.  And sir, is this for the

9    Tower Hotel?

10   A.   Yes.

11   Q.   And what is the date of this document?

12   A.   October 5th, 2020.

13   Q.   And is this after Joe Carollo took office?

14   A.   Yes.

15   Q.   Let's call up Defendant's 76.

16        Okay.  Sir, is this associated with the Tower Hotel?

17   A.   Yes.

18   Q.   Okay.  And what is the date of this document?

19   A.   October 20th of 2020.

20   Q.   And is this after Joe Carollo took office as District 3

21   commissioner?

22   A.   Yes.

23   Q.   Let's call up Defendant's 77.

24        And, sir, is this for the Tower Hotel?

25   A.   Yes.

```
 1   Q.   And what is the date of this document?
 2   A.   November 20th, 2020.
 3   Q.   Is this after Joe Carollo took office as District 3
 4   commissioner?
 5   A.   Yes.
 6   Q.   Yes?
 7   A.   Yes.
 8   Q.   Let's take that down.  Let's call up Defendant's 78, all
 9   right, and is this for the Tower Hotel?
10   A.   Yes.
11   Q.   What is the date of this?
12   A.   This is October 12th, 2021.
13   Q.   And is this after Joe Carollo took office?
14   A.   Yes.
15   Q.   Take it down.  Let's go to Defendant's 79, please.
16        And is this notice for the Tower Hotel?
17   A.   Yes.
18   Q.   And what is the date of this notice?
19   A.   January 9, 2018.
20   Q.   And this is after Joe Carollo took office?
21   A.   Yes.
22        MR. KUEHNE:  What number is this one?
23        MS. CAPRIO:  79.
24   BY MS. CAPRIO:
25   Q.   Let's go to Defendant's 81.  Okay.
```

1      And is this associated with the Tower Hotel?

2  A.   Yes.

3  Q.   And what is the date of this stop work order?

4  A.   24, 2019.

5  Q.   And is this after Joe Carollo took office?

6  A.   Yes.

7  Q.   Let's call up Defendant's 89.  And what is the date of this

8  document?  This is -- this is September 1st, 2021.

9  Q.   I don't think this one -- what is this compliance agreement

10 associated with, Mr. Fuller?

11 A.   This is a property that is majority owned by my mother,

12 but nothing was off limits for Mr. Carollo, not even my mother.

13      MR. KUEHNE:  Objection.  Nonresponsive.

14      THE COURT:  Sustained.

15 BY MS. CAPRIO:

16 Q.   So this property was owned by your mother?

17 A.   She owns 99 percent of this company.

18      MR. KUEHNE:  Objection.  Hearsay.

19      THE COURT:  Overruled.

20 BY MS. CAPRIO:

21 Q.   I'm sorry, what was your answer?

22 A.   She owns 99 percent of this company, Pierta Village, which

23 is her maiden name, Pierta.

24 Q.   So we just looked at all -- apart from that last exhibit,

25 all of those violations that you were shown on

 1   cross-examination concerned the Tower Hotel; is that right?

 2   A.   Yes.

 3   Q.   And they were all after Joe Carollo took office; is that

 4   right?

 5   A.   Yes.

 6   Q.   And why do you think that those violations happened?

 7        MR. KUEHNE:  Objection.  Speculation, foundation,

 8   Rule 403.

 9        THE COURT:  Overruled.

10        THE WITNESS:  So that we could get to court today and

11   their entire narrative could be about building and code

12   violations.

13        MR. KUEHNE:  Objection.  The story-telling is a

14   narrative, it's nonresponsive.

15        THE COURT:  Sustained.

16   BY MS. CAPRIO:

17   Q.   Do you think that these violations resulted from Joe

18   Carollo being in office?

19        MR. KUEHNE:  Objection.  Leading.

20        THE COURT:  Sustained.

21   BY MS. CAPRIO:

22   Q.   Why do you think that these violations --

23        MR. KUEHNE:  Objection.  Foundation, speculation.

24   Q.   -- happened, sir --

25        MR. KUEHNE:  Objection.  Speculation --

```
1    Q.   -- after Commissioner Carollo took office?
2         MR. KUEHNE:  -- opinion testimony not based on fact.
3         THE COURT:  Overruled.  Overruled.
4    BY MS. CAPRIO:
5    Q.   Do you need me to repeat my question?
6    A.   No, I don't.
7         This is very clear that Joe Carollo's hand and fingerprints
8    were all over this, and everyone in the City of Miami knew
9    this, everyone.
10        MR. KUEHNE:  Objection.
11        Move to strike, what everybody knows, unless he's going
12   to testify as to who these everybody's are.
13        THE COURT:  It's stricken.  Next.
14   BY MS. CAPRIO:
15   Q.   Did you know, Mr. Fuller?
16   A.   Yes.
17        MR. KUEHNE:  Objection.  Opinion, speculation, not
18   based on any facts, hearsay, and Rule 403.
19        THE COURT:  Overruled.
20        THE WITNESS:  Yes.
21   BY MS. CAPRIO:
22   Q.   Okay.  And now in that category of exhibits, we looked at
23   some compliance agreements.  Let's call up Defendant's 69 --
24   well, first of all -- we can keep it up, these are admitted
25   into evidence.
```

1      Mr. Fuller, could you please explain to the jury and His

2 Honor what a compliance agreement is?

3           MR. KUEHNE:  Objection.  Legal opinion, foundation.

4           THE COURT:  Sustained.

5 BY MS. CAPRIO:

6 Q.  Mr. Fuller, what is your understanding -- you entered into

7 these compliance agreements; correct?

8 A.  Yes.

9 Q.  And what is your understanding of these agreements?

10          MR. KUEHNE:  Objection.  The document speaks for

11 itself.  It's signed.

12          THE COURT:  Overruled.

13          THE WITNESS:  Over time, the building department was

14 getting more pressure, they were asking us to start signing

15 these documents.

16          MR. KUEHNE:  Objection.  Now the testimony's based on

17 hearsay, what somebody else told him.

18          THE COURT:  Overruled.

19          THE WITNESS:  The building department requested that we

20 start signing these documents --

21          MR. KUEHNE:  Objection.  Hearsay.

22          THE COURT:  Overruled.

23          THE WITNESS:  -- and to sign these documents, we had to

24 go into the City of Miami and sign them in the City of Miami

25 Building Department.  The later versions of the documents

1    reveal that they were signed.  They would not allow us to take

2    the documents out and have our attorneys review them.

3         In one case, the --

4         MR. KUEHNE:  Objection.  Hearsay, foundation.

5         THE COURT:  Sustained.

6    BY MS. CAPRIO:

7    Q.  And this date, let's look at the date, July 23rd, 2018.

8         Is that after Joe Carollo took office, sir?

9    A.  Yes.

10   Q.  And does this compliance agreement involve the Tower Hotel?

11   A.  Yes.

12   Q.  And were you trying to bring it into compliance?

13   A.  Yes.  And we did bring it into compliance.

14        MR. KUEHNE:  Objection.  Nonresponsive.

15        THE COURT:  Overruled.

16        MS. CAPRIO:  Do you want to take that down.

17   BY MS. CAPRIO:

18   Q.  And now let's look at Defendant's 73, and this is another

19   compliance agreement that -- do you recall reviewing this with

20   Mr. Kuehne, Mr. Fuller?

21   A.  Yes.

22   Q.  Okay.  And is this also for the Tower Hotel?

23   A.  Yes.

24   Q.  It's another folio of the Tower Hotel?

25   A.  Yes.

1   Q.   And this is the same date, July 23rd, 2018, as the other

2   agreement?

3   A.   Correct.  This is the Henry Schectman House.

4        MR. KUEHNE:  Could you give me the exhibit number,

5   please.

6        MS. CAPRIO:  Certainly.  It is Defendant's 73.

7   BY MS. CAPRIO:

8   Q.   I'm sorry, what was that, the Henry Schectman House?

9   A.   Henry Schectman House, the annex house there, as well.

10  Q.   And this is the same date as the document we just looked

11  at; correct?

12  A.   Yes.

13  Q.   And this is also after Joe Carollo took office?

14  A.   Yes.

15  Q.   You can take that down.

16       Now, let's go to Defendant's 80.

17       And do you recall discussing this with Mr. Kuehne in your

18  cross-examination, sir?

19  A.   Yes.

20  Q.   Okay.  And this is also a compliance agreement, is that the

21  Tower Hotel?

22  A.   Yes.

23  Q.   And what part of that Tower Hotel is that address?

24  A.   This is the 1444, the western building to the folios.

25  Q.   And it's the same date as the other two that we just looked

1  at, July 23rd, 2018?

2  A.   Yes.

3  Q.   And was Commissioner Carollo in office at that time?

4  A.   Yes.

5  Q.   Now, call up Defendant's 78, I believe we looked at that

6  just a minute ago.

7       Sir, this is another compliance agreement of the

8  Tower Hotel, October of 2020?

9  A.   Yes.

10 Q.   Can you describe the circumstances of this compliance

11 agreement?

12 A.   After this compliance agreement was signed and we were

13 moving with the City -- again, very complicated -- the City, it

14 got way more complicated for us to operate with the City,

15 everything was a snail pace, and all of our examinations in the

16 building department required extra reviews.

17      The City one day came in -- City attorney, Rachel Dooley,

18 came in and said, I'm sorry --

19           MR. KUEHNE:  Objection.

20           THE COURT:  Grounds?

21           MR. KUEHNE:  Hearsay, what somebody else said.

22           THE COURT:  Sustained.

23 BY MS. CAPRIO:

24 Q.   Okay.  Without talking about Ms. Dooley said, please

25 describe what the events were that happened.

1  A.   "Sorry, guys, you missed the timeline to fix the property,

2  we're now demolishing your building."

3          MR. KUEHNE:  Objection.

4          MS. CAPRIO:  Affect on the listener.

5          MR. KUEHNE:  Objection, which is a --

6          MS. CAPRIO:  Affect on the listener.

7          MR. KUEHNE:  -- hearsay objection, which was a

8  statement, he repeated the statement.

9          THE COURT:  Overruled.

10 BY MS. CAPRIO:

11 Q.   Can you say that again, please.

12 A.   "I'm really sorry, guys, you missed the timeline to fix --

13         MR. KUEHNE:  Objection.

14         THE COURT:  Sir, when --

15         MR. KUEHNE:  Objection, Your Honor.

16         THE COURT:  Excuse me, sir.

17         THE WITNESS:  I'm sorry, Your Honor.

18         THE COURT:  Mr. Kuehne, when I overrule the

19 objection --

20         MR. KUEHNE:  Objection, Your Honor.

21         THE COURT:  -- do not again make another objection.

22 I overruled the objection.  Of course, when an objection is

23 sustained, you don't see the plaintiff counsel objecting

24 thereto.  So please respect the Court's decision.

25         I make the decision as to whether an objection's

1    overruled or sustained, so you can move forward in an ordinary

2    fashion with this trial, sir.

3              MR. KUEHNE:  Of course, Judge.

4              THE COURT:  All right.  Thank you.

5              MR. KUEHNE:  Request a sidebar.

6              THE COURT:  Denied.

7         Please have a seat, sir, so we can move forward.

8         Again, you may make your objection.  If it's sustained,

9    it's sustained, which means, Mr. Fuller, do not answer the

10   question.  All right?

11             THE WITNESS:  Yes, sir.

12             THE COURT:  Thank you.

13             THE WITNESS:  Yes, Your Honor.

14   BY MS. CAPRIO:

15   Q.  Please proceed with your answer, Mr. Fuller.

16   A.  We had several of the compliance agreements, including this

17   one, in one foul swoop the City told us, Sorry, guys, you

18   missed the timeline, we're moving to demolish all six of your

19   properties; all six of them, we're going to demolish them.

20        And so what did we have to do?  Hire attorneys, spend

21   hundreds of thousands of dollars suing the City of Miami so

22   that we could protect these buildings, the same city that was

23   behind the National Preservation For Historic Trust, same city

24   that wants to improve our community.

25             MR. KUEHNE:  Objection.

```
1        THE COURT:  What is the grounds?

2        MR. KUEHNE:  Nonresponsive to the question.

3        THE COURT:  Sustained.  Next question, Ms. Caprio.

4        MS. CAPRIO:  Yes, Your Honor.

5  BY MS. CAPRIO:

6  Q.  And on your cross-examination you referenced an audit by

7  the City of Miami of the Tower Hotel.

8        Could you please explain the audit of the Tower Hotel that

9  was conducted by the City of Miami.

10  A.  When we were in the middle of COVID in October of 2020,

11  while we were notified that the Ball & Chain was closed, we

12  were notified that it was a result of the audit.

13        The audit was done on what we had been recommended by the

14  City of Miami was a private provider, the name of the company

15  was called Ordis.

16        Ordis was the recommended private provider by the City of

17  Miami.  They had been in business in the City of Miami for five

18  years, had done over 80 projects each year.

19        MR. KUEHNE:  Objection.  Nonresponsive.  It's now a

20  narrative.

21        THE COURT:  Overruled.

22        THE WITNESS:  They had done -- in the five years they

23  had done over 400 projects in the City of Miami of,

24  approximately, 80 a year.  And in October of 2020, in COVID,

25  Ordis, for the first time, was audited for the work that they
```

1    had done; and of all the 80 clients they had during that year,

2    only two clients of their entire portfolio were audited.

3           One was the Ball & Chain, the other was the

4    Tower Hotel.  Another first of its kind for us, we won that

5    lottery, too.

6           MR. KUEHNE:  Objection.

7           This is the narrative beyond the question.

8           THE COURT:  I will sustain that objection there.

9    BY MS. CAPRIO:

10   Q.  Mr. Fuller, and why did this audit of the Tower Hotel

11   occur?

12          MR. KUEHNE:  Objection.  Speculation, opinion, not

13   based on facts.

14          THE COURT:  Overruled, if he knows.

15          THE WITNESS:  As in the Ball & Chain, they wanted to

16   close and destroy the Tower Hotel; and this is what caused us

17   to lose our lease, this exact decision, we lost our lease.

18          MR. KUEHNE:  Objection.  Nonresponsive to the question.

19          THE COURT:  Overruled.

20   BY MS. CAPRIO:

21   Q.  And who is "they"?

22   A.  There is evidence of an e-mail from Joe Carollo, it's a Joe

23   Carollo investigation that caused these audits.  We will see

24   it.  It's a Joe Carollo investigation that caused the audits

25   that closed the Ball & Chain, and their desire was to destroy

1   us and close the Tower Hotel, and we had fought for over a year

2   to protect the Henry Schectman House.

3            MR. KUEHNE:  Objection -- objection --

4            THE WITNESS:  We even had to take it to Historic

5   Preservation --

6            THE COURT:  Mr. Fuller - Mr. Fuller, wait.  Wait.

7            THE WITNESS:  -- the City fought it --

8            THE COURT:  Mr. Fuller, wait.  There's an objection.

9            THE WITNESS:  Sorry, I didn't hear it.

10           THE COURT:  All right.

11           THE WITNESS:  I apologize.

12           MR. KUEHNE:  Objection.  Nonresponsive.  The

13   story-telling narrative continues.

14           THE COURT:  Sustained.

15   BY MS. CAPRIO:

16   Q.  Were you able to protect the Henry Schectman House, sir?

17   A.  When we went to protect the Henry Schectman House, the

18   application was actually submitted by the City of Miami.

19           MR. KUEHNE:  Objection.  Nonresponsive --

20           THE COURT:  Overruled.

21           MR. KUEHNE:  -- It's a yes or no answer.

22           THE COURT:  Overruled.

23           THE WITNESS:  But when we got to the final hearing, the

24   City attorney fought the City of Miami to have the house

25   protected.  The City attorney in the hearing fought the City of

1   Miami to have it protected.

2          THE COURT:  Next question, Ms. Caprio.

3          MS. CAPTIO:  Okay.

4   BY MS. CAPRIO:

5   Q.   And now let's shift gears to the Ball & Chain valet.

6          If we could please call up Plaintiff's 448, which is

7   already in evidence.

8          Mr. Fuller, do you recall looking at this document with

9   Mr. Kuehne on your cross-examination?

10  A.   Yes.

11  Q.   And did you ever receive this document on March 12, 2018?

12  A.   I don't recall receiving it, but I have seen it in the

13  past.  I don't know if I received it March 12th, but I have

14  received it and looked at it.

15  Q.   And are you copied on this document?

16  A.   No.

17  Q.   Who is copied on this document?

18  A.   Munirah Daniel, acting finance director, City of Miami, and

19  Victoria Mendez, city attorney.

20  Q.   Take that down.  Now let's call up Defendant's 408, which

21  is in evidence.  Scroll down.  I apologize, we will come back

22  to that document.  Let's move forward.

23          And now let's -- defendant's -- one second, apologies.

24          And, sir, while we're waiting for the document to be called

25  up, do you recall testifying about an audit on the Ball & Chain

1    valet?

2    A.   Yes.

3    Q.   And could you please describe what that audit is?

4    A.   This is an audit that was done --

5         MR. KUEHNE:  Objection.  Foundation, hearsay, lack of

6    personal knowledge.

7         THE COURT:  Overruled.

8         THE WITNESS:  This was an audit of, you know, that was

9    conducted on -- to show that all the businesses were being

10   inspected, right, because of things are being done fair and

11   equitably, and they're not being selectively targeted, you

12   inspect everyone, right, that's fair, I acknowledge that, I

13   respect that approach to the law.  And so, in this case, 13

14   parking lots were inspected.

15   Q.   Okay.  And do you see the line that says Complete

16   Consulting Services Group, CCSG, do you see that, sir?

17   A.   Yes.

18   Q.   And that was the letter we just looked at, right, that was

19   to Mr. Alain Garcia?

20   A.   This e-mail is from Jose Suarez, copied an Anthony Barcena

21   and Richard Blom, who are the three employees of Joe Carollo's

22   office.

23   Q.   And what's the date of this?

24   A.   This is from April 20th, 2018.

25   Q.   Okay.  And let's go down and look at these properties.

1    A.   These are those properties.

2    Q.   We see Casa Juan Show --

3    A.   Yes, Casa Juan Show, Oika Myette, Casa Ponza, Ball & Chain,

4    Quanta Amera, Fonda Lachismosa, Little Havana Lot, G & B Gas

5    Station, Latitude, Nordica condo, Habitat Residence, Homewood

6    Sweets Brickell, and the Soccer Cage at 330 Southwest 7th

7    Street.

8    Q.   Okay.  And which properties of this list are your

9    properties, Mr. Fuller?

10   A.   Ball & Chain and the Soccer Cage --

11   Q.   Okay.

12   A.   -- the only two that were cited with any violations of the

13   13, copied for Mr. Carollo's office to see in full sight.

14        And Mr. Alain Garcia, who was also --

15   Q.   Let me ask you the question.

16        THE COURT:  Mr. Fuller, listen to the question.

17   BY MS. CAPRIO:

18   Q.   We'll get there.  So, can you please describe for the jury

19   and His Honor Alain Garcia's relationship with these businesses

20   that are listed on Defense Exhibit 408?

21        MR. KUEHNE:  Objection.  Lack of personal knowledge,

22   speculation.

23        THE COURT:  Overruled.

24        THE WITNESS:  So, for example, if you look at Casa

25   Panza, S.H. Valet Service, Mr. Alain Garcia's business is the

1   valet operator; right?

2   Q.   Okay.  And was Casa Ponza, did they have any fines

3   associated with their audit?

4   A.   No.  He was -- in their mind, he was stealing only on the

5   Ball & Chain, but not in any other business he was associated

6   with.

7   Q.   And then, let's go down.

8        Are there any other -- so he had that other business that

9   he was also providing valet services for?

10  A.   Correct.

11  Q.   And that business was not fined as a result of this audit;

12  correct?

13  A.   That's correct.

14  Q.   Only your businesses were fined; right?

15  A.   That's correct.

16  Q.   Okay.  We can take that down.

17       Ddddddnow, again, let's shift to the Calle Ocho

18  Marketplace.

19       Just briefly, just so we can remember, the Calle Ocho

20  Marketplace was the farmer's market and the rum distillery

21  project; correct?

22  A.   That's correct.

23  Q.   And now, let's call up Defendant's 16.

24       And what is the date of this document, Mr. Fuller?

25  A.   May 27th -- May 22nd, 2017.

1   Q.   And this is a -- for the Calle Ocho Marketplace; correct?

2   A.   Yes.

3   Q.   Okay.  And this is before Joe Carollo took office; correct?

4   A.   Yes.

5   Q.   And during this time, can you please describe the

6   interactions between the City of Miami and your business Calle

7   Ocho Marketplace in connection with this type of violation for

8   work performed without a finalized permit?

9   A.   Well, we were -- at the time, the shipping containers was a

10  new concept that was something that the building department was

11  trying to digest.  Are they permanent?

12       Are they not permanent?  How do we work with them?

13       And they did not have anything defined in the code to

14  discuss them, and so we were actually having --

15           MR. KUEHNE:  Objection.  Hearsay, speculation, not

16  based on any evidence.

17           THE COURT:  Overruled.

18  A.   We were having direct communication with the building

19  department to do this because these containers were

20  proliferating all over the City of Miami.  And that was this

21  process.  And when we started these, we didn't know, because

22  the mobile containers we thought were mobile, and there was

23  nothing that provided specific guidelines.

24       We were working through this process until Carollo took

25  office and then everything changed related to this project, to

1    the point where we could never have it.

2    Q.   Okay.  And at some point did the Calle Ocho Marketplace

3    have a permit in place to operate a farmer's market?

4    A.   We had received a conditional approval for it, but then an

5    additional determination was made later and they revoked the

6    ability to do that.

7    Q.   Was the revocation of the farmer's market permit after Joe

8    Carollo took office?

9    A.   Yes.  I think Rachel Dooley was responsible for that.

10          MR. KUEHNE:  Objection, speculation, foundation.

11          THE COURT:  Sustained.

12   BY MS. CAPRIO:

13   Q.   The special events permit was revoked after Joe Carollo

14   took office, yes or no?

15   A.   Yes.

16          MR. KUEHNE:  Objection.  Leading.

17          THE COURT:  Sustained.

18   BY MS. CAPRIO:

19   Q.   When was the special events permit for the Calle Ocho

20   Marketplace revoked?

21   A.   In 2018, after Joe Carollo took office.

22   Q.   Thank you, sir.  Okay.

23       Now, at some point when you were being cross-examined by

24   Mr. Kuehne, do you recall testifying about an ALF named

25   El Paraiso?

1   A.   Yes.

2   Q.   And you also -- well, first of all, is El Paraiso an

3   Assisted Living Facility?

4   A.   That's my understanding of its operation.

5   Q.   Okay.  And you also mentioned that there was a litigation

6   that was concerning the ALF.

7        Do you recall testifying about that, sir?

8   A.   Yes.

9   Q.   Could you please explain for the jury and His Honor what

10  the subject matter of that litigation was?

11       MR.  KUEHNE:  Objection.  Speculation, foundation.

12       THE COURT:  Overruled, if he knows.

13       THE WITNESS:  After I understood that Mr. Carollo had

14  called the code enforcement director, Adele Valencia, on the

15  night that we had received two inspections of the Ball & Chain,

16  and she explained to me that, in fact, it wasn't Mr. Carollo

17  who called --

18       MR. KUEHNE:  Objection.  Hearsay.

19       THE COURT:  Sustained.

20       Ms. Caprio, move on to your next question.

21       MS. CAPRIO:  Yes, sir.

22  BY MS. CAPRIO:

23  Q.   Let's look at Plaintiff's 577, please.

24       Mr. Fuller, are you familiar with this e-mail?

25  A.   Yes.

```
 1   Q.   And who is Adele Valencia?

 2   A.   She at the time was the code compliance director.

 3   Q.   And this was in October of 2020; correct?

 4   A.   Yes.

 5   Q.   In here, did you speak with Ms. Valencia in connection with

 6   this e-mail?

 7   A.   Yes, I did.

 8   Q.   Without getting into the substance of your conversation,

 9   what was the connection between this e-mail and the ALF

10   litigation?

11   A.   Commissioner Carollo called Adele and said that the ALF had

12   made a complaint that night.

13        MR. KUEHNE:  Objection.

14        MS. CAPRIO:  It's not offered for the truth,

15   Your Honor.

16        MR. KUEHNE:  Objection.  Hearsay, what somebody else

17   said.

18        THE COURT:  What the defendant said, overruled.

19        THE WITNESS:  We knew this not to be true, that

20   Mr. Carollo had, in fact, fabricated this noise complaint.  And

21   so, we really -- as much as it sounds, we really are not

22   litigious people.

23        We have been working to defend our rights.  The last

24   thing I want to do is spend all my time and energy in a

25   courtroom or in litigation, it's very expensive.  It's been
```

1    extremely debilitating.  But we filed a lawsuit against --

2         MR. KUEHNE:  Objection.  Narrative, nonresponsive to

3    the question.

4         THE COURT:  Overruled.  Overruled.

5         THE WITNESS:  We filed the lawsuit against the ALF for

6    one purpose.  The only purpose to file the lawsuit was to

7    actually determine if Mr. Carollo had, in fact, called and made

8    a complaint -- that the ALF had made a complaint to Mr. Carollo

9    that night.

10        MR. KUEHNE:  Objection.  Beyond the scope.

11        THE COURT:  Overruled.

12        THE WITNESS:  And the ALF said no, sir, we did not file

13   a complaint.

14        MR. KUEHNE:  Objection.  Hearsay, what an ALF said.

15        THE COURT:  Overruled.

16        THE WITNESS:  And they gave us an affidavit that

17   confirmed, in fact, that they had not made the complaint, that

18   Mr. Carollo was lying that night that he did that, he

19   fabricated that story to try to shut us down that night.

20        And as a result of the affidavit, which was the only

21   purpose we filed the lawsuit, we dismissed the lawsuit

22   immediately, and we have that affidavit in our possession.

23        MS. CAPRIO:  Okay.  Thank you, sir.

24        So now -- to the witness and to opposing counsel, if we

25   could please call up that affidavit.  On this.

1    BY MS. CAPRIO:

2    Q.  Mr. Fuller, is this the affidavit you're referring to?

3    A.  Yes, it is.

4    Q.  Who is it made by?

5    A.  Gustavo Perez.

6    Q.  And who is --

7    A.  That's the officer of the El Paraiso ALF, the one that

8    Mr. Kuehne explained was catty-cornered to the Ball & Chain.

9            MR. KUEHNE:  Objection.  Request a sidebar.

10           THE COURT:  Denied.  What's the objection?

11           MR. KUEHNE:  The objection is he's testifying about a

12   document that's not in evidence.

13           THE COURT:  What's your legal objection, sir?  What's

14   your legal objection?

15           MR. KUEHNE:  Testifying about a document not in

16   evidence, Your Honor.

17           THE COURT:  It's sustained.

18           MS. CAPRIO:  Okay.

19   BY MS. CAPRIO:

20   Q.  Do you know who made -- does this document -- do you recall

21   who made the affidavit in the ALF litigation?

22           THE COURT:  Ms. Caprio, the objection was sustained.

23           When I sustain an objection, I don't want any further

24   question relating to it.  The rules apply, you agree, to both

25   people in this courtroom; right?

1          MS. CAPRIO:  Yes, Your Honor.

2          THE COURT:  Move on to the next question.

3          MS. CAPRIO:  You can take that down.

4    BY MS. CAPRIO:.

5    Q.  Let's pull up -- let's again shift gears to Joe Carollo's

6    event in Little Havana, the Little Havana Fridays, and let's

7    call it Plaintiffs' -- or excuse me, Defense 384.

8          Before we go there, actually, Christina Perez, who is

9    Christina Perez with the ALF?

10   A.  I believe she is the daughter of Mr. Gustavo Perez.

11   Q.  Okay.  We call up Defense 384, and we're still at the ALF,

12   I apologize, before we move on.

13         I'm sorry, Your Honor, we are moving on.

14         This is Defense 384, it's already in evidence.

15         And do you recall testifying about this in your

16   cross-examination, sir?

17   A.  This has to be the most famous image in this trial.

18   Q.  Okay.  And in this image there's Commissioner Carollo and

19   Commissioner Reyes.  Do you see that?

20   A.  Yes.

21   Q.  And do you know if Commissioner Reyes is actually a sponsor

22   of the Little Viernes Picatus Havana?

23         MR. KUEHNE:  Objection.  Speculation, foundation,

24   improper.

25         THE COURT:  Overruled, if he knows.

```
 1              THE WITNESS:  It is now my understanding that he is a
 2   sponsor of this event.
 3              MR. KUEHNE:  Objection.  Move to strike.
 4              THE COURT:  Stricken.
 5   BY MS. CAPRIO:
 6   Q.   Do you know if he's a sponsor of the event?
 7        Do you know if Mr. Reyes is also a sponsor of the event,
 8   along with Commissioner Carollo?
 9              MR. KUEHNE:  Objection.  Based on foundation.
10              THE COURT:  Sustained.
11   BY MS. CAPRIO:
12   Q.   Are you familiar with Little Picana Havana?
13   A.   Yes.
14   Q.   And that was the festival that we talked about on direct
15   examination; correct?
16   A.   Yes.
17   Q.   And that's Mr. Carollo's Festival; correct?
18   A.   Yes.
19   Q.   That's the one that blocked Viernes Culturales; correct?
20   A.   Yes.
21              MR. KUEHNE:  Objection to the questions.  They're
22   leading, "correct?".
23              THE COURT:  Sustained.
24   BY MS. CAPRIO:
25   Q.   What did Little Havana Fridays do in relation to Viernes
```

1   Culturales?

2   A.   Stole all our dates, and it stole all the good will that

3   our organization had built over the last 20 years.

4   Q.   And you had personal knowledge regarding Commissioner

5   Carollo's Little Havana Fridays; correct?

6           MR. KUEHNE:  Objection.

7           THE COURT:  What's the grounds?

8           MR. KUEHNE:  Speculation, asking him to define whether

9   he has personal knowledge.

10          THE COURT:  Overruled.

11          THE WITNESS:  I know it, and Mr. Carollo made it a very

12  public effort to let everybody else know it, that he had, in

13  fact, destroyed us, it was his mission.

14          MR. KUEHNE:  Objection.  Nonresponsive.

15          THE COURT:  Overruled.

16  BY MS. CAPRIO:

17  Q.   Let's call up just for the witness and opposing counsel

18  Plaintiffs' 641.  Let's lay a  foundation first.

19          If we can show the witness and opposing counsel.

20          Mr. Fuller, are you familiar with these advertisements for

21  Little Havana Fridays?

22  A.   Yes.

23  Q.   Let's go through them.

24          And these are all for Commissioner Carollo's events?

25  A.   Yes.

1      MS. CAPRIO:  Move to admit.

2      THE COURT:  Any objection?

3      MR. KUEHNE:  Yes, Your Honor, beyond the scope.  We've

4  never seen these documents before.  I have no idea what they

5  are, and it's nonresponsive to any of the examination on

6  cross-examination.

7      MR. KUEHNE:  All right, sustained.

8  BY MS. CAPRIO:

9  Q.   Let's move on to Ball & Chain.

10     And on cross-examination you were showed Defense 670.

11     If you could please call that up, it's admitted into

12 evidence.

13 A.   This is Taquerias Americana.

14 Q.   Oh, excuse me -- Taquerias.  Thank you.

15     And Mr. Fuller, do you recall looking at this document with

16 Mr. Kuehne?

17 A.   Yes.

18 Q.   And do you recall there was some testimony regarding the

19 timing between the paying of the fees and the activation of the

20 permit.  Do you see that?

21 A.   Yes.

22 Q.   Could you please explain -- this is your property, correct,

23 Taquerias?

24 A.   Yes.

25 Q.   All right.  Please explain the timing of that to the jury

1    and His Honor.

2    A.   The permit that was being secured for this was for an

3    electric overhaul of the property.  It was a very large job,

4    they required coordination with FP & L.

5          In order to do so, we had to have architects develop plans,

6    and they had to be reviewed by the City of Miami.

7          I cannot speak to the timing of this -- but -- and I've

8    maintained this from the beginning, I can assure you that the

9    review of the plans were not done in 30 minutes.

10         MR. KUEHNE:  Objection, Your Honor.  Nonresponsive to

11   the question.

12         THE COURT:  Overruled.

13   BY MS. CAPRIO:

14   Q.   When did you submit the plans for this project, Mr. Fuller?

15   A.   I don't know the exact details, because those are handled

16   by permit runners, and the sort.

17         But it required a lot of effort up front to be able to

18   repair the plans necessary to secure this permit.

19         And certainly these are documents the City provides in

20   their computer.  It's not what the actual facts are of the

21   story.  The facts are --

22         MR. KUEHNE:  Objection.

23         THE WITNESS:  -- is that it as a big job, it required a

24   lot of time.

25         THE COURT:  Wait, Mr. Fuller when there's an objection.

1          All right, Mr. Kuehne?

2          MR. KUEHNE:  Objection.

3          THE COURT:  What's the grounds for the objection,

4     Mr. Kuehne?

5          MR. KUEHNE:  Nonresponse to the question, number one.

6          THE COURT:  Overruled.

7          MR. KUEHNE:  And number two, not based on any personal

8     knowledge.

9          THE COURT:  Overruled.

10    BY MS. CAPRIO:

11    Q.   You can continue.

12         So, did it take longer than 30 minutes for these plans to

13    be approved for the electrical for Taq?

14         MR. KUEHNE:  Objection.

15         THE COURT:  What's the objection?

16         MR. KUEHNE:  Lack of personal knowledge.  This document

17    speaks for itself.

18         THE COURT:  Overruled.

19         THE WITNESS:  The document says 30 minutes, but it is

20    impossible to have plans of this type of scope of work approved

21    in 30 minutes.

22         MR. KUEHNE:  Objection.

23         THE COURT:  What grounds?

24         MR. KUEHNE:  Nonresponsive and speculation, not based

25    on personal knowledge.

1    THE COURT:  Overruled.

2    THE WITNESS:  So, this is basically  --

3  Q.  If you take a look at this, sir, it said that you paid the

4  fees and that the plans were approved within 30 minutes;

5  correct?

6  A.  Yes, it says that.  But these are the city documents, and I

7  don't understand --

8  Q.  The paying the fees --

9    THE COURT:  There's no objection.

10    MR. KUEHNE:  I'm going to let her ask the question as

11  the Court has instructed.  It's going to be a leading question,

12  but I rose because I expected it to be, but she hasn't finished

13  the question, Your Honor.

14    THE COURT:  Okay.

15    MS. CAPRIO:  I was anticipating an objection.

16  BY MS. CAPRIO:

17  Q.  So let's go through.  So here, on March 5th, 2018, at

18  10:24, the up-front fees were paid; correct?

19  A.  Yes.

20  Q.  So then after that the fees were accepted, as of 10:48

21  active, do you see that?

22  A.  Yes, plans -- this all happens within a period of 30

23  minutes, the plan -- you know, within 25 -- or I'm sorry,

24  within 30 minutes the fees are paid and the plan is approved.

25  Q.  And the fees were paid then; right?

1    A.   Yes.

2    Q.   That led to the approval?

3    A.   The plan had been submitted, the plan was reviewed, and it

4    was paid.  I mean, there is nothing irregular about this, other

5    than their suggestion --

6              MR. KUEHNE:  Objection, "their suggestion."

7              THE COURT:  Sustained.

8              MS. CAPRIO:  Okay, let's move on.

9              THE COURT:  Mr. Fuller, again, so we can move forward

10   without any objection needs to be raised, listen to the

11   question that counsel is asking of you, and ask what the

12   records are without stating anything else beyond what the

13   question is asking for; okay?

14             THE WITNESS:  Yes, sir.

15             THE COURT:  Thank you.

16             MS. CAPRIO:  Take that down.

17   BY MS. CAPRIO:

18   Q.   Okay.  And now, do you recall on cross-examination -- so

19   now, shifting from Taquerias to Ball & Chain.

20        Do you recall testifying about some noise complaints that

21   happened before Joe Carollo took office -- Mr. Kuehne?

22   A.   Yes.

23   Q.   You testified that you could describe the circumstances of

24   those complaints, but you did not do that with Mr. Kuehne.  I

25   would like for you to do that now with me, please.

1   A.   There was a resident that lived in a building not far away

2   that was made -- made complaints about everything on Calle

3   Ocho.  But I actually don't have a problem with that, like

4   everybody's entitled to make complaints.  We --

5           MR. KUEHNE:  Objection, Your Honor.  Specification,

6   time, place, who the person is he's talking about.

7           THE COURT:  All right.  Sustained.  Rephrase the

8   question to establish the time, and the location and place.

9   BY MS. CAPRIO:

10  Q.   Okay.  Do you recall testifying regarding 2017 noise

11  complaints at Ball & Chain with Mr. Kuehne on your

12  cross-examination?

13  A.   Yes.

14  Q.   Okay.  And those were prior to Joe Carollo taking office;

15  correct?

16  A.   Yes.

17  Q.   And so now, can you please explain briefly the

18  circumstances of those particular noise violations to the jury

19  and His Honor?

20  A.   The year was 2017.  The way the City of Miami worked is

21  that when -- even though they didn't have to, they would share

22  with you, Hey, we're getting a complaint from this resident.

23       And there was always an open dialogue in the community to

24  work with that resident, or that concern, or whatever it is,

25  because we want to be good citizens of the community.

1      And so we went and spoke to all the neighbors.  We actually

2  spoke to this lady, she lived on the third floor of a condo

3  that is in a building on the next block, but not far, but on

4  the next block.  And she was the one that was actively making

5  the complaints that arise in this issue --

6          MR. KUEHNE:  Objection, Your Honor.

7  A.  -- and we --

8          THE COURT:  What's the objection?

9          MR. KUEHNE:  Time, and who he's talking about.

10         It's an anonymous person.

11         MS. CAPRIO:  We're referencing the complaints you

12  introduced, Mr. Kuehne.

13         THE COURT:  Overruled.

14         THE WITNESS:  As I sit here today, I don't recall her

15  name, I don't.

16         I personally went with my staff member Vanessa Mendola,

17  and we knocked on every single door in that building, with the

18  permission of the building manager, so that we could have

19  dialogue with it.

