```
                UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
                      MIAMI DIVISION
                CASE NO. 14-24009-CIV-JLK

WILLIAM FULLER AND
MARTIN PINILLA,

          Plaintiffs,              MIAMI, FLORIDA
     vs.
                                   MAY 17, 2024
JOE CAROLLO
                                   PAGES 1 - 136
_____Defendants._____/
```

```
                TRANSCRIPT OF MOTION HEARING
         BEFORE THE HONORABLE JUDGE LAUREN LOUIS
               UNITED STATES DISTRICT JUDGE
```

<u>APPEARANCES:</u>

```
FOR THE PLAINTIFFS:        JEFFREY GUTCHESS, ESQ.
                           ROSSANA ARTEAGA-GOMEZ, ESQ.
                           SAMUEL KRAMER, ESQ.

FOR THE DEFENDANT:         MASON PERTNOY, ESQ.
                           JUSTIN HENNING, ESQ.
                           MARK SARNOFF, ESQ.
                           JAMES MILLER, ESQ.
                           BEN KUEHNE, ESQ

FOR CITY OF MIAMI:         CHRISTOPHER JOHNSON, ESQ.
                           Gray Robinson
```

```
                DIANE M. MILLER, RMR, CRR, CRC
                    Official Court Reporter
                diane_miller@flsd.uscourts.gov
```

<u>**I-N-D-E-X**</u>

<u>**WITNESSES**</u>                                                    <u>**PAGE**</u>

**KEN RUSSELL**

    Direct Examination by Mr. Kramer                19

    Cross-Examination by Mr. Pertnoy               39

    Redirect Examination by Mr. Kramer             49

**MIGUEL DE GRANDY**

    Direct Examination by Mr. Gutchess             50

    Cross-Examination by Mr. Pertnoy               63

**COMMISSIONER JOE CAROLLO**

    Direct Examination by Ms. Gomez                64

    Cross-Examination by Mr. Pertnoy               83

    Redirect Examination by Ms. Gomez              99

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2            THE COURTROOM DEPUTY:  United States District Court
 3       for the Southern District of Florida is now in session, the
 4       Honorable Lauren Louis presiding.
 5            THE COURT:  Good morning, please be seated.
 6            THE COURTROOM DEPUTY:  Calling case number
 7       18-24190-Civil, Judge Smith, William Fuller, et al., versus Joe
 8       Carollo.
 9            Counsel, would you please note your appearances, for
10       the record, beginning with the plaintiff.
11            MS. GOMEZ:  Good morning, Rossana Arteaga-Gomez,
12       Jeffrey Gutchess, and Samuel Kramer on behalf of Martin Pinilla
13       and Bill Fuller.
14            THE COURT:  Thank you, Ms. Gomez.
15            MR. PERTNOY:  Good morning, Your Honor; Mason
16       Pertnoy, Justin Henning, Mark Sarnoff, James Miller, and Ben
17       Kuehne on behalf of Mr. Carollo; and there is an attorney here
18       for the City, I'll let him make his appearance.
19            THE COURT:  Good morning, Mr. Johnson.
20            MR. JOHNSON:  Good morning, Your Honor; Chris Johnson
21       with Gray Robinson.  I'm here on behalf of the City of Miami.
22       I did file a notice of appearance solely to make objections to
23       any potential violation of the City's privilege.
24            THE COURT:  Okay.  As a preliminary matter,
25       Mr. Pertnoy, I haven't entered a written order, but I'm
```

1    prepared to deny the motion to dismiss for reasons that we'll

2    flesh out in the written order.  We just haven't been able to

3    get it filed.  To the extent it invokes Rule 12 and Rule 56,

4    they are both inapplicable here to the extent it sought to

5    avoid the evidentiary hearing.

6         The hearing was originally set but continued at your

7    request, it is the preferred method, I think I understand your

8    position on the absence of factual disputes, that should make

9    for a narrow hearing, but we are going to have it this morning,

10   and only this morning.

11        So know that your time is limited; use it to, I

12   submit, first give me a short proffer of that which you intend

13   to prove, as the party carrying the burden, through witness or

14   documentary evidence so that I can hopefully make fair rulings

15   on objections when I know what is coming and what you think is

16   at issue and also so that we are appropriately putting

17   guardrails on the time that we are spending, okay?

18        Ms. Gomez, are you making that opening?

19        MS. GOMEZ:  Sure, Your Honor.

20        In terms of the amount of time, we do intend to keep

21   it all very short.  We have three witnesses.  We intend to

22   begin with Ken Russell, who we think will be about 20 minutes

23   of testimony; then Mr. De Grandy, who we also think will be

24   about 20, 30 minutes of testimony; and then end with

25   Commissioner Carollo.  We don't expect it will be much longer

1   than hopefully 30, 45 minutes.

2          In terms of what we are trying to establish is that

3   Commissioner Carollo abandoned his residence in Coconut Grove,

4   in District -- at the time, it was in District 2; that he

5   abandoned it so that he could run for office, and that he has

6   never really regained his homestead in that property to date.

7          And, Your Honor, we could begin; we are prepared to

8   call our first witness.

9          MR. PERTNOY:  Your Honor, may I make a brief opening?

10         THE COURT:  Yes, you may, but I'll tell you, too, if

11  you prefer, you can also, because, again, know -- I think I

12  know that your position is that even if everything they say is

13  true, they are still not entitled to relief.  So if you want to

14  wait until after they have made their presentation to make your

15  opening, then you can do it at that time.  It's up to you.

16         MR. PERTNOY:  I'm going to make a brief opening, but

17  I think you understand the salient issues, so I'll keep it even

18  briefer than that.

19         May I approach the podium?

20         THE COURT:  Yes, of course.

21         Please, both of you just be cognizant of the fact

22  that our court reporter is remote, so she only hears you if you

23  are on the microphone.  So far, you both have been very

24  respectful about that, but her camera right now only catches

25  the podium.

```
 1              And, Diane, you will tell us if you want it turned to
 2     the witness, please.
 3              THE COURT REPORTER:  Yes, I will.  Thank you, Judge.
 4              THE COURT:  Do you want us to turn it to the witness?
 5              THE COURT REPORTER:  I prefer to see the attorneys so
 6     I can watch the dynamic.
 7              THE COURT:  Got it, okay.  So the camera right now
 8     has both Mr. Pertnoy and Ms. Gomez on it.
 9              Mr. Pertnoy, obviously, is a little clearer, but just
10     please, I don't want to have to keep interrupting to say "slow
11     it down" or "use the microphone," okay?  Just be aware.
12              Go ahead, Mr. Pertnoy.
13              MR. PERTNOY:  Thank you, Your Honor.
14              Obviously, the Court understands that this is an
15     incredibly important day for Mr. Carollo; but more, just as
16     important, this is a very important day for every resident of
17     the State of Florida.
18              Today, the plaintiffs are seeking to attack one of
19     the key bedrocks of the Florida constitution, and they are
20     asking this Court to rewrite, from an affirmed Florida Supreme
21     Court and Eleventh Circuit case, law and to erode and make --
22     render meaningless the Florida constitution constitutional
23     homestead protection.
24              As this Court is aware, in our papers -- and I'm not
25     going to belabor it -- that it is very clear in even their own
```

```
 1    case law that -- and their very first case in their response to
 2    our objection -- to our motion for summary judgment was the
 3    In Re:  Bethune case, where that Court, the Eleventh Circuit
 4    said, we reiterate under well-settled Florida law an equitable
 5    lien is available where the property owner seeks a homestead
 6    exemption for property purchased with funds obtained through
 7    fraud.
 8            They -- as you have already indicated, there has been
 9    no counter to any of the evidence that we have supplied in our
10    motion for summary judgment.  As such, you are going to see
11    there is going to be no evidence of egregious or fraudulent
12    conduct, let alone that that egregious or fraudulent conduct
13    which is -- this is the key part -- traceable or connected to
14    funds that were used to either invest or purchase Mr. Carollo's
15    homestead.  Ultimately, they are going to engage in a frolic
16    and detour and circus maximus to try to have this Court rewrite
17    the Florida constitution.
18            With respect to the witnesses that they intend to
19    call, they have no relevant knowledge as to the salient
20    question that's before this Court which is, at the end of the
21    day, in March or April of 2023, before there was even a
22    judgment let alone a valid lien recorded against Mr. Carollo's
23    property, had he established a constitutionally-protected
24    homestead?
25            THE COURT:  Give that date again.
```

```
 1              MR. PERTNOY:  March, April 2023.

 2              THE COURT:  March or April?

 3              MR. PERTNOY:  March or April, and you will see in

 4    some of the testimony why that's the case; but, regardless,

 5    that is before there was even a jury verdict, and that's before

 6    there was ever a valid lien recorded against the property.

 7              The evidence that was attached to our motion for

 8    summary judgment of Mr. Carollo moving into the property,

 9    living in that property, having electricity, having a DirecTV

10    account, having water delivered to that property, et cetera, et

11    cetera, filing taxes with that address, for his -- with the

12    IRS, every bit of evidence establishes that that was where he

13    was living with the full intention of living there, and that is

14    unrebutted.

15              Under the local rules, when we filed that statement

16    of undisputed facts, they had an obligation to dispute those

17    facts and they did not.  They are deemed admitted and the

18    inquiry should end right there.

19              But with respect to the witnesses that are being

20    intended to call over this red herring of redistricting, we

21    took Mr. Russell's deposition yesterday and he admitted that he

22    has no personal knowledge as to Mr. Carollo's intentions.  He

23    has no personal knowledge as to him directing anybody to put

24    the home in the homestead -- the home into his district.  And

25    even if it was, it would be irrelevant under the law which they
```

```
 1   are asking you to blatantly ignore.

 2            So we will be objecting to Mr. Russell testifying.

 3   We will be objecting to Mr. De Grandy testifying because they

 4   offer no relevant testimony, no personal knowledge on the only

 5   question that needs to be answered:  Did Mr. Carollo establish

 6   a constitutionally-protected homestead prior to them recording

 7   a valid lien against the property?

 8            The undisputed evidence, all of the evidence, nothing

 9   to the contrary indicates unequivocally yes.  And so that is

10   what we are going to show, that is what we are going to prove.

11   But we don't even get there because they never meet their

12   burden, and so we will be addressing that at a later point in

13   time in this hearing.

14            Thank you, Your Honor.

15            THE COURT:  Thank you.

16            Ms. Gomez, what is the proffer for De Grandy and

17   Russell?

18            MS. GOMEZ:  Your Honor, what Mr. Pertnoy just said

19   was very important.  It is the egregiousness.  So this Court

20   gets to consider whether Commissioner Carollo intended to make

21   that Coconut Grove home his actual home, and he went to great

22   lengths, egregious lengths to try to protect that home within a

23   district that had -- it was -- he had to split an entire

24   community into two to be able to get a sliver of a home.  And

25   Mr. Russell will be able to testify that, as a sitting
```

1    commissioner in his same shoes had no understanding, could not

2    appreciate how that map that actually was voted on -- they

3    called it the "base map," how that map actually furthered the

4    legitimate redistricting purpose that they were there to engage

5    in.

6              THE COURT:  What fact at issue in this hearing does

7    that make more or less likely to be true?

8              MS. GOMEZ:  It's whether the egregiousness of the

9    conduct to be able to try to get a piece of property into his

10   district so that he can continue serving as commissioner.

11             THE COURT:  You are not explaining it.  Why would

12   that have anything to do with whether or not this is homestead?

13             MS. GOMEZ:  Because, Your Honor, he still is a

14   sitting commissioner.

15             THE COURT:  I know.

16             MS. GOMEZ:  He hasn't resigned.

17             THE COURT:  Okay.

18             MS. GOMEZ:  That map has been invalidated.

19             THE COURT:  I know.

20             MS. GOMEZ:  And Mr. Russell, the idea that he

21   voted -- sorry.  There were communications between Commissioner

22   Carollo and Mr. De Grandy during the redistricting process.  A

23   map comes out of whole cloth that nobody on that commission

24   understands why we are splitting the community into two.

25             THE COURT:  Why doesn't it support Mr. Carollo's

```
 1   position.
 2          MS. GOMEZ:  It supports because it tends to show that
 3   there were communications, private communications between
 4   Mr. De Grandy and Commissioner Carollo that were inappropriate,
 5   that were -- the sole purpose of those conversations was to
 6   protect a piece of property and not the legitimate
 7   redistributing purpose that they were there to engage in.
 8          THE COURT:  That's not -- that's the Grace case.
 9   This is about whether or not he moved into the home and
10   intended to make it his home.  I don't understand why that
11   proffer doesn't support his claim of exemption.
12          MS. GOMEZ:  Your Honor, I'm going to defer to
13   Mr. Gutchess, who is going to be putting on Mr. De Grandy.
14          THE COURT:  Okay.
15          MR. GUTCHESS:  Thank you, Your Honor.
16          I recognize that this Court has familiarity with the
17   Grace case and with Mr. De Grandy's testimony.  In our briefs,
18   we have set this forth that the egregious conduct here --
19          THE COURT:  Sorry, can I ask you to pause just for a
20   second because I want to have respect for the separateness of
21   the actions.  Just because I personally am aware of those
22   transcripts, having presided over the PI, I don't want to deny
23   either side the opportunity to make a record that they want to
24   make here.  It is a different case.
25          MR. GUTCHESS:  Right.
```

1          THE COURT:  So sorry, I didn't mean to be -- to

2     shortcut anybody, when I say "I know;" make your record.

3          MR. GUTCHESS:  Right.

4          THE COURT:  Okay.

5          MR. GUTCHESS:  And so, Your Honor, what has happened

6     here is Carollo famously abandoned his homestead and left the

7     Coconut Grove house --

8          THE COURT:  Okay.

9          MR. GUTCHESS:  -- right, in 2017.  There was a court

10    hearing on that.  He introduced all sorts of evidence about his

11    intention to abandon that to reside in District 3 in Little

12    Havana.  He then resided in District 3, for seven or almost

13    eight years, and then, when the redistricting was up, as it is

14    every ten years, the first map did not include his home in D3.

15    And then Mr. De Grandy has testified, both in deposition and at

16    the trial, that the sole reason that he split Coconut Grove was

17    to protect Carollo's house, to enable Carollo to move into that

18    house as it was in District 3, to protect it from this very

19    lawsuit as an asset protection measure.  And that conduct not

20    only split up the neighborhood, but that was a large part of

21    what splitting up the Coconut Grove neighborhood was a large

22    part of what lead the ACLU to sue that cost the City millions

23    of dollars in legal fees that resulted in an embarrassing award

24    order from a federal judge that invalidated the maps.

25          And so Commissioner Carollo has no right to reside in

Friday, May 17, 2024.

1  District 2 and continue being a commissioner for District 3.

2  And so if his intent is to continue being a commissioner for

3  District 3, he has abandoned his homestead, and that's the

4  state of the law today, based upon Judge Moore's order, and

5  that is what this Court needs to hear.

6       MR. PERTNOY:  Your Honor, may I briefly respond to

7  this?

8       THE COURT:  I'm not quite finished asking

9  Mr. Gutchess my questions.

10       MR. PERTNOY:  Thank you.

11       THE COURT:  At the end of the day, we are going to

12  make use of this time, meaning you are both going to have

13  opportunities to file objections.  So the evidence that the

14  parties want to put on which we are doing today so -- and then

15  you can object to Judge Smith about whether or not it was --

16  all should have come in, but I have to move this forward to

17  Judge Smith, so; at the same time, I am concerned about the

18  confusion of issues that I think are being presented in the

19  Plaintiffs' objection.

20       On one hand, I think I hear the arguments to be

21  twofold -- and please tell me if I'm wrong -- that he abandoned

22  the Coconut Grove home, never intended to return there; that

23  would be, I think, relevant to the claim of exemption and your

24  objection.

25       That he fraudulently caused the City to carve out his

```
1    home for the purpose of defrauding creditors as opposed to

2    being able to return there, what is the best case that you can

3    advance to me that even if he had that ill will in his heart

4    that he -- if he has done the steps that he needs to do in

5    order to reside there, whether or not it was for the purpose of

6    protecting homestead, that your objection stands?

7              MR. PERTNOY:  So, Your Honor, the Florida Supreme

8    Court and the Eleventh Circuit both say fraudulent conduct or

9    other egregious conduct related to seeking the homestead

10   protection.  The other egregious conduct hasn't been as fully

11   explored by the courts, and our position is that if there is

12   ever any egregious conduct, it is abusing one's power in the

13   City and manipulating the City voting maps solely for asset

14   protection purposes which is what Mr. De Grandy testified to.

15   And then, when he has a personal financial interest in this map

16   where he represents that he is not going to vote on it because

17   he has a personal financial interest, changing that and voting

18   against the state ethics laws, being the deciding vote to pass

19   that map, that, Your Honor, is egregious conduct that the

20   Eleventh Circuit or the Florida Supreme Court, whoever decides

21   this at the end of the day, needs to hear and weigh upon.  And

22   we believe they will rule in our favor, that Mr. Carollo cannot

23   protect his home under these circumstances.

24             THE COURT:  Can you direct me to what you think your

25   best cases on that are?
```

1          MR. GUTCHESS:  Your Honor, we have submitted document

2     entry DE 658 that sets forth all of the case law on this issue.

3          And then on Page 13 of that brief, Your Honor, we set

4     forth the series of cases that all go into the -- all the

5     various ways that homestead can be challenged.

6          THE COURT:  True.

7          MR. GUTCHESS:  So in a divorce setting, if a husband

8     engages in an egregious pattern of conduct aimed at depriving

9     the ex-wife, the ex-wife is able to attack the homestead.  So

10    that would be a circumstance in which, you know, it is not a

11    fraud.  You steal money from one person, you use that money to

12    buy your house, that obviously invalidates the homestead; but,

13    if you are also trying to avoid paying alimony to your

14    ex-spouse, that can also void the homestead.

15         Your Honor, what we are saying here is that what

16    Mr. Carollo did is worse than either circumstance, right?

17    Stealing money from one person and using it to buy a house to

18    protect the money is bad.  But what Mr. Carollo did here in

19    terms of manipulating the Miami's voting maps for the sole

20    purpose of asset protection, right, in making these maps that

21    were invalid and unconstitutional and then trying to move back

22    in after the trial had started and the verdict is imminent

23    after which the maps are invalidated.  So they were never

24    valid, Your Honor, and he is still residing there and not

25    moving back into District 3.

Friday, May 17, 2024.

1        If Mr. Carollo follows the law, he will move back

2   into Little Havana and abandon this homestead, and we have a

3   right to question him about that.

4        THE COURT:  Okay.  My questions arose with respect to

5   Russell in particular.  I think I have an idea of where you

6   would go with Mr. Carollo himself.

7        What are the salient dates, Mr. Gutchess, you want me

8   to focus on?

9        MR. GUTCHESS:  I mean, our testimony today is going

10   to span from 2017, when he abandoned the home, through the

11   trial which is 2023, which is April and May of 2023, up to this

12   very day when Judge Moore has invalidated the map and the City

13   has agreed to a new map that does not include Mr. Carollo's

14   home.

15       I don't know if you watched the city commission

16   meeting last week, but after the map had been agreed upon and

17   basically settled, Mr. Carollo was able to defer that for two

18   weeks so he could come to this hearing and not have those new

19   maps without his home in it.  So he continues to manipulate the

20   process, Your Honor, and manipulate the City laws for his own

21   personal benefit.  So the time frame we will cover today is

22   2017 to this very day.

23       THE COURT:  Okay.

24       MR. GUTCHESS:  We will be done by lunch, Your Honor,

25   we have 20 minutes, 25 minutes each.

1          MR. PERTNOY:  Can I briefly respond to Mr. Gutchess?

2     I will be very brief.

3          THE COURT:  You said that last time, so really brief,

4     Mr. Pertnoy, okay?

5          MR. PERTNOY:  Yes, Your Honor.

6          The short answer is, they don't have a case that

7     supports their position.  They are asking you to rewrite the

8     law.  The cases that cover this are that Florida Supreme Court

9     *Havoco* opinion, which was a certified question from the

10    Eleventh Circuit which was then adopted by the Eleventh Circuit

11    which says, "We have invoked equitable principles to reach

12    beyond the literal language of the exceptions only where funds

13    obtained through fraud or egregious conduct were used to invest

14    in, purchase, or improve the homestead."

15         No funds, no investment, no purchase, the case law is

16    clear.  The Eleventh Circuit, the *FTC* case which we cite, "To

17    obtain an equitable lien on Florida homestead, a plaintiff must

18    show, by a preponderance of the evidence, that the defendant

19    engaged in fraudulent or egregious conduct and that the funds

20    from that conduct can be directly traced to the purchase of,

21    investment in, or improvement of the homestead."

22         No cases, the case law is clear.  And this entire red

23    herring on redistricting, this is about whether he can sit as

24    an elected official, whether he is in or out, but he did not

25    give up his rights as a citizen of Florida, and as a citizen of

1   Florida, he could have established a homestead in Key West,

2   Jacksonville, or Morris Lane.  He can do that.  Whether he can

3   then serve as an elected official, that's not the purpose of

4   today, and all they want to do is confuse that issue.

5          But the bottom line is, as a citizen of Florida, he

6   has the constitutional homestead protection which allows him to

7   establish a homestead, period, end of the day.  That's what

8   matters.  And again, Mr. Russell's testimony which is, again,

9   we don't believe relevant, he himself confirmed that

10  Commissioner Carollo did not engage in this conduct; that he

11  himself did not express a motive to do this; and, more

12  importantly, he directed nobody to do this.

13         And, in fact, Mr. Russell's testimony when asked,

14  "How did this happen?"  "It magically appeared, it magically

15  appeared," not that Mr. Carollo did it, that it "magically

16  appeared."  According to Mr. Russell, Harry Potter had a more

17  likely affect on that map than Mr. Carollo.  That's what the

18  evidence is going to show.

19         THE COURT:  On that note, are either of you invoking

20  the rule of sequestration?  Are the witnesses in the courtroom?

21         MR. GUTCHESS:  They are in the courtroom.

22         THE COURT:  Mr. Pertnoy, do you want to invoke the

23  rule?

24         MR. PERTNOY:  We are fine.

25         THE COURT:  Okay.

```
1              MS. GOMEZ:  Should we call our first witness?

2              THE COURT:  Please.

3              MR. KRAMER:  Your Honor, we would like to call

4   Mr. Ken Russell.  He has personal knowledge as -- we would like

5   to call Ken Russell.

6              MR. PERTNOY:  Your Honor, I renew my objection as to

7   relevance and the like.

8              THE COURT:  I understand, Mr. Pertnoy.  Your

9   objection is noted, I'll -- I assume, Mr. Pertnoy, that you

10  object to him in total as an irrelevant witness and that is

11  without prejudice.  Do you have any question-specific

12  objections?

13             MR. PERTNOY:  Understood.

14             THE COURT:  Okay.

15             THE COURTROOM DEPUTY:  Sir, please raise your right

16  hand.

17              KEN RUSSELL, PLAINTIFF WITNESS, SWORN

18             THE COURTROOM DEPUTY:  Thank you, sir.  Please be

19  seated, speak into the microphone; state your name, and spell

20  your last name for the record.

21             THE WITNESS:  Good morning, Ken Russell, K-E-N,

22  R-U-S-S-E-L-L.

23                     DIRECT EXAMINATION

24  BY MR. KRAMER:

25  Q    Good morning.  Please introduce yourself again.
```

1          THE COURT:  Mr. Kramer, you are already not using a

2    microphone, sir.  You have to just --

3          MR. KRAMER:  Apologies.

4          THE COURT:  Well, it is the court reporter.  If you

5    want to be on the transcript, you have to use the microphone.

6    BY MR. KRAMER:

7    Q    Good morning.  Please introduce yourself again.

8    A    Ken Russell, former City of Miami Commissioner.

9    Q    Mr. Russell, when did you serve as a commissioner?

10   A    I served from 2015 to the end of '22.

11   Q    For which district?

12   A    District 2, Coconut Grove, Brickell, Miami, downtown,

13   Edgewater, Northside area.

14   Q    Were you involved in the 2021-2022 redistricting?

15   A    Yes.  I was one of the five commissioners who voted on it.

16   Q    During that process, did you ever meet with Mr. Miguel

17   De Grandy?

18   A    Yes.  He was brought on as the consultant who would help us

19   navigate the whole process.

20   Q    What was Mr. De Grandy's role in the redistricting process?

21   A    He was hired by the City, having been involved in previous

22   redistricting efforts of the City of Miami, to help prepare

23   maps on which the commissioners could vote.

24   Q    Is Mr. De Grandy a lawyer?

25   A    Yes, he is.

1   Q   Was it part of Mr. De Grandy's role as a consultant to give

2   legal advice?

3   A   No.

4   Q   Let's move on and talk about districts and redistricting.

5           What are voting districts?

6   A   So the City of Miami is divided up into five districts

7   which are meant to be equalized by population, or just about

8   450,000 residents, so you split that into five.

9   Q   What is the purpose of redistricting?

10  A   So when the census happens every ten years, one district

11  may get imbalanced, get a higher population than the others,

12  and it needs to be normalized; and so, in this case, District 2

13  had grown, downtown and Brickell areas, and so the

14  redistricting process was necessary to re-equalize the

15  populations amongst the districts.

16  Q   What factors are to be considered in redistricting?

17  A   So there are legal factors and then there is policy

18  factors.  From a legal perspective, we need to honor the

19  constitution and the Voting Rights Act, and then the

20  commissioners gave direction to Mr. De Grandy on policy

21  concepts around keeping cohesive neighborhoods together,

22  avoiding voter confusion, following natural and manmade

23  boundaries, and things like that, and, of course, normalizing

24  population.

25  Q   What natural and manmade boundaries define Coconut Grove?

Friday, May 17, 2024.

```
 1            THE COURT:  Mr. Kramer, I'm going to put a tighter
 2  time limit on you, if we are going down this path.
 3            MR. KRAMER:  I'll keep that in mind, Your Honor.
 4            THE COURT:  Okay.
 5            THE WITNESS:  Coconut Grove is founded by US 1 on the
 6  west and north, and Biscayne Bay on the east and south.
 7  BY MR. KRAMER:
 8  Q   Has the Grove always been a single district?
 9  A   Yes, ever since we have had single number districts.
10  Before that, was it was at-large.
11  Q   Is it beneficial for residents to keep Coconut Grove as a
12  single district?
13  A   So it is governed by the neighborhood conservation
14  districts, as well as a Coconut Grove Village Council.  They
15  have like-minded interests.  Yes, the answer is yes.
16  Q   Why did they benefit?
17            THE COURT:  Okay, move on.
18  BY MR. KRAMER:
19  Q   When was the first time that the Grove was under threat of
20  division as a single district?
21  A   In this redistricting process on February 24th.
22  Q   What was the public's response?
23  A   Sorry, no, the first map, the preliminary map that came out
24  from Mr. De Grandy without commissioner input was on February
25  7th, and that already divided the Grove into three.
```

Friday, May 17, 2024.

```
 1   Q    What was the public's response to dividing the Grove?

 2   A    Hundreds came out to City Hall --

 3              MR. PERTNOY:  Objection.

 4              THE COURT:  Sustained.

 5   BY MR. KRAMER:

 6   Q    Other than the Grove, how were other communities

 7   complaining about redistricting?

 8              MR. PERTNOY:  Objection.

 9              THE COURT:  Sustained.

10   BY MR. KRAMER:

11   Q    What was your understanding of the commissioners' role in

12   providing feedback to De Grandy?

13              MR. PERTNOY:  Objection.

14              THE COURT:  Basis?

15              MR. PERTNOY:  He can -- it is speculation as to he is

16   not here as an expert on behalf of all commissioners.  He can

17   talk about his own personal experience; but for him to opine as

18   to the role of the commission, he is not here as an expert.

19              THE COURT:  I'll sustain it on competence.

20   BY MR. KRAMER:

21   Q    From your personal knowledge, what was the role of De

22   Grandy's redistrict -- what was your role in De Grandy's

23   redistricting?

24   A    My role was to give input to Mr. De Grandy on what I felt

25   the fairest and best maps that met all of the criteria were,
```

Friday, May 17, 2024.

```
 1   and he would work together with the other commissioners to come

 2   up with a consensus map.

 3   Q   Okay.  Mr. Russell, I'm going to show you what has been

 4   premarked as Plaintiffs' Exhibit 23 for identification.

 5            MR. KRAMER:  Your Honor, may I approach the witness?

 6            THE COURT:  Yes.  You have given a copy to Defense

 7   Counsel?

 8            MR. KRAMER:  We have --

 9            MR. PERTNOY:  And I object to the document.

10            THE COURT:  Wait, did you exchange exhibits before

11   the hearing?