20         And, you know, it was explained to us that that

21  particular resident was very agitated by all sort of things

22  and --

23         MR. KUEHNE:  Objection, Your Honor.

24         THE COURT:  Grounds?

25         MR. KUEHNE:  Objection.  Hearsay, somebody explained

```
 1   something to him.
 2           MS. CAPRIO:  Affect on the listener.
 3           THE COURT:  The objection is overruled.  You may
 4   continue.  Again, Mr. Fuller, if you could just get to the
 5   point.
 6           THE WITNESS:  Okay.  The point is that we worked it out
 7   with the lady.  We made certain improvements to noise diffuse,
 8   and she was very satisfied and felt very -- she felt important,
 9   she wanted to be heard, and we listened to her.  We worked to
10   bridge that gap.
11           MR. KUEHNE:  Objection.
12           THE COURT:  What's the objection?
13           MR. KUEHNE:  Lack of personal knowledge, speculation,
14   and based on hearsay.
15           THE COURT:  Overruled.
16           THE WITNESS:  I spoke to her.  I personally was
17   responsible for managing that relationship.
18           MS. CAPRIO:  Okay.  Thank you.
19   BY MS. CAPRIO:
20   Q.   Thank you.  So you resolved those complaints that you
21   looked at with Mr. Kuehne prior to Joe Carollo taking office;
22   correct?
23   A.   Yes.
24   Q.   And they were all made by the same woman; correct?
25   A.   Yes.
```

1   Q.   Now let's shift gears again.

2        And do you recall Mr. Kuehne asking you about a City of

3   Miami prohibition on outdoor music after 11:00 p.m. in

4   connection with these noise complaints?

5   A.   Yes.

6   Q.   Okay.  And was that an ordinance passed by the City of

7   Miami Commission?

8   A.   There was a special ordinance that was passed that

9   reinforced and restricted very finitely the things that were

10  related to our business, in particular, the Ball & Chain.

11            MR. KUEHNE:  Objection, Your Honor.  Move to strike.

12            THE COURT:  Stricken.

13            Ms. Caprio, move on to your next question, please.

14            MS. CAPRIO:  Yes, sir.  And -- Your Honor, I will note

15  that they opened the door to this line of questioning by asking

16  about this resolution.

17            THE COURT:  I understand that, that's why I said ask

18  your next question, so we can move on.

19            MS. CAPRIO:  I just want to clarify with the Court that

20  I'm allowed to continue to ask this line of questioning.

21            THE COURT:  Go ahead.

22            MS. CAPRIO:  I don't want to run afoul of Your Honor's

23  ruling.

24            THE COURT:  I will tell you if I think so.

25            MS. CAPRIO:  Okay, thank you.

1    BY MS. CAPRIO:

2    Q.   You mentioned that -- how did that ordinance apply to the

3    Ball & Chain?

4    A.   The ordinance now restricted the ability to play music

5    outside, so long that you are adjacent to a residential

6    building.

7         MR. KUEHNE:  Objection.

8         THE COURT:  Wait.  There's an objection.

9         MR. KUEHNE:  Objection.  The ordinance is -- if there

10   is such an ordinance exists, and the facts of the ordinance,

11   the statement speaks for itself, not some opinion by a

12   nonlawyer.

13        THE COURT:  I understand.  Overruled.

14        Go ahead, Mr. Fuller.

15        THE WITNESS:  It said that as so long that you were a

16   next door resident, you couldn't play music differently than

17   everybody else, except that they grandfathered everyone in, in

18   the City of Miami, so that they could continue playing the

19   music the way it always had been, except for one special

20   condition, they said, if you do not have an active CU, okay,

21   then you are not grandfathered in.

22   Q.   Okay.

23   A.   And two weeks before this, they voided our CU.

24   Q.   Okay.  So let's -- they voided the CU, so that was for

25   Ball & Chain; correct?

1   A.   Yes.

2   Q.   So, at the time this ordinance was passed, Ball & Chain did

3   not have an active certificate of use; correct?

4   A.   Yes.

5   Q.   So, as a result of that, Ball & Chain can no longer play

6   music after 11 p.m.?

7   A.   We won the lottery there, too.

8          MR. KUEHNE:  Objection.  Leading question.

9          THE COURT:  Sustained.

10         MS. CAPRIO:  What was the effect --

11         THE COURT:  Ms. Caprio, if you can focus on asking

12  nonleading questions, and we can move on the objection.

13         MS. CAPRIO:  Yes, Your Honor.  I'm trying to move it

14  along.

15         THE COURT:  Well, I will give that to you as well, but

16  you have to ask the appropriate question as well.

17         MS. CAPRIO:  Yes, sir.

18         THE COURT:  The Court will grant leeway when it feels

19  it's necessary to ask a leading question to develop testimony

20  when it's appropriate to do so.

21         MS. CAPRIO:  Okay.  Thank you, Your Honor.

22         THE COURT:  So, again, you may move onto your next

23  question.

24         MS. CAPRIO:  Okay.  Thank you, Your Honor.

25  BY MS. CAPRIO:

1   Q.   So, did that ordinance only apply to Ball & Chain,

2   prohibiting it from playing music?

3         MR. KUEHNE::  Objection.  Objection.  Leading,

4   foundation --

5         THE COURT:  Overruled.

6         MR. KUEHNE:  -- beyond the scope.

7         THE COURT:  Overruled.

8         THE WITNESS:  It carved out all the districts all over

9   the City of Miami, so that they wouldn't be impacted.  All the

10  other commissioners didn't want it in their district, so they

11  carved it out, too.  All these special areas they carved it and

12  then, of course, if you didn't have a CU, you weren't there as

13  well.

14         It impacts those businesses in our district and a few

15  other districts moving forward because they don't have CUs,

16  like a new business, but every other business -- because had

17  every other business been impacted, they could never have done

18  it because everybody else would have revolted.

19         THE COURT:  Wait, that's an objection, Mr. Fuller.

20         MR. KUEHNE:  Beyond the scope of the question.  It's a

21  narrative.  It also calls for an opinion as to all these other

22  businesses in the City of Miami.

23         THE COURT:  All right, the objection is sustained.

24  BY MS. CAPRIO:

25  Q.   So, now, presently, can Ball & Chain play music after 11

1   p.m.?

2   A.   No.

3   Q.   Now, let's shift gears and move on -- well, let's talk

4   about Sanguich.  So, do you recall testifying about Sanguich,

5   the sandwich container with Mr. Kuehne?

6   A.   Yes.

7   Q.   And whose responsibility was to obtain the necessary

8   permits for Sanguich to be able to operate on your property?

9   A.   Well, I believe it was ours for the utility connect, and it

10  was theirs for responsibility related to the container itself.

11  Q.   And let's pull up Plaintiff's 5, which is already into

12  evidence.  And if we could please -- Mr. Fuller, what is this

13  document again?

14  A.   This is the commercial lease.

15  Q.   Let's go to page six.  And then compliance with laws, and

16  is that the section which you're referencing where the tenant

17  is responsible for complying with the laws?

18  A.   Yes.

19  Q.   Okay.  And let's call up Defense 13 and, Mr. Fuller, what's

20  the date of this?

21  A.   November 30th, 2017.

22  Q.   Okay.  And is this a notice of violation -- which property

23  was this notice of violation issued for?

24  A.   This is for the lot that -- where Sanguich was, 1641 S.W.

25  8th Street.

1   Q.   And when was the Leon rally held on your property, sir?

2   A.   18th and 19th in November.

3   Q.   Okay.  And Joe Carollo knew you and Mr. Pinilla had

4   supported Alfie Leon before he was elected and took office;

5   correct?

6   A.   Yes.

7          MR. KUEHNE:  Objection.  Lack of personal knowledge,

8   speculation.

9          THE COURT:  Sustained.

10  BY MS. CAPRIO:

11  Q.   Let's call up Plaintiffs' 553.

12       This is a text message that you sent to Mr. Pinilla;

13  correct?

14  A.   Yes, this is contemporaneous text message made on November

15  21st, 2017, after I voted at the poll with my father, I say,

16  "Just saw Carollo at the polls."

17       He said to me, Where's your "blue and yellow shirt?"

18  Q.   So this is when Joe Carollo knew that you had supported

19  Alfie Leon as of November 21st, 2017, based on his admission to

20  you; correct?

21  A.   Yes.

22          MR. KUEHNE:  Objection.  Speculation, foundation.

23          THE COURT:  Overruled.

24  BY MS. CAPRIO:

25  Q.   Did Carollo's targeting of Sanguich begin before he took

1    office on December 2nd, 2017?

2    A.  Yes.

3           MR. KUEHNE:  Objection.  Leading.

4           THE COURT:  Overruled.

5    BY MS. CAPRIO:

6    Q.  And then, finally, let's please call up Defense 22.

7        Do you recall looking at this with Mr. Kuehne, Mr. Fuller?

8    A.  Yes.

9    Q.  And what's the date of this interview?  Let's go up.

10   A.  This is September 10th, 2018.

11   Q.  Okay.  And then let's go down where you say -- your

12   statement where you talk about supporting Carollo, Alfie Leon

13   and Regalado.

14       By the way, is Spanish your first language?

15   A.  It's my second.  I consider myself gringo-speaking.

16   Q.  And this was conducted in Spanish; correct?

17   A.  Yes, I did my best.

18   Q.  Okay.  And at some point we'll find the actual point of the

19   document.

20       Do you recall testifying with Mr. Kuehne about where you

21   say that you supported Carollo, Leon and Regalado?

22   A.  Yes.

23   Q.  Okay.  And why did you say that in September of 2018?

24   A.  Well, I had -- I provided financial support or political

25   contributions to each of these candidates -- it's just a policy

1    that we have, as I stated previously -- to welcome candidates

2    to the neighborhood and thank them for engaging in the

3    community dialogue.

4    Q.   Okay.  But we looked at your ethics complaint earlier that

5    you filed in August 2018, and you included in that ethics

6    complaint -- what did you include in that ethics complaint in

7    connection with the Alfie Leon rally?

8         MR. KUEHNE:  Objection.  The ethics complaint is in

9    evidence, asked and answered.  We went through this.

10        THE COURT:  Sustained.

11   BY MS. CAPRIO:

12   Q.   You testified that was when you were just donating, but you

13   said at the time here -- - and we'll call it up -- that nobody

14   really knew entirely what the real reason was why Carollo was

15   targeting you; right?

16   A.   People didn't know.  But at the time, they did not know and

17   understand that.

18   Q.   And what have you learned since you gave this interview in

19   Spanish -- your second language -- in September 2018 as to the

20   reasons why Carollo was targeting you?

21        MR. KUEHNE:  Objection, Your Honor.  Narrative, time

22   frame, beyond any categorization, what have you learned.

23        THE COURT:  Overruled.

24        THE WITNESS:  That Mr. Carollo had violated our first

25   amendment rights for free speech when he initiated and

 1    materialized the campaign against us over all these years.

 2              MS. CAPRIO:  I have no further questions.

 3              THE COURT:  All right, thank you.

 4              You may step down, Mr. Fuller.

 5              (Witness excused.)

 6              THE COURT:  Plaintiff, call your next witness.

 7              You need a break?  All right, we're going to be in

 8    recess for about 15 minutes.

 9              Again, please do not discuss this case with anyone,

10    ladies and gentlemen, do not formulate any opinions as well.

11    We'll see you back here at 10:41.  Thank you.

12              COURTROOM DEPUTY:  All rise.

13              (Jury exited courtroom at 10:26 p.m.)

14              MR. KUEHNE:  Your Honor, after the jury leaves, just

15    one quick thing.

16              I'm just going to wait until they're out of the room.

17              THE COURT:  All right, yes.

18              MR. KUEHNE:  I believe the plaintiffs are intending to

19    indicate that you're resting, is that --

20              THE COURT:  Everyone may sit down, unless you want to

21    get taller.

22              MR. PERTNOY:  I was going to say that I believe they're

23    going to indicate that they're going to rest.

24              There's a couple of housekeeping issues in regards to

25    that that I could address sidebar, we can do it now or on a

77

1    break.

2         THE COURT:  You can address it now, it doesn't need to

3    go sidebar.

4         MR. PERTNOY:  That's fine.  No, it does not.

5         The first one is, as we indicated in yesterday's

6    sidebar, we want to make sure that when they do rest, and we do

7    then go forward and indicate that we're proceeding with our

8    case, that we are not -- we're preserving our ability to bring

9    our directed verdict motion, and we're not waiving anything in

10   doing so by going forward; so we just want to make sure that

11   that's clear and on the record --

12        THE COURT:  That was clear yesterday.

13        MR. PERTNOY:  -- and stipulated to.  That's fine, I

14   just want to make sure we're clear because they're about to

15   rest.

16        Secondly, Your Honor has mentioned a number of times

17   this idea of conforming with the pleadings, and the like.  We

18   believe that we have not consented to that, and we do not

19   consent to that; and when we go forward with our case-in-chief,

20   we don't want it to be deemed as a waiver incc any way, shape,

21   or form, that we've consented to them trying this case on

22   matters outside of the second amended complaint.

23        We have a trial memorandum that sets forth some law in

24   that regard that I can present to Your Honor, as well as to

25   opposing counsel, preserving that issue, so as to not waive it,

1    as we have to now go into those issues which we believe go

2    beyond what this case is about, but we want to make sure that

3    we're not waiving anything in doing so.

4            And then lastly, a minor housekeeping issue is

5    Juror Number 8 was released a couple days ago, and Your Honor

6    has indicated that there may be another juror, depending on

7    timing, that may get released.

8            I think it's important that the Court instruct not only

9    the attorneys, but the non-parties, the parties, and everybody,

10   that they ought not to be talking to these released jurors

11   during this litigation, because that would be improper.

12           THE COURT:  Has that been the case?

13           MR. PERTNOY:  I don't believe it to be the case, and I

14   want to make sure that everybody in the open courtroom knows

15   that and has been instructed by the Court to --

16           THE COURT:  I'm not going to reiterate that.  So any

17   jurors that were in this case and have gotten released, no one

18   should have any communication with them now whatsoever, all

19   right.

20           If they want to volunteer to speak, I mean, as a juror,

21   they have their first Amendment right to do so, but do not

22   approach them; all right?

23           MR. PERTNOY:  I just wanted to make sure no parties --

24   whether it be the counsel, the parties, or non-parties

25   associated, are doing so because we think that would be

1    improper, and I just wanted to make sure it was out there in

2    the open and --

3            THE COURT:  Did you have any belief that anyone has

4    done that as well?

5            MR. PERTNOY:  No, I have no belief.  I just want to be

6    proactive rather than reactive.

7            THE COURT:  I appreciate that, sir.  Thank you.

8            MR. PERTNOY:  Those were the three things.  If you'd

9    like I can approach with the trial memorandum just so you have

10   it.

11           THE COURT:  Did you give it -- the trial memorandum,

12   to --

13           MR. PERTNOY:  We will.

14           MR. GUTCHESS:  I have not seen it Your Honor, but we

15   stipulate that there's no waiver.  There will be no waiver if

16   they proceed with their case.

17           MR. PERTNOY:  And I'll provide it just so that the

18   Court has a record of it and counsel has one.

19           May I approach, Your Honor?

20           THE COURT:  Sure.

21           MR. PERTNOY:  Thank you.

22           Your Honor, are we on recess now?

23           THE COURT:  Yes, we are.

24           MR. GUTCHESS:  Your Honor, I have one evidentiary issue

25   I'd like to raise about the next witness, Mr. Ace Marrero.

1          We have concerns that the defense seeks to elicit
2    expert-type testimony through him and show him --
3          THE COURT:  Well, first of all, we can stop there.
4    There's no expert witnesses in this case --
5          MR. GUTCHESS:  Right.
6          THE COURT:  -- so why are you suggesting there's going
7    to be --
8          MR. GUTCHESS:  Well, because the exhibits -- this
9    gentleman took his position in 2020 and they have exhibits
10   going back to 2012, these Tower Hotel exhibits, and we don't
11   think it's appropriate for somebody who's never seen this stuff
12   to testify about this.
13         We want to make sure the ruling is clear that he can
14   only testify to things that he's personally observed himself,
15   and we of course have case law to support this, if Your Honor
16   so desires.
17         MR. SARNOFF:  In this circumstance he's the records
18   custodian -- he's the building official records custodian for
19   the City of Miami.  For him to have done work with regard to
20   1450, 1444, 1460, it's necessary for him to go back in time to
21   research everything to find out when the last permit is pulled,
22   and he's capable of describing that because he's the records
23   custodian thereto.  We just intend on laying a foundation, a
24   predicate, on 8036, 8038, so that we can go back in time and in
25   a chronological manner for the first time establish what

1    permits were pulled, what work was done, because that is how

2    they come into compliance.

3          Compliance has certainly been part of their

4    case-in-chief.  And our case is based on failure to pull

5    permits, which is our -- I believe it's our fifth affirmative

6    defense in our answer, Your Honor.

7          So our case-in-chief is really a chronological

8    description based on the public records of the City of Miami,

9    based on the records custodian, which is the director of

10   building, and we're going to go through a chronology as to when

11   work was done, how it was documented, exactly when a permit was

12   pulled, what is the scope of that permit.

13         Because, inevitably, it had to all be researched for

14   them to come into compliance.  As Mr. Fuller testified, I think

15   it was March 22nd of this year that he got his C.O.

16         THE COURT:  So, let me ask you, so, plaintiff, what's

17   the issue with respect to this witness testifying as the

18   records custodian as to what's --

19         MR. GUTCHESS:  First off, A, he was never disclosed as

20   a records custodian; B, he's not the records custodian, he's

21   the top guy in the department; C, he testified in his

22   deposition that he has no personal knowledge of all this stuff

23   already.

24         THE COURT:  Show me in the list that he's been

25   designated as the records custodian.

1    MR. SARNOFF:  He is the director of the department.

2  He is the titular head of the building department.  He will

3  testify he is the records custodian on behalf of the City of

4  Miami.  He's the person that will bring them into compliance.

5    MR. GUTCHESS:  Your Honor, they had a separate entry

6  for records custodian that never appeared.

7    THE COURT:  Is he designated as a records custodian on

8  your trial list, sir?  Do you have that?

9    That he's designated, he can; if not, he's not.

10    All right?

11    MR. GUTCHESS:  Thank you, Your Honor.

12    MR. SARNOFF:  We've designated records custodian.

13    THE COURT:  Well, show it to me.  Show me what you

14  have.  I'm not looking at it now, saying I'm prohibiting it,

15  but if you show me, indeed, that's what it says, no problem.

16  Okay?

17    MR. GUTCHESS:  Your Honor, we have the defendant's

18  witness list where they disclose Mr. Marrero as expected to

19  testify about the allegations of the second amended complaint

20  only; and, of course, there's no allegations in there about

21  anything in 2012.

22    MR. SARNOFF:  Well, the Tower Hotel is listed in that

23  complaint.  Your Honor, this is tantamount to handcuffing the

24  defendant's case.  This is the -- we didn't bring a low-level

25  person.  We brought the director in, the person who will

1    inevitably bring them into compliance.

2         THE COURT:  Sir, it doesn't matter whether someone's

3    low level or high level, or skilled, I'm asking the question,

4    does he have the information?

5         MR. SARNOFF:  I don't understand, Your Honor.

6         THE COURT:  That has nothing to do with someone's

7    position or title.  That person has the knowledge or would

8    designate accordingly with this Court's instruction.  It is

9    what it is.  It has nothing to do with low level or high level.

10        MR. SARNOFF:  Marrero is listed as plaintiffs' and

11   defendants' amended witness list, which is under docket 381 --

12   or DE 381.  He's the director of the building department of the

13   City of Miami.

14        And Mr. Gutchess did not incorrectly state it.

15        It says he's expected to testify regarding the

16   allegations in the second amended complaint.

17        Now, he's prepared to testify about Tower.  He's

18   prepared to testify about -- there are three properties on

19   Tower, as Your Honor basically knows now, it's 1444, 1450 and

20   1460.  He is going to testify in a chronological manner what --

21        MR. GUTCHESS:  Your Honor --

22        THE COURT:  Let him finish speaking.

23        MR. GUTCHESS:  I'm sorry.

24        THE COURT:  Go ahead, Mr. Sarnoff.

25        MR. SARNOFF:  What's performed -- what permits were

1    taken out, and how they are either in compliance today or

2    they're not in compliance today.  I believe -- well, it doesn't

3    matter.  Virtually, all of the towers, certainly we know now,

4    that 1450 I think on March 22nd has received its C.O.; 1460 I

5    don't believe is in compliance; and 1444 I believe just

6    received compliance.

7          But it's a process, and this process should be

8    explained to the jury.  He's capable of doing it in public

9    records, 8038.  He has a duty under Florida law to be the

10   person -- I'll read it to you, Your Honor.  So, 8038:

11         It would be a statement of a public office that sets

12   out the office's activities, matter observed while under a duty

13   or legal duty to report; and as you know, Your Honor, in a

14   civil case if there's a legally authorized investigation, he's

15   entitled to describe what went on.  That's 8036, you know, is

16   the records of a regular conducted business activity.

17         The record was made near or at the time, by or from

18   information transmitted by somebody with knowledge, the record

19   was kept in the ordinary course of a regular conducted activity

20   in the City of Miami, and making the record was a regular

21   practice of that activity.

22         In addition to that, under Florida statutes, he is

23   mandated to be the custodial of all public records in the

24   building department for the City of Miami, which are presumed

25   to be correct.

1          MR. GUTCHESS:  Can we get that statute number so we can

2   check that?

3          MR. SARNOFF:  Florida Statute, yeah, I'll get that to

4   you.

5          MR. GUTCHESS:  Your Honor, I have two cases for the

6   Court, if I may.

7          THE COURT:  Sure.  May I have a copy of the cases?

8          MR. GUTCHESS:  Yeah, 238 F. Sup 2.d, 1231 Daily versus

9   Far Eastern Shipping, January 27th, 2003; and the second one is

10  2022 West Law 17551449, it's Government Employees Insurance

11  against Seco (phonetic), and that's a Southern District of

12  Florida case.

13         And, Your Honor, these are exactly on point.

14         In the first case there was an admiral of the Navy, who

15  they were seeking to introduce his testimony, and it was held

16  because he did not have personal knowledge he could not testify

17  to that fact.

18         In the second case, in the Southern District of Florida

19  case, it was two business owners and they were trying to seek

20  their testimony about certain coding issues, medical coding

21  issues, and the Court held that just because they were the

22  owners of the business, if they did not have personal knowledge

23  of those issues they could not testify, because it would be

24  testifying as an expert.

25         And we submit the same is true here, just because

1  Mr. Marrero is the director now doesn't mean he can testify

2  about everything that happened in the department that preceded

3  him merely because he can pull a record.

4         They could have brought in Mr. Ponz, who does have

5  personal knowledge, who's been testified about here.

6         And Mr. Marrero, in his deposition, testified under

7  oath that he did not have personal knowledge, that Mr. Ponz

8  did.  So if they would like to bring in Mr. Ponz, they can do

9  so.

10        THE COURT:  I want to see the deposition -- that

11 statement that he made -- that particular statement that he

12 didn't have personal knowledge, in his deposition.

13        MR. GUTCHESS:  May I approach?

14        THE COURT:  Sure.

15        MR. SARNOFF:  That's the deposition in the Madrin

16 (phonetic) case?  So the other litigation?

17        MR. GUTCHESS:  Yeah.  I apologize, it's on the

18 computer, but that's the portion of the transcript he says.

19        Your Honor, if they want to bring in somebody with

20 personal knowledge of these issues, we do not object to that.

21        THE COURT:  They want to bring in certain personnels,

22 I will allow that; that one witness, in addition, right now, to

23 testify.

24        So who's that one person you want to bring in who can

25 establish personal knowledge?

1          MR. SARNOFF:  Your Honor, Asael Marrero has personal

2     knowledge of every document that we're about to introduce that

3     -- by the way, all the documents we have indicated have not

4     been objected to, based I think it was on DE -- it was the

5     witness list, they didn't object to it.

6          MR. GUTCHESS:  But you can't use it with this witness.

7          MR. SARNOFF:  Let me finish.

8          If this Court deems or finds that he does not have

9     personal knowledge, then he shouldn't testify.  But he's the

10    records custodian on behalf of the City of Miami for the

11    building; and as such -- if you think about this, it's common

12    sense.

13         How do you determine at what level a building first

14    started and what level a contractor comes in and says, oh, no,

15    no, no, no, we only moved one wall over here.  You go back to

16    the building records --

17         THE COURT:  Listen, sir, it's not about whether it's

18    common sense or not.  It's whether or not did you comply on

19    this day, or this day.  I'm not saying you can't do so as well.

20         And I had asked you a specific question, was he

21    designated as the records custodian here as to what he's going

22    to testify to?  I'm not excluding him on the face, unless you

23    show me otherwise, sir.

24         But at any rate, what other witness did you have?  I

25    can revisit this issue later.

1          What other witness do you have, to move forward, sir?
2   I'm going to reserve on that.
3          MR. SARNOFF:  I don't want to interrupt the Court.
4   Well, let me ask the Court this way.
5          The first person here to testify is Asael Marrero.
6   He is the records custodian.  He's the person who had to look
7   at all this volume of documents in order to bring them into
8   compliance.
9          THE COURT:  All right, what I will do, I will let the
10  plaintiff voir dire him outside the presence of the jury first
11  as to that.  If he says he has personal knowledge and did not
12  speak to him, right now, no one, before hand -- where is he
13  now?
14         MR. SARNOFF:  He's outside.
15         THE COURT:  Bring him in here.
16         MR. GUTCHESS:  Your Honor, I'd just like to say, a
17  records custodian just authenticates records.  They're not
18  allowed to discuss them.
19         THE COURT:  Of course not, you can't -- right, I get
20  that.  They're not here to -- for example, in a medical
21  malpractice case, you have a records custodian.  They can't
22  give an opinion as to what happened medically.
23         It was kept in the ordinary course of business, these
24  are the records, and they cannot testify to the records.
25         Do you object to those records coming in?

1          MR. GUTCHESS:  No, we do not object to the authenticity

2    of the records.  There's no need for a records custodian.

3          THE COURT:  All right.

4          MR. SARNOFF:  Well, Judge, if Mr. Marrero has to use

5    the records in order to bring them into compliance, then he

6    becomes possessed of that knowledge.

7          THE COURT:  We can bring him in right now and let the

8    plaintiff voir dire.  Bring him in.

9          MR. GUTCHESS:  Your Honor, that whole notion that

10   counsel just said, that somebody becomes possessed of personal

11   knowledge because they read a historical document is crazy.

12         THE COURT:  All right.  You can bring him in, sir.

13         (Witness entered courtroom.)

14         COURTROOM DEPUTY:  Sir, state your name please, put

15   your hand down and have a seat.

16         COURTROOM DEPUTY:  Do you solemnly swear or affirm to

17   tell the truth, the whole truth, and nothing but the truth, so

18   help you God?

19         THE WITNESS:  I do.

20         MR. GUTCHESS:  Your Honor, I think you said the

21   plaintiff could voir dire?

22         THE COURT:  Exactly.

23         MR. GUTCHESS:  All right, so...

24         MR. SARNOFF:  Sorry, I thought I was just going to lay

25   the predicate.

1          MR. GUTCHESS:  Has the witness been sworn?

2          THE COURT REPORTER:  Yes.

3          THE COURT:  He has been sworn.

4          (ASAEL "ACE" MARRERO, being sworn, testified as

5     follows:)

6                    VOIR DIRE EXAMINATION

7     BY MR. GUTCHESS:

8     Q.   Could you please state your name for the record.

9     A.   Asael "Ace" Marrero.

10    Q.   Good morning, Mr. Marrero.

11         Could you please tell us your current position in the City

12    of Miami?

13    A.   Building director.

14    Q.   Building director.  And when did you assume that position?

15    A.   I was given the acting role in February of 2020 and the

16    permanent position in April of the same year, 2020.

17    Q.   Okay.  And what was your position before February 2020?

18    A.   I was the assistant director for the building department.

19    Q.   And before February 2020 when you were the assistant

20    director of the building department, can you explain for me

21    what interactions you had with Mr. Fuller or Pinilla, or any of

22    their properties?

23    A.   Prior to 2020?

24    Q.   Yes.

25    A.   Very limited.

1   Q.   Can you recall any interactions at all prior to 2020?

2   A.   Like I said, very limited.  No, I don't recall much.

3   Q.   Okay.  Were you involved in any of the notice of violations

4   issued to any of plaintiffs' properties prior to 2020?

5   A.   No.

6        MR. GUTCHESS:  No further questions, Your Honor.

7        THE COURT:  All right.

8                    VOIR DIRE EXAMINATION

9   BY MR. SARNOFF:

10  Q.   Mr. Marrero -- I should call you Director Marrero, you

11  inevitably, on 1450 and 1444 and 1460, have been heavily

12  involved to bring whatever buildings can be brought into

13  compliance; correct?

14  A.   I have.

15  Q.   And to do so, did you have to research the public records

16  of the City of Miami and, more specifically, the building

17  department in order to establish a baseline as to what work had

18  been performed?

19  A.   Yes, I have researched those files.

20  Q.   And so in order for you to bring the plaintiff into

21  compliance, it required you to go through the public records of

22  the building department of the City of Miami in order to first

23  establish the baseline to find out when a permit was pulled to

24  find out what the scope of that permit was to determine what

25  work was performed based upon a review of the documentary

1    evidence, and then establish what they needed to do going

2    forward in order for them to come into compliance?

3    A.   For the Tower Hotel, yes, I have done that.

4    Q.   Tower Hotel, 1460?

5    A.   Yes.

6    Q.   1444?

7    A.   Yes.

8    Q.   Do you know those as the three buildings that the

9    plaintiffs sometimes refer to as the "Tower Complex"?

10   A.   Yes.

11        MR. SARNOFF:  Your Honor, I would tender that he is

12   possessed with the knowledge and the requisite necessary

13   parameters in order to bring them into compliance, because he

14   has to have that requisite background in order to create

15   baselines here.

16        MR. GUTCHESS:  Are we now going into argument on this?

17   Or are you done with the witness?

18        THE COURT:  Are you done with the witness?

19        MR. GUTCHESS:  I'm sorry, yes.

20   BY MR. SARNOFF:

21   Q.   Without doing the work to go backwards in time to determine

22   what permits had been pulled, what work had been done, to

23   determine the scope of that work, could they have ever been

24   brought into compliance?

25   A.   The answer's no.

1          MR. SARNOFF:  Okay.  Thank you.

2          MR. GUTCHESS:  All right.

3          THE COURT:  Do you have anything further?

4          MR. GUTCHESS:  No, I have no further questions,

5    Your Honor.

6          THE COURT:  All right, you may be excused, sir.

7          (Witness excused.)

8          MR. GUTCHESS:  Your Honor, if I may, this is the exact

9    same issue the Court already addressed.

10          THE COURT:  Wait, wait.

11          MR. GUTCHESS:  Oh, I'm sorry.

12          This is the exact same issue the Court already

13    addressed with Mr. Kunert, and the Court did not allow him to

14    testify as to anything he had researched; remember, those were

15    actually his own e-mails where he specified the research he had

16    done, and the Court held that was not personal knowledge, so he

17    was not allowed to testify.

18          And we accepted that ruling and we moved on.  But that

19    same ruling applies here, not only because the Court already

20    gave it, but because of the case law I just gave you.  The fact

21    that this gentleman researched something does not give him the

22    right to go on and testify about the facts.

23          MR. SARNOFF:  Your Honor, this is 180 degrees, just as

24    Mr. Kunert, as you recall, was looking up Miami Herald

25    articles, was trying to put those into evidence.

1           We're not attempting to put Miami Herald articles, good

2    or bad, about plaintiff in this case.

3           We're here to establish and put into evidence what the

4    Florida Statutes require is the Florida Building Code.  It's

5    very clear that Mr. Marrero has a duty, and that duty is to

6    create baselines as to what work was performed with a permit

7    and then moving forward to determine what work is done without

8    a permit.  So as that, they can then come into compliance.

9           I believe they're in compliance on two out of the three

10   of these buildings, and they may be on the verge of -- I think

11   the only building left, candidly, is the pool and he may never

12   be able to comply with that.

13          MR. GUTCHESS:  Your Honor, Mr. Ponz is still employed.

14   He was there in 2012 at the Tower Hotel with these things.  If

15   they want to bring in Mr. Ponz to testify about that, we have

16   no objection.  We would love to cross-examine him.

17          But when there's a witness who is still employed by the

18   City of Miami, who has personal knowledge and was there on the

19   site, there's no basis at all to let this gentleman testify

20   about things he does not know about based upon documents he may

21   have researched or somebody gave him.

22          THE COURT:  I'm going to overrule the objection.

23          You can cross-examine him, and he can testify, and you

24   make your objection and I will make the rule accordingly; all

25   right?

1      MR. GUTCHESS:  Thank you, Your Honor.

2      MR. PERTNOY:  Can we grab five minutes to use the

3  restroom, Your Honor?

4      THE COURT:  You have it.

5      MR. PERTNOY:  Thank you.

6      (Recess taken from 10:54 a.m. to 11:02 a.m.)

7      THE COURT:  I want to address the motion as it pertains

8  to the rebuttal witnesses that was filed, the Court has read

9  the motions for the defendant and plaintiff response and the

10  court makes the following decision:

11      Rebuttal is a term of art denoting evidence introduced

12  by plaintiff to meet new facts brought out in his opponents'

13  case-in-chief.  A defense witness who propose -- is to

14  contradict and inspect it and anticipate a portion of the

15  plaintiff's case-in-chief can never be considered a rebuttal

16  witness or anything analogous to one, citing Morgan versus Com

17  Union Assurance Company, 606 F2d 554, 555, the Fifth Circuit

18  1979, which is now an Eleventh Circuit case.

19      There was the final witness list was submitted pursuant

20  to a Court order, did not include these witnesses, and the

21  defendant made a strategic decision not to include these

22  witnesses on its final witness list and must live with those

23  consequences.

24      Defendant would have known what evidence plaintiff was

25  going to present and, therefore, what rebuttal witnesses

1    defendant would want to call if defendant has chosen to do

2    discovery, but chose not to do discovery.  That was a strategic

3    decision that defendant made, and now defendant must live with

4    the consequences of that decision.

5         I am reminded of the 1993 championship game,

6    basketball, where Chris Weber played in the infamous University

7    of Michigan game versus University of North Carolina, where he

8    received a ball, walked it, and got called, got trapped and

9    decided to call a time out.

10        Well, there were in effect no timeouts; and yet,

11   unfortunately, they used that and they had to live with that

12   consequences as well.

13        Allowing the defendant to call 17 witnesses not

14   disclosed on the final witness list unduly prejudiced this

15   case; the plaintiff who has prepared their case in part based

16   on the witness list listed by the defendant.

17        The defendant sprung these 17 witnesses on the

18   plaintiff several days after openings and that the plaintiff

19   had already presented several witnesses.

20        This case has been pending for five years, has been

21   appealed twice to the Eleventh Circuit, which this Court was

22   affirmed, and also taken recently before the Supreme Court of

23   the United States of America, which also denies cert; allowing

24   such late amendment of the witness list as disruptive to this

25   trial, unnecessarily lengthened this trial and appeared to be

1    an attempt at got-you.

2           We have several jurors here who have expressed concerns

3    in terms of the length of this trial and have lost a couple

4    jurors as well, and we have done our best to move this case

5    forward in this process.

6           Under the Federal Rules of Civil Procedure, 26A and

7    local Rule 16(e) requires all witnesses names to be disclosed

8    as self-impeachment witnesses.

9           The defendant had an ongoing obligation to supplement

10   and did not.  The defendant has described these witnesses as

11   rebuttal.  And while defendants complains that plaintiffs'

12   late-disclosed witnesses were allowed to testify, the

13   difference is they were disclosed prior to trial and included

14   on the plaintiffs' final witness list, which was submitted

15   before trial.

16          And the defendant was given the opportunity to depose

17   those witnesses.  Moreover, the defendant has not identified

18   any subject of any of these witnesses' testimony.

19          Therefore, that's the Court's ruling as respect to

20   those potential 17 witnesses.

21          We will proceed with respect to your first witness.

22          Do you want to bring the jurors in, please?

23          COURTROOM DEPUTY:  Yes, Judge.

24          (Jury entered courtroom at 11:04 a.m.)

25          THE COURT:  Do you want to rest on the record now?

 1              The plaintiff, do you want to rest on the record now --

 2      or wait, do you want to rest on the record -- before they come

 3      back -- first?

 4              MR. GUTCHESS:  Go ahead.

 5              MS. CAPRIO:  Yes.

 6              COURTROOM DEPUTY:  All rise.

 7              (Jury entered courtroom at 11:06 p.m.)

 8              THE COURT:  Members of the jury are all present and

 9      accounted for.  You may be seated, everyone.

10              Plaintiffs, call your next witness.

11              MS. CAPRIO:  Plaintiffs rest our case.

12              Thank you very much.

13              THE COURT:  Defense, first witness.

14              MR. PERTNOY:  Your Honor, as discussed on the sidebar,

15      we preserve our rights and do not waive.

16              THE COURT:  I understand that, sir.  Thank you.

17              MR. SARNOFF:  Your Honor, at this time, we would call

18      director of building department, Asael Marrero.

19              THE COURT:  Is someone getting the witness?

20              MR. SARNOFF:  Yeah, I guess that's me.

21              THE COURT:  Glenda, could you swear the witness,

22      please.

23              THE COURT REPORTER:  Raise your right hand, please.

24              Do you solemnly swear or affirm to tell the truth, the

25      whole truth, and nothing but the truth, so help you God?

1        THE WITNESS:  I do.

2        THE COURT REPORTER:  Please have a seat and state your

3    name.

4        MR. SARNOFF:  Thank you.  You can just give us your

5    name again with the spelling for the record.

6        THE WITNESS:  Asael, A-S-A-E-L, Marrero, M-A-R-R-E-R-O.

7        (ASAEL "ACE" MARRERO, being sworn, testified as

8    follows:)

9                        DIRECT EXAMINATION

10   BY MR. SARNOFF:

11   Q.   Good morning, Mr. Marrero.

12   A.   Good morning.

13   Q.   Could you state to the ladies and gentlemen of the jury the

14   benefit of your background, what you've been doing pretty much

15   since high school?