12            MR. KRAMER:  Yeah.  They provided me with these, and

13   I advised that I objected to the use of the maps.

14            THE COURT:  Okay.  Okay.  We are not there yet.

15            When he advances it as an exhibit, I'll hear your

16   objection.

17            MR. PERTNOY:  Understood.

18   BY MR. KRAMER:

19   Q   Mr. Russell, do you recognize this map?

20   A   Yes.

21   Q   What map is it?

22   A   This was the preliminary map, as it was called, created

23   on -- given to us on February 7th commission meeting by

24   Mr. De Grandy before getting input from commissioners.

25   Q   Is it an accurate portrayal of the preliminary map?
```

```
 1              MR. PERTNOY:  Objection.

 2              THE WITNESS:  He didn't draw the map, he doesn't have

 3    the personal knowledge to determine whether that's the accurate

 4    map, only Mr. De Grandy who drew the map can do that.

 5              THE COURT:  Overruled.

 6              THE WITNESS:  I recognize this as the map and I know

 7    the lines of our districts.

 8              MR. KRAMER:  Your Honor, I move to admit Plaintiffs'

 9    Exhibit 23 into evidence.

10              MR. PERTNOY:  I object on the basis of relevance.

11              MR. KRAMER:  Your Honor, this is relevant because

12    this was the first proposed map as to the districts which does

13    not include Mr. Carollo's house.

14              THE COURT:  Is there any dispute at all from anybody

15    that the preliminary map didn't include Mr. Carollo's Coconut

16    Grove house?

17              THE WITNESS:  I'm not familiar with the maps, but I

18    don't --

19              THE COURT:  Well, then we do have to go down this

20    path.  Overruled.

21    BY MR. KRAMER:

22    Q   Mr. Russell, what district is Mr. Carollo's house in, on

23    this map?

24              MR. PERTNOY:  Objection.

25              THE COURT:  I didn't hear the question.
```

Friday, May 17, 2024.

```
 1   BY MR. KRAMER:
 2   Q   Mr. Russell, what district is Mr. Carollo's house in, on
 3   this map?
 4   A   District 2.
 5              MR. PERTNOY:  I object to the question.
 6              THE COURT:  Overruled.  If it is not an issue,
 7   Mr. Pertnoy, then I am going to let him go down.
 8              MR. PERTNOY:  Mr. Russell hasn't even been proffered
 9   that he knows where Commissioner Carollo's house is.
10              THE COURT:  Mr. Kramer.
11   BY MR. KRAMER:
12   Q   Mr. Russell, I'm going to show you what has been premarked
13   as Plaintiffs' Exhibit 24.
14              Mr. Russell, do you recognize this map?
15   A   Yes.
16   Q   What map is it?
17   A   This is what we call the base map which was presented on
18   February 25th, which was the second substantive meeting with
19   maps involved after commissioners had input.
20              MR. KRAMER:  Your Honor, I move to admit Plaintiffs'
21   Exhibit 24.
22              MR. PERTNOY:  Objection, relevance.
23              THE COURT:  Do you continue to dispute that
24   Mr. Carollo's house was, at one point, not in District 2 and
25   then was drawn into District 2?
```

Friday, May 17, 2024.

1        MR. PERTNOY:  I don't dispute that, but I don't

2   believe that whether -- where the district lines are has any

3   relevance to the establishment of constitutionally-protected

4   homestead.

5        THE COURT:  I get it, Mr. Pertnoy, but you either

6   think these facts are not in dispute or you do so...

7        MR. PERTNOY:  I don't dispute that the map shows his

8   home in that new part of District 2, but what I dispute is its

9   relevance in determining whether that's his constitutional

10  homestead which is what we are here for.

11       THE COURT:  Okay, and I'm going to overrule the

12  objection.

13  BY MR. KRAMER:

14  Q   Mr. Russell, what district does this map place

15  Mr. Carollo's house in?

16  A   It puts it into District 3.

17  Q   Did dividing the Grove --

18       THE COURT:  Sorry, I had said two, I meant three.

19       Sorry, go ahead.

20  BY MR. KRAMER:

21  Q   Did dividing the Grove to place Carollo's house into

22  District 3 further a legitimate purpose of redistricting?

23       MR. PERTNOY:  Objection, Your Honor.

24       It's his opinion.

25       THE COURT:  Well, I mean, the problem is it's -- you

```
 1    can try a different question.
 2              MR. KRAMER:  I'll rephrase, Your Honor.
 3              THE COURT:  It's -- I'm going to sustain that
 4    objection.
 5    BY MR. KRAMER:
 6    Q   Mr. Russell, as a commissioner, what legitimate purpose
 7    were you aware of that placing Carollo's house into District 3
 8    furthered?
 9              MR. PERTNOY:  Objection, again, this is asking his
10    opinion.
11              MR. MILLER:  I would like to assert an objection, as
12    well, Your Honor, on behalf of the City of Miami.  We are
13    raising the legislative privilege with regard to all
14    legislative process in coming up with the map that was done in
15    private.  I mean, all throughout the meetings, obviously, can
16    be talked about; but in terms of private legislative
17    discussions, deliberations, and whatnot, the City is invoking
18    legislative privilege.
19              THE COURT:  I understand the City's presence to do so
20    but disagree that that question intrudes on the privilege.
21              Mr. Russell, you are aware of and you understand
22    legislative privilege, right?
23              THE WITNESS:  Yes.
24              THE COURT:  And you understand Mr. Johnson's
25    objection on behalf of the City?
```

Friday, May 17, 2024.

```
 1                THE WITNESS:  Yes.
 2                THE COURT:  Can you answer that question without
 3      intruding on the privilege?
 4                THE WITNESS:  Yes.
 5                THE COURT:  Keep it to a yes or no.
 6           Do you want to hear the question again?  Mr. Kramer?
 7                THE WITNESS:  Yes, please.
 8      BY MR. KRAMER:
 9      Q   Mr. Russell, as a commissioner, what legitimate purpose --
10                THE COURT:  That was not the question you asked.
11      BY MR. KRAMER:
12      Q   As a commissioner, in your opinion --
13                THE COURT:  No, that still wasn't it.
14           Are you aware of a legitimate purpose that was
15      advanced by the redrawing?
16                MR. PERTNOY:  Same objection.
17                THE COURT:  If you can answer that question without
18      intruding on the legislative privilege, that's the one I'll
19      allow.
20                THE WITNESS:  There was no legitimate purpose.
21      BY MR. KRAMER:
22      Q   Who benefited from Morris Lane in Coconut Grove joining
23      District 3?
24                MR. PERTNOY:  Objection, calls for speculation, and
25      it would be his opinion as to who it benefited.
```

```
 1              THE COURT:  Sustained.
 2   BY MR. KRAMER:
 3   Q   As a commissioner representing District 2, who benefited
 4   from the area in Coconut Grove joining District 3?
 5              MR. PERTNOY:  Again, same objection, it's calling for
 6   his opinion and it is speculation.
 7              THE COURT:  It is more speculative than anything
 8   else, sustained.
 9   BY MR. KRAMER:
10   Q   Okay, let's talk about the concerns you personally raised
11   regarding the votes to enact the map.
12              THE COURT:  To whom?
13              MR. KRAMER:  So Mr. Russell raised concerns to both
14   Mr. Carollo and the City Attorney, Victoria Mendez, publicly on
15   the dais, Your Honor.
16              THE COURT:  Okay.  You are aware of the City's
17   presence here to protect the privilege that does not belong to
18   Mr. Russell alone.
19              MR. KRAMER:  Yes, Your Honor.
20              THE COURT:  So I'm having trouble figuring out what
21   questions you are going to ask that will fairly be elicited
22   through this witness.
23              MR. KRAMER:  Yes, Your Honor.
24              THE COURT:  Keep them focused.
25              MR. KRAMER:  I will, Your Honor.
```

Friday, May 17, 2024.

```
 1   BY MR. KRAMER:

 2   Q   Mr. Russell, were you on the dais on March 11, 2022?

 3   A   Yes.

 4   Q   At this public commission meeting, who did you speak with?

 5   A   At the March 11th meeting, who did I speak with on the

 6   dais?

 7   Q   Yes, sir.

 8   A   It was a long meeting, all day.

 9   Q   At this commission meeting, did you discuss with --

10   anything with the city attorney, Victoria Mendez?

11   A   Yes, I'm sure.

12   Q   Mr. Russell, I'm going to show you what has been premarked

13   as Plaintiffs' Exhibit 16, for identification.  I believe it is

14   a video.

15           THE COURT:  What are we doing?

16           MR. KRAMER:  We are going to put on a very quick

17   video, Your Honor. showing the commission meeting and what

18   conversations.

19           I promise I'm also done, Your Honor.

20           THE COURT:  You can't proffer what it says?

21           MR. KRAMER:  Okay.  We are going to play Plaintiffs'

22   Exhibit --

23           THE COURT:  You're not publishing anything that's not

24   in evidence.  So do you want to proffer what it is, so I can

25   hear Mr. Pertnoy's objection?
```

1          MR. KRAMER:  Yes, Your Honor.  It is victoria Mendez

2    agreeing with Mr. Russell that there are ethical considerations

3    on Carollo voting on whether or not the map should be approved.

4          THE COURT:  Okay.  Again, is it disputed that that

5    occurred in the public commission meeting?

6          MR. PERTNOY:  If it was said in the public record, it

7    was said in the public record.  I don't dispute what was said

8    in the public record.  I object on the basis of relevance.

9          THE COURT:  Do you have a transcript of it?

10          MR. KRAMER:  We do not, Your Honor.  I do not believe

11   we have transcripts.

12          THE COURT:  Okay.

13          Well, after the hearing, anything that is admitted,

14   you have to file under our local rule.  So rather than

15   conventionally filing a video, I think that it will make it

16   easier for the reviewing court if you just capture the portion

17   of the meeting from a transcript, which is publicly available,

18   and rely on that.

19          Is anyone in a position to proffer what words were

20   said, so that Mr. Pertnoy can hear it or do we have to play it?

21          MR. KRAMER:  It is -- the video itself is 20 seconds,

22   and I think that the video does a better job than I could do

23   showing it.

24          THE COURT:  The proffer is that Ms. Mendez agreed

25   there was an ethical concern with Mr. Carollo voting on the

```
 1    map?

 2              MR. KRAMER:  Yes, Your Honor.

 3              THE COURT:  For the purposes of establishing what,

 4    that he voted on the map anyway?

 5              MR. KRAMER:  That he was aware, at the time, that

 6    there was an ethical concern that he should not be able to vote

 7    on a map which would give him a personal benefit.

 8              THE COURT:  Okay.  Mr. Pertnoy, you object on

 9    relevance.

10              MR. PERTNOY:  Yes, Your Honor.

11              THE COURT:  Okay, I'm going to see the 20-minute

12    (sic) clip over your objection, which I note.

13              MR. PERTNOY:  I thought they said it was 20 seconds,

14    I hope 20 seconds.

15              THE COURT:  What did I say?

16              MR. KRAMER:  Twenty minutes.

17              MR. PERTNOY:  I was hoping it was 20 seconds.

18              THE COURT:  Twenty seconds.

19        (Video recording played in open court)

20              MR. PERTNOY:  Judge, Your Honor, I'm going to object,

21    A, on relevance, but more importantly, on the rule of

22    completeness.  I mean, there was clearly a conversation that

23    preceded that and that was subsequent to that, and so this --

24    there was no context of evidence whatsoever.

25              THE COURT:  Do you mean the conversation that she
```

```
 1   said she will have with him?

 2           MR. PERTNOY:  No, I'm referring to the clip that they

 3   showed.  There was clearly conversation that occurred

 4   preceding, and there was conversation that would have continued

 5   on that which we don't know what it says because they are

 6   showing you a 20-second clip, and it is all hearsay.

 7           THE COURT:  Okay.  If you want to advance any more of

 8   the commission meeting in your presentation, you can.

 9           MR. KRAMER:  Very well, Your Honor.  Thank you.

10   BY MR. KRAMER:

11   Q   What did that video portray?

12   A   I was asking -- I'm sorry, I was asking the City Attorney

13   about whether or not Joe Carollo could vote when his house was

14   in question and would be affected financially by the change of

15   lines.

16   Q   Does it accurately depict the discussion that took place

17   that day?

18   A   Yes.

19           MR. KRAMER:  Your Honor, I move what has been

20   premarked as Plaintiffs' Exhibit 16 into evidence.

21           MR. PERTNOY:  I preserve my objections, Your Honor.

22           THE COURT:  You do.  And as I have indicated, I want

23   you to attach a transcript, whether or not you attach the

24   video.

25           MR. KRAMER:  Yes, Your Honor.
```

Friday, May 17, 2024.

```
 1    BY MR. KRAMER:
 2    Q   Now, what was Ms. Mendez saying "correct" to, in that
 3    video?
 4              MR. PERTNOY:  Objection.
 5              THE COURT:  Well, in all candor, I couldn't make it
 6    out well, so I'm going to hear it one more time, Mr. Pertnoy;
 7    I'm sorry.
 8              MR. PERTNOY:  I understand that, but he is asking --
 9    that's fine, I made my objection; fair enough.
10              THE WITNESS:  I was stating to the City Attorney my
11    understanding from my briefing from her previous -- in my
12    office that --
13              MR. PERTNOY:  Objection.
14              THE COURT:  Limit your response, Mr. Russell, to what
15    you actually said in the video that was just played.
16              THE WITNESS:  She was saying yes, to my
17    understanding, that it's his decision to recuse himself.  If I
18    understand correctly, the piece that we just showed, that was
19    where I was asking is it his decision or is it imposed upon him
20    to recuse himself.
21    BY MR. KRAMER:
22    Q   Do you recognize the voice saying, "No, that is not true"?
23    A   Oh, I believe that was Commissioner Diaz de la Portilla.
24    Q   What conversations did you have with Carollo on the dais
25    about whether he should vote?
```

Friday, May 17, 2024.

1    A    We had arguments about houses and who lived in houses

2    where.

3    Q    Mr. Russell, I'm going to show you what has been premarked

4    as Plaintiffs' Exhibit 10 for identification.

5              MR. KRAMER:  It is a video, Your Honor, showing that

6    Mr. Carollo stated he would abstain from voting on the map.

7              THE COURT:  I don't honestly need that one published;

8    but I mean, for purposes of the hearing, I'm aware of it, but,

9    Mr. Pertnoy --

10             MR. PERTNOY:  Again, I object on relevance, rule of

11   completeness, and I'll leave it at that.

12             MR. KRAMER:  We can move on, Your Honor.

13   BY MR. KRAMER:

14   Q    Mr. Russell, what did Carollo state he would abstain to?

15             MR. PERTNOY:  Objection.

16             THE COURT:  Wait, I didn't hear the question.

17   BY MR. KRAMER:

18   Q    Mr. Russell, what did Carollo state he would abstain to?

19             MR. PERTNOY:  Objection.

20             THE COURT:  Overruled.

21             THE WITNESS:  He stated that he would not be voting

22   on the issue of redistricting because of his house.

23   BY MR. KRAMER:

24   Q    And did Carollo abstain?

25   A    He did at first.  For the March 11th meeting, he abstained.

1    Q    And what about the March 25th meeting?

2    A    He decided to come back in and vote.

3    Q    Why did you feel compelled to raise that ethical concern of

4    Carollo voting?

5              MR. PERTNOY:  Objection.

6              THE COURT:  Sustained.

7    BY MR. KRAMER:

8    Q    Mr. Russell, are there laws and rules governing public

9    officials on personal benefits?

10             MR. PERTNOY:  Objection.

11             THE COURT:  Sustained.

12   BY MR. KRAMER:

13   Q    Mr. Russell, from your personal knowledge as when you were

14   a commissioner, were you governed by rules and ethics on

15   whether or not you were entitled to receive a personal benefit?

16             MR. PERTNOY:  Objection.

17             THE COURT:  This is a relevance objection,

18   Mr. Kramer, as I best understand, and am sustaining it.

19             MR. KRAMER:  Your Honor, it is relevant because

20   whether or not Carollo was entitled to vote on whether his

21   house would be moved into District 3 would be barred by these

22   ethical laws and rules that Mr. Russell raised -- or raised

23   concern with.

24             THE COURT:  I understand.  There is no testimony that

25   I need from Mr. Russell that there are laws or ethical rules

```
 1   that you want me to take judicial notice of.  Let's do it

 2   outside of witness testimony, okay?

 3            MR. KRAMER:  Yes, Your Honor.

 4            THE COURT:  They either are or are not in place and

 5   you guys can advance them, not from testimony.

 6   BY MR. KRAMER:

 7   Q   Mr. Russell, how did Carollo's vote affect the passing of

 8   the map?

 9            MR. PERTNOY:  Objection.

10            THE COURT:  Overruled.

11            THE WITNESS:  He was the swing vote that allowed it

12   to pass.

13   BY MR. KRAMER:

14   Q   Mr. Russell, what effect has this map had on the City?

15            MR. PERTNOY:  Objection, he can't speak on behalf of

16   the effect of the City.

17            THE COURT:  Mr. Kramer, if you are asking a more

18   specific question, but that one is not going to do it.

19   BY MR. KRAMER:

20   Q   Mr. Russell, was there a lawsuit incurred because of this

21   map?

22            MR. PERTNOY:  Objection, Your Honor.

23            THE COURT:  Mr. Kramer --

24            MR. PERTNOY:  We are not here to litigate the *Grace*

25   case.
```

```
 1            THE COURT:  Where are we heading, Mr. Kramer?

 2            MR. KRAMER:  I have no further questions, Your Honor.

 3            THE COURT:  Okay, thank you.

 4            Same time limits, Mr. Pertnoy.

 5            MR. PERTNOY:  Understood, Your Honor.

 6                       CROSS-EXAMINATION

 7   BY MR. PERTNOY:

 8   Q    Good morning, Mr. Russell.  How are you?

 9   A    Good morning.

10   Q    You recall that yesterday I took your deposition.

11   A    Yes.

12   Q    And at that deposition yesterday, you answered truthfully,

13   correct?

14   A    Yes.

15            THE COURT:  Mr. Pertnoy, even though you have a time

16   limit, you still have a court reporter and you talk fast like

17   me, be nice --

18            MR. PERTNOY:  Yes, Your Honor.

19            THE COURT:  -- for the court reporter.

20            MR. PERTNOY:  No problem.

21   BY MR. PERTNOY:

22   Q    So yesterday when I asked you conversations you had with

23   Mr. Carollo, you advised that the only conversations you have

24   ever had with Mr. Carollo were on the dais, correct?

25   A    Of substantive city issues, yes.
```

Friday, May 17, 2024.

1    Q    Including issues concerning his Morris Lane property,

2    correct?

3    A    Correct.

4    Q    And yesterday, I asked you if you had any personal

5    knowledge of Mr. Carollo's intentions or motivations with

6    respect to his Morris Lane property or establishing homestead,

7    and you said you didn't have any of that knowledge, correct?

8    A    No personal knowledge.

9    Q    And when I asked you about the Morris Lane property itself,

10   you didn't know when he purchased it, correct?

11   A    Correct.

12   Q    You didn't know whether he had moved into it or when he

13   moved out of it, correct?

14   A    Correct.

15   Q    You don't know when -- how he used that property, correct?

16   A    Correct.

17   Q    You don't know whether he was renting the property or not

18   renting the property, correct?

19   A    Correct.

20   Q    And then I also asked you whether you had ever had any

21   conversations with somebody who told you what Commissioner

22   Carollo's intentions were with respect to his homestead, and

23   you told me you didn't recall any conversations of that effect,

24   correct?

25   A    I'm sorry, with whom?  Could you ask again?

```
1   Q   I asked you, have you ever had any conversations with

2   somebody who told you this is Carollo's intention with respect

3   to his homestead, and you said that you didn't recall any

4   conversations of that effect.

5   A   There have been --

6           MR. JOHNSON:  I'm going to object to the extent this

7   question is going to call for an invasion of the legislative

8   privilege or the attorney-client privilege.

9           THE COURT:  Again, Mr. Russell, can you answer the

10  question without invading legislative privilege or --

11          I can't guess what attorney-client privilege is at

12  issue here, though, Mr. Johnson.

13          MR. JOHNSON:  The conversations that he would have

14  had with Victoria Mendez as the city attorney, or with

15  Mr. De Grandy who is an attorney and was giving advice as to

16  the legal effect of the redistricting.

17          THE WITNESS:  My sitting staff and I discussed a lot

18  about how his house was being protected in this process.

19          MR. PERTNOY:  Understood.

20          THE COURT:  One at a time, Mr. Johnson is on his

21  feet.

22          MR. JOHNSON:  I'm still objecting to any internal

23  discussions of the legislative deliberative process.

24          MR. PERTNOY:  I'll move on, Your Honor --

25          THE COURT:  Okay.
```

Friday, May 17, 2024.

```
 1              MR. PERTNOY:  -- just to make life easier.
 2   BY MR. PERTNOY:
 3   Q   And, again, I had asked you at your deposition, "You have
 4   no personal knowledge again with respect to Mr. Carollo's
 5   intentions with respect to establishing a homestead," and you
 6   said that you did not have any of that knowledge, correct?
 7   A   My understanding of what personal knowledge is, no, I did
 8   not.
 9   Q   Okay.  And I also asked you about conversations you had on
10   the dais with Commissioner Carollo, and one of the items that
11   you recall was that -- and I'm going to read it to make sure I
12   get it correct.  You remember him saying he didn't care if his
13   home was taken out of the new map and placed into District 2,
14   correct?
15   A   Yes.  I then made a motion to then --
16              MR. PERTNOY:  No question pending.
17              THE COURT:  I'm sorry, I thought you just asked a
18   question.
19              MR. PERTNOY:  I answered (sic) and he said "correct,"
20   there was no question pending.
21              THE COURT:  I thought it was your "correct."  You
22   only respond to questions, Mr. Russell.
23   BY MR. PERTNOY:
24   Q   And, in fact, I asked you whether you recall him ever on
25   the dais directing anybody to put his home into the district,
```

1    and you said you did not recall that, correct?

2    A    Correct.

3    Q    And then you were discussing -- I asked you about the

4    discussions you had with your staff, do you remember us talking

5    about discussions you had with your staff?

6    A    Yes.

7    Q    And you said, "We all discussed it, and we had pretty much

8    a consensus that the redistricting effort was protecting his

9    home."  Do you remember you said that?

10   A    Yes.

11   Q    And then I asked you, "And that was what you believed to be

12   his intention," and you said, "Yes," correct?

13   A    Yes.

14   Q    And then I asked you again, "But not that you have any

15   evidence that was his intentions," and you responded, "Our

16   evidence was the inclusion of his home made no logical sense in

17   the evolution of the maps."

18            Do you remember that?

19   A    Yes.

20   Q    And then I said, "That is not evidence;" and you said,

21   "No," correct --

22   A    I don't recall.

23   Q    I said -- and then I asked you, "You have no concrete

24   evidence, you just have belief, correct;" and you said,

25   "Correct."

```
 1            MR. KRAMER:  Objection, Your Honor.  He is just

 2   reading the deposition transcripts at this point.

 3            THE COURT:  I know.  Treat it as refreshment.

 4   BY MR. PERTNOY:

 5   Q   Do you recall me asking you that you had no concrete

 6   evidence and you just had the belief that that was what Carollo

 7   did, correct?

 8   A   Yes.

 9   Q   Then we had a conversation about redrawing district lines

10   and whether that created homestead; do you remember having that

11   conversation?

12   A   Yes.

13            THE COURT:  I'm sorry, and how it created homestead.

14            MR. PERTNOY:  How it -- whether it created homestead,

15   I misspoke.  Sorry, Your Honor.

16   BY MR. PERTNOY:

17   Q   And I asked you, do you recall me asking you that -- do you

18   recall me asking you that Commissioner Carollo could establish

19   a homestead in Jacksonville as a citizen of Florida?  Do you

20   remember that?

21            MR. KRAMER:  Your Honor, I'm going to object.  I

22   don't understand the relevance as to what he testified

23   yesterday.

24            THE COURT:  I assume that this is a manner of trying

25   to closely control the witness's testimony to align with
```

```
 1   yesterday's without impeaching him; am I wrong?

 2               MR. PERTNOY:  That's correct.

 3               THE COURT:  Do you want to just try asking the

 4   questions you asked yesterday and see how it goes?

 5               MR. PERTNOY:  I was just trying to be efficient with

 6   our time, Your Honor.

 7               THE COURT:  I recognize that you were, but you hear

 8   the objection and so get a little closer to the rules of

 9   evidence and see how it goes.

10               MR. PERTNOY:  Sounds good.

11   BY MR. PERTNOY:

12   Q   So yesterday -- strike that.

13               You understand that as a citizen of Florida, a

14   citizen of Florida can establish a constitutional-protected

15   homestead anywhere in the State of Florida, correct?

16   A   Yes.

17   Q   And Mr. Carollo, therefore, has the right to establish a

18   constitutional-protected homestead anywhere in the State of

19   Florida, correct?

20   A   Not as a City of Miami commissioner.

21   Q   That wasn't my question, let's try it again.

22               My question was:  As a citizen of Florida,

23   Mr. Carollo has the right to establish a

24   constitutionally-protected homestead anywhere in the State of

25   Florida?
```

1    A    Yes.

2    Q    Now, as an elected official, he may pay a consequence if

3    that's not in his district, correct?

4    A    According to our charter, yes.

5    Q    But that would not affect his rights as a citizen of

6    Florida to have a constitutionally-protected homestead,

7    correct?

8    A    No.

9    Q    I asked it as -- it was a negative, so I want to make sure

10   we get it clean.  So him having a homestead outside of his

11   district as a citizen of Florida, that's okay, correct?

12   A    Yes.  Not under the charter of the City of Miami, but as a

13   citizen of Florida, yes.

14   Q    Now, yesterday, your counsel asked you, "What is your

15   understanding of how Carollo's house was put into the

16   district," and your response was, "It magically appeared."

17   A    Yes.

18   Q    You have no evidence, as you sit here today, that Carollo

19   directed or placed that home into his district, correct?

20   A    May I spoke freely?

21   Q    It is a yes or no question.  You have no evidence that

22   Mr. Carollo directed or had that home placed into -- into the

23   district, correct?

24   A    The evidence I have is that on February 7th, Mr. De Grandy

25   presented a map that did not have the home in it.  On

```
 1   February 25th, at commission meeting -- well, no, I'm sorry, on

 2   February 22nd, I received a map that did have his home in it;

 3   and in the February 7th meeting, Commissioner De Grandy said,

 4   "I am going to meet with each commissioner to see how they

 5   would like me to change this map."

 6              MR. PERTNOY:  Move to strike as nonresponsive.

 7   BY MR. PERTNOY:

 8   Q   I asked if you had any evidence and all you have done is

 9   regurgitate so I move to strike his response as nonresponsive.

10              THE COURT:  Overruled.

11              MR. KRAMER:  Objection, Your Honor, that was the

12   witness's testimony.

13              THE COURT:  You already won, Mr. Kramer.

14   BY MR. PERTNOY:

15   Q   I asked you yesterday, the 3-2 vote -- strike that.

16              The redistricting, that is a constitutionally

17   legislative required act by all the commissioners, correct?

18   A   Yes.

19   Q   And so all of the commissioners participated in that

20   process, correct?

21   A   Yes.

22   Q   Because it is their job, correct?

23   A   Yes.

24   Q   It is not egregious for a commissioner to participate in

25   that constitutionally-mandated requirement as a commissioner,
```

1    correct?

2    A    Unless they are not allowed to for their own ethical

3    conflicts of interest.

4    Q    And as you sit here today, there has been no one who has

5    affirmatively said that a specific commissioner, any

6    commissioner, was not allowed to participate in that vote,

7    correct?

8    A    As was established by the city attorney, it is up to that

9    commissioner to make that decision.

10   Q    Now, finally, when -- and I asked you yesterday, the house

11   that you were living in at the time of the redistricting map,

12   that remained in your district, correct?

13   A    Yes.

14   Q    As did all of the other commissioners' homes, correct?

15   A    Yes.

16   Q    Now, subsequent to the 3-2 vote, after you left the

17   commission, there was another map that was -- had to be

18   reissued, correct?

19   A    After the 3-2 vote on March 24th, that one.

20   Q    Right.  And then subsequently, in June of 2023, there was

21   another map that was voted on, correct?

22   A    Yes, I was off the commission.

23   Q    Correct.  You were off the commission, and that map was

24   approved four-to-one, correct?

25   A    I don't know.