16   A.   Since -- you said high school?

17       I went to the Miami Jackson Senior High in the City of

18   Miami.  I graduated and I had a full scholarship to F.I.U.

19   Q.   Great school.

20   A.   Yes, I actually put it on hold right after I graduated high

21   school and joined the Army Reserves as a combat engineer.  I

22   always wanted to do that, so I was in the Army Reserves from

23   '94 to 2001; got back from my basic training and went back to

24   F.I.U., got a degree from F.I.U. in architectural studies; and

25   then went to F.A.U., where I got a degree in architecture, my

1    professional degree that's required in order for you to take

2    the -- you know, state exams to become licensed in the State of

3    Florida.

4        I worked in the private sector in two firms, Orlando

5    Architects and Saqui Architects in the private sector.  I did

6    that from around '99 to 2006.  In 2006, I joined the -- I was

7    fortunate enough -- I was very fortunate to get a job with

8    Miami-Dade County, I worked for the County for, approximately,

9    12 years.

10       My last position at the County was as division director for

11   Design and Construction Services Division.  It was a division

12   that managed a portfolio of, approximately, close to five

13   hundred million dollars in construction, design, permitting,

14   procurement, different phases of the construction project

15   development.

16       And then in 2017, I was offered a great opportunity to come

17   to the City of Miami, and I joined the City as an assistant

18   director of the City in the building department.

19       As I stated just a few minutes ago, I became the director

20   in April of 2020 and been in that role since.

21   Q.   What degrees or certifications do you hold from the State

22   of Florida?

23   A.   I have -- I'm a licensed architect, I am a licensed

24   interior designer that's from the State of Florida.

25       I also have a license as a realtor, which I have never

1    used.  I -- with the county, with Miami-Dade County, I hold

2    licenses with BORA for plants, inspectors, and review, and I

3    also have licenses with ICC, for inspector licenses as well.

4    Q.  I notice about you building guys, you like to use acronyms?

5    A.  I'm sorry, BORA, B-O-R-A, it's the Bureaus of Rules and

6    Appeal for Miami-Dade County.  That's pretty much the

7    organization that regulates construction in Miami-Dade County.

8    Q.  And you said something, ICC?

9    A.  ICC, International Code Counsel.

10   Q.  Are you familiar with something called the Florida Building

11   Codes?

12   A.  I am.  And before you get there, I was also -- I mean,

13   we're talking about professional career and development, that

14   was also in March of this year.

15        I was very fortunate to have been nominated by the governor

16   to be a commissioner in the Florida building commission, so I

17   have been serving in that role since March of this year.

18   Q.  Congratulations.

19   A.  Thank you.

20   Q.  Getting back to the building code, are you familiar with

21   it?

22   A.  I am.

23   Q.  And the Florida Building Code -- first off, to be candid,

24   it's a lot more than this book; isn't it?

25   A.  It is.  It is.  There are multiple volumes.

1    Q.   And how many would there be?

2    A.   You have -- you have about seven volumes, you have

3    building, you have existing buildings, you have residential,

4    you have accessibility, you have mechanical, plumbing, you have

5    energy, and you also have a section for high velocity wind,

6    which applies to where we are here in Miami-Dade County and

7    Broward.

8    Q.   Now, for any commercial development in the State of

9    Florida, does the Florida Building Code apply?

10   A.   It does.

11   Q.   Are you familiar when Chapter 1 of the building code?

12   A.   I am.

13   Q.   Would it be helpful to the jury for you to describe to the

14   jury what Chapter 1 applies?

15   A.   Chapter 1 is what the attempt of what the Florida Building

16   Code is about and how it is administered.

17        It's administration and intent, pretty much.

18   Q.   Offer into evidence D 691, which is the Florida Building

19   Code.

20        THE COURT:  Any objection?

21        MR. GUTCHESS:  No objection.

22   BY MR. SARNOFF:

23   Q.   So if I can put up DX691, are you familiar with this?

24   A.   Yes, I am.

25   Q.   Just moving on to page three, it talks about scope.

1     It says it has been harmonized with the Florida Fire

2  Prevention Code.  What does that mean?

3  A.   When it's been harmonized?

4  Q.   Yes.

5  A.   It means that the code -- the actual -- all the codes are

6  consolidated into one.

7  Q.   And the code is comprised, according to this, of nine

8  volumes.  It talks about the Florida Building Code plumbing,

9  Florida Building Code mechanical, Florida Building Code fuel

10 and gas, Florida Building Code existing building, Florida

11 Building Code residential.  I guess for this purposes, we won't

12 use it, Florida Building Code energy conservation and the

13 Florida Building Code accessibility, Florida Building Code test

14 and protocols for high velocity hurricane zones.

15     THE COURT:  Wait, I'm sorry, sir, you have to answer

16 yes or no, because the court reporter has to get every spoken

17 word.  I know, maybe Mr. Sarnoff says certain words, yes or no;

18 if you don't understand, let Mr. Sarnoff know.

19     THE WITNESS:  Okay.

20     THE COURT:  Thank you.

21 BY MR. SARNOFF:

22 Q.   And finally, it incorporates something called the National

23 electrical Code, the NFPA 70?

24 A.   It is incorporated by reference, yes.

25 Q.   And the adoption of maintenance, does the Florida Building

1   Code even apply to swimming pools?

2   A.   It does.

3   Q.   What else about swimming pools is relevant?

4   A.   Specifically, about swimming pools, commercial swimming

5   pools, also are regulated by the Florida Health Department.

6        It is a code requirement that swimming pools -- commercial

7   swimming pools be given a certificate of use by the Florida

8   Health Department prior to a building permit being closed.

9   Q.   I'm going to move to page 10 just to try to get through

10  this a little faster and ask you to read Section 105 Permits,

11  and 105.1 required.  Could you read that to the jury?

12  A.   Sure, I can read it.

13       Any owner or owner's authorized agent who intends to

14  contruct, enlarge, alter, repair, move, demolish, or change the

15  occupancy of a building or structure, or to erect, install,

16  enlarge, alter, repair, remove, convert, or replace any

17  impact-resistant coverings, electrical, gas, mechanical, or

18  plumbing systems, the installation of which is regulated by

19  this code or to cause any such work to be performed shall first

20  make appointment with a building official and obtain a building

21  permit.

22  Q.   And does the City of Miami require permits?

23  A.   Yes, we do.

24  Q.   I want to move to page 12.  And I just want to be clear,

25  swimming pools are also addressed at Section 6.

1       Do you see that?  Page 12.

2   A.  Yes.  Yes, I see it.

3   Q.  And it says Chapter 514 of Florida Statutes.  What is that?

4   A.  That's when I made reference to the Health Department.

5   Q.  Okay.  Thank you.  Now I want to move on and invite your

6   attention to submittal of documents, that's at page 16, Section

7   107, and I'm going to read it to you, if you don't mind.

8   A.  Okay.

9   Q.  It says:  Submittal documents consisting of construction

10  documents, statement or special inspections, geotechnical

11  report, and other data, shall be submitted in two or more sets.

12      The construction documents shall be prepared by a

13  registered design professional where required, by Chapter 471

14  Florida Statutes, or Chapter 481, where special conditions

15  exist, the building official is authorized to require

16  additional construction documents prepared by a registered

17  design professional.  So, what does that mean?

18  A.  That means that the -- first of all, Chapter 471 is what

19  regulates professional engineers in the State of Florida, and

20  Chapter 481 is what regulates licensed architects in the State

21  of Florida, so that the --

22  Q.  Is that where you hold your license?

23  A.  I do.

24  Q.  I didn't mean to interrupt you, I'm sorry.

25  A.  That's okay.  What that means is that the submittal

1    documents, the construction documents, and any other supporting

2    documents have to be prepared by a licensed professional.

3         There are exemptions to minimum scope of work that may not

4    require to be licensed, signed and sealed by a licensed

5    professional, and the Florida Statutes talk about that.

6         There are certain exemptions where perhaps work can be

7    signed and sealed -- not signed and sealed.

8         Signed and notarized by a trade contractor, such as small

9    electrical, mechanical and plumbing work that may be performed.

10   But for the most part, it has to be signed and sealed by a

11   licensed professional architect, or an engineer, and it is up

12   to the discretion of the building official in the review and

13   approval of those documents to require additional documents.

14        A typical example of this is in a very complex

15   architectural submittal to the City -- not that everything is

16   submitted up front, in what's considered a permit set.

17        So all of the design intent is submitted in that document,

18   but you may require additional submittals by other licensed

19   engineers for very specific construction components that are

20   part of that overall project.

21        An example could be you may defer -- these are typically,

22   you know, deferred to as the first submittals.  You may defer

23   submittals of your doors and windows, your roofing, your

24   railings, you know, other specialty items that are designed and

25   installed by specialty engineers, both licensed under that

1    chapter.

2    Q.   And I want to move to page 17, and it discusses examination

3    of documents, and ask you if you could read that to the jury.

4         It should be 107.3, page 17.

5    A.   Examination of documents:  The building officials shall

6    examine or cause to be examined the accompanying submittal

7    documents and shall ascertain by such examination whether the

8    construction indicated and subscribed in accordance with the

9    requirements of this code and any other permanent laws or

10   ordinances.

11   Q.   What does that mean?

12   A.   That means that the building official will review and

13   examine the documents to make sure they're in compliance with

14   the applicable laws.

15   Q.   And it says "cause to be examined," meaning he can delegate

16   that; correct?

17   A.   That is correct.

18   Q.   And I want to go to just page 18, where it lists commercial

19   buildings.

20        And if you could just sort of just grossly explain what the

21   requirements are, not in detail, just to give us a general

22   understanding.

23   A.   It's extensive, I mean, it's a couple of pages at least.

24   What it talks about is minimum criteria, so depending on the

25   submittals that you're making to the building department, you

1    know, at the bear minimum, you're going to be required to

2    submit information for your site plan.  That's the overall --

3    that's the image that shows what is in context within the

4    actual site, your lot, you know, you need to show it's --

5    what's the context within the floor plan, within the

6    elevations, within the foundation, framing, plan, et cetera,.

7         And then it goes into detail and gives you a further

8    breakdown by each of those components.

9         For example, in the building, you know, what are the

10   requirements for the site plan, you need to show the occupancy,

11   the fire ratings, the life safety, the occupancy load,

12   et cetera, et cetera.

13        So a design professional should be very familiar with this

14   section of the code and what is the minimum requirements; and

15   again, this is just a minimum requirement.

16   Q.   Just for the layperson, are you going to be required to

17   review electrical, plumbing?

18   A.   Yes, if applicable, absolutely, you have to submit all

19   those documents.

20   Q.   For demolition, do you have to address asbestos removal?

21   A.   Yes, you do.

22   Q.   How?

23   A.   In asbestos, you have to -- the minimum requirement for

24   demolition is to provide an asbestos report, and an asbestos

25   report is, basically, a report for the testing company that

1   goes out to the site and examines every building product that

2   has been called out to be removed.

3        And through that testing it is verified whether that

4   particular building component has, or not, any

5   asbestos-containing material, in which case the contractor

6   would be ready to prepare a remediation plan to address that,

7   you know, the removal of any of those asbestos-containing

8   materials.

9   Q.   And I want to go to page 20 and talk about for a moment,

10  temporary structures and uses.

11       It says that the building official is authorized to issue a

12  permit for temporary structures and temporary uses.  Such

13  permits shall be limited in time, but shall not be permitted

14  for more than 180 days; is that correct?

15  A.   Correct.  Yes.

16  Q.   So after 180 days, what happens?

17  A.   After 180 days -- well, it also says that it is up to --

18  you know, the building official is authorized also to grant

19  extensions.

20       But if the intent of the structure is to remain in place

21  longer than 180 days, it needs to comply with this code, with

22  the Florida Building Code.

23  Q.   So if somebody had a five-year lease, you would have to

24  comply with the Florida Building Code?

25  A.   If you're doing construction that's intended to be in place

1    for more than 180 days, you need to comply with the Florida

2    Building Code.

3    Q.   And there are places in Miami that actually have containers

4    that are affixed to the ground and then become compliant;

5    correct?

6    A.   You have containers in the City of Miami that are meant to

7    be in place for less than 180 days, and then you have

8    containers in the City of Miami that are meant to be in place

9    for more than 180 days.

10   Q.   And for those that are meant to be there for more than 180

11   days, what has to occur?

12   A.   They have to comply with the Florida Building Code.

13   Q.   The Florida Building Code?

14   A.   Yes.

15   Q.   Would we go back then to plumbing, electrical, everything

16   that you would require in a normal building?

17   A.   Correct.

18   Q.   Are you allowed to provide temporary power to one of these

19   facilities by use of an extension cord?

20        MR. GUTCHESS:  Objection.

21   A.   By use of an extension cord, no.

22        THE COURT:  Wait, wait, what's that objection?

23        MR. GUTCHESS:  He's testifying as an expert.

24        THE COURT:  Sustained.  That's stricken.

25        Next question, please.

BY MR. SARNOFF:

Q.   Moving on to page 21, Section 110, inspections.

     First, tell us, what is the intention behind inspections
and the frequency?

     The intent of the inspections is to make sure that the work
that is being performed on the field complies with the approved
construction plans and that it meets code.

     You're supposed to -- I'm sorry?

Q.   No, that's all right.

     So you don't inspect at the end, you inspect
intermittently?

A.   That is correct.  The Code tells you what are the minimum
set of inspections that you need to conduct, and you conduct
inspections during construction, different stages of
construction, and at the end of construction.

Q.   And is that to ensure that there's no concealment of work
performed without a permit?

A.   A large amount of the inspections that you do throughout
the process of construction is -- are for items that will be
eventually concealed, so you have what are called "rough
inspections."

     So these are inspections that are meant for items that will
eventually concealed behind walls and partitions.  So the
inspectors will go and verify those components, electrical,
mechanical, plumbing components, and ensure that those are

1    installed per plans and per code you know, prior to them being

2    concealed.

3    Q.   And let's move to page 23 and talk about the inspection.

4         Is it the duty of the holder of --

5         MR. GUTCHESS:  Your Honor, I'm going to object to the

6    entire line of questioning.  He's testifying as an expert and

7    giving legal opinions as to the Florida Building Code.

8         THE COURT:  He's not testifying as an expert.  I will

9    sustain the objection.  No one has been designated in this

10   Court as an expert, okay.

11   BY MR. SARNOFF:

12   Q.   Does the Florida Building Code require the holder of a

13   permit to call for inspections?

14   A.   It does.

15   Q.   Does the Florida Building Code afford the building official

16   to suspend or revoke a certificate of occupancy?

17   A.   It does.

18        MR. GUTCHESS:  Objection.  Same objection, Your Honor.

19        THE COURT:  All right.  Sustained.

20   BY MR. SARNOFF:

21   Q.   Does the Florida Building Code specify something called a

22   "stop work order"?

23        MR. GUTCHESS:  Same objection.

24        THE COURT:  Sustained.

25   BY MR. SARNOFF:

1   Q.   Are you familiar with a stop work order?

2   A.   I am.

3   Q.   How are you familiar with it?

4   A.   Stop work order is a tool that's available to the building

5   department in order to stop work that is not being conducted in

6   accordance with the code or work that is being conducted

7   without an approved permit; so yes, that's a tool that's used

8   on a daily basis by every building department in the State of

9   Florida.

10  Q.   Are you familiar with Miami Code, Section 10-101 with

11  regard to unsafe structures and unsafe structures panel?

12  A.   I am.

13       MR. SARNOFF:  Your Honor, we would move into evidence

14  Section 101 DX, 652 of the City of Miami's unsafe structure

15  section.

16       THE COURT:  All right.  Any objections?

17       MR. GUTCHESS:  We have no objection, Your Honor.

18       THE COURT:  All right, that will be admitted.  Thank

19  you.

20       (Defendant's Exhibit 652 received into evidence.)

21  BY MR. SARNOFF:

22  Q.   And I just would like to visit page two:

23       A building shall be presumed unsafe if the construction

24  installation of electrical, plumbing, or other equipment

25  thereon, or partial construction or installation of electrical,

1  plumbing, and other equipment has been commenced or completed

2  without a permit, therefore, having been obtained where the

3  permit has expired prior to the completion of the issuance of

4  certificate of occupancy or certificate of completion.

5      Have I read that accurately?

6  A.  Yes.

7  Q.  And what does that mean?

8      MR. GUTCHESS:  Objection, Your Honor.

9      THE COURT:  What grounds?

10     MR. GUTCHESS:  Testifying as an expert.

11     THE COURT:  Sustained.

12 BY MR. SARNOFF:

13 Q.  Director Marrero, are you the records custodian on behalf

14 of the City of Miami Building Department?

15     MR. GUTCHESS:  Objection, Your Honor.

16     THE WITNESS:  I am.

17     THE COURT:  Overruled.

18 BY MR. SARNOFF:

19 Q.  And as such, do you have a duty under the State of Florida

20 to maintain all building records as the repository for the City

21 of Miami building records?

22 A.  I am.

23 Q.  And are those within your offices' activities to report

24 matters that are observed under a legal duty?

25     MR. GUTCHESS:  Objection.  Leading.

```
1            THE WITNESS:  Correct.

2            THE COURT:  Overruled.

3   BY MR. SARNOFF:

4   Q.  Is this a routine and regular business activity on behalf

5   of the City of Miami Building Department?

6   A.  Very much so.

7   Q.  Are you familiar with the Tower Hotel?

8   A.  I am.

9   Q.  The Tower Hotel records were provided to you by me -- I'm

10  sorry, were provided to me by you, let's get this right.

11           You have provided the records to me; correct?

12  A.  Through public records request, yes.

13  Q.  And I'd like to bring up Defense Exhibit 5.

14           MR. GUTCHESS:  Your Honor, I'm going to object to

15  questioning this witness, as he lacks personal knowledge of

16  Defense Exhibit 5.

17           MR. SARNOFF:  Was it --

18           THE COURT:  Overruled.  He can ask the question.

19           MR. SARNOFF:  Let me offer and introduce into evidence

20  Defense Exhibit 5, Your Honor, it was not objected to.

21           MR. GUTCHESS:  I think it's in evidence already.

22           THE COURT:  Ask your question, Mr. Sarnoff.

23  BY MR. SARNOFF:

24  Q.  A repair or demolish first, what is it and how does it

25  work?
```

1   A.   A first notice is, in this case, for work concealed and

2   work done, performed without permits.  The first notice is --

3   it's a notice that is issued to any property that has commenced

4   work without permits or is doing work without permits.

5        The notice is posted on the property in a very conspicuous

6   positions, locations so that both the owner or any contractor

7   that's performing that work without permits knows that that

8   particular property has been found to be in violation, and the

9   property owner is also notified by mail.

10  Q.   Let's go to the next page.  Next page.

11       And do you know this to be the Tower Hotel?

12  A.   I do.

13  Q.   Let's just go through it pretty quickly PX 3until we get to

14  the interior.  Okay.  What are you observing here?

15       MR. GUTCHESS:  I'm going to object.  No personal

16  knowledge.  I don't think the witness has ever been inside the

17  hotel.

18  BY MR. SARNOFF:

19  Q.   What are you observing based on the public records of the

20  City of Miami that you had to review in relation to bringing

21  this into compliance?

22  A.   What you saw was the inspector always --

23       MR. GUTCHESS:  Objection.

24       THE COURT:  Sustained.

25       MR. GUTCHESS:  Thank you.

1    BY MR. SARNOFF:

2    Q.   All right, let's just continue to go through.

3         And let's -- what exactly is depicted in that picture?

4              MR. GUTCHESS:  I'm going to object, Your Honor.

5              Same objection.

6              THE COURT:  Sustained.

7              MR. SARNOFF:  Let's just keep going through it.

8              MR. GUTCHESS:  I'm going to object.  They're flipping

9    through an exhibit where the witness has no personal knowledge.

10             THE COURT:  Right.  There's no question pending now.

11             MR. SARNOFF:  I'm just publishing to the jury, Your

12   Honor.

13             THE COURT:  It's already in evidence --

14             MR. SARNOFF:  I'd like to--

15             THE COURT:  -- too, sir.

16             MR. SARNOFF:  Sorry, Your Honor.

17   BY MR. SARNOFF:

18   Q.   I'd like to go to the stop work order.  What is this?

19   A.   A stop work order.  Again, so on this particular property,

20   a first notice was issued and --

21             MR. GUTCHESS:  I object, Your Honor.

22             THE COURT:  What's the grounds?

23             MR. GUTCHESS:  It's a narrative.  He said, What is it?

24             He said, "a stop work order," and then he launched into

25   something else.

1      THE COURT:  Overruled.  Go ahead.  Ask the question --

2   Ask the question again.

3   BY MR. SARNOFF:

4   Q.   What is a stop work order?

5   A.   A stop work order is a document that's issued by the

6   building department to, again, document that work is proceeding

7   without proper authorization to do so, and it's instructing the

8   owner, the contractors, and putting on notice any occupants of

9   that building to immediately stop.

10  Q.   This is not mailed out; this is affixed to the building?

11  A.   It is.

12  Q.   Is this part of the Florida Building Code?

13  A.   It is part of the Florida Building Code and our local

14  ordinances.

15  Q.   And do you go so far as to place these on door handles?

16  A.   We do.

17  Q.   Why?

18  A.   Because we want to make it as obvious as possible and put

19  in as many conspicuous locations as possible.

20  Q.   And can you just move forward to put in a picture of it

21  actually on a door handle.  Thank you.

22       Now, I want to be very candid and clear, I want to stay in

23  chronology.  So I'm going to pull up PX 453, pages 10 through

24  17, which the plaintiffs have put into evidence.

25       Do you see that up there?

1    A.   I do.

2    Q.   And under the "general information" section, what has to be

3    disclosed?

4    A.   You have to disclose the work that's being performed.

5    Q.   And do you have to disclose the costs of the work?

6    A.   You do.

7    Q.   Do you have to disclose the square footage of the work?

8    A.   You do.

9    Q.   In this circumstance, it's $2500 of total cost of

10   demolition; correct?

11   A.   That's what's on the application, correct.

12   Q.   And 25 lineal feet; correct?

13   A.   Correct.

14   Q.   It's stating there are 50 units --

15        MR. GUTCHESS:  Objection.  Leading.

16        THE COURT:  Sustained.

17   BY MR. SARNOFF:

18   Q.   Reading from the document, does it also provide -- and I'm

19   thumbing through now to page -- until we get to the site plan.

20        So is this a site plan for the Tower Hotel?

21   A.   No, it is not.

22   Q.   What is that?

23   A.   Well, this is --

24        MR. GUTCHESS:  I'm going to object.  No personal

25   knowledge.

1          THE COURT:  Overruled.  You can answer that question.

2          THE WITNESS:  Certainly.  It's a front page of a

3    survey.

4          MR. SARNOFF:  Oh, okay.  Sorry.  Shows you how much

5    construction I've done.

6    BY MR. SARNOFF:

7    Q.   The pages behind it, what are those?

8    A.   That's a floor plan.

9    Q.   At the very top reads:  River Rock on facade to restore

10   original arch windows, under separate permit.

11         What is your understanding of that?

12         MR. GUTCHESS:  Objection, Your Honor.  No personal

13   knowledge.

14         THE COURT:  Sustained.

15   BY MR. SARNOFF:

16   Q.   Okay.  And to continue on, it also shows the amount and

17   scope of work that's being done; correct?

18   A.   It does.

19   Q.   And again, the next page is the entire scope of work being

20   done; correct?

21   A.   Correct.

22   Q.   And then, if we go back to, I believe it's DX 6, if we go

23   to that stop work order -- the stop work order is for June

24   25th, 2012; correct?

25   A.   Correct.

1   Q.   The previous stop work order was June 1st of 2012; correct?

2   A.   Correct.

3   Q.   In the interim they provided a permit for $2500; correct?

4   A.   Correct.

5   Q.   And could we just show the photographs, and if you could --

6        MR. GUTCHESS:  I'm going to object again, lack of

7   personal knowledge.

8        THE COURT:  Sustained.

9        MR. SARNOFF:  Flip through it slowly, through the

10  pictures.

11       MR. GUTCHESS:  I'm going to object to flipping through

12  these pictures again with a witness that doesn't have personal

13  knowledge.

14       THE COURT:  Sustained.

15       MR. GUTCHESS:  Please take it down.

16  BY MR. SARNOFF:

17  Q.   Mr. Marrero, in order for Mr. Fuller to come into

18  compliance with whatever level of compliance he's in, was it

19  required of you to go through this file from 2017 forward to

20  see what work had been performed?

21       MR. GUTCHESS:  I'm going to object, Your Honor.

22       THE COURT:  Grounds?

23       MR. GUTCHESS:  When was Mr. Fuller coming into

24  compliance, you know.

25       THE COURT:  Sustained.

BY MR. SARNOFF:

Q.   So, Mr. Marrero, when you became the building assistant director or director, was part of your charge bringing the Tower Hotel coming into compliance, yes, I have.

A.   Yes, I have been involved after becoming director with the Tower Hotel coming into compliance, yes, I have.

Q.   And did that require you to go through the official records of the City of Miami to determine what level of construction had been taking place, what level of permitting had occurred to determine what further permitting or work needed to be performed?

A.   Yes, I am very familiar with the file.

Q.   Were you required to review what the 2012 time period in total?

A.   I have reviewed the entire file, yes, I have.

Q.   And is it accurate to say that you have reviewed the exterior work done on the windows?

A.   Yes, I have.

     MR. SARNOFF:  Your Honor, again, I think he should be allowed to --

     THE COURT:  I didn't ask you to think, just ask the questions, sir.

     MR. SARNOFF:  Okay.

BY MR. SARNOFF:

Q.   So I want to go back to DX 6, and I want to go to just

1    after the stop work order.

2             MR. GUTCHESS:  Again, Your Honor, he just testified he

3    has no personal knowledge of this.

4             THE COURT:  Overruled.

5    By MR. SARNOFF:

6    Q.   So, DX 6, what are we seeing here, in terms of an

7    architect's view with regard to the building envelope?

8    A.   You have demolition that's now extending to the building

9    envelope of the building.

10   Q.   What does that mean?  What does that indicate to you?

11   A.   You're removing the envelopes doors and windows, which are

12   part of the building envelope and --

13            MR. GUTCHESS:  Objection.  Objection.

14            THE COURT:  Wait.

15            MR. GUTCHESS:  Again, he has no personal knowledge of

16   what construction was going on.  He's looking at a photograph

17   and speculating.

18            THE COURT:  I'm going to sustain the objection.

19   BY MR. SARNOFF:

20   Q.   Why is the building envelope important?

21   A.   That's your first line of protection.

22   Q.   And did you have to review the change of the building

23   envelope on or about June 25th, 2012 as found in the records of

24   City of Miami?

25   A.   I have reviewed the file going back to 2012, yes, I have.

1   Q.   And if the jurors see when they go back into deliberations

2   the change of the building envelope by use of bricks, mortar,

3   or change of windows, was that work permitted at that time?

4          MR. GUTCHESS:  Objection, leading question.

5          THE COURT:  Sustained.

6   BY MR. SARNOFF:

7   Q.   There is an ensuing stop work order, correct, of June 25th,

8   2012?

9   A.   Yes.

10  Q.   Was that after the work that was done on the exterior of

11  the building?

12         MR. GUTCHESS:  Objection, lack of personal knowledge.

13         THE COURT:  Overruled, if he knows.

14         THE WITNESS:  The stop work order was for the entire

15  work that was being performed without permits, both on the

16  interior and on the outside.

17  BY MR. SARNOFF:

18  Q.   And I'd like to go back to DX 6.  I'd like to go onto the

19  final repair or demolish notice.

20         I believe it's August 24th, 2012.

21         Can you tell us what is involved with the final notice?

22  A.   The final notice is issued -- this is on every property

23  that is going through the same level of circumstances.

24         The final notice is issued after the first notice as a

25  means to notify, again, the owner, and in this case now, also,

1    any party that has a vested interest in the property, that, as

2    outlined in the -- as it is outlined in the final notice, what

3    level of work is not in compliance with the code.

4        Those are posted on the property, again, on a very

5    conspicuous location; and in this case now, not only mailed to

6    the owner but also to any other interested parties.

7    Q.   And if it says Section 104 FBC, does that stand for Florida

8    Building Code?

9    A.   It does.

10   Q.   And 8-10 of this code of Miami-Dade County, what does that

11   stand for?

12   A.   That's the Miami-Dade -- 8-10 is the county code,

13   Miami-Dade County code of ordinances.

14   Q.   Let's move on to -- and let's put in all of the plaintiffs

15   in chronology, their permits.  Let's pull up DX 453 page one.

16       Do you recognize that document?

17   A.   I do.

18   Q.   What is it?

19   A.   This was a -- an electric sub permit that was pulled in

20   reference to the demolition permit that you showed just a few

21   minutes ago.

22   Q.   And this is a $500 electric permit?

23   A.   Electric sub permit, yes.

24   Q.   Sub permit.  And this was dated July 16th of 2012?

25   A.   The date of the document -- the application was accepted,

1   yes, in this case -- I'm sorry, received and issued both --

2   Q.  Same date?

3   A.  --  same date.

4   Q.  Let's pull up PX 453, page two.  Again, this is a plaintiff

5   exhibit.  Are you there?  Can you kind of make that a little

6   bit bigger?  Let's go to the top right.  See up there.

7       Are you familiar with this document?

8   A.  Yes.

9   Q.  Is this a $2500 permit?

10  A.  It is an application for a $2500 demolition, yes.

11          MR. GUTCHESS:  Objection.

12          THE COURT:  Grounds?

13          MR. GUTCHESS:  His lack of personal knowledge.

14          THE COURT:  The document will speak for itself.  It's

15  in evidence.  Next question, Mr. Sarnoff.

16  BY MR. SARNOFF:

17  Q.  The date of this is March 27, 2013; correct?

18  A.  Correct.

19  Q.  Let's pull up PX 457, page two.  Again, plaintiff exhibit.

20  Let's go to the front page -- well, second page.  Sorry.

21      Can you blow that up a little bit bigger?  That's 457?

22      This is a $20,000 window replacement and structural repair;

23  correct?

24  A.  That's what is stated on the application, yes.

25  Q.  And this is June 10th of 2014; correct?

1   A.   Correct.

2   Q.   And I think I might have skipped one, so let me be

3   completely fair.

4        So, page two, I think I skipped chronology for a moment.

5   I think it's the $75,000 one.  There it is.

6        So this is PX 457, page two, and this is dated August 6th

7   of 2013; correct?

8   A.   Correct.

9        MR. GUTCHESS:  Objection, leading.

10  Q.   This would cover the exterior work --

11       Would this cover --

12       THE COURT:  Wait, wait, there's an objection.

13       MR. GUTCHESS:  I was just converting my possible

14  leading question to a nonleading question.

15       THE COURT:  Well, wait.  Go ahead now, sir.

16       The objection is sustained, but you may convert your

17  leading question to nonleading questions.  Thank you.

18       MR. SARNOFF:  Yes, sir.

19  BY MR. SARNOFF:

20  Q.   Would these two permits, the $75,000  window permit of

21  August 6th, 2013, the window replacement and structural repairs

22  dated June 10th of 2014, apply to the exterior of the building?

23  A.   Those two permits do apply to the exterior of the

24  buildings, yes.

25  Q.   So now, let's pull up DX 9, this is a -- what is this?

1    A.   Stop work order.

2    Q.   Did you have to review this in order for Mr. Fuller to come

3    into compliance with the Tower Hotel?

4    A.   Yes, I have reviewed this file completely.

5    Q.   And just moving forward, let's go to the next page; and

6    finally, the next page.

7         Let's just start thumbing through this a little quickly.

8         Did the work that we're seeing on the exterior, again,

9    that's for the window permit; right?

10   A.   The window and the structural repairs, they had two

11   permits.

12   Q.   Okay.  Now, let's -- if we can get into the interior.

13        What is being depicted here in these photographs?

14        MR. GUTCHESS:  I'm going to object, lack of personal

15   knowledge.

16        THE COURT:  Sustained.

17   BY MR. SARNOFF:

18   Q.   Did you have to review Exhibit 9 for the interior work to

19   determine what was permitted and what was not permitted?

20   A.   Yes, I did.

21   Q.   Any of the work contained in Exhibit 9, was any of it

22   permitted?

23   A.   No.

24        MR. GUTCHESS:  Objection, lack of personal knowledge.

25        THE COURT:  Overruled.

1    BY MR. SARNOFF:

2    Q.   Okay.  So would you just walk through with us and just

3    explain what it is, the kind of work that we're seeing being

4    done because we're all laypeople?

5    A.   You're seeing electrical --

6         MR. GUTCHESS:  Your Honor, I'm going to object.

7         THE COURT:  Sustain.

8    BY MR. SARNOFF:

9    Q.   Was any of the electrical work permitted?

10        MR. GUTCHESS:  Objection, lack of personal knowledge.

11        THE WITNESS:  No, it was not permitted.

12        THE COURT:  You can answer.

13   BY MR. SARNOFF:

14   Q.   Was any of the work done with regard to sheetrocking over

15   the electric permitted?

16   A.   No, it was not permitted.

17        MR. GUTCHESS:  Objection, personal knowledge.

18   Q.   Was any of the HVAC electric -- HVAC air conditioner system

19   permitted?

20   A.   No, it was not permitted.

21        MR. GUTCHESS:  Your Honor, object to the entire line of

22   questioning.  There's no foundation that he knows anything

23   about this.

24        THE COURT:  I understand.  Next question.

25        MR. SARNOFF:

1       MR. SARNOFF:  I'm sorry, I didn't hear the answer.

2       THE COURT:  Oh, what's the next question?

3       THE WITNESS:  No, it was not permitted.

4   BY MR. SARNOFF:

5   Q.   Was any of the plumbing permitted?

6   A.   No, it was not permitted.

7   Q.   You talked about interim inspections; right?

8   A.   Correct.

9   Q.   In the Florida Building Code?

10  A.   Correct.

11  Q.   What's the reason for interim inspections?

12  A.   To ensure that all the work being installed will eventually

13  be concealed and in compliance with the code.

14  Q.   And inevitably, what I've shown you on this photograph here

15  would have been concealed?

16  A.   Correct.

17  Q.   But instead it was unpermitted -- and what's wrong with

18  this particular electrical?

19  A.   Anything could be wrong with electrical.

20       MR. GUTCHESS:  Your Honor, I'm going to object, there's

21  no personal knowledge.

22       THE COURT:  The objection is sustained.  Sustained.

23  BY MR. SARNOFF:

24  Q.   Was any of the air conditioning system permitted?

25       MR. GUTCHESS:  Objection.

1    A.   No, it was not permitted.

2         THE COURT:  Overruled.

3         MR. SARNOFF: .

4    Q.   In addition to non-permitted work, you also looked to see

5    how the work that's being performed on an existing building

6    affects the building?

7    A.   Correct.

8    Q.   And would that be documented, cracks, sagging, things like

9    that?

10   A.   It would be the responsibility of the design professional

11   to document that, correct.

12   Q.   Let's go to DX 10.  Are you familiar with the unsafe

13   structures panel?

14   A.   Yes, I am.

15   Q.   Is that mandated by the Florida Building Code?

16   A.   No, it is not.  It is mandated by local ordinance.

17   Q.   The people that makeup the unsafe structure panel, are they

18   appointed by commissioners?

19   A.   No, they are not.

20   Q.   Who are they appointed by?

21   A.   They are appointed by -- to the Miami-Dade Clerk's Office.

22   They are appointed with Miami-Dade County Aisles, those are the

23   implementing orders, Miami-Dade County implementing orders.

24   Q.   So Joe Carollo has nothing to do with putting somebody on

25   that panel?

1   A.   Absolutely not.

2   Q.   And was the Tower, back on February 23rd, 2018, determined

3   to be an unsafe structure?

4   A.   Yes, it was.

5   Q.   Okay.  And go to PX 11.

6        Your Honor, I don't know if I've offered and introduced,

7   10, 11, and if I didn't offer 9, I'd like to offer to introduce

8   that into evidence as well.

9        THE COURT:  Any objections?

10       MR. GUTCHESS:  No objections if they're the ones we've

11  seen.

12       THE COURT:  All right.  Permitted.  Thank you.

13       (Plaintiffs' 9, 10, and 11 received into evidence.)

14  BY MR. SARNOFF:

15  Q.   Are you familiar with the compliance agreement?

16  A.   I am.

17  Q.   And it says very clearly at Section III, the owner agrees

18  the above property's in violation of the City of Miami code; is

19  that a correct statement?

20  A.   It is a required statement for any compliance agreement.

21  Q.   In addition, the owner had to post a bond for the

22  demolition of the premises if he didn't comply with the

23  compliance agreement?

24  A.   Correct.

25  Q.   That's on page two of five; correct?

1    A.   Yes.

2    Q.   Can we just go to page two of five.

3         You've become involved in the Tower, correct, personally?

4    A.   Yes.

5    Q.   Tell the ladies and gentlemen of the jury what you did to

6    help them come into compliance.

7    A.   Well, there were multiple orders and in this very same

8    document here that was never complied with said we can actually

9    cash that bond and demo the building, that was never executed

10   by the city; and instead, that building was allowed to finish

11   and obtain a C.O.

12   Q.   Were you obstructionist in doing that?

13   A.   Absolutely not.

14   Q.   Did you take any instruction from Commissioner Carollo?

15   A.   Absolutely not.

16   Q.   The building department acting independent just to make

17   sure that compliance was done?

18        MR. GUTCHESS:  Object.  Leading.

19        THE COURT:  Overruled.  You can answer that question.

20        THE WITNESS:  Yes.

21   BY MR. SARNOFF:

22   Q.   Let's go back to the end, signing of these documents.

23        Is there any reason why it's signed by Mr. Fuller on July

24   20th, but it's signed by the building official on July 23rd?

25   A.   That's the final signature.

1  Q.  Was Mr. Fuller allowed to take this home?

2        MR. GUTCHESS:  Objection.  Lack of personal knowledge.

3        THE COURT:  Sustained.

4  BY MR. SARNOFF:

5  Q.  And today, what is the status of the Tower Hotel?

6  A.  It has been issued a C.O.

7  Q.  When the Tower came to see you, did they -- how many rooms

8  did they say they had?

9  A.  Since '20 --

10       MR. GUTCHESS:  Objection.  I don't know who he is.

11       A, it's hearsay, but I don't know who he's talking

12  about when the Tower came to see him.

13       THE COURT:  Wait, wait.  Let Mr. Sarnoff rephrase his

14  question so that the witness can answer, okay.  Thank you.

15       You may proceed, Mr. Sarnoff.

16  BY MR. SARNOFF:

17  Q.  As part of getting into compliance, all the documents you

18  reviewed and submissions by the Tower, how many rooms did they

19  first state they had?