```
 1              MR. PERTNOY:  I'm going to check my notes, but I
 2    think I'm done, Your Honor.
 3              THE COURT:  Okay.
 4              MR. PERTNOY:  No further questions, Your Honor.
 5              THE COURT:  Thank you, Mr. Pertnoy.
 6              MR. PERTNOY:  Did you ask me again?
 7              THE COURT:  I said thank you, Mr. Pertnoy.
 8              MR. PERTNOY:  I'm sorry, thank you.
 9              THE COURT:  Okay.
10                        REDIRECT EXAMINATION
11    BY MR. KRAMER:
12    Q   Mr. Russell, what did you do after Carollo said he did not
13    care if the map included his house in District 2?
14    A   I moved to normalize the boundaries at US 1 which would
15    then remove his house from District 2 --
16    Q   What happened --
17    A   -- which would maintain his house in District 2.
18    Q   What happened to that motion?
19    A   He voted against it.
20              MR. KRAMER:  No further questions, Your Honor.
21              THE COURT:  All right.  Thank you, Mr. Russell.
22              THE WITNESS:  Thank you.
23        (Witness excused)
24              MR. GUTCHESS:  Your Honor, Plaintiffs call
25    Mr. De Grandy.
```

```
 1          MR. PERTNOY:  Your Honor, I'm going to maintain my

 2   objection as to relevance.

 3          THE COURT:  Yes, you are.

 4          MR. PERTNOY:  Thank you.

 5          THE COURTROOM DEPUTY:  Sir, please raise your right

 6   hand.

 7          MIGUEL DE GRANDY, PLAINTIFF WITNESS, SWORN

 8          THE COURTROOM DEPUTY:  Thank you.  Please be seated,

 9   speak into the microphone, state your name and spell your last

10   name for the record.

11          THE WITNESS:  My name is Miguel De Grandy, spelled

12   D-E space G-R-A-N-D-Y.

13          MR. GUTCHESS:  Thank you.

14                        DIRECT EXAMINATION

15   BY MR. GUTCHESS:

16   Q    Thank you.

17          Mr. De Grandy, where do you work?

18   A    Holland & Knight.

19   Q    What is your position at Holland & Knight?

20   A    I'm a partner.

21   Q    Were you head of the government relations practice for

22   South Florida?

23   A    Yes, sir.

24   Q    And I understand you have an event to get to this afternoon

25   and would like to get out of here as promptly as possible this
```

1   morning.

2   A    Actually, my attorneys do, I'm staying here.

3   Q    Okay.  That's good to know, but we will be quick anyways.

4   A    All right.

5   Q    Did you or your employer have a written engagement

6   agreement with the City of Miami concerning the district maps?

7   A    Yes.

8   Q    And in that agreement, you were defined as a "consultant,"

9   were you not?

10  A    That's correct.

11  Q    And there is no place in that agreement that talks about

12  you providing legal advice, is there?

13  A    That's incorrect.  The scope of services talks about my

14  providing legal advice.

15  Q    Okay.  I'm going to introduce into evidence Plaintiffs'

16  Exhibit 27, which is a copy of your engagement agreement.

17          MR. PERTNOY:  I'm going to object, Your Honor,

18  relevance.

19          THE COURT:  Yes.

20          MR. GUTCHESS:  Your Honor, this is the basis on which

21  he was hired as a consultant on redistricting and demographics.

22  It has no -- he has no -- said nothing at all about him acting

23  as an attorney or providing legal advice, and we are going to

24  have some objections to attorney-client privilege here, and I

25  want to establish that the engagement agreement has nothing to

```
 1   do with him acting as an attorney.
 2            THE COURT:  And how is this anything other than
 3   collateral to what we are doing?  What do I need to know from
 4   Mr. De Grandy that is going to be disputed under a claim of
 5   privilege?
 6            MR. GUTCHESS:  Okay.  So we can save that if a
 7   privilege comes up, and we can address it at that point, Your
 8   Honor.
 9            THE COURT:  Okay.
10   BY MR. GUTCHESS:
11   Q   Mr. De Grandy, you were not engaged in any way, shape, or
12   form to provide asset protection advice to Commissioner
13   Carollo, were you?
14   A   No, sir.
15   Q   And what consideration should be given in a redistricting
16   process to asset protection for a commissioner?
17            MR. PERTNOY:  Objection, Your Honor.
18            THE COURT:  Overruled.
19   BY MR. GUTCHESS:
20   Q   And you were not engaged by Mr. Carollo individually to
21   provide him any asset protection advice, were you?
22            MR. PERTNOY:  Objection.
23            THE COURT:  Relevance?
24            MR. PERTNOY:  Relevance, among many others, but
25   relevance, it seems to be relevance.
```

Friday, May 17, 2024.

```
 1              THE COURT:  Do you want to pick another one?
 2              MR. PERTNOY:  It's -- it assumes facts not in
 3   evidence.  There is no -- he hasn't even testified that he was
 4   engaged by Mr. Carollo.
 5              THE COURT:  Overruled.
 6              I think you gave the response; but, Mr. De Grandy, I
 7   don't know if the court reporter caught it over the objection.
 8   Do you mind repeating your answer?
 9              THE WITNESS:  No.
10   BY MR. GUTCHESS:
11   Q    Thank you, sir.
12              Now, Mr. De Grandy, you have testified in the past
13   about requests made by the commissioners to change district
14   lines; isn't that right?
15   A    Those that are in the public record, yes.
16   Q    For example, you talked about Commissioner Carollo's desire
17   to move District 3 deeper into Shenandoah, correct?
18   A    That was part of the public record, yes.
19   Q    Okay.  And there is no -- there was no claim of privilege
20   as a commissioner requesting to move a district line as long as
21   it is in the public record, correct?
22   A    That's correct, yes.
23   Q    Okay.  And when you drew up your first map that was
24   introduced earlier this morning, you did not include
25   Mr. Carollo's home in District 3; is that correct?
```

```
1    A    Could you make sure you tell me which home?

2    Q    Yes.  The home at 3220 Morris Lane is Commissioner

3    Carollo's home, on Morris Lane.  You did not include the Morris

4    Lane home in District 3, did you?

5    A    I did not.

6    Q    Why not?

7    A    No particular reason.  I had drawn a plan that had

8    sufficient population for each one of the districts, following

9    constitutional principles.

10   Q    Okay.  And, Mr. De Grandy, in your map that was distributed

11   on February 22nd, that was introduced into evidence this

12   morning, in that second map, you did draw the lines to include

13   Mr. Carollo's home into District 3, correct?

14   A    That's correct.  I made several changes that resulted in me

15   [unintelligible] population.

16   Q    And the reason that you drew Mr. Carollo's home into

17   District 3 was because you thought it would please the

18   commissioner, correct?

19            MR. PERTNOY:  Objection, leading.

20            THE COURT:  Overruled.

21            THE WITNESS:  That was a consideration, as I said, in

22   the public record when I presented the plan.  We had taken out

23   the Bay Heights area out of District 3.  We had also reduced a

24   portion of the triangle that would have gone to District 4, and

25   so I needed, because I took out that part of Bay Heights, to
```

Friday, May 17, 2024.

```
 1   bring in additional population to equalize districts.
 2   BY MR. GUTCHESS:
 3   Q    Okay.  But that has nothing to do with pleasing the
 4   commissioner, right?
 5   A    What has nothing to do?
 6   Q    Well, I asked you that the reason you drew the
 7   commissioner's home into District 3 was to please Commissioner
 8   Carollo, correct?
 9   A    And I just told you that was not the only reason.
10   Q    But that was one of the --
11   A    It was a consideration.  I have two considerations in
12   drawing a district plan, one that is constitutional and one
13   that can get a consensus vote.
14   Q    And you wanted to make Mr. Carollo happy, did you not?
15   A    I wanted to make sure I had a consensus plan.
16   Q    You previously testified in federal court before Judge
17   Moore that you did it to make him happy, and I quote "make him
18   happy," right?
19   A    I said I thought it would make him happy, yes.
20   Q    Yes.  And the reason you thought it would make him happy
21   was because of the lawsuit by the Ball & Chain against
22   Commissioner Carollo and his concern about his house being
23   liened?
24        MR. PERTNOY:  Objection, it's his witness and he is
25   leading the witness.
```

Friday, May 17, 2024.

```
 1              THE COURT:  All right.  I am prepared to recognize
 2    that this is an adverse witness.
 3              Overruled, you can answer the question.
 4              THE WITNESS:  Please state the question.
 5    BY MR. GUTCHESS:
 6    Q    Yes.  And the reason you knew it would make Commissioner
 7    Carollo happy is because you knew about the lawsuit by the Ball
 8    & Chain against Mr. Carollo, and you knew that there would be a
 9    lien placed upon his house if he was not able to move back in
10    and obtain homestead?
11              MR. PERTNOY:  Objection.
12              THE WITNESS:  The answer, as you phrase your
13    question, no because, at that time, I didn't know whether there
14    was going to be a judgment or not.
15    BY MR. GUTCHESS:
16    Q    Mr. De Grandy, in your deposition in the Grace case, before
17    this Court, did you not testify that, "I didn't include
18    Carollo's home in my first map.  I can tell you that I saw
19    numerous articles in the Ball & Chain lawsuit whether the
20    commissioner's house was going to be involved and liened," et
21    cetera, et cetera.  And so, you know, that's why I put it into
22    the district."
23              Did you not testify under oath to that exact
24    statement?
25    A    I did.
```

1   Q    Okay.  And at the time, Mr. De Grandy, there were no public

2   articles, were there?

3   A    Yes, there were.

4   Q    Which public articles did you read on February 2022 about

5   the lawsuit that may end up with a lien on Commissioner

6   Carollo's house?

7   A    I don't recall specifically.  There were articles in blogs,

8   there were articles in newspapers.

9   Q    Mr. De Grandy, you had a conversation with Mr. Carollo

10  where he asked you to redraw the district lines so he could

11  move into his house and claim homestead if there was a verdict

12  in this case, correct?

13          MR. MILLER:  Objection, I'm going to object to any

14  inquiry into any part of the deliberative process that would

15  have occurred in the meetings between Mr. De Grandy's

16  consulting the commissioners with the City's legislative

17  privilege.

18          THE COURT:  Mr. De Grandy, I know you have protracted

19  experience in this particular space.  So do you understand the

20  City's objection here with respect to legislative privilege?

21          THE WITNESS:  Yes, and I can also --

22          THE COURT:  My turn.  Can you answer the question

23  without invading on the legislative privilege?

24          THE WITNESS:  I could not, as to any conversations

25  unless he is asking me for conversations that occurred in the

1    public record.

2           THE COURT:  Can I see the deposition transcript you

3    are relying on?

4           MR. GUTCHESS:  Your Honor, I have the deposition

5    transcript and the trial testimony.

6           THE COURT:  I just want to see the one you are

7    questioning him about, the last question and answer.

8           MR. GUTCHESS:  Let me get the exact line for you.

9           THE COURT:  Okay.  I have lost track of the exact

10   question that you have pending, I think that your last question

11   was in February of 2022, what he knew.  Do you mean 2023?  And

12   if you don't, what was happening in February of 2022, that is

13   relevant because I'm -- then I'm lost.

14          Do you want your transcript back?

15          MR. GUTCHESS:  I believe the redistricting was

16   happening in February of 2022.  My question for Mr. De Grandy

17   was about conversations he had with Mr. Carollo, and there was

18   an objection, and there was a discussion of legislative

19   privilege.

20   BY MR. GUTCHESS:

21   Q   And I would like to get into that because, Mr. De Grandy,

22   do you recall when I first started questioning you, you told

23   this Court that nothing about your role involved asset

24   protection for Mr. Carollo, correct?

25   A   That's correct.

1    Q    Okay.  So if you had conversations with Mr. Carollo about

2    his homestead, that would not be any part of your role in

3    advising the City on the maps, correct?

4              MR. PERTNOY:  Objection, I think that now we are into

5    the world of hypotheticals.

6              THE COURT:  Overruled.

7              THE WITNESS:  I never discussed asset protection with

8    Mr. Carollo.

9    BY MR. GUTCHESS:

10   Q    Did you discuss the Ball & Chain lawsuit with Mr. Carollo?

11   A    I would have to claim attorney-client privilege on that.

12             THE COURT:  With whom?

13             THE WITNESS:  The City.

14             THE COURT:  That's not the question.

15             I'm going to stop right here.  I have a very low

16   tolerance for misuse of the invocation of privilege, as some of

17   the attorneys in this courtroom know.  So if you need to

18   consult with somebody before invoking a privilege on a

19   fallacious basis, you may do so; but, I caution everyone to be

20   honest in their assertion of privilege.

21             What was the question?

22   BY MR. GUTCHESS:

23   Q    I think the last question was whether you discussed the

24   Ball & Chain lawsuit with Mr. Carollo.

25             MR. MILLER:  I would still like to bring up the

1  legislative privilege because any discussion that is going to

2  be happening during that deliberative process --

3          THE COURT:  Are you straight-faced going to tell me

4  Mr. De Grandy's conversations with Mr. Carollo about the Ball &

5  Chain lawsuits were part of the legislative process?

6          MR. MILLER:  Possibly, Your Honor, if --

7          THE COURT:  I would like a proffer.

8          MR. MILLER:  A proffer of -- from me about --

9          THE COURT:  How.

10          MR. MILLER:  What I'm saying, Your Honor, is if you

11  have a legislative body and they are discussing a legislative

12  chain, anything they are discussing as part of that

13  deliberative process is going to be protected by the

14  legislative privilege, regardless of whether it is personal or

15  political or whatever.  The whole point of the legislative

16  privilege is to prevent this inquiry from happening, getting

17  into the -- how legislative -- how the sausage is made,

18  whatever that sausage looks like, that is why it is such a

19  broad privilege.

20          So I do believe, Your Honor, that any of those

21  conversations that are going to occur in that room, and it does

22  relate to redistricting, will be covered by that privilege.

23          THE COURT:  I'm going to give you a five-minute break

24  to speak to Mr. De Grandy.  I'm going to ask you to be mindful

25  of the answer that he just gave with respect to what he did or

```
 1   did not represent Mr. Carollo on individually; and then I'm
 2   going to let Mr. Gutchess ask Mr. De Grandy the question again,
 3   after you have consulted with him.  If there is a well-placed
 4   and informed and factual basis for asserting the privilege,
 5   then we will hear it then.
 6          MR. MILLER:  Let me be clear --
 7          THE COURT:  Not a hypothetical one, one that is
 8   informed by the actual facts and testimony that he would offer
 9   based on your advice as the attorney for the City.
10          MR. MILLER:  Yes, Your Honor, and just to be clear,
11   I'm not raising an attorney-client privilege here, I'm solely
12   raising a legislative privilege.
13          THE COURT:  I understand, but I don't want a
14   hypothetical assertion of privilege, if there is --
15          MR. MILLER:  Understood, Your Honor.
16          THE COURT:  -- an actual factual basis, not what he
17   could have said or whether it could have been covered, if it
18   transpired and, in your professional opinion, the City has an
19   actual claim of privilege to the answer he would give in
20   response to that question, then we will take it up then.
21          MR. MILLER:  Yes, Your Honor.
22          THE COURT:  And that is the full extent to which you
23   can discuss your testimony that you have given or anticipate
24   giving during this break, Mr. De Grandy.
25          THE WITNESS:  Yes, ma'am.
```

1                    THE COURT:  Consultation with the City attorney with

2    respect to its claim of privilege.

3                    THE WITNESS:  Yes, ma'am.

4                    THE COURT:  Five minutes, everyone.

5                    THE COURTROOM DEPUTY:  All rise.

6          (Recess was had at 10:26 a.m.; and the proceedings

7           resumed at 10:43 a.m.)

8                    THE COURTROOM DEPUTY:  All rise.  Court is in

9    session.  Appearances are as previously noted.

10                    THE COURT:  Okay, Mr. Gutchess, I think you are still

11    up.

12    BY MR. GUTCHESS:

13    Q   Mr. De Grandy, let me restart by just asking you a related

14    question about your trial testimony, I'm going to read it for

15    you.

16                    At trial, you said that you were -- "It was very

17    clear to me where the commissioner's home was and whether the

18    commissioner can homestead the house or not," and I tell you

19    that testimony because I want to ask you again:  Did you have

20    conversations with Commissioner Carollo about his desire to

21    claim homestead on his Morris Lane property?

22    A   About his desire to claim homestead, yes.

23    Q   Okay.  And what did Mr. Carollo tell you about his desire

24    to claim homestead?

25    A   He said he was considering moving into the property and

```
 1    claiming homestead.
 2    Q   And he would be unable to remain as a commissioner in
 3    District 3, if you did not redraw the map lines to include his
 4    Morris Lane property in District 3, correct?
 5    A   He would not.
 6              MR. GUTCHESS:  All right.  No further questions.
 7              THE COURT:  Okay, cross.
 8                      CROSS-EXAMINATION
 9    BY MR. PERTNOY:
10    Q   Good morning, Mr. De Grandy.  How are you?
11    A   I'm doing good.
12    Q   Okay.  The act of drawing district lines, that in and of
13    itself does not create or destroy a homestead, correct?
14    A   Not to my knowledge.
15    Q   In public hearings that were held, did any -- did
16    Commissioner Carollo ever direct you, instruct you, or insist
17    that his home be put in District 3?
18    A   In any public hearing, no.
19    Q   Did anybody ever instruct you or direct you to put his home
20    in District 3?
21    A   You are talking about public hearings?
22    Q   No, I'm just saying in general.  Did anybody on
23    Mr. Carollo's behalf ever direct you or instruct you to place
24    his home in District 3?
25    A   Anybody on Mr. Carollo's behalf, no.
```

```
 1   Q   And you have no knowledge of Commissioner Carollo's intent

 2   with respect to establishing his homestead in April 2023,

 3   correct?

 4   A   No.

 5           MR. PERTNOY:  I don't think I have any more

 6   questions.  Thank you.

 7           THE COURT:  Safe travels, Mr. De Grandy.

 8       (Witness excused)

 9           MS. GOMEZ:  Your Honor, we call Commissioner Carollo

10   to the stand.

11           THE COURTROOM DEPUTY:  Raise your right hand.

12           MR. PERTNOY:  Your Honor, may I approach the witness?

13           THE COURT:  Mr. Pertnoy, you don't need my permission

14   to move in the well.  I appreciate it, but you are fine.

15   Understood, there is no jury.

16       COMMISSIONER JOE CAROLLO, PLAINTIFF WITNESS, SWORN

17           THE COURTROOM DEPUTY:  Thank you, sir, please be

18   seated, speak into the microphone, state your name and spell

19   your last name for the record.

20           THE WITNESS:  Joe Carollo, C-A-R-O-L-L-O.

21                         DIRECT EXAMINATION

22   BY MS. GOMEZ:

23   Q   Good morning.

24   A   Good morning.

25   Q   You have been a commissioner of District 3 since 2017.
```

1    A    Since -- yes, since December.

2    Q    Since December, you are a conscientious public servant.

3    A    Ma'am?

4    Q    You are a conscientious public servant.

5    A    I believe I am.

6    Q    You want to do your job well.

7    A    I believe I do.

8    Q    You want to represent the people of your district the best

9    you can.

10   A    Yes.

11   Q    And that means learning your city's ordinances.

12   A    That's correct.

13   Q    Learning the rules governing the conduct of public

14   officials.

15   A    Yes.

16   Q    And the laws that apply to governing in the City of Miami.

17   A    Yes.

18   Q    And when you decided to run to be a commissioner, you

19   learned the rules governing someone's eligibility for the

20   position.

21   A    That's one of the requirements they have.

22   Q    You had to read the city charter.

23   A    You had to understand what the requirements were to run for

24   office.

25   Q    And one of those requirements was that you needed to be a

```
 1   resident of the district that you are running in.

 2   A    That's correct.

 3   Q    You wanted to be a commissioner in District 3.

 4   A    That's correct.

 5   Q    And you needed to -- so you needed to reside in District 3

 6   for a year prior to running in the election.

 7   A    Yes.

 8   Q    And there is only one home that you owned in Florida under

 9   your name, at this moment.

10   A    The only one that I owned then, the only one that I own

11   now.

12   Q    And it is in Coconut Grove.

13   A    That's correct.

14   Q    And at the time that we are talking about in 2017, and in

15   2016, that house in Coconut Grove was in District 2.

16   A    Yes.

17   Q    That's your largest asset.

18   A    Yes.

19   Q    That house is located at Morris Lane.

20   A    Yes.

21   Q    So you ended up having to move.

22   A    Yes.

23   Q    And you moved in, is it September of 2016?

24   A    Correct.

25   Q    You moved into an apartment.
```

```
 1   A    Yes.

 2   Q    It was located at 110 Southwest 10th Street.

 3   A    I believe so.  It was on 10th Street, the address sounds

 4   like the one that I remember.

 5   Q    The important part is that it was in District 3.

 6   A    Yes.

 7   Q    Okay.

 8             THE COURT:  Hold up.  Mr. Carollo, will you speak

 9   just a little closer to the microphone so the court reporter

10   isn't struggling.

11             THE WITNESS:  Okay.  Let me move it up, because I

12   can't move the chair.

13             THE COURTROOM DEPUTY:  You can't, it is bolted.

14             THE WITNESS:  Is that better, Your Honor?

15             THE COURT:  Great.

16             THE WITNESS:  Thank you.

17   BY MS. GOMEZ:

18   Q    So in 2017, you ceased claiming any homestead exemption for

19   that Morris Lane property in Coconut Grove.

20   A    I'm sorry.  Can you repeat the question?

21   Q    In 2017, you ceased claiming any exception for that Coconut

22   Grove property for, the Morris Lane property, that is located

23   in District 2.

24             MR. PERTNOY:  Objection, she is referring to I

25   believe the tax exemption which has nothing to do with
```

```
 1    constitutional homestead protection, and so I want the Court --
 2              THE COURT:  I do understand the distinction, I think
 3    it is still relevant to intent.
 4              MS. GOMEZ:  Thank you, Your Honor.
 5              THE WITNESS:  What I insisted in having, which the
 6    law requires, is the extra homestead tax benefit that you get
 7    if you live in the property.  But at no time did that mean that
 8    I waived my constitutional homestead rights on that property
 9    and, as you stated, and I vouched that's the only property that
10    I owned.
11    BY MS. GOMEZ:
12    Q   In 2017, did you have a -- were you asserting a
13    constitutional homestead in your Coconut Grove house in
14    District 2?
15    A   I always felt that from the minute that I bought the house
16    to the minute that I moved into District 3 to run for office,
17    that I had a constitutional protection on that home, and I
18    never gave up my constitutional protection because it was
19    always my intention of moving back into that home.  That's why
20    we signed a lease at the apartment that went until the
21    election, so if I did not win, I could move back.
22              I did win, and the only thing that I knew that I
23    would have would be four years.  I did not know if I would run
24    again for an additional four years, nor if I would be reelected
25    for four years.  So all during that time, it was always my
```

```
 1    intention, my wife's intention, that when I would be done as a
 2    commissioner or if we were not successful in the original
 3    campaign, that we would always move back to the Morris Lane
 4    address.
 5    Q    But in 2017, when you win the election and you are living
 6    in, I believe it was a Brickell apartment, Brickell Lofts.
 7    A    Yes, Brickell Lofts, yes.
 8    Q    In 2017, when you win the election and you are living in
 9    Brickell Lofts --
10    A    Yes.
11    Q    -- you did not have a constitutional homestead claim to the
12    house in Coconut Grove.
13             MR. PERTNOY:  Objection, calls for a legal
14    conclusion.
15             THE COURT:  Go with asked and answered; next
16    question.
17             THE WITNESS:  Your Honor, I'm sorry.
18    BY MS. GOMEZ:
19    Q    Alfie Leon was your opponent in that race, right?
20    A    Yes.
21    Q    And after the election, he sued claiming that you weren't
22    eligible for the position because your house was actually in a
23    different district.
24    A    I don't think that's quite what he claimed, but he did sue
25    me.
```

```
 1    Q    And did the Court find that you were a resident of
 2    District 2 -- I'm sorry, District 3 and therefore you were
 3    properly representing that district as their commissioner?
 4    A    To the best of my recollection, what the Court found was
 5    that I was properly living in District 3 and that is correct,
 6    but that has nothing to do with my constitutional --
 7    Q    And you were not --
 8              THE COURT:  Hold up, one at a time.
 9              Mr. Carollo, you've answered the question.  Once the
10    question is answered, listen for the next one.  Your attorney
11    is going to have a chance to ask you questions.
12              THE WITNESS:  Yes, Your Honor.
13              THE COURT:  Don't speak over each other.
14              MS. GOMEZ:  Thank you.
15    BY MS. GOMEZ:
16    Q    And at the time, you were not living in that Coconut Grove
17    house, you were living in the Brickell Lofts apartment.
18    A    Yes, correct.
19    Q    Now, in fact, you ended up moving back into the Morris Lane
20    home in Coconut Grove during the middle of the trial in this
21    case.
22    A    That's not so.
23    Q    You didn't move -- you weren't paying rent at 1521
24    Southwest 10th Street up until April of 2023?
25    A    Ma'am, I moved back into the Coconut Grove homestead fully.
```

Friday, May 17, 2024.

1    I started moving stuff out as I could, spent a few nights in

2    March, but fully before the trial began.  The lease had not

3    expired until some time later in April.  My wife stayed -- my

4    wife stayed at the house that we were living with at the time

5    trying to pack all the furniture.  She was afraid to come with

6    me, the house would be empty, and someone would break into it,

7    so she was packing the furniture.  I believe we -- she rented a

8    truck.

9         MS. GOMEZ:  Your Honor, object, this goes way beyond

10   my question of just when did he move.

11        THE WITNESS:  Okay.  But I was living there to answer

12   the question.

13        THE COURT:  Mr. Carollo, we are going to get a little

14   bit more formal.  Do not interrupt each other.  If I think a

15   witness needs to be interrupted, I, only I will do that.

16        Please do not speak over an attorney, you have.

17        And, Mr. Carollo, I want to make sure -- we have a

18   remote court reporter -- please don't make her job harder than

19   it has to be.

20        You asked when he moved and he is explaining the

21   steps.  Mr. Carollo, you can complete your answer.

22        THE WITNESS:  Thank you.

23        Bottom line is -- and I don't know why it would make

24   a difference -- before the court hearing started, I had moved

25   physically to the Morris Lane address, and as the court

1    progressed, with the exception of the times that I stayed in

2    Fort Lauderdale, I would sleep and stayed at the Morris Lane

3    address.

4    BY MS. GOMEZ:

5    Q   What was the date that you moved into the Morris Lane

6    address?

7    A   I don't remember exactly.  I think it was a few days before

8    the trial started.  I'm not sure exactly.  It was a couple of

9    days before, probably in April.

10   Q   Now, at the same time that you are dealing with this

11   lawsuit, you are also participating in the redistricting of the

12   City of Miami, right?

13   A   Well, I really don't understand your question.

14   Q   At the time you were participating in redistricting, was

15   this lawsuit already pending?

16   A   Yes.

17   Q   And Mr. De Grandy started working on the redistricting maps

18   in around 2021.

19   A   I don't remember when, whatever was stated is what it is.

20   I don't remember.

21   Q   As part of that process, you met with Mr. De Grandy alone

22   to discuss the maps that he was drawing.

23   A   What point in time are we talking about?

24   Q   At any point in time.

25   A   No.

```
 1              THE COURT:  Ms. Gomez, please focus your questions,
 2    you started with 2021, what period of time are you talking
 3    about?
 4    BY MS. GOMEZ:
 5    Q    Throughout the entire redistricting process.
 6    A    Well, if it started in 2021, then we had 2022 because I
 7    know we voted on it in March 2022, then we voted again for a
 8    map in June of 2023, so all during that time, I must have met
 9    with him I would imagine, to the best of my recollection, at
10    least once in 2022 and at least once in 2023.  That's to the
11    best of my recollection.
12    Q    And then on March 11th of 2022, there was a commission
13    meeting to consider community stakeholder feedback --
14    A    Yes.
15    Q    -- on De Grandy's February 25th map, the base map, what was
16    being called the base map, correct?
17    A    It was to go over the map and --
18    Q    And during that meeting, you said were going to abstain
19    from voting on the map.
20    A    I don't think that's quite what I stated.  If you could
21    bring my statement up and read my full statement, I think that
22    would be more accurate.
23              MS. GOMEZ:  Sure.
24              THE COURT:  Ms. Gomez, I missed the date, could you
25    please, it's March --
```

```
 1              MS. GOMEZ:  March 11, 2022.

 2              THE COURT:  Okay, I apologize.

 3              THE WITNESS:  Thank you.

 4    BY MS. GOMEZ:

 5    Q   Commissioner, I would direct you to page 22 at the very

 6    top.

 7    A   Yes.

 8    Q   So I showed you the beginning of your discussion but at the

 9    very top --

10    A   Yes.

11    Q   -- you said, "I'm going to abstain today."  It's at the

12    very end of the first line, "I'm going to abstain today."

13    A   And right after that is that, "Today, even though I feel I

14    have every right to be able to vote today."

15    Q   But you said you were going to abstain at that commission

16    meeting.