20       MR. GUTCHESS:  Objection.  Hearsay.

21       THE COURT:  Overruled.

22       THE WITNESS:  From 2018 application to legalize the

23  Tower Hotel, they have been --

24       THE COURT:  Wait, wait.

25       MR. GUTCHESS:  I don't know who "they" is.  Who is

1    "they?"

2         THE COURT:  Can you rephrase the question as to who you

3    are referring to?

4         MR. SARNOFF:  Sure.

5    Q.   The submissions of the Tower Hotel, 2018.

6         How many rooms did they claim they have?

7         MR. GUTCHESS:  Again, objection, Your Honor.  Vague.

8         I don't know what the conditions are of the

9    Tower Hotel.

10        THE COURT:  Sustained.  Rephrase the question,

11   Mr. Sarnoff.

12   BY MR. SARNOFF:

13   Q.   Tower was given an opportunity to submit building plans to

14   bring all the work they had done from 2012 to 2018 into

15   compliance; correct?

16   A.   Correct.

17   Q.   As part of that submission, how many rooms did they state

18   they had?

19   A.   50 rooms.

20   Q.   How many rooms had they really gotten?

21   A.   48 rooms.

22   Q.   Are you familiar with something that we referred to as 1460

23   Southwest 7th Street, some of us have called it a single-story

24   building with a pool.

25   A.   Yes, I am familiar.

136

1    Q.   And I asked you to provide me through a public records

2    request what is in Exhibit 32; correct?

3    A.   Correct.

4    Q.   Are these true and authentic copies?

5    A.   Yes, they are.

6    Q.   Are these made as part of your course and scope of your

7    duties as the building director of the City of Miami?

8    A.   That is correct.

9    Q.   Have they been maintained by the City?

10   A.   Yes, they have.

11   Q.   Pursuant to a duty imposed upon by the State of Florida?

12   A.   That is correct.

13   Q.   Is this the repository of records of the City of Miami,  as

14   being the official records?

15   A.   For the building department, yes, it is.

16        MR. SARNOFF:  Your Honor, I offer and introduce into

17   evidence Defendant's Exhibit 32, which back when 3379 was filed

18   had no objections.

19        THE COURT:  All right, thank you.

20        MR. GUTCHESS:  Can I just see -- I think it's fine,

21   but -- yeah, it's fine.

22        (Plaintiffs' Exhibit 32 received into evidence.)

23        MR. SARNOFF:  All right.  Can we put DX 32 up.

24   BY MR. SARNOFF:

25   Q.   Once again, a posted notice.  What is that posted notice?

1   A.   I believe it says "first notice."

2        Again, as stated before, these are notices that are posted

3   in a very conspicuous location in the building to let the

4   building occupants, the owners, any contractors that's

5   performing work without permit know that this building has been

6   found in violation of the code.

7   Q.   You know, I kind of skipped a step.

8        When the building --

9           THE COURT:  Can you use the microphone so I can hear,

10  sir.

11  Q.   When the building inspector goes out there, does he go out

12  there to photograph and create evidence?

13  A.   That's part of a routine inspection, yes, they need to

14  photograph every single component of the building as part of

15  their exercise of documenting the violation; typically, starts

16  from the very outside of the building, providing context of

17  where that building is located, and then, typically, a

18  walk-through of the inspections documenting every step.

19       And they typically do that with every inspection; not only

20  to -- every time they go back to the site they are required to

21  do that.

22  Q.   I apologize, my screw-up.

23       Same thing with the Tower Hotel, the building inspector

24  goes out there, documents it, evidences it?

25  A.   That's correct.  That's why you see sometimes very

1    duplicative images, because they, again, trying to document the

2    state of any particular site that is found in violation at any

3    given point when they go back to said properties.

4    Q.   Okay.  And did you have to review this January 8th, 2018,

5    photographic evidentiary documentation to help bring 1450 in

6    whatever compliance it's in right now?

7    A.   Yes, I have.

8    Q.   And can we just flip through it, and if you would describe

9    to me what it is that we're seeing, and why it's important to

10   you?

11   A.   It's a singe family -- what used to be a single family

12   home, masonry construction.

13        MR. GUTCHESS:  And I'm going to object, lack of

14   personal knowledge.

15        THE COURT:  Overruled.

16        THE WITNESS:  The inspector, again, is providing

17   context from the outside going around the building and

18   documenting, you know, what's considered to be done before

19   without permits, and the state of the building in that

20   particular point in time.

21   Q.   Stop right there.  I apologize.

22   A.   The building envelope is being closed without permits.

23   Q.   You talked a little earlier about the building envelope?

24   A.   Correct.

25   Q.   Is this evidence the building envelope changed?

1   A.   Correct.

2        MR. GUTCHESS:   Objection.   He has no personal knowledge

3   of when anything was done.

4        THE COURT:   That question is sustained.

5   BY MR. SARNOFF:

6   Q.   Inevitably, do they make entry into the interior of the

7   building?

8   A.   Correct.

9   Q.   Any of the work that we're seeing, is any of this

10  electrical, structural, any of it been permitted?

11  A.   You see extensive demolition that has been performed

12  without permits?

13       MR. GUTCHESS:   The witness does not know when any

14  demolition is performed.

15       THE COURT:   The objection is sustained.

16  BY MR. SARNOFF:

17  Q.   There is -- if we could go to the posted notice of hearing.

18  It might be back a little bit, I think.

19       So, what is a posted notice, how does it work, and where

20  does it go?

21  A.   So this particular notice, you have your first notice, your

22  final notice; and in this case, it's a notice of hearing, so

23  when there is continued non-compliance, a property will be set

24  before the on-site structures panel.

25       That particular notice is also posted on the property and

1    mailed to the owner and any interested parties in the property.

2        In this case, you see that this particular property was set

3    for a hearing date of February 23rd, 2018.

4    Q.   And is it proper for the inspectors to photograph where

5    they're placing the notice?

6    A.   Absolutely.

7    Q.   And did they do so in this file?

8    A.   Yes, they did.

9    Q.   Is there also a notice of unsafe structure violation that

10   is transmitted to the ownership?

11   A.   That is correct.

12   Q.   And I think if you move forward, you'll see that.  Okay.

13   A.   This here is actually a notice of pending lien.

14       So what happens is the building department incur costs in

15   maintaining that violation, right, so what we're going to do is

16   we're going to lien that property against those incurred costs.

17   Q.   And if I'm correct, there was a notice going to the unsafe

18   structures panel; if we move forward, there's a compliance

19   agreement; correct?

20   A.   That is correct.

21   Q.   And once again, the owner agrees the above property is in

22   violation of City of Miami code; correct?

23   A.   It's a requirement of the agreement.

24   Q.   And in the compliance agreement are there schedules of when

25   permits will be pulled, when the permits will be --

1  A.   Correct, the compliance agreement has very specific time

2  lines as to when you need to submittal plans to the building

3  department, when you need to obtain a building permit, and

4  after you obtain a building permit, how much time is available

5  to complete the work.

6  Q.   And did they -- based on your review of the file in total,

7  did they comply with the compliance agreement?

8  A.   They did not.

9  Q.   And if we move forward, there's going to be -- next page --

10  next page -- keep going -- keep going.

11       Are you familiar with this document?

12  A.   It's a screenshot of our system, city view, that's where we

13  log in and do the administrative work of documenting violations

14  in the City of Miami.

15  Q.   And this provides a one-story CBS, is SFH, single family

16  house?

17  A.   Correct.

18  Q.   Pool construction without permits, need to stop work

19  immediately, submit architectural engineering plans detailing

20  all work alterations taking place and acquire the permit and

21  inspections per -- is FBC, Florida Building Code?

22  A.   Correct.

23  Q.   And the ordinance -- and there's a double fee of $110.00;

24  is that correct?

25  A.   Per ordinance, when you do work without permits, per our

1    city ordinance, there is a -- we actually -- we've changed that
2    ordinance, but it used to be double the permit fee, plus $110.
3        We changed that ordinance for commercial buildings to
4    quadruple the permit fees plus $110.  I forget the date when it
5    was changed, but it was changed in the past, I want to say
6    two something.
7            THE COURT:  Also, Mr. Sarnoff, one more question before
8    we break for lunch.
9            MR. SARNOFF:  Yes, sir.
10   BY MR. SARNOFF:
11   Q.   If we could just move on, one or a few more, Curtis, I
12   believe it's the next one.  There you go.
13       Was the notice posted actually on the building itself?
14   A.   Correct.
15   Q.   Why do you do that?
16   A.   To make it known that the work is being performed without
17   permits, and again, to document that and inform any building
18   occupants, the owners, or any contractors working on the
19   property without permits.
20
21           MR. SARNOFF:  Your Honor, I will never stand in front
22   of anybody's desire for lunch.
23           THE COURT:  All right.  Thank you.  And I appreciate
24   that as well.  Like I said, ladies and gentlemen, we'll be at
25   lunch until 10 after one.

1          Do not discuss this case with anyone.  Do not form any

2     opinions or discuss among yourselves.

3          Be back from lunch at that time.  Thank you.

4          COURTROOM DEPUTY:  All rise.

5          (Witness steps down.)

6          (Jury exited courtroom at 12:10 p.m.)

7          (Luncheon recess taken from 12:11 p.m. to 1:15 p.m.)

8          THE COURT:  We are back in session.

9          We are going to have to continue this matter on Monday,

10    because I received information that one of the jurors has

11    become ill, so he wanted to continue all -- to deliberate and

12    hear everything together -- testimony, so I decided to excuse

13    them until Monday.

14          Try to stay on as much as you can, but I'm not going to

15    force anybody who's sick to -- it's not fair to defend the

16    other plaintiff where they're trying to get their undivided

17    attention to your testimony.

18          So, in all fairness, I thought it would be best that

19    they come and resume tomorrow so they can pay attention to the

20    testimony, give their direct attention without any external

21    issues.  All right?

22          So we will see everyone here Monday at nine a.m.

23          MR. KUEHNE:  Judge, one matter that I don't know that

24    needs to be on the record or not.

25          We got an order for response at 5:00 on Monday, which

1    is fine, we'll work on it over the weekend.

2         But is there any way we can make that a little bit

3    later?  We would have to get that file during the trial day,

4    and we're the ones responsible for getting those files, so...

5         THE COURT:  All right.  When?

6         MR. KUEHNE:  Later in the day, 9:00 would be great.

7         THE COURT:  That's fine.

8         MR. KUEHNE:  Thank you, Judge.

9         THE COURT:  You're welcome.

10        MR. PERTNOY:  Thank you.

11        THE COURT:  You're welcome.

12        Enjoy your weekend.

13        (Proceedings adjourned at 1:16 p.m.)

14

15                    C E R T I F I C A T E

16

17        I hereby certify that the foregoing is an

18        accurate transcription of the proceedings in the

19        above-entitled matter.

20

21             August 19th, 2023

22

23                         S/Glenda M. Powers

24                         GLENDA M. POWERS, RPR, CRR, FPR
                           United States District Court
25                         400 North Miami Avenue
                           Miami, Florida  33128

## $

**$110** [2] - 142:2, 142:4
**$110.00** [1] - 141:23
**$20,000** [1] - 126:22
**$2500** [4] - 119:9, 121:3, 126:9, 126:10
**$500** [1] - 125:22
**$75,000** [2] - 127:5, 127:20

## '

**'17** [1] - 31:9
**'18** [1] - 32:11
**'20** [1] - 134:9
**'94** [1] - 99:23
**'99** [1] - 100:6

## 1

**1** [4] - 1:8, 102:11, 102:14, 102:15
**10** [9] - 3:9, 4:6, 29:19, 104:9, 118:23, 131:12, 132:7, 132:13, 142:25
**10-101** [1] - 113:10
**100** [1] - 1:22
**101** [1] - 113:14
**104** [1] - 125:7
**105** [1] - 104:10
**105.1** [1] - 104:11
**107** [1] - 105:7
**107.3** [1] - 107:4
**10:24** [1] - 63:18
**10:26** [1] - 76:13
**10:41** [1] - 76:11
**10:48** [1] - 63:20
**10:54** [1] - 95:6
**10th** [3] - 74:10, 126:25, 127:22
**11** [6] - 4:6, 70:6, 71:25, 132:5, 132:7, 132:13
**110** [1] - 111:2
**113** [1] - 4:15
**11:00** [1] - 68:3
**11:02** [1] - 95:6
**11:04** [1] - 97:24
**11:06** [1] - 98:7
**12** [5] - 1:6, 47:11, 100:9, 104:24, 105:1
**1231** [1] - 85:8
**12:10** [1] - 143:6
**12:11** [1] - 143:7
**12th** [2] - 34:12, 47:13
**13** [3] - 48:13, 49:13, 72:19
**132** [1] - 4:6

**136** [1] - 4:7
**13th** [1] - 32:22
**1400** [1] - 2:5
**1444** [6] - 40:24, 80:20, 83:19, 84:5, 91:11, 92:6
**1450** [5] - 80:20, 83:19, 84:4, 91:11, 138:5
**1460** [6] - 80:20, 83:20, 84:4, 91:11, 92:4, 135:22
**15** [1] - 76:8
**16** [2] - 50:23, 105:6
**16(e** [1] - 97:7
**1641** [1] - 72:24
**165** [1] - 1:8
**169** [1] - 1:19
**16th** [1] - 125:24
**17** [6] - 96:13, 96:17, 97:20, 107:2, 107:4, 118:24
**17130** [1] - 11:2
**17551449** [1] - 85:10
**18** [2] - 1:9, 107:18
**18-24190-Civil** [1] - 5:6
**18-CV-24190** [1] - 1:3
**180** [9] - 93:23, 109:14, 109:16, 109:17, 109:21, 110:1, 110:7, 110:9, 110:10
**18th** [3] - 20:18, 21:11, 73:2
**1978** [1] - 14:19
**1979** [1] - 95:18
**1993** [1] - 96:5
**19th** [3] - 22:6, 73:2, 144:20
**1:15** [1] - 143:7
**1:16** [2] - 1:7, 144:13
**1st** [2] - 35:8, 121:1

## 2

**2-20** [1] - 33:4
**2.d** [1] - 85:8
**20** [6] - 9:1, 9:2, 9:3, 15:9, 59:3, 109:9
**200** [1] - 1:25
**2001** [1] - 99:23
**2003** [1] - 85:9
**2006** [2] - 100:6
**201** [1] - 1:15
**2012** [18] - 28:3, 28:6, 28:10, 29:14, 29:17, 30:7, 80:10, 82:21, 94:14, 120:24, 121:1, 122:13,

123:23, 123:25, 124:8, 124:20, 125:24, 135:14
**2013** [3] - 126:17, 127:7, 127:21
**2014** [2] - 126:25, 127:22
**2017** [14] - 7:13, 20:19, 21:11, 22:7, 30:21, 50:25, 65:10, 65:20, 72:21, 73:15, 73:19, 74:1, 100:16, 121:19
**2018** [27] - 7:15, 25:5, 25:16, 31:6, 31:20, 32:6, 32:14, 32:22, 34:19, 39:7, 40:1, 41:1, 47:11, 48:24, 52:21, 63:17, 74:10, 74:23, 75:5, 75:19, 132:2, 134:22, 135:5, 135:14, 138:4, 140:3
**2019** [2] - 7:15, 35:4
**2020** [17] - 33:5, 33:12, 33:19, 34:2, 41:8, 44:10, 44:24, 54:3, 80:9, 90:15, 90:16, 90:17, 90:19, 90:23, 91:1, 91:4, 100:20
**2021** [2] - 34:12, 35:8
**2022** [1] - 85:10
**2023** [2] - 1:6, 144:20
**20th** [4] - 33:19, 34:2, 48:24, 133:24
**21** [1] - 111:2
**2121** [1] - 1:15
**21st** [2] - 73:15, 73:19
**22** [2] - 32:11, 74:6
**22nd** [5] - 31:6, 32:14, 50:25, 81:15, 84:4
**23** [1] - 112:3
**238** [1] - 85:8
**23rd** [6] - 39:7, 40:1, 41:1, 132:2, 133:24, 140:3
**24** [1] - 35:4
**24th** [1] - 124:20
**25** [2] - 63:23, 119:12
**25th** [3] - 120:24, 123:23, 124:7
**26A** [1] - 97:6
**27** [1] - 126:17
**27th** [2] - 50:25, 85:9
**2nd** [4] - 1:15, 1:22, 33:5, 74:1

## 3

**3** [7] - 21:13, 30:20, 31:7, 32:15, 33:6,

33:20, 34:3
**30** [8] - 9:1, 61:9, 62:12, 62:19, 62:21, 63:4, 63:22, 63:24
**30th** [1] - 72:21
**3105** [1] - 1:22
**32** [5] - 4:7, 136:2, 136:17, 136:22, 136:23
**330** [1] - 49:6
**33127** [1] - 1:16
**33128** [2] - 2:11, 144:25
**33131** [3] - 1:19, 1:22, 1:25
**33156** [1] - 2:5
**3379** [1] - 136:17
**344** [1] - 10:18
**35** [1] - 15:21
**381** [2] - 83:11, 83:12
**384** [3] - 57:7, 57:11, 57:14
**3until** [1] - 116:13

## 4

**400** [3] - 2:11, 44:23, 144:24
**403** [6] - 27:13, 27:19, 29:24, 30:16, 36:8, 37:18
**408** [2] - 47:20, 49:20
**4100** [1] - 1:25
**425** [1] - 19:23
**448** [1] - 47:6
**453** [3] - 118:23, 125:15, 126:4
**457** [3] - 126:19, 126:21, 127:6
**471** [2] - 105:13, 105:18
**48** [1] - 135:21
**481** [2] - 105:14, 105:20
**4th** [1] - 28:17

## 5

**5** [4] - 72:11, 115:13, 115:16, 115:20
**50** [2] - 119:14, 135:19
**500** [1] - 1:19
**514** [1] - 105:3
**553** [1] - 73:11
**554** [1] - 95:17
**555** [1] - 95:17
**577** [1] - 53:23
**5:00** [1] - 143:25
**5th** [3] - 28:10, 33:12, 63:17

## 6

**6** [6] - 3:8, 104:25, 120:22, 122:25, 123:6, 124:18
**606** [1] - 95:17
**63** [1] - 28:8
**641** [1] - 59:18
**65** [1] - 7:5
**652** [3] - 4:15, 113:14, 113:20
**67** [1] - 31:4
**670** [1] - 60:10
**69** [1] - 37:23
**691** [1] - 102:18
**6th** [2] - 127:6, 127:21

## 7

**70** [1] - 32:2, 103:23
**71** [1] - 32:9
**72** [2] - 32:17
**73** [2] - 39:18, 40:6
**74** [1] - 32:25
**75** [1] - 33:8
**76** [1] - 33:15
**77** [1] - 33:23
**78** [2] - 34:8, 41:5
**79** [2] - 34:15, 34:23
**7th** [2] - 49:6, 135:23

## 8

**8** [1] - 78:5
**8-10** [2] - 125:10, 125:12
**80** [4] - 40:16, 44:18, 44:24, 45:1
**80,000** [1] - 7:8
**8036** [2] - 80:24, 84:15
**8038** [3] - 80:24, 84:9, 84:10
**81** [1] - 34:25
**89** [1] - 35:7
**8th** [2] - 72:25, 138:4

## 9

**9** [7] - 4:6, 34:19, 127:25, 128:18, 128:21, 132:7, 132:13
**90** [1] - 3:12
**91** [1] - 3:13
**9150** [1] - 2:4
**98** [1] - 3:15
**99** [3] - 3:22, 35:17, 35:22
**9:00** [1] - 144:6
**9:07** [2] - 1:7, 6:2

**9th** [1] - 32:6

# A

**a..** [1] - 11:22
**a.m** [6] - 1:7, 6:2, 95:6, 97:24, 143:22
**ability** [3] - 52:6, 69:4, 77:8
**able** [8] - 13:19, 26:24, 26:25, 27:12, 46:16, 61:17, 72:8, 94:12
**above-entitled** [1] - 144:18
**absent** [2] - 28:19, 29:6
**absolutely** [8] - 15:1, 25:22, 108:18, 132:1, 133:13, 133:15, 140:6
**accepted** [3] - 63:20, 93:18, 125:25
**accessibility** [2] - 102:4, 103:13
**accompanying** [1] - 107:6
**accordance** [2] - 107:8, 113:6
**according** [1] - 103:7
**accordingly** [2] - 83:8, 94:24
**accounted** [1] - 98:9
**accurate** [2] - 122:16, 144:17
**accurately** [1] - 114:5
**Ace** [2] - 79:25, 90:9
**ACE** [4] - 3:11, 3:21, 90:4, 99:7
**acknowledge** [1] - 48:12
**acquire** [1] - 141:20
**acronyms** [1] - 101:4
**acting** [3] - 47:18, 90:15, 133:16
**activation** [1] - 60:19
**active** [3] - 63:21, 69:20, 70:3
**actively** [1] - 66:4
**activities** [3] - 12:19, 84:12, 114:23
**activity** [5] - 22:13, 84:16, 84:19, 84:21, 115:4
**actual** [5] - 20:15, 61:20, 74:18, 103:5, 108:4
**addition** [4] - 84:22, 86:22, 131:4, 132:21
**additional** [4] - 52:5, 105:16, 106:13,

106:18
**address** [6] - 40:23, 76:25, 77:2, 95:7, 108:20, 109:6
**addressed** [3] - 93:9, 93:13, 104:25
**addressing** [2] - 29:17, 30:7
**Adele** [3] - 53:14, 54:1, 54:11
**adjacent** [1] - 69:5
**adjourned** [1] - 144:13
**adjudicate** [1] - 23:6
**administered** [1] - 102:16
**administration** [1] - 102:17
**administrative** [1] - 141:13
**admiral** [1] - 85:14
**admission** [1] - 73:19
**admit** [3] - 7:23, 29:19, 60:1
**admitted** [8] - 10:19, 10:20, 15:22, 19:23, 31:3, 37:24, 60:11, 113:18
**admitting** [2] - 8:9, 8:11
**adoption** [1] - 103:25
**advertisements** [1] - 59:20
**advice** [2] - 18:15, 19:9
**advised** [2] - 17:19, 17:25
**affect** [4] - 17:22, 42:4, 42:6, 67:2
**affects** [2] - 18:8, 131:6
**affidavit** [6] - 55:16, 55:20, 55:22, 55:25, 56:2, 56:21
**affirm** [2] - 89:16, 98:24
**affirmed** [1] - 96:22
**affixed** [2] - 110:4, 118:10
**afford** [1] - 112:15
**aforementioned** [1] - 22:14
**afoul** [1] - 68:22
**afterwards** [1] - 31:10
**age** [1] - 19:4
**agent** [1] - 104:13
**agitated** [1] - 66:21
**ago** [4] - 41:6, 78:5, 100:19, 125:21
**agree** [1] - 56:24
**agreement** [18] - 7:22,

35:9, 38:2, 39:10, 39:19, 40:2, 40:20, 41:7, 41:11, 41:12, 132:15, 132:20, 132:23, 140:19, 140:23, 140:24, 141:1, 141:7
**agreements** [8] - 8:12, 8:17, 8:20, 37:23, 38:7, 38:9, 43:16
**agrees** [2] - 132:17, 140:21
**ahead** [6] - 68:21, 69:14, 83:24, 98:4, 118:1, 127:15
**air** [2] - 129:18, 130:24
**Aisles** [1] - 131:22
**al** [1] - 5:5
**Alain** [5] - 12:3, 48:19, 49:14, 49:19, 49:25
**Albert** [1] - 22:3
**alerted** [1] - 22:24
**ALF** [12] - 52:24, 53:6, 54:9, 54:11, 55:5, 55:8, 55:12, 55:14, 56:7, 56:21, 57:9, 57:11
**Alfie** [6] - 21:11, 22:25, 73:4, 73:19, 74:12, 75:7
**allegations** [4] - 20:21, 82:19, 82:20, 83:16
**allow** [3] - 39:1, 86:22, 93:13
**allowed** [8] - 68:20, 88:18, 93:17, 97:12, 110:18, 122:20, 133:10, 134:1
**allowing** [2] - 96:13, 96:23
**almost** [1] - 14:10
**alter** [2] - 104:14, 104:16
**alterations** [1] - 141:20
**Amanda** [2] - 1:15, 5:9
**Amber** [2] - 2:4, 5:13
**amended** [4] - 77:22, 82:19, 83:11, 83:16
**amendment** [7] - 23:7, 24:6, 24:13, 25:12, 25:19, 75:25, 96:24
**Amendment** [1] - 78:21
**Amera** [1] - 49:4
**America** [1] - 96:23
**Americana** [1] - 60:13
**amount** [2] - 111:18, 120:16

**analogous** [1] - 95:16
**Anna** [1] - 1:14
**annex** [1] - 40:9
**anonymous** [1] - 66:10
**answer** [17] - 8:19, 14:3, 17:17, 17:24, 19:7, 20:8, 35:21, 43:9, 43:15, 46:21, 81:6, 103:15, 120:1, 129:12, 130:1, 133:19, 134:14
**answer's** [1] - 92:25
**answered** [2] - 24:1, 75:9
**Anthony** [1] - 48:20
**anticipate** [1] - 95:14
**anticipating** [1] - 63:15
**apart** [1] - 35:24
**apologies** [1] - 47:23
**apologize** [6] - 46:11, 47:21, 57:12, 86:17, 137:22, 138:21
**Appeal** [1] - 101:6
**appealed** [1] - 96:21
**appearances** [1] - 5:7
**APPEARANCES** [2] - 1:12, 2:1
**appeared** [2] - 82:6, 96:25
**applicable** [2] - 107:14, 108:18
**application** [6] - 46:18, 119:11, 125:25, 126:10, 126:24, 134:22
**applies** [3] - 93:19, 102:6, 102:14
**apply** [7] - 56:24, 69:2, 71:1, 102:9, 104:1, 127:22, 127:23
**appointed** [4] - 131:18, 131:20, 131:21, 131:22
**appointment** [1] - 104:20
**appreciate** [3] - 10:10, 79:7, 142:23
**approach** [5] - 48:13, 78:22, 79:9, 79:19, 86:13
**appropriate** [3] - 70:16, 70:20, 80:11
**approval** [3] - 52:4, 64:2, 106:13
**approved** [6] - 62:13, 62:20, 63:4, 63:24, 111:6, 113:7
**April** [3] - 48:24,

90:16, 100:20
**arch** [1] - 120:10
**architect** [2] - 100:23, 106:11
**architect's** [1] - 123:7
**architects** [2] - 61:5, 105:20
**Architects** [1] - 100:5
**architectural** [1] - 99:24, 106:15, 141:19
**architecture** [1] - 99:25
**areas** [1] - 71:11
**argument** [1] - 92:16
**argumentative** [1] - 8:2
**arise** [1] - 66:5
**Army** [2] - 99:21, 99:22
**arrived** [2] - 21:16, 21:22
**art** [1] - 95:11
**Art** [1] - 11:18
**articles** [2] - 93:25, 94:1
**ASAEL** [3] - 3:11, 3:21, 90:4, 99:6, 99:7
**Asael** [5] - 87:1, 88:5, 90:9, 98:18, 99:6
**asbestos** [6] - 108:20, 108:23, 108:24, 109:5, 109:7
**asbestos-containing** [2] - 109:5, 109:7
**ascertain** [1] - 107:7
**assistance** [1] - 22:2
**assistant** [4] - 90:18, 90:19, 100:17, 122:2
**Assisted** [1] - 53:3
**associated** [6] - 33:16, 35:1, 35:10, 50:3, 50:5, 78:25
**assume** [3] - 10:4, 19:8, 90:14
**assumed** [2] - 18:14, 18:24
**assumes** [9] - 7:6, 8:1, 8:8, 8:13, 9:6, 9:11, 9:22, 10:3, 31:16
**assumption** [1] - 19:5
**assumptions** [1] - 19:4
**Assurance** [1] - 95:17
**assure** [1] - 61:8
**attachments** [3] - 16:3, 16:4, 16:13
**attacks** [1] - 26:13
**attempt** [2] - 97:1,

102:15
**attempting** [1] - 94:1
**attendees** [1] - 21:18
**attention** [4] - 105:6, 143:17, 143:19, 143:20
**attorney** [4] - 41:17, 46:24, 46:25, 47:19
**attorneys** [4] - 24:20, 39:2, 43:20, 78:9
**audit** [11] - 44:6, 44:8, 44:12, 44:13, 45:10, 47:25, 48:3, 48:4, 48:8, 50:3, 50:11
**audited** [2] - 44:25, 45:2
**audits** [2] - 45:23, 45:24
**August** [5] - 75:5, 124:20, 127:6, 127:21, 144:20
**authentic** [1] - 136:4
**authenticates** [1] - 88:17
**authenticity** [1] - 89:1
**authorization** [1] - 118:7
**authorized** [5] - 84:14, 104:13, 105:15, 109:11, 109:18
**available** [2] - 113:4, 141:4
**Avenue** [3] - 1:15, 2:11, 144:24
**aware** [1] - 7:12
**AXS** [1] - 1:13

**B**

**background** [2] - 92:14, 99:14
**backwards** [1] - 92:21
**bad** [1] - 94:2
**Ball** [25] - 11:7, 11:15, 12:6, 12:9, 44:11, 45:3, 45:15, 45:25, 47:5, 47:25, 49:3, 49:10, 50:5, 53:15, 56:8, 60:9, 64:19, 65:11, 68:10, 69:3, 69:25, 70:2, 70:5, 71:1, 71:25
**ball** [1] - 96:8
**Barcena** [1] - 48:20
**Barlington** [2] - 20:5, 20:10
**based** [23] - 19:12, 24:15, 27:19, 30:16, 37:2, 37:18, 38:16, 45:13, 51:16, 58:9,

62:7, 62:24, 67:14, 73:19, 81:4, 81:8, 81:9, 87:4, 91:25, 94:20, 96:15, 116:19, 141:6
**baseline** [2] - 91:17, 91:23
**baselines** [2] - 92:15, 94:6
**basic** [1] - 99:23
**basis** [2] - 94:19, 113:8
**basketball** [1] - 96:6
**battle** [1] - 29:20
**bear** [1] - 108:1
**became** [2] - 100:19, 122:2
**become** [4] - 100:2, 110:4, 133:3, 143:11
**becomes** [2] - 89:6, 89:10
**becoming** [1] - 122:5
**BEFORE** [1] - 1:10
**began** [2] - 21:17, 21:25
**begin** [1] - 73:25
**beginning** [1] - 61:8
**begun** [1] - 31:12
**behalf** [8] - 5:10, 5:14, 20:10, 22:13, 82:3, 87:10, 114:13, 115:4
**behind** [4] - 43:23, 111:3, 111:23, 120:7
**belief** [2] - 79:3, 79:5
**Ben** [1] - 5:14
**Benedict** [1] - 1:21
**benefit** [1] - 99:14
**Benetiz** [1] - 28:16
**best** [5] - 18:1, 29:10, 74:17, 97:4, 143:18
**between** [3] - 51:6, 54:9, 60:19
**beyond** [9] - 30:2, 45:7, 55:10, 60:3, 64:12, 71:6, 71:20, 75:22, 78:2
**bid** [1] - 16:18
**bidding** [2] - 27:15, 27:16
**big** [1] - 61:23
**bigger** [2] - 126:6, 126:21
**Bill** [1] - 20:4
**Biscayne** [1] - 1:25
**bit** [4] - 126:6, 126:21, 139:18, 144:2
**block** [2] - 66:3, 66:4
**blocked** [1] - 58:19
**Blom** [1] - 48:21
**blow** [1] - 126:21

**blue** [1] - 73:17
**Blvd** [1] - 1:25
**board** [1] - 6:24
**bond** [2] - 132:21, 133:9
**book** [1] - 101:24
**BORA** [3] - 101:2, 101:5
**Boulevard** [1] - 2:4
**BOWEN** [1] - 1:24
**break** [3] - 76:7, 77:1, 142:8
**breakdown** [1] - 108:8
**Brickell** [1] - 49:6
**bricks** [1] - 124:2
**bridge** [1] - 67:10
**briefly** [3] - 10:12, 50:19, 65:17
**bring** [26] - 6:1, 30:13, 39:12, 39:13, 77:8, 82:4, 82:24, 83:1, 86:8, 86:19, 86:21, 86:24, 88:7, 88:15, 89:5, 89:7, 89:8, 89:12, 91:12, 91:20, 92:13, 94:15, 97:22, 115:13, 135:14, 138:5
**bringing** [3] - 30:8, 116:20, 122:3
**brother** [3] - 14:13, 14:16, 14:18
**brought** [5] - 82:25, 86:4, 91:12, 92:24, 95:12
**Broward** [1] - 102:7
**Building** [34] - 14:24, 38:25, 94:4, 101:10, 101:23, 102:9, 102:15, 102:18, 103:8, 103:9, 103:10, 103:11, 103:12, 103:13, 103:25, 109:22, 109:24, 110:2, 110:12, 110:13, 112:7, 112:12, 112:15, 112:21, 114:14, 115:5, 118:12, 118:13, 125:8, 130:9, 131:15, 141:21
**building** [105] - 14:6, 14:11, 29:1, 29:3, 36:11, 38:13, 38:19, 40:24, 41:16, 42:2, 51:10, 51:18, 65:1, 66:3, 66:17, 66:18, 69:6, 80:18, 81:10, 82:2, 83:12, 84:24,

87:11, 87:13, 87:16, 90:13, 90:14, 90:18, 90:20, 91:16, 91:22, 94:11, 98:18, 100:18, 101:4, 101:16, 101:20, 102:3, 102:11, 103:10, 104:8, 104:15, 104:20, 105:15, 106:12, 107:5, 107:12, 107:25, 108:9, 109:1, 109:4, 109:11, 109:18, 110:16, 112:15, 113:4, 113:8, 113:23, 114:20, 114:21, 118:6, 118:9, 118:10, 122:2, 123:7, 123:8, 123:9, 123:12, 123:20, 123:22, 124:2, 124:11, 127:22, 131:5, 131:6, 133:9, 133:10, 133:16, 133:24, 135:13, 135:24, 136:7, 136:15, 137:3, 137:4, 137:5, 137:8, 137:11, 137:14, 137:16, 137:17, 137:23, 138:17, 138:19, 138:22, 138:23, 138:25, 139:7, 140:14, 141:2, 141:3, 141:4, 142:13, 142:17
**buildings** [8] - 43:22, 91:12, 92:8, 94:10, 102:3, 107:19, 127:24, 142:3
**built** [1] - 59:3
**Bureaus** [1] - 101:5
**business** [24] - 6:16, 7:20, 9:16, 14:11, 14:19, 14:20, 16:16, 16:23, 44:17, 49:25, 50:5, 50:8, 50:11, 51:6, 68:10, 71:16, 71:17, 84:16, 85:19, 85:22, 88:23, 115:4
**businesses** [8] - 26:11, 26:14, 31:13, 48:9, 49:19, 50:14, 71:14, 71:22
**BY** [131] - 2:9, 6:10, 7:11, 7:19, 8:4, 8:15, 8:23, 9:14, 9:19, 9:24, 10:14, 10:21,

11:13, 11:24, 13:1, 13:21, 14:2, 15:19, 16:22, 17:4, 18:23, 19:3, 19:20, 20:7, 21:6, 22:20, 23:4, 23:21, 24:4, 24:11, 24:24, 25:3, 25:10, 25:17, 25:23, 26:5, 27:22, 28:22, 29:13, 30:5, 30:18, 31:18, 34:24, 35:15, 35:20, 36:16, 36:21, 37:4, 37:14, 37:21, 38:5, 39:6, 39:17, 40:7, 41:23, 42:10, 43:14, 44:5, 45:9, 45:20, 46:15, 47:4, 49:17, 52:12, 52:18, 53:22, 56:1, 56:19, 57:4, 58:5, 58:11, 58:24, 59:16, 60:8, 61:13, 62:10, 63:16, 64:17, 65:9, 67:19, 69:1, 70:25, 71:24, 73:10, 73:24, 74:5, 75:11, 90:7, 91:9, 92:20, 99:10, 102:22, 103:21, 111:1, 112:11, 112:20, 112:25, 113:21, 114:12, 114:18, 115:23, 116:18, 117:1, 117:17, 118:3, 119:17, 120:6, 120:15, 121:16, 122:1, 122:24, 123:19, 124:6, 124:17, 126:16, 127:19, 128:17, 129:1, 129:8, 129:13, 130:4, 130:23, 132:14, 133:21, 134:4, 134:16, 135:12, 136:24, 139:5, 139:16, 142:10

**C**

**C.O** [4] - 81:15, 84:4, 133:11, 134:6
**Cage** [2] - 49:6, 49:10
**Calle** [7] - 50:17, 50:19, 51:1, 51:6, 52:2, 52:19, 65:2
**camp** [1] - 22:8
**campaign** [2] - 25:24, 76:1
**candid** [2] - 101:23, 118:22

**candidate** [1] - 22:2
**candidates** [2] - 74:25, 75:1
**candidly** [1] - 94:11
**cannot** [3] - 27:2, 61:7, 88:24
**capable** [2] - 80:22, 84:8
**Caprio** [10] - 1:14, 3:9, 5:9, 19:18, 44:3, 47:2, 53:20, 56:22, 68:13, 70:11
**CAPRIO** [141] - 5:8, 5:16, 5:18, 5:22, 5:24, 7:6, 7:16, 7:24, 8:1, 8:8, 8:13, 9:6, 9:11, 9:17, 9:22, 10:3, 10:12, 10:14, 10:20, 10:21, 11:13, 11:24, 13:1, 13:21, 14:2, 15:6, 15:18, 15:19, 16:22, 17:4, 17:22, 18:8, 18:23, 19:3, 19:11, 19:17, 19:19, 19:20, 20:7, 20:23, 21:2, 21:5, 21:6, 22:15, 22:20, 23:4, 23:13, 23:21, 24:4, 24:11, 24:24, 25:2, 25:3, 25:8, 25:10, 25:17, 25:23, 26:4, 26:5, 27:21, 27:22, 28:22, 29:13, 30:5, 30:18, 31:18, 34:23, 34:24, 35:15, 35:20, 36:16, 36:21, 37:4, 37:14, 37:21, 38:5, 39:6, 39:16, 39:17, 40:6, 40:7, 41:23, 42:4, 42:6, 42:10, 43:14, 44:4, 44:5, 45:9, 45:20, 46:15, 47:4, 49:17, 52:12, 52:18, 53:21, 53:22, 54:14, 55:23, 56:1, 56:18, 56:19, 57:1, 57:3, 58:5, 58:11, 58:24, 59:16, 60:1, 60:8, 61:13, 62:10, 63:15, 63:16, 64:8, 64:16, 64:17, 65:9, 66:11, 67:2, 67:18, 67:19, 68:14, 68:19, 68:22, 68:25, 69:1, 70:10, 70:13, 70:17, 70:21, 70:24, 70:25, 71:24, 73:10, 73:24, 74:5, 75:11, 76:2, 98:5, 98:11
**CAPRIO:** [1] - 57:4