17    A   And I did.

18    Q   And -- but you ended up voting on the map at the March 24th

19    or 25th commission meeting, correct?

20    A   Yes, yes.

21    Q   And you were the deciding vote.

22    A   Well, yes, based on the actual map, if I would have let

23    District 4 take out the sliver on the other end from Coconut

24    Grove to District 4, they would have voted for the map, but I

25    thought that would be unfair because then District 3 would have
```

```
 1    to have more of Coconut Grove.

 2              THE COURT:  You have answered the question.

 3              Next question.

 4    BY MS. GOMEZ:

 5    Q   In effect, you said that you were going to abstain from

 6    voting because you didn't want to be used as an excuse for

 7    somebody to sue on those maps, correct?

 8    A   That's basically what is stated here that I said.

 9    Q   Okay.  And then that map, that February 25, 2022, map, the

10    base map that was approved, based on your deciding vote, that

11    was actually challenged in court in a case called Grace versus

12    City of Miami, correct?

13    A   Yes, mainly three districts, not just a slice of the Morris

14    Lane address.

15    Q   And on April 10, 2024, Judge Moore entered an order finding

16    that that map was unconstitutional.

17              MR. PERTNOY:  Objection, relevance.

18              THE COURT:  Overruled, just lay a predicate, I

19    assume.

20              THE WITNESS:  That's my understanding.

21    BY MS. GOMEZ:

22    Q   Okay.  So the map in effect today is not that February 25,

23    2022, map.

24    A   It is not, no.

25    Q   It is the map --
```

Friday, May 17, 2024.

```
 1    A    It's the map of June, in effect today, it is the map of
 2    June of 2023 which was a 4-1 vote that still included the
 3    Morris Lane address in the map.  We don't have a new district
 4    that has been approved yet.
 5    Q    Has Mr. Wysong, as the city attorney for the City of Miami,
 6    said that the governing map of the City of Miami is the one
 7    that existed in 2011, that 2011-2021 period prior to the
 8    redistricting beginning?
 9              MR. MILLER:  Objection to the extent she is inquiring
10    about privileged communications with the city attorney.
11              MS. GOMEZ:  Public, public communications.
12              THE COURT:  I don't understand the question well
13    enough.
14              THE WITNESS:  I don't either.
15              THE COURT:  Can you rephrase?
16              MS. GOMEZ:  Yes.
17    BY MS. GOMEZ:
18    Q    Is George Wysong -- has he -- is he now the city attorney
19    for the City of Miami?
20    A    Yes.
21    Q    Has he represented that the current map in effect that
22    shows the boundary lines, the districts of the City of Miami,
23    is the one from the prior redistricting?
24    A    I don't know.
25              MR. PERTNOY:  Objection, I think we are talking about
```

```
 1    an out-of-court hearsay statement.

 2              THE COURT:  Ms. Gomez, I don't know where we are,

 3    where we are going.

 4              MS. GOMEZ:  Where we are going is what his

 5    understanding is of the City's position which is the current

 6    district map.

 7              THE COURT:  Are you trying to ask this witness if

 8    what we have now, the city attorney has publicly opined as the

 9    2011 map?

10              MS. GOMEZ:  Yes.  Is the current map, is the City --

11    what I'm trying to understand is whether he -- does he

12    understand the City of Miami has taken the position that the

13    operative map drawing the districts --

14              THE COURT:  Why?

15              MS. GOMEZ:  Because it is relevant to whether he

16    lives in District 2 or District 3.

17              THE COURT:  Okay.  Let me make sure I understand your

18    proffer.  The city attorney thinks that we have reverted to a

19    2011 map.

20              MS. GOMEZ:  To the prior map.

21              THE COURT:  Okay.

22              Is that your understanding, Mr. Carollo, that the

23    city attorney has made that statement publicly?

24              THE WITNESS:  No, ma'am.  I have no recollection of

25    that being stated by him publicly or privately to me.
```

Friday, May 17, 2024.

1  BY MS. GOMEZ:

2  Q    And if that -- if your house, as a result of Judge Moore's

3  ruling, is determined to now be in District 2, do you intend to

4  resign as commissioner for the City of Miami for District 3?

5       MR. PERTNOY:  Objection.  First off, it is a

6  hypothetical.  Secondly, it's not relevant to whether his --

7  this is his homestead or not.  We are not here about him as an

8  elected official.  They are beyond the scope of these

9  proceedings, at this point.

10      MS. GOMEZ:  Your Honor, we are here for the Court to

11 determine whether he intends to continue living in that house

12 and making it his homestead; and so if his house is no longer

13 in the district that he serves in as commissioner, the Court

14 should be informed of his intention, whether he is going to

15 continue living in the house or whether he is going to resign

16 from his position.

17      THE COURT:  If he is going to continue living in the

18 house, I agree with you, but there is a limit on the witness --

19 well, let me say it this way:  I'm going to sustain the

20 objection to that question, and if you can ask him questions

21 about his intention about where he intends to reside and the

22 applicability of the exemption.

23 BY MS. GOMEZ:

24 Q    Where would you intend to reside, Commissioner Carollo, if

25 your house is found to be located in District 2?

1          MR. PERTNOY:  Objection, it's a hypothetical and

2     there is no facts in evidence that it's in District 2 at the

3     moment.

4          THE COURT:  Overruled.

5          THE WITNESS:  On Morris Lane, even though I need to

6     clarify that based upon the *Grace* offering that the City will

7     consider at the next meeting, it either will take effect later,

8     but it would not change any of the places where existing

9     commissioners live in, if their home is taken from a district

10    into another district.

11         So the -- even though the Morris Lane address would

12    be taken out of the district, I would be allowed to reside

13    there, as the District 3 commissioner until my term ends in

14    November 2025.

15    BY MS. GOMEZ:

16    Q    Under what exception?

17    A    Excuse me?

18    Q    Under what exception would you be allowed to continue

19    living in a house that would be located in District 2?

20    A    Under the agreement that -- if it's approved by the city

21    commission next week, that the plaintiffs suing the City have

22    agreed with the City that they would agree to, and then they

23    would present that so that Judge Moore would have the final

24    decision.

25         But if the plaintiffs are in agreement with the City,

1    you would think that would be the case.  But to not beat around

2    the bush in any way, let me be very specific to your question.

3         Let's say that none of that was on the table, which

4    it is, I would still be living in 3230 Morris Lane, my

5    homestead, constitutional homestead unless someone or some

6    court says that I can no longer serve.

7    Q   And you would resign as city commissioner.

8         MR. PERTNOY:  Objection.

9         THE WITNESS:  I think I've answered that question.

10        MS. GOMEZ:  Your Honor --

11        THE COURT:  Okay.

12   BY MS. GOMEZ:

13   Q   I'm sorry, Commissioner Carollo, you said if the

14   exception -- even if the exception didn't apply, you would

15   continue residing in your home, so I'm clarifying.  If the

16   exception doesn't apply, your home would be in District 2.

17   A   A court would --

18        MR. PERTNOY:  Objection.

19        THE COURT:  Hang on, everyone.

20        I don't know how many different ways I can say "don't

21   talk over each other."

22        So, Mr. Carollo, you didn't previously answer the

23   question because I had sustained the objection.

24        THE WITNESS:  Okay.

25        THE COURT:  And, Ms. Gomez, I will sustain it again.

```
 1              MS. GOMEZ:  I'm moving on, Your Honor.

 2              THE COURT:  Okay.

 3    BY MS. GOMEZ:

 4    Q   Now, if you could please tell me, Mr. Carollo, what is your

 5    wife's name?

 6    A   Marjorie.

 7    Q   When did you marry Marjorie?

 8    A   I married Marjorie in March of 2013.

 9    Q   And when did you buy the Morris Lane home?

10    A   Morris Lane home was bought, to the best of my

11    recollection, I think around January or February of 2002.  I

12    wasn't married to her then.

13    Q   And upon your marriage to Marjorie, you did not add her to

14    the deed at the time of the marriage.

15    A   At the time of the marriage, no.

16    Q   And it wasn't until May 16, 2023, that you tried to add her

17    name to the deed.

18    A   Yes.

19    Q   And in May 16, 2023, we were in the middle of the trial in

20    this case.

21    A   We were.

22    Q   The trial in this case ended on June 1st, right, of 2023?

23    A   I believe that was the date.

24    Q   Now that first quitclaim, your attempt to quitclaim that

25    house to her, did not work.
```

```
 1              MR. PERTNOY:  Objection, misstates the facts in
 2   evidence or not each in evidence.
 3              THE COURT:  Okay, then your client will answer it;
 4   overruled.
 5              THE WITNESS:  What I tried to do was --
 6              THE COURT:  Sorry, do you want to repeat the
 7   question, Ms. Gomez?
 8              MS. GOMEZ:  Sorry.
 9   BY MS. GOMEZ:
10   Q   Your first attempt to quitclaim deed the property to your
11   wife or an interest in the property to your wife --
12   A   An interest in the property for both of us.
13   Q   -- didn't work.
14   A   I found out later that there was a second signature that
15   would be required, that the same person could not witness both
16   of our signatures.
17   Q   And so, in fact, you had to file a corrected dead.
18   A   Yes.
19   Q   And that corrected deed wasn't filed until February 5,
20   2024, right?
21   A   I don't remember, but that date could be correct.
22   Q   Was the corrected deed filed months after the trial in the
23   case had ended?
24   A   It was filed some time later.  I don't remember the exact
25   time.  Whatever it is, it is.
```

1          MS. GOMEZ:  Your Honor, if I could have a second.

2       (Brief pause in the proceedings)

3          MS. GOMEZ:  Your Honor, no further questions.

4          THE COURT:  Okay.  Mr. Pertnoy, do you wish to

5    examine?

6          MR. PERTNOY:  Sure.

7                     CROSS-EXAMINATION

8    BY MR. PERTNOY:

9    Q   Mr. Carollo, let's focus for a moment on the relevant time

10   frame.  You confirmed to us and the Court -- when did you move

11   back into your constitutionally protected homestead at Morris

12   Lane?

13   A   Permanently, it was early April, maybe a couple days before

14   the court trial started, approximately that time.

15   Q   To be clear, that's April of 2023.

16   A   Correct.

17   Q   And the redistricting votes that the plaintiffs were asking

18   you about, that was in March of 2022.

19   A   Correct, over a year before.

20   Q   Now, to confirm, you own no other properties in the State

21   of Florida, correct?

22   A   None whatsoever.

23   Q   And the Morris Lane property, is it less than a half-acre

24   of contiguous land?

25   A   It is.

```
1    Q   And it is your residence.

2    A   It is.

3    Q   It is your wife's residence.

4    A   It is.

5    Q   You both live there with the full intention that it is your

6    permanent residence.

7    A   Yes.

8    Q   When you were living outside of the residence in 2016-

9    2017, did you -- and all the way up until you went back to the

10   residence in 2023, did you ever rent the property to anybody?

11   A   No, it was never rented.

12   Q   Did you maintain that property at all times?

13   A   Of course.

14   Q   Did you maintain it with the intention that that would be

15   your constitutionally-protected homestead?

16   A   Absolutely.

17           THE COURT:  Mr. Pertnoy, I don't think this witness

18   is adverse to you, is he?

19           MR. PERTNOY:  He is not.

20           THE COURT:  I wouldn't lead him then.

21           MR. PERTNOY:  I was just trying to save a little bit

22   of time.

23           THE COURT:  Understood, Mr. Pertnoy.

24   BY MR. PERTNOY:

25   Q   When was the judgment in this lawsuit entered, do you
```

Friday, May 17, 2024.

```
 1    recall?

 2    A    I think it was sometime in the early part of June.

 3    Q    Does June 1, 2023, ring a bell?

 4    A    Well, that's when the trial ended.  I believe that's when

 5    the judge signed it, but it was not filed until ten days after.

 6    Q    Prior to the entry of the jury verdict, were you living in

 7    the Morris Lane property?

 8    A    Yes.

 9    Q    And --

10    A    So was my wife.

11    Q    Okay.

12              MR. PERTNOY:  Justin, can I get the driver's license?

13              Your Honor, may I approach the witness?

14              THE COURT:  Yes, you may.

15              MR. PERTNOY:  Your Honor, may I approach to provide

16    you with a copy?

17              THE COURT:  Okay.  Have you given a copy to

18    Plaintiffs' counsel?

19              MR. PERTNOY:  Yes.  These were previously unobjected

20    to.

21              THE COURT:  Mr. Pertnoy, if you are admitting these,

22    make sure that you adhere to our local rule with respect to

23    redacting personal identification information before you file

24    this.

25              MR. PERTNOY:  Understood.  We understand that, Your
```

1   Honor, but for purposes of I needed to have him --

2             THE COURT:  That's fine.  I just want to make sure it

3   doesn't go on the docket.

4   BY MR. PERTNOY:

5   Q   Commissioner Carollo, do you recognize this image?

6   A   Yes.

7   Q   What is it?

8   A   That's a picture of my Florida driver's license.

9   Q   And what is the address on your driver's license?

10  A   3230 Morris Lane, Miami, Florida  33133.

11  Q   Is that the property that you claim constitutional

12  homestead protection in?

13  A   Yes.

14  Q   If you look right below where it says "safe driver," it

15  says "issuance "-- it says an issuance date and then it has two

16  more lines down below that "replaced date;" do you see that?

17  A   Yes, I do.

18  Q   What is the date it was replaced?

19  A   I believe it says here April 2, 2023.

20  Q   Why did you have the license replaced at that time?

21  A   Because I had moved to and was moving to this address at

22  the time.

23            MR. PERTNOY:  Seek to admit Defendant's 3, Your

24  Honor.

25            THE COURT:  Ms. Gomez?

```
 1              MS. GOMEZ:  No objection, Your Honor.

 2              THE COURT:  Admitted.

 3         (Evidence admitted as Defense Exhibit No. 3)

 4              MR. PERTNOY:  Your Honor, may I approach?

 5              THE COURT:  Yes.

 6    BY MR. PERTNOY:

 7    Q    Commissioner Carollo, can you identify the document I have

 8    handed to you as --

 9    A    Yes, it's a copy of my voter registration.

10    Q    And what is the address on the voter registration?

11    A    3230 Morris Lane, Miami Florida  33133.

12    Q    And what was the date that it was issued?

13    A    This particular card was issued on April 5, 2023.

14    Q    And why did you have it issued on April 5, 2023?

15    A    Because this is where I was going to be living at, this is

16    where I was living at, and this is my residence to vote from.

17              MR. PERTNOY:  Seek to admit Defendant's 5, Your

18    Honor.

19              MS. GOMEZ:  No objection.

20              THE COURT:  So admitted.

21         (Evidence admitted as Defense Exhibit No. 5)

22              MR. PERTNOY:  May I approach, Your Honor?

23              THE COURT:  Yes.

24              MR. PERTNOY:  Your Honor, I recognize that we will

25    have to do significant redaction before it is uploaded but --
```

Friday, May 17, 2024.

```
 1              THE WITNESS:  I would appreciate it.
 2              MR. PERTNOY:  Yes, understood.
 3              And also, as part of the record, this document is
 4    designated as "highly confidential, attorneys' eyes only" by
 5    the parties' agreement.
 6    BY MR. PERTNOY:
 7    Q    Mr. Carollo, can you identify the document?
 8    A    Yes.  This is a 1040 tax return for 2022.
 9    Q    And what is the address of -- that you indicated in your
10    tax return for your 2022 return?
11    A    3230 Morris Lane.
12    Q    And if you turn to the second page, please.
13    A    Yes.
14    Q    And it says, "paid use only."  Do you see a date down
15    there?
16    A    I do, even though I need to clarify.  This is the copy that
17    I was given and I believe that the date that was put down when
18    this was filed is erroneous.  I believe this was filed on, to
19    the best of my recollection, on 10/15.
20    Q    Of what year?
21    A    Of --
22    Q    2023?
23    A    I believe so, yes.
24    Q    Okay.
25    A    No, no, that would have been -- yeah, 10/15/23 because
```

```
1    these were the --
2    Q    And at the time that you filed this tax return on behalf of
3    yourself and your wife, was -- were you living at 3230 Morris
4    Lane?
5    A    Yes.
6              MR. PERTNOY:  Seek to admit Defendant's 7.
7              Is there any objection to Defendant's 7 being
8    admitted?
9              MS. GOMEZ:  Your Honor, I guess the witness did say
10   that it was incorrect.  It is an incorrect document.
11             THE COURT:  Sorry, Ms. Gomez, do you have an
12   objection to its admission?
13             MS. GOMEZ:  Your Honor, I have an objection to
14   admitting a document that the witness says -- or has incorrect
15   information in it, yes.
16             THE COURT:  The evidentiary basis for your objection
17   is?
18             MS. GOMEZ:  That the document doesn't reflect the
19   witness's testimony.
20             THE COURT:  On what rule of the evidence?
21             MS. GOMEZ:  It's not --
22             THE COURT:  It's not inauthentic.  I don't know what
23   your objection is, so I don't -- other than to overrule it, I
24   don't understand it.
25             MS. GOMEZ:  Your Honor, I will withdraw my objection.
```

```
 1              THE COURT:  Okay, admitted.

 2         (Evidence admitted as Defense Exhibit No. 7)

 3              MR. PERTNOY:  May I approach, Your Honor?

 4              THE COURT:  Yes, you will have a chance at

 5    redirect -- oh, to me, yes.

 6    BY MR. PERTNOY:

 7    Q   Mr. Carollo, can you please identify the document I have

 8    handed to you?

 9    A   1040 income tax return for 2023.

10    Q   And what is the address shown on your 2023 tax return?

11    A   3230 Morris Lane.

12    Q   And if you turn to the second page, was this tax return

13    filed on or about January 29, 2024?

14    A   Yes.

15    Q   And if you turn to the very last page of the return --

16    A   Yes.

17    Q   -- do you see attached is a W-2 statement for 2023?

18    A   Yes.

19    Q   And this is your W-2 statement from the City of Miami?

20    A   Yes.

21    Q   And what address were -- does it show you have for your W-2

22    statement?

23    A   3230 Morris Lane.

24    Q   And that's the constitutionally-protected homestead

25    property that you were living in?
```

```
 1  A    Yes.
 2          MR. PERTNOY:  Seek to admit Defendant's Exhibit 8.
 3          MS. GOMEZ:  No objection.
 4          THE COURT:  So admitted.
 5          MR. PERTNOY:  Just for the record, so it is clear,
 6  this document has been designated as attorneys' eyes only,
 7  highly confidential.
 8          THE COURT:  I will note here that the hearing is not
 9  sealed in any manner.
10          MR. PERTNOY:  I understand that.  I haven't asked --
11          THE COURT:  Hold up, give me a second, Mr. Pertnoy.
12  It is incumbent on you, and pursuant to your protective order,
13  to redact that information that should not be revealed beyond
14  the protective order, okay?
15          MR. PERTNOY:  Yes, Your Honor.
16          THE COURT:  Before you file it as an exhibit to the
17  hearing, make sure, please, that you share it with Ms. Gomez so
18  she has an opportunity to review the proposed redactions.
19          MR. PERTNOY:  Yes, Your Honor.
20          THE COURT:  Thank you.
21  BY MR. PERTNOY:
22  Q    You were asked about another property that you had moving
23  trucks at in April of 2023; do you recall that?
24  A    Yes.
25  Q    What property was that?
```

Friday, May 17, 2024.

```
 1   A    That was the rental house that we were renting in Little

 2   Havana.

 3   Q    Did you terminate that lease?

 4   A    Yes, that lease was terminated.

 5   Q    And why did you terminate that lease?

 6   A    Let me try to put it in the best way that I can.

 7            You have, ET, come home.

 8   Q    What do you mean by that?

 9   A    My wife and I both wanted to go home.  It had become

10   difficult.  Apparently the house that we were renting, they

11   wanted to sell it, I think, and they weren't maintaining it.  I

12   had mold in many of the rooms, black mold.  The walls were

13   cracking, falling down, and it started affecting me together

14   with other ailments.

15   Q    Mr. Carollo, did you terminate that lease at the same time

16   that you moved back into the Morris Lane property?

17   A    Yes.

18   Q    So around April of 2023.

19   A    It was April.  I think it was the later part of April.

20   Q    And at the Morris Lane property, do you maintain an FPL

21   account?

22   A    Yes.

23   Q    Did you maintain a DirecTV account?

24   A    I believe there is a DirecTV account, yeah.

25   Q    You get water deliveries at the house?
```

```
 1   A    Yes.

 2   Q    You have internet at the house?

 3   A    Yes.

 4   Q    Is it fair to say you have all the functions of somebody

 5   who lives at that house, at the house?

 6   A    Yes.

 7   Q    Let me take you through like a day-in-the-life of.  So is

 8   it fair to say that you sleep at that house?

 9   A    Yes, absolutely.

10   Q    And in -- when the trial started in April of 2023, were you

11   sleeping at that house?

12   A    Yes.

13   Q    Were your clothes at that house?

14   A    Yes.

15   Q    Were you showering at that house?

16   A    Yes.

17   Q    When you got picked up to go to the courthouse for trial,

18   where did you get picked up?

19   A    At 3230 Morris Lane.

20   Q    And when you ended the day at trial, where were you dropped

21   off?

22   A    3230 Morris Lane.

23        Let me clarify that.  That's when we were having the

24   trial in Miami.  When we went to Fort Lauderdale, I was staying

25   in Fort Lauderdale at a hotel.
```

Friday, May 17, 2024.

```
 1   Q   All right.  Now, with respect -- you were asked some

 2   questions about the redistricting process; do you recall that?

 3   A   Yes.

 4   Q   Let's start with this.  Did you ever direct anyone at the

 5   City of Miami in drawing the redistricting maps to put your

 6   3230 home in your district?

 7   A   No.

 8   Q   Can you explain to the Court when the map went from the

 9   first map to the second map, how that came to be?

10        MR. MILLER:  Objection to the extent that is going to

11   invade the legislative privilege.

12        THE COURT:  Have you had any chance to speak with

13   Mr. Carollo about the extent to which this question does, in

14   fact, invade on the legislative privilege?

15        MR. MILLER:  It is the broadness of the question,

16   Your Honor.

17        MR. PERTNOY:  I'll withdraw the question in order to

18   keep things moving along, Your Honor.

19        THE COURT:  Okay.

20   BY MR. PERTNOY:

21   Q   Let me ask it this way.  To your understanding, was the

22   change from the first map to the second map having to have

23   anything to do with your home?

24   A   I don't believe so at all.  I certainly don't have any

25   recollection of that.  If I may -- and I think that's in the
```

```
 1    record -- we were forced to expand the districts because
 2    District 2 had gotten such a large population, and I felt very
 3    strongly, even though I term limited out, so it would not
 4    affect me running again, that for the future of that district,
 5    whoever would serve, the district should have been expanded
 6    with people that had more roots in the community -- by that I
 7    mean owned their own homes -- than going to where former
 8    Commissioner Russell wanted it to go which was West Brickell
 9    which was full of apartments with transient renters.  The
10    district was more for families that owned homes.  If you went
11    across several blocks to Shenandoah, to the Roads, those were
12    basically all homeowners.
13          So that made more sense to me than going down into
14    the West Brickell area and putting apartments, high-rise
15    apartments with transient people that were renters.
16  Q   So to be clear, it had nothing to do with the fact that
17    there was a lawsuit against you.
18  A   Of course not.  I had no idea when or even if this lawsuit
19    was ever going to go to trial.
20  Q   Right.
21  A   I didn't move there until a year after March of 2022.
22  Q   You were asked about a transfer of legal interests from
23    yourself in the Morris Lane property to you and your wife; do
24    you recall that?
25  A   Yes.
```

```
1    Q    Why did you do that?

2    A    Well, my wife was on the mortgage that we had, she had

3    signed because she -- my wife had to sign and, frankly,

4    something that I should have done long before.  I had been

5    suffering with high blood pressure, I started getting asthma

6    attacks.  Even during the trial, I missed a day or two because

7    of it, and I started wondering, you know, I'm 68 -- I was two

8    years older than when my father died at 66, you know -- how

9    much longer am I going to live; and I wanted to make things as

10   simple as I could, if something happened to me, for my wife

11   into the future.

12   Q    Was it your understanding that you had the right to do that

13   because it was your constitutional homestead?

14   A    Yes.  I felt that I had every right to do it because it was

15   my constitutional homestead.

16   Q    Now, let me ask this:  You were asked about some statements

17   that you made in March of 11, 2022, where you said that you

18   were going to abstain from the vote today.  What did you mean

19   by that?

20   A    What I meant by that was -- and, again, let me bring up the

21   additional statement.

22   Q    We will get there in a moment --

23   A    What I meant by that, that I wanted to not have individuals

24   sue the City based only on my home or not and that game being

25   played.  I didn't know at the time what the law actually
```

Friday, May 17, 2024.

```
 1   stated, so even though I felt I didn't have any conflict, and

 2   overly cautious, I abstained.  I thought that the matter was

 3   going to be resolved that day.  It wasn't, at the end; and we

 4   had to come back on the 25th, I think it was.

 5   Q   Let me see if I can refresh your recollection.

 6           MR. PERTNOY:  May I approach, Your Honor?

 7           THE COURT:  Yes.

 8   BY MR. PERTNOY:

 9   Q   I'm going to show you a portion of the transcript from

10   March 24th.  Can you read that statement to yourself --

11   A   Yes.

12   Q   -- to refresh your recollection, and then I'll ask you a

13   question?

14   A   Yes.

15   Q   I'm going to take that back.

16           Commissioner Carollo, what happened between March 11,

17   2022, and this following commission meeting in March 24, 2022?

18           THE COURT:  Don't answer that question.  Mr. Pertnoy

19   is going to ask you a much more specific question.

20           MR. PERTNOY:  Thank you, I apologize.

21   BY MR. PERTNOY:

22   Q   Commissioner Carollo, at the March 24, 2022, hearing, what

23   did you advise on the dais was the reason why you would be

24   participating in the vote?

25   A   That since I did not have any conflict of interest that, by
```

1    Florida statutes, I had to vote.  As I stated before, I thought

2    that the matter was going to be resolved on the previous -- on

3    the meeting before, on March 11th.  It wasn't, and therefore,

4    after I was informed that, by law, I have to vote.  I went and

5    voted.

6    Q    So you were here when former Commissioner Russell was on

7    the stand, and he also said that this is a requirement of the

8    commissioners, correct?

9    A    If we are in the dais, we have to vote on any item that's

10   before us.

11   Q    But redistricting itself is a legislative requirement of

12   the City of Miami Commission?

13   A    It is, also by federal laws that we have to redistrict.

14   Q    And so your actions in regards to the redistricting efforts

15   by the City of Miami, were those carried out as -- in your

16   lawful manner as an elected official?

17   A    Yes.

18            MR. PERTNOY:  Let me just check my notes, Your Honor,

19   I might be done.

20            THE COURT:  All right.

21   BY MR. PERTNOY:

22   Q    Just so we are 100 percent clear in your testimony here

23   today, you have been living full-time in the Morris Lane

24   property since at least April 2023, with the intention that it

25   is your permanent home and your constitutionally-protected

```
 1    homestead?

 2    A    Yes.

 3    Q    And in the redistricting process, you never directed

 4    anybody to place that home in your district?

 5    A    No.

 6              MR. PERTNOY:  I have no further questions.  Thank

 7    you, Your Honor.

 8              Thank you, Mr. Carollo.

 9              THE WITNESS:  Thank you.

10              THE COURT:  All right, redirect.

11              MS. GOMEZ:  Thank you, Your Honor.

12                      REDIRECT EXAMINATION

13    BY MS. GOMEZ:

14    Q    You testified earlier that as a public servant, it is your

15    duty to be aware of the laws that pertain to your conduct, that

16    govern your conduct as a public official, correct?

17    A    Yes.

18    Q    You are aware Florida Statute 112.3143 called "Voting

19    conflicts," correct?

20    A    If you could give it to me so I can read it exactly.

21              MR. PERTNOY:  Your Honor, I object that this is

22    outside the scope of my cross.

23              MS. GOMEZ:  Your Honor, he just crossed on whether or

24    not he voted on it, whether he felt he was -- it was

25    appropriate for him to vote on it.
```

```
 1              THE COURT:  Overruled.

 2              MS. GOMEZ:  Thank you.

 3              THE WITNESS:  Okay, what part would you like me to

 4   read, the one that is highlighted?

 5   BY MS. GOMEZ:

 6   Q   Highlighted, yes.

 7   A   Two A, a state public officer may not vote --

 8              THE COURT:  To yourself, sir, just read it to

 9   yourself and then be prepared to answer the question.

10              THE WITNESS:  I'm sorry.

11              Yes, I read it.

12   BY MS. GOMEZ:

13   Q   Voting on a redistricting map that puts your house in your

14   district is something that would inure to your private gain,

15   correct?