**CAPTIO** [1] - 47:3
**capture** [1] - 13:19
**care** [1] - 20:5
**career** [1] - 101:13
**Carolina** [1] - 96:7
**Carollo** [85] - 5:5, 5:14, 7:2, 11:1, 11:4, 12:8, 12:18, 12:21, 13:3, 13:7, 16:4, 16:5, 16:6, 16:7, 16:8, 16:9, 16:10, 16:13, 16:19, 17:1, 17:9, 19:22, 20:2, 22:2, 22:8, 22:22, 25:24, 26:6, 26:11, 26:20, 27:8, 27:10, 30:20, 31:1, 31:7, 31:12, 31:25, 32:7, 32:14, 32:23, 33:5, 33:13, 33:20, 34:3, 34:13, 34:20, 35:5, 35:12, 36:3, 36:18, 37:1, 39:8, 40:13, 41:3, 45:22, 45:23, 45:24, 51:3, 51:24, 52:8, 52:13, 52:21, 53:13, 53:16, 54:11, 54:20, 55:7, 55:8, 55:18, 57:18, 58:8, 59:11, 64:21, 65:14, 67:21, 73:3, 73:16, 73:18, 74:12, 74:21, 75:14, 75:20, 75:24, 131:24, 133:14
**CAROLLO** [1] - 1:7
**Carollo's** [12] - 7:12, 21:9, 21:11, 21:16, 37:7, 48:21, 49:13, 57:5, 58:17, 59:5, 59:24, 73:25
**cars** [1] - 12:11
**carved** [3] - 71:8, 71:11
**Casa** [5] - 49:2, 49:3, 49:24, 50:2
**CASE** [1] - 1:3
**case** [46] - 8:16, 16:17, 18:18, 24:22, 39:3, 48:13, 76:9, 77:8, 77:19, 77:21, 78:2, 78:12, 78:13, 78:17, 79:16, 80:4, 80:15, 81:4, 81:7, 82:24, 84:14, 85:12, 85:14, 85:18, 85:19, 86:16, 88:21, 93:20, 94:2, 95:13, 95:15, 95:18, 96:15, 96:20, 97:4, 98:11, 109:5, 116:1, 124:25, 125:5,

126:1, 139:22, 140:2, 143:1
**case-in-chief** [5] - 77:19, 81:4, 81:7, 95:13, 95:15
**cases** [2] - 85:5, 85:7
**cash** [1] - 133:9
**categorization** [1] - 75:22
**category** [1] - 37:22
**catty** [1] - 56:8
**catty-cornered** [1] - 56:8
**caught** [1] - 7:21
**caused** [3] - 45:16, 45:23, 45:24
**CBS** [1] - 141:15
**CCSG** [1] - 48:16
**cert** [1] - 96:23
**certain** [5] - 67:7, 85:20, 86:21, 103:17, 106:6
**certainly** [6] - 13:17, 40:6, 61:19, 81:3, 84:3, 120:2
**certificate** [1] - 70:3, 104:7, 112:16, 114:4
**certifications** [1] - 100:21
**certify** [1] - 144:16
**cetera** [2] - 108:12
**cetera,** [1] - 108:6
**Chain** [25] - 11:7, 11:15, 12:6, 12:9, 44:11, 45:3, 45:15, 45:25, 47:5, 47:25, 49:3, 49:10, 50:5, 53:15, 56:8, 60:9, 64:19, 65:11, 68:10, 69:3, 69:25, 70:2, 70:5, 71:1, 71:25
**championship** [1] - 96:5
**change** [4] - 104:14, 123:22, 124:2, 124:3
**changed** [6] - 51:25, 138:25, 142:1, 142:3, 142:5
**Chapter** [8] - 102:11, 102:14, 102:15, 105:3, 105:13, 105:14, 105:18, 105:20
**chapter** [1] - 107:1
**character** [2] - 26:14, 27:2
**characterization** [1] - 25:20
**charge** [1] - 122:3
**check** [1] - 85:2

**chief** [6] - 21:16, 77:19, 81:4, 81:7, 95:13, 95:15
**childhood** [1] - 30:13
**chose** [1] - 96:2
**chosen** [1] - 96:1
**Chris** [1] - 96:6
**Christina** [2] - 57:8, 57:9
**Christmas** [1] - 31:23
**chronological** [3] - 80:25, 81:7, 83:20
**chronology** [4] - 81:10, 118:23, 125:15, 127:4
**church** [1] - 11:17
**Circuit** [3] - 95:17, 95:18, 96:21
**circumstance** [2] - 80:17, 119:9
**circumstances** [5] - 28:14, 41:10, 64:23, 65:18, 124:23
**cited** [2] - 9:3, 49:12
**citing** [1] - 95:16
**citizens** [1] - 65:25
**City** [79] - 7:14, 14:11, 14:19, 14:24, 15:9, 21:21, 22:4, 23:6, 23:12, 27:11, 29:16, 30:6, 30:10, 31:21, 37:8, 38:24, 41:13, 41:14, 41:17, 43:17, 43:21, 44:7, 44:9, 44:14, 44:16, 44:17, 44:23, 46:7, 46:18, 46:24, 46:25, 47:18, 51:6, 51:20, 61:6, 61:19, 65:20, 68:2, 68:6, 69:18, 71:9, 71:22, 80:19, 81:8, 82:3, 83:13, 84:20, 84:24, 87:10, 90:11, 91:16, 91:22, 94:18, 99:17, 100:17, 100:18, 104:22, 106:15, 110:6, 110:8, 113:14, 114:14, 114:20, 115:5, 116:20, 122:8, 123:24, 132:18, 136:7, 136:9, 136:13, 140:22, 141:14
**city** [10] - 22:1, 23:6, 30:11, 43:22, 43:23, 47:19, 63:6, 133:10, 141:12, 142:1
**Civil** [1] - 97:6
**civil** [1] - 84:14

**claim** [1] - 135:6
**clarification** [1] - 23:11
**clarify** [1] - 68:19
**clear** [11] - 13:10, 13:14, 23:22, 37:7, 77:11, 77:12, 77:14, 80:13, 94:5, 104:24, 118:22
**clearly** [5] - 7:1, 18:1, 18:10, 18:15, 132:17
**Clerk's** [1] - 131:21
**clients** [2] - 45:1, 45:2
**close** [3] - 45:16, 46:1, 100:12
**closed** [4] - 44:11, 45:25, 104:8, 138:22
**Code** [35] - 21:21, 94:4, 101:9, 101:23, 102:9, 102:16, 102:19, 103:2, 103:8, 103:9, 103:10, 103:11, 103:12, 103:13, 103:23, 104:1, 109:22, 109:24, 110:2, 110:12, 110:13, 111:12, 112:7, 112:12, 112:15, 112:21, 113:10, 118:12, 118:13, 125:8, 130:9, 131:15, 141:21
**code** [32] - 7:13, 7:22, 8:11, 8:16, 9:4, 9:16, 17:20, 22:5, 36:11, 51:13, 53:14, 54:2, 101:20, 102:11, 103:5, 103:7, 104:6, 104:19, 107:9, 108:14, 109:21, 111:7, 112:1, 113:6, 125:3, 125:10, 125:12, 125:13, 130:13, 132:18, 137:6, 140:22
**Codes** [1] - 101:11
**codes** [1] - 103:5
**coding** [2] - 85:20
**COLE** [1] - 2:3
**collaboration** [1] - 6:23
**collection** [1] - 29:23
**collectively** [1] - 6:24
**Com** [1] - 95:16
**combat** [1] - 99:21
**coming** [4] - 88:25, 121:23, 122:4, 122:6
**commenced** [3] -

29:12, 114:1, 116:3
**commend** [1] - 19:14
**commended** [1] -
30:10
**commenting** [1] -
15:14
**commercial** [6] -
72:14, 102:8, 104:4,
104:6, 107:18, 142:3
**Commission** [2] -
20:21, 68:7
**commission** [3] -
21:12, 22:24, 101:16
**Commissioner** [27] -
5:14, 7:2, 7:12, 13:7,
16:4, 16:5, 16:6,
16:7, 16:8, 16:9,
16:10, 16:13, 21:9,
21:11, 21:15, 27:8,
31:7, 37:1, 41:3,
54:11, 57:18, 57:19,
57:21, 58:8, 59:4,
59:24, 133:14
**commissioner** [8] -
21:1, 30:20, 31:8,
32:15, 33:6, 33:21,
34:4, 101:16
**commissioners** [2] -
71:10, 131:18
**common** [2] - 87:11,
87:18
**communication** [2] -
51:18, 78:18
**community** [4] -
43:24, 65:23, 65:25,
75:3
**company** [4] - 35:17,
35:22, 44:14, 108:25
**Company** [1] - 95:17
**complainant** [5] -
21:10, 21:14, 21:25,
22:7, 22:12
**complains** [1] - 97:11
**complaint** [25] - 19:21,
20:1, 20:15, 22:21,
23:5, 23:15, 24:5,
25:18, 26:1, 26:7,
54:12, 54:20, 55:8,
55:13, 55:17, 65:22,
75:4, 75:6, 75:8,
77:22, 82:19, 82:23,
83:16
**complaints** [9] -
64:20, 64:24, 65:2,
65:4, 65:11, 66:5,
66:11, 67:20, 68:4
**Complete** [1] - 48:15
**complete** [2] - 8:22,
141:5
**completed** [1] - 114:1

**completely** [2] -
127:3, 128:4
**completion** [2] -
114:3, 114:4
**Complex** [1] - 92:9
**complex** [1] - 106:14
**compliance** [62] -
7:14, 7:22, 8:12,
8:17, 30:8, 35:9,
37:23, 38:2, 38:7,
39:10, 39:12, 39:13,
39:19, 40:20, 41:7,
41:10, 41:12, 43:16,
54:2, 72:15, 81:2,
81:3, 81:14, 82:4,
83:1, 84:1, 84:2,
84:5, 84:6, 88:8,
89:5, 91:13, 91:21,
92:2, 92:13, 92:24,
94:8, 94:9, 107:13,
116:21, 121:18,
121:24, 122:4,
122:6, 125:3, 128:3,
130:13, 132:15,
132:20, 132:23,
133:6, 133:17,
134:17, 135:15,
138:6, 139:23,
140:18, 140:24,
141:1, 141:7
**compliant** [1] - 110:4
**complicated** [2] -
41:13, 41:14
**complied** [1] - 133:8
**complies** [1] - 111:6
**comply** [8] - 87:18,
94:12, 109:21,
109:24, 110:1,
110:12, 132:22,
141:7
**complying** [2] - 9:16,
72:17
**component** [2] -
109:4, 137:14
**components** [4] -
106:19, 108:8,
111:24, 111:25
**compound** [1] - 9:17
**comprised** [1] - 103:7
**computer** [2] - 61:20,
86:18
**concealed** [6] -
111:20, 111:23,
112:2, 116:1,
130:13, 130:15
**concealment** [1] -
111:16
**concept** [1] - 51:10
**concern** [2] - 28:19,
65:24

**concerned** [3] - 12:8,
28:18, 36:1
**concerning** [1] - 53:6
**concerns** [3] - 29:9,
80:1, 97:2
**conclusion** [1] - 23:9
**condition** [1] - 69:20
**conditional** [1] - 52:4
**conditioner** [1] -
129:18
**conditioning** [1] -
130:24
**conditions** [2] -
105:14, 135:8
**condo** [2] - 49:5, 66:2
**conduct** [2] - 111:13
**conducted** [7] - 44:9,
48:9, 74:16, 84:16,
84:19, 113:5, 113:6
**confirmed** [4] - 16:25,
22:6, 22:8, 55:17
**conforming** [1] -
77:17
**confronted** [1] - 21:18
**congratulations** [1] -
101:18
**connect** [1] - 72:9
**connection** [8] - 5:18,
29:17, 30:7, 51:7,
54:5, 54:9, 68:4,
75:7
**consent** [1] - 77:19
**consented** [2] - 77:18,
77:21
**consequences** [3] -
95:23, 96:4, 96:12
**conservation** [1] -
103:12
**consider** [1] - 74:15
**considered** [3] -
95:15, 106:16,
138:18
**consisting** [1] - 105:9
**consolidated** [1] -
103:6
**conspicuous** [4] -
116:5, 118:19,
125:5, 137:3
**construction** [25] -
9:21, 9:25, 28:5,
100:13, 100:14,
101:7, 105:9,
105:12, 105:16,
106:1, 106:19,
107:8, 109:25,
111:7, 111:14,
111:15, 111:19,
113:23, 113:25,
120:5, 122:8,
123:16, 138:12,

141:18
**Construction** [1] -
100:11
**Consulting** [1] - 48:16
**contacts** [1] - 22:1
**contained** [1] - 128:21
**container** [2] - 72:5,
72:10
**containers** [6] - 51:9,
51:19, 51:22, 110:3,
110:6, 110:8
**containing** [2] - 109:5,
109:7
**contemporaneous** [1]
- 73:14
**context** [4] - 108:3,
108:5, 137:16,
138:17
**continue** [12] - 25:7,
25:24, 26:23, 27:3,
62:11, 67:4, 68:20,
69:18, 117:2,
120:16, 143:9,
143:11
**continued** [2] - 6:7,
139:23
**CONTINUED** [2] - 2:1,
6:9
**Continued** [1] - 3:8
**continues** [1] - 46:13
**contracting** [2] -
14:18, 14:20
**contractor** [4] - 87:14,
106:8, 109:5, 116:6
**contractors** [3] -
118:8, 137:4, 142:18
**contradict** [1] - 95:14
**contributions** [1] -
74:25
**contruct** [1] - 104:14
**conversation** [1] -
54:8
**convert** [2] - 104:16,
127:16
**converting** [1] -
127:13
**coordination** [1] -
61:4
**copied** [4] - 47:15,
47:17, 48:20, 49:13
**copies** [1] - 136:4
**copy** [1] - 85:7
**cord** [2] - 110:19,
110:21
**cornered** [1] - 56:8
**correct** [99] - 5:22,
12:3, 17:10, 22:22,
22:25, 29:14, 31:10,
31:25, 32:16, 32:19,
38:7, 40:3, 40:11,

50:10, 50:12, 50:13,
50:15, 50:21, 50:22,
51:1, 51:3, 54:3,
58:15, 58:17, 58:19,
59:5, 60:22, 63:5,
63:18, 65:15, 67:22,
67:24, 69:25, 70:3,
73:5, 73:13, 73:20,
74:16, 84:25, 91:13,
107:16, 107:17,
109:14, 109:15,
110:5, 110:17,
111:12, 115:1,
115:11, 119:10,
119:11, 119:12,
119:13, 120:17,
120:20, 120:21,
120:24, 120:25,
121:1, 121:2, 121:3,
121:4, 124:7,
126:17, 126:18,
126:23, 126:25,
127:1, 127:7, 127:8,
130:8, 130:10,
130:16, 131:7,
131:11, 132:19,
132:24, 132:25,
133:3, 135:15,
135:16, 136:2,
136:3, 136:8,
136:12, 137:25,
138:24, 139:1,
139:8, 140:11,
140:17, 140:19,
140:20, 140:22,
141:1, 141:17,
141:22, 141:24,
142:14
**correct?"** [1] - 58:22
**cost** [1] - 119:9
**costs** [3] - 119:5,
140:14, 140:16
**Counsel** [1] - 101:9
**counsel** [15] - 5:7, 9:8,
24:22, 26:2, 26:19,
30:3, 42:23, 55:24,
59:17, 59:19, 64:11,
77:25, 78:24, 79:18,
89:10
**County** [12] - 23:12,
100:8, 100:10,
101:1, 101:6, 101:7,
102:6, 125:10,
125:13, 131:22,
131:23
**county** [2] - 101:1,
125:12
**couple** [4] - 76:24,
78:5, 97:3, 107:23
**course** [9] - 42:22,

43:3, 71:12, 80:15, 82:20, 84:19, 88:19, 88:23, 136:6
**court** [3] - 36:10, 95:10, 103:16
**COURT** [312] - 1:1, 5:3, 5:11, 5:15, 5:17, 5:21, 5:23, 5:25, 6:3, 7:7, 7:9, 7:18, 8:3, 8:10, 8:14, 8:19, 9:8, 9:13, 9:18, 9:23, 10:5, 10:10, 11:10, 11:12, 11:21, 11:23, 12:25, 13:6, 13:9, 13:13, 13:16, 14:1, 15:4, 15:7, 15:13, 15:15, 15:17, 16:21, 17:3, 17:15, 17:17, 17:24, 18:7, 18:9, 18:20, 18:22, 19:2, 19:7, 19:13, 19:16, 19:18, 20:6, 20:22, 20:24, 21:4, 22:18, 23:2, 23:10, 23:17, 23:20, 23:25, 24:3, 24:9, 24:16, 24:18, 24:23, 25:1, 25:7, 25:15, 25:21, 26:3, 26:9, 26:17, 26:19, 26:21, 27:5, 27:7, 27:9, 27:14, 27:20, 28:21, 29:7, 30:1, 30:3, 30:17, 31:15, 31:17, 35:14, 35:19, 36:9, 36:15, 36:20, 37:3, 37:13, 37:19, 38:4, 38:12, 38:18, 38:22, 39:5, 39:15, 41:20, 41:22, 42:9, 42:14, 42:16, 42:18, 42:21, 43:4, 43:6, 43:12, 44:1, 44:3, 44:21, 45:8, 45:14, 45:19, 46:6, 46:8, 46:10, 46:14, 46:20, 46:22, 47:2, 48:7, 49:16, 49:23, 51:17, 52:11, 52:17, 53:12, 53:19, 54:18, 55:4, 55:11, 55:15, 56:10, 56:13, 56:17, 56:22, 57:2, 57:25, 58:4, 58:10, 58:23, 59:7, 59:10, 59:15, 60:2, 61:12, 61:25, 62:3, 62:6, 62:9, 62:15, 62:18, 62:23, 63:1, 63:9, 63:14, 64:7, 64:9, 64:15, 65:7, 66:8, 66:13, 66:24, 67:3, 67:12, 67:15,

68:12, 68:17, 68:21, 68:24, 69:8, 69:13, 70:9, 70:11, 70:15, 70:18, 70:22, 71:5, 71:7, 71:19, 71:23, 73:9, 73:23, 74:4, 75:10, 75:23, 76:3, 76:6, 76:17, 76:20, 77:2, 77:12, 78:12, 78:16, 79:3, 79:7, 79:11, 79:20, 79:23, 80:3, 80:6, 81:16, 81:24, 82:7, 82:13, 83:2, 83:6, 83:22, 83:24, 85:7, 86:10, 86:14, 86:21, 87:17, 88:9, 88:15, 88:19, 89:3, 89:7, 89:12, 89:22, 90:2, 90:3, 91:7, 92:18, 93:3, 93:6, 93:10, 94:22, 95:4, 95:7, 97:25, 98:8, 98:13, 98:16, 98:19, 98:21, 98:23, 99:2, 102:20, 103:15, 103:20, 110:22, 110:24, 112:8, 112:19, 112:24, 113:16, 113:18, 114:9, 114:11, 114:17, 115:2, 115:18, 115:22, 116:24, 117:6, 117:10, 117:13, 117:15, 117:22, 118:1, 119:16, 120:1, 120:14, 121:8, 121:14, 121:22, 121:25, 122:21, 123:4, 123:14, 123:18, 124:5, 124:13, 126:12, 126:14, 127:12, 127:15, 128:16, 128:25, 129:7, 129:12, 129:24, 130:2, 130:22, 131:2, 132:9, 132:12, 133:19, 134:3, 134:13, 134:21, 134:24, 135:2, 135:10, 136:19, 137:9, 138:15, 139:4, 139:15, 142:7, 142:23, 143:8, 144:5, 144:7, 144:9, 144:11
**Court** [28] - 2:10, 2:10, 5:1, 15:5, 15:10,

27:1, 63:11, 68:19, 70:18, 78:8, 78:15, 79:18, 85:6, 85:21, 87:8, 88:3, 88:4, 93:9, 93:12, 93:13, 93:16, 93:19, 95:8, 95:20, 96:21, 96:22, 112:10, 144:24
**Court's** [3] - 42:24, 83:8, 97:19
**Courtney** [2] - 1:14, 5:9
**COURTROOM** [9] - 5:2, 5:5, 10:19, 76:12, 89:14, 89:16, 97:23, 98:6, 143:4
**courtroom** [9] - 6:2, 54:25, 56:25, 76:13, 78:14, 89:13, 97:24, 98:7, 143:6
**courts** [2] - 24:13, 25:12
**cover** [3] - 12:21, 127:10, 127:11
**covered** [1] - 13:20
**covering** [1] - 13:11
**coverings** [1] - 104:17
**COVID** [1] - 33:4, 44:10, 44:24
**cracks** [1] - 131:8
**crazy** [1] - 89:11
**create** [3] - 92:14, 94:6, 137:12
**criteria** [1] - 107:24
**cross** [18] - 10:23, 15:25, 17:16, 27:24, 30:22, 32:3, 36:1, 40:18, 44:6, 47:9, 52:23, 57:16, 60:6, 60:10, 64:18, 65:12, 94:16, 94:23
**CROSS** [1] - 6:9
**Cross** [1] - 3:8
**cross-examination** [15] - 10:23, 15:25, 17:16, 27:24, 30:22, 32:3, 36:1, 40:18, 44:6, 47:9, 57:16, 60:6, 60:10, 64:18, 65:12
**Cross-Examination** [1] - 3:8
**CROSS-EXAMINATION** [1] - 6:9
**cross-examine** [2] - 94:16, 94:23
**cross-examined** [1] - 52:23
**CRR** [2] - 2:9, 144:23

**CU** [4] - 69:20, 69:23, 69:24, 71:12
**Culturales** [2] - 58:19, 59:1
**current** [2] - 21:16, 90:11
**Curtis** [1] - 142:11
**CUs** [1] - 71:15
**custodial** [1] - 84:23
**custodian** [19] - 80:18, 80:23, 81:9, 81:18, 81:20, 81:25, 82:3, 82:6, 82:7, 82:12, 87:10, 87:21, 88:6, 88:17, 88:21, 89:2, 114:13

# D

**Dade** [12] - 23:12, 100:8, 101:1, 101:6, 101:7, 102:6, 125:10, 125:12, 125:13, 131:21, 131:22, 131:23
**Dadeland** [2] - 2:4
**daily** [1] - 113:8
**Daily** [1] - 85:8
**Daniel** [1] - 47:18
**data** [1] - 105:11
**date** [30] - 28:17, 31:5, 32:4, 32:10, 32:12, 32:18, 32:21, 33:3, 33:11, 33:18, 34:1, 34:11, 34:18, 35:3, 35:7, 39:7, 40:1, 40:10, 40:25, 48:23, 50:24, 72:20, 74:9, 125:25, 126:2, 126:3, 126:17, 140:3, 142:4
**dated** [3] - 125:24, 127:6, 127:22
**dates** [1] - 59:2
**daughter** [1] - 57:10
**DAVIS** [1] - 1:21
**Dawson** [2] - 2:4, 5:13
**days** [11] - 29:15, 78:5, 96:18, 109:14, 109:16, 109:17, 109:21, 110:1, 110:7, 110:9, 110:11
**dddddnow** [1] - 50:17
**DE** [2] - 83:12, 87:4
**debilitating** [1] - 55:1
**December** [3] - 30:20, 31:9, 74:1
**decided** [2] - 96:9, 143:12

**decision** [7] - 42:24, 42:25, 45:17, 95:10, 95:21, 96:3, 96:4
**deemed** [1] - 77:20
**deems** [1] - 87:8
**defend** [3] - 26:11, 54:23, 143:15
**defendant** [15] - 54:18, 95:9, 95:21, 95:24, 96:1, 96:3, 96:13, 96:16, 96:17, 97:9, 97:10, 97:16, 97:17
**Defendant** [1] - 1:8
**DEFENDANT** [2] - 1:17, 2:3
**Defendant's** [19] - 28:8, 31:4, 32:2, 32:25, 33:8, 33:15, 33:23, 34:8, 34:15, 34:25, 35:7, 37:23, 39:18, 40:6, 40:16, 41:5, 47:20, 50:23, 136:17
**DEFENDANT'S** [2] - 3:19, 4:13
**defendant's** [4] - 47:23, 82:17, 82:24, 113:20
**defendants** [1] - 97:11
**defendants'** [1] - 83:11
**Defense** [12] - 32:9, 32:17, 49:20, 57:7, 57:11, 57:14, 60:10, 72:19, 74:6, 115:13, 115:16, 115:20
**defense** [4] - 80:1, 81:6, 95:13, 98:13
**defer** [2] - 106:21, 106:22
**deferred** [1] - 106:22
**define** [1] - 59:8
**defined** [1] - 51:13
**degree** [3] - 99:24, 99:25, 100:1
**degrees** [2] - 93:23, 100:21
**delegate** [1] - 107:15
**deliberate** [1] - 143:11
**deliberations** [1] - 124:1
**demand** [1] - 22:5
**demo** [1] - 133:9
**demolish** [7] - 28:10, 28:14, 43:18, 43:19, 104:14, 115:24, 124:19
**demolishing** [1] - 42:2
**demolition** [9] -

108:20, 108:24,
119:10, 123:8,
125:20, 126:10,
132:22, 139:11,
139:14
**demoted** [1] - 27:17
**denied** [2] - 43:6,
56:10
**denies** [1] - 96:23
**Dennis** [2] - 17:6, 17:8
**denoting** [1] - 95:11
**department** [26] -
22:4, 38:13, 38:19,
41:16, 51:10, 51:19,
81:21, 82:1, 82:2,
83:12, 84:24, 86:2,
90:18, 90:20, 91:17,
91:22, 98:18,
100:18, 107:25,
113:5, 113:8, 118:6,
133:16, 136:15,
140:14, 141:3
**Department** [8] -
14:25, 21:22, 38:25,
104:5, 104:8, 105:4,
114:14, 115:5
**depicted** [2] - 117:3,
128:13
**depose** [1] - 97:16
**deposition** [5] - 81:22,
86:6, 86:10, 86:12,
86:15
**DEPUTY** [9] - 5:2, 5:5,
10:19, 76:12, 89:14,
89:16, 97:23, 98:6,
143:4
**describe** [10] - 28:24,
41:10, 41:25, 48:3,
49:18, 51:5, 64:23,
84:15, 102:13, 138:8
**described** [1] - 97:10
**describing** [1] - 80:22
**description** [1] - 81:8
**Design** [1] - 100:11
**design** [6] - 100:13,
105:13, 105:17,
106:17, 108:13,
131:10
**designate** [1] - 83:8
**designated** [6] -
81:25, 82:7, 82:9,
82:12, 87:21, 112:9
**designed** [1] - 106:24
**designer** [1] - 100:24
**desire** [2] - 45:25,
142:22
**desires** [1] - 80:16
**destroy** [6] - 27:1,
27:2, 27:3, 27:12,
45:16, 45:25

**destroyed** [1] - 59:13
**detail** [2] - 107:21,
108:7
**detailing** [1] - 141:19
**details** [1] - 61:15
**determination** [1] -
52:5
**determine** [9] - 55:7,
87:13, 91:24, 92:21,
92:23, 94:7, 122:8,
122:10, 128:19
**determined** [3] - 29:3,
29:6, 132:2
**develop** [3] - 29:19,
61:5, 70:19
**development** [3] -
100:15, 101:13,
102:8
**devised** [1] - 6:20
**dialogue** [3] - 65:23,
66:19, 75:3
**Diaz** [5] - 17:19, 17:21,
18:12, 18:16, 19:9
**difference** [1] - 97:13
**different** [6] - 6:23,
7:2, 7:3, 30:23,
100:14, 111:14
**differently** [1] - 69:16
**difficult** [1] - 29:21
**diffuse** [1] - 67:7
**digest** [1] - 51:11
**Dire** [2] - 3:12, 3:13
**dire** [3] - 88:10, 89:8,
89:21
**DIRE** [2] - 90:6, 91:8
**DIRECT** [1] - 99:9
**direct** [6] - 3:22, 6:13,
14:6, 51:18, 58:14,
143:20
**directed** [1] - 77:9
**Director** [1] - 91:10
**director** [22] - 17:19,
47:18, 53:14, 54:2,
81:9, 82:1, 82:25,
83:12, 86:1, 90:13,
90:14, 90:18, 90:20,
98:18, 100:10,
100:18, 100:19,
114:13, 122:3,
122:5, 136:7
**disclose** [4] - 82:18,
119:4, 119:5, 119:7
**disclosed** [6] - 81:19,
96:14, 97:7, 97:12,
97:13, 119:3
**discovery** [2] - 96:2
**discretion** [1] - 106:12
**discuss** [5] - 51:14,
76:9, 88:18, 143:1,
143:2

**discussed** [4] - 5:18,
6:18, 21:3, 98:14
**discusses** [1] - 107:2
**discussing** [1] - 40:17
**discussion** [1] - 18:1
**disguise** [1] - 13:11
**dismissed** [2] - 20:21,
55:21
**disrespected** [1] -
15:10
**disruptive** [1] - 96:24
**distillery** [1] - 50:20
**District** [11] - 2:10,
21:13, 30:20, 31:7,
32:15, 33:6, 33:20,
34:3, 85:11, 85:18,
144:24
**district** [5] - 6:17,
7:14, 16:23, 71:10,
71:14
**DISTRICT** [3] - 1:1,
1:1, 1:11
**districts** [2] - 71:8,
71:15
**division** [2] - 100:10,
100:11
**Division** [1] - 100:11
**docket** [2] - 5:24,
83:11
**document** [44] -
15:24, 18:1, 18:10,
19:24, 20:5, 32:3,
32:21, 33:3, 33:11,
33:18, 34:1, 35:8,
38:10, 40:10, 47:8,
47:11, 47:15, 47:17,
47:22, 47:24, 50:24,
56:12, 56:15, 56:20,
60:15, 62:16, 62:19,
72:13, 74:19, 87:2,
89:11, 106:17,
118:5, 118:6,
119:18, 125:16,
125:25, 126:7,
126:14, 131:11,
133:8, 138:1,
141:11, 142:17
**documentary** [1] -
91:25
**documentation** [1] -
138:5
**documented** [3] -
22:12, 81:11, 131:8
**documenting** [4] -
137:15, 137:18,
138:18, 141:13
**documents** [29] -
38:15, 38:20, 38:23,
38:25, 39:2, 60:4,
61:19, 63:6, 87:3,

88:7, 94:20, 105:6,
105:9, 105:10,
105:12, 105:16,
106:1, 106:2,
106:13, 107:3,
107:5, 107:7,
107:13, 108:19,
133:22, 134:17,
137:24
**dollars** [2] - 43:21,
100:13
**donating** [1] - 75:12
**done** [34] - 9:21, 17:1,
44:13, 44:18, 44:22,
44:23, 45:1, 48:4,
48:10, 61:9, 71:17,
79:4, 80:19, 81:1,
81:11, 92:3, 92:17,
92:18, 92:22, 93:16,
94:7, 97:4, 116:2,
120:5, 120:17,
120:20, 122:17,
124:10, 129:4,
129:14, 133:17,
135:14, 138:18,
139:3
**Dooley** [3] - 41:17,
41:24, 52:9
**door** [5] - 66:17,
68:15, 69:16,
118:15, 118:21
**doors** [2] - 106:23,
123:11
**double** [2] - 141:23,
142:2
**down** [23] - 20:15,
21:23, 32:9, 32:17,
32:25, 34:8, 34:15,
39:16, 40:15, 47:20,
47:21, 48:25, 50:7,
50:16, 55:19, 57:3,
64:16, 74:11, 76:4,
76:20, 89:15,
121:15, 143:5
**driving** [1] - 11:2
**duplicative** [1] - 138:1
**during** [8] - 12:16,
27:23, 30:24, 45:1,
51:5, 78:11, 111:14,
144:3
**duties** [1] - 136:7
**duty** [9] - 84:9, 84:12,
84:13, 94:5, 112:4,
114:19, 114:24,
136:11
**DX** [9] - 113:14,
120:22, 122:25,
123:6, 124:18,
125:15, 127:25,
131:12, 136:23

**DX691** [1] - 102:23

## E

**e-mail** [5] - 45:22,
48:20, 53:24, 54:6,
54:9
**e-mails** [1] - 93:15
**Eastern** [1] - 85:9
**ECF** [1] - 5:24
**effect** [2] - 70:10,
96:10
**effort** [3] - 27:10,
59:12, 61:17
**either** [3] - 16:15,
27:16, 84:1
**EI** [3] - 52:25, 53:2,
56:7
**elected** [3] - 7:4, 7:13,
73:4
**election** [2] - 21:9,
21:12
**electric** [6] - 61:3,
125:19, 125:22,
125:23, 129:15,
129:18
**electrical** [14] - 62:13,
103:23, 104:17,
106:9, 108:17,
110:15, 111:24,
113:24, 113:25,
129:5, 129:9,
130:18, 130:19,
139:10
**elevations** [1] - 108:6
**Eleventh** [2] - 95:18,
96:21
**elicit** [1] - 80:1
**emotionally** [1] - 27:3
**employed** [2] - 94:13,
94:17
**employee** [1] - 22:1
**employees** [1] - 48:21
**Employees** [1] - 85:10
**end** [3] - 111:10,
111:15, 133:22
**energy** [3] - 54:24,
102:5, 103:12
**Enforcement** [1] -
21:21
**enforcement** [2] -
22:5, 53:14
**engaging** [1] - 75:2
**engineer** [2] - 99:21,
106:11
**engineering** [1] -
141:19
**engineers** [1] -
105:19, 106:19,
106:25

**enjoy** [1] - 144:12
**enlarge** [4] - 15:23,
20:17, 104:14,
104:16
**ensuing** [1] - 124:7
**ensure** [3] - 111:16,
111:25, 130:12
**entered** [5] - 6:2, 38:6,
89:13, 97:24, 98:7
**entering** [1] - 8:11
**entire** [9] - 27:10,
29:2, 36:11, 45:2,
112:6, 120:19,
122:15, 124:14,
129:21
**entirely** [1] - 75:14
**entitled** [3] - 65:4,
84:15, 144:18
**entry** [2] - 82:5, 139:6
**envelope** [9] - 123:7,
123:9, 123:12,
123:20, 123:23,
124:2, 138:22,
138:23, 138:25
**envelopes** [1] - 123:11
**equipment** [2] -
113:24, 114:1
**equitably** [1] - 48:11
**erect** [1] - 104:15
**escalation** [1] - 26:13
**Esq** [9] - 1:13, 1:14,
1:14, 1:15, 1:18,
1:21, 1:24, 2:3, 2:4
**essentially** [1] - 11:6
**establish** [7] - 65:8,
80:25, 86:25, 91:17,
91:23, 92:1, 94:3
**estate** [2] - 16:16,
16:17
**et** [4] - 5:5, 108:6,
108:12
**ethics** [14] - 19:21,
20:1, 21:1, 22:21,
22:24, 23:5, 24:5,
25:18, 25:25, 26:6,
75:4, 75:5, 75:6,
75:8
**Ethics** [1] - 20:21
**event** [7] - 21:17,
21:19, 21:25, 57:6,
58:2, 58:6, 58:7
**events** [9] - 18:2,
18:11, 22:4, 28:24,
30:24, 41:25, 52:13,
52:19, 59:24
**eventually** [4] - 21:18,
111:20, 111:23,
130:12
**evidence** [50] - 7:6,
8:1, 8:8, 8:13, 8:16,

9:7, 9:12, 9:22, 10:3,
15:22, 19:23, 20:22,
20:23, 21:4, 24:15,
24:17, 27:19, 28:9,
31:3, 31:16, 37:25,
45:22, 47:7, 47:21,
51:16, 56:12, 56:16,
57:14, 60:12, 72:12,
75:9, 92:1, 93:25,
94:3, 95:11, 95:24,
102:18, 113:13,
113:20, 115:19,
115:21, 117:13,
118:24, 126:15,
132:8, 132:13,
136:17, 136:22,
137:12, 138:25
**EVIDENCE** [2] - 3:3,
3:19
**evidences** [1] - 137:24
**evidencing** [1] - 22:12
**evidentiary** [2] -
79:24, 138:5
**exact** [4] - 45:17,
61:15, 93:8, 93:12
**exactly** [4] - 81:11,
85:13, 89:22, 117:3
**EXAMINATION** [5] -
6:9, 10:13, 90:6,
91:8, 99:9
**Examination** [5] - 3:8,
3:9, 3:12, 3:13, 3:22
**examination** [20] -
10:23, 15:25, 17:16,
27:24, 30:22, 32:3,
36:1, 40:18, 44:6,
47:9, 57:16, 58:15,
60:5, 60:6, 60:10,
64:18, 65:12, 107:2,
107:5, 107:7
**examinations** [1] -
41:15
**examine** [4] - 94:16,
94:23, 107:6, 107:13
**examined** [3] - 52:23,
107:6, 107:15
**examines** [1] - 109:1
**example** [6] - 25:18,
49:24, 88:20,
106:14, 106:21,
108:9
**exams** [1] - 100:2
**excellent** [1] - 30:9
**except** [3] - 31:22,
69:17, 69:19
**excluding** [1] - 87:22
**Excuse** [1] - 42:16
**excuse** [3] - 57:7,
60:14, 143:12
**excused** [3] - 76:5,