16   A   No.

17              MR. PERTNOY:  Your Honor, hold on for a second, I

18   believe that the law that Mr. Carollo is looking at was not

19   enacted until July of 2023, so at the time of the vote, in

20   March of 2022, I don't believe this was the current state of

21   the law.  So I think it is improper to be asking a question on

22   a law that wasn't in place.

23              THE COURT:  Overruled; you can clarify, if you need

24   redirect.

25              THE WITNESS:  What is the question?  I don't
```

```
 1   understand.

 2   BY MS. GOMEZ:

 3   Q   So you just read the law --

 4   A   Yes.

 5   Q   -- and it says that you can't vote on any matter where

 6   there would be an economic benefit to you.  The exact words

 7   "would inure to his or her special private gain," correct?

 8   A   Yes.

 9   Q   Your house, at the time that you were voting on the map,

10   was in District 2?

11   A   So was the house of every other commissioner that voted on

12   the map was in their district.

13   Q   No, no, no, you were in a different district.  You are the

14   commissioner of District 3.

15   A   Yeah, but the same way, their house could be affected.

16   Q   But the maps for the other commissioners -- for the other

17   commissioners' homes, the maps weren't the boundaries of where

18   their homes was going to be located was not going to be

19   affected.

20   A   But that's the whole point.

21            THE COURT:  Excuse me, I'm over here, thanks.

22            Do not speak over each other again, please.  Ask a

23   discreet question, let the witness answer it.

24            Please, Mr. Carollo, if you can answer the question

25   Ms. Gomez asks, it will go faster.
```

Friday, May 17, 2024.

```
1              THE WITNESS:  I apologize, Your Honor.

2              THE COURT:  Go ahead.

3    BY MS. GOMEZ:

4    Q   The homes of all the other commissioners were not going to

5    be affected by the new district map, the base map.

6    A   They were not going to be affected because they kept them

7    in, but they could have been affected.  But to go beyond this,

8    I had no idea at the time if I was going to move back in April

9    of 2023 or not.  I didn't have a crystal ball before me,

10   therefore, I didn't feel that I had any conflict with this

11   statute or any other law.

12   Q   So your largest asset is that Morris Lane home.

13   A   Excuse me?

14   Q   Your largest asset is the Morris Lane home.

15   A   Yes.  It is basically all that I have.

16   Q   And you have been sued by Mr. Pinilla and Mr. Fuller.

17   A   Yes.

18   Q   And your trial is now going to start in at the beginning of

19   April 2023, first quarter of April 2023.

20   A   Ma'am, in March of 2022, we had no idea when a trial was

21   going to start.  In fact, we had no idea if there would even be

22   a trial.  I was very confident in Dean Martino and, you know,

23   this was one of the main things we put in our appeal.  But I

24   had no idea when there would be a trial or if we would even end

25   up going to trial.  You are talking well over a year later that
```

1   we went to court.

2   Q   But you did have some idea that you were going to go to

3   trial because the appeal had been denied in February of 2022,

4   correct?

5   A   I knew that I had a suit going on, but beyond that, I'm not

6   a mind reading as to what the future will bring.

7   Q   Your lawyers informed you that you had lost your appeal,

8   you knew that you had lost your appeal.

9           MR. PERTNOY:  Objection, asked and answered, at this

10  point, and we are now delving into what he spoke to his

11  attorneys about.

12          THE COURT:  There was nothing that even approached

13  attorney-client privilege in that question.

14          THE WITNESS:  What is your question?

15          THE COURT:  The question, Mr. Carollo, is whether you

16  knew in February of 2022 that the appeal had been denied in

17  this underlying civil suit.

18          THE WITNESS:  I'm sure that I was aware whatever

19  appeal we had, that it was denied, but still --

20          THE COURT:  No, no, that's the whole question,

21  Mr. Carollo.  I'm sorry, I want to make sure we are moving this

22  along.

23          THE WITNESS:  Thank you.

24  BY MS. GOMEZ:

25  Q   So February 2022, you learned that you lost the appeal; and

Friday, May 17, 2024.

```
 1   in February 25th, 2022, this base map comes out, correct?
 2   A    I don't know what date it came out, but we have a map that
 3   came out.
 4   Q    But you know that you voted on the map, on the base map, at
 5   the March commission meeting.
 6   A    I voted on a map on the March commission meeting.  I think
 7   what was given to me here said the 24th.
 8   Q    So you voted on the map within a month -- within weeks of
 9   learning that you lost the appeal.
10   A    That's when the whole issue came up before me.  It could
11   have come before, it could have come after.  I voted when it
12   came before the commission.
13   Q    And your largest asset is that Coconut Grove home.
14   A    I have already stated.
15            MR. PERTNOY:  Objection, asked and answered.
16            THE COURT:  Sustained.
17   BY MS. GOMEZ:
18   Q    And there is a statute that says that you can't vote on
19   matters that pertain -- that you stand to gain anything from
20   and, yet, you voted on it.
21   A    And I already answered that.
22            MR. PERTNOY:  Misstates the statute.
23            THE COURT:  So that's overruled on that basis.  I
24   didn't hear either question or if there had been an answer.
25            THE WITNESS:  There has been an answer before, Your
```

```
 1   Honor.  I had answered.
 2              THE COURT:  I'm sorry, I don't know what the question
 3   is.
 4   BY MS. GOMEZ:
 5   Q   Mr. Carollo, I would like you to explain to the Court how
 6   it's possible that your largest asset does not have homestead
 7   exemption, at the time that you're voting on the February 25,
 8   2022, base map that puts your house in your district so that
 9   you can now move into your house and remain commissioner, how
10   that is not a private gain that you have and that you are aware
11   that this is an issue because you have just lost an appeal.
12              MR. PERTNOY:  Objection.
13              THE WITNESS:  Ma'am --
14              THE COURT:  I'm going to deprive myself of the value
15   of the answer.  You don't have to explain it to the Court,
16   sustained.
17              If you have non-argumentive and non-repetitive
18   questions to complete this redirect, will you please ask them
19   now.
20              MS. GOMEZ:  Yes, Your Honor.
21   BY MS. GOMEZ:
22   Q   It would be wrong for you to ask Mr. De Grandy to draw your
23   house into the map, into the district -- into District 3 on the
24   map that's going to be voted on, right?
25              MR. PERTNOY:  Objection, now we are into
```

```
 1   hypotheticals again.

 2             THE COURT:  Overruled.

 3             THE WITNESS:  What is the question?

 4   BY MS. GOMEZ:

 5   Q   That it would be wrong for you to ask Mr. De Grandy to draw

 6   your house into District 3 on the map that is going to be voted

 7   on by the commission.

 8             MR. PERTNOY:  Object to that, it's also --

 9             THE COURT:  I think you covered that issue in your

10   exam.

11             MR. PERTNOY:  I'll withdraw the objection.

12             THE WITNESS:  I, to the best of my recollection, did

13   not discuss that, as you are saying with Mr. De Grandy.  We

14   discussed many issues that, for the most part, I don't

15   remember.  But, in fact, I don't remember from 2022 to 2023,

16   the two times we voted on, but that's as clear of an answer I

17   can give you.

18   BY MS. GOMEZ:

19   Q   You didn't answer my question.  The question is --

20   A   I think I did.

21   Q   The question is:  Would it be wrong for you to do that?

22             MR. PERTNOY:  Objection, calls for a legal

23   conclusion.

24             THE COURT:  Overruled.

25             THE WITNESS:  If I had a conflict of interest on
```

Friday, May 17, 2024.

1    something, yes, it would be wrong.  But I did not have a

2    conflict of interest, and if you would like for me to explain

3    why, I'll be happy to.

4    BY MS. GOMEZ:

5    Q    Yes, please do.

6    A    Okay.  In Florida law, you don't have to be living in a

7    home to have constitutional homestead protection.  You cannot

8    have the tax homestead protection, in other words, from the

9    clerk of the court of Miami-Dade, and they give you your tax

10   homestead where you pay less taxes.  But the case law, as I

11   researched it on my own before, was clear that for many

12   reasons, whether jobs, whether school, you go to school, and

13   many others, as long as you don't have homestead established

14   anywhere else, it is your intention to return to your home,

15   that is your homestead.  And whether my home was put into the

16   district or not, frankly, I felt that it was homesteaded and I

17   had homestead protection under the constitution of Florida, if

18   I moved out for a job.  But I fully intended to move back in

19   when that job expired or if I didn't get the job.

20   Q    Do you recall telling David Smiley at the Miami Herald, in

21   January 2017, that you were renting in the district?  This is

22   right after you won the election, that you were renting in the

23   district but that you were planning to sell your Coconut Grove

24   home.

25   A    No, ma'am, I do not whatsoever.

```
1   Q    And at the time that you were voting on the base map -- and
2   again, that base map is that February 25, 2022, the map that
3   De Grandy proposed at the time that you were voting on that
4   base map, you were living in District 3.
5   A    I'm sorry, I missed your --
6   Q    At the time that you were voting on the map, the base map
7   that Mr. De Grandy proposed --
8   A    Yes.
9   Q    -- you were living not in your Coconut Grove home.
10  A    Back in March of 2022?
11  Q    Yes.
12  A    Yes, I was living in Little Havana.
13  Q    In Little Havana?
14  A    Yes.
15  Q    You -- now when your home gets moved into District 3
16  through that base map, you are now able to move back into your
17  home?
18          MR. PERTNOY:  Objection, asked and answered, beyond
19  the scope.  In fact, the redirect is now longer than the
20  direct.
21          THE COURT:  Overruled.
22          And yet, Ms. Gomez, this is highly repetitive of the
23  direct.  Please, a handful of more questions that gets us where
24  it is that you are going.  I assume you are laying a
25  foundation, but please get there.  Base map, signed, able to
```

1   move back in the house, true?

2   BY MS. GOMEZ:

3   Q   By voting on the base map, you are able to move back

4   into the Coconut Grove home and remain the commissioner for

5   District 3.

6   A   Yes, just like in June of 2023, and before one vote --

7           THE COURT:  No, Mr. Carollo.  "Yes" was the answer.

8           THE WITNESS:  Yes.

9           THE COURT:  Ms. Gomez.

10  BY MS. GOMEZ:

11  Q   That was a gain that you obtained by voting on that map?

12  A   No, ma'am, because when I voted on that map, I had no idea

13  that over a year later, I was going to be moving.

14          THE COURT:  Okay.  I'm going to shortcut it.

15          Did you obtain a benefit by the redistricting map

16  being signed in the manner that let you move back into the

17  house, would you characterize it as a benefit?

18          THE WITNESS:  My answer is no, for the reasons that I

19  stated, Your Honor.

20          THE COURT:  Okay.

21          MS. GOMEZ:  Your Honor, I don't have any further

22  questions.

23          THE COURT:  Okay.  All right.

24          Mr. Pertnoy, I told you, you could have redirect on

25  this document, if you want it.

Friday, May 17, 2024.

1              MR. PERTNOY:  I think we will just keep the train

2     moving on schedule, Your Honor.

3              THE COURT:  Appreciate it.

4              Okay.

5              All right, Mr. Carollo, you can return to the --

6     well, I don't think there is room at the counsel table, you can

7     have a seat behind your attorneys.

8              THE WITNESS:  Thank you, Your Honor.

9         (Witness excused)

10             THE COURT:  Okay, I think, Ms. Gomez, you told me you

11    had three witnesses.  Does that conclude your evidentiary

12    presentation?

13             MS. GOMEZ:  Yes, Your Honor.

14             THE COURT:  Then, Mr. Pertnoy, I think that,

15    likewise, you told me that your only witness was going to be

16    Mr. Carollo; is that right?

17             MR. PERTNOY:  Well, before I even get there, I mean,

18    I have other witnesses I can call, but I have a motion to make

19    with respect to involuntary dismissal, since they have now

20    rested.

21             THE COURT:  Involuntary dismissal?

22             MR. PERTNOY:  Of their objection, yes.

23             THE COURT:  Okay.  So I understand that, I wasn't

24    able to get the order filed in advance, but the vehicle that

25    you keep trying to invoke, I cannot find any law that supports

 1   your insistence that Rule 12 or Rule 56 apply in the manner

 2   that you are suggesting.

 3          You have filed a claim of exemption.  They have

 4   objected.  We have now conducted an evidentiary hearing, and I

 5   will enter a report and recommendation to Judge Smith with my

 6   findings as to whether or not they have carried their burden on

 7   their objection.

 8          So if you want to be heard on whether or not they

 9   have met their burden, I would agree with you that that is

10   salient, and you should have the opportunity to do so, but I'm

11   not going to keep entertaining this procedural vehicle that you

12   are advancing.  You had the chance, I disagree that Rule 12 is

13   applicable here, that there is a complaint to be dismissed on

14   its face, 12(b) applies to complaints.  I understand that you

15   think they should have brought a complaint, but they didn't and

16   I can't dismiss what doesn't exist.

17          MR. PERTNOY:  Very well, Your Honor.  I will raise it

18   in my arguments then.

19          THE COURT:  Understood, okay.

20          Okay, you carry the burden and what I might suggest

21   is that -- well, I understand that both parties have an

22   interest in having this decided as quickly as it can; but, as

23   often happens, arguments tend to come out differently at oral

24   argument than they do on the briefing.  If you want -- I don't

25   think we need any more briefing, but if either of you are going

Friday, May 17, 2024.

```
 1    to ask for closings in writing, tell me now; otherwise, let me
 2    just hear, Ms. Gomez, your summary on your objection and the
 3    evidence that you think supported it.
 4         MS. GOMEZ:  Your Honor, we would like to present the
 5    summary of the evidence in writing.
 6         THE COURT:  If you are going to do so, then,
 7    because -- I will just tell you that sometimes, I don't quite
 8    get the most direct answers when I ask them here, in oral
 9    argument, like what are the salient dates on which you are
10    traveling for some of these events, because you really, I
11    think, have two theories and they overlap to some degree
12    factually but not legally.
13         And so I -- if you are going to submit something in
14    quick measure, I want you to advance it in a like almost
15    finding of fact way, "This is the legal premise, and this is
16    the evidence on which I want you to rely that this thing
17    happened on that date," or that this thing happened at all as
18    opposed to just another anticipation of the evidence type of
19    briefing, okay?
20         MS. GOMEZ:  Understood.
21         THE COURT:  And that doesn't mean you need a
22    transcript.  Both sides will rely on their best recollection
23    and their notes and what they think happened here.  A
24    transcript will eventually benefit you for the objection
25    period; but in quick measure, what it is that you are advancing
```

Friday, May 17, 2024.

```
 1   happened that supports your theory which I think you can

 2   acknowledge does push the envelope under existing Florida law.

 3              So it is the primary reason that I will afford you

 4   the opportunity to make sure that you have presented the

 5   argument that you are intending to make so that I am sure I

 6   understand it.

 7              MS. GOMEZ:  Thank you.

 8              THE COURT:  Do you want simultaneous response or do

 9   you -- no, your team is already shaking their head.

10              MR. PERTNOY:  Two things:  Number one is, I would

11   like to be able to make my argument on the issues that I

12   raised, regardless of the fact that this doesn't travel under

13   Rule 12 because I do have points on the objection from a

14   procedural standpoint that I think end this inquiry; but to the

15   extent that the Court then wants them to write their findings,

16   I would then want to respond to them.

17              THE COURT:  Okay.

18              MR. PERTNOY:  May I approach the lectern?

19              THE COURT:  Yes, but you have to keep it tight

20   because we are both seeing it in writing, and we are going to

21   get into writing a second time.

22              MR. PERTNOY:  That's fine, Your Honor.  I'm going to

23   make it very tight.

24              THE COURT:  And by that, I didn't mean fast,

25   Mr. Pertnoy.
```

1          MR. PERTNOY:  I understand, speak slowly but speak

2     efficiently.

3          So with respect to their heavy burden of objection,

4     they had to establish by evidence that they had a valid lien

5     and that it attached to the homestead and that the homestead

6     exemption was not valid.  They did not put forth today any

7     evidence of a valid lien.  You didn't get any valid lien

8     documentation from you [sic].  They failed to meet their burden

9     to establish a valid lien under 55.10 which is, under 55.10,

10    they needed to show to in this Court today and establish that

11    they had a recorded judgment that had the proper affidavits and

12    that it was all done simultaneously.  You didn't get any of

13    that evidence today.  And so that is the condition precedent to

14    getting out of the gate.  And they rested, and they did not

15    provide you with a valid enforceable lien that has the judgment

16    and the affidavits that are simultaneously recorded.

17         I had an expert sitting here ready to rebut that, had

18    they done so, because the facts of the matter are that there is

19    no valid lien, but they didn't even present that they had a

20    valid lien.

21         THE COURT:  Slow down.

22         Is the lien not attached to the objection itself?

23         MR. PERTNOY:  No.  In their objection --

24         THE COURT:  Hang on just because I am sure that I

25    have seen it, and now I'll ask the plaintiffs' counsel, but --

Friday, May 17, 2024.

1          MR. PERTNOY:  Your Honor, in their objection,

2     they maybe attached the June one, which was just the judgment

3     which didn't comply with 55.10.  In their response, they

4     attach, not as evidence -- and I don't even know if it was

5     attached to the response, what they filed in February of 2024.

6          But they did not present any evidence, and we raised

7     as a grounds to their objection that they did not have a valid

8     lien.  They needed to overcome that evidentiary burden and you

9     didn't even get a lien introduced.

10         So they missed the first condition precedent.  And as

11    I said in the beginning of my arguments with respect to the

12    Florida Supreme Court in *Havoco* and in *FTC* and onward through

13    the Eleventh Circuit that they needed to establish that there

14    was fraudulent and egregious conduct that then resulted in

15    funds obtained through that fraud or egregious conduct which

16    were used to invest, purchase, or improve the homestead.  They

17    didn't introduce any evidence as to funds or that any funds

18    were even those of the plaintiffs that were then used for the

19    purposes of purchase, investment, improvement of the homestead.

20    So at every level, they did not meet the conditions of the

21    claim that they needed to prove in their objection.

22         Why do we need to spend more time and money briefing

23    that which they didn't meet their heavy burden on?  This should

24    be resolved and resolved now, because they didn't meet their

25    burden and they didn't even give you a valid lien.

1           Thank you.

2           THE COURT:  Okay.

3           The two liens that are attached to the response is

4    Exhibits V and Z?

5           MR. PERTNOY:  They didn't introduce them into the

6    evidence in an evidentiary hearing.  I have an expert sitting

7    here ready to testify that they did not comply with 55.10, the

8    statute in simultaneously recording the -- because they

9    originally in their objections say, "We did it in June," but

10   they themselves concede that they didn't do it right in June of

11   2023 because they didn't attach the affidavits.

12          They then rerecorded in February, but it is required

13   that it's recorded simultaneously.  And they are on different

14   books, different days, hundreds of pages apart, that is not

15   simultaneous, and my expert would have testified had they put

16   forth that evidence.  But they chose, for whatever reason, not

17   to establish the very first element of their objection, that

18   they have a valid lien.  They didn't do it.

19          There is nowhere left to go.  They -- they did not do

20   what they were supposed to do at an evidentiary hearing, and

21   they can't rescue themselves from that, and the Court can't

22   take the evidence -- or that's not even evidence because it is

23   affidavits of their clients.  The affidavits, I get to test the

24   veracity of those affidavits against their clients.  So it is

25   not evidence on its face, as well.  So they needed to do this

```
1    at an evidentiary hearing that they have been begging for and

2    then they dropped the ball and fumbled it on the kickoff.

3             So as far as we are concerned, this -- they didn't

4    meet their burden at any stretch of the imagination, and they

5    didn't meet their burden under the case law for Havoco, FTC

6    with respect to establishing traceable funds, and all these

7    other things.  I really do not think that we need to waste more

8    time and more attorney's fees on an issue where they have

9    failed to meet their burden.

10            THE COURT:  Okay.  I understand.

11            I told you at the beginning that I would afford the

12   parties the opportunity to be heard, and if the plaintiffs want

13   to submit something in seven days, and if you want to respond

14   in seven days, I am inclined to give you all a 20-page limit on

15   it.  I think it should be shorter, but I don't know the extent

16   to which either of you would want to try --

17            MR. PERTNOY:  That's fine, Your Honor.  I just wanted

18   to say my piece.  I thank you and the Court for all the time

19   that you have afforded us today.

20            THE COURT:  Likewise, Mr. Pertnoy.

21            I do understand your positions, and at the same time,

22   I also recognize, as I think that many of us in this room have

23   to, my role in this is to conduct the evidentiary hearing and

24   make recommendations to my district court judge, and this I

25   will do.
```

```
 1              MR. PERTNOY:  Understood, and I have to advocate
 2    vigorously on behalf of my clients.
 3              THE COURT:  Understood.  Okay.  All right, so we all
 4    know where we understand.
 5              Seven days, Ms. Gomez?
 6              MR. GUTCHESS:  Your Honor, we have, I think, 12
 7    briefs due next week oddly.
 8              THE COURT:  Twelve briefs due next week.
 9              MR. GUTCHESS:  Yes.
10              THE COURT:  So you are asking for what date?
11              MR. GUTCHESS:  Fourteen days.
12              THE COURT:  Let me just look.
13              Okay.  I can't think what prejudice your client
14    suffers by not having this decided, but you're shaking your
15    head.
16              MR. PERTNOY:  Fourteen days, and I would just ask for
17    the reciprocal.
18              THE COURT:  That is fine.  I was going to extend it a
19    little bit anyway because you have the holiday in between, I
20    think.  So 31st for the plaintiffs, June 14th for Defense
21    Counsel.
22              MR. PERTNOY:  Your Honor, just as a housekeeping
23    reminder, we also have to, at some point, get an evidentiary
24    hearing on the head of family for the garnishment.  So maybe we
25    set a status conference to get a date for that, so that we can
```

1    plan ahead, but I just want to bring that to the Court's

2    attention.

3          THE COURT:  No, you are right, and so that following

4    week is when I'm on criminal duty, so I would rather allow you

5    to complete your briefing, and then we will look to the end

6    of -- the last week of June to conduct a hearing on that, if

7    the parties -- well, let me say this -- never mind.

8          Look to the week -- the final week of June 24th.  I

9    don't disagree with you that we might want to have a telephonic

10   status conference for the purpose of finalizing a date for it,

11   and any other interim deadlines that have to be set, so we will

12   solicit your availability for a telephonic status conference

13   sometime during your briefing schedule on this; but still, it

14   will be short, and it will be for the purpose of you being able

15   to advance a conflict.

16         MR. PERTNOY:  For the Court's edification, just a

17   reminder, I'm going to be out of the country from June 12th

18   through the 29th.

19         THE COURT:  We probably won't have it that week.

20         MR. PERTNOY:  Understood, I'm just reminding the

21   Court, and I thank you for your ability to roll with the

22   punches on that.  Thank you.

23         THE COURT:  Sure.

24         So let's try to have the status conference sooner

25   rather than later then.  We will solicit your availability, if

```
 1   you guys can talk next week, okay?

 2          MR. PERTNOY:  Thank you very much, Your Honor.

 3          THE COURT:  Thank you all.

 4          MS. GOMEZ:  Thank you.

 5      (PROCEEDINGS ADJOURNED AT 12:07 P.M.)

 6                  C-E-R-T-I-F-I-C-A-T-E

 7          I hereby certify that the foregoing is

 8      an accurate transcription and proceedings in the

 9      above-entitled matter.

10

11   5/28/2024                   /s/DIANE MILLER
     DATE                 DIANE MILLER, RMR, CRR, CRC
12                        Official Court Reporter
                          United States District Court
13                        101 South U.S. Highway 1
                          Fort Pierce, FL  34950
14                        772-467-2337

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**BY MR. GUTCHESS: [10]** 50/15 52/10 52/19 53/10 55/2 56/5 56/15 58/20 59/9 62/12

**BY MR. KRAMER: [32]** 19/24 20/6 22/7 22/18 23/5 23/10 23/20 24/18 25/21 26/1 26/11 27/13 27/20 28/5 29/8 29/11 29/21 30/2 30/9 31/1 34/10 35/1 35/21 36/13 36/17 36/23 37/7 37/12 38/6 38/13 38/19 49/11

**BY MR. PERTNOY: [21]** 39/7 39/21 42/2 42/23 44/4 44/16 45/11 47/7 47/14 63/9 83/8 84/24 86/4 87/6 88/6 90/6 91/21 94/20 97/8 97/21 98/21

**BY MS. GOMEZ: [31]** 64/22 67/17 68/11 69/18 70/15 72/4 73/4 74/4 75/4 75/21 76/17 78/1 78/23 79/15 80/12 81/3 82/9 99/13 100/5 100/12 101/2 102/3 103/24 104/17 105/4 105/21 106/4 106/18 107/4 109/2 109/10

**MR. GUTCHESS: [21]** 11/15 11/25 12/3 12/5 12/9 15/1 15/7 16/9 16/24 18/21 49/24 50/13 51/20 52/6 58/4 58/8 58/15 63/6 118/6 118/9 118/11

**MR. JOHNSON: [4]** 3/20 41/6 41/13 41/22

**MR. KRAMER: [34]** 19/3 20/3 22/3 24/5 24/8 24/12 25/8 25/11 26/20 28/2 30/13 30/19 30/23 30/25 31/16 31/21 32/1 32/10 32/21 33/2 33/5 33/16 34/9 34/19 34/25 36/5 36/12 37/19 38/3 39/2 44/1 44/21 47/11 49/20

**MR. MILLER: [13]** 28/11 57/13 59/25 60/6 60/8 60/10 61/6 61/10 61/15 61/21 76/9 94/10 94/15

**MR. PERTNOY: [146]**

**MS. GOMEZ: [47]** 3/11 4/19 9/18 10/8 10/13 10/16 10/18 10/20 11/2 11/12 19/1 64/9 68/4 70/14 71/9 73/23 74/1 76/11 76/16 77/4 77/10 77/15 77/20 78/10 80/10 81/1 82/8 83/1 83/3 87/1 87/19 89/9 89/13 89/18 89/21 89/25 91/3 99/11 99/23 100/2 105/20 109/21 110/13 112/4 112/20 113/7 120/4

**THE COURT: [258]**

**THE COURTROOM DEPUTY: [11]** 3/2 3/6 19/15 19/18 50/5 50/8 62/5 62/8 64/11 64/17 67/13

**THE WITNESS: [61]** 19/21 22/5

25/2 25/6 25/17 28/23 29/1 29/4 29/7 29/20 35/10 35/16 36/21 38/11 41/17 49/22 50/11 53/9 54/21 56/4 56/12 57/21 57/24 59/7 59/13 61/25 62/3 64/20 67/11 67/14 67/16 68/5 69/17 70/12 71/11 71/22 74/3 75/20 76/14 77/24 79/5 80/9 80/24 82/5 88/1 99/9 100/3 100/10 100/25 102/1 103/14 103/18 103/23 104/25 105/13 106/3 106/12 106/25 109/8 109/18 110/8

**,**

**'22 [1]** 20/10

**/**

**/s/DIANE [1]** 120/10

**1**

**10 [2]** 36/4 75/15
**10/15 [1]** 88/19
**10/15/23 [1]** 88/25
**100 percent [1]** 98/22
**101 [1]** 120/12
**1040 [2]** 88/8 90/9
**10:26 [1]** 62/6
**10:43 [1]** 62/7
**10th [3]** 67/2 67/3 70/24
**11 [4]** 31/2 74/1 96/17 97/16
**110 [1]** 67/2
**112.3143 [1]** 99/18
**11th [4]** 31/5 36/25 73/12 98/3
**12 [6]** 4/3 111/1 111/12 111/14 113/13 118/6
**12:07 [1]** 120/5

**12th [1]** 119/17
**13 [1]** 15/3
**136 [1]** 1/7
**14-24009-CIV-JLK [1]** 1/2
**14th [1]** 118/20
**15 [1]** 88/19
**1521 [1]** 70/23
**16 [4]** 31/13 34/20 81/16 81/19
**17 [1]** 1/6
**18-24190-Civil [1]** 3/7
**19 [1]** 2/4
**1st [1]** 81/22

**2**

**20 [7]** 4/22 4/24 16/25 32/21 33/13 33/14 33/17
**20-minute [1]** 33/11
**20-page [1]** 117/14
**20-second [1]** 34/6
**2002 [1]** 81/11
**2011 [3]** 76/7 77/9 77/19
**2011-2021 [1]** 76/7
**2013 [1]** 81/8
**2015 [1]** 20/10
**2016 [3]** 66/15 66/23 84/8
**2017 [12]** 12/9 16/10 16/22 64/25 66/14 67/18 67/21 68/12 69/5 69/8 84/9 107/21
**2021 [4]** 72/18 73/2 73/6 76/7
**2021-2022 [1]** 20/14
**2022 [31]** 20/14 31/2 57/4 58/11 58/12 58/16 73/6 73/7 73/10 73/12 74/1 75/9 75/23 83/18 88/8 88/10 95/21 96/17 97/17 97/17 97/22 100/20 102/20