93:6, 93:7
**execute** [1] - 27:12
**executed** [1] - 133:9
**exemptions** [2] -
106:3, 106:6
**exercise** [1] - 137:15
**EXHIBIT** [1] - 4:3
**Exhibit** [13] - 4:7,
10:18, 32:2, 49:20,
113:20, 115:13,
115:16, 115:20,
128:18, 128:21,
136:2, 136:17,
136:22
**exhibit** [6] - 4:15,
35:24, 40:4, 117:9,
126:5, 126:19
**exhibits** [4] - 37:22,
80:8, 80:9, 80:10
**EXHIBITS** [2] - 4:4,
4:13
**Exhibits** [1] - 4:6
**exist** [1] - 105:15
**existing** [3] - 102:3,
103:10, 131:5
**exists** [1] - 69:10
**exited** [2] - 76:13,
143:6
**expected** [5] - 12:9,
12:10, 63:12, 82:18,
83:15
**expensive** [1] - 54:25
**expert** [8] - 80:2, 80:4,
85:24, 110:23,
112:6, 112:8,
112:10, 114:10
**expert-type** [1] - 80:2
**expired** [1] - 114:3
**explain** [12] - 14:15,
17:18, 28:13, 38:1,
44:8, 53:9, 60:22,
60:25, 65:17, 90:20,
107:20, 129:3
**explained** [4] - 24:20,
53:16, 56:8, 66:20,
66:25, 84:8
**exponentially** [1] -
7:15
**expressed** [2] - 22:9,
97:2
**extending** [1] - 123:8
**extension** [2] -
110:19, 110:21
**extensions** [1] -
109:19
**extensive** [2] - 107:23,
139:11
**exterior** [6] - 122:17,
124:10, 127:10,
127:22, 127:23,

128:8
**external** [1] - 143:20
**extra** [1] - 41:16
**extremely** [1] - 55:1

**F**

**F.A.U** [1] - 99:25
**F.I.U** [3] - 98:18, 99:24
**F2d** [1] - 95:17
**fabricated** [2] - 54:20,
55:19
**facade** [1] - 127:10
**face** [5] - 12:21, 13:11,
13:19, 13:23, 87:22
**facilities** [1] - 110:19
**Facility** [1] - 53:3
**fact** [15] - 12:14,
14:21, 17:1, 20:16,
22:6, 29:3, 29:8,
37:2, 53:16, 54:20,
55:7, 55:17, 59:13,
85:17, 93:20
**facts** [18] - 7:6, 8:1,
8:8, 8:13, 9:7, 9:11,
9:22, 10:3, 19:6,
24:17, 31:16, 37:18,
45:13, 61:20, 61:21,
69:10, 93:22, 95:12
**failure** [1] - 81:4
**fair** [5] - 18:24, 48:10,
48:12, 127:3, 143:15
**fairness** [1] - 143:18
**familiar** [19] - 53:24,
58:12, 59:20,
101:10, 101:20,
102:11, 102:23,
108:13, 113:1,
113:3, 113:10,
115:7, 122:12,
126:7, 131:12,
132:15, 135:22,
135:25, 141:11
**family** [3] - 138:11,
141:15
**famous** [1] - 57:17
**far** [3] - 65:1, 66:3,
118:15
**Far** [1] - 85:9
**farmer's** [3] - 50:20,
52:3, 52:7
**fashion** [1] - 43:2
**faster** [1] - 104:10
**father** [4] - 14:17,
14:18, 14:19, 73:15
**FBC** [2] - 125:7,
141:21
**February** [6] - 32:22,
90:15, 90:17, 90:19,
132:2, 140:3

**Federal** [1] - 97:6
**federal** [2] - 24:6,
25:12
**fee** [2] - 141:23, 142:2
**fees** [8] - 60:19, 63:4,
63:8, 63:18, 63:20,
63:24, 63:25, 142:4
**feet** [1] - 119:12
**FELDMAN** [1] - 1:18
**felt** [3] - 18:12, 67:8
**festival** [1] - 58:14
**Festival** [1] - 58:17
**few** [9] - 9:3, 71:14,
100:19, 125:20,
142:11
**field** [1] - 111:6
**fifth** [1] - 81:5
**Fifth** [1] - 95:17
**file** [13] - 5:19, 23:5,
23:14, 55:6, 55:12,
121:19, 122:12,
122:15, 123:25,
128:4, 140:7, 141:6,
143:3
**filed** [16] - 5:21, 19:22,
20:2, 20:9, 20:10,
21:1, 22:22, 24:5,
25:25, 26:6, 55:1,
55:5, 55:21, 75:5,
95:8, 136:17
**files** [2] - 91:19, 144:4
**final** [12] - 46:23,
95:19, 95:22, 96:14,
97:14, 124:19,
124:21, 124:22,
124:24, 125:2,
133:25, 139:22
**finalized** [1] - 51:8
**finally** [3] - 74:6,
103:22, 128:6
**finance** [1] - 47:18
**financial** [1] - 74:24
**financially** [1] - 27:2
**fine** [6] - 77:4, 77:13,
136:20, 136:21,
144:1, 144:7
**fined** [2] - 50:11,
50:14
**fines** [1] - 50:2
**fingerprints** [1] - 37:7
**finish** [3] - 83:22,
87:7, 133:10
**finished** [1] - 63:12
**finitely** [1] - 68:9
**fire** [3] - 29:1, 29:2,
108:11
**Fire** [1] - 103:1
**firms** [1] - 100:4
**first** [47] - 20:17, 21:8,
23:6, 24:6, 24:12,

24:13, 24:25, 25:4, 25:11, 25:12, 25:18, 28:10, 28:14, 37:24, 44:25, 45:4, 53:2, 59:18, 74:14, 75:24, 77:5, 78:21, 80:3, 80:25, 81:19, 85:14, 87:13, 88:5, 88:10, 91:22, 97:21, 98:3, 98:13, 101:23, 104:19, 105:18, 106:22, 111:3, 115:24, 116:1, 116:2, 117:20, 123:21, 124:24, 134:19, 137:1, 139:21
**fit** [1] - 29:10
**five** [11] - 16:6, 16:13, 29:20, 44:17, 44:22, 95:2, 96:20, 100:12, 109:23, 132:25, 133:2
**five-year** [1] - 109:23
**fix** [2] - 42:1, 42:12
**Flagler** [1] - 1:19
**flip** [2] - 121:9, 138:8
**flipping** [2] - 117:8, 121:11
**floor** [3] - 66:2, 108:5, 120:8
**FLORIDA** [1] - 1:1
**Florida** [60] - 1:5, 1:16, 1:19, 1:22, 1:25, 2:5, 2:11, 84:9, 84:22, 85:3, 85:12, 85:18, 94:4, 100:3, 100:22, 100:24, 101:10, 101:16, 101:23, 102:9, 102:15, 102:18, 103:1, 103:8, 103:9, 103:10, 103:12, 103:13, 103:25, 104:5, 104:7, 105:3, 105:14, 105:19, 105:21, 106:5, 109:22, 109:24, 110:1, 110:12, 110:13, 112:7, 112:12, 112:15, 112:21, 113:9, 114:19, 118:12, 118:13, 125:7, 130:9, 131:15, 136:11, 141:21, 144:25
**focus** [2] - 12:17, 70:11
**folio** [1] - 39:24

**folios** [1] - 40:24
**following** [3] - 11:18, 12:10, 95:10
**follows** [3] - 6:8, 90:5, 99:8
**Fonda** [1] - 49:4
**footage** [1] - 119:7
**FOR** [3] - 1:13, 1:17, 2:3
**force** [2] - 26:24, 143:15
**forcing** [1] - 21:23
**foregoing** [1] - 144:16
**forget** [1] - 142:4
**form** [2] - 77:21, 143:1
**formulate** [1] - 76:10
**FORT** [1] - 1:2
**Fort** [1] - 1:5
**forth** [1] - 77:23
**fortunate** [3] - 100:7, 101:15
**forward** [26] - 16:4, 16:5, 16:6, 16:7, 16:8, 16:9, 27:3, 30:19, 43:1, 43:7, 47:22, 64:9, 71:15, 77:7, 77:10, 77:19, 88:1, 92:2, 94:7, 97:5, 118:20, 121:19, 128:5, 140:12, 140:18, 141:9
**fought** [4] - 46:1, 46:7, 46:24, 46:25
**foul** [1] - 43:17
**foundation** [19] - 20:4, 24:15, 27:19, 31:14, 36:7, 36:23, 38:3, 39:4, 48:5, 52:10, 53:11, 57:23, 58:9, 59:18, 71:4, 73:22, 80:23, 108:6, 129:22
**four** [1] - 16:7
**FP** [1] - 61:4
**FPR** [2] - 2:9, 144:23
**frame** [4] - 12:17, 30:24, 30:25, 75:22
**framing** [1] - 108:6
**free** [1] - 75:25
**frequency** [1] - 111:4
**Friday** [3] - 28:17, 28:18, 28:25
**Fridays** [4] - 57:6, 58:25, 59:5, 59:21
**front** [7] - 12:14, 61:17, 63:18, 106:16, 120:2, 126:20, 142:21
**fuel** [1] - 103:9
**full** [2] - 49:13, 99:18

**fuller** [2] - 5:5, 134:1
**FULLER** [3] - 1:4, 3:7, 6:7
**Fuller** [54] - 7:9, 8:19, 10:15, 10:22, 10:25, 14:5, 15:18, 15:23, 19:24, 20:4, 20:8, 21:7, 21:24, 25:11, 27:21, 28:11, 31:5, 32:18, 33:1, 35:10, 37:15, 38:1, 38:6, 39:20, 43:9, 43:15, 45:10, 46:6, 46:8, 47:8, 49:9, 49:16, 50:24, 53:24, 56:2, 59:20, 60:15, 61:14, 61:25, 64:9, 67:4, 69:14, 71:19, 72:12, 72:19, 74:7, 76:4, 81:14, 90:21, 121:17, 121:23, 128:2, 133:23
**funded** [1] - 29:22

## G

**game** [2] - 96:5, 96:7
**gap** [1] - 67:10
**Garcia** [3] - 12:3, 48:19, 49:14
**Garcia's** [2] - 49:19, 49:25
**Gardner** [1] - 5:13
**gas** [2] - 103:10, 104:17
**Gas** [1] - 49:4
**gathered** [1] - 22:10
**gears** [4] - 47:5, 57:5, 68:1, 72:3
**general** [2] - 107:21, 119:2
**gentleman** [4] - 18:13, 80:9, 93:21, 94:19
**gentlemen** [5] - 10:16, 76:10, 99:13, 133:5, 142:24
**gentrification** [2] - 6:12, 6:13
**geotechnical** [1] - 105:10
**given** [6] - 15:9, 90:15, 97:16, 104:7, 135:13, 138:3
**glenda** [1] - 98:21
**GLENDA** [2] - 2:9, 144:23
**God** [2] - 89:18, 98:25
**got-you** [1] - 97:1
**Government** [1] - 85:10

**governor** [1] - 101:15
**grab** [1] - 95:2
**graduated** [2] - 99:18, 99:20
**grandfathered** [2] - 69:17, 69:21
**grant** [2] - 70:18, 109:18
**great** [4] - 30:10, 99:19, 100:16, 144:6
**grew** [1] - 30:11
**gringo** [1] - 74:15
**gringo-speaking** [1] - 74:15
**grossly** [1] - 107:20
**ground** [1] - 110:4
**grounds** [15] - 11:10, 11:21, 13:6, 13:13, 17:15, 41:20, 44:1, 59:7, 62:3, 62:23, 66:24, 114:9, 117:22, 121:22, 126:12
**group** [1] - 22:10
**Group** [3] - 20:5, 20:10, 48:16
**GROUP** [1] - 1:13
**guess** [2] - 98:20, 103:11
**guests** [1] - 12:6
**guided** [1] - 29:9
**guidelines** [1] - 51:23
**guiding** [1] - 18:13
**Gustavo** [2] - 56:5, 57:10
**GUTCHESS** [89] - 79:14, 79:24, 80:5, 80:8, 81:19, 82:5, 82:11, 82:17, 83:21, 83:23, 85:1, 85:5, 85:8, 86:13, 86:17, 87:6, 88:16, 89:1, 89:9, 89:20, 89:23, 90:1, 90:7, 91:6, 92:16, 92:19, 93:2, 93:4, 93:8, 93:11, 94:13, 95:1, 98:4, 102:21, 110:20, 110:23, 112:5, 112:18, 112:23, 113:17, 114:8, 114:10, 114:15, 114:25, 115:14, 115:21, 116:15, 116:23, 116:25, 117:4, 117:8, 117:21, 117:23, 119:15, 119:24, 120:12, 121:6, 121:11, 121:15,

121:21, 121:23, 123:2, 123:13, 123:15, 124:4, 124:12, 126:11, 126:13, 127:9, 127:13, 128:14, 128:24, 129:6, 129:10, 129:17, 129:21, 130:20, 130:25, 132:10, 133:18, 134:2, 134:10, 134:20, 134:25, 135:7, 136:20, 138:13, 139:2, 139:13
**Gutchess** [5] - 1:13, 3:12, 5:9, 24:20, 83:14
**guy** [1] - 81:21
**guys** [4] - 42:1, 42:12, 43:17, 101:4

## H

**Habitat** [1] - 49:5
**hand** [5] - 13:23, 37:7, 88:12, 89:15, 98:23
**handcuffing** [1] - 82:23
**handle** [1] - 118:21
**handled** [1] - 61:15
**handles** [1] - 118:15
**hanging** [1] - 11:6
**harmonized** [2] - 103:1, 103:3
**Havana** [9] - 6:16, 49:4, 57:6, 57:22, 58:12, 58:25, 59:5, 59:21
**head** [1] - 82:2
**Health** [3] - 104:5, 104:8, 105:4
**hear** [4] - 46:9, 130:1, 137:9, 143:12
**heard** [2] - 9:25, 67:9
**hearing** [7] - 31:5, 32:10, 46:23, 46:25, 139:17, 139:22, 140:3
**hearsay** [27] - 11:22, 17:2, 17:21, 18:5, 18:21, 19:12, 22:16, 22:18, 24:15, 28:19, 29:5, 30:16, 35:18, 37:18, 38:17, 38:21, 39:4, 41:21, 42:7, 48:5, 51:15, 54:16, 55:14, 66:25, 67:14, 134:11, 134:20
**Hearsay** [1] - 53:18

**heavily** [1] - 91:11
**held** [6] - 21:13, 22:25, 73:1, 85:15, 85:21, 93:16
**help** [4] - 89:18, 98:25, 133:6, 138:5
**helped** [1] - 27:11
**helpful** [1] - 102:13
**Henry** [6] - 40:3, 40:8, 40:9, 46:2, 46:16, 46:17
**Herald** [2] - 93:24, 94:1
**hereby** [1] - 144:11
**high** [7] - 83:3, 83:9, 99:15, 99:16, 99:20, 102:5, 103:14
**High** [1] - 99:17
**himself** [2] - 29:1, 80:14
**hire** [1] - 43:20
**hired** [1] - 14:21
**Historic** [2] - 43:23, 46:4
**historical** [1] - 89:11
**hold** [4] - 99:20, 100:21, 101:1, 105:22
**holder** [2] - 112:4, 112:12
**home** [2] - 134:1, 138:12
**Homewood** [1] - 49:5
**Honor** [95] - 5:12, 5:16, 10:12, 14:15, 16:24, 17:22, 19:19, 20:20, 22:15, 28:13, 38:2, 42:15, 42:17, 42:20, 43:13, 44:4, 49:19, 53:9, 54:15, 56:16, 57:1, 57:13, 60:3, 61:1, 61:10, 63:13, 65:5, 65:19, 66:6, 66:23, 68:11, 68:14, 70:13, 70:21, 70:24, 75:21, 76:14, 77:16, 77:24, 78:5, 79:14, 79:19, 79:22, 79:24, 80:15, 81:6, 82:5, 82:11, 82:17, 82:23, 83:5, 83:19, 83:21, 84:10, 84:13, 85:5, 85:13, 86:19, 87:1, 88:16, 89:9, 89:20, 91:6, 92:11, 93:5, 93:8, 93:23, 94:13, 95:1, 95:3, 98:14, 98:17, 112:5, 112:18, 113:13, 113:17, 114:8,

114:15, 115:14, 115:20, 117:4, 117:12, 117:16, 117:21, 120:12, 121:21, 122:19, 123:2, 129:6, 129:21, 130:20, 132:6, 135:7, 136:16, 142:21
**Honor's** [3] - 14:9, 21:2, 68:22
**HONORABLE** [1] - 1:10
**hotel** [1] - 116:17
**Hotel** [44] - 27:23, 28:2, 28:5, 29:20, 30:24, 32:12, 32:19, 33:1, 33:9, 33:16, 33:24, 34:9, 34:16, 35:1, 36:1, 39:10, 39:22, 39:24, 40:21, 40:23, 41:8, 44:7, 44:8, 45:4, 45:10, 45:16, 46:1, 80:10, 82:22, 92:3, 92:4, 94:14, 115:7, 115:9, 116:11, 119:20, 122:4, 122:6, 128:3, 134:5, 134:23, 135:5, 135:9, 137:23
**HOTTE** [1] - 1:18
**House** [6] - 40:3, 40:8, 40:9, 46:2, 46:16, 46:17
**house** [3] - 40:9, 46:24, 141:16
**housekeeping** [3] - 5:16, 76:24, 78:4
**hundred** [1] - 100:13
**hundreds** [1] - 43:21
**hurricane** [1] - 103:14
**HUSS** [1] - 1:17
**HVAC** [2] - 129:18

---

**I**

**ICC** [3] - 101:3, 101:8, 101:9
**idea** [2] - 60:4, 77:17
**identified** [1] - 97:17
**identify** [4] - 11:6, 11:18, 11:19, 13:18
**II** [1] - 1:4
**III** [1] - 132:17
**ill** [1] - 143:11
**illegally** [1] - 29:11
**illicit** [1] - 21:9
**image** [3] - 57:17, 57:18, 108:3
**images** [1] - 138:1

**immediately** [4] - 12:13, 55:22, 118:9, 141:19
**impact** [1] - 104:17
**impact-resistant** [1] - 104:17
**impacted** [2] - 71:9, 71:17
**impacts** [1] - 71:14
**impeachment** [1] - 97:8
**implementing** [2] - 131:23
**important** [4] - 67:8, 78:8, 123:20, 138:9
**imposed** [1] - 136:11
**impossible** [1] - 62:20
**improper** [5] - 57:24, 78:11, 79:1
**impropriety** [2] - 15:1, 15:11
**improve** [1] - 43:24
**improved** [1] - 29:11
**improvement** [1] - 16:23
**improvements** [1] - 67:7
**incc** [1] - 77:20
**include** [3] - 75:6, 95:20, 95:21
**included** [2] - 75:5, 97:13
**including** [1] - 43:16
**incorporated** [1] - 103:24
**incorporates** [1] - 103:22
**incorrectly** [2] - 18:14, 83:14
**increased** [1] - 7:14
**incur** [1] - 140:14
**incurred** [1] - 140:16
**indeed** [1] - 82:15
**independent** [1] - 133:16
**indicate** [4] - 76:19, 76:23, 77:7, 123:10
**indicated** [4] - 77:5, 78:6, 87:3, 107:8
**individually** [1] - 20:11
**individuals** [1] - 27:11
**inevitably** [5] - 81:13, 83:1, 91:11, 130:14, 139:6
**infamous** [1] - 96:6
**inform** [1] - 142:17
**information** [5] - 83:4, 84:18, 108:2, 119:2, 143:10

**initiated** [1] - 75:25
**inside** [1] - 116:16
**inspect** [4] - 48:12, 95:14, 111:10
**inspected** [2] - 48:10, 48:14
**inspection** [9] - 16:5, 16:6, 16:7, 16:8, 16:9, 16:10, 112:3, 137:13, 137:19
**inspections** [16] - 16:13, 53:15, 105:10, 111:2, 111:3, 111:5, 111:13, 111:14, 111:18, 111:21, 111:22, 112:13, 130:7, 130:11, 137:18, 141:21
**inspector** [6] - 17:5, 101:3, 116:22, 137:11, 137:23, 138:16
**inspectors** [3] - 101:2, 111:24, 140:4
**install** [1] - 104:15
**installation** [3] - 104:18, 113:24, 113:25
**installed** [3] - 106:25, 112:1, 130:12
**instead** [2] - 130:17, 133:10
**instruct** [1] - 78:8
**instructed** [2] - 63:11, 78:15
**instructing** [1] - 118:7
**instruction** [2] - 83:8, 133:14
**instructions** [1] - 6:3
**Insurance** [1] - 85:10
**intend** [1] - 80:23
**intended** [1] - 109:25
**intending** [1] - 76:18
**intends** [1] - 104:13
**intent** [4] - 102:17, 106:17, 109:20, 111:5
**intention** [1] - 111:3
**interactions** [3] - 51:6, 90:21, 91:1
**interest** [1] - 125:1
**interested** [2] - 125:6, 140:1
**interference** [1] - 21:10
**interim** [3] - 121:3, 130:7, 130:11
**interior** [6] - 100:24, 116:14, 124:16,

128:12, 128:18, 139:6
**intermittently** [1] - 111:11
**International** [1] - 101:9
**internet** [1] - 6:4
**interrupt** [2] - 88:3, 105:24
**interrupted** [1] - 25:9
**interview** [2] - 74:9, 75:18
**introduce** [5] - 85:15, 87:2, 115:19, 132:7, 136:16
**introduced** [3] - 66:12, 95:11, 132:6
**inundation** [1] - 31:23
**investigation** [3] - 45:23, 45:24, 84:14
**invite** [1] - 105:5
**involve** [1] - 39:10
**involved** [6] - 15:11, 91:3, 91:12, 122:5, 124:21, 133:3
**involvement** [1] - 22:13
**irregular** [1] - 64:4
**issuance** [1] - 114:3
**issue** [9] - 66:5, 77:25, 78:4, 79:24, 81:17, 87:25, 93:9, 93:12, 109:11
**issued** [2] - 72:23, 91:4, 116:3, 117:20, 118:5, 124:22, 124:24, 126:1, 134:6
**issues** [8] - 29:9, 76:24, 78:1, 85:20, 85:21, 85:23, 86:20, 143:21
**items** [3] - 106:24, 111:19, 111:22
**itself** [6] - 38:11, 62:17, 69:11, 72:10, 126:14, 142:13

---

**J**

**Jackson** [1] - 99:17
**January** [8] - 31:6, 31:20, 32:6, 32:11, 32:14, 34:19, 85:9, 138:4
**Jeff** [1] - 5:9
**Jeffrey** [1] - 1:13
**Joanna** [1] - 1:14
**job** [3] - 61:3, 61:23, 100:7
**Joe** [45] - 5:14, 11:1,

11:4, 12:18, 12:21,
13:3, 19:22, 20:2,
22:2, 22:22, 25:24,
26:6, 30:20, 31:12,
31:25, 32:7, 32:14,
32:23, 33:5, 33:13,
33:20, 34:3, 34:13,
34:20, 35:5, 36:3,
36:17, 37:7, 39:8,
40:13, 45:22, 45:24,
48:21, 51:3, 52:7,
52:13, 52:21, 57:5,
64:21, 65:14, 67:21,
73:3, 73:18, 131:24
**JOE** [1] - 1:7
**joined** [1] - 99:21,
100:6, 100:17
**joint** [7] - 16:4, 16:6,
16:7, 16:8, 16:9,
16:10, 16:13
**Jose** [1] - 48:20
**Juan** [2] - 49:2, 49:3
**judge** [1] - 143:23
**JUDGE** [1] - 1:11
**Judge** [6] - 6:6, 10:8,
43:3, 89:4, 97:23,
144:8
**July** [8] - 33:4, 33:5,
39:7, 40:1, 41:1,
125:24, 133:23,
133:24
**jump** [1] - 12:1
**June** [8] - 28:10,
28:17, 120:23,
121:1, 123:23,
124:7, 126:25,
127:22
**Juror** [1] - 78:5
**juror** [2] - 78:6, 78:20
**jurors** [8] - 6:1, 78:10,
78:17, 97:2, 97:4,
97:22, 124:1, 143:10
**Jury** [1] - 76:13
**jury** [26] - 6:2, 6:15,
10:16, 14:9, 14:15,
16:24, 28:13, 38:1,
49:18, 53:9, 60:25,
65:18, 76:14, 84:8,
88:10, 97:24, 98:7,
98:8, 99:13, 102:13,
102:14, 104:11,
107:3, 117:11,
133:5, 143:6

## K

**keep** [5] - 20:18,
37:24, 117:7, 141:10
**kept** [2] - 84:19, 88:23
**kind** [4] - 45:4, 126:5,

129:3, 137:7
**KISSANE** [1] - 2:3
**knocked** [1] - 66:17
**knowledge** [51] -
17:23, 18:21, 19:10,
23:18, 24:14, 48:6,
49:21, 59:4, 59:9,
62:8, 62:16, 62:25,
67:13, 73:7, 81:22,
83:7, 84:18, 85:16,
85:22, 86:5, 86:7,
86:12, 86:20, 86:25,
87:2, 87:9, 88:11,
89:6, 89:11, 92:12,
93:16, 94:18,
115:15, 116:16,
117:9, 119:25,
120:13, 121:7,
121:13, 123:3,
123:15, 124:12,
126:13, 128:15,
128:24, 129:10,
129:17, 130:21,
134:2, 138:14, 139:2
**known** [2] - 95:24,
142:16
**knows** [9] - 37:11,
45:14, 53:12, 57:25,
78:14, 83:19, 116:7,
124:13, 129:22
**KRINZMAN** [1] - 1:17
**KUEHNE** [173] - 1:21,
6:6, 6:10, 7:11, 7:19,
8:4, 8:15, 8:23, 9:14,
9:19, 9:24, 10:8,
11:9, 11:11, 11:20,
11:22, 12:24, 13:5,
13:7, 13:12, 13:14,
13:25, 15:3, 15:12,
15:14, 15:16, 16:20,
17:2, 17:14, 17:16,
17:21, 17:23, 18:3,
18:5, 18:17, 18:19,
18:21, 19:1, 19:5,
19:10, 19:12, 19:15,
20:4, 20:20, 20:25,
22:16, 23:1, 23:8,
23:16, 23:18, 23:24,
24:1, 24:8, 24:14,
24:17, 24:21, 25:14,
25:20, 26:2, 26:8,
26:16, 26:18, 26:20,
27:4, 27:6, 27:8,
27:13, 27:18, 28:19,
29:5, 29:24, 30:2,
30:4, 30:15, 31:14,
31:16, 34:22, 35:13,
35:18, 36:7, 36:13,
36:19, 36:23, 36:25,
37:2, 37:10, 37:17,

38:3, 38:10, 38:16,
38:21, 39:4, 39:14,
40:4, 41:19, 41:21,
42:3, 42:5, 42:7,
42:13, 42:15, 42:20,
43:3, 43:5, 43:25,
44:2, 44:19, 45:6,
45:12, 45:18, 46:3,
46:12, 46:19, 46:21,
48:5, 49:21, 51:15,
52:10, 52:16, 53:11,
53:18, 54:13, 54:16,
55:2, 55:10, 55:14,
56:9, 56:11, 56:15,
57:23, 58:3, 58:9,
58:21, 59:6, 59:8,
59:14, 60:3, 60:7,
61:10, 61:22, 62:2,
62:5, 62:7, 62:14,
62:16, 62:22, 62:24,
63:10, 64:6, 65:5,
66:6, 66:9, 66:23,
66:25, 67:11, 67:13,
68:11, 69:7, 69:9,
70:8, 71:3, 71:6,
71:20, 73:7, 73:22,
74:3, 75:8, 75:21,
76:14, 76:18,
143:23, 144:6, 144:8
**Kuehne** [29] - 1:21,
3:8, 5:14, 6:5, 10:6,
14:12, 17:5, 24:18,
26:21, 28:6, 32:4,
39:20, 40:17, 42:18,
47:9, 52:24, 56:8,
60:16, 62:1, 62:4,
64:21, 64:24, 65:11,
66:12, 67:21, 68:2,
72:5, 74:7, 74:20
**Kunert** [2] - 93:13,
93:24

## L

**Lachismosa** [1] - 49:4
**lack** [14] - 24:14, 48:5,
49:21, 62:16, 67:13,
73:7, 121:6, 124:12,
126:13, 128:14,
128:24, 129:10,
134:2, 138:13
**lacks** [1] - 115:15
**ladies** [5] - 10:16,
76:10, 99:13, 133:5,
142:24
**lady** [2] - 66:2, 67:7
**language** [2] - 74:14,
75:19
**Lapchick** [2] - 16:17,
16:25

**large** [2] - 61:3,
111:18
**last** [7] - 29:20, 30:15,
35:24, 54:23, 59:3,
80:21, 100:10
**lastly** [1] - 78:4
**late** [2] - 96:24, 97:12
**late-disclosed** [1] -
97:12
**Latitude** [1] - 49:5
**LAUDERDALE** [1] -
1:2
**Lauderdale** [1] - 1:5
**launched** [1] - 117:24
**law** [5] - 48:13, 77:23,
80:15, 84:9, 93:20
**LAW** [2] - 1:13, 1:21
**Law** [1] - 85:10
**laws** [4] - 72:15,
72:17, 107:9, 107:14
**lawsuit** [6] - 24:7,
55:1, 55:5, 55:6,
55:21
**lawyer's** [1] - 44:22
**lay** [2] - 59:18, 89:24
**laying** [1] - 80:23
**laypeople** [1] - 129:4
**layperson** [1] - 108:16
**leading** [24] - 12:24,
13:25, 19:1, 23:1,
23:8, 24:8, 25:14,
26:2, 31:14, 36:19,
52:16, 58:22, 63:11,
70:8, 70:19, 71:3,
74:3, 114:25,
119:15, 124:4,
127:9, 127:14,
127:17, 133:18
**Leah** [1] - 5:13
**learn** [4] - 24:12,
24:25, 25:4, 25:11
**learned** [3] - 22:1,
75:18, 75:22
**learning** [1] - 21:25
**lease** [4] - 45:17,
72:14, 109:23
**least** [1] - 107:23
**leave** [1] - 21:23
**leaves** [1] - 76:14
**led** [2] - 7:4, 64:2
**leeway** [1] - 70:18
**left** [2] - 8:21, 94:11
**legacy** [1] - 29:23
**legal** [8] - 23:8, 23:18,
38:3, 56:13, 56:14,
84:13, 112:7, 114:24
**legality** [1] - 21:19
**legalize** [1] - 134:22
**legally** [1] - 84:14
**length** [1] - 97:3

**lengthened** [1] - 96:25
**Leon** [10] - 21:11,
21:13, 22:11, 22:25,
73:1, 73:4, 73:19,
74:12, 74:21, 75:7
**less** [1] - 110:7
**letter** [1] - 48:18
**level** [12] - 82:24, 83:3,
83:9, 87:13, 87:14,
121:18, 122:8,
122:9, 124:23, 125:3
**license** [2] - 100:25,
105:22
**licensed** [10] - 100:2,
100:23, 105:20,
106:2, 106:4,
106:11, 106:18,
106:25
**licenses** [3] - 101:2,
101:3
**lien** [2] - 140:13,
140:16
**life** [3] - 15:9, 29:8,
108:11
**limited** [3] - 90:25,
91:2, 109:13
**limits** [1] - 35:12
**line** [7] - 16:3, 48:15,
68:15, 68:20, 112:6,
123:21, 129:21
**lineal** [1] - 119:12
**lines** [1] - 141:2
**list** [12] - 49:8, 81:24,
82:8, 82:18, 83:11,
87:5, 95:19, 95:22,
96:14, 96:16, 96:24,
97:14
**listed** [5] - 16:12,
49:20, 82:22, 83:10,
96:16
**listen** [3] - 49:16,
64:10, 87:17
**listened** [2] - 6:3, 67:9
**listener** [5] - 17:22,
18:8, 42:4, 42:6,
67:2
**lists** [1] - 107:18
**litigation** [7] - 53:5,
53:10, 54:10, 54:25,
56:21, 78:11, 86:16
**litigious** [1] - 54:22
**live** [3] - 95:22, 96:3,
96:11
**lived** [2] - 65:1, 66:2
**Living** [1] - 53:3
**load** [1] - 108:11
**local** [3] - 97:7,
118:13, 131:16
**located** [1] - 137:17
**location** [4] - 12:12,

65:8, 125:5, 137:3
**locations** [2] - 116:6,
118:19
**log** [1] - 141:13
**look** [8] - 32:9, 39:7,
39:18, 48:25, 49:24,
53:23, 63:3, 88:6
**looked** [12] - 30:23,
32:3, 35:24, 37:22,
40:10, 40:25, 41:5,
47:14, 48:18, 67:21,
75:4, 131:4
**looking** [7] - 28:4,
47:8, 60:15, 74:7,
82:14, 93:24, 123:16
**lose** [1] - 45:17
**lost** [2] - 45:17, 97:3
**lottery** [2] - 45:5, 70:7
**love** [1] - 94:16
**low** [3] - 82:24, 83:3,
83:9
**low-level** [1] - 82:24
**LUBETSKY** [1] - 1:17
**Lugo** [1] - 22:3
**lunch** [4] - 142:8,
142:22, 142:25,
143:3
**luncheon** [1] - 143:7
**lying** [1] - 55:18

## M

**M-A-R-R-E-R-0** [1] -
99:6
**ma'am** [2] - 10:20,
14:4
**Madrin** [1] - 86:15
**maiden** [1] - 35:23
**mail** [6] - 45:22, 48:20,
53:24, 54:6, 54:9,
116:9
**mailed** [3] - 118:10,
125:5, 140:1
**mails** [1] - 93:15
**maintain** [1] - 114:20
**maintained** [2] - 61:8,
136:9
**maintaining** [1] -
140:15
**maintenance** [1] -
103:25
**majority** [1] - 35:11
**makeup** [1] - 131:17
**malpractice** [1] -
88:21
**man** [4] - 17:13, 18:12,
18:14, 18:25
**managed** [1] - 100:12
**manager** [1] - 66:18
**managing** [1] - 67:17

**mandated** [3] - 84:23,
131:15, 131:16
**manner** [2] - 80:25,
83:20
**Marc** [2] - 1:24, 5:13
**Marcus** [8] - 47:11,
47:13, 63:17, 81:15,
84:4, 101:14,
101:17, 126:17
**Marcus** [2] - 16:17,
16:25
**marine** [1] - 19:14
**Mario** [4] - 14:17,
14:20, 14:21, 14:23
**market** [3] - 50:20,
52:3, 52:7
**Marketplace** [6] -
50:18, 50:20, 51:1,
51:7, 52:2, 52:20
**Marrero** [19] - 79:25,
82:18, 83:10, 86:1,
86:6, 87:1, 88:5,
89:4, 90:9, 90:10,
91:10, 94:5, 98:18,
99:6, 99:11, 114:13,
121:17, 122:2
**MARRERO** [4] - 3:11,
3:21, 90:4, 99:7
**marshal** [2] - 29:1,
29:2
**Martin** [1] - 29:21
**MARTIN** [1] - 1:4
**Mary** [1] - 22:3
**Mason** [2] - 1:18, 5:13
**masonry** [1] - 138:12
**material** [1] - 109:5
**materialized** [1] - 76:1
**materials** [1] - 109:8
**matter** [8] - 5:16,
53:10, 83:2, 84:3,
84:12, 143:9,
143:23, 144:18
**matters** [2] - 77:22,
114:24
**Maurice** [7] - 14:6,
14:8, 14:10, 14:12,
14:16, 14:24, 15:8
**Maurice's** [1] - 14:18
**mean** [13] - 16:23,
19:2, 64:4, 78:20,
86:1, 101:12, 103:2,
105:17, 105:24,
107:11, 107:23,
114:7, 123:10
**meaning** [1] - 107:15
**means** [6] - 43:9,
103:5, 105:18,
105:25, 107:12,
124:25
**meant** [4] - 110:6,

110:8, 110:10,
111:22
**mechanical** [5] -
102:4, 103:9,
104:17, 106:9,
111:25
**medical** [2] - 85:20,
88:20
**medically** [1] - 88:22
**meet** [2] - 17:11, 95:12
**meets** [1] - 111:7
**member** [1] - 66:16
**members** [1] - 98:8
**memorandum** [3] -
77:23, 79:9, 79:11
**memory** [1] - 11:14
**Mendez** [1] - 47:19
**Mendola** [1] - 66:16
**mentioned** [4] - 23:7,
53:5, 69:2, 77:16
**mentoring** [1] - 18:13
**mentorship** [1] - 19:9
**merely** [1] - 86:3
**merging** [1] - 6:23
**message** [2] - 73:12,
73:14
**messages** [1] - 22:12
**met** [1] - 24:19
**Miami** [90] - 1:16,
1:19, 1:22, 1:25, 2:5,
2:11, 2:11, 7:14,
14:11, 14:19, 14:24,
15:9, 21:21, 22:4,
23:6, 23:12, 27:11,
29:16, 30:7, 30:10,
31:21, 37:8, 38:24,
43:21, 44:7, 44:9,
44:14, 44:17, 44:23,
46:18, 46:24, 47:1,
47:18, 51:6, 51:20,
61:6, 65:20, 68:3,
68:7, 69:18, 71:9,
71:22, 80:19, 81:8,
82:4, 83:13, 84:20,
84:24, 87:10, 90:12,
91:16, 91:22, 93:24,
94:1, 94:18, 99:17,
99:18, 100:8,
100:17, 101:1,
101:6, 101:7, 102:6,
104:22, 110:3,
110:6, 110:8,
113:10, 114:14,
114:21, 115:5,
116:20, 122:8,
123:24, 125:10,
125:12, 125:13,
131:21, 131:22,
131:23, 132:18,
136:7, 136:13,

140:22, 141:14,
144:24, 144:25
**Miami's** [1] - 113:14
**Miami-Dade** [12] -
23:12, 100:8, 101:1,
101:6, 101:7, 102:6,
125:10, 125:12,
125:13, 131:21,
131:22, 131:23
**Michigan** [1] - 96:7
**microphone** [2] -
25:7, 137:9
**middle** [1] - 44:10
**midnight** [1] - 11:1
**might** [2] - 127:2,
139:18
**million** [1] - 100:13
**mind** [2] - 50:4, 105:7
**minimum** [7] - 106:3,
107:24, 108:1,
108:14, 108:15,
108:23, 111:12
**minor** [1] - 78:4
**minute** [2] - 9:8, 41:6
**minutes** [11] - 61:9,
62:12, 62:19, 62:21,
63:4, 63:23, 63:24,
76:8, 95:2, 100:19,
125:21
**Miro** [5] - 21:15,
21:18, 22:3, 22:7
**Miro's** [1] - 22:13
**misinterpretation** [1] -
18:11
**missed** [3] - 42:1,
42:12, 43:18
**mission** [1] - 59:13
**mobile** [2] - 51:22
**moment** [2] - 109:9,
127:4
**Monday** [5] - 28:25,
143:9, 143:13,
143:22, 143:25
**monitoring** [1] - 12:19
**month** [1] - 31:10
**months** [1] - 33:4
**moreover** [1] - 97:17
**Morgan** [1] - 95:16
**morning** [12] - 5:4,
5:8, 5:11, 5:12, 5:15,
6:11, 10:15, 10:16,
10:17, 90:10, 99:11,
99:12
**mortar** [1] - 124:2
**most** [3] - 29:21,
57:17, 106:10
**mother** [3] - 35:11,
35:12, 35:16
**motion** [4] - 5:18,
5:20, 77:9, 95:7