103/3 103/16 103/25 104/1 105/8 106/15 108/2 108/10
**2023 [35]** 7/21 8/1 16/11 16/11 48/20 58/11 64/2 70/24 73/8 73/10 76/2 81/16 81/19 81/22 83/15 84/10 85/3 86/19 87/13 87/14 88/22 90/9 90/10 90/17 91/23 92/18 93/10 98/24 100/19 102/9 102/19 102/19 106/15 109/6 116/11
**2024 [6]** 1/6 75/15 82/20 90/13 115/5 120/10
**2025 [1]** 79/14
**22 [1]** 74/5
**22nd [2]** 47/2 54/11
**23 [3]** 24/4 25/9 88/25
**2337 [1]** 120/13
**24 [4]** 26/13 26/21 97/17 97/22
**24th [6]** 22/21 48/19 74/18 97/10 104/7 119/8
**25 [5]** 16/25 75/9 75/22 105/7 108/2
**25th [7]** 26/18 37/1 47/1 73/15 74/19 97/4 104/1
**27 [1]** 51/16
**29 [1]** 90/13
**29th [1]** 119/18

**3**

**3-2 [3]** 47/15 48/16 48/19
**30 [2]** 4/24 5/1
**31st [1]** 118/20
**3220 [1]** 54/2
**3230 [10]** 80/4 86/10 87/11 88/11 89/3 90/11 90/23 93/19 93/22 94/6
**33133 [2]** 86/10

**3**

**33133...** [1] 87/11
**34950** [1] 120/13
**39** [1] 2/5

**4**

**4-1** [1] 76/2
**45** [1] 5/1
**450,000** [1] 21/8
**49** [1] 2/6

**5**

**5/28/2024** [1]
120/10
**50** [1] 2/8
**55.10** [4] 114/9
114/9 115/3 116/7
**56** [2] 4/3 111/1

**6**

**63** [1] 2/9
**64** [1] 2/11
**658** [1] 15/2
**66** [1] 96/8
**68** [1] 96/7

**7**

**772-467-2337** [1]
120/13
**7th** [4] 22/25
24/23 46/24 47/3

**8**

**83** [1] 2/12

**9**

**99** [1] 2/13

**A**

**a.m** [2] 62/6 62/7
**abandon** [2]
12/11 16/2
**abandoned** [6]
5/3 5/5 12/6 13/3
13/21 16/10
**ability** [1] 119/21
**above** [1] 120/9
**above-entitled** [1]
120/9
**absence** [1] 4/8
**absolutely** [2]
84/16 93/9
**abstain** [10] 36/6
36/14 36/18 36/24

73/18 74/11 74/12
74/15 75/5 96/18
**abstained** [2]
36/25 97/2
**abusing** [1] 14/12
**According** [2]
18/16 46/4
**account** [4] 8/10
92/21 92/23 92/24
**accurately** [1]
34/16
**acknowledge** [1]
113/2
**ACLU** [1] 12/22
**acre** [1] 83/23
**across** [1] 95/11
**act** [3] 21/19
47/17 63/12
**acting** [2] 51/22
52/1
**actions** [2] 11/21
98/14
**add** [2] 81/13
81/16
**address** [16] 8/11
52/7 67/3 69/4
71/25 72/3 72/6
75/14 76/3 79/11
86/9 86/21 87/10
88/9 90/10 90/21
**adhere** [1] 85/22
**ADJOURNED** [1]
120/5
**admission** [1]
89/12
**admit** [6] 25/8
26/20 86/23 87/17
89/6 91/2
**admitted** [11]
8/17 8/21 32/13
87/2 87/3 87/20
87/21 89/8 90/1
90/2 91/4
**admitting** [2]
85/21 89/14
**adopted** [1] 17/10
**advance** [6] 14/3
34/7 38/5 110/24
112/14 119/15
**advance a** [1]
119/15
**advanced** [1]
29/15

**advaces** [1]
24/15
**advancing** [2]
111/12 112/25
**adverse** [2] 56/2
84/18
**advice** [8] 21/2
41/15 51/12 51/14
51/23 52/12 52/21
61/9
**advocate** [1]
118/1
**affidavits** [6]
114/11 114/16
116/11 116/23
116/23 116/24
**affirmatively** [1]
48/5
**affirmed** [1] 6/20
**afford** [2] 113/3
117/11
**afforded** [1]
117/19
**afraid** [1] 71/5
**afternoon** [1]
50/24
**agreement** [8]
51/6 51/8 51/11
51/16 51/25 79/20
79/25 88/5
**ailments** [1]
92/14
**aimed** [1] 15/8
**al** [1] 3/7
**Alfie** [1] 69/19
**align** [1] 44/25
**alimony** [1] 15/13
**allow** [2] 29/19
119/4
**allowed** [5] 38/11
48/2 48/6 79/12
79/18
**allows** [1] 18/6
**almost** [2] 12/12
112/14
**alone** [4] 7/12
7/22 30/18 72/21
**amongst** [1]
21/15
**amount** [1] 4/20
**answer** [27] 17/6
22/15 29/2 29/17
41/9 53/8 56/3

56/12 57/22 58/7
60/25 61/19 71/11
71/21 80/22 82/3
97/18 100/9
101/23 101/24
104/24 104/25
105/15 106/16
106/19 109/7
109/18
**answers** [1]
112/8
**anticipate** [1]
61/23
**anticipation** [1]
112/18
**anyways** [1] 51/3
**apartment** [4]
66/25 68/20 69/6
70/17
**apartments** [3]
95/9 95/14 95/15
**Apologies** [1]
20/3
**apologize** [3]
74/2 97/20 102/1
**appeal** [9] 102/23
103/3 103/7 103/8
103/16 103/19
103/25 104/9
105/11
**appearance** [2]
3/18 3/22
**appearances** [3]
1/13 3/9 62/9
**applicability** [1]
78/22
**applicable** [1]
111/13
**applies** [1]
111/14
**apply** [4] 65/16
80/14 80/16 111/1
**appreciate** [4]
10/2 64/14 88/1
110/3
**approach** [10]
5/19 24/5 64/12
85/13 85/15 87/4
87/22 90/3 97/6
113/18
**approached** [1]
103/12
**appropriately** [1]

4/16
**approved** [5] 32/3
48/24 75/10 76/4
79/20
**April 10** [1] 75/15
**April 2** [1] 86/19
**April 2023** [4]
64/2 98/24 102/19
102/19
**April 5** [2] 87/13
87/14
**April of** [1] 92/18
**area** [4] 20/13
30/4 54/23 95/14
**areas** [1] 21/13
**argument** [4]
111/24 112/9
113/5 113/11
**argumentive** [1]
105/17
**arguments** [5]
13/20 36/1 111/18
111/23 115/11
**arose** [1] 16/4
**ARTEAGA** [2]
1/14 3/11
**ARTEAGA-GOME
Z** [2] 1/14 3/11
**articles** [5] 56/19
57/2 57/4 57/7
57/8
**assert** [1] 28/11
**asserting** [2] 61/4
68/12
**assertion** [2]
59/20 61/14
**asset** [13] 12/19
14/13 15/20 52/12
52/16 52/21 58/23
59/7 66/17 102/12
102/14 104/13
105/6
**assume** [4] 19/9
44/24 75/19
108/24
**assumes** [1] 53/2
**asthma** [1] 96/5
**attach** [4] 34/23
34/23 115/4
116/11
**attached** [7] 8/7
90/17 114/5
114/22 115/2

# A

**attached... [2]** 115/5 116/3
**attack [2]** 6/18 15/9
**attacks [1]** 96/6
**attempt [2]** 81/24 82/10
**attorney [26]** 3/17 30/14 31/10 34/12 35/10 41/8 41/11 41/14 41/15 48/8 51/23 51/24 52/1 59/11 61/9 61/11 62/7 70/10 71/16 76/5 76/10 76/18 77/8 77/18 77/23 103/13
**attorney's [1]** 117/8
**attorney-client [6]** 41/8 41/11 51/24 59/11 61/11 103/13
**attorneys [5]** 6/5 51/2 59/17 103/11 110/7
**attorneys' [2]** 88/4 91/6
**availability [2]** 119/12 119/25
**avoid [2]** 4/5 15/13
**avoiding [1]** 21/22
**award [1]** 12/23

# B

**ball [8]** 55/21 56/7 56/19 59/10 59/24 60/4 102/9 117/2
**barred [1]** 37/21
**base [16]** 10/3 26/17 73/15 73/16 75/10 102/5 104/1 104/4 105/8 108/1 108/2 108/4 108/6 108/16 108/25 109/3
**basis [9]** 23/14 25/10 32/8 51/20 59/19 61/4 61/16 89/16 104/23

**Bay [3]** 22/6 54/23 54/25
**be able [1]** 10/9
**beat [1]** 80/1
**bedrocks [1]** 6/19
**begging [1]** 117/1
**behind [1]** 110/7
**belabor [1]** 6/25
**belief [2]** 43/24 44/6
**bell [1]** 85/3
**belong [1]** 30/17
**below [2]** 86/14 86/16
**BEN [2]** 1/18 3/16
**beneficial [1]** 22/11
**benefit [9]** 16/21 22/16 33/7 37/15 68/6 101/6 109/15 109/17 112/24
**benefits [1]** 37/9
**Bethune [1]** 7/3
**beyond [7]** 17/12 71/9 78/8 91/13 102/7 103/5 108/18
**Bill [1]** 3/13
**Biscayne [1]** 22/6
**black [1]** 92/12
**blatantly [1]** 9/1
**blocks [1]** 95/11
**blogs [1]** 57/7
**blood [1]** 96/5
**body [1]** 60/11
**bolted [1]** 67/13
**books [1]** 116/14
**bottom [2]** 18/5 71/23
**boundaries [4]** 21/23 21/25 49/14 101/17
**boundary [1]** 76/22
**Brickell [9]** 20/12 21/13 69/6 69/6 69/7 69/9 70/17 95/8 95/14
**brief [6]** 5/9 5/16 15/3 17/2 17/3 83/2
**briefer [1]** 5/18
**briefing [7]** 35/11

111/24 111/25 112/19 115/22 119/5 119/13
**briefs [3]** 11/17 118/7 118/8
**broad [1]** 60/19
**broadness [1]** 94/15
**burden [13]** 4/13 9/12 111/6 111/9 111/20 114/3 114/8 115/8 115/23 115/25 117/4 117/5 117/9
**bush [1]** 80/2

# C

**C-A-R-O-L-L-O [1]** 64/20
**C-E-R-T-I-F-I-C-A-T-E [1]** 120/6
**camera [2]** 5/24 6/7
**campaign [1]** 69/3
**candor [1]** 35/5
**capture [1]** 32/16
**card [1]** 87/13
**CAROLLO [96]** 1/6 2/10 3/8 3/17 4/25 5/3 6/15 8/8 9/5 9/20 10/22 11/4 12/6 12/17 12/25 14/22 15/16 15/18 16/1 16/6 16/17 18/10 18/15 18/17 30/14 32/3 32/25 34/13 35/24 36/6 36/14 36/18 36/24 37/4 37/20 39/23 39/24 42/10 44/6 44/18 45/17 45/23 46/18 46/22 49/12 52/13 52/20 53/4 55/8 55/14 55/22 56/7 56/8 57/9 58/17 58/24 59/1 59/8 59/10 59/24 60/4 61/1 62/20 62/23 63/16 64/9 64/16 64/20 67/8 70/9 71/13 71/17 71/21 77/22

78/24 80/13 80/22 81/4 83/9 86/5 87/7 88/7 90/7 92/15 94/13 97/16 97/22 99/8 100/18 101/24 103/15 103/21 105/5 109/7 110/5 110/16
**Carollo's [31]** 7/14 7/22 8/22 10/25 12/17 16/13 25/13 25/15 25/22 26/2 26/9 26/24 27/15 27/21 28/7 38/7 40/5 40/22 41/2 42/4 46/15 53/16 53/25 54/3 54/13 54/16 56/18 57/6 63/23 63/25 64/1
**carried [2]** 98/15 111/6
**carry [1]** 111/20
**carrying [1]** 4/13
**carve [1]** 13/25
**catches [1]** 5/24
**caught [1]** 53/7
**caution [1]** 59/19
**cautious [1]** 97/2
**ceased [2]** 67/18 67/21
**census [1]** 21/10
**certified [1]** 17/9
**certify [1]** 120/7
**cetera [4]** 8/10 8/11 56/21 56/21
**chain [7]** 55/21 56/8 56/19 59/10 59/24 60/5 60/12
**chair [1]** 67/12
**challenged [2]** 15/5 75/11
**chance [4]** 70/11 90/4 94/12 111/12
**characterize [1]** 109/17
**charter [3]** 46/4 46/12 65/22
**chose [1]** 116/16
**Chris [1]** 3/20
**CHRISTOPHER [1]** 1/19

**Circuit [8]** 6/21 7/3 14/8 14/20 17/10 17/10 17/16 115/13
**circumstance [2]** 15/10 15/16
**circumstances [1]** 14/23
**circus [1]** 7/16
**cite [1]** 17/16
**citizen [10]** 17/25 17/25 18/5 44/19 45/13 45/14 45/22 46/5 46/11 46/13
**city [63]** 1/19 3/18 3/21 12/22 13/25 14/13 14/13 16/12 16/15 16/20 20/8 20/21 20/22 21/6 23/2 28/12 28/17 28/25 30/14 31/10 34/12 35/10 38/14 38/16 39/25 41/14 45/20 46/12 48/8 51/6 59/3 59/13 61/9 61/18 62/1 65/16 65/22 72/12 75/12 76/5 76/5 76/6 76/10 76/18 76/19 76/22 77/8 77/10 77/12 77/18 77/23 78/4 79/6 79/20 79/21 79/22 79/25 80/7 90/19 94/5 96/24 98/12 98/15
**city's [7]** 3/23 28/19 30/16 57/16 57/20 65/11 77/5
**CIV [1]** 1/2
**civil [2]** 3/7 103/17
**claim [15]** 11/11 13/23 52/4 53/19 57/11 59/11 61/19 62/2 62/21 62/22 62/24 69/11 86/11 111/3 115/21
**claimed [1]** 69/24
**claiming [4]** 63/1 67/18 67/21 69/21
**clarify [4]** 79/6 88/16 93/23

# C

**clarify... [1]**
100/23
**clarifying [1]**
80/15
**clean [1]** 46/10
**clear [12]** 6/25
17/16 17/22 61/6
61/10 62/17 83/15
91/5 95/16 98/22
106/16 107/11
**clearer [1]** 6/9
**clerk [1]** 107/9
**client [8]** 41/8
41/11 51/24 59/11
61/11 82/3 103/13
118/13
**clients [3]** 116/23
116/24 118/2
**clip [3]** 33/12 34/2
34/6
**closely [1]** 44/25
**closer [2]** 45/8
67/9
**closings [1]**
112/1
**cloth [1]** 10/23
**clothes [1]** 93/13
**Coconut [29]** 5/3
9/21 12/7 12/16
12/21 13/22 20/12
21/25 22/5 22/11
22/14 25/15 29/22
30/4 66/12 66/15
67/19 67/21 68/13
69/12 70/16 70/20
70/25 74/23 75/1
104/13 107/23
108/9 109/4
**cognizant [1]**
5/21
**cohesive [1]**
21/21
**collateral [1]** 52/3
**commission [23]**
10/23 16/15 23/18
24/23 31/4 31/9
31/17 32/5 34/8
47/1 48/17 48/22
48/23 73/12 74/15
74/19 79/21 97/17
98/12 104/5 104/6

**104/12 106/7**
**commissioner**
**[74]** 2/10 4/25 5/3
9/20 10/1 10/10
10/14 10/21 11/4
12/25 13/1 13/2
18/10 20/8 20/9
22/24 26/9 28/6
29/9 29/12 30/3
35/23 37/14 40/21
42/10 44/18 45/20
47/3 47/4 47/24
47/25 48/5 48/6
48/9 52/12 52/16
53/16 53/20 54/2
54/18 55/4 55/7
55/22 56/6 57/5
62/18 62/20 63/2
63/16 64/1 64/9
64/16 64/25 65/18
66/3 69/2 70/3
74/5 78/4 78/13
78/24 79/13 80/7
80/13 86/5 87/7
95/8 97/16 97/22
98/6 101/11
101/14 105/9
109/4
**commissioner's**
**[3]** 55/7 56/20
62/17
**commissioners**
**[15]** 20/15 20/23
21/20 23/16 24/1
24/24 26/19 47/17
47/19 53/13 57/16
79/9 98/8 101/16
102/4
**commissioners'**
**[3]** 23/11 48/14
101/17
**communications**
**[5]** 10/21 11/3
11/3 76/10 76/11
**communities [1]**
23/6
**community [4]**
9/24 10/24 73/13
95/6
**compelled [1]**
37/3
**competence [1]**
23/19

**complaint [2]**
111/13 111/15
**complaints [1]**
111/14
**complete [3]**
71/21 105/18
119/5
**completeness [2]**
33/22 36/11
**comply [2]** 115/3
116/7
**concede [1]**
116/10
**concepts [1]**
21/21
**concern [5]** 32/25
33/6 37/3 37/23
55/22
**concerns [2]**
30/10 30/13
**conclude [1]**
110/11
**conclusion [2]**
69/14 106/23
**concrete [2]**
43/23 44/5
**condition [1]**
114/13 115/10
**conditions [1]**
115/20
**conduct [22]** 7/12
7/12 10/9 11/18
12/19 14/8 14/9
14/10 14/12 14/19
15/8 17/13 17/19
17/20 18/10 65/13
99/15 99/16
115/14 115/15
117/23 119/6
**conducted [1]**
111/4
**conference [4]**
118/25 119/10
119/12 119/24
**confident [1]**
102/22
**confidential [2]**
88/4 91/7
**confirm [1]** 83/20
**confirmed [2]**
18/9 83/10
**conflict [6]** 97/1
97/25 102/10

**106/25 107/2**
119/15
**conflicts [2]** 48/3
99/19
**confuse [1]** 18/4
**confusion [2]**
13/18 21/22
**connected [1]**
7/13
**conscientious [2]**
65/2 65/4
**consensus [4]**
24/2 43/8 55/13
55/15
**consequence [1]**
46/2
**conservation [1]**
22/13
**consideration [3]**
52/15 54/21 55/11
**considerations**
**[2]** 32/2 55/11
**constitution [5]**
6/19 6/22 7/17
21/19 107/17
**constitutional**
**[19]** 6/22 18/6
27/9 45/14 45/18
54/9 55/12 68/1
68/8 68/13 68/17
68/18 69/11 70/6
80/5 86/11 96/13
96/15 107/7
**constitutional-pro**
**tected [2]** 45/14
45/18
**constitutionally**
**[11]** 7/23 9/6 27/3
45/24 46/6 47/16
47/25 83/11 84/15
90/24 98/25
**constitutionally-**
**mandated [1]**
47/25
**constitutionally-p**
**rotected [8]** 7/23
9/6 27/3 45/24
46/6 84/15 90/24
98/25
**consult [1]** 59/18
**consultant [4]**
20/18 21/1 51/8
51/21

**Consultation [1]**
62/1
**consulted [1]**
61/3
**consulting [1]**
57/16
**context [1]** 33/24
**contiguous [1]**
83/24
**continued [2]** 4/6
34/4
**contrary [1]** 9/9
**control [1]** 44/25
**conventionally [1]**
32/15
**corrected [3]**
82/17 82/19 82/22
**Council [1]** 22/14
**counter [1]** 7/9
**country [1]**
119/17
**court [59]** 1/1
1/24 3/2 5/22 6/3
6/5 6/14 6/20 6/21
6/24 7/3 7/16 7/20
9/19 11/16 12/9
13/5 14/8 14/20
17/8 20/4 32/16
33/19 39/16 39/19
53/7 55/16 56/17
58/23 62/8 67/9
68/1 70/1 70/4
71/18 71/24 71/25
75/11 77/1 78/10
78/13 80/6 80/17
83/10 83/14 94/8
103/1 105/5
105/15 107/9
113/15 114/10
115/12 116/21
117/18 117/24
119/21 120/11
120/12
**Court's [2]** 119/1
119/16
**courthouse [1]**
93/17
**courtroom [3]**
18/20 18/21 59/17
**courts [1]** 14/11
**cover [2]** 16/21
17/8
**covered [3]** 60/22

## C

covered... [2] 61/17 106/9
cracking [1] 92/13
CRC [2] 1/24 120/11
create [1] 63/13
created [4] 24/22 44/10 44/13 44/14
creditors [1] 14/1
criminal [1] 119/4
criteria [1] 23/25
cross [8] 2/5 2/9 2/12 39/6 63/7 63/8 83/7 99/22
Cross-Examination [6] 2/5 2/9 2/12 39/6 63/8 83/7
crossed [1] 99/23
CRR [2] 1/24 120/11
crystal [1] 102/9

## D

D-E [1] 50/12
D3 [1] 12/14
Dade [1] 107/9
dais [9] 30/15 31/2 31/6 35/24 39/24 42/10 42/25 97/23 98/9
David [1] 107/20
de [58] 2/7 4/23 9/3 9/16 10/22 11/4 11/13 11/17 12/15 14/14 15/2 20/17 20/20 20/24 21/1 21/20 22/24 23/12 23/21 23/22 23/24 24/24 25/4 35/23 41/15 46/24 47/3 49/25 50/7 50/11 50/17 52/4 52/11 53/6 53/12 54/10 56/16 57/1 57/9 57/15 57/18 58/16 58/21 60/4 60/24 61/2 61/24 62/13 63/10 64/7 72/17 72/21 73/15 105/22 106/5 106/13 108/3

108/7
De Grandy [4] 47/3 50/11 57/18 108/3
De Grandy's [1] 73/15
dead [1] 82/17
deadlines [1] 119/11
Dean [1] 102/22
decided [4] 37/2 65/18 111/22 118/14
decides [1] 14/20
decision [4] 35/17 35/19 48/9 79/24
deed [5] 81/14 81/17 82/10 82/19 82/22
deemed [1] 8/17
deeper [1] 53/17
defendant [2] 1/16 17/18
Defendant's [5] 86/23 87/17 89/6 89/7 91/2
Defendants [1] 1/7
Defense [5] 24/6 87/3 87/21 90/2 118/20
defer [2] 11/12 16/17
defined [1] 51/8
defrauding [1] 14/1
deliberations [1] 28/17
deliberative [4] 41/23 57/14 60/2 60/13
delivered [1] 8/10
deliveries [1] 92/25
delving [1] 103/10
demographics [1] 51/21
denied [3] 103/3 103/16 103/19
deny [2] 4/1 11/22
depict [1] 34/16

deposition [9] 8/21 8/21 12/15 39/10 39/12 42/3 44/2 56/16 58/2 58/4
deprive [1] 105/14
depriving [1] 15/8
designated [2] 88/4 91/6
desire [4] 53/16 62/20 62/22 62/23
destroy [1] 63/13
determined [1] 78/3
detour [1] 7/16
diane [5] 1/24 1/25 6/1 120/10 120/11
Diaz [1] 35/23
died [1] 96/8
difference [1] 71/24
difficult [1] 92/10
direct [15] 2/4 2/8 2/11 14/24 19/23 50/14 63/16 63/19 63/23 64/21 74/5 94/4 108/20 108/23 112/8
directed [4] 18/12 46/19 46/22 99/3
direction [1] 21/20
DirecTV [3] 8/9 92/23 92/24
disagree [3] 28/20 111/12 119/9
discreet [1] 101/23
discussion [4] 34/16 58/18 60/1 74/8
discussions [4] 28/17 41/23 43/4 43/5
dismiss [2] 4/1 111/16
dismissal [2] 110/19 110/21
dismissed [1] 111/13
dispute [8] 8/16

distinction [9] 25/14 26/23 27/1 27/6 27/7 27/8 32/7
disputed [2] 32/4 52/4
disputes [1] 4/8
distinction [1] 68/2
distributed [1] 54/10
district [128]
districts [14] 21/4 21/5 21/6 21/15 22/9 22/14 25/7 25/12 54/8 55/1 75/13 76/22 77/13 95/1
divided [2] 21/6 22/25
dividing [3] 23/1 27/17 27/21
division [2] 1/2 22/20
divorce [1] 15/7
docket [1] 86/3
document [11] 15/1 24/9 87/7 88/3 88/7 89/10 89/14 89/18 90/7 91/6 109/25
documentary [1] 4/14
documentation [1] 114/8
dollars [1] 12/23
downtown [2] 20/12 21/13
draw [4] 25/2 54/12 105/22 106/5
drawing [5] 55/12 63/12 72/22 77/13 94/5
drawn [2] 26/25 54/7
drew [4] 25/4 53/23 54/16 55/6
driver [1] 86/14
driver's [3] 85/12 86/8 86/9
dropped [2] 93/20 117/2
duty [2] 99/15

119/4
dynamic [1] 6/6

## E

early [2] 83/13 85/2
easier [2] 32/16 42/1
east [1] 22/6
economic [1] 101/6
Edgewater [1] 20/13
edification [1] 119/16
effect [10] 38/14 38/16 40/23 41/4 41/16 75/5 75/22 76/1 76/21 79/7
efficient [1] 45/5
efficiently [1] 114/2
effort [1] 43/8
efforts [2] 20/22 98/14
egregious [14] 7/11 7/12 9/22 11/18 14/9 14/10 14/12 14/19 15/8 17/13 17/19 47/24 115/14 115/15
egregiousness [2] 9/19 10/8
eight [1] 12/13
elected [5] 17/24 18/3 46/2 78/8 78/14
election [6] 66/6 68/21 69/5 69/8 69/21 107/22
electricity [1] 8/9
element [1] 116/17
Eleventh [8] 6/21 7/3 14/8 14/20 17/10 17/10 17/16 115/13
elicited [1] 30/21
eligibility [1] 65/19
eligible [1] 69/22
embarrassing [1] 12/23

# E

**employer** [1] 51/5
**empty** [1] 71/6
**enable** [1] 12/17
**enact** [1] 30/11
**enacted** [1]
100/19
**enforceable** [1]
114/15
**engage** [4] 7/15
10/4 11/7 18/10
**engaged** [4]
17/19 52/11 52/20
53/4
**engagement** [3]
51/5 51/16 51/25
**engages** [1] 15/8
**enter** [1] 111/5
**entertaining** [1]
111/11
**entitled** [4] 5/13
37/15 37/20 120/9
**entry** [2] 15/2
85/6
**envelope** [1]
113/2
**equalize** [2] 21/14
55/1
**equalized** [1]
21/7
**equitable** [3] 7/4
17/11 17/17
**erode** [1] 6/21
**erroneous** [1]
88/18
**ESQ** [9] 1/14 1/14
1/15 1/16 1/16
1/17 1/17 1/18
1/19
**establish** [13] 5/2
9/5 18/7 44/18
45/14 45/17 45/23
51/25 114/4 114/9
114/10 115/13
116/17
**established** [4]
7/23 18/1 48/8
107/13
**establishes** [1]
8/12
**establishing** [5]
33/3 40/6 42/5

**establishment** [1]
27/3
**et** [6] 3/7 8/10
8/10 56/20 56/21
92/7
**ethical** [7] 32/2
32/25 33/6 37/3
37/22 37/25 48/2
**ethics** [2] 14/18
37/14
**event** [1] 50/24
**events** [1] 112/10
**everyone** [3]
59/19 62/4 80/19
**evidence** [50]
4/14 7/9 7/11 8/7
8/12 9/8 9/8 12/10
13/13 17/18 18/18
25/9 31/24 33/24
34/20 43/15 43/16
43/20 43/24 44/6
45/9 46/18 46/21
46/24 47/8 51/15
53/3 54/11 79/2
82/2 82/2 87/3
87/21 89/20 90/2
112/3 112/5
112/16 112/18
114/4 114/7
114/13 115/4
115/6 115/17
116/6 116/16
116/22 116/22
116/25
**evidentiary** [10]
4/5 89/16 110/11
111/4 115/8 116/6
116/20 117/1
117/23 118/23
**evolution** [1]
43/17
**ex** [3] 15/9 15/9
15/14
**ex-spouse** [1]
15/14
**ex-wife** [2] 15/9
15/9
**exam** [1] 106/10
**Examination** [16]
2/4 2/5 2/6 2/8 2/9
2/11 2/12 2/13
19/23 39/6 49/10