**motions** [1] - 95:9
**move** [39] - 6:24,
15:20, 19:21, 22:16,
30:19, 37:11, 43:1,
43:7, 47:22, 53:20,
57:2, 57:12, 58:3,
60:1, 60:9, 64:8,
64:9, 68:11, 68:13,
68:18, 70:12, 70:13,
70:22, 72:3, 88:1,
97:4, 104:19, 104:14,
104:24, 105:5,
107:2, 112:3,
113:13, 118:20,
125:14, 140:12,
140:18, 141:9,
142:11
**moved** [2] - 87:15,
93:18
**moving** [8] - 41:13,
43:18, 57:13, 71:15,
94:7, 102:25, 111:2,
128:5
**MR** [359] - 5:12, 6:6,
6:10, 7:11, 7:19, 8:4,
8:15, 8:23, 9:14,
9:19, 9:24, 10:8,
11:9, 11:11, 11:20,
11:22, 12:24, 13:5,
13:7, 13:12, 13:14,
13:25, 15:3, 15:12,
15:14, 15:16, 16:20,
17:2, 17:14, 17:16,
17:21, 17:23, 18:3,
18:5, 18:17, 18:19,
18:21, 19:1, 19:5,
19:10, 19:12, 19:15,
20:4, 20:20, 20:25,
22:16, 23:1, 23:8,
23:16, 23:18, 23:24,
24:1, 24:8, 24:14,
24:17, 24:21, 25:14,
25:20, 26:2, 26:8,
26:16, 26:18, 26:20,
27:4, 27:6, 27:8,
27:13, 27:18, 28:19,
29:5, 29:24, 30:2,
30:4, 30:15, 31:14,
31:16, 34:22, 35:13,
35:18, 36:7, 36:13,
36:19, 36:23, 36:25,
37:2, 37:10, 37:17,
38:3, 38:10, 38:16,
38:21, 39:4, 39:14,
40:4, 41:19, 41:21,
42:5, 42:7, 42:13,
42:15, 42:20, 43:3,
43:5, 43:25, 44:2,
44:19, 45:6, 45:12,
45:18, 46:3, 46:12,

46:19, 46:21, 48:5, 49:21, 51:15, 52:10, 52:16, 53:11, 53:18, 54:13, 54:16, 55:2, 55:10, 55:14, 56:9, 56:11, 56:15, 57:23, 58:3, 58:9, 58:21, 59:6, 59:8, 59:14, 60:3, 60:7, 61:10, 61:22, 62:2, 62:5, 62:7, 62:14, 62:16, 62:22, 62:24, 63:10, 64:6, 65:5, 66:6, 66:9, 66:23, 66:25, 67:11, 67:13, 68:11, 69:9, 70:8, 71:3, 71:6, 71:20, 73:7, 73:22, 74:3, 75:8, 75:21, 76:14, 76:18, 76:22, 77:4, 77:13, 78:13, 78:23, 79:5, 79:8, 79:13, 79:14, 79:17, 79:21, 79:24, 80:5, 80:8, 80:17, 81:19, 82:1, 82:5, 82:11, 82:12, 82:17, 82:22, 83:5, 83:10, 83:21, 83:23, 83:25, 85:1, 85:3, 85:5, 85:8, 86:13, 86:15, 86:17, 87:1, 87:6, 87:7, 88:3, 88:14, 88:16, 89:1, 89:4, 89:9, 89:20, 89:23, 89:24, 90:1, 90:7, 91:6, 91:9, 92:11, 92:16, 92:19, 92:20, 93:1, 93:2, 93:4, 93:8, 93:11, 93:23, 94:13, 95:1, 95:2, 95:5, 98:4, 98:14, 98:17, 98:20, 99:4, 99:10, 102:21, 102:22, 103:21, 110:20, 110:23, 111:1, 112:5, 112:11, 112:18, 112:20, 112:23, 112:25, 113:13, 113:17, 113:21, 114:8, 114:10, 114:12, 114:15, 114:18, 114:25, 115:3, 115:14, 115:17, 115:19, 115:21, 115:23, 116:15, 116:18, 116:23, 116:25, 117:1, 117:4, 117:7, 117:8, 117:11, 117:14, 117:16,

117:17, 117:21, 117:23, 118:3, 119:15, 119:17, 119:24, 120:4, 120:6, 120:12, 120:15, 121:6, 121:9, 121:11, 121:15, 121:16, 121:21, 121:23, 122:1, 122:19, 122:23, 122:24, 123:2, 123:5, 123:13, 123:15, 123:19, 124:4, 124:6, 124:12, 124:17, 126:11, 126:13, 126:16, 127:9, 127:13, 127:18, 127:19, 128:14, 128:17, 128:24, 129:1, 129:6, 129:8, 129:10, 129:13, 129:17, 129:21, 130:1, 130:4, 130:20, 130:23, 130:25, 131:3, 132:10, 132:14, 133:18, 133:21, 134:2, 134:4, 134:10, 134:16, 134:20, 134:25, 135:4, 135:7, 135:12, 136:16, 136:20, 136:23, 136:24, 138:13, 139:2, 139:5, 139:13, 139:16, 142:9, 142:10, 142:21, 143:23, 144:6, 144:8, 144:10

**MS** [143] - 5:8, 5:16, 5:18, 5:22, 5:24, 7:6, 7:16, 7:24, 8:1, 8:8, 8:13, 9:6, 9:11, 9:17, 9:22, 10:3, 10:12, 10:14, 10:20, 10:21, 11:13, 11:24, 13:1, 13:21, 14:2, 15:6, 15:18, 15:19, 16:22, 17:4, 17:22, 18:8, 18:23, 19:3, 19:11, 19:17, 19:19, 19:20, 20:7, 20:23, 21:2, 21:5, 21:6, 22:15, 22:20, 23:4, 23:13, 23:21, 24:4, 24:11, 24:24, 25:2, 25:3, 25:8, 25:10, 25:17, 25:23, 26:4, 26:5, 27:21, 27:22, 28:22,

29:13, 30:5, 30:18, 31:18, 34:23, 34:24, 35:15, 35:20, 36:16, 36:21, 37:4, 37:14, 37:21, 38:5, 39:6, 39:16, 39:17, 40:6, 40:7, 41:23, 42:4, 42:6, 42:10, 43:14, 44:4, 44:5, 45:9, 45:20, 46:15, 47:3, 47:4, 49:17, 52:12, 52:18, 53:21, 53:22, 54:14, 55:23, 56:1, 56:18, 56:19, 57:1, 57:3, 57:4, 58:5, 58:11, 58:24, 59:16, 60:1, 60:8, 61:13, 62:10, 63:15, 63:16, 64:8, 64:16, 64:17, 65:9, 66:11, 67:2, 67:18, 67:19, 68:14, 68:19, 68:22, 68:25, 69:1, 70:10, 70:13, 70:17, 70:21, 70:24, 70:25, 71:24, 73:10, 73:24, 74:5, 75:11, 76:2, 98:5, 98:11

**multiple** [3] - 8:25, 101:25, 133:7

**Munirah** [1] - 47:18

**music** [7] - 68:3, 69:4, 69:16, 69:19, 70:6, 71:2, 71:25

**must** [2] - 95:22, 96:3

**Myette** [1] - 49:3

## N

**name** [9] - 14:6, 17:6, 35:23, 44:14, 66:15, 89:14, 90:8, 99:3, 99:5

**named** [1] - 52:24

**names** [1] - 97:7

**narrative** [9] - 36:11, 36:14, 44:20, 45:7, 46:13, 55:2, 71:21, 75:21, 117:23

**National** [2] - 43:23, 103:22

**nature** [1] - 21:19

**Navy** [1] - 85:14

**near** [1] - 84:17

**necessary** [5] - 61:18, 70:19, 72:7, 80:20, 92:12

**need** [14] - 5:24, 25:7, 37:5, 76:7, 77:2, 89:2, 108:4, 108:10, 110:1, 111:13,

137:13, 141:2, 141:3, 141:18

**needed** [2] - 92:1, 122:10

**needs** [3] - 64:10, 109:21, 143:24

**neighborhood** [2] - 30:14, 75:2

**neighborhoods** [1] - 30:12

**neighbors** [1] - 66:1

**never** [13] - 27:1, 52:1, 60:4, 71:17, 80:11, 81:19, 82:6, 94:11, 95:15, 100:25, 133:8, 133:9, 142:21

**new** [6] - 11:18, 12:5, 12:12, 51:10, 71:16, 95:12

**news** [1] - 6:4

**newspaper** [1] - 6:4

**next** [28] - 19:18, 22:19, 37:13, 44:3, 47:2, 53:20, 57:2, 66:3, 66:4, 68:13, 68:18, 69:16, 70:22, 76:6, 79:25, 98:10, 110:25, 116:10, 120:19, 126:15, 128:5, 128:6, 129:24, 130:2, 141:9, 141:10, 142:12

**NFPA** [1] - 103:23

**night** [8] - 11:16, 11:17, 12:9, 53:15, 54:12, 55:9, 55:18, 55:19

**nine** [2] - 103:7, 143:22

**Niworowski** [1] - 1:14

**NO** [1] - 1:3

**nobody** [1] - 75:13

**noise** [6] - 54:20, 64:20, 65:10, 65:18, 67:7, 68:4

**nominated** [1] - 101:15

**non** [4] - 78:9, 78:24, 131:4, 139:23

**non-compliance** [1] - 139:23

**non-parties** [2] - 78:9, 78:24

**non-permitted** [1] - 131:4

**nonlawyer** [1] - 69:12

**nonleading** [3] - 70:12, 127:14, 127:17

**nonprofits** [1] - 26:15

**nonresponse** [1] - 62:5

**nonresponsive** [25] - 11:11, 15:3, 16:20, 17:16, 19:15, 23:16, 26:18, 27:6, 27:13, 27:18, 29:25, 30:15, 35:13, 36:14, 39:14, 44:2, 44:19, 45:18, 46:12, 46:19, 55:2, 59:14, 60:5, 61:10, 62:24

**nontestifying** [1] - 18:6

**Nordica** [1] - 49:5

**Noriega** [2] - 11:19, 11:25

**normal** [1] - 110:16

**North** [3] - 2:11, 96:7, 144:24

**notarized** [1] - 106:8

**note** [1] - 68:14

**nothing** [8] - 35:12, 51:23, 64:4, 83:6, 83:9, 89:17, 98:25, 131:24

**notice** [38] - 28:10, 28:14, 31:5, 32:10, 32:11, 34:16, 34:18, 72:22, 72:23, 91:3, 101:4, 116:1, 116:2, 116:3, 116:5, 117:20, 118:8, 124:19, 124:21, 124:22, 124:24, 125:2, 136:25, 137:1, 139:17, 139:19, 139:21, 139:23, 139:25, 140:5, 140:9, 140:13, 140:17, 142:13

**notices** [2] - 30:23, 137:2

**notified** [3] - 44:11, 44:12, 116:9

**notify** [1] - 124:25

**notion** [1] - 89:9

**November** [8] - 20:18, 21:11, 22:6, 34:2, 72:21, 73:2, 73:14, 73:19

**Number** [1] - 78:5

**number** [15] - 5:24, 16:6, 16:7, 16:8, 16:9, 16:10, 20:17, 21:7, 21:9, 34:22, 40:4, 62:5, 62:7, 77:16, 85:1

**NW** [1] - 1:15

# O

**oath** [1] - 86:7
**object** [20] - 86:20, 87:5, 88:25, 89:1, 112:5, 115:14, 116:15, 117:4, 117:8, 117:21, 119:24, 121:6, 121:11, 121:21, 128:14, 129:6, 129:21, 130:20, 133:18, 138:13
**objected** [2] - 87:4, 115:20
**objecting** [1] - 42:23
**objection** [200] - 7:6, 7:9, 7:16, 7:24, 8:8, 8:10, 8:13, 8:14, 9:6, 9:11, 9:13, 9:17, 9:22, 10:3, 10:5, 11:9, 11:20, 11:22, 12:24, 13:5, 13:12, 13:25, 15:3, 15:12, 15:13, 16:20, 17:2, 17:14, 17:21, 18:3, 18:5, 18:17, 18:19, 19:1, 19:5, 19:10, 19:15, 20:4, 20:20, 22:16, 23:1, 23:8, 23:16, 23:24, 23:25, 24:8, 24:14, 24:21, 25:1, 25:14, 25:20, 26:2, 26:8, 27:4, 27:5, 27:13, 28:19, 29:5, 29:24, 30:3, 30:15, 31:14, 35:13, 35:18, 36:7, 36:13, 36:19, 36:23, 36:25, 37:10, 37:17, 38:3, 38:10, 38:16, 38:21, 39:4, 39:14, 41:19, 42:3, 42:5, 42:7, 42:15, 42:19, 42:20, 42:21, 42:22, 43:8, 43:25, 44:19, 45:6, 45:8, 45:12, 45:18, 46:3, 46:8, 46:12, 46:19, 48:5, 49:21, 51:15, 52:10, 52:16, 53:11, 53:18, 54:13, 54:16, 55:2, 55:10, 55:14, 56:9, 56:10, 56:11, 56:13, 56:14, 56:22, 56:23, 57:23, 58:3, 58:9, 58:21, 59:6, 59:14, 60:2, 61:10, 61:22, 61:25, 62:2, 62:3, 62:14,
62:15, 62:22, 63:9, 63:15, 64:6, 64:10, 65:5, 66:6, 66:8, 66:23, 66:25, 67:3, 67:11, 67:12, 68:11, 69:7, 69:8, 69:9, 70:8, 70:12, 71:3, 71:19, 71:23, 73:7, 73:22, 74:3, 75:8, 75:21, 94:16, 94:22, 94:24, 102:20, 102:21, 110:20, 110:22, 112:9, 112:18, 112:23, 113:17, 114:8, 114:15, 114:25, 116:23, 117:5, 119:15, 120:12, 123:13, 123:18, 124:4, 124:12, 126:11, 127:9, 127:12, 127:16, 128:24, 129:10, 129:17, 130:22, 130:25, 134:10, 134:20, 135:7, 139:2, 139:15
**Objection** [4] - 26:16, 27:18, 42:13, 134:2
**objection's** [1] - 42:25
**objections** [4] - 113:16, 132:9, 132:10, 136:18
**obligation** [1] - 97:9
**observations** [2] - 13:15, 13:17
**observe** [3] - 12:18, 12:20, 13:2
**observed** [3] - 80:14, 84:12, 114:24
**observing** [4] - 11:4, 11:5, 116:14, 116:19
**obstructionist** [1] - 133:12
**obtain** [5] - 72:7, 104:20, 133:11, 141:3, 141:4
**obtained** [1] - 114:2
**obvious** [1] - 118:18
**occupancy** [5] - 104:15, 108:10, 108:11, 112:16, 114:4
**occupants** [3] - 118:8, 137:4, 142:18
**occupies** [1] - 16:17
**occur** [2] - 45:11, 110:11
**occurred** [1] - 122:9
**Ocho** [7] - 50:17,

50:19, 51:1, 51:7, 52:2, 52:19, 65:3
**October** [7] - 33:12, 33:19, 34:12, 41:8, 44:10, 44:24, 54:3
**OF** [1] - 1:1
**offer** [5] - 102:18, 115:19, 132:7, 136:16
**offered** [3] - 54:14, 100:16, 132:6
**office** [32] - 30:20, 31:7, 31:25, 32:7, 32:14, 32:23, 33:5, 33:13, 33:20, 34:3, 34:13, 34:20, 35:5, 36:3, 36:18, 37:1, 39:8, 40:13, 41:3, 48:22, 49:13, 51:3, 51:25, 52:8, 52:14, 52:21, 64:21, 65:14, 67:21, 73:4, 74:1, 84:11
**Office** [1] - 131:21
**office's** [1] - 84:12
**officer** [1] - 56:7
**offices'** [1] - 114:23
**Official** [1] - 2:10
**official** [14] - 14:6, 14:11, 29:3, 80:18, 104:20, 105:15, 106:12, 107:12, 109:11, 109:18, 112:15, 122:7, 133:24, 136:14
**officials** [3] - 29:1, 30:11, 107:5
**often** [1] - 30:9
**Oika** [1] - 49:3
**older** [2] - 14:20, 18:12
**on-site** [1] - 139:24
**once** [2] - 136:25, 140:21
**one** [51] - 5:16, 5:25, 8:5, 9:8, 9:9, 12:1, 12:11, 16:10, 20:18, 21:7, 21:9, 21:15, 31:10, 34:22, 35:9, 39:3, 41:17, 43:17, 45:3, 47:23, 55:6, 56:7, 58:19, 62:5, 66:4, 69:19, 76:15, 77:5, 78:17, 79:18, 79:24, 85:9, 86:22, 86:24, 87:15, 88:12, 95:16, 103:6, 110:18, 112:9, 125:15, 127:2, 127:5, 141:15,

142:7, 142:11, 142:12, 142:25, 143:10, 143:23
**one-story** [1] - 141:15
**ones** [3] - 8:21, 132:10, 144:4
**ongoing** [1] - 97:9
**open** [3] - 65:23, 78:14, 79:2
**opened** [1] - 68:15
**openings** [1] - 96:18
**operate** [3] - 41:14, 52:3, 72:8
**operation** [1] - 53:4
**operator** [2] - 12:3, 50:1
**opinion** [9] - 23:19, 24:15, 37:2, 37:17, 38:3, 45:12, 69:11, 71:21, 88:22
**opinions** [3] - 76:10, 112:7, 143:2
**opponent** [1] - 21:12
**opponents'** [1] - 95:12
**opportunity** [4] - 20:25, 97:16, 100:16, 135:13
**opposing** [4] - 55:24, 59:17, 59:19, 77:25
**order** [32] - 5:1, 35:3, 61:5, 88:7, 89:5, 91:17, 91:20, 91:22, 92:2, 92:13, 92:14, 95:20, 100:1, 112:22, 113:1, 113:4, 113:5, 117:18, 117:19, 117:24, 118:4, 118:5, 120:23, 121:1, 121:17, 123:1, 124:7, 124:14, 128:1, 128:2, 143:25
**orders** [3] - 131:23, 133:7
**ordinance** [15] - 68:6, 68:8, 69:2, 69:4, 69:9, 69:10, 70:2, 71:1, 131:16, 141:23, 141:25, 142:1, 142:2, 142:3
**ordinances** [3] - 107:10, 118:14, 125:13
**ordinary** [3] - 43:1, 84:19, 88:23
**Ordis** [3] - 44:15, 44:16, 44:25
**ore** [1] - 5:19
**organization** [2] -

59:3, 101:7
**original** [1] - 120:10
**Orlando** [6] - 17:19, 17:21, 18:11, 18:16, 19:9, 100:4
**otherwise** [1] - 87:23
**ought** [1] - 78:10
**Ouija** [1] - 6:24
**outdoor** [1] - 68:3
**outlined** [2] - 125:2
**outrage** [1] - 22:10
**outside** [10] - 9:6, 9:12, 12:14, 69:5, 77:22, 88:10, 88:14, 124:16, 137:16, 138:17
**overall** [2] - 106:20, 108:2
**overhaul** [1] - 61:3
**overrule** [2] - 42:18, 94:22
**overruled** [86] - 11:12, 13:9, 13:16, 14:1, 15:4, 16:21, 17:17, 17:24, 18:9, 19:7, 19:13, 20:6, 20:24, 23:2, 23:10, 23:17, 23:20, 24:9, 24:16, 24:18, 25:15, 25:21, 26:9, 26:19, 26:22, 27:7, 27:9, 27:14, 27:20, 29:7, 35:19, 36:9, 37:3, 37:19, 38:12, 38:18, 38:22, 39:15, 42:9, 42:22, 43:1, 44:21, 45:14, 45:19, 46:20, 46:22, 48:7, 49:23, 51:17, 53:12, 54:18, 55:4, 55:11, 55:15, 57:25, 59:10, 59:15, 61:12, 62:6, 62:9, 62:18, 63:1, 66:13, 67:3, 67:15, 69:13, 71:5, 71:7, 73:23, 74:4, 75:23, 114:17, 115:2, 115:18, 118:1, 120:1, 123:4, 124:13, 128:25, 131:2, 133:19, 134:21, 138:15
**Overruled** [1] - 26:17
**own** [1] - 93:15
**owned** [3] - 21:14, 35:11, 35:16
**owner** [11] - 29:11, 104:13, 116:6, 116:9, 118:8, 124:25, 125:6, 132:17, 132:21,

140:1, 140:21
**owner's** [1] - 104:13
**owners** [4] - 85:19,
85:22, 137:4, 142:18
**ownership** [3] - 16:15,
16:16, 140:10
**owns** [2] - 35:17,
35:22

**P**

**p.m** [12] - 1:7, 21:15,
21:20, 68:3, 70:6,
72:1, 76:13, 98:7,
143:6, 143:7, 144:13
**pace** [1] - 41:15
**package** [1] - 16:19
**PAGE** [1] - 3:4
**page** [32] - 33:1,
72:15, 102:25,
104:9, 104:24,
105:1, 105:6, 107:2,
107:4, 107:18,
109:9, 111:2, 112:3,
113:22, 116:10,
119:19, 120:2,
120:19, 125:15,
126:4, 126:19,
126:20, 127:4,
127:6, 128:5, 128:6,
132:25, 133:2,
141:9, 141:10
**Pages** [1] - 1:8
**pages** [3] - 107:23,
118:23, 120:7
**paid** [5] - 63:3, 63:18,
63:24, 63:25, 64:4
**panel** [6] - 113:11,
131:13, 131:17,
131:25, 139:24,
140:18
**Panza** [1] - 49:25
**paragraph** [2] - 21:8,
21:24
**Paraiso** [3] - 52:25,
53:2, 56:7
**parameters** [1] - 92:13
**parenthesis** [1] -
21:13
**Parjus** [1] - 22:3
**PARJUS** [1] - 22:3
**parking** [4] - 11:7,
12:5, 12:15, 48:14
**part** [17] - 16:19,
29:22, 30:15, 40:23,
81:3, 96:15, 106:10,
106:20, 118:12,
118:13, 122:3,
123:12, 134:17,
135:17, 136:6,

137:13, 137:14
**partial** [1] - 113:25
**particular** [13] - 65:18,
66:21, 68:10, 86:11,
109:4, 116:8,
117:19, 130:18,
138:2, 138:20,
139:21, 139:25,
140:2
**parties** [8] - 22:14,
78:9, 78:23, 78:24,
125:6, 140:1
**partitions** [1] - 111:23
**partner** [1] - 6:19
**partnership** [1] - 6:22
**party** [2] - 31:23,
125:1
**passed** [3] - 68:6,
68:8, 70:2
**passion** [1] - 29:22
**past** [3] - 14:21, 47:13,
142:5
**Patricia** [1] - 5:25
**pay** [1] - 143:19
**paying** [2] - 60:19,
63:8
**pending** [4] - 29:25,
96:20, 117:10,
140:13
**people** [6] - 7:3, 7:13,
54:22, 56:25, 75:16,
131:17
**per** [5] - 112:1,
141:21, 141:25
**percent** [3] - 7:5,
35:17, 35:22
**Perez** [4] - 56:5, 57:8,
57:9, 57:10
**performed** [18] - 51:8,
83:25, 91:18, 91:25,
94:6, 104:19, 106:9,
111:6, 111:17,
116:2, 119:4,
121:20, 122:11,
124:15, 131:5,
139:11, 139:14,
142:16
**performing** [2] -
116:7, 137:5
**perhaps** [1] - 106:6
**period** [2] - 63:22,
122:13
**permanent** [4] - 51:11,
51:12, 90:16, 107:9
**permission** [2] - 5:19,
66:18
**permit** [43] - 29:10,
29:12, 51:8, 52:3,
52:7, 52:13, 52:19,
60:20, 61:2, 61:16,

61:18, 80:21, 81:11,
81:12, 91:23, 91:24,
94:6, 94:8, 104:8,
104:21, 106:16,
109:12, 111:17,
112:13, 113:7,
114:2, 114:3,
120:10, 121:3,
125:19, 125:20,
125:22, 125:23,
125:24, 126:9,
127:20, 128:9,
137:5, 141:3, 141:4,
141:20, 142:2, 142:4
**permits** [29] - 7:21,
9:15, 9:20, 10:1,
72:8, 81:1, 81:5,
83:25, 92:22,
104:22, 109:13,
116:2, 116:4, 116:7,
124:15, 125:15,
127:20, 127:23,
128:11, 138:19,
138:22, 139:12,
140:25, 141:18,
141:25, 142:17,
142:19
**Permits** [1] - 104:10
**permitted** [19] -
109:13, 124:3,
128:19, 128:22,
129:9, 129:11,
129:15, 129:16,
129:19, 129:20,
130:3, 130:5, 130:6,
130:24, 131:1,
131:4, 132:12,
139:10
**permitting** [3] -
100:13, 122:9,
122:10
**person** [10] - 65:6,
66:10, 82:4, 82:25,
83:7, 84:10, 86:24,
88:5, 88:6
**personal** [47] - 17:23,
18:21, 19:10, 23:18,
24:14, 48:6, 49:21,
59:4, 59:9, 62:7,
62:16, 62:25, 67:13,
73:7, 81:22, 85:16,
85:22, 86:5, 86:7,
86:12, 86:20, 86:25,
87:1, 87:9, 88:11,
89:10, 93:16, 94:18,
115:15, 116:15,
117:9, 119:24,
120:12, 121:7,
121:12, 123:3,
123:15, 124:12,

126:13, 128:14,
128:24, 129:10,
129:17, 130:21,
134:2, 138:14, 139:2
**personally** [6] - 17:11,
22:2, 66:16, 67:16,
80:14, 133:3
**personnels** [1] - 86:21
**pertains** [1] - 95:7
**PERTNOY** [15] - 5:12,
76:22, 77:4, 77:13,
78:13, 78:23, 79:5,
79:8, 79:13, 79:17,
79:21, 95:2, 95:5,
98:14, 144:10
**Pertnoy** [2] - 1:18,
5:13
**phases** [1] - 100:14
**phone** [1] - 15:4
**phonetic** [2] - 85:11,
86:16
**photograph** [15] -
10:22, 10:25, 11:3,
12:6, 12:14, 12:17,
12:20, 12:21, 13:2,
13:22, 123:16,
130:14, 137:12,
137:14, 140:4
**photographic** [1] -
138:5
**photographs** [3] -
28:4, 121:5, 128:13
**photos** [1] - 21:17
**Picana** [1] - 58:12
**Picatus** [1] - 57:22
**pick** [1] - 6:5
**picture** [2] - 117:3,
118:20
**pictures** [3] - 30:23,
121:10, 121:12
**Pierta** [2] - 35:22,
35:23
**Pinea's** [1] - 31:13
**PINILLA** [1] - 1:4
**Pinilla** [7] - 20:1,
20:13, 24:19, 28:1,
73:3, 73:12, 90:21
**Pinilla's** [1] - 22:21
**place** [11] - 26:8, 52:3,
65:6, 65:8, 109:20,
109:25, 110:7,
110:8, 118:15,
122:9, 141:20
**places** [1] - 110:3
**placing** [1] - 140:5
**plaintiff** [18] - 42:23,
76:6, 81:16, 88:10,
89:8, 89:21, 91:20,
94:2, 95:9, 95:12,
95:24, 96:15, 96:18,

98:1, 126:4, 126:19,
143:16
**Plaintiff's** [4] - 10:18,
47:6, 53:23, 72:11
**plaintiff's** [1] - 95:15
**Plaintiffs** [1] - 1:5
**plaintiffs** [7] - 5:10,
76:18, 92:9, 98:10,
98:11, 118:24,
125:14
**PLAINTIFFS** [2] -
1:13, 3:15
**Plaintiffs'** [7] - 15:21,
19:23, 57:7, 59:18,
73:11, 132:13,
136:22
**plaintiffs'** [4] - 83:10,
91:4, 97:11, 97:14
**PLAINTIFFS'** [2] - 3:3,
4:4
**plan** [4] - 27:12,
63:23, 63:24, 64:3,
108:2, 108:5, 108:6,
108:10, 109:6,
119:19, 119:20,
120:8
**plans** [13] - 61:5, 61:9,
61:14, 61:18, 62:12,
62:20, 63:4, 63:22,
111:7, 112:1,
135:13, 141:2,
141:19
**plants** [1] - 101:2
**platform** [1] - 7:3
**play** [4] - 69:4, 69:16,
70:5, 71:25
**played** [1] - 96:6
**playing** [2] - 69:18,
71:2
**pleadings** [1] - 77:17
**plumbing** [10] - 102:4,
103:8, 104:18,
106:9, 108:17,
110:15, 111:25,
113:24, 114:1, 130:5
**plus** [2] - 142:2, 142:4
**point** [13] - 23:11,
31:12, 31:19, 52:1,
52:2, 52:23, 67:5,
67:6, 74:18, 85:13,
138:3, 138:20
**police** [1] - 21:22
**policy** [1] - 74:25
**political** [1] - 74:24
**poll** [1] - 73:15
**polls** [1] - 73:16
**Ponz** [13] - 14:6, 14:8,
14:10, 14:17, 14:21,
14:23, 14:24, 15:8,
86:4, 86:7, 86:8,

94:13, 94:15
**Ponz's** [2] - 14:13, 14:16
**Ponza** [2] - 49:3, 50:2
**pool** [3] - 94:11, 135:24, 141:18
**pools** [7] - 104:1, 104:3, 104:4, 104:5, 104:6, 104:7, 104:25
**portfolio** [2] - 45:2, 100:12
**portion** [2] - 86:18, 95:14
**position** [7] - 80:9, 83:7, 90:11, 90:14, 90:16, 90:17, 100:10
**positions** [1] - 116:6
**possessed** [3] - 89:6, 89:10, 92:12
**possession** [1] - 55:22
**possibility** [1] - 22:10
**possible** [3] - 118:18, 118:19, 127:13
**post** [2] - 31:1, 132:21
**post-Carollo** [1] - 31:1
**posted** [9] - 116:5, 125:4, 136:25, 137:2, 139:17, 139:19, 139:25, 142:13
**potential** [1] - 97:20
**power** [1] - 110:18
**Powers** [1] - 144:22
**POWERS** [2] - 2:9, 144:23
**practice** [2] - 7:20, 84:21
**pre** [1] - 21:9
**pre-election** [1] - 21:9
**preceded** [1] - 86:2
**predicate** [2] - 80:24, 89:25
**prejudiced** [1] - 96:14
**premises** [1] - 132:22
**prepare** [1] - 109:6
**prepared** [6] - 83:17, 83:18, 96:15, 105:12, 105:16, 106:2
**presence** [1] - 88:10
**present** [3] - 77:24, 95:25, 98:8
**presented** [1] - 96:19
**presently** [1] - 71:25
**Preservation** [2] - 43:23, 46:5
**preserve** [1] - 98:15
**preserving** [2] - 77:8, 77:25

**pressure** [1] - 38:14
**presumed** [2] - 84:24, 113:23
**pretty** [4] - 99:14, 101:6, 102:17, 116:13
**Prevention** [1] - 103:2
**previous** [2] - 29:11, 121:1
**previously** [2] - 6:7, 75:1
**private** [4] - 44:14, 44:16, 100:4, 100:5
**proactive** [1] - 79:6
**problem** [2] - 65:3, 82:15
**Procedure** [1] - 97:6
**proceed** [4] - 43:15, 79:16, 97:21, 134:15
**proceeding** [2] - 77:7, 118:6
**Proceedings** [1] - 144:13
**proceedings** [1] - 144:17
**process** [6] - 51:21, 51:24, 84:7, 97:5, 111:19
**procurement** [1] - 100:14
**product** [1] - 109:1
**professional** [10] - 100:1, 101:13, 105:13, 105:17, 105:19, 106:2, 106:5, 106:11, 108:13, 131:10
**prohibiting** [2] - 71:2, 82:14
**prohibition** [1] - 68:3
**project** [5] - 50:21, 51:25, 61:14, 100:14, 106:20
**projects** [2] - 44:18, 44:23
**proliferating** [1] - 51:20
**promoted** [1] - 27:15
**proper** [2] - 118:7, 140:4
**properties** [21] - 8:25, 9:1, 9:2, 9:3, 9:16, 9:21, 16:12, 16:14, 16:15, 26:11, 26:14, 31:24, 43:19, 48:25, 49:1, 49:8, 49:9, 83:18, 90:22, 91:4, 138:3
**property** [29] - 9:25, 10:1, 11:1, 22:25,

28:17, 29:2, 35:11, 35:16, 42:1, 60:22, 61:3, 72:8, 72:22, 73:1, 116:3, 116:5, 116:8, 116:9, 117:19, 124:22, 125:1, 125:4, 139:23, 139:25, 140:1, 140:2, 140:16, 140:21, 142:19
**property's** [1] - 132:18
**propose** [1] - 95:13
**protect** [4] - 43:22, 46:2, 46:16, 46:17
**protected** [2] - 46:25, 47:1
**protection** [1] - 123:21
**protocols** [1] - 103:14
**proud** [1] - 30:12
**provide** [5] - 79:17, 108:24, 110:18, 119:18, 136:1
**provided** [6] - 51:23, 74:24, 115:9, 115:10, 115:11, 121:3
**provider** [2] - 44:14, 44:16
**provides** [2] - 61:19, 141:15
**providing** [3] - 50:9, 137:16, 138:16
**public** [10] - 59:12, 81:8, 84:8, 84:11, 84:23, 91:15, 91:21, 115:12, 116:19, 136:1
**publishing** [1] - 117:11
**pull** [9] - 57:5, 72:11, 81:4, 86:3, 118:23, 125:15, 126:4, 126:19, 127:25
**pulled** [8] - 10:2, 80:21, 81:1, 81:12, 91:23, 92:22, 125:19, 140:25
**pulling** [2] - 9:15, 9:20
**purchase** [1] - 28:2
**purchased** [2] - 28:3, 28:5
**purpose** [5] - 11:5, 11:6, 55:6, 55:21
**purposes** [1] - 103:11
**pursuant** [2] - 95:19, 125:1
**put** [11] - 89:14, 93:25, 94:1, 94:3, 99:20,

102:23, 118:18, 118:20, 118:24, 125:14, 136:23
**putting** [2] - 118:8, 131:24
**PX** [6] - 116:13, 118:23, 126:4, 126:19, 127:6, 132:5

## Q

**quadruple** [1] - 142:4
**Quanta** [1] - 49:4
**questioning** [7] - 21:19, 22:1, 68:15, 68:20, 112:6, 115:15, 129:22
**questions** [10] - 6:13, 10:9, 12:24, 58:21, 70:12, 76:2, 91:6, 93:4, 122:22, 127:17
**quick** [1] - 76:15
**quickly** [2] - 116:13, 128:7

## R

**Rachel** [2] - 41:17, 52:9
**racheted** [1] - 26:12
**railings** [1] - 106:24
**raise** [2] - 79:25, 98:23
**raised** [1] - 64:10
**rally** [10] - 21:13, 21:16, 21:18, 21:22, 22:5, 22:9, 22:11, 22:25, 73:1, 75:7
**ramp** [1] - 12:11
**ran** [1] - 7:2
**rate** [1] - 87:24
**rather** [1] - 79:6
**ratings** [1] - 108:11
**re** [1] - 7:4
**re-elected** [1] - 7:4
**reactive** [1] - 79:6
**read** [15] - 6:4, 16:2, 20:17, 21:7, 21:8, 32:4, 84:10, 89:11, 95:8, 104:10, 104:11, 104:12, 105:7, 107:3, 114:5
**reading** [2] - 20:18, 119:18
**reads** [1] - 120:9
**ready** [1] - 109:6
**real** [3] - 16:16, 16:17, 75:14
**really** [6] - 42:12, 54:21, 75:14, 81:7, 135:20

**realtor** [1] - 100:25
**reason** [3] - 75:14, 130:11, 133:23
**reasons** [1] - 75:20
**rebuttal** [5] - 95:8, 95:11, 95:15, 95:25, 97:11
**receive** [1] - 47:11
**RECEIVED** [1] - 4:3
**received** [12] - 47:13, 47:14, 52:4, 53:15, 84:4, 84:6, 96:8, 113:20, 126:1, 132:13, 136:22, 143:10
**receiving** [1] - 47:12
**recently** [1] - 96:22
**recess** [4] - 76:8, 79:22, 95:6, 143:7
**recognize** [2] - 19:24, 125:16
**recollection** [1] - 14:9
**recommended** [2] - 44:13, 44:16
**record** [16] - 5:7, 16:3, 21:8, 32:5, 77:11, 79:18, 84:17, 84:18, 84:20, 86:3, 90:8, 97:25, 98:1, 98:2, 99:5, 143:24
**records** [44] - 64:12, 80:17, 80:18, 80:22, 81:8, 81:9, 81:18, 81:20, 81:25, 82:3, 82:6, 82:7, 82:12, 84:9, 84:16, 84:23, 87:10, 87:16, 87:21, 88:6, 88:17, 88:21, 88:24, 88:25, 89:2, 89:5, 91:15, 91:21, 114:13, 114:20, 114:21, 115:9, 115:11, 115:12, 116:19, 122:7, 123:23, 136:1, 136:13, 136:14
**recourse** [2] - 24:12, 25:11
**redirect** [1] - 10:11
**Redirect** [1] - 3:9
**REDIRECT** [1] - 10:13
**refer** [2] - 12:1, 92:9
**reference** [3] - 103:24, 105:4, 125:20
**referenced** [1] - 44:6
**referencing** [2] - 66:11, 72:16
**referred** [1] - 135:22
**referring** [3] - 11:14, 56:2, 135:3