**50/14 63/8 64/21**
83/7 99/12
**examine** [1] 83/5
**exception** [7]
67/21 72/1 79/16
79/18 80/14 80/14
80/16
**exceptions** [1]
17/12
**exchange** [1]
24/10
**excuse** [4] 75/6
79/17 101/21
102/13
**excused** [3]
49/23 64/8 110/9
**exemption** [9] 7/6
11/11 13/23 67/18
67/25 78/22 105/7
111/3 114/6
**exist** [1] 111/16
**existing** [2] 79/8
113/2
**expand** [1] 95/1
**expanded** [1]
95/5
**experience** [2]
23/17 57/19
**expert** [5] 23/16
23/18 114/17
116/6 116/15
**expired** [2] 71/3
107/19
**explored** [1]
14/11
**express** [1] 18/11
**extend** [1] 118/18
**extent** [9] 4/3 4/4
41/6 61/22 76/9
94/10 94/13
113/15 117/15
**extra** [1] 68/6
**eyes** [2] 88/4 91/6

# F

**face** [2] 111/14
116/25
**faced** [1] 60/3
**fact** [13] 5/21
10/6 18/13 42/24
70/19 82/17 94/14
95/16 102/21
106/15 108/19

**112/15 113/12**
**factors** [3] 21/16
21/17 21/18
**facts** [8] 8/16
8/17 27/6 53/2
61/8 79/2 82/1
114/18
**factual** [3] 4/8
61/4 61/16
**factually** [1]
112/12
**failed** [2] 114/8
117/9
**fairest** [1] 23/25
**fallacious** [1]
59/19
**falling** [1] 92/13
**familiarity** [1]
11/16
**families** [1] 95/10
**family** [1] 118/24
**famously** [1] 12/6
**fast** [2] 39/16
113/24
**faster** [1] 101/25
**father** [1] 96/8
**favor** [1] 14/22
**February 2022** [2]
57/4 103/25
**February 22nd** [2]
47/2 54/11
**February 24th** [1]
22/21
**February 25** [4]
75/9 75/22 105/7
108/2
**February 25th** [3]
26/18 47/1 73/15
**February 5** [1]
82/19
**February 7th** [3]
24/23 46/24 47/3
**federal** [3] 12/24
55/16 98/13
**feedback** [2]
23/12 73/13
**fees** [2] 12/23
117/8
**file** [6] 3/22 13/13
32/14 82/17 85/23
91/16
**final** [2] 79/23
119/8

**finalizing** [1]
119/10
**finally** [1] 48/10
**financial** [2]
14/15 14/17
**financially** [1]
34/14
**findings** [2] 111/6
113/15
**finished** [1] 13/8
**five-minute** [1]
60/23
**FL** [1] 120/13
**flesh** [1] 4/2
**FLORIDA** [38] 1/1
1/5 3/3 6/17 6/19
6/20 6/22 7/4 7/17
14/7 14/20 17/8
17/17 17/25 18/1
18/5 44/19 45/13
45/14 45/15 45/19
45/22 45/25 46/6
46/11 46/13 50/22
66/8 83/21 86/8
86/10 87/11 98/1
99/18 107/6
107/17 113/2
115/12
**flsd.uscourts.gov**
[1] 1/25
**focus** [3] 16/8
73/1 83/9
**focused** [1] 30/24
**forced** [1] 95/1
**foregoing** [1]
120/7
**form** [1] 52/12
**formal** [1] 71/14
**former** [3] 20/8
95/7 98/6
**Fort** [4] 72/2
93/24 93/25
120/13
**foundation** [1]
108/25
**founded** [1] 22/5
**Fourteen** [2]
118/11 118/16
**FPL** [1] 92/20
**frame** [2] 16/21
83/10
**frankly** [2] 96/3
107/16

**F**

**fraud [4]**  7/7
15/11 17/13
115/15
**fraudulent [5]**
7/11 7/12 14/8
17/19 115/14
**fraudulently [1]**
13/25
**freely [1]**  46/20
**frolic [1]**  7/15
**FTC [3]**  17/16
115/12 117/5
**full-time [1]** 98/23
**FULLER [4]**  1/3
3/7 3/13 102/16
**fumbled [1]** 117/2
**functions [1]** 93/4
**funds [9]** 7/6 7/14
17/12 17/15 17/19
115/15 115/17
115/17 117/6
**furniture [2]** 71/5
71/7
**furthered [2]** 10/3
28/8

**G**

**G-R-A-N-D-Y [1]**
50/12
**gain [5]** 100/14
101/7 104/19
105/10 109/11
**game [1]** 96/24
**garnishment [1]**
118/24
**gate [1]** 114/14
**general [1]** 63/22
**George [1]** 76/18
**gets [3]** 9/20
108/15 108/23
**GOMEZ [22]** 1/14
2/11 2/13 3/11
3/14 4/18 6/8 9/16
73/1 73/24 77/2
80/25 82/7 86/25
89/11 91/17
101/25 108/22
109/9 110/10
112/2 118/5
**gotten [1]** 95/2
**govern [1]** 99/16
**governed [2]**

22/13 37/14
**governing [5]**
37/8 65/13 65/16
65/19 76/6
**government [1]**
50/21
**Grace [6]** 11/8
11/17 38/24 56/16
75/11 79/6
**GRANDY [48]** 2/7
4/23 9/3 9/16
10/22 11/4 11/13
12/15 14/14 20/17
20/24 21/20 22/24
23/12 23/24 24/24
25/4 41/15 46/24
47/3 49/25 50/7
50/11 50/17 52/4
52/11 53/6 53/12
54/10 56/16 57/1
57/9 57/18 58/16
58/21 60/24 61/2
61/24 62/13 63/10
64/7 72/17 72/21
105/22 106/5
106/13 108/3
108/7
**Grandy's [8]**
11/17 20/20 21/1
23/22 23/22 57/15
60/4 73/15
**Gray [2]**  1/19 3/21
**great [2]** 9/21
67/15
**grounds [1]**
115/7
**Grove [36]** 5/3
9/21 12/7 12/16
12/21 13/22 20/12
21/25 22/5 22/8
22/11 22/14 22/19
22/25 23/1 23/6
25/16 27/17 27/21
29/22 30/4 66/12
66/15 67/19 67/22
68/13 69/12 70/16
70/20 70/25 74/24
75/1 104/13
107/23 108/9
109/4
**grown [1]** 21/13
**guardrails [1]**
4/17

**GUTCHESS [10]**
1/14 2/8 3/12
11/13 13/9 16/7
17/1 59/22 61/2
62/10

**H**

**half-acre [1]**
83/23
**Hall [1]**  23/2
**handful [1]**
108/23
**Hang [2]** 80/19
114/24
**happy [7]** 55/14
55/17 55/18 55/19
55/20 56/7 107/3
**harder [1]** 71/18
**Harry [1]** 18/16
**has no [1]** 51/22
**Havana [5]**  12/12
16/2 92/2 108/12
108/13
**Havoco [3]**  17/9
115/12 117/5
**hearing [23]**  1/9
4/5 4/6 4/9 9/13
10/6 12/10 16/18
24/11 32/13 36/8
63/18 71/24 91/8
91/17 97/22 111/4
116/6 116/20
117/1 117/23
118/24 119/6
**hearings [2]**
63/15 63/21
**hearsay [2]** 34/6
77/1
**heart [1]** 14/3
**heavy [2]** 114/3
115/23
**Heights [2]** 54/23
54/25
**HENNING [2]**
1/16 3/16
**Herald [1]** 107/20
**hereby [1]** 120/7
**herring [2]** 8/20
17/23
**high-rise [1]**
95/14
**higher [1]** 21/11
**highlighted [2]**

100/4 100/6
**highly [3]** 88/4
91/7 108/22
**Highway [1]**
120/12
**hired [2]** 20/21
51/21
**hold [4]** 67/8 70/8
91/11 100/17
**holiday [1]**
118/19
**Holland [2]** 50/18
50/19
**home [64]** 8/24
8/24 9/21 9/21
9/22 9/24 11/9
11/10 12/14 13/22
14/1 14/23 16/10
16/14 16/19 27/8
42/13 42/25 43/9
43/16 46/19 46/22
46/25 47/2 53/25
54/1 54/2 54/3
54/4 54/13 54/16
55/7 56/18 62/17
63/17 63/19 63/24
66/8 68/17 68/19
70/20 79/9 80/15
80/16 81/9 81/10
92/7 92/9 94/6
94/23 96/24 98/25
99/4 102/12
102/14 104/13
107/7 107/14
107/15 107/24
108/9 108/15
108/17 109/4
**homeowners [1]**
95/12
**homes [6]** 48/14
95/7 95/10 101/7
101/18 102/4
**homestead [77]**
5/6 6/23 7/5 7/15
7/24 8/24 9/6
10/12 12/6 13/3
14/6 14/9 15/5
15/9 15/12 15/14
16/2 17/14 17/17
17/21 18/1 18/6
18/7 27/4 27/10
40/6 40/22 41/3
42/5 44/10 44/13

44/14 44/19 45/15
45/18 45/24 46/6
46/10 56/10 57/11
59/2 62/18 62/21
62/22 62/24 63/1
63/13 64/2 67/18
68/1 68/6 68/8
68/13 69/11 70/25
78/7 78/12 80/5
80/5 83/11 84/15
86/12 90/24 96/13
96/15 99/1 105/6
107/7 107/8
107/10 107/13
107/15 107/17
114/5 114/5
115/16 115/19
**homesteaded [1]**
107/16
**honest [1]**  59/20
**honestly [1]**  36/7
**honor [130]**
**HONORABLE [2]**
1/9 3/4
**hope [1]** 33/14
**hopefully [2]**  4/14
5/1
**hoping [1]** 33/17
**hotel [1]** 93/25
**house [66]** 12/7
12/17 12/18 15/12
15/17 25/13 25/16
25/22 26/2 26/9
26/24 27/15 27/21
28/7 34/13 36/22
37/21 41/18 46/15
48/10 49/13 49/15
49/17 55/22 56/9
56/20 57/6 57/11
62/18 66/15 66/19
68/13 68/15 69/12
69/22 70/17 71/4
71/6 78/2 78/11
78/12 78/15 78/18
78/25 79/19 81/25
92/1 92/10 92/25
93/2 93/5 93/5
93/8 93/11 93/13
93/15 100/13
101/9 101/11
101/15 105/8
105/9 105/23
106/6 109/1

## H

**house... [1]**
109/17
**housekeeping [1]**
118/22
**houses [2]**  36/1
36/1
**hundreds [2]**
23/2 116/14
**hypothetical [4]**
61/7 61/14 78/6
79/1
**hypotheticals [2]**
59/5 106/1

## I

**I-N-D-E-X [1]**  2/1
**identification [4]**
24/4 31/13 36/4
85/23
**ignore [1]**  9/1
**ill [1]**  14/3
**image [1]**  86/5
**imagination [1]**
117/4
**imagine [1]**  73/9
**imbalanced [1]**
21/11
**imminent [1]**
15/22
**impeaching [1]**
45/1
**imposed [1]**
35/19
**improper [1]**
100/21
**improve [2]**  17/14
115/16
**improvement [2]**
17/21 115/19
**inapplicable [1]**
4/4
**inappropriate [1]**
11/4
**inauthentic [1]**
89/22
**inclined [1]**
117/14
**inclusion [1]**
43/16
**income [1]**  90/9
**incorrect [4]**
51/13 89/10 89/10

89/14
**incredibly [1]**
6/15
**incumbent [1]**
91/12
**incurred [1]**
38/20
**individually [2]**
52/20 61/1
**individuals [1]**
96/23
**information [3]**
85/23 89/15 91/13
**informed [5]**  61/4
61/8 78/14 98/4
103/7
**input [4]**  22/24
23/24 24/24 26/19
**inquiring [1]**  76/9
**inquiry [4]**  8/18
57/14 60/16
113/14
**insist [1]**  63/16
**insisted [1]**  68/5
**insistence [1]**
111/1
**instruct [3]**  63/16
63/19 63/23
**intend [6]**  4/12
4/20 4/21 7/18
78/3 78/24
**intended [5]**  8/20
9/20 11/10 13/22
107/18
**intending [1]**
113/5
**intends [2]**  78/11
78/21
**intent [3]**  13/2
64/1 68/3
**intention [13]**
8/13 12/11 41/2
43/12 68/19 69/1
69/1 78/14 78/21
84/5 84/14 98/24
107/14
**intentions [5]**
8/22 40/5 40/22
42/5 43/15
**interest [9]**  14/15
14/17 48/3 82/11
82/12 97/25
106/25 107/2

111/23
**interests [2]**
22/15 95/22
**interim [1]**  119/11
**internal [1]**  41/22
**internet [1]**  93/2
**interrupt [1]**
71/14
**interrupted [1]**
71/15
**interrupting [1]**
6/10
**introduce [5]**
19/25 20/7 51/15
115/17 116/5
**introduced [4]**
12/10 53/24 54/11
115/9
**intrudes [1]**  28/20
**intruding [2]**  29/3
29/18
**inure [2]**  100/14
101/7
**invade [2]**  94/11
94/14
**invading [2]**
41/10 57/23
**invalid [1]**  15/21
**invalidated [4]**
10/18 12/24 15/23
16/12
**invalidates [1]**
15/12
**invasion [1]**  41/7
**invest [3]**  7/14
17/13 115/16
**investment [3]**
17/15 17/21
115/19
**invocation [1]**
59/16
**invoke [2]**  18/22
110/25
**invoked [1]**  17/11
**invokes [1]**  4/3
**invoking [3]**
18/19 28/17 59/18
**involuntary [2]**
110/19 110/21
**irrelevant [2]**  8/25
19/10
**IRS [1]**  8/12
**issuance [2]**

86/15 86/15
**issue [11]**  4/16
10/6 15/2 18/4
26/6 36/22 41/12
104/10 105/11
106/9 117/8
**issued [3]**  87/12
87/13 87/14
**issues [6]**  5/17
13/18 39/25 40/1
106/14 113/11
**item [1]**  98/9
**items [1]**  42/10

## J

**Jacksonville [2]**
18/2 44/19
**JAMES [2]**  1/17
3/16
**January 2017 [1]**
107/21
**January 29 [1]**
90/13
**JEFFREY [2]**  1/14
3/12
**JLK [1]**  1/2
**job [7]**  32/22
47/22 65/6 71/18
107/18 107/19
107/19
**jobs [1]**  107/12
**JOE [6]**  1/6 2/10
3/7 34/13 64/16
64/20
**JOHNSON [5]**
1/19 3/19 3/20
41/12 41/20
**Johnson's [1]**
28/24
**joining [2]**  29/22
30/4
**judge [17]**  1/9
1/10 3/7 6/3 12/24
13/4 13/15 13/17
16/12 33/20 55/16
75/15 78/2 79/23
85/5 111/5 117/24
**judgment [9]**  7/2
7/10 7/22 8/8
56/14 84/25
114/11 114/15
115/2
**judicial [1]**  38/1

**July of [1]**  100/19
**June 1 [1]**  85/3
**June 12th [1]**
119/17
**June 14th [1]**
118/20
**June 1st [1]**
81/22
**June 24th [1]**
119/8
**June one [1]**
115/2
**jury [3]**  8/5 64/15
85/6
**JUSTIN [3]**  1/16
3/16 85/12

## K

**K-E-N [1]**  19/21
**KEN [7]**  2/3 4/22
19/4 19/5 19/17
19/21 20/8
**key [3]**  6/19 7/13
18/1
**kickoff [1]**  117/2
**Knight [2]**  50/18
50/19
**knows [1]**  26/9
**KRAMER [13]**
1/15 2/4 2/6 3/12
20/1 22/1 26/10
29/6 37/18 38/17
38/23 39/1 47/13
**KUEHNE [2]**  1/18
3/17

## L

**la [1]**  35/23
**land [1]**  83/24
**Lane [42]**  18/2
29/22 40/1 40/6
40/9 54/2 54/3
54/4 62/21 63/4
66/19 67/19 67/22
69/3 70/19 71/25
72/2 72/5 75/14
76/3 79/5 79/11
80/4 81/9 81/10
83/12 83/23 85/7
86/10 87/11 88/11
89/4 90/11 90/23
92/16 92/20 93/19
93/22 95/23 98/23

# L

**Lane... [2]** 102/12
102/14
**language [1]**
17/12
**large [4]** 12/20
12/21 22/10 95/2
**largest [5]** 66/17
102/12 102/14
104/13 105/6
**Lauderdale [3]**
72/2 93/24 93/25
**LAUREN [2]** 1/9
3/4
**law [23]** 6/21 7/1
7/4 8/25 13/4 15/2
16/1 17/8 17/15
17/22 68/6 96/25
98/4 100/18
100/21 100/22
101/3 102/11
107/6 107/10
110/25 113/2
117/5
**lawful [1]** 98/16
**laws [8]** 14/18
16/20 37/8 37/22
37/25 65/16 98/13
99/15
**lawsuit [13]** 12/19
38/20 55/21 56/7
56/19 57/5 59/10
59/24 72/11 72/15
84/25 95/17 95/18
**lawsuits [1]** 60/5
**lay [1]** 75/18
**laying [1]** 108/24
**lead [2]** 12/22
84/20
**leading [2]** 54/19
55/25
**learned [2]** 65/19
103/25
**learning [3]** 65/11
65/13 104/9
**lease [6]** 68/20
71/2 92/3 92/4
92/5 92/15
**lectern [1]** 113/18
**legal [12]** 12/23
21/2 21/17 21/18
41/16 51/12 51/14

51/23 69/13 95/22
106/22 112/15
**legally [1]** 112/12
**legislative [25]**
28/13 28/14 28/16
28/18 28/22 29/18
41/7 41/10 41/23
47/17 57/16 57/20
57/23 58/18 60/1
60/5 60/11 60/11
60/14 60/15 60/17
61/12 94/11 94/14
98/11
**legitimate [7]**
10/4 11/6 27/22
28/6 29/9 29/14
29/20
**lengths [2]** 9/22
9/22
**Leon [1]** 69/19
**license [4]** 85/12
86/8 86/9 86/20
**lien [19]** 7/5 7/22
8/6 9/7 17/17 56/9
57/5 114/4 114/7
114/7 114/9
114/15 114/19
114/20 114/22
115/8 115/9
115/25 116/18
**liened [2]** 55/23
56/20
**liens [1]** 116/3
**life [2]** 42/1 93/7
**like-minded [1]**
22/15
**limit [5]** 22/2
35/14 39/16 78/18
117/14
**limited [2]** 4/11
95/3
**limits [1]** 39/4
**lines [11]** 25/7
27/2 34/15 44/9
53/14 54/12 57/10
63/3 63/12 76/22
86/16
**listen [1]** 70/10
**literal [1]** 17/12
**litigate [1]** 38/24
**local [3]** 8/15
32/14 85/22
**Lofts [4]** 69/6

69/7 69/9 70/17
**logical [1]** 43/16
**LOUIS [2]** 1/9 3/4
**lunch [1]** 16/24

# M

**magically [4]**
18/14 18/14 18/15
46/16
**main [1]** 102/23
**mainly [1]** 75/13
**maintain [6]**
49/17 50/1 84/12
84/14 92/20 92/23
**maintaining [1]**
92/11
**mandated [1]**
47/25
**manipulate [2]**
16/19 16/20
**manipulating [2]**
14/13 15/19
**manmade [2]**
21/22 21/25
**manner [5]** 44/24
91/9 98/16 109/16
111/1
**map [115]** 10/2
10/3 10/3 10/18
10/23 12/14 14/15
14/19 16/12 16/13
16/16 18/17 22/23
22/23 24/2 24/19
24/21 24/22 24/25
25/2 25/4 25/4
25/6 25/12 25/15
25/23 26/3 26/14
26/16 26/17 27/7
27/14 28/14 30/11
32/3 33/1 33/4
33/7 36/6 38/8
38/14 38/21 42/13
46/25 47/2 47/5
48/11 48/17 48/21
48/23 49/13 53/23
54/10 54/12 56/18
63/3 73/8 73/15
73/15 73/16 73/17
73/19 74/18 74/22
74/24 75/9 75/9
75/10 75/16 75/22
75/23 75/25 76/1
76/1 76/3 76/6

76/21 77/6 77/9
77/10 77/13 77/19
77/20 94/8 94/9
94/9 94/22 94/22
100/13 101/9
101/12 102/5
102/5 104/1 104/2
104/4 104/4 104/6
104/8 105/8
105/23 105/24
106/6 108/1 108/2
108/2 108/4 108/6
108/6 108/16
108/25 109/3
109/11 109/12
109/15
**maps [20]** 12/24
14/13 15/19 15/20
15/23 16/19 20/23
23/25 24/13 25/17
26/19 43/17 51/6
59/3 72/17 72/22
75/7 94/5 101/16
101/17
**March 11 [3]** 31/2
74/1 97/16
**March 11th [4]**
31/5 36/25 73/12
98/3
**March 2022 [1]**
73/7
**March 24 [2]**
97/17 97/22
**March 24th [3]**
48/19 74/18 97/10
**March 25th [1]**
37/1
**Marjorie [4]** 81/6
81/7 81/8 81/13
**marriage [3]**
81/13 81/14 81/15
**married [2]** 81/8
81/12
**marry [1]** 81/7
**MARTIN [2]** 1/4
3/12
**Martino [1]**
102/22
**MASON [2]** 1/16
3/15
**matter [6]** 3/24
97/2 98/2 101/5
114/18 120/9

**matters [2]** 18/8
104/19
**maximus [1]** 7/16
**May 16 [2]** 81/16
81/19
**meaningless [1]**
6/22
**measure [3]**
12/19 112/14
112/25
**meeting [24]**
16/16 24/23 26/18
31/4 31/5 31/8
31/9 31/17 32/5
32/17 34/8 36/25
37/1 47/1 47/3
73/13 73/18 74/16
74/19 79/7 97/17
98/3 104/5 104/6
**meetings [2]**
28/15 57/15
**Mendez [6]** 30/14
31/10 32/1 32/24
35/2 41/14
**method [1]** 4/7
**MIAMI [30]** 1/2
1/5 1/19 3/21 20/8
20/12 20/22 21/6
28/12 45/20 46/12
51/6 65/16 72/12
75/12 76/5 76/6
76/19 76/22 77/12
78/4 86/10 87/11
90/19 93/24 94/5
98/12 98/15 107/9
107/20
**Miami's [1]** 15/19
**Miami-Dade [1]**
107/9
**microphone [8]**
5/23 6/11 19/19
20/2 20/5 50/9
64/18 67/9
**middle [2]** 70/20
70/25
**MIGUEL [4]** 2/7
20/16 50/7 50/11
**miller [6]** 1/17
1/24 1/25 3/16
120/10 120/11
**millions [1]** 12/22
**minded [1]** 22/15
**mindful [1]** 60/24

## M

missed [4] 73/24
96/6 108/5 115/10
misspoke [1]
44/15
misstates [2]
82/1 104/22
misuse [1] 59/16
mold [2] 92/12
92/12
moment [4] 66/9
79/3 83/9 96/22
month [1] 104/8
months [1] 82/22
Moore [4] 16/12
55/17 75/15 79/23
Moore's [2] 13/4
78/2
Morris [42] 18/2
29/22 40/1 40/6
40/9 54/2 54/3
54/3 62/21 63/4
66/19 67/19 67/22
69/3 70/19 71/25
72/2 72/5 75/13
76/3 79/5 79/11
80/4 81/9 81/10
83/11 83/23 85/7
86/10 87/11 88/11
89/3 90/11 90/23
92/16 92/20 93/19
93/22 95/23 98/23
102/12 102/14
mortgage [1]
96/2
motion [8] 1/9 4/1
7/2 7/10 8/7 42/15
49/18 110/18
motivations [1]
40/5
motive [1] 18/11
Mr [19] 2/4 2/5
2/6 2/8 2/9 2/12
20/9 39/1 49/7
49/25 57/18 59/22
63/25 64/7 64/13
84/23 91/11 99/8
113/25
Mr. [202]
Mr. Carollo [55]
3/17 6/15 8/8 9/5
14/22 15/16 15/18
16/1 16/6 16/17
18/15 18/17 30/14
32/25 36/6 39/23
39/24 45/17 45/23
46/22 52/20 53/4
55/14 56/8 57/9
58/17 58/24 59/1
59/8 59/10 59/24
60/4 61/1 62/23
67/8 70/9 71/13
71/17 71/21 77/22
80/22 81/4 83/9
88/7 90/7 92/15
94/13 100/18
101/24 103/15
103/21 105/5
109/7 110/5
110/16
Mr. Carollo's [17]
7/14 7/22 8/22
10/25 16/13 25/13
25/15 25/22 26/2
26/24 27/15 40/5
42/4 53/25 54/13
54/16 63/23
Mr. De [18] 4/23
9/3 10/22 11/4
11/13 11/17 12/15
14/14 20/20 20/24
21/1 21/20 22/24
23/24 52/11 57/1
57/15 58/16
Mr. De Grandy
[23] 24/24 25/4
41/15 46/24 50/17
52/4 53/6 53/12
54/10 56/16 57/9
58/21 60/24 61/2
61/24 62/13 63/10
72/17 72/21
105/22 106/5
106/13 108/7
Mr. De Grandy's
[1] 60/4
Mr. Fuller [1]
102/16
Mr. Gutchess [6]
11/13 13/9 16/7
17/1 61/2 62/10
Mr. Johnson [3]
3/19 41/12 41/20
Mr. Johnson's [1]
28/24
Mr. Ken [1] 19/4
Mr. Kramer [8]
20/1 22/1 26/10
29/6 37/18 38/17
38/23 47/13
Mr. Miguel [1]
20/16
Mr. Pertnoy [25]
3/25 6/8 6/9 6/12
9/18 17/4 18/22
19/8 19/9 26/7
27/5 32/20 33/8
35/6 36/9 39/4
39/15 49/5 83/4
84/17 85/21 97/18
109/24 110/14
117/20
Mr. Pertnoy's [1]
31/25
Mr. Pinilla [1]
102/16
Mr. Russell [36]
9/2 9/25 10/20
18/16 24/3 24/19
25/22 26/2 26/8
26/12 26/14 27/14
28/6 28/21 29/9
30/13 30/18 31/2
31/12 32/2 35/14
36/3 36/14 36/18
37/8 37/13 37/22
37/25 38/7 38/14
38/20 39/8 41/9
42/22 49/12 49/21
Mr. Russell's [3]
8/21 18/8 18/13
Mr. Wysong [1]
76/5
Ms [6] 2/11 2/13
3/14 73/1 112/2
118/5
Ms. [16] 4/18 6/8
9/16 32/24 35/2
73/24 77/2 80/25
82/7 86/25 89/11
91/17 101/25
108/22 109/9
110/10
Ms. Gomez [14]
4/18 6/8 9/16
73/24 77/2 80/25
82/7 86/25 89/11
91/17 101/25
108/22 109/9
110/10
Ms. Kramer [1]
32/24 35/2

## N

narrow [1] 4/9
natural [2] 21/22
21/25
navigate [1]
20/19
necessary [1]
21/14
negative [1] 46/9
neighborhood [3]
12/20 12/21
22/13
neighborhoods
[1] 21/21
newspapers [1]
57/8
nice [1] 39/17
nobody [2] 10/23
18/12
non [2] 105/17
105/17
non-argumentive
[1] 105/17
non-repetitive [1]
105/17
none [2] 80/3
83/22
nonresponsive
[2] 47/6 47/9
normalize [1]
49/14
normalized [1]
21/12
normalizing [1]
21/23
north [1] 22/6
Northside [1]
20/13
notice [2] 3/22
38/1
November 2025
[1] 79/14
nowhere [1]
116/19
number [3] 3/6
22/9 113/10
numerous [1]
56/19

## O

oath [1] 56/23
object [16] 13/15
19/10 24/9 25/10
26/5 32/8 33/8
33/20 36/10 41/6
44/21 51/17 57/13
71/9 99/21 106/8
objected [2]
24/13 111/4
objecting [3] 9/2
9/3 41/22
objection [91] 7/2
13/19 13/24 14/6
19/6 19/9 23/3
23/8 23/13 24/16
25/1 25/24 26/22
27/12 27/23 28/4
28/9 28/11 28/25
29/16 29/24 30/5
31/25 33/12 35/4
35/9 35/13 36/15
36/19 37/5 37/10
37/16 37/17 38/9
38/15 38/22 44/1
45/8 47/11 50/2
52/17 52/22 53/7
54/19 55/24 56/11
57/13 57/20 58/18
59/4 67/24 69/13
75/17 76/9 76/25
78/5 78/20 79/1
80/8 80/18 80/23
82/1 87/1 87/19
89/7 89/12 89/13
89/16 89/23 89/25
91/3 94/10 103/9
104/15 105/12
105/25 106/11
106/22 108/18
110/22 111/7
112/2 112/24
113/13 114/3
114/22 114/23
115/1 115/7
115/21 116/17
objections [7]
3/22 4/15 13/13
19/12 34/21 51/24
116/9
obligation [1]
8/16