**refresh** [2] - 11:14, 14:8
**Regalado** [2] - 74:13, 74:21
**regard** [5] - 77:24, 80:19, 113:11, 123:7, 129:14
**regarding** [5] - 22:24, 59:4, 60:18, 65:10, 83:15
**regards** [1] - 76:24
**registered** [2] - 105:13, 105:16
**regular** [4] - 84:16, 84:19, 84:20, 115:4
**regulated** [2] - 104:5, 104:18
**regulates** [3] - 101:7, 105:19, 105:20
**reinforced** [1] - 68:9
**reiterate** [1] - 78:16
**related** [4] - 14:23, 51:25, 68:10, 72:10
**relating** [1] - 56:24
**relation** [2] - 58:25, 116:20
**relationship** [10] - 14:13, 14:16, 14:24, 29:16, 30:6, 30:9, 31:20, 31:22, 49:19, 67:17
**released** [4] - 78:5, 78:7, 78:10, 78:17
**relevant** [1] - 104:3
**remain** [1] - 109:20
**remaining** [1] - 9:8
**remediation** [1] - 109:6
**remember** [2] - 50:19, 93:14
**reminded** [1] - 96:5
**removal** [2] - 108:20, 109:7
**remove** [1] - 104:16
**removed** [2] - 29:11, 109:2
**removing** [1] - 123:11
**renovations** [1] - 7:21
**repair** [8] - 28:10, 28:14, 61:18, 104:14, 104:16, 115:24, 124:19, 126:22
**repairs** [2] - 127:21, 128:10
**repeat** [1] - 37:5
**repeated** [1] - 42:8
**rephrase** [5] - 26:3, 65:7, 134:13, 135:2, 135:10

**rephrasing** [1] - 25:2
**replace** [1] - 104:16
**replacement** [2] - 126:22, 127:21
**report** [6] - 84:13, 105:11, 108:24, 108:25, 114:23
**REPORTED** [1] - 2:9
**reporter** [1] - 103:16
**Reporter** [1] - 2:10
**REPORTER** [3] - 90:2, 98:23, 99:2
**repository** [2] - 114:20, 136:13
**representatives** [1] - 21:21
**request** [5] - 20:25, 43:5, 56:9, 115:12, 136:2
**requested** [1] - 38:19
**require** [9] - 94:4, 104:22, 105:15, 106:4, 106:13, 106:18, 110:16, 112:12, 122:7
**required** [14] - 41:16, 61:4, 61:17, 61:23, 91:21, 100:1, 104:11, 105:13, 108:1, 108:16, 121:19, 122:13, 132:20, 137:20
**requirement** [4] - 104:6, 108:15, 108:23, 140:23
**requirements** [4] - 107:9, 107:21, 108:10, 108:14
**requires** [2] - 23:18, 97:7
**requisite** [2] - 92:12, 92:14
**research** [3] - 80:21, 91:15, 93:15
**researched** [5] - 81:13, 91:19, 93:14, 93:21, 94:21
**reserve** [1] - 88:2
**Reserves** [2] - 99:21, 99:22
**Residence** [1] - 49:5
**resident** [5] - 65:1, 65:22, 65:24, 66:21, 69:16
**residential** [3] - 69:5, 102:3, 103:11
**residents** [1] - 7:4
**resistant** [1] - 104:17
**resolution** [1] - 68:16
**resolved** [1] - 67:20

**resource** [1] - 6:20
**respect** [5] - 42:24, 48:13, 81:17, 97:19, 97:21
**response** [3] - 21:1, 95:9, 143:25
**responsibility** [6] - 9:15, 9:20, 10:4, 72:7, 72:10, 131:10
**responsible** [5] - 22:8, 52:9, 67:17, 72:17, 144:4
**rest** [8] - 13:20, 76:23, 77:6, 77:15, 97:25, 98:1, 98:2, 98:11
**REST** [1] - 3:15
**resting** [1] - 76:19
**restore** [2] - 30:13, 120:9
**restricted** [2] - 68:9, 69:4
**restroom** [1] - 95:3
**result** [6] - 11:8, 17:8, 44:12, 50:11, 55:20, 70:5
**resulted** [2] - 8:6, 36:17
**resume** [1] - 143:19
**retaliation** [2] - 24:6, 25:24
**reveal** [1] - 39:1
**revealed** [1] - 29:8
**review** [9] - 39:2, 61:9, 91:25, 101:2, 106:12, 107:12, 108:17, 116:20, 122:13, 123:22, 128:2, 128:18, 138:4, 141:6
**reviewed** [7] - 61:6, 64:3, 122:15, 122:16, 123:25, 128:4, 134:18
**reviewing** [1] - 39:19
**reviews** [1] - 41:16
**revisit** [1] - 87:25
**revocation** [1] - 52:7
**revoke** [1] - 112:16
**revoked** [3] - 52:5, 52:13, 52:20
**revolted** [1] - 71:18
**Rey** [1] - 28:16
**Reyes** [3] - 57:19, 57:21, 58:7
**Richard** [1] - 48:21
**ridealong** [1] - 17:8
**rights** [7] - 23:7, 24:13, 25:13, 26:11, 54:23, 75:25, 98:15
**rise** [4] - 5:2, 76:12,

98:6, 143:4
**river** [1] - 120:9
**Rock** [1] - 120:9
**RODNEY** [1] - 1:10
**role** [3] - 90:15, 100:20, 101:17
**roofing** [1] - 106:23
**room** [1] - 76:16
**rooms** [7] - 134:7, 134:18, 135:6, 135:17, 135:19, 135:20, 135:21
**rose** [1] - 63:12
**rough** [1] - 111:20
**routine** [2] - 115:4, 137:13
**RPR** [2] - 2:9, 144:23
**rule** [1] - 94:24
**Rule** [7] - 27:13, 27:19, 29:24, 30:16, 36:8, 37:18, 97:7
**ruled** [1] - 21:2
**Rules** [2] - 97:6, 101:5
**rules** [1] - 56:24
**ruling** [5] - 68:23, 80:13, 93:18, 93:19, 97:19
**rum** [1] - 50:20
**run** [2] - 21:12, 68:22
**run-off** [1] - 21:12
**runners** [1] - 61:16

## S

**S.E** [1] - 1:22
**S.H** [1] - 49:25
**S.W** [1] - 72:24
**s/Glenda** [1] - 144:22
**safety** [2] - 29:9, 108:11
**sagging** [1] - 131:8
**sandwich** [1] - 72:5
**Sanguich** [5] - 72:4, 72:8, 72:24, 73:25
**Saqui** [1] - 100:5
**sarnoff** [1] - 126:15
**Sarnoff** [12] - 1:24, 3:13, 3:22, 5:14, 83:24, 103:17, 103:18, 115:22, 134:13, 134:15, 135:11, 142:7
**SARNOFF** [86] - 80:17, 82:1, 82:12, 82:22, 83:5, 83:10, 83:25, 85:3, 86:15, 87:1, 87:7, 88:3, 88:14, 89:4, 89:24, 91:9, 92:11, 92:20, 93:1, 93:23, 98:17,

98:20, 99:4, 99:10, 102:22, 103:21, 111:1, 112:11, 112:20, 112:25, 113:13, 113:21, 114:12, 114:18, 115:3, 115:17, 115:19, 115:23, 116:18, 117:1, 117:7, 117:11, 117:14, 117:16, 117:17, 118:3, 119:17, 120:4, 120:6, 120:15, 121:9, 121:16, 122:1, 122:19, 122:23, 122:24, 123:5, 123:19, 124:6, 124:17, 126:16, 127:18, 127:19, 128:17, 129:1, 129:8, 129:13, 129:25, 130:1, 130:4, 130:23, 131:3, 132:14, 133:21, 134:4, 134:16, 135:4, 135:12, 136:16, 136:23, 136:24, 139:5, 139:16, 142:9, 142:10, 142:21
**satisfied** [1] - 67:8
**saw** [2] - 73:16, 116:22
**Schectman** [6] - 40:3, 40:8, 40:9, 46:2, 46:16, 46:17
**schedules** [1] - 140:24
**scholarship** [1] - 99:18
**school** [4] - 99:15, 99:16, 99:19, 99:21
**scope** [16] - 9:6, 9:12, 30:2, 55:10, 60:3, 62:20, 71:6, 71:20, 81:12, 91:24, 92:23, 102:25, 106:3, 120:17, 120:19, 136:6
**scoping** [1] - 12:14
**SCOTT** [1] - 2:3
**Scott** [1] - 2:3
**screenshot** [1] - 141:12
**screw** [1] - 137:22
**screw-up** [1] - 137:22
**scroll** [1] - 47:21
**seal** [2] - 5:19, 5:22

**sealed** [4] - 106:4, 106:7, 106:10
**searching** [1] - 6:4
**seat** [6] - 10:7, 21:12, 26:21, 43:7, 89:15, 99:2
**seated** [2] - 5:3, 98:9
**Seco** [1] - 85:11
**second** [11] - 12:1, 21:24, 47:23, 74:15, 75:19, 77:22, 82:19, 83:16, 85:9, 85:18, 126:20
**secondly** [1] - 77:16
**Section** [8] - 104:10, 104:25, 105:6, 111:2, 113:10, 113:14, 125:7, 132:17
**section** [6] - 20:16, 72:16, 102:5, 108:14, 113:15, 119:2
**sector** [2] - 100:4, 100:5
**secure** [1] - 61:18
**secured** [1] - 61:2
**see** [26] - 42:23, 45:23, 48:15, 48:16, 49:2, 49:13, 57:19, 60:20, 63:21, 76:11, 86:10, 105:1, 105:2, 118:25, 121:20, 124:1, 126:6, 131:4, 134:7, 134:12, 136:20, 137:25, 139:11, 140:2, 140:12, 143:22
**seeing** [6] - 123:6, 128:8, 129:3, 129:5, 138:9, 139:9
**seek** [1] - 85:19
**seeking** [2] - 19:9, 85:15
**seeks** [1] - 80:1
**selective** [1] - 8:20
**selectively** [1] - 48:11
**self** [2] - 29:22, 97:8
**self-funded** [1] - 29:22
**self-impeachment** [1] - 97:8
**senior** [1] - 29:2
**Senior** [1] - 99:17
**sense** [3] - 18:12, 87:12, 87:18
**sent** [1] - 73:12
**separate** [2] - 82:5, 120:10
**September** [4] - 35:8, 74:10, 74:23, 75:19

**sequence** [2] - 18:2, 18:10
**serve** [1] - 7:3
**Service** [1] - 49:25
**service** [1] - 19:14
**services** [2] - 14:22, 50:9
**Services** [2] - 48:16, 100:11
**serving** [1] - 101:17
**session** [1] - 143:8
**set** [4] - 106:16, 111:13, 139:23, 140:2
**sets** [3] - 77:23, 84:11, 105:11
**seven** [1] - 102:2
**several** [6] - 24:19, 27:11, 43:16, 96:18, 96:19, 97:2
**SFH** [1] - 141:15
**shall** [8] - 104:19, 105:11, 105:12, 107:5, 107:7, 109:13, 113:23
**shape** [1] - 77:20
**share** [1] - 65:21
**sheetrocking** [1] - 129:14
**shift** [5] - 47:5, 50:17, 57:5, 68:1, 72:3
**shifting** [1] - 64:19
**shipping** [1] - 51:9
**Shipping** [1] - 85:9
**shirt** [1] - 73:17
**shortly** [2] - 21:20, 28:5
**shot** [1] - 13:18
**Show** [2] - 49:2, 49:3
**show** [12] - 26:24, 48:9, 59:19, 80:2, 81:24, 82:13, 82:15, 87:23, 108:4, 108:10, 121:5
**showed** [3] - 8:21, 60:10, 125:20
**shown** [2] - 35:25, 130:14
**shows** [3] - 108:3, 120:4, 120:16
**shut** [2] - 21:22, 55:19
**shutdown** [6] - 11:8, 11:16, 11:17, 21:25, 22:5, 22:8
**Sorry** [1] - 43:17
**SHUTTS** [1] - 1:24
**sick** [1] - 143:15
**sidebar** [8] - 5:19, 21:3, 43:5, 56:9, 76:25, 77:3, 77:6, 98:14

**sight** [1] - 49:13
**sign** [2] - 38:23, 38:24
**signature** [1] - 133:25
**signed** [11] - 8:17, 38:11, 39:1, 41:12, 106:4, 106:7, 106:8, 106:10, 133:23, 133:24
**signing** [3] - 38:14, 38:20, 133:22
**singe** [1] - 138:11
**single** [5] - 66:17, 135:23, 137:14, 138:11, 141:15
**single-story** [1] - 135:23
**sit** [2] - 66:14, 76:20
**site** [10] - 94:19, 108:2, 108:4, 108:10, 109:1, 119:19, 119:20, 137:20, 138:2, 139:24
**six** [3] - 43:18, 43:19, 72:15
**skilled** [1] - 83:3
**skipped** [3] - 127:2, 127:4, 137:7
**slowly** [1] - 121:9
**small** [1] - 106:8
**SMITH** [1] - 1:10
**snail** [1] - 41:15
**so..** [2] - 89:23, 144:4
**Soccer** [2] - 49:6, 49:10
**solemnly** [2] - 89:16, 98:24
**someone** [3] - 15:4, 28:23, 98:19
**sometimes** [2] - 92:9, 137:25
**sorry** [30] - 7:10, 8:20, 16:5, 25:6, 25:8, 25:9, 30:25, 35:21, 40:8, 41:18, 42:1, 42:12, 42:17, 46:9, 57:13, 63:23, 83:23, 89:24, 92:19, 93:11, 101:5, 103:15, 105:24, 111:8, 115:10, 117:16, 120:4, 126:1, 126:20, 130:1
**Sorry** [1] - 43:17
**sort** [3] - 61:16, 66:21, 107:20
**sought** [1] - 18:15
**sounds** [1] - 54:21
**South** [1] - 2:4
**SOUTHERN** [1] - 1:1

**Southern** [2] - 85:11, 85:18
**Southwest** [2] - 49:6, 135:23
**Spanish** [3] - 74:14, 74:16, 75:19
**speaking** [3] - 6:25, 74:15, 83:22
**speaks** [3] - 38:10, 62:17, 69:11
**spec** [1] - 12:23
**special** [8] - 22:4, 52:13, 52:19, 68:8, 69:19, 71:11, 105:10, 105:14
**specialty** [2] - 106:24, 106:25
**specific** [4] - 51:23, 87:20, 106:19, 141:1
**specifically** [2] - 91:16, 104:4
**specification** [1] - 65:5
**specified** [1] - 93:15
**specify** [1] - 112:21
**speculating** [1] - 123:17
**speculation** [22] - 7:16, 13:7, 13:14, 19:5, 23:9, 24:15, 27:18, 36:7, 36:23, 36:25, 37:17, 45:12, 49:22, 51:15, 52:10, 53:11, 57:23, 59:8, 62:24, 67:13, 73:8, 73:22
**speech** [3] - 25:19, 26:2, 75:25
**spelling** [1] - 99:5
**spend** [2] - 43:20, 54:24
**spoken** [1] - 103:16
**sponsor** [4] - 57:21, 58:2, 58:6, 58:7
**spontaneous** [1] - 22:11
**sprung** [1] - 96:17
**square** [1] - 119:7
**staff** [2] - 21:16, 66:16
**stages** [1] - 111:14
**stand** [3] - 125:7, 125:11, 142:21
**start** [4] - 7:20, 38:14, 38:20, 128:7
**started** [5] - 14:18, 31:23, 33:4, 51:21, 87:14
**starting** [1] - 20:18
**starts** [1] - 137:15
**State** [9] - 100:2,

100:21, 100:24, 102:8, 105:19, 105:20, 113:8, 114:19, 136:11
**state** [11] - 5:7, 83:14, 89:14, 90:8, 99:2, 99:13, 100:2, 134:19, 135:17, 138:2, 138:19
**statement** [11] - 24:22, 42:8, 69:11, 74:12, 84:11, 86:11, 105:10, 132:19, 132:20
**statements** [2] - 22:17, 22:18
**States** [3] - 2:10, 96:23, 144:24
**states** [1] - 24:17
**STATES** [2] - 1:1, 1:11
**stating** [2] - 64:12, 119:14
**Station** [1] - 49:5
**status** [1] - 134:5
**statute** [1] - 85:1
**Statute** [1] - 85:3
**Statutes** [4] - 94:4, 105:3, 105:14, 106:5
**statutes** [1] - 84:22
**stay** [2] - 118:22, 143:14
**stealing** [1] - 50:4
**STENOGRAPHICALLY** [1] - 2:9
**step** [4] - 12:1, 76:4, 137:7, 137:18
**steps** [1] - 143:5
**Steve** [1] - 21:15
**still** [5] - 18:15, 31:22, 57:11, 94:13, 94:17
**stipulate** [1] - 79:15
**stipulated** [1] - 77:13
**stole** [2] - 59:2
**stop** [23] - 26:25, 35:3, 80:3, 112:22, 113:1, 113:4, 113:5, 117:18, 117:19, 117:24, 118:4, 118:5, 118:9, 120:23, 121:1, 123:1, 124:7, 124:14, 128:1, 138:21, 141:18
**story** [9] - 6:16, 8:22, 8:24, 36:13, 46:13, 55:19, 61:21, 135:23, 141:15
**story-telling** [2] - 36:13, 46:13
**strategic** [2] - 95:21,

96:2
**Street** [5] - 1:19, 1:22, 49:7, 72:25, 135:23
**stricken** [5] - 22:18, 37:13, 58:4, 68:12, 110:24
**strike** [5] - 22:16, 31:19, 37:11, 58:3, 68:11
**structural** [4] - 126:22, 127:21, 128:10, 139:10
**structure** [6] - 104:15, 109:20, 113:14, 131:17, 132:3, 140:9
**structures** [7] - 109:10, 109:12, 113:11, 131:13, 139:24, 140:18
**studies** [1] - 99:24
**stuff** [2] - 80:11, 81:22
**Suarez** [3] - 1:15, 5:9, 48:20
**sub** [3] - 125:19, 125:23, 125:24
**subject** [3] - 16:2, 53:10, 97:18
**submission** [1] - 135:17
**submissions** [2] - 134:18, 135:5
**submit** [7] - 20:25, 61:14, 85:25, 108:2, 108:18, 135:13, 141:19
**submittal** [6] - 105:6, 105:9, 105:25, 106:15, 107:6, 141:2
**submittals** [4] - 106:18, 106:22, 106:23, 107:25
**submitted** [7] - 46:18, 64:3, 95:19, 97:14, 105:11, 106:16, 106:17
**subscribed** [1] - 107:8
**substance** [2] - 20:16, 54:8
**sue** [1] - 24:6
**suggesting** [1] - 80:6
**suggestion** [4] - 15:2, 15:8, 64:5, 64:6
**suing** [1] - 43:21
**Suite** [5] - 1:15, 1:19, 1:22, 1:25, 2:5
**summer** [1] - 25:16
**Sunday** [1] - 22:6
**sup** [1] - 85:8
**supplement** [1] - 97:9
**support** [2] - 74:24,

80:15
**supported** [4] - 16:18, 73:4, 73:18, 74:21
**supporting** [2] - 74:12, 106:1
**supposed** [1] - 111:8
**Supreme** [1] - 96:22
**surrounding** [2] - 28:14, 30:24
**survey** [1] - 120:3
**suspend** [1] - 112:16
**sustain** [5] - 45:8, 56:23, 112:9, 123:18, 129:7
**sustained** [79] - 7:7, 7:9, 7:18, 8:3, 8:7, 8:10, 8:14, 9:8, 9:10, 9:13, 9:18, 9:23, 10:5, 11:23, 12:25, 15:15, 15:17, 17:3, 18:20, 18:22, 19:2, 19:16, 24:3, 24:23, 25:1, 26:3, 28:21, 30:1, 30:3, 30:17, 31:15, 31:17, 35:14, 36:15, 38:4, 39:5, 41:22, 42:23, 43:1, 43:8, 43:9, 44:3, 46:14, 52:11, 52:17, 53:19, 56:17, 56:22, 58:10, 58:23, 60:7, 64:7, 65:7, 70:9, 71:23, 73:9, 75:10, 110:24, 112:19, 112:24, 114:11, 116:24, 117:6, 119:16, 120:14, 121:8, 121:14, 121:25, 124:5, 127:16, 128:16, 130:22, 134:3, 135:10, 139:4, 139:15
**Sustained** [1] - 36:20
**swear** [3] - 89:16, 98:21, 98:24
**Sweets** [1] - 49:6
**swimming** [7] - 104:1, 104:3, 104:4, 104:6, 104:7, 104:25
**swoop** [1] - 43:17
**sworn** [5] - 6:7, 90:1, 90:3, 90:4, 99:7
**system** [3] - 129:18, 130:24, 141:12
**systems** [1] - 104:18

**T**

**talks** [3] - 102:25,

103:8, 107:24
**taller** [1] - 76:21
**tantamount** [1] - 82:23
**Taq** [1] - 62:13
**Taquerias** [4] - 60:13, 60:14, 60:23, 64:19
**targeted** [2] - 8:6, 48:11
**targeting** [5] - 25:25, 31:12, 73:25, 75:15, 75:20
**temporary** [4] - 109:10, 109:12, 110:18
**tenant** [1] - 72:16
**tender** [1] - 92:11
**tenus** [1] - 5:20
**term** [1] - 95:11
**terminated** [1] - 27:16
**terms** [2] - 97:3, 123:6
**test** [1] - 103:13
**testified** [15] - 6:12, 8:6, 9:4, 9:9, 10:1, 11:15, 64:23, 75:12, 81:14, 81:21, 86:5, 86:6, 90:4, 99:7, 123:2
**testify** [25] - 6:8, 37:12, 80:12, 80:14, 82:3, 82:19, 83:15, 83:17, 83:18, 83:20, 85:16, 85:23, 86:1, 86:23, 87:9, 87:22, 88:5, 88:24, 93:14, 93:17, 93:22, 94:15, 94:19, 94:23, 97:12
**testifying** [22] - 10:22, 13:15, 14:5, 15:24, 27:23, 28:11, 47:25, 52:24, 53:7, 56:11, 56:15, 57:15, 64:20, 65:10, 72:4, 74:20, 81:17, 85:24, 110:23, 112:6, 112:8, 114:10
**testimony** [15] - 8:25, 9:25, 15:3, 15:16, 17:6, 37:2, 60:18, 70:19, 80:2, 85:15, 85:20, 97:18, 143:12, 143:17, 143:20
**testimony's** [1] - 38:16
**testing** [2] - 108:25, 109:3
**text** [3] - 22:12, 73:12, 73:14
**THE** [385] - 1:10, 1:13,

1:17, 2:3, 5:3, 5:11, 5:15, 5:17, 5:21, 5:23, 5:25, 6:3, 7:7, 7:8, 7:9, 7:10, 7:18, 8:3, 8:10, 8:14, 8:19, 9:8, 9:13, 9:18, 9:23, 10:5, 10:10, 11:10, 11:12, 11:21, 11:23, 12:25, 13:6, 13:9, 13:10, 13:13, 13:16, 13:17, 14:1, 15:4, 15:7, 15:8, 15:13, 15:15, 15:17, 16:21, 17:3, 17:15, 17:17, 17:18, 17:24, 17:25, 18:4, 18:7, 18:9, 18:10, 18:18, 18:20, 18:22, 19:2, 19:7, 19:8, 19:13, 19:14, 19:16, 19:18, 20:6, 20:22, 20:24, 21:4, 22:18, 23:2, 23:3, 23:10, 23:11, 23:14, 23:17, 23:20, 23:25, 24:3, 24:9, 24:10, 24:16, 24:18, 24:19, 24:23, 25:1, 25:7, 25:15, 25:21, 25:22, 26:3, 26:9, 26:10, 26:17, 26:19, 26:21, 26:24, 27:5, 27:7, 27:9, 27:10, 27:14, 27:15, 27:20, 28:21, 29:7, 29:8, 30:1, 30:3, 30:17, 31:15, 31:17, 35:14, 35:19, 36:9, 36:10, 36:15, 36:20, 37:3, 37:13, 37:19, 37:20, 38:4, 38:12, 38:13, 38:18, 38:19, 38:22, 38:23, 39:5, 39:15, 41:20, 41:22, 42:9, 42:14, 42:16, 42:17, 42:18, 42:21, 43:4, 43:6, 43:11, 43:12, 43:13, 44:1, 44:3, 44:21, 44:22, 45:8, 45:14, 45:15, 45:19, 46:4, 46:6, 46:7, 46:8, 46:9, 46:10, 46:11, 46:14, 46:20, 46:22, 46:23, 47:2, 48:7, 48:8, 49:16, 49:23, 49:24, 51:17, 52:11, 52:17, 53:12, 53:13, 53:19, 54:18, 54:19, 55:4, 55:5, 55:11, 55:12, 55:15, 55:16, 56:10, 56:13, 56:17, 56:22, 57:2, 57:25,

58:1, 58:4, 58:10, 58:23, 59:7, 59:10, 59:11, 59:15, 60:2, 61:12, 61:23, 61:25, 62:3, 62:6, 62:9, 62:15, 62:18, 62:19, 62:23, 63:1, 63:2, 63:9, 63:14, 64:7, 64:9, 64:14, 64:15, 65:7, 66:8, 66:13, 66:14, 66:24, 67:3, 67:6, 67:12, 67:15, 67:16, 68:12, 68:17, 68:21, 68:24, 69:8, 69:13, 69:15, 70:9, 70:11, 70:15, 70:18, 70:22, 71:5, 71:7, 71:8, 71:19, 71:23, 73:9, 73:23, 74:4, 75:10, 75:23, 75:24, 76:3, 76:6, 76:17, 76:20, 77:2, 77:12, 78:12, 78:16, 79:3, 79:7, 79:11, 79:20, 79:23, 80:3, 80:6, 81:16, 81:24, 82:7, 82:13, 83:2, 83:6, 83:22, 83:24, 85:7, 86:10, 86:14, 86:21, 87:17, 88:9, 88:15, 88:19, 89:3, 89:7, 89:12, 89:19, 89:22, 90:2, 90:3, 91:7, 92:18, 93:3, 93:6, 93:10, 94:22, 95:4, 95:7, 97:25, 98:8, 98:13, 98:16, 98:19, 98:21, 98:23, 99:1, 99:2, 99:6, 102:20, 103:15, 103:19, 103:20, 110:22, 110:24, 112:8, 112:19, 112:24, 113:16, 113:18, 114:9, 114:11, 114:16, 114:17, 115:1, 115:2, 115:18, 115:22, 116:24, 117:6, 117:10, 117:13, 117:15, 117:22, 118:1, 119:16, 120:1, 120:2, 120:14, 121:8, 121:14, 121:22, 121:25, 122:21, 123:4, 123:14, 123:18, 124:5, 124:13, 124:14, 126:12, 126:14, 127:12, 127:15,

128:16, 128:25, 129:7, 129:11, 129:12, 129:24, 130:2, 130:3, 130:22, 131:2, 132:9, 132:12, 133:19, 133:20, 134:3, 134:13, 134:21, 134:22, 134:24, 135:2, 135:10, 136:19, 137:9, 138:15, 138:16, 139:4, 139:15, 142:7, 142:23, 143:8, 144:5, 144:7, 144:9, 144:11

**theirs** [1] - 72:10
**thereafter** [1] - 21:20
**therefore** [3] - 95:25, 97:19, 114:2
**thereon** [1] - 113:25
**thereto** [2] - 42:24, 80:23
**third** [1] - 66:2
**thomas** [1] - 2:3
**thousands** [1] - 43:21
**three** [9] - 16:8, 29:15, 33:4, 48:21, 79:8, 83:18, 92:8, 94:9, 102:25
**throughout** [1] - 111:18
**thumbing** [2] - 119:19, 128:7
**timeline** [3] - 42:1, 42:12, 43:18
**timeouts** [1] - 96:10
**timing** [4] - 60:19, 60:25, 61:7, 78:7
**tiny** [1] - 9:3
**title** [1] - 83:7
**titular** [1] - 82:2
**today** [5] - 36:10, 66:14, 84:1, 84:2, 134:5
**together** [1] - 143:22
**tomorrow** [1] - 143:19
**took** [25] - 14:20, 29:19, 32:7, 32:14, 32:23, 33:5, 33:13, 33:20, 34:3, 34:13, 34:20, 35:5, 36:3, 37:1, 39:8, 40:13, 51:3, 51:24, 52:8, 52:14, 52:21, 64:21, 73:4, 73:25, 80:9
**tool** [2] - 113:4, 113:7
**top** [3] - 81:21, 120:9, 126:6

**topic** [1] - 6:12
**total** [3] - 119:9, 122:14, 141:6
**Tower** [53] - 27:23, 28:2, 28:5, 29:19, 30:24, 32:12, 32:18, 33:1, 33:9, 33:16, 33:24, 34:9, 34:16, 35:1, 36:1, 39:10, 39:22, 39:24, 40:21, 40:23, 41:8, 44:7, 44:8, 45:4, 45:10, 45:16, 46:1, 80:10, 82:22, 83:17, 83:19, 92:3, 92:4, 92:9, 94:14, 115:7, 115:9, 116:11, 119:20, 122:4, 122:6, 128:3, 132:2, 133:3, 134:5, 134:7, 134:12, 134:18, 134:23, 135:5, 135:9, 135:13, 137:23
**towers** [1] - 84:3
**tracks** [1] - 26:25
**trade** [1] - 106:8
**training** [1] - 99:23
**transcript** [1] - 86:18
**transcription** [1] - 144:17
**transmitted** [2] - 84:18, 140:10
**trapped** [1] - 96:8
**Trial** [1] - 1:9
**trial** [12] - 43:2, 57:17, 77:23, 79:9, 79:11, 82:8, 96:25, 97:3, 97:13, 97:15, 144:3
**tried** [2] - 12:21, 26:10
**true** [3] - 54:19, 85:25, 136:4
**Trust** [1] - 43:23
**truth** [7] - 54:14, 89:17, 98:24, 98:25
**try** [4] - 6:24, 55:19, 104:9, 143:14
**trying** [10] - 13:11, 13:18, 39:12, 51:11, 70:13, 77:21, 85:19, 93:25, 138:1, 143:16
**turkeys** [1] - 7:8
**turn** [1] - 6:20
**twice** [1] - 96:21
**two** [25] - 16:9, 21:20, 29:1, 40:25, 45:2, 49:12, 53:15, 62:7, 69:23, 85:5, 85:19, 94:9, 100:4, 105:11, 113:22, 126:4, 126:19, 127:4,

127:6, 127:20, 127:23, 128:10, 132:25, 133:2, 142:6
**type** [3] - 51:7, 62:20, 80:2
**types** [1] - 29:17
**typical** [1] - 106:14
**typically** [4] - 106:21, 137:15, 137:17, 137:19

## U

**under** [14] - 5:19, 5:22, 16:12, 83:11, 84:9, 84:12, 84:22, 86:6, 97:6, 106:25, 114:19, 114:24, 119:2, 120:10
**understood** [1] - 53:13
**undivided** [1] - 143:16
**unduly** [1] - 96:14
**unfortunately** [2] - 16:18, 96:11
**Union** [1] - 95:17
**united** [1] - 2:10
**UNITED** [2] - 1:1, 1:11
**United** [2] - 96:23, 144:24
**units** [1] - 119:14
**University** [2] - 96:6, 96:7
**unlawful** [1] - 22:13
**unless** [3] - 37:11, 76:20, 87:22
**unnecessarily** [1] - 96:25
**unpermitted** [1] - 130:17
**unproven** [1] - 20:20
**unsafe** [9] - 113:11, 113:14, 113:23, 131:12, 131:17, 132:3, 140:9, 140:17
**up** [53] - 6:5, 10:6, 10:18, 15:21, 19:22, 26:12, 28:8, 30:11, 31:3, 31:4, 32:2, 32:25, 33:8, 33:15, 33:23, 34:8, 35:7, 37:23, 37:24, 41:5, 47:6, 47:20, 47:25, 50:23, 55:25, 57:5, 57:11, 59:17, 60:11, 61:17, 63:18, 72:11, 72:19, 73:11, 74:6, 74:9, 75:13, 93:24, 102:23, 106:11, 106:16, 109:17,

115:13, 118:23, 118:25, 125:15, 126:4, 126:6, 126:19, 126:21, 127:25, 136:23, 137:22
**up-front** [1] - 63:18
**upheld** [1] - 8:7
**Uriarte** [6] - 17:6, 17:8, 17:11, 17:25, 18:24, 19:4
**uses** [2] - 109:10, 109:12
**utility** [1] - 72:9

## V

**vague** [2] - 26:8, 135:7
**Valencia** [3] - 53:14, 54:1, 54:5
**valet** [8] - 11:7, 11:15, 12:3, 12:11, 47:5, 48:1, 50:1, 50:9
**Valet** [1] - 49:25
**Vanessa** [2] - 66:16
**vehicle** [3] - 11:2, 12:11, 12:13
**velocity** [2] - 102:5, 103:14
**venue** [1] - 23:14
**verdict** [1] - 77:9
**verge** [1] - 94:10
**verified** [1] - 109:3
**verify** [1] - 111:24
**versions** [1] - 38:25
**versus** [4] - 5:5, 85:8, 95:16, 96:7
**vested** [1] - 125:1
**vibrating** [1] - 15:5
**victim** [1] - 16:18
**Victoria** [1] - 47:19
**Viernes** [3] - 57:22, 58:19, 58:25
**view** [2] - 123:7, 141:12
**Village** [1] - 35:22
**violated** [1] - 75:24
**violation** [16] - 24:13, 25:12, 28:15, 28:16, 29:15, 51:7, 72:22, 72:23, 116:8, 132:18, 137:6, 137:15, 138:2, 140:9, 140:15, 140:22
**violations** [17] - 7:23, 8:5, 8:6, 8:11, 9:4, 29:18, 30:8, 31:23, 35:25, 36:6, 36:12, 36:17, 36:22, 49:12,

65:18, 91:3, 141:13
**virtually** [4] - 8:5, 9:4, 9:9, 84:3
**vision** [9] - 6:15, 6:16, 6:19, 7:1, 7:2, 7:3, 7:4, 7:12, 7:13
**visions** [1] - 6:23
**visit** [1] - 113:22
**voided** [2] - 69:23, 69:24
**Voir** [2] - 3:12, 3:13
**voir** [3] - 88:10, 89:8, 89:21
**VOIR** [2] - 90:6, 91:8
**volume** [1] - 88:7
**volumes** [3] - 101:25, 102:2, 103:8
**volunteer** [1] - 78:20
**voted** [1] - 73:15
**voters** [1] - 7:5
**vs** [1] - 1:6

## W

**wait** [20] - 46:6, 46:8, 61:25, 69:8, 71:19, 76:16, 93:10, 98:2, 103:15, 110:22, 123:14, 127:12, 127:15, 134:13, 134:24
**Wait** [1] - 110:22
**waiting** [1] - 47:24
**waive** [2] - 77:25, 98:15
**waiver** [3] - 77:20, 79:15
**waiving** [1] - 77:9, 78:3
**walk** [2] - 129:2, 137:18
**walk-through** [1] - 137:18
**walked** [2] - 29:2, 96:8
**wall** [1] - 87:15
**walls** [2] - 29:10, 111:23
**wants** [1] - 43:24
**watch** [1] - 6:4
**Weber** [1] - 96:6
**weekend** [2] - 144:1, 144:12
**weeks** [1] - 69:23
**welcome** [3] - 75:1, 144:9, 144:11
**West** [1] - 85:10
**western** [1] - 40:24
**whatsoever** [1] - 78:18
**wherein** [2] - 22:7,

22:9

**whole** [3] - 89:9,
89:17, 98:25
**WILLIAM** [2] - 1:4, 3:7
**wiLLIAM** [1] - 6:7
**wind** [1] - 102:5
**window** [5] - 126:22,
127:20, 127:21,
128:9, 128:10
**windows** [5] - 106:23,
120:10, 122:17,
123:11, 124:3
**WITNESS** [71] - 3:4,
7:8, 7:10, 13:10,
13:17, 15:8, 17:18,
17:25, 18:4, 18:10,
18:18, 19:8, 19:14,
23:3, 23:11, 23:14,
24:10, 24:19, 25:22,
26:10, 26:24, 27:10,
27:15, 29:8, 36:10,
37:20, 38:13, 38:19,
38:23, 42:17, 43:11,
43:13, 44:22, 45:15,
46:4, 46:7, 46:9,
46:11, 46:23, 48:8,
49:24, 53:13, 54:19,
55:5, 55:12, 55:16,
58:1, 59:11, 61:23,
62:19, 63:2, 64:14,
66:14, 67:6, 67:16,
69:15, 71:8, 75:24,
89:19, 99:1, 99:6,
103:19, 114:16,
115:1, 120:2,
124:14, 129:11,
130:3, 133:20,
134:22, 138:16
**Witness** [2] - 76:5,
93:7
**witness** [44] - 10:9,
10:25, 15:23, 18:6,
24:22, 28:20, 55:24,
59:17, 59:19, 76:6,
79:25, 81:17, 82:18,
83:11, 86:22, 87:5,
87:6, 87:24, 88:1,
89:13, 90:1, 92:17,
92:18, 94:17, 95:13,
95:16, 95:19, 95:22,
96:14, 96:16, 96:24,
97:14, 97:21, 98:10,
98:13, 98:19, 98:21,
115:15, 116:16,
117:9, 121:12,
134:14, 139:13,
143:5
**witnesses** [14] - 80:4,
95:8, 95:20, 95:22,
95:25, 96:13, 96:17,

96:19, 97:7, 97:8,
97:10, 97:12, 97:17,
97:20
**witnesses'** [1] - 97:18
**woman** [1] - 67:24
**won** [2] - 45:4, 70:7
**word** [1] - 103:17
**words** [1] - 103:17

## Y

**year** [10] - 44:18,
44:24, 45:1, 46:1,
65:20, 81:15, 90:16,
101:14, 101:17,
109:23
**years** [9] - 15:9, 29:19,
29:20, 44:18, 44:22,
59:3, 76:1, 96:20,
100:9
**yellow** [1] - 73:17
**yesterday** [4] - 10:23,
15:10, 21:3, 77:12
**yesterday's** [1] - 77:5
**younger** [4] - 17:13,
18:14, 18:25, 19:8
**yourself** [1] - 20:11
**yourselves** [1] - 143:2

## Z

**zones** [1] - 103:14