# O

**obtain [3]** 17/17 56/10 109/15
**obtained [4]** 7/6 17/13 109/11 115/15
**oddly [1]** 118/7
**offer [2]** 9/4 61/8
**offering [1]** 79/6
**office [4]** 5/5 35/12 65/24 68/16
**officer [1]** 100/7
**officer may [1]** 100/7
**official [8]** 1/24 17/24 18/3 46/2 78/8 98/16 99/16 120/11
**officials [2]** 37/9 65/14
**oh [2]** 35/23 90/5
**older [1]** 96/8
**one's [1]** 14/12
**onward [1]** 115/12
**open [1]** 33/19
**opening [4]** 4/18 5/9 5/15 5/16
**operative [1]** 77/13
**opine [1]** 23/17
**opined [1]** 77/8
**opinion [7]** 17/9 27/24 28/10 29/12 29/25 30/6 61/18
**opponent [1]** 69/19
**opportunities [1]** 13/13
**opportunity [5]** 11/23 91/18 111/10 113/4 117/12
**opposed [2]** 14/1 112/18
**oral [2]** 111/23 112/8
**order [10]** 3/25 4/2 12/24 13/4 14/5 75/15 91/12 91/14 94/17 110/24

**ordinances [1]** 65/11
**original [1]** 69/2
**originally [2]** 4/6 116/9
**overcome [1]** 115/8
**overlap [1]** 112/11
**overly [1]** 97/2
**overrule [2]** 27/11 89/23
**overruled [20]** 25/5 25/20 26/6 36/20 38/10 47/10 52/18 53/5 54/20 56/3 59/6 75/18 79/4 82/4 100/1 100/23 104/23 106/2 106/24 108/21
**owned [5]** 66/8 66/10 68/10 95/7 95/10
**owner [1]** 7/5

# P

**P-R-O-C-E-E-D-I-N-G-S [1]** 2/14
**P.M [1]** 120/5
**pack [1]** 71/5
**packing [1]** 71/7
**page [7]** 2/2 15/3 74/5 88/12 90/12 90/15 117/14
**pages [2]** 1/7 116/14
**papers [1]** 6/24
**part [18]** 7/13 12/20 12/22 21/1 27/8 53/18 54/25 57/14 59/2 60/5 60/12 67/5 72/21 85/2 88/3 92/19 100/3 106/14
**participate [2]** 47/24 48/6
**participated [1]** 47/19
**participating [3]** 72/11 72/14 97/24
**parties [4]** 13/14 111/21 117/12

119/16
**parties' [1]** 88/5
**partner [1]** 50/20
**party [1]** 4/13
**pass [2]** 14/18 38/12
**passing [1]** 38/7
**path [2]** 22/2 25/20
**pattern [1]** 15/8
**pause [2]** 11/19 83/2
**pay [2]** 46/2 107/10
**pending [4]** 42/16 42/20 58/10 72/15
**people [3]** 65/8 95/6 95/15
**period [4]** 18/7 73/2 76/7 112/25
**permanent [2]** 84/6 98/25
**Permanently [1]** 83/13
**permission [1]** 64/13
**person [3]** 15/11 15/17 82/15
**personal [20]** 8/22 8/23 9/4 14/15 14/17 16/21 19/4 23/17 23/21 25/3 33/7 37/9 37/13 37/15 40/4 40/8 42/4 42/7 60/14 85/23
**perspective [1]** 21/18
**pertain [2]** 99/15 104/19
**PERTNOY [35]** 1/16 2/5 2/9 2/12 3/16 3/25 6/8 6/9 6/12 9/18 17/4 18/22 19/8 19/9 26/7 27/5 32/20 33/8 35/6 36/9 39/4 39/15 49/5 49/7 64/13 83/4 84/17 84/23 85/21 91/11 97/18 109/24 110/14 113/25 117/20

**Pertnoy's [1]** 31/25
**phrase [1]** 56/12
**PI [1]** 11/22
**pick [1]** 53/1
**picked [2]** 93/17 93/18
**picture [1]** 86/8
**piece [4]** 10/9 11/6 35/18 117/18
**Pierce [1]** 120/13
**PINILLA [3]** 1/4 3/12 102/16
**place [8]** 27/14 27/21 34/16 38/4 51/11 63/23 99/4 100/22
**plaintiff [5]** 3/10 17/17 19/17 50/7 64/16
**plaintiffs [10]** 1/5 1/14 6/18 49/24 79/21 79/25 83/17 115/18 117/12 118/20
**plaintiffs' [12]** 13/19 24/4 25/8 26/13 26/20 31/13 31/21 34/20 36/4 51/15 85/18 114/25
**plan [5]** 54/7 54/22 55/12 55/15 119/1
**planning [1]** 107/23
**play [2]** 31/21 32/20
**played [3]** 33/19 35/15 96/25
**podium [2]** 5/19 5/25
**point [11]** 9/12 26/24 44/2 52/7 60/15 72/23 72/24 78/9 101/20 103/10 118/23
**points [1]** 113/13
**policy [2]** 21/17 21/20
**political [1]** 60/15
**population [7]** 21/7 21/11 21/24

54/8 54/15 55/1 95/2
**populations [1]** 21/15
**Portilla [1]** 35/23
**portray [1]** 34/11
**portrayal [1]** 24/25
**position [12]** 4/8 5/12 11/1 14/11 11/7 32/19 50/19 65/20 69/22 77/5 77/12 78/16
**positions [1]** 117/21
**potential [1]** 3/23
**Potter [1]** 18/16
**power [1]** 14/12
**practice [1]** 50/21
**preceded [1]** 33/23
**precedent [2]** 114/13 115/10
**preceding [1]** 34/4
**predicate [1]** 75/18
**prefer [2]** 5/11 6/5
**preferred [1]** 4/7
**prejudice [2]** 19/11 118/13
**preliminary [5]** 3/24 22/23 24/22 24/25 25/15
**premarked [5]** 24/4 26/12 31/12 34/20 36/3
**premise [1]** 112/15
**prepared [4]** 4/1 5/7 56/1 100/9
**preponderance [1]** 17/18
**presence [2]** 28/19 30/17
**present [4]** 79/23 112/4 114/19 115/6
**presentation [3]** 5/14 34/8 110/12
**preserve [1]** 34/21
**presided [1]**

## P

**presided...** [1] 11/22
**presiding** [1] 3/4
**pressure** [1] 96/5
**prevent** [1] 60/16
**primary** [1] 113/3
**principles** [2] 17/11 54/9
**private** [6] 11/3 28/15 28/16 100/14 101/7 105/10
**privately** [1] 77/25
**privilege** [38] 3/23 28/13 28/18 28/20 28/22 29/3 29/18 30/17 41/8 41/8 41/10 41/11 51/24 52/5 52/7 53/19 57/17 57/20 57/23 58/19 59/11 59/16 59/18 59/20 60/1 60/14 60/16 60/19 60/22 61/4 61/11 61/12 61/14 61/19 62/2 94/11 94/14 103/13
**privileged** [1] 76/10
**problem** [2] 27/25 39/20
**procedural** [2] 111/11 113/14
**proceedings** [5] 62/6 78/9 83/2 120/5 120/8
**process** [20] 10/22 16/20 20/16 20/19 20/20 21/14 22/21 28/14 41/18 41/23 47/20 52/16 57/14 60/2 60/5 60/13 72/21 73/5 94/2 99/3
**professional** [1] 61/18
**proffer** [10] 4/12 9/16 11/11 31/20 31/24 32/19 32/24 60/7 60/8 77/18

**proffered** [1] 26/8
**progressed** [1] 72/1
**promise** [1] 31/19
**promptly** [1] 50/25
**proper** [1] 114/11
**properly** [2] 70/3 70/5
**properties** [1] 83/20
**property** [41] 5/6 7/5 7/6 7/23 8/6 8/8 8/9 8/10 9/7 10/9 11/6 40/1 40/6 40/9 40/15 40/17 40/18 62/21 62/25 63/4 67/19 67/22 67/22 68/7 68/8 68/9 82/10 82/11 82/12 83/23 84/10 84/12 85/7 86/11 90/25 91/22 91/25 92/16 92/20 95/23 98/24
**proposed** [4] 25/12 91/18 108/3 108/7
**protect** [7] 9/22 11/6 12/17 12/18 14/23 15/18 30/17
**protected** [13] 7/23 9/6 27/3 41/18 45/14 45/18 45/24 46/6 60/13 83/11 84/15 90/24 98/25
**protecting** [2] 14/6 43/8
**protection** [18] 6/23 12/19 14/10 14/14 15/20 18/6 52/12 52/16 52/21 58/24 59/7 68/1 68/17 68/18 86/12 107/7 107/8 107/17
**protective** [2] 91/12 91/14
**protracted** [1] 57/18
**prove** [3] 4/13 9/10 115/21

**public** [24] 31/4 32/5 32/6 32/7 32/8 37/8 53/15 53/18 53/21 54/22 57/1 57/4 58/1 63/15 63/18 63/21 65/2 65/4 65/13 76/11 76/11 99/14 99/16 100/7
**public's** [2] 22/22 23/1
**publicly** [5] 30/14 32/17 77/8 77/23 77/25
**published** [1] 36/7
**publishing** [1] 31/23
**punches** [1] 119/22
**purchase** [6] 7/14 17/14 17/15 17/20 115/16 115/19
**purchased** [2] 7/6 40/10
**purposes** [5] 14/14 33/3 36/8 86/1 115/19
**pursuant** [1] 91/12
**push** [1] 113/2
**puts** [3] 27/16 100/13 105/8

## Q

**quarter** [1] 102/19
**question** [74] 7/20 9/5 16/3 17/9 19/11 25/25 26/5 28/1 28/20 29/2 29/6 29/10 29/17 34/14 36/16 38/18 41/7 41/10 42/16 42/18 42/20 45/21 45/22 46/21 56/3 56/4 56/13 57/22 58/7 58/10 58/10 58/16 59/14 59/21 59/23 61/2 61/20 62/14 67/20 69/16 70/9 70/10 71/10 71/12 72/13 75/2

75/3 76/12 78/20 80/2 80/9 80/23 82/7 94/13 94/15 94/17 97/13 97/18 97/19 100/9 100/21 100/25 101/23 101/24 103/13 103/14 103/15 103/20 104/24 105/2 106/3 106/19 106/19 106/21
**question-specific** [1] 19/11
**questioning** [2] 58/7 58/22
**questions** [19] 13/9 16/4 30/21 39/2 42/22 45/4 49/4 49/20 63/6 64/6 70/11 73/1 78/20 83/3 94/2 99/6 105/18 108/23 109/22
**quick** [4] 31/16 51/3 112/14 112/25
**quickly** [1] 111/22
**quitclaim** [3] 81/24 81/24 82/10
**quote** [1] 55/17

## R

**R-U-S-S-E-L-L** [1] 19/22
**race** [1] 69/19
**raise** [5] 19/15 37/3 50/5 64/11 111/17
**raised** [6] 30/10 30/13 37/22 37/22 113/12 115/6
**raising** [3] 28/13 61/11 61/12
**re** [2] 7/3 21/14
**re-equalize** [1] 21/14
**reach** [1] 17/11
**ready** [2] 114/17 116/7
**rebut** [1] 114/17
**Recess** [1] 62/6
**reciprocal** [1]

118/17
**recognize** [10] 11/16 24/19 25/6 26/14 35/22 45/7 56/1 86/5 87/24 117/22
**recollection** [11] 70/4 73/9 73/11 77/24 81/11 88/19 94/25 97/5 97/12 106/12 112/22
**recommendation** [1] 111/5
**recommendations** [1] 117/24
**record** [17] 3/10 11/23 12/2 19/20 32/6 32/7 32/8 50/10 53/15 53/18 53/21 54/22 58/1 64/19 88/3 91/5 95/1
**recorded** [5] 7/22 8/6 114/11 114/16 116/13
**recording** [3] 9/6 33/19 116/8
**recuse** [2] 35/17 35/20
**red** [2] 8/20 17/22
**redact** [1] 91/13
**redacting** [1] 85/23
**redaction** [1] 87/25
**redactions** [1] 91/18
**redirect** [10] 2/6 2/13 49/10 90/5 99/10 99/12 100/24 105/18 108/19 109/24
**redistributing** [1] 11/7
**redistrict** [2] 23/22 98/13
**redistricting** [39] 8/20 10/4 10/22 12/13 17/23 20/14 20/20 20/22 21/4 21/9 21/14 21/16 22/21 23/7 23/23 27/22 36/22 41/16

# R

**redistricting...**
**[21]** 43/8 47/16
48/11 51/21 52/15
58/15 60/22 72/11
72/14 72/17 73/5
76/8 76/23 83/17
94/2 94/5 98/11
98/14 99/3 100/13
109/15
**redraw [2]** 57/10
63/3
**redrawing [2]**
29/15 44/9
**reduced [1]** 54/23
**reelected [1]**
68/24
**reflect [1]** 89/18
**refresh [2]** 97/5
97/12
**refreshment [1]**
44/3
**regained [1]** 5/6
**registration [2]**
87/9 87/10
**regurgitate [1]**
47/9
**reissued [1]**
48/18
**reiterate [1]** 7/4
**relations [1]**
50/21
**relevance [18]**
19/7 25/10 26/22
27/3 27/9 32/8
33/9 33/21 36/10
37/17 44/22 50/2
51/18 52/23 52/24
52/25 52/25 75/17
**relief [1]** 5/13
**rely [3]** 32/18
112/16 112/22
**relying [1]** 58/3
**remain [3]** 63/2
105/9 109/4
**remained [1]**
48/12
**reminder [2]**
118/23 119/17
**remote [2]** 5/22
71/18
**remove [1]** 49/15

**render [1]** 6/22
**renew [1]** 19/6
**rental [1]** 92/1
**renters [2]** 95/9
95/15
**repetitive [2]**
105/17 108/22
**rephrase [2]** 28/2
76/15
**replaced [3]**
86/16 86/18 86/20
**report [1]** 111/5
**reporter [11]** 1/24
5/22 6/3 6/5 20/4
39/16 39/19 53/7
67/9 71/18 120/11
**request [1]** 4/7
**requests [1]**
53/13
**required [3]**
47/17 82/15
116/12
**requirement [3]**
47/25 98/7 98/11
**requirements [3]**
65/21 65/23 65/25
**rerecorded [1]**
116/12
**rescue [1]** 116/21
**researched [1]**
107/11
**reside [7]** 12/11
12/25 14/5 66/5
78/21 78/24 79/12
**resided [1]** 12/12
**residence [7]** 5/3
84/1 84/3 84/6
84/8 84/10 87/16
**resident [3]** 6/16
66/1 70/1
**residents [2]** 21/8
22/11
**residing [2]** 15/24
80/15
**resign [3]** 78/4
78/15 80/7
**resigned [1]**
10/16
**resolved [4]** 97/3
98/2 115/24
115/24
**respectful [1]**
5/24

**response [12]** 7/1
106/22 22/22 23/1 35/14
46/16 47/9 53/6
61/20 113/8 115/3
115/5 116/3
**restart [1]** 62/13
**rested [2]** 110/20
114/14
**result [1]** 78/2
**resumed [1]** 62/7
**return [12]** 13/22
14/2 88/8 88/10
88/10 89/2 90/9
90/10 90/12 90/15
107/14 110/5
**revealed [1]**
91/13
**reverted [1]** 77/18
**review [1]** 91/18
**rewrite [3]** 6/20
7/16 17/7
**rights [4]** 17/25
21/19 46/5 68/8
**ring [1]** 85/3
**rise [3]** 62/5 62/8
95/14
**RMR [2]** 1/24
120/11
**Roads [1]** 95/11
**Robinson [2]**
1/19 3/21
**role [10]** 20/20
21/1 23/11 23/18
23/21 23/22 23/24
58/23 59/2 117/23
**roll [1]** 119/21
**room [3]** 60/21
110/6 117/22
**rooms [1]** 92/12
**roots [1]** 95/6
**ROSSANA [2]**
1/14 3/11
**rule [14]** 4/3 4/3
14/22 18/20 18/23
32/14 33/21 36/10
85/22 89/20 111/1
111/1 111/12
113/13
**rules [8]** 8/15
37/8 37/14 37/22
37/25 45/8 65/13
65/19
**ruling [1]** 78/3

**rulings [1]** 4/14
**RUSSELL [48]**
2/3 4/22 9/2 9/17
9/25 10/20 16/5
18/16 19/4 19/5
19/17 19/21 20/8
20/9 24/3 24/19
25/22 26/2 26/8
26/12 26/14 27/14
28/6 28/21 29/9
30/13 30/18 31/2
31/12 32/2 35/14
36/3 36/14 36/18
37/8 37/13 37/22
37/25 38/7 38/14
38/20 39/8 41/9
42/22 49/12 49/21
95/8 98/6
**Russell's [3]** 8/21
18/8 18/13

# S

**safe [2]** 64/7
86/14
**salient [5]** 5/17
7/19 16/7 111/10
112/9
**SAMUEL [2]** 1/15
3/12
**SARNOFF [2]**
1/17 3/16
**sausage [2]**
60/17 60/18
**save [2]** 52/6
84/21
**schedule [2]**
110/2 119/13
**school [2]** 107/12
107/12
**scope [4]** 51/13
78/8 99/22 108/19
**sealed [1]** 91/9
**seat [1]** 110/7
**second [13]**
11/20 26/18 34/6
54/12 82/14 83/1
88/12 90/12 91/11
94/9 94/22 100/17
113/21
**seconds [5]**
32/21 33/13 33/14
33/17 33/18
**Seek [4]** 86/23

87/17 89/6 91/2
**seeking [2]** 6/18
14/9
**seeks [1]** 7/5
**sense [2]** 43/16
95/13
**separateness [1]**
11/20
**sequestration [1]**
18/20
**series [1]** 15/4
**servant [3]** 65/2
65/4 99/14
**serve [4]** 18/3
20/9 80/6 95/5
**served [1]** 20/10
**serves [1]** 78/13
**services [1]** 51/13
**serving [1]** 10/10
**session [2]** 3/3
62/9
**setting [1]** 15/7
**settled [2]** 7/4
16/17
**seven [4]** 12/12
117/13 117/14
118/5
**shaking [2]** 113/9
118/14
**shape [1]** 52/11
**share [1]** 91/17
**Shenandoah [2]**
53/17 95/11
**shoes [1]** 10/1
**short [4]** 4/12
4/21 17/6 119/14
**shortcut [2]** 12/2
109/14
**shorter [1]**
117/15
**showering [1]**
93/15
**shown [1]** 90/10
**sic [3]** 33/12
42/19 114/8
**side [1]** 11/23
**sides [1]** 112/22
**sign [1]** 96/3
**signature [1]**
82/14
**signatures [1]**
82/16
**signed [5]** 68/20

**S**

signed... [4]  85/5
96/3 108/25
109/16
simple [1]  96/10
simultaneous [2]
113/8 116/15
simultaneously
 [4]  114/12 114/16
116/8 116/13
single [4]  22/8
22/9 22/12 22/20
sleep [2]  72/2
93/8
sleeping [1]
93/11
slice [1]  75/13
sliver [2]  9/24
74/23
slow [2]  6/10
114/21
slowly [1]  114/1
Smiley [1]  107/20
Smith [4]  3/7
13/15 13/17 111/5
sole [3]  11/5
12/16 15/19
solely [3]  3/22
14/13 61/11
solicit [2]  119/12
119/25
someone's [1]
65/19
sometime [2]
85/2 119/13
sooner [1]  119/24
sorts [1]  12/10
sought [1]  4/4
sounds [2]  45/10
67/3
south [3]  22/6
50/22 120/12
SOUTHERN [2]
1/1 3/3
Southwest [2]
67/2 70/24
space [2]  50/12
57/19
span [1]  16/10
special [1]  101/7
specific [5]  19/11
38/18 48/5 80/2

97/19
speculation [3]
23/15 29/24 30/6
speculative [1]
30/7
spell [3]  19/19
50/9 64/18
spelled [1]  50/11
spend [1]  115/22
spending [1]  4/17
spent [1]  71/1
split [4]  9/23
12/16 12/20 21/8
splitting [2]  10/24
12/21
spoke [2]  46/20
103/10
spouse [1]  15/14
staff [3]  41/17
43/4 43/5
stakeholder [1]
73/13
stand [3]  64/10
98/7 104/19
standpoint [1]
113/14
stands [1]  14/6
state [15]  6/17
13/4 14/18 19/19
36/14 36/18 45/15
45/18 45/24 50/9
56/4 64/18 83/20
100/7 100/20
stated [11]  36/6
36/21 68/9 72/19
73/20 75/8 77/25
97/1 98/1 104/14
109/19
statement [11]
8/15 56/24 73/21
73/21 77/1 77/23
90/17 90/19 90/22
96/21 97/10
statements [1]
96/16
STATES [4]  1/1
1/10 3/2 120/12
status [4]  118/25
119/10 119/12
119/24
statute [5]  99/18
102/11 104/18
104/22 116/8

statutes [1]  98/1
stayed [4]  71/3
71/4 72/1 72/2
staying [2]  51/2
93/24
steal [1]  15/11
Stealing [1]  15/17
steps [2]  14/4
71/21
straight [1]  60/3
straight-faced [1]
60/3
Street [3]  67/2
67/3 70/24
stretch [1]  117/4
strongly [1]  95/3
struggling [1]
67/10
submit [3]  4/12
112/13 117/13
submitted [1]
15/1
subsequent [2]
33/23 48/16
substantive [2]
26/18 39/25
successful [1]
69/2
sue [4]  12/22
69/24 75/7 96/24
sued [2]  69/21
102/16
suffering [1]  96/5
sufficient [1]  54/8
suggest [1]
111/20
suggesting [1]
111/2
suing [1]  79/21
suit [2]  103/5
103/17
summary [5]  7/2
7/10 8/8 112/2
112/5
supplied [1]  7/9
support [2]  10/25
11/11
supported [1]
112/3
supports [4]  11/2
17/7 110/25 113/1
Supreme [5]  6/20
14/7 14/20 17/8

115/12
sustain [4]  23/19
28/3 78/19 80/25
sustained [9]
23/4 23/9 30/1
30/8 37/6 37/11
80/23 104/16
105/16
sustaining [1]
37/18
swing [1]  38/11
SWORN [3]  19/17
50/7 64/16

**T**

table [2]  80/3
110/6
tax [10]  67/25
68/6 88/8 88/10
89/2 90/9 90/10
90/12 107/8 107/9
taxes [2]  8/11
107/10
team [1]  113/9
telephonic [2]
119/9 119/12
tend [1]  111/23
tends [1]  11/2
term [2]  79/13
95/3
terminate [3]  92/3
92/5 92/15
terminated [1]
92/4
terms [4]  4/20 5/2
15/19 28/16
test [1]  116/23
testimony [20]
4/23 4/24 8/4 9/4
11/17 16/9 18/8
18/13 37/24 38/2
38/5 44/25 47/12
58/5 61/8 61/23
62/14 62/19 89/19
98/22
thank [44]  3/14
6/3 6/13 9/14 9/15
11/15 13/10 19/18
34/9 39/3 49/5
49/7 49/8 49/21
49/22 50/4 50/8
50/13 50/16 53/11
64/6 64/17 67/16

68/4 70/14 71/22
74/3 91/20 97/20
99/6 99/8 99/9
99/11 100/2
103/23 110/8
113/7 116/1
117/18 119/21
119/22 120/2
120/3 120/4
thanks [1]  101/21
theories [1]
112/11
theory [1]  113/1
they maybe [1]
115/2
this is [1]  78/7
thought [9]  33/13
42/17 42/21 54/17
55/19 55/20 74/25
97/2 98/1
threat [1]  22/19
tight [2]  113/19
113/23
tighter [1]  22/1
time [59]  4/11
4/17 4/20 5/4 5/15
9/13 13/12 13/17
16/21 17/3 22/2
22/19 33/5 35/6
39/4 39/15 41/20
45/6 48/11 56/13
57/1 66/14 68/7
68/25 70/8 70/16
71/3 71/4 72/10
72/14 72/23 72/24
73/2 73/8 81/14
81/15 82/24 82/25
83/9 83/14 84/22
86/20 86/22 89/2
92/15 96/25 98/23
100/19 101/9
102/8 105/7 108/1
108/3 108/6
113/21 115/22
117/8 117/18
117/21
times [3]  72/1
84/12 106/16
tolerance [1]
59/16
total [1]  19/10
traceable [2]  7/13
117/6

# T

**traced** [1]  17/20
**track** [1]  58/9
**transcript** [11]
1/9 20/5 32/9
32/17 34/23 58/2
58/5 58/14 97/9
112/22 112/24
**transcription** [1]
120/8
**transcripts** [3]
11/22 32/11 44/2
**transfer** [1]  95/22
**transient** [2]  95/9
95/15
**transpired** [1]
61/18
**travel** [1]  113/12
**traveling** [1]
112/10
**travels** [1]  64/7
**Treat** [1]  44/3
**trial** [26]  12/16
15/22 16/11 58/5
62/14 62/16 70/20
71/2 72/8 81/19
81/22 82/22 83/14
85/4 93/10 93/17
93/20 93/24 95/19
96/6 102/18
102/20 102/22
102/24 102/25
103/3
**triangle** [1]  54/24
**trouble** [1]  30/20
**truthfully** [1]
39/12
**Twelve** [1]  118/8
**Twenty** [2]  33/16
33/18
**twofold** [1]  13/21

# U

**U.S** [1]  120/12
**Ultimately** [1]
7/15
**unable** [1]  63/2
**unconstitutional**
 [2]  15/21 75/16
**underlying** [1]
103/17
**understanding**
 [11]  10/1 23/11

35/11 35/17 42/7
46/15 75/20 77/5
77/22 94/21 96/12
**undisputed** [2]
8/16 9/8
**unequivocally** [1]
9/9
**unfair** [1]  74/25
**unintelligible** [1]
54/15
**UNITED** [4]  1/1
1/10 3/2 120/12
**unless** [3]  48/2
57/25 80/5
**unobjected** [1]
85/19
**unrebutted** [1]
8/14
**uploaded** [1]
87/25
**us** [13]  6/1 6/4
20/18 22/5 24/23
43/4 49/14 82/12
83/10 98/10
108/23 117/19
117/22

# V

**valid** [15]  7/22 8/6
9/7 15/24 114/4
114/6 114/7 114/7
114/9 114/15
114/19 114/20
115/7 115/25
116/18
**value** [1]  105/14
**vehicle** [2]  110/24
111/11
**veracity** [1]
116/24
**verdict** [4]  8/5
15/22 57/11 85/6
**versus** [2]  3/7
75/11
**victoria** [4]  30/14
31/10 32/1 41/14
**video** [11]  31/14
31/17 32/15 32/21
32/22 33/19 34/11
34/24 35/3 35/15
36/5
**vigorously** [1]
118/2

**Village** [1]  22/14
**violation** [1]  3/23
**voice** [1]  35/22
**void** [1]  15/14
**vote** [31]  14/16
14/18 20/23 33/6
34/13 35/25 37/2
37/20 38/7 38/11
47/15 48/6 48/16
48/19 55/13 74/14
74/21 75/10 76/2
87/16 96/18 97/24
98/1 98/4 98/9
99/25 100/7
100/19 101/5
104/18 109/6
**voted** [21]  10/2
10/21 20/15 33/4
48/21 49/19 73/7
73/7 74/24 98/5
99/24 101/11
104/4 104/6 104/8
104/11 104/20
105/24 106/6
106/16 109/12
**voter** [3]  21/22
87/9 87/10
**votes** [2]  30/11
83/17
**voting** [22]  14/13
14/17 15/19 21/5
21/19 32/3 32/25
36/6 36/21 37/4
73/19 74/18 75/6
99/18 100/13
101/9 105/7 108/1
108/3 108/6 109/3
109/11
**vouched** [1]  68/9
**vs** [1]  1/5

# W

**W-2** [3]  90/17
90/19 90/21
**waived** [1]  68/8
**walls** [1]  92/12
**waste** [1]  117/7
**watch** [1]  6/6
**watched** [1]
16/15
**weigh** [1]  14/21
**well-placed** [1]
61/3

**well-settled** [1]
7/4
**west** [4]  18/1 22/6
95/8 95/14
**whatsoever** [3]
33/24 83/22
107/25
**wife's** [3]  69/1
81/5 84/3
**WILLIAM** [2]  1/3
3/7
**win** [4]  68/21
68/22 69/5 69/8
**wish** [1]  83/4
**withdraw** [3]
89/25 94/17
106/11
**witness's** [3]
44/25 47/12 89/19
**witnesses** [7]  2/2
4/21 7/18 8/19
18/20 110/11
110/18
**won** [2]  47/13
107/22
**wondering** [1]
96/7
**world** [1]  59/5
**worse** [1]  15/16
**Wysong** [2]  76/5
76/18

# Y

**yesterday's** [1]
45/1